**IN THE UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF COLUMBIA**

Senator RICHARD BLUMENTHAL )
706 Hart Senate Office Building )
Washington, D.C. 20510, )
)
Representative JOHN CONYERS, JR. )
2426 Rayburn House Office Building )   Civil Action No. 17-1154 (EGS)
Washington, D.C. 20515, )
)
Senator RICHARD J. DURBIN )
711 Hart Senate Office Building )
Washington, D.C. 20510, )
)
Senator PATTY MURRAY )
154 Russell Senate Office Building )
Washington, D.C. 20510, )
)
Senator ELIZABETH WARREN )
317 Hart Senate Office Building )
Washington, D.C. 20510, )
)
Senator AMY KLOBUCHAR )
302 Hart Senate Office Building )
Washington, D.C. 20510, )
)
Senator BERNARD SANDERS )
332 Dirksen Senate Office Building )
Washington, D.C. 20510, )
)
Senator PATRICK LEAHY )
437 Russell Senate Office Building )
Washington, D.C. 20510, )
)
Senator SHELDON WHITEHOUSE )
530 Hart Senate Office Building )
Washington, D.C. 20510, )
)
Senator AL FRANKEN )
309 Hart Senate Office Building )
Washington, D.C. 20510, )
)
Senator CHRISTOPHER A. COONS )
127A Russell Senate Office Building )
)

1

Washington, D.C. 20510,

    )
    )

Senator MAZIE K. HIRONO
730 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator MICHAEL F. BENNET
261 Russell Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator CORY A. BOOKER
141 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator MARIA CANTWELL
511 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator BENJAMIN L. CARDIN
509 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator TOM CARPER
513 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator CATHERINE CORTEZ MASTO
204 Russell Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator TAMMY DUCKWORTH
542 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator KIRSTEN E. GILLIBRAND
478 Russell Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator KAMALA D. HARRIS
112 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )

Senator MARTIN HEINRICH
303 Hart Senate Office Building
Washington, D.C. 20510,

    )
    )
    )
    )

2

Senator TIM KAINE                          )
231 Russell Senate Office Building         )
Washington, D.C. 20510,                    )
                                           )
Senator EDWARD J. MARKEY                   )
255 Dirksen Senate Office Building         )
Washington, D.C. 20510,                    )
                                           )
Senator JEFF MERKLEY                       )
313 Hart Senate Office Building            )
Washington, D.C. 20510,                    )
                                           )
Senator CHRIS MURPHY                       )
136 Hart Senate Office Building            )
Washington, D.C. 20510,                    )
                                           )
Senator JACK REED                          )
728 Hart Senate Office Building            )
Washington, D.C. 20510,                    )
                                           )
Senator BRIAN SCHATZ                       )
722 Hart Senate Office Building            )
Washington, D.C. 20510,                    )
                                           )
Senator TOM UDALL                          )
531 Hart Senate Office Building            )
Washington, D.C. 20510,                    )
                                           )
Senator CHRIS VAN HOLLEN                   )
110 Hart Senate Office Building            )
Washington, D.C. 20510,                    )
                                           )
Senator RON WYDEN                          )
221 Dirksen Senate Office Building         )
Washington, D.C. 20510,                    )
                                           )
Representative NANCY PELOSI                )
235 Cannon House Office Building           )
Washington, D.C. 20515,                    )
                                           )
Representative STENY H. HOYER              )
1705 Longworth House Office Building       )
Washington, D.C. 20515,                    )
                                           )
Representative JAMES E. CLYBURN            )
242 Cannon House Office Building           )
Washington, D.C. 20515,                    )
                                           )

3

Representative JOSEPH CROWLEY )
1035 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative LINDA T. SÁNCHEZ )
2329 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JERROLD NADLER )
2109 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ZOE LOFGREN )
1401 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative SHEILA JACKSON LEE )
2187 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative STEVE COHEN )
2404 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative HENRY C. "HANK" )
JOHNSON JR. )
2240 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative TED DEUTCH )
2447 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative LUIS V. GUTIÉRREZ )
2408 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative KAREN BASS )
2241 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative CEDRIC L. RICHMOND )
420 Cannon House Office Building )
Washington, D.C. 20515, )
)
)
)

4

Representative HAKEEM JEFFRIES )
1607 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative DAVID N. CICILLINE )
2244 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ERIC SWALWELL )
129 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative TED W. LIEU )
236 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative JAMIE RASKIN )
431 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative PRAMILA JAYAPAL )
319 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative BRADLEY S. SCHNEIDER )
1432 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative ALMA ADAMS )
222 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative PETE AGUILAR )
1223 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative NANETTE DIAZ )
BARRAGÁN )
1320 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOYCE BEATTY )
133 Cannon House Office Building )
Washington, D.C. 20515, )
)
)
)

5

Representative AMI BERA )
1431 Longworth House Office Building )
Washington, D.C. 20515, )

Representative DONALD S. BEYER, JR. )
1119 Longworth House Office Building )
Washington, D.C. 20515, )

Representative EARL BLUMENAUER )
1111 Longworth House Office Building )
Washington, D.C. 20515, )

Representative LISA BLUNT ROCHESTER )
1123 Longworth House Office Building )
Washington, D.C. 20515, )

Representative SUZANNE BONAMICI )
439 Cannon House Office Building )
Washington, D.C. 20515, )

Representative BRENDAN F. BOYLE )
1133 Longworth House Office Building )
Washington, D.C. 20515, )

Representative ROBERT A. BRADY )
2004 Rayburn House Office Building )
Washington, D.C. 20515, )

Representative ANTHONY BROWN )
1505 Longworth House Office Building )
Washington, D.C. 20515, )

Representative JULIA BROWNLEY )
1019 Longworth House Office Building )
Washington, D.C. 20515, )

Representative G.K. BUTTERFIELD )
2080 Rayburn House Office Building )
Washington, D.C. 20515, )

Representative MICHAEL E. CAPUANO )
1414 Longworth House Office Building )
Washington, D.C. 20515, )

Representative SALUD O. CARBAJAL )
212 Cannon House Office Building )
Washington, D.C. 20515, )

**Formatted:** Line spacing: Multiple 1.09 li

Representative TONY CÁRDENAS )
1510 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative ANDRÉ CARSON )
2135 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative KATHY CASTOR )
2052 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JOAQUIN CASTRO )
1221 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JUDY CHU )
2423 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative KATHERINE CLARK )
1415 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative YVETTE D. CLARKE )
2058 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative WILLIAM LACY CLAY )
2428 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative EMANUEL CLEAVER, II )
2335 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative GERALD E. CONNOLLY )
2238 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JIM COOPER )
1536 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOE COURTNEY )
2348 Rayburn House Office Building )
Washington, D.C. 20515, )

7

Representative CHARLIE CRIST          )
427 Cannon House Office Building      )
Washington, D.C. 20515,              )

Representative ELIJAH E. CUMMINGS    )
2163 Rayburn House Office Building    )
Washington, D.C. 20515,              )
                                     )
Representative DANNY K. DAVIS        )
2159 Rayburn House Office Building    )
Washington, D.C. 20515,              )

Representative SUSAN A. DAVIS        )
1214 Longworth House Office Building  )
Washington, D.C. 20515,              )

Representative PETER DEFAZIO         )
2134 Rayburn House Office Building    )
Washington, D.C. 20515,              )

Representative DIANA DEGETTE         )
2111 Rayburn House Office Building    )
Washington, D.C. 20515,              )

Representative JOHN K. DELANEY       )
1632 Longworth House Office Building  )
Washington, D.C. 20515,              )

Representative ROSA L. DELAURO       )
2413 Rayburn House Office Building    )
Washington, D.C. 20515,              )

Representative SUZAN K. DELBENE      )
2442 Rayburn House Office Building    )
Washington, D.C. 20515,              )

Representative VAL BUTLER DEMINGS    )
238 Cannon House Office Building      )
Washington, D.C. 20515,              )

Representative MARK DESAULNIER       )
115 Cannon House Office Building      )
Washington, D.C. 20515,              )

Representative DEBBIE DINGELL        )
116 Cannon House Office Building      )
Washington, D.C. 20515,              )
                                     )

Representative LLOYD DOGGETT )
2307 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative MICHAEL F. DOYLE )
239 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative KEITH ELLISON )
2263 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ELIOT L. ENGEL )
2462 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ANNA G. ESHOO )
241 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative ADRIANO ESPAILLAT )
1630 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative DWIGHT EVANS )
1105 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative BILL FOSTER )
1224 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative LOIS FRANKEL )
1037 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative MARCIA L. FUDGE )
2344 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative TULSI GABBARD )
1433 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative RUBEN GALLEGO )
1218 Longworth House Office Building )
Washington, D.C. 20515, )
)

Representative JOHN GARAMENDI                )
2438 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative JIMMY GOMEZ                    )
1226 Longworth House Office Building          )
Washington, D.C. 20515,                      )
                                             )
Representative AL GREEN                       )
2347 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative GENE GREEN                     )
2470 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative RAUL M. GRIJALVA              )
1511 Longworth House Office Building          )
Washington, D.C. 20515,                      )
                                             )
Representative COLLEEN HANABUSA              )
422 Cannon House Office Building             )
Washington, D.C. 20515,                      )
                                             )
Representative ALCEE L. HASTINGS             )
2353 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative DENNY HECK                     )
425 Cannon House Office Building             )
Washington, D.C. 20515,                      )
                                             )
Representative BRIAN HIGGINS                 )
2459 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative JAMES A. HIMES                )
1227 Longworth House Office Building          )
Washington, D.C. 20515,                      )
                                             )
Representative JARED HUFFMAN                 )
1406 Longworth House Office Building          )
Washington, D.C. 20515,                      )
                                             )
Representative EDDIE BERNICE JOHNSON         )
2468 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )

Formatted: Line spacing: Multiple 1.09 li

10

Representative MARCY KAPTUR                    )
2186 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative WILLIAM R. KEATING             )
2351 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative ROBIN L. KELLY                  )
1239 Longworth House Office Building          )
Washington, D.C. 20515,                        )
                                               )
Representative JOSEPH P. KENNEDY III          )
434 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative RO KHANNA                       )
513 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative RUBEN J. KIHUEN                 )
313 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative DANIEL T. KILDEE                )
227 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative DEREK KILMER                    )
1520 Longworth House Office Building          )
Washington, D.C. 20515,                        )
                                               )
Representative RAJA KRISHNAMOORTHI            )
515 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative JAMES R. LANGEVIN              )
2077 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative RICK LARSEN                     )
2113 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative JOHN B. LARSON                  )
1501 Longworth House Office Building          )
Washington, D.C. 20515,                        )

Representative BRENDA L. LAWRENCE )
1213 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative AL LAWSON )
1337 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative BARBARA LEE )
2267 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative SANDER M. LEVIN )
1236 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative JOHN LEWIS )
343 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative DAVE LOEBSACK )
1527 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative ALAN LOWENTHAL )
125 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative NITA M. LOWEY )
2365 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative BEN RAY LUJÁN )
2231 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative MICHELLE LUJAN )
GRISHAM )
214 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative CAROLYN B. MALONEY )
2308 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
                                    )
                                    )

Representative SEAN PATRICK MALONEY )
1027 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative DORIS MATSUI )
2311 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative BETTY MCCOLLUM )
2256 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative A. DONALD MCEACHIN )
314 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative JAMES P. MCGOVERN )
438 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative ANN MCLANE KUSTER )
137 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative JERRY MCNERNEY )
2265 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative GREGORY W. MEEKS )
2234 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative GRACE MENG )
1317 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative GWEN S. MOORE )
2252 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative SETH MOULTON )
1408 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative GRACE F. NAPOLITANO )
1610 Longworth House Office Building )
Washington, D.C. 20515, )

13

Representative RICHARD E. NEAL )
341 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative RICHARD M. NOLAN )
2366 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative DONALD NORCROSS )
1531 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative FRANK PALLONE, JR. )
237 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative JIMMY PANETTA )
228 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative BILL PASCRELL, JR. )
2370 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative DONALD M. PAYNE, JR. )
132 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative ED PERLMUTTER )
1410 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative SCOTT H. PETERS )
1122 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative CHELLIE PINGREE )
2162 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative MARK POCAN )
1421 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JARED POLIS )
1727 Longworth House Office Building )
Washington, D.C. 20515, )

14

Representative DAVID E. PRICE )
2108 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative MIKE QUIGLEY )
2458 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative KATHLEEN M. RICE )
1508 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative LUCILLE ROYBAL- )
ALLARD )
2083 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative C. A. DUTCH )
RUPPERSBERGER )
2416 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative BOBBY L. RUSH )
2188 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative TIM RYAN )
1126 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOHN P. SARBANES )
2444 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JAN SCHAKOWSKY )
2367 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ADAM B. SCHIFF )
2372 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ROBERT C. "BOBBY" )
SCOTT )
1201 Longworth House Office Building )
Washington, D.C. 20515, )
)

15

Representative JOSÉ E. SERRANO            )
2354 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative TERRI SEWELL               )
2201 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative CAROL SHEA-PORTER          )
1530 Longworth House Office Building      )
Washington, D.C. 20515,                   )
                                          )
Representative BRAD SHERMAN               )
2181 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative ALBIO SIRES                )
2342 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative LOUISE M. SLAUGHTER        )
2469 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative ADAM SMITH                 )
2264 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative DARREN SOTO                )
1429 Longworth House Office Building      )
Washington, D.C. 20515,                   )
                                          )
Representative JACKIE SPEIER              )
2465 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative MARK TAKANO                )
1507 Longworth House Office Building      )
Washington, D.C. 20515,                   )
                                          )
Representative BENNIE G. THOMPSON         )
2466 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative MIKE THOMPSON              )
231 Cannon House Office Building          )
Washington, D.C. 20515,                   )
                                          )

16

Representative DINA TITUS
2464 Rayburn House Office Building
Washington, D.C. 20515,                    )
                                           )
Representative PAUL D. TONKO               )
2463 Rayburn House Office Building         )
Washington, D.C. 20515,                    )
                                           )
Representative NORMA J. TORRES             )
1710 Longworth House Office Building       )
Washington, D.C. 20515,                    )
                                           )
Representative NIKI TSONGAS                )
1714 Longworth House Office Building       )
Washington, D.C. 20515,                    )
                                           )
Representative JUAN VARGAS                 )
1605 Longworth House Office Building       )
Washington, D.C. 20515,                    )
                                           )
Representative MARC VEASEY                 )
1519 Longworth House Office Building       )
Washington, D.C. 20515,                    )
                                           )
Representative FILEMON VELA                )
437 Cannon House Office Building           )
Washington, D.C. 20515,                    )
                                           )
Representative NYDIA M. VELÁZQUEZ          )
2302 Rayburn House Office Building         )
Washington, D.C. 20515,                    )
                                           )
Representative TIMOTHY J. WALZ             )
2313 Rayburn House Office Building         )
Washington, D.C. 20515,                    )
                                           )
Representative DEBBIE WASSERMAN            )
SCHULTZ                                    )
1114 Longworth House Office Building       )
Washington, D.C. 20515,                    )
                                           )
Representative MAXINE WATERS               )
2221 Rayburn House Office Building         )
Washington, D.C. 20515,                    )
                                           )
Representative BONNIE WATSON               )
COLEMAN                                    )

17

1535 Longworth House Office Building )
Washington, D.C. 20515,                )
                                       )
Representative PETER WELCH             )
2303 Rayburn House Office Building     )
Washington, D.C. 20515,                )
                                       )
Representative FREDERICA S. WILSON     )
2445 Rayburn House Office Building     )
Washington, D.C. 20515,                )
                                       )
Representative JOHN YARMUTH            )
131 Cannon House Office Building       )
Washington, D.C. 20515,                )
                                       )
                      Plaintiffs,      )
                                       )
          v.                           )
                                       )
DONALD J. TRUMP, in his official capacity )
as President of the United States of America )
1600 Pennsylvania Avenue, N.W.         )
Washington, D.C. 20500,                )
                                       )
                      Defendant.       )
_____

**FIRST AMENDED COMPLAINT**

Senator Richard Blumenthal and Representative John Conyers, Jr., along with ~~194~~199

other members of Congress, for their complaint against Donald J. Trump, in his official capacity

as President of the United States of America, allege as follows:

**I.**
**INTRODUCTION**

1.      Plaintiffs, 30 members of the United States Senate and ~~166~~171 members of the

United States House of Representatives, bring this action against President Donald J. Trump to

obtain relief from the President's continuing violation of the Foreign Emoluments Clause of the

United States Constitution, which was designed to ensure that our nation's leaders would not be

corrupted by foreign influence or put their own financial interests over the national interest.  To

achieve those aims, the Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."[1]  Through this measure, the nation's Founders invested members of Congress with an important role in preventing the corruption and foreign influence that the Founders sought to avoid—permitting federal officeholders to accept otherwise prohibited "Emolument[s]" only if they first received "the Consent of the Congress."

2.      Defendant, President Donald J. Trump, has a financial interest in vast business holdings around the world that engage in dealings with foreign governments and receive benefits from those governments.  By virtue of that financial interest, Defendant has accepted, or necessarily will accept, "Emolument[s] from "foreign State[s]" while holding the office of President of the United States.

3.      Because the Foreign Emoluments Clause requires the President to obtain "the Consent of the Congress" before accepting otherwise prohibited "Emolument[s]," Plaintiffs, as members of Congress, must have the opportunity to cast a binding vote that gives or withholds their "Consent" before the President accepts any such "Emolument."

4.      Despite this constitutional mandate, Defendant has chosen to accept numerous benefits from foreign states without first seeking or obtaining congressional approval.  Indeed, he has taken the position that the Foreign Emoluments Clause does not require him to obtain such approval before accepting benefits arising out of exchanges between foreign states and his businesses.  Because Defendant has failed to come to Congress and seek its consent for at least some foreign emoluments that have been the subject of public reporting, it is impossible to know

---

[1] U.S. Const. art. I, § 9, cl. 8.

whether Defendant has also accepted, or plans to accept, other foreign emoluments that have not yet been made public.  By accepting these benefits from foreign states without first seeking or obtaining congressional approval, Defendant has thwarted the transparency that the "Consent of the Congress" provision was designed to provide.

5.      Moreover, by accepting these benefits from foreign states without first seeking or obtaining congressional approval, Defendant has also denied Plaintiffs the opportunity to give or withhold their "Consent" to his acceptance of individual emoluments and has injured them in their roles as members of Congress.

6.      To redress that injury, Plaintiffs seek declaratory relief establishing that Defendant violates the Constitution when he accepts any monetary or nonmonetary benefit—any "present, Emolument, Office, or Title, of any kind whatever"—from a foreign state without first obtaining "the Consent of the Congress."  Plaintiffs also seek injunctive relief ordering Defendant not to accept any such benefits from a foreign state without first obtaining "the Consent of the Congress."

## II.
## PARTIES, JURISDICTION, AND VENUE

7.      Richard Blumenthal is a United States Senator who represents the state of Connecticut.  Senator Blumenthal is the Ranking Member of the Constitution Subcommittee of the Senate Judiciary Committee.

8.      John Conyers, Jr. is a United States Representative who represents Michigan's 13th congressional district.  Representative Conyers is the Ranking Member of the House Judiciary Committee.

9.      Additional plaintiffs are the 29 members of the United States Senate and 165 170 members of the United States House of Representatives whose names appear in the caption of this Complaint.

10.     As members of Congress, Plaintiffs have been entrusted by the Constitution with the important role of determining when the President and other individuals who hold an "Office of Profit or Trust" under the United States may accept "Emolument[s]" from "foreign States."  By empowering members of Congress with this important gatekeeping role, the Founders provided a mechanism by which federal officeholders could accept benefits from foreign governments in appropriate circumstances while still maintaining a structural safeguard against corruption and foreign influence.

11.     Defendant Donald J. Trump is the President of the United States of America and thus holds an "Office of Profit or Trust" under the United States.  He is being sued in his official capacity as President of the United States.

12.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).  Defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Columbia is a "judicial district" in which the "defendant in the action resides," in which "a substantial part of the events or omissions giving rise to the claim occurred," and in which "a substantial part of property that is the subject of the action is situated."  For example, Trump International Hotel Washington, D.C., which is central to some of Plaintiffs' allegations, is located in this district.

### III.
### BACKGROUND

14.     Article I, Section 9, Clause 8 of the U.S. Constitution provides: "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  Commonly known as the

21

"Foreign Emoluments Clause," this provision reflects the Founders' deep concern that corruption and foreign influence could undermine the new republic and harm the American people.

15.     Because the Founders believed that corruption was one of the gravest threats to the new nation, they viewed anti-corruption measures as essential to preserving an enduring republican system of government.  As George Mason warned his fellow delegates at the Constitutional Convention, "if we do not provide against corruption, our government will soon be at an end."[2] Thus, in drafting the Constitution, the Founders sought to ensure that "corruption was more effectually guarded against, in the manner this government was constituted, than in any other that had ever been formed."[3]  Alexander Hamilton explained that "[n]othing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."[4]

16.     This preoccupation with stemming corruption, born of the Founders' experience under British rule, pervaded the debates at the Constitutional Convention.  According to James Madison's notes of the Convention, fifteen delegates used the word "corruption" no fewer than fifty-four times,[5] and corruption was a topic of discussion on almost a quarter of the days that the Convention was in session.[6]  The Founders wanted to ensure that in the United States, unlike in Britain, the nation's leaders would be dependent on the people alone—not on those who would give them financial benefits—and would be motivated solely by the national interest, not their own

---

[2] 1 *The Records of the Federal Convention of 1787*, at 392 (Max Farrand ed., 1911) [hereinafter "*Convention Records*"].

[3] 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 302 (Jonathan Elliot ed., 1836) [hereinafter "*Elliot's Debates*"] (Charles Cotesworth Pinckney).

[4] *The Federalist No. 68*, at 411 (Clinton Rossiter ed., ~~1961~~Signet Classics 2003).

[5] James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174, 181 (1994).

[6] Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 352 (2009).

personal interests.  To promote that goal, the Founders included in the nation's new charter a number of safeguards against corruption.  These safeguards took the form of "procedural devices and organizational arrangements" meant to ward off "dependency, cabals, patronage, unwarranted influence, and bribery."[7]

17.      The Founders were also deeply worried that foreign powers would interfere with America's internal affairs, undermining the nation's republican institutions and making its leaders subservient to foreign interests.  Alexander Hamilton wrote that one of the vulnerabilities of republics "is that they afford too easy an inlet to foreign corruption."[8]  During the Constitutional Convention, Elbridge Gerry warned that "[f]oreign powers will intermeddle in our affairs, and spare no expence to influence them,"[9] while Gouverneur Morris invoked "the melancholy picture of foreign intrusions as exhibited in the History of Germany," and "urged it as a standing lesson to other nations."[10]

18.      Of particular concern to the Founders was the risk that foreign states would give benefits and rewards to the nation's chief executive to subvert his loyalty.  As Hamilton noted, the personal interest of a hereditary monarch was "so interwoven with that of the Nation . . . that he was placed above the danger of being corrupted from abroad."[11]  By contrast, as Madison observed, an elected President would lack "that permanent stake in the public interest which would place

---

[7] Savage, *supra* note 5, at 181; *see id*. at 177-82 (describing how fear of corruption influenced the structure of the electoral college, Congress's power to impeach, the prohibition on members of Congress holding other offices, and the prohibition on acceptance of foreign emoluments).

[8] *The Federalist No. 22*, at 145 (Clinton Rossiter ed., 1961Signet Classics 2003).

[9] 2 *Convention Records* 268 (Gerry).

[10] 1 *Convention Records* 530 (Morris).

[11] *Id.* at 289 (Hamilton).

23

him out of the reach of foreign corruption."[12]  During the state debates over ratification of the Constitution, former delegate Charles Cotesworth Pinckney similarly explained that while "kings are less liable to foreign bribery and corruption . . . because no bribe that could be given them could compensate the loss they must necessarily sustain for injuring their dominions . . . . the situation of a President would be very different."  As a temporary officeholder, the President "might receive a bribe which would enable him to live in greater splendor in another country than his own; and when out of office, he was no more interested in the prosperity of his country than any other patriotic citizen."[13]  This threat prompted the Founders to reject entrusting the treaty power solely to the President—susceptible as he was to foreign influence—and instead to require Senate approval, among other precautions.[14]

19.     As the Founders saw it, the dangers of corruption and foreign influence were joined together in the contemporary European practice of diplomatic gift-giving.  Eighteenth-century ambassadors and ministers were typically bestowed lavish presents by the monarchs with whom they dealt, often consisting of "jewels, plate, tapestry, or porcelain, or sometimes of money."[15]  The "usual presents from the European Courts" varied by country, and "in Holland, it was customary to give a gold chain and medal; in France, a gold snuff-box; and in Spain, a picture."[16]  America's Founders, however, made a clean break from such customs as soon as they established their own national government under the Articles of Confederation, prohibiting "any person

---

[12] *Id.* at 138 (Madison).

[13] 4 *Elliot's Debates* 264 (Charles Cotesworth Pinckney).

[14] *See id*. at 264-65.

[15] 4 John Bassett Moore, *A Digest of International Law* 578 (1906) (quoting Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790)).

[16] 5 Annals of Cong. 1589 (1798) (Joseph Gales ed., 1834) (Bayard).

24

holding any office of profit or trust under the United States, or any of them" from "accept[ing] any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state."[17] Emphatically rejecting the custom of foreign gift acceptance, the Founders sought to cultivate undivided loyalty on the part of American officeholders.  Absolute in its language, there was, in practice, only one exception to the ban: an officeholder could accept a foreign benefit if it was presented to Congress and if Congress approved of its receipt.[18]

20.     This restriction on accepting foreign emoluments was one of the few measures to be transferred from the Articles of Confederation to the new Constitution in 1787, reflecting its importance to the Founding generation.  At Philadelphia, the Foreign Emoluments Clause was added to the draft of the new Constitution by unanimous agreement of the state delegations after Charles Pinckney "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."[19]  In adding that Clause, the Founders largely borrowed the language of the precursor provision in the Articles of Confederation, but they made one important change: they "institutionalized the practice" that federal officeholders could accept otherwise prohibited emoluments from foreign states if they first obtained the consent of Congress.[20]

21.     During ratification, Edmund Jennings Randolph emphasized the twin evils that the

---

[17] Articles of Confederation of 1781, art. VI, para. 1.

[18] *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 16 n.4 (1994) (citing instances under the Articles in which Congress consented to American officials' acceptance of gifts from foreign monarchs); 5 Annals of Cong. 1585 (1798) (Otis) (citing officials who were offered gifts from foreign governments and presented those gifts to Congress for approval).

[19] 2 *Convention Records* 389; *see id.* at 384.

[20] *See Emoluments Clause*, The Heritage Guide to the Constitution, http://www.heritage.org/constitution/#!/articles/1/essays/68/emoluments-clause (last visited June 12, 2017).

Clause was meant to avert, explaining that "[i]t was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[21]   A prominent contemporary pamphleteer urging ratification stressed the value of the Clause in similar terms: "The influence which foreign powers may attempt to exercise in our affairs was foreseen, and a wholesome provision has been made against it."[22]   In sum, the Clause was "founded in a just jealousy of foreign influence of every sort."[23]

22.     Because the Founders wanted to eliminate "foreign influence of every sort," they drafted the Clause with language "both sweeping and unqualified,"[24] "prohibit[ing] those holding offices of profit or trust under the United States from accepting '*any* present, Emolument, Office, or Title, *of any kind whatever*' from '*any* . . . foreign State' unless Congress consents."[25] Consistent with that broad language, the Clause has been understood to be "'directed against every kind of influence by foreign governments upon officers of the United States,' in the absence of consent by Congress."[26]

23.     Notably, the word "emolument" was defined broadly in the eighteenth century to

---

[21] 3 *Convention Records* 327.

[22] Tench Coxe, *An Examination of the Constitution for the United States of America*, *No. 4* (Oct. 21, 1787), *in* The Federalist and Other Contemporary Papers on the Constitution of the United States 769 (E.H. Scott ed., 1894).

[23] Joseph Story, *Commentaries on the Constitution of the United States* § 1352 (5th ed. 1891).

[24] *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. at 17.

[25] *Id.* (quoting U.S. Const., art. I, § 9, cl. 8 (emphasis added by Office of Legal Counsel)).

[26] *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986) (quoting 24 Op. Att'y Gen. 116, 117 (1902)).

mean "profit," "advantage," "benefit," and "comfort."[27]   Contemporary writers used the term to
refer, among other things, to profits accruing from private commerce.[28]   Founding-era statesmen
including George Washington and James Madison likewise used the term when referring to "the
consequences of ordinary business dealings."[29]   And Governor Randolph's comments at the
Virginia Ratifying Convention, specifically addressing the Foreign Emoluments Clause, reflected
this broad definition as well.[30]

24.     Thus, it has long been understood by Congress and the executive branch that the
Foreign Emoluments Clause applies to the acceptance of any benefits or advantages from foreign
states—including compensation for services rendered in a private capacity.   Benefits and
advantages that have been viewed as falling within the scope of the Clause include the following:

a.   A NASA employee's receipt of a $150 consulting fee for reviewing a Ph.D.

---

[27] *Oxford English Dictionary* (2d ed. 1989) (citing eighteenth-century texts for definition
of "emolument" meaning "Advantage, benefit, comfort"); Samuel Johnson, *A Dictionary of the
English Language* (1755) (defining "emolument" as "Profit; advantage"); *see, e.g.*, Jonathan
Swift, *The Tale of a Tub* 91 (Henry Morley ed., 1889) (1704) ("And so I proceed with great
content of mind upon reflecting how much emolument this whole globe of earth is like to reap by
my labours.").

[28] *See, e.g.*, Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and
Address of the American Congress* 9 (1775) ("A merchant's desire is not of glory, but of gain;
not of publick wealth, but of private emolument; he is, therefore, rarely to be consulted about
war and peace, or any designs of wide extent and distant consequence.").

[29] John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan.
18, 2017) (citing examples), https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-
emolument.html (citing examples); *see* John Mikhail, *The Definition of 'Emolument' in English
Language and Legal Dictionaries, 1523–1806* (July 13, 2017),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693 (concluding that "'emolument'
was not a term of art at the founding with a highly restricted meaning" but rather was used in a
"broad variety of contexts, including private commercial transactions").

[30] Randolph observed in his comments that "[a]ll men have a natural inherent right of
receiving emoluments from any one, unless they are restrained by the regulations of the
community."  3 *Convention Records* 327.

thesis.[31]

b.  Payments to a Nuclear Regulatory Commission employee by an American consulting firm for work regarding the construction of a Mexican government power plant.[32]

c.  Payments to a part-time Nuclear Regulatory Commission staff consultant by an American corporation for work on a contract with the government of Taiwan.[33]

d.  Payments to members of the Administrative Conference of the United States, by those members' law firms, of "a share of partnership earnings, where some portion of that share is derived from the partnership's representation of a foreign government."[34]

e.  A retired U.S. Air Force member's employment "as a teacher in a local borough high school in the United Kingdom."[35]

f.  A courthouse employee's "receipt of pension payments from the British Government."[36]

---

[31] Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* 2-3 (May 23, 1986).

[32] *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 156 (1982).

[33] *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. at 96.

[34] *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 120 (1993).

[35] Comptroller General, *Matter of: Major James D. Dunn & Senior Master Sergeant Marcus A. Jenkins*, B-251084 (Oct. 12, 1993).

[36] Comptroller General, *Officers and Employees—Acceptance of Foreign Presents, Emoluments, Etc.—Court Employees*, B-132808 (Aug. 26, 1957).

g. A Post Office clerk's acceptance of an honorary military insignia from the German government.[37]

h. A gift of photographs to U.S. military and civilian officers by a foreign prince as "a simple remembrance of courtesy."[38]

i. A Navy surgeon's receipt of a "token of thankfulness" from a foreign government for his services on behalf of one of its citizens.[39]

25.     As these examples illustrate, the Clause has long been understood to apply to any rewards or benefits given by foreign states—whether tangible or honorary, monetary or nonmonetary, of great value or slight.  This interpretation prevents officeholders from accepting anything from a foreign state that might weaken their independence or cause them to act against the national interest—a danger the Founders perceived even in the "trifling presents"[40] of ornament and jewelry that were customary of European diplomacy and that motivated the adoption of the Clause.[41]

26.     By entrusting Congress with responsibility for deciding which specific benefits could be received from foreign states, the Founders ensured that federal officeholders would not decide for themselves whether particular emoluments were likely to compromise their own

---

[37] *Delivery of an Insignia from the German Emperor to a Clerk in the Post-Office Dep't*, 27 Op. Att'y Gen. 219, 220 (1909).

[38] *Gifts from Foreign Prince—Officer—Constitutional Prohibition*, 24 Op. Att'y Gen. 116, 118 (1902).

[39] A Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late Expedition to the ~~Artic~~Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present, Aug. 30, 1856, 11 Stat. 152.

[40] 5 Annals of Cong. 1587 (1798) (Bayard).

[41] *See supra*, ¶¶ 19-20.

29

independence or lead them to put personal interest over national interest.  An officeholder, in short, would not be the sole judge of his own integrity.  The important separation-of-powers principle embodied in Congress's gatekeeping role also ensured that any acceptance of foreign "Emolument[s]" would be transparent and subject to public examination, further minimizing the dangers of corruption and influence that such transfers of wealth or benefit might otherwise pose.

27.    When Congress was first called upon to exercise this responsibility in 1798,[42] lawmakers reaffirmed the views expressed a decade earlier during the Constitution's ratification about the dangers of foreign manipulation and the importance of the Foreign Emoluments Clause in guarding against it.  Representative William C.C. Claiborne described the Clause as "intended to lock up every door to foreign influence, to the influence of Courts and Monarchies, which could not but prove baneful to every free country."[43]  Representative James Bayard noted that "[i]f presents were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors."[44]  Representative Matthew Lyon expressed a refusal to consent to the acceptance of any foreign emoluments, as "he should not be willing to lay this country under an obligation to a foreign country by our Ministers accepting presents."[45]

28.    At the same time, lawmakers stressed that the dangers of foreign influence and

---

[42] Former envoy Thomas Pinckney was offered "the customary presents" by the kings of England and Spain, but "declined receiving them, saying, that he would lay the matter before Congress."  5 Annals of Cong. 1590 (1798) (Rutledge).  The Senate authorized acceptance of the presents, but the House withheld its consent, *see id.* at 1570-93, subsequently passing a resolution to clarify that the Congressmen "were induced to such refusal solely by motives of general policy, and not by any view personal to the said Thomas Pinckney," *id.* at 1775.

[43] 5 Annals of Cong. 1584 (1798) (Claiborne); *see id.* at 1587.

[44] *Id.* at 1583 (Bayard).

[45] *Id.* at 1589 (Lyon).

30

divided loyalty were reduced when officeholders obeyed the Constitution's mandate by seeking the consent of Congress before accepting any foreign benefit.   As Representative Bayard explained, the Clause required officeholders "to make known to the world whatever presents they might receive from foreign Courts and to place themselves in such a situation as to make it impossible for them to be unduly influenced by any such presents."[46]   Representative Harrison Gray Otis likewise noted: "When every present to be received must be laid before Congress, no fear need be apprehended from the effects of any such presents.  For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged."[47]

29.    In short, as Secretary of State Madison explained in 1803, "the Constitution of the United States has left with Congress the exclusive authority to permit the acceptance of presents from foreign governments by persons holding offices under the United States."[48]   In order "to exclude corruption and foreign influence,"[49] an officeholder must "make known to the world"[50] any benefit he wishes to accept from a foreign state and "come before his country to be judged"[51] by seeking "the Consent of the Congress."[52]

30.    By extending the reach of these important rules to everyone who holds "any Office

---

[46] *Id.* at 1583 (Bayard).

[47] *Id.* at 1585 (Otis).

[48] Letter from James Madison to David Humphreys (Jan. 5, 1803), *in* 4 Moore, *supra* note 15, at 579.

[49] 3 *Convention Records* 327 (Randolph).

[50] 5 Annals of Cong. 1583 (1798) (Bayard).

[51] *Id.* at 1585 (Otis).

[52] U.S. Const. art. I, § 9, cl. 8.

of Profit or Trust" under the United States, the Founders ensured that the Foreign Emoluments

Clause would apply to all federal officeholders and thus guard against corruption in the highest

reaches of the new nation's government.[53]  Such officeholders naturally included the President of

the United States.  As Randolph explained at the Virginia Ratifying Convention, "[t]here is another

provision against the danger . . . of the president receiving emoluments from foreign powers. . . .

I consider, therefore, that he is restrained from receiving any present or emoluments whatever.  It

is impossible to guard better against corruption."[54]  And as noted, the Founders were especially

afraid that foreign nations would use favors to subvert the loyalty of the President.[55]

    31.    Historically, presidents have respected their obligations under the Foreign

Emoluments Clause and have declined to accept presents or emoluments from foreign states

without obtaining the consent of Congress:

    a.    President Andrew Jackson transmitted to Congress in 1830 a commemorative

        gold medal that Colombia's president Simón Bolívar had presented to him.

        Congress directed that the medal be "deposited in the Department of State."[56]

    b.    President Martin Van Buren in 1840 was offered two horses, a case of rose oil,

        five bottles of rose water, a package of cashmere shawls, a Persian rug, a box

---

[53] *Emoluments Clause*, The Heritage Guide to the Constitution, *supra* note 20 ("the clause was directed not merely at American diplomats serving abroad, but more generally at officials throughout the federal government").

[54] David Robertson, *Debates and other Proceedings of the Convention of Virginia* 345 (2d ed. 1805) (1788).

[55] *See supra*, ¶ 18.

[56] *See Message from the President of the United States*, at 3 (Jan. 22, 1834), *in* Message from the President of the United States to the Two Houses of Congress at the Commencement of the First Session of the Twenty-Third Congress, at 259 (1833).

of pearls, and a sword by the Imam of Muscat.[57]  Writing to the Imam, Van

Buren explained that "a fundamental law of the Republic which forbids its

servants from accepting presents from foreign States or Princes, precludes me

from receiving" the items.[58]  Van Buren then apprised Congress of the gifts: "I

deem it my duty to lay the proposition before Congress, for such disposition as

they may think fit to make of it."[59]  Congress directed him to deposit the items

with the State Department, selling any items that could not "conveniently be

deposited or kept" there and placing the proceeds with the U.S. Treasury.[60]

c.  President John Tyler in 1843 was offered two horses by the Imam of Muscat.

He notified Congress, seeking direction regarding the disposition of the gifts.[61]

Congress directed Tyler to sell the horses at auction and place the proceeds with

the U.S. Treasury.[62]

d.  President Abraham Lincoln wrote to the King of Siam in 1862 regarding gifts

that the King had sent to the President—two decorative elephant tusks, an

ornate sword, and a photograph of the King.  Lincoln wrote that "our laws

forbid the President from receiving these rich presents as personal treasures. . . .

---

[57] 14 *Abridgment of the Debates of Congress from 1789 to 1856*, at 140-41 (Thomas Hart Benton ed., 1860).

[58] *Id.* at 141 (reprinting Letter from Martin Van Buren to Syed Bin Sutan, Imaum of Muscat (May 8, 1840)).

[59] *Id.* at 140 (reprinting Letter from Martin Van Buren to the Senate (May 21, 1840)).

[60] Joint Resolution No. 4, A Resolution to authorize the President to dispose of certain presents from the Imaum of Muscat and the Emperor of Morocco, July 20, 1840, 5 Stat. 409.

[61] 4 Moore, *supra* note 15, at 582.

[62] An Act to authorize the sale of two Arabian horses, received as a present by the Consul of the United States at Zanzibar, from the Imaum of Muscat, Mar. 1, 1845, 5 Stat. 730.

Congress being now in session at this capital, I have had great pleasure in making known to them this manifestation of Your Majesty's munificence and kind consideration."[63]  Congress directed that the items be deposited with the Department of the Interior.[64]

e.  President Benjamin Harrison had "certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States."[65]  In 1896, Congress authorized him to personally accept the medals.[66]

f.  President John F. Kennedy was offered honorary Irish citizenship in 1963 by the government of Ireland.  The White House sought the views of the Department of Justice's Office of Legal Counsel, which advised that acceptance would implicate the Foreign Emoluments Clause.[67]  Kennedy declined to accept the honor.[68]

g.  President Barack Obama was named the winner of the Nobel Peace Prize in

---

[63] Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862), *available at* http://quod.lib.umich.edu/l/lincoln/lincoln5/1:269.1?rgn=div2;view=fulltext.

[64] Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, Mar. 15, 1862, 12 Stat. 616.

[65] Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, Apr. 2, 1896, 29 Stat. 759.

[66] *Id.*

[67] Norbert A. Schlei, Office of Legal Counsel, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* 278 (May 10, 1963).

[68] *See* Clodagh Sheehy, *JFK Had To Turn Down Citizenship Offer From Government*, Irish Indep. (Dec. 29, 2006), http://www.independent.ie/irish-news/jfk-had-to-turn-down-citizenship-offer-from-government-26352995.html.

2009.  The White House sought the views of the Office of Legal Counsel, which

advised that acceptance of the prize would not fall within the Foreign

Emoluments Clause because the Nobel Committee that awards the prize is not

a foreign state or controlled by a foreign state.[69]

32.     In sum, past presidents have recognized that they are bound by the Foreign

Emoluments Clause and have responded accordingly—either seeking Congress's consent to accept

foreign emoluments or simply choosing not to receive them.

33.     Although Defendant Donald J. Trump has accepted the privilege of occupying the

highest office in the land, he is not obeying the same rules as the federal officers and employees

described above or following the example of compliance set by former presidents.  He has refused

to divest from his businesses and instead continues to accept financial payments and other benefits

from foreign states through his many business entities without first obtaining the consent of

Congress.

## IV.
## RELEVANT FACTS

**A.     Defendant's Acceptance of ~~Emoluments~~Benefits from Foreign States**

34.     Defendant is the owner, in whole or in part, of hundreds of businesses, which are

"linked in a complex network of interconnected individual corporations, limited liability

companies and partnerships.  The list includes more than 500 separate entities—hotels, golf

---

[69] *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1, 1 (2009).

courses, media properties, books, management companies, residential and commercial buildings, . . . airplanes and a profusion of shell companies set up to capitalize on licensing deals."[70]  These business interests are located in the United States and in at least twenty foreign countries.[71]

35.    While it is well known that Defendant's business empire is vast and global, the exact nature of his holdings and the benefits he receives from them remain unclear.  Defendant has refused to release his tax returns, and the complicated interconnection between the hundreds of discrete business entities and shell companies in which he owns an interest makes it impossible to determine the full scope of the benefits he is currently accepting from foreign states.  Contributing to the lack of transparency, "[o]ver the last 12 months, about 70% of buyers of Trump properties were limited liability companies—corporate entities that allow people to purchase property without revealing all of the owners' names."[72]

36.    Defendant has not divested or otherwise given up his ownership interest in his worldwide business holdings since he was elected President of the United States.

37.    Defendant has acknowledged, through his personal attorney, that his businesses receive funds and make a profit from payments by foreign governments, and that they will continue

---

[70] John W. Schoen, *Inside Trump's Holdings: A Web of Potential Conflicts*, CNBC.com (Jan. 23, 2017), http://www.cnbc.com/2017/01/19/inside-trumps-holdings-a-web-of-potential-conflicts.html.

[71] Marilyn Geewax, *Trump's Businesses and Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016), http://www.npr.org/2016/12/05/503611249/trumps-businesses-and-potential-conflicts-sorting-it-out; *see* Donald J. Trump, U.S. Office of Gov't Ethics Form 278e (May 16, 2016), *available at* https://www.documentcloud.org/documents/2838696-Trump-2016-Financial-Disclosure.html.

[72] Nick Penzenstadler et al., *Most Trump Real Estate Now Sold to Secretive Buyers*, USAToday (June 13, 2017), https://www.usatoday.com/story/news/2017/06/13/trump-property-buyers-make-clear-shift-secretive-llcs/102399558/?siteID=je6NUbpObpQ-p94xNqqEtnpXcOmZy086bA.

to do so while he is President.[73]  Further, public reporting has confirmed that Defendant and his

businesses have ~~already~~ accepted ~~some~~ benefits from foreign states since he took office.[74]

38.    These various benefits from foreign governments—payments, loans, permits,
exemptions, policy changes, and intellectual property rights—constitute prohibited
"Emolument[s]" and/or "present[s]" under the Foreign Emoluments Clause (hereinafter referred
to collectively as "Emolument[s]" or "foreign emoluments").[75]

~~38.~~39.  Defendant has not sought "the Consent of the Congress" with respect to any of the

benefits that he has accepted, or will accept, from foreign states in conjunction with his business

holdings.

~~39.~~40.  Because Defendant has failed to come to Congress and seek consent before

accepting foreign emoluments that have been confirmed through public reporting, it is impossible

to know whether Defendant is accepting other foreign emoluments that have not yet been made

public.  Indeed, through his personal attorney, Defendant has indicated that he does not believe the

Constitution requires him to seek or obtain Congress's consent before accepting benefits arising

---

[73] *See Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan.
11, 2017) (statement of Sheri A. Dillon, Partner, Morgan, Lewis & Bockius LLP),
https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html.

[74] *See infra*, ¶¶ ~~43-62~~44-67.

[75] Historically, certain awards and benefits from foreign states have been understood by
Congress and the executive branch to be prohibited by the Clause without a determination of
which specific term or terms they implicate.  *See, e.g.*, Schlei, *supra* note 67, at 280 ("medals and
decorations have always been regarded as coming within the constitutional provision, although it
has never been precisely articulated whether one of these constitutes a 'present, Emolument,
Office, or Title'").  Whether any of the benefits discussed below are better characterized as
"present[s]" or "Emolument[s]" may depend on their terms and the circumstances under which
they are conferred—information that Defendant has not fully disclosed.

out of exchanges between foreign states and his businesses.[76]

40.41.  Because Defendant has not sought congressional consent before accepting these foreign emoluments, nor provided information about them to Congress, Plaintiffs are unable to exercise their constitutional prerogative to authorize or reject the specific emoluments he is accepting.  While some information about Defendant's financial dealings with foreign states is publicly available in press reports and financial disclosures, that information is fragmentary.  Even where reliable sources confirm specific transactions between foreign states and Defendant's businesses, the complex structure of those transactions and Defendant's financial holdings makes it impossible to determine precisely how a given arrangement benefits him or affects the foreign state in question.[77]  Without that information, Plaintiffs cannot judge whether they should consent to the acceptance of any particular payment or other benefit from a foreign state, as the Constitution requires.

41.42.  In sum, Defendant's refusal to disclose to Congress the foreign emoluments he wishes to accept makes it impossible for Plaintiffs to judge whether any specific foreign emolumentemoluments should be approved, and often to know of their existence.  Defendant has therefore denied Plaintiffs the opportunity to decide, on a case-by-case basis, whether to authorize his acceptance of particular emoluments from foreign states.  The Constitution expressly demands that Plaintiffs be given that opportunity.

42.43.  By accepting benefits from foreign states without first obtaining "the Consent of the Congress," Defendant is therefore committing numerous violations of the Foreign Emoluments

---

[76] *See, e.g.*, *Donald Trump's News Conference: Full Transcript and Video*, *supra* note 7273 (statement of Sheri A. Dillon) ("The Constitution does not require [Defendant] to do anything here.").

[77] *See* Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20, 2016), https://www.nytimes.com/2016/08/21/us/politics/donald-trump-debt.html?_r=0.

Clause. Some of these violations have been partially described in media reports and other publicly available sources, as detailed below. But because Defendant refuses to come to Congress and seek consent, thereby preventing the transparency that "the Consent of the Congress" was designed to provide, other violations, upon information and belief, remain completely hidden.[78]

### Acceptance of Intellectual Property Rights

43. 44.  On February 14, 2017, the Chinese government registered a trademark to Defendant for branded construction services, "the result of a 10-year legal battle that turned in [Defendant]'s favor after he declared his candidacy."[79]

45.     On February 27 and March 6, 2017, the Chinese government granted preliminary approval of 38 new trademarks to Defendant and one of his companies, covering "branded spa and massage services, golf clubs, hotels, insurance, finance and real estate companies, restaurants, bars, and a trademark class that covers bodyguards, social escorts, and concierge services."[80]

46.     In May 2017, the Chinese government granted Defendant preliminary approval of

---

[78] The various foreign benefits discussed below—payments, loans, permits, exemptions, policy changes, and intellectual property rights—may constitute prohibited "present[s]" under the Foreign Emoluments Clause in addition to prohibited "Emolument[s]." Historically, certain awards and benefits have been understood by Congress and the executive branch to be prohibited by the Clause without a determination of which specific term or terms they implicate. *See, e.g.*, Schlei, *supra* note 67, at 280 ("medals and decorations have always been regarded as coming within the constitutional provision, although it has never been precisely articulated whether one of these constitutes a 'present, Emolument, Office, or Title'"). Whether any of the benefits discussed below constitutes a "present" depends on its terms and the circumstances under which it is conferred—information that Defendant has not fully disclosed.

[79] Erika Kinetz, *China Grants Preliminary Approval to 38 New Trump Trademarks*, AP (Mar. 9, 2017), https://apnews.com/8f54b14808a2459f9efcb0089f41f056/China-grants-preliminary-approval-to-38-new-Trump-trademarks.

[80] *Id.* Trademarks that receive preliminary approval are automatically registered after ninety days if there are no objections. *Id.*

two more trademarks, one for catering services and one that "can be used in clothing like trousers, underwear and suits."[81]

47.   On June 6 and June 13, 2017, the Chinese government granted Defendant preliminary approval of eight additional trademarks, covering services that include "construction, advertising, weather forecasting and dietary consulting."[82]

44.48.  Circumstances suggest that at least some of these trademarks were approved or expedited as a result of Defendant's status as President of the United States.   TheAfter the preliminary approval of trademarks in February and March, the director of a Hong Kong intellectual property consultancy, for instance, "said he had never seen so many applications approved so expeditiously,"[83] and thethose approvals closely followed Defendant's abrupt decision as President to honor the one-China policy, in contrast to his earlier statements.[84] Moreover, many of the preliminary approvals granted since Defendant became President were for

---

[81] Sui-Lee Wee, *Trump Adds Another Chinese Trademark to His Portfolio*, N.Y. Times (May 23, 2017), https://www.nytimes.com/2017/05/23/business/trump-china-trademarks.html?_r=1; Paul Mozur, *Trump Awarded a New Chinese Trademark, This Time for Catering*, N.Y. Times (June 1, 2017), https://www.nytimes.com/2017/06/01/business/trump-china-trademark.html; Sui-Lee Wee, *Trump Adds Another Chinese Trademark to His Portfolio*, N.Y. Times (May 23, 2017), https://www.nytimes.com/2017/05/23/business/trump-china-trademarks.html?_r=1..

[82] Jill Disis & Serenitie Wang, *Trump's Newest Chinese Trademarks: Religious Clothing, Advertising*, CNN Money (June 14, 2017), http://money.cnn.com/2017/06/14/news/trump-chinese-trademarks-religious-clothing/index.html; Sui-Lee Wee, *Trump Adds More Trademarks in China*, N.Y. Times (June 13, 2017), https://mobile.nytimes.com/2017/06/13/business/trump-china-trademarks.html?emc=edit_th_20170614&nl=todaysheadlines&nlid=51243100&_r=0&referer=.

[83] *Id.*

[84] Simon Denyer & Philip Rucker, *Backing Away From a Fight, Trump To Honor One-China Policy*, Wash. Post (Feb. 10, 2017), https://www.washingtonpost.com/world/asia_pacific/trump-agrees-to-honor-one-china-policy-in-call-to-xi-jinping/2017/02/10/ea6e7ece-ef4a-11e6-9973-c5efb7ccfb0d_story.html?utm_term=.655101b0f540.

trademarks that the Chinese government had previously rejected.[85]   Regarding these reversals, another intellectual property attorney stated: "The speed with which these appeals were decided is mind-blowing. . . . I have never seen any decisions made that quickly.   That suggests special treatment."[86]

45.1.   In May 2017, the Chinese government granted Defendant preliminary approval of two more trademarks, one for catering services and one that "can be used in clothing like trousers, underwear and suits."[87]

49.   Possession of these various trademarks "offers a potential business foothold for [Defendant]'s family company and protects his name in a country notorious for counterfeiters,"[88] benefits that are of particular value to Defendant as his company prepares to build twenty to thirty hotels in major Chinese cities.[89]  Foreign trademarks "can be enormously valuable—whether they are intended as groundwork for future business activity or defensive measures against squatting to protect the value of the brand,"[90] and a Trump Organization spokesman has stated that the company

[85] *See* Erika Kinetz, *China Approves 9 of Trump's Trademarks that They Had Previously Rejected*, AP (June 14, 2017), http://www.businessinsider.com/ap-china-overturns-rejections-of-9-trump-trademarks-2017-6.

[86] *Id.*

[87] Sui-Lee Wee, *Trump Adds Another Chinese Trademark to His Portfolio*, N.Y. Times (May 23, 2017), https://www.nytimes.com/2017/05/23/business/trump-china-trademarks.html?_r=1; Paul Mozur, *Trump Awarded a New Chinese Trademark, This Time for Catering*, N.Y. Times (June 1, 2017), https://www.nytimes.com/2017/06/01/business/trump-china-trademark.html; Sui-Lee Wee, *Trump Adds Another Chinese Trademark to His Portfolio*, N.Y. Times (May 23, 2017), https://www.nytimes.com/2017/05/23/business/trump-china-trademarks.html?_r=1.

[88] Kinetz, *China Grants Preliminary Approval, supra* note 7778.

[89] Rob Schmitz, *Trump's Hotels In in China Could Be a Conflict for the President-Elect*, NPR (Nov. 24, 2016), http://www.npr.org/2016/11/24/503236237/trumps-hotels-in-china-could-be-a-conflict-for-the-president-elect.

[90] Kinetz, *China Approves 9 of Trump's Trademarks*, *supra* note 84.

41

has pursued Chinese trademarks "to protect its brand and overall intellectual property rights from third-party infringers."[91]

46.50.  By accepting the registration of these trademarks, Defendant has violated the Foreign Emoluments Clause because he did not first seek and obtain "the Consent of the Congress" before accepting these benefits from a foreign state.

47.51.  As of April 2017, according to one investigation, Defendant's companies had 157 trademark applications pending in 36 foreign nations.[92]   Accepting the registration of these trademarks would violate the Foreign Emoluments Clause unless Defendant first sought and obtained "the Consent of the Congress," which he has not done.

**Acceptance of Payments for Hotel Rooms and Events**

48.52.  In 2013, Trump Old Post Office LLC signed a lease with the General Services Administration, so it could house Trump International Hotel Washington, D.C. in the Old Post Office building located at 1100 Pennsylvania Avenue, N.W., Washington, D.C. 20004.  Defendant owns approximately 77 percent of Trump Old Post Office LLC.[93]

49.53.  "For Washington hotels . . . diplomats' visits are big business," and Defendant's Washington, D.C. hotel has been "actively courting" foreign diplomats for their business,[94] including hiring a "director of diplomatic sales" and hosting an event soon after the November

---

[91] Wee, *Trump Adds More Trademarks, supra* note 81 (statement of Alan Garten, executive vice president and chief legal officer).

[92] Sharon LaFraniere & Danny Hakim, *Trump's Trademark Continues Its March Across the Globe, Raising Eyebrows*, N.Y. Times (Apr. 11, 2017), https://www.nytimes.com/2017/04/11/us/politics/trump-trademark-ethics.html.

[93] *See* U.S. Office of Gov't Ethics Form 278e, *supra* note 71.

[94] Eric Lipton & Susanne Craig, *At Trump Hotel in Washington, Champagne Toasts in an Ethical 'Minefield,'* N.Y. Times (Jan. 19, 2017), https://www.nytimes.com/2017/01/19/us/politics/trump-international-hotel-ethics.html.

2016 election in which "[a]bout 100 foreign diplomats, from Brazil to Turkey" were given "a sales pitch about [Defendant]'s newest hotel."[95]  An attendee who works with foreign officials noted that "'[t]he place was packed'" and that "much of the discussion among Washington-based diplomats [was] over 'how are we going to build ties with the new administration.'"[96]

54.     According to public reports, diplomats plan to stay at the hotel to curry favor with Defendant, because of his position as President of the United States.  "In interviews with a dozen diplomats . . . some said spending money at Trump's hotel is an easy, friendly gesture to the new president."[97]  According to an Asian diplomat, "Why wouldn't I stay at [Defendant's] hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!'  Isn't it rude to come to his city and say 'I am staying at your competitor?'"[98]  One Middle Eastern diplomat put it even more simply: "Believe me, all the delegations will go there."[99]

50.55.  Indeed, during the first four months of 2017, Defendant's company made nearly $2 million in profit from the hotel, although the company had earlier projected that it would *lose* over $2 million during that period.[100]  These profits accumulated despite an occupancy rate well

---

[95] Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place To Be*, Wash. Post (Nov. 18, 2016), https://www.washingtonpost.com/business/capitalbusiness/2016/11/18/9da9c572-ad18-11e6-977a-1030f822fc35_story.html?utm_term=.1a4c839c9c6a.

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

[100] Jonathan O'Connell, *Trump D.C. Hotel Turns $2 Million Profit in Four Months*, Wash. Post (Aug. 10, 2017), https://www.washingtonpost.com/politics/trump-dc-hotel-turns-2-million-profit-in-four-months/2017/08/10/23bd97f0-7e02-11e7-9d08-b79f191668ed_story.html?utm_term=.24484d88a37e.

below standard for the industry,[101] and despite the hotel's ranking by a "travel group that specializes in high-end accommodations" as "the world's third-lousiest new hotel."[102] "Driving the profits are the extraordinary prices guests have been willing to pay for rooms," as the hotel charges "three times the average rate," making it probably "the most expensive hotel in the city."[103]

51.56.  By virtue of his ownership of the Trump International Hotel Washington, D.C., Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality every time foreign diplomats stay at the hotel, foreign embassies hold events there, or foreign governments otherwise pay for rooms there.  On information and belief, there have been at least three such incidents since Defendant's inauguration:

     a. In late January 2017, "[a] lobbying firm working for Saudi Arabia paid for a room at [Defendant]'s Washington hotel after Inauguration Day," as part of its effort to bring activists to Washington "to urge Congress to repeal the law letting 9/11 victims' families sue the kingdom."[104]  This transaction marked "the first publicly known payment on behalf of a foreign government to a Trump property since [Defendant] became president."[105]  The lobbying firm made additional payments to the hotel in early February 2017, and all payments

---

[101] *Id.*

[102] Benjamin Freed, *Luxury Travel Group Gives Trump's DC Hotel a Brutal Review*, Washingtonian (Dec. 20, 2016), https://www.washingtonian.com/2016/12/20/travel-group-dc-trump-hotel-one-worlds-worst-new-luxury-hotels/.

[103] O'Connell, *supra* note 10098.

[104] Isaac Arnsdorf, *Saudis Foot Tab at Trump Hotel*, Politico (Feb. 9, 2017), http://www.politico.com/story/2017/02/trump-hotel-saudi-arabia-234878?cmpid+sf.

[105] *Id.*

were reimbursed by the Saudi government.[106]  Between November 2016 and February 2017, the firm paid Defendant's hotel approximately $270,000 for lodging, catering, and parking—all reimbursed by the Saudi government.[107]

b. On February 22, 2017, the Embassy of Kuwait held its National Day Celebration at Trump International Hotel Washington, D.C.[108]  According to cost estimates from the hotel, the price of the celebration was between $40,000 and $60,000.[109]

c. On or about April 6, 2017, the Ambassador & Permanent Representative of Georgia to the United Nations stayed at Trump International Hotel Washington, D.C.[110]

~~52.~~57.  Defendant has not sought or received "the Consent of the Congress" to accept these "Emolument[s]" and is therefore violating the Foreign Emoluments Clause when he accepts such "Emolument[s]."

---

[106] Byron Tau & Rebecca Ballhaus, *Trump Hotel Received $270,000 From Lobbying Campaign Tied to Saudis*, Wall St. J. (June 5, 2017), https://www.wsj.com/articles/trump-hotel-received-270-000-from-lobbying-campaign-tied-to-saudis-1496700739.

[107] *Id*.  Public reports do not indicate what portion of these payments were made after Defendant became President, though an executive from the lobbying firm has claimed that the majority of the payments occurred before he became President.  *Id*.

[108] ~~Julia Harte, *Kuwait Could Pay Up To $60,000 for Party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017), http://www.reuters.com/article/us-usa-trump-hotel-idUSKBN1640LE.~~

[109] ~~*Id*.~~ Julia Harte, *Kuwait Could Pay Up To $60,000 for Party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017), http://www.reuters.com/article/us-usa-trump-hotel-idUSKBN1640LE.

[110] Kaha Imnadze (@kahaimnadze), Twitter (Apr. 6, 2017, 8:49 AM), https://twitter.com/kahaimnadze/status/850012655347789824.

**Acceptance of Payments Derived from Real Estate Holdings**

~~53.~~58.  Defendant owns Trump Tower, a mixed-use skyscraper located at 725 Fifth Avenue, New York, N.Y. 10022.  Since Defendant became President, at least two entities owned by foreign states have been tenants of Trump Tower: (1) the Industrial and Commercial Bank of China, which is owned by China,[111] and (2) the Abu Dhabi Tourism & Culture Authority, which is owned by the United Arab Emirates.[112]

~~54.~~59.  By virtue of his ownership of Trump Tower and the leases of these entities, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality.  Defendant has not sought or received "the Consent of the Congress" to accept these "Emolument[s]" and is therefore violating the Foreign Emoluments Clause.

~~55.~~60.  Defendant also owns Trump World Tower, which is located at 845 United Nations Plaza, New York, N.Y. 10017.

~~56.~~61.  In 2001, the Kingdom of Saudi Arabia purchased a floor of Trump World Tower, and the floor currently belongs to the Saudi Mission to the United Nations.[113]  At the time of the

---

[111] Caleb Melby, Stephanie Baker, & Ben Brody, *When Chinese Bank's Trump Lease Ends, Potential Conflict Begins*, Bloomberg Pol. (Nov. 28, 2016), https://www.bloomberg.com/politics/articles/2016-11-28/trump-s-chinese-bank-tenant-may-negotiate-lease-during-his-term.

[112] Adam Schreck, *In a First, Emirati Foreign Minister Defends Trump Visa Ban*, AP (Feb. 1, 2017), http://bigstory.ap.org/article/4ecfcc9c03bb412fae7233be0f53f2b6/first-emirati-foreign-minister-defends-trump-visa-ban.  According to a ~~recent~~subsequent report, the Abu Dhabi tourism authority ended its lease effective January 31, 2017.  Lorraine Woellert, *Abu Dhabi Tourism Office Quits Trump Tower*, Politico (June 6, 2017), http://www.politico.com/story/2017/06/06/abu-dhabi-trump-tower-tourism-office-239188.

[113] Stephen Rex Brown, *Exclusive: Donald Trump Made Millions from Saudi Government, but Trashes Hillary Clinton for Saudi Donations to Clinton Foundations*, N.Y. Daily News (Sept. 4, 2016), http://www.nydailynews.com/news/politics/exclusive-donald-trump-made-millions-saudi-government-article-1.2777211.

sale, the floor had "yearly common charges of $85,585 for building amenities."[114]

~~57.~~62.  If Saudi Arabia continues to pay common charges to Defendant's company, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality, and he will have done so without first seeking and receiving "the Consent of the Congress," in violation of the Foreign Emoluments Clause.

### Acceptance of Licensing Fees for "The Apprentice"

~~58.~~63.   While serving as President, Defendant remains an executive producer of the MGM-produced television show "The Apprentice."   In that role, he is contractually entitled to a percentage of the profits derived from licensing the show and its related spin-offs to television networks, including in foreign countries.  "The show has current iterations in the U.K., Brazil, Bulgaria, Indonesia and Vietnam; each of these must pay MGM a licensing fee for the show's name and set-up, a portion of which goes to Trump."[115]

~~59.~~64.   In the United Kingdom, the television network that pays these licensing fees is owned and operated by the government.   Specifically, the state-owned network BBC One broadcasts a version of "The Apprentice,"[116] for which the network pays a licensing fee, a portion of which goes to Defendant.

~~60.~~65.   By taking a portion of licensing fees paid by foreign governments, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or

---

[114] *Id.*

[115] Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice,'* Forbes (Dec. 13, 2016), https://www.forbes.com/sites/maddieberg/2016/12/13/heres-how-much-trump-will-earn-from-producing-celebrity-apprentice/#505f22311d0c.

[116] *See The Apprentice*, BBC One, http://www.bbc.co.uk/programmes/b0071b63 (last visited June 12, 2017).

instrumentality, and he will have done so without first seeking and receiving "the Consent of the

Congress," in violation of the Foreign Emoluments Clause.

**Acceptance of Regulatory Benefits**

61. 66.  Defendant is at least part owner of numerous business ventures around the world,

including in Argentina,[117] China,[118] India,[119] Indonesia,[120] Scotland,[121] Turkey,[122] United Arab

Emirates,[123] and the Philippines.[124]  Many of these ventures are in the planning stages, and as

public reports note, "foreign developers could stand to benefit if their governments were to grease

the skids for Trump-branded projects as a way to curry favor with the new American president."[125]

---

[117] Josh Marshall & Catherine Thompson, *Cashing in BIGLY in Argentina!*, Talking Points Memo (Nov. 21, 2016), http://talkingpointsmemo.com/edblog/cashing-in-bigly-in-argentina.

[118] Schmitz, *supra* note 83 87.

[119] Richard C. Paddock et al., *Potential Conflicts Around the Globe for Trump, the Businessman President*, N.Y. Times (Nov. 26, 2016), https://www.nytimes.com/2016/11/26/us/politics/donald-trump-international-business.html.

[120] Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), https://www.nytimes.com/2016/12/31/world/asia/indonesia-donald-trump-resort.html.

[121] Severin Carrell, *Trump's Scotland Golf Resort Proceeds with Expansion Despite Business Pledge*, The Guardian (Jan. 14, 2017), https://www.theguardian.com/us-news/2017/jan/14/trump-scotland-golf-resort-conflicts-of-interest.

[122] Pema Levy, *Trump Admitted to a Conflict of Interest in Turkey*, Mother Jones (Nov. 15, 2016), http://www.motherjones.com/politics/2016/11/donald-trump-i-have-little-conflict-interest-turkey.

[123] Jon Gambrell, *AP Exclusive: Golf Club Shows Pitfalls of Trump Presidency*, AP (Jan. 3, 2017), http://bigstory.ap.org/article/f105158bacc94890bc952a26f8a5c819.

[124] Jackie Northam, *Trump Business Deals in Southeast Asia Raise Conflict of Interest Concerns*, NPR (Jan. 6, 2017), http://www.npr.org/sections/parallels/2017/01/06/508411598/trump-business-deals-in-southeast-asia-raise-conflict-of-interest-concerns.

[125] Rosalind S. Helderman & Tom Hamburger, *Trump's Presidency, Overseas Business Deals and Relations with Foreign Governments Could All Become Intertwined*, Wash. Post (Nov. 25, 2016), https://www.washingtonpost.com/politics/trumps-presidency-overseas-

Indeed, since the election, there have been reports of Defendant asking for, and receiving, such help from foreign governments:

> a.  In November 2016, when Argentine President Mauricio Macri called Defendant to congratulate him on his victory, Defendant reportedly asked him "to deal with the permitting issues that are currently holding up" a project that Defendant and Argentine partners have been working on for a number of years, namely, the development of a major office building in Buenos Aires.[126] "[T]hree days after Trump spoke with Argentina's president, . . . the long delayed project was moving ahead."[127]
>
> b.  In a meeting "held shortly after the presidential election," Defendant reportedly "encouraged [British politician Nigel Farage] . . . to oppose the kind of offshore wind farms that [Defendant] believes will mar the pristine view from one of his two Scottish golf courses."[128]
>
> c.  Further, "[d]ays after [Defendant]'s election victory, a news agency in the former Soviet republic of Georgia reported that a long-stalled plan for a Trump-branded tower in a seaside Georgian resort town was now back on track."[129]

62.67.  Defendant's acceptance of any benefits from foreign governments related to his

---

business-deals-and-relations-with-foreign-governments-could-all-become-intertwined/2016/11/25/d2bc83f8-b0e2-11e6-8616-52b15787add0_story.html?utm_term=.9f2b946fffd5.

[126] Marshall & Thompson, *supra* note 104114.

[127] Helderman & ~~Hambuger~~Hamburger, *supra* note ~~112~~122.

[128] Danny Hakim & Eric Lipton, *With a Meeting, Trump Renewed a British Wind Farm Fight*, N.Y. Times (Nov. 21, 2016), https://www.nytimes.com/2016/11/21/business/with-a-meeting-trump-renewed-a-british-wind-farm-fight.html.

[129] Helderman & Hamburger, *supra* note ~~112~~122.

business ventures abroad—including payments, loans, permits, exemptions, tax incentives, and favorable policy changes—would violate the Foreign Emoluments Clause unless Defendant first sought and obtained "the Consent of the Congress," which he has not done.

### Consequences of Defendant's Failure To Comply with the Constitution

~~63.~~68.  Defendant's refusal to seek and obtain "the Consent of the Congress" before accepting the payments and benefits discussed above suggests that Defendant may have accepted other payments and benefits from foreign states that have not yet been made public.  Neither the Plaintiffs nor the public, therefore, can know the full range of Defendant's unconstitutional acceptance of foreign emoluments.

~~64.~~69.  By accepting such benefits without first obtaining congressional consent, Defendant is causing the harms that the Founders sought to prevent when they adopted the Foreign Emoluments Clause.  The Clause was meant to ensure "the undivided loyalty of individuals occupying positions of trust under our government,"[130] because, as the Founders recognized, "[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty."[131]  Defendant's conduct deprives the American people of assurance that their highest elected official is pursuing their best interests with undivided loyalty.

~~65.~~70.  For instance, as Defendant addresses critical trade issues with China, which could dramatically affect the American economy and American jobs, he may be influenced by the fact that New York's Trump Tower will soon be renegotiating its lease with the state-owned Industrial

---

[130] *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. at 100.

[131] *Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. at 18.

and Commercial Bank of China,[132] or the fact that the Chinese government recently granted him numerous trademarks enabling his companies to pursue lucrative business opportunities in that country.[133]

66. 71.   As Defendant brokers arms deals with Saudi Arabia,[134] as he navigates conflicts between Saudi Arabia and Qatar,[135] and as he decides whether to commit U.S. resources to support Saudi military actions in Yemen, which potentially could escalate and put American servicemembers in harm's way, he may be influenced by his desire to pursue hotel deals in Saudi Arabia requiring government approvals.[136]   Indeed, Defendant said during the presidential campaign that he "would want to protect Saudi Arabia" from Iranian aggression and also stated:

---

[132] Melby, Baker, & Brody, *supra* note 98108.

[133] Kinetz, *China Grants Preliminary Approval, supra* note 7778.

[134] Michael J. de la Merced, *Saudi Arabia To Invest $20 Billion in Infrastructure, Mostly in U.S.*, N.Y. Times (May 20, 2017), https://www.nytimes.com/2017/05/20/business/dealbook/saudi-arabia-to-invest-20-billion-in-infrastructure-mostly-in-us.html; Mark Landler et al., *$110 Billion Weapons Sale to Saudis Has Jared Kushner's Personal Touch*, N.Y. Times (May 18, 2017), https://www.nytimes.com/2017/05/18/world/middleeast/jared-kushner-saudi-arabia-arms-deal-lockheed.html.

[135] Michael J. de la Merced, *Saudi Arabia To Invest $20 Billion*David D. Kirkpatrick, *Trump's Business Ties* in *Infrastructure, Mostly in U.S.;the Gulf Raise Questions About His Allegiances*, N.Y. Times (May 20June 17, 2017), https://www.nytimes.com/2017/05/20/business/dealbook/saudi-arabia-to-invest-20-billion-in-infrastructure-mostly-in-us.html; Mark Landler et al., *$110 Billion Weapons Sale to Saudis Has Jared Kushner's Personal Touch*, N.Y. Times (May 18, 2017), https://www.nytimes.com/2017/05/1806/17/world/middleeast/jared-kushner-saudi-arabia-arms-deal-lockheed.html.trumps-business-ties-in-persian-gulf-raise-questions-about-his-allegiances.html?cn=bWVudGlvbg%3D%3D&_r=0 (noting that Defendant's position on this dispute differed from the position of his Secretary of State).

[136] Drew Harwell & Anu Narayanswamy, *A Scramble To Assess the Dangers of President-Elect Donald Trump's Global Business Empire*, Wash. Post (Nov. 20, 2016), https://www.washingtonpost.com/business/economy/a-scramble-to-assess-the-dangers-of-president-elects-global-business-empire/2016/11/20/1bbdc2a2-ad18-11e6-a31b-4b6397e625d0_story.html?utm_term=.0926499e36bb.

"Saudi Arabia, I get along with all of them. They buy apartments from me.  They spend $40 million, $50 million.  Am I supposed to dislike them?"[137]

~~67.~~72.  As Defendant decides how to shape U.S. policy toward Russia, he may be influenced by his long-standing, though yet unrealized, desire to build housing and hotels in Russia,[138] which could also require government approvals or licenses.  Indeed, Donald Trump Jr., Defendant's son and an executive in the Trump Organization, has in the past acknowledged the business ties between Defendant and Russia, noting in 2008 that "Russians make up a pretty disproportionate cross-section of a lot of our assets" and that "we see a lot of money pouring in from Russia."[139]

~~68.~~73.  Finally, as Defendant weighs the United States' response to allegations that Philippine president Rodrigo Duterte has endorsed extrajudicial killings and other human rights abuses, he may be influenced by the millions of dollars he is set to receive in licensing revenue from the new Trump Tower in Manila, particularly because his business partner in that venture

---

[137] *Id.*

[138] Oren Dorell, *Donald Trump's Ties to Russia Go Back 30 Years*, USA Today (Feb. 15, 2017), https://www.usatoday.com/story/news/world/2017/02/15/donald-trumps-ties-russia-go-back-30-years/97949746~~/~~; *see* Mike McIntire, *Russia Renewed Unused Trump Trademarks in 2016*, N.Y. Times (June 18, 2017), https://www.nytimes.com/2017/06/18/us/politics/russia-trump-trademarks.html ("The extension of trademarks such as 'Trump International Hotel and Tower' protects his brand in that country and preserves conditions for potential business deals."); *see also* Kevin G. Hall & Ben Wieder, *Trump Dreamed of His Name on Towers Across Former Soviet Union*, McClatchy (June 28, 2017), http://www.mcclatchydc.com/news/nation-world/national/article158518589.html.

[139] Rosalind S. Helderman, *Here's What We Know About Donald Trump and His Ties to Russia*, Wash. Post (July 29, 2016), https://www.washingtonpost.com/politics/heres-what-we-know-about-donald-trump-and-his-ties-to-russia/2016/07/29/1268b5ec-54e7-11e6-88eb-7dda4e2f2aec_story.html?utm_term=.d25e09c907e7.

was appointed by President Duterte to serve as a top trade envoy to the United States.[140]

69.74.   As Defendant makes countless other foreign policy decisions, he may similarly be influenced by how those decisions will affect his business pursuits.  And because Defendant is not coming to Congress and identifying the emoluments he wishes to accept, the American people will have no way of knowing whether his actions as President reflect only his beliefs about what is best for the country, or whether they are partly motivated by personal financial considerations.  For instance, when Defendant publicly advocated during the presidential campaign for a ban on Muslims entering the United States, Turkish President Recep Tayyip Erdogan called for Defendant's name to be removed from the Trump Towers Istanbul, two high-rises containing offices and luxury apartments, connected by a shopping mall.  But after Defendant subsequently defended Erdogan's suppression of political dissidents, "the calls for the renaming of the Trump Towers Mall ended."[141]   Defendant himself has acknowledged that he has "a little conflict of interest" regarding Turkey because "I have a major, major building in Istanbul."[142]

70.75.   To avoid even the possibility that conflicts of interest like these would harm the American people by compromising the judgment of their leaders, the Founders laid down the strict prohibitions of the Foreign Emoluments Clause.

**B.    Plaintiffs' Injuries**

71.76.   The text of the Foreign Emoluments Clause expressly assigns members of Congress

---

[140] Drew Harwell & Matea Gold, *While in White House, Trumps Remained Selling Points for 'Very Special' Philippines Project*, Wash. Post (May 2, 2017), https://www.washingtonpost.com/politics/while-in-white-house-trumps-remained-selling-points-for-very-special-philippines-project/2017/05/02/09ee6164-2e99-11e7-9dec-764dc781686f_story.html?utm_term=.b60fdfde5a42.

[141] Paddock et al., *supra* note 106116.

[142] Harwell & Narayanswamy, *supra* note 122133.

a role in regulating federal officeholders' acceptance of emoluments from foreign states.  By providing that persons holding an "Office of Profit or Trust" under the United States may accept such "Emolument[s]" with, and only with, "the Consent of the Congress," the Constitution makes clear that members of Congress must have the opportunity to cast a binding vote that gives or withholds their "Consent" before the President or any other federal officeholder accepts a foreign "Emolument."

72.77.  Since taking office, Defendant has accepted, or necessarily will accept, numerous emoluments from foreign states.

73.78.  Congress has not consented to Defendant's acceptance of any of the emoluments that he has received or will be receiving in the future.

74.79.  Although the Foreign Emoluments Clause places on federal officeholders who wish to accept "Emolument[s]" the burden of seeking "the Consent of the Congress," Defendant has never sought Congress's consent for his acceptance of these foreign emoluments.

75.80.  Similarly, Defendant has not provided Congress with any information about the foreign emoluments he has accepted or the transactions that produced them.

76.81.  Defendant's refusal to seek Congress's consent and provide information about the foreign emoluments he is accepting makes it impossible for Plaintiffs to evaluate the unique circumstances of each emolument and decide, on a case-by-case basis, whether any of those specific emoluments should be approved.

77.82.  By accepting emoluments without "the Consent of the Congress," Defendant has violated the Foreign Emoluments Clause.  In the process, Defendant has deprived Plaintiffs of their ability to vote on which emoluments he, as a federal officeholder, may accept.  When legislators'

votes are "completely nullified" or "deprived of all validity,"[143] they may seek judicial redress to "have their votes given effect."[144]  Such nullification occurs both where a previously cast vote has been unlawfully disregarded and where, as here, legislators are unlawfully denied an "opportunity to cast a binding vote" in the first place.[145]  By refusing to seek Plaintiffs' consent as constitutionally required, "[t]he President's action has deprived them of this opportunity completely, in the sense that they have no legislative power to exercise an equivalent voting opportunity."[146]  Plaintiffs thus have "a plain, direct and adequate interest in maintaining the effectiveness of their votes" on whether consent should be given to Defendant's acceptance of foreign emoluments.[147]

 78. 83.  Without a judicial order, Plaintiffs cannot force Defendant to obey the Constitution's text by seeking their consent before accepting such foreign emoluments.  The

---

[143] *Raines v. Byrd*, 521 U.S. 811, 822-23 (1997).

[144] *Coleman v. Miller*, 307 U.S. 433, 438 (1939); *see Kennedy v. Sampson*, 511 F.2d 430, 436 (D.C. Cir. 1974) (recognizing legislator's standing "to vindicate the effectiveness of his vote" after "an illegal nullification" by the executive branch).

[145] *Goldwater v. Carter*, 617 F.2d 697, 702-03 (D.C. Cir. 1979) (en banc) (recognizing standing where President's action "deprived each individual Senator of his alleged right to cast a vote" on whether to terminate a treaty), *vacated on other grounds*, 444 U.S. 996 (1979); *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663, 2665 (2015) (recognizing standing where action that "strips the Legislature of its alleged prerogative to initiate redistricting" would "completely nullify any vote by the Legislature, now or in the future," on that topic (brackets and quotation marks omitted)); *Moore v. U.S. House of Representatives*, 733 F.2d 946, 949 (D.C. Cir. 1984) (recognizing standing where members of the House of Representatives were allegedly denied their constitutional prerogative "to originate bills for raising revenues"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982) (recognizing standing where legislator was allegedly deprived by the executive branch of his "statutory right to participate in the legislative process"); *cf. Raines*, 521 U.S. at 824 (denying standing because legislators could not claim that the statute they were challenging "will nullify their votes in the future").

[146] *Goldwater*, 617 F.2d at 703.

[147] *Coleman*, 307 U.S. at 438.

declarative and injunctive relief that Plaintiffs are seeking would redress this injury by ensuring that Defendant accepts no "present, Emolument, Office, or Title" from any "foreign State" without first giving them an opportunity to vote on whether to provide their consent.

## V.
## CLAIMS

### COUNT I
### Violations of the Foreign Emoluments Clause
### (Declaratory Relief)

~~79.~~84.  Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph of this Complaint as if set forth here in full.

~~80.~~85.  There is an actual controversy between Plaintiffs and Defendant as to the meaning of the Foreign Emoluments Clause and its application to Defendant and his conduct.  Specifically, Plaintiffs allege that Defendant, by virtue of his continuing ownership of vast business interests around the world, has been, or necessarily soon will be, accepting emoluments from foreign states. Because Defendant has not sought and received the consent of Congress, he is in violation of the Foreign Emoluments Clause.  Defendant, through his personal attorney, has indicated that he disagrees with these allegations, believing instead that "[t]he Constitution does not require [Defendant] to do anything here."[148]

~~81.~~86.  Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201.  A declaration resolving the actual controversy between Plaintiffs and Defendant will aid in the resolution of legal issues in this action.  Without this relief, Plaintiffs will continue to suffer injury.

### COUNT II
### Violations of the Foreign Emoluments Clause
### (Injunctive Relief)

---

[148] *Donald Trump's News Conference: Full Transcript and Video*, *supra* note ~~72~~73.

82.87.  Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph of this Complaint as if set forth here in full.

83.88.  Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause.

84.89.  The Foreign Emoluments Clause prohibits "Person[s] holding any Office of Profit or Trust" under the United States from accepting "present[s]" or "Emolument[s] . . . of any kind whatever"—that is, anything of value and any benefits, monetary or nonmonetary—from "any King, Prince, or foreign State," without "the Consent of the Congress."

85.90.  As described more fully in paragraphs 34-62 herein, Defendant has committed and, absent this Court's intervention, will continue to commit violations of the Foreign Emoluments Clause because he has accepted, or necessarily will accept, emoluments"Emolument[s]" from foreign states without obtaining the consent of Congress.

86.91.  By accepting emoluments"Emolument[s]" from foreign states without obtaining the consent of Congress, Defendant has denied each Plaintiff the opportunity to cast binding votes on whether to provide his or her consent to Defendant's acceptance of these individual emoluments."Emolument[s]."

87.92.  Plaintiffs are entitled to injunctive relief to stop the above-mentioned injury, and this Court has the power to grant such relief pursuant to its inherent ability to grant equitable relief and pursuant to 28 U.S.C. § 1331.  Such relief would order Defendant not to accept "any present, Emolument, Office, or Title, of any kind whatever" from a foreign state without obtaining "the Consent of the Congress," thus ensuring that individual members of Congress have the opportunity to vote on a case-by-case basis whether to give their consent, as the Constitution requires.

**VI.**
**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in Plaintiffs' favor and against Defendant, consisting of:

(a)    A declaratory judgment stating that:

    (1) Defendant is a "Person holding any Office of Profit or Trust" within the meaning of the Foreign Emoluments Clause;

    (2) the Foreign Emoluments Clause prohibits any "Person holding any Office of Profit or Trust" from accepting any benefits of value, monetary or nonmonetary, from "any King, Prince, or foreign State";

    (3) the phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof; and

    (4) by accepting ~~emoluments~~"Emolument[s]" from foreign states without first seeking and obtaining "the Consent of the Congress," Defendant is violating the Foreign Emoluments Clause;

(b)    Injunctive relief, enjoining Defendant from accepting ~~emoluments~~"Emolument[s]" from foreign states without first obtaining the consent of Congress; and

(c)    Such other and further relief as this Court may deem just and proper.

Dated: ~~June 14~~August 15, 2017

CONSTITUTIONAL ACCOUNTABILITY CENTER

By: */s/ Brianne J. Gorod*
    Brianne J. Gorod

    Elizabeth B. Wydra (DC Bar No. 483298)
    Brianne J. Gorod (DC Bar No. 982075)

**Formatted:** Font: Italic

Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W.
Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org