**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 17-cv-1154-EGS |
| DONALD J. TRUMP, in his official capacity as President of the United States, | |
| *Defendant*. | |

**STATEMENT OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................4

ARGUMENT ....................................................................................................................5

I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIM ........................5

    A.    Plaintiffs Have Failed to Allege a Judicially Cognizable Injury Under
        Supreme Court and D.C. Circuit Precedent ............................................................6

    B.    *Coleman v. Miller* and pre-*Raines* D.C. Circuit Precedent are Inapposite ............10

II.   PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE FOREIGN
     EMOLUMENTS CLAUSE AND EQUITY REQUIRES DISMISSAL ..........................14

III.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE FOREIGN
     EMOLUMENTS CLAUSE .........................................................................................18

    A.    The Foreign Emoluments Clause Prohibits Benefits Arising from the U.S.
        Official's Provision of Service Pursuant to an Office or Employment ................18

        1.    The text of the Foreign Emoluments Clause...............................................19

        2.    Adoption and historical interpretation of the Clause ................................25

            i.    Adoption of the Foreign Emoluments Clause................................25

            ii.   Historical interpretation of the Clause ..........................................28

        3.    Application of the Clause since the Founding Era.....................................32

    B.    Plaintiffs' Arguments in Support of Their Interpretation Have No Merit ............37

IV.   THE RELIEF SOUGHT BY PLAINTIFFS IS UNCONSTITUTIONAL ........................41

CONCLUSION................................................................................................................43

# TABLE OF AUTHORITIES

**CASES**                                                                           **PAGE(S)**

*Air Courier Conf. of Am. v. Am. Postal Workers Union*,
    498 U.S. 517 (1991) ............................................................................................. 16

*Allen v. Wright*,
    468 U.S. 737 (1984) ............................................................................................... 7

*American Federation of Government Employees v. Pierce*,
    697 F.2d 303 (D.C. Cir. 1982) ............................................................................ 12

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
    135 S. Ct. 2652 (2015) ......................................................................................... 12

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ............................................................................. 14, 15, 23

*Beecham v. United States*,
    511 U.S. 368 (1994) ............................................................................................. 21

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) .................................................................. 2, 11, 12

*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999) ........................................................... 2, 9, 10, 13

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................... 6

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ............................................................................................. 17

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................................. 43

*Coleman v. Miller*,
    307 U.S. 433 (1939) ............................................................................................. 10

*Ctr. for Reprod. Law & Policy v. Bush*,
    304 F.3d 183 (2d Cir. 2002) ............................................................................... 16

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ............................................................................................... 6

*Dole v. United Steelworkers of Am.*,
494 U.S. 26 (1990) ............................................................................................... 21

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
565 U.S. 606 (2012) ............................................................................................. 16

*E. Tenn. Nat. Gas Co. v. Sage*,
361 F.3d 808 (4th Cir. 2004) .............................................................................. 16

*eBay, Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ............................................................................................. 15

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) .............................................................................. 4

*Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*,
153 F. Supp. 3d 338 (D.D.C. 2016) ................................................................. 5, 6

*Flast v. Cohen*,
392 U.S. 83 (1968) .................................................................................................. 7

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................................. 4, 41, 42, 43

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (1992) ............................................................................................. 15

*Goldwater v. Carter*,
444 U.S. 996 (1979) ...................................................................................... 11, 14

*Goldwater v. Carter*,
617 F.2d 697 (D.C. Cir. 1979) ............................................................................ 14

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) .............................................................................. 5

*Harrington v. Bush*,
553 F.2d 190 (D.C. Cir. 1977) ............................................................................ 12

*Holmes v. Jennison*,
39 U.S. 540 (1840) ............................................................................................... 24

*Hoyt v. United States*,
51 U.S. 109 (1850) ............................................................................................... 19

*INS v. Chadha*,
   462 U.S. 919 (1983) ............................................................................................ 9

*Int'l Refugee Assistance Project v. Trump*,
   857 F.3d 557 (4th Cir. 2017), *cert. granted,* 137 S. Ct. 2080 (2017) ...................................... 42

*Jarecki v. G.D. Searle & Co.*,
   367 U.S. 303 (1961) .......................................................................................... 23

*Jerome Stevens Pharm., Inc. v. FDA*,
   402 F.3d 1249 (D.C. Cir. 2005) ............................................................................ 6

*Loving v. United States*,
   517 U.S. 748 (1996) ...................................................................................... 4, 43

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................... 6, 7

*Marbury v. Madison*,
   5 U.S. 137 (1803) .......................................................................................... 24

*Massachusetts v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004) .......................................................................... 15

*McCulloch v. Maryland*,
   17 U.S. 316 (1819) ........................................................................................ 18

*McLean v. United States*,
   226 U.S. 374 (1912) ...................................................................................... 20

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
   774 F.3d 895 (6th Cir. 2014) ........................................................................ 14, 15

*Mississippi v. Johnson*,
   71 U.S. 475 (1866) ...................................................................................... 3, 41

*Mistretta v. United States*,
   488 U.S. 361 (1989) ...................................................................................... 18

*Moore v. U.S. House of Representatives*,
   733 F.2d 946 (D.C. Cir. 1984) ........................................................................ 2, 13

*Morrison v. Work*,
   266 U.S. 481 (1925) ...................................................................................... 15

*Nev. Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ................................................................................................ 8

*Newdow v. Roberts*,
  603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 42

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ............................................................................................... 42

*Nixon v. United States*,
  506 U.S. 224 (1993) ............................................................................................... 23

*NLRB v. Noel Canning*,
  134 S. Ct. 2550 (2014) .......................................................................................... 18

*Raines v. Byrd*,
  521 U.S. 811 (1997) ....................................................................................... *passim*

*Rodriguez v. United States*,
  480 U.S. 522 (1987) ............................................................................................... 38

*Sanchez-Espinoza v. Reagan*,
  770 F.2d 202 (D.C. Cir. 1985) ........................................................................... 15

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) ................................................................................................. 8

*Schmidt v. U.S. Capitol Police Bd.*,
  826 F. Supp. 2d 59 (D.D.C. 2011) ...................................................................... 6

*Small v. United States*,
  544 U.S. 385 (2005) ............................................................................................... 38

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...................................................................................... 6, 8

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) ........................................................................... 42

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
  484 U.S. 365 (1988) ............................................................................................... 23

*United States v. Ballin*,
  144 U.S. 1 (1892) .................................................................................................... 17

*United States v. Hartwell*,
  73 U.S. 385 (1867) ................................................................................................ 19

*United States v. Hill*,
  120 U.S. 169 (1889) .............................................................................................. 20

*United States v. Palmer*,
  16 U.S. 610 (1818) ................................................................................................ 38

*United States v. Ripley*,
  32 U.S. 18 (1833) .................................................................................................. 19

*United States v. Stevens,*
  559 U.S. 460 (2010) .............................................................................................. 23

*United States v. Windsor*,
  133 S. Ct. 2675 (2013) ............................................................................................ 8

*Va. Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) .............................................................................................. 16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .......................................................................................... 7, 16

*Virginia v. Tennessee*,
  148 U.S. 503 (1893) .............................................................................................. 23

*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................................. 16

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) .............................................................................................. 15

*Williams* v. Taylor,
  529 U.S. 362 (2000) .............................................................................................. 24

## STATUTES

5 U.S.C. § 115 ........................................................................................................... 34

5 U.S.C. § 7341 ......................................................................................................... 34

5 U.S.C. § 7342 ......................................................................................................... 34

10 U.S.C. § 1060 ....................................................................................................... 37

22 U.S.C. § 3641 ................................................................................................................ 37

37 U.S.C. § 908 .................................................................................................................. 37

1 Stat. 130 (1790) ............................................................................................................... 30

Pub. L. No. 97-295, 96 Stat. 1287 (1982) ........................................................................ 37

Pub. L. No. 89-554, § 7341, 80 Stat. 378, 526–27 (1966) ............................................... 34

An act authorizing the persons therein named to accept of certain decorations and
   presents therein named, from foreign governments, and for other purposes,
   ch. 32, § 3, 21 Stat. 603 (1881) ................................................................................... 33

An Act for allowing a Compensation to the President and Vice President of the United States,
   1 Stat. 72 (1789) .......................................................................................................... 20

National Defense Authorization Act for Fiscal Year 1994,
   Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834 .................................................. 37

Panama Canal Commission Authorization Act for Fiscal Year 1994,
   Pub. L. No. 103-160, tit. XXXV, § 3504, 107 Stat. 1547, 1965 (1993) ................... 37

Thirty-Day Embargo,
   1 Stat. 400 (1794) ........................................................................................................ 29

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6, cl. 2 .............................................................................................. 22

U.S. Const. art. I, § 9, cl. 8 ...................................................................................... 1, 17, 18

U.S. Const. art. I, § 10, cl. 3 ............................................................................................ 23

U.S. Const. art. II, § 1, cl. 7 ....................................................................................... 21, 30

## FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(1) ................................................................................................................. 5, 6

Rule 12(b)(6) ..................................................................................................................... 6

## CONGRESSIONAL MATERIALS

1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802)
   https://memory.loc.gov/ammem/amlaw/lwsplink.html ........................................... 19

2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818)
   https://memory.loc.gov/ammem/amlaw/lwsplink.html ........................................... 32

8 Annals of Cong. 1582–93 (1798)........................................................................... 33

20 Annals of Cong. 672 (1810)................................................................................. 32

21 Annals of Cong. 2050–51 (1810) ........................................................................ 32

159 Cong. Rec. S5,116-22 (daily ed. June 25, 2013) ................................................. 40

*Confirmation of Nelson A. Rockefeller as Vice President of the United States*,
   H.R. Rep. No. 93-1609 (1974)............................................................................ 39

H.R. Rep. No. 23-302 (1834)................................................................................... 33

H.R.J. Res. 26, 115th Cong. (2017) ............................................................................ 1

*Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*,
   S. Exec. Doc. No. 93-34 (1974)......................................................................... 39

*Nomination of Penny Pritzker to be Secretary of the U.S. Department of Commerce: Hearing
   Before the S. Comm. on Commerce, Science, and Transportation*,
   Hrg. 113-619, 113th Cong. (2013) ..................................................................... 40

Proposing an Amendment to the Constitution,
   S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) ........................................................ 32

S. Con. Res. 8, 115th Cong. (2017) ........................................................................... 1

S. Exec. Doc. No. 23-49 (1834)............................................................................... 33

S. Exec. Doc. No. 37-23 (1862) .............................................................................. 33

## OFFICE OF COMPTROLLER GENERAL OPINIONS

*Assistant Comptroller General Weitzel to the Attorney General*,
   34 Comp. Gen. 331 (1955) .................................................................................. 36

*Dr. R. Edward Bellamy, USPHS, Ret.*,
  B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978) .......................................... 35

*Major Stephen M. Hartnett, USMC, Ret.*,
  65 Comp. Gen. 382 (1986) ................................................................................. 35

*Retired Marine Corps Officers*,
  B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) .................................... 35

*The Honorable George J. Mitchell U.S. Senate*,
  B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ..................................... 35

*To C.C. Gordon, USCG*,
  44 Comp. Gen. 130 (1964) ................................................................................. 35

*To Mr. Harvey E. Ward, USCG, Ret.*,
  B-154213, 1964 WL 1865 (Comp. Gen. Dec. 281, 1964) .................................... 35

*To N.R. Breningstall, Dep't of the Air Force*,
  53 Comp. Gen 753 (1974) .................................................................................. 35

*To the Secretary of Health, Educaction and Welfare*,
  51 Comp. Gen. 780 (1972) ................................................................................. 35

*To the Secretary of the Air Force*,
  49 Comp. Gen. 819 (1970) ................................................................................. 35

## ATTORNEY GENERAL OPINIONS

*Foreign Diplomatic Commission*,
  13 Op. Att'y Gen. 537 (1871) ...................................................................... 34, 35

*Marshal of Florida*,
  6 Op. Att'y Gen. 409 (1854) ........................................................................ 34, 35

## OFFICE OF LEGAL COUNSEL OPINIONS

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts
  and Decorations Act*,
  6 Op. O.L.C. 156 (1982) ................................................................................... 35

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear
  Regulatory Commission*,
  10 Op. O.L.C. 96 (1986) ................................................................................... 34

*Applicability of Emoluments Clause Employment of Government Employees by
    Foreign Public Universities*,
    18 Op. O.L.C. 13 (1994) ..................................................................... 39

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*,
    17 Op. O.L.C. 114 (1993) ................................................................... 36

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from
    J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of
    Compensation to Individual in Receipt of Compensation from a Foreign Government*
    (Oct. 4, 1954), https://www.justice.gov/olc/page/file/935721/download ................................ 36

Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant
    Attorney General,
    2010 WL 2516024 (June 3, 2010) ........................................................ 36

*President Reagan's Ability to Receive Retirement Benefits from the State of California*,
    5 Op. O.L.C. 187 (1981). ..................................................................... 35

## HISTORICAL MATERIALS

*A Complete Dictionary of the English Language* (2d ed. 1789) ................................... 23

1 *A Digest of the International Law of the United States*
    (Francis Wharton ed., 1886) ...................................................... 25, 32, 33

*A New General English Dictionary* (18th ed. 1754) ................................... 23

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) ........... 20, 22, 25

Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793),
    http://founders.archives.gov/documents/Washington/05-14-02-0074 ..................................... 30

4 *Revolutionary Diplomatic Correspondence of the United States*
    (Francis Wharton ed., 1889) ........................................................ 26

George Cochrane Hazelton, *The National Capitol* (1894) ......................................... 30

George Taylor, Arrangements between English and Southern Merchants (June 1790),
    http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003 ................................. 29

James Madison, *The Debates in the Federal Convention of 1787 Which Framed
    the Constitution of the United States of America*
    (Gaillard Hunt & James Brown Scott eds., 1920) ........................................ 25, 27, 31

1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* (1766) ................................ 22

1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891)......................................................................... 27, 31

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891)............................................................. 17, 26, 27, 31

18 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1910) ....................... 26

23 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1914) ....................... 19

30 *Journals of the Continental Congress, 1774–1789* (John C. Fitzpatrick ed., 1934)............... 27

Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068 ........ 30

Letter from George Washington to Bushrod Washington (July 27, 1789), http://founders.archives.gov/documents/Washington/05-03-02-0189..................................... 31

Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790), http://founders.archives.gov/documents/Washington/05-04-02-0363.............. 31

Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289 .......... 30

Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159.................................. 29

Letter from George Washington to James Madison (May 5, 1789), http://founders.archives.gov/documents/Washington/05-02-02-0157..................................... 31

Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050..................................... 29

Letter from George Washington to William Pearce (Apr. 20, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0488..................................... 29

Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794), https://founders.archives.gov/documents/Washington/05-15-02-0331 ................................... 31

Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111..................................... 29

Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790),
  http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003 ............................... 27

President George Washington, Inaugural Address of 1789 (Apr. 30, 1789),
  https://www.archives.gov/exhibits/american_originals/inaugtxt.html .................................... 20

*The Federalist* No. 73 (Jacob E. Cooke ed., 1961)........................................................................ 28

5 *The Papers of James Monroe* (Daniel Preston ed., 2014) ......................................................... 29

Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign
  Governments, ca. 1791,
  http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004 .......................... 26, 27

## SECONDARY AUTHORITIES

Akhil Amar, *America's Unwritten Constitution* (2012) ................................................................. 31

Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* (1991) ................................................... 29

Bruce Chadwick, *James & Dolley Madison* (2014) ...................................................................... 29

Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and
  Bibliographic Nightmare*, 88 L. Lib. J. 121 (1996) ................................................................... 32

David O. Stewart, *Madison's Gift* (2015) ..................................................................................... 29

6 Douglas Southall Freeman, *George Washington: A Biography* (1954) ..................................... 28

Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. &
  Biography 251 (1993) .................................................................................................................. 29

Leonard D. White, *The Federalists: A Study in Administrative History* (1st ed. 1948) ......... 19, 28

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American
  Government, 1780-1940* (2013).................................................................................................. 26

Restatement (Third) of the Law Governing Lawyers § 123, cmt. b ............................................. 36

Robert A. Nowlan, *The American Presidents, Washington to Tyler* (2012) ............................... 29

Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National
  Experience*, 32 The Historian 376 (1970)................................................................... 25, 26, 33

Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic
Site Historic Resource Study* (Aug. 2000),
https://www.nps.gov/chpi/learn/historyculture/ upload/CHPI_HRS.pdf ................................ 28

11 *The Works of Thomas Jefferson* (Paul Leicester Ford ed., 1905) ............................................ 29

**OTHER AUTHORITIES**

Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/ ................................... 39

Black's Law Dictionary (10th ed. 2014) .................................................................................... 22

Donald Trump's News Conference: Full Transcript and Video,
N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8) .................................................... 4

Form 10-K of Hyatt Hotels Corporation (2016), *available at*
http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/
Hyatt-Q4-2016-Form-10-K.pdf ........................................................................................ 39

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) ........................................... 36

National Park Service, Ash Lawn-Highland,
https://www.nps.gov/nr/travel/journey/hig.htm (last visited Sept. 15, 2017) ........................ 29

National Park Service, *Historic Jamestown, Tobacco: Colonial Cultivation Methods*,
https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-
methods.htm (last visited Sept. 15, 2017) ............................................................................. 29

National Register of Historic Places Registration Form, George Washington's
Gristmill, § 8, p. 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/
029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf ............................ 29

Oxford English Dictionary, Oxford University Press, *Emolument*, OED Online
(Dec. 2016), http://www.oed.com/view/Entry/61242 ............................................................. 22

Oxford English Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016),
http://www.oed.com/view/Entry/150677 .............................................................................. 25

Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en ........................................... 39

Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics,
Financial Disclosure, https://www.oge.gov .......................................................................... 40

Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016,
*available at* Office of Government Ethics, Financial Disclosure,
https://www.oge.gov/ ............................................................................................................. 39

*Ten Facts about the Gristmill*, George Washington's Mount Vernon, at Fact 9,
   http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill
   (last visited Sept. 15, 2017)......................................................................................................... 29

University of Melbourne, Library Catalog, http://library.unimelb.edu.au/ ................................. 39

University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en ........................................... 39

# INTRODUCTION

Two hundred and one minority Members of the United States Senate and United States House of Representatives bring this suit seeking the extraordinary relief of a declaration and an injunction against the sitting President of the United States for alleged violations of the Foreign Emoluments Clause of the Constitution.  That Clause prohibits federal officials holding "Office[s] of Profit or Trust" from "accept[ing] of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without "the Consent of the Congress."  U.S. Const. art. I, § 9, cl. 8.  Many of the Plaintiffs are sponsors of bills seeking either to declare that the President potentially has violated the Clause, *see* S. Con. Res. 8, 115th Cong. (2017), or to withhold consent for the President's alleged violations of the Clause, *see* H.R.J. Res. 26, 115th Cong. (2017).  None of the bills has come to a vote, nor has the President done anything to prevent Congress from holding a vote.  Plaintiffs could not convince their own colleagues in Congress to take the actions they desired, and now seek the aid of the Judiciary to circumvent the legislative process prescribed by the Constitution.

Plaintiffs' claim falters on threshold grounds: they have not alleged a judicially cognizable injury that would support this Court's exercise of Article III jurisdiction.  They allege that they have been denied "their constitutional prerogative to authorize or reject the specific emoluments [the President] is accepting" by the President's refusal to first seek the consent of the Congress.  Am. Compl. ¶ 41, ECF No. 14.  Even assuming arguendo that the President were required to obtain consent in these circumstances and that his failure to do so somehow deprived Plaintiffs' of their ability to vote on the issue (which it would not), it is a foundational principle that the denial of institutional legislative prerogative is not a judicially cognizable injury.  In *Raines v. Byrd*, the Supreme Court held that legislators do not have Article III standing based on "a claimed injury to official authority or power."  521 U.S. 811, 826 (1997).  A "diminution of legislative power" that "damages all Members of Congress and both Houses of Congress equally," *id.* at 821, the Court held, is not "a sufficiently concrete injury" to give Members of Congress a "personal stake in [the] dispute" with the Executive Branch, *id.* at 830.

D.C. Circuit precedent applying *Raines* similarly establishes that individual legislators have no standing to challenge an Executive action on the theory that the Executive has deprived them of their constitutionally guaranteed right to vote on measures concerning the challenged action. *See Chenoweth v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999). Even when a legislative vote is deemed defeated by Executive action, a legislator still has no standing to sue if Congress retains "ample legislative power" to work its will. *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000). Here, Plaintiffs' claimed injury is "fully susceptible to political resolution" because "'were a sufficient number in each House so inclined,'" Plaintiffs could vote on whether Plaintiffs' allegations constitute violations of the Foreign Emoluments Clause by the President and whether Congress should provide its consent. *Id.* at 21 (quoting *Chenoweth*, 181 F.3d at 116).

Supreme Court and D.C. Circuit precedent therefore squarely forecloses Plaintiffs' attempt to bring the present dispute into a judicial forum. The Supreme Court "ha[s] always insisted on strict compliance with th[e] jurisdictional standing requirement" to "keep[] the Judiciary's power within its proper constitutional sphere." *Raines*, 521 U.S. at 819–20. The Judiciary does not sit "to umpire disputes between [the political] branches regarding their respective powers." *Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring). "Unless and until . . . the resolution of those inter-branch disputes through the system of checks and balances . . . brings forth a result that harms private rights, it is no part of [the Judiciary's] constitutional province." *Id.*

The Amended Complaint is also deficient in several other respects. First, Plaintiffs do not have a cause of action under the Foreign Emoluments Clause to seek the relief requested and this is not an appropriate case to imply a cause of action in equity. Instead, equity requires dismissal for numerous reasons, and this Court should exercise its discretion to do so.

Second, the Amended Complaint fails to state a claim upon which relief can be granted. Plaintiffs' interpretation of the Foreign Emoluments Clause is contrary to the original understanding of the Clause and to historical practice. Plaintiffs read the Clause expansively to

2

cover any benefit derived from any business dealings with a foreign instrumentality by an entity in which the President has a financial interest—including payments for goods, food, hotel stays, licensing agreements, real estate leases, and condominium common charges, and the grant of trademarks, permits, tax credits, and other regulatory benefits.  The term "Emolument" in the Clause, however, refers only to benefits arising from personal service in an employment or equivalent relationship.  The prohibited foreign benefit must be conferred on the covered official in exchange for services rendered by the official in his capacity as such or in a capacity akin to an employee of the foreign government.  This construction accords with relevant historical sources; the practices of public officials ranging from George Washington to Nelson Rockefeller; and Congress's interpretation of the Clause, as evidenced by the various laws by which Congress provided advance consent to arrangements it perceived to be covered by the Clause.  What is more, it is not inconsistent with public determinations rendered by government components charged with determining the Clause's applicability.  Although Plaintiffs also allege that the various foreign benefits arising from commercial transactions or by operation of law also constitute "presents" under the Foreign Emoluments Clause, that interpretation is unnatural and nothing indicates that the Framers would have intended the Clause to be applied in that way.

Finally, the relief sought by Plaintiffs is unconstitutional.  Suing the President in his official capacity, Plaintiffs seek an injunction prohibiting the President from violating the Foreign Emoluments Clause without first obtaining the "Consent of the Congress."  Plaintiffs effectively seek to impose a condition on the President's ability to serve as the President and to carry out the duties he is duly elected to perform.  However, the Supreme Court has long held that courts have no power to issue such injunctions against the President in an official-capacity suit.  *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) (finding "no jurisdiction of a bill to enjoin the President in the performance of his official duties").  Moreover, the requested relief would "distract [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring), when "the separation-of-powers doctrine requires that a branch not impair another

in the performance of its constitutional duties," *Loving v. United States*, 517 U.S. 748, 757
(1996).  Given the President's unique status in the constitutional scheme, the Framers envisioned
only political means to ensure a President's compliance with constitutional provisions such as
the Foreign Emoluments Clause, not official-capacity injunctions against the President.

## BACKGROUND

Plaintiffs are 30 Senators and 171 Representatives, who allege that "[s]ince taking office,
[the President] has accepted, or necessarily will accept, numerous emoluments from foreign
states."  Am. Compl. ¶¶ 1, 77.  They allege that the President owns hundreds of businesses in the
United States and in at least twenty foreign countries, *id.* ¶ 34, and that he violates the Foreign
Emoluments Clause whenever such businesses receive "any monetary or nonmonetary benefit"
from a foreign state without the consent of Congress.  *Id.* ¶ 6; *see also id.* ¶ 89.  Citing the
President's pledge made before taking office that he would donate all profits from foreign
governments' patronage of his hotels and similar businesses to the U.S. Treasury, Plaintiffs
assert that the President has acknowledged "that his businesses receive funds and make a profit
from payments by foreign governments, and that [the businesses] will continue to do so while he
is President."  *See id.* ¶ 37 (citing *Donald Trump's News Conference: Full Transcript and Video*,
N.Y. Times (Jan. 11, 2017), https://www.nytimes.com/2017/01/11/us/politics/trump-press-
conference-transcript.html).[1]

Plaintiffs allege that "it is impossible to determine the full scope of the benefits [the
President] is currently accepting from foreign states," *id.* ¶ 35, but that at least the following
benefits received by the President's businesses are prohibited foreign emoluments: rental
payments for units in the Trump Tower by China and the United Arab Emirates, *id.* ¶¶ 58–59;
foreign-government payments for hotel stays and hotel events at the Trump International Hotel
in Washington, D.C., *id.* ¶¶ 52–57; trademark protections afforded by China and other foreign

---

[1] In determining whether a plaintiff has stated a claim, the Court may consider "documents either
attached to or incorporated in the complaint and matters of which [the Court] may take judicial
notice."  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

governments, *id.* ¶¶ 44–51; royalty payments from foreign-government-owned broadcast stations for the television program "The Apprentice," *id.* ¶¶ 63–65; foreign permits, tax benefits, "favorable policy changes," and other "regulatory benefits" for business ventures abroad, *id.* ¶¶ 66–67; and condominium common charges for units in the Trump World Tower owned by the government of Saudi Arabia, *id.* ¶¶ 60–62.

According to Plaintiffs, "[t]he Constitution expressly demands that [they] be given th[e] opportunity" to decide, "on a case-by-case basis, whether to authorize [the President's] acceptance of particular emoluments from foreign states." *Id.* ¶ 42.  Plaintiffs allege that because the President has refused to seek the consent of Congress, they are injured in their role as Members of Congress in that they are unable to "determine precisely how a given arrangement benefits [the President] or affects the foreign state in question," *id.* ¶ 41, "evaluate the unique circumstances of each emolument," *id.* ¶ 81, or "vote on which emoluments [the President], as a federal officeholder, may accept," *id.* ¶ 82.

Plaintiffs seek an injunction prohibiting the President from violating the Foreign Emoluments Clause without first obtaining the "Consent of the Congress." *Id.* ¶ 92.  They also seek a declaration that the President has violated the Clause.  *Id.* at 57–58 (Prayer for Relief (a)).

## ARGUMENT

## I.    THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIM.

This action should be dismissed for lack of subject matter jurisdiction because Plaintiffs have not met their burden to establish Article III standing.  "A motion to dismiss for lack of standing is properly considered a challenge to the Court's subject matter jurisdiction" and should be reviewed under Rule 12(b)(1).  *Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*, 153 F. Supp. 3d 338, 340 (D.D.C. 2016); *see also Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  To survive a Rule 12(b)(1) motion to dismiss, Plaintiffs "bear[] the burden of establishing jurisdiction by a preponderance of the evidence."  *Ellis*, 153 F. Supp. 3d at 340. "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court 'must scrutinize the plaintiff's allegations more closely . . . than it would under a [Rule 12(b)(6)

motion to dismiss.'"  *Id.* at 341 (quoting *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011)).  Moreover, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### A.    Plaintiffs Have Failed to Allege a Judicially Cognizable Injury Under Supreme Court and D.C. Circuit Precedent.

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies."  The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  One element of this constitutional limitation is that a plaintiff must establish that he has standing to sue.  *Raines*, 521 U.S. at 818.  The requirement is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper*, 568 U.S. at 408.  Because the relaxation of the standing inquiry "is directly related to the expansion of judicial power," *id.* at 408–09, the inquiry is "especially rigorous" when reaching the merits would force the judiciary "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," *id.* at 408.

To establish "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), Plaintiffs must show that they have suffered an injury in fact that is fairly traceable to the defendant's challenged actions and likely to be redressed by the requested relief.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).  The injury must be "legally and judicially cognizable," and the dispute must be one that "is 'traditionally thought to be capable of resolution through the judicial process.'"  *Raines*, 521 U.S. at 819 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)).  The requirement of "actual injury

6

redressable by the court" is to ensure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Moreover, "federal courts may exercise power only in the last resort, and as a necessity." *Allen v. Wright*, 468 U.S. 737, 752 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

Here, Plaintiffs allege that they have been deprived of their constitutional prerogative as Members of Congress to vote on whether to consent to the President's alleged acceptance of prohibited foreign emoluments. *See* Am. Compl. ¶¶ 4–5, 42, 81.[2] But a "dilution of institutional legislative power" would not be a "personal, particularized, concrete, [or] otherwise judicially cognizable" injury sufficient to establish Article III standing. *Raines*, 521 U.S. at 820, 826. In *Raines*, individual Members of Congress brought suit to challenge the Line Item Veto Act, which gave the President the authority to cancel spending provisions in an appropriations bill without vetoing the bill in its entirety. The Members argued that the Act altered "the legal and practical effect" of their votes on "bills containing vetoable items," depriving them of "their constitutional role in the [legislative process]." *Id.* at 816. The district court had held that the Members had standing under D.C. Circuit precedent, which "ha[d] repeatedly recognized Members' standing to challenge measures that affect their constitutionally prescribed lawmaking powers." *Id.* The Supreme Court reversed on direct appeal.[3] It found that the Members' claimed "institutional injury" of "the diminution of legislative power" was "wholly abstract and widely dispersed"

---

[2] Plaintiffs appear to assume that the Constitution imposes an affirmative obligation on a holder of an "Office of Profit or Trust" to seek the consent of Congress whenever the official's private businesses have dealings with foreign states, even when the official does not believe that he is accepting any prohibited emoluments. *See* Am. Compl. ¶¶ 4, 81. The Constitution clearly imposes no such obligation.

[3] Although the plaintiff Members had statutory authority to bring suit, the Court held that the statutory grant of authority "eliminate[d] only prudential standing limitations" and "[could] not erase Article III's standing requirements." *Raines*, 521 U.S. at 820 n.3.

because the injury "necessarily damage[d] all Members of Congress and both Houses of Congress equally." *Id.* at 821, 829. Moreover, the Court held that the Members "d[id] not have a sufficient 'personal stake' in th[e] dispute," *id.* at 830, because the "loss of political power" was not claimed in a "private capacity" but was "solely because they are Members of Congress," *id.* at 821. "If one of the Members were to retire tomorrow," the Court said, "he would no longer have a claim; the claim would be possessed by his successor instead." *Id.*; *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011) ("The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it.").

The Court further determined that the dispute at issue was not "traditionally . . . capable of resolution through the judicial process." *Raines*, 521 U.S. at 819; *see also Spokeo*, 136 S. Ct. at 1547 (the Article III standing doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood"); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) ("Our system of government leaves many crucial decisions to the political processes."). "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed *injury to official authority or power*." *Raines*, 521 U.S. at 826 (emphasis added); *see also United States v. Windsor*, 133 S. Ct. 2675, 2704 (2013) (Scalia, J., dissenting on the merits, with no majority opinion on the standing issue) ("The opinion [in *Raines*] spends three pages discussing famous, decades-long disputes between the President and Congress . . . that would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation. But it does not, and never has.").

Following *Raines*, the D.C. Circuit similarly held that Members of Congress have no standing to challenge Executive action on the basis of claimed injury to their legislative prerogative. In *Chenoweth v. Clinton*, several Members brought suit to challenge a Presidential program after unsuccessful legislative efforts to prevent the program's implementation. 181 F.3d at 113. The Members claimed that the President's establishment of the program through an

Executive Order "deprived them of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving the program. *Id.* The D.C. Circuit held that the alleged injury to the Members' "authority as legislators" was "identical to the injury the Court in *Raines* deprecated as 'widely dispersed' and 'abstract.'" *Id.* at 115 (quoting *Raines*, 521 U.S. at 816). If, as in *Raines*, a statute that allegedly divests the Members of their "constitutional role in the legislative process" does not give them standing to sue, the D.C. Circuit reasoned, "then neither does an Executive Order that allegedly deprives congressmen of their right to participate and vote on legislation in a manner defined by the Constitution." *Id.* (quotations and alteration omitted). Here, the alleged deprivation of Plaintiffs' legislative prerogative to vote on emoluments issues relating to the President is indistinguishable from the claimed injuries in *Raines* and *Chenoweth*.

Finally, there is no plausible allegation that the President somehow has prevented the bills sponsored by some of the Plaintiffs from progressing to a vote, nor any allegation that he has otherwise prevented Congress from holding a vote on the emoluments issue. In fact, Congress is free to vote on the issue pursuant to the "finely wrought and exhaustively considered, procedure" prescribed in Article I, Section 7 of the Constitution. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Congress could, for example, vote on a private bill consenting to the receipt of what it construed to be emoluments received from foreign governments or a joint resolution expressing its disagreement with such receipt. In short, if Plaintiffs wish to vote on whether to consent to the President's alleged violations of the Foreign Emoluments Clause, they must seek redress from their colleagues pursuant to the constitutional scheme. *Cf. Raines*, 521 U.S. at 829 n.11 ("it is far from clear that this injury [of diminution of legislative power] is 'fairly traceable' to [the executive branch officials], as our precedents require, since the alleged cause of [the legislators'] injury is . . . the actions of their own colleagues in Congress in passing the [Line Item Veto] Act"). The President has not deprived Plaintiffs of their ability to vote on the emoluments issue at all. Plaintiffs have alleged no judicially cognizable injury.

9

**B.**     *Coleman v. Miller* **and pre-***Raines* **D.C. Circuit Precedent are Inapposite.**

Plaintiffs nevertheless insist that they have standing under *Coleman v. Miller*, 307 U.S.

433 (1939).  *See* Am. Compl. ¶ 82.  In *Coleman*, a group of state senators had voted against

ratifying an amendment to the Federal Constitution.  Although their votes otherwise would have

been sufficient to defeat ratification because the total votes were tied, the state's Lieutenant

Governor cast a tie-breaking vote in favor of ratification, nullifying their votes.  *Coleman*, 307

U.S. at 441.  The Supreme Court held that the senators had Article III standing because they had

"a plain, direct and adequate interest in maintaining the effectiveness of their votes."  *Id.* at 438.

*Coleman* is inapposite.  As the Supreme Court explained in *Raines*, "*Coleman* stands (at

most . . .) for the proposition that legislators whose votes would have been sufficient to defeat (or

enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or

does not go into effect), on the ground that their votes have been completely nullified."  *Raines*,

521 U.S. at 823.  Here, Plaintiffs do not allege that "the necessary majorities in the Congress

voted" to withhold consent to the President's alleged acceptance of prohibited foreign

emoluments.  *Chenoweth*, 181 F.3d at 117.  In fact, Plaintiffs' proposed bills "never came to a

vote," as was the case in *Chenoweth*.  *Id.* at 113.  Accordingly, "[t]here is a vast difference

between the level of vote nullification at issue in *Coleman* and the abstract dilution of

institutional legislative power that is alleged" here.  *Raines*, 521 U.S. at 826.  To uphold standing

here would require "a drastic extension of *Coleman*," which the Supreme Court "[was]

unwilling" to do in *Raines*.  *Id.*  Neither should this Court.

Moreover, as the D.C. Circuit explained, "the key to understanding the [Supreme]

Court's . . . use of the word nullification" in *Coleman* is the "unusual" and irreversible nature of

a state's decision to ratify a Federal constitutional amendment; once the amendment is deemed

ratified by the state, the senators had "no legislative remedy" to reverse it in the future.

*Campbell*, 203 F.3d at 22–23.  The D.C. Circuit reasoned that this must have been why the

*Raines* Court contrasted the plaintiffs in *Raines* as being unable to "allege[] that the [Line item

Veto Act] would nullify their votes *in the future*."  *Id.* at 23 (quoting *Raines*, 521 U.S. at 824)

(emphasis added).  "[A]fter all, a majority of senators and congressmen could always repeal the Line Item Veto Act." *Id.*  Thus construing *Coleman*, the D.C. Circuit held in *Campbell v. Clinton* that the Members there did not have standing under the "very narrow possible *Coleman* exception to *Raines*" to challenge the President's use of military forces against Yugoslavia, despite the Members having defeated both an authorization for military intervention and a declaration of war.  *Id.*  The Court explained that the Supreme Court did not hold in *Raines* that "the President 'nullifies' a congressional vote and thus legislators have standing whenever the government does something Congress voted against." *Id.* at 22.  Rather, when legislators possess "political tools with which to remedy their purported injury," *id.* at 24, they may not seek the aid of the Judiciary, *id.* at 23.

Here, Plaintiffs have not cast any vote on the President's alleged Foreign Emoluments Clause violations, let alone had their votes deemed defeated.  *See Raines*, 521 U.S. at 824 (plaintiffs "ha[d] not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated").  As noted before, Congress may still choose to vote on the emoluments issue.  For now, "we do not know whether there ever will be an actual confrontation between the Legislative and Executive Branches . . . .  If the Congress chooses not to confront the President, it is not [the Judiciary's] task to do so." *Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Brennan, J., concurring).

*Coleman* is inapposite for another reason.  As the D.C. Circuit has observed, "the federal constitutional separation of powers concerns that underlay the [Supreme Court's] decision in *Raines* (and which [the D.C. Circuit] emphasized in *Chenoweth*) were not present in . . . *Coleman*." *Campbell*, 203 F.3d at 22; *see also Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977) ("A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators.").[4]  This is a significant distinction.  In *Arizona State Legislature v.*

---

[4] Moreover, the state court in *Coleman* had "treated" the state legislator plaintiffs' interest in their votes "as a basis for entertaining and deciding the federal [constitutional] questions,"

*Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), a case also cited by

Plaintiffs, the Supreme Court held that a state legislature had standing to challenge a state

initiative that removed congressional redistricting authority from the state legislature.  The Court

reasoned that the initiative—which amended the state constitution—"would 'completely

nullif[y]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting

plan."  *Id.* at 2665 (quoting *Raines*, 521 U.S. at 823–24).  In so holding, the Court emphasized

that the case before it "does not touch or concern the question whether Congress has standing to

bring a suit against the President" because "[t]here is no federal analogue to Arizona's initiative

power," whereas "a suit between Congress and the President would raise separation-of-powers

concerns."  *Id.* at 2665 n.12.

Plaintiffs also seek to rely on pre-*Raines* D.C. Circuit precedent on legislative standing.

*See* Am. Compl. ¶ 82.  For example, Plaintiffs cite *American Federation of Government

Employees v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982), which held that a Member on the House

Appropriations Committee had standing to challenge an agency's reduction in force because the

agency had failed to seek the prior approval of the Appropriations Committees as required by

statute.  Even assuming *Pierce* remains good law after *Raines*, it is distinguishable because the

D.C. Circuit's holding was predicated on that Member's "statutory right to participate in the

legislative process," which was "unique to members of the Appropriations Committees."  *Id.* at

63.  There is no such unique statutory right here, only the alleged deprivation of legislative

power "[that] necessarily damages all Members of Congress and both Houses of Congress

equally."  *Raines*, 521 U.S. at 721.

Plaintiffs also cite *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir.

1984), in which eighteen Representatives brought suit to challenge the constitutionality of a

statute that they alleged was revenue-raising and thus should have originated in the House as

mandated by the Constitution but was not.  The D.C. Circuit held that the Representatives had

---

*Raines*, 521 U.S. 824 at n.8, and "if the Court . . .  had not taken the case a question of federal
law . . . would remain as decided by the [state] court."  *Campbell*, 203 F.3d at 22.

alleged a cognizable injury to "an interest positively identified by the Constitution." *Id.* at 951–52. Nevertheless, the court held that the district court properly dismissed the complaint as a matter of equitable discretion given the separation-of-powers concerns posed by the suit and the fact that the plaintiffs' "rights [could] be vindicated by congressional repeal of the [offending] statute." *Id.* at 956; *see also id.* ("Congressional actions pose a real danger of misuse of the courts by members of Congress whose actual dispute is with their fellow legislators. We are reluctant to meddle in the internal affairs of the legislative branch."). In other words, "[w]hatever *Moore* gives the Representatives under the rubric of standing, it takes away as a matter of equitable discretion" because of "the separation of powers problems it created." *Chenoweth*, 181 F.3d at 115, 116.

*Moore*'s finding of standing, however, is "untenable in the light of *Raines*," *id.* at 115, which requires that the separation of powers and standing analyses be merged, *see id.* at 116 ("*Raines*, therefore, may not overrule *Moore* so much as require us to merge our separation of powers and standing analyses."). Thus, in *Chenoweth*, where Members of Congress complained that the President's action inflicted an institutional injury upon Congress by circumventing its legislative authority, the D.C. Circuit said that "[a]pplying *Moore*, this court presumably would have found that injury sufficient to satisfy the standing requirement; after *Raines*, however, we cannot." *Id.* at 116.

In sum, Plaintiffs' claim of standing is foreclosed by both Supreme Court and D.C. Circuit precedent, and this case should be dismissed for lack of jurisdiction.[5]

---

[5] Plaintiffs also cite *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir. 1979) (en banc), in which the D.C. Circuit found that the plaintiff Senators had standing to challenge the President's intent to terminate a treaty on the basis that they were denied the right to be consulted and to vote on treaty termination. *Id.* at 701. The Supreme Court, however, vacated the D.C. Circuit's judgment without oral argument and ordered the case to be remanded to this Court with direction to dismiss the complaint. *Goldwater v. Carter*, 444 U.S. 996 (1979) (per curiam). Although there was no majority opinion, six justices found the case not justiciable, with reasoning applicable to the present case. *See, e.g.*, *id.* at 996 (Powell, J., concurring) ("The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse. Otherwise, we would encourage small

## II.    PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE FOREIGN EMOLUMENTS CLAUSE AND EQUITY REQUIRES DISMISSAL.

Plaintiffs' claim should also be dismissed because they lack a cause of action to seek relief against Defendant under the Foreign Emoluments Clause.  The Clause is designed to prevent foreign influence by setting forth a rule of conduct for federal officeholders in dealings with foreign governments.  While it has a significant role in ensuring good governance, it is not a source of federal rights such that the Court may imply a cause of action under the Clause.  *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (Supremacy Clause not "a source of any federal rights" because it simply "instructs courts what to do when state and federal law clash" and thus, does not create a private right of action allowing "affected parties a constitutional . . . right" to enforce federals laws against States); *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) ("Private parties who act in compliance with federal law may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws . . .  But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*.") (citations omitted).

To be sure, the Supreme Court has indicated that "relief may be given in a court of equity" to enjoin unconstitutional actions by public officials.  *Armstrong*, 135 S. Ct. at 1384 (citation omitted); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).  But such ability to enjoin officials' unconstitutional actions is available only in "a proper case," *Armstrong*, 135 S. Ct. at 1384, which makes sense because the relief is a "judge-made remedy," *id.*, and "[t]he decision to grant or deny [] injunctive relief is an act of

---

groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict."); *id.* at 998 (Brennan, J., concurring) ("In the present posture of this case, we do not know whether there ever will be an actual confrontation between the Legislative and Executive Branches . . . .  It cannot be said that either the Senate or the House has rejected the President's claim.  If the Congress chooses not to confront the President, it is not our task to do so."); *id.* at 1003 (Rehnquist, J., concurring) ("the controversy in the instant case is a nonjusticiable political dispute that should be left for resolution by the Executive and Legislative Branches of the Government").

equitable discretion by the district court." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). That is, the relief is not granted as a matter of right but is subject to the court's "broad discretionary power to withhold equitable relief as it reasonably sees fit." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1214 (D.C. Cir. 2004); *Morrison v. Work*, 266 U.S. 481, 490 (1925) (an injunction "is an extraordinary remedial process, which is granted, not as a matter of right, but in the exercise of a sound judicial discretion"); *see, e.g.*, *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (suit seeking declaratory and injunctive relief in litigation involving the conduct of U.S. diplomatic relations with a foreign state; concluding that "[w]hether or not this is . . . a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all, we think it at least requires the withholding of discretionary relief").

Here, the circumstances do not support a cause of action in equity. First, Plaintiffs are not preemptively asserting a defense to a potential enforcement action against them by the Government, which is the paradigmatic situation where implied equitable claims against the Government have been recognized. *See*, *e.g.*, *Free Enter. Fund*, 561 U.S. at 487 (accounting firms subject to pervasive regulatory control by regulatory entity brought suit after a formal investigation of one of the firms was initiated); *Mich. Corr. Org.*, 774 F.3d at 906 (explaining that for plaintiffs in the pre-enforcement context, "an existing cause of action for that relief exists: an equitable anti-suit injunction," and "[a]s classically understood, anti-suit injunctions permit potential defendants in legal actions to raise in equity a defense available at law"); *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting) (rejecting, while answering a question not addressed by the majority, a putative equitable cause of action under the Supremacy Clause because "the respondents are not subject to or threatened with any enforcement proceeding like the one in *Ex parte Young*"); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (*Ex parte Young* "was nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law.").

15

Second, equity "may not be used to create new substantive rights," *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) (citing *Hedges v. Dixon Cty.*, 150 U.S. 182, 192 (1893)), and the Foreign Emoluments Clause does not create any personal or judicially enforceable rights.  Quite aside from that fact, the injury asserted by Plaintiffs does not fall within even the generalized zone of interests of the Clause.  The zone of interests test "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  *Warth v. Seldin*, 422 U.S. 490, 500 (1975).  Thus, even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint."  *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991) (emphasis in original) (citation omitted); *Valley Forge Christian Coll.*, 454 U.S. at 475 (test applies to claims under the Constitution); *see, e.g.*, *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 195–96 (2d Cir. 2002) (Sotomayor, J.) (plaintiffs' alleged injury did not fall within the zone of interests protected by the Due Process Clause because their "harm is derivative of" due process-type harms and concerns First Amendment interests).  The Supreme Court has also indicated that the zone of interests test may be even more rigorous when a plaintiff is asserting an implied cause of action rather than relying on the "generous review provisions of the APA."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) (citation omitted).

Here, the Foreign Emoluments Clause was intended to guard generally against the corruption of and foreign influence on federal officials.  It is not designed to protect any legislative prerogative that individual Members of Congress may have.  The right of Congress to consent to receipt of emoluments inures only to Congress as a whole, not to its individual Members, and thus Plaintiffs would not be the proper plaintiffs to assert any injury to such a right. *Cf. Raines*, 521 U.S. at 829 ("[w]e attach some importance to the fact that appellees have

not been authorized to represent their respective Houses of Congress in this action"); *United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole."). The fact that Plaintiffs fail to satisfy the zone of interests test thus strongly counsels against implying a cause of action in equity under the Foreign Emoluments Clause here.

Third, Plaintiffs can obtain relief only by suing the President himself, which (if not legally foreclosed, *see infra* Section IV), is at a minimum grounds for extreme equitable restraint. Indeed, because of the President's unique constitutional status, at the Virginia ratifying convention when discussing the Foreign Emoluments Clause being another source of constraint on the President, Edmund J. Randolph, who was the first Attorney General of the United States, mentioned only political means for redressing a President's violation. *See* 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 486 (2d ed. 1891) [hereinafter *Debates in the Several State Conventions*].

Finally, Congress is far better equipped than the courts to address whether particular arrangements violate the Foreign Emoluments Clause. As Plaintiffs themselves have emphasized, the Constitution vests in Congress the power to waive Foreign Emoluments Clause violations, U.S. Const. art. I, § 9, cl. 8, and, as explained below, Congress has exercised that power in deliberating whether to provide consent in specific circumstances. If Congress disagrees with the President (or any other public official) regarding the applicability of the Clause in individual cases, it has ample means for pressing its view. Equity counsels restraint in abrogating a centuries-long tradition of resolving emoluments-related issues through these political processes.

## III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE FOREIGN EMOLUMENTS CLAUSE.

Plaintiffs in any event fail to state a claim upon which relief can be granted.  Plaintiffs' interpretation of the terms "Emolument" and "present" as covering "any monetary or nonmonetary benefit" received by any business in which the President has a financial interest from any foreign government instrumentality exceeds the Foreign Emoluments Clause's intended scope and meaning.  Neither the text nor the history of the Clause shows that the term "Emolument" in the Clause was intended to reach benefits arising from a President's private business pursuits having nothing to do with his service to a foreign power in his capacity as President or in a capacity akin to an employee of the foreign power.  Were Plaintiffs' interpretation correct, Presidents from the very beginning of the Republic, including George Washington, likely would have received prohibited foreign "Emolument[s]."  *Cf. NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) ("in interpreting [a constitutional provision], the Court puts significant weight upon historical practice"); *Mistretta v. United States*, 488 U.S. 361, 401 (1989); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819).

### A.    The Foreign Emoluments Clause Prohibits Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment.

The Foreign Emoluments Clause of the Constitution provides:

> [N]o Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8.  Plaintiffs interpret this text to prohibit the receipt of "anything of value and any benefits, monetary or nonmonetary" from an instrumentality of a foreign government.  Am. Compl. ¶¶ 6, 84; *see also id.* ¶ 23 (citing one eighteenth century dictionary definition of "emolument" as "profit, advantage, benefit, and comfort").  This overbroad definition constitutes Plaintiffs' core legal error.

As explained below, the Foreign Emoluments Clause applies only to the receipt of compensation for services rendered by an official in an official capacity or in an employment (or

equivalent) relationship with a foreign government, and to the receipt of honors and gifts by an officeholder from a foreign government.  It is not a blanket prohibition on commercial transactions with foreign governments by businesses in which the official has a financial interest.

### 1.  The text of the Foreign Emoluments Clause

At the time of the Nation's founding, and in the decades following, an "emolument" was a common characteristic of a federal office, *see United States v. Hartwell*, 73 U.S. 385, 393 (1867), and comprehensively described "every species of compensation or pecuniary profit derived from *a discharge of the duties of the office*," *Hoyt v. United States*, 51 U.S. 109, 135 (1850) (emphasis added).  At the time, most federal officials were not paid salaries in the modern sense.  Leonard D. White, *The Federalists: A Study in Administrative History* 298 (1st ed. 1948) (discussing compensation for federal officials in the early Republic).  Following English precedent and as dictated by contemporary convenience, most federal employees were compensated by fees for services rendered.  *See id.*; *see, e.g.*, 1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802) (schedule of diplomatic consuls' "fees and emoluments").[6]  Their compensation could also include commissions and other privileges and benefits.  *See, e.g.*, 23 *Journals of the Continental Congress, 1774–1789*, at 670 (Gaillard Hunt ed., 1914) (Postmaster General authorized by the Act of 1782, which continued in force after 1789, to fix the fees of postmasters and to allow commissions on the postage received); *Hoyt*, 51 U.S. at 135 (customs collector's "emoluments" included fees for services rendered, commissions on duties, and a share of the fines, penalties, and forfeitures); *United States v. Ripley*, 32 U.S. 18, 18 (1833) (determining whether the "pay and emoluments" to which a military officer's "rank entitled him" included commission on moneys that passed through his hands and were disbursed by him for the supplies of the troops).[7]  The term could also mean salary for the minority of

---

[6] *Available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[7] Federal employees were then required to account for the "fees and emoluments" they received from private individuals for whom they performed services and from the Government if any.  *See United States v. Hill,* 120 U.S. 169, 174 (1889) (reprinting form used to account for all receipts).

officials who did receive one.  George Washington, for example, used the term to refer to his salary in his first inaugural address, when he declined "any share in the personal emoluments, which may be indispensably included in a permanent provision for the Executive Department."[8] *See also McLean v. United States*, 226 U.S. 374, 382 (1912) (army officer's emoluments included salary, pay for two servants, and forage for two horses).

In light of this common usage in the founding era and for many decades thereafter, the term "Emolument" in the Foreign Emoluments Clause should be interpreted to refer to a "profit arising from an office or employ."  *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).  That is, the benefit must be predicated on services rendered in an official capacity or an employment (or equivalent) relationship and be given in exchange for the provision of a service in that relationship.  For example, a federal official would receive an emolument if he or she was paid by a foreign government to take certain official actions.  Similarly, an emolument would also be received if the official became an employee or entered an employment-like relationship with the foreign government, such as if a federal government lawyer provided legal advice and services to a paying foreign power.  In either case, the benefits arising from these transactions would be predicated on the official's rendering of services pursuant to an office or employment.  Thus, they would constitute emoluments.  By contrast, an official does not receive prohibited emoluments where he or she merely receives benefits arising from a foreign government purchasing food or lodging at a hospitality establishment in which the official has a financial interest.

This interpretation is consistent with the nature of the other prohibited categories in the Foreign Emoluments Clause: present, office, and title, which are all things personally conferred or bestowed on a U.S. official holding an "Office of Profit or Trust."  *See Beecham v. United*

---

[8] President George Washington, Inaugural Address of 1789 (Apr. 30, 1789), https://www.archives.gov/exhibits/american_originals/inaugtxt.html.  Congress subsequently set the Presidential salary at $25,000 per year.  *See* An Act for allowing a Compensation to the President and Vice President of the United States, 1 Stat. 72 (1789).

*States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).  Thus, as relevant here, the term "Emolument" covers benefits arising from services the President provides to the foreign state either as President (*e.g.*, making executive decisions favorable to the paying foreign power) or in a capacity akin to an employee of a foreign state (*e.g.*, serving as a consultant to a foreign power).  It does not reach benefits arising from commercial transactions that may be engaged in by businesses in which the President has a financial interest, particularly where the Plaintiffs have not plausibly alleged that the President is using the businesses as a conduit to receive benefits from foreign governments in exchange for his service as President or as an employee (or equivalent) of the foreign government.

Further textual support is found in each of the other two instances in which the term emolument is used in the Constitution.  Each is associated with an office and refers to compensation for services rendered in the capacity as the holder of that office.  First, the Domestic Emoluments Clause provides that a President shall receive "for his Services" a fixed "Compensation" during his tenure and not "any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.  The term "Compensation" is qualified by "for his Services" as President.  That qualification must also apply to "any other Emolument"—as noted, compensation was long considered a species of emolument—and the Clause's usage of "other" between "for his Services" and "Emolument" confirms that "Compensation" and "Emolument" are intended to be read in parallel.  Thus properly construed, an "Emolument" under the Domestic Emoluments Clause must arise from the President's service as President.  The Clause thus fulfills its natural purpose of ensuring that a President's compensation and other benefits remain unaltered during his tenure, but does not preclude a President from acting on the same terms as any other citizen in transacting business with a federal or state instrumentality.  Second, the Incompatibility Clause prohibits a Senator or Representative from assuming "any civil Office . . . which shall have been created, or the Emoluments whereof shall have been increased"

21

during his or her tenure.  U.S. Const. art. I, § 6, cl. 2.  The Clause treats an "Emolument" as an aspect of an "Office" that may be "encreased" by Congress, expressly tying it to the official's employment and duties.  These two provisions differ from the Foreign Emoluments Clause only in that by their terms, the benefit is tied to services rendered in specific federal offices, whereas under the Foreign Emoluments Clause, the benefit could be tied to services rendered as a federal official or in a capacity akin to an employee of the foreign government.  Hence, as noted before, the Clause prohibits the President from receiving any compensation for his service to a foreign government either as President or in an employment-like relationship.

The use of the term "Emolument" to refer to the receipt of value for one's services rendered in an official position or in an employment relationship is also consistent with contemporaneous dictionary definitions.  One source from 1766 explained that "[e]molument relates to commissions and employments; intimating, not only the salaries, but, all other perquisites."[9]  Another source from 1774 defined the term to mean "profit arising from an office or employ."[10]  The Oxford English Dictionary, citing examples as far back as 1480, 1650, and 1743, provides as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary."[11]

To be sure, Plaintiffs' definition of the term "Emolument" as encompassing any "profit, advantage, benefit, and comfort," Am. Compl. ¶ 23, resembles a broader definition that also existed at the time of the founding.  For example, one dictionary defined the term emolument to

---

[9] 1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* 154–55 (1766) (emphasis omitted).

[10] *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).

[11] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.  Today, the Black's Law Dictionary (10th ed. 2014) provides a single definition of "[a]ny advantage, profit, or gain received as a result of one's employment or one's holding of office."  Consideration of contemporary definitions can also be appropriate.  *See Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (considering both contemporary and late-18th century definitions in interpreting the term "try" in Article I, Section 3, Clause 6 of the Constitution).

mean "benefit," "advantage," or "profit."[12]  But the law has long been clear that where a word is capable of different meanings or "[w]here any particular word is obscure or of doubtful meaning, taken by itself," the "obscurity or doubt may be removed by reference to associated words." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893); *see also United States v. Stevens*, 559 U.S. 460, 474 (2010) ("an ambiguous term may be given more precise content by the neighboring words with which it is associated").  "It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context."  *Virginia*, 148 U.S. at 519.  This doctrine (referred to as *noscitur a sociis*) thus "avoid[s] the giving of unintended breadth" to a statute, *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961), or a constitutional provision, *see, e.g.*, *Virginia*, 148 U.S. at 519.[13]  As discussed above, the term "Emolument," when read harmoniously with the rest of the Clause, has the natural meaning of the narrower definition of profit arising from an official's services rendered pursuant to an office or employ.

Moreover, Plaintiffs' interpretation of the term "Emolument" to mean any "monetary or nonmonetary benefit," or any "profit, advantage, benefit, and comfort," Am. Compl. ¶ 6, would subsume the term "present" in the Foreign Emoluments Clause and render it redundant.  And, as with a broad interpretation of the term "Emolument," a broad interpretation of the term "present"

---

[12] *A New General English Dictionary* (18th ed. 1754); *see also A Complete Dictionary of the English Language* (2d ed. 1789) (emolument means "[p]rofit, advantage").

[13] In *Virginia v. Tennessee*, for example, the Court applied the maxim to interpret the Compact Clause, which prohibits a State from entering into "any Agreement or Compact with another State" without the consent of Congress.  U.S. Const. art. I, § 10, cl. 3.  Although "[t]he terms 'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects," *Virginia*, 148 U.S. at 517–18, the Court held that they must be given "the meaning naturally attaching to them from their context," *id.* at 519.  And, "[l]ooking at the clause in which the terms 'compact' or 'agreement' appear," the Court found it evident that the prohibition is directed to only those agreements and compacts tending to increase the States' political power, and not those having nothing to do with the interest of the national government.  *Id.*; *cf. Armstrong*, 135 S. Ct. at 1383; *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear . . . .").

would unnecessarily construe the phrase "present, Emolument, Office, or Title" to contain substantial redundancies.  Plaintiffs do not dispute that they are treating "Emolument" and "present" interchangeably, noting only that whether a benefit is both a prohibited emolument and a present "may depend on its terms and the circumstances under which it is conferred."  Am. Compl. ¶ 38 n.75; *see also id.* ¶ 38 (asserting that the "various benefits from foreign governments" discussed in the complaint "constitute prohibited 'Emolument[s]' and/or 'present[s]' under the Foreign Emoluments Clause.").  In fact, Plaintiffs refer to "Emoluments" and "present[s]" collectively as "Emolument[s]" or "foreign emoluments."  *Id.*  However, the Supreme Court has long held that "[i]n expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added."  *Holmes v. Jennison*, 39 U.S. 540, 570–71 (1840); *see also Marbury v. Madison*, 5 U.S. 137, 174 (1803) (rejecting interpretation of constitutional provision that would result in "surplusage"); *Williams* v. *Taylor*, 529 U.S. 362, 404 (2000) ("[A] cardinal principle of statutory construction [is] that we must give effect, if possible, to every clause and word of a statute.") (citation omitted).  The Foreign Emoluments Clause treats an "Emolument" as something distinct from other potential types of benefits (a "present," an "Office," or a "Title"), indicating that it is not all-encompassing.[14]

Furthermore, it would be unnatural to describe a public official's receipt of benefits from private commercial transactions by businesses in which he owns an interest as "accept[ing] of [a] present," and nothing indicates that the Framers would have intended the Clause to be applied in that way.  At the time of the Nation's founding (as it is now), a "present" was defined as "[s]omething bestowed on another without price or exchange; the act of giving."  *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774); *see also* Oxford English

---

[14] Plaintiffs allege that whether a benefit is both a prohibited emolument and a present "may depend on its terms and the circumstances under which it is conferred."  Am. Compl. ¶ 38 n.75.  Furthermore, as with a broad interpretation of the term "Emolument," a broad interpretation of the term "present" would unnecessarily construe the phrase "present, Emolument, Office, or Title" to contain substantial redundancies.

Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/150677 ("present" is cross-referenced as a "gift" meaning "[s]omething, the possession of which is transferred to another without the expectation or receipt of an equivalent; a donation, present"). Benefits arising from commercial transactions or legal entitlements accruing to an official by operation of law do not reasonably fall within that definition.

### 2.    Adoption and historical interpretation of the Clause

The adoption and historical interpretation of the Foreign Emoluments Clause are consistent with the office- and employment-specific construction of the term "Emolument."

### i.    Adoption of the Foreign Emoluments Clause

The Foreign Emoluments Clause has its origin in the sixth article of the Articles of Confederation of 1781, which contained the identical proscription, without the current Clause's proviso authorizing a congressional waiver. The prohibition was adopted against the backdrop of "[a] custom [then] prevail[ing] among the European sovereigns, upon the conclusion of treaties, of bestowing presents of jewelry or other articles of pecuniary value upon the minister of the power with which they were negotiated," with "[t]he same usage [being] repeated upon the minister's taking leave at the termination of his mission."[15] The prohibition was prompted by an incident involving a foreign government's gift to a U.S. ambassador, and the concern that, as a result of such gifts, U.S. ministers could be subject to foreign influence. *See* James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America* 455 (Gaillard Hunt & James Brown Scott eds., 1920) [hereinafter *Debates in the Federal Convention*] (noting that the Clause was proposed by Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external

---

[15] 1 *A Digest of the International Law of the United States* 757 (Francis Wharton ed., 1886) [hereinafter Wharton's Digest] (quoting letter from John Q. Adams, Secretary of State, to Richard Rush, Minister to Great Britain (Nov. 6, 1817)); *see also* Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National Experience*, 32 The Historian 376, 376–78 (1970).

influence"). Edmund J. Randolph, who had attended the Constitutional Convention, explained at the Virginia ratification convention that:

> The [prohibition] restrains any person in office from accepting of any present or emolument, title or office, from any foreign prince or state . . . . This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any *emoluments* from foreign states. I believe that if, at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.[16]

The "accident" noted by Randolph appeared to be related to gifts King Louis XVI of France bestowed on American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin for successfully negotiating the Franco-American alliance treaty of 1778.[17] They each received a gold snuff box with the picture of Louis XVI set with diamonds.[18] Upon Lee's return to the United States in 1780, he asked the Continental Congress whether he could keep the gift and was given permission to do so.[19] Thomas Jefferson noted that this episode "formed the subsequent

---

[16] 3 *Debates in the Several State Conventions* at 465–66.

[17] Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign Governments, ca. 1791 [hereinafter Notes of Presents], http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004; Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 79 (2013); *id.* (noting also that the prohibition as contained in the Articles of Confederation had little effect).

[18] Jefferson, Notes of Presents, *supra*; Davis, *Diplomatic Gifts and Emoluments*, *supra*, at 379–80.

[19] Letter from Arthur Lee to the President of Congress (Oct. 7, 1780), *in* 4 *Revolutionary Diplomatic Correspondence of the United States* 85-86 (Francis Wharton ed., 1889); 18 *Journals of the Continental Congress, 1774–1789*, at 1114–15 (Gaillard Hunt ed., 1910) (consent of Continental Congress).

rule."[20]  When Franklin took leave of the French Court in 1785, he also received a miniature portrait of the King set with 408 diamonds,[21] which he later received permission to keep.[22]

Not only is the history of the Clause's adoption devoid of any concern about an official's private commercial businesses, historical context reinforces a bounded understanding of the Clause.  A theme throughout the Constitutional Convention and the ensuing debate over the ratification of the Constitution was the tension between the concern that public officials would be influenced by pecuniary inducements, on the one hand, and the need to adequately compensate capable persons who otherwise may not have sufficient means to assume public office, on the other.  *See, e.g.*, *Debates in the Federal Convention* at 43–46; *id.* at 402 ("the Legislature would make their own wages . . . too low, so that men ever so fit could not serve unless they were at the same time rich"); 3 *Debates in the Several State Conventions* at 371–72; *id.* at 388 (contrasting the President with the king of England, who "has a more permanent interest"; "His stock, his family, is to continue in possession of the same emolument"); *id.* at 484 ("it is not many years ago—since the revolution—that a foreign power offered emoluments to persons holding offices under our government"); 1 *id.* at 440 ("It is asserted that it will be very difficult to find men sufficiently qualified as legislators without the inducement of emolument.  I do believe that men of genius will be deterred, unless possessed of great virtues."); 3 *id.* at 368 ("the principal source of corruption in representatives is the hope or expectation of offices and emoluments").  Thus, for example, Benjamin Franklin advocated that the President should not receive any "salary, stipend[,] fee or reward whatsoever" for his services.  *Debates in the Federal Convention* at 43–46.  The delegates decided instead that the President would receive a fixed compensation during his tenure.  *Id.* at 103, 294, 326.  Franklin and John Rutledge then proposed that the President not receive "any other emolument" from the federal government or any of the States, *id.* at 571, thus

---

[20] Jefferson, Notes of Presents, *supra*.

[21] Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003.

[22] *See* 30 *Journals of the Continental Congress, 1774–1789*, at 95 (John C. Fitzpatrick ed., 1934).

avoiding the evils that would pose the greatest danger of undermining the President's independence—inducements in the forms of pecuniary compensation and other benefits for the President's services.  *See The Federalist* No. 73, at 494 (Jacob E. Cooke ed., 1961).  The Framers also settled on restricting the legislators' ability to assume those offices whose emoluments were increased during the legislators' tenure, and prohibiting public officials' receipt of foreign gifts, emoluments, offices, or titles.  There was no discussion about constraints on private business pursuits by public officials, and in fact, as discussed below, such pursuits were common at the time of the Nation's founding.

### ii.       Historical interpretation of the Clause

Historical evidence confirms that the Foreign Emoluments Clause was not designed to reach commercial transactions that a President (or other federal official) may engage in as an ordinary citizen through his business enterprises.  At the time of the Nation's founding, government officials were not given generous compensations, and many federal officials were employed with the understanding that they would continue to have income from private pursuits.  *See* White, *The Federalists*, *supra*, at 291–92, 296.  Charles Pinckney, who was credited with proposing the Foreign Emoluments Clause, maintained half a dozen plantations in South Carolina while holding various public offices.[23]  Presidents who were plantation owners similarly continued their agriculture businesses, exporting cash crops overseas.  George Washington, who had left his nephew in charge of his highly successful business,[24] required "weekly reports" from his farm managers at Mount Vernon,[25] and responded with detailed

---

[23] *See* Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic Site Historic Resource Study* 24–25 (Aug. 2000), https://www.nps.gov/chpi/learn/historyculture/upload/CHPI_HRS.pdf.

[24] 6 Douglas Southall Freeman, *George Washington: A Biography* 160 (1954).

[25] *See, e.g.*, Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111.

instructions.[26]  From his Presidential office, he wrote business plans, including those for his

gristmill, from which he exported flour and cornmeal to "England, Portugal, and the island of

Jamaica."[27]  Thomas Jefferson maintained his farm and nail factory at Monticello and exported

his tobacco crop to Great Britain.[28]  James Madison had a tobacco plantation in Montpelier,[29]

and James Monroe's 3,500 acre Highland plantation grew timber, tobacco, and grain.[30]  While

Madison's and Monroe's farm records apparently have not survived,[31] the export of farm

products such as tobacco to England and elsewhere had been common since colonial times.[32]

Had the Framers intended the Foreign Emoluments Clause to encompass benefits arising from a

---

[26] *See, e.g.*, Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050; Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159.

[27] *Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9, http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill (last visited Sept. 15, 2017); National Register of Historic Places Registration Form, George Washington's Gristmill, § 8, at 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf; Letter from George Washington to William Pearce (Apr. 20, 1794) (asking Pearce not to grind any more wheat until instructed otherwise because of an embargo against ships sailing to foreign ports), http://founders.archives.gov/documents/Washington/05-15-02-0488; *see also* Thirty-Day Embargo, 1 Stat. 400 (1794).

[28] Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in* 11 *The Works of Thomas Jefferson* 75–76 (Paul Leicester Ford ed., 1905); *see also* Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* 19, 57 (1991).

[29] Bruce Chadwick, *James & Dolley Madison* 167 (2014); Robert A. Nowlan, *The American Presidents, Washington to Tyler* 179 (2012).

[30] Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. & Biography 251, 262–63 (1993); National Park Service, *Ash Lawn-Highland*, https://www.nps.gov/nr/travel/journey/hig.htm (last visited Sept. 15, 2017).

[31] *See* David O. Stewart, *Madison's Gift* 396 n.1 (2015); 5 *The Papers of James Monroe* xviii (Daniel Preston ed., 2014).

[32] *See, e.g.*, George Taylor, Arrangements between English and Southern Merchants (June 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003; National Park Service, *Historic Jamestowne, Tobacco: Colonial Cultivation Methods*, https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-methods.htm (last visited Sept. 15, 2017).

federal official's private commercial transactions with a foreign state, surely someone would have raised concerns about whether foreign governments or government-owned corporations may have been among the customers of the farm and other products regularly exported by early Presidents.  Yet, there is no evidence of these Presidents taking any steps to ensure that they were not transacting business with a foreign government instrumentality.  And one can reasonably expect that they would have taken such steps because many of them were involved in drafting or ratifying the Constitution.

If the term "Emolument" is as broadly defined as Plaintiffs claim it is, then George Washington would have violated the Domestic Emoluments Clause.  As noted before, that Clause prohibits a President from accepting "any other Emolument from the United States, or any of them" beyond the compensation fixed by Congress for the duration of his term.  U.S. Const. art. II, § 1, cl. 7.  Washington directly transacted business with the federal government while President by purchasing several lots of public land in the then-Territory of Columbia in a public sale.[33]  Washington himself had authorized the public sale, and the sale was conducted by the Commissioners of the District of Columbia,[34] who were appointed by Washington, see 1 Stat. 130.[35]  In writing to the Commissioners to inquire about his prospect of being permitted to purchase more lots, Washington stated that he had "no desire . . . to stand on a different footing from every other purchaser."[36]  But no concern was raised that such transactions conferred a benefit, and thus a prohibited emolument, on Washington.  The absence of any such concern is especially telling because one of the three Commissioners had (like Washington himself)

---

[33] See Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074.

[34] See Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068.

[35] See also George Cochrane Hazelton, The National Capitol 2–3 (1914).

[36] See Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289.

attended the Constitutional Convention,[37] and the other two had voted in the state ratification conventions.[38]  Washington, as the first President, was especially careful about his conduct being beyond reproach in part because he recognized that his conduct could be precedent-setting.  *See* Letter from George Washington to Bushrod Washington (July 27, 1789) ("[m]y political conduct . . . must be exceedingly circumspect and proof against just criticism, for the Eyes of Argus are upon me, and no slip will pass unnoticed . . . .");[39] Letter from George Washington to James Madison (May 5, 1789) ("As the first of everything, in *our situation* will serve to establish a Precedent, it is devoutly wished on my part, that these precedents may be fixed on true principles.");[40] Akhil Amar, *America's Unwritten Constitution* 309 (2012) ("Washington set precedents from his earliest moments [as President] . . . .  Over the ensuing centuries, the constitutional understandings that crystallized during the Washington administration have enjoyed special authority over a wide range of issues.").

Plaintiffs' expansive construction of the Foreign Emoluments Clause is further undermined by a proposed constitutional amendment that would have extended the prohibitions of the Clause to all private citizens.  In 1810, Congress passed a resolution to forward the following proposed amendment to the States for ratification:

> If any citizen of the United States shall accept, claim, receive or retain any title of nobility or honour, or shall, without the consent of Congress, accept and retain any

---

[37]  *See* Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794), https://founders.archives.gov/documents/Washington/05-15-02-0331; *Debates in the Federal Convention* at lxxxiv (Carroll).

[38]  *See* 1 *Debates in the Several State Conventions* at 324 (Johnson); 3 *id.* at 654 (Stuart).

[39]  *Available at* http://founders.archives.gov/documents/Washington/05-03-02-0189.

[40]  *Available at* http://founders.archives.gov/documents/Washington/05-02-02-0157.  *See also* Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790) ("In our progress towards political happiness my station is new; and, if I may use the expression, I walk on untrodden ground. There is scarcely any action, whose motives may not be subject to a double interpretation.  There is scarcely any part of my conduct wch [sic] may not hereafter be drawn into precedent."), http://founders.archives.gov/documents/Washington/05-04-02-0363.

present, pension, office or emolument of any kind whatever, from any emperor,
king, prince or foreign power, such person shall cease to be a citizen of the United
States, and shall be incapable of holding any office of trust or profit under them, or
either of them.

Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810).

Although no floor debates were recorded to shed light on the purpose of the proposed amendment, it is implausible that this amendment was intended or understood as providing for the revocation of the citizenship of anyone engaging in commerce with foreign governments or their instrumentalities. Such a radical interpretation is all the more unlikely because the proposed constitutional amendment had overwhelming support in Congress,[41] and was only two States short of ratification.[42] Even if the proposed amendment were a manifestation of an anti-foreign attitude also speculated to exist at that time,[43] it is inconceivable that Congress and nearly three-fourths of the States intended to strip the citizenship of, for example, those hotel owners whose customers included visiting foreign diplomats using government funds.

### 3.      Application of the Clause since the Founding Era

For over two centuries, the Foreign Emoluments Clause has been interpreted and applied in an office- and employment-specific manner, without infringing on the ability of Presidents or other officeholders to have private business interests, when there is no indication that the official is using such businesses as a conduit to receive compensation for service to a foreign government in an official capacity or in an employment-like capacity. In line with its drafting history, the Clause was invoked most often, for the several decades following its adoption, in the context of foreign-government gifts tendered to U.S. diplomats or officials. *See* Wharton's Digest at 757–59. The first request made under the Constitution for congressional consent to

---

[41] 20 Annals of Cong. 672 (1810) (19 to 5 in the Senate); 21 Annals of Cong. 2050–51 (1810) (87 to 3 in the House).

[42] 2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818), *available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[43] Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and Bibliographic Nightmare*, 88 L. Lib. J. 121, 124 (1996).

retain such gifts was Thomas Pinckney's request in 1798 to keep gifts he received from the courts of Madrid and London on the termination of his missions to those places.[44]  The Senate gave its consent but the House refused for policy reasons.[45]  In 1817, Secretary of State John Quincy Adams instructed diplomats that "every offer of [a gift from a foreign sovereign] which may in future be made to any public minister or other officer of this Government abroad, will be respectfully but decisively declined."  Wharton's Digest at 757; *see also* H.R. Rep. No. 23-302, at 4 (1834) (Secretary of State Louis McLane giving the same instruction to U.S. diplomats in 1834).  But rather than always declining foreign gifts, U.S. diplomats sometimes accepted foreign presents on behalf of the United States so as not to cause offense or compromise the efficacy of their agency or their personal safety.  Wharton's Digest at 758 (citing a March 4, 1834 report from the Committee on Foreign Affairs).  "The presents in such cases, when not perishable, [were] deposited in the State Department, or, when not susceptible of such deposit (as with horses), sold, and the proceeds sent to the Treasury."  *Id.*  The practice by U.S.-based officials was similar.  *See, e.g.*, S. Exec. Doc. No. 23-49, at 2–3 (1834) (listing foreign gifts received by U.S. officials and deposited with the Department of State); H.R. Rep. No. 23-302, at 2 (noting that Thomas Jefferson, while President, had received horses as presents from a foreign government, which he then sold, depositing the money into the Treasury); S. Exec. Doc. No. 37-23, at 6–7 (1862) (reprinting Abraham Lincoln's letter to the King of Siam accepting the King's gifts to him on behalf of the American people).

By 1881, Congress enacted the first law relating to the Foreign Emoluments Clause.  *See An act authorizing the persons therein named to accept of certain decorations and presents therein named, from foreign governments, and for other purposes*, ch. 32, § 3, 21 Stat. 603 (1881).  Consistent with preexisting practice, the focus of the law was on the issue of foreign gifts, and the law required that all presents, decorations, or other things "conferred or presented

---

[44] *See* 8 Annals of Cong. 1582–93 (1798); Wharton's Digest at 757; Davis, *Diplomatic Gifts and Emoluments, supra*, at 379.

[45] *Id.*

by any foreign government" to U.S. officials shall be tendered through the Department of State. *Id.* at 604; *see also* 5 U.S.C. § 115 (1925–26) (same); Pub. L. No. 89-554, 80 Stat. 378, 526–27 (1966) (re-codifying same provision at 5 U.S.C. § 7341) ("A present, decoration, or other thing presented or conferred by a foreign government to an employee, a Member of Congress, the President, or a member of a uniformed service shall be tendered through the Department of State"); Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (providing advance Congressional consent for U.S. officials to accept "gifts and decorations" from foreign governments under certain limited circumstances).

While gifts from foreign governments dominated the early history of the Foreign Emoluments Clause, at least by the mid-19th century the Clause had also been invoked by the Attorney General to prohibit U.S. officials from accepting foreign "Offices" or compensation for personal services rendered directly to a foreign government. *See, e.g.*, *Marshal of Florida*, 6 Op. Att'y Gen. 409 (1854) (Marshal for the Southern District of Florida could not hold the office of commercial agent of France); *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. 537, 538 (1871) (American minister to one foreign power could not accept a diplomatic commission to the same foreign power from another foreign power). By way of contrast, the Government is not aware of any instance in this era where the Clause was applied to business transactions outside of government by private commercial entities in which a U.S. official had a financial interest.

More modern applications of the Foreign Emoluments Clause by the Comptroller General of the United States and the Office of Legal Counsel of the Department of Justice ("OLC")—the two government components charged with interpreting the Clause's application— are to similar effect. In every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited emoluments, the determination involved an employment relationship (or a relationship akin to an employment relationship) with the foreign government. *See, e.g.*, *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 97 (1986) (agency consultant could not accept employment with a private corporation to perform work on a contract with a foreign

34

government); *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158–59 (1982) (agency employee could not, on his leave time, work for an American consulting firm, which was under contract with a foreign government, to perform work on that contract); *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 819 (1970) (Air Force officer could not retain proceeds from the sale of contraband seized by the Republic of Colombia based upon information furnished by the officer while temporarily attached to the Colombian Air Force for training); *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *4 (Comp. Gen. Mar. 11, 1985) (retired Marine Corps officers who were attorneys employed by or served as "of counsel" to a law firm could not serve as legal counsel for the Office of the Saudi Military Attache without congressional consent); *Major Stephen M. Hartnett, USMC, Ret.*, 65 Comp. Gen. 382 (1986), *aff'd by* 69 Comp. Gen. 175 (1990); *To C.C. Gordon, USCG*, 44 Comp. Gen. 130 (1964), *aff'd by To Mr. Harvey E. Ward, USCG, Ret.*, B-154213, 1964 WL 1865 (Comp. Gen. Dec. 281, 1964); *To the Secretary of the Air Force*, 49 Comp. Gen 819 (1970); *To the Secretary of Health, Education and Welfare*, 51 Comp. Gen. 780 (1972), *aff'd by Dr. R. Edward Bellamy, USPHS, Ret.*, B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978); *To N.R. Breningstall, Dep't of the Air Force*, 53 Comp. Gen 753 (1974); *see also Marshal of Florida*, 6 Op. Att'y Gen. at 409; *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. at 538.  In the context of the Domestic Emoluments Clause, which also contains the term "Emolument," both components have determined that while in office, President Ronald Reagan could receive retirement benefits from the State of California, where he had served as the Governor, without violating the Domestic Emoluments Clause's prohibition against the receipt of "Emolument[s]" from a State.  *See The Honorable George J. Mitchell*, *U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (President Reagan's pension from California could not "be construed as being in any manner received in consequence of his possession of the Presidency"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 192 (1981) ("those

[retirement] benefits are not emoluments in the constitutional sense" nor does their receipt "violate the spirit of the Constitution").

The issues in these OLC and Comptroller General opinions often revolved around the nature of compensation from the foreign government and the U.S. official's precise employment relationship with the foreign government. *Compare* Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) [hereinafter *Payment of Compensation*] (concluding that annuity payments made by the German Government to a federal official that were payable to other former German civil servants were prohibited by the Foreign Emoluments Clause),[46] *with Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 335 (1955) (acceptance of annuity payments made by the German Government to a federal official as damages for injuries inflicted by the Nazi regime while he was a former citizen and public official of Germany did not violate the Foreign Emoluments Clause).[47]

---

[46] *Available at* https://www.justice.gov/olc/page/file/935721/download.

[47] One published opinion interpreted the Foreign Emoluments Clause to reach beyond a U.S. official's own personal service to encompass an employment relationship between a foreign government and the U.S. official's law partners, in circumstances where the official and his law partners shared a "community of interest." *See Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (non-paid, non-government members of the Administrative Conference of the United States ("ACUS") prohibited from receiving a distribution from their law partnerships that included revenues from foreign governments), *modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/18411/download (non-paid, nongovernment members of ACUS not subject to the Emoluments Clause because they do not hold "Office[s] of Profit or Trust"). Situations involving law partners and their profit sharing are distinct from the financial interests at issue in this case. *See* Restatement (Third) of the Law Governing Lawyers § 123, cmt. b; Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) (imputation of conflicts of interest within a law firm is based on the "premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated").

Congress's recent exercise of its constitutional authority to exempt particular activities from the scope of the Foreign Emoluments Clause is likewise inconsistent with viewing the Clause to reach private business arrangements having nothing to do with an official's personal service to a foreign power.  In recent decades, Congress has enacted Foreign Emoluments Clause-related laws to allow retired members of the armed forces and Reservists—who are holders of "Office[s] of Profit or Trust" because they may be recalled to active duty—to accept certain foreign civil or military employment under specified conditions.  *See* Pub. L. No. 97-295, 96 Stat. 1287 (1982), *codified at* 37 U.S.C. § 908 (providing general consent to civil employment); National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834 (1993), *codified at* 10 U.S.C. § 1060 (providing general consent to employment by military forces of a newly democratic nation).  It also has enacted laws to provide consent to other government employees' employment by foreign governments.  *See*, *e.g.*, Panama Canal Commission Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, tit. XXXV, § 3504, 107 Stat. 1547, 1965 (1993), *codified at* 22 U.S.C. § 3641 note (providing consent under the Foreign Emoluments Clause to civil employment, and compensation for that employment, of alien employees of the Panama Canal Commission by the Government of Panama).  Had Congress understood the Clause to reach more broadly than compensation arising from personal services rendered to a foreign government, it surely would have exempted a wider range of activities.  Moreover, it is implausible that Congress would have exempted direct personal services to foreign governments yet left in place the prohibition on more attenuated interactions, such as holding a financial interest in a business that sells to foreign officials.

### B.    Plaintiffs' Arguments in Support of Their Interpretation Have No Merit.

In arguing that "Emolument" means "any monetary or nonmonetary benefit," Plaintiffs assert that the Founders drafted the Clause "with language 'both sweeping and unqualified,'" prohibiting officials "from accepting '*any . . .* Emolument *. . . of any kind whatever*' from '*any . . .* foreign State' unless Congress consents."  *See* Am. Compl. ¶ 22 (emphasis in original). Plaintiffs' reliance on the italicized language is largely circular because such language does not

expand the meaning of "Emolument," but instead reflects an emphasis that the Clause does not exempt any type of "Emolument." *See Payment of Compensation* at 8 ("the phrase 'of any kind whatever' was intended to cover compensation of any sort arising out of an employment relationship with a foreign state"). That conclusion sheds no light on the antecedent question of what constitutes an "Emolument" in the first place.[48]

Plaintiffs' attempt to rely on the purpose of the Foreign Emoluments Clause, *see* Am. Compl. ¶¶ 1, 10, 14, 21–22, is similarly misplaced. Although the Clause was intended to combat corruption and foreign influence, the text, original understanding, and historical practice provide no support for Plaintiffs' inferential leap from the Clause's purpose to a blanket prohibition on receiving "any monetary or nonmonetary benefit" regardless of context. "[N]o legislation," including the Constitution, "pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam). Indeed, as noted above, even as the Framers confronted the competing concerns that public officials would be influenced by pecuniary inducements and that capable persons might not have sufficient means to assume public office, they gave no indication that they intended to require officeholders to divest their private commercial businesses in order to assume federal office.

Plaintiffs' definition also would create absurd consequences. For example, under Plaintiffs' theory, royalties from foreign book sales received by a President or covered official while in office would offend the Foreign Emoluments Clause if any of them were attributable to purchase by a foreign government instrumentality, such as a foreign public university. *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign*

---

[48] *See Small v. United States*, 544 U.S. 385, 388 (2005) ("[t]he word 'any' considered alone cannot answer th[e] question" of how narrowly or broadly to interpret a statute); *United States v. Palmer*, 16 U.S. 610, 631 (1818) (Marshall, C.J.) ("general words," such as the word "'any,'" must "be limited" in their application "to those objects to which the legislature intended to apply them").

*Public Universities*, 18 Op. O.L.C. 13, 15 (1994) (foreign public universities are "presumptively foreign states under the [Foreign] Emoluments Clause").[49]

And, if the term "Emolument" is as interpreted by Plaintiffs, a President also could not hold United States Treasury bonds while in office because the accrued interest would be benefits "from the United States" under the Domestic Emoluments Clause.  Also, mere stock holdings by a covered official in companies that conduct business globally would violate the Foreign Emoluments Clause, since some of those companies' earnings would be attributable to business with foreign governments.  Before this suit, that conclusion had never been contemplated.  For example, Vice President Nelson A. Rockefeller had stock holdings in major oil companies such as Exxon, Standard Oil of California and Indiana, and Texaco, as well as in other corporations that conducted business globally, including Dow Chemical, General Electric, and 3-M.  Although these companies surely received some benefit from business with foreign governments, no Foreign Emoluments Clause concern was raised in the Senate or House committee reports concerning his confirmation, despite extensive discussions of those holdings.[50]  Similarly, during her time in office, former Commerce Secretary Penny Pritzker owned a large quantity of stock in the Hyatt Hotels Corporation, which is substantially owned by her family and has hundreds of establishments throughout the world.[51]  No issue concerning the Foreign Emoluments Clause

---

[49] For 2009, President Obama reported foreign income of approximately $1.6 million (*see* https://obamawhitehouse.archives.gov/sites/default/files/president-obama-2010-complete-return.pdf), which likely included royalties from the sale of his books.  Many foreign public universities have President Obama's books in their library collection.  *See, e.g.*, University of Melbourne, Library Catalog, http://library.unimelb.edu.au/; University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en; Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/; Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en.

[50] *See Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*, S. Exec. Doc. No. 93-34, at 28 (1974); *Confirmation of Nelson A. Rockefeller as Vice President of the United States*, H.R. Rep. No. 93-1609, at 39–40 (1974).

[51] *See* Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/; Hyatt Hotels Corporation, Form 10-K at F-41 (2016), http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/Hyatt-Q4-2016-Form-10-K.pdf.

arose,[52] even though the Secretary surely derived benefits from foreign governments' patronage of Hyatt Hotels worldwide and from any permits, licenses, or other regulatory approvals those governments granted to Hyatt Hotels to operate in their respective countries. Under Plaintiffs' theory, such holdings would be in violation of the Foreign Emoluments Clause as well.

Moreover, if Plaintiffs were correct that regulatory benefits such as permits, tax incentives, or exemptions granted by a foreign government to the President's business ventures abroad constitute emoluments, *see* Am. Compl. ¶¶ 66–67, then a U.S. official with overseas property that is subject to foreign licensure requirements would violate the Foreign Emoluments Clause as well. Retired members of the armed forces, who are subject to the Foreign Emoluments Clause, would face similar problems if they were to live or to do business abroad. As noted, Congress has consented in specified conditions to foreign employment and receipt of compensation by retired military personnel, but not to receipt of licenses, permits, and other foreign-government "benefits" that retired military personnel might need to take advantage of that consent. And under Plaintiffs' theory, a retired military officer also would not be able to own stock in a company, such as a hospitality establishment, *in the United States*, unless the establishment turns away all foreign government customers.

In short, Plaintiffs' proposed definition of "Emolument" would impose new, stringent limits on the activities and stock holdings of every holder of a federal "Office of Profit or Trust" in all three Branches of the Government, including every active and retired military officer—and

---

[52] No concerns about the Foreign Emoluments Clause were raised during Secretary Pritzker's confirmation hearing before the Senate Committee on Commerce, Science, and Transportation, nor during the floor debate preceding her confirmation vote. *See Nomination of Penny Pritzker to be Secretary of the U.S. Department of Commerce: Hearing Before the S. Comm. on Commerce, Science, and Transportation*, S. Hrg. 113-619, 113th Cong. (2013); 159 Cong. Rec. S5,119-22 (daily ed. June 25, 2013). Moreover, Secretary Pritzker was confirmed by a vote of 97 for and one against, with 22 of the Plaintiffs voting to confirm her and one of the lead Plaintiffs, Senator Blumenthal, rising to give a speech on the Senate floor in support of her confirmation. *See id.*; 159 Cong. Rec. S5,116 (daily ed. June 25, 2013). Finally, nothing concerning the Foreign Emoluments Clause was raised in Secretary Pritzker's ethics agreement with the Department of Commerce. *See* Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/.

even Plaintiffs themselves.  For example, under Plaintiffs' theory, no President, Member of

Congress, or military officer could hold stock in any chain of hotels that is patronized by any

representative of a foreign government who was traveling on official business.  Indeed, covered

officials would be barred from holding stock in any company that does business with any foreign

government or government-owned corporation.

Plaintiffs have not stated a claim under the Foreign Emoluments Clause, and the case

should be dismissed.

## IV.    THE RELIEF SOUGHT BY PLAINTIFFS IS UNCONSTITUTIONAL.

Finally, Plaintiffs seek an unconstitutional remedy: an injunction against the President in

his official capacity effectively seeking to impose a condition on the President's ability to serve

as President and to perform the duties he is duly elected to perform.  In *Mississippi v. Johnson*,

for example, the Supreme Court held it had "no jurisdiction of a bill to enjoin the President in the

performance of his official duties."  71 U.S. at 500–01 ("The Congress is the legislative

department of the government; the President is the executive department.  Neither can be

restrained in its action by the judicial department.").[53]  A plurality of the Court later reiterated

that principle in *Franklin v. Massachusetts*.  *See* 505 U.S. at 802–03 ("[I]n general 'this court has

no jurisdiction of a bill to enjoin the President in the performance of his official duties.'")

(quoting *Johnson*, 71 U.S. at 501).  The plurality in *Franklin* found it "extraordinary" that the

district court in that case had issued an injunction against the President and two other

government officials.  *Id.* at 802, 806.  "At the threshold," it said, "the District Court should have

evaluated whether injunctive relief against the President was available, and, if not, whether

appellees' injuries were nonetheless redressable."  *Id.* at 803.  The plurality ultimately did not

address whether injunctive relief against the President was appropriate in the circumstances of

---

[53] The Supreme Court has left open the question whether the President might be subject to an injunction requiring the performance of a purely "ministerial" duty.  *See Johnson*, 71 U.S. at 500–01.  However, the relief sought in this case—forcing the President to restructure his financial affairs in order to comply with Plaintiffs' interpretation of the Constitution—cannot fairly be described as purely "ministerial."

that case because it found that the alleged injury was likely to be redressed by declaratory relief against the Secretary of Commerce alone.  *Id.*  In this case, however, the President is the only defendant here and injunctive relief is sought directly against him.  And in the 150 years since the Supreme Court decided *Johnson*, no court has issued an injunction against the President in his official capacity where he was the sole defendant.  Justice Scalia explained in his concurrence in *Franklin* that, under *Johnson*, courts may impose neither injunctive nor declaratory relief against the President in his official capacity.  *Id.* at 827–28 (noting that such principle is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history").  He reasoned that just as the President is absolutely immune from official capacity damages suits, so is he immune from efforts to enjoin him in his official capacity.  *Id.* at 827 ("[m]any of the reasons [the Court] gave in *Nixon v. Fitzgerald*, [457 U.S. 731, 749 (1982)], for acknowledging an absolute Presidential immunity from civil damages for official acts apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions").  The lower courts have often applied this settled principle. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [the] request for a declaratory judgment"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[w]ith regard to the President, courts do not have jurisdiction to enjoin him"); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir. 2017) ("we find that the district court erred in issuing an injunction against the President himself"), *cert. granted*, 137 S. Ct. 2080, 2089 (2017).

The *Johnson* case is supported by the President's unique position atop the Article II hierarchy.  Courts have "recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint."  *Fitzgerald*, 457 U.S. at 753.  The President "occupies a unique position in the constitutional scheme" and is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost

42

discretion and sensitivity." *Id.* at 749–50; *Franklin*, 505 U.S. at 827 (Scalia, J., concurring) (referring to the President and Congress as the "principals in whom the executive and legislative powers are ultimately vested"). Such restraint is particularly warranted in circumstances where, as here, Plaintiffs seek relief that would require detailed superintendence of the President's affairs. Plaintiffs challenge everything from a single diplomat's payment for hospitality services to any trademarks, permits, licenses, and approvals that may be granted by foreign governments in connection with the commercial activities of the President's business organization in numerous countries. Any relief directed at those activities would ensnare the President in prolonged litigation over any number of transactions, "distract[ing] [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *id.* at 828 (Scalia, J., concurring), even though "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties," *Loving*, 517 U.S. at 757; *see also Clinton v. Jones*, 520 U.S. 681, 714 (1997) (Breyer, J., concurring) ("Article II implicitly grants an official inviolability to the President while he is in the discharge of the duties of his office, and that this inviolability must be broad enough to permit him to perform his official duties without obstruction or impediment."). In sum, this Court cannot issue the requested injunctive relief against the President.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.


Dated: September 15, 2017                         Respectfully submitted,

                                                  CHAD A. READLER
                                                  Acting Assistant Attorney General

                                                  BRETT A. SHUMATE
                                                  Deputy Assistant Attorney General

                                                  JENNIFER D. RICKETTS
                                                  Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2017, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN