# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL,<br>Representative JOHN CONYERS, JR., et al.,<br><br>                             Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP,<br>in his official capacity as President of the United<br>States of America,<br><br>                             Defendant. | No. 17 Civ. 1154-EGS |

---

**BRIEF FOR SCHOLAR SETH BARRETT TILLMAN AND THE JUDICIAL
EDUCATION PROJECT AS *AMICI CURIAE* IN SUPPORT OF THE DEFENDANT**

---

Robert W. Ray, Esq.
D.C. Bar No. 401377
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Tel. (212) 751-3347
robert.ray@tklaw.com
*Co-Counsel for Amicus
Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
D.C. Bar No. 982084
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Tel. (571) 357-3134
carrie@judicialnetwork.com
*Counsel for Amicus Curiae
Judicial Education Project*

Josh Blackman
    Admission *pro hac vice* pending
1303 San Jacinto Street
Houston, Texas 77002
Tel. (202) 294-9003
Josh@joshBlackman.com
*Counsel of Record for Amicus
Curiae Scholar Seth Barrett Tillman*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ................................................................. 1

PRELIMINARY STATEMENT ................................................................... 2

ARGUMENT ................................................................................................ 3

   I.   The Framers of the Constitution Distinguished Between Different Types of Federal Positions ........................................................................................ 3

      A.  The "Officers of the United States" Drafting Convention Refers to Appointed Positions in the Executive or Judicial Branches ........................................ 4

      B.  "Office . . . under the United States" Refers to Appointed Positions in All Three Branches of Government ............................................................ 6

         1.  In the Colonial Period, "Office under the Crown" Did Not Extend to Elected Positions ....................................................................... 7

         2.  Revolutionary-Era Government Used the "Office . . . under" British Drafting Convention ...................................................................... 8

         3.  The Framers of the Constitution Adhered to the "Office . . . Under" British Drafting Convention .......................................................... 9

         4.  The First Congress Adhered to the "Office . . . Under" Drafting Convention ................................................................................. 12

         5.  President Washington's Secretary of the Treasury, Alexander Hamilton, Adhered to the "Office . . . Under" Drafting Convention ............... 14

   II.  The Foreign Emoluments Clause Does Not Encompass the Presidency ...... 15

      A.  Edmund Randolph and George Mason's Overly Broad Understanding of "Officer" Was Ultimately Rejected ...................................................... 16

      B.  Washington and His Successors During the Early Republic Openly Accepted Foreign Gifts Without Seeking Congressional Consent ............................ 18

CONCLUSION ............................................................................................ 22

i

# TABLE OF AUTHORITIES

**Cases**

Chisolm v. Georgia,
    2 U.S. (2 Dall.) 419 (1793) ........................................................................................ 9

Clinton v. City of N.Y.,
    524 U.S. 417 (1998) .............................................................................................. 20

Clinton v. Jones,
    520 U.S. 681 (1997) .............................................................................................. 20

De Veau v. Braisted,
    363 U.S. 144 (1960) .............................................................................................. 13

Doty v. State,
    6 Blackf. 529 (Ind. 1843) (*per curiam*) ................................................................ 10

Franklin v. Massachusetts,
    505 U.S. 788 (1992) ............................................................................................... 6

Free Enter. Fund v. PCAOB,
    561 U.S. 477 (2010) .............................................................................................. 20

Freytag v. C.I.R.,
    501 U.S. 868 (1991) .............................................................................................. 20

Hoyt v. United States, 51 U.S. (10 How.) 109 (1850) ................................................... 14

Lamar v. United States,
    241 U.S. 103, 112, 113 (1916) .............................................................................. 12

Lewis v. Clarke,
    137 S. Ct. 1285 (2017) .......................................................................................... 22

Morrison v. Olson,
    487 U.S. 654 (1988) ............................................................................................... 4

Myers v. United States,
    272 U.S. 52 (1926) .......................................................................................... 13, 20

N.L.R.B. v. Noel Canning,
    134 S. Ct. 2550 (2014) .......................................................................................... 20

N.L.R.B. v. SW Gen., Inc.,
    137 S. Ct. 929 (2017) ............................................................................................ 20

NASA v. Nelson,
    562 U.S. 134 (2011) .............................................................................................. 20

New York Times Co. v. Sullivan,
    376 U.S. 254 (1964) .............................................................................................. 13

Powell v. McCormack,
    395 U.S. 486 (1969) .............................................................................................. 12

R v. Obeid (No 2) [2015] New South Wales Supreme Court 1380 [30],
  *available at* bit.ly/2rSRiZv ........................................................................ 8

Schell v. Fauche,
  138 U.S. 562 (1891) ................................................................................... 13

Spokeo, Inc. v. Robins,
  No. 13-1339 (U.S. Sept. 8, 2015) 2015 WL 5244346 ................................ 15

U.S. Term Limits, Inc. v. Thornton,
  514 U.S. 779 (1995) ................................................................................... 20

United States v. Curtiss-Wright Exp. Corp.,
  299 U.S. 304 (1936) ................................................................................... 20

United States v. Germaine,
  99 U.S. 508 (1878) ....................................................................................... 7

Van Orden v. Perry,
  545 U.S. 677 (2005) ................................................................................... 20

Youngstown Sheet & Tube Co. v. Sawyer,
  343 U.S. 579 (1952) ................................................................................... 20

Zivotofsky v. Kerry,
  135 S.Ct. 2076 (2015) ................................................................................ 17

**Federal Statutes**

An Act for Registering and Clearing Vessels, 1 Stat. 55, 64–65 (1789) ...................................... 13

An Act for the Punishment of Certain Crimes, 1 Stat. 112, 117 (1790), *available at*
  bit.ly/2rbNfVq ........................................................................................... 12

An Act to regulate the Collection of the Duties, 1 Stat. 29, 46 (1789) ........................................ 13

An Act to regulate the Time and Manner of Administering certain Oaths, 1 Stat. 23-24
  (June 1, 1789) .............................................................................................. 5

Treasury Act, 1 Stat. 65, 67 (1789), *available at* bit.ly/2suQuv9 .............................................. 13

**State Statutes**

The Kentucky Resolution (Jefferson) (Nov. 16, 1798) ................................................................. 13

The Virginia Resolution (Madison) (Dec. 24, 1798) ................................................................... 13

**Statutes**

An Act for the Security of Her Majesty's Person and Government, 6 Ann. c. 7, § 25
  (1707), *available at* bit.ly/2riHlG1 ........................................................... 8

**Treatises**

FLOYD R. MECHEM, A TREATISE ON THE LAW OF PUBLIC OFFICES AND OFFICERS, § 13
  (1890), *available at* bit.ly/2wjc184 .......................................................... 10

**Other Authorities**

1 Joseph Story, *Commentaries on the Constitution of the United States* 577–79 (reprint 1891) (1833) ............................................................................................................ 4, 5

1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry), *available at* bit.ly/2rQswt8 ............................................................................................................... 14

1 *The Writings of James Monroe 1778–1794*, at 347 (1788), *available at* perma.cc/2E8V-GVV8 ................................................................................................. 11

2 Esther Singleton, *The Furniture of our Forefathers* 503 (1906) ................................... 19

2 Journal of the United States Senate 484 (May 2–4, 1798), *available at* bit.ly/2fbKLCs .......... 18

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution (2d ed. 1836), *available at* bit.ly/2fcvP7h (Randolph's position) ............................... 16

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution (2d ed. 1836), *available at* bit.ly/2gXirI1 (Mason's position) ................................... 16

11 Journal of the Continental Congress 502 (May 15, 1778), *available at* bit.ly/2sg5MDy .................................................................................................................. 9

14 The Papers of Alexander Hamilton , 157 (1969), *available at* perma.cc/49RT-TTGF .......... 14

*Alexander I (Sculpture)*, Monticello, *available at* perma.cc/G8K9-LLL4 ...................... 21

ANDRÉ MAUROIS, ADRIENNE: THE LIFE OF THE MARQUISE DE LA FAYETTE 178–82 (1961); A COMPLETE HISTORY OF THE MARQUIS DE LAFAYETTE 193, 194 (1826), *available at* bit.ly/2tauZfC ............................................................................................. 19

ANNE TWOMEY, THE CONSTITUTION OF NEW SOUTH WALES (2004) ............................................ 8

*Bastille Key*, GEORGE WASHINGTON'S MOUNT VERNON, *available at* http://www.mountvernon.org/digital-encyclopedia/article/bastille-key/ ................................. 19

Brianne J. Gorod, *A Little More on Alexander Hamilton and the Foreign Emoluments Clause*, TAKE CARE (Aug. 1, 2017), *available at* perma.cc/U4A6-EMVG ............................ 15

Brianne J. Gorod, *What Alexander Hamilton Really Said*, TAKE CARE (Jul 6, 2017), *available at* perma.cc/YCY8-XQC9 ................................................................................... 15

CALVIN TOWNSEND, ANALYSIS OF CIVIL GOVERNMENT (1869) ........................................................ 5

*Case Of Brigham H. Roberts*, 1 Hinds Prec. of the House of Reps. 546 (1900), *available at* bit.ly/2wTGGL5 ...................................................................................................... 6

Edward Corwin, *Marbury v. Madison and the Doctrine of Judicial Review*, 12 MICH. L. REV. 538 (1914), *available at* bit.ly/2xfihSl ................................................................... 13

Elizabeth Chew, *Tokens of Friendship*, Monticello, *available at* perma.cc/9BP2-565L ............. 21

Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, *available at* perma.cc/658Z-WN5S ................................................................................... 21

Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790, at 2, *available at* bit.ly/2rlnKjP ..... 18, 19

*Gifts from Foreign Dignitaries*, Monticello, *available at* perma.cc/C26E-X23E ...................... 20

*History of the Office*, U.S. House of Representatives, *available at* perma.cc/FM9J-K2EK .......... 7

J.L. De Lolme, *The Constitution of England* 62 (1775), *available at* bit.ly/2sl1yeK.................... 8

James E. Pfander, *Marbury, Original Jurisdiction, and the Supreme Court's Supervisory Powers*, 101 COLUM. L. REV. 1515 (2001) ............................................................... 13

JAMES MADISON, REPORT ON THE VIRGINIA RESOLUTIONS (Jan. 1800), *available at* perma.cc/CKQ5-L6HJ ......................................................................................... 13

James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis,* 59 SOUTH TEXAS L. REV. __ (Forthcoming 2018) ......................................................................................................... 14

Jennifer L. Mascott, *Who are "Officers of the United States"?*, 70 STAN. L. REV. __ (forthcoming 2018), *available at* ssrn.com/abstract=2918952 ................................... 4

Jonathan Fildes, *Science Probe for 'Space Pistols,'* BBC NEWS (May 26, 2008), *available at* perma.cc/4DJP-PUF4 ....................................................................... 21

LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6–35 n.51 (2000)............................ 12

Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791), *available at* perma.cc/5F2V-G5GU.................................................................................... 18

Letter from Louis Guillaume Otto to Armand Marc de Montmorin (Aug. 3, 1790), available in Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres, Correspondances Politiques, 39CP, Volume 35, Microfilm P5982, pages 147–149 .............. 19

Letter from T. Jefferson to Levett Harris (April 18, 1806), *available at* perma.cc/3FX8-Y5TG .......................................................................................................... 20

Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806), *available at* perma.cc/QB6Z-SWSD ..................................................................................... 21

Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816), *available at* perma.cc/D47U-V4H3 ...................................................................................... 21

Letter to J. Madison from John Graham (Aug. 8, 1816), *available at* perma.cc/RD8B-2ASW......................................................................................................... 21

Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7, 1804), *available at* perma.cc/4ATK-BWVN................................................... 20

*List Of Civil Officers Of The United States, Except Judges, With Their Emoluments, For The Year Ending October 1, 1792, in* 1 American State Papers/Miscellaneous 57 (1834)........................................................................................................... 15

*Louis Seize, Roi Des Français, Restaurateur De La Liberté*, George Washington's Mount Vernon, *available at* perma.cc/H328-NWWN.................................................. 19

Louise Weinberg, *Our Marbury*, 89 VA. L. REV. 1235 (2003) ................................................. 13

Mem. from Antonin Scalia, Asst. Att'y Gen, Re: Applicability of 3 C.F.R. Part 100 to the Pres. and V.P., OLC, at 2 (Dec. 19, 1974), *available at* ssrn.com/abstract=2889011 ................................................................................. 6

Mem. from William H. Rehnquist, Asst. Att'y Gen., Re: Closing of Government Offices, OLC, at 3 (Apr. 1, 1969) .................................................................................. 6

Mem. of the U.K. Att'y Gen., at 135–36 (May 1, 1941), *available at* bit.ly/2rjcw00 .................. 8

Motion for Leave to File Response to Brief of *Amici Curiae* by Certain Legal Historians, CREW et al v. Trump, 17 Civ. 458 (S.D.N.Y.) [ECF No. 85] ................................................ 15

Pa. Packet, & Daily Advertiser (Aug. 13, 1790), at 2, *available at* bit.ly/2r9bBiz ............... 18, 19

*Pistols*, James Monroe 3D, *available at* perma.cc/T796-ED5B (on website of the James Monroe Museum) ................................................................................................................... 21

PREAMBLE TO RESOLUTION ON INDEPENDENT GOVERNMENTS (May 15, 1776), *available at* perma.cc/8XB3-CUVB .......................................................................................... 8

REPORT ON THE SALARIES, FEES, AND EMOLUMENTS OF PERSONS HOLDING CIVIL OFFICE UNDER THE UNITED STATES, 14 The Papers of Alexander Hamilton, 157 (1969) (Feb. 26, 1793) ................................................................................................................................ 14

*Russia*, Monticello, *available at* perma.cc/D69R-CEAT ............................................................ 20

S.W. Jackman, *A Young Englishman Reports on the New Nation: Edward Thornton to James Bland Burges, 1791–1793*, 18 WM. & MARY Q. (3d ser.) 85, 108, 121 (1961) ........... 19

Seth Barrett Tillman, *The Emoluments Clauses Lawsuits's Weak Link: The Official Capacity Issue*, YALE J. OF REG. NOTICE & COMMENT BLOG (Aug. 15, 2017), *available at* perma.cc/759Y-CC2R .................................................................................... 22

Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 CORNELL L. REV. 1045, 1066 (1994) ................................... 10

Steven G. Calabresi, *The Political Question of Presidential Succession*, 48 STAN. L. REV. 155, 162 (1995) .......................................................................................................... 6

The Federalist No. 60 ...................................................................................................... 13

The Federalist No. 76 ....................................................................................................... 9

The Records of the Federal Convention of 1787, 379 (1911) .......................................... 9

*Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, *available at* perma.cc/WUT5-847L ................................................................................................. 21

William Baude, *Constitutional Officers: A Very Close Reading*, JOTWELL (Jul. 28, 2016), *available at* perma.cc/SR73-X56H ............................................................... 4

Zephyr Teachout, *The Anti-Corruption Principle*, 94 CORNELL L. REV. 341 (2009) ................ 17

**Legislative Materials**

8 Annals of Cong. 1582–1593 (May 4, 1798), *available at* bit.ly/2ttpIA5 ................................ 18

**Constitutional Provisions**

ARTICLES OF CONFEDERATION of 1781, art. VI, para. 1 ................................................... 9

THE DECLARATION OF INDEPENDENCE (U.S. 1776) ............................................................ 8

U.S. CONST. art. I, § 2 ................................................................................................ 7

U.S. CONST. art. I, § 3, cl. 7 ................................................................................ 10, 12

U.S. CONST. art. I, § 6 ................................................................................................ 4

U.S. CONST. art. I, § 6, cl. 2 ...................................................................................... 9

U.S. CONST. art. I, § 9 ................................................................................................ 4

U.S. CONST. art. I, § 9, cl. 8 .................................................................................... 11

U.S. CONST. art. II, § 1 ......................................................................................... 4, 5

U.S. CONST. art. II, § 1, cl. 2 .................................................................................. 10

U.S. CONST. art. II, § 2, cl. 2 .................................................................................... 4

U.S. CONST. art. II, § 3 ........................................................................................ 4, 17

U.S. CONST. art. II, § 4 ........................................................................................ 4, 18

U.S. CONST. art. VI ................................................................................................... 5

U.S. CONST. art. VI, cl. 3 ........................................................................................... 4

## INTEREST OF *AMICI CURIAE*

Scholar Seth Barrett Tillman, an American national, is a member of the regular full time faculty in the Maynooth University Department of Law, Ireland. Tillman is one of a very small handful of academics who has written extensively on the Constitution's Foreign Emoluments Clause. Arguments in the Defendant's Motion to Dismiss are from, or derived from, Tillman's scholarship. Since 2008, Tillman has consistently written that the Foreign Emoluments Clause and its "Office . . . under the United States" language does not encompass the presidency, a position that would require the dismissal of Plaintiffs' complaint.

The Judicial Education Project (JEP) is dedicated to strengthening liberty and justice through defending the Constitution as envisioned by the Framers—a federal government of defined and limited power, dedicated to the rule of law, and supported by a fair and impartial judiciary. JEP educates citizens about these constitutional principles and focuses on issues such as the judiciary's role in our democracy, how judges interpret the Constitution, and the impact of court rulings on the nation. JEP's educational efforts are conducted through various outlets, including print, broadcast, and internet media. In pursuit of these constitutional principles, JEP has filed amicus curiae briefs in numerous cases before the federal courts of appeals and the Supreme Court.

Plaintiffs consented to the filing of this brief. The Defendant took no position. No party's counsel authored this Brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this Brief; and no person other than *Amici Curiae* or their counsel contributed money that was intended to fund preparing or submitting this Brief.

## PRELIMINARY STATEMENT

The Foreign Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." Plaintiffs contend that because "Defendant Donald J. Trump is the President of the United States of America," he "thus holds an 'Office of Profit or Trust' under the United States."[1] Their argument certainly has an intuitive appeal: How could the presidency not qualify as an "Office of Profit or Trust under the United States" for purposes of this important anti-corruption provision? But an intuition is not an argument, and it is not evidence. Plaintiffs cannot point to a single judicial decision holding that this language in the Foreign Emoluments Clause, or the similar phrase "Office . . . under the United States" in other constitutional provisions, applies to the President. Rather, the text and history of the Constitution, and post-ratification practice during the Early Republic, strongly support the counter-intuitive view: the President does not hold an "Office . . . under the United States."

The Framers of the Constitution, making use of the progenitor British drafting convention of "Office under the Crown," used the phrase "Office . . . under the United States" to refer to *appointed* officials in all three branches of government. That category did not include elected officials, such as the President and members of Congress.  The weight of evidence, spanning from the colonial period to the American Revolution, then through the Constitutional Convention, to the First Congress, the Washington Administration, and finally into the Early Republic, demonstrates that elected federal officials, such as the President, do not hold "an 'Office of Profit or Trust' *under* the United States." Thus, the President is not subject to the Foreign Emoluments Clause.

---

[1] 1st Am. Compl. p. 21, ECF No. 14.

President Washington and other founders who were his successors during the Early Republic openly received, accepted, and kept diplomatic gifts and other gifts from foreign governments and their officials without seeking or receiving congressional consent. For example, President Washington received a diplomatic gift from the French ambassador to the United States; it was a framed full-length portrait of King Louis XVI.  Likewise, President Jefferson received a bust of Czar Alexander I as a diplomatic gift. If Plaintiffs were correct, these presidents and others central to the founding of the United States of America openly committed impeachable offenses or were ignorant of the Constitution they helped draft and define. Washington's practice, and the practices of his successors during the Early Republic, of accepting such gifts confirm that they understood that the President was not subject to the Foreign Emoluments Clause and its "Office . . . under the United States" language. The drafting practices of the First Congress and the writings of Alexander Hamilton lend further support to this position. For these reasons, Plaintiffs' prayer for a declaration that the President "is a 'Person holding any Office of Profit or Trust' within the meaning of the Foreign Emoluments Clause"[2] should be denied. President Trump's business activities may raise ethical conflicts under modern good governance standards, but they raise no constitutional conflicts under the Foreign Emoluments Clause.

## ARGUMENT

## I.    The Framers of the Constitution Distinguished Between Different Types of Federal Positions

The Framers drafted different rules for different types of federal positions. By making use of well-established British statutory drafting conventions, they carefully distinguished between different positions within the new government. Indeed, when the framers imposed restrictions on the receipt of "emoluments," in three different provisions, they used different terminology to re-

---

[2] *Id.* at p. 54 (praying for a declaration that the President "is a 'Person holding any Office of Profit or Trust' within the meaning of the Foreign Emoluments Clause").

fer to different types of positions: the Ineligibility Clause applies to "Senator[s] and Representative[s]," the Presidential Emoluments Clause applies only to the President, and the Foreign Emoluments Clause applies to any person holding "Office . . . under the United States."[3] These clauses operated to distinguish between elected and appointed positions. This litigation, like many cases before it, requires the courts to interpret and apply the Framers' taxonomy with respect to different federal positions.[4] This brief, based on prior scholarship by amicus Seth Barrett Tillman written before the current controversy arose, will set forth that taxonomy.[5] Specifically, the brief will explain that elected officials, such as the President, are not "Officers *of* the United States," nor do they fall into the broader category of those hold "Office . . . *under* the United States."

### A.    The "Officers of the United States" Drafting Convention Refers to Appointed Positions in the Executive or Judicial Branches

In four clauses, the Constitution uses the drafting convention "Officers of the United States": the Appointments Clause, the Impeachment Clause, the Oaths Clause, and the Commission Clause.[6] According to Joseph Story's *Commentaries*, such positions "derived their appointment from, and under the national government" and not from "the people of the states."[7] In other words, such officers are appointed under the Appointments Clause, and are not elected. The text and history of the Constitution confirm that Story was correct: this important and frequently-

---

[3] *Compare* U.S. CONST. art. I, § 6, with *id.* at art. II, § 1 , with *id.* at art. I, § 9.

[4] *See e.g.*, Morrison v. Olson, 487 U.S. 654, 671 (1988) (distinguishing between "inferior" and "principal" officers).

[5] *See* William Baude, *Constitutional Officers: A Very Close Reading*, JOTWELL (Jul. 28, 2016), *available at* perma.cc/SR73-X56H ("Professor Tillman's theory makes sense of patterns that most of us never saw. It brings order out of chaos."); Jennifer L. Mascott, *Who are "Officers of the United States"?*, 70 STAN. L. REV. __ (forthcoming 2018), *available at* ssrn.com/abstract=2918952 (noting that Tillman "presented strong arguments that numerous constitutional references to 'officers' do not apply to elected officials").

[6] U.S. CONST. art. II, § 2, cl. 2 ("he shall nominate . . . Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, all other *Officers of the United States*."); *id.* at art. II, § 4 ("The President, Vice President and all civil *Officers of the United States*, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."); *id.* at art. VI, cl. 3 ("all executive and judicial *Officers*, both *of the United States* and of the several States, shall be bound by Oath or Affirmation"); *id.* at art. II, § 3 (he "shall Commission all the *Officers of the United States*") (emphases added).

[7] 1 Joseph Story, *Commentaries on the Constitution of the United States* 577–79 (reprint 1891) (1833).

litigated category of positions is limited to executive- and judicial-branch appointed officers. First, the Appointments Clause spells out with clarity that the President can nominate "Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other *Officers of the United States*." Under the canon of *ejusdem generis*, "all other *Officers of the United States*" should be read to reference the same kind of executive and judicial branches officers that the Clause expressly lists. All these officers are appointed, not elected. Second, the Impeachment Clause expressly provides that "[t]he President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment. . . ."[8] Story explained that the President and Vice President's enumeration in the Impeachment Clause in addition to "all civil Officers of the United States" shows that the President and Vice President are not deemed "officers of the United States" themselves.[9] Otherwise, the Framers would have stated that "all *other* civil officers" were subject to impeachment.[10]

Further, the Oaths Clause specifically enumerates that "Senators and Representatives, and the Members of the several State Legislatures," as well as "all *executive and judicial* Officers, both of the United States and of the several States of the United States" were required to be "bound by Oath or Affirmation to, support this Constitution."[11] In contrast, the President—whose position is not listed Article VI—recites the oath provided in Article II, Section I. For other positions that are not covered by Article VI, Congress had to create oaths by statute.[12]

---

[8] Story explained that phrase "civil Officers" in the Constitution "seems to be in contradistinction to military, to indicate the rights and duties relating to citizens generally." *Id.*

[9] *Id.* (emphasis in original).

[10] *Id.*

[11] *See* Art. VI.

[12] The Constitution does not provide an oath for the Vice President. As a result, Congress's very first statute created the oath for the Vice President, in his capacity as the President of the Senate. An Act to regulate the Time and Manner of Administering certain Oaths, 1 Stat. 23-24 (June 1, 1789) ("The said oath or affirmation shall be administered within three days after the passing of this act, by any one member of the Senate, to the President of the Senate, and by him to all the members and to the secretary."). Two days after this statute was enacted, Vice President Adams took the oath. CALVIN TOWNSEND, ANALYSIS OF CIVIL GOVERNMENT 315 (1869). The same 1789 statute also estab-

Finally, the Commission Clause provides that "*all* the officers of the United States," receive presidential commissions. *All* means *all*. This structure explains why appointed executive and judicial-branch officers receive commissions, but there is no record of any elected official, president, vice president, or a member of Congress, ever receiving a commission.[13] The reason is simple: elected officials like the President are not "Officers of the United States." Future-Justice Antonin Scalia embraced this position in an Office of Legal Counsel memorandum.[14]

Just as Story explained that general *officer* language in the *Constitution* does not reach the President, federal courts have applied the same canon of construction to *federal statutes*, whereby general *officer* language does not extend to the President. Plaintiffs seek to upend this longstanding doctrine. The Supreme Court has recognized that "textual silence is not enough to subject the presidency to the provisions" of a statute; rather, an "express statement by Congress" is required before restricting the President's authority.[15] Federal courts do not extend general *officer* language in statutes to the President, as future-Justice William H. Rehnquist observed, "unless there is a specific indication that Congress intended to cover the Chief Executive."[16]

### B.      "Office . . . under the United States" Refers to Appointed Positions in All Three Branches of Government

Broader than "Officers of the United States" is the category of "Office . . . under the United States," which is the language used in the Foreign Emoluments Clause. This drafting

---

lished the oath for the Clerk of the House of Representatives and the Secretary of the Senate. *See* Steven G. Calabresi, *The Political Question of Presidential Succession*, 48 STAN. L. REV. 155, 162 (1995).

[13] *See, e.g., Case Of Brigham H. Roberts*, 1 Hinds Prec. of the House of Reps. 546 (1900), bit.ly/2wTGGL5 (noting that the Commission Clause "does not mean that [the President] is to commission members of Congress, [and] he is himself an officer, and he does not commission himself, nor does he commission the Vice President . . . .").

[14] Mem. from Antonin Scalia, Asst. Att'y Gen, Re: Applicability of 3 C.F.R. Part 100 to the Pres. and V.P., OLC, at 2 (Dec. 19, 1974), *available at* ssrn.com/abstract=2889011 ("[W]hen the word 'officer' is used in the Constitution, it invariably refers to someone other than the President or Vice President.").

[15] *See* Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992).

[16] Mem. from William H. Rehnquist, Asst. Att'y Gen., Re: Closing of Government Offices, OLC, at 3 (Apr. 1, 1969), *available at* bit.ly/2sAa6xK ("[S]tatutes which refer to 'officers' or 'officials' of the United States are construed not to include the President unless there is a specific indication that Congress intended to cover the Chief Executive.").

convention refers to a federal appointed position that is created, regularized, or defeasible by statute in any of the three branches of government. All "Officers of the United States" necessarily hold "Office . . . under the United States."[17] However, not all who hold "Office . . . under the United States" are also "Officers of the United States." For example, the Clerk of the House of Representatives holds an "Office . . . under the United States," but is not an "Officer[] of the United States." He is not nominated by the President, does not receive a commission, is not subject to impeachment, and his oath is not authorized by the Oaths Clause.[18] Instead, he is chosen by the House of Representatives, and his emoluments are regularized by statute.[19] Conversely, the Secretary of State, an Executive Branch officer, is *both* an "officer[] of the United States" and holds "Office . . . under the United States." He is nominated by the President, receives a commission, is subject to impeachment, and his oath is authorized by the Oaths Clause.

This understanding of the "Office . . . under the United States" drafting convention has its roots in the prior British statutory drafting practice using "Office under the Crown." This convention was used in colonial practice, governments of the revolutionary era, the Articles of Confederation, and later by the Framers of the Constitution and the First Congress.

### 1.    In the Colonial Period, "Office under the Crown" Did Not Extend to Elected Positions

In the Anglo-American legal tradition, "Office under the Crown" was and remains a commonly-used drafting convention that refers to appointed officers. For the last three centuries, "Office under the Crown," a phrase commonly used in British statutes, has not extended to elect-

---

[17] *See, e.g.*, United States v. Germaine, 99 U.S. 508, 510 (1878) ("That all persons who can be said to hold an office under the government about to be established under the Constitution were intended to be included within one or the other of these modes of appointment there can be but little doubt.")

[18] *See supra* note 14.

[19] U.S. CONST. art. I, § 2 ("The House of Representatives shall *chuse* their Speaker and *other Officers*") (emphasis added). At the first meeting of the House of Representatives in April 1789, after selecting its Speaker, the House chose its first Clerk. *See History of the Office*, U.S. House of Representatives, *available at* perma.cc/FM9J-K2EK.

ed positions.[20] To this day, Commonwealth courts distinguish between (1) officers who are appointed to a position "under the Crown" and (2) officials who "hold their position by virtue of their election by the people."[21] This drafting convention reflects a self-evident aspect of government: appointed officers are subject to removal and supervision in the normal course of their duties by higher governmental authority. By contrast elected officials are not subject to such supervision, and are answerable primarily through elections.

### 2.    Revolutionary-Era Government Used the "Office . . . under" British Drafting Convention

During the War of Independence, the Founders made use of this already extant drafting convention. For example, in a  May 15, 1776 resolution, the Continental Congress contrasted between "any Government *under the crown of Great Britain*" with the newly established "powers of government exerted, *under the authority of the people of the colonies*, for the preservation of internal peace, virtue and good order. . . ."[22] With the signing of the Declaration of Independence, "these United Colonies" at once were "Absolved from all Allegiance to the British Crown" and became "Free and Independent States."[23] Though the Framers rejected the concept of British

---

[20] *See, e.g.*, An Act for the Security of Her Majesty's Person and Government, 6 Ann. c. 7, § 25 (1707), *available at* bit.ly/2riHlG1 (disqualifying any person from holding a seat in the House of Commons if they hold a "new office or place of profit whatsoever under the [C]rown," that is, a position created after 1705); J.L. De Lolme, *The Constitution of England* 62 (1775), *available at* bit.ly/2sl1yeK  (explaining that one holding a "new office under the Crown" is "incapable of being elected [a] Member[]" of the Commons). Mem. of the U.K. Att'y Gen., at 135–36 (May 1, 1941), *available at* bit.ly/2rjcw00 ("If the Crown [the Executive Government] has the power of appointment and dismissal, this would raise a presumption that the Crown controls, and that the office is *one under the Crown*. . . . If the duties are duties under and controlled by the Government, then the office is, *prima facie* . . . an office under the Crown . . . ." (emphasis added)). ANNE TWOMEY, THE CONSTITUTION OF NEW SOUTH WALES 438 (2004) ("As it is an elective office, and not generally subject to the direction or supervision of the government, one would assume that it is not an office held 'under the Crown.'").

[21] *R v. Obeid* (No 2) [2015] New South Wales Supreme Court 1380 [30], *available at* bit.ly/2rSRiZv ("The[se] [authorities] only indicate that an [Member of the Legislative Council] does not hold an office 'under the Crown' or 'under the Government.' Instead they hold their position by virtue of their election by the people and legally are not answerable to, or under the direction of, the 'Crown' or the 'Government.'").

[22] PREAMBLE TO RESOLUTION ON INDEPENDENT GOVERNMENTS (May 15, 1776), *available at* perma.cc/8XB3-CUVB (emphasis added).

[23] THE DECLARATION OF INDEPENDENCE (U.S. 1776).

monarchical sovereignty,[24] like with many of our shared common-law traditions, they retained British drafting conventions. For example, a unanimous 1778 resolution of the Articles Congress granted half pay to former military officers unless they also held an "office of profit *under* these states, or any of them."[25]

The framers of the Articles of Confederation also adhered to this drafting practice. The predecessor to our Constitution's Foreign Emoluments Clause provided that no "person holding any office of profit or trust *under the United States*, or any of them [i.e., any state], [shall] accept any present, emolument, office or title of any kind whatever from any King, Prince or foreign State."[26] The Framers of the Constitution would continue adhering to this drafting convention.

> **3.    The Framers of the Constitution Adhered to the "Office . . . Under" British Drafting Convention**

In four clauses, the Constitution invokes the drafting convention "Office . . . under the United States." First, the Incompatibility Clause provides that "no person holding any *Office under the United States*" may serve in either the House or Senate.[27] This *Office under the United States* language applies to federal appointed positions created, regularized, or defeasible by statute in all three branches. The primary purpose of the Incompatibility Clause was to prevent the President from bribing members of Congress with appointed lucrative office, not to keep members of Congress from being President. The Framers saw the English Constitution as corrupt because the King could bribe Members of Parliament (MPs) with lucrative office.[28] But the King

---

[24] Chisolm v. Georgia, 2 U.S. (2 Dall.) 419, 456 (1793) (Wilson, J.) ("Under that Constitution there are citizens, but no subjects.").

[25] 11 Journal of the Continental Congress 502 (May 15, 1778), *available at* bit.ly/2sg5MDy (emphasis added).

[26] *See* ARTICLES OF CONFEDERATION of 1781, art. VI, para. 1. The Foreign Emoluments Clause in the Articles of Confederation expressly applied to state officers, but that restriction was not placed in the Constitution's Foreign Emoluments Clause. This decision illustrates that the Framers were sensitive to the scope of their handiwork.

[27] U.S. CONST. art. I, § 6, cl. 2 ("no Person holding any *Office under the United States*, shall be a Member of either House during his Continuance in Office.") (emphasis added).

[28] *See* The Federalist No. 76 (Hamilton) (discussing the Incompatibility Clause in light of the "venality of the British House of Commons"); *see also* The Records of the Federal Convention of 1787, 379 (1911) (quoting Pierce Butler's

never bribed MPs by making them King. Likewise, the President could bribe members of Congress with lucrative positions, but could not make them President. The Incompatibility Clause was as an ethics provision, not a "general separation-of-powers provision."[29]

Three other clauses in the Constitution use the "Office . . . under the United States" drafting convention, but with variants. First, the Disqualification Clause allows Congress to bar impeached officers from prospectively holding "any Office of *honor*, *Trust* or *Profit* under the United States."[30] An office of *profit* refers to a position with a regular salary or other emoluments, and an office of *trust* refers to a position with regular, non-delegable duties (i.e., requiring the exercise of discretion).[31] These terms may overlap.[32] Finally an office of *honor* refers to a position without fixed emoluments (and perhaps absent regular duties).[33] That Congress can impose separate disqualifications on those who hold "Office . . . under the United States" affirms the conclusion that the latter category was separate from elected officials.

Second, the Elector Incompatibility Clause prevents a "Senator or Representative, or person holding an Office of Trust or Profit under the United States" from serving as an Elector.[34] Listing Senators and Representatives, alongside those who hold "Office . . . under the United States," again reaffirms the conclusion that the "Office . . . under the United States" category was separate from elected officials. Finally, the Foreign Emoluments Clause limits the receipt of for-

---

convention comments in relation to the proposed Ineligibility Clause and noting the "great venality and corruption" of the "government of Great Britain").

[29] Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 CORNELL L. REV. 1045, 1066 (1994).

[30] U.S. CONST. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment [by the Senate] shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit under the United States*.") (emphasis added).

[31] FLOYD R. MECHEM, A TREATISE ON THE LAW OF PUBLIC OFFICES AND OFFICERS § 13, at 8 (1890), *available at* bit.ly/2wjc184 (offices of profit are those "to which salary, compensation or fees are attached."); *id.* at § 16, at 9 (an office of trust "require[s] the exercise of discretion, judgment, experience and skill").

[32] *See e.g.*, Doty v. State, 6 Blackf. 529, 530 (Ind. 1843) (*per curiam*).

[33] MECHEM, *supra* note 31 § 15, at 9 (An office of honor is one "to which no compensation attaches . . . and is supposed to be accepted merely for the public good.").

[34] U.S. CONST. art. II, § 1, cl. 2 ("no Senator or Representative, or Person *holding an Office of Trust or Profit under the United States*, shall be appointed an Elector.") (emphasis added).

eign presents for a person "holding any Office of Profit or Trust under [the United States]."[35] In his *Commentaries*, Story explained the President is not an "officer of the United States." In the very same passage, Story also indicated that the same interpretive position applied to the Constitution's "office . . . under the United States" language.[36] In other words, the Constitution's general *officer of the United States* and *office under the United States* language does not reach the presidency. Only express constitutional language reaches the presidency.

During the Virginia ratifying convention, Edmund Randolph and George Mason took a different position, arguing that members of Congress were subject to impeachment.[37] The two Virginians read the phrase "Officers of the United States" in the Impeachment Clause without limitation: they believed that general *office*-language in the Constitution, and in the Impeachment Clause in particular, referred to appointed and *all* elected positions, including Representatives and Senators, and by implication the President and the Vice President. Their views did not pass unnoticed, and even at the time, some saw their view as inconsistent with the constitutional text. For example, James Monroe, objecting contemporaneously in 1788, observed "that the Senators are not impeachable, and therefore Governor Randolph's objection falls to the ground."[38] Monroe, the future president, concluded: "I am surprised that a man of that gentleman's abilities . . . should have fallen into this mistake." More importantly, a decade later, the Senate adopted Mon-

---

[35] *Id.* at art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States: And no Person holding any *Office of Profit or Trust under them*, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.") (emphasis added). The "them" in the Foreign Emoluments Clause refers back to "the United States" in the Title of Nobility Clause. At the time of the Founding, the United States would have been referred to using a plural pronoun ("them"), rather than the more modern singular pronoun (e.g., "it").

[36] *See supra* note 7.

[37] *See* 3 *Debates in the Several State Conventions* at 222 (2d ed. 1836), *available at* bit.ly/2wQqkoO (Randolph stated that though Senators are chosen every two years, "they may also be impeached. There are no better checks upon earth."); *id.* at 402-03, *available at* bit.ly/2vODA9z (Mason stated that the House of Representatives should impeach a Senator who ratified a treaty because of "bribery and corruption").

[38] 1 *The Writings of James Monroe 1778–1794*, at 347, 361–62 (1788), *available at* perma.cc/2E8V-GVV8.

roe's reading of the Constitution in the first impeachment trial, which would become known as the *Blount* case.[39]

### 4. The First Congress Adhered to the "Office . . . Under" Drafting Convention

The First Congress continued to adhere to the "Office . . . under the United States" drafting convention. In a 1790 anti-bribery statute, Congress declared that a defendant convicted of bribing a federal judge "shall forever be disqualified to hold any *office of honor, trust, or profit under the United States*."[40] If, as Plaintiffs argue, the President holds an "Office of Profit or Trust under [the United States]" then this 1790 statute, enacted one year after the Constitution went into force, would be deeply problematic. Congress does not have the power to add, by statute, new qualifications for federal elected positions.[41] For example, a statute that required the President to "attain[] the Age" of 40, instead of 35, would be plainly unconstitutional.[42] If the Plaintiffs are correct that elected positions, such as the President, hold an "Office . . . under the United States," then this statute is plainly unconstitutional. The better view is that Plaintiffs' intuition is incorrect. Courts should avoid an interpretation of "Office . . . under the United States" under which the First Congress unconstitutionally added qualifications for the Presidency.

Rather, the more reasonable interpretation is that members of that body (which included many Framers and ratifiers) understood that "Office . . . under the United States" did not extend to elected positions. The preference for this latter construction, which raises no constitutional doubts and comports with longstanding "Office . . . under the United States" drafting conven-

---

[39] 8 Annals of Cong. 2319 (1799), *available at* perma.cc/EB4H-TDE8 (adopting resolution on January 11, 1799) (noting that "this Court ought not to hold jurisdiction."). *See* Lamar v. United States, 241 U.S. 103, 112, 113 (1916).

[40] An Act for the Punishment of Certain Crimes, 1 Stat. 112, 117 (1790), *available at* bit.ly/2rbNfVq (emphasis added). This language mirrored the text of the Disqualification Clause. *See* U.S. CONST. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment [by the Senate] shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit under the United States*.") (emphasis added).

[41] *See, e.g.*, Powell v. McCormack, 395 U.S. 486, 527–47 (1969); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6–35 n.51 (2000) (explaining that *Powell* was a "largely historical inquiry").

[42] *See* U.S. CONST. art. II, §. 1.

12

tions, is further bolstered by the special solicitude that is afforded to the First Congress.[43] It is certainly true that early Congresses took actions that were later disapproved of by the courts.[44] But such disputes concerned highly controversial legislation, such as the Alien and Sedition Acts,[45] or in the case of the Judiciary Act of 1789, implementation of a new complex statutory system.[46] There is no record indicating that the 1790 Act's "Office . . . under the United States" provision was hotly debated in Congress or by the public. And, unlike the Judiciary Act of 1789, which essentially built a new and complex structural constitution for the judiciary, the 1790 Act made use of long standing principles and policies, and most importantly, language. Indeed, the phrase at issue here—"Office . . . under the United States"—had a long established pedigree.

During this period, the Early Republic, Congress had several occasions to add disqualifications for appointed officers using the "office  . . . under the United States" language.[47] Congress knew such language could not extend to elected officials.[48] There is every good reason to conclude that because "office . . . under the United States" in the 1790 Act could not have reached elected officials, the same language in the Constitution does not reach elected officials, such as the President.

---

[43] *See* Myers v. United States, 272 U.S. 52, 136 (1926); Schell v. Fauche, 138 U.S. 562, 572 (1891).

[44] *See e.g.*, New York Times Co. v. Sullivan, 376 U.S. 254, 276 (1964).

[45] *See* The Virginia Resolution (Madison) (Dec. 24, 1798); The Kentucky Resolution (Jefferson) (Nov. 16, 1798); JAMES MADISON, REPORT ON THE VIRGINIA RESOLUTIONS (Jan. 1800), *available at* perma.cc/CKQ5-L6HJ.

[46] *See* Edward Corwin, *Marbury v. Madison and the Doctrine of Judicial Review*, 12 MICH. L. REV. 538, 541–42 (1914), *available at* bit.ly/2xfihSl; James E. Pfander, *Marbury, Original Jurisdiction, and the Supreme Court's Supervisory Powers*, 101 COLUM. L. REV. 1515, 1573–74 (2001). *Cf.* Louise Weinberg, *Our Marbury*, 89 VA. L. REV. 1235, 1321–31 (2003).

[47] *See e.g.*, Treasury Act, 1 Stat. 65, 67 (1789), *available at* bit.ly/2suQuv9 ("shall upon conviction be removed from office, and forever thereafter incapable of holding any *office under the United States*") (emphasis added); An Act to regulate the Collection of the Duties, 1 Stat. 29, 46 (1789); An Act for Registering and Clearing Vessels, 1 Stat. 55, 64–65 (1789); *see also* De Veau v. Braisted, 363 U.S. 144, 158–59 (1960) (Frankfurter, J., concurring) ("a large group of federal statutes disqualify persons 'from holding any office of honor, trust, or profit under the United States' because of their conviction of certain crimes").

[48] *See* The Federalist No. 60 (Hamilton) (noting that the qualifications for membership in Congress are "defined and fixed in the Constitution, and are unalterable by the [national] legislature").

### 5.    President Washington's Secretary of the Treasury, Alexander Hamilton, Adhered to the "Office . . . Under" Drafting Convention

In 1792, the Senate directed President Washington's Secretary of the Treasury, Alexander Hamilton, to draft a financial statement listing the "emoluments"[49] of "*every* person holding *any civil office or employment under the United States.*"[50] Hamilton took more than nine months to draft and submit a response, which spanned some ninety manuscript-sized pages. The report included appointed or administrative personnel in *each* of the three branches of the federal government, including the Legislative Branch (e.g., the Secretary of the Senate and Clerk of the House and their staffs) and the clerks of the federal courts.[51] But Hamilton's carefully-worded response did *not* include the President, Vice President, Senators, or Representatives.[52]

The Senate asked for a list of "*every* person holding *any civil office or employment under the United States,*" and that is precisely what Hamilton delivered—to the exclusion of any elected official. If the Constitution's "office . . . under the United States" language reached elected officials, then quite plainly Hamilton misunderstood the meaning of the Constitution which he helped to draft and ratify. It is counter-intuitive to suggest that Hamilton misunderstood this language. The better reading is that Hamilton accurately responded to the Senate's precise request: elected officials do not hold *office under the United States*, and so they were not listed.

---

[49] Consistent with the longstanding interpretation of "emoluments," Hamilton's complete report listed only the "compensation or pecuniary profit derived from a *discharge of the duties*" of "*every* person holding *any civil office or employment under the United States.*" *See* Hoyt v. United States, 51 U.S. (10 How.) 109, 135 (1850) (emphasis added). Contrary to the plaintiffs' attempt to redefine this term, Hamilton's report did not list financial gain arising from private business transactions, precisely because they are not "emoluments." Here, the language of "emoluments" is tied to "office" and "employment." Indeed, this is how the word was most commonly used at time of the ratification. *See* James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis,* 59 SO. TEXAS L. REV. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938.

[50] 1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry) (emphasis added), *available at* bit.ly/2rQswt8.

[51] *See* REPORT ON THE SALARIES, FEES, AND EMOLUMENTS OF PERSONS HOLDING CIVIL OFFICE UNDER THE UNITED STATES (Feb. 26, 1793), *in* 14 The Papers of Alexander Hamilton ("*PAH*"), 157, 157–59 (1969), *available at* perma.cc/49RT-TTGF. It goes without saying that no state (appointed) officers or elected officials were included, nor were federal electors.

[52] *Id.* The editors of *PAH* marked this document "DS," meaning "document signed," which indicates that this document was the original signed by Hamilton.

To support their view that the President holds an "office . . . under the United States," counsel for Plaintiffs has cited another document that lists President Washington and Vice President Adams along with the other officers included in Hamilton's original report.[53] Plaintiffs' reliance on this scrivener's copy is misplaced.[54] Contrary to counsel's incorrect supposition, a wide range of experts—including one whom counsel has previously cited—agree that Hamilton did not personally sign this scrivener's copy, which was likely drafted in the 1830s, but certainly no earlier than 1820.[55] Of course, Hamilton died in 1804. Whatever value this latter report, drafted by an unknown Senate functionary (or functionaries) has, it should not be accorded the same weight as the original document signed by Hamilton and transmitted to the Senate as an official Executive Branch communication.

## II.    The Foreign Emoluments Clause Does Not Encompass the Presidency

Plaintiffs contend that because "Defendant Donald J. Trump is the President of the United States of America," he "thus holds an 'Office of Profit or Trust' under the United States."[56] Plaintiffs' position is incorrect. The weight of evidence demonstrates that the President does not hold "an 'Office of Profit or Trust' *under* the United States." Thus, he is not subject to the Foreign Emoluments Clause.

Plaintiffs counter this evidence by citing two members of the Virginia ratifying convention, Edmund Randolph and George Mason, who argued that the President could be impeached

---

[53] *See List Of Civil Officers Of The United States, Except Judges, With Their Emoluments, For The Year Ending October 1, 1792*, *in* 1 American State Papers/Miscellaneous 57 (1834); Brianne J. Gorod, *What Alexander Hamilton Really Said*, TAKE CARE (Jul 6, 2017), perma.cc/YCY8-XQC9; Brianne J. Gorod, *A Little More on Alexander Hamilton and the Foreign Emoluments Clause*, TAKE CARE (Aug. 1, 2017), perma.cc/U4A6-EMVG.

[54] *See* Motion for Leave to File Response to Brief of *Amici Curiae* by Certain Legal Historians, CREW et al v. Trump, 17 Civ. 458 (S.D.N.Y.) [ECF No. 85] http://bit.ly/2yc175l.

[55] *Id.* (citing expert declarations of Michael E. Newton, John P. Kaminski, Professor Kenneth R. Bowling, Professor Stephen F. Knott, and Professor Robert W.T. Martin). *See, e.g.*, Brief of Constitutional Accountability center as *Amicus Curiae* in Support of Respondent at 10, Spokeo, Inc. v. Robins, No. 13-1339 (U.S. Sept. 8, 2015) 2015 WL 5244346 (citing historian John P. Kaminski).

[56] 1st Am. Compl. p. 21, ECF No. 14.

for accepting foreign emoluments. This evidence is problematic because those same members also argued that members of Congress could be impeached—a position that was rejected two centuries ago. Further, Mason's and Randolph's statements are in conflict with the practices of Presidents Washington, and other founders who succeeded him during the Early Republic, who accepted and kept diplomatic gifts and gifts from foreign governments and their officials without seeking or receiving congressional consent. Precedents set by George Washington and these early Presidents are entitled to special solicitude, which Plaintiffs cannot rebut. The weight of historical evidence confirms that the President does not hold an "Office . . . under the United States" and, therefore, is not bound by the Foreign Emoluments Clause.

A.    **Edmund Randolph and George Mason's Overly Broad Understanding of "Officer" Was Ultimately Rejected**

During the Virginia ratifying convention, George Mason and Edmund Randolph took the position that the Foreign Emoluments Clause applies to the President.[57] Randolph opined that the President "may be impeached" for violating the Foreign Emoluments Clause.[58] Randolph's and Mason's positions are problematic because they also thought that members of Congress could be impeached.[59] Specifically, they contended that the Constitution's general *office*-language (that is, "Officers of the United States" as used in the Impeachment Clause) extends to Representatives and Senators. Randolph and Mason's positions on the Impeachment and Foreign Emoluments Clauses are not independent, separate, or distinguishable: both positions arise from their view of the scope of the Constitution's general *office*-language, for example, "Officers of the United States" and "Office . . . under the United States." Their view in regard to the Impeachment

---

[57] *See e.g.*, 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 484 (2d ed. 1836), *available at* bit.ly/2gXirl1 (Mason's position); *id.* at 486, *available at* bit.ly/2fcvP7h (Randolph's position).

[58] *Id.* If Randolph is correct that impeachment is the proper remedy for the President's violating the Foreign Emoluments Clause (a view *Amicus* rejects), then Plaintiffs' grievances are being litigated in the wrong forum.

[59] *See supra* I.B.3.

Clause's *office*-language was contemporaneously rejected by James Monroe, ratifier and future President, and ultimately by the Senate sitting as a court of impeachment.[60]  There is no principled way for this Court to rely on their closely related view in regard to the scope of the Foreign Emoluments Clause's *office*-language. Further, Randolph's and Mason's positions are not consistent with the drafting convention employed by Revolutionary-era governments, the first Congress, and its statutes, and Alexander Hamilton's roll of officers. The credentials of these latter institutions and individual members of government are every bit as good (if not better) than Randolph's and Mason's.

It is true that Randolph and Mason's position mirrors Plaintiffs' intuition: How could the Presidency not qualify as an 'Office of Profit or Trust' under the United States for purposes of this important anti-corruption provision? However, in the realm of foreign affairs, our separation of powers jurisprudence provides extra latitude for the President. In support of his power to "receive Ambassadors,"[61] the President may need the authority to accept foreign gifts unilaterally without having to first seek congressional consent. This is precisely what George Washington did in regard to a diplomatic gift from our ally France.[62] Unlike the numerous diplomats stationed abroad, the elected and unitary President stands in a very unique position due to his largely unfettered powers over foreign affairs.[63] The contrary interpretation would be extremely problematic: if a hostile or slow moving Congress rebuffed the President's request to accept a foreign

---

[60] *Id.*

[61] U.S. CONST. art. II, § 3.

[62] *Cf.* Zephyr Teachout, *The Anti-Corruption Principle*, 94 CORNELL L. REV. 341, 362 (2009) (noting that "the countries that threatened [the new United States] were countries that many of the Framers had strong and direct ties to, even affection for—France, most prominently."). Yet, President Washington accepted these gifts from France.

[63] Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015).

present, the foreign diplomat (or head of state) making the gift could relay a message of umbrage and disrespect to his home country.[64]

If the Constitution vests the President with vast authority over recognizing foreign nations, then certainly it entails the far lesser authority to accept presents from those very same countries. Indeed, the President's decision to accept a gift from a new world leader could itself amount to an act of recognition. Like with many of the President's powers, he can act on his own in the first instance, but if Congress determines that the gifts amount to "Bribery," he can be removed from office via impeachment.[65] Further, the President and his party ultimately are answerable to the electorate. The practices of George Washington and founders who were his successors during the Early Republic confirm this understanding: they publicly accepted presents from allies and other governments, never sought congressional consent, and neither the House nor the Senate expressed any concern.

**B.   Washington and His Successors During the Early Republic Openly Accepted Foreign Gifts Without Seeking Congressional Consent**

In 1791, Washington received, accepted, and kept a diplomatic gift—a framed full-length portrait of King Louis XVI from the French ambassador to the United States.[66] There is no evidence that Washington ever sought or received congressional consent to keep this valuable gift. In addition to the portrait, Washington also received the main key to the Bastille accompanied with a picture of that fortress,[67] from the Marquis de Lafayette,[68] who at the time was a French

---

[64] Congress's first debate over the Foreign Emoluments Clause came in 1798—after Washington's presidency ended—when the "late Ambassador to Great Britain and Spain," sought "to receive certain presents from those courts." 8 Annals of Cong. 1582–1593 (May 4, 1798), *available at* bit.ly/2ttpIA5. The Senate approved the resolution, but after a lengthy and vigorous debate, the House voted it down. 2 Journal of the United States Senate 484, 486 (May 2–4, 1798), *available at* bit.ly/2fbKLCs.

[65] U.S. CONST. art. II, § 4.

[66] *See* Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791), *available at* perma.cc/5F2V-G5GU.

[67] Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790, at 2, *available a* bit.ly/2rlnKjP; Pa. Packet, & Daily Advertiser (Aug. 13, 1790), at 2, *available at* bit.ly/2r9bBiz (same).

government official.[69] Both of these items were prominently displayed in the federal capital. The portrait and valuable ornate frame, which included the Washington family crest and the monogram of the French King to "embod[y] . . . amicable Franco-American relations,"[70] hung in Washington's principal room.[71] The key was on display in Washington's first home in New York at No. 3 Cherry Street[72] and was "showcased in Philadelphia when the seat of government moved there in the fall of 1790."[73] To this day, the key is on public display at Mt. Vernon.

The foreign provenance of these gifts from foreign governments would have been immediately recognizable to anyone who saw them. Indeed, the provenance of the key was widely reported in contemporaneous newspapers.[74] Yet, there is no evidence that cabinet members—including Attorney General Edmund Randolph who advised the President on constitutional matters—recorded any dissent. Nor did anti-administration members of Congress or the press raise any objections. If the Foreign Emoluments Clause applies to Presidents, as Plaintiffs argue, then the President is precluded from accepting, not just "emoluments," but also "any present . . . of any kind whatever" from foreign states absent congressional consent. Here Washington accepted two such presents without congressional consent. That he did so absent any recorded objections

---

[68] Lest anyone mistakenly believe that the key was a private gift from LaFayette to his friend President Washington, this gift was discussed in diplomatic communications form the French government's representative in the United States to his superiors in the French ministry of foreign affairs. *See* Letter from Louis Guillaume Otto to Armand Marc de Montmorin (Aug. 3, 1790), available in Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres, Correspondances Politiques, 39CP, Volume 35, Microfilm P5982, pages 147–149.

[69] *See e.g.*, ANDRÉ MAUROIS, ADRIENNE: THE LIFE OF THE MARQUISE DE LA FAYETTE 178–82 (1961); A COMPLETE HISTORY OF THE MARQUIS DE LAFAYETTE 193, 194 (1826), *available at* bit.ly/2tauZfC (same). At the time, Lafayette held positions in the French government: member of the legislature (and its former vice president) and commander of the National Guard.

[70] *Louis Seize, Roi Des Français, Restaurateur De La Liberté*, George Washington's Mount Vernon, *available at* perma.cc/H328-NWWN.

[71] S.W. Jackman, *A Young Englishman Reports on the New Nation: Edward Thornton to James Bland Burges, 1791–1793*, 18 WM. & MARY Q. (3d ser.) 85, 108, 121 (1961).

[72] *See* 2 Esther Singleton, *The Furniture of our Forefathers* 503 (1906).

[73] *Bastille Key*, GEORGE WASHINGTON'S MOUNT VERNON, *available at* http://www.mountvernon.org/digital-encyclopedia/article/bastille-key/.

[74] *Supra* note 67 (citing newspapers).

in Congress or elsewhere provides strong evidence that the Foreign Emoluments Clause does not reach the presidency.

Time and again, the Supreme Court has looked to Washington's decisions and practice when interpreting the text and structure of the Constitution.[75] Justice Frankfurter fittingly "derive[d] consolation from the reflection that the President and the Congress between them will continue to safeguard the heritage which comes to them straight from George Washington."[76] Washington's conduct, particularly his public acts, are entitled to special solicitude when construing the Constitution.[77] Parties bear a heavy burden in asserting that "President Washington did not understand" the Constitution he helped define.[78] Given that Plaintiffs are effectively alleging that Washington publicly violated the Constitution absent any noticeable opposition, the burden on them is even heavier.

Moreover, Washington was not the lone President to accept foreign gifts. President Jefferson received a bust of Czar Alexander I, a diplomatic gift, from the Russian government.[79] Jefferson received, accepted, and kept this diplomatic gift.[80] Jefferson's "particular esteem" for Alexander "convinced him to break his [personal] rule of not accepting gifts while in public office."[81] There is no indication that Jefferson felt his decision was controlled by the Foreign Emoluments Clause. As with Washington, there is no evidence Jefferson ever sought or received

---

[75] N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 935 (2017); N.L.R.B. v. Noel Canning, 134 S. Ct. 2550, 2561 (2014); NASA v. Nelson, 562 U.S. 134, 149 (2011); Free Enter. Fund v. PCAOB, 561 U.S. 477, 483 (2010); Van Orden v. Perry, 545 U.S. 677, 686–87 (2005); Clinton v. City of N.Y., 524 U.S. 417, 440 (1998); Clinton v. Jones, 520 U.S. 681, 698 (1997); U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 814 n.26 (1995); United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320 (1936); Myers v. U.S., 272 U.S. 52, 207 (1926).

[76] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 614 (1952) (Frankfurter, J., concurring).

[77] *See* AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION 209, 308 (2015) ("Washington defined the archetypical presidential role," and "[a]s America's first 'first man,' [he] set precedents from his earliest moments on the job.").

[78] Freytag v. C.I.R., 501 U.S. 868, 917–18 (1991) (Scalia, J., concurring).

[79] *See* Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7, 1804), *available at* perma.cc/4ATK-BWVN; *Gifts from Foreign Dignitaries*, Monticello, *available at* perma.cc/C26E-X23E.

[80] *See* Letter from T. Jefferson to Levett Harris (April 18, 1806), *available at* perma.cc/3FX8-Y5TG.

[81] *Russia*, Monticello, *available at* perma.cc/D69R-CEAT.

congressional consent to keep the bust. Jefferson also received presents from Indian tribes, which he considered "diplomatic gifts" from foreign nations.[82] During their great trek, Lewis & Clark exchanged many gifts with the Indian tribes in "diplomatic and social contexts," which they later delivered to Jefferson.[83] Jefferson did not seek or receive congressional consent to keep the gifts. He put them on public display at Monticello, where they remain on display today.[84] What all these presents from foreign states had in common was that the presidential recipients believed (as best as we can tell) that keeping the presents had no constitutional implications under the Foreign Emoluments Clause. If that is true, if the President can keep "presents" absent congressional consent, then the same result applies to foreign "emoluments." The President may receive, accept, and keep them all without congressional consent precisely because the Foreign Emoluments Clause does not apply to the presidency.

The fourth and fifth Presidents continued the practices of Washington and Jefferson. In 1816, General Ignacio Alvarez of the United Provinces of the Rio de la Plata (in present-day Argentina) gave President Madison two pistols "to form a closer connexion with the United States."[85] The pistols were manufactured in Buenos Aires "as an homage due to the chief Magistrate of the United States of North America."[86] The pistols were delivered to Madison via diplomatic channels.[87] James Madison gave the guns to his successor, President James Monroe, all absent any congressional consent.[88] If Plaintiffs are correct about the scope of the Foreign Emol-

---

[82] *See* Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806), *available at* perma.cc/QB6Z-SWSD (emphasis added)). Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, *available at* perma.cc/658Z-WN5S.

[83] Elizabeth Chew, *Tokens of Friendship*, Monticello, *available at* perma.cc/9BP2-565L.

[84] *Alexander I (Sculpture)*, Monticello, *available at* perma.cc/G8K9-LLL4; *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, *available at* perma.cc/WUT5-847L.

[85] Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816), *available at* perma.cc/D47U-V4H3.

[86] *Id.*

[87] Letter to J. Madison from John Graham (Aug. 8, 1816), *available at* perma.cc/RD8B-2ASW.

[88] *See Pistols*, James Monroe 3D, *available at* perma.cc/T796-ED5B (on website of the James Monroe Museum); Jonathan Fildes, *Science Probe for 'Space Pistols,'* BBC NEWS (May 26, 2008), *available at* perma.cc/4DJP-PUF4.

uments Clause, then James Madison, another significant Framer, wrongfully converted government property. Likewise, James Monroe, another Founder—who had prior to ratification corrected Mason and Randolph about the scope of the Constitution's *Officer* language—connived with his predecessor to receive (what would amount to) stolen U.S. government property.

Plaintiffs' position, notwithstanding its intuitive appeal, must be rejected. Good history trumps modern linguistic intuitions. Washington, Jefferson, Madison, and Monroe did not act lawlessly, and if any of them had done so, surely there would be *some* record, *somewhere* recording *some* objection or dissent. But there is no such dissent. Furthermore, Plaintiffs cannot point to a single judicial decision holding that the Foreign Emoluments Clause's "Office . . . under the United States" language, or any closely similar language in other constitutional provisions, applies to the President. Rather, the text and history of the Constitution, and post-ratification practice during the Early Republic, strongly support the counter-intuitive view: the President does not hold an "Office . . . under the United States."

## CONCLUSION

The President does not hold an "Office of Profit or Trust under" the United States, so Counts I and II must be dismissed. President Trump's business activities may raise ethical conflicts under modern good governance standards, but they raise no constitutional conflicts under the Foreign Emoluments Clause.[89]

---

There is no doubt as to the provenance of the Washington and Jefferson diplomatic gifts, but the provenance of the pistols is disputed. Certainly, the pistols are not in the government's archives, where they would be unless someone had removed them.

[89] Plaintiffs' Complaint is brought against the President in his "official capacity." 1st Am. Compl. p. 21, ECF No. 14 ¶ 11. Given that the case could not continue against the President's successor, this suit cannot be an "official capacity" suit. *See* Lewis v. Clarke, 137 S. Ct. 1285, 1292 (2017). *See* Seth Barrett Tillman, *The Emoluments Clauses Lawsuits's Weak Link: The Official Capacity Issue*, Yale J. of Reg. Notice & Comment Blog (Aug. 15, 2017), *available at* perma.cc/759Y-CC2R.

Dated: New York, New York
       September 19, 2017

Respectfully submitted,

By:   /s/ Robert W. Ray
      Robert W. Ray
      D.C. Bar No. 401377
      THOMPSON & KNIGHT LLP
      900 Third Avenue, 20th Floor
      New York, New York 10022
      Telephone: (212) 751-3349
      Email:  robert.ray@tklaw.com
      *Co-Counsel for Amicus Curiae*
      *Scholar Seth Barrett Tillman*

      Josh Blackman
         Admission *pro hac vice* pending
      1303 San Jacinto Street
      Houston, Texas 77002
      Telephone: (202) 294-9003
      Email: Josh@JoshBlackman.com
      *Counsel for Amicus Curiae*
      *Scholar Seth Barrett Tillman*

      Carrie Severino
      D.C. Bar No. 982084
      Judicial Education Project
      722 12th St., N.W., Fourth Floor
      Washington, D.C. 20005
      Telephone: (571) 357-3134
      Email: carrie@judicialnetwork.com
      *Counsel for Amicus Curiae*
      *Judicial Education Project*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2017, I caused a true and correct copy of the fore-
going to be served on all counsel of record through the Court's CM/ECF system.

/s/ Robert W. Ray
Robert W. Ray, Esq.
