**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

Senator RICHARD BLUMENTHAL,
Representative JOHN CONYERS, JR., *et al.*,

         Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

         Defendant.

Civil Action No. 17-cv-1154 (EGS)

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**


Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
   CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................ 4

    I.    The Plaintiffs Have Standing ............................................................ 4

          A.    Members of Congress Have Standing To Sue When a President Deprives Them of Specific Votes to Which They Are Constitutionally Entitled ....... 5

               1.    Vote Deprivation Is a Cognizable Legal Injury ................................ 5

               2.    *Raines* Permits Members of Congress To Sue Over the Complete Deprivation of Their Right To Vote ..................................... 9

               3.    D.C. Circuit Precedent Since *Raines* Also Permits Genuine Vote Deprivation Claims ............................................................ 14

          B.    President Trump Is Denying Members of Congress Their Right To Vote on the Foreign Emoluments He Is Accepting Without Their Consent ........ 16

          C.    There Are No Adequate Legislative Remedies ........................................... 22

    II.    President Trump's Acceptance of Valuable Benefits from Foreign States Without Congressional Consent Violates the Foreign Emoluments Clause ......... 28

          A.    The Meaning of "Emolument" ..................................................... 29

          B.    Constitutional Text and Structure ................................................. 34

          C.    Constitutional Purpose ............................................................... 36

    III.    The President's Remaining Arguments Have No Merit ...................................... 41

CONCLUSION ............................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*,
    697 F.2d 303 (D.C. Cir. 1982) ................................................................. 8, 20-21

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ............................................................................. *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ............................................................................. 42

*ASARCO, Inc. v. Kadish*,
    490 U.S. 605 (1989) ................................................................................. 6

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................................. 6

*Bender v. Williamsport Area Sch. Dist.*,
    475 U.S. 534 (1986) ................................................................................. 13-14

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................. 43

*Bond v. United States*,
    564 U.S. 211 (2011) ................................................................................. 43

*Byrd v. Raines*,
    956 F. Supp. 25 (D.D.C. 1997) ............................................................... 10

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) ................................................... 11, 16, 22, 23, 27

*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999) .......................................... 7, 15, 16, 22, 23

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ................................................................................. 43

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................................. 14

*Clinton v. Jones*,
    520 U.S. 681 (1997) ................................................................................. 45

*Coleman v. Miller*,
    307 U.S. 433 (1939) ................................................................................. *passim*

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Comm. on Judiciary v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ................................................................ 42

*Comm. on Oversight & Gov't Reform v. Holder,*
    979 F. Supp. 2d 1 (D.D.C. 2013) .................................................................. 13

*Common Cause v. Biden,*
    909 F. Supp. 2d 9 (D.D.C. 2012) .................................................................. 15

*Corr. Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ......................................................................................... 42

*Dennis v. Higgins,*
    498 U.S. 439 (1991) ....................................................................................... 42

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................................... 29

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.,*
    565 U.S. 606 (2012) ....................................................................................... 42

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998) ......................................................................................... 13

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ....................................................................................... 44

*Free Enter. Fund v. P.C.A.O.B.,*
    561 U.S. 477 (2010) ....................................................................................... 42

*Goldwater v. Carter,*
    444 U.S. 996 (1979) ....................................................................................... 24

*Goldwater v. Carter,*
    617 F.2d 697 (D.C. Cir. 1979) ............................................................... *passim*

*Himely v. Rose,*
    9 U.S. 313 (1809) ........................................................................................... 30

*Hollingsworth v. Perry,*
    133 S. Ct. 2652 (2013) ................................................................................... 12

*Holmes v. Jennison,*
    39 U.S. 540 (1840) ......................................................................................... 34

*Kennedy v. Sampson,*
    511 F.2d 430 (D.C. Cir. 1974) ............................................................... 6, 9, 16

# TABLE OF AUTHORITIES – cont'd

Page(s)

*Kucinich v. Bush,*
  236 F. Supp. 2d 1 (D.D.C. 2002) ............................... 14

*LaRoque v. Holder,*
  650 F.3d 777 (D.C. Cir. 2011) ............................... 42

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  134 S. Ct. 1377 (2014) ............................... 43

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................... 4, 12

*Marbury v. Madison,*
  5 U.S. 137 (1803) ............................... 28

*Mendoza v. Perez,*
  754 F.3d 1002 (D.C. Cir. 2014) ............................... 18

*Metlife, Inc. v. F.S.O.C.,*
  865 F.3d 661 (D.C. Cir. 2017) ............................... 14

*Michel v. Anderson,*
  14 F.3d 623 (D.C. Cir. 1994) ............................... 10

*Mississippi v. Johnson,*
  71 U.S. 475 (1866) ............................... 43, 44

*Moore v. U.S. House of Representatives,*
  733 F.2d 946 (D.C. Cir. 1984) ............................... 10, 11, 16

*Nat'l Treasury Emps. Union v. Nixon,*
  492 F.2d 587 (D.C. Cir. 1974) ............................... 28

*Nev. Comm'n on Ethics v. Carrigan,*
  564 U.S. 117 (2011) ............................... 17

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) ............................... 37, 45

*Powell v. McCormack,*
  395 U.S. 486 (1969) ............................... 12

*Raines v. Byrd,*
  521 U.S. 811 (1997) ............................... *passim*

*Riegle v. Fed. Open Mkt. Comm.,*
  656 F.2d 873 (D.C. Cir. 1981) ............................... 7, 20, 43

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Rochester Pure Waters Dist. v. E.P.A.*,
   960 F.2d 180 (D.C. Cir. 1992) ................................................................. 27

*Russell v. DeJongh*,
   491 F.3d 130 (3d Cir. 2007) ..................................................................... 7

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................................. 4, 12

*Sporhase v. Nebraska ex rel. Douglas*,
   458 U.S. 941 (1982) .................................................................................. 26

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) .................................................................. 44, 45

*Thompson v. N. Am. Stainless, LP*,
   562 U.S. 170 (2011) .................................................................................. 43

*United States v. Adewani*,
   467 F.3d 1340 (D.C. Cir. 2006) ................................................................ 7

*United States v. MacCollom*,
   426 U.S. 317 (1976) .................................................................................. 27

*United States v. Sprague*,
   282 U.S. 716 (1931) .................................................................................. 29

*Vander Jagt v. O'Neill*,
   699 F.2d 1166 (D.C. Cir. 1982) ................................................................ 10


CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

U.S. Const. art. I, § 1 .................................................................................. 17

U.S. Const. art. I, § 3, cl. 1 ........................................................................ 17

U.S. Const. art. I, § 5, cl. 3 ........................................................................ 17

U.S. Const. art. I, § 6, cl. 2 ........................................................................ 35

U.S. Const. art. I, § 8, cl. 11 ...................................................................... 17

U.S. Const. art. I, § 7, cl. 2 ........................................................................ 26

U.S. Const. art. I, § 9, cl. 8 ........................................................................ 1, 16, 17

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

U.S. Const. art. II, § 2, cl. 2 .......................................................................... 17

Pa. Const. of 1776, art. 5.............................................................................. 30

5 Annals of Cong. (1798) (Joseph Gales ed., 1834) ................................ 1, 28, 37, 43

3 *The Debates in the Several State Conventions on the Adoption of the Federal
    Constitution* (Jonathan Elliot ed., 1836)........................................................ *passim*

Department of Housing and Urban Development–Independent Agencies Appropriation
    Act, Pub. L. No. 97-272, 96 Stat. 1160, 1164 (1982) ................................ 21

Foreign Gifts and Decorations Act of 1966, Pub. L. No. 89-673, 80 Stat. 952 (codified as
    amended at 5 U.S.C. § 7342).................................................................... 18

H.R.J. Res. 26, 115th Cong. (2017) ............................................................... 24

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911)......... *passim*

S. Con. Res. 8, 115th Cong. (2017) ............................................................... 24

Standing Rules of the Senate Rule XXII § 2 ................................................... 25

## EXECUTIVE BRANCH MATERIALS

49 Comp. Gen. 819 (1970) ............................................................................ 38, 40

53 Comp. Gen. 753 (1974) ............................................................................ 39

*Comptroller General*, *Matter of: Major James D. Dunn & Senior Master Sergeant
    Marcus A. Jenkins*, B-251084, 1993 WL 426335 (Oct. 12, 1993)........................... 41

5 Op. O.L.C. 187 (1981)................................................................................ 28

6 Op. O.L.C. 156 (1982) ............................................................................... 41

10 Op. O.L.C. 96 (1986)................................................................................ 37, 41

11 Op. O.L.C. 89 (1987) ............................................................................... 29, 45

17 Op. O.L.C. 114 (1993) ....................................................................... 3, 34, 39, 40, 41

18 Op. O.L.C. 13 (1994)............................................................................... 28, 37

24 Op. Att'y Gen. 116 (1902)........................................................................ 29

40 Op. Att'y Gen. 513 (1947)........................................................................ 41

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Memorandum for Andrew F. Gehmann, Exec. Assistant, Office of the Attorney Gen., from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* (Oct. 16, 1962)..................................................................................................... 38, 39

*Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel* (May 23, 1986)... 41

*Memorandum for James H. Thessin, Assistant Legal Advisor, U.S. Dep't of State, from John O. McGinnis, Deputy Assistant Attorney Gen., Office of Legal Counsel* (Aug. 29, 1988)..................................................................................................... 37

*Memorandum for S. A. Andretta, Admin. Assistant Attorney Gen., from J. Lee Rankin, Assistant Attorney Gen., Office of Legal Counsel* (Oct. 4, 1954)............................. 37-38

*Memorandum Opinion for the Counsel to the President from John M. Harmon, Acting Assistant Attorney Gen., Office of Legal Counsel* (Apr. 11, 1977) .......................... 34

*Memorandum Opinion for the Counsel to the President, Office of Legal Counsel,* 2009 WL 6365082 (Dec. 7, 2009)............................................................. 37, 39

*Memorandum Opinion for the Special Assistant to the President from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* (May 10, 1963)...................... 41


BOOKS, ARTICLES, AND OTHER AUTHORITIES

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774)......... 33

*Black's Law Dictionary* (10th ed. 2014)........................................................ 33

Brief for Appellants, *Raines v. Byrd,* 1997 WL 251415................................................................................ 11

Brief for Appellees, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,* 2015 WL 254635................................................................................ 8

Brief for United States, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,* 2015 WL 309078................................................................................ 8

Tench Coxe, *An Examination of the Constitution for the United States of America, No. 4* (Oct. 21, 1787)................................................................................ 37

Samuel Johnson, *A Dictionary of the English Language* (1755).................................. 30

Letter from James Madison to David Humphreys (Jan. 5, 1803)................................... 19

Letter from James Madison to Thomas Jefferson (Aug. 12, 1786) ............................... 31

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Merriam-Webster Dictionary Online*.................................................................. 33

John Mikhail, *A Note on the Original Meaning of "Emolument,"*
    Balkinization (Jan. 18, 2017) ..................................................... 31

John Mikhail, *"Emolument" in Blackstone's Commentaries*,
    Balkinization (May 28, 2017) ..................................................... 31

John Mikhail, *The Definition of "Emolument" in English Language and Legal*
    *Dictionaries, 1523-1806* (July 9, 2017) ................................................ 30, 31, 33, 34

4 John Bassett Moore, *A Digest of International Law* (1906) ....................................... 18

*Oxford English Dictionary* (2d ed. 1989) ........................................................ 30, 32

James C. Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the*
    *U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*
    (Sept. 14, 2017) ......................................................................... 31, 34

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1346 (1833) ........ 37

Jonathan Swift, *The Tale of a Tub* (Henry Morley ed., 1889) (1704) ........................... 30

U.S. Continental Congress, A Declaration by the Representatives of the United Colonies
    of North-America, Now Met in Congress at Philadelphia, Setting Forth the Causes and
    Necessity of Their Taking Up Arms (July 6, 1775).................................................. 30

Virginia Nonimportation Resolutions (June 22, 1770)................................................. 31

## INTRODUCTION

Recognizing the danger that foreign states "will intermeddle in our affairs, and spare no expence to influence them," 2 *The Records of the Federal Convention of 1787*, at 268 (Max Farrand ed., 1911) (Elbridge Gerry), the Framers imbued our national charter with vital safeguards against foreign influence. Chief among them is the Foreign Emoluments Clause, which provides that "no Person holding any Office of Profit or Trust under [the United States] shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8.

The Founding generation recognized that if benefits from foreign states "were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors." 5 Annals of Cong. 1583 (1798) (Joseph Gales ed., 1834) (James Bayard). To avoid that danger, they required such benefits to "be laid before Congress." *Id.* at 1585 (Harrison Gray Otis). Past presidents have done exactly that, *see* Am. Compl. ¶ 31, respecting the Constitution's clear rule—that they may accept such benefits only by first obtaining "the Consent of the Congress."

Not so President Trump. Rather than "make known to the world," 5 Annals of Cong. 1583 (Bayard), the financial rewards he is receiving from foreign governments through his business empire, and seek Congress's consent before accepting them, the President has disregarded the Constitution's structural safeguard against undue foreign influence on America's leaders.

The results are as clear as they are unsurprising. Foreign diplomats flock to the President's Washington, D.C., hotel, where they spend three times the market rate, so they can tell him, "'I love your new hotel!'" Am. Compl. ¶ 54-55. After the President reverses himself and pledges to honor China's policy toward Taiwan, the Chinese government grants him valuable trademarks,

including many it had previously denied. *Id.* ¶¶ 44-49. The success of countless Trump-branded projects abroad hinges on the regulatory decisions of foreign officials, and the President advocates for those projects in conversations with foreign leaders. *Id.* ¶ 66. Meanwhile, the President's New York properties collect annual payments from Saudi Arabia and China (and possibly other foreign states), who hold sway through their ability to relocate. *Id.* ¶¶ 58-61, 70. And these examples reflect only what public reporting has brought to light. Given the extent of the President's business empire and the secrecy surrounding it, Congress cannot know what other benefits the President is accepting from foreign states.

Despite the clear text of the Foreign Emoluments Clause, President Trump has not sought Congress's consent for any benefits he has been or will be accepting from foreign states. His excuse defies comprehension. According to the President, the Constitution prohibits him only from providing what he calls "personal services" to a foreign government, as an employee or something "akin" to one. Def. Mem. 3. Thus, were the President to "personally" provide services to a foreign state, the Clause would, he admits, prevent him from accepting payment in reward. But because he is wealthy enough to own companies that provide services without his personal involvement, he may, he says, accept unlimited sums from foreign governments. In his view, those governments may even funnel profits to him through his businesses specifically because he is the President, as long as they are not doing so in exchange for specific "services rendered" as President. *Id.*

There is a reason this tortured reading of the Clause has not been advanced before. To start, it rests on a novel and crabbed definition of the word "emolument." At the Founding, that word referred to benefit or gain of any kind, and it was frequently used to describe the profits of business. Such is its meaning in the Clause, as surrounding text and structure make clear, and adherence to this broad meaning enables the Clause to fulfil its vital role in our constitutional system. President

Trump's new definition, tailored to exempt his own business activities, would undermine the Clause's most basic purpose, allowing foreign largesse to flow freely to officeholders able to make money from foreign governments without providing "personal services." And by permitting foreign powers to shower him with benefits specifically because he is the President, except as payment for specific official decisions made in their favor, the President's interpretation would reduce the Clause to a mere regulation of quid-pro-quo bribery. Yet from the moment it was introduced in Philadelphia, the Clause has always been recognized as something far more than that—a prophylactic safeguard against the *possibility* of foreign corruption, meant to ensure that American officials are "independent of external influence." 2 *The Records of the Federal Convention of 1787*, at 389 (Charles Pinckney) [hereinafter *Convention Records*].

If the President believes that his judgment will not be affected by his receipt of financial rewards from foreign states through his businesses, the Constitution provides a simple solution: obtain "the Consent of the Congress." In the structure established by the Framers, "[t]he decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of … emoluments otherwise barred by the Clause." 17 Op. O.L.C. 114, 121 (1993).

The President attempts to use this textual commitment as a club, Def. Mem. 17, arguing that this case should be dismissed because the issue is better resolved by Congress. But it cannot be resolved by Congress, because Congress cannot force the President to do what the Constitution requires: seek and obtain consent *before* accepting foreign emoluments. By refusing to do that, the President is denying members of Congress their right to cast binding votes on whether he may accept those emoluments. Legislators have an Article III interest in "maintaining the effectiveness of their votes," *Coleman v. Miller*, 307 U.S. 433, 438 (1939), and the unlawful deprivation of an

opportunity to vote confers standing, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 (2015). When the President secretly accepts emoluments without consent, he prevents the Plaintiffs from casting votes on those emoluments. The result is no mere "abstract dilution of institutional legislative power," *Raines v. Byrd*, 521 U.S. 811, 826 (1997), but rather the nullification of an individual prerogative held by each voting member—one guaranteed in the Constitution. Because Congress cannot fix this problem itself, its members must turn to the courts to enforce their rights and vindicate the Constitution's key safeguard against foreign corruption.

## ARGUMENT

### I.     The Plaintiffs Have Standing

According to President Trump, members of Congress lack standing to enforce a constitutional decree that he seek and obtain "the Consent of the Congress" before accepting benefits from foreign states. This is wrong, as constitutional text, judicial precedent, historical practice, and respect for the rule of law all make clear.

Article III standing requires plaintiffs to have "suffered an injury in fact" that is "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, *Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). The Plaintiffs here meet all three criteria. They have suffered an "injury in fact" because they have been denied a voting opportunity to which the Constitution entitles them. That injury is "fairly traceable" to the President's conduct because they cannot vote on whether to consent to the acceptance of any emoluments when he accepts them secretly and without seeking congressional consent. And a "favorable judicial decision" by this Court requiring the President to obtain congressional consent before accepting foreign emoluments would redress this injury. Because the Plaintiffs meet these criteria, and because they have no effective legislative

means of redressing their injury, they may turn to the courts to enforce their rights.

## A.   Members of Congress Have Standing To Sue When a President Deprives Them of Specific Votes to Which They Are Constitutionally Entitled

### 1.   Vote Deprivation Is a Cognizable Legal Injury

Denying lawmakers their ability to cast an effective vote robs them of one of their core powers and responsibilities. For that reason, the Supreme Court has long recognized that legislators whose votes "have been completely nullified" by unlawful executive action "'have a plain, direct and adequate interest in maintaining the effectiveness of their votes,'" *Raines*, 521 U.S. at 823 (quoting *Coleman*, 307 U.S. at 438), and may seek judicial redress to "have their votes given effect," *Coleman*, 307 U.S. at 438. Vote nullification occurs not only when a previously cast vote is unlawfully disregarded but also when, as here, the opportunity to cast a vote is unlawfully denied. *Ariz. State Legislature*, 135 S. Ct. at 2665 (recognizing standing to challenge ballot measure that would "completely nullify any vote by the Legislature, now or in the future" on a particular subject (brackets and quotation marks omitted)).

President Trump nevertheless claims that "the denial of institutional legislative prerogative is not a judicially cognizable injury." Def. Mem. 1. That is flat wrong.

In *Coleman*, the Supreme Court held that individual state legislators had standing to challenge executive interference that caused their votes on a measure to be "overridden and virtually held for naught." 307 U.S. at 438. After the Kansas state senate split evenly on a vote to ratify a federal constitutional amendment, the lieutenant governor purported to cast a tie-breaking vote in favor of ratification. Arguing that he lacked authority to do so, senators who had voted against ratification sued. When the Kansas Supreme Court denied relief, the senators asked the U.S. Supreme Court to hear the case. *Id*. at 436-37. The Court rejected a challenge to their standing, recognizing that "[t]hey have set up and claimed a right and privilege under the Constitution of the

5

United States to have their votes given effect." *Id*. at 438. As the Court later explained, the plaintiffs, asserting an "institutional injury" to their roles as legislators, had standing because their votes were "deprived of all validity." *Raines*, 521 U.S. at 821-22.

In the years since *Coleman*, the Supreme Court has repeatedly reaffirmed it and relied on its standing analysis. When Tennessee residents sued to vindicate their "right to a vote free of arbitrary impairment by state action," the Court upheld their standing because "[t]hey [we]re asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,'" not merely a generalized interest in lawful government. *Baker v. Carr*, 369 U.S. 186, 208 (1962) (quoting *Coleman*, 307 U.S. at 438). When members of Congress challenged the constitutionality of the Line Item Veto Act, the Court rejected the "drastic extension of *Coleman*" needed to sustain their claims, but also squarely rejected the Justice Department's entreaty to overrule the decision. *Raines*, 521 U.S. at 826. And when the Arizona state legislature challenged a ballot measure that took away one of its institutional prerogatives, the Court relied on *Coleman* in holding that the legislature had standing—specifically reaffirming "the precedential weight of *Coleman*" in the process. *Ariz. State Legislature*, 135 S. Ct. at 2665 & n.13.[1]

Applying *Coleman*, the D.C. Circuit has repeatedly held that members of Congress have standing to contest the invalidation of their votes. Federal legislators, like their state counterparts, are injured within the meaning of Article III when their votes are unlawfully disregarded. *See Kennedy v. Sampson*, 511 F.2d 430, 436 (D.C. Cir. 1974) (affirming a Senator's standing "to

---

[1] The President tries to undermine *Coleman* by recycling an argument made to no avail in *Raines*: that having begun in state court, it "has no applicability to a similar [federal court] suit." *Raines*, 521 U.S. at 824 n.8. But the plaintiffs in *Coleman* needed to demonstrate Article III standing to "invoke [the Supreme Court's] jurisdiction," *Coleman*, 307 U.S. at 438, regardless of where the suit originated. *See ASARCO, Inc. v. Kadish*, 490 U.S. 605, 618 (1989). And *Arizona*'s reliance on *Coleman* leaves no doubt about its applicability to cases filed in federal court.

vindicate the effectiveness of his vote" after "an illegal nullification" by the President).

Importantly, the D.C. Circuit has also recognized that vote nullification under *Coleman* and *Kennedy* occurs not just when legislators' votes are negated after the fact, but also when legislators are denied their right to cast a vote to which they are entitled. Members of Congress are injured, in other words, when presidential action "nullifies a specific congressional vote or opportunity to vote." *Goldwater v. Carter*, 617 F.2d 697, 702 (D.C. Cir. 1979) (en banc), *vacated on other grounds*, 444 U.S. 996 (1979); *see Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999) (*Goldwater* rested "[o]n the same theory" as *Kennedy*); *see also Russell v. DeJongh*, 491 F.3d 130, 135 (3d Cir. 2007) (standing arises from "nullifying a legislator's vote or depriving a legislator of an opportunity to vote"). In *Goldwater*, for instance, Senators sued the President for terminating a treaty without obtaining Senate consent, as they alleged he was required to do. "By excluding the Senate from the treaty termination process," the D.C. Circuit held, "the President has deprived each individual Senator of his alleged right to cast a vote that will have binding effect on whether the Treaty can be terminated," giving them standing. 617 F.2d at 702.[2]

The crux of *Goldwater* and the cases that followed is this: members of Congress have standing when they plausibly allege that the law requires their consent for an action, and an executive branch official takes that action without submitting it for a vote. Thus, the Circuit recognized a Senator's standing when officials were allegedly serving as "officers of the United States" without Senate confirmation, "depriv[ing] him of his constitutional right to vote in determining the advice and consent of the Senate." *Riegle*, 656 F.2d at 877. Likewise, it recognized

---

[2] Although *Goldwater* was vacated by the Supreme Court, no Justice questioned its holding on standing. Indeed, "[t]he Court ignored the standing concept altogether." *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 880 (D.C. Cir. 1981). Because the Court did not address standing, that portion of *Goldwater* remains binding Circuit precedent in the absence of contrary authority. *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006).

the standing of a House appropriations committee member when a cabinet secretary reorganized his department without the committee's approval, as required by statute—"depriving [the member] of that specific statutory right to participate in the legislative process." *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982).

As these decisions illustrate, members of Congress are harmed in their institutional roles when an official performs a specific act that requires congressional consent without having obtained it—whether that lack of consent is due to the failure of a vote or a decision to bypass a vote entirely. After all, the problem in *Coleman* was not that the plaintiffs' votes went uncounted— they were all tallied correctly—but rather that the amendment was "deemed ratified" notwithstanding the failure of a senate majority to approve it. *Raines*, 521 U.S. at 822.

The Supreme Court recently reaffirmed that deprivation of a vote gives rise to standing. When Arizona voters "remove[d] redistricting authority from the Arizona Legislature," the Court concluded the legislature had standing to challenge the measure because it "would 'completely nullif[y]' any vote by the Legislature, now or 'in the future,' purporting to adopt a redistricting plan." *Ariz. State Legislature*, 135 S. Ct. at 2658, 2665 (quoting *Raines*, 521 U.S. at 823-24). After *Arizona*, one cannot seriously contend that votes are nullified only when a past vote is disregarded. *See* Def. Mem. 11. That very argument was pressed in *Arizona*—and rejected.[3]

In sum, the Supreme Court and the D.C. Circuit have held that legislators have a cognizable legal interest in preserving the effectiveness of their votes. They have also held that denying the ability to vote is just as harmful as disregarding the results of a vote. And that makes sense. Imagine

---

[3] *See* Appellees Br. at 20, 2015 WL 254635 ("Proposition 106 ... nullified no concrete exercise of the Legislature's power, as *Raines* requires ... Appellant cannot point to any specific legislative act that would have taken effect but for Proposition 106."); United States Br. at 21, 2015 WL 309078 ("appellant has not identified any 'specific' redistricting legislation that a sufficient number of state legislators have voted ... to enact").

if the *Coleman* defendants had simply deemed the amendment to be ratified without submitting it to the legislature. This would have harmed the plaintiffs no less than allowing them to go through the motions of voting but then ignoring the outcome. At bottom, the harm is identical: depriving legislators of their right to cast a vote that is given the legal effect which it is due. "No more essential interest could be asserted by a legislator." *Kennedy*, 511 F.2d at 436.

### 2. *Raines* Permits Members of Congress To Sue Over the Complete Deprivation of Their Right To Vote

President Trump relies chiefly on *Raines v. Byrd* to dispute the Plaintiffs' standing. But *Raines* is not the silver bullet he suggests—far from it. *Raines* did not overrule *Coleman*, do away with vote nullification, or hold that legislators cannot be injured in their institutional capacities. While the Court declined to adopt "a drastic extension of *Coleman*," *Raines*, 521 U.S. at 826, it reaffirmed that the complete denial of an effective vote is a cognizable injury.

In *Raines*, six members of Congress sued executive branch officials without alleging that those officials had harmed them. They claimed instead to be injured by a law recently passed by their colleagues, the Line Item Veto Act, which empowered the President to selectively "cancel" certain spending and tax provisions after signing them into law. *Id*. at 814. The plaintiffs maintained that this new presidential authority "'alter[ed] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items,'" "'divest[ed] the[m] of their constitutional role in the repeal of legislation,'" and "'alter[ed] the constitutional balance of powers between the Legislative and Executive Branches.'" *Id*. at 816 (quoting plaintiffs' complaint).

The plaintiffs did not allege that any votes they had cast had been invalidated or that they were being deprived of their right to vote. Thus, their claims were not within the framework of *Coleman*, *Kennedy*, and *Goldwater*. The district court nonetheless held that they had standing because, by that point, the Circuit had recognized legislator standing in cases well outside that

framework, based on allegations of indirect harm to a legislator's influence—even when Congress itself was to blame. *See, e.g.*, *Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994) (standing to challenge "dilution" of voting power caused by House rule granting voting rights to delegates from the territories and the District of Columbia); *Moore v. U.S. House of Representatives*, 733 F.2d 946, 953 (D.C. Cir. 1984) (standing to challenge revenue-raising bill that originated in the Senate); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1167 (D.C. Cir. 1982) (standing to sue House leadership for "providing [plaintiffs] with fewer seats on House committees … than they are proportionally owed"). Embracing those cases, the district court granted standing without once mentioning *Coleman*, *Kennedy*, or *Goldwater*. The court reasoned that the Act "dilute[d]" the plaintiffs' voting power and "affect[ed]" their duties. *Byrd v. Raines*, 956 F. Supp. 25, 30-31 (D.D.C. 1997) (citing *Michel*, 14 F.3d at 625; *Moore*, 733 F.2d at 950-53; *Vander Jagt*, 699 F.2d at 1168-71).

An expedited appeal was taken directly to the Supreme Court, where the plaintiffs argued that their votes would "be less 'effective' than before, and that the 'meaning' and 'integrity' of their vote ha[d] changed." *Raines*, 521 U.S. at 825 (quoting plaintiffs' brief).

The Supreme Court was "unwilling" to endorse the "drastic extension of *Coleman*" needed to sustain these claims. *Id.* at 826. It acknowledged that invalidating past votes and denying future votes are cognizable harms because they injure individual legislators in their institutional roles. *Id.* at 824. But neither harm had befallen the *Raines* plaintiffs. Their votes "were given full effect" in the passage of the Line Item Veto Act. "They simply lost that vote." *Id.* Nor would the Act "nullify their votes in the future," because "[i]n the future, a majority of Senators and Congressmen can pass or reject appropriations bills" just as before, and "can vote to repeal the Act, or to exempt a given appropriations bill." *Id*. Because no past votes were disregarded and no future votes denied, the Court said that *Coleman* provided "little meaningful precedent" for the plaintiffs' argument:

10

"There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here." *Id.* at 824, 826; *see Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000) ("the Court emphasized that the congressmen were not asserting that their votes had been 'completely nullified'").

That is what *Raines* said. Here is what it did *not* say.

**First,** the opinion did not say that "the denial of institutional legislative prerogative is not a judicially cognizable injury." Def. Mem. 1. The Justice Department pressed that very argument, as it does now, relying on the same non-precedential opinion. *See* Appellants Br. at 23, 1997 WL 251415 (disagreeing "that a Member of Congress has a judicially cognizable personal interest in the proper performance of his legislative duties" (citing *Moore*, 733 F.2d at 959 (Scalia, J., concurring in result))). Accepting that argument would have required overruling *Coleman*, which the Court instead reaffirmed—as it did again in *Arizona*. Justice Scalia's categorical opposition to legislator standing was never endorsed by the Supreme Court or the D.C. Circuit.[4]

**Second,** the Court did not say that Congress, or its members, can *never* sue the President over injury to their powers. While the Court discussed the novelty of such inter-branch litigation, and noted that this "appear[ed]" to cut against the plaintiffs, it did not elaborate further on the significance of this point. *Raines*, 521 U.S. at 826. Had the Court meant that members simply cannot sue the President over injury to their powers, it could easily have said that.

**Third,** as should be clear by now, *Raines* did not eliminate vote nullification as an injury

---

[4] In describing the plaintiffs' claims, the Court used the term "institutional injury" to mean "injury to their institutional power as legislators," *Raines*, 521 U.S. at 820 n.4, as distinct from injury in their personal capacities. In doing so, the Court made clear that some forms of institutional injury are cognizable, *id.* at 821 (nullification of votes in *Coleman* was "an institutional injury"), while others are not, *id.* (*Raines* plaintiffs allege "*a type* of institutional injury"); *id.* at 829 ("the institutional injury *they allege* is wholly abstract and widely dispersed" (emphases added)); *see Ariz. State Legislature*, 135 S. Ct. at 2664 (citing "[t]he 'institutional injury at issue'" in *Raines*).

over which individual legislators may sue. The Court instead emphasized the "vast difference between the level of vote nullification" in *Coleman* and the "abstract" claim in *Raines*, declaring itself "unwilling" to bridge that gap through "a drastic extension" of *Coleman. Id.* at 826.

**Fourth,** *Raines* did not hold that members lack standing whenever *every* member's vote has been nullified. While the Court observed that the plaintiffs' claimed injury "necessarily damages all Members of Congress and both Houses of Congress equally," *id.* at 821, it did not say, or even imply, that this fact alone makes a member's injury nonjusticiable. The Court was explaining why the plaintiffs could draw no support from *Powell v. McCormack*, 395 U.S. 486 (1969), where a Congressman was prevented from taking his seat and receiving his salary. Unlike that Congressman, the *Raines* plaintiffs were not "singled out" for the deprivation of a "private right." *Raines*, 521 U.S. at 821. Notably, when the Court later addressed "institutional injury" under *Coleman*, it distinguished that case on entirely different grounds. *See id.* at 821-26.

Moreover, if standing were lacking whenever an institutional injury harms all members of Congress, it would mean that there would be standing when the President negates the votes of some members of Congress, but not when he negates the votes of *all* members. No conceivable rationale supports that rule. The denial of a right held exclusively by the 535 voting members of Congress is not a "generalized grievance," in which a party "seek[s] relief that no more directly and tangibly benefits him than it does the public at large." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) (quoting *Lujan*, 504 U.S. at 573-74). After all, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 136 S. Ct. at 1548 n.7. "The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Id*.

Even if the shared nature of the harm in *Raines* were relevant to whether the plaintiffs

12

suffered a viable institutional injury, the Court clearly did not hold that this factor *alone* precludes standing. The claim in *Raines* was not only "widely dispersed," but also "wholly abstract." *Raines*, 521 U.S. at 829. Indeed, this was its central flaw—the plaintiffs were challenging a mere "abstract dilution" of Congress's power, vastly different from the nullification of individual votes. *Id.* at 826. In other words, "the harm at issue [was] not only widely shared, but [was] also of an abstract and indefinite nature," *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998), namely that "the dynamic of lawmaking" had changed, *Raines*, 521 U.S. at 817. While Congress as a body may have lost clout, no right of individual lawmakers was impaired. "None of the plaintiffs, therefore, could tenably claim a 'personal stake' in the suit." *Ariz. State Legislature*, 135 S. Ct. at 2664 (quoting *Raines*, 521 U.S. at 830); *see Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 13 (D.D.C. 2013) ("the problem ... was that the plaintiffs ... were simply complaining [about] … some 'abstract dilution' of the power of Congress as a whole").

By contrast, preventing a legislator from exercising voting power assigned to his seat is sufficiently concrete and particularized to constitute Article III injury—regardless of how many other legislators are harmed in the same way. "Often," as in *Raines*, "the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *Akins*, 524 U.S. at 24. Denial of a legislator's individual right to vote is just such a harm.

Not every injury to Congress fits that bill, so *Raines* did limit legislator standing. As illustrated by the line-item veto, Congress's influence can be weakened without negating discrete rights held by its members. But the abrogation of a unique right held by individual members is different. *Compare Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986) (school board member could not "step into the shoes of the Board" and litigate on its behalf in a case

involving no prerogatives of individual members), *with id.* at 544 n.7 ("It might be an entirely different case if, for example, state law authorized School Board action solely by unanimous consent, in which event [he] might claim that he was legally entitled to protect 'the effectiveness of [his] vot[e].'" (quoting *Coleman*, 307 U.S. at 438)). And when an individual member is denied her own right to vote, that injury does not vanish merely because the body in which she serves may also be injured, because "more than one party may have standing to challenge a particular action or inaction." *Clinton v. City of New York*, 524 U.S. 417, 434 (1998).[5]

The President asks the Court to ignore all this, in favor of a mechanical rule that injuring all members of Congress gives standing to none. His position is at odds with a fair reading of *Raines*, with general standing principles, and with common sense. In *Coleman*, for instance, the 20 Kansas senators (out of 40) who voted against a constitutional amendment had standing to prevent it from being unlawfully deemed ratified. Had the vote been 39 to 1 against ratification, all 39 senators would have had standing. *See Raines*, 521 U.S. at 823. But if the vote were instead 40 to 0 against ratification, no senator would have standing—on the President's theory—because all members of the senate would have been harmed equally. Def. Mem. 16. That cannot be right.

### 3.     D.C. Circuit Precedent Since *Raines* Also Permits Genuine Vote Deprivation Claims

In the wake of *Raines*, the D.C. Circuit acknowledged the need to pare back its precedent

---

[5] None of these considerations is addressed in *Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002), which misreads *Raines* as saying that legislators can never sue over institutional injury. In a footnote, the opinion acknowledges that "[t]he Supreme Court upheld legislative standing for institutional injuries in *Coleman*," *id.* at 7 n.7, but then simply recites the facts of *Coleman* and quotes *Raines* without further explanation. The opinion fails to acknowledge that members of Congress have an individual right to vote, or to reckon with the difference between a complete denial of that right and the abstract harm to congressional influence in *Raines*. Notably, the plaintiffs' briefing did not address these points, *cf. Metlife, Inc. v. F.S.O.C.*, 865 F.3d 661, 667 (D.C. Cir. 2017) ("our adversarial system relies on the arguments presented in the parties' briefs"), and the court held that the political question doctrine required dismissal in any event.

on legislator standing. But it also recognized that *Raines* is compatible with the Circuit's core line of vote nullification cases—on which the Plaintiffs here rely.

In *Chenoweth v. Clinton*, four House members challenged an environmental program established by executive order. Claiming the program violated "the Anti-Deficiency Act, the Federal Land Management and Policy Act, the National Environmental Policy Act, and the Commerce, Property, and Spending Clauses of, and the Tenth Amendment to, the Constitution," *Chenoweth*, 181 F.3d at 113 (citations omitted), the plaintiffs alleged that creating the program "without statutory authority therefor, 'deprived [them] of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation.'" *Id.* (quoting complaint). As evidenced by these charges, the essence of their claim was that the President "exceeded his statutory and constitutional authority," *id*. at 112, not that they were deprived of any specific vote. Accordingly, the district court dismissed their claim as a "generalized grievance[] about the conduct of government." *Id.* Affirming, the D.C. Circuit equated their alleged injury—a "dilution of their authority"—with the "abstract" injury rejected in *Raines*. *Id.* at 115.

What *Chenoweth* signifies, therefore, is not the futility of vote deprivation claims but that of generalized complaints about executive unlawfulness dressed up as vote deprivation claims. It did not overrule *Kennedy*, just as *Raines* did not overrule *Coleman*. Indeed, the Circuit took pains to distinguish those decisions: "Unlike the plaintiffs in *Kennedy* and *Coleman*," it explained, the plaintiffs in *Chenoweth* could not plausibly "claim their votes were effectively nullified by the machinations of the Executive." *Id.* at 117; *cf. Common Cause v. Biden*, 909 F. Supp. 2d 9, 26 (D.D.C. 2012) (House members' votes in favor of bills that passed the House were not nullified by the Senate's failure to debate those bills).

*Chenoweth* did acknowledge that certain "portions" of the Circuit's legislator standing

precedent were "untenable in the light of *Raines*." 181 F.3d at 115.[6] And those were precisely the portions on which the *Chenoweth* plaintiffs were forced to rely, because they could not credibly claim their votes were "nullified by the President's action." *Id*. at 117. Specifically, "they rel[ied] primarily upon *Moore*," *id.* at 113, which granted standing to House members on their claim that constitutional procedures were violated when a revenue-raising bill originated in the Senate, *Moore*, 733 F.2d at 948. The *Moore* plaintiffs, notwithstanding that defect, were able to vote on the bill. *Id*. at 949. Thus, they were seeking to vindicate "the right of the House to originate bills for raising revenue" without showing any nullification of their own votes. *Raines* foreclosed such actions. And so the plaintiffs in *Chenoweth* were out of luck—they could neither rely on a mere "dilution of their authority" as in *Raines* and *Moore*, nor plausibly allege "that their vote was nullified" as in *Coleman* and *Kennedy*. *Chenoweth*, 181 F.3d at 115, 117. Claims that fit squarely within the *Coleman*/*Kennedy*/*Goldwater* framework, as here, do not have that problem.

*Chenoweth* also emphasized the ample legislative remedies available to the plaintiffs, which made any dispute about the challenged program "fully susceptible to political resolution." *Id.* at 116. The Circuit would return to this point in *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000). As discussed below, *see infra*, Part I.C, comparable political remedies are absent here.

### B.   President Trump Is Denying Members of Congress Their Right To Vote on the Foreign Emoluments He Is Accepting Without Their Consent

To insulate federal officeholders from the threat of foreign corruption, the Constitution prohibits them from accepting presents and emoluments from foreign states "without the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. Congress "consist[s] of a Senate and House of

---

[6] For instance, one passage in *Kennedy* suggests that members may sue over a mere "diminution of congressional influence." 511 F.2d at 435-36. But *Kennedy*'s holding was more modest—an "application of the narrow rule announced in *Coleman*." *Chenoweth*, 181 F.3d at 116.

Representatives," *id*. art. I, § 1, and members of the House and Senate have an individual right to vote on matters that come before those bodies, *see id*. art. I, § 3, cl. 1 ("each Senator shall have one Vote"); *id*. art. I, § 5, cl. 3 (requiring the House and Senate to record "the Yeas and Nays of the Members" upon the request of one-fifth of those present). The Constitution, therefore, expressly entitles individual members of Congress to vote on whether to consent to an officeholder's acceptance of presents or emoluments from a foreign state.[7]

Indeed, the unambiguous nature of this entitlement is striking. While many constitutional provisions empower Congress to act without specifying how that power bears on the authorities of other branches, *e.g.*, U.S. Const. art. I, § 8, cl. 11 ("Congress shall have Power ... To declare War"), the Foreign Emoluments Clause is among a smaller group that explicitly conditions executive branch action on congressional permission, *e.g.*, *id*. art. II, § 2, cl. 2 ("The President ... shall have Power, by and with the Advice and Consent of the Senate, to make Treaties" and "appoint ... Officers of the United States"). Even among this group, the Clause stands out, insofar as it functions solely as a prohibition, which only a successful vote of Congress may waive.

The Foreign Emoluments Clause therefore demands that *before* an officeholder accepts an emolument from a foreign state, members of Congress be given the opportunity to vote on whether to consent. The Clause's text dictates that result, and its history and purpose confirm it.

The words of the Clause unambiguously state that "no Person" holding an office of profit or trust under the United States "shall ... accept ... any" emolument "without the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. Thus, if Congress has not already given its consent (through

---

[7] This is not a *perpetual* entitlement, of course—it "runs (in a sense) with the Member's seat" and eventually transfers to his successor. *Raines*, 521 U.S. at 821. While a member remains in office, however, his vote is "the commitment of *his apportioned share of the legislature's power* to the passage or defeat of a particular proposal." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (emphasis added)).

17

successful votes in both Houses), it is unlawful to "accept" the emolument.

Were it otherwise, the Clause could not achieve its purpose. If officeholders could accept foreign benefits until Congress affirmatively voted to *disapprove* of them, it would encourage acceptance of such benefits in hopes that congressional inertia, other legislative priorities, or even partisan or regional favoritism would prevent Congress from censuring an already accepted benefit. This would hardly advance the Clause's goal of making it "impossible to guard better against corruption." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 486 (Jonathan Elliot ed., 1836) [hereinafter *Elliot's Debates*] (Edmund Randolph). Accordingly, the Constitution's default rule is precisely the opposite: no consent, no acceptance.[8]

Since the 1790s, federal officeholders have obeyed this command by allowing Congress to vote on otherwise prohibited benefits *before* accepting them. *See* Am. Compl. ¶¶ 27-29; *see also* 4 John Bassett Moore, *A Digest of International Law* 582 (1906) (quoting 1834 circular from the Secretary of State reminding officers that they "will not, unless the consent of Congress shall have been previously obtained, accept" presents from foreign states). The process is simple: an officeholder informs Congress of a benefit he wishes to accept, and members of Congress respond (if they so choose) by voting on whether to consent.[9]

President Trump has refused to follow this process, instead choosing to retain ownership

---

[8] Even if President Trump were to dispute that the Clause works this way, the Court must assume that the Plaintiffs are right in assessing their standing. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Notably, though, the President has made no such argument. He asserts only that consent need not be sought when an official "does not believe that he is accepting any prohibited emoluments." Def. Mem. 7 n.2. That is not the point. If the official is wrong, and he has been accepting emoluments without prior consent, then he has violated the Constitution.

[9] Congress also can provide advance consent for particular classes of benefits. *See, e.g.*, Foreign Gifts and Decorations Act of 1966, 5 U.S.C. § 7342. But when blanket consent has not been given, members of Congress retain their right to vote on each individual emolument. 6 Op. O.L.C. 156, 158 (1982) ("Congress has consented only to the receipt of minimal *gifts* … Therefore, any other emolument stands forbidden.").

of his companies and failing to stop them from doing business with foreign governments. As a result, he has been accepting, and will continue to accept, prohibited benefits while in office. *See, e.g.*, Am. Compl. ¶¶ 44-50, 56-57, 60-62, 66.[10]

By flouting the Constitution's command and refusing to seek consent before accepting these foreign benefits, the President has deprived members of Congress of their right to vote on whether he may accept them. Simply put, Congress cannot vote on whether to give its consent to emoluments it does not know about—and the Clause imposes no responsibility on Congress to ferret out emoluments that federal officeholders are accepting in secret.

The President nonetheless says that he has not "prevented Congress from holding a vote on the emoluments issue," citing Congress's power to enact statutes. Def. Mem. 9. But this misunderstands the Clause. It does not grant authority to regulate the "issue" of emoluments, the way that other clauses empower Congress to regulate commerce, taxes, and other matters. Instead, the Clause itself regulates (and outlaws) certain conduct, reserving to Congress "the exclusive authority" to permit exceptions. Letter from James Madison to David Humphreys (Jan. 5, 1803), https://founders.archives.gov/documents/Madison/02-04-02-0275#. Engaging in that prohibited conduct without having obtained an exception denies Congress its ability to decide whether to grant one. Thus, when the President accepts emoluments without first informing Congress about them and seeking consent, he deprives its members of their ability to cast binding votes on whether he may accept those emoluments. And while legislating requires a majority of Congress to vote in favor of a measure and then secure the President's approval, the Clause gives Congress a unilateral power that it can wield by *not* acting—by failing to approve an emolument. Thus, the chance to

---

[10] For standing purposes, the Court must assume that these rewards violate the Clause, *see supra* note 8, despite President Trump's (unpersuasive) claims to the contrary, *see infra*, Part II.

vote on legislation is not the voting opportunity guaranteed by the Clause.

To be sure, journalists have provided accounts of some emoluments the President has accepted, but these after-the-fact reports do not give members what the Constitution demands— the right to vote on whether the President may accept an emolument *before* he does so. After all, by the time members are reading about an emolument in the paper, it has generally already been accepted. And while reports have brought to light *some* of the benefits President Trump has taken from foreign governments, the Plaintiffs allege that he is accepting others that "remain completely hidden" from them. Am. Compl. ¶ 43. Indeed, this is all but certain: the President has not sought consent for the emoluments that *have* been publicly revealed, he claims not to need consent, and he maintains fierce secrecy over his finances. *Id.* ¶ 35.

In sum, by refusing to seek and obtain congressional consent before accepting foreign emoluments, leaving Congress to learn about those emoluments only after the fact, if at all, the President is depriving the Plaintiffs of their right to vote on whether he may accept them.

This is a classic case of vote deprivation. In *Riegle*, for instance, the D.C. Circuit granted standing to a Senator who alleged that certain officials were acting "as officers of the United States when their nominations ha[d] never been submitted to the Senate," thereby "depriv[ing] him of his constitutional right to vote in determining the advice and consent of the Senate to the[ir] appointment." 656 F.2d at 877.[11] Similarly in *Goldwater*, the Circuit granted standing to Senators who claimed the President unconstitutionally terminated a treaty without Senate consent, "depriv[ing] each individual Senator of his alleged right to cast a vote that will have binding effect on whether the Treaty can be terminated." 617 F.2d at 702. And in *Pierce*, the Circuit granted

---

[11] The court withheld equitable relief because Congress could eliminate the powers of those officials that qualified them as officers of the United States. *Id.* at 882. When a President refuses to seek consent to accept emoluments, such legislative recourse is unavailable. *See infra*, Part I.C.

standing to a Congressman who alleged that a federal department was—contrary to statute—reorganized without his committee's approval, "injur[ing] him by depriving him of that specific statutory right to participate in the legislative process." 697 F.2d at 305.

The President is unable to distinguish these cases. His only attempt to do so is to argue that the committee members in *Pierce* had a "unique statutory right" to vote. Def. Mem. 12. But the statute said nothing about the committee's individual members. It simply prohibited reorganizing the department "'without the prior approval of the Committees on Appropriations,'" *Pierce*, 697 F.2d at 304 (quoting Pub. L. No. 97-272, 96 Stat. 1160, 1164 (1982)), just as the Foreign Emoluments Clause prohibits accepting emoluments "without the Consent of the Congress." *Pierce* underscores that membership in a legislative body confers an individual right to vote on matters requiring that body's approval. *See id.* at 305 ("the Appropriation Act gave Congressman Sabo the right, as a member of the Appropriations Committee, to participate in approval of any reorganization"). And the Circuit likened committee members' statutory right to vote on reorganization with the constitutional right of Senators to vote on treaties. *Id.* at 305 n.3.

Thus, by accepting emoluments from foreign states without Congress's consent, President Trump is denying the Plaintiffs votes to which they are constitutionally entitled. The result is "a disenfranchisement, a complete nullification or withdrawal of a voting opportunity." *Goldwater*, 617 F.2d at 702. And as shown below, only the judiciary can redress that injury.[12]

_____

[12] To be clear, the Plaintiffs need not establish how they or other members of Congress would vote with respect to the emoluments the President is accepting: the injury here is the denial of the right to vote, not the denial of a wish to have the vote turn out a certain way. When legislators sue over the nullification of past votes, they need to show "that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated." *Raines*, 521 U.S. at 824. That is because nothing was nullified unless the will of the voting majority was thwarted, and when that happens, only the legislators whose votes were thwarted are injured. In that context, therefore, standing is limited to "legislators whose votes would have been sufficient to defeat (or enact)" the measure. *Id.* at 823. But lawmakers who are deprived of a vote are injured

### C.       There Are No Adequate Legislative Remedies

The President says that even if he is repeatedly denying the Plaintiffs their right to vote under the Foreign Emoluments Clause, this case should nevertheless be dismissed because the Plaintiffs can put a stop to his behavior on their own. But none of the solutions he proposes would give the Plaintiffs what the Constitution entitles them to: the right to decide whether he may accept any particular foreign emolument before he accepts it, and the ability to deny him permission by *not* acting—by simply failing to grant him an exemption from the Clause.

Significantly, while members of Congress may not be able to sue if their colleagues have the power to remedy their injury, any such power must be *effective*—actually capable of ameliorating the harm. Thus, *Raines* explained that Congress remained free under the Line Item Veto Act "to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act," or to repeal the Act entirely. 521 U.S. at 824. Because the Act had "no effect" on these ready options, *id.*, the plaintiffs had "an adequate remedy." *Id*. at 829.

The D.C. Circuit made a similar point in *Chenoweth*: the dispute there was "fully" susceptible to political resolution because it was "uncontested" that Congress could terminate the challenged program. 181 F.3d at 116. And in *Campbell v. Clinton*, the Circuit again found that legislators could fix their own problem through "political self-help." 203 F.3d at 24. After the President commenced military strikes and Congress voted to fund the effort without authorizing it, dissatisfied congressmen filed suit. *Id*. at 20. Their claim, "although cast in terms of the nullification of a recent vote, essentially [was] that the President violated the … War Powers Resolution" and the War Powers Clause of the Constitution. *Id.* at 22. Treating this as a vote

---

by that deprivation regardless of how the vote might have turned out. *See Goldwater*, 617 F.2d at 703 ("courts consistently vindicate the right to vote without first demanding that the votes when cast will achieve their intended end").

deprivation claim, the Circuit distinguished *Coleman* based on the availability of adequate political recourse. While the aggrieved Kansas senators "had no legislative remedy," Congress "has a broad range of legislative authority it can use to stop a President's war making," including the power of the purse: Congress "could have cut off funds for the American role in the conflict" and thus possessed "ample" power "to have stopped prosecution of the 'war.'" *Id*. at 23.

In all three cases, Congress literally could have "stopped" the conduct about which the plaintiffs complained. *Id*. It therefore had an "adequate" remedy, *Raines*, 521 U.S. at 829, that could "fully" ameliorate any harm done to the plaintiffs, *Chenoweth*, 181 F.3d at 116.

Not so here. As the Founders knew too well, rewards from a foreign state can be accepted alone and in secret. *See* 3 *Elliot's Debates* 484 (George Mason) ("It will ... be difficult to know whether [the President] receives emoluments from foreign powers or not."). Unlike most constitutional provisions, the Foreign Emoluments Clause regulates personal conduct that an officeholder can carry out without government funds or personnel. And this limits the strings that Congress can pull to exert its will. Remedies that are available to stop activities requiring federal money and employees, such as military action, are ineffective when an officeholder insists on accepting foreign-government money through his private businesses.

***Congressional Resolutions.*** President Trump's main contention is this: when Congress happens to learn about a foreign emolument he has accepted (he does not say how Congress is supposed to learn about it), Congress can vote on whether to approve this already accepted emolument. Def. Mem. 9. Specifically, he suggests that Congress pass a resolution "expressing its disagreement" with his receipt of the emolument, or consenting to its receipt. *Id*.

The President's supposed fix would solve nothing, even with respect to emoluments that Congress happens to discover (and certainly not with respect to those the President manages to

keep hidden). To start, the Clause entitles the Plaintiffs to vote on foreign emoluments *before* the President accepts them. *See supra* at 16-18. Once the President has accepted a foreign emolument—the point at which he says Congress can step in and vote—he has already done the thing that the Constitution says he needs Congress's permission to do. Passing an after-the-fact resolution condemning his behavior would not change that. Indeed, a resolution by Congress "expressing its disagreement" with an emolument would not force him to return it or prevent him from accepting others. Such a resolution "might at most have persuasive effect with the President," but it would pose no obstacle "if he persisted in his present interpretation of the Constitution." *Goldwater*, 617 F.2d at 703. Indeed, the pending congressional resolutions cited by the President are only exhortative. *See* H.R.J. Res. 26, 115th Cong. (2017), at 4 (resolution "represents ... only a step taken to underscore the sense of Congress that compliance with the Clause is a matter of the greatest urgency and importance"); S. Con. Res. 8, 115th Cong. (2017), at 1 ("calling on President Trump" to comply).[13]

Even if passing a resolution after the fact could accomplish anything, treating that option as a reason to deny standing here would fundamentally transform the Clause. Its rule is textually clear and unambiguous: accepting foreign emoluments is barred unless Congress has approved of their receipt. The President's arguments would flip this structure on its head and require Congress to affirmatively *disapprove* of what he is doing.

Because that arrangement would rewrite the language of the Constitution, gutting the purpose and vitality of the Clause in the process, it is not "an adequate remedy." *Raines*, 521 U.S.

---

[13] Neither *Raines* nor *Chenoweth* nor *Campbell* held that Congress must engage in a symbolic expression of its views before its members may ask the courts to enforce their voting rights. That was the thesis of Justice Powell's concurring opinion in *Goldwater*. *See* 444 U.S. at 996 (Powell, J., concurring). No other Justice joined that opinion, and neither the Supreme Court nor the D.C. Circuit has ever endorsed that thesis.

at 829. The Clause establishes a default rule in which Congress's *failure* to act functions as a denial of consent. That puts the burden on officeholders to move Congress to action. Significant barriers stand in the way of such a legislative effort. It must compete with other priorities for lawmakers' attention. Members must be willing to go on record in support of the emolument's acceptance. Numerous parliamentary hurdles must be surmounted—particularly in the Senate, where individual members can often slow down legislative business or halt it entirely. In the end, a majority of lawmakers must vote in favor of acceptance. Once this process is completed in one house, it must be repeated in the other. The Clause harnesses these legislative obstacles in aid of its purpose, by requiring them to be surmounted to overcome its default prohibition on foreign rewards. In doing so, the Clause ensures that federal officials may accept the largesse of foreign states only when a request is deemed sufficiently compelling by the people's representatives. To say that Congress has an adequate remedy because it can *disapprove* of an emolument would make these legislative roadblocks an ally of foreign corruption, instead of an enemy.

*Legislation.* The prospect of enacting statutes offers no better avenue for relief. While in theory a statute could demand that a President divest from his financial holdings, or explicitly require consent for business transactions with foreign governments, these options share the flaw just discussed: they would require a majority of Congress to act in *disapproval* of President Trump's conduct, instead of requiring him to garner a majority willing to *approve* his conduct.

Indeed, the problem is actually worse. If President Trump were to obey the Constitution by seeking consent before accepting emoluments, he might need to secure *more* than a majority of votes in the Senate, given that body's Cloture Rule requiring 60 votes to end debate on a matter. *See* Standing Rules of the Senate Rule XXII § 2. In other words, when advance consent is sought, 41 Senators can block Congress's approval, whereas stopping the President from accepting

25

emoluments through corrective legislation may require mustering 60 Senators instead. Thus, prospective legislation is not an "adequate" remedy here, *Raines*, 521 U.S. at 829, even assuming that such legislation could correct the problem. This point was explained in *Goldwater*, where Senators claimed that terminating a treaty, like approving one, required two-thirds of the Senate:

> They claim the right to block termination with only one-third plus one of their colleagues. There is no way that such a minority can even force a resolution to the floor, let alone pass it .... The only way the Senate can effectively vote on a treaty termination, with the burden on termination proponents to secure a two-thirds majority, is for the President to submit the proposed treaty termination to the Senate as he would a proposed treaty. This is the concrete remedy appellees seek. For the court to require of them some other legislative action before allowing them standing to pursue this claim would be to require a useless act.

617 F.2d at 703.

The inadequacy of legislation as a remedy does not end there. To become law, bills require a presidential signature. U.S. Const. art. I, § 7, cl. 2. The nominal authority to enact statutes, therefore, is no remedy against a President who is intent on continuing to reap financial rewards from foreign states. Standing to sue over vote deprivation does not require pursuing legislative action that would be futile or "unavailing." *Ariz. State Legislature*, 135 S. Ct. at 2663 (rejecting argument that legislature divested of power lacks standing until it unsuccessfully tries to exercise the power it has lost); *see Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982) (standing to challenge a permitting regime does not require plaintiffs to first apply for a permit that "would not have been granted"). The option of convincing President Trump to bind himself against further self-enrichment is an especially poor remedy for a constitutional provision that gives Congress total authority over such enrichment—and the President none.[14]

---

[14] Moreover, insisting that Congress override a presidential veto would only compound the problems discussed earlier: instead of requiring a congressional majority to *approve* foreign emoluments, as the Constitution specifies, it would require a two-thirds majority to *disapprove*.

Finally, it is significant that Congress had a *unilateral* option at its disposal in *Raines*: it could exempt from the Line Item Veto Act any bill that it sent to the President. 521 U.S. at 824. Likewise, in *Campbell* and *Chenoweth*, Congress could have made use of its "absolute control of the moneys of the United States," *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185 (D.C. Cir. 1992) (citation omitted), by declining to appropriate funds for activities it wished to stop. *Campbell*, 203 F.3d at 23. Congress's power of the purse is especially noteworthy because, like the Clause, it allows Congress to exert its will through *inaction*—a failure to appropriate. *See United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress."). As such, that power can furnish an adequate remedy, but only when, unlike here, the conduct Congress wishes to stop requires federal funds.

*Impeachment.* The drastic measure of impeachment is not an adequate legislative remedy, especially in the context of the Foreign Emoluments Clause. While *Campbell* mentioned impeachment, it did not suggest that Congress's power to impeach, standing alone, provides adequate recourse in all cases—which would be tantamount to eliminating all congressional standing. Instead, the court noted that impeachment was available as an enforcement mechanism were the President to defy Congress's use of the more surgical options at its disposal. *Campbell*, 203 F.3d at 23. As shown above, comparable surgical options are absent here. And foreclosing judicial enforcement of the Clause, based on the impeachment power, would force upon Congress a Hobson's choice: either acquiesce to all of the President's foreign emoluments or overturn his entire presidency and the results of the most recent election. The ability to make that stark choice is not "an equivalent voting opportunity," *Goldwater*, 617 F.2d at 703, with the one guaranteed by the Constitution, which entitles Congress to approve or reject emoluments on a case-by-case basis.

27

It therefore cannot be regarded as the type of "adequate remedy," *Raines*, 521 U.S. at 829, that can foreclose legislator standing. *Cf. Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974) ("the Constitution should not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President.").[15]

## II.   President Trump's Acceptance of Valuable Benefits from Foreign States Without Congressional Consent Violates the Foreign Emoluments Clause

In defense of his actions, the President offers a truly outlandish interpretation of the Foreign Emoluments Clause—one that is unmoored from the constitutional text, the meaning of the word "emolument," the Framers' reasons for adopting the Clause, and the manner in which the Clause has been interpreted since its adoption more than two centuries ago.

"The language of the Emoluments Clause is both sweeping and unqualified." 18 Op. O.L.C. 13, 17 (1994). It bars the receipt of four distinct but overlapping types of benefits— presents, emoluments, offices, and titles—followed by an emphatic modifier used nowhere else in the Constitution: "of any kind whatever." *Id*. The clear purpose of this language is to "lock up every door to foreign influence," 5 Annals of Cong. 1584 (1798) (Claiborne), proscribing all types of benefits that have the "potential of influencing or corrupting the integrity of the recipient," 5 Op. O.L.C. 187, 188 (1981). "Consistent with its expansive language and underlying purpose," therefore, the Clause "has been interpreted as being 'particularly directed against every kind of

---

[15] For similar reasons, this Court should reject any suggestion that Congress can cure the Plaintiffs' injury by inflicting retribution on President Trump regarding unrelated matters. The reason for directing members of Congress to pursue legislative remedies before involving the courts is to help preserve our constitutional system. No one can seriously claim that an escalation of such retaliatory gamesmanship and paralysis would better serve our constitutional system than calling upon the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

influence by foreign governments upon officers of the United States.'" 11 Op. O.L.C. 89, 90 (1987) (quoting 24 Op. Att'y Gen. 116, 117 (1902)).

Against the grain of this constitutional text and historical consensus, President Trump advocates "a bounded understanding of the Clause." Def. Mem. 27. But the boundaries he suggests seem designed only to trace the contours of his own financial dealings. The President admits, as he must, that profits from financial transactions and contractual arrangements with foreign governments can be "emoluments" under the Clause. He claims, however, that the Clause applies only if he is paid for providing what he calls "personal services" in "a capacity akin to an employee of the foreign power" or in "his capacity as President." Def. Mem. 37, 18.

That convoluted interpretation of the Clause has never been articulated before now. There are three main problems with it. First, the President's lexicological argument is a shamble. He starts by retrofitting a modern definition of "emolument" onto the Founding era, but even that anachronistic definition covers the business profits and benefits at issue here. So he narrows the definition further, without a shred of support for these modifications. Second, even if the President's narrow definition of "emolument" had existed at the Founding, he does not dispute that there were also broader definitions then. Text and structure make clear that the Clause contemplates a broader meaning of the word, one that does not require an employment relationship or a connection with specific decisions made in one's official capacity. Third, the President's artificial reading of the Clause would eviscerate its clear and undeniable purpose.

### A.     The Meaning of "Emolument"

The Constitution "was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

29

At the Founding, "emolument" was a commonly used term that often referred to profit or gain in general. *See Oxford English Dictionary* (2d ed. 1989) (citing eighteenth-century texts for a contemporary definition meaning "advantage, benefit, comfort"). Samuel Johnson's preeminent 1755 dictionary, quoting illustrative examples, defined "emolument" simply as "Profit; advantage." *A Dictionary of the English Language* (1755). Indeed, "*every* known English language dictionary" published in the seventeenth and eighteenth centuries defined "emolument" in this broad fashion—as "profit," "advantage," "gain," and/or "benefit." John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at 7 (July 9, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693 (emphasis added).

Those expansive definitions reflect how the word was used during this era, in sources ranging from general-purpose writings, *see, e.g.*, Jonathan Swift, *The Tale of a Tub* 91 (Henry Morley ed., 1889) (1704) ("And so I proceed with great content of mind upon reflecting how much emolument this whole globe of earth is like to reap by my labours."), to official government documents. American state constitutions, for instance, used "emolument" in this broad sense. *See* Pa. Const. of 1776, art. 5 ("government is … instituted ... not for the particular emolument or advantage of any single man …"). So too did early legal decisions. *See, e.g.*, *Himely v. Rose*, 9 U.S. 313, 319 (1809) (owner of property who was deprived of its possession "lost those emoluments and mercantile advantages which might have resulted from the use of it"). A formal declaration issued by the colonies protesting British policy used the term in the same way. *See* U.S. Continental Congress, A Declaration by the Representatives of the United Colonies of North-America, Now Met in Congress at Philadelphia, Setting Forth the Causes and Necessity of Their Taking Up Arms (July 6, 1775), https://www.loc.gov/resource/rbpe.14400700/?sp=1 (accusing Britain of judging the colonies "to be in such a state, as to present victories without bloodshed, and

all the easy emoluments of statuteable plunder").

Significantly, "emolument" was frequently used to mean the profits accruing from private financial transactions, "including leasing, agriculture, trades, markets, and other business."[16] For instance, George Washington, Thomas Jefferson, and others criticized merchants who "preferred their own private emolument" by violating a boycott of British goods. Virginia Nonimportation Resolutions (June 22, 1770), http://founders.archives.gov/documents/Jefferson/01-01-02-0032. James Madison asked Jefferson to join him and James Monroe in a land purchase "for our triple emolument."[17] An Articles of Confederation signer advertised a sale of land, along with all its "'buildings, ways, paths, profits, commodities, advantages, emoluments and hereditaments.'"[18] These are but a few examples of the Founders using the word to refer to "the consequences of ordinary business dealings." John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan. 18, 2017), https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-emolument.html. The same usage is found in *Blackstone* and other legal treatises well known to the Founders.[19]

The President does not deny that this was the predominant dictionary definition of "emolument" at the Founding. Nor can he dispute that the Framers and their contemporaries frequently used the word to describe profits and benefits from private commercial transactions. Instead, he argues that the word is used in a narrower sense in the Clause: a benefit "predicated on

---

[16] James C. Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*, at 31 (Sept. 14, 2017), https://ssrn.com/abstract=3036938 (surveying nearly 800 contemporary uses of the word).

[17] Letter from James Madison to Thomas Jefferson (Aug. 12, 1786), https://founders.archives.gov/?q=emolument%20%20Author%3A%22Madison%2C%20James%22&s=1111311113&sa=&r=12&sr=.

[18] John Mikhail, *"Emolument" in Blackstone's Commentaries*, Balkinization (May 28, 2017), https://balkin.blogspot.com/2017/05/emolument-in-blackstones-commentaries.html.

[19] *See* Mikhail, *The Definition of "Emolument," supra*, at 11.

services rendered in an official capacity or an employment (or equivalent) relationship and ... given in exchange for the provision of a service in that relationship." Def. Mem. 20.

This definition is drawn from thin air. Its first part, requiring an employment-like relationship, is based on a flawed reading of Founding-era dictionaries. Its second, requiring the provision of specific services in an official capacity, is based on nothing at all.

While the word "emolument" was used at the Founding to refer to a wide range of benefits, it had a special association with a particular kind of benefit—one that accrued to a person because of his status or position. Thus, in addition to the broad definitions noted above, the *Oxford English Dictionary* provides another definition of "emolument" that was used in the eighteenth century: "Profit or gain arising from station, office, or employment; dues, reward; remuneration, salary." The President claims the latter definition reflects what the Framers meant in the Clause. Def. Mem. 22. He is wrong about that. *See infra* at 34-41. But remarkably, even this narrower definition does not help him, because while it includes profit arising from "office" or "employment" (and in the same vein includes "remuneration" and "salary"), it also includes more—profit or gain arising from "station," as well as "dues" and "reward."[20] Those terms easily encompass the gain arising from President Trump's status as the head of a worldwide business empire. When the owner of a skyscraper receives rent and fees from his tenants and unit owners, *see* Am. Compl. ¶¶ 58-62, he is certainly receiving profit or gain arising from his "station" (as well as "dues" and "reward").

The narrower definition the President cites also embraces profit or gain "arising from [his] office," as when foreign governments seek his favor by granting him lucrative trademarks or selecting his hotels. *Id*. ¶¶ 48, 54. Those benefits "arise from" the office he holds, because (the Plaintiffs allege) they are being given to him because he is the President. No basis is offered for

---

[20] *See* "Station," *Oxford English Dictionary* ("the place or position occupied by a person").

the additional limit that President Trump grafts onto this definition—which would require these benefits to be compensation for a specific service he provides to those foreign governments in his official role. Def. Mem. 20. That addendum is *sui generis*.[21]

To support his argument, the President relies on a single Founding-era dictionary that defines "emolument" as "profit arising from an office or employ" and as "gain, or advantage." *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).[22] He ignores the inconvenient latter definition. And the fact that the former definition appears at all makes this dictionary highly unusual: only 8% of English dictionaries in the seventeenth and eighteenth centuries included a definition of "emolument" that was qualified by reference to "office or employ." Mikhail, *The Definition of "Emolument," supra*, at 8. And each of those dictionaries also included the broader, unqualified definition of profit or gain in general (as does this one).

Worse still, the narrower definition in *Barclay's* does not even illustrate what the President claims. As noted, it defines "emolument" as "profit arising from an office or employ." The President assumes that "employ" means "employment" in the modern sense of being another person's employee. But turning to the very next page in *Barclay's*, one finds "employ" defined as "a person's trade, business" and "a public office." Thus, even the President's cherry-picked authority defines "emolument" to include "profit arising from ... a person's trade, business."[23] At

---

[21] The word's modern legal definition, even if relevant, does not help the President because it encompasses "[a]ny advantage, profit, or gain received *as a result of* one's employment or one's holding of office." *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

[22] He also cites a work by John Trusler that "is not a standard dictionary at all, but rather a thesaurus" that "has long been viewed skeptically by scholars," in part because its text was "copied directly from a French thesaurus." Mikhail, *The Definition of "Emolument," supra*, at 8.

[23] This definition goes back to the roots of the word "emolument." Its Latin predecessor, *emolumentum*, also "had come to mean simply 'profit' or 'gain,'" but originally referred to the profit a miller earned by grinding another's grain. *See Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/emolument. A miller was not an employee of those who came to use his mill, nor did he hold a public office. Related, a few Founding-era dictionaries

Case 1:17-cv-01154-EGS   Document 17   Filed 10/26/17   Page 43 of 55

the Founding, an innkeeper received profit from his "trade, business" no less than someone hired to drive a carriage. And today a real estate magnate derives profit from his business just as much as a lawyer who provides "legal advice and services." Def. Mem. 20. Thus, even the meager evidence the President musters does not actually support his position.[24]

### B.    Constitutional Text and Structure

Even if there were a definition of "emolument" at the Founding as narrow as the President claims—limited to remuneration for one's services as an employee or officeholder—the Foreign Emoluments Clause does not use the word in that narrow sense.

To start, the Framers specifically directed us not to read the Clause in that way, prohibiting the acceptance of "any ... Emolument ... *of any kind whatever*." The phrase "of any kind whatever" does not merely emphasize that no emoluments may be accepted. Def. Mem. 38. That work is already done by the text's reference to "*any* ... Emolument." On the President's reading, the subsequent words "of any kind whatever" would be mere surplusage. *Holmes v. Jennison*, 39 U.S. 540, 571 (1840). And it is evident that the phrase does something other than emphasize the Clause's lack of exceptions. *See Memorandum Opinion for the Counsel to the President from John M. Harmon, Acting Assistant Attorney Gen., Office of Legal Counsel* at 346 n.3 (Apr. 11, 1977) ("phrase 'of any kind whatever' indicates that the clause should be given a broad construction").

---

defined "emolument" as profit obtained by "labor and cost," *see* Mikhail, *The Definition of "Emolument," supra*, at A-2 to A-4, which likewise requires no employer-employee relationship or the holding of an office.

[24] Of course, the Clause's scope is limited by factors beyond the meaning of "emolument," such as the requirement that an officeholder "accept" an emolument "from" a foreign state. This means that certain benefits which might fit within the broadest definition of emolument, *see* Phillips & White, *supra*, at 31, are nevertheless outside the Clause's scope, because they cannot be "accepted" or are not "from" a foreign state. For instance, it will not necessarily be true that any identifiable proceeds a stockholder receives from a publicly traded company that deals with foreign states can "fairly be attributed to a foreign government," 17 Op. O.L.C. at 119, such that one can say the stockholder "accepted" an emolument "from" a foreign state.

Its function is not to rule out interpretations that would allow some emoluments to be accepted. Rather, it is to rule out interpretations that would allow some "kinds" of emolument to be accepted.

Comparing the Clause with another constitutional provision that uses the word "emolument" makes the Clause's intended breadth all the more apparent. Under the Incompatibility Clause, no member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office ... the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl. 2. By referencing "the Emoluments *whereof*," the text specifies that it pertains only to the emoluments that the federal government bestows upon the holders of these "civil Office[s]." The Foreign Emoluments Clause, by contrast, has no such language limiting its scope to the emoluments associated with a public office.  Rather, it addresses a wide range of benefits that foreign governments might bestow upon a person ("any ... Emolument"), and its concerns undeniably reach beyond the compensation associated with an office or employment—hence, its prohibition of "presents," for instance. And to remove all possible doubt about its breadth, the Clause goes further—clarifying that it extends to any emolument "of any kind whatever." Finally, in recognition of the unique severity of this rule, the Clause allows Congress to avoid injustice by giving its "Consent" to exceptions.

Lacking any textual support, the President falls back on "dog that didn't bark" historical arguments. His main contention is that the recorded history of the Clause's adoption is "devoid of any concern about an official's private commercial businesses." Def. Mem. 27. Assuming that this is true, it still tells us nothing. Discussion of the Clause was not extensive because the Clause was not controversial. *See* 2 *Convention Records* at 384, 389 (Clause adopted unanimously without debate). Indeed, the only objection apparently raised was that it did not go far enough because it allowed Congress to make exceptions. *See, e.g.*, 3 *Elliot's Debates* 484 (Mason). Moreover, the

agrarian economy of the eighteenth century, the comparatively limited role of government, and the primitive travel technology available would have made private commerce with foreign states an unlikely conduit for foreign influence at the time. Illustrating this point, the President has apparently been unable to find evidence (one can assume not for lack of effort) of any Founding-era American official conducting a commercial transaction with a foreign government—forcing him to claim only that they *might* have conducted such business.

Just as he relies on debates that never happened, the President relies on text that never became part of the Constitution—an amendment proposed in 1810 that would have extended the Clause to all citizens and revoked the citizenship of those who violated it. Ignoring the nationalistic fears of that era (the White House, after all, was set on fire by foreign troops while the amendment was up for ratification), he claims the harshness of this amendment shows that "emolument" must have had the narrow meaning he advocates because it is "inconceivable" that Congress and the states that ratified the amendment "intended to strip the citizenship of … those hotel owners whose customers included visiting foreign diplomats." Def. Mem. 32. Yet by his own interpretation, Congress and these states *did* intend to strip the citizenship of, say, a household servant temporarily hired by a visiting foreign diplomat, who would be "in an employment-like relationship" with the diplomat, *id*. at 22. The argument is self-defeating.

C.     **Constitutional Purpose**

Text and history get the President nowhere. But even if he had successfully created ambiguity about the meaning of "emolument," that ambiguity would have to be resolved against him because his proposed rule would defeat the Clause's purpose—throwing open the doors to the corruption of any officeholder wealthy enough to own businesses and reducing the Clause to a mere bribery law, not a prophylactic safeguard against the *possibility* of corruption.

The Clause's purpose is "to exclude corruption and foreign influence," 3 *Elliot's Debates* 465 (Randolph), and its adoption was prompted by "the necessity of preserving … officers of the U.S. independent of external influence," 2 *Convention Records* 389 (Pinckney). Federalists trumpeted the Clause as "a wholesome provision" made against the "influence which foreign powers may attempt to exercise in our affairs," Tench Coxe, *An Examination of the Constitution for the United States of America*, *No. 4* (Oct. 21, 1787), proclaiming that it was "impossible to guard better against corruption," 3 *Elliot's Debates* 486 (Randolph). From the Republic's earliest days, it was acknowledged that the Clause was meant to "lock up *every door* to foreign influence," 5 Annals of Cong. 1584 (1798) (Claiborne), and was "founded in a just jealousy of foreign influence *of every sort*," 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1346 (1833) (emphases added). By preventing "undue influence and corruption by foreign governments," 18 Op. O.L.C. at 15, it seeks to ensure "the undivided loyalty of individuals occupying positions of trust under our government," 10 Op. O.L.C. 96, 100 (1986), including, of course, the President—who "surely" occupies such a position, *Memorandum Opinion for the Counsel to the President, Office of Legal Counsel*, 2009 WL 6365082, at \*4 (Dec. 7, 2009); *cf. Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982) (presidents "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system").

To fulfill its purpose, the Clause "must be read broadly." *Memorandum for James H. Thessin, Assistant Legal Advisor, U.S. Dep't of State, from John O. McGinnis, Deputy Assistant Attorney Gen., Office of Legal Counsel* at 2 (Aug. 29, 1988); *see* 10 Op. O.L.C. at 98 ("its expansive language and underlying purpose ... strongly suggest that it be given broad scope"). Thus, Attorney General decisions, the Office of Legal Counsel, and the Comptroller General have always given the Clause "a broad construction." *Memorandum for S. A. Andretta, Admin. Assistant*

*Attorney Gen., from J. Lee Rankin, Assistant Attorney Gen., Office of Legal Counsel* at 9 (Oct. 4, 1954); *see* 49 Comp. Gen. 819, 821 (1970) ("drafters intended the prohibition to have the broadest possible scope and applicability"). That approach "is justified [by] the sweeping nature of the … prohibition," which is "directed against every possible kind of influence by foreign governments." *Memorandum for Andrew F. Gehmann, Exec. Assistant, Office of the Attorney Gen., from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* at 2 (Oct. 16, 1962).

President Trump's attitude toward the Clause is therefore at odds with how it has always been construed. He would sap its vitality as a bulwark against foreign corruption, allowing a President to accept unlimited rewards from a foreign state, so long as they are not payments for "personal services" that he provides "in a capacity akin to an employee" or in his role as President (such as "making executive decisions favorable to the paying foreign power"). Def. Mem. 37, 21. In his view, the Framers left open a gaping loophole in their attempt to keep American officials "independent of external influence." 2 *Convention Records* 389 (Pinckney).

This case demonstrates the intolerable results of the President's interpretation. Since his inauguration, foreign diplomats have flocked to his Washington, D.C., hotel, turning a projected $2 million loss for the hotel during the first months of 2017 into a nearly $2 million profit. Am. Compl. ¶¶ 52-56. Foreign diplomats, by their own admission, select the hotel as an "easy, friendly gesture to the new president." *Id*. ¶ 54. In New York City, foreign governments number among the tenants and unit owners of the President's skyscrapers, racking up payments for rent and common charges that can reach hundreds of thousands of dollars annually. *Id*. ¶¶ 58-61. Abroad, many ongoing Trump-branded business ventures benefit from regulatory approvals, exemptions, and tax incentives—all potential means of influence by foreign leaders. *See id*. ¶ 66 (since his election, President Trump exhorted the Argentinian president to fix permitting issues there and encouraged

a British official to oppose wind farms that could affect his Scottish golf courses). Meanwhile, the Chinese government has granted dozens of trademarks to President Trump and his companies under circumstances that suggest "special treatment." *Id*. ¶¶ 44-49; *see id*. ¶ 51 (President had over 150 trademark applications pending in 36 foreign nations in April 2017).

According to the President, accepting these benefits is fine because he is not *personally* providing services to these foreign states, and because the rewards they have given him are (he says) not for any official decisions. Def. Mem. 21.[25] This rationale is completely divorced from the Clause's purpose, which is to avoid the "evil … of undue influence by a foreign government upon officers of the United States." 53 Comp. Gen. 753, 756 (1974); *see Gehmann Memo*, *supra*, at 3 (identifying "the danger" as "placing [U.S.] officials in a position of obligation to a foreign power"). As OLC has explained: "Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government[.]" 17 Op. O.L.C. at 122 (citation omitted). The profit attainable through ownership of real estate or sale of products has the capacity to sway an officeholder's loyalty as much as, for instance, "remuneration for academic work or research." *Id*. The diplomats gravitating to President Trump's

---

[25] Remarkably, even this understanding of "emolument" does not eliminate all the claims of the Plaintiffs, who have plausibly alleged that the Chinese trademark approvals were a response to President Trump's actions regarding U.S. policy toward Taiwan. Am. Compl. ¶ 48. Moreover, even if some of the benefits the President is accepting are not "emoluments," they may nonetheless be "presents," *id.* ¶ 38 & n.75, and their acceptance would still be proscribed absent congressional consent. For example, when foreign officials use their discretionary authority to confer valuable trademarks on a President, giving him "special treatment," *id.* ¶ 48, it is not unnatural to describe this as a "present." So, too, when foreign officials ingratiate themselves with the President by selecting his businesses over their competitors for profitable transactions. And it is not unusual for a prohibited foreign benefit to straddle two of the four categories listed in the Clause. *See, e.g.*, *Memorandum Opinion for the Counsel to the President, supra*, 2009 WL 6365082, at *4 (Nobel Peace Prize is a "'present' or 'Emolument'"); *Gehmann Memo*, *supra*, at 2 (expense-paid foreign trip "can be regarded as literally a 'present' and possibly an 'emolument'").

Washington, D.C., hotel realize that. So does the President himself, who has admitted to "a little conflict of interest" regarding Turkey because he has "a major, major building in Istanbul," and who has noted that he "get[s] along" with Saudi Arabians because "[t]hey buy apartments from me. They spend $40 million, $50 million. Am I supposed to dislike them?" Am. Compl. ¶¶ 74, 71.

Unlike the President, decisions of OLC and the Comptroller General have not required "a relationship akin to an employment relationship." Def. Mem. 34. For instance, OLC has concluded that officeholders cannot receive partnership distributions from their private law firms if those earnings include foreign government income, even though the officeholders "do not personally represent foreign governmental clients and have no dealings with them." 17 Op. O.L.C. at 117. Notably, OLC's decision had nothing to do with legal ethics rules regarding client loyalty, Def. Mem. 36 n.47, but rested on the simple proposition that "some portion of the member's income could fairly be attributed to a foreign government," 17 Op. O.L.C. at 119. Likewise, the Comptroller General concluded that a military officer who turned over information to Colombian authorities that led to the capture of contraband could not accept a monetary award under a local statute providing for such awards. 49 Comp. Gen. at 821. The officer's lack of an employment (or "equivalent") relationship with the government was irrelevant.

While most decisions identifying prohibited emoluments have involved officeholders who wanted to accept employment or consulting work with a foreign government, the explanation for that is simple: OLC and the Comptroller General render decisions in response to requests from federal officers. Most such officers are not real estate magnates, but rather people who earn money by providing their individual labor or expertise. President Trump does not even try to explain why

the Clause would prevent officers from being paid to review a Ph.D. thesis,[26] consult on power plants or meteorology,[27] or teach at a public high school,[28] but then would allow an officer to accept millions of dollars through his business empire. That makes no sense.

Nor does the President's other chief contention: that foreign governments may steer their business toward his companies or grant those companies regulatory benefits, specifically because he is the President, as long as this is not done in exchange for specific services he renders in that role. This would reduce the Clause to a mere bribery law, instead of "a prophylactic provision," 10 Op. O.L.C. at 98, that seeks to prevent "any type of obligation to foreign countries," *Memorandum Opinion for the Special Assistant to the President from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* at 280 (May 10, 1963), in order to insulate officeholders from even the possibility of having their loyalty compromised.

President Trump may feel that the Clause's severity makes unreasonable demands on a business owner like him. But "[t]he decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause." 17 Op. O.L.C. at 121. Adherence to that rule is all the Plaintiffs are seeking.

## III.   The President's Remaining Arguments Have No Merit

President Trump offers several other reasons why his foreign emoluments violations should escape judicial review. None is substantial, much less persuasive.

*First,* the Plaintiffs have an implied cause of action to seek injunctive relief. The Supreme

---

[26] *Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel* at 2-3 (May 23, 1986).

[27] 10 Op. O.L.C. 96 (1986); 6 Op. O.L.C. 156 (1982); 40 Op. Att'y Gen. 513 (1947).

[28] Comptroller General, *Matter of: Major James D. Dunn & Senior Master Sergeant Marcus A. Jenkins*, B-251084, 1993 WL 426335 (Oct. 12, 1993).

Court has repeatedly made clear that "equitable relief … is traditionally available to enforce federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385-86 (2015). The "ability to sue to enjoin unconstitutional actions" by officials "reflects a long history of judicial review of illegal executive action, tracing back to England." *Id*. at 1384; *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). The President cites no decision holding that such relief is limited to situations involving "a defense to a potential enforcement action." Def. Mem. 15. Instead, when a plaintiff is injured by a constitutional violation, including a "separation-of-powers" violation, "an implied private right of action directly under the Constitution" exists "as a general matter," absent some reason the claim "should be treated differently than every other constitutional claim." *Free Enter. Fund v. P.C.A.O.B.*, 561 U.S. 477, 491 n.2 (2010) (citation and quotation marks omitted).

No such reason exists here. The President analogizes to the Supremacy Clause, but that Clause "operates differently than other constitutional provisions," *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 618 (2012) (Roberts, C.J., dissenting), simply "instruct[ing] courts what to do when state and federal law clash," *Armstrong*, 135 S. Ct. at 1383. The Foreign Emoluments Clause, by contrast, is a "self-executing limitation" on the conduct it prohibits, and thus, "individuals injured by [a violation] may sue and obtain injunctive and declaratory relief." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991).[29] While the President argues that the Clause provides no "substantive rights," that is both wrong, *see supra* at 16-18, and beside the point, *see LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (in "an otherwise justiciable case or controversy," a party may "object that [his] injury results from disregard of the federal structure of our

---

[29] Even in cases involving the *implicit* constitutional powers of Congress, such as its subpoena authority, courts have recognized "an implied cause of action" to vindicate those powers, rejecting the argument that Article I lacks "the sort of explicit 'rights creating' language required to imply a cause of action from the Constitution." *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 88 (D.D.C. 2008). Here, the power at issue is set forth in the text of the Constitution.

Government" (quoting *Bond v. United States*, 564 U.S. 211, 225-26 (2011))).

**Second,** the "zone of interests" test is no barrier to this suit. Recent Supreme Court precedent leaves doubt about whether any such test even applies to constitutional claims, or is only a matter of ascertaining, "as a matter of statutory interpretation, the scope of [a] private remedy created by Congress." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). Tellingly, the President cites no case in which a constitutional claim was dismissed under a zone-of-interests test, and cannot even suggest what test should apply here.

In any event, the Plaintiffs easily satisfy any test.[30] The interest they seek to vindicate is at the heart of the Clause, which employs the separation of powers to combat foreign corruption, reflecting the premise that "[w]hen every present to be received must be laid before Congress, no fear need be apprehended." 5 Annals of Cong. 1585 (Otis). The President concedes that "Congress as a whole" would satisfy whatever test applies, Def. Mem. 16, but he offers no reason why its members, whose votes are needed to approve any emolument, lack a similar interest in ensuring that "the Consent of the Congress" is given. Moreover, the Circuit has rejected that very argument. *See Riegle*, 656 F.2d at 879 (holding that "the interest which [a Senator] claim[ed] was injured by defendants' action," namely "his right to advise and consent to the appointment of [executive branch] officers," was "within the zone of interests protected by the Appointments Clause").

**Third,** the relief sought here is not barred by *Mississippi v. Johnson*. "The single point" decided there was whether the President could "be restrained by injunction from carrying into

---

[30] The Court has said that "[t]he test is not meant to be especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and that a plaintiff's grievance "must *arguably* fall within" the interests of the relevant provision, *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (emphasis added). Only when "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in" the provision that they cannot "reasonably" be thought to fall within it will they fail the test. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

effect an act of Congress." 71 U.S. 475, 498 (1866). And while the Court said more broadly that it could not enjoin the President "in the performance of his official duties," it distinguished injunctions that involve "a purely ministerial act under a positive law." *Id.* at 501, 498.[31]

Complying with the Clause's mandatory prohibition is not an exercise of the President's "official duties" as in *Johnson*, but is akin to a ministerial duty, which an official "has no authority to determine whether to perform." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996); *see Johnson*, 71 U.S. at 498 ("It is a simple, definite duty … imposed by law."). Because "the President is bound to abide by the requirements" of the Clause, his obligation to avoid violating it "is ministerial and not discretionary." *Swan*, 100 F.3d at 977. That does not change merely because the Clause's scope is subject to debate. *Id.* at 978 ("a ministerial duty can exist even where the interpretation of the controlling statute is in doubt, provided that the statute, once interpreted, creates a peremptory obligation" (quotation marks omitted)). Refraining from accepting emoluments simply requires the President to obey the same restriction as every other federal officeholder. It is nothing like the "purely executive and political" duties discussed in *Johnson*.[32]

That is especially clear in *this* case, where the activities sought to be enjoined are transactions of the President's personal businesses. Unlike most constitutional limits, the Clause reaches officeholders' private conduct, making *any* receipt of foreign emoluments unconstitutional. *See, e.g.*, 11 Op. O.L.C. at 90. An injunction ordering the President to stop

---

[31] In *Franklin v. Massachusetts*, a plurality of Justices faulted a district judge for enjoining the President without evaluating whether doing so was permissible, but the plurality ultimately concluded it "need not decide" that question itself. 505 U.S. 788, 802-03 (1992).

[32] *See Johnson*, 71 U.S. at 497, 499 (injunction would have restrained the President from "carrying out … acts of Congress" requiring him "to assign generals to command in the several military districts," supported by "military force …. under [his] supervision [as] commander-in-chief"); *see also Franklin*, 505 U.S. at 792 (injunction would have required the President to "transmit to the Congress" a new and revised "statement showing the whole number of persons in each State … and the number of Representatives to which each State would be entitled").

accepting emoluments through his companies would not be directed at his official duties. The Supreme Court has "never suggested that the President … has an immunity that extends beyond the scope of any action taken in an official capacity," and any reasons for declining to issue injunctions with respect to his official acts do not apply to "*unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694 (1997). "It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Nixon*, 457 U.S. at 753-54.

While enjoining the President is a measure "not lightly to be undertaken," it is also a "bedrock principle that our system of government is founded on the rule of law." *Swan*, 100 F.3d at 978. The circumstances here are extraordinary, involving open defiance of a foundational rule set down by the Framers to protect the nation from corrosive foreign influence. "When judicial action is needed to serve broad public interests … not in derogation of the separation of powers, but to maintain their proper balance," *Nixon*, 457 U.S. at 754, the courts can and must step in.

## CONCLUSION

For the foregoing reasons, the President's motion to dismiss should be denied.

Respectfully submitted,

Dated:  October 26, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

45

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2017, the foregoing document was filed with the Clerk

of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: October 26, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod
