# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Senator RICHARD BLUMENTHAL,
Representative JOHN CONYERS, JR.,
et al.,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States,

*Defendant.*

No. 17-cv-1154 (EGS)

## BRIEF OF FORMER GOVERNMENT ETHICS OFFICERS AS AMICI CURIAE SUPPORTING PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Thomas C. Goldstein
   Bar No. 458365
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362.0636
tgoldstein@goldsteinrussell.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTEREST OF THE AMICI ..................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 2

I.      The Government's Legal Interpretations Explain That The Foreign Emoluments Clause Prohibits All Payments That Have Any Realistic Potential Of Corrupting A Public Official. ................................................................................................... 2

    A.    The Government's Guidance Interprets Foreign Emoluments Clause Broadly, But Flexibly, Emphasizing Its Anti-Corruption Purpose. ................................. 3

    B.    The Government Has Never Approved An Arrangement Whereby A Public Official's Interest In A Business Could Even Potentially Constitute A Conduit For Prohibited Emoluments to Reach The Official. ....................................... 6

II.     Compliance With The Foreign Emoluments Clause Is Not Especially Difficult. .......... 9

III.    The Complaint States A Valid Claim, And This Is Not A Close Case. ................................................................................................................. 13

CONCLUSION ...................................................................................................................... 17

APPENDIX: THE AMICI AND THEIR QUALIFICATIONS ................................................. 18

# TABLE OF AUTHORITIES

## Cases

*American Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ...................................................................................................... 3

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981) ...................................................................................................... 3

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014) ................................................................................................. 3

## Statutes and Legislative Branch Materials

5 Annals of Cong. (1798) ..................................................................................................... 11

5 U.S.C. § 7342 .................................................................................................................... 12

37 U.S.C. § 908(a) ............................................................................................................... 12

*Hon. George J. Mitchell U.S. Senate*,
    B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ................................. 16, 17

Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept
    certain medals presented to him while President of the United States, Apr. 2, 1896,
    29 Stat. 759 .................................................................................................................. 12

*Matter of: Lieutenant Colonel Marvin S. Shaffer, USAF, Retired*,
    62 Comp. Gen. 432 (1983) .......................................................................................... 16

Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late
    Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of
    Acknowledgment from the Government of Great Britain as it may please to present,
    Aug. 30, 1856,
    11 Stat. 152 .................................................................................................................. 12

## Executive Branch Materials

*Applicability of Emoluments Clause to Employment of Government Employees by
    Foreign Public Universities*,
    18 Op. O.L.C. 13 (1994) ............................................................................................... 4

*Applicability of Emoluments Clause to Proposed Service of Government Employee on
    Commission of International Historians*,
    11 Op. O.L.C. 89 (1987) ............................................................................................... 7

*Applicability of the Emoluments Clause & the Foreign Gifts & Decorations Act to the
    Göteborg Award for Sustainable Development*,
    2010 WL 4963117 (Oct. 6, 2010) ............................................................................... 4

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*,
2009 WL 6365082 (Dec. 7, 2009) ........................................................... 4, 10, 12, 15

*Applicability of the Emoluments Clause to Non-government Members of ACUS*,
17 Op. O.L.C. 114 (1993) ................................................................. 3, 6, 7

*Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*,
2010 WL 2516024 (June 3, 2010) ............................................................ 6

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*,
10 Op. O.L.C. 96 (1986) ................................................................... 3

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*,
6 Op. O.L.C. 156 (1982) ............................................................. 4, 5, 15

*Assistant Comptroller General Weitzel to the Attorney General*,
34 Comp. Gen. 331 (1955) ................................................................. 8

Department of Defense, White Paper: Application of the Emoluments Clause to DoD Civilian Employees and Military Personnel ............................................. 15

*Expense Reimbursement in Connection with Chairman Stone's Trip to Indonesia*,
1980 WL 596567 (Aug. 11, 1980) ........................................................ 4, 5

Memorandum for Andrew F. Oehmann, Office of the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Invitation by Italian Government to officials of the Immigration & Naturalization Service & a Member of the White House Staff* (Oct. 16, 1962) ........................................... 3

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*,
1986 WL 1239553 (May 23, 1986) ....................................................... 4, 5

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) .................................................................. 8

Norbert A. Schlei, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* (May 10, 1963) ......... 12

*President Reagan's Ability to Receive Retirement Benefits from the State of California*,
5 Op. O.L.C. 187 (1981) ................................................................ 17

iii

## Other Authorities

Dan Alexander, *Trump's Vegas Partner Says Business Is Not Dividing Profits from Foreign Governments as Promised*,
Forbes (Mar. 22, 2017) .......................................................................................... 13

*Ethics Office Director Walter Shaub Resigns, Saying Rules Need to Be Tougher*,
NPR (July 6, 2017) ................................................................................................ 14

Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place to Be*,
Wash. Post (Nov. 16, 2016) ................................................................................... 13

Jonathan O'Connell, *How the Trump Hotel Changed Washington's Culture of Influence*,
Wash. Post (Aug. 7, 2017) ..................................................................................... 14

Jonathan O'Connell, *Trump D.C. Hotel Turns $2 Million Profit in Four Months*,
Wash. Post (Aug. 10, 2017) ................................................................................... 14

Sheelah Kolhatkar, *Walter Shaub's Brave, Quixotic Ethics Battle with Trump*,
New Yorker (July 7, 2017) ..................................................................................... 11

Trump Organization, Donation of Profits from Foreign Government Patronage (undated pamphlet) .............................................................................................................. 14

iv

## INTEREST OF THE AMICI[1]

Amici are former government ethics officials with decades of experience applying ethical rules in the real world, under administrations of both parties.[2] Throughout their service, in addition to advising their agencies about ethical considerations generally, they have also given advice about the Foreign Emoluments Clause, observing firsthand how the clause works. They submit this brief to explain how the clause is implemented in practice, and to highlight the pertinence of interpretive guidance already issued by the executive and legislative branches on the clause's modern meaning.

## SUMMARY OF ARGUMENT

The government—including the Office of Legal Counsel (OLC), the Comptroller General, and the Department of Defense—has decades of experience interpreting and applying the Foreign Emoluments Clause in a principled and pragmatic way. These offices' guidance establishes that the clause is not arcane or irrelevant today; in fact, it is an important check on corruption, and a beacon for good governance. The guidance also indicates that the clause should be read broadly, consistent with its text and its purpose of preventing foreign states from attempting to corrupt public officials—but not so broadly as to prohibit transactions that have no potential to undermine that purpose. The government has not articulated a one-size-fits-all rule for Emoluments Clause cases, but it is clear that whenever an official's interest in a business could plausibly create a conduit for improper payments and influence to reach him, the Emoluments Clause prohibits the interest.

---

[1] No party's counsel authored this brief in whole or in part; and no person other than the amici and their counsel—including any party or party's counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2] A full list of the amici and their qualifications is appended to this brief.

The defendant argues that such a rule would create "absurd consequences." Def. Br. 38. Those concerns are mistaken both because the government's approach is sufficiently flexible to avoid such results, and also because the Foreign Emoluments Clause has various remedial schemes and safety valves that facilitate compliance. Even when the clause is read broadly, public officials, including Presidents, have had no trouble modifying their conduct to comply with the Constitution.

Finally, we stress that in all of our experience as federal ethics officers, we have seen few financial disclosure reports containing a web of personal and business entanglements as thick and complex as President Trump's—and we have never seen a President go to such lengths to obscure his finances from Congress and the American people. These facts matter for two reasons. First, they explain why there is no precedent on point to the current unprecedented situation, and they counsel in favor of interpreting the Foreign Emoluments Clause consistent with its purpose in this case. Second, the extreme facts of this case mean that the Court need not define all the metes and bounds of the Foreign Emoluments Clause or decide how it would work in every possible hypothetical case. Indeed, the allegations in the complaint identify conduct that is on the wrong side of every reasonable line a court could draw.

## ARGUMENT

### I.   The Government's Legal Interpretations Explain That The Foreign Emoluments Clause Prohibits All Payments That Have Any Realistic Potential Of Corrupting A Public Official.

Given the dearth of judicial precedent interpreting the Foreign Emoluments Clause, the best sources of authority about how the clause actually works are opinions by the Office of Legal Counsel (in the Department of Justice) and the Comptroller General (in the Government Accountability Office), as well as guidance from the Department of Defense. For decades, these agencies have applied the clauses to modern government institutions, and their opinions have created strong ethical norms that guide the conduct of the executive branch every day. As this

Court seeks to interpret and apply the clause in this case, it would make sense to consider and heed those legal interpretations, which have allowed the government to manage ethical problems without creating practical ones. *See, e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559, 2573 (2014) (explaining that government practice can inform the proper interpretation of the Constitution); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (analyzing the foreign affairs power in light of "longstanding practice"); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (noting that government practice "may be treated as a gloss on" the Constitution) (quotation marks omitted).

### A. The Government's Guidance Interprets Foreign Emoluments Clause Broadly, But Flexibly, Emphasizing Its Anti-Corruption Purpose.

Before considering the opinions in detail, we highlight some of the interpretive principles contained therein. First, the government has consistently noted that the Foreign Emoluments Clause's "expansive language and underlying purpose . . . strongly suggest that it be given broad scope." *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986). *See also Applicability of the Emoluments Clause to Non-government Members of ACUS*, 17 Op. O.L.C. 114, 121 (1993) ("The language of the Emoluments Clause is both sweeping and unqualified."); Memorandum for Andrew F. Oehmann, Office of the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Invitation by Italian Government to officials of the Immigration & Naturalization Service & a Member of the White House Staff* 2 (Oct. 16, 1962), *available at* https://www.justice.gov/olc/page/file/935741/download (noting "the sweeping nature of the constitutional prohibition and the fact that in the past it has been strictly construed, being directed against every possible kind of influence by foreign governments over officers of the United States"). Government analyses have therefore usually started from the presumption that the clause

applies. This presumption of breadth is important. As OLC has explained, "[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty." *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 18 (1994). Payments by foreign governments carry the real potential to bias that judgment and divide that loyalty—cracking the bedrock of our system of public service.

Second, although the government has taken a broad view of the clause, it has eschewed one-size-fits-all rules, emphasizing instead that "[e]ach situation must . . . be judged on its facts," *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982), "with the underlying purpose of the constitutional prohibition in mind," Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, 1986 WL 1239553, at *1 (May 23, 1986). *See also Applicability of the Emoluments Clause & the Foreign Gifts & Decorations Act to the Göteborg Award for Sustainable Development*, 2010 WL 4963117, at *2 (Oct. 6, 2010) (explaining that OLC looks to a number of non-dispositive factors, "keeping in mind the underlying purpose that the Clause serves"); *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082, at *11 (Dec. 7, 2009) ("[D]etermining whether an entity is an instrumentality of a foreign government is necessarily a fact-bound inquiry."); *Expense Reimbursement in Connection with Chairman Stone's Trip to Indonesia*, 1980 WL 596567, at *1 (Aug. 11, 1980) ("[W]ith the underlying purpose of the

constitutional prohibition in mind, we have relied for our analysis on the terms of the contract . . . and on the circumstances under which the arrangements for the trip were made.").

For example, the government has reached varying conclusions as to whether particular payments come from a "foreign state" depending on how much control foreign governments exercise over those payments. When the government of Indonesia paid Harvard University to establish a consulting project, and some of those funds were used by Harvard to pay for the Chairman of the CFTC's trip to Indonesia, OLC determined that because "the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated." *Expense Reimbursement*, 1980 WL 596567, at *3. Instead, the payment effectively came from Harvard, which is not a foreign state. Similarly, when the University of New South Wales sought to enter into a consulting agreement with two NASA scientists, OLC concluded that the University's "functional and operational separation and independence from the government of Australia and state political instrumentalities" counseled against treating the University as a foreign state. *See NASA Scientists*, 1986 WL 1239553, at *2. On the other hand, when an employee of the Nuclear Regulatory Commission sought to accept employment with a domestic consulting company to review the design of a nuclear power plant being constructed by the Mexican government, the government concluded that because Mexico retained "ultimate control, including selection of personnel," the "interposition of the American corporation" was not enough to "relieve[] the NRC employee of the obligations imposed by the Emoluments Clause." *Application of the Emoluments Clause*, 6 Op. O.L.C. at 158-59.

In sum, the government applies a totality-of-the-circumstances approach to Emoluments Clause questions, with a bias in favor of breadth, and a keen eye to the anti-corruption purpose of the clauses. It has never come close to adopting anything like the rigid, narrow rule advanced by

the defendant, *i.e.*, that the Emoluments Clause is limited only to employment-or-office-related payments.

### B. The Government Has Never Approved An Arrangement Whereby A Public Official's Interest In A Business Could Even Potentially Constitute A Conduit For Prohibited Emoluments to Reach The Official.

In the decades that it has applied its purposive approach to the Foreign Emoluments Clause, the government has never determined that the clause permits a public officeholder to maintain an interest in a business that stands to benefit by virtue of that person holding public office. The purpose of the Foreign Emoluments Clause is to prevent foreign governments from attempting to influence public officers through money or other favors. In deciding whether a particular arrangement is constitutional or not, government ethics officials have paid close attention to whether the arrangement creates even a potential for improper foreign government influence over a person in an office of public trust. When such a potential exists—even if the probability is quite low—the government has found that such arrangements violate the Foreign Emoluments Clause.

Thus, in 1993, OLC considered whether lawyer members of the Administrative Conference of the United States (ACUS) could receive partnership distributions from their firms if the funds included fee revenue from foreign governments—and it concluded that the answer was "no" even if the lawyers "did not personally represent a foreign government, and indeed had no personal contact with that client of the firm." *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. at 119.[3] OLC reasoned that:

---

[3] OLC subsequently modified the conclusion of this guidance, deciding that private members of the ACUS were not officers covered by the Emoluments Clause. *Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 2010 WL 2516024 (June 3, 2010). But it did not question its prior analysis. *See id.* at *1 n.2.

> Because the amount the Conference member would receive from the partnership's profits would be a function of the amount paid to the firm by the foreign government, the partnership would in effect be a conduit for that government. Thus, some portion of the member's income could fairly be attributed to a foreign government. We believe that acceptance of that portion of the member's partnership share would constitute a prohibited emolument.

*Id.*

In the ACUS case, it was clear that if a lawyer's livelihood depended, in any part, on the fees paid to her firm by foreign governments, her judgment with respect to legal issues affecting those governments might be shaded by a desire to continue earning (or to augment) those fees—and those governments might attempt to exploit their client relationship to influence U.S. policy. The law firm partnership could therefore become an illicit conduit for foreign-government influence on U.S. law.

Indeed, the government has found a violation even when the risk of corruption was very low. Thus, OLC determined that an employee of the National Archives could not accept an appointment to a commission of international historians established by the Austrian government to review the wartime record of the President of Austria—even though the employee was willing to forgo an honorarium and seek private funding for his own expenses. OLC explained that even though it did not believe that the employee "would be subjected to improper foreign influence," his appointment "on an entity established and funded by a foreign government raises serious issues under the Emoluments Clause." *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 91 & n .5 (1987).

In contrast with that decision, the Comptroller General concluded that a U.S. employee who was entitled to damages from the German government for harm he suffered at the hands of the Nazi regime was not prohibited from receiving those damages while in office. The analysis explained that the payments did not contravene the letter of the clause, nor its spirit, because the

payments "obviously were not intended to influence [the employee] as an officer of the United States," but were instead "required largely as a result of the policy imposed by the United States and its allies and finally by the terms of the Bonn Convention." *Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 335 (1955).[4]

The key fact separating these cases is whether the arrangement creates the potential for a payment or favor to influence the official's conduct in office. Such potential did not exist when Germany paid officials in order to satisfy legal rights that vested prior to the official taking office. But it certainly exists whenever foreign governments may seek to do business with a public official's enterprise in order to curry favor with him—even if those governments do not do business with the official personally, and even if the official receives the money only as an owner.

For obvious reasons, the government has never approved such an arrangement, and this Court would be on very safe ground holding that, at a minimum, when an officeholder's business interests create the potential for outside influence, the Foreign Emoluments Clause applies.

---

[4] OLC actually reached the opposite conclusion about this same case, determining that the payments from Germany were not exclusively payment for past damages, but instead incident to the official's prior employment as a German judge. *See* Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954), *available at* https://www.justice.gov/olc/page/file/935721/download. In that opinion, OLC stated that "the term 'emolument', . . . particularly since it is modified by the phrase 'of any kind whatever', was intended to cover compensation of any sort arising out of an employment relationship with a foreign state." *Id.* at 8. Some have seized on this language to suggest that the Foreign Emoluments Clause applies only to payments arising from an employment relationship. Def. Br. 38. But in context, the language is clearly there to suggest breadth, not limitations. It does not remotely suggest that *only* compensation arising from an employment relationship is covered.

**II.     Compliance With The Foreign Emoluments Clause Is Not Especially Difficult.**

Defendant worries that if the Court adopts a broad interpretation of the Foreign Emoluments Clause, public officials will be unable to comply and to structure their lives around their jobs. That is wrong for four reasons.

*First*, there is already an established body of guidance in the OLC and Comptroller General opinions that covers a tremendous range of situations. A decision embracing those interpretations would enhance predictability; a rule like the defendant's—which deviates substantially from the government's legal interpretations—would have the opposite effect, creating a conflict between judicial precedent and the political branches' settled understandings.

The approach embodied in the government's opinions is also flexible enough to uphold the purpose of the Foreign Emoluments Clause while avoiding absurd results. Indeed, following the interpretations cited in this brief would resolve essentially all of the farfetched hypotheticals the defendant raises. Def. Br. 38-39. For example, defendant argues that under a broad reading of the word "emolument" a President could not hold Treasury bonds because the interest would violate the Domestic Emoluments Clause, and he could not hold stock in a publicly traded company that deals with foreign governments because that might violate the Foreign Emoluments Clause. But under the government's purposive approach, these payments are unlikely to raise concerns because it is highly doubtful that holding publicly traded securities would create the potential for others to exercise undue influence over the holder. The terms of Treasury bonds, for example, are relatively static, and it is unlikely that a President or Congress—never mind foreign governments—could do anything to augment those returns. Moreover, because of the size of publicly traded companies, the complexity of securities markets, and the many factors that affect share prices, it is highly unlikely that foreign government payments to publicly traded corporations would result in a traceable increase to a public official shareholder's wealth in the same way that payments to a law

firm would. Of course, an idiosyncratic case may arise if a public official owns a very large stake in a publicly traded company that does a lot of business with foreign governments, or if a foreign government contracts with a publicly traded company in order to curry favor with a public official shareholder. In those cases, there may be real emoluments concerns, and the clause may require obtaining congressional consent. But in the ordinary case, it is extremely unlikely that ownership of any publicly traded security would create potential for influence over the shareholder by that company's customers.[5]

Similarly, royalties from book sales to foreign libraries, when the books were published prior to a President taking office, are unlikely to raise concern. Even if all of the public libraries in a given country buy a book—and even if they do so because the author of the book is President—those payments will be filtered through wholesalers back to the publisher, and then on to the President. The President will likely never know who bought the books, and the amount of the royalty attributable to a particular country's book purchases will likely not be substantial. But again, the clauses are flexible: if a foreign government attempts to influence a President by purchasing copies of his book, or if a competent authority finds a real potential for such influence, then the Foreign Emoluments Clause could very well prohibit the President from accepting the royalties without Congressional approval.

*Second*, concerns about predictability are exaggerated because there is an easy way for any federal officer to determine whether particular conduct would violate the clause: just ask. Federal

---

[5] Independently, OLC has already explained that when a particular action has been common practice for an extended period of time, that may inform the constitutional inquiry. *See Nobel Peace Prize*, 2009 WL 6365082, at *4 (noting the "consistent historical practice of the political branches"). To the extent holding investments in publicly traded securities is also a common activity, there is a high probability that OLC would find it outside the scope of the Emoluments Clauses on that basis.

agencies have ethics officers, and it is their job to determine and communicate the answers to questions like these in a clear and timely fashion. Those officers can help to resolve cases at the margins after hearing and considering all of the relevant facts. In this case, the President could have obtained a formal opinion from OLC, but so far as the public is aware, he chose not to (likely for the obvious reason that his conduct is completely inconsistent with past OLC interpretations).

*Third*, the remedies for violations of the Foreign Emoluments Clause are hardly draconian; it is not as if violations carry criminal penalties or result in asset seizures. In this case, the plaintiffs ask the President to stop violating the clause—which, as they note, is exactly what past Presidents have done. Notably, stopping the violation by divesting his businesses is exactly what the Office of Government Ethics urged this President to do. *See* Sheelah Kolhatkar, *Walter Shaub's Brave, Quixotic Ethics Battle with Trump*, New Yorker (July 7, 2017), http://www.newyorker.com/news/news-desk/walter-shaubs-brave-quixotic-ethics-battle-with-trump. It is not unreasonable for Presidents to prioritize holding the highest office in the land over their business interests.

*Finally*, as the plaintiffs note (Br. 17-18, 41), the Foreign Emoluments Clause contains a safety valve, permitting Congress to create express waivers for particular emoluments or classes of conduct. By combining congressional power to approve foreign emoluments with an otherwise "sweeping and unqualified" prohibition on their acceptance, the Foreign Emoluments Clause "lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications." *ACUS*, 17 Op. O.L.C. at 121, 123 n.10. The congressional consent provision of the Clause serves two salutary functions: it fosters transparency by encouraging American officials to disclose potential emoluments to Congress, and it pragmatically allows the legislature to permit certain emoluments that do not jeopardize the public interest. *See* 5 Annals of Cong. 1583 (1798) (Bayard); *id*. at 1585 (Otis).

Congress has exercised its power to permit emoluments on multiple occasions. One well-known example is the Foreign Gifts and Decorations Act, codified at 5 U.S.C. § 7342, which permits federal personnel to accept certain small gifts, educational scholarships, foreign travel, meals, and lodging, and certain military honors. Congress has also acted to permit retired military personnel and other officials to accept paid civil employment by foreign governments under certain circumstances. *See* 37 U.S.C. § 908(a). On other occasions, Congress has acted to permit specific emoluments on a one-off basis, typically in response to requests from government officials. In 1856, for instance, it passed a resolution allowing a Navy surgeon to accept a "token of thankfulness" from a foreign government for his services on behalf of one of its citizens. *See* Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present, Aug. 30, 1856, 11 Stat. 152. In 1896, Congress authorized President Benjamin Harrison to personally accept certain medals from Brazil and Spain. *See* Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, Apr. 2, 1896, 29 Stat. 759. These examples illustrate that the process of seeking congressional consent is user-friendly and administrable—and most importantly, it can conclusively resolve any Foreign Emoluments Clause issue.[6]

---

[6] When it has been unclear whether accepting a particular type of benefit requires congressional consent, past presidents have honored the independent recommendations of the OLC. *See, e.g.*, Norbert A. Schlei, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* (May 10, 1963); *Nobel Peace Prize*, 2009 WL 6365082, at *1.

### III.     The Complaint States A Valid Claim, And This Is Not A Close Case.

Under the approach taken by the government in the past—and indeed, under any plausible reading of the Foreign Emoluments Clause—the question whether the complaint states a valid claim is not even close. The complaint alleges a dense web of personal and financial conflicts that expose the President to myriad sources of foreign influence. Since at least the enactment of the Ethics in Government Act, and likely going back much further than that, no full-time executive branch official has retained an ownership interest in a business that brandishes his name (usually in all-capital, shiny lettering) on hotels, real estate developments, consumer products, and services all across the world. And no President during that same period, or likely ever before that, has been so overtly focused on the development of his personal brand while in office. The statements cited by the plaintiffs show that the President welcomes favoritism from foreign governments for his business interests, and the facts alleged indicate his willingness to repay that largesse with political and policy favors. This is precisely the type of corruption that the Emoluments Clause was supposed to prevent.

Consider, for example, the President's Washington D.C. hotel, which raises Foreign Emoluments Clause concerns because foreign officials frequent the hotel. *See* Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place to Be*, Wash. Post (Nov. 16, 2016), http://wapo.st/2fNSW6E?tid=ss_mail&utm_term=.1014029956cf .[7] The hotel reported that in

---

[7] The hotel has agreed to donate profits from foreign governments to the U.S. Treasury, but it is not at all clear how those profits are tracked and attributed. Moreover, the co-owner of one of the Trump hotels said there was no plan in place at that hotel to segregate the profits from foreign governments. Dan Alexander, *Trump's Vegas Partner Says Business Is Not Dividing Profits from Foreign Governments as Promised*, Forbes (Mar. 22, 2017). When the Oversight and Government Reform Committee of the House of Representatives requested information from the Trump Organization about how the President's promise was being implemented, it received a sparse eight-page pamphlet making clear that the Trump Organization is not tracking all payments from foreign governments or calculating the profit that stems from any individual payment. *See* Trump

four short months, it turned a $2 million profit, a figure that "represents a 192 percent improvement over what the Trump family planned to make when the company opened the hotel in the fall." Jonathan O'Connell, *Trump D.C. Hotel Turns $2 Million Profit in Four Months*, Wash. Post (Aug. 10, 2017), http://wapo.st/2fwHh0s?tid=ss_mail&utm_term=.d2cd98095b03. And the building has been described as "a kind of White House annex," where "groups with foreign interests" go to "attract Washington star power." Jonathan O'Connell, *How the Trump Hotel Changed Washington's Culture of Influence*, Wash. Post (Aug. 7, 2017), https://www.washingtonpost.com/graphics/2017/politics/trump-hotel-business/?utm_term=.208ea23dc2bb. Put succinctly, "[t]his is nothing Washington has ever seen" because "[f]or the first time in Presidential history, a profit-making venture touts the name of the U.S. president in its gold signage." *Id*.[8]

Indeed, one of the most striking features of this case is how much more serious the allegations in the complaint are than any past case considered by OLC or the Comptroller General. In the opinions cited in this brief, the government frequently weighed in on cases involving relatively small one-time payments, or a relatively low risk of corruption—and nevertheless concluded that

---

Organization, Donation of Profits from Foreign Government Patronage (undated pamphlet), *available at* https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/Trump%20Org%20Pamphlet%20on%20Foreign%20Profits.pdf. Instead, the pamphlet directs Trump hotels to make only "commercially reasonable efforts" to identify foreign government payments, because identifying them "fully and completely" is "impractical" and "would impede upon personal privacy and diminish the guest experience of our brand." *Id*. at 5, 4. As for calculating profits from any payments that the hotels do track, the pamphlet says that attempting to "distinctly attribute certain business-related costs as specifically identifiable to a particular customer group is not practical," because it would require "an inordinate amount of time, resources and specialists." *Id*. at 6.

[8] Indeed, it is no coincidence that the head of the Office of Government Ethics repeatedly and publicly called for the President to divest his holdings, and then resigned in protest when it became clear that ethical norms were being flouted. *See Ethics Office Director Walter Shaub Resigns, Saying Rules Need to Be Tougher*, NPR (July 6, 2017), http://www.npr.org/2017/07/06/535781749/ethics-office-director-walter-shaub-resigns-saying-rules-need-to-be-tougher.

those payments were unlawful. *See, e.g.*, the Austrian historians' commission described *supra*. Even when the government found that the payments were permissible, it wrestled with the question. *See, e.g.*, *Nobel Peace Prize*, 2009 WL 6365082 (issuing a thirteen-page opinion canvassing the history of the Nobel Peace Prize to conclude that its receipt is constitutional—even though multiple U.S. officials had received the prize before). This case is simply on a different scale from anything in the published guidance.

To be sure, the defendant cites the OLC and Comptroller General opinions too. But he does not do much with them, and his efforts to distinguish or use those decisions are far from persuasive. He attempts to distinguish the ACUS case in a footnote, arguing that "[s]ituations involving law partners and their profit sharing are distinct from the financial interests at issue in this case." Def. Br. 36 n.47. But there is nothing special about a law firm's structure. The Department of Defense has extrapolated from OLC's guidance that revenues from a limited liability corporation would be covered by the Emoluments Clauses for the same reasons. *See* Department of Defense, White Paper: Application of the Emoluments Clause to DoD Civilian Employees and Military Personnel 5, *available at* http://ogc.osd.mil/defense_ethics/resource_library/emoluments_clause_ applications.pdf. Moreover, OLC also found—in the case of the NRC employee who sought to advise Mexico—that employees of U.S. corporations can violate the Foreign Emoluments Clause if the revenue coming their way comes from a foreign power. *See Application of the Emoluments Clause*, 6 Op. O.L.C. at 158-59.

There is no good reason to treat the owners of corporations any differently from their employees—or for the applicability of the Emoluments Clauses to turn on the vagaries of corporate forms at all. Indeed, the government itself has stated that a "corporate entity will be disregarded" when "equity dictates," including "when there is such unity of interest and ownership that the

separate personalities of the corporation and its shareholders no longer exist." *Matter of:*

*Lieutenant Colonel Marvin S. Shaffer, USAF, Retired*, 62 Comp. Gen. 432, 434 (1983). In this

case, the President holds a substantial stake in a closely held family business that bears his name.

It would make no sense to say that he should be less responsible for his business's foreign

government associations than an unnamed partner at a large law firm is for the firm's revenues.

If the ACUS case applies (and it does), it devastates the defendant's primary argument for a

narrow reading of the clause because it shows that even an attenuated economic interest in ordinary

commercial transactions that generate value for both sides can violate the Emoluments Clause if

that business nevertheless creates the potential for undue influence over public officials.

Defendant also cites (Br. 35) opinions holding that President Reagan could receive pension

benefits related to his tenure as governor of California as favorable precedent. But defendant never

discusses the reasoning in the opinions—which is damning for his position. The Comptroller

General decided that "the term emolument . . . cannot be considered to extend to benefits that have

been earned or to which entitlement arose before [Reagan's] occupancy of that office, and that

*clearly have no connection, either direct or indirect, with the Presidency*." *Hon. George J. Mitchell*

*U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (emphasis added).

Because the pension payments could not "be construed as being in any manner received in

consequence of his possession of the Presidency," they were not emoluments. *Id*. Moreover, the

Comptroller General found it:

> highly unlikely that the President could be swayed in his dealings with the State of
> California by the prospect of having his pension diminished or rescinded by the State.
> Similarly, because of the nature of the modern statutory retirement system, it is doubtful
> that the State could "appeal to his avarice" by rewarding sympathetic actions with
> increased pension benefits. Moreover, acceptance of pension benefits requires no
> obligation to the State for future services.

*Id.* OLC likewise determined that "the term emolument has a strong connotation of . . . payments which have a potential of influencing or corrupting the integrity of the recipient." *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188-89 (1981). OLC concluded that state pension "benefits are not emoluments in the constitutional sense," and their "receipt does not violate the spirit of the Constitution because they do not subject the President to any improper influence." *Id.* at 192. Thus, the pension payments in that case were similar to the damages owed by the German government: they flowed from a legal right that had vested prior to the official taking federal office, they were not in any way attributable to that office, and they had no real potential to influence the official's conduct in office.

Unlike President Reagan's California pension, President Trump's business relationships threaten to distort U.S. policy on an ongoing basis. And unlike the state of California, which was merely paying out a vested entitlement based on pre-election service, customers are now flocking to President Trump's businesses *because he is currently the President, in an effort to influence him or win his favor*. The Constitution plainly seeks to prevent that, and this Court should hold as much.

## CONCLUSION

The motion to dismiss should be denied.

Respectfully submitted,

s/Thomas C. Goldstein

Bar No. 458365
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362.0636
tgoldstein@goldsteinrussell.com

## APPENDIX: THE AMICI AND THEIR QUALIFICATIONS

Don Fox – Former Office of Government Ethics (OGE) General Counsel and Acting Director (career; also served at the Department of Defense in career legal capacity)

Marilyn Glynn – Former OGE Acting Director and General Counsel (career)

Karen Kucik – Former ethics official for DOJ, Department of Commerce, and Department of Health & Human Services (career)

Lawrence D. Reynolds – Former Assistant General Counsel for the Department of Housing and Urban Development with responsibility for ethics (career; also served at the Department of Labor in career ethics capacity)

Amy Comstock Rick – Former Director of the Office of Government Ethics; former Associate Counsel to President Clinton for ethics (originally career ethics official at Department of Education)

Walter Shaub – Former Director of the U.S. Office of Government Ethics (Senate-confirmed, Presidential appointee), former Deputy General Counsel for OGE (career), former supervisory attorney for OGE (career), former staff attorney for OGE

Trip Rothschild – Former Associate General Counsel at the Nuclear Regulatory Commission

Richard M. Thomas – Former Associate General Counsel, Office of Government Ethics; Former Ethics Counsel, Department of Health and Human Services

Kathleen Whalen – Former Associate Counsel to President Clinton for ethics (originally career ethics official at the Department of Commerce)

Harvey Wilcox – Former Navy Deputy General Counsel (career) and Designated Agency Ethics Official

Leslie Wilcox – Former Associate General Counsel for OGE (career), and principal author of the Standards of Ethical Conduct for Employees of the Executive Branch (5 CFR Part 2635)