# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Senator RICHARD BLUMENTHAL,
Representative JOHN CONYERS, JR., *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

Defendant.

Civil Action No. 17-1154 (EGS)

## BRIEF OF FEDERAL JURISDICTION AND CONSTITUTIONAL LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

Corey W. Roush (D.C. Bar #466337)
G. Michael Parsons, Jr. (D.C. Bar #1021454)
1333 New Hampshire Ave. NW
Washington, D.C. 20036-1564
TEL: 202.887.4000
FAX: 202.887.4288

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**PAGE**

INTEREST OF *AMICI CURIAE* ................................................. 1

SUMMARY OF ARGUMENT ................................................. 1

ARGUMENT ................................................. 3

PLAINTIFFS POSSESS ARTICLE III STANDING ................................................. 3

I.     Plaintiffs Have Alleged Cognizable Article III Injuries ................................................. 4

     A.    Plaintiffs' alleged injuries are particularized and concrete, not generalized or derivative ................................................. 9

          1. Nullification of specific, identifiable voting opportunities ................................................. 10

          2. Elimination of particularized institutional prerogatives ................................................. 17

     B.    Plaintiffs' injuries are actual and ongoing, not speculative or conjectural ................................................. 20

II.    Plaintiffs' Injuries Are Fairly Traceable to the Challenged Executive Action ................................................. 21

III.   Plaintiffs' Injuries Would Be—And Can Only Be—Redressed By A Court Order ................................................. 22

CONCLUSION ................................................. 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

APPENDIX A

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES:

*Allen v. Wright*,
    468 U.S. 737 (1984)............................................................................................3

*\*Ariz. State Legislature v. Ariz. Independent Redistricting Comm'n*,
    135 S. Ct. 2652 (2015)................................................................................ *passim*

*Assoc. of Data Processing Serv. Orgs. v. Camp*,
    397 U.S. 150 (1970)............................................................................................4

*Avacus Partners, L.P. v. Brian*,
    No. 11011, 1990 Del. Ch. LEXIS 178 (Ch. Oct. 24, 1990)................................12

*Bender v. Williamsport Area School District*,
    475 U.S. 534 (1986)............................................................................................9

*\*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) ..................................................................... *passim*

*\*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999) ...............................................................7, 11, 23

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)..........................................................................................21

*Cohens v. Virginia*,
    19 U.S. (6 Wheat.) 264 (1821)..................................................................3, 23, 25

*\*Coleman v. Miller*,
    307 U.S. 433 (1939).................................................................................. *passim*

*Colorado River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976)............................................................................................7

*Elk Grove Unified Sch. Dist. v. Newdow*,
    542 U.S. 1 (2004)..............................................................................................23

*FEC v. Akins*,
    524 U.S. 11 (1998)........................................................................................5, 12

*Goldwater v. Carter*,
    444 U.S. 996 (1979)..........................................................................................20

*INS v. Chadha*,
    462 U.S. 919 (1983)...................................................................................6, 14, 23

*L. Singer & Sons v. Union Pac. R. Co.*,
    311 U.S. 295 (1940)..................................................................................................5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014)...........................................................................................23

*Loving v. United States*,
    517 U.S. 748 (1996)...............................................................................................18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).............................................................................4, 20, 21, 22

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)................................................................................23

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) .................................................................................24

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010).............................................................................................2, 3

*New York v. United States*,
    505 U.S. 144 (1992)...............................................................................................19

*Nixon v. United States*,
    506 U.S. 224 (1993)...............................................................................................23

*Powell v. McCormack*,
    395 U.S. 486 (1969)...................................................................................12, 15, 23

*\*Raines v. Byrd*,
    521 U.S. 811 (1997)..................................................................................... *passim*

*Riegle v. Fed. Open Market Comm.*,
    656 F.2d 873 (D.C. Cir. 1981)...............................................................................22

*Robbins v. Chronister*,
    435 F.3d 1238 (10th Cir. 2006) .............................................................................17

*Shaw v. Hunt*,
    517 U.S. 899 (1996)...............................................................................................12

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976).............................................................................................21, 22

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ................................................................................4

*Sprint Commc'ns, Inc. v. Jacobs*,
  134 S. Ct. 584 (2013) .............................................................................3, 7

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) .........................................................................13

*United States v. Richardson*,
  418 U.S. 166 (1974) ...................................................................................4

*United States v. Windsor*,
  133 S. Ct. 2675 (2013) ...............................................................................6

*Valley Forge Christian College v. Ams. United for Separation of Church & State*,
  454 U.S. 464 (1982) .............................................................................4, 25

*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................2, 4, 8, 17

*Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) .................................................................................23

## CONSTITUTION:

U.S. CONST. art. I,
  § 3, cl. 1 .................................................................................................13
  § 5, cl. 3 .................................................................................................13
  § 9, cl. 8 ..............................................................................................1, 9

## OTHER AUTHORITIES:

5 Annals of Cong. 1582 (1798) (Joseph Gales ed., 1834) ...........................................16

FED. R. APP. P. 29(c)(5) ...............................................................................1

Hall, Matthew I., *Making Sense of Legislative Standing*, 90 S. CAL. L. REV. 1
  (2016) .............................................................................................5, 6, 7, 8

Hall, Matthew I., *Who Has Standing to Sue the President Under the Emoluments
  Clause?*, 95 WASH. U. L. REV. __ (forthcoming Nov. 2017) .....................................11, 15, 18

Huq, Aziz Z., *The Constitutional Law of Agenda Control,* 104 CALIF. L. REV
  1401 (2016) ......................................................................................18, 19

Kamin, David, *Legislating for Good Times and Bad*, 54 HARV. J. ON LEGIS. 201,
  (2017) ...............................................................................................18

L. Civ. R. 7(o)(5) ................................................................................................1

Manning, John F., *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2005) ............................17

Sant' Ambrogio, Michael, *Legislative Exhaustion*, 58 Wm. & Mary L. Rev. 1253 (2017) ...............................................................................................17, 21, 24

The Federalist No. 22 (Alexander Hamilton) (1787) ...............................................14

The Federalist No. 76 (Alexander Hamilton) (1788) ...............................................19

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are law professors who teach and publish in the areas of federal jurisdiction, standing, and constitutional law.  They have a professional interest in the proper and coherent development of the law as it relates to legislative standing and justiciability.  They bring a perspective informed by more than 342 combined years of teaching, research, and writing focused on the important questions of constitutional interpretation raised by this case.  *Amici* seek to assist the Court by presenting legal arguments, precedents, and scholarly commentary that bear on these questions.  *Amici* are listed in Appendix A.

## SUMMARY OF ARGUMENT

In this case, Plaintiffs—30 members of the United States Senate and 171 members of the United States House of Representatives—bring claims arising directly under the Foreign Emoluments Clause ("Emoluments Clause" or "Clause") of the Constitution, which states that "no Person holding any Office of Profit or Trust under [the United States], shall, *without the Consent of the Congress*, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  U.S. CONST. art. I, § 9, cl. 8 (emphasis added).  Plaintiffs allege that Defendant has accepted benefits from foreign governments that qualify as "Emolument[s]" without first seeking and obtaining "the Consent of the Congress," as the Constitution requires, thereby extinguishing their power to act.[2]

---

[1] Pursuant to Local Civil Rule 7(o)(5) and Federal Rules of Appellate Procedure 29(c)(5), *amici* certify that (1) this brief was authored entirely by counsel for *amici curiae* and not by counsel for any party, in whole or part; (2) no party or counsel for any party contributed money to fund preparing or submitting this brief; and (3) apart from *amici curiae* and its counsel, no other person contributed money to fund preparing or submitting this brief.

[2] *Amici* write only with respect to the legislative standing issue presented by the case and take no position on the merits of either party's position or the underlying question of what foreign benefits fall within the scope of the term "emoluments."

Before proceeding to the merits of the claim, the Court must decide whether Plaintiffs have standing under Article III of the Constitution to pursue their claims. To establish standing, Plaintiffs must demonstrate that they suffer a cognizable injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). These are not abstract philosophical inquiries; rather, standing "often turns on the nature and source of the claim asserted" and the specific facts alleged. *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

Because the Emoluments Clause prohibits federal officials from accepting foreign benefits *unless and until* Congress holds a specific vote and approves specific terms of consent, Defendant's alleged receipt of such foreign benefits injures Plaintiffs in two ways. First, if Defendant has "treat[ed] a vote that did not pass as if it had," *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000), then he has wholly nullified a specific, identifiable voting opportunity vested in Plaintiffs by the Constitution, *see Raines v. Byrd*, 521 U.S. 811, 822 (1997) (noting that legislator standing is proper when a measure is "deemed ratified" contrary to procedure defined by law because it nullifies a specific vote); *Ariz. State Legislature v. Ariz. Independent Redistricting Comm'n*, 135 S. Ct. 2652, 2663-666 (2015) (holding that the elimination of "the opportunity" to exercise a constitutionally defined prerogative and the nullification of a vote "now or 'in the future'" is sufficient to support legislative standing (quoting *Raines*, 521 U.S. at 823-24)). Second, if Defendant has circumvented the process laid out in the Emoluments Clause as alleged, then he has eliminated the institutional prerogatives possessed by Plaintiffs both as individual legislators and as a bloc of legislators. Because the receipt of emoluments is completely prohibited in the absence of *affirmative* legislative action, accepting them without

consent would destroy the institutional powers that Plaintiffs possess to delay or defeat proposed consent legislation, or to impose conditions on the grant of such consent.

Plaintiffs' injuries are also fairly traceable to the allegedly unlawful executive action, and a court order providing Plaintiffs' requested declaratory and injunctive relief would—indeed, is the only way to—redress the alleged injuries in the manner prescribed by the Constitution. Congress has no way to redress its injuries through the legislative process. Nothing Congress can do would restore the constitutional balance and ensure that congressional *inaction* suffices to prevent federal officials from accepting foreign emoluments.

Having satisfied the criteria necessary under Article III, Plaintiffs have established standing and the Court must take jurisdiction over their claims. *See Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 590–91 (2013) ("Federal courts . . . have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821))).

## ARGUMENT

### PLAINTIFFS POSSESS ARTICLE III STANDING

The Supreme Court has interpreted Article III of the Constitution to "confine[] the federal courts to adjudicating actual 'cases' and 'controversies'" and to "define[] with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984) (citation omitted). To establish the standing necessary to invoke judicial power, plaintiffs must allege a cognizable injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co.*, 561 U.S. at 149.

3

Despite the simplicity of this basic rule, articulating universal principles of application is difficult because standing "often turns on the nature and source of the claim asserted."[3] *Warth*, 422 U.S. at 500.  Careful attention to the nature of the claim and the purposes animating the doctrine is particularly important in cases like this one that involve an underdeveloped area of standing doctrine (legislator standing) and a rarely litigated constitutional provision (the Emoluments Clause).  Indeed, the unique source of Plaintiffs' claims ultimately resolves the legislative standing question in their favor because it grants legislators specific, particularized authority not otherwise available in the normal course of the legislative process.  Any other holding would raise profound problems of constitutional construction by allowing a judicial interpretation of the Cases and Controversies Clause to effectively eclipse the explicit textual command of the Emoluments Clause.

## I.      PLAINTIFFS HAVE ALLEGED COGNIZABLE ARTICLE III INJURIES

To present a judiciable case or controversy, Plaintiffs must suffer an "injury in fact"— "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-548 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Thus, standing requires "a 'personal stake in the outcome,' or a 'particular, concrete injury,' or 'a direct injury'; in short, something more than 'generalized grievances.'"  *United States v. Richardson*, 418 U.S. 166, 179-80 (1974) (internal citations omitted).

---

[3]  *See Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151 (1970) ("Generalizations about standing to sue are largely worthless as such."); *Valley Forge Christian College v. Ams. United for Separation of Church & State*, 454 U.S. 464, 471-76 (1982) ("We need not mince words when we say that the concept of 'Art. III standing' has not been defined with complete consistency . . . by this Court . . . [and] that the concept cannot be reduced to a one-sentence or one-paragraph definition.").

"[G]eneralized grievances" are "not only widely shared, but . . . also of an abstract and indefinite nature—for example, harm to the 'common concern for obedience to law.'" *FEC v. Akins*, 524 U.S. 11, 23 (1998) (quoting *L. Singer & Sons v. Union Pac. R. Co.*, 311 U.S. 295, 303 (1940)).  The political process is better suited to such nebulous complaints, which have more in common with policy preferences than the deprivation of defined rights.  *See id.* at 23.  For this reason, federal courts treat claims by legislators with understandable skepticism.  Lawmakers who fail to spur action in their own branch cannot press their preference in a pleading; the power to enact legislation belongs to Congress as a whole.  *See Raines*, 521 U.S. at 818-19.

Of course, that does not mean lawmakers have no right to avail themselves of the courts in situations where they are deprived of their individualized institutional prerogatives in a way distinguishable from harm to the body as a whole, *see Coleman v. Miller*, 307 U.S. 433 (1939), and where the legislature itself cannot remedy the injury.  Some injuries—such as an "interference with voting rights conferred by law"—are "sufficiently concrete and specific" to confer Article III standing despite being widely shared by every member of the relevant body of voters.  *Akins*, 524 U.S. at 24-25.  In evaluating legislative standing, courts should ask what "specific prerogative or power [has been] eliminated by the defendant."  Matthew I. Hall, *Making Sense of Legislative Standing*, 90 S. CAL. L. REV. 1, 26 (2016) [hereinafter, "Legislative Standing"].  In general, "legislative standing to litigate over a prerogative is derived from, and coextensive with, the authority to exercise that prerogative."  *Id*. at 28.

A legislative body, for example, has standing to sue over an injury to a prerogative belonging to that body.  In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court held that the Arizona Legislature had standing to challenge the constitutionality of an initiative that "strip[ped] the Legislature of its alleged prerogative to

initiate redistricting."  135 S. Ct. at 2663.  Pointing to a well-defined constitutional source for the alleged prerogative, the Legislature argued that "the Elections Clause vests in it 'primary responsibility' for redistricting."  *Id.* (citation omitted).  "[T]he Arizona Legislature, having lost authority to draw congressional districts, ha[d] standing to contest the constitutionality of [the initiative]."  *Id.* at 2659.[4]

Similarly, in *INS v. Chadha*, the Supreme Court allowed Congress to defend the constitutionality of a law that conferred "legislative veto" power over certain decisions by the Immigration and Naturalization Service ("INS").  462 U.S. 919, 939-40 (1983).  Because each chamber stood to lose a power that Congress had explicitly legislated for itself, and both the INS *and* Chadha argued that the law was unconstitutional, Congress was permitted to defend its claimed authority.  *See* Hall, *Legislative Standing*, *supra*, at 16 ("*Chadha* is generally understood to recognize legislative injury in the threatened elimination of legislative powers, but not in the threatened invalidation of general federal statutes."); *United States v. Windsor*, 133 S. Ct. 2675, 2700 (2013) (Scalia, J., dissenting) (describing *Chadha* as a case in which "the House and Senate were threatened with destruction of what they claimed to be one of their institutional powers").

In *Raines v. Byrd*, on the other hand, six Members of Congress attempted to challenge the constitutionality of the Line Item Veto Act—which Congress had passed over their nay votes— by alleging that the Act diluted their institutional power and changed the "meaning" and "effectiveness" of their votes.  *See* 521 U.S. at 814, 821, 825-26.  The Supreme Court held that the Members had suffered no personal injury and that any alleged institutional injury was to Congress itself rather than the Members in their official capacities.  *See id.* at 821-26.  Individual Members have a right to vote on legislation that comes before them, but they do not possess any

---

[4] Because the entire legislature sued, the Court did not address whether individual legislators would have had standing to sue based on injury to their redistricting-related prerogatives.

individual right to *enact* or *repeal* legislation standing alone; that power lies with Congress.  *See* Hall, *Legislative Standing*, *supra*, at 30 ("Because the plaintiffs could not exercise the legislative power, they could not establish standing by showing an injury to the legislative power.").

Likewise, in *Chenoweth v. Clinton*, four Members of Congress challenged an Executive Order establishing the American Heritage Rivers Initiative (AHRI) on the grounds that it "exceeded [the President's] statutory and constitutional authority," "denied them their proper role in the legislative process and . . . diminished their power as Members of the Congress."  181 F.3d 112, 112-13 (D.C. Cir. 1999).  The Members introduced a bill to terminate the AHRI, but "[t]he bill never came to a vote."  *Id.* at 113.  The D.C. Circuit held the Members lacked standing.  *Id.* at 116.  Not only did the decision to take up a bill rest with Congress as a whole, the President's Order had done nothing to deprive Congress of its own collective authority, let alone any authority residing in the plaintiffs.  *See id.* ("It is uncontested that the Congress could terminate the AHRI were a sufficient number in each House so inclined.").

Injuries to a legislative body's prerogatives can be asserted by that body (under *Arizona* and *Chadha*), but not by individual members of that body (under *Raines*).  *See* Hall, *Legislative Standing*, *supra*, at 22.  However, when *legislators* are denied the exercise of a prerogative that is particularized to the individual or to a bloc of individuals acting in their official capacities, then standing becomes not only appropriate but necessary.  *See Coleman,* 307 U.S. at 435-36*; see also Sprint Commc'ns, Inc.*, 134 S. Ct. at 591 (observing that "a federal court's 'obligation' to hear and decide" cases within its jurisdiction "is 'virtually unflagging.'" (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976))).

In *Coleman v. Miller*, a resolution to ratify an amendment to the U.S. Constitution came before the Kansas Senate, and the vote split 20 in favor, 20 opposed.  307 U.S. at 435-36.  The

Lieutenant Governor then cast a vote in favor, breaking the tie. *Id.* The senators who voted against the resolution challenged the right of the Lieutenant Governor to cast the deciding vote. *Id.* The Supreme Court granted standing, recognizing that "if [the senators] are right in their contentions their votes would have been sufficient to defeat ratification." *Id.* at 438. Because the claim "arose under Article V of the Constitution which alone conferred the power to amend and determined the manner in which that power could be exercised," and because the plaintiffs "set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege," the senators "ha[d] a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.*

Paying close attention to the "nature and source of the claim asserted," *Warth*, 422 U.S. at 500, the Court observed that "the question relates to legislative action deriving its force solely from [Article V]" and that the legislators "would have been decisive in defeating the ratifying resolution" if they were correct in their procedural interpretation, *Coleman*, 307 U.S. at 441. On the plaintiffs' theory, they possessed a right to have their votes counted under the proper ratification procedure. *See* Hall, *Legislative Standing*, *supra*, at 29. When their votes were improperly "deemed defeated," their particularized prerogatives—namely, the right to vote on a matter within the Legislature's authority, and to have their votes given effect in accordance with law—were nullified and their votes "were deprived of all validity." *Raines*, 521 U.S. at 822-24.

Indeed, *Raines* itself recognized that the nature and source of a claimed prerogative are critical to evaluating whether an injury is sufficiently particularized. In denying standing to the legislators in *Raines*, the Supreme Court relied heavily on *Bender v. Williamsport Area School District*. *See id.* at 819, 820, 823 n.6, 829 n.10. In *Bender*, a member of a school board claimed standing to appeal a judgment entered against the board despite the fact that the board itself had

voted to forego the appeal in an 8-to-1 vote.  *See* 475 U.S. 534, 536, 544-45 (1986).  The Court denied standing, but qualified its holding: "It might be an entirely different case if, for example, state law authorized School Board action solely by unanimous consent, in which event [Plaintiff] might claim that he was legally entitled to protect 'the effectiveness of [his][vote]."  *Id.* at 544 n.7 (quoting *Coleman*, 307 U.S. at 438) (second and third alterations in original).  The *Raines* decision also included this hypothetical, noting that the claim would be shaped by the relevant governing law.  *See* 521 U.S. at 823 n.6.

Legislative standing, like private party standing, is not susceptible to a single, blunt answer irrespective of the claims or context of the case.  Instead, courts should look to the origin and form of the specific claim alleged to determine (1) whether there is a well-defined prerogative provided by law; (2) if so, what relevant official, bloc, or body is legally entitled to exercise that power; and (3) whether that authority has been denied or nullified.

### A.    Plaintiffs' alleged injuries are particularized and concrete, not generalized or derivative

Plaintiffs ground their cause of action in the Emoluments Clause, which states that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  U.S. CONST. art. I, § 9, cl. 8.  This source of authority upends the ordinary standing analysis because it inverts the normal legislative process.

In the normal course of legislative conduct, it is a rarity to find true "vote nullification" or the elimination of any particularized institutional prerogatives because bills are taken up and enacted at the *body's* initiative.  Because legislative *inaction* is the default, members have no right to vote on any specific piece of legislation that the body has declined to put on the calendar and members have no power to enact any measure on their own.

9

The Emoluments Clause flips the consequences of this status quo by *prohibiting* officers from accepting foreign benefits *unless and until* Congress holds *a specific vote* and passes *specific terms of consent*.  If no vote is held, the officer is constitutionally *barred* from accepting the benefit.  If Plaintiffs' allegations that Defendant has violated this procedure are true—as the Court must assume for purposes of this motion—then Defendant has nullified identifiable voting opportunities guaranteed by the Constitution and eliminated the institutional powers afforded to the Plaintiffs (individually and as a bloc) to delay, deny, or shape the terms of consent.  In short, the nature and source of Plaintiffs' claims radically distinguish the injuries here from those found inadequate in *Raines* and *Chenoweth*, and provide a stronger case for legislative standing than *Coleman* itself.

1.   Nullification of specific, identifiable voting opportunities

By allegedly accepting foreign benefits before submitting them to Congress, Defendant has nullified specific and identifiable voting opportunities that the Emoluments Clause guarantees to Members of Congress as a well-defined constitutional right.  Vote nullification "mean[s] treating a vote that did not pass as if it had, or vice versa," *Campbell*, 203 F.3d at 22, or eliminating legislators' authority to vote on a matter constitutionally assigned to them, *see Ariz. State Legislature*, 135 S. Ct. at 2663-666 (recognizing that legislative standing is proper when challenged action eliminates "the opportunity" to vote and "'completely nullif[ies]' any vote by the Legislature, now or 'in the future'" (quoting *Raines*, 521 U.S. at 823-24)).  By "deeming" a vote to have passed in Defendant's favor despite none occurring, Defendant has completely nullified a distinct authority provided to Plaintiffs under the Constitution.  *See Raines*, 521 U.S. at 822 (recognizing that legislative standing is proper when a measure is "deemed ratified" contrary to procedure defined by law).

In the normal legislative course, a vote nullification theory of legislator standing will almost always fail because a majority would be the only bloc of individuals capable of wielding the legislature's power and a vote that passes by exercise of that power would not be "deemed" to have failed by any other government actor. *See id.* at 823-24 (plaintiffs "have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated"). In *Raines*, the plaintiffs were permitted to exercise their individual legislative right to vote on the Line Item Veto Act before them, but the plaintiffs "simply lost that vote" and the body as a whole enacted the measure. *Id.* at 824. In *Chenoweth*, the plaintiffs were permitted to introduce their bill, but the body simply declined to bring it to the floor. 181 F.3d at 113. To be sure, the plaintiffs alleged that the underlying statute or order in each case diminished the power of Congress as a whole, but in neither instance did the legislators possess any direct, individual legislative right under governing law that was voided or nullified.

Under the Emoluments Clause, however, "any federal officer wishing to accept a foreign emolument must first petition Congress for consent, and each member of Congress is entitled to cast a vote on whether to grant consent." Matthew I. Hall, *Who Has Standing to Sue the President Under the Emoluments Clause?*, 95 WASH. U. L. REV. __ (forthcoming Nov. 2017) (manuscript at 13), *available at https://ssrn.com/abstract=3026223* [hereinafter, "Emoluments Standing"]. "[B]y [allegedly] failing to present proposed emoluments to Congress for consent, [Defendant] has deprived [Plaintiffs] of an individual legislative prerogative: the right to consider, and to vote on, which emoluments [Defendant] may accept, before he accepts them." *Id.*

"[I]f [Plaintiffs'] contention [is] sustained" and their interpretation of the law is correct, 307 U.S. at 446, Defendant's conduct deprives them of a distinct, identifiable voting opportunity

guaranteed by law.  In *Coleman*, the governing law allegedly provided that a tie vote was insufficient to pass the proposed measure.  By declining to follow governing law and deeming the measure ratified nonetheless, the executive had nullified the legislators' votes.  Here, the governing law provides that Congress's failure to grant affirmative consent precludes acceptance of an emolument.  By allegedly declining to follow governing law and simply deeming the request approved, Defendant has nullified Plaintiffs' opportunity to vote.  In both cases, the governing law provides the right and defines the injury.

The unique procedural requirements set forth in the Emoluments Clause also dispose of any need to show that Members were "singled out for specially unfavorable treatment."  *See Raines*, 521 U.S. at 821 (citing *Powell v. McCormack*, 395 U.S. 486, 512-14 (1969)).  In *Raines*, the Supreme Court stressed the derivative nature of the claim being made and how any harm to the plaintiffs was indirect, pointing out that the alleged injury "necessarily damage[d] all Members of Congress . . . equally."  *Id.*  This, the Supreme Court observed, provided evidence that the harm was to the *body*, not to the individuals in their institutional capacities.

But while it is true that the harms endured in *Raines* and *Chenoweth* were derivative, not every injury endured "equally" in an official capacity is derivative.  An unlawful interference with voting rights in a jurisdiction injures all voters in the jurisdiction equally in their capacity as voters, but the harm is still direct and individualized.  *See Akins*, 524 U.S. at 24-25 (citing *Shaw v. Hunt*, 517 U.S. 899, 905 (1996)).  The fact that a plaintiff filing her claim does not bring a majority of other eligible voters in tow does nothing to negate her injury.

Similarly, an unlawful interference with corporate voting rights may injure all shareholders equally in their capacity as shareholders, but that does not make the harm derivative.  *See, e.g.*, *Avacus Partners, L.P. v. Brian*, No. 11011, 1990 Del. Ch. LEXIS 178, at

*21-*22 (Ch. Oct. 24, 1990) ("The fact that all shareholders have been affected equally does not make [a] claim of improper interference with the right to vote a corporate claim."). The question is not whether harm "falls equally upon all shareholders" or whether the plaintiffs can show a "special injury"; rather, the question is, "Who suffered the alleged harm . . . and who would receive the benefit of the recovery or other remedy?" *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035-37 (Del. 2004). How the shareholder intends or decides to vote is beside the point.

So too do each of the Plaintiffs here have a direct and individualized right guaranteed by the Emoluments Clause to vote on foreign benefits before they are received by any federal officeholder. Defendant fails to grapple with the distinction between an individual legislator's constitutionally mandated right to vote, *see* U.S. Const. art. I, § 3, cl. 1 ("each Senator shall have one Vote"); *id*. art. I, § 5, cl. 3 ("the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal"), and the legislative body's constitutional power to pass legislation. Injury to the latter provides standing to the legislative body. Injury to the former provides standing to the legislators themselves.

Muddling the difference, Defendant focuses on the mere fact that Congress still possesses the general power to pass legislation. Defendant points to bills introduced in Congress that were designed to mitigate the effects of the alleged violations and argues that he has not "prevented Congress from holding a vote on the emoluments issue." *See* Def.'s Mot. To Dismiss at 1, 9-11. According to Defendant, "Congress could, for example, vote on a private bill consenting to the receipt of what it construed to be emoluments received from foreign governments or a joint resolution expressing its disagreement with such receipt." Def.'s Mot. To Dismiss. at 9. That is both true and irrelevant. The Emoluments Clause requires Defendant's foreign benefits—not

Congress's mitigation legislation—to run the gauntlet of "the 'finely wrought and exhaustively considered, procedure' prescribed in Article I, Section 7 of the Constitution."   Def.'s Mot. To Dismiss at 9 (quoting *Chadha*, 462 U.S. at 951).   An emolument cannot be accepted until it survives this gauntlet, and one mandatory aspect of the gauntlet is a vote on the matter.

The Framers recognized that "[o]ne of the weak sides of republics . . . is that they afford too easy an inlet to foreign corruption."   THE FEDERALIST NO. 22 (Alexander Hamilton) (1787); *see also id.* ("[H]istory furnishes us with so many mortifying examples of the prevalency of foreign corruption in republican governments.").   To thwart this threat, the Framers put the onus of disclosing benefits and requesting consent on the official seeking approval.   The requirement precludes the need for Congress to undertake a perpetual, roving investigation into all U.S. officials and it explicitly shifts the burden of action and alters the legislative status quo so that officials are prohibited from receiving benefits (and are insulated from foreign influence) until a vote is held and consent is provided.[5]

In short, Defendant's interpretation of legislator standing would read the Cases and Controversies Clause into conflict with the Emoluments Clause.   The Constitution's default setting is an absolute prohibition on foreign benefits, not absolute permission.   The Judiciary cannot require legislators to spur affirmative congressional action as a matter of standing doctrine when the text of the Constitution grants legislators the power to vote on emoluments before they are accepted as a matter of law.

---

[5] Given the unique and purposeful construction of the Emoluments Clause, the failure to have a vote (*inaction*) is the functional equivalent of a majority vote against the receipt of the emolument.   Thus, if Plaintiffs' allegations are true, they have been deprived of the benefit of the constitutionally mandated effect of Congress's inaction, *i.e.*, that no emolument was accepted.   If a majority in Congress would like to pass a consent bill or adopt a legislative framework excepting certain types of receipts from the need for congressional approval, it may do so.   But until such *action* is taken, receipt is prohibited.

The incongruity of Defendant's "after-the-fact" construction is compounded by the fact that the President could veto any affirmative measure enacted by Congress.  "By requiring congressional consent *before* the President may accept an emolument, the Constitution gives Congress a robust power to reject a proposed emolument without mustering any particular number of votes; if either chamber simply fails to act on a proposed emolument, consent is denied."  Hall, *Emoluments Standing*, *supra*, at 14.  Construing the Cases and Controversies Clause in a way that would require two-thirds of both chambers to prohibit the acceptance of emoluments "would effectively nullify the Convention's decision to [prohibit acceptance in the absence of affirmative majority consent]."  *See Powell*, 395 U.S. at 548.

Indeed, there is simply no way for Congress to affirmatively ensure that its inaction is accorded proper constitutional effect.  A statute parroting what the Emoluments Clause already commands could hardly be any more effective than the Clause itself, and any attempt to retroactively deem certain benefits to be emoluments would seem to raise its own complex questions: Would such a law constitute a bill of attainder or a taking?  Could a successive Congress unwind a receipt two years hence?  Defendant does little to deal with these issues or to explain how such "remedies" do not render the Clause a dead letter.  Unlike in *Raines*, *Chenoweth*, and *Campbell*, Congress does not "enjoy ample legislative power" to vindicate its position in this case.  *Campbell*, 203 F.3d at 23.

Defendant's reading of Supreme Court and D.C. Circuit precedent also misses the mark. To start, *Raines* cannot be read to bar any and all legislator lawsuits filed without institutional approval.  In concluding its opinion, the *Raines* Court "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action," 521 U.S. at 829, but it did not purport to establish a flat rule that individual legislators

have standing only when authorized to sue by their chamber.  Were that the case, the opinion would have been notably shorter.  *See Campbell*, 203 F.3d at 21 n.3 (declining to rest a decision "on the basis that [the plaintiffs] do not constitute a majority of the Congress").

Nor can *Raines* be read to hold that *all* suits brought by legislators in their institutional capacities are barred.  The Court's recognition (and validation) of the *Coleman* decision forecloses such a reading.  *See* 521 U.S. at 821-24.  As the *Coleman* decision noted (and as Justice Souter pointed out in *Raines*), decades of Supreme Court cases recognize that injuries suffered in an official capacity can be cognizable under Article III, depending on the circumstances of the case.  *See Coleman*, 307 U.S. at 444-45; *Raines*, 521 U.S. at 830-32 (Souter, J., concurring).[6]

Institutional standing turns on the nature of the injury, and the nature of the injury turns on an analysis of the person or persons who are legally entitled to exercise the prerogative allegedly violated.   *See Raines*, 521 U.S. at 821-26 & 824 n.6.  As *Raines* properly recognized, the plaintiffs in that case claimed injury to the *legislature's* power, not their own; any interest

---

[6] The *Raines* majority and concurrence also stressed that the "certain" existence of a private plaintiff capable of bringing a suit weighed against the necessity of judicial intervention in that case.  *See* 521 U.S. at 829-30 ("We also note that our conclusion neither deprives Members of Congress of an adequate remedy . . . nor forecloses the Act from constitutional challenge . . . . Whether the case would be different if any of these circumstances were different we need not now decide."); *id.* at 834-35 (Souter, J., concurring) ("The parties agree . . . [on] the certainty of a [private] plaintiff who obviously would have standing to bring a suit to court. . . .").  Here, Defendant contests the standing of private plaintiffs, State Attorneys General, and legislators alike.  *See Citizens for Responsibility & Ethics in Wash. v. Trump*, No. 1:17-cv-458, ECF No. 35 at 7-24 (S.D.N.Y. June 9, 2017); *Dist. of Columbia v. Trump*, No. 8:17-cv-1596, ECF No. 21-1 at 9-26 (D. Md. Sept. 29, 2017); Def.'s Mot. To Dismiss at 5-13.  Moreover, *even if* private plaintiffs were granted standing to vindicate competitive injuries to their personal business interests, such a case would not—and could not—address the full gamut of harms that the Emoluments Clause was drafted to prevent.  Receipt of "a gold snuff-box" from France poses no threat to American businesses, but still raises the risk of foreign influence.  5 Annals of Cong. 1582, 1589 (1798) (Joseph Gales ed., 1834) (Bayard).  The Emoluments Clause prevents this risk by imposing a unique duty on officeholders and conferring a unique power upon Plaintiffs.

they had as individuals was too abstract and indirect to constitute an injury.  By ignoring "the nature and source of the claim[s] asserted," *Warth*, 422 U.S. at 500, Defendant mistakes the concrete right to vote on specific emoluments at issue here with the diffuse interests legislators possess in the normal course of legislative business.  By allegedly accepting foreign benefits in the absence of consent, Defendant "treat[s] a vote that [has] not pass[ed] as if it had," *Campbell*, 203 F.3d at 22, and wholly nullifies a distinct and identifiable opportunity to vote guaranteed by the Constitution.  Deprivation of that prerogative constitutes a particularized, cognizable injury under Article III.

2.     Elimination of particularized institutional prerogatives

The unique source of Plaintiffs' claims and the inversion of the traditional legislative role also causes a second injury: the elimination of Plaintiffs' institutional powers (both individually and as a bloc) to delay consent, deny consent, or shape the terms of consent.  Legislative action requiring the approval of both chambers must "clear several distinct institutions, numerous veto gates, the threat of a Senate filibuster, and countless other procedural devices that temper unchecked majoritarianism."  *Robbins v. Chronister*, 435 F.3d 1238, 1243 (10th Cir. 2006) (quoting John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2390 (2005)).  Circumventing this process strips each Member and blocs of Members of their institutional prerogatives.

In designing our intricate legislative process, the Framers made action purposefully difficult: "The House and the Senate, representing their different interests and with different time horizons, would both have to agree to the passage of any law.  To the extent they disagreed in any way, they would have to iron out the differences and vote on an identical bill[.]"  Michael Sant'Ambrogio, *Legislative Exhaustion*, 58 WM. & MARY L. REV. 1253, 1291 (2017).  In order to be approved, any proposed emolument must survive the numerous "stages in the legislative

process where one group or another has the ability to derail a bill."  Aziz Z. Huq, *The Constitutional Law of Agenda Control*, 104 CALIF. L. REV 1401, 1404 n.11 (2016).

These "veto gates" create a powerful status-quo bias because "if any of the players with veto power prefer the law on the books to alternatives to which the other relevant parties would agree, the existing law will be maintained."  David Kamin, *Legislating for Good Times and Bad*, 54 HARV. J. ON LEGIS. 201, 212 (2017).  "[E]ven majority coalitions frequently fail to enact legislative changes," *id.*, because "congressional inaction and obstruction does not require the broad consensus . . . of legislative action," Sant'Ambrogio, *supra*, at 1302.

For example, the institutional powers of a single U.S. Senator are never—standing alone—sufficient to enact legislation.  Yet, there can be no doubt that a single U.S. Senator is often sufficient to *defeat* legislation.  The *Raines* Court itself acknowledged that a single member of a body might have standing if the body were required "to take action only by unanimous consent."  521 U.S. at 823 n.6.  Because "Senate rules give each individual Senator the power to filibuster proposed legislation" and to issue holds, "a single Senator, if sufficiently determined, can prevent a matter from coming to a vote."  Hall, *Emoluments Standing*, *supra*, at 15.

"There are numerous 'veto gates' separate and apart from . . . the Senate filibuster that make any legislative action exceedingly difficult."  Sant'Ambrogio, *supra*, at 1320 n.353.  Any proposed "consent bill" would need to contend with other pressing legislative priorities, withstand public scrutiny, and garner the votes of lawmakers who would be forced to go on record supporting the measure.  This accountability is a *feature* of our Constitution's design, and it is consistent with—not counter to—the separation-of-powers considerations that animate standing doctrine.  *See Loving v. United States*, 517 U.S. 748, 758 (1996) ("The clear assignment of power to a branch . . . allows the citizen to know who may be called to answer for making, or

not making, those delicate and necessary decisions essential to governance."); *cf. New York v. United States*, 505 U.S. 144, 182 (1992) (upholding the Constitution's structural provisions is especially critical when "powerful incentives might lead . . . officials to view departures from the [Constitution's] structure to be in their personal interests").

The Emoluments Clause leverages all of these demanding legislative hurdles to ensure that foreign benefits pose no threat of improper influence.  Any measure approving emoluments must be above reproach to survive.  Thus, the Clause gives individual legislators and blocs of legislators a variety of tools to delay or defeat the requested consent and renders the elimination of these powers a cognizable and particularized injury separate from the body at large.  The potency of these powers becomes especially apparent when one considers that emoluments are not simply "approved" or "denied"; rather, consent can carry conditions for how the benefits are to be handled.  Members do not need to possess the power to block a vote in perpetuity to shape the conditions and contours of congressional approval.[7]

The strict procedural rules and other checks-and-balances defined in our Constitution are not a product of happenstance and were adopted at the Convention to create incentives and promote instincts vital to an enduring republic.  The "allocations of agenda control" in a constitutional design can "dramatically change the stability, coherence, and substance of outputs" from the resulting democratic institutions.  Huq, *supra*, at 1413.  Any constitutional

---

[7]  The Senate's advice-and-consent authority, for example, constrains presidents in their nomination choices and can shape the outcome of who is ultimately nominated and appointed. *See* Huq, *supra*, at 1447-48 (noting that while "presidents have unfettered authority to pick candidates to advance to the Senate," the appointment power "is weaker than might appear at first blush" because of senators' ability to delay moving nominees forward).  This is exactly what the Framers envisioned.  *See* THE FEDERALIST NO. 76 (Alexander Hamilton) (1788) (noting that "it is not likely that [the Senate's] sanction would often be refused, . . . [but] the necessity of their concurrence would have a powerful, though, in general, a silent operation . . . [that] would be an excellent check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters").

construction that risks functionally altering the bargains struck at the Convention must be approached with caution.

By allegedly sidestepping the process mandated by the Emoluments Clause, Defendant nullifies the institutional prerogatives vested in the Plaintiffs both as individual legislators and as a bloc capable of exerting substantial institutional control to delay, deny, or determine the contours of consent. This deprivation constitutes a concrete injury that is particularized to Plaintiffs and amply satisfies Article III's standing requirements.

**B.     Plaintiffs' injuries are actual and ongoing, not speculative or conjectural**

Plaintiffs' injuries must also be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). The denial of a distinct voting opportunity and the elimination of Members' particularized prerogatives occurs at the moment an official accepts any emolument in violation of the constitutionally-mandated procedure. Plaintiffs' allegations that the Defendant has already accepted and is continuing to accept foreign emoluments without first obtaining Congress's consent thus establish both actual injury and imminent further injury.

Defendant argues that Congress's ability to enact mitigating legislation should preclude a finding of actual or immediate injury, claiming that there is no "allegation that [the President] has . . . prevented Congress from holding a vote on the emoluments issue" and, therefore, "'we do not know whether there ever will be an actual confrontation between the Legislative and Executive Branches.'" Def.'s Mot. To Dismiss at 9, 11 (quoting *Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Brennan, J., concurring)). But this, again, looks at the Emoluments Clause upside-down: under the plain language of the Constitution, foreign benefits must be submitted to

the crucible of a legislative vote *before* they are accepted, not reviewed *after* they have been received.[8]

Assuming Plaintiffs' interpretation of the Emoluments Clause is correct, there is nothing "speculative" or "conjectural" about the discrete voting opportunities and distinct legislative prerogatives that Defendant's conduct has already nullified.  So long as Defendant persists in the current interpretation of the Constitution, Plaintiffs' actual injuries will remain immediate, ongoing, and un-vindicated.  In such circumstances, judicial intervention is warranted.  *See* Sant'Ambrogio, *supra*, at 1314-34 (arguing that legislative standing is appropriate when Congress has no statutory remedies remaining—such as when a President interprets the Constitution in a way that defeats congressional power).

## II.   PLAINTIFFS' INJURIES ARE FAIRLY TRACEABLE TO THE CHALLENGED EXECUTIVE ACTION

To satisfy Article III standing, Plaintiffs must also show "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (alterations and ellipsis in original).  This criterion merits close attention in the legislative standing context because many such claims are not truly "caused by" the party accused of unlawful conduct.

"[S]elf-inflicted injuries are not fairly traceable to . . . purported [unlawful action]." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).  When legislators challenge the

---

[8] *Cf. Ariz. State Legislature*, 135 S. Ct. at 2663 (rejecting the argument that the Legislature's injury would be "speculative . . . unless and until the Arizona Secretary of State refuses to implement a competing redistricting plan passed by the Legislature" since any such action by the Legislature would be "unavailing").

constitutionality of a statute passed by the legislature itself, for example, it's "far from clear" that the alleged injury can be described as "fairly traceable" to the party executing that statute.  *See Raines*, 521 U.S. at 830 n.11.  In such situations, "the alleged cause of [the] injury is not [the Executive's] exercise of legislative power but the actions of their own colleagues in Congress in passing the Act."  *Id.*  Such a deficiency strikes at the core of Article III:  if a legislator's "dispute appears to be primarily with his fellow legislators . . . separation-of-powers concerns are most acute."  *Riegle v. Fed. Open Market Comm.*, 656 F.2d 873, 881 (D.C. Cir. 1981).

Such concerns are not implicated here.  Plaintiffs do not claim that Congress has enacted an unconstitutional statute (as in *Raines*), and Plaintiffs' injuries are not based on any action (or lack of action) by Congress itself with respect to "the emoluments issue" generally or any piece of proposed legislation in particular (as in *Chenoweth*).  Quite the contrary.  The Constitution gives Congress the power to block foreign emoluments by simple *inaction*, and thus grants the individual plaintiffs the power to block, delay, or impose conditions on Defendant's receipt of foreign emoluments by use of the filibuster and other tools of the legislative process.  Plaintiffs allege that Defendant has nullified their constitutional prerogatives by accepting foreign benefits subject to the Emoluments Clause procedures and by declining to submit those benefits to Congress for review as the Clause requires.  As such, Plaintiffs' injuries are fairly—indeed, directly—traceable to Defendant's allegedly unlawful actions.

## III.   PLAINTIFFS' INJURIES WOULD BE—AND CAN ONLY BE—REDRESSED BY A COURT ORDER

Finally, to establish standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury would be 'redressed by a favorable decision.'"  *Lujan*, 504 U.S. at 560 (quoting *Simon*, 426 U.S. at 38, 43).  If Plaintiffs prevail, their requested declaratory judgment and injunctive relief would satisfy this requirement.

The central question in this case is the meaning of the word "emoluments," and resolving that issue "require[s] no more than an interpretation of the Constitution." *Powell*, 395 U.S. at 548.  As the Supreme Court stated in *Powell*: "Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch.  The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Id.* at 549.[9]

Nor is the interpretive question one "fully susceptible to political resolution" were "a sufficient number [of legislators] in each House so inclined." *Chenoweth*, 181 F.3d at 116.  In *Chenoweth*, the challenged executive action did not eliminate any specific voting opportunity and Congress remained free to terminate or displace the initiative *in the way prescribed by the*

---

[9] In recent years, the Supreme Court has grown markedly more skeptical of courts relying on "prudential" grounds to dispose of claims properly before them.  *Compare Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004) (describing the generalized-grievances, zone-of-interests, and third-party standing tests as part of "prudential standing"), *with Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3, 1386-88 (2014) (describing the generalized grievances as part of Article III standing, the zone-of-interests as a cause-of-action issue, and third-party standing limitations as "harder to classify").

Defendants' passing reference to the political question doctrine is also out of place.  *See* Def.'s Mot. To Dismiss at 13 n.5.  Standing and the political question doctrine are distinct concepts, as Defendant acknowledges.  *Id.*  "[T]he Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'"  *Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012) (quoting *Cohens*, 19 U.S. at 404).  A "narrow exception to that rule" arises "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"  *Id.* at 195 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).  But "courts cannot avoid their responsibility merely 'because the issues have political implications.'"  *Id.* at 196 (quoting *Chadha*, 462 U.S. at 943).  Here, as in *Zivotofsky*, "[r]esolution of [Plaintiffs'] claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the [Clause].  This is what courts do.  The political question doctrine poses no bar to judicial review of this case."  *Id.* at 201.  It remains "emphatically the province and duty of the judicial department to say what the law is."  *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

*Constitution*: passing legislation.  Here, the challenged executive action removes a specific voting opportunity mandated by the Constitution and any affirmative legislation enacted by Congress would do nothing to cure the actual violation *in the way prescribed by the Constitution*.  Only a court can resolve the question of constitutional interpretation at the heart of this case, and declaratory judgment would remedy the alleged violations of the Emoluments Clause in a manner consistent with the text, design, and purpose of that Clause.

Injunctive relief would also remedy the harm of which Plaintiffs complain.  Plaintiffs do not ask this Court to "enjoin the President in the performance of his official duties," *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867); rather, Plaintiffs ask the Court to prevent Defendant from accepting the allegedly violative foreign benefits via his *personal* businesses without first receiving congressional approval.  Such a judicial remedy is routine, appropriate, and would go no further than requiring what the Emoluments Clause itself requires: a prohibition on receipt prior to affirmative congressional consent.[10]

*          *          *

Legislator standing—like standing doctrine generally—raises intricate questions about the nature of our government.  The Cases and Controversies requirement of Article III "is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787."

---

[10] The fact that Congress always retains "the [power] of impeachment," *Campbell*, 203 F.3d at 23, does not militate against the propriety of judicial remedy here.  First, the *Campbell* court did not establish such a categorical rule, which would foreclose congressional standing in every case.  Such a cudgel is irreconcilable with the nuanced and measured treatment found in *Raines*.  Second, "[i]mpeachment should not be the congressional response to a sincere presidential belief [about a simple question of constitutional interpretation].  In such cases, the game is not worth the candle."  Sant'Ambrogio, *supra*, at 1305.  Third, the Emoluments Clause applies to "every holder of a federal 'Office of Profit or Trust' in *all three* Branches of the Government."  Def.'s Mot. To Dismiss 40-41 (emphasis added).  This is not a case—like *Raines*, *Chenoweth*, or *Campbell*—about the boundaries of the Executive vis-à-vis the Legislature; it is a claim about whether the particularized rights and prerogatives conferred by the Clause have been violated.

*Valley Forge*, 454 U.S. at 476.  So too is the demanding prohibition and mandatory procedural mechanism found in the Emoluments Clause of Article I.  Neither can be read to the exclusion of the other.  The plain text and purpose of these provisions must be read in harmony to fulfill the fundamental promise of republican self-government.

"Proper regard for the complex nature of our constitutional structure requires neither that the Judicial Branch shrink from a confrontation with the other two coequal branches of the Federal Government, nor that it [spoil for one]."  *Id.* at 454 U.S. at 474.  The Judicial Branch "ha[s] no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.  The one or the other would be treason to the constitution."  *Cohens*, 19 U.S. at 404.  *Amici* believe Plaintiffs have satisfied the requirements necessary to establish Article III standing, and the Court is therefore obligated to hear their case.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that the Court grant standing to Plaintiffs.

Dated: November 2, 2017                          Respectfully Submitted,

                                                 /s/ Corey W. Roush
                                                 Corey W. Roush (D.C. Bar #466337)
                                                 G. Michael Parsons, Jr. (D.C. Bar #1021454)
                                                 1333 New Hampshire Ave. NW
                                                 Washington, D.C. 20036-1564
                                                 TEL: 202.887.4000
                                                 FAX: 202.887.4288

                                                 *Counsel for Amici Curiae*

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing complies with Local Civil Rule 7(o)(4) and does not

exceed 25 pages.

<u>/s/ Corey W. Roush</u>
Corey W. Roush

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2017, I caused a true and correct copy of the

foregoing to be served on all counsel of record through the Court's CM/ECF system.

<u>/s/ Corey W. Roush</u>
Corey W. Roush

**APPENDIX A**

## APPENDIX A
### List of *Amici*

Matthew I. Hall, Associate Professor of Law, University of Georgia School of Law

Thomas Campbell, Professor of Law, Chapman University Dale E. Fowler School of Law

Erwin Chemerinsky, Dean and Jesse H. Choper Distinguished Professor of Law, University of California, Berkeley School of Law

Perry Dane, Professor of Law, Rutgers University Law School–Camden

Frank Deale, Professor of Law, City University of New York School of Law

Robin Effron, Professor of Law, Brooklyn Law School

Heather Elliott, Alumni, Class of '36 Professor of Law, University of Alabama School of Law

Jamal Greene, Dwight Professor of Law, Columbia Law School

Aziz Huq, Frank and Bernice J. Greenberg Professor of Law, University of Chicago Law School

Gregory Magarian, Professor of Law, Washington University School of Law

Jon D. Michaels, Professor of Law, University of California, Los Angeles School of Law

Sandra Rierson, Associate Professor of Law, Thomas Jefferson School of Law

Eric J. Segall, Kathy and Lawrence Ashe Professor of Law, Georgia State University College of Law

Joan E. Steinman, University Distinguished Professor of Law, Chicago-Kent College of Law

Emily Garcia Uhrig, Professor of Law, University of the Pacific, McGeorge School of Law

Arthur D. Wolf, Director of the Institute for Legislative & Governmental Affairs and Professor of Law, Western New England University School of Law