# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Senator RICHARD BLUMENTHAL,
Representative JOHN CONYERS, JR., *et al.*,

    *Plaintiffs*,

                 v.

DONALD J. TRUMP, in his official capacity as
    President of the United States,

    *Defendant*.

Civil Action No. 17-cv-1154 (EGS)

**BRIEF OF SEPARATION OF POWERS SCHOLARS AS
*AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………..ii

INTEREST OF *AMICI CURIAE* .................................................................................1

CORPORATE DISCLOSURE STATEMENT ............................................................1

RULE 29(A)(4) STATEMENT .....................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................2

ARGUMENT..................................................................................................................3

I.   ADJUDICATION OF THIS CASE IS CONSISTENT WITH PRECEDENT
     AND PRINCIPLES OF SEPARATION OF POWERS...........................................3

     A.   This case is well within both the competence and authority of the
          judiciary. ........................................................................................................3

     B.   This case represents a valid exercise of judicial power against the
          Executive. .......................................................................................................8

II.  THE FOREIGN EMOLUMENTS CLAUSE SUPPORTS
     CONSTITUTIONAL CHECKS AND BALANCES AND ANTI-
     CORRUPTION PRINCIPLES. ..............................................................................12

     A.   The Foreign Emoluments Clause was part of the framers' general anti-
          corruption orientation. ..................................................................................13

     B.   Congressional approval is an essential element of the Foreign
          Emoluments Clause. ......................................................................................15

     C.   The Foreign Emoluments Clause is mandatory................................................16

III. THE COURT SHOULD NOT LEAVE IMPEACHMENT AS THE ONLY
     REMEDY TO ADDRESS VIOLATIONS OF THE FOREIGN
     EMOLUMENTS CLAUSE. ...................................................................................20

CONCLUSION.............................................................................................................21

# TABLE OF AUTHORITIES

Page

## FEDERAL COURT CASES

*Baker v. Carr*, 369 U.S. 186 (1962)...........................................................................3, 4

*Bowsher v. Synar*, 478 U.S. 714 (1986)....................................................................2, 4

*\*Buckley v. Valeo*, 424 U.S. 1 (1976).............................................................2, 4, 6, 13

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)....................................9

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) ........................................... 6, 7-8

*Clinton v. Jones*, 520 U.S. 681 (1997)........................................................................12

*Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341 (1964).......................6

*Dep't of Revenue of Wash. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734 (1978).................6

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)...................................................... 9-10

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................9

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935)................................................4

*INS v. Chadha*, 462 U.S. 919 (1983) ................................................................. 4, 12-13

*La. Land & Expl. Co. v. Pilot Petroleum Corp.*, 900 F.2d 816 (5th Cir. 1990) ...............6

*Loving v. United States*, 517 U.S. 748 (1996) .............................................................11

*\*Marbury v. Madison*, 5 U.S. 137 (1803).............................................................2, 3, 5

*Michelin Tire Corp. v. Wages*, 423 U.S. 276 (1976) .....................................................6

*Minn. Chippewa Tribe v. Carlucci*, 358 F. Supp. 973 (D.D.C. 1973).....................11, 21

*Mississippi v. Johnson*, 71 U.S. 475 (1866)...........................................................9, 12

*Mississippi v. Stanton*, 154 U.S. 554 (1893)...............................................................9

*Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984)................ 6, 7-8

*Morrison v. Olson*, 487 U.S. 654 (1988) .....................................................................4

\*Authorities upon which we chiefly rely are marked with asterisks.

*Myers v. United States*, 272 U.S. 52 (1926)......................................................................4

*\*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) .................9, 10-11, 20-21

*Nat'l Treasury Emps. Union v. Nixon*, 521 F.2d 317, 319 (D.C. Cir. 1975) (abrogated on
    other grounds by *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993))................10

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977)................................................4, 5

*\*NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014)................................................ 3, 4-5

*Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1 (2009) ................................................6

*Pub. Citizen v. Dep't of Justice*, 491 U.S. 440 (1989)................................................2

*Swan v. Clinton*, 100 F.3d 973 (D.C. Cir. 1996)................................................9

*United States v. AT&T*, 551 F.2d 384 (D.C. Cir. 1976)................................................8

*United States v. Nixon*, 418 U.S. 683 (1974)................................................ 3, 5-6

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................4

## FEDERAL CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 3, cl. 7................................................16

*U.S. Const. art. I, § 9, cl. 8................................................ 2, 16-17

U.S. Const. art. II, § 1, cl. 2 ................................................16

U.S. Const. art. II, § 3 ................................................11, 12

## FEDERAL COURT RULES

Fed. R. App. P. 29................................................1

Fed. R. App. P. 29(a)(4)................................................1

Local Civil Rule 7(o)(5)................................................1

## OTHER AUTHORITIES

3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution*
    (Jonathan Elliot ed., 1827)................................................14, 15

4 John Bassett Moore, *A Digest of International Law* (1906)................................................16

5 *Annals of Cong.* (1798) ................................................................................... 15-16

14 *Abridgment of the Debates of Congress from 1789 to 1856* (Thomas Hart Benton ed.,
     1860) ........................................................................................................18

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the
     President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1 (Dec. 7, 2009).....................19

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts and
     Decorations Act*, 6 Op. O.L.C. 156 (1982) .............................................................17

*Applicability of Emoluments Clause to Employment of Government Employees by
     Foreign Public Universities*, 18 Op. O.L.C. 13 (1994) ...........................................17

Articles of Confederation of 1781, art. VI..................................................................15

*Compilation of the Messages and Papers of the Presidents* (James D. Richardson ed.,
     1897) ........................................................................................................18

*Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116 (1902) ...................................................13, 17

James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174
     (1994).......................................................................................................13

James Madison, *Notes of Debates in the Federal Convention of 1787 Reported by James
     Madison* (1787)..............................................................................................13-14

Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts
     from the King of Siam, Res. 20, 37th Cong., 12 Stat. 616 (1862)...........................................19

Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept
     certain medals presented to him while President of the United States, Res. 39, 54th
     Cong, 29 Stat. 759 (1896)................................................................................19

Letter from Abraham Lincoln, President of the United States of America, to His Majesty
     Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862),
     http://quod.lib.umich.edu/l/lincoln/lincoln5/1:269.1?rgn=div2;view=fulltext.................18-19

Letter from James Madison, Secretary of State, to David Humphreys (Jan. 5, 1803),
     https://founders.archives.gov/documents/Madison/02-04-02-0275 ........................................16

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA from Samuel A.
     Alito Jr., Deputy Assistant Attorney General, *Emoluments Clause Questions raised
     by NASA Scientist's Proposed Consulting Arrangement with the University of New
     South Wales*, 1986 OLC Lexis 67 (May 23, 1986).................................................17

Mem. Op. for the Associate Counsel to the President from Noel J. Francisco, Deputy
     Assistant Attorney General, Office of Legal Counsel, *Application of the Emoluments*

iv

*Clause to a Member of the President's Council on Bioethics*, 2005 WL 2476992 (March 9, 2005) ...................................................................................................16

*Proposal That the President Accept Honorary Irish Citizenship*, 1 Op. O.L.C. Supp. 278 (1963)..............................................................................................................17, 19

Seth Tillman, *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Professor Zephyr Teachout*, 107 Nw. Univ. L. Rev. Colloquy 180 (2013) ......................13

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...................................14

*The Federalist Nos. 2-5* (John Jay) .............................................................................14

*The Federalist No. 47* (James Madison) .....................................................................3

*The Federalist No. 51* (James Madison) ....................................................................21

*The Federalist No. 68* (Alexander Hamilton) ..............................................................14

*Zephyr Teachout, *Gifts, Offices, and Corruption*, 107 Nw. Univ. L. Rev. Colloquy 30 (2012)......................................................................................................13, 16, 18

## INTEREST OF *AMICI CURIAE*

*Amici curiae*—Rebecca L. Brown, Harold H. Bruff, Neil Kinkopf, Christopher H. Schroeder, Peter M. Shane, Kevin M. Stack, and Peter L. Strauss ("Separation of Powers Scholars")—are distinguished professors of constitutional and administrative law who are experts in separation of powers issues.[1]  They have a strong interest in ensuring that the Court's decision in this case upholds the separation of powers principles and the checks and balances found in the Constitution.  They thus file this *amicus* brief to urge the Court to find this case justiciable.[2]

## CORPORATE DISCLOSURE STATEMENT

Separation of Powers Scholars state that no signatory to the brief is a nongovernmental corporate party, nor do they issue any stock, thus they are not subject to the corporate disclosure statement requirement of Local Civil Rule 7(o)(5) or Rule 29 of the Federal Rules of Appellate Procedure.

## RULE 29(a)(4) STATEMENT

Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4), Separation of Powers Scholars represent that their counsel drafted this brief.  No party or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amici curiae* or their counsel contributed money that was intended to fund preparing or submitting this brief.

---

[1] Further biographical information is provided in Exhibit 2.

[2] Separation of Powers Scholars file this brief as a supplement to the brief filed by other scholars on standing; they do not address standing herein.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Constitution does not provide merely for an "abstract generalization" of the separation of powers, *Buckley v. Valeo*, 424 U.S. 1, 124 (1976), or for the "hermetic sealing off of the three branches of Government from one another," *id.* at 121.  Rather, it establishes a structure of government consisting of specific processes that enable concrete checks and balances.  These elements reflect the founders' belief that "checks and balances were the foundation of a structure of government that would protect liberty."  *Bowsher v. Synar*, 478 U.S. 714, 722 (1986).  And in that structure, it is the fundamental role of the courts "to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), and to police the "enduring structure" of the Constitution, *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 468 (1989) (Kennedy, J., concurring in judgment).  "When structure fails, liberty is always in peril."  *Pub. Citizen*, 491 U.S. at 468  (Kennedy, J., concurring in judgment).  At issue in this case is the integrity of one of the Constitution's critical checks and balances: the Foreign Emoluments Clause.

The Foreign Emoluments Clause states, "[a]nd no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  U.S. Const. art. I, § 9, cl. 8.  This clause addresses the founders' profound concerns about foreign influence and corruption.  It imposes a duty on all federal officials not to accept foreign emoluments of any kind and allocates to Congress the sole authority to provide exceptions to this absolute prohibition.

Despite Defendant's suggestions to the contrary, the true danger to the structure and processes set forth in the Constitution lies not in permitting this case to proceed, but, rather, in dismissing it.  Acceding to Defendant's suggestions that this case is non-justiciable would require Congress to take affirmative action in the event that the President accepts foreign

emoluments absent congressional consent.  Such an outcome would turn the Foreign Emoluments Clause on its head, undermining the President's duty to comply with his Constitutional obligations and abrogating the judiciary's duty to police the structure of the Constitution.  This Court should not allow the executive branch to deprive Congress of its ability to guard against foreign influence and corruption by selectively consenting to the acceptance of only those foreign emoluments it deems appropriate.  This case should be allowed to proceed.

## ARGUMENT

### I.  ADJUDICATION OF THIS CASE IS CONSISTENT WITH PRECEDENT AND PRINCIPLES OF SEPARATION OF POWERS.

#### A.  *This case is well within both the competence and authority of the judiciary.*

It is the "'duty of the judicial department'—in a separation-of-powers case as in any other—'to say what the law is.'"  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) (quoting *Marbury v. Madison*, 5 U.S. at 177); *see also Baker v. Carr*, 369 U.S. 186, 200 (1962) (clarifying that in cases arising under the Constitution, the subject matter is within the federal judicial power defined in U.S. Const. art. III, § 2).  To reach "[a]ny other conclusion would be contrary to the basic concept of separation of powers and the checks and balances that flow from the scheme of a tripartite government."  *United States v. Nixon*, 418 U.S. 683, 704 (1974) (citing *The Federalist No. 47* at 313 (James Madison)).  As such, in *U.S. v. Nixon*, the Court reached the conclusion that it is the province of the judiciary to "say what the law is" with respect to the claim of executive privilege presented in that case.  Here, too, it is the province of the judiciary to say what the law is with respect to the Foreign Emoluments Clause.  That this case implicates the separation of powers—in that it implicates a clause of the Constitution requiring legislative consent to the conduct of a member of the executive branch—does not remove it from the realm of justiciability.

Courts regularly address disputes that focus on the constitutional boundary between the legislative and executive branches.  In *Morrison v. Olson*, 487 U.S. 654 (1988), for instance, the Court considered justiciable the question of whether Congress could limit an executive officer's removal by the President for cause.  In *Bowsher*, 478 U.S. at 726, the Court concluded that "Congress cannot reserve for itself the power of removal of an [executive] officer charged with the execution of the laws except by impeachment."  In *Myers v. United States*, 272 U.S. 52 (1926), the Court considered whether Congress could reserve the right to consent to removal of a postmaster during his term, and in *Buckley*, 424 U.S. 1, whether Congress could appoint members of the Federal Election Commission.  *See also INS v. Chadha*, 462 U.S. 919 (1983) (striking down a one-house legislative veto); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (considering whether nationalization of the steel mills constituted law making); *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) (considering for-cause restrictions on removal of Federal Trade Commissioners).

Each branch of the Government does have "the duty initially to interpret the Constitution for itself" and "its interpretation of its powers is due great respect from the other branches." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 442 (1977).  But "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution."  *Baker*, 369 U.S. at 211.

Decisions involving congressional consent to executive action, or a lack thereof, are no exception.  Quite recently, the Supreme Court ruled on the scope of the Recess Appointments Clause, which provides an exception to the general rule that principal officers must be appointed

4

by the President with the advice and consent of the Senate. *Noel Canning*, 134 S. Ct. 2550. As

here, that case considered a conflict between the legislative branch and the Executive over the

issue of congressional consent: could the President appoint a principal officer without the

consent of the Senate?  The Court did not find that Congress was better equipped than the courts

to take action where the President sought to bypass the requirement calling for its consent.

Instead, it applied its well-established precedent: "it is the 'duty of the judicial department'—in a

separation-of-powers case as in any other—'to say what the law is.'" *Id.* at 2560 (quoting

*Marbury v. Madison*, 5 U.S. at 177).

Defendant's brief states that "Congress is far better equipped than the courts to address

whether particular arrangements violate the Foreign Emoluments Clause."  Statement of Points

and Authorities in Support of Defendant's Motion to Dismiss at 17 ("Def. Mem.").  Leaving

aside the limited options actually available to Congress, discussed below, such a statement

ignores the history and practice of the courts in interpreting the constitutional duties of each

branch.  It is the Executive's duty, in the first instance, to ensure that it does not violate

constitutional prohibitions that apply to it.  However, this duty does not, as Defendant suggests,

mean that the executive branch operates free of any check from its coordinate branches.  The

Supreme Court has "squarely rejected the argument that the Constitution contemplates a

complete division of authority between the three branches." *Nixon v. GSA*, 433 U.S. at 443.

This is the natural result of the interdependence—expressed in part as a system of checks and

balances—of the three branches of government.  As Justice Burger expressed in *U.S. v. Nixon*,

418 U.S. at 707, "[i]n designing the structure of our Government and dividing and allocating the

sovereign power among three co-equal branches, the Framers of the Constitution sought to

provide a comprehensive system, but the separate powers were not intended to operate with

absolute independence." *See Buckley*, 424 U.S. at 121 (explaining that the founders did not, in creating the Constitution, provide for the "hermetic sealing off of the three branches of Government from one another").  It is the province and duty of the courts to say what the law is—and the Foreign Emoluments Clause does not constitute an exception to that duty.

The courts' competence to resolve these cases is evident from the routine judicial resolution of analogous federalism cases that also delimit constitutional requirements for advance congressional consent.  The Import/Export Clause and the Tonnage Clause, both of which lay prohibitions on the actions of states that have not obtained such consent, are regularly litigated and certainly found justiciable—indeed, their justiciability appears to be unchallenged. *See, e.g.*, *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1 (2009); *Dep't of Revenue of Wash. v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734 (1978); *Michelin Tire Corp. v. Wages*, 423 U.S. 276 (1976); *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341 (1964); *La. Land & Expl. Co. v. Pilot Petroleum Corp.*, 900 F.2d 816 (5th Cir. 1990).  In no case has a court found that congressional action would substitute for a judicial finding where the state in question failed to ask for congressional consent as an initial matter.

Nor does equitable discretion counsel dismissal of Plaintiffs' claims.  Although courts have exercised judicial restraint in certain circumstances involving the other branches of government, those circumstances are not present here.  This case is not about the improper meddling of one branch in the internal affairs of another.  It is about the President's definite, nondiscretionary duty under the Constitution not to accept foreign emoluments of any kind absent the consent of Congress.

This is not a case, such as *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) or *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984), where the plaintiffs' rights can

be vindicated by congressional action.  In *Moore*, the D.C. Circuit held that members of the House of Representatives had standing to challenge the constitutionality of the Tax Equity and Fiscal Responsibility Act of 1982, but "affirm[ed] the district court's dismissal as a proper exercise of the court's remedial discretion to withhold declaratory relief for the appellants' claim." *Moore*, 733 F.2d at 948.  Remedial discretion, according to the court, was warranted because of the separation of powers concerns raised when plaintiffs' dispute "is primarily a controversy with other members of Congress" and their rights "can be vindicated by congressional repeal of the statute." *Id.* at 956.  Similarly, when the D.C. Circuit in *Chenoweth* affirmed the district court's dismissal of plaintiffs' complaint for lack of standing, it also noted that "[i]t is uncontested that the Congress could terminate the [President Clinton's American Heritage Rivers Initiative] were a sufficient number in each House so inclined" and therefore the dispute was "fully susceptible to political resolution." *Chenoweth*, 181 F.3d at 116.

In contrast, Plaintiffs' claims here cannot be viewed as a dispute with other members of Congress because nothing has been laid before Congress for its consideration.  Defendant has not informed Congress of either the foreign emoluments he has accepted, or those he plans to accept in the future (Complaint, ¶¶ 40-42).  And Congress cannot fulfill its constitutional duty to review and selectively consent to the acceptance of only certain emoluments if it has not been made aware of what foreign emoluments are being accepted by the President.[3]  Indeed, there is no viable action that Congress could take that could address Plaintiffs' claims in this case.[4]  To hold otherwise would turn the clause on its head and require that Congress take affirmative action even in the absence of information.  As a result, dismissal of this case is not necessary to "avoid

---

[3] Although Congress may have the ability to issue some sort of blanket consent, it has not done so here.

[4] Aside from impeachment, which is discussed in greater detail below.

'meddl[ing] in the internal affairs of the legislative branch.'" *Chenoweth*, 181 F.3d at 116

(quoting *Moore*, 733 F.2d at 956).

This case presents a clear legal question—whether the President has violated the Foreign

Emoluments Clause—that the judiciary is both authorized and well-suited to handle.  The "mere

fact that there is a conflict between the legislative and executive branches" has never been

sufficient to remove a case from justiciability.  *United States v. AT&T*, 551 F.2d 384, 390 (D.C.

Cir. 1976).  This case does not interfere with Congress's internal affairs, and, as discussed below,

adjudicating this case does not interfere with the President's constitutional duty to ensure that the

laws are faithfully executed.  To the contrary, allowing this case to proceed ensures that the

President's judgment in undertaking that duty is not compromised through violation of another

constitutional mandate.  And only judicial resolution of this case will ensure that Congress is

asked for its consent, as the Constitution requires.  This, then, is the power that has been

delegated to the judiciary: to adjudicate a dispute between two other co-equal branches of

government that is not susceptible to resolution in any other way.  The case should be allowed to

go forward.  Doing so will effectuate the checks and balances established by the Constitution.

> **B.**     ***This case represents a valid exercise of judicial power against the
>            Executive.***

Contrary to Defendant's suggestion, the fact that this action is brought against the

President only heightens the need for this Court to hear this case and preserve the specific checks

and balances in the Constitution.  The concerns regarding foreign influence and corruption that

underlie the Foreign Emoluments Clause are of even greater importance when applied to the

President as compared to lower officials.  Moreover, while injunctive or declaratory relief

against the President may be unusual, they are not prohibited by the Constitution.  And such

relief is the only way to address the claims raised in Plaintiffs' Complaint (absent the even more

extraordinary and disruptive remedy of impeachment, discussed below).

Indeed, the Plaintiffs in this case have no alternative means to press their Foreign

Emoluments Clause claims.  The D.C. Circuit has noted that "[i]n most cases, any conflict

between the desire to avoid confronting the elected head of a coequal branch of government and

to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified

by injunctive relief against subordinate officials."  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir.

1996) (citing *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992); *Chamber of Commerce v.

Reich*, 74 F.3d 1322, 1328, 1331 n.4 (D.C. Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 811

n.17 (1982)).  This is not "most cases."  Here, relief cannot be obtained by an injunction against

subordinate officials, and declaratory or injunctive relief against the President is the only way to

ensure the rule of law.

The cases cited by Defendant to make the contrary point, *Mississippi v. Johnson*, 71 U.S.

475 (1866) and *Franklin*, 505 U.S. 788, do not require dismissal of this suit.  In both of those

cases, there were alternative ways by which the courts could address plaintiffs' injuries.

*Mississippi v. Johnson* involved Mississippi's challenge to the Reconstruction Acts, and although

the Supreme Court dismissed that case, Mississippi subsequently brought suit against the

Secretary of War and two other defendants challenging the same two Reconstruction Acts.

*Mississippi v. Stanton*, 154 U.S. 554 (1893).[5]  And in *Franklin*, though a plurality of the Court

suggested that "the District Court should have evaluated whether injunctive relief against the

_____

[5] Although that latter case was dismissed for presenting a nonjusticiable political question,
"*Mississippi v. Stanton* indicates that even assuming *Mississippi v. Johnson* was dismissed solely
because the President was a defendant, that result probably did not leave the State of Mississippi
without any proper defendant to sue to test the constitutionality of the Reconstruction Acts."
*Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 614 (D.C. Cir. 1974)("*NTEU I*").

President was available, and, if not, whether appellees' injuries were nonetheless redressable,"

even the plurality did not address the merits of this question because the injury could be

redressed through declaratory relief against the Secretary of Commerce. *Franklin*, 505 U.S. at

803.

In situations similar to the one in this case, where there was no other remedy, courts have

allowed suits against the President to go forward. In *NTEU I*, the D.C. Circuit issued a

declaratory judgment against the President. Ultimately, this decision resulted in "some 3 1/2

million employees ultimately receiv[ng] retroactive salary payments ranging from $69 to more

than $450." *Nat'l Treasury Emps. Union v. Nixon*, 521 F.2d 317, 319 (D.C. Cir. 1975)

(abrogated on other grounds by *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993)).

In that case, Congress had passed the Federal Pay Comparability Act, which "provided a

mechanism pursuant to which pay rates for federal employees are adjusted by the President . . .

based upon a survey conducted by the Bureau of Labor Statistics." *NTEU I*, 492 F.2d at 592

(footnote omitted). In short, the statutory language provided that the President "shall" adjust pay

rates according to Section 5305(a)(2) unless he submitted an alternative plan by a certain date.

*Id.* at 601. The D.C. Circuit found that "the President failed to submit an alternative plan to

Congress by September 1, 1972— a plan he was required to submit if he desired to change or

delay the otherwise required pay adjustments mandated by Section 5305(a)(2) to become

effective in October, 1972." *Id.* In that case, as here, the Defendant relied on *Mississippi v.

Johnson* to argue that "the complaint should be dismissed . . . because to permit the President to

be sued in this case would violate the separation of powers doctrine." *Id.* at 606. The D.C.

Circuit rejected that argument, stating that:

> [I]n the circumstances of this case, this Court should be extremely
> reluctant in light of the fundamental constitutional reasons for

> subjecting Executive actions to the purview of judicial scrutiny to
> hold that the federal judiciary lacks power to compel the President
> to perform a ministerial duty in accordance with the law.

*Id.* at 612.[6]

Similarly, in *Minnesota Chippewa Tribe v. Carlucci*, 358 F. Supp. 973 (D.D.C. 1973), the

court denied the President's Suggestion for Dismissal of Action.  In that case, the President was

required under the Indian Education Act to appoint members of the National Advisory Council

on Indian Education but had neither made any such appointment nor delegated his power to do

so to another.  *Id*. at 974.  Although the court noted that suits against the President are generally

unsuccessful, one of the differentiating factors present in that case was that "it appears that

plaintiffs' only remedy is to sue the President directly."  *Id.* at 976 (noting that while "the

President clearly has discretion to choose whom to appoint to the Council, he apparently has no

discretion to decide if the Council should or should not be constituted").

Finally, although the Supreme Court has noted that "the separation-of-powers doctrine

requires that a branch not impair another in the performance of its constitutional duties," *Loving*

*v. United States*, 517 U.S. 748, 757 (1996), no risk of such impairment is present here.  Indeed,

adjudicating this case would reinforce the President's duty to "take Care that the Laws be

faithfully executed."  U.S. Const. art. II, § 3.  Defendant does not identify any particular laws the

execution of which could be impaired by this suit in any way.  Instead, Defendant offers only a

vague allegation that the magnitude of activities that Plaintiffs allege violate the Foreign

Emoluments Clause is so great that this litigation would distract the President from his general

---

[6] The D.C. Circuit declined to issue a writ of mandamus, finding that a declaratory decree was
most appropriate in that situation.  *Id.* at 616.  Here, the Court similarly has the option of
ordering the more limited remedy of declaratory relief.  However, the Court does not need to
address the question of what remedy is most appropriate when ruling on Defendant's Motion to
Dismiss.

duty to take care that all laws are faithfully executed.  Thus, this case is again distinguishable from *Mississippi v. Johnson*, in which the relief sought by the plaintiff against the President would have interfered directly with the President's ability to take care that the Reconstruction Acts were faithfully executed.  *See Mississippi v. Johnson*, 71 U.S. at 499.

It should also be clear that, far from distracting the President from his official duties, "any Presidential time spent dealing with, or action taken in response to" a case clarifying the scope of the Foreign Emoluments Clause is actually "part of a President's official duties." *Clinton v. Jones*, 520 U.S. 681, 718 (1997) (Breyer, J., concurring in the judgment).  "Insofar as a court orders a President, in any [separation of powers] proceeding, to act or to refrain from action, it defines, or determines, or clarifies the legal scope of an official duty." *Id*.

Moreover, the constitutional duty of the President to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, cannot be viewed in isolation.  In addition to being an independent constitutional duty, the Foreign Emoluments Clause is a critical check and balance on the President's Article II powers.  It protects against foreign influence over and corruption of the Executive, as with inferior officers.  Compliance with the Foreign Emoluments Clause bolsters the resistance of the Executive to corruption and foreign influence and thus enhances, rather than interferes with, his ability to take care that the laws are faithfully executed. By adjudicating this case, this Court would effectuate one of the checks and balances found in the Constitution, and thus be acting precisely in line with how the separation of powers was intended to function.

## II. THE FOREIGN EMOLUMENTS CLAUSE SUPPORTS CONSTITUTIONAL CHECKS AND BALANCES AND ANTI-CORRUPTION PRINCIPLES.

"The[] provisions of Art. I," which include the Foreign Emoluments Clause, "are integral parts of the constitutional design for the separation of powers." *Chadha*, 462 U.S. at 946.  As the

*Chadha* court explained, "[t]he principle of separation of powers was not simply an abstract generalization in the minds of the Framers: it was woven into the document that they drafted in Philadelphia in the summer of 1787." *Id.* (quoting *Buckley*, 424 U.S. at 124).  So too was a commitment to using the Constitution's myriad structures to enforce a general principle of anti-corruption.  *See* Zephyr Teachout, *Gifts, Offices, and Corruption*, 107 Nw. Univ. L. Rev. Colloquy 30, 30 (2012) (noting the Constitution's "structural commitment to fighting corruption").  Indeed, the Foreign Emoluments Clause relies on separation of powers as a means of preventing corruption in the Offices of the United States.

>   **A.      The Foreign Emoluments Clause was part of the framers' general anti-corruption orientation.**

It is uncontroverted that the Foreign Emoluments Clause was designed to combat corruption.[7]  Among the Constitutional Convention delegates, "there was near unanimous agreement that corruption was to be avoided, that its presence in the political system produced a degenerative effect, and that the new Constitution was designed in part to insulate the political system from corruption."  James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174, 181 (1994).  According to James Madison's notes on the convention, the term "corruption" was mentioned by 15 delegates "no less than 54 times" and "[e]ighty percent of these references were uttered by seven of the most important delegates, including Madison, Morris, Mason, and Wilson," *id.* at 177 (referencing James Madison, *Notes of Debates*

---

[7] *E.g.,* Complaint, ¶¶ 10, 14-21; Def. Mem. at 16 (noting that "the Foreign Emoluments Clause was intended to guard generally against the corruption of and foreign influence on federal officials"); *Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116, 117 (1902) (the Foreign Emoluments Clause was "particularly directed against every kind of influence by foreign *governments* upon officers of the United States, based on our historic policies as a nation." (emphasis in original); *see also* Teachout, *supra*; Seth Tillman, *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Professor Zephyr Teachout*, 107 Nw. Univ. L. Rev. Colloquy 180 (2013).

*in the Federal Convention of 1787 Reported by James Madison* (1787)), with Mr. Mason arguing

that "if we do not provide against corruption, our government will soon be at an end."  1 *The*

*Records of the Federal Convention of 1787*, at 392 (Max Farrand ed., 1911).

Anti-corruption concerns were likewise prominent in the public advocacy efforts to

garner support for the Constitution's ratification.  Four of the first five Federalist Papers

addressed the "Dangers from Foreign Force and Influence."  *The Federalist Nos. 2-5* (John Jay).

And the Office of the President was not considered immune from the danger.  As Alexander

Hamilton argued in *The Federalist No. 68* regarding the "mode of electing the President":

> [n]othing was more to be desired than that every practicable
> obstacle should be opposed to cabal, intrigue, and corruption.
> These most deadly adversaries of republican government might
> naturally have been expected to make their approaches from more
> than one quarter, but chiefly from the desire in foreign powers to
> gain an improper ascendant in our councils.

*The Federalist No. 68* (Alexander Hamilton).

The Foreign Emoluments Clause was one such measure intended to insulate the political

system from foreign influence.  As Governor Randolph observed during the Virginia Ratification

Convention:

> All men have a natural inherent right of receiving emoluments
> from any one, unless they be restrained by the regulations of the
> community. . . . It was thought proper, in order to exclude
> corruption and foreign influence, to prohibit any one in office from
> receiving or holding any emoluments from foreign states.

3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 465

(Jonathan Elliot ed., 1827).  The clause was inserted into the Constitution by a motion of Charles

Pinckney who "urged the necessity of preserving foreign Ministers & other officers of the U. S.

independent of external influence."  2 *The Records of the Federal Convention of 1787*, at 389

(Max Farrand ed., 1911).  The measure passed unanimously.  *Id.*

**B.      Congressional approval is an essential element of the Foreign Emoluments Clause.**

Pinckney's introduction of the clause was no historical happenstance.  The Constitutional clause mirrors a similar clause that was contained in the Articles of Confederation, the country's original governing document, with one essential difference—the clause used in the Constitution was not "preemptory, as under the old Congress."  5 *Annals of Cong.* 1585 (1798) (Otis).  Under the Articles of Confederation of 1781, art. VI, the clause stated that "nor shall any person holding any office of profit or trust under the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state."

By allocating to Congress the broad power to determine whether to grant an exception to this prohibition, the framers of the Constitution imbued the clause with two purposes.  It serves both to guard against corruption, and to establish a congressional check on persons holding offices under the United States.  As Governor Randolph further explained at the Virginia Ratification Convention, "though the confederation had restricted congress from exercising any powers not given them, [] they inserted [the Foreign Emoluments Clause], not from any apprehension of usurpation, but for greater security."  3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 465 (Jonathan Elliot ed., 1827).

This "greater security" arises from the mandate that Congress be given the opportunity to conduct a check on potential avenues of undue influence.  During the first recorded circumstance of Congress considering application of the clause, Representative Harrison Gray Otis explained that:

> [w]hen every present to be received must be laid before Congress, no fear need be apprehended from the effects of such presents. For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged.

5 *Annals of Cong.* 1585 (May 1798) (Otis).[8]

Ultimately, as one professor has described:

> Congressional acquiescence is not a minor check.  It takes power
> from the executive branch and gives Congress oversight
> responsibility to make sure that officers . . . are not being seduced
> from their obligations to the country.  The congressional
> requirement leads to a radical transparency and interrogation that
> could chill quiet transfers of wealth for affection.

Teachout, *supra* at 36.

### C.    *The Foreign Emoluments Clause is mandatory.*

The Constitution could not be clearer.  Congress has "exclusive authority to permit the

acceptance of presents from foreign governments by persons holding offices under the United

States."  4 John Bassett Moore, *A Digest of International Law* 579 (1906) (citing Letter from

James Madison, Secretary of State, to David Humphreys (Jan. 5, 1803)).  And it is mandatory

that any "Person holding any Office of Profit or Trust," including the President,[9] seek and obtain

---

[8] Congress had been asked to decide whether Thomas Pinkney could receive presents offered "at
the two Courts [Great Britain and Spain] at which he [had been] Minister." 5 *Annals of Cong.*
1590 (1798); *see also* Mem. Op. for the Associate Counsel to the President from Noel J.
Francisco, Deputy Assistant Attorney General, Office of Legal Counsel, *Application of the
Emoluments Clause to a Member of the President's Council on Bioethics*, 2005 WL 2476992
(March 9, 2005).  The exact nature of the presents was unknown at the time Congress engaged in
its deliberations. 5 *Annals of Cong.* 1586, 1590 (1798).

[9] *Amicus* for Defendant, Seth Barrett Tillman and the Judicial Education Project ("Defendant
*Amicus*") seek leave to file a brief arguing that the Foreign Emoluments Clause does not apply to
the President. Defendants have not taken that position.  And, regardless, Defendant *Amicus*'s
arguments hold no water.  In particular, Defendant *Amicus* presents a flawed analysis of the
phrase "any Office . . . under the United States."  The Constitution does not limit the Foreign
Emoluments Clause to "officers" or "civil officers"—phrases on which Defendant *Amicus*'s
arguments are based.  Rather, the Foreign Emoluments Clause applies broadly to any "person
holding any Office of Profit or Trust."  Outside of the Foreign Emoluments Clause, this phrasing
appears only two other times in the Constitution, both of which apply clearly to the President
(i.e., the impeachment clause, U.S. Const. art. I, § 3, cl. 7, and the prohibition against appointing
as an elector any "Senator or Representative, or Person[s] holding an Office of Trust or Profit
under the United States", U.S. Const. art. II, § 1, cl. 2).  Defendant *Amicus* "cannot point to a
single judicial decision[, contemporaneous document, or official government opinion] holding

16

congressional consent in order to keep "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince or foreign State." U.S. Const. art. I, § 9, cl. 8. This language "is both sweeping and unqualified." *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17-18 (1994) (noting that "[t]here is no express or implied exception for emoluments received from foreign states when the latter act in some capacity other than the performance of their political, military, or diplomatic functions. The decision whether to permit exceptions that qualify for the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause." (emphasis in original)). As now-Supreme Court Justice Alito observed while he was Deputy Assistant Attorney General at the Office of Legal Counsel of the Department of Justice ("OLC"), "the Emoluments Clause is 'directed against every kind of influence by foreign governments upon officers of the United States,' (24 Op. A.G. 116, 117 (1902)), unless the payment has been expressly consented to by Congress." Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA from Samuel A. Alito Jr., Deputy Assistant Attorney General, *Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, 1986 OLC Lexis 67 at *2 (May 23, 1986).

---

that . . . the Foreign Emoluments Clause . . . [does not] appl[y] to the President." *Compare* Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* in Support of the Defendant at 2, 22.

Indeed the executive branch itself has understood the scope of the clause to be broader and far more encompassing than just "appointed" officials. *See, e.g. Proposal That the President Accept Honorary Irish Citizenship*, 1 Op. O.L.C. Supp. 278 (1963) (holding that Foreign Emoluments clause applies to offer of honorary citizenship to President Kennedy); *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 157-58 (1982) (determining that the Foreign Emoluments Clause would apply to an employee of the Nuclear Regulatory Commission, and holding that "[b]oth the language and the purpose of" the Foreign Emoluments Clause and the Appointments Clause "are significantly different" and that "[t]he problem of divided loyalties can arise at any level.")

Indeed it has been customary for past Presidents prior to keeping presents or emoluments to either (1) seek and obtain the consent of Congress or (2) seek an opinion from the Attorney General and the OLC or the Comptroller General of the United States—the advisory departments to the executive and legislative branches, respectively—as to whether the item falls within the scope of the clause.

President Van Buren, for example, was "offered horses, pearls, a Persian rug, shawls, and a sword by Ahmet Ben Haman, the Imam of Muscat." Teachout, *supra* at 42. The President, through the Department of State, brought the matter to Congress noting that "under existing constitutional provisions" he was "precluded from accepting the presents for his own use." 14 *Abridgment of the Debates of Congress from 1789 to 1856*, at 141 (Thomas Hart Benton ed., 1860). Van Buren further wrote the Sultan explaining that it is "fundamental law of the Republic which forbids its servants from accepting presents from foreign States or Princes." *Id.* (statement of Martin Van Buren). Congress subsequently "authorized him to dispose of the presents by giving some to the Department of State and giving the proceeds of the rest to the Treasury." Teachout, *supra* at 42.

Similarly, when President Jackson was offered a medal from the Republic of Colombia, the President placed the medal "at the disposal of Congress." In so doing, Jackson noted that the Constitution "forbid[] the acceptance of presents" tendered to him by a foreign government. Message of President Andrew Jackson to the Senate and House of Representatives, dated January 19, 1830, 3 *Compilation of the Messages and Papers of the Presidents* 1029, 1030 (James D. Richardson ed., 1897). President Lincoln followed the same model. When he was presented various gifts from the King of Siam, the President explained to the King that "our laws forbid the President from receiving these rich presents as personal treasures. . . . Congress being

18

now in session at this capital, I have had great pleasure in making known to them this manifestation of Your Majesty's munificence and kind consideration."  Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862).[10]  Congress ultimately directed that these gifts "be deposited in the collection of curiosities at the Department of the Interior."  Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, Res. 20, 37th Cong., 12 Stat. 616 (1862).  And when President Harrison was presented medals by Brazil and Spain, he first sought the consent of Congress before retaining the items.  Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, Res. 39, 54th Cong., 29 Stat. 759 (1896).

With the exception of President Trump, modern Presidents have followed a similar pattern.  President Kennedy sought an opinion from the OLC as to whether the offer of an "honorary Irish citizenship" would be subject to the Foreign Emoluments clause.  1 Op. O.L.C. Supp. at 278.  The OLC determined that such an honorific "f[e]ll within the spirit, if not the letter" of the clause.  *Id.*[11]  And most recently, prior to accepting the Nobel Peace Prize, President Obama sought an OLC opinion as to whether accepting the Prize would conflict with the Foreign Emoluments Clause.  *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1 (Dec. 7, 2009).  OLC determined that the Nobel Committee which awarded the prize was not a "foreign state," and thus the Prize did not fall under the auspices of the foreign emoluments clause.

---

[10] Available at http://quod.lib.umich.edu/l/lincoln/lincoln5/1:269.1?rgn=div2;view=fulltext

[11] The opinion also discusses that "some Presidents have treated presents which they have received as gifts to the United States, rather than as personal gifts, [and] have therefore taken the view that acceptance is not subject to the constitutional provision."  In these cases however, the items in questions were not conferred upon the President, personally, but rather on the "President of the United States for the time being" and deposited with the Department of State. *Id.* at 281.

This history is not merely a matter of tradition.  It is the result of a mandatory constitutional duty imposed on the President, one that provides Congress with a critical check against the dangers of foreign influence and corruption.  It cannot constitutionally be evaded.

## III.   THE COURT SHOULD NOT LEAVE IMPEACHMENT AS THE ONLY REMEDY TO ADDRESS VIOLATIONS OF THE FOREIGN EMOLUMENTS CLAUSE.

A decision granting Defendant's Motion to Dismiss on grounds of justiciability would effectively interpret the Foreign Emoluments Clause as enforceable against the President only through impeachment.  Such a ruling would raise separation of powers concerns equal to or greater than those associated with injunctive or declaratory relief against the President.  As a result, the Court should reject Defendant's argument that equity requires dismissal of Plaintiffs' claims.

Defendant alleges that "[i]f Congress disagrees with the President (or any other public official) regarding the applicability of the Clause in individual cases, it has ample means for pressing its view." Def. Mem. at 17.  However, Defendant does not offer any description of those purported means, nor is this allegation supported by the Constitution.  The Foreign Emoluments Clause does not establish any affirmative steps for Congress to take if it believes that the President is violating this clause.  The clause gives Congress the discretionary authority to grant an official permission to accept a foreign emolument, but it does not vest in Congress the power or duty to invalidate an official's acceptance of a foreign emolument after the fact. Consequently, if Plaintiffs cannot obtain relief through the courts, as Defendant claims, then the only remaining means available to address presidential violations of the Foreign Emoluments Clause is through impeachment.

Although impeachment is a mechanism clearly provided for in the Constitution, any decision that renders impeachment the sole remedy for a violation of law would leave Congress

with no remedy save a "nuclear bomb.". *NTEU I*, 492 F.2d at 615.  In *NTEU I*, the D.C. Circuit addressed the serious nature of impeachment, explaining that "the Constitution should not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President." *NTEU I*, 492 F.2d at 615.  Here, the President has an absolute duty under the Constitution to not accept foreign emoluments of any kind without the consent of Congress.  The Court should not issue an order on Defendant's Motion to Dismiss that would leave impeachment as the only means of ensuring that this duty is fulfilled.

As discussed above, courts have declined to dismiss cases brought against the President when such suits were the only means available to obtain judicial relief, even though impeachment is also always available as a potential alternative source of relief.  *See NTEU I*, 492 F.2d 587; *Minn. Chippewa Tribe*, 358 F. Supp. 973.  As the D.C. Circuit explained, "[u]nder our system of law, the judiciary has a duty envisioned by the constitutional principle of checks and balances to keep both the Executive and Congress within their respective constitutional domains in order to prevent that concentration of power which the Founding Fathers so feared." *NTEU I*, 492 F.2d at 612 (footnote omitted) (citing *The Federalist No. 51* (James Madison)).  In order to protect the President's constitutional duties and obligations under the Foreign Emoluments Clause, and fulfill the role of the judiciary in enforcing the Constitution's structure of checks and balances, the Court should allow this case to proceed.

## CONCLUSION

For these reasons, *amici* Separation of Powers Scholars support Plaintiffs' opposition to Defendant's Motion to Dismiss.

Respectfully submitted,


/s/ *Katharine Mapes*

Katharine Mapes (DC Bar No. 993784)
Anjali Patel (DC Bar No. 1000826)
Jeffrey M. Bayne (DC Bar No. 1020810)
SPIEGEL & MCDIARMID LLP
1875 Eye Street, NW
Suite 700
Washington, DC  20006
(202) 879-4000
katharine.mapes@spiegelmcd.com
anjali.patel@spiegelmcd.com
jeffrey.bayne@spiegelmcd.com


*Attorneys for Separation of Powers Scholars*


November 2, 2017

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 2nd day of November, 2017, caused the foregoing

documents to be electronically served through the Court's CM/ECF system.


/s/ *Katharine Mapes*
Katharine Mapes

Law Offices of:
    Spiegel & McDiarmid LLP
    1875 Eye Street, NW
    Suite 700
    Washington, DC 20006
    (202) 879-4000