**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>  *Defendant*. | No. 17-cv-1154-EGS |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION .................................................................................................................1

ARGUMENT .......................................................................................................................3

I.      PLAINTIFFS' ALLEGED INJURY IS NOT JUDICIALLY COGNIZABLE..................3

      A.      Plaintiffs' Claim of Standing Is Foreclosed by Binding Precedent .........................3

      B.      Supreme Court Precedent on State Legislator Standing is Inapposite....................5

      C.      Pre-*Raines* D.C. Circuit Precedent Does Not Help Plaintiffs ..................................7

      D.      The President Has Not Denied Plaintiffs' Right to Vote and Plaintiffs Have Ample Legislative Remedies to Address Their Alleged Injuries ...........................9

II.     PLAINTIFF HAVE NO CAUSE OF ACTION UNDER THE FOREIGN EMOLUMENTS CLAUSE AND EQUITY REQUIRES DISMISSAL ...........................12

III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM ...................................................14

      A.      Plaintiffs' Interpretation of the Text of the Foreign Emoluments Clause is Overbroad and Unreasonable ...............................................................................14

      B.      The Purpose of the Foreign Emoluments Clause Does Not Compel Plaintiffs' Broad Reading ......................................................................................20

      C.      History Refutes Plaintiffs' Interpretation of the Clause, as Do the Absurd Results That Would Flow From the Interpretation .................................................21

      D.      Plaintiffs Do Not State a Claim Under the President's View of the Emoluments Clause ..............................................................................................23

IV.    THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.......24

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                     **PAGE(S)**

*Agostini v. Felton,*
  521 U.S. 203 (1997) ................................................................................................... 13

*American Federation of Government Employees v. Pierce,*
  697 F.2d 303 ............................................................................................................... 9

*Arizona State Legislature v. Arizona Independent Redistricting Commission,*
  135 S. Ct. 2652 (2015) ....................................................................................... 1, 6, 7

*Armstrong Paint & Varnish Works v. Nu-Enamel Corp.,*
  305 U.S. 315, 333 (1938) ........................................................................................ 22

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................. 24

*Bank of Am. Corp. v. City of Miami, Fla.,*
  137 S. Ct. 1296 (2017) ............................................................................................ 13

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................................. 24

*Bond v. United States,*
  564 U.S. 211 (2011) ................................................................................................. 12

*Campbell v. Clinton,*
  203 F.3d 19 (D.C. Cir. 2000) ........................................................................... *passim*

*Chenoweth v. Clinton,*
  181 F.3d 112 (D.C. Cir. 1999) ......................................................................... *passim*

*Clarke v. Sec. Indus. Ass'n,*
  479 U.S. 388 (1987) ................................................................................................. 13

*Clinton v. Jones,*
  520 U.S. 681 (1997) ................................................................................................. 25

*Coalition for Competitive Electricity, Dynegy Inc. v. Zibelman,*
  ---F. Supp. 3d---, No. 16-cv-8164, 2017 WL 3172866 (S.D.N.Y. July 25, 2017) .................. 13

*Coleman v. Miller,*
  307 U.S. 433 (1939) ........................................................................................... *passim*

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989) ................................................................................................. 15

*Dennis v. Higgins*,
    498 U.S. 439 (1991) ................................................................................................. 12

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................................................. 17

*DKT Memorial Fund Ltd. v. Agency for Int'l Development*,
    887 F.2d 275 (D.C. Cir. 1989) ................................................................................. 13

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) ................................................................................................. 11

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................................................. 24

*Goldwater v. Carter*,
    444 U.S. 996 (1979) ................................................................................................... 9

*Goldwater v. Carter*,
    617 F.2d 697 (D.C. Cir. 1979) ............................................................................... 6, 7

*Harrington v. Bush*,
    553 F.2d 190 (D.C. Cir. 1977) ................................................................................... 7

*Kennedy v. Sampson*,
    511 F.2d 430 (D.C. Cir. 1970) ............................................................................... 7, 8

*King v. Burwell*,
    135 S. Ct. 2480 (2015) ............................................................................................. 15

*Kucana v. Holder*,
    558 U.S. 233 (2010) ................................................................................................. 20

*Kucinich v. Bush*,
    236 F. Supp. 2d 1 (D.D.C. 2002) ...................................................................... *passim*

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011) ................................................................................. 12

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ............................................................................................. 13

*Los Angeles Cty. v. Davis*,
   440 U.S. 625 (1979) ............................................................................................. 9

*Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*,
   805 F.3d 98 (3d Cir. 2015) ................................................................................. 13

*McGrain v. Daugherty*,
   273 U.S. 135 (1927) ........................................................................................... 11

*\*Mississippi v. Johnson*,
   71 U.S. 475 (1867) .................................................................................. 2, 24, 25

*Mistretta v. United States*,
   488 U.S. 361 (1989) ........................................................................................... 21

*Moore v. U.S. House of Representatives*,
   733 F.2d 946 (D.C. Cir. 1984) ............................................................................ 8

*NLRB v. Noel Canning*,
   134 S. Ct. 2550 (2014) ....................................................................................... 21

*O'Connor v. Donaldson*,
   422 U.S. 563 (1975) ............................................................................................. 9

*\*Raines v. Byrd*,
   521 U.S. 811 (1997) ................................................................................... *passim*

*Riegle v. Federal Open Market Committee*,
   656 F.2d 873 (D.C. Cir. 1981) ............................................................................ 8

*South Central Timber Development, Inc. v. Wunnicke*,
   467 U.S. 82 (1984) ............................................................................................. 12

*South Dakota v. Yankton Sioux Tribe*,
   522 U.S. 329 (1998) ........................................................................................... 22

*Swan v. Clinton*,
   100 F.3d 973 (D.C. Cir. 1996) .......................................................................... 25

*Watkins v. United States*,
   354 U.S. 178 (1957) ........................................................................................... 11

## STATUTES

42 U.S.C. § 1983 ..................................................................................................... 12

iv

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6, cl. 2 ........................................................................... 19

U.S. Const. art. II, § 1, cl. 7 .......................................................................... 20

## CONGRESSIONAL MATERIALS

H.R.J. Res. 26, 115th Cong. (2017) ............................................................... 10

S. Con. Res. 8, 115th Cong. (2017) ............................................................... 10

## OFFICE OF COMPTROLLER GENERAL OPINIONS

*To the Secretary of the Air Force*,
    49 Comp. Gen. 819 (1970) ....................................................................... 18

## HISTORICAL MATERIALS

1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the
    English Language; And, the Proper Choice of them determined* (1766) ................................ 17

1 *Oxford English Dictionary* xi (1st ed. 1884) ........................................... 17

## OTHER AUTHORITIES

Allen Reddick, *The Making of Johnson's Dictionary*, *1746–1773* (1996) ................................... 16

Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era
    to Determine the Original Meaning of the Constitution*,
    82 Geo. Wash. L. Rev. 358 (2014) ...................................................... 16

James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century
    American English: A Corpus Linguistic Analysis*, 59 So. Texas L. Rev. __
    (Forthcoming 2018), https://ssrn.com/abstract=3036938. ..................................... 15

John Mikhail, *The Definition of "Emolument" in English Language and Legal
    Dictionaries, 1523-1806*, (July 9, 2017), https://papers.ssrn.com/sol3/papers.cfm?
    abstract_id=2995693 ...................................................................... 15, 16

Oxford University Press, *Emolument*, OED Online (Dec. 2016),
    http://www.oed.com/view/Entry/61242 ................................................ 17

Oxford University Press, *Employ*, OED Online (Mar. 2014)
    http://www.oed.com/view/Entry/61368 ................................................ 18

Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress:*
  *The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227 (1999)........... 16

*The Barnhart Dictionary of Etymology* 326 (1988)..................................................... 16

*The Oxford Dictionary of English Etymology* 310 (1966)............................................. 16

Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888).................. 16

## INTRODUCTION

The President's opening brief demonstrated that Plaintiffs have no standing to challenge the President's alleged violation of the Foreign Emoluments Clause of the Constitution. Both Supreme Court and D.C. Circuit precedent foreclose Plaintiffs' claimed injury to their constitutional prerogative to authorize or reject the President's alleged acceptance of prohibited emoluments. Under *Raines v. Byrd*, 521 U.S. 811 (1997), an injury to legislative authority that affects all Members of Congress equally does not give individual Members a personal stake in an Article III case or controversy with the Executive. *Id.* at 826; *see also Chenoweth v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999) (applying *Raines*); *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000) (same). Plaintiffs may not bypass the constitutionally prescribed legislative process by rushing to federal court when Congress has ample political means to press its views. Moreover, Plaintiffs' alleged injury is not traceable to the President: The President has not prevented Congress from voting on whether he may accept alleged emoluments, and Plaintiffs remain free to convince their congressional colleagues to redress their alleged injury. Indeed, many of the Plaintiffs were sponsors of bills on the emoluments issue, which were not voted on.

Plaintiffs' Opposition fails to rebut this showing. Plaintiffs seek to rely on inapposite cases involving suits by state legislators: *Coleman v. Miller*, 307 U.S. 433 (1939) and *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015). But those cases do not implicate federal separation of powers concerns, and "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Raines*, 521 U.S. at 820. And, in any event, *Coleman* and *Arizona* involved claims by a bloc of legislators whose votes would have been sufficient to take the action at issue, or by the entire legislature itself.

Plaintiffs' attempt to rely on pre-*Raines* D.C. Circuit case law is also unavailing. Even if *Raines* did not wholly foreclose their theory, the D.C. Circuit has explicitly held that the portions of the pre-*Raines* cases upon which Plaintiffs rely are no longer tenable. Finally, Plaintiffs' claim that they have no effective legislative means of redressing their injury should be rejected. As another judge of this Court has observed, "[p]ermitting individual congressmen to run to

federal court any time they are on the losing end of some vote or issue would circumvent and undermine the legislative process, and risk substituting judicial considerations and assessments for legislative ones." *Kucinich v. Bush*, 236 F. Supp. 2d 1, 11 (D.D.C. 2002).

The Court should also dismiss the Amended Complaint for multiple other reasons. First, Plaintiffs have no cause of action under the Foreign Emoluments Clause, and numerous factors counsel against inferring a cause of action in equity here. Most notably, Plaintiffs' asserted injury to their legislative prerogative is outside the zone of interests protected by the Clause. Plaintiffs have offered no persuasive response, and their suggestion that the zone-of-interests test no longer applies to constitutional claims is wrong.

Second, Plaintiffs have not stated a claim that the President violates the Foreign Emoluments Clause whenever one of his businesses engages in a transaction with a foreign government. As shown in the President's opening brief, the term "Emolument" in the Clause refers to profits arising from office or employ, and the prohibited benefits must be tendered in exchange for the President's service, either in his capacity as President or in an employment-like relationship with the foreign government. This analysis is grounded in the Constitution's text; the common historical usage of the term emolument in the context of federal employment; the Clause's history and purpose; and the practice of officials from the founding of the Nation.

Plaintiffs' primary rebuttal is to cite a number of founding-era dictionaries that contain a broad definition of emolument—any profit, gain, or advantage—and a number of instances where the term was used in that fashion. But even Plaintiffs do not contend that this was the only definition in use at the time; indeed, Plaintiffs' focus on historical definitions and etymology ultimately supports the President's analysis as to the meaning of the term. Most importantly, in context in the Constitution, where the term's usage is tied to the holding of federal office, the term "Emolument" does not mean "anything of value" as Plaintiffs allege. The Complaint's allegations, which are all based on this theory, thus fail to state a claim.

Finally, under *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867), this Court cannot issue the requested injunctive relief here. Contrary to Plaintiffs' arguments, this case does not merely

2

concern a ministerial duty because Plaintiffs seek a wide-ranging injunction that would require the exercise of significant planning and judgment and impose substantial burden on the President.  Nor is it correct or even relevant to argue that the injunction purportedly would affect only the President's private businesses.  The requested injunction would compel the President to comply with a constitutional requirement—one that applies only because of the President's holding of his office.  For these reasons, the requested relief is precluded by *Johnson*.

**ARGUMENT**

## I.     PLAINTIFFS' ALLEGED INJURY IS NOT JUDICIALLY COGNIZABLE.

### A.     Plaintiffs' Claim of Standing Is Foreclosed by Binding Precedent.

Plaintiffs' claimed injury—that they have been denied the ability to cast a vote on the President's alleged acceptance of foreign emoluments—is not a judicially cognizable injury under *Raines v. Byrd*, 521 U.S. at 826, and D.C. Circuit precedent applying *Raines*.  *Raines* held that a "diminution of legislative power" that "damages all Members of Congress and both Houses of Congress equally," *id.* at 821, is not "a sufficiently concrete injury" to give Members of Congress a "personal stake in [the] dispute" with the Executive Branch, *id.* at 830.  And such an injury also is not traditionally capable of resolution through the judicial process, as demonstrated by historical experience.  *See* Def.'s Statement of Points & Authorities in Support of Mot. to Dismiss at 7, ECF No. 15-1 ("Mot.").  As the *Raines* Court observed, throughout history, every confrontation between one or both Houses of Congress and the Executive Branch has been resolved through the political process rather than through suits brought by legislators to vindicate some claimed authority or power.  *See Raines*, 521 U.S. at 826–28.

Plaintiffs argue that *Raines* is distinguishable because the Members there "did not allege that any votes they had cast had been invalidated or that they were being deprived of their right to vote." Pls.' Opp'n to Def.'s Mot. to Dismiss at 9, ECF No. 17 ("Opp'n").  That distinction cannot bear the weight Plaintiffs place on it.  The Members in *Raines* argued, among other things, that the challenged Line Item Veto Act deprived them of "their constitutional role in the

3

repeal of legislation." 521 U.S. at 816. That argument does not differ materially from Plaintiffs' claim that they have been denied their constitutional role in deciding whether to consent to the President's acceptance of allegedly prohibited foreign emoluments. *Raines* speaks to the dilution of institutional legislative power regardless of how that power is diluted. And as the Court made clear, the relevant distinction is between the impairment of legislative power suffered equally by Members "solely because they are Members of Congress," which cannot support Article III standing, and the deprivation of "something to which they *personally* are entitled—such as their seats as Members of Congress after their constituents had elected *them*." *Id.* at 821 (emphasis in original). Plaintiffs' gloss on *Raines*—that *Raines* recognizes the standing of any legislators whose "votes have been completely nullified," Opp'n at 5 (quoting *Raines*, 521 U.S. at 823)—is, at best, misleading: by its terms, *Raines* recognizes standing, "at most," for legislators whose votes had been nullified when those "votes would have been sufficient to defeat (or enact) a specific legislative Act." *Raines*, 521 U.S. at 823.

D.C. Circuit precedent following *Raines* leaves no doubt that Plaintiffs' claimed injury to their legislative power is not judicially cognizable. *See* Mot. at 8–9, 11. *Chenoweth v. Clinton*, 181 F.3d at 113, held that individual Members of Congress had no standing to challenge an Executive action on the theory that the Executive had deprived them of their constitutionally guaranteed right to vote on measures concerning the challenged action. And *Campbell v. Clinton*, 203 F.3d at 23, held that legislators, whose votes were deemed defeated by the President's use of armed forces in Yugoslavia, had no standing to challenge the Executive action because Congress retained "ample legislative power" to work its will '"were a sufficient number in each House so inclined."' *Id.* at 21, 23 (quoting *Chenoweth*, 181 F.3d at 116). Because Congress has "political tools with which to remedy [Plaintiffs'] purported injury," *id.* at 24, this Court may not intrude into the legislative arena to assist Plaintiffs in their dispute with their colleagues.

Plaintiffs argue that *Chenoweth* is distinguishable because "the essence of [the *Chenoweth* plaintiffs'] claim was that the President exceeded his statutory and constitutional

authority."  Opp'n at 15 (citation omitted).  Moreover, according to Plaintiffs, the *Chenoweth* plaintiffs "could not credibly claim their votes were nullified by the President's action."  *Id.* at 16 (citation omitted).  But the claimed injury in *Chenoweth* clearly was the denial of the Members' proper role in the constitutionally prescribed legislative process.  *See Chenoweth*, 181 F.3d at 113 (Members claiming that they were deprived of "their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving interstate commerce and the expenditure of federal money).  As a judge in this district observed in a case involving the claim of 32 Representatives that the President could not terminate a treaty without congressional consent:

> The injuries alleged in *Chenoweth* and *Campbell* . . . are much like the injuries claimed here.  The congressmen claim that they have been divested of their constitutional role in treaty termination.  That is no different from the alleged injury in *Chenoweth*—being divested of a role in voting on and approving or rejecting legislation—or the alleged injury in *Campbell*—being divested of a role in declaring war . . . .  Plaintiffs do not—and cannot—explain how their alleged injuries are personal to them.  Rather, their claim of a "grievous institutional injury" where they are "deprived of their constitutional right . . . to participate in treaty termination" is no different from the institutional injuries alleged in *Chenoweth*, *Campbell*, and *Raines*.

*Kucinich*, 236 F. Supp. 2d at 9.  Like the Members in *Raines*, *Chenoweth*, and *Campbell*, Plaintiffs have failed to allege a discrete, personal, and particularized injury.  And as in those cases, Congress has the political tools to redress Plaintiffs' claimed injury.  Thus, Plaintiffs' alleged injury is not judicially cognizable.

### B.  Supreme Court Precedent on State Legislator Standing is Inapposite.

Plaintiffs' heavy reliance on *Coleman v. Miller*, 307 U.S. 433, to support their standing claim is misplaced.  In *Coleman*, the Supreme Court found that twenty of Kansas's forty senators, whose votes against the state's ratification of an amendment to the Federal Constitution were defeated by the state's Lieutenant Governor's tie-breaking vote, had standing to challenge the ratification.  *See id.* at 438, 441.  *Coleman* is inapposite.  *See* Mot. at 10–12.  Most significantly, in *Coleman*, the state senators' votes "would have been sufficient to defeat

ratification" if they were correct that the Lieutenant Governor were not authorized to cast the deciding vote. 307 U.S. at 438; *see also id.* at 441 (plaintiffs' votes "would have been decisive"); *id.* at 446 (same); *see also Raines*, 521 U.S. at 822 (highlighting *Coleman*'s repeated emphasis on that point). That fact was dispositive: "*Coleman* stands (at most . . .) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823. Here, Plaintiffs do not allege that they have the necessary majorities in both Houses to enact a legislative response to the President's perceived acceptance of foreign emoluments. That alone renders *Coleman* inapposite.[1] *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652, a state legislature case Plaintiffs cite for the proposition that the denial of future opportunity to vote could constitute vote nullification, *see* Opp'n at 8, likewise does not help Plaintiffs because the challenge there was brought by the legislature itself, rather than a minority group of legislators.

Similarly, Plaintiffs have no response to the President's showing that "the federal constitutional separation of powers concerns that underlay . . . *Raines* (and which [the D.C. Circuit] emphasized in *Chenoweth*) were not present [in] . . . *Coleman*." *Campbell*, 203 F.3d at 22. Indeed, in finding the state legislature to have standing in *Arizona State Legislature*, the Supreme Court emphasized that whereas "a suit between Congress and the President would raise separation-of-powers concerns," the case before it "d[id] not touch or concern the question whether Congress has standing to bring a suit against the President." 135 S. Ct. at 2665 n.12.

---

[1] Plaintiffs also argue that their minority status is irrelevant because they were denied the opportunity to cast a vote in the first place. *See* Opp'n at 21 n.12. But that theory lacks merit. First, unlike the plaintiffs in *Coleman*, Congress can still choose to vote on the emoluments issue, so the only obstacle to Plaintiffs' casting their votes is their (numeric) inability to bring legislation to a vote. Second, the argument suggests that a minority of legislators can properly claim vote nullification and have standing to sue, so long as no vote had actually occurred. Plaintiffs' authority for this (extraordinary) proposition is *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir. 1979) (en banc), *vacated*, 444 U.S. 996 (1979), which, as discussed below, is sharply undercut by more recent authority and its discussion of the separation of powers.

Because "[a] separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators," *Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977), *Coleman* and *Arizona State Legislature* are necessarily inapposite.

Nor do Plaintiffs offer any serious response to the fact that *Coleman*'s finding of vote nullification was premised on the irreversible nature of an amendment to the Federal Constitution. *See* Mot. at 10–11. As the *Campbell* court explained, once the amendment was deemed ratified by the state, the senators in *Coleman* had "no legislative remedy" to reverse it in the future. *Campbell*, 203 F.3d at 22–23. Similarly, in *Arizona State Legislature*, the challenged state initiative would have removed redistricting authority from the state legislature entirely and "'completely nullif[ied]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan." 135 S. Ct. at 2665 (quoting *Raines*, 521 U.S. at 823–24); *see also Raines*, 521 U.S. at 824 (the challenged Line Item Veto Act will not "nullify [plaintiff Members'] votes in the future in the same way that the votes of the *Coleman* legislators had been nullified"). But here, Congress may still choose to vote on the emoluments issue or take other legislative measures. *Coleman* and *Arizona State Legislature*, therefore, are no help to Plaintiffs.

### C.     Pre-*Raines* D.C. Circuit Precedent Does Not Help Plaintiffs.

Plaintiffs also argue that they have standing under two early D.C. Circuit cases: *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1970), and *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir. 1979) (en banc), *vacated*, 444 U.S. 996 (1979). *Kennedy* held that a Senator had standing to challenge the President's pocket veto of legislation that Congress had approved because the veto diminished congressional influence in the legislative process. 511 F.2d at 435. And *Goldwater* held that several Senators had standing to challenge the President's termination of a mutual defense treaty with Taiwan because the President's action had denied the Senate the opportunity to vote on whether to prevent the termination of the treaty. 617 F.2d at 702.

Those arguments are unavailing. As the D.C. Circuit later explained in *Chenoweth*, *Kennedy* and *Goldwater* were decided before "the Supreme Court began to place greater emphasis upon the separation of powers concerns underlying the Article III standing

7

requirement." *Chenoweth*, 181 F.3d at 114.  They were also decided before the D.C. Circuit

began, over three decades ago, to dismiss suits by Members of Congress against the Executive as

an exercise of equitable discretion in order to avoid "interfering in disputes arising out of the

legislative process when a political remedy is available from within that process." *Id.*  During

the period between *Kennedy*/*Goldwater* and *Raines*, a finding that Members had standing to sue

often would "[get] them into court just long enough to have their case dismissed because of the

separation of powers problems it created."  *Id.* at 115 (discussing *Moore v. U.S. House of

Representatives*, 733 F.2d 946, 956 (D.C. Cir. 1984)); *see also Riegle v. Federal Open Market

Committee*, 656 F.2d 873, 881 (D.C. Cir. 1981) (finding a Senator to have standing to challenge

the deprivation of the Senate's advice-and-consent role in the Executive's appointment of

officers under the Appointments Clause, but nonetheless dismissing his suit because "[w]here a

congressional plaintiff could obtain substantial relief from his fellow legislators . . . this court

should exercise its equitable discretion to dismiss the legislator's action").  If that regime were

still in force, as Plaintiffs seem to contend, their own suit would similarly merit dismissal under

an exercise of this Court's equitable discretion; Plaintiffs, too, could obtain substantial relief

from their fellow legislators.

But *Raines* rejected the D.C. Circuit's two-step approach, thus "requir[ing]" the court "to

merge [its] separation of powers and standing analyses."  *Chenoweth*, 181 F.3d at 116.  As

*Raines* held, "the law of Art. III standing is built on a single basic idea—the idea of separation of

powers."  521 U.S. at 820.  That is, "the availability of effective political remedies goes to the

very heart of the standing analysis."  *Kucinich*, 236 F. Supp. 2d at 11.  After *Raines*, Members of

Congress claiming to be deprived of their legislative role can no longer claim to have standing

under pre-*Raines* D.C. Circuit cases: "*Raines* leaves no room for the broad theory of legislative

standing that [the D.C. Circuit] adopted in *Moore* and *Kennedy*."  *Chenoweth*, 181 F.3d at 117.[2]

---

[2] *Chenoweth* did recognize that *Kennedy* "may survive a peculiar application of the narrow rule
announced in *Coleman*" because the challenged pocket veto had made ineffective a bill that
"both houses of the Congress had approved."  *Chenoweth*, 181 F.3d at 116–17.  However,

Following *Raines*, it cannot seriously be contended that individual Members have standing to sue whenever the Executive takes an action purportedly without complying with a constitutional mandate to first seek the consent of Congress.[3]  Moreover, "[t]he Supreme Court has observed that individual members of Congress cannot represent the interests of an entire House or all of Congress."  *Kucinich*, 236 F. Supp. 2d at 11 (collecting cases); *see also Raines*, 521 U.S. at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action."); *Kucinich*, 236 F. Supp. 2d at 11 ("a group of congressmen bringing suit in court, purportedly to protect Congress's interests, must first have the authority to represent the interests of Congress, the House of Representatives, or the Senate").  Here, Congress has not expressed its view about the emoluments issues, and Plaintiffs may not bypass the prescribed legislative process to do so.

**D.     The President Has Not Denied Plaintiffs' Right to Vote and Plaintiffs Have Ample Legislative Remedies to Address Their Alleged Injuries.**

Plaintiffs make several additional arguments in support of their standing, but none has merit.  First, Plaintiffs argue that because the Foreign Emoluments Clause gives Congress a

---

because the Representatives in *Chenoweth* "d[id] not allege that the necessary majorities in the Congress" voted to block the challenged Executive program, "even if *Kennedy* is still viable after *Raines*," the Court made clear that "it cannot bear the weight the Representatives would place upon it."  *Id.* at 117.  The same is true here.

[3] The other pre-*Raines* D.C. Circuit cases Plaintiffs rely on are similarly unavailing.  For example, Plaintiffs are wrong that *Goldwater* "remains binding Circuit precedent."  Opp'n at 7 n.2.  The Supreme Court vacated the D.C. Circuit's judgment and remanded the case with directions to dismiss the complaint.  *Goldwater v. Carter*, 444 U.S. 996 (1979).  "Of necessity [the] decision 'vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect . . .'"  *Los Angeles Cty. v. Davis*, 440 U.S. 625, 647 n.6 (1979) (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 577–78 n.12 (1975)).  Moreover, although there was no majority opinion in the Supreme Court, *Goldwater*'s concurring opinions underscore that the Judiciary should not mediate a dispute between the political branches where, as here, one of the branches has not spoken.  *See, e.g.*, 444 U.S at 996 (Powell, J., concurring); *id.* at 998 (Brennan, J., concurring); *see also id.* at 1003 (Rehnquist, J., concurring).  Likewise, it is doubtful that *American Federation of Government Employees v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982), remains good law after *Raines*, *Chenoweth*, and *Campbell*.  But even if it does, that case concerned injuries "unique to members of the Appropriations Committees."  *Id.* at 305.

"unilateral power that it can wield by *not* acting—by failing to approve an emolument," Opp'n at 19, the President deprives them of that power when he acts without first obtaining consent, *see id.* at 20.  But Plaintiffs' alleged injury is their inability to vote on measures relating to the President's supposed acceptance of prohibited emoluments.  They can redress that injury by convincing their colleagues to act.  Indeed, many of the Plaintiffs were sponsors of bills that would have either declared that the President potentially has violated the Foreign Emoluments Clause, *see* S. Con. Res. 8, 115th Cong. (2017), or withheld consent for the President's alleged violations of the Clause, *see* H.R.J. Res. 26, 115th Cong. (2017).  In circumstances such as these, "the alleged cause of [the minority legislators'] injury is . . . the actions of their own colleagues in Congress." *Raines*, 521 U.S. at 829 n.11.

Plaintiffs also argue that a legislative option would be inadequate because it "would require a majority of Congress to act in *disapproval* of President Trump's conduct, instead of requiring him to garner a majority willing to *approve* his conduct," and any proposed bill would be subject to the President's veto power.  Opp'n at 25, 26 & n.14 (emphasis in original).  But if Plaintiffs' alleged injury is really that they are deprived of the option not to vote at all, then they cannot rely on the *Coleman* vote nullification theory because neither *Coleman* nor any other case Plaintiffs cite recognizes such a purported injury.  And if the injury Plaintiffs allege is the deprivation of their prerogative to vote on the emoluments issues, the reasoning of *Raines*, *Chenoweth*, and *Campbell* refute the proposition that the political remedies must put the plaintiff Members back in the same position as if the Executive had not caused the alleged injury in the first place.  Those cases concluded that Members of Congress lacked standing even though Congress would be forced to take action that, according to those plaintiffs, need not be taken at all if Congress's legislative prerogatives had been honored.  *See, e.g.*, *Raines*, 521 U.S. at 82 (plaintiff Members of Congress had "adequate remedy" because "they may repeal the [challenged] Act or exempt appropriations bill from its reach"); *Campbell*, 203 F.3d at 23 ("Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav

campaign" and "always retains appropriations authority and could have cut off funds for the American role in the conflict.").

Plaintiffs also argue that *Raines*, *Chenoweth*, and *Campbell* are distinguishable because the Congresses at issue in those cases could take direct action on the very Executive action the Members were challenging by, for example, passing future legislation on the subject or denying funding for the challenged Executive program. Opp'n at 22–23. But here, too, Congress could undertake legislative actions with respect to the alleged emoluments. In fact, Congress is far better equipped than the courts to assess whether particular arrangements violate the Foreign Emoluments Clause and, if so, how best to address the violation. Congress has, for example, previously enacted various statutes relating to the Clause. *See* Mot. at 33–34. And contrary to Plaintiffs' argument, *see* Opp'n at 28 n.15, Congress could also take action on matters not directly related to emoluments issues as part of its give-and-take with the President. *See Kucinich*, 236 F. Supp. 2d at 10 (noting that in resolving its dispute with the President about treaty termination, Congress could, among numerous other political options, "refuse to fund unrelated matters that were important to the President, or even reduce budgets for the Executive Branch; the Senate could reject presidential nominees, or could refuse to provide consent to enter into other treaties submitted by the President"). Not only are political remedies "part of the fabric of *Raines*," *id.* at 10, but the Framers intended only political means for redressing a President's violation of the Foreign Emoluments Clause, *see* Mot. at 17.

Plaintiffs further argue that "Congress cannot vote on whether to give its consent to emoluments it does not know about." Opp'n at 19. But Congress clearly could vote on a joint resolution that provides what Congress perceives to be the proper definition of an emolument and prohibits any and all emoluments, including ones unknown to Congress. Moreover, the suggestion that Congress is incapable of performing its legislative function is simply wrong. *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975), *Watkins v. United States*, 354 U.S. 178, 200–01 (1957).

For the foregoing reasons, Plaintiffs have failed to establish their standing at the pleading stage, and accordingly the Court should dismiss the case for lack of jurisdiction.

## II.    PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE FOREIGN EMOLUMENTS CLAUSE AND EQUITY REQUIRES DISMISSAL.

The President's Motion (at 14–17) also demonstrated that Plaintiffs lack a cause of action under the Foreign Emoluments Clause and that equity counsels against this Court granting relief in this case because, among other reasons, Plaintiffs' claim does not fall within the zone of interests of the Clause.  Plaintiffs' response has no merit.

Plaintiffs argue that the Foreign Emoluments Clause is a "self-executing limitation" on the conduct it prohibits, thus permitting suits for equitable relief.  But the case Plaintiffs cite, *Dennis v. Higgins*, 498 U.S. 439 (1991), does not speak to the circumstances when an equitable cause of action may be inferred from a constitutional provision; instead, it describes the substantive, constitutional basis for the dormant Commerce Clause doctrine.  *Id*. at 447; *see also South Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984) (recognizing that "the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce").  Moreover, the observation from *Dennis* that Plaintiffs rely on was made in the context of analyzing whether the Commerce Clause claim could be pursued at all under 42 U.S.C. § 1983's express cause of action.  It did not address whether plaintiffs with alleged injuries from a dormant Commerce Clause violation that are *unrelated to the purposes* of the Clause could nevertheless invoke § 1983, much less an implied equitable cause of action.  *Dennis*, 498 U.S. at 447, 450–51.

Equally unavailing is Plaintiffs' reliance on cases such as *Bond v. United States*, 564 U.S. 211, 223 (2011), and *LaRoque v. Holder*, 650 F.3d 777, 793 (D.C. Cir. 2011), where Congress allegedly exceeded the limits on its legislative power in a manner that exposed the plaintiffs to injurious regulation (either as a criminal defendant subject to an allegedly unconstitutional criminal statute or as a political candidate forced to run under a more burdensome electoral regime).  Here, by contrast, the President's alleged receipt of foreign emoluments does not

expose plaintiffs to regulation at all, and the Foreign Emoluments Clause's limits were not meant to protect Congress, let alone individual legislators.

Plaintiffs also imply that the zone-of-interests test no longer applies after the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). In *Lexmark*, however, the Court did not abrogate the zone-of-interests test; it merely held that the zone-of-interests test is not an issue of prudential standing but a way "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." 134 S. Ct. at 1387. The Court noted that a statute ordinarily provides a cause of action "only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 1388; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302–03 (2017). Likewise, plaintiffs whose alleged interests fall outside the zone of interests of a *constitutional* provision ordinarily lack a right to sue, and *Lexmark* does not purport to overrule prior Supreme Court precedent so holding. *See* Mot. at 16; *see also, e.g.*, *DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.*, 887 F.2d 275, 291, 299 (D.C. Cir. 1989) (First Amendment claim). Indeed, even if *Lexmark* were in tension with that prior precedent, the Supreme Court has repeatedly admonished that lower courts must continue to follow its precedent despite such tensions unless and until it overturns them. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997). Given all this, it is unsurprising that, post-*Lexmark*, courts continue to apply the zone of interests test to constitutional claims. *See, e.g.*, *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105, 110 (3d Cir. 2015) (affirming dismissal of Tonnage Clause claim); *Coal. for Competitive Elec., Dynegy Inc. v. Zibelman*, ---F. Supp. 3d---, No. 16-cv-8164, 2017 WL 3172866, at *19–*21 (S.D.N.Y. July 25, 2017) (dismissing dormant Commerce Clause claim), *appeal filed*, Aug. 25, 2017. Here, Plaintiffs' claim that they have been deprived of legislative prerogatives as Members of Congress is at most "marginally related" to the Foreign Emoluments Clause's purpose of guarding against foreign influence. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 394, 399 (1987). Accordingly, Plaintiffs are outside of the Clause's zone of interests, which counsels against this Court's exercise of its equitable power.

### III.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM.

#### A.     Plaintiffs' Interpretation of the Text of the Foreign Emoluments Clause is Overbroad and Unreasonable.

The President's opening brief showed that Plaintiffs' interpretation of the Foreign Emoluments Clause is overly broad, encompassing "anything of value and any benefits, monetary or nonmonetary," that may be received by a federal official from a foreign government regardless of context.  Instead, in light of the common usage in the founding era and thereafter, the term "Emolument" in the Foreign Emoluments Clause refers to a "profit arising from an office or employ"—essentially, profit from labor—and that this definition fits most appropriately within the context of the Clause and its usage by the founders.  Mot. at 18–23.  Specifically, this definition fits harmoniously with the other prohibited categories in the Clause, which are all things conferred or bestowed on the officeholder personally.  *See id.* at 22–23 (applying the doctrine of *noscitur a sociis*).  Moreover, this reading avoids rendering any portion of the Clause superfluous, while Plaintiffs' definitions of "present" and "Emolument" contain substantial redundancies.  *See id.* at 23–25.  Indeed, given their overly broad interpretations of both terms, Plaintiffs are unable to differentiate between the two categories and offer only a collective definition of "Emolument" and "present," contending that some of the challenged benefits fall under both of these headings.[4]  Plaintiffs' various rejoinders are unpersuasive.

1. Plaintiffs first argue that their proposed definition of "Emolument" comports with the original public meaning, citing examples of usage of that definition in founding-era documents. *See* Opp'n at 30, 31, 33.  They also cite an article that found that the President's proposed definition appears in "only 8%" of the forty dictionaries catalogued for the period of 1604 to

---

[4] Plaintiffs also err in contending that profits arising from the commercial transactions alleged in the complaint may also constitute "presents" under the Foreign Emoluments Clause.  Opp'n at 39 n.25.  Not only does that interpretation render the terms "present" and "Emolument" redundant, but it defies a common sense understanding of "present."  As the President's Motion showed, a prohibited "present" is "something bestowed on another without price or exchange," and cannot naturally be read to include benefits arising from commercial transactions or accruing by operation of law.  *See* Mot. at 24–25.  Thus, for example, trademarks received by an official from a foreign government would not be "presents."

1806.  *Id.* at 33 (citing John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at 8 (July 9, 2017) ["Mikhail Article"], https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693).  That mechanical counting of dictionaries is unpersuasive.  "It is a fundamental canon of statutory construction" that a term "cannot be construed in a vacuum" but "must be read in [its] context."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("oftentimes the meaning—or ambiguity—of certain words or phrases may only become evident when placed in context") (citation omitted).  Here, even Plaintiffs do not dispute that the President's proposed definition existed during the founding era.  Thus, the relevant question is not how many sources cite one of the two available definitions, but rather which of those definitions should be applied in the context of a constitutional restriction on federal officeholders.  As previously demonstrated (Mot. at 18–32), the context provided by the Constitution—read in concert with the history of the Foreign Emoluments Clause and founding-era practices—shows that Plaintiffs' reading of the term "Emolument" to encompass "anything of value" is meritless.

In any event, Plaintiffs' reliance on the Mikhail article is misplaced given the article's limitations for the interpretive task here.  The article's conclusions have been criticized as "based on inaccurate assumptions about [founding-era] dictionaries and about the semantic inquiry at hand."[5]  First, the article fails to account for context or for frequency of usage.  As a more thorough treatment found, in instances where "the recipient of the emolument is an officer, regardless of the corpus [of documents analyzed], the narrower sense of *emolument* is the one overwhelmingly used."[6]  Second, the article accords an ahistorical precision to dictionary entries.  Lexicographers of the time "could not and did not engage in a systematic attempt to discern all of

---

[5] *See* James Phillips & Sara White, *The Meaning of Emolument(s) in 18th-Century American English: A Corpus Linguistic Analysis*, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938, at 13.

[6] *Id.* at 38.

the meanings of words."[7]  Thus, founding-era dictionaries may not have recorded all meanings of the words listed, but rather, may have simply chosen to include the broadest meaning that would encompass the other meanings.[8]  Similarly, dictionaries may have copied one another, rendering a simple tallying of definitions across sources misleading.[9]  And, in any event, founding-era dictionaries also were generally more prescriptive about how language *should* be used, rather than descriptive of how it was actually used at the time.[10]

Moreover, both the Mikhail article and its underlying sources ultimately provide support for the President's position.  Indeed, the dictionaries cited in Mikhail's article demonstrate that the President's definition is closely related to the etymology of emolument, which is profit from labor, or more specifically, from grinding corn.[11]  As confirmed by these dictionaries, the term "emolument" derives from the Latin "emolumentum," *see* Mikhail, *supra*, at A-6–A-9, nos. 4, 11, 15, 21, 23, 35, which was the combination of "mola," meaning "a mill," and "emole," meaning "to grind thoroughly," *id.* nos. 15, 35.  Excerpts from six of the dictionaries cited by Mikhail thus include variations of the definition of "profit gotten properly by grist; hence, by any labor and cost," *id.* no. 15; *see also id.* nos. 5, 7, 8, 11, 15, 35.  By focusing narrowly on dictionaries that define "emolument" as "profit arising from office or employ," Plaintiffs ignore

---

[7] *See* Gregory E. Maggs, *A Concise Guide to Using Dictionaries from the Founding Era to Determine the Original Meaning of the Constitution*, 82 Geo. Wash. L. Rev. 358, 371 (2014).

[8] *Id.*

[9] *See, e.g.*, Allen Reddick, *The Making of Johnson's Dictionary, 1746–1773*, at 11 (1996); Maggs, *supra* note 7, at 382.

[10] Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L. Rev. 227, 242 (1999).

[11] Walter W. Skeat, *An Etymological Dictionary of the English Language* 189 (1888) (emolument: "profit, what is gained by labour"); *The Barnhart Dictionary of Etymology* 326 (1988) (emolument: "*n.* profit from an office or position.  1435, *in Proceedings of the Privy Council*; borrowed through Middle French *émolument*, and directly from Latin *émolumentum* profit, gain, (originally) payment to a miller for grinding corn, from *émolere* grind out (*é*-out + *molere* to grind; see MEAL grain)"); *The Oxford Dictionary of English Etymology* 310 (1966) (similar).

16

these etymologically rooted definitions and significantly understate the percentage of dictionaries containing a definition supporting the President's position.  Also, the Oxford English Dictionary removes any doubt that the President's proposed definition is historically rooted.  The OED lists each definition in the order it appeared in the English language to "illustrate the word's development over time."[12]  It lists the President's definition of "emolument" first, before the broader one proposed by Plaintiffs.  Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242.

2.  Plaintiffs next argue that even if the President's proposed definition of "profit arising from office or employ" were the correct interpretation, there is no legitimate basis to limit "Emoluments" to benefits received for services rendered.  *See* Opp'n at 32–33.  As discussed above, however, the provision of personal service or labor is rooted in the very origin of the word "emolument," given its etymology relating to profits arising from labor.  The President's opening brief also cited many historical sources and legal interpretations for the proposition that "Emolument" refers to "every species of compensation or pecuniary profit derived from a discharge of the duties of the office," Mot. at 19 (citation omitted), and relates "to commissions and employments; intimating, not only the salaries, but, all other perquisites," *id.* at 22 (quoting 1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* 154–55 (1766)).[13]

Plaintiffs attempt to salvage their reliance on their favored historic definition by arguing that a "miller was not an employee of those who came to use his mill, nor did he hold a public office[,]" and that profit obtained by "labor and cost "requires no employer-employee

---

[12] Oxford University Press, *Guide to the Third Edition of the OED*, OED Online; *see also* 1 *Oxford English Dictionary* xi (1st ed. 1884) (stating that a definition is "placed first which was actually the earliest in the language: the others follow in the order in which they appear to have arisen").

[13] Plaintiffs argue that this source by Trusler is simply a founding-era thesaurus and is unpersuasive.  Opp'n at 33 n.22.  The source, however, has been cited by the Supreme Court as a source of founding-era interpretation.  *See District of Columbia v. Heller*, 554 U.S. 570, 581–82 (2008).

relationship or the holding of an office."  Opp'n at 33–34 n.23.  This response is beside the point.
The definitional issue concerns what the term emolument historically meant, and the etymology
of the term ties profit to the work or service of the person receiving the profit.  Moreover, the
analysis advanced by the President here does not rigidly depend on a formal employer-employee
relationship or the holding of an office.  The point, simply, is that an emolument—even defined
as a "profit"—concerns compensation for labor, which could be through work performed while
occupying an office or through an employee-like relationship to perform a particular task or job.
*See* Oxford University Press, *Employ*, OED Online (Mar. 2014), http://www.oed.com/view/
Entry/61368 (citing earliest definitions of the word "employ" as referring to employment to
"perform a task" or "job"); *see also* Mot. at 21 (discussing example of benefits arising from
providing consulting services to a foreign government as emoluments).  In either case, there is an
office- or service-related connection that Plaintiffs' "anything of value" theory disregards. [14]

3. Plaintiffs further argue that the phrase "of any kind whatever" in the Clause compels
their broader definition of "Emolument."  The President showed in his opening brief (at 37–38)
that the phrase merely emphasizes the Clause's reach—every kind of emolument, present, office,
or title—and is not a basis to choose which definition of emolument most appropriately applies.

---

[14] Plaintiffs argue that the opinions of the Office of Legal Counsel and the Comptroller General
"have not required a relationship akin to an employment relationship."  Opp'n at 40.  As fully
demonstrated in the President's opening Motion (at 34–36,) the President's position is not
inconsistent with the conclusions of all published OLC and Comptroller General opinions.
While those opinions do not specifically require an employment-like relationship in assessing the
meaning of "Emolument," the facts underlying each opinion already involved such an
employment relationship.

Similarly, Plaintiffs cite the Comptroller General's opinion concerning an Air Force officer who
was precluded from receiving an award from the Colombian government for turning over
information leading to the recovery of contraband.  *See To the Secretary of the Air Force*, 49
Comp. Gen. 819, 819 (1970).  Plaintiffs argue that "the officer's lack of an employment (or
'equivalent') relationship with the [Colombian] government was irrelevant."  Opp'n at 40.  But
Plaintiffs have things backwards; the opinion they point to was predicated on the fact that the
reward was for the officer's rendering of a service while the officer was temporarily attached to
the Colombian government's Air Force for training purposes.  For that reason, the opinion is
consistent with the President's understanding of the Foreign Emoluments Clause.

Indeed, founding era government officials were compensated in a number of different ways, including fees for services rendered; commissions; shares of fines, penalties, and forfeitures; the usage of horses; pay for servants; and, in some instances, salaries.  *Id*. at 19.  The phrase "of any kind whatever" ensures that all are captured by the Clause.

In response, Plaintiffs argue that the emphasis is already supplied by the Clause's prohibition on the receipt of "*any* . . . Emolument" and that the President's interpretation would therefore make "of any kind whatever" a surplusage.  But if that were the case, Plaintiffs' interpretation would also be a surplusage.  The more plausible role of this first use of the word "any" in the Clause is numeric—that *no* prohibited emoluments may be received by a covered official without the consent of Congress, whereas the phrase "of any kind whatever" operates to ensure that every *type* of the identified compensation is also prohibited.  There is no redundancy in this interpretation.

4.  Plaintiffs' contention that the Incompatibility Clause, which also contains the term "Emolument," bolsters their reading of the scope of the Foreign Emoluments Clause is similarly meritless.  The Incompatibility Clause provides that no member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office . . . the Emoluments whereof shall have been encreased during such time."  U.S. Const. art. I, § 6, cl. 2.  According to Plaintiffs, by referencing "the Emoluments whereof," the text specifies an office-related definition of emolument, whereas the Foreign Emoluments Clause includes no such limitation.  Opp'n at 35.  To the contrary, the Incompatibility Clause actually serves to underscore that the term "Emolument" in the Constitution refers to compensation for service in an office.  The term is not properly read to have distinct meanings in different provisions of the Constitution.  And the fact that a reference to an office is not included in the Foreign Emoluments Clause is simply due to the fact that the Foreign Emoluments Clause has a broader reach—it regulates not only compensation or benefits arising from holding federal office but also any employment-like relationship between a foreign government and a covered official.

Indeed, the only other instance where the term "Emolument" is used in the Constitution, the Domestic Emoluments Clause, also refers to the benefits associated with an office or employ. *See* U.S. Const. art. II, § 1, cl. 7 ("The President shall, at stated Times, receive for his Services, a Compensation . . . and he shall not receive within that Period any other Emolument from the United States, or any of them."). Again, it makes little sense that the term "Emolument" would have different meanings throughout the Constitution, when all three clauses in which the term appears are tied to holding office and regulate the conduct of officeholders.

### B.    The Purpose of the Foreign Emoluments Clause Does Not Compel Plaintiffs' Broad Reading.

Plaintiffs argue that the Court must adopt their broad reading of the Foreign Emoluments Clause to effectuate the Clause's purpose of protecting against undue influence by foreign governments. *See* Opp'n at 39–40. According to Plaintiffs, the President's interpretation would "defeat the Clause's purpose." *Id.* at 36. Plaintiffs are wrong.

To begin with, "no law pursues its purpose at all costs, and . . . the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations." *See Kucana v. Holder*, 558 U.S. 233, 252 (2010). The fact that the Framers were concerned about foreign influence, therefore, does not necessarily lead to the conclusion that the Foreign Emoluments Clause must be read in such an expansive way to include private business pursuits by officeholders. Indeed, while the Framers weighed concerns that public officials would be influenced by pecuniary inducements, it was common at the time for federal officials to have private business pursuits, and yet the Framers said nothing about requiring officials to divest their private commercial interests in order to assume federal office. *See* Mot. at 27–28. Moreover, the President's reading also serves the Clause's purpose of preventing foreign influence and corruption by determining whether the President's personal service or official conduct is actually at issue in a transaction.

As for Plaintiffs' contention that the President otherwise would profit from foreign government transactions were the President's interpretation correct, Opp'n at 38–40, the

argument is circular.  The Foreign Emoluments Clause is not a comprehensive conflict of interest provision covering every conceivable type of activity that may raise an appearance of impropriety.  Instead, it specifically identifies four categories of benefits that officeholders may not accept, each of which has different characteristics.  And Plaintiffs are wrong that the President's interpretation would turn the Clause into a "mere bribery law."  Opp'n at 41.  Under the President's theory, the prohibition on the receipt of emoluments is not limited to official capacity actions, but reaches an official's personal conduct as well, prohibiting foreign government compensation for services rendered in an employment-like setting.  Mot. at 18, 21.

### C.   History Refutes Plaintiffs' Interpretation of the Clause, as Do the Absurd Results That Would Flow From the Interpretation.

The President's Motion also showed that his interpretation is consistent with the practices of early Presidents and that such practices contradict Plaintiffs' interpretation.  Mot. at 28–31.  For example, the Motion put forth evidence of President George Washington purchasing public land from the Federal Government as a private citizen without any concerns about violating the analogous Domestic Emoluments Clause and also proffered evidence of early Presidents engaging in commerce and exporting their farm products overseas without any emoluments concerns.  Plaintiffs offer no serious response to this showing.

First, Plaintiffs have no response to the Washington example, a telling omission because Washington's action in transacting business with the Federal Government as a private citizen undermines Plaintiffs' interpretation of the term "Emolument."  Yet, President Washington's actions have been accorded great weight in constitutional interpretation, *see* Mot. at 31, and the Supreme Court has also taught that "significant weight" must be placed on "historical practice," *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014), including on "contemporaneous practice by the Founders themselves," *Mistretta v. United States*, 488 U.S. 361, 399 (1989).  Plaintiffs' definition of "Emolument" is unmoored from this historical practice.

Plaintiffs argue, however, that the President has not put forth evidence clearly indicating that the early Presidents actually sold their farm products to foreign governments.  But while the

extant farm records of those early Presidents are limited and inconclusive on the question, there is no question that private business pursuits by federal officials, including by early Presidents, were common at the time of the Nation's founding.  It is reasonable to infer that at least some of their transactions may have been with foreign or domestic government actors, including foreign state-chartered trading companies.  Given this possibility, it is also telling that there is an absence of any concerns being raised about possible emoluments violations by Presidents if they were to transact business with foreign or domestic government instrumentalities.

That the Foreign Emoluments Clause was not intended to prohibit such transactions is further confirmed by the historical incident of the proposed 1810 constitutional amendment, which would have extended the Clause's prohibitions to all citizens.  If Plaintiffs' definition of "Emolument" were correct, the amendment would have precluded all citizens from transacting business with any foreign government.  On this point, Plaintiffs note only that the proposed amendment ultimately was not ratified and that the amendment would have had harsh consequences in some circumstances under the President's interpretation as well.  But the proposed amendment enjoyed sweeping support in Congress—passing 19 to 5 in the Senate and 87 to 3 in the House—and 12 states ratified the amendment, only 2 states short of ultimate ratification.  Mot. at 32 & nn. 41–42.  Given such extensive support, the 1810 proposed amendment is additional strong historical evidence that the term "Emolument" did not have the broad meaning Plaintiffs propose.  And Plaintiffs' rejoinder concerning the harsh consequences of the amendment provides no support for their own interpretation, pursuant to which the proposed amendment would have caused substantially harsher consequences.

The President's Motion also showed that Plaintiffs' definition would have led to absurd results.  *Cf. South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 346 (1998) (construing statute to avoid an "absurd conclusion"); *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938) ("to construe statutes so as to avoid results glaringly absurd, has long been a judicial function") (citation omitted).  Under Plaintiffs' interpretation, the Clause would prohibit, for example, retired military officers from obtaining necessary permits or licenses while

living abroad, officeholders (including the President and Plaintiffs) from owning stock in companies conducting business globally, and even Presidents from owning Treasury bonds while in office under the analogous Domestic Emoluments Clause.  Mot. at 38–40.

Plaintiffs' only rebuttal is that certain benefits may be outside of the Clause's scope even though they are "Emoluments" within the meaning of the Clause because some benefits should not be deemed "accepted" "from" a foreign state as those terms are defined in the Clause.  *See* Opp'n at 34 n.24 (attempting to distinguish benefits arising from stockholdings on that basis). Even if Plaintiffs were correct, their theory still fails to explain the many benefits routinely accepted by government officials that are unquestionably "accepted" "from" a foreign state. There is no plausible basis offered, for example, to say that a retired military officer seeking a drivers' license or a permit to conduct business in a foreign country would not have "accepted" a benefit "from" a foreign government, and thus the logical result of Plaintiffs' theory is that such benefits are impermissible.  For these reasons, Plaintiffs cannot show that their proposed definition is a plausible meaning of the term "Emolument" in the Foreign Emoluments Clause.

**D.**    **Plaintiffs Do Not State a Claim Under the President's View of the Emoluments Clause.**

Finally, Plaintiffs argue that they have stated a claim even if the Foreign Emoluments Clause were viewed as the President has set forth.  *See* Opp'n at 32–33, 39 n.25.  According to Plaintiffs, even under the President's view, the proffered definition of the term "Emolument" would cover benefits arising from the President's "status as the head of a worldwide business empire."  *Id.* at 32; *id.* at 33.  Plaintiffs are wrong because, as previously explained at length, Mot. at 18–32, a prohibited emolument must arise in connection with an office or employ with a foreign government.  Merely owning an interest in a business does not create the kind of relationship governed by the Foreign Emoluments Clause.

Plaintiffs also contend that the President's understanding of the scope of the Foreign Emoluments Clause would cover alleged instances where a foreign government actor unilaterally seeks to influence the President through a commercial transaction with the President's

businesses.  Opp'n at 32–33.  Not so.  As explained above, an "Emolument" must be tendered in exchange for personal services rendered by the officeholder, in light of the term's original public meaning, including its etymological roots as compensation for labor.  The complaint contains no plausible allegations of such exchange and thus has failed to state any plausible claim.

Plaintiffs further assert that, under the President's theory, he has received prohibited "Emoluments" in the form of certain Chinese trademarks.  *See* Opp'n at 39 n.25.  But the complaint sets forth no plausible allegation that China awarded trademark protections to the President in exchange for the President's adherence to the United States' longstanding "One-China" policy.  Instead, Plaintiffs speculate about the Chinese government's motive in granting the trademark protections based on the timing of the trademarks' preliminary approval and the President's statement that he would adhere to the One-China policy.  Such speculative assertions are insufficient to state a claim.  *Cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564–69 (2007) (allegations of parallel conduct did not plausibly allege a conspiracy under antitrust law); *Ashcroft v. Iqbal*, 556 U.S. 662, 680–81 (2009) (conclusory allegations of intent were not entitled to presumption of truth and did not "plausibly suggest an entitlement to relief").

In sum, Plaintiffs have failed to state a claim upon which relief can be granted.

## IV.    THE RELIEF SOUGHT BY PLAINTIFFS WOULD BE UNCONSTITUTIONAL.

The President's Motion (at 41–43) also explained why this Court has no jurisdiction to issue the requested relief here because *Mississippi v. Johnson*, 71 U.S. 475, bars injunctions that run against the President himself in the exercise of his official duties.

Plaintiffs nevertheless argue that *Johnson* is inapplicable because compliance with the Emoluments Clause involves a purely ministerial duty.  Although *Johnson* did "le[ave] open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty," *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality op.), Plaintiffs' request for injunctive relief remains improper for at least two reasons.  First, this case does not involve a mere ministerial duty.  Were Plaintiffs' interpretation

of the Foreign Emoluments Clause correct, an injunction to require the President's compliance with the Clause would impose significant burdens on the President. The "judgment" and "planning" needed to ensure compliance can hardly be characterized as "ministerial." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

Second, even if the matters at hand could fairly be described as ministerial, this Court should still exercise utmost restraint in deciding whether to enjoin a sitting President. The Supreme Court has never done so, or even addressed the significant separation-of-powers concerns that would arise from such an injunction. Similarly, the D.C. Circuit recognized in *Swan* that it had "never attempted to exercise power to order the President to perform a ministerial duty" and that it is "painfully obvious" why courts should be "hesitant to grant such relief": doing so "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.* at 978.

Citing *Clinton v. Jones*, 520 U.S. 681, 694 (1997), Plaintiffs also argue that *Johnson* is inapplicable because their requested relief extends only to the President's private conduct. *See* Opp'n at 44. But *Clinton* was a personal capacity suit seeking to hold the President liable for conduct that took place prior to his taking office. Here, in contrast, Plaintiffs bring an official capacity suit based on the Foreign Emoluments Clause, which applies to the President only during his time in office. Moreover, the requested relief would effectively impose a condition on the President's ability to serve as President and to perform the duties he is duly elected to perform, implicating core "executive and political" duties. *Johnson*, 71 U.S. at 499.

## CONCLUSION

For the foregoing reasons and the reasons stated in his opening brief, the President respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

Dated:  November 21, 2017                Respectfully submitted,

                                         CHAD A. READLER
                                         Principal Deputy Assistant Attorney General

                                         BRETT A. SHUMATE
                                         Deputy Assistant Attorney General

                                         JENNIFER D. RICKETTS
                                         Director, Federal Programs Branch

                                         ANTHONY J. COPPOLINO
                                         Deputy Director

                                         /s/ *Jean Lin*
                                         JEAN LIN
                                         Special Counsel
                                         JAMES R. POWERS
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Ave. NW
                                         Washington, DC  20530
                                         Phone: (202) 514-3716
                                         Fax: (202) 616-8202
                                         Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2017, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's CM/ECF System.

_/s/ Jean Lin_
JEAN LIN