# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> Defendant. | Civil Action No. 17-cv-1154 (EGS) |

**BRIEF OF FORMER NATIONAL SECURITY OFFICIALS
AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Harold Hongju Koh
RULE OF LAW CLINIC
Yale Law School
127 Wall Street, P.O. Box 208215
New Haven, CT 06520-8215
203-432-4932
harold.koh@ylsclinics.org

Phillip Spector (D.C. Bar No. 479121)
MESSING & SPECTOR LLP
1200 Steuart St. #2112
Baltimore MD 21230
202-277-8173
ps@messingspector.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................ **iii**

**INTEREST OF AMICI CURIAE** .................................................................................. **1**

**ARGUMENT** ....................................................................................................................... **1**

    I.    The Foreign Emoluments Clause seeks to protect U.S. national security and foreign policy interests by requiring Congress' notice and approval of the President's private business dealings with foreign governments ........................................................................................ 4

    II.   A reading of the Foreign Emoluments Clause that encompasses private business dealings with foreign governments is essential to U.S. national security and foreign policy interests in the modern era. ........................................................................................ 12

**CONCLUSION** ................................................................................................................ **15**

**APPENDIX: List of *Amici Curiae*** .......................................................................... **17**
.

# TABLE OF AUTHORITIES

## CASES

*Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396 (2003).......................................................... 8

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) .................................. 8

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015) ....................................... 8

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 9, cl. 8.................................................................................................. 2

## STATUTES AND LEGISLATIVE MATERIALS

18 U.S.C. § 201 (2012) ......................................................................................................... 9

18 U.S.C. § 203 (2012) ......................................................................................................... 9

18 U.S.C. § 205 (2012) ......................................................................................................... 9

18 U.S.C. § 207 (2012) ..................................................................................................... 9, 10

18 U.S.C. § 208 (2012) ......................................................................................................... 9

18 U.S.C. § 209 (2012) ....................................................................................................... 12

18 U.S.C. § 219 (2012) ....................................................................................................... 10

18 U.S.C. § 210 (2012) ......................................................................................................... 9

18 U.S.C. § 211 (2012) ......................................................................................................... 9

22 U.S.C. § 612 ................................................................................................................... 10

37 U.S.C. § 908 ................................................................................................................... 15

5 U.S.C. § 7342 (2012) .................................................................................................. 12, 15

DAVID ROBERTSON, DEBATES AND OTHER PROCEEDINGS OF THE CONVENTION OF VIRGINIA (2d
  ed. 1805) (1788).............................................................................................................. 6

RECORDS OF THE FEDERAL CONVENTION OF 1787 (Max Farrand ed., 1911) ............................ 5, 6

**EXECUTIVE MATERIALS**

5 C.F.R. § 2635.502 (2017). ................................................................... 10

*Applicability of Foreign Emoluments Clause to Emp't of Gov't Emps. by Foreign Pub. Univs.*, 18 Op. O.L.C. 13 (1994). ............................................................. 6

*Application of Foreign Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Comm'n*, 10 Op. O.L.C. 96 (1986) .................................... 6, 7

*Applicability of the Emoluments Clause to Non-Government Members of ACUS,* 17 Op. O.L.C. 114 (1993) ................................................................... 6, 7

Brief for the United States as Amicus Curiae, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ....... 13

*Committee on Foreign Investment in U.S.: Process Overview*, U.S. Dep't of the Treasury (Dec. 1, 2010) ................................................................... 10

*FOCI FAQs*, U.S. Dep't of Def. ................................................................... 10

*Gifts from Foreign Prince-Officer-Constitutional Prohibition*, 24 Op. Att'y Gen. 116 (1902) ..... 7

*In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382 (1986) .......................... 7

Letter from Laurence H. Silberman, Acting Att'y Gen., to Howard W. Cannon, Chairman, Comm. on Rules and Admin., U.S. Senate (Sept. 20, 1974), .................................... 11

*Office of Overseas Prosecutorial Development Assistance and Training*, U.S. Dep't of Just. ..... 12

*To the Sec'y of the Air Force*, 49 Comp. Gen. 819 (1970) ............................................ 7

*The U.S. Global Anticorruption Agenda*, The White House (Sept. 24, 2015) ............................ 13

*U.S. Anti-Corruption Efforts*, U.S. Dep't of St. ................................................... 12

**OTHER AUTHORITIES**

*Annex to the Recommendation of the Council on OECD Guidelines for Managing Conflict of Interest in the Public Service*, Org. for Econ. Co-operation and Dev. (2003) ........................ 13

Clyde L. Grose, *Louis XIV's Financial Relations with Charles II and the English Parliament*, 1 J. Mod. Hist. 177, 200-01 (1929) ................................................................... 5

*Conflicts of Interest and the Presidency*, CRS Legal Sidebar (Oct. 14, 2016) ............................ 11

Jack Maskell, Cong. Research Serv., R43365, Financial Assets and Conflict of Interest Regulation in the Executive Branch (2014) ................................................................... 12

Lawrence Lessig, Republic, Lost: How Money Corrupts Congress—and a Plan To Stop It (2011) ................................................................................................ 5

Letter from George Washington to Robert Howe (Aug. 17, 1979) ................................ 4

Mary Dudziak, *Desegregation as a Cold War Imperative*, 41 Stan. L. Rev. 61 (1988) ............. 13

St. George Tucker, Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States (William Young Birch and Abraham Small, 1803) ................................................................ 5

The Association of the Bar of the City of New York, Special Committee on Congressional Ethics, James C. Kirby, Executive Director, Congress and the Public Trust (1970)............... 12

Theodoric Meyer and Matthew Nussbaum, *Trump Reports Assets of at Least $1.4 Billion in Financial Disclosure*, Politico (June 16, 2017) ........................................ 11

Zephyr Teachout, Corruption in America: From Benjamin Franklin's Snuff Box to Citizens United (2014) ................................................................................ 6

## INTEREST OF *AMICI CURIAE*[1]

Amici curiae are former national security, foreign policy, and intelligence officials who have worked at the senior-most levels of the U.S. government for Presidents of both major political parties. Through their decades of public service, amici are intimately familiar with the need for the Executive to act decisively, with one voice, on behalf of the nation. For the same reason, amici understand the critical importance of—and while in office sought scrupulously to obey—rigorous ethical rules to protect against undue influence in the national security and foreign policy making process.

Amici respectfully submit this brief to lend the Court their perspective on why such strict ethical standards are so important to the national security and foreign policy interests of the United States. The need for such standards supports reading the Foreign Emoluments Clause broadly enough to encompass private financial interactions with foreign governments. Such a reading would allow Congress to exercise its oversight to ensure that no foreign influences improperly interfere with American policy, in a manner that does not undercut, but rather supports the Executive's wise exercise of national security and foreign policy prerogative.

## ARGUMENT

Amici take no position on the facts of this case. But on this motion to dismiss, where Plaintiffs' factual allegations must be taken as true, the issue for decision is whether the facts alleged would make out an actionable claim under the correct legal reading of the Foreign

---

[1] Amici affirm that no counsel for any party authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than amici, their members, and counsel, contributed money that was intended to fund preparing or submitting this brief. The views expressed by Yale Law School's legal clinics are not necessarily those of the Yale Law School.

Emoluments Clause.  Plantiffs allege that the President has accepted something of value from a

foreign government without either notification of or approval by Congress.   If they can prove

that claim, then under the correct reading of the Foreign Emoluments Clause, they have stated a

claim upon which legal relief can be granted.  Amici write to address the significant national

security and foreign policy implications of this question.

The Foreign Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, declares that

> "No Title of Nobility shall be granted by the United States: And no Person
> holding any Office of Profit or Trust under them, shall, without the Consent of the
> Congress, accept of any present, Emolument, Office, or Title, of any kind
> whatever, from any King, Prince, or foreign State."

By so saying, the Framers sought to prevent the undue influence of foreign governments

in our national security and foreign policy.  The Foreign Emoluments Clause does not bar

foreign payments *per se*.  Instead, on its face, it defines a constitutional *process* to ensure that

U.S. policymakers act solely in the nation's interest by (1) requiring *notification* of and *approval*

by Congress prior to (2) *acceptance* of value from a foreign government (3) by the President or

other federal officials.

Defendant would substitute for this approach a much narrower rule that allows the

President to accept value from a foreign government in a broad sweep of cases without any

process at all, including either notification of or approval by Congress.  Defendant concedes only

that the President may not receive certain gifts or compensation for services rendered in an

official capacity or as an employee of a foreign government.  But the Defendant's overly narrow

reading would allow:  (1) without any congressional oversight whatsoever, (2) acceptance of

value from private business deals involving foreign governments or instrumentalities (3) by the

President or other federal official in a manner that adds to their personal enrichment.  The

Defendant's constricted reading of the Foreign Emoluments Clause to exclude private financial

dealings would undermine our existing national security and foreign policy process and eviscerate the Clause's prophylactic function.

Defendant's reading of the Foreign Emoluments Clause would give the President license to engage in a wide range of financial entanglements that could leave vulnerable even the most important national security and foreign policy interests of the United States.  The Defendant's reading would permit a nation that plays a central role in the balance of power in the Middle East, one of the most fraught regions for U.S. national security in the world, to curry favor with the President by purchasing real estate from one of his companies.  Their reading would allow a rising superpower with whom the U.S. is engaged in a wide range of sensitive security and trade relations to pursue an advantage by granting intellectual property benefits to the President immediately upon his taking office.  Defendant's reading would allow a nation with one of the largest economies in Latin America, a region with critical interests for the U.S. in areas ranging from oil to trade to immigration, to approve a regulatory deal that personally enriches the President.

These are not hypothetical examples, but rather, specific allegations in the Plaintiffs' complaint involving Saudi Arabia, China and Argentina.  As federal officials, we scrupulously avoided these sorts of private transactions with foreign governments, precisely because they would expose the U.S. to actual or perceived interference with U.S. national security and foreign policy. We also held the many government officials we supervised to the same standard.  And when we entered the Executive Branch with private financial holdings that could give rise to conflicts of interest, we: (a) fully disclosed those relations, including in the ethics and national security clearance process, (b) recused ourselves from participating in national security or foreign policy matters related to those interests, and (c) took steps to avoid even an appearance

of impropriety, including the foreswearing of income, (d) all unless we obtained a waiver or approval from the appropriate official under the appropriate laws and regulations. All of these were legal requirements that, however cumbersome, we understood were necessary and appropriate to fully safeguard our country's national security interests.

Allowing large streams of foreign government funds to go undisclosed and unreviewed would create a risk of undue influence through the entanglement of private funds and public decisions. It would undermine U.S. anti-corruption and good governance efforts around the globe as a key tenet of U.S. national security and foreign policy, and it would inject confusion and fragmentation into our diplomatic relations by allowing foreign officials multiple opportunities for leverage in our national security and foreign policy. Our security decisions should be based on national interest, not private gain; the venues for foreign policy and national security decision making should be embassies and diplomatic meetings, not corporate board rooms and private resorts; the means should be diplomatic engagement, not unreported financial relationships. The Framers of the U.S. Constitution wrote the Foreign Emoluments Clause precisely to protect these sound foreign policy practices. This Court should resist Defendant's efforts to gut it.

**I.      The Foreign Emoluments Clause seeks to protect U.S. national security and foreign policy interests by requiring Congress' notice and approval of the President's private business dealings with foreign governments.**

The Founders believed, in the words of George Washington, that "[f]ew men have virtue to withstand the highest bidder."[2]  They were especially concerned that foreign nations would use financial or other means to interfere in our national security and foreign policy decisions.

---

[2] Letter from George Washington to Robert Howe (Aug. 17, 1979), http://rotunda.upress.virginia.edu/founders/GEWN-03-22-02-0139.

Elbridge Gerry, a delegate to the Constitutional Convention, emphasized, "Foreign powers will intermeddle in our affairs, and spare no expence [sic] to influence them."[3]  Alexander Hamilton warned that "[f]oreign powers also will not be idle spectators.  They will interpose, the confusion will increase, and a dissolution of the Union ensue."[4]

    To guard against these very real dangers, the Framers of the U.S. Constitution developed the Foreign Emoluments Clause.  Delegate Charles Pinckney introduced the Clause with the explanation that it was meant to "preserve foreign Ministers & other officers of the U.S. independent of external influence."[5]  An influential early American edition of Blackstone's Commentaries described the motivation behind the Foreign Emolument Clause as follows: "Corruption is too subtle a poison to be approached, without injury.  Nothing can be more dangerous to any state, than influence from without, because it must be invariably bottomed upon corruption from within."[6]

---

[3] 2 RECORDS OF THE FEDERAL CONVENTION OF 1787, at 268 (Max Farrand ed., 1911).

[4] 1 *id.* at 285.  An elected president posed an even greater risk: Madison noted that a president, as opposed to a hereditary monarch, would lack "that permanent stake in the public interest which would place him out of the reach of foreign corruption."  1 RECORDS OF THE FEDERAL CONVENTION, *supra* note 3, at 138.  Even the British, however, were aware of the threat of external corruption:  After dissolving Parliament, Charles II received payments from France, which raised concerns among some about Britain's dependence on the French.  *See* LAWRENCE LESSIG, REPUBLIC, LOST: HOW MONEY CORRUPTS CONGRESS—AND A PLAN TO STOP IT 19 (2011); *see also* ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS, OF THE FEDERAL GOVERNMENT OF THE UNITED STATES (William Young Birch and Abraham Small, 1803) ("In the reign of Charles the second of England, that prince, and almost all his officers of state were either actual pensioners of the court France, or supposed to be under its influence . . . . The reign of that monarch has been . . . disgraceful to his memory."); Clyde L. Grose, *Louis XIV's Financial Relations with Charles II and the English Parliament*, 1 J. MOD. HIST. 177, 200-01 (1929) (noting that Charles II received funds from France after dissolving Parliament).

[5] 2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 3, at 389.

[6] ST. GEORGE TUCKER, *supra* note 4, at  295.

The leading historical incident that motivated the inclusion of the Foreign Emoluments Clause in the Constitution was the King of France's presentation of a snuff box to Benjamin Franklin and other U.S. envoys.[7]  These gifts focused America's attention on the need for constitutional guardrails on the ability of foreign powers to transfer items of value to influence U.S. national security.  Delegate Edmund Randolph would later explain, "if at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war."[8]  To address this concern, Randolph observed, "[i]t was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[9]

Consistent with this purpose, the Framers wrote a Foreign Emoluments Clause that is sweeping in its scope.  The broad constitutional language that emerged prohibited the acceptance by those holding offices of trust of emoluments "of any kind whatever".  The Justice Department's Office of Legal Counsel has interpreted the Clause to be "sweeping and unqualified"[10] and "directed against every kind of influence by foreign governments upon officers of the United States."[11]  Or as the Comptroller General has explained, "it seems clear

---

[7] *See* 3 RECORDS OF THE FEDERAL CONVENTION, *supra* note 3, at 327 n.1 (citations omitted); *see also* DAVID ROBERTSON, DEBATES AND OTHER PROCEEDINGS OF THE CONVENTION OF VIRGINIA 330-31 (2d ed. 1805) (1788) (recording Edmund Randolph's referring to a snuff box as the motivation for the Foreign Emoluments Clause); ZEPHYR TEACHOUT, CORRUPTION IN AMERICA: FROM BENJAMIN FRANKLIN'S SNUFF BOX TO CITIZENS UNITED (2014) 1-5, 23, 27 (2014) (discussing the French practice of giving snuff boxes to ambassadors and the concerns that generated).

[8] ROBERTSON, *supra* note 7, at 330-31 (1788) (recording the statement of Randolph).

[9] *Id.* at 330.

[10] *Applicability of Foreign Emoluments Clause to Emp't of Gov't Emps. by Foreign Pub. Univs.*, 18 Op. O.L.C. 13, 17 (1994).

[11] *Application of Foreign Emoluments Clause to Part-Time Consultant for the Nuclear*

from the wording of the constitutional provision that the drafters intended the prohibition to have the broadest possible scope and applicability."[12]

Two points about the Clause deserve special emphasis.  First, in their effort to protect the nation's security, the Framers never drew the line that Defendant would now draw between forbidden services rendered in an official or employee capacity versus permissible private business deals with a foreign government.  A President's public and private financial entanglements with a foreign government produce the same problems, which the Founders identified two centuries ago:  foreign governments will "spare no expense" to interfere in our national security and foreign policy decision-making, our enemies will exert "external influence" on our foreign ministers and other officials, and our allies will find their "mutual friendship" with us "diminished" by even the appearance of impropriety.  Yet the Defendant would have this Court believe that the Founders intended to prohibit a foreign nation from *giving* a snuff box to an ambassador, in order to protect against undue interference in our national security, but

---

*Regulatory Comm'n*, 10 Op. O.L.C. 96, 98 (1986) (quoting *Gifts from Foreign Prince-Officer-Constitutional Prohibition*, 24 Op. Att'y Gen. 116, 117 (1902)); *see also Application of Foreign Emoluments Clause to Part-Time Consultant*, 10 Op. O.L.C. at 98 ("Although no court has yet construed the Foreign Emoluments Clause, its expansive language and underlying purpose, as explained by Governor Randolph, strongly suggest that it be given broad scope."); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 122 (1993) (explaining that the Foreign Emoluments Clause purpose reflects the view that "[t]hose who hold offices under the United States must give the government their uncompromised loyalty" and "[t]hat judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government").  In addition to quoting Randolph, many of the opinions also cite a 1902 opinion in which the Solicitor General wrote, "[i]t is evident from the brief comments on this provision, and the established practice in our diplomatic intercourse that [the Foreign Emoluments Clause's] language has been viewed as particularly directed against every kind of influence by foreign governments upon officers of the United States, based on our historic policies as a nation." *Gifts from Foreign Prince-Officer-Constitutional Prohibition*, 24 OP. Att'y Gen. at 117 (emphasis omitted) (citations omitted).

[12] *To the Sec'y of the Air Force*, 49 Comp. Gen. 819, 821 (1970); *see also In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382, 385-86 (1986) ("We . . .  have concluded that this provision requires the broadest possible scope and application.").

intended to leave the foreign nation entirely free to *purchase* countless snuff boxes from that same ambassador (or the company he owns).

Second, the Founders created *a constitutional process* to implement their purpose: when the President chooses to accept something of value from a foreign government, the Clause does not ban the transaction outright. Rather, it simply requires the *consent of the Congress*. By so doing, the Clause strikes a thoughtful constitutional compromise, enabling Congress to protect against potential presidential abuse in the national security realm, without unduly restricting the President's ability to conduct national security affairs.

In our prior roles, amici have participated in countless urgent national security decisions in the national security, diplomatic, and intelligence spheres. Amici fully appreciate and acknowledge the need for the Executive to act expeditiously without congressional involvement to address urgent national security or foreign policy threats. But the President can claim no similar need to act without congressional participation when it comes to the ethical implications of his own private commercial transactions. This is not an area where the Executive must "speak . . . with one voice," *Am. Ins. Ass'n. v. Garamendi,* 539 U.S. 396, 424 (2003) (citations omitted), or where "secrecy" by federal officials is necessary or desirable, *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936). Nor is it an area where the President can credibly claim superior military or policy expertise, *id.*, or that he is "better positioned to take . . . decisive, unequivocal action," *Zivotofsky ex rel. Zivotofsky v. Kerry,* 135 S. Ct. 2076, 2086 (2015).

Instead, this is an area where the consultative process enshrined in the Foreign Emoluments Clause provides a critical, balanced check. It ensures that the Executive will exercise its national security and foreign policy authority solely for the nation's good. It enables Congress and the American people to evaluate whether foreign money has improperly influenced

otherwise opaque national security decision-making.  And it does so while ensuring that the President always coordinates our national security and foreign policy—if Congress refuses to grant its consent to a transaction of value involving a foreign government, the President cannot accept the transaction, but he can continue to engage in policy-making.  Indeed, this constitutional process is all the more important precisely because the President possesses such concentrated foreign policy powers.  To remove the consent of Congress from all cases involving private financial transactions would upset the constitutional balance. It would grant the President broad national security policy authority without the attendant congressional oversight required to ensure transparency and accountability in a sweeping category of financial deals involving foreign governments.

Since 1789, multiple Congresses have built on the Foreign Emolument Clause's constitutional foundation to develop a framework of conflict-of-interest laws and regulations to guard against the influence of foreign nations in our policy making.  Like the Foreign Emoluments Clause, this framework regulates both the private financial relationships and the official acts of U.S. officials who serve the public trust.  And like the Foreign Emoluments Clause, these laws in many cases are premised on the same scheme of *notification* and *approval*: they create processes to encourage transparency and bring potential conflicts of interest to light, yet offer officials an opportunity to clear the conflicts and to continue working on particular matters with a superior's approval.

Amici have all given public service under these laws.  We have complied with the federal statute prohibiting executive branch officials from participating in matters that will affect their private financial interests (with a waiver and public disclosure in cases where the interest is

deemed unlikely to affect the integrity of their services).[13]  We have complied with regulations

that require recusal where a financial interest would create even an appearance of bias (with a

waiver available if we inform the agency and receive authorization from an agency official).[14]

As public officials, we complied with laws prohibiting us from acting as agents of a foreign

government.[15]  As former officials, we have obeyed laws that restrict the capacity of a former

official to represent or assist a foreign government in the year after leaving office[16] and require

citizens who otherwise serve as such agents to publicly register their clients with the U.S.

government.[17]

     Through these laws and others,[18] Congresses over the years have affirmed what our

Founders understood from the start: our national security and foreign policy interests demand a

---

[13] 18 U.S.C. § 208 (2012). This provision is part of a larger anti-corruption segment of the
United States Code. Surrounding sections criminalize giving public officials bribes, *id.* §§ 201,
210; taking bribes*, id.* §§ 203, 211; the pursuit of a claim by a current government employee
when the government is an adverse party, *id.* § 205; and the involvement by ex-government
employees in matters in which they had previously "participated personally and substantially,"
*id.* § 207.

[14] *See* 5 C.F.R. § 2635.502 (2017).

[15] 18 U.S.C. § 219 (2012).

[16] *Id.* § 207(f).

[17] 22 U.S.C. § 612.

[18] *See, e.g.*, 5 U.S.C. § 7342; 18 U.S.C. § 209; *supra* note 13.  There are also other examples of
disclosure and approval statutory or regulatory schemes that are designed specifically to prevent
foreign government influence in national security matters.  In one regulatory regime overseen by
the Department of the Treasury, companies contemplating mergers with or sales to foreign
corporations in circumstances that could give rise to national security concerns must receive
clearance from an inter-agency process.  *See Committee on Foreign Investment in U.S. [CFIUS]:*
*Process Overview*, U.S. Dep't of the Treasury (Dec. 1, 2010), http://www.treasury.gov/resource-
center/international/foreign-investment/Pages/cfius-overview.aspx (providing an overview of the
CFIUS process).  Under another regime operated by the Department of Defense, a company
under foreign ownership, control of influence may not receive a facility security clearance (and a
company with such a clearance must report to the U.S. government that it is preparing to engage
in a transaction with a foreign counterpart).  *See FOCI FAQs*, U.S. Dep't of Def.,
http://www.dss.mil/isp/foci/foci_faqs.html (providing an overview of the National Industrial
Security Program process).

balanced set of guardrails against conflicts of interests from overseas business entanglements

with foreign governments.  These guardrails prevent undue influence, while allowing such

interactions in particular cases where there is disclosure and approval.  However, the Department

of Justice previously has taken the view that many of these statutory guardrails do not

constitutionally apply to the President due to separation of powers concerns, saying their impact

is either to "disable him from performing some of the functions prescribed by the Constitution or

to establish a qualification for his serving as President (to wit, elimination of financial conflicts)

beyond those contained in the Constitution."[19]  The Defendant now asks the Court to take the

additional step of reading private business transactions entirely out of the Foreign Emoluments

Clause—a constitutional provision that embodies these same separation of powers concerns.  For

the Court to do so would create a significant legal vacuum that exposes our national security

---

[19] Letter from Laurence H. Silberman, Acting Att'y Gen., to Howard W. Cannon, Chairman, Comm. on Rules and Admin., U.S. Senate 4 (Sept. 20, 1974), http://fas.org/irp/agency/doj/olc/092074.pdfhttp://fas.org/irp/agency/doj/olc/092074.pdf TA \l "Letter from Laurence H. Silberman, Acting Att'y Gen., to Howard W. Cannon, Chairman, Comm. on Rules and Admin., U.S. Senate 4 (Sept. 20, 1974), http://fas.org/irp/agency/doj/olc/092074.pdf" \s "Letter from Laurence H. Silberman, Acting Att'y Gen., to Howard W. Cannon, Chairman, Comm. on Rules and Admin., U.S. Senate (Sept. 20, 1974), http://f (discussing 18 U.S.C. § 208 (1970)); *see also Conflicts of Interest and the Presidency*, CRS Legal Sidebar (Oct. 14, 2016), http://fas.org/sgp/crs/misc/conflicts.pdf ("The Supreme Court has let stand a lower court decision recognizing the constitutionality of financial disclosures by elected officials under ethics laws. The Court also has generally upheld the constitutionality of campaign finance disclosure requirements as substantially related to the governmental interest of safeguarding the integrity of the electoral process by promoting transparency and accountability. Imposing any more formal restrictions on the President may require a constitutional amendment, given the concern that statutory limitations such as disqualification could impede constitutional duties and raise separation of powers concerns."). The President has submitted a financial disclosure under 5 U.S.C. app. § 101(d), (f)(1) (2012), but that disclosure does not identify for Congress or any other audience the financial dealings the President has with foreign governments.  Theodoric Meyer and Matthew Nussbaum, *Trump Reports Assets of at Least $1.4 Billion in Financial Disclosure*, Politico (June 16, 2017), http://www.politico.com/story/2017/06/16/us-ethics-office-releases-trumps-financial-disclosure-239649.

policy to the very foreign influences that both the Founders and subsequent Congresses tried to counteract.

## II. A reading of the Foreign Emoluments Clause that encompasses private business dealings with foreign governments is essential to U.S. national security and foreign policy interests in the modern era.

A reading of the Foreign Emoluments Clause that excludes private business entanglements with foreign governments could harm our national security and foreign policy in several ways. First, and most obvious, the United States is engaged in a range of highly sensitive interactions throughout the world in a fraught national security and foreign policy climate. Our adversaries and even our allies seek every advantage that is available on the international stage. A coherent national response to these threats requires our officials' undivided attention and commitment to serving our national interest. Allowing private business deals with foreign governments to go undisclosed, unapproved, and unmonitored creates substantial danger that national security or foreign policy decisions, "consciously or otherwise, will be motivated by something other than the public's interest."[20]

Second, leaving private business transactions unreviewed creates an appearance of impropriety that undermines our global interests. Across administrations of both parties, the United States has fought against corruption around the globe as a core tenet of its foreign policy, on the grounds that it "saps economic growth, hinders development, destabilizes governments, undermines democracy, and provides openings for dangerous groups like criminals, traffickers,

---

[20] Jack Maskell, Cong. Research Serv., R43365, Financial Assets and Conflict of Interest Regulation in the Executive Branch 1 (2014) (quoting The Association of the Bar of the City of New York, Special Committee on Congressional Ethics, James C. Kirby, Executive Director, Congress and the Public Trust, 38-39 (1970)).

and terrorists."[21]   The United States has been a global leader in these efforts, devoting roughly \$1

billion per year to anti-corruption and related programs.[22]   A central aspect of these global efforts

involves ensuring that government officials do not entangle their official interests with their

private business dealings.[23]   Allowing our own President to engage in precisely such

entanglements corrodes this pillar of U.S. foreign policy, by acknowledging that our legal system

will tolerate the very same self-dealing that we condemn whenever we see it abroad.[24]   And if a

foreign nation sees the United States taking an action on the international stage and is unsure

whether the step is being taken because it is in the rigorously assessed national security interests

---

[21] *U.S. Anti-Corruption Efforts*, U.S. Dep't of St., http://www.state.gov/anticorruption/ (accessed Nov. 1, 2017). USAID similarly funds anti-corruption efforts abroad, and the Justice Department's Office of Overseas Prosecutorial Development Assistance and Training works to promote anti-corruption abroad through the training of foreign prosecutors. *Office of Overseas Prosecutorial Development Assistance and Training*, U.S. Dep't of Just., http://www.justice.gov/criminal-opdat.

[22] *The U.S. Global Anticorruption Agenda*, The White House (Sept. 24, 2015), http://obamawhitehouse.archives.gov/the-press-office/2014/09/24/fact-sheet-us-global-anticorruption-agenda.

[23] *See, e.g.*, *Annex to the Recommendation of the Council on OECD Guidelines for Managing Conflict of Interest in the Public Service*, Org. for Econ. Co-operation and Dev. [OECD] 2 (2003), http://www.oecd.org/governance/ethics/2957360.pdfhttp://www.oecd.org/governance/ethics/2957360.pdf **TA \l "***Annex to the Recommendation of the Council on OECD Guidelines for Managing Conflict of Interest in the Public Service*, Org. for Econ. Co-operation and Dev. [OECD] 2 (2003), http://www.oecd.org/governance/ethics/2957360.pdf**" \s "Annex to the Recommendation of the Council on OECD Guidelines for Managing Conflict of Interest in the Public Service, Org. for Econ. Co-operation and Dev. [OECD] 2 (2003), http://w** ("Governments are increasingly expected to ensure that public officials do not allow their private interests and affiliations to compromise official decision-making and public management.").

[24] The potential for domestic affairs to undermine our stated foreign policy interests has, of course, previously affected judicial determinations involving purely domestic issues. *See generally* Mary Dudziak, *Desegregation as a Cold War Imperative*, 41 STAN. L. REV. 61, 65 (1988) (noting that "[a]ccording to the Department [of Justice], [*Brown v. Board of Education*] was important because '[t]he United States is trying to prove to the people of the world, of every nationality, race and color, that a free democracy is the most civilized and most secure form of government yet devised by men") (quoting Brief for the United States as Amicus Curiae at 6, Brown v. Bd. of Educ., 347 U.S. 483 (1954)).

of the country or the momentary financial interests of a single official, the foreign nation will begin to question the strength and durability of the U.S. commitment to that course of action.

Third, allowing the President to engage in undisclosed, unapproved private business deals with foreign governments will confuse and fragment the channels by which foreign policy and national security policy is made.  If they do not like the answer they receive on a diplomatic track, foreign governments looking to secure favorable policy outcomes from the U.S. government will start to think that they can pursue a more favorable answer on a business track. Inevitably, these diplomatic and business tracks will include different officials with different interests and views, and will lead to different conversations.  At the very least, this splintering of the channels of national security and foreign policy relations will undermine our government's capacity to speak with one voice.  Splintered channels of national security decision-making will confuse the consistency and clarity of our messages to other countries and hamstring the effectiveness of our policy decisions.

If anything, giving the Foreign Emoluments Clause its full and natural reading is more important today than ever before.  Nor has the broad, prophylactic function rule of the Clause ever been more important.  The global economy has drawn together more tightly, creating countless more opportunities for foreign governments to use private transactions and relationships to influence our economic health.  At the same time, the global nature of modern national security and foreign policy challenges, from terrorism to cyber threats to climate change, has compelled the United States to engage the world through a web of security, trade and other relations.  This growing interdependence has created a greater opportunity than ever for U.S. officials to engage in financial entanglements with foreign government actors, along with a

greater risk than ever that those private relations will compromise U.S. security and foreign policy interests.

Defendant never disputes that the Foreign Emoluments Clause was designed expressly to protect U.S. national security and foreign policy interests throughout the world.  And yet, their papers to this Court never actually address the grave national security or foreign policy consequences of their narrow reading of the Clause.  The Defendant claims that a narrow rule is needed because otherwise too many transactions would be barred—at least, without consent from Congress.[25]  But Congress can address this concern, as it has in the past, by exempting any transaction, or category of transactions, from the Clause *once the President discloses them to Congress*.[26]  More to the point, the appropriate judicial response to a violation of a constitutional provision that threatens our national security is not to ignore it and seek to artificially narrow the provision; it is to set into motion the constitutional checks and balances—here, disclosure and consent—that the Founders themselves expressly designed to address that issue.[27]

## CONCLUSION

For all of the foregoing reasons, Defendant's motion to dismiss should be denied.

Respectfully submitted,

_____/s/_____

Harold Hongju Koh                    Phillip Spector (D.C. Bar No. 479121)
RULE OF LAW CLINIC                   MESSING & SPECTOR LLP
Yale Law School                      1200 Steuart St. #2112
127 Wall Street, P.O. Box 208215     Baltimore MD 21230

---

[25] *See* Def. Mem. 38-41.
[26] *See, e.g.*, Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2012); 37 U.S.C. § 908. *See also* Def. Mem. 37.
[27] At the very least, where, as here, the official engages in knowing and, indeed, purposeful financial transactions involving foreign governments, the national security and foreign policy concerns loom especially large, because the risk of undue influence at its height.

New Haven, CT 06520-8215                 202-277-8173
203-432-4932

*Counsel for Amici Curiae*[28]

---

[28] We are grateful to the student members of the Yale Law School Rule of Law Clinic—Colleen Culbertson, Alexandra Mahler-Haug, Adeel Mohammadi, Joseph Schottenfeld, and Nathaniel Zelinsky—for their contributions to this submission.

## APPENDIX: List of *Amici Curiae*

1.  Madeleine K. Albright served as Secretary of State from 1997 to 2001. A refugee and naturalized American citizen, she served as U.S. Permanent Representative to the United Nations from 1993 to 1997. She has also been a member of the Central Intelligence Agency External Advisory Board since 2009 and of the Defense Policy Board since 2011, in which capacities she has received assessments of threats facing the United States.

2.  Bruce Andrews served as Deputy Secretary of Commerce from 2014 to January 20, 2017.

3.  Daniel Benjamin served as Ambassador-at-Large for Counterterrorism at the U.S. Department of State from 2009 to 2012.

4.  Antony Blinken served as Deputy Secretary of State from 2015 to January 20, 2017. He previously served as Deputy National Security Advisor to the President of the United States from 2013 to 2015.

5.  William J. Burns served as Deputy Secretary of State from 2011 to 2014. He previously served as Under Secretary of State for Political Affairs from 2008 to 2011, as U.S. Ambassador to Russia from 2005 to 2008, as Assistant Secretary of State for Near Eastern Affairs from 2001 to 2005, and as U.S. Ambassador to Jordan from 1998 to 2001.

6.  Bathsheba N. Crocker served as Assistant Secretary of State for International Organization Affairs from 2014 to 2017.

7.  Ryan Crocker served as U.S. Ambassador to Afghanistan from 2011 to 2012, as U.S. Ambassador to Iraq from 2007 to 2009, as U.S. Ambassador to Pakistan from 2004 to 2007, as U.S. Ambassador to Syria from 1998 to 2001, as U.S. Ambassador to Kuwait from 1994 to 1997, and U.S. Ambassador to Lebanon from 1990 to 1993.

8.  Daniel Feldman served as U.S. Special Representative for Afghanistan and Pakistan from 2014 to 2015, Deputy U.S. Special Representative for Afghanistan and Pakistan from 2009 to 2014, and previously Director for Multilateral and Humanitarian Affairs at the National Security Council.

9.  Joshua A. Geltzer served as Senior Director for Counterterrorism at the National Security Council from 2015 to 2017.  Previously, he served as Deputy Legal Advisor to the National Security Council and as Counsel to the Assistant Attorney General for National Security at the Department of Justice.

10. Suzy George served as Deputy Assistant to the President and Chief of Staff and Executive Secretary to the National Security Council from 2014 to 2017.

11. Chuck Hagel served as Secretary of Defense from 2013 to 2015, and previously served as Co-Chair of the President's Intelligence Advisory Board. From 1997 to 2009, he served

as U.S. Senator for Nebraska, and as a senior member of the Senate Foreign Relations and Intelligence Committees.

12.     Heather A. Higginbottom served as Deputy Secretary of State for Management and Resources from 2013 to 2017.

13.     Christopher R. Hill served as Assistant Secretary of State for East Asian and Pacific Affairs from 2005 to 2009. He also served as U.S. Ambassador to Macedonia, Poland, the Republic of Korea, and Iraq.

14.     John F. Kerry served as Secretary of State from 2013 to January 20, 2017.

15.     Prem Kumar served as Senior Director for the Middle East and North Africa on the National Security Council staff of the White House from 2013 to 2015.

16.     James C. O'Brien served as Special Presidential Envoy for Hostage Affairs from 2015 to January 20, 2017. He served in the U.S. Department of State from 1989 to 2001, including as Principal Deputy Director of Policy Planning and as Special Presidential Envoy for the Balkans.

17.     Jeffrey Prescott served as Special Assistant to the President and Senior Director for Iran, Iraq, Syria and the Gulf States from 2015 to 2017, and as Deputy National Security Advisor to the Vice President from 2013 to 2015.

18.     Kori Schake served as the Deputy Director for Policy Planning at the U.S. Department of State from December 2007 to May 2008. Previously, she was the director for Defense Strategy and Requirements on the National Security Council in President George W. Bush's first term.

19.     Eric P. Schwartz served as Assistant Secretary of State for Population, Refugees and Migration from 2009 to 2011. From 1993 to 2001, he was responsible for refugee and humanitarian issues on the National Security Council, ultimately serving as Special Assistant to the President for National Security Affairs and Senior Director for Multilateral and Humanitarian Affairs.

20.     Wendy R. Sherman served as Under Secretary of State for Political Affairs from 2011 to 2015.

21.     Vikram Singh served as Deputy Special Representative for Afghanistan and Pakistan from 2010 to 2011 and as Deputy Assistant Secretary of Defense for Southeast Asia from 2012 to 2014.

22.     James B. Steinberg served as Deputy National Security Adviser from 1996 to 2000 and as Deputy Secretary of State from 2009 to 2011.

**CERTIFICATE OF SERVICE**

I, Phillip Spector, hereby certify that on November 2, 2017, the foregoing document was filed and served through the CM/ECF system.

Respectfully submitted,

_____ /s/_____
Phillip Spector (D.C. Bar No. 479121)
MESSING & SPECTOR LLP
1200 Steuart Street #2112
Baltimore, MD  21230
*Counsel for Amici Curiae*

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

123 S.Ct. 2374
Supreme Court of the United States

AMERICAN INSURANCE
ASSOCIATION, et al., Petitioners,
v.
John GARAMENDI, Insurance
Commissioner, State of California.

No. 02–722.
|
Argued April 23, 2003.
|
Decided June 23, 2003. Rehearing Denied
Aug. 25, 2003. See 539 U.S. 982, 124 S.Ct. 35.

Insurance companies and a trade association of insurance companies brought action to enjoin Insurance Commissioner of the State of California from enforcing a California statute requiring disclosure of information about Holocaust-era insurance policies. The United States District Court for the Eastern District of California, William B. Shubb, Chief Judge, 186 F.Supp.2d 1099, permanently enjoined enforcement of the statute, and Commissioner appealed. The United States Court of Appeals for the Ninth Circuit, 296 F.3d 832, reversed. Certiorari was granted. The Supreme Court, Justice Souter, held that California's Holocaust Victim Insurance Relief Act (HVIRA), and in particular a provision of the HVIRA requiring any insurer that did business in California and that sold insurance policies in Europe which were in effect during Holocaust-era to disclose certain information about those policies to the California Insurance Commissioner or risk losing its license, impermissibly interfered with the President's conduct of foreign affairs, and was preempted on that basis.

Reversed.

Justice Ginsburg dissented and filed opinion, in which Justice Stevens, Justice Scalia, and Justice Thomas joined.

**West Codenotes**

**Preempted**

West's Ann.Cal.Ins.Code §§ 13800, 13801, 13802, 13803, 13804, 13805, 13806, 13807.

**2375  *396  Syllabus[*]

The Nazi Government of Germany confiscated the value or proceeds of many Jewish life insurance policies issued before and during the Second World War. After the war, even a policy that had escaped confiscation was likely to be dishonored, whether because insurers denied its existence or claimed it had lapsed from unpaid premiums, or because the German Government **2376 would not provide heirs with documentation of the policyholder's death. Responsibility as between the government and insurance companies is disputed, but the fact is that the proceeds of many insurance policies issued to Jews before and during the war were paid to the Third Reich or never paid at all. These confiscations and frustrations of claims fell within the subject of reparations, which became a principal object of Allied diplomacy after the war. Ultimately, the western Allies placed the obligation to provide restitution to victims of Nazi persecution on the new West German Government, which enacted restitution laws and signed agreements with other countries for the compensation of their nationals. Despite a payout of more than 100 billion deutsch marks as of 2000, however, these measures left out many claimants and certain types of claims. After German reunification, class actions for restitution poured into United States courts against companies doing business in Germany during the Nazi era. Protests by defendant companies and their governments prompted the United States Government to take action to try to resolve the matter. Negotiations at the national level produced the German Foundation Agreement, in which Germany agreed to establish a foundation funded with 10 billion deutsch marks contributed equally by the German Government and German companies to compensate the companies' victims during the Nazi era. The President agreed that whenever a German company was sued on a Holocaust-era claim in an American court, the Government would (1) submit a statement that it would be in this country's foreign policy interests for the foundation to be the exclusive forum and remedy for such claims, and (2) try to get state and local governments to respect the foundation as the exclusive mechanism.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

As for insurance claims in particular, both countries agreed that the German *397 Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), a voluntary organization whose mission is to negotiate with European insurers to provide information about and settlement of unpaid insurance policies, and which has set up procedures to that end. The German agreement has served as a model for similar agreements with Austria and France.

Meanwhile, California began its own enquiry into the issue, prompting state legislation designed to force payment by defaulting insurers. Among other laws, California's Holocaust Victim Insurance Relief Act of 1999 (HVIRA) requires any insurer doing business in the State to disclose information about all policies sold in Europe between 1920 and 1945 by the company or any one "related" to it upon penalty of loss of its state business license. After HVIRA was enacted, the State issued administrative subpoenas against several subsidiaries of European insurance companies participating in the ICHEIC. Immediately, the Federal Government informed California officials that HVIRA would damage the ICHEIC, the only effective means to process quickly and completely unpaid Holocaust era insurance claims, and that HVIRA would possibly derail the German Foundation Agreement. Nevertheless, the state insurance commissioner announced that he would enforce HVIRA to its fullest. Petitioner insurance entities then filed this suit challenging HVIRA's constitutionality. The District Court issued a preliminary injunction against enforcing HVIRA and later granted petitioners summary judgment. The Ninth Circuit reversed, holding, *inter alia,* that HVIRA did not violate the federal foreign affairs power.

*Held:* California's HVIRA interferes with the President's conduct of the Nation's foreign policy and is therefore preempted. Pp. 2386–2394.

(a) There is no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy or that generally there is executive authority to decide what that policy should be. In **2377 foreign policymaking, the President, not Congress, has the "lead role." *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466. Specifically, the President has authority

to make "executive agreements" with other countries, requiring no ratification by the Senate or approval by Congress. See, *e.g., Dames & Moore v. Regan,* 453 U.S. 654, 679, 682–683, 101 S.Ct. 2972, 69 L.Ed.2d 918. Making such agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice. Although the executive agreements with Germany, Austria, and France at issue differ from past agreements in that they address claims associated with formerly belligerent states, but against corporations, not the foreign governments, the distinction does not matter. Insisting on a sharp line between public and private *398 acts in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies. Generally, then, valid executive agreements are fit to preempt state law, and if the agreements here had expressly preempted laws like HVIRA, the issue would be straightforward. But since these agreements include no preemption clause, petitioners' preemption claim rests on the asserted interference with Presidential foreign policy that the agreements embody. The principal support for this claim of preemption is *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683. In invalidating an Oregon statute, the *Zschernig* majority relied on statements in previous cases that are open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict. See, *e.g., id.,* at 432, 88 S.Ct. 664. Justice Harlan, concurring in the result, disagreed on this point, arguing that its implication of preemption of the entire foreign affairs field was at odds with other cases suggesting that, absent positive federal action, States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations. *Id.,* at 459, 88 S.Ct. 664. Whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in *Zschernig* requires no answer here, for even on Justice Harlan's view, shared by the majority, the likelihood that state legislation will produce something more than incidental effect in conflict with the National Government's express foreign policy would require preemption of the state law. See also *United States v. Pink,* 315 U.S. 203, 230–231, 62 S.Ct. 552, 86

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

L.Ed. 796. And since on his view it is legislation within "areas of ... traditional competence" that gives a State any claim to prevail, 389 U.S., at 459, 88 S.Ct. 664, it is reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted. Pp. 2386–2390.

(b) There is a sufficiently clear conflict between HVIRA and the President's foreign policy, as expressed both in the executive agreements with Germany, Austria, and France, and in statements by high-level Executive Branch officials, to require preemption here even without any consideration of the State's interest. The account of negotiations toward those agreements shows that the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds and disclosure of policy information, in preference to litigation or coercive sanctions. California has taken a different tack: HVIRA's economic compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, **399** employs "a different, state system of economic pressure," and in doing so undercuts the President's diplomatic discretion and the choice he has made exercising it. *Crosby v. National* **2378** *Foreign Trade Council,* 530 U.S. 363, 376, 120 S.Ct. 2288, 147 L.Ed.2d 352. Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding "the coercive power of the national economy" as a tool of diplomacy, *id.,* at 377, 120 S.Ct. 2288, HVIRA denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own disclosure policies. HVIRA thus compromises the President's very capacity to speak for the Nation with one voice in dealing with other governments to resolve claims arising out of World War II. Although the HVIRA disclosure requirement's goal of obtaining compensation for Holocaust victims is also espoused by the National Government, the fact of a common end hardly neutralizes conflicting means. The express federal policy and the clear conflict raised by the state statute are alone enough to require state law to yield. Pp. 2390–2392.

(c) If any doubt about the clarity of the conflict remained, it would have to be resolved in the National Government's favor, given the weakness of the State's interest, when evaluated in terms of traditional state legislative subject matter, in regulating disclosure of European Holocaust-era insurance policies in the manner of HVIRA. Even if California's underlying concern for its several thousand Holocaust survivors is recognized as a powerful one, the same objective dignifies the National Government's interest in devising its chosen mechanism for voluntary settlements, there being approximately 100,000 survivors in the country, only a small fraction of them in California. As against the federal responsibility, the humanity underlying the state statute could not give the State the benefit of any doubt in resolving the conflict with national policy. Pp. 2392–2393.

(d) California seeks to use an iron fist where the President has consistently chosen kid gloves. The efficacy of the one approach versus the other is beside the point, since preemption turns not on the wisdom of the National Government's policy but on the evidence of conflict. Here, the evidence is more than sufficient to demonstrate that HVIRA stands in the way of the President's diplomatic objectives. P. 2393.

(e) The Court rejects the State's submission that even if HVIRA does interfere with Executive Branch foreign policy, Congress authorized state law of this sort in the McCarran–Ferguson Act and the U.S. Holocaust Assets Commission Act of 1998. To begin with, the effect of any congressional authorization on the preemption enquiry is far from clear, but in any event neither statute does the job the State ascribes to it. McCarran–Ferguson's purpose was to limit congressional preemption of **400** state insurance laws under the commerce power, whether dormant or exercised, see, *e.g., Department of Treasury v. Fabe,* 508 U.S. 491, 499–500, 113 S.Ct. 2202, 124 L.Ed.2d 449, and it cannot plausibly be read to address preemption by executive conduct in foreign affairs. Nor is HVIRA authorized by the Holocaust Commission Act, which set up a Presidential Commission to study Holocaust-era assets that came into the Government's control, § 3(a)(1), and directed the Commission to encourage state insurance commissioners to prepare a report on the Holocaust-related claims practices of all insurance companies doing business in this country after January 30, 1933, § 3(a)(4) (A). The Commission's focus was limited to assets held by the Government, and the Act's reference to the state

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

insurance commissioners' report was expressly limited "to the degree the information is available," § 3(a)(4)(B), which can hardly be read to condone state sanctions interfering with federal efforts to resolve claims. Finally, Congress has done nothing to express disapproval of the President's policy. Given the President's considerable independent authority in this **\*\*2379** area, Congress's silence cannot be equated with disapproval. Pp. 2393–2394.

296 F.3d 832, reversed.

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, KENNEDY, and BREYER, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SCALIA, and THOMAS, JJ., joined, *post,* p. 2394.

**Attorneys and Law Firms**

Kenneth S. Geller, Washington, DC, for petitioners.

Edwin S. Kneedler, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting the petitioners.

Frank Kaplan, Los Angeles, CA, for respondent.

Stephen M. Shapiro, Mayer, Brown, Rowe & Maw, Chicago, IL, Neil M. Soltman, Mayer, Brown, Rowe & Maw, Los Angeles, CA, Kenneth S. Geller, John J. Sullivan, Mayer, Brown, Rowe & Maw, Washington, DC, for American Insurance Association and American Re–Insurance Company.

Peter Simshauser, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, CA, for Assicurazioni Generali S.p.A.

William H. Webster, Milbank, Tweed, Hadley & McCloy LLP, Washington, DC, Linda Dakin–Grimm, Sally Agel, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA, for Winterthur International America Insurance Company; Winterthur International America Underwriters Insurance Company; General Casualty Company of Wisconsin; Regent Insurance Company; Southern Insurance Company; Unigard Indemnity Company; Unigard Insurance Company; and Blue Ridge Insurance Company.

George L. O'Connell, Timothy P. Grieve, Stevens & O'Connell LLP, Sacramento, CA, Frederick W. Reif, Dina G. Daskalakis, Keith D. Barrack, Riker, Danzig, Scherer, Hyland & Perretti LLP, New York City, for Gerling Companies.

**\*401** Frank Kaplan, Los Angeles, CA, Jesse J. Contreras, Ryan S. Hedges, Alschuler, Grossman, Stein & Kahan LLP, Santa Monica, CA, Larry G. Simon, Professor of Law, University of Southern California Law School, Los Angeles, CA, Andrew W. Stroud, Mennemeier, Glassman & Stroud LLP, Sacramento, CA, Michael D. Ramsey, Professor of Law, University of San Diego Law School, San Diego, CA, Leslie Tick, San Francisco, CA, for Respondent John Garamendi, in his capacity as Commissioner of Insurance for the State of California.

**Opinion**

Justice SOUTER delivered the opinion of the Court.

California's Holocaust Victim Insurance Relief Act of 1999 (HVIRA or Act), Cal. Ins.Code Ann. §§ 13800–13807 (West Cum.Supp.2003), requires any insurer doing business in that State to disclose information about all policies sold in Europe between 1920 and 1945 by the company itself or any one "related" to it. The issue here is whether HVIRA interferes with the National Government's conduct of foreign relations. We hold that it does, with the consequence that the state statute is preempted.

I

A

The Nazi Government of Germany engaged not only in genocide and enslavement but theft of Jewish assets, including **\*402** the value of insurance policies, and in particular policies of life insurance, a form of savings held by many Jews in Europe before the Second World War. **\*\*2380** Early on in the Nazi era, loss of livelihood forced Jews to cash in life insurance policies prematurely, only to have the government seize the proceeds of the repurchase,

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

and many who tried to emigrate from Germany were forced to liquidate insurance policies to pay the steep "flight taxes" and other levies imposed by the Third Reich to keep Jewish assets from leaving the country. See G. Feldman, Allianz and the German Insurance Business, 1933–1945, pp. 249–262 (2001). Before long, the Reich began simply seizing the remaining policies outright. [1] In 1941, the 11th Decree of the Reich Citizenship Law declared the confiscation of assets (including insurance policies) of Jews deported to the concentration camps, and two years later the 13th Decree did the same with respect to property of the dead, each decree requiring banks and insurance companies to identify Jewish accounts and transmit the funds to the Reich treasury. *Id.,* at 264–274. After the war, even a policy that had escaped confiscation was likely to be dishonored, whether because insurers denied its existence or claimed it had lapsed from unpaid premiums during the persecution, or because the government would not provide heirs with documentation of the policyholder's death. See M. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 117–122 (2003). Responsibility as between the government and insurance companies is disputed, but at the end **\*403** of the day, the fact is that the value or proceeds of many insurance policies issued to Jews before and during the war were paid to the Reich or never paid at all.

These confiscations and frustrations of claims fell within the subject of reparations, which became a principal object of Allied diplomacy soon after the war. At the Potsdam Conference, the United States, Britain, and the Soviet Union took reparations for wartime losses by seizing industrial assets from their respective occupation zones, putting into effect the plan originally envisioned at the Yalta Conference months before. Protocol of Proceedings of the Berlin (Potsdam) Conference, 1945, in 3 Dept. of State, Treaties and Other International Agreements of the United States of America 1776–1949, pp. 1207, 1213–1214 (C. Bevans comp.1969) (hereinafter Bevans); Report of the Crimea (Yalta) Conference, 1945, in 3 Bevans 1005; Protocol of the Crimea (Yalta) Conference on the Question of the German Reparation in Kind, 1945, in 3 Bevans 1020. A year later, the United States was among the parties to an agreement to share seized assets with other western allies as settlement, as to each signatory nation, of "all its claims and those of its nationals against

the former German Government and its Agencies, of a governmental or private nature, arising out of the war." Agreement on Reparation from Germany, on the Establishment of Inter–Allied Reparation Agency and Restitution of Monetary Gold, 61 Stat. 3163, Art. 2(A), T.I.A.S. No. 1655 (hereinafter Paris Agreement).

The effect of the Paris Agreement was curtailed, however, and attention to reparations intentionally deferred, when the western Allies moved to end their occupation and reestablish a sovereign Germany as a buffer against Soviet expansion. They worried that continued reparations would cripple the new Federal Republic of Germany economically, and so decided in the London Debt Agreement to put off "[c]onsideration of claims arising out of the second World War by countries which **\*\*2381** were at war with or were occupied by Germany **\*404** during that war, and by nationals of such countries, against the Reich and agencies of the Reich ... until the final settlement of the problem of reparation." Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, 449, T.I.A.S. No. 2792. These terms were construed by German courts as postponing resolution of foreign claims against both the German Government and German industry, to await the terms of an ultimate postwar treaty. See Neuborne, Preliminary Reflections on Aspects of Holocaust–Era Litigation in American Courts, 80 Wash. U.L.Q. 795, 813–814, and n. 62 (2002).

In the meantime, the western Allies placed the obligation to provide restitution to victims of Nazi persecution on the new West German Government. See Convention on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952, 6 U.S.T. 4411, 4452–4484, as amended by Protocol on Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, [1955] 6 U.S.T. 4117, T.I.A.S. No. 3425. This had previously been a responsibility of the western military governments, which had issued several decrees for the return of property confiscated by the Nazis. See N. Robinson, Restitution Legislation in Germany: A Survey of Enactments (1949); U.S. Military Law Nos. 52 and 59 (reprinted in U.S. Military Government Gazette, Germany, Issue A, p. 24 (June 1, 1946) and Issue G, p. 1 (Nov. 10, 1947)). West Germany enacted its own restitution laws in 1953 and 1956, see Institute of Jewish Affairs, The (West German) Federal Compensation Law

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

(BEG) and its Implementary Regulations (1957), and signed agreements with 16 countries for the compensation of their nationals, including the Luxembourg Agreement with Israel, Sept. 10, 1952, 162 U.N.T.S. 205; see Supplemental Excerpts of Record in No. 01–17023(CA9) (SER), p. 1244. Despite a payout of more than 100 billion deutsch marks as of 2000, see *ibid.,* these measures left out many claimants and certain types of claims, and when the agreement reunifying East and West **\*405** Germany, see Treaty on the Final Settlement with Respect to Germany, Sept. 12, 1990, 1696 U.N.T.S. 124, was read by the German courts as lifting the London Debt Agreement's moratorium on Holocaust claims by foreign nationals, class-action lawsuits for restitution poured into United States courts against companies doing business in Germany during the Nazi era. See Neuborne, *supra,* at 796, n. 2, 813–814; see generally Bazyler, Nuremberg in America: Litigating the Holocaust in United States Courts, 34 Rich. L.Rev. 1 (2000) (describing the flood of lawsuits after 1996).

These suits generated much protest by the defendant companies and their governments, to the point that the Government of the United States took action to try to resolve "the last great compensation related negotiation arising out of World War II." SER 940 (press briefing by Deputy Secretary of Treasury Eizenstat); see S. Eizenstat, Imperfect Justice 208–212 (2003). From the beginning, the Government's position, represented principally by Under Secretary of State (later Deputy Treasury Secretary) Stuart Eizenstat, stressed mediated settlement "as an alternative to endless litigation" promising little relief to aging Holocaust survivors. SER 953 (press conference by Secretary of State Albright). Ensuing negotiations at the national level produced the German Foundation Agreement, signed by President Clinton and German Chancellor Schröder in July 2000, in which Germany agreed to enact legislation establishing a foundation funded with 10 billion deutsch marks contributed equally by the German Government and German companies, to be used to compensate all those "who suffered at the hands of German companies during the National Socialist era." Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," 39 Int'l Legal Materials 1298 (2000).

**\*\*2382** The willingness of the Germans to create a voluntary compensation fund was conditioned on some expectation of security from lawsuits in United States courts, and after **\*406** extended dickering President Clinton put his weight behind two specific measures toward that end. SER 937 (letter from President Clinton to Chancellor Schröder committing to a "mechanism to provide the legal peace desired by the German government and German companies"); see also Eizenstat, *supra,* at 253–258. First, the Government agreed that whenever a German company was sued on a Holocaust-era claim in an American court, the Government of the United States would submit a statement that "it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II." 39 Int'l Legal Materials, at 1303. Though unwilling to guarantee that its foreign policy interests would "in themselves provide an independent legal basis for dismissal," that being an issue for the courts, the Government agreed to tell courts that "U.S. policy interests favor dismissal on any valid legal ground." *Id.,* at 1304. On top of that undertaking, the Government promised to use its "best efforts, in a manner it considers appropriate," to get state and local governments to respect the foundation as the exclusive mechanism. *Id.,* at 1300. [2]

As for insurance claims specifically, both countries agreed that the German Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), a voluntary organization formed in 1998 by several European insurance companies, the State of Israel, Jewish and Holocaust survivor associations, and the National **\*407** Association of Insurance Commissioners, the organization of American state insurance commissioners. The job of the ICHEIC, chaired by former Secretary of State Eagleburger, includes negotiation with European insurers to provide information about unpaid insurance policies issued to Holocaust victims and settlement of claims brought under them. It has thus set up procedures for handling demands against participating insurers, including "a reasonable review ... of the participating companies' files" for production of unpaid policies, "an investigatory process to determine the current status" of insurance policies for

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

which claims are filed, and a "claims and valuation process to settle and pay individual claims," employing "relaxed standards of proof." SER 1236–1237.

In the pact with the United States, Germany stipulated that "insurance claims that come within the scope of the current claims handling procedures adopted by the [ICHEIC] and are made against German insurance companies shall be processed by the companies and the German Insurance Association on the basis of such procedures and on the basis of additional claims handling procedures that may be agreed among the Foundation, ICHEIC, and the German Insurance Association." 39 Int'l Legal Materials, at 1299. And in a supplemental agreement formalized in October 2002, the German Foundation agreed to set aside 200 million deutsch marks, to be used for insurance claims approved by the ICHEIC and a portion of the ICHEIC's operating expenses, with another 100 million in reserve if the initial fund should run out. Agreement Concerning Holocaust Era Insurance Claims, in Lodging of Petitioners in *Gerling Global Reinsurance Corp. v. Garamendi,* No. 02–733, pp. L–70 **2383 to L–71, L–78 to L–79, cert. pending. [Reporter's Note: See 539 U.S. 955, 124 S.Ct. 43.] The foundation also bound itself to contribute 350 million deutsch marks to a "humanitarian fund" administered by the ICHEIC, *id.,* at L–80, and it agreed to work with the German Insurance Association and the German insurers who **408 had joined the ICHEIC, "with a view to publishing as comprehensive a list as possible of holders of insurance policies issued by German companies who may have been Holocaust victims," *id.,* at L–147. Those efforts, which control release of information in ways that respect German privacy laws limiting publication of business records, have resulted in the recent release of the names of over 360,000 Holocaust victims owning life insurance policies issued by German insurers. See Treaster, Holocaust List Is Unsealed by Insurers, N.Y. Times, Apr. 29, 2003, section A, p. 26, col. 6.

The German Foundation pact has served as a model for similar agreements with Austria and France,[3] and the United States Government continues to pursue comparable agreements with other countries. Reply Brief for Petitioners 6, n. 2.

B

While these international efforts were underway, California's Department of Insurance began its own enquiry into the issue of unpaid claims under Nazi-era insurance policies, prompting state legislation designed to force payment by defaulting insurers. In 1998, the state legislature made it an *409 unfair business practice for any insurer operating in the State to "fai[l] to pay any valid claim from Holocaust survivors." Cal. Ins.Code Ann. § 790.15(a) (West Cum.Supp.2003). The legislature placed "an affirmative duty" on the Department of Insurance "to play an independent role in representing the interests of Holocaust survivors," including an obligation to "gather, review, and analyze the archives of insurers ... to provide for research and investigation" into unpaid insurance claims. §§ 12967(a)(1), (2).

State legislative efforts culminated the next year with passage of Assembly Bill No. 600, 1999 Cal. Stats. ch. 827, the first section of which amended the State's Code of Civil Procedure to allow state residents to sue in state court on insurance claims based on acts perpetrated in the Holocaust and extended the governing statute of limitations to December 31, 2010. Cal.Civ.Proc.Code Ann. § 354.5 (West Cum.Supp.2003). The section of the bill codified as HVIRA, at issue here,[4] requires "[a]ny insurer currently doing business in the state" to disclose the details of "life, property, liability, health, annuities, dowry, educational, or casualty insurance policies" issued "to persons in Europe, which were in effect between 1920 and 1945." Cal. **2384 Ins.Code Ann. § 13804(a) (West Cum.Supp.2003). The duty is to make disclosure not only about policies the particular insurer sold, but also about those sold by any "related company," *ibid.,* including "any parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer," § 13802(b),[5] whether or not the companies were related during *410 the time when the policies subject to disclosure were sold, § 13804(a). Nor is the obligation restricted to policies sold to "Holocaust victims" as defined in the Act, § 13802(a); it covers policies sold to anyone during that time, § 13804(a). The insurer must report the current status of each policy, the city of origin, domicile, or address of each policyholder, and the names

of the beneficiaries, § 13804(a), all of which is to be put in a central registry open to the public, § 13803. The mandatory penalty for default is suspension of the company's license to do business in the State, § 13806, and there are misdemeanor criminal sanctions for falsehood in certain required representations about whether and to whom the proceeds of each policy have been distributed, § 13804(b).

HVIRA was meant to enhance enforcement of both the unfair business practice provision (§ 790.15) and the provision for suit on the policies in question (§ 354.5) by "ensur[ing] that any involvement [that licensed California insurers] or their related companies may have had with insurance policies of Holocaust victims in *[sic]* disclosed to the state." § 13801(e); see *ibid.* (HVIRA is designed to "ensure the rapid resolution" of unpaid insurance claims, "eliminating the further victimization of these policyholders and their families"); Excerpt of Record in No. 01–17023(CA9)(ER), p. 994 (California Senate Committee on Insurance report) (HVIRA was proposed to "ensure that Holocaust victims or their heirs can take direct action on their own behalf with regard to insurance policies and claims"). While the legislature acknowledged that "[t]he international Jewish community is in active **\*411** negotiations with responsible insurance companies through the [ICHEIC] to resolve all outstanding insurance claims issues," it still thought the Act "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." § 13801(f).

After HVIRA was enacted, administrative subpoenas were issued against several subsidiaries of European insurance companies participating in the ICHEIC. See, *e.g.,* SER 785, 791. Immediately, in November 1999, Deputy Secretary Eizenstat wrote to the insurance commissioner of California that although HVIRA "reflects a genuine commitment to justice for Holocaust victims and their families, it has the unfortunate effect of damaging the one effective means now at hand to process quickly and completely unpaid insurance claims from the Holocaust period, the [ICHEIC]." *Id.,* at 975. The Deputy Secretary said that "actions by California, pursuant to this law, have already threatened to damage the cooperative spirit which the [ICHEIC] requires to

resolve the important issue for Holocaust survivors," and he also noted that ICHEIC Chairman Eagleburger had expressed his opposition to "sanctions and other pressures brought by California on companies **\*\*2385** with whom he is obtaining real cooperation." *Id.,* at 976. The same day, Deputy Secretary Eizenstat also wrote to California's Governor making the same points, and stressing that HVIRA would possibly derail the German Foundation Agreement: "Clearly, for this deal to work ... German industry and the German government need to be assured that they will get 'legal peace,' not just from class-action lawsuits, but from the kind of legislation represented by the California Victim Insurance Relief Act." *Id.,* at 970. These expressions of the National Government's concern proved to be of no consequence, for the state commissioner announced at an investigatory hearing in December 1999 that he would enforce HVIRA to its **\*412** fullest, requiring the affected insurers to make the disclosures, leave the State voluntarily, or lose their licenses. ER 1097.

II

After this ultimatum, the petitioners here, several American and European insurance companies and the American Insurance Association (a national trade association), filed suit for injunctive relief against respondent insurance commissioner of California, challenging the constitutionality of HVIRA. The District Court issued a preliminary injunction against enforcing the Act, reflecting its probability judgment that "HVIRA is unconstitutional based on a violation of the federal foreign affairs power and a violation of the Commerce Clause." App. to Pet. for Cert. 110a. On appeal, the Ninth Circuit rejected these grounds for questioning the Act but left the preliminary injunction in place until the District Court could consider whether petitioners were likely to succeed on their due process claim. *Gerling Global Reinsurance Corp. of America v. Low,* 240 F.3d 739, 754 (C.A.9 2001).

On remand, the District Court addressed two points. Although it held the Act to be within the State's "legislative jurisdiction," as it applied only to insurers licensed to do business in the State, the District

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

Court granted summary judgment to the petitioners on the ground of a procedural due process violation in "mandating license suspension for non-performance of what may be impossible tasks without allowing for a meaningful hearing." *Gerling Global Reinsurance Corp. of America v. Low,* 186 F.Supp.2d 1099, 1108, 1113 (E.D.Cal.2001). In a second appeal, the same panel of the Ninth Circuit reversed again. While it agreed that the Act was not beyond the State's legislative authority, the Court of Appeals rejected the conclusion that procedural due process required an opportunity for insurers to raise an impossibility excuse for noncompliance with the law, 296 F.3d 832, 845–848 (C.A.9 2002), and it reaffirmed its prior ruling that **\*413** the Act violated neither the foreign affairs nor the foreign commerce powers, *id.,* at 849. Given the importance of the issue, [6] we granted certiorari, 537 U.S. 1100, 123 S.Ct. 817, 154 L.Ed.2d 768 (2003), and now reverse. [7]

## **\*\*2386** III

**[1]**   The principal argument for preemption made by petitioners and the United States as *amicus curiae* is that HVIRA interferes with foreign policy of the Executive Branch, as expressed principally in the executive agreements with Germany, Austria, and France. The major premises of the argument, at least, are beyond dispute. There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the "concern for uniformity in this country's dealings with foreign nations" that animated the Constitution's allocation of the foreign relations power to the National Government in the first place. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427, n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); see **\*414** *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 381–382, n. 16, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (" '[T]he peace of the WHOLE ought not to be left at the disposal of a PART' " (quoting The Federalist No. 80, pp. 535–536 (J. Cooke ed.1961) (A. Hamilton))); *Id.,* No. 44, at 299 (J. Madison) (emphasizing "the advantage of uniformity in all points which relate to foreign powers"); *Id.,* No. 42, at 279 (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations"); see also

*First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 769, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality opinion) (act of state doctrine was "fashioned because of fear that adjudication would interfere with the conduct of foreign relations"); *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 449, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979) (negative Foreign Commerce Clause protects the National Government's ability to speak with "one voice" in regulating commerce with foreign countries (internal quotation marks omitted)).

**[2]**   Nor is there any question generally that there is executive authority to decide what that policy should be. Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the "executive Power" vested in Article II of the Constitution has recognized the President's "vast share of responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). While Congress holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers, in foreign affairs the President has a degree of independent authority to act. See, *e.g., Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.,* 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ("The President ... possesses in his own right certain powers conferred by the Constitution on him as Commander–in–Chief and as the Nation's organ in foreign affairs"); *Youngstown, supra,* at 635–636, n. 2, 72 S.Ct. 863 (Jackson, J., concurring in judgment and opinion of Court) (the President can "act in external affairs without congressional authority" (citing *United States v. Curtiss–Wright* **\*415** *Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936))); *First Nat. City Bank v. Banco Nacional de Cuba, supra,* at 767, 92 S.Ct. 1808 (the President has "the lead role ... in foreign policy" (citing *Sabbatino, supra* )); *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (the President has "unique responsibility" for the conduct of "foreign and military affairs").

**[3]   [4]**   At a more specific level, our cases have recognized that the President has authority to make "executive agreements" with other countries, requiring no ratification by the Senate or approval by Congress, this

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

power having been exercised since the early years of the Republic. See **2387 *Dames & Moore v. Regan,* 453 U.S. 654, 679, 682–683, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Pink,* 315 U.S. 203, 223, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 330–331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); see also L. Henkin, Foreign Affairs and the United States Constitution 219, 496, n. 163 (2d ed.1996) ("Presidents from Washington to Clinton have made many thousands of agreements ... on matters running the gamut of U.S. foreign relations"). Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799, when the Adams administration settled demands against the Dutch Government by American citizens who lost their cargo when Dutch privateers overtook the schooner *Wilmington Packet.* See *Dames & Moore, supra,* at 679–680, and n. 8, 101 S.Ct. 2972; 5 Dept. of State, Treaties and Other International Acts of the United States 1075, 1078–1079 (H. Miller ed.1937). Given the fact that the practice goes back over 200 years and has received congressional acquiescence throughout its history, the conclusion "[t]hat the President's control of foreign relations includes the settlement of claims is indisputable." *Pink, supra,* at 240, 62 S.Ct. 552 (Frankfurter, J., concurring); see 315 U.S., at 223–225, 62 S.Ct. 552 (opinion of the Court); *Belmont, supra,* at 330–331, 57 S.Ct. 758; *Dames & Moore, supra,* at 682, 101 S.Ct. 2972.

The executive agreements at issue here do differ in one respect from those just mentioned insofar as they address *416 claims associated with formerly belligerent states, but against corporations, not the foreign governments. But the distinction does not matter. Historically, wartime claims against even nominally private entities have become issues in international diplomacy, and three of the postwar settlements dealing with reparations implicating private parties were made by the Executive alone.[8] Acceptance of this historical practice is supported by a good pragmatic reason for depending on executive agreements to settle claims against foreign corporations associated with wartime experience. As shown by the history of insurance confiscation mentioned earlier, untangling government policy from private initiative during wartime is often so hard that diplomatic action

settling claims against private parties may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments. While a sharp line between public and private acts works for many purposes in the domestic law, insisting on the same line in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies. Cf. *Pink, supra,* at 234–242, 62 S.Ct. 552 (Frankfurter, J., concurring) (noting the unsoundness of transplanting "judicial subtleties" of domestic law into "the solution of analogous problems between friendly nations").

**[5]** Generally, then, valid executive agreements are fit to preempt state law, just as treaties are,[9] and if the agreements **2388 *417 here had expressly preempted laws like HVIRA, the issue would be straightforward. See *Belmont, supra,* at 327, 331, 57 S.Ct. 758; *Pink, supra,* at 223, 230–231, 62 S.Ct. 552. But petitioners and the United States as *amicus curiae* both have to acknowledge that the agreements include no preemption clause, and so leave their claim of preemption to rest on asserted interference with the foreign policy those agreements embody. Reliance is placed on our decision in *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

*Zschernig* dealt with an Oregon probate statute prohibiting inheritance by a nonresident alien, absent showings that the foreign heir would take the property "without confiscation" by his home country and that American citizens would enjoy reciprocal rights of inheritance free. *Id.,* at 430–431, 88 S.Ct. 664. Two decades earlier, *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947), had held that a similar California reciprocity law "did not on its face intrude on the federal domain," *Zschernig, supra,* at 432, 88 S.Ct. 664, but by the time Zschernig (an East German resident) brought his challenge, it was clear that the Oregon law in practice had invited "minute inquiries concerning the actual administration of foreign law," 389 U.S., at 435, 88 S.Ct. 664, and so was providing occasions for state judges to disparage certain foreign regimes, employing the language of the anti-Communism prevalent here at the height of the Cold War, see *id.,* at 440, 88 S.Ct. 664 (the Oregon law had made "unavoidable judicial criticism of nations established on a more authoritarian basis than

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

our own"). Although the Solicitor General, speaking for the State Department, denied that the state statute "unduly interfere[d] with the United States' conduct of foreign relations," *id.,* at 434, 88 S.Ct. 664 (internal quotation marks omitted), the Court was not deterred from exercising its own judgment to invalidate the law as an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress," *id.,* at 432, 88 S.Ct. 664.

**\*418** The *Zschernig* majority relied on statements in a number of previous cases open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict. The Court cited the pronouncement in *Hines v. Davidowitz,* 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941), that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." See 389 U.S., at 432, 88 S.Ct. 664; *id.,* at 442–443, 88 S.Ct. 664 (Stewart, J., concurring) (setting out the foregoing quotation). Likewise, Justice Stewart's concurring opinion viewed the Oregon statute as intruding "into a domain of exclusively federal competence." *Id.,* at 442, 88 S.Ct. 664; see also *Belmont,* 301 U.S., at 331, 57 S.Ct. 758 ("[C]omplete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states" (citing *Curtiss–Wright Export Corp.,* 299 U.S., at 316, 57 S.Ct. 216 *et seq.*)).

Justice Harlan, joined substantially by Justice White, disagreed with the *Zschernig* majority on this point, arguing that its implication of preemption of the entire field of foreign affairs was at odds with some other cases suggesting that in the absence of positive federal action "the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations." 389 U.S., at 459, 88 S.Ct. 664 (opinion concurring in result) (citing cases); see **\*\*2389** *id.,* at 462, 88 S.Ct. 664 (White, J., dissenting).[10] Thus, for Justice Harlan it was crucial that the challenge to the Oregon **\*419** statute presented no evidence of a

"specific interest of the Federal Government which might be interfered with" by the law. *Id.,* at 459, 88 S.Ct. 664 (opinion concurring in result); see *id.,* at 461, 88 S.Ct. 664 (finding "no evidence of adverse effect in the record"). He would, however, have found preemption in a case of "conflicting federal policy," see *id.,* at 458–459, 88 S.Ct. 664, and on this point the majority and Justices Harlan and White basically agreed: state laws "must give way if they impair the effective exercise of the Nation's foreign policy," *id.,* at 440, 88 S.Ct. 664 (opinion of the Court). See also *Pink,* 315 U.S., at 230–231, 62 S.Ct. 552 ("[S]tate law must yield when it is inconsistent with, or impairs ... the superior Federal policy evidenced by a treaty or international compact or agreement"); *id.,* at 240, 62 S.Ct. 552 (Frankfurter, J., concurring) (state law may not be allowed to "interfer[e] with the conduct of our foreign relations by the Executive").

**[6]** It is a fair question whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in the *Zschernig* opinions,[11] but the question requires **\*420** no answer here. For even on Justice Harlan's view, the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law. And since on his view it is legislation within "areas of ... traditional competence" that gives a State any claim to prevail, 389 U.S., at 459, 88 S.Ct. 664, it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted. Cf. *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 768–769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (under negative Commerce Clause, "reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved"); Henkin, Foreign Affairs and the United States Constitution, at 164 (suggesting a test that "balance[s] the state's interest in a regulation against the impact on U.S. foreign relations"); Maier, Preemption of State Law: A Recommended Analysis, 83 Am. J. Int'l L. 832, 834 (1989) (similar). **\*\*2390** Judged by these standards, we think petitioners

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

and the Government have demonstrated a sufficiently clear conflict to require finding preemption here.

### IV

### A

To begin with, resolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, *Pink, supra,* at 225, 62 S.Ct. 552, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries, *Dames & Moore,* 453 U.S., at 679, 101 S.Ct. 2972. The issue of **\*421** restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two. The foregoing account of negotiations toward the three settlement agreements is enough to illustrate that the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions. See also, *e.g.,* Hearings on H.R. 2693 before the Subcommittee of Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 24 (2002) (statement of Ambassador Randolph M. Bell that it is the "policy of the

U.S. Government" "to resolve matters of Holocaust-era restitution and compensation through dialogue, negotiation, and cooperation"); Hearings on the Status of Insurance Restitution for Holocaust Victims and the Heirs before the House Committee on Government Reform, 107th Cong., 1st Sess., 77 (2001) (statement of Ambassador J.D. Bindenagel to the same effect). As for insurance claims in particular, the national position, expressed unmistakably in the executive agreements signed by the President with Germany and Austria, has been to encourage European insurers to work with the ICHEIC to develop acceptable claim procedures, including procedures governing disclosure of policy information. **\*422** See German Foundation Agreement, 39 Int'l Legal Materials, at 1299, 1303 (declaring the German Foundation to be the "exclusive forum" for demands against German companies and agreeing to have insurance claims resolved under procedures developed through negotiation with the ICHEIC); Agreement Relating to the Agreement of October 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, 2001 WL 935261, Annex A, § 2(n) (same for Austria). This position, of which the agreements are exemplars, has also been consistently supported in the high levels of the Executive Branch, as mentioned already, *supra,* at 2384–2385. See also, *e.g.,* Hearing before the Committee on House Banking and Financial Services, 106th Cong., 2d Sess., 173 (2000) (Deputy Secretary Eizenstat statement that "[t]he U.S. Government has supported [the ICHEIC] since it began, and we believe it should be considered the exclusive remedy for resolving insurance claims from the World **\*\*2391** War II era"); Hearings on H.R. 2693, at 24 (statement by Ambassador Bell to the same effect); Hearing on the Legacies of the Holocaust before the Senate Committee on Foreign Relations, 106th Cong., 2d Sess., 23 (2000) (Eizenstat testimony that a company's participation in the ICHEIC should give it " 'safe haven' from sanctions, subpoenas, and hearings relative to the Holocaust period"). [12] The approach taken serves to resolve the several competing matters of national concern apparent in the German Foundation Agreement: the national interest in maintaining amicable **\*423** relationships with current European allies; survivors' interests in a "fair and prompt" but nonadversarial resolution of their claims so as to "bring some measure

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

of justice ... in their lifetimes"; and the companies' interest in securing "legal peace" when they settle claims in this fashion. 39 Int'l Legal Materials, at 1304. As a way for dealing with insurance claims, moreover, the voluntary scheme protects the companies' ability to abide by their own countries' domestic privacy laws limiting disclosure of policy information. See Brief for Federal Republic of Germany as *Amicus Curiae* 12–13. [13]

California has taken a different tack of providing regulatory sanctions to compel disclosure and payment, supplemented by a new cause of action for Holocaust survivors if the other sanctions should fail. The situation created by the California legislation calls to mind the impact of the Massachusetts Burma law on the effective exercise of the President's power, as recounted in the statutory preemption case, *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). HVIRA's economic compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, employs "a different, state system of economic pressure," and in doing so undercuts the President's **\*424** diplomatic discretion and the choice he has made exercising it. *Id.,* at 376, 120 S.Ct. 2288. Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding "the coercive power of the national economy" as a tool of diplomacy, *id.,* at 377, 120 S.Ct. 2288, HVIRA denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own policies on disclosure. "Quite simply, if the [California] law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Ibid.* (citing *Dames & Moore,* 453 U.S., at 673, 101 S.Ct. 2972). The law **\*\*2392** thus "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" to resolve claims against European companies arising out of World War II. 530 U.S., at 381, 120 S.Ct. 2288. [14]

*Crosby's* facts are replicated again in the way HVIRA threatens to frustrate the operation of the particular mechanism the President has chosen. The letters from Deputy Secretary Eizenstat to California officials show

well enough how the portent of further litigation and sanctions has in fact placed the Government at a disadvantage in obtaining practical results from persuading "foreign governments and foreign companies to participate voluntarily in organizations such as ICHEIC." Brief for United States as *Amicus Curiae* 15; see also SER 1267, 1272 (Joint Statement with Switzerland noting the "potentially disruptive and counterproductive effects" of laws like HVIRA and promising effort by **\*425** the United States to call on state legislatures "to refrain from taking unwarranted investigative initiatives or from threatening or actually using sanctions against Swiss insurers"). In addition to thwarting the Government's policy of repose for companies that pay through the ICHEIC, California's indiscriminate disclosure provisions place a handicap on the ICHEIC's effectiveness (and raise a further irritant to the European allies) by undercutting European privacy protections. See ER 1182, 3131 (opinions of the German Government that public disclosure of all European insurance policies "is not permissible" under German privacy law); Brief for United States as *Amicus Curiae* 18 (noting protests from the German and Swiss Governments). It is true, of course, as it is probably true of all elements of HVIRA, that the disclosure requirement's object of obtaining compensation for Holocaust victims is a goal espoused by the National Government as well. But "[t]he fact of a common end hardly neutralizes conflicting means," *Crosby, supra,* at 379, 120 S.Ct. 2288, and here HVIRA is an obstacle to the success of the National Government's chosen "calibration of force" in dealing with the Europeans using a voluntary approach, 530 U.S., at 380, 120 S.Ct. 2288.

**B**

The express federal policy and the clear conflict raised by the state statute are alone enough to require state law to yield. If any doubt about the clarity of the conflict remained, however, it would have to be resolved in the National Government's favor, given the weakness of the State's interest, against the backdrop of traditional state legislative subject matter, in regulating disclosure of European Holocaust-era insurance policies in the manner of HVIRA.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

The commissioner would justify HVIRA's ambitious disclosure requirement as protecting "legitimate consumer protection interests" in knowing which insurers have failed to pay insurance claims. Brief for Respondent 1, 42–44. But, quite unlike a generally applicable "blue sky" law, HVIRA **\*426** effectively singles out only policies issued by European companies, in Europe, to European residents, at least 55 years ago. Cal. Ins.Code Ann. § 13804(a) (West Cum.Supp.2003); see also § 790.15(a) (mandating license suspension only for "fail[ure] to pay any valid claim from Holocaust survivors"). Limiting the public disclosure requirement to these policies raises great doubt that the purpose of the California law is an evaluation of corporate reliability in contemporary insuring in the State.

**\*\*2393** Indeed, there is no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand Holocaust survivors said to be living in the State. § 13801(d) (legislative finding that roughly 5,600 documented Holocaust survivors reside in California). But this fact does not displace general standards for evaluating a State's claim to apply its forum law to a particular controversy or transaction, under which the State's claim is not a strong one. "Even if a plaintiff evidences his desire for forum law by moving to the forum, we have generally accorded such a move little or no significance." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 820, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); see *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 311, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) ("[A] postoccurrence change of residence to the forum State—standing alone—[i]s insufficient to justify application of forum law").

But should the general standard not be displaced, and the State's interest recognized as a powerful one, by virtue of the fact that California seeks to vindicate the claims of Holocaust survivors? The answer lies in recalling that the very same objective dignifies the interest of the National Government in devising its chosen mechanism for voluntary settlements, there being about 100,000 survivors in the country, only a small fraction of them in California. ER 870 (press release of insurance commissioner of California); Bazyler, 34 Rich. L.Rev., at 8, n. 11. As against the responsibility of the United States of America, the humanity underlying the **\*427**

state statute could not give the State the benefit of any doubt in resolving the conflict with national policy.

C

The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves. We have heard powerful arguments that the iron fist would work better, and it may be that if the matter of compensation were considered in isolation from all other issues involving the European Allies, the iron fist would be the preferable policy. But our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress. The question relevant to preemption in this case is conflict, and the evidence here is "more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives." *Crosby, supra,* at 386, 120 S.Ct. 2288.

V

The State's remaining submission is that even if HVIRA does interfere with Executive Branch foreign policy, Congress authorized state law of this sort in the McCarran–Ferguson Act, 59 Stat. 33, ch. 20, 15 U.S.C. §§ 1011–1015, and the more recent U.S. Holocaust Assets Commission Act of 1998 (Holocaust Commission Act), 112 Stat. 611, note following 22 U.S.C. § 1621. There is, however, no need to consider the possible significance for preemption doctrine of tension between an Act of Congress and Presidential foreign policy, cf. generally *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S., at 637–638, 72 S.Ct. 863 (Jackson, J., concurring in judgment and opinion of Court), for neither statute does the job the commissioner ascribes to it.

**[7]** The provisions of the McCarran–Ferguson Act said to be relevant here specify that "[t]he business of insurance" shall be recognized as a subject of state regulation, **\*428** 15 U.S.C. § 1012(a), which will be good against preemption by federal legislation unless

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

that legislation "specifically relates to the business of insurance," § 1012(b); see also § 1011 (policy behind § 1012 is that "continued regulation and taxation by the several States of the business of insurance is in the public interest" and "silence on the part of the Congress **2394 shall not be construed to impose any barrier to the regulation or taxation of such business by the several States"). As the text itself makes clear, the point of McCarran–Ferguson's legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised. Compare *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429–430, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), with *United States v. South–Eastern Underwriters Assn.,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); see *Department of Treasury v. Fabe,* 508 U.S. 491, 499–500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Quite apart, then, from any doubt whether HVIRA would qualify as regulating "the business of insurance" given its tangential relation to present-day insuring in the State, see *FTC v. Travelers Health Assn.,* 362 U.S. 293, 300–301, 80 S.Ct. 717, 4 L.Ed.2d 724 (1960) (McCarran–Ferguson was not intended to allow a State to "regulate activities carried on beyond its own borders"), a federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs.

[8] Nor does the Holocaust Commission Act authorize HVIRA. That Act set up a Presidential Commission to "study and develop a historical record of the collection and disposition" of Holocaust–era assets that "came into the possession or control of the Federal Government." Pub.L. 105–186, § 3(a)(1), 112 Stat. 612. For this purpose, Congress directed the Commission to "encourage the National Association of Insurance Commissioners to prepare a report on the Holocaust-related claims practices of all insurance companies, both domestic and foreign, doing business in the *429 United States at any time after January 30, 1933, that issued any individual life, health, or property-casualty insurance policy to any individual on any list of Holocaust victims." § 3(a)(4)(A), 112 Stat. 613. These provisions are no help to HVIRA. The Commission's focus was limited to assets in the possession of the Government, and if anything, the federal Act assumed it was the National Government's responsibility to deal with returning those assets. See § 3(d), 112

Stat. 614 (President to collect recommendations from the commission and submit a suggested plan for "legislative, administrative, or other action" to Congress). In any event, the federal Act's reference to the state insurance commissioners as compiling information was expressly limited "to the degree the information is available," § 3(a)(4)(B), 112 Stat. 613, a proviso that can hardly be read to condone state sanctions interfering with federal efforts to resolve such claims.

Indeed, it is worth noting that Congress has done nothing to express disapproval of the President's policy. Legislation along the lines of HVIRA has been introduced in Congress repeatedly, but none of the bills has come close to making it into law. See H.R. 1210, 108th Cong., 1st Sess. (2003); S. 972, 108th Cong., 1st Sess. (2003); H.R. 2693, 107th Cong., 1st Sess. (2001); H.R. 126, 106th Cong., 1st Sess. (1999).

In sum, Congress has not acted on the matter addressed here. Given the President's independent authority "in the areas of foreign policy and national security, ... congressional silence is not to be equated with congressional disapproval." *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).

VI

The judgment of the Court of Appeals for the Ninth Circuit is reversed.

*So ordered.*

*430 Justice GINSBURG, with whom Justice STEVENS, Justice SCALIA, and Justice THOMAS join, dissenting.
Responding to Holocaust victims' and their descendents' long-frustrated efforts to collect unpaid insurance proceeds, California's Holocaust Victim Insurance Relief **2395 Act of 1999 (HVIRA), Cal. Ins.Code Ann. § 13800 *et seq.* (West Cum.Supp.2003), requires insurance companies operating in the State to disclose certain information about insurance policies they or their affiliates wrote in Europe between 1920 and

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

1945. In recent years, the Executive Branch of the Federal Government has become more visible in this area, undertaking foreign policy initiatives aimed at resolving Holocaust-era insurance claims. Although the federal approach differs from California's, no executive agreement or other formal expression of foreign policy disapproves state disclosure laws like the HVIRA. Absent a clear statement aimed at disclosure requirements by the "one voice" to which courts properly defer in matters of foreign affairs, I would leave intact California's enactment.

I

As the Court observes, *ante,* at 2379–2380, and n. 1, the Nazi regimentation of inhumanity we characterize as the Holocaust, marked most horrifically by genocide and enslavement, also entailed widespread destruction, confiscation, and theft of property belonging to Jews. For insurance policies issued in Germany and other countries under Nazi control, historical evidence bears out, the combined forces of the German Government and the insurance industry engaged in larcenous takings of gigantic proportions. For example, insurance policies covered many of the Jewish homes and businesses destroyed in the state-sponsored pogrom known as Kristallnacht. By order of the Nazi regime, claims arising out of the officially enabled destruction were made payable not to the insured parties, but to the State. M. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 114 (2003). In what one historian called a "charade **\*431** concocted by insurers and ministerial officials," insurers satisfied property loss claims by paying the State only a fraction of their full value. G. Feldman, Allianz and the German Insurance Business, 1933–1945, p. 227 (2001); see Bazyler, *supra,* at 114; App. 27–28 (declaration of Rabbi Abraham Cooper, Assoc. Dean, Simon Wiesenthal Center) ("There is documentary evidence that the insurance companies paid only one-half of the Jewish insurance proceeds to the Reich and kept the other half for themselves.").

The Court depicts Allied diplomacy after World War II as aimed in part at settling confiscated and unpaid insurance claims. *Ante,* at 2380. But the multilateral negotiations that produced the Potsdam, Yalta, and like accords failed to achieve any global resolution of such claims. European insurers, encountering no official compulsion, were themselves scarcely inclined to settle claims; turning claimants away, they relied on the absence of formal documentation and other technical infirmities that legions of Holocaust survivors were in no position to remedy. See, *e.g.,* Hearings on H.R. 2693 before the Subcommittee on Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 14–15 (2002) (statement of Rep. Waxman) ("Some survivors were rejected because they could not produce death certificates for loved ones who perished in Nazi concentration camps. Other insurance companies took advantage of the fact that claimants had no policy documents to prove their policy existed."). For over five decades, untold Holocaust-era insurance claims went unpaid. *Id.,* at 38 (statement of Leslie Tick, California Dept. of Insurance).

In the late 1990's, litigation in American courts provided a spur to action. See Bazyler, *supra,* at xi; Feldman, *supra,* at vii; Neuborne, Preliminary Reflections on Aspects of Holocaust–Era Litigation in American Courts, 80 Wash. U.L.Q. 795, 796 (2002). Holocaust survivors and their descendents initiated class-action suits against German and **\*432** other European firms seeking compensation for, *inter alia,* the confiscation of Jewish bank assets, the use of Jewish slave labor, and the failure **\*\*2396** to pay Jewish insurance claims. See generally Bazyler, *supra,* at 1–171.

In the insurance industry, the litigation propelled a number of European companies to agree on a framework for resolving unpaid claims outside the courts. This concord prompted the 1998 creation of the International Commission on Holocaust Era Insurance Claims (ICHEIC). A voluntary claims settlement organization, ICHEIC comprises several European insurers, Jewish and Holocaust survivor organizations, the State of Israel, and this country's National Association of Insurance Commissioners. See S. Eizenstat, Imperfect Justice 266 (2003); Bazyler, *supra,* at 132.

As the Court observes, *ante,* at 2382, ICHEIC has formulated procedures for the filing, investigation, valuation, and resolution of Holocaust-era insurance

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

claims. At least until very recently, however, ICHEIC's progress has been slow and insecure. See *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.,* 228 F.Supp.2d 348, 358 (S.D.N.Y.2002) (quoting a 2001 press account describing ICHEIC as having "repeatedly been at the point of collapse since its inception in 1998"). Initially, ICHEIC's insurance company members represented little more than one-third of the Holocaust-era insurance market. See App. 32 (declaration of Leslie Tick, California Dept. of Insurance) ("The five insurance company members of the ICHEIC represent approximately 35.5% of the pre-World War II European insurance market."); Eizenstat, *supra,* at 268 (despite repeated assurances that *all* German insurance companies would join ICHEIC, "[t]hey never have to this day"). Petitioners note that participation in ICHEIC has expanded in the past year, see Reply Brief 8–9, but it remains unclear whether ICHEIC does now or will ever encompass all relevant insurers.

Moreover, ICHEIC has thus far settled only a tiny proportion of the claims it has received. See Eizenstat, **\*433** *supra,* at 267 ("ICHEIC's administrative failings led to few claims paid and large costs."). Evidence submitted in a series of class actions filed against Italian insurer Generali indicated that by November 2001, ICHEIC had resolved only 797 of 77,000 claims. See *In re Assicurazioni Generali,* 228 F.Supp.2d, at 357. The latest reports show only modest increases. See Treaster, Holocaust List Is Unsealed by Insurers, N.Y. Times, Apr. 29, 2003, section A, p. 26, col. 6 ("In more than four years of operation [ICHEIC] has offered $38.2 million—or just short of the $40 million it had spent on expenses as of 18 months ago —to 3,006 claimants.").

Finally, although ICHEIC has directed its members to publish lists of unpaid Holocaust-era policies, that non-binding directive had not yielded significant compliance at the time this case reached the Court. See Brief for Respondent 10; Bazyler, Holocaust Justice, at 132 ("Using the ICHEIC process, the European insurers have been able to ... avoid revealing the names of possible claim holders."). Shortly after oral argument, ICHEIC-participating German insurers made more substantial disclosures. See N.Y. Times, *supra,* at 26 (list of 363,232 names published in April 2003). But other insurers have been less forthcoming. For a prime example, Generali

—which may have sold more life insurance and annuity policies in Eastern Europe during the Holocaust than any other company, see Bazyler, *supra,* at 113—reportedly maintains a 340,000–name list of persons to whom it sold insurance between 1918 and 1945, but has refused to disclose the bulk of the information on the list. See App. 37–38 (declaration of Leslie Tick, California Dept. of Insurance); Brief for Respondent 5.

II

A

California's disclosure law, the HVIRA, was enacted a year after ICHEIC's formation. Observing that at least 5,600 documented **\*\*2397** Holocaust survivors reside in California, **\*434** Cal. Ins.Code Ann. § 13801(d) (West Cum.Supp.2003), the HVIRA declares that "[i]nsurance companies doing business in the State of California have a responsibility to ensure that any involvement they or their related companies may have had with insurance policies of Holocaust victims [is] disclosed to the state," § 13801(e). The HVIRA accordingly requires insurance companies doing business in California to disclose information concerning insurance policies they or their affiliates sold in Europe between 1920 and 1945, § 13804(a), and directs California's Insurance Commissioner to store the information in a publicly accessible "Holocaust Era Insurance Registry," § 13803. The Commissioner is further directed to suspend the license of any insurer that fails to comply with the HVIRA's reporting requirements. § 13806.

These measures, the HVIRA declares, are "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." § 13801(f). Information published in the HVIRA's registry could, for example, reveal to a Holocaust survivor residing in California the existence of a viable claim, which she could then present to ICHEIC for resolution. [1]

The Court refers, *ante,* at 2383, 2392–2393, to a number of other California statutory provisions enabling the

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

litigation *435 of Holocaust-era insurance claims in California courts. Those provisions, it bears emphasis, are not at issue here. The HVIRA imposes no duty to pay any claim, nor does it authorize litigation on any claim. It mandates only information *disclosure,* and our assessment of the HVIRA is properly confined to that requirement alone.

## B

The Federal Government, after prolonged inaction, has responded to the Holocaust-era insurance issue by diplomatic means. Executive agreements with Germany, Austria, and France, the Court observes, are the principal expressions of the federal approach. *Ante,* at 2386. Signed in July 2000, the German Foundation Agreement establishes a voluntary foundation, funded by public and private sources, to address Holocaust-era claims. Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," 39 Int'l Legal Materials 1298 (2000).[2] "[I]t would be in the interests of both parties," the agreement declares, "for the Foundation to be the exclusive remedy and forum for addressing ... all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." *Id.,* at 1299. In the case of insurance, the agreement endorses ICHEIC as the appropriate forum for claims resolution. *Ibid.*

The German Foundation Agreement commits the Federal Government to certain conduct. It provides, for example, that when a German company is sued in a **2398 United States court on a Holocaust-era claim, the Federal Government will file with the court a statement that "the President of the United States has concluded that it would be in the foreign policy interests of the United States for the [German] Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising *436 from their involvement in the National Socialist era and World War II." *Id.,* at 1303. The agreement also provides that "[t]he United States will recommend dismissal on any valid legal ground (which, under the U.S. system of jurisprudence, will be for the U.S. courts to determine)." *Ibid.* The agreement makes clear, however, that "[t]he United States does not

suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal." *Id.,* at 1304.

## III

### A

The President's primacy in foreign affairs, I agree with the Court, empowers him to conclude executive agreements with other countries. *Ante,* at 2386–2387. Our cases do not catalog the subject matter meet for executive agreement,[3] but we have repeatedly acknowledged the President's authority to make such agreements to settle international claims. *Ante,* at 2387. And in settling such claims, we have recognized, an executive agreement may preempt otherwise permissible state laws or litigation. *Ante,* at 2387–2388. The executive agreements to which we have accorded preemptive effect, however, warrant closer inspection than the Court today endeavors.

In *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), the Court addressed the Litvinov Assignment, an executive agreement incidental to the United States' recognition of the Soviet Union. Under the terms of the agreement, the Soviet Union assigned to the United States all its claims against American nationals, including claims against New *437 York banks holding accounts of Russian nationals that the Soviet Government had earlier nationalized. The Federal Government sued to recover the accounts thus assigned to it. Applying New York law, the lower courts refused to enforce the assignment; those courts held that the account-nationalization upon which the assignment rested contravened public policy. *Id.,* at 325–327, 57 S.Ct. 758. This Court reversed, concluding that "no state policy can prevail against the international compact here involved." *Id.,* at 327, 57 S.Ct. 758. The Litvinov Assignment clearly assigned to the United States the claims in issue; the enforceability of that assignment, the Court stressed, "is not and cannot be subject to any curtailment or interference on the part of the several states." *Id.,* at 331, 57 S.Ct. 758.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

*United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), again addressed state-imposed obstacles to the Litvinov Assignment. Reiterating its holding in *Belmont,* the Court confirmed that no State may "deny enforcement of a claim under the Litvinov Assignment because of an overriding policy of the State." 315 U.S., at 222, 62 S.Ct. 552. Pointing both to the assignment itself and to a later exchange of diplomatic correspondence clarifying its scope, see *id.,* at 224–225, and n. 7, 62 S.Ct. 552, the Court saw no "serious doubt that claims of the kind here in question were included" in the "broad and inclusive" assignment, *id.,* at 224, 62 S.Ct. 552.

Four decades later, in **2399 *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the Court gave effect to an executive agreement arising out of the Iran hostage crisis. One of the agreement's announced "purpose[s]" was "to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." *Id.,* at 665, 101 S.Ct. 2972 (quoting the agreement). The agreement called for the formation of an Iran–United States Claims Tribunal to arbitrate claims not settled within six months. *Ibid.* In addition, under the agreement the United States undertook

*438 "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." *Ibid.* (internal quotation marks omitted).

In line with these firm commitments, the Court held that the agreement and the executive order implementing it validly "suspended" litigation in United States courts against Iranian interests. See *id.,* at 686–688, 101 S.Ct. 2972.

Notably, the Court in *Dames & Moore* was emphatic about the "narrowness" of its decision. *Id.,* at 688, 101 S.Ct. 2972. "We do not decide," the Court cautioned, "that the President possesses plenary power to settle claims, even as against foreign governmental entities."

*Ibid.* Before sustaining the President's action, the Court determined: (1) Congress "had implicitly approved" the practice of claim settlement by executive agreement, *id.,* at 680, 101 S.Ct. 2972; (2) the alternative forum created under the executive agreement was "capable of providing meaningful relief," *id.,* at 687, 101 S.Ct. 2972; (3) Congress had not in any way disapproved or resisted the President's action, *id.,* at 687–688, 101 S.Ct. 2972; and (4) the settlement of claims was "a necessary incident to the resolution of a major foreign policy dispute between our country and another," *id.,* at 688, 101 S.Ct. 2972.

Together, *Belmont, Pink,* and *Dames & Moore* confirm that executive agreements directed at claims settlement may sometimes preempt state law. The Court states that if the executive "agreements here had expressly preempted laws like HVIRA, the issue would be straightforward." *Ante,* at 2387–2388. One can safely demur to that statement, for, as the Court acknowledges, no executive agreement before us expressly preempts the HVIRA. *Ante,* at 2388. Indeed, no agreement so much as mentions the HVIRA's sole concern: public disclosure.

*439 B

Despite the absence of express preemption, the Court holds that the HVIRA interferes with foreign policy objectives implicit in the executive agreements. See *ibid.* I would not venture down that path.

The Court's analysis draws substantially on *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). In that case, the Oregon courts had applied an Oregon escheat statute to deny an inheritance to a resident of a Communist bloc country. The Oregon courts so ruled because the claimant failed to satisfy them that his country's laws would allow U.S. nationals to inherit estates, nor had the claimant shown he would actually receive payments from the Oregon estate with no confiscation by his home government. *Id.,* at 432, 88 S.Ct. 664. Applying Oregon's statutory conditions, the Court concluded, required Oregon courts to "launc[h] inquiries into the type of governments that obtain in particular foreign nations," *id.,* at 434, 88 S.Ct. 664, rendering "unavoidable judicial criticism of nations established on

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

a more authoritarian basis than our own," *id.,* at 440, 88 S.Ct. 664. Such criticism had a "direct impact upon foreign relations," the Court said, **\*\*2400** *id.,* at 441, 88 S.Ct. 664, and threatened to "impair the effective exercise of the Nation's foreign policy," *id.,* at 440, 88 S.Ct. 664. The Court therefore held the statute unconstitutional as applied in that case. *Id.,* at 433–434, 88 S.Ct. 664. But see *id.,* at 432, 88 S.Ct. 664 ("We do not accept the invitation to re-examine our ruling in *Clark v. Allen* [331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947)]," which held a substantively similar California statute facially constitutional.).

We have not relied on *Zschernig* since it was decided, and I would not resurrect that decision here. The notion of "dormant foreign affairs preemption" with which *Zschernig* is associated resonates most audibly when a state action "reflect[s] a state policy critical of foreign governments and involve[s] 'sitting in judgment' on them." L. Henkin, Foreign Affairs and the United States Constitution 164 (2d ed.1996); see **\*440** Constitutionality of South African Divestment Statutes Enacted by State and Local Governments, 10 Op. Off. Legal Counsel 49, 50 (1986) ("[W]e believe that *[Zschernig]* represents the Court's reaction to a particular regulatory statute, the operation of which intruded extraordinarily deeply into foreign affairs."). The HVIRA entails no such state action or policy. It takes no position on any contemporary foreign government and requires no assessment of any existing foreign regime. It is directed solely at private insurers doing business in California, and it requires them solely to disclose information in their or their affiliates' possession or control. I would not extend *Zschernig* into this dissimilar domain.[4]

Neither would I stretch *Belmont, Pink,* or *Dames & Moore* to support implied preemption by executive agreement. In each of those cases, the Court gave effect to the express terms of an executive agreement. In *Dames & Moore,* for example, the Court addressed an agreement explicitly extinguishing certain suits in domestic courts. 453 U.S., at 665, 101 S.Ct. 2972; see *supra,* at 2398–2399. Here, however, none of the executive agreements extinguish any underlying claim for relief. See Neuborne, 80 Wash. U.L. Q., at 824, n. 101. The United States has agreed to file precatory statements advising courts that dismissing Holocaust-era claims accords with American foreign policy, but the German Foundation Agreement confirms that such statements have no legally binding effect. See 39 Int'l Legal Materials, at 1304; *supra,* at 2398. It remains uncertain, therefore, whether even *litigation* on Holocaust-era insurance claims must be abated in deference to the German Foundation Agreement or the parallel agreements with Austria and France. Indeed, ambiguity **\*441** on this point appears to have been the studied aim of the American negotiating team. See Eizenstat, Imperfect Justice, at 272–273 (describing the "double negative" that satisfied German negotiators and preserved the flexibility sought by Justice Department litigators).

If it is uncertain whether insurance *litigation* may continue given the executive agreements on which the Court relies, it should be abundantly clear that those agreements leave *disclosure* laws like the HVIRA untouched. The contrast with the Litvinov Assignment at issue in *Belmont* and *Pink* is marked. That agreement spoke directly to claim assignment in no uncertain terms; *Belmont* and *Pink* confirmed that state law could not invalidate the very assignments accomplished by the agreement. See *supra,* at 2398. Here, the Court invalidates a state disclosure law on grounds of conflict with foreign policy "embod[ied]" in certain executive agreements, *ante,* at 2388, although those agreements do not refer to state disclosure laws **\*\*2401** specifically, or even to information disclosure generally.[5] It therefore is surely an exaggeration to assert that the "HVIRA threatens to frustrate the operation of the particular mechanism the President has chosen" to resolve Holocaust-era claims. *Ante,* at 2392. If that were so, one might expect to find some reference to laws like the HVIRA in the later-in-time executive agreements. There is none.

To fill the agreements' silences, the Court points to statements by individual members of the Executive Branch. See *ante,* at 2384–2385 (letters from Deputy Secretary of the Treasury **\*442** Stuart Eizenstat to California Governor Gray Davis and the Insurance Commissioner of California); *ante,* at 2390–2391 (testimony before Congress by Eizenstat, stating that a company's participation in ICHEIC should give it "safe haven from sanctions, subpoenas, and hearings

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

relative to the Holocaust period" (internal quotation marks omitted)). But we have never premised foreign affairs preemption on statements of that order. Cf. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 329–330, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) ("Executive Branch actions—press releases, letters, and *amicus* briefs"—that "express federal policy but lack the force of law" cannot render a state law unconstitutional under the Foreign Commerce Clause.). We should not do so here lest we place the considerable power of foreign affairs preemption in the hands of individual sub-Cabinet members of the Executive Branch. Executive officials of any rank may of course be expected "faithfully [to] represen[t] the President's chosen policy," *ante,* at 2391, n. 13, but no authoritative text accords such officials the power to invalidate state law simply by conveying the Executive's views on matters of federal policy. The displacement of state law by preemption properly requires a considerably more formal and binding federal instrument.

Sustaining the HVIRA would not compromise the President's ability to speak with one voice for the Nation. See *ante,* at 2391–2392. To the contrary, by declining to invalidate the HVIRA in this case, we would reserve foreign affairs preemption for circumstances where the President, acting under statutory or constitutional authority, has spoken clearly to the issue at hand. "[T]he Framers did not make the judiciary the overseer of our government." *Dames & Moore,* 453 U.S., at 660, 101 S.Ct. 2972 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring)). And judges should not be the expositors of the Nation's foreign policy, which is the role they play by acting when the President himself has not taken a clear **\*443** stand. As I see it, courts step out of their proper role when they rely on no legislative or even executive text, but only on inference and implication, to preempt state laws on foreign affairs grounds.

In sum, assuming, *arguendo,* that an executive agreement or similarly formal foreign policy statement targeting disclosure could override the HVIRA, there is no such declaration here. Accordingly, I would leave California's enactment in place, and affirm the judgment of the Court of Appeals.

**All Citations**

539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353, 2003 Daily Journal D.A.R. 6765, 16 Fla. L. Weekly Fed. S 401

Footnotes

\*      The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      A vivid precursor of the kind of direct confiscation that would become widespread by 1941 was the Reich's seizure of property and casualty insurance proceeds in the aftermath of the November 1938 Kristallnacht, in which Nazi looting and vandalism inflicted damage to Jewish businesses, homes, and synagogues worth nearly 50 million deutsch marks. Days afterward, a Reich decree mandated that all proceeds of all insurance claims arising from the damage be paid directly to the state treasury, an obligation ultimately settled by German insurance companies with the Reich at a mere pittance relative to full value. See Feldman, Allianz and the German Insurance Business, at 190–235.

2      The executive agreement was accompanied by a joint statement signed by the American and German Governments, the Governments of Israel and five Eastern European countries, and the Conference on Jewish Material Claims Against Germany, Inc., "[r]ecognizing that it would be in the participants' interests for the Foundation to be the exclusive remedy and forum" for all Holocaust-era claims against German companies. Excerpt of Record in No. 01–17023(CA9)(ER), pp. 812–816.

3      Agreement Between the Government of the United States of America and the Government of France Concerning Payments for Certain Losses Suffered During World War II, Jan. 18, 2001, 2001 WL 416465; Agreement between the Austrian Federal Government and the Government of the United States of America Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," 40 Int'l Legal Materials 523 (2001); Agreement Relating to the Agreement of October 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, 2001 WL

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

935261, Annex A, § 2(n). Though the French agreement does not address insurance, the agreement with Austria does. Austria agreed to devote a $25 million fund for payment of claims processed according to the ICHEIC's procedures. See *ibid.* Austria also agreed to "make the lists of Holocaust era policy holders publicly accessible, to the extent available." *Ibid.* The United States Government agreed, in turn, that the settlement fund should be viewed as "the exclusive ... forum" for the resolution of Holocaust-era claims asserted against the Austrian Government or Austrian companies. 40 Int'l Legal Materials, at 524.

4   Challenges to Cal.Civ.Proc.Code Ann. § 354.5 (West Cum.Supp.2003) and Cal. Ins.Code Ann. § 790.15 (West Cum.Supp.2003) were dismissed by the District Court for lack of standing, a ruling that was not appealed. See *Gerling Global Reinsurance Corp. of America v. Low,* 240 F.3d 739, 742–743 (C.A.9 2001).

5   These terms are further defined in the commissioner's regulations. Cal.Code Regs., Tit. 10, § 2278.1 (1996). An "affiliate" company is one that "directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the [insurer]." Cal. Ins.Code Ann. § 1215(a) (West 1993) (cross-referenced in § 2278.1(e)). A "[m]anaging [g]eneral [a]gent" is a company that "negotiates and binds ceding reinsurance contracts on behalf of an insurer or manages all or part of the insurance business of an insurer." § 769.819(c) (cross-referenced in § 2278.1(c)). A "reinsurer" is "a parent, subsidiary or affiliate of the insurer that provides reinsurance." Cal.Code Regs., Tit. 10, § 2278.1(i) (1996).

6   Several other States have passed laws similar to HVIRA. See Holocaust Victims Insurance Act, Fla. Stat. § 626.9543 (Cum.Supp.2003); Holocaust Victims Insurance Act, Md. Ins.Code Ann. §§ 28–101 to 28–110 (2002); Holocaust Victims Insurance Relief Act of 2000, Minn.Stat. § 60A.053 (Cum.Supp.2003); Holocaust Victims Insurance Act of 1998, N.Y. Ins. Law §§ 2701–2711 (Consol.2000); Holocaust Victims Insurance Relief Act of 1999, Wash. Rev.Code §§ 48.104.010–48.104.903 (2003); see also Ariz.Rev.Stat. Ann. § 20–490 (West Cum.Supp.2003); Tex. Ins.Code Ann., Art. 21.74 (Vernon 2003). And similar bills have been proposed in other States. See, *e.g.,* Mass. Senate Bill No. 843 (Jan. 1, 2003).

7   Two petitions for certiorari were filed, one by the petitioners in this case (No. 02–722), and one, raising additional issues, by the Gerling Companies (No. 02–733), which were also appellees below. Our grant of certiorari in No. 02–722 encompassed three of the questions addressed by the Ninth Circuit: whether HVIRA intrudes on the federal foreign affairs power, violates the self-executing element of the Foreign Commerce Clause, or exceeds the State's "legislative jurisdiction." Pet. for Cert. I. Because we hold that HVIRA is preempted under the foreign affairs doctrine, we have no reason to address the other questions.

8   The Yalta and Potsdam Agreements envisioning dismantling of Germany's industrial assets, public and private, and the followup Paris Agreement aspiring to settle the claims of western nationals against the German Government and private agencies were made as executive agreements. See *supra,* at 2380 (citing agreements); see also L. Margolis, Executive Agreements and Presidential Power in Foreign Policy 15–16 (1986).

9   Subject, that is, to the Constitution's guarantees of individual rights. See *Reid v. Covert,* 354 U.S. 1, 15–19, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Boos v. Barry,* 485 U.S. 312, 324, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Even Justice Sutherland's reading of the National Government's "inherent" foreign affairs power in *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), contained the caveat that the power, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.,* at 320, 57 S.Ct. 216.

10   Justice Harlan concurred in the majority's result because he would have found the Oregon statute preempted by a 1923 treaty with Germany. 389 U.S., at 457, 88 S.Ct. 664. This required overruling the Court's construction of that treaty in *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947), which Justice White, in dissent, declined to do, 389 U.S., at 462, 88 S.Ct. 664.

11   The two positions can be seen as complementary. If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government. See, *e.g., Hines v. Davidowitz,* 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Where, however, a State has acted within what Justice Harlan called its "traditional competence," 389 U.S., at 459, 88 S.Ct. 664, but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

or the traditional importance of the state concern asserted. Whether the strength of the federal foreign policy interest should itself be weighed is, of course, a further question. Cf. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) (congressional occupation of the field is not to be presumed "in a field which the States have traditionally occupied"); *Boyle v. United Technologies Corp.,* 487 U.S. 500, 507–508, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) ("In an area of uniquely federal interest," "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption").

12   In *Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 328–330, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994), we declined to give policy statements by Executive Branch officials conclusive weight as against an opposing congressional policy in determining whether California's "worldwide combined reporting" tax method violated the Foreign Commerce Clause. The reason, we said, is that "[t]he Constitution expressly grants Congress, not the President, the power to 'regulate Commerce with foreign Nations.' " *Id.,* at 329, 114 S.Ct. 2268 (quoting Art. I, § 8, cl. 3). As we have discussed, however, in the field of foreign policy the President has the "lead role." *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972).

13   The dissent would discount the executive agreements as evidence of the Government's foreign policy governing disclosure, saying they "do not refer to state disclosure laws specifically, or even to information disclosure generally." *Post,* at 2400–2401 (opinion of GINSBURG, J.). But this assertion gives short shrift to the agreements' express endorsement of the ICHEIC's voluntary mechanism, which encompasses production of policy information, not just actual payment of unpaid claims. See *supra,* at 2382–2383. The dissent would also dismiss the other Executive Branch expressions of the Government's policy, see *supra,* at 2384–2385, 2390–2391, insisting on nothing short of a formal statement by the President himself, see *post,* at 2401. But there is no suggestion that these high-level executive officials were not faithfully representing the President's chosen policy, and there is no apparent reason for adopting the dissent's "nondelegation" rule to apply within the Executive Branch.

14   It is true that the President in this case is acting without express congressional authority, and thus does not have the "plenitude of Executive authority" that "controll[ed] the issue of preemption" in *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 376, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). But in *Crosby* we were careful to note that the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues, *id.,* at 381, 120 S.Ct. 2288, and conflict with the exercise of that authority is a comparably good reason to find preemption of state law.

1   In addition, California may deem an insurer's or its affiliate's continuing failure to resolve Holocaust-era claims relevant marketplace information for California consumers. See Brief for Respondent 42–44; Brief for National Association of Insurance Commissioners as *Amicus Curiae* 11–13. The Court discounts the HVIRA's pursuit of this objective, stressing that the HVIRA covers only certain policies issued in Europe more than 50 years ago. *Ante,* at 2392–2393. But States have broad authority to regulate the insurance industry, *Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.,* 451 U.S. 648, 653–655, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), and a State does not exceed that authority by assigning special significance to an insurer's treatment of claims arising out of an era in which government and industry collaborated to rob countless Holocaust victims of their property.

2   The executive agreements with Austria and France are comparable. See *ante,* at 2383, and n. 3.

3   "One is compelled to conclude that there are agreements which the President can make on his sole authority and others which he can make only with the consent of the Senate (or of both houses), but neither Justice Sutherland [in *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) ] nor any one else has told us which are which." L. Henkin, Foreign Affairs and the United States Constitution 222 (2d ed.1996).

4   The Court also places considerable weight on *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). As the Court acknowledges, however, *ante,* at 2391, *Crosby* was a statutory preemption case. The state law there at issue posed "an obstacle to the accomplishment of Congress's full objectives under the [relevant] federal Act." 530 U.S., at 373, 120 S.Ct. 2288. That statutory decision provides little support for preempting a state law by inferring preclusive foreign policy objectives from precatory language in executive agreements.

5   The Court apparently finds in the executive agreements' "express endorsement of ICHEIC's voluntary mechanism" a federal purpose to preempt any information disclosure mechanism not controlled by ICHEIC itself. *Ante,* at 2391, n. 13. But nothing in the executive agreements suggests that the Federal Government supports the resolution of Holocaust-era insurance claims only to the extent they are based upon information disclosed by ICHEIC. The executive agreements

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

**American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)**

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

do not, for example, prohibit recourse to ICHEIC to resolve claims based upon information disclosed through laws like the HVIRA.

---

**End of Document**                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)

57 S.Ct. 216, 81 L.Ed. 255

57 S.Ct. 216
Supreme Court of the United States.

UNITED STATES

v.

CURTISS-WRIGHT EXPORT CORPORATION et al.

No. 98.
|
Argued Nov. 19, 20, 1936.
|
Decided Dec. 21, 1936.

Proceedings by the United States against the Curtiss-Wright Export Corporation and others, under indictment charging a conspiracy to sell arms of war to a foreign government in violation of a joint resolution of Congress. From a judgment sustaining a demurrer to the indictment (14 F.Supp. 230), the government appeals.

Reversed, and cause remanded.

Mr. Justice McREYNOLDS dissenting.

**217 *304 Appeal from the District Court of the United States for the Southern District of New York.

**Attorneys and Law Firms**

Messrs. Homer S. Cummings, Atty. Gen., and *306 Martin Conboy, of New York City (Messrs. Stanley F. Reed, Sol. Gen., Brien McMahon, Asst. Atty. Gen., and William W. Barron and Charles A. Horsky, both of Washington, D.C., on the brief), for the United States.

*308 Mr. William Wallace, of New York City (Mr. Robert D. Shea, of New York City, on the brief), for appellees Curtiss-Wright Export Corp. et al.

*307 Messrs. George Z. Medalie, J. Edward Lumbard, Jr., and Theodore S. Hope, Jr., all of New York City, for appellee Samuel J. Abelow.

*311 Mr. Neil P. Cullom, of New York City, for appellees Barr Shipping corp. et al.

**Opinion**

Mr. Justice SUTHERLAND delivered the opinion of the Court.

On January 27, 1936, an indictment was returned in the court below, the first count of which charges that appellees, beginning with the 29th day of May, 1934, conspired to sell in the United States certain arms of war, namely, fifteen machine guns, to Bolivia, a country then engaged in armed conflict in the Chaco, in violation of the Joint Resolution of Congress approved May 28, 1934, and the provisions of a proclamation issued on the same day by the President of the United States pursuant to authority conferred by section 1 of the resolution. In pursuance of the conspiracy, the commission of certain overt acts was alleged, details of which need not be stated. The Joint Resolution (chapter 365, 48 Stat. 811) follows:

*312 'Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That if the President finds that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reestablishment of peace between those countries, and if after consultation with the governments of other American Republics and with their cooperation, as well as that of such other governments as he may deem necessary, he makes proclamation to that effect, it shall be unlawful to sell, except under such limitations and exceptions as the President prescribes, any arms or munitions of war in any place in the United States to the countries now engaged in that armed conflict, or to any person, company, or association acting in the interest of either country, until otherwise ordered by the President or by Congress.

'Sec. 2. Whoever sells any arms or munitions of war in violation of section 1 shall, on conviction, be punished by a fine not exceeding $10,000 or by imprisonment not exceeding two years, or both.'

The President's proclamation (48 Stat. 1744, No. 2087), after reciting the terms of the Joint Resolution, declares:

'Now, Therefore, I, Franklin D. Roosevelt, President of the United States of America, acting under and by virtue of the authority conferred in me by the said joint

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

resolution of Congress, do hereby declare and proclaim that I have found that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaging in armed conflict in the Chaco may contribute to the reestablishment of peace between those countries, and that I have consulted with the governments of other American Republics and have been assured of the cooperation of such governments as I have deemed necessary as contemplated by the said joint resolution; and I do hereby admonish all citizens of the **\*313** United States and every person to abstain from every violation of the provisions of the joint resolution above set forth, hereby made applicable to Bolivia and Paraguay, and I do hereby warn them that all violations of such provisions will be rigorously prosecuted.

**\*\*218** 'And I do hereby enjoin upon all officers of the United States charged with the execution of the laws thereof, the utmost diligence in preventing violations of the said joint resolution and this my proclamation issued thereunder, and in bringing to trial and punishment any offenders against the same.

'And I do hereby delegate to the Secretary of State the power of prescribing exceptions and limitations to the application of the said joint resolution of May 28, 1934, as made effective by this my proclamation issued thereunder.'

On November 14, 1935, this proclamation was revoked (49 Stat. 3480), in the following terms:

'Now, therefore, I, Franklin D. Roosevelt, President of the United States of America, do hereby declare and proclaim that I have found that the prohibition of the sale of arms and munitions of war in the United States to Bolivia or Paraguay will no longer be necessary as a contribution to the reestablishment of peace between those countries, and the above-mentioned Proclamation of May 28, 1934, is hereby revoked as to the sale of arms and munitions of war to Bolivia or Paraguay from and after November 29, 1935, provided, however, that this action shall not have the effect of releasing or extinguishing any penalty, forfeiture or liability incurred under the aforesaid Proclamation of May 28, 1934, or the Joint Resolution of Congress approved by the President on the same date; and that the said Proclamation and Joint Resolution shall be treated as remaining in force for the purpose of sustaining any

proper action or prosecution for the enforcement of such penalty, forfeiture or liability.'

**\*314** Appellees severally demurred to the first count of the indictment on the grounds (1) that it did not charge facts sufficient to show the commission by appellees of any offense against any law of the United States; (2) that this court of the indictment charges a conspiracy to violate the Joint Resolution and the Presidential proclamation, both of which had expired according to the terms of the Joint Resolution by reason of the revocation contained in the Presidential proclamation of November 14, 1935, and were not in force at the time when the indictment was found. The points urged in support of the demurrers were, first, that the Joint Resolution effects an invalid delegation of legislative power to the executive; second, that the Joint Resolution never became effective because of the failure of the President to find essential jurisdictional facts; and, third, that the second proclamation operated to put an end to the alleged liability under the Joint Resolution.

The court below sustained the demurrers upon the first point, but overruled them on the second and third points. (D.C.) 14 F.Supp. 230. The government appealed to this court under the provisions of the Criminal Appeals Act of March 2, 1907, 34 Stat. 1246, as amended, U.S.C., title 18, s 682 (18 U.S.C.A. s 682). That act authorizes the United States to appeal from a district court direct to this court in criminal cases where, among other things, the decision sustaining a demurrer to the indictment or any count thereof is based upon the invalidity or construction of the statute upon which the indictment is founded.

First. It is contended that by the Joint Resolution the going into effect and continued operation of the resolution was conditioned (a) upon the President's judgment as to its beneficial effect upon the re-establishment of peace between the countries engaged in armed conflict in the Chaco; (b) upon the making of a proclamation, **\*315** which was left to his unfettered discretion, thus constituting an attempted substitution of the President's will for that of Congress; (c) upon the making of a proclamation putting an end to the operation of the resolution, which again was left to the President's unfettered discretion; and (d) further, that the extent of its operation in particular cases was subject to limitation and exception by the President, controlled by no standard.

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 52 of 482

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

In each of these particulars, appellees urge that Congress abdicated its essential functions and delegated them to the Executive.

Whether, if the Joint Resolution had related solely to internal affairs, it would be open to the challenge that it constituted an unlawful delegation of legislative power to the Executive, we find it unnecessary to determine. The whole aim of the resolution is to affect a situation entirely external to the United States, and falling within the category of foreign affairs. The determination which we are called to make, therefore, is whether the Joint **219 Resolution, as applied to that situation, is vulnerable to attack under the rule that forbids a delegation of the lawmaking power. In other words, assuming (but not deciding) that the challenged delegation, if it were confined to internal affairs, would be invalid, may it nevertheless be sustained on the ground that its exclusive aim is to afford a remedy for a hurtful condition within foreign territory?

It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted.

 **[1]**  **[2]**  The two classes of powers are different, both in respect of their origin and their nature. The broad statement that the federal government can exercise no powers except **\*316** those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers then possessed by the states such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. Carter v. Carter Coal Co., 298 U.S. 238, 294, 56 S.Ct. 855, 865, 80 L.Ed. 1160. That this doctrine applies only to powers which the states had is self-evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers but obviously were transmitted to the United States from some other source. During the Colonial period, those powers were possessed exclusively by and

were entirely under the control of the Crown. By the Declaration of Independence, 'the Representatives of the United States of America' declared the United (not the several) Colonies to be free and independent states, and as such to have 'full Power to levy War, conclude Peace, contract Alliances, establish Commerce and to do all other Acts and Things which Independent States may of right do.'

As a result of the separation from Great Britain by the colonies, acting as a unit, the powers of external sovereignty passed from the Crown not to the colonies severally, but to the colonies in their collective and corporate capacity as the United States of America. Even before the Declaration, the colonies were a unit in foreign affairs, acting through a common agency—namely, the Continental Congress, composed of delegates from the thirteen colonies. That agency exercised the powers of war and peace, raised an army, created a navy, and finally adopted the Declaration of Independence. Rulers come and go; governments end and forms of government change; but sovereignty survives. A political society cannot endure **\*317** without a supreme will somewhere. Sovereignty is never held in suspense. When, therefore, the external sovereignty of Great Britain in respect of the colonies ceased, it immediately passed to the Union. See Penhallow v. Doane, 3 Dall. 54, 80, 81, 1 L.Ed. 507, Fed.Cas. No. 10925. That fact was given practical application almost at once. The treaty of peace, made on September 3, 1783, was concluded between his Brittanic Majesty and the 'United States of America.' 8 Stat., European Treaties, 80.

The Union existed before the Constitution, which was ordained and established among other things to form 'a more perfect Union.' Prior to that event, it is clear that the Union, declared by the Articles of Confederation to be 'perpetual,' was the sole possessor of external sovereignty, and in the Union it remained without change save in so far as the Constitution in express terms qualified its exercise. The Framers' Convention was called and exerted its powers upon the irrefutable postulate that though the states were several their people in respect of foreign affairs were one. Compare The Chinese Exclusion Case, 130 U.S. 581, 604, 606, 9 S.Ct. 623, 32 L.Ed. 1068. In that

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

convention, the entire absence of state power to deal with those affairs was thus forcefully stated by Rufus King:

'The states were not 'sovereigns' in the sense contended for by some. They did not possess the peculiar features of sovereignty,—they could not make war, nor peace, nor alliances, nor treaties. Considering them as political beings, they were dumb, for they could not speak to any foreign sovereign whatever. They **220 were deaf, for they could not hear any propositions from such sovereign. They had not even the organs or faculties of defence or offence, for they could not of themselves raise troops, or equip vessels, for war.' 5 Elliot's Debates, 212.[1]

*318 [3] [4] [5] It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. Neither the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens (see American Banana Co. v. United Fruit Co., 213 U.S. 347, 356, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047); and operations of the nation in such territory must be governed by treaties, international understandings and compacts, and the principles of international law. As a member of the family of nations, the right and power of the United States in that field are equal to the right and power of the other members of the international family. Otherwise, the United States is not completely sovereign. The power to acquire territory by discovery and occupation (Jones v. United States, 137 U.S. 202, 212, 11 S.Ct. 80, 34 L.Ed. 691), the power to expel undesirable aliens (Fong Yue Ting v. United States, 149 U.S. 698, 705 et seq., 13 S.Ct. 1016, 37 L.Ed. 905), the power to make such international agreements as do not constitute treaties in the constitutional sense (Altman & Co. v. United States, 224 U.S. 583, 600, 601, 32 S.Ct. 593, 56 L.Ed. 894; Crandall, Treaties, Their Making and Enforcement (2d Ed.) p. 102 and note 1), none of which is expressly affirmed by the Constitution, nevertheless exist as inherently inseparable from the conception of nationality. This the court recognized, and in each of the cases cited found the warrant for its conclusions not in the provisions of the Constitution, but in the law of nations.

In Burnet v. Brooks, 288 U.S. 378, 396, 53 S.Ct. 457, 461, 77 L.Ed. 844, 86 A.L.R. 747, we said, 'As a nation with all the attributes of sovereignty, the United States is vested with all the powers of government necessary to maintain an effective control of international relations.' Cf. Carter v. Carter Coal Co., supra, 298 U.S. 238, at page 295, 56 S.Ct. 855, 865, 80 L.Ed. 1160.

*319 Not only, as we have shown, is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He makes treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' Annals, 6th Cong., col. 613. The Senate Committee on Foreign Relations at a very early day in our history (February 15, 1816), reported to the Senate, among other things, as follows:

'The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. For his conduct he is responsible to the Constitution. The committee considers this responsibility the surest pledge for the faithful discharge of his duty. They think the interference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety. The nature of transactions with foreign nations, moreover, requires caution and unity of design, and their success frequently depends on secrecy and dispatch.' **221 8 U.S.Sen.Reports Comm. on Foreign Relations, p. 24.

[6] [7] It is important to bear in mind that we are here dealing not alone with an authority vested in the

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

President by an **\*320** exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations —a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved. Moreover, he, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war. He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results. Indeed, so clearly is this true that the first President refused to accede to a request to lay before the House of Representatives the instructions, correspondence and documents relating to the negotiation of the Jay Treaty—a refusal the wisdom of which was recognized by the House itself and has never since been doubted. In his reply to the request, President Washington said:

'The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion a full disclosure of all the measures, demands, or eventual concessions which may have been proposed or contemplated would be extremely **\*321** impolitic; for this might have a pernicious influence on future negotiations, or produce immediate inconveniences, perhaps danger and mischief, in relation to other powers. The necessity of such caution and secrecy was one cogent reason for vesting the power of making treaties in the President, with the advice and consent of the Senate, the principle on which that body was formed confining it to a small number of members. To admit, then, a right in the House of Representatives to demand

and to have as a matter of course all the papers respecting a negotiation with a foreign power would be to establish a dangerous precedent.' 1 Messages and Papers of the Presidents, p. 194.

The marked difference between foreign affairs and domestic affairs in this respect is recognized by both houses of Congress in the very form of their requisitions for information from the executive departments. In the case of every department except the Department of State, the resolution directs the official to furnish the information. In the case of the State Department, dealing with foreign affairs, the President is requested to furnish the information 'if not incompatible with the public interest.' A statement that to furnish the information is not compatible with the public interest rarely, if ever, is questioned.

When the President is to be authorized by legislation to act in respect of a matter intended to affect a situation in foreign territory, the legislator properly bears in mind the important consideration that the form of the President's action—or, indeed, whether he shall act at all—may well depend, among other things, upon the nature of the confidential information which he has or may thereafter receive, or upon the effect which his action may have upon our foreign relations. This consideration, in connection with what we have already said on the subject discloses the unwisdom of requiring Congress in this field **\*322** of governmental power to lay down narrowly definite standards by which the President is to be governed. As this court said in Mackenzie v. Hare, 239 U.S. 299, 311, 36 S.Ct. 106, 108, 60 L.Ed. 297, Ann.Cas.1916E, 645, 'As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. We should hesitate long **\*\*222** before limiting or embarrassing such powers.' (Italics supplied.)

In the light of the foregoing observations, it is evident that this court should not be in haste to apply a general rule which will have the effect of condemning legislation like that under review as constituting an unlawful delegation of legislative power. The principles which justify such legislation find overwhelming support in the unbroken

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

legislative practice which has prevailed almost from the inception of the national government to the present day.

Let us examine, in chronological order, the acts of legislation which warrant this conclusion:

The Act of June 4, 1794, authorized the President to lay, regulate and revoke embargoes. He was 'authorized' 'whenever, in his opinion, the public safety shall so require,' to lay the embargo upon all ships and vessels in the ports of the United States, including those of foreign nations, 'under such regulations as the circumstances of the case may require, and to continue or revoke the same, whenever he shall think proper.' C. 41, 1 Stat. 372. A prior joint resolution of May 7, 1794, (1 Stat. 401), had conferred unqualified power on the President to grant clearances, notwithstanding an existing embargo, to ships or vessels belonging to citizens of the United States bound to any port beyond the Cape of Good Hope.

The Act of March 3, 1795 (c. 53, 1 Stat. 444), gave the President authority to permit the exportation of arms, cannon and military stores, the law prohibiting such exports **\*323** to the contrary notwithstanding, the only prescribed guide for his action being that such exports should be in 'cases connected with the security of the commercial interest of the United States, and for public purposes only.'

By the Act of June 13, 1798 (c. 53, s 5, 1 Stat. 566), it was provided that if the government of France 'shall clearly disavow, and shall be found to refrain from the aggressions, depredations and hostilities' theretofore maintained against vessels and property of the citizens of the United States, 'in violation of the faith of treaties, and the laws of nations, and shall thereby acknowledge the just claims of the United States to be considered as in all respects neutral, * * * it shall be lawful for the President of the United States, being well ascertained of the premises, to remit and discontinue the prohibitions and restraints hereby enacted and declared; and he shall be, and is hereby authorized to make proclamation thereof accordingly.'

By section 4 of the Act of February 9, 1799 (c. 2, 1 Stat. 615), it was made 'lawful' for the President, 'if he shall deem it expedient and consistent with the interest of the United States,' by order to remit certain restraints and prohibitions imposed by the act with respect to the French

Republic, and also to revoke any such order 'whenever, in his opinion, the interest of the United States shall require.'

Similar authority, qualified in the same way was conferred by section 6 of the Act of February 7, 1800, c. 10, 2 Stat. 9.

Section 5 of the Act of March 3, 1805 (c. 41, 2 Stat. 341), made it lawful for the President, whenever an armed vessel entering the harbors or waters within the jurisdiction of the United States and required to depart therefrom should fail to do so, not only to employ the land and naval forces to compel obedience, but, 'if he **\*324** shall think it proper, it shall be lawful for him to forbid, by proclamation, all intercourse with such vessel, and with every armed vessel of the same nation, and the officers and crew thereof; to prohibit all supplies and aid from being furnished them' and to do various other things connected therewith. Violation of the President's proclamation was penalized.

On February 28, 1806, an act was passed (c. 9, 2 Stat. 351) to suspend commercial intercourse between the United States and certain parts of the Island of St. Domingo. A penalty was prescribed for its violation. Notwithstanding the positive provisions of the act, it was by section 5 (2 Stat. 352) made 'lawful' for the President to remit and discontinue the restraints and prohibitions imposed by the act at any time 'if he shall deem it expedient and consistent with the interests of the United States' to do so. Likewise in respect of the Non-intercourse Act of March 1, 1809 (c. 24, 2 Stat. 528); the President was 'authorized' (section 11, p. 530), in case either of the countries affected should so revoke or modify her edicts 'as that they shall cease to violate the neutral commerce of the United States,' to proclaim the fact, after which the suspended **\*\*223** trade might be renewed with the nation so doing.

Practically every volume of the United States Statutes contains one or more acts or joint resolutions of Congress authorizing action by the President in respect of subjects affecting foreign relations, which either leave the exercise of the power to his unrestricted judgment, or provide a standard far more general than that which has always been considered requisite with regard to domestic affairs. Many, though not all, of these acts are designated in the footnote. [2]

**\*\*224** **\*325** It well may be assumed that these legislative precedents were in mind when Congress passed the joint

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

resolutions of April 22, 1898, 30 Stat. 739; March 14, 1912, 37 Stat. 630 (22 U.S.C.A. s 236 and note); and January 31, 1922, 42 Stat. 361 (22 U.S.C.A. s 236), to prohibit the export of coal or other war material. The resolution of 1898 authorized the President 'in his discretion, and with such limitation and exceptions as shall seem to him expedient' to prohibit such exportations. The striking identity of language found in the second resolution mentioned above and in the one now under review will be **\*326** seen upon comparison. The resolution of March 14, 1912 (see 22 U.S.C.A. s 236 and note) provides:

'That whenever the President shall find that in any American country conditions of domestic violence exist which are promoted by the use of arms or munitions of war procured from the United States, and shall make proclamation thereof, it shall be unlawful to export except under such limitations and exceptions as the President **\*327** shall prescribe any arms or munitions of war from any place in the United States to such country until otherwise ordered by the President or by Congress.

'Sec. 2. That any shipment of material hereby declared unlawful after such a proclamation shall be punishable by fine not exceeding ten thousand dollars, or imprisonment not exceeding two years, or both.'

The third resolution is in substantially the same terms, but extends to any country in which the United States exercises extraterritorial jurisdiction, and provides for the President's action not only when conditions of domestic violence exist which are promoted, but also when such conditions may be promoted, by the use of such arms or munitions of war.

We had occasion to review these embargo and kindred acts in connection with an exhaustive discussion of the general subject of delegation of legislative power in a recent case, Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 422, 55 S.Ct. 241, 249, 79 L.Ed. 446, and, in justifying such acts, pointed out that they confided to the President 'an authority which was cognate to the conduct by him of the foreign relations of the government.'

The result of holding that the joint resolution here under attack is void and unenforceable as constituting an unlawful delegation of legislative power would be to stamp this multitude of comparable acts and resolutions

as likewise invalid. And while this court may not, and should not, hesitate to declare acts of Congress, however many times repeated, to be unconstitutional if beyond all rational doubt it finds them to be so, an impressive array of legislation such as we have just set forth, enacted by nearly every Congress from the beginning of our national existence to the present day, must be given unusual weight in the process of reaching a correct determination of the problem. A legislative practice such as we have here, evidenced not by only occasional instances, **\*328** but marked by the movement of a steady stream for a century and a half of time, goes a long way in the direction of proving the presence of unassailable ground for the constitutionality of the practice, to be found in the origin and history of the power involved, or in its nature, or in both combined.

In The Laura, 114 U.S. 411, 416, 5 S.Ct. 881, 883, 29 L.Ed. 147, this court answered a challenge to the constitutionality of a statute authorizing the Secretary of the Treasury to remit or mitigate fines and penalties in certain cases, by repeating the language of a very early case (Stuart v. Laird, 1 Cranch 299, 309, 2 L.Ed. 115) that the long practice and acquiescence under the statute was a 'practical exposition * * * too strong and obstinate to be shaken or controlled. Of course, the question is at rest, and ought not now to be disturbed.' In Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 57, 4 S.Ct. 279, 281, 28 L.Ed. 349, the constitutionality of R.S. s 4952, conferring upon the author, inventor, designer or proprietor of a photograph certain rights, was involved. Mr. Justice Miller, speaking for the court, disposed of the point **\*\*225** by saying: 'The construction placed upon the constitution by the first act of 1790 and the act of 1802, by the men who were contemporary with its formation, many of whom were members of the convention which framed it, is of itself entitled to very great weight, and when it is remembered that the rights thus established have not been disputed during a period of nearly a century, it is almost conclusive.'

In Field v. Clark, 143 U.S. 649, 691, 12 S.Ct. 495, 504, 36 L.Ed. 294, this court declared that 'the practical construction of the constitution, as given by so many acts of congress, and embracing almost the entire period of our national existence, should not be overruled, unless upon a conviction that such legislation was clearly incompatible

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

with the supreme law of the land.' The rule is one which has been stated and applied many times by this court. As examples, see **\*329** Ames v. Kansas, 111 U.S. 449, 469, 4 S.Ct. 437, 28 L.Ed. 482; McCulloch v. Maryland, 4 Wheat. 316, 401, 4 L.Ed. 579; Downes v. Bidwell, 182 U.S. 244, 286, 21 S.Ct. 770, 45 L.Ed. 1088.

The uniform, long-continued and undisputed legislative practice just disclosed rests upon an admissible view of the Constitution which, even if the practice found far less support in principle than we think it does, we should not feel at liberty at this late day to disturb.

We deem it unnecessary to consider, seriatim, the several clauses which are said to evidence the unconstitutionality of the Joint Resolution as involving an unlawful delegation of legislative power. It is enough to summarize by saying that, both upon principle and in accordance with precedent, we conclude there is sufficient warrant for the broad discretion vested in the President to determine whether the enforcement of the statute will have a beneficial effect upon the re-establishment of peace in the affected countries; whether he shall make proclamation to bring the resolution into operation; whether and when the resolution shall cease to operate and to make proclamation accordingly; and to prescribe limitations and exceptions to which the enforcement of the resolution shall be subject.

 **[8]**  Second. The second point raised by the demurrer was that the Joint Resolution never became effective because the President failed to find essential jurisdictional facts; and the third point was that the second proclamation of the President operated to put an end to the alleged liability of appellees under the Joint Resolution. In respect of both points, the court below overruled the demurrer, and thus far sustained the government.

The government contends that, upon an appeal by the United States under the Criminal Appeals Act from a decision holding an indictment bad, the jurisdiction of the court does not extend to questions decided in favor of the United States, but that such questions may only be reviewed **\*330** in the usual way after conviction. We find nothing in the words of the statute or in its purposes which justify this conclusion. The demurrer in the present case challenges the validity of the statute upon

three separate and distinct grounds. If the court below had sustained the demurrer without more, an appeal by the government necessarily would have brought here for our determination all of these grounds, since in that case the record would not have disclosed whether the court considered the statute invalid upon one particular ground or upon all of the grounds alleged. The judgment of the lower court is that the statute is invalid. Having held that this judgment cannot be sustained upon the particular ground which that court assigned, it is now open to this court to inquire whether or not the judgment can be sustained upon the rejected grounds which also challenge the validity of the statute and, therefore, constitute a proper subject of review by this court under the Criminal Appeals Act (18 U.S.C.A. s 682). United States v. Hastings, 296 U.S. 188, 192, 56 S.Ct. 218, 219, 80 L.Ed. 148.

In Langnes v. Green, 282 U.S. 531, 51 S.Ct. 243, 75 L.Ed. 520, where the decree of a District Court (32 F.(2d) 284) had been assailed upon two grounds and the Circuit Court of Appeals (35 F.(2d) 447) had sustained the attack upon one of such grounds only, we held that a respondent in certiorari might nevertheless urge in this court in support of the decree the ground which the intermediate appellate court had rejected. That principle is applicable here.

We proceed, then, to a consideration of the second and third grounds of the demurrers which, as we have said, the court below rejected.
 **\*\*226**  **[9]**  1. The Executive proclamation recites, 'I have found that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reestablishment of peace between those countries, **\*331** and that I have consulted with the governments of other American Republics and have been assured of the cooperation of such governments as I have deemed necessary as contemplated by the said joint resolution.' This finding satisfies every requirement of the Joint Resolution. There is no suggestion that the resolution is fatally uncertain or indefinite; and a finding which follows its language, as this finding does, cannot well be challenged as insufficient.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

But appellees, referring to the words which we have italicized above, contend that the finding is insufficient because the President does not declare that the cooperation of such governments as he deemed necessary included any American republic, and, therefore, the recital contains no affirmative showing of compliance in this respect with the Joint Resolution. The criticism seems to us wholly wanting in substance. The President recites that he has consulted with the governments of other American republics, and that he has been assured of the co-operation of such governments as he deemed necessary as contemplated by the joint resolution. These recitals, construed together, fairly include within their meaning American republics.

[10]  2. The second proclamation of the President, revoking the first proclamation, it is urged, had the effect of putting an end to the Joint Resolution, and in accordance with a well-settled rule no penalty could be enforced or punishment inflicted thereafter for an offense committed during the life of the Joint Resolution in the absence of a provision in the resolution to that effect. There is no doubt as to the general rule or as to the absence of a saving clause in the Joint Resolution. But is the case presented one which makes the rule applicable?

It was not within the power of the President to repeal the Joint Resolution; and his second proclamation did not  *332  purport to do so. It 'revoked' the first proclamation; and the question is, did the revocation of the proclamation have the effect of abrogating the resolution or of precluding its enforcement in so far as that involved the prosecution and punishment of offenses committed during the life of the first proclamation? We are of opinion that it did not.

Prior to the first proclamation, the Joint Resolution was an existing law, but dormant, awaiting the creation of a particular situation to render it active. No action or lack of action on the part of the President could destroy its potentiality. Congress alone could do that. The happening of the designated events—namely, the finding of certain conditions and the proclamation by the President—did not call the law into being. It created the occasion for it to function. The second proclamation did not put an end to the law or affect what had been done in violation of the

law. The effect of the proclamation was simply to remove for the future a condition of affairs which admitted of its exercise.

We should have had a different case if the Joint Resolution had expired by its own terms upon the issue of the second proclamation. Its operative force, it is true, was limited to the period of time covered by the first proclamation. And when the second proclamation was issued. the resolution ceased to be a rule for the future. It did not cease to be the law for the antecedent period of time. The distinction is clearly pointed out by the Superior Court of Judicature of New Hampshire in Stevens v. Dimond, 6 N.H. 330, 332, 333. There, a town by-law provided that, if certain animals should be found going at large between the first day of April and the last day of October, etc., the owner would incur a prescribed penalty. The trial court directed the jury that the by-law, being in force for a year only, had expired so that the defendant could not be called upon to answer for a violation which   *333  occurred during the designated period. The state appellate court reversed, saying that when laws 'expire by their own limitation, or are repealed, they cease to be the law in relation to past, as well as the future, and can no longer be enforced in any case. No case is, however, to be found in which it was ever held before that they thus ceased to be  **227  law, unless they expired by express limitation in themselves, or were repealed. It has never been decided that they cease to be law, merely because the time they were intended to regulate had expired. * * * A very little consideration of the subject will convince any one that a limitation of the time to which a statute is to apply, is a very different thing from the limitation of the time a statute is to continue in force.'

The first proclamation of the President was in force from the 28th day of May, 1934, to the 14th day of November, 1935. If the Joint Resolution had in no way depended upon Presidential action, but had provided explicitly that, at any time between May 28, 1934, and November 14, 1935, it should be unlawful to sell arms or munitions of war to the countries engaged in armed conflict in the Chaco, it certainly could not be successfully contended that the law would expire with the passing of the time fixed in respect of offenses committed during the period.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)
57 S.Ct. 216, 81 L.Ed. 255

The judgment of the court below must be reversed and the cause remanded for further proceedings in accordance with the foregoing opinion.

It is so ordered.

Mr. Justice McREYNOLDS does not agree. He is of opinion that the court below reached the right conclusion and its judgment ought to be affirmed.

Mr. Justice STONE took no part in the consideration or decision of this case.

**All Citations**

299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255

Footnotes

1   In general confirmation of the foregoing views, see 1 Story on the Constitution (4th Ed.) ss 198—217, and especially sections 210, 211, 213, 214, 215 (p. 153), 216.

2   Thus, the President has been broadly 'authorized' to suspend embargo acts passed by Congress, 'if in his judgment the public interest should require if' (Act of December 19, 1806, c. 1, s 3, 2 Stat. 411), or if, 'in the judgment of the President,' there has been such suspension of hostilities abroad as may render commerce of the United States sufficiently safe. Act of April 22, 1808, c. 52, 2 Stat. 490. See, also, Act of March 3, 1817, c. 39, s 2, 3 Stat. 361. Compare, but as to reviving an embargo act, the Act of May 1, 1810, c. 39, s 4, 2 Stat. 605.

Likewise, Congress has passed numerous acts laying tonnage and other duties on foreign ships, in retaliation for duties enforced on United States vessels, but providing that, if the President should be satisfied that the countervailing duties were repealed or abolished, then he might by proclamation suspend the duties as to vessels of the nation so acting. Thus, the President has been 'authorized' to proclaim the suspension. Act of January 7, 1824, c. 4, s 4, 4 Stat. 3; Act of May 24, 1828, c. 111, 4 Stat. 308; Act of July 24, 1897, c. 13, 30 Stat. 214 (46 U.S.C.A. s 141). On it has been provided that the suspension should take effect whenever the President 'shall be satisfied' that the discriminating duties have been abolished. Act of March 3, 1815, c. 77, 3 Stat. 224; Act of May 31, 1830, c. 219, s 2, 4 Stat. 425. Or that the President 'may direct' that the tonnage duty shall cease to be levied in such circumstances. Act of July 13, 1832, c. 207, s 3, 4 Stat. 578. And compare Act of June 26, 1884, c. 121, s 14, 23 Stat. 53, 57.

Other acts, for retaliation against discriminations as to United States commerce, have placed broad powers in the hands of the President, 'authorizing' even the total exclusion of vessels of any foreign country so offending (Act of June 19, 1886, c. 421, s 17, 24 Stat. 79, 82, 83 (46 U.S.C.A. s 142)), or the increase of duties on its goods or their total exclusion from the United States (Act of June 17, 1930, c. 497, s 388, 46 Stat. 590, 704 (19 U.S.C.A. s 1338)), or the exclusion of its goods or the detention, in certain circumstances, of its vessels, or the exclusion of its vessels or nationals from privileges similar to those which it has denied to citizens of the United States (Act of September 8, 1916, c. 463, ss 804—806, 39 Stat. 756, 799, 800 (15 U.S.C.A. ss 75—77)). As to discriminations by particular countries, it has been made lawful for the President, by proclamation, which he 'may, in his discretion, apply * * * to any part or to all' of the subjects named, to exclude certain goods of the offending country, or its vessels. Act of March 3, 1887, c. 339, 24 Stat. 475. And compare Act of July 26, 1892, c. 248, 27 Stat. 267 (46 U.S.C.A. ss 144, 145 and note). Compare, also, authority given the Postmaster General to reduce or enlarge rates of foreign postage, among other things, for the purpose of counteracting any adverse measures affecting our postal intercourse with foreign countries. Act of March 3, 1851, c. 20, s 2, 9 Stat. 587, 589.

The President has been 'authorized' to suspend an act providing for the exercise of judicial functions by ministers, consuls and other officers of the United States in the Ottoman dominions and Egypt whenever he 'shall receive satisfactory information' that the governments concerned have organized tribunals likely to secure to United States citizens the same impartial justice enjoyed under the judicial functions exercised by the United States officials. Act of March 23, 1874, c. 62, 18 Stat. 23 (22 U.S.C.A. s 182).

Congress has also passed acts for the enforcement of treaties or conventions, to be effective only upon proclamation of the President. Some of them may be noted which 'authorize' the President to make proclamation when he shall be 'satisfied' or shall receive 'satisfactory evidence' that the other nation has complied: Act of August 5, 1854, c. 269, ss 1, 2, 10 Stat. 587; Act of March 1, 1873, c. 213, ss 1, 2, 17 Stat. 482; Act of August 15, 1876, c. 290, 19 Stat. 200; Act of

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

**U.S. v. Curtiss-Wright Export Corporation, 299 U.S. 304 (1936)**

57 S.Ct. 216, 81 L.Ed. 255

December 17, 1903, c. 1, s 1, 33 Stat. 3. Cf. Act of June 11, 1864, c. 116, s 1, 13 Stat. 121 (22 U.S.C.A. s 256); Act of February 21, 1893, c. 150, 27 Stat. 472.

Where appropriate, Congress has provided that violation of the President's proclamations authorized by the foregoing acts shall be penalized. See, e.g., Act of June 19, 1886; Act of March 3, 1887; Act of September 8, 1916; Act of June 17, 1930—all supra.

---

**End of Document**                                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

135 S.Ct. 2076
Supreme Court of the United States

Menachem Binyamin ZIVOTOFSKY, By
His Parents and Guardians, Ari Z. and
Naomi Siegman Zivotofsky, Petitioner

v.

John KERRY, Secretary of State.

No. 13–628.
|
Argued Nov. 3, 2014.
|
Decided June 8, 2015.

**Synopsis**
**Background:** Minor child, through his United States
citizen parents, brought action for declaratory and
injunctive relief against Secretary of State, alleging that
child, who was born in Jerusalem, was entitled pursuant
to the Foreign Relations Authorization Act (FRAA) to
have "Israel" listed as his place of birth on his U.S.
passport. The United States District Court for the District
of Columbia, Gladys Kessler, J., 2004 WL 5835212,
granted Secretary's motion to dismiss, and child appealed.
The United States Court of Appeals for the District of
Columbia Circuit, 444 F.3d 614, reversed and remanded
for further development of the record. On remand,
Secretary moved to dismiss or for summary judgment and
child cross-moved for summary judgment. The District
Court, Gladys Kessler, J., 511 F.Supp.2d 97, granted
Secretary's motion to dismiss, and child appealed. The
Court of Appeals, Griffith, Circuit Judge, 571 F.3d 1227,
affirmed, and, 610 F.3d 84, denied rehearing en banc, and
certiorari was granted. The United States Supreme Court,
Chief Justice Roberts, —— U.S. ——, 132 S.Ct. 1421,
182 L.Ed.2d 423, vacated and remanded. On remand,
the Court of Appeals, Karen LeCraft Henderson, Circuit
Judge, 725 F.3d 197, affirmed. Certiorari was granted.

**Holdings:** The United States Supreme Court, Justice
Kennedy, held that:

[1] President had exclusive power to recognize foreign
nations and governments, and

[2] FRAA provision infringed upon President's exclusive
power of recognition.

Affirmed.

Justice Breyer filed concurring opinion.

Justice Thomas filed opinion concurring in part and
dissenting in part.

Chief Justice Roberts filed dissenting opinion, in which
Justice Alito joined.

Justice Scalia filed dissenting opinion, in which Chief
Justice Roberts and Justice Alito joined.

*2078* *Syllabus* [*]

Petitioner Zivotofsky was born to United States citizens
living in Jerusalem. Pursuant to § 214(d) of the Foreign
Relations Authorization Act, Fiscal Year 2003, his
mother asked American Embassy officials to list his
place of birth as "Israel" on, *inter alia,* his passport.
Section 214(d) states for "purposes of the registration
of birth, certification of nationality, or issuance of a
passport of a United States citizen born in the city of
Jerusalem, the Secretary shall, upon the request of the
citizen or the citizen's legal guardian, record the place
of birth as Israel." The Embassy officials refused to list
Zivotofsky's place of birth as "Israel" on his passport,
citing the Executive Branch's longstanding position that
the United States does not recognize any country as
having sovereignty over Jerusalem. Zivotofsky's parents
brought suit on his behalf in federal court, seeking to
enforce § 214(d). Ultimately, the D.C. Circuit held the
statute unconstitutional, concluding that it contradicts the
Executive Branch's exclusive power to recognize foreign
sovereigns.

*Held* :

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 62 of 482

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

1. The President has the exclusive power to grant formal recognition to a foreign sovereign. Pp. 2083 – 2095.

(a) Where, as here, the President's action is "incompatible with the expressed or implied will of Congress," the President "can rely [for his authority] only upon his own constitutional powers minus any constitutional powers of Congress over the matter," *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (Jackson, J., concurring). His asserted power must be both "exclusive" and "conclusive" on the issue, *id.,* at 637–638, 72 S.Ct. 863 and he may rely solely on powers the Constitution grants to him alone, *id.,* at 638, 72 S.Ct. 863. To determine whether the President's power of recognition is exclusive, this Court examines the Constitution's text and structure and relevant precedent and history. Pp. 2083 – 2084.

   **\*2079** (b) The Constitution's text and structure grant the President the power to recognize foreign nations and governments. The Reception Clause directs that the President "shall receive Ambassadors and other public Ministers," Art. II, § 3. And at the time of the founding, receiving an ambassador was considered tantamount to recognizing the sending state's sovereignty. It is thus logical and proper to infer that the Reception Clause would be understood to acknowledge the President's power to recognize other nations. This inference is further supported by the President's additional Article II powers: to negotiate treaties and to nominate the Nation's ambassadors and dispatch other diplomatic agents. Though ratifying a treaty and confirming an ambassador require congressional approval, Congress lacks authority to initiate the actions without the President's involvement. The President, unlike Congress, also has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers. The Constitution thus assigns the President, not Congress, means to effect recognition on his own initiative.

Functional considerations also suggest that the President's recognition power is exclusive. The Nation must "speak ... with one voice" regarding which governments are legitimate in the eyes of the United States and which are not, *American Insurance Assn. v. Garamendi,* 539 U.S. 396, 424, 123 S.Ct. 2374, 156 L.Ed.2d 376, and only the Executive has the characteristic of unity at all times. Unlike Congress, the President is also capable of engaging in the delicate and often secret diplomatic contacts that may lead to a recognition decision, see, *e.g., United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796, and is better positioned to take the decisive, unequivocal action necessary to recognize other states at international law. The President has also exercised unilateral recognition power since the founding, a practice endorsed by this Court, see, *e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410, 84 S.Ct. 923, 11 L.Ed.2d 804.

Under basic separation-of-powers principles, Congress, which has the central role in making laws, see Art. I, § 8, cl. 18, does have substantial authority regarding many policy determinations that precede and follow an act of recognition. The President's recognition determination is thus only one part of a political process. Pp. 2084 – 2088.

(b) A fair reading of relevant precedent illustrates that this Court has long considered recognition to be the exclusive prerogative of the Executive. See, *e.g., Williams v. Suffolk Ins. Co.,* 13 Pet. 415, 420, 10 L.Ed. 226; *United States v. Belmont,* 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134; *United States v. Pink, supra,* at 229, 62 S.Ct. 552; *Banco Nacional de Cuba v. Sabbatino, supra,* at 410, 84 S.Ct. 923; *National City Bank of N.Y. v. Republic of China,* 348 U.S. 356, 358, 75 S.Ct. 423, 99 L.Ed. 389. *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255, does not support a broader definition of the Executive's power over foreign relations that would permit the President alone to determine the whole content of the Nation's foreign policy. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. See, *e.g., Medellín v. Texas,* 552 U.S. 491, 523–532, 128 S.Ct. 1346, 170 L.Ed.2d 190. Nonetheless, it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate, and his position must be clear. Pp. 2087 – 2091.

(c) The weight of historical evidence also indicates Congress has accepted that **\*2080** the recognition power is exclusive to the Presidency. Cf. *NLRB v. Noel Canning,* 573 U.S. ——, 134 S.Ct. 2550, 189 L.Ed.2d 538. Since the first Administration, the President has claimed unilateral authority to recognize foreign sovereigns. And Congress, for the most part, has acquiesced, generally

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Serv. 5662...

respecting the Executive's policies and positions on formal recognition and even defending the President's constitutional prerogative. Pp. 2091 – 2095.

2. Because the power to recognize foreign states resides in the President alone, § 214(d) infringes on the Executive's consistent decision to withhold recognition with respect to Jerusalem. See *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867. The provision forces the President, through the Secretary of State, to identify, upon request, citizens born in Jerusalem as being born in Israel when, as a matter of United States policy, neither Israel nor any other country is acknowledged as having sovereignty over Jerusalem.

If the recognition power is to mean anything, it must mean that the President not only makes the initial, formal recognition determination but also may maintain that determination in his and his agent's statements. Under international law, recognition may be effected by written or oral declaration. In addition, an act of recognition must leave no doubt as to the intention to grant it. Thus, if Congress could alter the President's statements on matters of recognition or force him to contradict them, Congress in effect would exercise the recognition power. An "exclusive" Presidential power "disabl[es] the Congress from acting upon the subject." *Youngstown, supra,* at 638, 72 S.Ct. 863 (Jackson, J., concurring). If Congress may not pass a law, speaking in its own voice, effecting formal recognition, then it may not force the President, through § 214(d), to contradict his prior recognition determination in an official document issued by the Secretary of State. See *Urtetiqui v. D'Arcy,* 9 Pet. 692, 698, 9 L.Ed. 276.

Section 214(d)'s flaw is further underscored by the fact that the statute's purpose was to infringe on the President's exclusive recognition power. While Congress may have power to enact passport legislation of wide scope, it may not "aggrandiz[e] its power at the expense of another branch" by requiring the President to contradict an earlier recognition determination in an official Executive Branch document. *Freytag v. Commissioner,* 501 U.S. 868, 878, 111 S.Ct. 2631, 115 L.Ed.2d 764. Pp. 2094 – 2096.

725 F.3d 197, affirmed.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. BREYER, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part. ROBERTS, C.J., filed a dissenting opinion, in which ALITO, J., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C.J., and ALITO, J., joined.

Attorneys and Law Firms

Alyza D. Lewin, Washington, DC, for Petitioner.

Donald B. Verrilli, Jr., Solicitor General, for Respondent.

Chaim Z. Kagedan, Of Counsel, Venable LLP, New York, NY, Nathan Lewin, Counsel of Record, Alyza D. Lewin, Lewin & Lewin, LLP, Washington, DC, for Petitioner.

Mary E. McLeod, Acting Legal Adviser, Department of State, Washington, DC, Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Joyce R. Branda, Acting **2081** Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Ginger D. Anders, Assistant to the Solicitor General, Douglas N. Letter, Dana Kaersvang, Attorneys, Department of Justice, Washington, DC, for Respondent.

Opinion

Justice KENNEDY delivered the opinion of the Court.

A delicate subject lies in the background of this case. That subject is Jerusalem. Questions touching upon the history of the ancient city and its present legal and international status are among the most difficult and complex in international affairs. In our constitutional system these matters are committed to the Legislature and the Executive, not the Judiciary. As a result, in this opinion the Court does no more, and must do no more, than note the existence of international debate and tensions respecting Jerusalem. Those matters are for Congress and the President to discuss and consider as they seek to shape the Nation's foreign policies.

The Court addresses two questions to resolve the interbranch dispute now before it. First, it must determine

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

whether the President has the exclusive power to grant formal recognition to a foreign sovereign. Second, if he has that power, the Court must determine whether Congress can command the President and his Secretary of State to issue a formal statement that contradicts the earlier recognition. The statement in question here is a congressional mandate that allows a United States citizen born in Jerusalem to direct the President and Secretary of State, when issuing his passport, to state that his place of birth is "Israel."

I

A

Jerusalem's political standing has long been, and remains, one of the most sensitive issues in American foreign policy, and indeed it is one of the most delicate issues in current international affairs. In 1948, President Truman formally recognized Israel in a signed statement of "recognition." See Statement by the President Announcing Recognition of the State of Israel, Public Papers of the Presidents, May 14, 1948, p. 258 (1964). That statement did not recognize Israeli sovereignty over Jerusalem. Over the last 60 years, various actors have sought to assert full or partial sovereignty over the city, including Israel, Jordan, and the Palestinians. Yet, in contrast to a consistent policy of formal recognition of Israel, neither President Truman nor any later United States President has issued an official statement or declaration acknowledging any country's sovereignty over Jerusalem. Instead, the Executive Branch has maintained that " 'the status of Jerusalem ... should be decided not unilaterally but in consultation with all concerned.' " United Nations Gen. Assembly Official Records, 5th Emergency Sess., 1554th Plenary Meetings, United Nations Doc. No. 1 A/PV.1554, p. 10 (July 14, 1967); see, e.g., Remarks by President Obama in Address to the United Nations Gen. Assembly (Sept. 21, 2011), 2011 Daily Comp. of Pres. Doc. No. 00661, p. 4 ("Ultimately, it is the Israelis and the Palestinians, not us, who must reach agreement on the issues that divide them," including "Jerusalem"). In a letter to Congress then-Secretary of State Warren Christopher expressed the Executive's concern that "[t]here is no issue related to the Arab–Israeli negotiations that is more sensitive **2082**

than Jerusalem." See 141 Cong. Rec. 28967 (1995) (letter to Robert Dole, Majority Leader, (June 20, 1995)). He further noted the Executive's opinion that "any effort ... to bring it to the forefront" could be "very damaging to the success of the peace process." *Ibid.*

The President's position on Jerusalem is reflected in State Department policy regarding passports and consular reports of birth abroad. Understanding that passports will be construed as reflections of American policy, the State Department's Foreign Affairs Manual instructs its employees, in general, to record the place of birth on a passport as the "country [having] present sovereignty over the actual area of birth." Dept. of State, 7 Foreign Affairs Manual (FAM) § 1383.4 (1987). If a citizen objects to the country listed as sovereign by the State Department, he or she may list the city or town of birth rather than the country. See *id.,* § 1383.6. The FAM, however, does not allow citizens to list a sovereign that conflicts with Executive Branch policy. See generally *id.,* § 1383. Because the United States does not recognize any country as having sovereignty over Jerusalem, the FAM instructs employees to record the place of birth for citizens born there as "Jerusalem." *Id.,* § 1383.5–6 (emphasis deleted).

In 2002, Congress passed the Act at issue here, the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1350. Section 214 of the Act is titled "United States Policy with Respect to Jerusalem as the Capital of Israel." *Id.,* at 1365. The subsection that lies at the heart of this case, § 214(d), addresses passports. That subsection seeks to override the FAM by allowing citizens born in Jerusalem to list their place of birth as "Israel." Titled "Record of Place of Birth as Israel for Passport Purposes," § 214(d) states "[f]or purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." *Id.,* at 1366.

When he signed the Act into law, President George W. Bush issued a statement declaring his position that § 214 would, "if construed as mandatory rather than advisory, impermissibly interfere with the President's constitutional authority to formulate the position of the United States, speak for the Nation in international

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

affairs, and determine the terms on which recognition is given to foreign states." Statement on Signing the Foreign Relations Authorization Act, Fiscal Year 2003, Public Papers of the Presidents, George W. Bush, Vol. 2, Sept. 30, 2002, p. 1698 (2005). The President concluded, "U.S. policy regarding Jerusalem has not changed." *Ibid.*

Some parties were not reassured by the President's statement. A cable from the United States Consulate in Jerusalem noted that the Palestine Liberation Organization Executive Committee, Fatah Central Committee, and the Palestinian Authority Cabinet had all issued statements claiming that the Act " 'undermines the role of the U.S. as a sponsor of the peace process.' " App. 231. In the Gaza Strip and elsewhere residents marched in protest. See The Associated Press and Reuters, Palestinians Stone Police Guarding Western Wall, The Seattle Times, Oct. 5, 2002, p. A7.

In response the Secretary of State advised diplomats to express their understanding of "Jerusalem's importance to both sides and to many others around the world." App. 228. He noted his belief that America's "policy towards Jerusalem" had not changed. *Ibid.*

### *2083 B

In 2002, petitioner Menachem Binyamin Zivotofsky was born to United States citizens living in Jerusalem. App. 24–25. In December 2002, Zivotofsky's mother visited the American Embassy in Tel Aviv to request both a passport and a consular report of birth abroad for her son. *Id.,* at 25. She asked that his place of birth be listed as " 'Jerusalem, Israel.' " *Ibid.* The Embassy clerks explained that, pursuant to State Department policy, the passport would list only "Jerusalem." *Ibid.* Zivotofsky's parents objected and, as his guardians, brought suit on his behalf in the United States District Court for the District of Columbia, seeking to enforce § 214(d).

**[1]** Pursuant to § 214(d), Zivotofsky claims the right to have "Israel" recorded as his place of birth in his passport. See *Zivotofsky v. Clinton,* 566 U.S. ——, ——, 132 S.Ct. 1421, 1426, 182 L.Ed.2d 423 (2012) ("[W]hile Zivotofsky had originally asked that 'Jerusalem, Israel' be recorded

on his passport, '[b]oth sides agree that the question now is whether § 214(d) entitles [him] to have just "Israel" listed' "). The arguments in Zivotofsky's brief center on his passport claim, as opposed to the consular report of birth abroad. Indeed, in the court below, Zivotofsky waived any argument that his consular report of birth abroad should be treated differently than his passport. *Zivotofsky v. Secretary of State,* 725 F.3d 197, 203, n. 3 (C.A.D.C.2013). He has also waived the issue here by failing to differentiate between the two documents. As a result, the Court addresses Zivotofsky's passport arguments and need not engage in a separate analysis of the validity of § 214(d) as applied to consular reports of birth abroad.

After Zivotofsky brought suit, the District Court dismissed his case, reasoning that it presented a nonjusticiable political question and that Zivotofsky lacked standing. App. 28–39. The Court of Appeals for the District of Columbia Circuit reversed on the standing issue, *Zivotofsky v. Secretary of State,* 444 F.3d 614, 617–619 (2006), but later affirmed the District Court's political question determination. See *Zivotofsky v. Secretary of State,* 571 F.3d 1227, 1228 (2009).

This Court granted certiorari, vacated the judgment, and remanded the case. Whether § 214(d) is constitutional, the Court held, is not a question reserved for the political branches. In reference to Zivotofsky's claim the Court observed "the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional"—not whether Jerusalem is, in fact, part of Israel. *Zivotofsky v. Clinton, supra,* at ——, 132 S.Ct., at 1427.

On remand the Court of Appeals held the statute unconstitutional. It determined that "the President exclusively holds the power to determine whether to recognize a foreign sovereign," 725 F.3d, at 214, and that "section 214(d) directly contradicts a carefully considered exercise of the Executive branch's recognition power." *Id.,* at 217.

This Court again granted certiorari. 572 U.S. ——, 134 S.Ct. 1873, 188 L.Ed.2d 910 (2014).

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

II

**[2]** **[3]** **[4]** In considering claims of Presidential power this Court refers to Justice Jackson's familiar tripartite framework from *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–638, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (concurring opinion). The framework divides exercises of Presidential power into three categories: First, when "the President acts pursuant to an express or implied authorization of **\*2084** Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Id.,* at 635, 72 S.Ct. 863. Second, "in absence of either a congressional grant or denial of authority" there is a "zone of twilight in which he and Congress may have concurrent authority," and where "congressional inertia, indifference or quiescence may" invite the exercise of executive power. *Id.,* at 637, 72 S.Ct. 863. Finally, when "the President takes measures incompatible with the expressed or implied will of Congress ... he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Ibid.* To succeed in this third category, the President's asserted power must be both "exclusive" and "conclusive" on the issue. *Id.,* at 637–638, 72 S.Ct. 863.

In this case the Secretary contends that § 214(d) infringes on the President's exclusive recognition power by "requiring the President to contradict his recognition position regarding Jerusalem in official communications with foreign sovereigns." Brief for Respondent 48. In so doing the Secretary acknowledges the President's power is "at its lowest ebb." *Youngstown,* 343 U.S., at 637, 72 S.Ct. 863. Because the President's refusal to implement § 214(d) falls into Justice Jackson's third category, his claim must be "scrutinized with caution," and he may rely solely on powers the Constitution grants to him alone. *Id.,* at 638, 72 S.Ct. 863.

To determine whether the President possesses the exclusive power of recognition the Court examines the Constitution's text and structure, as well as precedent and history bearing on the question.

A

**[5]** **[6]** Recognition is a "formal acknowledgement" that a particular "entity possesses the qualifications for statehood" or "that a particular regime is the effective government of a state." Restatement (Third) of Foreign Relations Law of the United States § 203, Comment *a,* p. 84 (1986). It may also involve the determination of a state's territorial bounds. See 2 M. Whiteman, Digest of International Law § 1, p. 1 (1963) (Whiteman) ("[S]tates may recognize or decline to recognize territory as belonging to, or under the sovereignty of, or having been acquired or lost by, other states"). Recognition is often effected by an express "written or oral declaration." 1 J. Moore, Digest of International Law § 27, p. 73 (1906) (Moore). It may also be implied—for example, by concluding a bilateral treaty or by sending or receiving diplomatic agents. *Ibid.*; I. Brownlie, Principles of Public International Law 93 (7th ed. 2008) (Brownlie).

**[7]** **[8]** **[9]** Legal consequences follow formal recognition. Recognized sovereigns may sue in United States courts, see *Guaranty Trust Co. v. United States,* 304 U.S. 126, 137, 58 S.Ct. 785, 82 L.Ed. 1224 (1938), and may benefit from sovereign immunity when they are sued, see *National City Bank of N. Y. v. Republic of China,* 348 U.S. 356, 358–359, 75 S.Ct. 423, 99 L.Ed. 389 (1955). The actions of a recognized sovereign committed within its own territory also receive deference in domestic courts under the act of state doctrine. See *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302–303, 38 S.Ct. 309, 62 L.Ed. 726 (1918). Recognition at international law, furthermore, is a precondition of regular diplomatic relations. 1 Moore § 27, at 72. Recognition is thus "useful, even necessary," to the existence of a state. *Ibid.*

Despite the importance of the recognition power in foreign relations, the Constitution does not use the term "recognition," either in Article II or elsewhere. The Secretary asserts that the President exercises **\*2085** the recognition power based on the Reception Clause, which directs that the President "shall receive Ambassadors and other public Ministers." Art. II, § 3. As Zivotofsky notes, the Reception Clause received little attention at the Constitutional Convention. See Reinstein, Recognition: A

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

Case Study on the Original Understanding of Executive Power, 45 U. Rich. L. Rev. 801, 860–862 (2011). In fact, during the ratification debates, Alexander Hamilton claimed that the power to receive ambassadors was "more a matter of dignity than of authority," a ministerial duty largely "without consequence." The Federalist No. 69, p. 420 (C. Rossiter ed. 1961).

**[10]** At the time of the founding, however, prominent international scholars suggested that receiving an ambassador was tantamount to recognizing the sovereignty of the sending state. See E. de Vattel, The Law of Nations § 78, p. 461 (1758) (J. Chitty ed. 1853) ("[E]very state, truly possessed of sovereignty, has a right to send ambassadors" and "to contest their right in this instance" is equivalent to "contesting their sovereign dignity"); see also 2 C. van Bynkershoek, On Questions of Public Law 156–157 (1737) (T. Frank ed. 1930) ("Among writers on public law it is usually agreed that only a sovereign power has a right to send ambassadors"); 2 H. Grotius, On the Law of War and Peace 440–441 (1625) (F. Kelsey ed. 1925) (discussing the duty to admit ambassadors of sovereign powers). It is a logical and proper inference, then, that a Clause directing the President alone to receive ambassadors would be understood to acknowledge his power to recognize other nations.

This in fact occurred early in the Nation's history when President Washington recognized the French Revolutionary Government by receiving its ambassador. See A. Hamilton, Pacificus No. 1, in The Letters of Pacificus and Helvidius 5, 13–14 (1845) (reprint 1976) (President "acknowledged the republic of France, by the reception of its minister"). After this incident the import of the Reception Clause became clear—causing Hamilton to change his earlier view. He wrote that the Reception Clause "includes th[e power] of judging, in the case of a revolution of government in a foreign country, whether the new rulers are competent organs of the national will, and ought to be recognised, or not." See *id.,* at 12; see also 3 J. Story, Commentaries on the Constitution of the United States § 1560, p. 416 (1833) ("If the executive receives an ambassador, or other minister, as the representative of a new nation ... it is an acknowledgment of the sovereign authority *de facto* of such new nation, or party"). As a result, the Reception

Clause provides support, although not the sole authority, for the President's power to recognize other nations.

The inference that the President exercises the recognition power is further supported by his additional Article II powers. It is for the President, "by and with the Advice and Consent of the Senate," to "make Treaties, provided two thirds of the Senators present concur." Art. II, § 2, cl. 2. In addition, "he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors" as well as "other public Ministers and Consuls." *Ibid.*

As a matter of constitutional structure, these additional powers give the President control over recognition decisions. At international law, recognition may be effected by different means, but each means is dependent upon Presidential power. In addition to receiving an ambassador, recognition may occur on "the conclusion of a bilateral treaty," or the "formal initiation of diplomatic relations," including the dispatch of an ambassador. Brownlie 93; see **\*2086** also 1 Moore § 27, at 73. The President has the sole power to negotiate treaties, see *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and the Senate may not conclude or ratify a treaty without Presidential action. The President, too, nominates the Nation's ambassadors and dispatches other diplomatic agents. Congress may not send an ambassador without his involvement. Beyond that, the President himself has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers. The Constitution thus assigns the President means to effect recognition on his own initiative. Congress, by contrast, has no constitutional power that would enable it to initiate diplomatic relations with a foreign nation. Because these specific Clauses confer the recognition power on the President, the Court need not consider whether or to what extent the Vesting Clause, which provides that the "executive Power" shall be vested in the President, provides further support for the President's action here. Art. II, § 1, cl. 1.

The text and structure of the Constitution grant the President the power to recognize foreign nations and governments. The question then becomes whether that power is exclusive. The various ways in which the President may unilaterally effect recognition—and the

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

lack of any similar power vested in Congress—suggest that it is. So, too, do functional considerations. Put simply, the Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not. Foreign countries need to know, before entering into diplomatic relations or commerce with the United States, whether their ambassadors will be received; whether their officials will be immune from suit in federal court; and whether they may initiate lawsuits here to vindicate their rights. These assurances cannot be equivocal.

Recognition is a topic on which the Nation must " 'speak ... with one voice.' " *American Ins. Assn. v. Garamendi,* 539 U.S. 396, 424, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (quoting *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 381, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)). That voice must be the President's. Between the two political branches, only the Executive has the characteristic of unity at all times. And with unity comes the ability to exercise, to a greater degree, "[d]ecision, activity, secrecy, and dispatch." The Federalist No. 70, p. 424 (A. Hamilton). The President is capable, in ways Congress is not, of engaging in the delicate and often secret diplomatic contacts that may lead to a decision on recognition. See, *e.g., United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct. 552, 86 L.Ed. 796 (1942). He is also better positioned to take the decisive, unequivocal action necessary to recognize other states at international law. 1 Oppenheim's International Law § 50, p. 169 (R. Jennings & A. Watts eds., 9th ed. 1992) (act of recognition must "leave no doubt as to the intention to grant it"). These qualities explain why the Framers listed the traditional avenues of recognition—receiving ambassadors, making treaties, and sending ambassadors —as among the President's Article II powers.

As described in more detail below, the President since the founding has exercised this unilateral power to recognize new states—and the Court has endorsed the practice. See *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Pink, supra,* at 229, 62 S.Ct. 552; *Williams v. Suffolk Ins. Co.,* 13 Pet. 415, 420, 10 L.Ed. 226 (1839). Texts and treatises on international law treat the President's word as the final word on recognition. See, *e.g.,* **\*2087** Restatement (Third) of Foreign Relations Law § 204, at 89 ("Under

the Constitution of the United States the President has exclusive authority to recognize or not to recognize a foreign state or government"); see also L. Henkin, Foreign Affairs and the U.S. Constitution (2d ed. 1996) ("It is no longer questioned that the President does not merely perform the ceremony of receiving foreign ambassadors but also determines whether the United States should recognize or refuse to recognize a foreign government"). In light of this authority all six judges who considered this case in the Court of Appeals agreed that the President holds the exclusive recognition power. See 725 F.3d, at 214 ("[W]e conclude that the President exclusively holds the power to determine whether to recognize a foreign sovereign"); *Zivotofsky,* 571 F.3d, at 1231 ("That this power belongs solely to the President has been clear from the earliest days of the Republic"); *id.,* at 1240 (Edwards, J., concurring) ("The Executive has exclusive and unreviewable authority to recognize foreign sovereigns").

It remains true, of course, that many decisions affecting foreign relations—including decisions that may determine the course of our relations with recognized countries —require congressional action. Congress may "regulate Commerce with foreign Nations," "establish an uniform Rule of Naturalization," "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," "declare War," "grant Letters of Marque and Reprisal," and "make Rules for the Government and Regulation of the land and naval Forces." U.S. Const., Art. I, § 8. In addition, the President cannot make a treaty or appoint an ambassador without the approval of the Senate. Art. II, § 2, cl. 2. The President, furthermore, could not build an American Embassy abroad without congressional appropriation of the necessary funds. Art. I, § 8, cl. 1. Under basic separation-of-powers principles, it is for the Congress to enact the laws, including "all Laws which shall be necessary and proper for carrying into Execution" the powers of the Federal Government. § 8, cl. 18.

In foreign affairs, as in the domestic realm, the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown,* 343 U.S., at 635, 72 S.Ct. 863 (Jackson, J., concurring). Although the President alone effects the formal act of recognition, Congress' powers, and its

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

central role in making laws, give it substantial authority regarding many of the policy determinations that precede and follow the act of recognition itself. If Congress disagrees with the President's recognition policy, there may be consequences. Formal recognition may seem a hollow act if it is not accompanied by the dispatch of an ambassador, the easing of trade restrictions, and the conclusion of treaties. And those decisions require action by the Senate or the whole Congress.

In practice, then, the President's recognition determination is just one part of a political process that may require Congress to make laws. The President's exclusive recognition power encompasses the authority to acknowledge, in a formal sense, the legitimacy of other states and governments, including their territorial bounds. Albeit limited, the exclusive recognition power is essential to the conduct of Presidential duties. The formal act of recognition is an executive power that Congress may not qualify. If the President is to be effective in negotiations over a formal recognition determination, it must be evident to his counterparts abroad that he speaks for the Nation on that precise question.

 **\*2088**  A clear rule that the formal power to recognize a foreign government subsists in the President therefore serves a necessary purpose in diplomatic relations. All this, of course, underscores that Congress has an important role in other aspects of foreign policy, and the President may be bound by any number of laws Congress enacts. In this way ambition counters ambition, ensuring that the democratic will of the people is observed and respected in foreign affairs as in the domestic realm. See The Federalist No. 51, p. 322 (J. Madison).

B

No single precedent resolves the question whether the President has exclusive recognition authority and, if so, how far that power extends. In part that is because, until today, the political branches have resolved their disputes over questions of recognition. The relevant cases, though providing important instruction, address the division of recognition power between the Federal Government and the States, see, *e.g., Pink,* 315 U.S. 203, 62 S.Ct. 552,

86 L.Ed. 796, or between the courts and the political branches, see, *e.g., Banco Nacional de Cuba,* 376 U.S., at 410, 84 S.Ct. 923—not between the President and Congress. As the parties acknowledge, some isolated statements in those cases lend support to the position that Congress has a role in the recognition process. In the end, however, a fair reading of the cases shows that the President's role in the recognition process is both central and exclusive.

 **[11]**  During the administration of President Van Buren, in a case involving a dispute over the status of the Falkland Islands, the Court noted that "when the executive branch of the government" assumes "a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department." *Williams,* 13 Pet., at 420. Once the President has made his determination, it "is enough to know, that in the exercise of his constitutional functions, he has decided the question. Having done this under the responsibilities which belong to him, it is obligatory on the people and government of the Union." *Ibid.*

 **[12]**  Later, during the 1930's and 1940's, the Court addressed issues surrounding President Roosevelt's decision to recognize the Soviet Government of Russia. In *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), and *Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796, New York state courts declined to give full effect to the terms of executive agreements the President had concluded in negotiations over recognition of the Soviet regime. In particular the state courts, based on New York public policy, did not treat assets that had been seized by the Soviet Government as property of Russia and declined to turn those assets over to the United States. The Court stated that it "may not be doubted" that "recognition, establishment of diplomatic relations, ... and agreements with respect thereto" are "within the competence of the President." *Belmont,* 301 U.S., at 330, 57 S.Ct. 758. In these matters, "the Executive ha[s] authority to speak as the sole organ of th[e] government." *Ibid.* The Court added that the President's authority "is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition." *Pink, supra,* at 229, 62 S.Ct. 552; see also *Guaranty Trust Co.,* 304 U.S., at 137–138, 58 S.Ct. 785 (The "political department['s] ... action in recognizing a foreign

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

government and in receiving its diplomatic representatives is conclusive on all domestic courts"). Thus, **\*2089** New York state courts were required to respect the executive agreements.

It is true, of course, that *Belmont* and *Pink* are not direct holdings that the recognition power is exclusive. Those cases considered the validity of executive agreements, not the initial act of recognition. The President's determination in those cases did not contradict an Act of Congress. And the primary issue was whether the executive agreements could supersede state law. Still, the language in *Pink* and *Belmont*, which confirms the President's competence to determine questions of recognition, is strong support for the conclusion that it is for the President alone to determine which foreign governments are legitimate.

*Banco Nacional de Cuba* contains even stronger statements regarding the President's authority over recognition. There, the status of Cuba's Government and its acts as a sovereign were at issue. As the Court explained, "Political recognition is exclusively a function of the Executive." 376 U.S., at 410, 84 S.Ct. 923. Because the Executive had recognized the Cuban Government, the Court held that it should be treated as sovereign and could benefit from the "act of state" doctrine. See also *Baker v. Carr,* 369 U.S. 186, 213, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ("[I]t is the executive that determines a person's status as representative of a foreign government"); *National City Bank of N.Y.,* 348 U.S., at 358, 75 S.Ct. 423 ("The status of the Republic of China in our courts is a matter for determination by the Executive and is outside the competence of this Court"). As these cases illustrate, the Court has long considered recognition to be the exclusive prerogative of the Executive.

The Secretary now urges the Court to define the executive power over foreign relations in even broader terms. He contends that under the Court's precedent the President has "exclusive authority to conduct diplomatic relations," along with "the bulk of foreign-affairs powers." Brief for Respondent 18, 16. In support of his submission that the President has broad, undefined powers over foreign affairs, the Secretary quotes *United States v. Curtiss–Wright Export Corp.,* which described the President as "the sole organ of the federal government

in the field of international relations." 299 U.S., at 320, 57 S.Ct. 216. This Court declines to acknowledge that unbounded power. A formulation broader than the rule that the President alone determines what nations to formally recognize as legitimate—and that he consequently controls his statements on matters of recognition—presents different issues and is unnecessary to the resolution of this case.

The *Curtiss–Wright* case does not extend so far as the Secretary suggests. In *Curtiss–Wright,* the Court considered whether a congressional delegation of power to the President was constitutional. Congress had passed a joint resolution giving the President the discretion to prohibit arms sales to certain militant powers in South America. The resolution provided criminal penalties for violation of those orders. *Id.,* at 311–312, 57 S.Ct. 216. The Court held that the delegation was constitutional, reasoning that Congress may grant the President substantial authority and discretion in the field of foreign affairs. *Id.,* at 315–329, 57 S.Ct. 216. Describing why such broad delegation may be appropriate, the opinion stated:

"In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He *makes* treaties with the advice and consent of the Senate; but he alone negotiates. Into **\*2090** the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it. As Marshall said in his great argument of March 7, 1800, in the House of Representatives, 'The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.' [10 Annals of Cong.] 613." *Id.,* at 319, 57 S.Ct. 216.

This description of the President's exclusive power was not necessary to the holding of *Curtiss–Wright*—which, after all, dealt with congressionally authorized action, not a unilateral Presidential determination. Indeed, *Curtiss–Wright* did not hold that the President is free from Congress' lawmaking power in the field of international relations. The President does have a unique role in communicating with foreign governments, as then-Congressman John Marshall acknowledged. See 10

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

Annals of Cong. 613 (1800) (cited in *Curtiss–Wright, supra,* at 319, 57 S.Ct. 216). But whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law.

In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. See, *e.g., Medellín v. Texas,* 552 U.S. 491, 523–532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); *Youngstown,* 343 U.S., at 589, 72 S.Ct. 863; *Little v. Barreme,* 2 Cranch 170, 177–179, 2 L.Ed. 243 (1804); Glennon, Two Views of Presidential Foreign Affairs Power: *Little v. Barreme* or *Curtiss–Wright* ? 13 Yale J. Int'l L. 5, 19–20 (1988); cf. *Dames & Moore v. Regan,* 453 U.S. 654, 680–681, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). It is not for the President alone to determine the whole content of the Nation's foreign policy.

That said, judicial precedent and historical practice teach that it is for the President alone to make the specific decision of what foreign power he will recognize as legitimate, both for the Nation as a whole and for the purpose of making his own position clear within the context of recognition in discussions and negotiations with foreign nations. Recognition is an act with immediate and powerful significance for international relations, so the President's position must be clear. Congress cannot require him to contradict his own statement regarding a determination of formal recognition.

Zivotofsky's contrary arguments are unconvincing. The decisions he relies upon are largely inapposite. This Court's cases do not hold that the recognition power is shared. *Jones v. United States,* 137 U.S. 202, 11 S.Ct. 80, 34 L.Ed. 691 (1890), and *Boumediene v. Bush,* 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), each addressed the status of territories controlled or acquired by the United States—not whether a province ought to be recognized as part of a foreign country. See also *Vermilya–Brown Co. v. Connell,* 335 U.S. 377, 380, 69 S.Ct. 140, 93 L.Ed. 76 (1948) ("[D]etermination of [American] sovereignty over an area is for the legislative and executive departments"). And no

one disputes that Congress has a role in determining the status of United States territories. See U.S. Const., Art. IV, § 3, cl. 2 (Congress may "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"). Other cases describing a shared power address the recognition of Indian tribes—which is, similarly, a distinct issue from the recognition **\*2091** of foreign countries. See *Cherokee Nation v. Georgia,* 5 Pet. 1, 8 L.Ed. 25 (1831).

To be sure, the Court has mentioned both of the political branches in discussing international recognition, but it has done so primarily in affirming that the Judiciary is not responsible for recognizing foreign nations. See *Oetjen,* 246 U.S., at 302, 38 S.Ct. 309 (" 'Who is the sovereign, *de jure* or *de facto,* of a territory is not a judicial, but is a political question, the determination of which by the legislative and executive departments of any government conclusively binds the judges' " (quoting *Jones, supra,* at 212, 11 S.Ct. 80)); *United States v. Palmer,* 3 Wheat. 610, 643, 4 L.Ed. 471 (1818) ("[T]he courts of the union must view [a] newly constituted government as it is viewed by the legislative and executive departments of the government of the United States"). This is consistent with the fact that Congress, in the ordinary course, does support the President's recognition policy, for instance by confirming an ambassador to the recognized foreign government. Those cases do not cast doubt on the view that the Executive Branch determines whether the United States will recognize foreign states and governments and their territorial bounds.

C

Having examined the Constitution's text and this Court's precedent, it is appropriate to turn to accepted understandings and practice. In separation-of-powers cases this Court has often "put significant weight upon historical practice." *NLRB v. Noel Canning,* 573 U.S. ——, ——, 134 S.Ct. 2550, 2559, 189 L.Ed.2d 538 (2014) (emphasis deleted). Here, history is not all on one side, but on balance it provides strong support for the conclusion that the recognition power is the President's alone. As Zivotofsky argues, certain historical incidents can be interpreted to support the position that recognition is

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

a shared power. But the weight of historical evidence supports the opposite view, which is that the formal determination of recognition is a power to be exercised only by the President.

The briefs of the parties and *amici,* which have been of considerable assistance to the Court, give a more complete account of the relevant history, as do the works of scholars in this field. See, *e.g.,* Brief for Respondent 26–39; Brief for Petitioner 34–57; Brief for American Jewish Committee as *Amicus Curiae* 6–24; J. Goebel, The Recognition Policy of the United States 97–170 (1915) (Goebel); 1 Moore §§ 28–58, 74–164; Reinstein, Is the President's Recognition Power Exclusive? 86 Temp. L. Rev. 1, 3–50 (2013). But even a brief survey of the major historical examples, with an emphasis on those said to favor Zivotofsky, establishes no more than that some Presidents have chosen to cooperate with Congress, not that Congress itself has exercised the recognition power.

From the first Administration forward, the President has claimed unilateral authority to recognize foreign sovereigns. For the most part, Congress has acquiesced in the Executive's exercise of the recognition power. On occasion, the President has chosen, as may often be prudent, to consult and coordinate with Congress. As Judge Tatel noted in this case, however, "the most striking thing" about the history of recognition "is what is absent from it: a situation like this one," where Congress has enacted a statute contrary to the President's formal and considered statement concerning recognition. 725 F.3d, at 221 (concurring opinion).

The first debate over the recognition power arose in 1793, after France had been torn by revolution. See Prakash & Ramsey, **\*2092** The Executive Power over Foreign Affairs, 111 Yale L.J. 231, 312 (2001). Once the Revolutionary Government was established, Secretary of State Jefferson and President Washington, without consulting Congress, authorized the American Ambassador to resume relations with the new regime. See Letter to Gouverneur Morris (Mar. 12, 1793), in 25 Papers of Thomas Jefferson 367, 367–368 (J. Catanzariti ed. 1992); Goebel 99–104. Soon thereafter, the new French Government proposed to send an ambassador, Citizen Genet, to the United States. See *id.,* at 105. Members of the President's Cabinet agreed that receiving Genet

would be a binding and public act of recognition. See Opinion on the Treaties with France (Apr. 28, 1793), in 25 Papers of Thomas Jefferson, at 608, 612 ("The reception of the Minister at all ... is an ackno[w]le [d]gement of the legitimacy of their government"); see also Letter from A. Hamilton to G. Washington (Cabinet Paper) (Apr. 1793), in 4 Works of Alexander Hamilton 369, 369–396 (H. Lodge ed. 1904). They decided, however, both that Genet should be received and that consultation with Congress was not necessary. See T. Jefferson, Anas (Apr. 18, 1793), in 1 Writings of Thomas Jefferson 226, 227 (P. Ford ed. 1892); Cabinet Opinion on Washington's Questions on Neutrality and the Alliance with France (Apr. 19, 1793), in 25 Papers of Thomas Jefferson, at 570. Congress expressed no disagreement with this position, and Genet's reception marked the Nation's first act of recognition—one made by the President alone. See Prakash, *supra,* at 312–313.

The recognition power again became relevant when yet another revolution took place—this time, in South America, as several colonies rose against Spain. In 1818, Speaker of the House Henry Clay announced he "intended moving the recognition of Buenos Ayres and probably of Chile." Goebel 121. Clay thus sought to appropriate money " '[f]or one year's salary' " for " 'a Minister' " to present-day Argentina. 32 Annals of Cong. 1500 (1818). President Monroe, however, did not share that view. Although Clay gave "one of the most remarkable speeches of his career," his proposed bill was defeated. Goebel 123; 32 Annals of Cong. 1655. That action has been attributed, in part, to the fact that Congress agreed the recognition power rested solely with the President. Goebel 124; see, *e.g.,* 32 Annals of Cong. 1570 (statement of Rep. Alexander Smyth) ("[T]he acknowledgment of the independence of a new Power is an exercise of Executive authority; consequently, for Congress to direct the Executive how he shall exercise this power, is an act of usurpation"). Four years later, after the President had decided to recognize the South American republics, Congress did pass a resolution, on his request, appropriating funds for "such missions to the independent nations on the American continent, as the President of the United States may deem proper." Act of May 4, 1822, ch. 52, 3 Stat. 678.

A decade later, President Jackson faced a recognition crisis over Texas. In 1835, Texas rebelled against Mexico

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

and formed its own government. See Goebel 144–147. But the President feared that recognizing the new government could ignite a war. See A. Jackson, To the Senate and House of Representatives of the United States (Dec. 21, 1836), in 3 Messages and Papers of the Presidents 265, 266–267 (J. Richardson ed. 1899). After Congress urged him to recognize Texas, see Cong. Globe, 24th Cong., 1st Sess., 453 (1836); H.R.Rep. No. 854, 24th Cong., 1st Sess. (1836), the President delivered a message to the Legislature. He concluded there had not been a "deliberate inquiry" into whether the President or Congress possessed the recognition power. See A. Jackson, in 3 Messages **2093** and Papers of the Presidents, at 267. He stated, however, "on the ground of expediency, I am disposed to concur" with Congress' preference regarding Texas. *Ibid.* In response Congress appropriated funds for a "diplomatic agent to be sent to the Republic of Texas, whenever the President of the United States ... shall deem it expedient to appoint such minister." Act of Mar. 3, 1837, 5 Stat. 170. Thus, although he cooperated with Congress, the President was left to execute the formal act of recognition.

President Lincoln, too, sought to coordinate with Congress when he requested support for his recognition of Liberia and Haiti. In his first annual message to Congress he said he could see no reason "why we should persevere longer in withholding our recognition of the independence and sovereignty of Hayti and Liberia." Lincoln's First Annual Message to Congress (Dec. 3, 1861), in 6 Messages and Papers of the Presidents 44, 47. Nonetheless, he was "[u]nwilling" to "inaugurate a novel policy in regard to them without the approbation of Congress." *Ibid.* In response Congress concurred in the President's recognition determination and enacted a law appropriating funds to appoint diplomatic representatives to the two countries—leaving, as usual, the actual dispatch of ambassadors and formal statement of recognition to the President. Act of June 5, 1862, 12 Stat. 421.

Three decades later, the branches again were able to reach an accord, this time with regard to Cuba. In 1898, an insurgency against the Spanish colonial government was raging in Cuba. President McKinley determined to ask Congress for authorization to send armed forces to Cuba to help quell the violence. See 31 Cong. Rec. 3699–3702 (1898). Although McKinley thought Spain was to blame

for the strife, he opposed recognizing either Cuba or its insurgent government. *Id.,* at 3701. At first, the House proposed a resolution consistent with McKinley's wishes. *Id.,* at 3810. The Senate countered with a resolution that authorized the use of force but that did recognize both Cuban independence and the insurgent government. *Id.,* at 3993. When the Senate's version reached the House, the House again rejected the language recognizing Cuban independence. *Id.,* at 4017. The resolution went to Conference, which, after debate, reached a compromise. See Reinstein, 86 Temp. L. Rev., at 40–41. The final resolution stated "the people of the Island of Cuba are, and of right ought to be, free and independent," but made no mention of recognizing a new Cuban Government. Act of Apr. 20, 1898, 30 Stat. 738. Accepting the compromise, the President signed the joint resolution. See Reinstein, 86 Temp. L. Rev., at 41.

For the next 80 years, "[P]residents consistently recognized new states and governments without any serious opposition from, or activity in, Congress." *Ibid.*; see 2 Whiteman §§ 6–60, at 133–242 (detailing over 50 recognition decisions made by the Executive). The next debate over recognition did not occur until the late 1970's. It concerned China.

President Carter recognized the People's Republic of China (PRC) as the government of China, and derecognized the Republic of China, located on Taiwan. See S. Kan, Cong. Research Serv., China/Taiwan: Evolution of the "One China" Policy—Key Statements from Washington, Beijing, and Taipei 1, 10 (Oct. 10, 2014). As to the status of Taiwan, the President "acknowledge[d] the Chinese position" that "Taiwan is part of China," *id.,* at 39 (text of U.S.–PRC Joint Communique on the Establishment of Diplomatic Relations (Jan. 1, 1979)), but he did not accept that claim. The President proposed a new law **2094** defining how the United States would conduct business with Taiwan. See Hearings on Taiwan Legislation before the House Committee on Foreign Affairs, 96th Cong., 1st Sess., 2–6 (1979) (statement of Warren Christopher, Deputy Secretary of State). After extensive revisions, Congress passed, and the President signed, the Taiwan Relations Act, 93 Stat. 14 (1979) (codified as amended at 22 U.S.C. §§ 3301–3316). The Act (in a simplified summary) treated Taiwan as if it were a legally distinct entity from China

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

—an entity with which the United States intended to maintain strong ties. See, *e.g.,* §§ 3301, 3303(a), (b)(1), (b)(7).

Throughout the legislative process, however, no one raised a serious question regarding the President's exclusive authority to recognize the PRC—or to decline to grant formal recognition to Taiwan. See, *e.g.,* 125 Cong. Rec. 6709 (1979) (statement of Sen. Jacob Javits) ("Neither bill [proposed by either Chamber] sought to reestablish official relations between the United States and the Republic of China on Taiwan; Congress ... does not have the authority to do that even if it wanted to do so"). Rather, Congress accepted the President's recognition determination as a completed, lawful act; and it proceeded to outline the trade and policy provisions that, in its judgment, were appropriate in light of that decision.

This history confirms the Court's conclusion in the instant case that the power to recognize or decline to recognize a foreign state and its territorial bounds resides in the President alone. For the most part, Congress has respected the Executive's policies and positions as to formal recognition. At times, Congress itself has defended the President's constitutional prerogative. Over the last 100 years, there has been scarcely any debate over the President's power to recognize foreign states. In this respect the Legislature, in the narrow context of recognition, on balance has acknowledged the importance of speaking "with one voice." *Crosby,* 530 U.S., at 381, 120 S.Ct. 2288. The weight of historical evidence indicates Congress has accepted that the power to recognize foreign states and governments and their territorial bounds is exclusive to the Presidency.

III

**[13]** As the power to recognize foreign states resides in the President alone, the question becomes whether § 214(d) infringes on the Executive's consistent decision to withhold recognition with respect to Jerusalem. See *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (action unlawful when it "prevents the Executive Branch from accomplishing its constitutionally assigned functions").

Section 214(d) requires that, in a passport or consular report of birth abroad, "the Secretary shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel" for a "United States citizen born in the city of Jerusalem." 116 Stat. 1366. That is, § 214(d) requires the President, through the Secretary, to identify citizens born in Jerusalem who so request as being born in Israel. But according to the President, those citizens were not born in Israel. As a matter of United States policy, neither Israel nor any other country is acknowledged as having sovereignty over Jerusalem. In this way, § 214(d) "directly contradicts" the "carefully calibrated and longstanding Executive branch policy of neutrality toward Jerusalem." 725 F.3d, at 217, 216.

If the power over recognition is to mean anything, it must mean that the President not only makes the initial, formal recognition determination but also **\*2095** that he may maintain that determination in his and his agent's statements. This conclusion is a matter of both common sense and necessity. If Congress could command the President to state a recognition position inconsistent with his own, Congress could override the President's recognition determination. Under international law, recognition may be effected by "written or oral declaration of the recognizing state." 1 Moore § 27, at 73. In addition an act of recognition must "leave no doubt as to the intention to grant it." 1 Oppenheim's International Law § 50, at 169. Thus, if Congress could alter the President's statements on matters of recognition or force him to contradict them, Congress in effect would exercise the recognition power.

**[14]** As Justice Jackson wrote in *Youngstown,* when a Presidential power is "exclusive," it "disabl[es] the Congress from acting upon the subject." 343 U.S., at 637–638, 72 S.Ct. 863 (concurring opinion). Here, the subject is quite narrow: The Executive's exclusive power extends no further than his formal recognition determination. But as to that determination, Congress may not enact a law that directly contradicts it. This is not to say Congress may not express its disagreement with the President in myriad ways. For example, it may enact an embargo, decline to confirm an ambassador, or even declare war. But none of these acts would alter the President's recognition decision.

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

If Congress may not pass a law, speaking in its own voice, that effects formal recognition, then it follows that it may not force the President himself to contradict his earlier statement. That congressional command would not only prevent the Nation from speaking with one voice but also prevent the Executive itself from doing so in conducting foreign relations.

Although the statement required by § 214(d) would not itself constitute a formal act of recognition, it is a mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State. See *Urtetiqui v. D'Arcy,* 9 Pet. 692, 699, 9 L.Ed. 276 (1835) (a passport "from its nature and object, is addressed to foreign powers" and "is to be considered ... in the character of a political document"). As a result, it is unconstitutional. This is all the more clear in light of the longstanding treatment of a passport's place-of-birth section as an official executive statement implicating recognition. See 725 F.3d, at 224 (Tatel, J., concurring). The Secretary's position on this point has been consistent: He will not place information in the place-of-birth section of a passport that contradicts the President's recognition policy. See 7 FAM § 1383. If a citizen objects to the country listed as sovereign over his place of birth, then the Secretary will accommodate him by listing the city or town of birth rather than the country. See *id.,* § 1383.6. But the Secretary will not list a sovereign that contradicts the President's recognition policy in a passport. Thus, the Secretary will not list "Israel" in a passport as the country containing Jerusalem.

The flaw in § 214(d) is further underscored by the undoubted fact that the purpose of the statute was to infringe on the recognition power—a power the Court now holds is the sole prerogative of the President. The statute is titled "United States Policy with Respect to Jerusalem as the Capital of Israel." § 214, 116 Stat. 1365. The House Conference Report proclaimed that § 214 "contains four provisions related to the recognition of Jerusalem as Israel's capital." H.R. Conf. Rep. No. 107–671, p. 123 (2002), 2002 U.S.C.C.A.N. 869. And, indeed, observers interpreted § 214 as altering United States policy regarding **\*2096** Jerusalem—which led to protests across the region. See *supra,* at 2082 – 2083. From the face of § 214, from the legislative history, and from its reception, it is clear that Congress wanted to express

its displeasure with the President's policy by, among other things, commanding the Executive to contradict his own, earlier stated position on Jerusalem. This Congress may not do.

It is true, as Zivotofsky notes, that Congress has substantial authority over passports. See *Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981); *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Kent v. Dulles,* 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). The Court does not question the power of Congress to enact passport legislation of wide scope. In *Kent v. Dulles,* for example, the Court held that if a person's " ' liberty ' " to travel "is to be regulated" through a passport, "it must be pursuant to the law-making functions of the Congress." See *id.,* at 129, 78 S.Ct. 1113. Later cases, such as *Zemel v. Rusk* and *Haig v. Agee,* also proceeded on the assumption that Congress must authorize the grounds on which passports may be approved or denied. See *Zemel, supra,* at 7–13, 85 S.Ct. 1271; *Haig, supra,* at 289–306, 101 S.Ct. 2766. This is consistent with the extensive lawmaking power the Constitution vests in Congress over the Nation's foreign affairs.

The problem with § 214(d), however, lies in how Congress exercised its authority over passports. It was an improper act for Congress to "aggrandiz[e] its power at the expense of another branch" by requiring the President to contradict an earlier recognition determination in an official document issued by the Executive Branch. *Freytag v. Commissioner,* 501 U.S. 868, 878, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991). To allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional.

* * *

In holding § 214(d) invalid the Court does not question the substantial powers of Congress over foreign affairs in general or passports in particular. This case is confined solely to the exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds. Congress

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

cannot command the President to contradict an earlier recognition determination in the issuance of passports.

The judgment of the Court of Appeals for the District of Columbia Circuit is

*Affirmed.*

Justice BREYER, concurring.

I continue to believe that this case presents a political question inappropriate for judicial resolution. See *Zivotofsky v. Clinton,* 566 U.S. ——, ——, 132 S.Ct. 1421, 182 L.Ed.2d 423 (2012) (BREYER, J., dissenting). But because precedent precludes resolving this case on political question grounds, see *id.,* at ——, 132 S.Ct., at 1424–1425 (majority opinion), I join the Court's opinion.

Justice THOMAS, concurring in the judgment in part and dissenting in part.

Our Constitution allocates the powers of the Federal Government over foreign affairs in two ways. First, it expressly identifies certain foreign affairs powers and vests them in particular branches, either individually or jointly. Second, it vests the residual foreign affairs powers of the Federal Government—*i.e.,* those not specifically enumerated in the Constitution—in the **\*2097** President by way of Article II's Vesting Clause.

Section 214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003, ignores that constitutional allocation of power insofar as it directs the President, contrary to his wishes, to list "Israel" as the place of birth of Jerusalem-born citizens on their passports. The President has long regulated passports under his residual foreign affairs power, and this portion of § 214(d) does not fall within any of Congress' enumerated powers.

By contrast, § 214(d) poses no such problem insofar as it regulates consular reports of birth abroad. Unlike passports, these reports were developed to effectuate the naturalization laws, and they continue to serve the role of identifying persons who need not be naturalized to obtain U.S. citizenship. The regulation of these reports does not fall within the President's foreign affairs powers,

but within Congress' enumerated powers under the Naturalization and Necessary and Proper Clauses.

Rather than adhere to the Constitution's division of powers, the Court relies on a distortion of the President's recognition power to hold both of these parts of § 214(d) unconstitutional. Because I cannot join this faulty analysis, I concur only in the portion of the Court's judgment holding § 214(d) unconstitutional as applied to passports. I respectfully dissent from the remainder of the Court's judgment.

I

A

The Constitution specifies a number of foreign affairs powers and divides them between the political branches. Among others, Article I allocates to Congress the powers "[t]o regulate Commerce with foreign Nations," "[t]o establish an uniform Rule of Naturalization," "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations," and "[t]o declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water." Art. I, § 8. For his part, the President has certain express powers relating to foreign affairs, including the power, "by and with the Advice and Consent of the Senate," to "appoint Ambassadors," and "to make Treaties, provided two thirds of the Senators present concur." Art. II, § 2. He is also assigned certain duties with respect to foreign affairs, including serving as "Commander in Chief of the Army and Navy of the United States," *ibid.,* and "receiv[ing] Ambassadors and other public Ministers," Art. II, § 3.

These specific allocations, however, cannot account for the entirety of the foreign affairs powers exercised by the Federal Government. Neither of the political branches is expressly authorized, for instance, to communicate with foreign ministers, to issue passports, or to repel sudden attacks. Yet the President has engaged in such conduct, with the support of Congress, since the earliest days of the Republic. Prakash & Ramsey, The Executive Power

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

Over Foreign Affairs, 111 Yale L.J. 231, 298–346 (2001) (Prakash & Ramsey).

The President's longstanding practice of exercising unenumerated foreign affairs powers reflects a constitutional directive that "the President ha[s] primary responsibility—along with the necessary power—to protect the national security and to conduct the Nation's foreign relations." *Hamdi v. Rumsfeld,* 542 U.S. 507, 580, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (THOMAS, J., dissenting). Specifically, the Vesting Clause of Article II provides that "[t]he executive Power shall be vested in a President of the United States." Art. **\*2098** II, § 1. This Clause is notably different from the Vesting Clause of Article I, which provides only that "[a]ll legislative Powers *herein granted* shall be vested in a Congress of the United States," Art. I, § 1 (emphasis added). By omitting the words "herein granted" in Article II, the Constitution indicates that the "executive Power" vested in the President is not confined to those powers expressly identified in the document. Instead, it includes all powers originally understood as falling within the "executive Power" of the Federal Government.

B

Founding-era evidence reveals that the "executive Power" included the foreign affairs powers of a sovereign State. See Prakash & Ramsey 253. John Locke's 17th-century writings laid the groundwork for this understanding of executive power. Locke described foreign affairs powers —including the powers of "war and peace, leagues and alliances, and all the transactions with all persons and communities without the commonwealth"—as "federative" power. Second Treatise of Civil Government § 146, p. 73 (J. Gough ed. 1947). He defined the "executive" power as "comprehending the execution of the municipal laws of the society within itself upon all that are parts of it." *Id.,* § 147, at 73. Importantly, however, Locke explained that the federative and executive powers must be lodged together, lest "disorder and ruin" erupt from the division of the "force of the public." *Id.,* § 148, at 73–74.

Subsequent thinkers began to refer to both of these powers as aspects of "executive power." William Blackstone, for example, described the executive power in England as including foreign affairs powers, such as the "power of sending embassadors to foreign states, and receiving embassadors at home"; making "treaties, leagues, and alliances with foreign states and princes"; "making war and peace"; and "issu[ing] letters of marque and reprisal." 1 Commentaries on the Laws of England 245, 249, 250, 242–252 (1765) (Blackstone). Baron de Montesquieu similarly described executive power as including the power to "mak[e] peace or war, sen[d] or receiv[e] embassies, establis[h] the public security, and provid[e] against invasions." The Spirit of the Laws bk. XI, ch. 6, p. 151 (O. Piest ed., T. Nugent transl. 1949). In fact, "most writers of [Montesquieu's] tim[e] w[ere] inclined to think of the executive branch of government as being concerned nearly entirely with foreign affairs." W. Gwyn, The Meaning of the Separation of Powers 103 (1965).

That understanding of executive power prevailed in America. Following independence, Congress assumed control over foreign affairs under the Articles of Confederation. See, *e.g.,* Articles of Confederation, Art. IX, cl. 1. At that time, many understood that control to be an exercise of executive power. See Prakash & Ramsey 272, 275–278. Letters among Members of the Continental Congress, for instance, repeatedly referred to the Department of Foreign Affairs, established under the control of the Continental Congress, as an "Executive departmen[t]" and to its officers as " 'Executives or Ministers.' " *Id.,* at 276, and nn. 194– 196. Similarly, the Essex Result of 1778—an influential report on the proposed Constitution for Massachusetts —described executive power as including both "external" and "internal" powers: The external executive power "comprehends war, peace, the sending and receiving ambassadors, and whatever concerns the transactions of the state with any other independent state," while the internal executive power "is employed in the peace, security and protection of the subject and his property." **\*2099** Essex Result, in The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780, pp. 324, 337 (O. Handlin & M. Handlin eds. 1966).

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

This view of executive power was widespread at the time of the framing of the Constitution. Thomas Rutherforth's Institutes of Natural Law—a treatise routinely cited by the Founders, McDowell, The Limits of Natural Law: Thomas Rutherforth and the American Legal Tradition, 37 Am. J. Juris. 57, 59, and n. 10 (1992)—explained that "external executive power" includes "not only what is properly called military power, but the power likewise of making war or peace, the power of engaging in alliances for an encrease of strength, ... the power of entering into treaties, and of making leagues to restore peace ... and the power of adjusting the rights of a nation in respect of navigation, trade, etc.," 2 Institutes of Natural Law 55–56, 54–61 (1756). During the ratification debates, James Wilson likewise referred to the "executive powers of government" as including the external powers of a nation. 2 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 500–502 (1863). And Alexander Hamilton, writing as Publius, asserted that "[t]he actual conduct of foreign negotiations," "the arrangement of the army and navy, the directions of the operations of war ... and other matters of a like nature" are "executive details" that "fal[l] peculiarly within the province of the executive department." The Federalist No. 72, pp. 435–436 (C. Rossiter ed. 1961).

Given this pervasive view of executive power, it is unsurprising that those who ratified the Constitution understood the "executive Power" vested by Article II to include those foreign affairs powers not otherwise allocated in the Constitution. James Iredell, for example, told the North Carolina ratifying convention that, under the new Constitution, the President would "regulate all intercourse with foreign powers" and act as the "primary agent" of the United States, though no specific allocation of foreign affairs powers in the document so provided. 4 Elliot, *supra,* at 127, 128. And Alexander Hamilton presumed as much when he argued that the "[e]nergy" created in the Constitution's Executive would be "essential to the protection of the community against foreign attacks," even though no specific allocation of foreign affairs powers provided for the Executive to repel such assaults. See The Federalist No. 70, p. 423. These statements confirm that the "executive Power" vested in the President by Article II includes the residual foreign

affairs powers of the Federal Government not otherwise allocated by the Constitution. [1]

C

Early practice of the founding generation also supports this understanding of the "executive Power." Upon taking office, President Washington assumed the role of chief diplomat; began to direct the Secretary of Foreign Affairs who, under the Articles of Confederation, had reported to the Congress; and established the foreign policy of the United States. Prakash & Ramsey 296–297. At the same time, he respected Congress' prerogatives to declare war, regulate foreign commerce, and appropriate funds. *Id.,* at 296.

For its part, Congress recognized a broad Presidential role in foreign affairs. **\*2100** *Id.,* at 297–298. It created an "Executive department" called the "Department of Foreign Affairs," with a Secretary wholly subordinate to the President. An Act for Establishing an Executive Department, to be denominated the Department of Foreign Affairs, 1 Stat. 28. The enabling Act provided that the Secretary was to "perform and execute such duties as shall from time to time be enjoined on or intrusted to him by the President," including those "relative to correspondences, commissions or instructions to or with public ministers or consuls, from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters respecting foreign affairs." § 1, *id.,* at 29. By referring to those duties as those "the President of the United States shall assign to the said department," *ibid.,* the Act presumed the President inherently possessed power to engage in those tasks.

Subsequent interactions between President Washington and Congress indicated that the parties involved believed the Constitution vested the President with authority to regulate dealings with foreign nations. In his first State of the Union Address, President Washington told Congress that "[t]he interests of the United States require, that our intercourse with other nations should be facilitated by such provisions as will enable me to fulfil my duty

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

in that respect." First Annual Message (Jan. 8, 1790), in George Washington: A Collection 467, 468 (W. Allen ed. 1988). To that end, he asked for compensation for employees and a fund designated for "defraying the expenses incident to the conduct of our foreign affairs." *Ibid.* Congress responded by passing "An Act providing the means of intercourse between the United States and foreign nations." Ch. 22, 1 Stat. 128.

During the congressional debate over that bill, the President sought an opinion from Thomas Jefferson— at that time, Secretary of State—about the scope of the Senate's power in this area. Jefferson responded that "[t]he transaction of business with foreign nations is executive altogether." Opinion on the Powers of the Senate (Apr. 24, 1790), in 5 Writings of Thomas Jefferson 161 (P. Ford ed. 1895). As such, Jefferson concluded that it properly belonged "to the head" of the executive department, "except as to such portions of it as are specially submitted to the senate." *Ibid.* According to Washington's diaries, he received similar advice from John Jay and James Madison about "the propriety of consulting the Senate on the places to which it would be necessary to send persons in the Diplomatic line, and Consuls." 6 The Diaries of George Washington 68 (D. Jackson & D. Twohig eds. 1979). All agreed that the Senate lacked a "Constitutional right to interfere with either, & that it might be impolitic to draw it into a precedent their powers extending no farther than to an approbation or disapprobation of the person nominated by the President all the rest being Executive and vested in the President by the Constitution." *Ibid.*

Washington followed this advice. He corresponded directly with U.S. ministers, moved them among countries, and removed them from their positions at will. Prakash & Ramsey 308–309. He also corresponded with foreign leaders, representing that his role as the " 'supreme executive authority' " authorized him to receive and respond to their letters on behalf of the United States. *Id.,* at 317. When foreign ministers addressed their communications to Congress, he informed them of their error. *Id.,* at 321.

Washington's control over foreign affairs extended beyond communications with other **\*2101** governments. When confronted with the question whether to recognize the French Republic as the lawful government of France,

he received the French Republic's emissary without the involvement of Congress. *Id.,* at 312. When he later concluded that the emissary had acted inappropriately, he again acted without the involvement of Congress to ask the French executive to recall him. *Id.,* at 314–315. Washington also declared neutrality on behalf of the United States during the war between England and France in 1793, see Proclamation of Neutrality (Apr. 22, 1793), an action Hamilton pseudonymously defended as a proper exercise of the power vested in the President by the "general grant" of executive power in the Vesting Clause. Pacificus No. 1 (June 29, 1793), Letters of Pacificus and Helvidius 10 (1845); *id.,* at 3. For its part, Congress applauded the President's decision. 4 Annals of Cong. 18, 138 (1793).

In short, the practices of the Washington administration and First Congress confirm that Article II's Vesting Clause was originally understood to include a grant of residual foreign affairs power to the Executive.

## II

The statutory provision at issue implicates the President's residual foreign affairs power. Section 214(d) instructs the Secretary of State, upon request of a citizen born in Jerusalem (or that citizen's legal guardian), to list that citizen's place of birth as Israel on his passport and consular report of birth abroad, even though it is the undisputed position of the United States that Jerusalem is not a part of Israel. The President argues that this provision violates his foreign affairs powers generally and his recognition power specifically. Zivotofsky rejoins that Congress passed § 214(d) pursuant to its enumerated powers and its action must therefore take precedence.

Neither has it quite right. The President is not constitutionally compelled to implement § 214(d) as it applies to passports because passport regulation falls squarely within his residual foreign affairs power and Zivotofsky has identified no source of congressional power to require the President to list Israel as the place of birth for a citizen born in Jerusalem on that citizen's passport. Section 214(d) can, however, be constitutionally applied to consular reports of birth abroad because those

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

documents do not fall within the President's foreign affairs authority but do fall within Congress' enumerated powers over naturalization.[2]

### A

### 1

In the Anglo–American legal tradition, passports have consistently been issued and controlled by the body exercising executive power—in England, by the King; in the colonies, by the Continental Congress; and in the United States, by President **\*2102** Washington and every President since.

Historically, "passports were classed with those documents known as safe conducts or letters of protection, by which the person of an enemy might be rendered safe and inviolable." G. Hunt, U.S. Dept. of State, The American Passport: Its History 3 (1898). Letters of safe conduct and passports performed different functions in England, but both grew out of the King's prerogative to regulate the "nation's intercourse with foreign nations," see 1 Blackstone 251–253. The King issued letters of safe conduct during times of war, *id.,* at 252, whereas passports were heirs to a tradition of requiring the King's license to depart the country, see, *e.g.,* Richard II, Feb. 26, 1383, 2 Calendar of Close Rolls, pp. 281–282 (1920); 1 E. Turner, The Privy Council of England in the Seventeenth and Eighteenth Centuries 1603–1784, p. 151 (1927); see also K. Diplock, Passports and Protection in International Law, in 32 The Grotius Society, Transactions for the Year 1946, Problems of Public and Private International Law 42, 44 (1947).

Both safe conducts and passports were in use at the time of the founding. Passports were given "for greater security" "on ordinary occasions [to] persons who meet with no special interference in going and coming," whereas "safe-conduct[s]" were "given to persons who could not otherwise enter with safety the dominions of the sovereign granting it." 3 E. de Vattel, The Law of Nations § 265, p. 331 (1758 ed. C. Fenwick transl. 1916) (emphasis deleted). Both were issued by the person exercising the external sovereign power of a state. See *id.,* §§ 162, 275, at 69,

332. In the absence of a separate executive branch of government, the Continental Congress issued passports during the American Revolution, see, *e.g.,* Resolution (May 9, 1776), in 4 Journals of the Continental Congress 340–341; Resolution (May 24, 1776), in *id.,* at 385; as did the Congress under the Articles of Confederation, see, *e.g.,* 25 *id.,* at 859 (Jan. 24, 1783) (discussing its authority to issue passports under the war power).

After the ratification of the Constitution, President Washington immediately took responsibility for issuing passports. Hunt, *supra,* at 3. Although " '[p]ast practice does not, by itself, create power,' " "a governmental practice [that] has been open, widespread, and unchallenged since the early days of the Republic ... should guide our interpretation of an ambiguous constitutional provision." *NLRB v. Noel Canning,* 573 U.S. ——, ——, 134 S.Ct. 2550, 2594, 189 L.Ed.2d 538 (2014) (SCALIA, J., concurring in judgment) (alteration in original; some internal quotation marks omitted). The history of the President's passport regulation in this country is one such practice. From the ratification until the end of the Civil War, the President issued passports without any authorization from Congress. As the Department of State later remarked, "In the absence of any law upon the subject, the issuing of passports to Americans going abroad naturally fell to the Department of State, as one of its manifestly proper functions." Hunt, *supra,* at 37. To that end, the Secretary's authority was "entirely discretionary." *Urtetiqui v. D'Arcy,* 9 Pet. 692, 699, 9 L.Ed. 276 (1835). Congress acted in support of that authority by criminalizing the "violat[ion] [of] any safe-conduct or passport duly obtained and issued under the authority of the United States." An Act for the Punishment of certain Crimes against the United States, § 28, 1 Stat. 118.[3] Congress only purported to authorize **\*2103** the President to issue such passports in 1856 and, even under that statute, it provided that passports should be issued "under such rules as the President shall designate and prescribe for and on behalf of the United States." An Act to regulate the Diplomatic and Consular Systems of the United States, § 23, 11 Stat. 60. The President has continued to designate and prescribe the rules for passports ever since.

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

2

That the President has the power to regulate passports under his residual foreign affairs powers does not, however, end the matter, for Congress has repeatedly legislated on the subject of passports. These laws have always been narrow in scope. For example, Congress enacted laws prohibiting the issuance of passports to noncitizens, *id.,* at 61, created an exception to that rule for "persons liable to military duty," Act of Mar. 3, 1863, § 23, 12 Stat. 754, and then eliminated that exception, Act of May 30, 1866, ch. 102, 14 Stat. 54. It passed laws regulating the fees that the State Department should impose for issuance of the passports. Act of May 16, 1932, ch. 187, 47 Stat. 157; Act of June 4, 1920, § 1, 41 Stat. 750; Act of June 15, 1917, ch. 30, Title IX, § 1, 40 Stat. 227; Act of Aug. 18, 1856, § 23, 11 Stat. 60; Act of Mar. 1, 1855, § 12, 10 Stat. 624. It also enacted legislation addressing the duration for which passports may remain valid. § 116, 96 Stat. 279; Pub.L. 90–428, 82 Stat. 446; Pub.L. 86–267, 73 Stat. 552; Act of July 3, 1926, 44 Stat. 887. And it passed laws imposing criminal penalties for false statements made when applying for passports, along with misuse of passports and counterfeiting or forgery of them. Act of June 25, 1948, 62 Stat. 771; Act of Mar. 28, 1940, § 7, 54 Stat. 80; 40 Stat. 227.[4]

As with any congressional action, however, such legislation is constitutionally permissible only insofar as it is promulgated pursuant to one of Congress' enumerated powers. I must therefore address whether Congress had constitutional authority to enact § 214(d)'s regulation of passports.

a

Zivotofsky and congressional *amici* identify three potential sources of congressional power to enact the portion of § 214(d) dealing with passports. Zivotofsky first argues that it falls within Congress' power "to regulate the issuance and content of United States passports." Brief for Petitioner 17. The U.S. Senate, as *amicus curiae,* likewise contends that it can be justified under Congress' "plenary authority over passports," which it derives from

the penumbras of its powers " '[t]o regulate Commerce with foreign Nations' " and " '[t]o establish an uniform Rule of Naturalization.' " Brief for United States Senate 3 (quoting U.S. Const., Art. I, § 8, cls. 3, 4). None of these arguments withstands scrutiny.

The Constitution contains no Passport Clause, nor does it explicitly vest Congress with "plenary authority over passports." Because our Government is one of enumerated powers, "Congress has no power to act unless the Constitution authorizes it to do so." *United States v. Comstock,* 560 U.S. 126, 159, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (THOMAS, J., dissenting). And "[t]he Constitution plainly sets forth the 'few and defined' powers that Congress **\*2104** may exercise." *Ibid.* A "passport power" is not one of them.

Section 214(d)'s passport directive fares no better under those powers actually included in Article I. To start, it does not fall within the power "[t]o regulate Commerce with foreign Nations." "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *United States v. Lopez,* 514 U.S. 549, 585, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (THOMAS, J., concurring). The listing of the place of birth of an applicant—whether born in Jerusalem or not—does not involve selling, buying, bartering, or transporting for those purposes. Cf. *United States v. Morrison,* 529 U.S. 598, 613, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ("[O]ur cases have upheld Commerce Clause regulation of intrastate activity [under the power to regulate commerce among the several States] only where that activity is economic in nature").

True, a passport is frequently used by persons who may intend to engage in commerce abroad, but that use is insufficient to bring § 214(d)'s passport directive within the scope of this power. The specific conduct at issue here—the listing of the birthplace of a U.S. citizen born in Jerusalem on a passport by the President—is not a commercial activity. Any commercial activities subsequently undertaken by the bearer of a passport are yet further removed from that regulation.

The power "[t]o establish an uniform Rule of Naturalization" is similarly unavailing. At the founding, the word "naturalization" meant "[t]he act of investing

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 82 of 482
Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

aliens with the privileges of native subjects." 2 S. Johnson, A Dictionary of the English Language 1293 (4th ed. 1773); see also T. Dyche & W. Pardon, A New General English Dictionary (1771) ("the making a foreigner or alien, a denizen or freeman of any kingdom or city, and so becoming, as it were, both a subject and a native of a king or country, that by nature he did not belong to"). A passport has never been issued as part of the naturalization process. It is—and has always been—a "travel document," Dept. of State, 7 Foreign Affairs Manual (or FAM) § 1311(b) (2013), issued for the same purpose it has always served: a request from one sovereign to another for the protection of the bearer. See *supra,* at 2101 – 2103.

b

For similar reasons, the Necessary and Proper Clause gives Congress no authority here. That Clause provides, "The Congress shall have Power ... [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const., Art. I, § 8, cl. 18. As an initial matter, "Congress lacks authority to legislate [under this provision] if the objective is anything other than 'carrying into Execution' one or more of the Federal Government's enumerated powers." *Comstock, supra,* at 161, 130 S.Ct. 1949 (THOMAS, J., dissenting). The "end [must] be legitimate" under our constitutional structure. *McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819).

But even if the objective of a law is carrying into execution one of the Federal Government's enumerated powers, the law must be both necessary and proper to that objective. The "Clause is not a warrant to Congress to enact any law that bears some conceivable connection to the exercise of an enumerated power." *Gonzales v. Raich,* 545 U.S. 1, 60, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (THOMAS, J., dissenting). Instead, "there must be a necessary and proper fit between the 'means' (the **\*2105** federal law) and the 'end' (the enumerated power or powers) it is designed to serve." *Comstock, supra,* at 160, 130 S.Ct. 1949 (THOMAS, J., dissenting). The "means" chosen

by Congress "will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power, and 'proper' if they are not otherwise 'prohibited' by the Constitution and not '[in]consistent' with its 'letter and spirit.' " *Id.,* at 160–161, 130 S.Ct. 1949 (alteration in original).

The argument that § 214(d), as applied to passports, could be an exercise of Congress' power to carry into execution its foreign commerce or naturalization powers falters because this aspect of § 214(d) is directed at neither of the ends served by these powers. Although at a high level of generality, a passport could be related to foreign commerce and naturalization, that attenuated relationship is insufficient. The law in question must be "directly link[ed]" to the enumerated power. *Id.,* at 169, n. 8, 130 S.Ct. 1949. As applied to passports, § 214(d) fails that test because it does not " 'carr[y] into Execution' " Congress' foreign commerce or naturalization powers. *Id.,* at 160, 130 S.Ct. 1949. At most, it bears a tertiary relationship to an activity Congress is permitted to regulate: It directs the President's formulation of a document, which, in turn, may be used to facilitate travel, which, in turn, may facilitate foreign commerce. And the distinctive history of the passport as a travel rather than citizenship document makes its connection to naturalization even more tenuous.

Nor can this aspect of § 214(d) be justified as an exercise of Congress' power to enact laws to carry into execution the President's residual foreign affairs powers. Simply put, § 214(d)'s passport directive is not a "proper" means of carrying this power into execution.

To be "proper," a law must fall within the peculiar competence of Congress under the Constitution. Though "proper" was susceptible of several definitions at the time of the founding, only two are plausible candidates for use in the Necessary and Proper Clause—(1) "[f]it; accommodated; adapted; suitable; qualified" and (2) "[p]eculiar; not belonging to more; not common." See 2 Johnson, *supra,* at 1537. Because the former would render the word "necessary" superfluous, *McCulloch, supra,* at 413, and we ordinarily attempt to give effect "to each word of the Constitution," *Knowlton v. Moore,* 178 U.S. 41, 87, 20 S.Ct. 747, 44 L.Ed. 969 (1900), the latter is the more plausible. That is particularly true because the

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

Constitution elsewhere uses the term "proper" by itself, Art. I, § 9, Art. II, §§ 2, 3; the term "necessary" by itself, Art. I, § 7; Art. V; and the term "necessary" as part of the phrase "necessary and expedient," Art. II, § 3. Thus, the best interpretation of "proper" is that a law must fall within the peculiar jurisdiction of Congress.

Our constitutional structure imposes three key limitations on that jurisdiction: It must conform to (1) the allocation of authority within the Federal Government, (2) the allocation of power between the Federal Government and the States, and (3) the protections for retained individual rights under the Constitution. See Lawson & Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L.J. 267, 291, 297 (1993). In other words, to be "proper," a law "must be consistent with principles of separation of powers, principles of federalism, and individual rights." *Id.,* at 297.

Commentators during the ratification debates treated "proper" as having this meaning. Writing as Publius, Hamilton posed the question who would "judge ... **\*2106** the *necessity* and *propriety* of the laws to be passed for executing the powers of the Union" and responded that "[t]he propriety of a law, in a constitutional light, must always be determined by the nature of the powers upon which it is founded." The Federalist, No. 33, pp. 203–204. For example, a law that "exceeded [Congress'] jurisdiction" and invaded the authority of the States would not meet that standard. *Id.,* at 204. Similarly, an "impartial citizen" wrote in a Virginia newspaper that, even if the governmental powers could not "be executed without the aid of a law, granting commercial monopolies, inflicting unusual punishments, creating new crimes, or commanding any unconstitutional act," thus making the law necessary to the execution of a power, "such a law would be manifestly not proper," and not "warranted by this clause, without absolutely departing from the usual acceptation of words." An Impartial Citizen V, Petersburg Va. Gazette, Feb. 28, 1788, in 8 Documentary History of the Ratification of the Constitution 428, 431 (J. Kaminski & G. Saladino eds. 1988) (emphasis deleted).

Early interpretations of the Clause following ratification largely confirm that view. Lawson & Granger, *supra,* at 298–308. During debate on the Bank of the United States

in the First Congress, for example, Representative Ames declared that the correct construction of the Necessary and Proper Clause "promotes the good of the society, and the ends for which the Government was adopted, without impairing the rights of any man, or the powers of any State." 2 Annals of Cong. 1906 (1791). During the Second Congress, Representative Niles railed against a bill that would have authorized federal mail carriers to transport passengers for hire in order to reduce the cost of the mails. He said that such a law would not be "proper" to the power to establish post offices and post roads because some States had "an exclusive right of carrying passengers for hire" and an interpretation of the word "proper" that would allow the bill would render "as nugatory, all [the States'] deliberations on the Constitution" and effectively vest Congress with "general authority to legislate on every subject." 3 *id.,* at 308–310 (1792) (emphasis deleted). Each of these comments presumed that the word "proper" imposed a jurisdictional limit on congressional activity.

This evidence makes sense in light of the Framers' efforts to ensure a separation of powers, reinforced by checks and balances, as "practical and real protectio[n] for individual liberty in the new Constitution." *Perez v. Mortgage Bankers Assn.,* 575 U.S. ——, ——, 135 S.Ct. 1199, 1216, 191 L.Ed.2d 186 (2015) (THOMAS, J., concurring in judgment). If Congress could rely on the Necessary and Proper Clause to exercise power expressly allocated to the other branches or to prevent the exercise of such power by other branches, it could undermine the constitutional allocation of powers.

That the evidence thus points to a definition of "proper" that protects the separation of powers does not fully explain the way that the "proper" requirement operates when Congress seeks to facilitate the exercise of a power allocated to another branch. I can see two potential mechanisms, either or both of which may accurately reflect the original understanding of the Clause. First, a law could be "improper" if it purports to direct another branch's exercise of its power. See Calabresi & Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541, 591 (1994) ("[T]he Clause ... does [not] allow Congress to tell constitutionally empowered actors how they can implement their exclusive powers"). Second, a law could be "improper" if it takes one of those actions *and* the branch to which the power **\*2107** is

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

allocated objects to the action. See Prakash & Ramsey 255–256 ("Congress has the general power to legislate in support of the President's foreign policy goals. But ... [s]ince it is derivative of the President's power, it must be exercised in coordination with, and not in opposition to, the President").

I need not resolve that question today, as the application of § 214(d) to passports would be improper under either approach. The President has made a determination that the "place of birth" on a passport should list the country of present sovereignty. 7 FAM, § 1300, App. D, § 1330 (2014). And the President has determined that no country is presently exercising sovereignty over the area of Jerusalem. Thus, the President has provided that passports for persons born in Jerusalem should list "Jerusalem" as the place of birth in the passport. *Id.,* § 1360(f). Section 214(d) directs the President to exercise his power to issue and regulate the content of passports in a particular way, and the President has objected to that direction. Under either potential mechanism for evaluating the propriety of a law under the separation-of-powers limitation, this law would be improper. [5]

c

In support of his argument that the President must enforce § 214(d), Zivotofsky relies heavily on a similar statute addressing the place of birth designation for persons born in Taiwan. See Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, § 132, 108 Stat. 395. That statute provided, "For purposes of the registration of birth or certification of nationality of a United States citizen born in Taiwan, the Secretary of State shall permit the place of birth to be recorded as Taiwan." *Ibid.* The President has adopted that practice.

The President's decision to adopt that practice, however, says nothing about the constitutionality of the Taiwan provision in the first place. The constitutional allocation of powers "does not depend on the views of individual Presidents, nor on whether the encroached upon branch approves the encroachment." *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 497, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (citation and

internal quotation marks omitted). [6] And the argument from Presidential acquiescence here is particularly weak, given that the Taiwan statute is consistent with the President's longstanding policy on Taiwan. At the time Congress enacted the statute, the Foreign Affairs Manual permitted consular officials to list "the city or area of birth" on a passport "[w]here the birthplace of the applicant is located in territory disputed by another country," 7 FAM § 1383.5–2 (1987), and to list "the city or town, rather than the country" of an applicant's birth "when there are objections to the listing shown on the birthplace guide," *id.,* § 1383.6. Because the President otherwise treats Taiwan as a geographical area within the People's Republic of China, listing Taiwan as the place of birth did not directly conflict with the President's prevailing practices. Section **\*2108** 214(d) *does* so conflict, as it requires the President to list citizens born in Jerusalem as born in "Israel," even though the Foreign Affairs Manual has long prohibited that action.

d

Justice SCALIA would locate Congress' power to enact the passport directive of § 214(d) in Congress' power under the Necessary and Proper Clause to bring into effect its enumerated power over naturalization. *Post,* at 2117 – 2118 (dissenting opinion). As an initial matter, he asserts that "[t]he naturalization power ... enables Congress to furnish the people it makes citizens with papers verifying their citizenship," *post,* at 2117, yet offers no support for this interpretation of a clause that, by its terms, grants Congress only the "Power ... To establish an uniform Rule of Naturalization," U.S. Const., Art. I, § 8, cl. 4. He then concludes that, if Congress can grant such documents, "it may also require these [documents] to record his birthplace as 'Israel' " pursuant to its power under the Necessary and Proper Clause, *post,* at 2117. But this theory does not account for the President's power to act in this area, nor does it confront difficult questions about the application of the Necessary and Proper Clause in the case of conflict among the branches.

Justice SCALIA disapproves of my "assertion of broad, unenumerated 'residual powers' in the President," *post,* at 2126, but offers no response to my interpretation of

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

the words "executive Power" in the Constitution. Instead, he claims that I have argued for "Presidential primacy over passports" and then rejects that position based on two postratification English statutes, the early practice of nonfederal actors issuing passports in this country, and the same congressional statutes that I have already discussed, most of which were enacted after the Civil War. *Post,* at 2124 – 2125; *supra,* at 2103, and n. 4. But I do not argue that the President possesses primary power over passports. I need not argue that. I argue only that Congress did not act according to any of the powers granted to it in the Constitution and, in such circumstances, the question of primacy does not arise.

In any event, the historical evidence cited in Justice SCALIA's dissent does not conflict with my analysis of the President's power in this area. The two postratification English statutes implicitly acknowledged that passports are issued by executive officers in the exercise of executive power, see 38 Geo. III, ch. 50, § 8, in 41 Eng. Stat. at Large 684; 33 Geo. III, ch. 4, § 8, in 39 Eng. Stat. at Large 12, and the practice of executive officials in the States of this country confirms that relationship. In addition, neither piece of historical evidence speaks to the scope of *Congress* ' power to regulate passports under our federal system. Justice SCALIA's final piece of historical support —the increased congressional regulation of passports following the Civil War—is perhaps more on point from an institutional perspective, but still does not resolve the issue. Those regulations were, as I have already described, narrow in scope and continued to leave primary regulation of the content of passports to the President. To draw an inference from these "late-arising historical practices that are ambiguous at best"—and that might conflict with the original meaning of the "executive Power" and the "proper" requirement in the Necessary and Proper Clause —is a dubious way to undertake constitutional analysis. See *Noel Canning,* 573 U.S., at ——, 134 S.Ct., at 2592 (SCALIA, J., concurring in judgment).

Even more dubious, however, is the cursory treatment of the Necessary and Proper Clause in Justice SCALIA's dissent. **\*2109** He asserts that, in acting pursuant to that Clause, "Congress ... may not transcend boundaries upon legislative authority stated or implied elsewhere in the Constitution." *Post,* at 2117. But he offers no explanation for what those implied limits might be or

how they would operate. Does he, for example, agree that the word "proper" requires Congress to act in a manner " 'consistent with principles of separation of powers, principles of federalism, and individual rights' "? *Supra,* at 2105 (quoting Lawson & Grainger, 43 Duke L. J., at 297). If so, then why does he find that requirement satisfied in this case? Is it because he views the President as having no constitutional authority to act in this area? Or is it because he views Congress' directive to the President as consistent with the separation of powers, irrespective of the President's authority? If the latter, is that because he perceives no separation-of-powers limitations on Congress when it acts to carry into execution one of *its* enumerated powers, as opposed to the enumerated powers of *another* branch? And if that is the case, what textual, structural, or historical evidence exists for that interpretation? Justice SCALIA's dissent raises more questions than it answers.

Justice SCALIA's dissent *does* at least answer how, in his view, the Constitution would resolve a conflict between the political branches, each acting pursuant to the powers granted them under the Constitution. He believes that congressional power should trump in any such conflict. *Post,* at 2125. I see nothing in the Constitution that clearly mandates that solution to a difficult separation-of-powers question, and I need not opine on it. I find no power under which Congress could lawfully have enacted the passport directive of § 214(d), apart from its power under the Necessary and Proper Clause to carry into effect the President's powers. And I have offered textual and historical support for my conclusion that the Clause does not include the power to direct the President's exercise of his passport power.

Finally, Justice SCALIA faults me for failing to consider a number of potential sources of congressional power for § 214(d) not argued by any of the parties, ranging from the Fourteenth Amendment; to the Migration or Importation Clause, Art. I, § 9, cl. 1; to the Territories Clause, Art. IV, § 3, cl. 2. *Post,* at 2123 – 2124. But no one—not even Justice SCALIA—has seriously contended that those provisions would afford a basis for the passport provision of § 214(d).

In the end, Justice SCALIA characterizes my interpretation of the executive power, the naturalization power, and the Necessary and Proper Clause as producing

"a presidency more reminiscent of George III than George Washington." *Post*, at 2126. But he offers no competing interpretation of either the Article II Vesting Clause or the Necessary and Proper Clause. And his decision about the Constitution's resolution of conflict among the branches could itself be criticized as creating a supreme legislative body more reminiscent of the Parliament in England than the Congress in America.

\* \* \*

Because the President has residual foreign affairs authority to regulate passports and because there appears to be no congressional power that justifies § 214(d)'s application to passports, Zivotofsky's challenge to the Executive's designation of his place of birth on his passport must fail.

**B**

Although the consular report of birth abroad shares some features with a passport, it is historically associated with naturalization, not foreign affairs. In order to **\*2110** establish a "uniform Rule of Naturalization," Congress must be able to identify the categories of persons who are eligible for naturalization, along with the rules for that process. Congress thus has always regulated the "acquisition of citizenship by being born abroad of American parents ... in the exercise of the power conferred by the Constitution to establish a uniform rule of naturalization." *United States v. Wong Kim Ark,* 169 U.S. 649, 688, 18 S.Ct. 456, 42 L.Ed. 890 (1898); see also *Miller v. Albright,* 523 U.S. 420, 456, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (SCALIA, J., concurring in judgment) (recognizing that "Congress has the power to set the requirements for acquisition of citizenship by persons not born within the territory of the United States"). It has determined that children born abroad to U.S. parents, subject to some exceptions, are natural-born citizens who do not need to go through the naturalization process. 8 U.S.C. §§ 1401(c), (d), (g).

The consular report of birth abroad is well suited to carrying into execution the power conferred on Congress in the Naturalization Clause. The report developed in response to Congress' requirement that children born abroad to U.S. citizens register with the consulate or lose their citizenship. And it continues to certify the acquisition of U.S. citizenship at birth by a person born abroad to a U.S. citizen. See 22 U.S.C. § 2705(2).

Although such persons have possessed a statutory right to citizenship at birth for much of this country's history, [7] the process by which that citizenship is evidenced has varied over time. Under the 1870 consular regulations, for instance, children born abroad to U.S. citizens were issued no certificates. If they applied for a U.S. passport, then they were issued one "qualified by the obligations and duties" that attached to those citizens by virtue of their residence in a foreign nation. Regulations Prescribed For The Use Of The Consular Service of the United States App. No. IV, p. 288 (1870); see also *id.,* § 109, at 38– 39. Congress acted in 1907 to require children residing abroad to register with their local consulate at the age of 18. Act of Mar. 2, 1907, § 6, 34 Stat. 1229. Because of the importance of this registration requirement, consular officials began to issue reports to citizens confirming their registration. See generally National Archives, General Records of the Dept. of State, Record Group 59, Passport Office, Decimal File, 1910–1949.

In 1919, the Department of State acted to standardize the consular registration of children born abroad. Report of Birth of Children to American Citizens Residing Abroad, General Instruction No. 652. It urged consulates to impress upon U.S. citizens abroad the need to record the birth of their children within two years. *Id.,* at 2. To encourage that effort, the Department permitted consular officials to issue reports attesting that the parents of U.S. citizens born abroad had presented sufficient evidence of citizenship for their children. *Ibid.*

The 1960's brought additional regulations of consular reports of birth abroad, 31 Fed.Reg. 13538 (1966), which continue in a substantially similar form to this day. See 22 CFR §§ 50.5, 50.7 (2014). As currently issued, the consular report of birth **\*2111** abroad includes the applicant's name, sex, place of birth, date of birth, and parents. It has had the "same force and effect as proof of United States citizenship as [a] certificat[e] of naturalization" since 1982. § 117, 96 Stat. 279.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

Thus, although registration is no longer required to maintain birthright citizenship, the consular report of birth abroad remains the primary means by which children born abroad may obtain official acknowledgement of their citizenship. See 22 CFR § 51.43. Once acknowledged as U.S. citizens, they need not pursue the naturalization process to obtain the rights and privileges of citizenship in this country. Regulation of the report is thus "appropriate" and "plainly adapted" to the exercise of the naturalization power. See *Comstock,* 560 U.S., at 161, 130 S.Ct. 1949 (THOMAS, J., dissenting).

By contrast, regulation of the report bears no relationship to the President's residual foreign affairs power. It has no historical pedigree uniquely associated with the President, contains no communication directed at a foreign power, and is primarily used for domestic purposes. To the extent that a citizen born abroad seeks a document to use as evidence of his citizenship abroad, he must obtain a passport. See generally 7 FAM § 1311.

Because regulation of the consular report of birth abroad is justified as an exercise of Congress' powers under the Naturalization and Necessary and Proper Clauses and does not fall within the President's foreign affairs powers, § 214(d)'s treatment of that document is constitutional. [8]

### III

The majority does not perform this analysis, but instead relies on a variation of the recognition power. That power is among the foreign affairs powers vested in the President by Article II's Vesting Clause, as is confirmed by Article II's express assignment to the President of the duty of receiving foreign Ambassadors, Art. II, § 3. But I cannot join the majority's analysis because no act of recognition is implicated here. [9]

Under international law, "recognition of a state signifies acceptance of its position within the international community and the possession by it of the full range of rights and obligations which are the normal attributes of statehood." 1 Oppenheim's International Law § 47, 158 (R. Jennings & A. Watts eds., 9th ed. 1992) (footnote omitted) (Oppenheim). [10] It can **2112** be accomplished expressly or implicitly, but the key is to discern a clear intention on the part of one state to recognize another. *Id.,* § 50, at 169. Important consequences are understood to flow from one state's recognition of another: The new state, for instance, acquires the capacity to engage in diplomatic relations, including the negotiation of treaties, with the recognizing state. *Id.,* § 47, at 158. The new state is also entitled to sue in, invoke sovereign immunity from, and demand acceptance of official acts in the courts of the recognizing state. *Ibid.*; see also I. Brownlie, Principles of Public International Law 95–96 (7th ed. 2008).

Changes in territory generally do not affect the status of a state as an international person. Oppenheim § 57, at 204–205. France, for example, "has over the centuries retained its identity although it acquired, lost and regained parts of its territory, changed its dynasty, was a kingdom, a republic, an empire, again a kingdom, again a republic, again an empire, and is now once more a republic." *Ibid.* "Even such loss of territory as occasions the reduction of a major power to a lesser status does not affect the state as an international person." *Id.,* § 57, at 205. Changes that *would* affect the status as an international person include the union of two separate international persons or a partial loss of independence. *Id.,* § 58, at 206.

Assuming for the sake of argument that listing a non-recognized foreign sovereign as a citizen's place of birth on a U.S. passport could have the effect of recognizing that sovereign under international law, no such recognition would occur under the circumstances presented here. The United States has recognized Israel as a foreign sovereign since May 14, 1948. Statement by the President Announcing the Recognition of the State of Israel, Public Papers of the Presidents, Harry S. Truman, p. 258 (1964). That the United States has subsequently declined to acknowledge Israel's sovereignty over Jerusalem has not changed its recognition of Israel as a sovereign state. And even if the United States were to acknowledge Israel's sovereignty over Jerusalem, that action would not change its recognition of Israel as a sovereign state. That is because the United States has already afforded Israel the rights and responsibilities attendant to its status as a sovereign State. Taking a different position

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

on the Jerusalem question will have no effect on that recognition. [11]

Perhaps recognizing that a formal recognition is not implicated here, the majority reasons that, if the Executive's exclusive recognition power "is to mean anything, it must mean that the President not only makes the initial, formal recognition determination but also that he may maintain that determination in his and his agent's statements." *Ante,* at 2094 – 2095. By "alter[ing] the President's statements on matters of recognition or forc[ing] him to contradict them," the majority reasons, "Congress in effect would exercise the recognition power." *Ante,* at 2095. This argument stretches the recognition power beyond all recognition. Listing a Jerusalem-born citizen's place of birth as "Israel" cannot amount to recognition because the United States already recognizes Israel as an international person. Rather than adopt a novel definition of the recognition **\*2113** power, the majority should have looked to other foreign affairs powers in the Constitution to resolve this dispute.

\* \* \*

Adhering to the Constitution's allocation of powers leads me to reach a different conclusion in this case from my colleagues: Section 214(d) can be constitutionally applied to consular reports of birth abroad, but not passports. I therefore respectfully concur in the judgment in part and dissent in part.

Chief Justice ROBERTS, with whom Justice ALITO joins, dissenting.
Today's decision is a first: Never before has this Court accepted a President's direct defiance of an Act of Congress in the field of foreign affairs. We have instead stressed that the President's power reaches "its lowest ebb" when he contravenes the express will of Congress, "for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637–638, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

Justice SCALIA's principal dissent, which I join in full, refutes the majority's unprecedented holding in detail. I write separately to underscore the stark nature of the Court's error on a basic question of separation of powers.

The first principles in this area are firmly established. The Constitution allocates some foreign policy powers to the Executive, grants some to the Legislature, and enjoins the President to "take Care that the Laws be faithfully executed." Art. II, § 3. The Executive may disregard "the expressed or implied will of Congress" only if the Constitution grants him a power "at once so conclusive and preclusive" as to "disabl[e] the Congress from acting upon the subject." *Youngstown,* 343 U.S., at 637–638, 72 S.Ct. 863 (Jackson, J., concurring).

Assertions of exclusive and preclusive power leave the Executive "in the least favorable of possible constitutional postures," and such claims have been "scrutinized with caution" throughout this Court's history. *Id.,* at 640, 638, 72 S.Ct. 863; see *Dames & Moore v. Regan,* 453 U.S. 654, 668–669, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). For our first 225 years, no President prevailed when contradicting a statute in the field of foreign affairs. See *Medellín v. Texas,* 552 U.S. 491, 524–532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008); *Hamdan v. Rumsfeld,* 548 U.S. 557, 590–595, 613–625, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006); *Youngstown,* 343 U.S., at 587–589, 72 S.Ct. 863 (majority opinion); *Little v. Barreme,* 2 Cranch 170, 177–179, 2 L.Ed. 243 (1804).

In this case, the President claims the exclusive and preclusive power to recognize foreign sovereigns. The Court devotes much of its analysis to accepting the Executive's contention. *Ante,* at 2083 – 2095. I have serious doubts about that position. The majority places great weight on the Reception Clause, which directs that the Executive "shall receive Ambassadors and other public Ministers." Art. II, § 3. But that provision, framed as an obligation rather than an authorization, appears alongside the *duties* imposed on the President by Article II, Section 3, not the *powers* granted to him by Article II, Section 2. Indeed, the People ratified the Constitution with Alexander Hamilton's assurance that executive reception of ambassadors "is more a matter of dignity than of authority" and "will be without consequence in the administration of the government." The Federalist No. 69, p. 420 (C. Rossiter ed. 1961). In short, at the time of the founding, "there was no reason to view the reception

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

clause as a source of discretionary **\*2114** authority for the president." Adler, The President's Recognition Power: Ministerial or Discretionary? 25 Presidential Studies Q. 267, 269 (1995).

The majority's other asserted textual bases are even more tenuous. The President does have power to make treaties and appoint ambassadors. Art. II, § 2. But those authorities are *shared* with Congress, *ibid.,* so they hardly support an inference that the recognition power is *exclusive.*

Precedent and history lend no more weight to the Court's position. The majority cites dicta suggesting an exclusive executive recognition power, but acknowledges contrary dicta suggesting that the power is shared. See, *e.g., United States v. Palmer,* 3 Wheat. 610, 643, 4 L.Ed. 471 (1818) ("the courts of the union must view [a] newly constituted government as it is viewed by *the legislative and executive departments* of the government of the United States" (emphasis added)). When the best you can muster is conflicting dicta, precedent can hardly be said to support your side.

As for history, the majority admits that it too points in both directions. Some Presidents have claimed an exclusive recognition power, but others have expressed uncertainty about whether such preclusive authority exists. Those in the skeptical camp include Andrew Jackson and Abraham Lincoln, leaders not generally known for their cramped conceptions of Presidential power. Congress has also asserted its authority over recognition determinations at numerous points in history. The majority therefore falls short of demonstrating that "Congress has accepted" the President's exclusive recognition power. *Ante,* at 2094 – 2096. In any event, we have held that congressional acquiescence is only "pertinent" when the President acts in the absence of express congressional authorization, not when he asserts power to disregard a statute, as the Executive does here. *Medellín,* 552 U.S., at 528, 128 S.Ct. 1346; see *Dames & Moore,* 453 U.S., at 678–679, 101 S.Ct. 2972.

In sum, although the President has authority over recognition, I am not convinced that the Constitution provides the "conclusive and preclusive" power required to justify defiance of an express legislative mandate.

*Youngstown,* 343 U.S., at 638, 72 S.Ct. 863 (Jackson, J., concurring). As the leading scholar on this issue has concluded, the "text, original understanding, post-ratification history, and structure of the Constitution do not support the ... expansive claim that this executive power is plenary." Reinstein, Is the President's Recognition Power Exclusive? 86 Temp. L. Rev. 1, 60 (2013).

But even if the President does have exclusive recognition power, he still cannot prevail in this case, because the statute at issue *does not implicate recognition.* See *Zivotofsky v. Clinton,* 566 U.S. ——, ——, 132 S.Ct. 1421, 1424–1425, 182 L.Ed.2d 423 (2012) (ALITO, J., concurring in judgment); *post,* at 2119 – 2121 (SCALIA, J., dissenting). The relevant provision, § 214(d), simply gives an American citizen born in Jerusalem the option to designate his place of birth as Israel "[f]or purposes of" passports and other documents. Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1366. The State Department itself has explained that "identification"—not recognition—"is the principal reason that U.S. passports require 'place of birth.' " App. 42. Congress has not disputed the Executive's assurances that § 214(d) does not alter the longstanding United States position on Jerusalem. And the annals of diplomatic history record no examples of official recognition accomplished via optional passport designation.

**\*2115** The majority acknowledges both that the "Executive's exclusive power extends no further than his formal recognition determination" and that § 214(d) does "not itself constitute a formal act of recognition." *Ante,* at 2095. Taken together, these statements come close to a confession of error. The majority attempts to reconcile its position by reconceiving § 214(d) as a "mandate that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State." *Ante,* at 2095. But as just noted, neither Congress nor the Executive Branch regards § 214(d) as a recognition determination, so it is hard to see how the statute could contradict any such determination.

At most, the majority worries that there may be a *perceived* contradiction based on a *mistaken* understanding of the effect of § 214(d), insisting that some "observers interpreted § 214 as altering United States policy regarding

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

Jerusalem." *Ante,* at 2095 – 2096. To afford controlling weight to such impressions, however, is essentially to subject a duly enacted statute to an international heckler's veto.

Moreover, expanding the President's purportedly exclusive recognition power to include authority to avoid potential misunderstandings of legislative enactments proves far too much. Congress could validly exercise its enumerated powers in countless ways that would create more severe perceived contradictions with Presidential recognition decisions than does § 214(d). If, for example, the President recognized a particular country in opposition to Congress's wishes, Congress could declare war or impose a trade embargo on that country. A neutral observer might well conclude that these legislative actions had, to put it mildly, created a perceived contradiction with the President's recognition decision. And yet each of them would undoubtedly be constitutional. See *ante,* at 2095. So too would statements by nonlegislative actors that might be seen to contradict the President's recognition positions, such as the declaration in a political party platform that "Jerusalem is and will remain the capital of Israel." Landler, Pushed by Obama, Democrats Alter Platform Over Jerusalem, N.Y. Times, Sept. 6, 2012, p. A14.

Ultimately, the only power that could support the President's position is the one the majority purports to reject: the "exclusive authority to conduct diplomatic relations." Brief for Respondent 18. The Government offers a single citation for this allegedly exclusive power: *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 319–320, 57 S.Ct. 216, 81 L.Ed. 255 (1936). But as the majority rightly acknowledges, *Curtiss–Wright* did not involve a claim that the Executive could contravene a statute; it held only that he could act pursuant to a legislative delegation. *Ante,* at 2089 – 2090.

The expansive language in *Curtiss–Wright* casting the President as the "sole organ" of the Nation in foreign affairs certainly has attraction for members of the Executive Branch. The Solicitor General invokes the case no fewer than ten times in his brief. Brief for Respondent 9, 10, 18, 19, 23, 24, 53, 54. But our precedents have never accepted such a sweeping understanding of executive power. See *Hamdan,* 548 U.S., at 591–592, 126 S.Ct. 2749;

*Dames & Moore,* 453 U.S., at 661–662, 101 S.Ct. 2972; *Youngstown,* 343 U.S., at 587, 72 S.Ct. 863 (majority opinion); *id.,* at 635 , n. 2, 101 S.Ct. 2972 (Jackson, J., concurring); cf. *Little,* 2 Cranch, at 179 (Marshall, C.J.) ("I confess the first bias of my mind was very strong in favour of ... the executive ... [b]ut I have been convinced that I was mistaken.").

**\*2116** Just a few Terms ago, this Court rejected the President's argument that a broad foreign relations power allowed him to override a state court decision that contradicted U.S. international law obligations. *Medellin,* 552 U.S., at 523–532, 128 S.Ct. 1346. If the President's so-called general foreign relations authority does not permit him to countermand a State's lawful action, it surely does not authorize him to disregard an express statutory directive enacted by Congress, which—unlike the States—has extensive foreign relations powers of its own. Unfortunately, despite its protest to the contrary, the majority today allows the Executive to do just that.

Resolving the status of Jerusalem may be vexing, but resolving this case is not. Whatever recognition power the President may have, exclusive or otherwise, is not implicated by § 214(d). It has not been necessary over the past 225 years to definitively resolve a dispute between Congress and the President over the recognition power. Perhaps we could have waited another 225 years. But instead the majority strains to reach the question based on the mere possibility that observers overseas might misperceive the significance of the birthplace designation at issue in this case. And in the process, the Court takes the perilous step—for the first time in our history—of allowing the President to defy an Act of Congress in the field of foreign affairs.

I respectfully dissent.

Justice SCALIA, with whom THE CHIEF JUSTICE and Justice ALITO join, dissenting.

Before this country declared independence, the law of England entrusted the King with the exclusive care of his kingdom's foreign affairs. The royal prerogative included the "sole power of sending ambassadors to foreign states, and receiving them at home," the sole authority to "make treaties, leagues, and alliances with foreign states

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

and princes," "the sole prerogative of making war and peace," and the "sole power of raising and regulating fleets and armies." 1 W. Blackstone, Commentaries *253, *257, *262. The People of the United States had other ideas when they organized our Government. They considered a sound structure of balanced powers essential to the preservation of just government, and international relations formed no exception to that principle.

The People therefore adopted a Constitution that divides responsibility for the Nation's foreign concerns between the legislative and executive departments. The Constitution gave the President the "executive Power," authority to send and responsibility to receive ambassadors, power to make treaties, and command of the Army and Navy—though they qualified some of these powers by requiring consent of the Senate. Art. II, §§ 1–3. At the same time, they gave Congress powers over war, foreign commerce, naturalization, and more. Art. I, § 8. "Fully eleven of the powers that Article I, § 8 grants Congress deal in some way with foreign affairs." L. Tribe, American Constitutional Law, § 5–18, p. 965.

This case arises out of a dispute between the Executive and Legislative Branches about whether the United States should treat Jerusalem as a part of Israel. The Constitution contemplates that the political branches will make policy about the territorial claims of foreign nations the same way they make policy about other international matters: The President will exercise his powers on the basis of his views, Congress its powers on the basis of its views. That is just what has happened here.

                    I

The political branches of our Government agree on the real-world fact that **2117 Israel controls the city of Jerusalem. See Jerusalem Embassy Act of 1995, 109 Stat. 398; Brief for Respondent 3. They disagree, however, about how official documents should record the birthplace of an American citizen born in Jerusalem. The Executive does not accept any state's claim to sovereignty over Jerusalem, and it maintains that the birthplace designation "Israel" would clash with this stance of neutrality. But the National Legislature has enacted a

statute that provides: "For purposes of the registration of birth, certification of nationality, or issuance of a passport of a United States citizen born in the city of Jerusalem, the Secretary [of State] shall, upon the request of the citizen or the citizen's legal guardian, record the place of birth as Israel." Foreign Relations Authorization Act, Fiscal Year 2003, § 214(d), 116 Stat. 1366. Menachem Zivotofsky's parents seek enforcement of this statutory right in the issuance of their son's passport and consular report of birth abroad. They regard their son's birthplace as a part of Israel and insist as "a matter of conscience" that his Israeli nativity "not be erased" from his identity documents. App. 26.

Before turning to Presidential power under Article II, I think it well to establish the statute's basis in congressional power under Article I. Congress's power to "establish an uniform Rule of Naturalization," Art. I, § 8, cl. 4, enables it to grant American citizenship to someone born abroad. *United States v. Wong Kim Ark,* 169 U.S. 649, 702–703, 18 S.Ct. 456, 42 L.Ed. 890 (1898). The naturalization power also enables Congress to furnish the people it makes citizens with papers verifying their citizenship— say a consular report of birth abroad (which certifies citizenship of an American born outside the United States) or a passport (which certifies citizenship for purposes of international travel). As the Necessary and Proper Clause confirms, every congressional power "carries with it all those incidental powers which are necessary to its complete and effectual execution." *Cohens v. Virginia,* 6 Wheat. 264, 429, 5 L.Ed. 257 (1821). Even on a miserly understanding of Congress's incidental authority, Congress may make grants of citizenship "effectual" by providing for the issuance of certificates authenticating them.

One would think that if Congress may grant Zivotofsky a passport and a birth report, it may also require these papers to record his birthplace as "Israel." The birthplace specification promotes the document's citizenship-authenticating function by identifying the bearer, distinguishing people with similar names but different birthplaces from each other, helping authorities uncover identity fraud, and facilitating retrieval of the Government's citizenship records. See App. 70. To be sure, recording Zivotofsky's birthplace as "Jerusalem" rather than "Israel" would fulfill these objectives, but when faced

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 92 of 482

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

with alternative ways to carry its powers into execution, Congress has the "discretion" to choose the one it deems "most beneficial to the people." *McCulloch v. Maryland,* 4 Wheat. 316, 421, 4 L.Ed. 579 (1819). It thus has the right to decide that recording birthplaces as "Israel" makes for better foreign policy. Or that regardless of international politics, a passport or birth report should respect its bearer's conscientious belief that Jerusalem belongs to Israel.

No doubt congressional discretion in executing legislative powers has its limits; Congress's chosen approach must be not only "necessary" to carrying its powers into execution, but also "proper." Congress thus may not transcend boundaries upon legislative authority stated or implied elsewhere in the Constitution. But as we shall see, § 214(d) does not transgress any such restriction.

### *2118  II

The Court frames this case as a debate about recognition. Recognition is a sovereign's official acceptance of a status under international law. A sovereign might recognize a foreign entity as a state, a regime as the other state's government, a place as part of the other state's territory, rebel forces in the other state as a belligerent power, and so on. 2 M. Whiteman, Digest of International Law § 1 (1963) (hereinafter Whiteman). President Truman recognized Israel as a state in 1948, but Presidents have consistently declined to recognize Jerusalem as a part of Israel's (or any other state's) sovereign territory.

The Court holds that the Constitution makes the President alone responsible for recognition and that § 214(d) invades this exclusive power. I agree that the Constitution *empowers* the President to extend recognition on behalf of the United States, but I find it a much harder question whether it makes that power exclusive. The Court tells us that "the weight of historical evidence" supports exclusive executive authority over "the formal determination of recognition." *Ante,* at 2091. But even with its attention confined to formal recognition, the Court is forced to admit that "history is not all on one side." *Ibid.* To take a stark example, Congress legislated in 1934 to grant independence to the Philippines, which were then an

American colony. 48 Stat. 456. In the course of doing so, Congress directed the President to "recognize the independence of the Philippine Islands as a separate and self-governing nation" and to "acknowledge the authority and control over the same of the government instituted by the people thereof." § 10, *id.,* at 463. Constitutional? And if Congress may control recognition when exercising its power "to dispose of ... the Territory or other Property belonging to the United States," Art. IV, § 3, cl. 2, why not when exercising other enumerated powers? Neither text nor history nor precedent yields a clear answer to these questions. Fortunately, I have no need to confront these matters today—nor does the Court—because § 214(d) plainly does not concern recognition.

Recognition is more than an announcement of a policy. Like the ratification of an international agreement or the termination of a treaty, it is a formal legal act with effects under international law. It signifies acceptance of an international status, and it makes a commitment to continued acceptance of that status and respect for any attendant rights. See, *e.g.,* Convention on the Rights and Duties of States, Art. 6, Dec. 26, 1933, 49 Stat. 3100, T.S. No. 881. "Its legal effect is to create an estoppel. By granting recognition, [states] debar themselves from challenging in future whatever they have previously acknowledged." 1 G. Schwarzenberger, International Law 127 (3d ed. 1957). In order to extend recognition, a state must perform an act that unequivocally manifests that intention. Whiteman § 3. That act can consist of an express conferral of recognition, or one of a handful of acts that by international custom imply recognition—chiefly, entering into a bilateral treaty, and sending or receiving an ambassador. *Ibid.*

To know all this is to realize at once that § 214(d) has nothing to do with recognition. Section 214(d) does not require the Secretary to make a formal declaration about Israel's sovereignty over Jerusalem. And nobody suggests that international custom infers acceptance of sovereignty from the birthplace designation on a passport or birth report, as it does from bilateral treaties or exchanges of ambassadors. Recognition would preclude the United States (as a matter of international law)  *2119  from later contesting Israeli sovereignty over Jerusalem. But making a notation in a passport or birth report does not encumber the Republic with any international obligations. It leaves

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

the Nation free (so far as international law is concerned) to change its mind in the future. That would be true even if the statute required *all* passports to list "Israel." But in fact it requires only those passports to list "Israel" for which the citizen (or his guardian) *requests* "Israel"; all the rest, under the Secretary's policy, list "Jerusalem." It is utterly impossible for this deference to private requests to constitute an act that unequivocally manifests an intention to grant recognition.

Section 214(d) performs a more prosaic function than extending recognition. Just as foreign countries care about what our Government has to say about their borders, so too American citizens often care about what our Government has to say about their identities. Cf. *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). The State Department does not grant or deny recognition in order to accommodate these individuals, but it does make exceptions to its rules about how it records birthplaces. Although normal protocol requires specifying the bearer's country of birth in his passport, Dept. of State, 7 Foreign Affairs Manual (FAM) § 1300, App. D, § 1330(a) (2014), the State Department will, if the bearer protests, specify the city of birth instead—so that an Irish nationalist may have his birthplace recorded as "Belfast" rather than "United Kingdom," *id.,* § 1380(a). And although normal protocol requires specifying the country with *present* sovereignty over the bearer's place of birth, *id.,* § 1330(b), a special exception allows a bearer born before 1948 in what was then Palestine to have his birthplace listed as "Palestine," *id.,* § 1360(g). Section 214(d) requires the State Department to make a further accommodation. Even though the Department normally refuses to specify a country that lacks recognized sovereignty over the bearer's birthplace, it must suspend that policy upon the request of an American citizen born in Jerusalem. Granting a request to specify "Israel" rather than "Jerusalem" does not recognize Israel's sovereignty over Jerusalem, just as granting a request to specify "Belfast" rather than "United Kingdom" does not derecognize the United Kingdom's sovereignty over Northern Ireland.

The best indication that § 214(d) does not concern recognition comes from the State Department's policies concerning Taiwan. According to the Solicitor General, the United States "acknowledges the Chinese position"

that Taiwan is a part of China, but "does not take a position" of its own on that issue. Brief for Respondent 51–52. Even so, the State Department has for a long time recorded the birthplace of a citizen born in Taiwan as "China." It indeed *insisted* on doing so until Congress passed a law (on which § 214(d) was modeled) giving citizens the option to have their birthplaces recorded as "Taiwan." See § 132, 108 Stat. 395, as amended by § 1(r), 108 Stat. 4302. The Solicitor General explains that the designation "China" "involves a geographic description, not an assertion that Taiwan is ... part of sovereign China." Brief for Respondent 51–52. Quite so. Section 214(d) likewise calls for nothing beyond a "geographic description"; it does not require the Executive even to assert, never mind formally recognize, that Jerusalem is a part of sovereign Israel. Since birthplace specifications in citizenship documents are matters within Congress's control, Congress may treat Jerusalem as a part of Israel when regulating the recording of birthplaces, even if the President does not do so when extending recognition. Section 214(d), by the way, **\*2120** expressly directs the Secretary to "record the place of birth as Israel" "*[f]or purposes of* the registration of birth, certification of nationality, or issuance of a passport." (Emphasis added.) And the law bears the caption, "Record of Place of Birth as Israel *for Passport Purposes.*" (Emphasis added.) Finding recognition in this provision is rather like finding admission to the Union in a provision that treats American Samoa as a State for purposes of a federal highway safety program, 23 U.S.C. § 401.

### III

The Court complains that § 214(d) requires the Secretary of State to issue official documents implying that Jerusalem is a part of Israel; that it appears in a section of the statute bearing the title "United States Policy with Respect to Jerusalem as the Capital of Israel"; and that foreign "observers interpreted [it] as altering United States policy regarding Jerusalem." *Ante,* at 2115. But these features do not show that § 214(d) recognizes Israel's sovereignty over Jerusalem. They show only that the law displays symbolic support for Israel's territorial claim. That symbolism may have tremendous significance as

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

a matter of international diplomacy, but it makes no difference as a matter of constitutional law.

Even if the Constitution gives the President sole power to extend recognition, it does not give him sole power to make all decisions relating to foreign disputes over sovereignty. To the contrary, a fair reading of Article I allows Congress to decide for itself how its laws should handle these controversies. Read naturally, power to "regulate Commerce with foreign Nations," § 8, cl. 3, includes power to regulate imports from Gibraltar as British goods or as Spanish goods. Read naturally, power to "regulate the Value ... of foreign Coin," § 8, cl. 5, includes power to honor (or not) currency issued by Taiwan. And so on for the other enumerated powers. These are not airy hypotheticals. A trade statute from 1800, for example, provided that "the whole of the island of Hispaniola"—whose status was then in controversy—"shall for purposes of [the] act be considered as a dependency of the French Republic." § 7, 2 Stat. 10. In 1938, Congress allowed admission of the Vatican City's public records in federal courts, decades before the United States extended formal recognition. ch. 682, 52 Stat. 1163; Whiteman § 68. The Taiwan Relations Act of 1979 grants Taiwan capacity to sue and be sued, even though the United States does not recognize it as a state. 22 U.S.C. § 3303(b)(7). Section 214(d) continues in the same tradition.

The Constitution likewise does not give the President exclusive power to determine which claims to statehood and territory "are legitimate in the eyes of the United States," *ante,* at 2086. Congress may express its own views about these matters by declaring war, restricting trade, denying foreign aid, and much else besides. To take just one example, in 1991, Congress responded to Iraq's invasion of Kuwait by enacting a resolution authorizing use of military force. 105 Stat. 3. No doubt the resolution reflected Congress's views about the legitimacy of Iraq's territorial claim. The preamble referred to Iraq's "illegal occupation" and stated that "the international community has demanded ... that Kuwait's independence and legitimate government be restored." *Ibid.* These statements are far more categorical than the caption "United States Policy with Respect to Jerusalem as the Capital of Israel." Does it follow that the authorization of the use of military force invaded the President's exclusive

powers? Or that it would have done so had the **\*2121** President recognized Iraqi sovereignty over Kuwait?

History does not even support an exclusive Presidential power to make what the Court calls "formal statements" about "the legitimacy of a state or government and its territorial bounds," *ante,* at 2096. For a long time, the Houses of Congress have made formal statements announcing their own positions on these issues, again without provoking constitutional objections. A recent resolution expressed the House of Representatives' "strong support for the legitimate, democratically-elected Government of Lebanon" and condemned an "illegitimate" and "unjustifiable" insurrection by "the terrorist group Hizballah." H. Res. 1194, 110th Cong, 2d Sess., 1, 4 (2008). An earlier enactment declared "the sense of the Congress that ... Tibet ... is an occupied country under the established principles of international law" and that "Tibet's true representatives are the Dalai Lama and the Tibetan Government in exile." § 355, 105 Stat. 713 (1991). After Texas won independence from Mexico, the Senate resolved that "the State of Texas having established and maintained an independent Government, ... it is expedient and proper ... that the independent political existence of the said State be acknowledged by the Government of the United States." Cong. Globe, 24th Cong., 2d Sess., 83 (1837); see *id.,* at 270.

In the final analysis, the Constitution may well deny Congress power to recognize—the power to make an international commitment accepting a foreign entity as a state, a regime as its government, a place as a part of its territory, and so on. But whatever else § 214(d) may do, it plainly does not make (or require the President to make) a commitment accepting Israel's sovereignty over Jerusalem.

IV

The Court does not try to argue that § 214(d) extends recognition; nor does it try to argue that the President holds the exclusive power to make all nonrecognition decisions relating to the status of Jerusalem. As just shown, these arguments would be impossible to make with a straight face.

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

The Court instead announces a rule that is blatantly gerrymandered to the facts of this case. It concludes that, in addition to the exclusive power to make the "formal recognition determination," the President holds an ancillary exclusive power "to control ... formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds." *Ante,* at 2096. It follows, the Court explains, that Congress may not "requir[e] the President to contradict an earlier recognition determination in an official document issued by the Executive Branch." *Ibid.* So requiring imports from Jerusalem to be taxed like goods from Israel is fine, but requiring Customs to issue an official invoice to that effect is not? Nonsense.

Recognition is a type of legal act, not a type of statement. It is a leap worthy of the Mad Hatter to go from exclusive authority over making legal commitments about sovereignty to exclusive authority over making statements or issuing documents about national borders. The Court may as well jump from power over issuing declaratory judgments to a monopoly on writing law-review articles.

No consistent or coherent theory supports the Court's decision. At times, the Court seems concerned with the possibility of congressional interference with the President's ability to extend or withhold legal recognition. The Court concedes, as it must, that the notation required by § 214(d) "would not itself constitute a formal **\*2122** act of recognition." *Ante,* at 2095. It still frets, however, that Congress *could* try to regulate the President's "statements" in a way that "override[s] the President's recognition determination." *Ibid.* But "[t]he circumstance, that ... [a] power may be abused, is no answer. All powers may be abused." 2 J. Story, Commentaries on the Constitution of the United States § 921, p. 386 (1833). What matters is whether *this* law interferes with the President's ability to withhold recognition. It would be comical to claim that it does. The Court identifies no reason to believe that the United States—or indeed any other country—uses the place-of-birth field in passports and birth reports as a forum for performing the act of recognition. That is why nobody thinks the United States withdraws recognition from Canada when it accommodates a Quebec nationalist's request to have his birthplace recorded as "Montreal."

To the extent doubts linger about whether the United States recognizes Israel's sovereignty over Jerusalem, § 214(d) leaves the President free to dispel them by issuing a disclaimer of intent to recognize. A disclaimer always suffices to prevent an act from effecting recognition. Restatement (Second) of Foreign Relations Law of the United States § 104(1) (1962). Recall that an earlier law grants citizens born in Taiwan the right to have their birthplaces recorded as "Taiwan." The State Department has complied with the law, but states in its Foreign Affairs Manual: "The United States does not officially recognize Taiwan as a 'state' or 'country,' although passport issuing officers may enter 'Taiwan' as a place of birth." 7 FAM § 1300, App. D, § 1340(d)(6). Nothing stops a similar disclaimer here.

At other times, the Court seems concerned with Congress's failure to give effect to a recognition decision that the President has already made. The Court protests, for instance, that § 214(d) "directly contradicts" the President's refusal to recognize Israel's sovereignty over Jerusalem. *Ante,* at 2095. But even if the Constitution empowers the President alone to extend recognition, it nowhere obliges Congress to align its laws with the President's recognition decisions. Because the President and Congress are "perfectly co-ordinate by the terms of their common commission," The Federalist No. 49, p. 314 (C. Rossiter ed. 1961) (Madison), the President's use of the recognition power does not constrain Congress's use of its legislative powers.

Congress has legislated without regard to recognition for a long time and in a range of settings. For example, responding in 1817 and 1818 to revolutions in Latin America, Congress amended federal neutrality laws—which originally prohibited private military action for or against *recognized* states—to prohibit private hostilities against *unrecognized* states too. ch. 58, 3 Stat. 370; ch. 88, 3 Stat. 447; see *The Three Friends,* 166 U.S. 1, 52–59, 17 S.Ct. 495, 41 L.Ed. 897 (1897). Legislation from 90 years ago provided for the revision of national immigration quotas upon one country's surrender of territory to another, even if "the transfer ... has not been recognized by the United States." § 12(c), 43 Stat. 161 (1924). Federal law today prohibits murdering a foreign government's officials, 18 U.S.C. § 1116, counterfeiting a foreign

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

government's bonds, § 478, and using American vessels to smuggle goods in violation of a foreign government's laws, § 546—all "irrespective of recognition by the United States," §§ 11, 1116. Just as Congress may legislate independently of recognition in all of those areas, so too may it legislate independently of recognition when regulating the recording of birthplaces.

**\*2123** The Court elsewhere objects that § 214(d) interferes with the autonomy and unity of the Executive Branch, setting the branch against itself. The Court suggests, for instance, that the law prevents the President from maintaining his neutrality about Jerusalem in "his and his agent's statements." *Ante,* at 2095. That is of no constitutional significance. As just shown, Congress has power to legislate without regard to recognition, and where Congress has the power to legislate, the President has a duty to "take Care" that its legislation "be faithfully executed," Art. II, § 3. It is likewise "the duty of the secretary of state to conform to the law"; where Congress imposes a responsibility on him, "he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others." *Marbury v. Madison,* 1 Cranch 137, 158, 166, 2 L.Ed. 60 (1803). The Executive's involvement in carrying out this law does not affect its constitutionality; the Executive carries out every law.

The Court's error could be made more apparent by applying its reasoning to the President's power "to make Treaties," Art. II, § 2, cl. 2. There is no question that Congress may, if it wishes, pass laws that openly flout treaties made by the President. *Head Money Cases,* 112 U.S. 580, 597, 5 S.Ct. 247, 28 L.Ed. 798 (1884). Would anyone have dreamt that the President may refuse to carry out such laws—or, to bring the point closer to home, refuse to execute federal courts' judgments under such laws—so that the Executive may "speak with one voice" about the country's international obligations? To ask is to answer. Today's holding puts the implied power to recognize territorial claims (which the Court infers from the power to recognize states, which it infers from the responsibility to receive ambassadors) on a higher footing than the express power to make treaties. And this, even though the Federalist describes the making of treaties as a "delicate and important prerogative," but the reception of ambassadors as "more a matter of dignity

than of authority," "a circumstance which will be without consequence in the administration of the government." The Federalist No. 69, p. 420 (Hamilton).

In the end, the Court's decision does not rest on text or history or precedent. It instead comes down to "functional considerations"—principally the Court's perception that the Nation "must speak with one voice" about the status of Jerusalem. *Ante,* at 2086 (ellipsis and internal quotation marks omitted). The vices of this mode of analysis go beyond mere lack of footing in the Constitution. Functionalism of the sort the Court practices today will *systematically* favor the unitary President over the plural Congress in disputes involving foreign affairs. It is possible that this approach will make for more effective foreign policy, perhaps as effective as that of a monarchy. It is certain that, in the long run, it will erode the structure of separated powers that the People established for the protection of their liberty.

V

Justice THOMAS's concurrence deems § 214(d) constitutional to the extent it regulates birth reports, but unconstitutional to the extent it regulates passports. *Ante,* at 2101 – 2102 (opinion concurring in judgment in part and dissenting in part). The concurrence finds no congressional power that would extend to the issuance or contents of passports. Including the power to regulate foreign commerce—even though passports facilitate the transportation of passengers, "a part of our commerce with foreign nations," *Henderson v. Mayor of New York,* 92 U.S. 259, 270, 23 L.Ed. 543 (1876). Including the power over naturalization—even though passports issued to **\*2124** citizens, like birth reports, "have the same force and effect as proof of United States citizenship as certificates of naturalization," 22 U.S.C. § 2705. Including the power to enforce the Fourteenth Amendment's guarantee that "[a]ll persons born or naturalized in the United States ... are citizens of the United States"— even though a passport provides evidence of citizenship and so helps enforce this guarantee abroad. Including the power to exclude persons from the territory of the United States, see Art. I, § 9, cl. 1—even though passports are the principal means of identifying citizens entitled

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

to entry. Including the powers under which Congress has restricted the ability of various people to leave the country (fugitives from justice, for example, see 18 U.S.C. § 1073)—even though passports are the principal means of controlling exit. Including the power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," Art. IV, § 3, cl. 2—even though "[a] passport remains at all times the property of the United States," 7 FAM § 1317 (2013). The concurrence's stingy interpretation of the enumerated powers forgets that the Constitution does not "partake of the prolixity of a legal code," that "only its great outlines [are] marked, its important objects designated, and the minor ingredients which compose those objects [left to] be deduced from the nature of the objects themselves." *McCulloch,* 4 Wheat., at 407. It forgets, in other words, "that it is a *constitution* we are expounding." *Ibid.*

Defending Presidential primacy over passports, the concurrence says that the royal prerogative in England included the power to issue and control travel documents akin to the modern passport. *Ante,* at 2085 – 2086. Perhaps so, but that power was assuredly not exclusive. The Aliens Act 1793, for example, enacted almost contemporaneously with our Constitution, required an alien traveling within England to obtain "a passport from [a] mayor or ... [a] justice of [the] peace," "in which passport shall be expressed the name and rank, occupation or description, of such alien." 33 Geo. III, ch. 4, § 8, in 39 Eng. Stat. at Large 12. The Aliens Act 1798 prohibited aliens from leaving the country without "a passport ... first obtained from one of his Majesty's principal secretaries of state," and instructed customs officers to mark, sign, and date passports before allowing their bearers to depart. 38 Geo. III, ch. 50, § 8, in 41 Eng. Stat. at Large 684. These and similar laws discredit any claim that, in the "Anglo–American legal tradition," travel documents have "consistently been issued *and controlled* by the body exercising executive power," *ante,* at 2101 (emphasis added).

Returning to this side of the Atlantic, the concurrence says that passports have a "historical pedigree uniquely associated with the President." *Ante,* at 2111. This statement overlooks the reality that, until Congress restricted the issuance of passports to the State Department in 1856, "passports were also issued by

governors, mayors, and even ... notaries public." Assn. of the Bar of the City of New York, Special Committee to Study Passport Procedures, Freedom to Travel 6 (1958). To be sure, early Presidents granted passports without express congressional authorization. *Ante,* at 2086 – 2087. But this point establishes Presidential authority over passports in the face of congressional *silence,* not Presidential authority in the face of congressional *opposition.* Early in the Republic's history, Congress made it a crime for a consul to "grant a passport or other paper certifying that any alien, knowing him or her to be such, is a citizen of the United States." § 8, 2 Stat. 205 (1803). Closer to the Civil War, Congress **\*2125** expressly authorized the granting of passports, regulated passport fees, and prohibited the issuance of passports to foreign citizens. § 23, 11 Stat. 60–61 (1856). Since then, Congress has made laws about eligibility to receive passports, the duration for which passports remain valid, and even the type of paper used to manufacture passports. 22 U.S.C. §§ 212, 217a; § 617(b), 102 Stat. 1755. (The concurrence makes no attempt to explain how these laws were supported by congressional powers other than those it rejects in the present case.) This Court has held that the President may not curtail a citizen's travel by withholding a passport, *except on grounds approved by Congress. Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). History and precedent thus refute any suggestion that the Constitution disables Congress from regulating the President's issuance and formulation of passports.

The concurrence adds that a passport "contains [a] communication directed at a foreign power." *Ante,* at 2111. The "communication" in question is a message that traditionally appears in each passport (though no statute, to my knowledge, expressly requires its inclusion): "The Secretary of State of the United States of America hereby requests all whom it may concern to permit the citizen/national of the United States named herein to pass without delay or hindrance and in case of need to give all lawful aid and protection." App. 22. I leave it to the reader to judge whether a request to "all whom it may concern" qualifies as a "communication directed at a foreign power." Even if it does, its presence does not affect § 214(d)'s constitutionality. Requesting protection is only a "subordinate" function of a passport. *Kent, supra,* at 129, 78 S.Ct. 1113. This subordinate function has never been thought to invalidate other laws regulating the

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)
192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

contents of passports; why then would it invalidate this one?

That brings me, in analytic crescendo, to the concurrence's suggestion that *even if* Congress's enumerated powers otherwise encompass § 214(d), and *even if* the President's power to regulate the contents of passports is not exclusive, the law might *still* violate the Constitution, because it "conflict[s]" with the President's passport policy. *Ante,* at 2093. It turns the Constitution upside-down to suggest that in areas of shared authority, it is the executive policy that preempts the law, rather than the other way around. Congress *may* make laws necessary and proper for carrying into execution the President's powers, Art. I, § 8, cl. 18, but the President *must* "take Care" that Congress's legislation "be faithfully executed," Art. II, § 3. And Acts of Congress made in pursuance of the Constitution are the "supreme Law of the Land"; acts of the President (apart from treaties) are not. Art. VI, cl. 2. That is why Chief Justice Marshall was right to think that a law prohibiting the seizure of foreign ships trumped a military order requiring it. *Little v. Barreme,* 2 Cranch 170, 178–179, 2 L.Ed. 243 (1804). It is why Justice Jackson was right to think that a President who "takes measures incompatible with the expressed or implied will of Congress" may "rely only upon his own constitutional powers *minus any constitutional powers of Congress over the matter*." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (concurring opinion) (emphasis added). And it is why Justice THOMAS is wrong to think that even if § 214(d) operates in a field of shared authority the President might still prevail.

Whereas the Court's analysis threatens congressional power over foreign affairs with gradual erosion, the concurrence's approach **\*2126** shatters it in one stroke. The combination of (a) the concurrence's assertion of broad, unenumerated "residual powers" in the President, see *ante,* at 2081 – 2085; (b) its parsimonious interpretation of Congress's enumerated powers, see *ante,* at 2087 – 2090; and (c) its even more parsimonious interpretation of Congress's authority to enact laws "necessary and proper for carrying into Execution" the President's executive

powers, see *ante,* at 2089 – 2091; produces (d) a presidency more reminiscent of George III than George Washington.

\* \* \*

International disputes about statehood and territory are neither rare nor obscure. Leading foreign debates during the 19th century concerned how the United States should respond to revolutions in Latin America, Texas, Mexico, Hawaii, Cuba. During the 20th century, attitudes toward Communist governments in Russia and China became conspicuous subjects of agitation. Disagreements about Taiwan, Kashmir, and Crimea remain prominent today. A President empowered to decide all questions relating to these matters, immune from laws embodying congressional disagreement with his position, would have uncontrolled mastery of a vast share of the Nation's foreign affairs.

That is not the chief magistrate under which the American People agreed to live when they adopted the national charter. They believed that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, ... may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 301 (Madison). For this reason, they did not entrust either the President or Congress with sole power to adopt uncontradictable policies about *any* subject—foreign-sovereignty disputes included. They instead gave each political department its own powers, and with that the freedom to contradict the other's policies. Under the Constitution they approved, Congress may require Zivotofsky's passport and birth report to record his birthplace as Israel, even if that requirement clashes with the President's preference for neutrality about the status of Jerusalem.

I dissent.

### All Citations

135 S.Ct. 2076, 192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662, 2015 Daily Journal D.A.R. 6145, 25 Fla. L. Weekly Fed. S 313

Footnotes

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

**Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S.Ct. 2076 (2015)**

192 L.Ed.2d 83, 83 USLW 4391, 15 Cal. Daily Op. Serv. 5662...

\*       The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1       This discussion of the allocation of *federal* foreign affairs powers should not be understood to address the allocation of foreign affairs powers between the Federal Government and the States. The extent to which the States retained foreign affairs powers following ratification is not before us today.

2       The majority asserts that Zivotofsky "waived any argument that his consular report of birth abroad should be treated differently than his passport" in the court below and in this Court because he "fail[ed] to differentiate between the two documents." *Ante,* at 2083. But at every stage of the proceedings, Zivotofsky has pressed his claim that he is entitled to have his place of birth listed as "Israel" on *both* his passport and his consular report of birth abroad, and the consular report issue is fairly included in the question presented. Parties cannot waive the correct interpretation of the law simply by failing to invoke it. See, *e.g., EEOC v. FLRA,* 476 U.S. 19, 23, 106 S.Ct. 1678, 90 L.Ed.2d 19 (1986) (*per curiam* ). That the parties have argued the case as if the same analysis should apply to both documents does not relieve this Court of its responsibility to interpret the law correctly.

3       Until 1978, passports were not generally required to enter or exit the country except during wartime. § 707, 92 Stat. 993.

4       Justice SCALIA, in his dissent, faults me for failing to identify the enumerated power under which these laws were permissible, but the question presented in *this* case is whether § 214(d) is a constitutional exercise of Congress' power, and that is the question I address.

5       Because § 214(d) is not proper, I need not resolve whether such a law could be understood to "carry into execution" the President's power.

6       This principle is not necessarily inconsistent with the second mechanism for evaluating congressional action under the Necessary and Proper Clause discussed above. Although that mechanism would tie the propriety of congressional action to the objection (or nonobjection) of another branch, the point of that tying feature is to determine whether, in fact, Congress has encroached upon another branch, not whether such encroachment is acceptable.

7       The First Congress passed a law recognizing citizenship at birth for children born abroad to U.S. citizens. Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 104. An 1802 amendment to the provision rendered the availability of this citizenship uncertain. Binney, The Alienigenae of the United States, 2 Am. L. Reg. 193, 193 (1854). But Congress acted to clarify the availability of such citizenship in 1855, Act of Feb. 10, 1855, ch. 71, 10 Stat. 604, and it continues to exist to this day, see Immigration and Nationality Act, § 301(a), 66 Stat. 235.

8       As the issue is not presented, I need not decide how a direct conflict between action pursuant to an enumerated power of Congress and action pursuant to the residual foreign affairs power of the President should be resolved.

9       I assume, as the majority does, that the recognition power conferred on the President by the Constitution is the power to accomplish the act of recognition as that act is defined under international law. It is possible, of course, that the Framers had a fixed understanding of the act of recognition that is at odds with the definition of that act under international law. But the majority does not make that argument, nor does the majority even specifically address how consular reports of birth abroad are related to recognition. Lacking any evidence that the modern practice of recognition deviates in any relevant way from the historical practice, or that the original understanding of the recognition power was something other than the power to take part in that practice, I proceed on the same assumption as the majority.

10      Scholars have long debated the extent to which official recognition by the sovereign states that make up the international community is necessary to bring a new "state" into the international community and thereby subject it to international law. Oppenheim § 39, at 128–129. Resolving this debate is not necessary to resolve the issue at hand, so I describe the modern view of recognition without endorsing it.

11      The analysis might look different if § 214(d) required the President to list as a "place of birth" a country that the United States has never officially recognized. That is not the case here.

**End of Document**                                            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Top



# The Constitution of the United States: A Transcription

*Note:* The following text is a transcription of the Constitution as it was inscribed by Jacob Shallus on parchment (the document on display in the Rotunda at the National Archives Museum.) *The spelling and punctuation reflect the original.*

**We the People** of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America.

## Article. I.

### Section. 1.

All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

### Section. 2.

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration

shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative; and until such enumeration shall be made, the State of New Hampshire shall be entitled to chuse three, Massachusetts eight, Rhode-Island and Providence Plantations one, Connecticut five, New-York six, New Jersey four, Pennsylvania eight, Delaware one, Maryland six, Virginia ten, North Carolina five, South Carolina five, and Georgia three.

When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies.

The House of Representatives shall chuse their Speaker and other Officers; and shall have the sole Power of Impeachment.

## Section. 3.

The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof, for six Years; and each Senator shall have one Vote.

Immediately after they shall be assembled in Consequence of the first Election, they shall be divided as equally as may be into three Classes. The Seats of the Senators of the first Class shall be vacated at the Expiration of the second Year, of the second Class at the Expiration of the fourth Year, and of the third Class at the Expiration of the sixth Year, so that one third may be chosen every second Year; and if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies.

No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.

The Vice President of the United States shall be President of the Senate, but shall have no Vote, unless they be equally divided.

The Senate shall chuse their other Officers, and also a President pro tempore, in the Absence of the Vice President, or when he shall exercise the Office of President of the United States.

The Senate shall have the sole Power to try all Impeachments. When sitting for that Purpose, they shall be on Oath or Affirmation. When the President of the United States is tried, the Chief Justice shall preside: And no Person shall be convicted without the Concurrence of two thirds of the Members present.

Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

## Section. 4.

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

The Congress shall assemble at least once in every Year, and such Meeting shall be on the first Monday in December, unless they shall by Law appoint a different Day.

## Section. 5.

Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and a Majority of each shall constitute a Quorum to do Business; but a smaller Number may adjourn from day to day, and may be authorized to compel the Attendance of absent Members, in such Manner, and under such Penalties as each House may provide.

Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such Parts as may in their Judgment require Secrecy; and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.

Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days, nor to any other Place than that in which the two Houses shall be sitting.

## Section. 6.

The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time; and no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office.

## Section. 7.

All Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills.

Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.

Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary (except on a question of Adjournment) shall be presented to the President of the United States; and before the Same shall take Effect, shall be approved by him, or being disapproved by him, shall be repassed by two thirds of the Senate and House of Representatives, according to the Rules and Limitations prescribed in the Case of a Bill.

## Section. 8.

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States;

To borrow Money on the credit of the United States;

To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes;

To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States;

To coin Money, regulate the Value thereof, and of foreign Coin, and fix the Standard of Weights and Measures;

To provide for the Punishment of counterfeiting the Securities and current Coin of the United States;

To establish Post Offices and post Roads;

To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

To provide and maintain a Navy;

To make Rules for the Government and Regulation of the land and naval Forces;

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings;—And

To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

## Section. 9.

The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.

No Bill of Attainder or ex post facto Law shall be passed.

No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken.

No Tax or Duty shall be laid on Articles exported from any State.

No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another.

No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time.

No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

## Section. 10.

No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque and Reprisal; coin Money; emit Bills of Credit; make any Thing but gold and silver Coin a Tender in Payment of Debts; pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Controul of the Congress.

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

# Article. II.

## Section. 1.

The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

Case 1:17-cv-01154-EGS Document 29-1 Filed 11/26/17 Page 106 of 482

The Electors shall meet in their respective States, and vote by Ballot for two Persons, of whom one at least shall not be an Inhabitant of the same State with themselves. And they shall make a List of all the Persons voted for, and of the Number of Votes for each; which List they shall sign and certify, and transmit sealed to the Seat of the Government of the United States, directed to the President of the Senate. The President of the Senate shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted. The Person having the greatest Number of Votes shall be the President, if such Number be a Majority of the whole Number of Electors appointed; and if there be more than one who have such Majority, and have an equal Number of Votes, then the House of Representatives shall immediately chuse by Ballot one of them for President; and if no Person have a Majority, then from the five highest on the List the said House shall in like Manner chuse the President. But in chusing the President, the Votes shall be taken by States, the Representation from each State having one Vote; A quorum for this Purpose shall consist of a Member or Members from two thirds of the States, and a Majority of all the States shall be necessary to a Choice. In every Case, after the Choice of the President, the Person having the greatest Number of Votes of the Electors shall be the Vice President. But if there should remain two or more who have equal Votes, the Senate shall chuse from them by Ballot the Vice President.

The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States.

No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President; neither shall any Person be eligible to that Office who shall not have attained to the Age of thirty five Years, and been fourteen Years a Resident within the United States.

In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the Same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President and Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected.

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

Before he enter on the Execution of his Office, he shall take the following Oath or Affirmation: —"I do solemnly swear (or affirm) that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

## Section. 2.

The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States; he may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices, and he shall have Power to grant Reprieves and Pardons for Offences against the United States, except in Cases of Impeachment.

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session.

## Section. 3.

He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

## Section. 4.

The President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors.

# Article III.

## Section. 1.

The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at

stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.

## Section. 2.

The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction;—to Controversies to which the United States shall be a Party;—to Controversies between two or more States;— between a State and Citizens of another State,—between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be Party, the supreme Court shall have original Jurisdiction. In all the other Cases before mentioned, the supreme Court shall have appellate Jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.

The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

## Section. 3.

Treason against the United States, shall consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort. No Person shall be convicted of Treason unless on the Testimony of two Witnesses to the same overt Act, or on Confession in open Court.

The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture except during the Life of the Person attainted.

# Article. IV.

## Section. 1.

Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

## Section. 2.

Case 1:17-cv-01154-EGS Document 29-1 Filed 11/26/17 Page 109 of 482

The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.

A Person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on Demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having Jurisdiction of the Crime.

No Person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

## Section. 3.

New States may be admitted by the Congress into this Union; but no new State shall be formed or erected within the Jurisdiction of any other State; nor any State be formed by the Junction of two or more States, or Parts of States, without the Consent of the Legislatures of the States concerned as well as of the Congress.

The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

## Section. 4.

The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened), against domestic Violence.

# Article. V.

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

# Article. VI.

All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

# Article. VII.

The Ratification of the Conventions of nine States, shall be sufficient for the Establishment of this Constitution between the States so ratifying the Same.

The Word, "the," being interlined between the seventh and eighth Lines of the first Page, The Word "Thirty" being partly written on an Erazure in the fifteenth Line of the first Page, The Words "is tried" being interlined between the thirty second and thirty third Lines of the first Page and the Word "the" being interlined between the forty third and forty fourth Lines of the second Page.

Attest William Jackson Secretary

done in Convention by the Unanimous Consent of the States present the Seventeenth Day of September in the Year of our Lord one thousand seven hundred and Eighty seven and of the Independance of the United States of America the Twelfth In witness whereof We have hereunto subscribed our Names,

G°. Washington
*Presidt and deputy from Virginia*

## Delaware

Geo: Read
Gunning Bedford jun
John Dickinson

Richard Bassett
Jaco: Broom

## Maryland

James McHenry
Dan of St Thos. Jenifer
Danl. Carroll

## Virginia

John Blair
James Madison Jr.

## North Carolina

Wm. Blount
Richd. Dobbs Spaight
Hu Williamson

## South Carolina

J. Rutledge
Charles Cotesworth Pinckney
Charles Pinckney
Pierce Butler

## Georgia

William Few
Abr Baldwin

## New Hampshire

John Langdon
Nicholas Gilman

## Massachusetts

Nathaniel Gorham
Rufus King

## Connecticut

Wm. Saml. Johnson
Roger Sherman

Zelinsky, Nathaniel 11/16/2017
**For Educational Use Only**

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 201

§ 201. Bribery of public officials and witnesses

Currentness

**(a)** For the purpose of this section--

**(1)** the term "public official" means Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror;

**(2)** the term "person who has been selected to be a public official" means any person who has been nominated or appointed to be a public official, or has been officially informed that such person will be so nominated or appointed; and

**(3)** the term "official act" means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

**(b)** Whoever--

**(1)** directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent--

    **(A)** to influence any official act; or

    **(B)** to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

    **(C)** to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person;

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

---

**(2)** being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:

    **(A)** being influenced in the performance of any official act;

    **(B)** being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

    **(C)** being induced to do or omit to do any act in violation of the official duty of such official or person;

**(3)** directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom;

**(4)** directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for being influenced in testimony under oath or affirmation as a witness upon any such trial, hearing, or other proceeding, or in return for absenting himself therefrom;

shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

**(c)** Whoever--

    **(1)** otherwise than as provided by law for the proper discharge of official duty--

    **(A)** directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official; or

    **(B)** being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person;

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

---

**(2)** directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

**(3)** directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom;

shall be fined under this title or imprisoned for not more than two years, or both.

**(d)** Paragraphs (3) and (4) of subsection (b) and paragraphs (2) and (3) of subsection (c) shall not be construed to prohibit the payment or receipt of witness fees provided by law, or the payment, by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding, or in the case of expert witnesses, a reasonable fee for time spent in the preparation of such opinion, and in appearing and testifying.

**(e)** The offenses and penalties prescribed in this section are separate from and in addition to those prescribed in sections 1503, 1504, and 1505 of this title.

## CREDIT(S)

(Added Pub.L. 87-849, § 1(a), Oct. 23, 1962, 76 Stat. 1119; amended Pub.L. 91-405, Title II, § 204(d) (1), Sept. 22, 1970, 84 Stat. 853; Pub.L. 99-646, § 46(a)-(l), Nov. 10, 1986, 100 Stat. 3601-3604; Pub.L. 103-322, Title XXXIII, §§ 330011(b), 330016(2)(D), Sept. 13, 1994, 108 Stat. 2144, 2148.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11222

Ex. Ord. No. 11222, May 8, 1965, 30 F.R. 6469, as amended Ex. Ord. No. 11590, Apr. 23, 1971, 36 F.R. 7831; Ex. Ord. 12107, Dec. 28, 1978, 44 F.R. 1055; Ex. Ord. No. 12565, Sept. 25, 1986, 51 F.R. 34437, which related to standards of ethical conduct for government officers and employees, was revoked by Ex. Ord. No. 12674, Apr. 12, 1989, 54 F.R. 15159, as amended set out as a note under section 7301 of Title 5, Government Organization and Employees. Ex. Ord. No. 12565, which amended Ex. Ord. No. 11222, was also revoked by Ex. Ord. No. 12674.

## MEMORANDUM OF ATTORNEY GENERAL REGARDING
## CONFLICT OF INTEREST PROVISIONS OF PUBLIC LAW 87-849

<Feb. 1, 1963, 28 F.R. 985>

---

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

<January 28, 1963>

Public Law 87-849, "To strengthen the criminal laws relating to bribery, graft, and conflicts of interest, and for other purposes," came into force January 21, 1963. A number of departments and agencies of the Government have suggested that the Department of Justice prepare and distribute a memorandum analyzing the conflict of interest provisions contained in the new act. I am therefore distributing the attached memorandum.

One of the main purposes of the new legislation merits specific mention. That purpose is to help the Government obtain the temporary or intermittent services of persons with special knowledge and skills whose principal employment is outside the Government. For the most part the conflict of interest statutes superseded by Public Law 87-849 imposed the same restraints on a person serving the Government temporarily or intermittently as on a full-time employee, and those statutes often had an unnecessarily severe impact on the former. As a result, they impeded the departments and agencies in the recruitment of experts for important work. Public Law 87-849 meets this difficulty by imposing a lesser array of prohibitions on temporary and intermittent employees than on regular employees. I believe that a widespread appreciation of this aspect of the new law will lead to a significant expansion of the pool of talent on which the departments and agencies can draw for their special needs.

ROBERT F. KENNEDY,

*Attorney General.*

**Memorandum re the Conflict of Interest Provisions of Public Law 87-849, 76 Stat. 1119, Approved October 23, 1962**

INTRODUCTION

Public Law 87-849, which came into force January 21, 1963, affected seven statutes which applied to officers and employees of the Government and were generally spoken of as the "conflict of interest" laws. These included six sections of the criminal code, 18 U.S.C. 216, 281, 283, 284, 434 and 1914 [§§ 216, 281, 283, 284, 434 and 1914 of this title], and a statute containing no penalties, § 190 of the Revised Statutes (5 U.S.C. 99) [former § 99 of Title 5, now covered by § 207 of this title]. Public Law 87-849 (sometimes referred to hereinafter as "the Act") repealed § 190 and one of the criminal statutes, 18 U.S.C. 216, without replacing them. [1] In addition it repealed and supplanted the other five criminal statutes. It is the purpose of this memorandum to summarize the new law and to describe the principal differences between it and the legislation it has replaced.

The Act accomplished its revisions by enacting new §§ 203, 205, 207, 208 and 209 of title 18 of the United States Code [§§ 203, 205, 207, 208 and 209 of this title] and providing that they supplant the above-mentioned §§ 281, 283, 284, 434 and 1914 of title 18 [§§ 281, 283, 284, 434 and 1914 of this title] respectively. [2] It will be convenient, therefore, after summarizing the principal provisions of the new sections, to examine each section separately, comparing it with its precursor before passing to the next. First of all, however, it is necessary to describe the background and provisions of the new 18 U.S.C. 202(a) [§ 202(a) of this title], which has no counterpart among the statutes formerly in effect.

SPECIAL GOVERNMENT EMPLOYEES--NEW 18 U.S.C. 202(a)

In the main the prior conflict of interest laws imposed the same restrictions on individuals who serve the Government intermittently or for a short period of time as on those who serve full-time. The consequences of this generalized treatment

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

were pointed out in the following paragraph of the Senate Judiciary Committee report on the bill which became Public Law 87-849: [3]

In considering the application of present law in relation to the Government's utilization of temporary or intermittent consultants and advisers, it must be emphasized that most of the existing conflict-of-interest statutes were enacted in the 19th century--that is, at a time when persons outside the Government rarely served it in this way. The laws were therefore directed at activities of regular Government employees, and their present impact on the occasionally needed experts--those whose main work is performed outside the Government--is unduly severe. This harsh impact constitutes an appreciable deterrent to the Government's obtaining needed part-time services.

The recruiting problem noted by the Committee generated a major part of the impetus for the enactment of Public Law 87-849. The Act dealt with the problem by creating a category of Government employees termed "special Government employees" and by excepting persons in this category from certain of the prohibitions imposed on ordinary employees. The new 18 U.S.C. 202(a) [§ 202(a) of this title] defines the term "special Government employee" to include, among others, officers and employees of the departments and agencies who are appointed or employed to serve, with or without compensation, for not more than 130 days during any period of 365 consecutive days either on a full-time or intermittent basis.

SUMMARY OF THE MAIN CONFLICT OF INTEREST PROVISIONS OF PUBLIC LAW 87-849

A regular officer or employee of the Government--that is, one appointed or employed to serve more than 130 days in any period of 365 days--is in general subject to the following major prohibitions (the citations are to the new sections of title 18):

1. He may not, except in the discharge of his official duties, represent anyone else before a court or Government agency in a matter in which the United States is a party or has an interest. This prohibition applies both to paid and unpaid representation of another (18 U.S.C. 203 and 205) [§§ 203 and 205 of this title].

2. He may not participate in his governmental capacity in any matter in which he, his spouse, minor child, outside business associate or person with whom he is negotiating for employment has a financial interest (18 U.S.C. 208) [§ 208 of this title].

3. He may not, after his Government employment has ended, represent anyone other than the United States in connection with a matter in which the United States is a party or has an interest and in which he participated personally and substantially for the Government (18 U.S.C. 207(a) ) [§ 207(a) of this title].

4. He may not, for 1 year after his Government employment has ended, represent anyone other than the United States in connection with a matter in which the United States is a party or has an interest and which was within the boundaries of his official responsibility [4] during the last year of his Government service (18 U.S.C. 207(b) ) [§ 207(b) of this title]. This temporary restraint of course gives way to the permanent restraint described in paragraph 3 if the matter is one in which he participated personally and substantially.

5. He may not receive any salary, or supplementation of his Government salary, from a private source as compensation for his services to the Government (18 U.S.C. 209) [§ 209 of this title].

A special Government employee is in general subject only to the following major prohibitions:

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

1. (a) He may not, except in the discharge of his official duties, represent anyone else before a court or Government agency in a matter in which the United States is a party or has an interest and in which he has at any time participated personally and substantially for the Government (18 U.S.C. 203 and 205) [§§ 203 and 205 of this title].

(b) He may not, except in the discharge of his official duties, represent anyone else in a matter pending before the agency he serves unless he has served there no more than 60 days during the past 365 (18 U.S.C. 203 and 205) [§§ 203 and 205 of this title]. He is bound by this restraint despite the fact that the matter is not one in which he has ever participated personally and substantially.

The restrictions described in subparagraphs (a) and (b) apply to both paid and unpaid representation of another. These restrictions in combination are, of course, less extensive than the one described in the corresponding paragraph 1 in the list set forth above with regard to regular employees.

2. He may not participate in his governmental capacity in any matter in which he, his spouse, minor child, outside business associate or person with whom he is negotiating for employment has a financial interest (18 U.S.C. 208) [§ 208 of this title].

3. He may not, after his Government employment has ended, represent anyone other than the United States in connection with a matter in which the United States is a party or has an interest and in which he participated personally and substantially for the Government (18 U.S.C. 207(a) ) [§ 207(a) of this title].

4. He may not, for 1 year after his Government employment has ended, represent anyone other than the United States in connection with a matter in which the United States is a party or has an interest and which was within the boundaries of his official responsibility during the last year of his Government service (18 U.S.C. 207(b) ) [§ 207(b) of this title]. This temporary restraint of course gives way to the permanent restriction described in paragraph 3 if the matter is one in which he participated personally and substantially.

It will be seen that paragraphs 2, 3 and 4 for special Government employees are the same as the corresponding paragraphs for regular employees. Paragraph 5 for the latter, describing the bar against the receipt of salary for Government work from a private source, does not apply to special Government employees.

As appears below, there are a number of exceptions to the prohibitions summarized in the two lists.

COMPARISON OF OLD AND NEW CONFLICT OF INTEREST SECTIONS OF TITLE 18, UNITED STATES CODE

New 18 U.S.C. 203 [§ 203 of this title]. Subsection (a) of this section in general prohibits a Member of Congress and an officer or employee of the United States in any branch or agency of the Government from soliciting or receiving compensation for services rendered on behalf of another person before a Government department or agency in relation to any particular matter in which the United States is a party or has a direct and substantial interest. The subsection does not preclude compensation for services rendered on behalf of another in court.

Subsection (a) is essentially a rewrite of the repealed portion of 18 U.S.C. 281 [former § 281 of this title]. However, subsections (b) and (c) have no counterparts in the previous statutes.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

Subsection (b) makes it unlawful for anyone to offer or pay compensation the solicitation or receipt of which is barred by subsection (a).

Subsection (c) narrows the application of subsection (a) in the case of a person serving as a special Government employee to two, and only two, situations. First, subsection (c) bars him from rendering services before the Government on behalf of others, for compensation, in relation to a matter involving a specific party or parties in which he has participated personally and substantially in the course of his Government duties. And second, it bars him from such activities in relation to a matter involving a specific party or parties, even though he has not participated in the matter personally and substantially, if it is pending in his department or agency and he has served therein more than 60 days in the immediately preceding period of a year.

New 18 U.S.C. 205 [§ 205 of this title]. This section contains two major prohibitions. The first prevents an officer or employee of the United States in any branch or agency of the Government from acting as agent or attorney for prosecuting any claim against the United States, including a claim in court, whether for compensation or not. It also prevents him from receiving a gratuity, or a share or interest in any such claim, for assistance in the prosecution thereof. This portion of § 205 is similar to the repealed portion of 18 U.S.C. 283 [former § 283 of this title], which dealt only with claims against the United States, but it omits a bar contained in the latter--i.e., a bar against rendering uncompensated aid or assistance in the prosecution or support of a claim against the United States.

The second main prohibition of § 205 is concerned with more than claims. It precludes an officer or employee of the Government from acting as agent or attorney for anyone else before a department, agency or court in connection with any particular matter in which the United States is a party or has a direct and substantial interest.

Section 205 provides for the same limited application to a special Government employee as § 203. In short, it precludes him from acting as agent or attorney only (1) in a matter involving a specific party or parties in which he has participated personally and substantially in his governmental capacity, and (2) in a matter involving a specific party or parties which is before his department or agency, if he has served therein more than 60 days in the year past.

Since new §§ 203 and 205 extend to activities in the same range of matters, they overlap to a greater extent than did their predecessor §§ 281 and 283. The following are the few important differences between §§ 203 and 205:

1. Section 203 applies to Members of Congress as well as officers and employees of the Government; § 205 applies only to the latter.

2. Section 203 bars services rendered for compensation solicited or received, but not those rendered without such compensation; § 205 bars both kinds of services.

3. Section 203 bars services rendered before the departments and agencies but not services rendered in court; § 205 bars both.

It will be seen that while § 203 is controlling as to Members of Congress, for all practical purposes § 205 completely overshadows § 203 in respect of officers and employees of the Government.

Section 205 permits a Government officer or employee to represent another person, without compensation, in a disciplinary, loyalty or other personnel matter. Another provision declares that the section does not prevent an officer

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

or employee from giving testimony under oath or making statements required to be made under penalty for perjury or contempt. [5]

Section 205 also authorizes a limited waiver of its restrictions and those of § 203 for the benefit of an officer or employee, including a special Government employee, who represents his own parents, spouse or child, or a person or estate he serves as a fiduciary. The waiver is available to the officer or employee, whether acting for any such person with or without compensation, but only if approved by the official making appointments to his position. And in no event does the waiver extend to his representation of any such person in matters in which he has participated personally and substantially or which, even in the absence of such participation, are the subject of his official responsibility.

Finally, § 205 gives the head of a department or agency the power, notwithstanding any applicable restrictions in its provisions or those of § 203, to allow a special Government employee to represent his regular employer or other outside organization in the performance of work under a Government grant or contract. However, this action is open to the department or agency head only upon his certification, published in the FEDERAL REGISTER, that the national interest requires it.

New 18 U.S.C. 207 [§ 207 of this title]. Subsections (a) and (b) of this section contain post-employment prohibitions applicable to persons who have ended service as officers or employees of the executive branch, the independent agencies or the District of Columbia. [6] The prohibitions for persons who have served as special Government employees are the same as for persons who have performed regular duties.

The restraint of subsection (a) is against a former officer or employee's acting as agent or attorney for anyone other than the United States in connection with certain matters, whether pending in the courts or elsewhere. The matters are those involving a specific party or parties in which the United States is one of the parties or has a direct and substantial interest and in which the former officer or employee participated personally and substantially while holding a Government position.

Subsection (b) sets forth a 1-year postemployment prohibition in respect of those matters which were within the area of official responsibility of a former officer or employee at any time during the last year of his service but which do not come within subsection (a) because he did not participate in them personally and substantially. More particularly, the prohibition of subsection (b) prevents his personal appearance in such matters before a court or a department or agency of the Government as agent or attorney for anyone other than the United States. [7] Where, in the year prior to the end of his service, a former officer or employee has changed areas of responsibility by transferring from one agency to another, the period of his postemployment ineligibility as to matters in a particular area ends 1 year after his responsibility for that area ends. For example, if an individual transfers from a supervisory position in the Internal Revenue Service to a supervisory position in the Post Office Department and leaves that department for private employment 9 months later, he will be free of the restriction of subsection (b) in 3 months insofar as Internal Revenue matters are concerned. He will of course be bound by it for a year in respect of Post Office Department matters.

The proviso following subsections (a) and (b) authorizes an agency head, notwithstanding anything to the contrary in their provisions, to permit a former officer or employee with outstanding scientific qualifications to act as attorney or agent or appear personally before the agency for another in a matter in a scientific field. This authority may be exercised by the agency head upon a "national interest" certification published in the FEDERAL REGISTER.

Subsections (a) and (b) describe the activities they forbid as being in connection with "particular matter[s] involving a specific party or parties" in which the former officer or employee had participated. The quoted language does not include

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

general rulemaking, the formulation of general policy or standards, or other similar matters. Thus, past participation in or official responsibility for a matter of this kind on behalf of the Government does not disqualify a former employee from representing another person in a proceeding which is governed by the rule or other result of such matter.

Subsection (a) bars permanently a greater variety of action than subsection (b) bars temporarily. The conduct made unlawful by the former is any action as agent or attorney, while that made unlawful by the latter is a personal appearance as agent or attorney. However, neither subsection precludes postemployment activities which may fairly be characterized as no more than aiding or assisting another.[8] An individual who has left an agency to accept private employment may, for example, immediately perform technical work in his company's plant in relation to a contract for which he had official responsibility--or, for that matter, in relation to one he helped the agency negotiate. On the other hand, he is forbidden for a year, in the first case, to appear personally before the agency as the agent or attorney of his company in connection with a dispute over the terms of the contract. And he may at no time appear personally before the agency or otherwise act as agent or attorney for his company in such dispute if he helped negotiate the contract.

Comparing subsection (a) with the antecedent 18 U.S.C. 284 [former § 284 of this title] discloses that it follows the latter in limiting disqualification to cases where a former officer or employee actually participated in a matter for the Government. However, subsection (a) covers all matters in which the United States is a party or has a direct and substantial interest and not merely the "claims against the United States" covered by 18 U.S.C. 284 [former § 284 of this title]. Subsection (a) also goes further than the latter in imposing a lifetime instead of a 2-year bar. Subsection (b) has no parallel in 18 U.S.C. 284 [former § 284 of this title] or any other provision of the former conflict of interest statutes.

It will be seen that subsections (a) and (b) in combination are less restrictive in some respects, and more restrictive in others, than the combination of the prior 18 U.S.C. 284 [former § 284 of this title] and 5 U.S.C. 99 [former § 99 of Title 5]. Thus, former officers or employees who were outside the Government when the Act came into force on January 21, 1963, will in certain situations be enabled to carry on activities before the Government which were previously barred. For example, the repeal of 5 U.S.C. 99 [former § 99 of Title 5] permits an attorney who left an executive department for private practice a year before to take certain cases against the Government immediately which would be subject to the bar of 5 U.S.C. 99 [former § 99 of Title 5] for another year. On the other hand, former officers or employees became precluded on and after January 21, 1963 from engaging or continuing to engage in certain activities which were permissible until that This result follows from the replacement of the 2-year bar of 18 U.S.C. 284 [former § 284 of this title] with the lifetime bar of subsection (a) in comparable situations, from the increase in the variety of matters covered by subsection (a) as compared with 18 U.S.C. 284 [former § 284 of this title] and from the introduction of the 1-year bar of subsection (b).

Subsection (c) of § 207 pertains to an individual outside the Government who is in a business or professional partnership with someone serving in the executive branch, an independent agency or the District of Columbia. The subsection prevents such individual from acting as attorney or agent for anyone other than the United States in any matters, including those in court, in which his partner in the Government is participating or has participated or which are the subject of his partner's official responsibility. Although included in a section dealing largely with postemployment activities, this provision is not directed to the postemployment situation.

The paragraph at the end of § 207 also pertains to individuals in a partnership but sets forth no prohibition. This paragraph, which is of importance mainly to lawyers in private practice, rules out the possibility that an individual will be deemed subject to § 203, 205, 207(a) or 207(b) solely because he has a partner who serves or has served in the Government either as a regular or a special Government employee.

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

New 18 U.S.C. 208 [§ 208 of this title]. This section forbids certain actions by an officer or employee of the Government in his role as a servant or representative of the Government. Its thrust is therefore to be distinguished from that of §§ 203 and 205 which forbid certain actions in his capacity as a representative of persons outside the Government.

Subsection (a) in substance requires an officer or employee of the executive branch, an independent agency or the District of Columbia, including a special Government employee, to refrain from participating as such in any matter in which, to his knowledge, he, his spouse, minor child or partner has a financial interest. He must also remove himself from a matter in which a business or nonprofit organization with which he is connected or is seeking employment has a financial interest.

Subsection (b) permits the agency of an officer or employee to grant him an *ad hoc* exemption from subsection (a) if the outside financial interest in a matter is deemed not substantial enough to have an effect on the integrity of his services. Financial interests of this kind may also be made nondisqualifying by a general regulation published in the FEDERAL REGISTER.

Section 208 is similar in purpose to the former 18 U.S.C. 434 [former § 434 of this title] but prohibits a greater variety of conduct than the "transaction of business with * * * [a] business entity" to which the prohibition of § 434 was limited. In addition, the provision in § 208 including the interests of a spouse and others is new, as is the provision authorizing exemptions for insignificant interests.

New 18 U.S.C. 209 [§ 209 of this title]. Subsection (a) prevents an officer or employee of the executive branch, an independent agency or the District of Columbia from receiving, and anyone from paying him, any salary or supplementation of salary from a private source as compensation for his services to the Government. This provision uses much of the language of the former 18 U.S.C. 1914 [former § 1914 of this title] and does not vary from that statute in substance. The remainder of § 209 is new.

Subsection (b) specifically authorizes an officer or employee covered by subsection (a) to continue his participation in a bona fide pension plan or other employee welfare or benefit plan maintained by a former employer.

Subsection (c) provides that § 209 does not apply to a special Government employee or to anyone serving the Government without compensation, whether or not he is a special Government employee.

Subsection (d) provides that the section does not prohibit the payment or acceptance of contributions, awards or other expenses under the terms of the Government Employees Training Act (72 Stat. 327, 5 U.S.C. 2301 to 2319 [§§ 2301 to 2319 to Title 5] ).

STATUTORY EXEMPTIONS FROM CONFLICT OF INTEREST LAWS

Congress has in the past enacted statutes exempting persons in certain positions--usually advisory in nature--from the provisions of some or all of the former conflict of interest laws. Section 2 of the Act grants corresponding exemptions from the new laws with respect to legislative and judicial positions carrying such past exemptions. However, § 2 excludes positions in the executive branch, an independent agency and the District of Columbia from this grant. As a consequence, all statutory exemptions for persons serving in these sectors of the Government ended on January 21, 1963.

RETIRED OFFICERS OF THE ARMED FORCES

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

Public Law 87-849 enacted a new 18 U.S.C. 206 [§ 206 of this title] which provides in general that the new §§ 203 and 205, replacing 18 U.S.C. 281 and 283 [former §§ 281 and 283 of this title], do not apply to retired officers of the armed forces and other uniformed services. However, 18 U.S.C. 281 and 283 [former §§ 281 and 283 of this title] contain special restrictions applicable to retired officers of the armed forces which are left in force by the partial repealer of those statutes set forth in § 2 of the Act.

The former 18 U.S.C. 284 [former § 284 of this title], which contained a 2-year disqualification against postemployment activities in connection with claims against the United States, applied by its terms to persons who had served as commissioned officers and whose active service had ceased either by reason of retirement or complete separation. Its replacement, the broader 18 U.S.C. 207 [§ 207 of this title], also applies to persons in those circumstances. Section 207, therefore applies to retired officers of the armed forces and overlaps the continuing provisions of 18 U.S.C. 281 and 283 [§§ 281 and 283 of this title] applicable to such officers although to a different extent than did 18 U.S.C. 284 [§ 284 of this title].

VOIDING TRANSACTIONS IN VIOLATION OF THE CONFLICT OF INTEREST OR BRIBERY LAWS

Public Law 87-849 enacted a new section, 18 U.S.C. 218 [§ 218 of this title], which did not supplant a pre-existing section of the criminal code. However, it was modeled on the last sentence of the former 18 U.S.C. 216 [former § 216 of this title] authorizing the President to declare a Government contract void which was entered into in violation of that section. It will be recalled that § 216 was one of the two statutes repealed without replacement.

The new 18 U.S.C. 218 [§ 218 of this title] grants the President and, under presidential regulations, an agency head the power to void and rescind any transaction or matter in relation to which there has been a "final conviction" for a violation of the conflict of interest or bribery laws. The section also authorizes the Government's recovery, in addition to any penalty prescribed by law or in a contract, of the amount expended or thing transferred on behalf of the Government.

Section 218 specifically provides that the powers it grants are "in addition to any other remedies provided by law." Accordingly, it would not seem to override the decision in United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961), a case in which there was no "final conviction."

BIBLIOGRAPHY

Set forth below are the citations to the legislative history of Public Law 87-849 and a list of recent material which is pertinent to a study of the Act. The listed 1960 report of the Association of the Bar of the City of New York is particularly valuable. For a comprehensive bibliography of earlier material relating to the conflict of interest laws, see 13 Record of the Association of the Bar of the City of New York 323 (May 1958).

LEGISLATIVE HISTORY OF PUBLIC LAW 87-849 (H.R. 8140, 87TH CONG.)

1. Hearings of June 1 and 2, 1961 before the Antitrust Subcommittee (Subcommittee No. 5) of the House Judiciary Committee, 87th Cong., 1st sess., ser. 3, on Federal Conflict of Interest Legislation.

2. H.Rept. 748, 87th Cong., 1st sess.

3. 107 Cong.Rec. 14774.

4. Hearing of June 21, 1962 before the Senate Judiciary Committee, 87th Cong., 2d sess., on Conflicts of Interest.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

5. S.Rept. 2213, 87th Cong., 2d sess.

6. 108 Cong.Rec. 20805 and 21130 (daily ed., October 3 and 4, 1962).

OTHER MATERIAL

1. President's special message to Congress, April 27, 1961, and attached draft bill, 107 Cong.Rec. 6835.

2. President's Memorandum of February 9, 1962 to the heads of executive departments and agencies entitled Preventing Conflicts of Interest on the Part of Advisers and Consultants to the Government, 27 F.R. 1341.

3. 42 Op.A.G. No. 6, January 31, 1962.

4. Memorandum of December 10, 1956 for the Attorney General from the Office of Legal Counsel re conflict of interest statutes, Hearings before the Antitrust Subcommittee (Subcommittee No. 5) of House Judiciary Committee, 86th Cong., 2d sess., ser. 17, pt. 2, p. 619.

5. Staff report of Antitrust Subcommittee (Subcommittee No. 5) of House Judiciary Committee, 85th Cong., 2d sess., Federal Conflict of Interest Legislation (Comm. Print 1958).

6. Report of the Association of the Bar of the City of New York, Conflict of Interest and Federal Service (Harvard Univ.Press 1960).

FOOTNOTES

18 U.S.C. 216, which was repealed by section 1(c) of Public Law 87-849, prohibited the payment to or acceptance by a Member of Congress or officer or employee of the Government of any money or thing of value for giving or procuring a Government contract. Since this offense is within the scope of the newly enacted 18 U.S.C. 201 and 18 U.S.C. 203, relating to bribery and conflicts of interest, respectively, section 216 is no longer necessary.

Notes of Decisions (996)

Footnotes

1    Section 190 of the Revised Statutes (5 U.S.C. 99), which was repealed by section 3 of Public Law 87-849, applied to a former officer or employee of the Government who had served in a department of the executive branch. It prohibited him, for a period of two years after his employment had ceased, from representing anyone in the prosecution of a claim against the United States which was pending in that or any other executive department during his period of employment. The subject of postemployment activities of former Government officers and employees was also dealt with in another statute which was repealed. 18 U.S.C. 284. Public Law 87-849 covers the subject in a single section enacted as the new 18 U.S.C. 207.

2    See section 2 of Public Law 87-849. 18 U.S.C. 281 and 18 U.S.C. 283 were not completely set aside by section 2 but remain in effect to the extent that they apply to retired officers of the Armed Forces (see "Retired Officers of the Armed Forces," infra).

3    S.Rept. 2213, 87th Cong., 2d sess., p. 6.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 201. Bribery of public officials and witnesses, 18 USCA § 201

4       The term "official responsibility" is defined by the new 18 U.S.C. 202(b) to mean "the direct administrative or operating authority, whether intermediate or final, and either exercisable alone or with others, and either personally or through subordinates, approve, disapprove, or otherwise direct Government action."

5       These two provisions of section 205 refer to an "officer or employee" and not, as do certain of the other provisions of the Act, to an "officer or employee, including a special Government employee." However, it is plain from the definition in section 202(a) that a special Government employee is embraced within the comprehensive term "officer or employee." There would seem to be little doubt, therefore, that the instant provisions of section 205 apply to special Government employees even in the absence of an explicit reference to them.

6       The prohibitions of the two subsections apply to persons ending service in these areas whether they leave the Government entirely or move to the legislative or judicial branch. As a practical matter, however, the prohibitions would rarely be significant in the latter situation because officers and employees of the legislative and judicial branches are covered by sections 203 and 205.

7       Neither section 203 nor section 205 prevents a special Government employee, during his period of affiliation with the Government, from representing another person before the Government in a particular matter only because it is within his official responsibility. Therefore the inclusion of a former special Government employee within the 1-year postemployment ban of subsection (b) may subject him to a temporary restraint from which he was free prior to the end of his Government service. However, since special Government employees usually do not have "official responsibility," as that term is defined in section 202(b), their inclusion within the 1-year ban will not have a widespread effect.

8       Subsection (a), as it first appeared in H.R. 8140, the bill which became Public Law 87-849, made it unlawful for a former officer or employee to act as agent or attorney for, or aid or assist, anyone in a matter in which he had participated. The House Judiciary Committee struck the underlined words, and the bill became law without them. It should be noted also that the repealed provisions of 18 U.S.C. 283 made the distinction between one's acting as agent or attorney for another and his aiding or assisting another.

18 U.S.C.A. § 201, 18 USCA § 201

Current through P.L. 115-82

End of Document                                                       © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 203. Compensation to Members of Congress, officers, and..., 18 USCA § 203

---

| United States Code Annotated |
| --- |
| Title 18. Crimes and Criminal Procedure (Refs & Annos) |
| Part I. Crimes (Refs & Annos) |
| Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos) |

18 U.S.C.A. § 203

§ 203. Compensation to Members of Congress, officers, and others in matters affecting the Government

Currentness

(a) Whoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly--

(1) demands, seeks, receives, accepts, or agrees to receive or accept any compensation for any representational services, as agent or attorney or otherwise, rendered or to be rendered either personally or by another--

(A) at a time when such person is a Member of Congress, Member of Congress Elect, Delegate, Delegate Elect, Resident Commissioner, or Resident Commissioner Elect; or

(B) at a time when such person is an officer or employee or Federal judge of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States,

in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency, court, court-martial, officer, or any civil, military, or naval commission; or

(2) knowingly gives, promises, or offers any compensation for any such representational services rendered or to be rendered at a time when the person to whom the compensation is given, promised, or offered, is or was such a Member, Member Elect, Delegate, Delegate Elect, Commissioner, Commissioner Elect, Federal judge, officer, or employee;

shall be subject to the penalties set forth in section 216 of this title.

(b) Whoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly--

(1) demands, seeks, receives, accepts, or agrees to receive or accept any compensation for any representational services, as agent or attorney or otherwise, rendered or to be rendered either personally or by another, at a time when such person is an officer or employee of the District of Columbia, in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the District of Columbia is a party or has a direct and substantial interest, before any department, agency, court, officer, or commission; or

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 203. Compensation to Members of Congress, officers, and..., 18 USCA § 203

---

(2) knowingly gives, promises, or offers any compensation for any such representational services rendered or to be rendered at a time when the person to whom the compensation is given, promised, or offered, is or was an officer or employee of the District of Columbia;

shall be subject to the penalties set forth in section 216 of this title.

(c) A special Government employee shall be subject to subsections (a) and (b) only in relation to a particular matter involving a specific party or parties--

(1) in which such employee has at any time participated personally and substantially as a Government employee or as a special Government employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise; or

(2) which is pending in the department or agency of the Government in which such employee is serving except that paragraph (2) of this subsection shall not apply in the case of a special Government employee who has served in such department or agency no more than sixty days during the immediately preceding period of three hundred and sixty-five consecutive days.

(d) Nothing in this section prevents an officer or employee, including a special Government employee, from acting, with or without compensation, as agent or attorney for or otherwise representing his parents, spouse, child, or any person for whom, or for any estate for which, he is serving as guardian, executor, administrator, trustee, or other personal fiduciary except--

(1) in those matters in which he has participated personally and substantially as a Government employee or as a special Government employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise; or

(2) in those matters that are the subject of his official responsibility,

subject to approval by the Government official responsible for appointment to his position.

(e) Nothing in this section prevents a special Government employee from acting as agent or attorney for another person in the performance of work under a grant by, or a contract with or for the benefit of, the United States if the head of the department or agency concerned with the grant or contract certifies in writing that the national interest so requires and publishes such certification in the Federal Register.

(f) Nothing in this section prevents an individual from giving testimony under oath or from making statements required to be made under penalty of perjury.

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 203. Compensation to Members of Congress, officers, and..., 18 USCA § 203

## CREDIT(S)

(Added Pub.L. 87-849, § 1(a), Oct. 23, 1962, 76 Stat. 1121; amended Pub.L. 91-405, Title II, § 204(d) (2), (3), Sept. 22, 1970, 84 Stat. 853; Pub.L. 99-646, § 47(a), Nov. 10, 1986, 100 Stat. 3604; Pub.L. 101-194, Title IV, § 402, Nov. 30, 1989, 103 Stat. 1748; Pub.L. 101-280, § 5(b), May 4, 1990, 104 Stat. 159.)

Notes of Decisions (154)

18 U.S.C.A. § 203, 18 USCA § 203
Current through P.L. 115-82

End of Document                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 205

§ 205. Activities of officers and employees in claims against and other matters affecting the Government

Effective: November 2, 2002
Currentness

**(a)** Whoever, being an officer or employee of the United States in the executive, legislative, or judicial branch of the Government or in any agency of the United States, other than in the proper discharge of his official duties--

**(1)** acts as agent or attorney for prosecuting any claim against the United States, or receives any gratuity, or any share of or interest in any such claim, in consideration of assistance in the prosecution of such claim; or

**(2)** acts as agent or attorney for anyone before any department, agency, court, court-martial, officer, or civil, military, or naval commission in connection with any covered matter in which the United States is a party or has a direct and substantial interest;

shall be subject to the penalties set forth in section 216 of this title.

**(b)** Whoever, being an officer or employee of the District of Columbia or an officer or employee of the Office of the United States Attorney for the District of Columbia, otherwise than in the proper discharge of official duties--

**(1)** acts as agent or attorney for prosecuting any claim against the District of Columbia, or receives any gratuity, or any share of or interest in any such claim in consideration of assistance in the prosecution of such claim; or

**(2)** acts as agent or attorney for anyone before any department, agency, court, officer, or commission in connection with any covered matter in which the District of Columbia is a party or has a direct and substantial interest;

shall be subject to the penalties set forth in section 216 of this title.

**(c)** A special Government employee shall be subject to subsections (a) and (b) only in relation to a covered matter involving a specific party or parties--

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 205. Activities of officers and employees in claims against and..., 18 USCA § 205

**(1)** in which he has at any time participated personally and substantially as a Government employee or special Government employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise; or

**(2)** which is pending in the department or agency of the Government in which he is serving.

Paragraph (2) shall not apply in the case of a special Government employee who has served in such department or agency no more than sixty days during the immediately preceding period of three hundred and sixty-five consecutive days.

**(d)(1)** Nothing in subsection (a) or (b) prevents an officer or employee, if not inconsistent with the faithful performance of that officer's or employee's duties, from acting without compensation as agent or attorney for, or otherwise representing--

**(A)** any person who is the subject of disciplinary, loyalty, or other personnel administration proceedings in connection with those proceedings; or

**(B)** except as provided in paragraph (2), any cooperative, voluntary, professional, recreational, or similar organization or group not established or operated for profit, if a majority of the organization's or group's members are current officers or employees of the United States or of the District of Columbia, or their spouses or dependent children.

**(2)** Paragraph (1)(B) does not apply with respect to a covered matter that--

**(A)** is a claim under subsection (a)(1) or (b)(1);

**(B)** is a judicial or administrative proceeding where the organization or group is a party; or

**(C)** involves a grant, contract, or other agreement (including a request for any such grant, contract, or agreement) providing for the disbursement of Federal funds to the organization or group.

**(e)** Nothing in subsection (a) or (b) prevents an officer or employee, including a special Government employee, from acting, with or without compensation, as agent or attorney for, or otherwise representing, his parents, spouse, child, or any person for whom, or for any estate for which, he is serving as guardian, executor, administrator, trustee, or other personal fiduciary except--

**(1)** in those matters in which he has participated personally and substantially as a Government employee or special Government employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, or

**(2)** in those matters which are the subject of his official responsibility,

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 205. Activities of officers and employees in claims against and..., 18 USCA § 205

subject to approval by the Government official responsible for appointment to his position.

**(f)** Nothing in subsection (a) or (b) prevents a special Government employee from acting as agent or attorney for another person in the performance of work under a grant by, or a contract with or for the benefit of, the United States if the head of the department or agency concerned with the grant or contract certifies in writing that the national interest so requires and publishes such certification in the Federal Register.

**(g)** Nothing in this section prevents an officer or employee from giving testimony under oath or from making statements required to be made under penalty for perjury or contempt.

**(h)** For the purpose of this section, the term "covered matter" means any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest, or other particular matter.

**(i)** Nothing in this section prevents an employee from acting pursuant to--

  **(1)** chapter 71 of title 5;

  **(2)** section 1004 or chapter 12 of title 39;

  **(3)** section 3 of the Tennessee Valley Authority Act of 1933 (16 U.S.C. 831b);

  **(4)** chapter 10 of title I of the Foreign Service Act of 1980 (22 U.S.C. 4104 et seq.); or

  **(5)** any provision of any other Federal or District of Columbia law that authorizes labor-management relations between an agency or instrumentality of the United States or the District of Columbia and any labor organization that represents its employees.

## CREDIT(S)

(Added Pub.L. 87-849, § 1(a), Oct. 23, 1962, 76 Stat. 1122; amended Pub.L. 101-194, Title IV, § 404, Nov. 30, 1989, 103 Stat. 1750; Pub.L. 101-280, § 5(c), May 4, 1990, 104 Stat. 159; Pub.L. 104-177, § 2, Aug. 6, 1996, 110 Stat. 1563; Pub.L. 107-273, Div. B, Title IV, § 4002(a)(9), Nov. 2, 2002, 116 Stat. 1807.)

Notes of Decisions (44)

18 U.S.C.A. § 205, 18 USCA § 205

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

**§ 205. Activities of officers and employees in claims against and..., 18 USCA § 205**

Current through P.L. 115-82

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

---

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 207

§ 207. Restrictions on former officers, employees, and elected officials of the executive and legislative branches

Effective: December 16, 2014
Currentness

**(a) Restrictions on all officers and employees of the executive branch and certain other agencies.--**

**(1) Permanent restrictions on representation on particular matters.**--Any person who is an officer or employee (including any special Government employee) of the executive branch of the United States (including any independent agency of the United States), or of the District of Columbia, and who, after the termination of his or her service or employment with the United States or the District of Columbia, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States or the District of Columbia, on behalf of any other person (except the United States or the District of Columbia) in connection with a particular matter--

   **(A)** in which the United States or the District of Columbia is a party or has a direct and substantial interest,

   **(B)** in which the person participated personally and substantially as such officer or employee, and

   **(C)** which involved a specific party or specific parties at the time of such participation,

   shall be punished as provided in section 216 of this title.

**(2) Two-year restrictions concerning particular matters under official responsibility.**--Any person subject to the restrictions contained in paragraph (1) who, within 2 years after the termination of his or her service or employment with the United States or the District of Columbia, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States or the District of Columbia, on behalf of any other person (except the United States or the District of Columbia), in connection with a particular matter--

   **(A)** in which the United States or the District of Columbia is a party or has a direct and substantial interest,

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(B)** which such person knows or reasonably should know was actually pending under his or her official responsibility as such officer or employee within a period of 1 year before the termination of his or her service or employment with the United States or the District of Columbia, and

**(C)** which involved a specific party or specific parties at the time it was so pending,

shall be punished as provided in section 216 of this title.

**(3) Clarification of restrictions.**--The restrictions contained in paragraphs (1) and (2) shall apply--

**(A)** in the case of an officer or employee of the executive branch of the United States (including any independent agency), only with respect to communications to or appearances before any officer or employee of any department, agency, court, or court-martial of the United States on behalf of any other person (except the United States), and only with respect to a matter in which the United States is a party or has a direct and substantial interest; and

**(B)** in the case of an officer or employee of the District of Columbia, only with respect to communications to or appearances before any officer or employee of any department, agency, or court of the District of Columbia on behalf of any other person (except the District of Columbia), and only with respect to a matter in which the District of Columbia is a party or has a direct and substantial interest.

**(b) One-year restrictions on aiding or advising.**--

**(1) In general.**--Any person who is a former officer or employee of the executive branch of the United States (including any independent agency) and is subject to the restrictions contained in subsection (a)(1), or any person who is a former officer or employee of the legislative branch or a former Member of Congress, who personally and substantially participated in any ongoing trade or treaty negotiation on behalf of the United States within the 1-year period preceding the date on which his or her service or employment with the United States terminated, and who had access to information concerning such trade or treaty negotiation which is exempt from disclosure under section 552 of title 5, which is so designated by the appropriate department or agency, and which the person knew or should have known was so designated, shall not, on the basis of that information, knowingly represent, aid, or advise any other person (except the United States) concerning such ongoing trade or treaty negotiation for a period of 1 year after his or her service or employment with the United States terminates. Any person who violates this subsection shall be punished as provided in section 216 of this title.

**(2) Definition.**--For purposes of this paragraph--

**(A)** the term "trade negotiation" means negotiations which the President determines to undertake to enter into a trade agreement pursuant to section 1102 of the Omnibus Trade and Competitiveness Act of 1988, and does not include any action taken before that determination is made; and

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(B)** the term "treaty" means an international agreement made by the President that requires the advice and consent of the Senate.

**(c) One-year restrictions on certain senior personnel of the executive branch and independent agencies.--**

**(1) Restrictions.**--In addition to the restrictions set forth in subsections (a) and (b), any person who is an officer or employee (including any special Government employee) of the executive branch of the United States (including an independent agency), who is referred to in paragraph (2), and who, within 1 year after the termination of his or her service or employment as such officer or employee, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of the department or agency in which such person served within 1 year before such termination, on behalf of any other person (except the United States), in connection with any matter on which such person seeks official action by any officer or employee of such department or agency, shall be punished as provided in section 216 of this title.

**(2) Persons to whom restrictions apply.--(A)** Paragraph (1) shall apply to a person (other than a person subject to the restrictions of subsection (d))--

**(i)** employed at a rate of pay specified in or fixed according to subchapter II of chapter 53 of title 5,

**(ii)** employed in a position which is not referred to in clause (i) and for which that person is paid at a rate of basic pay which is equal to or greater than 86.5 percent of the rate of basic pay for level II of the Executive Schedule, or, for a period of 2 years following the enactment of the National Defense Authorization Act for Fiscal Year 2004, a person who, on the day prior to the enactment of that Act, was employed in a position which is not referred to in clause (i) and for which the rate of basic pay, exclusive of any locality-based pay adjustment under section 5304 or section 5304a of title 5, was equal to or greater than the rate of basic pay payable for level 5 of the Senior Executive Service on the day prior to the enactment of that Act,

**(iii)** appointed by the President to a position under section 105(a)(2)(B) of title 3 or by the Vice President to a position under section 106(a)(1)(B) of title 3,

**(iv)** employed in a position which is held by an active duty commissioned officer of the uniformed services who is serving in a grade or rank for which the pay grade (as specified in section 201 of title 37) is pay grade O-7 or above; or

**(v)** assigned from a private sector organization to an agency under chapter 37 of title 5.

**(B)** Paragraph (1) shall not apply to a special Government employee who serves less than 60 days in the 1-year period before his or her service or employment as such employee terminates.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

---

**(C)** At the request of a department or agency, the Director of the Office of Government Ethics may waive the restrictions contained in paragraph (1) with respect to any position, or category of positions, referred to in clause (ii) or (iv) of subparagraph (A), in such department or agency if the Director determines that--

**(i)** the imposition of the restrictions with respect to such position or positions would create an undue hardship on the department or agency in obtaining qualified personnel to fill such position or positions, and

**(ii)** granting the waiver would not create the potential for use of undue influence or unfair advantage.

**(3) Members of the Independent Payment Advisory Board.--**

**(A) In general.**--Paragraph (1) shall apply to a member of the Independent Payment Advisory Board under section 1899A.

**(B) Agencies and congress.**--For purposes of paragraph (1), the agency in which the individual described in subparagraph (A) served shall be considered to be the Independent Payment Advisory Board, the Department of Health and Human Services, and the relevant committees of jurisdiction of Congress, including the Committee on Ways and Means and the Committee on Energy and Commerce of the House of Representatives and the Committee on Finance of the Senate.

**(d) Restrictions on very senior personnel of the executive branch and independent agencies.--**

**(1) Restrictions.**--In addition to the restrictions set forth in subsections (a) and (b), any person who--

**(A)** serves in the position of Vice President of the United States,

**(B)** is employed in a position in the executive branch of the United States (including any independent agency) at a rate of pay payable for level I of the Executive Schedule or employed in a position in the Executive Office of the President at a rate of pay payable for level II of the Executive Schedule, or

**(C)** is appointed by the President to a position under section 105(a)(2)(A) of title 3 or by the Vice President to a position under section 106(a)(1)(A) of title 3,

and who, within 2 years after the termination of that person's service in that position, knowingly makes, with the intent to influence, any communication to or appearance before any person described in paragraph (2), on behalf of any other person (except the United States), in connection with any matter on which such person seeks official action by any officer or employee of the executive branch of the United States, shall be punished as provided in section 216 of this title.

---

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(2) Persons who may not be contacted.**--The persons referred to in paragraph (1) with respect to appearances or communications by a person in a position described in subparagraph (A), (B), or (C) of paragraph (1) are--

**(A)** any officer or employee of any department or agency in which such person served in such position within a period of 1 year before such person's service or employment with the United States Government terminated, and

**(B)** any person appointed to a position in the executive branch which is listed in section 5312, 5313, 5314, 5315, or 5316 of title 5.

**(e) Restrictions on Members of Congress and officers and employees of the legislative branch.--**

**(1) Members of Congress and elected officers of the house.--**

**(A) Senators.**--Any person who is a Senator and who, within 2 years after that person leaves office, knowingly makes, with the intent to influence, any communication to or appearance before any Member, officer, or employee of either House of Congress or any employee of any other legislative office of the Congress, on behalf of any other person (except the United States) in connection with any matter on which such former Senator seeks action by a Member, officer, or employee of either House of Congress, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(B) Members and officers of the House of Representatives.--(i)** Any person who is a Member of the House of Representatives or an elected officer of the House of Representatives and who, within 1 year after that person leaves office, knowingly makes, with the intent to influence, any communication to or appearance before any of the persons described in clause (ii) or (iii), on behalf of any other person (except the United States) in connection with any matter on which such former Member of Congress or elected officer seeks action by a Member, officer, or employee of either House of Congress, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(ii)** The persons referred to in clause (i) with respect to appearances or communications by a former Member of the House of Representatives are any Member, officer, or employee of either House of Congress and any employee of any other legislative office of the Congress.

**(iii)** The persons referred to in clause (i) with respect to appearances or communications by a former elected officer are any Member, officer, or employee of the House of Representatives.

**(2) Officers and staff of the Senate.**--Any person who is an elected officer of the Senate, or an employee of the Senate to whom paragraph (7)(A) applies, and who, within 1 year after that person leaves office or employment, knowingly makes, with the intent to influence, any communication to or appearance before any Senator or any officer or employee of the Senate, on behalf of any other person (except the United States) in connection with any matter on which such

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

former elected officer or former employee seeks action by a Senator or an officer or employee of the Senate, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(3) Personal staff.--(A)** Any person who is an employee of a Member of the House of Representatives to whom paragraph (7)(A) applies and who, within 1 year after the termination of that employment, knowingly makes, with the intent to influence, any communication to or appearance before any of the persons described in subparagraph (B), on behalf of any other person (except the United States) in connection with any matter on which such former employee seeks action by a Member, officer, or employee of either House of Congress, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(B)** The persons referred to in subparagraph (A) with respect to appearances or communications by a person who is a former employee are the following:

**(i)** the Member of the House of Representatives for whom that person was an employee; and

**(ii)** any employee of that Member of the House of Representatives.

**(4) Committee staff.**--Any person who is an employee of a committee of the House of Representatives, or an employee of a joint committee of the Congress whose pay is disbursed by the Clerk of the House of Representatives, to whom paragraph (7)(A) applies and who, within 1 year after the termination of that person's employment on such committee or joint committee (as the case may be), knowingly makes, with the intent to influence, any communication to or appearance before any person who is a Member or an employee of that committee or joint committee (as the case may be) or who was a Member of the committee or joint committee (as the case may be) in the year immediately prior to the termination of such person's employment by the committee or joint committee (as the case may be), on behalf of any other person (except the United States) in connection with any matter on which such former employee seeks action by a Member, officer, or employee of either House of Congress, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(5) Leadership staff.--(A)** Any person who is an employee on the leadership staff of the House of Representatives to whom paragraph (7)(A) applies and who, within 1 year after the termination of that person's employment on such staff, knowingly makes, with the intent to influence, any communication to or appearance before any of the persons described in subparagraph (B), on behalf of any other person (except the United States) in connection with any matter on which such former employee seeks action by a Member, officer, or employee of either House of Congress, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(B)** The persons referred to in subparagraph (A) with respect to appearances or communications by a former employee are any Member of the leadership of the House of Representatives and any employee on the leadership staff of the House of Representatives.

**(6) Other legislative offices.--(A)** Any person who is an employee of any other legislative office of the Congress to whom paragraph (7)(B) applies and who, within 1 year after the termination of that person's employment in such

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

office, knowingly makes, with the intent to influence, any communication to or appearance before any of the persons described in subparagraph (B), on behalf of any other person (except the United States) in connection with any matter on which such former employee seeks action by any officer or employee of such office, in his or her official capacity, shall be punished as provided in section 216 of this title.

**(B)** The persons referred to in subparagraph (A) with respect to appearances or communications by a former employee are the employees and officers of the former legislative office of the Congress of the former employee.

**(7) Limitation on restrictions.--(A)** The restrictions contained in paragraphs (2), (3), (4), and (5) apply only to acts by a former employee who, for at least 60 days, in the aggregate, during the 1-year period before that former employee's service as such employee terminated, was paid a rate of basic pay equal to or greater than an amount which is 75 percent of the basic rate of pay payable for a Member of the House of Congress in which such employee was employed.

**(B)** The restrictions contained in paragraph (6) apply only to acts by a former employee who, for at least 60 days, in the aggregate, during the 1-year period before that former employee's service as such employee terminated, was employed in a position for which the rate of basic pay, exclusive of any locality-based pay adjustment under section 5302 of title 5, is equal to or greater than the basic rate of pay payable for level IV of the Executive Schedule.

**(8) Exception.**--This subsection shall not apply to contacts with the staff of the Secretary of the Senate or the Clerk of the House of Representatives regarding compliance with lobbying disclosure requirements under the Lobbying Disclosure Act of 1995.

**(9) Definitions.**--As used in this subsection--

**(A)** the term "committee of Congress" includes standing committees, joint committees, and select committees;

**(B)** a person is an employee of a House of Congress if that person is an employee of the Senate or an employee of the House of Representatives;

**(C)** the term "employee of the House of Representatives" means an employee of a Member of the House of Representatives, an employee of a committee of the House of Representatives, an employee of a joint committee of the Congress whose pay is disbursed by the Clerk of the House of Representatives, and an employee on the leadership staff of the House of Representatives;

**(D)** the term "employee of the Senate" means an employee of a Senator, an employee of a committee of the Senate, an employee of a joint committee of the Congress whose pay is disbursed by the Secretary of the Senate, and an employee on the leadership staff of the Senate;

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

---

**(E)** a person is an employee of a Member of the House of Representatives if that person is an employee of a Member of the House of Representatives under the clerk hire allowance;

**(F)** a person is an employee of a Senator if that person is an employee in a position in the office of a Senator;

**(G)** the term "employee of any other legislative office of the Congress" means an officer or employee of the Architect of the Capitol, the United States Botanic Garden, the Government Accountability Office, the Government Publishing Office, the Library of Congress, the Office of Technology Assessment, the Congressional Budget Office, the United States Capitol Police, and any other agency, entity, or office in the legislative branch not covered by paragraph (1), (2), (3), (4), or (5) of this subsection;

**(H)** the term "employee on the leadership staff of the House of Representatives" means an employee of the office of a Member of the leadership of the House of Representatives described in subparagraph (L), and any elected minority employee of the House of Representatives;

**(I)** the term "employee on the leadership staff of the Senate" means an employee of the office of a Member of the leadership of the Senate described in subparagraph (M);

**(J)** the term "Member of Congress" means a Senator or a Member of the House of Representatives;

**(K)** the term "Member of the House of Representatives" means a Representative in, or a Delegate or Resident Commissioner to, the Congress;

**(L)** the term "Member of the leadership of the House of Representatives" means the Speaker, majority leader, minority leader, majority whip, minority whip, chief deputy majority whip, chief deputy minority whip, chairman of the Democratic Steering Committee, chairman and vice chairman of the Democratic Caucus, chairman, vice chairman, and secretary of the Republican Conference, chairman of the Republican Research Committee, and chairman of the Republican Policy Committee, of the House of Representatives (or any similar position created on or after the effective date set forth in section 102(a) of the Ethics Reform Act of 1989);

**(M)** the term "Member of the leadership of the Senate" means the Vice President, and the President pro tempore, Deputy President pro tempore, majority leader, minority leader, majority whip, minority whip, chairman and secretary of the Conference of the Majority, chairman and secretary of the Conference of the Minority, chairman and co-chairman of the Majority Policy Committee, and chairman of the Minority Policy Committee, of the Senate (or any similar position created on or after the effective date set forth in section 102(a) of the Ethics Reform Act of 1989).

**(f) Restrictions relating to foreign entities.--**

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(1) Restrictions.**--Any person who is subject to the restrictions contained in subsection (c), (d), or (e) and who knowingly, within 1 year after leaving the position, office, or employment referred to in such subsection--

**(A)** represents a foreign entity before any officer or employee of any department or agency of the United States with the intent to influence a decision of such officer or employee in carrying out his or her official duties, or

**(B)** aids or advises a foreign entity with the intent to influence a decision of any officer or employee of any department or agency of the United States, in carrying out his or her official duties,

shall be punished as provided in section 216 of this title.

**(2) Special rule for Trade Representative.**--With respect to a person who is the United States Trade Representative or Deputy United States Trade Representative, the restrictions described in paragraph (1) shall apply to representing, aiding, or advising foreign entities at any time after the termination of that person's service as the United States Trade Representative.

**(3) Definition.**--For purposes of this subsection, the term "foreign entity" means the government of a foreign country as defined in section 1(e) of the Foreign Agents Registration Act of 1938, as amended, or a foreign political party as defined in section 1(f) of that Act.

**(g) Special rules for detailees.**--For purposes of this section, a person who is detailed from one department, agency, or other entity to another department, agency, or other entity shall, during the period such person is detailed, be deemed to be an officer or employee of both departments, agencies, or such entities.

**(h) Designations of separate statutory agencies and bureaus.**--

**(1) Designations.**--For purposes of subsection (c) and except as provided in paragraph (2), whenever the Director of the Office of Government Ethics determines that an agency or bureau within a department or agency in the executive branch exercises functions which are distinct and separate from the remaining functions of the department or agency and that there exists no potential for use of undue influence or unfair advantage based on past Government service, the Director shall by rule designate such agency or bureau as a separate department or agency. On an annual basis the Director of the Office of Government Ethics shall review the designations and determinations made under this subparagraph and, in consultation with the department or agency concerned, make such additions and deletions as are necessary. Departments and agencies shall cooperate to the fullest extent with the Director of the Office of Government Ethics in the exercise of his or her responsibilities under this paragraph.

**(2) Inapplicability of designations.**--No agency or bureau within the Executive Office of the President may be designated under paragraph (1) as a separate department or agency. No designation under paragraph (1) shall apply to persons referred to in subsection (c)(2)(A)(i) or (iii).

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(i) Definitions.**--For purposes of this section--

**(1)** the term "officer or employee", when used to describe the person to whom a communication is made or before whom an appearance is made, with the intent to influence, shall include--

**(A)** in subsections (a), (c), and (d), the President and the Vice President; and

**(B)** in subsection (f), the President, the Vice President, and Members of Congress;

**(2)** the term "participated" means an action taken as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or other such action; and

**(3)** the term "particular matter" includes any investigation, application, request for a ruling or determination, rulemaking, contract, controversy, claim, charge, accusation, arrest, or judicial or other proceeding.

**(j) Exceptions.**--

**(1) Official government duties.**--

**(A) In general.**--The restrictions contained in this section shall not apply to acts done in carrying out official duties on behalf of the United States or the District of Columbia or as an elected official of a State or local government.

**(B) Tribal organizations and inter-tribal consortiums.**--The restrictions contained in this section shall not apply to acts authorized by section 104(j) of the Indian Self-Determination and Education Assistance Act (25 U.S.C. 450i(j)).

**(2) State and local governments and institutions, hospitals, and organizations.**--The restrictions contained in subsections (c), (d), and (e) shall not apply to acts done in carrying out official duties as an employee of--

**(A)** an agency or instrumentality of a State or local government if the appearance, communication, or representation is on behalf of such government, or

**(B)** an accredited, degree-granting institution of higher education, as defined in section 101 of the Higher Education Act of 1965, or a hospital or medical research organization, exempted and defined under section 501(c)(3) of the Internal Revenue Code of 1986, if the appearance, communication, or representation is on behalf of such institution, hospital, or organization.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(3) International organizations.**--The restrictions contained in this section shall not apply to an appearance or communication on behalf of, or advice or aid to, an international organization in which the United States participates, if the Secretary of State certifies in advance that such activity is in the interests of the United States.

**(4) Special knowledge.**--The restrictions contained in subsections (c), (d), and (e) shall not prevent an individual from making or providing a statement, which is based on the individual's own special knowledge in the particular area that is the subject of the statement, if no compensation is thereby received.

**(5) Exception for scientific or technological information.**--The restrictions contained in subsections (a), (c), and (d) shall not apply with respect to the making of communications solely for the purpose of furnishing scientific or technological information, if such communications are made under procedures acceptable to the department or agency concerned or if the head of the department or agency concerned with the particular matter, in consultation with the Director of the Office of Government Ethics, makes a certification, published in the Federal Register, that the former officer or employee has outstanding qualifications in a scientific, technological, or other technical discipline, and is acting with respect to a particular matter which requires such qualifications, and that the national interest would be served by the participation of the former officer or employee. For purposes of this paragraph, the term "officer or employee" includes the Vice President.

**(6) Exception for testimony.**--Nothing in this section shall prevent an individual from giving testimony under oath, or from making statements required to be made under penalty of perjury. Notwithstanding the preceding sentence--

**(A)** a former officer or employee of the executive branch of the United States (including any independent agency) who is subject to the restrictions contained in subsection (a)(1) with respect to a particular matter may not, except pursuant to court order, serve as an expert witness for any other person (except the United States) in that matter; and

**(B)** a former officer or employee of the District of Columbia who is subject to the restrictions contained in subsection (a)(1) with respect to a particular matter may not, except pursuant to court order, serve as an expert witness for any other person (except the District of Columbia) in that matter.

**(7) Political parties and campaign committees.--(A)** Except as provided in subparagraph (B), the restrictions contained in subsections (c), (d), and (e) shall not apply to a communication or appearance made solely on behalf of a candidate in his or her capacity as a candidate, an authorized committee, a national committee, a national Federal campaign committee, a State committee, or a political party.

**(B)** Subparagraph (A) shall not apply to--

**(i)** any communication to, or appearance before, the Federal Election Commission by a former officer or employee of the Federal Election Commission; or

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

---

**(ii)** a communication or appearance made by a person who is subject to the restrictions contained in subsections [1] (c), (d), or (e) if, at the time of the communication or appearance, the person is employed by a person or entity other than--

**(I)** a candidate, an authorized committee, a national committee, a national Federal campaign committee, a State committee, or a political party; or

**(II)** a person or entity who represents, aids, or advises only persons or entities described in subclause (I).

**(C)** For purposes of this paragraph--

**(i)** the term "candidate" means any person who seeks nomination for election, or election, to Federal or State office or who has authorized others to explore on his or her behalf the possibility of seeking nomination for election, or election, to Federal or State office;

**(ii)** the term "authorized committee" means any political committee designated in writing by a candidate as authorized to receive contributions or make expenditures to promote the nomination for election, or the election, of such candidate, or to explore the possibility of seeking nomination for election, or the election, of such candidate, except that a political committee that receives contributions or makes expenditures to promote more than 1 candidate may not be designated as an authorized committee for purposes of subparagraph (A);

**(iii)** the term "national committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the national level;

**(iv)** the term "national Federal campaign committee" means an organization that, by virtue of the bylaws of a political party, is established primarily for the purpose of providing assistance, at the national level, to candidates nominated by that party for election to the office of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress;

**(v)** the term "State committee" means the organization which, by virtue of the bylaws of a political party, is responsible for the day-to-day operation of such political party at the State level;

**(vi)** the term "political party" means an association, committee, or organization that nominates a candidate for election to any Federal or State elected office whose name appears on the election ballot as the candidate of such association, committee, or organization; and

**(vii)** the term "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

---

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

---

**(k)(1)(A)** The President may grant a waiver of a restriction imposed by this section to any officer or employee described in paragraph (2) if the President determines and certifies in writing that it is in the public interest to grant the waiver and that the services of the officer or employee are critically needed for the benefit of the Federal Government. Not more than 25 officers and employees currently employed by the Federal Government at any one time may have been granted waivers under this paragraph.

**(B)(i)** A waiver granted under this paragraph to any person shall apply only with respect to activities engaged in by that person after that person's Federal Government employment is terminated and only to that person's employment at a Government-owned, contractor operated entity with which the person served as an officer or employee immediately before the person's Federal Government employment began.

**(ii)** Notwithstanding clause (i), a waiver granted under this paragraph to any person who was an officer or employee of Lawrence Livermore National Laboratory, Los Alamos National Laboratory, or Sandia National Laboratory immediately before the person's Federal Government employment began shall apply to that person's employment by any such national laboratory after the person's employment by the Federal Government is terminated.

**(2)** Waivers under paragraph (1) may be granted only to civilian officers and employees of the executive branch, other than officers and employees in the Executive Office of the President.

**(3)** A certification under paragraph (1) shall take effect upon its publication in the Federal Register and shall identify--

   **(A)** the officer or employee covered by the waiver by name and by position, and

   **(B)** the reasons for granting the waiver.

A copy of the certification shall also be provided to the Director of the Office of Government Ethics.

**(4)** The President may not delegate the authority provided by this subsection.

**(5)(A)** Each person granted a waiver under this subsection shall prepare reports, in accordance with subparagraph (B), stating whether the person has engaged in activities otherwise prohibited by this section for each six-month period described in subparagraph (B), and if so, what those activities were.

**(B)** A report under subparagraph (A) shall cover each six-month period beginning on the date of the termination of the person's Federal Government employment (with respect to which the waiver under this subsection was granted) and ending two years after that date. Such report shall be filed with the President and the Director of the Office of Government Ethics not later than 60 days after the end of the six-month period covered by the report. All reports filed with the Director under this paragraph shall be made available for public inspection and copying.

---

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 207. Restrictions on former officers, employees, and elected..., 18 USCA § 207

**(C)** If a person fails to file any report in accordance with subparagraphs (A) and (B), the President shall revoke the waiver and shall notify the person of the revocation. The revocation shall take effect upon the person's receipt of the notification and shall remain in effect until the report is filed.

**(D)** Any person who is granted a waiver under this subsection shall be ineligible for appointment in the civil service unless all reports required of such person by subparagraphs (A) and (B) have been filed.

**(E)** As used in this subsection, the term "civil service" has the meaning given that term in section 2101 of title 5.

**(l) Contract advice by former details.**--Whoever, being an employee of a private sector organization assigned to an agency under chapter 37 of title 5, within one year after the end of that assignment, knowingly represents or aids, counsels, or assists in representing any other person (except the United States) in connection with any contract with that agency shall be punished as provided in section 216 of this title.

## CREDIT(S)

(Added Pub.L. 87-849, § 1(a), Oct. 23, 1962, 76 Stat. 1123; amended Pub.L. 95-521, Title V, § 501(a), Oct. 26, 1978, 92 Stat. 1864; Pub.L. 96-28, June 22, 1979, 93 Stat. 76; Pub.L. 101-189, Div. A, Title VIII, § 814(d)(2), Nov. 29, 1989, 103 Stat. 1499; Pub.L. 101-194, Title I, § 101(a), Nov. 30, 1989, 103 Stat. 1716; Pub.L. 101-280, §§ 2(a), 5(d), May 4, 1990, 104 Stat. 149, 159; Pub.L. 101-509, Title V, § 529 [Title I, § 101 (b)(8)(A)], Nov. 5, 1990, 104 Stat. 1427, 1440; Pub.L. 102-25, Title VII, § 705(a), Apr. 6, 1991, 105 Stat. 120; Pub.L. 102-190, Div. C, Title XXXI, § 3138(a), Dec. 5, 1991, 105 Stat. 1579; Pub.L. 102-395, Title VI, § 609(a), Oct. 6, 1992, 106 Stat. 1873; Pub.L. 103-322, Title XXXIII, §§ 330002(i), 330010(15), Sept. 13, 1994, 108 Stat. 2140, 2144; Pub.L. 104-65, § 21(a), Dec. 19, 1995, 109 Stat. 704; Pub.L. 104-179, §§ 5, 6, Aug. 6, 1996, 110 Stat. 1567, 1568; Pub.L. 104-208, Div. A, Title I, § 101(f) [Title VI, § 635], Sept. 30, 1996, 110 Stat. 3009-314, 3009-363; Pub.L. 105-244, Title I, § 102(a)(5), Oct. 7, 1998, 112 Stat. 1618; Pub.L. 107-347, Title II, § 209(d)(1), (3), Dec. 17, 2002, 116 Stat. 2930; Pub.L. 108-136, Div. A, Title XI, § 1125(b)(1), Nov. 24, 2003, 117 Stat. 1639; Pub.L. 108-271, § 8(b), July 7, 2004, 118 Stat. 814; Pub.L. 110-81, Title I, §§ 101, 104(a), Sept. 14, 2007, 121 Stat. 736, 740; Pub.L. 111-148, Title III, § 3403(a)(2), Title X, § 10320(b), Mar. 23, 2010, 124 Stat. 506, 952; Pub.L. 113-235, Div. H, Title I, § 1301(b), Dec. 16, 2014, 128 Stat. 2537.)

Notes of Decisions (68)

Footnotes

1    So in original. Probably should be "subsection".

18 U.S.C.A. § 207, 18 USCA § 207

Current through P.L. 115-82

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 208. Acts affecting a personal financial interest, 18 USCA § 208

---

| United States Code Annotated |
| --- |
| Title 18. Crimes and Criminal Procedure (Refs & Annos) |
| Part I. Crimes (Refs & Annos) |
| Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos) |

18 U.S.C.A. § 208

§ 208. Acts affecting a personal financial interest

Currentness

**(a)** Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest--

Shall be subject to the penalties set forth in section 216 of this title.

**(b)** Subsection (a) shall not apply--

**(1)** if the officer or employee first advises the Government official responsible for appointment to his or her position of the nature and circumstances of the judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter and makes full disclosure of the financial interest and receives in advance a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee;

**(2)** if, by regulation issued by the Director of the Office of Government Ethics, applicable to all or a portion of all officers and employees covered by this section, and published in the Federal Register, the financial interest has been exempted from the requirements of subsection (a) as being too remote or too inconsequential to affect the integrity of the services of the Government officers or employees to which such regulation applies;

**(3)** in the case of a special Government employee serving on an advisory committee within the meaning of the Federal Advisory Committee Act (including an individual being considered for an appointment to such a position), the official responsible for the employee's appointment, after review of the financial disclosure report filed by the individual pursuant to the Ethics in Government Act of 1978, certifies in writing that the need for the individual's services outweighs the potential for a conflict of interest created by the financial interest involved; or

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 208. Acts affecting a personal financial interest, 18 USCA § 208

**(4)** if the financial interest that would be affected by the particular matter involved is that resulting solely from the interest of the officer or employee, or his or her spouse or minor child, in birthrights--

**(A)** in an Indian tribe, band, nation, or other organized group or community, including any Alaska Native village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act, which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians,

**(B)** in an Indian allotment the title to which is held in trust by the United States or which is inalienable by the allottee without the consent of the United States, or

**(C)** in an Indian claims fund held in trust or administered by the United States,

if the particular matter does not involve the Indian allotment or claims fund or the Indian tribe, band, nation, organized group or community, or Alaska Native village corporation as a specific party or parties.

**(c)(1)** For the purpose of paragraph (1) of subsection (b), in the case of class A and B directors of Federal Reserve banks, the Board of Governors of the Federal Reserve System shall be deemed to be the Government official responsible for appointment.

**(2)** The potential availability of an exemption under any particular paragraph of subsection (b) does not preclude an exemption being granted pursuant to another paragraph of subsection (b).

**(d)(1)** Upon request, a copy of any determination granting an exemption under subsection (b)(1) or (b)(3) shall be made available to the public by the agency granting the exemption pursuant to the procedures set forth in section 105 of the Ethics in Government Act of 1978. In making such determination available, the agency may withhold from disclosure any information contained in the determination that would be exempt from disclosure under section 552 of title 5. For purposes of determinations under subsection (b)(3), the information describing each financial interest shall be no more extensive than that required of the individual in his or her financial disclosure report under the Ethics in Government Act of 1978.

**(2)** The Office of Government Ethics, after consultation with the Attorney General, shall issue uniform regulations for the issuance of waivers and exemptions under subsection (b) which shall--

**(A)** list and describe exemptions; and

**(B)** provide guidance with respect to the types of interests that are not so substantial as to be deemed likely to affect the integrity of the services the Government may expect from the employee.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 208. Acts affecting a personal financial interest, 18 USCA § 208

---

### CREDIT(S)

(Added Pub.L. 87-849, § 1(a), Oct. 23, 1962, 76 Stat. 1124; amended Pub.L. 95-188, Title II, § 205, Nov. 16, 1977, 91 Stat. 1388; Pub.L. 101-194, Title IV, § 405, Nov. 30, 1989, 103 Stat. 1751; Pub.L. 101-280, § 5(e), May 4, 1990, 104 Stat. 159; Pub.L. 103-322, Title XXXIII, §§ 330002(b), 330008(6), Sept. 13, 1994, 108 Stat. 2140, 2143.)

Notes of Decisions (84)

18 U.S.C.A. § 208, 18 USCA § 208
Current through P.L. 115-82

---

                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

§ 209. Salary of Government officials and employees payable only..., 18 USCA § 209

---

> United States Code Annotated
>   Title 18. Crimes and Criminal Procedure (Refs & Annos)
>     Part I. Crimes (Refs & Annos)
>       Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 209

§ 209. Salary of Government officials and employees payable only by United States

Effective: October 28, 2004

Currentness

**(a)** Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality; or

Whoever, whether an individual, partnership, association, corporation, or other organization pays, makes any contribution to, or in any way supplements, the salary of any such officer or employee under circumstances which would make its receipt a violation of this subsection--

Shall be subject to the penalties set forth in section 216 of this title.

**(b)** Nothing herein prevents an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, or of the District of Columbia, from continuing to participate in a bona fide pension, retirement, group life, health or accident insurance, profit-sharing, stock bonus, or other employee welfare or benefit plan maintained by a former employer.

**(c)** This section does not apply to a special Government employee or to an officer or employee of the Government serving without compensation, whether or not he is a special Government employee, or to any person paying, contributing to, or supplementing his salary as such.

**(d)** This section does not prohibit payment or acceptance of contributions, awards, or other expenses under the terms of chapter 41 of title 5.

**(e)** This section does not prohibit the payment of actual relocation expenses incident to participation, or the acceptance of same by a participant in an executive exchange or fellowship program in an executive agency: *Provided*, That such program has been established by statute or Executive order of the President, offers appointments not to exceed three hundred and sixty-five days, and permits no extensions in excess of ninety additional days or, in the case of participants in overseas assignments, in excess of three hundred and sixty-five days.

§ 209. Salary of Government officials and employees payable only..., 18 USCA § 209

**(f)** This section does not prohibit acceptance or receipt, by any officer or employee injured during the commission of an offense described in section 351 or 1751 of this title, of contributions or payments from an organization which is described in section 501(c) (3) of the Internal Revenue Code of 1986 and which is exempt from taxation under section 501(a) of such Code.

**(g)(1)** This section does not prohibit an employee of a private sector organization, while assigned to an agency under chapter 37 of title 5, from continuing to receive pay and benefits from such organization in accordance with such chapter.

**(2)** For purposes of this subsection, the term "agency" means an agency (as defined by section 3701 of title 5) and the Office of the Chief Technology Officer of the District of Columbia.

**(h)** This section does not prohibit a member of the reserve components of the armed forces on active duty pursuant to a call or order to active duty under a provision of law referred to in section 101(a)(13) of title 10 from receiving from any person that employed such member before the call or order to active duty any payment of any part of the salary or wages that such person would have paid the member if the member's employment had not been interrupted by such call or order to active duty.

## CREDIT(S)

(Added Pub.L. 87-849, § 1(a), Oct. 23, 1962, 76 Stat. 1125; amended Pub.L. 96-174, Dec. 29, 1979, 93 Stat. 1288; Pub.L. 97-171, § 1, Apr. 13, 1982, 96 Stat. 67; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 99-646, § 70, Nov. 10, 1986, 100 Stat. 3617; Pub.L. 101-194, Title IV, § 406, Nov. 30, 1989, 103 Stat. 1753; Pub.L. 101-647, Title XXXV, § 3510, Nov. 29, 1990, 104 Stat. 4922; Pub.L. 103-322, Title XXXIII, § 330008(7), Sept. 13, 1994, 108 Stat. 2143; Pub.L. 107-273, Div. A, Title III, § 302(3), Nov. 2, 2002, 116 Stat. 1781; Pub.L. 107-347, Title II, § 209(g)(2), Dec. 17, 2002, 116 Stat. 2932; Pub.L. 108-375, Div. A, Title VI, § 663, Oct. 28, 2004, 118 Stat. 1974.)

18 U.S.C.A. § 209, 18 USCA § 209
Current through P.L. 115-82

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 219. Officers and employees acting as agents of foreign principals, 18 USCA § 219

---

United States Code Annotated
   Title 18. Crimes and Criminal Procedure (Refs & Annos)
      Part I. Crimes (Refs & Annos)
         Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 219

§ 219. Officers and employees acting as agents of foreign principals

Currentness

**(a)** Whoever, being a public official, is or acts as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938 or a lobbyist required to register under the Lobbying Disclosure Act of 1995 in connection with the representation of a foreign entity, as defined in section 3(6) of that Act shall be fined under this title or imprisoned for not more than two years, or both.

**(b)** Nothing in this section shall apply to the employment of any agent of a foreign principal as a special Government employee in any case in which the head of the employing agency certifies that such employment is required in the national interest. A copy of any certification under this paragraph shall be forwarded by the head of such agency to the Attorney General who shall cause the same to be filed with the registration statement and other documents filed by such agent, and made available for public inspection in accordance with section 6 of the Foreign Agents Registration Act of 1938, as amended.

**(c)** For the purpose of this section "public official" means Member of Congress, Delegate, or Resident Commissioner, either before or after he has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency, or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government.

**CREDIT(S)**

(Added Pub.L. 89-486, § 8(b), July 4, 1966, 80 Stat. 249; amended Pub.L. 98-473, Title II, § 1116, Oct. 12, 1984, 98 Stat. 2149; Pub.L. 99-646, § 30, Nov. 10, 1986, 100 Stat. 3598; Pub.L. 101-647, Title XXXV, § 3511, Nov. 29, 1990, 104 Stat. 4922; Pub.L. 104-65, § 12(b), Dec. 19, 1995, 109 Stat. 701.)

18 U.S.C.A. § 219, 18 USCA § 219
Current through P.L. 115-82

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 210. Offer to procure appointive public office, 18 USCA § 210

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 210

§ 210. Offer to procure appointive public office

Currentness

Whoever pays or offers or promises any money or thing of value, to any person, firm, or corporation in consideration of the use or promise to use any influence to procure any appointive office or place under the United States for any person, shall be fined under this title or imprisoned not more than one year, or both.

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 694, § 210, formerly § 214; renumbered § 210, Pub.L. 87-849, § 1(b), Oct. 23, 1962, 76 Stat. 1125; Pub.L. 103-322, Title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 2147.)

Notes of Decisions (5)

18 U.S.C.A. § 210, 18 USCA § 210
Current through P.L. 115-82

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 211. Acceptance or solicitation to obtain appointive public office, 18 USCA § 211

---

United States Code Annotated
    Title 18. Crimes and Criminal Procedure (Refs & Annos)
        Part I. Crimes (Refs & Annos)
            Chapter 11. Bribery, Graft, and Conflicts of Interest (Refs & Annos)

18 U.S.C.A. § 211

§ 211. Acceptance or solicitation to obtain appointive public office

Currentness

Whoever solicits or receives, either as a political contribution, or for personal emolument, any money or thing of value, in consideration of the promise of support or use of influence in obtaining for any person any appointive office or place under the United States, shall be fined under this title or imprisoned not more than one year, or both.

Whoever solicits or receives any thing of value in consideration of aiding a person to obtain employment under the United States either by referring his name to an executive department or agency of the United States or by requiring the payment of a fee because such person has secured such employment shall be fined under this title, or imprisoned not more than one year, or both. This section shall not apply to such services rendered by an employment agency pursuant to the written request of an executive department or agency of the United States.

**CREDIT(S)**

(June 25, 1948, c. 645, 62 Stat. 694, § 211, formerly § 215; Sept. 13, 1951, c. 380, 65 Stat. 320; renumbered § 211, Pub.L. 87-849, § 1(b), Oct. 23, 1962, 76 Stat. 1125; Pub.L. 103-322, Title XXXIII, § 330016(1)(H), Sept. 13, 1994, 108 Stat. 2147.)

Notes of Decisions (45)

18 U.S.C.A. § 211, 18 USCA § 211
Current through P.L. 115-82

---

End of Document      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 612. Registration statement, 22 USCA § 612

---

| |
|---|
| United States Code Annotated |
|    Title 22. Foreign Relations and Intercourse |
|       Chapter 11. Foreign Agents and Propaganda |
|          Subchapter II. Registration of Foreign Propagandists (Refs & Annos) |

22 U.S.C.A. § 612

§ 612. Registration statement

Currentness

**(a) Filing; contents**

No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by subsections (a) and (b) of this section or unless he is exempt from registration under the provisions of this subchapter. Except as hereinafter provided, every person who becomes an agent of a foreign principal shall, within ten days thereafter, file with the Attorney General, in duplicate, a registration statement, under oath on a form prescribed by the Attorney General. The obligation of an agent of a foreign principal to file a registration statement shall, after the tenth day of his becoming such agent, continue from day to day, and termination of such status shall not relieve such agent from his obligation to file a registration statement for the period during which he was an agent of a foreign principal. The registration statement shall include the following, which shall be regarded as material for the purposes of this subchapter:

   **(1)** Registrant's name, principal business address, and all other business addresses in the United States or elsewhere, and all residence addresses, if any;

   **(2)** Status of the registrant; if an individual, nationality; if a partnership, name, residence addresses, and nationality of each partner and a true and complete copy of its articles of copartnership; if an association, corporation, organization, or any other combination of individuals, the name, residence addresses, and nationality of each director and officer and of each person performing the functions of a director or officer and a true and complete copy of its charter, articles of incorporation, association, constitution, and bylaws, and amendments thereto; a copy of every other instrument or document and a statement of the terms and conditions of every oral agreement relating to its organization, powers, and purposes; and a statement of its ownership and control;

   **(3)** A comprehensive statement of the nature of registrant's business; a complete list of registrant's employees and a statement of the nature of the work of each; the name and address of every foreign principal for whom the registrant is acting, assuming or purporting to act or has agreed to act; the character of the business or other activities of every such foreign principal, and, if any such foreign principal be other than a natural person, a statement of the ownership and control of each; and the extent, if any, to which each such foreign principal is supervised, directed, owned, controlled, financed, or subsidized, in whole or in part, by any government of a foreign country or foreign political party, or by any other foreign principal;

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 612. Registration statement, 22 USCA § 612

---

**(4)** Copies of each written agreement and the terms and conditions of each oral agreement, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances, by reason of which the registrant is an agent of a foreign principal; a comprehensive statement of the nature and method of performance of each such contract, and of the existing and proposed activity or activities engaged in or to be engaged in by the registrant as agent of a foreign principal for each such foreign principal, including a detailed statement of any such activity which is a political activity;

**(5)** The nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received within the preceding sixty days from each such foreign principal, either as compensation or for disbursement or otherwise, and the form and time of each such payment and from whom received;

**(6)** A detailed statement of every activity which the registrant is performing or is assuming or purporting or has agreed to perform for himself or any other person other than a foreign principal and which requires his registration hereunder, including a detailed statement of any such activity which is a political activity;

**(7)** The name, business, and residence addresses, and if an individual, the nationality, of any person other than a foreign principal for whom the registrant is acting, assuming or purporting to act or has agreed to act under such circumstances as require his registration hereunder; the extent to which each such person is supervised, directed, owned, controlled, financed, or subsidized, in whole or in part, by any government of a foreign country or foreign political party or by any other foreign principal; and the nature and amount of contributions, income, money, or thing of value, if any, that the registrant has received during the preceding sixty days from each such person in connection with any of the activities referred to in clause (6) of this subsection, either as compensation or for disbursement or otherwise, and the form and time of each such payment and from whom received;

**(8)** A detailed statement of the money and other things of value spent or disposed of by the registrant during the preceding sixty days in furtherance of or in connection with activities which require his registration hereunder and which have been undertaken by him either as an agent of a foreign principal or for himself or any other person or in conection [1] with any activities relating to his becoming an agent of such principal, and a detailed statement of any contributions of money or other things of value made by him during the preceding sixty days (other than contributions the making of which is prohibited under the terms of section 613 of Title 18) in connection with an election to any political office or in connection with any primary election, convention, or caucus held to select candidates for any political office;

**(9)** Copies of each written agreement and the terms and conditions of each oral agreement, including all modifications of such agreements, or, where no contract exists, a full statement of all the circumstances, by reason of which the registrant is performing or assuming or purporting or has agreed to perform for himself or for a foreign principal or for any person other than a foreign principal any activities which require his registration hereunder;

**(10)** Such other statements, information, or documents pertinent to the purposes of this subchapter as the Attorney General, having due regard for the national security and the public interest, may from time to time require;

---

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 612. Registration statement, 22 USCA § 612

---

(11) Such further statements and such further copies of documents as are necessary to make the statements made in the registration statement and supplements thereto, and the copies of documents furnished therewith, not misleading.

**(b) Supplements; filing period**

Every agent of a foreign principal who has filed a registration statement required by subsection (a) of this section shall, within thirty days after the expiration of each period of six months succeeding such filing, file with the Attorney General a supplement thereto under oath, on a form prescribed by the Attorney General, which shall set forth with respect to such preceding six months' period such facts as the Attorney General, having due regard for the national security and the public interest, may deem necessary to make the information required under this section accurate, complete, and current with respect to such period. In connection with the information furnished under clauses (3), (4), (6), and (9) of subsection (a) of this section, the registrant shall give notice to the Attorney General of any changes therein within ten days after such changes occur. If the Attorney General, having due regard for the national security and the public interest, determines that it is necessary to carry out the purposes of this subchapter, he may, in any particular case, require supplements to the registration statement to be filed at more frequent intervals in respect to all or particular items of information to be furnished.

**(c) Execution of statement under oath**

The registration statement and supplements thereto shall be executed under oath as follows: If the registrant is an individual, by him; if the registrant is a partnership, by the majority of the members thereof; if the registrant is a person other than an individual or a partnership, by a majority of the officers thereof or persons performing the functions of officers or by a majority of the board of directors thereof or persons performing the functions of directors, if any.

**(d) Filing of statement not deemed full compliance nor as preclusion from prosecution**

The fact that a registration statement or supplement thereto has been filed shall not necessarily be deemed a full compliance with this subchapter and the regulations thereunder on the part of the registrant; nor shall it indicate that the Attorney General has in any way passed upon the merits of such registration statement or supplement thereto; nor shall it preclude prosecution, as provided for in this subchapter, for willful failure to file a registration statement or supplement thereto when due or for a willful false statement of a material fact therein or the willful omission of a material fact required to be stated therein or the willful omission of a material fact or copy of a material document necessary to make the statements made in a registration statement and supplements thereto, and the copies of documents furnished therewith, not misleading.

**(e) Incorporation of previous statement by reference**

If any agent of a foreign principal, required to register under the provisions of this subchapter, has previously thereto registered with the Attorney General under the provisions of section 2386 of Title 18, the Attorney General, in order to eliminate inappropriate duplication, may permit the incorporation by reference in the registration statement or supplements thereto filed hereunder of any information or documents previously filed by such agent of a foreign principal under the provisions of said section.

---

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 612. Registration statement, 22 USCA § 612

**(f) Exemption by Attorney General**

The Attorney General may, by regulation, provide for the exemption--

**(1)** from registration, or from the requirement of furnishing any of the information required by this section, of any person who is listed as a partner, officer, director, or employee in the registration statement filed by an agent of a foreign principal under this subchapter, and

**(2)** from the requirement of furnishing any of the information required by this section of any agent of a foreign principal,

where by reason of the nature of the functions or activities of such person the Attorney General, having due regard for the national security and the public interest, determines that such registration, or the furnishing of such information, as the case may be, is not necessary to carry out the purposes of this subchapter.

**(g) Electronic filing of registration statements and supplements**

A registration statement or supplement required to be filed under this section shall be filed in electronic form, in addition to any other form that may be required by the Attorney General.

**CREDIT(S)**

(June 8, 1938, c. 327, § 2, 52 Stat. 632; Apr. 29, 1942, c. 263, § 1, 56 Stat. 251; Aug. 3, 1950, c. 524, § 1, 64 Stat. 399; July 4, 1966, Pub.L. 89-486, § 2, 80 Stat. 245; Sept. 14, 2007, Pub.L. 110-81, Title II, § 212(a), 121 Stat. 749.)

Notes of Decisions (9)

Footnotes

1        So in original. Probably should be "connection".
22 U.S.C.A. § 612, 22 USCA § 612
Current through P.L. 115-82

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Mahler-Haug, Alexandra 11/21/2017
For Educational Use Only

§ 908. Employment of reserves and retired members by foreign..., 37 USCA § 908

---

United States Code Annotated
   Title 37. Pay and Allowances of the Uniformed Services (Refs & Annos)
      Chapter 17. Miscellaneous Rights and Benefits (Refs & Annos)

37 U.S.C.A. § 908

§ 908. Employment of reserves and retired members by foreign governments

Currentness

**(a) Congressional consent.**--Subject to subsection (b), Congress consents to the following persons accepting civil employment (and compensation for that employment) for which the consent of Congress is required by the last paragraph of section 9 of article I of the Constitution, related to acceptance of emoluments, offices, or titles from a foreign government:

(1) Retired members of the uniformed services.

(2) Members of a reserve component of the armed forces.

(3) Members of the Commissioned Reserve Corps of the Public Health Service.

**(b) Approval required.**--A person described in subsection (a) may accept employment or compensation described in that subsection only if the Secretary concerned and the Secretary of State approve the employment.

**(c) Military service in foreign armed forces.**--For a provision of law providing the consent of Congress to service in the military forces of certain foreign nations, see section 1060 of title 10.

### CREDIT(S)

(Added Pub.L. 97-295, § 3(6)(A), Oct. 12, 1982, 96 Stat. 1304; amended Pub.L. 102-25, Title VII, § 702(b)(1), Apr. 6, 1991, 105 Stat. 117; Pub.L. 103-160, Div. A, Title XIV, § 1433(c), Nov. 30, 1993, 107 Stat. 1834; Pub.L. 103-337, Div. A, Title X, § 1070(d)(6), Oct. 5, 1994, 108 Stat. 2858.)

37 U.S.C.A. § 908, 37 USCA § 908
Current through P.L. 115-82

---

End of Document                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

---

United States Code Annotated
  Title 5. Government Organization and Employees (Refs & Annos)
    Part III. Employees (Refs & Annos)
      Subpart F. Labor-Management and Employee Relations
        Chapter 73. Suitability, Security, and Conduct (Refs & Annos)
          Subchapter IV. Foreign Gifts and Decorations (Refs & Annos)

5 U.S.C.A. § 7342

§ 7342. Receipt and disposition of foreign gifts and decorations

Effective: January 4, 2011
Currentness

**(a)** For the purpose of this section--

  **(1)** "employee" means--

    **(A)** an employee as defined by section 2105 of this title and an officer or employee of the United States Postal Service or of the Postal Regulatory Commission;

    **(B)** an expert or consultant who is under contract under section 3109 of this title with the United States or any agency, department, or establishment thereof, including, in the case of an organization performing services under such section, any individual involved in the performance of such services;

    **(C)** an individual employed by, or occupying an office or position in, the government of a territory or possession of the United States or the government of the District of Columbia;

    **(D)** a member of a uniformed service;

    **(E)** the President and the Vice President;

    **(F)** a Member of Congress as defined by section 2106 of this title (except the Vice President) and any Delegate to the Congress; and

    **(G)** the spouse of an individual described in subparagraphs (A) through (F) (unless such individual and his or her spouse are separated) or a dependent (within the meaning of section 152 of the Internal Revenue Code of 1986) of such an individual, other than a spouse or dependent who is an employee under subparagraphs (A) through (F);

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

**(2)** "foreign government" means--

**(A)** any unit of foreign governmental authority, including any foreign national, State, local, and municipal government;

**(B)** any international or multinational organization whose membership is composed of any unit of foreign government described in subparagraph (A); and

**(C)** any agent or representative of any such unit or such organization, while acting as such;

**(3)** "gift" means a tangible or intangible present (other than a decoration) tendered by, or received from, a foreign government;

**(4)** "decoration" means an order, device, medal, badge, insignia, emblem, or award tendered by, or received from, a foreign government;

**(5)** "minimal value" means a retail value in the United States at the time of acceptance of $100 or less, except that--

**(A)** on January 1, 1981, and at 3 year intervals thereafter, "minimal value" shall be redefined in regulations prescribed by the Administrator of General Services, in consultation with the Secretary of State, to reflect changes in the consumer price index for the immediately preceding 3-year period; and

**(B)** regulations of an employing agency may define "minimal value" for its employees to be less than the value established under this paragraph; and

**(6)** "employing agency" means--

**(A)** the Committee on Standards of Official Conduct of the House of Representatives, for Members and employees of the House of Representatives, except that those responsibilities specified in subsections (c)(2)(A), (e)(1), and (g)(2)(B) shall be carried out by the Clerk of the House;

**(B)** the Select Committee on Ethics of the Senate, for Senators and employees of the Senate, except that those responsibilities (other than responsibilities involving approval of the employing agency) specified in subsections (c)(2), (d), and (g)(2)(B) shall be carried out by the Secretary of the Senate;

**(C)** the Administrative Office of the United States Courts, for judges and judicial branch employees; and

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

**(D)** the department, agency, office, or other entity in which an employee is employed, for other legislative branch employees and for all executive branch employees.

**(b)** An employee may not--

**(1)** request or otherwise encourage the tender of a gift or decoration; or

**(2)** accept a gift or decoration, other than in accordance with the provisions of subsections (c) and (d).

**(c)(1)** The Congress consents to--

**(A)** the accepting and retaining by an employee of a gift of minimal value tendered and received as a souvenir or mark of courtesy; and

**(B)** the accepting by an employee of a gift of more than minimal value when such gift is in the nature of an educational scholarship or medical treatment or when it appears that to refuse the gift would likely cause offense or embarrassment or otherwise adversely affect the foreign relations of the United States, except that--

**(i)** a tangible gift of more than minimal value is deemed to have been accepted on behalf of the United States and, upon acceptance, shall become the property of the United States; and

**(ii)** an employee may accept gifts of travel or expenses for travel taking place entirely outside the United States (such as transportation, food, and lodging) of more than minimal value if such acceptance is appropriate, consistent with the interests of the United States, and permitted by the employing agency and any regulations which may be prescribed by the employing agency.

**(2)** Within 60 days after accepting a tangible gift of more than minimal value (other than a gift described in paragraph (1)(B)(ii)), an employee shall--

**(A)** deposit the gift for disposal with his or her employing agency; or

**(B)** subject to the approval of the employing agency, deposit the gift with that agency for official use.

Within 30 days after terminating the official use of a gift under subparagraph (B), the employing agency shall forward the gift to the Administrator of General Services in accordance with subsection (e)(1) or provide for its disposal in accordance with subsection (e)(2).

Zelinsky, Nathaniel 11/16/2017
**For Educational Use Only**

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

---

**(3)** When an employee deposits a gift of more than minimal value for disposal or for official use pursuant to paragraph (2), or within 30 days after accepting travel or travel expenses as provided in paragraph (1)(B)(ii) unless such travel or travel expenses are accepted in accordance with specific instructions of his or her employing agency, the employee shall file a statement with his or her employing agency or its delegate containing the information prescribed in subsection (f) for that gift.

**(d)** The Congress consents to the accepting, retaining, and wearing by an employee of a decoration tendered in recognition of active field service in time of combat operations or awarded for other outstanding or unusually meritorious performance, subject to the approval of the employing agency of such employee. Without this approval, the decoration is deemed to have been accepted on behalf of the United States, shall become the property of the United States, and shall be deposited by the employee, within sixty days of acceptance, with the employing agency for official use, for forwarding to the Administrator of General Services for disposal in accordance with subsection (e)(1), or for disposal in accordance with subsection (e)(2).

**(e)(1)** Except as provided in paragraph (2), gifts and decorations that have been deposited with an employing agency for disposal shall be (A) returned to the donor, or (B) forwarded to the Administrator of General Services for transfer, donation, or other disposal in accordance with the provisions of subtitle I of title 40 and division C (except sections 3302, 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41. However, no gift or decoration that has been deposited for disposal may be sold without the approval of the Secretary of State, upon a determination that the sale will not adversely affect the foreign relations of the United States. Gifts and decorations may be sold by negotiated sale.

**(2)** Gifts and decorations received by a Senator or an employee of the Senate that are deposited with the Secretary of the Senate for disposal, or are deposited for an official use which has terminated, shall be disposed of by the Commission on Arts and Antiquities of the United States Senate. Any such gift or decoration may be returned by the Commission to the donor or may be transferred or donated by the Commission, subject to such terms and conditions as it may prescribe, (A) to an agency or instrumentality of (i) the United States, (ii) a State, territory, or possession of the United States, or a political subdivision of the foregoing, or (iii) the District of Columbia, or (B) to an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 which is exempt from taxation under section 501(a) of such Code. Any such gift or decoration not disposed of as provided in the preceding sentence shall be forwarded to the Administrator of General Services for disposal in accordance with paragraph (1). If the Administrator does not dispose of such gift or decoration within one year, he shall, at the request of the Commission, return it to the Commission and the Commission may dispose of such gift or decoration in such manner as it considers proper, except that such gift or decoration may be sold only with the approval of the Secretary of State upon a determination that the sale will not adversely affect the foreign relations of the United States.

**(f)(1)** Not later than January 31 of each year, each employing agency or its delegate shall compile a listing of all statements filed during the preceding year by the employees of that agency pursuant to subsection (c)(3) and shall transmit such listing to the Secretary of State who shall publish a comprehensive listing of all such statements in the Federal Register.

**(2)** Such listings shall include for each tangible gift reported--

  **(A)** the name and position of the employee;

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

**(B)** a brief description of the gift and the circumstances justifying acceptance;

**(C)** the identity, if known, of the foreign government and the name and position of the individual who presented the gift;

**(D)** the date of acceptance of the gift;

**(E)** the estimated value in the United States of the gift at the time of acceptance; and

**(F)** disposition or current location of the gift.

**(3)** Such listings shall include for each gift of travel or travel expenses--

**(A)** the name and position of the employee;

**(B)** a brief description of the gift and the circumstances justifying acceptance; and

**(C)** the identity, if known, of the foreign government and the name and position of the individual who presented the gift.

**(4)(A)** In transmitting such listings for an element of the intelligence community, the head of such element may delete the information described in subparagraph (A) or (C) of paragraph (2) or in subparagraph (A) or (C) of paragraph (3) if the head of such element certifies in writing to the Secretary of State that the publication of such information could adversely affect United States intelligence sources or methods.

**(B)** Any information not provided to the Secretary of State pursuant to the authority in subparagraph (A) shall be transmitted to the Director of National Intelligence who shall keep a record of such information.

**(C)** In this paragraph, the term "intelligence community" has the meaning given that term section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)).

**(g)(1)** Each employing agency shall prescribe such regulations as may be necessary to carry out the purpose of this section. For all employing agencies in the executive branch, such regulations shall be prescribed pursuant to guidance provided by the Secretary of State. These regulations shall be implemented by each employing agency for its employees.

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

**(2)** Each employing agency shall--

**(A)** report to the Attorney General cases in which there is reason to believe that an employee has violated this section;

**(B)** establish a procedure for obtaining an appraisal, when necessary, of the value of gifts; and

**(C)** take any other actions necessary to carry out the purpose of this section.

**(h)** The Attorney General may bring a civil action in any district court of the United States against any employee who knowingly solicits or accepts a gift from a foreign government not consented to by this section or who fails to deposit or report such gift as required by this section. The court in which such action is brought may assess a penalty against such employee in any amount not to exceed the retail value of the gift improperly solicited or received plus $5,000.

**(i)** The President shall direct all Chiefs of a United States Diplomatic Mission to inform their host governments that it is a general policy of the United States Government to prohibit United States Government employees from receiving gifts or decorations of more than minimal value.

**(j)** Nothing in this section shall be construed to derogate any regulation prescribed by any employing agency which provides for more stringent limitations on the receipt of gifts and decorations by its employees.

**(k)** The provisions of this section do not apply to grants and other forms of assistance to which section 108A of the Mutual Educational and Cultural Exchange Act of 1961 applies.

## CREDIT(S)

(Added Pub.L. 90-83, § 1(45)(C), Sept. 11, 1967, 81 Stat. 208; amended Pub.L. 95-105, Title V, § 515(a)(1), Aug. 17, 1977, 91 Stat. 862; Pub.L. 95-426, Title VII, § 712(a) to (c), Oct. 7, 1978, 92 Stat. 994; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 107-217, § 3(a)(1), Aug. 21, 2002, 116 Stat. 1295; Pub.L. 108-458, Title I, § 1079(b), Dec. 17, 2004, 118 Stat. 3696; Pub.L. 109-435, Title VI, § 604(b), Dec. 20, 2006, 120 Stat. 3241; Pub.L. 111-259, Title III, § 361, Oct. 7, 2010, 124 Stat. 2701; Pub.L. 111-350, § 5(a)(10), Jan. 4, 2011, 124 Stat. 3841.)

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11320

Ex. Ord. No. 11320, Dec. 12, 1966. 31 F.R. 15789, formerly set out as a note under this section and section 2626 of Title 22, Foreign Relations and Intercourse, which delegated to the Secretary of State the authority of the President under section 2626 of title 22 to prescribe rules and regulations to carry out the Foreign Gifts and Decorations Act of 1966, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 7342. Receipt and disposition of foreign gifts and decorations, 5 USCA § 7342

---

## EXECUTIVE ORDER NO. 11446

<Jan. 16, 1969, 34 F.R. 803, as amended Ex. Ord. No. 13286, Sec. 62, Feb. 28, 2003, 68 F.R. 10629>

### Acceptance of Service Medals and Ribbons from Multilateral Organizations Other than United Nations

By virtue of the authority vested in me as President of the United States and as Commander in Chief of the Armed Forces of the United States, I hereby authorize the Secretary of Defense, with respect to members of the Army, Navy, Air Force, and Marine Corps, and the Secretary of Homeland Security, with respect to members of the Coast Guard when it is not operating as a service in the Navy, to prescribe regulations for the acceptance of medals and ribbons which are offered by multilateral organizations, other than the United Nations, to members of the Armed Forces of the United States in recognition of service conducted under the auspices of those organizations. A determination that service for a multilateral organization in a particular geographical area or for a particular purpose constitutes a justifiable basis for authorizing acceptance of the medal or ribbon offered to eligible members of the Armed Forces of the United States shall be made with the concurrence of the Secretary of State.

LYNDON B. JOHNSON

Notes of Decisions (1)

5 U.S.C.A. § 7342, 5 USCA § 7342
Current through P.L. 115-82

---

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.



# DEBATES

### AND

## OTHER PROCEEDINGS

###### OF THE

## Convention of Virginia,

CONVENED AT RICHMOND, ON MONDAY THE SECOND DAY OF JUNE,
1788, FOR THE PURPOSE OF DELIBERATING ON THE CON-
STITUTION RECOMMENDED BY THE GRAND
FEDERAL CONVENTION.

#### TO WHICH IS PREFIXED

## THE FEDERAL CONSTITUTION.

TAKEN IN SHORT HAND,
BY DAVID ROBERTSON.....*OF PETERSBURG.*

#### SECOND EDITION.

### Richmond:

PRINTED AT THE ENQUIRER-PRESS,
FOR RITCHIE & WORSLEY AND AUGUSTINE DAVIS.

1805.

## ( 321 )

of extorting confeffion from the criminal in thofe countries where tor-
ture is ufed ; but ftill he faw no fecurity arifing from the bill of rights
as feparate from the conftitution, for that it had been frequently violat-
ed with impunity.

After fome irregular converfation,

The committee then rofe—and on motion, *Refolved*, That this con-
vention will, to-morrow, again refolve itfelf into a committee of the
whole convention, to take into farther confideration, the propofed con-
ftitution of government.

And then the convention adjourned until to-morrow morning nine
o'clock.

### TUESDAY, *THE* 17*th* OF *JUNE,* 1788.

The convention according to the order of the day, again refolved it-
felf into a committee of the whole convention, to take into farther
confideration, the propofed plan of goverament.——Mr. *Wythe* in the
chair.

*[The firft claufe, of the ninth fection, read.]*

Mr. *George Mafon.*—Mr. Chairman—This is a fatal fection, which
has created more dangers than any other.—The firft claufe, allows the
importation of flaves for twenty years. Under the royal government,
this evil was looked upon as a great oppreffion, and many attempts were
made to prevent it ; but the intereft of the African merchants prevent-
ed its prohibition. No fooner did the revolution take place, than it
was thought of. It was one of the great caufes of our feparation from
Great-Britain. Its exclufion has been a principal object of this ftate,
and moft of the ftates in the union. The augmentation of flaves weak-
ens the ftates ; and fuch a trade is diabolical in itfelf, and difgraceful
to mankind. Yet by this conftitution it is continued for twenty years.
As much as I value an union of all the ftates, I would not admit the
fouthern ftates into the union, unlefs they agreed to the difcontinuance
of this difgraceful trade, becaufe it would bring weaknefs and not
ftrength to the union. And though this infamous traffic be continued,
we have no fecurity for the property of that kind which we have al-
ready. There is no claufe in this conftitution to fecure it ; for they may
lay fuch a tax as will amount to manumiffion. And fhould the govern-
ment be amended, ftill this deteftable kind of commerce cannot be dif-
continued till after the expiration of twenty years.—For the fifth arti-
cle, which provides for amendments, exprefsly excepts this claufe. I
have ever looked upon this as a moft difgraceful thing to America. I
cannot exprefs my deteftation of it. Yet they have not fecured us the
property of the flaves we have already. So that " they have done
what they ought not to have done, and have left undone what they
ought to have done."

Mr. *Madifon.*—Mr. Chairman—I fhould conceive this claufe to be
impolitic, if it were one of thofe things which could be excluded with-
out encountering greater evils.—The fouthern ftates would not have
entered into the union of America, without the temporary permiffion
R 2

## ( 322 )

of that trade. And if they were excluded from the union, the confequences might be dreadful to them and to us. We are not in a worfe fituation than before. That traffic is prohibited by our laws, and we may continue the prohibition. The union in general is not in a worfe fituation. Under the articles of confederation, it might be continued forever: But by this claufe an end may be put to it after twenty years. There is therefore an amelioration of our circumftances. A tax may be laid in the mean time ; but it is limited, otherwife congrefs might lay fuch a tax as would amount to a prohibition. From the mode of reprefentation and taxation, congrefs cannot lay fuch a tax on flaves as will amount to manumiffion. Another claufe fecures us that property which we now poffefs. At prefent, if any flave elopes to any of thofe ftates where flaves are free, he becomes emancipated by their laws. For the laws of the ftates are uncharitable to one another in this refpect. But in this conftitution, " no perfon held to fervice, or labor, in one ftate, under the laws thereof, efcaping into another, fhall in confequence of any law or regulation therein, be difcharged from fuch fervice or labor ; but fhall be delivered up on claim of the party to whom fuch fervice or labor may be due."—This claufe was ex-prefsly inferted to enable owners of flaves to reclaim them. This is a better fecurity than any that now exifts. No power is given to the general government to interpofe with refpect to the property in flaves now held by the ftates. The taxation of this ftate being equal only to its reprefentation, fuch a tax cannot be laid as he fuppofes. They cannot prevent the importation of flaves for twenty years; but after that period they can. The gentlemen from South-Carolina and Georgia argued in this manner :—" We have now liberty to import this fpe-cies of property, and much of the property now poffeffed, has been pur-chafed, or otherwife acquired, in contemplation of improving it by the affiftance of imported flaves. What would be the confequence of hindering us from it ? The flaves of Virginia would rife in value, and we would be obliged to go to your markets." I need not expatiate on this fubject. Great as the evil is, a difmemberment of the union would be worfe. If thofe ftates fhould difunite from the other ftates, for not indulging them in the temporary continuance of this traffic, they might folicit and obtain aid from foreign powers.

Mr. *Tyler* warmly enlarged on the impolicy, iniquity, and difgrace-fulnefs of this wicked traffic. He thought the reafons urged by gen-tlemen in defence of it, were inconclufive, and ill-founded. It was one caufe of the complaints againft Britifh tyranny, that this trade was per-mitted. The revolution had put a period to it ; but now it was to be revived. He thought nothing could juftify it. This temporary ref-triction on congrefs militated, in his opinion, againft the arguments of gentlemen on the other fide, that what was not given up was retained by the ftates ; for that if this reftriction had not been inferted, congrefs could have prohibited the African trade. The power of prohibiting it, was not exprefsly delegated to them ; yet they would have had it by im-plication, if this reftraint had not been provided. This feemed to him to demonftrate moft clearly the neceffity of reftraining them by a bill of rights, from infringing our unalienable rights. It was immaterial whether the bill of rights was by itfelf, or included in the conftitution. But he contended for it one way or the other. It would be juftified

## ( 323 )

by our own example, and that of England. His earneſt deſire was, that it ſhould be handed down to poſterity, that he had oppoſed this wicked clauſe. He then reverted to the clauſes which enabled congreſs, to legiſlate excluſively in the ten miles ſquare, and other places purchaſed for forts, magazines, &c.—To provide for the general welfare—to raiſe a ſtanding army; and to make any law that may be neceſſary to carry their laws into execution. From the combined operation of theſe unlimited powers, he dreaded the moſt fatal conſequences. If any acts of violence ſhould be committed on perſons or property, the perpetrators of ſuch acts might take refuge in the ſanctuary of the ten miles ſquare, and the ſtrong holds. They would thus eſcape with impunity, as the ſtates had no power to puniſh them. He called to the recollection of the committee, the hiſtory of the Athenian, who from ſmall beginnings had enſlaved his country. He begged them to remember, that Cæſar, who proſtrated the liberties of his country, did not poſſeſs a powerful army at firſt. Suppoſe, ſays he, the time ſhould come, that a king ſhould be propoſed by congreſs. Will they not be able by the ſweeping clauſe to call in foreign aſſiſtance, and raiſe troops, and do whatever they think proper to carry this propoſition into effect ? He then concluded, that unleſs this clauſe were expunged he would vote againſt the conſtitution.

Mr. *Madiſon* was ſurpriſed, that any gentleman ſhould return to the clauſes which had already been diſcuſſed. He begged the gentleman to read the clauſe which gave the power of excluſive legiſlation, and he might ſee that nothing could be done without the conſent of the ſtates. With reſpect to the ſuppoſed operation of what was denominated the ſweeping clauſe, the gentleman, he ſaid, was miſtaken; for it only extended to the enumerated powers. Should congreſs attempt to extend it to any power not enumerated, it would not be warranted by the clauſe. As to the reſtriction in the clauſe under conſideration, it was a reſtraint on the exerciſe of a power expreſsly delegated to congreſs, namely, that of regulating commerce with foreign nations.

Mr. *Henry* inſiſted, that the inſertion of theſe reſtrictions on congreſs, was a plain demonſtration, that congreſs could exerciſe powers by implication. The gentleman had admitted that congreſs could have interdicted the African trade, were it not for this reſtriction. If ſo, the power not having been expreſsly delegated, muſt be obtained by implication. He demanded, where then was their doctrine of reſerved rights ? He wiſhed for negative clauſes to prevent their aſſuming any powers but thoſe expreſsly given. He aſked, why it was omitted to ſecure us that property in ſlaves, which we held now ? He feared its omiſſion was done with deſign. They might lay ſuch heavy taxes on ſlaves, as would amount to emancipation; and then the ſouthern ſtates would be the only ſufferers. His opinion was confirmed by the mode of levying money. Congreſs, he obſerved, had power to lay and collect taxes, impoſts and exciſes. Impoſts (or duties) and exciſes were to be uniform. But this uniformity did not extend to taxes. This might compel the ſouthern ſtates to liberate their negroes. He wiſhed this property therefore to be guarded. He conſidered the clauſe which had been adduced by the gentleman as a ſecurity for this property, as no ſecurity at all. It was no more than this—That a run-away negro could

be taken up in Maryland or New-York. This could not prevent congrefs from interfering with that property by laying a grievous and enormous tax on it, fo as to compel owners to emancipate their flaves rather than pay the tax. He apprehended it would be productive of much flock-jobbing, and that they would play into one another's hands in fuch a manner as that this property would be loft to this country.

Mr. *George Nicholas* wondered that gentlemen who were againft flavery, would be oppofed to this claufe, as after that period the flave trade would be done away. He afked, if gentlemen did not fee the inconfiftency of their arguments? They object, fays he, to the conftitution, bécaufe the flave trade is laid open for twenty odd years ; and yet they tell you, that by fome latent operation of it, the flaves who are fo now, will be manumitted ! At the fame moment it is oppofed for being promotive and deftructive of flavery !——He contended that it was advantageous to Virginia, that it fhould be in the power of congrefs to prevent the importation of flaves after twenty years, as it would then put a period to the evil complained of.

As the fouthern ftates would not confederate without this claufe, he afked, if gentlemen would rather diffolve the confederacy than to fuffer this temporary inconvenience, admitting it to be fuch ? Virginia might continue the prohibition of fuch importation during the intermediate period; and would be benefited by it, as a tax of ten dollars, each flave, might be laid ; of which fhe would receive a fhare. He endeavored to obviate the objection of gentlemen, that the reftriction on congrefs was a proof that they would have power not given them, by remarking, that they would only have had a general fuperintendency of trade, if the reftriction had not been inferted. But the fouthern ftates infifted on this exception to that general fuperintendency for twenty years. It could not therefore have been a power by implication, as the reftriction was an exception from a delegated power. The taxes could not, as had been fuggefted, be laid fo high on negroes as to amount to emancipation; becaufe taxation and reprefentation were fixed according to the cenfus eftablifhed in the conftitution.— The exception of taxes, from the uniformity annexed to duties and excifes, could not have the operation contended for by the gentleman ; becaufe other claufes had clearly and pofitively fixed the cenfus. Had taxes been uniform, it would have been univerfally objected to, for no one object could be felected without involving great inconveniencies and oppreffions. But, fays Mr. *Nicholas*, is it from the general government we are to fear emancipation ? Gentlemen will recollect what I faid in another houfe, and what other gentlemen have faid that advocated emancipation. Give me leave to fay, that that claufe is a great fecurity for our flave tax. I can tell the committee, that the people of our country are reduced to beggary by the taxes on negroes. Had this conftitution been adopted, it would not have been the cafe. The taxes were laid on all our negroes. By this fyftem two-fifths are exempted. He then added, that he had imagined gentlemen would not fupport here what they had oppofed in another place.

Mr. *Henry* replied, that though the proportion of each was to be fixed by the cenfus, and three-fifths of the flaves only were included

in the enumeration, yet the proportion of Virginia being once fixed, might be laid on blacks and blacks only. For the mode of raising the proportion of each ftate being to be directed by congrefs, they might make flaves the fole object to raife it of. Perforalities he wifhed to take leave of: They had nothing to do with the queftion, which was folely whether that paper was wrong or not.

Mr. *Nicholas* replied, that negroes muft be confidered as perfons or property. If as property, the proportion of taxes to be laid on them was fixed in the conftitution: If he apprehended a poll tax on negroes, the conftitution had prevented it. For, by the cenfus, where a white man paid ten fhillings, a negro paid but fix fhillings For the exemption of two-fifths of them reduced it to that proportion.

[*The 2d, 3d, and 4th claufes read.*]

Mr. *George Mafon* faid, that gentlemen might think themfelves fecured by the reftriction in the fourth claufe, that no capitation or other direct tax fhould be laid but in proportion to the cenfus before directed to be taken. But that when maturely confidered it would be found to be no fecurity whatfoever. It was nothing but a direct affertion, or mere confirmation of the claufe which fixed the ratio of taxes and reprefentation. It only meant that the quantum to be raifed of each ftate, fhould be in proportion to their numbers in the manner therein directed. But the general government was not precluded from laying the proportion of any particular ftate on any one fpecies of property they might think proper. For inftance, if 500,000 dollars were to be raifed, they might lay the whole of the proportion of the fouthern ftates on the blacks, or any one fpecies of property : So that by laying taxes too heavily on flaves, they might totally annihilate that kind of property. No real fecurity could arife from the claufe which provides, that perfons held to labour in one ftate, efcaping into another, fhall be delivered up. This only meant, that run-away flaves fhould not be protected in other ftates. As to the exclufion of *ex poft facto* laws, it could not be faid to create any fecurity in this cafe. For laying a tax on flaves would not be *ex poft facto*.

Mr. *Madifon* replied, that even the fouthern ftates, who were moft affected, were perfectly fatisfied with this provifion, and dreaded no danger to the property they now hold. It appeared to him, that the general government would not intermeddle with that property for twenty years, but to lay a tax on every flave imported, not exceeding ten dollars; and that after the expiration of that period they might prohibit the traffic altogether. The cenfus in the conftitution was intended to introduce equality in the burdens to be laid on the community.— No gentleman objected to laying duties, impofts, and excifes, uniformly. But uniformity of taxes would be fubverfive of the principles of equality: For that it was not poffible to felect any article which would be eafy for one ftate, but what would be heavy for another.— That the proportion of each ftate being afcertained, it would be raifed by the general government in the moft convenient manner for the people, and not by the felection of any one particular object. That there muft be fome degree of confidence put in agents, or elfe we muft reject a ftate of civil fociety altogether. Another great fecurity to this property, which he mentioned, was, that five ftates were greatly inte-

refted in that fpecies of property, and there were other ftates which had fome flaves, and had made no attempt, or taken any ftep to take them from the people. There were a few flaves in New-York, New-Jerfey and Connecticut: Thefe ftates would probably oppofe any attempts to annihilate this fpecies of property. He concluded, by obferving, that he would be glad to leave the decifion of this to the committee.

### [ *The 5th and 6th claufes read.*]

Mr. *George Mafon,* apprehended the loofe expreffion of " publication from time to time," was applicable to any time. It was equally applicable to monthly and feptennial periods. It might be extended ever fo much. The reafons urged in favor of this ambiguous expreffion, was, that there might be fome matters which might require fecrecy. In matters relative to military operations, and foreign negotiations, fecrecy was neceffary fometimes. But he did not conceive that the receipts and expenditures of the public money ought ever to be concealed. The people, he affirmed, had a right to know the expenditures of their money. But that this expreffion was fo loofe, it might be concealed forever from them, and might afford opportunities of mifapplying the public money, and fheltering thofe who did it. He concluded it to be as exceptionable as any claufe in fo few words could be.

Mr. *Lee* of *Wefmoreland,* thought fuch trivial arguments as that juft ufed by the honorable gentleman, would have no weight with the committee. He conceived the expreffion to be fufficiently explicit and fatisfactory. It muft be fuppofed to mean, in the common acceptation of language, fhort, convenient periods. It was as well, as if it had faid one year, or a fhorter term. Thofe who would neglect this provifion, would difobey the moft pointed directions. As the affembly was to meet next week, he hoped gentlemen would confine themfelves to the inveftigation of the principal parts of the conftitution.

Mr. *Mafon* begged to be permitted to ufe that mode of arguing to which he had been accuftomed. However defirous he was of pleafing that worthy gentleman, his duty would give way to that pleafure.

Mr. *George Nicholas* faid it was a better direction and fecurity than was in the ftate government. No appropriation fhall be made of the public money but by law. There could not be any mifapplication of it. Therefore he thought inftead of cenfure, it merited applaufe. Being a cautious provifion which few conftitutions, or none, had ever adopted.

Mr. *Corbin* concurred in the fentiments of Mr. *Nicholas* on this fubject.

Mr. *Madifon* thought it much better than if it had mentioned any fpecified period. Becaufe if the accounts of the public receipts and expenditures were to be publifhed at fhort ftated periods, they would not be fo full and connected as would be neceffary for a thorough comprehenfion of them, and detection of any errors. But by giving them an opportunity of publifhing them from time to time, as might be found eafy and convenient, they would be more full and fatisfactory to the public, and would be fufficiently frequent. He thought, after all, that

( 327 )

this provifion went farther than the conftitution of any ftate in the union, or perhaps in the world.

Mr. *Mafon* replied, that in the confederation the public proceedings were to be publifhed monthly, which was infinitely better than depending on men's virtue to publifh them or not, as they might pleafe. If there was no fuch provifion in the conftitution of Virginia, gentlemen ought to confider the difference between fuch a full reprefentation, difperfed and mingled with every part of the community, as the ftate reprefentation was, and fuch an inadequate reprefentation as this was. One might be fafely trufted, but not the other.

Mr. *Madifon* replied, that the inconveniences which had been experienced from the confederation in that refpect, had their weight with him in recommending this in preference to it ; for that it was impoffible, in fuch fhort intervals, to adjuft the public accounts in any fatisfactory manner.

[*The 7th claufe read.*]

Mr. *Henry.*—Mr. Chairman—We have now come to the ninth fection, and I confider myfelf at liberty to take a fhort view of the whole. I wifh to do it very briefly. Give me leave to remark, that there is a bill of rights in that government. There are exprefs reftrictions which are in the fhape of a bill of rights: But they bear the name of the ninth fection. The defign of the negative expreffions in this fection is to prefcribe limits, beyond which the powers of congrefs fhall not go. Thefe are the fole bounds intended by the American government. Where abouts do we ftand with refpect to a bill of rights ? Examine it, and compare it to the idea manifefted by the Virginian bill of rights, or that of the other ftates. The reftraints in this congreffional bill of rights, are fo feeble and few, that it would have been infinitely better to have faid nothing about it. The fair implication is, that they can do every thing they are not forbidden to do. What will be the refult if congrefs, in the courfe of their legiflation, fhould do a thing not reftrained by this ninth fection ? It will fall as an incidental power to congrefs, not being prohibited exprefsly in the conftitution. The firft prohibition is, that the privilege of the writ of *habeas corpus* fhall not be fufpended, but when in cafes of rebellion, or invafion, the public fafety may require it. It refults clearly, that if it had not faid fo, they could fufpend it in all cafes whatfoever. It reverfes the pofition of the friends of this conftitution, that every thing is retained which is not given up. For inftead of this, every thing is given up, which is not exprefsly referved.—It does not fpeak affirmatively, and fay that it fhall be fufpended in thofe cafes. But that it fhall not be fufpended but in certain cafes; going on a fuppofition that every thing which is not negatived, fhall remain with congrefs. If the power remains with the people, how can congrefs fupply the want of an affirmative grant ? They cannot do it but by implication, which deftroys their doctrine. The Virginia bill of rights interdicts the relinquifhment of the fword and purfe without controul. That bill of rights fecures the great and principal rights of mankind. But this bill of rights extends to but very few cafes, and is deftructive of the doctrine advanced by the friends of that paper.

If *ex poſt faſto* laws had not been interdicted, they might alſo have been extended by implication at pleaſure. Let us conſider whether this reſtriction be founded in wiſdom or good policy. If no *ex poſt faſto* laws be made, what is to become of the old continental paper dollars? Will not this country be forced to pay it in gold and ſilver, ſhilling for ſhilling ?   Gentlemen may think that this does not deſerve an anſwer : But it is an all important queſtion.   Becauſe the property of this country is not commenſurate to the enormous demand.   Our own government triumphs with infinite ſuperiority when put in contraſt with that paper.—The want of a bill of rights will render all their laws, however oppreſſive, conſtitutional.

If the government of Virginia paſſes a law in contradiction to our bill of rights, it is nugatory.   By that paper the national wealth is to be diſpoſed of under the veil of ſecrecy :   For the publication from time to time, will amount to nothing ; and they may conceal what they may think requires ſecrecy.   How different is it in your own government ? Have not the people ſeen the journals of our legiſlature every day during every ſeſſion ?   Is not the lobby full of people every day ?   Yet, gentlemen ſay, that the publication from time to time is a ſecurity unknown in our ſtate government !   Such a regulation would be nugatory and vain, or at leaſt needleſs, as the people ſee the journals of our legiſlature, and hear their debates every day.   If this be not more ſecure than what is in that paper, I will give up that I have totally miſconceived the principles of the government.   You are told, that your rights are ſecured in this new government.   They are guarded in no other part but this ninth ſection.   The few reſtrictions in that ſection are your only ſafeguards. · They may controul your actions, and your very words, without being repugnant to that paper.   The exiſtence of your deareſt privileges will depend on the conſent of congreſs :   For theſe are not within the reſtrictions of the ninth ſection.

If gentlemen think that ſecuring the ſlave trade is a capital object ; that the privilege of the *habeas corpus* is ſufficiently ſecured ; that the excluſion of *ex poſt faſto* laws will produce no inconvenience ; that the publication from time to time will ſecure their property ; in one word, that this ſection alone will ſufficiently ſecure their liberties, I have ſpoken in vain.—Every word of mine, and of my worthy coadjutor, is loſt. I truſt that gentlemen, on this occaſion, will ſee the great objects of religion, liberty of the preſs, trial by jury, interdiction of cruel puniſhments, and every other ſacred right ſecured, before they agree to that paper.   Theſe moſt important human rights are not protected by that ſection, which is the only ſafeguard in the conſtitution.—My mind will not be quieted till I ſee ſomething ſubſtantial come forth in the ſhape of a bill of rights.

Governor *Randolph*.—Mr. Chairman—The general review which the gentleman has taken of the ninth ſection, is ſo inconſiſtent, that in order to anſwer him, I muſt with your permiſſion, who is the cuſtos of order here, depart from the rule of the houſe in ſome degree.   I declared ſome days ago that I would give my ſuffrage for this conſtitution, not becauſe I conſidered it without blemiſh, but becauſe the critical ſituation of our country demanded it.   I invite thoſe who think

with me to vote for the conftitution.—But where things occur in it which I difapprove of, I fhall be candid in expofing my objections.

Permit me to return to that claufe, which is called by gentlemen the fweeping claufe. I obferved yefterday, that I conceived the conftruction which had been put on this claufe by the advocates of the conftitution was too narrow ; and that the conftruction put upon it by the other party, was extravagant. The intermediate explanation appears to me moft rational. The former contend, that it gives no fupplementary power ; but only enables them to make laws to execute the delegated powers, or in other words, that it only involves the powers incidental to thofe exprefsly delegated.—By incidental powers they mean thofe which are neceffary for the principal thing.—That the incident is infeparable from the principal, is a maxim in the conftruction of laws. A conftitution differs from a law.—For a law only embraces one thing —but a conftitution embraces a number of things, and is to have a more liberal conftruction. I need not recur to the conftitutions of Europe for a precedent to direct my explication of this claufe, becaufe in Europe there is no conftitution wholly in writing. The European conftitutions fometimes confift in detached ftatutes or ordinances :— Sometimes they are on record, and fometimes they depend on immemorial tradition. The American conftitutions are fingular, and their conftruction ought to be liberal. On this principle what fhould be faid of the claufe under confideration *(the fweeping claufe.)* If incidental powers be thofe only which are neceffary for the principal thing, the claufe would be fupurfluous.

Let us take an example of a fingle department : For inftance that of the prefident, who has certain things annexed to his office. Does it not reafonably follow, that he muft have fome incidental powers ? The principle of incidental powers extends to all parts of the fyftem. If you then fay, that the prefident has incidental powers, you reduce it to tautology. I cannot conceive that the fair interpretation of thefe words is as the honorable member fays.

Let me fay, that, in my opinion, the adverfaries of the conftitution wander equally from the true meaning. If it would not fatigue the houfe too far, I would go back to the queftion of referved rights. The gentleman fuppofes, that compleat and unlimited legiflation is vefted in the congrefs of the United States. This fuppofition is founded on falfe reafoning. What is the prefent fituation of this ftate ? She has poffeffion of all rights of fovereignty, except thofe given to the confederation. She *muft* delegate powers to the confederate government. It is neceffary for her public happinefs. Her weaknefs compels her to confederate with the twelve other governments. She trufts certain powers to the general government in order to fupport, protect, and defend the union. Now is there not a demonftrable difference between the principle of the ftate government, and the general government ? There is not a word faid in the ftate government of the powers given to it, becaufe they are general. But in the general conftitution, its powers are enumerated. Is it not then fairly deducible, that it has no power but what is exprefsly given it ? For if its powers were to be general, an enumeration would be needlefs.

But the infertion of the negative reftrictions has given caufe of tri-
umph it feen s, to gentlemen. They fuppofe, that it demonftrates that
congrefs are to have powers by implication. I will meet them on that
ground. I perfuade myfelf, that every exception here mentioned, is an
exception not from general powers, but from the particular powers
therein vefted. To what power in the general government is the ex-
ception made, refpecting the importation of negroes ? Not from a
general power, but from a particular power exprefsly enumerated.
This is an exception from the power given them of regulating com-
merce. He afks, where is the power to which the prohibition of fuf-
pending the *babees corpus* is an exception. I contend that by virtue of
the power given to congrefs to regulate courts, they could fufpend the
writ of *babeas corpus*.—This is therefore an exception to that power.

The third reftriction is, that " no bill of attainder, or *ex poft facto*
law fhall be paffed."—This is a manifeft exception to another power.
We know well that attainders, and *ex poft facto* laws, have always been
the engines of crimial jurifprudence. This is therefore an exception to
the criminal jurifdiction vefted in that body.

The fourth reftriction is, that no capitation, or other direct tax fhall
be laid, unlefs in proportion to the cenfus before directed to be taken.
Our debates fhew from what power this is an exception.

The reftrictions in the fifth claufe, are an exception to the power of
regulating commerce.

The reftriction of the fixth claufe, that no money fhall be drawn
from the treafury, but in confequence of appropriations made by law, is
an exception to the power of paying the debts of the United States ;
for the power of drawing money from the treafury is confequential
of that of paying the public debts.

The next reftriction is, that no titles of nobility fhall be granted by
the United States. If we caft our eyes to the manner in which titles
of nobility firft originated, we fhall find this refriction founded on the
fame principles. Thefe fprung from military and civil offices : Both
are put in the hands of the united States, and therefore I prefume it to
be an exception to that power.

The laft reftriction reftrains any perfons in office from accepting of
any prefent or emolument, title or office, from any foreign prince or
ftate. It muft have been obferved before, that though the confedera-
tion had reftricted congrefs from exercifing any powers not given them,
yet they inferted it, not from any apprehenfion of ufurpation, but for
greater fecurity. This reftriction is provided to prevent corruption.
All men have a natural inherent right of receiving emoluments from
any one, unlefs they be reftrained by the regulations of the communi-
ty. An accident which actually happened, operated in producing the
reftriction. A box was prefented to our ambaffador by the king of our
allies. It was thought proper, in order to exclude corruption and fo-
reign influence, to prohibit any one in office from receiving or holding
any emoluments from foreign ftates. I believe, that if at that moment,
when we were in harmony with the king of France, we had fuppofed
that he was corrupting our ambaffador, it might have difturbed that

confidence, and diminifhed that mutual friendfhip, which contributed
to carry us through the war.

The honorable gentleman obferved, that congrefs might define pu-
nifhments, from petty larceny to high treafon. This is an unfortunate
quotation for the gentleman; becaufe treafon is exprefsly defined in
the third fection, of the third article, and they can add no feature to
it. They have not cognizance over any other crime, except piracies,
felonies cofmitted on the high feas, and offences againft the law of na-
tions.

But the rhetoric of the gentleman has highly coloured the dangers
of giving the general government an indefinite power of providing for
the general welfare. I contend that no fuch power is given. They
have power " to lay and collect taxes, duties, impofts, and excifes, to
pay the debts and provide for the common defence and general welfare
of the United States." Is this an independent, feparate, fubftantive
power, to provide for the general welfare of the United States ?—No,
Sir.—They can lay and collect taxes, &c.—For what ?—To pay the
debts and provide for the general welfare. Were not this the cafe the
following part of the claufe would be abfurd. It would have been
treafon againft common language. Take it altogether, and let me afk
if the plain interpretation be not this—a power to lay and collect tax-
es, &c. in order to provide for the general welfare, and pay debts.

On the fubject of a bill of rights, the want of which has been com-
plained of, I will obferve that it has been fanctified by fuch reverend
authority, that I feel fome difficulty in going againft it. I fhall not,
however, be deterred from giving my opinion on this occafion, let the
confequence be what it may. At the beginning of the war we had no
certain bill of rights: For our charter cannot be confidered as a bill
of rights. It is nothing more than an inveftiture in the hands of the
Virginian citizens, of thofe rights which belonged to the Britifh fub-
jects. When the Britifh thought proper to infringe our rights, was it
not neceffary to mention in our conftitution, thofe rights which ought
to be paramount to the power of the legiflature ? Why is the bill of
rights diftinct from the conftitution ? I confider bills of rights in this
view, that the government fhould ufe them when there is a departure
from its fundamental principles, in order to reftore them. This is the
true fenfe of a bill of rights. If it be confiftent with the conftitution,
or contains additional rights, why not put it in the conftitution ? If it
be repugnant to the conftitution, there will be a perpetual fcene of war-
fare between them. The honorable gentleman has praifed the bill of
rights of Virginia, and called it his guardian angel, and vilified this
conftitution for not having it. Give me leave to make a diftinction be-
tween the reprefentatives of the people of a particular country, who
are appointed as the ordinary legiflature, having no limitation to their
powers, and another body arifing from a compact and certain delineat-
ed powers. Were a bill of rights neceffary in the former, it would
not in the latter ; for the beft fecurity that can be in the latter is the
exprefs enumeration of its powers. But let me afk the gentleman
where his favorite rights are violated ? They are not violated by the
tenth fection, which contains reftrictions on th ftates. Are they vio-
lated by the enumerated powers ? [Here his excellency read from the

eighth to the twelfth article of the declaration of rights.]——Is there not provifion made in this conftitution for the trial by jury in criminal cafes ?   Does not the third article provide, that the trial of all crimes fhall be by jury, and held in the ftate where the faid crimes ft all have been committed ?   Does it not follow, that the caufe and nature of the accufation muft be produced, becaufe otherwife they cannot proceed on the caufe ?   Every one knows, that the witneffes muft be brought before the jury, or elfe the prifoner will be difcharged.   Calling for evidence in his favor is co-incident to his trial.   There is no fufpicion, that lefs than twelve jurors will be thought fufficient.   The only defect is, that there is no fpeedy trial.—Confider how this could have been amended.   We have heard complaints againft it, becaufe it is fuppofed the jury is to come from the ftate at large.   It will be in their power to have juries from the vicinage.   And would not the complaints have been louder, if they had appointed a federal court to be had in every county in the ftate ?— Criminals are brought in this ftate from every part of the country to the general court, and jurors from the vicinage are fummoned to the trials.   There can be no reafon to prevent the general government from adopting a fimilar regulation.

As to the exclufion of exceffive bail and fines, and cruel and unufual punifhments, this would follow of itfelf without a bill of rights. Obfervations have been made about watchfulnefs ever thofe in power, which deferve our attention.   There muft be a combination—we muft prefume corruption in the houfe of reprefentatives, fenate, and prefident, before we can fuppofe that exceffive fines can be impofed, or cruel punifhments inflicted.   Their number is the higheft fecurity.— Numbers are the higheft fecurity in our own conftitution, which has attracted fo many eulogiums from the gentleman.   Here we have launched into a fea of fufpicions.   How fhall we check power ?—By their numbers.   Before thefe cruel punifhments can be inflicted, laws muft be paffed, and judges muft judge contrary to juftice.   This would excite univerfal difcontent, and deteftation of the members of the government.   They might involve their friends in the calamities refulting from it, and could be removed from office.   I never defire a greater fecurity than this, which I believe to be abfolutely fufficient.

That general warrants are grievous and oppreffive, and ought not to be granted, I fully admit.   I heartily concur in expreffing my deteftation of them.   But we have fufficient fecurity here alfo.   We do not rely on the integrity of any one particular perfon or body ; but on the number and different orders of the members of the government :— Some of them having neceffarily the fame feelings with ourfelves.— Can it be believed, that the federal judiciary would not be independent enough to prevent fuch oppreffive practices ?   If they will not do juftice to perfons injured, may they not go to our own ftate judiciaries and obtain it ?

Gentlemen have been mifled to a certain degree, by a general declaration, that the trial by jury was gone.   We fee that in the moft valuable cafes, it is referved.   Is it abolifhed in civil cafes ?   Let him put his finger on the part where it is abolifhed.   The conftitution is filent on it.   What expreffion would you wifh the conftitution to ufe,

to eftablifh it ?   Remember we were not making a conftitution for
Virginia alone, or we might have taken Virginia for our directory.—
But we were forming a conftitution for thirteen ftates.   The trial by
jury is different in different ftates.   In fome ftates it is excluded in ca-
fes in which it is admitted in others.   In admiralty caufes it is not ufed.
Would you have a jury to determine the cafe of a capture ?   The Vir-
ginian legiflature thought proper to make an exception of that cafe.
Thefe depend on the law of nations, and no twelve men that could be
picked up would be equal to the decifion of fuch a matter.

Then, fir, the freedom of the prefs is faid to be infecure.   God for-
bid that I fhould give my voice againft the freedom of the prefs.   But
I afk, (and with confidence that it cannot be anfwered) where is the
page where it is reftrained ?   If there had been any regulation about
it, leaving it infecure, then there might have been reafon for clamours.
But this is not the cafe.   If it be, I again afk for the particular claufe
which gives liberty to deftroy the freedom of the prefs. ,

He has added religion to the objects endangered in his confervation.
Is there any power given over it ?   Let it be pointed out.   Will he
not be contented with the anfwer which has been frequently given to
that objection ?   That variety of fects which abounds in the United
States is the beft fecurity for the freedom of religion.   No part of the
conftitution, even if ftrictly conftrued, will juftify a conclufion, that
the general government can take away, or impair the freedom of re-
ligion.

The gentleman afks with triumph, fhall we be deprived of thefe
valuable rights ?   Had there been an exception or exprefs infringe-
ment of thofe rights, he might object.   But I conceive every fair rea-
foner will agree, that there is no juft caufe to fufpect that they will be
violated.

But he objects, that the common law is not eftablifhed by the confti-
tution.   The wifdom of the convention is difplayed by its omiffion ;
becaufe the common law ought not to be immutably fixed.   Is it efta-
blifhed in our own conftitution, or the bill of rights which has been re-
founded through the houfe.   It is eftablifhed only by an act of the le-
giflature, and can therefore be changed as circumftances may require
it.   Let the honorable gentleman confider what would be the deftruc-
tive confequences of its eftablifhment in the conftitution.   Even in
England, where the firmeft oppofition has been made to encroachments
upon it, it has been frequently changed.   What would have been our
dilemma if it had been eftablifhed ?   Virginia has declared, that chil-
dren fhall have equal portions of the real eftates of their inteftate pa-
rents, and it is confiftent to the principles of a republican government.
The immutable eftablifhment of the common law, would have been
repugnant to that regulation.   It would in many refpects be deftruc-
tive to republican principles, and productive of great inconveniences.
I might indulge myfelf, by fhewing many parts of the common law
which would have this effect.   I hope I fhall not be thought to fneak
ludicroufly, when I fay, that the *writ* of *burning heretics*, would have
been revived by it.   It would tend to throw real property in few hands,
and prevent the introduction of many falutary regulations.   Thus,
were the common law adopted in that fyftem, it would deftroy the

## ( 334 )

principles of republican government. But it is not excluded. It may
be eftablifhed by an act of the legiflature. Its defective parts may be
altered, and it may be changed and modified as the convenience of the
public may require it.

I faid when I opened my obfervations, that I thought the friends of
the conftitution were miftaken, when they fuppofed the powers granted
by the laft claufe of the eighth fection, to be merely incidental ; and
that its enemies were equally miftaken when they put fuch an extrava-
gant conftruction upon it.

My objection is, that the claufe is ambiguous, and that that ambi-
guity may injure the ftates. My fear is, that it will by gradual accef-
fions gather to a dangerous length. This is my apprehenfion, and I
difdain to difown it. I will praife it where it deferves it, and cenfure
it where it appears defective. But, fir, are we to reject it, be-
caufe it is ambiguous in fome particular inftances ? I caft my eyes to
the actual fituation of America ; I fee the dreadful tempeft, to which
the prefent calm is a prelude, if difunion takes place. I fee the anar-
chy which muft happen if no energetic government be eftablifhed. In
this fituation, I would take the conftitution were it more objectionable
than it is.—For if anarchy and confufion follow difunion, an enterpriz-
ing man may enter into the American throne. I conceive there is no
danger. The reprefentatives are chofen by and from among the peo-
ple. They will have a fellow-feeling for the farmers and planters.—
The twenty-fix fenators, reprefentatives of the ftates, will not be thofe
defperadoes and horrid adventurers which they are reprefented to be.
The ftate legiflatures, I truft, will not forget the duty they owe to their
country fo far, as to choofe fuch men to manage their federal interefts.
I truft, that the members of congrefs themfelves, will explain the am-
biguous parts : And if not, the ftates can combine in order to infift
on amending the ambiguities. I would depend on the prefent actual
feelings of the people of America, to introduce any amendment which
may be neceffary. I repeat it again, though I do not reverence
the conftitution, that its adoption is neceffary to avoid the ftorm
which is hanging over America, and that no greater curfe can be-
fal her, than the diffolution of the political connection between the
ftates. Whether we fhall propofe previous or fubfequent amend-
ments, is now the only difpute. It is fupererogation to repeat again
the arguments in fupport of each. But I afk gentlemen, whether, as
eight ftates have adopted it, it be not fafer to adopt it, and rely on the
probability of obtaining amendments, than by a rejection to hazard a
breach of the Union ? I hope to be excufed for the breach of order
which I have committed.

Mr. *Henry* lamented, that he could not fee with that perfpicuity
which other gentlemen were bleffed with. But the ninth fection
ftruck his mind ftill in an unfavourable light. He hoped, as the gen-
tleman had been indulged in fpeaking of the conftitution in gene-
ral, that he would be allowed to anfwer him before they adopted or
rejected it.

[ *The firft claufe of the tenth fection, read.* ]

Mr. *Henry* apologized for repeatedly troubling the committee with
his fears. But he apprehended the moft ferious confequences from

thefe reftrictions on the ftates. As they could not emit bills of credit, make any thing but gold and filver coin a tender in payment of debts, pafs *ex poft facto* laws, or impair the obligation of contracts; though thefe reftrictions were founded on good principles, yet he feared they would have this effect—That this ftate would be obliged to pay for her fhare of the continental money, fhilling for fhilling. He afked gentlemen who had been in high authority, whether there were not fome ftate fpeculations on this matter? He had been informed that fome ftates had acquired vaft quantities of that money, which they would be able to recover in its nominal value of the other ftates.

Mr. *Madifon* admitted there might be fome fpeculations on the fubject. He believed the old continental money was fettled in a very difproportionate manner. It appeared to him, however, that it was unneceffary to fay any thing on this point, for there was a claufe in the conftitution which cleared it up. The firft claufe of the fixth article, provides, that " All debts contracted, and engagements entered into before the adoption of this conftitution, fhall be as valid againft the U. States under this conftitution, as under the confederation." He affirmed that it was meant there fhould be no change with refpect to claims by this political alteration ; and that the public would ftand, with refpect to their creditors, as before. He thought that the validity of claims ought not to diminifh by the adoption of the conftitution. But however, it could not increafe the demands on the public.

Mr. *George Mafon* declared, he had been informed that fome ftates had fpeculated moft enormoufly in this matter. Many individuals had fpeculated fo as to make great fortunes on the ruin of their fellow-citizens. The claufe which has been read as a fufficient fecurity, feemed to him to be fatisfactory as far as it went.—That is, that the continental money ought to ftand on the fame ground as it did previoufly, or that the claim fhould not be impaired. Under the confederation there were means of fettling the old paper money, either in congrefs or in the ftate legiflatures. The money had at laft depreciated to a thoufand for one. The intention of ftate fpeculation, as well as individual fpeculation, was to get as much as poffible of that money, in order to recover its nominal value. The means, fays he, of fettling this money were in the hands of the old congrefs. They could difcharge it at its depreciated value. Is there that means here? No, fir, we muft pay it fhilling for fhilling, or at leaft at the rate of one for forty. The amount will furpafs the value of the property of the United States. Neither the ftate legiflatures nor congrefs can make an *ex poft facto* law. The nominal value muft therefore be paid. Where is the power in the new government, to fettle this money fo as to prevent the country from being ruined ? When they prohibit the making *ex poft facto* laws, they will have no authority to prevent our being ruined by paying that money at its nominal value. Without fome fecurity againft it, we fhall be compelled to pay it to the laft particle of our property. Shall we ruin our people by taxation, from generation to generation, to pay that money ? Should any *ex poft facto* law be made to relieve us from fuch payment, it will not be regarded, becaufe *ex poft facto* laws are interdicted in the conftitution. We may be taxed for centuries, to give advantage to a few particular ftates in the union,

and a number of rapacious fpeculators. If there be any real fecurity againft this misfortune, let gentlemen fhew it.—I can fee none.—— The claufe under confideration does away the pretended fecurity in the claufe which was adduced by the honorable gentleman. This enormous mafs of worthlefs money, which has been offered at a thoufand for one, muft be paid in actual gold or filver at the nominal value.

Mr. *Madifon.*—Mr. Chairman—It appears to me immaterial who holds thofe great quantities of paper money, which were in circulation before the peace, or at what value they acquired it ; for it will not be affected by this conftitution. What would fatisfy gentlemen more than that the new conftitution would place us in the fame fituation with the old ? In this refpect it has done fo. The claims againft the United States are declared to be *as valid* as they were, but *not more fo.* Would they have a particular fpecification of thefe matters ? Where can there be any danger ?—Is there any reafon to believe that the new rulers, one branch of which will be drawn from the mafs of the people, will neglect or violate our interefts more than the old ?—It refts on the obligation of public faith only in the articles of confederation. It will be fo in this conftitution fhould it be adopted. If the new rulers fhould wifh to enhance its value, in order to gratify its holders, how can they compel the ftates to pay it if the letter of the conftitution be obferved? Do gentlemen wifh the public creditors fhould be put in a worfe fituation ? Would the people at large wifh to fatisfy creditors in fuch a manner as to ruin them ? There cannot be a majority of the people of America that would wifh to defraud their public creditors. I confider this as well guarded as poffible. It refts on plain and honeft principles. I cannot conceive how it could be more honorable or fafe.——[Mr. *Madifon* made fome other obfervations, which could not be heard.]

Mr. *Henry.*—Mr. Chairman—I am convinced, and I fee clearly that this paper money muft be difcharged, fhilling for fhilling. The honorable gentleman muft fee better than I can, from his particular fituation and judgment, but this has certainly efcaped his attention. The queftion arifing on the claufe before you, is, whether an act of the legiflature of this ftate, for fcaling money, will be of fufficient validity to exonerate you from paying the nominal value, when fuch a law called *ex poft facto,* and impairing the obligation of contracts, are exprefsly interdicted by it ?—Your hands are tied up by this claufe, and you muft pay fhilling for fhilling ; and, in the laft fection, there is a claufe that prohibits the general legiflature from paffing any *ex poft facto* law— fo that the hands of congrefs are tied up, as well as the hands of the ftate legiflatures.

How will this thing operate, when ten or twenty millions are demanded as the quota of this ftate ? You will cry out that fpeculators have got it at one for a thoufand, and that they ought to be paid fo. Will you then have recourfe for relief, to legiflative interference ? They cannot relieve you becaufe of that claufe. The expreffion includes public contracts, as well as private contracts between individuals. Notwithftanding the fagacity of the gentleman, he cannot prove its exclufive relation to private contracts. Here is an enormous demand, which your children to the tenth generation will not be able to pay. Should we afk, if there be any obligation in juftice to pay

more than the depreciated value, we fhall be told that contracts muft not be impaired. Juftice may make a demand of millions, but the people cannot pay them.

I remember the clamours and public uneafinefs concerning the payments of Britifh debts, put into the treafury. Was not the alarm great and general left thefe payments fhould be laid on the people at large ? Did not the legiflature interfere and pafs a law to prevent it ? Was it not re-echoed every where, that the people of this country ought not to pay the debts of their great ones ? And though fome urged their patriotifm, and merits in putting money on the faith of the public into the treafury, yet the outcry was fo great, that it required legiflative interference. Shou'd thofe enormous demands be made upon us, would not legiflative interference be more neceffary than it was in that cafe ? Let us not run the rifk of being charged with carelefffnefs, and neglect of the intereft of our conftituents and pofterity. I would afk the number of millions ? It is without exaggeration, immenfe. I afk gentlemen if they can pay one hundred millions, or two hundred millions ? Where have they the means of paying it ? Still they would make us proceed to tie the hands of the ftates and of congrefs.

A gentleman has faid with great force, that there is a conteft for empire : There is alfo a conteft for money. The ftates of the north wifh to fecure a fuperiority of intereft and influence. In one part their deliberation is marked with wifdom, and in the other with the moft liberal generofity. When we have paid all the gold and filver we could to replenifh the congreffional coffers, here they afk for confidence. Their hands will be tied up. They cannot merit confidence. Here is a transfer from the old to the new government, without the means of relieving the greateft diftreffes which can befall the people. This money might be fcaled, fir, but the exclufion of *ex poft facto* laws, and laws impairing the obligation of contracts, fteps in and prevents it. Thefe were admitted by the old confederation.—There is a conteft for money as well as empire, as I have faid before. The eaftern ftates have fpeculated chiefly in this money. As there can be no congreffional fcale, their fpeculation will be extremely profitable. Not fatisfied with a majority in the legiflative councils, they muft have all our property. I wifh the fouthern genius of America had been more watchful.

This ftate may be fued in the federal court, for thofe enormous demands ; and judgment may be obtained, unlefs *ex poft facto* laws be paffed. To benefit whom are we to run this rifk ? I have heard there were vaft quantities of that money packed up in barrels—thofe formidable millions are depofited in the northern ftates, and whether in public or private hands, makes no odds. They have acquired it for the moft inconfiderable trifle. If you accord to this part, you are bound hand and foot. Judgment muft be rendered againft you for the whole. Throw all pride out of the queftion, this is a moft nefarious bufinefs. Your property will be taken from you to fatisfy this moft infamous fpeculation. It will deftroy your public peace, and eftablifh the ruin of your citizens. Only general refiftance will remedy it. You

T 2

will fhut the door againft every ray of hope, if you allow the holders of this money, by this claufe, to recover their formidable demands. I hope gentlemen will fee the abfolute neceffity of amending it, by enabling the ftate legiflatures to relieve their people from fuch nefarious oppref- fions.

Mr. *George Nicholas*.—Mr. Chairman—I beg gentlemen to confider moft attentively the claufe under confideration, and the objections a- gainft it.   He fays there exifts the moft dangerous profpect.   Has the legiflature of Virginia any right to make a law or regulation to inter- fere with the continental debts ?   Have they a right to make *ex poſt facto* laws, and laws impairing the obligation of contracts for that pur- pofe ?   No, fir.   If his fears proceed from this claufe, they are with- out foundation.   This claufe does not hinder them from doing it, be- caufe the ftate never could do it—the jurifdiction of fuch general ob- jects being exclufively vefted in congrefs.

But, fays he, this claufe will hinder the general government from preventing the nominal value of thofe millions from being paid.   On what footing does this bufinefs ftand if the conftitution be adopted ? By it all contracts will be as valid, and *only as valid* as under the old confederation.   The new government will give the holders the fame power of recovery as the old one.   There is no law under the exifting fyftem which gives power to any tribuual to enforce the payment of fuch claims.   On the will of congrefs alone the payment depends. The conftitution exprefsly fays, that they fhall be only as binding as under the prefent confederation.   Cannot they decide according to real equity ?   Thofe who have this money muft make application to con- grefs for payment.   Some pofitive regulation muft be made to redeem it. It cannot be faid, that they have power of paffing a law to enhance its value.   They cannot make a law that that money fhall no longer be but one for one.—For though they have power to pay the debts of the United States, they can only pay the real debts, and this is no farther a debt than it was before.   Application muft therefore be made by the holders of that money, to congrefs, who will make the moft proper re- gulation to difcharge its real and equitable, and not its nominal va- lue.

We are told of the act paffed to exonerate the public from the pay- ments of the Britifh debts put into the treafury.—That has no analogy to this :   Thofe payments were oppofed, becaufe they were unjuft. But he fuppofes that congrefs may be fued by thofe fpeculators.   Where is the claufe that gives that power ?   It gives no fuch power.   This according to my idea, is inconfiftent.   Can the fupreme legiflature be fued in their own fubordinate courts, by their own citizens, in cafes where they are not a party ?   They may be plaintiffs, but not defend- ants.   But the individual ftates perhaps may be fued ?   Pennfylvania or Virginia may be fued.—How is this ?   Do I owe the man in New- England any thing ?   Does Virginia owe any thing to the Pennfylvani- an holder of fuch money ?   Who promifed to pay it ?   Congrefs, fir. Congrefs are anfwerable to the individual holders of this money, and in- dividuals are anfwerable over to congrefs.   Therefore no individual can call on any ftate.

But the northern ftates ftruggle for money as well as for empire.

Cannot congrefs make fuch a regulation as they pleafe at prefent ? If
the northern ftates wifh to injure us, why do they not do it now ?
What greater dangers are there to be dreaded from the new govern-
ment, fince there is no alteration ? If they have a majority in the one
cafe, they have in the other. The interefts of thofe ftates would be as
dangerous for us under the old as under the new government, which
leaves this bufinefs where it ftands, becaufe the conclufion fays, that all
debts contracted, or engagements entered into, fhall be only as valid in
the one cafe as the other.

Governor *Randolph.*—Mr. Chairman—This claufe in fpite of the in-
vective of the gentleman, is a great favourite of mine ; becaufe it is ef-
fential to juftice. I fhall referve my anfwer refpecting the fafety of the
people, till the objection be urged : But I muft make a few obfervati-
ons. He fays, this claufe will be injurious, and that ,no fcale can be
made, becaufe there is a prohibition on congrefs of paffing *ex poft fac-
to* laws. If the gentleman did not make fuch ftrong objections to logi-
cal reafoning, I could prove by fuch reafoning, that there is no danger.
*Ex poft facto* laws, if taken technically, relate folely to criminal cafes ;
and my honorable colleague tells you it was fo interpreted in conventi-
on. What greater fecurity can we have againft arbitrary proceedings
in criminal jurifprudence than this ? In addition to the interpretati-
on of the convention, let me fhew him ftill greater authority. The
fame claufe provides, that no bill of attainder fhall be paffed. It fhews
that the attention of the convention was drawn to criminal matters a-
lone.—Shall it be complained againft this government, that it prohi-
bits the paffing of a law annexing a punifhment to an act which was
lawful at the time of committing it ? With regard to retrofpective
laws there is no reftraint.

Let us examine the caufe of the clamours which are made with re-
gard to the continental money. A friend has mentioned a claufe which
fhews there is no danger from the new congrefs. Does it not mani-
feftly appear, that they are precifely in the fame predicament as un-
der the old confederation ? And do gentlemen wifh that this fhould
be put in a worfe condition ? If they have equity under the old con-
federation, they have equity ftill. There is no tribunal to recur to by
the old government. There is none in the new for that purpofe. If
the old congrefs can fcale that money, they have this power ftill. But
he fays not, becaufe the ftates cannot impair the obligation of con-
tracts. What is to be done by the ftates with regard to it ? Congrefs,
and not they, have contracted to pay it. It is not affected by this claufe
at all. I am ftill a warm friend to the prohibition, becaufe it muft be
promotive of virtue and juftice, and preventive of injuftice and fraud.
If we take a review of the calamities which have befallen our reputati-
on as a people, we will find they have been produced by frequent in-
terferences of the ftate legiflatures with private contracts. If you in-
fpect the great corner ftone of republicanifm, you will find it to be
juftice and honour.

I come now to what will be agitated by the judiciary.—They are to
inforce the performance of private contracts. The Britifh debts, which
are withheld contrary to treaty, ought to be paid. Not only the law
of nations, but juftice and honor require that they be punctually dif-

charged. I fear their payment may prefs on my country, but we muft
retrench our fuperfluities, and profufe and idle extravagance, and be-
come more œconomical and induftrious. Let me not be fufpected of
being interefted in this refpect ; for without a fad reverfe of my for-
tune, I fhall never be in a fituation to be benefited by it.  I am confi-
dent the honeft convention of Virginia will not oppofe it.  Can any
fociety exift without a firm adherence to juftice and virtue ?  The fe-
deral judiciary cannot intermeddle with thofe public claims without vi-
olating the letter of the conftitution.  Why then fuch oppofition to the
claufe ?  His excellency then concluded, that he would, if neceffary,
difplay his feelings more fully on the fubject another time.

Mr. *George Mafon.*—Mr. Chairman—The debt is transferred to
congrefs, but not the means of paying it.  They cannot pay it any
other way than according to the nominal value :  For they are prohi-
bited from making *ex poft facto* laws ; and it would be *ex poft facto* to
all intents and purpofes, to pay off creditors with lefs than the nominal
fum, which they were originally promifed.  But the honorable gen-
tleman has called to his aid technical definitions.  He fays, that *ex poft
facto* laws relate folely to criminal matters.  I beg leave to differ from
him.  Whatever it may be at the bar, or in a profeffional line, I conceive,
that according to the common acceptation of the words, *ex poft facto*
laws, and retrofpective laws are fynonimous terms.  Are we to truft
bufinefs of this fort to technical definitions ?  The contrary is the plain
meaning of the words.  Congrefs has no power to fcale this money.
The ftates are equally precluded.  The debt is transferred without the
means of difcharging it.  Implication will not do.  The means of pay-
ing it are exprefsly withheld.  When this matter comes before the fe-
deral judiciary, they muft determine according to this conftitution.
It fays exprefsly, that they fhall not make *ex poft facto* laws.  Whatever
may be the profeffional meaning, yet the general meaning of *ex poft facto*
law, is, an act having a retrofpective operation.  This conftruction is
agreeable to its primary etymology.  Will it not be the duty of the fede-
ral court to fay, that fuch laws are prohibited ?  This goes to the deftruc-
tion and annihilation of all the citizens of the United States, to enrich
a few.  Are we to part with every fhilling of our property, and be
reduced to the loweft infignificance, to aggrandize a few fpeculators ?
Let me mention a remarkable effect this conftitution will have.  How
ftood our taxes before this conftitution was introduced ?  Requifitions
were made on the ftate legiflatures, and if they were unjuft, they could
be refufed.  If we were called upon to pay twenty millions, fhilling
for fhilling, or at the rate of one for forty, our legiflature could refufe
it, and remonftrate againft the injuftice of the demand.  But now this
could not be done ; for direct taxation is brought home to us.  The
federal officer collects immediately of the planters.  When it withholds
the only poffible means of difcharging thofe debts, and by direct tax-
ation prevents any oppofition to the moft enormous and unjuft demand,
where are you ?—Is there a ray of hope ?  As the law has never been
my profeffion, if I err, I hope to be excufed.  I fpoke from the ge-
neral fenfe of the word.  The worthy gentleman has told you, that the
United States can be plaintiffs, but never defendants.—If fo, it ftands
on very unjuft grounds.  The United States cannot be come at for a-
ny thing they may owe, but may get what is due to them.  There is

therefore no reciprocity. The thing is fo incomprehenfible, that it cannot be explained. As an exprefs power is given to the federal court to take cognizance of fuch controverfies, and to declare null all *ex poft facto* laws, I think gentlemen muft fee there is danger, and that it ought to be guarded againft.

Mr. *Madifon.*—Mr. Chairman—I did expect from the earneftnefs he has expreffed, that he would caft fome light upon it.—But the ingenuity of the honorable member could make nothing of this objection. He argues from a fuppofition that the ftate legiflatures individually, might have paffed laws to effect the value of the continental debt.   I believe he did not well confider this, before he hazarded his obfervations.   He fays, that the United States being reftrained in this cafe, will be obliged to pay it at an unjuft rate.   It has been fo clearly explained, by the honorable gentleman over the way, that there could be no danger, that it is unneceffary to fay more on the fubject.   The validity of thefe claims will neither be increafed or diminifhed by this change.— There muft be a law made by congrefs refpecting their redemption.   The ftates cannot interfere.—Congrefs will make fuch a regulation as will be juft. There is, in my opinion, but one way of fcaling improperly and unjuftly, and that is, by acceding to the favorite mode of the honorable gentleman—by requifitions.   Is it to be prefumed, any change can be made in the fyftem inconfiftent with reafon or equity ?   Strike the claufe out of the conftitution—what will it be then ? The debt will be as valid only, as it was before the adoption.   Gentlemen will not fay, that obligations are varied.   This is merely a declaratory claufe, that things are to exift in the fame manner as before.

But I fear the very extenfive affertions of the gentleman, may have mifled the committee.   The whole of that continental money amounted to but little more than one hundred millions.—A confiderable quantity of it has been deftroyed.—At the time when no fhare of it had been deftroyed, the quota of this ftate did not amount to more than twenty-fix millions.   At forty for one, this is but five hundred thoufand dollars at moft.   In every point of view it appears to me that it cannot be on a more reafonable, equitable, or honorable footing than it is.   Do gentlemen fuppofe, that they will agree to any fyftem or alteration, that will place them in a worfe fituation than before ?   Let us fuppofe this commonwealth was poffeffed of the fame money that the northern ftates have ; and fuppofe that an objection was made by them to its redemption at its real value—what would be the confequence ?   We fhould pronounce them to be unreafonable, and on good grounds.   This cafe is fo extremely plain, that it was unneceffary to fay as much as has been faid.

Mr. *Mafon* was ftill convinced of the rectitude of his former opinion. He thought it might be put on a fafer footing, by three words.   By continuing the reftriction of *ex poft facto* laws to crimes—It would then ftand under the new government as it did under the old.

Governor *Randolph* could not coincide with the conftruction put by the honorable gentleman on *ex poft facto* laws.   The technical meaning which confined fuch laws folely to criminal cafes, was followed in the interpretation of treaties between nations, and was concurred in by

all civilians. The prohibition of bills of attainder, he thought a suffi-
cient proof, that *ex post facto* laws related to criminal cafes only, and
that fuch was the idea of the convention.

[*The next claufe read.*]

Mr. *George Mafon.*—Mr. Chairman—If gentlemen attend to this
claufe, they will fee we cannot make any infpection-law but what is
fubject to the controul and revifion of congrefs. Hence gentlemen,
who know nothing of the bufinefs, will make rules concerning it, which
may be detrimental to our interefts. For forty years we have laid du-
ties on tobacco to defray the expences of the infpection and to raife an
incidental revenue for the ftate. Under this claufe that incidental re-
venue which is calculated to pay for the infpection, and to defray con-
tingent charges, is to be put into the federal treafury. But if any to-
bacco houfe is burnt, we cannot make up the lofs. I conceive this to
be unjuft and unreafonable—When any profit arifes from it, it goes
into the federal treafury.—But when there is any lofs or deficiency
from damage, it cannot be made up. Congrefs are to make regulati-
ons for our tobacco. Are the men in the ftates where no tobacco is
made, proper judges of this bufinefs? They may perhaps judge as
well, but furely not better than our own immediate legiflature, who
are accuftomed and familiar with this bufinefs. This is one of the
moft wanton powers of the General Government. I would concede
any power that was effentially neceffary for the interefts of the Union.
But this inftead of being neceffary, will be extremely oppreffive.

Mr. *George Nicholas*—Mr. Chairman.—I confider this claufe as a
good regulation. It will be agreed to that they will impofe duties in
the moft impartial manner, and not throw the burdens on a part of the
community. Every man who is acquainted with our laws, muft know
that the duties on tobacco were as high as fixteen fhillings a hogfhead.
The confequence was, that the tobacco-makers have paid upwards of
20,000 pounds, annually, more than the other citizens; becaufe they
paid every other kind of tax as well as the reft of the community. We
have every reafon to believe that this claufe will prevent injuftice and
impartiality.—Tobacco-makers will be benefited by it. But the gen-
tleman fays, that our tobacco regulations will be fubject to the con-
troul of congrefs, who will be unacquainted with the fubject. The
claufe fays, that all fuch laws fhall be fubject to the revifion and con-
troul of congrefs. What laws are meant by this?—It means laws im-
pofing duties on the exports of tobacco. But it does not follow, that
laws made for the regulation of the infpection fhall be fubject to the re-
vifion of congrefs. He may fay, that the laws for impofing duties on
the exports of tobacco, and laws regulating the infpection, muft be
blended in the fame acts. Give me leave to fay, that they need not be
fo: for the duties on exports might be in one law, and the regulation
of the infpection in another. The ftates may eafily make them fepa-
rately. But, he fays, we fhall loofe the profit. We fhall then find equity
in our legiflature, which we have not found heretofore: for as they will
lay it, not for their own exclufive advantage, but partly for the benefit
of others, they will not be interefted in laying it partially. As to the
effect of ware-houfes being burnt, I differ from him. ' A tax may be
laid to make up this lofs.—Though the amount of the duties go into the

( 343 )

federal treafury, yet a tax may be laid for that purpofe. Is it not ne-
ceffary and juft, if the infpection law obliges the planter to carry his to-
bacco to a certain place, that he fhould receive a compenfation for the
lofs, if it be deftroyed ? The legiflature muft defray the expences and
contingent charges by laying a tax for that purpofe: for fuch a tax is
not prohibited. The nett amounts only go into the federal treafury,
after paying the expences. Gentlemen muft be pleafed with this part,
efpecially thofe who are tobacco makers.

Mr. *George Mafon* replied, that the ftate legiflatures could make no
law but what would come within the general controul given to con-
grefs; and that the regulation of the infpection and the impofition of
duties, muft be infeparably blended together.

Mr. *Madifon.*—Mr. Chairman—Let us take a view of the relative
fituation of the ftates. Some ftates export the produce of other ftates.
Virginia exports the produce of North-Carolina ; Pennfylvania thofe
of Jerfey and Delaware ; and Rhode-Ifland thofe of Connecticut and
Maffachufetts. The exporting ftates wifhed to retain the power of
laying duties on exports, to enable them to pay the expences incurred.
The ftates whofe produce is exported by other ftates, were extremely
jealous, left a contribution fhould be raifed of them by the exporting
ftates, by laying heavy duties on their commodities. If this claufe be
fully confidered, it will be found to be more confiftent with juftice and
equity than any other practicable mode : For if the ftates had the ex-
clufive impofition of duties on exports, they might raife a heavy con-
tribution of the other ftates, for their own exclufive emoluments. The
honorable member who fpoke in defence of the claufe, has fairly re-
prefented it. As to the reimburfement of the lofs that may be fuftain-
ed by individuals, a tax may be laid on tobacco when brought to the
warehoufes, for that purpofe. The fum arifing therefrom may be ap-
propriated to it confiftently with the claufe. For it only fays, that
" the *nett* produce of all duties and impofts, laid by any ftate on im-
ports or exports, fhall be for the ufe of the treafury of the United States,"
which neceffarily implies that all contingent charges fhall have been
previoufly paid.

[ *The 1ft fection, of the 2d article, read.* ]

Mr. *George Mafon.*—Mr. Chairman—There is not a more impor-
tant article in the conftitution than this. The great fundamental prin-
ciple of refponfibility in republicanifm is here faped. The prefident
is elected without rotation.——It may be faid that a new election may
remove him, and place another in his ftead. If we judge from the
experience of all other countries, and even our own, we may conclude,
that as the prefident of the United States may be re-elected, fo he will.
How is it in every government where rotation is not required ? Is there
a fingle inftance of a great man not being re-elected ? Our governor
is obliged to return after a given period, to a private ftation. It is fo in
moft of the ftates. This prefident will be elected time after time——
He will be continued in office for life. If we wifh to change him, the
great powers in Europe will not allow us.

The honorable gentleman my colleague in the late federal conven-
tion, mentions with applaufe thofe parts of which he had expreffed his

difapprobation, he fays not a word. If I am miftaken, let me be put right. I fhall not make ufe of his name, but in the courfe of this inveftigation, I fhall ufe the arguments of that gentleman againft it.

Will not the great powers of Europe, as France and Great-Britain, be interefted in having a friend in the prefident of the United States; and will they not be more interefted in his election, than in that of the king of Poland? The people of Poland have a right to difplace their king. But do they ever do it? No. Pruffia and Ruffia, and other European powers, would not fuffer it. This claufe will open a door to the dangers and misfortunes which the people of Poland undergo. The powers of Europe will interpofe, and we fhall have a civil war in the bowels of our country, and be fubject to all the horrors and calamities of an elective monarchy. This very executive officer, may by confent of congrefs, receive a ftated penfion from European potentates. This is an idea not altogether new in America. It is not many years ago, fince the revolution, that a foreign power offered emoluments to perfons holding offices under our government. It will moreover be difficult to know, whether he receives emoluments from foreign powers or not. The electors who are to meet in each ftate to vote for him, may be eafily influenced. To prevent the certain evils of attempting to elect a new prefident, it will be neceffary to continue the old one. The only way to alter this, would be to render him ineligible after a certain number of years, and then no foreign nation would interfere to keep *in* a man who was utterly ineligible. Nothing is fo effential to the prefervation of a republican government, as a periodical rotation. Nothing fo ftrongly impels a man to regard the intereft of his conftituents, as the certainty of returning to the general mafs of the people, from whence he was taken; where he muft participate their burdens. It is a great defect in the fenate, that they are not ineligible at the end of fix years. The biennial exclufion of one third of them, will have no effect, as they can be re-elected. Some ftated time ought to be fixed, when the prefident ought to be reduced to a private ftation. I fhould be contented that he might be elected for eight years: But I would wifh him to be capable of holding the office only eight years, out of twelve or fixteen years. But as it now ftands, he may continue in office for life; or in other words, it will be an elective monarchy.

Governor *Randolph.*—Mr. Chairman—The honorable gentleman laft up, fays that I do not mention the parts to which I object. I have hitherto mentioned my objections with freedom and candour. But, fir, I confidered that our critical fituation rendered adoption neceffary, were it even more defective than it is. I obferved, that if opinions ought to lead the committee on one fide, they ought on the other. Every gentleman who has turned his thoughts to the fubject of politics, and has confidered of the moft eligible mode of republican government, agrees that the greateft difficulty arifes from the executive, as to the time of his election, mode of his election, quantum of power, &c. I will acknowledge that at one ftage of this bufinefs, I had embraced the idea of the honorable gentleman, that the re-eligibility of the prefident was improper. But I will acknowledge, that on a further confideration of the fubject, and attention to the lights which were thrown upon it by others, I altered my opinion of the limitation of his eligibili-

ty. When we confider the advantages arifing to us from it, we cannot object to it. That which has produced my opinion againft the limitation of his eligibility, is this—that it renders him more independent in his place, and more folicitous of promoting the intereft of his conftituents: For, unlefs you put it in his power to be re-elected, inftead of being attentive to their interefts, he will lean to the augmentation of his private emoluments. This fubject will admit of high colouring and plaufible arguments ; but on confidering it attentively and cooly, I believe it will be found lefs exceptionable than any other mode. The mode of election here, excludes that faction which is productive of thofe hoftilities and confufion in Poland. It renders it unneceffary and impoffible for foreign force or aid to interpofe. The electors muft be elected by the people at large. To procure his re-election his influence muft be co-extenfive with the continent. And there can be no combination between the electors, as they elect him on the fame day in every ftate. When this is the cafe, how can foreign influence or intrigues enter ? There is no reafon to conclude, from the experience of thefe ftates, that he will be continually re-elected. There has been feveral inftances, where officers have been difplaced where they were re-eligible. This has been the cafe with the executive of Maffachufets, and I believe of New-Hampfhire. It happens from the mutation of fentiments though the officers be good.

There is another provifion againft the danger mentioned by the honorable member, of the prefident receiving emoluments from foreign powers. If difcovered he may be impeached. If he be not impeachable he may be difplaced at the end of the four years. By the ninth fection, of the firft article, " No perfon holding an office of profit or truft, fhall accept of any prefent or emolument whatever, from any foreign power, without the confent of the reprefentatives of the people;" and by the firft fection, of the fecond article, his compenfation is neither to be increafed or diminifhed, during the time for which he fhall have been elected; and he fhall not, during that period, receive any emolument from the United States or any of them. I confider, therefore, that he is reftrained from receiving any prefent or emoluments whatever. It is impoffible to guard better againft corruption. The honorable member feems to think, that he may hold his office without being re-elected. He cannot hold over four years, unlefs he be re-elected, any more than if he were prohibited. As to forwarding and tranfmitting the certificates of the electors, I think the regulation as good as could be provided.

Mr. *George Mafon.*—Mr. Chairman—The vice-prefident appears to me to be not only an unneceffary but a dangerous officer. He is, contrary to the ufual courfe of parliamentary proceedings, to be prefident of the fenate. The ftate from which he comes may have two votes, when the others will have but one. Befides, the legiflative and executive are hereby mixed and incorporated together. I cannot at this diftance of time forefee the confequences ; but I think, that in the courfe of human affairs, he will be made a tool of in order to bring about his own intereft, and aid in overturning the liberties of his country. There is another part which I difapprove of, but which perhaps

U 2.

## ( 346 )

I do not underſtand. " In caſe of removal of the preſident from office, or of his death, reſignation, or inability to diſcharge the powers and duties of the ſaid office, the ſame ſhall devolve on the vice-preſident, and the congreſs may by law provide for the caſe of removal, death, reſignation, or inability both of the preſident and vice-preſident, declaring what officer ſhall then act as preſident; and ſuch officer ſhall act accordingly, until the diſability be removed, or a preſident ſhall be elected."——The power of congreſs is right and proper ſo far as it enables them to provide what officer ſhall act, in caſe both the preſident and vice-preſident be dead or diſabled. But gentlemen ought to take notice that the election of this officer is only for four years. There is no proviſion for a ſpeedy election of another preſident, when the former is dead or removed. The influence of the vice-preſident may prevent the election of the preſident.——But perhaps I may be miſtaken.

Mr. *Madiſon.*—Mr. Chairman—I think there are ſome peculiar advantages incident to this office, which recommend it to us. There is in the firſt place a great probability this officer will be taken from one of the largeſt ſtates, and if ſo, the circumſtance of his having an eventual vote will be ſo far favorable. The conſideration which recommends it to me, is, that he will be the choice of the people at large. There are to be ninety-one electors, each of whom has two votes : If he have one-fourth of the whole number of votes, he is elected vice-preſident. There is much more propriety in giving this office to a perſon choſen by the people at large, than to one of the ſenate who is only the choice of the legiſlature of one ſtate. His eventual vote is an advantage too obvious to comment upon. I differ from the honorable member in the caſe which enables the congreſs to make a temporary appointment. When the preſident and vice-preſident die, the election of another preſident will immediately take place, and ſuppoſe it would not, all that congreſs could do, would be to make an appointment between the expiration of the four years and the laſt election, and to continue only till ſuch expiration. This can rarely happen. This power continues the government in motion, and is well guarded.

The committee then roſe—and on motion, *Reſolved*, That this convention will, to-morrow, again reſolve itſelf into a committee of the whole convention, to take into farther conſideration, the propoſed conſtitution of government.

And then the convention adjourned until to-morrow morning nine o'clock.

### WEDNESDAY, THE 18th OF JUNE, 1788.

The convention according to the order of the day, again reſolved itſelf into a committee of the whole convention, to take into farther conſideration, the propoſed plan of government.——Mr. *Wythe* in the chair.

[ *The* 1ſt *ſection, of the* 2d *article, ſtill under conſideration.* ]

Mr. *Monroe,* after a brief exordium, in which he inſiſted, that on the judicious organization of the executive power, the ſecurity of our

# THE RECORDS

OF THE

# FEDERAL CONVENTION

## of 1787

*EDITED BY*

## MAX FARRAND

PROFESSOR OF HISTORY IN YALE UNIVERSITY

VOLUME I

NEW HAVEN: YALE UNIVERSITY PRESS

LONDON: HENRY FROWDE

OXFORD UNIVERSITY PRESS

MCMXI

# WEDNESDAY, JUNE 6, 1787.

### JOURNAL

### Wednesday June 6. 1787.

The Order of the day being read.

The House resolved itself into a Committee of the whole House to consider of the State of the American Union

Mr President left the Chair.

Mr. Gorham took the Chair of the Committee

Mr President resumed the Chair

Mr Gorham reported from the Committee that the Committee had made a further progress in the matter to them referred; and had directed him to move that they may have leave to sit again.

Resolved that this House will to-morrow again resolve itself into a Committee of the whole House to consider of the State of the american union.

And then the House adjourned till to-morrow at 11 o'Clock A. M.

### In a Committee of the whole House

### Wednesday June 6. 1787.

### Mr Gorham in the Chair

It was moved by Mr C. Pinckney seconded by Mr Rutledge to strike the word "people" out of the 4th resolution submitted by Mr Randolph, and to insert in it's place the word

"Legislatures" so as to read "resolved that the Members "of the first branch of the national legislature ought to be "elected by the Legislatures of the several states"

and On the question to strike out

it passed in the negative   [Ayes — 3; noes — 8.] [1]

---

[1] Vote 29, Detail of Ayes and Noes.

*Wednesday*                         JOURNAL                         *June 6*

On motion of Mr Wilson seconded by Mr Madison to amend the         resolution, which respects the negative to be vested in the national executive by adding after the words "national executive" the words

"with a convenient number of the national Judiciary"
On the question to agree to the addition of these words
        it passed in the negative.  [Ayes — 3; noes — 8.][2]

Mr C. Pinckney gave notice that to-morrow he should move for the reconsideration of that clause in the         resolution, adopted by the Committee, which vests a negative in the national legislatute on the laws of the several States.  friday assigned to reconsider

It was then moved and seconded that the Committee do now rise, report a further progress, and request leave to sit again.

The Committee then rose.

DETAIL OF AYES AND NOES

[Beginning of second loose sheet]

| | New Hampshire | Massachusetts | Rhode Island | Connecticut | New York | New Jersey | Pennsylvania | Delaware | Maryland | Virginia | North Carolina | South Carolina | Georgia | Questions | Ayes | Noes | Divided |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [29] | no | | aye | no | aye | no | no | no | no | no | aye | no | for striking out the words "people" in the first clause of the 4th resolution and inserting the words "Legislatures | 3 | 8 | |
| [30] | no | | aye | aye | no | no | no | no | aye | no | no | no | for adding a convenient number of the national Judiciary to the Executive in the exercise of the negative | 3 | 8 | |

[2] Vote 30, Detail of Ayes and Noes.

| *Wednesday* | MADISON | *June 6* |

# MADISON

Wednesday June 6th.   In Committee of the whole

Mr. Pinkney according to previous notice & rule obtained, moved "that the first branch of the national Legislature be elected by the State Legislatures, and not by the people". contending that the people were less fit Judges ⟨in such a case,⟩ and that the Legislatures would be less likely to promote the adoption of the new Government, if they were to be excluded from all share in it.[3]

Mr. Rutlidge 2ded. the motion.

Mr. Gerry.   Much depends on the mode of election.   In England, the people will probably lose their liberty from the smallness of the proportion having a right of suffrage.   Our danger arises from the opposite extreme: hence in Massts. the worst men get into the Legislature.   Several members of that Body had lately been convicted of infamous crimes.   Men of indigence, ignorance & baseness, spare no pains however dirty to carry their point agst. men who are superior to the artifices practiced.   He was not disposed to run into extremes. He was as much principled as ever agst. aristocracy and monarchy.   It was necessary on the one hand that the people should appoint one branch of the Govt. in order to inspire them with the necessary confidence.   But he wished the election on the other to be so modified as to secure more effectually a just preference of merit.   His idea was that the people should nominate certain persons in certain districts, out of whom the State Legislatures shd. make the appointment.

Mr. Wilson.   He wished for vigor in the Govt. but he wished that vigorous authority to flow immediately from the legitimate source of all authority.   The Govt. ought to possess not only 1st. the *force* but 2ndly. the *mind or sense* of the people at large.   The Legislature ought to be the most exact transcript of the whole Society.   Representation is made neces-

---

[3] See Appendix A, CCXXXVII, CCXXXVIII.

| *Wednesday* | MADISON | *June 6* |
|---|---|---|

sary only because it is impossible for the people to act collectively. The opposition was to be expected he said from the *Governments,* not from the Citizens of the States. The latter had parted as was observed (by Mr. King) with all the necessary powers; and it was immaterial to them, by whom they were exercised, if well exercised. The State officers were to be losers of power. The people he supposed would be rather more attached to the national Govt. than to the State Govts. as being more important in itself, and more flattering to their pride. There is no danger of improper elections if made by *large* districts. Bad elections proceed from the smallness of the districts which give an opportunity to bad men to intrigue themselves into office.

Mr. Sherman. If it were in view to abolish the State Govts. the elections ought to be by the people. If the State Govts. are to be continued, it is necessary in order to preserve harmony between the national & State Govts. that the elections to the former shd. be made by the latter. The right of participating in the National Govt. would be sufficiently secured to the people by their election of the State Legislatures. The objects of the Union, he thought were few. 1. defence agst. foreign danger. 2. agst. internal disputes & a resort to force. 3. Treaties with foreign nations 4 regulating foreign commerce, & drawing revenue from it. These & perhaps a few lesser objects alone rendered a Confederation of the States necessary. All other matters civil & criminal would be much better in the hands of the States. The people are more happy in small than large States. States may indeed be too small as Rhode Island, & thereby be too subject to faction. Some others were perhaps too large, the powers of Govt not being able to pervade them. He was for giving the General Govt. power to legislate and execute within a defined province.

Col. Mason. Under the existing Confederacy, Congs. represent the *States* not the *people* of the States: their acts operate on the *States* not on the individuals. The case will be changed in the new plan of Govt. The people will be represented; they ought therefore to choose the Representatives. The requisites in actual representation are that the

Reps. should sympathize with their constituents; shd. think as they think, & feel as they feel; and that for these purposes shd. even be residents among them.   Much he sd. had been alledged agst. democratic elections.   He admitted that much might be said; but it was to be considered that no Govt. was free from imperfections & evils; and that improper elections in many instances, were inseparable from Republican Govts. But compare these with the advantage of this Form in favor of the rights of the people, in favor of human nature.   He was persuaded there was a better chance for proper elections by the people, if divided into large districts, than by the State Legislatures.   Paper money had been issued by the latter when the former were against it.   Was it to be supposed that the State Legislatures then wd. not send to the Natl. legislature patrons of such projects. if the choice depended on them.

Mr. Madison considered an election of one branch at least of the Legislature by the people immediately, as a clear principle of free Govt. and that this mode under proper regulations had the additional advantage of securing better representatives, as well as of avoiding too great an agency of the State Governments in the General one. — He differed from the member from Connecticut (Mr. Sherman) in thinking the objects mentioned to be all the principal ones that required a National Govt.   Those were certainly important and necessary objects; but he combined with them the necessity, of providing more effectually for the security of private rights, and the steady dispensation of Justice.   Interferences with these were evils which had more perhaps than any thing else, produced this convention.   Was it to be supposed that republican liberty could long exist under the abuses of it practiced in ⟨some of⟩ the States.   The gentleman (Mr. Sherman) had admitted that in a very small State, faction & oppression wd. prevail.   It was to be inferred then that wherever these prevailed the State was too small.   Had they not prevailed in the largest as well as the smallest tho' less than in the smallest; and were we not thence admonished to enlarge the sphere as far as the nature of the Govt. would admit.   This was the

*Wednesday*                 MADISON                 *June 6*

only defence agst. the inconveniences of democracy consistent with the democratic form of Govt. All civilized Societies would be divided into different Sects, Factions, & interests, as they happened to consist of rich & poor, debtors & creditors, the landed the manufacturing, the commercial interests, the inhabitants of this district, or that district, the followers of this political leader or that political leader, the disciples of this religious sect or that religious sect. In all cases where a majority are united by a common interest or passion, the rights of the minority are in danger. What motives are to restrain them? A prudent regard to the maxim that honesty is the best policy is found by experience to be as little regarded by bodies of men as by individuals. Respect for character is always diminished in proportion to the number among whom the blame or praise is to be divided. Conscience, the only remaining tie is known to be inadequate in individuals: In large numbers, little is to be expected from it. Besides, Religion itself may become a motive to persecution & oppression.—These observations are verified by the Histories of every Country antient & modern. In Greece & Rome the rich & poor, the creditors & debtors, as well as the patricians & plebeians alternately oppressed each other with equal unmercifulness. What a source of oppression was the relation between the parent Cities of Rome, Athens & Carthage, & their respective provinces: the former possessing the power & the latter being sufficiently distinguished to be separate objects of it? Why was America so justly apprehensive of Parliamentary injustice? Because G. Britain had a separate interest real or supposed, & if her authority had been admitted, could have pursued that interest at our expense. We have seen the mere distinction of colour made in the most enlightened period of time, a ground of the most oppressive dominion ever exercised by man over man. What has been the source of those unjust laws complained of among ourselves? Has it not been the real or supposed interest of the major number? Debtors have defrauded their creditors. The landed interest has borne hard on the mercantile interest. The Holders of one species of property have thrown a disproportion of taxes

136   RECORDS OF THE FEDERAL CONVENTION

| *Wednesday* | MADISON | *June 6* |

on the holders of another species. The lesson we are to draw from the whole is that where a majority are united by a common sentiment and have an opportunity, the rights of the minor party become insecure. In a Republican Govt. the Majority if united have always an opportunity. The only remedy is to enlarge the sphere, & thereby divide the community into so great a number of interests & parties, that in the 1st. place a majority will not be likely at the same moment to have a common interest separate from that of the whole or of the minority; and in the 2d. place, that in case they shd. have such an interest, they may not be apt to unite in the pursuit of it. It was incumbent on us then to try this remedy, and with that view to frame a republican system on such a scale & in such a form as will controul all the evils wch. have been experienced.[4]

Mr. Dickinson considered it as essential that one branch of the Legislature shd. be drawn immediately from the people; and as expedient that the other shd. be chosen by the Legislatures of the States. This combination of the State Govts. with the National Govt. was as politic as it was unavoidable. In the formation of the Senate we ought to carry it through such a refining process as will assimilate it as near as may be to the House of Lords in England. He repeated his warm eulogiums on the British Constitution. He was for a strong National Govt. but for leaving the States a considerable agency in the System. The objection agst. making the former dependent on the latter might be obviated by giving to the Senate an authority permanent & irrevocable for three, five or seven years. Being thus independent they will speak & decide with becoming freedom.

Mr. Read. Too much attachment is betrayed to the State Govermts. We must look beyond their continuance. A national Govt. must soon of necessity swallow all of them up. They will soon be reduced to the mere office of electing the national Senate. He was agst. patching up the old federal System: he hoped the idea wd. be dismissed. It would be

---

[4] See June 4, note 25.

*Wednesday*                   MADISON                   *June 6*

like putting new cloth on an old garment.   The confederation was founded on temporary principles.   It cannot last: it cannot be amended.   If we do not establish a good Govt. on new principles, we must either go to ruin, or have the work to do over again.   The people at large are wrongly suspected of being averse to a Genl. Govt.   The aversion lies among interested men who possess their confidence.

Mr. Pierce was for an election by the people as to the 1st. branch & by the States as to the 2d. branch; by which means the Citizens of the States wd. be represented both *individually & collectively*.

General Pinkney wished to have a good national Govt. & at the same time to leave a considerable share of power in the States.   An election of either branch by the people scattered as they are in many States, particularly in S. Carolina was totally impracticable.   He differed from gentlemen who thought that a choice by the people wd. be a better guard agst. bad measures, than by the Legislatures.   A majority of the people in S. Carolina were notoriously for paper money as a legal tender; the Legislature had refused to make it a legal tender.   The reason was that the latter had some sense of character and were restrained by that consideration.   The State Legislatures also he said would be more jealous, & more ready to thwart the National Govt. if excluded from a participation in it.   The Idea of abolishing these Legislatures wd. never go down.

Mr. Wilson, would not have spoken again, but for what had fallen from Mr. Read; namely, that the idea of preserving the State Govts. ought to be abandoned.   He saw no incompatability between the national & State Govts. provided the latter were restrained to certain local purposes; nor any probability of their being devoured by the former.   In all confederated systems antient & modern the reverse had happened; the Generality being destroyed gradually by the usurpations of the parts composing it.

On the question for electing the 1st. branch by the State Legislatures as moved by Mr. Pinkney; ⟨it was negatived:⟩

Mass no. Ct. ay. N. Y. no. N. J. ay. Pa. no. Del. no. Md.

138    RECORDS OF THE FEDERAL CONVENTION

| *Wednesday* | MADISON | *June 6* |

no. Va. no. N. C. no. S. C. ay. Geo. no.  [Ayes — 3; noes — 8.]

Mr. Wilson moved to reconsider the vote excluding the Judiciary from a share in the revision of the laws, and to add after "National Executive" the words "with a convenient number of the national Judiciary"; remarking the expediency of reinforcing the Executive with the influence of that Department.

Mr. Madison 2ded. the motion.  He observed that the great difficulty in rendering the Executive competent to its own defence arose from the nature of Republican Govt. which could not give to an individual citizen that settled pre-eminence in the eyes of the rest, that weight of property, that personal interest agst. betraying the National interest, which appertain to an hereditary magistrate.  In a Republic personal merit alone could be the ground of political exaltation, but it would rarely happen that this merit would be so pre-eminent as to produce universal acquiescence.  The Executive Magistrate would be envied & assailed by disappointed competitors:  His firmness therefore wd. need support.  He would not possess those great emoluments from his station, nor that permanent stake in the public interest which wd. place him out of the reach of foreign corruption:  He would stand in need therefore of being controuled as well as supported.  An association of the Judges in his revisionary function wd both double the advantage and diminish the danger.  It wd. also enable the Judiciary Department the better to defend itself agst. Legislative encroachments.  Two objections had been made 1st. that the Judges ought not to be subject to the bias which a participation in the making of laws might give in the exposition of them.   2dly. that the Judiciary Departmt. ought to be separate & distinct from the other great Departments.   The 1st. objection had some weight; but it was much diminished by reflecting that a small proportion of the laws coming in question before a Judge wd. be such wherein he had been consulted; that a small part of this proportion wd. be so ambiguous as to leave room for his prepossessions; and that but a few cases wd. probably arise in the life of a Judge under

| *Wednesday* | MADISON | *June 6* |
|---|---|---|

such ambiguous passages. How much good on the other hand wd. proceed from the perspicuity, the conciseness, and the systematic character wch. the Code of laws wd. receive from the Judiciary talents. As to the 2d. objection, it either had no weight, or it applied with equal weight to the Executive & to the Judiciary revision of the laws. The maxim on which the objection was founded required a separation of the Executive as well as of the Judiciary from the Legislature & from each other. There wd. in truth however be no improper mixture of these distinct powers in the present case. In England, whence the maxim itself had been drawn, the Executive had an absolute negative on the laws; and the supreme tribunal of Justice (the House of Lords) formed one of the other branches of the Legislature. In short, whether the object of the revisionary power was to restrain the Legislature from encroaching on the other co-ordinate Departments, or on the rights of the people at large; or from passing laws unwise in their principle, or incorrect in their form, the utility of annexing the wisdom and weight of the Judiciary to the Executive seemed incontestable.[5]

Mr. Gerry thought the Executive, whilst standing alone wd. be more impartial than when he cd. be covered by the sanction & seduced by the sophistry of the Judges

Mr. King. If the Unity of the Executive was preferred for the sake of responsibility, the policy of it is as applicable to the revisionary as to the Executive power.

Mr. Pinkney had been at first in favor of joining the heads of the principal departmts. the Secretary at War, of foreign affairs & — in the council of revision. He had however relinquished the idea from a consideration that these could be called on by the Executive Magistrate whenever he pleased to consult them. He was opposed to an introduction of the Judges into the business.

Col Mason was for giving all possible weight to the revisionary institution. The Executive power ought to be well secured agst. Legislative usurpations on it. The purse & the

---

[5] See June 4 note 25.

| *Wednesday* | YATES | *June 6* |
|---|---|---|

sword ought never to get into the same hands ⟨whether Legislative or Executive.⟩

Mr. Dickinson.   Secrecy, vigor & despatch are not the principal properties reqd. in the Executive.   Important as these are, that of responsibility is more so, which can only be preserved; by leaving it singly to discharge its functions.   He thought too a junction of the Judiciary to it, involved an improper mixture of powers.

Mr Wilson remarked, that the responsibility required belonged to his Executive duties.   The revisionary duty was an extraneous one, calculated for collateral purposes.

Mr. Williamson, was for substituting a clause requiring ⅔ for every effective act of the Legislature, in place of the revisionary provision

On the question for joining the Judges to the Executive in the revisionary business Mass. no. Cont. ay. N. Y. ay. N. J. no. Pa. no. Del. no. Md. no. Va. ay. N. C. no. S. C. no. Geo. no.   [Ayes — 3; noes — 8.]

⟨Mr. Pinkney gave notice [6] that to morrow he should move for the reconsideration of that clause in the sixth Resolution adopted by the Comme. which vests a negative in the National Legislature on the laws of the several States.

The Come rose & the House adjd. to 11 OC.[7]

## YATES

### WEDNESDAY, JUNE 6th, 1787.

Met pursuant to adjournment.

Mr. Pinkney moved (pursuant to a standing order for re-consideration) that in the 4th resolve, the words *by the people*, be expunged, and the words *by the legislature*, be inserted.

Mr. Gerry. — If the national legislature are appointed by the state legislatures, demagogues and corrupt members will creep in.

---

[6] Taken from *Journal.*
[7] See further Appendix A, XXXVI–XXXVIII*a.*

# THE RECORDS

## OF THE

# FEDERAL CONVENTION

## of 1787

*EDITED BY*

## MAX FARRAND

PROFESSOR OF HISTORY IN YALE UNIVERSITY

Volume I

NEW HAVEN: YALE UNIVERSITY PRESS

LONDON: HENRY FROWDE

OXFORD UNIVERSITY PRESS

MCMXI

*Saturday*                    PATERSON                    *June 16*

bination of Parts — Orders — States — Proportion of Votes — State-Politicks and Attachments — Great Britain and America

Objns. The larger States contribute most, and therefore Representn. ought to be in Proportion —

No — they have more to protect.

A rich State and poor State in same Relation as a rich individual and a poor one.[19a] 2. For the Sake of preserving the Liberty of the others —

3. Wealth will have its Influence —

Objn. — Mr. Wilson — first Principles — All Authority derived from the People — The People entitled to exercise Authority in Person. One free Citizen ought to be of equal Importance with another — true — One free State of equal Importance with another — Both true when properly applied. The Beauty of all Knowledge consists in the Application —

A large County and a small County[19a] — One free Citizen ought to be of equal Importance with another — they are Members of the Society, and therefore true — England and Switzerland. Pennsylva. and Jersey — they have the same Privileges, partake in the same common Stock, for Instance, in back and unlocated Lands. The Genn. soon found out the Diffe. between a Pennsylva. and a Jersey-Man when we talked of Consolidn. then the Pennsyla. gave up $\frac{1}{3}$ — No; no — A Nation, when it is necessary to go by Majority of Votes, a State, when it is necessary to divide the common Stock —

Equalize the States — No Harm — no Hurt. No authority for that Purpose — and then it is impracticable —

*Authority* — Why talk of the first set of Propositions —

Impracticable — how does that appear — Make the Experiment — Propose the Measure to the Consideration of the States —

Objn. — There must be a national Governmt. to operate individually upon the People in the first Instance, and not upon the States — and therefore a Representation from the People at Large and not from the States —

1. Will the Operation and Force of the Govt. depend upon the mode of Representn. — No — it will depend upon the Quantum of Power lodged in the leg. ex. and judy. Depart-

*Saturday*                    WILSON                    *June 16*

ments — it will operate individually in the one Case as well as in the other —

2. Congress are empowered to act individually or to carry the Reqt. into Execn. in the same Manner as is set forth in the first Plan —

3. If not, it may be modified to answer the Purpose.

4. If it cannot be done, better than to have some States devoured by others —

Objn. — Congress not sufficient — there must be two Branches — a House of Delegates and a Senate; why, they will be a Check — This not applicable to the supreme Council of the States — The Representatives from the several States are Checks upon each other.

In a single State Party Heat and Spirit may pervade the whole, and a single Branch may of a sudden do a very improper Act — A second Branch gives Time for Reflexion; the Season of Calmness will return, etc. Is this likely to be the Case among the Representatives of 13 States —

What is the Fact — Congress has hitherto conducted with great Prudence and Sagacity — the People have been satisfied — Give Congress the same Powers, that you intend to give the two Branches, and I apprehend they will act with as much Propriety and more Energy than the latter.

The Chance for Wisdom greater — Refinement — Secretion —

The Expence will be enormous —

Congress the Sun of our political World.

### W I L S O N

### [A — 1] [20]

### Propositions

from Virginia                         from New Jersey

1. A Legislature consisting of    1. A single Legislature.
two or three branches

---

[20] This document was found among the Wilson papers in the Library of the Historical Society of Pennsylvania. It is evidently an outline of Wilson's speech of this

*Saturday*                       WILSON                       *June 16*

| | |
|---|---|
| 2. On the original Authority of the People | 2. On the derivative Authority of the Legislatures of the States |
| 3. Representation of Citizens according to Numbers and Importance | 3. Representation of States without Regard to Numbers and Importance |
| 4. A single Executive Magistrate. | 4. More than one Executive Magistrate. |
| 5. A Majority empowered to act | 5. A small Minority able to control |
| 6. The national Legislature to legislate in all Cases to which the State Legislatures are incompetent, or in which the Harmony of the Union may be interrupted. | 6. The United States in Congress vested with additional Powers only in a few inadequate Instances. |
| 7. To negative Laws contrary to the Union or Treaties | 7. To call forth the Powers of the confederated States in order [21] to compel Obedience. |
| 8. Executive removeable on Impeachment and Conviction. | 8. ——— by Congress on Application by a Majority of the Executives of the States. |
| 9. The Executive to have a qualified Negative | 9. ——— to have none. |

day. There is also a preliminary draft which differs from this document mainly in the order of arrangement of the various items.

In the preliminary draft there was a sort of headline:

"I Proper Powers — A Body in which they may be safely lodged". And the first three items were in the order — 2, 3, 1.

[21] Crossed out in the preliminary draft: "To punish Opposition by calling".

*Saturday*                    WILSON                    *June 16*

10. Provision made for in-     10 ——— None
    ferior national Tribunals

11. The Jurisdiction of the    11 ——— Only by Appeal in
    national Tribunal to ex-       the dernier Resort.
    tend to Cases of national
    Revenue.

12. ——— to Questions that      12 ——— Only limited and
    may involve the national       appellate Jurisdiction.
    Peace

13. The national Govern-       13. The Alterations in the
    ment to be ratified under      Confederation must be
    the authority of the Peo-      confirmed by the "Legis-
    ple by Delegates expressly     latures of every State"
    appointed for that Pur-
    pose.

[A — 2] [22]

Consider the different Points
in Question — 1. on Principle
— 2. on the declared Sense of
the Committee — 3. By some
striking Instances, which may
happen, if the Plan from New-
Jersey be adopted.

Uncertain what the Sense
of the People is on several
Points —

Reasons why it should be in
Favour of national Govern-
ment — 1. from Interest — 2.
from Honour.

Distinction between Citizens
and State-Officers.

---

[22] The original document is written on the first three pages of a single folded
sheet.   A–2 is written on the first inside page opposite A–3.

*Saturday*                    WILSON                    *June 16*

Uncertain how long the present Opinion of the People may continue unaltered.

But we mean that our Plan of national Government shall stand or fall by their Opinion.

In forming a Government for the United States two great Objects demand our Attention — 1. That proper Powers be given — 2. That the different Departments of Government be so instituted and arranged that proper Powers may, with Safety, be lodged in them.

The Plan from New-Jersey is liable to three general Objections

[A — 3] [22]

No. 1. 4. 5.)

1. The Government is instituted in an improper Manner —

To secure the Constitution the Legislature must be restrained: It can be restrained only in its Operations: That can be accomplished only by dividing it into distinct and independent Branches.

— legislative Authority single

— executive divided

2. It flows from an illegitimate Sources, the Legislative and Executive Powers of the States, and not the People at large.

No. 2. 3. 13.)

| Saturday | WILSON | June 16 |
|----------|--------|---------|

|  |  |
|--|--|
|  | Inequality of Representation —<br>— Great Britain —<br>Experience of the United States.<br>— Solomon. |
| No. 6. 7. 8. 9. 10. 11. 12.) | 3. It provides not sufficiently for the true Ends of Government.<br><br>The legislative and executive Powers are too feeble and dependent ——<br><br>They and the judicial Power are too confined.<br><br>II. What |

# MONDAY, JUNE 18, 1787.

## JOURNAL
### Monday June 18. 1787.

The Order of the day being read.

The House resolved itself into a Committee of the whole House to consider of the State of the American Union

Mr President left the Chair

Mr Gorham took the Chair of the Committee

Mr President resumed the Chair.

Mr Gorham reported from the Committee that the Committee had made a further progress in the matter to them referred: and had directed him to move that they may have leave to sit again

Resolved that this House will to-morrow again resolve itself into a Committee of the whole House to consider of the state of the american Union.

and then the House adjourned till to-morrow at 11 oClock A. M.

### In a Committee of the whole House
### Monday June 18. 1787
### Mr Gorham in the Chair.

It was moved by Mr Dickinson seconded by            to postpone the consideration of the first resolution submitted by Mr Paterson namely. in order to introduce the following.

"Resolved that the articles of confederation ought to be "revised and amended, so as to render the government of "the United States adequate to the Exigencies, the preserva-"tion, and the prosperity of the Union."

And on the question to agree to the same it passed in the affirmative [Ayes — 10; noes — 0; divided — 1.][1]

---

[1] Vote 64, Detail of Ayes and Noes.

281

| | |
|---|---|
| *Monday* | MADISON | *June 18* |

It was then moved and seconded that the Committee do now rise, report a further progress, and request leave to sit again
The Committee then rose.

### DETAIL OF AYES AND NOES

[Beginning of third loose sheet]

| | New Hampshire | Massachusetts | Rhode Island | Connecticut | New York | New Jersey | Pennsylvania | Delaware | Maryland | Virginia | North Carolina | South Carolina | Georgia | Questions | Ayes | Noes | Divided |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [64] | aye | | | aye | aye | aye | dd | aye | aye | aye | aye | aye | aye | To postpone the first resolution offered by Mr Patterson in order to take up Mr. Dickinson's motion | 10 | | 1 |

## MADISON

Monday June 18. in Committee of the whole. on the propositions of Mr. Patterson & Mr. Randolph.

⟨On motion of Mr. Dickinson to postpone the 1st. Resolution in Mr. Patterson's plan, in order to take up the following. viz: "that the articles of confederation ought to be revised and amended so as to render the Government of the U. S. adequate to the exigencies, the preservation and the prosperity of the union."  the postponement was agreed to by 10 States, Pen: divided.)[2]

Mr. Hamilton, had been hitherto silent on the business before the Convention, partly from respect to others whose superior abilities age & experience rendered him unwilling to bring forward ideas dissimilar to theirs, and partly from his delicate situation with respect to his own State, to whose sentiments as expressed by his Colleagues, he could by no means accede.  The crisis however which now marked our affairs, was too serious to permit any scruples whatever to prevail

---

[2] Taken from *Journal.*

over the duty imposed on every man to contribute his efforts for the public safety & happiness. He was obliged therefore to declare himself unfriendly to both plans. He was particularly opposed to that from N. Jersey, being fully convinced, that no amendment of the confederation, leaving the States in possession of their sovereignty could possibly answer the purpose. On the other hand he confessed he was much discouraged by the amazing extent of Country in expecting the desired blessings from any general sovereignty that could be substituted. — As to the powers of the Convention, he thought the doubts started on that subject had arisen from distinctions & reasonings too subtle.[3] A *federal* Govt. he conceived to mean an association of independent Communities into one. Different Confederacies have different powers, and exercise them in different ways. In some instances the powers are exercised over collective bodies; in others over individuals. as in the German Diet — & among ourselves in cases of piracy. Great latitude therefore must be given to the signification of the term. The plan last proposed departs itself from the *federal* idea, as understood by some, since it is to operate eventually on individuals. He agreed moreover with the Honble. gentleman from Va. (Mr. R.) that we owed it to our Country, to do on this emergency whatever we should deem essential to its happiness. The States sent us here to provide for the exigences of the Union. To rely on & propose any plan not adequate to these exigences, merely because it was not clearly within our powers, would be to sacrifice the means to the end. It may be said that the *States* can not *ratify* a plan not within the purview of the article of Confederation providing for alterations & amendments. But may not the States themselves in which no constitutional authority equal to this purpose exists in the Legislatures, have had in view a reference to the people at large. In the Senate of N. York, a proviso was moved, that no act of the Convention should be binding untill it should be referred to the people & ratified; and the motion was lost by a single voice only, the reason

---

[3] See above June 16, note 2.

| *Monday* | MADISON | *June 18* |
|---|---|---|

assigned agst. it, being that it ⟨might possibly⟩ be found an inconvenient shackle.

The great question is what provision shall we make for the happiness of our Country? He would first make a comparative examination of the two plans — prove that there were essential defects in both — and point out such changes as might render a *national one*, efficacious. — The great & essential principles necessary for the support of Government. are 1. an active & constant interest in supporting it. This principle does not exist in the States in favor of the federal Govt. They have evidently in a high degree, the esprit de corps. They constantly pursue internal interests adverse to those of the whole. They have their particular debts — their partcular plans of finance &c. all these when opposed to, invariably prevail over the requisitions & plans of Congress. 2. the love of power, Men love power. The same remarks are applicable to this principle. The States have constantly shewn a disposition rather to regain the powers delegated by them than to part with more, or to give effect to what they had parted with. The ambition of their demagogues is known to hate the controul of the Genl. Government. It may be remarked too that the Citizens have not that anxiety [4] to prevent a dissolution of the Genl. Govt as of the particular Govts. A dissolution of the latter would be fatal: of the former would still leave the purposes of Govt. attainable to a considerable degree. Consider what such a State as Virga. will be in a few years, a few compared with the life of nations. How strongly will it feel its importance & self-sufficiency? 3. an habitual attachment of the people. The whole force of this tie is on the side of the State Govt. Its sovereignty is immediately before the eyes of the people: its protection is immediately enjoyed by them. From its hand distributive justice, and all those acts which familiarize & endear Govt. to a people, are dispensed to them. 4. *Force* by which may be understood a *coertion of laws* or *coertion of arms*. Congs. have not the former except in few cases. In particular States, this coercion

---

[4] Crossed out "interest".

*Monday*                    MADISON                    *June 18*

is nearly sufficient; tho' he held it in most cases, not entirely
so.   A certain portion of military force is absolutely necessary
in large communities.   Massts. is now feeling this necessity
& making provision for it.   But how can this force be exerted
on the States collectively.   It is impossible.   It amounts to
a war between the parties.   Foreign powers also will not be
idle spectators.   They will interpose, the confusion will in-
crease, and a dissolution of the Union ensue.   5. *influence.*‐
he did not ⟨mean⟩ corruption, but a dispensation of those
regular honors & emoluments, which produce an attachment
to the Govt.   almost all the weight of these is on the side of
the States; and must continue so as long as the States continue
to exist.   All the passions then we see, of avarice, ambition,
interest, which govern most individuals, and all public bodies,
fall into the current of the States, and do not flow in the stream
of the Genl. Govt.   the former therefore will generally be an
overmatch for the Genl. Govt. and render any confederacy, in
its very nature precarious.   Theory is in this case fully confirmed
by experience.   The Amphyctionic Council had it would seem
ample powers for general purposes.   It had in particular the
power of fining and using force agst. delinquent members.
What was the consequence.   Their decrees were mere signals
of war.   The Phocian war is a striking example of it.   Philip
at length taking advantage of their disunion, and insinuating
himself into their Councils, made himself master of their
fortunes.   The German Confederacy affords another lesson.
The authority of Charlemagne seemed to be as great as could
be necessary.   The great feudal chiefs however, exercising
their local sovereignties, soon felt the spirit & found the means,
of, encroachments, which reduced the imperial authority to
a nominal sovereignty.   The Diet has succeeded, which tho'
aided by a Prince at its head, of great authority independently
of his imperial attributes, is a striking illustration of the weak-
ness of Confederated Governments.   Other examples instruct
us in the same truth.   .The Swiss cantons have scarce any
Union at all, and ⟨have been more than once at⟩ [5] war with

---

[5] Crossed out "are frequently at".

one another — How then are all these evils to be avoided?
only by such a compleat sovereignty in the general Govermt.
as will turn all the strong principles & passions above men-
tioned on its side.    Does the scheme of N. Jersey produce this
effect? does it afford any substantial remedy whatever?  On
the contrary it labors under great defects, and the defect of
some of its provisions will destroy the efficacy of others.    It
gives a direct revenue to Congs. but this will not be sufficient.
The balance can only be supplied by requisitions;  which
experience proves can not be relied on.    If States are to delib-
erate on the mode, they will also deliberate on the object of
the supplies, and will grant or not grant as they approve or
disapprove of it.    The delinquency of one will invite and
countenance it in others.    Quotas too must in the nature of
things be so unequal as to produce the same evil.    To what
standard will you resort? Land is a fallacious one.    Compare
Holland with Russia: France or Engd. with other countries
of Europe.    Pena. with N. Carolia. will the relative pecuniary
abilities in those instances, correspond with the relative value
of land.    Take numbers of inhabitants for the rule and make
like comparison of different countries, and you will find it to
be equally unjust.    The different degrees of industry and
improvement in different Countries render the first object a
precarious measure of wealth.    Much depends too on *situa-
tion*.    Cont. N. Jersey & N. Carolina, not being commercial
States & contributing to the wealth of the commercial ones,
can never bear quotas assessed by the ordinary rules of pro-
portion.    They will & must fail ⟨in their duty.⟩ their example
will be followed, and the Union itself be dissolved.    Whence
then is the national revenue to be drawn? from Commerce,
even ⟨from⟩ exports which notwithstanding the common opin-
ion are fit objects of moderate taxation, ⟨from⟩ excise, &c &c.
These tho' not equal, are less unequal than quotas.    Another
destructive ingredient in the plan, is that equality of suffrage
which is so much desired by the small States.    It is not in
human nature that Va. & the large States should consent to
it, or if they did that they shd. long abide by it.    It shocks too
much the ideas of Justice, and every human feeling.    Bad

principles in a Govt. tho slow are sure in their operation, and will gradually destroy it. A doubt has been raised whether Congs. at present have a right to keep Ships or troops in time of peace. He leans to the negative. Mr. P.s plan provides no remedy. — If the powers proposed were adequate, the organization of Congs. is such that they could never be properly & effectually exercised. The members of Congs. being chosen by the States & subject to recall, represent all the local prejudices. Should the powers be found effectual, they will from time to time be heaped on them, till a tyrannic sway shall be established. The general power whatever be its form if it preserves itself, must swallow up the State powers. otherwise it will be swallowed up by them. It is agst. all the principles of a good Government to vest the requisite powers in such a body as Congs. Two Sovereignties can not co-exist within the same limits. Giving powers to Congs. must eventuate in a bad Govt. or in no Govt. The plan of N. Jersey therefore will not do. What then is to be done? Here he was embarrassed. The extent of the Country to be governed, discouraged him. The expence of a general Govt. was also formidable; unless there were such a diminution of expence on the side of the State Govts. as the case would admit. If they were extinguished, he was persuaded that great œconomy might be obtained by substituting a general Govt. He did not mean however to shock the public opinion by proposing such a measure. On the other ⟨hand⟩ he saw no *other* necessity for declining it. They are not necessary for any of the great purposes of commerce, revenue, or agriculture. Subordinate authorities he was aware would be necessary. There must be district tribunals: corporations for local purposes. But cui bono, the vast & expensive apparatus now appertaining to the States. The only difficulty of a serious nature which occurred to him, was that of drawing representatives from the extremes to the center of the Community. What inducements can be offered that will suffice? The moderate wages for the 1st. branch, would only be a bait to little demagogues. Three dollars or thereabouts he supposed would be the Utmost. The Senate he feared from a similar cause, would be filled by

certain undertakers who wish for particular offices under the Govt. This view of the subject almost led him to despair that a Republican Govt. could be established over so great an extent. He was sensible at the same time that it would be unwise to propose one of any other form. In his private opinion he had no scruple in declaring, supported as he was by the opinions of so many of the wise & good, that the British Govt. was the best in the world: and that he doubted much whether any thing short of it would do in America.[6] He hoped Gentlemen of different opinions would bear with him in this, and begged them to recollect the change of opinion on this subject which had taken place and was still going on. It was once thought that the power of Congs was amply sufficient to secure the end of their institution. The error was now seen by every one. The members most tenacious of republicanism, he observed, were as loud as any in declaiming agst. the vices of democracy. This progress of the public mind led him to anticipate the time, when others as well as himself would join in the praise bestowed by Mr. Neckar on the British Constitution, namely, that it is the only Govt. in the world "which unites public strength with individual security." — In every community where industry is encouraged, there will be a division of it into the few & the many. Hence separate interests will arise There will be debtors & Creditors &c. Give all power to the many, they will oppress the few. Give all power to the few they will oppress the many. Both therefore ought to have power, that each may defend itself agst. the other. To the want of this check we owe our paper money — instalment laws &c To the proper adjustment of it the British owe the excellence of their Constitution. Their house of Lords is a most noble institution. Having nothing to hope for by a change, and a sufficient interest by means of their property, in being faithful to the National interest, they form a permanent barrier agst. every pernicious innovation, whether

---

[6] This is doubtless the basis of the charge that in the Convention Hamilton favored the establishment of a monarchy. See Appendix A, CCXXXIII, CCLXXI, CCXCII, CCXCIV, CCXCV, CCCIX, CCCXI, CCCXII, CCCXXIV, CCCXXVIII, CCCLIV, CCCLXVII, CCCLXXX, CCCXCVII.

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 220 of 482

attempted on the part of the Crown or of the Commons. No temporary Senate will have firmness en'o' to answer the purpose. The Senate ⟨(of Maryland)⟩ which seems to be so much appealed to, has not yet been sufficiently tried. Had the people been unanimous & eager, in the late appeal to them on the subject of a paper emission they would would have yielded to the torrent. Their acquiescing in such an appeal is a proof of it. — Gentlemen differ in their opinions concerning the necessary checks, from the different estimates they form of the human passions. They suppose Seven years a sufficient period to give the Senate an adequate firmness, from not duly considering the amazing violence & turbulence of the democratic spirit. When a great object of Govt. is pursued, which seizes the popular passions, they spread like wild fire, and become irresistable. He appealed to the gentlemen from the N. England States whether experience had not there verified the remark. As to the Executive, it seemed to be admitted that no good one could be established on Republican principles. Was not this giving up the merits of the question; for can there be a good Govt. without a good Executive. The English model was the only good one on this subject. The Hereditary interest of the King was so interwoven with that of the Nation, and his personal emoluments so great, that he was placed above the danger of being corrupted from abroad — and at the same time was both sufficiently independent and sufficiently controuled, to answer the purpose of the institution at home. one of the weak sides of Republics was their being liable to foreign influence & corruption. Men of little character, acquiring great power become easily the tools of intermedling neibours. Sweeden was a striking instance. The French & English had each their parties during the late Revolution which was effected by the predominant influence of the former. What is the inference from all these observations? That we ought to go as far in order to attain stability and permanency, as republican principles will admit. Let one branch of the Legislature hold their places for life or at least during goodbehaviour. Let the Executive also be for life. He appealed to the feelings of the members present whether a term of seven

years, would induce the sacrifices of private affairs which an acceptance of public trust would require, so so as to ensure the services of the best Citizens. On this plan we should have in the Senate a permanent will, a weighty interest, which would answer essential purposes. But is this a Republican Govt. it will be asked? Yes, if all the Magistrates are appointed, and vacancies are filled, by the people, or a process of election originating with the people. He was sensible that an Executive constituted as he proposed would have in fact but little of the power and independence that might be necessary. On the other plan of appointing him for 7 years, he thought the Executive ought to have but little power. He would be ambitious, with the means of making creatures; and as the object of his ambition wd. be to *prolong* his power, it is probable that in case of a war, he would avail himself of the emergence, to evade or refuse a degradation from his place. An Executive for life has not this motive for forgetting his fidelity, and will therefore be a safer depositary of power. It will be objected probably, that such an Executive will be an *elective Monarch*, and will give birth to the tumults which characterise that form of Govt. He wd. reply that *Monarch* is an indefinite term. It marks not either the degree or duration of power. If this Executive Magistrate wd. be a monarch for life — the other propd. by the Report from the Committee of the whole, wd. be a monarch for seven years. The circumstance of being elective was also applicable to both. It had been observed by judicious writers that elective monarchies wd. be the best if they could be guarded agst. the *tumults* excited by the ambition and intrigues of competitors. He was not sure that tumults were an inseparable evil. He rather thought this character of Elective Monarchies had been taken rather from particular cases than from general principles. The election of Roman Emperors was made by the *Army*. In *Poland* the election is made by great rival *princes* with independent power, and ample means, of raising commotions. In the German Empire, The appointment is made by the Electors & Princes, who have equal motives & means, for exciting cabals & parties. Might ⟨not⟩ such a mode of election be devised

| *Monday* | MADISON | *June 18* |
|---|---|---|

among ourselves as will defend the community agst. these effects in any dangerous degree? Having made these observations he would read to the Committee a sketch of a plan which he shd. prefer to either of those under consideration. He was aware that it went beyond the ideas of most members. But will such a plan be adopted out of doors? In return ⟨he would ask⟩ will the people adopt the other plan? At present they will adopt neither. But ⟨he⟩ sees the Union dissolving or already dissolved — he sees evils operating in the States which must soon cure the people of their fondness for democracies — he sees that a great progress has been already made & is still going on in the public mind. He thinks therefore that the people will in time be unshackled from their prejudices; and whenever that happens, they will themselves not be satisfied at stopping where the plan of Mr. R. wd. place them, but be ready to go as far at least as he proposes. He did not mean to offer the paper he had sketched as a proposition to the Committee. It was meant only to give a more correct view of his ideas, and to suggest the amendments which he should probably propose to the plan of Mr. R. in the proper stages of its future discussion. He reads his sketch in the words following:[7] to wit

I "The Supreme Legislative power of the United States of America to be vested in two different bodies of men; the one to be called the Assembly, the other the Senate who together shall form the Legislature of the United States with power to pass all laws whatsoever subject to the Negative hereafter mentioned.

II The Assembly to consist of persons elected by the people to serve for three years.

III. The Senate to consist of persons elected to serve during good behaviour; their election to be made by electors chosen for that purpose by the people: in order to this the States to be divided into election districts. On the death, removal or resignation of any Senator his place to be filled out of the district from which he came.

---

[7] Several different texts of this document are in existence. For a discussion of these and of Hamilton's more detailed plan given to Madison at the close of the Convention, see Appendix F. See also further references in note 9, below.

IV. The supreme Executive authority of the United States to be vested in a Governour to be elected to serve during good behaviour — the election to be made by Electors chosen by the people in the Election Districts aforesaid —   The authorities & functions of the Executive to be as follows: to have a negative on all laws about to be passed, and the execution of all laws passed, to have the direction of war when authorized or begun; to have with the advice and approbation of the Senate the power of making all treaties; to have the sole appointment of the heads or chief officers of the departments of Finance, War and Foreign Affairs; to have the nomination of all other officers (Ambassadors to foreign Nations included) subject to the approbation or rejection of the Senate; to have the power of pardoning all offences except Treason; which he shall not pardon without the approbation of the Senate.

V. On the death resignation or removal of the Governour his authorities to be exercised by the President of the Senate till a Successor be appointed.

VI The Senate to have the sole power of declaring war, the power of advising and approving all Treaties, the power of approving or rejecting all appointments of officers except the heads or chiefs of the departments of Finance War and foreign affairs.

VII. The Supreme Judicial authority to be vested in Judges to hold their offices during good behaviour with adequate and permanent salaries. This Court to have original jurisdiction in all causes of capture, and an appellative jurisdiction in all causes in which the revenues of the general Government or the citizens of foreign nations are concerned.

VIII. The Legislature of the United States to have power to institute Courts in each State for the determination of all matters of general concern.

IX. The Governour Senators and all officers of the United States to be liable to impeachment for mal — and corrupt conduct; and upon conviction to be removed from office, & disqualified for holding any place of trust or profit — all impeachments to be tried by a Court to consist of the Chief or Judge of the Superior Court of Law of each State,

provided such Judge shall hold his place during good behavior, and have a permanent salary.

X All laws of the particular States contrary to the Constitution or laws of the United States to be utterly void; and the better to prevent such laws being passed, the Governour or president of each state shall be appointed by the General Government[8] and shall have a negative upon the laws about to be passed in the State of which he is Governour or President

XI No State to have any forces land or Naval; and the Militia of all the States to be under the sole and exclusive direction of the United States, the officers of which to be appointed and commissioned by them

⟨On these several articles he entered into explanatory observations corresponding with the principles of his introductory reasoning [9]

Comittee rose & the House adjourned.⟩

---

[8] See Appendix A, CCXCVI.

[9] J. C. Hamilton (*History of the Republic of the United States*, III, 283–4), in giving a brief of this speech, states that it "occupied in the delivery between five and six hours, and was pronounced by a competent judge, (Gouverneur Morris), the most able and impressive he had ever heard."

Madison states that Hamilton "happened to call on me when putting the last hand" to the report of this speech. He "acknowledged its fidelity, without suggesting more than a few verbal alterations which were made." See Appendix A, CCCXCV and CCCCI, also CCCXXV, CCCXXIX, CCCXCI.

Gilpin (*Papers of Madison* II, 892–893) prints the following note, which seems to have been inspired if not written by Madison:

"The speech introducing the plan, as above taken down and written out, was seen by Mr. Hamilton, who approved its correctness with one or two verbal changes, which were made as he suggested. The explanatory observations which did not immediately follow, were to have been furnished by Mr. H. who did not find leisure at the time to write them out, and they were not obtained. Judge Yates, in his notes, appears to have consolidated the explanatory with the introductory observations of Mr. Hamilton (under date of June 19th, a typographical error). It was in the former, Mr. Madison observed, that Mr. Hamilton, in speaking of popular governments, however modified, made the remark attributed to him by Judge Yates, that they were '*but pork still, with a little change of sauce.*'"

Hunt makes no reference to this in his *Writings of James Madison*, and the present editor has not found it among the Madison papers.

U.S. Constitutional convention 1787

# THE RECORDS

OF THE

# FEDERAL CONVENTION

## of 1787

*EDITED BY*

## MAX FARRAND

**PROFESSOR OF HISTORY IN YALE UNIVERSITY**

VOLUME II

INDIANA UNIVERSITY
LIBRARY

NEW HAVEN: YALE UNIVERSITY PRESS
LONDON: HENRY FROWDE
OXFORD UNIVERSITY PRESS
MCMXI

*Monday*      MADISON      *August 13*

DETAIL OF AYES AND NOES

| | New Hampshire | Massachusetts | Rhode Island | Connecticut | New York | New Jersey | Pennsylvania | Delaware | Maryland | Virginia | North Carolina | South Carolina | Georgia | Questions | Ayes | Noes | Divided |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [281] | no | no | | aye | | no | aye | no | aye | aye | no | no | no | On Mr Hamilton's amendment of the 2nd sect. of the 4 article | 4 | 7 | |
| [282] | aye | no | | no | | no | no | no | no | no | no | aye | aye | To strike out the word "seven" and to insert the word "nine" 2 sect. 4 art. | 3 | 8 | |
| [283] | no | no | | aye | | no | no | no | aye | aye | no | no | no | To agree to the amendmt of "four" 2 sect. 4 article. | 3 | 8 | |
| [284] | no | no | | aye | | aye | aye | no | aye | aye | no | no | no | To agree to the Proviso offered to ye 2 sect of the 4 art. by Mr. G. Morris. | 5 | 6 | |
| [285] | no | no | | aye | | no | dd | no | aye | aye | no | no | no | instead of the word "seven" to insert "five | 3 | 7 | 1 |
| [286] | aye | aye | | no | | aye | no | aye | no | aye | aye | aye | aye | shall the word nine in the 3rd sect of the 5 art: remain. | 8 | 3 | |
| [287] | dd | aye | | aye | | no | aye | aye | aye | no | no | no | no | To adjourn.— | 5 | 5 | 1 |
| [288] | aye | aye | | no | | no | no | no | no | aye | aye | no | no | To agree to the first clause of Mr Randolph's proposition for reinstating the 5 Section 4 article | 4 | 7 | |
| [289] | aye | aye | | no | | no | no | no | no | no | aye | no | no | To agree to the 5 sect. 4 art. as reported | 3 | 8 | |
| [290] | no | aye | | no | | no | no | no | no | no | no | no | no | last clause 5 section 4. article | 1 | 10 | |

# MADISON

## Monday. Augst. 13. In Convention

### Art. IV. Sect. 2. reconsidered —[6]

[6] Article IV, Sect. 2 (as amended). "Every member of the House of Representatives shall be of the age of twenty-five years at least; shall have been a citizen of the United States for at least seven years before his election; and shall be, at the time of his election an inhabitant of the State in which he shall be chosen."

Mr. Wilson & Mr. Randolph moved to strike out "7 years" and insert "4 years," as the requisite term of Citizenship to qualify for the House of Reps. Mr. Wilson said it was very proper the electors should govern themselves by this consideration; but unnecessary & improper that the Constitution should chain them down to it.

Mr. Gerry wished that in future the eligibility might be confined to Natives. Foreign powers will intermeddle in our affairs, and spare no expence to influence them. Persons having foreign attachments will be sent among us & insinuated into our councils, in order to be made instruments for their purposes. Every one knows the vast sums laid out in Europe for secret services — He was not singular in these ideas. A great many of the most influential men in Massts. reasoned in the same manner.

Mr. Williamson moved to insert 9 years instead of seven. He wished this Country to acquire as fast as possible national habits. Wealthy emigrants do more harm by their luxurious examples, than good, by the money, they bring with them.

Col. Hamilton was in general agst. embarrassing the Govt. with minute restrictions. There was on one side the possible danger that had been suggested — on the other side, the advantage of encouraging foreigners was obvious & admitted. Persons in Europe of moderate fortunes will be fond of coming here where they will be on a level with the first Citizens. He moved that the section be so altered as to require merely Citizenship & inhabitancy. The right of determining the rule of naturalization will then leave a discretion to the Legislature on this subject which will answer every purpose.

Mr ⟨Madison⟩ seconded the motion. He wished to maintain the character of liberality which had been professed in all the Constitutions & publications of America. He wished to invite foreigners of merit & republican principles among us. America was indebted to emigration for her settlement & Prosperity. That part of America which had encouraged them most had advanced most rapidly in population, agriculture & the arts. There was a possible danger he admitted that men with foreign predilections might obtain appoint-

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 228 of 482

ments but it was by no means probable that it would happen in any dangerous degree.   For the same reason that they would be attached to their native Country, our own people wd. prefer natives of this Country to them.   Experience proved this to be the case.   Instances were rare of a foreigner being elected by the people within any short space after his coming among us —   If bribery was to be practised by foreign powers, it would not be attempted among the electors, but among the elected; and among natives having full Confidence of the people not among strangers who would be regarded with a jealous eye.

Mr. Wilson. Cited Pennsylva. as a proof of the advantage of encouraging emigrations.   It was perhaps the youngest (except Georgia) settlemt. on the Atlantic;   yet it was at least among the foremost in population & prosperity.   He remarked that almost all the Genl. officers of ⟨the⟩ Pena. line ⟨of the late army⟩ were foreigners.   And no complaint had ever been made against their fidelity or merit.   Three of her deputies to the Convention (Mr. R. Morris, Mr. Fitzsimmons & himself) were also not natives.   He had no objection to Col. Hamiltons motion & would withdraw the one made by himself.[7]

Mr. Butler was strenuous agst. admitting foreigners into our public Councils.

Question on Col. Hamilton's Motion

N. H. no. Mas. no. Ct. ay. N. J. no. Pa. ay. Del. no. Md. ay. Va. ay. N. C. no. S. C. no. Geo. no.   [Ayes — 4; noes — 7.]

Question on Mr. Williamson's moution, to insert 9 years instead of seven.

N. H. ay. Masts. no. Ct. no. N. J. no. Pa. no. Del. no. Md. no. Va no. N– C. no. S. C. ay. Geo. ay.   [Ayes — 3; noes — 8.]

Mr. Wilson's renewed the motion for 4 years instead of 7. & on question

N. H. no Mas. no. Ct. ay. N. J. no. Pa. no. Del. no. Md. ay. Va. ay. N. C. no. S. C. no Geo. no.   [Ayes — 3;  noes — 8.]

[7] See Appendix A, CCCXXXVI.

Mr. Govr. Morris moved to add to the end of the section (art IV. s. 2) a proviso that the limitation ⟨of seven years⟩ should not affect ⟨the rights of⟩ any person now a Citizen.[8]

Mr. Mercer 2ded. the motion. It was necessary he said to prevent a disfranchisement of persons who had become Citizens under the faith ⟨& according to⟩ — the laws & Constitution ⟨from⟩ being on a level in all respects with natives.

Mr. Rutlidge. It might as well be said that all qualifications are disfranchisemts. and that to require the age of 25 years was a disfranchisement. The policy of the precaution was as great with regard to foreigners now Citizens; as to those who are to be naturalized in future.

Mr Sherman. The U. States have not invited foreigners nor pledged their faith that they should enjoy equal privileges with native Citizens. The Individual States alone have done this. The former therefore are at liberty to make any discriminations they may judge requisite.

Mr. Ghorum. When foreigners are naturalized it wd. seem as if they stand on an equal footing with natives. He doubted then the propriety of giving a retrospective force to the restriction.

Mr. ⟨Madison⟩ animadverted on the peculiarity of the doctrine of Mr. Sharman. It was ⟨a subtilty⟩ by which every national engagement might be evaded. By parity of reason, Whenever our public debts, or foreign treaties become inconvenient nothing ⟨more⟩ would be necessary to relieve us from them, than to[9] new model the Constitution. It was said that the *U. S.* as such have not pledged their faith to the naturalized foreigners, & therefore are not bound. Be it so, & that the States alone are bound. Who are to form the New Constitution by which the condition of that class of citizens is to be made worse than the other class? Are not the States ye agents? will they not be the members of it? Did they not appoint this Convention? Are not they to ratify its proceedings? Will not the new Constitution be their Act? If the new Constitution then violates the faith pledged to any

---

[8] Revised from *Journal.*        [9] Crossed out: "abolish them by".

description of people will not the makers of it, will not the States, be the violators.   To justify the doctrine it must be said that the States can get rid of their obligation by revising the Constitution, though they could not do it by repealing the law under which foreigners held their privileges.   He considered this a matter of real importance.   It woud expose us to the reproaches of all those who should be affected by it, reproaches which wd. soon be echoed from the other side of the Atlantic; and would unnecessarily enlist among the Adversaries of the reform a very considerable body of Citizens: We should moreover reduce every State to the dilemma of rejecting it or of violating the faith pledged to a part of its citizens.      .

Mr. Govr. Morris[10] considered the case of persons under 25 years, as very different from that of foreigners.   No faith could be pleaded by the former in bar of the regulation.   No assurance had ever been given that persons under that age should be in all cases on a level with those above it.   But with regard to foreigners among us, the faith had been pledged that they should enjoy the privileges of Citizens.   If the restriction as to age had been confined to natives, & had left foreigners under 25 years, eligible in this case, the discrimination wd. have been an equal injustice on the other side.

Mr. Pinkney remarked that the laws of the States had varied much the terms of naturalization in different parts of America; and contended that the U. S. could not be bound to respect them on such an occasion as the present.   It was a sort of recurrence to first principles.

Col– Mason was struck not like (Mr. ⟨Madison⟩), with the *peculiarity*,[11] but the *propriety*[11] of the doctrine of Mr. Sharman. The States have formed different qualifications themselves, for enjoying different rights of citizenship.   Greater caution wd. be necessary in the outset of the Govt. than afterwards. All the great objects wd. be then provided for.   Every thing would be then set in Motion.   If persons among us attached to G– B. should work themselves into our Councils, a turn might be given to our affairs & particularly to our Commer-

---

[10] Crossed out: "Mr. Randolph remarked".
[11] Underscored by Madison when he revised his notes.

| *Monday* | MADISON | *August 13* |
|---|---|---|

cial regulations which might have pernicious consequences. The great Houses of British Merchants would spare no pains to insinuate the instruments of their views ⟨into the Govt —⟩

Mr. Wilson read the clause in the Constitution of Pena. giving to foreigners after two years residence all the rights whatsoever of Citizens, combined it with the Article of Confederation making the Citizens or one State Citizens of all, inferred the obligation Pena. was under to maintain the faith thus pledged to her citizens of foreign birth, and the just complaints which her failure would authorize: He observed likewise that the Princes & States of Europe would avail themselves of such breach ⟨of faith⟩ to deter their subjects from emigrating to the U. S.[12]

Mr. Mercer enforced the same idea of a breach of faith.

Mr. Baldwin could ⟨not⟩ enter into the force of the arguments agst. extending the disqualification to foreigners now Citizens. The discrimination of the place of birth, was not more objectionable than that of age which all had concurred in the propriety of.

Question on the proviso of Mr Govr. Morris in favor of foreigners now Citizens

N. H. no. Mas. no. Ct. ay. N. J. ay. Pa. ay. Del. no. Maryd. ay. Va. ay. N– C. no. S. C. no. Geo. no.   [Ayes — 5; noes — 6.]

Mr. Carrol moved to ⟨insert⟩ "5 years" instead "of seven," ⟨in section 2d. Art: IV⟩[13]

N– H. no. Mas. no. Ct. ay. N. J. no. Pa. divd. Del. no. Md. ay. Va. ay. N. C. no. S. C. no. Geo. no.   [Ayes — 3; noes — 7; divided — 1.]

The Section (Art IV. Sec. 2.) ⟨as formerly amended was⟩[13] then agreed to nem. con.

Mr. Wilson moved that (in Art: V. sect. 3)[14] 9 years be reduced to seven.   ⟨which was disagd. to and the 3d. Section (art. V.) confirmed by the following vote.⟩[15]

---

[12] See Appendix A, CCCXXXVI.     [13] Revised from *Journal.*
[14] Relating to qualifications of Senators.
[15] Taken from *Journal.*   Madison originally gave the vote which follows to the question preceding.

N. H. ay. Mas. ay. Ct. no. N. J. ay. Pa. no. Del. ay. Md. no. Va. ay. N. C. ay. S. C. ay. Geo. ay. [Ayes —8 ; noes — 3.]

Art. IV. ⟨Sec.⟩ 5. ⟨being⟩ reconsidered.

Mr. Randolph moved that the clause be altered so as to read — "Bills for raising money for the *purpose of revenue* ⟨or for appropriating the same shall originate in the House of Representatives⟩ and shall not be ⟨so⟩ amended or altered by the Senate as to increase or diminish the sum to be raised, or change the mode of levying it, or the object of its appropriation." [15a] — He would not repeat his reasons, but barely remind the members from the smaller States of the compromise by which the larger States were entitled to this privilege.

Col. Mason. This amendment removes all the objections urged agst. the section as it stood at first. By specifying *purposes of revenue*, it obviated the objection that the Section extended to all bills under which money might incidentally arise. By authorizing amendments in the Senate it got rid of the objections that the Senate could not correct errors of any sort, & that it would introduce into the House of Reps. the practice of tacking foreign matter to money bills: These objections being removed, the arguments in favor of the proposed restraint on the Senate ought to have their full force. 1. the Senate did not represent the *people*, but the *States* in their political character. It was improper therefore that it should tax the people. The reason was the same agst. their doing it; as it had been agst. Congs. doing it. Nor was it in any respect necessary in order to cure the evils of our Republican system. He admitted that notwithstanding the superiority of the Republican form over every other, it had its evils. The chief ones, were the danger of the majority oppressing the minority, and the mischievous influence of demagogues. The Genl. Government of itself will cure these. As the States will not concur at the same time in their unjust & oppressive plans, the general Govt. will be able to check &

---

[15a] Revised from *Journal.*

*Monday*                    MADISON                    *August 13*

defeat them, whether they result from the wickedness of the majority, or from the misguidance of demagogues. Again, the Senate is not like the H. of Reps. chosen frequently and obliged to return frequently among the people. They are to be chosen by the Sts for 6 years, will probably settle themselves at the seat of Govt. will pursue schemes for their own aggrandizement — will be able by wearyg out the H. of Reps and taking advantage of their impatience at the close of a long Session, to extort measures for that purpose. If they should be paid as he expected would be yet determined & wished to be so, out of the Natl. Treasury, they will particularly extort an increase of their wages. A bare negative was a very different thing from that of originating bills. The practice in Engld was in point. The House of Lords does not represent nor tax the people, because not elected by the people. If the Senate can originate, they will in the recess of the Legislative Sessions, hatch their mischievous projects, for their own purposes, and have their money bills ready cut & dried, (to use a common phrase) for the meeting of the H. of Reps. He compared the case to Poyning's law — and signified that the House of Reps. might be rendered by degrees like the Parliament of Paris, the mere depository of the decrees of the Senate. As to the compromise so much had passed on that subject that he would say nothing about it. He did not mean by what he had said to oppose the permanency of the Senate. On the contrary he had no repugnance to an increase of it — nor to allowing it a negative, though the Senate was not by its present constitution entitled to it. But in all events he would contend that the pursestrings should be in the hands of the Representatives of the people.

Mr. Wilson was himself directly opposed to the equality of votes granted to the Senate by its present Constitution. At the same time he wished not to multiply the vices of the system. He did not mean to enlarge on a subject which had been so much canvassed, but would remark as an insuperable objection agst. the proposed restriction of money bills to the H. of Reps. that it would be a source of perpetual contentions where there was no mediator to decide them. The Presidt.

here could not like the Executive Magistrate in England interpose by a prorogation, or dissolution. This restriction had been found pregnant with altercation in every State where the Constitution had established it. The House of Reps. will insert the other things in money bills, and by making them conditions of each other, destroy the deliberate liberty of the Senate. He stated the case of a Preamble to a money bill sent up by the House of Commons in the reign of Queen Anne, to the H. of Lords, in which the conduct of the displaced Ministry, who were to be impeached before the Lords, was condemned; the Commons thus extorting a premature judgmt. without any hearing of the Parties to be tried, and the H. of Lords being thus reduced to the poor & disgraceful expedient of opposing to the authority of a law a protest on their Journals agst. its being drawn into precedent. If there was any thing like Poynings law in the present case, it was in the attempt to vest the exclusive right of originating in the H. of Reps. and so far he was agst it. He should be equally so if the right were to be exclusively vested in the Senate. With regard to the pursestrings, it was to be observed that the purse was to have two strings, one of which was in the hands of the H. of Reps. the other in those of the Senate. Both houses must concur in untying, and of what importance could it be which untied first, which last. He could not conceive it to be any objection to the senate's preparing the bills, that they would have leisure for that purpose and would be in the habits of business. War, Commerce, & Revenue were the great objects of the Genl. Government. All of them are connected with money. The restriction in favor of the H. of Represts. would exclude the Senate from originating any important bills whatever —

Mr Gerry. considered this as a part of the plan that would be much scrutinized. Taxation & representation are strongly associated in the minds of the people, and they will not agree that any but their immediate representatives shall meddle with their purses. In short the acceptance of the plan will inevitably fail, if the Senate be not restrained from originating Money bills.

Mr. Govermr. Morris   All the arguments suppose the right to originate & to tax, to be exclusively vested in the Senate. — The effects commented on may be produced by a Negative only in the Senate.   They can tire out the other House, and extort their concurrence in favorite measures, as well by withholding their negative, as by adhering to a bill introduced by themselves.

Mr ⟨Madison thought⟩   If the substitute offered by Mr. Randolph for the original section is to be adopted it would be proper to allow the Senate at least so to amend as to *diminish* the sums to be raised.   Why should they be restrained from checking the extravagance of the other House? — One of the greatest evils incident to Republican Govt. was the spirit of contention & faction.   The proposed substitute, which in some respects lessened the objections agst. the section, had a contrary effect with respect to this particular.   It laid a foundation for new difficulties and disputes between the two houses.   The word *revenue* was ambiguous.   In many acts, particularly in the regulations of trade, the object would be twofold.   The raising of revenue would be one of them.   How could it be determined which was the primary or predominant one; or whether it was necessary that revenue shd: be the sole object, in exclusion even of other incidental effects.   When the Contest was first opened with G. B. their power to regulate trade was admitted.   Their power to raise revenue rejected.   An accurate investigation of the subject afterward proved that no line could be drawn between the two cases. The words *amend or alter*, form an equal source of doubt & altercation.   When an obnoxious paragraph shall be sent down from the Senate to the House of Reps it will be called an origination under the name of an amendment.   The Senate may actually couch extraneous matter under that name. In these cases, the question will turn on the *degree* of connection between the matter & object of the bill and the ⟨alteration or⟩ amendment offered to it.   Can there be a more fruitful source of dispute, or a kind of dispute more difficult to be settled?   His apprehensions on this point were not conjectural. Disputes had actually flowed from this source in Virga. where

the Senate can originate no bill.   The words "so as to *increase or diminish* the sum to be raised," were liable to the same objections.   In levying indirect taxes, which it seemed to be understood were to form the principal revenue of the new Govt. the sum to be raised, would be increased or diminished by a variety of collateral circumstances influencing the consumption, in general, the consumption of foreign or of domestic articles — of this or that particular species of articles, and even by the mode of collection which may be closely connected with the productiveness of a tax. — The friends of the section had argued its necessity from the permanency of the Senate. He could not see how this argumt. applied.   The Senate was not more permanent now than in the form it bore in the original propositions of Mr. Randolph and at the time when no objection whatever was hinted agst. its originating money bills. Or if in consequence of a loss of the present question, a proportional vote in the Senate should be reinstated as has been urged as the indemnification the permanency of the Senate will remain the same. — If the right to originate be vested exclusively in the House of Reps. either the Senate must yield agst. its judgment to that House, in which ⟨case⟩ the Utility of the check will be lost — or the Senate will be inflexible & the H. of Reps must adapt its Money bill to the views of the Senate, in which case, the exclusive right will be of no avail. — As to the Compromise of which so much had been said, he would make a single observation.   There were 5 States which had opposed the equality of votes in the Senate. viz. Masts. Penna. Virga. N. Carolina & S. Carola.   As a compensation for the sacrifice extorted ⟨from them⟩ on this head, the exclusive origination of money bills in the other House had been tendered.   Of the five States a majority viz. Penna. Virga. & S. Carola. have uniformly voted agst. the proposed compensation, on its own merits, as rendering the plan of Govt. still more objectionable– Massts has been divided.   N. Carolina alone has set a value on the compensation, and voted on that principle.   What obligation then can the small States be under to concur agst. their judgments in reinstating the section?

Mr. Dickenson. Experience must be our only guide. Reason may mislead us. It was not Reason that discovered the singular & admirable mechanism of the English Constitution. It was not Reason that discovered or ever could have discovered the odd & in the eye of those who are governed by reason, the absurd mode of trial by Jury. Accidents probably produced these discoveries, and experience has give a sanction to them. This is then our guide. And has not experience verified the utility of restraining money bills to the immediate representatives of the people. Whence the effect may have proceeded he could not say; whether from the respect with which this privilege inspired the other branches of Govt. to the H. of Commons, or from the turn of thinking it gave to the people at large with regard to their rights, but the effect was visible & could not be doubted   Shall we oppose to this long experience, the short experience of 11 years which we had ourselves, on this subject — As to disputes, they could not be avoided any way. If both Houses should originate, each would have a different bill to which it would be attached, and for which it would contend. — He observed that all the prejudices of the people would be offended by refusing this exclusive privilege to the H. of Repress. and these prejudices shd. never be disregarded by us when no essential purpose was to be served. When this plan goes forth, it will be attacked by the popular leaders. Aristocracy will be the watchword; the Shibboleth among its adversaries. Eight States have inserted in their Constitutions the exclusive right of originating money bills in favor of the popular branch of the Legislature. Most of them however allowed the other branch to amend. This he thought would be proper for us to do.

Mr Randolph regarded this point as of such consequence, that as he valued the peace of this Country, he would press the adoption of it. We had numerous & monstrous difficulties to combat. Surely we ought not to increase them. When the people behold in the Senate, the countenance of an aristocracy; and in the president, the form at least of a little monarch, will not their alarms be sufficiently raised without

taking from their immediate representatives, a right which has been so long appropriated to them. — The Executive will have more influence over the Senate, than over the H. of Reps — Allow the Senate to originate in this case, & that influence will be sure to mix itself in their deliberations & plans. The Declaration of War he conceived ought not to be in the Senate composed of 26 men only, but rather in the other House. In the other House ought to be placed the origination of the means of war. As to Commercial regulations which may involve revenue, the difficulty may be avoided by restraining the definition to bills for the *mere* or *sole*, purpose of raising revenue. The Senate will be more likely to be corrupt than the H. of Reps and should therefore have less to do with money matters. His principal object however was to prevent popular objections against the plan, and to secure its adoption.

Mr. Rutlidge. The friends of this motion are not consistent in their reasoning. They tell us, that ⟨we ought to be guided by⟩ the long experience of G. B. & not our own experience of 11 years: and yet they themselves propose to depart from it. The *H. of Commons* not only have the exclusive right of originating, but the *Lords* are not allowed to alter or amend a money bill. Will not the people say that this restriction is but a mere tub to the whale. They cannot but see that it is of no real consequence; and will be more likely to be displeased with it as an attempt to bubble them, than to impute it to a watchfulness over their rights. For his part, he would prefer giving the exclusive right to the Senate, if it was to be given ⟨exclusively⟩ at all. The Senate being more conversant in business, and having more leisure, will digest the bills much better, and as they are to have no effect, till examined & approved by the H. of Reps there can be no possible danger. These clauses in the Constitutions of the States had been put in through a blind adherence to the British model. If the work was to be done over now, they would be omitted. The experiment in S. Carolina– where the Senate cannot originate or amend money bills, has shown that it answers no good purpose; and produces the very bad one of

continually dividing & heating the two houses. Sometimes indeed if the matter of the amendment of the Senate is pleasing to the other House they wink at the encroachment; if it be displeasing, then the Constitution is appealed to. Every Session is distracted by altercations on this subject. The practice now becoming frequent is for the Senate not to make formal amendments; but to send down a schedule of the alterations which will procure the bill their assent.

Mr. Carrol. The most ingenious men in Maryd. are puzzled to define the case of money bills, or explain the Constitution on that point; tho' it seemed to be worded with all possible plainness & precision. It is a source of continual difficulty & squabble between the two houses.

Mr. McHenry mentioned an instance of extraordinary subterfuge, to get rid of the apparent force of the Constitution

On Question on the first part of the motion as to the exclusive originating of Money bills in the H. of Reps.

N. H. ay. Mas. ay. Ct. no. N. J. no. Pa. no. Del. no. Md. no. Virga. ay. Mr. Blair & Mr. M. no– Mr. R. Col. Mason and *Genl. Washington ay. N. C. ay. S. C. no. Geo. no [Ayes — 4; noes — 7.]

Question on Originating by H. of Reps & *amending* by Senate. ⟨as reported, Art IV. Sect. 5.⟩[16]

N. H. ay. Mas. ay. Ct. no. N J. no. Pa. no. Del. no. Md. no Va.† ay. ⟨N. C. ay⟩ S. C. no. Geo. no [Ayes — 4; noes — 7.]

⟨Question on the last clause of sect: 5 — Art: IV — viz "No money shall be drawn from the Public Treasury, but in pursuance of *appropriations* that shall originate in the House of Reps. It passed in the negative

N. H. no. Mas. ay Con. no N. J no. Pa. no Del no. Md no Va no. N. C. no. S. C. no. Geo. no.⟩[17]    [Ayes — 1; noes —10.]
                                                Adjd.[18]

---

* he disapproved & till now voted agst., the exclusive privilege, he gave up his judgment he said, because it was not of very material weight with him & was made an essential point with others, who if disappointed, might be less cordial in other points of real weight.                    † ⟨In the printed Journ Virga — no⟩

---

[16] Taken from *Journal*.          [17] Taken from *Journal*, see above, note 5.
[18] See further Appendix A, LXXXIII, LXXXIIIa.

## McHENRY

### *August 13.*

The 2 sect. of the 4 article and the 3 sect. of the 5 article was reconsidered and lengthily debated.   The 7 years however in the first and the 9 years in the latter remained and the articles stood as before reconsideration.

# THE  RECORDS  OF  THE  FEDERAL
## CONVENTION  OF  1787

Volume III

324      RECORDS OF THE FEDERAL CONVENTION

JAMES MCHENRY TO REVEREND JOHN CARROLL.

BALTIMORE 16 June 1788.

*Dr. Sir.*

You have been so kind as to put your brothers letter into my hand.  I have read it attentively and cannot help thinking that he has looked for an illustration where his own experience might have taught him it could not possibly be found.  He doubts where the blame lays.  When did Mr. Martin and Mr. Mercer become authorities?  He suggests also that I should have made him acquainted with the list.  If I had shewn it to him, I must have shewn it to others who were equally affected by it, with some of whom I have been for these thirteen years past in the closest habits of intimacy and friendship.  Such a step, he must be aware, would have brought on immediate personal altercations (at a most critical time) with a man prone to anger, and excessively captious.  I did what I thought much safer and more decisive.  I reserved myself to expose it publicly in case a public use had been made of it.  This has never been done tho' the fairest opportunity in the world was offred for doing it.  Can any one who witnessed that occasion, who heard me charge Mr. Martin with uttering falsehoods, entertain a belief that his representation to Mr. Carroll is true, or that he would have remained silent and condemned before the general assembly, if he could have given me as an evidence of what he there asserts?  As to Mr. Mercer, I wish your brother had mentioned what he has recently done or said that has induced him to think favorably of his veracity.

I have only to regret in this affair that my anxiety for the public good and your brothers quiet, for whom I have the most sincere friendship, should have occasioned him a moments uneasiness, and am only surprised that he has not treated this as he has the other fictions which have been gravely reported to the world for truths.

I am very respectfully
Sir Your obt. and hble st.

JAMES MCHENRY

[Address:]  Revd. John Carroll Esqr.

———

CCXII.  DEBATE IN THE VIRGINIA CONVENTION.[1]

June 17, 1788.

*(The first clause, of the ninth section, read.)*

. . . Mr. *Madison.* — Mr. Chairman — I should conceive this clause to be impolitic, if it were one of those things which could be excluded without encountering greater evils. — The southern

———

[1] Robertson, *Debates of the Convention of Virginia, 1788* (2d edit., 1805), pp. 321–345.

states would not have entered into the union of America, without the temporary permission of that trade. And if they were excluded from the union, the consequences might be dreadful to them and to us. We are not in a worse situation than before. That traffic is prohibited by our laws, and we may continue the prohibition. The union in general is not in a worse situation. Under the articles of confederation, it might be continued forever: But by this clause an end may be put to it after twenty years. There is therefore an amelioration of our circumstances. A tax may be laid in the mean time; but it is limited, otherwise congress might lay such a tax as would amount to a prohibition. From the mode of representation and taxation, congress cannot lay such a tax on slaves as will amount to manumission. Another clause secures us that property which we now possess. At present, if any slave elopes to any of those states where slaves are free, he becomes emancipated by their laws. For the laws of the states are uncharitable to one another in this respect. But in this constitution, "no person held to service, or labor, in one state, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on claim of the party to whom such service or labor may be due." — This clause was expressly inserted to enable owners of slaves to reclaim them. This is a better security than any that now exists. No power is given to the general government to interpose with respect to the property in slaves now held by the states. The taxation of this state being equal only to its representation, such a tax cannot be laid as he supposes. They cannot prevent the importation of slaves for twenty years; but after that period they can. The gentlemen from South-Carolina and Georgia argued in this manner: — "We have now liberty to import this species of property, and much of the property now possessed, has been purchased, or otherwise acquired, in contemplation of improving it by the assistance of imported slaves. What would be the consequence of hindering us from it? The slaves of Virginia would rise in value, and we would be obliged to go to your markets." I need not expatiate on this subject. Great as the evil is, a dismemberment of the union would be worse. If those states should disunite from the other states, for not indulging them in the temporary continuance of this traffic, they might solicit and obtain aid from foreign powers. . . .

*(The 2d, 3d, and 4th clauses read.)*

. . . Mr. *Madison* replied, that even the southern states, who were most affected, were perfectly satisfied with this provision, and

dreaded no danger to the property they now hold.  It appeared to him, that the general government would not intermeddle with that property for twenty years, but to lay a tax on every slave imported, not exceeding ten dollars; and that after the expiration of that period they might prohibit the traffic altogether.  The census in the constitution was intended to introduce equality in the burdens to be laid on the community. — No gentleman objected to laying duties, imposts, and excises, uniformly.  But uniformity of taxes would be subversive of the principles of equality:  For that it was not possible to select any article which would be easy for one state, but what would be heavy for another. — . . .

(<em>The 5th and 6th clauses read.</em>)

Mr. *George Mason*, apprehended the loose expression of "publication from time to time," was applicable to any time.  It was equally applicable to monthly and septennial periods.  It might be extended ever so much.  The reasons urged in favor of this ambiguous expression, was, that there might be some matters which might require secrecy.  In matters relative to military operations, and foreign negotiations, secrecy was necessary sometimes.  But he did not conceive that the receipts and expenditures of the public money ought ever to be concealed.  The people, he affirmed, had a right to know the expenditures of their money.  But that this expression was so loose, it might be concealed forever from them, and might afford opportunities of misapplying the public money, and sheltering those who did it.  He concluded it to be as exceptionable as any clause in so few words could be.  . . .

Mr. *Madison* thought it much better than if it had mentioned any specified period.  Because if the accounts of the public receipts and expenditures were to be published at short stated periods, they would not be so full and connected as would be necessary for a thorough comprehension of them, and detection of any errors.  But by giving them an opportunity of publishing them from time to time, as might be found easy and convenient, they would be more full and satisfactory to the public, and would be sufficiently frequent.  He thought, after all, that this provision went farther than the constitution of any state in the union, or perhaps in the world.

Mr. *Mason* replied, that in the confederation the public proceedings were to be published monthly, which was infinitely better than depending on men's virtue to publish them or not, as they might please.  If there was no such provision in the constitution of Virginia, gentlemen ought to consider the difference between such a full representation, dispersed and mingled with every part of the

community, as the state representation was, and such an inadequate representation as this was.   One might be safely trusted, but not the other.

Mr. *Madison* replied, that the inconveniences which had been experienced from the confederation in that respect, had their weight with him in recommending this in preference to it; for that it was impossible, in such short intervals, to adjust the public accounts in any satisfactory manner.   . . .

Governor *Randolph*.   . . . The next restriction is, that no titles of nobility shall be granted by the United States.   If we cast our eyes to the manner in which titles of nobility first orginated, we shall find this restriction founded on the same principles.   These sprung from military and civil offices;   Both are put in the hands of the united states, and therfore I presume it to be an exception to that power.

The last restriction restrains any persons in office from accepting of any present or emolument, title or office, from any foreign prince or state.   It must have been observed before, that though the confederation had restricted congress from exercising any powers not given them, yet they inserted it, not from any apprehension of usurpation, but for greater security.   This restriction is provided to prevent corruption.   All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community.   An accident which actually happened, operated in producing the restriction.   A box was presented to our ambassador by the king of our allies.[1]   It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states.   I believe, that if at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.   . . .

*(The first clause, of the tenth section, read.)*

. . . Mr. *Madison* . . . The first clause of the sixth article, provides, that "All debts contracted, and engagements entered into before

---

[1] "Dr. Franklin is the person alluded to by Randolph.   In the winter of 1856, in Philadelphia, under the roof of a venerable granddaughter of Dr. Franklin, I saw the beautiful portrait of Louis XVI, snuff-box size, presented by that king to the doctor. As the portrait is exactly such as is contained in the snuff-boxes presented by Crowned heads, one of which I have seen, it is probable this portrait of Louis was originally attached to the box in question, which has in the lapse of years been lost or given away by Dr. Franklin."   H. B. Grigsby, *History of the Virginia Federal Convention of 1788* (Virginia Historical Society *Collections*, vols. 9-10), p. 264.

the adoption of this constitution, shall be as valid against the U. States under this constitution, as under the confederation." He affirmed that it was meant there should be no change with respect to claims by this political alteration; and that the public would stand, with respect to their creditors, as before. He thought that the validity of claims ought not to diminish by the adoption of the constitution. But however, it could not increase the demands on the public.

. . . Governor *Randolph*.—Mr. Chairman—This clause in spite of the invective of the gentleman, is a great favourite of mine; . . . He says, this clause will be injurious, and that no scale can be made, because there is a prohibition on congress of passing *ex post facto* laws. . . . *Ex post facto* laws, if taken technically, relate solely to criminal cases; and my honorable colleague tells you that it was so interpreted in convention. What greater security can we have against arbitrary proceedings in criminal jurisprudence than this? In addition to the interpretation of the convention, let me shew him still greater authority. The same clause provides, that no bill of attainder shall be passed. It shews that the attention of the convention was drawn to criminal matters alone. . . .

Governor *Randolph* could not coincide with the construction put by the honorable gentleman on *ex post facto* laws. The technical meaning which confined such laws solely to criminal cases, was followed in the interpretation of treaties between nations, and was concurred in by all civilians. The prohibition of bills of attainder, he thought a sufficient proof, that *ex post facto* laws related to criminal cases only, and that such was the idea of the convention.

*(The next clause read.)*

. . . Mr. *Madison*. — Mr. Chairman — Let us take a view of the relative situation of the states. Some states export the produce of other states. Virginia exports the produce of North-Carolina; Pennsylvania those of Jersey and Delaware; and Rhode-Island those of Connecticut and Massachusetts. The exporting states wished to retain the power of laying duties on exports, to enable them to pay the expences incurred. The states whose produce is exported by other states, were extremely jealous, lest a contribution should be raised of them by the exporting states, by laying heavy duties on their commodities. If this clause be fully considered, it will be found to be more consistent with justice and equity than any other practicable mode: For if the states had the exclusive imposition of duties on exports, they might raise a heavy contribution of the other states, for their own exclusive emoluments. The hon-

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 247 of 482

orable member who spoke in defence of the clause, has fairly repre-
sented it.   As to the reimbursement of the loss that may be sustained
by individuals, a tax may be laid on tobacco when brought to the
warehouses, for that purpose.   The sum arising therefrom may be
appropriated to it consistently with the clause.   For it only says,
that "the *nett* produce of all duties and imposts, laid by any state
on imports or exports, shall be for the use of the treasury of the
United States," which necessarily implies that all contingent charges
shall have been previously paid.

*(The 1st section, of the 2d article, read.)*

. . . Governor *Randolph*. . . . I will acknowledge that at one
stage of this business, I had embraced the idea of the honorable gentle-
man, that the re-eligibility of the president was improper.   But I
will acknowledge, that on a further consideration of the subject,
and attention to the lights which were thrown upon it by others,
I altered my opinion of the limitation of his eligibility.   When we
consider the advantages arising to us from it, we cannot object to it.
That which has produced my opinion against the limitation of his
eligibility, is this — that it renders him more independent in his
place, and more solicitous of promoting the interest of his consti-
tuents.   For, unless you put it in his power to be re-elected, instead
of being attentive to their interests, he will lean to the augmentation
of his private emoluments.

--------

CCXIII.   James Madison in the Virginia Convention.[1]

June 18, 1788.

*(The 1st section, of the 2d article, still under consideration.)*

. . . Mr. *Madison*. — Mr. Chairman — I will take the liberty of
making a few observations which may place this in such a light as
may obviate objections.   It is observable, that none of the honorable
members objecting to this, have pointed out the right mode of elec-
tion.   It was found difficult in the convention, and will be found
so by any Gentleman who will take the liberty of delineating a mode
of electing the president, that would exclude those inconveniences
which they apprehend.   I would not contend against some of the
principles laid down by some gentlemen if the interests of some
states only were to be consulted.   But there is a great diversity of
interests.   The choice of the people ought to be attended to.   I have
found no better way of selecting the man in whom they place the

--------

[1] Robertson, *Debates of the Convention of Virginia, 1788* (2d edit., 1805), p. 351.

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 2635.502 Personal and business relationships., 5 C.F.R. § 2635.502

---

| |
|---|
| Code of Federal Regulations |
|    Title 5. Administrative Personnel |
|       Chapter XVI. Office of Government Ethics |
|          Subchapter B. Government Ethics |
|             Part 2635. Standards of Ethical Conduct for Employees of the Executive Branch (Refs & Annos) |
|             Subpart E. Impartiality in Performing Official Duties |

5 C.F.R. § 2635.502

§ 2635.502 Personal and business relationships.

Currentness

(a) Consideration of appearances by the employee. Where an employee knows that a particular matter involving specific parties is likely to have a direct and predictable effect on the financial interest of a member of his household, or knows that a person with whom he has a covered relationship is or represents a party to such matter, and where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter, the employee should not participate in the matter unless he has informed the agency designee of the appearance problem and received authorization from the agency designee in accordance with paragraph (d) of this section.

(1) In considering whether a relationship would cause a reasonable person to question his impartiality, an employee may seek the assistance of his supervisor, an agency ethics official or the agency designee.

(2) An employee who is concerned that circumstances other than those specifically described in this section would raise a question regarding his impartiality should use the process described in this section to determine whether he should or should not participate in a particular matter.

(b) Definitions. For purposes of this section:

(1) An employee has a covered relationship with:

(i) A person, other than a prospective employer described in § 2635.603(c), with whom the employee has or seeks a business, contractual or other financial relationship that involves other than a routine consumer transaction;

Note: An employee who is seeking employment within the meaning of § 2635.603 shall comply with subpart F of this part rather than with this section.

(ii) A person who is a member of the employee's household, or who is a relative with whom the employee has a close personal relationship;

---

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 2635.502 Personal and business relationships., 5 C.F.R. § 2635.502

---

(iii) A person for whom the employee's spouse, parent or dependent child is, to the employee's knowledge, serving or seeking to serve as an officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee;

(iv) Any person for whom the employee has, within the last year, served as officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee; or

(v) An organization, other than a political party described in 26 U.S.C. 527(e), in which the employee is an active participant. Participation is active if, for example, it involves service as an official of the organization or in a capacity similar to that of a committee or subcommittee chairperson or spokesperson, or participation in directing the activities of the organization. In other cases, significant time devoted to promoting specific programs of the organization, including coordination of fundraising efforts, is an indication of active participation. Payment of dues or the donation or solicitation of financial support does not, in itself, constitute active participation.

Note: Nothing in this section shall be construed to suggest that an employee should not participate in a matter because of his political, religious or moral views.

(2) Direct and predictable effect has the meaning set forth in § 2635.402(b)(1).

(3) Particular matter involving specific parties has the meaning set forth in § 2637.102(a)(7) of this chapter.

Example 1: An employee of the General Services Administration has made an offer to purchase a restaurant owned by a local developer. The developer has submitted an offer in response to a GSA solicitation for lease of office space. Under the circumstances, she would be correct in concluding that a reasonable person would be likely to question her impartiality if she were to participate in evaluating that developer's or its competitor's lease proposal.

Example 2: An employee of the Department of Labor is providing technical assistance in drafting occupational safety and health legislation that will affect all employers of five or more persons. His wife is employed as an administrative assistant by a large corporation that will incur additional costs if the proposed legislation is enacted. Because the legislation is not a particular matter involving specific parties, the employee may continue to work on the legislation and need not be concerned that his wife's employment with an affected corporation would raise a question concerning his impartiality.

Example 3: An employee of the Defense Logistics Agency who has responsibilities for testing avionics being produced by an Air Force contractor has just learned that his sister-in-law has accepted employment as an engineer with the contractor's parent corporation. Where the parent corporation is a conglomerate, the employee could reasonably conclude that, under the circumstances, a reasonable person would not be likely to question his impartiality if he were to continue to perform his test and evaluation responsibilities.

Example 4: An engineer has just resigned from her position as vice president of an electronics company in order to accept employment with the Federal Aviation Administration in a position involving procurement responsibilities. Although the employee did not receive an extraordinary payment in connection with her resignation and has severed all financial ties with the firm, under the circumstances she would be correct in concluding that her former service as an officer of the company would be likely to cause a reasonable person to question her impartiality if she were to participate in the administration of a DOT contract for which the firm is a first-tier subcontractor.

---

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 2635.502 Personal and business relationships., 5 C.F.R. § 2635.502

---

Example 5: An employee of the Internal Revenue Service is a member of a private organization whose purpose is to restore a Victorian-era railroad station and she chairs its annual fundraising drive. Under the circumstances, the employee would be correct in concluding that her active membership in the organization would be likely to cause a reasonable person to question her impartiality if she were to participate in an IRS determination regarding the tax-exempt status of the organization.

(c) Determination by agency designee. Where he has information concerning a potential appearance problem arising from the financial interest of a member of the employee's household in a particular matter involving specific parties, or from the role in such matter of a person with whom the employee has a covered relationship, the agency designee may make an independent determination as to whether a reasonable person with knowledge of the relevant facts would be likely to question the employee's impartiality in the matter. Ordinarily, the agency designee's determination will be initiated by information provided by the employee pursuant to paragraph (a) of this section. However, at any time, including after the employee has disqualified himself from participation in a matter pursuant to paragraph (e) of this section, the agency designee may make this determination on his own initiative or when requested by the employee's supervisor or any other person responsible for the employee's assignment.

(1) If the agency designee determines that the employee's impartiality is likely to be questioned, he shall then determine, in accordance with paragraph (d) of this section, whether the employee should be authorized to participate in the matter. Where the agency designee determines that the employee's participation should not be authorized, the employee will be disqualified from participation in the matter in accordance with paragraph (e) of this section.

(2) If the agency designee determines that the employee's impartiality is not likely to be questioned, he may advise the employee, including an employee who has reached a contrary conclusion under paragraph (a) of this section, that the employee's participation in the matter would be proper.

(d) Authorization by agency designee. Where an employee's participation in a particular matter involving specific parties would not violate 18 U.S.C. 208(a), but would raise a question in the mind of a reasonable person about his impartiality, the agency designee may authorize the employee to participate in the matter based on a determination, made in light of all relevant circumstances, that the interest of the Government in the employee's participation outweighs the concern that a reasonable person may question the integrity of the agency's programs and operations. Factors which may be taken into consideration include:

(1) The nature of the relationship involved;

(2) The effect that resolution of the matter would have upon the financial interests of the person involved in the relationship;

(3) The nature and importance of the employee's role in the matter, including the extent to which the employee is called upon to exercise discretion in the matter;

---

Zelinsky, Nathaniel 11/16/2017
For Educational Use Only

§ 2635.502 Personal and business relationships., 5 C.F.R. § 2635.502

(4) The sensitivity of the matter;

(5) The difficulty of reassigning the matter to another employee; and

(6) Adjustments that may be made in the employee's duties that would reduce or eliminate the likelihood that a reasonable person would question the employee's impartiality.

Authorization by the agency designee shall be documented in writing at the agency designee's discretion or when requested by the employee. An employee who has been authorized to participate in a particular matter involving specific parties may not thereafter disqualify himself from participation in the matter on the basis of an appearance problem involving the same circumstances that have been considered by the agency designee.

Example 1: The Deputy Director of Personnel for the Department of the Treasury and an attorney with the Department's Office of General Counsel are general partners in a real estate partnership. The Deputy Director advises his supervisor, the Director of Personnel, of the relationship upon being assigned to a selection panel for a position for which his partner has applied. If selected, the partner would receive a substantial increase in salary. The agency designee cannot authorize the Deputy Director to participate on the panel under the authority of this section since the Deputy Director is prohibited by criminal statute, 18 U.S.C. 208(a), from participating in a particular matter affecting the financial interest of a person who is his general partner. See § 2635.402.

Example 2: A new employee of the Securities and Exchange Commission is assigned to an investigation of insider trading by the brokerage house where she had recently been employed. Because of the sensitivity of the investigation, the agency designee may be unable to conclude that the Government's interest in the employee's participation in the investigation outweighs the concern that a reasonable person may question the integrity of the investigation, even though the employee has severed all financial ties with the company. Based on consideration of all relevant circumstances, the agency designee might determine, however, that it is in the interest of the Government for the employee to pass on a routine filing by the particular brokerage house.

Example 3: An Internal Revenue Service employee involved in a long and complex tax audit is advised by her son that he has just accepted an entry-level management position with a corporation whose taxes are the subject of the audit. Because the audit is essentially complete and because the employee is the only one with an intimate knowledge of the case, the agency designee might determine, after considering all relevant circumstances, that it is in the Government's interest for the employee to complete the audit, which is subject to additional levels of review.

(e) Disqualification. Unless the employee is authorized to participate in the matter under paragraph (d) of this section, an employee shall not participate in a particular matter involving specific parties when he or the agency designee has concluded, in accordance with paragraph (a) or (c) of this section, that the financial interest of a member of the employee's household, or the role of a person with whom he has a covered relationship, is likely to raise a question in the mind of a reasonable person about his impartiality. Disqualification is accomplished by not participating in the matter.

(1) Notification. An employee who becomes aware of the need to disqualify himself from participation in a particular matter involving specific parties to which he has been assigned should notify the person responsible for his assignment. An employee who is responsible for his own assignment should take whatever steps are necessary

**Zelinsky, Nathaniel 11/16/2017**
**For Educational Use Only**

§ 2635.502 Personal and business relationships., 5 C.F.R. § 2635.502

to ensure that he does not participate in the matter from which he is disqualified. Appropriate oral or written notification of the employee's disqualification may be made to coworkers by the employee or a supervisor to ensure that the employee is not involved in a particular matter involving specific parties from which he is disqualified.

(2) Documentation. An employee need not file a written disqualification statement unless he is required by part 2634 of this chapter to file written evidence of compliance with an ethics agreement with the Office of Government Ethics or is specifically asked by an agency ethics official or the person responsible for his assignment to file a written disqualification statement. However, an employee may elect to create a record of his actions by providing written notice to a supervisor or other appropriate official.

(f) Relevant considerations. An employee's reputation for honesty and integrity is not a relevant consideration for purposes of any determination required by this section.

SOURCE: 57 FR 35041, Aug. 7, 1992; 62 FR 48747, Sept. 17, 1997, unless otherwise noted.

AUTHORITY: 5 U.S.C. 7301, 7351, 7353; 5 U.S.C. App. (Ethics in Government Act of 1978); E.O. 12674, 54 FR 15159; 3 CFR, 1989 Comp., p. 215, as modified by E.O. 12731, 55 FR 42547; 3 CFR, 1990 Comp., p. 306.

Notes of Decisions (14)

Current through November 9, 2017; 82 FR 52014.

End of Document
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

18 U.S. Op. Off. Legal Counsel 13 (O.L.C.), 1994 WL 810701

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF EMOLUMENTS CLAUSE TO EMPLOYMENT OF
GOVERNMENT EMPLOYEES BY FOREIGN PUBLIC UNIVERSITIES

March 1, 1994

The Emoluments Clause of the Constitution does not apply in the cases of government employees offered faculty employment by a foreign public university where it can be shown that the university acts independently of the foreign state when making faculty employment decisions.

**1  MEMORANDUM OPINION FOR THE CHIEF COUNSEL
GODDARD SPACE FLIGHT CENTER
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

This memorandum responds to your request of September 9, 1993, for our opinion concerning the applicability of the Emoluments Clause, U.S. Const. art. I, § 9, cl. 8 ("Emoluments Clause"), to the employment by the University of Victoria in British Columbia, Canada, of two scientists on leave without pay from the Goddard Space Flight Center ("Goddard"), a component of the National Aeronautics and Space Administration ("NASA").[B1] [FN1]FN;F1 We conclude that the Emoluments Clause does not apply in these cases.

I.

As Goddard has explained, Drs. Inez Fung and James K. B. Bishop have sought your administrative approval for employment as Professors in the School of Earth and Ocean Sciences at the University of Victoria until August 31, 1994. During that period, the two scientists would be in Leave Without Pay status from their positions at the Goddard Institute for Space Studies, a component of Goddard. (Goddard is itself a NASA field installation.) Both scientists hold the position of Aerospace Technology (AST)/Global Ecology Studies at the GS-15 level. For their services in teaching and research while on leave, Drs. Fung and Bishop would be paid $85,000 and $70,000 respectively by the University of Victoria.

The University of Victoria operates under the University Act, a statute enacted by the legislature of British Columbia. *See* University Act, R.S.B.C., ch. 419 (1979) (Can.) ("University Act"). The Act provides that the university is to consist of a chancellor, convocation, board, senate, and faculties. University Act, § 3(2). The chancellor is to be elected by the members of the convocation, *id.* § 11(1), and is to serve on the board of governors, *id.* § 19(a). The convocation is composed of **14** the chancellor, the president, the members of the senate, all faculty members, all graduates, all persons added to the roll of the convocation by the senate, and all other persons carried on the roll before July 4, 1974. *Id.* § 5(1).

The Supreme Court of Canada has outlined the powers of the boards of governors and senates subject to the University Act:

> Under the *University Act*, R.S.B.C. 1979, c. 419, the management, administration and control of the property, revenue, business and affairs of the university are vested in a board of governors consisting of 15 members. Eight of the members are appointed by the Lieutenant Governor in Council, but two

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

of these must be nominated by the alumni association. The provincial government, therefore, has the power to appoint a majority of the members of the board of governors, but it does not have the power to select a majority. The academic government of the university is vested in the senate, only a minority of the members of which are appointed by the Lieutenant Governor.

**\*\*2**  *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451, 459 (Can.) (plurality op.). Further, "under s. 22(1) of the Act, the Lieutenant Governor 'may, at any time, remove from office an appointed member of the board.'" *Id.* at 467 (Wilson, J., dissenting).

In general, the "management, administration and control of the property, revenue, business and affairs of the university are vested in the board." University Act, § 27. In addition, the university "enjoys special government-like powers in a number of respects and the exercise of these would presumably fall under the jurisdiction of the board. It has the power to expropriate property under s. 48 and its property is protected against expropriation under s. 50. It is exempt from taxation under s. 51. The board may also borrow money to meet University expenditures (s. 30) and appoint advisory boards for purposes it considers advisable (s. 33). The University may not dispose of its property without the approval of the Lieutenant Governor (s. 47(2))." *Harrison*, [1990] 3 S.C.R. at 467 (Wilson, J., dissenting).

As pointed out above, the academic governance of the university is vested in the senate. University Act, § 36. The senate is composed of a number of persons, including the chancellor, the president, deans, administrators, faculty, students, four members of convocation, representatives of affiliated colleges, and four persons appointed by the Lieutenant Governor. *Id.* § 34(2). Thus, only a relatively small minority of the senate will consist of governmental appointees.[B2][FN2]FN;F2

**\*15**  Finally, the faculty is "constituted by the board, on the recommendation of the senate." University Act, § 38. The faculty has various powers, including the power to determine, subject to the approval of the senate, courses of instruction. *Id.* § 39(d).

II.

The Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

Goddard advances two basic arguments for concluding that the Emoluments Clause is inapplicable in these cases. First, it maintains that the University of Victoria is not a "foreign State" within the meaning of the Clause. Second, it suggests that when a Federal employee is on Leave of Absence Without Pay status, he or she does not occupy an "Office of Profit or Trust" under the United States.

For reasons somewhat different from Goddard's, we agree that the Clause is inapplicable here. Although we believe that foreign public universities, such as the University of Victoria, are presumptively foreign states under the Emoluments Clause, we also find that, in this case, the university can be shown to be acting independently of the foreign state with respect to its faculty employment decisions. Because such a showing can be made, we conclude that in that context the University of Victoria should not be considered a foreign state.

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

A.

**\*\*3** The Emoluments Clause was adopted unanimously at the Constitutional Convention, and was intended to protect foreign ministers and other officers of the United States from undue influence and corruption by foreign governments -- a danger of which the Framers were acutely aware. [B3] [FN3][FN;F3] James Madison's notes on the Convention for August 23, 1787, report:

Mr[.] Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and **\*16** moved to insert -- after Art[.] VII sect[.] 7. the clause following -- "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State["] which passed nem: contrad.

2 *The Records of the Federal Convention of 1787*, at 389 (M. Farrand ed., 1966) ("Records"); *see also* 3 *id.* at 327 (remarks of Governor Randolph). [B4] [FN4][FN;F4] "Consistent with its expansive language and underlying purpose, the provision has been interpreted as being 'particularly directed against every kind of influence by foreign *governments* upon officers of the United States, based upon our historic policies as a nation.'" *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) (quoting 24 Op. Att'y Gen. 116, 117 (1902)).

Our Office has been asked from time to time whether foreign entities that are public institutions but not diplomatic, military, or political arms of their government should be considered to be "foreign State[s]" for purposes of the Emoluments Clause. In particular, we have been asked whether foreign public universities constitute "foreign State[s]" under the Clause. Our prior opinions on this subject have not been a seamless web. Thus, in an opinion that Goddard cites and relies upon, we concluded that while the University of New South Wales was clearly a public institution, it was not so clear that it was a "foreign State" under the Emoluments Clause, given its functional and operational independence from the federal and state governments in Australia. [B5] [FN5][FN;F5] Accordingly, we opined that the question posed there -- whether a NASA employee could accept a fee of $150 for reviewing a Ph.D. thesis -- had to be answered by considering the particular circumstances of the case, in order to determine whether the proposed arrangement had the potential **\*17** for corruption or improper foreign influence of the kind that the Emoluments Clause was designed to address. On other occasions, however, we have construed the Emoluments Clause to apply to public institutions of higher education in foreign countries without engaging in such an inquiry. [B6] [FN6][FN;F6]

In re-examining these precedents, we have considered the claim that foreign universities, even if "public" in character, should generally not be considered to be instrumentalities of foreign states for purposes of the Emoluments Clause. On behalf of this view, it can be argued that the Clause was designed to guard against the exercise of improper influence on United States officers or employees by the political, military, or diplomatic agencies of foreign states, because payments by those agencies are most likely to create a conflict between the recipient's Federal employment and his or her outside activity. Because public universities do not generally perform such functions, they ought not, on this analysis, to be brought within the Clause. [B7] [FN7][FN;F7]

**\*\*4** After considering the question carefully, we have concluded that such an interpretation of the Emoluments Clause is mistaken. Foreign public universities are, presumptively, foreign states within the meaning of the Clause. [B8] [FN8][FN;F8]

The language of the Emoluments Clause is both sweeping and unqualified. [B9] [FN9][FN;F9] The Clause in terms prohibits those holding offices of profit or trust under the United States from accepting "*any* present, Emolument, Office, or Title,

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

*of any kind whatever*" from "*any . . . foreign State*" unless Congress consents. U.S. Const. art. I, § 9, cl. 8. (emphases added). There is no express or implied exception for emoluments received from foreign states when the latter act in some capacity other than the performance of their political, military, or diplomatic functions. The decision whether to permit exceptions that qualify for the Clause's absolute prohibition or that temper any harshness it may cause is textually committed **\*18** to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause. :B10[FN10]FN;F10

Further, it serves the policy behind the Emoluments Clause to construe it to apply to foreign states even when they act through instrumentalities, such as universities, which do not perform political, military, or diplomatic functions. Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. :B11[FN11]FN;F11 That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government, even when those benefits took the form of remuneration for academic work or research. :B12[FN12]FN;F12 Moreover, institutions of higher learning are often substantially funded, whether directly or indirectly, by their governments, and university research programs or other academic activities may be linked to the missions of their governmental sponsors, including national scientific and defense agencies. :B13[FN13]FN;F13 Thus, United States Government officers or employees might well find themselves exposed to conflicting claims on their interests and loyalties if they were permitted to accept employment at foreign public universities. :B14[FN14]FN;F14

Finally, Congress has exercised its power under the Emoluments Clause to create a limited exception for academic research at foreign public institutions of learning. The Foreign Gifts and Decorations Act provides in part that Federal employees may accept from foreign governmental sources "a gift of more than minimal value when such gift is in the nature of an educational scholarship." 5 U.S.C. § 7342(c)(1)(B). :B15[FN15]FN;F15 Thus, Congress has recognized that foreign governmental bodies may wish to reward or encourage scholarly or scientific work by employees of our Government, but has carefully delimited the circumstances in which Federal employees may accept such honors or emoluments. That suggests that Congress **\*19** believes both that the Emoluments Clause extends to paid academic work by Federal employees at foreign public universities and that the Clause's prohibition on such activity should generally remain in force.

**\*\*5** Accordingly, we conclude that foreign governmental entities, including public universities, are presumptively instrumentalities of foreign states under the Emoluments Clause, even if they do not engage specifically in political, military, or diplomatic functions. :B16[FN16]FN;F16

B.

Having found that foreign public universities may and presumptively do fall under the Emoluments Clause, we turn next to the question whether the University of Victoria in particular is an instrumentality of a foreign state (the province of British Columbia), and hence within the Clause. We conclude that it is not, at least with respect to the faculty employment decisionmaking that is in issue here. Goddard contends:

The ability of [Canadian] federal or provincial government officials to influence and control the actions of [the University of Victoria's board, senate, and faculty] is most possible concerning the Board, but in all three cases is minimized by the other members of the organizations, the sources from which those members are obtained, the method of their ominations and appointments, and the procedures concerning replacement . . . .

Thus, it appears [that] the University of Victoria is established as a largely self-governing institution, with minimal influence exercisable over the daily affairs and even general policies of the University.

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

Goddard Mem. at 6.

 **\*20**  Without attempting to decide whether, as Goddard claims, the University of Victoria is generally free from the control of the provincial government of British Columbia, we think that the evidence shows that the university is independent of that government when making faculty employment decisions. We rely here chiefly on the Supreme Court of Canada's decisions in the *Harrison* case, cited above, and in the companion case, *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229 (Can.).

The principal question presented in *Harrison* was whether the University of British Columbia's mandatory retirement policy respecting its faculty and administrative staff was consistent with the requirements of the Canadian Charter of Rights and Freedoms ("the Charter").[B17][FN17][FN;F17] Whether the Charter applied turned on whether the challenged policy constituted governmental action -- an inquiry raising issues at least somewhat akin to those posed by the "State action" doctrine in United States jurisprudence. *See Harrison*, [1990] 3 S.C.R. at 463 (plurality op.).[B18][FN18][FN;F18] Over dissent, the Court held that the university's policy was not governmental action under the Charter. In reaching that conclusion, three of the seven judges drew a distinction between "ultimate or extraordinary control and routine or regular control," and held that while the government of British Columbia may be able to exercise the former, it lacked "the quality of control that would justify the application of the *Charter*." *Id.*; *see also id.* at 478 (L'Heureux-Dubè, J., dissenting on the appeal only) (university not "government" for purpose of section 32 of Charter).

 **\*\*6**  Similarly, in *McKinney*, a majority of the Court, again over dissent, held that the mandatory retirement policies of the defendant universities (there, located in the Province of Ontario) did not implicate the Charter. Moreover, the lead opinion emphasized the autonomy of the provincial universities when making faculty employment decisions:

> The *Charter* apart, there is no question of the power of the universities to negotiate contracts and collective agreements with their employees and to include within them provisions for mandatory retirement. These actions are not taken under statutory compulsion, so a *Charter* attack cannot be sustained on that ground. There is  **\*21**  nothing to indicate that in entering into these arrangements, the universities were in any way following the dictates of the government. They were acting purely on their own initiative . . . .

. . . . .
The legal autonomy of the universities is fully buttressed by their traditional position in society. Any attempt by government to influence university decisions, especially decisions regarding appointment, tenure and dismissal of academic staff, would be strenuously resisted by the universities on the basis that this could lead to breaches of academic freedom. In a word, these are not government decisions.

*McKinney*, [1990] 3 S.C.R. at 269, 273 (plurality op.); *see also id.* at 418-19 (L'Heureux-Dubè, J., dissenting) (while universities may perform certain public functions attracting Charter review, hiring and firing of employees at universities in both British Columbia and Ontario are not among such actions: "Canadian universities have always fiercely defended their independence").

While the Ontario statute at issue in *McKinney* differed from the British Columbia statute considered in *Harrison* (in particular, Ontario's statutes, unlike British Columbia's, did not permit the provincial government to appoint a majority

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

of a university board's membership), the *Harrison* plurality held that these differences did not establish that the core functions of the British Columbian universities were under the province's control. *Harrison*, [1990] 3 S.C.R. at 463-64 (plurality op.) Thus, the Court's statements in *McKinney* concerning the autonomy of Ontario's universities in matters of faculty employment would apparently hold true for the universities in British Columbia as well. [B19] [FN19] FN;F19 Furthermore, even the dissent in *Harrison* acknowledged "the lack of government control over the mandatory retirement policy specifically in issue here and over matters specifically directed to the principle of academic freedom." *Id.* at 471-72 (Wilson, J., dissenting). [B20] [FN20] FN;F20 The remaining member of the Court accepted the trial court's finding that the university's employment  **22**  agreements were essentially private contracts. *Id.* at 479-80 (L'Heureux-Dubè, J., dissenting on appeal only).

These Canadian cases cannot of course determine our interpretation of the Emoluments Clause. But they do provide compelling evidence that the University of Victoria is independent of the government of British Columbia with respect to decisions regarding the terms and conditions of faculty employment. Because that showing can be made, we believe the university should not be considered to be a foreign state under the Emoluments Clause when it is acting in that context. [B21] [FN21] FN;F21

CONCLUSION

**\*\*7**  The Emoluments Clause does not prohibit the two NASA scientists from accepting paid teaching positions at the University of Victoria during their unpaid leave of absence from their agency.

WALTER DELLINGER
Assistant Attorney General
Office of Legal Counsel

Footnotes

1   *See* Letter for Walter Dellinger, Acting Assistant Attorney General, Office of Legal Counsel, from Lawrence F. Watson, Chief Counsel, Goddard Space Flight Center, National Aeronautics and Space Administration (Sept. 9, 1993) (the "Goddard Mem.").

2   "With respect to some important matters, however, the decisions of the senate are effectively controlled by the board of governors." *Harrison*, [1990] 3 S.C.R. at 469 (Wilson, J., dissenting). For example, "every resolution passed by the senate respecting the establishment or discontinuance of any faculty, department, course of instruction, chair fellowship, scholarship, exhibition, bursary or prize (s. 36(i)) as well as internal faculty matters and terms of affiliation with other universities is of no force or effect unless approved by the board (s. 37)." *Id.*

3   *See, e.g., The Federalist* No. 22, at 149 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("One of the weak sides of republics, among their numerous advantages, is that they afford too easy an inlet to foreign corruption.").

4   The Emoluments Clause builds upon practices that had developed during the period of the Confederation: It was the practice of Louis XVI of France to give presents to departing ministers who signed treaties with France. Before he left France in mid-1780, Arthur Lee received a portrait of Louis set in diamonds atop a gold snuff box. In October 1780 Lee turned the gift over to Congress, and on 1 December Congress resolved that he could keep the gift. In September 1785 Benjamin Franklin informed Secretary for Foreign Affairs John Jay that, when he left France, Louis XVI presented him with a miniature portrait of himself, set with 408 diamonds. In October Jay recommended to Congress that Franklin be permitted to keep the miniature in accordance with its December 1780 ruling about a similar miniature given to Lee. In March 1786 Congress ordered that Franklin be permitted to keep the gift. At the same time, Congress also allowed Jay himself to accept the gift of a horse from the King of Spain even though Jay was then engaged in negotiations with Spain's representative, Don Diego de Gardoqui. 10 *The Documentary History of the Ratification of the Constitution* 1369 n.7 (John P. Kaminski et al. eds., 1993); *see also*

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

*President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing background of the ratification of the Clause).

5   *See* Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986).

6   *See, e.g.*, Memorandum to File from Robert J. Delahunty, Acting Special Counsel, *Re: Applicability of Emoluments Clause to Employment of CFTC Attorney by East China Institute of Politics and Law* (Aug. 27, 1992); Memorandum to Files from Barbara E. Armacost, *Re: Emoluments Clause and Appointment to the President's Committee on the Arts and Humanities* (Nov. 15, 1990). The General Accounting Office has reached a similar result in a related context. *See* 44 Comp. Gen. 130 (1964) (retired Coast Guard officer subject to recall to active duty held not entitled to retirement pay for period in which he was teaching for Department of Education of State of Tasmania, Australia).

7   *See* Gerald S. Schatz, *Federal Advisory Committees, Foreign Conflicts of Interest, The Constitution, and Dr. Franklin's Snuff Box*, 2 D.C. L. Rev. 141, 163, 166 (1993) ("The Emoluments Clause's reference to foreign states was a reference to foreign governments' acts in their sovereign capacity, as distinguished from the acts . . . of foreign governmental entities without the legal capacity to represent the national sovereign . . . . The Clause addresses the problem of conflict of interest on the part of a U.S. Government functionary vis- -vis a foreign sovereign in a sovereign capacity. The Clause thus may not be assumed to disqualify from U.S. Government service . . . an academic paid by a foreign government with which the officer does not deal.").

8   *See also Applicability of the Emoluments Clause To Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 121-23 (1993) (opining that Emoluments Clause applies to foreign public universities).

9   *Accord* 49 Comp. Gen. 819, 821 (1970) (the "drafters [of the Clause] intended the prohibition to have the broadest possible scope and applicability").

10  Accordingly, Congress has acted in appropriate cases to relieve certain classes of government personnel, e.g., retired military officers, from applications of the Clause. *See Ward v. United States*, 1 Cl. Ct. 46 (1982).

11  *See Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 100 (1986).

12  Consistent with this view, we have opined that an employee of the National Archives could not serve on an international commission of historians created and funded by the Austrian Government to review the wartime record of Dr. Kurt Waldheim, the President of Austria. *See generally*, 11 Op. O.L.C. 89 (1987).

13  Goddard's own link with Columbia University in New York City, *see* Goddard Mem. at 3, 7, is illustrative.

14  Of course, the same predicament could arise if Government employees worked at *private* universities abroad (or even in the United States). But the fact that the Emoluments Clause does not address every situation in which Government employees might be subjected to improper influence from foreign states is no reason to refuse to apply it to the cases which it *does* reach.

15  We have opined that this exception applied to an award of approximately $24,000 by a foundation acting on behalf of the West German Government to a scientist employed by the Naval Research Laboratory. We reasoned that a "program designed to honor United States scientists and enable them to stay for an extended period at research institutes in the Federal Republic of Germany to carry out research of the Awardee's own choice seems to be in the nature of an educational scholarship, acceptance of which Congress has permitted." Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 4 (Mar. 17, 1983) (internal quotation omitted).

16  We would also reject any argument that foreign public universities should be excluded from the purview of the Emoluments Clause on the theory that the Clause must be taken to prohibit only the acceptance of office or emoluments bestowed by a foreign state while engaged in performing "traditional" governmental functions, i.e., functions that governments would normally have performed at the time of the framing. The theory assumes that governmental support for higher education would not have been among such functions. The argument has several flaws. First, there is no such exception provided by or implicit in the language of the Clause. Second, the purposes of the Clause are better served if it is understood to cover all the functions of modern government, not some narrow class of them. Third, the Framers appear to have thought that support for higher education was indeed a legitimate function of government. The Constitutional Convention considered a proposal to empower Congress to establish a national university, but rejected it on the ground that the power was already embraced within the District of Columbia Clause. *See* 2 *Records* at 616. President George Washington, in his first and eighth annual addresses, called on Congress to consider establishing a national university. *See* 30 *The Writings of George Washington* 494 (John Fitzpatrick ed., 1939); 35 *id.* at 316-17.

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

17    The Canadian Charter is, in essence, a bill of rights. The Federal Government of Canada "enacted first the *Canadian Bill of Rights*, R.S.C., 1985, App. III, in 1960 and then the *Canadian Charter of Rights and Freedoms* in 1982, the latter having constitutional status. The values reflected in the *Charter* were to be the foundation of all laws, part of the 'supreme law of Canada' against which the constitutionality of all other laws was to be measured." *McKinney v. University of Guelph*, [1990] 3 S.C.R. at 355 (Wilson, J., dissenting).

18    *But see McKinney*, [1990] 3 S.C.R. at 274-75 (plurality op.) (noting certain differences between Canadian and American doctrines); *id.* at 343-44 (Wilson, J., dissenting) ("This Court has already recognized that while the American jurisprudential record may provide assistance in the adjudication of *Charter* claims, its utility is limited . . . . The *Charter* has to be understood and respected as a uniquely Canadian constitutional document.").

19    Judge Sopinka concurred in the conclusions and reasoning of the *Harrison* plurality except on the question whether the mandatory retirement policy was "law" within the meaning of section 15(1) of the Canadian Charter. He would have preferred not to decide that question on the basis of the assumption that the university was part of the government. *Harrison*, [1990] 3 S.C.R. at 481 (Opinion of Sopinka, J.). In *McKinney*, Judge Sopinka agreed that "a university is not a government entity for the purpose of attracting the provisions of the *Canadian Charter of Rights and Freedoms*." [1990] 3 S.C.R. at 444. While not being willing to say that "none of the activities of a university are governmental in nature," he was of the opinion that "the core functions of a university are non-governmental and therefore not directly subject to the *Charter*. This applies *a fortiori* to the university's relations with its staff." *Id.* (Opinion of Sopinka, J.) As in his opinion in *Harrison*, he preferred not to reach the question whether, if a university were part of the government, its mandatory retirement policies would be "law" for purposes of the Canadian Charter. *Id.*

20    Judge Cory agreed with Judge Wilson that the University of British Columbia formed part of the government for purposes of section 32 of the Canadian Charter, but disagreed with her on other grounds. *Harrison*, [1990] 3 S.C.R. at 481 (Opinion of Cory, J.) .

21    Since it is not necessary to our decision, we do not address Goddard's alternative argument that Federal employees in Leave Without Pay status do not occupy an Office of Profit or Trust within the meaning of the Emoluments Clause.

## 18 U.S. Op. Off. Legal Counsel 13 (O.L.C.), 1994 WL 810701

**End of Document**                                            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

---

10 U.S. Op. Off. Legal Counsel 96 (O.L.C.), 1986 WL 213241

Office of Legal Counsel

U.S. Department of Justice

APPLICATION OF EMOLUMENTS CLAUSE TO PART-TIME
CONSULTANT FOR THE NUCLEAR REGULATORY COMMISSION

June 3, 1986

A part-time consultant for the Nuclear Regulatory Commission occupied a position of profit or trust under the United States such that he could not, consistent with the Emoluments Clause of the Constitution, accept employment with a private domestic corporation to perform work on a contract with a foreign government.

**\*\*1**  MEMORANDUM OPINION FOR THE GENERAL COUNSEL
NUCLEAR REGULATORY COMMISSION

This responds to your request that this Office provide a written opinion giving the legal basis for our prior oral advice that Mr. A, a part-time staff consultant to the Nuclear Regulatory Commission (NRC), may not accept employment with a private domestic corporation to perform work on a contract with the government of Taiwan, consistent with the Emoluments Clause of the Constitution. :B1[FN1 FN;F1

At the time that you originally requested our advice on this matter, you informed us that the Taiwanese government must approve Mr. A's participation on this contract and that Mr. A would be paid by the corporation out of funds it receives from the contract. As you recognized, under prior opinions of this Office such an employment arrangement would appear to be proscribed, unless Mr. A does not hold an "office of profit or trust" within the meaning of the Emoluments Clause. :B2[FN2 FN;F2 See "Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act," 6 Op. O.L.C. 156 (1982).

**\*97**  In March 1985, we advised your office orally that this was a difficult question of constitutional analysis and that we would be unable to respond fully in writing in time for Mr. A to make a decision with regard to the proposed employment. We also indicated our preliminary conclusion that Mr. A did hold an "office of profit or trust" within the meaning of the Emoluments Clause, even though he worked for the NRC on a part-time basis only. We therefore suggested that he decline the Taiwanese government's offer of employment.

Based upon our recent thorough review of the history and purpose of this constitutional provision, we conclude that, in light of the nature of Mr. A's employment with the United States government, Mr. A holds an "office of profit or trust" within the meaning of that provision and that, therefore, he could not have accepted the proposed employment without the consent of Congress. :B3[FN3 FN;F3

I. History and Purpose of the Emoluments Clause

The Emoluments Clause, adopted unanimously at the Constitutional convention of 1787, was intended by the Framers to preserve the independence of foreign ministers and other officers of the United States from corruption and foreign influence. 3 Farrand, The Records of the Federal Convention of 1787 327; see also 2 Farrand, supra, at 389. As Governor Randolph explained during the ratification debate in the Virginia convention:

---

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

(This) restriction restrains any persons in office from accepting of any present or emolument, title or office, from any foreign prince or state. This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened, operated in producing the restriction. A box was presented to our ambassador by the king of our allies.( :B4[FN4 FN;F4) It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding emoluments from foreign states. I believe, that if at that moment, when we were in harmony with the King of France, we had supposed he was corrupting our ambassador, it might have disturbed that confidence,  **98  and diminished that mutual friendship, which contributed to carry us through the war.


 **2  3 Farrand, supra, at 327. Although no court has yet construed the Emoluments Clause, its expansive language and underlying purpose, as explained by Governor Randolph, strongly suggest that it be given broad scope. Consistent with a broad interpretation, past Attorneys General have stated that the Clause is "directed against every kind of influence by foreign governments upon officers of the United States," 24 Op. Att'y Gen. 116, 117 (1902), in the absence of consent by Congress. 40 Op. Att'y Gen. 513 (1947). See 5 U.S.C. s 7342.

Prior opinions of this Office have assumed without discussion that the persons covered by the Emoluments Clause were "officers of the United States" in the sense used in the Appointments Clause, U.S. Const. art. II, s 2, cl. 2. :B5[FN5 FN;F5 Nevertheless, in 1982, we did advise that a person may hold an "office of profit or trust" under the Emoluments Clause without necessarily being an "officer of the United States" for purposes of the Appointments Clause. At that time, we explained that the language and the purposes of the two provisions are significantly different. The Appointments Clause, which is rooted in separation of powers principles, had been construed to require that "any appointee exercising significant authority pursuant to the laws of the United States" is an "officer of the United States" who must be appointed in the manner prescribed by Article II. Buckley v. Valeo, 424 U.S. 1, 124-37 (1976). Employees are "lesser functionaries" subordinate to officers. Id. By contrast, the Emoluments Clause is a prophylactic provision, and hence, was intended to apply not merely to those appointees exercising "significant authority" but to "lesser functionaries" as well. Thus, although the possibility of corruption and foreign influence of foreign ministers apparently was of particular concern to the Framers, they expressly chose not to limit the prohibition on accepting emoluments from foreign governments to foreign ministers. They recognized that such a prohibition was also necessary for other officials and, accordingly, drafted the Clause to require undivided loyalty from all persons holding offices of profit or trust under the United States. :B6[FN6 FN;F6

We believe that the relevant inquiry, therefore, is not whether Mr. A should be considered an "officer of the United States" in the Appointments Clause sense. Rather, under the Emoluments Clause, the inquiry is whether Mr. A's part-time position at the NRC could be characterized as one of profit or trust under the United States -- a position requiring undivided loyalty to the United States government.

**99  II. Mr. A's Position

Although this Office expressed the view in 1982 that the Emoluments Clause applies to all government employees, see 6 Op. O.L.C. at 158, the clause need not be read so broadly to resolve the matter at hand. The information that you have provided concerning the nature of Mr. A's employment strongly suggests that Mr. A holds a position of trust within the meaning of the Emoluments Clause.

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

**\*\*3** We understand that the NRC selected Mr. A on the basis of his personal qualifications and his particular expertise. :B7[FN7 FN;F7 The NRC considered the renewal of Mr. A's appointment "essential to the conduct of the agency's mission." His assignments may involve high priority, quick turn-around issues, and the NRC furnishes him with various materials and documentation. Mr. A's position requires a security clearance, see 42 U.S.C. s 2165, and he is required to and has taken an oath of office. You have supplied us with a copy of the NRC's "Employment Conditions for Consultants and Advisers," which provides that Mr. A must conform to NRC policy and regulations regarding employee conduct, conflict of interest, non-disclosure of confidential information, and political activity. Mr. A is also required to report to the NRC any change in his private employment or financial interests. Finally, you note that he is "on call to serve the agency." All of these factors together indicate that Mr. A is highly valued for his abilities and that, in the course of his employment, he may develop or have access to sensitive and important, perhaps classified, information. Even without knowing more specifically the duties of his employment, these factors are a sufficient indication that the United States government has placed great trust in Mr. A and requires and expects his undivided loyalty. Therefore, we believe the Emoluments Clause applies to him.

Finally, we recognize that for purposes of the federal conflict-of-interest laws only, Mr. A is classified as a "special government employee." See 18 U.S.C. s 202. This classification, without more, however, does not exempt Mr. A from the constitutional prohibition in the Emoluments Clause. The legislative history of the conflict-of-interest laws reveals that Congress intended to create a category of special government employees for whom the restraints upon regular government employees would be relaxed. This category would permit the government to employ part- time or intermittent consultants with less difficulty. See H.R Rep. No. 748, 87th Cong., 1st Sess. 4-5 (1961); S. Rep. No. 2213, 87th Cong., 2d Sess. 16 (1962) (individual views of Sen. Carroll). Nonetheless, special government employees are covered by broad prophylactic statutes which, like the Emoluments Clause, are aimed at preventing corruption and extra-government influence. For example, special government employees are included within the coverage of 18 U.S.C. s 207 (governing post-employment **\*100** activities) and 18 U.S.C. s 208 (governing acts affecting a personal financial interest), as well as 18 U.S.C. ss 203 and 205 in certain cases. The conflict- of-interest laws do not address whether a special government employee may accept simultaneous employment with a foreign government. We do not read 18 U.S.C. s 202 as an implied expression of congressional consent under the Emoluments Clause to such employment, particularly when, pursuant to that Clause, Congress has expressly consented to the acceptance of gifts of minimal value from foreign governments by all employees, including experts and consultants. See 5 U.S.C. s 7342.

**\*\*4** In our view, the policy behind the Emoluments Clause, requiring the undivided loyalty of individuals occupying positions of trust under our government, has as much force with respect to part-time employees as it does with respect to full-time employees. Although we do not doubt that Mr. A is worthy of the trust placed in him by the NRC, we believe that his proposed employment with a domestic corporation on a contact with a foreign government is within the proscription of the Emoluments Clause.

Conclusion

For the foregoing reasons, we conclude that the Emoluments Clause of the Constitution prohibits Mr. A from accepting employment under a contract with a foreign government, absent express congressional consent.

Charles J. Cooper
Assistant Attorney General
Office of Legal Counsel

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

Footnotes

1    The Emoluments Clause provides:

     No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the consent of the Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State.

     U.S. Const. art. I, s 9, cl. 8.

2    It is well established that compensation for services performed for a foreign government constitutes an "emolument" for purposes of Article I, s 9, cl. 8. See 40 Op. Att'y Gen. 513 (1947); 44 Comp. Gen. 130 (1964).

3    This opinion addresses only the constitutional issue under Article I, s 9, cl. 8. It does not purport to deal with any other statutory or regulatory restrictions that Mr. A's proposed employment may have implicated. We note, however, that you have expressed the view that the proposed employment would not have contravened NRC's conflict of interest regulations.

4    "Dr. (Benjamin) Franklin is the person alluded to by Randolph. In the winter of 1756, in Philadelphia, under the roof of a venerable granddaughter of Dr. Franklin, I saw the beautiful portrait of Louis XVI, snuff-box size, presented by that king to the doctor. As the portrait is exactly such as is contained in the snuff-boxes presented by crowned heads, one of which I have seen, it is probable that this portrait of Louis was originally attached to the box in question, which has in the lapse of years been lost or given away by Dr. Franklin." H.B. Grigsby, History of the Virginia Federal Convention of 1788 (Virginia Historical Society Collections, Vols. 9- 10) 264.

5    In prior memoranda, it was unnecessary for this Office directly to address the issue whether the Emoluments Clause applies to employees or "lesser functionaries," as well as officers.

6    We also indicated in 1982, as support for this proposition, that in enacting the Foreign Gifts and Decorations Act of 1966, 5 U.S.C. s 7342, Congress assumed without discussion that the Emoluments Clause requires congressional consent before any government employee may accept a gift from a foreign government. See 6 Op. O.L.C. at 158. See also S. Rep. No. 1160, 89th Cong., 2d Sess. (1966); H.R. Rep. No. 2052, 89th Cong., 2d Sess. (1966). The Foreign Gifts and Decorations Act was extended in 1977 to apply to experts an consultants hired by the government under 5 U.S.C. s 3109. See 5 U.S.C. s 7342(a); S. Rep. No. 294, 95th Cong., 1st Sess. (1977).

7    See 15 Op. Att'y Gen. 187, 188 (1877) (Commissioners appointed by the President for the Centennial Exhibition hold offices of "trust" within the meaning of the Emoluments Clause, even though their duties are of a special and temporary character, because they have been entrusted with those duties "on account of their personal qualifications and fitness for the place.").

10 U.S. Op. Off. Legal Counsel 96 (O.L.C.), 1986 WL 213241

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   4

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

17 U.S. Op. Off. Legal Counsel 114 (O.L.C.), 1993 WL 777080

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO NON-GOVERNMENT MEMBERS OF ACUS

October 28, 1993

The Emoluments Clause of the Constitution prohibits non-government members of the Administrative Conference of the United States from accepting, absent Congress's consent, a distribution from their partnerships that includes some proportionate share of the revenues generated from the partnership's foreign government clients. Non-government members of ACUS are also generally forbidden, absent Congress's consent, from accepting payments from commercial entities owned or controlled by foreign governments.

**\*\*1** MEMORANDUM OPINION FOR THE GENERAL COUNSEL
ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

This memorandum responds to your request of July 30, 1993, which sought clarification of a portion of our April 29, 1991, letter to the Deputy Counsel to the President.[B1] [FN1]FN;F1 Specifically, you raise two questions concerning the advice we gave on that occasion concerning the scope and application of the Emoluments Clause, U.S. Const. art. I, § 9, cl. 8. After noting that a significant number of the 101 members of the Administrative Conference (the "Conference" or "ACUS") are lawyers in private practice, professors of law, or other experts in administrative law, you ask whether the Emoluments Clause prevents service on the Conference by a private individual who receives a partnership distribution from his or her firm that may include income received by the firm from a foreign government solely because of the pooling of partnership revenues. Further, you ask whether the Clause prevents service on the Conference by a private individual who receives payment from government-owned or controlled instrumentalities that do not engage in traditional functions -- including, but not limited to, foreign public universities.

I.

Congress established the Conference "to provide suitable arrangements through which Federal agencies, assisted by outside experts, may cooperatively study mutual problems, exchange information, and develop recommendations for action by proper authorities to the end that private rights may be fully protected and regulatory **\*115** activities and other Federal responsibilities may be carried out expeditiously in the public interest." 5 U.S.C. § 591; *see also* Marshall J. Breger, *The Administrative Conference of the United States: A Quarter Century Perspective*, 53 U. Pitt. L. Rev. 813, 814-19 (1992) ("Breger") (discussing origins and purposes of ACUS). "The bulk of the Conference's work has been its research function and it is here that it has performed its most important role as a ventilator of new ideas in administrative procedure." *Id.* at 829. The Conference must transmit an annual report to the President and Congress and such interim reports as the Chairman considers desirable. *See* 5 U.S.C. § 595(c). In addition, "[o]n a number of occasions, Congress has specifically mandated that the Conference undertake particular activities." Breger at 835.

**\*\*2** The Conference consists of not more than 101 nor fewer than 75 members, including a Chairman appointed by the President with the advice and consent of the Senate, the chairman (or designee) of each independent regulatory board or commission, the head (or designee) of each executive department or other administrative agency which is designated by the President, certain other governmental members, certain Presidential appointees, and "not more than 40 other

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

members appointed by the Chairman." 5 U.S.C. § 593. The Chairman's appointees "may at no time be less than one-third nor more than two-fifths of the total number of members." *Id.* § 593(b)(6). The Chairman is to select appointees "in a manner which will provide broad representation of the views of private citizens and utilize diverse experience. The members shall be members of the practicing bar, scholars in the field of administrative law or government, or others specially informed by knowledge and experience with respect to Federal administrative procedure." *Id.*

Apart from the Chairman, the members of the Conference are not entitled to payment for their services. 5 U.S.C. § 593(c). Non-government members of the Conference may be deemed to be special government employees within the meaning of 18 U.S.C. § 202 and subject to the provisions of 18 U.S.C. §§ 201-224. *See* 1 C.F.R. § 302.5(a) (1993).

The membership of the Conference meeting in plenary session constitutes the Assembly. 5 U.S.C. § 595(a). The Assembly has various powers, including that of "adopt[ing] such recommendations as it considers appropriate for improving administrative procedure." *Id.* § 595(a)(1). "Conference recommendations and statements are published in the *Federal Register* and then codified in the Code of Federal Regulations." Breger at 827-28. "Since its establishment, the Conference's recommendations have had a significant effect on the workings of the federal government." *Id.* at 831.

The Conference includes a Council composed of the Chairman and ten other members appointed by the President, "of whom not more than one-half shall be employees of Federal regulatory agencies or Executive departments." 5 U.S.C. § 595(b). The Council may exercise various powers, including calling meetings of the Conference, proposing by-laws and regulations, making recommendations to **\*116** the Conference on subjects germane to its purpose, and receiving and considering reports of Conference committees[B2][FN2][FN;F2] and distributing such reports to Conference members with the Council's own views and recommendations. *Id.*

II.

The Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

The Emoluments Clause was adopted unanimously at the Constitutional Convention, and was intended to protect foreign ministers and other officers of the United States from undue influence and corruption by foreign governments. James Madison's notes on the Convention for August 23, 1787, report:

**\*\*3** Mr[.] Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and moved to insert -- after Art[.] VII sect[.] 7. the clause following -- "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State["] which passed nem: contrad.

2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966 reprint); *see also* 3 *id.* at 327 (remarks of Governor Randolph); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing history of ratification of Clause).

A.

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

The ACUS Letter represents that, typically, half of the Council members come from outside the Federal government, as do somewhat less than half (i.e., approximately forty) of the remaining Conference members. It points out that these private members "are typically lawyers in private practice, law professors, and other **\*117** experts in administrative law and government." ACUS Letter at 1. Some of the Conference members are partners in law firms that include foreign governments among their clients. Although we are informed that these Conference members do not personally represent foreign governmental clients and have no dealings with them, "their partnership arrangements provide that client revenues are pooled in some fashion so that the member receives a partnership distribution from the firm that includes some proportionate share of revenues generated by those partners who have the foreign government among their clients." *Id.* at 2. ACUS asks whether such members are barred from Conference service by the Emoluments Clause.

As a threshold matter, ACUS does not dispute that Conference members from the private sector (who are unpaid for their services to the Conference) occupy an "Office of . . . Trust" within the meaning of the Emoluments Clause. We believe that Conference membership is such an office. To begin with, the Conference is a Federal agency established by statute. *See* 5 U.S.C. § 593. By virtue of their positions within that agency, Conference members are necessarily brought within the Clause. Although the Conference is an advisory committee as well as an agency, *see* ACUS Letter at 1, the April 1991 opinion stated that "Federal advisory committee members hold offices of profit or trust within the meaning of the Emoluments Clause," 15 Op. O.L.C. at 68, and we do not understand ACUS to be contesting that view. Moreover, the Conference's advice and recommendations have had (and were intended to have) a significant effect on the Government's administrative processes. Indeed, Congress has from time to time assigned specific statutory missions to the Conference, requiring it to assist other Federal agencies and demonstrating that the Conference's membership occupies a trusted and confidential role in governmental decisionmaking.[B3][FN3]FN;F3 Finally, under the Conference's own by-laws, its members may be considered to be special government employees subject to Federal conflict of interest statutes and regulations. *See* 1 C.F.R. § 302.5(a). Accordingly, we have no difficulty in concluding that the non-government members of the Conference occupy offices subject to the Clause. *See Offices of Trust*, 15 Op. Att'y Gen. 187, 188 (1877) (Commissioners appointed by the President for the Centennial Exhibition hold offices of "Trust" under Clause because they were entrusted with duties "on account of their personal qualifications and fitness for the place."); *see also Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986) (reviewing prior opinions).

**\*4  \*118** ACUS suggests that the Emoluments Clause does not apply to a Conference member's acceptance of a proportionate share of partnership earnings attributable to his or her law firm's representation of a foreign government. ACUS argues that such payments are not emoluments "from" a foreign State, but rather from the partnership itself. ACUS Letter at 2-3. In support of that analysis, ACUS cites an opinion of this Office, *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156 (1982). In that opinion, we considered the question whether an employee of the Nuclear Regulatory Commission ("NRC") was authorized to work on his leave time for an American consulting firm on a contract to design a nuclear power plant being built by an electrical commission of the Mexican government. The employee was to be paid by the consulting firm from funds received from the Mexican government in connection with the contract, although not all the proceeds of the contract were to go to him. On the facts, we concluded that "ultimate control, including selection of personnel, remains with the Mexican government," so that "the interposition of the American corporation [does not] relieve[] the NRC employee of the obligations imposed by the Emoluments Clause." *Id.* at 158-59. ACUS infers that this opinion "strongly suggests that the receipt of income from a partnership arrangement, standing alone, does not violate the Constitutional prohibition" on accepting emoluments from a foreign State. ACUS Letter at 2.

We agree with ACUS that our prior opinions suggest that when an employment relationship formally exists between a domestic employer and a Federal office-holder, the question whether the latter may be paid from foreign governmental

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

funds that the employer receives turns on whether the employer is acting as a mere conduit for those funds. This test may be illustrated by contrasting the opinion that ACUS cites (which found that the foreign government would in effect be paying for the covered person's services) with an earlier opinion that arrived at a different result. In Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with [X's] Trip to Indonesia* (Aug. 11, 1980), we considered a proposed contract under which Harvard University provided expert consultants to the government of Indonesia. The Indonesian government had no control over the selection of the experts and their payments, nor had it sought to influence the selection of experts during the years in which the consulting relationship had been in effect. We concluded in that case that the payment of the individual consultant would not be "from" the foreign government, but rather from the employing university.[B4] [FN4]FN;F4 *Id.* at 5.

 **\*119** In the present case, our inquiry focuses on the partnership relation rather than the employer-employee relation. "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business *and when there is community of interest in the profits and losses*." *Commissioner v. Tower,* 327 U.S. 280, 286 (1946) (emphasis added); *see also Meehan v. Valentine,* 145 U.S. 611, 623 (1892) ("those persons are partners, who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions."). There is typically no such community of interest or proportionate sharing of profits in the employment relation. Hence, our precedents in the employment area, while relevant and suggestive, are not directly on point.

 **\*\*5** ACUS contends that, "absent some direct personal contact or relationship between the Conference member and a foreign government," the member should not be barred from accepting "a proportionate share of partnership earnings . . . solely because his or her firm has a foreign government among its clients." ACUS Letter at 3. To the extent that our opinions in the employment area suggest that the proper test is whether the domestic employer or the foreign government has the power to *control* the covered person's activity, those opinions lend some support to ACUS's argument. A Conference member who did not personally represent a foreign government, and indeed had no personal contact with that client of the firm, could not be said to be subject to the foreign government's "control" in his or her activities on behalf of the partnership. But we think that this consideration is not decisive. More important, in our view, is the fact that the Conference member would draw a proportionate share of the partnership's pooled profits, which would include any profits the firm earned from representing its foreign governmental client. Because the amount the Conference member would receive from the partnership's profits would be a function of the amount paid to the firm by the foreign government, the partnership would in effect be a conduit for that government. Thus, some portion of the member's income could fairly be attributed to a foreign government. We believe that acceptance of that portion of the member's partnership share would constitute a prohibited emolument.

ACUS points out that our April 1991 Opinion stated that 18 U.S.C. § 219 does not implicitly disqualify an individual from serving on an advisory committee simply because he or she is a partner at a firm that is required by statute to register as a foreign agent. *See* ACUS Letter at 3; 15 Op. O.L.C. at 66 n.4. ACUS urges that we adopt a similar conclusion with respect to the Emoluments Clause. Section 219, a criminal statute, makes it an offense for a public official (including members of advisory committees covered by the Federal Advisory Committee Act, **\*120** 5 U.S.C. app. 2, §§ 1-16) to be or act as the agent of certain foreign principals. We think that the action of one partner acting as such a foreign agent cannot under this criminal statute be fairly imputed to another partner who serves on an advisory committee. But it by no means follows that a partner does not receive income from a foreign government within the meaning of the Emoluments Clause when an identifiable portion of his or her partnership draw can be attributed to the partnership's fees from such a client.

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Accordingly, we conclude that, absent the consent of Congress, the Emoluments Clause would prohibit members of the Conference from accepting a share of partnership earnings, where some portion of that share is derived from the partnership's representation of a foreign government.

B.

ACUS further informs us that some private Conference members from time to time have among their personal clients foreign government-owned or -controlled instrumentalities, or business or proprietary corporations in which foreign governments have ownership interests. Other Conference members may from time to time receive payment for teaching at foreign public universities. ACUS Letter at 2.

**6** ACUS suggests that payments accepted by private members for services rendered to a foreign government should not be considered to be forbidden emoluments when such a government is acting through commercial instrumentalities that it owns or controls, or through public academic institutions. *See* ACUS Letter at 3-4. Such payments, ACUS suggests, would not be accepted "from any . . . foreign State."

We deal first with the question of foreign government-owned or -controlled commercial enterprises. In our opinion, such a corporation should indeed be considered to be a "foreign State" within the meaning of the Emoluments Clause. *Accord* 53 Comp. Gen. at 756 (corporation owned by government of Israel held within purview of Clause). It may be true, as ACUS says, that when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns. *See* ACUS Letter at 3 (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976)); *but see id.* at 715 (Powell, J., concurring) ("the line between commercial and political acts of a foreign state often will be difficult to delineate"). [B5] [FN5]FN;F5 But nothing in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns*.

***121*** The language of the Emoluments Clause is both sweeping and unqualified. *See* 49 Comp. Gen. 819, 821 (1970) (the "drafters [of the Clause] intended the prohibition to have the broadest possible scope and applicability"). It prohibits those holding offices of profit or trust under the United States from accepting "*any* present, Emolument, Office, or Title, *of any kind whatever*" from "*any* . . . foreign State" unless Congress consents. U.S. Const. art. I, § 9, cl. 8 (emphasis added). There is no express or implied exception for emoluments received from foreign States when the latter act in some capacity other than the performance of their political or diplomatic functions. The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause.

Moreover, a foreign government's ownership or control of a corporation may render the corporation that government's agent. *See First Nat'l City Bank v. Banco Para El Commercio*, 462 U.S. at 629. Indeed, as the Court has noted, "[a] typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed *by a board selected by the government in a manner consistent with the enabling law*." *Id.* at 624 (emphasis added). We believe that the Emoluments Clause should be interpreted to guard against the risk that occupants of Federal office will be paid by corporations that are, or are susceptible of becoming, agents of foreign States, or that are typically administered by boards selected by foreign States. Accordingly, we think that, in general, business corporations owned or controlled by foreign governments will fall within the Clause. [B6] [FN6]FN;F6

**7** The question whether the Emoluments Clause extends to foreign public universities is somewhat more difficult. Our prior opinions on this subject have not been a seamless web. Thus, in Memorandum for H. Gerald Staub, Office

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986), we concluded that while the University of New South Wales was clearly a public institution, it was not so clear that it was a "foreign State" under the Emoluments Clause, given its functional and operational independence from the government of Australia and state political instrumentalities. Accordingly, we opined that the question posed there -- whether a NASA employee could accept a **\*122** fee of $150 for reviewing a Ph.D. thesis -- had to be answered by considering the particular circumstances of the case, in order to determine whether the proposed arrangement had the potential for corruption or improper foreign influence of the kind that the Emoluments Clause was designed to address. On other occasions, however, we have construed the Emoluments Clause to apply to public institutions of higher education in foreign countries. :B7[FN7]FN;F7

In support of its view that the Emoluments Clause does not apply to foreign public universities, ACUS argues that the Clause was designed to guard against the exercise of improper influence on Federal office-holders by the political or diplomatic agencies of foreign States, because payments by those agencies are most likely to create a conflict between the recipient's Federal employment and his or her outside activity. *See* ACUS Letter at 4. Because public universities do not generally perform political or diplomatic functions, they ought not, on ACUS's analysis, to be brought within the Clause. We think, however, that the contrary view is the better one.

To begin with, we reiterate that the language of the Emoluments Clause does not warrant any distinction between the various capacities in which a foreign State may act. *Any* emoluments from a foreign State, whether dispensed through its political or diplomatic arms or through other agencies, are forbidden to Federal office-holders (unless Congress consents). Further, it serves the policy behind the Emoluments Clause to construe it to apply to foreign States even when they act through instrumentalities which, like universities, do not perform political or diplomatic functions. Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. *See* 10 Op. O.L.C. at 100. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government, even when those benefits took the form of remuneration for academic work or research. :B8[FN8]FN;F8 Thus, United States Government officers or employees might well find themselves exposed to conflicting claims on their interests and loyalties if they were permitted to accept employment at foreign public universities.

 **\*\*8** Finally, Congress has exercised its power under the Emoluments Clause to create a limited exception for academic research at foreign public institutions of learning. The Foreign Gifts and Decorations Act provides in part that Federal employees **\*123** may accept from foreign governmental sources "a gift of more than minimal value when such gift is in the nature of an educational scholarship." 5 U.S.C. § 7342(c)(1)(B). :B9[FN9]FN;F9 Thus, Congress has recognized that foreign governmental bodies may wish to reward or encourage scholarly or scientific work by employees of our Government, but has carefully delimited the circumstances in which Federal employees may accept such honors or emoluments. That suggests that Congress believes both that the Emoluments Clause extends to paid academic work by Federal employees at foreign public universities, and that the Clause's prohibition on such activity should generally remain in force.

Accordingly, we conclude that foreign governmental entities, including public universities, can and presumptively do constitute instrumentalities of foreign States under the Emoluments Clause, even if they do not engage specifically in political or diplomatic functions. :B10[FN10]FN;F10

*Conclusion*

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Non-government members of the Administrative Conference are prohibited by the Emoluments Clause from accepting a distribution from their partnerships that includes some proportionate share of the revenues generated from the firm's foreign government clients.

Similarly, non-government members of the Conference are in general forbidden by the Emoluments Clause from accepting payments from commercial entities owned or controlled by foreign States. This prohibition also extends to the acceptance of payments for teaching at foreign universities that are instrumentalities of foreign States.

WALTER DELLINGER
Assistant Attorney General
Office of Legal Counsel

Footnotes

1    Your request is set forth in the Letter for Daniel Koffsky, Esq., Acting Assistant Attorney General, Office of Legal Counsel, from Gary J. Edles, General Counsel, Administrative Conference of the United States (July 30, 1993) ("ACUS Letter"). The opinion to which your letter refers is *Applicability of 18 U.S.C. § 219 to Members of Federal Advisory Committees*, 15 Op. O.L.C. 65 (1991) ("the April 1991 Opinion").

2    Under its by-laws, the Conference has six standing committees: adjudication, administration, governmental processes, judicial review, regulation and rulemaking. *See* 1 C.F.R. § 302.3. In addition, with the approval of the Council, the Chairman may establish special ad hoc committees and assign special projects to them. *Id.* The committees, which include both government and non-government members, are "vital to the Conference's research and review process." Breger at 826.

3    For example, the Magnuson-Moss Warranty Act, § 202(d), 15 U.S.C. § 57a note, directed ACUS to study the Federal Trade Commission's "hybrid" rulemaking procedures. The Government in the Sunshine Act § 3(a), 5 U.S.C. § 552b(g), required agencies affected by the Act's open meeting requirements to consult with ACUS in developing their regulations. The Equal Access to Justice Act § 203(a)(1), 5 U.S.C. § 504(c)(1), required agencies to consult with ACUS before establishing uniform procedures for the submission and consideration of applications for awards of fees and expenses. *See* Breger at 835-36.

4    The Comptroller General appears to have adopted the same tests for determining whether a proposed payment from a domestic employer would violate the Emoluments Clause. In 69 Comp. Gen. 220 (1990), reconsidering and affirming 65 Comp. Gen. 382 (1986), the General Accounting Office ruled that a retired military officer employed under a contract between a domestic corporation and the Saudi Arabian Navy was subject to the Emoluments Clause. There was sufficient evidence to conclude that the officer "is in actuality an employee of the Royal Saudi Naval Forces since this entity may control and supervise him as well as terminate his employment." 65 Comp. Gen. at 385. Similarly, the General Accounting Office ruled that a retired military officer who was employed and paid by a domestic corporation and then assigned to work for an Israeli government instrumentality was within the Clause. It was shown that the domestic corporation was in effect merely an employment agency, and that the officer was actually working for the foreign government that had procured his services. *See* 53 Comp. Gen. 753 (1974).

5    In *Dunhill*, the Court declined to extend the Act of State doctrine "to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." 425 U.S. at 695. The case is at best marginally relevant to the issues here. Moreover, underlying the presumptive distinction between foreign governmental business corporations and the sovereigns that own or control them are concerns for "economic development and efficient administration," reinforced by "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity." *First Nat'l City Bank v. Banco Para El Comercio*, 462 U.S. 611, 626 (1983). But even in commercial contexts where concerns for economy and efficiency loom larger than they do here, the Court has been prepared to hold that presumptive distinction overcome. *Id.* at 630-33.

6    We acknowledge that the Foreign Gifts and Decorations Act, which provides Congress's consent to certain transactions otherwise forbidden by the Emoluments Clause, does not expressly subsume corporations owned or controlled by foreign States within its definition of a "foreign government." *See* 5 U.S.C. § 7342(a)(2). Rather, that definition extends primarily to "any unit of foreign governmental authority," *id.* § 7342(a)(2)(A), and it is plausible to argue that such corporations are

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

not units of governmental authority. However, we do not assume that the Act's definition is necessarily coextensive with the constitutional concept of a "foreign State."

7  *See, e.g.*, Memorandum for Files from Robert J. Delahunty, Acting Special Counsel, Office of Legal Counsel, *Re: Applicability of Emoluments Clause to Employment of CFTC Attorney by East China Institute of Politics and Law* (Aug. 27, 1992); Memorandum for Files from Barbara E. Armacost, Attorney-Adviser, Office of Legal Counsel, *Re: Emoluments Clause and Appointment to the President's Committee on the Arts and Humanities* (Nov. 15, 1990). The General Accounting Office has reached a similar result. *See* 44 Comp. Gen. 130 (1964) (retired Coast Guard officer subject to recall to active duty held not entitled to retirement pay for period in which he was teaching for the Department of Education of the State of Tasmania, Australia).

8  Consistent with this view, we have opined that an employee of the National Archives could not serve on an international commission of historians created and funded by the Austrian Government to review the wartime record of Dr. Kurt Waldheim, the President of Austria. *See Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89 (1987).

9  We have opined that this exception applied to an award of approximately $24,000 by a foundation acting on behalf of the West German Government to a scientist employed by the Naval Research Laboratory. We reasoned that a "program designed to honor United States scientists and enable them 'to stay for an extended period at research institutes in the Federal Republic of Germany to carry out research of the Awardee's own choice' seems to be in the nature of an educational scholarship, acceptance of which Congress has permitted." Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 4 (Mar. 17, 1983).

10  ACUS points out that it is an advisory committee, and that "the nature of an advisory committee is that an individual -- or even the committee as a whole -- cannot determine the course of governmental action." ACUS Letter at 4. But, as we have noted above, ACUS is also, by statute, a Federal *agency*. Moreover, even considered solely as an advisory committee, ACUS could influence governmental decisionmaking. *See Association of Am. Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 913-14 (D.C. Cir. 1993). Hence, the advisory nature of ACUS does not render it immune from the possibility that a foreign State might exert improper influence on and through it. ACUS also objects that "[i]t would be particularly unusual for a recommendation by the Administrative Conference to be of significant interest to a foreign government." ACUS Letter at 5. But there may be no way of fine-tuning the prohibitions on the acceptance of foreign governmental emoluments to reach precisely such "unusual" cases. In any event, the Constitution itself lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications.

17 U.S. Op. Off. Legal Counsel 114 (O.L.C.), 1993 WL 777080

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

1952 WL 82045 (U.S.) (Appellate Brief)
Supreme Court of the United States.

Oliver BROWN, et al., Appellants,

v.

BOARD OF EDUCATION OF TOPEKA, Shawnee County, Kansas, et al.;

Harry Briggs, Jr., et al., Appellants,

v.

R. W. Elliott, et al.;

Dorothy E. Davis, et al., Appellants,

v.

County School Board of Prince Edward County, Virginia, et al;

Spotiswood Thomas Bolling, et al., Petitioners,

v.

C. Melvin Sharpe, et al.;

Francis B. Gebhart, et al., Petitioners,

v.

Ethel Louise Belton, et al.

Nos. 1, 2, 3, 4, 5.
October Term, 1952.
December 2, 1952.

**Brief for the United States as Amicus Curiae**

### *I INDEX

I. The interest of the United States ...................................................................................................... 2

II. The Court may not find it necessary to reach the question whether the "separate but equal" 8
doctrine should be reaffirmed or overruled .......................................................................................

III. If the Court should reach the question, the "separate but equal" doctrine should be reexamined 17
and overruled .....................................................................................................................................

IV. If in any of these cases the Court should hold that a system of "separate but equal" public 27
schools is unconstitutional, it should remand the case to the district court with directions to devise
and execute such program for relief as appears most likely to achieve orderly and expeditious
transition to a non-segregated system .................................................................................................

Conclusion ......................................................................................................................................... 31

### CITATIONS

*Cases:*

*Addison v. Holly Hill Co.,* 322 U. S. 607........................... 27

*Alexander v. Hillman,* 296 U. S. 232................................ 27

*Ashwander v. T. V. A.,* 297 U. S. 288............................... 9

*Buchanan v. Warley,* 245 U. S. 60. ................................. 18, 22

*Carr v. Corning,* 182 F. 2d 14........................................ 15

*Eccles v. Peoples Bank,* 333 U. S. 426............................. 27

*Endo, Ex parte,* 323 U. S. 283........................................ 16

*Fisher v. Hurst,* 333 U. S. 147........................................ 10

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

| | |
|---|---|
| *Gompera v. United States,* 233 U. S. 604 | 25 |
| *Graves v. N. Y. ex rel. O'Keefe,* 306 U. S. 466 | 26 |
| *Great Northern R. Co. v. Sunburst Oil Co.,* 287 U. S. 358 | 31 |
| *Henderson v. United States,* 339 U. S. 816 | 10, 13, 17 |
| *Hurd v. Hodge,* 334 U. S. 24. | 22 |
| *Liverpool Steamship Company v. Emigration Commissioners,* 113 U. S. 33 | 9 |
| *McCollum v. Board of Education,* 333 U. S. 203 | 19 |
| *McLaurin v. Oklahoma State Regents,* 339 U. S. 637 | 17, 18, 23 |
| *Missouri ex rel. Gaines v. Canada,* 305 U. S. 337 | 9, 11, 18 |
| *Passenger Cases,* 7 How. 283 | 26 |
| *Peres v. Sharp,* 32 Calif. 2d 711 | 24 |
| *Plessy v. Ferguson,* 163 U. S. 537 | 4, 13, 14, 23, 32 |
| *Radio Station WOW, Inc. v. Johnson,* 326 U. S. 120 | 27 |
| *Rescue Army v. Municipal Court,* 331 U. S. 549 | 14 |
| *Shelley v. Kraemer,* 334 U. S. 1 | 22 |
| *Sipuel v. Board of Regents,* 332 U. S. 631 | 9, 11 |
| **II** *Slaughter-House Cases,* 16 Wall. 36 | 22 |
| *Smith v. Allwright,* 321 U. S. 649 | 26 |
| *Standard Oil Co. v. United States,* 221 U. S. 1 | 27 |
| *Strauder v. West Virginia,* 100 U. S. 303 | 19 |
| *Sweatt v. Painter,* 339 U. S. 629 | 8, 9, 10, 11, 17, 18 |
| *Takahashi v. Fish and Game Commission,* 334 U. S. 410 | 22 |
| *Union Pacific Railway Co. v. Chicago, M. & St. P. Railway Co.,* 163 U. S. 564 | 27 |
| *United States v. Aluminum Co.,* 322 U. S. 716, 148 F. 2d 416, 171 F. 2d 285, 91 F. Supp. 333 | 27 |
| *United States v. CIO,* 335 U. S. 106 | 9, 15 |
| *United States v. National Lead Co.,* 332 U. S. 319 | 27 |
| *United States v. Paramount Pictures,* 70 F. Supp. 53, 334 U. S. 131, 85 F. Supp. 881, 339 U. S. 974 | 27 |
| *Virginia v. Rives,* 100 U. S. 313 | 21 |
| *Wilshire Oil Co. v. United States,* 295 U. S. 100 | 12 |
| *Wolf v. Colorado,* 338 U. S. 25 | 25 |
| Statutes: | |
| Public Utility Holding Company Act of 1935, 49 Stat. 820, 15 U. S. C. 79k | 28 |
| 8 U. S. C. 41 | 21 |
| 8 U. S. C. 42 | 21 |
| Virginia: | |
| Code (1950), Section 22-221 | 16 |
| Constitution (1902), Article IX, Section 140 | 15 |
| Miscellaneous: | |
| Letter from Secretary of State to Attorney General dated December 2, 1952 | 6-8 |
| Message to the Congress, February 2, 1948, H. Doc. No. 516, 80th Cong., 2d sess | 2, 4, 33 |
| *To Secure These Rights,* Report of the President's Committee on Civil Rights (1947), p. 89 | 4, 6, 8, 31-32 |

**\*1** Because of the national importance of the constitutional questions presented in these cases, the United States considers it appropriate to submit this brief as *amicus curiae.* We shall not undertake, however, to deal with every aspect of the issues involved. Comprehensive briefs have been submitted by the parties and other *amici curiae;* and, so far as possible, this brief will avoid repetition of arguments and materials contained in those briefs. We shall try to confine

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

ourselves to those aspects of the cases which are of particular concern to the Government or within its special competence to discuss.

## *2 I

### The interest of the United States

In recent years the Federal Government has increasingly recognized its special responsibility for assuring vindication of the fundamental civil rights guaranteed by the Constitution. The President has stated: "We shall not * * * finally achieve the ideals for which this Nation was founded so long as any American suffers discrimination as a result of his race, or religion, or color, or the land of origin of his forefathers. * * * The Federal Government has a clear duty to see that constitutional guaranties of individual liberties and of equal protection under the laws are not denied or abridged anywhere in our Union." [1]

Recognition of the responsibility of the Federal Government with regard to civil rights is not a matter of partisan controversy, even though differences of opinion may exist as to the need for particular legislative or executive action. Few Americans believe that government should pursue a *laissez-faire* policy in the field of civil rights, or that it adequately discharges its duty to the people so long as it does not itself intrude on their civil liberties. Instead, there is general acceptance of an affirmative government obligation to insure respect for fundamental human rights.

**\*3** The constitutional right invoked in these cases is the basic right, secured to all Americans, to equal treatment before the law. The cases at bar do not involve isolated acts of racial discrimination by private individuals or groups. On the contrary, it is contended in these cases that public school systems established in the states of Kansas, South Carolina, Virginia, and Delaware, and in the District of Columbia, unconstitutionally discriminate against Negroes solely because of their color.

This contention raises questions of the first importance in our society. For racial discriminations imposed by law, or having the sanction or support of government, inevitably tend to undermine the foundations of a society dedicated to freedom, justice, and equality. The proposition that all men are created equal is not mere rhetoric. It implies a rule of law---an indispensable condition to a civilized society---under which all men stand equal and alike in the rights and opportunities secured to them by their government. Under the Constitution every agency of government, national and local, legislative, executive, and judicial, must treat each of our people as an *American,* and not as a member of a particular group classified on the basis of race or some other constitutional irrelevancy. The color of a man's skin---like his religious beliefs, or his political attachments, or the country from which he or his ancestors came to the United States---does not **\*4** diminish or alter his legal status or constitutional rights. "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." [2]

The problem of racial discrimination is particularly acute in the District of Columbia, the nation's capital. This city is the window through which the world looks into our house. The embassies, legations, and representatives of all nations are here, at the seat of the Federal Government. Foreign officials and visitors naturally judge this country and our people by their experiences and observations in the nation's capital; and the treatment of colored persons here is taken as the measure of our attitude toward minorities generally. The President has stated that "The District of Columbia should be a true symbol of American freedom and democracy for our own people, and for the people of the world." [3] Instead, as the President's Committee on Civil Rights found, the District of Columbia "is a graphic illustration of a failure of democracy." [4] The Committee summarized its findings as follows:

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

For Negro Americans, Washington is not just the nation's capital. It is the **\*5** point at which all public transportation into the South becomes "Jim Crow." If he stops in Washington, a Negro may dine like other men in the Union Station, but as soon as he steps out into the capital, he leaves such democratic practices behind. With very few exceptions, he is refused service at downtown restaurants, he may not attend a downtown movie or play, and he has to go into the poorer section of the city to find a night's lodging. The Negro who decides to settle in the District must often find a home in an overcrowded, substandard area. He must often take a job below the level of his ability. He must send his children to the inferior public schools set aside for Negroes and entrust his family's health to medical agencies which give inferior service. In addition, he must endure the countless daily humiliations that the system of segregation imposes upon the one-third of Washington that is Negro.

The shamefulness and absurdity of Washington's treatment of Negro Americans is highlighted by the presence of many dark-skinned foreign visitors. Capital custom not only humiliates colored citizens, but is a source of considerable embarrassment to these visitors. * * * Foreign officials are often mistaken for American Negroes and refused food, lodging and entertainment. However, once it **\*6** is established that they are not Americans, they are accommodated. [5]


It is in the context of the present world struggle between freedom and tyranny that the problem of racial discrimination must be viewed. The United States is trying to prove to the people of the world, of every nationality, race, and color, that a free democracy is the most civilized and most secure form of government yet devised by man. We must set an example for others by showing firm determination to remove existing flaws in our democracy.

The existence of discrimination against minority groups in the United States has an adverse effect upon our relations with other countries. Racial discrimination furnishes grist for the Communist propaganda mills, and it raises doubts even among friendly nations as to the intensity of our devotion to the democratic faith. In response to the request of the Attorney General for an authoritative statement of the effects of racial discrimination in the United States upon the conduct of foreign relations, the Secretary of State has written as follows:
* * * I wrote the Chairman of the Fair Employment Practices Committee on May 8, 1946, that the existence of discrimination against minority groups was having an adverse effect upon our relations with other countries. At that time I pointed out that **\*7** discrimination against such groups in the United States created suspicion and resentment in other countries, and that we would have better international relations were these reasons for suspicion and resentment to be removed.

During the past six years, the damage to our foreign relations attributable to this source has become progressively greater. The United States is under constant attack in the foreign press, over the foreign radio, and in such international bodies as the United Nations because of various practices of discrimination against minority groups in this country. As might be expected, Soviet spokesmen regularly exploit this situation in propaganda against the United States, both within the United Nations and through radio broadcasts and the press, which reaches all corners of the world. Some of these attacks against us are based on falsehood or distortion; but the undeniable existence of racial discrimination gives unfriendly governments the most effective kind of ammunition for their propaganda warfare. The hostile reaction among normally friendly peoples, many of whom are particularly sensitive in regard to the status of non-European races, is growing in alarming proportions. In such countries the view is expressed more and more vocally that the United States is hypocritical in claiming to be the champion of democracy while permitting practices of racial discrimination here in this country.

 **\*8** The segregation of school children on a racial basis is one of the practices in the United States that has been singled out for hostile foreign comment in the United Nations and elsewhere. Other peoples cannot understand how such a

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

practice can exist in a country which professes to be a staunch supporter of freedom, justice, and democracy. The sincerity of the United States in this respect will be judged by its deeds as well as by its words.

Although progress is being made, the continuance of racial discrimination in the United States remains a source of constant embarrassment to this Government in the day-to-day conduct of its foreign relations; and it jeopardizes the effective maintenance of our moral leadership of the free and democratic nations of the world. [6]

## II

### The Court may not find it necessary to reach the question whether the "separate but equal" doctrine should be reaffirmed or overruled

The briefs in these cases are largely concerned with the question, specifically reserved in *Sweatt v. Painter,* 339 U. S. 629, 635-636, whether the "separate but equal" doctrine of *Plessy v. Ferguson,* 163 U. S. 537, "should be reexamined in the light of contemporary knowledge respecting **\*9** the purposes of the Fourteenth Amendment and the effects of racial segregation."

In the *Sweatt* case (p. 631) the opinion stated: "We have frequently reiterated that this Court will decide constitutional questions only when necessary to the disposition of the case at hand, and that such decisions will be drawn as narrowly as possible." The essential requisites for constitutional adjudication "may be lacking though there be entire disinterestedness on both sides in their desire to secure at the earliest possible moment an adjudication on constitutional power." [7] The Court has emphasized that "it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. These rules are safe guides to sound constitutional judgment. It is the dictate of wisdom to follow them closely and carefully." *Liverpool Steamship Company v. Emigration Commissioners,* 113 U. S. 33, 39. Additional authorities are collected in the concurring opinion of Brandeis, J., in *Ashwander v. T. V. A.,* 297 U. S. 288, 346-348.

Because of its "traditional reluctance to extend constitutional interpretations to situations or facts" not actually presented to it, the Court **\*10** has declined to pass on the abstract constitutionality of racial segregation *per se* in cases where such an issue was raised but where other or additional grounds for finding inequality were present. *Sweatt v. Painter, supra; Sipuel v. Board of Regents,* 332 U. S. 631, 633; *Fisher v. Hurst,* 333 U. S. 147, 150; *Missouri ex rel. Gaines v. Canada,* 305 U. S. 337; cf. *Henderson v. United States,* 339 U. S. 816, 826. The Court may find, upon examination of the records in the cases at bar, that none of them presents inescapably the question whether separate but otherwise equal public schools for white and colored children are, solely because they are separate, constitutionally unequal.

That question would not arise unless and until it were found as a fact, upon the basis of supporting evidence, that the separate schools are equal in the educational benefits and opportunities afforded children of both races. Such a finding, if made by a district court and sustained by the evidence, would make it necessary to decide whether the establishment of such "separate but equal" schools satisfies the requirements of the Constitution. In none of the cases before the Court, however, is there such a finding.

In the Virginia, South Carolina, and Delaware cases, physical inequality, apart from segregation, was expressly found, and these findings of fact are not here challenged. (No. 101, R. 210, 307; No. 191, R. 622, 624; No. 448, R. 48-66.) The specific **\*11** findings of inequality in those cases make it unnecessary to go further in order to establish that plaintiffs'

constitutional rights have been violated. Failure of a state to provide "equal" educational facilities to some of its citizens, solely because of their race or color, is without more a violation of the Fourteenth Amendment. "The admissibility of laws separating the races in the enjoyment of privileges afforded by the State rests wholly upon the equality of the privileges which the laws give to the separated groups within the State." *Missouri ex rel. Gaines v. Canada,* 305 U. S. 337, 349. The constitutional right to equality of educational opportunity is "personal and present" (*Sweatt v. Painter,* 339 U. S. 629, 635), and it is no answer to the particular plaintiffs' claim to say that, at some time in the future, colored persons as a group will be treated "equally." A state can discharge its obligation to persons discriminated against only by furnishing them equal educational benefits "as soon as it does for applicants of any other group." *Sipuel v. Board of Regents,* 332 U. S. 631, 633. We agree with the Supreme Court of Delaware in No. 448 that, in cases where separate schools are found physically unequal, the particular plaintiffs should not be required to attend inferior schools until such time as the state may complete an "equalization" program. Accordingly, the district courts, upon making such findings in the Virginia and South Carolina cases, erred in withholding from the plaintiffs the relief to which they were then immediately **\*12** entitled. If and when it should be found as a fact, and not merely prophesied, that "equalization" has been accomplished, there would arise the question which on the present records in the Virginia and South Carolina cases may be deemed hypothetical, namely, whether "equalization" is the same as equality. Of. *Wilshire Oil Co. v. United States,* 295 U. S. 100, 102.

In the Kansas case, the district court found equality of physical facilities, curricula, qualifications of teachers, transportation service, etc., and held that the plaintiffs were "denied no constitutional rights or privileges by reason of any of these matters." (. 245-246.) But it also made the following finding of fact (*ibid.*):

> Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to retain [retard?] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial integrated school system. [8]

**\*13** This is not a finding of "separate but equal." On the contrary, it is a finding of "separate but unequal," or more precisely, "separate and hence unequal." Despite this finding, the district court held that the plaintiffs' constitutional right to equality of treatment had not been violated. This holding was based solely on the court's understanding of the "separate but equal" doctrine of *Plessy v. Ferguson.* The district court thought that that case required it to hold as a matter of law that separate schools are legally equal even though it finds that, because of segregation, they are in fact unequal. This, we submit, was plain error even if it be assumed that *Plessy* is still controlling.

*Plessy v. Ferguson* did not purport to lay down an inexorable rule of law, which could not be challenged at any time in the future no matter how different the circumstances, that segregation could *never* create inequality. In the *Plessy* case the Court said only that, as a general matter, laws requiring the separation of white and colored persons "do not *necessarily* imply the inferiority of either race to the other." (P. 544; italics added.) This was asserted as if it were axiomatic and too obvious to admit of dissent. We do not pause here to demonstrate the errors of fact and law contained in the Court's generalization. [9] It suffices to note that the *Plessy* case plainly does not **\*14** preclude a district court from finding, as the district court found in the Kansas case, that segregation can, and in the particular instance does, produce unequal and inferior treatment. In *Plessy* the Court indulged in an abstract speculation as to the effects of racial segregation in general; in No. 8 there is a contrary finding of fact, based on evidence and not on unproved assumptions, as to the particular effects of racial segregation in public schools on the education of colored children. Hence, we believe, the

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

---

Kansas district court erred in construing *Plessy v. Ferguson* as compelling a holding of constitutional equality where there is a specific finding of fact that the particular type of enforced racial segregation creates inequality.

The District of Columbia case arises on the pleadings, the precise issue being whether the district court erred in granting the motion to dismiss the complaint. No evidence was taken, and no findings of fact were made. To the extent that determination of the constitutional questions raised may depend on facts, the case may not be in an appropriate posture for deciding such questions. *Rescue Army v. Municipal Court,* 331 U. S. 549, 568-575, and cases cited.

In any event, it is contended that the action of respondents in establishing segregated schools in the District of Columbia infringes petitioners' rights under the Fifth Amendment. Respondents assert that such segregation is compelled by certain **\*15** Acts of Congress, and their interpretation of these Acts was upheld by the district court in dismissing the complaint, apparently on the authority of *Carr v. Corning,* 182 F. 2d 14 (C. A. D. C.). There is, therefore, an initial question of statutory construction.

The Court may find this an appropriate case for application of the well-settled rule of construction that doubts as to the meaning of a statute should be resolved so as to avoid serious constitutional questions. The Court has in countless cases affirmed its duty "in construing congressional enactments to take care to interpret them so as to avoid a danger of unconstitutionality." *United States v. CIO,* 335 U. S 106, 120-121, and cases cited. There is room for reasonable argument that in the pertinent statutes Congress *assumed* the existence of a system of segregated schools in the District of Columbia, but did not make it mandatory upon the responsible District authorities to maintain and continue such segregation.

The language of these Acts of Congress may be regarded as significantly different from the constitutional and statutory provisions involved in the state cases. Typical of the latter in their explicitness are those of Virginia. [10]   Its Constitution (1902, Article IX, section 140) provides: **\*16** "White and colored children shall not be taught in the same school." Its statutes (Code 1950, section 22-221) provide: "White and colored persons shall not be taught in the same school, but shall be taught in separate schools, under the same general regulations as to management, usefulness and efficiency."

No similarly explicit and mandatory language, manifesting an unmistakable intention to make racial segregation compulsory in the public schools of the District of Columbia, is to be found in the pertinent Acts of Congress. [11]   If Congress had expressly required such segregation, a grave and difficult question under the Fifth Amendment would arise. This question could be avoided if these Acts were construed as meaning only that in them Congress assumed, but neither approved nor disapproved, the fact of a segregated school system in the District. Such a construction, we suggest, is not precluded by the terms of the legislation. Cf. *Ex parte Endo,* 323 U. S. 283, 303, note 24, and cases cited. If the Court should adopt this construction, it would be appropriate to remand the case to the district court with instructions to enter a declaratory judgment to that effect. The respondent Board of Education would then be free to abandon the present segregated school system in the District of Columbia. If it should thereafter continue to maintain such a segregated school system, its action **\*17**  could not be based upon any asserted mandate from Congress but would arise solely from its own independent choice In such event the legal questions which might arise would not be the same as those now sought to be raised.

### III

#### If the Court should reach the question, the "separate but equal" doctrine should be reexamined and overruled

In the briefs submitted by the United States in *Henderson v. United States,* 339 U. S. 816, and in *Sweatt v. Painter,* 339 U. S. 629, and *McLaurin v. Oklahoma State Regents,* 339 U. S. 637, the Government argued that racial segregation

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

imposed or supported by law *per se* unconstitutional. We renew that argument here. Without repeating in detail the grounds, stated at length in those briefs, for the conclusion that the doctrine of "separate but equal" is wrong as a matter of constitutional law, history, and policy, the United States again urges the Court, if it should reach the question, to reexamine and overrule that doctrine.

The Government submits that compulsory racial segregation is itself, without more, an unconstitutional discrimination. "Separate but equal" is a contradiction in terms. Schools or other public facilities where persons are segregated by law, solely on the basis of race or color, cannot in any circumstances be regarded as equal. The constitutional **\*18** requirement is that of equality, not merely in one sense of the word but in every sense. Nothing in the language or history of the Fourteenth Amendment supports the notion that facilities need be equal only in a physical sense.

People who are compelled by law to live in a ghetto do not enjoy equality, even though their houses are as good as, or better than, those on the outside. Cf. *Buchanan v. Warley,* 245 U. S. 60. The same is true of children who know that because of their color the law sets them apart from others, and requires them to attend separate schools specially established for members of their race. The facts of every-day life confirm the finding of the district court in the Kansas case that segregation has a "detrimental effect" on colored children; that it affects their motivation to learn; and that it has a tendency to retard their educational and mental development and to deprive them of benefits they would receive in an integrated school system. (*Supra,* p. 12.) Similar considerations are reflected in the opinions of this Court in the *Sweatt* and *McLaurin* cases, 339 U. S. at 633-635 and 641-642.

The broad principle underlying the decisions of this Court from *Missouri ex rel. Gaines v. Canada,* 305 U. S. 337, to the *Sweatt* and *McLaurin* cases is that the Fourteenth Amendment forbids the classification of students on the basis of race or color so as to deny one group educational advantages and opportunities afforded to another. To **\*19** be sure, those cases involved university graduate and professional schools, but nothing in the language or history of the Fourteenth Amendment could support a constitutional distinction between universities on the one hand, and public elementary or high schools on the other. Strict insistence upon the constitutional requirement of equality is no less necessary as applied to public schools which, as has been said, are "designed to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people * * *. The public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny." [12]

Similarly, nothing in the language or history of the Fourteenth Amendment could support an interpretation which permits segregation of Negroes but not of other groups in the community. Indeed, as the Court has pointed out in many cases, that Amendment was primarily designed to assure to colored persons the right to be treated under the law exactly like white persons, and to protect them against being singled out for special or discriminatory treatment.

*Strauder v. West Virginia,* 100 U. S. 303, decided in 1880, was the first case in which the Court was called upon to deal with the application of the Fourteenth Amendment to a state law making **\*20** a classification based on race or color. The interpretation placed on the Amendment in that case (pp. 306-308) is especially significant, not merely because of its comprehensive nature, but because it was made by a Court whose members had lived during the period when the Amendment was adopted:

This [the Fourteenth Amendment] is one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy. The true spirit and meaning of the amendments, as we said in the *Slaughter-House Cases* (16 Wall. 36), cannot be understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate * * * that State laws might be enacted or enforced to perpetuate

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

the distinctions that had before existed. Discriminations against them had been habitual. It is well known that in some States laws making such discriminations then existed, and others might well be expected. * * * It was in view of these considerations the Fourteenth Amendment was framed and adopted. It was designed to assure to the colored race the *21 enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. * * *

* * * What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color?

* * * The very fact that colored people are singled out * * * is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.

Referring to the civil rights statutes (now 8 U. S. C. 41 and 42) enacted by Congress pursuant to the Fourteenth Amendment, the Court in *Virginia v. Rives,* 100 U. S. 313, 318, stated: "The plain object of these statutes, as of the Constitution which authorized them, was to place the colored race, in respect of civil rights, upon a level with whites. They made the rights and responsibilities, civil and criminal, of the two races exactly the same." See also the *22 *Slaughter-House Cases,* 16 Wall. 36, 70-72, 81, and *Buchanan v. Warley,* 245 U. S. 60, 76.

In *Takahashi v. Fish and Game Commission,* 334 U. S. 410, 420, the Court said: "The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." Cf. *Hurd v. Hodge,* 334 U. S. 24, 30-34. And in *Shelley v. Kraemer,* 334 U. S. 1, 23, the Chief Justice stated for the Court:

> The historical context in which the Fourteenth Amendment became a part of the Constitution should not be forgotten. Whatever else the framers sought to achieve, it is clear that the matter of primary concern was the establishment of equality in the enjoyment of basic civil and political rights and the preservation of those rights from discriminatory action on the part of the States based on considerations of race or color.

"Separate but equal" is sometimes described as an "ancient" doctrine of constitutional law. But its antiquity dates not from the adoption of the Fourteenth Amendment in 1868 but from a judicial expression which did not make its appearance in the reports of this Court until 1896. Almost three decades after ratification of the post-bellum Amendments, when "the history of the times when they were adopted, and the general *23 objects they plainly sought to accomplish" may have become blurred by the passage of time, the opinion in *Plessy v. Ferguson,* 163 U. S. 537, read into the Fourteenth Amendment a qualification that enforced separation of white and colored persons in the use of public facilities does not violate the Amendment so long as the separate accommodations are "equal." This judicial contraction of the constitutional rights secured by the Amendment is irreconcilable with the body of decisions which preceded and followed *Plessy v. Ferguson,* and is not justified by the considerations adduced to support it.

In the *Plessy* case the view was expressed (p. 551) that the alternative to racial segregation compelled by law is "an enforced commingling" of white and colored persons. This observation, apart from its irrelevance to the constitutional issue, is a plain *non sequitur.* Segregation imposed by law is an interference with the right of an individual to exercise

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

a voluntary choice as to those with whom he will associate. To remove such an interference is to enlarge individual freedom, not to limit it. "Commingling" between white and colored persons can then result as the product of voluntary choice, not of legal coercion. Cf. *McLaurin v. Oklahoma State Regents,* 339 U. S. 637, 641-642.

In the *Plessy* case the Court also said (p. 551) that "Legislation is powerless to eradicate racial instincts or to abolish distinctions based upon **\*24** physical differences, and the attempt to do so can only result in accentuating the difficulties of the present situation." This observation also was irrelevant to the constitutional issue before the Court. It might properly have been made before a legislative body considering a bill to penalize acts manifesting racial prejudice. But the Court was not called upon to make a judgment of policy as to the wisdom of legislation designed to eradicate racial prejudice; the only question before it was whether a particular statute violated a constitutionally-protected right.

In any event, this observation in the *Plessy* opinion is, at best, a half-truth. Although legislation may not be able to "eradicate" racial prejudice, experience has shown that it can create conditions favorable to the gradual elimination of racial prejudice; or it can, on the other hand, strengthen and enhance it. As the Supreme Court of California has said, the way to eradicate racial tension is not "through the perpetuation by law of the prejudices that give rise to the tension." [13] Even if statutes cannot in themselves remove racial antagonisms, they cannot constitutionally exacerbate such antagonisms by giving the sanction of law to what would otherwise be private acts of discrimination.

The above-quoted statements in the *Plessy* opinion illustrate the extent to which the "separate **\*25** but equal" doctrine represented the views of the members of the Court as the best solution for "the difficulties of the present situation" then existing. But the Justices were being called upon to make, not a judgment as to desirable legislative policy, but a judicial judgment as to the interpretation of the Fourteenth Amendment which would be most faithful to its terms, history, and purposes.

Whatever the merits in 1896 of a judgment as to the wisdom or reasonableness of the rule of "separate but equal", it should now be discarded as a negation of rights secured by the Constitution. The Court has said that "It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or essentials of fundamental rights." *Wolf v. Colorado,* 338 U. S. 25, 27. "\* \* \* the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth." *Gompers v. United States,* 233 U. S. 604, 610.

In sum, the doctrine of "separate but equal" is an unwarranted departure, based upon dubious **\*26** assumptions of fact combined with a disregard of the basic purposes of the Fourteenth Amendment, from the fundamental principle that all Americans, whatever their race or color, stand equal and alike before the law. The rule of *stare decisis* does not give it immunity from reexamination and rejection. In *Smith v. Allwright,* 321 U. S. 649, 665-666, the Court said:

> \* \* \* we are not unmindful of the desirability of continuity of decision in constitutional questions. However, when convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions. This has long been accepted practice, and this practice has continued to this day. This is particularly true when the decision believed erroneous is the application of a constitutional principle rather than an interpretation of the Constitution to extract the principle itself. [14]

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

**\*27  IV**

**If in any of these cases the Court should hold that a system of "separate but equal" public schools is unconstitutional, it should remand the case to the district court with directions to devise and execute such program for relief as appears most likely to achieve orderly and expeditious transition to a non-segregated system**

It is fundamental that a court of equity has full power to fashion a remedy to meet the needs of the particular situation before it. *Addison v. Holly Hill Co.,* 322 U. S. 607, 622; *Radio Station WOW, Inc. v. Johnson,* 326 U. S. 120, 132; *Eccles v. Peoples Bank,* 333 U. S. 426, 431; *Alexander v. Hillman,* 296 U. S. 222, 239; *Union Pacific Railway Co. v. Chicago, M. & St. P. Railway Co.,* 163 U. S. 564, 600-601. The fact that a system or practice is determined to be unlawful does not of itself require the court to order that it be abandoned forthwith. Thus, where a violation of the antitrust laws has persisted over a long period of time, resulting in a tangled complex of economic arrangements tainted with illegality, it is recognized that a decree calling for complete elimination of the illegal arrangements overnight would be impracticable. For example, dissolution of the illegal combinations involved in the *Standard Oil* and *Motion Picture* [15] cases was deliberately  **\*28** required to take place over a period of years. [16]

If, in any of the present cases, the Court should hold that to compel colored children to attend "separate but equal" public schools is unconstitutional, the Government would suggest that in shaping the relief the Court should take into account the need, not only for prompt vindication of the constitutional rights violated, but also for orderly and reasonable solution of the vexing problems which may arise in eliminating such segregation. The public interest plainly would be served by avoidance of needless dislocation and confusion in the administration of the school systems affected. It must be recognized that racial segregation in public schools has been in effect in many states for a long time. Its roots go deep in the history and traditions of these states. The practical difficulties which may be met in making progressive adjustment to a non-segregated system cannot be ignored or minimized. [17]

 **\*29**  A decision that the Constitution forbids the maintenance of "separate but equal" public schools will necessarily result in invalidation of provisions of constitutions, statutes, and administrative regulations in many states---provisions which were adopted in good faith upon the assumption, supported by previous declarations of this Court, that they were consistent with the requirements of the Fourteenth Amendment. A reasonable period of time will obviously be required to permit formulation of new provisions of law governing the administration of schools in areas affected by the Court's decision. School authorities may wish to give pupils a choice of attending one of several schools, a choice now prohibited. Teachers may have to be transferred, and teaching schedules rearranged. It is possible, of course, that abolition of segregation would in many areas produce no serious dislocations, and no wholesale transfers of teachers or pupils would be required. This could result from purely geographical factors, for it would still be likely that the pupils of a school would be representative of the area in which it is situated.

These are indicative of the kinds of problems which may arise in giving effect to a holding that "separate but equal" school systems are unconstitutional. We suggest that any relief which  **\*30**  this Court may direct should contemplate the possibility of such problems and afford opportunity for their expeditious settlement within a specified period. Moreover, to the extent that there may exist popular opposition in some sections to abolition of racially-segregated school systems, we believe that a program for orderly and progressive transition would tend to lessen such antagonism. An appropriate tribunal to devise and supervise execution of such a program is a district court, which could fashion particular orders to meet particular needs. On remand, that court could direct the parties to submit proposals for such a program. And if the district court so desires, it could appoint an advisory committee of lawyers and other citizens to assist it in this task. After the district court adopts a program, either side could seek review, by appeal or otherwise, if it believes the program does not conform to this Court's decision. At reasonable intervals after the program is put into effect, the parties should

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

submit progress reports to the district court, which should have the power, if circumstances so require, to enter any further orders found to be necessary.

Such a procedure should afford opportunity to responsible school authorities to develop a program most suited to their own conditions and needs. Thus, subject to the court's approval, a school board might propose integration on a grade basis, *i. e.,* to integrate the first grades immediately, and to continue **\*31** such integration until completed as to all grades in the elementary schools. Cf. *Great Northern R. Co. v. Sunburst Oil Co.,* 287 U. S. 358. Another board might deem it more feasible to integrate on a school-by-school basis. In some states where there is segregation only in some grades of the elementary schools, as a result of the discretionary action of the authorities, it may be feasible to put a non-segregated system into effect immediately. [18]

## CONCLUSION

The subordinate position occupied by Negroes in this country as a result of governmental discriminations ("second-class citizenship," as it is sometimes called) presents an unsolved problem for American democracy, an inescapable challenge to the sincerity of our espousal of the democratic faith.

In these days, when the free world must conserve and fortify the moral as well as the material sources of its strength, it is especially important to affirm that the Constitution of the United States places no limitation, express or implied, **\*32** on the principle of the equality of all men before the law. Mr. Justice Harlan said in his dissent in the *Plessy* case (163 U. S. at 562):

> We boast of the freedom enjoyed by our people above all other peoples. But it is difficult to reconcile that boast with a state of the law which, practically, puts the brand of servitude and degradation upon a large class of our fellow-citizens, our equals before the law.

The Government and people of the United States must prove by their actions that the ideals expressed in the Bill of Rights are living realities, not literary abstractions. As the President has stated:

If we wish to inspire the people of the world whose freedom is in jeopardy, if we wish to restore hope to those who have already lost their civil liberties, if we wish to fulfill the promise that is ours, we must correct the remaining imperfections in our practice of democracy.

We know the way. We need only the Will. [19]

Footnotes

1    Message to the Congress, February 2, 1948, H. Doc. No. 516, 80th Cong., 2d sess., p. 2.

2    Mr. Justice Harlan in *Plessy v. Ferguson,* 163 U. S. 537, 559. Regrettably, he was speaking only for himself, in dissent.

3    Message to the Congress, note 1, *supra,* p. 5.

4    *To Secure These Rights,* Report of the President's Commttee on Civil Rights (1947), p. 89.

5    *Id.,* pp. 89, 95.

6    Letter to the Attorney General, dated December 2, 1952. The earlier letter of May 8, 1946, referred to by the Secretary, is quoted in *To Secure These Rights,* note 4, *supra,* pp. 146-147.

7    *United States v. CIO,* 335 U. S. 106, 126 (concurring opinion).

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

Brown v. Bd. of Educ. of Topeka, 1952 WL 82045 (1952)

---

8    A substantially identical finding of fact was made by the Chancellor in the Delaware case. The state Supreme Court, although it held that this finding was "immaterial" to the constitutional issue, did not reject it as unsupported by the evidence.

9    See Brief for the United States, pp. 27-35, 49-60, in *Henderson v. United States*, No. 25, Oct. Term 1949, 339 U. S. 816.

10   The texts of the constitutional and statutory provisions in states having school segregation are quoted in appellees' brief in No. 101, pp. 38-46.

11   These provisions are set out in petitioners' brief in No. 413, pp. 23-26.

12   *McCollum v. Board of Education,* 333 U. S. 203, at 216, 231 (concurring opinion).

13   *Perez v. Sharp,* 32 Calif. 2d 711, 725.

14   "* * * the ultimate touchstone of constitutionality is the Constitution itself and not what we have said about it." *Graves v. N. Y. ex rel. O'Keefe,* 306 U. S. 466, 491-492 (concurring opinion). In *Passenger Cases,* 7 How. 283, 470, Mr. Chief Justice Taney agreed that "it be regarded hereafter as the law of this court, that its opinion upon the construction of the Constitution is always open to discussion when it is supposed to have been founded in error, and that its judicial authority should hereafter depend altogether on the force of the reasoning by which it is supported."

15   *Standard Oil Co. v. United States,* 221 U. S. 1; *United States v. Paramount Pictures,* 70 F. Supp. 53 (S. D. N. Y.), 334 U. S. 131, 85 F. Supp. 881, 339 U. S. 974. See also *United States v. National Lead Co.,* 332 U. S. 319, 329-335; *United States v. Aluminum Co.,* 322 U. S. 716, 148 F. 2d 416 (S. D. N. Y.), 171 F. 2d 285, 91 F. Supp. 333, 419.

16   As another example, when Congress determined that certain holding company arrangements were illegal, it delayed elimination of such arrangements in particular cases until a satisfactory plan for their dissolution should be proposed by the parties and approved by the Securities and Exchange Commission. Public Utility Holding Company Act of 1935, 49 Stat. 820, 15 U. S. C. § 79k.

17   These anticipated difficulties relate, of course, only to the question of relief; they cannot affect the merits the constitutionality of compulsory racial segregation. Moreover, the discussion in this section of the brief assumes that the separate schools for colored children are in other respects "equal." It would be manifestly unfair and unjust, and contrary to the Court's decisions, to withhold immediate relief where the separate schools are also physically unequal and inferior. See pp. 10-12, *supra.*

18   It is assumed that the district courts are, because of their familiarity with local conditions, the appropriate tribunals to deal with issues of relief. It may be, however, that the Court will wish to formulate more precise standards and provisions for the guidance of the district courts. In that event we suggest that several procedures are available. One would be for the Court to issue no decree at this time, but to set the matter down for argument at a later date on the question of relief. Another would be to appoint a special master to hold hearings and make recommendations to the Court on that question.

19   Message to the Congress, note 1, *supra,* p. 7.

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

U.S. DEPARTMENT OF THE TREASURY

# Resource Center

### Process Overview

Prior to filing a voluntary notice, parties may consult with CFIUS or submit a draft notice, as described in the Filing Instructions section of this website, to ensure that the review will proceed as efficiently as possible.  The CFIUS process generally begins formally when parties to a proposed or pending transaction jointly file a voluntary notice with CFIUS containing information required by § 800.402 of the regulations.  Upon receiving the notice, the Staff Chairperson will promptly determine whether the notice is complete and satisfies the requirements stated in the regulations.  If the notice is complete, the Staff Chairperson will circulate the notice to all CFIUS members.  A review period of up to 30 days begins on the next business day.

During the review period, CFIUS members examine the transaction in order to identify and address, as appropriate, any national security concerns that arise as a result of the transaction.  During the review period, CFIUS members, through the Department of the Treasury as Committee Chair, may request additional information from the parties.  Parties must respond to such follow-up requests within three business days of the request or within a longer time frame if the parties so request in writing and the Staff Chairperson grants that request in writing.

CFIUS concludes action on the preponderant majority of transactions during or at the end of the initial 30-day review period.  In certain circumstances defined in section 721 and at § 800.503 of the regulations, CFIUS may initiate a subsequent investigation, which must be completed within 45 days.  In certain circumstances described at section 6(c) of Executive Order 11858, as amended, and § 800.506 of the regulations, CFIUS may also refer a transaction to the President for decision.  In such case, section 721 requires the President to announce a decision with respect to a transaction within 15 days of CFIUS's completion of the investigation.

Parties to a transaction may request withdrawal of their notice at any time during the review or investigation stages.  Such a request must be approved by CFIUS and may include conditions on the parties, such as requirements that they keep CFIUS informed of the status of the transaction or that they re-file the transaction at a later time.  CFIUS tracks withdrawn transactions.

CFIUS may also reject voluntary notices in certain circumstances, such as when the voluntary notice is not complete, the parties do not respond to follow-up information requests within the required time frame, there is a material change in the transaction, or information comes to light that contradicts material information provided in the notice by the parties.

If CFIUS finds that the covered transaction does not present any national security risks or that other provisions of law provide adequate and appropriate authority to address the risks, then CFIUS will advise the parties in writing that CFIUS has concluded all action under section 721 with respect to such transaction.

If CFIUS finds that a covered transaction presents national security risks and that other provisions of law do not provide adequate authority to address the risks, then CFIUS may enter into an agreement with, or impose conditions on, parties to mitigate such risks or may refer the case to the President for action.

Where CFIUS has completed all action with respect to a covered transaction or the President has announced a decision not to exercise his authority under section 721 with respect to the covered transaction, then the parties receive a "safe harbor" with respect to that transaction, as described in § 800.601 of the regulations and section 7(f) of Executive Order 11858, as amended.

Parties to a transaction that choose to file notice of the transaction with CFIUS must do so in accordance with the procedures stated in the regulations at § 800.401 of the regulations.  Such notice must include the information required in the regulations at § 800.402.

This website outlines the basic requirements for voluntary notices and other information that may be useful to parties, but does not create any rights for, or confer any rights on, any person, nor operate to bind the U.S. Government.  Parties must consult the regulations to ensure that the notice meets all legal requirements for acceptance.  Parties may also contact the Staff Chairperson with questions.



U.S. Department of Defense
# DEFENSE SECURITY SERVICE

Home    About Us    Directorates    Services    Information Systems    Contact Us

**INDUSTRIAL SECURITY**

*Personnel Security Investigations-Industry (PSI-I) Program Office*

*Field Operations*

*Foreign Ownership, Control or Influence (FOCI)*

- FOCI News and Updates

- FOCI Mitigation Instruments

- In-Process Companies

- Foreign Acquisitions

- Required Documentation

- FOCI Action Plan

- Implementation Procedures

  • Affiliated Operations Plan

  • Technology Control Plan

  • Electronic Communications Plan

  • Visitation Plan

  • Facilities Location Plan

- National Interest Determinations

- ODs/PHs/VTs

- Facility Security Officers

- DSS FOCI Conferences

- FOCI FAQs

- Business Analysis & Mitigation Strategy (BAMS)

*International*

*Industrial Security Integration & Application (IP)*

*Special Programs*

*NISP Agencies*

*NISP Library*

Home » Industrial Security » FOCI » FOCI FAQs

## FOCI FAQs

NATIONAL INDUSTRIAL SECURITY PROGRAM

DEFENSE SECURITY SERVICE (DSS)

FOREIGN OWNERSHIP, CONTROL OR INFLUENCE (FOCI)

Below are answers to the most frequently asked questions regarding US companies participating or sponsored for participation in the National Industrial Security Program. Please keep in mind that the below responses may not be all inclusive. There may be situations where additional requirements may apply. (Refer to Chapter 2, Section 3, National Industrial Security Program Operating Manual (NISPOM). (The NISPOM can be found here)

1. When is a company determined to be under foreign ownership, control or influence (FOCI)?
2. Can a company obtain a facility security clearance (FCL) if found to be under FOCI?
3. How do you determine if a company is under FOCI?
4. How often should a company submit the SF 328?
5. What criterion is used in determining if a company is under FOCI?
6. Can non-US citizens serve as key management personnel at the company?
7. Can officers and/or directors of the foreign parent organization or one of its affiliates also serve as an officer and/or director of the cleared company?
8. What are the methods in which a company can mitigate its FOCI factors, if considered to be under foreign ownership, control or influence?
9. When is the Security Control Agreement used?
10. What are a PA and a VTA?
11. Does the PA or VTA require that the company be an economically viable business entity?
12. What is the role of the Proxy Holder and Trustee?
13. Does the SSA have access limitations?
14. Who should initiate the NID process?
15. When can a Board Resolution be used to mitigate FOCI?
16. Can a company be collocated with its foreign parent organization or one of its affiliates and still be cleared through the auspices of a PA, VTA, or SSA?
17. Can a company receive any administrative support services from its foreign parent or one of its affiliates?
18. What should I consider when selecting a nominee for Outside Director, Proxy Holder or Trustee?
19. How is the term "disinterested" defined?
20. When a company submits an Outside Director, Proxy Holder or Trustee nomination, is the nominee automatically approved?
21. Should the Outside Director, Proxy Holder and Trustee be appointed to serve as a member of the company's Board of Directors?
22. How many Outside Directors, Proxy Holders or Trustees need to be nominated?
23. Does DSS maintain a listing of candidates who are eligible to serve as Outside Directors, Proxy Holders or Trustees at companies operating under a SCA, SSA, PA or VTA?
24. Under the SSA, who can be selected to serve as an Inside Director?
25. What is the role of the Government Security Committee (GSC)?
26. Who comprises the GSC?
27. Who should serve as Chairman of the GSC?
28. The draft SSA, PA or VTA states that the GSC members will exercise their "best efforts" to ensure that the company maintains policies and procedures to safeguard classified and export controlled information in the possession of the company. What is meant by the term "best efforts?"
29. Must a Technology Control Officer (TCO) be appointed?
30. What is the role of the FSO?
31. Is the company required to prepare a Technology Control Plan (TCP)?
32. Is the company required to prepare and submit to DSS an electronic communication plan once the Agreement has been executed?
33. Once the SSA, PA or VTA is executed is the company required to prepare procedures for implementing the agreement?

34. What is the Committee on Foreign Investment in the United States (CFIUS)?
35. What action should a cleared company take when entering into discussions, consultations, or agreements that may reasonably lead to effective ownership or control of the company by a foreign interest?
36. Where can I obtain electronic copies of the draft SCA, SSA, PA or VTA?
37. Who should I contact if I have questions regarding FOCI?
38. Who should I contact if I have questions regarding e-FCL?
39. What does the Directive-type Memorandum 09-019, "Policy Guidance for Foreign Ownership, Control or Influence (FOCI)" mean for Industry?

1. **When is a company determined to be under foreign ownership, control or influence (FOCI)?**
   A US company is considered to be under FOCI when a foreign interest has the power, direct or indirect, whether or not exercised, to direct or decide matters affecting the management or operations of the company in a manner which may result in unauthorized access to classified information or may affect adversely the performance of classified contracts. (NISPOM, paragraph 2-300a)
   [top]

2. **Can a company obtain a facility security clearance (FCL) if found to be under FOCI?**
   No. A company determined to be under FOCI is not eligible for an FCL until the FOCI factors have been favorably resolved. (NISPOM, paragraph 2-300c)
   [top]

3. **How do you determine if a company is under FOCI?**
   A company's FOCI factors are reviewed as part of the facility clearance process and throughout the life of the facility security clearance. The company's FOCI factors should be documented on the Certificate Pertaining to Foreign Interests (Standard Form 328). In a corporate family, the SF 328 should be a consolidated response rather than separate submissions from individual members of the corporate family (NISPOM, paragraph 2-302). In the case of an organization with multiple tiers of parent-subsidiary relationships, the SF 328 should be certified by the highest tier cleared entity. (Note: this would not preclude a subordinate entity from preparing the form as long as the top tier cleared entity certified the form). This principle applies equally to changed condition reports. (The SF 328 and instructions can be found here ). 
   [top]

4. **How often should a company submit the SF 328?**
   The NISPOM requires that a SF 328 be submitted during the initial facility clearance process and when significant changes occur to information previously forwarded. (NISPOM paragraph 2-302)
   [top]

5. **What criterion is used in determining if a company is under FOCI?**
   The following factors are considered in the aggregate in determining whether a company is under FOCI: (NISPOM, paragraph 2-301)
   a. Record of economic and government espionage against US targets,
   b. Record of enforcement and/or engagement in unauthorized technology transfer,
   c. Type and sensitivity of information requiring protection,
   d. The source, nature and extent of FOCI,
   e. Record of compliance with pertinent US laws, regulations and contracts,
   f. Nature of bilateral and multilateral security and information exchange agreements, and
   g. Ownership or control, in whole or in part, by a foreign government.
   [top]

6. **Can non-US citizens serve as key management personnel at the company?**
   No. Key Management Personnel are required to be processed for a personnel security clearance in conjunction with the FCL. non-US citizens are not eligible for a personnel security clearance. (NISPOM, paragraph 2-104)
   [top]

7. **Can officers and/or directors of the foreign parent organization or one of its affiliates also serve as an officer and/or director of the cleared company?**
   No. There can be no interlocking relationships under the Proxy Agreement (PA) and Voting Trust Agreement (VTA). However, under the Special Security Agreement (SSA), the foreign shareholder can appoint a representative(s) (referred to in the SSA as the "Inside Director") to the company's board of directors consistent with the requirements of the board composition identified in Article 1.01 of the DSS draft SSA. Other than the Inside Director position(s), there can be no other interlocking relationships.
   [top]

8. **What are the methods in which a company can mitigate its FOCI factors, if considered to be under foreign ownership, control or influence?**
   The SSA, PA or VTA is used to mitigate FOCI in cases where companies are effectively owned or

controlled by a foreign entity.

[top]

9. **When is the Security Control Agreement used?**
   The SCA is used when a company is not effectively owned or controlled by a foreign interest and the foreign interest is entitled to representation on the company's board of directors. There are no access limitations under the SCA. (NISPOM, paragraph 2-303c(1))

   [top]

10. **What are a PA and a VTA?**
    The PA and the VTA are substantially identical arrangements whereby the voting rights of the foreign shareholder are transferred to cleared US citizens approved by DSS. Both Agreements provide for the exercise of all prerogatives of ownership by the Trustees or Proxy Holders with complete freedom to act independently from the foreign stockholder, with the exception of the areas identified in NISPOM, paragraph 2-305. Neither Agreement imposes restrictions on access to classified information or restricts the company's ability to compete for classified contracts. (NISPOM, paragraph 2-303b)

    [top]

11. **Does the PA or VTA require that the company be an economically viable business entity?**
    Yes. The company must demonstrate that it is organized, structured and financed so as to be capable of operating as a viable business entity independent from the foreign shareholder. (NISPOM, paragraph 2-303b(2))

    [top]

12. **What is the role of the Proxy Holder and Trustee?**
    Individuals who serve as Voting Trustees or Proxy Holders must be US citizens, residing within the US and eligible for a personnel security clearance. They must be capable of assuming full responsibility for voting the stock and exercising management prerogatives relating to the company in a way that ensures that the foreign shareholder can be effectively insulated from the cleared company. The Proxy Holders or Trustees are required to be appointed to the company's Board of Directors and they have the same fiduciary responsibilities as any other Board member.

    [top]

13. **Does the SSA have access limitations?**
    Yes. Classified contracts requiring access to proscribed information (Top Secret, Communications Security, Sensitive Compartmented Information, Special Access Program information and Restricted Data) may require the government contracting activity to render a favorable National Interest Determination (NID) consistent with NISPOM, paragraph 2-303c(2).

    [top]

14. **Who should initiate the NID process?**
    Defense Security Service (DSS) will advise the government contacting activity (GCA) of the requirement for a NID. The NID can be program, project or contract specific. The NID decision shall be made by the GCA's Program Executive Office. The GCA will forward the completed NID to DSS. DSS does not need to delay implementation of a FOCI action plan pending completion of a GCA's NID as long as there is no indication the NID will be denied.

    [top]

15. **When can a Board Resolution be used to mitigate FOCI?**
    A board resolution is used when a foreign entity does not own voting stock sufficient to elect directors, or is not otherwise entitled to representation to the company's board of directors. (NISPOM, paragraph 2-303a)

    [top]

16. **Can a company be collocated with its foreign parent organization or one of its affiliates and still be cleared through the auspices of a PA, VTA, or SSA?**
    No, FOCI collocation is not authorized, and DSS will determine when a company is collocated in its sole discretion. When a company is located within close proximity to its foreign parent or an affiliate a Facilities Location Plan (FLP) must be approved by DSS in advance. Download the Facilities Location Plan Template.

    [top]

17. **Can a company receive any administrative support services from its foreign parent or one of its affiliates?**
    As a general rule, no, and not without prior approval from DSS. However, if the company determines that there is a specific service(s) that the company needs the parent or one of its affiliates to provide, the company should identify the service and forward a rationale/justification to DSS for consideration.

    [top]

18. **What should I consider when selecting a nominee for Outside Director, Proxy Holder or Trustee?**
    The nominee must be a US citizen, residing in the US, who can exercise management prerogatives relating to their position in a way that ensures that the foreign owner can be effectively insulated from

the company and be eligible for a personnel security clearance consistent with the level of the FCL, (NISPOM, paragraph 2-305)

[top]

19. **How is the term "disinterested" defined?**
The term "disinterested" is defined as having no prior contractual, financial, or employment relationship with the applicant company, the parent corporation, the foreign shareholder(s), or any entities and affiliates that the applicant company controls. The application of the term "disinterested" extends to members of the nominee's immediate family. (NISPOM, paragraph 2-305b)

[top]

20. **When a company submits an Outside Director, Proxy Holder or Trustee nomination, is the nominee automatically approved?**
No. DSS must approve the nomination, and approval is granted only after DSS has reviewed and considered the nominee's resume and the answers to a questionnaire that the nominee will be asked to complete. A copy of each nominee's resume should be provided to DSS Headquarters along with his/her address, telephone, fax number, and email address when requesting approval.

[top]

21. **Should the Outside Director, Proxy Holder and Trustee be appointed to serve as a member of the company's Board of Directors?**
Yes, once DSS approves the nomination. In addition to ensuring that the company has appropriate policies and procedures in place to ensure the company's compliance with the Agreement, the Outside Director, Proxy Holder and Trustee are required to be appointed to the Board of Directors and to be granted the same fiduciary responsibilities as any other Board member.

[top]

22. **How many Outside Directors, Proxy Holders or Trustees need to be nominated?**
The SSA, PA and VTA require the appointment of three Outside Directors, Proxy Holders or Trustees. However, if a company finds that less than three Outside Directors, Proxy Holders or Trustees may be sufficient, full justification should be submitted to DSS HQs for consideration.

[top]

23. **Does DSS maintain a listing of candidates who are eligible to serve as Outside Directors, Proxy Holders or Trustees at companies operating under a SCA, SSA, PA or VTA?**
No. DSS does not maintain a listing of candidates. Companies are responsible for determining who they wish to nominate to serve in this capacity. It may be helpful to contact industry associations such as the National Classification Management Society (NCMS), Aerospace Industries Association (AIA), the American Society for Industrial Security (ASIS) or your local or state chamber of commerce in determining eligible candidates.

[top]

24. **Under the SSA, who can be selected to serve as an Inside Director?**
The nomination of an Inside Director is left to the discretion of the foreign shareholder. However, keep in mind that the Inside Director will not possess a personnel security clearance at the cleared company in which he/she serves as the Inside Director.

[top]

25. **What is the role of the Government Security Committee (GSC)?**
The role of the GSC is to ensure that the Company maintains policies and procedures to safeguard classified information and controlled unclassified information in the possession of the Company and that violations of those policies and procedures are promptly investigated and reported to the appropriate authority when it has been determined that a violation has occurred. The GSC should also ensure that the company complies with US export control laws and regulations and does not take action deemed adverse to performance on classified contracts. (NISPOM paragraph 2-306)

[top]

26. **26. Who comprises the GSC?**
Under the SSA, the GSC is comprised of cleared officers/directors and the Outside Directors. Under a PA and VTA, the GSC is comprised of the Proxy Holder or Trustee Directors and those officers of the company, who are also directors, who hold personnel security clearances at the level of the company's FCL.

[top]

27. **Who should serve as Chairman of the GSC?**
One of the Outside Directors, Proxy Holders or Trustees should serve as the Chairman of the GSC.

[top]

28. **The draft SSA, PA or VTA states that the GSC members will exercise their "best efforts" to ensure that the company maintains policies and procedures to safeguard classified and export controlled information in the possession of the company. What is meant by the term "best efforts"?**
The term "best efforts" signifies performance of duties reasonably and in good faith, in the manner

believed to be in the best interests of the company, but consistent with the national security concerns of the US, and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

[top]

29. **Must a Technology Control Officer (TCO) be appointed?**
Yes. The company must appoint a TCO. The TCO serves as the principal advisor to the GSC concerning the protection of controlled unclassified information and other proprietary technology and data subject to regulatory or contractual control by the US Government. The TCO can be the same individual serving as Facility Security Officer (FSO).

[top]

30. **What is the role of the FSO?**
Every cleared company must appoint a FSO. The FSO serves as the principal advisor to the GSC concerning the safeguarding of classified information. The FSO's responsibility includes the operational oversight of the company's compliance with the requirements of the NISP.

[top]

31. **Is the company required to prepare and submit to DSS a technology control plan once the Agreement has been executed?**
Yes. The draft TCP should be provided to your servicing DSS, Industrial Security Representative within 45 days of the effective date of the SSA, PA or VTA for approval. (NISPOM, paragraph 2-307)

[top]

32. **Is the company required to prepare and submit to DSS an electronic communication plan once the Agreement has been executed?**
Yes. The draft electronic communication plan should be submitted to your servicing DSS Industrial Security Representative for review within 45 days of the effective date of the agreement. The plan should provide procedures that will ensure the GSC and the Government that no classified or export controlled information is being lost through communications such as, email, telephone, video-teleconferencing, facsimile, etc.

[top]

33. **Once the SSA, PA or VTA is executed is the company required to prepare procedures for implementing the agreement?**
Once the Agreement has been executed; the company should submit a written plan for implementation of the Agreement to your servicing DSS, Industrial Security Representative within 45 days for review. The plan should explain the administrative and physical security controls the company intends to implement in order to comply with the terms of the Agreement. The Industrial Security will review the plan and provide comments as necessary.

[top]

34. **What is the Committee on Foreign Investment in the United States (CFIUS)?**
CFIUS is an interagency committee chaired by the Secretary of the Treasury to conduct reviews of proposed mergers, acquisitions or takeovers of US persons by foreign interests under section 721 of the Defense Production Act. CFIUS is a voluntary process that affords an opportunity to foreign persons and US persons entering into a covered transaction to submit the transaction for review by CFIUS to assess the impact of the transaction on US national security.

The CFIUS and the DSS industrial security FOCI review are carried out in two parallel but separate processes with different time constraints and considerations.

[top]

35. **What action should a cleared company take when entering into discussions, consultations, or agreements that may reasonably lead to effective ownership or control of the company by a foreign interest?**
The company should notify DSS of the details in writing. (NISPOM, paragraph 2-302(b). The failure to report this information to DSS could result in an adverse impact on the company's facility security clearance. The company should advise DSS, initially by telephone and then follow-up in writing.

[top]

36. **Where can I obtain electronic copies of the draft SCA, SSA, PA or VTA?**
An electronic draft copy of the Agreements can be obtained on the DSS FOCI Web page.

[top]

37. **Who should I contact if I have questions regarding FOCI?**

If you need further assistance, please contact the DSS Headquarters FOCI Specialist assigned to your region.  For contacts click here.

[top]

38. **What does the** [Directive-type Memorandum 09-019, "Policy Guidance for Foreign Ownership, Control or Influence (FOCI)"](#) 🔴 **mean for Industry?**

September 02, 2009, The Office of the Under Secretary of Defense (Intelligence) released the Directive-type Memorandum (DTM) 09-019, "Policy Guidance for Foreign Ownership, Control or Influence (FOCI)" for DoD Components; June 8, 2010, Change 1 was incorporated.

The DTM applies to DoD Components but does not levy requirements on contractors. Cleared contractors and companies in process for a facility security clearance are required to comply with the requirements stipulated in the National Industrial Security Operating Manual.

[[top](#)]

*February 2009*

Security and Privacy Notice • Section 508 • USA.gov • No Fear Act • FOIA/Privacy Act/Civil Liberties • Operating Status

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

24 U.S. Op. Atty. Gen. 116 (U.S.A.G.), 1902 WL 794

United States Attorney General

GIFTS FROM FOREIGN PRINCE—OFFICER—CONSTITUTIONAL PROHIBITION.

September 8, 1902

The provision of Article 1, section 9, clause 9 of the Constitution, which forbids the acceptance, without the consent of Congress, by any person holding any office of profit or trust under the United States, of any 'present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state,' applies as well to a titular prince as to a reigning one; and a simple remembrance of courtesy, even if merely a photograph, falls under the inclusion of 'any present of any kind whatever.' This prohibition expressly relates to official *persons*, and does not extend, under the circumstances outlined, to a department of the Government or to governmental institutions.

**1  The SECRETARY OF STATE.

SIR:

I have the honor to respond to your note of August 27, submitting for my consideration a copy of a note from the German embassy, which communicates a list of presents bestowed by Prince Henry of Prussia on the occasion of his recent visit to this country. You ask my opinion on the question whether the constitutional provision which forbids the acceptance, without the consent of Congress, of any 'present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state,' may be construed as applying only to a reigning prince, in which case the authority of Congress for the delivery of these presents would not be required. The presents consist of portraits given to the Navy Department, the Military Academy and the Naval Academy, and of a photograph to each of several military and civil officers of the United States. The provision of the Constitution is as follows:

'No title of nobility shall be granted by the United States: And no person holding any office of profit or trust under them, shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state.' (Art. I, sec. 9, cl. 9.)

It is evident from the brief comments on this provision, and the established practice in our diplomatic intercourse (2 Story on the Constitution, 4th ed., pp. 216, 217; 1 Wharton's Int. Law Dig., sec. 110, p. 757), that its language has been viewed as particularly directed against every kind of influence by foreign *governments* upon officers of the United States, based on our historic policies as a nation. Although it is manifest that the particular collcation of words in the Constitution, like the words 'any foreign prince or state' in the neutrality statutes, refers chiefly to a foreign government and its regular executive (cf. act January 31, 1881; 21 Stat., 604), it would not, in my judgment, be sound to hold that a titular prince, even if not a reigning potentate, is not included in the constitutional  **118  prohibition. For the phrase of the provision is '*any* king, prince, or foreign state,' and a titular prince, although not reigning, might have the function of bestowing an office or title of nobility or decoration, which would clearly fall under the prohibition. As this remark suggests generally the character of the gift, whether a present or some title of honor (although you do not suggest this point), it must be observed that even a simple remembrance of courtesy, which from motives of delicacy recognizes our policy, like the photographs in this case, falls under the inclusion of 'any present * * * of any kind whatever.' The act of 1881 (*supra*) which, it is true, refers only to a foreign *government*, uses the words 'any present, decoration, *or other thing*.'

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

GIFTS FROM FOREIGN..., 24 U.S. Op. Atty. Gen....

**\*\*2**  But as the constitutional prohibition expressly and exclusively relates to official *persons*, it could not properly be extended, under the circumstances at all events, in my judgment, to a department of the Government and to governmental institutions.

I have the honor to answer your question in the negative.
 Very respectfully,

HENRY M. HOYT,
*Acting Attorney-General.*

24 U.S. Op. Atty. Gen. 116 (U.S.A.G.), 1902 WL 794

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

**Major Stephen M. Hartnett, USMC, Retired, 65 Comp. Gen. 382 (1986)**

---

🚩 KeyCite Yellow Flag - Negative Treatment

On Reconsideration Major Stephen M. Hartnett, USMC -Reconsideration-Suspension of Retired Pay-Employment by Foreign Government, Comp.Gen., February 2, 1990

65 Comp. Gen. 382 (Comp.Gen.), B- 220860, 1986 WL 60690

COMPTROLLER GENERAL

MATTER OF: Major Stephen M. Hartnett, USMC, Retired

March 10, 1986

**DIGEST:**

**\*\*1   \*382**  The prohibition against an officer of the United States accepting emoluments, office, etc., from a foreign government without the consent of Congress in Article I, section 9, clause 8 of the U.S. Constitution, and 37 U.S.C. § 908, is applicable to a retired member of the U.S. Marine Corps, who, under an employment agreement with a domestic corporation, serves as an instructor for, and is subject to the supervision and control of the Royal Saudi Navy, which is the source of the funds for his salary and other emoluments. Since he has not received the required congressional consent, his military retired pay must be withheld.

The question presented in this case is whether a retired military officer employed under an agreement with a Delaware corporation to be a Marine Corps Seamanship Instructor for the Royal Saudi Naval Forces of Saudi Arabia must receive the required approvals under 37 U.S.C. § 908 or continue to have his military retired pay suspended because of the constitutional provision prohibiting officers of the United States from receiving offices, emoluments, etc.,  **\*383** from foreign governments without congressional consent. [1] Since under the terms of his employment agreement the officer performs work as an instructor for the Royal Saudi Naval Forces which supervises and controls him, and which is the source of the salary and other emoluments he receives, we conclude that without the statutory approvals of the employment the retired pay must be withheld.

BACKGROUND

Major Stephen M. Hartnett, USMC, Retired, filed with the Marine Corps a DD Form 1357, "Statement of Employment," in May 1985 in which he states that he is employed by Frank E. Basil, Inc. (Basil), Washington, D.C., in the position of "Marine Corps Seamanship Instructor, Royal Saudi Naval Forces, Jeddah, Saudi Arabia." Additionally, Major Hartnett supplied a copy of his employment agreement in which he agreed to work for Basil, a corporation incorporated in Delaware, for 24 months commencing on May 25, 1985, or when he arrived in Saudi Arabia, whichever was later.

Of importance to this case are several sections of the employment agreement. The most important, section 4, provides that:

"Section 4—ASSIGNMENT OF WORK

"(a) The Employee will be assigned during the Term of Employment to the performance of work for SIBC–BASIL, a joint venture of the Company and Saudi International Business Centre, a Saudi Arabian company. While so assigned the Employee will work under the direction and control of SIBC–BASIL personnel and, as and when directed to do so,

---

Major Stephen M. Hartnett, USMC, Retired, 65 Comp. Gen. 382 (1986)

under the direction and control of personnel of the Royal Saudi Naval Forces (hereinafter called the RSNF), subject to the provisions of paragraph (b) of Section 14. [2]

"(b) Although the Employee will normally be assigned work in his Job Classification, it is understood that if, in the sole opinion of the Company or SIBC–BASIL or the RSNF, the nature or volume of the work or the aptitudes of the Employee make it desirable to do so, the Company or SIBC–BASIL or the RSNF may reassign the Employee from time to time to one or more other job classification. * * *" (Emphases and footnote added.)

**2** Another section of import is "Section 16—termination," under which, among other things, Basil will terminate Major Hartnett's employment if directed to do so by the Saudi Arabian Government. Additionally under "Section 6—Training" and "Section 8—Hours of Work, Overtime and Holidays," the Royal Saudi Naval Forces respectively may direct the employee to train certain personnel in the work of his job classification and may schedule overtime for him.

**\*384** In view of the above, the Marine Corps found that it appeared that Major Hartnett effectively was an employee of the Saudi Arabian Government since it could control and direct him. Consequently, the Marine Corps suspended payment of Major Hartnett's retired pay and advised him to request approval of his employment under 37 U.S.C. § 908, the statute granting conditional congressional consent for retired members to accept civil employment with a foreign government without loss of their retired pay.

Major Hartnett declined to seek approval of his employment, asserting instead that he is not employed by a foreign government. In support of his position he furnished a statement from the Acting Manager, Personnel and Administration, Saudi International Business Centre, stating in part:

"This is to certify that Stephen M. Hartnett is employed by Frank E. Basil, Inc. of Delaware, United States of America. He receives life support services from the Jeddah Site of SIBC–BASIL, a Joint Venture Project of the Saudi International Business Centre and Frank E. Basil, Inc. of Delaware, U.S.A. [3] All pay and benefits are received from Frank E. Basil, Inc. of Delaware, U.S.A. "In no way is Mr. Hartnett employed by either a Saudi controlled company or an Agency of the Government of Saudi Arabia."

The Disbursing Officer forwarded the matter to us for decision indicating that there is some doubt in the matter since it appears that both Basil and the Saudi Navy have power to direct and control Major Hartnett's employment. Pending our decision, Major Hartnett's retired pay remains suspended and an indebtedness has been established for him for compensation he earned between May 25 and August 31, 1985. The Disbursing Officer also asks whether, if it is determined that Major Hartnett's employment violates the constitutional provision, the value of the transportation and other relocation expenses furnished him under the employment agreement also should be considered emoluments received from a foreign government.

ANALYSIS

Article I, section 9, clause 8 of the Constitution of the United States prohibits any person "holding any Office of Profit or Trust" under the United States from accepting any present, emolument, office or title, "of any kind whatever," from a foreign government without the consent of Congress. Because retired members of the uniformed services retain their status as members of their service, this constitutional prohibition consistently has been interpreted to apply to them. They are subject to the withholding of their retired pay in an amount equal to the emoluments received from a foreign government (or instrumentality thereof) without the consent of Congress. See e.g., 58 Comp.Gen. 487 (1979); **\*385** 53 Comp.Gen. 753 (1974). Therefore, it is clear that if Major Hartnett were employed directly by the Royal Saudi Naval Forces, his employment would be subject to this constitutional prohibition.

Major Stephen M. Hartnett, USMC, Retired, 65 Comp. Gen. 382 (1986)

**\*\*3**  Accordingly, our inquiry is whether Major Hartnett's employment is with Basil, not the Royal Saudi Navy, so as to make the constitutional provision inapplicable to him.

In a somewhat similar case, a retired officer was employed and paid by a domestic corporation which then assigned him to work for Israeli Aircraft Industries, an instrumentality of the Government of Israel. It was shown that the domestic corporation was in effect merely an employment agency and that actually there existed an employee-employer relationship between the officer and an instrumentality of a foreign government for which the domestic corporation procured personnel. We, therefore, looked through the ostensible relationship with the domestic corporation and held that the officer was actually working for Israeli Aircraft Industries, an instrumentality of the Government of Israel. 53 Comp.Gen. 753 (1974).

In that case we focused on the nature of the relationship between the retired member and Israeli Aircraft Industries. We applied well-established rules to determine whether there was an employee-employer relationship between the member and that organization focusing on several aspects including, particularly, who had the authority to hire, fire, and control the conduct of the employee. Indeed, we recognized that the critical aspect to establish the relationship of employee-employer was the right of the employer to exercise supervision and control, not the means used or the actual exercise thereof. See 53 Comp.Gen. at 756–757. See also B–165378, October 25, 1968.

In this case also, while we have no specific information showing that Basil is merely an employment agency, there is sufficient evidence to conclude that Major Hartnett is in actuality an employee of the Royal Saudi Naval Forces since this entity may control and supervise him as well as terminate his employment. Also, although Major Hartnett does not receive his salary directly from the Saudi Arabian Government, the Saudi Arabian Government is apparently the source of the funds Basil uses to pay Major Hartnett and to provide the "life support" services to him. Therefore, he is in violation of Article I, section 9, clause 8 of the Constitution so as to require withholding of his retired pay. See B–217096, March 11, 1985.

Having determined that Major Hartnett's employment is in violation of the constitutional provision, we must now answer the question whether the transportation and other relocation expenses furnished him under his employment agreement are to be considered emoluments received from a foreign government. The constitutional provision does not merely preclude the acceptance of compensation but any presents, emoluments, office or title, "of any kind whatever" from a foreign state. We, therefore, have concluded **\*386**  that this provision requires the broadest possible scope and application, and have held that the transportation and payment of other expenses, such as received by Major Hartnett, are presents or emoluments received from a foreign government. See 58 Comp.Gen. 487, 493 (1979). Accordingly, assuming that the costs of these benefits furnished Major Hartnett are ultimately being borne by the Saudi government, similarly to his salary, they too are considered emoluments received from a foreign government.

**\*\*4**  Congress has given its consent to retired members of the uniformed services accepting civil employment by foreign governments and compensation for that employment provided that the retired members receive the approval of both the Secretary of State and the Secretary of the service concerned. See 37 U.S.C. § 908. Therefore, as the Marine Corps advised him, Major Hartnett should seek the required approval if he wishes to have payment of his retired pay resumed.

Milton J. Socolar
Comptroller General of the United States

Footnotes

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

**Major Stephen M. Hartnett, USMC, Retired, 65 Comp. Gen. 382 (1986)**

1      This decision is issued in response to a request from Lieutenant Colonel M.K. Chetkovich, USMC, Marine Corps Finance
       Center. The matter was forwarded to us after the Department of Defense Military Pay and Allowance Committee had assigned
       it control number DO–MC–1457.

2      Paragraph (b) of Section 14 provides that the employee will follow the provisions of any applicable U.S. Government approved
       security manual insofar as U.S. classified information, materials or equipment is concerned.

3      Presumably the "life support services" referred to are medical services, insurance, housing and meals referred to in Sections
       12 and 13 of the Employment Agreement.

65 Comp. Gen. 382 (Comp.Gen.), B- 220860, 1986 WL 60690

---

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

SEP 20 1974

Honorable Howard W. Cannon
Chairman, Committee on Rules
    and Administration
United States Senate
Washington, D.C.   20510

Dear Mr. Chairman:

    This is in response to your letter to the Attorney
General of September 16 in connection with the hearing
to be held by your committee on the nomination of
Nelson A. Rockefeller to be Vice President of the United
States.

    You have asked for a summary and analysis of the
Federal conflict of interest law, 18 U.S.C. 208, and of
any other statutes which might apply to Mr. Rockefeller
if he were confirmed as Vice President. In addition, you
have specifically requested an opinion as to whether it
would be lawful for Mr. Rockefeller, while serving as Vice
President, to be an officer, director or stockholder of,
or to hold any other beneficial interest in, any company
having contracts with any agency of the United States
Government.

    I should note at the outset that the legislative
history of the Twenty-Fifth Amendment, pursuant to which
Mr. Rockefeller has been nominated as Vice President, is
silent as to the question of conflict of interest; the
subject does not appear to have been of any concern to the
Congress when it proposed the amendment. There are, however,
two statutes which are relevant to the questions you raise.
One, as noted in your letter, is 18 U.S.C. 208; the other
is 18 U.S.C. 431.

## 18 U.S.C. 208

In substance, 18 U.S.C. 208(a) prohibits an officer or employee of the "executive branch" from participating personally and substantially in any particular matter in which "to his knowledge," he, his spouse, minor child, partner or organization in which he is serving as officer, director or trustee has a financial interest. Section 208(b) authorizes a waiver of the prohibition by the "official responsible for appointment" where the outside financial interest is deemed not substantial enough to affect the integrity of the officer's or employee's services.

To summarize the views expressed in detail below: Section 208 does not expressly apply to the Vice President. Some of its language and its legislative history indicate the contrary. Moreover, serious doubt as to constitutionality urges against an interpretation which would render Section 208 applicable to the President; and it seems almost certain that the President and Vice President were intended to be treated alike.

Section 208(a) prohibits an "officer or employee of the executive branch" from participating as such in a particular matter in which, "to his knowledge," he, his spouse, minor child, partner or other business associates with which he is connected, have a financial interest. The section does not refer to, or specifically cover, the President or Vice President. Moreover, the legislative history of sections 202-209 (the conflict of interest provisions), as evidenced by committee reports and debates in the Senate and the House of Representatives, does not demonstrate that section 208 was intended to apply to the Chief Executive and his immediate successor: In seeking to ascertain the intention of Congress, it is useful to refer to the report, Conflict of Interest and Federal Service (1960), prepared by the Special Committee on the Federal

Conflict of Interest Laws, the Association of the Bar of
the City of New York (Bar Association Report), where it
was said (pp. 16-17):

> The role of the Presidency is a vital
> aspect of the administration of conflict of
> interest restrictions in the executive branch,
> and the proper function of the Chief Executive
> in this field is a major center of consideration
> in this study.  But the conflict of interest
> problems of the President and the Vice President
> as individual persons must inevitably be treated
> separately from the rest of the executive branch.
> For example, as Chief of State, the President
> is the inevitable target of a running stream
> of symbolic gifts pouring in from all over
> the world, for reasons ranging from the best
> to the worst.  The uniqueness of the President's
> situation is also illustrated by the fact that
> disqualification of the President from policy
> decisions because of personal conflicting interests
> is inconceivable.  Personal conflict of interest
> problems of the Presidency and the Vice Presidency
> are unique and are therefore not within the scope
> of this book.

While the recommendations of the Bar Association were
not entirely accepted in the conflict of interest legislation
as enacted, both the House and Senate committees reporting on
the bill and members of Congress in debate acknowledged the
contributions made by the Bar Association in the ultimate
formulation of the legislation.  See, e.g., H. Rept. No. 748,
87th Cong., 1st Sess. 8 (1961); S. Rept. No. 2213, 87th Cong.,
2d Sess. 4 (1962).  It seems most unlikely that disagreement
on so important an aspect of the Bar Association's report --
that personal conflict of interest problems of the President
and the Vice President "must inevitably be treated separately

- 3 -

from the rest of the executive branch" -- would have gone
without mention by both committees and in floor debate.  I
believe it more reasonable to conclude that Congress in
speaking of an "officer or employee of the executive branch"
in section 208 meant to include only those "officers of the
United States" who receive their appointment from the
President under Article II, section 3, of the Constitution
and those subordinate officials who are employed by depart-
ments and agencies in the executive branch.

My belief is strengthened by the fact that the waiver
provision in subsection (b) of section 208 assumes the
existence of an "official responsible for appointment" of
the officer or employee in question.  At the time the
statute was enacted, of course, the Vice President was
elected; and the subsequent Twenty-fifth Amendment to the
Constitution does not use the term "appointment" in
describing the President's role in the selection of his
successor.  It is conceivable, of course, that the provision
of a waiver procedure exercisable only by the "official
responsible for appointment" was merely meant to indicate
by omission the unavailability of a waiver for nonappointed
officers or employees; but one would think that an
exempting mechanism would be more necessary for the
President and the Vice President (if they were covered)
than for other officials.  On balance, subsection (b) tends
to negate coverage of the President and Vice President.

These considerations derived both from the statutory
language and its legislative history are buttressed by two
applicable canons of statutory construction.  The first is
that interpretations which give rise to serious questions of
constitutionality should be avoided if reasonably possible.
The effect of applying section 208 to the President is
certainly either to disable him from performing some of the
functions prescribed by the Constitution or to establish a
qualification for his serving as President (to wit, elimination
of financial conflicts) beyond those contained in the
Constitution.  The same may be said with respect to the
Vice President, unless the Vice President's only constitutionally

- 4 -

prescribed function (presiding over the Senate) is not
covered by section 208 because it is not an executive
act.  In any event, whether or not application of
section 208 to the Vice President is constitutionally
permissible, it would seem that any reasonable construction
of the statute would treat the President and the Vice
President alike.  In light of the weighty constitutional
problems with respect to the President, the statute should
not be interpreted to apply to either official.

Another canon of construction calls for strict
construction of a criminal statute -- which is what is
at issue here.  It would argue strongly against inter-
preting the statute to apply to the President and Vice
President in light of what must be conceded to be (at
very least) the textual uncertainty described above.

Although, as I see it, these considerations are
dispositive, without regard to them it might be asserted
that the Vice President is not an officer of the executive
branch for purposes of section 208.  The Vice President's
only constitutionally prescribed function is that of
presiding over the Senate.  Article I, sec. 3, cl. 4.

### 18 U.S.C. 431

As to your specific question concerning the permissibility
of a Vice President's financial or managerial connection with
a Government contractor:  The only possibly relevant statute
of which we are aware is 18 U.S.C. 431, dealing with contracts
by a "Member" of Congress.  It prohibits the member "directly
or indirectly, himself or by any person in trust for him,
or for his use or benefit, or on his account" from undertaking,
executing, holding, or enjoying, in whole or in part, any
contract made on behalf of the United States or any agency
thereof, by any officer or employee authorized to make contracts
on its behalf.

- 5 -

The key issue thus is whether the Vice President is a "Member of . . . Congress" within the meaning of 18 U.S.C. 431. I do not so regard him. Certainly the Vice President is not a Member of Congress as that term is used in the Constitution. To be sure, for certain purposes he can be regarded as being in the legislative branch. Thus, for example, the Vice President is empowered to be President of the Senate and to vote in the event of an equal division in the Senate. Art. 1, sec. 3, cl. 4. Unlike Members of the Senate, however, the Vice President (like the President) is subject to impeachment. Art. II, sec. 4. Moreover, while clauses 1 and 2 of section 5 of Article I provide that each House shall be the judge of the elections, returns and qualifications of its own "members" and may punish them for disorderly behavior and expel them, these clauses plainly do not apply to the Vice President. The Constitution also provides that no person holding "any Office under the United States" (which, of course, includes the Vice President), shall be a "Member of either House" during his continuance in office. Art. 1, sec. 6, cl. 2. Considered as a whole, these provisions indicate that the Vice President has a unique status in the legislative branch, but not the status of a "Member" of the Congress within the meaning of the Constitution.

Turning next to the meaning of "Member . . . of Congress" in the precise context of 18 U.S.C. 431: Since it is a criminal statute, to be strictly construed, I cannot interpret it to apply to the Vice President when it makes no specific reference to him, and when he is not regarded as a "Member" of either the House of Representatives or the Senate (the Congress) under the Constitution. It should be noted that the statute in question was passed less than twenty years after the Constitution was written, so that it is not unreasonable to assume a parallel use of terminology. This is particularly the case since our examination of the legislative history of that section discloses no mention whatever of the Vice President. Congress has not been at a loss for words when it intends a statute, criminal or civil,

to reach offenses against a Vice President or to apply
to him in other respects. */  For these reasons, I
conclude that the statute does not apply to that office.

If you have any further specific questions, I will
be glad to be of whatever help I can to the Committee.

Sincerely,

Laurence H. Silberman
Acting Attorney General

---

*/  See, e.g., 18 U.S.C. 871, 1751; 10 U.S.C. 888, 9342(a);
5 U.S.C. 2106.  For example, in 5 U.S.C. 2106, which deals with
Government organization and employees, it is provided:  "For
the purposes of this title, 'Member of Congress' means the
Vice President, a member of the Senate or the House of
Representatives . . . ."

# OFFICE OF OVERSEAS PROSECUTORIAL DEVELOPMENT ASSISTANCE AND TRAINING (OPDAT)

### ABOUT OPDAT

In 1991, the breakup of the former Soviet Union and the intensifying drug war in Latin America ushered in an era of far-reaching change for the world's justice institutions. In response to these transitions, OPDAT, with funding from the State Department, began its first Resident Legal Advisor (RLA) programs for justice sector assistance in Bolivia, Colombia, Haiti, Poland, and Russia. The RLA programs assisted host countries in their development of new Codes of Criminal Procedure to replace inquisitorial systems and Soviet-era laws; helped strengthen independent judiciaries; and improved prosecutorial capacity to combat high-priority criminal activity. OPDAT has since grown to become a global force in justice sector capacity building, with a heavy emphasis on combatting terrorism and transnational crime. Today, OPDAT works in more than 50 countries to improve their rule of law and our own national security.

OPDAT's programs are part of the Department of Justice's two-pronged law enforcement strategy: first, an operational prong, targeting transnational criminal organizations; and second, a capacity-building prong, designed to increase the ability of our foreign counterparts to investigate and prosecute these criminal groups before their criminal activities reach the United States. These two prongs are mutually reinforcing: the partnerships and skills we build through our capacity-building efforts— development of legislative frameworks, case-based mentoring, and a train-the-trainer approach to instruction— greatly strengthen our vital operational work. OPDAT coordinates these efforts with the U.S. interagency, the international donor community, and with relevant international experts.

### GLOBAL REACH AND PROGRAM SCOPE

OPDAT implements the majority of its programs in-country through Resident or Intermittent Legal Advisors (RLAs and ILAs), experienced U.S. prosecutors assigned to U.S. Embassies overseas. With the assistance of their Foreign Service National staff and in conjunction with their foreign counterparts, they assess host-country criminal justice institutions and procedures; draft, review and comment on legislation and criminal enforcement policy; and provide technical assistance to host country prosecutors, judges, and other justice sector personnel working in the field.

OPDAT headquarters staff plan and implement state-specific and regional programs in countries without an RLA or ILA presence. These programs include the innovative Judicial Studies Institute, which strengthens the judicial capacity throughout the Western Hemisphere, religious freedom programs that promote the protection of religious minorities, computer crime and intellectual property programs that work with partner governments to improve cyber security and the protection of private property, and strategic trade enforcement workshops that enhance the investigative and prosecutorial skills of foreign law enforcement agencies to prevent the proliferation of dangerous weapons and hazardous materials.

### BREADTH OF EXPERTISE

OPDAT enjoys unique access to some of the most experienced criminal justice experts in the nation. The Department of Justice, with over 5,500 Assistant U.S. Attorneys and over 600 Criminal Division attorneys, provides a primary source of expertise. Depending upon the needs of the host country, OPDAT also coordinates with other Department of Justice components, including the National Security Division; Civil Rights Division; Antitrust Division; ICITAP; Office of Justice Programs; National Advocacy Center; Federal Bureau of Prisons; ATF; DEA; FBI; and U.S. Marshals Service. In addition, OPDAT can utilize the law enforcement expertise of other federal departments, such as Treasury, and Homeland Security, as well as state and local prosecutor offices. OPDAT also coordinates with the private bar, state and federal judiciaries, and professional organizations such as the American Bar Association's Rule of Law Initiative. Further, OPDAT works collaboratively with international organizations, nongovernmental institutions, as well as international experts.

TO THE SECRETARY OF THE AIR FORCE, 49 Comp. Gen. 819 (1970)

49 Comp. Gen. 819 (Comp.Gen.), B- 169035, 1970 WL 3772

COMPTROLLER GENERAL

TO THE SECRETARY OF THE AIR FORCE

JUNE 1, 1970

**\*819  AWARDS — INFORMERS — REWARDS — BY FOREIGN GOVERNMENTS**
**\*\*1  THE REWARD MONIES WHICH REPRESENT THE VALUES OF THE PROCEEDS DERIVED FROM THE SALE OF CONTRABAND ARTICLES SEIZED BY THE REPUBLIC OF COLUMBIA ACTING UPON INFORMATION FURNISHED BY AN AIR FORCE OFFICER WHILE TEMPORARILY ATTACHED TO THE COLUMBIAN AIR FORCE FOR TRAINING PURPOSES ARE PAYABLE NOT TO THE OFFICER BUT TO THE UNITED STATES PURSUANT TO THE PRINCIPLE OF LAW THAT THE EARNINGS OF AN EMPLOYEE IN EXCESS OF HIS REGULAR COMPENSATION GAINED IN THE COURSE OF, OR IN CONNECTION WITH, HIS SERVICE BELONG TO THE EMPLOYER, AND THE MONIES SHOULD BE COVERED INTO THE TREASURY. EVEN IF THE UNITED STATES WERE NOT ENTITLED TO THE REWARD, ITS ACCEPTANCE BY THE OFFICER IS PRECLUDED, ABSENT CONGRESSIONAL CONSENT, BY ARTICLE 1, SECTION 9, CLAUSE 8 OF THE UNITED STATES CONSTITUTION, WHICH PROHIBITS ACCEPTANCE BY PUBLIC OFFICERS OF PRESENTS, EMOLUMENTS, OFFICE, OR TITLE, 'OF ANY KIND WHATEVER,' FROM A FOREIGN STATE, AND THE REWARD CONSTITUTES AN 'EMOLUMENT.'**

REFERENCE IS MADE TO LETTER DATED FEBRUARY 6, 1970, AND ENCLOSURES, FROM THE PRINCIPAL DEPUTY ASSISTANT SECRETARY (FINANCIAL MANAGEMENT), DEPARTMENT OF THE AIR FORCE, REQUESTING A DECISION CONCERNING REWARD MONIES OFFERED TO MAJOR BRYANT HESTON, UNITED STATES AIR FORCE, BY THE REPUBLIC OF COLUMBIA. THESE MONIES REPRESENT THE VALUE OF A PORTION OF THE PROCEEDS DERIVED FROM THE SALE OF CERTAIN CONTRABAND ARTICLES SEIZED BY THAT GOVERNMENT ACTING UPON INFORMATION SUPPLIED BY MAJOR HESTON WHO AT THE TIME WAS TEMPORARILY ATTACHED TO THE COLUMBIAN AIR FORCE FOR TRAINING PURPOSES.

YOUR DEPARTMENT'S REQUEST FOR DECISION HAS BEEN ASSIGNED SUBMISSION NO. SS-AF-1068 BY THE DEPARTMENT OF DEFENSE MILITARY PAY AND ALLOWANCE COMMITTEE.

THE RECORD INDICATES THAT IN APRIL 1960, MAJOR HESTON WAS ASSIGNED THE COMMAND OF A SMALL UNITED STATES MILITARY TRAINING TEAM IN THE REPUBLIC OF COLUMBIA, THE MISSION OF WHICH WAS TO TRAIN AND INCREASE THE PROFICIENCY OF SELECTED AIRCREWS OF THE COLUMBIAN AIR FORCE IN SPECIAL AIR OPERATIONS. THOSE OPERATIONS INCLUDED SPECIALIZED TECHNIQUES RELATING TO TROOP AND CARGO AIRDROPS, ASSAULT TAKEOFFS AND LANDINGS, LOW-LEVEL NAVIGATION, LOUDSPEAKER OPERATIONS AND CIVIC ACTION. THE PROGRAM WAS CARRIED OUT AT THE GOMEZ-NINO BASE AT VILLAVICENCIO AND CONDUCTED THROUGH THE UNITED STATES AIR FORCE MISSION TO COLUMBIA.

DURING ONE OF THE PLANNED TRAINING MISSIONS, WHICH WAS INTENDED TO PRACTICE LOW-LEVEL NAVIGATION AND PARABUNDLE DROPS, MAJOR HESTON, HIS COLUMBIAN AIR FORCE STUDENT PILOT, AND ANOTHER COLUMBIAN OFFICER BY CHANCE CAME UPON A C-46 CARGO

TO THE SECRETARY OF THE AIR FORCE, 49 Comp. Gen. 819 (1970)

PLANE UNLOADING CARGO ONTO TWO TRUCKS, WHICH AROUSED THEIR SUSPICIONS BECAUSE OF THE UNLIKELY LOCALE. AFTER FURTHER INVESTIGATION AND IDENTIFICATION OF THE PLANE, WHICH HAD TAKEN OFF IN AN ATTEMPT TO ESCAPE, MAJOR HESTON NOTIFIED, AND OTHERWISE ASSISTED, COLUMBIAN MILITARY AUTHORITIES, WHO DISPATCHED **\*820** TROOPS AND A PLANE TO THE AREA IN A SUCCESSFUL EFFORT TO SEIZE THE UNLOADED CARGO, WHICH WAS IN FACT CONTRABAND. THE SMUGGLER'S PLANE WAS LATER CAPTURED IN PANAMA. MAJOR HESTON WAS SUBSEQUENTLY NOTIFIED THAT COLUMBIA LAW PROVIDES THAT INFORMANTS WHO SUPPLY INFORMATION LEADING TO THE CAPTURE OF CONTRABAND ARE ENTITLED TO 25 PERCENT OF THE TOTAL VALUE OF SUCH CONTRABAND, AND, THEREFORE, THAT HE WAS ENTITLED TO A SHARE OF THE VALUE OF THE CAPTURED CONTRABAND.

**\*\*2** IN LIGHT OF THE FOREGOING THE FOLLOWING TWO QUESTIONS ARE PRESENTED FOR OUR DECISION:

1. IS THE UNITED STATES ENTITLED TO ALL OR ANY PORTION OF MAJOR HESTON'S SHARE OF THE CAPTURED CONTRABAND SINCE THIS UNITED STATES AIR FORCE OFFICER WAS ON ACTIVE DUTY AND PERFORMING MILITARY DUTIES AT THE TIME OF DISCOVERY AND CAPTURE OF THE PANAMANIAN AIRCRAFT?

2. IF THE UNITED STATES IS NOT ENTITLED TO ALL OF MAJOR HESTON'S SHARE, WOULD ACCEPTANCE BY THIS OFFICER OF THE VALUE OF ANY PORTION OF THE CAPTURED CONTRABAND VIOLATE ARTICLE I, SECTION 9, CLAUSE 8, OF THE CONSTITUTION OF THE UNITED STATES WHICH PROHIBITS, WITHOUT THE CONSENT OF CONGRESS, THE ACCEPTANCE BY GOVERNMENT EMPLOYEES OF ANY PRESENT OR EMOLUMENT FROM A FOREIGN STATE?

IT IS A WELL-ESTABLISHED PRINCIPLE OF LAW THAT THE EARNINGS OF AN EMPLOYEE IN EXCESS OF HIS REGULAR COMPENSATION GAINED IN THE COURSE OF, OR IN CONNECTION WITH, HIS SERVICES, BELONG TO THE EMPLOYER AND IN THE CASE OF OFFICERS AND EMPLOYEES OF THE UNITED STATES IT LONG HAS BEEN THE RULE THAT AMOUNTS SO RECEIVED ARE, IN EFFECT, RECEIVED FOR THE UNITED STATES AND ARE TO BE COVERED INTO THE TREASURY. SEE 37 COMP. GEN. 29 (1957); 32 ID. 454 (1953); AND THE AUTHORITIES AND CASES THEREIN CITED. SINCE MAJOR HESTON WAS ON ACTIVE DUTY AND ACTUALLY PERFORMING MILITARY DUTIES RELATING TO HIS MISSION AND HIS CAPACITY AS AN OFFICER OF THE UNITED STATES WHEN HE EARNED HIS SHARE OF THE VALUE OF THE CONTRABAND, THE UNITED STATES IS ENTITLED TO ALL OF MAJOR HESTON'S SHARE THEREOF.

EVEN IF IT BE HELD THAT THE UNITED STATES IS NOT ENTITLED TO ANY PORTION OF MAJOR HESTON'S SHARE OF THE REWARD MONIES, WE ARE OF THE OPINION THAT HIS ACCEPTANCE OF SUCH MONIES IS PRECLUDED BY THE PROHIBITION CONTAINED IN ARTICLE 1, SECTION 9, CLAUSE 8, OF THE UNITED STATES CONSTITUTION. THAT CLAUSE PROVIDES AS FOLLOWS:

> NO TITLE OF NOBILITY SHALL BE GRANTED BY THE UNITED STATES: AND NO PERSON HOLDING ANY OFFICE OF PROFIT OR TRUST UNDER THEM, SHALL, WITHOUT THE CONSENT OF THE CONGRESS, ACCEPT OF ANY PRESENT, EMOLUMENT OFFICE OR TITLE, OF ANY KIND WHATEVER FROM ANY KING, PRINCE, OR FOREIGN STATE.

IT IS OUR VIEW THAT THE REWARD MONIES IN QUESTION CONSTITUTE AN 'EMOLUMENT ' WITHIN THE MEANING OF THE CONSTITUTIONAL PROVISION. 'EMOLUMENT' IS BROADLY DEFINED AS

Schottenfeld, Joseph 11/12/2017
For Educational Use Only

**TO THE SECRETARY OF THE AIR FORCE, 49 Comp. Gen. 819 (1970)**

PROFIT, GAIN, OR COMPENSATION RECEIVED FOR SERVICES RENDERED. SEE BLACKS LAW DICTIONARY, DELUXE FOURTH EDITION. REWARD MONIES RECEIVED FOR THE SERVICE OF SUPPLYING INFORMATION TO PUBLIC AUTHORITIES WOULD, IN OUR OPINION, FALL WITHIN THE ABOVE DEFINITION.

**\*821** FURTHER, IT SEEMS CLEAR FROM THE WORDING OF THE CONSTITUTIONAL PROVISION THAT THE DRAFTERS INTENDED THE PROHIBITION TO HAVE THE BROADEST POSSIBLE SCOPE AND APPLICABILITY. THIS IS EVIDENCED BY THE FACT THAT THE PROVISION BARS THE ACCEPTANCE BY PUBLIC OFFICERS OF PRESENTS, EMOLUMENTS, ETC., 'OF ANY KIND WHATEVER' FROM A FOREIGN STATE.

ACCORDINGLY, YOU ARE ADVISED THAT, IN OUR OPINION, MAJOR HESTON'S ACCEPTANCE OF THE REWARD MONIES PRESENTLY BEING OFFERED BY THE COLUMBIAN GOVERNMENT WOULD VIOLATE ARTICLE 1, SECTION 9, CLAUSE 8, OF THE UNITED STATES CONSTITUTION, ABSENT THE CONSENT OF THE CONGRESS. ACCORDINGLY THE SECOND QUESTION IS ANSWERED IN THE AFFIRMATIVE.

**\*\*3** SINCE YOUR DEPARTMENT'S LETTER REQUESTS THAT OUR DECISION BE SENT TO THE DEPUTY COMPTROLLER FOR ACCOUNTING AND FINANCE, AFAACFA, HEADQUARTERS, UNITED STATES AIR FORCE, WASHINGTON, D.C. 20330, WE ARE SENDING A COPY OF THIS DECISION TO THAT OFFICIAL.

49 Comp. Gen. 819 (Comp.Gen.), B- 169035, 1970 WL 3772

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

This is historical material "frozen in time". The website is no longer updated and links to external websites and some internal pages may not work.



## Briefing Room

Your Weekly Address

Speeches & Remarks

Press Briefings

**Statements & Releases**

White House Schedule

Presidential Actions

    Executive Orders

    Presidential Memoranda

    Proclamations

Legislation

    Pending Legislation

    Signed Legislation

    Vetoed Legislation

Nominations & Appointments

Disclosures

**The White House**

Office of the Press Secretary

For Immediate Release      September 24, 2014

# FACT SHEET: The U.S. Global Anticorruption Agenda

SHARE THIS:







President Obama and the U.S. Government continue to drive a robust agenda to stem corruption around the world and hold to account those who exploit the public's trust for private gain.

Preventing corruption preserves funds for public revenue and thereby helps drive development and economic growth. By contrast, pervasive corruption siphons revenue away from the public budget and undermines the rule of law and the confidence of citizens in their governments, facilitates human rights abuses and organized crime, empowers authoritarian rulers, and can threaten the stability of entire regions. The United States views corruption as a growing threat to the national security of our country and allies around the world.

The United States has been a global leader on anticorruption efforts since enacting the first foreign bribery law, the Foreign Corrupt Practices Act (FCPA), in 1977. The United States was a leader in developing fundamental international legal frameworks such as the UN Convention against Corruption and the Organization for Economic Cooperation and Development (OECD) Anti-Bribery Convention and the rest of the global architecture for international legal cooperation in areas such as asset recovery and denial of entry. The United States also has been a leader in providing funding for capacity building to fight corruption and promote good governance.

The United States continues to take action to prevent the U.S. legal and financial systems from being exploited by those who engage in, or launder the proceeds of, corruption. We will continue to work with key allies and partners, including in the Open Government Partnership, the G-7, the G-20, and the OECD Working Group on Bribery, to improve transparency, integrity, and accountability worldwide. We will continue our support to promote the important role of civil society in providing accountability, including through non-government organizations, a robust and independent media, and the private sector, and will continue to work with governments to safeguard the independence of judiciaries, prosecutors, and oversight bodies. We will hold responsible governments that tolerate or commit corrupt practices in contravention of international norms, including by adjusting our bilateral relations and advising our businesses and investors accordingly.

This Administration is undertaking a number of actions to promote transparency and stem corruption worldwide.

- **Pursuing corrupt actors and the proceeds of corruption.** The United States continues to use law enforcement and administrative tools to hold corrupt actors accountable and to retrieve the proceeds of corruption hidden in the U.S. financial system.
  - The United States continues to apply the FCPA to prosecute those who pay bribes to foreign officials to obtain business benefits. Since 2009, the United States has resolved criminal cases against more than 50 corporations worldwide with penalties of approximately $3 billion, and it has convicted more than 50 individuals, including CEOs, CFOs, and other high-level corporate executives, for FCPA and FCPA-related crimes.
  - The United States continues to work with partner governments to pursue recovery of the proceeds of corruption, for the benefit of the citizens of the affected nations, including by establishing the recent Ukraine Forum on Asset Recovery and the Arab Forum on Asset Recovery which will hold its third session in November 2014. The United States has

established anti-kleptocracy units of investigators and prosecutors dedicated to cooperate with other countries on asset recovery.

- The United States will continue to use visa authorities to deter the corrupt, their beneficiaries, and their enablers from engaging in corruption and using the United States as a safe haven.
- The Administration will advocate for legislation to close gaps in our money laundering laws regarding the proceeds of certain crimes committed abroad.

- **Working with U.S. businesses.** The U.S. Government works closely with U.S. businesses to ensure that private actors maintain their international brand as transparent and accountable partners. The United States will develop a National Action Plan to promote and incentivize responsible business conduct, including with respect to transparency and anticorruption, consistent with the UN Guiding Principles on Business and Human Rights and the OECD Guidelines on Multinational Enterprises.

- **Preventing the abuse of anonymous shell companies.** The United States is taking several actions to prevent corrupt actors from using anonymous shell companies to engage in or launder the proceeds of corruption.
  - In his Fiscal Year 2015 budget request, the President proposed legislation to give law enforcement access to the identity of the natural persons exercising control over legal entities organized in the United States in order to facilitate law enforcement investigations and enhance transparency.
  - In August 2014, the Department of the Treasury published in the Federal Register a notice of proposed rulemaking to clarify and strengthen customer due diligence obligations for U.S. financial institutions, including a requirement to identify beneficial owners of certain customers that are legal entities.

- **Improving transparency in the extractives industry.** The extractives industry is especially susceptible to corruption, and the United States is taking several actions to ensure that extractives companies and governments remain accountable.
  - The United States will conduct a review of how the U.S. government integrates international best practices for transparency in the extractive industries in its foreign policy engagements.
  - The United States is working with G-7 and other partners to improve assistance to governments for negotiating complex contracts with the private sector to promote the adoption of more sustainable agreements, including supporting the launch of **www.negotiationsupport.org** to provide requesting governments a complete picture of the negotiation process and to connect them with further assistance.

- **Working with other countries to promote anticorruption, transparency and open government.** The United States, through numerous assistance programs, works closely with countries around the world to build transparent and accountable financial and legal systems. The Departments of State and U.S. Agency for International Development devote approximately $1 billion per year to anticorruption and related good governance programs.

- **Galvanizing global efforts to promote open government principles in the Open Government Partnership (OGP)**. With the leaders of seven other nations, President Obama in 2011

launched the Open Government Partnership (OGP), a voluntary, multi-stakeholder initiative in which governments make concrete commitments to promote transparency, empower citizens, fight corruption, and harness new technologies.  The OGP has grown rapidly from 8 to 64 countries and has generated thousands of new commitments to improve government for more than 2 billion people around the world.  From the passage of anticorruption legislation, to robust commitments to publish information on government spending, to new freedom of information laws, OGP has initiated a race to the top and is helping to transform the way that governments serve their citizens in the 21st century.



# U.S. Department of State
## Diplomacy in Action

## U.S. Anti-Corruption Efforts

Around the world, corruption saps economic growth, hinders development, destabilizes governments, undermines democracy, and provides openings for dangerous groups like criminals, traffickers, and terrorists.

The U.S. Department of State has made anti-corruption a national security priority and works across the globe to prevent graft, promote accountability, and empower reformers.

The Department's global anti-corruption efforts have three elements:

**Preventing Corruption & Increasing Accountability:** We assist countries committed to tackling corruption by both strengthening democratic institutions and building new support for reform by empowering citizen advocates to hold governments accountable to global standards.

**Strengthening Law Enforcement Across Borders:** We work with global partners to enhance law enforcement cooperation across borders, improve data sharing between major financial hubs, and develop tools to recover stolen assets.

**Tackling the Corruption-Security Nexus:** We address corruption in the security arena, exposing how corruption threatens national security and the ability to protect citizens, defeat terrorists, and defend national sovereignty.

By prioritizing anti-corruption, the Department of State seeks to make it even harder for criminals and terrorists to take root and spread, to promote governments that are more stable and accountable, and to level the playing field for U.S. businesses to compete in every region

---

## In This Section:

Resources (http://www.state.gov/anticorruption/resources/index.htm)

---

## Learn More

**Open Government Partnership» (http://www.opengovpartnership.org/)**

---

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

# RECOMMENDATION OF THE COUNCIL ON
## GUIDELINES FOR MANAGING CONFLICT OF INTEREST IN THE PUBLIC SERVICE

**THE COUNCIL,**

Having regard to articles 1(c), 3(a) and 5(b) of the Convention on the Organisation for Economic Co-operation and Development of 14 December 1960;

Having regard to Rule 18(b) of the OECD Rules of Procedure;

Having regard to the Recommendation of the Council on *Improving Ethical Conduct in the Public Service* of 23 April 1998 [C(98)70/FINAL] that includes the Principles for Managing Ethics in the Public Service, and noting, in particular, that Principle 7 indicates that "there should be clear guidelines for interaction between the public and private sectors";

Having regard to the Communiqué of the 2000 Council meeting at Ministerial level that emphasised "building trust in public institutions is a keystone of good governance";

Recognising the desirability of establishing and maintaining a set of core principles, policy frameworks, institutional strategies, and practical management tools for managing conflict of interest matters in the public service;

On the proposal of the Public Management Committee:

a)  RECOMMENDS that Member countries, in establishing, amending or reviewing their conflict of interest policies in accordance with their own political, administrative and legal context, take due account of the *Guidelines for Managing Conflict of Interest in the Public Service* (hereafter the Guidelines) which are set out in the Annex to this Recommendation and form an integral part thereof.

b)  INVITES Member countries, through their work in the Public Management Committee, to identify and disseminate good practices in the management of conflict of interest, as well as to assess areas in which further work could be appropriate.

c)  INSTRUCTS the Public Management Committee to report to Council on progress made in implementing this Recommendation within three years of its adoption and regularly thereafter.

**ANNEX TO THE**
**RECOMMENDATION OF THE COUNCIL ON**
**OECD GUIDELINES FOR MANAGING CONFLICT OF INTEREST**
**IN THE PUBLIC SERVICE**

**Preface**

*A growing public concern*

1.      Serving the public interest is the fundamental mission of governments and public institutions. Citizens expect individual public officials to perform their duties with integrity, in a fair and unbiased way. Governments are increasingly expected to ensure that public officials do not allow their private interests and affiliations to compromise official decision-making and public management. In an increasingly demanding society, inadequately managed conflicts of interest on the part of public officials have the potential to weaken citizens' trust in public institutions.

2.      Conflicts of interest in both the public and private sectors have become a major matter of public concern world-wide. In government and the public sector, conflict of interest situations have long been the focus of specific policy; legislation and management approaches intended to maintain integrity and disinterested decision-making in government and public institutions. In the private sector there has also been a long history of concern for integrity in business, and in particular for protecting the interests of shareholders and the public at large. Recent scandals have drawn attention to the importance of avoiding conflicts of interest which can become an issue when, for example, a public official leaves public office for employment in the business or NGO sector, or an accounting firm offers both auditing and consulting services to the same client, or a regulatory agency becomes too closely aligned to the business entities it is intended to supervise.

3.      New forms of relationship have developed between the public sector and the business and non-profit sectors, giving rise for example to increasingly close forms of collaboration such as public/private partnerships, self-regulation, interchanges of personnel, and sponsorships. New forms of employment in the public sector have also emerged with potential for changes to traditional employment obligations and loyalties. In consequence, there is clearly an emerging potential for new forms of conflict of interest involving an individual official's private interests and public duties, and growing public concern has put pressure on governments to ensure that the integrity of official decision-making is not compromised.

4.      While a conflict of interest is not *ipso facto* corruption, there is increasing recognition that conflicts between the private interests and public duties of public officials, if inadequately managed, can result in corruption. The proper objective of an effective Conflict of Interest policy is not the simple prohibition of all private-capacity interests on the part of public officials, even if such an approach were conceivable. The immediate objective should be to maintain the integrity of official policy and administrative decisions, and of public management generally, recognising that an unresolved conflict of interest may result in abuse of public office.

© OECD, June 2003
All rights reserved

2

5.      This objective can generally be achieved by ensuring that public bodies possess and implement relevant policy standards for promoting integrity, effective processes for identifying risk and dealing with emergent conflicts of interest, appropriate external and internal accountability mechanisms, and management approaches -- including sanctions -- that aim to ensure that public officials take personal responsibility for complying with both the letter and the spirit of such standards.

6.      Traditionally, the different approaches to managing conflict of interest situations which have been taken by member countries have reflected their different historical, legal and public service traditions. Institutional measures such as positive external audit and verification, or other internal supervisory approaches, do have a place in the management of conflict situations.  Other measures, such as limited or full publication of disclosed interests and/or the development of a strong management culture supporting integrity, may also be effective.

**Managing Conflict of Interest**

7.      In a rapidly changing public sector environment, conflicts of interest will always be an issue for concern. A too-strict approach to controlling the exercise of private interests may be conflict with other rights, or be unworkable or counter-productive in practice, or may deter some people from seeking public office altogether.  Therefore a modern Conflict of Interest policy should seek to strike a balance, by identifying risks to the integrity of public organisations and public officials, prohibiting unacceptable forms of conflict, managing conflict situations appropriately, making public organisations and individual officials aware of the incidence of such conflicts, ensuring effective procedures are deployed for the identification, disclosure, management, and promotion of the appropriate resolution of conflict of interest situations.

*Aims of the Guidelines*

8.      The primary aim of the Guidelines is to help member countries, at central government level, consider existing Conflict of Interest policy and practice relating to public officials -- including public servants/civil servants, employees, and holders of public office -- who work in the national public administration. The Guidelines can also provide general guidance for other branches of government, sub-national level government, and state-owned corporations.

9.      In particular, the Guidelines reflect policies and practices that have proved effective in OECD countries, and are intended to:

- Help government institutions and agencies to develop an effective Conflict of Interest policy that fosters public confidence in their integrity, and the integrity of public officials and public decision-making.

- Create a practical framework of reference for reviewing existing solutions and modernising mechanisms in line with good practices in OECD countries.

- Promote a public service culture where conflicts of interest are properly identified and resolved or managed, in an appropriately transparent and timely way, without unduly inhibiting the effectiveness and efficiency of the public organisations concerned.

- Support partnerships between the public sector and the business and non-profit sectors, in accordance with clear public standards defining the parties' responsibilities for integrity.

© OECD, June 2003                                3
All rights reserved

*Defining a "conflict of interest"*

10.     Historically, defining the term 'conflict of interest' has been the subject of many and varying approaches.  As all public officials have legitimate interests which arise out of their capacity as private citizens, conflicts of interest cannot simply be avoided or prohibited, and must be defined, identified, and managed. These Guidelines adopt a definitional approach which is deliberately simple and practical to assist effective identification and management of conflict situations, as follows:

> *A 'conflict of interest' involves a conflict between the public duty and private interests of a public official, in which the public official has private-capacity interests which could improperly influence the performance of their official duties and responsibilities.*

11.     Defined in this way, 'conflict of interest' has the same meaning as 'actual conflict of interest'. A conflict of interest situation can thus be current, or it may be found to have existed at some time in the past.

12.     By contrast, an *apparent* conflict of interest can be said to exist where it *appears* that a public official's private interests could improperly influence the performance of their duties *but this is not in fact the case*. A *potential* conflict arises where a public official has private interests which are such that a conflict of interest would arise if the official were to become involved in relevant (i.e. conflicting) official responsibilities in the future.

13.     Where a private interest has *in fact* compromised the proper performance of a public official's duties, that specific situation is better regarded as an instance of misconduct or 'abuse of office', or even an instance of corruption, rather than as a 'conflict of interest'.

14.     In this definition, 'private interests' are not limited to financial or pecuniary interests, or those interests which generate a direct personal benefit to the public official. A conflict of interest may involve otherwise legitimate private-capacity activity, personal affiliations and associations, and family interests, if those interests could reasonably be considered likely to influence improperly the official's performance of their duties. A special case is constituted by the matter of post-public office employment for a public official: the negotiation of future employment by a public official prior to leaving public office is widely regarded as a conflict of interest situation.

15.     Defined in this way, conflict of interest is the focus of these Guidelines because, if not managed or resolved appropriately, it has the potential to undermine the proper functioning of democratic governments by:

- Weakening adherence by public officials to the ideals of legitimacy, impartiality, and fairness in public decision-making, and

- Distorting the rule of law, the development and application of policy, the functioning of markets, and the allocation of public resources.

**Core principles for managing conflict of interest**

16.     In the interests of maintaining public confidence in public institutions, the Guidelines reflect the fact that public officials may be expected to observe in particular the following core principles in dealing with conflict of interest matters to promote integrity in the performance of official duties and responsibilities:

© OECD, June 2003                                           4
All rights reserved

*Serving the public interest*

- Public officials should make decisions and provide advice on the basis of the relevant law and policy, and the merits of each case, without regard for personal gain (i.e. be "disinterested"). The integrity of official decision-making, in particular in the application of policy to individual cases, should not be prejudiced by the religious, professional, party-political, ethnic, family, or other personal preferences or alignments of the decision-maker.

- Public officials should dispose of, or restrict the operation of, private interests that could compromise official decisions in which they participate. Where this is not feasible, a public official should abstain from involvement in official decisions which could be compromised by their private-capacity interests and affiliations.

- Public officials should avoid private-capacity action which could derive an improper advantage from 'inside information' obtained in the course of official duties, where the information is not generally available to the public, and are required not to misuse their position and government resources for private gain.

- Public officials should not seek or accept any form of improper benefit in expectation of influencing the performance or non-performance of official duties or functions.

- Public officials are expected not to take improper advantage of a public office or official position which they held previously, including privileged information obtained in that position, especially when seeking employment or appointment after leaving public office.

*Supporting transparency and scrutiny*

- Public officials and public organisations are expected to act in a manner that will bear the closest public scrutiny. This obligation is not fully discharged simply by acting within the letter of the law; it also entails respecting broader public service values such as disinterestedness, impartiality and integrity.

- Public officials' private interests and affiliations that could compromise the disinterested performance of public duties should be disclosed appropriately, to enable adequate control and management of a resolution.

- Public organisations and officials should ensure consistency and an appropriate degree of openness in the process of resolving or managing a conflict of interest situation.

- Public officials and public organisations should promote scrutiny of their management of conflict of interest situations, within the applicable legal framework.

*Promoting individual responsibility and personal example*

- Public officials are expected to act at all times so that their integrity serves an example to other public officials and the public.

- Public officials should accept responsibility for arranging their private-capacity affairs, as far as reasonably possible, so as to prevent conflicts of interest arising on appointment to public office and thereafter.

© OECD, June 2003                                    5
All rights reserved

- Public officials should accept responsibility for identifying and resolving conflicts in favour of the public interest when a conflict does arise.

- Public officials and public organisations are expected to demonstrate their commitment to integrity and professionalism through their application of effective Conflict of Interest policy and practice.

***Engendering an organisational culture which is intolerant of conflicts of interest***

- Public organisations should provide and implement adequate management policies, processes, and practices in the working environment to encourage the effective control and management of conflict of interest situations.

- Organisational practices should encourage public officials to disclose and discuss conflict of interest matters, and provide reasonable measures to protect disclosures from misuse by others.

- Public organisations should create and sustain a culture of open communication and dialogue concerning integrity and its promotion.

- Public organisations should provide guidance and training to promote understanding and dynamic evolution of the public organisation's established rules and practices, and their application to the working environment.

**Developing the Policy Framework**

17.      Defining a policy approach to dealing with conflict of interest is an essential part of the political, administrative and legal context of a country's public administration.  These Guidelines do not attempt to cover every possible situation in which a conflict of interest might arise, but instead are designed as a general policy and practice reference that is relevant to a rapidly changing social context. The proposed measures are intended to reinforce each other to provide a coherent and consistent approach to managing conflict of interest situations.  The key functions of this approach are:

- **Definition** of the general features of conflict of interest situations which have potential to put organisational and individual integrity at risk.

- **Identification** of specific occurrences of unacceptable conflict of interest situations.

- **Leadership and commitment** to implementation of the Conflict of Interest policy.

- **Awareness** that assists compliance, and **anticipation** of at-risk areas for prevention.

- **Appropriate disclosure** of adequate information, and **effective management** of conflicts.

- **Partnerships** with other stakeholders, including contractors, clients, sponsors and the community.

- **Assessment and evaluation** of a Conflict of Interest policy in the light of experience.

- **Redevelopment and adjustment** of policy and procedures as necessary to meet evolving situations.

© OECD, June 2003
All rights reserved

## 1.1. Identify relevant conflict of interest situations

### 1.1.1. Provide a clear and realistic description of what circumstances and relationships can lead to a conflict of interest situation.

a)  The general description of conflict of interest situations should be consistent with the fundamental idea that there are situations in which the private interests and affiliations of a public official create, or have the potential to create, conflict with the proper performance of his/her official duties. The description should emphasise the overall aim of the policy -- fostering public trust in government institutions.

b)  The description should also recognise that, while some conflict of interest situations may be unavoidable in practice, public organisations have the responsibility to define those particular situations and activities that are incompatible with their role or public function because public confidence in the integrity, impartiality, and personal disinterestedness of public officials who perform public functions could be damaged if a conflict remains unresolved.

c)  The policy should give a range of examples of private interests which could constitute conflict of interest situations: financial and economic interests, debts and assets, affiliations with for-profit and non-profit organisations, affiliations with political, trade union or professional organisations, and other personal-capacity interests, undertakings and relationships (such as obligations to professional, community, ethnic, family, or religious groups in a personal or professional capacity, or relationships to people living in the same household).

d)  More focused examples of unacceptable conduct and relationships should be provided for those groups that are working in at-risk areas, such as the public-private sector interface, government procurement, regulatory and inspectorial functions, and government contracting. Specific attention needs to be given to functions which are subject to close public scrutiny or media attention.

### 1.1.2. Ensure that the Conflict of Interest policy is supported by organisational strategies and practices to help with identifying the variety of conflict of interest situations.

a)  Laws and codes, as primary sources, should state the necessary definitions, principles and essential requirements of the Conflict of Interest policy.

b)  In addition, guidelines and training materials, as well as advice and counselling, should provide practical examples of concrete steps to be taken for resolving conflict of interest situations, especially in rapidly-changing or "grey" areas such as private-sector sponsorships, privatisation and deregulation programmes, NGO relations, political activity, public-private partnerships and the interchange of personnel between sectors.

## 1.2. Establish procedures for identifying, managing and resolving conflict of interest situations

### 1.2.1. Ensure that public officials know what is required of them in relation to identifying and declaring conflict of interest situations.

a)  *Initial disclosure on appointment or taking up a new position* -- Develop procedures that enable public officials, when they take up office, to identify and disclose relevant private interests that potentially conflict with their official duties. Such disclosure is usually formal, (by means of *registration* of information identifying the interest), and is required to be provided periodically, (generally on commencement in office and thereafter at regular intervals, usually annually), and in writing. Disclosure is not necessarily required to be a public process: internal or limited-access disclosure within the public organisation, together with appropriate resolution or management of any conflicts,

© OECD, June 2003
All rights reserved

7

may be sufficient to achieve the policy objective of the process -- encouraging public confidence in the integrity of the public official and their organisation. In general, the more senior the public official, the more likely it is that public disclosure will be appropriate; the more junior, the more likely it is that internal disclosure to the management of the official's organisation will be sufficient.

b) *In-service disclosure in office* **--** Make public officials aware that they must promptly disclose all relevant information about a conflict when circumstances change after their initial disclosure has been made, or when new situations arise, resulting in an emergent conflict of interest. As with formal registration, *ad hoc* disclosure itself is not necessarily required to be a public process: internal declaration may be sufficient to encourage public confidence that integrity is being managed appropriately.

c) *Completeness of disclosure* **--** Determine whether disclosures of interests contain sufficient detail on the conflicting interest to enable an adequately-informed decision to be made about the appropriate resolution. The responsibility for the adequacy of a disclosure rests with the individual public official.

d) *Effective disclosure process* **--** Ensure that the organisation's administrative process assists full disclosure, and that the information disclosed is properly assessed, and maintained in up-to-date form. It is appropriate that the responsibility for providing adequate disclosure of relevant information should rest with individual officials. Ensure that the responsibility for providing relevant information rests with individual officials and this requirement is explicitly communicated and reinforced in employment and appointment arrangements and contracts.

### *1.2.2.   Set clear rules on what is expected of public officials in dealing with conflict of interest situations.*

a) *Dealing with conflicting private interests* -- Public officials should be required to accept responsibility for identifying their relevant private interests. An organisation's policy statement should make it clear that the registration or declaration of a private interest does not in itself resolve a conflict. Additional measures to resolve or manage the conflict positively must be considered.

b) *Resolution and management options* -- Options for positive resolution or management of a continuing or pervasive conflict can include one or more of several strategies as appropriate, for example:

   – Divestment or liquidation of the interest by the public official.

   – Recusal of the public official from involvement in an affected decision-making process.

   – Restriction of access by the affected public official to particular information.

   – Transfer of the public official to duty in a non-conflicting function.

   – Re-arrangement of the public official's duties and responsibilities.

   – Assignment of the conflicting interest in a genuinely 'blind trust' arrangement.

   – Resignation of the public official from the conflicting private-capacity function, and/or

   – Resignation of the public official from their public office.

c) *Recusal and restriction* **--** Where a particular conflict is not likely to recur frequently, it may be appropriate for the public official concerned to maintain their current position but not participate in decision-making on the affected matters, for example by having an affected decision made by an independent third party, or by abstaining from voting on decisions, or withdrawing from discussion of affected proposals and plans, or not receiving relevant documents and other information relating to

© OECD, June 2003                                                8
All rights reserved

their private interest. The option of re-assigning certain functions of the public official concerned should also be available, where a particular conflict is considered likely to continue, thereby making *ad hoc* recusal inappropriate. Particular care must be exercised to ensure that all affected parties to the decision know of the measures taken to protect the integrity of the decision-making process where recusal is adopted.

d) *Resignation* -- Public officials should be required to remove the conflicting private interest if they wish to retain their public position and the conflict of interest cannot be resolved in any other way (for example by one or more of the measures suggested above). Where a serious conflict of interest cannot be resolved in any other way, the public official should be required to resign from their official position. The Conflict of Interest policy (together with the relevant employment law and/or employment contract provisions) should provide the possibility that their official position can be terminated in accordance with a defined procedure in such circumstances.

e) *Transparency of decision-making* -- Registrations and declarations of private interests, as well as the arrangements for resolving conflicts, should be clearly recorded in formal documents, to enable the organisation concerned to demonstrate, if necessary, that a specific conflict has been appropriately identified and managed. Further disclosure of information about a conflict of interest may also be appropriate in supporting the overall policy objective, for example by demonstrating how the disclosure of a specific conflict of interest was recorded and considered in the minutes of a relevant meeting.

**Implementing the Policy Framework**

18.    While it is primarily the responsibility of individual public officials to be aware of possible conflicts of interest, public bodies and government organisations have the responsibility to ensure that the Conflict of Interest policy is implemented effectively. Particular attention needs to be paid to at-risk areas and functions, especially where significant conflicts are more likely to arise or to prove more damaging to organisational integrity and public confidence. In so doing, the potential for overly-complex procedures to discourage compliance should be recognised.

**2.1. Demonstrate leadership commitment**

***2.1.1. Leadership* --** All public officials, particularly more senior public officials and senior managers, should arrange their private-capacity interests in a manner that preserves public confidence in their own integrity and the integrity of their organisation, and sets an example to others. Mere compliance with the letter of the Conflict of Interest policy or law, narrowly interpreted, is not generally sufficient to encourage public confidence in an organisation's integrity.

***2.1.2. Commitment* -- Organisations should take responsibility for the effective application of their Conflict of Interest policy, by:**

a) *Deciding in individual cases* -- Managers must be prepared to exercise judgement when dealing with a disclosure of private interests. In particular, they should consider carefully the larger question of whether a reasonable person who is in possession of the relevant facts would be likely to think that the organisation's integrity was at risk from an unresolved conflict of interest. When determining the most appropriate solution to resolve or manage the actual conflict situation, managers should weigh the interests of the organisation, the public interest, and the legitimate interests of employees, as well as other factors -- including in specific cases the level and type of position held by the public official concerned, and the nature of the conflict.

© OECD, June 2003
All rights reserved                                    9

b) *Monitoring and evaluating the effectiveness of the policy* -- Over time, organisations should ensure that the policy remains effective and relevant in dealing with current and anticipated conflicts in a continuously evolving environment, and change or redevelop the policy as necessary.

## 2.2. Create a partnership with employees: awareness, anticipation and prevention

### 2.2.1. Ensure wide publication and understanding of the Conflict of Interest policy.

a) *Publish the Conflict of Interest policy* -- Give all new public officials, upon initial appointment and on taking up a new position or function, a clear and concise statement of the current Conflict of Interest policy.

b) *Give regular reminders* -- Regularly remind public officials of the application of the policy in changing circumstances, and in particular ensure that public officials know how the rules are applied in the organisation and what their own responsibilities are. For example, an organisation's *Code of Conduct* can be tailored as a practical instrument for setting and communicating Conflict of Interest standards both to public officials and the wider public.

c) *Ensure that rules and procedures are available* -- Provide up-to-date information about the organisation's policy, rules and administrative procedures relevant to conflict of interest, and clearly establish any additional requirements specific to the organisation.

d) *Provide guidance* -- Support public officials with information and advice, including real-world examples and discussions on how specific conflict situations have been handled in the past and are expected to be handled in the future. In particular, consult with staff on the application of the policy, and ensure that the policy's rationale is understood and accepted.

e) *Provide assistance* -- Identify sources of appropriate assistance for public officials who are in doubt about the application of the policy, and widely publicise how to obtain such advice. Make such advice available to clients of the organisation and others, including contractors, agents, and partnering bodies, to assist stakeholders to be well-informed. Such advice may be especially valuable to parties who may feel that the public organisation's Conflict of Interest policy is not fully effective but are reluctant to complain formally to the organisation concerned.

### 2.2.2. Review 'at-risk' areas for potential conflict of interest situations.

a) *Additional employment* -- Define the circumstances, including the required authorisation procedures, under which public officials may engage in ancillary ("outside") employment while retaining their official position.

b) *"Inside" information* -- Make sure that information collected or held by public organisations which is not in the public domain, or information obtained in confidence in the course of official functions, is understood to be privileged, and is effectively protected from improper use or disclosure.

c) *Contracts* -- Consider the circumstances in which the preparation, negotiation, management, or enforcement of a contract involving the public organisation could be compromised by a conflict of interest on the part of a public official within the public organisation.

d) *Gifts and other forms of benefit* – Consider whether the organisation's current policy is adequate in recognising conflicts of interest arising from traditional and new forms of gifts or benefits.

© OECD, June 2003
All rights reserved

10

e) *Family and community expectations* -- Consider whether the organisation's current policy is adequate in recognising conflicts of interest arising from expectations placed on public officials by their family and community, especially in a multicultural context.

f) *'Outside' appointments* -- Define the circumstances, including the required authorisation procedures, under which a public official may undertake an appointment on the board or controlling body of, for example, a community group, an NGO, a professional or political organisation, another government entity, a government-owned corporation, or a commercial organisation which is involved in a contractual, regulatory, partnership, or sponsorship arrangement with their employing organisation.

g) *Activity after leaving public office* -- Define the circumstances, including the required authorisation procedures, under which a public official who is about to leave public office may negotiate an appointment or employment or other activity, where there is potential for a conflict of interest involving the organisation.

### 2.2.3  *Identify preventive measures that deal with emergent conflict situations.*

a) *Meeting procedures* -- Enable participants in official decision-making to foresee potential conflicts, where feasible: for example by providing meeting agendas in advance; record in meeting proceedings any conflicts that arise and the measures taken to resolve them.

b) *Recusal* -- Establish clear rules and efficient procedures (for example, a register of interests for board members, advisors and senior management), to ensure that *ad hoc* conflicts of interest are made transparent so that decision-making is not compromised.

c) *Screening processes* -- As part of selection processes, require identification in advance of relevant interests, and discuss possible strategies for resolution of identified conflicts; obtain appropriate clearances (such as tax clearance certificates), declarations or undertakings, to identify and deal with potential conflict of interest situations at an early stage.

d) *Periodic system assessment* -- Review the implementation of policy and procedures on a regular basis and update mechanisms and procedures to ensure their relevance to a constantly evolving situation. Consider the relevance of current assumptions – for example concerning the impact of new technology, which makes possible 'day-trading' of stocks and shares via the Internet, which in turn could necessitate daily disclosures of an individual's changing pecuniary interests. Draw on surveys of client and partner bodies' experience of risk, where appropriate, partly to engage a broader set of experience, and partly to indicate continuing commitment to the process of risk-management and safeguarding the organisation's integrity.

### 2.2.4. *Develop an open organisational culture where dealing with conflict of interest matters can be freely raised and discussed.*

a) *Involve employees, their representatives and other interested parties* in the review of existing Conflict of Interest policy. Their opinion, as users, on the daily problems faced in the implementation of the Conflict of Interest policy can substantially contribute to the improvement of existing measures.

b) *Consult* on future prevention measures to bring a practical aspect into the policy-making process and to build a common understanding that is vital for the implementation of agreed policy.

c) *Assist understanding* by providing training for public officials to develop an understanding of the relevant general principles and specific rules, and to help them improve decision-making skills for practical application.

© OECD, June 2003                                11
All rights reserved

d) *Provide support mechanisms* for assisting managers in reviewing and improving their skills in identifying and resolving or managing conflicts in their day-to-day work.

## 2.3. Enforce the Conflict of Interest policy

### 2.3.1. Provide procedures for establishing a conflict of interest offence, and proportional consequences for non-compliance with Conflict of Interest policy including disciplinary sanctions.

a) *Personal consequences* -- Non-compliance with the organisation's Conflict of Interest policy should generally be regarded as, at minimum, a disciplinary matter, while more serious breaches involving an actual conflict could result in sanctions for abuse of office, or prosecution for a corruption offence. Other sanctions may apply to the public official depending on the seriousness of the breach -- for example, a simple failure to register a relevant interest as required, compared with a more serious refusal to resolve an actual conflict of interest of which the public official is aware. Sanctions should be enforceable, to the extent of ultimately affecting the appointment or career of the public official involved where appropriate.

b) *Management measures* -- Positive management can provide effective complementary forms of redress for breaches of Conflict of Interest policy, and can be effective in dissuading those who would seek to benefit, directly or indirectly, from such breaches. Such measures could include retroactive cancellation of affected decisions and tainted contracts, and exclusion of the beneficiaries -- whether corporations, individuals, or associations, etc. -- from future processes. Such exclusion measures may operate for a given period of time, within given contract monetary limits, or for certain types of activities.

### 2.3.2. Develop monitoring mechanisms to detect breaches of policy and take into account any gain or benefit that resulted from the conflict.

a) *Controls* -- Ensure that management and internal controls as well as external oversight institutions -- such as independent auditors or an ombudsman -- work together to detect those who do not comply with required standards. Appropriate reporting for independent oversight institutions, and the publication of regular reports on the implementation of integrity-management arrangements and on the progress of any investigation, can play an important role in encouraging compliance with policy and discouraging abuse of the integrity-management process.

b) *Complaint-handling* -- Develop complaint mechanisms to deal with allegations of non-compliance, and devise effective measures to encourage their use. Provide clear rules and procedures for whistle-blowing, and take steps to ensure that those who report violations in compliance with stated rules are protected against reprisal, and that the complaint mechanisms themselves are not abused.

### 2.3.3. Co-ordinate prevention and enforcement measures and integrate them into a coherent institutional framework.

a) *Policy Responsibility* -- Identify a central function, not necessarily an independent organisation or government agency, as being responsible for the development and maintenance of the Conflict of Interest policy and procedures; this function could also evaluate and provide guidance on agencies' management of Conflict of Interest policy and procedures, as well as selecting 'champion' organisations and disseminating their best practices.

b) *Synergies* -- Consider the combined use of complementary instruments to support related policy objectives; for example, disclosure systems that require regular declaration of financial and other

© OECD, June 2003
All rights reserved

12

interests can prevent potential conflicts of interest, help to detect illicit enrichment of public officials, and also help to deter corrupt practices.

c) *Consistency of Laws* -- Harmonise existing laws with the Conflict of Interest policy to remove conflicts and enable effective enforcement of the policy, including disclosure requirements and sanctions.

## 2.4. Initiate a new partnership with the business and non-profit sectors

19.      Mechanisms for resolving conflict of interest situations must be kept up-to-date in the context of increasing co-operation between public organisations and the business and non-profit sectors. This is particularly crucial when appointing representatives to public bodies from other sectors to benefit from their particular experience, knowledge and involvement.

### 2.4.1. Create partnerships for integrity with the business and non-profit sectors by involving them in the elaboration and implementation of the Conflict of Interest policy for public officials.

a) *Stakeholder Involvement* -- Engage representatives of the business and non-profit sectors in reviewing the policy in order to have their views on the problems of implementation, and possible applications of the policy.

b) *Consultation* -- Ensure that proposed standards reflect actual public expectations by involving the business and non-profit sectors in the design of new integrity measures. Consultations could be used to identify or negotiate mutually acceptable solutions and encourage co-operation in the implementation process.

### 2.4.2. Anticipate potential conflict of interest situations when public organisations invite the involvement of persons representing businesses and the non-profit sector.

a) *Potential problems* -- Anticipate potential problems in order to maximise the benefit of involving representatives from other sectors in the work of public bodies -- such as boards and advisory bodies – by identifying situations where the involvement of these representatives could result in a conflict of interest.

b) *Safeguards* -- Set up mechanisms that prevent confidential information, authority or influence gained through involvement in the activities of public bodies, from being used for personal gain or for the improper advantage of other businesses and non-profit organisations. Examples of potentially effective prevention mechanisms include the restriction of an individual's access to particular information, formally recording the fact that a specific individual has had access to particular confidential information, and requiring the identification of relevant private and business interests of appointees from the business and non-profit sectors.

### 2.4.3. Raise awareness of the Conflict of Interest policy when dealing with other sectors, and include safeguards against potential conflict of interest situations when co-operating with the business and non-profit sectors.

a) *Provide information* -- Make other organisations aware of the potential consequences of non-compliance (which can include the termination or retrospective cancellation of a contract, recording and publicising a proven breach in a register, or prosecution for criminal offences such as corruption). Assist partner organisations, for example through providing contractors with training in compliance with and enforcement of the stated requirements.

All rights reserved

b) *Review together high-risk areas* **--** Potential conflict of interest areas should be identified, and appropriate preventive mechanisms developed, to protect both sides in a potential conflict situation. Ensure, for example, that partner organisations and the business sector accept that relevant private interests are to be disclosed transparently in the process of lobbying, and that breaches or attempted breaches of policy are to be brought to light so that they can be dealt with firmly and constructively. Similarly, ensure that partner organisations and the business sector are aware of the public organisation's requirements regarding the handling of privileged "inside" information that is not available in the public domain, ensure that "commercial-in-confidence" information is adequately protected by verifiable processes, and ensure that decision-making procedures at all stages can be audited for integrity and justified.

© OECD, June 2003                    14
All rights reserved



THE UNIVERSITY OF CHICAGO PRESS JOURNALS

Louis XIV's Financial Relations with Charles II and the English Parliament
Author(s): Clyde L. Grose
Source: *The Journal of Modern History*, Vol. 1, No. 2 (Jun., 1929), pp. 177-204
Published by: The University of Chicago Press
Stable URL: http://www.jstor.org/stable/1872003
Accessed: 20-10-2017 17:40 UTC

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at http://about.jstor.org/terms



*The University of Chicago Press* is collaborating with JSTOR to digitize, preserve and extend access to *The Journal of Modern History*

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

# THE JOURNAL OF
# MODERN HISTORY

*Volume I*          **JUNE 1929**          *Number 2*

## LOUIS XIV'S FINANCIAL RELATIONS WITH CHARLES II AND THE ENGLISH PARLIAMENT[1]

THE rôle played by French money in Restoration England is an old theme to historians. Sir John Dalrymple's early publication[2] of pertinent documents from the French foreign archives has influenced all later historians of the period; and recent attempts to remove some of the odium long attached to Charles II's name have been only partly successful. It is the purpose of this study to relate the facts concerning this aspect of his reign.

During the early years of the Restoration, it was unnecessary for Louis XIV to employ special means to maintain good

[1] The following abbreviations are used throughout the footnotes: A.A.E., Angl. (Archives des Affaires Étrangères, Angleterre); B.M. (British Museum); P.R.O. (Public Record Office); *Cal. St. P., Dom. (Calendars of State Papers, Domestic).*

The relation of the various coins referred to was about as follows: the pound sterling (£) or guinea of 20 shillings equaled 4 crowns (Eng.), or *écus* (Fr.), or *rixtalers* (Ger.), or *patacons* (Port.), or gold florins (Austrian, etc.). The *pistole* (Sp. and Fr.) and *louis d'or* (Fr.) corresponded to, but were usually slightly less than, the pound sterling. The *livre tournois* (herein called *livre*) was the denomination most commonly used in Anglo-French transactions of the period. Exchange values cannot be stated with any accuracy for the entire period, but the number of *livres* to the pound was usually about 12, although varying to 15.

Dates of documents and letters are unchanged—that is, they are Old Style if originating in England, and New Style if originating on the Continent. Dates not connected with a source citation are New Style unless otherwise specified.

[2] *Memoirs of Great Britain and Ireland* (London, 1771–73).

177

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

relations with England. Mazarin's short-lived and artificial alliance with Cromwell proved no barrier to the natural *liaison* soon to obtain between restored Stuart and Bourbon. Early in 1661, Louis XIV stated with assurance and satisfaction that England was "porté d'inclination pour la France."[3]

Charles II's marriage to Catherine of Braganza was promoted by Louis XIV,[4] who, restrained by the treaty of 1659 from attacking Spain directly, was pleased at the opportunity to assist Portugal in her war against Spain by presenting her with an English alliance. France promised England 2,000,000 *livres* to aid the cause of Portuguese independence, and one-fourth of this amount was delivered in February, 1662.[5] But the remainder does not appear to have been paid, owing to instant confusion of this transaction with another: the sale of Dunkirk.

Count d'Estrades came to England in August, 1662, and after two months of diplomatic sparring secured a treaty by which Dunkirk was sold to France for 5,000,000 *livres*.[6] Two million *livres* were to be paid at once, and the remainder in quarterly instalments extending over three years. So desperate, however, was Charles's financial situation that he immediately discounted the later payments at 16 per cent through a French banker who was, unknown to Charles, an agent of Louis XIV. The latter thereby effected a considerable saving over the price agreed upon.[7] Forty-six carts laden with silver bore the money from the Louvre to Dunkirk, whence it was shipped to England, where Charles allocated it to army arrears, the navy loan, the

---

[3] E. Lavisse, *Histoire de France* (Paris, 1901–11), VII, Part II, 207.

[4] Through M. Bastide, who came to England in March, 1661, as Fouquet's secret agent. See the writer's article, "The Anglo-Portuguese Marriage of 1662," soon to appear in the *Hispanic American Historical Review*.

[5] *Cal. St. P., Dom., 1661–1662*, p. 269. Clarendon relates in detail Bastide's unsuccessful attempt to bribe and pension him at this time (*Life* [Oxford, 1827], I, 522–23; T. H. Lister, *Life and Administration of Edward, First Earl of Clarendon* [London, 1838], II, 131–33).

[6] D'Estrades' letters of September 2 and 8, 1662, in A.A.E., Angl., 77, fols. 175, 181; *Letters and Negotiations of Count d'Estrades, 1637–1662* (London, 1755), pp. 245–319; Lister, II, 171–73; Clarendon, II, 384–87; Lavisse, VII, Part II, 275; C. Gaillardin, *Histoire du règne de Louis XIV* (Paris, 1871–76), III, 156–58; O. Klopp, *Fall des Hauses Stuart* (Vienna, 1875–88), I, 105.

[7] "Je gagnai, sur ce marché, cinq cette mille livres, sans que les Anglais s'en apercussent," said Louis XIV (quoted by Gaillardin, III, 157).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

royal jeweler, and the mint, which coined about one-third of it into English money.[8] The advantage was mutual. Charles got rid of an expensive post at a good price,[9] while Louis now had a splendid base for operations against the Spanish Netherlands.

It would seem that these two transactions were made quite independently, but Louis XIV regarded the latter as a tacit abrogation of further payments on the former. Letellier wrote to Montagu that "upon his Majesty's receipt of so much money for Dunkirk, he would be sufficiently enabled to relieve Portugal." Clarendon at once protested. A memorial of January, 1663,[10] stated that in the negotiations relating to Dunkirk "all care was taken to remove any possible imagination that any part of the money which should bee received from Dunkirk could bee applied towards the relief of Portugal." The memoir was apparently resultless, although Portugal was to receive further help from France, but not by way of England. The Portuguese themselves, fearing that some of the money would stay in England, probably suggested the more direct payment.

The Dutch war of 1665–67 did not completely destroy the Anglo-French entente, in spite of France's somewhat abeyant alliance with the Netherlands; for the war between England and France, when finally declared in 1666, was scarcely more than a farce. It was after the fall of Clarendon and the formation of the Triple Alliance that Louis XIV began to take more seriously the maintenance of English friendship; and when Colbert de Croissy came to England as the new Bourbon ambassador in August, 1668, he was well provided with funds and gifts for

[8] *Calendar of Treasury Books*, I, 457–59; *Cal. St. P., Dom., 1661–1662*, pp. 519, 523, 545, 561, 563, 587, 628; P.R.O., Declared Accounts, Pipe Office Rolls, No. 1273; P. Clement, *Lettres, Instructions, et Mémoires de Colbert* (Paris, 1861–65), II, 63–64, 233.

[9] See "His Majesty's reasons and resolucion concerning the parting with Dunkerke," delivered in Council, October 17, 1662, in B.M., Egerton MSS, 2543, fol. 117. Its maintenance cost England about £100,000 a year (L. von Ranke, *History of England, Principally in the Seventeenth Century* [Oxford, 1875], III, 387). See further J. Corbett, *England in the Mediterranean* (London, 1904), II, 12–21. There is every reason to disregard the scandalous charges heaped on Clarendon in connection with this transaction.

[10] P.R.O., State Papers, Foreign, France 117, fols. 16–21. Cf. copy in A.A.E., Angl., 79, fols. 47–50.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

distribution among French agents and friends. From this time until the end of Charles's reign money played an important, and at times a vital, rôle in Anglo-French relations.

Among the members of the "Cabal" which succeeded to Clarendon's prerogatives Arlington was generally regarded as the arch-opponent of France, and De Croissy was instructed to win him at any cost.[11] Joseph Williamson was at this time Arlington's agent in French relations. On November 7, 1668, Louis XIV wrote: "Let me know what sums should be offered to the two agents [Williamson and Leighton], as well as to the Duke [of Buckingham] and to Lord Arlington."[12] On November 24 he stated that "200,000 gold pieces" would not be too much to pay Arlington if it proved necessary. Leighton received 400 *pistoles,* but Williamson was incorruptible. As for Arlington himself, it is doubtful if any money was paid to him then,[13] for Charles's attitude was such as to encourage Louis XIV to hope for the alliance without great expenditure. The influence of Henrietta, Duchess of Orleans, sister of Charles II, was utilized; and Charles's vague religious aspirations were made to fit in with Louis's clear-cut political designs against Spain and Holland. The result was the Treaty of Dover. It carried heavy financial commitments for Louis XIV—3,000,-000 *livres* (£225,000) annual war subsidy and 2,000,000 *livres* (£150,000) for Charles's declaration of Catholicism—but it was a cheap purchase.[14] There had been no parliament to bribe,

[11] See De Croissy's instructions in F. A. M. Mignet, *Négociations relatives à la succession d'Espagne* (Paris, 1835–42), III, 23–29.

[12] H. Forneron, *Louise de Kérouaille, Duchess of Portsmouth, 1649–1734* (London, 1887), pp. 33–44.

[13] V. Barbour, *Henry Bennett, Earl of Arlington* (Washington, 1914), p. 169. In December, 1671, Lady Arlington accepted an expensive gift from Louis XIV for which her husband "reproached her, but very obligingly" (Dalrymple, II, 82).

[14] Charles had at first demanded £800,000 a year war subsidy, and £200,000 for his declaration of Catholicism (Dalrymple, II, 44–58; A. Legrelle, *La diplomatie française et la succession d'Espagne* [Ghent, 1888–92], I, 222–26; C. F. S. de Grovestins, *Histoire des luttes et rivalités politiques entre les puissances maritimes et la France* [Paris, 1851–54], II, 176). The £150,000 for the Catholic declaration was to be paid in two instalments, three and six months after the treaty. The first year's war subsidy was to be paid in three instalments as follows: one-fourth three months before war was declared, one-fourth upon the declaration

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

and apparently no large doles had been necessary in order to persuade the English ministers.[15] Following English defection, there was a rapid disintegration of the Triple Alliance, which resulted in the complete isolation of Holland by the close of 1671. Charles II never announced his conversion, but the 2,000,000 *livres* were paid nevertheless;[16] and during 1672 and 1673 it appears that the instalments of the war subsidy were remitted regularly.[17] When Colbert de Croissy returned to France in January, 1674, he bore with him a receipt signed by the king and Arlington for 8,000,000 *livres*,[18] the exact amount promised for two years of war and a declaration of Catholicism.

The war had not been long under way, however, when there arose developments disconcerting to Charles. The murder of the De Witts (August, 1672) and the rise of William of Orange meant to the Stuarts the substitution of a friend and nephew for an enemy at the head of the Dutch republic. The parliament of early 1673 wrought havoc at court by its passage of the Test Act. Clifford and James, Duke of York, both Catholics, had to resign the treasureship and admiralty, respectively; and the

———

of war, and one-half six months later. Thereafter, these same three proportions were to be paid on February 1, May 1, and October 15, respectively. Payment was to be made on Charles's order at Calais, Dieppe, or Havre, or by letter of exchange at London (Bib. Nat., MSS Français, 11147, fol. 88).

Two later treaties made no actual change in the amount of the subsidy. In December, 1670, Buckingham negotiated the well-known "sham treaty," identical with that of Dover in every respect except in the omission of all reference to Catholicism. The £150,000 to be paid upon Charles's declaration thereof was included as an extra war subsidy, one half payable within fifteen days and the rest in three months; but a secret declaration, unknown even to Buckingham, made this vaguely conditional upon the Catholic declaration.

[15] There were, however, many gifts distributed to persons about the court. Lady Shrewsbury received 10,000 *livres* to influence Buckingham. Cf. Hist. MSS Com., *Le Fleming MSS (Twelfth Rept.* [London, 1890], App. Part VII), p. 78; and see the long list of French gifts in Grovestins, II, 233–34.

[16] It had not been stated as to whether the payment should precede or follow the declaration, an omission leading to considerable argument until the payment of the first instalment in February, 1671 (see Chiffinch's account, *infra*, pp. 201–2; also Dalrymple, II, 61–68; and Mignet, III, 230–31).

[17] See Hist. MSS Com., *Le Fleming MSS*, p. 87; *Cal. St. P., Dom., 1671–1672*, pp. 92, 97, 191; *Hatton Correspondence* (Camden Soc., London, 1878), p. 100; *Cal. Treas. Bks.*, III, Part II, 1352; *ibid.*, IV, 150, 185; Clement, II, ccxxxix.

[18] Bib. Nat., MSS Français, 11147, fol. 93 (dated Jan. 6, 1673/4).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

**182**                     CLYDE L. GROSE

former position soon passed into the hands of Thomas Osborne, Earl of Danby, an Anglican and avowed enemy of France. Parliament's hostility to France had undoubtedly encouraged the alliance of Spain, Lorraine, and the Empire for the assistance of the Dutch (August, 1673). Viewing the wreck of this disastrous session, Louis XIV had reason to think that in case of another, Charles II would not be able to prevent a separate peace with Holland. He appears to have felt, however, that another session would probably prove as distasteful to Charles as to himself, and that either the houses would not convene at all or, as proved to be the case, they would soon be dismissed. De Croissy offered small subsidies payable in case parliament should not be called,[19] but no agreement was reached; and parliament met on November 16.

It was an unpropitious moment. The Duke of York had just been married to the Duchess of Modena, an Italian Catholic and protégé of Louis XIV; England resented the marriage with combined Protestant and nationalist zeal, and after two fiery days a prorogation was hurriedly announced. De Croissy now found himself wholly unfitted by his Catholicism to deal with parliament,[20] and a more acceptable ambassador was found in the Huguenot Marquis de Ruvigny. He was not a typical French diplomat; he hated the "filthy traffic" of Bourbon diplomacy, and he doubted its eventual efficacy.[21] He nevertheless accepted the position, went to England, and, using his Protestantism as a decoy and his French *livres* as a persuasion, set to work to re-create and foster a French party which might prevent an Anglo-Dutch peace.

No financial statement of Ruvigny's disbursements at this period has come to light, but his letters show that money passed to various members of parliament by the hands of Buckingham,

[19] Mignet, IV, 224–25; Dalrymple, II, 96; *Essex Papers* (Camden Soc., London, 1890), I, 139–41.

[20] De Croissy's letters of November 20, 1673, in Mignet, IV, 233–37. Cf. Grovestins, II, 477.

[21] Mignet, IV, 238–39, 256; Forneron, p. 103 (quoting Ruvigny to Louis, November 27); A. de Galtier de Laroque, *Le Marquis de Ruvigny* (Paris, 1892), pp. 141–42.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

Leighton, and the Earl of Berkshire.[22] The Duke of Newcastle and Lord Berkeley were two peers whom Ruvigny was especially proud to have attracted to the French cause.[23] He also felt certain that he had won over Shaftesbury, who had just retired from the chancellorship—so certain that he wanted (Louis XIV wisely disapproved) to give him 10,000 *livres* to distribute in parliament at his own discretion.[24] The Duchess of Portsmouth's assistance was stimulated by Louis XIV's presentation to her of estates in Aubigny.[25] It was, nevertheless, soon evident that the French party was in a minority, and a separate peace with the Dutch appeared inevitable unless another session of parliament could be prevented. Ruvigny made new offers of subsidies—now larger than those offered by De Croissy—but without avail; parliament met, and in February, 1674, the Peace of Westminster was signed.

During the next four years it was the task of French ambassadors to keep England neutral. Immediately following the peace parliament was prorogued to November; but long before that time Ruvigny suggested to Charles that both English and French interests would be served by deferring the session. "Si le parlement s'assemble," he informed Louis on June 4, "il fera de la cour tout ce qu'il voudra."[26]

Charles apparently needed little encouragement.[27] He had never before taken money from France simply for postponing parliament, and it appears that he now made no attempt to extort compensation. Instead, he assured Ruvigny early in July that it was his secret intention to prorogue parliament to April,

[22] Forneron, pp. 32–35. Berkshire—a low knave of noble birth whom Ruvigny called Lord Barker—received 1,000 florins (*ibid.,* pp. 172–73).

[23] Mignet, IV, 252.

[24] De Croissy to Louis, December 7, and the latter's reply on December 13, quoted in *ibid.,* p. 245. W. D. Christie, *Life of Anthony Ashley Cooper, First Earl of Shaftesbury* (London, 1871), II, 198; H. D. Traill, *Shaftesbury* (London, 1888), p. 103; J. MacPherson, *Original Papers* (London, 1775), I, 72–73.

[25] Forneron, p. 103. For other gifts to her, see A.A.E., Angl., 112, fol. 312.

[26] W. Cobbett, *Parliamentary History* (London, 1806–20), IV, 319–20.

[27] Coleman to Rizzini, April 12–22, 1674, in Marquise Campana de Cavelli, *Les Derniers Stuarts à St. Germain en Laye* (Paris, 1871), I, 142–43; Conway to Essex, February 17, 1674, in *Essex Papers,* I, 175.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

1675,[28] and in the following October he made good this promise. During the summer the notorious Edward Coleman, then secretary to the Duchess of York, was beginning his correspondence with the Jesuit confessor of Louis XIV,[29] in an attempt to secure French funds to bring about a dissolution of parliament;[30] and it appears that he interested James to such a degree that in August the latter—unaware of (or perhaps disregarding) Charles's promise of July—asked Ruvigny for 400,000 *livres*.[31] Naturally, after Charles's assurance aforementioned, Louis XIV took little interest in either of these solicitors.

It appears that Ruvigny expected to persuade Charles to a further prorogation without difficulty, and in January he suggested it.[32] But now the ambassador had to deal with someone besides the king. Danby, the new lord treasurer, had risen to his full stature and was the chief power in the king's council. Late in January, Danby called on Ruvigny, and for two hours he explained that the meeting of parliament was absolutely necessary in order to stave off a revolution.[33] About the same time James told Ruvigny that he thought Danby would be satisfied with 300,000 *livres*.[34] The ambassador was naturally

[28] A.A.E., Angl., 112, fols. 386–87, and see also fol. 416; cf. Mignet, IV, 320.

[29] Père Ferrier until his death in October, 1674; thereafter, Père la Chaise. J. F. M. Crétineau-Joly, *Histoire de la Compagnie de Jésus* (Paris, 1845–46), IV, 278; G. Treby, *A Collection of Letters* (London, 1681), p. 112; J. Pollock, *Popish Plot* (London, 1903), p. 34 (date in error); R. de Chantelauze, *Le père de la Chaize* (Paris, 1859), pp. 136–38.

[30] Pollock, pp. 33–34; Coleman to Père la Chaise, September 29, 1675, in Hist. MSS Com., *Hodgkin MSS (Fifteenth Rept.* [London, 1897], App., Part II, pp. 315–16; also in *State Tracts* (London, 1689), pp. 137–47. See also Treby, pp. 1–2 *passim*.

[31] A.A.E., Angl., 113, fols. 31–32. Cf. Dalrymple, II, 98; Mignet, IV, 330; Klopp, II, 10. Later in the month James came down to 300,000 *livres*.

[32] Mignet, IV, 330. Cf. *Essex Papers*, I, 284.

[33] A.A.E., Angl., 115, fols. 61–65 (cf. Mignet, IV, 330). For a commonly held mistaken interpretation of Danby's position, see *Essex Papers*, I, 288.

[34] Letter of January 27, cited above. York's arguments, as stated in this letter, were cogently put: "que la paix dépendait absolument de la cassation du parlement; que le roi de France avait besoin sans doute de ses finances pour soutenir une grande guerre, mais qu'elles ne sauraient etre, à son avis, mieux em-

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

puzzled, but decided to offer 100,000 *livres* if parliament should be either dissolved or prorogued for one year.[35]

Meanwhile, Ruvigny was being enlightened on two points: that James's terms were in no sense official and that Danby meant what he said. By the time Ruvigny was empowered from Paris to offer the 100,000 *livres*, he met a new and unfavorable situation created chiefly by the hand of Danby. Charles refused the subsidy, spoke in high terms of parliament, and for once stood firm and immovable through a three-hour conference.[36] Ruvigny had to resign himself to the assembling of parliament, and took steps accordingly.

The importance and significance of this change in French tactics have usually been overlooked by historians. On the surface it appears to be a "second best," after France had been unsuccessful in bribing Charles to dissolve parliament. Such an explanation takes no account of the great change in the situation wrought by Danby's rise to power; nor does it explain Ruvigny's failure to offer more to prevent the session.

Ruvigny and the French party undoubtedly saw in this parliament much more than a necessary evil. Danby, immovable arch-enemy of France and Catholicism, ruling without parliament, would be more dangerous to French interests than if moderated by the debates and party strife of that body. The French had not succeeded very well with the last parliament, but they were not succeeding at all with Danby; and perhaps, for the moment, he was deemed the more dangerous of the two. Not that Danby's system of corrupting parliament was not well known and of reputed efficiency. But Ruvigny had hopes of beating him at his own game. Danby in power without parliament was bad; Danby in power with a parliament behind him was worse. But Danby in power, restrained by a parliament under Ruvigny's hand, was least perilous of all. It is quite prob-

---

ployées qu'à la destruction d'un puissant ennemi qui soutenait tous les autres." Cf. Throckmorton's (an agent of Coleman) arguments to Pomponne in Hist. MSS Com., *Fitzherbert MSS (Thirteenth Rept.* [London, 1893], App., Part VI), p. 50.

[35] Louis to Ruvigny, February 9 and 16, 1675, cited in Mignet, IV, 331. Cf. Ranke, IV, 7n.

[36] Mignet, IV, 332–33.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

able that Ruvigny undertook his second line of attack, not as a poor substitute for the first, but as the best possible means by which to combat the new peril which the early months of 1675 first revealed in its full significance.[37]

There is no available account of Ruvigny's disbursements to members of this session, except that which passed through Coleman's hands; and his report was written under circumstances (his trial in connection with the Popish Plot) which cast grave doubts upon his veracity. In recommending himself to Père la Chaise, Coleman stated, perhaps with exaggeration, that he had received 20,000 *livres* from Ruvigny for members of parliament.[38] We know, however, that in March, Louis sent 100,000 *livres* to be distributed at Ruvigny's discretion, and an extra 3,000 *livres* a month throughout the session, for table expenses,[39] to offset Dutch hospitality.[40]

When parliament met, the results obtained by Ruvigny's efforts seemed temporarily satisfactory, but offered no promise

[37] Ruvigny's letters point to this at various places. Coleman, in his long letters to his various Catholic correspondents on the Continent, attempted detailed explanations of motives and policies on both sides; and while often mistaken, and certainly not much (if at all) in Ruvigny's confidence, he nevertheless saw this change of attitude clearly and explained it. "When we saw the session secured, we declared we were for the Parliament's meeting, *as indeed we were* from the moment we saw ourselves used by all the King's ministers at such a rate, that we had reason to believe they would sacrifice France, religion, and his Royal Highness too to their own interest if occasion served, and that they were led to believe that that was the only way they had to save themselves at that time; *for we saw no expedient fit to stop them in their career of persecution and those other destructive counsels but the Parliament*, etc." (Coleman to Père la Chaise, September 29, 1675, in Treby, p. 114). Cf. Sheldon to Coleman, September 24, in *ibid.*, pp. 33–34; and Coleman to Albani, August 30, in *ibid.*, p. 17 (also in Hist. MSS Com., *Fitzherbert MSS*, p. 109).

[38] Treby, p. 115.

[39] Louis to Ruvigny, March 20, in Mignet, IV, 335. See also Ruvigny to Pomponne, March 11 and 25, in A.A.E., Angl., 115, fols. 139–40, 158. In the former of these two letters, Ruvigny drew an interesting contrast between the honest upright men with whom he dealt, and the low-down rascals with whom Van Beuninghen and Fonseca (the Dutch and Spanish representatives) consorted.

[40] A.A.E., Angl., 115, fols. 128, 139; cf. Mignet, IV, 334. Van Beuninghen took up his residence in a fine mansion in Westminster in order, according to Ruvigny, "d'y recueillir plus facilement les plus factieux pour les persuader par ses discours, ses présents et sa bonne chère" *(ibid.)*. Ruvigny also said that the Dutch were providing the Danish resident with special money for his table hospitality *(ibid., fol. 139)*.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

of a fair future.[41] Opposition leaders took French money and opposed Danby at every point; and the chief measure, relating to the recall of English troops in French service, was defeated. But this French victory rested on a single vote, and the prorogation at the close of the session was for a period of only four months. Ruvigny had not controlled the debate as he had hoped. Never before had such violent tirades against France been heard in parliament. Worst of all, Danby's position was unimpaired.

The shortness of the prorogation gave Ruvigny no rest. He immediately set to work along the same two lines as before: intrigues with members of parliament, and negotiations with the king to dissolve it or prorogue it further. In parliament he now centered his efforts on the Dissenters, who were more approachable than formerly on the subject of toleration. With them he seems to have been fairly successful. By September it appears that he felt able to control the approaching session in case he could not prevent it.[42] But all summer he had been trying to prevent it, particularly after the death of Turenne and the failure of the French campaign. His efforts brought results when Charles made it known (through James) that he would prorogue parliament to the following April for about 3,000,-000 *livres*. But Ruvigny was tired of short prorogations. The enemies of France, expecting English support through parliamentary pressure, were only temporarily discouraged thereby. Charles was finally persuaded to offer France a choice of two propositions: (*a*) he would prorogue parliament to the following April for 1,500,000 *livres* (to which amount Ruvigny reduced him "avec beaucoup de discours"), or (*b*) parliament was to meet in November, but, if it undertook anti-French measures, it was to be dissolved in return for an annual subsidy of

[41] Cobbett, IV, 672–740; A. Grey, *Debates of the House of Commons* (London, 1769), III, 1–264; A. Marvell, *Complete Works* (N.P., 1872–75), II, 429–68. See also Ranke, IV, 9–12; W. Temple, *Works* (London, 1770), II, 309; and W. C. Abbott, in *Eng. Hist. Rev.*, XXI (1906), 265–67.

[42] Coleman saw only Ruvigny's intrigues with parliament, and not with the king, and thus had a somewhat incorrect impression (as oftentimes) of the French attitude. See his letter of August 30 to Cardinal Albani, in Treby, p. 17 (also in Hist. MSS Com., *Fitzherbert MSS*, p. 109).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

1,500,000 *livres* (£100,000).[43] Louis's reply of a week later accepted the latter plan.

The session met and wrangled, according to French prophecy and French plans; but the attempt of the opposition party to bring about a dissolution gave Charles pause in carrying out his promise to Ruvigny.[44] He finally decided to prorogue parliament for fifteen months—an unheard-of length of time for a prorogation, so long that it was generally regarded as a sure prelude to a dissolution soon to be announced.[45] But Ruvigny was not sure of it. He had bargained for a dissolution, and at first he did not propose to pay dissolution prices for a prorogation, however long. Louis XIV saw an opportunity to escape an expense which he could just then ill afford. Ruvigny therefore was instructed to explain to Charles that since there was no dissolution Louis XIV really owed nothing, but out of the kindness of his heart he would grant him 900,000 *livres*. Should this move fail, Ruvigny might, at his discretion, promise the entire 1,500,000 *livres*.[46]

At James's first request for an instalment on the subsidy[47]—for Charles never implied that there might be trouble in collecting it on the ground of questionable fulfilment of the contract—Ruvigny demurred, but only for an instant. He realized that France's refusal was on purely technical grounds; and, remembering that the opposition or "country party," which was in general favorable to the Dutch (when not bribed by France), would be delighted by a dissolution, he saw that this might not be so great an asset to French interests as a fifteen months' pro-

[43] Ruvigny to Louis, August 19, in Mignet, IV, 367–69, and in Dalrymple, II, 99.

[44] Cobbett, IV, 800; Mignet, IV, 374; Grey, III, 341; Hist. MSS Com., *Hodgkin MSS,* pp. 316–17. Meanwhile, Ruvigny was playing a double game, though revealing both sides, apparently, to Charles. On November 28 he wrote that some leading members of parliament "dans le parti contraire à la cour, et par consequent à la France" had asked to meet him; and he, after getting Charles's permission, met them, and then told Charles all about it (A.A.E., Angl., 117, fols. 99–100).

[45] Hist. MSS Com., *Sixth Rept.* (London, 1877), p. 374, and *Kenyon MSS (Fourteenth Rept.* [London, 1894], App., Part IV), p. 101.

[46] Mignet, IV, 376.

[47] On December 8 (A.A.E., Angl., 117, fols. 106–7).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

rogation. He heard of heated debates in the king's council between the French and Dutch parties, the latter led by the powerful lord treasurer. It is to Ruvigny's credit as a diplomatist that he soon advised Louis to promise the entire 1,500,000 *livres*,[48] and this was done. A secret treaty or "gentlemen's agreement" between the two monarchs in February, 1676, completed the bond between them;[49] and the subsidy was paid in quarterly instalments throughout the year.[50]

Toward the close of 1676 the new French ambassador, Honoré Courtin, offered to continue the subsidy if parliament were not called; but no notice was taken of the offer, and apparently not to his surprise.[51] A further prorogation (after one of fifteen months) without calling a session seemed out of the question; and a dissolution, considering the obvious state of popular feeling, might compel an election and result in a worse parliament. Courtin therefore began to dispense funds to Coleman, Berkshire, and others to secure votes in the coming session.[52] His report of disbursements[53] makes interesting reading. Courtin, a dainty-fingered Frenchman who was better fitted for gay attentions to court ladies and royal mistresses, showed some repugnance to dealing with such dirty-handed Englishmen as

[48] *Ibid.*, fols. 137–44 (Ruvigny to Louis, January 9, 1676).

[49] See Ruvigny's letters of February 10, 17, 20, and 27, 1676, in *ibid.*, fols. 178–79, 187, 189, 193, 201; and the memoir of Blancard (Ruvigny's secretary, who bore the agreement to Paris and, twenty years later, wrote this account) in Dalrymple, II, 117–23, and Grovestins, II, 537–39.

[50] Forneron, pp. 171–72 (citing A.A.E., Angl., 121, fols. 213, 216, 307). The agreement, all in Charles's own hand, is in the French foreign archives (printed in Mignet, IV, 382–84). The fact that the first instalment of the subsidy arrived soon after the agreement was made caused Dalrymple (II, 99) and others to suppose incorrectly that the document itself contained a financial article. It was all a part of one long negotiation that lasted from September, 1675, until March, 1676; but the treaty was separate from the subsidy agreement, though it may rightly be regarded as a natural sequel to it. In the Bibliothèque National (MSS Français 11147, fol. 94) is Charles's receipt for the second instalment:

"J'ai reçu du Roy Tres-Chrestien par les mains de Mr de Ruvigny la somme de cent mille escus de France pour le quartier de Janvier, en deduction de quatre cens mille escus payable à la fin de l'année. Fait a Withaal le 13 May 1676.

[*Original signature*] CHARLES R."

[51] Mignet, IV, 430, 434.

[52] Forneron, p. 173; Dalrymple, II, 314.

[53] A.A.E., Angl., 123, fols. 289–90.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

he judged Coleman and Berkshire to be; but he received a speedy reminder from Paris that nothing was considered dirty that put Louis in possession of Flanders and the Rhine.[54] Lauderdale was one whom Courtin especially desired to win, but the duke's reputation for clean-handedness precluded any direct approach. Knowing the duchess' influence over her husband, he recommended that a gift of jewelry be presented to her.[55] With various opposition leaders, particularly Lords Holles and Shaftesbury, he conferred; and while his and their ends were by no means one, they were able to unite on a program of breaking Danby's power.[56] In general, however, Courtin soon saw that he had little support in the commons, and that beyond the king and James, he had little sincere support anywhere. He expended only 53,644 *livres* out of the 300,000 allowed him "pour le service du roi dans le parlement," and seemed confident that a subsidy to the king and a dissolution which he was constantly urging would solve French difficulties. Like most Frenchmen of the time, he comprehended poorly the English government, particularly the power of parliamentary pressure.[57]

The session came to a close under such circumstances[58] as to make Charles quite amenable to French offers. Nevertheless, in spite of extreme need,[59] he would not sell himself cheaply. As the price of a prorogation to March, 1678, he asked 800,000

[54] Forneron, p. 174 (citing Louis to Courtin, December 28, 1676).

[55] *Ibid.*, p. 175; and Courtin to Louis, February 4, 1677, in A.A.E., Angl., 122, fol. 103 (in which she is described as one "qui ayme la despence et qui a envie d'acheter tout ce qu'elle voit"). Cf. P. H. Brown, *History of Scotland* (Cambridge, 1899–1905), II, 403.

[56] Mignet, IV, 434. See also Brisbane's letter from Paris, January 13, in Hist. MSS Com., *Lindsey MSS (Fourteenth Rept.* [London, 1895], App., Part IX), p. 379.

[57] See his letters of April 8 and 26, 1677, in Mignet, IV, 443–44. French astonishment at English political practices appears frequently in the correspondence. "Les manières de ce pays ici ne ressemblent point du tout a celles des autres" (Barrillon, May, 1678, in A.A.E., Angl., 129, fol. 176). "What I write to your Majesty will appear without doubt very extraordinary, *but England has no resemblance to other countries*" (Barrillon, November, 1680, quoted in Dalrymple, II, 280).

[58] A stormy scene caused by parliamentary invasion of the royal prerogative, described in Grey, IV, 389; Cobbett, IV, 888; and Marvell, II, 556.

[59] Courtin's letters of June 3, 7, 10, 1677, in P.R.O., Baschet Transcripts, 136, fols. 134, 142, 144 (from A.A.E., Angl., 123, fols. 199, 224, 239).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

*écus*—twice the sum received in 1676.[60] Louis XIV objected to the amount, but told Courtin to promise it if necessary.[61] The ambassador went about it by degrees: 550,000 *écus*, 600,000 *écus;* but Charles would not budge. Courtin thereupon feigned indifference, and let the matter rest for a few days, during which time the Stuart ruler also feigned indifference and dined freely with the Dutch ambassador. It appears that James was willing to accept the amount offered, but Danby stood firmly for 800,000 *écus.*[62]

Louis had insisted on a single prorogation to March, 1678, and not several in succession. While the foregoing negotiation was pending, parliament met on July 26, and was prorogued to December 13. Louis immediately informed Courtin that the maximum he would now pay was 700,000 *écus.*[63] Then occurred an interesting incident in Stuart history. The wily French ambassador secured Charles's consent to 700,000 *écus* behind Danby's back;[64] and the king and James then left for Newmarket to avoid the storm. Danby was enraged and would not acknowledge defeat. He found a technicality by which he could still demand the full 800,000 *écus;* and demand it he did. Unrestrained by the absent king and James, he advanced the claim that the sum of 700,000 *écus* agreed upon by Charles was still

[60] Courtin to Louis, June 21, 1677, in P.R.O., Baschet Transcripts, 136, fol. 153 (from A.A.E., Angl., 123, fol. 274).

[61] Mignet, IV, 485–97.

[62] Danby had been in close correspondence with Montagu, the English ambassador at Paris, who had continually emphasized the "prodigious advantages" France drew from English neutrality, and the ease with which more money could be had for the asking. See e.g., Montagu to Danby, April 4, 1677, in Hist. MSS Com., *Ninth Report* (London, 1884), Part II, p. 451. Cf. Courtin's letters of July 12, 19, and August 5, in P.R.O., Baschet Transcripts, 136, fols. 173, 196, 203 (from A.A.E., Angl., 124, fols. 25, 72, 110).

[63] Louis to Courtin, July 28, 1677, in Mignet, IV, 499. This was in spite of Charles's assurance that it would not meet in December.

[64] Courtin's letter of August 16, 1677, in P.R.O., Baschet Transcripts, 136, fol. 231 (from A.A.E., Angl., 124, fol. 136). This was really an agreement for a new subsidy of 300,000 *écus* in addition to the regular (by the treaty of January, 1676) subsidy of 400,000 *écus* a year. Cf. Montagu to Danby, August 12, 1677, in Hist. MSS Com., *Ninth Report*, Part II, p. 452, which shows Montagu's astonishment on hearing of this bargain, after he had been insisting at Danby's behest on the entire 800,000 *écus* (A.A.E., Angl., 124, fol. 264; 125, fol. 67 *passim*).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

due in its entirety,[65] although 100,000 *écus* had already been paid on the year's subsidy.[66] Courtin maintained that he and the king had never bargained in any other terms than that of the annual subsidy—which was, obviously, the truth—and that therefore only 600,000 *écus* were still due. He longed for the return of Charles and James, who would verify the agreement and call off the extortionate treasurer. They returned; and for a moment the ambassador's hope was realized. They assured Courtin (according to Courtin) that Danby's claim was at fault, and upbraided Danby for resuming a negotiation already settled.[67] Then there was a sudden change; Danby's financial dictatorship again asserted itself; and combined with the king's characteristic inconstancy, it created an extremely awkward situation from which Charles extricated himself in a manner scarcely befitting royalty. He told Courtin that he had been mistaken as to the English equivalent of the French money offered; he had thought that 700,000 *écus* equaled £200,000. He now discovered, so he said, that it was only £175,000. *Ergo,* he must have the full 800,000 *écus,* equaling £200,000, which he had thought he was getting. He begged Courtin to arrange details with Danby. Poor Courtin was undoubtedly happy to be extricated from the muddle by being recalled.[68]

His successor, Barrillon, on his arrival tried to deal only with Charles, and was quietly referred to Danby.[69] Between

[65] See particularly Courtin's letter of August 19, 1677, in P.R.O., Baschet Transcripts, 136, fol. 236 (from A.A.E., Angl., 124, fol. 143). This letter (partially printed in Mignet, IV, 500–501) relates a history of the negotiation from the beginning with which Courtin reported he had regaled Danby without visible impression.

[66] This is clear from the correspondence, but I have not been able to find the date or dates at which it was paid. The sum of £11,000, which was paid in February, 1677, was "sur le quartier d'octobre [i.e., 1676]" (Dalrymple, II, 130). Forneron (p. 189) states that Charles drew £40,526 from the French embassy between March 1 and September 6, 1677.

[67] Courtin's letter of September 2 in P.R.O., Baschet Transcripts, 137, fol. 247 (from A.A.E., Angl., 124, fol. 181).

[68] Montagu to Danby, September 29, and to Pomponne, October 12, 1677, in Hist. MSS Com., *Ninth Report,* Part II, pp. 212–13, 452. See also Barrillon's description of the situation in his letter to Louis, October 4, in A.A.E., Angl., 125, fols. 20–43; partially printed in Dalrymple, II, 214–15.

[69] See the foregoing letter, and most of his others for two months after his arrival (A.A.E., Angl., 125 *passim*).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

him and Danby no agreement was ever reached, the inevitability of an Anglo-Dutch alliance soon putting the whole question in abeyance. In December, Danby demanded the full payment;[70] and Barrillon was instructed to refuse nothing definitely, to maintain English expectations, to discuss possible new arrangements for 1678, and—incidentally—to pay nothing.[71] This attitude was maintained by both until the middle of January, when England's actual alliance with Holland rendered it too ridiculous for continuance.

During the series of complex situations which crowd the first eight months of 1678, Barrillon opened, closed, or held loosely the French purse strings with all the skill and discretion of the consummate Bourbon diplomat that he was.[72] At first every effort was made to postpone parliament, which, following the marriage of William and Mary, had been set for January 25. Danby was to be bribed, and Barrillon was given power to offer Charles a large sum—"les moyens," so wrote the experienced French king, "que je crois les plus capables de changer la resolution que vient de prendre le roi de la Grande-Bretagne."[73] At Paris, a similar proposition was made to Montagu by Louvois.[74] The money for the king was to be sent to England in the form of wedges of gold, packed in bales of silk. Danby would receive diamonds and pearls in such fashion "that nobody could ever know it." But the treasurer could not be bribed, and the king stood by him.[75] Barrillon resigned himself

[70] *Ibid.*, fols. 309, 342–60. Danby claimed that 550,000 *écus* were still due, and Barrillon's orders restricted him, apparently, to 400,000 *écus*.

[71] Louis to Barrillon, December 18, 1677, referred to in *ibid.*, fol. 384. Cf. Mignet, IV, 522. On December 27 Barrillon wrote: "I have so far avoided telling the Lord High Treasurer that I would not give the money to Sieur Chiffinch. I shall try to moderate what I have to say to him, and I shall make other proposals to prevent his considering it as a rupture of relations" (*ibid.*, fol. 388). Cf. letter of December 30 (*ibid.*, fol. 394).

[72] See estimates of him by Forneron (pp. 193–94), Ranke (IV, 105), Imbert-Terry (p. 245), and R. Koechlin (*La Grande Encyclopédie*).

[73] Mignet, IV, 521.

[74] Hist. MSS Com., *Ninth Report,* Part II, pp. 453–54.

[75] Van Beuninghen's letter of January 7, 1678, in B.M., Add. MSS, 17677DD, fol. 188.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

CLYDE L. GROSE

to the assembling of parliament,[76] and began to take measures with his henchmen to influence the session.

A report of his parliamentary transactions is extant, and throws interesting light on his methods.[77] He used chiefly the same men as his predecessors: Coleman, Leighton, and Berkshire. Coleman drew £360 for himself and £2,500 for others. Later, when on trial in connection with the Popish Plot, Coleman was reported to have said that he appropriated all this to himself.[78] He was probably either lying with selfish intent in order to shield the members of the Whig committee examining him, some of whose names appear in Barrillon's list of recipients of French money,[79] or else (a more likely explanation) his deposition was falsified by the committee, which had every reason for wanting to conceal the facts as to the distribution of this money.[80] Leighton, always dishonest and at this time a fugitive from justice as a result of accepting bribes while prize commissioner at Paris,[81] received £800. Berkshire is credited with £1,000. Barrillon's correspondence displays careful business-dealing which apparently wasted little money.[82] He usually asked specific advice from Paris before making payments, although Louis' replies generally gave him a free hand.[83] For the

[76] But he continued to try to prevent it (A.A.E., Angl., 127, fols. 118, 125, 168; Mignet, IV, 530).

[77] A.A.E., Angl., 130, fols. 67–68.

[78] Cobbett, V, 1035; *Commons Journals* (November 7, 1678); Pollock, pp. 32–33n.

[79] H. Capell, Powle, Maynard, Titus, Wych. Mrs. Coleman later tried to secure money from Barrillon, stating that her husband had only received half of the 65,000 *livres* promised him (Dalrymple, II, 200).

[80] This explanation appears to be borne out by Harbord's (whose name is on Barrillon's list for 500 guineas) speech in the house of commons, December 14, 1680 (Grey, VIII, 141), as well as in G. Sitwell's *Letters of the Sitwells and Sacheverells* (Scarborough, 1900–1901), I, 114–15.

[81] *Cal. St. P., Dom., 1676–1677,* pp. 349, 365, etc.; P.R.O., St. P. For., Holland, 202, fols. 420–21; Hist. MSS Com., *Lindsey MSS,* p. 378; A.A.E., Angl., 117, fols. 72–73; R. North, *Examen* (London, 1740), p. 488 ("the most corrupt man, then or since living").

[82] Cf. Forneron, pp. 193–94; and D. J. Hill, *History of Diplomacy* (New York, 1905–14), III, 132.

[83] There is every reason to discredit the insinuation of some writers (Mme de Sévigné, *Mémoires,* April 22, 1672, and March 21, 1689; a poor authority, copied by J. Russell, *Life of William Lord Russell* [London, 1820], I, 191, and

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

se 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 351 of 4

purpose of influencing members of parliament who disliked Barrillon's Catholicism, the ambassador sent for Ruvigny's clever son, later Earl of Galway, who proved himself very useful.[84]

Meanwhile, Charles was getting disgusted with both parliament and the Dutch.[85] Late in February he sent Ruvigny to Paris, with a peace proposal, and, more important still, a suggestion that were it accepted, he would be pleased to renew his Bourbon alliance for a cash subsidy of £600,000.[86] Louis rejected the peace proposal, but promised in general terms to satisfy Charles's financial needs after peace was made.[87] From the time of Ruvigny's return, March 10, Barrillon seems to have counted on paying Charles 6,000,000 *livres* (about £500,-000);[88] and ten days later he received definite power to offer that amount to be paid in six or perhaps four, years. He was also provided with 300,000 *livres*, "pour déterminer le grand trésorier."[89]

For several days Barrillon could not persuade Charles to run the risk of dismissing parliament.[90] Meanwhile, he did not reveal his exact offer,[91] but sought in vain to persuade Louis to pay the entire amount in one year instead of several.[92] Danby

---

Imbert-Terry, p. 248; Sitwell, I, 114; R. Vaughan, *History of England under the House of Stuart* [London, 1840], p. 707; H. Hallam, *Constitutional History of England* [London, 1882], II, 158 *passim*) that Barrillon appropriated to his own use funds received by him for parliamentary members. Persons who received French money (as well as their descendants) were naturally interested in abetting such rumors.

[84] He had already been used by his father in influencing members of Parliament (A.A.E., Angl., 117, fol. 109; 127, fols. 153, 171, 218; and 128, fol. 168).

[85] See the writer's article, "The Anglo-Dutch Alliance of 1678," *Eng. Hist. Rev.*, XXXIX (1924), particularly pp. 362–72.

[86] Mignet, IV, 536.

[87] *Ibid.*, p. 571. Cf. Barrillon's earlier (February 19) general statement of this in A.A.E., Angl., 127, fol. 277.

[88] A.A.E., Angl., 127, fols. 77, 107–8.

[89] Mignet, IV, 571. He did not use the money (A.A.E., Angl., 129, fol. 77).

[90] A.A.E., Angl., 128, fol. 149.

[91] "Si j'avais déclaré que le terme seroit de quatre ans, je jetterais une deffiance dans l'esprit du Grand Tresorier capable de tout rompre" (*ibid.*, fol. 171).

[92] "Si quelque chose peut tenter le Tresorier, c'est une grande somme presente dans le temps que le Roy son Maitre perdra beaucoup de ses revenues" (Barrillon to Pomponne, March 28, in *ibid.*, fol. 173). The time was soon reduced,

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

as usual was driving a hard bargain, encouraged therein by Montagu's boast of what he could do at Paris if it were left to him; and early in April he announced the King's price as three times the amount offered, namely, 6,000,000 *livres* each year for three years.[93] Barrillon called it extortion, and the well-instructed king replied that such an amount was necessary to prevent "une révolution pareille à celle qui avait perdu le roi son père"—an asset in argument often used with French ambassadors. It is probable that Danby had persuaded Charles to demand so much in the hope that it would be rejected; for in spite of parliament's ill temper and desultory support, the treasurer was at that time undoubtedly anxious for war. Barrillon definitely refused, the negotiation dropped, and nothing more of it was heard until the middle of May, when the king, despairing of retaining allies for the war, hastened to capitalize his neutrality while it was still of value to France.

On May 9 news arrived that the Dutch were about to make peace; and Ruvigny again hastened to Paris with Danby's terms.[94] At first he seemed to be too late. Louis XIV, fairly assured of peace, instructed Ruvigny on May 15 to withdraw his April offer.[95] But Ruvigny's arrival on May 17 changed Louis's mind, and he was soon on his way back to England bearing an offer of 6,000,000 *livres* for at least one year, and encouraging intimations regarding later years.[96] Charles, dissatisfied but afraid of losing all if he delayed, and Danby, now afraid of parliament, which was encompassing his downfall, agreed to this; and the treaty of May 27, 1678, was signed.[97] Before rati-

---

however, from four to three years (Mignet, IV, 571; but cf. A.A.E., Angl., 129, fol. 113).

[93] A.A.E., Angl., 128, fols. 175–79, 190–91. The same day Danby instructed Montagu to negotiate for that amount at Paris—the fatal letter which was to cause Danby's disgrace following Montagu's publication thereof (Hist. MSS Com., *Fourteenth Report,* App., Part II [*Hodgkin MSS*], pp. 194–96; A.A.E., Angl., 132, fols. 36–42).

[94] "Projêt de traité entre Louis XIV et Charles II, 12 Mai 1678," in A.A.E., Angl., 129, fols. 78–80. This contained no financial clause, that being fully explained in an accompanying letter (*ibid.,* fols. 67–74).

[95] Mignet, IV, 575.            [96] *Ibid.,* pp. 575–76.

[97] For the treaty, see A.A.E., Angl., 129, fols. 164–73 (printed in Mignet, IV, 578–81). Cf. Hist. MSS Com., *First Report* (London, 1870), p. 33. The Public

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

fication, however, Louis XIV declared that the general peace must include the restoration of Swedish losses: a stand which brought the Anglo-Dutch alliance together again for a few weeks. During this tense interval Danby tried to maintain the subsidy agreement in theory, claiming that a mere postponement of ratification was necessary;[98] and the moment the news came that the Dutch had signed a separate peace at Nymwegen, August 10, he and his royal master put forth every effort to restore their subsidy tie with France.[99] But Louis, now certain of general peace, saw no need for further subsidies to Charles II—particularly since Barrillon's masterful hand was obviously able to stay any English danger without expense. In continuing to send troops to the Continent when peace seemed certain, Charles exposed himself to the suspicion, often recurrent in Restoration England, of trying to maintain a standing army abroad for future use at home. Barrillon naturally fed these suspicions;[100] and at the same time sought permission of Louis to reveal the treaty of the preceding May, if necessary, for the embarrassment of the court.[101] He obviously had the upper hand, and that without the need of disbursements to anyone. Buckingham's demands for money were quietly put off; Oates was at hand with his Popish Plot; and Montagu was ready to accept a bribe to demolish Danby by his disclosures.[102]

In the maze of domestic and foreign intrigue of the next thirty months, into which this paper need not go, Barrillon

_____

Record Office yields no copy, which is easily explained since it was never ratified and was merely a personal agreement on the part of Charles II, who would soon have had many reasons to want to destroy it.

[98] A.A.E., Angl., 130, fols. 108–10, 120, 126–29, 135–36.

[99] *Ibid.*, fols. 130, 198–99, 210, 262. The Duke of St. Albans was sent on special mission to this end. See his correspondence in *ibid.,* fols. 211–323 *passim.* Cf. Dalrymple, II, 178–79.

[100] Barrillon wrote that he would try to show "que tout ce dessein de guerre n'a pour but que de changer le gouvernement et d'assujetir l'Angleterre par le moyen de l'armée" (A.A.E., Angl., 130, fol. 284).

[101] Letter of September 26, 1678, in *ibid.,* fols. 309–21.

[102] Montagu was promised 100,000 *écus* for causing Danby's fall, but only received half that amount (Dalrymple, I, 249, 334, 384). In 1683 he was in Paris vainly seeking an audience with Louis XIV in order to secure the remainder (Hist. MSS Com., *Seventh Report* [London, 1879], p. 202).

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

se 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 354 of 4

played a splendid part, always keeping a strong party in parliament, never losing the ear of the King, and shifting from James to Monmouth to Orange in the Exclusion struggle, as French interests dictated. And it was no losing fight; for when Charles dissolved his last parliament in March, 1681, Barrillon had won.

His intrigues with parliament during this period read as before, except for new names and more of them. From December 22, 1678, to December 14, 1679, he paid out 56,550 *livres;* and from October 31 to December 5, 1680, 114,550 *livres.*[103] Conditions were such as to cause him to work more secretly than before, and seldom directly. He retained the services of several who had aided him in overthrowing Danby: Montagu and his sister, Mrs. Harvey;[104] William Harbord; Algernon Sidney; and Sir John Baber. Algernon Sidney—whose name in Barrillon's list made the Whig historian Dalrymple feel "as if [he] had seen a son turn his back in the day of battle"[105]—was a strong republican, and useful to Barrillon when the latter sought powerful opposition to the court. Baber, not in parliament himself, was helpful in influencing its Presbyterian members.[106] "It is through him," wrote Barrillon, "that I have gained two popular preachers who can insinuate things which it would never do to say openly. I know they have spoken in the pulpit of a matter which would not count anywhere else except here, but which in England is no trifle. It is that the Prince of Orange hunts on Sundays."[107] Barrillon's use of the Presbyte-

[103] See his reports of December 14, 1679, and December 5, 1680, in A.A.E., Angl., 136, fols. 184–85, and 140, fol. 338. They are analyzed in Dalrymple, II, 314–17. I have been unable to locate the reports of December 22, 1678, and of October 31, 1680, which are mentioned in Barrillon's letters.

[104] Duke of Manchester, *Court and Society from Elizabeth to Anne* (London, 1864), I, 275; c. St. Évrèmonde, *Œuvres* (Paris, 1740), I, 197n., and IV, 224–27. On December 14, 1679, Barrillon wrote: "It was by an intrigue of Mrs. Hervey [*sic*] that I caused to be continued at Brussels a certain person named Bulstrode, who, as Mons. de Louvois at that time informed me, was useful to your Majesty's service" (Dalrymple, II, 264).

[105] Dalrymple, II, ix, and cf. II, 312.

[106] *Dict. Nat. Biog.;* North, *Examen,* p. 362; Dalrymple, II, 261, 287, 317; H. Sidney, *Diary* (London, 1843), I, 3; Forneron, p. 208n.; A.A.E., Angl., 131, fol. 351.

[107] Quoted in Forneron, p. 242.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

rian Baber and his comments on the influence of William Penn, and of Dr. John Owen, "the patriarch of the Sectaries," testify to his continued intrigues with the Dissenters.[108]

As for subsidies to the king, there were two futile attempts in 1679, and no agreement until during the final parliament of the reign, March, 1681. In January, 1679, with the Long Parliament ended, Danby tottering under Montagu's disclosures, and Charles so poor that he declared he might have to withdraw all his foreign representatives,[109] France was again asked for a subsidy. The advance was received coldly,[110] and naturally so: Danby, long the chief object of French attack, had fallen; and the king's power was obviously at low ebb. Furthermore, the anti-Catholic madness, engendered by the Popish Plot, made Louis suspect an understanding between Charles and William of Orange. He saw more advantage to France in abetting parliament. The passing months did not change this attitude. Power lay with the heads of parties, and for some time they were the allies sought.

The temporary menace of Temple's "Great Council" was soon brought to a close, thanks largely to the machinations of Barrillon's friends; and its power fell chiefly to Halifax, Essex, and Sunderland. Of these three, Sunderland was the most in-

[108] Regarding Owen, see Wood, *Athenae oxonienses* (ed. P. Bliss; London, 1813–20), IV, 97–114; and *Dict. Nat. Biog.* Other names were: Richard Hampden, son of the ship-money hero; Thomas Herbert, married to Sunderland's cousin; Powle; Sir Thomas Armstrong ("Hermstrand"); Sir Roger Hill; and Colonel Titus. Hampden and Herbert, as well as Montagu, Berkshire, and Algernon Sidney, received 1,000 guineas each; the others, as well as Baber and Harbord, 500 each. The following received 300 guineas each: Benet, secretary to Shaftesbury, Sir John Hotham ("Hodam"); Sir William Hickman ("Hicdal"); Sir William Franklyn; Sir Eliab Harvey; Sir Edward Harley, former governor of Dunkirk; Garroway; Sacheverell; and Sir Thomas Byde ("very rich and in great credit"). Le Pin, Sunderland's clerk, "who sometimes gave valuable hints," received 150 guineas. Two foreign representatives, Du Cros of Holstein, and De Witt of Spain, received respectively 150 and 100 guineas for information. While perhaps paying them nothing, Barrillon recommended to Louis the following, "who could be made according to opportunities and conjunctures to serve our ends": Vindington, the solicitor general; Sir Thomas Player, the treasurer of the Corporation of London; and four London merchants, "highly respected Presbyterians": Burnet, Bernard, Eslon, Papillon. For the last, see *Memoirs of Thomas Papillon of London, Merchant, 1623–1702* (Reading, 1887), particularly pp. 203 ff.

[109] Dalrymple, II, 229.        [110] *Ibid.*, pp. 209–10.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

fluential; and he was a close ally of the Duchess of Portsmouth, in whose apartments at Windsor on August 11 Barrillon and the king discussed a three-year subsidy.[111] During the next four months the negotiations continued at intervals, but neither side was surefooted in its offers or promises, and it came to naught.[112]

Before and even during the parliament of late 1680 Barrillon was extremely perplexed. He considered Charles helpless in the hands of parliament, and parties were so confused on the exclusion issue that he went slow in disbursing funds;[113] but in December he instituted the final step in the subsidy history of the reign: an approach to the king through the veteran Anglo-French link, the Duke of St. Albans. While still unable to count upon Charles, and while compelled to pursue both parliamentary and royal negotiations, Barrillon began to see his way more clearly. It was necessary to defeat the newest proposal of the Exclusionists: an Orangist regency for James. All was kept very secret, with James exiled in Scotland, while Barrillon still promoted parliamentary contacts to use if necessary. The parliament met at Oxford on March 21 (O.S.), and showed the traits of its predecessors. Charles, disgusted, treated with Barrillon three days later, and after a session of just one week he dissolved his last parliament. He had agreed to call no more, in return for which he would receive from France 2,000,000 *livres*

---

[111] Barrillon's letter of August 3 in *ibid.*, pp. 233–37.

[112] Charles first asked for 6,000,000 *livres* the first year, and 4,000,000 each of the other two years. He soon dropped to a total of 9,000,000, 4,000,000 of which was to be paid the first year. In the autumn Barrillon offered only 1,000,-000 a year (Dalrymple, II, 243–44), but in February, with Charles veering toward Spain, he promised 1,500,000 *livres* (*ibid.*, p. 254).

Sunderland and the Duchess of Portsmouth were the chief English intermediaries. Gifts and pensions for both were discussed, and finally—after Charles was negotiating with Spain—promised (10,000 and 5,000 *pistoles*, respectively), but undoubtedly never paid (*ibid.*, pp. 318–19). Laurence Hyde, the new lord treasurer, was also prominent in the negotiations toward the last. He was James's brother-in-law and worked in his interests (S. W. Singer, *The Correspondence of Henry Hyde, Earl of Clarendon, and of His Brother, Laurence Hyde, Earl of Rochester* [London, 1828], I, 42–47, 49).

James, an exile at Brussels, sent Churchill to Paris to hasten matters (Dalrymple, II, 240), and as a mark of good faith offered to loan Louis XIV some money—which Barrillon suggested might be used in subsidies (*ibid.*, p. 237)! Charles tried to smooth the way by dismissing Shaftesbury and recalling James (Christie, II, 347).

[113] A.A.E., Angl., 140, fols. 125–26.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

se 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 357 of 4

the first year, and 1,500,000 *livres* each of the next two years.[114]
Barrillon wanted it in writing, but Charles demurred. It re-
mained a verbal agreement, of which only two Englishmen,
Charles and Hyde, knew the exact terms. St. Albans and James
merely knew that an agreement had been made.[115] This subsidy
continued to the close of the reign; and after protracted nego-
tiations it was renewed by James II, whose Catholic policy soon
brought to an end the Anglo-French entente dating from the
marriage of his parents in 1625.

French subsidies to Charles II were ordinarily placed with
London bankers, subject to the order of the French ambassa-
dor, who made the payments usually to William Chiffinch, the
king's private secretary and "master of the royal backstairs."[116]
There exists an account of his disbursements for the period,
February 18, 1671, to November 13, 1677,[117] but there is
nothing similar for the last four years of the reign.[118] Chif-
finch's account extends from the beginning of the first period
of French subsidies (1671–74) to the marriage of William and
Mary, which put an end to the second period (1676–77); and
it was presented on March 1, 1681, at the beginning of the third
and last period.

This account shows total receipts (not listed or dated) of

[114] Ranke, IV, 28, 135–36; Dalrymple, II, 301; Christie, II, 402. Hume (*Eng-land*, VI, 279) was the first to secure definite information on this treaty from the French foreign archives, to which he did not have access, but from which he secured a copy of an extract of Barrillon's letter, entitled: "Convention verbale arrêtée le 1 Avril 1681."

[115] James did not congratulate Barrillon on the treaty until July 26, 1681. The Duchess of Portsmouth was kept in ignorance of it in order that—according to Charles—she might deny knowledge of it with a clear conscience if the occasion arose; but the more probable reason was that Charles distrusted her on account of her past connection with Sunderland, who was now in disgrace (Christie, II, 403; Dalrymple, II, 7). Barrillon was instructed to present St. Albans with a diamond-studded box, worth £1,500, previously refused by Lord Holles (*ibid.*, pp. 260–62, 319).

[116] *Dict. Nat. Biog.*

[117] P.R.O., Declared Accounts, Pipe Office, No. 51; copied in King's War-rant Book $T\frac{5}{8}^{2}$, pp. 125–33. It is printed in full in *Cal. Treas. Bks.*, VII, Part I, 198–203, and summarized in *ibid.*, III, lxiv–lxvi.

[118] Chiffinch, however, continued to be the receiver of French subsidies. See *ibid.*, VII, 30, 718, 774.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

£689,750, and disbursements of a slightly less amount, he claiming 1*d.* on the pound as commission. That amount may be said to represent the total subsidies received from France during the period, except for about £70,000, which went direct to the mint in February, 1672.[119] These two amounts total £759,750. According to known treaties and agreements, about £750,000 should have been paid.[120] Chiffinch's account therefore appears trustworthy.

This amount, spread over six years, is not enormous. In fact, it is too small to justify further belief in the traditional assertion that Charles could get more from France than from parliament. He could at almost any time have made concessions to parliament that would have brought forth substantial grants, and sometimes he did. More frequently he preferred not to, because he craved absolute monarchy of the Bourbon kind. Sometimes subtle intrigues of French ambassadors made a *rapprochement* of king and parliament impossible even if sought. But in general Charles was paid for doing what he himself desired; and he took from Louis XIV whatever he could get in place of the parliamentary grants which would often have cost him heavily in pride and principle.

Not only is the amount of the subsidies comparatively small, but the use to which it was put does not point to royal extravagance or culpable misuse of funds on a large scale. Considera-

---

[119] "Account of Thomas Holden [director of the Mint] for moneys by him received of Sir Thomas Bond [late controller of Queen Henrietta's household] in French coin by warrant of the Treasury Lords of date February 2, 1671–72, and brought into the mint" (P.R.O., Declared Accounts, Pipe Office, No. 2188). Cf. *Cal. Treas. Bks.*, III, lxvi, 1026, 1176, 1193, 1352; IV, 17, 50, 82, 181; *Cal. St. P., Dom., 1671–1672*, p. 78; *ibid., 1672–1673*, pp. 305, 333. Bond's instructions and his receipt are in Bib. Nat. MSS Français, 11147, fols. 90–92 (cf. Mignet, III, 701n.). The transaction was not wholly secret (*Cal. St. P., Dom., 1671–1672*, pp. 92, 97, 191; Hist. MSS Com., *Le Fleming MSS*, p. 87).

[120]

| | |
|---|---:|
| 1671–74 (two years' war subsidy at £225,000 per year, and £150,000 for Charles's declaration of Catholicism) | £600,000 |
| 1676 . . . . . . . . . . . . . . . . | 100,000 |
| 1677 (estimate, since the misunderstanding on this year's subsidy was never settled [*supra*, pp. 191–92]. From Barrillon's letters of December, 1678, it appears that about 750,000 *livres* were paid) . . . . . . . . | 50,000 |
| Total . . . . . . . . . . . . . . . | £750,000 |

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

bly over half the money which passed through Chiffinch's hands went directly to the navy. Monmouth drew £43,000 during the period of his military command in France. Small payments to diplomatic agents, moderate expenses at Windsor Castle and other residences and parks, "hay for deer in Windsor Forest," upholstering Whitehall furniture, a present for William of Orange, and a few royal pensions consume the remainder. Sums of £44,768 and £95,559 "for secret service" are charged respectively to Stephen Fox and Charles Bertie, who were in succession chief deputies to the lord treasurer.[121] There is no account of Fox's funds. Bertie, however, presented on May 31, 1683, an itemized statement of disbursements of this and other special moneys which he received from 1676 to 1678.[122] These items are not of "secret" or sensational character (from which we may judge that Fox's also were not), and they are recorded separately only because they did not come from the ordinary exchequer sources and were not paid out in regular treasury form.[123] The navy and the army each received about £15,000, and smaller amounts were charged against the Virginia and Leeward Islands expeditions.[124] The Duchess of Portsmouth drew £3,100, and three other women received a total of about the same: a seraglio item not remarkable, considering Charles's tastes. Public works,[125] "the poor of Southwark," horses for Louis XIV (a fitting gift, considering the source of the money

[121] Bertie was really secretary to Danby until November 10, 1676, when he succeeded Fox as paymaster of guards and garrisons (see *Dict. Nat. Biog.;* and *Retrospective Review,* [2d ser.], II, 179–80).

[122] P.R.O., Declared Accounts, Pipe Office, No. 40; copied in King's Warrant Book, T $\frac{52}{9}$, pp. 172–75. It is printed in *Cal. Treas. Bks.,* VII, Part II, 802–5; cf. V, Part II, 1317–23. The total accounted for by Bertie is £124,818 7s. 4d., but £15,050 was received from A. Stephens, the navy cashier, who had received it from Chiffinch (cf. *ibid.,* VII, Part II, 774). Thus the statement was nearly all concerned directly or indirectly with French money.

[123] Payments were made "pursuant to the King's orders and directions from time to time although such orders and directions were not signified under the great seal or privy seal in accordance with the strict rules of the Exchequer." Chiffinch explained the manner of his disbursements similarly.

[124] Cf. *Cal. Treas. Bks.,* V, Part I, 351, 360, 370, 372, 414, 524; and *Cal. St. P., America and West Indies, 1675–1676,* pp. 449, 455, 457, 460–62.

[125] Cf. *Cal. Treas. Bks.,* V, Part I, 46, 52, 193, 215.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

204                       CLYDE L. GROSE

expended!),[126] royal jewels, some civil-service salaries, and miscellaneous pensions account for the remainder—except for £17,802 paid to Danby without explanation. (It was perhaps used to bribe parliament.) It is clear from these two accounts that Charles used money received from France for the regular expenses of his court and government, and not for the scandalous and selfish purposes usually stated by Whig historians. There is no reason to think he did otherwise from 1681 to 1685, when he received a total subsidy of about £400,000.

In summary it may be stated that (*a*) French subsidies to Charles II were smaller than usually supposed but sufficient to assist materially in periods of no parliament, even making such periods possible at times; (*b*) they were used in general for the regular and legitimate expenses of the government and court; (*c*) French expenditures on parliamentary intrigues were small compared with the cost of subsidies to the king, and (*d*) they brought some but usually not determining results; (*e*) English ministers seldom discussed, solicited, or received French bribes, and (*f*) Charles II, although strongly French in religious, political, and personal inclinations, was seldom clay in French hands; yet such courage as he displayed is to be attributed much less to his own weak will than to his ministers, to the religious and political fears of his subjects, and to his desire "not to go upon his travels again."

CLYDE L. GROSE

NORTHWESTERN UNIVERSITY

[126] *Ibid.*, Part II, p. 1321.

This content downloaded from 130.132.173.42 on Fri, 20 Oct 2017 17:40:39 UTC
All use subject to http://about.jstor.org/terms

CRS Reports & Analysis

## Legal Sidebar

# Conflicts of Interest and the Presidency

10/14/2016

.......................................................................................................................................

Does federal law require the President to relinquish control of his or her business interests? Federal regulation of financial conflicts of interest is aimed at preventing opportunities for officials to personally benefit from influence they may have in their official capacity. As a general rule, public officials in the executive branch are subject to criminal penalties if they personally and substantially participate in matters in which they (or their immediate families, business partners or associated organizations) hold financial interests. However, because of concerns regarding interference with the exercise of constitutional duties, Congress has not applied these restrictions to the President. Consequently, there is no current legal requirement that would compel the President to relinquish financial interests because of a conflict of interest.

**Disqualification Based on Conflicts of Interest:** Federal ethics law generally prohibits officers and employees in the executive branch from personally and substantially participating in matters in which the official, the official's family, the official's "general partner," or an organization in which the official serves has a financial interest. To comply with this disqualification requirement, covered individuals may recuse themselves from participation in the matter.

For the purposes of the disqualification requirement, though, officers and employees are defined to exclude the President and Vice President, meaning that these individuals are not required to recuse themselves in potential conflicts, though they may take measures to avoid the *appearance* of such conflicts, as discussed below. Before the statutory exemption was adopted, the U.S. Department of Justice had advised the Senate of its interpretation that a statutory disqualification requirement might interfere with the President's and Vice President's constitutional duties. Congress subsequently limited the scope of the prohibition in accordance with that view.

**Divestiture of Assets to Avoid Conflicts:** Officials may avoid the need for recusal if they divest themselves of the financial interest that poses the conflict. Under one option for such divestiture, an official may establish a qualified blind trust. By placing assets in a qualified blind trust, officials transfer control and management of their private assets to an independent trustee who cannot communicate information about the holdings in the trust to the official. The trust is considered "blind" because the trustee will eventually sell the original assets and acquire new ones that are unknown to the official. Without knowledge of the composition of the trust's assets, the official arguably avoids the appearance of a conflict because no known interest could influence his or her exercise of official duties. Nevertheless, questions about these arrangements remain: Could officials really forget what went into the trust? Even if the original assets were sold, would the substituted assets or management thereof really be a mystery to an official with extensive knowledge of the general portfolio?

**Disclosure Requirements:** The principal method of regulation of potential conflicts of interests for elected officials such as the President has been disclosure of such interests and the associated publicity that may result. In other words, the current regulatory scheme suggests that any potential conflicts will be addressed by the electorate at the ballot box.

To that end, presidential candidates are required to disclose certain potential conflicts under federal ethics law. To provide transparency for potential conflicts, the Ethics in Government Act requires high-level elected and appointed officials in each branch of government – including candidates for President, Vice President, and Congress – to disclose personal assets, investments, interests, and income upon entering office and on an annual basis thereafter. Furthermore, federal campaign finance law requires disclosure of campaign contributions received and spent. Under the Federal

Election Campaign Act (FECA), candidate campaign committees must register with the Federal Election Commission (FEC) and comply with periodic disclosure requirements. Thus, candidates must file reports that show the total amount of all contributions received, including those from individuals, political action committees (PACs), and parties, and the identity of any person who contributes more than $200 during a calendar year.

The Supreme Court has let stand a lower court decision recognizing the constitutionality of financial disclosures by elected officials under ethics laws. The Court also has generally upheld the constitutionality of campaign finance disclosure requirements as substantially related to the governmental interest of safeguarding the integrity of the electoral process by promoting transparency and accountability. Imposing any more formal restrictions on the President may require a constitutional amendment, given the concern that statutory limitations such as disqualification could impede constitutional duties and raise separation of powers concerns.

**History of Presidential Practices:** Historical practice illustrates a relatively longstanding precedent of Presidents – including Lyndon Johnson, Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, and George W. Bush – who have voluntarily "divested" their assets. President Barack Obama reportedly did not use a blind trust, asserting that it would be unnecessary because the composition of his financial portfolio included assets over which he has little influence (e.g., mutual funds, Treasury notes). In 2012, presidential nominee Mitt Romney, who was a founder of a private equity firm in which he still held an interest, reportedly relied on a blind trust for his personal assets.

**Issues in the 2016 Election:** In the 2016 election cycle, attention has focused on several points relevant to the analysis of potential conflicts of interest as a result of the roles of the presidential candidates and their families in their respective business or charitable organizations. First, the structure of the organization involved (e.g., for profit versus nonprofit) might be relevant to the analysis. Second, an official's decision to disassociate from an organization may not resolve a potential appearance of a conflict of interest if his or her family remains connected to the organization. Under the statutory prohibition that applies to executive branch government officials generally, (but again, not to the President), the continued involvement of family members (including spouses and minor children) in an organization could constitute a conflict of interest even if the official disassociated from the organization. Finally, questions have arisen regarding how a blind trust might be managed to avoid the alleged appearance of financial conflicts of interest, considering that a qualifying trustee must be independent, must not have been previously employed by or affiliated with any interested party, and must not be a relative of any interested party.

Posted at 10/14/2016 10:03 AM



# Financial Assets and Conflict of Interest Regulation in the Executive Branch

**Jack Maskell**
Legislative Attorney

January 17, 2014

**Congressional Research Service**

7-5700

www.crs.gov

R43365

**CRS REPORT**
Prepared for Members and
Committees of Congress

# Summary

Congressional offices reviewing or conducting oversight concerning the operations of executive agencies and departments, reviewing executive branch nominees for high-level appointments, or responding to constituent inquiries or petitions, may often be confronted with issues and questions of possible "conflicts of interest" of agency officials or nominees. This report summarizes and analyzes the issues of conflicts of interest that are addressed in federal law and regulation regarding officers and employees in the executive branch of the federal government.

Federal conflict of interest laws and regulations deal for the most part with the potential conflict between the official duties and responsibilities of a public officer on the one hand, and the outside, personal economic or financial interests of that individual (including the financial interests of that individual's spouse and minor children) on the other. When a particular governmental matter may have a real and predictable impact on an officer's or employee's personal financial interests or assets, that officer's or employee's work on such a matter for the government would raise conflict of interest issues. The concern in such cases is that the judgment of the officer or employee could be influenced and affected, even subtly or unconsciously, by his or her own personal financial stake in the matter, as opposed to decisions, advice, and official actions of public officers being based solely on the overall, general public interest.

Although federal officials may have many and varied outside, personal "interests," federal conflict of interest law and regulation focuses specifically on regulating outside, personal *financial* interests of the officer. The regulatory scheme for conflicts of interest in the executive branch of the federal government may generally be summarized in three broad categories: disqualification, disclosure, and divestiture.

The principal conflict of interest statute under federal law is a criminal provision which requires federal executive branch officials to *disqualify* or "recuse" themselves from working personally and substantially on any particular matter before the government in which that official (or those close enough to the official that their interests may be imputed to the official) has any "financial interest." 18 U.S.C. § 208. There are certain financial interests which are considered either *de minimis*, or too remote or inconsequential to affect the duties expected of employees, and such interests are exempted from the prohibition by regulations of the Office of Government Ethics. Most high-ranking federal officials must file public annual financial *disclosure* reports, as well as periodic disclosure reports on certain financial transactions, which detail financial holdings, assets, property, and financial transactions of the official, the official's spouse, and dependent children. Additionally, there may be confidential financial disclosure reports required from certain rank-and-file employees who do not file publicly. All of these disclosure reports are reviewed by agency ethics personnel, and are intended to facilitate conflict of interest regulation by identifying assets, property, and ownerships with a conflict potential, and to resolve any such conflicts of interest. Although there is no overall, general *divestiture* requirement in federal law, the divestiture of assets may be one method of conflict of interest resolution or avoidance that could be required by agency ethics personnel for assets with conflict of interest potential. Additionally, there are particular statutes and regulations applicable to certain officers and agencies which may prohibit the ownership of a range or category of particular assets. These provisions, in addition to prohibiting the acquisition of such assets, may also require the divestiture of such assets already held by incumbent officers or nominees to certain positions.

# Contents

Conflicts of Interest, Generally............................................................................................... 1
   Principles Underlying Conflict of Interest Regulation ............................................................. 1
   Outside Interests Regulated ................................................................................................ 2
Disqualification................................................................................................................ 3
   Effect on Covered Financial Interests.................................................................................. 4
   Recusal from Personal and Substantial Participation ............................................................. 5
   Particular Matter ............................................................................................................. 5
   Accomplishing Recusal .................................................................................................... 6
   Exemptions, Waivers for Covered Interests ......................................................................... 7
   Regulatory Disqualification Requirement ............................................................................ 8
Disclosure ....................................................................................................................... 9
   Who Must Publicly Disclose ............................................................................................ 10
   Information Disclosed ..................................................................................................... 10
   Filing and Availability of Reports .................................................................................... 10
   Periodic Reporting of Financial Transactions ..................................................................... 11
   Confidential Disclosures ................................................................................................. 11
Divestiture ..................................................................................................................... 12
   Prohibitions on Owning Certain Assets.............................................................................. 12
   Divestiture Required Upon Ethics Review .......................................................................... 14
   Blind Trusts ................................................................................................................. 14

# Contacts

Author Contact Information................................................................................................ 15

T his report discusses the federal regulation of potential "conflicts of interest" which may arise as a result of the personal financial holdings, assets, securities, property, and financial transactions in assets and securities of an official in the executive branch of the federal government.

# Conflicts of Interest, Generally

## Principles Underlying Conflict of Interest Regulation

The underlying principle of the financial conflict of interest laws adopted by Congress, and of the regulations promulgated in the executive branch, embodies the axiom "that a public servant owes undivided loyalty to the Government,"[1] and that decisions, advice, and recommendations made by or given to the government by its officers be made in the public interest and not be tainted, even unintentionally, with influence from personal financial interests.[2] The House Judiciary Committee, reporting out major conflict of interest revisions made in the 1960s, found:

> The proper operation of a democratic government requires that officials be independent and impartial; that Government decisions and policy be made in the proper channels of the governmental structure; ... and that the public have confidence in the integrity of its government. The attainment of one or more of these ends is impaired whenever there exists, or appears to exist an actual or potential conflict between the private interests of a Government employee and his duties as an official.[3]

As noted in expert studies in the field of conflicts of interest, the concern in such regulation is generally, "... not only the possibility or appearance of private gain from public office, but the risk that official decisions, whether consciously or otherwise, will be motivated by something other than the public's interest. The ultimate concern is bad government.... "[4]

The conflict of interest laws are thus directed not only at conduct which is improper, but rather are often preventative or prophylactic in nature, directed at situations which merely have the *potential* to tempt or subtly influence an official in the performance of official public duties. As explained by the Supreme Court with regard to a predecessor conflict of interest law requiring disqualification of officials from matters in which they have a personal financial interest:

> This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government.[5]

---

[1] H. Rpt. No. 748, 87th Cong., 1st Sess. at 3 (1961). House Judiciary Committee report on the comprehensive amendments and revisions to the conflict of interest laws in 1962.

[2] H. Rpt. No. 748, *supra* at 4-6; *see also* United States v. Mississippi Valley Generating Co., 364 U.S. 520, 549 (1960); and Association of the Bar of the City of New York, CONFLICT OF INTEREST AND FEDERAL SERVICE, at 3-4 (1960).

[3] H. Rpt. No. 748, *supra* at 4-6.

[4] The Association of the Bar of the City of New York, Special Committee on Congressional Ethics, James C. Kirby, Executive Director, CONGRESS AND THE PUBLIC TRUST, 38-39 (1970).

[5] United States v. Mississippi Valley Generating Co., *supra* at 549, concerning 18 U.S.C. § 434 (1960 Code ed.), the predecessor statute to current 18 U.S.C. § 208.

# Outside Interests Regulated

The term "conflict of interest" may have many diverse meanings in common usage. When used specifically in reference to federal laws and rules regulating official conduct, however, it generally relates to a potential conflict between a federal employee's official governmental duties and responsibilities on the one hand, and the personal financial or economic interests of the employee on the other.[6]

Officers and employees of the federal government may naturally have many outside, private, and personal "interests." However, limiting the federal regulation of an employee's outside interests to *financial* interests may avoid, as one federal court has noted, "invit[ing] challenges to officials based not upon true conflicts of interest but upon their philosophical or ideological leanings.... "[7] Such limitation of conflict of interest regulation to outside, personal financial interests may also ameliorate First Amendment issues regarding attempts to regulate the outside, private associations, memberships, or organizational activities of public employees.[8]

Federal employees in the executive branch have an express obligation to be "impartial" in the exercise of their official responsibilities.[9] Although the impartiality language is fairly broad on its face, the "impartiality" actually required of a federal employee in a governmental matter by the *specific* conflict of interest and federal ethical standards—in addition to treating all organizations and individuals fairly—is a disinterestedness in the matter from the point of view of any financial impact that such a matter may have upon the employee personally (or upon certain entities, persons, or organizations which are closely associated with the employee and whose interests may thus be fairly "imputed" to the employee).[10] As noted by the Office of Government Ethics, the central office for ethics administration and interpretation in the executive branch of the federal government:

> Questions regarding impartiality necessarily arise when an employee's official duties impact upon the employee's own financial interests or those of certain other persons, such as the employee's spouse or minor child.[11]

The "impartiality" required of a federal employee in a matter thus does not mean that every federal employee must be completely "neutral" on an issue or matter before him or her, in the sense that the employee has no personal opinion, view, position, or predilection on a matter based

---

[6] Manning, Federal Conflict of Interest Law, at 2-3 (1964); Association of the Bar of the City of New York, Conflict of Interest and Federal Service, at 3 (1960); House Committee on Ethics, *House Ethics Manual*, 110th Cong., 2d Sess. at 187 (2006); *see* Regulations of the Office of Government Ethics, 5 C.F.R. part 2635. There may be statutes or regulations which are characterized as "conflict of interest" provisions which do not expressly deal with financial interests or compensated activities, such as, for example, 18 U.S.C. § 205, which prohibits a federal employee from acting as an agent or attorney for a private party before a federal agency even if the activity is uncompensated.

[7] Center for Auto Safety v. Federal Trade Commission, 586 F. Supp. 1245, 1248 (D.D.C. 1984).

[8] The Supreme Court explained in Smith v. Arkansas Highway Employees, 441 U.S. 463, 465 (1979): "The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." See also, Van Ee v. E.P.A., 202 F.3d 296, 304 (D.C. Cir. 2000); United States v. N.T.E.U., 513 U.S. 454, 465 (1995), citing Pickering v. Board of Education, 391 U.S. 563, 568 (1968); and Connick v. Meyers, 461 U.S. 138 (1983).

[9] "Basic obligation of public service," 5 C.F.R. § 2635.101(8): "(8) Employees shall act impartially and not give preferential treatment to any private organization or individual."

[10] "Impartiality in Performing Official Duties," 5 C.F.R. part 2635, subpart E, §§ 2635.501 *et seq.*

[11] 5 C.F.R. § 2635.501, note.

on noneconomic "interests" and factors such as the ethical, religious, ideological, or political beliefs in the background or in the current outside affiliations of the employee. In the specific regulations on "impartiality" and participation in outside organizations, the Office of Government Ethics notes: "Nothing in this section shall be construed to suggest that an employee should not participate in a matter because of his political, religious or moral views."[12] Executive branch employees—whose duties involve generally administration, enforcement, or regulation—are not held to the strict neutrality standard applicable to federal judges and to those involved in adjudications or quasi-adjudicatory functions.[13] As a federal court has noted, "We must not impose judicial roles upon administrators when they perform functions very different from those of judges."[14] The Supreme Court has recognized that the Due Process Clause which imposes "rigid" neutrality requirements "designed for officials performing judicial or quasi-judicial functions, are not applicable" to officials performing different, executive and administrative duties.[15]

There are several methods by which conflicts of interest for public employees may be regulated and avoided. In the federal sector, for executive branch employees, these methods have been described as involving the "3-D" scheme of conflict of interest regulation: (1) disqualification, (2) disclosure, and (3) divestiture.

# Disqualification

The principal statutory method of dealing with potential conflicts of interest of an executive branch officer or employee is to require, under 18 U.S.C. § 208, the disqualification (or "recusal") of the officer or employee from participating in any official governmental matter in which that official (or those persons or entities close enough to the official that their interests may be "imputed" to the official) has any "financial interest."[16] This criminal statute requiring disqualification applies to all officers and employees in the executive branch and independent agencies, but expressly excludes the President and Vice President.[17]

There is, it should be noted, no *de minimis* exception expressly stated in the statute for the value of an asset or ownership interest. However, regulations may exempt certain categories of investments and interests which are deemed too remote or inconsequential to affect the

---

[12] 5 C.F.R. § 2635.502(b)(1)(v), note.

[13] Association of National Advertisers, Inc. v. F.T.C., 627 F.2d 1151 (D.C. Cir. 1979), *cert. denied*, 447 U.S. 921 (1980). *Note* discussion in Center for Auto Safety v. F.T.C., 586 F. Supp. 1245, 1248-1249 (D.D.C. 1984); United States v. Halderman, 559 F.2d 31, 132-133 n. 274 (D.C.Cir. 1976); Cinderella Career & Finishing Schools, Inc. v. F.T.C., 425 F.2d 583 (D.C.Cir. 1970).

[14] Association of National Advertisers, Inc. v. F.T.C., *supra* at 1168.

[15] Marshall v. Jerrico, 446 U.S. 238, 248 (1980).

[16] 18 U.S.C. § 208 provides criminal penalties for "an officer or employee of the executive branch of the United States Government ... [who] participates personally and substantially as a Government officer or employee, through decision, approval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee ... has a financial interest.... "

[17] 18 U.S.C. § 202(c). The statute does not cover elected officials such as the President and Vice President because it may have potentially interfered with constitutionally required functions. See letter to Senate Committee on Rules and Administration, from Dept. of Justice, Acting Attorney General Laurence H. Silberman, September 20, 1974, at 4.

performance of federal officials' governmental duties,[18] and Office of Government Ethics regulations exempt several such interests in stocks, bonds, and mutual funds.[19] Additionally, executive branch officers or employees may receive an individual written waiver from their employing authority to participate in a matter when the employees' interests are not deemed so substantial as to affect the integrity of the performance of their official duties.[20]

## Effect on Covered Financial Interests

The statutory language of § 208 requires a disqualification of a government employee in a particular matter in which the employee, the employee's family, or an organization or business connected to the employee, "has a financial interest." This has been interpreted to mean that the particular governmental matter in which the employee would be involved has a "real possibility" of affecting those financial interests.[21] The regulations of the Office of Government Ethics (OGE) state that an employee must recuse himself or herself if the governmental matter "will have a direct and predictable effect" on those covered financial interests.[22] OGE explains that a matter will have a direct effect on a financial interest "if there is a close causal link between any decision or action to be taken in the matter and any expected effect," that is, if the "chain of causation" is neither "attenuated" nor "contingent upon the occurrence of events that are speculative or that are independent of, and unrelated to, the matter."[23]

The financial interests of businesses and outside private entities with which an employee is associated (as an "officer, director, trustee, general partner or employee" of such organization) are among those interests which are imputed to the employee for disqualification purposes. However, the participation by an employee in or association with an outside non-profit organization which has an *advocacy* interest in public policy matters, even concerning public policy matters associated and connected with one's agency, does not necessarily raise a "conflict of interest" disqualification requirement.[24] This is because it is only "financial" interests that are regulated and affected by the disqualification statute, and it has been determined that a non-profit, advocacy organization's "financial interests" are not generally directly or predictably affected by the attainment or non-attainment of public policy goals.[25]

---

[18] 18 U.S.C. § 208(b)(2).

[19] 5 C.F.R. § 2640.202. Exemptions and waivers from the disqualification requirement of § 208 are discussed in more detail below.

[20] 18 U.S.C. § 208(b)(1).

[21] The required impact on a financial holding of an employee, or on an entity with which the employee is connected, for the disqualification provision to apply, was described in terms of the real, as opposed to a speculative, possibility of financial gain or detriment to an entity, by the United States Court of Appeals in *United States v. Gorman*, 807 F.2d 1299, 1303 (6th Cir. 1988): "A financial interest exists on the part of a party to a Section 208 action where there is a real possibility of gain or loss as a result of developments in or resolution of a matter. Gain or loss need not be probable for the prohibition against official action to apply. All that is required is that there be a real, as opposed to a speculative, possibility of benefit or detriment." See also *United States v. Mississippi Valley Generating Co., supra* at 549, 555 (1960). Note 5 C.F.R. § 2635.402(b)(1)(ii).

[22] 5 C.F.R. § 2635.402(a).

[23] 5 C.F.R. § 2635.402(b)(1)(i).

[24] Department of Justice, Office of Legal Counsel [OLC], Memorandum Opinion for the General Counsel Office of Government Ethics, January 11, 2006.

[25] *Id.* at 4: The "interests" that such "organizations have in the matters you describe are *policy* interests in the questions being addressed by the Government, not *financial* interests in the resolution of those questions."

The disqualification requirement of § 208 applies only to current and existing financial and economic factors. The language of the statute requires an official's recusal from a particular governmental matter in which the officer, his or her spouse, or dependent "*has* a financial interest," or which impacts a financial interest of an outside entity "in which he [the government official] *is* serving" as an employee, officer, or director, or with whom he "*is* negotiating or *has* an arrangement" for future employment.[26] The statutory language is thus stated in the present tense and is directed only to current financial interests and existing arrangements or current understandings for future employment, and the statutory provision does not require disqualification on a matter because of a past affiliation or previous economic interest.[27] Although past affiliations and prior economic interests may not be a subject of the law, certain *pensions* to which an employee is entitled because of past employment may be considered a current and existing economic interest.[28]

## Recusal from Personal and Substantial Participation

The kind of "participation" which is barred for a federal official in matters such as contracts, claims, drafting of regulations, applications, or determinations which affect the financial interests of the employee, is participation in a matter "personally and substantially ... through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise.... " It would appear that the qualifier "personally" within § 208 means that one took the governmental action (or inaction) in question oneself, as opposed to having it merely under one's overall, general responsibility (as a head of a department would have over all department matters). However, regulations adopted by the Office of Government Ethics note that personal participation "includes the direct and active supervision of the participation of a subordinate in the matter."[29] The qualifier "substantially" would appear to rule out merely "ministerial" or procedural acts or acts on a peripheral matter, and relates to the significance and nature of the involvement, and not merely the time devoted to the matter.[30]

## Particular Matter

The personal participation by an official in a governmental matter, such as giving advice or making recommendations, will come within the statute when such involvement is in regard to a "particular matter," rather than just merely in relation to a general area of public policy, such as

---

[26] 18 U.S.C. § 208 (2000 Code ed.), emphasis added.

[27] *CACI, Inc.-Federal v. United States,* 719 F.2d 1567,1578 (Fed. Cir. 1983); *Center for Auto Safety v. F.T.C.,* 586 F. Supp. 1245, 1246 (D.D.C. 1984).

[28] Conflict of interest concerns arise more typically in a "defined benefit plan" where the employer itself is obligated to make the pension payments, but not so in a "defined contribution plan" where the pension payments come out of an already established and funded retirement account. For purposes of the statutory disqualification requirement, therefore, the Office of Government Ethics [OGE] would not consider a "defined contribution plan" as a "disqualifying" financial interest of the employee: "For matters affecting the sponsor of a defined contribution plan, an employee's interest is not ordinarily a disqualifying financial interest under section 208 because the sponsor is not obligated to fund the employee's pension plan." OGE Memorandum 99 x 6, to Designated Agency Ethics Officials, April 14, 1999.

[29] 5 C.F.R. § 2635.402(b)(4).

[30] *Note* discussion in Perkins, *The New Federal Conflict of Interest Laws,* 76 HARVARD LAW REVIEW, 1113, 1128 (1963): "The qualifying adverbs personally and substantially are intended to rule out participation by purely ministerial or procedural acts, but not to create a loophole for the lazy executive in the chain of command who may not have bothered to dig into the substance of the case." *See* also 5 C.F.R. § 2635.402(b)(4).

"in relation to economics."[31] The term "particular matter" and the enumeration of those particular matters in the statute have been recognized to be "comprehensive of all matters that come before a federal department or agency."[32] Since, for the statutory disqualification requirement, the "particular matter" need not involve specific or identified parties,[33] such term has been broadly interpreted to mean any "discrete and identifiable matter" such as "general rulemaking" or proposed regulations.[34] As stated by the Department of Justice's Office of Legal Counsel, the restrictions of § 208 will apply when a federal official reviews proposed rules that will impact an entire industry of which a firm connected to the federal official is part, and need not affect or deal with *only* that particular firm to come within the restrictions of § 208(a):

> [W]e have consistently interpreted § 208(a) to apply to rule-making proceedings or advisory committee deliberations of general applicability where the outcome may have a "direct and predictable effect" on a firm in which the Government employee is affiliated, even though all other firms similarly situated will be affected in a like manner. An example might be the drafting or review of environmental regulations which would require the considerable expenditures by all firms in the particular industry of which the company is a part.[35]

The Office of Government Ethics, in regulations issued under the statutory disqualification provision, has explained that the recusal requirement will extend to "governmental action such as legislation or policy-making that is narrowly focused on the interests of ... a discrete and identifiable class of persons."[36] These regulations note, however, that the disqualification provision will not apply to "the consideration or adoption of broad policy options that are directed to the interests of a large and diverse group of persons."[37]

## Accomplishing Recusal

Recusal or disqualification is generally accomplished simply by not participating in a matter. An employee who knows that he needs to be disqualified on a matter is instructed to notify the "person responsible for his assignment," who is then instructed to "take whatever steps are necessary to ensure" that the employee does not participate in the matter.[38] There is no general requirement for a written or filed disqualification, unless such statement is required from an official to comply with a written "ethics agreement" with the Office of Government Ethics, or is required by the agency.[39] It is suggested that an employee "may elect to create a record" of his actions concerning a disqualification, and so provide written statements.[40] Although there is no general requirement for written recusal statements, employees of particular agencies may be

---

[31] *Note* discussion of "particular" matter as used in 18 U.S.C. §§ 203 and 208, in Manning, FEDERAL CONFLICT OF INTEREST LAW, Harvard University Press (Cambridge 1963), at 134-135, 54-55, citing H.R. Rpt. No. 748, 87th Congress, 1st Session, at 20 (1961).

[32] H.R. Rpt. No. 748, *supra* at 20.

[33] *Compare* to 18 U.S.C. § 207(a),(b), and 5 C.F.R. § 2635.502(a); see 2 O.L.C. 151, 153-154 (1978).

[34] 2 Op.O.L.C. 151, 153-154 (1978).

[35] 2 Op.O.L.C. *supra* at 155. A different interpretation and application of the restriction may apply to those who are "special Government employees" employed on a part-time or intermittent basis to advise the government.

[36] 5 C.F.R. § 2635.402(b)(3).

[37] *Id.*

[38] 5 C.F.R. § 2635.402(c)(1).

[39] 5 C.F.R. § 2635.402(c)(2).

[40] 5 C.F.R. § 2635.402(c)(2).

required, under agency-specific supplemental ethics regulations, to file such written recusal statements with agency personnel.

## Exemptions, Waivers for Covered Interests

The statutory provision at 18 U.S.C. § 208 applies generally to all officers and employees in the executive branch of government, including the independent agencies, but does not apply to the President or the Vice President.[41] Although there is no *de minimis* exception expressly stated in the statute, the law does provide that regulations may exempt certain categories of investments and interests which are deemed too remote or inconsequential to affect the performance of an official's governmental duties.[42] The current Office of Government Ethics regulations exempt several such interests, including all interests in "diversified" mutual funds; interests in sector funds which include some companies affected by a governmental matter but where those companies are outside of the primary sector in which that fund specializes; and other sector funds specializing in the particular sector but where one's interest in the fund is no more than $50,000; securities, stocks, and bonds in a publicly traded company which is a party to and directly affected by a governmental matter if one's ownership value is no more than $15,000; securities, stocks, and bonds in such a company which is not a specific party to a matter but is in a class affected by the governmental matter, if the employee's ownership interest is no more than $25,000 (if securities in more than one such company are owned, then the aggregate value cannot exceed $50,000 to be exempt from the statute).[43]

Waivers may also be obtained by an individual employee for insubstantial financial interests under § 208(b)(1). These individual waivers may be obtained by an employee or officer concerning a particular financial interest if the employee advises the government official responsible for his or her appointment about the nature and circumstances of the interest, discloses the interest, and receives a written determination from the appointing official that the financial interest "is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee."[44] Finally, advisory committee members who are "special Government employees" may receive individual waivers for conflicting interests even though such interests are not "insubstantial" (as under a 208(b)(1) waiver), if, after a review of the financial disclosure report of the advisory committee member by the official who appoints that advisory committee member, the appointing official determines that the "potential" conflicts of interest raised by the financial interests of the individual, or by those imputed to him, are "outweigh[ed]" by the "need for the individual's services.... "[45] This waiver may apply to even substantial economic or financial interests of the employee/advisor.

---

[41] 18 U.S.C. § 202(c).

[42] 18 U.S.C. § 208(b)(2). There may also be an individual exception for a particular government officer made in writing by the officer's appointing authority that the interest in question is "not so substantial as to ... affect the integrity of the services" of that officer. 18 U.S.C. § 208(b)(1).

[43] 5 C.F.R. § 2640.201 (mutual funds); § 2640.202 (securities in companies).

[44] 18 U.S.C. § 208(b)(1); 5 C.F.R. § 2635.402(d)(2).

[45] 18 U.S.C. § 208(b)(3). Note also other "general" waivers for "special Government employees" on advisory committees under § 208(b)(2).

# Regulatory Disqualification Requirement

In addition to the *statutory* disqualification requirement, recusal or disqualification may be required of executive branch officials under *regulations* promulgated by the Office of Government Ethics. These regulations require recusal from a narrower range of official "matters" (narrower than the statutory recusal requirement), but which may impact the financial interests of a broader range of persons or entities associated with the public official (a broader range of "imputed" personal interests than the statute includes).[46]

The regulations of the Office of Government Ethics provide this *regulatory* disqualification provision to help assure the avoidance of "an appearance of loss of impartiality in the performance of" official duties by a federal employee.[47] The recusal regulation covers a government employee's participation in a "particular matter involving specific parties" when (1) the employee knows that the matter will have a direct and predictable effect on the financial interests of a member of his or her household, or (2) when a person or entity with whom the employee has a "covered relationship" represents or is a party in that matter. The employee must recuse himself or herself from such a matter where the employee believes that his or her impartiality may be questioned, unless the employee first advises his or her agency about the matter and receives authorization to participate in the matter.[48] This regulation, like the *statutory* recusal requirement, expressly excludes the President and Vice President,[49] and may be waived for other officers and employees by supervisory personnel.[50]

For the purposes of requiring recusal, the regulation imputes to the employee the financial interests of persons other than the employee's spouse, minor children, and entities with whom the employee is affiliated (as in the statutory recusal requirement), and requires recusal from a "particular matter involving specific parties" when the employee knows that the matter will have a direct and predictable effect on the financial interests of a "member of his household." Additionally, the interests of an even wider range of persons and entities may be relevant when any person or entity with whom the employee "has a covered relationship" is a party to the matter, or represents a party to the matter. The regulation defines a "covered relationship" to be one with: those persons or entities with whom the employee seeks a business, contractual or other financial relationship; a member of the employee's household, or a relative with whom the employee has a close personal relationship; a person or entity with whom the employee's spouse, child, or parent is serving or seeks to serve as an officer, director, trustee, general partner, agent, attorney, consultant, contractor, or employee; any person or entity for whom the employee served within the last year as an officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee; or an organization (other than a political party) in which the employee is an active participant.[51]

Under the regulation, therefore, although the financial interests of persons or entities that may be imputed to the employee are broadened, the types of governmental "matters" from which an

---

[46] 5 C.F.R. § 2635.502.

[47] 5 C.F.R. § 2635.501(a).

[48] 5 C.F.R. § 2635.502(a).

[49] 5 C.F.R. § 2635.102(h).

[50] 5 C.F.R. § 2635.502(c) and (d).

[51] 5 C.F.R. § 2635.502(b)(1). An "active participant" means more than merely paying dues and attending meetings of an organization

employee should recuse himself or herself are narrowed. A particular governmental matter "involving specific parties" is narrower than merely a "particular matter," and would not include such things as general rulemaking affecting an industry, but rather would apply only to matters such as a determination, contract, claim, controversy, investigation, charge, accusation, arrest or other such matter involving a particular party where the United States is also a party or has a direct or substantial interest. A particular matter "involving specific parties" is generally or typically a matter involving "a specific proceeding affecting the legal rights of the parties or an isolatable transaction or related set of transactions between identifiable parties," as opposed to rulemaking, legislation, or the formulation of general policy or standards.[52] Additionally, when it is the financial interests of those with whom the employee may have a "covered relationship" beyond the household of the employee, the disqualification requirement would only apply when such persons or entities are actually parties to the particular matter or represent parties to the particular matter involving specific parties.

# Disclosure

Detailed annual public financial *disclosure* is required for all high-level officials in all three branches of the United States Government under the public financial disclosure provisions of the Ethics in Government Act of 1978, as amended.[53] Such disclosures were intended to serve the purpose of identifying "potential conflicts of interest or situations that might present the appearance of a conflict of interest" for government officials in policy making positions; to increase public confidence in the integrity of the institutions of government and in those who serve them; and to deter the ownership of particular assets and interests which may raise conflicts issues for a public official.[54]

Under the disclosure law, assets "held for investment or the production of income,"[55] such as stocks, stock options, bonds, mutual funds, and other income producing property held by the reporting individual, and the individual's spouse and dependent children, are the types of financial interests that must be disclosed.[56] Although the financial disclosure laws are principally directed at current and existing financial interests, such current interests may also reflect "retain[ed] ties" to a former employer or to former associates of a current executive branch official.[57]

---

[52] *See* definition of "particular Government matter involving a specific party" at 5 C.F.R. § 2637.102(a)(7) (in context of 18 U.S.C. § 207); and at 5 C.F.R. § 2637.201(c)(same).

[53] P.L. 95-521, as amended. S*ee* now 5 U.S.C. appendix, §§ 101 *et seq.*

[54] S. Rpt. No. 95-170, 95th Cong., 1st Sess. 117 (1977).

[55] U.S. Office of Government Ethics, *Public Financial Disclosure: A Reviewer's Reference,* at 3-7.

[56] *Public Financial Disclosure: A Reviewer's Reference, supra* at 6-5.

[57] *Id.* "Filers may retain ties to a former employer in a number of ways, each of which they must list on the SF 278 [the standard form for executive branch financial disclosures]. One common linkage is a leave of absence, which many people use to retain a highly competitive position, such as a tenured faculty slot at a university. In addition, an employee may have other benefits from a former employer, such as deferred compensation, profit-sharing, stock options, employee pension, medical and insurance plans. Most of these linkages to former employers represent a continuing financial interest in those employers, which makes them potential conflicts of interest."

## Who Must Publicly Disclose

Generally, all high-level officials of the federal government are required to file by May 15 of every year a public financial disclosure statement. The public disclosure law applies to the President and Vice President, all Members of Congress, federal judges, and all officers and employees of the executive branch occupying, for more than 60 days in a calendar year, "a position classified above GS-15," or, if not on the General Schedule, in a position compensated at a "rate of basic pay ... equal to or greater than 120 percent of the minimum rate of basic pay payable for GS-15." [58]

## Information Disclosed

The annual disclosure statement provides detailed financial information about the private financial interests and ownerships of the public official, and the official's spouse and dependent children. The disclosure statement requires public revelation of the identity and/or the value (generally in "categories of value") of such items as (1) the official's private income (including unearned income and capital gains), (2) gifts received (including reimbursements for travel over certain amounts), (3) assets and income-producing property of over $1,000 in value (including savings accounts over $5,000), (4) liabilities exceeding $10,000, (5) financial transactions exceeding $1,000 in income-producing property and securities, (6) positions held in outside businesses and organizations, (7) agreements for future employment or leaves of absence with private entities, continuing payments from or participation in benefit plans of former employers, and (8) the cash value of the interests in any blind trusts. [59]

## Filing and Availability of Reports

An official's annual financial disclosure report is generally to be filed with the designated agency ethics officer within the individual's agency or department, and for high-level presidential appointees such report is then required to be transmitted to the Director of the Office of Government Ethics (OGE). [60] The report is reviewed within the agency (and by the Director of the Office of Government Ethics when appropriate for high level officials and nominees) to flag potential conflict of interest issues or problems, and to resolve any such conflicts. [61]

The financial disclosure reports of the highest level federal officials—the President, Vice President, Cabinet officers (Level I of the Executive Schedule), and sub-Cabinet positions and certain heads of regulatory agencies (on Level II of the Executive Schedule)—are now required to be posted on the Internet, and may be accessed and searched by the public. [62] For all other executive branch officials, the public financial disclosure reports remain available to the public

---

[58] 5 U.S.C. app. § 101(d) and (f)(1) - (12). Covered employees also file a report upon entry into government service, and upon leaving government service.

[59] 5 U.S.C. app., § 102(a)(1) - (8). For items to be disclosed in relation to the official's spouse and dependent children, see 5 U.S.C. § 102(e)(1)(A) - (F).

[60] 5 U.S.C. app. § 103(a), (c).

[61] 5 U.S.C. app. § 106.

[62] P.L. 112-105, 126 Stat. 291 (April 4, 2012), Sections 8(a)(1) and 11(a)(1), as amended by P.L. 113-7, 127 Stat. 438 (April 15, 2013). In the legislative branch, the disclosure reports of Members of Congress are also required to be posted on the Internet.

for copy or inspection from the official's agency within 30 days after the May 15 filing deadline, and are to be released to a member of the public (for a reasonable fee to cover necessary reproduction and mailing) when requested by written application providing the requester's name, occupation, and address; the name of the organization or other person on whose behalf the inspection or copy is requested; and a statement that the person requesting the copy is aware of the prohibitions on using such reports for commercial, credit rating, or solicitation purposes.[63] The reports are generally retained by the filing agency for six years, then are destroyed.

## Periodic Reporting of Financial Transactions

Under the provisions of the "STOCK Act," signed into law on April 4, 2012, all federal officials who are required to file annual public financial disclosure statements must also file periodic reports during the year which detail financial transactions of $1,000 or more taken by or for the official.[64] These more frequent, periodic transaction reports must be filed within 30 days after the official is notified of a covered transaction in stocks, bonds, or other such securities (but no later than 45 days after the date of the transaction). The requirement for more frequent filing applies generally to transactions in stocks and bonds of individual companies, but does not apply to most mutual funds or to exchange traded funds (ETFs), nor to transactions in real property.

## Confidential Disclosures

In addition to the legislative and regulatory scheme for *public* financial disclosure for certain federal officials, there is in place a requirement for *confidential* disclosure reports to be filed with an employee's agency by some lower level federal officers and employees. The confidential reporting requirements are intended to complement the public disclosure system, and apply to those employees who do not have to file under the public reporting provisions of the Ethics in Government Act.[65]

Generally, the confidential reporting requirements apply to certain "rank and file" employees who are compensated below the threshold rate of pay for public disclosures (GS-15 or below, or less than 120% of the basic rate of pay for a GS-15), *and* who are determined by the employee's agency to perform duties or exercise responsibilities in regard to government contracting or procurement, government grants, government subsidies or licensing, auditing, or other duties which may particularly require the employee to avoid financial conflicts of interest.[66] Such a person may be required to file a confidential report if he or she performs the duties of the position "for a period in excess of 60 days during the calendar year."[67] Additionally, unless required to file *public* reports, confidential reports are required from all "special Government employees" in the executive branch (those employees who are employed by the government for not more than 130

---

[63] 5 U.S.C. app. § 105.

[64] P.L. 112-105, Section 6; 5 U.S.C. app. § 103(l).

[65] 5 U.S.C. app. § 107; see also 5 C.F.R. § 2634.901(a). Supplemental information, however, may be requested by an agency even from employees filing *public* disclosures. 5 C.F.R. § 2634.901(c).

[66] 5 C.F.R. § 2634.904(a). Confidential filing in the executive branch is done on form OGE-450, optional form 450-A, or with the approval of OGE, in an alternative procedure using an agency-specific form. 5 C.F.R. § 2634.905.

[67] 5 C.F.R. § 2634.903(a).

days in a year), including those "special Government employees" who serve on federal advisory committees.[68]

# Divestiture

There is no federal statute which expressly implements a general, executive branch-wide requirement for federal officials to divest particular private assets or holdings to resolve likely or potential conflicts of interest with an official's public duties. However, there are a few instances in which divestiture of an asset or assets may be required. In some cases, a statutory provision might provide that a director, commissioner, or board member of a particular federal regulatory entity shall have no financial interests in the business, industry, or sector which the agency, bureau, or commission regulates or oversees. Furthermore, an agency may by regulation prohibit or restrict the ownership of certain financial assets or class of assets by its officers and employees where a perceived "conflict of interest" with the agency mission may arise. In such instances, these statutory and regulatory provisions would not only prohibit the acquisition of such assets, but may also require the divestiture of a particular asset or holding of certain individuals to be appointed to such positions or who are incumbents in such positions. Finally, in reviewing financial holdings of its officers, an agency's ethics officer may recommend (or require) divestiture of particular assets of a certain official which, because of the official's duties and responsibilities, may raise substantial conflict issues.

## Prohibitions on Owning Certain Assets

There may be certain statutory provisions, often the organic act establishing an agency, bureau, or commission, which will provide an express prohibition upon the directors or heads of such agency or commission from owning stock or having other such financial interests in businesses or other private entities in the particular industry or field that the agency is to regulate. For example, federal law provides that "No member of the Board of Governors of the Federal Reserve System shall ... hold stock in any bank, banking institution, or trust company.... "[69] With respect to the Federal Aviation Administration, federal law provides that "The Administrator and the Deputy Administrator may not have a pecuniary interest in, or own stock in or bonds of, an aeronautical enterprise, or engage in another business, vocation, or employment."[70] Federal law provides that no person may be appointed to the National Indian Gaming Commission who has any financial interest in any gaming activity.[71] The Office of Surface Mining Reclamation and Enforcement is within the Department of Interior, and the legislation establishing such office provides that "No employee of the Office or any other Federal employee performing any function or duty under this chapter shall have a direct or indirect financial interest in underground or surface coal mining

---

[68] 5 C.F.R. § 2634.904(a)(2), 5 C.F.R. § 2634.901(e). Only persons who are serving on advisory committees and are federal "employees," however, must file disclosure reports. Private "representatives" on advisory committees are not federal employees and thus are not generally required to file disclosure reports. See OGE, DO-05-012, Memorandum to Designated Agency Ethics Officials, "Federal Advisory Committee Appointments," August 18, 2005; DO-04-022, "SGEs and Representatives on Federal Advisory Committees," July 19, 2004; and Advisory Opinion 82 x 22, "Members of Federal Advisory Committees and the Conflict-of-Interest Statutes," July 9, 1982.

[69] 12 U.S.C. § 244.

[70] 49 U.S.C. § 106(e).

[71] 25 U.S.C. § 2704.

operations."[72] The head of the Transportation Security Administration is the Under Secretary of Transportation for Security, and such person "may not own stock in or bonds of a transportation or security enterprise or an enterprise that makes equipment that could be used for security purposes."[73] Members of the Surface Transportation Board within the Department of Transportation may also "not have a pecuniary interest in, hold an official relation to, or own stock in or bonds of, a carrier providing transportation by any mode.... "[74]

In addition to statutory provisions, executive agencies are permitted to issue additional and supplemental ethics regulations for their own personnel upon the concurrence and joint issuance of the regulations by the Office of Government Ethics.[75]  Agencies may, therefore −by such regulations −prohibit officers and employees of the agency from acquiring, or owning or holding, certain financial interests, assets, and property when the ownership or holding of such interests would, because of the mission of the agency, "cause a reasonable person to question the impartiality and objectivity with which agency programs are administered."[76] The broadest regulatory restriction upon the employees of an agency would appear to be that of the Securities and Exchange Commission which prohibits, with some exceptions, officers and employees (as well as an employee's spouse and dependent children) from "knowingly purchasing or holding a security or other financial interest in an entity regulated by the Commission."[77] Other examples of agency or departmental-specific restrictions on agency officers and employees (and in many cases, their spouse and dependent children) owning particular assets or financial interests of companies and entities directly regulated by or affected by the agency include restrictions on employees of: the Bureau of Alcohol, Tobacco and Firearms; the Office of the Comptroller of the Currency; the Office of Thrift Supervision; Federal Deposit Insurance Corporation; the Federal Energy Regulatory Commission; Department of Interior; the Farm Credit System Insurance Corporation; Farm Credit Administration; the Interstate Commerce Commission; Mine Safety and Health Administration (Department of Labor); Food and Drug Administration (HHS); National Institutes of Health (HHS); Postal Rate Commission; Nuclear Regulatory Commission; Federal Railroad Administration and Federal Aviation Administration, Department of Transportation; Environmental Protection Agency; Board of Governors of the Federal Reserve System; Housing and Urban Development; Rural Development, Department of Agriculture; Federal Mine Safety and Health Review Commission; Federal Housing Finance Agency; and the Consumer Financial Protection Bureau.[78]

---

[72] 30 U.S.C. § 1211(f).

[73] 49 U.S.C. § 114(c).

[74] 49 U.S.C. § 701(b)(6).

[75] 5 C.F.R. § 2635.105.

[76] 5 C.F.R. § 2635.403(a).

[77] 5 C.F.R. § 4401.102(c). This would appear to include all corporations which issue publicly traded securities.

[78] 5 C.F.R. § 3101.105 (Bureau of Alcohol, Tobacco, and Firearms); 5 C.F.R. § 3101.108 (Comptroller of the Currency); 5 C.F.R. § 3101.109(b) (Office of Thrift Supervision); 5 C.F.R. § 3201.103 (FDIC); 5 C.F.R. § 3401.102 (FERC); 5 C.F.R. §§ 3501.103 and 104 (Department of Interior); 5 C.F.R. § 4001.103 (Farm Credit System Insurance Corporation); 5 C.F.R. § 4101.193 (Farm Credit Administration); 5 C.F.R. § 5001.102 (Interstate Commerce Commission); 5 C.F.R. § 5201.105 (Mine Safety and Health Administration); 5 C.F.R. § 5501.104 (FDA); 5 C.F.R. § 5501.110 (NIH); 5 C.F.R. § 5601.102 (Postal Rate Commission); 5 C.F.R. § 5801.102 (Nuclear Regulatory Commission); 5 C.F.R. § 6001.104 (FRA and FAA); 5 C.F.R. § 6401.102 (EPA); 5 C.F.R. § 6801.103 (Board of Governors of the Federal Reserve System); 5 C.F.R. § 7501.104 (HUD); 5 C.F.R. § 8301.107 (RD, Department of Agriculture); 5 C.F.R. § 8401.102 (Federal Mine Safety and health Review Commission); 5 C.F.R. § 9001.104 (Federal Housing Finance Agency); 5 C.F.R. § 9401.106 (Consumer Financial Protection Bureau).

In reviewing or examining the financial interests and potential conflicts of interest of an executive branch official, the agency-specific regulations or statutory provisions—specifically applicable only to officers and employees of that particular agency, commission, or bureau—which limit or prohibit the acquisition or ownership of a particular category or type of financial asset or financial interest, need to be considered and consulted.

## Divestiture Required Upon Ethics Review

The divestiture of particular assets, properties, or holdings may be required of an individual as a conflict of interest resolution or avoidance mechanism by administrative provisions and review in the executive branch, as well as required by a Senate committee or the Senate as a whole as a condition of favorable action on a presidential nominee requiring Senate confirmation.

With respect to administrative review, as noted above, the principal statutory method of conflict of interest avoidance—concerning particular assets and holdings of a federal official—is to require the *disqualification* of that official from a governmental matter affecting those financial interests.[79] Under current regulations of the Office of Government Ethics, as part of the ethics review process, an agency may require the divestiture of certain assets of an individual employee where those interests would require the employee's disqualification from matters so central to his or her job that it would impair the employee's ability to perform his or her duties, or where it could adversely affect the agency's mission because another employee could not easily be substituted for the disqualified employee.[80] Such a requirement may be imposed as part of an "ethics agreement" which an appointee or a nominee may make with his or her agency, and approved by the Office of Government Ethics, as a device to provide options and alternatives to avoid conflicts of interest because of the ownership of certain assets and financial instruments.[81]

When divestiture is required for ethics reasons, a current employee should be afforded a "reasonable amount of time" to effectuate the disposal of the asset; furthermore, it is possible to ameliorate potential unfair tax burdens that may arise because of such required sale of an asset by receiving a certificate of divestiture and postponing capital gains taxes.[82]

## Blind Trusts

In some instances, the establishment of a "qualified blind trust" may be used to ameliorate or avoid conflicts of interest as an alternative to divestiture of conflicting assets. Although generally, the underlying assets in a trust in which one has a beneficial interest must normally be disclosed in annual public financial disclosure reports[83]—and would under conflict of interest law be considered "financial interests" of the employee/beneficiary for disqualification purposes—federal officials may, as a conflict of interest avoidance measure, place certain assets with an independent trustee in what is called a "qualified blind trust."[84]

---

[79] 18 U.S.C. § 208.

[80] 5 C.F.R. § 2635.403(b).

[81] 5 C.F.R. §§ 2634.801 *et seq*.

[82] 26 U.S.C. § 1043. *See* 5 C.F.R. §§ 2635.403(d),(e), and 2634.1001 *et. seq.*

[83] 5 U.S.C. app. § 102(f)(1).

[84] *See*, generally, 5 U.S.C. app. §102(f). Assets of an official may also be in a qualified "diversified trust" which has (continued...)

The nature of a "blind trust," generally, is such that the official will have no control over, will receive no communications about, and will (eventually as existing assets are sold and new ones obtained by the trustee) have no knowledge of the identity of the specific assets held in the trust. As such, an official will not need to identify and disclose the particular assets in the corpus of a "blind trust" in future financial disclosure reports,[85] and such assets will not be "financial interests" of the employee for disqualification purposes.[86] The conflict of interest theory under which the blind trust provisions operate is that since the official will not know the identity of the specific assets in the trust, those assets and financial interests could not influence the official decisions and governmental duties of the reporting official, thus avoiding potential conflict of interest problems or appearances.[87] Assets originally placed into the trust by the official will, of course, be known to that official, and therefore will continue to be "financial interests" of the public official for conflict of interest purposes until the trustee notifies the official "that such asset has been disposed of, or has a value of less than $1,000."[88]

# Author Contact Information

Jack Maskell
Legislative Attorney
jmaskell@crs.loc.gov, 7-6972

---

(...continued)
been established for the benefit of the official, the official's spouse or children, and may avoid disclosure and conflict of interest disqualification requirements. 5 U.S.C. app. §102(f)(4)(B). However, in addition to being required to be well diversified, such a trust may not consist of the assets of entities "having substantial activities in the area of the [official's] primary area of responsibility." 5 U.S.C. app. § 102(f)(4)(B)(i)(II). Such well diversified portfolios of assets with an independent trustee, with no conflicting assets in the trust portfolio, are not considered "financial interests" of the employee for conflict of interest purposes at any time. 5 C.F.R. § 2634.401(a)(1)(iii).

[85] 5 U.S.C. app. § 102(f)(2)(A).

[86] 5 U.S.C. app. § 102(f)(4)(A); 5 C.F.R. § 2634.401(ii).

[87] S. Rpt. 95-639, 95th Cong., 2d Sess., Report of the Committee on Governmental Affairs, *Blind Trusts*, at 13 (1978).

[88] 5 U.S.C. app. § 102(f)(4)(A); 401(a)(1)(ii).  One of the requirements of a blind trust is that there can be no conditions placed on the independent judgment of the trustee to dispose of any assets in the corpus of the trust.  5 U.S.C. app. § 102(f)(3)(B).



# REPUBLIC, LOST

*How Money Corrupts Congress—and a Plan to Stop It*

★

Lawrence Lessig

# *Introduction*

There is a feeling today among too many Americans that we might not make it. Not that the end is near, or that doom is around the corner, but that a distinctly American feeling of inevitability, of greatness—culturally, economically, politically—is gone. That we have become Britain. Or Rome. Or Greece. A generation ago Ronald Reagan rallied the nation to deny a similar charge: Jimmy Carter's worry that our nation had fallen into a state of "malaise." I was one of those so rallied, and I still believe that Reagan was right. But the feeling I am talking about today is different: not that we, *as a people*, have lost anything of our potential, but that we, *as a republic*, have. That our capacity for governing—the product, in part, of a Constitution we have revered for more than two centuries—has come to an end. That the thing that we were once most proud of—this, our republic—is the one thing that we have all learned to ignore. Government is an embarrassment. It has lost the capacity to make the most essential decisions. And slowly it begins to dawn upon us: a ship that can't be steered is a ship that will sink.

We didn't always feel this way. There were times when we were genuinely proud—as a people, *and* as a republic—and when we proudly boasted to the world about the Framers' (flawed but still) ingenious design. No doubt, we still speak of the founding with reverence. But we seem to miss that the mess that is our government today grew out of the genius that the Framers crafted two centuries ago. That, however much we condemn what government has become, we forget it is the heir to something we still believe divine. We inherited an extraordinary estate. On our watch, we have let it fall to ruin.

The clue that something is very wrong is the endless list of troubles that sit on our collective plate but that never get resolved:

YALE LAW LIBRARY

*Introduction*

bloated and inefficient bureaucracies; an invisible climate policy; a tax code that would embarrass Dickens; health care policies that have little to do with health; regulations designed to protect inefficiency; environmental policies that exempt the producers of the greatest environmental harms; food that is too expensive (since protected); food that is unsafe (since unregulated); a financial system that has already caused great harm, has been left unreformed, and is primed and certain to cause great harm again.

The problems are many. Too many. Our eyes get fixed upon one among them, and our passions get devoted to fixing that one. In that focus, however, we fail to see the thread that ties them all together.

We are, to steal from Thoreau, the "thousand[s] hacking at the branches of evil," with "[n]one striking at the root."

This book names that root. It aims to inspire "rootstrikers." The root—not the single cause of everything that ails us, not the one reform that would make democracy hum, but instead, the root, the thing that feeds the other ills, and the thing that we must kill first. The cure that would be generative—the single, if impossibly difficult, intervention that would give us the chance to repair the rest.

For we have no choice but to try to repair the rest. Republicans and Democrats alike insist we are on a collision course with history. Our government has made fiscal promises it cannot keep. Yet we ignore them. Our planet spins furiously to a radically changed climate, certain to impose catastrophic costs on a huge portion of the world's population. We ignore this, too. Everything our government touches—from health care to Social Security to the monopoly rights we call patents and copyright—it poisons. Yet our leaders seem oblivious to the thought that there's anything that needs fixing. They preen about, ignoring the elephant in the room. They act as if Ben Franklin would be proud.

Ben Franklin would weep. The republic that he helped birth is lost. The 89 percent of Americans who have no confidence in Congress (as reported by the latest Gallup poll)[1] are not idiots. They are not even wrong. Yet they fail to recognize just why this government

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 384 of 482

doesn't deserve our confidence. Most of us get distracted. Most of us ignore the root.

We were here at least once before.

One hundred years ago America had an extraordinary political choice. The election of 1912 gave voters an unprecedented range of candidates for president of the United States.

On the far Right was the "stand pat," first-term Republican William Howard Taft, who had served as Teddy Roosevelt's secretary of war, but who had not carried forward the revolution on the Right that Roosevelt thought he had started.

On the far Left was the most successful socialist candidate for president in American history, Eugene Debs, who had run for president twice before, and who would run again, from prison, in 1920 and win the largest popular vote that any socialist has ever received in a national American election.

In the middle were two "Progressives": the immensely popular former president Teddy Roosevelt, who had imposed upon himself a two-term limit, but then found the ideals of reform that he had launched languishing within the Republican Party; and New Jersey's governor and former Princeton University president Woodrow Wilson, who promised the political machine–bound Democratic Party the kind of reform that Roosevelt had begun within the Republican Party.

These two self-described Progressives were very different. Roosevelt was a big-government reformer. Wilson, at least before the First World War, was a small-government, pro-federalist reformer. Each saw the same overwhelming threat to America's democracy— the capture of government by powerful special interests—even if each envisioned a very different remedy for that capture. Roosevelt wanted a government large enough to match the concentrated economic power that was then growing in America; Wilson, following Louis Brandeis, wanted stronger laws limiting the size of the concentrated economic power then growing in America.

Presidential reelection campaigns are not supposed to be

YALE LAW LIBRARY

bloody political battles. But Taft had proven himself to be a particularly inept politician (he was later a much better chief justice of the Supreme Court), and after Roosevelt's term ended, business interests had reasserted their dominant control of the Republican Party. Yet even though dissent was growing across the political spectrum, few seemed to doubt that the president would be reelected. Certainly Roosevelt felt certain enough of that to delay any suggestion that he would enter the race to challenge his own hand-picked successor.

A Wisconsin Republican changed all that. In January 1911, Senator Robert La Follette and his followers launched the National Progressive Republican League. Soon after, La Follette announced his own campaign for the presidency. Declaring that "popular government in America has been thwarted . . . by the special interests," the League advocated five core reforms, all of which attacked problems of process, not substance. The first four demanded changes to strengthen popular control of government (the election of senators, direct primaries, direct election of delegates to presidential conventions, and the spread of the state initiative process). The last reform demanded "a thoroughgoing corrupt practices act."

La Follette's campaign initially drew excitement and important support. It faltered, however, when he seemed to suffer a mental breakdown during a speech at a press dinner in Philadelphia. But the campaign outed, and increasingly embarrassed, the "stand pat" Republicans. As Roosevelt would charge in April 1912:

> The Republican party is now facing a great crisis. It is to decide whether it will be, as in the days of Lincoln, the party of the plain people, the party of progress, the party of social and industrial justice; or whether it will be the party of privilege and of special interests, the heir to those who were Lincoln's most bitter opponents, the party that represents the great interests within and without Wall Street which desire through their control over the servants of the public to be kept immune from punishment when they do wrong and to be given privileges to which they are not entitled.[2]

The term *progressive* is a confused and much misunderstood moniker for perhaps the most important political movement at the turn of the last century. We confuse it today with *liberals*, but back then there were progressives of every political stripe in America— on the Left and on the Right, and with dimensional spins in the middle (the Prohibitionists, for example). Yet one common thread that united these different strands of reform was the recognition that democratic government in America had been captured. Journalists and writers at the turn of the twentieth century taught America "that business corrupts politics,"[3] as Richard McCormick put it. Corruption of the grossest forms—the sort that would make convicted lobbyist Jack Abramoff wince—was increasingly seen to be the norm throughout too much of American government. Democracy, as in rule of the people, was a joke. As historian George Thayer wrote, describing the "golden age of boodle" (1876–1926): "Never has the American political process been so corrupt. No office was too high to purchase, no man too pure to bribe, no principle too sacred to destroy, no law too fundamental to break."[4]

Or again, Teddy Roosevelt (1910): "Exactly as the special interests of cotton and slavery threatened our political integrity before the Civil War, so now the great special business interests too often control and corrupt the men and methods of government for their own profit."[5]

To respond to this "corruption," Progressives launched a series of reforms to reclaim government. Many of these reforms were hopeless disasters (the ballot initiative and elected judges), and some were both disasters and evil (Prohibition and eugenics, to name just two). But mistakes notwithstanding, the Progressive Era represents an unprecedented moment of experimentation and engagement, all motivated by a common recognition that the idea of popular sovereignty in America had been sold. The problem was not, as McCormick describes, a "product of misbehavior by 'bad' men," but was instead now seen as the predictable "outcome of identifiable economic and political forces."[6]

That recognition manifested itself powerfully on November 5,

YALE LAW LIBRARY

the complexity of modern society demands this minimal regulatory assurance at least.

Not all societies are yet at this place. The weekend my wife and I discovered she was pregnant with our first child, we were in China. In the paper that morning was the story of a Chinese businessman who had been convicted for selling sugar water as baby formula. Parents who had relied upon the assurances of safety printed on the bottles watched in horror as their children bloated and died. The owner of the factory defended himself in a Chinese court with words Charles Dickens might have penned: "No one forced these parents to use my formula. They chose to use it. Any deaths are their own fault, not mine."

But in fact, the demon pestering you as you lie awake in bed after putting your child back to sleep has asked a pretty good question. For years my wife imported our pacifiers from Europe. Until I began the research for this book, I never asked why. "BPA" (aka Bisphenol A), she said. In America, the vast majority of soft plastic for children contains BPA. In many countries around Europe that chemical has been removed from children's products.

Why?

Among the complexities in the development of a fetus is the precision of its timing. Certain things must happen at certain times, and ordinarily they do. At certain times, for example, exposure of the fetus to estrogen can be harmful. At those precise times, the fetus develops a protective layer, a sex-hormone-binding globulin, that blocks the fetus from its mother's estrogen.

In the mid-1990s, Frederick vom Saal, a professor of biological sciences now at the University of Missouri–Columbia, began to wonder whether the same blocking mechanism blocked man-made estrogenic chemicals as well. Those chemicals, in theory at least, could have the same harmful effect on the fetus. Did sex-hormone-binding globulins protect against those, too?

The answer was not good. "The great majority of man-made chemicals," vom Saal found, "are not inhibited from entering cells like natural estrogens are." Worse, vom Saal found, "the receptor in

the cell that causes changes when estrogen binds to it [remember, changes that can, at specific stages of development, be extremely harmful] is very responsive" to synthetic estrogenic chemicals, including BPA.[1]

Armed with (and alarmed by) this finding, vom Saal and others started testing the actual effects of BPA on the development of mice. The findings confirmed their worst fears. And because the "molecular mechanisms at the cellular level [produce] no difference in the way that mouse and rat cells respond to BPA and the way that human cells respond to it,"[2] vom Saal believed he had tripped onto a potential health disaster. Almost everyone (95 percent) within the developed world now has "blood levels of [BPA] within the range 'that is predicted to be biologically active,' based on animal studies conducted with low doses of the chemical."[3] A study by the Harvard School of Public Health found that "BPA concentrations increased by 69% in the urine of subjects who drank from plastic bottles containing BPA."[4] Some studies have even detected BPA in the cord blood of newborns.[5] The consequences of this exposure according to this study range from "reduced sperm count to spontaneous miscarriages; from prostate and breast cancers to degenerative brain diseases; from attention deficit disorders to obesity and insulin resistance, which links it to Type 2 diabetes."[6] Indeed, just last year, "the White House task force on childhood obesity worried [that BPA] might be promoting obesity in children."[7] Its fear followed this extensive and growing research.

Vom Saal's conclusions are not his alone. Indeed, to give the issue prominence, more than thirty-six "of the world's best brains on BPA" signed "an unprecedented consensus statement [that] laid out [the] chilling conclusions" of the research.[8] In the view of these scientists, BPA is a danger already causing significant harm to children in developed nations, and will no doubt cause more harm in the years to come.

Not all scientists agree with vom Saal and his colleagues, however. Indeed, there are many who believe BPA is either harmless or not yet proven to cause harm in humans. Many of the studies of

YALE LAW LIBRARY

BPA, these scientists believe, have been methodologically flawed. Indeed, the National Institutes of Health itself has acknowledged problems with some of the research.[9] Regulations that would ban BPA, these scientists believe, are an unnecessary burden that will only raise the cost of the products our children need (and yes, reader who has never had a child, children *need* pacifiers).

Among those insisting upon the safety of BPA is, not surprisingly, the industry that produces it. In December 2009, *Harper's* published a summary memo from a meeting of the "BPA Joint Trade Association." That meeting was intended to "develop potential communication/media strategies around BPA." Members at the meeting believed that a "balance of legislative and grassroots outreach (to young mothers and students) is imperative to the stability of their industry." Among the strategies discussed was "using fear tactics (e.g., 'Do you want to have access to baby food anymore?')," and urging that consumers should have choice (e.g., "You have a choice: the more expensive product that is frozen or fresh, or foods packaged in cans"). The association was concerned that the "media is starting to ignore their side," and "doubts obtaining a scientific spokesman is attainable." The memo identified the "holy grail spokesman" for the BPA industry in the minds of these committee members: a "pregnant young mother who would be willing to speak around the country about the benefits of BPA."[10]

Okay, so some say that BPA is dangerous. Some say it is not. You may be with me in the former camp, or you may be in the latter camp. Both views are fair enough.

But notice how your feelings change when you read the following:

Since vom Saal published his first study in 1997, there have been at least 176 studies of the low-dose effects of BPA. Thirteen of these studies have been sponsored by industry. The balance (163) have been funded by the government, and conducted at universities. The industry-funded studies have the advantage of being large scale. Most of the government-funded studies are smaller scale. Nonetheless, here are the results:

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 390 of 482

All of the large-scale studies found no evidence of harm. When added to the smaller-scale studies, this meant about 24 out of the 176 found no evidence of harm. But 152 of these studies did find evidence of harm. So from this perspective, we could say about 15 percent of the studies found the chemical harmless, while 85 percent found it potentially harmful.[11]

That doesn't sound good for BPA. And it does not get any better.

If you divide the studies on the basis of their funding, the results are even starker.

|  | HARM | NO HARM |
|---|---|---|
| **Industry Funded** | 0 (0%) | 13 (100%) |
| **Independently Funded** | 152 (86%) | 11 (14%) |

In a single line, none of the industry-funded studies found evidence of harm, while more than 85 percent of the independent studies did.

Researchers who conduct these industry-sponsored studies are of course "offended," as one director commented, "when someone suggests that who pays for the study determines the outcome."[12] She explains the difference by pointing to the "nature of the study," not "who pays for the studies." Independent studies "typically focus on hazards, or the intrinsic capacity to do harm," while industry-funded studies "are interested in determining the risks of exposure."[13]

Maybe. And maybe that's enough to explain the difference. But here is the point I want you to recognize: Some will read this analysis and conclude that BPA is unsafe. Some will read it and won't change their view of BPA in the slightest. But the vast majority will read this analysis and become less certain about whether BPA is safe. The presence of money with the wrong relationship to the truth is enough to dislodge at least some of the confidence that these souls once had.

YALE LAW LIBRARY

And among those not so sure, at least some will have the reaction that I did, and do, every time I hand my kid a piece of plastic: It is absurd that in America I don't know if the thing I'm feeding my child with is safe—for her or for us.

## 2.

The next time you're holding your cell phone against your ear and notice your ear getting a bit warm, ask yourself this question: Is your cell phone safe? Does the radiation coming from that hand-held device—microwave radiation, emitted one inch from your brain—cause damage to your brain? Or head? Or hand?

The vast majority of Americans (70 percent) either believe the answer to the latter question is no or they don't know.[14] Part of that belief comes from the same sort of confidence I've just described—we've had cell phone technology for almost fifty years; certainly someone must have determined whether the radiation does any damage. Part of that belief could also come from reports of actual studies—hundreds of studies of cell phone radiation have concluded that cell phones cause no increased risk of biological harm.[15] And, finally, part of that belief comes from a familiar psychological phenomenon: cognitive dissonance—it would be too hard to believe to the contrary. Like smokers who disbelieved reports about the link between smoking and lung cancer, we cell phone users would find it too hard to accept that this essential technology of modern life was in fact (yet) another ticking cancer time bomb.

Yet, once again, the research raises some questions.

Depending on how you count, there have been at least three hundred studies related to cell phone safety—or, more precisely, studies that try to determine if there is any "biologic effect" from cell phone radiation. The most prominent of these is a recent, $24 million UN-sponsored study covering thirteen thousand users in thirteen nations for more than a decade. That study was deemed "inconclusive," but it did find that "frequent cell phone use may increase the chances of developing rare but deadly forms of brain

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 392 of 482

cancer."[16] Specifically, the study found up to "40% higher incidence of glioma among the top 10 percent of people who" used their phone the most.[17] That qualification may give you comfort, at least if you don't think of yourself as one of those sad souls glued to their cell phones. But don't get too comfortable yet, because the study was conceived more than a decade ago, when "heavy use" was actually quite moderate by today's standards: thirty minutes a day put you in the highest category for the purposes of this study.[18] Indeed, as Dr. Devra Davis writes in her book *Disconnect* (2010), there's a very general problem with the established standards for cell phone usage: "Today's standards...were set in 1993, based on models that used a very large heavy man with an eleven-pound head talking for six minutes, when fewer than 10% of all adults had cell phones. Half of all ten-year-olds now have cell phones. Some young adults use phones for more than four hours a day."[19]

The concern that I want to flag, however, begins, again, when one looks at the source of these studies. Dr. Henry Lai of the University of Washington has examined 326 of these radiation studies. His analysis divides the studies into those that found some biologic effect and those that did not. Good news: the numbers are about even. Fifty-six percent of the studies found a biologic effect, while 44 percent did not. Not great (for cell phone users), but perhaps not reason enough (yet) to chuck your iPhone.

But Professor Lai then divided the studies into those that were funded by industry and those that were not. Once that division was made, the numbers no longer seemed so benign. Industry-funded studies overwhelmingly found no biologic effect, while independent studies found overwhelmingly that there was a biologic effect.

|  | BIOLOGIC EFFECT | NO BIOLOGIC EFFECT |
|---|---|---|
| **Industry Funded** | 27 (28%) | 69 (72%) |
| **Independently Funded** | 154 (67%) | 76 (33%) |

YALE LAW LIBRARY

Lai's work is careful, but it has not yet been published in a peer-reviewed journal. Its conclusions, however, have been supported by important peer-reviewed work. In a paper published in 2007 in the journal *Environmental Health Perspectives*, researchers reviewed published studies of controlled exposure to radio-frequency radiation. They isolated fifty-nine studies that they believed meaningful, and divided those into ones funded by industry, funded by the public or charity, and funded in a mixed way.

Their conclusions are consistent with Lai's. As they wrote, "studies funded exclusively by industry were indeed substantially less likely to report statistically significant effects on a range of end points that may be relevant to health."[20] This conclusion added "to the existing evidence that single-source sponsorship is associated with outcomes that favor the sponsors' products."[21]

So how do these facts affect your view of cell phones?

Again, some will conclude that cell phones are dangerous. Some will continue to believe that they are safe. But the majority will process these facts by concluding that they are now no longer sure about whether cell phones are safe. The mere fact of money in the wrong place changes their confidence about this question of science.

### 3.

These two stories rely upon an obvious intuition—that money in the wrong places makes us trust less. My colleagues and I at Harvard wanted to test that intuition more systematically. Can we really show that money wrongly placed weakens the confidence or trust that people have in any particular institution? And if it does, does it have the same effect regardless of the institution? Or are some institutions more vulnerable—more untrustworthy—than others?

Our experiment presented participants with a series of vignettes in three different institutional contexts: politics, medicine, and consumer products. In each context, the cases differed only by the extent to which an actor's financial incentive was described to be dependent upon a particular outcome.

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 394 of 482

Across all three of the domains we tested, the mere suggestion of a link between financial incentives and a particular outcome significantly influenced the participants' trust and confidence in the underlying actor or institution. Doctors' advice was judged to be less trustworthy if the procedure they recommended was tied to a financial incentive. Politicians were judged to be less trustworthy if they supported a policy consistent with the agenda of contributing lobbyists. Researchers for consumer products were judged less trustworthy if their work was funded by an agency that had a financial stake in the outcome. And most surprisingly to us, these variations in the hypotheticals we presented also significantly influenced the participants' judgments *of their own* doctors, politicians, and consumer goods. Even the suggestion of one bad apple was enough to spoil the barrel.

In each of these contexts, of course, we might well say that the participants made a logical mistake. In none of the cases did we prove that the money was affecting the results. In none of the cases did we even suggest that it was. But logic notwithstanding, trust was affected merely because money was present in a way that *could have* biased the results. We infer bias from the structure of the case. Rightly or wrongly, this is how we read.[22]

### 4.

The field of "conflicts of interest" focuses on the question of when we should be concerned about dueling loyalties within a single decision maker or single institution. If, for example, you're a judge deciding a billion-dollar lawsuit brought against Exxon, the fact that you've got *any* financial connection to Exxon, however small, is enough to disqualify you from that suit. Your decision should depend upon the law alone. And one fear addressed by "conflicts" rules is that your loyalty might be split between the law and your own personal gain.

But come on—a single share of Exxon stock is enough to get a judge kicked from the case? Does anyone actually believe that a judge would throw a case because her stock might move from sixty

YALE LAW LIBRARY

# To Major General Robert Howe

Dear Sir,                                              Head Quarters West Point Augt 17th 79

I have received your letter of yesterday on the subject of our confidential friend.[1]

It appears to me that the detail he seems to desire will be rather too minute and tend to excite suspicion instead of giving him credit with the enemy. The idea of what was communicated before was to pretend that he had made general observations and inquiries in the army, and had formed an average estimate of the several brigades as the result.[2] The particular strength of each regiment would exceed this purpose and in some measure contradict the principle. But if on his return he finds the present not satisfactory and the enemy press for what he now requires it shall not be refused—Let him in the first place make the experiment with what he has.

I have thought it necessary to endeavour to impose upon this person himself by making him believe the return sent to the enemy is a true one;[3] if you could assist the deception by indirectly giving him an intimation of your strength conformable to the number expressed in my estimate it may have a good effect—I have stated Glovers brigade at 1160—The cavalry and Armand's corps at 680—*both fit for duty.*

I am really at a loss what opinion to form of this man—His former conduct in this dispute, from the accounts I have had of it are in his favour; his conduct in the execution of his present occupation has not been to his disadvantage: But still there are some little appearances about him that give me distrust, and as the enemy have it more in their power to reward certain services than we have in the way which is most tempting, I always think it necessary to be very guarded, with those who are professedly acting as double characters—This has hitherto prevented my doing any thing for the man in question in the way of office, lest it might really put it in his power to do us mischief; but as the pretext upon which he applies is plausible and may be honest, I shall endeavour to find some place which will answer the purpose and by keeping him mostly remote from the army, leave it the less in his power to turn it to our injury. We must endeavour to make it his interest to be faithful, for as it is apparent he means to get something by the business, and will even receive double wages, we must take care if possible not to let motives of interest on the other side bear down his integrity and inclination to serve us—Few men have virtue to withstand the highest bidder.[4] I am with great regard D. Sir Your obed. servant.

P.S. I have also received your public letter of the 16th.[5] I have never seen the letter you mention from Col. Armand.

An acct of one of the important evts which in a late letter I told you I thought the next 10 or 12 days would bring forth, is arrived[6]—the paper herewith inclosed contains a narrative of the west India business.[7]

Df, in Alexander Hamilton's writing, DLC:GW; Varick transcript, DLC:GW. GW wrote the final paragraph of the postscript.

[1] This letter has not been found. The "confidential friend" was the double spy Elijah Hunter.

[2] See GW to Hunter, 12 August.

[3] For this return, see GW to Hunter, 12 Aug., n.2.

[4] For more on GW's assessment of Hunter, see GW to Jay, 7 Sept. (first letter); see also Jay to GW, 25 August. For GW's additional cautions to Howe regarding employment of Hunter, see GW to Howe, 21 August.

[5] This letter has not been found.

[6] See GW to Howe, 9 Aug. (second letter).

[7] This may have been the *Pennsylvania Packet or the General Advertiser* (Philadelphia) of 12 Aug., which published an "Extract of a letter from Baltimore, dated July 22," giving the report of a "Captain Waters from St. Eustatia." The report concluded that, in the naval combat off Grenada on 6 July between the fleets of French vice admiral d'Estaing and British vice admiral John Byron, "the French have undoubtedly drubbed the English." The same issue of *The Packet als*o carried an extensive account of the battle taken from the *Martinique Gazette,* also of 22 July, which reported somewhat erroneously that d'Estaing had achieved a "victory, one of the most distinguished which the French navy has ever obtained." For the actual results of this combat, see John Jay to GW, 10 Aug., n.1.

**Cite as:** *The Papers of George Washington Digital Edition.* Charlottesville: University of Virginia Press, Rotunda, 2008.
**Canonic URL:** http://rotunda.upress.virginia.edu/founders/GEWN-03-22-02-0139 [accessed 12 Nov 2017]
**Original source:** Revolutionary War Series (16 June 1775–31 December 1783 [in progress]), Volume 22 (1 August–21 October 1779)

**Stanford Law Review**

Desegregation as a Cold War Imperative
Author(s): Mary L. Dudziak
Source: *Stanford Law Review*, Vol. 41, No. 1 (Nov., 1988), pp. 61-120
Published by: Stanford Law Review
Stable URL: http://www.jstor.org/stable/1228836
Accessed: 12-11-2017 16:43 UTC

**REFERENCES**

Linked references are available on JSTOR for this article:
http://www.jstor.org/stable/1228836?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at http://about.jstor.org/terms



*Stanford Law Review* is collaborating with JSTOR to digitize, preserve and extend access to *Stanford Law Review*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

# Desegregation as a Cold War Imperative

## Mary L. Dudziak[*]

It is in the context of the present world struggle between freedom and tyranny that the problem of racial discrimination must be viewed.

— Brief for the United States as Amicus Curiae, *Brown v. Board of Education* [1]

## I. INTRODUCTION

At the height of the McCarthy era, when Congressional committees were exposing "communist infiltration" in many areas of American life,[2] the Supreme Court was upholding loyalty oath requirements,[3]

[*]  Associate Professor, University of Iowa College of Law. A.B., 1978, University of California, Berkeley; J.D., 1984, Yale; M.A., M.Phil., 1986, Yale.

For their helpful comments and other important support for my work, I am grateful to Brooks Ammerman, Ian Ayres, David Baldus, Derrick Bell, Steve Burton, Richard Buxbaum, Michael Green, Jack Greenberg, Herb Hovenkamp, Carolyn Jones, Laura Kalman, Rick Matasar, and Ellen Schrecker. I would also like to thank those who attended my faculty seminars at the Univeristy of Iowa College of Law and Tulane Law School, and my presentation at the 1987 American Society for Legal History Conference. Their questions and ideas contributed to this article. Sally Marks at the National Archives and Carol Briley at the Truman Library provided valuable assistance with archival research. Funding for research was provided by the American Historical Association in the the form of a Littleton-Griswold Research Grant, The University of Iowa, and the Iowa Law foundation. I am eternally grateful to University House at the University of Iowa and to the History Department at the University of California, Santa Barbara for providing me with quiet places to write. I would like to thank my research assistants, Leanne Lay, Peter Parry, Bill Hoekstra, and Penny Arnold, my secretary, Rita Jansen, and the Iowa Law Library staff, for the parts they have played in this effort.

1.  Brief for the United States as Amicus Curiae at 6, Brown v. Board of Education, 347 U.S. 483 (1954).

2.  *See* V. NAVASKY, NAMING NAMES (1980); INTERNAL SECURITY MANUAL, S. DOC. NO. 47, 83rd Cong., 1st Sess. 221-26 (1953) (lists dozens of hearings on communists and subversives concerning infiltration of minority groups, infiltration of labor unions, communist activities in Cincinnati, communist espionage, subversion of the telegraph industry, communist infiltration of veterans groups, communist underground printing facilities, and other matters).

3.  *See* Gerende v. Board of Supervisors, 341 U.S. 56 (1951) (unanimously upheld Maryland statute that required candidates for public office to swear out affidavits that they were not engaged in seeking the violent overthrow of the government, and were not knowing members of an organization with such goals); Garner v. Board of Public Works, 341 U.S. 716 (1951) (sustained Los Angeles ordinance that required city employees to swear they had not belonged to an organization advocating the overthrow of the government within the last five years); Adler v. Board of Education, 342 U.S. 485 (1952) (upheld New York statute that barred from employment in the public schools anyone belonging to an organization listed by the state board of regents as advocating the violent overthrow of the government).

Notwithstanding its willingness to uphold many "loyalty" programs, the court did impose some constitutional limits. *See* Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123 (1951) (divided Court overturned dismissal of Committee's complaint concerning its inclusion on the Attorney General's list of subversive organizations); Wieman v. Updegraff, 344

61

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

and the executive branch was ferreting out alleged communists in government,[4] the U.S. Attorney General filed a pro-civil rights brief in what would become one of the most celebrated civil rights cases in American history: *Brown v. Board of Education*.[5] Although seemingly at odds with the restrictive approach to individual rights in other contexts,[6] the U.S. government's participation in the desegregation cases during the McCarthy era was no anomaly.

In the years following World War II, racial discrimination in the United States received increasing attention from other countries. Newspapers throughout the world carried stories about discrimination against non-white visiting foreign dignitaries, as well as against American blacks. At a time when the U.S. hoped to reshape the postwar world in its own image, the international attention given to racial segregation was troublesome and embarrassing. The focus of American foreign policy at this point was to promote democracy and to "contain" communism. However, the international focus on U.S. racial problems meant that the image of American democracy was tarnished. The apparent contradictions between American political ideology and practice led to particular foreign policy difficulties with countries in Asia, Africa and Latin America. U.S. government officials realized that their ability

---

U.S. 183 (1952) (Oklahoma statute requiring state employees to swear they had not belonged in the last five years to an organization listed by the Attorney General as a "communist front" or "subversive" violated Due Process Clause of the Fourteenth Amendment, since as construed by the Oklahoma Supreme Court it punished membership by those unaware of organization's activities).

4. On March 22, 1947, President Harry S Truman signed Exec. Order No. 9835, 12 Fed. Reg. 1935, which required loyalty investigations for all persons entering employment in Executive Branch departments and agencies. Subsequently, on June 23, 1947, ten Department of State officials were summarily dismissed because of their alleged involvement with an unnamed foreign power. R. FREELAND, THE TRUMAN DOCTRINE AND THE ORIGINS OF McCARTHYISM 203-04 (1972). In December 1947, the Attorney General issued a list of "fascist, Communist, or subversive" organizations that was used by government and private employers to measure loyalty. *Id.* at 207-16. On April 28, 1951, Truman issued Exec. Order No. 10241, 16 Fed. Reg. 3690, tightening standards for reviewing loyalty from "reasonable grounds . . . for the belief that the person is disloyal to the government" to "reasonable doubt as to the loyalty of the individual involved to the Government." The result was that 565 employees cleared under the earlier standard were again investigated. E. BONTECOU, THE FEDERAL LOYALTY-SECURITY PROGRAM 26-30, 68-72 (1953).

5. 347 U.S. 483 (1954). The Justice Department's brief was filed in December 1952, in the final weeks of the Truman Administration. *See* Elman, *The Solicitor General's Office, Justice Frankfurter, and Civil Rights Litigation, 1946-1960: An Oral History*, 100 HARV. L. REV. 817, 826-27 (1987). At that time, Senator Joseph R. McCarthy was preparing to take over the Committee on Government Operations, as well as its Permanent Subcommittee on Investigations, which was quickly dubbed the "McCarthy Subcommittee." McCarthy used the Committee as a vehicle to continue his investigations of alleged subversives. *See* T. REEVES, THE LIFE AND TIMES OF JOE McCARTHY: A BIOGRAPHY 459-62 (1982); R. ROVERE, SENATOR JOE McCARTHY 185-91 (1959). By the time *Brown* was decided on May 17, 1954, McCarthy's influence was on the decline. On that very day, President Eisenhower called a halt to the Army-McCarthy hearings. *See* N.Y. Times, May 18, 1954, at 1, col. 1. It was McCarthy's widely televised behavior during the hearings that initiated his fall from grace. *See* T. REEVES, *supra*, at 595-637; R. ROVERE, *supra*, at 215-31.

6. *See* T. EMERSON & D. HABER, POLITICAL AND CIVIL RIGHTS IN THE UNITED STATES at vii (1st ed. 1952).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

to sell democracy to the Third World was seriously hampered by continuing racial injustice at home. Accordingly, efforts to promote civil rights within the United States were consistent with, and important to, the more central U.S. mission of fighting world communism.

The literature on desegregation during the 1940s and 1950s has failed to consider the subject within the context of other important aspects of American cultural history during the postwar era. Most scholars seem to assume that little outside the subject of race relations is relevant to the topic.[7] As a result, historians of *Brown* seem to write

---

7. As Gerald Horne has noted, "the fact that the *Brown* ruling came in the midst of a concerted governmental campaign against international and domestic communism is one of the most overlooked aspects of the decision." G. HORNE, BLACK AND RED: W.E.B. DU BOIS AND THE AFRO-AMERICAN RESPONSE TO THE COLD WAR, 1944-1963, at 227 (1986).

The literature on school desegregation is very rich in many other respects. Scholars have studied desegregation in a variety of different settings. *See* T. FREYER, THE LITTLE ROCK CRISIS: A CONSTITUTIONAL INTERPRETATION (1984) (Little Rock, Ark.); D. KIRP, JUST SCHOOLS: THE IDEA OF RACIAL EQUALITY IN AMERICAN EDUCATION (1982) (San Francisco Bay Area, Calif.); J. LUKAS, COMMON GROUND (1985) (Boston, Mass.); B. SMITH, THEY CLOSED THEIR SCHOOLS: PRINCE EDWARD COUNTY, VIRGINIA, 1951-1964 (1965). They have focused on different kinds of participants in desegregation efforts: courts and judges, *see* J. BASS, UNLIKELY HEROES (1981); J. PELTASON, FIFTY-EIGHT LONELY MEN (1961); the NAACP and its lawyers, *see* R. KLUGER, SIMPLE JUSTICE (1975); M. TUSHNET, THE NAACP'S LEGAL STRATEGY AGAINST SEGREGATED EDUCATION, 1925-1950 (1987), organized opponents to desegregation, *see* F. WILHOIT, THE POLITICS OF MASSIVE RESISTANCE (1973), federal government officials, *see* Mayer, *With Much Deliberation and Some Speed: Eisenhower and the* Brown *Decision*, 52 J. SOUTHERN HIST. 43 (1986), and school board members, *see* Dudziak, *The Limits of Good Faith: Desegregation in Topeka, Kansas, 1950-56*, 5 LAW & HIST. REV. 351 (1987).

Some commentators have followed the development of Supreme Court case law. *See* B. SCHWARTZ, SWANN'S WAY: THE SCHOOL BUSING CASE AND THE SUPREME COURT (1986); J. WILKINSON, FROM BROWN TO BAKKE: THE SUPREME COURT AND SCHOOL INTEGRATION, 1954-1978 (1979); S. WASBY, A. D'AMATO & R. METRAILER, DESEGREGATION FROM BROWN TO ALEXANDER: AN EXPLORATION OF SUPREME COURT STRATEGIES (1977). Others have viewed desegregation from the perspective of community-level decisionmaking. *See* J. LUKAS, *supra*; *see also* J. HOCHSCHILD, THE NEW AMERICAN DILEMMA: LIBERAL DEMOCRACY AND SCHOOL DESEGREGATION (1984).

Approaching desegregation from a variety of different empirical and political perspectives, scholars have drawn different kinds of lessons. Some have seen *Brown* as the Supreme Court's highest moment, *see, e.g.,* R. KLUGER, *supra*, while others have viewed it as troublesome. *See, e.g.,* R. WOLTERS, THE BURDEN OF BROWN: THIRTY YEARS OF SCHOOL DESEGREGATION (1984).

Despite the richness and variety within this body of literature, it stands apart from other studies of postwar American culture. Little or no mention is made of the anticommunist ideology which so powerfully pervaded political discourse following World War II, *see* R. PELLS, THE LIBERAL MIND IN A CONSERVATIVE AGE (1985), even though anticommunist rhetoric appears consistently in primary historical documents relating to desegregation. *See, e.g.,* Brief for the United States as Amicus Curiae, Brown v. Board of Education, 347 U.S. 483 (1954); N.Y. Times, May 18, 1954, at 1, col. 7; H. TALMADGE, YOU AND SEGREGATION (1955). The failure to discuss initial desegregation efforts within the broader historical context in which they occurred has meant that scholars have been unable to fully examine the question of how *Brown* happened when it did. Since this widely heralded advance in the area of civil rights occurred during a period regarded as a time when civil rights were generally repressed, the issue of causality and timing is a very provocative historical question.

There are, of course, great differences of opinion within the literature on school desegregation. The debates tend to center on the proper role for courts in the process of social change. *Compare* J. PELTASON, *supra* (celebrating judicial activism) *with* R. WOLTERS, *supra* (criticizing judicial activism).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

about a different world than do those who consider other aspects of postwar American culture. The failure to contextualize *Brown* reinforces the sense that the movement against segregation somehow happened in spite of everything else that was going on. During a period when civil liberties and social change were repressed in other contexts, somehow, some way, *Brown* managed to happen.

This study represents an effort to begin to examine the desegregation cases within the context of the cultural and political period in which they occurred. The wealth of primary historical documents on civil rights during the Cold War that explicitly draw connections between civil rights and anticommunism suggests that an effort to examine desegregation within the context of Cold War American culture may be more than an interesting addition to a basically well told tale. It may ultimately cause us to recast our interpretations of the factors motivating the critical legal and cultural transformation that *Brown* has come to represent.

In one important deviation from the dominant trend in scholarship on desegregation, Derrick Bell has suggested that the consensus against school segregation in the 1950s was the result of a convergence of interests on the part of whites and blacks, and that white interests in abandoning segregation were in part a response to foreign policy concerns and an effort to suppress the potential of black radicalism at home. According to Bell, without a convergence of white and black interests in this manner, *Brown* would never have occurred.[8] While Bell's work is important and suggestive, neither Bell nor other scholars have developed this approach historically.[9]

One need not look far to find vintage '50s Cold War ideology in

---

8. Bell, *Brown v. Board of Education and the Interest-Convergence Dilemma*, 93 HARV. L. REV. 518 (1980), *reprinted in* D. BELL, SHADES OF BROWN: NEW PERSPECTIVES ON SCHOOL DESEGREGATION (1980) [hereinafter Bell, *Convergence Dilemma*]; *see also* Bell, *Racial Remediation: An Historical Perspective on Current Conditions*, 52 NOTRE DAME L. REV. 5, 12 (1976) [hereinafter Bell, *Racial Remediation*].

9. There have been occasional, brief references to the relevance of Cold War foreign affairs to *Brown*. For example, after noting the foreign policy-related arguments in the *Brown* briefs, Albert Blaustein and Clarence Ferguson suggest that "[i]t is inconceivable that the international discord between East and West had no effect on the nine men who were to determine a national discord between North and South." A. BLAUSTEIN AND C. FERGUSON, JR., DESEGREGATION AND THE LAW: THE MEANING AND EFFECT OF THE SCHOOL SEGREGATION CASES 11-12 (1957). *See also* G. HORNE, *supra* note 7 at 227, 277; W.E.B. DU BOIS, THE AUTOBIOGRAPHY OF W.E.B. DU BOIS 333 (1968); C. VANN WOODWARD, THE STRANGE CAREER OF JIM CROW 130-32 (3d. rev. ed. 1974). In addition, historians of the Truman Administration have occasionally noted the relevance of foreign affairs to other Truman-era civil rights efforts. *See* W. BERMAN, THE POLITICS OF CIVIL RIGHTS IN THE TRUMAN ADMINISTRATION 66, 77-78 (1970); Bernstein, *The Ambiguous Legacy: The Truman Administration and Civil Rights*, in POLITICS AND POLICIES OF THE TRUMAN ADMINISTRATION 269, 275, 279-80 (B. Bernstein ed. 1970.); *see also* Kellogg, *Civil Rights Consciousness in the 1940s*, 42 THE HISTORIAN 18, 31-36 (1979); Solomon, *Black Critics of Colonialism and the Cold War*, in T. PATERSON, COLD WAR CRITICS: ALTERNATIVES TO AMERICAN FOREIGN POLICY IN THE TRUMAN YEARS 205-39 (1971). These references have generally relied on Cold War rhetoric in the desegregation briefs, and/or statements in the media. They have not examined State Department records documenting the Truman administration's concern about the effect of race discrimination on U.S. foreign policy.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

primary historical documents relating to *Brown*. For example, the amicus brief filed in *Brown* by the U.S. Justice Department argued that desegregation was in the national interest in part due to foreign policy concerns. According to the Department, the case was important because "[t]he United States is trying to prove to the people of the world, of every nationality, race and color, that a free democracy is the most civilized and most secure form of government yet devised by man."[10] Following the decision, newspapers in the United States and throughout the world celebrated *Brown* as a "blow to communism"[11] and as a vindication of American democratic principles.[12] As was true in so many other contexts during the Cold War era, anticommunist ideology was so pervasive that it set the terms of the debate on all sides of the civil rights issue.[13]

In addition to its important consequences for U.S. race relations, *Brown* served U.S. foreign policy interests. The value of a clear Supreme Court statement that segregation was unconstitutional was recognized by the State Department. Federal government policy on civil rights issues during the Truman Administration was framed with the international implications of U.S. racial problems in mind. And through a series of amicus briefs detailing the effect of racial segregation on U.S. foreign policy interests, the Administration impressed upon the Supreme Court the necessity for world peace and national security of upholding black civil rights at home.

As has been thoroughly documented by other historians, the federal government's efforts in the late 1940s and early 1950s to achieve some level of racial equality had much to do with the personal commitment on the part of some in government to racial justice, and with the consequences of civil rights policies for domestic electoral politics.[14] In addi-

---

10. Brief for the United States as Amicus Curiae at 6, Brown v. Board of Education, 347 U.S. 483 (1954).

11. *See* N.Y. Times, May 18, 1954, at 19, col. 4.

12. *See* text accompanying notes 308-319 *infra*.

13. *See* text accompanying notes 73-79, 308-328 *infra*.

14. The Truman administration's record on civil rights has been the subject of much scholarly debate. Historians have differed in the degree to which they have viewed efforts to further black civil rights to be motivated by political considerations, rather than a moral commitment to equality. *See generally* Sitkoff, *Years of the Locust: Interpretations of the Truman Presidency Since 1965*, in THE TRUMAN PERIOD AS A RESEARCH FIELD: A REAPPRAISAL, 1972, at 75 (R. Kirkendall ed. 1974) [hereinafter THE TRUMAN PERIOD AS A RESEARCH FIELD]. Some scholars have celebrated Truman's accomplishments. *See* R. DALFIUME, DESEGREGATION OF THE U.S. ARMED FORCES: FIGHTING ON TWO FRONTS, 1939-1953 (1969); D. McCOY & R. RUETTEN, QUEST AND RESPONSE: MINORITY RIGHTS AND THE TRUMAN ADMINISTRATION (1973). Others have focused on the limits to Truman-era civil rights reform, and the political considerations motivating Truman's actions. *See* W. BERMAN, *supra* note 9 at 239. Alonzo Hamby put it this way:

> No historian can precisely define Truman's motivation on so complex and emotional an issue; it was probably not entirely clear even to Truman. It seems fair to say that he really believed in the principles of equal rights and equal opportunity. But it is also just to observe that he was well aware of the importance of the black vote. It is reasonable to assume that he acted in part out of a sense of self-interest but more

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

tion to these motivating factors, the effect of U.S. race discrimination on international relations during the postwar years was a critical motivating factor in the development of federal government policy. Without attention to the degree to which desegregation served important foreign policy interests, the federal government's posture on civil rights issues in the postwar years cannot be fully understood.

This article begins with a discussion of the idea that racism was "un-American," a notion that informed scholarship, political discourse, and popular culture during World War II and after. I then contrast this ideology with the reality of race discrimination during this period. The article briefly considers postwar anticommunism in foreign and domestic policy and the Truman Administration's stance on civil rights, to set the stage on which the intersection between foreign policy, civil rights, and anticommunism played itself out. I then consider the international attention given to U.S. race discrimination, demonstrating: 1) that other countries were attentive to the issue and concerned about it, 2) that the Soviet Union took advantage of this American weakness, and 3) that the State Department considered the issue to be a serious foreign policy problem.

Next, I address the Truman Administration's responses to the problem, particularly the Justice Department's arguments in civil rights amicus briefs that racial segregation harmed U.S. foreign policy interests, and that Court decisions upholding segregation would have negative consequences for world peace. I then discuss the positive effect the *Brown* decision had on international relations. Finally, I conclude by suggesting that this article demonstrates Derrick Bell's interest-convergence thesis: The consensus against racial segregation in the 1950s resulted from a convergence of interests on the part of whites and persons of color. And at least as far as the Truman Administration was concerned, the Cold War imperative was an important impetus for civil rights reform.[15]

## II. RACISM AND AMERICAN DEMOCRACY

### A. *An American Dilemma*

During World War II, many believed that racism was fundamentally at odds with the principles of American democracy.[16] Because racism

---

important that he interpreted his self interest in a fashion both astute and morally enlightened.
A. HAMBY, LIBERALISM AND ITS CHALLENGERS: FDR TO REAGAN 66-67 (1985).

15. In arguing that foreign policy imperatives motivated Truman administration civil rights efforts, I do not intend to suggest that moral considerations and political pressure from blacks were unimportant. Rather, Cold War foreign policy was one critical factor, among others.

16. *See* Kellogg, *supra* note 9, at 18. In one example of public attitudes, a July 1944 national survey of college students asked respondents their opinion on the following statement: "Our postwar policy should be to end discrimination against the Negro in schools,

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

was considered to be inconsistent with all that the United States stood for, racially discriminatory practices posed particular problems for the nation. Swedish sociologist Gunnar Myrdal explored this theme in his important 1944 study, *An American Dilemma*.[17] For Myrdal, American racism was a dilemma not only in absolute moral terms. Race discrimination posed a particular problem for Americans because it was at odds with the "American creed" and the tenets of American democracy. According to Myrdal, all Americans shared a belief in a creed consisting of "ideals of the essential dignity of the individual human being, of the fundamental equality of all men, and of certain inalienable rights to freedom, justice, and a fair opportunity . . . ."[18]

Myrdal believed that the American dilemma had, in recent years, "acquired tremendous international implications. . . . The situation is actually such that any and all concessions to Negro rights in this phase of the history of the world will repay the nation many times, while any and all injustices inflicted upon them will be extremely costly."[19] Addressing the "color angle to this War," Myrdal noted that "America, for its international prestige, power, and future security, needs to demonstrate to the world that American Negroes can be satisfactorily integrated into its democracy."[20]

An anti-racist posture would have strategic consequences, for "[i]t is commonly observed that the mistrust of, or open hostility against, the white man by colored people everywhere in the world has greatly increased the difficulties for the United Nations[21] to win this War." As Pearl S. Buck had written, "Japan . . . is declaring in the Philippines, in China, in India, Malaya, and even Russia that there is no basis for hope that colored peoples can expect any justice from the people who rule in the United States. . . . Every lynching, every race riot, gives joy to Japan. . . . 'Look at America,' Japan is saying to millions of listening ears. 'Will White Americans give you equality?' "[22] Accordingly, Buck argued, "[w]e cannot . . . win this war without convincing our colored allies—who are most of our allies—that we are not fighting for ourselves as continuing superior over colored peoples."[23] Similarly, Myrdal noted that "[t]he German radio often mentions America's harsh treatment of Negroes in its propaganda broadcasts to European

---

colleges and universities." 68% approved of the statement, 18% disapproved, and 14% were uncertain. H. Cantril, Public Opinion 1935-46 509 (1951).

   17. G. Myrdal, An American Dilemma: The Negro Problem and Modern Democracy (1944); *see generally* D. Southern, Gunnar Myrdal and Black-White Relations: The Use and Abuse of *An American Dilemma*, 1944-1969 (1987).

   18. G. Myrdal, *supra* note 17, at 4.

   19. *Id.* at 1015.

   20. *Id.* at 1016.

   21. Myrdal's use of the term "United Nations" refers to the Allies in World War II. *See* S. Fenichell, The United Nations: Design For Peace 2 (1960).

   22. *Quoted in* G. Myrdal, *supra* note 17, at 1016.

   23. *Quoted in id.* at 1017.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

peoples."[24]

Notwithstanding the weightiness of the problem, Myrdal was cautiously optimistic about the future.

> When in this crucial time the international leadership passes to America, the great reason for hope is that this country has a national experience of uniting racial and cultural diversities and a national theory, if not a consistent practice, of freedom and equality for all. What America is constantly reaching for is democracy at home and abroad. The main trend in its history is the gradual realization of the American Creed.[25]

Myrdal believed that "the Negro problem is not only America's greatest failure but also America's incomparably great opportunity for the future."[26] By bringing about racial equality, the U.S. would enhance its posture at home and abroad. In so doing, "[t]he century-old dream of American patriots, that America should give to the entire world its own freedoms and its own faith, would come true. America can demonstrate that justice, equality and cooperation are possible between white and colored people."[27]

## B. *World War II as a War Against Racism*

In 1944, democracy was, to many Americans, much more than an abstract idea. It was a principle Americans were dying for. And although U.S. soldiers fought and died in Jim Crow trenches in a segregated army,[28] part of the meaning of the democracy they fought for was its incompatibility with Nazi racism and anti-Semitism.[29]

Frank Sinatra brought this idea—the antipathy of prejudice to

---

24. *Id.* at 1016 note a. Even after the war, Myrdal believed that the international implications of domestic racism would remain significant. Declining white birthrates coupled with population growth in the "colored nations" meant that "whites will, therefore, from now on become a progressively smaller portion of the total world population." *Id.* at 1017. Perhaps because he felt that "Russia cannot be reckoned on to adhere to white supremacy," *id.* at 1018, Myrdal noted that "[i]f we except the Russian peoples, who are still rapidly increasing, the rapid change in proportion [of population] stands out still more dramatically." *Id.* at 1017. In addition, the industrialization of Japan, Russia and China suggested that "the 'backward' countries, where most colored people live, are going to become somewhat industrialized." *Id.* Industrialization would lead to an enhanced capacity for producing war materials and for warfare. Consequently,

> within a short period the shrinking minority of white people in our Western lands will either have to succumb or to find ways of living on peaceful terms with colored people. If white people, for their own preservation, attempt to reach a state in which they will be tolerated by their colored neighbors, equality will be the most they will be strong enough to demand.

*Id.* at 1018.

25. *Id.* at 1021.

26. *Id.*

27. *Id.*

28. *See* A. BUCHANAN, BLACK AMERICANS IN WORLD WAR II, at 84-88, 98-99 (1977); N. WYNN, THE AFRO-AMERICAN AND THE SECOND WORLD WAR 24 (1975).

29. *See* Kellogg, *supra* note 9, at 30-33. Notwithstanding the abstract commitment to equality, racism was important to the way World War II was fought. *See generally* J. DOWER, WAR WITHOUT MERCY: RACE AND POWER IN THE PACIFIC WAR (1986).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

American democracy—to the silver screen in the World War II era short film "The House I Live In."[30] In the film, Sinatra, playing himself doing a recording session, took a break between two songs. He stepped out into an alley where he saw a group of ten little boys chasing a Jewish boy. Sinatra broke up the scuffle, asking "What's going on here? Why the gang war?" Referring to the object of the group's fury, one boy said, "We don't like his religion." "His religion?" Sinatra replied. "You must be a bunch of those Nazi werewolves I've been reading about." "Mister, are you screwy?" "Not me, I'm an American." "What do you think we are?" "Nazis."

Sinatra then attempted to explain to the boys that prejudice was un-American. He discussed anti-Semitism in the context of the war effort. At one point he described the bombing of a "Jap battleship" by an American plane with Presbyterian and Jewish crew members. After the ship sank, "every American threw his head back and felt much better. . . . You think maybe they should have called the bombing off because they had different religions? Think about that, fellas. Use your good American heads." Sinatra then explicitly tied his vision of America to racial harmony, singing "all races and religions, that's America to me."[31] Predictably, the film ended with at least some of the little boys having learned their lesson.[32]

The theme that prejudice was un-American was prominent in war-

---

30. *The House I Live In* (RKO 1945) (transcript on file with the *Stanford Law Review*). I will always be grateful to Steve Wizner for telling me about this film.

Sinatra's involvement in the film stemmed from a number of sources. Sinatra personally identified with the problem of prejudice due to anti-Italian sentiments directed at him when he was growing up. In addition, though not much of a reader, Sinatra became interested in books in the early 1940s, and read Myrdal's *American Dilemma, see* note 17 *supra,* and other books on prejudice. K. KELLEY, HIS WAY: THE UNAUTHORIZED BIOGRAPHY OF FRANK SINATRA 115-16 (pap. ed. 1987); *see also* D. SOUTHERN, *supra* note 17, at 108. According to a biographer, this reading "made a powerful impression on Frank, who embraced their teachings on the evils of racial prejudice and promised to dedicate himself to righting social wrongs. 'I'm in it for life,' he said. 'After all, I'm only coming out for the basic American ideal, and who can object to that?' " K. KELLEY, *supra,* at 116. There was also a box-office motive. Sinatra's reputation was occasionally in need of attention. Accordingly, his agents encouraged his " 'newly developed social conscience, for we could see that along this road, except in the Deep South, it would certainly set Frank aside as a "citizen of the community" as well as being a star. We convinced him to make . . . *The House I Live In,* which caused a lot of people to sit up and take notice," *Id.* at 116 (quoting Jack Keller). Sinatra received a special Academy Award for the film. *Id.*

31. *The House I Live In, supra* note 30. In his discussion with the boys, Sinatra also referred directly to prejudice against persons with immigrant backgrounds. "My dad came from Italy, but I'm an American. But should I hate your father because he came from Ireland or France or Russia? Wouldn't I be a first class fathead?" The contradictions in the film are quite apparent. Although intolerance of Italians was discouraged, the same was not true of Japanese, although both nations fought against the United States in the war. Sinatra used the word "Jap" every time he referred to them. *Id.*

32. At the end of the film the boys waved goodbye to Sinatra and, as they left, one boy picked up the Jewish boy's fallen books. Walking together, the two followed the group offstage. The film closed with the music from the final bars of "America the Beautiful." The words that would accompany the score are: "And crown thy good with brotherhood from sea to shining sea." *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

time popular culture.[33]  For example, on May 31, 1945, a New York radio commentator read Chaplain Roland B. Gittelsohn's Iwo Jima memorial address on the air.[34]  "Here lie men who loved America[,]," he said.

> Here lie officers and men, Negroes and whites, rich and poor, together. Here are Protestants, Catholics and Jews, together. Here no man prefers another because of his faith, or despises him because of his color. . . . Among these men there is no discrimination, no prejudice, no hatred. Theirs is the highest and purest democracy.[35]

These deaths in the name of democracy left the living with a duty. "Whoever of us lifts his hand in hate against a brother, or thinks himself superior to those who happen to be in the minority, makes of this ceremony, and of the bloody sacrifice it commemorates, an empty, hollow mockery."[36]  The living, Gittelsohn continued, "now dedicate ourselves, to the right of Protestants, Catholics and Jews, of white men and Negroes alike, to enjoy the democracy for which all of them have paid the price."[37]

### C.  World War II Era Racism

Notwithstanding the attention given to the "un-American" nature of prejudice, in the 1940s race discrimination was a characteristic experience for persons of color in the U.S.[38]  Pervasive discrimination in

---

33.  See Kellogg, supra note 16 at 30-33. Although the abstract concept that prejudice was unAmerican was an important war-time theme, blacks continued to be cast in stereotyped roles in war-time movies, and films explicitly dealing with racial themes were thought to be too controversial. See Koppes & Black, Blacks, Loyalty, and Motion-Picture Propaganda in World War II, 73 J. Am. Hist. 383, 391-406 (1986).

34.  Rabbi on Iwo (pamphlet), President's Committee on Civil Rights Pamphlets File, Box 28, Papers of the President's Committee on Civil Rights, Harry S Truman Library (on file with the Stanford Law Review).

35.  Id. at 4.

36.  Id. at 4-5.

37.  Id. at 5.

38.  Japanese-Americans and resident aliens were a special focus of war-time racism, particularly following Pearl Harbor. Whereas immigrants from Germany and Italy remained at liberty during the war, American citizens as well as resident aliens of Japanese descent living on the West Coast were excluded from this area and interned in camps in remote areas of the West. The U.S. government claimed that some or even all persons of Japanese descent held a primary loyalty to Japan, even if they were U.S. citizens who had never lived outside the United States. The imputed loyalty was race-based. See U.S. Department of War, Final Report: Japanese Evacuation from the West Coast, 1942, at 34 (1943 & photo. reprint 1978); Report of the Commission on Wartime Relocation and Internment of Civilians, Personal Justice Denied 4-5 (1982); see also P. Irons, Justice at War (1983).

Moreover, many government officials argued that even if most Japanese residents posed no threat to national security, lack of time and Japanese racial characteristics made separating the loyal from the disloyal impossible in the wake of Pearl Harbor. See Preliminary Report of Select Committee Investigating National Defense Migration on Evacuation of Military Area, H.R. Rep. No. 1911, 77th Cong., 2d Sess. 14 (1942). This argument appears to have heavily influenced the Supreme Court in its decisions upholding the curfew and exclusion aspects of the internment program. See Hirabayashi v. United States, 320 U.S. 81, 99 (1943); Korematsu v. United States, 323 U.S. 214, 218-19 (1944).

The convictions of Hirabayashi and Korematsu have recently been overturned in coram

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 407 of 482

employment had created a segregated labor market.[39]  In 1940, 62.2 percent of black men were farmers, farm laborers and other laborers, while only 28.5 percent of white men held such jobs.  Approximately 30 percent of white men held jobs in professional, semiprofessional, proprietary, managerial, and clerical or sales categories, while approximately 5 percent of black men held such jobs.  In addition, 15.6 percent of white men and 4.4 percent of black men were skilled craft workers.[40] Among women who worked outside the home in 1940, 56.7 percent of black women in the northern United States held jobs in domestic service, while only 12.9 percent of white women held such jobs; 51.7 percent of white women held jobs in professional, managerial, sales, or clerical occupations, while only 9.6 percent of black women were employed in such jobs.[41]

Racial minorities made significant gains during World War II when increased production in war industries led to a labor shortage.[42]  Nevertheless, segregation and discrimination continued to be central characteristics of the labor market.  For example, while white women were encouraged to enter the factory, black women were encouraged to take up the laundry, cafeteria, and domestic service work whites had abandoned.[43]  In late 1942, defense plants in the Detroit area had a female work force of ninety-six thousand.  Of that number, only one hundred female production employees were black.[44]  In private and public employment, racial minorities were concentrated in war-related jobs. Consequently, there was a concern that postwar reconversion would affect minorities disproportionately.[45]

---

nobis actions, based on recently discovered documents showing that government officials withheld evidence from the Supreme Court indicating that the claims of military necessity for the internment program were questionable or based on racial prejudice.  *See* Hirabayashi v. United States, 627 F. Supp. 1445 (W.D. Wash. 1986); Korematsu v. United States, 584 F. Supp. 1406 (N.D. Cal. 1984).

39.  In addition, within job categories, blacks earned less than whites.  In July 1942, the average hourly wage for unskilled laborers was 47.4 cents for blacks and 65.3 cents for whites. Following the war, an American Federation of Labor study of twenty-six primarily Southern communities found that the average weekly income of white veterans was 30 to 78% above the average weekly income of black veterans.  PRESIDENT'S COMMITTEE ON CIVIL RIGHTS, TO SECURE THESE RIGHTS 57 (1947) [hereinafter PRESIDENT'S COMMITTEE].

40.  *Id.*

41.  E. MCDONAGH & E. RICHARDS, ETHNIC RELATIONS IN THE UNITED STATES 144 (1953).

42.  For example, employment of blacks in the federal government jumped from a prewar level of 40,000 to 300,000 in 1944.  In 1938, 90% of blacks in federal employment held custodial jobs.  As of 1944, 60% held clerical and professional positions.  *Id.* at 39.

43.  J. JONES, LABOR OF LOVE, LABOR OF SORROW: BLACK WOMEN, WORK AND THE FAMILY FROM SLAVERY TO THE PRESENT 237 (1985); *see also* P. GIDDINGS, WHEN AND WHERE I ENTER: THE IMPACT OF BLACK WOMEN ON RACE AND SEX IN AMERICA 235-38 (1984).

44.  J. JONES, *supra* note 43, at 239.

45.  PRESIDENT'S COMMITTEE, *supra* note 39, at 59, 61.  In addition, once the war ended in 1945, war-era restrictions on discrimination by government contractors went the way of war-related contracts.  According to the Fair Employment Practices Committee, "the wartime gains of Negro, Mexican American, and Jewish workers are being lost through an unchecked revival of discriminatory practices."  *Id.* at 59.  Between July 1945 and April 1946, unemployment rose twice as much for nonwhite workers as for whites: white unemployment rose ap-

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

A particularly egregious area of discrimination by the federal government was in the military. Black men who wished to serve were often excluded by caps on black enlistment, and those who did enlist were segregated into particular job categories.[46] For example, blacks in the Marine Corps could only serve in the steward's branch.[47] In the Navy, almost 80 percent of blacks were cooks, stewards, and steward's mates, as compared with less than 2 percent of whites in such positions.[48] In the Army, there was one white officer for every seven white enlisted men, and one black officer for every seventy black enlisted men.[49] Blacks and other racial minorities were often excluded from combat duty, and when they did see combat, they fought in segregated units.[50]

Black women also volunteered for military service, and encountered similar barriers. Approximately four thousand black women served in the Women's Army Corps, 10 percent of all WACs. However, in the WACs and the Army Nurse Corps, black women were assigned to segregated units and were rarely sent overseas. Black women were barred from the Women's Reserves of the Navy until October 1944.[51] As with male military personnel, tasks were often assigned along racial lines. Protest against such different treatment was greeted harshly. When six black WACs refused to do kitchen and custodial work while white WACs did motor pool and other non-custodial work, they were court-martialed.[52]

Segregation and discrimination affected many other areas of life in the 1940s, from voting, where poll taxes and white primaries disenfranchised most Southern blacks,[53] to housing, where racially restrictive covenants were widespread, affecting, for example, approximately 80 percent of the land in the city of Chicago.[54]

Even though the war tended to mute domestic criticism of problems in the U.S., black protest against race discrimination continued. Black Americans called for a "double V"—victory abroad against fascism, and victory at home against racism.[55] However, the government's wartime posture toward racial protest was that such dissension impeded the war effort. A justification for postponing action was that it was more impor-

---

proximately one and one-half times, while nonwhite unemployment more than tripled. *Id.* at 61.

46. *Id.* at 41.
47. *Id.*
48. *Id.* at 45.
49. *Id.* at 44.
50. *See* A. BUCHANAN, *supra* note 28, at 98-99; N. WYNN, *supra* note 28, at 24.
51. J. JONES, *supra* note 43, at 253.
52. *Id.*
53. *See* PRESIDENT'S COMMITTEE, *supra* note 39, at 35-40.
54. *Id.* at 68.
55. J. BLUM, V WAS FOR VICTORY 208 (1976); A. BUCHANAN, *supra* note 28, at 113. *See generally* Finkle, *The Conservative Aims of Militant Rhetoric: Black Protest During World War II*, 60 J. AM. HIST. 692 (1973); Sitkoff, *Racial Militancy and Interracial Violence in the Second World War*, 58 J. AM. HIST. 661 (1971).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 409 of 482

tant to present a united front against the greater evils of Nazism and totalitarianism.[56] Following the war, however, American blacks expected that the principles of democracy they fought for would at last be extended to them at home. Accordingly, the postwar period brought renewed black activism.[57] Along with it came concern that the postwar years would bring the same racial tensions and race riots that had occurred following World War I.[58]

## III.  POSTWAR POLITICS

### A.  *Containment, Foreign and Domestic*

As World War II came to a close, American international concerns shifted from a focus on defeating Nazism and fascism to an anti-Soviet, anticommunist stance.[59] By early 1946, the Soviet Union, a recent ally, was seen as the primary threat to world peace. The anti-Soviet focus of American foreign policy crystallized in early 1947 over the instability of the anticommunist Greek government.[60] The State Department argued that U.S. funding of Greece was necessary or, as Under Secretary of State Dean Acheson put it, "[l]ike apples in a barrel infected by the corruption of one rotten one, the corruption of Greece would infect Iran and all to the East, . . . Africa . . . Italy, and France."[61]

To sell foreign aid to Congress and the American people, President Truman cast the issue in stark terms. In a March 12, 1947 address to a joint session of Congress, he emphasized that "[a]t the present moment in world history nearly every nation must choose between alternative ways of life. The choice is too often not a free one."[62] The choices were between a way of life "distinguished by free institutions, representative government, free elections, guarantees of individual liberty, freedom of speech and religion, and freedom from political oppression," and a way of life that "relies upon terror and oppression, a controlled press and radio, fixed elections, and the suppression of personal freedoms."[63] The gravity of the situation made this a "fateful hour."[64]

---

56. J. BLUM, *supra* note 55, at 207.

57. *See* S. LAWSON, BLACK BALLOTS: VOTING RIGHTS IN THE SOUTH, 1944-1969, at 102-03 (1976).

58. *See* Kellogg, *supra* note 9, at 26-27. *See also* W. TUTTLE, RACE RIOT: CHICAGO IN THE RED SUMMER OF 1919 (1970).

59. *See* B. WEISBERGER, COLD WAR, COLD PEACE: THE UNITED STATES AND RUSSIA SINCE 1945, at 59 (1984); *see generally* Adler & Paterson, *Red Fascism: The Merger of Nazi Germany and Soviet Russia in the American Image of Totalitarianism, 1930s-1950s*, 75 AM. HIST. REV. 1046 (1970).

60. *See* B. WEISBERGER, *supra* note 59, at 55-60; D. ACHESON, PRESENT AT THE CREATION: MY YEARS IN THE STATE DEPARTMENT 217-19 (1969).

61. B. WEISBERGER, *supra* note 59, at 60-61; *see also* D. ACHESON, *supra* note 60, at 219.

62. Truman, *Special Message to the Congress on Greece and Turkey: The Truman Doctrine*, March 12, 1947, in PUBLIC PAPERS OF THE PRESIDENTS OF THE UNITED STATES, HARRY S. TRUMAN, 1947, at 176, 178 (1963).

63. *Id.*

64. *Id.* at 179.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

"The free peoples of the world look to us for support in maintaining their freedoms. If we falter in our leadership, we may endanger the peace of the world—and we shall surely endanger the welfare of this Nation."[65]

Truman's speech was "greeted with rapture" by members of Congress.[66] This approach to international relations, what would be called the Truman Doctrine, informed U.S. foreign policy throughout the Truman Administration and beyond.[67] Anticommunism would not be limited to foreign affairs. With the communist threat now perceived in global, apocalyptic terms, scrutiny of how domestic policies might interface with the struggle against world communism became a priority. The most direct way in which this manifested itself was the concern about communist "infiltration" in American government.[68]

In this atmosphere, many government policies were evaluated in terms of whether they served or undercut the more central U.S. mission of fighting communism. For example, in June 1947, Congress passed the Taft-Hartley Act over Truman's veto. The Act required officers of labor unions to sign affidavits indicating that the officer

> is not a member of the Communist Party nor affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional

---

65. *Id.* at 180.

66. D. CAUTE, THE GREAT FEAR: THE ANTI-COMMUNIST PURGE UNDER TRUMAN AND EISENHOWER 30 (1978).

67. *See* B. WEISBERGER, *supra* note 59, at 64-103, 126-152.

68. On March 21, 1947, only nine days after his Truman Doctrine speech, the President signed an executive order creating a loyalty program for federal employees. Exec. Order No. 9835, 12 Fed. Reg. 1935 (1947). According to the order, "complete and unswerving loyalty" on the part of federal employees was of "vital importance." In addition, the employment of "any disloyal or subversive person constitutes a threat to our democratic processes." *Id.* Consequently, the program made employment in executive branch departments or agencies conditioned upon a favorable determination in a loyalty investigation.

Matters to be considered in loyalty investigations included "[m]embership in, affiliation with or sympathetic association with" any organization the Attorney General designated as "subversive" or "as having adopted a policy of advocating or approving the commission of acts of force or violence to deny other persons their rights under the Constitution of the United States, or as seeking to alter the form of government of the United States by unconstitutional means." *Id.* at 1938. In addition, employment could be denied due to "[i]ntentional, unauthorized disclosure to any person, under circumstances which may indicate disloyalty to the United States, of documents or information of a confidential or non-public character obtained by the person making the disclosure as a result of his employment by the Government of the United States;" or if an employee acted "so as to serve the interests of another government in preference to the interests of the United States." *Id.*

Historians have engaged in a fierce debate over the question of the degree to which Truman was responsible for McCarthyism. *Compare* A. HAMBY, *supra* note 14, at 86-91 (arguing that McCarthyism as a social phenomenon was due to factors external to Truman Administration politics, and that Truman was a strong, although ineffective, denouncer of McCarthyism), *with* R. FREELAND, *supra* note 4, at 5 (arguing that McCarthyism was "the result of a deliberate and highly organized effort by the Truman Administration in 1947-48 to mobilize support for the program of economic assistance to Europe"). *See also* THE TRUMAN PERIOD AS A RESEARCH FIELD, *supra* note 14, at 105-08, 129-36, 182-87.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

methods.[69]

Motivated by the fear that communist infiltration in the public schools would lead to the poisoning of fragile young minds, many states adopted loyalty oath requirements for public school teachers.[70] A New York State loyalty oath statute[71] was upheld by the Supreme Court in 1952 in *Adler v. Board of Education*.[72] According to the Court, the statute was premised on findings that Communists "have been infiltrating into public employment in the public schools of the State. . . . As a result, propaganda can be disseminated among the children by those who teach them and to whom they look for guidance, authority, and leadership."[73]

In the area of race relations, anticommunism figured prominently on both sides of the debate. Segregationists argued that efforts to abandon racial segregation were communist-inspired, and would undermine the fabric of American society.[74]

Whether for strategic or ideological reasons,[75] anticommunism in-

---

69. Labor Management Relations (Taft-Hartley) Act, § 9(h), Pub. L. 80-101, 61 Stat. 136, 146 (1947). *See* D. CAUTE, *supra* note 66, at 355. A union whose officers refused to sign such an affidavit could not be a certified bargaining agent with the National Labor Relations Board, could not place a union-shop clause in any collective bargaining agreement and could not bring unfair labor practices complaints against employers before the NLRB. Labor Management Relations (Taft-Hartley) Act, § 9(h), 61 Stat. at 146. The justification for these provisions was that Communists had supposedly infiltrated the labor movement with the subversive goal of disrupting commerce in mind. *See* D. CAUTE, *supra* note 66, at 356. The Supreme Court held this section of the Act constitutional in 1950. American Communications Ass'n v. Douds, 339 U.S. 382 (1950); Osman v. Douds, 339 U.S. 846 (1950).

70. D. RAVITCH, THE TROUBLED CRUSADE: AMERICAN EDUCATION, 1945-1980, at 82 (1983). Public colleges and universities were also a particular focus of anticommunist concern. *See* E. SCHRECKER, NO IVORY TOWER: MCCARTHYISM AND THE UNIVERSITIES (1987).

71. 1939 N.Y. Laws § 1318, as amended 1940 N.Y. Laws § 1499; 1949 N.Y. Laws § 1024.

72. 342 U.S. 485 (1952).

73. *Id.* at 489. In holding the statute constitutional, the Court observed that: "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools." *Id.* at 493. As far as the associational rights of school teachers were concerned, "[o]ne's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps." *Id.*

In *Adler*, the New York courts had interpreted the statute as only permitting dismissal of an employee due to membership in a subversive organization if the employee had knowledge of the organization's subversive purpose. *Id.* at 494 n.8. In Wieman v. Updegraff, 344 U.S. 183 (1952), the Court overturned an Oklahoma loyalty oath statute that had no scienter requirement. *Id.* at 189-91.

74. *See* W. Clark, An Analysis of the Relationship Between Anti-Communism and Segregationist Thought in the Deep South, 1946-1964, at 30, 34 (1976) (PhD. diss., Univ. of North Carolina). According to Wayne Addison Clark: "Realizing the vulnerability of racial segregation as a social system, southerners most intent on pressing white supremacy consistently promoted the notion that only alien forces bent on social upheaval would challenge the racial status quo. Large segments of the population in the Deep South, including educated whites, accepted this explanation as the primary force behind resistance to white supremacy." *Id.* at 12.

75. There were important differences between the NAACP and the Communist Party (CPUSA) on the issue of race. The key to racial reform for the Party was "self determination

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 412 of 482

formed the rhetoric of the NAACP as well. At the Forty-First Annual Convention of the NAACP in June 1950, the organization passed a resolution instructing its Board of Directors to "take the necessary action to eradicate [communist] infiltration, and if necessary to suspend and reorganize, or lift the charter and expel any unit, which . . . comes under Communist or other political control and action."[76] In reaffirming the resolution the following year, the organization stated that "the cardinal principle of those who follow the Communist line is to support whatever happens to be at the moment the foreign policy of Russia, a totalitarian dictatorship, while the cardinal principle of the NAACP is to support and strengthen American democracy by winning complete equal rights for all people regardless of race . . . ."[77]

While efforts to change American society during the Cold War were usually viewed as "un-American," the NAACP cast its efforts at racial reform as part of the struggle against communism. According to NAACP Executive Director Roy Wilkins, "the survival of the American democratic system in the present global conflict of ideologies depends upon the strength it can muster from the minds, hearts, and spiritual convictions of all its people."[78] He argued that "[t]he Negro wants change in order that he may be brought in line with the *American* standard . . . [which] must be done not only to preserve and strengthen that standard here at home, but to guarantee its potency in the world struggle against dictatorship."[79]

---

for the Negro in the Black Belt" in the South. *See* D. WYNN, THE NAACP VERSUS NEGRO REVOLUTIONARY PROTEST: A COMPARATIVE STUDY OF THE EFFECTIVENESS OF EACH MOVEMENT 27 (1955). The separatism this strategy suggested was at odds with the NAACP's integrationist philosophy.

Conflicts also arose over the issue of presenting a united front during World War II. After the Soviet Union entered the war, the Communist Party called for "unity against the fascist aggressor." Because all other matters were to be subordinated to the need for unity, the CPUSA refused to support efforts for racial reform in the military or on the home front and denounced the NAACP as "fascist sympathizers" because of its wartime protest. Following the war, however, wartime Party strategy was termed a "political mistake," and the Party again focused on issues of race equality. *See* W. RECORD, RACE AND RADICALISM: THE NAACP AND THE COMMUNIST PARTY IN CONFLICT 132-41 (1964).

76. Current, *The 41st: A Convention of Great Decision*, 57 THE CRISIS 512, 523 (1950).

77. *Resolutions Adopted by the Forty-Second Annual Convention of the NAACP at Atlanta, Ga., June 30, 1951*, 58 THE CRISIS 475, 476 (1951).

A need to publicly distance the organization from the Communist party may have been considered to be politically necessary in light of the fact that many prominent blacks, including some NAACP members, joined the Party or espoused ideas associated with the Party during the 1930s. *See* W. RECORD, *supra* note 75; *see also* M. NAISON, COMMUNISTS IN HARLEM DURING THE DEPRESSION (1983). Accordingly, during the anticommunist fifties, public recantations were the order of the day. *See, e.g., Langston Hughes Speaks*, 60 THE CRISIS 279 (1953) (Hughes' Senate testimony repudiating communist influences in his poetry); Wright, untitled essay denouncing the Communist Party, in THE GOD THAT FAILED 115 (R. Crossman ed. 1949).

78. Wilkins, *Undergirding the Democratic Ideal*, 58 THE CRISIS 647, 650 (1951).

79. *Id.* (emphasis in original).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

B.   *President Truman and Civil Rights Politics*

When Harry S Truman assumed the Presidency after Roosevelt's death in April 1945, people on both sides of the civil rights issue saw reason for encouragement. As a border-state senator, Truman's nomination as Vice-President had been supported by the South. When he became President, Southerners assumed he would be sensitive to Southern-style race relations.[80] Nevertheless, Truman's record on civil rights in the Senate was considered good enough by the NAACP that an editorial in the *Crisis* remarked that he was "entitled to a chance to add to that record as President."[81]

In the years following World War II, race was an issue the federal government was unable to ignore. A wave of violence swept the South as black veterans returned home. Lynchings and beatings of blacks, sometimes involving local law enforcement officials, were covered in the media in this country and abroad. The violence spawned protests and demands that the federal government take steps to alleviate that brutality and other forms of racial injustice.

In one incident during the summer of 1946, Sergeant Issac Woodard was beaten with a nightstick and blinded in both eyes by the Chief of Police in Aiken, South Carolina. Woodard had been on his way home after three years of military service.[82] The police chief was indicted for the incident, but was then acquitted "to the cheers of a

---

80. R. DONOVAN, CONFLICT AND CRISIS: THE PRESIDENCY OF HARRY S TRUMAN, 1945-1948, at 33 (1977).

81. *Id.* at 32. As far as the NAACP was concerned, Truman did well in an early test. The burning issue in domestic civil rights politics in 1945 was the establishment of a permanent Fair Employment Practices Commission which would protect racial and religious minorities from discrimination by government agencies and government contractors. *Id.* at 32-33, 114. Roosevelt had established an FEPC by executive order in 1941 in response to A. Philip Randolph's call for blacks to march on Washington. *Id.* at 32. *See* Randolph, *Call to the March*, in BLACK PROTEST THOUGHT IN THE TWENTIETH CENTURY 220-24 (Meier, Rudwick & Broderick 2d ed. 1971) [hereinafter BLACK PROTEST THOUGHT]. Legislation to establish a permanent FEPC had been introduced in Congress, but Roosevelt had not pushed the matter. In contrast, upon the urging of NAACP Executive Secretary Walter White, Truman intervened with the House Rules Committee where the bill was mired, urging that it was "unthinkable" to abandon the principle the FEPC was based on. And when Truman found Congress uncooperative on the issue, he continued to keep the FEPC alive through issuing executive orders. R. DONOVAN, *supra* note 80, at 32. The FEPC's effectiveness was seriously hampered, however, because without authorizing legislation, it had no enforcement powers, and because Congress refused to grant more than token funding. *Id.* at 32; D. McCOY & R. RUETTEN, *supra* note 14, at 32-33.

While some historians have viewed Truman's support for FEPC legislation as evidence of the President's commitment to civil rights, others have considered it to be an example of his ineffectiveness. According to Louis Ruchames, Truman supported permanent FEPC legislation, which he knew wouldn't get through Congress, and at the same time refused to push for an appropriation for the existing temporary FEPC, which might have been aided by his active support. L. RUCHAMES, RACE, JOBS AND POLITICS 126 (1953); *accord* W. BERMAN, *supra* note 9, at 26-29.

82. D. McCOY & R. RUETTEN, *supra* note 14, at 47-48.

---

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

crowded courtroom."[83] Also that summer, Macio Snipes, the only black in his district in Georgia to vote in a state election, was killed at his home by four whites.[84] In Monroe, Georgia, on July 25, 1946, Roger Malcolm, who was black, was jailed after fighting with a white man. Malcolm was released later that day. Malcolm, his wife, and two friends, all of whom were black, were then driven by his employer down a back road to a waiting mob. All four were killed.[85]

These incidents and others like them fueled black protest. Demonstrations were held and thousands of letters of protest were sent to President Truman and the Attorney General demanding federal action. In one protest action, close to four hundred members of the National Association of Colored Women marched on the White House. They maintained a picket line for over a week.[86]

In response to the lynchings, civil rights, religious, labor, and other groups formed the National Emergency Committee Against Mob Violence. The Committee met with President Truman on September 19, 1946 to call for federal government action to ensure that lynchers were prosecuted. During the meeting, Walter White described acts of violence to Truman, including the blinding of Isaac Woodard. Truman "sat with clenched hands through the recounting,"[87] and expressed his shock at how bad things were. Following the meeting, he set up a presidential committee to study the problem of racial violence and discrimination, and to make recommendations for federal policy.[88]

The President's Committee on Civil Rights issued its report, *To Secure These Rights*, in 1947. The report documented the effects of race discrimination, and called for federal government reform efforts.[89] Truman could not comfortably ignore the recommendations of his committee. Neither could he ignore black activists like A. Philip Randolph who, in 1948, called upon blacks to engage in civil disobedience to protest racial segregation in the military.[90] The pressure on Truman to address race discrimination coincided with an impending presidential campaign.

In the eyes of Clark Clifford, a close Truman advisor, the black vote

---

83. W. White, A Man Called White: The Autobiography of Walter White 327 (1948).

84. D. McCoy & R. Ruetten, *supra* note 14, at 45.

85. *Id.*; W. White, *supra* note 83, at 322-23.

86. D. McCoy & R. Ruetten, *supra* note 14, at 45.

87. *Id.* at 47.

88. *Id.* at 48. While Truman appeared to be acting spontaneously upon Walter White's suggestion that he set up a committee on civil rights, William Berman has written that Truman and his advisors had previously decided to set up such a committee, and used the meeting with the National Emergency Committee Against Mob Violence as the vehicle to announce the decision. W. Berman, *supra* note 9, at 51.

89. *See* President's Committee, *supra* note 39.

90. Randolph, *A. Philip Randolph Urges Civil Disobedience Against a Jim Crow Army*, in Black Protest Thought, *supra* note 81, at 274-80.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

would be important in the 1948 election.[91] In order to court black voters away from Progressive Party candidate Henry A. Wallace and Republican Thomas E. Dewey, Clifford recommended that Truman should "go as far as he feels he possibly could go in recommending measures to protect the rights of minority groups."[92] Otherwise, Clifford warned, the black vote might go Republican.[93] Clifford predicted that a pro-civil rights posture would not jeopardize Truman's Southern support. "As always, the South can be considered safely Democratic. And in formulating national policy, it can be safely ignored."[94]

Clifford was right on two counts: the black vote was of great importance in the '48 election, and it could not be earned without a strong pro-civil rights position.[95] He miscalculated on the South, however. In keeping with Clifford's recommendations, Truman called for civil rights legislation that had no chance of passage.[96] Southern politicians reacted by threatening to break with the Democratic Party if the Convention nominated Truman and adopted a pro-civil rights plank.[97] When both occurred, Southerners formed the States' Rights Party and nominated South Carolina segregationist Strom Thurmond as their presidential candidate. The party's platform denounced "totalitarian government" and advocated racial segregation.[98] While Thurmond had no chance of winning the election, the States' Rights Party hoped to deprive Truman of enough votes to throw the election into the House of Representatives.

Southern protest meant that the political consequences of a pro-civil rights posture were not all positive. Accordingly, Truman downplayed the issue, depending on his audience. The black vote, however, remained a priority. Consequently, although he appeared at a segre-

---

91. The same view was held by others. In 1948, Henry Lee Moon published a book arguing that the black vote could play a critical role in the 1948 election, and that the black vote was "in the vest pocket of no party," but would have to be earned. H. MOON, BALANCE OF POWER: THE NEGRO VOTE 11-12, 213-14 (1948).

92. Confidential Memorandum from Clark M. Clifford to President Truman, November 19, 1947, at 40, Political File—Confidential Memo to President, Box 21, Clark Clifford Papers, Harry S Truman Library; *see also* Sitkoff, *Harry Truman and the Election of 1948: The Coming of Age of Civil Rights in American Politics,* 37 J. SOUTHERN HIST. 597, 597 (1971). For Clifford, Truman's position on civil rights need only involve election-year posturing, not tangible results. The strategy assumed that the Administration "will get no major part of its own program approved." Clifford Memorandum, *supra,* at 19. Consequently, its tactics would be "entirely different than if there were any real point to bargaining and compromise. Its recommendations . . . must be tailored for the voter, not the Congressman; they must display a label which reads 'no compromises.' " *Id.*

93. *See* Clifford Memorandum, *supra* note 92, at 12-13.

94. *Id.* at 3.

95. *See* D. McCOY & R. RUETTEN, *supra* note 14, at 145-46.

96. *Id.* at 131-34. In addition, he issued executive orders desegregating the military and establishing a Fair Employment Board in the Civil Service Commission to review complaints of race discrimination in employment in the executive branch. *Id.* at 129.

97. *Id.* at 127.

98. *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

gated white college,[99] Truman also became the first President to speak in Harlem. Before the Harlem audience he promised to work for the achievement of equal rights "with every ounce of strength and determination that I have."[100]

During the 1948 campaign, Truman took a significant step to promote racial equality, issuing an executive order calling for desegregation of the armed forces.[101] According to Harvard Sitkoff, desegregation of the military was Truman's "most concrete" civil rights success.[102] An important reason that real progress was possible in that area was that Truman's authority over the armed forces meant that he did not have to depend on Congress to approve his efforts. Truman failed to achieve other objectives—such as establishment of a permanent Fair Employment Practices Commission and enhancement of federal government authority to prosecute lynchers—because Congress would not cooperate.[103]

Though the polls predicted otherwise, Truman defeated Dewey by a surprising margin in the electoral college. The popular vote in key states was sufficiently close, however, that some have argued that blacks, particularly in urban areas in the North, provided the President with the margin of victory.[104]

### IV.  American Racism in the Eyes of the World

#### A.   *International Press Coverage*

Apart from pressure from civil rights activists and electoral politics at home, the Truman Administration had another reason to address domestic racism: other countries were paying attention to the problem. Newspapers in many corners of the world covered stories of racial discrimination against visiting non-white foreign dignitaries and Americans. And as tension between the United States and the Soviet Union increased in the years after the war, the Soviets made effective use of

---

99. Sitkoff, *supra* note 92, at 610.

100. D. McCoy & R. Ruetten, *supra* note 14, at 143.

101. Exec. Order No. 9981, 13 Fed. Reg. 4313 (1948). *See generally* R. Dalfiume, *supra* note 14.

102. Sitkoff, *supra* note 14, at 101 n.33.

103. *See* A. Hamby, *supra* note 14, at 65; Bernstein, *supra* note 9, at 296. *See generally* S. Hartmann, Truman and the 80th Congress (1971).

Barton J. Bernstein has argued that Truman could have accomplished much more than he did, notwithstanding the fact that he could not get civil rights legislation through Congress. Truman's strategy "seemed to be one of reasonably bold requests in the legislative arena, where they could not succeed, and more cautious proposals in the executive arena, where the President had greater power." Bernstein, *supra* note 9, at 284; *accord* W. Berman, *supra* note 9, at 26-28.

104. *See* Sitkoff, *supra* note 92, at 613-14; *see also* D. McCoy & R. Ruetten, *supra* note 14, at 143-44, 145-47. In many areas, including Harlem, Truman received a greater proportion of the black vote than Roosevelt had in 1944. *Id.* at 143. Barton J. Bernstein has suggested that "[t]he election revealed that the urban Negro vote, in a close election, could be more important than Southern solidarity . . . ." Bernstein, *supra* note 9, at 292.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 417 of 482

U.S. failings in this area in anti-American propaganda.  Concern about the effect of U.S. race discrimination on cold war American foreign policy led the Truman Administration to consider a pro-civil rights posture as part of its international agenda to promote democracy and contain communism.

In one example of foreign press coverage, in December 1946 the *Fiji Times & Herald* published an article entitled "Persecution of Negroes Still Strong in America."[105]  According to the Fiji paper, "the United States has within its own borders, one of the most oppressed and persecuted minorities in the world today."[106]  In the Southern states, "hundreds of thousands of negroes exist today in an economic condition worse than the out-and-out slavery of a century ago."  Treatment of blacks was not merely a question of race discrimination; "it is frequently a question of the most terrible forms of racial persecution."[107]

The article described the 1946 lynching of four blacks in Georgia.[108]  "This outrage," the article continued, followed Supreme Court action invalidating Georgia voting restrictions.[109]  "The decision gave

---

105.  Dispatch No. 96, from American Consulate General, Suva, Fiji Islands, to Secretary of State (Dec. 27, 1946), National Archives and Records Service Doc. No. 811.4016/12-2746. (Hereinafter records from the National Archives are cited as "NARS Doc. No." National Archives documents cited in this article are State Department records.  The document numbers refer to the State Department Central Decimal File.  Researchers can locate the documents at the National Archives by referring to the Decimal File Number.  Copies of all National Archives and Truman Library documents cited in the article are also on file at the *Stanford Law Review*.)  The article was motivated by a *Chicago Tribune* article criticizing Britain for its handling of the Palestine crisis in 1946.  The *Fiji Times & Herald* article began by claiming that "[m]any people in the United States seem to enjoy crusading as long as they avoid entanglements and can direct criticism across the Atlantic."  *Id.*

The idea that the U.S. had unclean hands and accordingly, no standing to criticize Britain on the issue of Palestine was suggested in the British media as well.  A cartoon in the June 8, 1947 *London Sunday Express* showed two white men reading a newspaper entitled "Southern Press," and standing in front of a whites-only hotel that was draped with an American flag.  Behind them a dead black man lay beneath a tree beside a rope.  One of the whites remarked to the other: "Shameful the way the British are handling this Palestine business."  Dispatch No. 436, from American Consul General, Hamburg, Germany, to Secretary of State, June 10, 1947, NARS Doc. No. 811.4016/6-1047.

106.  Dispatch No. 96, *supra* note 105.

107.  *Id.*

108.  *See* text accompanying note 85 *supra.*

109.  The reference is to the denial of certiorari in a case in which lower federal courts had found Georgia voting laws to be unconstitutional.  King v. Chapman, 62 F. Supp. 639 (M.D. Ga. 1945), *aff'd*, 154 F.2d 460 (5th Cir. 1946), *cert. denied*, 327 U.S. 800 (1946).  In this case Primus E. King sued the Democratic Executive Committee of Muscogee County, Georgia, claiming that he had been denied the right to vote in the July 1944 Democratic primary solely on the grounds of his race.  Following Smith v. Allwright, 321 U.S. 649 (1944) (abolishing Texas white primary), the district court ruled that the Georgia Democratic primary was an integral part of the state electoral process, and therefore the refusal of Democratic officials to allow King to vote was impermissible state action, violating the Fourteenth, Fifteenth, and Seventeenth Amendments.  62 F. Supp. at 649-50.

This victory was short-lived, however.  In February 1947 the Georgia legislature repealed all state primary laws.  *See* S. Lawson, Black Ballots: Voting Rights in the South, 1944-1969, at 49 (1976).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

the negro the legal right to vote but [Georgia Governor] Talmadge challenged him to exercise it. He also flung a defiance to the Court itself and asked the voters of his State to back him up, which they did."[110] According to the paper, "[v]ery few negroes dared to vote, even though the country's highest tribunal had found them entitled to. Most of those who did, or tried to, were badly mauled by white ruffians."[111] The article noted that federal antilynching legislation had been proposed in the past, and "further attempts are certain in the next Congress."[112]

The *Fiji Times & Herald* was not entirely critical. Reporting that a recent dinner honoring black journalists had brought together blacks and white Southerners,[113] the paper concluded that "[t]he point is that the best culture of the south, in America, is opposed to the Bilbo-Talmadge anti-negro oppression and seems today more than ever inclined to join with the north in fighting it."[114] Efforts against racial intolerance had particular consequences in the U.S., for "there cannot be, on the basic tenants [sic] of Americanism, such a thing as second class citizenship."[115] The issue also had broader implications, however. "The recognition and acceptance of the concept of a common humanity should, and must, shatter the longstanding bulwarks of intolerance, racial or otherwise, before anything entitled to call itself true civilisation can be established in America or any other country."[116]

The American Consul in Fiji was unhappy with the *Times & Herald* article, which it saw as "an indication of certain of the anti-American and/or misinformation or propaganda now carried" in the paper.[117] A response to the article seemed appropriate and necessary. "If and when a favorable opportunity occurs, the matter of the reasonableness or justification in the publication of such biased and unfounded material, obviously prejudicial to American prestige throughout this area, will be tactfully broached to the Editor and appropriate government

---

110. Dispatch No. 96, *supra* note 105.

111. *Id.*

112. *Id.* The article also discussed other instances of discrimination, such as the Daughters of the American Revolution's refusal to allow opera singer Marian Anderson to perform in Constitution Hall. *Id.* Instances of racism on the part of the DAR received widespread, critical attention in the foreign press. For example, when the DAR refused to permit black pianist Hazel Scott to perform in Constitution Hall, the American Consul General in Bombay, India stated that news of the incident "was fully reported in practically all of the local press." The Bombay *Morning Standard* called it a "shameful manifestation of racial intolerance." *See* Dispatch No. 2397, from American Consulate General, Bombay, India, to Secretary of State (Oct. 17, 1948), NARS Doc. No. 811.4016/10-1745.

113. The dinner was funded by an endowment left by Wendell Wilkie, the 1940 Republican presidential candidate, who the *Fiji Times & Herald* described as "a notable fighter against the persecution of negroes." Dispatch No. 96, *supra* note 105.

114. *Id.*

115. *Id.*

116. *Id.*

117. *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 419 of 482

officials."[118]

In Ceylon, American Embassy officials were concerned about what they considered to be "Asian preoccupation with racial discrimination in the United States."[119] Ceylon newspapers ran stories on U.S. racial problems picked up from Reuters wire service.[120] In addition, a Ceylon *Observer* columnist focused on the issue, particularly the seeming contradiction of segregation in the capital of American democracy. In his article, Lakshman Seneviratne quoted *Time* magazine as saying, "[i]n Washington, the seated figure of Abraham Lincoln broods over the capital of the U.S. where Jim Crow is the rule." According to Seneviratne, in Washington "the colour bar is the greatest propaganda gift any country could give the Kremlin in its persistent bid for the affections of the coloured races of the world, who, if industrialized, and technically mobilized, can well dominate, if domination is the obsession, the human race."[121]

The effect of U.S. race discrimination on the country's leadership in postwar world politics was discussed in the Chinese Press. The Shanghai *Ta Kung Pao* covered the May 2, 1948 arrest of U.S. Senator Glen Taylor for violating Alabama segregation laws.[122] Criticizing Taylor's arrest, the paper noted that "[t]he Negro problem is a problem of U.S. internal politics, and naturally, it is unnecessary for anybody else to meddle with it."[123] However, the issue had international ramifications.

[W]e cannot help having some impressions of the United States which actually already leads half of the world and which would like to con-

---

118. *Id.*

119. *See* Dispatch no. 297, from American Embassy, Colombo, Ceylon [Sri Lanka], to Secretary of State (Dec. 22, 1948), NARS Doc. No. 811.4016/12-2248; Dispatch No. 311, from American Embassy, Colombo, Ceylon [Sri Lanka], to Secretary of State (Dec. 31, l948), NARS Doc. No. 811.4016/12-3148; Dispatch No. 466, from American Embassy, Colombo, Ceylon [Sri Lanka], to Secretary of State (May 25, 1949), NARS Doc. No. 811.4016/5-2549.

120. Dispatch No. 297 and Dispatch No. 311, *supra* note 119. According to a U.S. Embassy official in Colombo, Reuters, a British wire service, had a practice of "accentuating the unfavorable side of news from the United States for foreign readers." Dispatch No. 297, *supra* note 119.

121. Dispatch No. 466, *supra* note 119.

In response to coverage given to U.S. racial problems, American Embassy officials planned to put together a brief description of "the 'caste system' as it exists in Ceylon today." Dispatch No. 297, *supra* note 119.

122. At the time, Taylor was the vice-presidential running mate of third party candidate Henry A. Wallace. On May 2, 1948, Taylor, who was white, attempted to use the "colored entrance" to a Birmingham, Alabama church where he was scheduled to speak to a meeting of the Southern Negro Youth Congress. N.Y. Times, May 3, 1948, at 1, col. 2. A police officer stationed at the door informed Taylor that "this was the colored entrance." Taylor responded that "it did not make any difference to me and started in." *Id.* at 12, col. 6. Five officers then arrested Taylor, who sustained minor injuries in the process. "[They] treated me very rough—anything but gentlemanly," he later said. "God help the ordinary man." *Id.* Although Taylor violated the Birmingham segregation law, he was only charged with disorderly conduct, circumventing a challenge to the city law. *Id.* at 1, col. 2.

123. Chinese Press Review No. 635, American Consulate General, Shanghai, China (May 6, 1948), Enclosure No. 1 to Dispatch No. 452, from American Consulate General, Shanghai, China, to Secretary of State (May 10, 1948), NARS Doc. No. 811.4016/5-1048 (quoting Shanghai *Ta Kung Pao*).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

tinue to lead it. If the United States merely wants to "dominate" the world, the atomic bomb and the U.S. dollar will be sufficient to achieve this purpose. However, the world cannot be "dominated" for a long period of time. If the United States wants to "lead" the world, it must have a kind of moral superiority in addition to military superiority.[124]

According to the paper, "the United States prides itself on its 'liberal traditions,' and it is in the United States itself that these traditions can best be demonstrated."[125]

The American Consul General in Shanghai believed that the Ta Kung Pao editorial "discusses the Negro problem in the U.S. in a manner quite close to the Communist Party line."[126] The Consul General preferred an editorial in the China Daily Tribune which cast American race discrimination as a problem generated by a small minority who were acting against the grain. According to that paper, "Prejudice against people of color seems to die hard in some parts of the United States despite all that President Truman and the more enlightened leaders of the nation are doing to ensure that race equality shall become an established fact."[127]

Attention to problems of U.S. race discrimination sometimes focused on matters in the courts.[128] State or federal court decisions that overturned discriminatory practices had favorable consequences for foreign relations. For example, when the California Supreme Court overturned that state's anti-miscegenation statute in 1948,[129] the Manila Chronicle called the action "[a]n answer to the prayer of Filipinos now residing in San Francisco, California."[130] In commenting on the story, the Charge d'Affaires in the American Embassy in Manila noted that

> "color" feeling, stimulated by hearsay and/or fact of discrimination in the United States, is an ever-present catalyst among Filipinos. Therefore, it may be readily understood that the action of the Supreme Court of California, seemingly being evidence of concrete progress in eliminating racial discrimination, is important in dispelling or mitigating "color barrier" psychology and its concomitant, the tendency to forma-

---

124. *Id.*

125. *Id.*

126. Dispatch No. 452, *supra* note 123.

127. Chinese Press Review No. 635, *supra* note 123 (quoting *China Daily Tribune*).

128. *See, e.g.,* Dispatch No. 112, from American Consulate General, Madras, India, to Secretary of State (May 6, 1948), NARS Doc. No. 811-4016/5-648 (concerning editorial on Shelley v. Kraemer, 344 U.S. 1 (1948)).

129. Perez v. Sharp, 32 Cal. 2d 711, 198 P.2d 17 (1948). In *Perez*, a black man and a white woman had been denied a marriage license by the Los Angeles County Clerk. The California Supreme Court held that the statute forbidding interracial marriage was void on equal protection grounds. *Id.* at 731-32, 198 P.2d at 29.

130. Dispatch No. 995, from American Embassy, Manila, the Philippines, to Secretary of State (Oct. 5, 1948), NARS Doc. No. 811.4016/10-548. According to the Manila paper, there were "not enough women among the Filipinos there. So the laborers have been forced to seek life partners from among the whites." *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

tion of "color", racial or "Asia for the Asiatics" groupings.[131]

Indian newspapers were particularly attuned to the issue of race discrimination in the U.S. According to the American Consul General in Bombay, "[t]he color question is of intense interest in India."[132] Numerous articles with titles like "Negro Baiting in America,"[133] "Treatment of Negroes a Blot on U.S."[134] and "Untouchability Banished in India: Worshipped in America,"[135] appeared in the Indian press. Regarding the latter article, the American Consul General commented that it was "somewhat typical of the irresponsible and malicious type of story on the American Negro which appears not too infrequently in segments of the Indian press . . . ."[136] The article was written by Canadian George T. Prud'homme, who the Consul General described as a "communist writer."[137] It concerned a trip through the South, and included a photograph of a chain gang.[138] According to Prud'homme, "[t]he farther South one travels, the less human the Negro status becomes, until in Georgia and Florida it degenerates to the level of the beast in the field."[139]

Prud'homme described an incident following his attempt to speak to blacks seated behind him on a segregated bus. He was later warned "not to talk to 'those damned niggers.'"

> "We don't even talk to niggers down here," said [a] blond young man.
>
> "You better not either . . . unless you want to get beaten up."
>
> I replied I didn't think the Negroes would attempt to beat me up with the bus half-filled with whites.
>
> "*It isn't the niggers that will beat you up, it's the whites you have to look out for,*" confided the driver. "*This ain't the North. Everything is different down here.*"[140]

The article discussed segregation, the history of the Ku Klux Klan,

---

131. *Id.* The Charge d'Affaires commented that the *Manila Chronicle* story was "fairly representative of Philippine opinion on this matter." *Id.*

132. Dispatch No. 76, from John J. Macdonald, American Consul General, Bombay, India, to Secretary of State (Mar. 28, 1947), NARS Doc. No. 811.4016/3-2847.

133. *Id.* (quoting Bombay Chronicle, Mar. 22, 1947).

134. Dispatch No. 2169, from Howard Donovan, American Consul General, Bombay, India, to Secretary of State (July 11, 1945), NARS Doc. No. 311.4016/7-1145 (quoting Sunday Standard (Bombay), July 8, 1945).

135. Dispatch No. 214, from Clare H. Timberlake, American Consul General, Bombay, India, to Secretary of State (May 4, 1949), NARS Doc. No. 811.4016/5-449 (quoting Blitz, Apr. 23, 1949).

136. *Id.*

137. *Id.*

138. Another photograph of a black man lying on bedding on the ground had the caption "Waiting for Death: 'When the time comes to die, it don't make much difference if you are poor; you just have a feeling you're sorry to be leaving.' In these pathetic words, this Negro youth, worn out by hard labour and tortured by man's [in]humanity to man, summed up his little philosophy of life as he lay in his bed, waiting for death!" *Id.*

139. *Id.*

140. *Id.* (emphasis in original).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 422 of 482

and the denial of voting rights through poll taxes and discriminatory voter registration tests. The writer believed that American treatment of blacks "strangely resembles the story of India under British domination." The "only bright spot in this picture" was provided by individuals such as a white Baptist pastor who was committed to racial equality. But the minister told Prud'homme, "If one of us fights for true democracy and progress, he is labelled a Communist. . . . That is an effective way of shutting him up."[141]

U.S. officials in India felt that Indian criticism of U.S. racial practices was somewhat ironic in light of the continuing caste system in India.[142] According to the American Consul in Madras, India, "[a]n oft-repeated answer by the recent Consul General at this post to questions about the 'color problem' in the United States was 'Yes, it's almost as bad as it is in India.' This often caused such embarrassed confusion that the subject was immediately dropped."[143]

Criticism came even from the nation's closest allies. The British press covered postwar racial tension in the South and Ku Klux Klan activity.[144] Particular attention was given to scheduled executions of blacks. For example, in 1946, Charles Trudell and James Lewis, Jr., both fourteen years old, were sentenced to death in Jackson, Mississippi, for murdering their white employer.[145] By January 16, 1947, the U.S. Embassy in London had received three hundred and two communications protesting the death sentences. Forty-eight of those were petitions with several hundred signatures.[146] In addition, three members of the House of Commons sent a telegram to President Truman, urging him to "protect basic human rights by intervening" to stop the execu-

---

141. *Id.*

142. The caste system in India was based on the ancient Hindu belief that society was divided into four divinely ordained and hierarchical classes which were fixed at birth and thus became immutable throughout life. The highest caste was the Brahmins, which encompassed priests and other spiritual or intellectual leaders. Then came the Kshatriyas, or warrior class. Next were the Vaishyas, or trader class, and finally the Sudras, or servant class. Below that were the so-called "backward castes," also known as "the untouchables." G. VERMA, CASTE RESERVATION IN INDIA—LAW AND THE CONSTITUTION 112-16 (1980). The caste system sharply delineated the social, economic, and political privileges available to caste members, although the Indian constitution attempted to break down the rigidity of the caste system by reserving certain government jobs for members of the "backward castes." *See generally id.*

143. Dispatch No. 112, *supra* note 128.

144. *See, e.g.*, Dispatch No. 825, from American Embassy, London, England, to Secretary of State (June 25, 1946), NARS Doc. No. 811.4016/6-2546 (concerning *Manchester Guardian* editorial on Ku Klux Klan); Dispatch No. 1709, from American Embassy, London, England, to Secretary of State (Sept. 12, 1946), NARS Doc. No. 811.4016/9-1246 (concerning *Manchester Guardian* article "Race Friction in the South: The War and the Negro"); *see also London Sunday Express* cartoon, in Dispatch No. 436, *supra* note 105.

145. *See* Lewis v. State, 201 Miss. 48, 28 So. 2d 122 (1946); Trudell v. State, 28 So. 2d 124 (Miss. 1946); *see also* Telegram No. 195, from London, via War Department, to Secretary of State (Jan. 10, 1947, 6:00 p.m.), NARS Doc. No. 811.4016/1-1047 (discussing attention given to case in London press and Parliament).

146. Telegram No. 338, from London, via War Dep't, to Secretary of State (Jan. 16, 1947, 7:00 p.m.), NARS Doc. No. 811.4016/1-1647.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

tions.[147] The convictions and sentences were affirmed by the Mississippi Supreme Court,[148] and the U.S. Supreme Court denied certiorari in the cases.[149] Notwithstanding the attention given to the cases, Mississippi Governor Fielding Wright denied clemency.[150]

Reports by American Embassy staff on foreign press coverage of racial problems in the U.S. usually contained information on the political leanings of the publication, particularly whether they tended to be "anti-American" and/or "leftist."[151]    When criticism came from sources perceived as leftist, the motive of the writers was often called into question. For example, a dispatch from the American Embassy in Oslo regarding Norwegian press coverage of the treatment of blacks in the U.S. noted that "although certain writers discuss the matter with some understanding, the tone generally employed by the Leftist press is critical and unfriendly to the United States."[152]

On the other hand, when U.S. Embassy officials found critical coverage of U.S. race discrimination in politically conservative publications, they were less likely to assume that the writer was biased. In one example, Helen Vlachos, a writer in a prominent "conservative" Greek newspaper, noted, "America has its Achilles heel and . . . the heel is quite black!"[153] Following a trip to the American South, the writer felt that she understood "the bitter answer of a small Negro boy who, when asked by his teacher what punishment he would impose upon Adolph Hitler, said: 'I would paint his face black and send him to America im-

---

147. Petitions were also sent to the British Secretary of State for Foreign Affairs, requesting his intervention, and the matter was discussed in the House of Commons. The Secretary declined to become involved because the death sentences were "a matter of United States domestic policy in which it would not be proper for His Majesty's Government to intervene" and because the case was pending in the U.S. Supreme Court. *See* Dispatch No. 3662, from American Embassy, London, England, to Secretary of State (Feb. 6, 1947), NARS Doc. No. 811.4016/2-647.

148. *Lewis*, 201 Miss. at 61, 28 So. 2d at 124; *Trudell*, 28 So. 2d at 125.

149. Trudell v. Mississippi, 331 U.S. 785 (1947).

150. N.Y. Times, Jan. 5, 1947, at 42, col. 4. Publicity from such protests was important in generating outside scrutiny of the criminal justice system in the South. Such protests were often unsuccessful in changing the outcome in a particular case, however. The impact of Cold War anticommunism on local politics helped to undercut the effectiveness of mass protest. For example, in the Martinsville Seven case, in which seven black men were sentenced to death in Virginia for the rape of a white woman, domestic and international protest was in part orchestrated by the Communist Party, and by the left-wing Civil Rights Congress. *See* E. Rise, Race, Rape, and Radicalism: The Martinsville Seven and Cold War Criminal Justice, 1949-1951, at 105-11 (M.A. Thesis, University of Florida, 1987). Eric Rise has written that Virginia Governor John Stewart Battle's refusal to grant clemency to at least some of the defendants was influenced by his desire to "avoid the appearance that radical protest had swayed him." *Id.* at 112.

151. *See, e.g.*, Dispatch No. 452, *supra* note 124; Dispatch No. 214, *supra* note 135; Dispatch No. 2062, *infra* note 187.

152. *See* Dispatch No. 1261, from American Embassy, Oslo, Norway, to Dep't of State (Aug. 5, 1947), NARS Doc. No. 811.4016/8-547 (discussing press coverage).

153. *See* Dispatch No. 775, from K.L. Rankin, American Embassy, Athens, Greece, to Secretary of State (July 22, 1938), NARS Doc. No. 811.4016/7-2248. According to the Embassy memorandum, the Athens daily newspaper, *Kathimerini*, was a "conservative" paper and had the highest circulation of all Athens daily papers. *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

mediately'!"[154] According to K.L. Rankin, the Charge d'Affaires at the American Embassy in Athens, Vlachos' writing on the U.S. had generally been "well disposed with respect to the American people and their institutions and in harmony with the basically friendly attitude the author has always shown toward the United States."[155] Accordingly, "[h]er comments . . . should therefore be regarded, not as stemming from any anti-American bias, but as the author's frank reaction to what she regards as a deplorable situation."[156] Rankin noted that Vlachos' views were "being widely read and discussed by educated Athenians, the overwhelming majority of whom share her feelings in the matter."[157]

Of particular concern to the State Department was coverage of U.S. racism in the Soviet media. The U.S. Embassy in Moscow believed that a number of articles in 1946 "may portend stronger emphasis on this theme as [a] Soviet propaganda weapon."[158] In August 1946, the U.S. Embassy in Moscow sent the State Department a translation of an editorial from the periodical *Trud* which was "representative of the frequent Soviet press comment on the question of Negro discrimination in the United States."[159] The *Trud* article was based on information the Soviets had gathered from the "progressive American press,"[160] and it concerned lynching and black labor in the South.

According to *Trud*, American periodicals had reported "the increasing frequency of terroristic acts against negroes," including "the bestial mobbing of four negroes by a band of 20 to 25 whites" in July 1946 in Monroe, Georgia.[161] In another incident near Linden, Louisiana, "a crowd of white men tortured a negro war veteran, John Jones, tore his arms out and set fire to his body. The papers stress the fact that the murderers, even though they are identified, remain unpunished."[162]

---

154. *Id.*

155. *Id.*

156. *Id.*

157. *Id.*

158. Telegram No. 4180, from Moscow to Secretary of State (Nov. 20, 1946), NARS Doc. No. 811.4016/11-2046.

159. Dispatch No. 355, from American Embassy, Moscow, U.S.S.R., to Dep't of State (Aug. 26, 1946), NARS Doc. No. 811.4016/8-2646.

160. *Id.*

161. *See* text accompanying note 85 *supra* (discussing Monroe lynching).

162. Dispatch No. 355, *supra* note 159. The *New York Times* reported that John Jones's body was discovered on Dorcheat Bayou in Louisiana by a group of fishermen. He had apparently been beaten to death. Jones and a companion, who was also black, had been arrested after allegedly trying to break into a white woman's home. No charges were filed, and the two were released. Soon after their release, the men were picked up by a group of unidentified persons, and placed in separate cars. Jones's companion was beaten and survived. Jones was later found dead. N.Y. Times, Aug. 16, 1946, at 36, col. 2.

The Linden, Louisiana Police Chief, B. Geary Gantt, two Deputy Sheriffs, and three others were later indicted by a federal grand jury for depriving Jones and his companion of their constitutional rights by "causing them to be released and handed over to a mob which then inflicted a beating upon both." N.Y. Times, Oct. 19, 1946, at 22, col. 6. Five of the defendants were tried and acquitted by a Shreveport, Louisiana jury. N.Y. Times, March 2,

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

U.S. census figures indicated that three quarters of American blacks lived in the South. In the Southern "Black Belt," "the negroes are overwhelmingly engaged in agriculture, as small tenant-farmers, share-croppers and hired hands. Semi-slave forms of oppression and exploitation are the rule . . . ."[163] Blacks were denied economic rights due to the way the legal system protected the interests of the landowners upon whose property share-croppers and tenant farmers labored.[164] In addition, "[t]he absence of economic rights is accompanied by the absence of social rights. The poll tax, in effect in the Southern States, deprives the overwhelming majority of negroes of the right to vote."[165] *Trud* observed that "[t]he movement for full economic, political and social equality is spreading among the negro population," but that "[t]his movement has evoked exceptional fury and resistance."[166] According to the paper, "[t]he progressive public opinion of the USA is indignant at the baiting of negroes, and rightly sees in this one of the means by which reaction is taking the offensive against the working people."[167]

By 1949, according to the U.S. Embassy in Moscow, "the 'Negro question' [was] [o]ne of the principal Soviet propaganda themes regarding the United States."[168] "[T]he Soviet press hammers away unceasingly on such things as 'lynch law,' segregation, racial discrimination, deprivation of political rights, etc., seeking to build up a

---

1947, at 63, col. 5. The *Times* did not report the disposition of the charges against Police Chief Gantt. *See id.*

163. Dispatch No. 355, *supra* note 159.

164. *See id.* The paper continued,

> The unjust position of the negro population of the South is expressed in a slave system of economic relationships and in the laws. For example, there are laws which give the landowners, who are almost exclusively white, the right to seize the tenants' harvest in that manner actually bind the negro farmers to the land. The negroes depend on the mercy of the landowners and usurers who pitilessly exploit them. On the basis of the law which permits seizure of the harvest, the negro may be sentenced to hard labor for non-payment of a debt.

*Id.* State laws which continued to allow the system of peonage described in the *Trud* article were overturned by the Supreme Court in the 1940s. *See* Taylor v. Georgia, 315 U.S. 25 (1942); Pollock v. Williams, 322 U.S. 4 (1949); *see also* P. DANIEL, THE SHADOW OF SLAVERY: PEONAGE IN THE SOUTH, 1901-1969, at 175-92 (1972). *See generally* Cohen, *Involuntary Servitude in the South, 1865-1940: A Preliminary Analysis*, 42 J. SOUTHERN HIST. 31 (1976), *reprinted in* AMERICAN LAW AND THE CONSTITUTIONAL ORDER 317 (L. Friedman & H. Scheiber eds. 1978).

165. Dispatch No. 355, *supra* note 159.

166. "[P]articularly great efforts" had been made by "the reaction" during recent primary elections in the South.

> The purpose of the unbridled terror directed against the negroes was to keep the negro masses from participating in the elections in such states as Virginia, South Carolina, Georgia and Tennessee, and to crush the liberation movement among the negroes at its root. The terror proves the intention of finance capital to smash the campaign begun by the CIO to bring more than 2,000,000 unorganized negro and white workers in industrial enterprises of the South into the unions.

*Id.*

167. *Id.*

168. Airgram A-677, from Moscow, U.S.S.R., to Secretary of State (July 27, 1949), NARS Doc. No. 811.4016/6-2749.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 426 of 482

picture of an America in which the Negroes are brutally downtrodden with no hope of improving their status under the existing form of government." [169] An Embassy official believed that "this attention to the Negro problem serves political ends desired by the Soviet Union and has nothing whatsoever to do with any desire to better the Negro's position . . . ."[170] The "Soviet press seizes upon anything showing the position of the US Negro in a derogatory light while ignoring entirely the genuine progress being made in America in improving the situation."[171]

Race discrimination in the U.S. was not only directed at U.S. citizens. When non-white foreign dignitaries visited the country, they were often subjected to similar treatment, and incidents of discrimination against visiting foreign officials would generate a highly critical reaction against U.S. racism in the official's country.

In one such incident, Francois Georges, Haitian Secretary of Agriculture, travelled to Biloxi, Mississippi in November 1947 to attend a conference he had been invited to by the National Association of Commissioners, Secretaries and Directors of Agriculture.[172] Unaware that Georges was black, the Biloxi Buena Vista Hotel had confirmed a reservation for the Minister.[173] Upon Georges' arrival, he was informed that for "reasons of color" he would not be able to stay in the hotel with others attending the conference,[174] but would have to stay in separate accommodations. He was informed that his meals during the conference would be served in his rooms, rather than in the hotel restaurant with other guests.[175] Georges left without attending the conference. He later indignantly told a U.S. Embassy official in Haiti, "You can see

---

169. *Id.*

170. *Id.*

171. *Id.* The writer felt that his point was "graphically revealed" by the way Ralph Bunche, a United States representative in the United Nations, was treated in the Soviet media. Although Bunche's name was mentioned frequently in conjunction with his role in the UN, in that context his race was not mentioned. He was identified as a black, however, when Bunche announced that " 'Jim Crow' practices in Washington had been one of the contributing factors in his decision to decline the offer of an appointment as an Assistant Secretary of State." In addition, "[t]he Moscow newspapers passed over in silence Dr. Bunche's speech at Fisk University in May when he asserted that the democratic framework of society in the United States offers the greatest hope to the American Negro." *Id.*

172. Memorandum of Conversation, Dep't of State, Subject: Alleged Discrimination Against Haitian Agriculture Minister (Nov. 14, 1947), NARS Doc. No. FW 811.4016/11-1247; Letter from H.K. Thatcher, Executive Secretary of the National Association of Commissioners, Secretaries, and Directors of Agriculture, to Norman Armour, Assistant Secretary of State (Dec. 1, 1947), NARS Doc. No. 811.4016/12-147.

173. Letter from Jimmie Love, General Manager, The Buena Vista, to Robert F. Woodward, Dept. of State (Nov. 25, 1947), NARS Doc. No. 811.4016/11-2547.

174. Dispatch No. 785, from American Embassy, Port-au-Prince, Haiti, to Secretary of State (Nov. 18, 1947), NARS Doc. No. 811.4016/11.1847.

175. Letter from Love to Woodward, *supra* note 173. There was some dispute regarding the nature of the separate accommodations. According to one source, they were "servants' quarters which had not been prepared to receive guests." Memorandum of Conversation, Nov. 14, 1947, *supra* note 172. According to the Manager of the Buena Vista, the accommodations consisted of "one of our attractive guest cottages which are very much in demand with

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

how I would not wish to visit your country soon again."[176]

The Haitian Ambassador to the United States lodged a complaint with the Secretary of State regarding the incident. According to the Ambassador, Georges had accepted the invitation to attend the conference in the belief that "it would afford one more occasion for setting forth how much his country is determined to furnish its co-operation in all circumstances for strengthening the solidarity among the democratic nations anxious to see the establishment in the world of a just and lasting peace based on the principles of justice and equality."[177] The Ambassador found the treatment of Georges to be out of step with such principles. He concluded that, "[c]onsidering the unfavorable repercussion produced on opinion by incidents of this kind, the Haitian Government would be disposed to decline all invitations to congresses and conferences which are to take place in States where its delegates would be exposed to slights not to be endured by the representatives of a sovereign and friendly country."[178]

Although some Haitian newspapers initially "thought [it] better not to mention" the Biloxi incident, on November 17, *La Phalange* reprinted a *Miami Herald* article reporting the Haitian Ambassador's protest over the discrimination against Georges.[179] Other papers followed with editorials the next day. According to a U.S. Embassy airgram, "Popular Socialist *La Nation* begins its attack on United States with reference to recent accusations made by its readers to effect this newspaper was too pro-Soviet and anti-United States."[180] According to the paper,

> the ardent defenders of American democracy now have before their eyes the brutal fact of what this democracy is . . . . Can a civilized people call the treatment of which our minister has been a victim other than barbaric; can serious people still speak of American democracy? Can the Americans themselves speak of Pan-American solidarity when among themselves they make a fierce discrimination between the peoples of the Americas?[181]

The editorial concluded with the "assertion that the Negro of Haiti understands that the word democracy in the United States has no meaning."[182]

---

our regular guests located immediately adjacent to the hotel." Letter from Love to Woodward, *supra* note 173.

   176. Dispatch No. 785, *supra* note 174.

   177. Letter from Ambassador of Haiti to Secretary of State (Nov. 12, 1947), TC No. 46760, Dept. of State translation, NARS Doc. No. 811.4016/11.1247.

   178. *Id.*

   179. Airgram 3151, from Port-au-Prince, Haiti, to Secretary of State (Nov. 20, 1947), NARS Doc. No. 811.4016/11-2047.

   180. *Id.*

   181. *Id.* (quoting *La Nation*). Representatives from other countries and territories in North and Central America were in attendance and were not segregated. *See* Dispatch No. 785, *supra* note 174.

   182. Airgram 3151, *supra* note 179.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

In contrast to *La Nation's* indictment of American democracy, *Le Nouvelliste* "place[d] [the] onus on ignorance and backwardness in [the] Southern states."[183] That paper noted that other states, such as New York, prohibited race discrimination. Nevertheless, Southern racism was a "hideous disgusting fact that constitutes shame for any country as civilized as [the] United States."[184] The Biloxi incident "reenforces [sic] the unhappy opinion which is held throughout the world of the stupid color prejudice which is rotting certain Southern states of the United States."[185]

The U.S. Embassy's response to this incident was to apologize and to advise the Haitians that they should contact the State Department before accepting invitations from non-government organizations in the future.[186] Meanwhile, the international implications of the event were not lost on a New York import-export company. Vice President Robert P. Holt of Gillespie & Company wrote to Secretary of State George C. Marshall that

> [a]t a time when the vast problems of international relationship not only presuppose but require the utmost tact, it is to be deplored that an incident of this nature should have occurred, but even more so that those on the ground apparently should have been unable to mitigate the effect if not the circumstances.[187]

U.S. Embassy officials were concerned about the effect of domestic race discrimination, and of propaganda on U.S. racial problems, on the anti-American or procommunist leanings of other nations. In a confi-

---

183. *Id.*

184. *Id.* (quoting *Le Nouvelliste*).

185. *Id.* (quoting *Le Nouvelliste*).

186. Memorandum of Conversation, *supra* note 172.

187. Letter from Holt to Secretary of State (Nov. 28, 1947), NARS Doc. No. 811.4016/ 11-2847.

In another example of discrimination against a foreign national, Pan American Airways refused to allow a black Jamaican journalist to eat in its Miami airport public restaurant. Dispatch No. 2062 from John H. Lord, American Consul, Kingston, Jamaica, to Secretary of State (Sept. 12, 1945), NARS Doc. No. 811.4016/9-1245. The incident was reported in the Kingston paper, *The Daily Gleaner*, on September 11 and 12, 1945. According to the September 11 article, the matter was discussed in the Jamaican Council, where Councillor Wills O. Isaacs stated that "any nation which indulges in racial discrimination . . . is a nation that is devoid of any real culture and any real decency." He continued, "if these people cannot respect the people of this country and place them on an equal footing with the people of America, then as far as I am concerned I would not allow one Pan American plane to fly over this country at all." *Id.*

While Deputy Mayor Alderman Gunter wished to disassociate himself from Isaacs' denunciation of the U.S., Councillor E. H. Fagan agreed with Isaacs. "If we are to get anywhere as a coloured people," he argued, "let us get it in our cranium that Jamaicans as a whole are coloured people, and in common with the big majority of coloured people all over the world it is time for us to talk out loud whenever acts of discrimination are practised against us. We find that the Americans do not care anything about us." *Id.*

In reporting on the incident to the Secretary of State, the American Consul in Kingston noted that Isaacs "has definite leftist tendencies." *Id.* Identifying a critic as "leftist" was the State Department's way of discounting the sincerity or validity of some criticism. *See* text accompanying notes 151-152 *supra*.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 429 of 482

dential memorandum to the State Department regarding "Dutch Attitudes Toward American Racism," Robert Coe of the American Embassy in The Hague, reported on a "casual conversation" between an unnamed Embassy officer and a Dutch Foreign Ministry official. According to Coe, the Dutch official

> remarked that the Netherlands is very unreceptive to anti-American propaganda, whether it emanates from Communist sources or from right-wing colonial die-hards. However, he added that the opponents of American policies possess one propaganda theme which is extremely effective throughout Europe and even more effective in Asia—criticism of American racial attitudes.[188]

According to the memorandum, the Dutch official was "well-informed about American politics and the American culture generally," but nevertheless, "he himself had never been able to understand the American point of view toward negroes and other minority groups, and that the point of view was extremely difficult for friends of America to explain, let alone defend."[189] The Dutch official's "knowledge of America" had

> convinced him that America has made real progress in eliminating the worst aspects of racism, and he agreed that the nature and extent of American racial feeling has been grossly exaggerated by the Communists. However, he said that, in his opinion, the actual situation is sufficiently bad to provide a very solid foundation for the fabulous structure of lies which the Communists have built up.[190]

There was a solution to this problem, however. The Dutch official suggested that the "United States information program should devote a major portion of its facilities and energies to a campaign aimed at counteracting the impression which so many people have of American racial suppression."[191]

B.   *The United Nations as a Forum for Black Grievances*

After World War II, the Allies sought to create a new institution dedicated to world peace. The United Nations was envisioned as an international forum in which nations could peacefully resolve their differences. The hope of the founding countries was that the United Nations would "save succeeding generations from the scourge of war, . . . reaffirm faith in fundamental human rights, . . . establish conditions under which justice and respect for . . . international law can be maintained, and . . . promote social progress and better standards of life in

---

188. Memorandum from Robert Coe, U.S. Embassy, The Hague, the Netherlands, to Dep't of State (Feb. 13, 1950), NARS Doc. No. 811.411/2-1350.

189. *Id.*

190. *Id.*

191. *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 430 of 482

larger freedom . . . ."[192]  The United States was a driving force behind the formation of the United Nations.[193]  As much as the U.S. supported the organization, however, its formation gave rise to particular domestic and foreign relations difficulties.  United Nations concern with human rights made the organization a perfect forum for American blacks to air their grievances before the world.  In addition, it provided an environment in which critics of the U.S. would have an opportunity to focus attention on the country's weaknesses.

In February 1946, the UN Commission on Human Rights was established.  The Commission was charged with preparing "proposals, recommendations and reports concerning: a) an international bill of rights; b) international declarations or conventions on civil liberties, the status of women, freedom of information and similar matters; c) the protection of minorities; d) the prevention of discrimination on the grounds of race, sex, language or religion."[194]  The work of the Subcommission on the Prevention of Discrimination and Protection of Minorities would create the greatest difficulty for the United States.  State Department officials recognized this prior to the Subcommission's first meeting.  Dean Rusk wrote in a November 4, 1947 memorandum that the

> first session of the Subcommission is a very important one to the United States, principally because it deals with a very difficult problem affecting the internal affairs of the United States.  United States problems concerning relationships with minority groups have been fully treated in the press of other countries.  This Subcommission was established on the initiative of the U.S.S.R., and there is every indication that that country and others will raise questions concerning our domestic problems in this regard.[195]

Rusk was right.  However, the most powerful critique of U.S. racism presented before the United Nations came from American blacks.  On October 23, 1947, the NAACP filed a petition in the United Nations protesting the treatment of blacks in the U.S. called *An Appeal to the World*.[196]  The petition denounced U.S. race discrimination as "not only

---

192.  U.N. CHARTER, Preamble, *reprinted in* U.N. DEPT. OF PUBLIC INFORMATION, BASIC FACTS ABOUT THE UNITED NATIONS 1-2 (1987).

193.  The initial impetus toward a multinational peacekeeping organization came in the Atlantic Charter signed by Roosevelt and Churchill in August 1941. The organization took its name from the wartime coalition of "United Nations" allied against the Axis. The plan for such an organization was expanded and clarified at the Dumbarton Oaks and Yalta conferences and reached fruition with the signing of the United Nations Charter by fifty nations at San Francisco in 1945. S. FENICHELL, THE UNITED NATIONS: DESIGN FOR PEACE 3-5 (1960).

194.  V. PRATT, THE INFLUENCE OF DOMESTIC CONTROVERSY ON AMERICAN PARTICIPATION IN THE UNITED NATIONS COMMISSION ON HUMAN RIGHTS, 1946-1953, at 37 (1986).

195.  Memo from Rusk to Hulten (Nov. 4, 1947), NARS Doc. No. 501.B.D Human Rights/11-447.

196.  D. McCOY & R. RUETTEN, *supra* note 14, at 67; *see* W. BERMAN, *supra* note 9, at 65-66; *see* N.Y. Times, Oct. 12, 1947, at 52, col. 3. The first such petition was filed by the National Negro Congress in June 1946. That petition sought "relief from oppression" for American blacks. In presenting it, the Congress expressed "profound regret that we, a sec-

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

indefensible but barbaric."[197]  It claimed that racism harmed the nation
as a whole. "It is not Russia that threatens the United States so much
as Mississippi; not Stalin and Molotov but Bilbo and Rankin; internal
injustice done to one's brothers is far more dangerous than the aggres-
sion of strangers from abroad."[198]  The consequences of American fail-
ings were potentially global. "[T]he disfranchisement of the American
Negro makes the functioning of all democracy in the nation difficult;
and as democracy fails to function in the leading democracy in the
world, it fails the world."[199]  According to W.E.B. Du Bois, the princi-
pal author of the petition, the purpose behind the appeal was to enable
the UN "to prepare this nation to be just to its own people."[200]

The NAACP petition "created an international sensation."[201]  It re-
ceived extensive coverage in the American and foreign media.[202]
Meanwhile, U.S. Attorney General Tom Clark remarked, "I was humili-
ated . . . to realize that in our America there could be the slightest foun-
dation for such a petition."[203]  Although she was a member of the
Board of Directors of the NAACP,[204] Eleanor Roosevelt, who was also
a member of the American UN delegation, refused to introduce the
NAACP petition in the United Nations out of concern that it would
harm the international reputation of the United States.[205]  The Soviet

tion of the Negro people, having failed to find relief from oppression through constitutional
appeal, find ourselves forced to bring this vital issue, which we have sought, for almost a
century since emancipation, to solve within the boundary of our country to the attention of
this historic body . . . ." N.Y. Times, June 2, 1946, at 33, col. 6. *See The First Petition to the
United Nations from the Afro-American People*, in H. Aptheker, Afro-American History: The
Modern Era 301-11 (1971); Berry, *Rough, Tough and Angry*, New Masses, June 18, 1946, at 17-
19. The group sent a copy of the petition to President Truman. N.Y. Times, June 2, 1946, at
33, col. 6.

197. Petition, *reprinted in* Du Bois, *Three Centuries of Discrimination*, 54 The Crisis 362, 380
(1947).

198. *Id.*

199. *Id.*

200. N.Y. Times, Oct. 24, 1947, at 9, col. 5.

201. W. White, *supra* note 83, at 358; *see also* D. McCoy & R. Ruetten, *supra* note 14, at
67 (footnote omitted); G.Horne, *supra* note 7, at 78. According to Walter White, the NAACP
was

flooded with requests for copies of the document, particularly from nations which
were critical of the United States, including Russia, Great Britain, and the Union of
South Africa. It was manifest that they were pleased to have documentary proof that
the United States did not practice what it preached about freedom and democracy.
But it was equally apparent that Russia, Great Britain, and the Union of South Africa
were morally afraid that acceptance of the appeal on behalf of American Negroes and
action on the document would establish a precedent giving the United Nations au-
thority in those countries.

W. White, *supra* note 83, at 358-59.

202. W. Berman, *supra* note 9, at 66.

203. D. McCoy & R. Ruetten, *supra* note 14, at 67. Clark should not have been so
surprised. "[I]t is apparent that he was using the petition to support the federal government's
quest for solutions to civil-rights problems, [as] when he announced that he was going to
enlarge and strengthen the Justic Department's Civil Rights Section," *Id.*

204. Zangrando & Zangrando, *ER and Black Civil Rights*, in Without Precedent: The
Life and Career of Eleanor Roosevelt 88, 101 (1984).

205. *Id.* at 102. According to W.E.B. Du Bois, the American delegation had "refused to

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Union, however, proposed that the NAACP's charges be investigated. On December 4, 1947, the UN Commission on Human Rights rejected that proposal, and the UN took no action on the petition.[206] Nevertheless, the *Des Moines Register* remarked that the petition had "accomplished its purpose of arousing interest in discrimination."[207] Although the domestic press reaction was generally favorable, the West Virginia *Morgantown Post* criticized the NAACP for "furnishing Soviet Russia with new ammunition to use against us."[208]

In December 1948, the United Nations General Assembly adopted the Convention on the Prevention and Punishment of the Crime of Genocide.[209] The Genocide Convention provided the vehicle for another major UN petition from American blacks. Under the Convention, genocide was defined as the attempt to destroy a national, ethnic, racial, or religious group. Genocidal actions included killing persons or causing serious bodily harm to persons because they were members of a particular group.[210] Ratifying states agreed to punish any of their citizens who committed genocide, "including public officials responsible for genocidal policies."[211]

In 1951, the Civil Rights Congress filed a petition in the United Nations charging that the U.S. government had committed genocide against American blacks in violation of the Genocide Convention.[212] The bulk of the Civil Rights Congress's lengthy petition consisted of documentation of 153 killings, 344 other crimes of violence against blacks, and other human rights abuses committed in the United States

---

bring the curtailment of our civil rights to the attention of the General Assembly [and] refused willingly to allow any other nation to bring this matter up; if any should, Mr. [sic] Roosevelt has declared that she would probably resign from the United Nations delegation." *Id.* (quoting memo from Du Bois to NAACP Board of Directors, Sept. 1948).

206. W. BERMAN, *supra* note 9, at 66; W. WHITE, *supra* note 83, at 359.

207. G. HORNE, *supra* note 7, at 79 (quoting *Des Moines Register*).

208. *See id.* (quoting *Margantown Post*). Du Bois responded to similar criticism from Southern journalist Jonathan Daniels, a member of the UN Subcommission on Discrimination and Protection of Minorities, by stating that "[t]he NAACP is not 'defending Russia' or anybody else; it is trying to get men like Mr. Daniels to stand up and be counted for the decent treatment of Negroes in America." *Id.* at 79-80.

209. D. COYLE, THE UNITED NATIONS AND HOW IT WORKS 84-85 (rev. ed. 1969); CIVIL RIGHTS CONGRESS, WE CHARGE GENOCIDE: THE HISTORIC PETITION TO THE UNITED NATIONS FOR RELIEF FROM A CRIME OF THE UNITED STATES GOVERNMENT AGAINST THE NEGRO PEOPLE 3 (2d ed. 1970).

210. Other genocidal actions included: "(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part; (d) Imposing measures intended to prevent births within the group; (e) Forcibly transferring children of the group to another group." CIVIL RIGHTS CONGRESS, *supra* note 209, at 32 (quoting Article II of the Genocide Convention).

211. D. COYLE, *supra* note 209, at 84-85.

212. CIVIL RIGHTS CONGRESS, *supra* note 209, at vii, xiv-xvi; N.Y. Times, Dec. 18, 1951, at 13, col. 3. Ninety-four individuals signed the petition. Among them was W.E.B. Du Bois, the person behind the 1947 NAACP petition. *See* CIVIL RIGHTS CONGRESS, *supra* note 209, at xvii-xviii.

I am grateful to Professor David Baldus for calling my attention to the Petition.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

from 1945 to 1951.[213]  The Congress claimed:

> Out of the inhuman black ghettos of American cities, out of the cotton plantations of the South, comes this record of mass slayings on the basis of race, of lives deliberately warped and distorted by the willful creation of conditions making for premature death, poverty and disease.  It is a record that calls aloud for condemnation, for an end to these terrible injustices that constitute a daily and ever-increasing violation of the United Nations Convention on the Prevention and Punishment of the Crime of Genocide.[214]

According to the Civil Rights Congress, American blacks "suffer from genocide as the result of the consistent, conscious, unified policies of every branch of government."[215]  The petition was filed with an international body because "[h]istory has shown that the racist theory of government of the U.S.A. is not the private affair of Americans, but the concern of mankind everywhere."[216]

The Civil Rights Congress called upon the United Nations "to act and to call the Government of the United States to account."[217]  The consequences for the U.S. related not only to internal human rights matters, but to its posture in international politics.

> We believe that the test of the basic goals of a foreign policy is inherent in the manner in which a government treats its own nationals and is not to be found in the lofty platitudes that pervade so many treaties or constitutions.  The essence lies not in the form, but rather, in the substance.[218]

According to the petition, American genocide had important consequences for world peace.

> This genocide of which your petitioners complain serves now, as it has in previous forms in the past, specific political and economic aims.  Once its goal was the subjugation of American Negroes for the profits of chattel slavery.  Now its aim is the splitting and emasculation of mass movements for peace and democracy, so that reaction may perpetuate its control and continue receiving the highest profits in the entire history of man.  That purpose menaces the peace of the world as well as the life and welfare of the Negro people . . . .[219]

---

213. CIVIL RIGHTS CONGRESS, *supra* note 209, at 58-187.
214. *Id.* at xiv.
215. *Id.*
216. *Id.* at xv. The petition continued:
It is our hope, and we fervently believe that it was the hope and aspiration of every black American whose voice was silenced forever through premature death at the hands of racist-minded hooligans or Klan terrorists, that the truth recorded here will be made known to the world; that it will speak with a tongue of fire loosing an unquenchable moral crusade, the universal response to which will sound the death knell of all racist theories.
*Id.*
217. *Id.* at xvi.
218. *Id.*
219. *Id.* at 27.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Ending genocide against American blacks "will mean returning this country to its people. It will mean a new growth of popular democracy and the forces of peace."[220]

As with the NAACP petition, the petition of the Civil Rights Congress focused international attention on American racism.[221] The State Department did not look favorably upon the Civil Rights Congress's efforts, however. After William Patterson, the organization's Executive Secretary, submitted the petition in Paris, the U.S. Embassy in Paris asked him to surrender his U.S. passport.[222] Patterson refused, but his passport was seized when he returned to the United States. The *New York Times* reported that "the State Department said that further travel by Mr. Patterson would not be in the 'best interest of the United States.' "[223] As with the NAACP petition, the United Nations took no action on the Civil Rights Congress petition.[224]

## V. INTERNATIONAL IMPRESSION-MANAGEMENT

### A. *State Department Responses*

Criticism from these many corners called for a response. American Embassies did their part by cooperating with the State Department in an effort to present what they considered to be a more balanced perspective on the race issue in the U.S. In 1947, Public Affairs Officer Frederick C. Jochem wrote an article for a Rangoon, Burma newspaper, with the approval of the U.S. Consul General in Rangoon.[225] The article, entitled "Negro Problem," politely suggested that the Burmese did not have all the facts on the issue of race in the U.S. It began:

> A Burmese friend was astonished the other day when I told him that a Negro had just been appointed to a professorship in my university back home. We were discussing the "Negro problem" in America, and it turned out that a number of facts and viewpoints that I take for granted are surprising news in Burma.[226]

---

220. *Id.* at 28.

221. *See* G. HORNE, COMMUNIST FRONT?: THE CIVIL RIGHTS CONGRESS, 1946-1956, at 173-74 (1988); W. PATTERSON, THE MAN WHO CRIED GENOCIDE: AN AUTOBIOGRAPHY 193-95, 205-06 (1971).

222. N.Y. Times, Dec. 25, 1951, at 15, col. 6; *see* W. PATTERSON, *supra* note 221, at 198-201; *see also* N.Y. Times, Jan. 1, 1952, at 10, col. 7; N.Y. Times, Dec. 27, 1951, at 11, col. 4.

223. N.Y. Times, Jan. 24, 1952, at 8, col. 5; *see* G. HORNE, *supra* note 221, at 174; W. PATTERSON, *supra* note 221, at 209-10.

The strongly negative domestic reaction to the Civil Rights Congress petition had much to do with the fact that the organization was considered to be left-wing, and was on the Attorney General's list of subversive organizations. Consequently, its motives were thought to be suspect. *See* N.Y. Times, Dec. 18, 1951, at 13, col. 3. *See generally* G. HORNE, *supra* note 221. The Civil Rights Congress was under constant pressure from anticommunists in the federal government, so that, according to Gerald Horne, it "seemed . . . to be in business in order to defend itself." *Id.* at 156.

224. CIVIL RIGHTS CONGRESS, *supra* note 209, at vii.

225. Dispatch No. 30, from American Embassy, Rangoon, Burma, to Secretary of State (Oct. 7, 1947), NARS Doc. No. 811.4016/10-747.

226. *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Among the facts unknown to the Burmese was the statistic that "more than fifty Negroes now hold major teaching posts in prominent American universities." Jochem noted that the students and nearly all faculty at the institutions were "black as the proverbial ace of spades," seeing that as evidence of the availability of higher education to blacks. He did not comment on the issue of segregation. Jochem recognized that "there is still a 'Negro problem' in the United States," particularly in the South. However, he presented race prejudice as an understandable phenomenon in light of the legacy of slave society. "Of course there is prejudice against Negroes, because for the first few generations of their life in America nothing was done to educate or train them, and the heritage of ignorance, and all that goes with it, persists." Nevertheless, he concluded,

> [s]ome of the best people in the North and South are working constantly to improve the position of the Negro everywhere in the United States . . . . The goal now is to realize, to the letter, and in every one of the 48 states, the provisions of the fourteenth and fifteenth amendments which abolish all legal distinctions between individuals.[227]

State Department and American Embassy officials recognized that American blacks themselves would be most effective in countering negative international press. Consequently, the State Department sponsored trips by American blacks to speak on the "Negro Problem" in the United States.[228] When Max Yergan, a black activist concerned with anticolonialism in Africa,[229] traveled to Africa on such a trip, the American Consul in Lagos, Nigeria made sure he received ample exposure.[230] An advance story on Yergan's visit was sent by the U.S. Information Service to the Lagos press and radio, where it received "substantial play."[231] Notice of a scheduled speaking engagement was carried in all local newspapers, as requested by an American Information Officer. Following Yergan's July 17, 1952 speech, the U.S. Information Service sent out a special press release with the title: "Yergan

---

227. *Id.*

228. *See* G. HORNE, *supra* note 7, at 280-81.

229. Yergan was a founder and Executive Secretary of the Council on African Affairs, an organization that attempted to gain American support for anti-colonial movements in Africa. The CAA, co-founded by Paul Robeson, operated from the 1930s to 1955, when, according to Mark Solomon, it "was finally dissolved . . . under ferocious McCarthyite attacks." Solomon, *supra* note 9, at 207-08, 233-34 & n.9.

230. Yergan had previously been associated with the Communist Party, W. RECORD, THE NEGRO AND THE COMMUNIST PARTY 197 (1951), although he claimed, after his break with the Party, that he had never been a member. *See id.* at 197 n.*; N.Y. Times, May 14, 1952, at 12, col. 2. On May 13, 1952, he testified before the Senate Internal Security Committee that the Party had "used him for ten years to spread Red propaganda among American Negroes." He claimed that "the Reds were 'interested in exploiting undesirable conditions and in preventing a solution of racial problems.' " N.Y. Times, May 14, 1952, at 12, col. 2. Yergan's recantation before Senator McCarthy's committee is consistent with the genre of anticommunist confessionals during the McCarthy era. *See generally* THE GOD THAT FAILED, *supra* note 77.

231. Dispatch No. 27, from American Consul, Lagos, Nigeria, to Dep't of State (July 30, 1952), NARS Doc. No. 811.411/7-3052.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Says Trend In U.S. Race Relations Is Toward Full Civil Rights For Negroes."[232]

Yergan's value as a State Department-sponsored speaker was not merely that he could speak from personal experience and claim that his family enjoyed "ever-expanding rights and privileges which his grandfather, a Negro slave, could only dream of."[233] He also spoke against communism. In Yergan's view,

> [a] testimony to the progressive direction of American race relations . . . was that Negroes in the United States have as a group rejected communism as a "sinister force" interested in exploiting their position in America for the designs of a foreign power. "Every communist is a potential traitor to his country, . . . and my people in America have chosen to cast their lot with democracy, because they believe it offers them the opportunity to achieve full equality.[234]

According to the American Vice Consul in Lagos, the reaction to Yergan's visit was generally favorable. Nevertheless, Yergan was criticized in editorials in two local papers. According to the *West African Pilot*,

> Any honest inquirer after truth pondering over the monivations (sic) of Dr. Max Yergan urging the African to shun the vices of "Communism and its agents as one shuns poison" will only surmise: "We have heard this before." For, in the grim days of the battle against the forces of Nazism and Fascism, Africans were warned too to shun Nazism and Fascism as one shuns poison all because at the time we were—all lovers of freedom—engaged in a battle to guarantee freedom in order that free men may continue to learn freedom.[235]

The paper concluded that "[f]or the African, no less [than for] the Negro in the United States of America, two world wars have brought no dramatic changes in status . . . . Daily we grapple with the forces of imperialism, projected by the democracies who condemn Communism ever so much."[236]

American embassies scattered throughout the world tried to do their part to salvage the tarnished image of American democracy. They used the tools available to them: speakers and news stories that would

---

232. *Id.*

233. *Id.* (as paraphrased in press release).

234. *Id.* (as paraphrased and quoted in press release). Two members of the audience challenged Yergan's characterization of communism, asking "1) if the Communists were not the leading fighters for full civil rights for Negroes? and 2) if the Communists had made promises to the American Negro and broken them, had not the American Constitution done the same thing?" *Id.* In response, "Dr. Yergan called upon his own bitter experience with Communists to answer the questions negatively." *Id.*

235. *Id.*

236. *Id.* The American Vice Consul believed that the author of the *Pilot* editorial had a "personal axe to grind" because of an argument he and Yergan had "over the merits of Africans taking sides in the Cold War." In the Vice Consul's view, the paper attempted to smear Yergan by publishing a photograph of him with former officials of the Council on African Affairs. With Yergan in the photograph were "convicted Communist Dr. Hunton and the controversial Dr. W.E.B. Du Bois." *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

cast American difficulties in the best light possible. Meanwhile, in Washington, State Department officials could take more affirmative, less reactive steps. They sought change in the domestic policies and practices that fueled international outrage.

Among President Truman's Secretaries of State,[237] Dean Acheson played an important role in State Department efforts to advance domestic civil rights. As Acting Secretary in 1946, Acheson wrote a letter to the Chair of the Fair Employment Practices Committee detailing the foreign policy implications of U.S. race discrimination. Others in the administration considered the letter sufficiently important that they used it in the report of the President's Committee on Civil Rights[238] and the amicus brief filed by the Justice Department in *Shelley v. Kraemer*.[239] Acheson wrote:

> The existence of discrimination against minority groups in this country has an adverse effect upon our relations with other countries. We are reminded over and over by some foreign newspapers and spokesmen, that our treatment of various minorities leaves much to be desired . . . . Frequently we find it next to impossible to formulate a satisfactory answer to our critics in other countries. . . .
>
> An atmosphere of suspicion and resentment in a country over the way a minority is being treated in the United States is a formidable obstacle to the development of mutual understanding and trust between the two countries. We will have better international relations when these reasons for suspicion and resentment have been removed.[240]

Because he felt it was "quite obvious" that race discrimination interfered with foreign relations, Acheson wrote that the State Department had "good reason to hope for the continued and increased effectiveness of public and private efforts to do away with these discriminations."[241]

Federal concern over international attention to U.S. race discrimination, and its impact on U.S. foreign policy interests, extended beyond the State Department. The President's Committee on Civil Rights was sufficiently convinced of the international implications of U.S. racial problems that it focused on the issue in its final report. The Committee argued that there were three reasons why civil rights abuses in the U.S.

---

237. When Truman became President in 1945, Edward Stettinius was Secretary of State. Later that year, Truman replaced Stettinius with James F. Byrnes. Byrnes served until 1947. Truman then appointed General George C. Marshall, who held the post until 1949. Dean Acheson became Secretary in 1949 and held the position throughout the rest of the Truman Administration. *See* R. Donovan, *supra* note 80, at 17, 193, 266; *see also* M. Truman, Harry S. Truman 404 (1972).

238. President's Committee, *supra* note 39, at 146-47.

239. Brief for the United States as Amicus Curiae at 19-20, Shelley v. Kraemer, 334 U.S. 1 (1948).

240. *Id.*

241. *Id.* at 20.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

should be redressed: a moral reason,[242] an economic reason,[243] and an international reason. With regard to the latter, the Committee stated:

> Our foreign policy is designed to make the United States an enormous, positive influence for peace and progress throughout the world. We have tried to let nothing, not even extreme political differences between ourselves and foreign nations, stand in the way of this goal. But our domestic civil rights shortcomings are a serious obstacle.[244]

The Committee stressed that "[w]e cannot escape the fact that our civil rights record has been an issue in world politics. The world's press and radio are full of it."[245] Countries with "competing philosophies" had stressed and distorted American problems. "They have tried to prove our democracy an empty fraud, and our nation a consistent oppressor of underprivileged people."[246] However, the Committee indicated that

> [t]he international reason for acting to secure our civil rights now is not to win the approval of our totalitarian critics . . . [for whom] our civil rights record is only a convenient weapon with which to attack us[,] [but rather because] . . . we are more concerned with the good opinion of the peoples of the world. Our achievements in building and maintaining a state dedicated to the fundamentals of freedom have already served as a guide for those seeking the best road from chaos to liberty and prosperity. But it is not indelibly written that democracy will encompass the world. We are convinced that our way of life—the free way of life—holds a promise of hope for all people. We have what is perhaps the greatest responsibility ever placed upon a people to keep this promise alive. Only still greater achievements will do it.[247]

The Committee concluded its report to the President by emphasizing that "[t]he United States is not so strong, the final triumph of the democratic ideal is not so inevitable that we can ignore what the world thinks of us or our record."[248]

---

242. According to the Committee, "[t]he pervasive gap between our aims and what we actually do is creating a kind of moral dry rot which eats away at the emotional and rational bases of democratic beliefs." PRESIDENT'S COMMITTEE, *supra* note 39, at 139. U.S. failures in the area of civil rights bred "cynicism about democratic values" that was harmful to all. *Id.* at 141.

243. The Committee believed that "[o]ne of the principal economic problems facing us and the rest of the world is achieving maximum production and continued prosperity." *Id.* Discrimination interfered with economic growth because it led to "[t]he loss of a huge, potential market for goods." *Id.* Discrimination in the marketplace gave rise to interrelated losses in market and human terms. *Id.* at 146.

244. *Id.* at 146. To support this point, the Committee quoted from the letter from Dean Acheson to the FEPC. *Id.* at 146-47; *see* text accompanying notes 240-241 *supra.*

245. PRESIDENT'S COMMITTEE, *supra* note 39, at 147.

246. *Id.* at 148.

247. *Id.*

248. *Id.* (emphasis removed).

One way of affecting "what the world thinks of us" was organized U.S. government efforts to disseminate favorable information about the U.S. to other countries. During World War II, the Roosevelt Administration increasingly recognized the value of print and broadcast media in U.S. government efforts to influence international opinion. J. TYSON, U.S. INTERNATIONAL BROADCASTING AND NATIONAL SECURITY 4-5 (1983). By 1948, the Cold War increased the perceived importance of such efforts. In some government circles fears were expressed

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

B.  *Amicus Briefs and Foreign Affairs*

Truman's pro-civil rights speeches and platforms would help him achieve the political mileage he needed in the area of civil rights. Yet, given the posture of Congress toward his civil rights initiatives, Truman's legislative proposals were not likely to dampen international criticism. The image of a well-meaning President struggling against a recalcitrant Congress might help Truman at the polls in the United States, but not in the United Nations. Some actual change in American racial policies was needed to silence foreign critics. In the late 1940s and early 1950s, that change would not come from Congress. It might, however, come from the courts. Through filing amicus curiae briefs in civil rights cases, the Truman Administration stressed to the Supreme Court the international implications of U.S. race discrimination, and at times focused on the negative impact on American foreign policy that a pro-segregation decision might have.[249] In terms of its consequences

---

that America was losing an unequal war of propaganda in which the Soviet Union and its satellites routinely misrepresented and distorted American ideals and actions. The federal government needed to respond by disseminating the "truth" to counteract such communist propaganda. *See* 93 Cong. Rec. 6560-61 (1947) (remarks of Rep. Everett Dirksen); S. Rep. No. 811, 80th Cong., 2d Sess., *reprinted in* 1948 U.S. Code Cong. & Admin. News 1011, 1013, 1023; *Expanded International Information and Education Program by the United States: Hearings Before a Subcommittee of the Senate Committee on Foreign Relations on S. Res. 243*, 81st Cong., 2d Sess. 39-40 (1950) (statement of Secretary of State Dean Acheson).

While the U.S. hoped that, with the help of its information program, other countries would rally behind the flag of democracy and would perceive communism as the most important threat to world peace, many Third World countries did not view the conflict between the superpowers as their primary concern. According to a 1952 report on the status of U.S. propaganda efforts, "In South and Southeast Asia, anti-colonialism and associated racial resentments have been far more important elements in the psychological situation than anti-communism . . . ." Psychological Strategy Board, Status Report on the National Psychological Effort and First Progress Report of the Psychological Stategy Board, Aug. 1, 1952, at 3, File 391.1, Box 22, Papers of the Psychological Strategy Board, Harry S Truman Library (on file with the *Stanford Law Review*). The U.S. attempted to shape its propaganda accordingly, finding that approaches which focused on matters of local concern were "particularly relevant" in "underdeveloped" nations "where the memory or actuality of domination by the white man is a far greater psychological reality than the Soviet menace." *Id.* at 3-4. Nevertheless, the report concluded that, as of 1952, "efforts to counteract communist exploitation of the race relations problem in the United States have not been fully successful." *Id.* at 4.

249. The amicus briefs were also helpful for domestic political purposes. Truman referred to them in his 1948 campaign speeches before black audiences. *See* D. McCoy & R. Ruetten, *supra* note 14, at 134-35.

While other scholars have counted the civil rights amicus briefs as important Truman Administration action to further black civil rights, *see* A. Hamby, Beyond the New Deal: Harry S. Truman and American Liberalism 189-90 (1973); D. McCoy & R. Ruetten, *supra* note 9, at 211-12, 218-21; J. Elliff, The United States Department of Justice and Individual Rights, 1937-1962, at 254-59 (1987) (reprint of PhD. dissertation, Harvard University, 1967), Barton J. Bernstein has argued that the briefs were filed due to the efforts of members of the Solicitor General's staff, and that the administration simply acquiesced in them. Bernstein, *supra* note 9, at 296-97, 303; Bernstein, *Commentary*, in The Truman Period as a Research Field, *supra* note 14, at 161, 187 [hereinafter Bernstein, *Commentary*]; *see also* Bernstein, *The Truman Administration and Minority Rights: A Review Essay*, J. Ethnic Studies, Fall 1973 at 66, 70-71 [hereinafter Bernstein, *Minority Rights*]. Bernstein's analysis of the amicus briefs is in keeping with his view that Truman was a "reluctant liberal" who left an "ambiguous . . . legacy" in the area of civil rights. Bernstein, *supra* note 9, at 303. Bernstein's primary source

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

for the American dilemma, a Court decision rendering segregation un-
constitutional was potentially of the greatest symbolic value. Change
emanating from a Court interpretation of the Constitution would show
that the principle of racial equality had always been there in the gov-
erning document of American democracy. This would show that, as

---

for this interpretation appears to have been a 1966 interview with Philip Elman, a former
attorney in the Solicitor General's office who was involved in writing the amicus briefs. *See*
Bernstein, *supra* note 9, at 312 n.49 & 314 n.60.

A later Elman interview published in the *Harvard Law Review* undercuts Bernstein's argu-
ment. *See* Elman, *supra* note 5 (interview conducted by Norman Silber). While Elman views
his role as pivotal, *see* Elman, *supra* note 5, at 818-19, 826-30, he also provides enough infor-
mation to show that the amicus briefs were not simply the effort of an isolated and committed
group of lawyers in the Solicitor General's office, but can appropriately be described as Tru-
man Administration actions. *See also* Kennedy, *A Reply to Philip Elman*, 100 HARV. L. REV. 1938
(1987) (questioning the importance of Elman's role).

The first amicus brief, filed in *Shelley v. Kraemer*, was signed by Attorney General Tom C.
Clark, as well as Solicitor General Perlman. As Elman noted, it was unusual for the Attorney
General to sign Supreme Court briefs. Clark's name was placed on the brief so that it would
be "as authoritative a statement of the position of the United States as possible." Elman,
*supra* note 5, at 819. Although Elman does not say whether Clark personally approved having
his name on the brief, it is unlikely that such a departure from Justice Department policy
involving the use of his name, in such a high-profile case, would have happened without his
knowledge. The fact that the very filing of the brief was an innovation in Department policy
reinforces the likelihood that Clark knew about and approved the fact that his name was being
placed on the brief. *See* note 250 *infra*. Further, Clark and Perlman were so pleased with the
*Shelley* brief that they published it as a book. Elman, *supra* note 5, at 820. *See* T. CLARK & P.
PERLMAN, PREJUDICE AND PROPERTY: AN HISTORIC BRIEF AGAINST RACIAL COVENANTS (1948).
Truman identified the government's participation in *Shelley* as one of his administration's civil
rights accomplishments in a 1948 campaign speech in Harlem. PUBLIC PAPERS OF THE PRESI-
DENTS OF THE UNITED STATES: HARRY S. TRUMAN, 1948, at 923, 924 (1964); *see* W. BERMAN,
*supra* note 9, at 127.

According to Elman, pressure from within the administration to file a brief in *Shelley* first
came from Phineas Indritz, an attorney in the Department of the Interior, and Oscar Chap-
man, the Secretary of the Interior. Elman, *supra* note 5, at 818. The State Department as-
sisted Elman's efforts on the brief by sending a letter to the Attorney General regarding the
effect of race discrimination on foreign policy. Elman, *supra* note 5, at 818. Although Elman
did not know who finally approved the filing of a brief, his best guess was that "[p]robably
Tom Clark made the decision after checking with Truman." Elman, *supra* note 5, at 818.

Attorney General J. Howard McGrath, in a departure from Justice Department practices,
participated in oral argument in *Henderson v. United States*. *See* 339 U.S. 816, 817 (1950); *see also*
Bernstein, *Minority Rights, supra*, at 71. Attorney General James P. McGranery unsuccessfully
petitioned the Court for permission to present an oral argument in *Brown*. D. BERMAN, IT IS
SO ORDERED: THE SUPREME COURT RULES ON SCHOOL SEGREGATION 61 (1966). Notwithstand-
ing his argument that Truman was disinterested and uninvolved in the amicus briefs, Bern-
stein has written that Truman "specifically approved the filing of a brief in *Brown*." Bernstein,
*Minority Rights, supra*, at 71 (apparently relying on an interview with Elman). *But see* Berman,
*supra* note 9, at 232 (*Brown* brief filed on Justice Department's own initiative).

In my view, this record of high-level participation in the desegregation cases makes it
appropriate to characterize the amicus briefs as consciously adopted Truman Administration
policy. Cabinet-level advisors were involved in the cases. Even if, as is likely, Truman did not
personally approve all of the briefs, high-level members of his administration charged with
furthering his interests and desires participated in the cases. Truman's advisors were so at-
tuned to the political consequences of civil rights efforts, *see* A. HAMBY, *supra* note 14, at 66-67;
Sitkoff, *supra* note 14, at 101; *see generally* Bernstein, *supra* note 9, that it is hard to imagine
government participation in such well-publicized civil rights cases as being anything other
than a deliberate policy decision made at the highest levels of the Truman Administration.
*Accord* Berman, *supra* note 9, at 239-40.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Myrdal had suggested, it was a principle waiting to be realized as Americans perfected their practice of democracy.

The Truman Justice Department first participated as amicus curiae in civil rights cases involving restrictive covenants.[250] In previous civil rights cases, the Solicitor General participated when the litigation involved a federal agency,[251] and when the question in the case concerned the supremacy of federal law.[252] A different sort of federal interest was involved in the restrictive covenant cases. According to Solicitor General Phillip Perlman, racially restrictive covenants hampered the federal government "in doing its duty in the fields of public health, housing, home finance, and in the conduct of foreign affairs."[253] The Brief for the United States in *Shelley v. Kraemer*[254] relied on the State Department's view that "the United States has been embarrassed in the conduct of foreign relations by acts of discrimination taking place in this country."[255] To support this argument, the brief quoted at length from the letter Acting Secretary of State Acheson had written to the FEPC in 1946.[256]

Although not addressing the international implications of the case, the Supreme Court agreed with the result sought by the Justice Department. The Court ruled that enforcement of racially restrictive covenants in state courts constituted state action which violated the rights of the blacks to equal protection of the laws.[257]

The Solicitor General's office continued its efforts in civil rights cases in 1949.[258] In *Henderson v. United States*,[259] the Department of Jus-

---

250. J. ELLIFF, *supra* note 249, at 254-59. *See* Shelley v. Kraemer, 334 U.S. 1 (1948); Hurd v. Hodge, 334 U.S. 24 (1948). According to Solicitor General Perlman, the brief filed in the restrictive covenant cases was "the first instance in which the Government had intervened in a case to which it was not a party and in which its sole purpose was the vindication of rights guaranteed by the Fifth and Fourteenth Amendments." J. ELLIFF, *supra* note 249, at 258 (quoting Address by Perlman to the National Civil Liberties Clearing House (Feb. 23, 1950)).

Because my purpose is to examine the Truman Administration's participation in these cases, this article does not dwell on the crucial role in the cases played by the NAACP. For excellent treatments of the NAACP's litigation efforts, see M. TUSHNET, *supra* note 7; R. KLUGER, *supra* note 7.

251. *See* Mitchell v. United States, 313 U.S. 80 (1941).

252. *See* Taylor v. Georgia, 315 U.S. 25 (1942).

253. Oral argument of Solicitor General Perlman, 16 U.S.L.W. 3219 (Jan. 20, 1948) (paraphrased account of argument); *see also* C. VOSE, CAUCASIANS ONLY: THE SUPREME COURT, THE NAACP, AND THE RESTRICTIVE COVENANT CASES 200 (1959).

254. 334 U.S. 1 (1948). In *Shelley*, whites sold residential property to blacks in violation of a covenant among landowners prohibiting sales to nonwhites. State Supreme Courts in Missouri and Michigan had ruled that the covenants were enforceable. *Id.* at 6-7. The question in *Shelley* was whether judicial enforcement of the covenants constituted state action violating the fourteenth amendment rights of the blacks who purchased the property. The Supreme Court ruled that it did. *Id.* at 20.

255. Brief for the United States as Amicus Curiae at 19, Shelley v. Kraemer, 334 U.S. 1 (1948) (quoting letter from Ernest A. Gross, Legal Adviser to the Secretary of State, to the Attorney General (Nov. 4, 1947)).

256. *See* text accompanying notes 240-241 *supra*.

257. 334 U.S. at 20.

258. *See generally* J. ELLIFF, *supra* note 249, at 323-29.

259. 339 U.S. 816 (1950).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

tice took a position contrary to the Interstate Commerce Commission on the question of the validity of railroad dining car segregation under the Interstate Commerce Act.[260] As in *Shelley*, an important motivation behind the government's anti-segregation position was the international implications of segregation.[261] The *Henderson* brief elaborated more fully on the problem. One area in which international criticism of the U.S. manifested itself was the United Nations. The brief quoted from recent statements made by representatives of other governments in a UN subcommittee meeting which "typify the manner in which racial discrimination in this country is turned against us in the international field."[262] For example, a representative of the Soviet Union had commented: "Guided by the principles of the United Nations Charter, the General Assembly must condemn the policy and practice of racial discrimination in the United States and any other countries of the American continent where such a policy was being exercised."[263] Similarly, the representative from Poland "did not . . . believe that the United States Government had the least intention to conform to the recommendations which would be made by the United Nations with regard to the improvement of living conditions of the coloured population of that country."[264]

As it had in *Shelley*, the Justice Department made reference to foreign press coverage of U.S. race discrimination, noting that "[t]he references to this subject in the unfriendly foreign press are frequent and caustic."[265] This time the brief bolstered this claim with examples from Soviet publications. *The Bolshevik*, for example, carried an article which claimed that

> [t]he theory and practice of racial discrimination against the negroes in America is known to the whole world. The poison of racial hatred has become so strong in post-war America that matters go to unbelievable

---

260. The Interstate Commerce Act provided that "[i]t shall be unlawful for any common carrier . . . to make, give, or cause any undue or unreasonable preference or advantage to any particular person . . . in any respect whatsoever; or to subject any particular person . . . to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ." Interstate Commerce Act, ch. 722, § 5(a), 54 Stat. 898, 902, 49 U.S.C. § 3(1) (1946) (codified as amended at 49 U.S.C. § 1074(b) (1982)). The Interstate Commerce Commission ruled that the Southern Railway Company's practice of providing separate seating behind a curtain in dining cars for black passengers did not violate the Act. *See* Henderson v. United States, 339 U.S. 816, 820-22 (1950). On appeal, the ICC defended its interpretation of the Act, and the Justice Department filed a brief on behalf of the United States arguing that 1) dining car segregation violated the Act, and 2) segregation violated the equal protection clause. *See* Brief for the United States at 9-11, Henderson v. United States, 339 U.S. 816 (1950).

261. The brief quoted from the same letter from Dean Acheson that the Department had relied on in *Shelley*. *See* Brief for the United States at 60-61, Henderson v. United States, 339 U.S. 816 (1950).

262. *Id.* at 61.

263. *Id.* (quoting United Nations, General Assembly, *Ad Hoc* Political Committee, Third Session, Part II, Summary Record of the Fifty-Third Meeting (May 11, 1949), at 12).

264. *Id.* (quoting United Nations, General Assembly, *Ad Hoc* Political Committee, Third Session, Part II, Summary Record of Fifty-Fourth Meeting (May 13, 1949), at 6).

265. *Id.*

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

lengths; for example a Negress injured in a road accident could not be taken to a neighbouring hospital since this hospital was only for "whites."[266]

Through its reliance on UN statements and the Soviet Press, the *Henderson* brief powerfully made the point that racial segregation hampered the U.S. government's fight against world communism.

There was other turf upon which the battle for democracy was waged: the home front. The *Henderson* brief raised the spectre of black radicalism in the U.S. "[T]he apparent hypocrisy of a society professing equality but practicing segregation and other forms of racial discrimination furnishes justification and reason for the latent urge to rebel, and frequently leads to lasting bitterness or total rejection of the American creed and system of government."[267] However, the brief argued that black protest in the U.S. was not tied to the Communist Party. The brief drew from the testimony of baseball player Jackie Robinson,[268] who had appeared before the House Committee on Un-American Activities. According to Robinson,

Just because Communists kick up a big fuss over racial discrimination

---

266.  *Id.* at 61 n.73 (quoting Frantsov, *Nationalism—The Tool of Imperialist Reaction*, THE BOLSHEVIK (U.S.S.R.), No. 15 (1948)).

In another example, a story in the Soviet *Literary Gazette* titled "The Tragedy of Coloured America," stated:

> It is a country within a country. Coloured America is not allowed to mix with the other white America, it exists within it like the yolk in the white of an egg. Or, to be more exact, like a gigantic ghetto. The walls of this ghetto are invisible but they are nonetheless indestructible. They are placed within cities where the Negroes live in special quarters, in buses where the Negroes are assigned only the back seats, in hairdressers where they have special chairs.

*Id.* (quoting Berezko, *The Tragedy of Coloured America*, THE LITERARY GAZETTE (U.S.S.R.), No. 51 (1948)).

267.  *Id.* at 59.

268.  Robinson was the first black player to join a major league baseball team. His widely publicized breaking of the color barrier in baseball in 1947 was heralded as a sign of diminishing race prejudice in the nation. *See generally* J. TYGIEL, BASEBALL'S GREATEST EXPERIMENT: JACKIE ROBINSON AND HIS LEGACY (1983).

On July 18, 1949, Robinson was called as a witness before the House Committee on Un-American Activities during the Committee's hearings on "Communist infiltration of minority groups." Robinson testified that segregation, like Communism, "kills off democracy." *Hearings Regarding Communist Infiltration of Minority Groups—Part I before the House Comm. on Un-American Activities,* 81st Cong., 1st Sess. 481 (1949). Robinson criticized Paul Robeson's pro-Soviet views as "silly." *Id.* However, he stressed that his criticism of Robeson "doesn't mean that we're going to stop fighting race discrimination in this country until we've got it licked. . . . We can win our fight without the Communists and we don't want their help." *Id.* at 482.

Denouncing Robeson was a sure way blacks could demonstrate their loyalty to HUAC. *See* V. NAVASKY, *supra* note 2, at 187. In a speech at the Partisans of Peace World Peace Congress in Paris in 1949, Robeson denounced American racism as "similar to that of Hitler and Goebbels," and said that it was "unthinkable . . . that American Negroes would go to war on behalf of those who have oppressed us for generations . . . against a country (the Soviet Union) which in one generation has raised our people to full human dignity of mankind." D. GILLIAM, PAUL ROBESON: ALL AMERICAN 137 (1976). Although he apparently never joined the Communist party, *id.* at 142, Robeson was blacklisted as a communist during the McCarthy era. *See id.* at 159.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

*STANFORD LAW REVIEW* [Vol. 41:61

> when it suits their purposes, a lot of people try to pretend that the whole issue is a creation of Communist imagination.
>
> But they are not fooling anyone with this kind of pretense, and talk about "Communists stirring up Negroes to protest," only makes present misunderstanding worse than ever. Negroes were stirred up long before there was a Communist Party, and they'll stay stirred up long after the party has disappeared—unless Jim Crow has disappeared by then as well.[269]

The clear implication was that, while black protest was not directly tied to communism, racial injustice added to discontent among American blacks which, if not remedied, could lead blacks to reject American democracy. Accordingly, racial segregation threatened the ability of the U.S. government to maintain its role as a leader of the free world, and to govern peacefully at home.

The Supreme Court ruled in favor of the Justice Department's position on statutory grounds, without reaching the question of the constitutionality of segregation in interstate travel.[270]

Also in 1949, the Justice Department participated for the first time in cases challenging school segregation. As with *Henderson*, the Department argued that *McLaurin v. Oklahoma State Regents for Higher Education*[271] and *Sweatt v. Painter*[272] were of "great importance" to the nation because "they test the vitality and strength of the democratic ideals to which the United States is dedicated."[273] Referring again to the notion that U.S. race discrimination was "the greatest unsolved task for American democracy,"[274] the brief considered the foreign policy repercussions the Supreme Court opinions in *Sweatt* and *McLaurin* might have:

> The Court is here asked to place the seal of constitutional approval upon an undisguised species of racial discrimination. If the imprimatur of constitutionality should be put on such a denial of equality, one would expect the foes of democracy to exploit such an action for their own purposes. The ideals embodied in our Bill of Rights would be

---

269. Brief for the United States at 59-60, *Henderson*, 339 U.S. 816 (1950) (quoting *Hearings Regarding Communist Infiltration of Minority Groups— Part I, supra* note 268, at 479).

270. 339 U.S. at 825-26.

271. 339 U.S. 637 (1950). In *McLaurin*, the black plaintiff was admitted to the graduate program in education at the University of Oklahoma following a challenge to Oklahoma's segregation statutes in federal district court. *Id.* at 638-39. However, the plaintiff was segregated within the University. He was assigned to a separate table in the library, a separate row in the classroom, and a separate table in the cafeteria. *Id.* at 640. The NAACP argued that this different treatment on the basis of race violated the equal protection clause of the fourteenth amendment. *Id.* at 638.

272. 339 U.S. 629 (1950). *Sweatt* involved a challenge to racial segregation at the University of Texas Law School. The plaintiff was denied admission to the law school because he was black. When a state trial court found that the University's action violated the fourteenth amendment, the State responded by opening a separate black law school. *Id.* at 631-32. The question in the Supreme Court was whether the legal education provided at the black school was equal to that provided by the University of Texas. *Id.* at 632-34.

273. Memorandum for the United States as Amicus Curiae at 1-2, McLaurin v. Oklahoma, 339 U.S. 637 (1950), and Sweatt v. Painter, 339 U.S. 629 (1950).

274. *Id.* at 11.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

ridiculed as empty words, devoid of any real substance.[275]
The consequences of such a ruling would be stark, extending far be-
yond the cases, and affecting the American way of life.

> It is in the context of a world in which freedom and equality must be-
> come living realities, if the democratic way of life is to survive, that the
> issues in these cases should be viewed. In these times, when even the
> foundations of our free institutions are not altogether secure, it is espe-
> cially important that it again be unequivocally affirmed that the Consti-
> tution of the United States, like the Declaration of Independence and
> the other great state papers in American history, places no limitation,
> express or implied, on the principle of the equality of all men before
> the law.[276]

In *Sweatt* and *McLaurin*, the Supreme Court again sided with the Justice
Department. It found that segregation at the University of Texas Law
School and the University of Oklahoma School of Education denied the
black plaintiffs equal treatment. However, the Court declined to recon-
sider the constitutionality of segregation in general.[277]

While racial discrimination in Southern states and throughout the
nation had been the subject of foreign criticism, segregation in the Dis-
trict of Columbia was particularly embarrassing, and was often a special
focus of international attention.[278] If segregation only existed in par-
ticular areas of the country, it would have been easier for the federal
government to characterize it as a regional phenomenon, as something
at odds with generally accepted American practices. As long as the seat
of the federal government was segregated, however, any claims that
segregation was not a widespread national practice seemed hollow.
The District of Columbia was "the window through which the world
looks into our house."[279] If the U.S. were to clean up its international
image, Washington was the place it would need to begin.

The question of segregation in the District of Columbia was at issue
in *Bolling v. Sharpe*,[280] a companion case to *Brown v. Board of Educa-*

---

275. *Id.* at 12.

276. *Id.* at 13. The brief referred to the specific foreign policy implications of U.S. race
discrimination outlined in the *Henderson* brief. *Id.* at 12 n.4. *See* text accompanying notes 258-
270 *supra*.

   In 1949, the Solicitor General's office also filed a brief in Graham v. Brotherhood of
Locomotive Firemen, 338 U.S. 232 (1949), a case involving non-compliance by a railroad and
a union with a previous Supreme Court decision, Steele v. Louisville & Nashville R.R. Co.,
323 U.S. 192 (1944), forbidding discriminatory collective bargaining agreements. *See generally*
J. ELLIFF, *supra* note 249, at 323.

277. *Sweatt*, 339 U.S. at 636; *McLaurin*, 339 U.S. at 638, 642.

278. *See* text accompanying note 121 *supra*. American blacks focused on the contradic-
tions of segregation in the capital as well. *See generally* NATIONAL COMMITTEE ON SEGREGATION
IN THE NATION'S CAPITAL, SEGREGATION IN WASHINGTON (1948).

279. Brief for the United States as Amicus Curiae at 4, Brown v. Board of Education,
347 U.S. 483 (1954).

280. 347 U.S. 497 (1954). In *Bolling*, the plaintiffs argued that racial segregation in pub-
lic schools in the District of Columbia violated the due process clause of the fifth amendment.
*Id.* at 498.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

*tion.*[281] Consequently, in its amicus brief in the consolidated school desegregation cases, the Justice Department emphasized the embarrassment of race discrimination in the nation's capital. According to the brief, "[f]oreign officials and visitors naturally judge this country and our people by their experiences and observations in the nation's capital; and the treatment of colored persons here is taken as the measure of our attitude toward minorities generally."[282] As President Truman had stated, " '[t]he District of Columbia should be a true symbol of American freedom and democracy for our own people, and for the people of the world.' "[283] However, the brief continued, the President's Committee on Civil Rights had found that the District of Columbia was " 'a graphic illustration of a failure of democracy.' "[284]

More generally, the Department's brief argued that the allegations of unconstitutional discrimination in public school systems raised "questions of the first importance in our society. For racial discriminations imposed by law, or having the sanction or support of government, inevitably tend to undermine the foundations of a society dedicated to freedom, justice, and equality."[285] Under the "rule of law" embodied in the U.S. Constitution, every arm of government "must treat each of our people as an *American*, and not as a member of a particular group classified on the basis of race or some other constitutional irrelevancy."[286]

Racial segregation interfered with the Cold War imperative of winning the world over to democracy, for

> [t]he existence of discrimination against minority groups in the United
> States has an adverse effect upon our relations with other countries.

---

281.  347 U.S. 483 (1954). In *Brown*, the Supreme Court considered the constitutionality of racial segregation in public schools in cases from the states of Kansas, South Carolina, Virginia, and Delaware. *Id.* at 486; *see* Briggs v. Elliott, 103 F. Supp. 920 (E.D.S.C. 1952), *rev'd*, Brown v. Board of Educ., 349 U.S. 294 (1955) (*Brown II*); Davis v. County School Board, 103 F. Supp. 337 (E.D. Va. 1952), *rev'd*, Brown v. Board of Educ., 349 U.S. 294 (1955) (*Brown II*); Brown v. Board of Educ., 98 F. Supp. 797 (D. Kan. 1951), *rev'd*, Brown v. Board of Education, 349 U.S. 294 (1955) (*Brown II*); Belton v. Gebhart, 32 Del. Ch. 343, 87 A.2d 862, *aff'd*, Gebhart v. Belton, 33 Del. Ch. 144, 91 A.2d 137 (Del. 1952), *aff'd*, Brown v. Board of Educ., 349 U.S. 294 (1955) (*Brown II*).

282.  Brief for the United States as Amicus Curiae at 4, *Brown*, 347 U.S. 483.

283.  *Id.* (quoting Truman, Message to the Congress (Feb. 2, 1948), H.R. Doc. No. 516, 80th Cong., 2d Sess. 2 (1948)).

284.  *Id.* (quoting PRESIDENT'S COMMITTEE, *supra* note 39, at 89). The brief quoted at length from the Committee's report describing the segregation of American blacks in the nation's capital. *Id.* at 4-6. In addition, the Committee's Report, quoted in the brief, emphasized that

> [t]he shamefulness and absurdity of Washington's treatment of Negro Americans is highlighted by the presence of many dark-skinned foreign visitors. Capital custom not only humiliates colored citizens, but is a source of considerable embarrassment to these visitors. . . . Foreign officials are often mistaken for American Negroes and refused food, lodging and entertainment. However, once it is established that they are not Americans, they are accommodated.

*Id.* at 5-6 (quoting PRESIDENT'S COMMITTEE, *supra* note 39, at 95).

285.  *Id.* at 3.

286.  *Id.* (emphasis in original).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 447 of 482

Racial discrimination furnishes grist for the Communist propaganda mills, and it raises doubts even among friendly nations as to the intensity of our devotion to the democratic faith.[287]

To document this claim, the Department devoted nearly two pages of the brief to a lengthy quotation from Secretary of State Acheson. According to Acheson,

[d]uring the past six years, the damage to our foreign relations attributable to [race discrimination] has become progressively greater. The United States is under constant attack in the foreign press, over the foreign radio, and in such international bodies as the United Nations because of various practices of discrimination against minority groups in this country. As might be expected, Soviet spokesmen regularly exploit this situation in propaganda against the United States, both within the United Nations and through radio broadcasts and the press, which reaches all corners of the world. Some of these attacks against us are based on falsehood or distortion; but the undeniable existence of racial discrimination gives unfriendly governments the most effective kind of ammunition for their propaganda warfare.[288]

World attention to U.S. discrimination was of increasing concern to the State Department, because

[t]he hostile reaction among normally friendly peoples, many of whom are particularly sensitive in regard to the status of non-European races, is growing in alarming proportions. In such countries the view is expressed more and more vocally that the United States is hypocritical in claiming to be the champion of democracy while permitting practices of racial discrimination here in this country.[289]

School segregation, in particular, had been "singled out for hostile foreign comment in the United Nations and elsewhere. Other peoples cannot understand how such a practice can exist in a country which professes to be a staunch supporter of freedom, justice, and democracy."[290] The Secretary of State concluded that "racial discrimination in the United States remains a source of constant embarrassment to this Government in the day-to-day conduct of its foreign relations; and it

---

287. *Id.* at 6. The NAACP made the same point, although briefly, when the case was reargued. They stressed that the "[s]urvival of our country in the present international situation is inevitably tied to resolution of this domestic issue." Brief for Appellants on Reargument at 194, Brown v. Board of Educ., 347 U.S. 483 (1954). The NAACP's jurisdictional statement in *Brown* also alluded to Cold War tensions:

The issues are of vital importance especially at this time because the preservation of strong democratic institutions necessarily depends upon the intelligence and enlightenment of our citizenry. When the educational and mental development of a portion of our population is retarded by state practices which violate the Constitution, it becomes impossible to fully muster the capabilities and energies of the country to meet whatever crises lie ahead.

Statement as to Jurisdiction at 5, Brown v. Board of Education, 347 U.S. 483 (1954).

288. Brief for the United States as Amicus Curiae at 7, *Brown,* 347 U.S. 483 (quoting letter from the Attorney General (Dec. 2, 1952)).

289. *Id.*

290. *Id.* at 8.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

jeopardizes the effective maintenance of our moral leadership of the free and democratic nations of the world."[291]

With this clear statement of the national security implications of the cases before the Court, the Justice Department brought its discussion of the interest of the United States to a close. The centrality of the Cold War imperative to the government's posture on segregation was then reemphasized in the brief's conclusion. The Department concluded by reiterating the notion that race discrimination "presents an unsolved problem for American democracy, an inescapable challenge to the sincerity of our espousal of the democratic faith."[292] An affirmance of constitutional principles "[i]n these days, when the free world must conserve and fortify the moral as well as the material sources of its strength, . . . is especially important."[293] In the final paragraph, the brief quoted from President Truman:

> If we wish to inspire the people of the world whose freedom is in jeopardy, if we wish to restore hope to those who have already lost their civil liberties, if we wish to fulfill the promise that is ours, we must correct the remaining imperfections in our practice of democracy.
>
> We know the way. We need only the will.[294]

The significance of the pending *Brown* litigation was not lost on foreign critics of American racism. In December 1952, a prominent Amsterdam newspaper pointed to the pending cases as a "dynamic development of the handling of the negro problem in the United States."[295] Referring to Gunnar Myrdal's definition of the "American Dilemma" as "the divergence between the American credo and American practice," the paper believed that "[t]he fact that the Washington Court deals with this problem, indicates that the bridge between credo and reality is nearing its completion."[296]

In *Brown* and *Bolling*, the Court ruled in favor of the plaintiffs, this time adopting the position the Justice Department had been urging since *Henderson*: segregation as such violated the Constitution.[297] The Court emphasized the "importance of education to our democratic society." Education was "required in the performance of our most basic public responsibilities, even service in the armed forces." It was "the very foundation of good citizenship." Because, "[i]n these days, it is doubtful that any child may reasonably be expected to succeed in life if

---

291. *Id.*
292. *Id.* at 31.
293. *Id.*
294. *Id.* at 32 (quoting Truman, Message to the Congress, *supra* note 283, at 7).
295. Dispatch No. 766, from The Hague, the Netherlands, to Dept. of State (Dec. 30, 1952), NARS Doc. No. 811.411/12-3052 LWC.
296. *Id.*
297. In *Brown*, the Court ruled that public school segregation by states violated the equal protection clause of the fourteenth amendment. 347 U.S. at 495. In *Bolling*, the Court found that such segregation in the District of Columbia violated the due process clause of the fifth amendment. 347 U.S. at 500.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

he is denied the opportunity of an education," where a state provided public education, it was "a right which must be made available to all on equal terms."[298] Relying partly on social science data regarding the harmful effects of segregation on school children, the Court concluded that "[s]eparate educational facilities are inherently unequal."[299]

## VI. The Impact of *Brown* on American Foreign Policy Interests

When *Brown v. Board of Education* was decided, the opinion gave the State Department the counter to Soviet propaganda it had been looking for, and the State Department wasted no time in making use of it. Within an hour after the decision was handed down, the Voice of America broadcast the news to Eastern Europe.[300] An analysis accompanying the "straight news broadcasts" emphasized that "the issue was settled by law under democratic processes rather than by mob rule or dictatorial fiat."[301] The *Brown* broadcast received "top priority on the Voice's programs," and was to be "beamed possibly for several days, particularly to Russian satellites and Communist China." The *New York Times* quoted a Voice of America official as commenting that "[i]n these countries . . . the people would know nothing about the decision except what would be told them by the Communist press and radio, which you

---

298. *Brown*, 347 U.S. at 493.

299. *Id.* at 494-95. The *Brown* opinion itself differs from so many of the historical sources concerning the case in that it does not contain explicit Cold War rhetoric. It would have been, of course, somewhat impolitic of the Court to suggest that the decision was motivated not by a dispassionate reading of the Constitution, but rather by a concern about how others viewed the morality of the American form of government.

I am not, at this point, making an argument about the Supreme Court: I am not arguing that the Cold War imperative determined the way members of the Court cast their votes in *Brown*. It is very possible that, as with the executive branch, archival research on Supreme Court Justices might disclose specific ways in which members of the Court were influenced by Cold War ideology. While I don't make strong claims about the Court in this article, the connections between Cold War ideology and civil rights nonetheless remain important in considering the Court's actions. The Supreme Court, in any given historical period, is necessarily influenced by the intellectual history of its times. The ideas available to Supreme Court justices that are regarded as reasonable ways to think about the world are the same ideas available to others, or at least to others in their social class. *Cf.* K. Mannheim, Ideology and Utopia: An Introduction to the Sociology of Knowledge 2-4 (L. Worth & E. Shils trans. 1936) (discussing the contextuality of thought). Accordingly, a starting point for any analysis of Supreme Court actions in history must be an understanding of the broader cultural milieu within which members of the Court lived, thought, and acted. During the late 1940s and early 1950s, a period of substantial progress in the area of minority rights by the Court, Cold War ideology informed the broader discourse on civil rights in important and powerful ways. It is unlikely that these ideas did not inform the Court in a manner similar to that in which they informed executive branch actions during this period.

300. N.Y. Times, May 18, 1954, at 1, col. 7. The Voice of America's ability to effectively use the decision was enhanced by the fact that the opinion was short and easily understandable by lay persons. Chief Justice Earl Warren intended to write "a short opinion so that any layman interested in the problem could read the entire opinion [instead of getting just] a little piece here and a little piece there. . . . I think most of the newspapers printed the entire decision." *See* J. Wilkinson, *supra* note 7, at 30 (quoting H. Abraham, Freedom and the Court 372 n.90 (3d ed. 1977)).

301. N.Y. Times, May 18, 1954, at 1, col. 7.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

may be sure would be twisted and perverted. They have been told that the Negro in the United States is still practically a slave and a declassed citizen.''[302]

The *Brown* decision had the kind of effect on international opinion that the U.S. government had hoped for. Favorable reaction to the opinion spanned the globe. On May 21, 1954, for example, the President of the Municipal Council of Santos, Sao Paulo, Brazil sent a letter to the U.S. Embassy in Rio de Janeiro celebrating the *Brown* decision. The Municipal Council had passed a motion recording "a vote of satisfaction" with the ruling. They viewed *Brown* as "establishing the just equality of the races, essential to universal harmony and peace." The Council desired that "the Consul of that great and friendly nation be officially notified of our desire to partake in the rejoicing with which the said decision was received in all corners of the civilized world.''[303]

Newspapers in Africa gave extensive coverage to the decision. According to a dispatch from the American Consul in Dakar, *Brown* was "greeted with enthusiasm in French West Africa although the press has expressed some slight skepticism over its implementation.''[304] *Afrique Nouvelle*, a weekly paper that was a "highly vocal opponent of all racial discrimination," carried an article under the headline "At last! Whites and Blacks in the United States on the same school benches." The dispatch noted that the writer was concerned that there would be

> "desperate struggles" in some states against the decision but expresses the hope that the representatives of the negroes and the "spiritual forces" of the United States will apply themselves to giving it force and life. The article concludes by saying that "all the peoples of the world can salute with joy this measure of progress.''[305]

The American Consul concluded the dispatch by observing that

> [w]hile it is, of course too soon to speculate on the long range effects of the decision in this area, it is well to remember that school segregation more than any other single factor has lowered the prestige of the United States among Africans here and the over-all results, therefore, can hardly fail to be beneficial.[306]

---

302. *Id.*

303. Dispatch No. 1498, from U.S. Embassy, Rio de Janiero, to Dep't of State (June 2, 1954) (Embassy translation), NARS Doc. No. 811.411/6-254.

304. Dispatch No. 248, from U.S. Consul, Dakar, French West Africa, to Dep't of State (May 26, 1954), NARS Doc. No. 811.411/5-2654.

305. *Id.* According to the dispatch, "Other editorial comment has been similar and the news has been prominently featured in all papers received by the Consulate General since the decision was made." *Id.*

306. *Id.* Not all reaction to *Brown* was enthusiastic. In South Africa, the decision "elicited general public interest, but little articulate reaction." According to a dispatch from the U.S. Embassy in Cape Town, "[m]ost South African Whites are segregationists and, though they may see some similarity in America's color problem, regard their own racial situation as having no true parallel elsewhere. Their interest in the decisions, then, would be very academic." Dispatch No. 224 (Cape Town Series), from U.S. Embassy, Cape Town, South Africa, to Dep't of State (June 9, 1954), NARS Doc. No. 811.411/6-954.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 451 of 482

Although the initial decision to participate in *Brown* had been made by the Truman Administration, the Republican National Committee (RNC) was happy to take credit for it. On May 21, 1954, the RNC issued a statement which claimed that the decision "falls appropriately within the Eisenhower Administration's many-frontal attack on global Communism. Human equality at home is a weapon of freedom. . . . [I]t helps guarantee the Free World's cause."[307]

Newspapers in many parts of the United States celebrated *Brown* as affirming democratic principles. According to the *New York Herald Tribune*, the decision "squared the country's basic law with its conscience and its deepest convictions."[308] Others considered the decision's foreign policy benefits to be of central importance. The *San Francisco Chronicle* believed that "[g]reat as the impact of the antisegregation ruling will be upon the states of the South in their struggle to make the physical and intellectual adjustment which it requires, still greater, we believe, will be its impact on South America, Africa and Asia, to this country's lasting honor and benefit."[309] As the *Pittsburgh Courier*, a black newspaper, saw it, "[t]his clarion announcement will . . . stun and silence America's Communist traducers behind the Iron Curtain. It will effectively impress upon millions of colored people in Asia and Africa the fact that idealism and social morality can and do prevail in the United States, regardless of race, creed or color."[310]

Throughout the South, many newspapers called for calm.[311] In North Carolina, the *Charlotte News* urged that "[s]omehow, the South must keep the sweep of human history in proper perspective, must apply its intelligence cooly and dispassionately, and must find the resources for giving all its children equality of education."[312] The *St. Petersburg Times* in Florida declared: "A major blow for man's freedom has been struck. Americans can take pride in the patience and common

---

307. Republican National Committee, News Release, May 21, 1954, at 3, White House Files—Civil Rights—Republican National Committee 1954, Box 37, Philleo Nash Papers, Harry S Truman Library (on file with the *Stanford Law Review*).

President Eisenhower himself was less enthusiastic. He repeatedly refused to publicly endorse *Brown. See* R. BURK, THE EISENHOWER ADMINISTRATION AND BLACK CIVIL RIGHTS 144, 162, 165-66 (1984). *See generally* Mayer, *With Much Deliberation and Some Speed: Eisenhower and the Brown Decision*, 52 J. SOUTHERN HIST. 43 (1986). Eisenhower criticized "foolish extremists on both sides" of the school desegregation controversy, R. BURK, *supra*, at 163, and, in an effort to distance his administration from the Supreme Court's ruling, he "rebuked Vice President Nixon for referring to Earl Warren as the 'Republican Chief Justice'. . . ." *Id.* at 162. Chief Justice Warren was angered by Eisenhower's stance. He believed that if Eisenhower had fully supported *Brown*, "we would have been relieved . . . of many of the racial problems that have continued to plague us." E. WARREN, THE MEMOIRS OF EARL WARREN 291 (1977); *see* J. WILKINSON, *supra* note 7, at 24.

308. N.Y. Times, May 18, 1954, at 19, col. 2 (quoting *New York Herald Tribune*).

309. *Id.* at col. 3 (quoting *San Francisco Chronicle*).

310. *Id.* at col. 5 (quoting *Pittsburgh Courier*).

311. News coverage of *Brown* was itself a news story, as many papers reported on the reaction to the decision by other papers. *See, e.g.,* N.Y. Times, May 18, 1954, at 19, col. 1; Birmingham Post-Herald, May 18, 1954, at 5, col. 1.

312. Birmingham Post-Herald, May 18, 1954, at 5, col. 4 (quoting *Charlotte* (N.C.) *News*).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

sense of its white and black citizens that this major change is being made through our courts rather than brawls and violence."[313]

Many Southern politicians were less magnanimous. Governor Herman Talmadge of Georgia, who had promised that "there will never be mixed schools while I am governor," claimed that the decision "has reduced our Constitution to a mere scrap of paper."[314] Georgia Lieutenant Governor Marvin Griffin, a candidate to succeed Talmadge, said "the races will not be mixed, come hell or high water."[315] South Carolina Governor James F. Byrnes was "shocked" at the decision, but called for whites and blacks to "exercise restraint and preserve order."[316] Although most Alabama public officials "met news of the high court's ruling with a calm wait and see attitude," one state legislator claimed that "[w]e are going to keep every brick in our segregation wall intact."[317]

Some southerners, however, welcomed the decision. According to the *Atlanta Daily World*, "[l]ocal leaders and educators" in Atlanta viewed *Brown* "as a giant step forward for democracy at home and abroad."[318] A member of the Atlanta Board of Education proclaimed that "[i]n this decision we have not only lived up to the high moral principles which are at the foundation upon which this country has been built. But we have also given an effective and a resounding reply to the Communist criticism of our treatment of our minority group."[319]

Anticommunism also informed the segregationists' response. Robert Patterson, a founder of the first white Citizens Council,[320] protested the "dark cloud of integration."[321] He believed "[a] lot of people are resigning themselves to seeing their children crammed into schools and churches with children of other races and being taught the Communist theme of all races and mongrelization." He urged that, if southerners worked together, "we will defeat this communistic disease that is being thrust upon us."[322]

Governor Talmadge responded directly to the claim that segregation had to be abandoned because of its use in Soviet propaganda. In

---

313. *Id.* at 5, col. 5 (quoting *St. Petersburg* Fla. *Times*). The *Charlotte News* counseled that "[i]f the South as a region, and North Carolina as a state, are able to do these things, they will find that the problem is far more manageable than it appears at the moment." *Id.* at col. 4 (quoting *Charlotte* (N.C.) *News*).

314. N.Y. Times, May 18, 1954, at 1, col. 5.

315. *Id.* at 20, col. 6.

316. *Id.* at 1, col. 5.

317. *Id.* at 20, col. 4.

318. Atlanta Daily World, May 18, 1954, at 1, col. 3.

319. *Id.* Another Atlanta educator remarked, presciently, that the decision would have " 'very little immediate effect' because of existing residential segregation, which will tend to hold Negro students in schools in their communities and whites in theirs." *Id.*

320. J. MARTIN, THE DEEP SOUTH SAYS NEVER, 1-4 (1957). Citizens Councils throughout the South played a key role in Massive Resistance efforts. *See* F. WILHOIT, THE POLITICS OF MASSIVE RESISTANCE 49-50 (1973).

321. J. MARTIN, *supra* note 320, at 24.

322. *Id.* at 1-2 (quoting Patterson).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 453 of 482

his book *You and Segregation*,[323] Talmadge claimed that "[f]or over a decade now, the American people have been undergoing . . . vicious and dangerous 'brain-washing' "[324] directed by international Communists. "Stop and think for a moment," he urged.

> How many times have you read in your newspapers and magazines or heard over the airwaves this question: "What will Russia say if our government does this?" How many times have you read or heard this: "What will the Reds say if we don't do this?" or "What will the Communist newspaper *Pravda* print about the United States because we do this or that?" In some instances we have shaped our national policy by trying to please the Communists.[325]

Talmadge believed that "[t]oo many things are being done in our country and by our country because we keep looking back over our shoulders at the Communists. Who cares what the Reds say? Who cares what *Pravda* prints?"[326] He continued, "[t]hese are the answers I give when asked, 'What will the Communists say about the stand you Southerners take on racial segregation?' or 'Wouldn't the end of segregation stop Moscow and *Pravda* from slandering the United States?' Who cares what the Communists say! Who cares what *Pravda* prints!"[327] Talmadge claimed that "only one group stands to gain" from the "attacks on the Bill of Rights" that *Brown* represented. "That group is the Communist party and its fellow-travelers."[328]

## VII. Conclusion

As Talmadge's segregationist polemic suggested, U.S. actions taken to dismantle racial segregation were motivated, in part, by what *Pravda* printed. Concerns on the part of the State Department and others about how Soviet propaganda on American racism affected U.S. foreign policy interests informed the Truman Administration's pro-civil rights posture. The foreign policy problem was considered to be sufficiently important that the Justice Department sought out documentation from the State Department to use in its civil rights amicus briefs. The Justice Department devoted a considerable amount of space to these arguments, and stressed to the Supreme Court that a decision upholding segregation would have demonstrable, negative effects on international relations.

The desegregation cases came before the Court at a time when the sanctity of American democracy had tremendous implications for U.S.

---

323. H. TALMADGE, *supra* note 7. Talmadge's book was popular. The first printing of 10,000 copies sold out in one week, and a second printing of 50,000 copies was ordered. TIME, Nov. 14, 1955, at 31.
324. H. TALMADGE, *supra* note 7, at vi.
325. *Id.*
326. *Id.*
327. *Id.*
328. *Id.* at 1.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 454 of 482

foreign policy interests. The U.S. hoped to save the world for democracy, and promoted its ideology and form of government as providing for greater personal freedom. In the U.S., the Voice of America proclaimed, the Bill of Rights and the Constitution protected American citizens from state tyranny. Yet as news story after news story of voting rights abuses, state-enforced segregation, and lynchings appeared in the world media, many questioned whether American constitutional rights and democratic principles had any meaning. In many African and Asian countries, where issues of race, nationalism and anti-colonialism were of much greater import than Cold War tensions between the superpowers, the reality of U.S. racism was particularly problematic. America could not save the Third World for democracy if democracy meant white supremacy. The Soviet Union's efforts to take advantage of this American dilemma reinforced its Cold War implications.

In responding to foreign critics, State Department officials attempted to characterize American racism as a regional, rather than a national, problem, and as something that was on its way out. They argued that democracy was working, and that it would eventually overcome the anachronistic practices of a marginal few. The desegregation cases posed a threat to this characterization. If the Supreme Court had ruled in favor of the defendants in *Shelley, Henderson, Sweatt, McLaurin,* and *Brown*, the Court would have reaffirmed the idea that the American Constitution accommodated the racist practices challenged in those cases. American Embassy officials in Nigeria would have found it difficult to counter arguments that the Communist Party was more committed to the interests of people of color, if the Court had interpreted the document embodying the principles of democracy and individual rights to be consistent with racial segregation.

The Truman Administration recognized and responded to this threat, marshalling evidence in its amicus briefs on the foreign policy implications of the desegregation cases. The Eisenhower Administration took advantage of the denouement, prominently using *Brown* in its propaganda efforts. Although American racism would continue to pose foreign policy difficulties from time to time, and the Soviet Union would continue to use it as a propaganda theme,[329] *Brown* helped to undercut the more powerful anti-American arguments. *Brown* laundered the principles of democracy in the eyes of the world. The decision announced that racial segregation and American constitutional rights were inconsistent with each other. After *Brown*, the State Department could blame racism on the Klan and the crazies. They could argue that the American Constitution provided for effective social change. And, most importantly, they could point to the *Brown* decision as evidence that racism was at odds with the principles of American

---

329. *See* A. BLAKELY, RUSSIA AND THE NEGRO: BLACKS IN RUSSIAN HISTORY AND THOUGHT 116-18 (1986).

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

democracy. This foreign policy angle, this Cold War imperative, was one of the critical factors driving the federal government's postwar civil rights efforts.[330]

As Derrick Bell has argued, efforts to achieve social change on matters of race in American history cannot be understood solely in terms of the benefits people of color have derived from them.[331] Whites who have participated in such efforts have acted out of self-interested as well as beneficent motives. Recognizing this principle, which Bell has called the interest-convergence dilemma,[332] is particularly critical to unpacking the relative commitment of different groups in a coalition to the full realization of the changes they seek. A group's commitment to social change is informed by the nature of the group's interest in social change.[333] Accordingly, to the extent that the Cold War imperative motivated U.S. government efforts to achieve racial equality, the degree of commitment to continued action may have been diminished by the degree to which Cold War motives were satisfied.[334] As the focus of

---

330. I am not arguing that the *only* reason the Truman Administration acted was the foreign policy implications of segregation. Concern about racial injustice and political motivations also played a part. *See* text accompanying notes 80-101 *supra*. Nevertheless, the Cold War imperative was sufficiently important that federal government actions in the area of civil rights cannot be fully understood without examining it.

Some might argue that Cold War arguments were simply a useful rhetorical device employed by people who were actually motivated by moral considerations. Under this interpretation, government officials got involved in pro-civil rights efforts simply because it was "the right thing to do." Having made such a policy decision on moral grounds, they then employed whatever arguments might be effective, including foreign policy-related ones. In other words, Cold War arguments were purely instrumental; they were not part of the policy-making process. They were used because they might be effective, not because they were believed to be important in and of themselves.

I do not argue that moral considerations were unimportant. *Cf.* A. HAMBY, *supra* note 14, at 66-67 (noting the moral concerns which motivated Truman). However, in my view, the wealth of material in the State Department archives documenting the government's attention to, and concern about, the effect of domestic race discrimination on international relations, demonstrates that the Truman Administration took this problem very seriously. They considered the negative effect of race discrimination on foreign policy to be a grave problem, not simply a convenient argument used to serve an independent purpose.

Further, the President's Committee on Civil Rights argued that foreign relations was one of the three key reasons why the federal government had to do something about race discrimination. *See* PRESIDENT'S COMMITTEE, *supra* note 39, at 146-48. Others agreed that racism hampered foreign relations, and had to be dealt with if the United States were to be a true leader in world politics. *See* G. MYRDAL, *supra* note 17, at 1015-21; T. HAREVAN, ELEANOR ROOSEVELT: AN AMERICAN CONSCIENCE 204 (1968).

In light of this evidence, the foreign policy-related arguments in the desegregation cases cannot be dismissed merely as strategic rhetoric devoid of independent substance.

331. Bell, *Convergence Dilemma, supra* note 8, at 524-25; Bell, *Racial Remediation, supra* note 8, at 6-13.

332. Bell, *Convergence Dilemma, supra* note 8, at 518.

333. According to Bell, "[i]f . . . rights for blacks require for survival a climate permeated by white self-interest, those rights can be expected to wither in the far more hostile atmosphere that exists when the interests and priorities of whites change." Bell, *Racial Remediation, supra* note 8, at 21.

334. For example, to the degree that symbolic change, not actual desegregation, was what was needed to rehabilitate America's international image, *Brown II*, 349 U.S. 294 (1955), which delayed enforcement of *Brown I*, would not be inconsistent with foreign policy needs.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

120                 *STANFORD LAW REVIEW*                [Vol. 41:61

this article is on federal government actions leading up to *Brown*, it does not explore the way in which this analysis might affect interpretations of post-*Brown* civil rights efforts. This remains an area where further scholarship is needed. In examining later civil rights policy, the role of foreign policy imperatives in domestic civil rights may help us to understand not only what motivated the federal government to act. It may also enable us to understand more fully the limits of the majority's commitment to racial equality.

---

Action on the part of the executive branch and the Court would only be necessary when, due to overt resistance, the symbol of *Brown* itself was threatened. *See* Cooper v. Aaron, 358 U.S. 1 (1958). *See generally* T. Freyer, *supra* note 7.

This content downloaded from 130.132.173.70 on Sun, 12 Nov 2017 16:43:31 UTC
All use subject to http://about.jstor.org/terms

# HEINONLINE

Citation:
William; Tucker, St. George Blackstone. Blackstone's
Commentaries: With Notes of Reference, to the
Constitution and Laws, of the Federal Government of the
United States; and of the Commonwealth of Virginia
(1803).
Provided by:
Yale Law Library

Content downloaded/printed from *HeinOnline*

Mon Oct 30 20:44:31 2017

-- Your use of this HeinOnline PDF indicates your acceptance
  of HeinOnline's Terms and Conditions of the license
  agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
  uncorrected OCR text.



Use QR Code reader to send PDF to
your smartphone or tablet device

Case 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 458 of 482

that no capitation or other direct tax shall be laid, unless in pro-
portion to the census, or enumeration, by the constitution direct-
ed to be taken. [C. U. S. Art. 1. § 9.] And the fifth article of
the constitution declares, that no amendment made prior to the
year 1808, shall in any manner affect this, and the first clause of
the ninth section, above noticed.

The acts of 3 Cong. c. 45, and 4 Cong. c. 37, laying duties
upon carriages for the conveyance of persons, were thought to
be infringements of this article, it being supposed, that such a tax
was a direct tax, and ought to have been apportioned among the
states.   The question was tried in this state, in the case of the
United States, against Hylton, and the court being divided in
opinion, was carried to the supreme court of the United States,
by consent.   It was there argued by the proposer of it, (the first
secretary of the treasury,) on behalf of the United States, and
by the present chief justice of the United States, on behalf of the
defendant.   Each of those gentlemen was supposed to have de-
fended his own private opinion.   That of the secretary of the
treasury prevailed, and the tax was afterwards submitted to, uni-
versally, in Virginia *.

6. Upon similar principles of equity, and impartiality, the
succeeding clause declares, that no tax or duty shall be laid on
articles exported from any state.   No preference shall be given
by any regulation of commerce, or revenue, to the ports of one
state, over those of another; nor shall vessels bound to, or from
one state, be obliged to enter, clear, or pay duties, in another....
And the fourth article of the constitution, Sec. 3, further provides,
that nothing in the constitution of the United States shall be so
construed as to prejudice any claims of the United-States, or of
any particular state.   The reasons of these several restrictions
and explanations having been already noticed, I shall add no-
thing more to the subject here; they being mentioned in this place
only for the sake of method.

* The president of the court of appeals in Virginia was one of those who
refused to pay the tax, until the question was judicially determined.   The opi-
nion of the author of this essay, with the reasons of it have been shewn before,
page 197.

APPENDIX. 295

6. No title of nobility shall be granted by the United States, or any state: and no person holding any office of profit or trust under the United States, shall, without consent of congress, ac-cept of any present, emolument, office, or title of any kind what-ever, from any king, prince, or foreign state. C. U. S. Art. 1. Sec. 9, 10.

The first of these prohibitions was indispensably necessary to preserve the several states in their democratic form, tone, and vigour. Distinctions between the citizens of the same state, are utterly incompatible with the principles of such governments. Their admission, therefore, can not be too cautiously guarded against: and their total exclusion seems to be the only mode by which this caution can operate effectually. We have already noticed, that the several acts passed for establishing an uniform rule of naturalization, require of every alien becoming a citizen, of the United States, an absolute renunciation, on oath, of any title of nobility, which he might have borne under any other prince or state. Without this wise provision, this clause of the consti-tution might have failed of some of those salutary effects which it was intended to produce. The second prohibition is not less important. Corruption is too subtle a poison to be approached, without injury. Nothing can be more dangerous to any state, than influence from without, because it must be invariably bot-tomed upon corruption within. Presents, pensions, titles and offices are alluring things. In the reign of Charles the second of England, that prince, and almost all his officers of state were either actual pensioners of the court of France, or supposed to be under its influence, directly, or indirectly, from that cause. The reign of that monarch has been, accordingly, proverbially dis-graceful to his memory. The economy which ought to prevail in republican governments, with respect to salaries and other emoluments of office, might encourage the offer of presents from abroad, if the constitution and laws did not reprobate their ac-ceptance. Congress, with great propriety, refused their assent to one of their ministers to a foreign court, accepting, what was called the usual presents, upon taking his leave: a precedent which we may reasonably hope will be remembered by all *future* ministers, and ensure a proper respect to this clause of the con-

stitution, which on a former occasion is said to have been over-looked.

Thus far the restrictions contained in the constitution extend: ". The conventions of a number of the states having, at the time of adopting the constitution, expressed a desire, in order to prevent misconstruction, or abuse of its powers, that further declaratory and restrictive clauses should be added; and as extending the ground of public confidence in the government, will best ensure the beneficent ends of its institution*." The following articles were proposed by congress, as amendments to the constitution, which having been duly ratified by the several states, now form a part thereof.

7. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.....Amendments to C. U. S. Art. 3.

On the first of these subjects, our state bill of rights contains, what, if prejudice were not incapable of perceiving truth, might be deemed an axiom, concerning the human mind. That " religion, or the duty we owe to our Creator, and the manner of discharging it, can be dictated only by reason and conviction, not by force or violence." In vain, therefore, may the civil magistrate interpose the authority of human laws, to prescribe that belief, or produce that conviction, which human reason rejects : in vain may the secular arm be extended, the rack stretched, and the flames kindled, to realize the tortures denounced against unbelievers by all the various sects of the various denominations of fanatics and enthusiasts throughout the globe. The martyr at the stake, glories in his tortures, and proves that human laws may punish, but cannot convince. The pretext of religion, and the pretences of sanctity and humility, have been employed throughout the world, as the most direct means of gaining influence and power. Hence the numberless martyrdoms and massacres

* Preamble to the amendments proposed by the 1 Cong. 1 Sess.

which have drenched the whole earth with blood, from the first moment that civil and religious institutions were blended together. To separate them by mounds which can never be overleaped, is the only means by which our duty to God, the peace of mankind, and the genuine fruits of charity and fraternal love, can be preserved or properly discharged. This prohibition, therefore, may be regarded as the most powerful cement of the federal government, or rather, the violation of it will prove the most powerful engine of separation. Those who prize the union of the states will never think of touching this article with unhallowed hands. The ministry of the unsanctified sons of Aaron scarcely produced a flame more sudden, more violent, or more destructive, than such an attempt would inevitably excite....I forbear to say more, in this place, upon this subject, having treated of it somewhat at large in a succeeding note.

The second part of this clause provides, against any law, abridging the freedom of speech, or of the press.

It being one of the great fundamental principles of the American governments, that the people are the sovereign, and those who administer the government their agents, and servants, not their kings and masters, it would have been a political solecism to have permitted the smallest restraint upon the right of the people to enquire into, censure, approve, punish or reward their agents according to their merit, or demerit. The constitution, therefore, secures to them the unlimited right to do this, either by speaking, writing, printing, or by any other mode of publishing, which they may think proper. This being the only mode by which the responsibility of the agents of the public can be secured, and practically enforced, the smallest infringement of the rights guaranteed by this article, must threaten the total subversion of the government. For a representative democracy ceases to exist the moment that the public functionaries are by any means absolved from their responsibility to their constituents ; and this happens whenever the constituent can be restrained in any manner from speaking, writing, or publishing his opinions upon any public measure, or upon the conduct of those who may advise or execute it.

Our state bill of rights declares, that the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments. The constitutions of most of the other states in the union contain articles to the same effect. When the constitution of the United States was adopted by the convention of Virginia, they inserted the following declaration in the instrument of ratification: " that among other essential rights, the liberty of conscience, and of the press, cannot be cancelled, abridged, restrained, or modified by any authority of the United States."

An ingenious foreigner seems to have been a good deal puzzled to discover the law which establishes the freedom of the press in England: after many vain researches, he concludes, (very rightly, as it relates to that government,) that the liberty of the press there, is grounded on its not being prohibited*. But with us, there is a visible solid foundation to be met with in the constitutional declarations which we have noticed. — The English doctrine, therefore, that the liberty of the press consists only in this, that there shall be no previous restraint laid upon the publication of any thing which any person may think proper, as was formerly the case in that country, is not applicable to the nature of our government, and still less to the express tenor of the constitution. That this necessary and invaluable liberty has been sometimes abused, and " carried to excess; that it has " sometimes degenerated into licentiousness, is seen and la- " mented; but the remedy has not been discovered. Perhaps " it is an evil inseparable from the good to which it is allied: " perhaps it is a shoot which cannot be stripped from the stalk, " without wounding vitally the plant from which it is torn. How- " ever desirable those measures might be which correct without " enslaving the press, they have never yet been devised in Ame- " rica†."

It may be asked; is there no protection for any man in America from the wanton, malicious, and unfounded attacks of en-

* De Lolme on the English constitution. 317. Phila. printed.
† Letter from the American envoys to the French minister of foreign affairs. This nervous passage bespeaks its author; a gentleman who now fills the highest judicial office under the federal government.

venomed calumny? Is there no security for his good name? Is there no value put upon reputation? No reparation for an injury done to it?

To this we may answer with confidence, that the judicial courts of the respective states are open to all persons alike, for the redress of injuries of this nature; there, no distinction is made between one individual and another; the farmer, and the man in authority, stand upon the same ground: both are equally entitled to redress for any false aspersion on their respective characters, nor is there any thing in our laws or constitution which abridges this right. But the genius of our government will not permit the federal legislature to interfere with the subject; and the federal courts are, I presume, equally restrained by the principles of the constitution, and the amendments which have since been adopted.

Such, I contend, is the true interpretation of the constitution of the United States: it has received a very different interpretation both in congress and in the federal courts. This will form a subject for a discussion on the freedom of the press, which the student will find more at large in another place.

The same article secures to the people the right of assembling peaceably; and of petitioning the government for the redress of grievances. The convention of Virginia proposed an article expressed in terms more consonant with the nature of our representative democracy, declaring, that the people have a right, peaceably to assemble together to consult for their common good, or to instruct their representatives: that every freeman has a right to petition, or apply to the legislature, for the redress of grievances. This is the language of a free people asserting their rights: the other savours of that stile of condescension, in which favours are supposed to be granted. In England, no petition to the king, or either house of parliament for any alteration in church or state, shall be signed by above twenty persons, unless the matter thereof be approved by three justices of the peace, or a major part of the grand-jury in the

county ; nor be presented by more than ten persons.  In America, there is no such restraint.

8. A well regulated militia being necessary to the security of a free state, the right of the people to keep, and bear arms, shall not be infringed.   Amendments to C. U. S. Art. 4.

This may be considered as the true palladium of liberty....
The right of self-defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible.   Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction. In England, the people have been disarmed, generally, under the specious pretext of preserving the game : a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes. True it is, their bill of rights seems at first view to counteract this policy : but the right of bearing arms is confined to protestants, and the words suitable to their condition and degree, have been interpreted to authorise the prohibition of keeping a gun or other engine for the destruction of game, to any farmer, or inferior tradesman, or other person not qualified to kill game. So that not one man in five hundred can keep a gun in his house without being subject to a penalty.

9. No soldier shall in time of peace be quartered in any house without the consent of the owner ; nor in time of war, but in a manner to be prescribed by law.   Amendments to C. U. S. Art. 5.

Our state bill of rights, conforming to the experience of all nations, declares, that standing armies in time of peace, should be avoided as dangerous to liberty ; this article of the constitution, seems by a kind of side wind, to countenance, or at least, not to prohibit them. The billeting of soldiers upon the citizens of a state, has been generally found burthensome to the people,

and so far as this article may prevent that evil it may be deemed valuable; but it certainly adds nothing to the national security.

10. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but upon probable cause supported by oath, or affirmation, and particularly describing the place to be searched, and the person or things to be seized.    Amendments to C. U. S. Art. ·6, and herewith agrees the tenth article of our state bill of rights. ·

The case of general warrants, under which term all warrants not comprehended within the description of the preceding article may be included, was warmly contested in England about thirty or thirty-five years ago, and after much altercation they were finally pronounced to be illegal by the common law*. The constitutional sanction here given to the same doctrine, and the test which it affords for trying the legality of any warrant by which a man may be deprived of his liberty, or disturbed in the enjoyment of his property, can not be too highly valued by a free people.

But, notwithstanding this constitutional sanction, and the security which it promises to all persons, an act passed during the second session of the fifth congress, entitled an act concerning aliens, which was supposed to violate this article of the constitution, in the most flagrant and unjustifiable degree: by authorising the president of the United States to order all such aliens as he should judge dangerous to the peace and safety of the United States, or have reasonable grounds to suspect of any treasonable or secret machinations against the government thereof, to depart out of the territory of the United States within a limited time; and in case of disobedience, every alien so ordered was liable on conviction to be imprisoned for any term not exceeding three years. And any alien so ordered to depart, and remaining in the United States without a licence from

* See 3 Burrows Rep. 1743. 1 Blacks. Reports, 555. 4 Blacks Com. 291..

302                          APPENDIX.

the president might be arrested, and sent out of them, by his
order : and, in case of his voluntary return, might be imprison-
ed so long, as in the opinion of the president, the public safety
might require.    Alien friends, only, were the objects of this
act, another act being passed at the same session, respecting
alien enemies.....The general assembly of Virginia at their ses-
sion in 1798, " protested against the palpable, and alarming in-
" fractions of the constitution in this act; which exercises a
" power no where delegated to the federal government; and
" which, by uniting legislative and judicial powers to those of
" executive, subverts the general principles of a free govern-
" ment, as well as the particular organization, and positive pro-
" visions of the federal constitution."   Kentucky had before
adopted a similar conduct.

    Among the arguments used by the general assembly of Vir-
ginia in their strictures upon this act, the following seem to be
more peculiarly apposite to the subject of this article.

    In the administration of preventive justice, the following
principles have been held sacred; that some probable ground
of suspicion be exhibited before some judicial authority; that
it be supported by oath or affirmation; that the party may
avoid being thrown into confinement, by finding pledges or secu-
rities for his legal conduct, sufficient in the judgment of some
judicial authority; that he may have the benefit of a writ of
habeas corpus, and thus obtain his release, if wrongfully con-
fined; and that he may at any time be discharged from his
recognizance, or his confinement, and restored to his former
liberty and rights, on the order of the proper judicial autho-
rity; if it shall see sufficient cause*.

    Let the student diligently compare these principles of the
only preventive justice known to American jurisprudence,
and he will probably find that they are all violated by the alien
act.   The ground of suspicion is to be judged of, not by any
judicial authority, but by the executive magistrate, alone; no

    * Report of the committee of the general assembly of Virginia, on the alien
and sedition laws, January 20, 1800.

# CONGRESS
# AND THE
# PUBLIC TRUST

*Report of*

*The Association of the Bar*

*of the City of New York*

*Special Committee on Congressional*

*Ethics*

*James C. Kirby, Jr., Executive Director*

*Armin Rosencranz, Associate Director*

*Ellen W. Ober, Administrative Assistant*

ATHENEUM   1970   *NEW YORK*

# CHAPTER TWO

# CONFLICTS OF INTEREST

The most serious charge which can be made against a public official's ethics is that he betrays the public's trust in him by using the office to advance his own financial interests at the public's expense. Bribery and embezzlement are the most extreme forms of this and are covered by criminal statutes. A lesser form of the same evil, which may or may not be covered by statute, is the "conflict of interest." More accusations of official dereliction are lumped under this label than under any other. Much distrust of government flows from ambiguous circumstances where there is ground for suspicion that officials are promoting their own welfare rather than the public's. Our study has shown us that much can be done in the conflict-of-interest area to improve the Congressional image and enhance public confidence in Federal lawmakers.

## THE FIDUCIARY CONCEPT

The term "conflict of interest" has widely varying connotations. This is especially true at the Congressional level because the Congress has never supplied a formal definition for its own guidance. Many different views flourish in the literature of the subject.

The broadest concept of Congressional conflicts of interest, and a valid one for many purposes, has been stated by Senator Wallace Bennett (R-Utah), a Member of the Senate Ethics Committee. He said:

> The legislator comes to office as the result of a struggle for power between groups of voters whose interests are in conflict, and he is elected because he is the choice of the larger number. . . .
>
> [Legislation], with its inevitable compromises, is produced by the clash of obviously conflicting interests; and to say that a legislator must avoid conflict of interests in that situation is to ask the impossible.
>
> . . . [A] legislator's own vote, in committee or on the floor, is usually arrived at through the same process of conflict, because all the people he represents are never in agreement. In fact, the list of potential types and sources of conflict in which he may find himself is long and fraught with inevitability. . . .
>
> For the record I should like to list these areas of conflict. It is not a complete list.
>
> First, there are interests represented by political entities. There is the national interest. There is the interest of the Senator's state. There is the interest of his political party. There is the interest of the "administration"—which controls the executive department. Then there is the interest of the Senate or the House, as the case may be, as an institution. And to assume or assert that all of these interests always line up in a parallel is, of course, ridiculous. . . .
>
> Then there are the interests that are represented by privately organized groups that from time to time and in various ways seek to influence Government policies for their private benefits. There are national organizations of citizens with a common purpose, such as labor unions, veterans' organizations, business associations, and so forth. There are similar groups operating within the Senator's State whose programs may not be exactly the same as their national counterparts.
>
> Then there are individual interests. There is the interest of an individual constituent. There is the interest of a group constituent formed as a corporation or organization. Then there is the interest of fellow legislators.

Then there are interests of each Senator that might be described as personal—his personal philosophy of life and government; his personal goals, political and in private life; the well-being of people and institutions in which he has a personal interest, such as his family, his friends, his church, the schools with which he or his family have been involved; other groups or organizations in which in private life he is a loyal and active member; his hobbies; and at the bottom of the list, his personal financial affairs.[1]

As an analysis of Congressional decision-making and the pluralistic qualities of legislation, Senator Bennett's thoughtful statement is very helpful; but, as he would doubtless agree, a more specific concept must be developed if conflict of interest is to be a guiding ethical consideration for Members.

Some narrower meanings of the term were suggested in 1964 by the Senate Rules Committee in the report of its investigation of former Senate Majority Secretary Robert G. (Bobby) Baker's financial activities. The Committee said:

The average citizen interprets the words to include any conduct of a public official which will or may impose any sort of restraint upon such official's complete freedom in performing all his official acts. For instance, if a public official engages in an outside private profit-making business, however legitimate or laudable the business may be, a conflict of interest arises if such official gives so much time and attention to it that his attention to his official duties is lessened.

Likewise, a conflict of interest is deemed by people generally to arise when a public official engages in private business for profit and uses the facilities of his office and his official position to promote and carry on such business.[2]

The Rules Committee characterized these as the "popular conceptions" of the term and concluded that Baker's outside activities[3] were within them. The Committee also noted as a "technical definition" the relevant Federal criminal statutes on conflicts of interest.[4] The Committee declined to judge Baker's guilt or innocence under these laws.

In our opinion, these statutes incorporate portions of the popular concepts identified by the Rules Committee. They are aimed at uses of public office for private economic gain and incorporate the fiduciary concept governing private trustees as the basic standard of conduct for public trustees in public office. This concept is very much applicable to Congressional office, although implementation must take somewhat different forms from that used for the Executive Branch.

The fiduciary nature of Congressional office was recognized by the United States Senate in 1968, when it adopted as the preamble to its Ethics Code:

The ideal concept of public office, expressed by the words, "a public office is a public trust," signifies that the officer has been entrusted with public power by the people; that the officer holds this power in trust to be used only for their benefit and never for the benefit of himself or a few; and that the officer must never conduct his own affairs so as to infringe on the public interest.[5]

The Senate's admonition that a public official should never use his power for the benefit of himself states a basic fiduciary principle and holds the key to a workable system for regulating Congressional conflicts of interest. It is part of a pervasive legal concept that "the exercise of a granted power to act in behalf of others involves the assumption toward them of a duty to exercise the power in their interest and behalf. . . ."[6]

This duty prevents a fiduciary from acquiring any personal interest in the subject of the trust[7] because his sole motivation must be service of his beneficiary's interests. As stated by one expert:

It is the duty of a trustee to administer the trust solely in the interest of the beneficiaries. He is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries.[8]

Fiduciaries are never permitted to confuse their duty with their self-interest because:

. . . when a conflict between duty and self-interest arises in the breast of a person holding a fiduciary relation, the only safe rule

to adopt . . . ascribes to self-interest rather than a sense of duty the motive power of ensuing action.[9]

This principle accounts for much of the law governing public officials. Like private trustees, they can even be required to account for personal profits earned from a breach of trust. In a leading English case, the Crown was held to be entitled to money received by an army sergeant for guiding smugglers past police inspectors in North Africa during World War II.[10] The United States Supreme Court reached a similar result in *United States v. Carter*,[11] an action against an army procurement officer who received a kickback of half a million dollars on contracts let for harbor improvements. Although several conflict-of-interest statutes apparently were applicable, the Court mentioned none of them and relied solely on the fiduciary principle to impose a constructive trust on the tainted proceeds in the hands of the officer and others.[12]

A lawsuit based on the same theory was brought by the United States against Robert G. Baker in July 1969. A civil complaint filed by the U.S. Department of Justice in the Federal District Court for the District of Columbia alleged that Baker's net worth increased from $11,000 in 1956, the year after he became Majority Secretary, to $1,700,000 in 1963 ,when he resigned. An accounting was sought to determine what portion of this increase resulted from Baker's breaches of fiduciary obligation and exploitation of the influence and confidences of his office. Recovery of this amount for the benefit of the United States government is the ultimate relief sought.[13]

Conflict-of-interest rules governing public trustees reach corrupting influences which stop far short of outright bribes and activity such as Baker's. The controlling concept is considerably broader and appealingly simple. As our predecessor committee said when studying these problems in the Executive Branch:

The central conception of conflict of interest regulation is that an official should not act for the government where his private economic interests are involved.[14]

The evil is not only the possibility or appearance of private gain from public office, but the risk that official decisions, whether consciously or otherwise, will be motivated by something other than the public's

interests. The ultimate concern is bad government, which always means actual harm to the public.

That this is the basic thrust of conflict-of-interest laws governing the Executive Branch is shown by the decision of the United States Supreme Court in the famous Dixon-Yates litigation. A government contract for electric power was invalidated because the government had been represented in negotiations by a part-time financial consultant whose company could have been expected to profit from financing the construction of the contemplated power plants. In holding that a situation of such divided loyalty was an unlawful conflict of interest,[15] the Court said:

. . . The statute does not specify as elements of the crime that there be actual corruption or that there be any actual loss suffered by the Government as a result of the defendant's conflict of interest. This omission indicates that the statute establishes an objective standard of conduct, and that whenever a government agent fails to act in accordance with that standard, he is guilty of violating the statute, regardless of whether there is positive corruption. The statute is thus directed not only at dishonor, but also at conduct which tempts dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government.[16]

The evil, then, is risk of impairment of impartial judgment, a risk which arises whenever there is temptation to serve personal interests. The quality of specific results is immaterial. In this sense, conflict-of-interest regulation is true to the fiduciary principle. Like other fiduciaries, such as guardians, executors, lawyers, and agents, the public trustee has a duty to avoid private interests which cause even a risk that he will not be motivated solely by the interests of the beneficiaries of his trust. Properly conceived, conflict-of-interest regulation does not condemn bad actions so much as it erects a system designed to protect a decision-making process. It is preventive and prophylactic. Its aim is not detection and punishment of evil, but providing safeguards which lessen the risk of undesirable action.

The dangers controlled by other conflict-of-interest regulations exist

at the Congressional level also. Members must act upon many matters in which they have private economic interests. But can regulation of Congressional conflicts be built upon the same basic concept: avoiding the risk of impairment of independent judgment?

Two main techniques of controlling conflicts of interest are used in the statutes governing officials in the Executive Branch and administrative agencies. The basic weapon is *disqualification*. Officials are forbidden to act on matters in which they have personal financial interests.[17] The disqualifying interest may be another's, like that of a relative or a law firm; or it may be prospective, like that of a possible employer. In either event, the decision-making process is protected by removing the decision from the interested official. This may have some utility in the Congressional context, but it also has obvious limitations. Constituents of the disqualified Member of Congress are denied their Constitutional right to representation in the particular legislation at hand.* There is no substitute or deputy who can act in his stead.

The second basic weapon is more promising. It is *interest avoidance*, which requires total abstention from particular holdings or relationships. Decision-making remains at its regular place, but its integrity is protected by mandatory prohibitions against certain interests which unquestionably have potential for impairing the judgment of particular officials. For instance, members and employees of the Interstate Commerce Commission are prohibited by law from any ownership interests in common carriers subject to their jurisdiction.[18] Cabinet members are similarly limited. The first Congress prohibited the Secretary of the Treasury from investing in government securities.[19] Interest avoidance is more commonly required of Cabinet members by non-statutory means. As conditions of Senate confirmation, they are normally required to divest themselves of certain holdings. Department of Defense appointees are generally required by the Senate Armed Services Committee to dispose of all stock in companies doing

substantial business with the Department of Defense. The Secretary of the Treasury is similarly limited with respect to bank holdings by the Finance Committee, and the Committee on Interior and Insular Affairs requires the Secretary of the Interior to give up oil investments.

This type of regulation also extends beyond present property interests to prospective opportunities. Executive officials are barred indefinitely from personally representing private interests against the government in specific matters in which they participated while in government,[20] and are barred for one year from matters which were under their official responsibility.[21] Our first and oldest conflict-of-interest limitation of this type is in the Constitution itself. During a term of office Members of Congress may not be appointed to any Federal office which was created, or whose emoluments were increased, during that term.[22] In all instances the purpose is the same: to eliminate a personal interest or opportunity which might subtly tempt the public official into subordinating the public interest to self-interest. Protecting the integrity of governmental decisions is again the key.

Interest avoidance obviously cannot be applied to Members of Congress as neatly as it is to administrators with limited spheres of responsibility. But this does not mean that it cannot be applied at all. Perhaps interests can be identified which have sufficiently close and recurring involvements in Congressional decisions, particularly at the committee level, so that it is reasonable to expect Members to avoid them.

In the previously quoted speech, after listing the various interests which compete in the decision-making process of a Senator, Senator Bennett said:

> Every important vote requires the resolution of conflicts in several areas, and among several groups, so who can say what interests were included in the combination that persuaded him to vote as he did? True, each interest that benefited from his vote can think he did it for them, and each of those on the losing side can assume that their interest alone was rejected, but none can say for sure, and if a personal financial interest were included in the combination, who can say it was the decisive one? I am always amused when a Senator is publicly given credit for great

---

* Former Senator Kenneth B. Keating of New York once announced that he might abstain from voting on a tax-relief bill which affected duPont stockholders because he personally owned such stock. Four stockholder-constituents wrote to praise him, but more than 100 wrote to criticize, one saying: "Your duty to represent me is preeminent to any incidental interest you might have because of duPont ownership." Keating voted for the tax relief and it became law. B. Bagdikian and D. Oberdorfer, *Conflict of Interest: Can Congress Crack Down on Its Own Members?* THE SATURDAY EVENING POST, Nov. 17, 1962, at 26–27.

virtue for voting against what seems to be his own financial interest and attacked when his vote seems to promise him some financial gain, however remote.[23]

The Senator's questioning that anyone could assess the decisiveness of personal financial interests goes to the key issue. Granting that no one can be certain that it *was* the decisive factor, the more pertinent question is: Who can say it *was not* the decisive factor. Granting the impossibility of probing a legislator's mental process, is it not a loss for citizens to be compelled to speculate whether their interest or the legislator's was decisive? Beneficiaries of fiduciary decision-making are not supposed to be left to such speculation. The fact that beneficiaries of Congressional trusteeship must sometimes be uncertain does not mean that such occasions should not be kept to a minimum. Reducing the causes for such speculation to the lowest possible level would inevitably bring gains in public confidence in Congress and, theoretically at least, it should improve the quality of legislative decisions.

Some may think it quixotic to attempt to move elected officials toward true fiduciary standards, arguing that the complexity of Congressional service and the multiplicity of interests and pressures operating on a Member make it unrealistic to deal simply with pressure from his personal *economic* interests. This could be said of any attempt to codify ethics for public officials. Our predecessor committee faced the same question in dealing with appointed officials in the Executive Branch. Despite other differences in our subjects, we can endorse their statement of the rationale for singling out economic interests for special attention:

> . . . [T]his inquiry is limited to conflicts between the official's duties and his personal economic interests. But man is driven by many motivations. What of conflicts between his official duties and, for example, his religious or family affiliations? In preference to his business associates, an official may choose to favor his old college roommate with a contract or his mother with a market tip. Job appointments in government are often made in accord with political debts; and intangible loyalties to an institution, such as a school, company, or law firm, may long survive resignation, sale of stock, or severance from a payroll. Then why single out simple economic ties for study and regulation?

The simplest reason is that it is better to control whatever fraction of improper behavior is attributable to economic motives than to control none. The second reason is that regulatory schemes have to be administered. Restrictions on outside economic affiliations can be written with reasonable particularity and enforced with moderate predictability; no one has yet devised a method for sorting out acquaintances, friends, relations, and lovers for purposes of a rule permitting official dealings with some and not with the others.[24]

Others may concede the manageability of the private-interest portion of the problem but question this as a means to the end of increasing the likelihood that Congressional decisions will serve the public interest and provide better government. What is "the public interest"? [25] And how can one be sure that it is served? We can add little to such customary terminology as "the general welfare" and "the greatest good for the greatest number." It must be conceded that reasonable men frequently differ on what serves the public interest in a given instance and that interested and disinterested men often agree. This makes our subject all the more important. Inherently difficult decisions should be as free as possible from unnecessary complication from decision-makers' private stakes in the outcome.

The term "unnecessary complication" is used advisedly. It must be conceded that the risk of selfish decision-making can only be controlled and reduced to some minimum, not totally eradicated. This does not frustrate our efforts. That some Congressional economic conflicts of interest are inevitable under our system does not mean that all such conflicts must be tolerated. Our inquiry accordingly turns to a search for conflicts which are not inevitable, those which may be called "avoidable conflicts of interest." If *unavoidable* conflicts can first be identified and separated from the total, those remaining can become the focus of attention. By definition, these will be *avoidable* and therefore regulable.

## Unavoidable Conflicts of Interest

Conflicts of interest which must be endured for legitimate reasons and hence are unavoidable can be divided into three groups:

### 1. Inherent Conflicts

Since legislative bodies must be constituted from the general public, it is inevitable that legislators bring with them the interests of the economic groups to which they belong. As parents, homeowners, taxpayers, consumers, and representative members of their communities, legislators inherently have attributes which at various times produce some risk that their decisions may be made in the interests of something less than the entire public. Lawyers could not be expected to abstain from voting on bills regulating admission to practice before Federal agencies or requiring legal training for particular offices. If they did, there would be no quorum. Nor could homeowners and parents in Congress be disqualified on tax measures which benefit them. Such groups are quite large, however, and the legislator's interest is common to many persons. The potential for adverse effects from such conflicts is quite low.

Another type of conflict also inheres in legislative bodies. They have affirmative Constitutional duties to act upon some matters in which they are specially interested. No sharper conflict of interest can be envisioned than that which occurs when a Member of Congress votes upon his own salary. Distasteful as it is to most of them, this is a conflict which they and the public must accept. Political considerations and high visibility usually cause self-interest to be outweighed on this issue, but a Member's high sense of public duty can also control, as in 1933, when depression conditions moved Members to reduce their own salaries.

### 2. Politically Dictated Conflicts

A frequently cited example of the inevitability of conflicts of interest in Congress is the farmer elected from an agricultural district. His personal interest is shared by the dominant segment of his constituency, and he may well have been elected in large part because of his personal involvement with farm problems. The oil man from the Southwest and the textile man from the Carolinas may be comparable. Without suggesting fixed lines, however, one may question whether this over-all category includes many relevant groups, such as practicing lawyers, bankers, insurance agents, or real-estate developers. It is exceptional when a Member's business interests are a positive political asset.

### 3. Personally Necessary Conflicts

Although most Members give up active, compensated involvements in their businesses or professions when they enter Congress, some decline to do so for what they regard as reasons of personal necessity. Before the 1969 pay raise, the realities of Congressional campaign costs and levels of official salaries and allowances made it reasonable—perhaps in some cases essential—for a Member to have some source of outside income. Also, Members have personal assets which must continue to exist in some form. They cannot be expected to give them away. Whatever the size or form, such interests carry some potential conflict of interest. Typical income-producing investments can normally be managed so as to minimize the conflict problem. A difficult case is illustrated by the 1968 action of the Senate in allowing Deputy Defense Secretary David Packard to retain beneficial interests in a large defense-contracting firm. He was allowed to continue such holdings in contrast to the precedents of Charles Wilson and Robert MacNamara. Full divestment would have depressed the market and caused huge financial hardship to others.

Standards which required withdrawal from small, closely held family enterprises might similarly create hardships out of proportion to gains to the legislative process. This is a flexible area. Retention of particular holdings might be dictated for one Member but not for another, for a number of reasons related to their personal circumstances. What might be viewed as unnecessarily and unreasonably creating a conflict if voluntarily acquired by a Member after election to Congress might be reasonable for a Member who had owned it before his election. Representative Robert Taft, Jr. (R-Ohio) owned a large number of shares in Taft Broadcasting Company when

elected. He retained beneficial ownership, but placed the stock in trust for all purposes. He also continued to serve as trustee of several family trusts which held Taft stock. This seems reasonable, since he is not on the Commerce Committee and disqualifies himself on all communications legislation. It would seem very different for a member of one of the Commerce Committees to join in a new broadcasting venture which required a license from the Federal Communications Commission.

## Avoidable Conflicts of Interest

The foregoing categories of unavoidable conflicts are believed to be all-inclusive. It is apparent from their narrowness that many economic interests of Members which risk impairment of their independence are neither inherent, politically dictated, nor personally necessary. It can therefore be concluded that many Congressional conflicts of interest are "avoidable."

For purposes of our analysis, an avoidable conflict of interest may be said to arise when a Member of Congress acts officially upon a matter in which he has a personal economic interest which is neither inherent in Congress, politically dictated, nor personally necessary. Since all three grounds of unavoidability can fairly be characterized as "necessary," avoidable conflicts of interest may then be further defined as those created by personal economic interests which substantially risk impairment of independence and are unnecessarily held by a Member.

Note that the interests in question are those carrying substantial risks to independence of judgment. As will be shown shortly, there are many investment alternatives which do not carry such risk. As for the fact of continued holding of the interest, the word "unnecessarily" is emphasized and intended to refer back to the three categories of unavoidable (necessary) conflicts.

This is not to say that Members are necessarily to be condemned for their avoidable conflicts. Whether these should be avoided or should require some sort of disqualification or merely be disclosed publicly raises a host of difficult questions. It is not necessary to quar-

# POLITICO



The document shows President Donald Trump's assets, debts and transactions, but does not provide an exact picture of his net worth. | Getty

## Trump reports assets of at least $1.4 billion in financial disclosure

By **THEODORIC MEYER** and **MATTHEW NUSSBAUM** | 06/16/2017 05:20 PM EDT | Updated 06/16/2017 08:02 PM EDT

The campaign and the early months of President Donald Trump's presidency have been good for Donald Trump.

The Trump International Hotel, which opened last year just blocks from the White House in a building leased from the federal government, brought in nearly $20 million in revenue for the president, according to Trump's latest financial disclosure, released by the U.S. Office of Government Ethics on Friday.

Trump's Mar-a-Lago resort, which he visited often in the early months of his presidency, raked in $37 million – up from $30 million in the report Trump filed last year and about $16 million in the report filed two years ago.

Sales of Trump's "The Art of the Deal" brought in as much as $1 million for Trump, compared to the less than $100,000 in royalties that Trump reported in his 2016 filing. And sales of Trump's book "Crippled America" brought in up to another $5 million.

Trump reported assets of at least $1.4 billion and income of at least $596.3 million in the 2016 calendar year and the early months of 2017. He reported owing at least $310 million to various financial institutions, including at least $130 million to Deutsche Bank.

It's difficult to say how beneficial the presidency has been overall for Trump's sprawling business empire. Most of the figures detailing Trump's income, assets and debt are reported in brackets, and the highest brackets do not include an upper bound. And the reports for different years don't cover exactly the same time periods.

The 98-page document, which Trump filed voluntarily, does not provide an exact picture of his net worth. Trump has claimed he is worth in "excess of $10 billion" but Fortune put the number at less than $4 billion late last year.

The report also doesn't reveal how much Trump paid in taxes last year, but it still provides a snapshot into his range of investments. The White House said last month that Trump would voluntarily release his financial disclosure from the 2016 calendar year.

Trump has taken steps to reduce his conflicts of interest, stepping back from the Trump Organization and turning over daily control to his adult sons, Donald Trump Jr. and Eric Trump. However, he has maintained his financial interest, and his sons give him updates on the financial condition of the company.

## Breaking News Alerts

✉ breaking news when it happens — in your inbox.

| Your email... |
| --- |

By signing up you agree to receive email newsletters or alerts from POLITICO. You can unsubscribe at any time.

Trump sold off all of his stocks, as his aides said he had, with the exception of some private funds over which he has no control — a typical practice for elected officials. Trump also

apparently maintains a small investment in a private, New Jersey-based apparel company, Eco Tek 360, Inc.

Trump also collected $84,292 in pension payments from the Screen Actors Guild.

"President Trump welcomed the opportunity to voluntarily file his personal financial disclosure form; while this filing is voluntary (as no report was due until May 2018), it has been certified by the Office of Government Ethics pursuant to its normal procedures," press secretary Sean Spicer said in a statement on Friday evening.



intent to influence policy are not corrupting. As they explained it, corruption requires more than intent on the part of the gift giver; it requires something like an explicit deal between the giver and receiver. When they made these pronouncements, they claimed to be merely following precedent. In fact, they were doing what Lowenstein suggested: identifying and circumscribing a small subset of activities as corrupt. Their circle was particularly small. In the early days of the republic, the new Americans took the opposite approach. They drew a large circle around gifts that they called corrupt. They were committed to treating gifts as political threats, even when such treatment violated the law of nations and complicated vitally important international negotiations, and certainly when the gifts were not accompanied by an explicit deal.

## Plato's Republic in the New World

During and after the Revolutionary War the new Americans were driven by a fear of being corrupted by foreign powers, and a related fear of adopting the Old World's corrupt habits. The two national powers that dominated the colonies, France and Britain, represented two different models of corruption. Britain was seen as a failed ideal. It was corrupted republic, a place where the premise of government was basically sound but civic virtue—that of the public and public officials—was degenerating. On the other hand, France was seen as more essentially corrupt, a nation in which there was no true polity, but instead exchanges of luxury for power; a nation populated by weak subjects and flattering courtiers. Britain was the greater tragedy, because it held the promise of integrity, whereas France was

simply something of a civic cesspool. John Adams said of France, "there is everything here too which can seduce, betray, deceive, corrupt, and debauch."[2] As Thomas Jefferson—who adored Paris—wrote in 1801, the year he became president:

> We have a perfect horror at everything like connecting ourselves with the politics of Europe. It would indeed be advantageous to us to have neutral rights established on a broad ground; but no dependence can be placed in any European coalition for that. They have so many other bye-interests of greater weight, that someone or other will always be bought off. To be entangled with them would be a much greater evil than a temporary acquiescence in the false principles which have prevailed.[3]

This "hatred" of the European political culture and the fear of entanglement led to a problem. The new Americans wanted to be part of the international community, respect the laws and customs of nations as a matter of principle, and be respected as an autonomous new nation. But they also wanted to reject corrupt European customs. When it came to internal affairs, this was not a major conflict. But when it came to the customs of international diplomacy—like the custom of exempting ambassadors from paying duties—they wanted it both ways.

One of the customs of the international community was the giving and receiving of personal presents to ambassadors, as I described briefly in the Introduction. Expensive gifts—sometimes called *presents du roi* or *presents du congé*—functioned as "tokens of esteem, prestige items, and perhaps petty bribes,"[4] and were embedded in the culture of international relations. Gifts were

YALE LAW LIBRARY

typically given at the end of diplomatic tours. They were often very expensive, and were understood to be a supplement to salaries. In some cases the value of gifts constituted a substantial part of the income received by diplomats. The value of a gift might reflect the esteem in which a diplomat was held, or the importance of the relationship with his nation.

This practice was hateful to the Americans because it symbolized and embodied part of a particular culture they rejected. Jewels themselves signify luxury. They pointed to an old-world privilege that would not come easily to even the richest Americans. In the founders' minds, luxury represented a kind of internal corrosion—even in cases where there was no external dependency, a man could be tempted into seeking out things for himself, instead of seeking things for a country—he could, in some ways, self-corrupt. The diamonds of Franklin's gift would have seemed ostentatious to the founders.

The Articles of Confederation included this provision: "Nor shall any person holding any office of profit or trust under the United States, or any of them, accept any present, emolument, office or title of any kind." This ban on receiving gifts was perceived as severe and not a little eccentric. The provision was a close copy of a 1651 Dutch rule that their foreign ministers were not allowed to take "any presents, directly or indirectly, in any manner or way whatever."[5] The code was so far outside the normal state of affairs that it was ridiculed for its sanctimony. The Dutch political writer Wicquefort's analysis of the Dutch prohibition against receiving gifts was scathing: "The custom of making a present . . . is so well established that it is of as great an extent as the law of nations itself, there is reason to be surprised at the regulation that has been made on that subject in

ase 1:17-cv-01154-EGS   Document 29-1   Filed 11/26/17   Page 482 of 48

Holland." Wicquefort went on to write about how so scrupulously observant they are that they refuse even the most trivial presents. He accused his countrymen of silliness for making a fuss over the smallest gifts, even a plate of fruit. "I cannot tell," he writes, "whether the authors of this regulation pretended to found a Republick of Plato in their fens and marshes," but "it cannot be denied" that they "condemn the sentiments of all the other kings and potentates of the universe."[6] He may have been referring to Plato because Plato had been rather severe about gifts. Not only did he recommend dishonor for judges who were bribed by flattery, but he thought that public servants who accepted gifts should die:

> Those who serve their country ought to serve without receiving gifts, and there ought to be no excusing or approving the saying, "Men should receive gifts as the reward of good, but not of evil deeds"; for to know which we are doing, and to stand fast by our knowledge, is no easy matter. The safest course is to obey the law which says, "Do no service for a bribe," and let him who disobeys, if he be convicted, simply die.[7]

The American founders did not advocate execution for gift-acceptance, but they might have taken Wicquefort's ridicule as a compliment—they *were* interested in establishing their own just republic. But their idealism quickly became difficult in the international context. The Europeans were not interested in complying with this new, self-imposed ban. During the early years of American independence, foreign princes generously loaded American emissaries with expensive gifts, and the Americans receiving the gifts had to figure out how to respond.