**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., et al., | |
| *Plaintiffs*, | No. 17-cv-1154 (EGS) |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, | |
| *Defendant*. | |

**BRIEF OF FORMER GOVERNMENT ETHICS OFFICERS
AS AMICI CURIAE SUPPORTING PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Thomas C. Goldstein
 Bar No. 458365
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362.0636
tgoldstein@goldsteinrussell.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTEREST OF THE AMICI ......................................................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 1

ARGUMENT ................................................................................................................. 2

   I.     The Government's Legal Interpretations Explain That The Foreign Emoluments Clause Prohibits All Payments That Have Any Realistic Potential Of Corrupting A Public Official. ............................................................................................ 2

     A.   The Government's Guidance Interprets Foreign Emoluments Clause Broadly, But Flexibly, Emphasizing Its Anti-Corruption Purpose. ............................... 3

     B.   The Government Has Never Approved An Arrangement Whereby A Public Official's Interest In A Business Could Even Potentially Constitute A Conduit For Prohibited Emoluments to Reach The Official. ....................................... 6

   II.    Compliance With The Foreign Emoluments Clause Is Not Especially Difficult........... 9

   III.   The Complaint States A Valid Claim, And This Is Not A Close Case. ...................................................................................................................... 13

CONCLUSION ............................................................................................................. 17

APPENDIX: THE AMICI AND THEIR QUALIFICATIONS ................................... 18

i

# TABLE OF AUTHORITIES

## Cases

*American Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ................................................................................................ 3

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) ................................................................................................ 3

*NLRB v. Noel Canning*,
  134 S. Ct. 2550 (2014) ............................................................................................ 3

## Statutes and Legislative Branch Materials

5 Annals of Cong. (1798) ............................................................................................ 11

5 U.S.C. § 7342 .......................................................................................................... 12

37 U.S.C. § 908(a) ...................................................................................................... 12

*Hon. George J. Mitchell U.S. Senate*,
  B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ................................. 16, 17

Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept
  certain medals presented to him while President of the United States, Apr. 2, 1896,
  29 Stat. 759 ............................................................................................................. 12

*Matter of: Lieutenant Colonel Marvin S. Shaffer, USAF, Retired*,
  62 Comp. Gen. 432 (1983) ..................................................................................... 16

Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late
  Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of
  Acknowledgment from the Government of Great Britain as it may please to present,
  Aug. 30, 1856,
  11 Stat. 152 ............................................................................................................. 12

## Executive Branch Materials

*Applicability of Emoluments Clause to Employment of Government Employees by
  Foreign Public Universities*,
  18 Op. O.L.C. 13 (1994) .......................................................................................... 4

*Applicability of Emoluments Clause to Proposed Service of Government Employee on
  Commission of International Historians*,
  11 Op. O.L.C. 89 (1987) .......................................................................................... 7

*Applicability of the Emoluments Clause & the Foreign Gifts & Decorations Act to the
  Göteborg Award for Sustainable Development*,
  2010 WL 4963117 (Oct. 6, 2010) ............................................................................ 4

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize,*
2009 WL 6365082 (Dec. 7, 2009) ........................................................................ 4, 10, 12, 15

*Applicability of the Emoluments Clause to Non-government Members of ACUS,*
17 Op. O.L.C. 114 (1993) ....................................................................................... 3, 6, 7

*Applicability of the Emoluments Clause to Nongovernmental Members of ACUS,*
2010 WL 2516024 (June 3, 2010) .................................................................................. 6

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission,*
10 Op. O.L.C. 96 (1986) ............................................................................................... 3

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act,*
6 Op. O.L.C. 156 (1982) .......................................................................................... 4, 5, 15

*Assistant Comptroller General Weitzel to the Attorney General,*
34 Comp. Gen. 331 (1955) ............................................................................................ 8

Department of Defense, White Paper: Application of the Emoluments Clause to DoD
Civilian Employees and Military Personnel ............................................................... 15

*Expense Reimbursement in Connection with Chairman Stone's Trip to Indonesia,*
1980 WL 596567 (Aug. 11, 1980) ............................................................................... 4, 5

Memorandum for Andrew F. Oehmann, Office of the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Invitation by Italian Government to officials of the Immigration & Naturalization Service & a Member of the White House Staff* (Oct. 16, 1962) .......................................................................... 3

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales,*
1986 WL 1239553 (May 23, 1986) ............................................................................... 4, 5

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) .................................................................................................................... 8

Norbert A. Schlei, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* (May 10, 1963) ................. 12

*President Reagan's Ability to Receive Retirement Benefits from the State of California,*
5 Op. O.L.C. 187 (1981) ............................................................................................... 17

iii

# Other Authorities

Dan Alexander, *Trump's Vegas Partner Says Business Is Not Dividing Profits from Foreign Governments as Promised*,
Forbes (Mar. 22, 2017) ............................................................................................................ 13

*Ethics Office Director Walter Shaub Resigns, Saying Rules Need to Be Tougher*,
NPR (July 6, 2017) ................................................................................................................... 14

Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place to Be*,
Wash. Post (Nov. 16, 2016) ...................................................................................................... 13

Jonathan O'Connell, *How the Trump Hotel Changed Washington's Culture of Influence*,
Wash. Post (Aug. 7, 2017) ....................................................................................................... 14

Jonathan O'Connell, *Trump D.C. Hotel Turns $2 Million Profit in Four Months*,
Wash. Post (Aug. 10, 2017) ..................................................................................................... 14

Sheelah Kolhatkar, *Walter Shaub's Brave, Quixotic Ethics Battle with Trump*,
New Yorker (July 7, 2017) ....................................................................................................... 11

Trump Organization, Donation of Profits from Foreign Government Patronage (undated pamphlet) ................................................................................................................................. 14

iv

## INTEREST OF THE AMICI[1]

Amici are former government ethics officials with decades of experience applying ethical rules in the real world, under administrations of both parties.[2] Throughout their service, in addition to advising their agencies about ethical considerations generally, they have also given advice about the Foreign Emoluments Clause, observing firsthand how the clause works. They submit this brief to explain how the clause is implemented in practice, and to highlight the pertinence of interpretive guidance already issued by the executive and legislative branches on the clause's modern meaning.

## SUMMARY OF ARGUMENT

The government—including the Office of Legal Counsel (OLC), the Comptroller General, and the Department of Defense—has decades of experience interpreting and applying the Foreign Emoluments Clause in a principled and pragmatic way. These offices' guidance establishes that the clause is not arcane or irrelevant today; in fact, it is an important check on corruption, and a beacon for good governance. The guidance also indicates that the clause should be read broadly, consistent with its text and its purpose of preventing foreign states from attempting to corrupt public officials—but not so broadly as to prohibit transactions that have no potential to undermine that purpose. The government has not articulated a one-size-fits-all rule for Emoluments Clause cases, but it is clear that whenever an official's interest in a business could plausibly create a conduit for improper payments and influence to reach him, the Emoluments Clause prohibits the interest.

---

[1] No party's counsel authored this brief in whole or in part; and no person other than the amici and their counsel—including any party or party's counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2] A full list of the amici and their qualifications is appended to this brief.

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/02/17 Page 7 of 395

The defendant argues that such a rule would create "absurd consequences." Def. Br. 38. Those concerns are mistaken both because the government's approach is sufficiently flexible to avoid such results, and also because the Foreign Emoluments Clause has various remedial schemes and safety valves that facilitate compliance. Even when the clause is read broadly, public officials, including Presidents, have had no trouble modifying their conduct to comply with the Constitution.

Finally, we stress that in all of our experience as federal ethics officers, we have seen few financial disclosure reports containing a web of personal and business entanglements as thick and complex as President Trump's—and we have never seen a President go to such lengths to obscure his finances from Congress and the American people. These facts matter for two reasons. First, they explain why there is no precedent on point to the current unprecedented situation, and they counsel in favor of interpreting the Foreign Emoluments Clause consistent with its purpose in this case. Second, the extreme facts of this case mean that the Court need not define all the metes and bounds of the Foreign Emoluments Clause or decide how it would work in every possible hypothetical case. Indeed, the allegations in the complaint identify conduct that is on the wrong side of every reasonable line a court could draw.

## ARGUMENT

I. **The Government's Legal Interpretations Explain That The Foreign Emoluments Clause Prohibits All Payments That Have Any Realistic Potential Of Corrupting A Public Official.**

Given the dearth of judicial precedent interpreting the Foreign Emoluments Clause, the best sources of authority about how the clause actually works are opinions by the Office of Legal Counsel (in the Department of Justice) and the Comptroller General (in the Government Accountability Office), as well as guidance from the Department of Defense. For decades, these agencies have applied the clauses to modern government institutions, and their opinions have created strong ethical norms that guide the conduct of the executive branch every day. As this

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/02/17   Page 8 of 24

Court seeks to interpret and apply the clause in this case, it would make sense to consider and heed those legal interpretations, which have allowed the government to manage ethical problems without creating practical ones. *See, e.g.*, *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559, 2573 (2014) (explaining that government practice can inform the proper interpretation of the Constitution); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (analyzing the foreign affairs power in light of "longstanding practice"); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (noting that government practice "may be treated as a gloss on" the Constitution) (quotation marks omitted).

### A. The Government's Guidance Interprets Foreign Emoluments Clause Broadly, But Flexibly, Emphasizing Its Anti-Corruption Purpose.

Before considering the opinions in detail, we highlight some of the interpretive principles contained therein. First, the government has consistently noted that the Foreign Emoluments Clause's "expansive language and underlying purpose . . . strongly suggest that it be given broad scope." *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986). *See also Applicability of the Emoluments Clause to Non-government Members of ACUS*, 17 Op. O.L.C. 114, 121 (1993) ("The language of the Emoluments Clause is both sweeping and unqualified."); Memorandum for Andrew F. Oehmann, Office of the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Invitation by Italian Government to officials of the Immigration & Naturalization Service & a Member of the White House Staff* 2 (Oct. 16, 1962), *available at* https://www.justice.gov/olc/page/file/935741/download (noting "the sweeping nature of the constitutional prohibition and the fact that in the past it has been strictly construed, being directed against every possible kind of influence by foreign governments over officers of the United States"). Government analyses have therefore usually started from the presumption that the clause

applies. This presumption of breadth is important. As OLC has explained, "[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty." *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 18 (1994). Payments by foreign governments carry the real potential to bias that judgment and divide that loyalty—cracking the bedrock of our system of public service.

Second, although the government has taken a broad view of the clause, it has eschewed one-size-fits-all rules, emphasizing instead that "[e]ach situation must . . . be judged on its facts," *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982), "with the underlying purpose of the constitutional prohibition in mind," Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, 1986 WL 1239553, at *1 (May 23, 1986). *See also Applicability of the Emoluments Clause & the Foreign Gifts & Decorations Act to the Göteborg Award for Sustainable Development*, 2010 WL 4963117, at *2 (Oct. 6, 2010) (explaining that OLC looks to a number of non-dispositive factors, "keeping in mind the underlying purpose that the Clause serves"); *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082, at *11 (Dec. 7, 2009) ("[D]etermining whether an entity is an instrumentality of a foreign government is necessarily a fact-bound inquiry."); *Expense Reimbursement in Connection with Chairman Stone's Trip to Indonesia*, 1980 WL 596567, at *1 (Aug. 11, 1980) ("[W]ith the underlying purpose of the

constitutional prohibition in mind, we have relied for our analysis on the terms of the contract . . . and on the circumstances under which the arrangements for the trip were made.").

For example, the government has reached varying conclusions as to whether particular payments come from a "foreign state" depending on how much control foreign governments exercise over those payments. When the government of Indonesia paid Harvard University to establish a consulting project, and some of those funds were used by Harvard to pay for the Chairman of the CFTC's trip to Indonesia, OLC determined that because "the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated." *Expense Reimbursement*, 1980 WL 596567, at *3. Instead, the payment effectively came from Harvard, which is not a foreign state. Similarly, when the University of New South Wales sought to enter into a consulting agreement with two NASA scientists, OLC concluded that the University's "functional and operational separation and independence from the government of Australia and state political instrumentalities" counseled against treating the University as a foreign state. *See NASA Scientists*, 1986 WL 1239553, at *2. On the other hand, when an employee of the Nuclear Regulatory Commission sought to accept employment with a domestic consulting company to review the design of a nuclear power plant being constructed by the Mexican government, the government concluded that because Mexico retained "ultimate control, including selection of personnel," the "interposition of the American corporation" was not enough to "relieve[] the NRC employee of the obligations imposed by the Emoluments Clause." *Application of the Emoluments Clause*, 6 Op. O.L.C. at 158-59.

In sum, the government applies a totality-of-the-circumstances approach to Emoluments Clause questions, with a bias in favor of breadth, and a keen eye to the anti-corruption purpose of the clauses. It has never come close to adopting anything like the rigid, narrow rule advanced by

the defendant, *i.e.*, that the Emoluments Clause is limited only to employment-or-office-related payments.

**B. The Government Has Never Approved An Arrangement Whereby A Public Official's Interest In A Business Could Even Potentially Constitute A Conduit For Prohibited Emoluments to Reach The Official.**

In the decades that it has applied its purposive approach to the Foreign Emoluments Clause, the government has never determined that the clause permits a public officeholder to maintain an interest in a business that stands to benefit by virtue of that person holding public office. The purpose of the Foreign Emoluments Clause is to prevent foreign governments from attempting to influence public officers through money or other favors. In deciding whether a particular arrangement is constitutional or not, government ethics officials have paid close attention to whether the arrangement creates even a potential for improper foreign government influence over a person in an office of public trust. When such a potential exists—even if the probability is quite low—the government has found that such arrangements violate the Foreign Emoluments Clause.

Thus, in 1993, OLC considered whether lawyer members of the Administrative Conference of the United States (ACUS) could receive partnership distributions from their firms if the funds included fee revenue from foreign governments—and it concluded that the answer was "no" even if the lawyers "did not personally represent a foreign government, and indeed had no personal contact with that client of the firm." *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. at 119.[3] OLC reasoned that:

---

[3] OLC subsequently modified the conclusion of this guidance, deciding that private members of the ACUS were not officers covered by the Emoluments Clause. *Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 2010 WL 2516024 (June 3, 2010). But it did not question its prior analysis. *See id.* at *1 n.2.

> Because the amount the Conference member would receive from the partnership's profits would be a function of the amount paid to the firm by the foreign government, the partnership would in effect be a conduit for that government. Thus, some portion of the member's income could fairly be attributed to a foreign government. We believe that acceptance of that portion of the member's partnership share would constitute a prohibited emolument.

*Id.*

In the ACUS case, it was clear that if a lawyer's livelihood depended, in any part, on the fees paid to her firm by foreign governments, her judgment with respect to legal issues affecting those governments might be shaded by a desire to continue earning (or to augment) those fees—and those governments might attempt to exploit their client relationship to influence U.S. policy. The law firm partnership could therefore become an illicit conduit for foreign-government influence on U.S. law.

Indeed, the government has found a violation even when the risk of corruption was very low. Thus, OLC determined that an employee of the National Archives could not accept an appointment to a commission of international historians established by the Austrian government to review the wartime record of the President of Austria—even though the employee was willing to forgo an honorarium and seek private funding for his own expenses. OLC explained that even though it did not believe that the employee "would be subjected to improper foreign influence," his appointment "on an entity established and funded by a foreign government raises serious issues under the Emoluments Clause." *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 91 & n .5 (1987).

In contrast with that decision, the Comptroller General concluded that a U.S. employee who was entitled to damages from the German government for harm he suffered at the hands of the Nazi regime was not prohibited from receiving those damages while in office. The analysis explained that the payments did not contravene the letter of the clause, nor its spirit, because the

payments "obviously were not intended to influence [the employee] as an officer of the United States," but were instead "required largely as a result of the policy imposed by the United States and its allies and finally by the terms of the Bonn Convention." *Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 335 (1955).[4]

The key fact separating these cases is whether the arrangement creates the potential for a payment or favor to influence the official's conduct in office. Such potential did not exist when Germany paid officials in order to satisfy legal rights that vested prior to the official taking office. But it certainly exists whenever foreign governments may seek to do business with a public official's enterprise in order to curry favor with him—even if those governments do not do business with the official personally, and even if the official receives the money only as an owner.

For obvious reasons, the government has never approved such an arrangement, and this Court would be on very safe ground holding that, at a minimum, when an officeholder's business interests create the potential for outside influence, the Foreign Emoluments Clause applies.

---

[4] OLC actually reached the opposite conclusion about this same case, determining that the payments from Germany were not exclusively payment for past damages, but instead incident to the official's prior employment as a German judge. *See* Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954), *available at* https://www.justice.gov/olc/page/file/935721/download. In that opinion, OLC stated that "the term 'emolument', . . . particularly since it is modified by the phrase 'of any kind whatever', was intended to cover compensation of any sort arising out of an employment relationship with a foreign state." *Id.* at 8. Some have seized on this language to suggest that the Foreign Emoluments Clause applies only to payments arising from an employment relationship. Def. Br. 38. But in context, the language is clearly there to suggest breadth, not limitations. It does not remotely suggest that *only* compensation arising from an employment relationship is covered.

## II. Compliance With The Foreign Emoluments Clause Is Not Especially Difficult.

Defendant worries that if the Court adopts a broad interpretation of the Foreign Emoluments Clause, public officials will be unable to comply and to structure their lives around their jobs. That is wrong for four reasons.

*First*, there is already an established body of guidance in the OLC and Comptroller General opinions that covers a tremendous range of situations. A decision embracing those interpretations would enhance predictability; a rule like the defendant's—which deviates substantially from the government's legal interpretations—would have the opposite effect, creating a conflict between judicial precedent and the political branches' settled understandings.

The approach embodied in the government's opinions is also flexible enough to uphold the purpose of the Foreign Emoluments Clause while avoiding absurd results. Indeed, following the interpretations cited in this brief would resolve essentially all of the farfetched hypotheticals the defendant raises. Def. Br. 38-39. For example, defendant argues that under a broad reading of the word "emolument" a President could not hold Treasury bonds because the interest would violate the Domestic Emoluments Clause, and he could not hold stock in a publicly traded company that deals with foreign governments because that might violate the Foreign Emoluments Clause. But under the government's purposive approach, these payments are unlikely to raise concerns because it is highly doubtful that holding publicly traded securities would create the potential for others to exercise undue influence over the holder. The terms of Treasury bonds, for example, are relatively static, and it is unlikely that a President or Congress—never mind foreign governments—could do anything to augment those returns. Moreover, because of the size of publicly traded companies, the complexity of securities markets, and the many factors that affect share prices, it is highly unlikely that foreign government payments to publicly traded corporations would result in a traceable increase to a public official shareholder's wealth in the same way that payments to a law

9

Case 1:17-cv-01154-EGS   Document 21-1   Filed 11/02/17   Page 15 of 395

firm would. Of course, an idiosyncratic case may arise if a public official owns a very large stake in a publicly traded company that does a lot of business with foreign governments, or if a foreign government contracts with a publicly traded company in order to curry favor with a public official shareholder. In those cases, there may be real emoluments concerns, and the clause may require obtaining congressional consent. But in the ordinary case, it is extremely unlikely that ownership of any publicly traded security would create potential for influence over the shareholder by that company's customers.[5]

Similarly, royalties from book sales to foreign libraries, when the books were published prior to a President taking office, are unlikely to raise concern. Even if all of the public libraries in a given country buy a book—and even if they do so because the author of the book is President—those payments will be filtered through wholesalers back to the publisher, and then on to the President. The President will likely never know who bought the books, and the amount of the royalty attributable to a particular country's book purchases will likely not be substantial. But again, the clauses are flexible: if a foreign government attempts to influence a President by purchasing copies of his book, or if a competent authority finds a real potential for such influence, then the Foreign Emoluments Clause could very well prohibit the President from accepting the royalties without Congressional approval.

*Second*, concerns about predictability are exaggerated because there is an easy way for any federal officer to determine whether particular conduct would violate the clause: just ask. Federal

---

[5] Independently, OLC has already explained that when a particular action has been common practice for an extended period of time, that may inform the constitutional inquiry. *See Nobel Peace Prize*, 2009 WL 6365082, at *4 (noting the "consistent historical practice of the political branches"). To the extent holding investments in publicly traded securities is also a common activity, there is a high probability that OLC would find it outside the scope of the Emoluments Clauses on that basis.

agencies have ethics officers, and it is their job to determine and communicate the answers to questions like these in a clear and timely fashion. Those officers can help to resolve cases at the margins after hearing and considering all of the relevant facts. In this case, the President could have obtained a formal opinion from OLC, but so far as the public is aware, he chose not to (likely for the obvious reason that his conduct is completely inconsistent with past OLC interpretations).

*Third*, the remedies for violations of the Foreign Emoluments Clause are hardly draconian; it is not as if violations carry criminal penalties or result in asset seizures. In this case, the plaintiffs ask the President to stop violating the clause—which, as they note, is exactly what past Presidents have done. Notably, stopping the violation by divesting his businesses is exactly what the Office of Government Ethics urged this President to do. *See* Sheelah Kolhatkar, *Walter Shaub's Brave, Quixotic Ethics Battle with Trump*, New Yorker (July 7, 2017), http://www.newyorker.com/ news/news-desk/walter-shaubs-brave-quixotic-ethics-battle-with-trump. It is not unreasonable for Presidents to prioritize holding the highest office in the land over their business interests.

*Finally*, as the plaintiffs note (Br. 17-18, 41), the Foreign Emoluments Clause contains a safety valve, permitting Congress to create express waivers for particular emoluments or classes of conduct. By combining congressional power to approve foreign emoluments with an otherwise "sweeping and unqualified" prohibition on their acceptance, the Foreign Emoluments Clause "lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications." *ACUS*, 17 Op. O.L.C. at 121, 123 n.10. The congressional consent provision of the Clause serves two salutary functions: it fosters transparency by encouraging American officials to disclose potential emoluments to Congress, and it pragmatically allows the legislature to permit certain emoluments that do not jeopardize the public interest. *See* 5 Annals of Cong. 1583 (1798) (Bayard); *id.* at 1585 (Otis).

Case 1:17-cv-01154-EGS Document 21-1 Filed 11/02/17 Page 18 of 24

Congress has exercised its power to permit emoluments on multiple occasions. One well-known example is the Foreign Gifts and Decorations Act, codified at 5 U.S.C. § 7342, which permits federal personnel to accept certain small gifts, educational scholarships, foreign travel, meals, and lodging, and certain military honors. Congress has also acted to permit retired military personnel and other officials to accept paid civil employment by foreign governments under certain circumstances. *See* 37 U.S.C. § 908(a). On other occasions, Congress has acted to permit specific emoluments on a one-off basis, typically in response to requests from government officials. In 1856, for instance, it passed a resolution allowing a Navy surgeon to accept a "token of thankfulness" from a foreign government for his services on behalf of one of its citizens. *See* Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present, Aug. 30, 1856, 11 Stat. 152. In 1896, Congress authorized President Benjamin Harrison to personally accept certain medals from Brazil and Spain. *See* Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, Apr. 2, 1896, 29 Stat. 759. These examples illustrate that the process of seeking congressional consent is user-friendly and administrable—and most importantly, it can conclusively resolve any Foreign Emoluments Clause issue.[6]

---

[6] When it has been unclear whether accepting a particular type of benefit requires congressional consent, past presidents have honored the independent recommendations of the OLC. *See, e.g.*, Norbert A. Schlei, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* (May 10, 1963); *Nobel Peace Prize*, 2009 WL 6365082, at *1.

### III. The Complaint States A Valid Claim, And This Is Not A Close Case.

Under the approach taken by the government in the past—and indeed, under any plausible reading of the Foreign Emoluments Clause—the question whether the complaint states a valid claim is not even close. The complaint alleges a dense web of personal and financial conflicts that expose the President to myriad sources of foreign influence. Since at least the enactment of the Ethics in Government Act, and likely going back much further than that, no full-time executive branch official has retained an ownership interest in a business that brandishes his name (usually in all-capital, shiny lettering) on hotels, real estate developments, consumer products, and services all across the world. And no President during that same period, or likely ever before that, has been so overtly focused on the development of his personal brand while in office. The statements cited by the plaintiffs show that the President welcomes favoritism from foreign governments for his business interests, and the facts alleged indicate his willingness to repay that largesse with political and policy favors. This is precisely the type of corruption that the Emoluments Clause was supposed to prevent.

Consider, for example, the President's Washington D.C. hotel, which raises Foreign Emoluments Clause concerns because foreign officials frequent the hotel. *See* Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place to Be*, Wash. Post (Nov. 16, 2016), http://wapo.st/2fNSW6E?tid=ss_mail&utm_term=.1014029956cf .[7] The hotel reported that in

---

[7] The hotel has agreed to donate profits from foreign governments to the U.S. Treasury, but it is not at all clear how those profits are tracked and attributed. Moreover, the co-owner of one of the Trump hotels said there was no plan in place at that hotel to segregate the profits from foreign governments. Dan Alexander, *Trump's Vegas Partner Says Business Is Not Dividing Profits from Foreign Governments as Promised*, Forbes (Mar. 22, 2017). When the Oversight and Government Reform Committee of the House of Representatives requested information from the Trump Organization about how the President's promise was being implemented, it received a sparse eight-page pamphlet making clear that the Trump Organization is not tracking all payments from foreign governments or calculating the profit that stems from any individual payment. *See* Trump

four short months, it turned a $2 million profit, a figure that "represents a 192 percent improvement over what the Trump family planned to make when the company opened the hotel in the fall." Jonathan O'Connell, *Trump D.C. Hotel Turns $2 Million Profit in Four Months*, Wash. Post (Aug. 10, 2017), http://wapo.st/2fwHh0s?tid=ss_mail&utm_term=.d2cd98095b03. And the building has been described as "a kind of White House annex," where "groups with foreign interests" go to "attract Washington star power." Jonathan O'Connell, *How the Trump Hotel Changed Washington's Culture of Influence*, Wash. Post (Aug. 7, 2017), https://www.washingtonpost.com/graphics/2017/politics/trump-hotel-business/?utm_term=.208ea23dc2bb. Put succinctly, "[t]his is nothing Washington has ever seen" because "[f]or the first time in Presidential history, a profit-making venture touts the name of the U.S. president in its gold signage." *Id*.[8]

Indeed, one of the most striking features of this case is how much more serious the allegations in the complaint are than any past case considered by OLC or the Comptroller General. In the opinions cited in this brief, the government frequently weighed in on cases involving relatively small one-time payments, or a relatively low risk of corruption—and nevertheless concluded that

---

Organization, Donation of Profits from Foreign Government Patronage (undated pamphlet), *available at* https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/Trump%20Org%20Pamphlet%20on%20Foreign%20Profits.pdf. Instead, the pamphlet directs Trump hotels to make only "commercially reasonable efforts" to identify foreign government payments, because identifying them "fully and completely" is "impractical" and "would impede upon personal privacy and diminish the guest experience of our brand." *Id*. at 5, 4. As for calculating profits from any payments that the hotels do track, the pamphlet says that attempting to "distinctly attribute certain business-related costs as specifically identifiable to a particular customer group is not practical," because it would require "an inordinate amount of time, resources and specialists." *Id*. at 6.

[8] Indeed, it is no coincidence that the head of the Office of Government Ethics repeatedly and publicly called for the President to divest his holdings, and then resigned in protest when it became clear that ethical norms were being flouted. *See Ethics Office Director Walter Shaub Resigns, Saying Rules Need to Be Tougher*, NPR (July 6, 2017), http://www.npr.org/2017/07/06/535781749/ethics-office-director-walter-shaub-resigns-saying-rules-need-to-be-tougher.

those payments were unlawful. *See, e.g.*, the Austrian historians' commission described *supra*. Even when the government found that the payments were permissible, it wrestled with the question. *See, e.g.*, *Nobel Peace Prize*, 2009 WL 6365082 (issuing a thirteen-page opinion canvassing the history of the Nobel Peace Prize to conclude that its receipt is constitutional—even though multiple U.S. officials had received the prize before). This case is simply on a different scale from anything in the published guidance.

To be sure, the defendant cites the OLC and Comptroller General opinions too. But he does not do much with them, and his efforts to distinguish or use those decisions are far from persuasive. He attempts to distinguish the ACUS case in a footnote, arguing that "[s]ituations involving law partners and their profit sharing are distinct from the financial interests at issue in this case." Def. Br. 36 n.47. But there is nothing special about a law firm's structure. The Department of Defense has extrapolated from OLC's guidance that revenues from a limited liability corporation would be covered by the Emoluments Clauses for the same reasons. *See* Department of Defense, White Paper: Application of the Emoluments Clause to DoD Civilian Employees and Military Personnel 5, *available at* http://ogc.osd.mil/defense_ethics/resource_library/emoluments_clause_applications.pdf. Moreover, OLC also found—in the case of the NRC employee who sought to advise Mexico—that employees of U.S. corporations can violate the Foreign Emoluments Clause if the revenue coming their way comes from a foreign power. *See Application of the Emoluments Clause*, 6 Op. O.L.C. at 158-59.

There is no good reason to treat the owners of corporations any differently from their employees—or for the applicability of the Emoluments Clauses to turn on the vagaries of corporate forms at all. Indeed, the government itself has stated that a "corporate entity will be disregarded" when "equity dictates," including "when there is such unity of interest and ownership that the

separate personalities of the corporation and its shareholders no longer exist." *Matter of: Lieutenant Colonel Marvin S. Shaffer, USAF, Retired*, 62 Comp. Gen. 432, 434 (1983). In this case, the President holds a substantial stake in a closely held family business that bears his name. It would make no sense to say that he should be less responsible for his business's foreign government associations than an unnamed partner at a large law firm is for the firm's revenues.

If the ACUS case applies (and it does), it devastates the defendant's primary argument for a narrow reading of the clause because it shows that even an attenuated economic interest in ordinary commercial transactions that generate value for both sides can violate the Emoluments Clause if that business nevertheless creates the potential for undue influence over public officials.

Defendant also cites (Br. 35) opinions holding that President Reagan could receive pension benefits related to his tenure as governor of California as favorable precedent. But defendant never discusses the reasoning in the opinions—which is damning for his position. The Comptroller General decided that "the term emolument . . . cannot be considered to extend to benefits that have been earned or to which entitlement arose before [Reagan's] occupancy of that office, and that *clearly have no connection, either direct or indirect, with the Presidency.*" *Hon. George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (emphasis added). Because the pension payments could not "be construed as being in any manner received in consequence of his possession of the Presidency," they were not emoluments. *Id*. Moreover, the Comptroller General found it:

> highly unlikely that the President could be swayed in his dealings with the State of California by the prospect of having his pension diminished or rescinded by the State. Similarly, because of the nature of the modern statutory retirement system, it is doubtful that the State could "appeal to his avarice" by rewarding sympathetic actions with increased pension benefits. Moreover, acceptance of pension benefits requires no obligation to the State for future services.

16

*Id*. OLC likewise determined that "the term emolument has a strong connotation of . . . payments which have a potential of influencing or corrupting the integrity of the recipient." *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188-89 (1981). OLC concluded that state pension "benefits are not emoluments in the constitutional sense," and their "receipt does not violate the spirit of the Constitution because they do not subject the President to any improper influence." *Id*. at 192. Thus, the pension payments in that case were similar to the damages owed by the German government: they flowed from a legal right that had vested prior to the official taking federal office, they were not in any way attributable to that office, and they had no real potential to influence the official's conduct in office.

Unlike President Reagan's California pension, President Trump's business relationships threaten to distort U.S. policy on an ongoing basis. And unlike the state of California, which was merely paying out a vested entitlement based on pre-election service, customers are now flocking to President Trump's businesses *because he is currently the President, in an effort to influence him or win his favor*. The Constitution plainly seeks to prevent that, and this Court should hold as much.

## CONCLUSION

The motion to dismiss should be denied.

Respectfully submitted,

s/Thomas C. Goldstein

   Bar No. 458365
Tejinder Singh
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Ave.
Suite 850
Bethesda, MD 20814
(202) 362.0636
tgoldstein@goldsteinrussell.com

## APPENDIX: THE AMICI AND THEIR QUALIFICATIONS

Don Fox – Former Office of Government Ethics (OGE) General Counsel and Acting Director (career; also served at the Department of Defense in career legal capacity)

Marilyn Glynn – Former OGE Acting Director and General Counsel (career)

Karen Kucik – Former ethics official for DOJ, Department of Commerce, and Department of Health & Human Services (career)

Lawrence D. Reynolds – Former Assistant General Counsel for the Department of Housing and Urban Development with responsibility for ethics (career; also served at the Department of Labor in career ethics capacity)

Amy Comstock Rick – Former Director of the Office of Government Ethics; former Associate Counsel to President Clinton for ethics (originally career ethics official at Department of Education)

Walter Shaub – Former Director of the U.S. Office of Government Ethics (Senate-confirmed, Presidential appointee), former Deputy General Counsel for OGE (career), former supervisory attorney for OGE (career), former staff attorney for OGE

Trip Rothschild – Former Associate General Counsel at the Nuclear Regulatory Commission

Richard M. Thomas – Former Associate General Counsel, Office of Government Ethics; Former Ethics Counsel, Department of Health and Human Services

Kathleen Whalen – Former Associate Counsel to President Clinton for ethics (originally career ethics official at the Department of Commerce)

Harvey Wilcox – Former Navy Deputy General Counsel (career) and Designated Agency Ethics Official

Leslie Wilcox – Former Associate General Counsel for OGE (career), and principal author of the Standards of Ethical Conduct for Employees of the Executive Branch (5 CFR Part 2635)

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 24 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

🏳 KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Medellin v. Texas, U.S.Tex., March 25, 2008

123 S.Ct. 2374
Supreme Court of the United States

AMERICAN INSURANCE
ASSOCIATION, et al., Petitioners,

v.

John GARAMENDI, Insurance
Commissioner, State of California.

No. 02–722.
|
Argued April 23, 2003.
|
Decided June 23, 2003. Rehearing Denied
Aug. 25, 2003. See 539 U.S. 982, 124 S.Ct. 35.

Insurance companies and a trade association of insurance companies brought action to enjoin Insurance Commissioner of the State of California from enforcing a California statute requiring disclosure of information about Holocaust-era insurance policies. The United States District Court for the Eastern District of California, William B. Shubb, Chief Judge, 186 F.Supp.2d 1099, permanently enjoined enforcement of the statute, and Commissioner appealed. The United States Court of Appeals for the Ninth Circuit, 296 F.3d 832, reversed. Certiorari was granted. The Supreme Court, Justice Souter, held that California's Holocaust Victim Insurance Relief Act (HVIRA), and in particular a provision of the HVIRA requiring any insurer that did business in California and that sold insurance policies in Europe which were in effect during Holocaust-era to disclose certain information about those policies to the California Insurance Commissioner or risk losing its license, impermissibly interfered with the President's conduct of foreign affairs, and was preempted on that basis.

Reversed.

Justice Ginsburg dissented and filed opinion, in which Justice Stevens, Justice Scalia, and Justice Thomas joined.

West Headnotes (8)

**[1]** **States**
    👉 International relations;aliens

At some point, exercise of state power that touches on foreign relations must yield to federal government policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of foreign relations power to federal government.

40 Cases that cite this headnote

**[2]** **United States**
    👉 Authority for particular actions

While Congress holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers, the President has degree of independent authority to act in area of foreign affairs.

36 Cases that cite this headnote

**[3]** **United States**
    👉 Authority for particular actions

President has authority to make executive agreements with other countries, without need for ratification by the Senate or approval by Congress.

8 Cases that cite this headnote

**[4]** **United States**
    👉 Authority for particular actions

President's control over foreign relations includes settlement of claims.

7 Cases that cite this headnote

**[5]** **States**
    👉 Preemption in general
    **Treaties**

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 25 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

☞ Operation as to laws inconsistent with or repugnant to treaty provisions

Generally, valid executive agreements are fit to preempt state law, just as treaties are.

7 Cases that cite this headnote

**[6]**   **Insurance**
☞ Particular Laws or Activities

**States**
☞ International relations;aliens

California's Holocaust Victim Insurance Relief Act (HVIRA), and in particular a provision of the HVIRA requiring any insurer that did business in California and that sold insurance policies in Europe which were in effect during Holocaust-era to disclose certain information about those policies to the California Insurance Commissioner or risk losing its license, impermissibly interfered with the President's conduct of foreign affairs, and was preempted on that basis. West's Ann.Cal.Ins.Code § 13804(a).

41 Cases that cite this headnote

**[7]**   **Commerce**
☞ Insurance

**Insurance**
☞ Preemption;Application of State or Federal Law

**States**
☞ Insurance

Point of provision of the McCarran–Ferguson Act leaving insurance regulation generally to the states was to limit Congressional preemption under the commerce power, whether dormant or exercised; provision does not address preemption by executive conduct in foreign affairs. McCarran–Ferguson Act, § 2, 15 U.S.C.A. § 1012.

28 Cases that cite this headnote

**[8]**   **Insurance**
☞ Particular Laws or Activities

**States**

☞ International relations;aliens

Provision of the Holocaust Commission Act which, in setting up a Presidential Commission to develop record of collection and disposition of Holocaust-era assets, provided that certain information, if available, would be compiled by state insurance commissioners was not authorized for state to interfere with federal efforts to resolve Holocaust-era insurance claims by imposing disclosure obligations on insurance companies that interfered with the President's foreign policy initiatives. U.S. Holocaust Assets Commission Act of 1998, § 3(a)(1), 22 U.S.C.A. § 1621 note.

32 Cases that cite this headnote

**West Codenotes**

**Preempted**

West's Ann.Cal.Ins.Code §§ 13800, 13801, 13802, 13803, 13804, 13805, 13806, 13807.

**\*\*2375   \*396** *Syllabus* \*

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The Nazi Government of Germany confiscated the value or proceeds of many Jewish life insurance policies issued before and during the Second World War. After the war, even a policy that had escaped confiscation was likely to be dishonored, whether because insurers denied its existence or claimed it had lapsed from unpaid premiums, or because the German Government **\*\*2376** would not provide heirs with documentation of the policyholder's death. Responsibility as between the government and insurance companies is disputed, but the fact is that the proceeds of many insurance policies issued to Jews before and during the war were paid to the Third Reich or never paid at all. These confiscations and frustrations of claims fell within the subject of reparations, which became a principal object of

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

Allied diplomacy after the war. Ultimately, the western Allies placed the obligation to provide restitution to victims of Nazi persecution on the new West German Government, which enacted restitution laws and signed agreements with other countries for the compensation of their nationals. Despite a payout of more than 100 billion deutsch marks as of 2000, however, these measures left out many claimants and certain types of claims. After German reunification, class actions for restitution poured into United States courts against companies doing business in Germany during the Nazi era. Protests by defendant companies and their governments prompted the United States Government to take action to try to resolve the matter. Negotiations at the national level produced the German Foundation Agreement, in which Germany agreed to establish a foundation funded with 10 billion deutsch marks contributed equally by the German Government and German companies to compensate the companies' victims during the Nazi era. The President agreed that whenever a German company was sued on a Holocaust-era claim in an American court, the Government would (1) submit a statement that it would be in this country's foreign policy interests for the foundation to be the exclusive forum and remedy for such claims, and (2) try to get state and local governments to respect the foundation as the exclusive mechanism. As for insurance claims in particular, both countries agreed that the German **\*397** Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), a voluntary organization whose mission is to negotiate with European insurers to provide information about and settlement of unpaid insurance policies, and which has set up procedures to that end. The German agreement has served as a model for similar agreements with Austria and France.

Meanwhile, California began its own enquiry into the issue, prompting state legislation designed to force payment by defaulting insurers. Among other laws, California's Holocaust Victim Insurance Relief Act of 1999 (HVIRA) requires any insurer doing business in the State to disclose information about all policies sold in Europe between 1920 and 1945 by the company or any one "related" to it upon penalty of loss of its state business license. After HVIRA was enacted, the State issued administrative subpoenas against several subsidiaries of European insurance companies participating in the ICHEIC. Immediately, the Federal Government informed California officials that HVIRA would damage the

ICHEIC, the only effective means to process quickly and completely unpaid Holocaust era insurance claims, and that HVIRA would possibly derail the German Foundation Agreement. Nevertheless, the state insurance commissioner announced that he would enforce HVIRA to its fullest. Petitioner insurance entities then filed this suit challenging HVIRA's constitutionality. The District Court issued a preliminary injunction against enforcing HVIRA and later granted petitioners summary judgment. The Ninth Circuit reversed, holding, *inter alia,* that HVIRA did not violate the federal foreign affairs power.

*Held:* California's HVIRA interferes with the President's conduct of the Nation's foreign policy and is therefore preempted. Pp. 2386–2394.

(a) There is no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy or that generally there is executive authority to decide what that policy should be. In **\*\*2377** foreign policymaking, the President, not Congress, has the "lead role." *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466. Specifically, the President has authority to make "executive agreements" with other countries, requiring no ratification by the Senate or approval by Congress. See, *e.g., Dames & Moore v. Regan,* 453 U.S. 654, 679, 682–683, 101 S.Ct. 2972, 69 L.Ed.2d 918. Making such agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice. Although the executive agreements with Germany, Austria, and France at issue differ from past agreements in that they address claims associated with formerly belligerent states, but against corporations, not the foreign governments, the distinction does not matter. Insisting on a sharp line between public and private **\*398** acts in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies. Generally, then, valid executive agreements are fit to preempt state law, and if the agreements here had expressly preempted laws like HVIRA, the issue would be straightforward. But since these agreements include no preemption clause, petitioners' preemption claim rests on the asserted interference with Presidential foreign policy that the agreements embody. The principal support for this claim of preemption is *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683. In invalidating an Oregon statute, the *Zschernig* majority relied on

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

statements in previous cases that are open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict. See, *e.g.,* *id.,* at 432, 88 S.Ct. 664. Justice Harlan, concurring in the result, disagreed on this point, arguing that its implication of preemption of the entire foreign affairs field was at odds with other cases suggesting that, absent positive federal action, States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations. *Id.,* at 459, 88 S.Ct. 664. Whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in *Zschernig* requires no answer here, for even on Justice Harlan's view, shared by the majority, the likelihood that state legislation will produce something more than incidental effect in conflict with the National Government's express foreign policy would require preemption of the state law. See also *United States v. Pink,* 315 U.S. 203, 230–231, 62 S.Ct. 552, 86 L.Ed. 796. And since on his view it is legislation within "areas of ... traditional competence" that gives a State any claim to prevail, 389 U.S., at 459, 88 S.Ct. 664, it is reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted. Pp. 2386–2390.

(b) There is a sufficiently clear conflict between HVIRA and the President's foreign policy, as expressed both in the executive agreements with Germany, Austria, and France, and in statements by high-level Executive Branch officials, to require preemption here even without any consideration of the State's interest. The account of negotiations toward those agreements shows that the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds and disclosure of policy information, in preference to litigation or coercive sanctions. California has taken a different tack: HVIRA's economic compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, **\*399** employs "a different, state system of economic pressure," and in doing so undercuts the President's diplomatic discretion and the choice he has made exercising it. *Crosby v. National* **\*\*2378** *Foreign Trade Council,* 530 U.S. 363, 376, 120 S.Ct. 2288, 147

L.Ed.2d 352. Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding "the coercive power of the national economy" as a tool of diplomacy, *id.,* at 377, 120 S.Ct. 2288, HVIRA denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own disclosure policies. HVIRA thus compromises the President's very capacity to speak for the Nation with one voice in dealing with other governments to resolve claims arising out of World War II. Although the HVIRA disclosure requirement's goal of obtaining compensation for Holocaust victims is also espoused by the National Government, the fact of a common end hardly neutralizes conflicting means. The express federal policy and the clear conflict raised by the state statute are alone enough to require state law to yield. Pp. 2390–2392.

(c) If any doubt about the clarity of the conflict remained, it would have to be resolved in the National Government's favor, given the weakness of the State's interest, when evaluated in terms of traditional state legislative subject matter, in regulating disclosure of European Holocaust-era insurance policies in the manner of HVIRA. Even if California's underlying concern for its several thousand Holocaust survivors is recognized as a powerful one, the same objective dignifies the National Government's interest in devising its chosen mechanism for voluntary settlements, there being approximately 100,000 survivors in the country, only a small fraction of them in California. As against the federal responsibility, the humanity underlying the state statute could not give the State the benefit of any doubt in resolving the conflict with national policy. Pp. 2392–2393.

(d) California seeks to use an iron fist where the President has consistently chosen kid gloves. The efficacy of the one approach versus the other is beside the point, since preemption turns not on the wisdom of the National Government's policy but on the evidence of conflict. Here, the evidence is more than sufficient to demonstrate that HVIRA stands in the way of the President's diplomatic objectives. P. 2393.

(e) The Court rejects the State's submission that even if HVIRA does interfere with Executive Branch foreign policy, Congress authorized state law of this sort in the McCarran–Ferguson Act and the U.S. Holocaust Assets Commission Act of 1998. To begin with, the effect of any

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 28 of 395
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

congressional authorization on the preemption enquiry is far from clear, but in any event neither statute does the job the State ascribes to it. McCarran–Ferguson's purpose was to limit congressional preemption of **\*400** state insurance laws under the commerce power, whether dormant or exercised, see, *e.g., Department of Treasury v. Fabe,* 508 U.S. 491, 499–500, 113 S.Ct. 2202, 124 L.Ed.2d 449, and it cannot plausibly be read to address preemption by executive conduct in foreign affairs. Nor is HVIRA authorized by the Holocaust Commission Act, which set up a Presidential Commission to study Holocaust-era assets that came into the Government's control, § 3(a)(1), and directed the Commission to encourage state insurance commissioners to prepare a report on the Holocaust-related claims practices of all insurance companies doing business in this country after January 30, 1933, § 3(a)(4)(A). The Commission's focus was limited to assets held by the Government, and the Act's reference to the state insurance commissioners' report was expressly limited "to the degree the information is available," § 3(a)(4)(B), which can hardly be read to condone state sanctions interfering with federal efforts to resolve claims. Finally, Congress has done nothing to express disapproval of the President's policy. Given the President's considerable independent authority in this **\*\*2379** area, Congress's silence cannot be equated with disapproval. Pp. 2393–2394.

296 F.3d 832, reversed.

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and O'CONNOR, KENNEDY, and BREYER, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SCALIA, and THOMAS, JJ., joined, *post,* p. 2394.

**Attorneys and Law Firms**

Kenneth S. Geller, Washington, DC, for petitioners.

Edwin S. Kneedler, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting the petitioners.

Frank Kaplan, Los Angeles, CA, for respondent.

Stephen M. Shapiro, Mayer, Brown, Rowe & Maw, Chicago, IL, Neil M. Soltman, Mayer, Brown, Rowe & Maw, Los Angeles, CA, Kenneth S. Geller, John J. Sullivan, Mayer, Brown, Rowe & Maw, Washington, DC,

for American Insurance Association and American Re–Insurance Company.

Peter Simshauser, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, CA, for Assicurazioni Generali S.p.A.

William H. Webster, Milbank, Tweed, Hadley & McCloy LLP, Washington, DC, Linda Dakin–Grimm, Sally Agel, Milbank, Tweed, Hadley & McCloy LLP, Los Angeles, CA, for Winterthur International America Insurance Company; Winterthur International America Underwriters Insurance Company; General Casualty Company of Wisconsin; Regent Insurance Company; Southern Insurance Company; Unigard Indemnity Company; Unigard Insurance Company; and Blue Ridge Insurance Company.

George L. O'Connell, Timothy P. Grieve, Stevens & O'Connell LLP, Sacramento, CA, Frederick W. Reif, Dina G. Daskalakis, Keith D. Barrack, Riker, Danzig, Scherer, Hyland & Perretti LLP, New York City, for Gerling Companies.

**\*401** Frank Kaplan, Los Angeles, CA, Jesse J. Contreras, Ryan S. Hedges, Alschuler, Grossman, Stein & Kahan LLP, Santa Monica, CA, Larry G. Simon, Professor of Law, University of Southern California Law School, Los Angeles, CA, Andrew W. Stroud, Mennemeier, Glassman & Stroud LLP, Sacramento, CA, Michael D. Ramsey, Professor of Law, University of San Diego Law School, San Diego, CA, Leslie Tick, San Francisco, CA, for Respondent John Garamendi, in his capacity as Commissioner of Insurance for the State of California.

**Opinion**

Justice SOUTER delivered the opinion of the Court.

California's Holocaust Victim Insurance Relief Act of 1999 (HVIRA or Act), Cal. Ins.Code Ann. §§ 13800–13807 (West Cum.Supp.2003), requires any insurer doing business in that State to disclose information about all policies sold in Europe between 1920 and 1945 by the company itself or any one "related" to it. The issue here is whether HVIRA interferes with the National Government's conduct of foreign relations. We hold that it does, with the consequence that the state statute is preempted.

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 29 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

I

A

The Nazi Government of Germany engaged not only in genocide and enslavement but theft of Jewish assets, including **\*402** the value of insurance policies, and in particular policies of life insurance, a form of savings held by many Jews in Europe before the Second World War. **\*\*2380** Early on in the Nazi era, loss of livelihood forced Jews to cash in life insurance policies prematurely, only to have the government seize the proceeds of the repurchase, and many who tried to emigrate from Germany were forced to liquidate insurance policies to pay the steep "flight taxes" and other levies imposed by the Third Reich to keep Jewish assets from leaving the country. See G. Feldman, Allianz and the German Insurance Business, 1933–1945, pp. 249–262 (2001). Before long, the Reich began simply seizing the remaining policies outright. [1] In 1941, the 11th Decree of the Reich Citizenship Law declared the confiscation of assets (including insurance policies) of Jews deported to the concentration camps, and two years later the 13th Decree did the same with respect to property of the dead, each decree requiring banks and insurance companies to identify Jewish accounts and transmit the funds to the Reich treasury. *Id.,* at 264–274. After the war, even a policy that had escaped confiscation was likely to be dishonored, whether because insurers denied its existence or claimed it had lapsed from unpaid premiums during the persecution, or because the government would not provide heirs with documentation of the policyholder's death. See M. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 117–122 (2003). Responsibility as between the government and insurance companies is disputed, but at the end **\*403** of the day, the fact is that the value or proceeds of many insurance policies issued to Jews before and during the war were paid to the Reich or never paid at all.

[1]    A vivid precursor of the kind of direct confiscation that would become widespread by 1941 was the Reich's seizure of property and casualty insurance proceeds in the aftermath of the November 1938 Kristallnacht, in which Nazi looting and vandalism inflicted damage to Jewish businesses, homes, and synagogues worth nearly 50 million deutsch marks. Days afterward, a Reich decree mandated that all proceeds of all insurance claims arising from the

damage be paid directly to the state treasury, an obligation ultimately settled by German insurance companies with the Reich at a mere pittance relative to full value. See Feldman, Allianz and the German Insurance Business, at 190–235.

These confiscations and frustrations of claims fell within the subject of reparations, which became a principal object of Allied diplomacy soon after the war. At the Potsdam Conference, the United States, Britain, and the Soviet Union took reparations for wartime losses by seizing industrial assets from their respective occupation zones, putting into effect the plan originally envisioned at the Yalta Conference months before. Protocol of Proceedings of the Berlin (Potsdam) Conference, 1945, in 3 Dept. of State, Treaties and Other International Agreements of the United States of America 1776–1949, pp. 1207, 1213–1214 (C. Bevans comp.1969) (hereinafter Bevans); Report of the Crimea (Yalta) Conference, 1945, in 3 Bevans 1005; Protocol of the Crimea (Yalta) Conference on the Question of the German Reparation in Kind, 1945, in 3 Bevans 1020. A year later, the United States was among the parties to an agreement to share seized assets with other western allies as settlement, as to each signatory nation, of "all its claims and those of its nationals against the former German Government and its Agencies, of a governmental or private nature, arising out of the war." Agreement on Reparation from Germany, on the Establishment of Inter–Allied Reparation Agency and Restitution of Monetary Gold, 61 Stat. 3163, Art. 2(A), T.I.A.S. No. 1655 (hereinafter Paris Agreement).

The effect of the Paris Agreement was curtailed, however, and attention to reparations intentionally deferred, when the western Allies moved to end their occupation and reestablish a sovereign Germany as a buffer against Soviet expansion. They worried that continued reparations would cripple the new Federal Republic of Germany economically, and so decided in the London Debt Agreement to put off "[c]onsideration of claims arising out of the second World War by countries which **\*\*2381** were at war with or were occupied by Germany **\*404** during that war, and by nationals of such countries, against the Reich and agencies of the Reich ... until the final settlement of the problem of reparation." Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, 449, T.I.A.S. No. 2792. These terms were construed by German courts as postponing resolution of foreign claims against both the German Government and German industry, to await the terms of an ultimate postwar treaty.

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...
Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 30 of 395

See Neuborne, Preliminary Reflections on Aspects of Holocaust–Era Litigation in American Courts, 80 Wash. U.L.Q. 795, 813–814, and n. 62 (2002).

In the meantime, the western Allies placed the obligation to provide restitution to victims of Nazi persecution on the new West German Government. See Convention on the Settlement of Matters Arising Out of the War and the Occupation, May 26, 1952, 6 U.S.T. 4411, 4452–4484, as amended by Protocol on Termination of the Occupation Regime in the Federal Republic of Germany, Oct. 23, 1954, [1955] 6 U.S.T. 4117, T.I.A.S. No. 3425. This had previously been a responsibility of the western military governments, which had issued several decrees for the return of property confiscated by the Nazis. See N. Robinson, Restitution Legislation in Germany: A Survey of Enactments (1949); U.S. Military Law Nos. 52 and 59 (reprinted in U.S. Military Government Gazette, Germany, Issue A, p. 24 (June 1, 1946) and Issue G, p. 1 (Nov. 10, 1947)). West Germany enacted its own restitution laws in 1953 and 1956, see Institute of Jewish Affairs, The (West German) Federal Compensation Law (BEG) and its Implementary Regulations (1957), and signed agreements with 16 countries for the compensation of their nationals, including the Luxembourg Agreement with Israel, Sept. 10, 1952, 162 U.N.T.S. 205; see Supplemental Excerpts of Record in No. 01–17543(CA9) (SER), p. 1244. Despite a payout of more than 100 billion deutsch marks as of 2000, see *ibid.,* these measures left out many claimants and certain types of claims, and when the agreement reunifying East and West **\*405** Germany, see Treaty on the Final Settlement with Respect to Germany, Sept. 12, 1990, 1696 U.N.T.S. 124, was read by the German courts as lifting the London Debt Agreement's moratorium on Holocaust claims by foreign nationals, class-action lawsuits for restitution poured into United States courts against companies doing business in Germany during the Nazi era. See Neuborne, *supra,* at 796, n. 2, 813–814; see generally Bazyler, Nuremberg in America: Litigating the Holocaust in United States Courts, 34 Rich. L.Rev. 1 (2000) (describing the flood of lawsuits after 1996).

These suits generated much protest by the defendant companies and their governments, to the point that the Government of the United States took action to try to resolve "the last great compensation related negotiation arising out of World War II." SER 940 (press briefing by Deputy Secretary of Treasury Eizenstat); see S. Eizenstat,

Imperfect Justice 208–212 (2003). From the beginning, the Government's position, represented principally by Under Secretary of State (later Deputy Treasury Secretary) Stuart Eizenstat, stressed mediated settlement "as an alternative to endless litigation" promising little relief to aging Holocaust survivors. SER 953 (press conference by Secretary of State Albright). Ensuing negotiations at the national level produced the German Foundation Agreement, signed by President Clinton and German Chancellor Schröder in July 2000, in which Germany agreed to enact legislation establishing a foundation funded with 10 billion deutsch marks contributed equally by the German Government and German companies, to be used to compensate all those "who suffered at the hands of German companies during the National Socialist era." Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," 39 Int'l Legal Materials 1298 (2000).

**\*\*2382** The willingness of the Germans to create a voluntary compensation fund was conditioned on some expectation of security from lawsuits in United States courts, and after **\*406** extended dickering President Clinton put his weight behind two specific measures toward that end. SER 937 (letter from President Clinton to Chancellor Schröder committing to a "mechanism to provide the legal peace desired by the German government and German companies"); see also Eizenstat, *supra,* at 253–258. First, the Government agreed that whenever a German company was sued on a Holocaust-era claim in an American court, the Government of the United States would submit a statement that "it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II." 39 Int'l Legal Materials, at 1303. Though unwilling to guarantee that its foreign policy interests "in themselves provide an independent legal basis for dismissal," that being an issue for the courts, the Government agreed to tell courts "that U.S. policy interests favor dismissal on any valid legal ground." *Id.,* at 1304. On top of that undertaking, the Government promised to use its "best efforts, in a manner it considers appropriate," to get state and local governments to respect the foundation as the exclusive mechanism. *Id.,* at 1300. [2]

[2]     The executive agreement was accompanied by a joint statement signed by the American and German

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

Governments, the Governments of Israel and five Eastern European countries, and the Conference on Jewish Material Claims Against Germany, Inc., "[r]ecognizing that it would be in the participants' interests for the Foundation to be the exclusive remedy and forum" for all Holocaust-era claims against German companies. Excerpt of Record in No. 01–17023(CA9)(ER), pp. 812–816.

As for insurance claims specifically, both countries agreed that the German Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC), a voluntary organization formed in 1998 by several European insurance companies, the State of Israel, Jewish and Holocaust survivor associations, and the National **\*407** Association of Insurance Commissioners, the organization of American state insurance commissioners. The job of the ICHEIC, chaired by former Secretary of State Eagleburger, includes negotiation with European insurers to provide information about unpaid insurance policies issued to Holocaust victims and settlement of claims brought under them. It has thus set up procedures for handling demands against participating insurers, including "a reasonable review ... of the participating companies' files" for production of unpaid policies, "an investigatory process to determine the current status" of insurance policies for which claims are filed, and a "claims and valuation process to settle and pay individual claims," employing "relaxed standards of proof." SER 1236–1237.

In the pact with the United States, Germany stipulated that "insurance claims that come within the scope of the current claims handling procedures adopted by the [ICHEIC] and are made against German insurance companies shall be processed by the companies and the German Insurance Association on the basis of such procedures and on the basis of additional claims handling procedures that may be agreed among the Foundation, ICHEIC, and the German Insurance Association." 39 Int'l Legal Materials, at 1299. And in a supplemental agreement formalized in October 2002, the German Foundation agreed to set aside 200 million deutsch marks, to be used for insurance claims approved by the ICHEIC and a portion of the ICHEIC's operating expenses, with another 100 million in reserve if the initial fund should run out. Agreement Concerning Holocaust Era Insurance Claims, in Lodging of Petitioners in *Gerling Global Reinsurance Corp. v. Garamendi,* No. 02–733, pp. L–70 **\*\*2383** to L–71, L–78 to L–79, cert. pending. [Reporter's Note: See 539 U.S. 955, 124 S.Ct. 43.] The

foundation also bound itself to contribute 350 million deutsch marks to a "humanitarian fund" administered by the ICHEIC, *id.,* at L–80, and it agreed to work with the German Insurance Association and the German insurers who **\*408** had joined the ICHEIC, "with a view to publishing as comprehensive a list as possible of holders of insurance policies issued by German companies who may have been Holocaust victims," *id.,* at L–147. Those efforts, which control release of information in ways that respect German privacy laws limiting publication of business records, have resulted in the recent release of the names of over 360,000 Holocaust victims owning life insurance policies issued by German insurers. See Treaster, Holocaust List Is Unsealed by Insurers, N.Y. Times, Apr. 29, 2003, section A, p. 26, col. 6.

The German Foundation pact has served as a model for similar agreements with Austria and France,[3] and the United States Government continues to pursue comparable agreements with other countries. Reply Brief for Petitioners 6, n. 2.

[3]     Agreement Between the Government of the United States of America and the Government of France Concerning Payments for Certain Losses Suffered During World War II, Jan. 18, 2001, 2001 WL 416465; Agreement between the Austrian Federal Government and the Government of the United States of America Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," 40 Int'l Legal Materials 523 (2001); Agreement Relating to the Agreement of October 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, 2001 WL 935261, Annex A, § 2(n). Though the French agreement does not address insurance, the agreement with Austria does. Austria agreed to devote a $25 million fund for payment of claims processed according to the ICHEIC's procedures. See *ibid.* Austria also agreed to "make the lists of Holocaust era policy holders publicly accessible, to the extent available." *Ibid.* The United States Government agreed, in turn, that the settlement fund should be viewed as "the exclusive ... forum" for the resolution of Holocaust-era claims asserted against the Austrian Government or Austrian companies. 40 Int'l Legal Materials, at 524.

B

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS    Document 31-1    Filed 11/28/17    Page 32 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

While these international efforts were underway, California's Department of Insurance began its own enquiry into the issue of unpaid claims under Nazi-era insurance policies, prompting state legislation designed to force payment by defaulting insurers. In 1998, the state legislature made it an **\*409** unfair business practice for any insurer operating in the State to "fai[l] to pay any valid claim from Holocaust survivors." Cal. Ins.Code Ann. § 790.15(a) (West Cum.Supp.2003). The legislature placed "an affirmative duty" on the Department of Insurance "to play an independent role in representing the interests of Holocaust survivors," including an obligation to "gather, review, and analyze the archives of insurers ... to provide for research and investigation" into unpaid insurance claims. §§ 12967(a)(1), (2).

State legislative efforts culminated the next year with passage of Assembly Bill No. 600, 1999 Cal. Stats. ch. 827, the first section of which amended the State's Code of Civil Procedure to allow state residents to sue in state court on insurance claims based on acts perpetrated in the Holocaust and extended the governing statute of limitations to December 31, 2010. Cal.Civ.Proc.Code Ann. § 354.5 (West Cum.Supp.2003). The section of the bill codified as HVIRA, at issue here, [4] requires "[a]ny insurer currently doing business in the state" to disclose the details of "life, property, liability, health, annuities, dowry, educational, or casualty insurance policies" issued "to persons in Europe, which were in effect between 1920 and 1945." Cal. **\*\*2384** Ins.Code Ann. § 13804(a) (West Cum.Supp.2003). The duty is to make disclosure not only about policies the particular insurer sold, but also about those sold by any "related company," *ibid.,* including "any parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer," § 13802(b), [5] whether or not the companies were related during **\*410** the time when the policies subject to disclosure were sold, § 13804(a). Nor is the obligation restricted to policies sold to "Holocaust victims" as defined in the Act, § 13802(a); it covers policies sold to anyone during that time, § 13804(a). The insurer must report the current status of each policy, the city of origin, domicile, or address of each policyholder, and the names of the beneficiaries, § 13804(a), all of which is to be put in a central registry open to the public, § 13803. The mandatory penalty for default is suspension of the company's license to do business in the State, § 13806, and there are misdemeanor criminal sanctions for falsehood in certain required representations about whether and to whom the proceeds of each policy have been distributed, § 13804(b).

4    Challenges to Cal.Civ.Proc.Code Ann. § 354.5 (West Cum.Supp.2003) and Cal. Ins.Code Ann. § 790.15 (West Cum.Supp.2003) were dismissed by the District Court for lack of standing, a ruling that was not appealed. See *Gerling Global Reinsurance Corp. of America v. Low,* 240 F.3d 739, 742–743 (C.A.9 2001).

5    These terms are further defined in the commissioner's regulations. Cal.Code Regs., Tit. 10, § 2278.1 (1996). An "affiliate" company is one that "directly, or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the [insurer]." Cal. Ins.Code Ann. § 1215(a) (West 1993) (cross-referenced in § 2278.1(e)). A "[m]anaging [g]eneral [a]gent" is a company that "negotiates and binds ceding reinsurance contracts on behalf of an insurer or manages all or part of the insurance business of an insurer." § 769.819(c) (cross-referenced in § 2278.1(c)). A "reinsurer" is "a parent, subsidiary or affiliate of the insurer that provides reinsurance." Cal.Code Regs., Tit. 10, § 2278.1(i) (1996).

HVIRA was meant to enhance enforcement of both the unfair business practice provision (§ 790.15) and the provision for suit on the policies in question (§ 354.5) by "ensur[ing] that any involvement [that licensed California insurers] or their related companies may have had with insurance policies of Holocaust victims are *[sic]* disclosed to the state." § 13801(e); see *ibid.* (HVIRA is designed to "ensure the rapid resolution" of unpaid insurance claims, "eliminating the further victimization of these policyholders and their families"); Excerpt of Record in No. 01–17023(CA9)(ER), p. 994 (California Senate Committee on Insurance report) (HVIRA was proposed to "ensure that Holocaust victims or their heirs can take direct action on their own behalf with regard to insurance policies and claims"). While the legislature acknowledged that "[t]he international Jewish community is in active **\*411** negotiations with responsible insurance companies through the [ICHEIC] to resolve all outstanding insurance claims issues," it still thought the Act "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." § 13801(f).

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 33 of 395

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)
123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

After HVIRA was enacted, administrative subpoenas were issued against several subsidiaries of European insurance companies participating in the ICHEIC. See, *e.g.,* SER 785, 791. Immediately, in November 1999, Deputy Secretary Eizenstat wrote to the insurance commissioner of California that although HVIRA "reflects a genuine commitment to justice for Holocaust victims and their families, it has the unfortunate effect of damaging the one effective means now at hand to process quickly and completely unpaid insurance claims from the Holocaust period, the [ICHEIC]." *Id.,* at 975. The Deputy Secretary said that "actions by California, pursuant to this law, have already threatened to damage the cooperative spirit which the [ICHEIC] requires to resolve the important issue for Holocaust survivors," and he also noted that ICHEIC Chairman Eagleburger had expressed his opposition to "sanctions and other pressures brought by California on companies **2385 with whom he is obtaining real cooperation." *Id.,* at 976. The same day, Deputy Secretary Eizenstat also wrote to California's Governor making the same points, and stressing that HVIRA would possibly derail the German Foundation Agreement: "Clearly, for this deal to work ... German industry and the German government need to be assured that they will get 'legal peace,' not just from class-action lawsuits, but from the kind of legislation represented by the California Victim Insurance Relief Act." *Id.,* at 970. These expressions of the National Government's concern proved to be of no consequence, for the state commissioner announced at an investigatory hearing in December 1999 that he would enforce HVIRA to its **412 fullest, requiring the affected insurers to make the disclosures, leave the State voluntarily, or lose their licenses. ER 1097.

## II

After this ultimatum, the petitioners here, several American and European insurance companies and the American Insurance Association (a national trade association), filed suit for injunctive relief against respondent insurance commissioner of California, challenging the constitutionality of HVIRA. The District Court issued a preliminary injunction against enforcing the Act, reflecting its probability judgment that "HVIRA is unconstitutional based on a violation of the federal foreign affairs power and a violation of the Commerce Clause." App. to Pet. for Cert. 110a. On appeal, the

Ninth Circuit rejected these grounds for questioning the Act but left the preliminary injunction in place until the District Court could consider whether petitioners were likely to succeed on their due process claim. *Gerling Global Reinsurance Corp. of America v. Low,* 240 F.3d 739, 754 (C.A.9 2001).

On remand, the District Court addressed two points. Although it held the Act to be within the State's "legislative jurisdiction," as it applied only to insurers licensed to do business in the State, the District Court granted summary judgment to the petitioners on the ground of a procedural due process violation in "mandating license suspension for non-performance of what may be impossible tasks without allowing for a meaningful hearing." *Gerling Global Reinsurance Corp. of America v. Low,* 186 F.Supp.2d 1099, 1108, 1113 (E.D.Cal.2001). In a second appeal, the same panel of the Ninth Circuit reversed again. While it agreed that the Act was not beyond the State's legislative authority, the Court of Appeals rejected the conclusion that procedural due process required an opportunity for insurers to raise an impossibility excuse for noncompliance with the law, 296 F.3d 832, 845–848 (C.A.9 2002), and it reaffirmed its prior ruling that **413 the Act violated neither the foreign affairs nor the foreign commerce powers, *id.,* at 849. Given the importance of the issue, [6] we granted certiorari, 537 U.S. 1100, 123 S.Ct. 817, 154 L.Ed.2d 768 (2003), and now reverse. [7]

[6]   Several other States have passed laws similar to HVIRA. See Holocaust Victims Insurance Act, Fla. Stat. § 626.9543 (Cum.Supp.2003); Holocaust Victims Insurance Act, Md. Ins.Code Ann. §§ 28–101 to 28–110 (2002); Holocaust Victims Insurance Relief Act of 2000, Minn.Stat. § 60A.053 (Cum.Supp.2003); Holocaust Victims Insurance Act of 1998, N.Y. Ins. Law §§ 2701–2711 (Consol.2000); Holocaust Victims Insurance Relief Act of 1999, Wash. Rev.Code §§ 48.104.010–48.104.903 (2003); see also Ariz.Rev.Stat. Ann. § 20–490 (West Cum.Supp.2003); Tex. Ins.Code Ann., Art. 21.74 (Vernon 2003). And similar bills have been proposed in other States. See, *e.g.,* Mass. Senate Bill No. 843 (Jan. 1, 2003).

[7]   Two petitions for certiorari were filed, one by the petitioners in this case (No. 02–722), and one, raising additional issues, by the Gerling Companies (No. 02–733), which were also appellees below. Our grant of certiorari in No. 02–722 encompassed three of the

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 34 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

questions addressed by the Ninth Circuit: whether HVIRA intrudes on the federal foreign affairs power, violates the self-executing element of the Foreign Commerce Clause, or exceeds the State's "legislative jurisdiction." Pet. for Cert. I. Because we hold that HVIRA is preempted under the foreign affairs doctrine, we have no reason to address the other questions.

**\*\*2386**  III

**[1]**    The principal argument for preemption made by petitioners and the United States as *amicus curiae* is that HVIRA interferes with foreign policy of the Executive Branch, as expressed principally in the executive agreements with Germany, Austria, and France. The major premises of the argument, at least, are beyond dispute. There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the "concern for uniformity in this country's dealings with foreign nations" that animated the Constitution's allocation of the foreign relations power to the National Government in the first place. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427, n. 25, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); see **\*414** *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 381–382, n. 16, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (" '[T]he peace of the WHOLE ought not to be left at the disposal of a PART' " (quoting The Federalist No. 80, pp. 535–536 (J. Cooke ed.1961) (A. Hamilton))); *Id.,* No. 44, at 299 (J. Madison) (emphasizing "the advantage of uniformity in all points which relate to foreign powers"); *Id.,* No. 42, at 279 (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations"); see also *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 769, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (plurality opinion) (act of state doctrine was "fashioned because of fear that adjudication would interfere with the conduct of foreign relations"); *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 449, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979) (negative Foreign Commerce Clause protects the National Government's ability to speak with "one voice" in regulating commerce with foreign countries (internal quotation marks omitted)).

**[2]**    Nor is there any question that there is executive authority to decide what that policy should be. Although the source of the President's power to

act in foreign affairs does not enjoy any textual detail, the historical gloss on the "executive Power" vested in Article II of the Constitution has recognized the President's "vast share of responsibility for the conduct of our foreign relations." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). While Congress holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers, in foreign affairs the President has a degree of independent authority to act. See, *e.g., Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.,* 333 U.S. 103, 109, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ("The President ... possesses in his own right certain powers conferred by the Constitution on him as Commander–in–Chief and as the Nation's organ in foreign affairs"); *Youngstown, supra,* at 635–636, n. 2, 72 S.Ct. 863 (Jackson, J., concurring in judgment and opinion of Court) (the President can "act in external affairs without congressional authority" (citing *United States v. Curtiss–Wright* **\*415** *Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936))); *First Nat. City Bank v. Banco Nacional de Cuba, supra,* at 767, 92 S.Ct. 1808 (the President has "the lead role ... in foreign policy" (citing *Sabbatino, supra* )); *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 188, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (the President has "unique responsibility" for the conduct of "foreign and military affairs").

**[3]**    **[4]**    At a more specific level, our cases have recognized that the President has authority to make "executive agreements" with other countries, requiring no ratification by the Senate or approval by Congress, this power having been exercised since the early years of the Republic. See **\*\*2387** *Dames & Moore v. Regan,* 453 U.S. 654, 679, 682–683, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *United States v. Pink,* 315 U.S. 203, 223, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 330–331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); see also L. Henkin, Foreign Affairs and the United States Constitution 219, 496, n. 163 (2d ed.1996) ("Presidents from Washington to Clinton have made many thousands of agreements ... on matters running the gamut of U.S. foreign relations"). Making executive agreements to settle claims of American nationals against foreign governments is a particularly longstanding practice, the first example being as early as 1799, when the Adams administration settled demands against the Dutch Government by American citizens who lost their cargo when Dutch

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

privateers overtook the schooner *Wilmington Packet.* See *Dames & Moore, supra,* at 679–680, and n. 8, 101 S.Ct. 2972; 5 Dept. of State, Treaties and Other International Acts of the United States 1075, 1078–1079 (H. Miller ed.1937). Given the fact that the practice goes back over 200 years and has received congressional acquiescence throughout its history, the conclusion "[t]hat the President's control of foreign relations includes the settlement of claims is indisputable." *Pink, supra,* at 240, 62 S.Ct. 552 (Frankfurter, J., concurring); see 315 U.S., at 223–225, 62 S.Ct. 552 (opinion of the Court); *Belmont, supra,* at 330–331, 57 S.Ct. 758; *Dames & Moore, supra,* at 682, 101 S.Ct. 2972.

The executive agreements at issue here do differ in one respect from those just mentioned insofar as they address **\*416** claims associated with formerly belligerent states, but against corporations, not the foreign governments. But the distinction does not matter. Historically, wartime claims against even nominally private entities have become issues in international diplomacy, and three of the postwar settlements dealing with reparations implicating private parties were made by the Executive alone.[8] Acceptance of this historical practice is supported by a good pragmatic reason for depending on executive agreements to settle claims against foreign corporations associated with wartime experience. As shown by the history of insurance confiscation mentioned earlier, untangling government policy from private initiative during wartime is often so hard that diplomatic action settling claims against private parties may well be just as essential in the aftermath of hostilities as diplomacy to settle claims against foreign governments. While a sharp line between public and private acts works for many purposes in the domestic law, insisting on the same line in defining the legitimate scope of the Executive's international negotiations would hamstring the President in settling international controversies. Cf. *Pink, supra,* at 234–242, 62 S.Ct. 552 (Frankfurter, J., concurring) (noting the unsoundness of transplanting "judicial subtleties" of domestic law into "the solution of analogous problems between friendly nations").

[8]   The Yalta and Potsdam Agreements envisioning dismantling of Germany's industrial assets, public and private, and the followup Paris Agreement aspiring to settle the claims of western nationals against the German Government and private agencies were made as executive agreements. See *supra,* at 2380

(citing agreements); see also L. Margolis, Executive Agreements and Presidential Power in Foreign Policy 15–16 (1986).

**[5]**    Generally, then, valid executive agreements are fit to preempt state law, just as treaties are,[9] and if the agreements **\*\*2388  \*417** here had expressly preempted laws like HVIRA, the issue would be straightforward. See *Belmont, supra,* at 327, 331, 57 S.Ct. 758; *Pink, supra,* at 223, 230–231, 62 S.Ct. 552. But petitioners and the United States as *amicus curiae* both have to acknowledge that the agreements include no preemption clause, and so leave their claim of preemption to rest on asserted interference with the foreign policy those agreements embody. Reliance is placed on our decision in *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968).

[9]       Subject, that is, to the Constitution's guarantees of individual rights. See *Reid v. Covert,* 354 U.S. 1, 15–19, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Boos v. Barry,* 485 U.S. 312, 324, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Even Justice Sutherland's reading of the National Government's "inherent" foreign affairs power in *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), contained the caveat that the power, "like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution." *Id.,* at 320, 57 S.Ct. 216.

*Zschernig* dealt with an Oregon probate statute prohibiting inheritance by a nonresident alien, absent showings that the foreign heir would take the property "without confiscation" by his home country and that American citizens would enjoy reciprocal rights of inheritance there. *Id.,* at 430–431, 88 S.Ct. 664. Two decades earlier, *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947), had held that a similar California reciprocity law "did not on its face intrude on the federal domain," *Zschernig, supra,* at 432, 88 S.Ct. 664, but by the time Zschernig (an East German resident) brought his challenge, it was clear that the Oregon law in practice had invited "minute inquiries concerning the actual administration of foreign law," 389 U.S., at 435, 88 S.Ct. 664, and so was providing occasions for state judges to disparage certain foreign regimes, employing the language of the anti-Communism prevalent here at the height of the Cold War, see *id.,* at 440, 88 S.Ct. 664 (the Oregon law had made "unavoidable judicial criticism of nations established on a more authoritarian basis than our own"). Although the Solicitor General, speaking

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 36 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

for the State Department, denied that the state statute "unduly interfere[d] with the United States' conduct of foreign relations," *id., at 434, 88 S.Ct. 664* (internal quotation marks omitted), the Court was not deterred from exercising its own judgment to invalidate the law as an "intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress," *id., at 432, 88 S.Ct. 664.*

**\*418** The *Zschernig* majority relied on statements in a number of previous cases open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict. The Court cited the pronouncement in *Hines v. Davidowitz,* 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941), that "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." See 389 U.S., at 432, 88 S.Ct. 664; *id., at 442–443, 88 S.Ct. 664* (Stewart, J., concurring) (setting out the foregoing quotation). Likewise, Justice Stewart's concurring opinion viewed the Oregon statute as intruding "into a domain of exclusively federal competence." *Id., at 442, 88 S.Ct. 664;* see also *Belmont,* 301 U.S., at 331, 57 S.Ct. 758 ("[C]omplete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states" (citing *Curtiss–Wright Export Corp.,* 299 U.S., at 316, 57 S.Ct. 216 *et seq.*)).

Justice Harlan, joined substantially by Justice White, disagreed with the *Zschernig* majority on this point, arguing that its implication of preemption of the entire field of foreign affairs was at odds with some other cases suggesting that in the absence of positive federal action "the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations." 389 U.S., at 459, 88 S.Ct. 664 (opinion concurring in result) (citing cases); see **\*\*2389** *id., at 462, 88 S.Ct. 664* (White, J., dissenting).[10] Thus, for Justice Harlan it was crucial that the challenge to the Oregon **\*419** statute presented no evidence of a "specific interest of the Federal Government which might be interfered with" by the law. *Id., at 459, 88 S.Ct. 664* (opinion concurring in result); see *id., at 461, 88 S.Ct. 664* (finding "no evidence of adverse effect in the record").

He would, however, have found preemption in a case of "conflicting federal policy," see *id., at 458–459, 88 S.Ct. 664,* and on this point the majority and Justices Harlan and White basically agreed: state laws "must give way if they impair the effective exercise of the Nation's foreign policy," *id., at 440, 88 S.Ct. 664* (opinion of the Court). See also *Pink,* 315 U.S., at 230–231, 62 S.Ct. 552 ("[S]tate law must yield when it is inconsistent with, or impairs ... the superior Federal policy evidenced by a treaty or international compact or agreement"); *id., at 240, 62 S.Ct. 552* (Frankfurter, J., concurring) (state law may not be allowed to "interfer[e] with the conduct of our foreign relations by the Executive").

10    Justice Harlan concurred in the majority's result because he would have found the Oregon statute preempted by a 1923 treaty with Germany. 389 U.S., at 457, 88 S.Ct. 664. This required overruling the Court's construction of that treaty in *Clark v. Allen,* 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947), which Justice White, in dissent, declined to do, 389 U.S., at 462, 88 S.Ct. 664.

**[6]**   It is a fair question whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in the *Zschernig* opinions,[11] but the question requires **\*420** no answer here. For even on Justice Harlan's view, the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law. And since on his view it is legislation within "areas of ... traditional competence" that gives a State any claim to prevail, 389 U.S., at 459, 88 S.Ct. 664, it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted. Cf. *Southern Pacific Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 768–769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (under negative Commerce Clause, "reconciliation of the conflicting claims of state and national power is to be attained only by some appraisal and accommodation of the competing demands of the state and national interests involved"); Henkin, Foreign Affairs and the United States Constitution, at 164 (suggesting a test that "balance[s] the state's interest in a regulation against the impact on U.S. foreign relations"); Maier, Preemption of State Law: A Recommended Analysis, 83 Am. J. Int'l L. 832, 834 (1989) (similar).

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 37 of 395

 **\*\*2390** Judged by these standards, we think petitioners and the Government have demonstrated a sufficiently clear conflict to require finding preemption here.

11      The two positions can be seen as complementary. If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government. See, *e.g., Hines v. Davidowitz,* 312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Where, however, a State has acted within what Justice Harlan called its "traditional competence," 389 U.S., at 459, 88 S.Ct. 664, but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted. Whether the strength of the federal foreign policy interest should itself be weighed is, of course, a further question. Cf. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) (congressional occupation of the field is not to be presumed "in a field which the States have traditionally occupied"); *Boyle v. United Technologies Corp.,* 487 U.S. 500, 507–508, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) ("In an area of uniquely federal interest," "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption").

## IV

### A

To begin with, resolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, *Pink, supra,* at 225, 62 S.Ct. 552, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries, *Dames & Moore,* 453 U.S., at 679, 101 S.Ct. 2972. The issue of **\*421** restitution for Nazi crimes has in fact been

addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

The exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two. The foregoing account of negotiations toward the three settlement agreements is enough to illustrate that the consistent Presidential foreign policy has been to encourage European governments and companies to volunteer settlement funds in preference to litigation or coercive sanctions. See also, *e.g.,* Hearings on H.R. 2693 before the Subcommittee of Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 24 (2002) (statement of Ambassador Randolph M. Bell that it is the "policy of the U.S. Government" "to resolve matters of Holocaust-era restitution and compensation through dialogue, negotiation, and cooperation"); Hearings on the Status of Insurance Restitution for Holocaust Victims and the Heirs before the House Committee on Government Reform, 107th Cong., 1st Sess., 77 (2001) (statement of Ambassador J.D. Bindenagel to the same effect). As for insurance claims in particular, the national position, expressed unmistakably in the executive agreements signed by the President with Germany and Austria, has been to encourage European insurers to work with the ICHEIC to develop acceptable claim procedures, including procedures governing disclosure of policy information. **\*422** See German Foundation Agreement, 39 Int'l Legal Materials, at 1299, 1303 (declaring the German Foundation to be the "exclusive forum" for demands against German companies and agreeing to have insurance claims resolved under procedures developed through negotiation with the ICHEIC); Agreement Relating to the Agreement of October 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, 2001 WL 935261, Annex A, § 2(n) (same for Austria). This position, of which

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

the agreements are exemplars, has also been consistently supported in the high levels of the Executive Branch, as mentioned already, *supra,* at 2384–2385. See also, *e.g.,* Hearing before the Committee on House Banking and Financial Services, 106th Cong., 2d Sess., 173 (2000) (Deputy Secretary Eizenstat statement that "[t]he U.S. Government has supported [the ICHEIC] since it began, and we believe it should be considered the exclusive remedy for resolving insurance claims from the World **2391 War II era"); Hearings on H.R. 2693, at 24 (statement by Ambassador Bell to the same effect); Hearing on the Legacies of the Holocaust before the Senate Committee on Foreign Relations, 106th Cong., 2d Sess., 23 (2000) (Eizenstat testimony that a company's participation in the ICHEIC should give it " 'safe haven' from sanctions, subpoenas, and hearings relative to the Holocaust period"). [12] The approach taken serves to resolve the several competing matters of national concern apparent in the German Foundation Agreement: the national interest in maintaining amicable **423 relationships with current European allies; survivors' interests in a "fair and prompt" but nonadversarial resolution of their claims so as to "bring some measure of justice ... in their lifetimes"; and the companies' interest in securing "legal peace" when they settle claims in this fashion. 39 Int'l Legal Materials, at 1304. As a way for dealing with insurance claims, moreover, the voluntary scheme protects the companies' ability to abide by their own countries' domestic privacy laws limiting disclosure of policy information. See Brief for Federal Republic of Germany as *Amicus Curiae* 12–13. [13]

[12] In *Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 328–330, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994), we declined to give policy statements by Executive Branch officials conclusive weight as against an opposing congressional policy in determining whether California's "worldwide combined reporting" tax method violated the Foreign Commerce Clause. The reason, we said, is that "[t]he Constitution expressly grants Congress, not the President, the power to 'regulate Commerce with foreign Nations.' " *Id.,* at 329, 114 S.Ct. 2268 (quoting Art. I, § 8, cl. 3). As we have discussed, however, in the field of foreign policy the President has the "lead role." *First Nat. City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972).

[13] The dissent would discount the executive agreements as evidence of the Government's foreign policy governing disclosure, saying they "do not refer to state disclosure laws specifically, or even to information disclosure generally." *Post,* at 2400–2401 (opinion of GINSBURG, J.). But this assertion gives short shrift to the agreements' express endorsement of the ICHEIC's voluntary mechanism, which encompasses production of policy information, not just actual payment of unpaid claims. See *supra,* at 2382–2383. The dissent would also dismiss the other Executive Branch expressions of the Government's policy, see *supra,* at 2384–2385, 2390–2391, insisting on nothing short of a formal statement by the President himself, see *post,* at 2401. But there is no suggestion that these high-level executive officials were not faithfully representing the President's chosen policy, and there is no apparent reason for adopting the dissent's "nondelegation" rule to apply within the Executive Branch.

California has taken a different tack of providing regulatory sanctions to compel disclosure and payment, supplemented by a new cause of action for Holocaust survivors if the other sanctions should fail. The situation created by the California legislation calls to mind the impact of the Massachusetts Burma law on the effective exercise of the President's power, as recounted in the statutory preemption case, *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). HVIRA's economic compulsion to make public disclosure, of far more information about far more policies than ICHEIC rules require, employs "a different, state system of economic pressure," and in doing so undercuts the President's **424 diplomatic discretion and the choice he has made exercising it. *Id.,* at 376, 120 S.Ct. 2288. Whereas the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding "the coercive power of the national economy" as a tool of diplomacy, *id.,* at 377, 120 S.Ct. 2288, HVIRA denies this, by making exclusion from a large sector of the American insurance market the automatic sanction for noncompliance with the State's own policies on disclosure. "Quite simply, if the [California] law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence." *Ibid.* (citing *Dames & Moore,* 453 U.S., at 673, 101 S.Ct. 2972). The law **2392 thus "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" to resolve claims against European

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 39 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

companies arising out of World War II. 530 U.S., at 381, 120 S.Ct. 2288. [14]

[14]    It is true that the President in this case is acting without express congressional authority, and thus does not have the "plenitude of Executive authority" that "controll[ed] the issue of preemption" in *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 376, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). But in *Crosby* we were careful to note that the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues, *id.,* at 381, 120 S.Ct. 2288, and conflict with the exercise of that authority is a comparably good reason to find preemption of state law.

*Crosby's* facts are replicated again in the way HVIRA threatens to frustrate the operation of the particular mechanism the President has chosen. The letters from Deputy Secretary Eizenstat to California officials show well enough how the portent of further litigation and sanctions has in fact placed the Government at a disadvantage in obtaining practical results from persuading "foreign governments and foreign companies to participate voluntarily in organizations such as ICHEIC." Brief for United States as *Amicus Curiae* 15; see also SER 1267, 1272 (Joint Statement with Switzerland noting the "potentially disruptive and counterproductive effects" of laws like HVIRA and promising effort by **\*425** the United States to call on state legislatures "to refrain from taking unwarranted investigative initiatives or from threatening or actually using sanctions against Swiss insurers"). In addition to thwarting the Government's policy of repose for companies that pay through the ICHEIC, California's indiscriminate disclosure provisions place a handicap on the ICHEIC's effectiveness (and raise a further irritant to the European allies) by undercutting European privacy protections. See ER 1182, 3131 (opinions of the German Government that public disclosure of all European insurance policies "is not permissible" under German privacy law); Brief for United States as *Amicus Curiae* 18 (noting protests from the German and Swiss Governments). It is true, of course, as it is probably true of all elements of HVIRA, that the disclosure requirement's object of obtaining compensation for Holocaust victims is a goal espoused by the National Government as well. But "[t]he fact of a common end hardly neutralizes conflicting means," *Crosby, supra,* at 379, 120 S.Ct. 2288, and here HVIRA is an obstacle to the success of the National

Government's chosen "calibration of force" in dealing with the Europeans using a voluntary approach, 530 U.S., at 380, 120 S.Ct. 2288.

B

The express federal policy and the clear conflict raised by the state statute are alone enough to require state law to yield. If any doubt about the clarity of the conflict remained, however, it would have to be resolved in the National Government's favor, given the weakness of the State's interest, against the backdrop of traditional state legislative subject matter, in regulating disclosure of European Holocaust-era insurance policies in the manner of HVIRA.

The commissioner would justify HVIRA's ambitious disclosure requirement as protecting "legitimate consumer protection interests" in knowing which insurers have failed to pay insurance claims. Brief for Respondent 1, 42–44. But, quite unlike a generally applicable "blue sky" law, HVIRA **\*426** effectively singles out only policies issued by European companies, in Europe, to European residents, at least 55 years ago. Cal. Ins.Code Ann. § 13804(a) (West Cum.Supp.2003); see also § 790.15(a) (mandating license suspension only for "fail[ure] to pay any valid claim from Holocaust survivors"). Limiting the public disclosure requirement to these policies raises great doubt that the purpose of the California law is an evaluation of corporate reliability in contemporary insuring in the State.

**\*\*2393**  Indeed, there is no serious doubt that the state interest actually underlying HVIRA is concern for the several thousand Holocaust survivors said to be living in the State. § 13801(d) (legislative finding that roughly 5,600 documented Holocaust survivors reside in California). But this fact does not displace general standards for evaluating a State's claim to apply its forum law to a particular controversy or transaction, under which the State's claim is not a strong one. "Even if a plaintiff evidences his desire for forum law by moving to the forum, we have generally accorded such a move little or no significance." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 820, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); see *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 311, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) ("[A] postoccurrence

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 40 of 395

change of residence to the forum State—standing alone—[i]s insufficient to justify application of forum law").

But should the general standard not be displaced, and the State's interest recognized as a powerful one, by virtue of the fact that California seeks to vindicate the claims of Holocaust survivors? The answer lies in recalling that the very same objective dignifies the interest of the National Government in devising its chosen mechanism for voluntary settlements, there being about 100,000 survivors in the country, only a small fraction of them in California. ER 870 (press release of insurance commissioner of California); Bazyler, 34 Rich. L.Rev., at 8, n. 11. As against the responsibility of the United States of America, the humanity underlying the **\*427** state statute could not give the State the benefit of any doubt in resolving the conflict with national policy.

C

The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves. We have heard powerful arguments that the iron fist would work better, and it may be that if the matter of compensation were considered in isolation from all other issues involving the European Allies, the iron fist would be the preferable policy. But our thoughts on the efficacy of the one approach versus the other are beside the point, since our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress. The question relevant to preemption in this case is conflict, and the evidence here is "more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives." *Crosby, supra,* at 386, 120 S.Ct. 2288.

V

The State's remaining submission is that even if HVIRA does interfere with Executive Branch foreign policy, Congress authorized state law of this sort in the McCarran–Ferguson Act, 59 Stat. 33, ch. 20, 15 U.S.C. §§ 1011–1015, and the more recent U.S. Holocaust Assets Commission Act of 1998 (Holocaust Commission Act), 112 Stat. 611, note following 22 U.S.C. § 1621. There is, however, no need to consider the possible significance

for preemption doctrine of tension between an Act of Congress and Presidential foreign policy, cf. generally *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S., at 637–638, 72 S.Ct. 863 (Jackson, J., concurring in judgment and opinion of Court), for neither statute does the job the commissioner ascribes to it.

**[7]**    The provisions of the McCarran–Ferguson Act said to be relevant here specify that "[t]he business of insurance" shall be recognized as a subject of state regulation, **\*428** 15 U.S.C. § 1012(a), which will be good against preemption by federal legislation unless that legislation "specifically relates to the business of insurance," § 1012(b); see also § 1011 (policy behind § 1012 is that "continued regulation and taxation by the several States of the business of insurance is in the public interest" and "silence on the part of the Congress **\*\*2394** shall not be construed to impose any barrier to the regulation or taxation of such business by the several States"). As the text itself makes clear, the point of McCarran–Ferguson's legislative choice of leaving insurance regulation generally to the States was to limit congressional preemption under the commerce power, whether dormant or exercised. Compare *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 429–430, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), with *United States v. South–Eastern Underwriters Assn.,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); see *Department of Treasury v. Fabe,* 508 U.S. 491, 499–500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Quite apart, then, from any doubt whether HVIRA would qualify as regulating "the business of insurance" given its tangential relation to present-day insuring in the State, see *FTC v. Travelers Health Assn.,* 362 U.S. 293, 300–301, 80 S.Ct. 717, 4 L.Ed.2d 724 (1960) (McCarran–Ferguson was not intended to allow a State to "regulate activities carried on beyond its own borders"), a federal statute directed to implied preemption by domestic commerce legislation cannot sensibly be construed to address preemption by executive conduct in foreign affairs.

**[8]**    Nor does the Holocaust Commission Act authorize HVIRA. That Act set up a Presidential Commission to "study and develop a historical record of the collection and disposition" of Holocaust–era assets that "came into the possession or control of the Federal Government." Pub.L. 105–186, § 3(a)(1), 112 Stat. 612. For this purpose, Congress directed the Commission to "encourage the National Association of Insurance Commissioners to prepare a report on the Holocaust-related claims practices

of all insurance companies, both domestic and foreign, doing business in the **\*429** United States at any time after January 30, 1933, that issued any individual life, health, or property-casualty insurance policy to any individual on any list of Holocaust victims." § 3(a)(4)(A), 112 Stat. 613. These provisions are no help to HVIRA. The Commission's focus was limited to assets in the possession of the Government, and if anything, the federal Act assumed it was the National Government's responsibility to deal with returning those assets. See § 3(d), 112 Stat. 614 (President to collect recommendations from the commission and submit a suggested plan for "legislative, administrative, or other action" to Congress). In any event, the federal Act's reference to the state insurance commissioners as compiling information was expressly limited "to the degree the information is available," § 3(a)(4)(B), 112 Stat. 613, a proviso that can hardly be read to condone state sanctions interfering with federal efforts to resolve such claims.

Indeed, it is worth noting that Congress has done nothing to express disapproval of the President's policy. Legislation along the lines of HVIRA has been introduced in Congress repeatedly, but none of the bills has come close to making it into law. See H.R. 1210, 108th Cong., 1st Sess. (2003); S. 972, 108th Cong., 1st Sess. (2003); H.R. 2693, 107th Cong., 1st Sess. (2001); H.R. 126, 106th Cong., 1st Sess. (1999).

In sum, Congress has not acted on the matter addressed here. Given the President's independent authority "in the areas of foreign policy and national security, ... congressional silence is not to be equated with congressional disapproval." *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).

## VI

The judgment of the Court of Appeals for the Ninth Circuit is reversed.

*So ordered.*

**\*430** Justice GINSBURG, with whom Justice STEVENS, Justice SCALIA, and Justice THOMAS join, dissenting.

Responding to Holocaust victims' and their descendents' long-frustrated efforts to collect unpaid insurance proceeds, California's Holocaust Victim Insurance Relief **\*\*2395** Act of 1999 (HVIRA), Cal. Ins.Code Ann. § 13800 *et seq.* (West Cum.Supp.2003), requires insurance companies operating in the State to disclose certain information about insurance policies they or their affiliates wrote in Europe between 1920 and 1945. In recent years, the Executive Branch of the Federal Government has become more visible in this area, undertaking foreign policy initiatives aimed at resolving Holocaust-era insurance claims. Although the federal approach differs from California's, no executive agreement or other formal expression of foreign policy disapproves state disclosure laws like the HVIRA. Absent a clear statement aimed at disclosure requirements by the "one voice" to which courts properly defer in matters of foreign affairs, I would leave intact California's enactment.

### I

As the Court observes, *ante,* at 2379–2380, and n. 1, the Nazi regimentation of inhumanity we characterize as the Holocaust, marked most horrifically by genocide and enslavement, also entailed widespread destruction, confiscation, and theft of property belonging to Jews. For insurance policies issued in Germany and other countries under Nazi control, historical evidence bears out, the combined forces of the German Government and the insurance industry engaged in larcenous takings of gigantic proportions. For example, insurance policies covered many of the Jewish homes and businesses destroyed in the state-sponsored pogrom known as Kristallnacht. By order of the Nazi regime, claims arising out of the officially enabled destruction were made payable not to the insured parties, but to the State. M. Bazyler, Holocaust Justice: The Battle for Restitution in America's Courts 114 (2003). In what one historian called a "charade **\*431** concocted by insurers and ministerial officials," insurers satisfied property loss claims by paying the State only a fraction of their full value. G. Feldman, Allianz and the German Insurance Business, 1933–1945, p. 227 (2001); see Bazyler, *supra,* at 114; App. 27–28 (declaration of Rabbi Abraham Cooper, Assoc. Dean, Simon Wiesenthal Center) ("There is documentary evidence that the insurance companies paid only one-half

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 42 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

of the Jewish insurance proceeds to the Reich and kept the other half for themselves.").

The Court depicts Allied diplomacy after World War II as aimed in part at settling confiscated and unpaid insurance claims. *Ante,* at 2380. But the multilateral negotiations that produced the Potsdam, Yalta, and like accords failed to achieve any global resolution of such claims. European insurers, encountering no official compulsion, were themselves scarcely inclined to settle claims; turning claimants away, they relied on the absence of formal documentation and other technical infirmities that legions of Holocaust survivors were in no position to remedy. See, *e.g.,* Hearings on H.R. 2693 before the Subcommittee on Government Efficiency, Financial Management and Intergovernmental Relations of the House Committee on Government Reform, 107th Cong., 2d Sess., 14–15 (2002) (statement of Rep. Waxman) ("Some survivors were rejected because they could not produce death certificates for loved ones who perished in Nazi concentration camps. Other insurance companies took advantage of the fact that claimants had no policy documents to prove their policy existed."). For over five decades, untold Holocaust-era insurance claims went unpaid. *Id.,* at 38 (statement of Leslie Tick, California Dept. of Insurance).

In the late 1990's, litigation in American courts provided a spur to action. See Bazyler, *supra,* at xi; Feldman, *supra,* at vii; Neuborne, Preliminary Reflections on Aspects of Holocaust–Era Litigation in American Courts, 80 Wash. U.L.Q. 795, 796 (2002). Holocaust survivors and their descendents initiated class-action suits against German and **\*432** other European firms seeking compensation for, *inter alia,* the confiscation of Jewish bank assets, the use of Jewish slave labor, and the failure **\*\*2396** to pay Jewish insurance claims. See generally Bazyler, *supra,* at 1–171.

In the insurance industry, the litigation propelled a number of European companies to agree on a framework for resolving unpaid claims outside the courts. This concord prompted the 1998 creation of the International Commission on Holocaust Era Insurance Claims (ICHEIC). A voluntary claims settlement organization, ICHEIC comprises several European insurers, Jewish and Holocaust survivor organizations, the State of Israel, and this country's National Association of Insurance Commissioners. See S. Eizenstat, Imperfect Justice 266 (2003); Bazyler, *supra,* at 132.

As the Court observes, *ante,* at 2382, ICHEIC has formulated procedures for the filing, investigation, valuation, and resolution of Holocaust-era insurance claims. At least until very recently, however, ICHEIC's progress has been slow and insecure. See *In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.,* 228 F.Supp.2d 348, 358 (S.D.N.Y.2002) (quoting a 2001 press account describing ICHEIC as having "repeatedly been at the point of collapse since its inception in 1998"). Initially, ICHEIC's insurance company members represented little more than one-third of the Holocaust-era insurance market. See App. 32 (declaration of Leslie Tick, California Dept. of Insurance) ("The five insurance company members of the ICHEIC represent approximately 35.5% of the pre-World War II European insurance market."); Eizenstat, *supra,* at 268 (despite repeated assurances that *all* German insurance companies would join ICHEIC, "[t]hey never have to this day"). Petitioners note that participation in ICHEIC has expanded in the past year, see Reply Brief 8–9, but it remains unclear whether ICHEIC does now or will ever encompass all relevant insurers.

Moreover, ICHEIC has thus far settled only a tiny proportion of the claims it has received. See Eizenstat, **\*433** *supra,* at 267 ("ICHEIC's administrative failings led to few claims paid and large costs."). Evidence submitted in a series of class actions filed against Italian insurer Generali indicated that by November 2001, ICHEIC had resolved only 797 of 77,000 claims. See *In re Assicurazioni Generali,* 228 F.Supp.2d, at 357. The latest reports show only modest increases. See Treaster, Holocaust List Is Unsealed by Insurers, N.Y. Times, Apr. 29, 2003, section A, p. 26, col. 6 ("In more than four years of operation [ICHEIC] has offered \$38.2 million—or just short of the \$40 million it had spent on expenses as of 18 months ago —to 3,006 claimants.").

Finally, although ICHEIC has directed its members to publish lists of unpaid Holocaust-era policies, that non-binding directive had not yielded significant compliance at the time this case reached the Court. See Brief for Respondent 10; Bazyler, Holocaust Justice, at 132 ("Using the ICHEIC process, the European insurers have been able to ... avoid revealing the names of possible claim holders."). Shortly after oral argument, ICHEIC-participating German insurers made more substantial disclosures. See N.Y. Times, *supra,* at 26 (list of 363,232

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

names published in April 2003). But other insurers have been less forthcoming. For a prime example, Generali —which may have sold more life insurance and annuity policies in Eastern Europe during the Holocaust than any other company, see Bazyler, *supra,* at 113—reportedly maintains a 340,000–name list of persons to whom it sold insurance between 1918 and 1945, but has refused to disclose the bulk of the information on the list. See App. 37–38 (declaration of Leslie Tick, California Dept. of Insurance); Brief for Respondent 5.

## II

### A

California's disclosure law, the HVIRA, was enacted a year after ICHEIC's formation. Observing that at least 5,600 documented **2397** Holocaust survivors reside in California, **434** Cal. Ins.Code Ann. § 13801(d) (West Cum.Supp.2003), the HVIRA declares that "[i]nsurance companies doing business in the State of California have a responsibility to ensure that any involvement they or their related companies may have had with insurance policies of Holocaust victims [is] disclosed to the state," § 13801(e). The HVIRA accordingly requires insurance companies doing business in California to disclose information concerning insurance policies they or their affiliates sold in Europe between 1920 and 1945, § 13804(a), and directs California's Insurance Commissioner to store the information in a publicly accessible "Holocaust Era Insurance Registry," § 13803. The Commissioner is further directed to suspend the license of any insurer that fails to comply with the HVIRA's reporting requirements. § 13806.

These measures, the HVIRA declares, are "necessary to protect the claims and interests of California residents, as well as to encourage the development of a resolution to these issues through the international process or through direct action by the State of California, as necessary." § 13801(f). Information published in the HVIRA's registry could, for example, reveal to a Holocaust survivor residing in California the existence of a viable claim, which she could then present to ICHEIC for resolution.[1]

era claims relevant marketplace information for California consumers. See Brief for Respondent 42–44; Brief for National Association of Insurance Commissioners as *Amicus Curiae* 11–13. The Court discounts the HVIRA's pursuit of this objective, stressing that the HVIRA covers only certain policies issued in Europe more than 50 years ago. *Ante,* at 2392–2393. But States have broad authority to regulate the insurance industry, *Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.,* 451 U.S. 648, 653–655, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981), and a State does not exceed that authority by assigning special significance to an insurer's treatment of claims arising out of an era in which government and industry collaborated to rob countless Holocaust victims of their property.

The Court refers, *ante,* at 2383, 2392–2393, to a number of other California statutory provisions enabling the litigation **435** of Holocaust-era insurance claims in California courts. Those provisions, it bears emphasis, are not at issue here. The HVIRA imposes no duty to pay any claim, nor does it authorize litigation on any claim. It mandates only information *disclosure,* and our assessment of the HVIRA is properly confined to that requirement alone.

### B

The Federal Government, after prolonged inaction, has responded to the Holocaust-era insurance issue by diplomatic means. Executive agreements with Germany, Austria, and France, the Court observes, are the principal expressions of the federal approach. *Ante,* at 2386. Signed in July 2000, the German Foundation Agreement establishes a voluntary foundation, funded by public and private sources, to address Holocaust-era claims. Agreement Concerning the Foundation "Remembrance, Responsibility and the Future," 39 Int'l Legal Materials 1298 (2000).[2] "[I]t would be in the interests of both parties," the agreement declares, "for the Foundation to be the exclusive remedy and forum for addressing ... all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II." *Id.,* at 1299. In the case of insurance, the agreement endorses ICHEIC as the appropriate forum for claims resolution. *Ibid.*

---

[1]    In addition, California may deem an insurer's or its affiliate's continuing failure to resolve Holocaust-

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003) Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 44 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

2    The executive agreements with Austria and France are comparable. See *ante,* at 2383, and n. 3.

The German Foundation Agreement commits the Federal Government to certain conduct. It provides, for example, that when a German company is sued in a **\*\*2398** United States court on a Holocaust-era claim, the Federal Government will file with the court a statement that "the President of the United States has concluded that it would be in the foreign policy interests of the United States for the [German] Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising **\*436** from their involvement in the National Socialist era and World War II." *Id.,* at 1303. The agreement also provides that "[t]he United States will recommend dismissal on any valid legal ground (which, under the U.S. system of jurisprudence, will be for the U.S. courts to determine)." *Ibid.* The agreement makes clear, however, that "[t]he United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal." *Id.,* at 1304.

### III

### A

The President's primacy in foreign affairs, I agree with the Court, empowers him to conclude executive agreements with other countries. *Ante,* at 2386–2387. Our cases do not catalog the subject matter meet for executive agreement, [3] but we have repeatedly acknowledged the President's authority to make such agreements to settle international claims. *Ante,* at 2387. And in settling such claims, we have recognized, an executive agreement may preempt otherwise permissible state laws or litigation. *Ante,* at 2387–2388. The executive agreements to which we have accorded preemptive effect, however, warrant closer inspection than the Court today endeavors.

3    "One is compelled to conclude that there are agreements which the President can make on his sole authority and others which he can make only with the consent of the Senate (or of both houses), but neither Justice Sutherland [in *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937) ] nor any one else has told us which are which." L. Henkin,

Foreign Affairs and the United States Constitution 222 (2d ed.1996).

In *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), the Court addressed the Litvinov Assignment, an executive agreement incidental to the United States' recognition of the Soviet Union. Under the terms of the agreement, the Soviet Union assigned to the United States all its claims against American nationals, including claims against New **\*437** York banks holding accounts of Russian nationals that the Soviet Government had earlier nationalized. The Federal Government sued to recover the accounts thus assigned to it. Applying New York law, the lower courts refused to enforce the assignment; those courts held that the account-nationalization upon which the assignment rested contravened public policy. *Id.,* at 325–327, 57 S.Ct. 758. This Court reversed, concluding that "no state policy can prevail against the international compact here involved." *Id.,* at 327, 57 S.Ct. 758. The Litvinov Assignment clearly assigned to the United States the claims in issue; the enforceability of that assignment, the Court stressed, "is not and cannot be subject to any curtailment or interference on the part of the several states." *Id.,* at 331, 57 S.Ct. 758.

*United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), again addressed state-imposed obstacles to the Litvinov Assignment. Reiterating its holding in *Belmont,* the Court confirmed that no State may "deny enforcement of a claim under the Litvinov Assignment because of an overriding policy of the State." 315 U.S., at 222, 62 S.Ct. 552. Pointing both to the assignment itself and to a later exchange of diplomatic correspondence clarifying its scope, see *id.,* at 224–225, and n. 7, 62 S.Ct. 552, the Court saw no "serious doubt that claims of the kind here in question were included" in the "broad and inclusive" assignment, *id.,* at 224, 62 S.Ct. 552.

Four decades later, in **\*\*2399** *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the Court gave effect to an executive agreement arising out of the Iran hostage crisis. One of the agreement's announced "purpose[s]" was "to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." *Id.,* at 665, 101 S.Ct. 2972 (quoting the agreement). The agreement called for the formation of an Iran–United States Claims Tribunal to arbitrate claims not settled within six months.

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 45 of 395

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

*Ibid.* In addition, under the agreement the United States undertook

**\*438** "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." *Ibid.* (internal quotation marks omitted).

In line with these firm commitments, the Court held that the agreement and the executive order implementing it validly "suspended" litigation in United States courts against Iranian interests. See *id.,* at 686–688, 101 S.Ct. 2972.

Notably, the Court in *Dames & Moore* was emphatic about the "narrowness" of its decision. *Id.,* at 688, 101 S.Ct. 2972. "We do not decide," the Court cautioned, "that the President possesses plenary power to settle claims, even as against foreign governmental entities." *Ibid.* Before sustaining the President's action, the Court determined: (1) Congress "had implicitly approved" the practice of claim settlement by executive agreement, *id.,* at 680, 101 S.Ct. 2972; (2) the alternative forum created under the executive agreement was "capable of providing meaningful relief," *id.,* at 687, 101 S.Ct. 2972; (3) Congress had not in any way disapproved or resisted the President's action, *id.,* at 687–688, 101 S.Ct. 2972; and (4) the settlement of claims was "a necessary incident to the resolution of a major foreign policy dispute between our country and another," *id.,* at 688, 101 S.Ct. 2972.

Together, *Belmont, Pink,* and *Dames & Moore* confirm that executive agreements directed at claims settlement may sometimes preempt state law. The Court states that if the executive "agreements here had expressly preempted laws like HVIRA, the issue would be straightforward." *Ante,* at 2387–2388. One can safely demur to that statement, for, as the Court acknowledges, no executive agreement before us expressly preempts the HVIRA. *Ante,* at 2388. Indeed, no agreement so much as mentions the HVIRA's sole concern: public disclosure.

**\*439** B

Despite the absence of express preemption, the Court holds that the HVIRA interferes with foreign policy objectives implicit in the executive agreements. See *ibid.* I would not venture down that path.

The Court's analysis draws substantially on *Zschernig v. Miller,* 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968). In that case, the Oregon courts had applied an Oregon escheat statute to deny an inheritance to a resident of a Communist bloc country. The Oregon courts so ruled because the claimant failed to satisfy them that his country's laws would allow U.S. nationals to inherit estates, nor had the claimant shown he would actually receive payments from the Oregon estate with no confiscation by his home government. *Id.,* at 432, 88 S.Ct. 664. Applying Oregon's statutory conditions, the Court concluded, required Oregon courts to "launc[h] inquiries into the type of governments that obtain in particular foreign nations," *id.,* at 434, 88 S.Ct. 664, rendering "unavoidable judicial criticism of nations established on a more authoritarian basis than our own," *id.,* at 440, 88 S.Ct. 664. Such criticism had a "direct impact upon foreign relations," the Court said, **\*\*2400** *id.,* at 441, 88 S.Ct. 664, and threatened to "impair the effective exercise of the Nation's foreign policy," *id.,* at 440, 88 S.Ct. 664. The Court therefore held the statute unconstitutional as applied in that case. *Id.,* at 433–434, 88 S.Ct. 664. But see *id.,* at 432, 88 S.Ct. 664 ("We do not accept the invitation to re-examine our ruling in *Clark v. Allen* [331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633 (1947)]," which held a substantively similar California statute facially constitutional.).

We have not relied on *Zschernig* since it was decided, and I would not resurrect that decision here. The notion of "dormant foreign affairs preemption" with which *Zschernig* is associated resonates most audibly when a state action "reflect[s] a state policy critical of foreign governments and involve[s] 'sitting in judgment' on them." L. Henkin, Foreign Affairs and the United States Constitution 164 (2d ed.1996); see **\*440** Constitutionality of South African Divestment Statutes Enacted by State and Local Governments, 10 Op. Off. Legal Counsel 49, 50 (1986) ("[W]e believe that *[Zschernig]* represents the Court's reaction to a particular regulatory statute, the operation of which intruded extraordinarily deeply into foreign affairs."). The HVIRA entails no such state action or policy. It takes no position on any contemporary foreign government and requires no assessment of any

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

existing foreign regime. It is directed solely at private insurers doing business in California, and it requires them solely to disclose information in their or their affiliates' possession or control. I would not extend *Zschernig* into this dissimilar domain. [4]

[4]    The Court also places considerable weight on *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). As the Court acknowledges, however, *ante,* at 2391, *Crosby* was a statutory preemption case. The state law there at issue posed "an obstacle to the accomplishment of Congress's full objectives under the [relevant] federal Act." 530 U.S., at 373, 120 S.Ct. 2288. That statutory decision provides little support for preempting a state law by inferring preclusive foreign policy objectives from precatory language in executive agreements.

Neither would I stretch *Belmont, Pink*, or *Dames & Moore* to support implied preemption by executive agreement. In each of those cases, the Court gave effect to the express terms of an executive agreement. In *Dames & Moore,* for example, the Court addressed an agreement explicitly extinguishing certain suits in domestic courts. 453 U.S., at 665, 101 S.Ct. 2972; see *supra,* at 2398–2399. Here, however, none of the executive agreements extinguish any underlying claim for relief. See Neuborne, 80 Wash. U.L. Q., at 824, n. 101. The United States has agreed to file precatory statements advising courts that dismissing Holocaust-era claims accords with American foreign policy, but the German Foundation Agreement confirms that such statements have no legally binding effect. See 39 Int'l Legal Materials, at 1304; *supra,* at 2398. It remains uncertain, therefore, whether even *litigation* on Holocaust-era insurance claims must be abated in deference to the German Foundation Agreement or the parallel agreements with Austria and France. Indeed, ambiguity **\*441** on this point appears to have been the studied aim of the American negotiating team. See Eizenstat, Imperfect Justice, at 272–273 (describing the "double negative" that satisfied German negotiators and preserved the flexibility sought by Justice Department litigators).

If it is uncertain whether insurance *litigation* may continue given the executive agreements on which the Court relies, it should be abundantly clear that those agreements leave *disclosure* laws like the HVIRA untouched. The contrast with the Litvinov Assignment at issue in *Belmont* and *Pink* is marked. That agreement spoke directly to claim

assignment in no uncertain terms; *Belmont* and *Pink* confirmed that state law could not invalidate the very assignments accomplished by the agreement. See *supra,* at 2398. Here, the Court invalidates a state disclosure law on grounds of conflict with foreign policy "embod[ied]" in certain executive agreements, *ante,* at 2388, although those agreements do not refer to state disclosure laws **\*\*2401** specifically, or even to information disclosure generally. [5] It therefore is surely an exaggeration to assert that the "HVIRA threatens to frustrate the operation of the particular mechanism the President has chosen" to resolve Holocaust-era claims. *Ante,* at 2392. If that were so, one might expect to find some reference to laws like the HVIRA in the later-in-time executive agreements. There is none.

[5]    The Court apparently finds in the executive agreements' "express endorsement of ICHEIC's voluntary mechanism" a federal purpose to preempt any information disclosure mechanism not controlled by ICHEIC itself. *Ante,* at 2391, n. 13. But nothing in the executive agreements suggests that the Federal Government supports the resolution of Holocaust-era insurance claims only to the extent they are based upon information disclosed by ICHEIC. The executive agreements do not, for example, prohibit recourse to ICHEIC to resolve claims based upon information disclosed through laws like the HVIRA.

To fill the agreements' silences, the Court points to statements by individual members of the Executive Branch. See *ante,* at 2384–2385 (letters from Deputy Secretary of the Treasury **\*442** Stuart Eizenstat to California Governor Gray Davis and the Insurance Commissioner of California); *ante,* at 2390–2391 (testimony before Congress by Eizenstat, stating that a company's participation in ICHEIC should give it "safe haven from sanctions, subpoenas, and hearings relative to the Holocaust period" (internal quotation marks omitted)). But we have never premised foreign affairs preemption on statements of that order. Cf. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.,* 512 U.S. 298, 329–330, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994) ("Executive Branch actions—press releases, letters, and *amicus* briefs"—that "express federal policy but lack the force of law" cannot render a state law unconstitutional under the Foreign Commerce Clause.). We should not do so here lest we place the considerable power of foreign affairs preemption in the hands of individual sub-Cabinet members of the Executive Branch. Executive

American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003)

123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353...

officials of any rank may of course be expected "faithfully [to] represen[t] the President's chosen policy," *ante,* at 2391, n. 13, but no authoritative text accords such officials the power to invalidate state law simply by conveying the Executive's views on matters of federal policy. The displacement of state law by preemption properly requires a considerably more formal and binding federal instrument.

Sustaining the HVIRA would not compromise the President's ability to speak with one voice for the Nation. See *ante,* at 2391–2392. To the contrary, by declining to invalidate the HVIRA in this case, we would reserve foreign affairs preemption for circumstances where the President, acting under statutory or constitutional authority, has spoken clearly to the issue at hand. "[T]he Framers did not make the judiciary the overseer of our government." *Dames & Moore,* 453 U.S., at 660, 101 S.Ct. 2972 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)

(Frankfurter, J., concurring)). And judges should not be the expositors of the Nation's foreign policy, which is the role they play by acting when the President himself has not taken a clear **\*443** stand. As I see it, courts step out of their proper role when they rely on no legislative or even executive text, but only on inference and implication, to preempt state laws on foreign affairs grounds.

In sum, assuming, *arguendo,* that an executive agreement or similarly formal foreign policy statement targeting disclosure could override the HVIRA, there is no such declaration here. Accordingly, I would leave California's enactment in place, and affirm the judgment of the Court of Appeals.

### All Citations

539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376, 71 USLW 4524, 03 Cal. Daily Op. Serv. 5353, 2003 Daily Journal D.A.R. 6765, 16 Fla. L. Weekly Fed. S 401

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Texas v. U.S., S.D.Tex., February 16, 2015

101 S.Ct. 2972
Supreme Court of the United States

DAMES & MOORE, Petitioner,

v.

Donald T. REGAN, Secretary of the Treasury, et al.

No. 80–2078.
|
Argued June 24, 1981.
|
Decided July 2, 1981.

Petitioner, which had obtained a prejudgment attachment of assets of certain Iranian banks, brought an action against the United States and the Secretary of Treasury seeking to prevent enforcement of the various executive orders and regulations implementing the hostage release agreement with Iran. The United States District Court for the Central District of California dismissed the complaint for failure to state a claim upon which relief could be granted, and appeal was taken to the United States Court of Appeals for the Ninth Circuit. After granting certiorari before judgment, the Supreme Court, Justice Rehnquist, held that: (1) President was authorized by International Emergency Economic Powers Act to nullify post-November 14, 1979, attachments and direct those persons holding blocked Iranian funds and securities to transfer them to Federal Reserve Bank for ultimate transfer to Iran, and (2) President did not lack the power to suspend claims of American nationals against Iran and terminate such claims through binding arbitration in an Iran-United States Claims Tribunal.

Affirmed.

Justice Stevens filed opinion concurring in part.

Justice Powell filed opinion concurring and dissenting in part.

West Headnotes (6)

**[1]**      **United States**

📝 Review of presidential actions

Presidential action taken pursuant to specific congressional authorization is supported by strongest presumptions and widest latitude of judicial interpretation, and burden of persuasion rests heavily upon anyone who might attack it.

39 Cases that cite this headnote

**[2]**      **Creditors' Remedies**

📝 Relief Against Attachment

**United States**

📝 Authority for particular actions

**War and National Emergency**

📝 Executive proclamations and orders

President was authorized by International Emergency Economic Powers Act to nullify post-November 14, 1979, attachments and direct those persons holding blocked Iranian funds and securities to transfer them to Federal Reserve Bank for ultimate transfer to Iran pursuant to terms of hostage release agreement. International Emergency Economic Powers Act, § 203, 50 U.S.C.A. § 1702.

77 Cases that cite this headnote

**[3]**      **Constitutional Law**

📝 Attachment

Petitioner's interest in its attachment of Iranian property was conditional and revocable and, as such, President's action in nullifying the attachments and ordering transfer of the assets pursuant to hostage release agreement did not effect a taking of property in violation of Fifth Amendment absent just compensation since petitioner did not acquire any "property" interest in its attachment of the sort that would support a constitutional claim for compensation. U.S.C.A.Const. Amend. 5; International Emergency Economic Powers Act, § 203, 50 U.S.C.A. § 1702.

22 Cases that cite this headnote

[4]   **International Law**
    👉 Claims against states by foreign subjects or citizens

**United States**
    👉 Authority for particular actions

**War and National Emergency**
    👉 Executive proclamations and orders

Neither International Emergency Economic Powers Act nor Hostage Act constituted specific authorization for President's suspension of claims of American citizens against Iran which were pending in American courts. Executive Order No. 12294, February 24, 1981; 22 U.S.C.A. § 1732; International Emergency Economic Powers Act, §§ 202–207, 202(a), 203(a)(1)(B), 50 U.S.C.A. §§ 1701–1706, 1701(a), 1702(a)(1)(B).

28 Cases that cite this headnote

[5]   **International Law**
    👉 Claims against states by foreign subjects or citizens

**International Law**
    👉 Arbitration

**United States**
    👉 Authority for particular actions

Where settlement of claims had been determined to be a necessary incident to resolution of major foreign policy dispute between United States and Iran and where long-continued executive practice of settling claims of American nationals against foreign countries by executive agreement, known to and acquiesced in by Congress, raised a presumption that President's actions had been taken pursuant to Congress' consent, President did not lack the power to suspend claims of American nationals against Iran and terminate such claims through binding arbitration in an Iran-United States Claims Tribunal.

95 Cases that cite this headnote

[6]   **Eminent Domain**
    👉 Conditions precedent to action; ripeness

Possibility that President's action in settling petitioner's claims against Iran through implementation of hostage release agreement effected a taking of petitioner's property in violation of Fifth Amendment in absence of just compensation made ripe for adjudication question whether petitioner would have a remedy at law in Court of Claims and there was no jurisdictional obstacle to an appropriate action in that court under the Tucker Act. 28 U.S.C.A. § 1491; U.S.C.A.Const. Amend. 5.

57 Cases that cite this headnote

**\*\*2973** *Syllabus* [\*]

[\*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*654** In response to the seizure of American personnel as hostages at the American Embassy in Tehran, Iran, President Carter, pursuant to the International Emergency Economic Powers Act (IEEPA), declared a national emergency on November 14, 1979, and blocked the removal or transfer of all property and interests in property of the Government of Iran which were subject to the jurisdiction of the United States. The Treasury Department then issued implementing regulations providing that "[u]nless licensed or authorized ... any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since [November 14, 1979,] there existed an interest of Iran; " and that any licenses or authorizations granted could be "amended, modified, or revoked at any time." The President then granted a general license that authorized certain judicial proceedings, including prejudgment attachments, against Iran but did not allow the entry of any judgment or decree. On December 19, 1979, petitioner filed suit in Federal District Court against the Government of Iran, the Atomic Energy Organization of Iran, and a number of Iranian banks, alleging that it was owed a certain amount of money

for services performed under a contract with the Atomic Energy Organization. The District Court issued orders of attachment against the defendants' property, and property of certain Iranian banks was then attached to secure any judgment that might be entered against them. Subsequently, on January 19, 1981, the Americans held hostage were released by Iran pursuant **\*\*2974** to an agreement with the United States. Under this agreement the United States was obligated to terminate all legal proceedings in United States courts involving claims of United States nationals against Iran, to nullify all attachments and judgments obtained therein, and to bring about the termination of such claims through binding arbitration in an Iran-United States Claims Tribunal. The President at the same time issued implementing Executive Orders revoking all licenses that permitted the exercise of "any right, power, or privilege" with regard to Iranian funds, nullifying all non-Iranian interests in such assets acquired after the blocking order of November **\*655** 14, 1979, and requiring banks holding Iranian assets to transfer them to the Federal Reserve Bank of New York to be held or transferred as directed by the Secretary of the Treasury. On February 24, 1981, President Reagan issued an Executive Order which ratified President Carter's Executive Orders and "suspended" all claims that may be presented to the Claims Tribunal, but which provided that the suspension of a claim terminates if the Claims Tribunal determines that it has no jurisdiction over the claim. Meanwhile, the District Court granted summary judgment for petitioner and awarded it the amount claimed under the contract plus interest, but stayed execution of the judgment pending appeal by the defendants, and ordered that all prejudgment attachments against the defendants be vacated and that further proceedings against the bank defendants be stayed. Petitioner then filed an action in Federal District Court against the United States and the Secretary of the Treasury, seeking to prevent enforcement of the various Executive Orders and regulations implementing the agreement with Iran. It was alleged that the actions of the President and the Secretary of the Treasury were beyond their statutory and constitutional powers, and in any event, were unconstitutional to the extent they adversely affect petitioner's final judgment against Iran and the Atomic Energy Organization, its execution of that judgment, its prejudgment attachments, and its ability to continue to litigate against the Iranian banks. The District Court dismissed the complaint for failure to state a claim upon which relief could be granted, but

entered an injunction pending appeal to the Court of Appeals prohibiting the United States from requiring the transfer of Iranian property that is subject to any writ of attachment issued by any court in petitioner's favor. This Court then granted certiorari before judgment.

*Held:*

1. The President was authorized to nullify the attachments and order the transfer of Iranian assets by the provision of the IEEPA, 50 U.S.C. § 1702(a)(1)(B), which empowers the President to "compel," "nullify," or "prohibit" any "transfer" with respect to, or transactions involving, any property subject to the jurisdiction of the United States, in which any foreign country has any interest. Pp. 2982–2984.

(a) Nothing in the legislative history of either § 1702 or § 5(b) of the Trading With the Enemy Act (TWEA), from which § 1702 was directly drawn, requires reading out of § 1702 all meaning to the words "transfer," "compel," or "nullify," and limiting the President's authority in this case only to continuing the freeze, as petitioner claims. To the contrary, both the legislative history and cases interpreting the TWEA fully sustain the President's broad authority when acting under **\*656** such congressional grant of power. And the changes brought about by the enactment of the IEEPA did not in any way affect the President's authority to take the specific action taken here. By the time petitioner brought the instant action, the President had already entered the freeze order, and petitioner proceeded against the blocked assets only after the Treasury Department had issued revocable licenses authorizing such proceedings and attachments. The attachments obtained by petitioner, being subject to revocation, were specifically made subordinate to further actions which the President might take under the IEEPA. Pp. 2983–2984.

**\*\*2975** (b) Blocking orders, such as the one here, permit the President to maintain foreign assets at his disposal for use in negotiating the resolution of a declared national emergency, and the frozen assets serve as a "bargaining chip" to be used by the President when dealing with a hostile country. To limit the President's authority, as petitioner urges, would mean that claimants could minimize or eliminate this "bargaining chip" through attachments or similar encumbrances. P. 2984.

(c) Petitioner's interest in its attachments was conditional and revocable and as such the President's action nullifying the attachments and ordering the transfer of the assets did not effect a taking of property in violation of the Fifth Amendment absent just compensation. P. 2984, n.6.

(d) Because the President's action in nullifying the attachments and ordering the transfer of assets was taken pursuant to specific congressional authorization, it is "supported by the strongest presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 72 S.Ct. 863, 871, 96 L.Ed. 1153 (Jackson, J., concurring). Under the circumstances of this case, petitioner has not sustained that burden. P. 2984.

2. On the basis of the inferences to be drawn from the character of the legislation, such as the IEEPA and the Hostage Act, which Congress has enacted in the area of the President's authority to deal with international crises, and from the history of congressional acquiescence in executive claims settlement, the President was authorized to suspend claims pursuant to the Executive Order in question here. Pp. 2984–2991.

(a) Although neither the IEEPA nor the Hostage Act constitutes specific authorization for the President's suspension of the claims, these statutes are highly relevant as an indication of congressional acceptance of a broad scope for executive action in circumstances such as those presented in this case. Pp. 2984–2986.

(b) The United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries. **\*657** Although those settlements have sometimes been made by treaty, there has also been a longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate, and this practice continues at the present time. Pp. 2986–2987.

(c) That Congress has implicitly approved the practice of claims settlement by executive agreement is best demonstrated by Congress' enactment of the International Claims Settlement Act of 1949, which created the International Claims Commission, now the Foreign Claims Settlement Commission, and gave it jurisdiction to make final and binding decisions with respect to claims

by United States nationals against settlement funds. And the legislative history of the IEEPA further reveals that Congress has accepted the authority of the President to enter into settlement agreements. Pp. 2987–2988.

(d) In addition to congressional acquiescence in the President's power to settle claims, prior cases of this Court have also recognized that the President has some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate. See, *e. g., United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796. Pp. 2988–2989.

(e) Petitioner's argument that all settlement claims prior to 1952 when the United States had adhered to the doctrine of absolute sovereign immunity should be discounted because of the evolution of sovereign immunity, is refuted by the fact that since 1952 there have been at least 10 claim settlements by executive agreement. Thus, even if the pre-1952 cases should be disregarded, congressional acquiescence in settlement agreements since that time supports the President's power to act here. P. 2989.

(f) By enacting the Foreign Sovereign Immunities Act of 1976 (FSIA), which granted personal and subject-matter jurisdiction to federal district courts over commercial **\*\*2976** suits by claimants against foreign states that waived immunity, Congress did not divest the President of the authority to settle claims. The President, by suspending petitioner's claim, has not circumscribed the jurisdiction of the United States courts in violation of Art. III, but has simply effected a change in the substantive law governing the lawsuit. The FSIA was designed to remove one particular barrier to suit, namely, sovereign immunity, and cannot be read as *prohibiting* the President from settling claims of United States nationals against foreign governments. Pp. 2989–2990.

(g) Long continued executive practice, known to and acquiesced in by Congress, raises a presumption that the President's action has been taken pursuant to Congress' consent. Such practice is present here and such a presumption is also appropriate. P. 2990.

(h) The conclusion that the President's action in suspending petitioner's **\*658** claim did not exceed his powers is buttressed by the fact the President has provided an alternative forum, the Claims Tribunal, to settle the

claims of the American nationals. Moreover, Congress has not disapproved the action taken here. Pp. 2990–2991.

(i) While it is not concluded that the President has plenary power to settle claims, even against foreign governmental entities, nevertheless, where, as here, the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between this country and another, and Congress has acquiesced in the President's action, it cannot be said that the President lacks the power to settle such claims. P. 2991.

3. The possibility that the President's actions with respect to the suspension of the claims may effect a taking of petitioner's property in violation of the Fifth Amendment in the absence of just compensation, makes ripe for adjudication the question whether petitioner will have a remedy at law in the Court of Claims. And there is no jurisdictional obstacle to an appropriate action in that court under the Tucker Act. Pp. 2991–2992.

Affirmed.

**Attorneys and Law Firms**

C. Stephen Howard, Tuttle & Taylor, Inc., Los Angeles, Cal., for petitioner.

Rex E. Lee, Special Atty., U.S. Dept. of Justice, Washington, D. C., for federal respondents.

Thomas Shack, Jr., Abourezk, Shack & Mendenhall, Washington, D. C., for the Islamic Republic of Iran.

Eric M. Lieberman, New York City, for the Bank Markazi Iran.

**Opinion**

**\*659** Justice REHNQUIST delivered the opinion of the Court.

The questions presented by this case touch fundamentally upon the matter in which our Republic is to be governed. Throughout the nearly two centuries of our Nation's existence under the Constitution, this subject has generated considerable debate. We have had the benefit of commentators such as John Jay, Alexander Hamilton, and James Madison writing in The Federalist Papers at the Nation's very inception, the benefit of astute

foreign observers of our system such as **\*660** Alexis deTocqueville and James Bryce writing during the first century of the Nation's existence, and the benefit of many other treatises as well as more than 400 volumes of reports of decisions of this Court. As these writings reveal it is doubtless both futile and perhaps dangerous to find any epigrammatical explanation of how this country has been governed. Indeed, as Justice Jackson noted, "[a] judge ... may be surprised at the poverty of really useful and unambiguous authority applicable to concrete problems of executive power as they actually present themselves." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634, 72 S.Ct. 863, 888, 96 L.Ed. 1153 (1952) (concurring opinion).

Our decision today will not dramatically alter this situation, for the Framers "did not make the judiciary the overseer of our government." *Id.*, at 594, 72 S.Ct., at 889 **\*\*2977** (Frankfurter, J., concurring). We are confined to a resolution of the dispute presented to us. That dispute involves various Executive Orders and regulations by which the President nullified attachments and liens on Iranian assets in the United States, directed that these assets be transferred to Iran, and suspended claims against Iran that may be presented to an International Claims Tribunal. This action was taken in an effort to comply with an Executive Agreement between the United States and Iran. We granted certiorari before judgment in this case, and set an expedited briefing and argument schedule, because lower courts had reached conflicting conclusions on the validity of the President's actions and, as the Solicitor General informed us, unless the Government acted by July 19, 1981, Iran could consider the United States to be in breach of the Executive Agreement.

But before turning to the facts and law which we believe determine the result in this case, we stress that the expeditious treatment of the issues involved by all of the courts which have considered the President's actions makes us acutely aware of the necessity to rest decision on the narrowest possible ground capable of deciding the case. **\*661** *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). This does not mean that reasoned analysis may give way to judicial fiat. It does mean that the statement of Justice Jackson—that we decide difficult cases presented to us by virtue of our commissions, not our competence—is especially true here. We attempt to lay down no general "guidelines" covering other situations not involved here,

and attempt to confine the opinion only to the very questions necessary to decision of the case.

Perhaps it is because it is so difficult to reconcile the foregoing definition of Art. III judicial power with the broad range of vitally important day-to-day questions regularly decided by Congress or the Executive, without either challenge or interference by the Judiciary, that the decisions of the Court in this area have been rare, episodic, and afford little precedential value for subsequent cases. The tensions present in any exercise of executive power under the tri-partite system of Federal Government established by the Constitution have been reflected in opinions by Members of this Court more than once. The Court stated in *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319–320, 57 S.Ct. 216, 220–221, 81 L.Ed. 255 (1936):

> "[W]e are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution."

And yet 16 years later, Justice Jackson in his concurring opinion in *Youngstown, supra,* which both parties agree brings together as much combination of analysis and common sense as there is in this area, focused not on the "plenary and exclusive **\*662** power of the President" but rather responded to a claim of virtually unlimited powers for the Executive by noting:

> "The example of such unlimited executive power that must have most impressed the forefathers was the prerogative exercised by George III, and the description of its evils in the Declaration of Independence leads me to doubt that they were creating their new Executive in his image." 343 U.S., at 641, 72 S.Ct., at 873.

As we now turn to the factual and legal issues in this case, we freely confess that we are obviously deciding only one more episode in the never-ending tension between the President exercising the executive authority in a world that presents each day some new challenge with which he must deal and the Constitution under which we **\*\*2978** all live and which no one disputes embodies some sort of system of checks and balances.

I

On November 4, 1979, the American Embassy in Tehran was seized and our diplomatic personnel were captured and held hostage. In response to that crisis, President Carter, acting pursuant to the International Emergency Economic Powers Act, 91 Stat. 1626, 50 U.S.C. §§ 1701–1706 (1976 ed., Supp. III) (hereinafter IEEPA), declared a national emergency on November 14, 1979,[1] and blocked the removal or transfer of "all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to **\*663** the jurisdiction of the United States...." Exec. Order No. 12170, 3 CFR 457 (1980), note following 50 U.S.C. § 1701 (1976 ed., Supp. III).[2] President Carter authorized the Secretary of the Treasury to promulgate regulations carrying out the blocking order. On November 15, 1979, the Treasury Department's Office of Foreign Assets Control issued a regulation providing that "[u]nless licensed or authorized ... any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since [November 14, 1979,] there existed an interest of Iran." 31 CFR § 535.203(e) (1980). The regulations also made clear that any licenses or authorizations granted could be "amended, modified, or revoked at any time." § 535.805.[3]

[1]   Title 50 U.S.C. § 1701(a) (1976 ed., Supp. III) states that the President's authority under the Act "may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." Petitioner

does not challenge President Carter's declaration of a national emergency.

2    Title 50 U.S.C. § 1702(a)(1)(B) (1976 ed., Supp. III) empowers the President to

> "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest...."

3    Title 31 CFR § 535.805 (1980) provides in full: "The provisions of this part and any rulings, licenses, authorizations, instructions, orders, or forms issued thereunder may be amended, modified, or revoked at any time."

On November 26, 1979, the President granted a general license authorizing certain judicial proceedings against Iran but which did not allow the "entry of any judgment or of any decree or order of similar or analogous effect...." § 535.504(a). On December 19, 1979, a clarifying regulation was issued stating that "the general authorization for judicial proceedings contained in § 535.504(a) includes pre-judgment attachment." § 535.418.

On December 19, 1979, petitioner Dames & Moore filed suit in the United States District Court for the Central District of California against the Government of Iran, the Atomic  **\*664**  Energy Organization of Iran, and a number of Iranian banks. In its complaint, petitioner alleged that its wholly owned subsidiary, Dames & Moore International, S. R. L., was a party to a written contract with the Atomic Energy Organization, and that the subsidiary's entire interest in the contract had been assigned to petitioner. Under the contract, the subsidiary was to conduct site studies for a proposed nuclear power plant in Iran. As provided in the terms of the contract, the Atomic Energy Organization terminated the agreement for its own convenience on June 30, 1979. Petitioner contended, however, that it was owed $3,436,694.30 plus interest for services performed under the contract prior to the date of termination. [4]  **\*\*2979**  The District Court issued orders of attachment directed against property of

the defendants, and the property of certain Iranian banks was then attached to secure any judgment that might be entered against them.

4    The contract stated that any dispute incapable of resolution by agreement of the parties would be submitted to conciliation and that, if either party was unwilling to accept the results of conciliation, "the matter shall be decided finally by resort to the courts of Iran." Pet. for Cert., n.2. In its complaint, which was based on breach of contract and related theories, petitioner alleged that it had sought a meeting with the Atomic Energy Organization for purposes of settling matters relating to the contract but that the Organization "has continually postponed [the] meeting and obviously does not intend that it take place." Complaint in *Dames & Moore v. Atomic Energy Organization of Iran*, No. CV 79–04918 LEW (Px) (CD Cal.), ¶ 27.

On January 20, 1981, the Americans held hostage were released by Iran pursuant to an Agreement entered into the day before and embodied in two Declarations of the Democratic and Popular Republic of Algeria. Declaration of the Government of the Democratic and Popular Republic of Algeria (App. to Pet. for Cert. 21–29), and Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (*id.,* at 30–35). The Agreement  **\*665**  stated that "[i]t is the purpose of [the United States and Iran] ... to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all claims through binding arbitration." *Id.,* at 21–22. In furtherance of this goal, the Agreement called for the establishment of an Iran-United States Claims Tribunal which would arbitrate any claims not settled within six months. Awards of the Claims Tribunal are to be "final and binding" and "enforceable ... in the courts of any nation in accordance with its laws." *Id.,* at 32. Under the Agreement, the United States is obligated

> "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." *Id.,* at 22.

In addition, the United States must "act to bring about the transfer" by July 19, 1981, of all Iranian assets held in this country by American banks. *Id.*, at 24–25. One billion dollars of these assets will be deposited in a security account in the Bank of England, to the account of the Algerian Central Bank, and used to satisfy awards rendered against Iran by the Claims Tribunal. *Ibid.*

On January 19, 1981, President Carter issued a series of Executive Orders implementing the terms of the agreement. Exec. Orders Nos. 12276–12285, 46 Fed.Reg. 7913–7932. These Orders revoked all licenses permitting the exercise of "any right, power, or privilege" with regard to Iranian funds, securities, or deposits; "nullified" all non-Iranian interests in such assets acquired subsequent to the blocking order of November 14, 1979; and required those banks holding Iranian assets to transfer them "to the Federal Reserve Bank of New **\*666** York, to be held or transferred as directed by the Secretary of the Treasury." Exec. Order No. 12279, 46 Fed.Reg. 7919.

On February 24, 1981, President Reagan issued an Executive Order in which he "ratified" the January 19th Executive Orders. Exec. Order No. 12294, 46 Fed.Reg. 14111. Moreover, he "suspended" all "claims which may be presented to the ... Tribunal" and provided that such claims "shall have no legal effect in any action now pending in any court of the United States." *Ibid.* The suspension of any particular claim terminates if the Claims Tribunal determines that it has no jurisdiction over that claim; claims are discharged for all purposes when the Claims Tribunal either awards some **\*\*2980** recovery and that amount is paid, or determines that no recovery is due. *Ibid.*

Meanwhile, on January 27, 1981, petitioner moved for summary judgment in the District Court against the Government of Iran and the Atomic Energy Organization, but not against the Iranian banks. The District Court granted petitioner's motion and awarded petitioner the amount claimed under the contract plus interest. Thereafter, petitioner attempted to execute the judgment by obtaining writs of garnishment and execution in state court in the State of Washington, and a sheriff's sale of Iranian property in Washington was noticed to satisfy the judgment. However, by order of May 28, 1981, as amended by order of June 8, the District Court stayed execution of its judgment pending appeal by the Government of Iran and the Atomic Energy

Organization. The District Court also ordered that all prejudgment attachments obtained against the Iranian defendants be vacated and that further proceedings against the bank defendants be stayed in light of the Executive Orders discussed above. App. to Pet. for Cert. 106–107.

On April 28, 1981, petitioner filed this action in the District Court for declaratory and injunctive relief against the United States and the Secretary of the Treasury, seeking to **\*667** prevent enforcement of the Executive Orders and Treasury Department regulations implementing the Agreement with Iran. In its complaint, petitioner alleged that the actions of the President and the Secretary of the Treasury implementing the Agreement with Iran were beyond their statutory and constitutional powers and, in any event, were unconstitutional to the extent they adversely affect petitioner's final judgment against the Government of Iran and the Atomic Energy Organization, its execution of that judgment in the State of Washington, its prejudgment attachments, and its ability to continue to litigate against the Iranian banks. *Id.*, at 1–12. On May 28, 1981, the District Court denied petitioner's motion for a preliminary injunction and dismissed petitioner's complaint for failure to state a claim upon which relief could be granted. *Id.*, at 106–107. Prior to the District Court's ruling, the United States Courts of Appeals for the First and the District of Columbia Circuits upheld the President's authority to issue the Executive Orders and regulations challenged by petitioner. See *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority,* 651 F.2d 800 (CA1 1981); *American Int'l Group, Inc. v. Islamic Republic of Iran,* 211 U.S.App.D.C. 468, 657 F.2d 430 (1981).

On June 3, 1981, petitioner filed a notice of appeal from the District Court's order, and the appeal was docketed in the United States Court of Appeals for the Ninth Circuit. On June 4, the Treasury Department amended its regulations to mandate "the transfer of bank deposits and certain other financial assets of Iran in the United States to the Federal Reserve Bank of New York by noon, June 19." App. to Pet. for Cert. 151–152. The District Court, however, entered an injunction pending appeal prohibiting the United States from requiring the transfer of Iranian property that is subject to "any writ of attachment, garnishment, judgment, levy, or other judicial lien" issued by any court in favor of petitioner. *Id.*, at 168. Arguing that this is a case of "imperative

public importance," petitioner then sought a writ of certiorari before **\*668** judgment. Pet. for Cert. 10. See 28 U.S.C. § 2101(e); this Court's Rule 18. Because the issues presented here are of great significance and demand prompt resolution, we granted the petition for the writ, adopted an expedited briefing schedule, and set the case for oral argument on June 24, 1981. 452 U.S. 932, 101 S.Ct. 3071, 69 L.Ed.2d 434 (1981).

## II

 **[1]**   The parties and the lower courts, confronted with the instant questions, all agreed that much **\*\*2981** relevant analysis is contained in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). Justice Black's opinion for the Court in that case, involving the validity of President Truman's effort to seize the country's steel mills in the wake of a nationwide strike, recognized that "[t]he President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself." *Id.*, at 585, 72 S.Ct. at 864. Justice Jackson's concurring opinion elaborated in a general way the consequences of different types of interaction between the two democratic branches in assessing Presidential authority to act in any given case. When the President acts pursuant to an express or implied authorization from Congress, he exercises not only his powers but also those delegated by Congress. In such a case the executive action "would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Id.*, at 637, 72 S.Ct., at 871. When the President acts in the absence of congressional authorization he may enter "a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Ibid.* In such a case the analysis becomes more complicated, and the validity of the President's action, at least so far as separation-of-powers principles are concerned, hinges on a consideration of all the circumstances which might shed light on the views of the Legislative Branch toward such action, including "congressional **\*669** inertia, indifference or quiescence." *Ibid.* Finally, when the President acts in contravention of the will of Congress, "his power is at its lowest ebb," and the Court can sustain his actions "only by disabling the Congress from acting upon the subject." *Id.*, at 637–638, 72 S.Ct., at 871–872.

Although we have in the past found and do today find Justice Jackson's classification of executive actions into three general categories analytically useful, we should be mindful of Justice Holmes' admonition, quoted by Justice Frankfurter in *Youngstown, supra,* at 597, 72 S.Ct., at 890 (concurring opinion), that "[t]he great ordinances of the Constitution do not establish and divide fields of black and white." *Springer v. Philippine Islands*, 277 U.S. 189, 209, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1928) (dissenting opinion). Justice Jackson himself recognized that his three categories represented "a somewhat over-simplified grouping," 343 U.S., at 635, 72 S.Ct., at 870, and it is doubtless the case that executive action in any particular instance falls, not neatly in one of three pigeonholes, but rather at some point along a spectrum running from explicit congressional authorization to explicit congressional prohibition. This is particularly true as respects cases such as the one before us, involving responses to international crises the nature of which Congress can hardly have been expected to anticipate in any detail.

## III

 **[2]**   In nullifying post-November 14, 1979, attachments and directing those persons holding blocked Iranian funds and securities to transfer them to the Federal Reserve Bank of New York for ultimate transfer to Iran, President Carter cited five sources of express or inherent power. The Government, however, has principally relied on § 203 of the IEEPA, 91 Stat. 1626, 50 U.S.C. § 1702(a)(1) (1976 ed., Supp. III), as authorization for these actions. Section 1702(a)(1) provides in part:

> "At the times and to the extent specified in section 1701 of this title, the President may, under such regulations **\*670** as he may prescribe, by means of instructions, licenses, or otherwise—

> "(A) investigate, regulate, or prohibit—

> "(i) any transactions in foreign exchange,

>  **\*\*2982**   "(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

"(iii) the importing or exporting of currency or securities, and

"(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;

"by any person, or with respect to any property, subject to the jurisdiction of the United States."

The Government contends that the acts of "nullifying" the attachments and ordering the "transfer" of the frozen assets are specifically authorized by the plain language of the above statute. The two Courts of Appeals that have considered this question agreed with this contention. In *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority,* the Court of Appeals for the First Circuit explained:

"The President relied on his IEEPA powers in November 1979, when he 'blocked' all Iranian assets in this country, and again in January 1981, when he 'nullified' interests acquired in blocked property, and ordered that property's transfer. The President's actions, in this regard, are in keeping with the language of IEEPA: initially he 'prevent[ed] and prohibit[ed]' 'transfers' of Iranian assets; later he 'direct[ed] and compel[led]' the **\*671** 'transfer' and 'withdrawal' of the assets, 'nullify[ing]' certain 'rights' and 'privileges' acquired in them.

"Main argues that IEEPA does not supply the President with power to override judicial remedies, such as attachments and injunctions, or to extinguish 'interests' in foreign assets held by United States citizens. But we can find no such limitation in IEEPA's terms. The language of IEEPA is sweeping and unqualified. It provides broadly that the President may void or nullify the 'exercising [by *any* person of] *any* right, power or privilege with respect to ... any property in which any foreign country has any interest....' 50 U.S.C. § 1702(a) (1)(B)." 651 F.2d, at 806–807 (emphasis in original).

In *American Int'l Group, Inc. v. Islamic Republic of Iran,* the Court of Appeals for the District of Columbia Circuit employed a similar rationale in sustaining President Carter's action:

"The Presidential revocation of the license he issued permitting prejudgment restraints upon Iranian assets is an action that falls within the plain language of the IEEPA. In vacating the attachments, he acted to 'nullify [and] void ... any ... exercising any right, power, or privilege with respect to ... any property in which any foreign country ... has any interest ... by any person ... subject to the jurisdiction of the United States.' " 211 U.S.App.D.C., at 477, 657 F.2d, at 439 (footnote omitted).

Petitioner contends that we should ignore the plain language of this statute because an examination of its legislative history as well as the history of § 5(b) of the Trading With the Enemy Act (hereinafter TWEA), 40 Stat. 411, as amended, 50 U.S.C. App. § 5(b) (1976 ed. and Supp. III), from which the pertinent language of § 1702 is directly drawn, **\*672** reveals that the statute was not intended to give the President such extensive power over the assets of a foreign state during times of national emergency. According to petitioner, once the President instituted the November 14, 1979, blocking order, § 1702 authorized him "only to continue **\*\*2983** the freeze or to discontinue controls." Brief for Petitioner 32.

We do not agree and refuse to read out of § 1702 all meaning to the words "transfer," "compel," or "nullify." Nothing in the legislative history of either § 1702 or § 5(b) of the TWEA requires such a result. To the contrary, we think both the legislative history and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power. See, *e. g., Orvis v. Brownell*, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938 (1953). [5] Although Congress intended to **\*673** limit the President's emergency power in peacetime, we do not think the changes brought about by the enactment of the IEEPA in any way affected the authority of the President to take the specific actions taken here. We likewise note that by the time petitioner instituted this action, the President had already entered the freeze order. Petitioner proceeded against the blocked assets only after the Treasury Department had issued revocable licenses authorizing such proceedings and attachments. The Treasury Regulations provided that "unless licensed" any attachment is null and void, 31 CFR § 535.203(e) (1980), and all licenses "may be amended, modified, or revoked at any time." § 535.805. As such, the attachments obtained by petitioner were specifically made subordinate

to further actions which the President might take under the IEEPA. Petitioner was on notice of the contingent nature of its interest in the frozen assets.

5    Petitioner argues that under the TWEA the President was given two powers: (1) the power temporarily to freeze or block the transfer of foreign-owned assets; and (2) the power summarily to seize and permanently vest title to foreign-owned assets. It is contended that only the "vesting" provisions of the TWEA gave the President the power *permanently* to dispose of assets and when Congress enacted the IEEPA in 1977 it purposefully did not grant the President this power. According to petitioner, the nullification of the attachments and the transfer of the assets will permanently dispose of the assets and would not even be permissible under the TWEA. We disagree. Although it is true the IEEPA does not give the President the power to "vest" or to take title to the assets, it does not follow that the President is not authorized under both the IEEPA and the TWEA to otherwise permanently dispose of the assets in the manner done here. Petitioner errs in assuming that the only power granted by the language used in both § 1702 and § 5(b) of the TWEA is the power temporarily to freeze assets. As noted above, the plain language of the statute defies such a holding. Section 1702 authorizes the President to "direct and compel" the "transfer, withdrawal, transportation, ... or exportation of ... any property in which any foreign country ... has any interest...."

We likewise reject the contention that *Orvis v. Brownell* and *Zittman v. McGrath*, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951), grant petitioner the right to retain its attachments on the Iranian assets. To the contrary, we think *Orvis* supports the proposition that an American claimant may not use an attachment that is subject to a revocable license and that has been obtained after the entry of a freeze order to limit in any way the actions the *President* may take under § 1702 respecting the frozen assets. An attachment so obtained is in every sense subordinate to the President's power under the IEEPA.

**[3]**   This Court has previously recognized that the congressional purpose in authorizing blocking orders is "to put control of foreign assets in the hands of the President...." *Propper v. Clark*, 337 U.S. 472, 493, 69 S.Ct. 1333, 1345, 93 L.Ed. 1480 (1949). Such orders permit the President to maintain the foreign assets at his disposal for use in negotiating the resolution of a declared national emergency. The frozen assets serve as a "bargaining chip"

to be used by the President when dealing with a hostile country. Accordingly, it is difficult to accept petitioner's argument because the practical effect of it is to allow individual claimants throughout the country to minimize or wholly eliminate this "bargaining chip" through attachments, garnishments, or similar encumbrances on property. Neither the purpose the **\*674** statute was enacted to serve nor its plain language supports such a result.[6]

6    Although petitioner concedes that the President could have forbidden attachments, it nevertheless argues that once he allowed them the President permitted claimants to acquire property interests in their attachments. Petitioner further argues that only the licenses to obtain the attachments were made revocable, not the attachments themselves. It is urged that the January 19, 1981, order revoking all licenses only affected petitioner's right to obtain future attachments. We disagree. As noted above, the regulations specifically provided that any attachment is null and void "unless licensed," and all licenses may be revoked at any time. Moreover, common sense defies petitioner's reading of the regulations. The President could hardly have intended petitioner and other similarly situated claimants to have the power to take control of the frozen assets out of his hands.

Our construction of petitioner's attachments as being "revocable," "contingent," and "in every sense subordinate to the President's power under the IEEPA," in effect answers petitioner's claim that even if the President had the authority to nullify the attachments and transfer the assets, the exercise of such would constitute an unconstitutional taking of property in violation of the Fifth Amendment absent just compensation. We conclude that because of the President's authority to prevent or condition attachments, and because of the orders he issued to this effect, petitioner did not acquire any "property" interest in its attachments of the sort that would support a constitutional claim for compensation.

**\*\*2984** Because the President's action in nullifying the attachments and ordering the transfer of the assets was taken pursuant to specific congressional authorization, it is "supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it." *Youngstown*, 343 U.S., at 637, 72 S.Ct., at 871 (Jackson, J., concurring). Under the circumstances of this case, we cannot say that petitioner has sustained

that heavy burden. A contrary ruling would mean that the Federal Government as a whole lacked the power exercised by the President, see *id.*, at 636–637, 72 S.Ct., at 870–871, and that we are not prepared to say.

## *675 IV

Although we have concluded that the IEEPA constitutes specific congressional authorization to the President to nullify the attachments and order the transfer of Iranian assets, there remains the question of the President's authority to suspend claims pending in American courts. Such claims have, of course, an existence apart from the attachments which accompanied them. In terminating these claims through Executive Order No. 12294 the President purported to act under authority of both the IEEPA and 22 U.S.C. § 1732, the so-called "Hostage Act." [7] 46 Fed.Reg. 14111 (1981).

[7]   Judge Mikva, in his separate opinion in *American Int'l Group, Inc. v. Islamic Republic of Iran*, 211 U.S.App.D.C. 468, 490, 657 F.2d 430, 452 (1981), argued that the moniker "Hostage Act" was newly coined for purposes of this litigation. Suffice it to say that we focus on the language of 22 U.S.C. § 1732, not any shorthand description of it. See W. Shakespeare, Romeo and Juliet, Act II, scene 2, line 43 ("What's in a name?").

 **[4]**   We conclude that although the IEEPA authorized the nullification of the attachments, it cannot be read to authorize the suspension of the claims. The claims of American citizens against Iran are not in themselves transactions involving Iranian property or efforts to exercise any rights with respect to such property. An *in personam* lawsuit, although it might eventually be reduced to judgment and that judgment might be executed upon, is an effort to establish liability and fix damages and does not focus on any particular property within the jurisdiction. The terms of the IEEPA therefore do not authorize the President to suspend claims in American courts. This is the view of all the courts which have considered the question. *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d at 809–814; *American Int'l Group, Inc. v. Islamic Republic of Iran*, 211 U.S.App.D.C., at 481, n. 15, 657 F.2d, at 443, n. 15; **\*676** *The Marschalk Co. v. Iran National Airlines Corp.*, 518 F.Supp. 69, 79 (SDNY 1981); *Electronic Data Systems Corp. v.* **\*\*2985** *Social Security Organization of Iran*, 508 F.Supp. 1350, 1361 (ND Tex. 1981).

The Hostage Act, passed in 1868, provides:

 "Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress." Rev.Stat. § 2001, 22 U.S.C. § 1732.

We are reluctant to conclude that this provision constitutes specific authorization to the President to suspend claims in American courts. Although the broad language of the Hostage Act suggests it may cover this case, there are several difficulties with such a view. The legislative history indicates that the Act was passed in response to a situation unlike the recent Iranian crisis. Congress in 1868 was concerned with the activity of certain countries refusing to recognize the citizenship of naturalized Americans traveling abroad, and repatriating such citizens against their will. See, *e. g.*, Cong. Globe, 40th Cong., 2d Sess., 4331 (1868) (Sen. Fessenden); *id.*, at 4354 (Sen. Conness); see also 22 U.S.C. § 1731. These countries were not interested in returning the citizens in exchange for any sort of ransom. This also explains the reference in the Act to imprisonment "in violation of the rights of American citizenship." Although the Iranian hostage-taking violated international law and common decency, **\*677** the hostages were not seized out of any refusal to recognize their American citizenship—they were seized precisely *because of* their American citizenship. The legislative history is also somewhat ambiguous on the question whether Congress contemplated Presidential action such as that involved here or rather simply reprisals directed against the offending foreign country and *its* citizens. See, *e. g.*, Cong. Globe, 40th Cong., 2d Sess., 4205 (1868); *American Int'l Group, Inc. v. Islamic Republic of Iran, supra*, at 490–491, 657 F.2d, at 452–453 (opinion of Mikva, J.).

Concluding that neither the IEEPA nor the Hostage Act constitutes specific authorization of the President's action suspending claims, however, is not to say that these statutory provisions are entirely irrelevant to the question of the validity of the President's action. We think both statutes highly relevant in the looser sense of indicating congressional acceptance of a broad scope for executive action in circumstances such as those presented in this case. As noted in Part III, *supra*, at 2982–2983, the IEEPA delegates broad authority to the President to act in times of national emergency with respect to property of a foreign country. The Hostage Act similarly indicates congressional willingness that the President have broad discretion when responding to the hostile acts of foreign sovereigns. As Senator Williams, draftsman of the language eventually enacted as the Hostage Act, put it:

> "If you propose any remedy at all, you must invest the Executive with some discretion, so that he may apply the remedy to a case as it may arise. As to England or France he might adopt one policy to relieve a citizen imprisoned by either one of those countries; as to the Barbory powers, he might adopt another policy; as to the islands of the ocean, another. With different countries that have different systems of government he might adopt different means." Cong. Globe, 40th Cong., 2d Sess., 4359 (1868).

**\*678 \*\*2986** Proponents of the bill recognized that it placed a "loose discretion" in the President's hands, *id.*, at 4238 (Sen. Stewart), but argued that "[s]omething must be intrusted to the Executive" and that "[t]he President ought to have the power to do what the exigencies of the case require to rescue [a] citizen from imprisonment." *Id.*, at 4233, 4357 (Sen. Williams). An original version of the Act, which authorized the President to suspend trade with a foreign country and even arrest citizens of that country in the United States in retaliation, was rejected because "there may be a great variety of cases arising where other and different means would be equally effective, and where the end desired could be accomplished without resorting to such dangerous and violent measures." *Id.*, at 4233 (Sen. Williams).

**[5]** Although we have declined to conclude that the IEEPA or the Hostage Act directly authorizes the President's suspension of claims for the reasons noted, we cannot ignore the general tenor of Congress' legislation in this area in trying to determine whether the President

is acting alone or at least with the acceptance of Congress. As we have noted, Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act. Such failure of Congress specifically to delegate authority does not, "especially ... in the areas of foreign policy and national security," imply "congressional disapproval" of action taken by the Executive. *Haig v. Agee,* 453 U.S. 280, 291, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640. On the contrary, the enactment of legislation closely related to the question of the President's authority in a particular case which evinces legislative intent to accord the President broad discretion may be considered to "invite" "measures on independent presidential responsibility," *Youngstown,* 343 U.S., at 637, 72 S.Ct., at 871 (Jackson, J., concurring). At least this is so where there is no contrary indication of legislative intent and when, as here, there is a history of congressional acquiescence in conduct of the sort **\*679** engaged in by the President. It is to that history which we now turn.

Not infrequently in affairs between nations, outstanding claims by nationals of one country against the government of another country are "sources of friction" between the two sovereigns. *United States v. Pink,* 315 U.S. 203, 225, 62 S.Ct. 552, 563, 86 L.Ed. 796 (1942). To resolve these difficulties, nations have often entered into agreements settling the claims of their respective nationals. As one treatise writer puts it, international agreements settling claims by nationals of one state against the government of another "are established international practice reflecting traditional international theory." L. Henkin, Foreign Affairs and the Constitution 262 (1972). Consistent with that principle, the United States has repeatedly exercised its sovereign authority to settle the claims of its nationals against foreign countries. Though those settlements have sometimes been made by treaty, there has also been a longstanding practice of settling such claims by executive agreement without the advice and consent of the Senate. [8] Under such agreements, the President has agreed to renounce or extinguish claims of United States nationals against foreign governments in return for lump-sum payments or the establishment of arbitration procedures. To be sure, many of these settlements were **\*\*2987** encouraged by the United States claimants themselves, since a claimant's only hope of obtaining any payment at all might lie in having his Government negotiate a diplomatic settlement on his behalf. But it is also undisputed **\*680** that the "United States has sometimes

disposed of the claims of its citizens without their consent, or even without consultation with them, usually without exclusive regard for their interests, as distinguished from those of the nation as a whole." Henkin, *supra*, at 262–263. Accord, Restatement (Second) of Foreign Relations Law of the United States § 213 (1965) (President "may waive or settle a claim against a foreign state ... [even] without the consent of the [injured] national"). It is clear that the practice of settling claims continues today. Since 1952, the President has entered into at least 10 binding settlements with foreign nations, including an $80 million settlement with the People's Republic of China. [9]

[8]   At least since the case of the "Wilmington Packet" in 1799, Presidents have exercised the power to settle claims of United States nationals by executive agreement. See Lillich, The Gravel Amendment to the Trade Reform Act of 1974, 69 Am.J.Int'l L. 837, 844 (1975). In fact, during the period of 1817–1917, "no fewer than eighty executive agreements were entered into by the United States looking toward the liquidation of claims of its citizens." W. McClure, International Executive Agreements 53 (1941). See also 14 M. Whiteman, Digest of International Law 247 (1970).

[9]   Those agreements are [1979] 30 U.S.T. 1957 (People's Republic of China); [1976] 27 U.S.T. 3933 (Peru); [1976] 27 U.S.T. 4214 (Egypt); [1974] 25 U.S.T. 227 (Peru); [1973] 24 U.S.T. 522 (Hungary); [1969] 20 U.S.T. 2654 (Japan); [1965] 16 U.S.T. 1 (Yugoslavia); [1963] 14 U.S.T. 969 (Bulgaria); [1960] 11 U.S.T. 1953 (Poland); [1960] 11 U.S.T. 317 (Rumania).

Crucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement. This is best demonstrated by Congress' enactment of the International Claims Settlement Act of 1949, 64 Stat. 13, as amended, 22 U.S.C. § 1621 *et seq.* (1976 ed. and Supp. IV). The Act had two purposes: (1) to allocate to United States nationals funds received in the course of an executive claims settlement with Yugoslavia, and (2) to provide a procedure whereby funds resulting from future settlements could be distributed. To achieve these ends Congress created the International Claims Commission, now the Foreign Claims Settlement Commission, and gave it jurisdiction to make final and binding decisions with respect to claims by United States nationals against settlement funds. 22 U.S.C. § 1623(a). By creating a procedure to implement future settlement

agreements, Congress placed its stamp of approval on such agreements. Indeed, the legislative history of the Act observed that the United States was seeking settlements **\*681** with countries other than Yugoslavia and that the bill contemplated settlements of a similar nature in the future. H.R.Rep. No. 770, 81st Cong., 1st Sess., 4, 8 (1949).

Over the years Congress has frequently amended the International Claims Settlement Act to provide for particular problems arising out of settlement agreements, thus demonstrating Congress' continuing acceptance of the President's claim settlement authority. With respect to the Executive Agreement with the People's Republic of China, for example, Congress established an allocation formula for distribution of the funds received pursuant to the Agreement. 22 U.S.C. § 1627(f) (1976 ed. and Supp. IV). As with legislation involving other executive agreements, Congress did not question the fact of the settlement or the power of the President to have concluded it. In 1976, Congress authorized the Foreign Claims Settlement Commission to adjudicate the merits of claims by United States nationals against East Germany, prior to any settlement with East Germany, so that the Executive would "be in a better position to negotiate an adequate settlement ... of these claims." S.Rep. No. 94–1188, p. 2 (1976), U.S. Code Cong. & Admin. News, 1976, pp. 5582, 5583; 22 U.S.C. § 1644b. Similarly, Congress recently amended the International Claims Settlement Act to facilitate the settlement of claims against Vietnam. 22 U.S.C. §§ 1645, 1645a(5) (1976 ed., Supp. IV). The House Report stated that the purpose of the legislation was to establish an official inventory of losses of private United States property in Vietnam so that recovery could be achieved "through future direct Government-to-Government negotiation of private property claims." H.R.Rep. **\*\*2988** No. 96–915, pp. 2–3, U.S. Code Cong. & Admin. News, 1980, pp. 7328, 7329–7330. Finally, the legislative history of the IEEPA further reveals that Congress has accepted the authority of the Executive to enter into settlement agreements. Though the IEEPA was enacted to provide for some limitation on the President's emergency powers, Congress stressed that "[n]othing in this act is intended ... to interfere with the authority **\*682** of the President to [block assets], or to impede the settlement of claims of U. S. citizens against foreign countries." S.Rep. No. 95–466, p. 6 (1977), U.S. Code Cong. & Admin. News, 1977, pp. 4540, 4544; 50 U.S.C. § 1706(a)(1) (1976 ed., Supp. III). [10]

10    Indeed, Congress has consistently failed to object to this longstanding practice of claim settlement by executive agreement, even when it has had an opportunity to do so. In 1972, Congress entertained legislation relating to congressional oversight of such agreements. But Congress took only limited action, requiring that the text of significant executive agreements be transmitted to Congress. 1 U.S.C. § 112b. In *Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640, we noted that "[d]espite the longstanding and officially promulgated view that the Executive has the power to withhold passports for reasons of national security and foreign policy, Congress in 1978, 'though it once again enacted legislation relating to passports, left completely untouched the broad rule-making authority granted in the earlier Act.' " *Id.*, at 301, 101 S.Ct., at 2779, quoting *Zemel v. Rusk*, 381 U.S. 1, 12, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965). Likewise in this case, Congress, though legislating in the area has left "untouched" the authority of the President to enter into settlement agreements.

The legislative history of 1 U.S.C. § 112b further reveals that Congress has accepted the President's authority to settle claims. During the hearings on the bill, Senator Case, the sponsor of the Act, stated with respect to executive claim settlements:

"I think it is a most interesting [area] in which we have accepted the right of the President, one individual, acting through his diplomatic force, to adjudicate and settle claims of American nationals against foreign countries. But that is a fact." Transmittal of Executive Agreements to Congress: Hearings on S. 596 before the Senate Committee on Foreign Relations, 92d Cong., 1st Sess., 74 (1971).

In addition to congressional acquiescence in the President's power to settle claims, prior cases of this Court have also recognized that the President does have some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate. In *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), for example, the Court upheld the validity of the Litvinov Assignment, which was part of an Executive Agreement whereby the Soviet Union assigned to the United States amounts owed to it by American nationals so that outstanding claims of other American nationals could **\*683** be paid. The Court explained that the resolution of such claims was integrally connected with normalizing United States' relations with a foreign state:

"Power to remove such obstacles to full recognition as settlement of claims of our nationals ... certainly is a modest implied power of the President.... No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities ... is to be drastically revised." *Id.*, at 229–230, 62 S.Ct., at 565–566.

Similarly, Judge Learned Hand recognized:

"The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government; and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations." *Ozanic v. United States*, 188 F.2d 228, 231 (CA2 1951).

**\*\*2989** Petitioner raises two arguments in opposition to the proposition that Congress has acquiesced in this longstanding practice of claims settlement by executive agreement. First, it suggests that all pre-1952 settlement claims, and corresponding court cases such as *Pink*, should be discounted because of the evolution of the doctrine of sovereign immunity. Petitioner observes that prior to 1952 the United States adhered to the doctrine of absolute sovereign immunity, so that absent action by the Executive there simply would be no remedy for a United States national against a foreign government. When the United States in 1952 adopted a more restrictive **\*684** notion of sovereign immunity, by means of the so-called "Tate" letter, it is petitioner's view that United States nationals no longer needed executive aid to settle claims and that, as a result, the President's authority to settle such claims in some sense "disappeared." Though petitioner's argument is not wholly without merit, it is refuted by the fact that since 1952 there have been at least 10 claims settlements by executive agreement. Thus, even if the pre-1952 cases should be disregarded, congressional acquiescence in settlement agreements since that time supports the President's power to act here.

Petitioner next asserts that Congress divested the President of the authority to settle claims when it enacted the Foreign Sovereign Immunities Act of 1976 (hereinafter FSIA), 28 U.S.C. §§ 1330, 1602 *et seq.* The FSIA granted personal and subject-matter jurisdiction in the federal district courts over commercial suits brought by claimants against those foreign states which have waived immunity. 28 U.S.C. § 1330. Prior to the enactment of the FSIA, a foreign government's immunity to suit was determined by the Executive Branch on a case-by-case basis. According to petitioner, the principal purpose of the FSIA was to depoliticize these commercial lawsuits by taking them out of the arena of foreign affairs—where the Executive Branch is subject to the pressures of foreign states seeking to avoid liability through a grant of immunity—and by placing them within the exclusive jurisdiction of the courts. Petitioner thus insists that the President, by suspending its claims, has circumscribed the jurisdiction of the United States courts in violation of Art. III of the Constitution.

We disagree. In the first place, we do not believe that the President has attempted to divest the federal courts of jurisdiction. Executive Order No. 12294 purports only to "suspend" the claims, not divest the federal court of "jurisdiction." As we read the Executive Order, those claims not within the jurisdiction of the Claims Tribunal will "revive" **\*685** and become judicially enforceable in United States courts. This case, in short, illustrates the difference between modifying federal-court jurisdiction and directing the courts to apply a different rule of law. See *United States v. Schooner Peggy*, 1 Cranch 103, 2 L.Ed. 49 (1801). The President has exercised the power, acquiesced in by Congress, to settle claims and, as such, has simply effected a change in the substantive law governing the lawsuit. Indeed, the very example of sovereign immunity belies petitioner's argument. No one would suggest that a determination of sovereign immunity divests the federal courts of "jurisdiction." Yet, petitioner's argument, if accepted, would have required courts prior to the enactment of the FSIA to reject as an encroachment on their jurisdiction the President's determination of a foreign state's sovereign immunity.

Petitioner also reads the FSIA much too broadly. The principal purpose of the FSIA was to codify contemporary concepts concerning the scope of sovereign immunity and withdraw from the President the authority to make binding determinations of the sovereign immunity to be

accorded foreign states. See *Chas. T. Main Int'l, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d, at 813–814; *American Int'l Group*, **\*\*2990** *Inc. v. Islamic Republic of Iran*, 211 U.S.App.D.C., at 482, 657 F.2d, at 444. The FSIA was thus designed to remove one particular barrier to suit, namely sovereign immunity, and cannot be fairly read as *prohibiting* the President from settling claims of United States nationals against foreign governments. It is telling that the Congress which enacted the FSIA considered but rejected several proposals designed to limit the power of the President to enter into executive agreements, including claims settlement agreements.[11] **\*686** It is quite unlikely that the same Congress that rejected proposals to limit the President's authority to conclude executive agreements sought to accomplish that very purpose *sub silentio* through the FSIA. And, as noted above, just one year after enacting the FSIA, Congress enacted the IEEPA, where the legislative history stressed that nothing in the IEEPA was to impede the settlement of claims of United States citizens. It would be surprising for Congress to express this support for settlement agreements had it intended the FSIA to eliminate the President's authority to make such agreements.

[11]   The rejected legislation would typically have required congressional approval of executive agreements before they would be considered effective. See Congressional Oversight of Executive Agreements: Hearings on S. 632 and S. 1251 before the Subcommittee on Separation of Powers of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 243–261, 302–311 (1975); Congressional Review of International Agreements: Hearings before the Subcommittee on International Security and Scientific Affairs of the House Committee on International Relations, 94th Cong., 2d Sess., 167, 246 (1976).

In light of all of the foregoing—the inferences to be drawn from the character of the legislation Congress has enacted in the area, such as the IEEPA and the Hostage Act, and from the history of acquiescence in executive claims settlement—we conclude that the President was authorized to suspend pending claims pursuant to Executive Order No. 12294. As Justice Frankfurter pointed out in *Youngstown*, 343 U.S., at 610–611, 72 S.Ct., at 897–898, "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned ... may be treated as a gloss on 'Executive Power' vested in the President by § 1

of Art. II." Past practice does not, by itself, create power, but "long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent...." *United States v. Midwest Oil Co.*, 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915). See *Haig v. Agee*, 453 U.S., at 291, 292, 101 S.Ct., at 2774. Such practice is present here and such a presumption is also appropriate. In light of the fact that Congress may be considered to have consented to the President's action in suspending claims, we cannot say that action exceeded the President's powers.

Our conclusion is buttressed by the fact that the means **\*687** chosen by the President to settle the claims of American nationals provided an alternative forum, the Claims Tribunal, which is capable of providing meaningful relief. The Solicitor General also suggests that the provision of the Claims Tribunal will actually *enhance* the opportunity for claimants to recover their claims, in that the Agreement removes a number of jurisdictional and procedural impediments faced by claimants in United States courts. Brief for Federal Respondents 13–14. Although being overly sanguine about the chances of United States claimants before the Claims Tribunal would require a degree of naiveté which should not be demanded even of judges, the Solicitor General's point cannot be discounted. Moreover, it is important to remember that we have already held that the President has the *statutory* authority to nullify attachments and to transfer the assets out of the country. The President's power to do so does not depend on his provision of a forum whereby claimants can recover on those claims. The fact that the President has provided such a forum here means that the claimants are receiving something in return for the suspension of their claims, namely, access to an international tribunal before which they may well recover something on their claims. **\*\*2991** Because there does appear to be a real "settlement" here, this case is more easily analogized to the more traditional claim settlement cases of the past.

Just as importantly, Congress has not disapproved of the action taken here. Though Congress has held hearings on the Iranian Agreement itself,[12] Congress has not enacted legislation, or even passed a resolution, indicating its displeasure with the Agreement. Quite the contrary, the relevant Senate **\*688** Committee has stated that the establishment of the Tribunal is "of vital importance to the United States." S.Rep.No.97–71, p. 5 (1981).[13] We are thus clearly not confronted with a situation in

which Congress has in some way resisted the exercise of Presidential authority.

[12]  See Hearings on the Iranian Agreements before the Senate Committee on Foreign Relations, 97th Cong., 1st Sess. (1981); Hearings on the Iranian Asset Settlement before the Senate Committee on Banking, Housing and Urban Affairs, 97th Cong., 1st Sess. (1981); Hearings on the Algerian Declarations before the House Committee on Foreign Affairs, 97th Cong., 1st Sess. (1981).

[13]  Contrast congressional reaction to the Iranian Agreements with congressional reaction to a 1973 Executive Agreement with Czechoslovakia. There the President sought to settle over $105 million in claims against Czechoslovakia for $20.5 million. Congress quickly demonstrated its displeasure by enacting legislation requiring that the Agreement be renegotiated. See Lillich, *supra*, n. 8, at 839–840. Though Congress has shown itself capable of objecting to executive agreements, it has rarely done so and has not done so in this case.

Finally, we re-emphasize the narrowness of our decision. We do not decide that the President possesses plenary power to settle claims, even as against foreign governmental entities. As the Court of Appeals for the First Circuit stressed, "[t]he sheer magnitude of such a power, considered against the background of the diversity and complexity of modern international trade, cautions against any broader construction of authority than is necessary." *Chas T. Main Int'l, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d, at 814. But where, as here, the settlement of claims has been determined to be a necessary incident to the resolution of a major foreign policy dispute between our country and another, and where, as here, we can conclude that Congress acquiesced in the President's action, we are not prepared to say that the President lacks the power to settle such claims.

## V

[6]  We do not think it appropriate at the present time to address petitioner's contention that the suspension of claims, if authorized, would constitute a taking of property in violation of the Fifth Amendment to the United States Constitution in the absence of just compensation.[14] Both petitioner and **\*689** the Government concede that the question whether the

suspension of the claims constitutes a taking is not ripe for review. Brief for Petitioner 34, n. 32; Brief for Federal Respondents 65. Accord, *Chas T. Main Int'l, Inc. v. Khuzenstan Water & Power Authority, supra*, at 814–815; *American Int'l Group, Inc. v. Islamic Republic of Iran*, 211 U.S.App.D.C., at 485, 657 F.2d, at 447. However, this contention, and the possibility that the President's actions may effect a taking of petitioner's property, make ripe for adjudication the question whether petitioner will have a remedy at law in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491 (1976 ed., Supp. III), in such an event. That the fact and extent of the taking in this case is yet speculative is inconsequential because "there must be at the time of taking 'reasonable, certain and adequate provision for obtaining compensation.' " *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 124–125, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974), quoting **\*\*2992** *Cherokee Nation v. Southern Kansas R. Co.*, 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295 (1890); see also *Cities Service Co. v. McGrath*, 342 U.S. 330, 335–336, 72 S.Ct. 334, 337–338, 96 L.Ed. 359 (1952); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 94, n. 39, 98 S.Ct. 2620, 2641, n. 39, 57 L.Ed.2d 595 (1978).

14    Though we conclude that the President has settled petitioner's claims against Iran, we do not suggest that the settlement has terminated petitioner's possible taking claim against the United States. We express no views on petitioner's claims that it has suffered a taking.

It has been contended that the "treaty exception" to the jurisdiction of the Court of Claims, 28 U.S.C. § 1502, might preclude the Court of Claims from exercising jurisdiction over any takings claim the petitioner might bring. At oral argument, however, the Government conceded that § 1502 would not act as a bar to petitioner's action in the Court of Claims. Tr. of Oral Arg. 39–42, 47. We agree. See *United States v. Weld*, 127 U.S. 51, 8 S.Ct. 1000, 32 L.Ed. 62 (1888); *United States v. Old Settlers*, 148 U.S. 427, 13 S.Ct. 650, 37 L.Ed. 509 (1893); *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 209 Ct.Cl. 446 (1976). Accordingly, to the extent petitioner believes it has suffered an unconstitutional taking by the suspension of the claims, we see no jurisdictional **\*690** obstacle to an appropriate action in the United States Court of Claims under the Tucker Act.

The judgment of the District Court is accordingly affirmed, and the mandate shall issue forthwith.

*It is so ordered.*

Justice STEVENS, concurring in part.

In my judgment the possibility that requiring this petitioner to prosecute its claim in another forum will constitute an unconstitutional "taking" is so remote that I would not address the jurisdictional question considered in Part V of the Court's opinion. However, I join the remainder of the opinion.

Justice POWELL, concurring and dissenting in part.

I join the Court's opinion except its decision that the nullification of the attachments did not effect a taking of property interests giving rise to claims for just compensation. *Ante*, at 2984, n. 6. The nullification of attachments presents a separate question from whether the suspension and proposed settlement of claims against Iran may constitute a taking. I would leave both "taking" claims open for resolution on a case-by-case basis in actions before the Court of Claims. The facts of the hundreds of claims pending against Iran are not known to this Court and may differ from the facts in this case. I therefore dissent from the Court's decision with respect to attachments. The decision may well be erroneous,[1] and it certainly is premature with respect to many claims.

1    Even though the Executive Orders purported to make attachments conditional, there is a substantial question whether the Orders themselves may have effected a taking by making conditional the attachments that claimants against Iran otherwise could have obtained without condition. Moreover, because it is settled that an attachment entitling a creditor to resort to specific property for the satisfaction of a claim is a property right compensable under the Fifth Amendment, *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); *Louisville Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935), there is a question whether the revocability of the license under which petitioner obtained its attachments suffices to render revocable the attachments themselves. See *Marschalk Co. v. Iran National Airlines Corp.*, 518 F.Supp. 69 (SDNY 1981).

**Dames & Moore v. Regan, 453 U.S. 654 (1981)**
101 S.Ct. 2972, 69 L.Ed.2d 918

**\*691**  I agree with the Court's opinion with respect to the suspension and settlement of claims against Iran and its instrumentalities. The opinion makes clear that some claims may not be adjudicated by the Claims Tribunal and that others may not be paid in full. The Court holds that parties whose valid claims are not adjudicated or not fully paid may bring a "taking" claim against the United States in the Court of Claims, the jurisdiction of which this Court acknowledges. The Government must pay just compensation when it furthers the Nation's foreign policy goals by using as "bargaining **\*\*2993** chips" claims lawfully held by a relatively few persons and subject to the jurisdiction of our courts. [2] The extraordinary powers of the President and Congress upon which our decision rests cannot, in the circumstances of this case, displace the Just Compensation Clause of the Constitution.

[2]     As the Court held in *Armstrong v. United States, supra,* at 49, 80 S.Ct., at 1569:

"The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

The Court unanimously reaffirmed this understanding of the Just Compensation Clause in the recent case of *Agins v. City of Tiburon,* 447 U.S. 255, 260–261, 100 S.Ct. 2138, 2141–2142, 65 L.Ed.2d 106 (1980).

**All Citations**

453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

📒 KeyCite Yellow Flag - Negative Treatment

Distinguished by Quality Health Services of P.R., Inc. v. National Labor
Relations Board, 1st Cir., October 16, 2017

134 S.Ct. 2550
Supreme Court of the United States

NATIONAL LABOR
RELATIONS BOARD, Petitioner

v.

NOEL CANNING, et al.

No. 12–1281.
|
Argued Jan. 13, 2014.
|
Decided June 26, 2014.

**Synopsis**

**Background:** Employer petitioned for review of a National
Labor Relations Board (NLRB) order, 2012 WL 402322,
finding that employer violated National Labor Relations
Act (NLRA) by refusing to reduce to writing and execute
a collective bargaining agreement reached with union.
Board cross-petitioned for enforcement of its order.
The United States Court of Appeals for the District
of Columbia Circuit, Sentelle, Chief Judge, 705 F.3d
490,granted the employer's petition and vacated the order,
finding that Board lacked a quorum because President's
recess appointments for three positions in five-member
Board were invalid. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Breyer, held that:

[1] recesses, within meaning of Recess Appointments
Clause, include intra-session recesses of substantial length;

[2] Recess Appointments Clause extends to vacancies
arising before recesses; and

[3] President's recess appointments, made in three-day
period between two pro forma sessions of the Senate, were
not valid.

Affirmed.

Justice Scalia filed an opinion concurring in the judgment,
in which Chief Justice Roberts and Justices Thomas and
Alito joined.

West Headnotes (14)

**[1]**    **Federal Courts**
           🔑 Case or controversy requirement;
           justiciability;mootness and ripeness

Questions regarding validity, under Recess
Appointments Clause, of President's recess
appointments for three positions on five-
member National Labor Relations Board
(NLRB) were not moot, on certiorari
review, by Supreme Court, of Court of
Appeals' decision that appointments were
invalid, though President had nominated
others to fill the positions once occupied
by the recess appointees and the Senate
had confirmed those successors, so that
Board now unquestionably had a quorum;
controversy still existed as to validity of
Board order in case in bar, which was
issued when the three recess appointees were
on the Board, Supreme Court had pending
certiorari petitions from Board decisions in
other cases, involving challenges to another
recess appointment to the Board, and cases
involving similar challenges were also pending
in Courts of Appeals. U.S.C.A. Const. Art. 2,
§ 2, cl. 2, 3; National Labor Relations Act, §
3(a, b), 29 U.S.C.A. § 153(a, b).

48 Cases that cite this headnote

**[2]**    **Public Employment**
           🔑 Election or appointment

           **United States**
           🔑 Recess appointments

The Recess Appointments Clause sets forth
a subsidiary, not a primary, method for
appointing officers of the United States.
U.S.C.A. Const. Art. 2, § 2, cl. 3.

Cases that cite this headnote

**[3]**   United States
   In general;nature

United States
   In general;nature

Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions regulating the relationship between Congress and the President.

9 Cases that cite this headnote

**[4]**   Constitutional Law
   Separation of Powers

Constitutional Law
   Nature and scope in general

Constitutional separation of powers can serve to safeguard individual liberty, and it is the duty of the judicial department, in a separation-of-powers case as in any other, to say what the law is, but it is equally true that the longstanding practice of the government can inform the judicial department's determination of what the law is.

11 Cases that cite this headnote

**[5]**   Public Employment
   Election or appointment

United States
   Recess appointments

"Recess," within meaning of Recess Appointments Clause, which gives the President the power to make recess appointments of United States officers for vacancies during a Senate recess, refers not only to an inter-session recess, i.e., a break between formal sessions of Congress, but also to an intra-session recess of substantial length. U.S.C.A. Const. Art. 2, § 2, cl. 3.

10 Cases that cite this headnote

**[6]**   Constitutional Law
   Nature and Authority of Constitutions

Constitutional Law

   Purposes of constitutions

A Constitution is intended to endure for ages to come, and must adapt itself to a future that can only be seen dimly, if at all.

Cases that cite this headnote

**[7]**   Public Employment
   Election or appointment

United States
   Recess appointments

A three–day recess of the Senate is too short to trigger the President's power under the Recess Appointments Clause to make recess appointments of United States officers; a three-day recess of the Senate is so short that it does not require the consent of the House of Representatives under the Adjournments Clause. U.S.C.A. Const. Art. 1, § 5, cl. 4; Art. 2, § 2, cl. 3.

9 Cases that cite this headnote

**[8]**   Public Employment
   Election or appointment

United States
   Recess appointments

In light of historical practice, a Senate recess of more than three days but less than ten days is presumptively too short to fall within the Recess Appointments Clause, which gives the President the power to make recess appointments of United States officers for vacancies during a Senate recess, but that presumption leaves open the possibility that some very unusual circumstance, such as a national catastrophe that renders the Senate unavailable but calls for an urgent response, could demand the exercise of the recess-appointment power during a shorter break. U.S.C.A. Const. Art. 2, § 2, cl. 3.

8 Cases that cite this headnote

**[9]**   Public Employment
   Election or appointment

United States

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Recess appointments

"Happen," within meaning of Recess Appointments Clause, which gives the President the power to make recess appointments of United States officers for vacancies that may happen during a Senate recess, refers not only to vacancies that first come into existence during a recess, but also to vacancies that arise prior to a recess but continue to exist during the recess. U.S.C.A. Const. Art. 2, § 2, cl. 3.

3 Cases that cite this headnote

[10]    Public Employment
        Election or appointment

        United States
        Recess appointments

The purpose of the Recess Appointments Clause is to permit the President to obtain the assistance of subordinate officers when the Senate, due to its recess, cannot confirm them. U.S.C.A. Const. Art. 2, § 2, cl. 2, 3.

Cases that cite this headnote

[11]    Labor and Employment
        Administrative officers

        Public Employment
        Election or appointment

        United States
        Recess appointments

President's recess appointments for three positions on five-member National Labor Relations Board (NLRB), which appointments were made in three-day period between two pro forma sessions of the Senate, were not valid under the Recess Appointments Clause, and thus, the Board lacked a quorum; a three-day period was too short to constitute a recess for purposes of the Recess Appointments Clause, and the pro forma sessions could not be construed as actually being recesses and thereby lengthening the recess period. U.S.C.A. Const. Art. 2, § 2, cl. 3; National Labor Relations Act, § 3(a, b), 29 U.S.C.A. § 153(a, b).

18 Cases that cite this headnote

[12]    Public Employment
        Election or appointment

        United States
        Recess appointments

For purposes of the Recess Appointments Clause, which gives the President the power to make recess appointments of United States officers for vacancies during a Senate recess, the Senate is in session, and therefore is not in recess, when it says it is in session, provided that, under its own rules, it retains the capacity to transact Senate business. U.S.C.A. Const. Art. 1, § 5, cl. 2; U.S.C.A. Const. Art. 2, § 2, cl. 3.

3 Cases that cite this headnote

[13]    United States
        Proceedings in Congress

All matters of method of conducting its business are open to the determination of the Senate, under its constitutional power to determine the rules of its proceedings, as long as there is a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained, and the rule does not ignore constitutional restraints or violate fundamental rights. U.S.C.A. Const. Art. 1, § 5, cl. 2.

Cases that cite this headnote

[14]    Public Employment
        Election or appointment

        United States
        Recess appointments

Senate's pro forma sessions were not recesses, for purposes of the President's power to make recess appointments of United States officers, though Senate's unanimous consent resolution stated that no business would be conducted during the pro forma sessions; Senate said it was in session, and Senate's rules made it clear that Senate retained the power

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 70 of 395

to conduct business, despite the resolution's statement that the Senate would conduct no business. U.S.C.A. Const. Art. 2, § 2, cl. 3.

1 Cases that cite this headnote

*2552 *Syllabus**

*

The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

Respondent Noel Canning, a Pepsi–Cola distributor, asked the D.C. Circuit to set aside an order of the National Labor Relations Board, claiming that the Board lacked a quorum because three of the five Board members had been invalidly appointed. The nominations of the three members in question were pending in the Senate when it passed a December 17, 2011, resolution providing for a series of "*pro forma* session[s]," with "no business ... transacted," every Tuesday and Friday through January 20, 2012. S. J., 112th **\*2553** Cong., 1st Sess., 923. Invoking the Recess Appointments Clause—which gives the President the power "to fill up all Vacancies that may happen during the Recess of the Senate," Art. II, § 2, cl. 3—the President appointed the three members in question between the January 3 and January 6 *pro forma* sessions. Noel Canning argued primarily that the appointments were invalid because the 3–day adjournment between those two sessions was not long enough to trigger the Recess Appointments Clause. The D.C. Circuit agreed that the appointments fell outside the scope of the Clause, but on different grounds. It held that the phrase "the recess," as used in the Clause, does not include intra-session recesses, and that the phrase "vacancies that may happen during the recess" applies only to vacancies that first come into existence during a recess.

*Held* :

1. The Recess Appointments Clause empowers the President to fill any existing vacancy during any recess—intra-session or inter-session—of sufficient length. Pp. 2558 – 2573.

(a) Two background considerations are relevant to the questions here. First, the Recess Appointments Clause is a subsidiary method for appointing officers of the United States. The Founders intended the norm to be the method of appointment in Article II, § 2, cl. 2, which requires Senate approval of Presidential nominations, at least for principal officers. The Recess Appointments Clause reflects the tension between the President's continuous need for "the assistance of subordinates," *Myers v. United States,* 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160, and the Senate's early practice of meeting for a single brief session each year. The Clause should be interpreted as granting the President the power to make appointments during a recess but not offering the President the authority routinely to avoid the need for Senate confirmation.

Second, in interpreting the Clause, the Court puts significant weight upon historical practice. The longstanding "practice of the government," *McCulloch v. Maryland,* 4 Wheat. 316, 401, 4 L.Ed. 579, can inform this Court's determination of "what the law is" in a separation-of-powers case, *Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60. See also, *e.g., Mistretta v. United States,* 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714; *The Pocket Veto Case,* 279 U.S. 655, 689–690, 49 S.Ct. 463, 73 L.Ed. 894. There is a great deal of history to consider here, for Presidents have made recess appointments since the beginning of the Republic. Their frequency suggests that the Senate and President have recognized that such appointments can be both necessary and appropriate in certain circumstances. The Court, in interpreting the Clause for the first time, must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached. Pp. 2558 – 2560.

(b) The phrase " the recess of the Senate" applies to both inter-session recess (*i.e.,* breaks between formal sessions of the Senate) and intra-session recesses (*i.e.,* breaks in the midst of a formal session) of substantial length. The constitutional text is ambiguous. Founding-era dictionaries and usages show that the phrase "the recess" can encompass intra-session breaks. And this broader interpretation is demanded by the purpose of the Clause, which is to allow the President to make appointments so as to ensure the continued functioning of the Government while the Senate is away. The Senate is equally away and unavailable to participate in the appointments process during both an inter-session and an intra-

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 71 of 395

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

session recess. History offers further support for **\*2554** this interpretation. From the founding until the Great Depression, every time the Senate took a substantial, non-holiday intra-session recess, the President made recess appointments. President Andrew Johnson made the first documented intra-session recess appointments in 1867 and 1868, and Presidents made similar appointments in 1921 and 1929. Since 1929, and particularly since the end of World War II, Congress has shortened its inter-session breaks and taken longer and more frequent intra-session breaks; Presidents accordingly have made more intra-session recess appointments. Meanwhile, the Senate has never taken any formal action to deny the validity of intra-session recess appointments. In 1905, the Senate Judiciary Committee defined "the recess" as "the period of time when the Senate" is absent and cannot "participate as a body in making appointments," S.Rep. No. 4389, 58th Cong., 3d Sess., p. 2, and that functional definition encompasses both intra-session and inter-session recesses. A 1940 law regulating the payment of recess appointees has also been interpreted functionally by the Comptroller General (an officer of the Legislative Branch). In sum, Presidents have made intra-session recess appointments for a century and a half, and the Senate has never taken formal action to oppose them. That practice is long enough to entitle it to "great weight in a proper interpretation" of the constitutional provision. *The Pocket Veto Case, supra,* at 689, 49 S.Ct. 463.

The Clause does not say how long a recess must be in order to fall within the Clause, but even the Solicitor General concedes that a 3–day recess would be too long. The Adjournments Clause, Art. I, § 5, cl. 4, reflects the fact that a 3–day break is not a significant interruption of legislative business. A Senate recess that is so short that it does not require the consent of the House under that Clause is not long enough to trigger the President's recess-appointment power. Moreover, the Court has not found a single example of a recess appointment made during an intra-session recess that was shorter than 10 days. There are a few examples of inter-session recess appointments made during recesses of less than 10 days, but these are anomalies. In light of historical practice, a recess of more than 3 days but less than 10 days is presumptively too short to fall within the Clause. The word "presumptively" leaves open the possibility that a very unusual circumstance could demand the exercise of the recess-appointment power during a shorter break. Pp. 2560 – 2567.

(c) The phrase "vacancies that may happen during the recess of the Senate," Art. II, § 2, cl. 3, applies both to vacancies that first come into existence during a recess and to vacancies that initially occur before a recess but continue to exist during the recess. Again, the text is ambiguous. As Thomas Jefferson observed, the Clause is "certainly susceptible of [two] constructions." Letter to Wilson Cary Nicholas (Jan. 26, 1802), in 36 Papers of Thomas Jefferson 433. It "may mean 'vacancies that may happen to be' or 'may happen to fall' " during a recess. *Ibid.* And, as Attorney General Wirt wrote in 1821, the broader reading is more consonant with the "reason and spirit" of the Clause. 1 Op. Atty. Gen. 632. The purpose of the Clause is to permit the President, who is always acting to execute the law, to obtain the assistance of subordinate officers while the Senate, which acts only in intervals, is unavailable to confirm them. If a vacancy arises too late in the session for the President and Senate to have an opportunity to select a replacement, the narrower reading could paralyze important functions of the Federal Government, particularly at the time of the founding. The **\*2555** broader interpretation ensures that offices needing to be filled can be filled. It does raise a danger that the President may attempt to use the recess-appointment power to circumvent the Senate's advice and consent role. But the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often. It would prevent a President from making any recess appointment to fill a vacancy that arose before a recess, no matter who the official, how dire the need, how uncontroversial the appointment, and how late in the session the office fell vacant.

Historical practice also strongly favors the broader interpretation. The tradition of applying the Clause to pre-recess vacancies dates at least to President Madison. Nearly every Attorney General to consider the question has approved the practice, and every President since James Buchanan has made recess appointments to pre-existing vacancies. It is a fair inference from the historical data that a large proportion of recess appointments over our Nation's history have filled pre-recess vacancies. The Senate Judiciary Committee in 1863 did issue a report disagreeing with the broader interpretation, and Congress passed a law known as the Pay Act prohibiting payment of recess appointments to pre-recess vacancies soon after. However, the Senate subsequently abandoned its hostility. In 1940, the Senate amended the Pay Act to permit

payment of recess appointees in circumstances that would be unconstitutional under the narrower interpretation. In short, Presidents have made recess appointments to preexisting vacancies for two centuries, and the Senate as a body has not countered this practice for nearly three-quarters of a century, perhaps longer. The Court is reluctant to upset this traditional practice where doing so would seriously shrink the authority that Presidents have believed existed and have exercised for so long. Pp. 2567 – 2573.

2. For purposes of the Recess Appointments Clause, the Senate is in session when it says that it is, provided that, under its own rules, it retains the capacity to transact Senate business.

This standard is consistent with the Constitution's broad delegation of authority to the Senate to determine how and when to conduct its business, as recognized by this Court's precedents. See Art. I, § 5, cl. 2; *Marshall Field & Co. v. Clark,* 143 U.S. 649, 672, 12 S.Ct. 495, 36 L.Ed. 294; *United States v. Ballin,* 144 U.S. 1, 5, 9, 12 S.Ct. 507, 36 L.Ed. 321. Although the Senate's own determination of when it is and is not in session should be given great weight, the Court's deference cannot be absolute. When the Senate is without the capacity to act, under its own rules, it is not in session even if it so declares.

Under the standard set forth here, the Senate was in session during the *pro forma* sessions at issue. It said it was in session, and Senate rules make clear that the Senate retained the power to conduct business. The Senate could have conducted business simply by passing a unanimous consent agreement. In fact, it did so; it passed a bill by unanimous consent during its *pro forma* session on December 23, 2011. See 2011 S.J. 924; Pub.L. 112–78. The Court will not, as the Solicitor General urges, engage in an in-depth factual appraisal of what the Senate actually did during its *pro forma* sessions in order to determine whether it was in recess or in session for purposes of the Recess Appointments Clause.

Because the Senate was in session during its *pro forma* sessions, the President made the recess appointments at issue during a 3–day recess. Three days is too short a time to bring a recess within **\*2556** the scope of the Clause, so the President lacked the authority to make those appointments. Pp. 2573 – 2578.

705 F.3d 490, affirmed.

BREYER, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which ROBERTS, C.J., and THOMAS and ALITO, JJ., joined.

**Attorneys and Law Firms**

Donald B. Verrilli, Jr., Solicitor General, for Petitioner.

Noel J. Francisco, Washington, DC, for Respondents.

Miguel Estrada, for Senate Republican Leader Mitch McConnell, et al. as amici curiae, by special leave of the Court, supporting the respondents.

Laurence Gold, of counsel, Bradley T. Raymond, James B. Coppess, Counsel of Record, Washington, DC, for Petitioner.

Gary E. Lofland, Halverson Northwest Law Group, Yakima, WA, Lily Fu Claffee, Rachel L. Brand, Steven P. Lehotsky, National Chamber Litigation Center, Inc., Noel J. Francisco, Counsel of Record, G. Roger King, James M. Burnham, Washington, DC, for Respondent Noel Canning.

Lafe E. Solomon, Acting General Counsel, Celeste J. Mattina, Deputy General Counsel, John H. Ferguson, Margery E. Lieber, Associate General Counsels, Linda Dreeben, Deputy Associate General Counsel, National Labor Relations Board, Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Stuart F. Delery, Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Beth S. Brinkmann, Deputy Assistant Attorney General, Curtis E. Gannon, Assistant to the Solicitor General, Douglas N. Letter, Scott R. McIntosh, Melissa N. Patterson, Benjamin M. Shultz, Attorneys, Department of Justice, Washington, DC, for Petitioner.

**Opinion**

Justice BREYER delivered the opinion of the Court.

Ordinarily the President must obtain "the Advice and Consent of the Senate" before appointing an "Office[r] of the United States." U.S. Const., Art. II, § 2, cl. 2. But the Recess Appointments Clause creates an exception. It gives the President alone the power "to fill up all Vacancies

that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." Art. II, § 2, cl. 3. We here consider three questions about the application of this Clause.

The first concerns the scope of the words "recess of the Senate." Does that phrase refer only to an inter-session recess (*i.e.,* a break between formal sessions of Congress), or does it also include an intra-session recess, such as a summer recess in the midst of a session? We conclude that the Clause applies to both kinds of recess.

The second question concerns the scope of the words "vacancies that may happen." Does that phrase refer only to vacancies that first come into existence during a recess, or does it also include vacancies that arise prior to a recess but continue to exist during the recess? We conclude that the Clause applies to both kinds of vacancy.

The third question concerns calculation of the length of a "recess." The President made the appointments here at issue on **\*2557** January 4, 2012. At that time the Senate was in recess pursuant to a December 17, 2011, resolution providing for a series of brief recesses punctuated by "*pro forma* session[s]," with "no business ... transacted," every Tuesday and Friday through January 20, 2012. S. J., 112th Cong., 1st Sess., 923 (2011) (hereinafter 2011 S. J.). In calculating the length of a recess are we to ignore the *pro forma* sessions, thereby treating the series of brief recesses as a single, month-long recess? We conclude that we cannot ignore these *pro forma* sessions.

Our answer to the third question means that, when the appointments before us took place, the Senate was in the midst of a 3–day recess. Three days is too short a time to bring a recess within the scope of the Clause. Thus we conclude that the President lacked the power to make the recess appointments here at issue.

I

The case before us arises out of a labor dispute. The National Labor Relations Board (NLRB) found that a Pepsi–Cola distributor, Noel Canning, had unlawfully refused to reduce to writing and execute a collective-bargaining agreement with a labor union. The Board ordered the distributor to execute the agreement and to make employees whole for any losses. *Noel Canning,* 358 N.L.R.B. No. 4 (2012).

The Pepsi–Cola distributor subsequently asked the Court of Appeals for the District of Columbia Circuit to set the Board's order aside. It claimed that three of the five Board members had been invalidly appointed, leaving the Board without the three lawfully appointed members necessary for it to act. See 29 U.S.C. § 160(f) (providing for judicial review); § 153(a) (providing for a 5–member Board); § 153(b) (providing for a 3–member quorum); *New Process Steel, L.P. v. NLRB,* 560 U.S. 674, 687–688, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010) (in the absence of a lawfully appointed quorum, the Board cannot exercise its powers).

The three members in question were Sharon Block, Richard Griffin, and Terence Flynn. In 2011 the President had nominated each of them to the Board. As of January 2012, Flynn's nomination had been pending in the Senate awaiting confirmation for approximately a year. The nominations of each of the other two had been pending for a few weeks. On January 4, 2012, the President, invoking the Recess Appointments Clause, appointed all three to the Board.

The distributor argued that the Recess Appointments Clause did not authorize those appointments. It pointed out that on December 17, 2011, the Senate, by unanimous consent, had adopted a resolution providing that it would take a series of brief recesses beginning the following day. See 2011 S.J. 923. Pursuant to that resolution, the Senate held *pro forma* sessions every Tuesday and Friday until it returned for ordinary business on January 23, 2012. *Ibid.*; 158 Cong. Rec. S1–S11 (Jan. 3–20, 2012). The President's January 4 appointments were made between the January 3 and January 6 *pro forma* sessions. In the distributor's view, each *pro forma* session terminated the immediately preceding recess. Accordingly, the appointments were made during a 3–day adjournment, which is not long enough to trigger the Recess Appointments Clause.

The Court of Appeals agreed that the appointments fell outside the scope of the Clause. But the court set forth different reasons. It held that the Clause's words "the recess of the Senate" do not include recesses that occur *within* a formal session of Congress, *i.e.,* intra-session recesses. Rather those words apply only to recesses *between* those formal sessions, *i.e.,* inter- **\*2558** session recesses. Since the second session of the 112th Congress

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

began on January 3, 2012, the day before the President's appointments, those appointments occurred during an intra-session recess, and the appointments consequently fell outside the scope of the Clause. 705 F.3d 490, 499–507 (C.A.D.C.2013).

The Court of Appeals added that, in any event, the phrase "vacancies that may happen during the recess" applies only to vacancies that come into existence during a recess. *Id., at 507–512.* The vacancies that Members Block, Griffin, and Flynn were appointed to fill had arisen before the beginning of the recess during which they were appointed. For this reason too the President's appointments were invalid. And, because the Board lacked a quorum of validly appointed members when it issued its order, the order was invalid. 29 U.S.C. § 153(b); *New Process Steel, supra.*

We granted the Solicitor General's petition for certiorari. We asked the parties to address not only the Court of Appeals' interpretation of the Clause but also the distributor's initial argument, namely, "[w]hether the President's recess-appointment power may be exercised when the Senate is convening every three days in *pro forma* sessions." 570 U.S. ——, 133 S.Ct. 2861, 186 L.Ed.2d 908 (2013).

[1] We shall answer all three questions presented. We recognize that the President has nominated others to fill the positions once occupied by Members Block, Griffin, and Flynn, and that the Senate has confirmed these successors. But, as the parties recognize, the fact that the Board now unquestionably has a quorum does not moot the controversy about the validity of the previously entered Board order. And there are pending before us petitions from decisions in other cases involving challenges to the appointment of Board Member Craig Becker. The President appointed Member Becker during an intra-session recess that was not punctuated by *pro forma* sessions, and the vacancy Becker filled had come into existence prior to the recess. See Congressional Research Service, H. Hogue, M. Carey, M. Greene, & M. Bearden, The *Noel Canning* Decision and Recess Appointments Made from 1981–2013, p. 28 (Feb. 4, 2013) (hereinafter The *Noel Canning* Decision); NLRB, Members of the NLRB since 1935, online at http://www.nlrb.gov/who–we–are/board/ members–nlrb–1935 (all Internet materials as visited June 24, 2014, and available in Clerk of Court's case file). Other

cases involving similar challenges are also pending in the Courts of Appeals. *E.g., NLRB v. New Vista Nursing & Rehabilitation,* No. 11–3440 etc. (C.A.3). Thus, we believe it is important to answer all three questions that this case presents.

## II

[2] Before turning to the specific questions presented, we shall mention two background considerations that we find relevant to all three. First, *the Recess Appointments Clause sets forth a subsidiary, not a primary, method for appointing officers of the United States.* The immediately preceding Clause—Article II, Section 2, Clause 2—provides the primary method of appointment. It says that the President "shall nominate, *and by and with the Advice and Consent of the Senate,* shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States" (emphasis added).

The Federalist Papers make clear that the Founders intended this method of appointment, requiring Senate approval, to be the norm (at least for principal officers). Alexander Hamilton wrote that the Constitution vests the power of *nomination* in **\*2559** the President alone because "one man of discernment is better fitted to analise and estimate the peculiar qualities adapted to particular offices, than a body of men of equal, or perhaps even of superior discernment." The Federalist No. 76, p. 510 (J. Cooke ed. 1961). At the same time, the need to secure Senate approval provides "an excellent check upon a spirit of favoritism in the President, and would tend greatly to preventing the appointment of unfit characters from State prejudice, from family connection, from personal attachment, or from a view to popularity." *Id.,* at 513. Hamilton further explained that the

"ordinary power of appointment is confided to the President and Senate *jointly,* and can therefore only be exercised during the session of the Senate; but as it would have been improper to oblige this body to be continually in session for the appointment of officers; and as vacancies might happen *in their recess,* which it might be necessary for the public service to fill without delay, the succeeding clause is evidently intended to authorise the President *singly* to make temporary appointments." *Id.,* No. 67, at 455.

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 75 of 395

Thus the Recess Appointments Clause reflects the tension between, on the one hand, the President's continuous need for "the assistance of subordinates," *Myers v. United States,* 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160 (1926), and, on the other, the Senate's practice, particularly during the Republic's early years, of meeting for a single brief session each year, see Art. I, § 4, cl. 2; Amdt. 20, § 2 (requiring the Senate to "assemble" only "once in every year"); 3 J. Story, Commentaries on the Constitution of the United States § 1551, p. 410 (1833) (it would be "burthensome to the senate, and expensive to the public" to require the Senate to be "perpetually in session"). We seek to interpret the Clause as granting the President the power to make appointments during a recess but not offering the President the authority routinely to avoid the need for Senate confirmation.

[3]  Second, *in interpreting the Clause, we put significant weight upon historical practice*. For one thing, the interpretive questions before us concern the allocation of power between two elected branches of Government. Long ago Chief Justice Marshall wrote that

> "a doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice." *McCulloch v. Maryland,* 4 Wheat. 316, 401, 4 L.Ed. 579 (1819).

And we later confirmed that "[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions" regulating the relationship between Congress and the President. *The Pocket Veto Case,* 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929); see also *id.,* at 690, 49 S.Ct. 463 ("[A] practice of at least twenty years duration 'on the part of the executive department, acquiesced in by the legislative department, ... is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning' " (quoting *State v. South Norwalk,* 77 Conn. 257, 264, 58 A. 759, 761 (1904))).

[4]  We recognize, of course, that the separation of powers can serve to safeguard individual liberty, **\*2560** *Clinton v. City of New York,* 524 U.S. 417, 449–450, 118 S.Ct. 2091,

141 L.Ed.2d 393 (1998) (KENNEDY, J., concurring), and that it is the "duty of the judicial department"— in a separation-of-powers case as in any other—"to say what the law is," *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803). But it is equally true that the longstanding "practice of the government," *McCulloch, supra,* at 401, can inform our determination of "what the law is," *Marbury, supra,* at 177.

That principle is neither new nor controversial. As James Madison wrote, it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter ... and that it might require a regular course of practice to liquidate & settle the meaning of some of them." Letter to Spencer Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908). And our cases have continually confirmed Madison's view. *E.g., Mistretta v. United States,* 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *Dames & Moore v. Regan,* 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring); *The Pocket Veto Case, supra,* at 689–690, 49 S.Ct. 463; *Ex parte Grossman,* 267 U.S. 87, 118–119, 45 S.Ct. 332, 69 L.Ed. 527 (1925); *United States v. Midwest Oil Co.,* 236 U.S. 459, 472–474, 35 S.Ct. 309, 59 L.Ed. 673 (1915); *McPherson v. Blacker,* 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869 (1892); *McCulloch, supra; Stuart v. Laird,* 1 Cranch 299, 2 L.Ed. 115 (1803).

These precedents show that this Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era. See *Mistretta, supra,* 400–401, 109 S.Ct. 647 ("While these [practices] spawned spirited discussion and frequent criticism, ... 'traditional ways of conducting government ... give meaning' to the Constitution" (quoting *Youngstown, supra,* at 610, 72 S.Ct. 863) (Frankfurter, J., concurring); *Regan, supra,* at 684, 101 S.Ct. 2972 ("[E]ven if the pre–1952 [practice] should be disregarded, congressional acquiescence in [a practice] since that time supports the President's power to act here"); *The Pocket Veto Case, supra,* at 689–690, 49 S.Ct. 463 (postfounding practice is entitled to "great weight"); *Grossman, supra,* at 118–119, 45 S.Ct. 332 (postfounding practice "strongly sustains" a "construction" of the Constitution).

There is a great deal of history to consider here. Presidents have made recess appointments since the beginning of the Republic. Their frequency suggests that the Senate and President have recognized that recess appointments can be both necessary and appropriate in certain circumstances. We have not previously interpreted the Clause, and, when doing so for the first time in more than 200 years, we must hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached.

### III

[5] The first question concerns the scope of the phrase "*the recess* of the Senate." Art. II, § 2, cl. 3 (emphasis added). The Constitution provides for congressional elections every two years. And the 2–year life of each elected Congress typically consists of two formal 1–year sessions, each separated from the next by an "inter-session recess." Congressional Research Service, H. Hogue, Recess Appointments: Frequently Asked Questions 2 (2013). The Senate or the House of Representatives announces an inter-session recess **\*2561** by approving a resolution stating that it will "adjourn *sine die*," *i.e.,* without specifying a date to return (in which case Congress will reconvene when the next formal session is scheduled to begin).

The Senate and the House also take breaks in the midst of a session. The Senate or the House announces any such "intra-session recess" by adopting a resolution stating that it will "adjourn" to a fixed date, a few days or weeks or even months later. All agree that the phrase "the recess of the Senate" covers inter-session recesses. The question is whether it includes intra-session recesses as well.

In our view, the phrase "the recess" includes an intra-session recess of substantial length. Its words taken literally can refer to both types of recess. Founding-era dictionaries define the word "recess," much as we do today, simply as "a period of cessation from usual work." 13 The Oxford English Dictionary 322–323 (2d ed. 1989) (hereinafter OED) (citing 18th- and 19th-century sources for that definition of "recess"); 2 N. Webster, An American Dictionary of the English Language (1828) ("[r]emission or suspension of business or procedure"); 2 S. Johnson, A Dictionary of the English Language 1602–1603 (4th ed. 1773) (hereinafter Johnson) (same).

The Founders themselves used the word to refer to intra-session, as well as to inter-session, breaks. See, *e.g.,* 3 Records of the Federal Convention of 1787, p. 76 (M. Farrand rev. 1966) (hereinafter Farrand) (letter from George Washington to John Jay using "the recess" to refer to an intra-session break of the Constitutional Convention); *id.,* at 191 (speech of Luther Martin with a similar usage); 1 T. Jefferson, A Manual of Parliamentary Practice § LI, p. 165 (2d ed. 1812) (describing a "recess by adjournment" which did *not* end a session).

We recognize that the word "the" in "*the* recess" might suggest that the phrase refers to the single break separating formal sessions of Congress. That is because the word "the" frequently (but not always) indicates "a particular thing." 2 Johnson 2003. But the word can also refer "to a term used generically or universally." 17 OED 879. The Constitution, for example, directs the Senate to choose a President *pro tempore* "in *the* Absence of the Vice–President." Art. I, § 3, cl. 5 (emphasis added). And the Federalist Papers refer to the chief magistrate of an ancient Achaean league who "administered the government in *the* recess of the Senate." The Federalist No. 18, at 113 (J. Madison) (emphasis added). Reading "the" generically in this way, there is no linguistic problem applying the Clause's phrase to both kinds of recess. And, in fact, the phrase "the recess" was used to refer to intra-session recesses at the time of the founding. See, *e.g.,*3 Farrand 76 (letter from Washington to Jay); New Jersey Legislative–Council Journal, 5th Sess., 1st Sitting 70, 2d Sitting 9 (1781) (twice referring to a 4–month, intra-session break as "the Recess"); see also Brief for Petitioner 14–16 (listing examples).

The constitutional text is thus ambiguous. And we believe the Clause's purpose demands the broader interpretation. The Clause gives the President authority to make appointments during "the recess of the Senate" so that the President can ensure the continued functioning of the Federal Government when the Senate is away. The Senate is equally away during both an inter-session and an intra-session recess, and its capacity to participate in the appointments process has nothing to do with the words it uses to signal its departure.

History also offers strong support for the broad interpretation. We concede that pre-Civil War history is not helpful. But it **\*2562** shows only that Congress generally took long breaks between sessions, while

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 77 of 395

taking no significant intra-session breaks at all (five times it took a break of a week or so at Christmas). See Appendix A, *infra*. Obviously, if there are no significant intra-session recesses, there will be no intra-session recess appointments. In 1867 and 1868, Congress for the first time took substantial, nonholiday intra-session breaks, and President Andrew Johnson made dozens of recess appointments. The Federal Court of Claims upheld one of those specific appointments, writing "[w]e have *no doubt* that a vacancy occurring while the Senate was thus temporarily adjourned" during the "first session of the Fortieth Congress" was "legally filled by appointment of the President alone." *Gould v. United States,* 19 Ct.Cl. 593, 595–596 (1884) (emphasis added). Attorney General Evarts also issued three opinions concerning the constitutionality of President Johnson's appointments, and it apparently did not occur to him that the distinction between intra-session and inter-session recesses was significant. See 12 Op. Atty. Gen. 449 (1868); 12 Op. Atty. Gen. 455 (1868); 12 Op. Atty. Gen. 469 (1868). Similarly, though the 40th Congress impeached President Johnson on charges relating to his appointment power, he was not accused of violating the Constitution by making intra-session recess appointments. Hartnett, Recess Appointments of Article III Judges: Three Constitutional Questions, 26 Cardozo L.Rev. 377, 409 (2005).

In all, between the founding and the Great Depression, Congress took substantial intra-session breaks (other than holiday breaks) in four years: 1867, 1868, 1921, and 1929. Appendix A, *infra*. And in each of those years the President made intra-session recess appointments. See App. to Brief for Petitioner 1a–11a.

Since 1929, and particularly since the end of World War II, Congress has shortened its inter-session breaks as it has taken longer and more frequent intra-session breaks; Presidents have correspondingly made more intra-session recess appointments. Indeed, if we include military appointments, Presidents have made thousands of intra-session recess appointments. *Id.,* at 11a–64a. President Franklin Roosevelt, for example, commissioned Dwight Eisenhower as a permanent Major General during an intra-session recess; President Truman made Dean Acheson Under Secretary of State; and President George H.W. Bush reappointed Alan Greenspan as Chairman of the Federal Reserve Board. *Id.,* at 11a, 12a, 40a. Justice SCALIA does not dispute any of these facts.

Not surprisingly, the publicly available opinions of Presidential legal advisers that we have found are nearly unanimous in determining that the Clause authorizes these appointments. In 1921, for example, Attorney General Daugherty advised President Harding that he could make intra-session recess appointments. He reasoned:

> "If the President's power of appointment is to be defeated because the Senate takes an adjournment to a specified date, the painful and inevitable result will be measurably to prevent the exercise of governmental functions. I can not bring myself to believe that the framers of the Constitution ever intended such a catastrophe to happen." 33 Op. Atty. Gen. 20, 23.

We have found memoranda offering similar advice to President Eisenhower and to every President from Carter to the present. See 36 Opinion of Office of Legal Counsel (Op. OLC) ___, ___ (2012), online at www.justice.gov/olc/opinion docslpro-forma-sessions-opinion.pdf; **\*2563** 25 Op. OLC 182 (2001); 20 Op. OLC 124, 161 (1996); 16 Op. OLC 15 (1992); 13 Op. OLC 271 (1989); 6 Op. OLC 585, 586 (1982); 3 Op. OLC 314, 316 (1979); 41 Op. Atty. Gen. 463, 466 (1960).

We must note one contrary opinion authored by President Theodore Roosevelt's Attorney General Philander Knox. Knox advised the President that the Clause did not cover a 19–day intra-session Christmas recess. 23 Op. Atty. Gen. 599 (1901). But in doing so he relied heavily upon the use of the word "the," a linguistic point that we do not find determinative. See *supra,* at 2561. And Knox all but confessed that his interpretation ran contrary to the basic purpose of the Clause. For it would permit the Senate to adjourn for "several months," to a fixed date, and thereby "seriously curtail the President's power of making recess appointments." 23 Op. Atty. Gen., at 603. Moreover, only three days before Knox gave his opinion, the Solicitor of the Treasury came to the opposite conclusion. Reply Brief 7, n. 5. We therefore do not think Knox's isolated opinion can disturb the consensus advice within the Executive Branch taking the opposite position.

What about the Senate? Since Presidents began making intra-session recess appointments, individual Senators have taken differing views about the proper definition of "the recess." See, *e.g.,* 130 Cong. Rec. 23234 (1984) (resolution introduced by Senator Byrd urging limits on

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

the *length* of applicable intra-session recesses); Brief for Sen. Mitch McConnell et al. as *Amici Curiae* 26 (an intra-session adjournment does not count as "the recess"); Brief for Sen. Edward M. Kennedy as *Amicus Curiae* in *Franklin v. United States,* O.T. 2004, No. 04–5858, p. 5 (same). But neither the Senate considered as a body nor its committees, despite opportunities to express opposition to the practice of intra-session recess appointments, has done so. Rather, to the extent that the Senate or a Senate committee has expressed a view, that view has favored a functional definition of "recess," and a functional definition encompasses intra-session recesses.

Most notably, in 1905 the Senate Committee on the Judiciary objected strongly to President Theodore Roosevelt's use of the Clause to make more than 160 recess appointments during a "fictitious" inter-session recess. S.Rep. No. 4389, 58th Cong., 3d Sess., p. 2 (hereinafter 1905 Senate Report). At noon on December 7, 1903, the Senate President *pro tempore* had "declare[d]" a formal, "extraordinary session" of the Senate "adjourned without day," and the next formal Senate session began immediately afterwards. 37 Cong. Rec. 544 (1903). President Roosevelt made over 160 recess appointments during the instantaneous inter-session interval. The Judiciary Committee, when stating its strong objection, defined "recess" in functional terms as

> "the period of time when the Senate is not sitting in regular or extraordinary session as a branch of the Congress ...; when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." 1905 Senate Report, at 2 (emphasis deleted).

That functional definition encompasses intra-session, as well as inter-session, recesses. Justice SCALIA is right that the 1905 Report did not specifically address the distinction between inter-session and intra-session recesses. But the animating principle of the Report—that "recess" should be practically construed to mean a time when the Senate is unavailable to participate in the appointments process— is inconsistent **\*2564** with the formalistic approach that Justice SCALIA endorses.

Similarly, in 1940 the Senate helped to enact a law regulating the payment of recess appointees, and the Comptroller General of the United States has interpreted

that law functionally. An earlier 1863 statute had denied pay to individuals appointed to fill up vacancies first arising prior to the beginning of a recess. The Senate Judiciary Committee then believed that those vacancies fell outside the scope of the Clause. See *infra,* at 2571 – 2572. In 1940, however, the Senate amended the law to permit many of those recess appointees to be paid. Act of July 11, 54 Stat. 751. Interpreting the amendments in 1948, the Comptroller General—who, unlike the Attorney General, is an "officer of the Legislative Branch," *Bowsher v. Synar,* 478 U.S. 714, 731, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)—wrote:

> "I think it is clear that [the Pay Act amendments'] primary purpose was to relieve 'recess appointees' of the burden of serving without compensation during periods when the Senate is not actually sitting and is not available to give its advice and consent in respect to the appointment, irrespective of whether the recess of the Senate is attributable to a final adjournment *sine die* or to an adjournment to a specified date." 28 Comp. Gen. 30, 37.

We recognize that the Senate cannot easily register opposition as a body to every governmental action that many, perhaps most, Senators oppose. But the Senate has not been silent or passive regarding the meaning of the Clause: A Senate Committee did register opposition to President Theodore Roosevelt's use of the Clause, and the Senate as a whole has legislated in an effort to discourage certain kinds of recess appointments. And yet we are not aware of any formal action it has taken to call into question the broad and functional definition of "recess" first set out in the 1905 Senate Report and followed by the Executive Branch since at least 1921. Nor has Justice SCALIA identified any. All the while, the President has made countless recess appointments during intra-session recesses.

The upshot is that restricting the Clause to inter-session recesses would frustrate its purpose. It would make the President's recess-appointment power dependent on a formalistic distinction of Senate procedure. Moreover, the President has consistently and frequently interpreted the word "recess" to apply to intra-session recesses, and has acted on that interpretation. The Senate as a body has done nothing to deny the validity of this practice for at least three-quarters of a century. And three-quarters of a century of settled practice is long enough to entitle a practice to "great weight in a proper interpretation" of the

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

constitutional provision. *The Pocket Veto Case,* 279 U.S., at 689, 49 S.Ct. 463.

 **[6]**   We are aware of, but we are not persuaded by, three important arguments to the contrary. First, some argue that the Founders would likely have intended the Clause to apply only to inter-session recesses, for they hardly knew any other. See, *e.g.,* Brief for Originalist Scholars as *Amici Curiae* 27–29. Indeed, from the founding until the Civil War inter-session recesses were the only kind of significant recesses that Congress took. The problem with this argument, however, is that it does not fully describe the relevant founding intent. The question is not: Did the Founders at the time think about intra-session recesses? Perhaps they did not. The question is: Did the Founders intend to restrict the scope of the Clause to the form of congressional recess then prevalent, or did they intend a broader scope **\*2565** permitting the Clause to apply, where appropriate, to somewhat changed circumstances? The Founders knew they were writing a document designed to apply to ever-changing circumstances over centuries. After all, a Constitution is "intended to endure for ages to come," and must adapt itself to a future that can only be "seen dimly," if at all. *McCulloch,* 4 Wheat., at 415. We therefore think the Framers likely did intend the Clause to apply to a new circumstance that so clearly falls within its essential purposes, where doing so is consistent with the Clause's language.

Second, some argue that the intra-session interpretation permits the President to make "illogic[ally]" long recess appointments. Brief for Respondent Noel Canning 13; *post,* at 2597 (SCALIA, J., concurring in judgment). A recess appointment made between Congress' annual sessions would permit the appointee to serve for about a year, *i.e.,* until the "end" of the "next" Senate "session." Art. II, § 2, cl. 3. But an intra-session appointment made at the beginning or in the middle of a formal session could permit the appointee to serve for 1 ½; or almost 2 years (until the end of the following formal session).

We agree that the intra-session interpretation permits somewhat longer recess appointments, but we do not agree that this consequence is "illogical." A President who makes a recess appointment will often also seek to make a regular appointment, nominating the appointee and securing ordinary Senate confirmation. And the Clause ensures that the President and Senate always have at

least a full session to go through the nomination and confirmation process. That process may take several months. See O'Connell, Vacant Offices: Delays in Staffing Top Agency Positions, 82 S. Cal. L.Rev. 913, 967 (2009) (from 1987 to 2005 the nomination and confirmation process took an average of 236 days for noncabinet agency heads). A recess appointment that lasts somewhat longer than a year will ensure the President the continued assistance of subordinates that the Clause permits him to obtain while he and the Senate select a regular appointee. An appointment should last until the Senate has "an opportunity to act on the subject," Story, § 1551, at 410, and the Clause embodies a determination that a full session is needed to select and vet a replacement.

Third, the Court of Appeals believed that application of the Clause to intra-session recesses would introduce "vagueness" into a Clause that was otherwise clear. 705 F.3d, at 504. One can find problems of uncertainty, however, either way. In 1867, for example, President Andrew Johnson called a special session of Congress, which took place during a lengthy intra-session recess. Consider the period of time that fell just after the conclusion of that special session. Did that period remain an intra-session recess, or did it become an inter-session recess? Historians disagree about the answer. Compare Hartnett, 26 Cardozo L.Rev., at 408–409, with Brief for Constitutional Law Scholars as *Amici Curiae* 23–24.

Or suppose that Congress adjourns *sine die,* but it does so conditionally, so that the leadership can call the members back into session when "the public interest shall warrant it." *E.g.,* 155 Cong. Rec. 33429 (2009); 152 Cong. Rec. 23731–23732 (2006); 150 Cong. Rec. 25925–25926 (2004). If the Senate Majority Leader were to reconvene the Senate, how would we characterize the preceding recess? Is it still inter-session? On the narrower interpretation the label matters; on the broader it does not.

The greater interpretive problem is determining how long a recess must be in **\*2566** order to fall within the Clause. Is a break of a week, or a day, or an hour too short to count as a "recess"? The Clause itself does not say. And Justice SCALIA claims that this silence itself shows that the Framers intended the Clause to apply only to an inter-session recess. *Post,* at 2598 – 2599.

We disagree. For one thing, the most likely reason the Framers did not place a textual floor underneath the

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 80 of 395

word "recess" is that they did not foresee the *need* for one. They might have expected that the Senate would meet for a single session lasting at most half a year. The Federalist No. 84, at 596 (A. Hamilton). And they might not have anticipated that intra-session recesses would become lengthier and more significant than inter-session ones. The Framers' lack of clairvoyance on that point is not dispositive. Unlike Justice SCALIA, we think it most consistent with our constitutional structure to presume that the Framers would have allowed intra-session recess appointments where there was a long history of such practice.

Moreover, the lack of a textual floor raises a problem that plagues *both* interpretations—Justice SCALIA's and ours. Today a brief inter-session recess is just as possible as a brief intra-session recess. And though Justice SCALIA says that the "notion that the Constitution empowers the President to make unilateral appointments every time the Senate takes a half-hour lunch break is *so absurd as to be self-refuting,*" he must immediately concede (in a footnote) that the President "can make recess appointments during any break *between* sessions, *no matter how short.*" *Post,* at 2597, 2599 – 2600, n. 4 (emphasis added).

 [7]   Even the Solicitor General, arguing for a broader interpretation, acknowledges that there is a lower limit applicable to both kinds of recess. He argues that the lower limit should be three days by analogy to the Adjournments Clause of the Constitution. Tr. of Oral Arg. 11. That Clause says: "Neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." Art. I, § 5, cl. 4.

We agree with the Solicitor General that a 3–day recess would be too short. (Under Senate practice, "Sunday is generally considered a day," and so is not counted for purposes of the Adjournments Clause. S. Doc. No. 101–28, F. Riddick & A. Frumin, Riddick's Senate Procedure: Precedents and Practices 1265 (hereinafter Riddick's).) The Adjournments Clause reflects the fact that a 3–day break is not a significant interruption of legislative business. As the Solicitor General says, it is constitutionally *de minimis.* Brief for Petitioner 18. A Senate recess that is so short that it does not require the consent of the House is not long enough to trigger the President's recess-appointment power.

That is not to say that the President may make recess appointments during any recess that is "more than three days." Art. I, § 5, cl. 4. The Recess Appointments Clause seeks to permit the Executive Branch to function smoothly when Congress is unavailable. And though Congress has taken short breaks for almost 200 years, and there have been many thousands of recess appointments in that time, we have not found a single example of a recess appointment made during an intra-session recess that was shorter than 10 days. Nor has the Solicitor General. Reply Brief 23. Indeed, the Office of Legal Counsel once informally advised against making a recess appointment during a 6–day intra-session recess. 3 Op. OLC, at 315–316. The lack of examples suggests that the recess-appointment power is not needed in that context. (The length of a recess is "ordinarily calculated by counting the calendar days running from the day  **\*2567**  after the recess begins and including the day the recess ends." 36 Op. OLC, at ___, n. 1 (citation omitted).)

 [8]   There are a few historical examples of recess appointments made during inter-session recesses shorter than 10 days. We have already discussed President Theodore Roosevelt's appointments during the instantaneous, "fictitious" recess. President Truman also made a recess appointment to the Civil Aeronautics Board during a 3–day inter-session recess. Hogue, Recess Appointments: Frequently Asked Questions, at 5–6. President Taft made a few appointments during a 9–day recess following his inauguration, and President Lyndon Johnson made several appointments during an 18–day recess several weeks after assuming office. Hogue, *The Law* : Recess Appointments to Article III Courts, 34 Presidential Studies Q. 656, 671 (2004); 106 S. Exec. J. 2 (1964); 40 S. Exec. J. 12 (1909). There may be others of which we are unaware. But when considered against 200 years of settled practice, we regard these few scattered examples as anomalies. We therefore conclude, in light of historical practice, that a recess of more than 3 days but less than 10 days is presumptively too short to fall within the Clause. We add the word "presumptively" to leave open the possibility that some very unusual circumstance —a national catastrophe, for instance, that renders the Senate unavailable but calls for an urgent response— could demand the exercise of the recess-appointment power during a shorter break. (It should go without saying —except that Justice SCALIA compels us to say it—that political opposition in the Senate would not qualify as an unusual circumstance.)

In sum, we conclude that the phrase "the recess" applies to both intra-session and inter-session recesses. If a Senate recess is so short that it does not require the consent of the House, it is too short to trigger the Recess Appointments Clause. See Art. I, § 5, cl. 4. And a recess lasting less than 10 days is presumptively too short as well.

### IV

[9]  The second question concerns the scope of the phrase "vacancies *that may happen* during the recess of the Senate." Art. II, § 2, cl. 3 (emphasis added). All agree that the phrase applies to vacancies that initially occur during a recess. But does it also apply to vacancies that initially occur before a recess and continue to exist during the recess? In our view the phrase applies to both kinds of vacancy.

We believe that the Clause's language, read literally, permits, though it does not naturally favor, our broader interpretation. We concede that the most natural meaning of "happens" as applied to a "vacancy" (at least to a modern ear) is that the vacancy "happens" when it initially occurs. See 1 Johnson 913 (defining "happen" in relevant part as meaning "[t]o fall out; to chance; to come to pass"). But that is not the only possible way to use the word.

Thomas Jefferson wrote that the Clause is "certainly susceptible of [two] constructions." Letter to Wilson Cary Nicholas (Jan. 26, 1802), in 36 Papers of Thomas Jefferson 433 (B. Oberg ed., 2009). It "may mean 'vacancies that may happen to be' or 'may happen to fall' " during a recess. *Ibid.* Jefferson used the phrase in the first sense when he wrote to a job seeker that a particular position was unavailable, but that he (Jefferson) was "happy that *another vacancy happens* wherein I can ... avail the public of your integrity & talents," for "the office of Treasurer of the US. *is vacant* by the resignation of mr Meredith." Letter to Thomas Tudor Tucker (Oct. 31, 1801), in 35 *id.*, at 530 (B. Oberg ed. 2008) (emphasis added). See **\*2568** also Laws Passed by the Legislature of Florida, No. 31, An Act to Organize and Regulate the Militia of the Territory of Florida § 13, H.R. Exec. Doc. No. 72, 27th Cong., 3d Sess., 22 (1842) ("[W]hen any vacancy shall take place in the office of any lieutenant colonel, it shall be the duty of the colonel of the regiment in which such vacancy may happen to order an election to be held at the

several precincts in the battalion in which such vacancy *may happen* " (emphasis added)).

Similarly, when Attorney General William Wirt advised President Monroe to follow the broader interpretation, he wrote that the "expression seems not perfectly clear. It may mean 'happen to take place:' that is, '*to originate,*' " or it "may mean, also, without violence to the sense, 'happen to exist.' " 1 Op. Atty. Gen. 631, 631–632 (1823). The broader interpretation, he added, is "most accordant with" the Constitution's "reason and spirit." *Id.,* at 632.

We can still understand this earlier use of "happen" if we think of it used together with another word that, like "vacancy," can refer to a continuing state, say, a financial crisis. A statute that gives the President authority to act in respect to "any financial crisis that may happen during his term" can easily be interpreted to include crises that arise before, and continue during, that term. Perhaps that is why the Oxford English Dictionary defines "happen" in part as "chance *to be,*" rather than "chance to occur." 6 OED 1096 (emphasis added); see also 19 OED 383 (defining "vacancy" as the "condition of an office or post being ... vacant").

In any event, the linguistic question here is not whether the phrase can be, but whether it must be, read more narrowly. The question is whether the Clause is ambiguous. *The Pocket Veto Case,* 279 U.S., at 690, 49 S.Ct. 463. And the broader reading, we believe, is at least a permissible reading of a " 'doubtful' " phrase. *Ibid.* We consequently go on to consider the Clause's purpose and historical practice.

[10]  The Clause's purpose strongly supports the broader interpretation. That purpose is to permit the President to obtain the assistance of subordinate officers when the Senate, due to its recess, cannot confirm them. Attorney General Wirt clearly described how the narrower interpretation would undermine this purpose:

"Put the case of a vacancy occurring in an office, held in a distant part of the country, on the last day of the Senate's session. Before the vacancy is made known to the President, the Senate rises. The office may be an important one; the vacancy may paralyze a whole line of action in some essential branch of our internal police; the public interests may imperiously demand that it shall be immediately filled. But the vacancy happened to occur during the session of the Senate; and if the

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 82 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

President's power is to be limited to such vacancies only as happen to occur during the recess of the Senate, the vacancy in the case put must continue, however ruinous the consequences may be to the public." 1 Op. Atty. Gen., at 632.

Examples are not difficult to imagine: An ambassadorial post falls vacant too soon before the recess begins for the President to appoint a replacement; the Senate rejects a President's nominee just before a recess, too late to select another. Wirt explained that the "substantial purpose of the constitution was to keep these offices filled," and "if the President shall not have the power to fill a vacancy thus circumstanced, ... the substance of the constitution will be sacrificed to a dubious construction of its letter." *Ibid.* Thus the broader construction, encompassing vacancies that initially occur before the beginning **\*2569** of a recess, is the "only construction of the constitution which is compatible with its spirit, reason, and purposes; while, at the same time, it offers no violence to its language." *Id.,* at 633.

We do not agree with Justice SCALIA's suggestion that the Framers would have accepted the catastrophe envisioned by Wirt because Congress can always provide for acting officers, see 5 U.S.C. § 3345, and the President can always convene a special session of Congress, see U.S. Const., Art. II, § 3. Acting officers may have less authority than Presidential appointments. 6 Op. OLC 119, 121 (1982). Moreover, to rely on acting officers would lessen the President's ability to staff the Executive Branch with people of his own choosing, and thereby limit the President's control and political accountability. Cf. *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 497–498, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010). Special sessions are burdensome (and would have been especially so at the time of the founding). The point of the Recess Appointments Clause was to *avoid* reliance on these inadequate expedients.

At the same time, we recognize one important purpose-related consideration that argues in the opposite direction. A broad interpretation might permit a President to avoid Senate confirmations as a matter of course. If the Clause gives the President the power to "fill up all vacancies" that occur before, and continue to exist during, the Senate's recess, a President might not submit any nominations to the Senate. He might simply wait for a recess and then provide all potential nominees with recess appointments.

He might thereby routinely avoid the constitutional need to obtain the Senate's "advice and consent."

Wirt thought considerations of character and politics would prevent Presidents from abusing the Clause in this way. 1 Op. Atty. Gen., at 634. He might have added that such temptations should not often arise. It is often less desirable for a President to make a recess appointment. A recess appointee only serves a limited term. That, combined with the lack of Senate approval, may diminish the recess appointee's ability, as a practical matter, to get a controversial job done. And even where the President and Senate are at odds over politically sensitive appointments, compromise is normally possible. Indeed, the 1940 Pay Act amendments represent a general compromise, for they foresee payment of salaries to recess appointees where vacancies occur *before* the recess began but not *too long* before (namely, within 30 days before). 5 U.S.C. § 5503(a)(1); see *infra,* at 2573. Moreover, the Senate, like the President, has institutional "resources," including political resources, "available to protect and assert its interests." *Goldwater v. Carter,* 444 U.S. 996, 1004, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Rehnquist, J., concurring in judgment). In an unusual instance, where a matter is important enough to the Senate, that body can remain in session, preventing recess appointments by refusing to take a recess. See Part V, *infra.* In any event, the Executive Branch has adhered to the broader interpretation for two centuries, and Senate confirmation has always remained the norm for officers that require it.

While we concede that both interpretations carry with them some risk of undesirable consequences, we believe the narrower interpretation risks undermining constitutionally conferred powers more seriously and more often. It would prevent the President from making any recess appointment that arose before a recess, no matter who the official, no matter how dire the need, no matter how uncontroversial **\*2570** the appointment, and no matter how late in the session the office fell vacant. Overall, like Attorney General Wirt, we believe the broader interpretation more consistent with the Constitution's "reason and spirit." 1 Op. Atty. Gen., at 632.

Historical practice over the past 200 years strongly favors the broader interpretation. The tradition of applying the Clause to pre-recess vacancies dates at least to President James Madison. There is no undisputed record

of Presidents George Washington, John Adams, or Thomas Jefferson making such an appointment, though the Solicitor General believes he has found records showing that Presidents Washington and Jefferson did so. We know that Edmund Randolph, Washington's Attorney General, favored a narrow reading of the Clause. Randolph believed that the "Spirit of the Constitution favors the participation of the Senate in all appointments," though he did not address—let alone answer—the powerful purposive and structural arguments subsequently made by Attorney General Wirt. See Edmund Randolph's Opinion on Recess Appointments (July 7, 1792), in 24 Papers of Thomas Jefferson 166 (J. Catanzariti ed. 1990).

President Adams seemed to endorse the broader view of the Clause in writing, though we are not aware of any appointments he made in keeping with that view. See Letter to J. McHenry (Apr. 16, 1799), in 8 Works of John Adams 632–633 (C. Adams ed. 1853). His Attorney General, Charles Lee, later informed Jefferson that, in the Adams administration, "whenever an office became vacant so short a time before Congress rose, as not to give an opportunity of enquiring for a proper character, they let it lie always till recess." 36 Papers of Thomas Jefferson 433. We know that President Jefferson thought that the broad interpretation was linguistically supportable, though his actual practice is not clear. But the evidence suggests that James Madison—as familiar as anyone with the workings of the Constitutional Convention—appointed Theodore Gaillard to replace a district judge who had left office before a recess began. Hartnett, 26 Cardozo L.Rev., at 400–401. It also appears that in 1815 Madison signed a bill that created two new offices prior to a recess which he then filled later during the recess. See Act of Mar. 3, ch. 95, 3 Stat. 235; S.J. 13th Cong., 3d Sess., 689–690 (1815); 3 S. Exec. J. 19 (1828) (for Monday, Jan. 8, 1816). He also made recess appointments to "territorial" United States attorney and marshal positions, both of which had been created when the Senate was in session more than two years before. Act of Feb. 27, 1813, ch. 35, 2 Stat. 806; 3 S. Exec. J. 19. Justice SCALIA refers to "written evidence of Madison's own beliefs," *post,* at 2611, but in fact we have no direct evidence of what President Madison believed. We only know that he declined to make one appointment to a pre-recess vacancy after his Secretary of War advised him that he lacked the power. On the other hand, he *did*

apparently make at least five other appointments to pre-recess vacancies, as Justice SCALIA does not dispute.

The next President, James Monroe, received and presumably acted upon Attorney General Wirt's advice, namely that "all vacancies which, from any casualty, happen to exist at a time when the Senate cannot be consulted as to filling them, may be temporarily filled by the President." 1 Op. Atty. Gen., at 633. Nearly every subsequent Attorney General to consider the question throughout the Nation's history has thought the same. *E.g.,* 2 Op. Atty. Gen. 525, 528 (1832); 7 Op. Atty. Gen. 186, 223 (1855); 10 Op. Atty. Gen. 356, 356–357 (1862); 12 Op. Atty. Gen. 32, 33 (1866); **\*2571** 12 Op. Atty. Gen., at 452, 14 Op. Atty. Gen. 562, 564 (1875); 15 Op. Atty. Gen. 207 (1877); 16 Op. Atty. Gen. 522, 524 (1880); 17 Op. Atty. Gen. 521 (1883); 18 Op. Atty. Gen. 29, 29–30 (1884); 19 Op. Atty. Gen. 261, 262 (1889); 26 Op. Atty. Gen. 234, 234–235 (1907); 30 Op. Atty. Gen. 314, 315 (1914); 41 Op. Atty. Gen. 463, 465 (1960); 3 Op. OLC 314 (1979); 6 Op. OLC 585, 586 (1982); 20 Op. OLC 124, 161 (1996); 36 Op. OLC ___ (2012). Indeed, as early as 1862, Attorney General Bates advised President Lincoln that his power to fill pre-recess vacancies was "settled ... as far ... as a constitutional question can be settled," 10 Op. Atty. Gen., at 356, and a century later Acting Attorney General Walsh gave President Eisenhower the same advice "without any doubt," 41 Op. Atty. Gen., at 466.

This power is important. The Congressional Research Service is "unaware of any official source of information tracking the dates of vacancies in federal offices." The *Noel Canning* Decision 3, n. 6. Nonetheless, we have enough information to believe that the Presidents since Madison have made many recess appointments filling vacancies that initially occurred prior to a recess. As we have just said, nearly every 19th- and 20th-century Attorney General expressing a view on the matter has agreed with William Wirt, and Presidents tend to follow the legal advice of their chief legal officers. Moreover, the Solicitor General has compiled a list of 102 (mostly uncontested) recess appointments made by Presidents going back to the founding. App. to Brief for Petitioner 65a–89a. Given the difficulty of finding accurate information about vacancy dates, that list is undoubtedly far smaller than the actual number. No one disputes that every President since James Buchanan has made recess appointments to pre-existing vacancies.

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Common sense also suggests that many recess appointees filled vacancies that arose before the recess began. We have compared the list of *intra-session* recess appointments in the Solicitor General's brief with the chart of congressional recesses. Where a specific date of appointment can be ascertained, more than half of those intra-session appointments were made within two weeks of the beginning of a recess. That short window strongly suggests that many of the vacancies initially arose prior to the recess. See App. to Brief for Petitioner 1a–64a; Appendix A, *infra*. Thus, it is not surprising that the Congressional Research Service, after examining the vacancy dates associated with a random sample of 24 inter-session recess appointments since 1981, concluded that "[i]n most of the 24 cases, the preponderance of evidence indicated that the vacancy arose prior to the recess during which the appointment was made." The *Noel Canning* Decision 3. Further, with research assistance from the Supreme Court Library, we have examined a random sample of the recess appointments made by our two most recent Presidents, and have found that almost all of those appointments filled pre-recess vacancies: Of a sample of 21 recess appointments, 18 filled pre-recess vacancies and only 1 filled a vacancy that arose during the recess in which he was appointed. The precise date on which 2 of the vacancies arose could not be determined. See Appendix B, *infra*. Taken together, we think it is a fair inference that a large proportion of the recess appointments in the history of the Nation have filled pre-existing vacancies.

Did the Senate object? Early on, there was some sporadic disagreement with the broad interpretation. In 1814 Senator Gore said that if "the vacancy happen at another time, it is not the case described by the Constitution." 26 Annals of Cong. 653. In 1822 a Senate committee, while **\*2572** focusing on the President's power to fill a new vacancy created by statute, used language to the same effect. 38 *id.,* at 489, 500. And early Congresses enacted statutes authorizing certain recess appointments, see *post,* at 2608, a fact that may or may not suggest they accepted the narrower interpretation of the Clause. Most of those statutes—including the one passed by the First Congress—authorized appointments to newly created offices, and may have been addressed to the separate question of whether new offices are vacancies within the meaning of the Clause. See Letter from Alexander Hamilton to James McHenry (May 3, 1799), in 23 Papers of Alexander Hamilton 94 (H. Syrett ed. 1976) ("*Vacancy*

is a relative term, and presupposes that the Office has been once filled"); Reply Brief 17. In any event, by 1862 Attorney General Bates could still refer to "the unbroken acquiescence of the Senate" in support of the broad interpretation. 10 Op. Atty. Gen., at 356.

Then in 1863 the Senate Judiciary Committee disagreed with the broad interpretation. It issued a report concluding that a vacancy "must have its inceptive point after one session has closed and before another session has begun." S.Rep. No. 80, 37th Cong., 3d Sess., p. 3. And the Senate then passed the Pay Act, which provided that "no money shall be paid ... as a salary, to any person appointed during the recess of the Senate, to fill a vacancy ... which ... existed while the Senate was in session." Act of Feb. 9, 1863, § 2, 12 Stat. 646. Relying upon the floor statement of a single Senator, Justice SCALIA suggests that the passage of the Pay Act indicates that the Senate as a whole endorsed the position in the 1863 Report. But the circumstances are more equivocal. During the floor debate on the bill, not a single Senator referred to the Report. Cong. Globe, 37th Cong., 3d Sess. 564–565 (1863). Indeed, Senator Trumbull, who introduced the Pay Act, acknowledged that there was disagreement about the underlying constitutional question. *Id.,* at 565 ("[S]ome other persons think he has that power"). Further, if a majority of the Senate had believed appointments to pre-recess vacancies were unconstitutional, it could have attempted to do far more than temporarily dock the appointees' pay. Cf. Tenure of Office Act of 1867, § 5, 14 Stat. 431 (making it a federal crime for "any person" to "accept any appointment" in certain circumstances).

In any event, the Senate subsequently abandoned its hostility. In the debate preceding the 1905 Senate Report regarding President Roosevelt's "constructive" recess appointments, Senator Tillman—who chaired the Committee that authored the 1905 Report—brought up the 1863 Report, and another Senator responded: "Whatever that report may have said in 1863, I do not think that has been the view the Senate has taken" of the issue. 38 Cong. Rec. 1606 (1904). Senator Tillman then agreed that "the Senate has acquiesced" in the President's "power to fill" pre-recess vacancies. *Ibid.* And Senator Tillman's 1905 Report described the Clause's purpose in terms closely echoing Attorney General Wirt. 1905 Senate Report, at 2 ("Its sole purpose was to render it *certain* that at all times there should be, whether the Senate was

in session or not, an officer for every office" (emphasis added)).

In 1916 the Senate debated whether to pay a recess appointee who had filled a pre-recess vacancy and had not subsequently been confirmed. Both Senators to address the question—one on each side of the payment debate—agreed that the President had the constitutional power to make the appointment, and the Senate voted to pay the appointee for his service. 53 Cong. Rec. 4291–4299; 39 Stat. 818–819. In 1927 the Comptroller General, a legislative  **\*2573**  officer, wrote that "there is *no question* but that the President has authority to make a recess appointment to fill *any* vacancy," including those that "existed while the Senate was in session." 7 Comp. Gen. 10, 11 (emphasis added). Meanwhile, Presidents continued to make appointments to pre-recess vacancies. The Solicitor General has identified 40 between 1863 and 1940, but that number is clearly not comprehensive. See, *e.g.,* 32 Op. Atty. Gen. 271–272 (1920) (listing 5 appointments that are not in the Solicitor General's appendix); Recess Appointments, Washington Post, July 7, 1880, p. 1 (noting that President Hayes made "quite a number of appointments" to pre-recess vacancies).

Then in 1940 Congress amended the Pay Act to authorize salary payments (with some exceptions) where (1) the "vacancy arose within thirty days prior to the termination of the session," (2) "at the termination of the session" a nomination was "pending," or (3) a nominee was "rejected by the Senate within thirty days prior to the termination of the session." Act of July 11, 54 Stat. 751 (codified, as amended, at 5 U.S.C. § 5503). All three circumstances concern a vacancy that did not initially occur during a recess but happened to exist during that recess. By paying salaries to this kind of recess appointee, the 1940 Senate (and later Senates) in effect supported the President's interpretation of the Clause.

The upshot is that the President has consistently and frequently interpreted the Recess Appointments Clause to apply to vacancies that initially occur before, but continue to exist during, a recess of the Senate. The Senate as a body has not countered this practice for nearly three-quarters of a century, perhaps longer. See A. Amar, The Unwritten Constitution 576–577, n. 16 (2012) (for nearly 200 years "the overwhelming mass of actual practice" supports the President's interpretation); *Mistretta v. United States,* 488 U.S. 361, 401, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)

(a "200–year tradition" can " 'give meaning' to the Constitution" (quoting *Youngstown,* 343 U.S., at 610, 72 S.Ct. 863 (Frankfurter, J., concurring))). The tradition is long enough to entitle the practice "to great regard in determining the true construction" of the constitutional provision. *The Pocket Veto Case,* 279 U.S., at 690, 49 S.Ct. 463. And we are reluctant to upset this traditional practice where doing so would seriously shrink the authority that Presidents have believed existed and have exercised for so long.

In light of some linguistic ambiguity, the basic purpose of the Clause, and the historical practice we have described, we conclude that the phrase "all vacancies" includes vacancies that come into existence while the Senate is in session.

V

The third question concerns the calculation of the length of the Senate's "recess." On December 17, 2011, the Senate by unanimous consent adopted a resolution to convene "*pro forma* session[s]" only, with "no business ... transacted," on every Tuesday and Friday from December 20, 2011, through January 20, 2012. 2011 S.J. 923. At the end of each *pro forma* session, the Senate would "adjourn until" the following *pro forma* session. *Ibid.* During that period, the Senate convened and adjourned as agreed. It held *pro forma* sessions on December 20, 23, 27, and 30, and on January 3, 6, 10, 13, 17, and 20; and at the end of each *pro forma* session, it adjourned until the time and date of the next. *Id.,* at 923–924; 158 Cong. Rec. S1–S11.

**[11]**   The President made the recess appointments before us on January 4,  **\*2574**  2012, in between the January 3 and the January 6 *pro forma* sessions. We must determine the significance of these sessions—that is, whether, for purposes of the Clause, we should treat them as periods when the Senate was in session or as periods when it was in recess. If the former, the period between January 3 and January 6 was a 3–day recess, which is too short to trigger the President's recess-appointment power, see *supra,* at 2566 – 2567. If the latter, however, then the 3–day period was part of a much longer recess during which the President did have the power to make recess appointments, see *ibid.*

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

The Solicitor General argues that we must treat the *pro forma* sessions as periods of recess. He says that these "sessions" were sessions in name only because the Senate was in recess as a *functional* matter. The Senate, he contends, remained in a single, unbroken recess from January 3, when the second session of the 112th Congress began by operation of the Twentieth Amendment, until January 23, when the Senate reconvened to do regular business.

 [12]   In our view, however, the *pro forma* sessions count as sessions, not as periods of recess. We hold that, for purposes of the Recess Appointments Clause, the Senate is in session when it says it is, provided that, under its own rules, it retains the capacity to transact Senate business. The Senate met that standard here.

 [13]   The standard we apply is consistent with the Constitution's broad delegation of authority to the Senate to determine how and when to conduct its business. The Constitution explicitly empowers the Senate to "determine the Rules of its Proceedings." *Art. I, § 5, cl. 2*. And we have held that "all matters of method are open to the determination" of the Senate, as long as there is "a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained" and the rule does not "ignore constitutional restraints or violate fundamental rights." *United States v. Ballin,* 144 U.S. 1, 5, 12 S.Ct. 507, 36 L.Ed. 321 (1892).

In addition, the Constitution provides the Senate with extensive control over its schedule. There are only limited exceptions. See Amdt. 20, § 2 (Congress must meet once a year on January 3, unless it specifies another day by law); *Art. II, § 3* (Senate must meet if the President calls it into special session); *Art. I, § 5, cl. 4* (neither House may adjourn for more than three days without consent of the other). See also *Art. II, § 3* ("[I]n Case of Disagreement between [the Houses], with Respect to the Time of Adjournment, [the President] may adjourn them to such Time as he shall think proper"). The Constitution thus gives the Senate wide latitude to determine whether and when to have a session, as well as how to conduct the session. This suggests that the Senate's determination about what constitutes a session should merit great respect.

Furthermore, this Court's precedents reflect the breadth of the power constitutionally delegated to the Senate. We generally take at face value the Senate's own report of its actions. When, for example, "the presiding officers" of the House and Senate sign an enrolled bill (and the President "approve[s]" it), "its authentication as a bill that has passed Congress should be deemed complete and unimpeachable." *Marshall Field & Co. v. Clark,* 143 U.S. 649, 672, 12 S.Ct. 495, 36 L.Ed. 294 (1892). By the same principle, when the Journal of the Senate indicates that a quorum was present, under a valid Senate rule, at the time the Senate passed a bill, we will not consider an argument that a quorum was **\*2575**  not, in fact, present. *Ballin, supra,* at 9, 12 S.Ct. 507. The Constitution requires the Senate to keep its Journal, *Art. I, § 5, cl. 3* ("Each House shall keep a Journal of its proceedings ..."), and "if reference may be had to" it, "it must be assumed to speak the truth," *Ballin, supra,* at 4, 12 S.Ct. 507.

For these reasons, we conclude that we must give great weight to the Senate's own determination of when it is and when it is not in session. But our deference to the Senate cannot be absolute. When the Senate is without the *capacity* to act, under its own rules, it is not in session even if it so declares. See Tr. of Oral Arg. 69 (acknowledgment by counsel for *amici* Senators that if the Senate had left the Capitol and "effectively given up ... the business of legislating" then it might be in recess, even if it said it was not). In that circumstance, the Senate is not simply unlikely or unwilling to act upon nominations of the President. It is *unable* to do so. The purpose of the Clause is to ensure the continued functioning of the Federal Government while the Senate is unavailable. See *supra,* at 2558 – 2559. This purpose would count for little were we to treat the Senate as though it were in session even when it lacks the ability to provide its "advice and consent." *Art. II, § 2, cl. 2*. Accordingly, we conclude that when the Senate declares that it is in session and possesses the capacity, under its own rules, to conduct business, it is in session for purposes of the Clause.

 [14]   Applying this standard, we find that the *pro forma* sessions were sessions for purposes of the Clause. First, the Senate said it was in session. The Journal of the Senate and the Congressional Record indicate that the Senate convened for a series of twice-weekly "sessions" from December 20 through January 20. 2011 S.J. 923–924; 158 Cong. Rec. S1–S11. (The Journal of the Senate for 2012 has not yet been published.) And these reports of

the Senate "must be assumed to speak the truth." *Ballin, supra,* at 4, 12 S.Ct. 507.

Second, the Senate's rules make clear that during its *pro forma* sessions, despite its resolution that it would conduct no business, the Senate retained the power to conduct business. During any *pro forma* session, the Senate could have conducted business simply by passing a unanimous consent agreement. See Riddick's 1313. The Senate in fact conducts much of its business through unanimous consent. *Id.,* at 1311–1312. Senate rules presume that a quorum is present unless a present Senator questions it. *Id.,* at 1041–1042. And when the Senate has a quorum, an agreement is unanimously passed if, upon its proposal, no present Senator objects. *Id.,* at 1329–1330. It is consequently unsurprising that the Senate *has* enacted legislation during *pro forma* sessions even when it has said that no business will be transacted. Indeed, the Senate passed a bill by unanimous consent during the second *pro forma* session after its December 17 adjournment. 2011 S.J. 924. And that bill quickly became law. Pub.L. 112–78, 125 Stat. 1280.

By way of contrast, we do not see how the Senate could conduct business during a recess. It could terminate the recess and then, when in session, pass a bill. But in that case, of course, the Senate would no longer be in recess. It would be in session. And that is the crucial point. Senate rules make clear that, once in session, the Senate can act even if it has earlier said that it would not.

The Solicitor General argues that more is required. He contends that what counts is not the Senate's *capacity* to conduct business but what the Senate actually does (or here, *did* ) during its *pro forma* sessions. And he looks for support to the **\*2576** functional definition of "recess" set forth in the 1905 Senate Report discussed above. See *supra,* at 2563. That Report describes a "recess" of the Senate as

> "the period of time ... when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." 1905 Senate Report, at 2.

Even were we, for argument's sake, to accept all of these criteria as authoritative, they would here be met. Taking the last criterion first, could the Senate, during its *pro forma* sessions, "participate as a body in making

appointments"? It could. It could confirm nominees by unanimous consent, just as it passed the bill mentioned above. See Riddick's 1313.

Could the Senate "receive communications from the President"? It could. The Congressional Record indicates that the Senate "received" a message from the President on January 12, during a 3–day adjournment between two *pro forma* sessions. See 158 Cong. Rec. S37 (Jan. 23, 2012). If the Senate could receive Presidential messages between two *pro forma* sessions, it could receive them during a *pro forma* session.

Was the Senate's Chamber "empty"? It was not. By its official rules, the Senate operates under the presumption that a quorum is present until a present Senator suggests the absence of a quorum, Riddick's 1041–1042, and nothing in the Journal of the Senate or the Congressional Record reflects any such suggestion.

Did Senators "owe [a] duty of attendance"? They did. The Senate's rules dictate that Senators are under a duty to attend every session. See Riddick's 214; Standing Rule of the Senate VI(2), S. Doc. No. 112–1, p. 5 (2011) ("No Senator shall absent himself from the service of the Senate without leave"). Nothing excused the Senators from this duty during the Senate's *pro forma* sessions. If any present Senator had raised a question as to the presence of a quorum, and by roll call it had become clear that a quorum was missing, the Senators in attendance could have directed the Sergeant at Arms to bring in the missing Senators. Rule VI(4).

The Solicitor General asks us to engage in a more realistic appraisal of what the Senate actually did. He argues that, during the relevant *pro forma* sessions, business was not in fact conducted; messages from the President could not be received in any meaningful way because they could not be placed before the Senate; the Senate Chamber was, according to C–SPAN coverage, almost empty; and in practice attendance was not required. See Brief for Petitioner 48–49, 54–55.

We do not believe, however, that engaging in the kind of factual appraisal that the Solicitor General suggests is either legally or practically appropriate. From a legal perspective, this approach would run contrary to precedent instructing us to "respect ... coequal and independent departments" by, for example, taking the

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS    Document 31-1    Filed 11/28/17    Page 88 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Senate's report of its official action at its word. *Field, 143 U.S., at 672, 12 S.Ct. 495;* see *Ballin,* 144 U.S., at 4, 12 S.Ct. 507. From a practical perspective, judges cannot easily determine such matters as who is, and who is not, in fact present on the floor during a particular Senate session. Judicial efforts to engage in these kinds of inquiries would risk undue judicial interference with the functioning of the Legislative Branch.

Finally, the Solicitor General warns that our holding may " 'disrup[t] the proper balance between the coordinate branches by preventing the Executive Branch from accomplishing its constitutionally assigned **\*2577** functions.' " Brief for Petitioner 64 (quoting *Morrison v. Olson,* 487 U.S. 654, 695, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); alteration in original). We do not see, however, how our holding could significantly alter the constitutional balance. Most appointments are not controversial and do not produce friction between the branches. Where political controversy is serious, the Senate unquestionably has other methods of preventing recess appointments. As the Solicitor General concedes, the Senate could preclude the President from making recess appointments by holding a series of twice-a-week *ordinary* (not *pro forma* ) sessions. And the nature of the business conducted at those ordinary sessions—whether, for example, Senators must vote on nominations, or may return to their home States to meet with their constituents—is a matter for the Senate to decide. The Constitution also gives the President (if he has enough allies in Congress) a way to force a recess. Art. II, § 3 ("[I]n Case of Disagreement between [the Houses], with Respect to the Time of Adjournment, [the President] may adjourn them to such Time as he shall think proper"). Moreover, the President and Senators engage with each other in many different ways and have a variety of methods of encouraging each other to accept their points of view.

Regardless, the Recess Appointments Clause is not designed to overcome serious institutional friction. It simply provides a subsidiary method for appointing officials when the Senate is away during a recess. Here, as in other contexts, friction between the branches is an inevitable consequence of our constitutional structure. See *Myers,* 272 U.S., at 293, 47 S.Ct. 21 (Brandeis, J., dissenting). That structure foresees resolution not only through judicial interpretation and compromise among the branches but also by the ballot box.

VI

The Recess Appointments Clause responds to a structural difference between the Executive and Legislative Branches: The Executive Branch is perpetually in operation, while the Legislature only acts in intervals separated by recesses. The purpose of the Clause is to allow the Executive to continue operating while the Senate is unavailable. We believe that the Clause's text, standing alone, is ambiguous. It does not resolve whether the President may make appointments during intra-session recesses, or whether he may fill pre-recess vacancies. But the broader reading better serves the Clause's structural function. Moreover, that broader reading is reinforced by centuries of history, which we are hesitant to disturb. We thus hold that the Constitution empowers the President to fill any existing vacancy during any recess—intra-session or inter-session—of sufficient length.

Justice SCALIA would render illegitimate thousands of recess appointments reaching all the way back to the founding era. More than that: Calling the Clause an "anachronism," he would basically read it out of the Constitution. *Post,* at 2598. He performs this act of judicial excision in the name of liberty. We fail to see how excising the Recess Appointments Clause preserves freedom. In fact, Alexander Hamilton observed in the very first Federalist Paper that "the vigour of government is essential to the security of liberty." The Federalist No. 1, at 5. And the Framers included the Recess Appointments Clause to preserve the "vigour of government" at times when an important organ of Government, the United States Senate, is in recess. Justice SCALIA's interpretation of the Clause would defeat the power of the Clause to achieve that objective.

**\*2578** The foregoing discussion should refute Justice SCALIA's claim that we have "embrace[d]" an "adverse-possession theory of executive power." *Post,* at 2617. Instead, as in all cases, we interpret the Constitution in light of its text, purposes, and "our whole experience" as a Nation. *Missouri v. Holland,* 252 U.S. 416, 433, 40 S.Ct. 382, 64 L.Ed. 641 (1920). And we look to the actual practice of Government to inform our interpretation.

Given our answer to the last question before us, we conclude that the Recess Appointments Clause does not give the President the constitutional authority to make the

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 89 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

appointments here at issue. Because the Court of Appeals reached the same ultimate conclusion (though for reasons we reject), its judgment is affirmed.

*It is so ordered.*

# APPENDIXES

## Appendix A to opinion of the Court

## APPENDIXES

## A

The following table contains the dates of all the intra-session and inter-session recesses that Congress has taken since the founding. The information (including the footnotes) is taken from 2011–2012 Official Congressional Directory, 112th Cong., 522–539.

SESSIONS OF CONGRESS, 1st–112th CONGRESSES, 1789–2011



Appendix A to opinion of the Court

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 90 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length in days | Recesses |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  | Senate | Hours of Representatives |

Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length in days | Recesses |  |
|---|---|---|---|---|---|---|
|  |  |  |  |  | Senate | Hours of Representatives |

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 91 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

## Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length (in days) | Recesses[a] | |
|---|---|---|---|---|---|---|
| | | | | | Senate | Means of Representatives |

*(Table data not legibly reproducible at available resolution.)*

## Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length (in days) | Recesses[a] | |
|---|---|---|---|---|---|---|
| | | | | | Senate | House of Representatives |

*(Table data not legibly reproducible at available resolution.)*

N.L.R.B. v. Noel Canning, 134 S. Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 92 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

## Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length in days | Recesses |
|----------|---------|----------------|------------------|----------------|----------|
| | | | | | Dates / Houses of Representatives |

## Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length in days | Recesses |
|----------|---------|----------------|------------------|----------------|----------|
| | | | | | Dates / Houses of Representatives |

Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] Senate | Recesses[2] House of Representatives |
|---|---|---|---|---|---|---|
| 106th | 1 | Jan. 3, 2001 | Dec. 20, 2001 | 352 | *(illegible)* | *(illegible)* |
|  | 2 | Jan. 23, 2002 | Nov. 22, 2002 | 304 | *(illegible)* | *(illegible)* |
| 108th | 1 | Jan. 7, 2003 | Dec. 9, 2003 | 338 | *(illegible)* | *(illegible)* |
|  | 2 | Jan. 20, 2004 | Dec. 9, 2004 | 324 | *(illegible)* | *(illegible)* |
| 109th | 1 | Jan. 4, 2005 | Dec. 22, 2005 | 353 | *(illegible)* | *(illegible)* |
|  | 2 | Jan. 3, 2006 | Dec. 9, 2006 | 341 | *(illegible)* | *(illegible)* |
| 110th | 1 | Jan. 4, 2007 | Dec. 31, 2007 | 362 | *(illegible)* | *(illegible)* |
|  | 2 | Jan. 3, 2008 | Jan. 3, 2009 | 367 | *(illegible)* | *(illegible)* |
| 111th | 1 | Jan. 6, 2009 | Dec. 24, 2009 | 353 | *(illegible)* | *(illegible)* |

Appendix A to opinion of the Court

| Congress | Session | Convening Date | Adjournment Date | Length in days[1] | Recesses[2] Senate | Recesses[2] House of Representatives |
|---|---|---|---|---|---|---|
|  | 2 | Jan. 5, 2010 | Dec. 22, 2010 | 352 | *(illegible)* | *(illegible)* |
| 112th | 1 | Jan. 5, 2011 | *(illegible)* | *(illegible)* | *(illegible)* | *(illegible)* |

[1] For the purpose of this table, a session's "length in days" is defined as the total number of calendar days from the convening date to the adjournment date, inclusive. It does not mean the actual number of days that Congress met during that session.

[2] For the purposes of this table, a "recess" is defined as a break in House or Senate proceedings of three or more days, excluding Sundays. According to Article I, section 5 of the U.S. Constitution, neither house may adjourn for more than three days without the consent of the other. On occasion, both chambers have held one or more pro forma sessions because of this constitutional obligation or for other purposes. Treated here as recesses, usually no business is conducted during these time periods. On this table, beginning in the 1990s, such pro forma sessions are indicated with a P.

Appendix B to opinion of the Court

## B

The following table shows the proportion of recent appointments that have filled pre-recess vacancies. It was compiled with research assistance from the Supreme Court Library. It contains a random sample of the recess appointments by President George W. Bush and President Barack Obama. The last column indicates whether the vacancy arose during the recess in which it was filled. "A" indicates a vacancy that arose during the recess, "P" indicates a vacancy that arose before the recess, and "U" indicates that the vacancy date could not be ascertained.

| Name[1] | Position | Date of Recess Appointment | Date the Position Became Vacant | Status of Vacancy |
|---|---|---|---|---|
| Peter J. Hurtgen | Member (designated Chair), NLRB | 8/31/01 | 8/27/2001[2] | A |
| Dennis L. Schornack | Comm'r on the Part of the US, Int'l Joint Comm'n, US and Can. | 3/29/02 | Unknown[3] | U |
| Tony Hammond | Comm'r, Postal Rate Comm'n | 8/06/02 | 2/2001[4] | P |
| R. Bruce Matthews | Member, Def. Nuclear Facilities Safety Bd. | 4/22/03 | 6/2002[5] | P |
| Ephraim Batambuze | Bd. Member, African Dev. Found. | 8/22/03 | 2/10/2002[6] | P |
| Bradley D. Belt | Member, Soc. Sec. Advisory Bd. (SSAB) | 12/23/03 | 9/2002[7] | P |
| Ronald E. Meisburg | Member, NLRB | 12/23/03 | 8/21/03[8] | P |
| Charles Johnson | Chief Financial Officer, EPA | 5/28/04 | 2003[9] | P |
| Jack E. McGregor | Member, Advisory Bd., St. Lawrence Seaway Dev. Corp. | 7/02/04 | Unknown[10] | U |
| James R. Kunder | Assistant Adm'r, Bureau for Asia and the Near East, USAID | 8/02/04 | 1/2004[11] | P |
| Susan A. Grant | Chief Financial Officer, Dept. of Energy | 8/02/04 | 2003[12] | P |

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 94 of 395

N.L.R.B. v. Noel Canning, 134 S. Ct. 2550 (2014)
199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Appendix B to opinion of the Court

| Name[1] | Position | Date of Recess Appointment | Date the Position Became Vacant | Status of Vacancy |
|---|---|---|---|---|
| Anthony J. Principi | Member (designated Chair), Def. Base Closure and Realignment Comm'n | 4/01/05 | 3/2006 (new position)[13] | P |
| John R. Bolton | US Representative to the UN | 8/01/05 | 1/2005[14] | P |
| Ellen R. Sauerbrey | Assistant Sec'y, Population, Refugees, and Migration, Dept. of State | 1/04/06 | by 7/2005[15] | P |
| Ronald E. Meisburg | General Counsel, NLRB | 1/04/06 | 6/03/2005[16] | P |
| John L. Palmer | Member, Bd. of Trustees, Fed. Old-Age and Survivors Ins. Trust Fund and the Fed. Disability Ins. Trust Fund | 4/19/06 | 10/2004[17] | P |
| Richard E. Stickler | Assistant Sec'y, Mine, Safety, and Health Admin. | 10/19/06 | 11/19/2004[18] | P |
| Susan E. Dudley | Adm'r, OIRA, OMB | 4/04/07 | 2/2006[19] | P |
| Mark G. Pearce | Member, NLRB | 3/27/10 | 1/2008[20] | P |
| Mark C. Aponte | Chief of Mission, El Salvador, Dept. of State | 8/19/10 | 1/17/09[21] | P |
| Richard Griffin Jr. | Member, NLRB | 1/04/12 | 8/27/11[22] | P |

[1] The name, position, and date of each recess appointment were taken from The Noel Canning Decision 21–23. The sample was generated by selecting every 10th appointment from a chronological list of all recess appointments made during the presidencies of George W. Bush and Barack Obama.

[2] See White House Press Release: President Bush Announces Hurtgen To Stay on as Member and Chairman of the National Labor Relations Board, Aug. 31, 2001, online at http://georgewbush-whitehouse.archives.gov/news/releases/2001/08/20010831-14.html.

[3] Schornack was preceded by Thomas L. Baldini. 147 Cong. Rec. 15597 (2001). We could not find a specific date for Baldini's departure. See Lane, Zugler Advisory Tapped for Water Jobs, Crain's Detroit Business, June 18, 2001, p. 6 (Schornack "would replace Marquette's Thomas Baldini, former President Bill Clinton's appointee"); Pinkey, Senate Often Turns its Role of Advice and Consent into Object and Obstruct, Detroit News, Feb. 10, 2002, p. 15A, col. 1. ("The International Joint Commission post is still held by Clinton appointee Tom Baldini, alas of Michigan").

[4] Hammond was preceded by Edward Jay Gleiman, 148 Cong. Rec. 4472 (2002), who retired in February 2001, see Campanelli, PRC Chairman Retires, Direct Marketing News, Feb. 6, 2001, online at http://www.dmnews.com/prc-chairman-gleiman-retires/article/70877.

[5] Matthews was preceded by Joseph J. DiNunno, 38 Weekly Comp. of Pres. Doc. 804 (2002), who retired in May 2002, see DNFSB Member Biography, online at http://www.dnfsb.gov/aboutboard-members/joseph-j-dinunno.

[6] Batambus was preceded by Henry McKoy, 149 Cong. Rec. 4875 (2003), whose term expired on February 9, 2002, see 32 Weekly Comp. of Pres. Doc. 363 (1996).

[7] Belt was preceded by Stanford G. Ross, 149 Cong. Rec. 20963 (2003), whose term on the SSAB expired in September 2002, see SSAB Member List, online at http://www.ssab.gov/AboutheBoard/Members.aspx.

[8] See Division of Information, NLRB, Ronald Meisburg Receives Recess Appointment From President Bush to Be NLRB Member (Dec. 29, 2003), online at http://mynlrb.nlrb.gov/link/document.aspx/09031d4980045475.

[9] Johnson was preceded by Linda Morrison Combs, 150 Cong. Rec. 236 (2004), who apparently left in 2003, see Hearings on S. 113 before the Committee on Homeland Security and Governmental Affairs, 109th Cong., 1st Sess., 2 (2005) ("Combs served as [CFO] of the [EPA] from 2001 to 2003"); see also 149 Cong. Rec. 31985 (2003) (nomination of Linda Morrison Combs to be Assistant Secretary of Transportation); 150 Cong. Rec. 10973 (2004) (confirmation of Combs to be Assistant Secretary of Transportation).

[10] McGregor was preceded by Vincent J. Sorrentino. 149 Cong. Rec. 31985 (2003). We have located no further information about Sorrentino's departure date.

[11] Kinder was preceded by Wendy J. Chamberlin. 150 Cong. Rec. 8983 (2004), who accepted a new appointment as of January 2004, see United Nation Refugee Agency Press Release, Wendy Chamberlin Appointed Deputy High Commissioner, Dec. 12, 2003, online at http://www.unhcr.org/news/NEWS/3fdad0934.html.

[12] Grant was preceded by Bruce M. Carnes. 149 Cong. Rec. 24627 (2003), who resigned during 2003, see Bush Nominee to Energy Department CFO Post OK'd by Committee, Environment and Energy Daily, March 11, 2004; see also 39 Weekly Comp. of Pres. Doc. 208 (2003).

[13] Principi was nominated for this newly created position on March 4, 2005. 151 Cong. Rec. 3543 (2005). The position was created by statute in 2001. 115 Stat. 1343–1344.

[14] See Hoge, Diplomats at U. N. Surprised by Danforth's Resignation, N.Y. Times, Dec. 3, 2004, p. A6.

[15] Sauerbrey was preceded by Arthur Dewey. 151 Cong. Rec. 19654 (2005); see also Weekly Review of Developments in Human Rights and Democracy, Dow Jones Factiva, June 30, 2005; Arthur E. Dewey, Dept. of State Biography, online at http://2001-2009.state.gov/outofdate/bios/d/7988.htm.

[16] Meisburg was preceded by Arthur F. Rosenfeld, whose term expired on June 3, 2005, see NLRB General Counsels Since 1935, online at http://www.nlrb.gov/who-we-are/general-counsel/general-counsels-1935.

[17] Palmer was nominated as a reappointment on November 7, 2005. 151 Cong. Rec. 25015 (2005). The Senate confirmed Palmer to his previous 4-year term on October 24, 2000. 146 Cong. Rec. 23920 (2000).

[18] Stickler was preceded by David D. Lauriski, 152 Cong. Rec. 17151 (2006), who resigned on November 19, 2004, see Dept. of Labor, News Release, U.S. Assistant Secretary of Labor for Mine Safety and Health Dave D. Lauriski Announces His Plans for Departure, Nov. 12, 2004.

[19] Dudley was preceded by John D. Graham, 152 Cong. Rec. 16707 (2006), who left the office in February 2006, see J.R. Pegg, Bush Bypasses Senate to Appoint Controversial Regulatory Chief, Pesticide & Toxic Chemical News, Apr. 9, 2007, vol. 35, No. 24, pp. 13–14.

[20] Pearce was preceded by Peter N. Kirsanow, whose term had ended by January 2008, see Members of the NLRB since 1935, online at http://www.nlrb.gov/who-we-are/board/members-nlrb-1935.

[21] Aponte was preceded by Charles Glazer, who left his post on January 17, 2009, see Dept. of State, Office of the Historian, Chiefs of Mission for El Salvador, online at http://history.state.gov/departmenthistory/people/glazer-charles-l.

[22] See App. to Brief for Petitioner 89a.

Justice SCALIA, with whom THE CHIEF JUSTICE, Justice THOMAS, and Justice ALITO join, concurring in the judgment.

Except where the Constitution or a valid federal law provides otherwise, all "Officers of the United States" must be appointed by the President "by and with the Advice and Consent of the Senate." U.S. Const., Art. II, § 2, cl. 2. That general rule is subject to an exception: "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." Id., § 2, cl. 3. This case requires us to decide whether the Recess Appointments Clause authorized three appointments made by President Obama to the National Labor Relations Board in January 2012 without the Senate's consent.

To prevent the President's recess-appointment power from nullifying the Senate's role in the appointment process, the Constitution cabins that power in two significant ways. First, it may be exercised only in "the Recess of the Senate," that is, the intermission between two formal legislative sessions. Second, it may be used to fill only those vacancies that "happen during the Recess," that

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

is, offices that become vacant during that intermission. Both conditions are clear from the Constitution's text and structure, and both were well understood at the founding. The Court of Appeals correctly held that the appointments here at issue are invalid because they did not meet either condition.

Today's Court agrees that the appointments were invalid, but for the far narrower reason that they were made during a 3–day break in the Senate's session. On its way to that result, the majority sweeps away the key textual limitations on the recess-appointment power. It holds, first, that the President can make appointments without the Senate's participation even during short breaks in the middle of the Senate's session, and second, that those appointments can fill offices that became vacant long before the break in which they were filled. The majority justifies those atextual results on an adverse-possession theory of executive authority: Presidents have long claimed the powers in question, and the Senate has not disputed those claims with sufficient vigor, so the Court should not "upset the compromises and working arrangements that the elected branches of Government themselves have reached." *Ante,* at 2560.

The Court's decision transforms the recess-appointment power from a tool carefully designed to fill a narrow and specific need into a weapon to be wielded by future Presidents against future Senates. To reach that result, the majority casts aside the plain, original meaning of the constitutional text in deference to late-arising historical practices that are ambiguous at best. The majority's insistence on deferring to the Executive's untenably broad interpretation of the power is in clear conflict with our precedent and forebodes a diminution of this Court's role in controversies involving the separation of powers and the structure of government. I concur in the judgment only.

## I. Our Responsibility

Today's majority disregards two overarching principles that ought to guide our consideration of the questions presented here.

First, the Constitution's core, government-structuring provisions are no less critical to preserving liberty than are the later adopted provisions of the Bill of Rights.

Indeed, "[s]o convinced were the **\*2593** Framers that liberty of the person inheres in structure that at first they did not consider a Bill of Rights necessary." *Clinton v. City of New York,* 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (KENNEDY, J., concurring). Those structural provisions reflect the founding generation's deep conviction that "checks and balances were the foundation of a structure of government that would protect liberty." *Bowsher v. Synar,* 478 U.S. 714, 722, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). It is for that reason that "the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances." *Bond v. United States,* 564 U.S. ——, ——, 131 S.Ct. 2355, 2365, 180 L.Ed.2d 269 (2011); see, *e.g., Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010); *Clinton, supra* ; *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995); *Bowsher, supra* ; *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Those decisions all rest on the bedrock principle that "the constitutional structure of our Government" is designed first and foremost not to look after the interests of the respective branches, but to "protec[t] individual liberty." *Bond, supra,* at ——, 131 S.Ct., at 2365.

Second and relatedly, when questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch " 'to say what the law is.' " *Zivotofsky v. Clinton,* 566 U.S. ——, ——, 132 S.Ct. 1421, 1428, 182 L.Ed.2d 423 (2012) (quoting *Marbury v. Madison,* 1 Cranch 137, 177, 2 L.Ed. 60 (1803)). This Court does not defer to the other branches' resolution of such controversies; as Justice KENNEDY has previously written, our role is in no way "lessened" because it might be said that "the two political branches are adjusting their own powers between themselves." *Clinton, supra,* at 449, 118 S.Ct. 2091 (concurring opinion). Since the separation of powers exists for the protection of individual liberty, its vitality "does not depend" on "whether the encroached-upon branch approves the encroachment.' " *Free Enterprise Fund, supra,* at 497, 130 S.Ct. 3138 (quoting *New York v. United States,* 505 U.S. 144, 182, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)); see also *Freytag v. Commissioner,* 501 U.S. 868, 879–880, 111 S.Ct. 2631, 115

L.Ed.2d 764 (1991); *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 276–277, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991). Rather, policing the "enduring structure" of constitutional government when the political branches fail to do so is "one of the most vital functions of this Court." *Public Citizen v. Department of Justice,* 491 U.S. 440, 468, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (KENNEDY, J., concurring in judgment).

Our decision in *Chadha* illustrates that principle. There, we held that a statutory provision authorizing one House of Congress to cancel an executive action taken pursuant to statutory authority—a so-called "legislative veto"—exceeded the bounds of Congress's authority under the Constitution. 462 U.S., at 957–959, 103 S.Ct. 2764. We did not hesitate to hold the legislative veto unconstitutional even though Congress had enacted, and the President had signed, nearly 300 similar provisions over the course of 50 years. *Id.,* at 944–945, 103 S.Ct. 2764. Just the opposite: We said the other branches' enthusiasm for the legislative veto "sharpened rather than blunted" our review. **\*2594** *Id.,* at 944, 103 S.Ct. 2764. Likewise, when the charge is made that a practice "enhances the President's powers beyond" what the Constitution permits, "[i]t is no answer ... to say that Congress surrendered its authority by its own hand." *Clinton,* 524 U.S., at 451, 118 S.Ct. 2091 (KENNEDY, J., concurring). "[O]ne Congress cannot yield up its own powers, much less those of other Congresses to follow. Abdication of responsibility is not part of the constitutional design." *Id.,* at 452, 118 S.Ct. 2091 (citations omitted).

Of course, where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision. See, *e.g., Alden v. Maine,* 527 U.S. 706, 743–744, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *Bowsher, supra,* at 723–724, 106 S.Ct. 3181; *Myers v. United States,* 272 U.S. 52, 174–175, 47 S.Ct. 21, 71 L.Ed. 160 (1926); see also *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring) (arguing that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned" should inform interpretation of the "Executive Power" vested in the President); *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 95, and n. 1, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (SCALIA, J., dissenting).

But " '[p]ast practice does not, by itself, create power.' " *Medellín v. Texas,* 552 U.S. 491, 532, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (quoting *Dames & Moore v. Regan,* 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981)). That is a necessary corollary of the principle that the political branches cannot by agreement alter the constitutional structure. Plainly, then, a self-aggrandizing practice adopted by one branch well after the founding, often challenged, and never before blessed by this Court—in other words, the sort of practice on which the majority relies in this case—does not relieve us of our duty to interpret the Constitution in light of its text, structure, and original understanding.

Ignoring our more recent precedent in this area, which is extensive, the majority relies on *The Pocket Veto Case,* 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929), for the proposition that when interpreting a constitutional provision "regulating the relationship between Congress and the President," we must defer to the settled practice of the political branches if the provision is " ' "in any respect of doubtful meaning." ' " *Ante,* at 2559; see *ante,* at 2560, 2564, 2568, 2573. The language the majority quotes from that case was pure dictum. The *Pocket Veto* Court had to decide whether a bill passed by the House and Senate and presented to the President less than 10 days before the adjournment of the first session of a particular Congress, but neither signed nor vetoed by the President, became a law. Most of the opinion analyzed that issue like any other legal question and concluded that treating the bill as a law would have been inconsistent with the text and structure of the Constitution. Only near the end of the opinion did the Court add that its conclusion was "confirmed" by longstanding Presidential practice in which Congress appeared to have acquiesced. 279 U.S., at 688–689, 49 S.Ct. 463. We did not suggest that the case would have come out differently had the longstanding practice been otherwise. [1]

---

[1]     The other cases cited by the majority in which we have afforded significant weight to historical practice, *ante,* at 2560, are consistent with the principles described above. Nearly all involved venerable and unchallenged practices, and constitutional provisions that were either deeply ambiguous or plainly supportive of the practice. See *Dames & Moore v. Regan,* 453 U.S. 654, 679–681, and n. 8, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (citing Presidential practice dating from 1799 and never questioned by

Congress to inform meaning of "Executive Power"); *Ex parte Grossman,* 267 U.S. 87, 118–119, 45 S.Ct. 332, 69 L.Ed. 527 (1925) (citing unchallenged Presidential practice dating from 1841 as support for a construction of the pardon power based on the "common law," the "history of the clause in the Convention," and "the ordinary meaning of its words"); *United States v. Midwest Oil Co.,* 236 U.S. 459, 469–471, 474, 35 S.Ct. 309, 59 L.Ed. 673 (1915) (citing Presidential practice dating from "an early period in the history of the government," "uniformly and repeatedly acquiesced in" by Congress and previously upheld by this Court, to establish "a recognized administrative power of the Executive in the management of the public lands"); *McPherson v. Blacker,* 146 U.S. 1, 25–35, 13 S.Ct. 3, 36 L.Ed. 869 (1892) (citing method of choosing Presidential electors prevalent among the States "from the formation of the government until now," as to the constitutionality of which " 'no question ha[d] ever arisen,' " in support of construction consistent with the constitutional text and its drafting history); *McCulloch v. Maryland,* 4 Wheat. 316, 401–402, 4 L.Ed. 579 (1819) (citing power "exercised by the first Congress elected under the present constitution," "recognized by many successive legislatures, and ... acted upon by the judicial department," in support of the conclusion that the Necessary and Proper Clause allowed Congress to incorporate a bank); *Stuart v. Laird,* 1 Cranch 299, 309, 2 L.Ed. 115 (1803) (citing practice that "commence[d] with the organization of the judicial system" in rejecting challenge to Supreme Court Justices' riding circuit). Even *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), which concluded that the constitutional text did not prohibit judges from undertaking extrajudicial duties and found "additional evidence" for that conclusion in a longstanding practice that it acknowledged had been "controversial," emphasized that it was relying on "contemporaneous practice by the Founders themselves" that had been "frequent and continuing" since ratification. *Id.,* at 397–400, 109 S.Ct. 647.

**\*2595  II. Intra–Session Breaks**

The first question presented is whether "the Recess of the Senate," during which the President's recess-appointment power is active, is (a) the period between two of the Senate's formal sessions, or (b) any break in the Senate's proceedings. I would hold that "the Recess" is the gap between sessions and that the appointments at issue here are invalid because they undisputedly were made *during* the Senate's session. The Court's contrary conclusion—that "the Recess" includes "breaks in the midst of a session," *ante,* at 2561—is inconsistent with the Constitution's text and structure, and it requires judicial fabrication of vague, unadministrable limits on the recess-appointment power (thus defined) that overstep the judicial role. And although the majority relies heavily on "historical practice," no practice worthy of our deference supports the majority's conclusion on this issue.

### A. Plain Meaning

A sensible interpretation of the Recess Appointments Clause should start by recognizing that the Clause uses the term "Recess" in contradistinction to the term "Session." As Alexander Hamilton wrote: "The time within which the power is to operate 'during the recess of the Senate' and the duration of the appointments 'to the end of the next session' of that body, conspire to elucidate the sense of the provision." The Federalist No. 67, p. 455 (J. Cooke ed. 1961).

In the founding era, the terms "recess" and "session" had well-understood meanings in the marking-out of legislative time. The life of each elected Congress typically consisted (as it still does) of two or more formal sessions separated by adjournments "*sine die,*" that is, without a specified return date. See GPO, Congressional **\*2596**  Directory, 113th Cong., pp. 524–542 (2013–2014) (hereinafter Congressional Directory) (listing sessions of Congress from 1789 through 2013); 705 F.3d 490, 512, and nn. 1–2 (C.A.D.C.2013) (case below); *ante,* at 2560. The period *between* two sessions was known as "the recess." See 26 Annals of Cong. 748 (1814) (Sen. Gore) ("The time of the Senate consists of two periods, viz: their session and their recess"). As one scholar has thoroughly demonstrated, "in government practice the phrase 'the Recess' *always* referred to the gap between sessions." Natelson, The Origins and Meaning of "Vacancies that May Happen During the Recess" in the Constitution's Recess Appointments Clause, 37 Harv. J.L. & Pub. Pol'y 199, 213 (2014) (hereinafter Natelson); see *id.,* at 214–227 (providing dozens of examples). By contrast, other provisions of the Constitution use the verb "adjourn" rather than "recess" to refer to the commencement of breaks *during* a formal legislative session. See, *e.g.,* Art. I, § 5, cl. 1; *id.,* § 5, cl. 4.[2]

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 98 of 395

**2**   The majority claims that "the phrase 'the recess' was used to refer to intra-session recesses at the time of the founding," *ante,* at 2561, but it offers strikingly little support for that assertion. It first cites a letter from George Washington that is quite obviously an example of imprecise, colloquial usage. See 3 Records of the Federal Convention of 1787, p. 76 (M. Farrand rev. 1966) ("I had put my carriage in the hands of a workman to be repaired and had not the means of mooving [sic] during the recess"). It next cites an example from the New Jersey Legislature that simply reflects that body's practice of dividing its time not only into "sessions" but also into distinct, formal "sittings" within each session, with "the recess" denoting the period between sittings. See Brief for Respondent Noel Canning 23; see also Natelson 207. Finally, the majority cites three pages from the Solicitor General's brief without acknowledging the arguments offered in response to the Solicitor General's few supposed counterexamples. See, *e.g.,* Brief for Respondent Noel Canning 21–24; Natelson 222, n. 120.

To be sure, in colloquial usage both words, "recess" and "session," could take on alternative, less precise meanings. A session could include any short period when a legislature's members were "assembled for business," and a recess could refer to any brief "suspension" of legislative "business." 2 N. Webster, American Dictionary of the English Language (1828). So the Continental Congress could complain of the noise from passing carriages disrupting its "daily Session," 29 Journals of the Continental Congress 1774–1789, p. 561 (1785) (J. Fitzpatrick ed. 1933), and the House could "take a recess" from 4 o'clock to 6 o'clock, Journal of the House of Representatives, 17th Cong., 2d Sess., p. 259 (1823). But as even the majority acknowledges, the Constitution's use of "the word 'the' in '*the* [R]ecess' " tends to suggest "that the phrase refers to the single break separating formal sessions." *Ante,* at 2561.

More importantly, neither the Solicitor General nor the majority argues that the Clause uses "session" in its loose, colloquial sense. And if "the next Session" denotes a *formal* session, then "the Recess" must mean the break *between* formal sessions. As every commentator on the Clause until the 20th century seems to have understood, the "Recess" and the "Session" to which the Clause refers are mutually exclusive, alternating states. See, *e.g.,* The Federalist No. 67, at 455 (explaining that appointments

would require Senatorial consent "during the session of the Senate" and would be made by the President alone "*in their recess* "); 1 Op. Atty. Gen. 631 (1823) (contrasting vacancies occurring "during the recess of the Senate" with those occurring "during the session of the Senate"); 2 Op. Atty Gen. 525, 527 (1832) (discussing a vacancy that "took place while the Senate was in session, **\*2597** and not during the recess"). It is linguistically implausible to suppose—as the majority does—that the Clause uses one of those terms ("Recess") informally and the other ("Session") formally in a single sentence, with the result that an event can occur during *both* the "Recess" *and* the "Session."

Besides being linguistically unsound, the majority's reading yields the strange result that an appointment made during a short break near the beginning of one official session will not terminate until the end of the *following* official session, enabling the appointment to last for up to two years. The majority justifies that result by observing that the process of confirming a nominee "may take several months." *Ante,* at 2565. But the average duration of the confirmation process is irrelevant. The Clause's self-evident design is to have the President's unilateral appointment last only until the Senate has "had an *opportunity* to act on the subject." 3 J. Story, Commentaries on the Constitution of the United States § 1551, p. 410 (1833) (emphasis added).

One way to avoid the linguistic incongruity of the majority's reading would be to read both "the Recess" and "the next Session" colloquially, so that the recess-appointment power would be activated during any temporary suspension of Senate proceedings, but appointments made pursuant to that power would last only until the beginning of the next suspension (which would end the next colloquial session). See, *e.g.,* Rappaport, The Original Meaning of the Recess Appointments Clause, 52 UCLA L. Rev. 1487, 1569 (2005) (hereinafter Rappaport, Original Meaning). That approach would be more linguistically defensible than the majority's. But it would not cure the most fundamental problem with giving "Recess" its colloquial, rather than its formal, meaning: Doing so leaves the recess-appointment power without a textually grounded principle limiting the time of its exercise.

The dictionary definitions of "recess" on which the majority relies provide no such principle. On the contrary,

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

they make clear that in colloquial usage, a recess could include *any* suspension of legislative business, no matter how short. See 2 S. Johnson, A Dictionary of the English Language 1602 (4th ed. 1773). Webster even provides a stark illustration: "[T]he house of representatives had a *recess* of half an hour." 2 Webster, *supra.* The notion that the Constitution empowers the President to make unilateral appointments every time the Senate takes a half-hour lunch break is so absurd as to be self-refuting. But that, in the majority's view, is what the text authorizes.

The boundlessness of the colloquial reading of "the Recess" thus refutes the majority's assertion that the Clause's "purpose" of "ensur[ing] the continued functioning of the Federal Government" demands that it apply to intra-session breaks as well as inter-session recesses. *Ante,* at 2561. The majority disregards another self-evident purpose of the Clause: to preserve the Senate's role in the appointment process—which the founding generation regarded as a critical protection against " 'despotism,' " *Freytag,* 501 U.S., at 883, 111 S.Ct. 2631—by clearly delineating the times when the President can appoint officers without the Senate's consent. Today's decision seriously undercuts *that* purpose. In doing so, it demonstrates the folly of interpreting constitutional provisions designed to establish "a structure of government that would protect liberty," *Bowsher,* 478 U.S., at 722, 106 S.Ct. 3181, on the narrow-minded assumption that their only purpose is to make the government run as efficiently as possible. "Convenience and efficiency," we have repeatedly **\*2598** recognized, "are not the primary objectives" of our constitutional framework. *Free Enterprise Fund,* 561 U.S., at 499, 130 S.Ct. 3138 (internal quotation marks omitted).

Relatedly, the majority contends that the Clause's supposed purpose of keeping the wheels of government turning demands that we interpret the Clause to maintain its relevance in light of the "new circumstance" of the Senate's taking an increasing number of intra-session breaks that exceed three days. *Ante,* at 2565. Even if I accepted the canard that courts can alter the Constitution's meaning to accommodate changed circumstances, I would be hard pressed to see the relevance of that notion here. The rise of intra-session adjournments has occurred in tandem with the development of modern forms of communication and transportation that mean the Senate "is always available" to consider nominations, even when its Members are temporarily dispersed for an intra-session break. Tr. of Oral Arg. 21 (GINSBURG, J.). The Recess Appointments Clause therefore is, or rather, should be, an anachronism—"essentially an historic relic, something whose original purpose has disappeared." *Id.,* at 19 (KAGAN, J.). The need it was designed to fill no longer exists, and its only remaining use is the ignoble one of enabling the President to circumvent the Senate's role in the appointment process. That does not justify "read[ing] it out of the Constitution" and, contra the majority, *ante,* at 2577, I would not do so; but neither would I distort the Clause's original meaning, as the majority does, to ensure a prominent role for the recess-appointment power in an era when its influence is far more pernicious than beneficial.

To avoid the absurd results that follow from its colloquial reading of "the Recess," the majority is forced to declare that some intra-session breaks—though undisputedly within the phrase's colloquial meaning—are simply "too short to trigger the Recess Appointments Clause." *Ante,* at 2567. But it identifies no textual basis whatsoever for limiting the length of "the Recess," nor does it point to any clear standard for determining how short is too short. It is inconceivable that the Framers would have left the circumstances in which the President could exercise such a significant and potentially dangerous power so utterly indeterminate. Other structural provisions of the Constitution that turn on duration are quite specific: Neither House can adjourn "for more than three days" without the other's consent. Art. I, § 5, cl. 4. The President must return a passed bill to Congress "within ten Days (Sundays excepted)," lest it become a law. *Id.,* § 7, cl. 2. Yet on the majority's view, when the first Senate considered taking a 1–month break, a 3–day weekend, or a half-hour siesta, it had no way of knowing whether the President would be constitutionally authorized to appoint officers in its absence. And any officers appointed in those circumstances would have served under a cloud, unable to determine with any degree of confidence whether their appointments were valid. [3]

[3]     The majority insists that "the most likely reason the Framers did not place a textual floor underneath the word 'recess' is that they did not foresee the *need* for one" because they did not anticipate that intra-session breaks "would become lengthier and more significant than inter-session ones." *Ante,* at 2566. The majority's logic escapes me. The Framers' supposed failure to anticipate "length[y]" intra-session breaks might

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 100 of 395

explain why (as I maintain) they did not bother to authorize recess appointments during intra-session breaks at all; but it cannot explain why (as the majority holds) they would have enacted a text that authorizes appointments during *all* intra-session breaks—even the short ones the majority says they *did* anticipate—without placing a temporal limitation on that power.

**\*2599** Fumbling for some textually grounded standard, the majority seizes on the Adjournments Clause, which bars either House from adjourning for more than three days without the other's consent. *Id.,* § 5, cl. 4. According to the majority, that clause establishes that a 3–day break is *always* "too short" to trigger the Recess Appointments Clause. *Ante,* at 2566. It goes without saying that nothing in the constitutional text supports that disposition. If (as the majority concludes) "the Recess" means a recess in the colloquial sense, then it necessarily includes breaks shorter than three days. And the fact that the Constitution includes a 3–day limit in one clause but omits it from the other weighs strongly against finding such a limit to be implicit in the clause in which it does not appear. In all events, the dramatically different contexts in which the two clauses operate make importing the 3–day limit from the Adjournments Clause into the Recess Appointments Clause "both arbitrary and mistaken." Rappaport, Original Meaning 1556.

And what about breaks longer than three days? The majority says that a break of four to nine days is "presumptively too short" but that the presumption may be rebutted in an "unusual circumstance," such as a "national catastrophe ... that renders the Senate unavailable but calls for an urgent response." *Ante,* at 2567. The majority must hope that the *in terrorem* effect of its "presumptively too short" pronouncement will deter future Presidents from making any recess appointments during 4–to–9–day breaks and thus save us from the absurd spectacle of unelected judges evaluating (after an evidentiary hearing?) whether an alleged "catastrophe" was sufficiently "urgent" to trigger the recess-appointment power. The majority also says that "political opposition in the Senate would not qualify as an unusual circumstance." *Ibid.* So if the Senate should refuse to confirm a nominee whom the President considers highly qualified; or even if it should refuse to confirm any nominee for an office, thinking the office better left vacant for the time being, the President's power would not be triggered during a 4–to–9–day break, no matter how "urgent" the President's perceived need for

the officer's assistance. (The majority protests that this "should go without saying—except that Justice SCALIA compels us to say it," *ibid.,* seemingly forgetting that the appointments at issue in this very case were justified on those grounds and that the Solicitor General has asked us to view the recess-appointment power as a "safety valve" against Senatorial "intransigence." Tr. of Oral Arg. 21.)

As for breaks of 10 or more days: We are presumably to infer that such breaks do not trigger any "presumpt[ion]" against recess appointments, but does that mean the President has an utterly free hand? Or can litigants seek invalidation of an appointment made during a 10–day break by pointing to an absence of "unusual" or "urgent" circumstances necessitating an immediate appointment, albeit without the aid of a "presumpt[ion]" in their favor? Or, to put the question as it will present itself to lawyers in the Executive Branch: Can the President make an appointment during a 10–day break simply to overcome "political opposition in the Senate" despite the absence of any "national catastrophe," even though it "go[es] without saying" that he cannot do so during a 9–day break? Who knows? The majority does not say, and neither does the Constitution. [4]

[4]    The majority erroneously suggests that the "lack of a textual floor raises a problem that plagues" both interpretations of "the Recess." *Ante,* at 2566. Not so. If the Clause is given its plain meaning, the President cannot make recess appointments during the session but can make recess appointments during any break *between* sessions, no matter how short. Contra the majority, that is not a "problem." True, the recess-appointment power applies even during very short inter-session breaks. But inter-session breaks typically occur at most a few times a year, and the recess-appointment power is of limited utility during very short inter-session breaks since, as explained below, the President can fill only those vacancies that arise during the break. See Part III, *infra.* Of course, as the Senate Judiciary Committee has argued, the break must be actual and not "constructive"; the Senate must adjourn for some measurable period of time between the two sessions. See *infra,* at 2602 – 2603. But the requirement that there actually *be* a recess does not involve anywhere near the level of indeterminacy entailed by the majority's requirement that the recess be *long enough* (or the circumstances unusual enough), as determined by a court, to trigger the recess-appointment power.

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

**\*2600** Even if the many questions raised by the majority's failure to articulate a standard could be answered, a larger question would remain: If the Constitution's text empowers the President to make appointments during any break in the Senate's proceedings, by what right does the majority subject the President's exercise of that power to vague, court-crafted limitations with no textual basis? The majority claims its temporal guideposts are informed by executive practice, but a President's self-restraint cannot "bind his successors by diminishing their powers." *Free Enterprise Fund,* 561 U.S., at 497, 130 S.Ct. 3138; cf. *Clinton v. Jones,* 520 U.S. 681, 718, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) (BREYER, J., concurring in judgment) ("voluntary actions" by past Presidents "tel[l] us little about what the Constitution commands").

An interpretation that calls for this kind of judicial adventurism cannot be correct. Indeed, if the Clause really did use "Recess" in its colloquial sense, then there would be no "judicially discoverable and manageable standard for resolving" whether a particular break was long enough to trigger the recess-appointment power, making that a nonjusticiable political question. *Zivotofsky,* 566 U.S., at ——, 132 S.Ct., at 1427 (internal quotation marks omitted).

### B. Historical Practice

For the foregoing reasons, the Constitution's text and structure unambiguously refute the majority's freewheeling interpretation of "the Recess." It is not plausible that the Constitution uses that term in a sense that authorizes the President to make unilateral appointments during *any* break in Senate proceedings, subject only to hazy, atextual limits crafted by this Court centuries after ratification. The majority, however, insists that history "offers strong support" for its interpretation. *Ante,* at 2561. The historical practice of the political branches is, of course, irrelevant when the Constitution is clear. But even if the Constitution were thought ambiguous on this point, history does not support the majority's interpretation.

### 1. 1789 to 1866

To begin, the majority dismisses the 78 years of history from the founding through 1866 as "not helpful" because

during that time Congress took hardly any "significant" intra-session breaks, by which the majority evidently means breaks longer than three days. *Ibid.* (citing table in Appendix A, which does not include breaks of three or fewer days). In fact, Congress took 11 intra-session breaks of more than three days during that time, see Congressional Directory 524–527, and it appears Presidents made recess appointments during none of them.

**\*2601** More importantly, during those eight decades, Congress must have taken thousands of breaks that were three days or shorter. On the majority's reading, every one of those breaks would have been within the Clause's text —the majority's newly minted limitation not yet having been announced. Yet there is no record of anyone, ever, having so much as *mentioned the possibility* that the recess-appointment power was activated during those breaks. That would be surprising indeed if the text meant what the majority thinks it means. Cf. *Printz v. United States,* 521 U.S. 898, 907–908, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

### 2. 1867 and 1868

The first intra-session recess appointments in our history almost certainly were made by President Andrew Johnson in 1867 and 1868.[5] That was, of course, a period of dramatic conflict between the Executive and Congress that saw the first-ever impeachment of a sitting President. The Solicitor General counts 57 intra-session recess appointments during those two years. App. to Brief for Petitioner 1a–9a. But the precise nature and historical understanding of many of those appointments is subject to debate. See, *e.g.,* Brief for Constitutional Law Scholars as *Amici Curiae* 23–24; Rappaport, Nonoriginalism 27–33. It seems likely that at least 36 of the 57 appointments were made with the understanding that they took place during a recess *between sessions*. See *id.,* at 27–31.

[5]  The majority does not contend otherwise. The Solicitor General claims that President Lincoln appointed a handful of brigadier generals during intra-session breaks in 1862 and 1863, but he does not include those appointments in his list of known intra-session recess appointments. Compare Brief for Petitioner 22 with App. to Brief for Petitioner 1a. Noel Canning convincingly argues that the generals were not given recess appointments

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 102 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

but only unofficial "acting appointments" for which they received no commissions. Brief for Respondent Noel Canning 25; see Rappaport, Why Nonoriginalism Does Not Justify Departing from the Original Meaning of the Recess Appointments Clause (manuscript, at 27, n. 79) (hereinafter Rappaport, Nonoriginalism), online at http://papers.ssrn. com/ sol3/papers.cfm?abstract_id=2374563 (all Internet materials as visited June 24, 2014, and available in the Clerk of Court's case file).

As for the remainder, the historical record reveals nothing about how they were justified, if at all. There is no indication that Johnson's Attorney General or anyone else considered at the time whether those appointments were made between or during formal legislative sessions or, if the latter, how they could be squared with the constitutional text. The majority drives that point home by citing a judicial opinion that upheld one of the appointments nearly two decades later with no analysis of the question presented here. See *ante,* at 2562 (citing *Gould v. United States,* 19 Ct.Cl. 593 (1884)). Johnson's intra-session appointments were disavowed by the first Attorney General to address that question, see *infra,* at 2602, and were not followed as precedent by the Executive Branch for more than 50 years, see *infra,* at 2603. Thus, the relevance of those appointments to our constitutional inquiry is severely limited. Cf. Brief for Political Scientists and Historians as *Amici Curiae* 21 (Johnson's appointments "should be viewed as anomalies" that were "*sui generis* in the first 130 years of the Republic").

### 3. 1869 to 1920

More than half a century went by before any other President made an intra-session recess appointment, and there is strong reason to think that during that period neither the Executive nor the Senate believed such a power existed. For one thing, the Senate adjourned for more than 3 days 45 times during that period, and 43 **\*2602** of those adjournments exceeded 10 days (and thus would not even be subject to the majority's "presumption" against the availability of recess appointments). See Congressional Directory 527–529. Yet there is no evidence that a single appointment was made during any of those adjournments or that any President before the 20th century even considered making such appointments.

In 1901 Philander Knox, the first Attorney General known to have opined on the question, explicitly stated that the recess-appointment power was limited to the period between formal sessions. 23 Op. Atty. Gen. 599. Knox advised President Theodore Roosevelt that he could not appoint an appraiser of merchandise during an intra-session adjournment. He explained:

> "[T]he Constitution and laws make it clear that in our legislative practice an adjournment during a session of Congress means a merely temporary suspension of business from day to day ... whereas *the recess* means the period after the final adjournment of Congress for the session, and before the next session begins.... It is this period following the final adjournment for the session which is *the recess* during which the President has power to fill vacancies.... Any intermediate temporary adjournment is not such recess, although it may be *a* recess in the general and ordinary use of that term." *Id.,* at 601. [6]

[6]
> The majority dismisses Knox's opinion as overly formalistic because it "relied heavily upon the use of the word 'the' " in the phrase "the Recess." *Ante,* at 2563. It did not. As the passage quoted above makes clear, Knox was relying on the common understanding of what "the Recess" meant in the context of marking out legislative time.

Knox went on to observe that none of the "many elaborate opinions" of previous Attorneys General concerning the recess-appointment power had asserted that the power could be exercised "during a temporary adjournment of the Senate," rather than "during the recess of the Senate between two sessions of Congress." *Id.,* at 602. He acknowledged the contrary example furnished by Johnson's appointments in 1867 and 1868, but noted (with perhaps too much tact) that "[t]he public circumstances producing this state of affairs were unusual and involved results which should not be viewed as precedents." *Id.,* at 603.

That was where things stood when, in 1903, Roosevelt made a number of controversial recess appointments. At noon on December 7, the Senate moved seamlessly from a special session into a regular one scheduled to begin at that hour. See 37 Cong. Rec. 544; 38 Cong. Rec. 1. Roosevelt claimed to have made the appointments in a "constructive" recess between the two sessions. See Special Session Is Merged Into Regular, N.Y. Times, Dec.

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 103 of 395

8, 1903, p. 1. He and his allies in the Senate justified the appointments on the theory that "at the moment the gavel falls to summon the regular session into being there is an infinitesimal fraction of a second, which is the recess between the two sessions." Extra Session Muddle, N.Y. Times, Dec. 7, 1903, p. 3. In 1905, the Senate Judiciary Committee published a report criticizing the appointments on the ground that "the Constitution means a real recess, not a constructive one." S.Rep. No. 4389, 58th Cong., 3d Sess., p. 4. The report explained that the recess is "the period of time when the Senate is not sitting in regular or extraordinary session ... when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." *Id.,* at 2 (emphasis deleted).

**\*2603** The majority seeks support in this episode, claiming that the Judiciary Committee embraced a "broad and functional definition of 'recess' " consistent with the one the majority adopts. *Ante,* at 2564. On the contrary, the episode powerfully *refutes* the majority's theory. Roosevelt's legal justification for his appointments was extremely aggressive, but even he recognized that "the Recess of the Senate" could take place only between formal sessions. If the majority's view of the Clause had been considered plausible, Roosevelt could have strengthened his position considerably by making the appointments during an intra-session break of a few days, or at least a few hours. (Just 10 minutes after the new session began on December 7, the Senate took "a recess for one hour." 38 Cong. Rec. 2.) That he instead strained to declare a dubious *inter-session* recess of an "infinitesimal fraction of a second" is powerful evidence that the majority's view of "the Recess" was not taken seriously even as late as the beginning of the 20th century.

Yet the majority contends that "to the extent that the Senate or a Senate committee has expressed a view, that view has favored a functional definition of 'recess' [that] encompasses intra-session recesses." *Ante,* at 2563. It rests that contention entirely on the 1905 Judiciary Committee Report. This distorts what the committee said when it denied Roosevelt's claim that there had been a recess. If someone avers that a catfish is a cat, and I respond by pointing out that a catfish lives in water and does not have four legs, I have not endorsed the proposition that every land-dwelling quadruped is a cat. Likewise, when

the Judiciary Committee explained that an instantaneous transition from one session to another is not a recess because the Senate is never absent, it did not suggest that the Senate's absence is enough to create a recess. To assume otherwise, as the majority does, is to commit the fallacy of the inverse (otherwise known as denying the antecedent): the incorrect assumption that if P implies Q, then not-P implies not-Q. Contrary to that fallacious assumption, the Judiciary Committee surely believed, consistent with the Executive's clear position at the time, that "the Recess" was limited to (actual, not constructive) breaks *between sessions*.

### 4. 1921 to the Present

It is necessary to skip over the first 13 decades of our Nation's history in order to find a Presidential legal adviser arguably embracing the majority's interpretation of "the Recess." In 1921 President Harding's Attorney General, Harry Daugherty, advised Harding that he could make recess appointments while the Senate stood adjourned for 28 days during the session because "the term 'recess' must be given a practical construction." 33 Op. Atty. Gen. 20, 25. Daugherty acknowledged Knox's 1901 opinion to the contrary, *id.,* at 21, but he (committing the same fallacy as today's majority) thought the 1905 Judiciary Committee report had come to the opposite conclusion, *id.,* at 23–24. He also recognized the fundamental flaw in this interpretation: that it would be impossible to "accurately dra[w]" a line between intra-session breaks that constitute "the Recess" and those that do not. *Id.,* at 25. But he thought the absence of a standard gave the President "discretion to determine when there is a real and genuine recess." *Ibid.* While a "palpable abuse of discretion might subject his appointment to review," Daugherty thought that "[e]very presumption [should] be indulged in favor of the validity of whatever action he may take." *Ibid.* [7]

[7]    I say Daugherty "arguably" embraced the majority's view because he may have been endorsing, not the majority's position, but the intermediate view that reads both "the Recess" and "the next Session" in functional terms, so that intra-session appointments would last only until the next intra-session break. See *supra,* at 2597; Rappaport, Nonoriginalism 34–35.

**\*2604** Only after Daugherty's opinion did the flow of intra-session recess appointments start, and for several

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 104 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

years it was little more than a trickle. The Solicitor General has identified 22 such appointments made by Presidents Harding, Coolidge, Hoover, and Franklin Roosevelt between 1921 and 1944. App. to Brief for Petitioner 9a–12a. Intra-session recess appointments experienced a brief heyday after World War II, with President Truman making about 150 such appointments to civilian positions and several thousand to military posts from 1945 through 1950. *Id.,* at 12a–27a. (The majority's impressive-sounding claim that "Presidents have made thousands of intra-session recess appointments," *ante,* at 2562, depends entirely on post-war military appointments that Truman made in just two years, 1947 and 1948.) President Eisenhower made only 43 intra-session recess appointments, *id.,* at 27a–30a, after which the practice sank back into relative obscurity. Presidents Kennedy, Lyndon Johnson, and Ford made none, while Nixon made just 7. *Id.,* at 30a–31a. The practice rose again in the last decades of the 20th century: President Carter made 17 intra-session recess appointments, Reagan 72, George H.W. Bush 37, Clinton 53, and George W. Bush 135. *Id.,* at 31a–61a. When the Solicitor General filed his brief, President Obama had made 26. *Id.,* at 62a–64a. Even excluding Truman's military appointments, roughly 90 percent of all the intra-session recess appointments in our history have been made since 1945.

Legal advisers in the Executive Branch during this period typically endorsed the President's authority to make intra-session recess appointments by citing Daugherty's opinion with little or no additional analysis. See, *e.g.,* 20 Opinions of Office of Legal Counsel (Op. OLC) 124, 161 (1996) (finding the question to have been "settled within the executive branch" by Daugherty's "often-cited opinion"). The majority's contention that "opinions of Presidential legal advisers ... are nearly unanimous in determining that the Clause authorizes [intra-session recess] appointments," *ante,* at 2562, is thus true but misleading: No Presidential legal adviser approved that practice before 1921, and subsequent approvals have rested more on precedent than on independent examination.

The majority is correct that during this period, the Senate "as a body" did not formally repudiate the emerging executive practice. *Ante,* at 2563. And on one occasion, Comptroller General Lindsay Warren cited Daugherty's opinion as representing "the accepted view" on the question, 28 Comp. Gen. 30, 34 (1948), although there is no evidence he consulted any Senators or that his statement reflected their views. But the rise of intra-session recess appointments in the latter half of the 20th century drew sharp criticism from a number of Senators on both sides of the aisle. At first, their objections focused on the length of the intra-session breaks at issue. See, *e.g.,* 130 Cong. Rec. 22774–22776 (1984) (Sen. Sarbanes) (decrying recess appointment during a 3–week intra-session adjournment as "a circumvention of the Senate confirmation power"); *id.,* at 23235 (resolution offered by Sen. Byrd, with 39 cosponsors, urging that no recess appointments occur during intra-session breaks of fewer than 30 days).

Later, many Senators sought to end intra-session recess appointments altogether. In 1993, the Senate Legal Counsel **\*2605** prepared a brief to be filed on behalf of the Senate in *Mackie v. Clinton,* 827 F.Supp. 56 (D.D.C.1993), vacated in part as moot, 1994 WL 163761 (C.A.D.C.1994) (*per curiam* ), but "Republican opposition" blocked the filing. 139 Cong. Rec. 15266– 15267. The brief argued that "the recess[-appointment] power is limited to Congress' annual recess between sessions," that no contrary executive practice "of any appreciable magnitude" had existed before "the past fifty years," and that the Senate had not "acquiesced in this steady expansion of presidential power." *Id.,* at 15268, 15270. It explained that some Senators had limited their objections to shorter intra-session breaks out of a desire "to coexist with the Executive" but that "the Executive's subsequent, steady chipping away at the length of recess sufficient for making recess appointments ha[d] demonstrated the need to return to the Framers' original intent and limit the power to intersession adjournments." *Id.,* at 15267, 15272. Senator Kennedy reiterated that position in a brief to this Court in 2004. Brief for Sen. Edward M. Kennedy as *Amicus Curiae* in *Franklin v. United States,* O.T. 2004, No. 04–5858, p. 5. Today the partisan tables are turned, and that position is urged on us by the Senate's Republican Members. See Brief for Sen. McConnell et al. as *Amici Curiae* 26.

\* \* \*

What does all this amount to? In short: Intra-session recess appointments were virtually unheard of for the first 130 years of the Republic, were deemed unconstitutional by the first Attorney General to address them, were not openly defended by the Executive until 1921, were not

made in significant numbers until after World War II, and have been repeatedly criticized as unconstitutional by Senators of both parties. It is astonishing for the majority to assert that this history lends "strong support," *ante,* at 2561, to its interpretation of the Recess Appointments Clause. And the majority's contention that recent executive practice in this area merits deference because the Senate has not done more to oppose it is utterly divorced from our precedent. "The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic," *Freytag,* 501 U.S., at 880, 111 S.Ct. 2631, and the Senate could not give away those protections even if it wanted to. See *Chadha,* 462 U.S., at 957–958, 103 S.Ct. 2764; *Clinton,* 524 U.S., at 451–452, 118 S.Ct. 2091 (KENNEDY, J., concurring).

Moreover, the majority's insistence that the Senate gainsay an executive practice "as a body" in order to prevent the Executive from acquiring power by adverse possession, *ante,* at 2563, will systematically favor the expansion of executive power at the expense of Congress. In any controversy between the political branches over a separation-of-powers question, staking out a position and defending it over time is far easier for the Executive Branch than for the Legislative Branch. See generally Bradley and Morrison, Historical Gloss and the Separation of Powers, 126 Harv. L. Rev. 411, 439–447 (2012). All Presidents have a high interest in expanding the powers of their office, since the more power the President can wield, the more effectively he can implement his political agenda; whereas individual Senators may have little interest in opposing Presidential encroachment on legislative prerogatives, especially when the encroacher is a President who is the leader of their own party. (The majority would not be able to point to a lack of "formal action" by the Senate "as a body" challenging intra-session recess appointments, *ante,* at 2563 – 2564, had the appointing President's party in the Senate not blocked such action on multiple occasions.) **\*2606** And when the President wants to assert a power and establish a precedent, he faces neither the collective-action problems nor the procedural inertia inherent in the legislative process. The majority's methodology thus all but guarantees the continuing aggrandizement of the Executive Branch.

## III. Pre–Recess Vacancies

The second question presented is whether vacancies that "happen during the Recess of the Senate," which the President is empowered to fill with recess appointments, are (a) vacancies that *arise* during the recess, or (b) all vacancies that *exist* during the recess, regardless of when they arose. I would hold that the recess-appointment power is limited to vacancies that arise during the recess in which they are filled, and I would hold that the appointments at issue here—which undisputedly filled pre-recess vacancies—are invalid for that reason as well as for the reason that they were made during the session. The Court's contrary conclusion is inconsistent with the Constitution's text and structure, and it further undermines the balance the Framers struck between Presidential and Senatorial power. Historical practice also fails to support the majority's conclusion on this issue.

### A. Plain Meaning

As the majority concedes, "the most natural meaning of 'happens' as applied to a 'vacancy' ... is that the vacancy 'happens' when it initially occurs." *Ante,* at 2567. The majority adds that this meaning is most natural "to a modern ear," *ibid.,* but it fails to show that founding-era ears heard it differently. "Happen" meant then, as it does now, "[t]o fall out; to chance; to come to pass." 1 Johnson, Dictionary of the English Language 913. Thus, a vacancy that *happened* during the Recess was most reasonably understood as one that *arose* during the recess. It was, of course, possible in certain contexts for the word "happen" to mean "happen to be" rather than "happen to occur," as in the idiom "it so happens." But that meaning is not at all natural when the subject is a vacancy, a state of affairs that comes into existence at a particular moment in time. [8]

[8]   Despite initially admitting that the text "does not naturally favor" its interpretation, the majority halfheartedly suggests that the " 'happen to be' " reading may be admissible when the subject, like "vacancy," denotes a "continuing state." *Ante,* at 2567 – 2568. That suggestion distorts ordinary English usage. It is indeed natural to say that an ongoing activity or event, like a war, a parade, or a financial crisis, is "happening" for as long as it continues. But the same is not true when the subject

is a settled state of affairs, like death, marriage, or vacancy, all of which "happen" when they come into being.

In any event, no reasonable reader would have understood the Recess Appointments Clause to use the word "happen" in the majority's "happen to be" sense, and thus to empower the President to fill all vacancies that might *exist* during a recess, regardless of when they arose. For one thing, the Clause's language would have been a surpassingly odd way of giving the President that power. The Clause easily could have been written to convey that meaning clearly: It could have referred to "all Vacancies that may exist during the Recess," or it could have omitted the qualifying phrase entirely and simply authorized the President to "fill up all Vacancies during the Recess." Given those readily available alternative phrasings, the reasonable reader might have wondered, why would any intelligent drafter intending the majority's reading have inserted the words "that may happen"—words that, as the majority admits, make the majority's desired reading awkward and unnatural, and that must be effectively **\*2607** read out of the Clause to achieve that reading?

For another thing, the majority's reading not only strains the Clause's language but distorts its constitutional role, which was meant to be subordinate. As Hamilton explained, appointment with the advice and consent of the Senate was to be "the general mode of appointing officers of the United States." The Federalist No. 67, at 455. The Senate's check on the President's appointment power was seen as vital because " 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag,* 501 U.S., at 883, 111 S.Ct. 2631. The unilateral power conferred on the President by the Recess Appointments Clause was therefore understood to be "nothing more than a supplement" to the "general method" of advice and consent. The Federalist No. 67, at 455.

If, however, the Clause had allowed the President to fill *all* pre-existing vacancies during the recess by granting commissions that would last throughout the following session, it would have been impossible to regard it—as the Framers plainly did—as a mere codicil to the Constitution's principal, power-sharing scheme for filling federal offices. On the majority's reading, the President would have had no need *ever* to seek the Senate's advice and consent for his appointments: Whenever

there was a fair prospect of the Senate's rejecting his preferred nominee, the President could have appointed that individual unilaterally during the recess, allowed the appointment to expire at the end of the next session, renewed the appointment the following day, and so on *ad infinitum.* (Circumvention would have been especially easy if, as the majority also concludes, the President was authorized to make such appointments during any intra-session break of more than a few days.) It is unthinkable that such an obvious means for the Executive to expand its power would have been overlooked during the ratification debates. [9]

[9]    The majority insists that "character and politics" will ordinarily prevent the President from circumventing the Senate, and that the Senate has "political resources" to respond to attempts at circumvention. *Ante,* at 2569. Neither character nor politics prevented Theodore Roosevelt from proclaiming a fictitious recess lasting an "infinitesimal fraction of a second." In any event, the Constitution does not entrust the Senate's role in the appointments process to the vagaries of character and politics. See, *e.g., Freytag v. Commissioner,* 501 U.S. 868, 879–880, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991).

The original understanding of the Clause was consistent with what the majority concedes is the text's "most natural meaning." *Ante,* at 2567. In 1792, Attorney General Edmund Randolph, who had been a leading member of the Constitutional Convention, provided the Executive Branch's first formal interpretation of the Clause. He advised President Washington that the Constitution did not authorize a recess appointment to fill the office of Chief Coiner of the United States Mint, which had been created by Congress on April 2, 1792, during the Senate's session. Randolph wrote: "[I]s it a vacancy which has *happened* during the recess of the Senate? It is now the same and no other vacancy, than that, which existed on the 2nd. of April 1792. It commenced therefore on that day or may be said to have *happened* on that day." Opinion on Recess Appointments (July 7, 1792), in 24 Papers of Thomas Jefferson 165–166 (J. Catanzariti ed. 1990). Randolph added that his interpretation was the most congruent with the Constitution's structure, which made the recess-appointment power "an exception to the general participation of the Senate." *Ibid.* (footnote omitted).

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 107 of 395

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)
199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

**\*2608** President John Adams' Attorney General, Charles Lee, was in agreement. See Letter to George Washington (July 7, 1796) (the President may "fill for a limited time an old office *become vacant* during [the] recess" (emphasis added)), online at http://founders.archives. gov/documents/Washington/99–01–02–00702; Letter from James McHenry to John Adams (May 7, 1799) (hereinafter 1799 McHenry Letter) (conveying Lee's advice that certain offices were " 'vacanc[ies] happening during the session, which the President cannot fill, during the recess, by the powers vested in him by the constitution' "), online at http://wardepartmentpapers.org/document.php?id=31766. [10] One of the most prominent early academic commenters on the Constitution read the Clause the same way. See 1 St. George Tucker, Blackstone's Commentaries, App. 342–343 (1803) (assuming the President could appoint during the recess only if "the office became vacant during the recess").

[10]     The majority does not deny that Lee took those positions, but it claims he also "later informed [Thomas] Jefferson that, in the Adams administration, 'whenever an office became vacant, so short a time before Congress rose, as not to give an opportunity of enquiring for a proper character, they let it lie always till recess.' " *Ante,* at 2570 (quoting Letter from Jefferson to Wilson Cary Nicholas (Jan. 26, 1802), in 36 Papers of Thomas Jefferson 433 (B. Oberg ed. 2009) (hereinafter 1802 Jefferson Letter)). Assuming Lee in fact made the statement attributed to him by Jefferson, and further assuming that Lee endorsed the constitutionality of the practice described in that statement (which Jefferson does not say), that practice could only have been regarded as a pragmatic exception to the general view of the Clause that Lee, like Randolph, espoused. And the practice must not have been extensive, since the Solicitor General has been unable to identify even a single appointment made by Adams that filled a pre-recess vacancy. See *infra,* at 2610 – 2611.

Early Congresses seem to have shared Randolph's and Lee's view. A statute passed by the First Congress authorized the President to appoint customs inspectors "with the advice and consent of the Senate" and provided that "if the appointment ... shall not be made during the present session of Congress, the President ... is hereby empowered to make such appointments during the recess of the Senate, by granting commissions which shall expire at the end of their next session." Act of Mar. 3, 1791,

§ 4, 1 Stat. 200. That authorization would have been superfluous if the Recess Appointments Clause had been understood to apply to pre-existing vacancies. We have recognized that an action taken by the First Congress "provides 'contemporaneous and weighty evidence' of the Constitution's meaning." *Bowsher,* 478 U.S., at 723–724, 106 S.Ct. 3181. And other statutes passed in the early years of the Republic contained similar authorizations. See App. to Brief for Respondent Noel Canning 1a–17a. [11]

[11]     The majority suggests that these statutes may have reflected, not a belief that the recess-appointment power was limited to vacancies arising during the recess, but a "separate" belief that the power could not be used for "new offices" created by Congress and not previously filled. *Ante,* at 2572. But the latter view (which the majority does not endorse) was inseparably linked with the former (which the majority rejects), as is made clear by the very source the majority cites. See Letter from Alexander Hamilton to James McHenry (May 3, 1799), in 23 Papers of Alexander Hamilton 94 (H. Syrett ed. 1976) ("[T]he power to fill the vacancy is not the power to make an original appointment. The phrase 'Which may have happened' serves to confirm this construction.... [I]ndependent of the authority of a special law, the President cannot fill a vacancy which happens during a session of the Senate"); see also 2 Op. Atty. Gen., at 334 ("If the vacancy exist during the session of the Senate, as in the first creation of an office by law, it has been held that the President cannot appoint during the recess, unless he is specially authorized so to do by law"); W. Rawle, A View of the Constitution of the United States of America 163 (2d ed. 1829) (reprint 2009) ("It has been held by [the Senate], that if new offices are created by congress, the president cannot, after the adjournment of the senate, make appointments to fill them. The vacancies do not *happen* during the recess of the senate").

**\*2609** Also illuminating is the way the Third Congress interpreted the Constitution's Senate Vacancies Clause, which uses language similar to that of the Recess Appointments Clause. Before the passage of the Seventeenth Amendment, the Constitution provided that "if Vacancies [in the Senate] happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature." Art. I, § 3, cl. 2. Senator George Read of Delaware

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 108 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

resigned in December 1793; the state legislature met in January and February 1794; and the Governor appointed Kensey Johns to fill the seat in March 1794. The Senate refused to seat Johns, resolving that he was "not entitled to a seat in the Senate of the United States; a session of the Legislature of the said State having intervened, between the resignation ... and the appointment." 4 Annals of Cong. 77–78 (1794). It is thus clear that the phrase "happen ... during the Recess" in the Senate Vacancies Clause was understood to refer to vacancies that *arose,* not merely existed, during the recess in which the appointment was made. It is not apparent why the nearly identical language of the Recess Appointments Clause would have been understood differently.

The majority, however, relies heavily on a contrary account of the Clause given by Attorney General William Wirt in 1823. See 1 Op. Atty. Gen. 631. Wirt notably began—as does the majority—by acknowledging that his predecessors' reading was "most accordant with the letter of the constitution." *Id.,* at 632. But he thought the "most natural" reading had to be rejected because it would interfere with the "substantial purpose of the constitution," namely, "keep[ing] ... offices filled." *Id.,* at 631–632. He was chiefly concerned that giving the Clause its plain meaning would produce "embarrassing inconveniences" if a distant office were to become vacant during the Senate's session, but news of the vacancy were not to reach the President until the recess. *Id.,* at 632, 634. The majority fully embraces Wirt's reasoning. *Ante,* at 2567 – 2569.

Wirt's argument is doubly flawed. To begin, the Constitution provides ample means, short of rewriting its text, for dealing with the hypothetical dilemma Wirt posed. Congress can authorize "acting" officers to perform the duties associated with a temporarily vacant office—and has done that, in one form or another, since 1792. See 5 U.S.C. § 3345; Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281; 705 F.3d, at 511; Rappaport, Original Meaning 1514–1517. And on "extraordinary Occasions" the President can call the Senate back into session to consider a nomination. Art. II, § 3. If the Framers had thought those options insufficient and preferred to authorize the President to make recess appointments to fill vacancies arising late in the session, they would have known how to do so. Massachusetts, for example, had authorized its Governor to make certain recess appointments "in case a vacancy shall happen ... in the recess of the General Court [*i.e.,* the state legislature], *or at so late a period in any session of the same Court, that the vacancy ... shall not be supplied in the same session thereof.*" 1783 Mass. Acts ch. 12, in Acts and Laws of the Commonwealth of Massachusetts 523 (1890) (emphasis added).

The majority protests that acting appointments, unlike recess appointments, **\*2610** are an "inadequate" solution to Wirt's hypothetical dilemma because acting officers "may have less authority than Presidential appointments." *Ante,* at 2569. It cites an OLC opinion which states that "an acting officer ... is frequently considered merely a caretaker without a mandate to take far-reaching measures." 6 Op. OLC 119, 121 (1982). But just a few lines later, the majority says that "the lack of Senate approval ... may diminish the recess appointee's ability, as a practical matter, to get a controversial job done." *Ante,* at 2569. The majority does not explain why an acting officer would have less authority "as a practical matter" than a recess appointee. The majority also objects that requiring the President to rely on acting officers would "lessen the President's ability to staff the Executive Branch with people of his own choosing," *ante,* at 2569 —a surprising charge, since that is the very purpose of the Constitution's advice-and-consent requirement. As for special sessions, the majority thinks it a sufficient answer to say that they are "burdensome," *ibid.,* an observation that fails to distinguish them from many procedures required by our structural Constitution.

More fundamentally, Wirt and the majority are mistaken to say that the Constitution's " 'substantial purpose' " is to " 'keep ... offices filled.' " *Ibid.* (quoting 1 Op. Atty. Gen., at 632). The Constitution is not a road map for maximally efficient government, but a system of "carefully crafted restraints" designed to "protect the people from the improvident exercise of power." *Chadha,* 462 U.S., at 957, 959, 103 S.Ct. 2764. Wirt's and the majority's *argumentum ab inconvenienti* thus proves far too much. There are many circumstances other than a vacancy that can produce similar inconveniences if they arise late in the session: For example, a natural disaster might occur to which the Executive cannot respond effectively without a supplemental appropriation. But in those circumstances, the Constitution would not permit the President to appropriate funds himself. See Art. I, § 9, cl. 7. Congress must either anticipate such eventualities or be prepared to be haled back into session.

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)
199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 109 of 395

The troublesome need to do so is not a bug to be fixed by this Court, but a calculated feature of the constitutional framework. As we have recognized, while the Constitution's government-structuring provisions can seem "clumsy" and "inefficient," they reflect "hard choices ... consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked." *Chadha, supra,* at 959, 103 S.Ct. 2764.

### B. Historical Practice

For the reasons just given, it is clear that the Constitution authorizes the President to fill unilaterally only those vacancies that arise during a recess, not every vacancy that happens to exist during a recess. Again, however, the majority says "[h]istorical practice" requires the broader interpretation. *Ante,* at 2569. And again the majority is mistaken. Even if the Constitution were wrongly thought to be ambiguous on this point, a fair recounting of the relevant history does not support the majority's interpretation.

### 1. 1789 to 1822

The majority correctly admits that there is "no undisputed record of Presidents George Washington, John Adams, or Thomas Jefferson" using a recess appointment to fill a pre-recess vacancy. *Ibid.* That is not surprising in light of Randolph's early conclusion that doing so would be unconstitutional. Adams on one occasion contemplated filling pre-recess vacancies but was dissuaded by, among **\*2611** others, Attorney General Lee, who said the Constitution did not permit him to do so. See 1799 McHenry Letter. [12] And the Solicitor General does not allege that even a single appointment made by Adams filled a pre-recess vacancy. Jefferson, too, at one point thought the Clause "susceptible of" the majority's reading, 1802 Jefferson Letter, but his administration, like Adams', appears never to have adopted that reading.

[12]   See also Letter from Adams to James McHenry (April 16, 1799), in 8 Works of John Adams 632 (C. Adams ed. 1853) (proposing the appointments); Letter from Adams to McHenry (May 16, 1799), in *id.,* at 647 (agreeing to "suspend [the appointments] for the present, perhaps till the meeting of the Senate"). Before advising Adams, McHenry also consulted Alexander Hamilton, who agreed that the appointments would be unlawful. See Letter from McHenry to Hamilton (Apr. 26, 1799), in 23 Papers of Alexander Hamilton, at 69, 70 ("It would seem that, under this Constitutional power, the President cannot alone ... fill up vacancies that may happen during a session of the senate"); Letter from Hamilton to McHenry (May 3, 1799), in *id.,* at 94 ("It is clear, that independent of the authority of a special law, the President cannot fill a vacancy which happens during a session of the Senate").

James Madison's administration seems to have rejected the majority's reading as well. In 1814, Madison wanted to appoint Andrew Jackson to a vacant major-generalship in the Army during the Senate's recess, but he accepted, without contradiction or reservation, his Secretary of War's advice that he lacked the power to do so because the post's previous occupant had resigned before the recess. He therefore ordered that Jackson be given a "brevet of Major General," *i.e.,* a warrant conferring the nominal rank without the salary thereof. Letter from John Armstrong to Madison (May 14, 1814); Letter from Madison to Armstrong (May 17, 1814). In conveying the brevet, Madison's Secretary of War explained to Jackson that " '[t]he vacancy produced by General Hampton's resignation, not having been filled during the late session of the Senate, cannot be supplied constitutionally, during the recess.' " Letter from Armstrong to Jackson (May 22, 1814). A week later, when Madison learned that a different major general had resigned *during* the recess, he thought that development would enable him to appoint Jackson "at once." Letter from Madison to Armstrong (May 24, 1814); see Letter from Armstrong to Madison (May 20, 1814) (reporting the resignation). [13]

[13]   All the letters cited in this paragraph are available online courtesy of the Library of Congress. See James Madison Papers, http:// memory.loc.gov/ammem/ collections/madison_papers.

The majority discounts that evidence of an occasion when Madison and his advisers actually considered the precise constitutional question presented here. It does so apparently because Madison, in acting on the advice he was given without questioning the interpretation of the recess-appointment power that was offered as the reason for that advice, did not explicitly say "I agree." The majority prefers to focus on five appointments by Madison, unremarked by anyone at the time, that

"the evidence suggests" filled pre-recess vacancies. *Ante,* at 2570. Even if the majority is correct about those appointments, there is no indication that any thought was given to their constitutionality, either within or outside the Executive Branch. A handful of appointments that appear to contravene the written opinions of Attorneys General Randolph and Lee and the written evidence of Madison's own beliefs about what the Constitution authorized, and that lack any contemporaneous explanation, are not convincing evidence of the Constitution's original meaning. [14]

[14]    The same can be said of the Solicitor General's claim to have found two recess appointments by Washington and four by Jefferson that filled pre-existing vacancies. Noel Canning disputes that claim, pointing out that Washington told the Senate the offices in question had " 'fallen vacant during the recess' " and arguing that Jefferson may have removed the incumbent officers during the recess. Brief for Respondent Noel Canning 44. Suffice it to say that if either Washington or Jefferson had adopted the broader reading, against the written advice of Attorneys General Randolph and Lee, one would expect a good deal more evidence of that fact.

**\*2612**  If Madison or his predecessors made any appointments in reliance on the broader reading, those appointments must have escaped general notice. In 1822, the Senate Committee on Military Affairs declared that the President had "no power to make [appointments] in the recess" where "the vacancies did not *happen* in the recess." 38 Annals of Cong. 500. The Committee believed its construction had been "heretofore observed" and that "no instance ha[d] before occurred ... where the President ha[d] felt himself authorized to fill such vacancies, without special authority by law." *Ibid.*; see also T. Sergeant, Constitutional Law 373 (2d ed. 1830) ("[I]t seemed distinctly understood to be the sense of the senate, that [it] is only in offices that become vacant during the recess, that the president is authorised to exercise the right of appointing").

### 2. 1823 to 1862

The Executive Branch did not openly depart from Randolph and Lee's interpretation until 1823, when Wirt issued the opinion discussed earlier. Even within that branch, Wirt's view was hotly contested: William Crawford, Monroe's Treasury Secretary, argued "with great pertinacity" that the Clause authorized the President to fill only "vacancies which happen during the recess" and not those "which happen while Congress are in session." 5 Memoirs of John Quincy Adams 486–487 (C. Adams ed. 1875). Wirt's analysis nonetheless gained ground in the Executive Branch over the next four decades; but it did so slowly and fitfully.

In 1830, Attorney General Berrien disagreed with Wirt when he wrote that "[i]f the vacancy exist during the session of the Senate, ... the President cannot appoint during the recess." 2 Op. Atty. Gen. 333, 334. Two years later, Attorney General Taney endorsed Wirt's view although doing so was, as he acknowledged, unnecessary to resolve the issue before him: whether the President could, during the recess, fill a vacancy resulting from the expiration of a prior recess appointment at the end of the Senate's session. 2 Op. Atty Gen. 525, 528 (1832). Addressing the same issue in 1841, Attorney General Legare appeared to believe the dispositive question was whether the office could be said to have "becom[e] vacant" during the recess. 3 Op. Atty. Gen. 673, 674. And in 1845, Attorney General Mason thought it "well established" that "[i]f vacancies are known to exist during the session of the Senate, and nominations are not then made, they cannot be filled by executive appointments in the recess." 4 Op. Atty. Gen. 361, 363. [15]

[15]    A year later Mason, like Taney and Legaré before him, concluded that when a recess appointment expired at the end of the Senate's session, the President could fill the resulting vacancy during the ensuing recess. In reaching that conclusion, Mason reiterated that the recess-appointment power "depends on the happening of vacancies when the Senate is not in session" and said the vacancy at issue was "within the meaning of" the Clause because the happening of the vacancy and the termination of the session had "occurred *eo instanti.*" 4 Op. Atty. Gen. 523, 526–527 (1846).

**\*2613**  The tide seemed to turn—as far as the Executive Branch was concerned—in the mid–19th century: Attorney General Cushing in 1855 and Attorney General Bates in 1862 both treated Wirt's position as settled without subjecting it to additional analysis. 7 Op. Atty. Gen. 186, 223, 10 Op. Atty. Gen. 356. Bates, however, entertained "serious doubts" about its validity. *Ibid.* And as one 19th-century court shrewdly observed in

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

rejecting Wirt's interpretation, the frequency with which Attorneys General during this period were called upon to opine on the question likely "indicate [s] that no settled administrative usage had been ... established." *In re District Attorney of United States,* 7 F.Cas. 731, 738 (No. 3,924) (D.C.Pa.1868). The Solicitor General identifies only 10 recess appointments made between 1823 and 1863 that filled pre-recess vacancies—about one every four years. App. to Brief for Petitioner 68a–71a. That is hardly an impressive number, and most of the appointments were to minor offices (like Deputy Postmaster for Janesville, Wisconsin, *id.,* at 70a) unlikely to have gotten the Senate's attention. But the Senate did notice when, in 1862, President Lincoln recess-appointed David Davis to fill a seat on this Court that had become vacant before the recess, *id.,* at 71a—and it reacted with vigor.

### 3. 1863 to 1939

Two months after Lincoln's recess appointment of Davis, the Senate directed the Judiciary Committee "to inquire whether the practice ... of appointing officers to fill vacancies which have not occurred during the recess of Congress, but which existed at the preceding session of Congress, is in accordance with the Constitution; and if not, what remedy shall be applied." Cong. Globe, 37th Cong., 3d Sess., 100 (1862). The committee responded with a report denouncing Wirt's interpretation of the Clause as "artificial," "forced and unnatural," "unfounded," and a "perversion of language." S.Rep. No. 80, 37th Cong., 3d Sess., pp. 4–6 (1863). Because the majority all but ignores this evidence of the Senate's views, it is worth quoting the report at some length:

> "When must the vacancy ... accrue or spring into existence? May it begin during the session of the Senate, or must it have its beginning during the recess? We think the language too clear to admit of reasonable doubt, and that, upon principles of just construction, this period must have its inceptive point after one session has closed and before another session has begun....

. . . . .

> "We ... dissent from the construction implied by the substituted reading, 'happened to exist,' for the word 'happen' in the clause.... [I]f a vacancy once exists, it has in law happened; for it is in itself an instantaneous

event. It implies no continuance of the act that produces it, but takes effect, and is complete and perfect at an indivisible point of time, like the beginning or end of a recess. Once in existence, it has *happened,* and the mere continuance of the condition of things which the occurrence produces, cannot, without confounding the most obvious distinctions, be taken or treated as the occurrence itself, as Mr. Wirt seems to have done....

> "Again, we see no propriety in forcing the language from its popular meaning in order to meet and fulfill one confessedly great purpose, (the keeping the office filled,) while there is plainly another purpose of equal magnitude and importance (fitting qualifications) attached to and inseparable from the former." *Id.,* at 3–6.

The Committee acknowledged that the broad reading "ha[d] been, from time to **\*2614** time, sanctioned by Attorneys General ... and that the Executive ha [d], from time to time, practiced upon it," but it said the Executive's practice was entitled to no weight because the Constitution's text was "too plain to admit of a doubt or to need interpretation." *Id.,* at 7.

On the same day the Committee published its scathing report, its chairman, Senator Trumbull, proposed a law barring the payment of any officer appointed during the recess to fill a pre-recess vacancy. Cong. Globe, 37th Cong., 3d Sess., 564. Senator Fessenden spoke in support of the proposal:

> "It ought to be understood distinctly, that when an officer does not come within the rules of law, and is appointed in that way in defiance of the wishes of the Senate, he shall not be paid. It may not be in our power to prevent the appointment, but it is in our power to prevent the payment; and when payment is prevented, I think that will probably put an end to the habit of making such appointments." *Id.,* at 565.

The amendment was adopted by the Senate, *ibid.,* and after passing the House became the Pay Act, which provided that "no money shall be paid ... out of the Treasury, as salary, to any person appointed during the recess of the Senate, to fill a vacancy ... which ... existed while the Senate was in session." Act of Feb. 9, 1863, § 2, 12 Stat. 646 (codified at Rev. Stat. § 1761; subsequently codified as amended at 5 U.S.C. § 56 (1925–1926 ed.)).

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 112 of 395

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)
199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

The Pay Act would remain in force without significant modification for nearly eight decades. The Executive Branch, however, refused to acknowledge that the Act embodied the Senate's rejection of the broad reading of "happen." Several Attorneys General continued to treat Wirt's interpretation as settled without so much as mentioning the Act. See 12 Op. Atty. Gen. 32 (1866); 12 Op. Atty. Gen. 449 (1868); 14 Op. Atty. Gen. 562 (1875); 15 Op. Atty. Gen. 207 (1877). And when, 17 years after its passage, Attorney General Devens deigned to acknowledge the Act, he preposterously described it as "conced[ing]" the President's power to make the appointments for which the Act barred payment. 16 Op. Atty. Gen. 522, 531 (1880).

The majority is not that bold. Instead, it relegates the 1863 Judiciary Committee report to a pair of anodyne sentences in which it says only that the committee "disagreed with" Wirt's interpretation. *Ante,* at 2572. (With like understatement, one could say that Shakespeare's Mark Antony "disagreed with" Caesar's detractors.) Even more remarkably, the majority goes on to claim that the Senate's passage of the Pay Act on the same day the committee issued its report was not a strong enough statement to impede the constitutionalization-by-adverse-possession of the power asserted by the Executive. Why not? Because, the majority says, some Senators may have disagreed with the report, and because the Senate did not go so far as to make acceptance of a recess appointment that filled a pre-recess vacancy "a federal crime." *Ante,* at 2572. That reasoning starkly illustrates the excessive burden the majority places on the Legislative Branch in contests with the Executive over the separation of powers. See *supra,* at 2605.

Despite its minimization by subsequent Attorneys General and by today's majority, there is no reason to doubt that the Pay Act had a deterrent effect. The Solicitor General has identified just 40 recess appointments that filled pre-recess vacancies during the nearly eight decades between the Act's passage in 1863 and its amendment in 1940. App. to Brief for Petitioner 71a–79a. [16]

[16]    In the early 20th century, some Senators acceded to the majority's reading of the Clause, as the majority is eager to point out, *ante,* at 2572. In 1904, Senator Tillman allowed that "the Senate ha[d] acquiesced" in the President's use of the recess-appointment power to fill pre-existing vacancies, 38 Cong. Rec. 1606, though

he also quoted at length from the 1863 Judiciary Committee report and said he did "not see how anybody can find any argument to controvert the position [the report] takes," *id.,* at 1608. And in 1916, Senators Robinson and Sutherland accepted the majority's reading without analysis. 53 Cong. Rec. 4298. The reader can decide whether those statements by three Senators justify the assertion that the Senate "abandoned its hostility" to the broad reading, *ante,* at 2572.

**\*2615  4. 1940 to the Present**

The majority finds it highly significant that in 1940, Congress created a few carefully limited exceptions to the Pay Act's prohibition on paying recess appointees who filled pre-recess vacancies. See Act of July 11, 1940, ch. 580, 54 Stat. 751, now codified with nonsubstantive amendments at 5 U.S.C. § 5503. Under the current version of the Act, "[p]ayment for services may not be made from the Treasury of the United States to an individual appointed during a recess of the Senate to fill a vacancy" that "existed while the Senate was in session" *unless* either the vacancy arose, or a different individual's nomination to fill the vacancy was rejected, "within 30 days before the end of the session"; or a nomination was pending before the Senate at the end of the session, and the individual nominated was not himself a recess appointee. § 5503(a)(1)–(3). And if the President fills a pre-recess vacancy under one of the circumstances specified in the Act, the law requires that he submit a nomination for that office to the Senate "not later than 40 days after the beginning of the next session." § 5503(b).

The majority says that by allowing salaries to be paid to recess appointees in these narrow circumstances, "the 1940 Senate (and later Senates) in effect supported" the majority's interpretation of the Clause. *Ante,* at 2573. Nonsense. Even as amended, the Act strictly regulates payment to recess appointees who fill pre-recess vacancies, and it still forbids payment to many officers whose appointments are constitutional under the majority's interpretation. As *amici* Senators observe, the 1940 amendments "reflect at most a desire not to punish public servants caught in the crossfire" of interbranch conflict. Brief for Sen. McConnell et al. as *Amici Curiae* 30. Surely that inference is more reasonable than the majority's supposition that Congress, by permitting *some* of the appointees covered by the Act to be paid, meant to

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 113 of 395

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

signal that it now believed *all* of the covered appointments were valid.

Moreover, given the majority's interpretation of the Recess Appointments Clause, it is fairly debatable whether the current version of the Pay Act is constitutional (and *a fortiori,* whether the pre–1940 version was constitutional). Even as amended, the Act seeks to limit and channel the President's exercise of the recess-appointment power by prohibiting payment to officers whose appointments are (per the majority) within the President's sole constitutional authority if those appointments do not comply with conditions imposed by Congress, and by requiring the President to submit a nominee to the Senate in the first 40 days of the ensuing session. There is a colorable argument —which is routinely made by lawyers in the Executive Branch—that Congress " 'cannot use the appropriations power to control a Presidential power that is beyond its direct control.' " 33 Op. OLC ___, ___ (2009), online at http://www.justice.gov/olc/ **2616** opiniondocs/ section7054.pdf (quoting 20 Op. OLC 253, 267 (1996)). Consistent with that view, the Office of Legal Counsel has maintained that Congress could not "condition ... the funding of an officer's salary on being allowed to appoint the officer." 13 Op. OLC 258, 261 (1989).

If that is correct, then the Pay Act's attempt to control the President's exercise of the recess-appointment power at least raises a substantial constitutional question under the majority's reading of the Recess Appointments Clause. See Rappaport, Original Meaning 1544–1546. The Executive has not challenged the Act's constitutionality in this case, and I express no opinion on whether such a challenge would succeed. I simply point out that it is impossible to regard the amended Pay Act as evidence of Senatorial acquiescence in the majority's reading when that reading has the potential to invalidate the Act.

Since the Pay Act was amended, individual Senators have continued to maintain that recess appointments may not constitutionally be used to fill pre-recess vacancies. See, *e.g.,* 130 Cong. Rec. 22780 (statement of seven Senators that a recess appointment to the Federal Reserve Board in 1984 was unconstitutional because the vacancy "did not happen during the recess"); Brief for Sen. McConnell et al. as *Amici Curiae* 26 (45 Senators taking that view of the Clause). And there is no evidence that the watering-down of the Pay Act produced an immediate flood of recess

appointments filling pre-recess vacancies. The Solicitor General has pointed us to only 40 such appointments between 1940 and the present. App. to Brief for Petitioner 79a–89a.

The majority, however, finds it significant that in two small "random sample [s]" of contemporary recess appointments—24 since 1981 and 21 since 2000—the bulk of the appointments appear to have filled pre-existing vacancies. *Ante,* at 2571. Based on that evidence, the majority thinks it "a fair inference that a large proportion of the recess appointments in the history of the Nation have filled pre-existing vacancies." *Ibid.* The extrapolation of that sweeping conclusion from a small set of recent data does not bear even the slightest scrutiny. The majority ignores two salient facts: First, from the founding until the mid–19th century, the President's authority to make such appointments was far from settled even within the Executive Branch. Second, from 1863 until 1940, it was *illegal* to pay *any* recess appointee who filled a pre-recess vacancy, which surely discouraged Presidents from making, and nominees from accepting, such appointments. Consequently, there is no reason to assume that the majority's sampling—even if it accurately reflects practices during the last three decades—is at all typical of practices that prevailed throughout "the history of the Nation." [17]

[17]    The majority also notes that many of the *intra-session* recess appointments identified by the Solicitor General were made "within two weeks of the beginning of the recess," which, according to the majority, "strongly suggests that many of the vacancies initially arose prior to the recess." *Ante,* at 2571. The inference is unwarranted, since there are many circumstances other than random chance that could cause a vacancy to arise early in the recess: For example, the prior officeholder may have been another recess appointee whose commission expired at the end of the Senate's session, or he may have waited until the recess to resign so that his successor could be compensated without violating the Pay Act. In any event, the overwhelming majority of the intra-session recess appointments on the Solicitor General's list occurred after 1945 and do not shed light on earlier practices.
* * *

In sum: Washington's and Adams' Attorneys General read the Constitution to **2617** restrict recess appointments to vacancies arising during the recess, and there is no

N.L.R.B. v. Noel Canning, 134 S.Ct. 2550 (2014)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 114 of 395

199 L.R.R.M. (BNA) 3685, 189 L.Ed.2d 538, 82 USLW 4599, 164 Lab.Cas. P 10,699...

evidence that any of the first four Presidents consciously departed from that reading. The contrary reading was first defended by an executive official in 1823, was vehemently rejected by the Senate in 1863, was vigorously resisted by legislation in place from 1863 until 1940, and is arguably inconsistent with legislation in place from 1940 to the present. The Solicitor General has identified only about 100 appointments that have ever been made under the broader reading, and while it seems likely that a good deal more have been made in the last few decades, there is good reason to doubt that many were made before 1940 (since the appointees could not have been compensated). I can conceive of no sane constitutional theory under which this evidence of "historical practice"—which is actually evidence of a long-simmering inter-branch conflict—would require us to defer to the views of the Executive Branch.

## IV. Conclusion

What the majority needs to sustain its judgment is an ambiguous text and a clear historical practice. What it has is a clear text and an at-best-ambiguous historical practice. Even if the Executive could accumulate power through adverse possession by engaging in a *consistent* and *unchallenged* practice over a long period of time, the oft-disputed practices at issue here would not meet that standard. Nor have those practices created any justifiable expectations that could be disappointed by enforcing the Constitution's original meaning. There is thus no ground for the majority's deference to the unconstitutional recess-appointment practices of the Executive Branch.

The majority replaces the Constitution's text with a new set of judge-made rules to govern recess appointments. Henceforth, the Senate can avoid triggering the President's now-vast recess-appointment power by the odd contrivance of never adjourning for more than three days without holding a *pro forma* session at which it is understood that no business will be conducted. *Ante,* at 2555 – 2556. How this new regime will work in practice remains to be seen. Perhaps it will reduce the prevalence

of recess appointments. But perhaps not: Members of the President's party in Congress may be able to prevent the Senate from holding *pro forma* sessions with the necessary frequency, and if the House and Senate disagree, the President may be able to adjourn both "to such Time as he shall think proper." U.S. Const., Art. II, § 3. In any event, the limitation upon the President's appointment power is there not for the benefit of the Senate, but for the protection of the people; it should not be dependent on Senate action for its existence.

The real tragedy of today's decision is not simply the abolition of the Constitution's limits on the recess-appointment power and the substitution of a novel framework invented by this Court. It is the damage done to our separation-of-powers jurisprudence more generally. It is not every day that we encounter a proper case or controversy requiring interpretation of the Constitution's structural provisions. Most of the time, the interpretation of those provisions is left to the political branches—which, in deciding how much respect to afford the constitutional text, often take their cues from this Court. We should therefore take every opportunity to affirm the primacy of the Constitution's enduring principles over the politics of the moment. Our failure to do so today will resonate well beyond the particular dispute at hand. Sad, but true: The Court's embrace of the adverse-possession theory of executive power (a characterization the majority resists but does not refute) will **\*2618** be cited in diverse contexts, including those presently unimagined, and will have the effect of aggrandizing the Presidency beyond its constitutional bounds and undermining respect for the separation of powers.

I concur in the judgment only.

## All Citations

134 S.Ct. 2550, 189 L.Ed.2d 538, 199 L.R.R.M. (BNA) 3685, 82 USLW 4599, 164 Lab.Cas. P 10,699, 14 Cal. Daily Op. Serv. 7129, 2014 Daily Journal D.A.R. 8373, 24 Fla. L. Weekly Fed. S 941

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 115 of 395

on their taking leave, we must also calculate upon giving presents to all the foreign Ministers who come here, and these, we have every reason to expect, will be constantly increasing. Besides, he objected to the principle of these presents. What are they given for? He supposed it was to gain their friendly offices and good wishes towards the country who gave them. He thought this improper; and he believed it would be well now to put a stop to the business, as a fairer opportunity could never occur of trying the principle, for if it ever could be allowed, in consideration of public services, it could not be better deserved than in the present case; but, believing the principle to be a bad one, he should, therefore, be opposed to it.

Mr. Bayard said, every Constitutional objection must vanish on a single view of the article, because it allows that presents may be received, if the consent of Congress is obtained; and, so far from the Constitution insinuating that it would be bad policy to allow these presents to be received, it proves that they might be received if inconvenience in receiving them could be avoided. He supposed the Constitutional provision was meant to oblige Ministers to make known to the world whatever presents they might receive from foreign Courts, and to place themselves in such a situation as to make it impossible for them to be unduly influenced by any such presents. Indeed, he supposed these presents would produce a directly contrary effect, for when a Minister was known to have received a present of this kind, he would naturally be particularly careful of all his actions, lest he should be supposed to be improperly biassed. If presents were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors; but any evil of this kind was securely avoided by the notoriety of the act.

What, said Mr. B., is this present? It is a gold snuff-box, a gold chain, a picture, or some trifling thing, which could have no possible operation upon any man. It was necessary, he believed, to attend to these little civilities and ceremonies, as the want of attention to them often produced hostility between nations. He had some doubt from the Constitution, whether it was necessary in this case, to have applied to Congress at all for leave to have received these presents, as the office of this gentleman had expired before they were offered. Under the old articles of Confederation, a like provision was in being, only that the receipt of presents by our Ministers was positively forbidden, without any exception about leave of Congress; but their being allowed to be received under the present Government, by consent of Congress, shows that they might be received in certain cases. He had indeed, been informed that, notwithstanding the prohibition under the former Constitution, presents were frequently received by Ministers; for, though persons holding offices were forbidden to receive presents, the moment their office ceased, and they became private individuals, they were no longer prohibited from receiving any presents which might be offered to them.

Under these circumstances he thought the resolution ought to be agreed to.

Mr. W. C. Claiborne hoped the present resolution would not be adopted. When this subject was first brought into view, he felt inclined to favor the request. This first impression arose from his great personal respect for the applicant, and the desire he felt to gratify his wishes. But, upon a little reflection, it appeared to him that policy dictated the propriety of rejecting the present resolution. So far as relates to the constitutionality of receiving the presents in question, he thought no member would join in opinion with the member from Delaware last up. By recurring to the letter of the gentleman from South Carolina, (Mr. Pinckney,) it would appear that these presents were offered to him when he was about to take leave of the Courts to which he was Minister. He was, of course, at that time, the Minister of the United States, and came within the Constitutional prohibition.

This prohibition in the Constitution appeared to him to be bottomed on sound policy, and of great importance to the security, the happiness, and freedom of the nation. [Mr. C. read the clause.] The object of this clause appeared to him very different from what had been stated to be its object by the gentleman from Delaware. He believed it was intended to lock up every door to foreign influence, to the influence of Courts and Monarchies, which could not but prove baneful to every free country. He had been told that it was the custom of Europe, when a favorite Minister was about to take his departure, not only to present him with presents, but also to confer a title upon him; and if the leave now asked was granted, a precedent would be established which he apprehended would, at a future day, bring the question before Congress, whether leave should be given for a citizen of this country to receive a title from a foreign Monarch, and thus all the folly and vices of European Courts will be brought up for discussion before the Congress of the United States; and he had no doubt characters might be found who would desire such a distinction, and others who would advocate the granting of it. On the contrary, he was persuaded that, if the vote of this House negatived the present resolution, no future application would be made on this subject. The reason, in his opinion, which induced the insertion of a clause in the Constitution that presents might be received when leave of Congress was obtained, was this: That, in the course of events, a case might exist in which it might be proper for a citizen of the United Sattes to receive a present from a foreign Government. Many, perhaps, might be named; he thought of one: Suppose an officer of our Navy were to render essential service to the vessel of a foreign Power in distress on the high seas, it might be proper, in such a case, for Congress to permit the officer to receive any suitable present as a reward for his service and benevolent exertions in the cause of the unfortunate. But, he believed, in all ordinary cases, every present ought to be rejected.

Mr. OTIS saw no ground for the apprehensions which the gentleman from Tennessee had manifested, as to the effects to be produced by concurring in the resolution now before them. When every present to be received must be laid before Congress, no fear need be apprehended from the effects of any such presents. For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged. In the present case, he supposed no idea could be entertained that our Minister had not done his duty, or that he had been bribed by a foreign Power, as a reason for not granting the request. But it was strange that gentlemen should assert that, if presents were allowed to be received, Congress might next be asked to consent to the introduction of titles; for the Constitution expressly says, presents may be received, but, with respect to titles, it says, "no title of nobility shall be granted."

[Mr. CLAIBORNE said, those were not the words of the Constitution to which he alluded. What he had reference to was the following: "No person holding any office of profit or trust under the United States, shall, without the consent of Congress, accept of any present, emolument, office, or *title*, of any kind whatever, from any King, Prince, or foreign State."]

The first part, Mr. O. said, was distinct from the last. Titles of nobility were expressly forbidden; but presents, emoluments, offices, or titles, (not titles of nobility,) might be received by the consent of Congress. But as no title of nobility could be granted, the gentleman from Tennessee need not be alarmed on this ground. If such titles had not been excluded, he should have supposed that, at this time of day, when titles were going so fast out of fashion, there could be no fear of their obtaining here. The intention of the Constitution must have been, that these presents should be received, on their being made known to Congress, otherwise the clause would have been peremptory, as under the old Congress.

Mr. O. said it was altogether a matter of discretion in the gentleman from South Carolina, whether or not he had asked consent to receive the presents in question; for he is at present no officer of the United States, and he might receive them as a private citizen. He believed he had a perfect right to do so, though it might not consist with the delicacy of his character. Mr. O. said he had it from the best authority, that, even under the old Confederation, though presents were unconditionally prohibited, Dr. Franklin, Mr. Jefferson, and Mr. Laurens, received the customary presents on their departure from the foreign Courts at which they were employed. They, to be sure, communicated the fact to Congress after they had received them. And they received them for a good reason, because they could not refuse them without giving umbrage to the Courts which presented them. He, therefore, thought it very improper for gentlemen to suggest difficulties of the kind which had been brought forward, as if the gentleman making the application was personally concerned—it could not be considered as any object to him. The question was merely whether we would conform or not to the customs and usages of other nations, with the presents in question; in which there certainly could be nothing either dangerous or alarming.

Mr. MACON had no doubt Congress had a right to grant leave to receive the presents in question, and believed the determination in this case would fix the usage in future. He believed an application could never be made to the House, in which there could be less objection to the applicant, than in the present case. He was convinced that the gentleman from Massachusetts need not to have said that this was no object to the gentleman from South Carolina. He was sure no one thought so. He believed it was improper to bring any personal considerations into the question. He was sure there had not been a more popular act done for this country for a long time than the treaty which that gentleman had concluded with Spain. But the committee were told that this resolution ought to be adopted, because it was a European custom. If, said he, we adopt this custom, we must adopt another—that of paying foreign Ministers who come here. And he owned he should not be willing to see any of them carry off the money of his constituents, because he did not think the conduct of any of them was deserving of such a fee.

The gentleman from South Carolina had made a conditional refusal of the presents offered to him, and he now wishes the point to be settled by Congress, whether he shall receive these presents or not. He had no idea, whether these presents were a gold snuff-box, a gold chain, a picture, or three hundred guineas, they could possibly have any effect upon the applicant. Nor had he much fear about the introduction of titles into this country; for if any such thing were ever proposed, there would be such a scramble for the highest, among certain gentlemen, that he believed it would be a security against any.

Mr. M. said it might not always happen that the applicants for leave to receive these presents were free from objection; and, in such cases, very unpleasant, and probably very lengthy, discussions would take place. He hoped, therefore, the custom would now be put an end to.

Mr. BAYARD remarked that the gentleman from Tennessee seemed to be greatly alarmed, lest the agreeing to this resolution should destroy the liberties of the country; and that a precedent of leave being given to a Minister to accept of a gold snuff-box or a gold chain, should hereafter be brought as a sanction to the granting of titles of nobility. But he asked the gentleman, as a lawyer, whether he conceived that a precedent for granting permission to a Minister to receive a snuff-box could be adduced as a precedent for granting titles of nobility? It certainly could not. Therefore, as to precedent, the gentleman might feel himself perfectly at ease. There could be no doubt but that the Congress of the United States might give their consent to a citizen receiving a title from a foreign Power; but he could not apprehend that they would ever do so. Was this, then,

United States Code Annotated
    Title 5. Government Organization and Employees (Refs & Annos)
        Part III. Employees (Refs & Annos)
            Subpart F. Labor-Management and Employee Relations
                Chapter 73. Suitability, Security, and Conduct (Refs & Annos)
                    Subchapter IV. Foreign Gifts and Decorations (Refs & Annos)

5 U.S.C.A. § 7342

§ 7342. Receipt and disposition of foreign gifts and decorations

Effective: January 4, 2011

Currentness

**(a)** For the purpose of this section--

**(1)** "employee" means--

**(A)** an employee as defined by section 2105 of this title and an officer or employee of the United States Postal Service or of the Postal Regulatory Commission;

**(B)** an expert or consultant who is under contract under section 3109 of this title with the United States or any agency, department, or establishment thereof, including, in the case of an organization performing services under such section, any individual involved in the performance of such services;

**(C)** an individual employed by, or occupying an office or position in, the government of a territory or possession of the United States or the government of the District of Columbia;

**(D)** a member of a uniformed service;

**(E)** the President and the Vice President;

**(F)** a Member of Congress as defined by section 2106 of this title (except the Vice President) and any Delegate to the Congress; and

**(G)** the spouse of an individual described in subparagraphs (A) through (F) (unless such individual and his or her spouse are separated) or a dependent (within the meaning of section 152 of the Internal Revenue Code of 1986) of such an individual, other than a spouse or dependent who is an employee under subparagraphs (A) through (F);

**(2)** "foreign government" means--

(A) any unit of foreign governmental authority, including any foreign national, State, local, and municipal government;

(B) any international or multinational organization whose membership is composed of any unit of foreign government described in subparagraph (A); and

(C) any agent or representative of any such unit or such organization, while acting as such;

(3) "gift" means a tangible or intangible present (other than a decoration) tendered by, or received from, a foreign government;

(4) "decoration" means an order, device, medal, badge, insignia, emblem, or award tendered by, or received from, a foreign government;

(5) "minimal value" means a retail value in the United States at the time of acceptance of $100 or less, except that--

(A) on January 1, 1981, and at 3 year intervals thereafter, "minimal value" shall be redefined in regulations prescribed by the Administrator of General Services, in consultation with the Secretary of State, to reflect changes in the consumer price index for the immediately preceding 3-year period; and

(B) regulations of an employing agency may define "minimal value" for its employees to be less than the value established under this paragraph; and

(6) "employing agency" means--

(A) the Committee on Standards of Official Conduct of the House of Representatives, for Members and employees of the House of Representatives, except that those responsibilities specified in subsections (c)(2)(A), (e)(1), and (g)(2)(B) shall be carried out by the Clerk of the House;

(B) the Select Committee on Ethics of the Senate, for Senators and employees of the Senate, except that those responsibilities (other than responsibilities involving approval of the employing agency) specified in subsections (c)(2), (d), and (g)(2)(B) shall be carried out by the Secretary of the Senate;

(C) the Administrative Office of the United States Courts, for judges and judicial branch employees; and

(D) the department, agency, office, or other entity in which an employee is employed, for other legislative branch employees and for all executive branch employees.

(b) An employee may not--

**(1)** request or otherwise encourage the tender of a gift or decoration; or

**(2)** accept a gift or decoration, other than in accordance with the provisions of subsections (c) and (d).

**(c)(1)** The Congress consents to--

**(A)** the accepting and retaining by an employee of a gift of minimal value tendered and received as a souvenir or mark of courtesy; and

**(B)** the accepting by an employee of a gift of more than minimal value when such gift is in the nature of an educational scholarship or medical treatment or when it appears that to refuse the gift would likely cause offense or embarrassment or otherwise adversely affect the foreign relations of the United States, except that--

**(i)** a tangible gift of more than minimal value is deemed to have been accepted on behalf of the United States and, upon acceptance, shall become the property of the United States; and

**(ii)** an employee may accept gifts of travel or expenses for travel taking place entirely outside the United States (such as transportation, food, and lodging) of more than minimal value if such acceptance is appropriate, consistent with the interests of the United States, and permitted by the employing agency and any regulations which may be prescribed by the employing agency.

**(2)** Within 60 days after accepting a tangible gift of more than minimal value (other than a gift described in paragraph (1)(B)(ii)), an employee shall--

**(A)** deposit the gift for disposal with his or her employing agency; or

**(B)** subject to the approval of the employing agency, deposit the gift with that agency for official use.

Within 30 days after terminating the official use of a gift under subparagraph (B), the employing agency shall forward the gift to the Administrator of General Services in accordance with subsection (e)(1) or provide for its disposal in accordance with subsection (e)(2).

**(3)** When an employee deposits a gift of more than minimal value for disposal or for official use pursuant to paragraph (2), or within 30 days after accepting travel or travel expenses as provided in paragraph (1)(B)(ii) unless such travel or travel expenses are accepted in accordance with specific instructions of his or her employing agency, the employee shall file a statement with his or her employing agency or its delegate containing the information prescribed in subsection (f) for that gift.

**(d)** The Congress consents to the accepting, retaining, and wearing by an employee of a decoration tendered in recognition of active field service in time of combat operations or awarded for other outstanding or unusually meritorious

performance, subject to the approval of the employing agency of such employee. Without this approval, the decoration is deemed to have been accepted on behalf of the United States, shall become the property of the United States, and shall be deposited by the employee, within sixty days of acceptance, with the employing agency for official use, for forwarding to the Administrator of General Services for disposal in accordance with subsection (e)(1), or for disposal in accordance with subsection (e)(2).

**(e)(1)** Except as provided in paragraph (2), gifts and decorations that have been deposited with an employing agency for disposal shall be (A) returned to the donor, or (B) forwarded to the Administrator of General Services for transfer, donation, or other disposal in accordance with the provisions of subtitle I of title 40 and division C (except sections 3302, 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41. However, no gift or decoration that has been deposited for disposal may be sold without the approval of the Secretary of State, upon a determination that the sale will not adversely affect the foreign relations of the United States. Gifts and decorations may be sold by negotiated sale.

**(2)** Gifts and decorations received by a Senator or an employee of the Senate that are deposited with the Secretary of the Senate for disposal, or are deposited for an official use which has terminated, shall be disposed of by the Commission on Arts and Antiquities of the United States Senate. Any such gift or decoration may be returned by the Commission to the donor or may be transferred or donated by the Commission, subject to such terms and conditions as it may prescribe, (A) to an agency or instrumentality of (i) the United States, (ii) a State, territory, or possession of the United States, or a political subdivision of the foregoing, or (iii) the District of Columbia, or (B) to an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 which is exempt from taxation under section 501(a) of such Code. Any such gift or decoration not disposed of as provided in the preceding sentence shall be forwarded to the Administrator of General Services for disposal in accordance with paragraph (1). If the Administrator does not dispose of such gift or decoration within one year, he shall, at the request of the Commission, return it to the Commission and the Commission may dispose of such gift or decoration in such manner as it considers proper, except that such gift or decoration may be sold only with the approval of the Secretary of State upon a determination that the sale will not adversely affect the foreign relations of the United States.

**(f)(1)** Not later than January 31 of each year, each employing agency or its delegate shall compile a listing of all statements filed during the preceding year by the employees of that agency pursuant to subsection (c)(3) and shall transmit such listing to the Secretary of State who shall publish a comprehensive listing of all such statements in the Federal Register.

**(2)** Such listings shall include for each tangible gift reported--

**(A)** the name and position of the employee;

**(B)** a brief description of the gift and the circumstances justifying acceptance;

**(C)** the identity, if known, of the foreign government and the name and position of the individual who presented the gift;

**(D)** the date of acceptance of the gift;

**(E)** the estimated value in the United States of the gift at the time of acceptance; and

**(F)** disposition or current location of the gift.

**(3)** Such listings shall include for each gift of travel or travel expenses--

    **(A)** the name and position of the employee;

    **(B)** a brief description of the gift and the circumstances justifying acceptance; and

    **(C)** the identity, if known, of the foreign government and the name and position of the individual who presented the gift.

**(4)(A)** In transmitting such listings for an element of the intelligence community, the head of such element may delete the information described in subparagraph (A) or (C) of paragraph (2) or in subparagraph (A) or (C) of paragraph (3) if the head of such element certifies in writing to the Secretary of State that the publication of such information could adversely affect United States intelligence sources or methods.

**(B)** Any information not provided to the Secretary of State pursuant to the authority in subparagraph (A) shall be transmitted to the Director of National Intelligence who shall keep a record of such information.

**(C)** In this paragraph, the term "intelligence community" has the meaning given that term in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4)). [1]

**(g)(1)** Each employing agency shall prescribe such regulations as may be necessary to carry out the purpose of this section. For all employing agencies in the executive branch, such regulations shall be prescribed pursuant to guidance provided by the Secretary of State. These regulations shall be implemented by each employing agency for its employees.

**(2)** Each employing agency shall--

    **(A)** report to the Attorney General cases in which there is reason to believe that an employee has violated this section;

    **(B)** establish a procedure for obtaining an appraisal, when necessary, of the value of gifts; and

    **(C)** take any other actions necessary to carry out the purpose of this section.

**(h)** The Attorney General may bring a civil action in any district court of the United States against any employee who knowingly solicits or accepts a gift from a foreign government not consented to by this section or who fails to deposit or report such gift as required by this section. The court in which such action is brought may assess a penalty against such employee in any amount not to exceed the retail value of the gift improperly solicited or received plus $5,000.

**(i)** The President shall direct all Chiefs of a United States Diplomatic Mission to inform their host governments that it is a general policy of the United States Government to prohibit United States Government employees from receiving gifts or decorations of more than minimal value.

**(j)** Nothing in this section shall be construed to derogate any regulation prescribed by any employing agency which provides for more stringent limitations on the receipt of gifts and decorations by its employees.

**(k)** The provisions of this section do not apply to grants and other forms of assistance to which section 108A of the Mutual Educational and Cultural Exchange Act of 1961 applies.

**CREDIT(S)**

(Added Pub.L. 90-83, § 1(45)(C), Sept. 11, 1967, 81 Stat. 208; amended Pub.L. 95-105, Title V, § 515(a)(1), Aug. 17, 1977, 91 Stat. 862; Pub.L. 95-426, Title VII, § 712(a) to (c), Oct. 7, 1978, 92 Stat. 994; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub.L. 107-217, § 3(a)(1), Aug. 21, 2002, 116 Stat. 1295; Pub.L. 108-458, Title I, § 1079(b), Dec. 17, 2004, 118 Stat. 3696; Pub.L. 109-435, Title VI, § 604(b), Dec. 20, 2006, 120 Stat. 3241; Pub.L. 111-259, Title III, § 361, Oct. 7, 2010, 124 Stat. 2701; Pub.L. 111-350, § 5(a)(10), Jan. 4, 2011, 124 Stat. 3841.)

Footnotes

1       Reclassified to 50 U.S.C.A. § 3003(4). See References in Text note set out for this section.

5 U.S.C.A. § 7342, 5 USCA § 7342

Current through P.L. 115-82

---

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
  Title 37. Pay and Allowances of the Uniformed Services (Refs & Annos)
    Chapter 17. Miscellaneous Rights and Benefits (Refs & Annos)

37 U.S.C.A. § 908

§ 908. Employment of reserves and retired members by foreign governments

Currentness

**(a) Congressional consent.**--Subject to subsection (b), Congress consents to the following persons accepting civil employment (and compensation for that employment) for which the consent of Congress is required by the last paragraph of section 9 of article I of the Constitution, related to acceptance of emoluments, offices, or titles from a foreign government:

  **(1)** Retired members of the uniformed services.

  **(2)** Members of a reserve component of the armed forces.

  **(3)** Members of the Commissioned Reserve Corps of the Public Health Service.

**(b) Approval required.**--A person described in subsection (a) may accept employment or compensation described in that subsection only if the Secretary concerned and the Secretary of State approve the employment.

**(c) Military service in foreign armed forces.**--For a provision of law providing the consent of Congress to service in the military forces of certain foreign nations, see section 1060 of title 10.

CREDIT(S)

   (Added Pub.L. 97-295, § 3(6)(A), Oct. 12, 1982, 96 Stat. 1304; amended Pub.L. 102-25, Title VII, § 702(b)(1), Apr. 6, 1991, 105 Stat. 117; Pub.L. 103-160, Div. A, Title XIV, § 1433(c), Nov. 30, 1993, 107 Stat. 1834; Pub.L. 103-337, Div. A, Title X, § 1070(d)(6), Oct. 5, 1994, 108 Stat. 2858.)

37 U.S.C.A. § 908, 37 USCA § 908
Current through P.L. 115-82

End of Document

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

B- 207467 (Comp.Gen.), 1983 WL 27823

COMPTROLLER GENERAL

The Honorable George J. Mitchell
United States Senate

January 18, 1983

**\*1**  Dear Senator Mitchell:

By letter dated June 17, 1982, you requested our views on whether President Reagan's receipt of a pension from the State of California violates article II, section 1, clause 6 of the United States Constitution. Among other things, that clause prohibits the President from receiving any emolument from any state during the period for which he has been elected.

The question presented is not one to which there is an unequivocal answer. Persuasive arguments may be made both for and against the proposition that the President's retirement allowance is an emolument whose receipt is prohibited by the Constitution. Nonetheless, having examined the issue and considered the views of both the Department of Justice and opposing citizens groups, we are of the opinion that the President's acceptance of a retirement allowance from the State of California does not violate the prohibition contained in article II, section 1, clause 6.

BACKGROUND

President Reagan's financial disclosure report, filed May 14, 1982, showed that he received $22,197 in 1981 from the State of California as a retirement allowance, based upon his two terms as Governor. According to the Justice Department, then-Governor Reagan became a member of the California Legislator's Retirement System as an elective constitutional officer under section 9355.4 of the California Government Code. The Legislator's Retirement System is a contributory, non-fully funded system whose benefits are based upon length of service. Cal. Govt. Code §§ 9355.4, 9357–59 (Deering 1973 and Supp. 1982). Under California law, retirees in the system who have fulfilled the necessary prerequisites have a vested right to their allowances. That right may not be withdrawn except under a previously-existing provision of the plan. Betts v. Board of Admin. of Pub. Employees' Ret. Sys., 21 Cal. 3d 859, 863, 582 P.2d 614, 617, 148 Cal. Rptr. 158, 160–61 (1978).

Several months after the President took office, his Counsel requested an opinion from the Justice Department about whether the President's receipt of retirement benefits violated article II, section 1, clause 6. That opinion, provided to us with the comments of the Deputy Counsel to the President, concluded that retirement benefits are not emoluments in the constitutional sense. According to the Justice Department, the purposes of article II, section 1, clause 6 'would not bar the receipt by President Reagan of a pension in which he acquired a vested right six years before he became President, for which he no longer has to perform any services, and of which the State of California cannot deprive him.' Memorandum from Deputy Assistant Attorney General Simms to Hon. Fred Fielding, at 4 (June 23, 1981). In addition, the Justice Department stated that the term 'emolument' in the constitutional prohibition does not apply to pension benefits because such benefits are considered by the California courts to be 'incidents of the pensionable status.' Interests of this kind were not contemplated by the drafters of the prohibition, and consequently do not fall within its terms. Id. at 7.

DISCUSSION

**\*2**  The sixth clause of section 1, article II of the United States Constitution provides that:
'The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.' (Emphasis added.)

The term 'emolument' refers to '[a]ny perquisite, advantage, profit, or gain arising from the possession of an office.' Black's Law Dictionary 470 (5th ed. 1979), citing McLean v. United States, 226 U.S. 374, 381–82 (1912); 34 Comp. Gen. 331, 333–34 (1955). It is a comprehensive term which embraces "every species' of pecuniary profit derived from the discharge of the duties of * * * office * * *.' Hoyt v. United States, 51 U.S. (10 How.) 109, 135 (1850).

Generally courts have been consistent in describing a right to a pension as a part of the compensation of the office the holding of which gives rise to that right. See Betts v. Board of Admin. of Public Emp. Ret. System, 21 Cal. 3d 859, 863, 582 P.2d 614, 617, 148 Cal. Rptr. 158, 161 (1978) ('[a] public employee's pension constitutes an element of compensation * * *'). See also Boryszewski v. Brydges, 37 N.Y.2d 361, 367, 334 N.E.2d 579, 583, 372 N.Y.S.2d 623, 629 (1975) ('retirement benefits constitute as real and substantial a form of compensation as does a pay check. The only significant difference lies in the time of payment'). [1] On the other hand, there have been few cases that have considered whether pensions are emoluments of the office from which they arise, and those that have are conflicting. In several instances involving provisions of state constitutions limiting 'allowances' or 'emoluments,' [2] state courts have found that pensions are not emoluments on the basis that pensions were not contemplated by the writers of state constitutions, or that they are contingent benefits rather than actual pecuniary gains. See Campbell v. Kelly, 202 S.E.2d 369, 375–77 (W. Va. 1974); State ex rel. Todd v. Reeves, 82 P.2d 173, 175 (Wash. 1938). Yet, at least one state has concluded that judicial pensions are emoluments within the meaning of a similar constitutional provision. Carper v. Stiftel, 384 A.2d 2, 6–7 (Del. 1977).

It is our view, however, that this conflict need not be resolved in the present case: we conclude that the term emolument in article II, section 1, clause 6 does not extend to payments for services rendered prior to the occupancy of, and having no connection with the Presidency.

With respect to the intent of clause 6, The Federalist No. 73 states:
'The legislature, on the appointment of a President, is once [and] for all to declare what shall be the compensation for his services during the time for which he shall have been elected. This done, they will have no power to alter it, either by increase or diminution, till a new period of service by a new election commences. They can neither weaken his fortitude by operating on his necessities nor corrupt his integrity by appealing to his avarice. Neither the Union nor any of its members will be at liberty to give, nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act. He can, of course, have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.' The Federalist No. 73 (A. Hamilton).

*3 It is evident from this statement that the prohibition in clause 6 was intended to prevent the President from being subject to influence in carrying-out his duties by changes made to the remuneration given for the performance of those duties, or by rewards given for additional services performed as President. Consequently, it seems to us that the term 'emolument' cannot be considered to extend to benefits that have been earned or to which entitlement arose before his occupancy of that office, and that clearly have no connection, either direct or indirect, with the Presidency. To do so would unfairly penalize the President. [3]

The pension payments President Reagan receives from the State of California cannot be construed as being in any manner received in consequence of his possession of the Presidency. The payments are made solely in connection with an entitlement previously earned by reason of his service to that State. The amount of his entitlement is set by statute, and is no different from that to which others with similar governmental service records would be entitled.

We note in addition that the President's receipt of pension benefits poses none of the dangers that the constitutional prohibition was intended to avoid. Thus, as the pension is fully vested under California law, it is highly unlikely that the President could be swayed in his dealings with the State of California by the prospect of having his pension diminished or rescinded by the State. Similarly, because of the nature of the modern statutory retirement system, it is doubtful that the State could 'appeal to his avarice' by rewarding sympathetic actions with increased pension benefits. Moreover,

acceptance of pension benefits requires no obligation to the State for future services. The benefits are in fact akin to a form of insurance, a vested right derived from contract or statute. [4]

For these reasons, we do not consider the prohibition in article II, section 1, clause 6 to be applicable to pension benefits such as those received by President Reagan from the State of California. We therefore have no objection to his continued acceptance of such benefits during his term of Office.

We hope that the foregoing will be of assistance to you.

Sincerely yours,

Milton J. Socolar
for Comptroller General of the United States

[1]   The Justice Department, however, apparently takes the position, based upon a reading of California court decisions, that pension benefits are not elements of compensation (and consequently never fall into the category of emoluments), but are instead incidents of 'the pensionable status.' See Memorandum of Deputy Assistant General Counsel Simms to Hon. Fred Fielding, at 7 (June 23, 1981), citing Sweesy v. Los Angeles Cty. Peace Officers' Ret. Bd., 17 Cal. 2d 356, 361–63, 110 P.2d 37, 39–40 (1941). The latter concept, however, was used by the California courts to avoid applying a state constitutional provision in such a way as to prevent increases in retirement benefits subsequent to actual retirement. It is clear to us that the California courts, as do the courts of many other jurisdictions, continue to view retirement benefits as deferred compensation. See Betts v. Board of Admin. of Pub. Emp. Ret. System, supra.

[2]   Many state constitutions prohibit legislators or other officials from receiving compensation or emoluments other than those set by the Constitution or by law. See, e.g., N.J. Const. art IV, § 4, par. 7. A related type of provision, intended to discourage self-dealing, is that which prohibits an individual from accepting any position the emoluments of which were increased by an act of the legislature during a period when the officer was a member. See Wash. Const., art. II, § 13. Moreover, similar to article II, section 1, clause 6 is the Federal Constitution's prohibition of the receipt by any officer of the United States of any 'emolument' from any foreign state without the consent of the Congress. U.S. Const. art. I, § 9, cl. 8.

[3]   We should point out, however, that we would view as prohibited under article II, section 1, clause 6 any type of additional benefit, contractual or otherwise, received by the President from a state or Federal body as having been earned prior to his occupancy of the Office, yet made in anticipation of that event.

[4]   Modern retirement plans have in fact been described by the United States Supreme Court as a form of insurance. Los Angeles Dept. of Water and Power v. Manhart, 435 U.S. 702, 721 (1978). It is also of interest to note that Federal conflict of interest laws specifically permit Federal officers and employees to receive pensions from previous employers in addition to their normal salaries. See 18 U.S.C. § 209(b) (1976).

The view that we express here is not entirely consistent with previous decisions of this Office, which have construed the term emolument somewhat more broadly. For example, in 37 Comp. Gen. 138, 140 (1957), we held that a newly-appointed court crier's receipt of a military pension from the British Government was prohibited by article I, section 9, clause 8. Our view was that the pension was either a gratuity or deferred compensation: if a gratuity, it was prohibited as a 'present;' if deferred compensation, it was prohibited as an emolument. In another case, we held that President Kennedy was not entitled to collect retired pay as a Lieutenant, United States Naval Reserve (Retired), during the period that he occupied the Office of President of the United States. See B–153438, November 10, 1964 (letter from General Counsel Keller, GAO, to Assistant Attorney General Schlei). Our opinion was based upon alternative statutory and constitutional grounds; with regard to the latter, we were of the opinion that retired pay was an additional 'emolument' receipt of which was prohibited by article II, section 1, clause 6.

To the extent that these decisions are contrary to the views expressed here, we consider our present views to prevail.

B- 207467 (Comp.Gen.), 1983 WL 27823

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

FIFTY-FOURTH CONGRESS.  SESS. I  RES. 39, 54, 61.  1896.          759

[No. 39.] Joint Resolution To authorize Benjamin Harrison to accept certain    April 2, 1896.
medals presented to him while President of the United States.

*Resolved by the Senate and House of Representatives of the United States*
*of America in Congress assembled,* That Benjamin Harrison be, and he    Benjamin Harrison.
is hereby, authorized to accept certain medals presented to him by the    Acceptance of medals from Brazil and
Governments of Brazil and Spain during the term of his service as    Spain authorized.
President of the United States.

     Approved, April 2, 1896.

_____

[No. 54.] Joint Resolution For the relief of ex-Naval Cadet Henry T. Baker.    May 18, 1896.

*Resolved by the Senate and House of Representatives of the United States*
*of America in Congress assembled,* That the Secretary of the Navy be, and    Henry T. Baker.
he is hereby, authorized to reappoint Henry T. Baker as a naval cadet    May be reappointed naval cadet.
to fill the vacancy in the engineers' division of his class caused by his
resignation of March seventh, eighteen hundred and ninety-six, with the
same standing, rights and privileges in all respects as if such resigna-    *Proviso.*
tion had not been tendered: *Provided,* That he shall not receive pay    No pay while out of service.
while out of the service.

     Approved, May 18, 1896.

_____

[No. 61.] Joint Resolution For the relief of James P. Veach.    June 10, 1896.

*Resolved by the Senate and House of Representatives of the United States*
*of America in Congress assembled,* That the Secretary of War be, and he    James P. Veach.
hereby is, empowered, authorized, and directed to cause record to be    Granted honorable discharge.
made in the military history of James P. Veach, a private of Company
I of the One hundred and nineteenth (Seventh Cavalry) Regiment
of Indiana Volunteers, in the service of the United States, that the
said James P. Veach, having received from the President of the
United States a full and unconditional pardon of all military offenses
for which he was tried and convicted by court-martial, and sentence
of which court was promulgated January eighth, eighteen hundred
and sixty-six, in General Orders, Numbered Six, Department of Texas,
is thereby absolved from said offenses and from all the penalties of
such offense and sentence, and is therefore entitled to an honor-
able discharge ; and thereupon to discharge said Veach as of the date
October eighth, eighteen hundred and sixty-five.

     Approved, June 10, 1896.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Retired Marine Corps Officers, Comp.Gen., March 11, 1985

62 Comp. Gen. 432 (Comp.Gen.), B- 210346, 1983 WL 26216

COMPTROLLER GENERAL

MATTER OF: Lieutenant Colonel Marvin S. Shaffer, USAF, Retired

June 2, 1983

**DIGEST:**

**\*\*1  \*432**  Corporation incorporated in the United States does not necessarily become an instrumentality of foreign government when its principal shareholder is a foreign corporation substantially owned by a foreign government. Therefore, prohibitions against employment of Federal officers or employees by a foreign government without the consent of Congress in Article I, section 9, clause 8 of the Constitution and the approvals required by section 509 of Public Law 95–105 (37 U.S.C. 801 note) in order to permit such employment do not apply to retired members of uniformed services employed by that corporation, if the corporation maintains a separate identity and does not become a mere agent or instrumentality of a foreign government.

This decision responds to a request from the Acting Assistant Secretary of Defense (Comptroller) concerning the limitations of Article I, section 9, clause 8 of the Constitution and the application of section 509 of Public Law 95–105, to those retired members of uniformed services employed by American corporations whose principal shareholders are foreign corporations which are in turn controlled by foreign governments. We do not find that the Constitutional provision or Public Law 95–105, is applicable.

This request for decision has been assigned Committee Action Number 556 by the Department of Defense Military Pay and Allowance Committee.

The Air Force is in receipt of a DD Form 1357, Statement of Employment, dated August 31, 1981, from Lieutenant Colonel Marvin S. Shaffer, USAF, Retired. It indicates that Colonel Shaffer is employed by American Motors Corporation (American Motors) at **\*433** director of that firm's 'China Project.' This is apparently a 'joint venture' between American Motors and the People's Republic of China, but the exact nature of the arrangement is unknown. The Committee Action notes that 46.9 percent of American Motors' stock has been acquired by the French automotive firm of Regie Nationale des Usines Renault (Renault), 92 percent of which is owned by the French government. Further, Colonel Shaffer has not requested or obtained permission from the Secretary of State and the Secretary of the Air Force to accept 'foreign employment' as required by section 509 of the Foreign Relations Authorization Act, Fiscal Year 1978, Public Law 95–105, August 17, 1977, 91 Stat. 844, 859–860, 37 U.S.C. 801 note.

On the basis of these facts the submission poses the question:

> 'Whether a corporation, incorporated in the United States, becomes an instrumentality of a foreign government when its principal stockholder is a foreign corporation substantially owned by a foreign government, so as to subject retired members of the uniformed services employed by such corporation to the constraints of Article 1, section 9, clause 8 of the Constitution?'

Article I, section 9, clause 8 of the Constitution prohibits any person 'holding any Office of Profit or Trust' under the United States from accepting any compensation, office or title from a foreign government without the consent of Congress. It is well established that that prohibition applies to retired members of the uniformed services. 58 Comp. Gen. 487 (1979), and cases cited therein. However, by enacting section 509 of Public Law 95–105, cited above, Congress gave

Lieutenant Colonel Marvin S. Shaffer, USAF, Retired, 62 Comp. Gen. 432 (1983)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 130 of 395

its consent to the employment by foreign governments in the case of various categories of personnel, including retired members of a Regular component of a uniformed service, provided they receive the approval of both the Secretary of State and the Secretary of their service or department.

**\*\*2**  However, we feel that neither Article I, section 9, clause 8, nor section 509 of Public Law 95–105 is applicable in this case.

The Committee Action refers to a decision of the Comptroller General, 53 Comp. Gen. 753 (1974), in which we concluded that a retired Regular officer of the Air Force, although nominally employed by a domestic corporation, was actually employed by a foreign corporation which was a wholly owned instrumentality of a foreign government. In that case the foreign corporation was determined to be the instrumentality of the foreign government. It was further determined that the corporation had the right to control and direct the retiree as an employee; i.e., in the performance of his work and the manner in which it was to be done. In that decision we relied upon the common law of agency. In this case, it is also necessary to rely on some of the principles of the law of corporations. While these principles were developed for entirely different reasons, we find that their application in situations such as this one will adequately protect the interests of the United States without being overly restrictive on the individuals involved.

**\*434**  As a general rule, a corporation is a legal entity separate and distinct from its shareholders. However, where equity dictates the corporate entity will be disregarded. For example, this may be done when there is such unity of interest and ownership that the separate personalities of the corporation and its shareholders no longer exist. FMC Corporation v. Murphree, 632 F.2d 413 (1980). Also, when a parent corporation used its subordinate corporation as an instrumentality or mere agent, the corporate entity was disregarded. C. M. Corporation v. Oberer Development Co., 631 F.2d 536 (1980). These are but two of many variables to be considered in establishing whether a corporate entity should be disregarded in dealing with corporations and their shareholders. For the purposes of this decision we do not believe a detailed discussion of these concepts is necessary.

Here, Colonel Shaffer is an employee of American Motors Corporation, a domestic corporation. While it is true that a controlling interest has been acquired by a foreign corporation, which is in turn controlled by a foreign government, we find no basis to disregard the corporate entity of American Motors Corporation. No indication or evidence appears which requires a conclusion that American Motors is acting as an agent or instrumentality of Renault. Notwithstanding that both American Motors and Renault may have common directors, we see no indication that American Motors and Renault are not separate entities.

Accordingly, since Colonel Shaffer is employed by a domestic corporation which appears to be a separate legal entity from its dominant shareholder, and the power to control and direct his employment is with the domestic corporation, it is our view that no violation of Article I, section 9, clause 8 of the Constitution exists. As a result, it is not necessary for Colonel Shaffer to seek the Secretarial approval required by Public Law 95–105. Additionally, we do not view the fact that Colonel Shaffer will be working on the 'China Project' as having any bearing so long as his employment is exclusively with American Motors. The basic question is answered in the negative. Since the two other questions presented were contingent on an affirmative answer, they are not relevant.

**\*\*3**  We would like to add that in circumstances where it appears that a domestic corporation is ultimately controlled by a foreign government and the domestic corporation acts as an agent or instrumentality of a foreign government, the approval required by Public Law 95–105, should be secured prior to employment. Since this is a complex area, and in order to avoid a violation, if any doubt exists concerning an employment situation, the individual concerned should request the required approval.


Milton J. Socolar

Lieutenant Colonel Marvin S. Shaffer, USAF, Retired, 62 Comp. Gen. 432 (1983)

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 131 of 395

for Comptroller General of the United States

62 Comp. Gen. 432 (Comp.Gen.), B- 210346, 1983 WL 26216

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Aug. 30, 1856. [No. 3.] *A Resolution allowing Doctor E. K. Kane, and the Officers associated with him in their late Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present.*

Preamble.

WHEREAS, the President of the United States has communicated to Congress a request from the Government of Great Britain that permission should be given by this Government allowing Doctor Elisha K. Kane, a Passed-Assistant Surgeon in the Navy of the United States, and the officers who were with him in his late expedition to the Arctic seas in search of Sir John Franklin, to accept from the Government of Great Britain some "token of thankfulness," and as a memorial of the sense entertained by that Government of "their arduous and generous services" in that behalf—

Dr. Kane and the other officers of the Arctic Expedition authorized to accept a testimonial from the British Government.

*Be it therefore resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That Congress hereby consents that Dr. Elisha K. Kane, of the Navy of the United States, and such of the officers who were with him in the expedition aforesaid, as may yet remain in the service of the United States, may accept from the Government of Great Britain such token of the character aforesaid as it may be the pleasure of that government to present to them.

APPROVED, August 30, 1856.

Aug. 30, 1856. [No. 4.] *A Resolution authorizing Alexander D. Bache to accept a Medal presented to him by the King of Sweden.*

A. D. Bache authorized to accept the medal presented to him by Sweden.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That Alexander D. Bache, Superintendent of the Coast Survey, be and he is hereby authorized to accept the gold medal recently presented to him by the King of Sweden.

APPROVED, August 30, 1856.

2010 WL 4963117 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF THE EMOLUMENTS CLAUSE AND THE FOREIGN GIFTS AND
DECORATIONS ACT TO THE GÖTEBORG AWARD FOR SUSTAINABLE DEVELOPMENT

October 6, 2010

*Neither the Emoluments Clause of the Constitution nor the Foreign Gifts and Decorations Act would bar an employee of the National Oceanic and Atmospheric Administration from accepting the 2010 Göteborg Award for Sustainable Development.*

**\*1** Memorandum Opinion for the Assistant General Counsel
Department of Commerce

You have asked for our opinion whether the Emoluments Clause of the Constitution would bar an employee of the National Oceanic and Atmospheric Administration ("NOAA") from accepting the 2010 Göteborg Award for Sustainable Development. *See* Memorandum for David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Barbara S. Fredericks, Assistant General Counsel, Department of Commerce (July 22, 2010) ("Commerce Memo"). The Clause forbids anyone "holding any Office of Profit or Trust" under the United States from accepting, without Congressional consent, "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. On the facts you have provided, we conclude that the employee may accept the award without violating the Emoluments Clause, because the award would not be "from any King, Prince, or foreign State." For similar reasons, we conclude that acceptance of the award would not violate the Foreign Gifts and Decorations Act, 5 U.S.C § 7342 (2006).

I.

The Association for the Göteborg Award for Sustainable Development ("Göteborg Award Association") has chosen a NOAA scientist [a1] to be one of two recipients of the 2010 Göteborg Award. [1] The award consists of one million Swedish Kroner (approximately $142,000) to be shared equally with the co-recipient, travel expenses to the award ceremony in Sweden, and a ceremonial globe.

The Göteborg Award Association is registered under Swedish law as a non-governmental entity, and its sole function is to administer the Göteborg Award. You have told us that the Association consists of the City of Göteborg and twelve businesses and that the Association is "funded one-third by the City and two-thirds by the private businesses." Commerce Memo at 1. The Association is managed by a Board of Trustees that currently consists of three officials of the City of Göteborg and one businessman. *See* http:// www.goteborgaward.com/en/informations sida/organisation.html (last visited Oct. 5, 2010). That Board appoints the seven-member jury that selects the winners and presents the award during a formal ceremony. None of the members of the jury that selected the 2010 awardees was a government official. The Göteborg Association's bylaws authorize the Board to act as the "ultimate decisionmaker," but you have told us that, as a matter of practice, neither the City of Göteborg nor the Association's Board has interfered with the jury's selection process during the ten years the award has existed. *See* Jacobi E-mail.

II.

**\*2** Under the Emoluments Clause of the Constitution, "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind

whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. The Clause was intended to "preserv[e] foreign Ministers & other officers of the U.S. independent of external influence" by foreign governments. 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966) (notes of James Madison); *see also* 3 *id.* at 327 ("It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." (remarks of Governor Randolph)); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing background of ratification of the Clause).

In our view, the Emoluments Clause does not apply to the NOAA scientist's acceptance of the Göteborg Award because that prize would not be tendered by a "foreign State" within the Clause's meaning.[2] That view does not rest on the notion that the City of Göteborg is not a "foreign State" under the Emoluments Clause,[3] but rather on the conclusion, based on the representations you have made, that the City does not appear to control the granting of the Göteborg Award. Rather, the selection of the award recipients appears to be made by the Göteborg Award Association, acting through a jury appointed by the Board of the Association. The relevant question here is whether the decision to grant the award to a particular individual by the jury appointed by the Board of the Association is sufficiently independent of the government of the City of Göteborg that conferral of the award should not be deemed an action of a foreign state for the purposes of the Emoluments Clause. *See Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize* at 7-8 (Dec. 7, 2009) ("*Nobel Peace Prize*"), *available at* www.justice.gov/olc/opinions.htm.

In previous opinions, the factors we have considered in conducting such an assessment include whether a foreign government has an active role in the management of the decisionmaking entity, *Foreign Public Universities*, 18 Op. O.L.C. at 15; whether a foreign government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument, Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with Trip to Indonesia* (Aug. 11, 1980) ("*Indonesia Trip*"); *see also Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156 (1982); and whether a foreign government is a substantial source of funding for the entity, *see Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) ("*International Historians*"). None of these factors has been dispositive. We have looked to them in combination to assess the status of the decisionmaking entity for purposes of the Clause, keeping in mind the underlying purpose that the Clause serves. *See, e.g.*, Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* at 4-5 (May 23, 1986) ("*NASA Scientist*") ("The answer to the Emoluments Clause question ... must depend [on] whether the consultancy would raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional prohibition").

**\*3** Although the question is close, we believe that the Göteborg Award Association, acting through the jury, is not an instrumentality of a foreign state for purposes of the Emoluments Clause. As you have told us, the Association is governed by a Board, a majority of whose members are City officials. For the Emoluments Clause analysis, however, this fact is less significant than the composition of the entity that actually selects award recipients. The selection is made not by the Association as a whole or by its Board, but by the jury of seven private individuals, without interference from the Association's members, including the municipal government. To be sure, the bylaws of the Association designate the Board as the "ultimate decisionmaker," and we assume that this control could potentially include the authority to veto the jury's selection of award winners. Our Office's precedents nonetheless suggest that such ultimate authority is not dispositive where, as here, there is a strong indication that the decision at issue was in fact made autonomously and without governmental influence.

In our *Foreign Public Universities* opinion, for example, we considered whether the University of British Columbia's hiring of faculty members was so independent of the provincial government's control as not to implicate the Emoluments Clause. We acknowledged that the University's faculty was "constituted by the board [of governors]," a majority of whose members were appointed by the provincial government. *Id.* at 14-15, 22. We nevertheless determined that the Emoluments Clause was inapplicable, in significant part because there was no evidence of a governmental effort to influence the University's faculty hiring decisions. *Id.* at 15 ("[T]he [U]niversity can be shown to be acting independently of the foreign state with respect to its faculty employment decisions."); *id.* at 20-21 ("'There is nothing to indicate that in entering into these arrangements, the universities were in any way following the dictates of the government. They were acting purely on their own initiative.'"" (quoting *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229, 269, 273 (Can.))); *id.* at 20 (noting "the autonomy of the provincial universities when making faculty employment decisions"). Despite the board of governors' "ultimate" control over the constitution of the faculty, *id.* at 20, faculty hiring decisions were, in practice, made autonomously by the University itself. [4]

Similarly, while the Board of the Göteborg Association may formally be the "ultimate decisionmaker" with respect to various aspects of the Göteborg Award, neither the Board nor the City of Göteborg has dictated the selection of recipients. Indeed, the Secretary of the Board, Lennart Wassenius, has represented that "[d]uring [his] close to ten years with the [A]ssociation it has been absolutely clear that the jury de facto has the complete control of and the full responsibility for the selection process as well as the final decision as regards the award. The Board has never discussed less so questioned, the work of the jury." Jacobi E-mail (emphases deleted). [5]

**\*4** Besides looking to whether the government makes the ultimate decision as to the conferral of a gift or emolument, our opinions indicate that a substantial amount of government funding may help to establish that an institution is an instrumentality of a "foreign State" for the purposes of the Emoluments Clause. For instance, our conclusion that a commission of international historians was a foreign state within the meaning of the Clause was based on the "Commission's establishment and funding" by the Austrian government. *International Historians*, 11 Op. O.L.C. at 89-90.

The presence of some public funding, however, does not necessarily mean that an institution counts as a "foreign State." Although the existence of significant public funding raises the potential for foreign governmental influence, other evidence of an entity's independence may establish that the Emoluments Clause does not apply. The more an entity is financed by a foreign government, the more likely it is that the state exercises control over that entity's decision to confer a present or emolument. A greater measure of public funding would require correspondingly stronger evidence that the foreign government does not in fact retain control over the decision at issue. Nevertheless, even when a foreign government was the sole source of funding for an institution, we have determined that the particular institution was not a foreign state because of its "functional and operational separation and independence" from the government. *See NASA Scientist* at 4. Such considerations of autonomy also informed our view that a federal officer could serve as a consultant to Harvard University on a project funded substantially, if not entirely, by the government of Indonesia. *See Indonesia Trip* at 5. Despite the funding by the foreign government, we determined that the Emoluments Clause did not apply because "Harvard has complete discretion in the selection" of consultants and Indonesia "neither controls nor even influences ... [Harvard's] selection and payment of consultants." *Id.* at 4-5. Here, similarly, although the City of Göteborg's contribution of one-third of the Association's annual funding is significant, this factor does not outweigh the jury's consistent ten-year practice of selecting both the nominees for and ultimate recipients of the award without governmental interference.

On the facts presented, we accordingly conclude that the NOAA scientist's receipt of the award would not violate the Emoluments Clause.

### III.

The reasons making the Emoluments Clause inapplicable also lead to the conclusion that the NOAA scientist may accept the Göteborg Award without violating the Foreign Gifts and Decorations Act. The Act generally bars the acceptance of "gifts and decorations" from "foreign government[s]" except under certain limited circumstances. 5 U.S.C. § 7342(b)(2) (2006); *id.* § 7342(a)(3) (defining "gift" to mean "a tangible or intangible present (other than a decoration) tendered by, or received from, a foreign government"). We need not address whether any of those exceptions would apply here because we do not believe that the scientist would be receiving an award "tendered by, or received from, a foreign government."

**\*5** In pertinent part, the Act defines the term "foreign government" to mean:
(A) any unit of foreign governmental authority, including any foreign national, State, local, and municipal government; .... and

(C) any agent or representative of any such unit or such organization, while acting as such.

*Id.* § 7342(a)(2).

Our Office previously gave some guidance about this definitional provision in the context of a prize awarded by the Alexander Von Humboldt Foundation. *See* Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel (Mar. 17, 1983) ("*Von Humboldt Foundation*"). The Foundation was established and mainly financed by the West German government, and we noted that the West German government was undoubtedly a "unit of foreign governmental authority." *Id.* at 2. Yet we explained that it was not necessary "to go into the questions whether, in view of its intimate connection with the German Government, the Foundation should always be considered a foreign government." *Id.* at 3. Under the statute, the relevant question was instead whether the Alexander Von Humboldt Foundation was a "foreign government, as defined in section 7342(a)(2)(C), while it [was] acting as the agent for the German Government in connection with the administration of [the award program]." *Id.; see also* 5 U.S.C. § 7342(a)(2)(C) ("agent or representative ... *while acting as such*" (emphasis added)). On the facts, we concluded that the Foundation was acting as an agent in awarding the prize. In particular, ministers of the German government sat not only on the Board of the Foundation, but also on the special committee of the Foundation that selected the award recipients.[6]

This prior interpretation of the Act supports the conclusion that the Göteborg Association is not a "foreign government" within the meaning of the Act. Although, as a "local" or "municipal government," the City of Göteborg is a "unit of foreign governmental authority," *id.* § 7342(a)(2)(A), we do not believe that this definition of "foreign government" applies to the Göteborg Award Association, which is registered as a non-governmental entity under Swedish law, when it acts through its award jury consisting of private persons. To be sure, the City's representation on the Association's Board makes it theoretically possible that the Association could function as an agent or representative of the City for certain purposes, but the critical question is whether the Association acts as an agent or representative of the City in determining the winners of the award. *Id.* § 7342(a)(2)(C); *see also Von Humboldt Foundation* at 1. As explained above, the Association has assigned a jury of private persons the authority to select the recipients of the Göteborg Award-a decision made without interference by either the Board or the Association's members, including the City government. The Board does appoint the award jury's members, but the jury's private composition and decisional autonomy refute the idea that the jury members act as "agents or representatives" of the City when they choose the recipients of the Göteborg Award. Furthermore, unlike the special committee of the Von Humboldt Foundation, the Göteborg Award Association does not distribute a wholly (or even mostly) government-financed award. *See Von Humboldt Foundation* at 2. The majority of the Association's funding (two-thirds) comes from private businesses. The Act consequently poses no bar to the scientist's acceptance of the Göteborg Award.

**IV.**

**\*6**  For the foregoing reasons, we conclude that neither the Emoluments Clause nor the Foreign Gifts and Decorations Act would prohibit the NOAA scientist from accepting the Göteborg Award. [7]


Daniel L. Koffsky

Deputy Assistant Attorney General

[a1]  **Editor's Note: For privacy purposes, the published version of the opinion does not identify the NOAA scientist.**

[1]  For the facts regarding the award, we rely chiefly upon the statements of the Commerce Department. *See* Commerce Memo at 1; *see also* E-mail for Pankaj Venugopal, Attorney-Adviser, Office of Legal Counsel, from Will Jacobi, Senior Counsel, Department of Commerce (Aug. 20, 2010) ("Jacobi E-mail").

[2]  In light of this conclusion, we do not address whether the NOAA scientist holds an "Office of Profit or Trust" within the meaning of the Emoluments Clause. Nor do we consider whether each element of the Göteborg Award-the cash prize, the travel to Sweden, or the ceremonial globe-is a "present" or "Emolument ... of any kind whatever." U.S. Const. art I, § 9, cl. 8.

[3]  We need not resolve that issue definitively here. At least once, we have informally advised that the term "foreign State" in the Emoluments Clause applies equally to national governments and to sub-national governmental units. *See* Memorandum to Files from Rosemary Nidiry, Attorney-Adviser, *Re: Title of Honorary Village Chief from a Nigerian Village* at 2 (Jan. 19, 2001) (rejecting a "literal reading" of the term "foreign State" in the Emoluments Clause and noting that "just as 'King' and 'Prince' should be read to cover a foreign 'Queen' or 'Princess' or 'Duke,' 'foreign State' did not mean merely the 'national government of that foreign State,' but also should include any political governing entity within that foreign state"). And we appear to have assumed the same position in one of our published opinions. *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 19 (1994) ("*Foreign Public Universities*") (characterizing University of Victoria as "an instrumentality of a foreign state (the province of British Columbia)"). The Comptroller General has also taken the position that the Emoluments Clause is not limited to the national government of a foreign state. *See Major James D. Dunn*, B-251084, 1993 WL 426335, at \*3 (Comp. Gen. Oct. 12, 1993) ("Foreign governmental influence can just as readily occur whether a member is employed by local government within a foreign country or by the national government of the country. For this reason, we believe that the term 'foreign State' should be interpreted to include local governmental units within a foreign country as well as the national government itself."); *see also* 44 Comp. Gen. 130, 131 (1964) ("[T]he State of Tasmania must be considered a 'foreign State' within the meaning of the constitutional provision.").

[4]  We acknowledge that, in the *Foreign Public Universities* opinion, decisions of Canadian courts had affirmed the independence of the universities from day-to-day control by the government, 18 Op. O.L.C. at 20 (citing *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451 (Can.); *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229 (Can.)), while here the conclusion that the jury is independent does not rest on a foreign judicial determination. The issue here is thus closer than in our earlier opinion. Even in *Foreign Public Universities*, however, we observed that the Canadian court cases, while "compelling evidence" of independence, "cannot of course determine our interpretation of the Emoluments Clause." *Id.* at 22. The question, here as there, is whether the decisionmaking entity is free from governmental control when it makes its selection.

[5]  The Board does appoint the jury members, but in view of the private composition of the jury and its de facto autonomy in selecting award recipients, we do not view the Board's "appointment authority ... as having dispositive significance." *Nobel Peace Prize* at 10.

[6]  Although we concluded that the award was from a foreign government, we advised that the award could be accepted because it fell within the Act's exception for "educational scholarship[s]." *See Von Humboldt* at 4 (citing 5 U.S.C. § 7342(c)(1)(B)).

[7]  We address here only the Emoluments Clause and the Foreign Gifts and Decorations Act. In particular, we do not consider 5 C.F.R. § 2635.502(d) (2010), a provision in the Standards of Ethical Conduct for Employees in the Executive Branch dealing with acceptance of awards.

2010 WL 4963117 (O.L.C.)

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 6365082 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF THE EMOLUMENTS CLAUSE AND THE FOREIGN GIFTS AND
DECORATIONS ACT TO THE PRESIDENT'S RECEIPT OF THE NOBEL PEACE PRIZE

December 7, 2009

*The Emoluments Clause of the Constitution does not apply to the President's receipt of the Nobel Peace Prize. The Foreign Gifts and Decorations Act does not bar the President from accepting the Peace Prize without congressional consent.*

**\*1**  Memorandum Opinion for the Counsel to the President

This memorandum concerns whether the President's receipt of the Nobel Peace Prize would conflict with the Emoluments Clause of the Constitution, which provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. As we previously explained in our oral advice and now explain in greater detail, because the Nobel Committee that awards the Peace Prize is not a "King, Prince, or foreign State," the Emoluments Clause does not apply. You have also asked whether the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2006), bars the President from receiving the Peace Prize. Here, too, we confirm our previous oral advice that it does not.

I.

On October 9, 2009, the Norwegian Nobel Committee (the "Peace Prize Committee" or the "Committee"), headquartered in Oslo, Norway, announced that the President will be this year's recipient of the Nobel Peace Prize. The 2009 Peace Prize, which will consist of ten million Swedish Kroner (or approximately $1.4 million), a certificate, and a gold medal bearing the image of Alfred Nobel, is expected to be awarded by the Nobel Committee to the President on December 10, 2009—the anniversary of Nobel's death. *See Statutes of the Nobel Foundation* § 9, *available at* http://nobelprize.org/nobelfoundation/statutes.html (last visited Nov. 24, 2009) ("Nobel Foundation Statutes"); *see also The Nobel Prize Amounts, available at* http://nobelprize.org/nobel_prizes/amounts.html (last visited Nov. 24, 2009).

The Peace Prize is a legacy of Swedish chemist Alfred Bernhard Nobel. In his will, Nobel directed that a portion of his wealth be used to establish a set of awards, one of which, the Peace Prize, was intended to honor the person or entity that "shall have done the most or the best work for fraternity between nations, for the abolition or reduction of standing armies and for the holding and promotion of peace congresses." Nobel Foundation Statutes § 1 (setting forth the pertinent provision of Nobel's will). The relevant assets of the Nobel estate have been managed since 1900 by the Nobel Foundation, a private institution based in Stockholm, Sweden. *See* Birgitta Lemmel, *The Nobel Foundation: A Century of Growth and Change* (2007), *available at* http:// nobelprize.org/nobelfoundation/history/lemmel (last visited Nov. 24, 2009). The Foundation is responsible for managing the assets of the bequest in such a manner as to provide for the annual award of the Nobel prizes and the operation of the prize-awarding bodies, including the Nobel Committee that selects the Peace Prize. Nobel Foundation Statutes § 14; *see also* Lemmel, *supra* ("One vital task of the Foundation is to manage its assets in such a way as to safeguard the financial base of the prizes themselves and of the prize selection process."). Unlike the other Nobel prizes, for accomplishments in fields such as literature and physics, which are awarded by committees appointed by Swedish institutions, Nobel specified in his will that the recipient of the prize "for champions of peace" was to be selected "by a committee of five persons to be elected by the Norwegian Storting [i.e., the Norwegian Parliament]." Nobel Foundation Statutes § 1.

**\*2** On April 26, 1897, the Storting formally agreed to carry out Nobel's will and, in August of that year, elected the first members of the Nobel Committee that would award the prize funded by Nobel's estate. That Committee— not the Storting itself, or any other official institution of the Norwegian government, or the Nobel Foundation—has selected the Peace Prize recipients since 1901. To be sure, in its nascent years, the Nobel Committee was more "closely linked not only to the Norwegian political establishment in general, but also to the Government," than it is today. *See* Øyvind T‰Fnnesson, *The Norwegian Nobel Committee* (1999), *available at* http://nobelprize.org/nobel_ prizes/peace/articles/ committee (last visited Nov. 24, 2009). Indeed, until 1977, the Committee's official title was the Nobel Committee of the Norwegian Storting. Nevertheless, it has long been recognized that the "[C]ommittee is formally independent even of the Storting, and since 1901 it has repeatedly emphasized its independence." T‰Fnnesson, *supra*. In 1936, for instance, the Norwegian Foreign Minister and a former Prime Minister recused themselves from the Committee's deliberations out of concern that bestowing the award on the German pacifist Carl von Ossietzky would be perceived as an act of Norwegian foreign policy. *Id.; see also Berlin Protests Ossietzky Award*, N.Y. Times, Nov. 26, 1936, at 22 (noting that "Norway [d]enies [r]esponsibility for Nobel [d]ecision"). To make clear the independent nature of the Committee's decisions, moreover, the Storting in the very next year, 1937, barred government ministers from sitting on the Nobel Committee. *See Special Regulations for the Award of the Nobel Peace Prize and the Norwegian Nobel Institute, etc., adopted by the Nobel Committee of the Norwegian Storting on the 10th day of April in the year 1905 (including amendments of 1977, 1991, 1994, 1998 and 2000)* § 9, *available at* http:// nobelprize.org/nobelfoundation/statutes-no.html (last visited Nov. 24, 2009) ("Nobel Peace Prize Regulations") ("If a member of the [Nobel] Committee is appointed a member of the Government during his period of office, or if a member of the Government is elected a member of the Committee, he shall resign from the Committee for as long as he continues in office as a Minister"). Furthermore, for more than 30 years, no member of the Committee has been permitted as a general matter to continue serving in the Storting. *See* T‰ DFnnesson, *supra* ("[I]n 1977 ... the Storting decided that its members should not participate in nonparliamentary committees appointed by the Storting itself."). [1] That said, an appointment to the Committee does not appear to require a sitting member of the Storting to resign immediately from his or her government position, and thus two of the current members, who joined the Nobel Committee in 2009, appear to have served on the Storting during much, if not all, of the period during which this year's Prize recipient was selected. *See* List of Nobel Committee Members, *available at* http:// nobelpeaceprize.org/en_ GB/nomination_committee/members/ (last visited Dec. 4, 2009). The other three members of the Committee were private individuals. *Id.*

**\*3** Apart from the Storting's role in selecting the members of the Nobel Committee, the Norwegian government has no meaningful role in selecting the Prize recipients or financing the Prize itself. In addition to fully funding the Prize, the Sweden-based private Nobel Foundation, established pursuant to Alfred Nobel's will, is responsible for the Committee's viability and the administration of the award. Specifically, your Office has informed us that the Committee's operations, including the salaries of the various Committee members and of the staff, are funded by the Foundation and not by the Norwegian or Swedish governments. *See* E-mail from Virginia R. Canter, Associate Counsel to the President, to David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel (Nov. 2, 2009, 19:11 EST) ("E-mail to Barron") (summarizing telephonic interview with Geir Lundestad, Secretary to the Nobel Committee and Director of the Nobel Institute); *see also* Nobel Foundation Statutes § 11 ("The Board of the Foundation shall establish financial limits on the work that the prize-awarding bodies perform in accordance with these statutes"); *Id.* § 6 ("A member of a Nobel Committee shall receive remuneration for his work, in an amount to be determined by the prize-awarding body [i.e., the Nobel Committee]."). The Committee also deliberates and maintains staff in the Nobel Institute building, which is owned by the private Nobel Foundation rather than by the government of Sweden or Norway. *See The Nobel Institute, available at* http://nobelpeaceprize.org/en_GB/institute/ (last visited Dec. 4, 2009) (noting that Nobel Institute building is also where the recipient of the Peace Prize is announced); *see also* Description of Nobel Institute Building, *available at* http://nobelpeaceprize.org/en_GB/institute/nobel-building/ (last visited Dec. 4, 2009). Although the Nobel Foundation plays a critical role in sustaining the Nobel Committee and the Peace Prize, it is the Nobel Committee that independently selects the Prize recipients. *See* Organizational Structure of the Nobel Entities, *available at* http://nobelprize.org/nobelfoundation/org_ structure.html (last visited Nov. 24, 2009) ("The Nobel Foundation does

not have the right or mandate to influence the nomination and selection procedures of the Nobel Laureates."); *see also* Lemmel, *supra* ("[T]he Prize-Awarding Institutions are not only entirely independent of all government agencies and organizations, but also of the Nobel Foundation.").

II.

The Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. Adopted unanimously at the Constitutional Convention, the Emoluments Clause was intended to recognize the "necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence," specifically, undue influence and corruption by foreign governments. *See* 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966) (notes of James Madison); *see also* 3 *Id.* at 327 ("It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." (remarks of Governor Randolph)); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 116 (1993) ("*ACUS*"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing the background of the ratification of the Clause).

**\*4**  The President surely "hold[s] an[] Office of Profit or Trust," and the Peace Prize, including its monetary award, is a "present" or "Emolument ... of any kind whatever." U.S. Const. art I, § 9, cl. 8. The critical question, therefore, concerns the status of the institution that makes the award. Based on the consistent historical practice of the political branches for more than a century with respect to receipt of the Peace Prize by high federal officials, as well as our Office's precedents interpreting the Emoluments Clause in other contexts, we conclude that the President in accepting the Prize would not be accepting anything from a "foreign State" within the Clause's meaning. Accordingly, we do not believe that the President's acceptance of the Peace Prize without congressional consent would violate the Emoluments Clause.

A.

None of our Office's precedents concerning the Emoluments Clause specifically considers the status of the Nobel Committee (or the Nobel Foundation), but there is substantial and consistent historical practice of the political branches that is directly relevant. The President would be far from the first government official holding an "Office of Profit or Trust" to receive the Nobel Peace Prize. Rather, since 1906, there have been at least six federal officers who have accepted the Prize while serving in their elected or appointed offices. The Peace Prize has been received by two other sitting Presidents— Theodore Roosevelt and Woodrow Wilson—by a sitting Vice President, Secretary of State, and Senator, and by a retired General of the Army, [2] with the most recent of these acceptances having occurred in 1973. Throughout this history, we have found no indication that either the Executive or the Legislative Branch thought congressional approval was necessary.

The first instance of the Nobel Committee awarding the Peace Prize to a sitting officer occurred only five years after the Committee began awarding the Prize. In 1906, President Theodore Roosevelt received the Peace Prize. [3] On December 10 of that year, United States Minister to Norway Herbert H.D. Pierce accepted the "diploma, medal, and order upon the Nobel trustees [of the Nobel Foundation] for the amount of the prize" on Roosevelt's behalf. *See "Emperor Dead" and Other Historic American Diplomatic Dispatches* 336-37 (dispatch from Pierce to Secretary of State Elihu Root) (Peter D. Eicher ed., 1997) ("Pierce Dispatch"). Not only did Roosevelt accept the Peace Prize while President, he also chose as President to use the award money (roughly $37,000) to establish a foundation for the promotion of "industrial peace." *See* Oscar S. Straus, *Under Four Administrations: from Cleveland to Taft* 239-40 (1922) (noting that Roosevelt transferred the draft of the monetary award to Chief Justice Fuller in January of 1907 to initiate efforts to establish the Foundation).

**\*5**  We have found no indication that the President or Congress believed that receipt of the Prize, including its award money, required legislative approval. Although Congress passed legislation to establish Roosevelt's foundation, *see* Act of Mar. 2, 1907, ch. 2558, 34 Stat. 1241 (1907), it did so some months *after* he accepted the Peace Prize, and we think it clear that neither the President nor Congress thought this law necessary to satisfy the Emoluments Clause.[4] The bill that established the trust said nothing about consent even though Congress assuredly knew how to express such legislative approval for Emoluments Clause purposes. For instance, the same Congress that established the foundation at Roosevelt's request also "authorized [Professor Simon Newcomb, a retired Naval Officer] to accept the decoration of the order 'Pour le Mérite, für Wissenschaftern und Kunste,' conferred upon him by the German Emperor," Act of Mar. 30, 1906, ch. 1353, 34 Stat. 1713, and granted "[p]ermission ... to [a Navy Rear-Admiral] ... to accept the China war medal, with Pekin clasp, tendered to him by the King of Great Britain, and the Order of the Red Eagle, with swords, tendered to him by the Emperor of Germany," S.J. Res. 98, 59th Cong., 34 Stat. 2825 (1907).[5]

Perhaps most importantly, the statute that established the foundation to administer the prize money that Roosevelt had accepted does not address at all Roosevelt's receipt of the gold medal and diploma. Yet the medal and the diploma have always constituted elements of the Peace Prize, *see* Pierce Dispatch at 337 (noting receipt of Nobel medal); *see also* Nobel Lecture of President Roosevelt (May 5, 1910), *available at* http://nobelprize.org/nobel_ prizes/peace/laureates/1906/ roosevelt-lecture.html (last visited Nov. 23, 2009) ("The gold medal which formed part of the prize I shall always keep, and I shall hand it on to my children as a precious heirloom."), and they constitute a "present" or "Emolument ... of any kind whatever" within the meaning of the Emoluments Clause. Thus, if the law establishing the trust to be funded by the award money had been intended to provide congressional consent for President Roosevelt's receipt of the Prize, it would presumably have encompassed these elements of the Prize as well.

The example more than a decade later of President Wilson also clearly reflects an understanding by the political branches that receipt of the Peace Prize does not implicate the Emoluments Clause. When, in December of 1920, President Wilson received the Peace Prize, he, unlike President Roosevelt, did not seek to donate the Prize proceeds to a charitable cause or enlist Congress's aid in accomplishing such a charitable purpose. Instead, he simply accepted the Prize and deposited the award money in a personal account in a Swedish bank, apparently hoping for a favorable movement in the Kroner/ dollar exchange rate. *See* 67 *The Papers of Woodrow Wilson* 51-52 (Arthur S. Link ed., 1992) (diary of Charles Lee Swem). President Wilson does not appear to have sought congressional approval for his acceptance, nor does it appear that Congress thought its consent was required.

**\*6**  These Presidents are not, as indicated above, the only federal officers who have received the Peace Prize. Senator Elihu Root in 1913, Vice President Charles Dawes in 1926, retired General of the Army George Marshall in 1953, and Secretary of State Henry Kissinger in 1973 each received the Nobel Peace Prize. *See* List of Nobel Peace Prize Laureates, *supra*. As was the case with Presidents Roosevelt and Wilson, none of these recipients, as far as we are aware, received congressional consent prior to accepting the Prize or congressional ratification of such receipt at any time thereafter.

This longstanding treatment of the Nobel Peace Prize is particularly significant to our analysis because several of the Prizes were awarded when the Nobel Committee—then known as the Nobel Committee of the Norwegian Storting—lacked some of the structural barriers to governmental control that are present today, such as rules generally barring government ministers and legislators from serving on the Committee. If anything, then, these prior cases arguably would cause more reason for concern than would be present today, and yet the historical record reveals no indication that either the Congress or the Executive believed receipt of the Prize implicated the Emoluments Clause at all. The absence of such evidence is particularly noteworthy since the Clause was recognized as a bar to gifts by foreign states without congressional consent throughout this same period of time, such that the Attorney General and this Office advised that various gifts from foreign states could not be accepted, *see, e.g., Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116, 118 (1902), and Congress passed legislation specifically manifesting its consent to some gifts bestowed by foreign states on individuals covered by the Clause. *See supra* n.5. To be sure, this long, unbroken practice of high federal officials accepting the Nobel Peace Prize without congressional consent cannot dictate the outcome of our constitutional analysis.

But we do think such practice strongly supports the conclusion that the President's receipt of the Nobel Peace Prize would not conflict with the Emoluments Clause, as it may fairly be said to reflect an established understanding of what constitutes a gift from a "foreign State" that would trigger application of the Clause's prohibition. *Cf. American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (analyzing President's foreign affairs power under the Constitution in light of "longstanding practice" in Executive Branch and congressional silence); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981) (noting that a "'systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned ... may be treated as a gloss on'" the Constitution); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring) ("Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them."); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 315, 401 (1819) (where "the great principles of liberty are not concerned ... [a doubtful question,] if not put at rest by the practice of the government, ought to receive a considerable impression from that practice").

**B**.

**\*7**  The precedents of our Office reinforce the constitutional conclusion that the historical practice recounted above strongly suggests. Indeed, our Office's numerous opinions on the Emoluments Clause have never adverted to the receipt of the Peace Prize by government officials and certainly have never suggested that the numerous acceptances of the Prize were contrary to the Clause. That is not surprising. Under these same opinions, it is clear that, due to the unique organization of the Nobel Committee (including its reliance on the privately endowed Nobel Foundation), Nobel Peace Prize recipients do not receive presents or emoluments from a "foreign State" for purposes of the Emoluments Clause.

The precedents of the Office do establish that the Emoluments Clause reaches not only "foreign State[s]" as such but also their instrumentalities. *ACUS*, 17 Op. O.L.C. at 122; *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 18 (1994) ("*Public Univ.*"). Quite clearly, the Nobel Committee is not itself a foreign state in any traditional sense. The issue, therefore, is whether the Committee has the kind of ties to a foreign government that would make it, and by extension the Nobel Foundation in financing the Prize, an instrumentality of a foreign state under our precedents. Our past opinions make clear that an entity need not engage specifically in "political, military, or diplomatic functions" to be deemed an instrumentality of a foreign state. [6] *See Public Univ.*, 18 Op. O.L.C. at 19; *see also ACUS*, 17 Op. O.L.C. at 122 ("[T]he language of the Emoluments Clause does not warrant any distinction between the various capacities in which a foreign State may act."). Thus, for example, we have determined that entities such as corporations owned or controlled by a foreign government and foreign public universities may fall within the prohibition of the Clause. *ACUS*, 17 Op. O.L.C. at 121-22.

To determine whether a particular case involves receipt of a present or emolument from a foreign state, however, our Office has closely examined the particular facts at hand. Specifically, we have sought to determine from those facts whether the entity in question is sufficiently independent of the foreign government to which it is arguably tied— specifically with respect to the conferral of the emolument or present at issue, e.g., hiring an employee or bestowing an award, *Public Univ.*, 18 Op. O.L.C. at 20—that its actions cannot be deemed to be those of that foreign state. In short, our opinions reflect a consistent focus on whether an entity's decision to confer a particular present or emolument is subject to governmental control or influence. [7]

The factors we have considered include whether a government is the substantial source of funding for the entity, *e.g., Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) ("*International Historians*"); whether a government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument, *e.g.*, Memorandum for John F. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with Trip to Indonesia* (Aug. 11, 1980) ("Indonesia Op."); and whether a government has an active role in the management of the entity, such as through having government

officials serve on an entity's board of directors, *e.g.*, *Public Univ.*, 18 Op. O.L.C. at 15. No one of these factors has proven dispositive in our prior consideration of Emoluments Clause issues. Rather, we have looked to them in combination to assess the status of the entity for purposes of the Clause, keeping in mind at all times the underlying purpose that the Clause is intended to serve. *See, e.g.*, Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986) ("given [foreign public university's] functional and operational separation and independence from the government of Australia and state political instrumentalities .... [t]he answer to the Emoluments Clause question ... must depend [on] whether the consultancy would raise the kind of concern (viz., the potential for 'corruption and foreign influence') that motivated the Framers in enacting the constitutional prohibition").

**\*8**  Consistent with this analysis, we have concluded in the past that Emoluments Clause concerns are raised where the "ultimate control" over the decision at issue—e.g., an employment decision or a decision to bestow an award— resides with the foreign government. For instance, an employee of the Nuclear Regulatory Commission ("NRC") sought authorization to work for a consulting firm that was retained by the Mexican government. *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982). Because we concluded that the "ultimate control, including selection of personnel, remains with the Mexican government," *Id.* ("the retention of the NRC employee by the consulting firm appears to be the principal reason for selection of the consulting firm by the Mexican government"), we determined that the Emoluments Clause barred the arrangement. Similarly, we concluded that an invitation to join a commission of international historians that was established and funded entirely by the Austrian government constituted an invitation from the Austrian government itself. *International Historians*, 11 Op. O.L.C. at 90.

By contrast, although we have previously opined that foreign public universities are presumptively instrumentalities of a foreign state for the purposes the Emoluments Clause, we determined that two NASA scientists on leave without pay could be employed by the University of Victoria in British Columbia, Canada, without triggering that constitutional restraint. *Public Univ.*, 18 Op. O.L.C. at 13. We came to this conclusion because the evidence demonstrated that the University acted independently of the Canadian (or the British Columbian) government when making faculty employment decisions. *Id.* at 15 ("[T]he University of Victoria should not be considered a foreign state."). To be sure, as we acknowledged, the University was under the formal control of the British Columbia government. *Id.* at 20 (noting that the government had "ultimate" control of the University); *see also id.* at 15 (noting that the faculty was "constituted" by the University's Board of Governors, the majority of whom were appointed by the provincial government). Nevertheless, it was critical to our analysis that the specific conduct at issue—the University's selection of faculty—was not made by the University "under statutory compulsion" or pursuant to the "dictates of the government." *Id.* at 20-21 (quoting *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229, 269 (Can.) (plurality op.)).

Similar considerations of autonomy informed our view that a federal officer could serve as a consultant to Harvard University on a project funded by the government of Indonesia. *See* Indonesia Op. at 5. Although the consulting services were to be rendered for the benefit of Indonesia and the individual consultant's expenses were to be reimbursed by Harvard from funds paid by Indonesia, we identified no violation of the Emoluments Clause. We reached this conclusion in significant part because, under the consulting arrangement, Harvard had the sole discretion over the consultants it chose, and Indonesia had no veto power over those choices. *Id.* ("Since ... the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated.").

**\*9**  In light of these precedents, we believe that it is significant that the Nobel Committee's selection of the Peace Prize recipient is independent of the dictate or influence of the Norwegian government. As far as we are aware, the Norwegian government has no authority to compel the Committee to choose the Prize recipient; nor does it have any veto authority with respect to the selection by the Committee members, who, in any event, are not appointed by a single official to whom they are accountable, but are instead elected by the multimember Storting. *See* Nobel Foundation Statutes § 1. To

be sure, Norwegian government officials may submit nominations to the Committee, but that opportunity is shared by any "[m]embers of national assemblies and governments of states," along with "University rectors" and "professors of social sciences, history, philosophy, law and theology." Nobel Peace Prize Regulations § 3. Indeed, the formal process of nomination and selection of a Prize recipient is not guided by the government, but by the private, Sweden-based Nobel Foundation and the Nobel Committee. [8] For example, pursuant to the Foundation's rules, no prize-awarding body, including the Peace Prize Committee, may reveal the details of its deliberations "until at least 50 years have elapsed after the date on which the decision in question was made." Nobel Foundation Statutes § 10. We have found no indication that the Norwegian government or its officials, if requesting such information, would be exempt from this restraint on disclosure. Other aspects of the selection process, including guidelines on nominations and supporting materials, are either provided in the private Foundation's statutes or delegated by the Foundation—not by the Norwegian government —to the prize-awarding bodies, including the Peace Prize Committee. *E.g., Id.* § 7 ("To be considered eligible for an award, it is necessary to be nominated in writing by a person competent to make such a nomination."). These formal limits on the capacity of the Norwegian government to influence, let alone control, the Committee's decision, are consistent with the Committee's own repeated assertions of its independence. *See* T%DFnnesson, *supra*.

The Government of Norway's financial connection to the Nobel Committee is even more attenuated. It appears that the members of the Nobel Committee are compensated for their services by the privately funded Nobel Foundation, *see* E-mail to Barron, and the precise amount of the remuneration is set by the Nobel Committee, not the Norwegian government. *See* Nobel Foundation Statutes § 6. The Peace Prize itself, including its cash award and other elements, is funded by the Nobel Foundation, which alone is responsible for ensuring that all of the Nobel prize-awarding bodies can accomplish their purposes and which is itself financed by private investments and not government funding. *Id.* § 14 ("The Board [of the Foundation] shall administer the property of the Foundation for the purposes of maintaining good long-term prize-awarding capacity and safeguarding the value of the Foundation's assets in real terms."); *see also* The Nobel Foundation's Income Statement (2008), *available at* http:// nobelprize.org/nobelfoundation/incomes.html (last visited Dec. 7, 2009); Lemmel, *supra* (describing Nobel Foundation's investment strategies to ensure financial base of Nobel Prizes).

**\*10** Thus, in our view, the only potentially relevant tie to the Norwegian government is that, in accordance with Alfred Nobel's will, the Storting elects the Nobel Committee's five members. Further, we are aware that, notwithstanding the rules generally barring sitting members of the Storting from the Nobel Committee, two members of the Storting served on the Committee for several months before leaving their parliamentary seats. However, in light of the strong basis for the Committee's autonomy, both as to the decision it makes and the finances upon which it draws, we do not view the Storting's appointment authority, or a minority of the Committee members' short-term overlap with parliamentary service, as having dispositive significance.

Nor has our Office done so in the past in analogous cases. In determining that an award to a Navy scientist from the Alexander von Humboldt Foundation was from the German government for the purposes of the Emoluments Clause, for example, we noted that the "awards are made by a 'Special Committee,' on which the Federal Ministries for Foreign Affairs and Research and Technology are represented." *See* Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Mar. 17, 1983). But we did not indicate that the presence of the government ministers on the award committee was the decisive factor in our analysis. Instead, we also noted that the Foundation was reestablished (because it had once been dissolved) by the Federal Republic of Germany, specifically by its Ministry of Foreign Affairs. In addition, we noted that the Foundation that administered the award was financed mainly through annual payments from the West German government. *See id.* By contrast, the Nobel Committee is financed by the private Nobel Foundation, and although the Norwegian government may have formally established the Committee (as the "Nobel Committee of the Norwegian Storting"), it did so pursuant to a private individual's will, which assigned the Storting the limited role of electing the Committee's members, who would be charged with exercising their independent judgments.

Likewise, we concluded that the University of British Columbia in hiring faculty was not acting as a foreign state for the purposes of the Emoluments Clause—notwithstanding the provincial government's power to appoint a majority of the members of the University's board of governors. *Public Univ.*, 18 Op. O.L.C. at 14, 22 (citing *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451, 459 (Can.) (plurality op.)). We also determined that the Prince Mahidol Foundation was not an instrumentality of the Government of Thailand for the purposes of the Emoluments Clause, although several officials of the Thai government and the Royal Princess of Thailand sat on the Foundation's board. Memorandum to File from Daniel L. Koffsky, *Re: Application of the Emoluments Clause to a U.S. Government Employee Who Performs Services for the Prince Mahidol Foundation* (Nov. 19, 2002) ("Mahidol Op."). [9]  In each case, we found countervailing indications of autonomy to be more significant. As noted above, we concluded that the University of British Columbia's faculty decisions, including contract negotiations and collective bargaining, were not subject to governmental compulsion. *Public Univ.*, 18 Op. O.L.C. at 20-21 (noting University's "'legal autonomy'"). And despite the presence of the Thai government and royalty, we determined that the decision-making process of the Prince Mahidol Foundation's Board evidenced "independent judgment." Mahidol Op. at 4 (also noting that "most of the funds for the Foundation do not come from the [Thai] government"). These same considerations concerning the exercise of independent judgment and financial autonomy are at least as present here.

   **\*11**  In sum, determining whether an entity is an instrumentality of a foreign government is necessarily a fact-bound inquiry, *see Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158 (1982) ("Each situation must ... be judged on its facts."), and the weight of the evidence in light of this Office's consistent precedents—and as reinforced by the substantial historical practice—demonstrates that the awarding of the privately financed Peace Prize through the Nobel Committee does not constitute the conferral of a present or emolument by a "foreign State" for the purposes of the Emoluments Clause.

**III**.

Our reasoning regarding the Emoluments Clause is equally applicable to the Foreign Gifts and Decorations Act. The Act provides express consent for officials to accept "gifts and decorations" from "foreign government[s]" under certain limited circumstances not present here. *See* 5 U.S.C. § 7342(b) (2006) ("An employee may not ... accept a gift or decoration, other than in accordance with the provisions of" the Act); *see also id.* § 7342(a)(1)(E) (providing that the President is subject to the Act). Section 7342(a)(2) defines the term "foreign government" as follows:
"foreign government" means —
(A) any unit of foreign governmental authority, including any foreign national, State, local, and municipal government;

(B) any international or multinational organization whose membership is composed of any unit of foreign government described in subparagraph (A); and

(C) any agent or representative of any such unit or such organization, while acting as such.


While we do not necessarily assume that Congress intended the meaning of "foreign government" to be coextensive with the constitutional term "foreign State," we have recognized that the Act's reference to "any unit of foreign governmental authority" is likely narrower in scope than the Emoluments Clause. *See ACUS*, 17 Op. O.L.C. at 121 (recognizing that corporations owned or controlled by foreign States are arguably not "units of foreign governmental authority," although they are presumptively subject to the Emoluments Clause); *cf.* S. Rep. No. 95-194, at 29 (1977) (definition of "foreign government" intended to reach "foreign governmental subdivision(s)" and "quasi-government organizations"). For the reasons discussed in detail above, the Nobel Committee in choosing the recipients of the Peace Prize, like the Nobel Foundation in financing the Prize, operates as a private non-governmental organization and not as a "unit" of a foreign government. Moreover, given the Foundation's private nature and the facts that the Committee acts independently of any

government and is not required to include any government officials on it, *see The Norwegian Nobel Committee, available at* http://nobelprize.org/prize_ awarders/peace/committee.html (last visited Nov. 23, 2009) ("Although this is not a requirement, all committee members have been Norwegian nationals."), we conclude that neither is an "international or multinational organization" because neither is "composed of any unit of foreign government," let alone composed of units of more than one foreign government. 5 U.S.C. § 7342(a)(2)(B); *see also* Memorandum to the General Counsel, The Smithsonian Institution, from Daniel L. Koffsky, Acting Assistant Attorney General, *Re: Emoluments Clause and World Bank* (May 24, 2001), *available at* www.usdoj.gov/olc/opinions.htm (concluding that international organizations of which the United States is a member are not generally subject to the Emoluments Clause and observing that the Act's coverage of international organizations was likely "motivated by policy concerns as opposed to constitutional ones"). Nor is the Committee as a whole, or, by extension, the Nobel Foundation in financing the Prize, an "agent or representative" of any unit of a foreign government or any international organization for purposes of the Act. Although two members of the Committee continued to serve in the Storting before leaving their parliamentary seats, we do not believe this limited tie between the Government of Norway and the Committee, affecting a minority of the Committee's members, transformed the Nobel Committee into an agent or representative of the Norwegian government. *Id.* § 7342(a)(2)(C). The countervailing indications of autonomy described above support that conclusion. Consequently, the Foreign Gifts and Decorations Act poses no bar to the President's receipt of the Peace Prize.

### IV.

**\*12**  For the reasons given above, we conclude that neither the Emoluments Clause nor the Foreign Gifts and Decorations Act prohibits the President from receiving the Nobel Peace Prize without congressional consent.

Please let us know if we may be of further assistance.

David J. Barron
Acting Assistant Attorney General

[1]  To further emphasize the Committee's independence from the Norwegian government, including the monarchy, "[u]nlike the prize award ceremony in Stockholm [for the other Nobel Prizes], it is the Chairperson of the Nobel Committee, and not the King [of Norway]" who formally presents the Peace Prize. T%DFnnesson, *supra.*

[2]  *See* Memorandum to File from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Award of Honorary British Knighthood to Retiring Military Officer* (Aug. 27, 1996) (retired military officers continue to "hold[] [an] Office of Profit or Trust" under the United States and hence remain subject to the Emoluments Clause); *see also* 53 Comp. Gen. 753 (1974) (same).

[3]  *See* List of Nobel Peace Prize Laureates, *available at* http:// nobelprize.org/nobel_prizes/peace/laureates (last visited Nov. 19, 2009).

[4]  Consistent with this understanding of the congressional action, the bill establishing the foundation was modeled after documents creating trusts, *see* Straus, *supra*, at 239, and not statutes conferring legislative consent to officers' receipt of gifts from foreign states. Further, the statute's legislative history contains no indication that the bill was intended to ratify Roosevelt's acceptance of a gift from a foreign power; nor does it indicate that his acceptance of the Prize without congressional consent was inappropriate. *See* S. Rep. No. 59-7283 (1907); *see also* 41 Cong. Rec. 4113 (1907) ("There can be no possible objection [to the bill]. It establishes trustees, who are to receive from the President the Nobel prize for the foundation of a society for the promotion of industrial peace." (statement of Sen. Lodge)). Ultimately, the Foundation never expended any funds, and in July of 1917, Congress dissolved the trust. *See* H.J. Res. 313, 65th Cong., 40 Stat. 899 (1918) ("Joint Resolution Providing for the disposition of moneys represented in the Alfred Bernard Nobel peace prize, awarded in nineteen hundred and six"). Roosevelt then distributed the Nobel Prize money, along with the interest it had accrued, to various charities in the United States and Europe. *See* Straus, *supra*, at 241.

5     *See also, e.g.*, J. Res. 39, 54th Cong., 29 Stat. 759 (1896) ("authoriz [ing]" President Harrison "to accept certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States"); J. Res. 4, 42d Cong., 17 Stat. 643 (1871) ("[C]onsent of Congress is hereby given to ... [the] secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific service and character by the King of Sweden and Norway"); J. Res. 39, 38th Cong., 13 Stat. 604 (1865) (Navy Captain "authorized to accept the sword of honor recently presented to him by the government of Great Britain"); J. Res. 14, 33d Cong., 10 Stat. 830 (1854) ("authoriz[ing] ... accept[ance of] a gold medal recently presented ... by His Majesty the King of Sweden").

6     Accordingly, we have explained that corporations owned or controlled by a foreign government are presumptively foreign states under the Emoluments Clause, even though the Act of State doctrine suggests that "when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns," and thus are not entitled to the immunity from suit that might be available. *ACUS*, 17 Op. O.L.C. at 120 ("[N]othing in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns*.").

7     Where a foreign state indisputably and directly confers a present or emolument, such considerations of autonomy and control may be relevant, but not decisive. *See ACUS*, 17 Op. O.L.C. at 119. Here, however, the critical issue is whether the Nobel Committee, and by extension the Nobel Foundation, is an instrumentality of a foreign government for purposes of awarding the privately endowed Peace Prize.

8     The Storting appears to have the limited authority only to approve "[i]nstructions concerning the election of members of the Nobel Committee" itself. *See* Nobel Foundation Regulations § 9. Any other amendments to the Committee's rules of operation, including its award selection guidelines, are decided upon by the Committee itself, after views are solicited from the Nobel Foundation. *Id.* ("Proposals for amendments to other provisions of these regulations may be put forward by members of the Norwegian Nobel Committee or by members of the Board of Directors of the Nobel Foundation. Before the Norwegian Nobel Committee makes a decision concerning the proposal, it shall be submitted to the Board of Directors of the Nobel Foundation for an opinion.").

9     Similarly, the Supreme Court has indicated that a government's appointment authority is not given dispositive weight in determining whether a nominally private entity is, in fact, "what the Constitution regards as the Government." *See Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (holding that Amtrak was a state actor subject to the First Amendment). That the federal government appointed a majority of Amtrak's directors was not considered to be of controlling importance. As the *Lebron* Court observed, the Consolidated Rail Corporation ("Conrail") was held "not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors." *Id.* at 399; *see also Regional Rail Reorganization Act Cases*, 419 U.S. 102, 152 (1974) ("Conrail is not a federal instrumentality by reason of the federal representation on its board of directors.").

2009 WL 6365082 (O.L.C.)

---

**End of Document**     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 149 of 395

18 U.S. Op. Off. Legal Counsel 13 (O.L.C.), 1994 WL 810701

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF EMOLUMENTS CLAUSE TO EMPLOYMENT OF
GOVERNMENT EMPLOYEES BY FOREIGN PUBLIC UNIVERSITIES

March 1, 1994

The Emoluments Clause of the Constitution does not apply in the cases of government employees offered faculty employment by a foreign public university where it can be shown that the university acts independently of the foreign state when making faculty employment decisions.

**1  MEMORANDUM OPINION FOR THE CHIEF COUNSEL
GODDARD SPACE FLIGHT CENTER
NATIONAL AERONAUTICS AND SPACE ADMINISTRATION

This memorandum responds to your request of September 9, 1993, for our opinion concerning the applicability of the Emoluments Clause, U.S. Const. art. I, § 9, cl. 8 ("Emoluments Clause"), to the employment by the University of Victoria in British Columbia, Canada, of two scientists on leave without pay from the Goddard Space Flight Center ("Goddard"), a component of the National Aeronautics and Space Administration ("NASA"). ;B1 [FN1]FN;F1 We conclude that the Emoluments Clause does not apply in these cases.

I.

As Goddard has explained, Drs. Inez Fung and James K. B. Bishop have sought your administrative approval for employment as Professors in the School of Earth and Ocean Sciences at the University of Victoria until August 31, 1994. During that period, the two scientists would be in Leave Without Pay status from their positions at the Goddard Institute for Space Studies, a component of Goddard. (Goddard is itself a NASA field installation.) Both scientists hold the position of Aerospace Technology (AST)/Global Ecology Studies at the GS-15 level. For their services in teaching and research while on leave, Drs. Fung and Bishop would be paid $85,000 and $70,000 respectively by the University of Victoria.

The University of Victoria operates under the University Act, a statute enacted by the legislature of British Columbia. *See* University Act, R.S.B.C., ch. 419 (1979) (Can.) ("University Act"). The Act provides that the university is to consist of a chancellor, convocation, board, senate, and faculties. University Act, § 3(2). The chancellor is to be elected by the members of the convocation, *id.* § 11(1), and is to serve on the board of governors, *id.* § 19(a). The convocation is composed of  **14  the chancellor, the president, the members of the senate, all faculty members, all graduates, all persons added to the roll of the convocation by the senate, and all other persons carried on the roll before July 4, 1974. *Id.* § 5(1).

The Supreme Court of Canada has outlined the powers of the boards of governors and senates subject to the University Act:

> Under the *University Act*, R.S.B.C. 1979, c. 419, the management, administration and control of the property, revenue, business and affairs of the university are vested in a board of governors consisting of 15 members. Eight of the members are appointed by the Lieutenant Governor in Council, but two of these must be nominated by the alumni association. The provincial government, therefore, has the power to appoint a majority of the members of the board of governors, but it does not have the power

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 150 of 395

to select a majority. The academic government of the university is vested in the senate, only a minority of the members of which are appointed by the Lieutenant Governor.

**2 *Harrison v. University of British Columbia*, [1990] 3 S.C.R. 451, 459 (Can.) (plurality op.). Further, "under s. 22(1) of the Act, the Lieutenant Governor 'may, at any time, remove from office an appointed member of the board.'" *Id.* at 467 (Wilson, J., dissenting).

In general, the "management, administration and control of the property, revenue, business and affairs of the university are vested in the board." University Act, § 27. In addition, the university "enjoys special government-like powers in a number of respects and the exercise of these would presumably fall under the jurisdiction of the board. It has the power to expropriate property under s. 48 and its property is protected against expropriation under s. 50. It is exempt from taxation under s. 51. The board may also borrow money to meet University expenditures (s. 30) and appoint advisory boards for purposes it considers advisable (s. 33). The University may not dispose of its property without the approval of the Lieutenant Governor (s. 47(2))." *Harrison*, [1990] 3 S.C.R. at 467 (Wilson, J., dissenting).

As pointed out above, the academic governance of the university is vested in the senate. University Act, § 36. The senate is composed of a number of persons, including the chancellor, the president, deans, administrators, faculty, students, four members of convocation, representatives of affiliated colleges, and four persons appointed by the Lieutenant Governor. *Id.* § 34(2). Thus, only a relatively small minority of the senate will consist of governmental appointees.[:B2] [FN2][FN;F2]

*15 Finally, the faculty is "constituted by the board, on the recommendation of the senate." University Act, § 38. The faculty has various powers, including the power to determine, subject to the approval of the senate, courses of instruction. *Id.* § 39(d).

II.

The Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

Goddard advances two basic arguments for concluding that the Emoluments Clause is inapplicable in these cases. First, it maintains that the University of Victoria is not a "foreign State" within the meaning of the Clause. Second, it suggests that when a Federal employee is on Leave of Absence Without Pay status, he or she does not occupy an "Office of Profit or Trust" under the United States.

For reasons somewhat different from Goddard's, we agree that the Clause is inapplicable here. Although we believe that foreign public universities, such as the University of Victoria, are presumptively foreign states under the Emoluments Clause, we also find that, in this case, the university can be shown to be acting independently of the foreign state with respect to its faculty employment decisions. Because such a showing can be made, we conclude that in that context the University of Victoria should not be considered a foreign state.

A.

**3 The Emoluments Clause was adopted unanimously at the Constitutional Convention, and was intended to protect foreign ministers and other officers of the United States from undue influence and corruption by foreign governments

-- a danger of which the Framers were acutely aware. [:B3][FN3][FN;F3] James Madison's notes on the Convention for August 23, 1787, report:

Mr[.] Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and **\*16** moved to insert -- after Art[.] VII sect[.] 7. the clause following -- "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State["] which passed nem: contrad.

2 *The Records of the Federal Convention of 1787*, at 389 (M. Farrand ed., 1966) ("Records"); *see also* 3 *id.* at 327 (remarks of Governor Randolph). [:B4][FN4][FN;F4] "Consistent with its expansive language and underlying purpose, the provision has been interpreted as being 'particularly directed against every kind of influence by foreign *governments* upon officers of the United States, based upon our historic policies as a nation.'" *Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 (1987) (quoting 24 Op. Att'y Gen. 116, 117 (1902)).

Our Office has been asked from time to time whether foreign entities that are public institutions but not diplomatic, military, or political arms of their government should be considered to be "foreign State[s]" for purposes of the Emoluments Clause. In particular, we have been asked whether foreign public universities constitute "foreign State[s]" under the Clause. Our prior opinions on this subject have not been a seamless web. Thus, in an opinion that Goddard cites and relies upon, we concluded that while the University of New South Wales was clearly a public institution, it was not so clear that it was a "foreign State" under the Emoluments Clause, given its functional and operational independence from the federal and state governments in Australia. [:B5][FN5][FN;F5] Accordingly, we opined that the question posed there -- whether a NASA employee could accept a fee of $150 for reviewing a Ph.D. thesis -- had to be answered by considering the particular circumstances of the case, in order to determine whether the proposed arrangement had the potential **\*17** for corruption or improper foreign influence of the kind that the Emoluments Clause was designed to address. On other occasions, however, we have construed the Emoluments Clause to apply to public institutions of higher education in foreign countries without engaging in such an inquiry. [:B6][FN6][FN;F6]

In re-examining these precedents, we have considered the claim that foreign universities, even if "public" in character, should generally not be considered to be instrumentalities of foreign states for purposes of the Emoluments Clause. On behalf of this view, it can be argued that the Clause was designed to guard against the exercise of improper influence on United States officers or employees by the political, military, or diplomatic agencies of foreign states, because payments by those agencies are most likely to create a conflict between the recipient's Federal employment and his or her outside activity. Because public universities do not generally perform such functions, they ought not, on this analysis, to be brought within the Clause. [:B7][FN7][FN;F7]

 **\*\*4** After considering the question carefully, we have concluded that such an interpretation of the Emoluments Clause is mistaken. Foreign public universities are, presumptively, foreign states within the meaning of the Clause. [:B8][FN8][FN;F8]

The language of the Emoluments Clause is both sweeping and unqualified. [:B9][FN9][FN;F9] The Clause in terms prohibits those holding offices of profit or trust under the United States from accepting "*any* present, Emolument, Office, or Title, *of any kind whatever*" from "*any . . .* foreign State" unless Congress consents. U.S. Const. art. I, § 9, cl. 8. (emphases added). There is no express or implied exception for emoluments received from foreign states when the latter act in some capacity other than the performance of their political, military, or diplomatic functions. The decision whether to permit exceptions that qualify for the Clause's absolute prohibition or that temper any harshness it may cause is textually committed **\*18** to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause. [:B10][FN10][FN;F10]

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 152 of 395

Further, it serves the policy behind the Emoluments Clause to construe it to apply to foreign states even when they act through instrumentalities, such as universities, which do not perform political, military, or diplomatic functions. Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. [:B11] [FN11]FN;F11 That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government, even when those benefits took the form of remuneration for academic work or research. [:B12] [FN12]FN;F12 Moreover, institutions of higher learning are often substantially funded, whether directly or indirectly, by their governments, and university research programs or other academic activities may be linked to the missions of their governmental sponsors, including national scientific and defense agencies. [:B13] [FN13]FN;F13 Thus, United States Government officers or employees might well find themselves exposed to conflicting claims on their interests and loyalties if they were permitted to accept employment at foreign public universities. [:B14] [FN14]FN;F14

Finally, Congress has exercised its power under the Emoluments Clause to create a limited exception for academic research at foreign public institutions of learning. The Foreign Gifts and Decorations Act provides in part that Federal employees may accept from foreign governmental sources "a gift of more than minimal value when such gift is in the nature of an educational scholarship." 5 U.S.C. § 7342(c)(1)(B). [:B15] [FN15]FN;F15 Thus, Congress has recognized that foreign governmental bodies may wish to reward or encourage scholarly or scientific work by employees of our Government, but has carefully delimited the circumstances in which Federal employees may accept such honors or emoluments. That suggests that Congress **\*19** believes both that the Emoluments Clause extends to paid academic work by Federal employees at foreign public universities and that the Clause's prohibition on such activity should generally remain in force.

**\*\*5** Accordingly, we conclude that foreign governmental entities, including public universities, are presumptively instrumentalities of foreign states under the Emoluments Clause, even if they do not engage specifically in political, military, or diplomatic functions. [:B16] [FN16]FN;F16

B.

Having found that foreign public universities may and presumptively do fall under the Emoluments Clause, we turn next to the question whether the University of Victoria in particular is an instrumentality of a foreign state (the province of British Columbia), and hence within the Clause. We conclude that it is not, at least with respect to the faculty employment decisionmaking that is in issue here. Goddard contends:

The ability of [Canadian] federal or provincial government officials to influence and control the actions of [the University of Victoria's board, senate, and faculty] is most possible concerning the Board, but in all three cases is minimized by the other members of the organizations, the sources from which those members are obtained, the method of their ominations and appointments, and the procedures concerning replacement . . . .

Thus, it appears [that] the University of Victoria is established as a largely self-governing institution, with minimal influence exercisable over the daily affairs and even general policies of the University.

Goddard Mem. at 6.

**\*20** Without attempting to decide whether, as Goddard claims, the University of Victoria is generally free from the control of the provincial government of British Columbia, we think that the evidence shows that the university is independent of that government when making faculty employment decisions. We rely here chiefly on the Supreme Court of Canada's decisions in the *Harrison* case, cited above, and in the companion case, *McKinney v. University of Guelph*, [1990] 3 S.C.R. 229 (Can.).

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 153 of 395

The principal question presented in *Harrison* was whether the University of British Columbia's mandatory retirement policy respecting its faculty and administrative staff was consistent with the requirements of the Canadian Charter of Rights and Freedoms ("the Charter"). :B17[FN17]FN;F17 Whether the Charter applied turned on whether the challenged policy constituted governmental action -- an inquiry raising issues at least somewhat akin to those posed by the "State action" doctrine in United States jurisprudence. *See Harrison*, [1990] 3 S.C.R. at 463 (plurality op.). :B18[FN18]FN;F18 Over dissent, the Court held that the university's policy was not governmental action under the Charter. In reaching that conclusion, three of the seven judges drew a distinction between "ultimate or extraordinary control and routine or regular control," and held that while the government of British Columbia may be able to exercise the former, it lacked "the quality of control that would justify the application of the *Charter*." *Id.*; *see also id.* at 478 (L'Heureux-Dubè, J., dissenting on the appeal only) (university not "government" for purpose of section 32 of Charter).

 **6  Similarly, in *McKinney*, a majority of the Court, again over dissent, held that the mandatory retirement policies of the defendant universities (there, located in the Province of Ontario) did not implicate the Charter. Moreover, the lead opinion emphasized the autonomy of the provincial universities when making faculty employment decisions:

> The *Charter* apart, there is no question of the power of the universities to negotiate contracts and collective agreements with their employees and to include within them provisions for mandatory retirement. These actions are not taken under statutory compulsion, so a *Charter* attack cannot be sustained on that ground. There is  *21  nothing to indicate that in entering into these arrangements, the universities were in any way following the dictates of the government. They were acting purely on their own initiative . . . .

. . . . .

The legal autonomy of the universities is fully buttressed by their traditional position in society. Any attempt by government to influence university decisions, especially decisions regarding appointment, tenure and dismissal of academic staff, would be strenuously resisted by the universities on the basis that this could lead to breaches of academic freedom. In a word, these are not government decisions.

*McKinney*, [1990] 3 S.C.R. at 269, 273 (plurality op.); *see also id.* at 418-19 (L'Heureux-Dubè, J., dissenting) (while universities may perform certain public functions attracting Charter review, hiring and firing of employees at universities in both British Columbia and Ontario are not among such actions: "Canadian universities have always fiercely defended their independence").

While the Ontario statute at issue in *McKinney* differed from the British Columbia statute considered in *Harrison* (in particular, Ontario's statutes, unlike British Columbia's, did not permit the provincial government to appoint a majority of a university board's membership), the *Harrison* plurality held that these differences did not establish that the core functions of the British Columbian universities were under the province's control. *Harrison*, [1990] 3 S.C.R. at 463-64 (plurality op.) Thus, the Court's statements in *McKinney* concerning the autonomy of Ontario's universities in matters of faculty employment would apparently hold true for the universities in British Columbia as well. :B19[FN19]FN;F19 Furthermore, even the dissent in *Harrison* acknowledged "the lack of government control over the mandatory retirement policy specifically in issue here and over matters specifically directed to the principle of academic freedom." *Id.* at 471-72 (Wilson, J., dissenting). :B20[FN20]FN;F20 The remaining member of the Court accepted the trial court's finding that the university's employment  *22  agreements were essentially private contracts. *Id.* at 479-80 (L'Heureux-Dubè, J., dissenting on appeal only).

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 154 of 395

These Canadian cases cannot of course determine our interpretation of the Emoluments Clause. But they do provide compelling evidence that the University of Victoria is independent of the government of British Columbia with respect to decisions regarding the terms and conditions of faculty employment. Because that showing can be made, we believe the university should not be considered to be a foreign state under the Emoluments Clause when it is acting in that context. ;B21 [FN21]FN;F21

CONCLUSION

**7** The Emoluments Clause does not prohibit the two NASA scientists from accepting paid teaching positions at the University of Victoria during their unpaid leave of absence from their agency.


WALTER DELLINGER
Assistant Attorney General
Office of Legal Counsel

1   *See* Letter for Walter Dellinger, Acting Assistant Attorney General, Office of Legal Counsel, from Lawrence F. Watson, Chief Counsel, Goddard Space Flight Center, National Aeronautics and Space Administration (Sept. 9, 1993) (the "Goddard Mem.").

2   "With respect to some important matters, however, the decisions of the senate are effectively controlled by the board of governors." *Harrison,* [1990] 3 S.C.R. at 469 (Wilson, J., dissenting). For example, "every resolution passed by the senate respecting the establishment or discontinuance of any faculty, department, course of instruction, chair fellowship, scholarship, exhibition, bursary or prize (s. 36(i)) as well as internal faculty matters and terms of affiliation with other universities is of no force or effect unless approved by the board (s. 37)." *Id.*

3   *See, e.g., The Federalist* No. 22, at 149 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("One of the weak sides of republics, among their numerous advantages, is that they afford too easy an inlet to foreign corruption.").

4   The Emoluments Clause builds upon practices that had developed during the period of the Confederation: It was the practice of Louis XVI of France to give presents to departing ministers who signed treaties with France. Before he left France in mid-1780, Arthur Lee received a portrait of Louis set in diamonds atop a gold snuff box. In October 1780 Lee turned the gift over to Congress, and on 1 December Congress resolved that he could keep the gift. In September 1785 Benjamin Franklin informed Secretary for Foreign Affairs John Jay that, when he left France, Louis XVI presented him with a miniature portrait of himself, set with 408 diamonds. In October Jay recommended to Congress that Franklin be permitted to keep the miniature in accordance with its December 1780 ruling about a similar miniature given to Lee. In March 1786 Congress ordered that Franklin be permitted to keep the gift. At the same time, Congress also allowed Jay himself to accept the gift of a horse from the King of Spain even though Jay was then engaged in negotiations with Spain's representative, Don Diego de Gardoqui. 10 *The Documentary History of the Ratification of the Constitution* 1369 n.7 (John P. Kaminski et al. eds., 1993); *see also President Reagan's Ability to Receive Retirement Benefits from the State of California,* 5 Op. O.L.C. 187, 188 (1981) (discussing background of the ratification of the Clause).

5   *See* Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986).

6   *See, e.g.,* Memorandum to File from Robert J. Delahunty, Acting Special Counsel, *Re: Applicability of Emoluments Clause to Employment of CFTC Attorney by East China Institute of Politics and Law* (Aug. 27, 1992); Memorandum to Files from Barbara E. Armacost, *Re: Emoluments Clause and Appointment to the President's Committee on the Arts and Humanities* (Nov. 15, 1990). The General Accounting Office has reached a similar result in a related context. *See* 44 Comp. Gen. 130 (1964) (retired Coast Guard officer subject to recall to active duty held not entitled to retirement pay for period in which he was teaching for Department of Education of State of Tasmania, Australia).

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS  Document 31-1  Filed 11/28/17  Page 155 of 395

7    *See* Gerald S. Schatz, *Federal Advisory Committees, Foreign Conflicts of Interest, The Constitution, and Dr. Franklin's Snuff Box*, 2 D.C. L. Rev. 141, 163, 166 (1993) ("The Emoluments Clause's reference to foreign states was a reference to foreign governments' acts in their sovereign capacity, as distinguished from the acts . . . of foreign governmental entities without the legal capacity to represent the national sovereign . . . . The Clause addresses the problem of conflict of interest on the part of a U.S. Government functionary vis- -vis a foreign sovereign in a sovereign capacity. The Clause thus may not be assumed to disqualify from U.S. Government service . . . an academic paid by a foreign government with which the officer does not deal.").

8    *See also Applicability of the Emoluments Clause To Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 121-23 (1993) (opining that Emoluments Clause applies to foreign public universities).

9    *Accord* 49 Comp. Gen. 819, 821 (1970) (the "drafters [of the Clause] intended the prohibition to have the broadest possible scope and applicability").

10   Accordingly, Congress has acted in appropriate cases to relieve certain classes of government personnel, e.g., retired military officers, from applications of the Clause. *See Ward v. United States*, 1 Cl. Ct. 46 (1982).

11   *See Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 100 (1986).

12   Consistent with this view, we have opined that an employee of the National Archives could not serve on an international commission of historians created and funded by the Austrian Government to review the wartime record of Dr. Kurt Waldheim, the President of Austria. *See generally*, 11 Op. O.L.C. 89 (1987).

13   Goddard's own link with Columbia University in New York City, *see* Goddard Mem. at 3, 7, is illustrative.

14   Of course, the same predicament could arise if Government employees worked at *private* universities abroad (or even in the United States). But the fact that the Emoluments Clause does not address every situation in which Government employees might be subjected to improper influence from foreign states is no reason to refuse to apply it to the cases which it *does* reach.

15   We have opined that this exception applied to an award of approximately $24,000 by a foundation acting on behalf of the West German Government to a scientist employed by the Naval Research Laboratory. We reasoned that a "program designed to honor United States scientists and enable them to stay for an extended period at research institutes in the Federal Republic of Germany to carry out research of the Awardee's own choice seems to be in the nature of an educational scholarship, acceptance of which Congress has permitted." Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 4 (Mar. 17, 1983) (internal quotation omitted).

16   We would also reject any argument that foreign public universities should be excluded from the purview of the Emoluments Clause on the theory that the Clause must be taken to prohibit only the acceptance of office or emoluments bestowed by a foreign state while engaged in performing "traditional" governmental functions, i.e., functions that governments would normally have performed at the time of the framing. The theory assumes that governmental support for higher education would not have been among such functions. The argument has several flaws. First, there is no such exception provided by or implicit in the language of the Clause. Second, the purposes of the Clause are better served if it is understood to cover all the functions of modern government, not some narrow class of them. Third, the Framers appear to have thought that support for higher education was indeed a legitimate function of government. The Constitutional Convention considered a proposal to empower Congress to establish a national university, but rejected it on the ground that the power was already embraced within the District of Columbia Clause. *See* 2 *Records* at 616. President George Washington, in his first and eighth annual addresses, called on Congress to consider establishing a national university. *See* 30 *The Writings of George Washington* 494 (John Fitzpatrick ed., 1939); 35 *id.* at 316-17.

17   The Canadian Charter is, in essence, a bill of rights. The Federal Government of Canada "enacted first the *Canadian Bill of Rights*, R.S.C., 1985, App. III, in 1960 and then the *Canadian Charter of Rights and Freedoms* in 1982, the latter having constitutional status. The values reflected in the *Charter* were to be the foundation of all laws, part of the 'supreme law of Canada' against which the constitutionality of all other laws was to be measured." *McKinney v. University of Guelph*, [1990] 3 S.C.R. at 355 (Wilson, J., dissenting).

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 18 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 156 of 395

18      *But see McKinney*, [1990] 3 S.C.R. at 274-75 (plurality op.) (noting certain differences between Canadian and American doctrines); *id.* at 343-44 (Wilson, J., dissenting) ("This Court has already recognized that while the American jurisprudential record may provide assistance in the adjudication of *Charter* claims, its utility is limited . . . . The *Charter* has to be understood and respected as a uniquely Canadian constitutional document.").

19      Judge Sopinka concurred in the conclusions and reasoning of the *Harrison* plurality except on the question whether the mandatory retirement policy was "law" within the meaning of section 15(1) of the Canadian Charter. He would have preferred not to decide that question on the basis of the assumption that the university was part of the government. *Harrison*, [1990] 3 S.C.R. at 481 (Opinion of Sopinka, J.). In *McKinney*, Judge Sopinka agreed that "a university is not a government entity for the purpose of attracting the provisions of the *Canadian Charter of Rights and Freedoms.*" [1990] 3 S.C.R. at 444. While not being willing to say that "none of the activities of a university are governmental in nature," he was of the opinion that "the core functions of a university are non-governmental and therefore not directly subject to the *Charter*. This applies *a fortiori* to the university's relations with its staff." *Id.* (Opinion of Sopinka, J.) As in his opinion in *Harrison*, he preferred not to reach the question whether, if a university were part of the government, its mandatory retirement policies would be "law" for purposes of the Canadian Charter. *Id.*

20      Judge Cory agreed with Judge Wilson that the University of British Columbia formed part of the government for purposes of section 32 of the Canadian Charter, but disagreed with her on other grounds. *Harrison*, [1990] 3 S.C.R. at 481 (Opinion of Cory, J.) .

21      Since it is not necessary to our decision, we do not address Goddard's alternative argument that Federal employees in Leave Without Pay status do not occupy an Office of Profit or Trust within the meaning of the Emoluments Clause.

18 U.S. Op. Off. Legal Counsel 13 (O.L.C.), 1994 WL 810701

---

                                          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   8

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 11 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 157 of 395

11 U.S. Op. Off. Legal Counsel 89 (O.L.C.), 1987 WL 256400

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF EMOLUMENTS CLAUSE TO PROPOSED SERVICE OF
GOVERNMENT EMPLOYEE ON COMMISSION OF INTERNATIONAL HISTORIANS

July 30, 1987

A government employee's proposed service as a member of a commission of international historians established under the auspices of the Austrian government would violate the Emoluments Clause of the Constitution, U.S. Const. art. I, s 9, cl. 8.

**\*\*1**  MEMORANDUM OPINION FOR THE ACTING ARCHIVIST OF THE UNITED STATES

This memorandum responds to your request of July 27, 1987, for our views on the applicability of the Emoluments Clause of the Constitution to proposed service by Mr. A, an employee of the National Archives, as a member of a commission of international historians established to review the wartime record of Dr. Kurt Waldheim, President of Austria. According to the information you have provided us, the Commission was established at the request of the Austrian government, and is being funded entirely by the Austrian government. You indicate that Mr. A has asked that he be permitted to accept an invitation to serve as a member of the commission, extended to him by the commission's co-chairman, in his private capacity. Although you have stated that Mr. A would be entitled to reimbursement of his expenses and an honorarium from the Austrian government, we understand that Mr. A has indicated a willingness to forego the honorarium and to rely upon private sources of funding for his expenses.

As discussed more fully below, we believe that, in the circumstances as we understand them, Mr. A's acceptance of the invitation to serve as a member of the Commission would be inconsistent with the prohibition in the Emoluments Clause against a federal official's accepting an "office" from a foreign state.

Article I, s 9, cl. 8 of the Constitution provides:

No title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the consent of Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

The Emoluments Clause, adopted unanimously at the Constitutional Convention of 1787, was intended by the Framers to preserve the independence of foreign ministers and other officers of the United States from "corruption and **\*90** foreign influence." 3 M. Farrand, Records of the Federal Convention of 1787 327 (1966) (Farrand). See also 2 Farrand, at 327, 389. [*]B1 [FN1]FN;F1 Consistent with its expansive language and underlying purpose, the provision has been interpreted as being "particularly directed against every kind of influence by foreign governments upon officers of the United States, based upon our historic policies as a nation." 24 Op. Att'y Gen. 116, 117 (1902) (emphasis in original). See also J. Story, Commentaries on the Constitution of the United States s 684 (Carolina Academic Press 1987) (1833 Abridgement) ("the provision is highly important, as it puts out of the power of any officer of the government to wear borrowed honours, which shall enhance his supposed importance abroad by a titular dignity at home"). By its terms, the prohibition is directed not just to payments of money of gifts from foreign governments, but also to the acceptance of an "office."

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.          1

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 11 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 158 of 395

**\*\*2**  There seems little doubt that Mr. A occupies an "Office of Profit or Trust under (the United States)" as that phrase is used in the Emoluments Clause.<sup>.B2</sup>[FN2]FN;F2 And the Emoluments Clause is plainly applicable where an official is offered the gift, title or office in his private capacity.<sup>.B3</sup>[FN3]FN;F3 Moreover, as we understand the circumstances of the Commission's establishment and funding, it is clear that the invitation in this case came from the Austrian government, itself indisputably a "foreign state" under the Emoluments Clause.<sup>.B4</sup>[FN4]FN;F4

The only question as to which there appears to be any issue is whether acceptance of membership on the Commission would constitute acceptance of an "office" under the Emoluments Clause. We believe that it would.

**\*91**  Although we have found no case or other formal precedent directly on point, there are several Attorney General opinions that indicate that a United States government official's acceptance of membership, in a personal capacity, on an entity established and funded by a foreign government may violate the Emoluments Clause. In 13 Op. Att'y Gen. 537 (1871), Attorney General Akerman considered "whether an American minister to one foreign power can accept a diplomatic commission to the same power from another foreign power." He concluded that:

> Unquestionably, a minister of the United States abroad is not prohibited by the Constitution from rendering a friendly service to a foreign power, even that of negotiating a treaty for it, provided he does not become an officer of that power. But whatever difficulties may grow out of the vagueness with which this term is defined in the books, it is clear that the acceptance of a formal commission as minister plenipotentiary creates an official relation between the individual thus commissioned and the government which in this way accredits him as its representative.

Id. at 538. See also 6 Op. Att'y Gen. 409 (1854) (United States Marshal for Florida could not hold the "office" of Commercial Agent of France).

We are advised by the Legal Adviser's Office of the Department of State that it has construed the Emoluments Clause to prohibit a federal official from accepting, in a private capacity, appointment to a commission established by a foreign government. In 1983, the Legal Adviser informed a member of a Presidential advisory committee that his membership on a "bi-national" commission established by the Costa Rican government constituted acceptance of a foreign "office" prohibited by the Emoluments Clause, and advised him that he must resign.

As a general matter, we believe that a United States government official's membership on an entity established and funded by a foreign government raises serious issues under the Emoluments Clause. In this case, the facts lead us to conclude that Mr. A's membership on the Commission would create the kind of "official relation" between him and the Austrian government that the Framers of the Constitution wished to avoid, and that it therefore constitutes an "office" under the Emoluments Clause. Accordingly, we believe Mr. A is constitutionally prohibited from accepting the invitation to serve as a member of the Austrian Commission.<sup>.B5</sup>[FN5]FN;F5

**\*\*3**  Charles J. Cooper

Assistant Attorney General

Office of Legal Counsel

1    Farrand reports Governor Randolph's explanation of the Emoluments Clause at the Virginia Convention as follows:
(This) restriction restrains any persons in office from accepting of any present or emolument, title or office, from any foreign prince or state. . . . This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened, operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding

APPLICABILITY OF EMOLUMENTS CLAUSE TO..., 11 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 159 of 395

any emoluments from foreign states. I believe, that if at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.
3 Farrand at 327.

[2]  See 27 Op. Att'y Gen. 219 (1909) (postal clerk holds an office of profit or trust for Emoluments Clause purposes, because he "holds his appointment from a head of a Department . . . , receives for his services a fixed compensation from moneys appropriated for the purpose by Congress, . . . has regularly prescribed services to perform, and his duties are continuing and permanent, and not occasional and temporary"). See also "Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission," 10 Op. O.L.C. ___ (1986) (part-time staff consultant for NRC holds a position requiring his undivided loyalty to the United States).

[3]  Cf. "Assumption by People's Republic of China of Expenses of U.S. Delegation," 2 Op. O.L.C. 345 (1978) (Emoluments Clause does not prohibit assumption by the People's Republic of China of the expenses of an official U.S. delegation).

[4]  Even if it could be concluded that the invitation in this case had been extended by an international body, we believe the concerns expressed by the Framers in the Emoluments Clause would still be applicable. In this regard, we note that the Foreign Gifts and Decorations Act, by which Congress gave its express consent for officials to accept gifts from foreign countries under certain limited circumstances, includes within its definition of "foreign government" "any international or multinational organization whose membership is composed of any unit of foreign government." 5 U.S.C. s 7342(a)(2)(B).

[5]  Our conclusion in this situation is reinforced by the circumstances surrounding the Commission's creation and its mandate. We do not, however, intend our conclusion respecting the applicability of the Emoluments Clause to suggest that Mr. A would be subjected to improper foreign influence, or otherwise to leave any negative inference respecting the integrity of the service he would render as a member of the Commission.

11 U.S. Op. Off. Legal Counsel 89 (O.L.C.), 1987 WL 256400

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 160 of 395

17 U.S. Op. Off. Legal Counsel 114 (O.L.C.), 1993 WL 777080

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO NON-GOVERNMENT MEMBERS OF ACUS

October 28, 1993

The Emoluments Clause of the Constitution prohibits non-government members of the Administrative Conference of the United States from accepting, absent Congress's consent, a distribution from their partnerships that includes some proportionate share of the revenues generated from the partnership's foreign government clients.Non-government members of ACUS are also generally forbidden, absent Congress's consent, from accepting payments from commercial entities owned or controlled by foreign governments.

**1  MEMORANDUM OPINION FOR THE GENERAL COUNSEL
ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

This memorandum responds to your request of July 30, 1993, which sought clarification of a portion of our April 29, 1991, letter to the Deputy Counsel to the President. :B1 [FN1]FN;F1 Specifically, you raise two questions concerning the advice we gave on that occasion concerning the scope and application of the Emoluments Clause, U.S. Const. art. I, § 9, cl. 8. After noting that a significant number of the 101 members of the Administrative Conference (the "Conference" or "ACUS") are lawyers in private practice, professors of law, or other experts in administrative law, you ask whether the Emoluments Clause prevents service on the Conference by a private individual who receives a partnership distribution from his or her firm that may include income received by the firm from a foreign government solely because of the pooling of partnership revenues. Further, you ask whether the Clause prevents service on the Conference by a private individual who receives payment from government-owned or controlled instrumentalities that do not engage in traditional functions -- including, but not limited to, foreign public universities.

I.

Congress established the Conference "to provide suitable arrangements through which Federal agencies, assisted by outside experts, may cooperatively study mutual problems, exchange information, and develop recommendations for action by proper authorities to the end that private rights may be fully protected and regulatory  **115  activities and other Federal responsibilities may be carried out expeditiously in the public interest." 5 U.S.C. § 591; *see also* Marshall J. Breger, *The Administrative Conference of the United States: A Quarter Century Perspective*, 53 U. Pitt. L. Rev. 813, 814-19 (1992) ("Breger") (discussing origins and purposes of ACUS). "The bulk of the Conference's work has been its research function and it is here that it has performed its most important role as a ventilator of new ideas in administrative procedure." *Id.* at 829. The Conference must transmit an annual report to the President and Congress and such interim reports as the Chairman considers desirable. *See* 5 U.S.C. § 595(c). In addition, "[o]n a number of occasions, Congress has specifically mandated that the Conference undertake particular activities." Breger at 835.

**2  The Conference consists of not more than 101 nor fewer than 75 members, including a Chairman appointed by the President with the advice and consent of the Senate, the chairman (or designee) of each independent regulatory board or commission, the head (or designee) of each executive department or other administrative agency which is designated by the President, certain other governmental members, certain Presidential appointees, and "not more than 40 other members appointed by the Chairman." 5 U.S.C. § 593. The Chairman's appointees "may at no time be less than one-third nor more than two-fifths of the total number of members." *Id.* § 593(b)(6). The Chairman is to select appointees "in a manner which will provide broad representation of the views of private citizens and utilize diverse experience. The

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 161 of 395

members shall be members of the practicing bar, scholars in the field of administrative law or government, or others specially informed by knowledge and experience with respect to Federal administrative procedure." *Id.*

Apart from the Chairman, the members of the Conference are not entitled to payment for their services. 5 U.S.C. § 593(c). Non-government members of the Conference may be deemed to be special government employees within the meaning of 18 U.S.C. § 202 and subject to the provisions of 18 U.S.C. §§ 201-224. *See* 1 C.F.R. § 302.5(a) (1993).

The membership of the Conference meeting in plenary session constitutes the Assembly. 5 U.S.C. § 595(a). The Assembly has various powers, including that of "adopt[ing] such recommendations as it considers appropriate for improving administrative procedure." *Id.* § 595(a)(1). "Conference recommendations and statements are published in the *Federal Register* and then codified in the Code of Federal Regulations." Breger at 827-28. "Since its establishment, the Conference's recommendations have had a significant effect on the workings of the federal government." *Id.* at 831.

The Conference includes a Council composed of the Chairman and ten other members appointed by the President, "of whom not more than one-half shall be employees of Federal regulatory agencies or Executive departments." 5 U.S.C. § 595(b). The Council may exercise various powers, including calling meetings of the Conference, proposing by-laws and regulations, making recommendations to **\*116** the Conference on subjects germane to its purpose, and receiving and considering reports of Conference committees;[B2] [FN2] [FN;F2] and distributing such reports to Conference members with the Council's own views and recommendations. *Id.*

II.

The Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

The Emoluments Clause was adopted unanimously at the Constitutional Convention, and was intended to protect foreign ministers and other officers of the United States from undue influence and corruption by foreign governments. James Madison's notes on the Convention for August 23, 1787, report:
**\*3** Mr[.] Pinkney urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence and moved to insert -- after Art[.] VII sect[.] 7. the clause following -- "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State["] which passed nem: contrad.

2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., rev. ed. 1966 reprint); *see also* 3 *id.* at 327 (remarks of Governor Randolph); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 188 (1981) (discussing history of ratification of Clause).

A.

The ACUS Letter represents that, typically, half of the Council members come from outside the Federal government, as do somewhat less than half (i.e., approximately forty) of the remaining Conference members. It points out that these private members "are typically lawyers in private practice, law professors, and other **\*117** experts in administrative law and government." ACUS Letter at 1. Some of the Conference members are partners in law firms that include foreign governments among their clients. Although we are informed that these Conference members do not personally represent foreign governmental clients and have no dealings with them, "their partnership arrangements provide that

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 162 of 395

client revenues are pooled in some fashion so that the member receives a partnership distribution from the firm that includes some proportionate share of revenues generated by those partners who have the foreign government among their clients." *Id.* at 2. ACUS asks whether such members are barred from Conference service by the Emoluments Clause.

As a threshold matter, ACUS does not dispute that Conference members from the private sector (who are unpaid for their services to the Conference) occupy an "Office of . . . Trust" within the meaning of the Emoluments Clause. We believe that Conference membership is such an office. To begin with, the Conference is a Federal agency established by statute. *See* 5 U.S.C. § 593. By virtue of their positions within that agency, Conference members are necessarily brought within the Clause. Although the Conference is an advisory committee as well as an agency, *see* ACUS Letter at 1, the April 1991 opinion stated that "Federal advisory committee members hold offices of profit or trust within the meaning of the Emoluments Clause," 15 Op. O.L.C. at 68, and we do not understand ACUS to be contesting that view. Moreover, the Conference's advice and recommendations have had (and were intended to have) a significant effect on the Government's administrative processes. Indeed, Congress has from time to time assigned specific statutory missions to the Conference, requiring it to assist other Federal agencies and demonstrating that the Conference's membership occupies a trusted and confidential role in governmental decisionmaking.[B3] [FN3]FN;F3 Finally, under the Conference's own by-laws, its members may be considered to be special government employees subject to Federal conflict of interest statutes and regulations. *See* 1 C.F.R. § 302.5(a). Accordingly, we have no difficulty in concluding that the non-government members of the Conference occupy offices subject to the Clause. *See Offices of Trust*, 15 Op. Att'y Gen. 187, 188 (1877) (Commissioners appointed by the President for the Centennial Exhibition hold offices of "Trust" under Clause because they were entrusted with duties "on account of their personal qualifications and fitness for the place."); *see also Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986) (reviewing prior opinions).

**\*\*4  \*118** ACUS suggests that the Emoluments Clause does not apply to a Conference member's acceptance of a proportionate share of partnership earnings attributable to his or her law firm's representation of a foreign government. ACUS argues that such payments are not emoluments "from" a foreign State, but rather from the partnership itself. ACUS Letter at 2-3. In support of that analysis, ACUS cites an opinion of this Office, *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156 (1982). In that opinion, we considered the question whether an employee of the Nuclear Regulatory Commission ("NRC") was authorized to work on his leave time for an American consulting firm on a contract to design a nuclear power plant being built by an electrical commission of the Mexican government. The employee was to be paid by the consulting firm from funds received from the Mexican government in connection with the contract, although not all the proceeds of the contract were to go to him. On the facts, we concluded that "ultimate control, including selection of personnel, remains with the Mexican government," so that "the interposition of the American corporation [does not] relieve[] the NRC employee of the obligations imposed by the Emoluments Clause." *Id.* at 158-59. ACUS infers that this opinion "strongly suggests that the receipt of income from a partnership arrangement, standing alone, does not violate the Constitutional prohibition" on accepting emoluments from a foreign State. ACUS Letter at 2.

We agree with ACUS that our prior opinions suggest that when an employment relationship formally exists between a domestic employer and a Federal office-holder, the question whether the latter may be paid from foreign governmental funds that the employer receives turns on whether the employer is acting as a mere conduit for those funds. This test may be illustrated by contrasting the opinion that ACUS cites (which found that the foreign government would in effect be paying for the covered person's services) with an earlier opinion that arrived at a different result. In Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with [X's] Trip to Indonesia* (Aug. 11, 1980), we considered a proposed contract under which Harvard University provided expert consultants to the government of Indonesia. The Indonesian government had no control over the selection of the experts and their payments, nor had it sought to influence the selection of experts during the years in which the consulting relationship

had been in effect. We concluded in that case that the payment of the individual consultant would not be "from" the foreign government, but rather from the employing university. [B4][FN4]FN;F4 *Id.* at 5.

**\*119** In the present case, our inquiry focuses on the partnership relation rather than the employer-employee relation. "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business *and when there is community of interest in the profits and losses.*" *Commissioner v. Tower*, 327 U.S. 280, 286 (1946) (emphasis added); *see also Meehan v. Valentine*, 145 U.S. 611, 623 (1892) ("those persons are partners, who contribute either property or money to carry on a joint business for their common benefit, and who own and share the profits thereof in certain proportions."). There is typically no such community of interest or proportionate sharing of profits in the employment relation. Hence, our precedents in the employment area, while relevant and suggestive, are not directly on point.

**\*\*5** ACUS contends that, "absent some direct personal contact or relationship between the Conference member and a foreign government," the member should not be barred from accepting "a proportionate share of partnership earnings . . . solely because his or her firm has a foreign government among its clients." ACUS Letter at 3. To the extent that our opinions in the employment area suggest that the proper test is whether the domestic employer or the foreign government has the power to *control* the covered person's activity, those opinions lend some support to ACUS's argument. A Conference member who did not personally represent a foreign government, and indeed had no personal contact with that client of the firm, could not be said to be subject to the foreign government's "control" in his or her activities on behalf of the partnership. But we think that this consideration is not decisive. More important, in our view, is the fact that the Conference member would draw a proportionate share of the partnership's pooled profits, which would include any profits the firm earned from representing its foreign governmental client. Because the amount the Conference member would receive from the partnership's profits would be a function of the amount paid to the firm by the foreign government, the partnership would in effect be a conduit for that government. Thus, some portion of the member's income could fairly be attributed to a foreign government. We believe that acceptance of that portion of the member's partnership share would constitute a prohibited emolument.

ACUS points out that our April 1991 Opinion stated that 18 U.S.C. § 219 does not implicitly disqualify an individual from serving on an advisory committee simply because he or she is a partner at a firm that is required by statute to register as a foreign agent. *See* ACUS Letter at 3; 15 Op. O.L.C. at 66 n.4. ACUS urges that we adopt a similar conclusion with respect to the Emoluments Clause. Section 219, a criminal statute, makes it an offense for a public official (including members of advisory committees covered by the Federal Advisory Committee Act, **\*120** 5 U.S.C. app. 2, §§ 1-16) to be or act as the agent of certain foreign principals. We think that the action of one partner acting as such a foreign agent cannot under this criminal statute be fairly imputed to another partner who serves on an advisory committee. But it by no means follows that a partner does not receive income from a foreign government within the meaning of the Emoluments Clause when an identifiable portion of his or her partnership draw can be attributed to the partnership's fees from such a client.

Accordingly, we conclude that, absent the consent of Congress, the Emoluments Clause would prohibit members of the Conference from accepting a share of partnership earnings, where some portion of that share is derived from the partnership's representation of a foreign government.

B.

ACUS further informs us that some private Conference members from time to time have among their personal clients foreign government-owned or -controlled instrumentalities, or business or proprietary corporations in which foreign governments have ownership interests. Other Conference members may from time to time receive payment for teaching at foreign public universities. ACUS Letter at 2.

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 164 of 395

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

**\*\*6**  ACUS suggests that payments accepted by private members for services rendered to a foreign government should not be considered to be forbidden emoluments when such a government is acting through commercial instrumentalities that it owns or controls, or through public academic institutions. *See* ACUS Letter at 3-4. Such payments, ACUS suggests, would not not be accepted "from any . . . foreign State."

We deal first with the question of foreign government-owned or -controlled commercial enterprises. In our opinion, such a corporation should indeed be considered to be a "foreign State" within the meaning of the Emoluments Clause. *Accord* 53 Comp. Gen. at 756 (corporation owned by government of Israel held within purview of Clause). It may be true, as ACUS says, that when foreign governments act in their commercial capacities, they do not exercise powers peculiar to sovereigns. *See* ACUS Letter at 3 (citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976)); *but see id.* at 715 (Powell, J., concurring) ("the line between commercial and political acts of a foreign state often will be difficult to delineate"). ;B5 [FN5]FN;F5 But nothing in the text of the Emoluments Clause limits its application solely to foreign governments acting *as sovereigns*.

**\*121**  The language of the Emoluments Clause is both sweeping and unqualified. *See* 49 Comp. Gen. 819, 821 (1970) (the "drafters [of the Clause] intended the prohibition to have the broadest possible scope and applicability"). It prohibits those holding offices of profit or trust under the United States from accepting "*any* present, Emolument, Office, or Title, *of any kind whatever*" from "*any* . . . foreign State" unless Congress consents. U.S. Const. art. I, § 9, cl. 8 (emphasis added). There is no express or implied exception for emoluments received from foreign States when the latter act in some capacity other than the performance of their political or diplomatic functions. The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause.

Moreover, a foreign government's ownership or control of a corporation may render the corporation that government's agent. *See First Nat'l City Bank v. Banco Para El Commercio*, 462 U.S. at 629. Indeed, as the Court has noted, "[a] typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed *by a board selected by the government in a manner consistent with the enabling law*." *Id.* at 624 (emphasis added). We believe that the Emoluments Clause should be interpreted to guard against the risk that occupants of Federal office will be paid by corporations that are, or are susceptible of becoming, agents of foreign States, or that are typically administered by boards selected by foreign States. Accordingly, we think that, in general, business corporations owned or controlled by foreign governments will fall within the Clause. ;B6 [FN6]FN;F6

**\*\*7**  The question whether the Emoluments Clause extends to foreign public universities is somewhat more difficult. Our prior opinions on this subject have not been a seamless web. Thus, in Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* (May 23, 1986), we concluded that while the University of New South Wales was clearly a public institution, it was not so clear that it was a "foreign State" under the Emoluments Clause, given its functional and operational independence from the government of Australia and state political instrumentalities. Accordingly, we opined that the question posed there -- whether a NASA employee could accept a  **\*122** fee of $150 for reviewing a Ph.D. thesis -- had to be answered by considering the particular circumstances of the case, in order to determine whether the proposed arrangement had the potential for corruption or improper foreign influence of the kind that the Emoluments Clause was designed to address. On other occasions, however, we have construed the Emoluments Clause to apply to public institutions of higher education in foreign countries. ;B7 [FN7]FN;F7

In support of its view that the Emoluments Clause does not apply to foreign public universities, ACUS argues that the Clause was designed to guard against the exercise of improper influence on Federal office-holders by the political or

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 165 of 395

diplomatic agencies of foreign States, because payments by those agencies are most likely to create a conflict between the recipient's Federal employment and his or her outside activity. *See* ACUS Letter at 4. Because public universities do not generally perform political or diplomatic functions, they ought not, on ACUS's analysis, to be brought within the Clause. We think, however, that the contrary view is the better one.

To begin with, we reiterate that the language of the Emoluments Clause does not warrant any distinction between the various capacities in which a foreign State may act. *Any* emoluments from a foreign State, whether dispensed through its political or diplomatic arms or through other agencies, are forbidden to Federal office-holders (unless Congress consents). Further, it serves the policy behind the Emoluments Clause to construe it to apply to foreign States even when they act through instrumentalities which, like universities, do not perform political or diplomatic functions. Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. *See* 10 Op. O.L.C. at 100. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government, even when those benefits took the form of remuneration for academic work or research. [B8][FN8][FN;F8] Thus, United States Government officers or employees might well find themselves exposed to conflicting claims on their interests and loyalties if they were permitted to accept employment at foreign public universities.

 **8  Finally, Congress has exercised its power under the Emoluments Clause to create a limited exception for academic research at foreign public institutions of learning. The Foreign Gifts and Decorations Act provides in part that Federal employees  *123  may accept from foreign governmental sources "a gift of more than minimal value when such gift is in the nature of an educational scholarship." 5 U.S.C. § 7342(c)(1)(B). [B9][FN9][FN;F9] Thus, Congress has recognized that foreign governmental bodies may wish to reward or encourage scholarly or scientific work by employees of our Government, but has carefully delimited the circumstances in which Federal employees may accept such honors or emoluments. That suggests that Congress believes both that the Emoluments Clause extends to paid academic work by Federal employees at foreign public universities, and that the Clause's prohibition on such activity should generally remain in force.

Accordingly, we conclude that foreign governmental entities, including public universities, can and presumptively do constitute instrumentalities of foreign States under the Emoluments Clause, even if they do not engage specifically in political or diplomatic functions. [B10][FN10][FN;F10]

*Conclusion*

Non-government members of the Administrative Conference are prohibited by the Emoluments Clause from accepting a distribution from their partnerships that includes some proportionate share of the revenues generated from the firm's foreign government clients.

Similarly, non-government members of the Conference are in general forbidden by the Emoluments Clause from accepting payments from commercial entities owned or controlled by foreign States. This prohibition also extends to the acceptance of payments for teaching at foreign universities that are instrumentalities of foreign States.

WALTER DELLINGER
Assistant Attorney General
Office of Legal Counsel

1      Your request is set forth in the Letter for Daniel Koffsky, Esq., Acting Assistant Attorney General, Office of Legal Counsel, from Gary J. Edles, General Counsel, Administrative Conference of the United States (July 30, 1993) ("ACUS Letter"). The

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 166 of 395

opinion to which your letter refers is *Applicability of 18 U.S.C. § 219 to Members of Federal Advisory Committees*, 15 Op. O.L.C. 65 (1991) ("the April 1991 Opinion").

2    Under its by-laws, the Conference has six standing committees: adjudication, administration, governmental processes, judicial review, regulation and rulemaking. *See* 1 C.F.R. § 302.3. In addition, with the approval of the Council, the Chairman may establish special ad hoc committees and assign special projects to them. *Id.* The committees, which include both government and non-government members, are "vital to the Conference's research and review process." Breger at 826.

3    For example, the Magnuson-Moss Warranty Act, § 202(d), 15 U.S.C. § 57a note, directed ACUS to study the Federal Trade Commission's "hybrid" rulemaking procedures. The Government in the Sunshine Act § 3(a), 5 U.S.C. § 552b(g), required agencies affected by the Act's open meeting requirements to consult with ACUS in developing their regulations. The Equal Access to Justice Act § 203(a)(1), 5 U.S.C. § 504(c)(1), required agencies to consult with ACUS before establishing uniform procedures for the submission and consideration of applications for awards of fees and expenses. *See* Breger at 835-36.

4    The Comptroller General appears to have adopted the same tests for determining whether a proposed payment from a domestic employer would violate the Emoluments Clause. In 69 Comp. Gen. 220 (1990), reconsidering and affirming 65 Comp. Gen. 382 (1986), the General Accounting Office ruled that a retired military officer employed under a contract between a domestic corporation and the Saudi Arabian Navy was subject to the Emoluments Clause. There was sufficient evidence to conclude that the officer "is in actuality an employee of the Royal Saudi Naval Forces since this entity may control and supervise him as well as terminate his employment." 65 Comp. Gen. at 385. Similarly, the General Accounting Office ruled that a retired military officer who was employed and paid by a domestic corporation and then assigned to work for an Israeli government instrumentality was within the Clause. It was shown that the domestic corporation was in effect merely an employment agency, and that the officer was actually working for the foreign government that had procured his services. *See* 53 Comp. Gen. 753 (1974).

5    In *Dunhill*, the Court declined to extend the Act of State doctrine "to include the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." 425 U.S. at 695. The case is at best marginally relevant to the issues here. Moreover, underlying the presumptive distinction between foreign governmental business corporations and the sovereigns that own or control them are concerns for "economic development and efficient administration," reinforced by "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity." *First Nat'l City Bank v. Banco Para El Comercio*, 462 U.S. 611, 626 (1983). But even in commercial contexts where concerns for economy and efficiency loom larger than they do here, the Court has been prepared to hold that presumptive distinction overcome. *Id.* at 630-33.

6    We acknowledge that the Foreign Gifts and Decorations Act, which provides Congress's consent to certain transactions otherwise forbidden by the Emoluments Clause, does not expressly subsume corporations owned or controlled by foreign States within its definition of a "foreign government." *See* 5 U.S.C. § 7342(a)(2). Rather, that definition extends primarily to "any unit of foreign governmental authority," *id.* § 7342(a)(2)(A), and it is plausible to argue that such corporations are not units of governmental authority. However, we do not assume that the Act's definition is necessarily coextensive with the constitutional concept of a "foreign State."

7    *See, e.g.*, Memorandum for Files from Robert J. Delahunty, Acting Special Counsel, Office of Legal Counsel, *Re: Applicability of Emoluments Clause to Employment of CFTC Attorney by East China Institute of Politics and Law* (Aug. 27, 1992); Memorandum for Files from Barbara E. Armacost, Attorney-Adviser, Office of Legal Counsel, *Re: Emoluments Clause and Appointment to the President's Committee on the Arts and Humanities* (Nov. 15, 1990). The General Accounting Office has reached a similar result. *See* 44 Comp. Gen. 130 (1964) (retired Coast Guard officer subject to recall to active duty held not entitled to retirement pay for period in which he was teaching for the Department of Education of the State of Tasmania, Australia).

8    Consistent with this view, we have opined that an employee of the National Archives could not serve on an international commission of historians created and funded by the Austrian Government to review the wartime record of Dr. Kurt Waldheim, the President of Austria. *See Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89 (1987).

9    We have opined that this exception applied to an award of approximately $24,000 by a foundation acting on behalf of the West German Government to a scientist employed by the Naval Research Laboratory. We reasoned that a "program designed

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO..., 17 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 167 of 395

to honor United States scientists and enable them 'to stay for an extended period at research institutes in the Federal Republic of Germany to carry out research of the Awardee's own choice' seems to be in the nature of an educational scholarship, acceptance of which Congress has permitted." Letter for Walter T. Skallerup, Jr., General Counsel, Department of the Navy, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel at 4 (Mar. 17, 1983).

10    ACUS points out that it is an advisory committee, and that "the nature of an advisory committee is that an individual -- or even the committee as a whole -- cannot determine the course of governmental action." ACUS Letter at 4. But, as we have noted above, ACUS is also, by statute, a Federal *agency*. Moreover, even considered solely as an advisory committee, ACUS could influence governmental decisionmaking. *See Association of Am. Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 913-14 (D.C. Cir. 1993). Hence, the advisory nature of ACUS does not render it immune from the possibility that a foreign State might exert improper influence on and through it. ACUS also objects that "[i]t would be particularly unusual for a recommendation by the Administrative Conference to be of significant interest to a foreign government." ACUS Letter at 5. But there may be no way of fine-tuning the prohibitions on the acceptance of foreign governmental emoluments to reach precisely such "unusual" cases. In any event, the Constitution itself lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications.

17 U.S. Op. Off. Legal Counsel 114 (O.L.C.), 1993 WL 777080

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2516024 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

APPLICABILITY OF THE EMOLUMENTS CLAUSE TO NONGOVERNMENTAL MEMBERS OF ACUS

June 3, 2010

*A nongovernmental member of the Administrative Conference of the United States does not occupy an office of profit or trust within the meaning of the Emoluments Clause.*

 **\*1**  Memorandum Opinion for the Chairman
Administrative Conference of the United States

This memorandum responds to your request that we reconsider our 1993 opinion that the nongovernmental members of the Administrative Conference of the United States ("ACUS" or "the Conference") hold an "Office of ... Trust" within the meaning of the Emoluments Clause of the Constitution, art. I, § 9, cl. 8. *See* Memorandum for David J. Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Paul R. Verkuil, Chairman, ACUS (May 18, 2010) ("Verkuil Memorandum"); *see also Applicability of the Emoluments Clause to NonGovernment Members of ACUS*, 17 Op. O.L.C. 114 (1993) ("*ACUS Op.*"). The Clause forbids anyone "holding any Office of Profit or Trust" under the United States from accepting, without Congressional consent, "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. Since the issuance of our 1993 opinion, our Office has addressed the applicability of the Emoluments Clause to members of advisory committees in four published opinions, and in none of these have we concluded that the Clause was implicated. [1]  In light of this subsequent guidance, we now confirm and further explain the oral advice we recently provided that a nongovernmental member of ACUS does not occupy an office of profit or trust within the meaning of the Emoluments Clause. [2]

I.

ACUS was established in 1964 to develop recommendations to improve the efficiency and fairness of federal agencies. Among its stated purposes is to "provide suitable arrangements through which Federal agencies, assisted by outside experts, may cooperatively study mutual problems, exchange information, and develop recommendations for action by proper authorities to the end that private rights may be fully protected and regulatory activities and other federal responsibilities may be carried out expeditiously in the public interest." 5 U.S.C. § 591(1) (2006); *see also ACUS Op.*, 17 Op. O.L.C. at 114-16 (describing background and structure of ACUS). Although agencies are not compelled to follow ACUS's recommendations, several of ACUS's studies have had a significant influence on administrative law over the years. *See* Marshall J. Breger, *The Administrative Conference of the United States: A Quarter Century Perspective*, 53 U. Pitt. L. Rev. 813, 831 (1992). Congress has also, from time to time, assigned ACUS to study and formulate recommendations as to particular issues, *see ACUS Op.*, 17 Op. O.L.C. at 117 n.3 (citing several examples). Nonetheless, we are not aware of any instance in which ACUS's role has been anything but advisory in nature. *See* Verkuil Memorandum at 2 (characterizing these statutory assignments as involving "purely consultative, research, or reporting roles").

 **\*2**  Although Congress created ACUS in 1964, the "idea of a government-sponsored organization which reviews and recommends improvements in agency procedures" dates back to a 1949 report of the Judicial Conference of the United States suggesting that the President convene such a body. *See* Breger, *supra* at 814-15. In 1953, President Eisenhower established a temporary Conference on Administrative Procedure, which consisted of representatives of federal agencies and several private-sector lawyers with expertise in administrative law. *Id.*

President Kennedy in 1961 convened a second temporary conference called the Administrative Conference of the United States, to recommend improvements regarding administrative procedure. This 1961 predecessor to ACUS was led by a Chairman, and its members consisted not only of federal agency officials but also of members of the public. *See* Exec. Order No. 10934, § 1, 3 C.F.R. 464 (1959-1963). As President Kennedy's Executive Order establishing the 1961 Conference stated, "[m]embers of the Conference who are not in Government service shall participate in the activities of the Conference solely as private individuals without official responsibility on behalf of the Government of the United States." *Id.* § 3. After several years and six plenary sessions, President Kennedy's conference issued thirty recommendations regarding administrative procedure, one of which was to establish a permanent Administrative Conference. *See* Breger, *supra* at 817-18.

In 1964, Congress did just that. *See* Pub. L. No. 88-499, 78 Stat. 615; *see also* S. Rep. No. 88-621, at 4 (1963) (noting the statute "would establish a permanent Administrative Conference of the United States"). In creating a permanent body, Congress replicated the 1961 Conference's limited advisory role of developing recommendations for improving agency procedure. S. Rep. No. 88-621, at 5 ("The basic powers of the Conference would be to study problems and make recommendations. It would have no power whatever to enforce such recommendations."). In addition, Congress established a structure much like the one that President Kennedy had established. The Conference consists of not more than 101 or fewer than 75 governmental and nongovernmental members, including a Chairman and a Council. 5 U.S.C. § 593(a); *see also id.* § 595(a) (noting that when meeting in plenary session, the Conference's members along with the Chairman and the Council are known as "the Assembly of the Conference"). ACUS's Chairman is appointed by the President for a five-year term, with the advice and consent of the Senate. *Id.* § 593(b)(1). The Council is composed of the Chairman and ten other governmental and nongovernmental members, and the latter ten members are appointed for three-year terms by the President (without Senate involvement). *Id.* § 595(b) (2006). Congress specified that "not more than one-half [of the Council's members] shall be employees of Federal regulatory agencies or Executive Departments." *Id.*

 **\*3** Together, the Chairman and the Council manage several critical aspects of the Conference's operations, including the selection of a portion of the Conference's membership. Specifically, the Chairman may appoint to the Conference, with the Council's approval, not more than forty nongovernmental members for two-year terms in addition to certain government officials who are required to serve on ACUS. *Id.* § 593(b)(6) ("[T]he number of members appointed by the Chairman may at no time be less than one-third nor more than two-fifths of the total numbers of members."). These nongovernmental members are selected by the Chairman to "provide [a] broad representation of the views of private citizens and [to] utilize diverse experiences." *Id.* ("The [nongovernmental] members shall be members of the practicing bar, scholars in the field of administrative law or government, or others specially informed by knowledge and experience with respect to Federal administrative procedure.").

ACUS ceased operations on October 31, 1995, but in 2004 Congress authorized funds for ACUS, Pub. L. No. 108-401, § 2(a), 118 Stat. 2255, although no funds were appropriated before the expiration of the authorization period. In 2008, Congress reauthorized ACUS, Pub. L. No. 110-290, § 2, 122 Stat. 2914, which began operations on March 11, 2009, with the passage of the Omnibus Appropriations statute, Pub. L. No. 111-8, 123 Stat. 524.

## II.

In 1993 our Office advised that the Emoluments Clause applied to the nongovernmental members of ACUS. *ACUS Op.*, 17 Op. O.L.C. at 117. More specifically, given that ACUS's nongovernmental members were not paid for their services to the Conference, we concluded that they occupied an "Office of ... Trust" (and not an office of profit) within the meaning of the Emoluments Clause. *Id.* We reached this conclusion for several reasons. First, we noted that ACUS was a "Federal agency established by statute." *Id.* Second, although we acknowledged that ACUS was an advisory committee as well as an agency, we cited to our then prevailing view that "'Federal advisory committee members hold offices of profit

or trust within the meaning of the Emoluments Clause."' *Id.* (quoting *Applicability of 18 U.S.C. § 219 to Members of Federal Advisory Committees*, 15 Op. O.L.C. 65, 68 (1991) ("*Section 219*")). Third, we noted that the Conference's advice and recommendations "have had (and were intended to have) a significant effect on the Government's administrative processes." *Id.* Finally, we observed that "under the Conference's own by-laws, its members may be considered to be special government employees subject to Federal conflict of interest statutes and regulations." *Id.*

Subsequent Office precedent, however, has undermined the rationale for our 1993 opinion's conclusion that nongovernmental members of ACUS are subject to the Emoluments Clause. *Cf. Representative Members*, 21 Op. O.L.C. at 176-77 (disavowing prior OLC opinion because of subsequent "refinements to our position" and because the opinion led to results that were "exceedingly incongruous" with intervening opinions of the Office). While we have previously characterized the Emoluments Clause as broad in scope, *see, e.g., Applicability of the Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17-18 (1994), the text of the Clause also makes clear that it applies only to a specified class of persons— *i.e.*, those who hold offices of profit or trust under the United States—and not to all positions in the United States government. Consistent with that textual limitation, our precedents since our *ACUS* opinion have endeavored to give substance to that category.

 **\*4**  In accord with this textual limitation, we have receded from the view, set forth in our *Section 219* opinion, that all federal advisory committee members hold offices of profit or trust within the meaning of the Emoluments Clause. Indeed, only months after issuing our *ACUS* opinion, we advised that this categorical position, on which the *ACUS* opinion itself appeared to rely in part, was "overbroad" and that "not every member of an advisory committee necessarily occupies an 'Office of Profit or Trust' under the Clause." Letter for Conrad K. Harper, Legal Adviser, Department of State, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel (Mar. 1, 1994). In a subsequent published opinion, we characterized that same conclusion in our *Section 219* opinion as "sweeping and unqualified," and specifically determined that members of an advisory committee established by the Department of State were not subject to the Emoluments Clause on the basis of a multi-factor test. *See IEP*, 20 Op. O.L.C. at 123. Under that test, we noted that the members of the committee were not subject to the Clause because they "meet only occasionally, serve without compensation, take no oath, and do not have access to classified information," and that "the Committee is purely advisory, is not a creature of statute, and discharges no substantive statutory responsibilities." *Id.*

In addition, on two later occasions, we concluded in published opinions that members of other advisory bodies are not subject to the prohibitions of the Emoluments Clause. In 2005, based on an extensive historical analysis of the phrase "Office of Profit or Trust," we advised that the Clause did not apply to members of the President's Council on Bioethics because that Council was "purely advisory" in nature. *See Bioethics Council* at 18; *id.* at 15 (noting that our conclusion was "generally consistent" with our Office's 1996 opinion regarding the State Department's Advisory Committee on International Economic Policy). We stated that to qualify as an office within the meaning of the Constitution, a position must "at least involve some exercise of governmental authority, and an advisory position does not." *Id.* at 10. Two years later, we advised that the Emoluments Clause did not apply to a board charged with providing advice to the FBI Director on improving the FBI's operations because that Board served a purely advisory function. *FBI Advisory Board* at 1 ("The sole role of the Board is to advise the Director, who is free to adopt, modify, or ignore its recommendations. Board members have no decisional or enforcement authority, and they exercise no supervisory responsibilities over other persons or employees as a result of their positions on the Board.").

Our *Bioethics Council* and *FBI Advisory Board* opinions go further than our *IEP* opinion and indicate that only those persons considered officers within the meaning of the Appointments Clause, U.S. Const. art. II, § 2, may be subject to the Emoluments Clause, *see, e.g., FBI Advisory Board* at 2-3 ("The threshold question ... in determining whether a member of the Board holds an 'Office of Profit or Trust under [the United States]' is whether a position on the Board is an 'Office under the United States'"); *Bioethics Council* at 16 ("A position that carried with it no governmental authority (significant or otherwise) would not be an office for purposes of the Appointments Clause, and therefore, under that analysis, would not be an office under the Emoluments Clause"), a conclusion that plainly would foreclose application of

the Emoluments Clause here, given the purely advisory functions of ACUS. But, for present purposes, we need not rest our decision on that ground. Because our Office had rejected the "sweeping and unqualified" view that *all* advisory bodies are subject to the Emoluments Clause, *IEP*, 20 Op. O.L.C. at 123, even before it had issued opinions suggesting that only those persons who were officers for purposes of the Appointments Clause were subject to the Emoluments Clause, it suffices to observe that, under the precedents issued since we decided *ACUS*, the nature of this advisory body is such that its nongovernmental members cannot be deemed to hold the kind of office to which the Emoluments Clause applies.

  **5**  In particular, the same factors that led us to conclude in our *IEP* opinion that the advisory committee for the State Department was not subject to the Emoluments Clause also lead to us to conclude that the nongovernmental members of ACUS, itself a purely advisory body, are not subject to it. *See IEP*, 20 Op. O.L.C. at 123 (setting out multiple factors indicating that particular advisory body was not subject to the Clause). Such a conclusion best accords with our Office's now substantial precedents giving substance to the Emoluments Clause through a careful explication of its proper scope, so as to ensure that concerns about foreign corruption and influence are accounted for with respect to the types of "Office[s]" that the Clause was meant to cover in identifying "Office[s] of Profit or Trust."

First, as was the case with the committee at issue in our *IEP* opinion, ACUS's nongovernmental members serve without compensation, 5 U.S.C. § 593(c) (2006) ("Members of the Conference, except the Chairman, are not entitled to pay for service."), and meet only on an occasional basis. By law, the Conference as a whole (*i.e.*, the Chairman, the Council, and ACUS's governmental and nongovernmental members) is required to meet for "at least one plenary session each year," *id.* § 595(b)(1), and we understand that the practice was to convene two such sessions a year. ACUS's Council has in the past typically met only five to six times a year. *See* E-mail from Paul R. Verkuil, Chairman, ACUS, to Daniel L. Koffsky, Deputy Assistant Attorney General (May 28, 2010, 8:40 EST) ("Verkuil E-mail"). In addition, most ACUS members also participate in various subject matter committees, which in the past have held four or five meetings a year. *See* 1 C.F.R. § 302.3 (1995) (listing ACUS's standing committees). By any measure, then, the nongovernmental members of ACUS "meet only occasionally." *IEP*, 20 Op. O.L.C. at 123.

To support the application of the Emoluments Clause, our 1993 opinion did point to the status of ACUS's members as special government employees ("SGEs") subject to federal conflict of interest statutes and regulations. *See ACUS Op.*, 17 Op. O.L.C. at 117. Advisory committee members often have that status, however, and subsequent opinions of this Office make clear that this factor is far from determinative. *See IEP*, 20 Op. O.L.C. at 123 (concluding that advisory body members were not subject to the Emoluments Clause notwithstanding their SGE status; *see also Representative Members*, 21 Op. O.L.C. at 177 ("special government employees on some advisory committees do not occupy offices of profit or trust").

Moreover, as was also the case with the committee members at issue in *IEP*, 20 Op. O.L.C. at 123, neither the statutes nor the bylaws governing ACUS indicate that its nongovernmental members would be given access to classified information. *See* Verkuil Memorandum at 5 n.7 ("I cannot foresee any likelihood that nongovernmental members of ACUS would require ... access [to classified information] in the performance of their role with ACUS, particularly because ACUS is barred by statute from addressing 'a military or foreign affairs function of the United States.'" (quoting 5 U.S.C. § 592(1))). It is the case that, unlike the committee members in *IEP*, the nongovernmental members of ACUS have traditionally taken oaths of office. *See* Verkuil E-mail. We are uncertain how longstanding this practice is, however, and, we understand that, in contrast to the requirements of several other federal agencies, ACUS's nongovernmental members are not required to take an oath by either organic statute or governing regulations. *Cf.* 12 U.S.C. § 242 (2006) (requiring members of the Board of Governors of the Federal Reserve System to "make and subscribe to the oath of office"); 16 U.S.C.A. § 831g(c) (West Supp. 2010) (requiring Board members of the Tennessee Valley Authority to take an oath of office). Thus, while there is support for the notion that the taking of an oath may in certain circumstances indicate a constitutional office, *see, e.g.*, Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 6 (1890) (noting that "the taking of the oath is not an indispensable criterion" of an office), for purposes of analyzing purely advisory bodies, this factor is, in our view, not particularly weighty.

**\*6**  We have arguably indicated that supervisory or decisional control may be of some relevance in determining the applicability of the Emoluments Clause to an advisory body, *cf. FBI Advisory Board* at 1 (noting that the Board was not subject to the Emoluments Clause in part because its members "have no decisional ... authority, and they exercise no supervisory responsibilities over other persons or employees as a result of their positions on the Board"), but even if that factor is relevant, it is not significant here. The Council and the Assembly (*i.e.*, ACUS's membership meeting in plenary session, 5 U.S.C. § 595(a)) do appear to have authority over certain limited decisions of the Chairman, *see, e.g., id.* § 595(b)(7) (Council may "approve or revise the budgetary proposals of the Chairman"); *id.* § 595(c)(5) (Chairman may "appoint, with the approval of the Council, members of committees authorized by the bylaws and regulations of the Conference"); *id.* § 595(c)(10) (Chairman may "organize and direct studies ordered by the Assembly or the Council"), but nongovernmental members are likely to constitute only a minority of the members of the Conference and the Council. By statute, no more than two-fifths of the Conference's general membership may consist of nongovernmental persons, 5 U.S.C. § 593(b)(6), while ACUS's Council may be composed of a majority of government officials. *See id.* § 595(b) (permitting the appointment of up to five government officers, in addition to the Chairman, on the eleven-person Council). That Congress did not structure ACUS to ensure a majority of nongovernmental members reinforces our view that such members were not vested (either individually or collectively) with the type of discretion and authority that inheres in an office of profit or trust within the meaning of the Emoluments Clause. In light of ACUS's purely advisory function as well as its governance structure, we do not believe its nongovernmental members exercise the type of supervisory power or decisional authority that could potentially be relevant to a conclusion that they are subject to the Emoluments Clause.

We acknowledge that ACUS is established by statute and that we have characterized it as an "agency." We emphasized these points in our 1993 *ACUS* opinion, 17 Op. O.L.C. at 117, and appealed to it again in distinguishing our application of the Emoluments Clause to ACUS from our conclusion that the Clause did not apply to the President's Bioethics Council, which also exercised purely advisory functions, *see Bioethics Council* at 16. In the latter opinion, we observed that "while nominally called an 'advisory committee,' [ACUS] was, in fact, a 'Federal agency established by statute' with certain statutorily assigned powers and functions." *Id.; see also IEP*, 20 Op. O.L.C. at 123 (noting that advisory panel was "not a creature of statute"). In neither opinion, however, did we explain precisely why ACUS's status in this regard would be significant to the analysis of whether ACUS's nongovernmental members are subject to the Emoluments Clause, and on reflection we do not believe that it is.

**\*7**  To be sure, ACUS's policy recommendations may "have had (and were intended to have) a significant effect on the Government's administrative processes," *id.*, and our prior characterization of it as an "agency" is reflective of the importance of its mission. But this status ultimately does not meaningfully distinguish ACUS from other similar advisory bodies, which also are established to play an important advisory role in the formulation of public policy. In our *IEP* opinion, for example, we did not suggest the advisory committee at issue there was exempt from the Clause because its mission was unimportant, and the Office's consistent decisions since 1993 have rejected the Clause's application to various advisory committees, even though they plainly had been charged with important missions. *Cf. FBI Advisory Board* at 1 (concluding that the Advisory Board was not subject to the Clause, while noting that it was charged with recommending to the FBI Director how the "FBI can more effectively exploit science and technology to improve its operations, particularly its priorities of preventing terrorist attacks, countering foreign intelligence operations, combating cyber-based attacks, and strengthening the FBI's collaboration with other federal law enforcement agencies."). And the mere fact that ACUS is not within an otherwise established agency does not provide a sufficient basis for drawing a different conclusion. Not every position in a free-standing agency constitutes an office of profit or trust within the meaning of the Emoluments Clause, and thus we do not think that the entity's location within the federal government is determinative of whether ACUS's nongovernmental members are subject to the Clause.

Nor do we believe that the fact that ACUS was established by statute compels the judgment that the Clause applies to that entity's nongovernmental members. Here, too, recent precedents of the Office are in direct tension with such a

conclusion. For example, Congress by statute required the FBI Director to establish a board to advise on certain matters, *see* Pub. L. No. 108-7, § 109, 117 Stat. 11, 67 (2003), and yet we nevertheless concluded that its members were not subject to the Emoluments Clause. *FBI Advisory Board* at 3. Similarly, although statutes created both the purely advisory Board of Trustees of the Federal Old-Age and Survivors Insurance Trust Fund and Federal Disability Insurance Trust Fund and the purely advisory Board of Trustees of the Federal Hospital Trust Insurance Fund, *see* 42 U.S.C.A. § 401(c) (West Supp. 2009); 42 U.S.C. § 910 (2006), we advised that the members of neither were subject to the Emoluments Clause. *See* E-mail for John Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, from Daniel L. Koffsky, Special Counsel, Office of Legal Counsel (Jan. 22, 2008, 12:31 EST) (memorializing oral advice). But equally importantly, we do not see why the fact that ACUS is established by statute matters here. The Clause's underlying concerns with undue foreign influence and corruption would seem, in principle, to be no more relevant with respect to the nongovernmental members of a purely advisory agency like ACUS that has been established directly by statute than they would be with respect to the nongovernmental members of an important advisory body that Congress has by statute authorized an executive official to establish. Consistent with this judgment, our precedents since 1993 provide no support for concluding that the Clause applies whenever (as will often be the case) an advisory committee's creation may be traced to a statute; indeed, these precedents point against that conclusion in rejecting the "sweeping and unqualified view" that all advisory committees are subject to the Clause. *See IEP*, 20 Op. O.L.C. at 123. Thus, particularly given our Office's subsequent precedents, we do not believe ACUS's status as a statutorily created entity, *ACUS Op.*, 17 Op. O.L.C. at 117, 123 n.10, provides sufficient ground to compel the application of the Emoluments Clause to ACUS's nongovernmental members, even assuming that the Clause may apply in some instances to persons who do not hold an office under the Appointments Clause.

III.

**\*8** For the reasons given above, we conclude that the Emoluments Clause does not apply to the nongovernmental members of ACUS.

David J. Barron

Acting Assistant Attorney General

1    *See* Memorandum Opinion for the General Counsel, Federal Bureau of Investigation, from John R. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Member of the FBI Director's Advisory Board* (June 15, 2007) ("*FBI Advisory Board*") (*available at* www.justice.gov/olc/opinions.htm); Memorandum Opinion for the Associate Counsel to the President, from Noel J. rancisco, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Member of the President's Council on Bioethics* (Mar. 9, 2005) ("*Bioethics Council*") (*available at* www.justice.gov/olc/opinions.htm); *Applicability of Emoluments Clause to "Representative" Members of Advisory Committees*, 21 Op. O.L.C. 176 (1997) ("*Representative Members*"); *The Advisory Committee on International Economic Policy*, 20 Op. O.L.C. 123 (1996) ("*IEP*").

2    Nothing in this opinion should be viewed as expressing our views on any aspect of our 1993 opinion other than the narrow legal issue regarding the applicability of the Emoluments Clause to the nongovernmental members of ACUS.

2010 WL 2516024 (O.L.C.)

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 174 of 395

10 U.S. Op. Off. Legal Counsel 96 (O.L.C.), 1986 WL 213241

Office of Legal Counsel

U.S. Department of Justice

APPLICATION OF EMOLUMENTS CLAUSE TO PART-TIME
CONSULTANT FOR THE NUCLEAR REGULATORY COMMISSION

June 3, 1986

A part-time consultant for the Nuclear Regulatory Commission occupied a position of profit or trust under the United States such that he could not, consistent with the Emoluments Clause of the Constitution, accept employment with a private domestic corporation to perform work on a contract with a foreign government.

**\*\*1  MEMORANDUM OPINION FOR THE GENERAL COUNSEL**
**NUCLEAR REGULATORY COMMISSION**

This responds to your request that this Office provide a written opinion giving the legal basis for our prior oral advice that Mr. A, a part-time staff consultant to the Nuclear Regulatory Commission (NRC), may not accept employment with a private domestic corporation to perform work on a contract with the government of Taiwan, consistent with the Emoluments Clause of the Constitution. ;B1[FN1] FN;F1

At the time that you originally requested our advice on this matter, you informed us that the Taiwanese government must approve Mr. A's participation on this contract and that Mr. A would be paid by the corporation out of funds it receives from the contract. As you recognized, under prior opinions of this Office such an employment arrangement would appear to be proscribed, unless Mr. A does not hold an "office of profit or trust" within the meaning of the Emoluments Clause. ;B2[FN2] FN;F2 See "Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act," 6 Op. O.L.C. 156 (1982).

**\*97**  In March 1985, we advised your office orally that this was a difficult question of constitutional analysis and that we would be unable to respond fully in writing in time for Mr. A to make a decision with regard to the proposed employment. We also indicated our preliminary conclusion that Mr. A did hold an "office of profit or trust" within the meaning of the Emoluments Clause, even though he worked for the NRC on a part-time basis only. We therefore suggested that he decline the Taiwanese government's offer of employment.

Based upon our recent thorough review of the history and purpose of this constitutional provision, we conclude that, in light of the nature of Mr. A's employment with the United States government, Mr. A holds an "office of profit or trust" within the meaning of that provision and that, therefore, he could not have accepted the proposed employment without the consent of Congress. ;B3[FN3] FN;F3

I. History and Purpose of the Emoluments Clause

The Emoluments Clause, adopted unanimously at the Constitutional convention of 1787, was intended by the Framers to preserve the independence of foreign ministers and other officers of the United States from corruption and foreign influence. 3 Farrand, The Records of the Federal Convention of 1787 327; see also 2 Farrand, supra, at 389. As Governor Randolph explained during the ratification debate in the Virginia convention:

(This) restriction restrains any persons in office from accepting of any present or emolument, title or office, from any foreign prince or state. This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened, operated in producing the restriction. A box was presented to our ambassador by the king of our allies.( :B4[FN4 FN;F4) It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding emoluments from foreign states. I believe, that if at that moment, when we were in harmony with the King of France, we had supposed he was corrupting our ambassador, it might have disturbed that confidence, **98** and diminished that mutual friendship, which contributed to carry us through the war.

**\*\*2** 3 Farrand, _supra_, at 327. Although no court has yet construed the Emoluments Clause, its expansive language and underlying purpose, as explained by Governor Randolph, strongly suggest that it be given broad scope. Consistent with a broad interpretation, past Attorneys General have stated that the Clause is "directed against every kind of influence by foreign governments upon officers of the United States," 24 Op. Att'y Gen. 116, 117 (1902), in the absence of consent by Congress. 40 Op. Att'y Gen. 513 (1947). See 5 U.S.C. s 7342.

Prior opinions of this Office have assumed without discussion that the persons covered by the Emoluments Clause were "officers of the United States" in the sense used in the Appointments Clause, U.S. Const. art. II, s 2, cl. 2. :B5[FN5 FN;F5 Nevertheless, in 1982, we did advise that a person may hold an "office of profit or trust" under the Emoluments Clause without necessarily being an "officer of the United States" for purposes of the Appointments Clause. At that time, we explained that the language and the purposes of the two provisions are significantly different. The Appointments Clause, which is rooted in separation of powers principles, had been construed to require that "any appointee exercising significant authority pursuant to the laws of the United States" is an "officer of the United States" who must be appointed in the manner prescribed by Article II. Buckley v. Valeo, 424 U.S. 1, 124-37 (1976). Employees are "lesser functionaries" subordinate to officers. Id. By contrast, the Emoluments Clause is a prophylactic provision, and hence, was intended to apply not merely to those appointees exercising "significant authority" but to "lesser functionaries" as well. Thus, although the possibility of corruption and foreign influence of foreign ministers apparently was of particular concern to the Framers, they expressly chose not to limit the prohibition on accepting emoluments from foreign governments to foreign ministers. They recognized that such a prohibition was also necessary for other officials and, accordingly, drafted the Clause to require undivided loyalty from all persons holding offices of profit or trust under the United States. :B6[FN6 FN;F6

We believe that the relevant inquiry, therefore, is not whether Mr. A should be considered an "officer of the United States" in the Appointments Clause sense. Rather, under the Emoluments Clause, the inquiry is whether Mr. A's part-time position at the NRC could be characterized as one of profit or trust under the United States -- a position requiring undivided loyalty to the United States government.

## **\*99** II. Mr. A's Position

Although this Office expressed the view in 1982 that the Emoluments Clause applies to all government employees, see 6 Op. O.L.C. at 158, the clause need not be read so broadly to resolve the matter at hand. The information that you have provided concerning the nature of Mr. A's employment strongly suggests that Mr. A holds a position of trust within the meaning of the Emoluments Clause.

**\*\*3** We understand that the NRC selected Mr. A on the basis of his personal qualifications and his particular expertise. :B7[FN7 FN;F7 The NRC considered the renewal of Mr. A's appointment "essential to the conduct of the agency's mission." His assignments may involve high priority, quick turn-around issues, and the NRC furnishes him with various materials and documentation. Mr. A's position requires a security clearance, see 42 U.S.C. s 2165, and he is required to and has taken an oath of office. You have supplied us with a copy of the NRC's "Employment Conditions for

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS Document 31-1 Filed 11/28/17 Page 176 of 395

Consultants and Advisers," which provides that Mr. A must conform to NRC policy and regulations regarding employee conduct, conflict of interest, non-disclosure of confidential information, and political activity. Mr. A is also required to report to the NRC any change in his private employment or financial interests. Finally, you note that he is "on call to serve the agency." All of these factors together indicate that Mr. A is highly valued for his abilities and that, in the course of his employment, he may develop or have access to sensitive and important, perhaps classified, information. Even without knowing more specifically the duties of his employment, these factors are a sufficient indication that the United States government has placed great trust in Mr. A and requires and expects his undivided loyalty. Therefore, we believe the Emoluments Clause applies to him.

Finally, we recognize that for purposes of the federal conflict-of-interest laws only, Mr. A is classified as a "special government employee." See 18 U.S.C. s 202. This classification, without more, however, does not exempt Mr. A from the constitutional prohibition in the Emoluments Clause. The legislative history of the conflict-of-interest laws reveals that Congress intended to create a category of special government employees for whom the restraints upon regular government employees would be relaxed. This category would permit the government to employ part- time or intermittent consultants with less difficulty. See H.R Rep. No. 748, 87th Cong., 1st Sess. 4-5 (1961); S. Rep. No. 2213, 87th Cong., 2d Sess. 16 (1962) (individual views of Sen. Carroll). Nonetheless, special government employees are covered by broad prophylactic statutes which, like the Emoluments Clause, are aimed at preventing corruption and extra-government influence. For example, special government employees are included within the coverage of 18 U.S.C. s 207 (governing post-employment **100 activities) and 18 U.S.C. s 208 (governing acts affecting a personal financial interest), as well as 18 U.S.C. ss 203 and 205 in certain cases. The conflict- of-interest laws do not address whether a special government employee may accept simultaneous employment with a foreign government. We do not read 18 U.S.C. s 202 as an implied expression of congressional consent under the Emoluments Clause to such employment, particularly when, pursuant to that Clause, Congress has expressly consented to the acceptance of gifts of minimal value from foreign governments by all employees, including experts and consultants. See 5 U.S.C. s 7342.

**4  In our view, the policy behind the Emoluments Clause, requiring the undivided loyalty of individuals occupying positions of trust under our government, has as much force with respect to part-time employees as it does with respect to full-time employees. Although we do not doubt that Mr. A is worthy of the trust placed in him by the NRC, we believe that his proposed employment with a domestic corporation on a contact with a foreign government is within the proscription of the Emoluments Clause.

Conclusion

For the foregoing reasons, we conclude that the Emoluments Clause of the Constitution prohibits Mr. A from accepting employment under a contract with a foreign government, absent express congressional consent.

Charles J. Cooper
Assistant Attorney General
Office of Legal Counsel

1  The Emoluments Clause provides:
   No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the consent of the Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State.
   U.S. Const. art. I, s 9, cl. 8.

2  It is well established that compensation for services performed for a foreign government constitutes an "emolument" for purposes of Article I, s 9, cl. 8. See 40 Op. Att'y Gen. 513 (1947); 44 Comp. Gen. 130 (1964).

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

APPLICATION OF EMOLUMENTS CLAUSE TO..., 10 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 177 of 395

3    This opinion addresses only the constitutional issue under Article I, s 9, cl. 8. It does not purport to deal with any other statutory or regulatory restrictions that Mr. A's proposed employment may have implicated. We note, however, that you have expressed the view that the proposed employment would not have contravened NRC's conflict of interest regulations.

4    "Dr. (Benjamin) Franklin is the person alluded to by Randolph. In the winter of 1756, in Philadelphia, under the roof of a venerable granddaughter of Dr. Franklin, I saw the beautiful portrait of Louis XVI, snuff-box size, presented by that king to the doctor. As the portrait is exactly such as is contained in the snuff-boxes presented by crowned heads, one of which I have seen, it is probable that this portrait of Louis was originally attached to the box in question, which has in the lapse of years been lost or given away by Dr. Franklin." H.B. Grigsby, History of the Virginia Federal Convention of 1788 (Virginia Historical Society Collections, Vols. 9- 10) 264.

5    In prior memoranda, it was unnecessary for this Office directly to address the issue whether the Emoluments Clause applies to employees or "lesser functionaries," as well as officers.

6    We also indicated in 1982, as support for this proposition, that in enacting the Foreign Gifts and Decorations Act of 1966, 5 U.S.C. s 7342, Congress assumed without discussion that the Emoluments Clause requires congressional consent before any government employee may accept a gift from a foreign government. See 6 Op. O.L.C. at 158. See also S. Rep. No. 1160, 89th Cong., 2d Sess. (1966); H.R. Rep. No. 2052, 89th Cong., 2d Sess. (1966). The Foreign Gifts and Decorations Act was extended in 1977 to apply to experts an consultants hired by the government under 5 U.S.C. s 3109. See 5 U.S.C. s 7342(a); S. Rep. No. 294, 95th Cong., 1st Sess. (1977).

7    See 15 Op. Att'y Gen. 187, 188 (1877) (Commissioners appointed by the President for the Centennial Exhibition hold offices of "trust" within the meaning of the Emoluments Clause, even though their duties are of a special and temporary character, because they have been entrusted with those duties "on account of their personal qualifications and fitness for the place.").

10 U.S. Op. Off. Legal Counsel 96 (O.L.C.), 1986 WL 213241

---

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   4

APPLICATION OF THE EMOLUMENTS CLAUSE OF THE..., 6 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 178 of 395

6 U.S. Op. Off. Legal Counsel 156 (O.L.C.), 1982 WL 170682

Office of Legal Counsel

U.S. Department of Justice

APPLICATION OF THE EMOLUMENTS CLAUSE OF THE
CONSTITUTION AND THE FOREIGN GIFTS AND DECORATIONS ACT

February 24, 1982

The Emoluments Clause of the Constitution prohibits government employees from accepting any sort of payment from a foreign government, except with the consent of Congress. Congress has consented to the receipt of minimal gifts from a foreign state, 5 U.S.C. § 342, but has not consented to receipt of compensation for services rendered.The fact that an employee of the Nuclear Regulatory Commission would be paid by an American consulting firm for services he rendered in connection with construction of a nuclear power plant in Mexico would not, under the circumstances presented here, avoid the Emoluments Clause, since the Mexican government would be the actual source of the payment.

**1  MEMORANDUM OPINION FOR THE ASSISTANT GENERAL COUNSEL
UNITED STATES NUCLEAR REGULATORY COMMISSION

This responds to your letter asking for an interpretation of the Emoluments Clause of the Constitution, Article I, § 9, cl. 8, and the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (Supp. III 1979).

According to your letter and subsequent conversations with Nuclear Regulatory Commission (NRC) staff, an employee of the NRC is seeking authorization to work on his leave time for an American consulting firm. In that capacity he would review the design of a nuclear power plant being constructed in Mexico. The plant is being built by the Mexican government through its Federal Electrical Commission.

The American consulting firm would be under contract to the Federal Electrical Commission; that firm would compensate the NRC employee for his expenses and services. The American firm has no other nuclear contracts and would be relying solely on the experience of this employee in securing the contract. The employee's work at NRC involves the assessment of operating reactors. This is the same job he will perform in Mexico. The consulting firm is a small firm that has three other engineers in unrelated fields. It has not been created for the purpose of securing this particular contract or insulating the employee from the Mexican government. The employee would be paid from the funds received from the Mexican government in connection with the proposed contract, although not all of the proceeds from the contract will go to him.

*157  The employee expects to spend from seven to ten work days on the contract. He has worked previously on this project in an official capacity when he was made available for a year to work on it under the auspices of the State Department and the International Atomic Energy Agency. As a result, when the employee, together with others from the NRC, circulated a proposal to act as consultants, the Mexican government initiated discussions with him personally. Subsequent negotiations, we understand, have been conducted through the consulting firm.

At the outset we note that your agency has concluded that the proposed activity is permissible under the NRC conflict of interest regulations governing outside employment by NRC employees. 10 C.F.R. § 0.735–50 (1981). We have not been asked for our views concerning these regulations and therefore take no position as to them.

**2  The Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (Supp. III 1979), generally prohibits employees from requesting or otherwise encouraging the tender of a gift or decoration, or from accepting or retaining a gift of more

APPLICATION OF THE EMOLUMENTS CLAUSE OF THE..., 6 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 179 of 395

than minimal value. That section defines "gift" as "a tangible or intangible present (other than a decoration) tendered by, or received from, a foreign government." It seems clear that this Act only addresses itself to gratuities, rather than compensation for services actually performed, as would be the case here. We therefore conclude that 5 U.S.C. § 7342 is not applicable to the conduct contemplated.

The Emoluments Clause presents more difficult problems. Article I, § 9, cl. 8 provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

A threshold question is presented as to whether the NRC employee is a "Person holding any Office of Profit or Trust" under the United States. We understand that he is not employed in a supervisory capacity. In past opinions, this Office seems to have assumed without discussion that the only persons covered by the Emoluments Clause were those holding an "Office" in the sense used in the Appointments Clause, Article II, § 2, cl. 2. We so stated in a letter from Deputy Assistant Attorney General Ulman to the General Counsel of your agency on July 26, 1976. It is not clear, however, that the words "any Office of Profit or Trust," as used in the Emoluments Clause, should be limited to persons considered "Officers" under the Appointments Clause. Both the language and the purpose of the two provisions are significantly different.

The latter finds its roots in separation of powers principles. The Supreme Court has said that "any appointee exercising significant authority pursuant to the laws of the United States" is an officer under the Appointments Clause and must be appointed in the manner prescribed by that Article. Employees are "lesser functionaries" subordinate to officers. Buckley v. Valeo, 424 U.S. 1, 126 & n. 162 (1976). See generally 424 U.S. at 124–137. The Emoluments Clause, on the **158** other hand, is designed "to exclude corruption and foreign influence." 3 M. Farrand, The Records of the Federal Convention of 1787, 327 (Gov. Randolph at the Virginia Convention) (rev. ed. 1937, 1966 reprint). Even though the Framers may have had the example of high officials such as "foreign Ministers" in mind when discussing the clause, 2 id. 389, its policy would appear to be just as important as applied to subordinates. The problem of divided loyalties can arise at any level. This may be particularly true in a field where, as here, secrecy is pervasive.

It is presumably for this reason that Congress, in enacting the Foreign Gifts and Decorations Act, assumed without discussion that under the Emoluments Clause its consent was necessary for any employee to accept a gift from a foreign government. 5 U.S.C. § 7342(a). E.g., H.R.Rep. No. 2052, 89th Cong., 2d Sess. (1966). Although the view of Congress is not, by itself, conclusive, we are persuaded that the interpretation suggestion by the Foreign Gifts and Decorations Act is appropriate here. It is not necessary therefore for us to decide whether the NRC employee in this case must be considered an officer in the Appointments Clause sense.

**3** The next issue presented under the Emoluments Clause is whether the payment in this case is "from any King, Prince, or foreign State." As noted, Congress has consented only to the receipt of minimal gifts from any foreign state as provided by 5 U.S.C. § 7342. Therefore, any other emolument stands forbidden unless the conclusion can be reached that the payment is not "from" a foreign government at all. We must thus decide whether payment through the consulting firm, in effect, shields the employee from payment by the Mexican government.

The question of when a foreign government, as opposed to an intermediary, is the actual source of a gift or payment has, as far as we know, only been discussed in writing once before. In 1980, this Office noted that no relevant opinion or commentary addressed this issue. We considered a proposed contract under which a large university provided expert consultants to a foreign government. The foreign government had no control over the selection of the experts and their payment and in the years in which the consulting relationship has been in effect, had never sought to influence the selection of experts. These matters were within the discretion of the university. This Office concluded therefore that the payment of an individual consultant could not be said to be "from" a foreign government.

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 180 of 395

APPLICATION OF THE EMOLUMENTS CLAUSE OF THE..., 6 U.S. Op. Off. Legal...

In the present case, the retention of the NRC employee by the consulting firm appears to be the principal reason for selection of the consulting firm by the Mexican government. He is the firm's sole source of expertise and was, at least in part, selected because of prior experience gained while working on the same project in an official capacity. As we understand the situation, it seems clear that ultimate control, including selection of personnel, remains with the Mexican government. It is difficult to state what the outer limits of our earlier opinion may be. Each situation must, of course, be judged on its facts. Under the circumstances presented here, however, we cannot conclude that the interposition of the **\*159** American corporation relieves the NRC employee of the obligations imposed by the Emoluments Clause.

Robert B. Shanks
Deputy Assistant Attorney General
Office of Legal Counsel

6 U.S. Op. Off. Legal Counsel 156 (O.L.C.), 1982 WL 170682

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

34 Comp. Gen. 331 (Comp.Gen.), B- 122100, 1955 WL 918

COMPTROLLER GENERAL

ASSISTANT COMPTROLLER GENERAL WEITZEL TO THE ATTORNEY GENERAL

JANUARY 12, 1955

**\*331  OFFICERS AND EMPLOYEES - ACCEPTANCE OF ANNUITY FROM FOREIGN GOVERNMENT - CONSTITUTIONAL PROHIBITION**
**\*\*1**  ACCEPTANCE OF ANNUITY PAYMENTS MADE BY THE GERMAN GOVERNMENT TO A UNITED STATES EMPLOYEE AS DAMAGES FOR INJURIES INFLICTED BY THE NAZI REGIME WHILE HE WAS A FORMER CITIZEN AND PUBLIC OFFICIAL OF GERMANY DOES NOT VIOLATE ARTICLE I, SECTION 9, CLAUSE 8, OF THE UNITED STATES CONSTITUTION PROHIBITING THE ACCEPTANCE BY GOVERNMENT EMPLOYEES OF ANY PRESENT, EMOLUMENT, ETC., FROM A FOREIGN STATE.


REFERENCE IS MADE TO LETTER OF NOVEMBER 10, 1954, FILE REFERENCE A3, FROM THE ADMINISTRATIVE ASSISTANT ATTORNEY GENERAL, REQUESTING MY ADVICE WHETHER MR. RICHARD E. NEWKIRK, AN EMPLOYEE OF THE OFFICE OF ALIEN PROPERTY, DEPARTMENT OF JUSTICE, WHO PRESENTLY IS CARRIED IN A LEAVE-WITHOUT-PAY STATUS, LAWFULLY MAY BE PAID THE COMPENSATION OF HIS POSITION CONCURRENTLY WITH THE RECEIPT OF CERTAIN PAYMENTS—- HEREINAFTER DESCRIBED—- FROM THE GOVERNMENT OF GERMANY.

THE PERTINENT FACTS IN MR. NEWKIRK'S CASE, AS DISCLOSED BY THE DEPARTMENT'S LETTER OF NOVEMBER 10, AND THE SUPPLEMENTAL INFORMATION TRANSMITTED HERE INFORMALLY IN CONNECTION WITH THE CASE, ARE AS FOLLOWS: MR. NEWKIRK WAS SERVING AS A JUDGE IN THE COURT OF COMMON  **\*332**  PLEAS, KASSEL, GERMANY, WHEN HE WAS INVOLUNTARILY RETIRED FROM THAT OFFICE EFFECTIVE OCTOBER 1, 1933, BY THE NATIONAL-1SOCIALIST GOVERNMENT FOR RACIAL REASONS. INCIDENT TO THAT RETIREMENT HE WAS PAID A SMALL PENSION UNTIL SUCH TIME AS HE EMIGRATED TO THE UNITED STATES IN 1936. IN NOVEMBER 1941 BY NAZI DECREE HE, TOGETHER WITH ALL GERMANS OF JEWISH DESCENT WHO RESIDED ABROAD, WAS DEPRIVED OF HIS GERMAN CITIZENSHIP. IN THAT SAME YEAR MR. NEWKIRK BECAME A NATURALIZED CITIZEN OF THE UNITED STATES. FURTHER, IT APPEARS THAT IN 1954 THE GOVERNMENT OF GERMANY, ACTING UPON THE APPLICATION OF MR. NEWKIRK, AWARDED HIM A LUMP-SUM PAYMENT UNDER THE ' FEDERAL SUPPLEMENTARY LAW FOR THE COMPENSATION OF VICTIMS OF NATIONAL SOCIALIST PERSECUTION' (DATED SEPTEMBER 18, 1953) AND AN ANNUITY FOR LIFE UNDER GERMAN POSTWAR LEGISLATION DATED MARCH 18, 1952, ENTITLED ' LAW FOR THE REDRESS OF NATIONAL SOCIALIST WRONGS INFLICTED ON MEMBERS OF THE CIVIL SERVICE LIVING ABROAD.'

IN THE INFORMAL SUPPLEMENTAL REPORT RECEIVED FROM THE DEPARTMENT OF JUSTICE IT IS STATED AT LENGTH THAT THE LAWS UNDER WHICH MR. NEWKIRK RECEIVED PAYMENTS FROM THE GERMAN GOVERNMENT ARE LAWS OF INDEMNIFICATION TO REDRESS WRONGS COMMITTED BY THE NATIONAL-1SOCIALIST GOVERNMENT; THAT BOTH THE LUMP-SUM PAYMENTS AND ANNUITY PAYMENTS MADE PURSUANT TO THOSE LAWS REPRESENT DAMAGES FOR INJURIES INFLICTED UPON CERTAIN CIVIL SERVANTS BECAUSE OF THEIR POLITICAL CONVICTION, RACE, CREED OR IDEOLOGY; THAT THOSE LAWS ARE GENERAL IN NATURE APPLYING TO LARGE CLASSES OF INDIVIDUALS, AND THAT THE ENACTMENT OF SAID LAWS

WAS ATTRIBUTABLE IN A LARGE MEASURE TO THE MILITARILY ENFORCED POLICY OF THE VICTORIOUS ALLIES, AND FINALLY TO THE BONN CONVENTION, A TREATY RESTORING GERMAN SOVEREIGNTY. IT IS STATED THAT IN ESTABLISHING DAMAGES FOR THE TORTIOUS ACTS COMMITTED, IT WAS ONLY LOGICAL FOR THE GERMAN LEGISLATURE TO APPLY THE GERMAN CONCEPT OF INDEMNIFICATION FOR WRONGS COMMITTED WITH ITS EMPHASIS UPON RESTITUTION IN KIND AND UPON PAYMENT OF ANNUITIES IN SATISFACTION OF TORT JUDGMENTS. THE LANGUAGE OF THE TRANSLATED GERMAN LAWS TRANSMITTED HERE SUPPORTS THE VIEW THAT THE PAYMENTS INVOLVED REPRESENT DAMAGES OR REPARATIONS FOR WRONGFUL ACTS COMMITTED UNDER THE NAZI REGIME.

**2  THE SOLE QUESTION INVOLVED IS WHETHER ACCEPTANCE OF THE PAYMENTS SO PROVIDED BY THE GERMAN LAWS BY MR. NEWKIRK, WHO, IT IS STATED, CONCEDEDLY 'OCCUPIES A POSITION OF PROFIT OR TRUST UNDER THE UNITED STATES,' CONSTITUTES A VIOLATION OF CLAUSE 8, SECTION 9, ARTICLE I, OF THE CONSTITUTION OF THE UNITED STATES, READING IN PERTINENT PART AS FOLLOWS:

> * * * AND NO PERSON HOLDING ANY OFFICE OF PROFIT OR TRUST UNDER THEM (THE UNITED STATES), SHALL, WITHOUT THE CONSENT OF THE CONGRESS, ACCEPT OF ANY PRESENT, EMOLUMENT, OFFICE, OR TITLE, OF ANY KIND WHATEVER, FROM ANY KING, PRINCE, OR FOREIGN STATE. (PARENTHETICAL PORTION ADDED.)

*333  WHILE THE THINGS FORBIDDEN IN THAT PART OF THE CONSTITUTION JUST QUOTED ARE 'PRESENT, EMOLUMENT, OFFICE, OR TITLE, OF ANY KIND WHATEVER,' AND WHILE THE ONLY ONE HERE PROPERLY IN QUESTION WOULD APPEAR TO BE ' EMOLUMENT,' A FEW COMMENTS UPON THE OTHER FORBIDDEN THINGS NAMED ARE NOT CONSIDERED AMISS SO FAR AS THEY APPEAR TO BEAR SOME RELATIONSHIP TO IT, HOWEVER REMOTELY.

CLEARLY, THERE IS NOT INVOLVED IN THE INSTANT CASE ANY QUESTION OF ACCEPTANCE OF ' TITLE * * * FROM ANY KING, PRINCE, OR FOREIGN STATE,' AND NO FURTHER COMMENT WILL BE MADE WITH RESPECT THERETO.

NEITHER IS IT CONSIDERED THAT MR. NEWKIRK HOLDS AN ' OFFICE' UNDER THE GERMAN GOVERNMENT. HE WRONGFULLY WAS REMOVED FROM THE JUDGESHIP BY THE NATIONAL-1SOCIALIST GOVERNMENT; WAS SUBSEQUENTLY DIVESTED OF GERMAN CITIZENSHIP AND THEREAFTER BECAME A CITIZEN OF THE UNITED STATES. IT IS CLEAR AT THIS POINT THAT MR. NEWKIRK DID NOT HOLD ANY OFFICE UNDER THE GERMAN GOVERNMENT. DID THEN ACCEPTANCE OF INDEMNIFICATION PAYMENTS AUTOMATICALLY CONFER UPON MR. NEWKIRK AN OFFICE UNDER THE GOVERNMENT? IN MY OPINION, IT DID NOT. THE LAW PROVIDING RESTITUTION TO INJURED CIVIL SERVICE WORKERS OF GERMANY WHO HAD EMIGRATED TO OTHER COUNTRIES GRANTED THEM AN OPTION EITHER TO RETURN TO GERMANY AND BE REINSTATED IN POSITIONS CORRESPONDING TO THOSE WHICH THEY WOULD HAVE ATTAINED HAD THEIR CAREERS NOT BEEN INTERRUPTED BY THE NAZI REGIME OR TO RECEIVE COMPENSATORY MONEY DAMAGES. MR. NEWKIRK, AN AMERICAN CITIZEN, DID NOT WISH TO RESUME HIS STATUS IN GERMAN SOCIETY AND DID NOT WISH TO HAVE GERMAN CITIZENSHIP REINSTATED. IN LIEU THEREOF HE ELECTED TO RECEIVE MONEY DAMAGES. ACCEPTANCE OF SUCH INDEMNIFICATION FROM THE GERMAN GOVERNMENT DID NOT OBLIGATE HIM OR RENDER HIM RESPONSIBLE TO THAT GOVERNMENT, NOR DID IT VEST IN THE GERMAN GOVERNMENT ANY MEASURE OF CONTROL OR SUPERVISION OVER MR. NEWKIRK. WHILE FOR ECONOMIC OR BUDGETARY REASONS INDEMNIFICATION IS BEING

EFFECTED BY THE GERMAN GOVERNMENT UNDER A DEFERRED PAYMENT PLAN IN THE FORM OF ANNUITY PAYMENTS, NEVERTHELESS SUCH PAYMENTS ARE REGARDED AS NOTHING MORE THAN MONEY DAMAGES FOR THE INJURIES SUFFERED BY MR. NEWKIRK AT THE HANDS OF THE NATIONAL-1SOCIALIST GOVERNMENT, AND ACCEPTANCE OF SUCH PAYMENTS IS NOT REGARDED BY ME AS ACCEPTANCE OF AN OFFICE UNDER THE GERMAN GOVERNMENT.

THE PRINCIPAL QUESTION WHICH CONCERNS US HERE IS WHETHER SUCH PAYMENTS CONSTITUTE AN ' MOLUMENT' AS THAT TERM IS USED IN THE ABOVE-QUOTED CONSTITUTIONAL PROVISION. THE TERM,'EMOLUMENT' IS DEFINED IN BLACK'S LAW DICTIONARY, THIRD EDITION, AS ' THE PROFIT ARISING FROM OFFICE OR EMPLOYMENT; THAT WHICH IS RECEIVED AS A COMPENSATION FOR SERVICES, OR WHICH IS ANNEXED TO THE POSSESSION OF AN OFFICE AS SALARY, FEES, AND PERQUISITES; ADVANTAGE; GAIN, PUBLIC OR PRIVATE. WEBSTER. ANY PERQUISITE, ADVANTAGE, PROFIT OR GAIN ARISING FROM THE POSSESSION **\*334** OF AN OFFICE.' THE AMOUNTS RECEIVED BY MR. NEWKIRK AS INDEMNIFICATION ARE NOT PAID AS PROFIT, GAIN, COMPENSATION, PERQUISITE, OR ADVANTAGE FLOWING TO HIM AS AN INCIDENT TO POSSESSION OF AN OFFICE OR AS COMPENSATION FOR SERVICES RENDERED. SUCH PAYMENTS DO NOT STEM DIRECTLY FROM HIS PRIOR POSSESSION OF AN OFFICE UNDER THE GERMAN GOVERNMENT NOR FROM SERVICES RENDERED THE GERMAN GOVERNMENT. RATHER, SUCH AMOUNTS REPRESENT DAMAGES PAYABLE AS A DIRECT RESULT OF A MORAL AND LEGAL WRONG INFLICTED UPON MR. NEWKIRK AT THE HANDS OF THE NATIONAL-1SOCIALIST GOVERNMENT. THE PAYMENTS ARE MADE TO LIQUIDATE A RECOGNIZED LEGAL LIABILITY ARISING FROM THE TORTIOUS ACTS OF THE NAZI REGIME, AND THE FACT THAT SUCH LIABILITY IS LIQUIDATED IN INSTALLMENTS IN THE FORM OF ANNUITY PAYMENTS FOR THE CONVENIENCE OF THE GERMAN GOVERNMENT OR FOR ECONOMIC AND BUDGETARY REASONS DOES NOT OPERATE TO CHANGE THE BASIC CHARACTER OF SUCH PAYMENTS. I CONCLUDE, THEREFORE, THAT SUCH PAYMENTS DO NOT CONSTITUTE AN EMOLUMENT WITHIN THE PURVIEW OF THE CONSTITUTIONAL PROVISIONS UNDER CONSIDERATION HERE.

**\*\*3** FINALLY, IT IS MY OPINION THAT THE PAYMENTS IN QUESTION DO NOT CONSTITUTE A 'PRESENT.' THE M,'PRESENT,' IS DEFINED IN BLACK'S LAW DICTIONARY, THIRD EDITION, AS 'A GRATUITY; ANYTHING PRESENTED OR GIVEN.' THE TERM, ' PRESENT, ' IS GENERALLY REGARDED AS SYNONYMOUS WITH THE TERM,'GIFT,' AND DENOTES SOMETHING VOLUNTARILY GIVEN, FREE FROM LEGAL COMPULSION OR OBLIGATION. THE PAYMENTS MADE IN THE INSTANT CASE WERE MADE IN LIQUIDATION OF A RECOGNIZED LEGAL OBLIGATION AND NOT AS GIFTS. SUCH PAYMENTS WERE IN LIQUIDATION OF THE LEGALLY ACKNOWLEDGED LIABILITY OF THE GERMAN GOVERNMENT FOR THE TORTIOUS ACTS INFLICTED UPON MR. NEWKIRK BY THE NATIONAL-1SOCIALIST GOVERNMENT. COMPARE THE CASE OF EVANS V. BERRY, 186 N.E. 203, HOLDING IN PART THAT ASSUMPTION OF LIABILITY BY CITY FOR TORT COMMITTED BY A POLICE OFFICER DOES NOT CONSTITUTE A 'GIFT' OR 'GRATUITY' TO INJURED PERSON IF A LEGITIMATE RECOGNITION OF AN EQUITABLE CLAIM. IN THE CASE OF BOWMAN'S ADM-NS V. BOWMAN'S EX-R AND ADM-R, 192 S.W.2D 955, IT WAS STATED THAT THE TERM 'GIFT' IN ITS ORDINARY MEANING DENOTES NOTHING OTHER THAN 'A VOLUNTARY AND GRATUITOUS GIVING OF SOMETHING BY ONE WITHOUT COMPENSATION TO ANOTHER WHO TAKES IT WITHOUT VALUABLE CONSIDERATION.'

FOR THE REASONS ENUMERATED ABOVE, I DO NOT CONSIDER THAT THE ACCEPTANCE OF THE PAYMENTS FROM THE GERMAN GOVERNMENT BY MR. NEWKIRK WHILE HOLDING A POSITION IN THE OFFICE OF ALIEN PROPERTY IN ANYWISE CONTRAVENES THE LETTER OF THE CONSTITUTION OF THE UNITED STATES.

ASSISTANT COMPTROLLER GENERAL WEITZEL TO THE..., 34 Comp. Gen. 331...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 184 of 395

AS A FINAL POINT, I DEEM IT APPROPRIATE TO CONSIDER HERE WHETHER ACCEPTANCE OF SUCH PAYMENTS WOULD CONTRAVENE THE SPIRIT OF THE CONSTITUTIONAL PROVISION INVOLVED. IN REFERRING TO THE EVILS SOUGHT TO BE AVOIDED BY SUCH PROVISION, IT IS STATED IN 24 OP. A.G. 117 THAT ' IT IS EVIDENT FROM THE BRIEF COMMENTS ON THIS PROVISION AND THE ESTABLISHED **335** PRACTICE IN OUR DIPLOMATIC INTERCOURSE (2 STORY ON THE CONSTITUTION, 4TH EDITION, 216, 217; 1 WHARTON'S INT. LAW DIG., SEC. 110, P. 575) THAT ITS LANGUAGE HAS BEEN VIEWED AS PARTICULARLY DIRECTED AGAINST EVERY KIND OF INFLUENCE BY FOREIGN GOVERNMENTS UPON OFFICERS OF THE UNITED STATES BASED ON OUR HISTORIC POLICIES AS A NATION.' THE INDEMNITY PAYMENTS MADE TO MR. NEWKIRK OBVIOUSLY WERE NOT INTENDED TO INFLUENCE HIM AS AN OFFICER OF THE UNITED STATES. THE LAWS UNDER WHICH SUCH PAYMENTS ARE MADE ARE GENERAL IN NATURE APPLYING TO ALL PERSECUTEES SIMILARLY SITUATED REGARDLESS OF WHETHER THEY BE HOLDERS OF OFFICERS UNDER THE UNITED STATES. MOREOVER, SUCH INDEMNIFICATION WAS NOT PROVIDED VOLUNTARILY AS AN ACT OF GRADE BY THE GERMAN GOVERNMENT, BUT RATHER WAS REQUIRED LARGELY AS A RESULT OF THE POLICY IMPOSED BY THE UNITED STATES AND ITS ALLIES AND FINALLY BY THE TERMS OF THE BONN CONVENTION. ACCEPTANCE OF A PAYMENT REQUIRED TO BE MADE BY THE GERMANY GOVERNMENT TO COMPLY WITH THE TERMS OF SUCH A TREATY HARDLY CAN BE SAID TO BE A PAYMENT DESIGNED TO INFLUENCE AN OFFICER OF THE UNITED STATES SUCH AS IS PROHIBITED BY THE CONSTITUTIONAL PROVISION INVOLVED. MOREOVER, UNDER THE CIRCUMSTANCES, WHATEVER FEELING OF GRATITUDE MR. NEWKIRK MIGHT HAVE FOR THE PAYMENTS IN QUESTION PROBABLY WOULD FLOW TO THE UNITED STATES.

**4 IN MY JUDGMENT, ACCEPTANCE OF THE PAYMENTS INVOLVED VIOLATES NEITHER THE LETTER NOR THE SPIRIT OF THE CONSTITUTIONAL PROVISION AND, AS THE MATTER NOW STANDS, WOULD AFFORD NO BASIS FOR THIS OFFICE TO QUESTION OTHERWISE PROPER PAYMENTS OF COMPENSATION TO MR. NEWKIRK UNDER HIS PRESENT EMPLOYMENT BY YOUR DEPARTMENT.

34 Comp. Gen. 331 (Comp.Gen.), B- 122100, 1955 WL 918

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# WHITE PAPER

## APPLICATION OF THE EMOLUMENTS CLAUSE TO DoD CIVILIAN EMPLOYEES AND MILITARY PERSONNEL

**INTRODUCTION**

In 1787, the Founding Fathers, concerned about the possibility of undue influence caused by foreign governments providing gifts to United States ambassadors, included a provision in the U.S. Constitution that prohibits Federal personnel from accepting compensated positions with a foreign state or from accepting any items of value -- such as travel and gifts -- from a foreign government, except as authorized by Congress.  This little known provision, the "Emoluments Clause," is still in effect today and applies to Federal civilian employees and active-duty military personnel.  It also applies to retired military officers and enlisted personnel from the active and reserve components.  including military officers, enlisted retirees and retired Reservists.   Ethics counselors advising DoD personnel need to understand the Emoluments Clause, especially when advising retiring military personnel.

This paper explains how the U.S. Constitution's Emoluments Clause applies to DoD personnel.  Specifically, the paper:  (1) introduces the Emoluments Clause; (2) describes the categories of DoD employees to which the Clause applies; (3) identifies common payments subject to the Emoluments Clause; (4) summarizes the types of entities that are considered "foreign states"; (5) outlines the requirement and process for receiving advance approval before accepting an emolument from a foreign government; (6) describes the penalty for violating the Emoluments Clause, along with the debt collection procedures that are followed in situations of noncompliance; and (7) describes the waiver process and appeal rights for situations where Federal personnel may have unwittingly accepted an emolument without prior approval.  Finally, the paper explores several related issues that may arise once an employee obtains consent to receive an emolument.

**DISCUSSION**

**I.     The Emoluments Clause, U. S. Constitution**

The Emoluments Clause, U.S. Constitution, Art. I § 9, cl. 8 states:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

1

Without the consent of Congress, an individual who holds an "Office of Profit or Trust"[1] in the Government may not accept a compensated position (an "emolument") from a foreign state unless Congressional consent is obtained.  When Congressional consent is obtained, no violation of the Constitution occurs.

"Emoluments" is defined as "the profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office as salary, fees, and perquisites; advantage; gain, public or private", except as authorized by Congress.[2]  Thus, for example compensation[3] in the form of honoraria, travel expenses, household goods shipments at employer's expense, housing allowances, and gifts from a foreign state, except as authorized by Congress, are considered emoluments.  As a result, most federal personnel, including retired military personnel, cannot accept outside compensated employment with, or receive gifts in excess of the minimal value from, a foreign government.[4]

Significantly, the Constitution provides an exception to this absolute ban on receipt of foreign gifts by authorizing Congress to consent to certain activities, gifts or honors through legislation.  An example of Congressional consent is set forth in the Foreign Gifts and Decorations Act[5].  This statute permits all Federal personnel[6] to accept certain gifts from a foreign government: (1) a gift of "minimal value" or less (as of publication date, minimal value is $375); (2) travel paid for by a foreign government, provided that none of the travel takes place

---

[1]  See *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158, February 24, 1982 (see footnote 4, *infra*)

[2] Black's Law Dictionary, 2nd Edition.

[3] "Emolument" has been interpreted to include compensation for employment.  See, *e.g.,* 40 Op. Atty. Gen. 513 (1947).  DoD Financial Management Regulation (FMR) Vol. 7B, Ch. 5, 050304, at pp. 5-6 defines "compensation."

[4] See *footnote 4, infra.*

[5] 5 U.S.C. § 7342

[6] Note that 5 U.S.C. § 7342 covers all civilian appointees appointed under 5 U.S.C § 2105 and all members of the uniformed services.  See 6 Op. O.L.C. 156, 157-58 (1982) (accepting Congress' assumption that the Emoluments Clause applies to "any employee" who takes a gift from a foreign government).  See discussion at II.

2

leaving from or coming back to the United States;[7] (3) meals provided by a foreign government; and (4) lodging provided by a foreign government overseas.[8]

Congress' consent is also set forth at 37 U.S.C. § 908, "Employment of Reserves and Retired Members by Foreign Governments."  Retired members of the uniformed services and reservists may accept compensated civil employment from a foreign government if they obtain advance approval from both the Service and the Secretary of State.

Congress also provided statutory consent for retired military members of the armed forces to accept employment by, or hold an office in, the military forces of a newly democratic nation[9] provided advance approval is obtained.[10]

### Is An Honorific Title an Emolument?

DoD personnel may accept an "honorific" title from a foreign government provided: (i) he or she has no duties that must be performed for the foreign government that are connected to the title and (ii) he or she obtains advance approval to  accept the honorific title from the head of the component consistent with DoD Directive 1005.13 .  Provided these conditions are met, then receipt of the honorific tile would not be considered a violation of the Emoluments Clause to the Constitution.  For example, a DoD employee was offered the title of Honorary member of the Department of the Army for Bolivia.  The employee is not from Bolivia, and did not perform any work for the Bolivian government.  In this instance, the employee may accept the honorific title provided he or she receives advance approval from the head of the component.

## II.    Who is Covered by the Emoluments Clause?

Only those persons holding an "Office of Profit or Trust" under the United States are subject to the Constitution's Emoluments Clause.

### Civilian Employees

The Department of Justice's Office of Legal Counsel (OLC) has opined that the term "Office of Profit or Trust" includes all full-time Federal employees.[11]  It further concluded that the problem of divided loyalties can arise at any management level in the Government.  Indeed

---

[7] In other words, travel expenses may be paid by a foreign state only for travel which originates and ends outside of the U.S.

[8] See 5 U.S.C. § 7342.

[9] (10 U.S.C. § 1060)

[10] (See *infra Section IV(d))*

[11] See 6 Op. O.L.C., 156, 158 (1982)

OLC pointed out that Congress presumes that the Emoluments Clause applies to all Federal personnel because it enacted the Foreign Gifts and Decorations Act which applies to all Federal personnel in the Federal Government.[12]   At DoD, this includes all civilian appointees.

### Military Personnel

Like their civilian counterparts, **active-duty** military personnel (officers and enlisted members) hold an "Office of Profit or Trust", and are therefore subject to the Emoluments Clause.[13]

Significantly, **retired** regular military officers are also subject to the Emoluments Clause because they are subject to recall, and, therefore, hold an "Office of Profit or Trust" under the Emoluments Clause.[14]   **Retired** regular military enlisted personnel are subject to the Emoluments Clause for the same reason as **retired** regular military officers.[15]   Finally, reservists are also subject to the Emoluments Clause, even after reservists complete the requisite number of years to be eligible for retired pay and are transferred to inactive status.[16]

### III.   Types of Employment That May Involve an "Emolument": Traps for the Unwary

As noted above, an emolument includes compensation or other items of value.   Whereas foreign travel, meals and lodging may present straightforward issues under the Emoluments Clause, other situations are less obvious, especially where the retired military member has not personally provided representational services to a foreign government.   There are several types of scenarios in which an employee will be deemed to have received an "emolument" where the payment is indirectly received from a foreign state.   Such scenarios include consulting, law, or

---

[12]  Id.

[13]  See generally *Applicability of the Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 18 (March 1, 1994).

[14]  See *Applicability of 18 U.S.C. § 219 to Retired Foreign Service Officers*, 11 Op. O.L.C. 67 (1987), footnotes 5 and 6.

[15]  See *Comptroller General to the Secretary of the Navy,* 44 Comp. Gen. 227 (1964).

[16]  37 U.S.C. § 908.  This statute requires advance approval before accepting an emolument from a foreign government "by members of a reserve component of the armed forces".  Other military members that may obtain advance approval under this statute include "retired members of the uniformed services."  Note that active duty military members may not obtain advance approval under this statute.

other partnership distributions, as well as payments (such as salary) from domestic professional corporations.  Federal personnel, especially retired military personnel, need to be aware of these potential traps for the unwary.

### Partnership Distributions

Query: Does a retired military officer violate the Emoluments Clause by becoming a partner in a large U.S. law firm and accepting pro rata partnership profits that include representation of foreign government clients?  Yes.  OLC has opined that this would violate the Emoluments Clause.

Accepting a share of partnership profits is considered an emolument where some portion of the share is derived from the partnership's representation of a foreign government.[17] OLC has determined that because the partnership would "be a conduit" for that foreign government payment, a portion of the recipient's income could be attributed to a foreign government.  This is so even if the individual subject to the Emoluments Clause did not actually provide services to the foreign government.  In other words, a distribution from a partnership that includes some proportionate share of revenues generated from the partnership's foreign government clients is an emolument.[18]  We believe that this same rationale applies to distributions from limited liability corporations although this view has not been officially sanctioned by the Department of Justice

### Payments from a Professional Corporation

The Emoluments Clause also applies to payments received by a professional corporation for services rendered to a foreign government.  The Comptroller General found that retired Marine Corps lawyers, who were "of counsel" to a law firm that had been formed as a professional corporation (PC), were subject to the Clause if they represented a foreign government.[19]  The Comptroller General concluded that the law firm's incorporation did not shield these former officers from the applicability of the Clause.  While the monies from the foreign government would be paid to the PC, these attorneys would benefit from the payments.  The opinion states that "where equity dictates, the corporate entity will be disregarded, for example, where there is such interest and ownership that the separate personalities of the corporation and its shareholders no longer exist."[20]  In addition, the Comptroller General pointed out that the attorneys' loyalty was to their client directly, so the structure of the professional corporation did not shield the

---

[17] *Applicability of the Emoluments Clause to Non-Government Members of the Administrative Conference of the United States (ACUS)*, 17 Op. O.L.C. 114, at 120 (October 28, 1993).
[18] Id.

[19] *Matter of Retired Marine Corps Officers*, Comp. Gen. B-217096 (Mar. 11, 1985) (1985 Comp. Gen. Lexis 1483).

[20] Id.

5

attorneys from the Emoluments Clause.  The retired Marine Corps lawyers were required to obtain consent under 37 U.S.C. § 908 if they wanted to represent the foreign government.

## IV.   What is a "Foreign State"?

Except as authorized by Congress, the Emoluments Clause prohibits covered personnel from accepting a position with, or an emolument from, any king, prince, or "foreign state."  A foreign state includes any organization that is owned or operated by a foreign government, including federal, regional and local level governments.  Both OLC and the Comptroller General have opined that the term "foreign state" in the Emoluments Clause applies to both national governments and to sub-national governmental units.[21]  Thus, foreign governmental entities, such as commercial entities owned or controlled by a foreign government and foreign public universities controlled by a foreign government, can be considered instrumentalities of "foreign states" for purposes of the Emoluments Clause.

### Foreign Corporation

In general, business corporations owned or controlled by foreign governments are considered part of a foreign state for purposes of the Emoluments Clause.[22]  By contrast, the Emoluments Clause does not apply to privately-owned foreign corporations.

OLC has articulated several factors to consider when assessing whether a foreign entity should be deemed a "foreign state" for purposes of the Emoluments Clause.[23]

These factors include: (1) whether a foreign government has an active role in the management of the decision–making entity; (2) whether a foreign government, as opposed to a private

---

[21] See Memorandum Opinion For Assistant General Counsel for the Department of Commerce from Daniel Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the Goteborg Award for Sustainable Development ("Goteborg Award") 34 Op. O.L.C. at 3 (Oct. 6, 2010); Foreign Public Universities, 18 Op. O.L.C. 13, 19 (noting that "foreign state" should include any political governing entity within that foreign state)(March 1, 1994); Major James D. Dunn, B-251084, 1993 WL 426335, at *3 (Comp. Gen. Oct. 12, 1993).

[22] Applicability of the Emoluments Clause to Non-Government Members of the American Conference of the United States (ACUS), 17 Op. O.L.C. 114, at 121 (1993).

[23] See Goteborg Award, 34 Op. O.L.C. at 3 (October 6, 2010) (neither the Emoluments Clause nor the Foreign Gifts and Decorations Act barred an employee of NOAA from accepting the 2010 Goteborg Award on Sustainable Development because the award was not from a king, prince, or foreign state).

intermediary, makes the ultimate decision regarding the gift or emolument; and (3) whether a foreign government is a substantial source of funding for the entity.[24]

### *DoD Financial Management Regulation: What Constitutes Foreign Control*

One way to show foreign control is through an employer-employee relationship.  At DoD, to determine whether an employer-employee relationship exists between the retired military member and a foreign government, DoD relies upon the DoD Financial Management Regulation 7000.14-R (DoD FMR) which implements the Clause.  DoD FMR 7000.14-R provides that the employment analysis will follow the common law rules of agency.  The analysis involves the evaluation of the following factors:

> the selection and engagement of the employee;
> the payment of wages;
> the power to discharge;
> the power to control the employee's conduct; and
> the relationship of the work to the employer's business, whether the work is a part of the regular business of the employer.

DoD FMR Vol. 7B 5-5 to 5-6.  The regulation further provides that the "decisive test" is whether the employer has "the right to control and direct the employee in the performance of his or her work and in the manner in which the work is to be done."[25]

### a.  **Foreign Public University**

Payments from a foreign public university influenced or controlled by a foreign government may be a prohibited emolument.[26]  OLC opinions addressing whether the Emolument Clause extends to foreign public universities have come to contrary conclusions depending on the facts.  The key for OLC has been the extent of influence or control by the foreign government.  OLC reasoned that improper "influence" occurs when the foreign government, and not the university, is making the payment.  OLC explained that "control" is based on whether the foreign government selects the faculty members.  OLC enumerated two factors to be considered in determining when a foreign government influences or controls a university: 1) whether a foreign government, as opposed to a private intermediary, makes the ultimate decision regarding the gift or emolument; and 2) whether a foreign government has an

---

[24] *Goteborg Award,* p. 3.

[25] DoD FMR Vol. 7B 5-5 to 5-6.

[26] *ACUS*, 17 Op. O.L.C. 114, at 121-22.

active role in the management of the entity, such as choosing the faculty or the Board of Governors.[27]

By contrast, for example, OLC opined that two NASA scientists could teach at the University of Canada without violating the Emoluments Clause. OLC concluded that evidence clearly demonstrated that the University acted independently from the Canadian Government, and the University selected its own faculty members independent from the Canadian government.[28] Similarly, a Federal officer serving as a consultant at Harvard on a project funded by the Government of Indonesia did not violate the Clause because the Indonesian Government had no veto power over Harvard's selection of consultants. In other words, Indonesia funded a Harvard study. Harvard selected a Federal employee who also was a consultant to Harvard. Harvard determined which consultant would participate in the project. The Indonesian Government never took part in the selection or rejection of the consultant; rather, it just provided funding to Harvard for the study. Because Harvard selected the Federal employee, and the Indonesian Government did not select or reject whom Harvard offered, the Federal employee was not considered to have violated the Emoluments Clause.[29] In sum, the foreign public university is generally considered part of a foreign state unless there is evidence that the university is independent of the foreign government on decisions regarding the terms and conditions of faculty appointments, and it is clear that the gift given is from the university and not from the foreign government.

### b. Consultant to a Foreign Government

OLC also focuses on "control" for purposes of determining if an employee is subject to the Clause when he or she consults for a foreign government. Ultimate control is exercised when a foreign government selects the consultant. For example, the Government of Mexico specifically wanted a Nuclear Regulatory Commission (NRC) employee to serve as a consultant on a project.[30] Knowing that paying him directly could be a problem, the Mexican Government hired a consulting firm, and requested that the Federal employee be hired by the consulting firm for the sole purpose of providing consulting services to the Mexican Government. OLC concluded that, in this instance, the "ultimate control, including selection of personnel, remains with the Mexican government. That is because the principal reason for the Mexican government

---

[27] *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, December 7, 2009 ("*Nobel*").

[28] *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities ("Public University")*, 18 Op. O.L.C. 13 (1994)

[29] Nobel at page 9.

[30] 6 Op. O.L.C 156 (1982).

to hire the consulting firm was the selection of the Nuclear Regulatory Commission's employee." Therefore, OLC concluded that the Nuclear Regulatory Commission employee would violate the Emoluments Clause if he served as a consultant in this circumstance.[31]  Note that Congress has not provided the option of advance approval for the career NRC employee.

By contrast, as discussed above, the Indonesian government paid Harvard for consulting services without selecting or rejecting any consultant Harvard assigned to the project.  Harvard assigned the project to the Federal employee who happened also to be a consultant to Harvard. Because the Indonesian government did not select or reject the consultant who provided consulting services to Harvard, OLC concluded that the Federal employee did not violate the Clause because the Indonesian government had no veto power over Harvard's selection of consultants.[32]

### c.  International Organizations

OLC has concluded that the Emoluments Clause does not apply to emoluments from international organizations such as the World Bank, the United Nations, and other entities in which the United States is a member because those organizations are not deemed to be "foreign governments."[33]  OLC reached that conclusion by making four points.  First, the United States could not be a member of a "foreign state."  Second the organization in which the United States is a member plays an important role in carrying out United States foreign policy.  Third, the United States actually participates in the governance of the organization and undertakes a leadership role in its decision-making.  Finally, OLC reasoned that because Congress approved participation by the United States in the World Bank, employment of government employees by the organization would not directly raise the concerns about divided loyalty that the Emoluments Clause was designed to address.  By contrast, OLC advised that the Emoluments Clause would prohibit employees from receiving a salary or a gift from an international organization in which the U.S. is not a member because that organization could be considered a foreign state when none of the four points above would be applicable and there is evidence of foreign government control.

### d.  Newly Democratic Nations

Finally, a retired military member may be able to work for a "newly democratic nation" without violating the Emoluments Clause, but must comply with 10 U.S.C. § 1060, which also

---

[31] 6 Op.O.L.C. 156, 158 (1982).

[32] Nobel at 9.

[33] Memorandum for John E. Huerta, General Counsel, Smithsonian Institution. from Daniel Koffsky, Acting Assistant Attorney General, May 24, 2001.

requires advance approval from the Service Secretary and the Secretary of State.  This statute does not extend to non-retired Reservists.[34]

## V.    Getting Advance Approval for an Emolument from a Foreign Government

If current personnel violate the Emoluments Clause by accepting a salary, payment or gift in excess of the minimal value from a foreign state, they would be subject to debt collection procedures.  That is because the Congress has not consented to current employees' accepting such foreign payments or gifts.  By contrast, Congress has consented to permitting retired military personnel to accept foreign state salary, payment or gifts in excess of the minimal value provided that advance approval is obtained from the Service Secretary and the Department of State.[35]

The process for obtaining advance approval is slightly different for each of the Services and requires contacting specific components within each Service as follows:

### a.  Air Force

The Department of the Air Force Instruction, AFI 36-2913, Request for Approval of Foreign Government Employment (19 Nov. 2003), provides guidance and explicitly requires advance approval from the Secretary of the Air Force and the Secretary of State for military retirees to accept an emolument.  To request advance approval, contact:

> AFPC/DPFFF
> 550 C Street West
> Joint Base San Antonio-Randolph, Texas 78150-4713
> Telephone: COM 210-565-2273 or DSN 665-2273

### b.  Army

An Army regulation[36]governs the need for and process by which a military retiree should obtain advance approval before working for a foreign government.[37]

To request advance approval, contact:

---

[34] See 0505 of Volume 7B, of Chapter 5, http://www.defenselink.mil/comptroller/fmr/07b/index.html (last viewed on September 10, 2012).

[35] 37 U.S.C. 908.

[36] AR 600-291.

[37] See http://www.apd.army.mil/pdffiles/r600_291.pdf(last viewed on September 10, 2012).

U.S. Army Human Resources Command
ATTN: AHRC-PDR
1600 Spearhead Division Avenue
Department 420
Fort Knox, KY 40122-5402
Telephone: 502-613-8980

### c.   **Navy**

The Department of the Navy has no pertinent instruction.  However, in 1981, then-Navy Secretary Lehman delegated authority to the Chief of Naval Personnel (CNP) to act on requests from Navy retirees to accept emoluments from foreign governments.  The delegation letter provides some guidance on how the Navy will process requests.  When the Navy receives an inquiry, it provides a questionnaire to the requesting individual.  Then, after reviewing the request, Navy counsel makes a recommendation to CNP.  If CNP approves, the Navy transmits the matter to the State Department (Political/Military) for a final determination.  To seek advance approval, a retired Navy member should submit a written request to:

Navy Personnel Command, Office of Legal Counsel (Pers-OOL)
Naval Support Facility Arlington
701 South Courthouse Road, Room 4T035
Arlington, VA 22204
(703) 604-0443

The request should contain a full description of the contemplated employment and the nature and extent of the involvement of the foreign government.

### d.   **Marines**

Like the Navy, the Marine Corps has no specific instruction providing guidance on receipt of emoluments from foreign governments, but in keeping with the Navy guidance, the retired Marine is well-served by providing a full description of the contemplated employment and the nature and extent of the involvement of the foreign government.   A retired Marine Corps member seeking advance approval for a payment from a foreign government should write to:

Judge Advocate Division (JAR)
Headquarters, U.S. Marine Corps
3000 Marine Corps Pentagon
Washington, DC  20350-3000
Telephone: 703-614-2510

### VI.   **Government Remedy for Failure to Obtain Advance Consent**

The Government's remedy when an employee accepts an emolument from a foreign state without consent varies depending upon the circumstances.

### a.   Remedies

Generally, compensation received from a foreign government without advance approval is deemed an "erroneous payment," a payment that is not in compliance with applicable laws and regulations.  Such an erroneous payment creates a debt in favor of the Government.  Specifically, the DoD Financial Management Regulation[38] explains how the Emoluments Clause applies to retired military personnel.  "[I]f the compensation received from a foreign government without approval is considered received by the retired member for the United States, a debt in favor of the Federal Government is created which is to be collected by withholding from retired pay."[39]

The Comptroller General of the United States has issued opinions regarding debt collection when an employee accepts an emolument from a foreign government.  For example, if the employee who accepts an emolument from a foreign government without consent is a retired military member, the Comptroller found that the Government can suspend the member's retirement pay up to the amount of the foreign salary (or other emoluments) received if the foreign salary is less than or equal to his retirement pay.[40]  By contrast, when the compensation earned during the period of unauthorized employment with a foreign state exceeds the amount of retired pay accrued during the same period, only the retired pay amount may be collected during the period of the violation.[41]

In one particular case, a retired Marine major went to work for an American corporation, Frank E. Basil, Inc., where he served as an instructor for the Royal Saudi Naval Forces by way of an employment agreement with Frank E. Basil, Inc.  Even though the retired officer was working for an American corporation, and had an employment agreement with the corporation, the

---

[38] (FMR) Volume 7B, Chapter 5 (June 2011).

[39] FMR, Chapter 5, Section 0503.

[40] 65 Comp. Gen. 382 (1986, affirmed in 1990).

[41] See Comp. Gen. Op., B-193562 (the penalty imposed on a retired officer who violated the Emoluments Clause was suspension of military pay at the time the violation occurred, but not the payments from the foreign government).  See also Comp.Gen. Op., B-251084 (applying the same remedy).  Also, see the DoD Financial Management Regulation (FMR), Vol. 7B, Ch. 13.  Note that loss of citizenship may occur if an oath is taken to uphold allegiance to the foreign state by a Federal employee (Coast Guard employee agreed to teach a course in Tasmania while still a US employee on leave, but did not take the foreign oath so did not lose citizenship).  Comp Gen B-1542132 (December 28, 1964) and DoD FMR Vol. 7B, Ch. 6

Marine Corps found that the Saudi Arabian Government could control and direct him and then pay him for his services. The agreement specifically stated that the Saudi Arabian government may direct the employee. The Marine Corps suspended the retired member's retirement pay. The Comptroller General agreed with the Marine Corps view that the American corporation was just a shell or sham, and that the Saudi government's payments to the shell corporation went directly to the former retiree for work he performed on behalf of the Saudis. The Comptroller General advised the retired member to seek approval under 37 U.S.C. § 908 if he desired to have his retirement pay resumed.[42]

Similarly, in another case,[43] a regular retired officer was employed and paid by a U.S. corporation, which then assigned him to work for Israeli Aircraft Industries (IAI), an instrumentality of the Government of Israel. It was shown that the U.S. corporation was, in effect, merely an employment agency that procured personnel for IAI. The Comptroller General concluded that the officer and IAI had an employee-employer relationship and that IAI had the right to exercise supervision and control over the retired military officer. The Comptroller General opined that the retired officer's retired pay should be withheld until such time as the withholdings equaled the amount of foreign salary received since the foreign salary was less than the retired military pay.

### b. DoD Debt Collection Procedures

#### 1. Army

The Department of the Army's Deputy General Counsel for Fiscal and Ethics Law works with Army Financial Management Command to establish the debt incurred by accepting the emolument. That information is then sent to the Defense Finance and Accounting Agency (DFAS). DFAS can waive a portion or all of the debt per AR 37-104-4, paragraph 32-6 e(3). The regulation can be found on the web.[44]

#### 2. Air Force, Navy and Marines

These Services do not have separate instructions or regulations for debt collection. Rather, these Services follow the debt collection procedures in the DoD FMR, Chapter 28.

---

[42] 65 Comp. Gen. 382 (1986).

[43] 53 Comp. Gen. 753 (1974).

[44] http://www.apd.army.mil/pdffiles/r37_104_4.pdf (last viewed on September 28, 2012).

Any debt collection of up to $10,000 is handled by the Defense Finance and Accounting Agency (DFAS).[45]  Any debts in excess of $10,000 (up to any amount) are handled by the Defense Office of Hearings and Appeals (DOHA).  Regardless of the amount of the debt, all cases must go through DFAS because DFAS prepares information that DOHA would need if the debt is in excess of $10,000.  DFAS debt collection procedures are set forth in Chapter 28 of the FMR.  DFAS must receive notice of the debt, which would be the obligation incurred for violating the Clause.  Consistent with Chapter 5, the debt submission to DFAS should include, in practice, the elements for determining if a violation has occurred: selection and engagement of the employee, payment of wages, power to discharge, power to control the employee's conduct and the relationship of the work to the employer's business.  After it receives information about the debt, DFAS has five days to notify the debtor about the debt.  The debtor then becomes subject to the due process procedures set forth at section 2805 of the FMR.  The collection procedures for DFAS are set forth in chapters 2806 and 2807.

## VII.    Waiver or Appeal of the Debt Collection Decision

### a.  Waivers

What if a retired military member did not know about the Emoluments Clause and has already accepted post-Government employment with a foreign-owned company?  What if a retired military member asked for advice about an upcoming foreign trip but was misinformed by his ethics official?  In these types of scenarios, an individual may seek a waiver of the debt resulting from the erroneous payment and, in some circumstances, a waiver may be granted.  Good faith and ignorance of the law are not defenses.[46]   However, equitable waiver of indebtedness may be granted in certain circumstances.

For example, the Comptroller General waived a debt where the retired military officer asked for prior approval to work for a foreign company that was an instrumentality of the foreign government, but he did not receive approval in a timely manner from the Air Force.  In this case,[47] a retired Air Force major worked for an independent oil company, ARAMCO, in Saudi Arabia.  When the major learned that the Saudi Arabian Government was preparing to nationalize his employer, ARAMCO, the Air Force major requested advance approval from the Air Force to perform work for the nationalized ARAMCO.  At the time the major submitted his advance approval request, ARAMCO was yet to be nationalized.

---

[45]  10 U.S.C. § 2774.  The DFAS web site for debt collection can be found at: http://www.dfas.mil/civilianpay/debts/informationondebtwaivers.html.

[46] Comp. Gen. Op. B-154213 (Dec. 28, 1964).

[47] *Matter of:  Major Gilbert S. Sanders, U.S.A.F. (Retired) (Deceased) – Employment by a Federal Government*, Comp. Gen. B-231498 (June 21, 1989) (1989 WL 240844).

14

Ultimately, while the major was waiting to hear from the Air Force, the Government of Saudi Arabia took over control of ARAMCO. The major then worked for the nationalized entity, ARAMCO. The major subsequently passed away, and the question was whether the estate was responsible for the Emoluments Clause debt. While the major never received advance approval during his lifetime to work for the nationalized ARAMCO, the major had responded each time the Air Force had questions about his application for advance approval. The Comptroller General held that the retired major had acted in good faith by seeking advance approval -- the Air Force had not given it, but was not withholding its approval. Concluding that a "waiver was in equity and in good conscience, and [the retired major] responded whenever Air Force contacted him to complete the requisite form," the Comptroller General waived the debt pursuant to 10 U.S.C. § 2774 and the estate did not have an obligation to pay.

At DoD, DFAS has authority to grant waivers for all or a portion of an individual's debt, including Emolument Clause debt, pursuant to chapter 2810 for debts of $10,000 or less as part of the debt collection procedures. Likewise, DFAS may grant waivers of the debt incurred because of the Emoluments Clause violation, especially where the employee did not know about the Emoluments Clause and/or did not know he had a debt. Chapter 2810 includes instructions on how to apply for a waiver, as well as a link to DD Form 2789, which is a form that must be completed to begin seeking the waiver. The debtor has an opportunity to challenge whether he or she is subject to debt collection before DFAS consistent with the FMR.

b. **Appeals**

A current or former DoD employee who wants to challenge the initial determination denying all or part of a waiver application may appeal the decision. Appeals for waivers of a debt created by receiving an emolument are governed by DoD Instruction 1340.23 (Feb. 14, 2006).

Final administrative appeals, pursuant to 31 U.S.C. § 3702, may be made to the Defense Office of Hearings and Appeals (DOHA) under its Claims Division pursuant to DoD Directive 1340.20 (July 14, 2003) and codified at 32 C.F.R. part 281. Detailed procedures for the settlement of claims are set forth in DoD Instruction 1340.21 (effective May 12, 2004) and codified at 32 C.F.R. part 282.

**VIII.   Other Issues to Consider**

There are several other legal restrictions that a military retiree may face if he or she decides to do work for a foreign entity. These are not related to the Emoluments Clause but might be helpful to share during the post-government employment briefing. These include: registering as a foreign agent; representing a foreign government concerning an ongoing trade or

treaty negotiation; enhanced representational restrictions for political appointees; and receiving representational funds earned from Government contracts by his or her new private employer.

1. An employee cannot act as an "agent of a foreign principal" as defined by the Foreign Agents Registration Act (FARA) (22 U.S.C. § 611) or as a "lobbyist" for a foreign entity required to register under the Lobbying Disclosure Act (LDA).  The FARA ban prohibits <u>representation of a foreign government or foreign political party before the United States Government</u> as well as other activities conducted on behalf of foreign entities with respect to influencing the United States Government.  Retired officers who represent a foreign government or foreign entity before the United States are required to register as foreign agents under FARA.[48]

2. For a period of 1 year after leaving Government service, former employees or officers may not knowingly represent, aid, or advise someone else on the basis of *covered information*, concerning any ongoing *trade or treaty negotiation* in which the employee participated personally and substantially in his last year of Government service.  (18 U.S.C. § 207(b))

3. Retired officers who represent a foreign government or government-controlled entity may face <u>post-employment restrictions under 18 U.S.C. § 207(f)</u> because they cannot represent those entities before the Federal Government during their first year after retirement if the entity at issue is either a foreign government or it exercises control and sovereignty like a foreign government.[49]

4. Non-career SES members and Presidential appointees confirmed by the Senate have enhanced representational restrictions that prohibit them from representing another before the Defense Department for two years after leaving service.[50]

5. Retired military officers who are <u>employed by a representational entity (e.g., law, public relations, lobbying, advertising firms)</u> that represents clients before the Executive or Judicial branches of the Federal Government and who are paid in the form of partnership shares based on those representations may violate 18 U.S.C. § 203 unless they accept their first year's compensation in the form of a straight salary.

---

[48] 28 C.F.R. § 5.2.  The FARA Registration Unit, Criminal Division, Department of Justice, fara.public@usdoj.gov can provide further information.

[49] <u>See</u> *Applicability of 18 U.S.C. 207(f) to Public Relations Activities Undertaken by a Foreign Corporation Controlled by a Foreign Government*, Op. O.L.C. (August 13, 2008).

[50] Executive Order 13490.

**CONCLUSION**

The Emoluments Clause to the Constitution applies to all Federal personnel.  The Clause prohibits receipt of foreign gifts unless Congress consents such as in the Foreign Gifts and Decorations Act, 5 U.S.C. § 7342.  For retired military personnel, the Emoluments Clause continues to apply to them because they are subject to recall.  The Justice Department opinions referred to in this paper construe the Emoluments Clause broadly.  Specifically, the Justice Department construes the Clause to include not only gifts of travel and food, but also payments such as proportionate profit-sharing.  To avoid an Emoluments Clause problem resulting in suspension of retired pay, retired military personnel should seek advance consent through their respective Service consistent with 37 U.S.C. § 908.  It is prudent for retired military personnel to obtain advance approval even when there is uncertainty about the Clause's applicability.

Finally, if a retired military member suspects that he or she has violated the Clause, but wants to continue to perform compensated work for a foreign state, he or she should expeditiously seek advance consent for future compensated work, and terminate current compensated employment with the foreign government until such approval is granted.  This would be done to avoid increasing the amount of an erroneous payment.

1980 WL 596567 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

EXPENSE REIMBURSEMENT IN CONNECTION WITH CHAIRMAN STONE'S TRIP TO INDONESIA

August 11, 1980

*1  Memorandum for John G. Gaine, Esq.
General Counsel
Commodity Futures Trading Commission

This reponds to your request of August 6, 1980, for our opinion on a constitutional question presented in connection with Commodity Futures Trading Commission (CFTC) Chairman James M. Stone's proposed trip to Indonesia as a consultant for the Harvard Institute for International Development of Harvard University (Harvard). You inform us that the trip is to take place during Chairman Stone's vacation, and the subject of his consultancy, insurance regulation, is unrelated to his official position as Chairman of the CFTC. His travel and associated expenses on the trip are to be reimbursed by Harvard from funds paid under a consultancy contract with the Finance Ministry of the Government of Indonesia (Indonesia). The question is whether this arrangement violates Article I, section 9, clause 8 of the Constitution, the so-called Emoluments Clause. [1] Based on our understanding of the terms and conditions of the consultancy, and of the contract between Harvard and Indonesia, we conclude that it would not.

Article I, section 8, clause 8 provides as follows:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince or foreign State.

The purpose of this provision, as explained in the records of the Constitutional Convention, is "to exclude corruption and foreign influence [by prohibiting] any one in office from receiving or holding any emoluments from foreign states." 3 Farrand, The Records of the Federal Convention of 1787 327 (1966 ed.). See also 2 Farrand 389. Thus, it is "directed against every kind of influence by foreign governments upon officers of the United States," 24 Op. Atty. Gen. 116, 117 (1902), unless it has been expressly consented to by Congress. 40 Op. Atty, Gen. 513 (1947). See 5 U.S.C. § 7342. Ordinarily, reimbursement from a foreign government of a public official's travel expenses would be considered a "present" or "emolument" within the meaning of this constitutional prohibition. [2] The question in this case, however, is whether the reimbursement. is "from" a foreign government at all.

We have found no judicial opinions construing the Emoluments Clause in which the actual source of a "present" or "emolument" was at issue, and no discussion of this issue in any relevant commentary. In the absence of any authoritative guidance on this issue, but with the underlying purpose of the constitutional prohibition in mind, we have relied for our analysis on the terms of the contract between Harvard and Indonesia, and on the circumstances under which the arrangements for the trip were made. While the time constraints indicated in your letter of August 6 have precluded our obtaining a copy of the contract, we have discussed its terms at length with Mr. Richard Pagett, Associate Director of the Harvard Institute for International Development. Mr. Pagett also described to us the manner in which Harvard's invitation was extended to and accepted by Mr. Stone.

**\*2**  As we understand the relevant facts, they are as follows: Harvard has for some years been a party to successive contracts with the Finance Ministry of the Government of Indonesia by which it provides expert consultants to Indonesia in a variety of specified fields relating to trade and finance. Under the most recent contract, effective September 1, 1979, Harvard agrees to conduct certain training programs in Indonesia, and to provide as consultants a number of named individuals, roost of them members of the faculty at Harvard or other universities. In addition, other unnamed experts are to be invited from time to time by Harvard to deal with particular problems relating to fiscal policy arising during the period of the contract.

As under its previous contracts with Harvard, Indonesia agrees to pay specified amounts to Harvard in semiannual installments to defray Harvard's costs in administering the program and compensating its experts. At the conclusion of the contract period, some two years hence, an accounting will be made to determine what, if any, additional sums are due Harvard — or recoverable by Indonesia. In the meantime, Harvard disburses funds in a discretionary manner in fulfilling its obligations to Indonesia under the contract.

Mr. Pagett has informed us that during all of the years in which Harvard has had this contractual consultancy relationship with Indonesia, that government has never sought to influence Harvard's selection of consultants, either before or after an invitation has been extended. The individuals named as consultants in the present contract were chosen unilaterally by Harvard, and agreed to by Indonesia as part of the overall contract. With respect to any additional consultants not named in the contract, such as Chairman Stone, Harvard has. complete discretion in the selection. The contract gives Indonesia no veto power over Harvard's choice; indeed, the present contract does not contain even the clause appearing in its predecessor contracts committing Harvard to give "due consideration" to Indonesia's wishes in this regard.

The terms and conditions of a consultancy are arranged exclusively between Harvard and those it invites to be consultants, and are memorialized in a separate agreement between Harvard and each individual consultant. In Chairman Stone's case, this agreement is represented by Mr. Pagett's letter to him of July 11, 1980, outlining the amount and manner of expense reimbursement. As is the usual case, his expenses are to be reimbursed to him directly by Harvard.

The circumstances of Chairman Stone's invitation from Harvard were also described to us by Mr. Pagett. Sometime in the Spring of this year, the Indonesian Finance Ministry requested assistance from Harvard in dealing with a number of questions which had arisen relating to insurance regulation and investment. Harvard approached several faculty members at its School of Business, who declined an interest in taking on the consultancy themselves, but recommended that Chairman Stone, a former faculty member at Harvard and Massachusetts State Insurance Commissioner, be considered. Other experts in the field of insurance seconded this recommendation. Harvard then contacted Chairman Stone, offering him the consultancy with an honorarium and expense reimbursement. He agreed to accept the invitation and offer of expense reimbursement, but declined the honorarium. His consultancy is to last about two weeks, and was arranged so that it would take place during his vacation. Upon acceptance, Harvard for the first time informed Indonesia that Chairman Stone was the expert it had chosen. [3]

**\*3**  Assuming the above facts to be accurate, and in the absence of any additional information that would suggest same contrary conclusion, the reimbursement offered Chairman Stone for his travel expenses in connection with the Harvard consultancy cannot be said to be "from" a foreign government within, the meaning of Article I, section 9, clause 8. His acceptance of reimbursement would not therefore implicate that provision.

We might note that we have discussed the arrangements for Chairman Stone's proposed trip with the Legal Adviser's Office at the State Department. That Office informs us that in analogous situations involving reimbursement for unofficial foreign travel by U.S. officials a key consideration in determining its propriety has been the degree of control which the foreign government retains over the selection and payment of individual participants. Since, as appears to be the case here, the foreign government neither controls nor even influences the selection and payment of consultants, the Emoluments Clause is not implicated.

Sincerely,

Leon Ulman

Deputy Assistant Attorney General

1   We emphasize that this opinion addresses only the constitutional issue raised under Article I, section 9, clause 8, and does not purport to deal with any other statutory or regulatory-restrictions which may be implicated by Chairman Stone's proposed trip. We note your conclusion, referred to in your letter of August 6 at Note 1, that Chairman Stone's rendering of advice to Indonesia on insurance regulation would not constitute a conflict of interest under the CFTC's Code of Conduct or applicable statutory law.

2   See 58 Comp. Gen. 487, 493 (1979)(constitutional prohibition extends to free or reduced transportation, housing allowances, and shipment of household goods at government expense); 49 Comp. Gen. 821 (19 70)(prohibition should be given "the broadest possible scope and application"). Congress has consented to reimbursement by a foreign government of travel expenses for travel which is "consistent with the interests of the United States," see 5 U.S.C. § 7342(c)(1)(&)(ii). The legislative history of this provision indicates that the consent given is restricted to reimbursement of expenses to official travel on behalf of the United States, see S. Rep. No. 194, 95th Cong., 1st Sess. 30 (1977), and we are informed by the Legal Adviser's Office in the State Department that the exception has consistently been so construed. You do not suggest — and, indeed, the facts here would not support the conclusion — that Chairman Stone's trip should be considered an official one for which reimbursement from a foreign government might be permitted under the statute.

3   According to Mr. Pagett, Chairman Stone may be the first U.S. official to be invited to serve as a consultant in this program. Apparently, under the impression that an official invitation from the Indonesian Government would have to be extended in order to permit his trip, officials at Harvard suggested to the Indonesian Finance Ministry that a letter be sent directly to the United States Government indicating Indonesia's desire to have Chairman Stone's services as a consultant. This letter, addressed to the American Ambassador in Jakarta, requested that Chairman Stone be "released" to perform the consultancy, and promised the payment of air fare and per diem expense "by the Government of Indonesia." This latter conclusory characterization of the source of Chairman Stone's reimbursement must be measured against the strong countervailing evidence that control of the funds for reimbursement is entirely in Harvard's hands, and that payment will in fact be made from Harvard directly to Chairman Stone.

1980 WL 596567 (O.L.C.)

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Andrew F. Oehmann
Executive Assistant
Office of the Attorney General
Norbert A. Schlei
Assistant Attorney General
Office of Legal Counsel

OCT 16 1962

Invitation by Italian Government to officials of
the Immigration and Naturalization Service and a
member of the White House Staff, and their wives,
to be guests of the Italian Government, all
expenses, including travel, to be born by that
Government.

Schmann 10/16

By letter dated September 27, 1962, the Italian Ambassa-
dor wrote to the Attorney General as follows:

"I am pleased to inform you that, according
to a communication I have just received from the
Under Secretary of State Giuseppi Lupis, the
Italian Government wishes to extend an official
invitation to visit Italy to the Commissioner
of the Immigration and Naturalization Service Mr.
Raymond Farrell, to the Associate Commissioner
Mr. Mario Noto and to the Special Consultant to
the President Mr. Carmine Bellino. The three
officials and their wives would be the guests of
the Italian Government for about a week. The
invitation, which includes of course the trip
and sojourn expenses, is to be considered as a
sign of good will and a token of friendship, in
the spirit of cooperation existing between our
two countries.

"I shall appreciate very much if you could
kindly inform Mr. Farrell, Mr. Noto and Mr. Bellino
of my Government's invitation, in order to proceed
to the necessary arrangements, in case of their
acceptance."

You have asked whether acceptance of the Italian Govern-
ment's invitation by the three named officials may, as a
matter of law or policy, be accepted. It is my opinion that

acceptance of this invitation is probably barred by Article
I, section 9, clause 8 of the Constitution and by the Presi-
dent's Executive Order No. 10939, "To Provide a Guide on
Ethical Standards to Government Officials." Acceptance of
the invitation would, in addition, be contrary to the spirit
of 5 U.S.C. 115 and be barred by policy considerations em-
bodied in State Department regulations.

1. Article I, section 9, clause 8 of the Constitution
provides:

"No Title of Nobility shall be granted
by the United States: And no Person holding
any Office of Profit or Trust under them, shall,
without the Consent of the Congress, accept of
any present, Emolument, Office, or Title, of
any kind whatever, from any King, Prince, or
foreign State."

The trip here involved can be regarded as being literally
a "present"/1/ and possibly as an "Emolument"/2/ so far as the
invited officials are concerned. Such an interpretation is
justified because of the sweeping nature of the constitutional
prohibition and the fact that in the past it has been strictly
construed, being directed against every possible kind of in-
fluence by foreign governments over officers of the United
States. For example, one opinion of the Attorney General in
1902 (24 Op. A.G. 116) went to the length of holding that

/1/    As a verb, the word "present" means "to offer as a gift;
to give or bestow formally." Webster's New International
Dictionary, (2nd Ed.) 1955. As a noun, it is "a gift; a
gratuity"; Black's Law Dictionary, (3rd Ed.) 1407. It is some-
times used interchangeably with the word "gift," anything vol-
untarily transferred by one person to another without compensa-
tion. See 18 Words and Phrases, (1962 Supp.) 18. A "gift" may
take various forms. In Spirt v. Bechtel, 232 F. 2d 241, 248 (2
Cir. 1956) it was held that free or reduced rate trips made by
corporate officers of the United States Lines Company and their
families and servants on the company's steamships were "gifts."

/2/  The term "emolument" has generally been defined as the
profit, gain or advantage from office or employment. 14 Words
and Phrases, 484.

- 2 -

"even a simple remembrance of courtesy" (in that instance a photograph of Prince Henry of Prussia) comes within the constitutional prohibition against acceptance of "any present . . . or other thing." See also, 6 Op. A.G. 409 (1854); 13 Op. A.G. 537 (1871); 27 Op. A.G. 219 (1909); cf. 40 Op. A.G. 513 (1947).

Despite the sweep of the constitutional prohibition and the strictness of some of the constructions which have been adopted, we are not prepared to take the position that a literal construction is always required and that, without congressional authorization, everything that might fall within a legal definition of the words "present" or "Emolument" must always be rejected. Obviously food can be regarded as a "present," yet acceptance of invitations to meals has never been regarded as falling within the proscription. Similarly, if a government official were in a foreign country, and the foreign government arranges a local tour which has some reasonable relation to his official duties, the fact that the host government pays the expenses, would not in our view make the trip a "present" or "Emolument." 3/

The trip here proposed, however, is described "as a sign of good will and a token of friendship, in the spirit of cooperation existing between our two countries." It seems to bear little relationship to the official duties of the officials invited and goes far beyond the usual amenities or niceties of diplomatic intercourse. In these circumstances the danger of the underlying purpose of the constitutional prohibition-- placing United States officials in a position of obligation to a foreign power--appears to be substantial enough to conclude that acceptance would probably be barred under Article I, section 9, clause 8, and certainly would be inconsistent with its spirit.

Acceptance of the invitation probably also would be contrary to the spirit of section 3 of the Act of January 31, 1881 (21 Stat. 604, 5 U.S.C. 115 (1958)). Section 3 provides as follows:

---

3/     In regard to trips paid for by foreign countries we understand that as a matter of practice the State Department distinguishes between trips made to and from such a country and trips made within it. The Department bars the former under all circumstances but permits the latter if related to official duties.

- 3 -

"Any present, decoration, or other thing,
which shall be conferred or presented by any
foreign government to any officer of the United
States, civil, naval, or military, shall be
tendered through the Department of State, and
not to the individual in person, but such present,
decoration, or other thing shall not be delivered
by the Department of State unless so authorized
by act of Congress."

It could be contended that section 3 is a limitation
only upon the acceptance of concrete things, i.e., things
which are physically capable of delivery to the State De-
partment and that passage on an Italian ship or airplane,
acceptance of shelter, entertainment and food are not a
"present . . . or other thing" which can be "tendered" or
"delivered" under the statute.  Yet the statute illustrates
Congress was concerned about possible undue influence being
exerted by foreign governments on our officials through gifts
of value and, if as part of the invitation actual things were
presented, e.g., airline tickets, it is conceivable that the
statute would literally apply.

Finally, Executive Order No. 10939, issued May 5, 1961,
would also constitute a bar to acceptance of this free trip
to Italy.  The order applies "to all heads and assistant
heads of departments, . . . and members of the White House
Staff."  Section 2 prohibits an official from accepting any
"gift, payment of expenses, or any other thing of monetary
value in circumstances which may result in, or <u>create the
appearance of</u>, resulting in -

10 (a).  <u>Use of public office for private gain</u>;
   (b).  An undertaking to give preferential treatment
         to any person;
   (c).  Impeding government efficiency or economy;
10 (d).  <u>Any loss of complete independence or impartiality</u>;
   (e).  The making of a Government decision outside
         official channels; or
10 (f).  <u>Any adverse effect on the confidence of the public
         in the integrity of the Government</u>."  (Underscoring
         added).

- 4 -

And section 3 of this Executive Order provides:

> "No such official shall receive compensation
> or anything of monetary value, other than that to
> which he is duly entitled from the Government, for
> the performance of any activity during his services
> as such official and within the scope of his official
> responsibilities."

The Code of Ethics contained in Executive Order 10939, made
applicable to all employees of the Department of Justice by
Memo No. 295 issued May 31, 1961, covers Messrs. Farrell and
Noto, while Mr. Bellino is subject to the order as a member
of the White House Staff.

2.   While we know of no decided cases or opinions in-
volving paid trips by foreign governments we have, as already
noted, been advised by the Protocol Office of the Department
of State that its officials are required to decline invitations
to make trips to or from a foreign country at its expense.
In addition, at least one recent precedent of a gift or
"present" warrants careful attention since it was the subject
of an investigation by the Senate Committee on Government
Operations.   In 1958, newspaper publicity disclosed that the
King of Saudi Arabia had made gifts of money and watches to
Army personnel who participated in the medical treatment of
his infant son at Walter Reed Medical Center, an Army medical
facility; and that after his departure, the King had given a
$3000 Oldsmobile to the wife of Victor Purse, the protocol
officer of the Department of State who had been detailed to
the King during his visit.   It later appeared that the Army
personnel deposited such gifts with the Department of the Army.
The gift to Mrs. Purse, however, had unpleasant and embarrassing
consequences.   The State Department stated that Purse had
shown "bad judgment" in permitting his wife to accept the gift,
and subsequently transferred him out of the Protocol Division.
(N.Y. Times, Oct. 31, 1957, 15:1).   When former President
Eisenhower was asked about the matter and of officials taking
gifts, he replied that each case should be decided according
to "good taste" (Id.; October 31, 1957, 10:8), and that the
State Department was wrestling with the problem.

As a sequel to the Purse incident, in the following month
the State Department issued a new Code of Ethics tightening

- 5 -

the rules against acceptance of gifts, and extending their
application to relatives of foreign officials in the State
Department (Id. November 19, 1957, 8:6).  In a circular to
members of the Department and of the Foreign Service, the
principle was stressed that unless the gift from a foreign
government has "only minor intrinsic value" it should not be
accepted, and if accepted to avoid impairment of good inter-
national relations, it should be delivered into the custody
of the Department of State for later disposition in accordance
with law.  Return of the gift to the official to whom it was
given will not be permitted, the circular stated, "in the case
of gifts of such nature or value that, irrespective of the
actual intent of the giver, it could reasonably be inferred
by anyone that the gift would, in fact, establish influence
or constitute an added payment for services already included
in the employment relationship of the recipient to the United
States Government".  Department of State Circular No. 277,
November 13, 1957, a copy of which is contained in Department
of Justice File No. 145475, section 1.

Based upon the foregoing, it seems clear that this in-
vitation should be declined by all three officials.

- 6 -

1986 WL 1239553 (O.L.C.)

Office of Legal Counsel

U.S. Department of Justice

EMOLUMENTS CLAUSE QUESTIONS RAISED BY NASA SCIENTIST'S PROPOSED
CONSULTING ARRANGEMENT WITH THE UNIVERSITY OF NEW SOUTH WALES

May 23, 1986

**\*1**  H. Gerald Staub
Office of Chief Counsel
National Aeronautics and Space Administration

MEMORANDUM

This responds to your request of April 10, 1986, for our views as to whether there is any constitutional obstacle to a NASA employee's accepting a fee for the performance of certain consulting services for a foreign university. Specifically, you wish to know whether a NASA scientist may accept an invitation from the University of New South Wales to review a thesis submitted by an Australian Ph. D. candidate. The total amount of the remuneration for this service would be $150. The question is whether the employee's acceptance of the $150 consulting fee would violate the Emoluments Clause of the Constitution, Article I, section 9, clause 8. Based on our understanding of the facts in this situation, including the relationship between the University of New South Wales and the government of Australia, we conclude that there would be no constitutional violation. [1]

Article I, section 9, clause 8 provides:

> No Title of Nobility shall be granted by the United States: and no Person holding any Office of Profit or Trust under them, shall, without the consent of Congress, accept of any present, Emolument, Office or Title, of any kind whatever, from any King, Prince, or foreign State.

This clause was adopted unanimously at the Constitutional Convention as a means of preserving the independence of foreign ministers and other officers of the United States from external influences. 3 J. Madison, Papers 1408 (1840). Its purpose, as explained by Governor Randolph during the ratification debate in the Virginia Convention, is "to exclude corruption and foreign influence [by prohibiting] any one in office from receiving or holding any emoluments from foreign states." 3 M. Farrand, The Records of the Federal Convention of 1787, at 327 (1966 ed.) See also 2 M. Farrand, supra, 389. [2] Thus the Emoluments Clause is "directed against every kind of influence by foreign governments upon officers of the United States," (24 Op. A.G. 116, 117 (1902)), unless the payment has been expressly consented to by Congress. See 5 U.S.C. 7342.

The individual who has been offered the consultancy is a full-time permanent employee of NASA and thus occupies an "Office of Profit or Trust under [the United States]" as that phrase is used in the Emoluments Clause. [3] Moreover, a stipend or consulting fee from a foreign government would ordinarily be considered an "emolument" within the meaning of the constitutional prohibition. [4] The question in this case, however, is whether the consulting fee from the University of New South Wales can be said to be from a "foreign state."

We have found no judicial opinions construing the Emoluments Clause in which the identity of the source of an emolument was at issue; nor have we found any discussion of this issue in any relevant commentary. [5]  In the absence of any authoritative guidance, but with the underlying purpose of the constitutional prohibition in mind, we have relied for our analysis on the factual circumstances of the proposed consultancy.

 **\*2**  Our understanding of the facts is based on the descriptive material included in your letter of April 10, as amplified in subsequent conversations between our staff and personnel at the Australian Embassy.

The University of New South Wales was established pursuant to a 1949 Act of the legislature of the state of New South Wales, Australia. It is governed by a Council, which consists of 44 elected and appointed members. Two members are so-called "parliamentary members," or members of the state government of New South Wales; 21 members are elected from within the University community to represent the administration, faculty, and student body; and 21 members are appointed by the Minister of Education of New South Wales, who is an elected member of the state legislature, to represent various interest groups, including business, the professions, and trade unions.

Under the University's organic act, the Council has complete power over the University's academic program, the appointment and termination of faculty and other employees, and the management of the affairs, property and funds of the University. In general, it "may act in all matters concerning the University in such manner as appears to it best calculated to promote the objects and interests of the University." Act No. 11, 1949, s. 25, reprinted in the Calendar of the University for 1981. There is no provision in the law for review of any of the Council's decisions by any state agency or official. It would appear, therefore,, that although a bare majority of members of the Council consists of state officials or their appointees, the Council itself acts entirely independently of the state government in making decisions affecting the management and academic governance of the University.

While the University's governing body reflects state and local interests, its finances are derived from and controlled entirely by the federal government. Like other public universities in Australia, the University charges no tuition or fees to its students, and no state or local taxes are levied for its support. All of the University's funding comes directly from the Australian federal government, and decisions relating to the level and general allocation of that funding are made by the Australian Tertiary Education Commission, subject to review by the Australian Parliament.

Given its source of financial support and governing structure, the University of New South Wales is clearly a public institution. However, it is not so clear that it should necessarily be regarded as a "foreign state" for Emoluments Clause purposes, given its functional and operational separation and independence from the government of Australia and state political instrumentalities. The answer to the Emoluments Clause question in this particular situation must depend, we believe, upon a further inquiry into the circumstances of the proposed consultancy, to determine whether the consultancy would raise the kind of concern (viz., the potential for "corruption and foreign influence") that motivated the Framers in enacting the constitutional prohibition.

 **\*3**  We turn now to those particular facts, as you have described them to us. The NASA scientist was selected by the University of New South Wales to review the Ph.D. thesis because of his international reputation as a scholar in the field to which the thesis relates, and not because of his position with the U.S. government. [6]  The invitation was extended to him on University letterhead by the chairman of the academic department in which the Ph.D. candidate is enrolled. The $150 consulting fee is apparently to be paid from funds made available to departments of the University for this purpose and is in an amount ordinarily paid by departments to outside experts for services of this kind. The thesis to be reviewed will be sent directly to the NASA scientist in this country, and he will review it here on his own time and submit a written report to the University. There does not appear to be any reason for him to have any direct contact with officials of the University during the course of the consultancy, and you expect that he will not. The consultancy is by its terms limited both in time and in substantive scope, and you do not anticipate that there will be any continuing relationship between the University and the NASA employee after the consultant's report has been submitted.

Considering the factual setting described above in light of the Framers' concerns expressed in the Emoluments Clause, we do not believe that it presents the opportunity for "corruption and foreign influence" that concerned the Framers and that we must presume exists whenever a gift or emolument comes directly from a foreign government or one of its instrumentalities. We therefore conclude that the NASA employee's acceptance of the consultant's stipend from the University in this case would not be prohibited by the Emoluments Clause.

Samuel A. Alito, Jr.
Deputy Assistant Attorney General

1    This opinion addresses only the constitutional issue raised under Article I, section 9, clause 8, and does not purport to deal with other statutory or regulatory restrictions that may be implicated by your employee's proposed consultancy. We assume that your office has considered whether the consultancy would be permissible under applicable NASA regulations governing outside employment by agency employees.

2    Governor Randolph referred to the incident that apparently precipitated the enactment of the clause: King Louis XIV's presentation of a snuffbox to the departing Ambassador Franklin. See H. Grigsby, History of the Virginia Federal Convention of 1788, contained in 9 Virginia Historical Society Collections (New Series) 264.

3    See, e.g., 27 Op. A.G. 219 (1909) (Clerk of Class 4 in the Post Office holds an office of profit or trust for Emoluments Clause purposes, since he "holds his appointment from the head of a Department ..., receives for his services a fixed compensation from moneys appropriated for the purpose by Congress, ... has regularly prescribed services to perform, and his duties are continuing and permanent, and not occasional and temporary"). See United States v. Hartwell, 73 U.S. (6 Wall.) 385, 395 (1867) (the concept of office "embraces the ideas of tenure, duration, emoluments, and duties").

4    See 6 Op. A.G. 409 (1854)(United States Marshal may not accept compensation for acting as commercial agent of France); 40 Op. A.G. 513 (1947)(clause would preclude Irish government from paying the salaries of detailed U.S. government employees, were it not authorized by legislation); Memorandum from the Deputy Assistant Attorney General, Office of Legal Counsel, to the Assistant General Counsel, Nuclear Regulatory Commission, February 24, 1982 (clause prohibits employee of NRC from undertaking paid consultancy with Mexican government). See also Hoyt v. United States, 51 U.S. (10 How.) 109, 135 (1850) ("... the term emoluments, that being more comprehensive, and embracing every species of compensation or pecuniary profit derived from a discharge of the duties of the office"); Sherburne v. United States, 16 ct. Cl. 491, 496 (1880) ("emoluments ... are indirect or contingent remuneration, which may or may not be earned, and which is sometimes in the nature of compensation, and sometimes in the nature of reimbursement.")

5    This Office has on two previous occasions considered whether a proferred "emolument" was "from" a foreign government. In a August 11, 1980, memorandum for the General Counsel of the Comodities Futures Trading Commission, we concluded that a government official could be reimbursed by Harvard University for travel expenses from funds paid under a consultancy contract with the government of Indonesia by which Harvard provided expert consultants on a variety of issues. There, the foreign government had no control over the selection of experts and their payment, which matters were entirely within the discretion of the University. By contrast, in the February 24, 1982, opinion for the Nuclear Regulatory Commission cited above in the text, we concluded that the Emoluments Clause could not be avoided by channeling funds from the foreign government through a consulting firm that had been established apparently for the sole purpose of providing the consulting services at issue. There, the facts suggested that the retention of the NRC employee by the consulting firm was the principal reason for selection of the firm by the Mexican government.

6    The field in question involves the measurement of components of the atmosphere. The Ph.D. thesis deals with the use of inversion methods for aerosol remote sensing.

1986 WL 1239553 (O.L.C.)

35-012-10

S. A. Andretta,
Administrative Assistant Attorney General                    OCT 4 1954

J. Lee Rankin, Assistant Attorney General,
Office of Legal Counsel                                    To Andretta 10/4

Payment of compensation to individual in receipt of compensation
from a foreign government (Mr. Richard E. Newkirk, OAP).

        This is in reply to your memorandum of August 24, 1954, in which you
inquire whether any law or regulation prevents the payment of salary to
Mr. Richard E. Newkirk, in view of the fact that he receives an annuity from
the Government of Hessen, Germany, and at the same time is employed by the
Office of Alien Property of the Department of Justice.

## STATEMENT

        Mr. Richard E. Newkirk was re-employed by the Office of Alien Property
on July 26, 1954, on a 3-month W.A.E. contract as an Attorney Adviser, G-13.
Subject to security clearance, it is expected that he will receive a temporary-
indefinite appointment at the expiration of his present contract at the same
grade and salary. He is assigned to the Claims Branch, where his principal
duty is to make recommendations with respect to claims to vested property.

        Until June 26, 1933, Mr. Newkirk was a judge at the Court of Common Pleas
in Kassel, Germany. At that time he was involuntarily retired, effective
October 1, 1933, by the National-Socialist Government for racial reasons. In
1936, Mr. Newkirk emigrated to the United States, where he has since resided
and become a naturalized citizen.

        The German Government on May 11, 1951, enacted a law entitled "Law on
Indemnification of National-Socialist Wrong with Relation to Civil Servants".
(This law, a translation, and other relevant documents are attached and should
be made a part of the file.) Pursuant to its terms, a German civil servant,
who was prematurely retired by reason of persecution for racial or religious
reasons under the National-Socialist Government, was granted a right of re-
employment or retirement at the status and salary he probably would have
reached had he not been prematurely retired. The period between dismissal
and reappointment or retirement is regarded as a period of actual service for
purposes of computing an annuity, and such annuity is payable for the period
one year prior to the effective date of the law (April 1, 1950) to the date of
re-employment or retirement and thereafter for life. As originally enacted,
this law was inapplicable to persecutees living abroad.

        On March 18, 1952, the law was amended to provide that persecutees living
abroad were eligible to claim under the act, provided the claimant had taken up

permanent residence abroad prior to May 24, 1949, and provided further that the Government of his residence maintained diplomatic relations with the Republic of Germany.

Mr. Newkirk filed a claim in which he elected to retire rather than seek re-employment. His claim was allowed on February 16, 1954, pursuant to which he draws a monthly annuity of $263.00 for life, effective April 1, 1950.

Mr. Newkirk also filed a claim under the Hessian Law on Indemnification of August 10, 1949, covering the period from 1933 to 1950 for damages by reason of his premature retirement. That claim has also been allowed in the amount of DM 14,963.92 or approximately $4,000.00, of which he has been paid DM 5000, less DM 500 for taxes, or approximately $1,300. The remainder will be paid when money is appropriated for that purpose.

On July 28, 1954, two days after his re-employment, Mr. Newkirk summarized the foregoing facts in a memorandum to the Chief of the Claims Branch. This office has been asked to determine whether the receipt of these payments is consistent with his continued employment in the Department of Justice.

## LAW INVOLVED

Article I, section 9, clause 8, of the Constitution is the only relevant law and provides, in part, --

"* * * no person holding any office of profit or trust under them [the United States], shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign State."

## QUESTIONS PRESENTED

1. Is Mr. Newkirk by virtue of his employment as an Attorney Adviser in the Office of Alien Property holding an "office of profit or trust" under the United States?

2. If the answer to the first question is in the affirmative, is Mr. Newkirk by virtue of receiving a monthly annuity from the Hessian Government of the Republic of Germany accepting "any present, emolument, office, or title, of any kind whatever" from a foreign State?

## OPINION

I. Is Mr. Newkirk by virtue of his employment as an Attorney Adviser in the Office of Alien Property holding an "office of profit or trust" under the United States?

The question "who is a person holding an office of profit or trust under the United States within the meaning of Article I, section 9, clause 8, of the

Constitution" has been the subject of two opinions of the Attorney General, which, in my opinion, spell out the considerations which control the instant case.

In 27 Ops. A.G. 219, the question was raised whether a clerk of Class 4 in the Post Office Department could accept the insignia of the third class of the Order of the Red Eagle conferred upon him by the German Emperor. In holding that in the absence of consent from Congress the individual was inhibited from accepting the insignia, Attorney General Wickersham said:

> "* * * It therefore appears that Mr. Brooks holds his appointment from the head of a Department, that he receives for his services a fixed compensation from moneys appropriated for the purpose by Congress, that he has regularly prescribed services to perform, and his duties are continuing and permanent, and not occasional and temporary. He is, therefore, an inferior officer of the United States within the meaning of that clause of Article II, section 2, of the Constitution, which provides that 'Congress may, by law, vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of Departments.' (United States v. McCrory, 91 Fed. 295; United States v. Germaine, 99 U. S. 508; Hall v. Wisconsin, 103 U. S. 5, 8; United States v. Hartwell, 6 Wall. 385; United States v. Hendee, 124 U.S. 312.)

> "It follows, therefore, that in the absence of a special consent obtained from Congress, Mr. Brooks is inhibited from accepting the insignia in question, by the last clause of Article I, section 9, of the Constitution, which provides that 'No person holding any office of profit or trust under them [the United States], shall, without consent of the Congress, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state!"

On the other hand, in 28 Ops. A.G. 598, Attorney General Wickersham held that a special assistant on the United States Geological Survey could accept from the King of Sweden the order of the "Knighthood of the North Star" because he was found not to be an officer within the meaning of Article I, section 9, clause 8, of the Constitution. In so holding, the Attorney General relied on the following facts:

> "He was employed under Civil-Service Rule VIII as field assistant, grade four (designated as special agent in this case);

> "He is employed by the chief geologist, with the approval of the director, under authority of the Civil Service Commission;

- 4 -

"His work is indefinite in term, his employment being from time to time during the year, with the limitation that the compensation is not to exceed $300 in any one year;

"He is paid by the day when actually employed, at $5 per day;

"He does not take any oath of office, and, in reply to the question: 'Do his duties require a continuous service, or only as they may be occasionally called for by his superior?' the answer is: 'Only occasional work.'

"Under these conditions I am of the opinion that Professor Udden can not be called an officer under the United States within the meaning of the provision above quoted. (United States v. Germaine, 99 U.S. 508.)"

I have no hesitation in concluding that an Attorney Adviser, G-13, is an inferior officer of the United States and holds an office of profit or trust. Mr. Newkirk was appointed by the Attorney General, the head of a department;1/ he took the oath prescribed for all persons appointed "to any office of honor or profit;2/ he is employed full time at a fixed salary, presently on a "when actually employed" basis, but with the understanding that it will be converted to a temporary-indefinite appointment at such time as his security clearance is obtained.  In short, the position Mr. Newkirk holds satisfies the tests laid down by the Court in United States v. Germaine, 99 U.S. 508, and by the Attorney General in 27 Ops. A.G. 219, for determining officer status.3/

## FN1

1/  5 U.S.C. 43, 22a.  The fact that the Attorney General has delegated this function to the Deputy Attorney General (see Order No. 3732, Supp. 52, 58) makes his appointment nonetheless that of the head of the Department.

## FN2

2/  5 U.S.C. 16.

## FN3

3/  And see, United States v. Hartwell, 6 Wall. 385, 393, where the Court defined office as follows:

"An office is a public station, or employment, conferred by the appointment of government.  The term embraces the ideas of tenure, duration, emolument, and duties.

"The employment of the defendant was in the public service of the United States.  He was appointed pursuant to law, and his compensation was fixed by law.  Vacating the office of his superior would not have affected the tenure of his place.  His duties were continuing and permanent, not occasional or temporary.  They were to be such as his superior in office should prescribe.

"A government office is different from a government contract.  The latter from its nature is necessarily limited in its duration and specific in its objects.  The terms agreed upon define the rights and obligations of both parties, and neither may depart from them without the assent of the other."

-- 5 --

Moreover, the term "office of profit or trust" or similar language appears in several sections of the Constitution in contexts which quite clearly disclose that the category of positions involved was not intended to be given a narrow construction. Article I, section 3, clause 7, provides that "judgment in cases of impeachment shall not extend further than to removal from office, and disqualification to hold and enjoy any office of honor, trust or profit under the United States * * *." Article VI, section 3, provides that "* * * no religious test shall ever be required as a qualification to any office or public trust under the United States." Surely the drafters of the Constitution did not intend that an impeached person could thereafter secure employment with the Government or that a religious oath could be attached to governmental offices other than those occupied by "officers" in a narrow sense of the word. Patently, the provision of the Constitution under consideration was designed to require undivided loyalty from all persons holding positions of trust or profit under the United States and should not be narrowly construed./4/

I have examined the opinion of January 20, 1954, of the Labor Department, which reaches a contrary conclusion with respect to an individual employed by that Department. The opinion (copy attached) does not set forth the facts concerning the position occupied by the individual involved, but the authorities there cited are not inconsistent with the conclusion that an Attorney Adviser in the Department of Justice occupies a position of "honor or trust under the United States."/5/

## FN4

4/ Article VI of the Articles of Confederation is the forerunner of Article I, section 9, clause 8, of the Constitution, and is in haec verba. In the first printed form of the Articles of Confederation, the clause read:

"Nor shall any Colony or Colonies, nor any Servant or Servants of the United States, or of any Colony or Colonies, accept of any Present, Emolument, Office or Title of any Kind whatever, from the King or Kingdom of Great Britian, or any foreign Prince or State." (Underscoring supplied.)

While there is no explanatory statement concerning the changes made in the final form, this earliest form lends support to the conclusion that the clause was intended to have broad coverage.

## FN5

5/ Numerous statutes describe attorneys of the Department of Justice as "officers" (see e.g., 5 U.S.C. § § 49, 302, 306, 309, 310, 311, 316). And see the Appendix to 40 Ops. A.G. 294, 300, where Attorney General Gregory said with respect to attorneys employed by the Alien Property Custodian: "No doubt there is room for the contention that the attorneys * * * in your service are neither 'officers of the United States' nor hold places 'under any Executive Department * * *.' As prosecuting officer, however, I could not adopt so narrow a view * * *." Since that opinion, the Office of Alien Property has been placed in the Department of Justice.

II. Is Mr. Newkirk, by virtue of receiving a monthly
annuity from the Russian Government, accepting
"any present, emolument, office, or title of any
kind whatever" from a foreign State?

The answer to this question depends upon what was intended by "emolument",
for quite clearly the payments are from a foreign State, and it is equally clear
that no present or office or title is involved.

The question is novel and not free from doubt. I have found no authority
construing the term "emolument" as used in the Constitution. The historical
material, however, discloses that the purpose of the clause was to prevent cor-
ruption and foreign influence. In 3 Farrand, Records of the Federal Convention
of 1787, p. 327, there appears the following explanatory remarks concerning the
clause:

"The last restriction restrains any persons in office from
accepting of any present or emolument, title or office, from any
foreign prince or state. It must have been observed before, that
though the confederation had restricted congress from exercising
any powers not given them, yet they inserted it, not from any
apprehension of usurpation, but for greater security. This re-
striction is provided to prevent corruption. All men have a
natural inherent right of receiving emoluments from any one, un-
less they be restrained by the regulations of the community. An
accident which actually happened, operated in producing the re-
striction. A box was presented to our ambassador by the king of
our allies. It was thought proper, in order to exclude corrup-
tion and foreign influence, to prohibit any one in office from
receiving or holding any emoluments from foreign states. I be-
lieve, that if at that moment, when we were in harmony with the
king of France, we had supposed that he was corrupting our
ambassador, it might have disturbed that confidence, and dimin-
ished that mutual friendship, which contributed to carry us
through the war. * * *"

##FN6

"'Dr. Franklin is the person alluded to by Randolph. In
the winter of 1756, in Philadelphia, under the roof of a venerable
granddaughter of Dr. Franklin, I saw the beautiful portrait of
Louis XVI, snuff-box size, presented by that king to the doctor.
As the portrait is exactly such as is contained in the snuff-boxes
presented by Crowned heads, one of which I have seen, it is proba-
ble this portrait of Louis was originally attached to the box in
question, which has in the lapse of years been lost or given away
by Dr. Franklin.'" H. B. Grigsby, History of the Virginia Federal
Convention of 1788 (Virginia Historical Society Collections, Vols.
9-10), p. 264.

Similar statements appear in 2 Story on the Constitution, Boston, 1873, pp.
216-217, and in 5 Elliot's Debates on the Federal Constitution, p. 467.

The word "emolument" is defined in The Century Dictionary to mean "(1)
the profit arising from office or employment; that which is received as a
compensation for services, or which is annexed to the possession of office,
as salary fees and perquisites. * * * (2) Profit; advantage; gain in general;
that which promotes the good of any person or thing." 6/

The term as used in statutes has been construed in several Supreme Court
decisions.  In McLean v. United States, 226 U.S. 374, the question arose whether
forage and rations should be compensated for under a statute to award "all back
pay and emoluments that would have been due and payable" to Major McLean, had he
not resigned from the Army.  In many respects the statute is similar to the
German law under which Mr. Newkirk is being paid.  The Court said, in part, --

"It certainly may be assumed that the act was not a simple gratuity.
Public moneys are not appropriated as mere gifts.  They are appro-
priated in recognition and reward of merit or in recompense for ser-
vice, or, as it may be inferred in the present case, reparation for
injustice done.  * * * The act, in order to make its relief complete,
treats the officer and compensates him as though he had been in
actual service from the date of his retirement to the date of his
reinstatement.  * * * Whatever is directed to be settled -- pay or
emoluments -- is for compensation, not for actual service but for
attributed service.  * * * It is difficult to deal with a distinc-
tion between pay and emoluments.  Both are rewards or compensation,
the one no more than the other, for services supposed.  * * * emolu-
ments were additive to pay * * * 'they are sometimes in the nature
of compensation and sometimes in the nature of reimbursement'.  * * *
'All' excludes the idea of limitation and the word 'emolument' is the
most adequate that could have been used.  It especially expresses the
perquisites of an office, and its use in conjunction with 'pay' makes
the restitution of the statute complete." 226 U.S. at 381-383.

In Hoyt v. United States, 10 How. 108 (1850), the following definition
appears:  "The term emoluments, that being more comprehensive, and embracing
every species of compensation or pecuniary profit derived from a discharge of
the duties of the office."  And, in Sherburne v. United States, 16 Ct. Cl. 491,
the court held that "* * * emoluments * * * are indirect or contingent remunera-
tion, which may or may not be earned, and which is sometimes in the nature of
compensation, and sometimes in the nature of reimbursement."  (16 Ct. Cl. at
496.)

## FN 7

─────────────────────────────────────────────────

Funk & Wagnall's College Standard Dictionary defines "emolument" as "the
remuneration connected with an office or service * * *.  General advantage;
gain; profit".

- 3 -

Keeping in mind that the purpose of the clause was to prevent undue influence, it is my opinion that the term "emolument", as used in Article I, section 9, clause 8, of the Constitution, particularly since it is modified by the phrase "of any kind whatever", was intended to cover compensation of any sort arising out of an employment relationship with a foreign state. Undoubtedly, it would prohibit a person holding a position of trust or profit under the United States from receiving at the same time retirement pay, pensions, or annuities from a foreign government. Such benefits are unquestionably part of the emoluments of office and are well recognized as important elements in any contract of employment.

On the other hand, it is my opinion that the Constitutional provision would not prevent an officer of the United States from receiving damages arising from some wrongful act of a foreign state. Therefore, if all that Mr. Newkirk is receiving is damages for redress of past injuries, he should not be precluded from accepting them.

There is considerable force to the argument that the German laws involved were intended solely to redress wrongs of the Nazi regime by paying the injured party damages for breach of contract. The Republic of Germany acknowledged in the Bonn Convention "the obligation to assure * * * adequate compensation to persons persecuted for their political convictions, race, faith or ideology, who thereby have suffered damage to life, limb, health, liberty, property, their possessions or economic prospects * * *." Senate Executives Q and R, 82d Cong., 2d sess., Transmitting the Convention on Relations Between the Three Powers and the Federal Republic of Germany. The German laws under which Mr. Newkirk is being compensated clearly disclose by their titles that they award payments as indemnification for National Socialist wrongs. And certainly the payments made bear no relationship to services rendered, nor do they impose any obligations or duties upon the part of the recipient.

However, it is my opinion that the annuity payment of $263 a month for life to Mr. Newkirk is not exclusively a payment for damages. The annuity is in major part a payment intended to restore Mr. Newkirk to the financial position he would have enjoyed had he continued as a judge in the German Government until retirement. Under the Law of 1949, Mr. Newkirk has been awarded damages for economic loss for the period from 1933 to 1951. The 1951 law, amended and made applicable to persecutees living abroad in 1952, provides a comprehensive scheme for restoring eligible claimants to the positions they would have been entitled to had they not been prematurely retired. It grants a priority right of re-employment, if the claimant meets the legal requirements. However, the claimant was given an election; he could elect to retire in lieu of accepting reappointment, in which case he may demand an annuity. Mr. Newkirk chose this latter course. In the Determination of his claim (attached), the annuity was computed as follows:

- 9 -

10 "In accordance with the status to which the claimant is enti-
tled, he may demand payment of an annuity commencing April 1,
1951, the amount of which shall be equal to the amount to
which he would be entitled, if he had been re-employed, and
simultaneously received the promotions which he missed, and
then had retired from his new office on the effective date of
the Federal Law on Indemnification for Civil Servants (April
1, 1951).

This scheme, for all ostensible purposes, treats Mr. Newkirk as any other
retired civil servant. The annuity is for the rest of his life. In my
opinion, such payments are emoluments within the Constitutional prohibition,
aimed at preventing corruption,/ a clause which has received in other con-
texts a broad construction. For example, Attorney General Hoyt, in 24 Ops.
A.G. 116, 118, held that "even a simple rememberance of courtesy * * * falls
under the inclusion of "any present * * * of any kind whatever."

It is to be noted that emoluments or presents may be received with the
"consent of Congress". Such consent has been obtained in many cases. Since
means of relief are provided, that remedy should be pursued, and doubtful
cases, such as this, should be resolved against holding a continuing compen-
sation from a foreign state not covered by the Constitutional provision.

It is therefore my opinion that Mr. Newkirk should be required to make
an election, and if he desires to continue to receive his annuity from the
German Government, he should resign from public office.

###FN8

That such provisions are probably of little effect was noted in 2 Story
on the Constitution, pp. 216-217:

"The other clause, as to the acceptance of any emoluments,
title or office, from foreign governments, is founded in
a just jealousy of foreign influence of every sort.
Whether, in a practical sense, it can produce much effect,
has been thought doubtful. A patriot will not be likely
to be seduced from his duties to his country by the accept-
ance of any title, or present, from a foreign power. An
intriguing,or corrupt, agent will not be restrained from
guilty machinations in the service of a foreign state by
such constitutional restrictions."

###FN9

Another factor cannot be overlooked. It might prove highly embarrassing
to the Department of Justice should it come to the attention of Congress
that a lawyer in the Claims Branch of the Office of Alien Property,
handling claims to German property, was drawing a $263 monthly annuity
for life from the German Government, and that the Attorney General had
concluded that legislative consent to such an arrangement was unnecessary.

Of course, Mr. Newkirk has no election if the German laws fix his rights
so that his annuity would continue to accrue to his account and could not
be relinquished.

###FN10

# Proposal That the President Accept
# Honorary Irish Citizenship

Acceptance by the President of honorary Irish citizenship would fall within the spirit, if not the letter, of the Emoluments Clause of the Constitution.

The procedure which has developed under the constitutional provision and its implementing statute would permit the President to participate in the formal ceremonies, accept the written evidence of the award and have it deposited with the Department of State, subject to the subsequent consent of Congress.

Even if Congress does not enact consenting legislation, the President could probably have the document conferring honorary Irish citizenship delivered to him by the Department of State after he leaves the White House.

May 10, 1963

MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE PRESIDENT[*]

   The Attorney General has asked me to respond to your memorandum of April 17, 1963, with respect to the legal aspects of the proposal that the President accept "honorary Irish citizenship." For the reasons set forth hereafter, I believe that acceptance by the President of honorary Irish citizenship would fall within the spirit, if not the letter, of Article I, Section 9, Clause 8, of the Constitution which requires that an individual who holds an office of profit or trust under the United States must obtain the consent of Congress in order to accept "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince or foreign State." Nevertheless, the procedure which has developed under the constitutional provision and under section 3 of the Act of January 3, 1881 (ch. 32, 21 Stat. 603, 604 (codified at 5 U.S.C. § 115)), a statute which implements the provision, would permit the President to participate in the formal ceremonies, accept the written evidence of the award and have it deposited with the Department of State, subject to the subsequent consent of Congress. Moreover, even if Congress should thereafter fail to enact consenting legislation, the President could probably have the document conferring honorary Irish citizenship delivered to him by the Department of State after he leaves the White House.

   At the outset, it should be emphasized that what would be conferred upon the President would not be Irish citizenship but merely honorary Irish citizenship. Your memorandum of April 17, 1963 indicated that it was originally the intention that the grant be conferred pursuant to section 12 of the Irish Nationality and Citizenship Act, 1956. That act provides that "Irish citizenship" may be granted to individuals or the children or grandchildren of individuals who have "done signal

---

[*] Editor's Note: The Special Assistant to whom this memorandum was addressed was McGeorge Bundy, National Security Adviser to the President.

*Proposal That the President Accept Honorary Irish Citizenship*

honour or rendered distinguished service to" Ireland, but it makes it clear that once the grant is made the individual "shall . . . be an Irish citizen." *Id.* § 12. Accordingly, action pursuant to this statute would impose upon the President whatever duties and obligations are ordinarily attached to Irish citizenship and would raise the serious problems attendant upon an undertaking by a President of fealty to another nation.

As a result of discussion of this problem with the Irish Ambassador, the Government of Ireland has drafted a special act, a copy of which is attached. The act would provide that "[t]he President [of Ireland] may by warrant confer on John Fitzgerald Kennedy, President of the United States of America, the title of honour of Honorary Citizen of Ireland." In an Aide-Mémoire of April 30, 1963, which is also attached, the Irish ambassador states:

> The Attorney General of Ireland has given opinion that the Bill as drafted would not confer citizenship with its attendant duties and obligations but only a title of honor.

I agree. In fact, the Department of Justice took a similar position when honorary United States citizenship was conferred upon Sir Winston Churchill. H.R. Rep. No. 88-57 (1963). Consequently, the problems which might have arisen as a result of dual citizenship are no longer presented.

However, the question still remains whether acceptance comes within the letter or spirit of Article I, Section 9, Clause 8, which provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

This clause was adopted unanimously at the constitutional convention as a means of preserving the independence of foreign ministers and other officers of the United States from external influences. 3 *Papers of James Madison* 1408 (1841). It is virtually copied from a similar provision in Article VI of the Article of Confederation. The constitutional provision has been interpreted as being "particularly directed against every kind of influence by foreign *governments* upon officers of the United States, based on our historic policies as a nation." *Gifts from Foreign Prince*, 24 Op. Att'y Gen. 116, 117 (1902) (emphasis in original); *see also* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1352 (Thomas M. Cooley ed., 4th ed. 1873).

It will be noted that the proposed Irish statute describes what would be conferred upon the President as a "title of honour." As such, it could be argued that what would be conferred falls within the literal language of the constitutional provision. Ambassador Kiernan has advised us that the bill could be redrafted to

279

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

omit the reference to a "title of honour." However, I do not believe that the legal problem would be significantly modified if this should be done. The spirit of the provision clearly extends to any type of obligation to foreign countries, and the designation of what is conferred appears to be of little relevance.

Moreover, in analyzing Public Law 88-6 and Proclamation 3525 of April 9, 1963, which operated to confer honorary citizenship of the United States upon Sir Winston Churchill, this Department took the view that what would be conferred upon him would be "similar in effect to . . . a medal or decoration." H.R. Rep. No. 88-57, at 4 (letter of Deputy Attorney General Katzenbach). The House Committee on the Judiciary stated that it "subscribes to the interpretation of the import of this legislation as outlined in the report rendered by the Department of Justice." *Id.* at 5. And medals and decorations have always been regarded as coming within the constitutional provision,[1] although it has never been precisely articulated whether one of these constitutes a "present, Emolument, Office, or Title." Thus, section 3 of the Act of January 31, 1881 provides:

> [A]ny present, decoration, or other thing, which shall be conferred or presented by any foreign government to any officer of the United States, civil, naval, or military, shall be tendered through the Department of State, and not to the individual in person, but such present, decoration, or other thing shall not be delivered by the Department of State unless so authorized by act of Congress.

5 U.S.C. § 115. The constitutional provision requires the consent of Congress to the acceptance of the enumerated honors and presents "of any kind whatever." Since the statute is intended to implement this provision, the phrase "other thing" should probably be construed in a similarly inclusive manner. Accordingly, it could be reasonably contended that a warrant or other documentary evidence of honorary Irish citizenship that may be presented to the President is an "other thing" within the meaning of the statute.

Literally read, the statute precludes direct tender of a present or mark of honor to an officer of the United States; the tender is to be through the Department of State. However, on the ground that it avoids offense to other countries, a custom has developed under which officers of the United States may accept foreign honors tendered to them and subsequently have them deposited in the Department

---

[1] *See, e.g.*, Message of President Andrew Jackson to the Senate and House of Representatives, dated January 19, 1830, *in* 3 *Compilation of the Messages and Papers of the Presidents* 1029, 1030 (James D. Richardson ed., 1897), stating that the Constitution prevented him from accepting a medal tendered to him by the Republic of Colombia, and that he was placing it at the disposal of Congress. Congress did not grant its consent to acceptance. The House Committee on Foreign Affairs merely recommended that the medal be deposited with the Department of State. H.R. Rep. No. 21-170 (Feb. 9, 1830). *See also* 5 U.S.C. § 114 (prohibiting an officer of the United States from wearing a decoration without the consent of Congress).

of State. This procedure has been treated as substantial compliance with the statute. If Congress subsequently enacts legislation consenting to acceptance (*see, e.g.*, Act of Aug. 3, 1956, Priv. L. No. 84-850, 70 Stat. A171), delivery is made to the recipient.[2] Therefore, if the President should accept the tender of honorary Irish citizenship, it would be appropriate for him to include in his acceptance remarks a statement that he is thereupon placing the warrant in the hands of the United States Ambassador to Ireland in accordance with United States law. If the President handled the matter in this way, it would be difficult for anyone to contend that his action was inconsistent with the constitutional provision or the statute.[3] In order to minimize possible congressional criticism in that regard, it might also be appropriate to advise the Chairmen of the House and Senate Foreign Relations Committees in advance that this procedure will be followed.

Two final points might be made. First, some Presidents have treated presents which they have received as gifts to the United States, rather than as personal gifts. They have therefore taken the view that acceptance is not subject to the constitutional provision. This view was apparently followed by President Lincoln, who received a "Diploma" from the Republic of San Marino declaring that "the President pro tempore of the United States of America" was a citizen of that Republic. Although Lincoln wrote the Regent Captains of San Marino thanking its Council for the honor that it had "conferred upon me" (4 *The Collected Works of Abraham Lincoln* 360 (Roy P. Basler ed., 1953)), he had the document deposited with the Department of State and it is now in the National Archives. The "Diploma" was conferred on the President of the United States "pro tempore," and it indicates that the action to authorize its issuance was taken while Buchanan was still President. The circumstances thus appear to have differed markedly from those here involved. It seems clear that Ireland proposes to confer honorary citizenship on President Kennedy personally, not on him as the President of the United States for the time being.

Second, we are informed that it is the practice of the Protocol Office of the State Department, the custodian of gifts and other marks of honor deposited

---

[2] Under 5 U.S.C. § 115a, the Secretary of State is directed to submit to each alternate Congress a list of retired personnel for whom the Department of State is holding decorations, medals or other marks of honor pursuant to 5 U.S.C. § 115. In a memorandum to department and agency heads, dated April 13, 1954, President Eisenhower directed that lists submitted to Congress pursuant to 5 U.S.C. § 115a be limited to retired personnel. Of course this direction has not prevented Congress from granting the required consent to incumbent officers. 70 Stat. A171.

[3] As a legal matter, the consent of Congress can be obtained either in advance or following receipt of anything covered by Article I, Section 9, Clause 8. We have, however, been able to locate only one statute in which it was clear that the consent had been granted in advance, Pub. Res. 34-3, 11 Stat. 152 (Aug. 30, 1856), and this did not involve a President. On the other hand, in the only instance in which we have been able to discover a grant of consent to a President, it followed receipt. Pub. Res. 54-39, 29 Stat. 759 (Apr. 2, 1896) (authorizing delivery to Benjamin Harrison of medals presented to him by Brazil and Spain during his term as President). The Harrison precedent would strengthen the view that the procedure suggested above is consistent with constitutional practice.

pursuant to the 1881 Act, to deliver to a former officer who has severed any official relationship with the United States, upon his request and without referral to Congress, a gift or other mark of honor tendered to him during his incumbency and deposited under the Act. Accordingly, even if Congress should not act in this matter, the President could probably obtain the warrant when he no longer holds office.[4]

I assume that the President will independently appraise the policy considerations involved in acceptance of the foreign honor here involved. In this regard, he may wish to know that President Wilson refused all foreign decorations while in office.[5] On the other hand, it is clear that this attitude does not represent an established policy of the presidency, as evidenced by the incidents, referred to above, involving Presidents Jackson, Lincoln and Benjamin Harrison.

NORBERT A. SCHLEI
*Assistant Attorney General*
*Office of Legal Counsel*

---

[4] While a former President is entitled to a monetary allowance of $25,000 per year (Pub. L. No. 85-745, 72 Stat. 838 (codified at 3 U.S.C. § 102 note (1958)), he could hardly be considered to hold an "Office" within the meaning of the constitutional prohibition.

[5] Edith Bolling Wilson, *My Memoir* 343 (1st ed. 1938).

*Proposal That the President Accept Honorary Irish Citizenship*

ATTACHMENT 1

**President Kennedy Bill, 1963**

**Arrangement of Sections**

*Section*

1. Conferring of title of honour on President Kennedy.

2. Short title.

**Draft of Bill**

An Act to enable the title of honour of Honorary Citizen of Ireland to be conferred on John Fitzgerald Kennedy, President of the United States of America.

*BE IT ENACTED* by the Oireachtas as follows:

| | |
|---|---|
| Conferring of title of honour on President Kennedy. | 1. The President may by warrant confer on John Fitzgerald Kennedy, President of the United States of America, the title of honour of Honorary Citizen of Ireland. |
| Short title. | 2. This Act may be cited as the President Kennedy Act, 1963. |

*Supplemental Opinions of the Office of Legal Counsel in Volume 1*

ATTACHMENT 2

**Aide-Mémoire**

The Government of Ireland is prepared to promote special legislation to enable the title of Honorary Citizen of Ireland to be conferred on President Kennedy, instead of pursuing the idea of offering citizenship as a token of honor under Section 12 of the Irish Nationality and Citizenship Act, 1956. A draft bill has been prepared with this objective in mind. The text of the bill is conveyed herewith.

The Attorney General of Ireland has given opinion that the Bill as drafted would not confer citizenship with its attendant duties and obligations but only a title of honor.

An informal intimation is requested as to whether the title of honor of Honorary Citizen of Ireland, as contemplated in the draft bill, would be acceptable to President Kennedy.

April 10, 1963

President Reagan's Ability to Receive Retirement Benefits..., 5 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 230 of 395

5 U.S. Op. Off. Legal Counsel 187 (O.L.C.), 1981 WL 30896

Office of Legal Counsel

U.S. Department of Justice

President Reagan's Ability to Receive Retirement Benefits from the State of California

June 23, 1981

Payment to President Reagan of the state retirement benefits to which he is entitled is not intended to subject him to improper influence, nor would it have any such effect, and therefore his receipt of such benefits would not violate the Presidential Emoluments Clause. U.S. Const., Art. II, § 1, cl. 7. Even if the Presidential Emoluments Clause were interpreted strictly on the basis of the dictionary definition of the term 'emolument,' it would not prohibit President Reagan's receipt of state retirement benefits since under state law those benefits are neither a gift nor a part of the retiree's compensation. The role of the Comptroller General in enforcing compliance with the Presidential Emoluments Clause is debatable, the penalty for a violation is unclear, and the Constitution might in any case make questionable the withholding of any part of the President's salary for an indebtedness to the United States.

**1  MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This responds to your request for our opinion whether the receipt by President Reagan of the retirement benefits to which he became entitled as the result of his service as Governor of the State of California conflicts with the Presidential Emoluments Clause of the Constitution, which provides:

> The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and *he shall not receive within that Period any other Emolument from the United States, or any of them.*

U.S. Const., Art. II., § 1, cl. 7 (emphasis added).

We have been advised that, while serving as Governor of the State of California, the President elected to become a member of the Legislators' Retirement System pursuant to § 9355.4 of the California Government Code. He became entitled to, and has drawn, retirement benefits under that system since the expiration of his second term as Governor in 1975. The California Legislators' Retirement System is contributory, § 9357, and the benefits under it are based on length of service, § 9359. According to the decisions of the California courts, the benefits under the state retirement systems, including the one of which President *188 Reagan is a member, constitute vested rights. They are not gratuities which the state is free to withdraw. *Betts* v. *Board of Admin. of Pub. Employees' Ret. System*, 21 Cal. 3d 859, 863 (1978). *See also Kern* v. *City of Long Beach*, 29 Cal. 2d 848, 851, 853 (1947).

I.

The word 'emolument' is an archaic term. The Oxford English Dictionary defines it as 'profit or gain arising from station, office, or employment: reward, remuneration, salary.' It also gives the obsolete meanings of 'advantage, benefit, comfort.' Webster's Third New International Dictionary contains similar definitions.

The extant records of the Constitutional Convention are silent regarding the purposes which Article II, § 1, clause 7, and related Article I, § 9, clause 8 [B1] [FN1] FN;F1 were intended to serve. Both clauses, however, were discussed during the State Ratification Conventions. *The Federalist No. 73*, attributed to Alexander Hamilton, explains that Art. II, § 1,

President Reagan's Ability to Receive Retirement Benefits.., 5 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 231 of 395

clause 7 was designed to protect 'the independence intended for him [the President] by the Constitution,' so that neither Congress nor the states could

**\*\*2** weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice. Neither the Union, nor any of its members, will be at liberty to give, nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act. :B2[FN2]FN;F2

*Id.* at 442.

Governor Randolph gave a similar explanation of the purposes underlying Article I, § 9, clause 8 in the Virginia Ratification Convention. He stated that it had been prompted by the gift of a snuff box by the King of France to Benjamin Franklin, then Ambassador to France. It therefore 'was thought proper, in order to exclude corruption and foreign influence, to prohibit anyone in office from receiving or holding any emoluments from foreign states.' 3 M. Farrand, Records of the Federal Convention of 1787 327 (rev. ed. 1937, 1966 reprint). Governor Randolph used the term 'emolument' in the sense of a present rather than compensation for services. From this history, it appears that the term emolument has a strong connotation of, if it is not indeed limited to, payments which have a potential of influencing or corrupting the integrity of the recipient. To our knowledge, these two provisions were interpreted by federal authorities in that manner in all but one of the incidents in which this problem arose.

**\*189** In 1902 Acting Attorney General Hoyt explained that the purpose of Article I, § 9, clause 8 was 'particularly directed against every kind of influence by foreign governments upon officers of the United States . . . .' 24 Op. Att'y Gen. 116, 117 (1902).

A similar approach was taken by the Comptroller General :B3[FN3]FN;F3 in 1955 in the case of a former German judge who, after his removal from office by the national-socialist regime, had emigrated to the United States and become an attorney in the Department of Justice. After World War II, as the result of the German indemnification legislation, the enactment of which was required by the United States occupation authorities, he received from the German government a lump sum payment and an annuity for life in compensation for the wrongful dismissal. The Comptroller General ruled that those payments did not constitute emoluments directly stemming from his former office, but that they 'represent damages payable as a direct result of a moral and legal wrong.' 34 Comp. Gen. 331, 334 (1955). In addition the Comptroller General felt it 'appropriate' to determine whether the receipt of the indemnity would violate the spirit of the Constitution. Referring to Acting Attorney General Hoyt's opinion, *supra*, he considered the test to be whether the payments were intended to influence, or had the effect of influencing, the recipient as an officer of the United States. The Comptroller General held that not to be the case in these circumstances. *Id.* at 335.

The same analysis of the problem was made by this Office in 1964 in connection with the question whether the estate of President Kennedy was entitled to the naval retirement pay that had accrued while he was President. A memorandum prepared in this Office was based on the consideration that Article II, § 1, clause 7 has to be interpreted in the light of its basic purposes and principles, *viz.*, to prevent Congress or any of the states from attempting to influence the President through financial awards or penalties. :B4[FN4]FN;F4 It concluded that this constitutional purpose would be **\*\*3** in no wise furthered by interpreting the clause as prohibiting the President from continuing to receive payments to which he was, prior to his taking office, entitled as a matter of law and for which he does not have to perform any services or fulfill any other obligations as a condition precedent to receipt of such payments.

**\*190** The General Accounting Office denied the claim, not on the ground that its allowance would violate the Constitution, but on the statutory basis that the President had received active duty pay as Commander-in-Chief of the

President Reagan's Ability to Receive Retirement Benefits..., 5 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 232 of 395

Armed Forces and therefore was precluded by 10 U.S.C. § 684 and 38 U.S.C. § 314(c) from receiving retired pay for the same period. :B5 [FN5]FN;F5

Hence, if Article II, § 1, clause 7 is to be interpreted only on the basis of the purposes it is intended to achieve, it would not bar the receipt by President Reagan of a pension in which he acquired a vested right 6 years before he became President, for which he no longer has to perform any services, and of which the State of California cannot deprive him.

## II.

The result would be the same, under California law, if Article II, § 1, clause 7 were interpreted exclusively on the basis of the dictionary meaning of the term emolument. The Comptroller General took that approach in 1957 when he was confronted with the question whether the receipt by a federal court crier of a pension from the British government for war services violated Article I, § 9, clause 8 of the Constitution. Disregarding the issue whether the receipt of the pension could have the effect of enabling the British government to influence the court crier in its favor, the Comptroller General ruled that the receipt of the pension would violate that constitutional provision, because a pension constituted either a 'gratuity' or a 'deferred compensation.' If a 'gratuity,' it was a present, if 'deferred compensation' was compensation for services and therefore came within the dictionary definition of the term emolument. 37 Comp. Gen. 138, 140 (1957).

Assuming, *arguendo*, that the Comptroller General was correct in limiting himself to the issue whether the pension was to be classified technically as a gift or compensation for services and, hence, constituted an emolument in the dictionary sense :B6 [FN6]FN;F6 regardless of whether it had the potential of influencing the recipient in favor of the British government, we would not say that his ruling was erroneous. Under British law the pension may have been a gift or compensation for past services. Rulings of the courts of California interpreting Article 16, § 6  **191**  of the California Constitution, which prohibits the gifts of public moneys, and Article 4, § 17 and Article 11, § 1, which prohibit the grant of extra compensation by local governments after services have been rendered, however, have determined that in California retirement benefits such as those received by President Reagan are neither gifts nor compensation for services.

 **4**  The California courts have established firmly that the benefits under the California pension or retirement statutes are not gifts. *O'Dea* v. *Cook*, 176 Cal. 659, 661–62 (1917), *Sweesy* v. *Los Angeles etc. Retirement Board*, 17 Cal. 2d 356, 359–60 (1941), and the authorities there cited; *Kern* v. *City of Long Beach*, 29 Cal. 2d 848, 851, 853 (1947), and the authorities there cited.

California decisions holding that retirement benefits are not gratuities, however, frequently characterize them, as do rulings in other jurisdictions, as 'deferred benefits' or 'deferred compensation.' See *Kern* v. *City of Long Beach, supra*, at 852, 855, *Miller* v. *State of California*, 18 Cal. 3d 808, 815 (1977). If retirement benefits actually constituted compensation, even though deferred, Article 4, § 17, and Article 11, § 1 of the California Constitution would prohibit them to be increased subsequent to the rendering of the services for which they were earned, in particular after retirement. The California courts, however, have realized, as have the courts of many other jurisdictions, :B7 [FN7]FN;F7 that the term 'deferred compensation' is essentially convenient shorthand for the conclusion that retirement benefits are not gifts or gratuities, and that it may not be taken literally.

In *Sweesy* v. *Los Angeles, etc. Retirement Board, supra* at 361–63 (1941), which involved an increase of pension benefits after the employee had retired, the Supreme Court of California rejected the notion that pensions are simply additional or increased compensation and, observing (at 362) that the definition of retirement benefits as additional or increased compensation 'may not be accurate in every case,' it created the concept that pension benefits are derived from the 'pensionable status,' :B8 [FN8]FN;F8 *See also Nelson* v. *City of Los Angeles*, 21 Cal. App. 3d 916, 919 (1971). Under California law retirement benefits therefore constitute an incident of the pensionable status. They are neither a gift nor a part of the retiree's compensation, earned while employed, the payment of which is deferred until after his retirement. In

President Reagan's Ability to Receive Retirement Benefits..., 5 U.S. Op. Off. Legal...

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 233 of 395

any event, regardless of any dictionary definition, retirement benefits are not **\*192** emoluments within the meaning of the Constitution because interests of this kind were not contemplated by the members of the Constitutional Convention of 1789. :B9[FN9]FN;F9

In sum, the receipt by President Reagan of his California retirement benefits does not violate the language of Article II, § 1, clause 7 of the Constitution because those benefits are not emoluments in the constitutional sense. Similarly, such receipt does not violate the spirit of the Constitution because they do not subject the President to any improper influence. The principal question presented by you therefore must be answered in the negative. In view of this conclusion, it is not necessary to answer the subsidiary questions raised in the last paragraph of your inquiry.

 **\*\*5** The Attorney General and Assistant Attorney General Olson have not participated in the preparation of this opinion.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

Annex Attached

## \*193  ANNEX

The role of the Comptroller General in this field is debatable. His involvement in this issue usually resulted from agency inquiries as to the legality of the payment of salary to employees who received payments from a foreign government. The opinions of January 12, 1955, 34 Comp. Gen. 331 (1955) and August 26, 1957, 37 Comp. Gen. 138 (1957) assume without explanation that at employee of the United States who accepts any emolument from a foreign government in violation of Article I. § 9, clause 8 of the Constitution forfeits the entire compensation for his employment by the federal government. The subsequent decisions of September 11, 1964, 44 Comp. Gen. 130 (1964) and of April 9, 1974, 53 Comp. Gen. 753, 758 (1974) concede that Article I, § 9, clause 8 does not specify the penalty to be imposed for its violation. The opinions, however, assert without any statutory basis that 'substantial effect' can be given to the clause by withholding from the employee's pay an amount equal to the one which he received in violation of the Constitution. This result is in marked contrast to the position long held by the Comptroller General that in the absence of specific statutory authority his Office is not justified in setting off against the salaries of government employees any debts owed by them to the government, even if those debts are liquidated and undisputed. 29 Comp. Gen. 99 (1949). :B10[FN10]FN;F10

Additional problems would be presented if the Comptroller General sought to reduce the President's salary by the amount of the retirement benefits he receives from the State of California. Article II, § 1, clause 7 provides that the President's salary shall not be diminished during the period for which he shall be elected. The corresponding provision of Article III, § 1, which prohibits the diminution of the salary of Article III judges during their continuance in office, has been interpreted as prohibiting the withholding of a judge's statutory salary for an alleged indebtedness to the United States. *Smith* v. *Jackson*, 241 Fed. 747, 758 (D.C.C.Z. 1916), *aff'd on the opinion below*, 241 Fed. 747, 777 (5th Cir. 1917), *aff'd* 246 U.S. 388 (1918).

1     Article I, § 9, clause 8 provides in pertinent part 'no person holding any Office of Profit or Trust under them [the United States] shall without the Consent of the Congress, accept any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince or foreign State.'

2     The 'first act' refers to the legislation governing the President's compensation which is in effect at the beginning of the period for which he is elected.

Case 1:17-cv-01154-EGS   Document 31-1   Filed 11/28/17   Page 234 of 395

President Reagan's Ability to Receive Retirement Benefits..., 5 U.S. Op. Off. Legal...

3    On the role of the Comptroller General in this area, see the Annex to this memorandum.

4    Since Robert Kennedy was Attorney General at the time when this matter was before the Department of Justice, it was felt that the Department of Justice should take no official position on the question involved. Instead, the Office of Legal Counsel furnished to the General Accounting Office a staff memorandum which 'should not be deemed an official utterance of the Department. It is an unofficial work-product supplied for whatever the idea may be wroth to you (the General Counsel, General Accounting Office).' Letter from Assistant Attorney General Schlei to General Counsel Keller, General Accounting Office, dated October 13, 1964, and attached staff memorandum, dated October 12, 1964.

5    Letter from General Counsel Keller, General Accounting Office, to Assistant Attorney General Schlei, dated November 1, 1964.

6    *See*, however, state court decisions such as *Opinion of the Justices*, 117 N.H. 409, 411 (1977), and *Campbell* v. *Kelly*, 157 W. Va. 453, 464, 466 (1974), which point to the irrelevance of the dictionary definition of the term emolument in this context. Those decisions are based on the consideration that modern retirement systems do not give rise to the evils at which the prohibitions against emoluments, gifts, and pensions in 18th and 19th century constitutions were directed. They therefore conclude that these benefits are not 'within the contemplation' of such prohibitions. On the development of pensions from arbitrary grants to favorites and persons 'who could be counted on to do the government's bidding' to a politically neutral system of insurance, *see* 12 *Encyclopedia of the Social Sciences*, pp. 65–69, *s.v.* Pensions (1934).

7    Some states have held that the 'deferred compensation' description of retirement benefits is misleading and that those benefits are *sui generis*, not readily subject to classification. *See, e.g. State ex rel. Wittler* v. *Yelle*, 65 Wash. 2d 660 (1965). Illinois and New Mexico liken retirement benefits to insurance contracts, *Raines* v. *Board of Trustees Pen. Fund*, 365 Ill. 610 (1937), *State ex rel. Hudgins* v. *Public Employees Retirement Board*, 58 N.M. 543 (1954). Still others hold that retirement benefits are not compensation for past services but an inducement to remain in service and to retire when superannuated. *See, e.g. Rochlin* v. *State*, 112 Ariz. 171 (1975).

8    For an analysis of the concept of 'pensionable status' *see Jorgenson* v. *Cranston*, 211 Cal. App. 2d 292, 298–300 (1962).

9    *See* n. 6, *supra*.

10    The Comptroller General adhered to this opinion as recently as May 8, 1979, File B–189154.

5 U.S. Op. Off. Legal Counsel 187 (O.L.C.), 1981 WL 30896

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.



**Forbes** / Lists / #TrumpsAmerica

MAR 22, 2017 @ 09:46 AM    38,711 👁

# Trump's Vegas Partner Says Business Is Not Dividing Profits From Foreign Governments As Promised

**Dan Alexander,** FORBES STAFF ✔

FULL BIO ⌄



Tim Pannell for Forbes

*Phil Ruffin is the only person Donald Trump has actually invested alongside in a Trump-branded property.*

Two months ago Donald Trump's lawyer Sheri Dillon stood in Trump Tower and announced that the president would donate all profits from foreign governments at his hotels to the U.S. Treasury—part of an effort to resolve concerns that the he would be in violation of a little-known clause in the U.S. Constitution the day he took office. Now Phil Ruffin, who owns the Trump International Hotel Las Vegas in a 50-50 joint venture with the president, says that's not happening.

"I don't know anything about that," said Ruffin, sitting in his office inside the Treasure Island Hotel & Casino, which he owns separately from the president. Is there a plan in place to hand over the profits at Trump's Las Vegas property

eventually? "They have to pay like everybody else," Ruffin said. But if he did chop away the profits from foreign dignitaries, would that affect the value of the hotel? "They're not going to do that," Ruffin said, before repeating: "They're not going to do that."

When subsequently questioned, the president's son Eric Trump, who now serves as co-chief of his father's business, directly contradicted Ruffin. "It's something that our internal controlling teams take seriously," said Eric Trump, in his glass office in Trump Tower. "At the end of the year, that money will go to the Treasury. Again, we didn't need to do it. It's probably the right thing to do. We didn't need to do it. But it's something we are doing and will do. We'll watch it closely."

So will ethics experts. The president is facing a lawsuit by a bipartisan group of government watchdogs and legal scholars who, even before questions about whether Trump was following through on his plan to hand over profits, claimed that he was violating a previously obscure section of the Constitution called the Emoluments Clause. The barely litigated clause prohibits federal officials from receiving "any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state." Some foreign dignitaries have already told reporters they will stay at Trump hotels to try to ingratiate themselves with the president. Legal experts are divided over whether that sort of payment would violate the Constitution.

Anticipating challenges, Trump's lawyers began staking out a position on the clause even before the president was elected. "No one would have thought when the Constitution was written that paying your hotel bill was an emolument," Dillon said at the January press conference. "The Constitution does not require President-elect Trump to do anything here. But, just like with conflicts of interests, he wants to do more than what the Constitution requires. So, President-elect Trump has decided, and we are announcing today, that he is going to voluntarily donate all profits from foreign government payments made to his hotels to the United States Treasury. This way, it is the American people who will profit."

Eric Trump says the arrangement is already in place but would not explain exactly how it works. What is considered profit? Is the Trump Organization handing over the gross profits, operating profits or net profits—numbers that typically vary dramatically because they subtract different amounts of expenses from overall revenues? "The CPAs have to figure out how it works," Eric Trump said, later adding that they have already implemented the plan.

But according to Ruffin, that's not the case, at least at the Vegas hotel. Ruffin's comments concern ethics experts like Scott Amey, general counsel at the nonpartisan Project on Government Oversight. "It's extremely disappointing that

both Trump and his lawyers stood up at a press conference that they were going to take these added precautions to not potentially violate the Constitution and that they've done an about-face and decided that they won't monitor foreign government stays at their hotels and pass that money onto the Treasury," Amey said. "It's not what you expect in a normal course of business, for someone to say something and then decide not follow through. But it's certainly not the type of ethical behavior that you would expect out of the president of the United States."

See a full feature story on Phil Ruffin and his partnership with the president here.

*Find me on Twitter or Facebook.*



WAMU 88.5 · LIVE NOW

# npr**politics**

POLITICS

# Ethics Office Director Walter Shaub Resigns, Saying Rules Need To Be Tougher

Listen · 3:43    ( Queue )   Download Transcript

July 6, 2017 · 1:01 PM ET
Heard on All Things Considered

 PETER OVERBY      MARILYN GEEWAX



Outgoing ethics director Walter Shaub said in January that President Trump's plan to reduce conflicts of interest "doesn't meet the standards ... that every president in the past four decades has met."

*Claire Harbage/NPR*

Office of Government Ethics Director Walter Shaub Jr. is turning in his resignation on Thursday.

The move follows months of clashes with the White House over issues such as President Trump's refusal to divest his businesses and the administration's delay in disclosing ethics waivers for appointees.



UNITED STATES OFFICE OF
**GOVERNMENT ETHICS**

— ★ —

July 6, 2017

The President of the United States
The White House
1600 Pennsylvania Avenue, NW
Washington DC 20500

Dear Mr. President:

I am resigning from my position as Director of the U.S. Office of Government Ethics effective Wednesday, July 19, 2017.

The great privilege and honor of my career has been to lead OGE's staff and the community of ethics officials in the federal executive branch. They are committed to protecting the principle that *public service is a public trust*, requiring employees to place loyalty to the Constitution, the laws, and ethical principles above private gain. I am grateful for the efforts of this dedicated and patriotic assembly of public servants, and I am proud to have served with them.

Respectfully,

Walter M. Shaub, Jr.
Director

★ ★ ★ ★

1201 NEW YORK AVE NW · SUITE 500 · WASHINGTON DC · 20005

**Walter Shaub** ✔
@waltshaub

11:59 AM - Jul 6, 2017

💬 1,120    ♺ 5,331    ♡ 8,557

Shaub, an attorney, has accepted a job with the Campaign Legal Center, a nonpartisan organization of election-law experts.

Thursday morning, Shaub told NPR that "the current situation has made it clear that the ethics program needs to be stronger than it is. At the Campaign Legal Center, I'll have more freedom to push for reform. I'll also be broadening my focus to include ethics issues at all levels of government."



**POLITICS**

Majority Of Americans Believe Trump Acted Either Illegally Or Unethically With Russia

He did not elaborate on what is so wrong with the "current situation," but Shaub has been sharply critical of Trump's approach to ethics compliance since the election.

The battle began in late November when the ethics office began issuing a series of tweets that mimicked Trump's style, exclaiming: "Brilliant! Divestiture is good for you, good for America!"

The tweets were clearly intended as pointed satire, given that Trump had not promised total divestiture.

And then on Jan. 11, shortly before Inauguration Day, Shaub spoke out at the Brookings Institution, causing a stir when he said Trump's plan for avoiding conflicts of interest "doesn't meet the standards that the best of his nominees are meeting and that every president in the past four decades has met."

Trump's plan involved moving his business interests into a trust run by his two oldest sons and a longtime business associate. Trump is the sole beneficiary of the trust. Since the 1970s, presidents have moved their assets into blind trusts run by third parties.



**POLITICS**

Trump Ethics Monitor: Has The President Kept His Promises?



**POLITICS**

In U.S. Ethics Chief, An Unlikely Gadfly To Trump

Trump's trust is "not even halfway blind," Shaub said at Brookings. "His sons are still running the businesses, and, of course, he knows what he owns."

Since Trump began naming appointees following the November election, the ethics office has been racing to keep up with the workload. That involves reviewing appointees' financial information to identify conflicts of interest and then negotiating with them to resolve or at least diminish any problems. For example, OGE might suggest a White House staffer sell off a business interest or move an asset into a blind trust.

But the small agency, with about 70 employees, can only advise on ethics — not enforce rules.

Many Americans have been calling the once-obscure office to report on, or demand action on, ethical issues involving the administration. That has caused a spike in OGE's workload, without an increase in staff.

The agency reports that during the six months between October 2008 and March 2009, as the Obama presidency was taking shape, it got 733 public contacts, such as calls, letters and emails. During the October 2016 to March 2017 period in the Trump era, it was swamped with 39,105 contacts — an increase of 5,235 percent.

## Ethics Inquiries Soared At The Start Of The Trump Administration

### Public and media contacts

| STAKEHOLDER INTEREST | FY 09 Q1+Q2 | FY 16 Q1+Q2 | FY 17 Q1+Q2 | PERCENT CHANGE (2009-2017) |
|---|---|---|---|---|
| Public contacts | 733 | 164 | 39,105 | 5,235% |
| FOIA requests | 39 | 36 | 280 | 618% |
| Media inquiries | N/A | 59 | 873 | N/A |

### Requests from other government offices

| STAKEHOLDER INTEREST | FY 13 Q1+Q2 | FY 16 Q1+Q2 | FY 17 Q1+Q2 | PERCENT CHANGE (2013-2017) |
|---|---|---|---|---|
| Congressional requests | 26* | 20 | 113 | 335% |
| Requests for assistance from agency ethics officials | N/A | 804 | 984 | N/A |

**Notes**

* Data is not available for 2009.

*Source: The Office of Government Ethics*
*Credit: Brittany Mayes/NPR*

"We've even had a couple days where the volume was so huge it filled up the voicemail box, and we couldn't clear the calls as fast as they were coming in," Shaub said in an NPR interview in April.

Shaub has headed the ethics office since January 2013, following his appointment by President Barack Obama. His five-year term was set to expire in January 2018.

His departure now — effective July 19 — leaves a leadership hole at a tough time. The agency must work with a new administration that has been hiring unprecedented numbers of former lobbyists, lawyers and industry consultants. The White House also has been giving many of those appointees waivers to get around ethics rules.

**POLITICS**

Trump's Business Empire: An Update On His Sources Of Revenue



In April, Shaub began publicly demanding that the White House make those waivers public. He won that battle at the end of May, when the administration released the information for White House appointees, including chief of staff Reince Priebus, counselor Kellyanne Conway and chief strategist Steve Bannon.

Waivers are considered public documents, but the Trump White House had been holding them back, saying OGE lacked the legal authority to require disclosure. After weeks of back-and-forth, the administration did start to post the waivers online and Shaub said public disclosure of "the waivers is critical to ensuring that agencies and individual appointees are adhering to ethics requirements."

OGE pushed out more waiver information in June.

Shaub also has been vocal about the limitations on the ethics office's power and the failure of House Republicans to follow up on ethics issues. For example, when he was in the midst of his fight with the White House over ethics waiver disclosures, he told NPR that then-House Oversight Committee Chairman Jason Chaffetz, a Utah Republican, has "authority to investigate these things and compel responses, so hopefully we'll see some action from him."

In contrast, OGE "has no investigative authority, so we're limited as to what we can do if these waivers are not being released publicly," he said.

## Correction

### July 6, 2017

A previous caption incorrectly said Walter Shaub is resigning Thursday. He will leave the post on July 19.

walter shaub     conflicts of interest     ethics

# Sign Up for the NPR Politics Newsletter

We follow politics; you follow us. Catch up the latest stories, news and analysis from NPR politics reporters around the country.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy.

## More Stories From NPR



**POLITICS**

Trump Enters Fraught Territory By Criticizing Al Franken

*The Washington Post*

**Capital Business**

# For foreign diplomats, Trump hotel is place to be

By **Jonathan O'Connell** and **Mary Jordan**   November 18, 2016

About 100 foreign diplomats, from Brazil to Turkey, gathered at the Trump International Hotel this week to sip Trump-branded champagne, dine on sliders and hear a sales pitch about the U.S. president-elect's newest hotel.

The event for the diplomatic community, held one week after the election, was in the Lincoln Library, a junior ballroom with 16-foot ceilings and velvet drapes that is also available for rent.

Some attendees won raffle prizes — among them overnight stays at other Trump properties around the world — allowing them to become better acquainted with the business holdings of the new commander in chief.

"The place was packed," said Lynn Van Fleit, founder of the nonprofit Diplomacy Matters Institute, which organizes programs for foreign diplomats and government officials. She said much of the discussion among Washington-based diplomats is over "how are we going to build ties with the new administration."

Back when many expected Trump to lose the election, speculation was rife that business would suffer at the hotels, condos and golf courses that bear his name. Now, those venues offer the prospect of something else: a chance to curry favor or access with the next president.

Perhaps nowhere is that possibility more obvious than Trump's newly renovated hotel a few blocks from the White House, on Pennsylvania Avenue. Rooms sold out quickly for the inauguration, many for five-night minimums priced at five times the normal rate, according to the hotel's manager.

To many of the guests at the reception Tuesday, accepting an invitation to tour the $212 million hotel and check out the $20,000-a-night, 6,300-square-foot "town house" suite seemed like a good idea. They spoke admiringly about the renovation and left with a goody bag of chocolates and a brochure. It listed the choices of accommodations and meeting rooms and expounded on the location's "striking prominence" at historical moments such as the Inauguration Day parade.

"Believe me, all the delegations will go there," said one Middle Eastern diplomat who recently toured the hotel and booked an overseas visitor. The diplomat said many stayed away from the hotel before the election for fear of a "Clinton backlash," but that now it's the place to be seen.

In interviews with a dozen diplomats, many of whom declined to be named because they were not authorized to speak about anything related to the next U.S. president, some said spending money at Trump's hotel is an easy, friendly gesture to the new president.

"Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?' " said one Asian diplomat.

Guests at the Trump hotel have begun parking themselves in the lobby, ordering expensive cocktails, hoping to see one of the Trump family members or the latest Cabinet pick. One foreign official hoped Trump, famous for the personal interest he takes in his businesses, might check the guest logs himself.

But several expressed concern that spending thousands of dollars on a Trump property could look like an attempt to buy access or favors.

"The temptation and the inclination will certainly be there," said Arturo Sarukhan, a former Mexican ambassador to the United States. "Some might think it's the right way to engage, to be able to tell the next president, 'Oh, I stayed at your hotel.' If I were still in government, I would discourage it, among other reasons because it can be questioned and looked at in a very poor light, as though you are trying to buy influence via a hotel bill."

If diplomats, as well as corporate representatives and executives — whom the hotel hosted in a separate room Tuesday — want to spend lavishly at Trump properties, there appears to be no ethics rule to stop it, short of an act of Congress.

The Trumps opened the hotel in the Old Post Office pavilion, a 117-year-old property the company leases from the federal government. Officials at the General Services Administration, the landlord, have consulted the Office of Government Ethics about how to handle such conflicts, but the measures preventing other federal employees from profiting from their positions do not apply to the president.

"Consequently, there is no current legal requirement that would compel the President to relinquish financial interests because of a conflict of interest," an analysis produced last month by the Congressional Research Service at the Library of Congress said.

Foreign leaders and top officials visiting Washington often stay at Blair House or in their ambassador's residence, but many are accompanied by entourages who take over entire floors of hotels. The 180-country-strong diplomatic community in the capital spends millions of dollars every year on hotels, including for huge events marking their countries' independence days.

Foreign business is so critical to Washington hotels that the Trumps, like others, hired a "director of diplomatic sales," luring the manager from a top competitor, the Four Seasons in Georgetown.

The hotel's general manager, Mickael Damelincourt, said in an interview that business had been picking up before the election and that interest has surged for the inauguration. Hotels throughout the city, as well as Airbnb users, are charging higher rates

because of increased demand.

"I got 50 calls in the last day, from some very important people, and we have no space," Damelincourt said.

He said he didn't think inauguration guests were coming to his hotel in order to curry favor with the president-elect. "I don't think that has an effect on the hotel," he said.

"I think we would be doing amazing business anyway because of our location and because of the quality. Look at the W hotel, they are doing amazing, as well."

Trump has said he will turn over his businesses, including hotels and golf courses around the world, to his children Donald Jr., Ivanka and Eric.

"This is a top priority at the Organization and the structure that is ultimately selected will comply with all applicable rules and regulations," including at the Old Post Office, the Trump Organization said.

Several top ethics experts, including former White House counsels, say handing the properties to the Trump children will not go nearly far enough in quashing concerns that Trump could use the presidency to enrich himself or his family.

More than a dozen watchdog organizations penned a letter to Trump on Thursday, urging him to create a true blind trust or liquidate the assets. (Under a blind trust, an independent trustee with no familial ties would manage the properties.)

"Failure to follow this course of action will create conflicts of interest of unprecedented magnitude," groups including Common Cause wrote.

Rep. Katherine M. Clark (D-Mass.) introduced a bill this week that would require presidents to take similar steps.

F. Joseph Warin, a lawyer and expert on the Foreign Corrupt Practices Act, said Trump should consider bringing in a third-party administrator.

"It's about perception of conflict of interest," Warin said. "We want our leader laser-focused on fixing the problems of the United States and not diverted on commercial issues."

💬 **713 Comments**

Jonathan O'Connell covers economic development with a focus on commercial real estate and the Trump Organization. He joined the Post in 2010. 🐦 Follow @OConnellPostBiz

Mary Jordan is a Pulitzer-Prize winning correspondent currently traveling America writing about the Trump era. She was the founding editor and moderator of Washington Post Live, which organizes current affairs forums and debates. As a correspondent based in London, Mexico and Tokyo she spent years reporting from around the globe. 🐦 Follow @marycjordan

**The Washington Post**



Photo by Evelyn Hockstein For The Washington Post

# How the Trump hotel changed Washington's culture of influence

The hotel's managers press conservative, Republican and Christian groups to do business where they can rub shoulders with Trump's Cabinet.

By **Jonathan O'Connell**

Aug. 7, 2017



On a June morning, Romanian President Klaus Iohannis <span>⊕</span> and his wife enjoyed croissants in the lounge of the opulent hotel, a day before joining President Trump a few blocks away at the White House for a Rose Garden news conference.

Downstairs that same day in the grand ballroom, hundreds of bankers discussed their industry's future under Treasury Secretary Steven Mnuchin <span>⊕</span>, who lived in the hotel for six months at his own expense, according to a spokesman, after Trump picked him for the job.

The scenes illustrate a daily spectacle of Washington influence at 1100 Pennsylvania Ave., the city's newest luxury hotel that has quickly become a kind of White House annex. Since Trump's election, the Trump International Hotel has emerged as a Republican Party power center where on a good day — such as July 28 around 8 p.m. — excited visitors can watch the president share intimate dinner conversation with his just-named chief of staff, John F. Kelly, and be the first to brag about it on social media.



This is nothing Washington has ever seen. For the first time in presidential history, a profit-making venture touts the name of a U.S. president in its gold signage. And every cup of coffee served, every fundraiser scheduled, every filet mignon ordered feeds the revenue of the Trump family's private business.

In conversations with The Washington Post, the hotel's management described its strategy to capitalize on the president's popularity. It markets the hotel to Republican and conservative groups that embrace Trump's politics but takes care not to solicit business from fringe groups that would embarrass the president. Trump supporters in red "Make America Great Again" caps get a chance to rub elbows with White House officials against an American flag backdrop at the Benjamin Bar, where a signature concoction of winter wheat vodka, oysters and caviar goes for $100.

"While we can't quantify how much business we have received because of politics, neither can we quantify how much we have lost," Patricia Tang ⊕ , director of sales and marketing, said in an interview.

It is difficult to see comings and goings at the hotel. There are no signs in the lobby to direct guests to daily events, velvet ropes block the public from meeting areas, and some groups holding conventions and banquets omit references to Trump's name in their promotional materials. Many decline to answer questions about why they chose the Trump hotel from the many similar luxury Washington venues.

————————— | —————————

# Inside D.C.'s Trump International Hotel



Swipe to see more

← →



**The Lounge** is full of couches and o
size chairs where members of Trump
administration, Trump family membe
and fans in MAGA hats regularly stop

Source: Diagram based on floor plans submitted to the National Capital Planning Commission.

The Post spent part of every day in May in the hotel's bars, restaurants and lobby. What reporters saw ranged from events hosted by foreign groups with policy priorities to Republican glitterati — Rudolph W. Giuliani ⊕ posing for selfies at the bar the night Trump fired FBI Director James B. Comey; White House aide Omarosa Manigault conferring with the former producer of "The Apprentice"; former Trump campaign adviser Corey Lewandowski ⊕ plopping into a black leather chair marked "Reserved"; then-press secretary Sean Spicer ⊕ scrolling through his phone on a plush blue sofa in the lobby.

The parade included out-of-town tourists gawking in the lobby; bartenders hawking $2,500-per-bottle champagne; a light artist at nightfall projecting a protest message on the gray stone facade that read "Pay Trump Bribes Here."

Trump, as titular leader of the Republican Party, has showcased the hotel as a destination of choice for GOP loyalists.

In July, about 300 Republican donors, paying $35,000 apiece, gathered at the hotel for a fundraiser headlined by the president. The event raised an

estimated $10 million for Trump's campaign, the Republican National Committee and other GOP groups, according to news reports at the time.

Money also has poured in from other Republican political committees that have chosen the Trump hotel as a venue for receptions. The hotel has hosted events for Reps. Dana Rohrabacher (R-Calif.) ✪ , Bill Shuster (R-Pa.) ✪ and nine other Republican members of Congress, according to campaign spending disclosures.

No one has yet calculated how much taxpayer money is being spent at the hotel. A Texas newspaper is seeking records of state expenditures at the hotel. In Maine, the Portland Press Herald dug into Republican Gov. Paul LePage's spending at the hotel when in Washington for White House meetings. LePage's spokesman defended the expenditures, telling the newspaper that the governor was meeting with federal officials "in an effort to benefit the Maine people."



The Trump International Hotel, Washington's newest luxury hotel, has quickly become a kind of White House annex. (Linda Davidson/The Washington Post)

Business from foreign customers is brisk, the hotel says, but as an ethical precaution, it says it does not market directly to foreign embassies. Under an agreement signed by Trump, the hotel has promised to donate any profits made from foreign governments to the U.S. Treasury. An obscure constitutional provision known as the emoluments clause prohibits the president from profiting from foreign governments without specific approval from Congress.

But groups with foreign interests have found that the location helps attract Washington star power. In May, a pair of business groups promoting Turkish American relations staged their annual convention at the Trump hotel during a tense moment between the countries.

The Turkish ambassador was there, and a high-ranking State Department official offered his thoughts on a violent protest that led to arrests at the ambassador's residence in Washington. Trump confidant Newt Gingrich ➕ stressed the importance of smooth relations in a keynote luncheon speech.

At the convention's end, 190 guests feasted on a three-course dinner at $95 per person, with the bill paid by the event sponsors, according to a billing obtained by The Post. Breakfast, dinner and drinks on May 23 alone ran to more than $30,000, including a "Banquet Event Service Charge" of 24 percent and eight gallons of Trump Signature Segafredo Zanetti Coffee, internal documents show.

---

# 'It's doing well'

A high-end renovation of the historic Old Post Office Pavilion, the 263-room hotel has become a symbol of the tangled ethical questions posed by Trump's presidency. The Trump Organization, then headed by the billionaire New York developer, leased the property from the General Services Administration in 2013 and pays the federal agency $250,000 in rent each month.

Since Trump's election, his critics have charged that anyone seeking favor from the White House has an incentive to stay in posh rooms that can be booked on the Internet for $400 per night or more. One of Washington's most expensive hotels, the Trump International brought in $19.7 million between its opening last fall and mid-April, according to Trump's most recent financial disclosure. Some hotel industry experts say that number is higher than expected, and senior analyst Michael Bellisario of Robert W. Baird and Co. said, "Anecdotally, it's doing well because people are staying there when they come to visit the White House."

Trump tried to address ethical concerns by turning over the hotel's management to his two eldest sons and vowing to take no hotel profits during his tenure. But he retained his ownership interest, allowing him to eventually profit from the holdings.



The Trump International Hotel inside the federally owned Old Post Office building in downtown D.C. has been mired in controversy even before opening its doors.
(Claritza Jimenez, Osman Malik, Jonathan O'Connell/The Washington Post)

The arrangement did little to quell controversy. Early this year, lobbying reports revealed that some veterans groups had been brought in to lobby Congress against a law allowing victims of the Sept. 11, 2001, attacks to sue Saudi Arabia. The veterans groups ran up $270,000 in hotel charges, including about $190,000 for rooms, $78,000 for catering and $1,600 for parking, the filings showed.

The bill was ultimately paid by the Kingdom of Saudi Arabia, leading to criticism as Trump embarked three months later to Saudi Arabia on his first international trip. The White House did not respond to questions. The Saudi embassy did not respond to requests for comment.

The Trump hotel has faced lawsuits since its opening. The most recent ones filed by two state attorneys general, members of Congress and competing

Washington convention businesses contend that Trump is violating the emoluments clause.

Trump's donation to the U.S. Treasury is aimed for the end of the year, and Tang said the hotel keeps a separate ledger to record any payments from foreign governments.

But Trump critics such as Del. Eleanor Holmes Norton ⊕ (D-D.C.), who worked with Ivanka Trump on the original development plans for the hotel, argue that the novel legal questions posed by the emoluments lawsuits will eventually force the president to give up ownership.

"I can't believe that there's any court that will say the emoluments clause does not apply here, notwithstanding that it has never been tried in court before," Norton said.



The president's supporters get a chance to rub elbows with White House officials against an American flag backdrop at the hotel's Benjamin Bar, where a signature concoction of winter

whose broad, gray-and-cream goldleafed arrival hall was once a Treasury building's courtyard.

---

# A Republican respite

For Trump supporters, the hotel offers a safe space in an overwhelmingly Democratic city. For Republican lobbyists, conservative groups and foreign entities, including many that do not typically enjoy White House access, it has become a frequent stop.

The hotel's visibility also has made it a central target for activists representing immigrants, climate science and labor groups who aren't always successful on Capitol Hill but can sometimes make the evening news protesting at the hotel.

In May, Trump's son Eric ⊕ and his wife, Lara, stopped by while in town for a golf tournament at Trump's Virginia course. Spicer ⊕, who promoted the hotel as "absolutely stunning" after Trump was elected, ate alone near the bar.

Lobbying groups and foreign entities held galas in the 13,200-square-foot Presidential Ballroom designed by daughter Ivanka to offer larger event space than any other luxury hotel in the city.



**Other luxury hotels in D.C.**

Source: The hotels, District of Columbia Geographic Information Services

The Benjamin Bar, named for Benjamin Franklin, served as a nightly resting spot for White House visitors and a green room for Trump surrogates on their way to or from media hits.

Lewandowski ⊕ , the former campaign strategist, rolled through once a week or more. On the day Robert S. Mueller III was appointed special counsel to investigate possible coordination between the Trump campaign and Russian officials, Lewandowski — shortly after denying on Tucker Carlson's Fox News show that he saw anyone on the campaign have conversations with a foreign government — showed up to pace the marble-floored lobby. Weeks later, he sat and had beers with New York Times Magazine reporter Mark Leibovich ⊕ .

Sen. Rand Paul (R-Ky.) ⊕ had dinner with his wife. David Clarke ⊕ , the Milwaukee sheriff who was then reportedly under consideration for a homeland security job, hung out at the bar in camo shorts. The Trump family's event planner, Lynne Patton ⊕ , now a senior official in the Department of Housing and Urban Development, posted a video online from the hotel lobby in which she and friends pitched Ivanka Trump's new book.

One Friday evening in May, a group of Russian clerics arrived in the long, black flowing robes and beards of the Eastern Orthodox church for closing ceremonies of the World Summit in Defense of Persecuted Christians, in partnership with the Rev. Franklin Graham and his evangelical organization, the Billy Graham Evangelistic Association. More than 800 people from 130 countries and territories attended.

A spokesman for Graham said the choice to use the Trump hotel "was based on space and availability." He said Graham "isn't aware of any facts that would give him concern at this point" regarding Trump's continued property ownership.

The Turkish event May 21 to 23 was booked before the election, according
to organizers, but came as the government of Turkey stepped up its
presence in Washington, hiring a Florida-based Trump fundraiser,
Brian Ballard ⊕ , as a lobbyist with a $1.5 million initial contract, according
to public filings.

The event was co-chaired by a group headed by K. Ekim Alptekin ⊕ ,
founder of a company that paid retired Lt. Gen. Michael Flynn for lobbying
work that may have benefited the Turkish government. The former Trump
national security adviser is now under investigation by the Pentagon and
congressional committees regarding his relationships with foreign
governments.

Alptekin surprised ballroom guests during the first morning session by
directly addressing the hiring of Flynn's company to "help me understand
where the Turkish American relationship is going and what the obstacles to
the relationship are."

An Italian medical foundation hosted cancer doctors from the University of
Texas MD Anderson Cancer Center and the University Medical Center in
Hamburg from May 11 to 13. The program omitted mention of Trump,
listing the location as "Congress Center — Old Post Office Building."

A spokesman for the German university said it played no role in selecting
the location, and the foundation, Fondazione Internazionale Menarini, did
not respond to a request for comment.

The PenFed Foundation held its 800-person charity gala at the hotel to
benefit veterans, and president Tamara Darvish said the hotel choice was
not political. "We are there to help veterans," she said.

Consulting giant Deloitte did not respond to questions about its decision to
use the hotel for a June 8 event that attracted hundreds of banking leaders

as Congress discussed whether Dodd-Frank financial regulations should be rolled back.



Mickael Damelincourt, the Trump International Hotel managing director, talks with a staff member at the valet entrance of the renovated Old Post Office Pavilion. (Linda Davidson/The Washington Post)

Meanwhile, the ties between the hotel and the White House have only strengthened. First lady Melania Trump chose the hotel's director of rooms as White House usher, adding to a former caddie, hotel spokeswoman and bodyguard from Trump's business who have all found positions in the White House.

Trump has yet to name a new GSA administrator, who will oversee his company's lease. And congressional Democrats, led by

Rep. Peter A. DeFazio (D-Ore.) ✚ , have accused the GSA of withholding

documents about the Trump lease arrangements from the committee overseeing the agency.

Anti-Trump protesters continue to use the venue to speak out on the president's policies. It is not unusual for the hotel to suspend service at its European-style sidewalk cafe and move guests inside.

One evening, hotel staff guided guests inside just in time to miss a man in a wheelchair rolling down the street out front giving the hotel the middle finger as part of a demonstration for disabled rights.

"It's such a symbol of Trump and his excesses," said Donna Norton of MomsRising, a liberal network with more than 1 million members who led about 100 people on a march to the hotel in May.

She said when her protest group arrived, the hotel staff was very polite in turning them away.

"I think they're getting used to it," she said.

---

### About this story

Unlike money spent lobbying the government or supporting a political campaign, there is no public record of who books business at Trump's D.C. hotel. Since his election, information has come out in dribs and drabs. So the Post made its own log – as best it could – by sending a reporter to the hotel every day for the month of May to try to identify the people and organizations patronizing his property.

Post staffers Amy Brittain, Shawn Boburg, Aaron Davis, Karoun Demirjian, Kayla Epstein, Matea Gold, Tom Hamburger, Drew Harwell, Abigail Hauslohner, Emily Heil, Rosalind S. Helderman, Jenna Johnson, Mary Jordan, Michelle Ye Hee Lee, Danielle Paquette, Abby Phillip, Jenna Portnoy, Steven Rich and Perry Stein contributed to this report.

Graphics by Darla Cameron and Aaron Steckelberg. Video by Claritza Jimenez, Osman Malik and Jonathan O'Connell. Design and development by Courtney Kan.

# The Washington Post

**Politics**

# Trump D.C. hotel turns $2 million profit in four months

By **Jonathan O'Connell**   August 10

Donald Trump's company turned a $1.97 million profit at its opulent Trump International Hotel so far in 2017, dramatically beating its expectations and giving the first hard numbers to critics who charge that Trump is profiting from his presidency.

The Trump Organization had projected that it would lose $2.1 million during the first four months of 2017 as it established a new hotel and convention business in the nation's capital, according to newly released federal documents.

Instead the hotel, with its namesake in the White House down the street, is already turning a hefty profit and charging more for its rooms than most or all of the city's other hotels.

The $4.1 million swing from projected losses to profitability represents a 192 percent improvement over what the Trump family planned to make when the company opened the hotel in the fall.

Driving the profits are the extraordinary prices guests have been willing to pay for rooms, including members of Trump's Cabinet who have stayed or lived there, as well as big spending on food and beverages in the meeting areas, bar and restaurant — spots frequented by members of Trump's inner circle and other Republican leaders.

This year, guests have paid an average of $652.98 a night to stay there, beating the company's expectations by 57 percent, according to documents posted online recently by the General Services Administration.

That probably makes it the most expensive hotel in the city, according to industry experts, as guests at competing luxury hotels such as the Hay-Adams, Four Seasons and Willard paid an average of $495 a night, according to data from STR.

Since Trump entered the White House in January, the hotel has emerged as a Republican Party power center and popular destination for conservative, foreign and Christian groups holding meetings in Washington, earning Trump's company $19.7 million through April 15, according to his financial disclosure with the government.

Government ethics experts and Democrats in Congress have railed against the government's lease, with Rep. Peter A. DeFazio (D-Ore.) calling it a "highly unethical arrangement."

"What makes all of this particularly galling is that we now have the unprecedented situation where the President of the United States is both the landlord and tenant of a federal building," he said in a July statement.

Upon taking office, Trump tried to address ethical concerns by turning over the hotel's management to his two eldest sons and vowing to take no hotel profits during his tenure. But he retained his ownership interest, allowing him to eventually profit from the holdings, against the advice of the government's top ethics official.

Government watchdog groups, competing businesses and state attorneys general have sued over what they call unfair business practices that allow Trump to use the presidency to enrich himself — a tension likely to be heightened by the hotel's almost immediate profitability.

Of his 202 days in office, Trump has spent 65 days at his properties, most of them at his golf properties. He has twice been to the Pennsylvania Avenue hotel to have dinner, appearances that critics say amount to promotional displays.

But although there has been evidence of revenue slipping at Trump golf courses, his D.C. hotel is already able to charge more than most — if not all — other hotels in the capital.

"The Trump International is, if not the, then one of the top rate-getters in the city," said Marc Magazine, an executive at the real estate firm Savills Studley.

Trump International visitors have spent $8.2 million on food and drinks so far at the hotel this year, beating expectations by 37.2 percent. Those gains easily outweighed underperformance by the hotel's retail, parking and Spa by Ivanka Trump, which all failed to meet the company's expectations.

Ivanka Trump, the president's daughter, led the development of the project as a Trump Organization executive before resigning to join the White House. She also retained her stake in the hotel and reported $2.4 million in hotel-related revenue from its opening to June.

The hotel's management has sought to capitalize on the president's popularity in the GOP by marketing meeting space and rooms to Republicans and conservatives.

"We are very proud of the success of the project," the president's son Eric Trump, who took over the company with his brother Don Jr., said in an email.

The data does not show how much of the hotel's profits come from foreign governments, money the hotel has promised to donate to the U.S. treasury at the end of the year to avoid violating the Constitution's emoluments clause, which prohibits the president from profiting from foreign governments without specific approval from Congress.

The Trump International's performance to date comes despite the fact that its rooms are more often empty than its competitors', meaning there is room to grow its profits. It posted an occupancy rate of 42.3 percent, compared with nearly 70

percent in the industry.

Management is charging so much, however, that the hotel is doing just fine.

"Basically, this hotel is getting three times the average rate," said analyst Michael Bellisario of Robert W. Baird & Co. "So some people really want to stay there, and then there's a bunch of people who don't."

 343 Comments

Jonathan O'Connell covers economic development with a focus on commercial real estate and the Trump Organization. He joined the Post in 2010. 🐦 Follow @OConnellPostBiz

# THE NEW YORKER

NEWS DESK

# WALTER SHAUB'S BRAVE, QUIXOTIC ETHICS BATTLE WITH TRUMP

**By Sheelah Kolhatkar**   July 7, 2017



*The government's top ethics officer has tried to appeal to the President to eliminate his conflicts of interest—and set a better example.*

Photograph by T.J. Kirkpatrick / NYT / Redux

Ever since Donald Trump was elected President of the United States and declared, shortly afterward, "The law's totally on my side, the President can't have a conflict of interest," the hopes of those concerned about government integrity have resided largely in one man: Walter Shaub, the head of the Office of Government Ethics. Although Shaub's term was set to end in January, 2018, the announcement this week

that he is departing his post five months early was greeted with concern by ethics watchers. In their view, Shaub and people like him are urgently needed.

"Public service is a public trust," Shaub wrote in his resignation letter, one requiring "employees to place loyalty to the Constitution, the laws and ethical principles above private gain."

One of the gravest concerns that has weighed on ethics watchers over the last six months is the disquieting sense that Trump and his family are using his time in the White House to enrich themselves, a fear which Trump has done little to assuage. As of July 4th, the President had visited a Trump-branded property forty-nine out of his hundred and thirty-three days in office, according to the Washington *Post*, providing a running product placement for his Presidency, while a lawsuit filed by the attorneys general of Maryland and D.C. asserts that the Trump International Hotel in Washington has "specifically marketed itself to the diplomatic community" since the Presidential election. The suit also mentioned the troubling implications of Trump-branded real-estate projects that are proceeding in the United Arab Emirates and Indonesia. In an interview on CBS News on Thursday evening, Shaub clarified some of his thoughts. "I can't know what their intention is," he said of the Trumps. "I know that the effect is that there's an appearance that the businesses are profiting from his occupying the Presidency. And appearance matters as much as reality. So, even aside from whether or not that's actually happening, we need to send a message to the world that the United States is gonna have the gold standard for an ethics program in government, which is what we've always had."

He also said, "I really feel like I've achieved all I can achieve under the current circumstances."

In the past, the Office of Government Ethics was a quiet, not terribly exciting place whose director's name was rarely known among the public; under Trump, the office was transformed into a place of urgency. Shaub has served as the only independent voice inside the government, monitoring the many conflicts of interest that surround Trump, and as a regular source of pressure and publicity around the Administration's many ethics violations. He has shown through his actions that he regards his role as that of a guardian of the public interest in the purest sense. Most recently, Shaub criticized the Administration's attempt to keep secret its decision to grant dozens of waivers that

allowed government officials to circumvent the Administration's own ethics rules. When, under pressure from Shaub, the waivers were made public, Shaub was quick to point out that some waivers had been, essentially, backdated to the beginning of Trump's Presidency and might not even be valid. "If you need a retroactive waiver, you have violated a rule," he told the *Times*.

His most powerful public comments came after Trump decided that he would break with Presidential precedent and retain full ownership of his real-estate and branding companies while in office. Previous Presidents have divested themselves of their business interests or put their assets in a blind trust, managed by a third party, over which they had no control. The President pledged to place his ownership interest in a trust and hand the day-to-day operational-management duties over to his sons, which, Shaub noted, assuredly and publicly, was largely a cosmetic decision. "This is not a blind trust," he said at the time. "Not even close."

Shaub also took issue with Trump's claim that he couldn't sell his business, which most ethics experts said would come closest to resolving his conflicts, because it would be complicated to try to sell off a company based on his own brand and he might lose money in the process. As President, there are many policies Trump is involved in that could materially affect his company—rewriting the tax code; changing environmental or trade rules; developing relationships with countries in which the Trump Organization manages or licenses properties, or hopes to in the future. Continuing to collect revenue from the Trump Organization while making decisions as President that could affect the company would have an irreparable, cheapening effect on the office of the President: "We can't risk creating the perception that government leaders would use their official positions for profit," Shaub said.

After leaving his post at the O.G.E., Shaub will join the Campaign Legal Center, a nonpartisan organization based in Washington, D.C., as the director of its ethics program. According to Lawrence Noble, the Center's general counsel, Shaub learned about the job opening only recently. "When the opportunity came for us to hire Walt, we couldn't pass it up," Noble said. He added that, to the best of his knowledge, Shaub "was under no outside pressure" to leave the O.G.E. before his term ended, and Shaub told the Washington *Post* much the same.

VIDEO FROM THE NEW YORKER

In his new role, Shaub will be helping the Center to expand its ethics program, strengthen its watchdog role, and help design potential fortifications to the ethics rules, which have been "stress-tested" under President Trump, as Noble put it. He added that Trump had exposed many weaknesses in ethics laws. With Shaub's help, his organization will be looking at ways to strengthen and update conflict-of-interest rules for the President specifically, as well as ways to potentially give more power to the O.G.E., which, currently, can only offer advice and suggestions and has no enforcement role.

Shaub made the best use of his advisory role as he could. As my colleague Ryan Lizza described, after Trump revealed his plan for keeping his business assets, Shaub gave a speech at the Brookings Institution in which he tried to appeal to the President to set a better example. "It's important to understand that the President is now entering the world of public service," Shaub said in that speech. "He's going to be asking his own appointees to make sacrifices. He's going to be asking our men and women in uniform to risk their lives in conflicts around the world. So, no, I don't think divestiture is too high a price to pay to be the President of the United States of America."

If there is one thing to worry about surrounding Shaub's departure from government, it is whether the next head of the Office of Government Ethics will use his or her position in the same fashion in the future. "I hope he selects someone who is dedicated to the mission of the office, but we'll see," Noble said. "I am waiting to see what he does, anxiously."



*Sheelah Kolhatkar joined The New Yorker as a staff writer in 2016. She is the author of "Black Edge: Inside Information, Dirty Money and the Quest to Bring Down the Most Wanted Man on Wall Street."* *Read more »*

CONDÉ NAST

© 2017 Condé Nast. All rights reserved. Use of this site constitutes acceptance of our **user agreement** (effective 1/2/2016) and **privacy policy** (effective 1/2/2016). **Your California privacy rights**. The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with prior written permission of Condé Nast. *The New Yorker* may earn a portion of sales from products and services that are purchased through links on our site as part of our affiliate partnerships with retailers.



# TRUMP

Donation of Profits
from Foreign
Government Patronage

OVERVIEW ................................................................................................................................ 2

POLICY SCOPE ......................................................................................................................... 3

IDENTIFICATION OF FOREIGN GOVERNMENT PATRONAGE ........................................................ 4

CALCULATION OF PROFIT ........................................................................................................ 6

DONATIONS TO US TREASURY ................................................................................................. 8

**TABLE OF CONTENTS**

*1*

# OVERVIEW

The purpose of this policy is to define the procedure and application of The Trump Organization's (the "**Company"**) voluntary directive to donate all profits from foreign governments' patronage at our hotels and similar businesses during President Trump's presidential term to the U.S. Treasury.

We acknowledge that it is not customary in the hospitality industry to identify and calculate profits from a particular customer group. Therefore, this policy has been designed for our hotels and similar businesses to rely on known and identifiable source data and documentation to quantify amounts and profit calculations.

Regarding the calculation of profit, consistent with the hospitality industry, our hotels follow the accounting and financial reporting guidance provided for in the Uniform System of Accounts for the Lodging Industry, Eleventh Revised Edition (**"USALI"**). The USALI provides a format of operating statement which calculates and defines net income (**"Profit"**) as operating revenue less all expenses in connection with the business.



# POLICY SCOPE

Our portfolio of hotels and similar businesses (the **"Properties"**) consists of both (1) wholly-owned hotels, resorts and clubs, and (2) managed hotels and condominium-hotels. The scope of this policy is applicable to:

(1)   Profit generated from foreign governments' patronage from wholly-owned Properties and;

(2)   Profit generated from management fees earned from managed hotels and condominium-hotels attributed to foreign governments' patronage.

The policy is <u>not</u> applicable to profits earned by and attributed to the owners of condominium-hotel units located in the Company's managed condominium-hotel properties, as those profits belong to the individual condominium-units owners.

*3*





# IDENTIFICATION OF FOREIGN GOVERNMENT PATRONAGE

In the normal course of operating hotels, revenue is generated from the sale of overnight guestroom stays, food and beverage, conference and banquet services, spa services, retail sales, recreation activities and other ancillary services.  Consistent with the hotel industry, we may accept patronage from not only registered guests and contracted groups staying at our Properties, but also transient, walk-in customers (for example, restaurant patrons).

To fully and completely identify all patronage at our Properties by customer type is impractical in the service industry and putting forth a policy that requires all guests to identify themselves would impede upon personal privacy and diminish the guest experience of our brand. It is not the intention nor design of this policy for our Properties to attempt to identify individual travelers who have not specifically identified themselves as being a representative of a foreign government entity on foreign government business.

4

It is the intention of this policy for our Properties to make commercially reasonable efforts using the three sources noted below to determine when a Property has received revenue from an entity that represents a foreign government on foreign government business (**"Foreign Government Revenues"**).

To practically track and identify Foreign Government Revenues received from customers representing a foreign government, our Properties shall utilize the following sources:

1.  **All direct billings from the Property to a foreign government;**
2.  **All contracted group, banquet and catering business with the Property from a foreign government; and**
3.  **All payments received by the Property via check or electronic payment (i.e., bank wire transfer) from a reasonably  identifiable foreign government entity.**

This policy defines **"foreign government entity"** to mean a (i) department or agency of a foreign government, (ii) a foreign embassy, (iii) a foreign political party, (iv) members of a royal family, or (v) a sovereign wealth fund.  We recognize that foreign governments can be organized in very different ways.  Some may operate through state-owned and state-controlled entities in industries such as aerospace and defense, banking, finance, healthcare, energy and others, which may not be reasonably identifiable as foreign government entities, and therefore may not be included in our calculation of profit to be donated.

Our Properties shall identify and provide a separate accounting for all revenues received from foreign governments' patronage on a regular basis. The accumulated total amount of revenues identified shall be aggregated on an annual basis and used for the calculation of profit attributed from that patronage, as defined below.







# CALCULATION OF PROFIT

## WHOLLY-OWNED PROPERTIES

In summary, the USALI calculation of Profit is defined as total operating revenue ("Revenue") less (1) total departmental expenses, (2) total undistributed expenses and (3) total non-operating expenses.

As our Properties generate various revenue streams from sales of product offerings with different revenue pricing and cost structures, our most relevant measure of Profit is the Revenue received by the Property less the costs required to provide such Revenue. To attempt to individually track and distinctly attribute certain business-related costs as specifically identifiable to a particular customer group is not practical, nor would it even be possible without an inordinate amount of time, resources and specialists, which would still be subject to some measure of estimation and cost allocation methodology.

As such, the most reasonable and effective way to measure Profit from a particular customer base is to apply an overall Property Profit calculation on a pro-rata basis to the revenue generated from that customer base.  It is our policy therefore to calculate Profit from foreign governments' patronage in this manner. An example of this methodology is summarized below for illustrative purposes only:

**Example:**  A wholly-owned hotel generated on an annual basis $10,000,000 in Revenue, of which $500,000 (5%) was identified as Foreign Government Revenue.  The hotel's total annual department expenses are $7,500,000 and annual non-operating expenses are $1,000,000.  Annual net income (Profit) for this hotel is $1,500,000.

1. In this example, the hotel's gross operating profit as defined by USALI is $2,500,000, or 25% of Revenue.  The hotel applies the same 25% gross operating percentage margin to the $500,000 of Foreign Government Revenue to determine its gross operating profit on the Foreign Government  Revenue to be $125,000 ($500,000 x 25%).
2. The hotel then applies a 5% (based on the % of Foreign Government Revenue) allocation to the non-operating business expenses, which calculation is $50,000 ($1,000,000 x 5%).
3. The hotel profit therefore attributed to being from foreign government patronage (**"Foreign Government Profit"**) is $75,000 in this example.  This is calculated as gross operating profit amount of $125,000, less the $50,000 amount of non-operating expenses for a net Foreign Government Profit of $75,000.

Foreign Government Profit shall be tabulated for each wholly-owned Property on an Annual basis.

## MANAGED HOTELS

For our managed Hotels, the Company, through its management agreements, may earn management and similar fees which may be based on a percentage of Property revenue or a fixed fee amount.  For such fees where the fee is based on percentage of revenue or operating performance, the Company will attribute a percentage of the management fee based on a percentage of Foreign Government Percentage amount over total revenues. This percentage of the management fee, less the Company's associated corporate overhead expenses to administer the management services, shall be deemed as Profit from management fees attributed to foreign governments' patronage.



# DONATIONS TO U.S. TREASURY

On an annual basis, and after the completion of our fiscal year, the Company's wholly-owned Properties shall send their Foreign Government Profit to a master Company bank account for aggregation. Also on an annual basis, and after the completion of the Company's fiscal year, the Company shall send to the same master Company bank account its accumulation of Profit from management fees that is deemed attributed from foreign governments' patronage.  The Company shall then make its annual donation of Profit from foreign governments' patronage to the U.S. Treasury in one lump sum payment from this master account representing its voluntary donation in accordance with this policy.



*8*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> *Defendant*. | No. 17-cv-1154-EGS |

**STATEMENT OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................4

ARGUMENT ..........................................................................................................5

I.     THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIM ........................5

       A.     Plaintiffs Have Failed to Allege a Judicially Cognizable Injury Under Supreme Court and D.C. Circuit Precedent ............................................6

       B.     *Coleman v. Miller* and pre-*Raines* D.C. Circuit Precedent are Inapposite ...........10

II.    PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE FOREIGN EMOLUMENTS CLAUSE AND EQUITY REQUIRES DISMISSAL ..........................14

III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE FOREIGN EMOLUMENTS CLAUSE ..................................................................................18

       A.     The Foreign Emoluments Clause Prohibits Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment ................18

            1.     The text of the Foreign Emoluments Clause...............................................19

            2.     Adoption and historical interpretation of the Clause ...............................25

                  i.     Adoption of the Foreign Emoluments Clause...............................25

                  ii.    Historical interpretation of the Clause ...........................................28

            3.     Application of the Clause since the Founding Era....................................32

       B.     Plaintiffs' Arguments in Support of Their Interpretation Have No Merit ...........37

IV.   THE RELIEF SOUGHT BY PLAINTIFFS IS UNCONSTITUTIONAL ........................41

CONCLUSION....................................................................................................43

i

# TABLE OF AUTHORITIES

**CASES**                                                                                 **PAGE(S)**

*Air Courier Conf. of Am. v. Am. Postal Workers Union*,
  498 U.S. 517 (1991)................................................................................ 16

*Allen v. Wright*,
  468 U.S. 737 (1984).................................................................................. 7

*American Federation of Government Employees v. Pierce*,
  697 F.2d 303 (D.C. Cir. 1982)................................................................. 12

*Arizona State Legislature v. Arizona Independent Redistricting Commission*,
  135 S. Ct. 2652 (2015)............................................................................ 12

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015)................................................................ 14, 15, 23

*Beecham v. United States*,
  511 U.S. 368 (1994)................................................................................ 21

*Campbell v. Clinton*,
  203 F.3d 19 (D.C. Cir. 2000)...................................................... 2, 11, 12

*Chenoweth v. Clinton*,
  181 F.3d 112 (D.C. Cir. 1999)................................................ 2, 9, 10, 13

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).................................................................................. 6

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987)................................................................................ 17

*Clinton v. Jones*,
  520 U.S. 681 (1997)................................................................................ 43

*Coleman v. Miller*,
  307 U.S. 433 (1939)................................................................................ 10

*Ctr. for Reprod. Law & Policy v. Bush*,
  304 F.3d 183 (2d Cir. 2002).................................................................... 16

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006).................................................................................. 6

*Dole v. United Steelworkers of Am.*,
　494 U.S. 26 (1990) ............................................................................................... 21

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
　565 U.S. 606 (2012) ............................................................................................. 16

*E. Tenn. Nat. Gas Co. v. Sage*,
　361 F.3d 808 (4th Cir. 2004) .............................................................................. 16

*eBay, Inc. v. MercExchange, LLC*,
　547 U.S. 388 (2006) ............................................................................................. 15

*EEOC v. St. Francis Xavier Parochial Sch.*,
　117 F.3d 621 (D.C. Cir. 1997) .............................................................................. 4

*Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*,
　153 F. Supp. 3d 338 (D.D.C. 2016) ................................................................. 5, 6

*Flast v. Cohen*,
　392 U.S. 83 (1968) ................................................................................................. 7

*Franklin v. Massachusetts*,
　505 U.S. 788 (1992) ............................................................................... 4, 41, 42, 43

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
　561 U.S. 477 (1992) ............................................................................................. 15

*Goldwater v. Carter*,
　444 U.S. 996 (1979) ....................................................................................... 11, 14

*Goldwater v. Carter*,
　617 F.2d 697 (D.C. Cir. 1979) ............................................................................ 14

*Haase v. Sessions*,
　835 F.2d 902 (D.C. Cir. 1987) .............................................................................. 5

*Harrington v. Bush*,
　553 F.2d 190 (D.C. Cir. 1977) ............................................................................ 12

*Holmes v. Jennison*,
　39 U.S. 540 (1840) ............................................................................................... 24

*Hoyt v. United States*,
　51 U.S. 109 (1850) ............................................................................................... 19

*INS v. Chadha*,
  462 U.S. 919 (1983) ........................................................................................... 9

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 557 (4th Cir. 2017), *cert. granted,* 137 S. Ct. 2080 (2017) ...................... 42

*Jarecki v. G.D. Searle & Co.*,
  367 U.S. 303 (1961) ........................................................................................... 23

*Jerome Stevens Pharm., Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) ........................................................................... 6

*Loving v. United States*,
  517 U.S. 748 (1996) ...................................................................................... 4, 43

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 6, 7

*Marbury v. Madison*,
  5 U.S. 137 (1803) ............................................................................................. 24

*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004) ........................................................................... 15

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ........................................................................................... 18

*McLean v. United States*,
  226 U.S. 374 (1912) ......................................................................................... 20

*Mich. Corr. Org. v. Mich. Dep't of Corr.*,
  774 F.3d 895 (6th Cir. 2014) ......................................................................... 14, 15

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ....................................................................................... 3, 41

*Mistretta v. United States*,
  488 U.S. 361 (1989) ......................................................................................... 18

*Moore v. U.S. House of Representatives*,
  733 F.2d 946 (D.C. Cir. 1984) ....................................................................... 2, 13

*Morrison v. Work*,
  266 U.S. 481 (1925) ......................................................................................... 15

*Nev. Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) ............................................................................... 8

*Newdow v. Roberts*,
603 F.3d 1002 (D.C. Cir. 2010) .......................................................... 42

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ............................................................................. 42

*Nixon v. United States*,
506 U.S. 224 (1993) ............................................................................. 23

*NLRB v. Noel Canning*,
134 S. Ct. 2550 (2014) ........................................................................ 18

*Raines v. Byrd*,
521 U.S. 811 (1997) ..................................................................... *passim*

*Rodriguez v. United States*,
480 U.S. 522 (1987) ............................................................................. 38

*Sanchez-Espinoza v. Reagan*,
770 F.2d 202 (D.C. Cir. 1985) ........................................................... 15

*Schlesinger v. Reservists Comm. to Stop the War*,
418 U.S. 208 (1974) ............................................................................... 8

*Schmidt v. U.S. Capitol Police Bd.*,
826 F. Supp. 2d 59 (D.D.C. 2011) ....................................................... 6

*Small v. United States*,
544 U.S. 385 (2005) ............................................................................. 38

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) .................................................................... 6, 8

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ........................................................... 42

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
484 U.S. 365 (1988) ............................................................................. 23

*United States v. Ballin*,
144 U.S. 1 (1892) ................................................................................. 17

*United States v. Hartwell,*
    73 U.S. 385 (1867) .................................................................................................. 19

*United States v. Hill,*
    120 U.S. 169 (1889) ................................................................................................ 20

*United States v. Palmer,*
    16 U.S. 610 (1818) .................................................................................................. 38

*United States v. Ripley*,
    32 U.S. 18 (1833) .................................................................................................... 19

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................................................ 23

*United States v. Windsor*,
    133 S. Ct. 2675 (2013) .............................................................................................. 8

*Va. Office for Prot. & Advocacy v. Stewart,*
    563 U.S. 247 (2011) ................................................................................................ 16

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ........................................................................................... 7, 16

*Virginia v. Tennessee,*
    148 U.S. 503 (1893) ................................................................................................ 23

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................................ 16

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ................................................................................................ 15

*Williams* v. Taylor,
    529 U.S. 362 (2000) ................................................................................................ 24

**STATUTES**

5 U.S.C. § 115 ............................................................................................................... 34

5 U.S.C. § 7341 ............................................................................................................. 34

5 U.S.C. § 7342 ............................................................................................................. 34

10 U.S.C. § 1060 ........................................................................................................... 37

22 U.S.C. § 3641 ................................................................................................................ 37

37 U.S.C. § 908 .................................................................................................................. 37

1 Stat. 130 (1790) .............................................................................................................. 30

Pub. L. No. 97-295, 96 Stat. 1287 (1982) ...................................................................... 37

Pub. L. No. 89-554, § 7341, 80 Stat. 378, 526–27 (1966) ............................................ 34

An act authorizing the persons therein named to accept of certain decorations and
    presents therein named, from foreign governments, and for other purposes,
    ch. 32, § 3, 21 Stat. 603 (1881) .................................................................................. 33

An Act for allowing a Compensation to the President and Vice President of the United States,
    1 Stat. 72 (1789) ......................................................................................................... 20

National Defense Authorization Act for Fiscal Year 1994,
    Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834 ................................................. 37

Panama Canal Commission Authorization Act for Fiscal Year 1994,
    Pub. L. No. 103-160, tit. XXXV, § 3504, 107 Stat. 1547, 1965 (1993) ................... 37

Thirty-Day Embargo,
    1 Stat. 400 (1794) ....................................................................................................... 29

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6, cl. 2 ............................................................................................. 22

U.S. Const. art. I, § 9, cl. 8 ....................................................................................... 1, 17, 18

U.S. Const. art. I, § 10, cl. 3 ........................................................................................... 23

U.S. Const. art. II, § 1, cl. 7 ...................................................................................... 21, 30

## FEDERAL RULES OF CIVIL PROCEDURE

Rule 12(b)(1) ................................................................................................................ 5, 6

Rule 12(b)(6) .................................................................................................................... 6

## CONGRESSIONAL MATERIALS

1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802)
  https://memory.loc.gov/ammem/amlaw/lwsplink.html ............................................................. 19

2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818)
  https://memory.loc.gov/ammem/amlaw/lwsplink.html ............................................................. 32

8 Annals of Cong. 1582–93 (1798)................................................................................................. 33

20 Annals of Cong. 672 (1810)..................................................................................................... 32

21 Annals of Cong. 2050–51 (1810) ............................................................................................. 32

159 Cong. Rec. S5,116-22 (daily ed. June 25, 2013) ................................................................. 40

*Confirmation of Nelson A. Rockefeller as Vice President of the United States*,
  H.R. Rep. No. 93-1609 (1974)................................................................................................ 39

H.R. Rep. No. 23-302 (1834)....................................................................................................... 33

H.R.J. Res. 26, 115th Cong. (2017) ............................................................................................. 1

*Nomination of Nelson A. Rockefeller of New York to be Vice President of the United States*,
  S. Exec. Doc. No. 93-34 (1974)............................................................................................... 39

*Nomination of Penny Pritzker to be Secretary of the U.S. Department of Commerce: Hearing
  Before the S. Comm. on Commerce, Science, and Transportation*,
  Hrg. 113-619, 113th Cong. (2013) .......................................................................................... 40

Proposing an Amendment to the Constitution,
  S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) ............................................................................. 32

S. Con. Res. 8, 115th Cong. (2017) .............................................................................................. 1

S. Exec. Doc. No. 23-49 (1834).................................................................................................... 33

S. Exec. Doc. No. 37-23 (1862) ................................................................................................... 33

## OFFICE OF COMPTROLLER GENERAL OPINIONS

*Assistant Comptroller General Weitzel to the Attorney General*,
  34 Comp. Gen. 331 (1955) ...................................................................................................... 36

*Dr. R. Edward Bellamy, USPHS, Ret.*,
  B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978) .......................................... 35

*Major Stephen M. Hartnett, USMC, Ret.*,
  65 Comp. Gen. 382 (1986) ...................................................................................... 35

*Retired Marine Corps Officers*,
  B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985) ...................................... 35

*The Honorable George J. Mitchell U.S. Senate*,
  B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983) ........................................ 35

*To C.C. Gordon, USCG*,
  44 Comp. Gen. 130 (1964) ...................................................................................... 35

*To Mr. Harvey E. Ward, USCG, Ret.*,
  B-154213, 1964 WL 1865 (Comp. Gen. Dec. 281, 1964) ...................................... 35

*To N.R. Breningstall, Dep't of the Air Force*,
  53 Comp. Gen 753 (1974) ....................................................................................... 35

*To the Secretary of Health, Educaction and Welfare*,
  51 Comp. Gen. 780 (1972) ...................................................................................... 35

*To the Secretary of the Air Force*,
  49 Comp. Gen. 819 (1970) ...................................................................................... 35

## ATTORNEY GENERAL OPINIONS

*Foreign Diplomatic Commission*,
  13 Op. Att'y Gen. 537 (1871) ........................................................................... 34, 35

*Marshal of Florida*,
  6 Op. Att'y Gen. 409 (1854) ............................................................................. 34, 35

## OFFICE OF LEGAL COUNSEL OPINIONS

*Application of the Emoluments Clause of the Constitution and the Foreign Gifts
  and Decorations Act*,
  6 Op. O.L.C. 156 (1982) ......................................................................................... 35

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear
  Regulatory Commission*,
  10 Op. O.L.C. 96 (1986) ......................................................................................... 34

*Applicability of Emoluments Clause Employment of Government Employees by*
   *Foreign Public Universities,*
   18 Op. O.L.C. 13 (1994) ......................................................................... 39

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS,*
   17 Op. O.L.C. 114 (1993) ....................................................................... 36

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from
   J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of*
   *Compensation to Individual in Receipt of Compensation from a Foreign Government*
   (Oct. 4, 1954), https://www.justice.gov/olc/page/file/935721/download ................................ 36

Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant
   Attorney General,
   2010 WL 2516024 (June 3, 2010) ......................................................... 36

*President Reagan's Ability to Receive Retirement Benefits from the State of California,*
   5 Op. O.L.C. 187 (1981). ....................................................................... 35

## HISTORICAL MATERIALS

*A Complete Dictionary of the English Language* (2d ed. 1789) .................................................. 23

1 *A Digest of the International Law of the United States*
   (Francis Wharton ed., 1886) ......................................................................... 25, 32, 33

*A New General English Dictionary* (18th ed. 1754) ....................................................................... 23

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) ........... 20, 22, 25

Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793),
   http://founders.archives.gov/documents/Washington/05-14-02-0074 ...................................... 30

4 *Revolutionary Diplomatic Correspondence of the United States*
   (Francis Wharton ed., 1889) ......................................................................... 26

George Cochrane Hazelton, *The National Capitol* (1894) ......................................................... 30

George Taylor, Arrangements between English and Southern Merchants (June 1790),
   http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003 ................................. 29

James Madison, *The Debates in the Federal Convention of 1787 Which Framed*
   *the Constitution of the United States of America*
   (Gaillard Hunt & James Brown Scott eds., 1920) ....................................................... 25, 27, 31

1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* (1766) ................................ 22

1 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891) .......................................................... 27, 31

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (2d ed. 1891) ............................................. 17, 26, 27, 31

18 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1910) ........................ 26

23 *Journals of the Continental Congress, 1774–1789* (Gaillard Hunt ed., 1914) ........................ 19

30 *Journals of the Continental Congress, 1774–1789* (John C. Fitzpatrick ed., 1934) ................ 27

Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068 ........ 30

Letter from George Washington to Bushrod Washington (July 27, 1789), http://founders.archives.gov/documents/Washington/05-03-02-0189 ..................................... 31

Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790), http://founders.archives.gov/documents/Washington/05-04-02-0363 .............. 31

Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289 .......... 30

Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159 ................................... 29

Letter from George Washington to James Madison (May 5, 1789), http://founders.archives.gov/documents/Washington/05-02-02-0157 ..................................... 31

Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050 ..................................... 29

Letter from George Washington to William Pearce (Apr. 20, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0488 ..................................... 29

Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for the District of Columbia to George Washington (Mar. 23, 1794), https://founders.archives.gov/documents/Washington/05-15-02-0331 ................................... 31

Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111 ..................................... 29

Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790),
   http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003 ................................ 27

President George Washington, Inaugural Address of 1789 (Apr. 30, 1789),
   https://www.archives.gov/exhibits/american_originals/inaugtxt.html .................................... 20

*The Federalist* No. 73 (Jacob E. Cooke ed., 1961)........................................................................ 28

5 *The Papers of James Monroe* (Daniel Preston ed., 2014) ......................................................... 29

Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign
   Governments, ca. 1791,
   http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004 .......................... 26, 27

## SECONDARY AUTHORITIES

Akhil Amar, *America's Unwritten Constitution* (2012) ................................................................ 31

Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* (1991) .................................................. 29

Bruce Chadwick, *James & Dolley Madison* (2014) .................................................................... 29

Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and
   Bibliographic Nightmare*, 88 L. Lib. J. 121 (1996) .................................................................. 32

David O. Stewart, *Madison's Gift* (2015) .................................................................................... 29

6 Douglas Southall Freeman, *George Washington: A Biography* (1954) .................................... 28

Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. &
   Biography 251 (1993) ............................................................................................................... 29

Leonard D. White, *The Federalists: A Study in Administrative History* (1st ed. 1948) ......... 19, 28

Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American
   Government, 1780-1940* (2013) ............................................................................................... 26

Restatement (Third) of the Law Governing Lawyers § 123, cmt. b ............................................ 36

Robert A. Nowlan, *The American Presidents, Washington to Tyler* (2012) ............................... 29

Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National
   Experience*, 32 The Historian 376 (1970)................................................................... 25, 26, 33

Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic Site Historic Resource Study* (Aug. 2000), https://www.nps.gov/chpi/learn/historyculture/ upload/CHPI_HRS.pdf ................................ 28

11 *The Works of Thomas Jefferson* (Paul Leicester Ford ed., 1905) ............................................ 29

**OTHER AUTHORITIES**

Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/ ................................... 39

Black's Law Dictionary (10th ed. 2014) .................................................................................. 22

Donald Trump's News Conference: Full Transcript and Video, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8) ................................................................ 4

Form 10-K of Hyatt Hotels Corporation (2016), *available at* http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/ Hyatt-Q4-2016-Form-10-K.pdf ...................................................................................... 39

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983).......................................... 36

National Park Service, Ash Lawn-Highland, https://www.nps.gov/nr/travel/journey/hig.htm (last visited Sept. 15, 2017).......................... 29

National Park Service, *Historic Jamestown, Tobacco: Colonial Cultivation Methods*, https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-methods.htm (last visited Sept. 15, 2017).................................................................. 29

National Register of Historic Places Registration Form, George Washington's Gristmill, § 8, p. 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/ 029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf.............................. 29

Oxford English Dictionary, Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242............................................................ 22

Oxford English Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/150677................................................................... 25

Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en ............................................ 39

Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov ............................................................................ 40

Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/.......................................................................................................... 39

*Ten Facts about the Gristmill*, George Washington's Mount Vernon, at Fact 9,
   http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill
   (last visited Sept. 15, 2017) ............................................................................................ 29

University of Melbourne, Library Catalog, http://library.unimelb.edu.au/ ................................. 39

University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en ........................................... 39

## INTRODUCTION

Two hundred and one minority Members of the United States Senate and United States House of Representatives bring this suit seeking the extraordinary relief of a declaration and an injunction against the sitting President of the United States for alleged violations of the Foreign Emoluments Clause of the Constitution. That Clause prohibits federal officials holding "Office[s] of Profit or Trust" from "accept[ing] of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without "the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. Many of the Plaintiffs are sponsors of bills seeking either to declare that the President potentially has violated the Clause, *see* S. Con. Res. 8, 115th Cong. (2017), or to withhold consent for the President's alleged violations of the Clause, *see* H.R.J. Res. 26, 115th Cong. (2017). None of the bills has come to a vote, nor has the President done anything to prevent Congress from holding a vote. Plaintiffs could not convince their own colleagues in Congress to take the actions they desired, and now seek the aid of the Judiciary to circumvent the legislative process prescribed by the Constitution.

Plaintiffs' claim falters on threshold grounds: they have not alleged a judicially cognizable injury that would support this Court's exercise of Article III jurisdiction. They allege that they have been denied "their constitutional prerogative to authorize or reject the specific emoluments [the President] is accepting" by the President's refusal to first seek the consent of the Congress. Am. Compl. ¶ 41, ECF No. 14. Even assuming arguendo that the President were required to obtain consent in these circumstances and that his failure to do so somehow deprived Plaintiffs' of their ability to vote on the issue (which it would not), it is a foundational principle that the denial of institutional legislative prerogative is not a judicially cognizable injury. In *Raines v. Byrd*, the Supreme Court held that legislators do not have Article III standing based on "a claimed injury to official authority or power." 521 U.S. 811, 826 (1997). A "diminution of legislative power" that "damages all Members of Congress and both Houses of Congress equally," *id.* at 821, the Court held, is not "a sufficiently concrete injury" to give Members of Congress a "personal stake in [the] dispute" with the Executive Branch, *id.* at 830.

D.C. Circuit precedent applying *Raines* similarly establishes that individual legislators have no standing to challenge an Executive action on the theory that the Executive has deprived them of their constitutionally guaranteed right to vote on measures concerning the challenged action. *See Chenoweth v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999). Even when a legislative vote is deemed defeated by Executive action, a legislator still has no standing to sue if Congress retains "ample legislative power" to work its will. *Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000). Here, Plaintiffs' claimed injury is "fully susceptible to political resolution" because "'were a sufficient number in each House so inclined,'" Plaintiffs could vote on whether Plaintiffs' allegations constitute violations of the Foreign Emoluments Clause by the President and whether Congress should provide its consent. *Id.* at 21 (quoting *Chenoweth*, 181 F.3d at 116).

Supreme Court and D.C. Circuit precedent therefore squarely forecloses Plaintiffs' attempt to bring the present dispute into a judicial forum. The Supreme Court "ha[s] always insisted on strict compliance with th[e] jurisdictional standing requirement" to "keep[] the Judiciary's power within its proper constitutional sphere." *Raines*, 521 U.S. at 819–20. The Judiciary does not sit "to umpire disputes between [the political] branches regarding their respective powers." *Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring). "Unless and until . . . the resolution of those inter-branch disputes through the system of checks and balances . . . brings forth a result that harms private rights, it is no part of [the Judiciary's] constitutional province." *Id.*

The Amended Complaint is also deficient in several other respects. First, Plaintiffs do not have a cause of action under the Foreign Emoluments Clause to seek the relief requested and this is not an appropriate case to imply a cause of action in equity. Instead, equity requires dismissal for numerous reasons, and this Court should exercise its discretion to do so.

Second, the Amended Complaint fails to state a claim upon which relief can be granted. Plaintiffs' interpretation of the Foreign Emoluments Clause is contrary to the original understanding of the Clause and to historical practice. Plaintiffs read the Clause expansively to

cover any benefit derived from any business dealings with a foreign instrumentality by an entity in which the President has a financial interest—including payments for goods, food, hotel stays, licensing agreements, real estate leases, and condominium common charges, and the grant of trademarks, permits, tax credits, and other regulatory benefits. The term "Emolument" in the Clause, however, refers only to benefits arising from personal service in an employment or equivalent relationship. The prohibited foreign benefit must be conferred on the covered official in exchange for services rendered by the official in his capacity as such or in a capacity akin to an employee of the foreign government. This construction accords with relevant historical sources; the practices of public officials ranging from George Washington to Nelson Rockefeller; and Congress's interpretation of the Clause, as evidenced by the various laws by which Congress provided advance consent to arrangements it perceived to be covered by the Clause. What is more, it is not inconsistent with public determinations rendered by government components charged with determining the Clause's applicability. Although Plaintiffs also allege that the various foreign benefits arising from commercial transactions or by operation of law also constitute "presents" under the Foreign Emoluments Clause, that interpretation is unnatural and nothing indicates that the Framers would have intended the Clause to be applied in that way.

Finally, the relief sought by Plaintiffs is unconstitutional. Suing the President in his official capacity, Plaintiffs seek an injunction prohibiting the President from violating the Foreign Emoluments Clause without first obtaining the "Consent of the Congress." Plaintiffs effectively seek to impose a condition on the President's ability to serve as the President and to carry out the duties he is duly elected to perform. However, the Supreme Court has long held that courts have no power to issue such injunctions against the President in an official-capacity suit. *See Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) (finding "no jurisdiction of a bill to enjoin the President in the performance of his official duties"). Moreover, the requested relief would "distract [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring), when "the separation-of-powers doctrine requires that a branch not impair another

in the performance of its constitutional duties," *Loving v. United States*, 517 U.S. 748, 757 (1996). Given the President's unique status in the constitutional scheme, the Framers envisioned only political means to ensure a President's compliance with constitutional provisions such as the Foreign Emoluments Clause, not official-capacity injunctions against the President.

## BACKGROUND

Plaintiffs are 30 Senators and 171 Representatives, who allege that "[s]ince taking office, [the President] has accepted, or necessarily will accept, numerous emoluments from foreign states." Am. Compl. ¶¶ 1, 77. They allege that the President owns hundreds of businesses in the United States and in at least twenty foreign countries, *id.* ¶ 34, and that he violates the Foreign Emoluments Clause whenever such businesses receive "any monetary or nonmonetary benefit" from a foreign state without the consent of Congress. *Id.* ¶ 6; *see also id.* ¶ 89. Citing the President's pledge made before taking office that he would donate all profits from foreign governments' patronage of his hotels and similar businesses to the U.S. Treasury, Plaintiffs assert that the President has acknowledged "that his businesses receive funds and make a profit from payments by foreign governments, and that [the businesses] will continue to do so while he is President." *See id.* ¶ 37 (citing *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html).[1]

Plaintiffs allege that "it is impossible to determine the full scope of the benefits [the President] is currently accepting from foreign states," *id.* ¶ 35, but that at least the following benefits received by the President's businesses are prohibited foreign emoluments: rental payments for units in the Trump Tower by China and the United Arab Emirates, *id.* ¶¶ 58–59; foreign-government payments for hotel stays and hotel events at the Trump International Hotel in Washington, D.C., *id.* ¶¶ 52–57; trademark protections afforded by China and other foreign

---

[1] In determining whether a plaintiff has stated a claim, the Court may consider "documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

4

governments, *id.* ¶¶ 44–51; royalty payments from foreign-government-owned broadcast stations for the television program "The Apprentice," *id.* ¶¶ 63–65; foreign permits, tax benefits, "favorable policy changes," and other "regulatory benefits" for business ventures abroad, *id.* ¶¶ 66–67; and condominium common charges for units in the Trump World Tower owned by the government of Saudi Arabia, *id.* ¶¶ 60–62.

According to Plaintiffs, "[t]he Constitution expressly demands that [they] be given th[e] opportunity" to decide, "on a case-by-case basis, whether to authorize [the President's] acceptance of particular emoluments from foreign states." *Id.* ¶ 42. Plaintiffs allege that because the President has refused to seek the consent of Congress, they are injured in their role as Members of Congress in that they are unable to "determine precisely how a given arrangement benefits [the President] or affects the foreign state in question," *id.* ¶ 41, "evaluate the unique circumstances of each emolument," *id.* ¶ 81, or "vote on which emoluments [the President], as a federal officeholder, may accept," *id.* ¶ 82.

Plaintiffs seek an injunction prohibiting the President from violating the Foreign Emoluments Clause without first obtaining the "Consent of the Congress." *Id.* ¶ 92. They also seek a declaration that the President has violated the Clause. *Id.* at 57–58 (Prayer for Relief (a)).

## ARGUMENT

## I. THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIM.

This action should be dismissed for lack of subject matter jurisdiction because Plaintiffs have not met their burden to establish Article III standing. "A motion to dismiss for lack of standing is properly considered a challenge to the Court's subject matter jurisdiction" and should be reviewed under Rule 12(b)(1). *Ellis v. Holy Comforter Saint Cyprian Cmty. Action Grp.*, 153 F. Supp. 3d 338, 340 (D.D.C. 2016); *see also Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). To survive a Rule 12(b)(1) motion to dismiss, Plaintiffs "bear[] the burden of establishing jurisdiction by a preponderance of the evidence." *Ellis*, 153 F. Supp. 3d at 340. "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court 'must scrutinize the plaintiff's allegations more closely . . . than it would under a [Rule 12(b)(6)]

motion to dismiss.'" *Id.* at 341 (quoting *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011)). Moreover, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### A. Plaintiffs Have Failed to Allege a Judicially Cognizable Injury Under Supreme Court and D.C. Circuit Precedent.

Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." The Supreme Court has explained that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). One element of this constitutional limitation is that a plaintiff must establish that he has standing to sue. *Raines*, 521 U.S. at 818. The requirement is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408. Because the relaxation of the standing inquiry "is directly related to the expansion of judicial power," *id.* at 408–09, the inquiry is "especially rigorous" when reaching the merits would force the judiciary "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," *id.* at 408.

To establish "the irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), Plaintiffs must show that they have suffered an injury in fact that is fairly traceable to the defendant's challenged actions and likely to be redressed by the requested relief. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An "injury in fact" is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The injury must be "legally and judicially cognizable," and the dispute must be one that "is 'traditionally thought to be capable of resolution through the judicial process.'" *Raines*, 521 U.S. at 819 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). The requirement of "actual injury

redressable by the court" is to ensure that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Moreover, "federal courts may exercise power only in the last resort, and as a necessity." *Allen v. Wright*, 468 U.S. 737, 752 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).

Here, Plaintiffs allege that they have been deprived of their constitutional prerogative as Members of Congress to vote on whether to consent to the President's alleged acceptance of prohibited foreign emoluments. *See* Am. Compl. ¶¶ 4–5, 42, 81.[2]  But a "dilution of institutional legislative power" would not be a "personal, particularized, concrete, [or] otherwise judicially cognizable" injury sufficient to establish Article III standing. *Raines*, 521 U.S. at 820, 826.  In *Raines*, individual Members of Congress brought suit to challenge the Line Item Veto Act, which gave the President the authority to cancel spending provisions in an appropriations bill without vetoing the bill in its entirety.  The Members argued that the Act altered "the legal and practical effect" of their votes on "bills containing vetoable items," depriving them of "their constitutional role in the [legislative process]." *Id.* at 816.  The district court had held that the Members had standing under D.C. Circuit precedent, which "ha[d] repeatedly recognized Members' standing to challenge measures that affect their constitutionally prescribed lawmaking powers." *Id.*  The Supreme Court reversed on direct appeal.[3]  It found that the Members' claimed "institutional injury" of "the diminution of legislative power" was "wholly abstract and widely dispersed"

---

[2] Plaintiffs appear to assume that the Constitution imposes an affirmative obligation on a holder of an "Office of Profit or Trust" to seek the consent of Congress whenever the official's private businesses have dealings with foreign states, even when the official does not believe that he is accepting any prohibited emoluments. *See* Am. Compl. ¶¶ 4, 81.  The Constitution clearly imposes no such obligation.

[3] Although the plaintiff Members had statutory authority to bring suit, the Court held that the statutory grant of authority "eliminate[d] only prudential standing limitations" and "[could] not erase Article III's standing requirements." *Raines*, 521 U.S. at 820 n.3.

because the injury "necessarily damage[d] all Members of Congress and both Houses of Congress equally." *Id.* at 821, 829. Moreover, the Court held that the Members "d[id] not have a sufficient 'personal stake' in th[e] dispute," *id.* at 830, because the "loss of political power" was not claimed in a "private capacity" but was "solely because they are Members of Congress," *id.* at 821. "If one of the Members were to retire tomorrow," the Court said, "he would no longer have a claim; the claim would be possessed by his successor instead." *Id.*; *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011) ("The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it.").

The Court further determined that the dispute at issue was not "traditionally . . . capable of resolution through the judicial process." *Raines*, 521 U.S. at 819; *see also Spokeo*, 136 S. Ct. at 1547 (the Article III standing doctrine was developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood"); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) ("Our system of government leaves many crucial decisions to the political processes."). "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed *injury to official authority or power*." *Raines*, 521 U.S. at 826 (emphasis added); *see also United States v. Windsor*, 133 S. Ct. 2675, 2704 (2013) (Scalia, J., dissenting on the merits, with no majority opinion on the standing issue) ("The opinion [in *Raines*] spends three pages discussing famous, decades-long disputes between the President and Congress . . . that would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation. But it does not, and never has.").

Following *Raines*, the D.C. Circuit similarly held that Members of Congress have no standing to challenge Executive action on the basis of claimed injury to their legislative prerogative. In *Chenoweth v. Clinton*, several Members brought suit to challenge a Presidential program after unsuccessful legislative efforts to prevent the program's implementation. 181 F.3d at 113. The Members claimed that the President's establishment of the program through an

8

Executive Order "deprived them of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation" involving the program. *Id.* The D.C. Circuit held that the alleged injury to the Members' "authority as legislators" was "identical to the injury the Court in *Raines* deprecated as 'widely dispersed' and 'abstract.'" *Id.* at 115 (quoting *Raines*, 521 U.S. at 816). If, as in *Raines*, a statute that allegedly divests the Members of their "constitutional role in the legislative process" does not give them standing to sue, the D.C. Circuit reasoned, "then neither does an Executive Order that allegedly deprives congressmen of their right to participate and vote on legislation in a manner defined by the Constitution." *Id.* (quotations and alteration omitted). Here, the alleged deprivation of Plaintiffs' legislative prerogative to vote on emoluments issues relating to the President is indistinguishable from the claimed injuries in *Raines* and *Chenoweth*.

Finally, there is no plausible allegation that the President somehow has prevented the bills sponsored by some of the Plaintiffs from progressing to a vote, nor any allegation that he has otherwise prevented Congress from holding a vote on the emoluments issue. In fact, Congress is free to vote on the issue pursuant to the "finely wrought and exhaustively considered, procedure" prescribed in Article I, Section 7 of the Constitution. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Congress could, for example, vote on a private bill consenting to the receipt of what it construed to be emoluments received from foreign governments or a joint resolution expressing its disagreement with such receipt. In short, if Plaintiffs wish to vote on whether to consent to the President's alleged violations of the Foreign Emoluments Clause, they must seek redress from their colleagues pursuant to the constitutional scheme. *Cf. Raines*, 521 U.S. at 829 n.11 ("it is far from clear that this injury [of diminution of legislative power] is 'fairly traceable' to [the executive branch officials], as our precedents require, since the alleged cause of [the legislators'] injury is . . . the actions of their own colleagues in Congress in passing the [Line Item Veto] Act"). The President has not deprived Plaintiffs of their ability to vote on the emoluments issue at all. Plaintiffs have alleged no judicially cognizable injury.

9

**B.**     *Coleman v. Miller* **and pre-***Raines* **D.C. Circuit Precedent are Inapposite.**

Plaintiffs nevertheless insist that they have standing under *Coleman v. Miller*, 307 U.S. 433 (1939).  *See* Am. Compl. ¶ 82.  In *Coleman*, a group of state senators had voted against ratifying an amendment to the Federal Constitution.  Although their votes otherwise would have been sufficient to defeat ratification because the total votes were tied, the state's Lieutenant Governor cast a tie-breaking vote in favor of ratification, nullifying their votes.  *Coleman*, 307 U.S. at 441.  The Supreme Court held that the senators had Article III standing because they had "a plain, direct and adequate interest in maintaining the effectiveness of their votes."  *Id.* at 438.

*Coleman* is inapposite.  As the Supreme Court explained in *Raines*, "*Coleman* stands (at most . . .) for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified."  *Raines*, 521 U.S. at 823.  Here, Plaintiffs do not allege that "the necessary majorities in the Congress voted" to withhold consent to the President's alleged acceptance of prohibited foreign emoluments.  *Chenoweth*, 181 F.3d at 117.  In fact, Plaintiffs' proposed bills "never came to a vote," as was the case in *Chenoweth*.  *Id.* at 113.  Accordingly, "[t]here is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged" here.  *Raines*, 521 U.S. at 826.  To uphold standing here would require "a drastic extension of *Coleman*," which the Supreme Court "[was] unwilling" to do in *Raines*.  *Id.*  Neither should this Court.

Moreover, as the D.C. Circuit explained, "the key to understanding the [Supreme] Court's . . . use of the word nullification" in *Coleman* is the "unusual" and irreversible nature of a state's decision to ratify a Federal constitutional amendment; once the amendment is deemed ratified by the state, the senators had "no legislative remedy" to reverse it in the future. *Campbell*, 203 F.3d at 22–23.  The D.C. Circuit reasoned that this must have been why the *Raines* Court contrasted the plaintiffs in *Raines* as being unable to "allege[] that the [Line item Veto Act] would nullify their votes *in the future*."  *Id.* at 23 (quoting *Raines*, 521 U.S. at 824)

10

(emphasis added).  "[A]fter all, a majority of senators and congressmen could always repeal the Line Item Veto Act."  *Id.*  Thus construing *Coleman*, the D.C. Circuit held in *Campbell v. Clinton* that the Members there did not have standing under the "very narrow possible *Coleman* exception to *Raines*" to challenge the President's use of military forces against Yugoslavia, despite the Members having defeated both an authorization for military intervention and a declaration of war.  *Id.*  The Court explained that the Supreme Court did not hold in *Raines* that "the President 'nullifies' a congressional vote and thus legislators have standing whenever the government does something Congress voted against."  *Id.* at 22.  Rather, when legislators possess "political tools with which to remedy their purported injury," *id.* at 24, they may not seek the aid of the Judiciary, *id.* at 23.

Here, Plaintiffs have not cast any vote on the President's alleged Foreign Emoluments Clause violations, let alone had their votes deemed defeated.  *See Raines*, 521 U.S. at 824 (plaintiffs "ha[d] not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated").  As noted before, Congress may still choose to vote on the emoluments issue.  For now, "we do not know whether there ever will be an actual confrontation between the Legislative and Executive Branches . . . .  If the Congress chooses not to confront the President, it is not [the Judiciary's] task to do so."  *Goldwater v. Carter*, 444 U.S. 996, 998 (1979) (Brennan, J., concurring).

*Coleman* is inapposite for another reason.  As the D.C. Circuit has observed, "the federal constitutional separation of powers concerns that underlay the [Supreme Court's] decision in *Raines* (and which [the D.C. Circuit] emphasized in *Chenoweth*) were not present in . . . *Coleman*."  *Campbell*, 203 F.3d at 22; *see also Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977) ("A separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators.").[4]  This is a significant distinction.  In *Arizona State Legislature v.*

---

[4] Moreover, the state court in *Coleman* had "treated" the state legislator plaintiffs' interest in their votes "as a basis for entertaining and deciding the federal [constitutional] questions,"

*Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), a case also cited by Plaintiffs, the Supreme Court held that a state legislature had standing to challenge a state initiative that removed congressional redistricting authority from the state legislature. The Court reasoned that the initiative—which amended the state constitution—"would 'completely nullif[y]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan." *Id.* at 2665 (quoting *Raines*, 521 U.S. at 823–24). In so holding, the Court emphasized that the case before it "does not touch or concern the question whether Congress has standing to bring a suit against the President" because "[t]here is no federal analogue to Arizona's initiative power," whereas "a suit between Congress and the President would raise separation-of-powers concerns." *Id.* at 2665 n.12.

Plaintiffs also seek to rely on pre-*Raines* D.C. Circuit precedent on legislative standing. *See* Am. Compl. ¶ 82. For example, Plaintiffs cite *American Federation of Government Employees v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982), which held that a Member on the House Appropriations Committee had standing to challenge an agency's reduction in force because the agency had failed to seek the prior approval of the Appropriations Committees as required by statute. Even assuming *Pierce* remains good law after *Raines*, it is distinguishable because the D.C. Circuit's holding was predicated on that Member's "statutory right to participate in the legislative process," which was "unique to members of the Appropriations Committees." *Id.* at 63. There is no such unique statutory right here, only the alleged deprivation of legislative power "[that] necessarily damages all Members of Congress and both Houses of Congress equally." *Raines*, 521 U.S. at 721.

Plaintiffs also cite *Moore v. U.S. House of Representatives*, 733 F.2d 946 (D.C. Cir. 1984), in which eighteen Representatives brought suit to challenge the constitutionality of a statute that they alleged was revenue-raising and thus should have originated in the House as mandated by the Constitution but was not. The D.C. Circuit held that the Representatives had

_____

*Raines*, 521 U.S. 824 at n.8, and "if the Court . . . had not taken the case a question of federal law . . . would remain as decided by the [state] court." *Campbell*, 203 F.3d at 22.

12

alleged a cognizable injury to "an interest positively identified by the Constitution." *Id.* at 951–52. Nevertheless, the court held that the district court properly dismissed the complaint as a matter of equitable discretion given the separation-of-powers concerns posed by the suit and the fact that the plaintiffs' "rights [could] be vindicated by congressional repeal of the [offending] statute." *Id.* at 956; *see also id.* ("Congressional actions pose a real danger of misuse of the courts by members of Congress whose actual dispute is with their fellow legislators. We are reluctant to meddle in the internal affairs of the legislative branch."). In other words, "[w]hatever *Moore* gives the Representatives under the rubric of standing, it takes away as a matter of equitable discretion" because of "the separation of powers problems it created." *Chenoweth*, 181 F.3d at 115, 116.

*Moore*'s finding of standing, however, is "untenable in the light of *Raines*," *id.* at 115, which requires that the separation of powers and standing analyses be merged, *see id.* at 116 ("*Raines*, therefore, may not overrule *Moore* so much as require us to merge our separation of powers and standing analyses."). Thus, in *Chenoweth*, where Members of Congress complained that the President's action inflicted an institutional injury upon Congress by circumventing its legislative authority, the D.C. Circuit said that "[a]pplying *Moore*, this court presumably would have found that injury sufficient to satisfy the standing requirement; after *Raines*, however, we cannot." *Id.* at 116.

In sum, Plaintiffs' claim of standing is foreclosed by both Supreme Court and D.C. Circuit precedent, and this case should be dismissed for lack of jurisdiction.[5]

---

[5] Plaintiffs also cite *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir. 1979) (en banc), in which the D.C. Circuit found that the plaintiff Senators had standing to challenge the President's intent to terminate a treaty on the basis that they were denied the right to be consulted and to vote on treaty termination. *Id.* at 701. The Supreme Court, however, vacated the D.C. Circuit's judgment without oral argument and ordered the case to be remanded to this Court with direction to dismiss the complaint. *Goldwater v. Carter*, 444 U.S. 996 (1979) (per curiam). Although there was no majority opinion, six justices found the case not justiciable, with reasoning applicable to the present case. *See, e.g.*, *id.* at 996 (Powell, J., concurring) ("The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse. Otherwise, we would encourage small

13

## II. PLAINTIFFS HAVE NO CAUSE OF ACTION UNDER THE FOREIGN EMOLUMENTS CLAUSE AND EQUITY REQUIRES DISMISSAL.

Plaintiffs' claim should also be dismissed because they lack a cause of action to seek relief against Defendant under the Foreign Emoluments Clause. The Clause is designed to prevent foreign influence by setting forth a rule of conduct for federal officeholders in dealings with foreign governments. While it has a significant role in ensuring good governance, it is not a source of federal rights such that the Court may imply a cause of action under the Clause. *Cf. Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) (Supremacy Clause not "a source of any federal rights" because it simply "instructs courts what to do when state and federal law clash" and thus, does not create a private right of action allowing "affected parties a constitutional . . . right" to enforce federals laws against States); *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014) ("Private parties who act in compliance with federal law may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws . . . But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*.") (citations omitted).

To be sure, the Supreme Court has indicated that "relief may be given in a court of equity" to enjoin unconstitutional actions by public officials. *Armstrong*, 135 S. Ct. at 1384 (citation omitted); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). But such ability to enjoin officials' unconstitutional actions is available only in "a proper case," *Armstrong*, 135 S. Ct. at 1384, which makes sense because the relief is a "judge-made remedy," *id.*, and "[t]he decision to grant or deny [] injunctive relief is an act of

---

groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict."); *id.* at 998 (Brennan, J., concurring) ("In the present posture of this case, we do not know whether there ever will be an actual confrontation between the Legislative and Executive Branches . . . . It cannot be said that either the Senate or the House has rejected the President's claim. If the Congress chooses not to confront the President, it is not our task to do so."); *id.* at 1003 (Rehnquist, J., concurring) ("the controversy in the instant case is a nonjusticiable political dispute that should be left for resolution by the Executive and Legislative Branches of the Government").

equitable discretion by the district court." *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). That is, the relief is not granted as a matter of right but is subject to the court's "broad discretionary power to withhold equitable relief as it reasonably sees fit." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1214 (D.C. Cir. 2004); *Morrison v. Work*, 266 U.S. 481, 490 (1925) (an injunction "is an extraordinary remedial process, which is granted, not as a matter of right, but in the exercise of a sound judicial discretion"); *see, e.g.*, *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (suit seeking declaratory and injunctive relief in litigation involving the conduct of U.S. diplomatic relations with a foreign state; concluding that "[w]hether or not this is . . . a matter so entirely committed to the care of the political branches as to preclude our considering the issue at all, we think it at least requires the withholding of discretionary relief").

Here, the circumstances do not support a cause of action in equity. First, Plaintiffs are not preemptively asserting a defense to a potential enforcement action against them by the Government, which is the paradigmatic situation where implied equitable claims against the Government have been recognized. *See*, *e.g.*, *Free Enter. Fund*, 561 U.S. at 487 (accounting firms subject to pervasive regulatory control by regulatory entity brought suit after a formal investigation of one of the firms was initiated); *Mich. Corr. Org.*, 774 F.3d at 906 (explaining that for plaintiffs in the pre-enforcement context, "an existing cause of action for that relief exists: an equitable anti-suit injunction," and "[a]s classically understood, anti-suit injunctions permit potential defendants in legal actions to raise in equity a defense available at law"); *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting) (rejecting, while answering a question not addressed by the majority, a putative equitable cause of action under the Supremacy Clause because "the respondents are not subject to or threatened with any enforcement proceeding like the one in *Ex parte Young*"); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (*Ex parte Young* "was nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law.").

Second, equity "may not be used to create new substantive rights," *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) (citing *Hedges v. Dixon Cty.*, 150 U.S. 182, 192 (1893)), and the Foreign Emoluments Clause does not create any personal or judicially enforceable rights. Quite aside from that fact, the injury asserted by Plaintiffs does not fall within even the generalized zone of interests of the Clause. The zone of interests test "serve[s] to limit the role of the courts in resolving public disputes," by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. 490, 500 (1975). Thus, even when the Article III standing requirements have been met, a plaintiff still must "establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of interests' sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint." *Air Courier Conf. of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 523–24 (1991) (emphasis in original) (citation omitted); *Valley Forge Christian Coll.*, 454 U.S. at 475 (test applies to claims under the Constitution); *see, e.g.*, *Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 195–96 (2d Cir. 2002) (Sotomayor, J.) (plaintiffs' alleged injury did not fall within the zone of interests protected by the Due Process Clause because their "harm is derivative of" due process-type harms and concerns First Amendment interests). The Supreme Court has also indicated that the zone of interests test may be even more rigorous when a plaintiff is asserting an implied cause of action rather than relying on the "generous review provisions of the APA." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987) (citation omitted).

Here, the Foreign Emoluments Clause was intended to guard generally against the corruption of and foreign influence on federal officials. It is not designed to protect any legislative prerogative that individual Members of Congress may have. The right of Congress to consent to receipt of emoluments inures only to Congress as a whole, not to its individual Members, and thus Plaintiffs would not be the proper plaintiffs to assert any injury to such a right. *Cf. Raines*, 521 U.S. at 829 ("[w]e attach some importance to the fact that appellees have

16

not been authorized to represent their respective Houses of Congress in this action"); *United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of Congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole."). The fact that Plaintiffs fail to satisfy the zone of interests test thus strongly counsels against implying a cause of action in equity under the Foreign Emoluments Clause here.

Third, Plaintiffs can obtain relief only by suing the President himself, which (if not legally foreclosed, *see infra* Section IV), is at a minimum grounds for extreme equitable restraint. Indeed, because of the President's unique constitutional status, at the Virginia ratifying convention when discussing the Foreign Emoluments Clause being another source of constraint on the President, Edmund J. Randolph, who was the first Attorney General of the United States, mentioned only political means for redressing a President's violation. *See* 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 486 (2d ed. 1891) [hereinafter *Debates in the Several State Conventions*].

Finally, Congress is far better equipped than the courts to address whether particular arrangements violate the Foreign Emoluments Clause. As Plaintiffs themselves have emphasized, the Constitution vests in Congress the power to waive Foreign Emoluments Clause violations, U.S. Const. art. I, § 9, cl. 8, and, as explained below, Congress has exercised that power in deliberating whether to provide consent in specific circumstances. If Congress disagrees with the President (or any other public official) regarding the applicability of the Clause in individual cases, it has ample means for pressing its view. Equity counsels restraint in abrogating a centuries-long tradition of resolving emoluments-related issues through these political processes.

## III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE FOREIGN EMOLUMENTS CLAUSE.

Plaintiffs in any event fail to state a claim upon which relief can be granted.  Plaintiffs' interpretation of the terms "Emolument" and "present" as covering "any monetary or nonmonetary benefit" received by any business in which the President has a financial interest from any foreign government instrumentality exceeds the Foreign Emoluments Clause's intended scope and meaning.  Neither the text nor the history of the Clause shows that the term "Emolument" in the Clause was intended to reach benefits arising from a President's private business pursuits having nothing to do with his service to a foreign power in his capacity as President or in a capacity akin to an employee of the foreign power.  Were Plaintiffs' interpretation correct, Presidents from the very beginning of the Republic, including George Washington, likely would have received prohibited foreign "Emolument[s]."  *Cf. NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) ("in interpreting [a constitutional provision], the Court puts significant weight upon historical practice"); *Mistretta v. United States*, 488 U.S. 361, 401 (1989); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819).

### A.    The Foreign Emoluments Clause Prohibits Benefits Arising from the U.S. Official's Provision of Service Pursuant to an Office or Employment.

The Foreign Emoluments Clause of the Constitution provides:

> [N]o Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8.  Plaintiffs interpret this text to prohibit the receipt of "anything of value and any benefits, monetary or nonmonetary" from an instrumentality of a foreign government.  Am. Compl. ¶¶ 6, 84; *see also id.* ¶ 23 (citing one eighteenth century dictionary definition of "emolument" as "profit, advantage, benefit, and comfort").  This overbroad definition constitutes Plaintiffs' core legal error.

As explained below, the Foreign Emoluments Clause applies only to the receipt of compensation for services rendered by an official in an official capacity or in an employment (or

equivalent) relationship with a foreign government, and to the receipt of honors and gifts by an officeholder from a foreign government. It is not a blanket prohibition on commercial transactions with foreign governments by businesses in which the official has a financial interest.

### 1. The text of the Foreign Emoluments Clause

At the time of the Nation's founding, and in the decades following, an "emolument" was a common characteristic of a federal office, *see United States v. Hartwell*, 73 U.S. 385, 393 (1867), and comprehensively described "every species of compensation or pecuniary profit derived from *a discharge of the duties of the office*," *Hoyt v. United States*, 51 U.S. 109, 135 (1850) (emphasis added). At the time, most federal officials were not paid salaries in the modern sense. Leonard D. White, *The Federalists: A Study in Administrative History* 298 (1st ed. 1948) (discussing compensation for federal officials in the early Republic). Following English precedent and as dictated by contemporary convenience, most federal employees were compensated by fees for services rendered. *See id.*; *see, e.g.*, 1 American State Papers, 7th Cong., 1st Sess., Misc. 307–08 (1802) (schedule of diplomatic consuls' "fees and emoluments").[6] Their compensation could also include commissions and other privileges and benefits. *See, e.g.*, 23 *Journals of the Continental Congress, 1774–1789*, at 670 (Gaillard Hunt ed., 1914) (Postmaster General authorized by the Act of 1782, which continued in force after 1789, to fix the fees of postmasters and to allow commissions on the postage received); *Hoyt*, 51 U.S. at 135 (customs collector's "emoluments" included fees for services rendered, commissions on duties, and a share of the fines, penalties, and forfeitures); *United States v. Ripley*, 32 U.S. 18, 18 (1833) (determining whether the "pay and emoluments" to which a military officer's "rank entitled him" included commission on moneys that passed through his hands and were disbursed by him for the supplies of the troops).[7] The term could also mean salary for the minority of

---

[6] *Available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[7] Federal employees were then required to account for the "fees and emoluments" they received from private individuals for whom they performed services and from the Government if any. *See United States v. Hill,* 120 U.S. 169, 174 (1889) (reprinting form used to account for all receipts).

officials who did receive one.  George Washington, for example, used the term to refer to his salary in his first inaugural address, when he declined "any share in the personal emoluments, which may be indispensably included in a permanent provision for the Executive Department."[8] *See also McLean v. United States*, 226 U.S. 374, 382 (1912) (army officer's emoluments included salary, pay for two servants, and forage for two horses).

In light of this common usage in the founding era and for many decades thereafter, the term "Emolument" in the Foreign Emoluments Clause should be interpreted to refer to a "profit arising from an office or employ."  *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).  That is, the benefit must be predicated on services rendered in an official capacity or an employment (or equivalent) relationship and be given in exchange for the provision of a service in that relationship.  For example, a federal official would receive an emolument if he or she was paid by a foreign government to take certain official actions. Similarly, an emolument would also be received if the official became an employee or entered an employment-like relationship with the foreign government, such as if a federal government lawyer provided legal advice and services to a paying foreign power.  In either case, the benefits arising from these transactions would be predicated on the official's rendering of services pursuant to an office or employment.  Thus, they would constitute emoluments.  By contrast, an official does not receive prohibited emoluments where he or she merely receives benefits arising from a foreign government purchasing food or lodging at a hospitality establishment in which the official has a financial interest.

This interpretation is consistent with the nature of the other prohibited categories in the Foreign Emoluments Clause: present, office, and title, which are all things personally conferred or bestowed on a U.S. official holding an "Office of Profit or Trust."  *See Beecham v. United*

---

[8] President George Washington, Inaugural Address of 1789 (Apr. 30, 1789), https://www.archives.gov/exhibits/american_originals/inaugtxt.html.  Congress subsequently set the Presidential salary at $25,000 per year.  *See* An Act for allowing a Compensation to the President and Vice President of the United States, 1 Stat. 72 (1789).

*States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).  Thus, as relevant here, the term "Emolument" covers benefits arising from services the President provides to the foreign state either as President (*e.g.*, making executive decisions favorable to the paying foreign power) or in a capacity akin to an employee of a foreign state (*e.g.*, serving as a consultant to a foreign power).  It does not reach benefits arising from commercial transactions that may be engaged in by businesses in which the President has a financial interest, particularly where the Plaintiffs have not plausibly alleged that the President is using the businesses as a conduit to receive benefits from foreign governments in exchange for his service as President or as an employee (or equivalent) of the foreign government.

  Further textual support is found in each of the other two instances in which the term emolument is used in the Constitution.  Each is associated with an office and refers to compensation for services rendered in the capacity as the holder of that office.  First, the Domestic Emoluments Clause provides that a President shall receive "for his Services" a fixed "Compensation" during his tenure and not "any other Emolument from the United States, or any of them."  U.S. Const. art. II, § 1, cl. 7.  The term "Compensation" is qualified by "for his Services" as President.  That qualification must also apply to "any other Emolument"—as noted, compensation was long considered a species of emolument—and the Clause's usage of "other" between "for his Services" and "Emolument" confirms that "Compensation" and "Emolument" are intended to be read in parallel.  Thus properly construed, an "Emolument" under the Domestic Emoluments Clause must arise from the President's service as President.  The Clause thus fulfills its natural purpose of ensuring that a President's compensation and other benefits remain unaltered during his tenure, but does not preclude a President from acting on the same terms as any other citizen in transacting business with a federal or state instrumentality.  Second, the Incompatibility Clause prohibits a Senator or Representative from assuming "any civil Office . . . which shall have been created, or the Emoluments whereof shall have been increased"

during his or her tenure. U.S. Const. art. I, § 6, cl. 2. The Clause treats an "Emolument" as an aspect of an "Office" that may be "encreased" by Congress, expressly tying it to the official's employment and duties. These two provisions differ from the Foreign Emoluments Clause only in that by their terms, the benefit is tied to services rendered in specific federal offices, whereas under the Foreign Emoluments Clause, the benefit could be tied to services rendered as a federal official or in a capacity akin to an employee of the foreign government. Hence, as noted before, the Clause prohibits the President from receiving any compensation for his service to a foreign government either as President or in an employment-like relationship.

The use of the term "Emolument" to refer to the receipt of value for one's services rendered in an official position or in an employment relationship is also consistent with contemporaneous dictionary definitions. One source from 1766 explained that "[e]molument relates to commissions and employments; intimating, not only the salaries, but, all other perquisites."[9] Another source from 1774 defined the term to mean "profit arising from an office or employ."[10] The Oxford English Dictionary, citing examples as far back as 1480, 1650, and 1743, provides as one of two definitions: "[p]rofit or gain arising from station, office, or employment; dues; reward, remuneration, salary."[11]

To be sure, Plaintiffs' definition of the term "Emolument" as encompassing any "profit, advantage, benefit, and comfort," Am. Compl. ¶ 23, resembles a broader definition that also existed at the time of the founding. For example, one dictionary defined the term emolument to

---

[9] 1 John Trusler, *The Difference, Between Words, Esteemed Synonymous, in the English Language; And, the Proper Choice of them determined* 154–55 (1766) (emphasis omitted).

[10] *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).

[11] Oxford University Press, *Emolument*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/61242. Today, the Black's Law Dictionary (10th ed. 2014) provides a single definition of "[a]ny advantage, profit, or gain received as a result of one's employment or one's holding of office." Consideration of contemporary definitions can also be appropriate. *See Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (considering both contemporary and late-18th century definitions in interpreting the term "try" in Article I, Section 3, Clause 6 of the Constitution).

mean "benefit," "advantage," or "profit."[12]  But the law has long been clear that where a word is capable of different meanings or "[w]here any particular word is obscure or of doubtful meaning, taken by itself," the "obscurity or doubt may be removed by reference to associated words." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893); *see also United States v. Stevens*, 559 U.S. 460, 474 (2010) ("an ambiguous term may be given more precise content by the neighboring words with which it is associated").  "It is a familiar rule in the construction of terms to apply to them the meaning naturally attaching to them from their context."  *Virginia*, 148 U.S. at 519.  This doctrine (referred to as *noscitur a sociis*) thus "avoid[s] the giving of unintended breadth" to a statute, *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961), or a constitutional provision, *see, e.g.*, *Virginia*, 148 U.S. at 519.[13]  As discussed above, the term "Emolument," when read harmoniously with the rest of the Clause, has the natural meaning of the narrower definition of profit arising from an official's services rendered pursuant to an office or employ.

Moreover, Plaintiffs' interpretation of the term "Emolument" to mean any "monetary or nonmonetary benefit," or any "profit, advantage, benefit, and comfort," Am. Compl. ¶ 6, would subsume the term "present" in the Foreign Emoluments Clause and render it redundant.  And, as with a broad interpretation of the term "Emolument," a broad interpretation of the term "present"

---

[12] *A New General English Dictionary* (18th ed. 1754); *see also A Complete Dictionary of the English Language* (2d ed. 1789) (emolument means "[p]rofit, advantage").

[13] In *Virginia v. Tennessee*, for example, the Court applied the maxim to interpret the Compact Clause, which prohibits a State from entering into "any Agreement or Compact with another State" without the consent of Congress.  U.S. Const. art. I, § 10, cl. 3.  Although "[t]he terms 'agreement' or 'compact,' taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects," *Virginia*, 148 U.S. at 517–18, the Court held that they must be given "the meaning naturally attaching to them from their context," *id.* at 519.  And, "[l]ooking at the clause in which the terms 'compact' or 'agreement' appear," the Court found it evident that the prohibition is directed to only those agreements and compacts tending to increase the States' political power, and not those having nothing to do with the interest of the national government.  *Id.*; *cf. Armstrong*, 135 S. Ct. at 1383; *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear . . . .").

would unnecessarily construe the phrase "present, Emolument, Office, or Title" to contain substantial redundancies. Plaintiffs do not dispute that they are treating "Emolument" and "present" interchangeably, noting only that whether a benefit is both a prohibited emolument and a present "may depend on its terms and the circumstances under which it is conferred." Am. Compl. ¶ 38 n.75; *see also id.* ¶ 38 (asserting that the "various benefits from foreign governments" discussed in the complaint "constitute prohibited 'Emolument[s]' and/or 'present[s]' under the Foreign Emoluments Clause."). In fact, Plaintiffs refer to "Emoluments" and "present[s]" collectively as "Emolument[s]" or "foreign emoluments." *Id.* However, the Supreme Court has long held that "[i]n expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added." *Holmes v. Jennison*, 39 U.S. 540, 570–71 (1840); *see also Marbury v. Madison*, 5 U.S. 137, 174 (1803) (rejecting interpretation of constitutional provision that would result in "surplusage"); *Williams* v. *Taylor*, 529 U.S. 362, 404 (2000) ("[A] cardinal principle of statutory construction [is] that we must give effect, if possible, to every clause and word of a statute.") (citation omitted). The Foreign Emoluments Clause treats an "Emolument" as something distinct from other potential types of benefits (a "present," an "Office," or a "Title"), indicating that it is not all-encompassing.[14]

Furthermore, it would be unnatural to describe a public official's receipt of benefits from private commercial transactions by businesses in which he owns an interest as "accept[ing] of [a] present," and nothing indicates that the Framers would have intended the Clause to be applied in that way. At the time of the Nation's founding (as it is now), a "present" was defined as "[s]omething bestowed on another without price or exchange; the act of giving." *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774); *see also* Oxford English

---

[14] Plaintiffs allege that whether a benefit is both a prohibited emolument and a present "may depend on its terms and the circumstances under which it is conferred." Am. Compl. ¶ 38 n.75. Furthermore, as with a broad interpretation of the term "Emolument," a broad interpretation of the term "present" would unnecessarily construe the phrase "present, Emolument, Office, or Title" to contain substantial redundancies.

Dictionary, Oxford University Press, *Present*, OED Online (Dec. 2016), http://www.oed.com/view/Entry/150677 ("present" is cross-referenced as a "gift" meaning "[s]omething, the possession of which is transferred to another without the expectation or receipt of an equivalent; a donation, present").  Benefits arising from commercial transactions or legal entitlements accruing to an official by operation of law do not reasonably fall within that definition.

### 2.  Adoption and historical interpretation of the Clause

The adoption and historical interpretation of the Foreign Emoluments Clause are consistent with the office- and employment-specific construction of the term "Emolument."

### i.  Adoption of the Foreign Emoluments Clause

The Foreign Emoluments Clause has its origin in the sixth article of the Articles of Confederation of 1781, which contained the identical proscription, without the current Clause's proviso authorizing a congressional waiver.  The prohibition was adopted against the backdrop of "[a] custom [then] prevail[ing] among the European sovereigns, upon the conclusion of treaties, of bestowing presents of jewelry or other articles of pecuniary value upon the minister of the power with which they were negotiated," with "[t]he same usage [being] repeated upon the minister's taking leave at the termination of his mission."[15]  The prohibition was prompted by an incident involving a foreign government's gift to a U.S. ambassador, and the concern that, as a result of such gifts, U.S. ministers could be subject to foreign influence.  *See* James Madison, *The Debates in the Federal Convention of 1787 Which Framed the Constitution of the United States of America* 455 (Gaillard Hunt & James Brown Scott eds., 1920) [hereinafter *Debates in the Federal Convention*] (noting that the Clause was proposed by Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external

---

[15] 1 *A Digest of the International Law of the United States* 757 (Francis Wharton ed., 1886) [hereinafter Wharton's Digest] (quoting letter from John Q. Adams, Secretary of State, to Richard Rush, Minister to Great Britain (Nov. 6, 1817)); *see also* Robert Ralph Davis, Jr., *Diplomatic Gifts and Emoluments: The Early National Experience*, 32 The Historian 376, 376–78 (1970).

influence"). Edmund J. Randolph, who had attended the Constitutional Convention, explained at the Virginia ratification convention that:

> The [prohibition] restrains any person in office from accepting of any present or emolument, title or office, from any foreign prince or state . . . . This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any *emoluments* from foreign states. I believe that if, at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.[16]

The "accident" noted by Randolph appeared to be related to gifts King Louis XVI of France bestowed on American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin for successfully negotiating the Franco-American alliance treaty of 1778.[17] They each received a gold snuff box with the picture of Louis XVI set with diamonds.[18] Upon Lee's return to the United States in 1780, he asked the Continental Congress whether he could keep the gift and was given permission to do so.[19] Thomas Jefferson noted that this episode "formed the subsequent

---

[16] 3 *Debates in the Several State Conventions* at 465–66.

[17] Thomas Jefferson, Notes of Presents Given to American Diplomats by Foreign Governments, ca. 1791 [hereinafter Notes of Presents], http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0004; Nicholas R. Parrillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780–1940*, at 79 (2013); *id.* (noting also that the prohibition as contained in the Articles of Confederation had little effect).

[18] Jefferson, Notes of Presents, *supra*; Davis, *Diplomatic Gifts and Emoluments*, *supra*, at 379–80.

[19] Letter from Arthur Lee to the President of Congress (Oct. 7, 1780), *in* 4 *Revolutionary Diplomatic Correspondence of the United States* 85-86 (Francis Wharton ed., 1889); 18 *Journals of the Continental Congress, 1774–1789*, at 1114–15 (Gaillard Hunt ed., 1910) (consent of Continental Congress).

rule."[20]  When Franklin took leave of the French Court in 1785, he also received a miniature

portrait of the King set with 408 diamonds,[21] which he later received permission to keep.[22]

Not only is the history of the Clause's adoption devoid of any concern about an official's

private commercial businesses, historical context reinforces a bounded understanding of the

Clause.  A theme throughout the Constitutional Convention and the ensuing debate over the

ratification of the Constitution was the tension between the concern that public officials would be

influenced by pecuniary inducements, on the one hand, and the need to adequately compensate

capable persons who otherwise may not have sufficient means to assume public office, on the

other.  *See, e.g.*, *Debates in the Federal Convention* at 43–46; *id*. at 402 ("the Legislature would

make their own wages . . . too low, so that men ever so fit could not serve unless they were at the

same time rich"); 3 *Debates in the Several State Conventions* at 371–72; *id.* at 388 (contrasting

the President with the king of England, who "has a more permanent interest"; "His stock, his

family, is to continue in possession of the same emolument"); *id.* at 484 ("it is not many years

ago—since the revolution—that a foreign power offered emoluments to persons holding offices

under our government"); 1 *id.* at 440 ("It is asserted that it will be very difficult to find men

sufficiently qualified as legislators without the inducement of emolument.  I do believe that men

of genius will be deterred, unless possessed of great virtues."); 3 *id.* at 368 ("the principal source

of corruption in representatives is the hope or expectation of offices and emoluments").  Thus,

for example, Benjamin Franklin advocated that the President should not receive any "salary,

stipend[,] fee or reward whatsoever" for his services.  *Debates in the Federal Convention* at 43–

46.  The delegates decided instead that the President would receive a fixed compensation during

his tenure.  *Id.* at 103, 294, 326.  Franklin and John Rutledge then proposed that the President not

receive "any other emolument" from the federal government or any of the States, *id.* at 571, thus

---

[20] Jefferson, Notes of Presents, *supra*.

[21] Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790),
http://founders.archives.gov/documents/Jefferson/01-16-02-0206-0003.

[22] *See* 30 *Journals of the Continental Congress, 1774–1789*, at 95 (John C. Fitzpatrick ed.,
1934).

avoiding the evils that would pose the greatest danger of undermining the President's independence—inducements in the forms of pecuniary compensation and other benefits for the President's services. *See The Federalist* No. 73, at 494 (Jacob E. Cooke ed., 1961). The Framers also settled on restricting the legislators' ability to assume those offices whose emoluments were increased during the legislators' tenure, and prohibiting public officials' receipt of foreign gifts, emoluments, offices, or titles. There was no discussion about constraints on private business pursuits by public officials, and in fact, as discussed below, such pursuits were common at the time of the Nation's founding.

### ii. Historical interpretation of the Clause

Historical evidence confirms that the Foreign Emoluments Clause was not designed to reach commercial transactions that a President (or other federal official) may engage in as an ordinary citizen through his business enterprises. At the time of the Nation's founding, government officials were not given generous compensations, and many federal officials were employed with the understanding that they would continue to have income from private pursuits. *See* White, *The Federalists*, *supra*, at 291–92, 296. Charles Pinckney, who was credited with proposing the Foreign Emoluments Clause, maintained half a dozen plantations in South Carolina while holding various public offices.[23] Presidents who were plantation owners similarly continued their agriculture businesses, exporting cash crops overseas. George Washington, who had left his nephew in charge of his highly successful business,[24] required "weekly reports" from his farm managers at Mount Vernon,[25] and responded with detailed

---

[23] *See* Robert W. Blythe et al., National Park Service, *Charles Pinckney National Historic Site Historic Resource Study* 24–25 (Aug. 2000), https://www.nps.gov/chpi/learn/historyculture/upload/CHPI_HRS.pdf.

[24] 6 Douglas Southall Freeman, *George Washington: A Biography* 160 (1954).

[25] *See, e.g.*, Letter from William Pearce to George Washington (Nov. 11, 1794), http://founders.archives.gov/documents/Washington/05-17-02-0111.

instructions.[26]  From his Presidential office, he wrote business plans, including those for his

gristmill, from which he exported flour and cornmeal to "England, Portugal, and the island of

Jamaica."[27]  Thomas Jefferson maintained his farm and nail factory at Monticello and exported

his tobacco crop to Great Britain.[28]  James Madison had a tobacco plantation in Montpelier,[29]

and James Monroe's 3,500 acre Highland plantation grew timber, tobacco, and grain.[30]  While

Madison's and Monroe's farm records apparently have not survived,[31] the export of farm

products such as tobacco to England and elsewhere had been common since colonial times.[32]

Had the Framers intended the Foreign Emoluments Clause to encompass benefits arising from a

---

[26] *See, e.g.*, Letter from George Washington to William Pearce (Jan. 12, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0050; Letter from George Washington to James Anderson (Jan. 8, 1797), http://founders.archives.gov/documents/Washington/99-01-02-00159.

[27] *Ten Facts about the Gristmill*, George Washington's Mount Vernon, Fact 9, http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill (last visited Sept. 15, 2017); National Register of Historic Places Registration Form, George Washington's Gristmill, § 8, at 9 (2003), http://www.dhr.virginia.gov/registers/Counties/Fairfax/029-0330_George_Washington_Grist_Mill_2003_Final_Nomination.pdf; Letter from George Washington to William Pearce (Apr. 20, 1794) (asking Pearce not to grind any more wheat until instructed otherwise because of an embargo against ships sailing to foreign ports), http://founders.archives.gov/documents/Washington/05-15-02-0488; *see also* Thirty-Day Embargo, 1 Stat. 400 (1794).

[28] Letter from Thomas Jefferson to William A. Burwell (Nov. 22, 1808), *in* 11 *The Works of Thomas Jefferson* 75–76 (Paul Leicester Ford ed., 1905); *see also* Alf J. Mapp, Jr., *Thomas Jefferson: Passionate Pilgrim* 19, 57 (1991).

[29] Bruce Chadwick, *James & Dolley Madison* 167 (2014); Robert A. Nowlan, *The American Presidents, Washington to Tyler* 179 (2012).

[30] Gerald W. Gawalt, *James Monroe, Presidential Planter*, 101 Va. Mag. Hist. & Biography 251, 262–63 (1993); National Park Service, *Ash Lawn-Highland*, https://www.nps.gov/nr/travel/journey/hig.htm (last visited Sept. 15, 2017).

[31] *See* David O. Stewart, *Madison's Gift* 396 n.1 (2015); 5 *The Papers of James Monroe* xviii (Daniel Preston ed., 2014).

[32] *See, e.g.*, George Taylor, Arrangements between English and Southern Merchants (June 1790), http://founders.archives.gov/documents/Jefferson/01-16-02-0308-0003; National Park Service, *Historic Jamestowne, Tobacco: Colonial Cultivation Methods*, https://www.nps.gov/jame/learn/historyculture/tobacco-colonial-cultivation-methods.htm (last visited Sept. 15, 2017).

federal official's private commercial transactions with a foreign state, surely someone would have raised concerns about whether foreign governments or government-owned corporations may have been among the customers of the farm and other products regularly exported by early Presidents. Yet, there is no evidence of these Presidents taking any steps to ensure that they were not transacting business with a foreign government instrumentality. And one can reasonably expect that they would have taken such steps because many of them were involved in drafting or ratifying the Constitution.

If the term "Emolument" is as broadly defined as Plaintiffs claim it is, then George Washington would have violated the Domestic Emoluments Clause. As noted before, that Clause prohibits a President from accepting "any other Emolument from the United States, or any of them" beyond the compensation fixed by Congress for the duration of his term. U.S. Const. art. II, § 1, cl. 7. Washington directly transacted business with the federal government while President by purchasing several lots of public land in the then-Territory of Columbia in a public sale.[33] Washington himself had authorized the public sale, and the sale was conducted by the Commissioners of the District of Columbia,[34] who were appointed by Washington, *see* 1 Stat. 130.[35] In writing to the Commissioners to inquire about his prospect of being permitted to purchase more lots, Washington stated that he had "no desire . . . to stand on a different footing from every other purchaser."[36] But no concern was raised that such transactions conferred a benefit, and thus a prohibited emolument, on Washington. The absence of any such concern is especially telling because one of the three Commissioners had (like Washington himself)

---

[33] *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074.

[34] *See* Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068.

[35] *See also* George Cochrane Hazelton, *The National Capitol* 2–3 (1914).

[36] *See* Letter from George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), http://founders.archives.gov/documents/Washington/05-15-02-0289.

attended the Constitutional Convention,[37] and the other two had voted in the state ratification

conventions.[38]  Washington, as the first President, was especially careful about his conduct being

beyond reproach in part because he recognized that his conduct could be precedent-setting.  *See*

Letter from George Washington to Bushrod Washington (July 27, 1789) ("[m]y political conduct

. . . must be exceedingly circumspect and proof against just criticism, for the Eyes of Argus are

upon me, and no slip will pass unnoticed . . . .");[39] Letter from George Washington to James

Madison (May 5, 1789) ("As the first of everything, in *our situation* will serve to establish a

Precedent, it is devoutly wished on my part, that these precedents may be fixed on true

principles.");[40] Akhil Amar, *America's Unwritten Constitution* 309 (2012) ("Washington set

precedents from his earliest moments [as President] . . . .  Over the ensuing centuries, the

constitutional understandings that crystallized during the Washington administration have

enjoyed special authority over a wide range of issues.").

Plaintiffs' expansive construction of the Foreign Emoluments Clause is further

undermined by a proposed constitutional amendment that would have extended the prohibitions

of the Clause to all private citizens.  In 1810, Congress passed a resolution to forward the

following proposed amendment to the States for ratification:

> If any citizen of the United States shall accept, claim, receive or retain any title of
> nobility or honour, or shall, without the consent of Congress, accept and retain any

---

[37] *See* Letter from Thomas Johnson, David Stuart, and Daniel Carroll as the Commissioners for
the District of Columbia to George Washington (Mar. 23, 1794),
https://founders.archives.gov/documents/Washington/05-15-02-0331; *Debates in the Federal
Convention* at lxxxiv (Carroll).

[38] *See* 1 *Debates in the Several State Conventions* at 324 (Johnson); 3 *id.* at 654 (Stuart).

[39] *Available at* http://founders.archives.gov/documents/Washington/05-03-02-0189.

[40] *Available at* http://founders.archives.gov/documents/Washington/05-02-02-0157.  *See also*
Letter from George Washington to Catherine Sawbridge Macaulay Graham (Jan. 9, 1790) ("In
our progress towards political happiness my station is new; and, if I may use the expression, I
walk on untrodden ground. There is scarcely any action, whose motives may not be subject to a
double interpretation.  There is scarcely any part of my conduct wch [sic] may not hereafter be
drawn into precedent."), http://founders.archives.gov/documents/Washington/05-04-02-0363.

31

> present, pension, office or emolument of any kind whatever, from any emperor,
> king, prince or foreign power, such person shall cease to be a citizen of the United
> States, and shall be incapable of holding any office of trust or profit under them, or
> either of them.

Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810).

Although no floor debates were recorded to shed light on the purpose of the proposed amendment, it is implausible that this amendment was intended or understood as providing for the revocation of the citizenship of anyone engaging in commerce with foreign governments or their instrumentalities. Such a radical interpretation is all the more unlikely because the proposed constitutional amendment had overwhelming support in Congress,[41] and was only two States short of ratification.[42] Even if the proposed amendment were a manifestation of an anti-foreign attitude also speculated to exist at that time,[43] it is inconceivable that Congress and nearly three-fourths of the States intended to strip the citizenship of, for example, those hotel owners whose customers included visiting foreign diplomats using government funds.

### 3.    Application of the Clause since the Founding Era

For over two centuries, the Foreign Emoluments Clause has been interpreted and applied in an office- and employment-specific manner, without infringing on the ability of Presidents or other officeholders to have private business interests, when there is no indication that the official is using such businesses as a conduit to receive compensation for service to a foreign government in an official capacity or in an employment-like capacity. In line with its drafting history, the Clause was invoked most often, for the several decades following its adoption, in the context of foreign-government gifts tendered to U.S. diplomats or officials. *See* Wharton's Digest at 757–59. The first request made under the Constitution for congressional consent to

---

[41] 20 Annals of Cong. 672 (1810) (19 to 5 in the Senate); 21 Annals of Cong. 2050–51 (1810) (87 to 3 in the House).

[42] 2 American State Papers, 15th Cong., 1st Sess., Misc. 477–78 (1818), *available at* https://memory.loc.gov/ammem/amlaw/lwsplink.html.

[43] Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment: A Historical and Bibliographic Nightmare*, 88 L. Lib. J. 121, 124 (1996).

retain such gifts was Thomas Pinckney's request in 1798 to keep gifts he received from the courts of Madrid and London on the termination of his missions to those places.[44]  The Senate gave its consent but the House refused for policy reasons.[45]  In 1817, Secretary of State John Quincy Adams instructed diplomats that "every offer of [a gift from a foreign sovereign] which may in future be made to any public minister or other officer of this Government abroad, will be respectfully but decisively declined."  Wharton's Digest at 757; *see also* H.R. Rep. No. 23-302, at 4 (1834) (Secretary of State Louis McLane giving the same instruction to U.S. diplomats in 1834).  But rather than always declining foreign gifts, U.S. diplomats sometimes accepted foreign presents on behalf of the United States so as not to cause offense or compromise the efficacy of their agency or their personal safety.  Wharton's Digest at 758 (citing a March 4, 1834 report from the Committee on Foreign Affairs).  "The presents in such cases, when not perishable, [were] deposited in the State Department, or, when not susceptible of such deposit (as with horses), sold, and the proceeds sent to the Treasury."  *Id.*  The practice by U.S.-based officials was similar.  *See, e.g.*, S. Exec. Doc. No. 23-49, at 2–3 (1834) (listing foreign gifts received by U.S. officials and deposited with the Department of State); H.R. Rep. No. 23-302, at 2 (noting that Thomas Jefferson, while President, had received horses as presents from a foreign government, which he then sold, depositing the money into the Treasury); S. Exec. Doc. No. 37-23, at 6–7 (1862) (reprinting Abraham Lincoln's letter to the King of Siam accepting the King's gifts to him on behalf of the American people).

By 1881, Congress enacted the first law relating to the Foreign Emoluments Clause.  *See An act authorizing the persons therein named to accept of certain decorations and presents therein named, from foreign governments, and for other purposes*, ch. 32, § 3, 21 Stat. 603 (1881).  Consistent with preexisting practice, the focus of the law was on the issue of foreign gifts, and the law required that all presents, decorations, or other things "conferred or presented

---

[44] *See* 8 Annals of Cong. 1582–93 (1798); Wharton's Digest at 757; Davis, *Diplomatic Gifts and Emoluments, supra*, at 379.

[45] *Id.*

33

by any foreign government" to U.S. officials shall be tendered through the Department of State. *Id.* at 604; *see also* 5 U.S.C. § 115 (1925–26) (same); Pub. L. No. 89-554, 80 Stat. 378, 526–27 (1966) (re-codifying same provision at 5 U.S.C. § 7341) ("A present, decoration, or other thing presented or conferred by a foreign government to an employee, a Member of Congress, the President, or a member of a uniformed service shall be tendered through the Department of State"); Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (providing advance Congressional consent for U.S. officials to accept "gifts and decorations" from foreign governments under certain limited circumstances).

While gifts from foreign governments dominated the early history of the Foreign Emoluments Clause, at least by the mid-19th century the Clause had also been invoked by the Attorney General to prohibit U.S. officials from accepting foreign "Offices" or compensation for personal services rendered directly to a foreign government. *See, e.g.*, *Marshal of Florida*, 6 Op. Att'y Gen. 409 (1854) (Marshal for the Southern District of Florida could not hold the office of commercial agent of France); *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. 537, 538 (1871) (American minister to one foreign power could not accept a diplomatic commission to the same foreign power from another foreign power). By way of contrast, the Government is not aware of any instance in this era where the Clause was applied to business transactions outside of government by private commercial entities in which a U.S. official had a financial interest.

More modern applications of the Foreign Emoluments Clause by the Comptroller General of the United States and the Office of Legal Counsel of the Department of Justice ("OLC")—the two government components charged with interpreting the Clause's application— are to similar effect. In every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited emoluments, the determination involved an employment relationship (or a relationship akin to an employment relationship) with the foreign government. *See, e.g.*, *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 97 (1986) (agency consultant could not accept employment with a private corporation to perform work on a contract with a foreign

34

government); *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 158–59 (1982) (agency employee could not, on his leave time, work for an American consulting firm, which was under contract with a foreign government, to perform work on that contract); *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 819 (1970) (Air Force officer could not retain proceeds from the sale of contraband seized by the Republic of Colombia based upon information furnished by the officer while temporarily attached to the Colombian Air Force for training); *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *4 (Comp. Gen. Mar. 11, 1985) (retired Marine Corps officers who were attorneys employed by or served as "of counsel" to a law firm could not serve as legal counsel for the Office of the Saudi Military Attache without congressional consent); *Major Stephen M. Hartnett, USMC, Ret.*, 65 Comp. Gen. 382 (1986), *aff'd by* 69 Comp. Gen. 175 (1990); *To C.C. Gordon, USCG*, 44 Comp. Gen. 130 (1964), *aff'd by To Mr. Harvey E. Ward, USCG, Ret.*, B-154213, 1964 WL 1865 (Comp. Gen. Dec. 281, 1964); *To the Secretary of the Air Force*, 49 Comp. Gen 819 (1970); *To the Secretary of Health, Education and Welfare*, 51 Comp. Gen. 780 (1972), *aff'd by Dr. R. Edward Bellamy, USPHS, Ret.*, B-175166, 1978 WL 10026 (Comp. Gen. Apr. 7, 1978); *To N.R. Breningstall, Dep't of the Air Force*, 53 Comp. Gen 753 (1974); *see also Marshal of Florida*, 6 Op. Att'y Gen. at 409; *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. at 538. In the context of the Domestic Emoluments Clause, which also contains the term "Emolument," both components have determined that while in office, President Ronald Reagan could receive retirement benefits from the State of California, where he had served as the Governor, without violating the Domestic Emoluments Clause's prohibition against the receipt of "Emolument[s]" from a State. *See The Honorable George J. Mitchell*, *U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983) (President Reagan's pension from California could not "be construed as being in any manner received in consequence of his possession of the Presidency"); *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 192 (1981) ("those

35

[retirement] benefits are not emoluments in the constitutional sense" nor does their receipt "violate the spirit of the Constitution").

The issues in these OLC and Comptroller General opinions often revolved around the nature of compensation from the foreign government and the U.S. official's precise employment relationship with the foreign government. *Compare* Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) [hereinafter *Payment of Compensation*] (concluding that annuity payments made by the German Government to a federal official that were payable to other former German civil servants were prohibited by the Foreign Emoluments Clause),[46] *with Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 335 (1955) (acceptance of annuity payments made by the German Government to a federal official as damages for injuries inflicted by the Nazi regime while he was a former citizen and public official of Germany did not violate the Foreign Emoluments Clause).[47]

---

[46] *Available at* https://www.justice.gov/olc/page/file/935721/download.

[47] One published opinion interpreted the Foreign Emoluments Clause to reach beyond a U.S. official's own personal service to encompass an employment relationship between a foreign government and the U.S. official's law partners, in circumstances where the official and his law partners shared a "community of interest." *See Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (non-paid, non-government members of the Administrative Conference of the United States ("ACUS") prohibited from receiving a distribution from their law partnerships that included revenues from foreign governments), *modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/18411/download (non-paid, nongovernment members of ACUS not subject to the Emoluments Clause because they do not hold "Office[s] of Profit or Trust"). Situations involving law partners and their profit sharing are distinct from the financial interests at issue in this case. *See* Restatement (Third) of the Law Governing Lawyers § 123, cmt. b; Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983) (imputation of conflicts of interest within a law firm is based on the "premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated").

Congress's recent exercise of its constitutional authority to exempt particular activities from the scope of the Foreign Emoluments Clause is likewise inconsistent with viewing the Clause to reach private business arrangements having nothing to do with an official's personal service to a foreign power. In recent decades, Congress has enacted Foreign Emoluments Clause-related laws to allow retired members of the armed forces and Reservists—who are holders of "Office[s] of Profit or Trust" because they may be recalled to active duty—to accept certain foreign civil or military employment under specified conditions. *See* Pub. L. No. 97-295, 96 Stat. 1287 (1982), *codified at* 37 U.S.C. § 908 (providing general consent to civil employment); National Defense Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, § 1058, 107 Stat. 1547, 1834 (1993), *codified at* 10 U.S.C. § 1060 (providing general consent to employment by military forces of a newly democratic nation). It also has enacted laws to provide consent to other government employees' employment by foreign governments. *See*, *e.g.*, Panama Canal Commission Authorization Act for Fiscal Year 1994, Pub. L. No. 103-160, tit. XXXV, § 3504, 107 Stat. 1547, 1965 (1993), *codified at* 22 U.S.C. § 3641 note (providing consent under the Foreign Emoluments Clause to civil employment, and compensation for that employment, of alien employees of the Panama Canal Commission by the Government of Panama). Had Congress understood the Clause to reach more broadly than compensation arising from personal services rendered to a foreign government, it surely would have exempted a wider range of activities. Moreover, it is implausible that Congress would have exempted direct personal services to foreign governments yet left in place the prohibition on more attenuated interactions, such as holding a financial interest in a business that sells to foreign officials.

### B.  Plaintiffs' Arguments in Support of Their Interpretation Have No Merit.

In arguing that "Emolument" means "any monetary or nonmonetary benefit," Plaintiffs assert that the Founders drafted the Clause "with language 'both sweeping and unqualified,'" prohibiting officials "from accepting '*any* . . . Emolument . . . *of any kind whatever*' from '*any* . . . foreign State' unless Congress consents." *See* Am. Compl. ¶ 22 (emphasis in original). Plaintiffs' reliance on the italicized language is largely circular because such language does not

expand the meaning of "Emolument," but instead reflects an emphasis that the Clause does not exempt any type of "Emolument."  *See Payment of Compensation* at 8 ("the phrase 'of any kind whatever' was intended to cover compensation of any sort arising out of an employment relationship with a foreign state").  That conclusion sheds no light on the antecedent question of what constitutes an "Emolument" in the first place.[48]

Plaintiffs' attempt to rely on the purpose of the Foreign Emoluments Clause, *see* Am. Compl. ¶¶ 1, 10, 14, 21–22, is similarly misplaced.  Although the Clause was intended to combat corruption and foreign influence, the text, original understanding, and historical practice provide no support for Plaintiffs' inferential leap from the Clause's purpose to a blanket prohibition on receiving "any monetary or nonmonetary benefit" regardless of context.  "[N]o legislation," including the Constitution, "pursues its purposes at all costs."  *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam).  Indeed, as noted above, even as the Framers confronted the competing concerns that public officials would be influenced by pecuniary inducements and that capable persons might not have sufficient means to assume public office, they gave no indication that they intended to require officeholders to divest their private commercial businesses in order to assume federal office.

Plaintiffs' definition also would create absurd consequences.  For example, under Plaintiffs' theory, royalties from foreign book sales received by a President or covered official while in office would offend the Foreign Emoluments Clause if any of them were attributable to purchase by a foreign government instrumentality, such as a foreign public university.  *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign*

---

[48] *See Small v. United States*, 544 U.S. 385, 388 (2005) ("[t]he word 'any' considered alone cannot answer th[e] question" of how narrowly or broadly to interpret a statute); *United States v. Palmer*, 16 U.S. 610, 631 (1818) (Marshall, C.J.) ("general words," such as the word "'any,'" must "be limited" in their application "to those objects to which the legislature intended to apply them").

*Public Universities*, 18 Op. O.L.C. 13, 15 (1994) (foreign public universities are "presumptively foreign states under the [Foreign] Emoluments Clause").[49]

And, if the term "Emolument" is as interpreted by Plaintiffs, a President also could not hold United States Treasury bonds while in office because the accrued interest would be benefits "from the United States" under the Domestic Emoluments Clause. Also, mere stock holdings by a covered official in companies that conduct business globally would violate the Foreign Emoluments Clause, since some of those companies' earnings would be attributable to business with foreign governments. Before this suit, that conclusion had never been contemplated. For example, Vice President Nelson A. Rockefeller had stock holdings in major oil companies such as Exxon, Standard Oil of California and Indiana, and Texaco, as well as in other corporations that conducted business globally, including Dow Chemical, General Electric, and 3-M. Although these companies surely received some benefit from business with foreign governments, no Foreign Emoluments Clause concern was raised in the Senate or House committee reports concerning his confirmation, despite extensive discussions of those holdings.[50] Similarly, during her time in office, former Commerce Secretary Penny Pritzker owned a large quantity of stock in the Hyatt Hotels Corporation, which is substantially owned by her family and has hundreds of establishments throughout the world.[51] No issue concerning the Foreign Emoluments Clause

---

[49] For 2009, President Obama reported foreign income of approximately $1.6 million (*see* https://obamawhitehouse.archives.gov/sites/default/files/president-obama-2010-complete-return.pdf), which likely included royalties from the sale of his books. Many foreign public universities have President Obama's books in their library collection. *See, e.g.*, University of Melbourne, Library Catalog, http://library.unimelb.edu.au/; University of Ottawa, Library Catalog, http://biblio.uottawa.ca/en; Beijing Normal University, Library Catalog, http://www.lib.bnu.edu.cn/; Peking University, Library Catalog, http://lib.pku.edu.cn/portal/en.

[50] *See Nomination of Nelson A. Rockefeler of New York to be Vice President of the United States*, S. Exec. Doc. No. 93-34, at 28 (1974); *Confirmation of Nelson A. Rockefeller as Vice President of the United States*, H.R. Rep. No. 93-1609, at 39–40 (1974).

[51] *See* Secretary Penny Pritzker's financial disclosures for years 2014, 2015, 2016, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/; Hyatt Hotels Corporation, Form 10-K at F-41 (2016), http://s2.q4cdn.com/278413729/files/doc_financials/q4_2016/Hyatt-Q4-2016-Form-10-K.pdf.

39

arose,[52] even though the Secretary surely derived benefits from foreign governments' patronage of Hyatt Hotels worldwide and from any permits, licenses, or other regulatory approvals those governments granted to Hyatt Hotels to operate in their respective countries. Under Plaintiffs' theory, such holdings would be in violation of the Foreign Emoluments Clause as well.

Moreover, if Plaintiffs were correct that regulatory benefits such as permits, tax incentives, or exemptions granted by a foreign government to the President's business ventures abroad constitute emoluments, *see* Am. Compl. ¶¶ 66–67, then a U.S. official with overseas property that is subject to foreign licensure requirements would violate the Foreign Emoluments Clause as well. Retired members of the armed forces, who are subject to the Foreign Emoluments Clause, would face similar problems if they were to live or to do business abroad. As noted, Congress has consented in specified conditions to foreign employment and receipt of compensation by retired military personnel, but not to receipt of licenses, permits, and other foreign-government "benefits" that retired military personnel might need to take advantage of that consent. And under Plaintiffs' theory, a retired military officer also would not be able to own stock in a company, such as a hospitality establishment, *in the United States*, unless the establishment turns away all foreign government customers.

In short, Plaintiffs' proposed definition of "Emolument" would impose new, stringent limits on the activities and stock holdings of every holder of a federal "Office of Profit or Trust" in all three Branches of the Government, including every active and retired military officer—and

---

[52] No concerns about the Foreign Emoluments Clause were raised during Secretary Pritzker's confirmation hearing before the Senate Committee on Commerce, Science, and Transportation, nor during the floor debate preceding her confirmation vote. *See Nomination of Penny Pritzker to be Secretary of the U.S. Department of Commerce: Hearing Before the S. Comm. on Commerce, Science, and Transportation*, S. Hrg. 113-619, 113th Cong. (2013); 159 Cong. Rec. S5,119-22 (daily ed. June 25, 2013). Moreover, Secretary Pritzker was confirmed by a vote of 97 for and one against, with 22 of the Plaintiffs voting to confirm her and one of the lead Plaintiffs, Senator Blumenthal, rising to give a speech on the Senate floor in support of her confirmation. *See id.*; 159 Cong. Rec. S5,116 (daily ed. June 25, 2013). Finally, nothing concerning the Foreign Emoluments Clause was raised in Secretary Pritzker's ethics agreement with the Department of Commerce. *See* Secretary Pritzker's ethics agreement, *available at* Office of Government Ethics, Financial Disclosure, https://www.oge.gov/.

even Plaintiffs themselves. For example, under Plaintiffs' theory, no President, Member of Congress, or military officer could hold stock in any chain of hotels that is patronized by any representative of a foreign government who was traveling on official business. Indeed, covered officials would be barred from holding stock in any company that does business with any foreign government or government-owned corporation.

Plaintiffs have not stated a claim under the Foreign Emoluments Clause, and the case should be dismissed.

## IV.  THE RELIEF SOUGHT BY PLAINTIFFS IS UNCONSTITUTIONAL.

Finally, Plaintiffs seek an unconstitutional remedy: an injunction against the President in his official capacity effectively seeking to impose a condition on the President's ability to serve as President and to perform the duties he is duly elected to perform. In *Mississippi v. Johnson*, for example, the Supreme Court held it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties." 71 U.S. at 500–01 ("The Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department.").[53]  A plurality of the Court later reiterated that principle in *Franklin v. Massachusetts*. *See* 505 U.S. at 802–03 ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'") (quoting *Johnson*, 71 U.S. at 501). The plurality in *Franklin* found it "extraordinary" that the district court in that case had issued an injunction against the President and two other government officials. *Id.* at 802, 806. "At the threshold," it said, "the District Court should have evaluated whether injunctive relief against the President was available, and, if not, whether appellees' injuries were nonetheless redressable." *Id.* at 803. The plurality ultimately did not address whether injunctive relief against the President was appropriate in the circumstances of

---

[53] The Supreme Court has left open the question whether the President might be subject to an injunction requiring the performance of a purely "ministerial" duty. *See Johnson*, 71 U.S. at 500–01. However, the relief sought in this case—forcing the President to restructure his financial affairs in order to comply with Plaintiffs' interpretation of the Constitution—cannot fairly be described as purely "ministerial."

that case because it found that the alleged injury was likely to be redressed by declaratory relief against the Secretary of Commerce alone. *Id.* In this case, however, the President is the only defendant here and injunctive relief is sought directly against him. And in the 150 years since the Supreme Court decided *Johnson*, no court has issued an injunction against the President in his official capacity where he was the sole defendant. Justice Scalia explained in his concurrence in *Franklin* that, under *Johnson*, courts may impose neither injunctive nor declaratory relief against the President in his official capacity. *Id.* at 827–28 (noting that such principle is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history"). He reasoned that just as the President is absolutely immune from official capacity damages suits, so is he immune from efforts to enjoin him in his official capacity. *Id.* at 827 ("[m]any of the reasons [the Court] gave in *Nixon v. Fitzgerald*, [457 U.S. 731, 749 (1982)], for acknowledging an absolute Presidential immunity from civil damages for official acts apply with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions"). The lower courts have often applied this settled principle. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [the] request for a declaratory judgment"); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("[w]ith regard to the President, courts do not have jurisdiction to enjoin him"); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 557, 605 (4th Cir. 2017) ("we find that the district court erred in issuing an injunction against the President himself"), *cert. granted*, 137 S. Ct. 2080, 2089 (2017).

The *Johnson* case is supported by the President's unique position atop the Article II hierarchy. Courts have "recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint." *Fitzgerald*, 457 U.S. at 753. The President "occupies a unique position in the constitutional scheme" and is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost

42

discretion and sensitivity." *Id.* at 749–50; *Franklin*, 505 U.S. at 827 (Scalia, J., concurring) (referring to the President and Congress as the "principals in whom the executive and legislative powers are ultimately vested"). Such restraint is particularly warranted in circumstances where, as here, Plaintiffs seek relief that would require detailed superintendence of the President's affairs. Plaintiffs challenge everything from a single diplomat's payment for hospitality services to any trademarks, permits, licenses, and approvals that may be granted by foreign governments in connection with the commercial activities of the President's business organization in numerous countries. Any relief directed at those activities would ensnare the President in prolonged litigation over any number of transactions, "distract[ing] [the President] from his constitutional responsibility to 'take Care that the Laws be faithfully executed,'" *id.* at 828 (Scalia, J., concurring), even though "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties," *Loving*, 517 U.S. at 757; *see also Clinton v. Jones*, 520 U.S. 681, 714 (1997) (Breyer, J., concurring) ("Article II implicitly grants an official inviolability to the President while he is in the discharge of the duties of his office, and that this inviolability must be broad enough to permit him to perform his official duties without obstruction or impediment."). In sum, this Court cannot issue the requested injunctive relief against the President.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.


Dated: September 15, 2017                    Respectfully submitted,

                                             CHAD A. READLER
                                             Acting Assistant Attorney General

                                             BRETT A. SHUMATE
                                             Deputy Assistant Attorney General

                                             JENNIFER D. RICKETTS
                                             Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

Case 1:17-cv-01154-EGS Document 21-1 Filed 09/15/17 Page 60 of 60

**CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2017, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jean Lin*
JEAN LIN

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> Defendant. | Civil Action No. 17-cv-1154 (EGS) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION .................................................................................................. 1

ARGUMENT .......................................................................................................... 4

    I.    The Plaintiffs Have Standing ................................................................. 4

          A.    Members of Congress Have Standing To Sue When a President Deprives Them of Specific Votes to Which They Are Constitutionally Entitled ....... 5

               1.    Vote Deprivation Is a Cognizable Legal Injury ................................. 5

               2.    *Raines* Permits Members of Congress To Sue Over the Complete Deprivation of Their Right To Vote ..................................................... 9

               3.    D.C. Circuit Precedent Since *Raines* Also Permits Genuine Vote Deprivation Claims ............................................................................. 14

          B.    President Trump Is Denying Members of Congress Their Right To Vote on the Foreign Emoluments He Is Accepting Without Their Consent ....... 16

          C.    There Are No Adequate Legislative Remedies ........................................... 22

    II.    President Trump's Acceptance of Valuable Benefits from Foreign States Without Congressional Consent Violates the Foreign Emoluments Clause ......... 28

          A.    The Meaning of "Emolument" .................................................................... 29

          B.    Constitutional Text and Structure ............................................................... 34

          C.    Constitutional Purpose ................................................................................ 36

    III.    The President's Remaining Arguments Have No Merit ....................................... 41

CONCLUSION ...................................................................................................... 45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*,
    697 F.2d 303 (D.C. Cir. 1982) ................................................................. 8, 20-21

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ................................................................. *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ................................................................. 42

*ASARCO, Inc. v. Kadish*,
    490 U.S. 605 (1989) ................................................................. 6

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................. 6

*Bender v. Williamsport Area Sch. Dist.*,
    475 U.S. 534 (1986) ................................................................. 13-14

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................. 43

*Bond v. United States*,
    564 U.S. 211 (2011) ................................................................. 43

*Byrd v. Raines*,
    956 F. Supp. 25 (D.D.C. 1997) ................................................................. 10

*Campbell v. Clinton*,
    203 F.3d 19 (D.C. Cir. 2000) ................................................................. 11, 16, 22, 23, 27

*Chenoweth v. Clinton*,
    181 F.3d 112 (D.C. Cir. 1999) ................................................................. 7, 15, 16, 22, 23

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ................................................................. 43

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ................................................................. 14

*Clinton v. Jones*,
    520 U.S. 681 (1997) ................................................................. 45

*Coleman v. Miller*,
    307 U.S. 433 (1939) ................................................................. *passim*

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Comm. on Judiciary v. Miers,*
558 F. Supp. 2d 53 (D.D.C. 2008) ............................................................... 42

*Comm. on Oversight & Gov't Reform v. Holder,*
979 F. Supp. 2d 1 (D.D.C. 2013) ................................................................. 13

*Common Cause v. Biden,*
909 F. Supp. 2d 9 (D.D.C. 2012) ................................................................. 15

*Corr. Servs. Corp. v. Malesko,*
534 U.S. 61 (2001) ....................................................................................... 42

*Dennis v. Higgins,*
498 U.S. 439 (1991) ..................................................................................... 42

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ..................................................................................... 29

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.,*
565 U.S. 606 (2012) ..................................................................................... 42

*Fed. Election Comm'n v. Akins,*
524 U.S. 11 (1998) ....................................................................................... 13

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ..................................................................................... 44

*Free Enter. Fund v. P.C.A.O.B.,*
561 U.S. 477 (2010) ..................................................................................... 42

*Goldwater v. Carter,*
444 U.S. 996 (1979) ..................................................................................... 24

*Goldwater v. Carter,*
617 F.2d 697 (D.C. Cir. 1979) ............................................................. *passim*

*Himely v. Rose,*
9 U.S. 313 (1809) ......................................................................................... 30

*Hollingsworth v. Perry,*
133 S. Ct. 2652 (2013) ................................................................................. 12

*Holmes v. Jennison,*
39 U.S. 540 (1840) ....................................................................................... 34

*Kennedy v. Sampson,*
511 F.2d 430 (D.C. Cir. 1974) ............................................................. 6, 9, 16

iii

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Kucinich v. Bush*,
  236 F. Supp. 2d 1 (D.D.C. 2002) ................................................................ 14

*LaRoque v. Holder*,
  650 F.3d 777 (D.C. Cir. 2011) ................................................................ 42

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) ................................................................ 43

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................ 4, 12

*Marbury v. Madison*,
  5 U.S. 137 (1803) ................................................................ 28

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ................................................................ 18

*Metlife, Inc. v. F.S.O.C.*,
  865 F.3d 661 (D.C. Cir. 2017) ................................................................ 14

*Michel v. Anderson*,
  14 F.3d 623 (D.C. Cir. 1994) ................................................................ 10

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ................................................................ 43, 44

*Moore v. U.S. House of Representatives*,
  733 F.2d 946 (D.C. Cir. 1984) ................................................................ 10, 11, 16

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) ................................................................ 28

*Nev. Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ................................................................ 17

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ................................................................ 37, 45

*Powell v. McCormack*,
  395 U.S. 486 (1969) ................................................................ 12

*Raines v. Byrd*,
  521 U.S. 811 (1997) ................................................................ *passim*

*Riegle v. Fed. Open Mkt. Comm.*,
  656 F.2d 873 (D.C. Cir. 1981) ................................................................ 7, 20, 43

iv

# TABLE OF AUTHORITIES – cont'd

<strong>Page(s)</strong>

*Rochester Pure Waters Dist. v. E.P.A.*,
  960 F.2d 180 (D.C. Cir. 1992) .................................................................... 27

*Russell v. DeJongh*,
  491 F.3d 130 (3d Cir. 2007) ...................................................................... 7

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................ 4, 12

*Sporhase v. Nebraska ex rel. Douglas*,
  458 U.S. 941 (1982) ................................................................................ 26

*Swan v. Clinton*,
  100 F.3d 973 (D.C. Cir. 1996) .................................................................. 44, 45

*Thompson v. N. Am. Stainless, LP*,
  562 U.S. 170 (2011) ................................................................................ 43

*United States v. Adewani*,
  467 F.3d 1340 (D.C. Cir. 2006) ................................................................ 7

*United States v. MacCollom*,
  426 U.S. 317 (1976) ................................................................................ 27

*United States v. Sprague*,
  282 U.S. 716 (1931) ................................................................................ 29

*Vander Jagt v. O'Neill*,
  699 F.2d 1166 (D.C. Cir. 1982) ................................................................ 10


## CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

U.S. Const. art. I, § 1 ................................................................................ 17

U.S. Const. art. I, § 3, cl. 1 ....................................................................... 17

U.S. Const. art. I, § 5, cl. 3 ....................................................................... 17

U.S. Const. art. I, § 6, cl. 2 ....................................................................... 35

U.S. Const. art. I, § 8, cl. 11 ..................................................................... 17

U.S. Const. art. I, § 7, cl. 2 ....................................................................... 26

U.S. Const. art. I, § 9, cl. 8 ....................................................................... 1, 16, 17

# TABLE OF AUTHORITIES – cont'd

|  | Page(s) |
|---|---|
| U.S. Const. art. II, § 2, cl. 2 | 17 |
| Pa. Const. of 1776, art. 5 | 30 |
| 5 Annals of Cong. (1798) (Joseph Gales ed., 1834) | 1, 28, 37, 43 |
| 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 1836) | *passim* |
| Department of Housing and Urban Development–Independent Agencies Appropriation Act, Pub. L. No. 97-272, 96 Stat. 1160, 1164 (1982) | 21 |
| Foreign Gifts and Decorations Act of 1966, Pub. L. No. 89-673, 80 Stat. 952 (codified as amended at 5 U.S.C. § 7342) | 18 |
| H.R.J. Res. 26, 115th Cong. (2017) | 24 |
| 2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) | *passim* |
| S. Con. Res. 8, 115th Cong. (2017) | 24 |
| Standing Rules of the Senate Rule XXII § 2 | 25 |

### EXECUTIVE BRANCH MATERIALS

|  | Page(s) |
|---|---|
| 49 Comp. Gen. 819 (1970) | 38, 40 |
| 53 Comp. Gen. 753 (1974) | 39 |
| *Comptroller General*, Matter of: Major James D. Dunn & Senior Master Sergeant *Marcus A. Jenkins*, B-251084, 1993 WL 426335 (Oct. 12, 1993) | 41 |
| 5 Op. O.L.C. 187 (1981) | 28 |
| 6 Op. O.L.C. 156 (1982) | 41 |
| 10 Op. O.L.C. 96 (1986) | 37, 41 |
| 11 Op. O.L.C. 89 (1987) | 29, 45 |
| 17 Op. O.L.C. 114 (1993) | 3, 34, 39, 40, 41 |
| 18 Op. O.L.C. 13 (1994) | 28, 37 |
| 24 Op. Att'y Gen. 116 (1902) | 29 |
| 40 Op. Att'y Gen. 513 (1947) | 41 |

**TABLE OF AUTHORITIES – cont'd**

*Memorandum for Andrew F. Gehmann, Exec. Assistant, Office of the Attorney Gen., from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* (Oct. 16, 1962).................................................................................................................... 38, 39

*Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel* (May 23, 1986)... 41

*Memorandum for James H. Thessin, Assistant Legal Advisor, U.S. Dep't of State, from John O. McGinnis, Deputy Assistant Attorney Gen., Office of Legal Counsel* (Aug. 29, 1988).................................................................................................................... 37

*Memorandum for S. A. Andretta, Admin. Assistant Attorney Gen., from J. Lee Rankin, Assistant Attorney Gen., Office of Legal Counsel* (Oct. 4, 1954)............................... 37-38

*Memorandum Opinion for the Counsel to the President from John M. Harmon, Acting Assistant Attorney Gen., Office of Legal Counsel* (Apr. 11, 1977) .......................... 34

*Memorandum Opinion for the Counsel to the President, Office of Legal Counsel*, 2009 WL 6365082 (Dec. 7, 2009)............................................................................ 37, 39

*Memorandum Opinion for the Special Assistant to the President from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* (May 10, 1963)...................... 41

BOOKS, ARTICLES, AND OTHER AUTHORITIES

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774)......... 33

*Black's Law Dictionary* (10th ed. 2014)....................................................................... 33

Brief for Appellants, *Raines v. Byrd*, 1997 WL 251415............................................................................................... 11

Brief for Appellees, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 2015 WL 254635................................................................................................ 8

Brief for United States, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 2015 WL 309078................................................................................................ 8

Tench Coxe, *An Examination of the Constitution for the United States of America*, No. 4 (Oct. 21, 1787).................................................................................................. 37

Samuel Johnson, *A Dictionary of the English Language* (1755)................................... 30

Letter from James Madison to David Humphreys (Jan. 5, 1803)................................... 19

Letter from James Madison to Thomas Jefferson (Aug. 12, 1786) ............................... 31

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Merriam-Webster Dictionary Online*....................................................................... 33

John Mikhail, *A Note on the Original Meaning of "Emolument,"*
Balkinization (Jan. 18, 2017) ...................................................................... 31

John Mikhail, *"Emolument" in Blackstone's Commentaries*,
Balkinization (May 28, 2017) ...................................................................... 31

John Mikhail, *The Definition of "Emolument" in English Language and Legal
Dictionaries, 1523-1806* (July 9, 2017) ............................................... 30, 31, 33, 34

4 John Bassett Moore, *A Digest of International Law* (1906) ....................................... 18

*Oxford English Dictionary* (2d ed. 1989) ........................................................ 30, 32

James C. Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the
U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*
(Sept. 14, 2017) ........................................................................................... 31, 34

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1346 (1833) 37

Jonathan Swift, *The Tale of a Tub* (Henry Morley ed., 1889) (1704) ........................... 30

U.S. Continental Congress, A Declaration by the Representatives of the United Colonies
of North-America, Now Met in Congress at Philadelphia, Setting Forth the Causes and
Necessity of Their Taking Up Arms (July 6, 1775)................................................... 30

Virginia Nonimportation Resolutions (June 22, 1770)................................................. 31

# INTRODUCTION

Recognizing the danger that foreign states "will intermeddle in our affairs, and spare no expence to influence them," 2 *The Records of the Federal Convention of 1787*, at 268 (Max Farrand ed., 1911) (Elbridge Gerry), the Framers imbued our national charter with vital safeguards against foreign influence. Chief among them is the Foreign Emoluments Clause, which provides that "no Person holding any Office of Profit or Trust under [the United States] shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8.

The Founding generation recognized that if benefits from foreign states "were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors." 5 Annals of Cong. 1583 (1798) (Joseph Gales ed., 1834) (James Bayard). To avoid that danger, they required such benefits to "be laid before Congress." *Id.* at 1585 (Harrison Gray Otis). Past presidents have done exactly that, *see* Am. Compl. ¶ 31, respecting the Constitution's clear rule—that they may accept such benefits only by first obtaining "the Consent of the Congress."

Not so President Trump. Rather than "make known to the world," 5 Annals of Cong. 1583 (Bayard), the financial rewards he is receiving from foreign governments through his business empire, and seek Congress's consent before accepting them, the President has disregarded the Constitution's structural safeguard against undue foreign influence on America's leaders.

The results are as clear as they are unsurprising. Foreign diplomats flock to the President's Washington, D.C., hotel, where they spend three times the market rate, so they can tell him, "'I love your new hotel!'" Am. Compl. ¶ 54-55. After the President reverses himself and pledges to honor China's policy toward Taiwan, the Chinese government grants him valuable trademarks,

1

including many it had previously denied. *Id.* ¶¶ 44-49. The success of countless Trump-branded projects abroad hinges on the regulatory decisions of foreign officials, and the President advocates for those projects in conversations with foreign leaders. *Id.* ¶ 66. Meanwhile, the President's New York properties collect annual payments from Saudi Arabia and China (and possibly other foreign states), who hold sway through their ability to relocate. *Id.* ¶¶ 58-61, 70. And these examples reflect only what public reporting has brought to light. Given the extent of the President's business empire and the secrecy surrounding it, Congress cannot know what other benefits the President is accepting from foreign states.

Despite the clear text of the Foreign Emoluments Clause, President Trump has not sought Congress's consent for any benefits he has been or will be accepting from foreign states. His excuse defies comprehension. According to the President, the Constitution prohibits him only from providing what he calls "personal services" to a foreign government, as an employee or something "akin" to one. Def. Mem. 3. Thus, were the President to "personally" provide services to a foreign state, the Clause would, he admits, prevent him from accepting payment in reward. But because he is wealthy enough to own companies that provide services without his personal involvement, he may, he says, accept unlimited sums from foreign governments. In his view, those governments may even funnel profits to him through his businesses specifically because he is the President, as long as they are not doing so in exchange for specific "services rendered" as President. *Id.*

There is a reason this tortured reading of the Clause has not been advanced before. To start, it rests on a novel and crabbed definition of the word "emolument." At the Founding, that word referred to benefit or gain of any kind, and it was frequently used to describe the profits of business. Such is its meaning in the Clause, as surrounding text and structure make clear, and adherence to this broad meaning enables the Clause to fulfil its vital role in our constitutional system. President

Case 1:17-cv-01154-EGS Document 17 Filed 10/26/17 Page 32 of 58

Trump's new definition, tailored to exempt his own business activities, would undermine the Clause's most basic purpose, allowing foreign largesse to flow freely to officeholders able to make money from foreign governments without providing "personal services." And by permitting foreign powers to shower him with benefits specifically because he is the President, except as payment for specific official decisions made in their favor, the President's interpretation would reduce the Clause to a mere regulation of quid-pro-quo bribery. Yet from the moment it was introduced in Philadelphia, the Clause has always been recognized as something far more than that—a prophylactic safeguard against the *possibility* of foreign corruption, meant to ensure that American officials are "independent of external influence." 2 *The Records of the Federal Convention of 1787*, at 389 (Charles Pinckney) [hereinafter *Convention Records*].

If the President believes that his judgment will not be affected by his receipt of financial rewards from foreign states through his businesses, the Constitution provides a simple solution: obtain "the Consent of the Congress." In the structure established by the Framers, "[t]he decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of … emoluments otherwise barred by the Clause." 17 Op. O.L.C. 114, 121 (1993).

The President attempts to use this textual commitment as a club, Def. Mem. 17, arguing that this case should be dismissed because the issue is better resolved by Congress. But it cannot be resolved by Congress, because Congress cannot force the President to do what the Constitution requires: seek and obtain consent *before* accepting foreign emoluments. By refusing to do that, the President is denying members of Congress their right to cast binding votes on whether he may accept those emoluments. Legislators have an Article III interest in "maintaining the effectiveness of their votes," *Coleman v. Miller*, 307 U.S. 433, 438 (1939), and the unlawful deprivation of an

3

opportunity to vote confers standing, *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 (2015). When the President secretly accepts emoluments without consent, he prevents the Plaintiffs from casting votes on those emoluments. The result is no mere "abstract dilution of institutional legislative power," *Raines v. Byrd*, 521 U.S. 811, 826 (1997), but rather the nullification of an individual prerogative held by each voting member—one guaranteed in the Constitution. Because Congress cannot fix this problem itself, its members must turn to the courts to enforce their rights and vindicate the Constitution's key safeguard against foreign corruption.

## ARGUMENT

### I.      The Plaintiffs Have Standing

According to President Trump, members of Congress lack standing to enforce a constitutional decree that he seek and obtain "the Consent of the Congress" before accepting benefits from foreign states. This is wrong, as constitutional text, judicial precedent, historical practice, and respect for the rule of law all make clear.

Article III standing requires plaintiffs to have "suffered an injury in fact" that is "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, *Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). The Plaintiffs here meet all three criteria. They have suffered an "injury in fact" because they have been denied a voting opportunity to which the Constitution entitles them. That injury is "fairly traceable" to the President's conduct because they cannot vote on whether to consent to the acceptance of any emoluments when he accepts them secretly and without seeking congressional consent. And a "favorable judicial decision" by this Court requiring the President to obtain congressional consent before accepting foreign emoluments would redress this injury. Because the Plaintiffs meet these criteria, and because they have no effective legislative

4

means of redressing their injury, they may turn to the courts to enforce their rights.

### A. Members of Congress Have Standing To Sue When a President Deprives Them of Specific Votes to Which They Are Constitutionally Entitled

#### 1. Vote Deprivation Is a Cognizable Legal Injury

Denying lawmakers their ability to cast an effective vote robs them of one of their core powers and responsibilities. For that reason, the Supreme Court has long recognized that legislators whose votes "have been completely nullified" by unlawful executive action "'have a plain, direct and adequate interest in maintaining the effectiveness of their votes,'" *Raines*, 521 U.S. at 823 (quoting *Coleman*, 307 U.S. at 438), and may seek judicial redress to "have their votes given effect," *Coleman*, 307 U.S. at 438. Vote nullification occurs not only when a previously cast vote is unlawfully disregarded but also when, as here, the opportunity to cast a vote is unlawfully denied. *Ariz. State Legislature*, 135 S. Ct. at 2665 (recognizing standing to challenge ballot measure that would "completely nullify any vote by the Legislature, now or in the future" on a particular subject (brackets and quotation marks omitted)).

President Trump nevertheless claims that "the denial of institutional legislative prerogative is not a judicially cognizable injury." Def. Mem. 1. That is flat wrong.

In *Coleman*, the Supreme Court held that individual state legislators had standing to challenge executive interference that caused their votes on a measure to be "overridden and virtually held for naught." 307 U.S. at 438. After the Kansas state senate split evenly on a vote to ratify a federal constitutional amendment, the lieutenant governor purported to cast a tie-breaking vote in favor of ratification. Arguing that he lacked authority to do so, senators who had voted against ratification sued. When the Kansas Supreme Court denied relief, the senators asked the U.S. Supreme Court to hear the case. *Id*. at 436-37. The Court rejected a challenge to their standing, recognizing that "[t]hey have set up and claimed a right and privilege under the Constitution of the

5

United States to have their votes given effect." *Id*. at 438. As the Court later explained, the plaintiffs, asserting an "institutional injury" to their roles as legislators, had standing because their votes were "deprived of all validity." *Raines*, 521 U.S. at 821-22.

In the years since *Coleman*, the Supreme Court has repeatedly reaffirmed it and relied on its standing analysis. When Tennessee residents sued to vindicate their "right to a vote free of arbitrary impairment by state action," the Court upheld their standing because "[t]hey [we]re asserting 'a plain, direct and adequate interest in maintaining the effectiveness of their votes,'" not merely a generalized interest in lawful government. *Baker v. Carr*, 369 U.S. 186, 208 (1962) (quoting *Coleman*, 307 U.S. at 438). When members of Congress challenged the constitutionality of the Line Item Veto Act, the Court rejected the "drastic extension of *Coleman*" needed to sustain their claims, but also squarely rejected the Justice Department's entreaty to overrule the decision. *Raines*, 521 U.S. at 826. And when the Arizona state legislature challenged a ballot measure that took away one of its institutional prerogatives, the Court relied on *Coleman* in holding that the legislature had standing—specifically reaffirming "the precedential weight of *Coleman*" in the process. *Ariz. State Legislature*, 135 S. Ct. at 2665 & n.13.[1]

Applying *Coleman*, the D.C. Circuit has repeatedly held that members of Congress have standing to contest the invalidation of their votes. Federal legislators, like their state counterparts, are injured within the meaning of Article III when their votes are unlawfully disregarded. *See Kennedy v. Sampson*, 511 F.2d 430, 436 (D.C. Cir. 1974) (affirming a Senator's standing "to

---

[1] The President tries to undermine *Coleman* by recycling an argument made to no avail in *Raines*: that having begun in state court, it "has no applicability to a similar [federal court] suit." *Raines*, 521 U.S. at 824 n.8. But the plaintiffs in *Coleman* needed to demonstrate Article III standing to "invoke [the Supreme Court's] jurisdiction," *Coleman*, 307 U.S. at 438, regardless of where the suit originated. *See ASARCO, Inc. v. Kadish*, 490 U.S. 605, 618 (1989). And *Arizona*'s reliance on *Coleman* leaves no doubt about its applicability to cases filed in federal court.

vindicate the effectiveness of his vote" after "an illegal nullification" by the President).

Importantly, the D.C. Circuit has also recognized that vote nullification under *Coleman* and *Kennedy* occurs not just when legislators' votes are negated after the fact, but also when legislators are denied their right to cast a vote to which they are entitled. Members of Congress are injured, in other words, when presidential action "nullifies a specific congressional vote or opportunity to vote." *Goldwater v. Carter*, 617 F.2d 697, 702 (D.C. Cir. 1979) (en banc), *vacated on other grounds*, 444 U.S. 996 (1979); *see Chenoweth v. Clinton*, 181 F.3d 112, 114 (D.C. Cir. 1999) (*Goldwater* rested "[o]n the same theory" as *Kennedy*); *see also Russell v. DeJongh*, 491 F.3d 130, 135 (3d Cir. 2007) (standing arises from "nullifying a legislator's vote or depriving a legislator of an opportunity to vote"). In *Goldwater*, for instance, Senators sued the President for terminating a treaty without obtaining Senate consent, as they alleged he was required to do. "By excluding the Senate from the treaty termination process," the D.C. Circuit held, "the President has deprived each individual Senator of his alleged right to cast a vote that will have binding effect on whether the Treaty can be terminated," giving them standing. 617 F.2d at 702.[2]

The crux of *Goldwater* and the cases that followed is this: members of Congress have standing when they plausibly allege that the law requires their consent for an action, and an executive branch official takes that action without submitting it for a vote. Thus, the Circuit recognized a Senator's standing when officials were allegedly serving as "officers of the United States" without Senate confirmation, "depriv[ing] him of his constitutional right to vote in determining the advice and consent of the Senate." *Riegle*, 656 F.2d at 877. Likewise, it recognized

---

[2] Although *Goldwater* was vacated by the Supreme Court, no Justice questioned its holding on standing. Indeed, "[t]he Court ignored the standing concept altogether." *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 880 (D.C. Cir. 1981). Because the Court did not address standing, that portion of *Goldwater* remains binding Circuit precedent in the absence of contrary authority. *United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006).

the standing of a House appropriations committee member when a cabinet secretary reorganized his department without the committee's approval, as required by statute—"depriving [the member] of that specific statutory right to participate in the legislative process." *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982).

As these decisions illustrate, members of Congress are harmed in their institutional roles when an official performs a specific act that requires congressional consent without having obtained it—whether that lack of consent is due to the failure of a vote or a decision to bypass a vote entirely. After all, the problem in *Coleman* was not that the plaintiffs' votes went uncounted—they were all tallied correctly—but rather that the amendment was "deemed ratified" notwithstanding the failure of a senate majority to approve it. *Raines*, 521 U.S. at 822.

The Supreme Court recently reaffirmed that deprivation of a vote gives rise to standing. When Arizona voters "remove[d] redistricting authority from the Arizona Legislature," the Court concluded the legislature had standing to challenge the measure because it "would 'completely nullif[y]' any vote by the Legislature, now or 'in the future,' purporting to adopt a redistricting plan." *Ariz. State Legislature*, 135 S. Ct. at 2658, 2665 (quoting *Raines*, 521 U.S. at 823-24). After *Arizona*, one cannot seriously contend that votes are nullified only when a past vote is disregarded. *See* Def. Mem. 11. That very argument was pressed in *Arizona*—and rejected.[3]

In sum, the Supreme Court and the D.C. Circuit have held that legislators have a cognizable legal interest in preserving the effectiveness of their votes. They have also held that denying the ability to vote is just as harmful as disregarding the results of a vote. And that makes sense. Imagine

---

[3] *See* Appellees Br. at 20, 2015 WL 254635 ("Proposition 106 ... nullified no concrete exercise of the Legislature's power, as *Raines* requires ... Appellant cannot point to any specific legislative act that would have taken effect but for Proposition 106."); United States Br. at 21, 2015 WL 309078 ("appellant has not identified any 'specific' redistricting legislation that a sufficient number of state legislators have voted ... to enact").

if the *Coleman* defendants had simply deemed the amendment to be ratified without submitting it to the legislature. This would have harmed the plaintiffs no less than allowing them to go through the motions of voting but then ignoring the outcome. At bottom, the harm is identical: depriving legislators of their right to cast a vote that is given the legal effect which it is due. "No more essential interest could be asserted by a legislator." *Kennedy*, 511 F.2d at 436.

> ## 2. *Raines* Permits Members of Congress To Sue Over the Complete Deprivation of Their Right To Vote

President Trump relies chiefly on *Raines v. Byrd* to dispute the Plaintiffs' standing. But *Raines* is not the silver bullet he suggests—far from it. *Raines* did not overrule *Coleman*, do away with vote nullification, or hold that legislators cannot be injured in their institutional capacities. While the Court declined to adopt "a drastic extension of *Coleman*," *Raines*, 521 U.S. at 826, it reaffirmed that the complete denial of an effective vote is a cognizable injury.

In *Raines*, six members of Congress sued executive branch officials without alleging that those officials had harmed them. They claimed instead to be injured by a law recently passed by their colleagues, the Line Item Veto Act, which empowered the President to selectively "cancel" certain spending and tax provisions after signing them into law. *Id*. at 814. The plaintiffs maintained that this new presidential authority "'alter[ed] the legal and practical effect of all votes they may cast on bills containing such separately vetoable items,'" "'divest[ed] the[m] of their constitutional role in the repeal of legislation,'" and "'alter[ed] the constitutional balance of powers between the Legislative and Executive Branches.'" *Id*. at 816 (quoting plaintiffs' complaint).

The plaintiffs did not allege that any votes they had cast had been invalidated or that they were being deprived of their right to vote. Thus, their claims were not within the framework of *Coleman*, *Kennedy*, and *Goldwater*. The district court nonetheless held that they had standing because, by that point, the Circuit had recognized legislator standing in cases well outside that

framework, based on allegations of indirect harm to a legislator's influence—even when Congress itself was to blame. *See, e.g.*, *Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994) (standing to challenge "dilution" of voting power caused by House rule granting voting rights to delegates from the territories and the District of Columbia); *Moore v. U.S. House of Representatives*, 733 F.2d 946, 953 (D.C. Cir. 1984) (standing to challenge revenue-raising bill that originated in the Senate); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1167 (D.C. Cir. 1982) (standing to sue House leadership for "providing [plaintiffs] with fewer seats on House committees … than they are proportionally owed"). Embracing those cases, the district court granted standing without once mentioning *Coleman*, *Kennedy*, or *Goldwater*. The court reasoned that the Act "dilute[d]" the plaintiffs' voting power and "affect[ed]" their duties. *Byrd v. Raines*, 956 F. Supp. 25, 30-31 (D.D.C. 1997) (citing *Michel*, 14 F.3d at 625; *Moore*, 733 F.2d at 950-53; *Vander Jagt*, 699 F.2d at 1168-71).

An expedited appeal was taken directly to the Supreme Court, where the plaintiffs argued that their votes would "be less 'effective' than before, and that the 'meaning' and 'integrity' of their vote ha[d] changed." *Raines*, 521 U.S. at 825 (quoting plaintiffs' brief).

The Supreme Court was "unwilling" to endorse the "drastic extension of *Coleman*" needed to sustain these claims. *Id.* at 826. It acknowledged that invalidating past votes and denying future votes are cognizable harms because they injure individual legislators in their institutional roles. *Id.* at 824. But neither harm had befallen the *Raines* plaintiffs. Their votes "were given full effect" in the passage of the Line Item Veto Act. "They simply lost that vote." *Id.* Nor would the Act "nullify their votes in the future," because "[i]n the future, a majority of Senators and Congressmen can pass or reject appropriations bills" just as before, and "can vote to repeal the Act, or to exempt a given appropriations bill." *Id.* Because no past votes were disregarded and no future votes denied, the Court said that *Coleman* provided "little meaningful precedent" for the plaintiffs' argument:

10

"There is a vast difference between the level of vote nullification at issue in *Coleman* and the abstract dilution of institutional legislative power that is alleged here." *Id*. at 824, 826; *see Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000) ("the Court emphasized that the congressmen were not asserting that their votes had been 'completely nullified'").

That is what *Raines* said. Here is what it did *not* say.

***First,*** the opinion did not say that "the denial of institutional legislative prerogative is not a judicially cognizable injury." Def. Mem. 1. The Justice Department pressed that very argument, as it does now, relying on the same non-precedential opinion. *See* Appellants Br. at 23, 1997 WL 251415 (disagreeing "that a Member of Congress has a judicially cognizable personal interest in the proper performance of his legislative duties" (citing *Moore*, 733 F.2d at 959 (Scalia, J., concurring in result))). Accepting that argument would have required overruling *Coleman*, which the Court instead reaffirmed—as it did again in *Arizona*. Justice Scalia's categorical opposition to legislator standing was never endorsed by the Supreme Court or the D.C. Circuit.[4]

***Second,*** the Court did not say that Congress, or its members, can *never* sue the President over injury to their powers. While the Court discussed the novelty of such inter-branch litigation, and noted that this "appear[ed]" to cut against the plaintiffs, it did not elaborate further on the significance of this point. *Raines*, 521 U.S. at 826. Had the Court meant that members simply cannot sue the President over injury to their powers, it could easily have said that.

***Third,*** as should be clear by now, *Raines* did not eliminate vote nullification as an injury

---

[4] In describing the plaintiffs' claims, the Court used the term "institutional injury" to mean "injury to their institutional power as legislators," *Raines*, 521 U.S. at 820 n.4, as distinct from injury in their personal capacities. In doing so, the Court made clear that some forms of institutional injury are cognizable, *id*. at 821 (nullification of votes in *Coleman* was "an institutional injury"), while others are not, *id*. (*Raines* plaintiffs allege "*a type* of institutional injury"); *id*. at 829 ("the institutional injury *they allege* is wholly abstract and widely dispersed" (emphases added)); *see Ariz. State Legislature*, 135 S. Ct. at 2664 (citing "[t]he 'institutional injury at issue" in *Raines*).

11

over which individual legislators may sue. The Court instead emphasized the "vast difference between the level of vote nullification" in *Coleman* and the "abstract" claim in *Raines*, declaring itself "unwilling" to bridge that gap through "a drastic extension" of *Coleman. Id.* at 826.

**Fourth,** *Raines* did not hold that members lack standing whenever *every* member's vote has been nullified. While the Court observed that the plaintiffs' claimed injury "necessarily damages all Members of Congress and both Houses of Congress equally," *id.* at 821, it did not say, or even imply, that this fact alone makes a member's injury nonjusticiable. The Court was explaining why the plaintiffs could draw no support from *Powell v. McCormack*, 395 U.S. 486 (1969), where a Congressman was prevented from taking his seat and receiving his salary. Unlike that Congressman, the *Raines* plaintiffs were not "singled out" for the deprivation of a "private right." *Raines*, 521 U.S. at 821. Notably, when the Court later addressed "institutional injury" under *Coleman*, it distinguished that case on entirely different grounds. *See id.* at 821-26.

Moreover, if standing were lacking whenever an institutional injury harms all members of Congress, it would mean that there would be standing when the President negates the votes of some members of Congress, but not when he negates the votes of *all* members. No conceivable rationale supports that rule. The denial of a right held exclusively by the 535 voting members of Congress is not a "generalized grievance," in which a party "seek[s] relief that no more directly and tangibly benefits him than it does the public at large." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2662 (2013) (quoting *Lujan*, 504 U.S. at 573-74). After all, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 136 S. Ct. at 1548 n.7. "The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Id*.

Even if the shared nature of the harm in *Raines* were relevant to whether the plaintiffs

suffered a viable institutional injury, the Court clearly did not hold that this factor *alone* precludes standing. The claim in *Raines* was not only "widely dispersed," but also "wholly abstract." *Raines*, 521 U.S. at 829. Indeed, this was its central flaw—the plaintiffs were challenging a mere "abstract dilution" of Congress's power, vastly different from the nullification of individual votes. *Id.* at 826. In other words, "the harm at issue [was] not only widely shared, but [was] also of an abstract and indefinite nature," *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998), namely that "the dynamic of lawmaking" had changed, *Raines*, 521 U.S. at 817. While Congress as a body may have lost clout, no right of individual lawmakers was impaired. "None of the plaintiffs, therefore, could tenably claim a 'personal stake' in the suit." *Ariz. State Legislature*, 135 S. Ct. at 2664 (quoting *Raines*, 521 U.S. at 830); *see Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 13 (D.D.C. 2013) ("the problem ... was that the plaintiffs ... were simply complaining [about] … some 'abstract dilution' of the power of Congress as a whole").

By contrast, preventing a legislator from exercising voting power assigned to his seat is sufficiently concrete and particularized to constitute Article III injury—regardless of how many other legislators are harmed in the same way. "Often," as in *Raines*, "the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'" *Akins*, 524 U.S. at 24. Denial of a legislator's individual right to vote is just such a harm.

Not every injury to Congress fits that bill, so *Raines* did limit legislator standing. As illustrated by the line-item veto, Congress's influence can be weakened without negating discrete rights held by its members. But the abrogation of a unique right held by individual members is different. *Compare Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 544 (1986) (school board member could not "step into the shoes of the Board" and litigate on its behalf in a case

13

involving no prerogatives of individual members), *with id*. at 544 n.7 ("It might be an entirely different case if, for example, state law authorized School Board action solely by unanimous consent, in which event [he] might claim that he was legally entitled to protect 'the effectiveness of [his] vot[e].'" (quoting *Coleman*, 307 U.S. at 438)). And when an individual member is denied her own right to vote, that injury does not vanish merely because the body in which she serves may also be injured, because "more than one party may have standing to challenge a particular action or inaction." *Clinton v. City of New York*, 524 U.S. 417, 434 (1998).[5]

The President asks the Court to ignore all this, in favor of a mechanical rule that injuring all members of Congress gives standing to none. His position is at odds with a fair reading of *Raines*, with general standing principles, and with common sense. In *Coleman*, for instance, the 20 Kansas senators (out of 40) who voted against a constitutional amendment had standing to prevent it from being unlawfully deemed ratified. Had the vote been 39 to 1 against ratification, all 39 senators would have had standing. *See Raines*, 521 U.S. at 823. But if the vote were instead 40 to 0 against ratification, no senator would have standing—on the President's theory—because all members of the senate would have been harmed equally. Def. Mem. 16. That cannot be right.

### 3. D.C. Circuit Precedent Since *Raines* Also Permits Genuine Vote Deprivation Claims

In the wake of *Raines*, the D.C. Circuit acknowledged the need to pare back its precedent

---

[5] None of these considerations is addressed in *Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002), which misreads *Raines* as saying that legislators can never sue over institutional injury. In a footnote, the opinion acknowledges that "[t]he Supreme Court upheld legislative standing for institutional injuries in *Coleman*," *id*. at 7 n.7, but then simply recites the facts of *Coleman* and quotes *Raines* without further explanation. The opinion fails to acknowledge that members of Congress have an individual right to vote, or to reckon with the difference between a complete denial of that right and the abstract harm to congressional influence in *Raines*. Notably, the plaintiffs' briefing did not address these points, *cf. Metlife, Inc. v. F.S.O.C.*, 865 F.3d 661, 667 (D.C. Cir. 2017) ("our adversarial system relies on the arguments presented in the parties' briefs"), and the court held that the political question doctrine required dismissal in any event.

on legislator standing. But it also recognized that *Raines* is compatible with the Circuit's core line of vote nullification cases—on which the Plaintiffs here rely.

In *Chenoweth v. Clinton*, four House members challenged an environmental program established by executive order. Claiming the program violated "the Anti-Deficiency Act, the Federal Land Management and Policy Act, the National Environmental Policy Act, and the Commerce, Property, and Spending Clauses of, and the Tenth Amendment to, the Constitution," *Chenoweth*, 181 F.3d at 113 (citations omitted), the plaintiffs alleged that creating the program "without statutory authority therefor, 'deprived [them] of their constitutionally guaranteed responsibility of open debate and vote on issues and legislation.'" *Id.* (quoting complaint). As evidenced by these charges, the essence of their claim was that the President "exceeded his statutory and constitutional authority," *id.* at 112, not that they were deprived of any specific vote. Accordingly, the district court dismissed their claim as a "generalized grievance[] about the conduct of government." *Id.* Affirming, the D.C. Circuit equated their alleged injury—a "dilution of their authority"—with the "abstract" injury rejected in *Raines*. *Id.* at 115.

What *Chenoweth* signifies, therefore, is not the futility of vote deprivation claims but that of generalized complaints about executive unlawfulness dressed up as vote deprivation claims. It did not overrule *Kennedy*, just as *Raines* did not overrule *Coleman*. Indeed, the Circuit took pains to distinguish those decisions: "Unlike the plaintiffs in *Kennedy* and *Coleman*," it explained, the plaintiffs in *Chenoweth* could not plausibly "claim their votes were effectively nullified by the machinations of the Executive." *Id.* at 117; *cf. Common Cause v. Biden*, 909 F. Supp. 2d 9, 26 (D.D.C. 2012) (House members' votes in favor of bills that passed the House were not nullified by the Senate's failure to debate those bills).

*Chenoweth* did acknowledge that certain "portions" of the Circuit's legislator standing

precedent were "untenable in the light of *Raines*." 181 F.3d at 115.[6] And those were precisely the portions on which the *Chenoweth* plaintiffs were forced to rely, because they could not credibly claim their votes were "nullified by the President's action." *Id*. at 117. Specifically, "they rel[ied] primarily upon *Moore*," *id*. at 113, which granted standing to House members on their claim that constitutional procedures were violated when a revenue-raising bill originated in the Senate, *Moore*, 733 F.2d at 948. The *Moore* plaintiffs, notwithstanding that defect, were able to vote on the bill. *Id*. at 949. Thus, they were seeking to vindicate "the right of the House to originate bills for raising revenue" without showing any nullification of their own votes. *Raines* foreclosed such actions. And so the plaintiffs in *Chenoweth* were out of luck—they could neither rely on a mere "dilution of their authority" as in *Raines* and *Moore*, nor plausibly allege "that their vote was nullified" as in *Coleman* and *Kennedy*. *Chenoweth*, 181 F.3d at 115, 117. Claims that fit squarely within the *Coleman*/*Kennedy*/*Goldwater* framework, as here, do not have that problem.

    *Chenoweth* also emphasized the ample legislative remedies available to the plaintiffs, which made any dispute about the challenged program "fully susceptible to political resolution." *Id*. at 116. The Circuit would return to this point in *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000). As discussed below, *see infra*, Part I.C, comparable political remedies are absent here.

    **B.**    **President Trump Is Denying Members of Congress Their Right To Vote on the Foreign Emoluments He Is Accepting Without Their Consent**

    To insulate federal officeholders from the threat of foreign corruption, the Constitution prohibits them from accepting presents and emoluments from foreign states "without the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. Congress "consist[s] of a Senate and House of

---

[6] For instance, one passage in *Kennedy* suggests that members may sue over a mere "diminution of congressional influence." 511 F.2d at 435-36. But *Kennedy*'s holding was more modest—an "application of the narrow rule announced in *Coleman*." *Chenoweth*, 181 F.3d at 116.

Representatives," *id.* art. I, § 1, and members of the House and Senate have an individual right to vote on matters that come before those bodies, *see id.* art. I, § 3, cl. 1 ("each Senator shall have one Vote"); *id.* art. I, § 5, cl. 3 (requiring the House and Senate to record "the Yeas and Nays of the Members" upon the request of one-fifth of those present). The Constitution, therefore, expressly entitles individual members of Congress to vote on whether to consent to an officeholder's acceptance of presents or emoluments from a foreign state.[7]

Indeed, the unambiguous nature of this entitlement is striking. While many constitutional provisions empower Congress to act without specifying how that power bears on the authorities of other branches, *e.g.*, U.S. Const. art. I, § 8, cl. 11 ("Congress shall have Power ... To declare War"), the Foreign Emoluments Clause is among a smaller group that explicitly conditions executive branch action on congressional permission, *e.g.*, *id.* art. II, § 2, cl. 2 ("The President ... shall have Power, by and with the Advice and Consent of the Senate, to make Treaties" and "appoint ... Officers of the United States"). Even among this group, the Clause stands out, insofar as it functions solely as a prohibition, which only a successful vote of Congress may waive.

The Foreign Emoluments Clause therefore demands that *before* an officeholder accepts an emolument from a foreign state, members of Congress be given the opportunity to vote on whether to consent. The Clause's text dictates that result, and its history and purpose confirm it.

The words of the Clause unambiguously state that "no Person" holding an office of profit or trust under the United States "shall ... accept ... any" emolument "without the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. Thus, if Congress has not already given its consent (through

---

[7] This is not a *perpetual* entitlement, of course—it "runs (in a sense) with the Member's seat" and eventually transfers to his successor. *Raines*, 521 U.S. at 821. While a member remains in office, however, his vote is "the commitment of *his apportioned share of the legislature's power* to the passage or defeat of a particular proposal." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (emphasis added)).

successful votes in both Houses), it is unlawful to "accept" the emolument.

Were it otherwise, the Clause could not achieve its purpose. If officeholders could accept foreign benefits until Congress affirmatively voted to *disapprove* of them, it would encourage acceptance of such benefits in hopes that congressional inertia, other legislative priorities, or even partisan or regional favoritism would prevent Congress from censuring an already accepted benefit. This would hardly advance the Clause's goal of making it "impossible to guard better against corruption." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 486 (Jonathan Elliot ed., 1836) [hereinafter *Elliot's Debates*] (Edmund Randolph). Accordingly, the Constitution's default rule is precisely the opposite: no consent, no acceptance.[8]

Since the 1790s, federal officeholders have obeyed this command by allowing Congress to vote on otherwise prohibited benefits *before* accepting them. *See* Am. Compl. ¶¶ 27-29; *see also* 4 John Bassett Moore, *A Digest of International Law* 582 (1906) (quoting 1834 circular from the Secretary of State reminding officers that they "will not, unless the consent of Congress shall have been previously obtained, accept" presents from foreign states). The process is simple: an officeholder informs Congress of a benefit he wishes to accept, and members of Congress respond (if they so choose) by voting on whether to consent.[9]

President Trump has refused to follow this process, instead choosing to retain ownership

---

[8] Even if President Trump were to dispute that the Clause works this way, the Court must assume that the Plaintiffs are right in assessing their standing. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). Notably, though, the President has made no such argument. He asserts only that consent need not be sought when an official "does not believe that he is accepting any prohibited emoluments." Def. Mem. 7 n.2. That is not the point. If the official is wrong, and he has been accepting emoluments without prior consent, then he has violated the Constitution.

[9] Congress also can provide advance consent for particular classes of benefits. *See, e.g.*, Foreign Gifts and Decorations Act of 1966, 5 U.S.C. § 7342. But when blanket consent has not been given, members of Congress retain their right to vote on each individual emolument. 6 Op. O.L.C. 156, 158 (1982) ("Congress has consented only to the receipt of minimal *gifts* … Therefore, any other emolument stands forbidden.").

of his companies and failing to stop them from doing business with foreign governments. As a result, he has been accepting, and will continue to accept, prohibited benefits while in office. *See, e.g.*, Am. Compl. ¶¶ 44-50, 56-57, 60-62, 66.[10]

By flouting the Constitution's command and refusing to seek consent before accepting these foreign benefits, the President has deprived members of Congress of their right to vote on whether he may accept them. Simply put, Congress cannot vote on whether to give its consent to emoluments it does not know about—and the Clause imposes no responsibility on Congress to ferret out emoluments that federal officeholders are accepting in secret.

The President nonetheless says that he has not "prevented Congress from holding a vote on the emoluments issue," citing Congress's power to enact statutes. Def. Mem. 9. But this misunderstands the Clause. It does not grant authority to regulate the "issue" of emoluments, the way that other clauses empower Congress to regulate commerce, taxes, and other matters. Instead, the Clause itself regulates (and outlaws) certain conduct, reserving to Congress "the exclusive authority" to permit exceptions. Letter from James Madison to David Humphreys (Jan. 5, 1803), https://founders.archives.gov/documents/Madison/02-04-02-0275#. Engaging in that prohibited conduct without having obtained an exception denies Congress its ability to decide whether to grant one. Thus, when the President accepts emoluments without first informing Congress about them and seeking consent, he deprives its members of their ability to cast binding votes on whether he may accept those emoluments. And while legislating requires a majority of Congress to vote in favor of a measure and then secure the President's approval, the Clause gives Congress a unilateral power that it can wield by *not* acting—by failing to approve an emolument. Thus, the chance to

---

[10] For standing purposes, the Court must assume that these rewards violate the Clause, *see supra* note 8, despite President Trump's (unpersuasive) claims to the contrary, *see infra*, Part II.

19

vote on legislation is not the voting opportunity guaranteed by the Clause.

To be sure, journalists have provided accounts of some emoluments the President has accepted, but these after-the-fact reports do not give members what the Constitution demands— the right to vote on whether the President may accept an emolument *before* he does so. After all, by the time members are reading about an emolument in the paper, it has generally already been accepted. And while reports have brought to light *some* of the benefits President Trump has taken from foreign governments, the Plaintiffs allege that he is accepting others that "remain completely hidden" from them. Am. Compl. ¶ 43. Indeed, this is all but certain: the President has not sought consent for the emoluments that *have* been publicly revealed, he claims not to need consent, and he maintains fierce secrecy over his finances. *Id*. ¶ 35.

In sum, by refusing to seek and obtain congressional consent before accepting foreign emoluments, leaving Congress to learn about those emoluments only after the fact, if at all, the President is depriving the Plaintiffs of their right to vote on whether he may accept them.

This is a classic case of vote deprivation. In *Riegle*, for instance, the D.C. Circuit granted standing to a Senator who alleged that certain officials were acting "as officers of the United States when their nominations ha[d] never been submitted to the Senate," thereby "depriv[ing] him of his constitutional right to vote in determining the advice and consent of the Senate to the[ir] appointment." 656 F.2d at 877.[11] Similarly in *Goldwater*, the Circuit granted standing to Senators who claimed the President unconstitutionally terminated a treaty without Senate consent, "depriv[ing] each individual Senator of his alleged right to cast a vote that will have binding effect on whether the Treaty can be terminated." 617 F.2d at 702. And in *Pierce*, the Circuit granted

---

[11] The court withheld equitable relief because Congress could eliminate the powers of those officials that qualified them as officers of the United States. *Id*. at 882. When a President refuses to seek consent to accept emoluments, such legislative recourse is unavailable. *See infra*, Part I.C.

standing to a Congressman who alleged that a federal department was—contrary to statute—
reorganized without his committee's approval, "injur[ing] him by depriving him of that specific
statutory right to participate in the legislative process." 697 F.2d at 305.

The President is unable to distinguish these cases. His only attempt to do so is to argue that
the committee members in *Pierce* had a "unique statutory right" to vote. Def. Mem. 12. But the
statute said nothing about the committee's individual members. It simply prohibited reorganizing
the department "'without the prior approval of the Committees on Appropriations,'" *Pierce*, 697
F.2d at 304 (quoting Pub. L. No. 97-272, 96 Stat. 1160, 1164 (1982)), just as the Foreign
Emoluments Clause prohibits accepting emoluments "without the Consent of the Congress."
*Pierce* underscores that membership in a legislative body confers an individual right to vote on
matters requiring that body's approval. *See id.* at 305 ("the Appropriation Act gave Congressman
Sabo the right, as a member of the Appropriations Committee, to participate in approval of any
reorganization"). And the Circuit likened committee members' statutory right to vote on
reorganization with the constitutional right of Senators to vote on treaties. *Id.* at 305 n.3.

Thus, by accepting emoluments from foreign states without Congress's consent, President
Trump is denying the Plaintiffs votes to which they are constitutionally entitled. The result is "a
disenfranchisement, a complete nullification or withdrawal of a voting opportunity." *Goldwater*,
617 F.2d at 702. And as shown below, only the judiciary can redress that injury.[12]

---

[12] To be clear, the Plaintiffs need not establish how they or other members of Congress
would vote with respect to the emoluments the President is accepting: the injury here is the denial
of the right to vote, not the denial of a wish to have the vote turn out a certain way. When legislators
sue over the nullification of past votes, they need to show "that they voted for a specific bill, that
there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated."
*Raines*, 521 U.S. at 824. That is because nothing was nullified unless the will of the voting majority
was thwarted, and when that happens, only the legislators whose votes were thwarted are injured.
In that context, therefore, standing is limited to "legislators whose votes would have been sufficient
to defeat (or enact)" the measure. *Id.* at 823. But lawmakers who are deprived of a vote are injured

## C.      There Are No Adequate Legislative Remedies

The President says that even if he is repeatedly denying the Plaintiffs their right to vote under the Foreign Emoluments Clause, this case should nevertheless be dismissed because the Plaintiffs can put a stop to his behavior on their own. But none of the solutions he proposes would give the Plaintiffs what the Constitution entitles them to: the right to decide whether he may accept any particular foreign emolument before he accepts it, and the ability to deny him permission by *not* acting—by simply failing to grant him an exemption from the Clause.

Significantly, while members of Congress may not be able to sue if their colleagues have the power to remedy their injury, any such power must be *effective*—actually capable of ameliorating the harm. Thus, *Raines* explained that Congress remained free under the Line Item Veto Act "to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act," or to repeal the Act entirely. 521 U.S. at 824. Because the Act had "no effect" on these ready options, *id.*, the plaintiffs had "an adequate remedy." *Id*. at 829.

The D.C. Circuit made a similar point in *Chenoweth*: the dispute there was "fully" susceptible to political resolution because it was "uncontested" that Congress could terminate the challenged program. 181 F.3d at 116. And in *Campbell v. Clinton*, the Circuit again found that legislators could fix their own problem through "political self-help." 203 F.3d at 24. After the President commenced military strikes and Congress voted to fund the effort without authorizing it, dissatisfied congressmen filed suit. *Id*. at 20. Their claim, "although cast in terms of the nullification of a recent vote, essentially [was] that the President violated the … War Powers Resolution" and the War Powers Clause of the Constitution. *Id.* at 22. Treating this as a vote

---

by that deprivation regardless of how the vote might have turned out. *See Goldwater*, 617 F.2d at 703 ("courts consistently vindicate the right to vote without first demanding that the votes when cast will achieve their intended end").

deprivation claim, the Circuit distinguished *Coleman* based on the availability of adequate political recourse. While the aggrieved Kansas senators "had no legislative remedy," Congress "has a broad range of legislative authority it can use to stop a President's war making," including the power of the purse: Congress "could have cut off funds for the American role in the conflict" and thus possessed "ample" power "to have stopped prosecution of the 'war.'" *Id.* at 23.

In all three cases, Congress literally could have "stopped" the conduct about which the plaintiffs complained. *Id.* It therefore had an "adequate" remedy, *Raines*, 521 U.S. at 829, that could "fully" ameliorate any harm done to the plaintiffs, *Chenoweth*, 181 F.3d at 116.

Not so here. As the Founders knew too well, rewards from a foreign state can be accepted alone and in secret. *See* 3 *Elliot's Debates* 484 (George Mason) ("It will ... be difficult to know whether [the President] receives emoluments from foreign powers or not."). Unlike most constitutional provisions, the Foreign Emoluments Clause regulates personal conduct that an officeholder can carry out without government funds or personnel. And this limits the strings that Congress can pull to exert its will. Remedies that are available to stop activities requiring federal money and employees, such as military action, are ineffective when an officeholder insists on accepting foreign-government money through his private businesses.

***Congressional Resolutions.*** President Trump's main contention is this: when Congress happens to learn about a foreign emolument he has accepted (he does not say how Congress is supposed to learn about it), Congress can vote on whether to approve this already accepted emolument. Def. Mem. 9. Specifically, he suggests that Congress pass a resolution "expressing its disagreement" with his receipt of the emolument, or consenting to its receipt. *Id.*

The President's supposed fix would solve nothing, even with respect to emoluments that Congress happens to discover (and certainly not with respect to those the President manages to

keep hidden). To start, the Clause entitles the Plaintiffs to vote on foreign emoluments *before* the President accepts them. *See supra* at 16-18. Once the President has accepted a foreign emolument—the point at which he says Congress can step in and vote—he has already done the thing that the Constitution says he needs Congress's permission to do. Passing an after-the-fact resolution condemning his behavior would not change that. Indeed, a resolution by Congress "expressing its disagreement" with an emolument would not force him to return it or prevent him from accepting others. Such a resolution "might at most have persuasive effect with the President," but it would pose no obstacle "if he persisted in his present interpretation of the Constitution." *Goldwater*, 617 F.2d at 703. Indeed, the pending congressional resolutions cited by the President are only exhortative. *See* H.R.J. Res. 26, 115th Cong. (2017), at 4 (resolution "represents ... only a step taken to underscore the sense of Congress that compliance with the Clause is a matter of the greatest urgency and importance"); S. Con. Res. 8, 115th Cong. (2017), at 1 ("calling on President Trump" to comply).[13]

Even if passing a resolution after the fact could accomplish anything, treating that option as a reason to deny standing here would fundamentally transform the Clause. Its rule is textually clear and unambiguous: accepting foreign emoluments is barred unless Congress has approved of their receipt. The President's arguments would flip this structure on its head and require Congress to affirmatively *disapprove* of what he is doing.

Because that arrangement would rewrite the language of the Constitution, gutting the purpose and vitality of the Clause in the process, it is not "an adequate remedy." *Raines*, 521 U.S.

---

[13] Neither *Raines* nor *Chenoweth* nor *Campbell* held that Congress must engage in a symbolic expression of its views before its members may ask the courts to enforce their voting rights. That was the thesis of Justice Powell's concurring opinion in *Goldwater*. *See* 444 U.S. at 996 (Powell, J., concurring). No other Justice joined that opinion, and neither the Supreme Court nor the D.C. Circuit has ever endorsed that thesis.

at 829. The Clause establishes a default rule in which Congress's *failure* to act functions as a denial of consent. That puts the burden on officeholders to move Congress to action. Significant barriers stand in the way of such a legislative effort. It must compete with other priorities for lawmakers' attention. Members must be willing to go on record in support of the emolument's acceptance. Numerous parliamentary hurdles must be surmounted—particularly in the Senate, where individual members can often slow down legislative business or halt it entirely. In the end, a majority of lawmakers must vote in favor of acceptance. Once this process is completed in one house, it must be repeated in the other. The Clause harnesses these legislative obstacles in aid of its purpose, by requiring them to be surmounted to overcome its default prohibition on foreign rewards. In doing so, the Clause ensures that federal officials may accept the largesse of foreign states only when a request is deemed sufficiently compelling by the people's representatives. To say that Congress has an adequate remedy because it can *disapprove* of an emolument would make these legislative roadblocks an ally of foreign corruption, instead of an enemy.

*Legislation.* The prospect of enacting statutes offers no better avenue for relief. While in theory a statute could demand that a President divest from his financial holdings, or explicitly require consent for business transactions with foreign governments, these options share the flaw just discussed: they would require a majority of Congress to act in *disapproval* of President Trump's conduct, instead of requiring him to garner a majority willing to *approve* his conduct.

Indeed, the problem is actually worse. If President Trump were to obey the Constitution by seeking consent before accepting emoluments, he might need to secure *more* than a majority of votes in the Senate, given that body's Cloture Rule requiring 60 votes to end debate on a matter. *See* Standing Rules of the Senate Rule XXII § 2. In other words, when advance consent is sought, 41 Senators can block Congress's approval, whereas stopping the President from accepting

emoluments through corrective legislation may require mustering 60 Senators instead. Thus, prospective legislation is not an "adequate" remedy here, *Raines*, 521 U.S. at 829, even assuming that such legislation could correct the problem. This point was explained in *Goldwater*, where Senators claimed that terminating a treaty, like approving one, required two-thirds of the Senate:

> They claim the right to block termination with only one-third plus one of their colleagues. There is no way that such a minority can even force a resolution to the floor, let alone pass it .... The only way the Senate can effectively vote on a treaty termination, with the burden on termination proponents to secure a two-thirds majority, is for the President to submit the proposed treaty termination to the Senate as he would a proposed treaty. This is the concrete remedy appellees seek. For the court to require of them some other legislative action before allowing them standing to pursue this claim would be to require a useless act.

617 F.2d at 703.

The inadequacy of legislation as a remedy does not end there. To become law, bills require a presidential signature. U.S. Const. art. I, § 7, cl. 2. The nominal authority to enact statutes, therefore, is no remedy against a President who is intent on continuing to reap financial rewards from foreign states. Standing to sue over vote deprivation does not require pursuing legislative action that would be futile or "unavailing." *Ariz. State Legislature*, 135 S. Ct. at 2663 (rejecting argument that legislature divested of power lacks standing until it unsuccessfully tries to exercise the power it has lost); *see Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 n.2 (1982) (standing to challenge a permitting regime does not require plaintiffs to first apply for a permit that "would not have been granted"). The option of convincing President Trump to bind himself against further self-enrichment is an especially poor remedy for a constitutional provision that gives Congress total authority over such enrichment—and the President none.[14]

---

[14] Moreover, insisting that Congress override a presidential veto would only compound the problems discussed earlier: instead of requiring a congressional majority to *approve* foreign emoluments, as the Constitution specifies, it would require a two-thirds majority to *disapprove*.

Finally, it is significant that Congress had a *unilateral* option at its disposal in *Raines*: it could exempt from the Line Item Veto Act any bill that it sent to the President. 521 U.S. at 824. Likewise, in *Campbell* and *Chenoweth*, Congress could have made use of its "absolute control of the moneys of the United States," *Rochester Pure Waters Dist. v. E.P.A.*, 960 F.2d 180, 185 (D.C. Cir. 1992) (citation omitted), by declining to appropriate funds for activities it wished to stop. *Campbell*, 203 F.3d at 23. Congress's power of the purse is especially noteworthy because, like the Clause, it allows Congress to exert its will through *inaction*—a failure to appropriate. *See United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress."). As such, that power can furnish an adequate remedy, but only when, unlike here, the conduct Congress wishes to stop requires federal funds.

**Impeachment.** The drastic measure of impeachment is not an adequate legislative remedy, especially in the context of the Foreign Emoluments Clause. While *Campbell* mentioned impeachment, it did not suggest that Congress's power to impeach, standing alone, provides adequate recourse in all cases—which would be tantamount to eliminating all congressional standing. Instead, the court noted that impeachment was available as an enforcement mechanism were the President to defy Congress's use of the more surgical options at its disposal. *Campbell*, 203 F.3d at 23. As shown above, comparable surgical options are absent here. And foreclosing judicial enforcement of the Clause, based on the impeachment power, would force upon Congress a Hobson's choice: either acquiesce to all of the President's foreign emoluments or overturn his entire presidency and the results of the most recent election. The ability to make that stark choice is not "an equivalent voting opportunity," *Goldwater*, 617 F.2d at 703, with the one guaranteed by the Constitution, which entitles Congress to approve or reject emoluments on a case-by-case basis.

27

It therefore cannot be regarded as the type of "adequate remedy," *Raines*, 521 U.S. at 829, that can foreclose legislator standing. *Cf. Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974) ("the Constitution should not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President.").[15]

## II. President Trump's Acceptance of Valuable Benefits from Foreign States Without Congressional Consent Violates the Foreign Emoluments Clause

In defense of his actions, the President offers a truly outlandish interpretation of the Foreign Emoluments Clause—one that is unmoored from the constitutional text, the meaning of the word "emolument," the Framers' reasons for adopting the Clause, and the manner in which the Clause has been interpreted since its adoption more than two centuries ago.

"The language of the Emoluments Clause is both sweeping and unqualified." 18 Op. O.L.C. 13, 17 (1994). It bars the receipt of four distinct but overlapping types of benefits— presents, emoluments, offices, and titles—followed by an emphatic modifier used nowhere else in the Constitution: "of any kind whatever." *Id*. The clear purpose of this language is to "lock up every door to foreign influence," 5 Annals of Cong. 1584 (1798) (Claiborne), proscribing all types of benefits that have the "potential of influencing or corrupting the integrity of the recipient," 5 Op. O.L.C. 187, 188 (1981). "Consistent with its expansive language and underlying purpose," therefore, the Clause "has been interpreted as being 'particularly directed against every kind of

---

[15] For similar reasons, this Court should reject any suggestion that Congress can cure the Plaintiffs' injury by inflicting retribution on President Trump regarding unrelated matters. The reason for directing members of Congress to pursue legislative remedies before involving the courts is to help preserve our constitutional system. No one can seriously claim that an escalation of such retaliatory gamesmanship and paralysis would better serve our constitutional system than calling upon the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

influence by foreign governments upon officers of the United States.'" 11 Op. O.L.C. 89, 90 (1987) (quoting 24 Op. Att'y Gen. 116, 117 (1902)).

Against the grain of this constitutional text and historical consensus, President Trump advocates "a bounded understanding of the Clause." Def. Mem. 27. But the boundaries he suggests seem designed only to trace the contours of his own financial dealings. The President admits, as he must, that profits from financial transactions and contractual arrangements with foreign governments can be "emoluments" under the Clause. He claims, however, that the Clause applies only if he is paid for providing what he calls "personal services" in "a capacity akin to an employee of the foreign power" or in "his capacity as President." Def. Mem. 37, 18.

That convoluted interpretation of the Clause has never been articulated before now. There are three main problems with it. First, the President's lexicological argument is a shamble. He starts by retrofitting a modern definition of "emolument" onto the Founding era, but even that anachronistic definition covers the business profits and benefits at issue here. So he narrows the definition further, without a shred of support for these modifications. Second, even if the President's narrow definition of "emolument" had existed at the Founding, he does not dispute that there were also broader definitions then. Text and structure make clear that the Clause contemplates a broader meaning of the word, one that does not require an employment relationship or a connection with specific decisions made in one's official capacity. Third, the President's artificial reading of the Clause would eviscerate its clear and undeniable purpose.

A.     The Meaning of "Emolument"

The Constitution "was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

At the Founding, "emolument" was a commonly used term that often referred to profit or gain in general. *See Oxford English Dictionary* (2d ed. 1989) (citing eighteenth-century texts for a contemporary definition meaning "advantage, benefit, comfort"). Samuel Johnson's preeminent 1755 dictionary, quoting illustrative examples, defined "emolument" simply as "Profit; advantage." *A Dictionary of the English Language* (1755). Indeed, "*every* known English language dictionary" published in the seventeenth and eighteenth centuries defined "emolument" in this broad fashion—as "profit," "advantage," "gain," and/or "benefit." John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries, 1523-1806*, at 7 (July 9, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693 (emphasis added).

Those expansive definitions reflect how the word was used during this era, in sources ranging from general-purpose writings, *see, e.g.*, Jonathan Swift, *The Tale of a Tub* 91 (Henry Morley ed., 1889) (1704) ("And so I proceed with great content of mind upon reflecting how much emolument this whole globe of earth is like to reap by my labours."), to official government documents. American state constitutions, for instance, used "emolument" in this broad sense. *See* Pa. Const. of 1776, art. 5 ("government is … instituted ... not for the particular emolument or advantage of any single man …"). So too did early legal decisions. *See, e.g.*, *Himely v. Rose*, 9 U.S. 313, 319 (1809) (owner of property who was deprived of its possession "lost those emoluments and mercantile advantages which might have resulted from the use of it"). A formal declaration issued by the colonies protesting British policy used the term in the same way. *See* U.S. Continental Congress, A Declaration by the Representatives of the United Colonies of North-America, Now Met in Congress at Philadelphia, Setting Forth the Causes and Necessity of Their Taking Up Arms (July 6, 1775), https://www.loc.gov/resource/rbpe.14400700/?sp=1 (accusing Britain of judging the colonies "to be in such a state, as to present victories without bloodshed, and

all the easy emoluments of statuteable plunder").

Significantly, "emolument" was frequently used to mean the profits accruing from private financial transactions, "including leasing, agriculture, trades, markets, and other business."[16] For instance, George Washington, Thomas Jefferson, and others criticized merchants who "preferred their own private emolument" by violating a boycott of British goods. Virginia Nonimportation Resolutions (June 22, 1770), http://founders.archives.gov/documents/Jefferson/01-01-02-0032. James Madison asked Jefferson to join him and James Monroe in a land purchase "for our triple emolument."[17] An Articles of Confederation signer advertised a sale of land, along with all its "'buildings, ways, paths, profits, commodities, advantages, emoluments and hereditaments.'"[18] These are but a few examples of the Founders using the word to refer to "the consequences of ordinary business dealings." John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan. 18, 2017), https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-emolument.html. The same usage is found in *Blackstone* and other legal treatises well known to the Founders.[19]

The President does not deny that this was the predominant dictionary definition of "emolument" at the Founding. Nor can he dispute that the Framers and their contemporaries frequently used the word to describe profits and benefits from private commercial transactions. Instead, he argues that the word is used in a narrower sense in the Clause: a benefit "predicated on

---

[16] James C. Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*, at 31 (Sept. 14, 2017), https://ssrn.com/abstract=3036938 (surveying nearly 800 contemporary uses of the word).

[17] Letter from James Madison to Thomas Jefferson (Aug. 12, 1786), https://founders.archives.gov/?q=emolument%20%20Author%3A%22Madison%2C%20James%22&s=1111311113&sa=&r=12&sr=.

[18] John Mikhail, *"Emolument" in Blackstone's Commentaries*, Balkinization (May 28, 2017), https://balkin.blogspot.com/2017/05/emolument-in-blackstones-commentaries.html.

[19] *See* Mikhail, *The Definition of "Emolument," supra*, at 11.

services rendered in an official capacity or an employment (or equivalent) relationship and ... given in exchange for the provision of a service in that relationship." Def. Mem. 20.

This definition is drawn from thin air. Its first part, requiring an employment-like relationship, is based on a flawed reading of Founding-era dictionaries. Its second, requiring the provision of specific services in an official capacity, is based on nothing at all.

While the word "emolument" was used at the Founding to refer to a wide range of benefits, it had a special association with a particular kind of benefit—one that accrued to a person because of his status or position. Thus, in addition to the broad definitions noted above, the *Oxford English Dictionary* provides another definition of "emolument" that was used in the eighteenth century: "Profit or gain arising from station, office, or employment; dues, reward; remuneration, salary." The President claims the latter definition reflects what the Framers meant in the Clause. Def. Mem. 22. He is wrong about that. *See infra* at 34-41. But remarkably, even this narrower definition does not help him, because while it includes profit arising from "office" or "employment" (and in the same vein includes "remuneration" and "salary"), it also includes more—profit or gain arising from "station," as well as "dues" and "reward."[20] Those terms easily encompass the gain arising from President Trump's status as the head of a worldwide business empire. When the owner of a skyscraper receives rent and fees from his tenants and unit owners, *see* Am. Compl. ¶¶ 58-62, he is certainly receiving profit or gain arising from his "station" (as well as "dues" and "reward").

The narrower definition the President cites also embraces profit or gain "arising from [his] office," as when foreign governments seek his favor by granting him lucrative trademarks or selecting his hotels. *Id*. ¶¶ 48, 54. Those benefits "arise from" the office he holds, because (the Plaintiffs allege) they are being given to him because he is the President. No basis is offered for

---

[20] *See* "Station," *Oxford English Dictionary* ("the place or position occupied by a person").

the additional limit that President Trump grafts onto this definition—which would require these benefits to be compensation for a specific service he provides to those foreign governments in his official role. Def. Mem. 20. That addendum is *sui generis*.[21]

To support his argument, the President relies on a single Founding-era dictionary that defines "emolument" as "profit arising from an office or employ" and as "gain, or advantage." *Barclay's A Complete and Universal English Dictionary on a New Plan* (1774).[22] He ignores the inconvenient latter definition. And the fact that the former definition appears at all makes this dictionary highly unusual: only 8% of English dictionaries in the seventeenth and eighteenth centuries included a definition of "emolument" that was qualified by reference to "office or employ." Mikhail, *The Definition of "Emolument," supra*, at 8. And each of those dictionaries also included the broader, unqualified definition of profit or gain in general (as does this one).

Worse still, the narrower definition in *Barclay's* does not even illustrate what the President claims. As noted, it defines "emolument" as "profit arising from an office or employ." The President assumes that "employ" means "employment" in the modern sense of being another person's employee. But turning to the very next page in *Barclay's*, one finds "employ" defined as "a person's trade, business" and "a public office." Thus, even the President's cherry-picked authority defines "emolument" to include "profit arising from ... a person's trade, business."[23] At

---

[21] The word's modern legal definition, even if relevant, does not help the President because it encompasses "[a]ny advantage, profit, or gain received *as a result of* one's employment or one's holding of office." *Black's Law Dictionary* (10th ed. 2014) (emphasis added).

[22] He also cites a work by John Trusler that "is not a standard dictionary at all, but rather a thesaurus" that "has long been viewed skeptically by scholars," in part because its text was "copied directly from a French thesaurus." Mikhail, *The Definition of "Emolument," supra*, at 8.

[23] This definition goes back to the roots of the word "emolument." Its Latin predecessor, *emolumentum*, also "had come to mean simply 'profit' or 'gain,'" but originally referred to the profit a miller earned by grinding another's grain. *See Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/emolument. A miller was not an employee of those who came to use his mill, nor did he hold a public office. Related, a few Founding-era dictionaries

33

the Founding, an innkeeper received profit from his "trade, business" no less than someone hired to drive a carriage. And today a real estate magnate derives profit from his business just as much as a lawyer who provides "legal advice and services." Def. Mem. 20. Thus, even the meager evidence the President musters does not actually support his position.[24]

### B.    Constitutional Text and Structure

Even if there were a definition of "emolument" at the Founding as narrow as the President claims—limited to remuneration for one's services as an employee or officeholder—the Foreign Emoluments Clause does not use the word in that narrow sense.

To start, the Framers specifically directed us not to read the Clause in that way, prohibiting the acceptance of "any ... Emolument ... *of any kind whatever*." The phrase "of any kind whatever" does not merely emphasize that no emoluments may be accepted. Def. Mem. 38. That work is already done by the text's reference to "*any* ... Emolument." On the President's reading, the subsequent words "of any kind whatever" would be mere surplusage. *Holmes v. Jennison*, 39 U.S. 540, 571 (1840). And it is evident that the phrase does something other than emphasize the Clause's lack of exceptions. *See Memorandum Opinion for the Counsel to the President from John M. Harmon, Acting Assistant Attorney Gen., Office of Legal Counsel* at 346 n.3 (Apr. 11, 1977) ("phrase 'of any kind whatever' indicates that the clause should be given a broad construction").

---

defined "emolument" as profit obtained by "labor and cost," *see* Mikhail, *The Definition of "Emolument," supra*, at A-2 to A-4, which likewise requires no employer-employee relationship or the holding of an office.

[24] Of course, the Clause's scope is limited by factors beyond the meaning of "emolument," such as the requirement that an officeholder "accept" an emolument "from" a foreign state. This means that certain benefits which might fit within the broadest definition of emolument, *see* Phillips & White, *supra*, at 31, are nevertheless outside the Clause's scope, because they cannot be "accepted" or are not "from" a foreign state. For instance, it will not necessarily be true that any identifiable proceeds a stockholder receives from a publicly traded company that deals with foreign states can "fairly be attributed to a foreign government," 17 Op. O.L.C. at 119, such that one can say the stockholder "accepted" an emolument "from" a foreign state.

34

Its function is not to rule out interpretations that would allow some emoluments to be accepted. Rather, it is to rule out interpretations that would allow some "kinds" of emolument to be accepted.

Comparing the Clause with another constitutional provision that uses the word "emolument" makes the Clause's intended breadth all the more apparent. Under the Incompatibility Clause, no member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office ... the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl. 2. By referencing "the Emoluments *whereof*," the text specifies that it pertains only to the emoluments that the federal government bestows upon the holders of these "civil Office[s]." The Foreign Emoluments Clause, by contrast, has no such language limiting its scope to the emoluments associated with a public office. Rather, it addresses a wide range of benefits that foreign governments might bestow upon a person ("any ... Emolument"), and its concerns undeniably reach beyond the compensation associated with an office or employment—hence, its prohibition of "presents," for instance. And to remove all possible doubt about its breadth, the Clause goes further—clarifying that it extends to any emolument "of any kind whatever." Finally, in recognition of the unique severity of this rule, the Clause allows Congress to avoid injustice by giving its "Consent" to exceptions.

Lacking any textual support, the President falls back on "dog that didn't bark" historical arguments. His main contention is that the recorded history of the Clause's adoption is "devoid of any concern about an official's private commercial businesses." Def. Mem. 27. Assuming that this is true, it still tells us nothing. Discussion of the Clause was not extensive because the Clause was not controversial. *See* 2 *Convention Records* at 384, 389 (Clause adopted unanimously without debate). Indeed, the only objection apparently raised was that it did not go far enough because it allowed Congress to make exceptions. *See, e.g.*, 3 *Elliot's Debates* 484 (Mason). Moreover, the

35

agrarian economy of the eighteenth century, the comparatively limited role of government, and the primitive travel technology available would have made private commerce with foreign states an unlikely conduit for foreign influence at the time. Illustrating this point, the President has apparently been unable to find evidence (one can assume not for lack of effort) of any Founding-era American official conducting a commercial transaction with a foreign government—forcing him to claim only that they *might* have conducted such business.

Just as he relies on debates that never happened, the President relies on text that never became part of the Constitution—an amendment proposed in 1810 that would have extended the Clause to all citizens and revoked the citizenship of those who violated it. Ignoring the nationalistic fears of that era (the White House, after all, was set on fire by foreign troops while the amendment was up for ratification), he claims the harshness of this amendment shows that "emolument" must have had the narrow meaning he advocates because it is "inconceivable" that Congress and the states that ratified the amendment "intended to strip the citizenship of … those hotel owners whose customers included visiting foreign diplomats." Def. Mem. 32. Yet by his own interpretation, Congress and these states *did* intend to strip the citizenship of, say, a household servant temporarily hired by a visiting foreign diplomat, who would be "in an employment-like relationship" with the diplomat, *id*. at 22. The argument is self-defeating.

C.      **Constitutional Purpose**

Text and history get the President nowhere. But even if he had successfully created ambiguity about the meaning of "emolument," that ambiguity would have to be resolved against him because his proposed rule would defeat the Clause's purpose—throwing open the doors to the corruption of any officeholder wealthy enough to own businesses and reducing the Clause to a mere bribery law, not a prophylactic safeguard against the *possibility* of corruption.

The Clause's purpose is "to exclude corruption and foreign influence," 3 *Elliot's Debates* 465 (Randolph), and its adoption was prompted by "the necessity of preserving ... officers of the U.S. independent of external influence," 2 *Convention Records* 389 (Pinckney). Federalists trumpeted the Clause as "a wholesome provision" made against the "influence which foreign powers may attempt to exercise in our affairs," Tench Coxe, *An Examination of the Constitution for the United States of America, No. 4* (Oct. 21, 1787), proclaiming that it was "impossible to guard better against corruption," 3 *Elliot's Debates* 486 (Randolph). From the Republic's earliest days, it was acknowledged that the Clause was meant to "lock up *every door* to foreign influence," 5 Annals of Cong. 1584 (1798) (Claiborne), and was "founded in a just jealousy of foreign influence *of every sort*," 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1346 (1833) (emphases added). By preventing "undue influence and corruption by foreign governments," 18 Op. O.L.C. at 15, it seeks to ensure "the undivided loyalty of individuals occupying positions of trust under our government," 10 Op. O.L.C. 96, 100 (1986), including, of course, the President—who "surely" occupies such a position, *Memorandum Opinion for the Counsel to the President, Office of Legal Counsel*, 2009 WL 6365082, at *4 (Dec. 7, 2009); *cf. Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982) (presidents "must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system").

To fulfill its purpose, the Clause "must be read broadly." *Memorandum for James H. Thessin, Assistant Legal Advisor, U.S. Dep't of State, from John O. McGinnis, Deputy Assistant Attorney Gen., Office of Legal Counsel* at 2 (Aug. 29, 1988); *see* 10 Op. O.L.C. at 98 ("its expansive language and underlying purpose ... strongly suggest that it be given broad scope"). Thus, Attorney General decisions, the Office of Legal Counsel, and the Comptroller General have always given the Clause "a broad construction." *Memorandum for S. A. Andretta, Admin. Assistant*

37

*Attorney Gen., from J. Lee Rankin, Assistant Attorney Gen., Office of Legal Counsel* at 9 (Oct. 4, 1954); *see* 49 Comp. Gen. 819, 821 (1970) ("drafters intended the prohibition to have the broadest possible scope and applicability"). That approach "is justified [by] the sweeping nature of the … prohibition," which is "directed against every possible kind of influence by foreign governments." *Memorandum for Andrew F. Gehmann, Exec. Assistant, Office of the Attorney Gen., from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* at 2 (Oct. 16, 1962).

President Trump's attitude toward the Clause is therefore at odds with how it has always been construed. He would sap its vitality as a bulwark against foreign corruption, allowing a President to accept unlimited rewards from a foreign state, so long as they are not payments for "personal services" that he provides "in a capacity akin to an employee" or in his role as President (such as "making executive decisions favorable to the paying foreign power"). Def. Mem. 37, 21. In his view, the Framers left open a gaping loophole in their attempt to keep American officials "independent of external influence." 2 *Convention Records* 389 (Pinckney).

This case demonstrates the intolerable results of the President's interpretation. Since his inauguration, foreign diplomats have flocked to his Washington, D.C., hotel, turning a projected $2 million loss for the hotel during the first months of 2017 into a nearly $2 million profit. Am. Compl. ¶¶ 52-56. Foreign diplomats, by their own admission, select the hotel as an "easy, friendly gesture to the new president." *Id*. ¶ 54. In New York City, foreign governments number among the tenants and unit owners of the President's skyscrapers, racking up payments for rent and common charges that can reach hundreds of thousands of dollars annually. *Id*. ¶¶ 58-61. Abroad, many ongoing Trump-branded business ventures benefit from regulatory approvals, exemptions, and tax incentives—all potential means of influence by foreign leaders. *See id*. ¶ 66 (since his election, President Trump exhorted the Argentinian president to fix permitting issues there and encouraged

38

a British official to oppose wind farms that could affect his Scottish golf courses). Meanwhile, the

Chinese government has granted dozens of trademarks to President Trump and his companies

under circumstances that suggest "special treatment." *Id*. ¶¶ 44-49; *see id*. ¶ 51 (President had over

150 trademark applications pending in 36 foreign nations in April 2017).

According to the President, accepting these benefits is fine because he is not *personally*

providing services to these foreign states, and because the rewards they have given him are (he

says) not for any official decisions. Def. Mem. 21.[25] This rationale is completely divorced from

the Clause's purpose, which is to avoid the "evil … of undue influence by a foreign government

upon officers of the United States." 53 Comp. Gen. 753, 756 (1974); *see Gehmann Memo*, *supra*,

at 3 (identifying "the danger" as "placing [U.S.] officials in a position of obligation to a foreign

power"). As OLC has explained: "Those who hold offices under the United States must give the

government their unclouded judgment and their uncompromised loyalty. That judgment might be

biased, and that loyalty divided, if they received financial benefits from a foreign government[.]"

17 Op. O.L.C. at 122 (citation omitted). The profit attainable through ownership of real estate or

sale of products has the capacity to sway an officeholder's loyalty as much as, for instance,

"remuneration for academic work or research." *Id*. The diplomats gravitating to President Trump's

---

[25] Remarkably, even this understanding of "emolument" does not eliminate all the claims of the Plaintiffs, who have plausibly alleged that the Chinese trademark approvals were a response to President Trump's actions regarding U.S. policy toward Taiwan. Am. Compl. ¶ 48. Moreover, even if some of the benefits the President is accepting are not "emoluments," they may nonetheless be "presents," *id.* ¶ 38 & n.75, and their acceptance would still be proscribed absent congressional consent. For example, when foreign officials use their discretionary authority to confer valuable trademarks on a President, giving him "special treatment," *id.* ¶ 48, it is not unnatural to describe this as a "present." So, too, when foreign officials ingratiate themselves with the President by selecting his businesses over their competitors for profitable transactions. And it is not unusual for a prohibited foreign benefit to straddle two of the four categories listed in the Clause. *See, e.g.*, *Memorandum Opinion for the Counsel to the President, supra*, 2009 WL 6365082, at *4 (Nobel Peace Prize is a "'present' or 'Emolument'"); *Gehmann Memo*, *supra*, at 2 (expense-paid foreign trip "can be regarded as literally a 'present' and possibly an 'emolument'").

Washington, D.C., hotel realize that. So does the President himself, who has admitted to "a little conflict of interest" regarding Turkey because he has "a major, major building in Istanbul," and who has noted that he "get[s] along" with Saudi Arabians because "[t]hey buy apartments from me. They spend $40 million, $50 million. Am I supposed to dislike them?" Am. Compl. ¶¶ 74, 71.

Unlike the President, decisions of OLC and the Comptroller General have not required "a relationship akin to an employment relationship." Def. Mem. 34. For instance, OLC has concluded that officeholders cannot receive partnership distributions from their private law firms if those earnings include foreign government income, even though the officeholders "do not personally represent foreign governmental clients and have no dealings with them." 17 Op. O.L.C. at 117. Notably, OLC's decision had nothing to do with legal ethics rules regarding client loyalty, Def. Mem. 36 n.47, but rested on the simple proposition that "some portion of the member's income could fairly be attributed to a foreign government," 17 Op. O.L.C. at 119. Likewise, the Comptroller General concluded that a military officer who turned over information to Colombian authorities that led to the capture of contraband could not accept a monetary award under a local statute providing for such awards. 49 Comp. Gen. at 821. The officer's lack of an employment (or "equivalent") relationship with the government was irrelevant.

While most decisions identifying prohibited emoluments have involved officeholders who wanted to accept employment or consulting work with a foreign government, the explanation for that is simple: OLC and the Comptroller General render decisions in response to requests from federal officers. Most such officers are not real estate magnates, but rather people who earn money by providing their individual labor or expertise. President Trump does not even try to explain why

40

the Clause would prevent officers from being paid to review a Ph.D. thesis,[26] consult on power plants or meteorology,[27] or teach at a public high school,[28] but then would allow an officer to accept millions of dollars through his business empire. That makes no sense.

Nor does the President's other chief contention: that foreign governments may steer their business toward his companies or grant those companies regulatory benefits, specifically because he is the President, as long as this is not done in exchange for specific services he renders in that role. This would reduce the Clause to a mere bribery law, instead of "a prophylactic provision," 10 Op. O.L.C. at 98, that seeks to prevent "any type of obligation to foreign countries," *Memorandum Opinion for the Special Assistant to the President from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel* at 280 (May 10, 1963), in order to insulate officeholders from even the possibility of having their loyalty compromised.

President Trump may feel that the Clause's severity makes unreasonable demands on a business owner like him. But "[t]he decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause." 17 Op. O.L.C. at 121. Adherence to that rule is all the Plaintiffs are seeking.

## III. The President's Remaining Arguments Have No Merit

President Trump offers several other reasons why his foreign emoluments violations should escape judicial review. None is substantial, much less persuasive.

*First,* the Plaintiffs have an implied cause of action to seek injunctive relief. The Supreme

---

[26] *Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel* at 2-3 (May 23, 1986).

[27] 10 Op. O.L.C. 96 (1986); 6 Op. O.L.C. 156 (1982); 40 Op. Att'y Gen. 513 (1947).

[28] Comptroller General, *Matter of: Major James D. Dunn & Senior Master Sergeant Marcus A. Jenkins*, B-251084, 1993 WL 426335 (Oct. 12, 1993).

Court has repeatedly made clear that "equitable relief … is traditionally available to enforce federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385-86 (2015). The "ability to sue to enjoin unconstitutional actions" by officials "reflects a long history of judicial review of illegal executive action, tracing back to England." *Id*. at 1384; *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001). The President cites no decision holding that such relief is limited to situations involving "a defense to a potential enforcement action." Def. Mem. 15. Instead, when a plaintiff is injured by a constitutional violation, including a "separation-of-powers" violation, "an implied private right of action directly under the Constitution" exists "as a general matter," absent some reason the claim "should be treated differently than every other constitutional claim." *Free Enter. Fund v. P.C.A.O.B.*, 561 U.S. 477, 491 n.2 (2010) (citation and quotation marks omitted).

No such reason exists here. The President analogizes to the Supremacy Clause, but that Clause "operates differently than other constitutional provisions," *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 618 (2012) (Roberts, C.J., dissenting), simply "instruct[ing] courts what to do when state and federal law clash," *Armstrong*, 135 S. Ct. at 1383. The Foreign Emoluments Clause, by contrast, is a "self-executing limitation" on the conduct it prohibits, and thus, "individuals injured by [a violation] may sue and obtain injunctive and declaratory relief." *Dennis v. Higgins*, 498 U.S. 439, 447 (1991).[29] While the President argues that the Clause provides no "substantive rights," that is both wrong, *see supra* at 16-18, and beside the point, *see LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (in "an otherwise justiciable case or controversy," a party may "object that [his] injury results from disregard of the federal structure of our

---

[29] Even in cases involving the *implicit* constitutional powers of Congress, such as its subpoena authority, courts have recognized "an implied cause of action" to vindicate those powers, rejecting the argument that Article I lacks "the sort of explicit 'rights creating' language required to imply a cause of action from the Constitution." *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 88 (D.D.C. 2008). Here, the power at issue is set forth in the text of the Constitution.

42

Government" (quoting *Bond v. United States*, 564 U.S. 211, 225-26 (2011))).

**Second,** the "zone of interests" test is no barrier to this suit. Recent Supreme Court precedent leaves doubt about whether any such test even applies to constitutional claims, or is only a matter of ascertaining, "as a matter of statutory interpretation, the scope of [a] private remedy created by Congress." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). Tellingly, the President cites no case in which a constitutional claim was dismissed under a zone-of-interests test, and cannot even suggest what test should apply here.

In any event, the Plaintiffs easily satisfy any test.[30] The interest they seek to vindicate is at the heart of the Clause, which employs the separation of powers to combat foreign corruption, reflecting the premise that "[w]hen every present to be received must be laid before Congress, no fear need be apprehended." 5 Annals of Cong. 1585 (Otis). The President concedes that "Congress as a whole" would satisfy whatever test applies, Def. Mem. 16, but he offers no reason why its members, whose votes are needed to approve any emolument, lack a similar interest in ensuring that "the Consent of the Congress" is given. Moreover, the Circuit has rejected that very argument. *See Riegle*, 656 F.2d at 879 (holding that "the interest which [a Senator] claim[ed] was injured by defendants' action," namely "his right to advise and consent to the appointment of [executive branch] officers," was "within the zone of interests protected by the Appointments Clause").

**Third,** the relief sought here is not barred by *Mississippi v. Johnson*. "The single point" decided there was whether the President could "be restrained by injunction from carrying into

---

[30] The Court has said that "[t]he test is not meant to be especially demanding," *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and that a plaintiff's grievance "must *arguably* fall within" the interests of the relevant provision, *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (emphasis added). Only when "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in" the provision that they cannot "reasonably" be thought to fall within it will they fail the test. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011).

effect an act of Congress." 71 U.S. 475, 498 (1866). And while the Court said more broadly that it could not enjoin the President "in the performance of his official duties," it distinguished injunctions that involve "a purely ministerial act under a positive law." *Id.* at 501, 498.[31]

Complying with the Clause's mandatory prohibition is not an exercise of the President's "official duties" as in *Johnson*, but is akin to a ministerial duty, which an official "has no authority to determine whether to perform." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996); *see Johnson*, 71 U.S. at 498 ("It is a simple, definite duty … imposed by law."). Because "the President is bound to abide by the requirements" of the Clause, his obligation to avoid violating it "is ministerial and not discretionary." *Swan*, 100 F.3d at 977. That does not change merely because the Clause's scope is subject to debate. *Id.* at 978 ("a ministerial duty can exist even where the interpretation of the controlling statute is in doubt, provided that the statute, once interpreted, creates a peremptory obligation" (quotation marks omitted)). Refraining from accepting emoluments simply requires the President to obey the same restriction as every other federal officeholder. It is nothing like the "purely executive and political" duties discussed in *Johnson*.[32]

That is especially clear in *this* case, where the activities sought to be enjoined are transactions of the President's personal businesses. Unlike most constitutional limits, the Clause reaches officeholders' private conduct, making *any* receipt of foreign emoluments unconstitutional. *See, e.g.*, 11 Op. O.L.C. at 90. An injunction ordering the President to stop

---

[31] In *Franklin v. Massachusetts*, a plurality of Justices faulted a district judge for enjoining the President without evaluating whether doing so was permissible, but the plurality ultimately concluded it "need not decide" that question itself. 505 U.S. 788, 802-03 (1992).

[32] *See Johnson*, 71 U.S. at 497, 499 (injunction would have restrained the President from "carrying out … acts of Congress" requiring him "to assign generals to command in the several military districts," supported by "military force …. under [his] supervision [as] commander-in-chief"); *see also Franklin*, 505 U.S. at 792 (injunction would have required the President to "transmit to the Congress" a new and revised "statement showing the whole number of persons in each State … and the number of Representatives to which each State would be entitled").

44

accepting emoluments through his companies would not be directed at his official duties. The Supreme Court has "never suggested that the President … has an immunity that extends beyond the scope of any action taken in an official capacity," and any reasons for declining to issue injunctions with respect to his official acts do not apply to "*unofficial* conduct." *Clinton v. Jones*, 520 U.S. 681, 694 (1997). "It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Nixon*, 457 U.S. at 753-54.

While enjoining the President is a measure "not lightly to be undertaken," it is also a "bedrock principle that our system of government is founded on the rule of law." *Swan*, 100 F.3d at 978. The circumstances here are extraordinary, involving open defiance of a foundational rule set down by the Framers to protect the nation from corrosive foreign influence. "When judicial action is needed to serve broad public interests … not in derogation of the separation of powers, but to maintain their proper balance," *Nixon*, 457 U.S. at 754, the courts can and must step in.

## CONCLUSION

For the foregoing reasons, the President's motion to dismiss should be denied.

Respectfully submitted,

Dated:  October 26, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

45

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2017, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: October 26, 2017

/s/ Brianne J. Gorod
Brianne J. Gorod