# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Senator RICHARD BLUMENTHAL,
Representative JOHN CONYERS, JR., *et al.*,

Plaintiffs,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

Defendant.

Civil Action No. 17-1154 (EGS)

---

## BRIEF OF FORMER MEMBERS OF CONGRESS
## AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

Ben Feuer
Anna-Rose Mathieson
California Appellate Law
Group LLP
96 Jessie Street
San Francisco, CA 94105
Tel: (415) 649-6700
Fax: (415) 649-6700
ben@calapplaw.com
annarose@calapplaw.com

Walter E. Dellinger III
Duke University
210 Science Drive
Durham, NC 27708
Tel: (202) 383-5319

Sean H. Donahue
*DC/DDC Bar No. 450940*
Susannah L. Weaver
*DC/DDC Bar No. 1023021*
Donahue & Goldberg, LLP
1111 14th Street, N.W.
Suite 510A
Washington, D.C. 20005
Tel: (202) 277-7085
Fax: (202) 315-3582
sean@donahuegoldberg.com
susannah@donahuegoldberg.com

*Counsel for Amici Curiae Former Members of Congress*

**Table of Contents**

Table of Contents.................................................................................................................. i

Table of Authorities ............................................................................................................. ii

Interests of *Amici Curiae* ....................................................................................................1

Statement of Compliance......................................................................................................2

Introduction...........................................................................................................................2

Argument ..............................................................................................................................4

      I.     From textualist, originalist, and structuralist perspectives, the Constitution prohibits the President from accepting presents or emoluments "of any kind whatever" from a foreign state unless he first obtains Congress's approval. Period. ..........................................................................................4

          A.    The text of the Foreign Emoluments Clause is clear and unambiguous. ...................................................................................4

          B.    An originalist analysis of the Foreign Emoluments Clause establishes the Framers' intent to provide a sweeping, expansive bulwark against foreign corruption of the President....................................6

          C.    The Constitution's structure relies on the President disclosing to Congress any financial gain or valuable asset he receives from a foreign state, and past Presidents have understood and followed that command...........................................................................................10

      II.    To perform its constitutional duty, Congress needs the federal courts to engage in the limited and modest task of enforcing the Foreign Emoluments Clause's clear command. ..............................................15

Conclusion ..........................................................................................................................18

## Table of Authorities

### *Constitutions*

Appointments Clause of Article II, Section 2, Clause 2 ............................................................ 9

Articles of Confederation of 1781, art. VI, § 1 ........................................................................ 8

Foreign Emoluments Clause, Article I, Section 9, Clause 8 ................................................ passim

### *Statutes*

37 U.S.C. § 908 ........................................................................................................................ 17

5 U.S.C. § 115 (1881) ............................................................................................................... 12

5 U.S.C. § 7342 ................................................................................................................. 14, 17

*An Act to Authorize the Sale of Two Arabian Horses, Received as a Present by the Consul of the United States at Zanzibar, from the Imaum [sic] of Muscat*, Mar. 1, 1845, 5 Stat. 730 .................................................................................................................................. 12

*Joint Resolution No. 20, A Resolution Providing for the Custody of the Letter and Gifts from the King of Siam*, Mar. 15, 1862, 12 Stat. 616 ........................................................ 12

*Joint Resolution No. 39, Joint Resolution to Authorize Benjamin Harrison to Accept Certain Medals Presented to Him While President of the United States*, Apr. 2, 1896, 29 Stat. 759 ........................................................................................................... 13

*Joint Resolution No. 4, A Resolution to Authorize the President to Dispose of Certain Presents from the Imaum [sic] of Muscat and the Emperor of Morocco*, July 20, 1840, 5 Stat. 409 .......................................................................................................... 12

### *Other Authorities*

*Abridgment of the Debates of Congress from 1789 to 1856* (Thomas Hart Benton ed., 1860) ....................................................................................................................................... 11

*Annals of Cong.* (1798) ...................................................................................................... passim

*Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13 (1994) ............................................... 4, 5, 9

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize* 33 Op. O.L.C. 1 (2009) ........................... 14

*Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114 (1993) .................................................................................................................. 5

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96 (1986) .................................................................................. 4

David Robertson, *Debates and other Proceedings of the Convention of Virginia* (2d ed. 1805) ...................................................................................................................................... 4

*Donald Trump's Many, Many Business Dealings in 1 Map*, Time Magazine, Jan. 10, 2017 ........................................................................................................................................ 15

Edith Bolling Wilson, *My Memoir* (1938) .................................................. 13

James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174 (Feb. 1994) ....................................................................................... 8

John Bassett Moore, *A Digest of International Law* (1906) ............................... 7, 10, 12

Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (1836) ....................................................................... 7

Joseph Story, *Commentaries on the Constitution of the United States* (5th ed. 1891) .................. 4

*Letter for Allie B. Latimer, General Counsel, General Services Administration, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel* (Feb. 8, 1978) ........... 14

*Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam* (Feb. 3, 1862) ....................... 12

*Letter from Martin Van Buren to Syed Bin Sutan, Imaum [sic] of Muscat* (May 8, 1840) .......... 11

*Letter from Martin Van Buren to the Senate* (May 21, 1840) ...................................... 11

Maxine Cheshire, *Unraveling the Nixons' Jewel Tangle*, Washington Post, Sept. 23, 1974 ....... 14

*Memorandum for the Honorable McGeorge Bundy, Special Assistant to the President, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, Re: Proposal that the President Accept Honorary Irish Citizenship* (May 10, 1963) ........... 13

*Message from the President of the United States* (Jan. 22, 1834) ................................. 11

Noah Webster, *An American Dictionary of the English Language* (1828) ..................... 5

*Oxford English Dictionary* (2d ed. 1989) ...................................................... 5

Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ....................... 5

Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and Address of the American Congress* (1775) ....................................................................... 5

*The Federalist* No. 22 (Clinton Rossiter ed., 1961) ........................................... 7

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...................... passim

**Brief of Former Members of Congress
as *Amici Curiae* in Support of Plaintiffs**

The undersigned former members of Congress respectfully submit this brief as *amici curiae* in support of plaintiffs.

**Interests of *Amici Curiae***

*Amici* are a bipartisan group of former members of Congress—Republicans and Democrats, Senators and Representatives—from across both the political spectrum and the nation. Together, they have nearly four centuries of combined congressional service.  They have no personal stake in the outcome of this case; their interest is purely in assisting this Court in understanding why it is imperative that today's elected officials comply with the anticorruption components, including the Foreign Emoluments Clause, of the Constitution they devoted so much of their lives to serving.  As former members of Congress, they offer their perspective from decades of congressional experience into how the Constitution does and must apply, how important congressional approval of foreign government presents and emoluments to the President is in practice, and how vital this Court's role is in protecting this part of the constitutional structure.

*Amici* are the following former members of Congress:

Michael Barnes (D-MD), H.R. 1979-87
Leonard Boswell (D-IA), H.R. 1997-2013
Barbara Boxer (D-CA),
   H.R. 1983-93, Sen. 1983-2017
Bob Carr (D-MI), H.R. 1975-81 & 1983-95
Tom Coleman (R-MO), H.R. 1976-93
Mickey Edwards (R-OK), H.R. 1977-93
Lee Hamilton (D-IN), H.R. 1965-99
Tom Harkin (D-IA),
   H.R. 1975-85, Sen. 1985-2015
Gary Hart (D-CO), Sen. 1975-87

Bob Inglis (R-SC), H.R. 1993-99 & 2005-11
Carl Levin (D-MI), Sen. 1979-2015
Brad Miller (D-NC), H.R. 2003-13
George Miller (D-CA), H.R. 1975-2015
Philip Sharp (D-IN), H.R. 1975-95
Chris Shays (R-CT), H.R. 1987-2009
Peter Smith (R-VT), H.R. 1989-91
Mark Udall (D-CO),
   H.R. 1999-2009, Sen. 2009-2015
Henry Waxman (D-CA), H.R. 1975-2015
Dick Zimmer (R-NJ), H.R. 1991-97

**Statement of Compliance**

Plaintiffs have given their consent to the filing of this brief.  Defendant has taken no position regarding the filing of this brief, and *amici* have submitted a motion for leave to file concurrently with this brief.  No party or party's counsel authored this brief in whole or in part; no party or party's counsel contributed money to fund the preparation or submission of this brief; and no other person except *amici curiae* and their counsel contributed money to fund the preparation or submission of this brief.

**Introduction**

Few corners of the Constitution are as explicit as the Foreign Emoluments Clause, Article I, Section 9, Clause 8.  From textualist, originalist, and structuralist perspectives, the clause unequivocally prohibits the President from accepting "any present [or] Emolument . . . of any kind whatever, from any . . . foreign State" unless Congress consents.  The Founders were deeply concerned about a foreign power corrupting an elected President, so provided an expansive, all-encompassing ban on the President's receipt of anything of value from a foreign state absent Congress's approval.

Like an 18th-century pocketwatch, the entire mechanism turns on a single key:  the President's constitutional obligation to disclose to Congress any "Emolument[s]" or "present[s]" a foreign state gives him and obtain Congress's consent before he accepts it.  Once the President discloses what he's been offered—something past Presidents have done without hesitation, so clear is the constitutional command—Congress has vast discretion whether and how to approve or disapprove the "present" or "Emolument."  Absent that disclosure and consent, however, no such foreign "Emolument[s]" or "presents" "of any kind whatever" may pass to the President.

2

The text, history, and structure of the Foreign Emoluments Clause make clear it is not a "gotcha" game between the President and Congress.  The Framers did not envision a cash-strapped legislature spending its time chasing after the President's private foreign business dealings, catching those it can when its investigators get lucky, after deals have already been consummated, sometimes affirmatively disapproving and somehow unwinding those it dislikes.  Rather, the Constitution unambiguously sets the default for this "supreme law of the land" as disentitling the President from taking any foreign "present or Emolument . . . of any kind whatever" unless he first discloses it to Congress and obtains consent.

It is entirely Congress's choice whether to opt in to the President's request before he can benefit personally from a foreign state.  It is not, as the President would have it, Congress's obligation to opt out.  The federal courts are empowered—and needed—to enforce this unambiguous constitutional requirement.  Disclosure of emoluments to Congress before they are accepted is the condition precedent that allows Congress to perform its constitutional function.  Without disclosure, Congress has no way to know what it needs to approve or how compromised the President's loyalty might become.  And conceptually, Congress cannot give or withhold approval for something it doesn't know exists.

*Amici* implore this Court, accordingly, to recognize that Congress cannot fulfill its constitutional duty under the Foreign Emoluments Clause, and meet the Framers' goals of transparency, accountability, and constraining presidential corruption, so long as the President is accepting foreign emoluments without first disclosing them to Congress and obtaining its consent.

## Argument

I.   **From textualist, originalist, and structuralist perspectives, the Constitution prohibits the President from accepting presents or emoluments "of any kind whatever" from a foreign state unless he first obtains Congress's approval. Period.**

A.   **The text of the Foreign Emoluments Clause is clear and unambiguous.**

For a document frequently shrouded in ambiguities and flourishes, the text of Article I, Section 9, Clause 8 of the Constitution is strikingly concrete.  The clause establishes a negative default position:  that "no Person holding any Office" of the United States "shall . . . accept" any "present [or] Emolument . . . of any kind whatever" that comes from "any . . . foreign State."  That is pretty much as absolute as constitutional prohibitions come.  The *only* exception that alters the office-holder's inability to accept a present from a foreign state comes with the "Consent of the Congress."

The Office of Legal Counsel has described the clause as "both sweeping and unqualified," *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17 (1994), designed to ensure "the undivided loyalty of individuals occupying positions of trust under our government," *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 100 (1986).  Virginia delegate Edmund Randolph thought the text, which "restrained [the President] from receiving any present or emoluments whatever," made it utterly "impossible to guard better against corruption." David Robertson, *Debates and other Proceedings of the Convention of Virginia* 345 (2d ed. 1805). It was language chosen to eliminate "foreign influence of every sort."  Joseph Story, *Commentaries on the Constitution of the United States* § 1352 (5th ed. 1891).

Nor is there reasonable dispute about the meanings of the words the Framers chose.  "No" had the same meaning in 1787 as it does today.  The word "emolument" had an especially broad meaning; in the late 18th century, the word was defined expansively to include any "profit,"

"advantage," "benefit," or "comfort."  *See* Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) (defining "emolument" as "Profit; advantage"); *Oxford English Dictionary* (2d ed. 1989) (citing eighteenth-century texts for definition of "emolument" meaning "Advantage, benefit, comfort").  At the time, an "emolument" could include any number of benefits, including financial profits accruing from a private business.  *See, e.g.*, Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and Address of the American Congress* 9 (1775) ("A merchant's desire is not of glory, but of gain; not of publick wealth, but of private emolument").  "Consent" in early America was understood much as it is today, as "[a]greement of the mind to what is proposed or state[d] by another" or "a yielding of the mind or will to that which is proposed."  Noah Webster, *An American Dictionary of the English Language* (1828).  Critically, consent comes only *in response* to *another's proposal*.

Thus, the text of the Foreign Emoluments Clause is about as clear as the Constitution's text gets:  The President can accept all the benefits from foreign governments he wants, but he needs to request and receive congressional approval first.  "The decision whether to permit exceptions that qualify the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause."  *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 121 (1993) ("ACUS") (original emphasis).  Without Congress's consent to the President's request, the ban is absolute; the Foreign Emoluments Clause "lays down a stark and unqualified rule, and leaves it to the legislative process to work out any needed qualifications."  *Id.* at 123 n.10; *see also Foreign Public Universities*, 18 Op. O.L.C. at 16 n.4, 17 ("The Clause in terms prohibits . . . accepting 'any present, Emolument, Office, or Title,

of any kind whatever' from 'any . . . foreign State' unless Congress consents." (quoting U.S. Const., art. I, § 9, cl. 8)).

The President would take a red quill to the clause and rewrite it.

> **Constitution:** "[N]o Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."

> **President's Rewrite:** "[A]ny Person holding any Office of Profit or trust under [the United States], may, unless Congress affirmatively Objects, accept of any present, Emolument, Office, or Title, from any King, Prince, or foreign State."

The President's version might be a fine clause to some, but it wasn't to the Framers—and it certainly isn't in the Constitution.  While Congress might choose to approve all emoluments and presents the President receives, the President may not receive any without first obtaining Congressional consent.

> **B.    An originalist analysis of the Foreign Emoluments Clause establishes the Framers' intent to provide a sweeping, expansive bulwark against foreign corruption of the President.**

In 1787, when the United States was a poor, agrarian, unstable, but strategically located country, the corrupting influence of foreign governments was a major concern for the Constitution's Framers.  "Foreign powers will intermeddle in our affairs, and spare no expen[s]e to influence them," worried Elbridge Gerry.  2 *The Records of the Federal Convention of 1787* 268 (Max Farrand ed., 1911) (hereinafter "Convention Records").  "[I]f we do not provide against corruption, our government will soon be at an end," feared George Mason.  1 *id*. at 392.

An elected President was thought to be at special risk of foreign corruption.  Charles Cotesworth Pinckney, a South Carolinian delegate to the constitutional convention, observed that "kings are less liable to foreign bribery and corruption" than Presidents, "because no bribe that could be given them could compensate the loss they must necessarily sustain for injuring their

dominions" whereas "the situation of a President would be very different." 4 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 264 (1836). As a temporary officeholder, a President "might receive a bribe which would enable him to live in greater splendor in another country than his own; and when out of office, he was no more interested in the prosperity of his country than any other patriotic citizen." *Id.* In Federalist No. 22, Alexander Hamilton warned that "persons elevated from the mass of the community, by the suffrages of their fellow-citizens, to stations of great pre-eminence and power, may find compensations for betraying their trust, which, to any but minds animated and guided by superior virtue, may appear . . . to overbalance the obligations of duty." *The Federalist* No. 22, at 149 (Clinton Rossiter ed., 1961).

Hamilton also noted that the personal interest of a hereditary king was "so interwoven with that of the Nation . . . that he was placed above the danger of being corrupted from abroad." 1 *Convention Records* 289. On the other hand, as James Madison pointed out, an elected President would lack "that permanent stake in the public interest which would place him out of the reach of foreign corruption." *Id.* at 138.

Seeking to create a new kind of order that broke with Europe's corrupt past, the Framers intentionally designed the Constitution to avoid the blatant influence peddling they saw in European governments. Europe embraced lavish gift-giving from host governments to diplomats, openly offering presents of "jewels, plate, tapestry, or porcelain, or sometimes of money." 4 John Bassett Moore, *A Digest of International Law* 578 (1906) (quoting Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790)). Delaware Representative James Bayard distastefully noted that "in Holland, it was customary to give a gold chain and medal; in France, a gold snuff-box; and in Spain, a picture." 5 *Annals of Cong.* 1589 (1798); *id.* at 1587 (Venable)

("these presents were sometimes made in pictures, sometimes in snuff-boxes, and sometimes in money").

These were the very gifts the Conventioneers sought to ban. Even "trifling presents" were of concern. *Id*. at 1587 (Bayard). Representative Joseph McDowell of North Carolina "objected to the principle of these presents," asking suspiciously, "[w]hat are they given for?" and concluding, "to gain their friendly offices and good wishes towards the country who gave them." *Id*. at 1583. McDowell "thought this improper[.]" *Id*. Likewise, Bayard expressed concern that "[i]f presents were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors." *Id*. Matthew Lyon, representative from Vermont, declared that "he should not be willing to lay this country under an obligation to a foreign country by our Ministers accepting presents." *Id*. at 1589.

Thus, to fend off "dependency, cabals, patronage, unwarranted influence, and bribery," the Framers drafted the Constitution to include "procedural devices and organizational arrangements" which would discourage corruption. James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174, 181 (Feb. 1994); *see id*. at 177-82 (describing how fear of corruption influenced the structure of the electoral college, Congress's power to impeach, the prohibition on members of Congress holding additional offices, and the prohibition on acceptance of foreign emoluments). The Foreign Emoluments Clause was one such device, and it was a broad one. At the Virginia Ratifying Convention, Randolph explained that the Constitution's authors thought it "proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states." 3 *Convention Records* 327.

Notably, the Foreign Emoluments Clause was one of the only provisions of the Articles of Confederation imported into the Constitution wholesale, indicating its importance to political thinking in the late 18th century.  *See* 2 *Convention Records* 384, 389; Articles of Confederation of 1781, art. VI, § 1 (prohibiting "any person holding any office of profit or trust under the United States, or any of them" from "accept[ing] any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State").  In the process, though, the Founders added the congressional approval mechanism, which reflected the actual practice under the Articles.  *See Foreign Public Universities*, 18 Op. O.L.C. at 16 n.4 (examples under the Articles in which Congress approved gifts from foreign sovereigns, including art and a horse); 5 *Annals of Cong*. 1585 (1798) (Otis) (officials were offered gifts from foreign governments and "communicated the fact to Congress" for approval).

That makes sense.  The Framers understood "in the course of events, a case might exist in which it might be proper for a citizen of the United States to receive a present from a foreign Government." 5 *Annals of Cong*. 1584 (Claiborne).  They thought that in an electoral government, an approval mechanism would be sufficient to prevent corruption primarily because it would make foreign emoluments public through congressional disclosure.  In "mak[ing] known to the world whatever presents they might receive from foreign Courts," officials would "place themselves in such a situation as to make it impossible for them to be unduly influenced by any such presents." *Id*. at 1583 (Bayard).  Public disclosure was essential:  As Representative Harrison Gray Otis of Massachusetts opined, "[w]hen every present to be received must be laid before Congress, no fear need be apprehended from the effects of any such presents.  For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged." *Id*. at 1585.

Accordingly, the Foreign Emoluments Clause was adopted, in the words of Representative William C.C. Claiborne of Tennessee, "to lock up every door to foreign influence," which "could not but prove baneful to every free country." *Id*. at 1584. That's why the Founders gave Congress alone authority to permit "the acceptance of presents from foreign governments by persons holding offices under the United States." Moore, *supra*, at 579 (quoting Letter from James Madison to David Humphreys (Jan. 5, 1803)). Authority to approve emoluments also promotes Congress's own accountability, in that elected representatives must weigh the risks of corruption against the opprobrium of voters, and indeed their own party politics, when making their decision.

**C.     The Constitution's structure relies on the President disclosing to Congress any financial gain or valuable asset he receives from a foreign state, and past Presidents have understood and followed that command.**

From a structural perspective, the Foreign Emoluments Clause is similar to the Appointments Clause of Article II, Section 2, Clause 2, which states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States . . . ." Both clauses invoke the mandatory directive "shall," and both clauses provide for a discretionary determination by the Legislature once the President transmits notice to Congress. Under the Appointments Clause, it is up to the President whether he wishes to transmit the name of a potential judge or ambassador to the Senate for approval, but his choice cannot fill the position until he does so and the Senate approves. Likewise, under the Foreign Emoluments Clause, it is up to the President whether he wishes to transmit information about presents and emoluments given him by foreign governments, but he cannot accept the benefit of them until he does so and Congress approves.

10

Presidents and officers have long complied with the disclosure requirement.  As early as 1798, Washington's minister to Great Britain, Thomas Pinckney, was offered "the customary presents" by the kings of England and Spain, but following the Foreign Emoluments Clause, he "declined receiving them, saying, that he would lay the matter before Congress . . . ." *5 Annals of Cong.* 1590 (1798) (Rutledge).

This has long been the practice when Presidents have faced dilemmas involving emoluments and presents:

▪  In 1830, President Andrew Jackson requested congressional approval to accept a commemorative gold medal from Simón Bolívar.  Congress directed that the medal be "deposited in the Department of State." *See Message from the President of the United States* 3 (Jan. 22, 1834), in *Message from the President of the United States to the Two Houses of Congress at the Commencement of the First Session of the Twenty-Third Congress* 259 (1833).

▪  In 1840, the Imam of Muscat offered President Martin Van Buren two horses, a case of rose oil, five bottles of rose water, a package of cashmere shawls, a Persian rug, a box of pearls, and a sword.  14 *Abridgment of the Debates of Congress from 1789 to 1856* 140-41 (Thomas Hart Benton ed., 1860).  Van Buren told the Imam of "a fundamental law of the Republic which forbids its servants from accepting presents from foreign States or Princes, [that] precludes me from receiving" the items without Congress's approval.  *Id*. at 141 (reprinting *Letter from Martin Van Buren to Syed Bin Sutan, Imaum [sic] of Muscat* (May 8, 1840)).  Van Buren informed Congress of the presents, writing:  "I deem it my duty to lay the proposition before Congress, for such disposition as they may think fit to make of it."  *Id*. at 140 (reprinting *Letter from Martin Van Buren to the Senate* (May 21, 1840)).  Congress directed him to deposit the items with the State Department or sell the items and place the proceeds with the U.S. Treasury.  *Joint Resolution No.*

*4, A Resolution to Authorize the President to Dispose of Certain Presents from the Imaum [sic] of Muscat and the Emperor of Morocco*, July 20, 1840, 5 Stat. 409.

- In 1843, the Imam of Muscat (perhaps forgetting his experience with President Van Buren) offered President John Tyler two horses.  Moore, *supra*, at 582.  Tyler notified Congress, which instructed Tyler to sell the horses and give the money to the Treasury.  *See An Act to Authorize the Sale of Two Arabian Horses, Received as a Present by the Consul of the United States at Zanzibar, from the Imaum* [sic] *of Muscat*, Mar. 1, 1845, 5 Stat. 730.

- In 1862, President Abraham Lincoln wrote to the King of Siam to decline a series of presents that included two elephant tusks, an ornate sword, and a photograph of the King.  Lincoln told the King that "our laws forbid the President from receiving these rich presents as personal treasures. . . .  Congress being now in session at this capital, I have had great pleasure in making known to them this manifestation of Your Majesty's munificence and kind consideration."  *Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam* (Feb. 3, 1862).  Congress directed that the items be deposited with the Department of the Interior.  *See Joint Resolution No. 20, A Resolution Providing for the Custody of the Letter and Gifts from the King of Siam*, Mar. 15, 1862, 12 Stat. 616.

By the late-19th century, Congress began legislating to regularly require that presents to officers of the United States from foreign governments be automatically turned over to the Department of State permanently absent a congressional act.  *See* 5 U.S.C. § 115 (1881) ("Any present, decoration, or other thing which shall be conferred or presented to any officer of the United States, civil, naval, or military, shall be tendered through the Department of State, and not to the individual in person, but such present, decoration, or other thing shall not be delivered by the Department of State unless so authorized by an act of Congress.").

Thus, in 1896, President Benjamin Harrison had "certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States." *Joint Resolution No. 39, Joint Resolution to Authorize Benjamin Harrison to Accept Certain Medals Presented to Him While President of the United States*, Apr. 2, 1896, 29 Stat. 759. Congress authorized him to personally accept the medals.

As the 20th century rolled on, with a baseline set by statute that nearly all presents and emoluments must automatically be conveyed to the United States, Presidents generally sought to avoid any appearance of foreign corruption rather than request permission from Congress to accept every gift.  To that end, they followed the statutory procedure or refused emoluments outright, often simply following the advice of the Office of Legal Counsel.

▪        President Woodrow Wilson refused all foreign decorations while in office and during World War I.  *See Memorandum for the Honorable McGeorge Bundy, Special Assistant to the President, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, Re: Proposal that the President Accept Honorary Irish Citizenship* 10 n.5 (May 10, 1963) (unpublished), citing Edith Bolling Wilson, *My Memoir* 343 (1938), *available at* https://www.justice.gov/olc/page/file/935746/download.

▪        In 1963, President John Kennedy sought guidance from the OLC about whether his acceptance of an offer of honorary citizenship from Ireland without congressional consent would implicate the Foreign Emoluments Clause.  The OLC concluded it would and advised President Kennedy to deposit the "warrant" for the honorary citizenship with the Department of State until Congress approved or he left office.  *Id*. at 7.  Plans for Kennedy's honorary citizenship were later shelved.

▪        In 1978, the General Counsel of the General Services Administration requested advice from the OLC about whether gifts to President Richard Nixon's daughters at their weddings from heads of foreign states ran afoul of the Foreign Emoluments Clause and related statutes.  The OLC concluded wedding gifts to Nixon's daughter during his presidency from foreign governments required congressional consent.  *Letter for Allie B. Latimer, General Counsel, General Services Administration, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel* 5-6 (Feb. 8, 1978) (unpublished), available at https://justice.gov/olc/page/file/936081/download.   The presents were in possession of GSA because President Gerald Ford ordered them withheld from shipment to the Nixon family estate after Nixon resigned.  Maxine Cheshire, *Unraveling the Nixons' Jewel Tangle*, Washington Post, Sept. 23, 1974, at A1.

Congress's modern regulation restricting foreign gifts to public officials is the *Foreign Gifts and Decorations Act*, 5 U.S.C. § 7342 ("FAGA").  It requires all employees of the United States, including the President and Vice-President, to convey all foreign gifts to the government except souvenirs worth less than $100, educational scholarships, or certain emergency medical care and foreign travel expenses, absent congressional approval.

So in 2009, President Barack Obama asked the OLC whether he could accept the Nobel Peace Prize without congressional consent and without violating the Foreign Emoluments Clause or FAGA.  *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1 (2009).  The OLC concluded Obama could accept the prize without congressional consent because the Nobel committee is not a foreign state and no prior President who received the Nobel prize considered it to fall within the clause.  *Id.* at 6, 9.

Accordingly, past Presidents considered even small gifts and trinkets subject to disclosure, or followed the OLC's advice about disclosure. Due to his unique role as head of state, potential corruption of the President by a foreign power through money or things of value is an existential concern of the republic, and ensuring disclosure and accountability are fundamental priorities for the Constitution. If the plaintiffs are correct and the President has accepted or will accept money, rights, or things of value from foreign governments without congressional approval, the constitutional structure has been thrown out of balance.

II.   **To perform its constitutional duty, Congress needs the federal courts to engage in the limited and modest task of enforcing the Foreign Emoluments Clause's clear command.**

Congress needs the federal courts to enforce the Foreign Emoluments Clause to address unprecedented alleged violations of the Clause.

The threat of undue foreign influence of the President remains as great now as when the Constitution was written. Indeed, the threat may be even greater today. Whereas once America's poverty and weakness formed the basis for fear of presidential corruption, it is precisely America's wealth and power that make the President so prime a target for foreign corruption in the early 21st century. Foreign states with adverse interests have little reason not to try to hold outsized sway over American policy, since the benefit to them could be so great. In the globalized age, where transcontinental travel and business ownership are commonplace and seamless, the President even more lacks "that permanent stake in the public interest which would place him out of the reach of foreign corruption" than at the nation's founding. *1 Convention Records* 138; *see also Donald Trump's Many, Many Business Dealings in 1 Map*, Time Magazine, Jan. 10, 2017, *available at* https://goo.gl/v6Km7j (identifying nearly 25 countries in which businesses owned by President Trump operate).

That is why the Constitution's structure and text require the President to disclose emoluments or presents to Congress *before* accepting them. Disclosure by the President before acceptance allows Congress to exercise its approval authority. If the President does not initiate disclosure—and the text puts the onus unquestionably on him—Congress can't approve any gifts given him. It has no way to know whether he's on a foreign government's payroll or how much these gifts could compromise his loyalty.

Indeed, Congress need never reject a presidential request for emoluments to prevent the President from taking them—it merely need not *approve* one. Under the Constitution's plain text, rejection is automatic until affirmative approval comes through. While this structure of congressional consent may be inconvenient for the President's private business interests, it is one of the compromises he must accept when he becomes the leader of 300 million Americans.

The courts' role in this ballet is to guard the outermost boundaries of the Foreign Emoluments Clause. Courts are there to help facilitate Congress's ability to perform its duty by ensuring the President does not accept emoluments without first disclosing and obtaining consent. Importantly, the courts have *no ability* to second-guess Congress's decision whether to consent to the President's request *after* disclosure. But disclosure itself, for the Framers, was a given—one it is vital that the courts help ensure.

The President sees the Foreign Emoluments Clause as setting up a "gotcha" game between the executive and legislative branches. But the Constitution does not direct Congress to constantly track and investigate the President's international business dealings and affirmatively issue a disapproval when it decides it doesn't like one. Such a regime is antithetical to the Clause's unambiguous default presumption that the President may not accept any foreign emoluments *unless* approved by Congress. Such an interpretation of the Clause would also undermine the

Framers' clearly expressed anti-corruption goals, because it would substantially increase the likelihood that emoluments would slip through undisclosed and unreviewed, in contradiction of the firewall they sought.  It would also virtually guarantee that any emolument discoveries by Congress would come months or years after the emolument was already accepted, with the damage quite possible done.

The Constitution creates, instead, an "opt in" rule:  Congress must "opt in" to the President's request, and unless it does, the President cannot accept presents or emoluments without violating the Constitution.  Period.  Of course, Congress can streamline its review procedures, approve the emolument without debate, or hold hearings and investigate, as it sees fit.  But the initial triggering event is the President's disclosure.

That's why Congress legislates in advance to exercise its power of consent only when it knows in advance what it's consenting to.  Thus, Congress pre-approved accepting certain military honors, 5 U.S.C. § 7342(d) (permitting government employees to retain certain foreign medals or decorations and requiring reporting), taking some jobs with foreign governments, 37 U.S.C. § 908 (requiring reporting and approval from the Secretary of State), and accepting low-value souvenirs, emergency medical treatment, and educational scholarships, 5 U.S.C. § 7342(c)(1).  These are all small-value items offered with great frequency.  (Indeed, for government jobs and military honors, Congress still requires specific disclosure even though it has pre-consented.)  So, for example, if the President wants his business to receive valuable trademark approvals from foreign states, Congress might approve him doing so in advance, but only after he discloses that his business is seeking or has been offered those trademarks.  Congress needs to know what it's approving before it can consent—and whether there might be a corruption problem it needs to consider beforehand.

The goal of this lawsuit is not to remove the President from office.  Rather, the plaintiffs merely seek compliance with the Constitution's unambiguous requirement that the President disclose whatever he is offered from a foreign state and get Congress's okay before he accepts it. This court is well-suited to helping that occur, and *amici* implore it to.  Doing so will help restore functioning to the Constitution's most essential protection against foreign corruption.

### Conclusion

For these reasons, *amici* respectfully request that the motion to dismiss be denied.

Respectfully submitted,

Date: November 2, 2017            By:  */s/ Sean H. Donahue*
                                       Sean H. Donahue
                                       Susannah L. Weaver
                                       Donahue & Goldberg, LLP
                                       1111 14th Street, N.W.
                                       Suite 510A
                                       Washington, D.C. 20005

                                       Ben Feuer
                                       Anna-Rose Mathieson
                                       California Appellate Law Group LLP
                                       96 Jessie Street
                                       San Francisco, CA 94105

                                       Walter E. Dellinger III
                                       Duke University
                                       210 Science Drive
                                       Durham, NC 27708

                                       *Counsel for Amici Curiae*
                                       *Former Members of Congress*

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2017, I caused a true and correct copy of the foregoing to be

served on all counsel of record through the Court's CM/ECF system.

_/s/ Sean H. Donahue_____
Sean H. Donahue