**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> Defendant. | Civil Action No. 1:17-cv-01154-EGS |

**BRIEF OF *AMICI CURIAE* BY CERTAIN LEGAL HISTORIANS**
**ON BEHALF OF PLAINTIFFS**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................... 1

II.   "EMOLUMENTS" IN FOUNDING-ERA DICTIONARIES AND TREATISES ............ 2

    A.    DOJ's Narrow Definition of "Emolument" is Inaccurate, Unrepresentative, and Misleading ................................................................................. 2

    B.    "Emolument" Had a Broad Commercial Meaning in Eighteenth Century Legal and Economic Treatises ................................................................. 4

        1.    "Emolument" in Blackstone's *Commentaries* ........................... 4

        2.    "Emolument" in Pufendorf's *Law of Nature and of Nations* and Smith's *Wealth of Nations* .......................................................... 6

III.   HISTORY OF THE EMOLUMENTS CLAUSE ............................................... 7

    A.    Historical Background from the English and Dutch to the Articles of Confederation Era ................................................................................. 8

    B.    Federal Constitutional Convention ..................................................... 14

    C.    The Ratification Debates ...................................................................... 16

    D.    The Founding Generation Used the Word "Emolument" Broadly ...................... 19

IV.   CONCLUSION ............................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                   Page(s)

*Baker v. State*,
   744 A.2d 864, 170 Vt. 194 (Vt. 1999) .................................................................. 12

*Dist. of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................................................................. 22

*Ellis v. Marshall*,
   2 Mass. 269 (1807) .............................................................................................. 21

*Hite v. Fairfax*,
   4 Call 42, 8 Va. 42 (1786) ................................................................................... 20

*Himely v. Rose*,
   9 U.S. (5 Cranch) 313 .......................................................................................... 21

*Hoyt v. United States*,
   51 U.S. 109 (1850) ............................................................................................... 22

*Opinion of the Justices*,
   190 A. 425, 88 N.H. 484 (1937) .......................................................................... 12

*Opinion of the Justices (Municipal Tax Exemptions for Electric Utility Personal Property)*,
   746 A.2d 981 (N.H. 1999) ................................................................................... 12

*President of Portland Bank v. Apthorp*,
   12 Mass. 252 (1815) ............................................................................................ 21

*Trs. of Dartmouth Coll. v. Woodward*,
   17 U.S. (4 Wheat.) 518 (1819) ............................................................................. 21

*Virginia v. Tennessee*,
   148 U.S. 503 (1893) ............................................................................................. 15

*Yancey v. Hopkins*,
   15 Va. 419 (1810) ................................................................................................ 21

**Statutes and Constitutional Provisions**

American Colonies Act, the "Declaratory Act," of 1766, 6 Geo. 3 c. 12 ...................... 8

Act to Establish the Treasury Department, 1 Stat. 65 (1789-1799) .............................. 13

1 Stat. 400-1 (1794) ................................................................................................... 24

1 Stat. 565 (1798) ...................................................................................................... 24

1 Stat. 611 (1798) .......................................................................................... 24

1 Stat. 613 (1799) .......................................................................................... 24

2 Stat. 172 § 3 (1802) ..................................................................................... 22

2 Stat. 379 (1806) .......................................................................................... 24

2 Stat. 451 (1807) .......................................................................................... 24

2 Stat. 473 (1808) .......................................................................................... 24

2 Stat. 506 (1809) .......................................................................................... 24

2 Stat. 528 (1809) .......................................................................................... 24

2 Stat. 605 (1810) .......................................................................................... 24

2 Stat. 700 (1812) .......................................................................................... 24

2 Stat. 778 (1812) .......................................................................................... 24

3 Stat. 88 (1813) ............................................................................................ 24

3 Stat. 123 (1814) .......................................................................................... 24

3 Stat. 195 (1815) .......................................................................................... 24

3 Stat. 368 (1817) .......................................................................................... 23

3 Stat. 693 (1822) .......................................................................................... 23

N.H. Const. art. 10 (1784) ............................................................................. 12

U.S. Const. art. 1, § 9, cl. 8 ............................................................................. 1

Vt. Const. Ch. 1, art. 7 (1793) ....................................................................... 12

**Historical Materials**

*The Papers of John Adams, vol. 2, December 1773-April 1775* (Robert J. Taylor ed., 1977) ....... 6

Letter from John Quincy Adams to John Adams, *Writings of John Quincy Adams, vol. 2, December 1773-April 1775* (Worthington C. Ford ed., 1913) ................................................. 10

John Adams, *Notes of Debates on the Articles of Confederation*, July 26, 1776, Univ. of Va. Rotunda Online Database ("Rotunda") ..................................................................................... 19

John Ash, *The New and Complete Dictionary of the English Language* (1st ed. 1775) ................ 3

Nathan Bailey, *A Universal Etymological Dictionary* (2d ed. 1724) ............................................. 3

William Blackstone, *Analysis of the Laws of England* (1756) ..................................................... 5

William Blackstone, *Commentaries on the Laws of England,* vol. 1
    (D. Lemmings ed., 2016) (1765) ......................................................................................... 4-5

William Blackstone, *Commentaries on the Laws of England*, vol. 2
    (S. Stern ed., 2016) (1765) ................................................................................................. 4-5

William Blackstone, *Commentaries on the Laws of England,* vol. 4
    (R. Paley ed., 2016) (1769) ................................................................................................. 4-5

Letter from Tench Coxe to Thomas Jefferson, March 10, 1801, Univ. of Va. Rotunda Online
    Database .............................................................................................................................. 23

Thomas Dyche & William Pardon, *A New General English Dictionary* (8th ed. 1754) ............... 3

*The Debates in the Several State Conventions on the Adoption of the Federal
    Constitution in 1787* (Jonathan Elliot ed., 1836) ("Elliot's *Debates*") ............................ 2, 17

John Entick, *The New Spelling Dictionary* (1st ed. 1772) ......................................................... 3

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ("Farrand") ....... passim

*Journals of the Continental Congress 1774-1789*
    (Worthington C. Ford et al, eds., 1904-1937) ("JCC") ................................................. 2, 10, 11

Federal Farmer, *An Additional Number of Letters to the Republican, New York,
    Letter IX,* Jan. 4, 1788, Univ. of Va. Rotunda Documentary History of the Ratification
    of the Constitution ("DHRC") Database ................................................................................ 23

*The Papers of Benjamin Franklin,* vol. 23 (William B. Willcox ed., 1983) .................................. 6

THE FEDERALIST No. 75 (Alexander Hamilton) ......................................................................... 8

Letter from Alexander Hamilton to George Washington, Jan 24, 1795,
    Univ. of Va. Rotunda Online Database ................................................................................ 21

*The Papers of Alexander Hamilton,vol. 15, June 1793-January 1794*
    (Harold C. Syrett ed., 1969) ................................................................................................. 6

Giles Jacob, *Law Dictionary* (1729) ........................................................................................... 5

Letter from John Jay to Samuel Shaw, *The Diplomatic Correspondence of United States of
    America,* vol. 3 (1837) ......................................................................................................... 23

*The Papers of Thomas Jefferson*, vol. 1, 14 Jan 1760 – 25 Dec. 1776
    (Julian P. Boyd ed., 1950) .................................................................................................. 20

*The Papers of Thomas Jefferson*, vol. 10, 22 June – 31 Dec. 1786
(Julian P. Boyd ed., 1954)............................................................... 20

Thomas Jefferson, First Inaugural Address (1801)..................................................... 8

Letter from Thomas Jefferson to William Short, Oct. 3, 1801, *Memoir, Correspondence and Miscellanies from the Papers of Thomas Jefferson,* vol. 3
(Thomas Jefferson Randolph ed., 1829). .................................. 8

Letter from Thomas Jefferson to George Washington, Sept. 9, 1792,
Univ. of Va. Rotunda Online Database ................................... 23

Univ. of Va. online database, *Documentary History of the Ratification of the Constitution*
(Merrill Jensen et al. eds., 1976) ("DHRC") ................................... passim

Samuel Johnson, *A Dictionary of the English Language* (1st ed. 1755) ....................................... 3

Letter from John Marshall to Carey and Lea, June 2, 1832, Univ. of Va. Rotunda Online
Database ........................................................... 20

THE FEDERALIST No. 55 (James Madison) ......................................... 23

*The Papers of James Madison,* vol. 6 (W. T. Hutchinson & W. M. E. Rachel eds., 1969) ........... 7

Letter from Robert Morris to George Washington, May 23, 1783, *The Papers of Robert Morris, 1781-1784* (E. James Ferguson ed., 1989).................... 13

*The Report of a Constitution or Form of Government for the Commonwealth of Massacusetts*, 28-31 Oct. 1779, Univ. of Va. Rotunda Online Database ............................ 19

Adam Smith, *An Inquiry Into the Nature and Causes of the Wealth of Nations*,
(Robert Maynard Hutchins ed., 1952) (1776)...................................... 6-7

*Letters of Delegates to Congress 1774-1789* (Paul H. Smith et al eds., 1976-2000) ................. 2

Letter from George Washington to Elias Boudinot, June 17, 1783, *Founders Online*,
National Archives, last modified June 29, 2017, http://bit.ly/2fwDVL5 ............... 21

Letter from George Washington to Colonel Josias Carvil Hall, Feb. 3, 1778,
Univ. of Va. Rotunda Online Database ................................... 20

George Washington, Farewell Address, Sept. 17, 1796 ......................................... 8

Letter from George Washington to Joseph Jones, Dec. 14, 1782,
Univ. of Va. Rotunda Online Database ................................... 23

Letter from George Washington to Benjamin Lincoln, Oct. 2, 1782,
Univ. of Va. Rotunda Online Database ................................... 23

Letter from George Washington to William Livingston, April 11, 1778,
Univ. of Va. Rotunda Online Database ................................................................. 21

Letter from George Washington to James Madison, Oct. 29, 1785,
Univ. of Va. Rotunda Online Database ................................................................. 21

Letter from George Washington to James McHenry, July 7, 1797,
Univ. of Va. Rotunda Online Database ................................................................. 21

Letter from George Washington to John Price Posey, August 7, 1782, *The Papers of George Washington 8 April–31 May 1779*
(Edward G. Lengel ed., Univ. of Va. Press 2010) ................................................ 21

Letter from George Washington to Friedrich von Poellnitz, March 23, 1790,
Univ. of Va. Rotunda Online Database ................................................................. 21

Letter from George Washington to Samuel Vaughn, Aug. 5, 1791,
Univ. of Va. Rotunda Online Database ................................................................. 21

*Collected Works of James Wilson,* vol. 1 (K.L. Hall & M.D Hall, eds., 2007)
oll.libertyfund.org/titles/2072 ............................................................................... 6

Consular Convention between His Most Christian Majesty and the Thirteen United
States of North America, *The Diplomatic Correspondence of the American Revolution,* vol. 4 (1829)......................................................................................... 13

Convention Defining and Establishing the Functions and Privileges of Consuls and
Vice Consuls between the United States and France, *The American Diplomatic Code, Embracing a Collection of Treaties and Conventions Between The United States and Foreign Powers* , vol. 1 (Jonathan Eliot, ed., 1834)................................................ 13

Drafts of the Articles of Confederation, July 1776 and August 20, 1776, *Journals of the Continental Congress 1774-1789,* vol. 5 (Worthington C. Ford, ed., 1906) ...................... 10-11

Military Order, Jan. 15, 1777, Univ. of Va. Rotunda Online Database....................................... 21

**Books, Articles, and Other Sources**

Akhil Reed Amar, *America's Constitution: A Biography* (2005).................................. 8

Bernard Bailyn, *The Ideological Origins of the American Revolution* (1967) ............................. 7

Jack M. Balkin, *The Construction of Original Public Meaning,* 31 Const. Comm. 71 (2016).... 22

William Baude and Stephen E. Sachs, *The Law of Interpretation*,
130 Harv. L. Rev. 1079 (2017). ............................................................................. 22

Samuel Flagg Bemis, "Washington's Farewell Address: A Foreign Policy of Independence,"
*American Historical Review*, vol. 2 (1934) ............................................................... 8

*Boston Evening Post and the General Advertiser*, May 3, 1783 (front page) .............................. 13

Douglas Bradburn, *The Citizenship Revolution:Politics and the Creation of the American
Union, 1774-1804* (2009)................................................................................ 7

Gerorge Clark, *The Later Stuarts (1660-1714)* (2d ed. 1956) ...................................................... 9

Saul Cornell, *Meaning and Understanding in the History of Constitutional Ideas: The
Intellectual History Alternative to Originalism*, 82 Fordham L.R. 721 (2013-2014).............. 22

Saul Cornell, *The Other Founders: Anti-Federalism and the Dissenting Tradition in
America, 1788-1828* (2012) ............................................................................... 7

Barry Coward, *The Stuart Age* (1980) ......................................................................... 9

Stanley Elkins & Eric McKitrick, *The Federalists* (1992) ........................................................ 7

E. James Ferguson, *The Power of the Purse: A History of American Public
Finance, 1776-1790* (1961) ............................................................................... 13

Eric Foner, *Tom Paine and Revolutionary America* (1976) ......................................................... 7

Jonathan Gienapp, *Making Constitutional Meaning:The Removal Debate and the Birth of
Constitutional Essentialism*, 35 J. Early Rep. 375 (2015) ......................................... 22

Gideon Hart, *The 'Original' Thirteenth Amendment: The Misunderstood Titles of Nobility
Amendment*, 94 Marquette L. Rev.311 (2010)......................................................... 24

H. James Henderson, *Party Politics in the Continental Congress* (1974)................................... 13

J.P. Kenyon, *The History Men, The Historical Profession in England Since the Renaissance*
(Weidenfeld and Nicholson, 2d ed., 1993) .......................................................... 9

Larry D. Kramer, *Two (More) Problems with Originalism*,
31 Harv. J.L. & Pub. Pol'y 907 (2008).............................................................. 22

*The Founders' Constitution, vol. 5* (Philip Kurland and Ralph Lerner eds., 2000)....................... 8

David Lefer, *The Founding Conservatives* (2013) ......................................................... 7

Francis Lewis, *New-York Packet*, January 5, 1787........................................................ 5

Forrest McDonald & Ellen Shapiro McDonald, *Requiem: Variations on Eighteenth-Century
Themes* (1988)......................................................................................... 7

John Mikhail, *The Definition of 'Emolument' in English Language and Legal Dictionaries, 1523-1806*, June 30, 2017, https://ssrn.com/abstract=2995693 ................................................. 3

John Mikhail, *"Emoluments" in Blackstone's Commentaries*, Balkinization (blog), May 28, 2017, http://bit.ly/2rwBGIw ................................................. 4-5

John Bassett Moore and Francis Wharton, *A Digest of International Law* (1906)..................... 10

J.G.A. Pocock, *The Machiavellian Moment: Florentine Political Thought and the Atlantic Republican Tradition* (1975)................................................................................................ 7

James C. Phillips and Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799* (September 14, 2017). South Texas Law Review, Vol. 59, No. 2, 2018. Available at SSRN: https://ssrn.com/abstract=3036938 ...................................................................................... 22

Samuel Pufendorf, *De Jure Naturae et Gentium, (On the Law of Nature and of Nations)* (Basil Kennett, translator, 3rd ed. 1717) (1672) .......................................................... 6-7, 24

Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* (1979) ...................................................................................... 13

Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (1996) ................................................................................... 22

Gautham Rao, *National Duties: Custom Houses and the Making of the American State* (2016) .......................................................................... 7

Charles Rappleye, *Robert Morris: Financier of the American Revolution* (2010)..................... 13

Antonin Scalia and Bryan A. Garner, *Reading Law, The Interpretation of Legal Texts* (2012) .... 3

Bernard Schwartz, *Thomas Jefferson and Bolling v. Bolling: Law and the Legal Profession in Pre-Revolutionary America* (1997).............................................................................. 6

Lawrence B. Solum, *Originalist Methodology*, 84 U. Chi. L. Rev. 269 (2017).......................... 22

Joseph Story, *Commentaries on the Constitution*, vol. 3 (1833) ............................................. 8, 16

Zephyr Teachout, *Corruption in America: From Franklin's Snuff Box to Citizens United* (2014) ................................................................................... 7, 10, 14

Charles P. Whittemore, *A General of the Revolution: John Sullivan of New Hampshire* (New York, 1961) ................................................................................................ 16

Keith Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* (1999) .......................................................................... 22

Keith E. Whittington, *The New Originalism,* 2 Geo. J. L. & Pub. Pol'y 599 (2004) .................. 27

Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (1969) ............................ 7

I.       **INTRODUCTION**

The Foreign Emoluments Clause ("FEC") of the U.S. Constitution states that "no person holding any office of profit or trust under [the United States], shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state."[1] The framers adopted this clause to protect against corruption, foreign entanglements, and other threats to republican government, and wrote the clause broadly to accomplish these purposes.

In its memorandum of law in support of the President's motion to dismiss,[2] the Department of Justice ("DOJ") contends that the original public meaning of the Constitution permits a president to engage in private commercial transactions with foreign governments without violating the FEC. This historical claim is flawed for at least three overlapping reasons. First, DOJ's definition of "emolument" is inaccurate, unrepresentative, and misleading. The word "emolument" was not a term of art in the eighteenth century; it was used, in both legal and non-legal contexts, in a much broader sense than the unduly narrow and artificial one articulated by the government. In particular, "emolument" encompassed profits or advantages arising from private commercial transactions. Second, DOJ's interpretation is at odds with historical understandings of the Emoluments Clause and of similar prohibitions adopted from 1776 to 1789. Third, DOJ's interpretation of this clause is inconsistent with the founders' purposes of preventing corruption and conflicts of interest, avoiding dangerous foreign entanglements, and preserving a careful balance of state and federal power.

---

[1] U.S. Const. art. 1, § 9, cl. 8.
[2] Statement of Points and Authorities in Support of Defendant's Motion to Dismiss, Dkt. No. 15-1 (Sept. 15, 2017) [hereinafter "DOJ Brief"].

## II.    "EMOLUMENTS" IN FOUNDING-ERA DICTIONARIES AND TREATISES

### A.    DOJ's Narrow Definition of "Emolument" is Inaccurate, Unrepresentative, and Misleading

In its brief, DOJ narrowly defines the word "emolument" as "profit arising from office or employ," contending that this original understanding of "emolument" is grounded in "contemporaneous dictionary definitions."[3] However, the government's linguistic evidence is weak and cannot withstand scrutiny.

First, the government's dictionary-based argument is fundamentally flawed. Little or no evidence indicates that the two obscure sources—Barclay (1774) and Trusler (1766)—on which DOJ relies for its "office- and employment-specific" definition of "emolument" were owned, possessed, or used by the founders, let alone had any impact on them, or on those who debated and ratified the Constitution. For example, neither of these sources is mentioned in the more than 178,000 searchable documents in the *Founders Online* database, which makes publicly available the papers of the six most prominent founders. Nor do these volumes appear in other pertinent databases, such as *Journals of the Continental Congress*,[4] *Letters of Delegates to Congress*,[5] *Farrand's Records*,[6] *Elliot's Debates*,[7] or the *Documentary History of the Ratification of the Constitution*.[8] By contrast, all of the dictionaries that the founding generation did possess and use

---

[3] DOJ Brief at 3, 20-22.  DOJ also claims that "the benefit must be predicated on services rendered in an official capacity or an employment (or equivalent) relationship and be given in exchange for the provision of a service in that relationship." *Id*. at 20.

[4] *See Journals of the Continental Congress 1774-1789* (Worthington C. Ford *et al*. eds., 1904-37) [JCC].

[5] *See Letters of Delegates to Congress 1774-1789* (Paul H. Smith *et al*. eds., 1976-2000).

[6] *See* Max Farrand, *The Records of the Federal Convention of 1787* (1911) [henceforth "Farrand"].

[7] *See The Debates in the Several State Conventions on the Adoption of the Federal Constitution in 1787* (Jonathan Elliot ed., 1836) [henceforth "Elliot's *Debates*"].

[8] *See Documentary History of the Ratification of the Constitution* (Merrill Jensen *et al*. eds., 1976-present) [henceforth "DHRC"].

regularly define "emolument" in the broad manner favoring the plaintiffs: "profit," "advantage," or "benefit."[9]

Second, a careful review of English language dictionaries from 1604 to 1806 shows that *every* definition of "emolument" published during this period relies on one or more of the elements of the broad definition DOJ rejects in its brief: "profit," "advantage," "gain," or "benefit." Furthermore, over 92% of these dictionaries define "emolument" *exclusively* in these terms, with no reference to "office" or "employment." By contrast, DOJ's preferred definition—"profit arising from office or employ"—appears in less than 8% of these dictionaries. Even those outlier dictionaries always include "gain, or advantage" in their definitions, a fact obscured by DOJ's selective quotation of only one part of its favored definition from Barclay. Finally, Trusler's volume is not a standard dictionary, but rather a thesaurus, which presumes that "gain," "profit," and "emolument" are synonyms; moreover, its explanation of "emolument" was copied directly from a French thesaurus, hence it is not even reliably grounded in English usage. The impression DOJ creates in its brief by contrasting four historical definitions of "emolument"—two broad and two narrow—is, therefore, highly misleading.[10]

---

[9] *See, e.g.,* Samuel Johnson, A Dictionary of the English Language (1st ed. 1755) ("Profit; advantage"); Nathan Bailey, A Universal Etymological Dictionary (2d ed. 1724) ("Advantage, Profit"); Thomas Dyche & William Pardon, A New General English Dictionary (8th ed. 1754) ("Benefit, advantage, profit"); John Ash, The New and Complete Dictionary of the English Language (1st ed. 1775) ("An advantage, a profit"); John Entick, The New Spelling Dictionary (1st ed. 1772) ("Profit, advantage, benefit"). Cf. Antonin Scalia and Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 419 (2012) (identifying Johnson, Bailey, Dynche & Pardon, and Ash as "the most useful and authoritative" English dictionaries from 1750 to 1800). DOJ relies on the Oxford English Dictionary, but it, too, offers "reward" and "remuneration," without the qualification of an office or employment. DOJ brief at 34.

[10] *See* John Mikhail, *The Definition of "Emolument" in English Language and Legal Dictionaries* 1523-1806 (June 30, 2017), *available at* https://ssrn.com/abstract=2995693.

Third, the suggestion that "emolument" was a legal term of art at the founding, with a sharply limited "office- and employment-specific" meaning, is also inconsistent with the historical record. The founding generation used the word "emolument" in a broad variety of contexts, including private commercial transactions. Moreover, none of the most significant common law dictionaries published from 1523 to 1792 even includes "emolument" in its list of defined terms. In fact, this term is only used in these legal dictionaries to define or explain other, less familiar words and concepts. These findings reinforce the conclusion that "emolument" was not a term of art with a highly restricted meaning at the founding.[11]

**B.    "Emolument" Had a Broad Commercial Meaning in Eighteenth Century Legal and Economic Treatises**

**1.    "Emolument" in Blackstone's *Commentaries***

In William Blackstone's *Commentaries on the Laws of England*—probably the best-known legal treatise when the Constitution was adopted—the word "emolument" occurs on sixteen occasions.[12] Although some of these contexts involve government officials, the majority of Blackstone's usages of "emolument" refer to benefits other than public salaries or perquisites.

For example, Blackstone uses "emolument" in the context of family inheritance, private employment, and private ownership of land. He refers to "the power and emoluments" of monastic orders; to "the rents and emoluments of the estate" managed by ecclesiastical corporations; and to the "pecuniary emoluments" which the law of bankruptcy assigns to debtors. Blackstone describes the advantages to third-party beneficiaries of a gift as "the emolument of third persons." He uses "emolument of the exchequer" to refer to an increase in the national treasury. Finally, in explaining

---

[11] *Id.*

[12] *See* John Mikhail, *"Emolument in Blackstone's Commentaries,"* Balkinization (May 28, 2017), at https://balkin.blogspot.ca/2017/05/emolument-in-blackstones-commentaries.html.

the law of corporations, he characterizes "parish churches, the freehold of the church, the churchyard, the parsonage house, the glebe, and the tithes of the parish" as among the "emoluments" vested in the church parson.[13]

A further illustration of Blackstone's broad understanding of emoluments can be found in the forms of "Conveyance by Lease and Release" that appear at the end of Book II of the *Commentaries*. In the first of these forms ("Lease, or Bargain and Sale, for a year"), Blackstone lists "emoluments" among the benefits that are transferred when conveying parcels of land. Blackstone uses the same language in his second form ("Deed of Release"). Both forms can also be found in his *Analysis of the Laws of England* (1756). In fact, many form books and other legal manuals of the period included similar templates. In Giles Jacob's *Law Dictionary* (1729), for instance, one finds a "Form of a Release and Conveyance of Lands" with similar language, in which "A.B." conveys to "C.D." a piece of property together with "all . . . Easements, Profits, Commodities, Advantages, Emoluments, and Hereditaments whatsoever."[14]

When Americans bought and sold property during the founding era, they frequently referred to emoluments in their deeds and conveyances. To take one pertinent illustration, on January 5, 1787, Francis Lewis, a prominent New Yorker who signed the Declaration of Independence and Articles of Confederation, placed a notice in *The New-York Packet* announcing the sale of land at a public auction, together with "all buildings, ways, paths, profits, commodities, advantages, emoluments and hereditaments whatsoever . . . ." Lewis's advertisement ran throughout the spring and summer of 1787. As with Blackstone's form contracts, the emoluments

---

[13] *See* William Blackstone, 2 *Commentaries on the Laws of England* 18, 23, 50, 185, 318 (2016) (S. Stern, ed.) (third persons, private employment, inheritance, estates, and bankruptcy); 1 *Commentaries* 75, 247, 304 (2016) (D. Lemmings, ed.) (land, monastic orders, and corporations); 4 *Commentaries* 277 (2016) (R. Paley, ed.) (exchequer).

[14] *See* Mikhail, *"Emolument" in Blackstone's Commentaries*, *supra* note 12.

to which he referred were not government salaries, but rather private benefits that ran with the land.[15]

### 2. "Emolument" in Pufendorf's *Law of Nature and of Nations* and Smith's *Wealth of Nations*

With the possible exception of Hugo Grotius, no early modern writer on the law of nations was more influential than Samuel Pufendorf. His most significant work, *De Jure Naturae et Gentium* (*On the Law of Nature and of Nations*), was published in Latin in 1672 and soon translated into every major European language. The founders were familiar with Pufendorf's treatise and often quoted Basil Kennet's English translation. For instance, George Wythe did so in his argument in *Bolling v. Bolling*; John Adams did so in his *Novanglus* essays; James Wilson did so in his *Law Lectures*; and Alexander Hamilton did so in his *Pacificus* essays.[16] In Kennet's translation, the word "emolument" occurs twice, both referring to private market transactions.[17]

Likewise, many of the founders were well-acquainted with Adam Smith and his influential economic theories. For example, Benjamin Franklin requested a copy of *An Inquiry into the Nature and Causes of the Wealth of Nations* shortly after it was published in 1776; James Madison included Smith's book in his 1783 *Report on Books for Congress*; Robert Morris reportedly gave out copies of *The Wealth of Nations* to members of Congress in the 1780s; and James Wilson

---

[15] *Id.*

[16] *See* Bernard Schwartz, *Thomas Jefferson and Bolling v. Bolling: Law and the Legal Profession in Pre-Revolutionary America* 417-18 (1997) (reproducing Wythe's argument in *Bolling*, which quotes Kennet's edition of Pufendorf's *Law of Nature and Nations*); 2 *The Papers of John Adams* 288-307 (R. Taylor, ed., 1977) (quoting Kennet's translation of Pufendorf); 1 *Collected Works of James Wilson* 478-79 (K.L. Hall & M.D. Hall eds., 2007) (same); 15 *The Papers of Alexander Hamilton*, 65-69 (1969) (same).

[17] Samuel Pufendorf, *Of the Law of Nature and of Nations* 259-260 (3d. ed. 1717) (Basil Kennet, trans.) (A "Seller" of goods may claim "Emolument."); *id.* at 271 (The benefits from a "Pawn" are an "Emolument.").

quoted Smith in defense of the Bank of North America in 1785.[18] The word "emolument" also occurs twice in *The Wealth of Nations*. Once again, both instances involve private market transactions (monopolistic profits and bank interest).[19]

In sum, the works of Blackstone, Pufendorf, and Smith did not use "emolument" in the restricted fashion advocated by DOJ in its brief. In their usage, "emolument" was not a rigid term of art, but rather a flexible word used to refer to a wide range of profits and benefits.

## III. HISTORY OF THE EMOLUMENTS CLAUSE

The framers adopted the Emoluments Clause to advance core republican goals: to protect against corruption and the appearance of corruption,[20] and to avoid foreign entanglements with

---

[18] *See* 23 *The Papers of Benjamin Franklin* 241-43 (1983) (W. B. Willcox, ed.) (noting that "Smith's Wealth of Nations" was sent to Franklin); 6 *The Papers of James Madison* 62-115 (W. T. Hutchinson & W. M. E. Rachal, eds., 1969) (including "Smith on the wealth of Nations" in his book list); David Lefer, *The Founding Conservatives* 245-246 (2013) (Morris "found Smith's thought so persuasive . . . that he gave out copies to members of Congress"); 1 *Collected Works of James Wilson*, *supra* note 16, at 60-79, 73-74 (quoting Smith's remarks on banking).

[19] "[M]onopolists, by keeping the market constantly under-stocked . . . sell their commodities much above the natural price, and raise their emoluments, whether they consist in wages or profit, greatly above their natural rate." Adam Smith, *An Inquiry into the Nature and Causes of the Wealth of Nations* 26 (Robert Maynard Hutchins, ed. 1952) "These different *emoluments* [from bank interest] amount to a good deal more than what is necessary for paying the salaries of officers, and defraying the expense of management." *Id*. at 208.

[20] The consensus among historians is that the fear of political corruption was a primary factor in seeking independence from Great Britain and in drafting the U.S. Constitution. *See, e.g.,* Bernard Bailyn, *The Ideological Origins of the American Revolution* (1967); Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (1969); J.G.A. Pocock, *The Machiavellian Moment: Florentine Political Thought and the Atlantic Republican Tradition* (1975); Eric Foner, *Tom Paine and Revolutionary America* (1976); Forrest McDonald and Ellen Shapiro McDonald, *Requiem: Variations on Eighteenth-Century Themes* (1988); Stanley Elkins and Eric McKitrick, *The Federalists* (1992); Douglas Bradburn, *The Citizenship Revolution: Politics and the Creation of the American Union, 1774-1804* (2009); Saul Cornell, *The Other Founders: Anti-Federalism and the Dissenting Tradition in America, 1788-1828* (2012); Zephyr Teachout, *Corruption in America: From Franklin's Snuff Box to Citizens United* (2014); Gautham Rao, *National Duties: Custom Houses and the Making of the American State* (2016).

Europe.[21] The Emoluments Clause was not a subject of great debate or disagreement in 1787 and1788. The absence of controversy reflects a broad consensus against the dangers of political corruption. Moreover, the extant voluminous records of debates, particularly those tied to the ratification of the Constitution by the states, demonstrate that in ordinary usage the word "emolument" had a broad range of meanings. It was not reducible to a simple fee or salary.

###   A.   Historical Background from the English and Dutch to the Articles of Confederation Era

Within the framework of Anglo-American political thinking, a concern with emoluments was closely tied to the pervasive fear of political corruption. In the middle decades of the eighteenth century, this concern dominated Real Whig views of the insidious ways in which the British Crown had corrupted Parliament's vaunted independence and legal supremacy after the Glorious Revolution of 1688.[22] The concern was that the Crown could use an array of emoluments (e.g., offices, pensions, grants of income, and other benefits) to make members of both houses docile tools of the reigning ministry. The American colonists were schooled to think that a power-seeking ministry was scheming to deprive them of their vested rights of self-government, leaving them to be governed by a supine Parliament that had the power to legislate for America "in all

---

[21] *See* Joseph Story, 3 *Commentaries on the Constitution*, p. 202, 215-16, § 1346 (1833) (the Foreign Emoluments clause was adopted to protect against "Foreign influence of every sort"); *accord* Federalist No. 75 (Hamilton) (specific concerns with the president having control over treaties and foreign relations unchecked by the Senate); Akhil Reed Amar, *America's Constitution; A Biography* 304-07 (2005); George Washington's Farewell Address (European wars show why Americans should tolerate as "little political connection as possible" with foreign nations"); Samuel Flagg Bemis, "Washington's Farewell Address: A Foreign Policy of Independence," 2 *American Historical Review* 250–68 (1934); President Thomas Jefferson, First Inaugural Address (1801); Letter from Thomas Jefferson to William Short, Oct. 3, 1801, in 3 *Memoir, Correspondence and Miscellanies from the Papers of Thomas Jefferson* 492 (Thomas Jefferson Randolph, ed., 1829).
[22] *See generally* Bailyn, *supra* note 20.

cases whatsoever."[23]

The use of emoluments to undermine self-governance was viewed as a significant problem. There was, however, another famous example in which an emolument conveyed from one king to another threatened the fundamental rights of the entire realm. This was the secret Treaty of Dover of 1670, when Louis XIV of France paid large sums of cash to Charles II (and provided a young French mistress) in order for Charles to convert to Catholicism and ally with France in an ill-fated war against Holland. Louis XIV also secretly paid James II in 1687 for similarly compromising allegiances.[24] These well-known events contributed to the Glorious Revolution of 1688, an inspiration for the American Revolution and the Founding, but the secret payments were not revealed until 1771.[25] At the Federal Convention, Gouverneur Morris, regarded as a chief architect of the presidency, explicitly invoked this episode during the July 20, 1787 debate over impeachment:

> Our Executive was not like a Magistrate having a life interest, much less like one having an hereditary interest in his office. He may be bribed by a greater interest to betray his trust; and no one would say that we ought to expose ourselves to the danger of seeing the first Magistrate in foreign pay, without being able to guard agst. it by displacing him. One would think the King of England well secured agst. bribery. He has as it were a fee simple in the whole Kingdom. Yet Charles II was bribed by Louis XIV.[26]

Although Morris did not use the word "emolument" in this passage, this incident provides a paradigmatic historical explanation for why the framers adopted a prohibition on foreign emoluments in the Constitution.

---

[23] Declaratory Act of 1766 (6 Geo. 3 c. 12).

[24] George Clark, *The Later Stuarts (1660-1714)*, at 86-87, 130 (2d ed. 1956); Barry Coward, *The Stuart Age* 262-65, 267, 274-75 (1980).

[25] *See* J.P. Kenyon, *The History Men. The Historical Profession in England Since the Renaissance* 67-68 (Weidenfeld and Nicolson, 2d. ed., 1993).

[26] 2 Farrand, *supra* note 6, at 68-69.

Several key constitutional documents reflect concern with the corrupting effect of foreign emoluments. The Articles of Confederation adopted the text that would become the FEC. The drafters may have borrowed from the Dutch rule, adopted in 1651, prohibiting foreign ministers from taking "any presents, directly or indirectly, in any manner or way whatever."[27] The French practice of giving expensive diplomatic gifts was called *presents du roi* or *presents du congé*, so these prohibitions likely stemmed initially from the problem of "presents."[28] The DOJ brief claims that a broad interpretation of "emolument" would produce a "surplusage" or redundancy because it would include presents, making the word "present" unnecessary.[29] The argument fails for at least two reasons. First, "presents" generally connotes gratuitous exchange, while "emoluments" encompasses benefits of commercial transactions. Second, the origin of this clause probably lies with the Dutch bar on "presents," which the Americans broadened by adding the term "emoluments," without deleting the earlier wording. As legal texts evolve, historical layers sometimes resist the logic of interpretive canons.

The Dickinson draft of the Articles of Confederation in June 1776 prohibited the colonies from engaging in any diplomatic relations with Great Britain "or any Foreign Prince or State; nor shall any Colony or Colonies, nor any Servant or Servants of any Colony or Colonies, accept of any Present, Emolument, Office or Title of any kind whatever from the King or Kingdom of G.B. or any foreign Prince or State."[30] The clause was further modified during the debates of late July

---

[27] Zephyr Teachout, *Corruption in America* 20 (2014) (citing John Bassett Moore and Francis Wharton, *A Digest of International Law* 579 (1906)). Americans continued to be aware of the Dutch rule later in the 1790s. John Quincy Adams asked a Dutch friend how they enforced their similar rule, and the friend replied that as long as the minister sought approval, the government would permit him to keep it. *Id.* at 27 (citing Letter from John Quincy Adams to John Adams, June 7, 1797, in 2 Writings of John Quincy Adams 180 n. 1 (1913)).

[28] *Id.* at 19.

[29] DOJ Brief at 23-24.

[30] 5 JCC, *supra* note 4, at 547.

and August 1776. In the August 20 version, Article IV read: "nor shall any person holding any office of profit or trust under the United States or any [of] them, accept of any present, emolument, office, or title of any kind whatever, from any King, Prince or foreign State."[31]

The reference to "profit and trust" in the August 20 draft identified the two main satisfactions that eighteenth-century observers ascribed to public office: the financial rewards it would produce; and the prestige, status, and honor it would also provide. In the constitutional debates of 1787-1788, the phrase "profit and trust" was often replaced by "honor and emoluments" as the complementary benefits of public service, but the underlying conception remained constant. In the final text of the Articles that Congress submitted to the states in November 1777, this clause, now found in Article VI, remained unaltered. DOJ overlooks this historical timeline when it asserts that events limited to office-holding in 1778 led to the drafting of the FEC.[32]

Two other foundational constitutional texts of 1776 illustrate the link between the concept of emolument and fundamental republican values. Article IV of the Virginia Declaration of Rights states "[t]hat no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services." Article V of the Pennsylvania Declaration of Rights similarly declares "[t]hat government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only

---

[31] *Id.* at 675.

[32] DOJ claims that the prohibition on receiving foreign emoluments in the Articles of Confederation "was prompted by" a series of events involving American diplomats Arthur Lee, Silas Deane, and Benjamin Franklin, which occurred in connection with their "successfully negotiating the Franco-American alliance treaty of 1778." DOJ Brief at 25-26. This causal claim is at odds with the fact that the prohibition on foreign emoluments in the Articles was initially drafted by John Dickinson at least two years before the events in question. 5 JCC, *supra* note 4, 547 (July 12, 1776). The reasons for adopting this prohibition speak more broadly to various sources of corruption besides those closely tied to the performance of official duties.

of that community." Later, New Hampshire's 1784 Constitution[33] and Vermont's 1793 Constitution[34] contained almost identical clauses using the word "emolument" broadly which their state courts have applied to general benefits under a "principle of equality." Article VII of the Massachusetts Declaration of Rights (1780) affirmed the same principle, but without the word "emolument": that "Government is instituted for the common good . . . and not for the profit, honor, or private interest of any one man, family, or class of men."[35] These state constitutions used the word "emolument" broadly to mean a benefit or advantage.

In the years between the drafting of the Articles of Confederation, the first state constitutions in the 1770s, and the calling of the Federal Convention of 1787, this principle was sorely tested. Because neither the Continental Congress nor the state governments had anything resembling an institutional bureaucracy, they necessarily relied on merchants and commissaries to obtain the goods and materiel needed to sustain the war effort. There were no mechanisms readily

---

[33] "Government being instituted for the common benefit, protection, and security, of the whole community, and not for the private interest or emolument of any one man, family, or class of men . . . ." N.H. Const. art. 10 (1784 text). The New Hampshire Supreme Court has interpreted the clause to embody a "principle of equality." *Opinion of the Justices (Municipal Tax Exemptions for Electric Utility Personal Property)*, 746 A.2d 981, 987 (N.H. 1999). It broadly reads "emolument" to include, for example, the benefit accruing to a private industry from a dam built with public funds. *See In re Opinion of the Justices*, 190 A. 245 (N.H. 1937) (interpreting the clause to prohibit all "appropriation[s] of public money for a private purpose").

[34] "That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community . . . ." Vt. Const. Ch. 1, art. 7 (1793) (emphasis added). The Vermont Supreme Court also interprets this clause—the Common Benefits Clause—expansively. *Baker v. State*, 744 A.2d 864 (Vt. 1999), finding that that same-sex couples were entitled to the same legal rights as different-sex couples, based on this clause. *Id.* at 867. In that case, "emolument or advantage" was held to include "the statutory benefits and protections afforded persons of the opposite sex who choose to marry." *Id.* The court noted that the Common Benefits Clause was intended to ensure "equal access to public benefits and protections for the community as a whole." *Id.* at 877. The Vermont Supreme Court's reading of "emolument" is thus significantly broader than one limited to office-related benefits.

[35] 5 *Founders' Constitution* 8 (Philip Kurland and Ralph Lerner, ed., 2000).

available to monitor these exchanges, and charges of corruption, which were often easy to offer but difficult to prove, flowed freely. Merchants like Robert Morris, who played a critical role in importing military supplies while also serving as Superintendent of Finance, frequently blended their public and private ventures. Drawing a manageable line between these activities proved both difficult and controversial.[36]

These events were part of the background motivating a separation between public service and international moneyed interests (again not limited to offices and salaries). Soon thereafter, an emoluments restriction was placed in the 1784 Consular Convention with France,[37] as well as the 1788 Consular Convention with France[38] and the 1789 Act to Establish the Treasury Department.[39] DOJ asserts that "the history of the [FEC's] adoption" is "devoid of any concern about an official's private commercial businesses."[40] The example of Robert Morris, the emoluments prohibitions

---

[36] *See, e.g.*, E. James Ferguson, *The Power of the Purse: A History of American Public Finance, 1776-1790*, at 70-105 (1961); H. James Henderson, *Party Politics in the Continental Congress* 218-245 (1974); Jack N. Rakove, *The Beginnings of National Politics: An Interpretive History of the Continental Congress* 249-274 (1979); Charles Rappleye, *Robert Morris: Financier of the American Revolution* 149-197, 331-357 (2010). Morris's critics frequently attacked his conflicts of interest, often referring explicitly to his pursuit of personal "emoluments." *See, e.g.*, *Boston Evening Post and the General Advertiser*, front page (May 3, 1783) (printing one such criticism by "Lucius" a few weeks after the Newburgh controversy). See also Letter from Robert Morris to George Washington, May 23, 1783, in 8 *The Papers of Robert Morris, 1781-1784*, at 130-31 (E. J. Ferguson, ed. 1973) (Morris explaining to Washington that others would have to decide "whether a sincere Regard to public Justice and public Interest or a sinister Respect to my own private Emolument were the influential Motives of my Conduct").

[37] *See* "Consular Convention between His Most Christian Majesty and the Thirteen United States of North America," in 4 *The Diplomatic Correspondence of the American Revolution* 198-208, 199-200 (1829).

[38] *See* "Convention Defining and Establishing the Functions and Privileges of Consuls and Vice Consuls between the United States and France," in 1 *The American Diplomatic Code, Embracing a Collection of Treaties and Conventions between the United States and Foreign Powers* 70-82.

[39] *See* 1 Stat. 65 (1789-1799).

[40] DOJ Brief at 27.

adopted by American governments from 1776 to 1789, and the constitutional debates themselves undercut DOJ's claim.

### B.      Federal Constitutional Convention

As the legislative history indicates, the Foreign Emoluments Clause was not controversial at the Federal Convention. Notwithstanding its prior version in Article VI of the Confederation, the Virginia Plan contained no comparable clause. Its first appearance came with the work of the Committee of Detail, which convened on July 26, 1787, and reported on August 6, 1787, and even then it was restricted solely to a prohibition against the United States granting "any Title of Nobility."[41] On August 23, 1787, Pinckney again took the initiative, moving that "No person holding any office of profit or trust under the U.S. shall without the consent of the Legislature, accept of any present, emolument, office or title of any kind whatever, from any King, Prince or foreign State." Pinckney's rationale, as reported by James Madison, was to urge "the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence." This rationale tracks the Dutch rule's focus on "foreign ministers,"[42] but the FEC's wording went further, covering any office of profit or trust under the United States. This amendment was promptly approved unanimously (*nemine contradicente*).[43]

A narrow definition of "emolument" limited to official services is inconsistent with the FEC's basic purposes and with the text of the clause. The FEC seeks to prevent activities that have the potential to influence or corrupt the person who profits from them. That is why it prohibits "present[s]" as well as "emolument[s]." Nothing in the historical record suggests that the ban of foreign "present[s]" would extend only to gifts received for the performance of an official duty, or

---

[41] 2 Farrand, *supra* note 6 at 169, 183.
[42] Teachout, *Corruption in America*, at 27.
[43] 2 Farrand, *supra* note 6, at 389.

14

that titles of nobility would be permissible if they were not connected to a federal office. Similarly, nothing in the text or context of the FEC suggests that the Framers wanted a special unwritten exception for "emoluments" in the clause, to permit foreign states to give benefits so long as they were not for official services. Such an exception would open a loophole for foreign states (and for U.S. officials) to defeat the FEC's purposes.[44] Such a narrow reading is particularly in tension with the FEC's text: an emolument "of any kind whatever" would not be limited to official services.

In discussions about the allocation of treaty power, some of the framers focused on the possibility of foreign corruption of American officials. Nathaniel Gorham, for example, noted that such discussions "will be generally influenced by two or three men, who will be corrupted by the Ambassadors here."[45] He might have been contemplating the controversial negotiations that Secretary of Foreign Affairs John Jay had conducted with the Spanish emissary Don Diego de Gardoqui the year before. Jay had not acted corruptly in 1786, but his actions indicated how much the conduct of diplomacy could pivot on individuals. Gorham and other framers probably knew about the allegations that swirled around John Sullivan of New Hampshire, who was widely suspected of having been bribed by the French minister, the Chevalier de la Luzerne, in 1781, to

---

[44] On DOJ's reading, the FEC extends to (1) all gifts whatsoever, and (2) all honorary titles and offices, but *only* (3) all forms of income relating to the performance of official duties. This interpretation leaves out a large swath of arrangements that reliably and predictably create opportunities for influence—namely, commercial transactions. It would be even stranger to imagine that the framers sought to restrict the prohibition in this fashion, by using a term whose normal sense sweeps more widely, to permit so many profitable or beneficial arrangements generally. Hence there is no occasion to speak, as DOJ does in its Motion to Dismiss, of the ambiguities that arise "where a word is capable of different meanings or '[w]here…[a] word is obscure or of doubtful meaning, taken by itself,' [such that] the 'obscurity or doubt may be removed by reference to associated words.'" DOJ Brief at 23, quoting *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). However, assuming *arguendo* that there is any ambiguity, the context shows that "emolument" cannot refer only to duties connected with an office, but must be understood to include commercial transactions, especially in light of the phrase "any kind whatever."

[45] 2 Farrand, *supra* note 6, at 393.

draft new instructions directing John Adams, the American peace commissioner in Paris, to accept French "advice and opinion."[46] This may have been the incident that George Mason, a framer turned Anti-Federalist, alluded to in the Virginia ratification convention, when he noted that "It is not many years ago, since the revolution, that a foreign power offered emoluments to persons holding offices under our Governments."[47]

The desire to insulate all national officials from improper foreign influence encountered no opposition. It became, in effect, a constitutional norm of American diplomacy. Nothing in the admittedly limited records of debate could be read to justify restricting this norm to official salaries or exempting the president. Indeed, the decision to give the president a more significant role in directing American foreign relations, made during the penultimate week of debate, likely would have increased rather than diminished the perceived importance of the FEC. Prior to late August and early September, 1787, it is by no means clear that the president would have enjoyed such a role. Joseph Story would later explain that the FEC was adopted to protect against "Foreign influence of every sort."[48]

### C.    The Ratification Debates

Once the Constitution was submitted to the state ratification conventions, the Foreign Emoluments Clause was largely though not wholly neglected. A striking exchange on the FEC, involving two framers—George Mason and Edmund Randolph—took place in the Virginia ratification convention on June 17, 1788, in conjunction with a debate over presidential elections.

---

[46] On Sullivan's collaboration with Luzerne, see Charles P. Whittemore, *A General of the Revolution: John Sullivan of New Hampshire* 165-79 (1961).

[47] 10 *DHRC, supra* note 8, at 1365-66.

[48] Joseph Story, 3 *Commentaries on the Constitution*, p. 202, 215-16, § 1346 (1833).

Randolph first explained the purposes of the clause in terms of "greater security" in the context of war, diplomacy, and anti-corruption:

> This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states, I believe that if, at that moment, when we were in harmony with the king of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence, and diminished that mutual friendship, which contributed to carry us through the war.[49]

Two points deserve emphasis. First, Randolph used the word "emolument" in its broadest sense: All men have a "natural right" to receive emoluments "from anyone." The only limitation would be "the regulations of the community" (and not the appointment to a specific office). This sentence only makes sense if one is referring to private market transactions. Second, Randolph emphasizes the problem of appearances of corruption: The "supposed" corruption or perception would have been enough to endanger the crucial French-American alliance during Revolution.

Mason was particularly concerned that the president might seek to stay in office "for life." Mason agreed that "the great powers of Europe" would have a deep interest in the selection and continuation of the president. "This very executive officer, may, by consent of Congress, receive a stated pension from European Potentates," Mason warned. It would also "be difficult to know, whether he receives emoluments from foreign powers or not." Moreover, the electors in the states might also "be easily influenced," again by foreign emoluments.[50] In reply, Randolph argued that the requirement that electors be appointed separately in the states and vote on the same day

---

[49] 3 Elliot's *Debates*, *supra* note 7, at 465-66; 3 Farrand, *supra* note 6, at 327.
[50] 10 *DHRC*, *supra* note 8, at 1365-66.

"renders it unnecessary and impossible for foreign force or aid to interpose." But should the president be charged with "receiving emoluments from foreign powers," Randolph continued, the Constitution provided a simple remedy: impeachment.[51] This exchange between Mason and Randolph—the two Virginia delegates who refused to sign the Constitution before the Federal Convention adjourned—is certainly revealing, especially insofar as it refers to foreign intervention in presidential elections.

The amply documented records of the ratification debates of 1787-88 remain important for another reason. They demonstrate that "emolument"—which today sounds archaic, but which was commonly used in the eighteenth century—had an array of uses. As one might expect in constitutional debates, the salary and fees one might earn from holding government office were among the most obvious uses of the word. But its common usage was hardly limited to that context. In general, "emolument" was synonymous with multiple forms of material benefits and enrichment that applied not only to individuals, but also to whole communities, classes, and regions.

Consider these examples:

- In the same convention where Mason and Randolph discussed the applicability of the FEC to the president, William Grayson, a senator in the First Congress, referring to the economic advantages to be enjoyed by merchants residing at the national capital: "The whole commerce of the United States may be exclusively carried on by the merchants residing within the seat of Government, and those places of arms, which may be purchased of the State Legislatures. How detrimental and injurious to the community, and how repugnant to the equal rights of mankind, such exclusive emoluments would be, I submit to the consideration of the Committee."[52]

---

[51] *Id.* at 1367.
[52] *Id.* at 1191.

- Grayson, comparing the compensation of congressmen to members of Parliament: "The Members of the House of Commons, if I recollect rightly, get nothing for their services as such. But there are some noble emoluments to be derived from the Minister, and some other advantages to be obtained. Those who go to Parliament form an idea of emoluments. They expect something besides wages. They go in with the wishes and expectations of getting offices."[53]

- Luther Martin of Maryland, referring to the western land claims of states like Virginia: "Let it be remembered that the State of Maryland was so deeply sensible of the injustice that these lands should be held by particular States for their own emolument . . . ."[54]

- James Madison, alluding to the potential benefits of American neutrality in a future European war: "We need not expect in case of such a war, that we should be suffered to participate of the profitable emoluments of the carrying trade, unless we were in a respectable situation."[55]

### D.  The Founding Generation Used the Word "Emolument" Broadly

A search for the word "emolument" in one of the most comprehensive resources on the Founding Era, the University of Virginia's "Founders Early Access Rotunda" site, produces numerous examples of the founders using the term to mean general benefits or advantages: statements by Hamilton, Madison, Washington, Adams, Jefferson, Jay, Gouverneur Morris, and John Marshall; by those writing to them; and by others in the Convention and ratifying debates— more examples than could possibly be cited here.[56] Here are some illustrations:

---

[53] *Id*. at 1263.

[54] 11 DHRC, *supra* note 8, at 284.

[55] 10 DHRC, *supra* note 8, at 1206.

[56] *See infra* note 60 for many examples of George Washington's frequent uses of "emolument" in a broad sense of benefit or profit from market transactions. For Adams, *see, e.g.*, John Adams, *Notes of Debates on the Articles of Confederation* (Rotunda) (July 26, 1776) ("G[eorgia] is not equal to the Expence of giving the Donations to the Indians, which will be necessary to keep them at Peace. The Emoluments of the Trade are not a Compensation for the Expence of donations."); *The Report of a Constitution or Form of Government for the Commonwealth of Massachusetts*,

In response to the Townshend Acts, American colonists formed nonimportation associations, which pledged not to purchase British goods until their grievances were met. In 1770, one such group in Virginia retaliated against local merchants who refused to join the boycott. Denouncing these holdouts, George Washington, Thomas Jefferson, and other prominent Virginians vowed to "avoid purchasing any commodity … from any importer or seller of British merchandise or European goods, whom we may know or believe . . . to have preferred their own private *emolument*, by importing or selling articles prohibited by this association."[57]

John Marshall, in his successful argument as a lawyer in *Hite v. Fairfax* in 1786, described a property title dispute in these terms: "Again, the words are 'and where upon such grants, quit-rents have been reserved[,]' [p]lainly referring the word *such* to those grants, from the terms of which some advantages, profits and *emoluments* arose to the crown."[58]

In the spring of 1786, James Madison and James Monroe invited Jefferson to join them in a purchase of land in upstate New York. The terms of Madison's proposal called for Jefferson to borrow "four or five thousand louis" (*i.e.*, French coins) "on the obligation of Monroe and myself, with your suretyship to be laid out by Monroe and myself for our triple *emolument*: an interest not exceeding six per cent to be paid annually and the principal within a term not less than eight or ten years."[59] Finally, Washington frequently used the word "emolument" in private commercial contexts or to convey a broader meaning of benefits and advantages.[60]

---

28-31 October 1779 (Rotunda) ("There shall be no suspension of any law for the private interest, advantage, or emolument, of any one man or class of men.").

[57] *The Papers of Thomas Jefferson*, vol. 1, *1760–1776*, at 43-48 (Julian P. Boyd ed. 1950).

[58] *Hite v. Fairfax* (Original Case Citation: 4 Call 42) 8 Va. 42, 76 (1786) (emphasis added) (recording lawyers' full legal arguments); *see also* Letter from John Marshall to Carey and Lea (Rotunda DHRC) (June 2, 1832) (referring to "business" emoluments).

[59] 10 *The Papers of Thomas Jefferson*, 229-36 (1954) (J. Boyd, Ed.) (emphasis added).

[60] *See, e.g.*, Letter from George Washington to Colonel Josias Carvil Hall (Apr. 3, 1778), in Univ. of Va. Rotunda Database (Rotunda, Washington Publications) ("On the contrary from the Crisis

The First and Second Continental Congress,[61] the U.S. Supreme Court[62] and state supreme courts[63] of the Early Republic also used "emoluments" in the context of market transactions, profits, and general benefits. A recent quantitative study suggests that the general public also used

at which our affairs have arrived and the frequent defection of Officers seduced by views of private interest and emolument to abandon the cause of their Country—I think every man who does not merely make profession of Patriotism is bound by indissoluble ties to remain in the Army"); Letter from Washington to William Livingston (Apr. 11, 1778) (Rotunda) ("It is said that these Boats carry private ventures, often put into bye places to take in additional Cargoes to barter with the Enemy, are navigated by the most worthless fellows and bring back a variety of merchandize for the emolument of individuals."); Letter from George Washington to John Price Posey (Aug. 7, 1782), in *The Papers of George Washington 8 April–31 May 1779*, at 181–82 (Edward G. Lengel ed., Univ. of Va. Press, 2010) (criticizing Posey for "selling another Mans Negros [sic] for your own emolument"); Letter from George Washington to Elias Boudinot (June 17, 1783), *Founders Online,* National Archives, last modified June 29, 2017, http://founders.archives.gov/documents/Washington/99-01-02-11469 (referring to "the emoluments which might be derived from the Peltry Trade at our Factories"); Letter from Washington to Madison (Oct. 29, 1785) (Rotunda) (for more context of letter to Patrick Henry); Letter from Washington to Friedrich von Poellnitz (Mar. 23, 1790) (Rotunda) (describing the "public emoluments" of farming); Letter from Washington to Samuel Vaughn (Aug. 25, 1791) (Rotunda) (offering good wishes to an inventor "for his own emolument and the benefit of mankind"); Letter from Washington to James McHenry (July 7, 1797) (Rotunda) (condemning one who "seek[s] private emolument at the expence of Public Peace."). *See also* Letter from Alexander Hamilton to George Washington (Jan. 24, 1795) (Rotunda) (describing bank charges on a loan as "the emolument being their own"); Military Order (Jan. 15, 1777) (Rotunda) ("The General understands, that some individuals are so lost to obedience, as to hold up and conceal, from the rest of the Army several valuable Horses, for their own private emolument taken in the Action of the 3rd Instant at Princeton, and on the march from thence . . . .").

[61] *See* Pro Se Motion to File Pro Se Brief of Amicus Curiae Edward H. Sisson (citing Address to the People of Great Britain (Oct. 21, 1774); Declaration by the Representatives of North-America (July 6, 1775); Olive Branch Petition (July 8, 1775); and Address to the Inhabitants of the United Colonies (Feb. 13, 1776)).

[62] *See Himely v. Rose*, 9 U.S. (5 Cranch) 313, 318-19 (1809) (Johnson, J.); *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 688 (1819) (Story, J.).

[63] "If it be a private act, obtained at the solicitation of individuals, for their private emolument, or for the improvement of their estates, it must be construed, as to its effect and operation, like a grant." *Ellis v. Marshall*, 2 Mass. 269, 276 (1807); "He farther denied having received any profit or emolument whatever from the said land, except the money arising from the sale thereof . . . ." *Yancey v. Hopkins*, 15 Va. 419, 422 (1810); "But there are other sources of emolument and profit, not strictly called property, but which are rather to be considered as the means of acquiring property, from which a reasonable revenue may be exacted by the legislature, within the fair meaning of the other branches of the power above recited." *President of Portland Bank v. Apthorp*, 12 Mass. 252, 255 (1815).

the word more often than not in a broad sense covering private transactions, and that legal sources and prominent framers regularly used the term broadly.[64] DOJ seeks refuge in an 1850 case, but it overlooks that the fact that the Court was not interpreting a constitutional provision, but a statute explicitly related to official compensation.[65]

In fact, when the founding generation wanted to refer to the narrower office-based definition that DOJ proposes, they often used the phrase "emoluments of office" or similar

---

[64] *See* James C. Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*, at 35 (Sept. 14, 2017), *available at* https://ssrn.com/abstract=3036938. The original public meaning of the Constitution is significant, of course, because any constitutional provision becomes law through public debate and ratification, not the drafting process. The Constitution "was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Dist. of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). At the same time, we caution against a narrowly linguistic approach to original public meaning if it ignores the historian's commitment to understanding the political and intellectual contexts of constitutional debate. For sophisticated discussions of these methodological questions, *see*, for example, Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 3-22 (1996); Keith Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* (1999); Keith Whittington, "The New Originalism," 2 *Geo. J. L. & Pub. Pol'y* 599 (2004); Larry D. Kramer, "Two (More) Problems with Originalism," 31 *Harv. J.L. & Pub. Pol'y* 907 (2008); Saul Cornell, "Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism," 82 *Fordham L. Rev*. 721 (2013-2104), Jack M. Balkin, "The Construction of Original Public Meaning," 31 *Const. Comm.* 71 (2016); Jonathan Gienapp, "Making Constitutional Meaning: The Removal Debate and the Birth of Constitutional Essentialism," 35 *J. Early Rep*. 375 (2015); Lawrence B. Solum, "Originalist Methodology," 84 *U. Chi. L. Rev*. 269 (2017); William Baude and Stephen E. Sachs, "The Law of Interpretation," 130 *Harv. L. Rev*. 1079 (2017).

[65] DOJ cites *Hoyt v. United States*, 51 U.S. 109, 135 (1850), a case in which the Supreme Court wrote that "the term emoluments . . . embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of the office." DOJ Brief at 19.  *Hoyt* was a statutory case, however, which required the Court to interpret an 1802 statute specifically referring to "the annual emoluments of any collector of the customs." 2 Stat. at Large, 172, § 3 (April 30, 1802). The Court's language makes perfect sense in that specific statutory context, but it has no constitutional implications. It certainly did not purport to circumscribe the scope of "emolument" for constitutional purposes.

language. Madison did so in Federalist No. 55.[66] Likewise, Washington, Jefferson, Adams, Jay, Tench Coxe, the Anti-Federalist writer Federal Farmer, and the U.S. Congress also employed this type of qualified language to refer to office-based emoluments.[67]

DOJ argues that the FEC must have a narrow meaning because of a proposed constitutional amendment in 1810: "If any citizen of the United States shall accept, claim, receive or retain, any title of nobility or honour, or shall, without the consent of Congress, accept and retain any present, pension, office or emolument of any kind whatever, from any emperor, king, prince or foreign power, such person shall cease to be a citizen of the United States, and shall be incapable of holding any office of trust or profit under them, or either of them." DOJ argues that Congress and the states taking away citizenship under a broad definition of emoluments would be "inconceivable."[68] We do not think that word means what they think it means. In 1810, Americans *conceived* precisely of this problem. The context of this moment clarifies why. On a war footing during the Napoleonic Wars and rising conflict with England, Americans on both sides of the French/British divide worried that these European powers were financing American newspapers to be partisan propaganda outlets on either side. Americans feared "a partisan press financially beholden to and

---

[66] Federalist No. 55 (Madison); cf. 1 Farrand, *supra* note 6, at 386 (June 23, 1787) ("Mr. Madison then moved, that after the word established, be added, or the *emoluments whereof* shall have been augmented by the legislature of the United States, during the time they were members thereof, and for one year thereafter.).

[67] *See, e.g.*, "An Act Further to Establish the Compensation of Officers of the Customs," (May 7, 1822), U.S. Statutes at Large, 17th Cong., Sess. 1, at 693; "An Act Respecting the Compensation of the Collectors Therein Mentioned" (Mar. 3, 1817), U.S. Statutes at Large, 14th Cong., Sess. 2, at 368; Letter from George Washington to Joseph Jones (Dec. 14, 1782); Letter from George Washington to Benjamin Lincoln (Oct. 2, 1782); Letter from Thomas Jefferson to Georger Washington (Sept. 9, 1792) (U. Va. Rotunda); Federal Farmer, *An Additional Number of Letters to the Republican*, (N.Y. Jan. 4, 1788) (U. Va. Rotunda); Letter from Tench Coxe to Thomas Jefferson (Mar. 10, 1801) (U. Va. Rotunda); Letter from John Jay to Samuel Shaw (Jan. 30, 1786) *The Diplomatic Correspondence of United States of America*, vol. 3 (1837).

[68] DOJ Brief at 32.

funded by European powers."[69] Like the FEC itself, the 1810 proposal only applied to foreign

governments. To prevent this kind of financial influence, a broad meaning of "emolument" would

have served as a barrier to subsidizing foreign propaganda. In this era of European conflict and

war, strict prohibitions on foreign commerce were common. In 1794,[70] between 1798 and 1800,[71]

and between 1806 and 1812, Congress imposed embargoes and restricted private commerce with

foreign powers.[72] During the Quasi-War with France a decade previously, the 1799 Logan Act

criminalized "any correspondence or intercourse with any foreign government or any officer or

agent thereof, with intent to influence the measures or conduct of any foreign government or of

any officer or agent thereof, in relation to any disputes or controversies with the United States, or

to defeat the measures of the United States."[73] In the 1790s and early 1800s, Congress was not

always troubled by overly broad restrictions on foreign entanglements.

## IV.    CONCLUSION

An investigation of English language dictionaries published from 1604 to 1806, of the

influential writings of Blackstone, Pufendorf, and Adam Smith, and of the contemporary usage by

the Founding generation in the constitutional debates and in their private writings all confirm a

broad definition of the word "emolument": as "profit," "advantage," "gain," or "benefit." DOJ

cherry-picks from two insignificant dictionaries and from the historical sources, despite a mountain

of evidence to the contrary. The history of these clauses from their European background through

---

[69] Gideon Hart, "The 'Original' Thirteenth Amendment: The Misunderstood Titles of Nobility Amendment," 94 *Marquette L. Rev.* 311, 344 n. 177-78 (2010) (for colorful quotations from newspapers in 1809-1811 making these allegations).

[70] 1 Stat. 400-01 (1794).

[71] 1 Stat. 565 (1798), 1 Stat. 611 (1798), 1 Stat. 613 (1799).

[72] 2 Stat. 379 (1806), 2 Stat. 451 (1807), 2 Stat. 473 (1808), 2 Stat. 506 (1809), 2 Stat. 528 (1809), 2 Stat. 605 (1810), 2 Stat. 700 (1812), 2 Stat. 778 (1812), 3 Stat. 88 (1813), 3 Stat. 123 (1814); 3 Stat. 195 (1815).

[73] 1 Stat. 613 (1799).

the Articles of Convention, the Philadelphia Convention, and the ratifying debates shows that they

were meant to serve as a broad and robust protection against corruption and foreign entanglements,

and to defend republican values. The founders feared that foreign governments would use financial

pressure and incentives to influence and corrupt American officials, or to create the appearance of

corruption. Only a broad interpretation of the Foreign Emoluments Clause can guard against such

improper influence and be true to the founders' republican purposes.

Dated:  November 2, 2017                     Respectfully submitted,


                                             */s/ Melissa H. Maxman*
                                             Melissa H. Maxman
                                             D.C. Bar No. 426231
                                             **Cohen & Gresser LLP**
                                             2001 Pennsylvania Ave, N.W.
                                             Suite 300
                                             Washington, DC 20006
                                             Tel: (202) 851-2070
                                             Email: mmaxman@cohengresser.com

                                             H. Laddie Montague, Jr.
                                             Eric L. Cramer
                                             Candice J. Enders
                                             **Berger & Montague, P.C.**
                                             1622 Locust Street
                                             Philadelphia, PA 19103
                                             Tel: (215) 875-3000
                                             Email:  hlmontague@bm.net
                                                     ecramer@bm.net
                                                     cenders@bm.net

                                             ***Counsel for Proposed Amici Curiae Legal
                                             Historians***

Prof. Jed Handelsman Shugerman
**Fordham University School of Law**
150 W. 62d St.
New York, NY 10023
Tel: (646) 293-3955
Email: jshugerman@law.fordham.edu

Prof. John Mikhail
**Georgetown University Law Center**
600 New Jersey Ave., NW
Washington, D.C. 20001
Tel: (202) 662-9392
Email: mikhail@law.georgetown.edu

Prof. Jack N. Rakove
**Stanford University**
Lane History Corner 117
Stanford, CA 94305
Tel: (650) 723-4514
Email: rakove@stanford.edu

Prof. Gautham Rao
**American University**
4400 Massachusetts Avenue NW
Battelle Tompkins 157
Washington, DC 20016
Tel: (202) 885-6745
Email: grao@american.edu

Prof. Simon Stern
**University of Toronto, Faculty of Law**
84 Queen's Park Crescent
Toronto, ON M5S 2C5
Tel: (416) 978-0293
Email: simon.stern@utoronto.ca

Kal7831647