# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **THE DISTRICT OF COLUMBIA** | * | |
| and **THE STATE OF MARYLAND,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil No. **PJM 17-1596** |
| | * | |
| **DONALD J. TRUMP,** | * | |
| *individually and in his official capacity* | * | |
| *as President of the United States*, | * | |
| | * | |
| Defendant. | * | |

## <u>OPINION</u>

This suit alleges that President Donald J. Trump has violated the Foreign and Domestic

Emoluments Clauses of the U.S. Constitution.[1]  Plaintiffs, the District of Columbia and the State of

Maryland, submit that the President is violating these Clauses because the Trump Organization, in

which he has an ownership interest and from which he derives financial benefits, owns and

operates a global business empire, including hotels, restaurants, and event spaces. The President's

receipt of these benefits is said to offend the sovereign, quasi-sovereign, proprietary, and *parens*

*patriae* interests of the State of Maryland and the District of Columbia. Plaintiffs seek declaratory

relief establishing their rights *vis-à-vis* the President's actions as well as injunctive relief

prohibiting him from further violating the Clauses.

---

[1]  The Foreign Emoluments Clause, U.S. Const. art. I, § 9, cl. 8, provides that "no person holding any office of profit or trust under them, shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state." The Domestic Emoluments Clause, U.S. Const. art. II, § 1, cl. 7, provides: "The President shall, at stated times, receive for his services, a compensation, which shall neither be increased nor diminished during the period for which he shall have been elected, and he shall not receive within that period any other emolument from the United States, or any of them."

-1-

The President has filed a Motion to Dismiss, arguing, *inter alia*, that Plaintiffs lack standing to pursue the litigation, i.e., that they have shown no injury-in-fact, fairly traceable to his acts, or likely to be redressed by any court order. Plaintiffs reject all these propositions. Although the parties have briefed other arguments pertaining to the viability *vel non* of Plaintiffs' suit,[2] the Court held oral argument limited to the issue of standing and advised the parties that it would address that issue in a stand-alone Opinion and Order. This is that Opinion and Order.

For the reasons that follow, the Court **DENIES-IN-PART** the Motion to Dismiss and finds that Plaintiffs do have standing to challenge the actions of the President with respect to the Trump International Hotel and its appurtenances in Washington, D.C., as well as the operations in the Trump Organization with respect to them. It **GRANTS-IN-PART WITHOUT PREJUDICE** the Motion to Dismiss as to Plaintiffs' standing with respect to the operations of the Trump Organization and the President's involvement in the same outside the District of Columbia. The Court **DEFERS** ruling on other arguments in the Motion to Dismiss pending further oral argument.[3]

## I.      FACTUAL BACKGROUND

The basic facts are not in dispute.

### A.  The Parties

Plaintiffs are the District of Columbia and the State of Maryland. The District of Columbia is a municipal corporation and the local government for the territory constituting the seat of the

---

[2] One of those arguments pertains to the meaning of the word "emolument" in the Clauses. For the sole purpose of determining the standing question, the Court will assume that "emolument" covers "anything of value," as alleged in the Amended Complaint. Am. Compl. ¶¶ 25-27, ECF No. 95. The Court will address the President's arguments pertaining to the meaning of the term in a separate Opinion pending further oral argument.

[3] *See* note 2, *supra*.

Federal Government. Am. Compl. ¶ 18. The State of Maryland is a sovereign State of the United

States. *Id.* ¶ 19.

Donald J. Trump is the President of the United States, originally sued in his official

capacity, subsequently added as a Defendant in his individual capacity.[4] Am. Compl. ¶ 20. He is

the sole owner of both the Trump Organization LLC and The Trump Organization, Inc.

(collectively, the Trump Organization), an umbrella organization under which many, if not all, of

his corporations, limited-liability companies, limited partnerships, and other entities are loosely

organized. *Id.* ¶ 29. Through these various business entities, the President owns and receives

payments from a number of properties, hotels, restaurants, and event spaces in the United States

and abroad. *Id.* Of particular importance in the present suit is the President's ownership, through

the Trump Organization, of the Trump International Hotel in Washington, D.C. (the Hotel).

The Hotel is a five-star, luxury hotel located on Pennsylvania Avenue, N.W., in

Washington, near the White House. *Id.* ¶ 34. While the President does not actively manage the

Hotel, through the Trump Organization, he owns and purportedly controls the Hotel as well as the

bar and restaurant, BLT Prime, and the event spaces located within the establishment. *Id.* ¶¶ 29,

34-36. Directly or indirectly, the President shares in the revenues that the Hotel and its appurtenant

restaurant, bar, and event spaces generate. *Id.*

---

[4] On February 23, 2018, without objection by Defendant, Plaintiffs filed a Motion for Leave to File an Amended Complaint which adds the President as a Defendant in his individual capacity. On March 12, 2018, the Court granted the Motion, accepting the proposed Amended Complaint that had accompanied the Motion. Mem. Order (Mar. 12, 2018), ECF No. 94. The parties have agreed that the Court should apply the arguments in the President's pending Motion to Dismiss (ECF No. 21) to the Amended Complaint with respect to Plaintiffs' official capacity claims. *See* Mem. Order (Mar. 12, 2018). The President has indicated that he wishes to file a Motion to Dismiss with respect to Plaintiffs' individual capacity claims. Def.'s Resp. at 2 (Mar. 8, 2018), ECF No. 93. He will be permitted to do so. The Court will deal with the viability of the individual capacity claims in a subsequent Opinion and Order.

### B.  The Alleged Violations

On January 11, 2017, shortly before his inauguration, the President announced that he would be turning over the "leadership and management" of the Trump Organization to his sons, Eric Trump and Donald Trump, Jr. *Id.* ¶ 30. Prior to taking office, he also announced that all profits earned from foreign governments would be donated to the U.S. Treasury. *Id.* ¶ 46. The Trump Organization stated that it would not be tracking all payments it might receive from foreign governments and only planned to make an estimate with regard to such payments. *Id.* As of the date of the filing of this action, the President had made no such "donations" to the U.S. Treasury.[5] *See* Am. Compl. ¶¶ 46, 138. Despite these announcements, Plaintiffs allege that the President continues to own and know about the activities of the Trump Organization. *Id.* ¶ 31. Indeed, according to Plaintiffs, one of the President's sons has stated that he would be providing business updates to the President regarding the Organization on a quarterly basis and, although the President has formed a trust to hold his business assets, it appears that he remains able to obtain distributions from this trust at anytime. *Id.* ¶¶ 31-32.

Since the President's election, a number of foreign governments have patronized or expressed a definite intention to patronize the Hotel, some of which have indicated that they are doing so precisely because of the President's association with it. *Id.* ¶¶ 39-43. For example, the Amended Complaint alleges that the Kingdom of Saudi Arabia spent thousands of dollars at the Hotel between October 1, 2016, and March 31, 2017. *Id.* ¶ 41. Plaintiffs also cite a statement from

---

[5]  According to a recent press report, the President has stated that he has now paid to the U.S. Treasury the profits the Hotel has received from foreign governments. No details with respect to such payments, however, have been provided, viz., how the payments were calculated, who verified the calculations, how much was calculated over what period of time, and which foreign payor(s) were involved. *See* David A. Fahrenthold & Jonathan O'Connell, *Trump Organization Says It Has Donated Foreign Profits to U.S. Treasury, but Declines to Share Details*, Wash. Post (Feb. 26, 2018), https://www.washingtonpost.com/politics/trump-organization-says-it-has-donated-foreign-profits-to-us-treasury-but-declines-to-share-details/2018/02/26/747522e0-1b22-11e8-ae5a-16e60e4605f3_story.html?utm_term=.d8a282e07ec0.

a Middle Eastern diplomat who told the *Washington Post*, "Believe me, all the delegations will go there." *Id.* ¶ 39. An Asian diplomat allegedly agreed, explaining "Isn't it rude to come to [the President's] city and say, 'I'm staying at your competitor?'" *Id.*

Plaintiffs further allege that at least some foreign governments have withdrawn their business from other hotels in the area not affiliated with the President and have transferred it to the Hotel. As an example, they assert that the Embassy of Kuwait held its National Day celebration at the Hotel on February 22, 2017, despite having made a prior "save the date reservation with the Four Seasons hotel." *Id.* ¶ 40.

Plaintiffs also contend that the President has been more than a passive actor with respect to the Hotel. Since his election, the Hotel has specifically sought to market itself to diplomats by hiring a "director of diplomatic sales" and by hosting an event where it pitched the Hotel to approximately 100 foreign diplomats. *Id.* ¶ 37. The President himself has appeared at the Hotel on several occasions, while a number of members of his administration continue to live there. *Id.* ¶ 38. As a result, Plaintiffs allege that goods and services at the Hotel have been marketed at a premium level since the election. *Id.* ¶ 100. A portion of benefits, particularly expenditures by foreign governments, is said to have been passed along to the President through the Trump Organization. *Id.* ¶ 29.

In addition, at least one State—the State of Maine—patronized the Hotel when its Governor, Paul LePage, visited Washington to discuss official business with the Federal Government, including discussions with the President. Pls.' Opp'n. at 8, ECF No. 46. Indeed, on one of those trips, the President and Governor LePage appeared together at a news conference at which the President signed an executive order to review orders of the prior administration that established national monuments within the National Park Service, which could apply to a park and

national monument in Maine, which President Obama had established over LePage's objections in 2016. *Id.*

Plaintiffs submit that the President's receipt of benefits from these sources violates both the Foreign and Domestic Emoluments Clauses.

### C. Plaintiffs' Alleged Injuries

The District of Columbia and Maryland claim they have been harmed by the President's alleged violations in several ways.

First, Maryland alleges injuries to its **sovereign interests**.[6] It claims a special interest in "enforcing the terms on which it agreed to enter the Union," Am. Compl. ¶ 104, stating that the Emoluments Clauses were "material inducements" to its decision to enter the Union and that it retains the power to enforce those provisions today. *Id.* ¶ 106. Maryland also claims injury to its sovereign interests in that it receives tax revenues from comparable hotels, bars, restaurants and event spaces within the State of Maryland located nearby the Hotel, which it has lost and will continue to lose because patrons choose to avail themselves of the Hotel as opposed to comparable establishments in Maryland. *Id.* ¶¶ 116-118.

Second, both Plaintiffs submit that their **quasi-sovereign interests** are harmed in that the President's violations have placed them in an "intolerable dilemma." *Id.* ¶ 110. In particular, they claim a governmental interest in the enforcement of their respective laws pertaining to taxation, zoning, and land use involving real property that the President may own or seek to acquire. *Id.* ¶ 108. They allege that the President's receipt of emoluments from other States of the United States, in violation of the Domestic Emoluments Clause, forces them, on the one hand, to choose between granting requests for exemptions or waivers by the Trump Organization for activities

---

[6] The District of Columbia concedes that it cannot allege injury to a sovereign interest because it is not a sovereign. *See* Pls.' Opp'n at 6 n.1; Hr'g Tr. at 180:24-25, Jan. 25, 2018, ECF No. 92 (Hr'g Tr.).

conducted within Maryland and the District of Columbia and losing revenue or, on the other hand,

denying such requests by the President's organization and risk being placed at a disadvantage

*vis-à-vis* other States that have agreed to grant the Organization such concessions. *Id.* ¶ 110.[7]

Third, Plaintiffs assert injuries to their own **proprietary interests**. The District of

Columbia states that it directly owns building and land interests in properties in the District of

Columbia that directly compete with the Hotel, and which are either losing business to the Hotel or

which face the imminent prospect of losing such business by virtue of the President's continuing

involvement in the Hotel. Am. Compl. ¶¶ 119-129. Specifically, the District of Columbia claims it

possess an ownership or financial interest in the Walter E. Washington Convention Center

(Washington Convention Center), the Washington Convention Center and Sports Authority (also

known as Events D.C.), and the Carnegie Library. *Id.* ¶¶ 120-122.

The State of Maryland maintains that it has a direct financial interest in the Montgomery

County Conference Center, which is part of the Bethesda North Marriott Hotel located in

Bethesda, Maryland, (approximately thirteen miles from the Hotel)[8] as well as in the gambling

proceeds it receives from the casino at the MGM Hotel in the National Harbor, located

approximately ten miles from the Hotel across the Potomac River in lower Prince George's

County, Maryland. Am. Compl. ¶¶ 117, 131-32; Pls.' Opp'n at 16, 23. Maryland argues that, like

the District of Columbia, it is harmed because these entities compete with the Hotel for the

business of both foreign and domestic governments and that the President's violations of the

Emoluments Clauses have illegally skewed the hospitality market in his favor. Am. Compl. ¶ 130.

---

[7] The *Washington Post*, for example, has reported that the District of Columbia Office of Tax and Revenue granted
substantial tax reductions to the Hotel of approximately $1 million. *See* Jonathan O'Connell, *Tax Official Reduce
Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, Wash. Post (Jan. 12, 2018),
https://www.washingtonpost.com/news/business/wp/2018/01/12/tax-officials-reduce-trumps-tax-bill-on-d-c-hotel-b
y-nearly-1-million/?utm_term=.6b527c071c30.
[8] *See* Def.'s Mot. Dismiss at 23, ECF No. 21-1.

Finally, the District of Columbia and the State of Maryland assert that they are entitled to pursue this litigation on behalf of their respective residents as ***parens patriae***.[9] As *parens patriae*, they allege that the President's violations cause competing companies and their employees within the respective jurisdictions to lose business, wages, and tips, which in turn generate a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition. Am. Compl. ¶¶ 113-115.

The President disputes all these purported injuries and seeks dismissal of the suit, *inter alia*, on the ground that Plaintiffs have not shown that they have standing to pursue it. ECF No. 21.

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

A party may move for dismissal of a suit pursuant to Federal Rule of Civil Procedure 12(b)(1) where the court lacks subject matter jurisdiction over the claims alleged in the complaint. Fed. R. Civ. P. 12(b)(1).  "Article III gives federal courts jurisdiction only over 'cases and controversies,' U.S. Const. art. III, § 2, cl. 1, and the doctrine of standing identifies disputes appropriate for judicial resolution." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006) (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471–76 (1982)). As the party asserting jurisdiction, the plaintiff bears the burden of proving that the district court has subject matter jurisdiction. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). In considering whether to dismiss for lack of jurisdiction, the court may consider "evidence outside of the pleadings without

---

[9]  *Parens Patriae* standing is a "judicial construct that does not lend itself to a simple or exact definition." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). It means literally "parent of the country" and has its roots in common law, and literally refers to a State's right as sovereign to step into litigation as guardian of persons under legal disability. *Id.* at 600. It has developed in American law to be a theory of standing by virtue of which a State may assert a quasi-sovereign interest on behalf of its citizens in general. *Id.* at 600-01, 607. The term is discussed further *infra*.

converting the proceeding into one for summary judgment." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (quoting *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) will be granted if the allegations in a complaint do not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and quotation marks omitted). "[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

### B. Article III Standing

To establish "the irreducible constitutional minimum of standing," a plaintiff must "clearly . . . allege facts demonstrating" that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). An "injury-in-fact" has been defined as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). The injury must be "legally and judicially cognizable," and the dispute must be one that "is traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997)

(quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Of particular relevance to this proceeding, States are not "normal litigants for the purposes of invoking federal jurisdiction" and are entitled to "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007). Indeed, the invasion of three types of unique State interests justifying standing were identified by the Supreme Court in *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, being (a) sovereign interests; (b) nonsovereign interests; and (c) quasi-sovereign interests. 458 U.S. at 601-02 .

Thus, States have a sovereign interest in "the power to create and enforce a legal code, both civil and criminal" as well as in the "demand of recognition from other sovereigns," such as in the recognition of borders. *Id.* at 601.

However, "[n]ot all that a State does . . . is based on its sovereign character." *Id.* Like private parties, a State may "have a [nonsovereign] variety of proprietary interests," which a State may pursue in court, including its ownership of land or participation in a business venture. *Id*. at 601-02.

The *Snapp* Court recognized two distinct categories of quasi-sovereign interests held by States. First, "a State has a quasi-sovereign-interest in not being discriminatorily denied its rightful status within the federal system." *Id*. at 607. Second, a State has an interest in the "health and well-being—both physical and economic—of its residents." *Id*. In these actions, the State is said to sue in its capacity as *parens patriae.* When suing in that particular capacity, the State must be more than a nominal party and must allege more than an "injury to an identifiable group of individual

-10-

residents." *Id.* The injury must be of the type "that the State, if it could, would likely attempt to address through its sovereign lawmaking power." *Id.* If so, the State likely is deemed to have standing as *parens patriae* to bring the suit. *Id.*

### III.   STANDING

#### A. Injury-in-Fact

The first requirement for Article III standing is that the plaintiff articulate an injury-in-fact, "which helps to ensure the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). While hypothetical or conjectural injuries will not suffice, an allegation of future injury may be sufficient if the threatened injury is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 409 (2013). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, [since] on a motion to dismiss [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation and quotation marks omitted). At the same time, it has been said that "[i]njury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.).

Plaintiffs submit that their injuries are sufficiently concrete and imminent to satisfy the requirement of injury-in-fact. It should be noted, however, that, during oral argument, Plaintiffs clarified that their alleged competitive injuries—namely, Maryland's claimed injuries to its sovereign interest in taxes, to both parties' proprietary interests, and, to some extent, to both parties' *parens patriae* interests—centered almost exclusively around the District of Columbia-based Trump International Hotel and its appurtenant restaurant, bar, and event space,

whereas the alleged injuries to their sovereign and certain of their quasi-sovereign interests were said to have "no boundaries." Hr'g Tr. at 62-63.

The President disputes that any of Plaintiffs' alleged injuries, bounded or not, in fact exist much less that they satisfy the standard for injury-in-fact.

The Court finds that Maryland has suffered no injury to its sovereign interests[10] but that both Plaintiffs have stated cognizable injuries to their quasi-sovereign, proprietary, and *parens patriae* interests.

1) *Maryland's Sovereign Interests.*

The State of Maryland asserts two distinct sovereign interests.

i.    <u>Detrimental Reliance in Joining the Union.</u>

First, Maryland claims a sovereign interest in enforcing the terms upon which it entered the Union. Am. Compl. ¶¶ 104-106. It argues that because its 1776 Declaration of Rights contained a precursor to the United States Constitution's Emoluments Clauses, the Court should infer that Maryland felt strongly about preventing corruption when it joined the Union and therefore has standing to enforce these terms. Pls.' Opp'n at 14.

The President counters that this injury is not judicially cognizable because Maryland is essentially asking the Court to adjudicate "abstract questions of political power," which is beyond its authority under Article III. Def.'s Mot. Dismiss at 10, ECF No. 21-1 (citing *Massachusetts v. Mellon*, 262 U.S. 447, 484-84 (1923)); Hr'g Tr. at 69. In any event, says the President, even if Maryland's alleged detrimental reliance were cognizable, the Amended Complaint contains no plausible allegation to support a claim that Maryland's present-day interpretation of "emolument" induced it to join the Union. Def.'s Mot. Dismiss at 11-12.

---

[10] Again, the District of Columbia has no sovereign interest to be offended. *See* note 6, *supra*.

The Court is unaware of any legal support for the proposition that a State may establish injuries to its sovereign interest, by alleging reliance on the expectation that one of its own constitutional provisions pre-dating the federal Constitution would be carried forward to the federal Constitution when it joined the Union, when a comparable provision was in fact carried forward but is not at some later time being enforced to that State's satisfaction. As the President suggests, States may not serve as "roving constitutional watchdog[s]" raising any issue "no matter how generalized or quintessentially political." *Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 272 (4th Cir. 2011). Lack of legal precedent aside, more fatal to Maryland's argument is the highly doubtful historical proposition that a causal connection existed between the inclusion of the Emoluments Clauses in the federal Constitution and Maryland's decision to ratify it. Even the most casual student of American history would likely conclude that Maryland would have ratified the federal Constitution for a myriad of reasons with or without inclusion of the Clauses and, if carried forward, without regard to the strictness with which over time they would be enforced. The inclusion of a "precursor" to the Emoluments Clauses in Maryland's pre-Union Declaration of Rights and the State's alleged frustration that the Clauses are not being appropriately enforced today establishes no injury-in-fact to Maryland's sovereign interests for standing purposes.

ii.    Tax Revenues.

Maryland, as sovereign, relying on the Supreme Court's decision in *Wyoming v.*

*Oklahoma*, 502 U.S. 437, 448 (1992), also argues that it has suffered a "direct injury in the form of

a loss of specific tax revenues," Pls.' Opp'n at 14. Maryland invites the Court's attention to the

revenue it receives from the sales and room-rental taxes on Maryland hotels, restaurants, and event

spaces that compete with the Hotel for government business. Pls.' Opp'n at 18-19. Because this is

a competitive injury, Maryland asserts, for standing purposes, it is not required to submit actual

lost tax or sales data. *Id.*; Hr'g Tr. at 59-60.

The President argues that Maryland's supposed tax revenue injury is too general to qualify

as an injury-in-fact. In contrast to *Wyoming*, he says, where there was "unrebutted evidence" of a

specific loss of revenue by reason of a tax on coal going back several years, Maryland is engaged

in extreme speculation about potential future tax loss of general hospitality revenues. Def.'s Mot.

Dismiss at 13 (citing *Wyoming*, 502 U.S. at 445, 447-50); Hr'g Tr. at 34, 76-77. He submits that it

is altogether improbable that Maryland's tax coffers will suffer any injury at all. Def.'s Mot.

Dismiss at 14.

The Court agrees with the President. Though Maryland looks to the competitor standing

theory in support of its lost tax revenue injury, in marked contrast to the losses to its proprietary

interests, as will be discussed *infra*, the case law indicates that a plaintiff has the burden of

showing "a direct injury in the form of a loss of specific tax revenues." *Wyoming*, 502 U.S. at 448.

A "decline in general tax revenues" is not enough. *Id.* (citing *Pennsylvania v. Kleppe*, 533 F.2d

668 (D.C. Cir. 1976)). As the President points out, in *Wyoming*, the Supreme Court was satisfied

that a direct injury was shown because there was "[u]nrebutted evidence demonstrat[ing] that,

since the effective date of the [applicable] Act, Wyoming ha[d] lost severance taxes" every year

-14-

for a period of almost three years. *Id*. at 445-46. Though Maryland points out that *Wyoming* was decided at the summary judgment stage, that would seem to make little difference at the Motion to Dismiss stage. Just to get through the gate at this point, Maryland has to demonstrate with at least some measure of specificity how much tax revenue it may have lost to the Hotel. It has not done so. As distinguished from the other competitive injuries to be discussed presently, Maryland's suggestion of loss of tax revenue is too speculative for the Court to find that it constitutes injury-in-fact for standing purposes. *See Florida v. Mellon*, 273 U.S. 12, 17-18 (1927) (claimed loss of tax revenue was too speculative, remote and indirect to establish standing).

The Court finds that neither claimed injury to Maryland's sovereign interests satisfies the injury-in-fact prong of the standing test.

    2)   *District of Columbia's and Maryland's Quasi-Sovereign Interests.*[11]

Both Plaintiffs assert injury to their quasi-sovereign interests.

With respect to the President's alleged violations of the Domestic Emoluments Clause, Plaintiffs argue that they have been placed in an "intolerable dilemma" in that, on the one hand, they are forced to choose between granting the Trump Organization's requests for special concessions, exemptions, waivers, and the like, thereby losing revenue, and, on the other hand, denying such requests and risk being placed at a disadvantage *vis-à-vis* other States that already have been or may in the future be constrained to grant such concessions. Am. Compl. ¶¶ 107-112. Because this dilemma supposedly violates the "fundamental principle of *equal* sovereignty among the States," Pls.' Opp'n at 7-8 (quoting *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2623 (2013)), Plaintiffs claim injury-in-fact, hence standing, to protect their "position among . . . sister States." *Id*. at 9 (quoting *Georgia v. Pennsylvania Railroad*, 324 U.S. 439, 451 (1945)).

---

[11]  The District of Columbia, as a United States territory, is "similarly situated to a State in this respect" and may assert quasi-sovereign interests in federal court. *See Snapp*, 458 U. S. at 608 n.15.

As to the Foreign Emoluments Clause, Plaintiffs allege that the President's violations deny them their "rightful status in the federal system" because the Federal Government becomes responsive to the desires of foreign governments rather than to those of the States. *Id.* (citing *Snapp*, 458 U.S. at 607). Since these injuries supposedly occur each time the President receives an emolument from any location, Plaintiffs argue they have been injured in the past and continue to be injured by the President's actions. *Id*. at 11-12.[12] They claim standing under *Snapp* to vindicate their interests in "securing observance of the terms under which [they] participate[] in the federal system." *Snapp*, 458 U.S. at 607-08.

The President's position is that these claimed injuries are again based on a "speculative chain of possibilities," such that they cannot be deemed "certainly impending." Def.'s Mot. Dismiss at 17 (citing *Clapper*, 568 U.S. at 410, 414). To start, the President points out that Maryland has not alleged that it is faced with any threatened need to grant concessions to him or his Organization. In fact, he says, the Amended Complaint does not even allege that the Trump Organization or the President do any business in Maryland. Though the District of Columbia is home to the Hotel, the President argues that, as to it, any hypothetical special treatment of the Hotel, were the District to provide such treatment, would be a self-inflicted injury. *Id.* at 17-18. Further, he maintains that it is purely conjectural that other States would grant favors or concessions to the President's businesses in violation of their own laws. He submits that it requires even greater speculation to say that he would retaliate against Plaintiffs if they failed to grant such concessions. *Id.* at 18. At best, the President says, Plaintiffs' alleged injuries are an "abstract threat to federalism," not an injury-in-fact cognizable for standing purposes under Article III. Def.'s Reply at 5, ECF No. 70.

---

[12]  It is through these claimed injuries that Plaintiffs seek to encompass the President's other business activities beyond the Washington-based Hotel, both national and global. Hr'g Tr. at 62-63.

This issue requires careful parsing. The Court has located no case that recognizes an "intolerable dilemma" as the basis for establishing injury-in-fact for standing purposes, whether suffered by a State, a business, or an individual litigant. Yet what cannot be denied is that Trump Organization hotels and, through it, the President have reportedly been accorded substantial tax concessions by at least the District of Columbia and the State of Mississippi. *See* Steve Eder & Ben Protess, *Hotel Carrying New Trump Brand Secures $6 Million Tax Break*, N.Y. Times (Feb. 21, 2018), https://www.nytimes.com/2018/02/21/business/trump-hotel-scion-mississippi-tax-rebate.html; O'Connell, *Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, note 7, *supra*. At the time of the briefing in this case, the Trump Organization had merely applied for these District of Columbia concessions. Since then, however, the District's tax authorities, according to a report in the *Washington Post*, in fact granted the Hotel a reduction in its 2018 tax bill for a savings of $991,367.00. *See* O'Connell, *Tax Official Reduce Trump's Tax Bill on D.C. Hotel by Nearly $1 Million*, note 7, *supra*.

Tax authorities in the District of Columbia have declared (and those in Mississippi would presumably take the same position) that these concessions were routine and that no favoritism was involved. But, while ordinarily there may be a presumption of regularity as far as the decisions of the tax authorities are concerned, the fact remains that Trump Organization hotels, from which the President allegedly derives substantial illegal profits, have been the beneficiaries of these decisions. Nor can the mere say-so of the tax authorities—at least in the District of Columbia—be taken as the final word that its tax concessions were merely "routine." As has been reported in the press and as noted in the Amended Complaint and confirmed at oral argument, almost immediately after the President took office, federal regulations were amended so that the former U.S. Post Office, which is the site of the Trump International Hotel, which could not previously be leased to

someone associated with the Federal Government, suddenly could be leased to someone despite that someone's connection with the Federal Government. *See* Am. Compl. ¶¶ 80-88; Hr'g Tr. at 150-51; Bryon Tau, *GSA Says Trump Hotel Not in Violation of Lease*, Wall Street J. (Mar. 23, 2017), https://www.wsj.com/articles/gsa-says-trump-hotel-not-in-violation-of-lease-1490315114. This abrupt administrative about-face at a minimum gives pause before accepting any claim that the tax concessions given to the Hotel by the District of Columbia tax authorities were "routine." Given these circumstances, there is a decent possibility, at least as far as the Hotel in Washington is concerned, that the District of Columbia may have felt itself effectively "coerced" into granting special concessions to the Hotel and that Maryland may feel itself under pressure to respond in similar fashion.

There is yet another consideration Plaintiffs find concerning. As reported in the press, Governor Paul LePage of the State of Maine stayed at the Hotel on an official visit to Washington during the spring of 2017, met with the President, and not long after appeared with the President at a news conference at which the President signed an executive order to review national monuments that are part of the National Park Service, which could apply to a park and national monument in Maine, which President Obama had established over LePage's objections in 2016. *See* Pls.' Opp'n at 8 (citing Miller & Thistle, *Luxury hotels, fine dining for LePage on taxpayers' dime*, Portland Press Herald (July 23, 2017), https://goo.gl/xPxeeP; Sambides, *Leaked report advises Trump to open Maine monument to commercial forestry*, Bangor Daily News (Sept. 18, 2017), https://goo.gl/Un5cmK); *see also* Scott Thistle, *LePage Joins Trump for Signing of Order to Review Designations of National Monuments*, Portland Press Herald (Apr. 27, 2017), https://www.pressherald.com/2017/04/26/lepage-joins-trump-for-executive-order-signing-ceremony/. Leaving aside how Maine's citizens may have felt about the propriety of their

Governor living large at the Hotel while on official business in Washington, the fact that States other than Maryland or the District of Columbia (while, not a State) might patronize the Hotel while on official business in Washington rather clearly suggests that Maryland and the District of Columbia may very well feel themselves obliged, i.e., coerced, to patronize the Hotel in order to help them obtain federal favors.

In the Court's view, these circumstances do not, as the President maintains, involve numerous inferential leaps to demonstrate injury to the quasi-sovereign interests of Maryland and the District of Columbia insofar as the President's purported violations of the Domestic Emoluments Clause are concerned. At least with respect to the D.C.-based Hotel's operations, Plaintiffs have adequately demonstrated that their quasi-sovereign interests in this particular way have been injured-in-fact.

That said, the Court finds it is considerably more difficult to conclude that Plaintiffs' quasi-sovereign interests have been offended by Trump Organization operations outside the District of Columbia. There appears to be no "actual or imminent" injury to either Plaintiff, for example, with respect to the decision of the State of Florida or any other State to patronize the Trump Organization's Mar-a-Lago facility in Palm Beach. In that respect, any alleged injury to Maryland or the District of Columbia seems much more "hypothetical and conjectural," not "concrete and particularized." To be sure, while Florida or other States in which Trump Organization operations are located may be able to successfully establish their own injury-in-fact for standing purposes were they to bring Emoluments Clause suits with respect to those operations, Plaintiffs here cannot. The Court holds that Plaintiffs' injuries-in-fact to their quasi-sovereign interests for standing purposes have been shown, but only as to the Trump Organization and the

Hotel operations in the District of Columbia and the President's involvement with respect to the same.

3) *District of Columbia's and Maryland's Proprietary Interests.*

Both Plaintiffs allege that they have proprietary interests in entities that compete with the Hotel. Specifically, the District of Columbia owns the Washington Convention Center, located within the District, which it argues competes directly with the Hotel for similar events involving both foreign and domestic governments. Pls.' Opp'n at 22-23. Maryland, as both a landlord and through its management authority in overseeing the activities of the Bethesda Marriott Conference Center, submits that it has a direct financial interest in the Conference Center, which competes with the Hotel for foreign and domestic business. Am. Compl. ¶ 131; Hr'g Tr. at 169. Maryland also claims a proprietary interest in the gambling proceeds it receives from the MGM National Harbor casino pursuant to Maryland law. Pls.' Opp'n at 23 (citing Md. Code. Ann., State Gov't § 9-1A-26(a)(1)). Because the casino is integrated into the MGM Hotel and adjacent to the Gaylord Hotel, Maryland says its proprietary interests are directly affected when an individual or, more to the point, a foreign or domestic government, chooses to stay at the President's Hotel instead of the MGM or Gaylord, because Maryland suffers a loss to its income stream. *Id.* at 24.

Plaintiffs thus argue that the President's violations of both the Foreign and Domestic Clauses have left them with an "inability to compete on an equal footing" with the Hotel. *Id.* It is this loss of the "opportunity to compete," they claim, that establishes an alternative injury sufficient for Article III standing. *Id.* at 24-25 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)). Relying on this theory of "competitor standing," Plaintiffs again argue that they are not obliged to provide "a balance sheet with 'lost sales data' they can link directly to the President." *Id.* at 25 (quoting *TrafficSchool.com*

-20-

*Inc. v. Edriver Inc.*, 658 F.3d 820, 825 (9th Cir. 2011)). Rather, they submit that they have shown

injury-in-fact because their position "in the relevant market place is affected adversely." *Id.* (citing

*Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993)).

Once again, the President argues that Plaintiffs' alleged injuries, this time to their

proprietary interests, are highly speculative—far from "certainly impending" in nature. Def.'s

Reply at 8 (citing *Clapper*, 568 U.S. at 409). It is not enough, says the President, for Plaintiffs to

merely allege that they compete with the Hotel. They must show an "actual or imminent increase

in competition, which increase . . . will almost certainly cause an injury-in-fact." *Id.* at 9 (quoting

*Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)). The President disputes that any of the

entities in which Plaintiffs claim a proprietary interest are comparable to the Hotel. Given the

substantial differences between the venues and the "diffuse and competitive" hospitality market in

the area, he says, Plaintiffs have not met their burden. *Id.* at 10-11.

While the Court has agreed with the President as to certain of Maryland's claims of injury

to its sovereign interests, it finds that Plaintiffs have met their burden as to their claims with respect

to injuries to at least some of their proprietary interests.[13]

The Supreme Court has recognized that plaintiffs with an economic interest have standing

to sue to prevent a direct competitor from receiving an illegal market benefit leading to an

unlawful increase in competition. *See, e.g., Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620-21 (1971)

(concluding that an association of open-end investment companies and several individual

companies had standing to challenge a regulatory decision allowing national banks to operate

---

[13] Maryland's claim of injury based on the purported loss of proceeds from gambling at the MGM facility is, in the Court's view, too attenuated to establish injury-in-fact to its proprietary interests, just as its claim of lost tax revenues from the MGM or Gaylord operations could not sustain a claim of injury-in-fact to its sovereign interest. In fact, as the Court elicited at oral argument, the Trump International Hotel does not even offer casino gambling. But Maryland's claim of injury to its proprietary interest is sustained with respect to its participation in the Bethesda Marriott Conference Center.

collective investment funds because they were sufficiently injured by the competition the

regulation authorized); *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151-52, 158

(1970) (holding an association of data processing service providers had standing to challenge a

regulation allowing banks to provide such services because they had an injury in the form of future

lost profits). In such cases, a plaintiff must show that it is "sufficiently injured by the competition

. . . to create a case or controversy." *Inv. Co. Inst.*, 401 U.S. at 620.

Several courts have interpreted a sufficient competitive disadvantage to mean that a

plaintiff must show that it "personally competes in the same arena" with the party that has received

an illegal benefit. *See, e.g.*, *Ctr. for Reprod. Law v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002); *Becker

v. FEC*, 230 F.3d 381, 387 n.5 (1st Cir. 2000); *Gottlieb v. FEC*, 143 F.3d 618, 621 (D.C. Cir.

1998); *In re U.S. Catholic Conf.*, 885 F.2d 1020, 1029 (2d Cir. 1989). "Because increased

competition almost surely injures a seller in one form or another, [a plaintiff] need not wait until

'allegedly illegal transactions . . . hurt [it] competitively.'" *Sherley*, 610 F.3d at 72 (quoting *La.

Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). Thus, in competitor

standing cases, lost sales data are not required to prove a competitive injury; instead basic

economic logic will permit a finding that a plaintiff will suffer an injury-in-fact. *See, e.g.*, *Traffic

School.com*, 653 F.3d at 825 ("A plaintiff who can't produce lost sales data may therefore establish

an injury by creating a chain of inferences showing how defendant's false advertising could harm

plaintiff's business."); *Sherley*, 610 F.3d at 74 (noting that, although it was not certain how likely

the plaintiffs would lose funding to the challenged projects, "having been put into competition

with those projects, the [plaintiffs] face a substantial enough probability to deem the injury to them

imminent").

In the present case, Plaintiffs have attached to their Opposition to the Motion to Dismiss declarations of experts stating that the entities in which Plaintiffs claim a proprietary interest in fact compete in the same arena as the Hotel for certain customers and events. *See generally* Rachel J. Roginsky Decl., ECF No. 47; Christopher C. Muller Decl., ECF No. 48. Roginsky, a private consultant with expertise in assessing competition in the hotel industry, indicates that both the Washington Convention Center and the Hotel host events and meetings for up to 1,200 people and offer overlapping services for such events, including high-end catering and customized menu planning. Roginsky Decl. ¶ 31. Because of their close proximity—less than one mile apart—both the Washington Convention Center and the Hotel are equally accessible to federal agencies, law firms, and large businesses that would seek to use the spaces. *Id.* ¶ 30. She also concludes that both facilities are of "similar class and image." *Id.* ¶ 32. Additionally, Events D.C., a District of Columbia-controlled entity, caters to both foreign and domestic governments and a portion of its revenue is based on demand for use of the Washington Convention Center. Am. Compl. ¶¶ 120-22; Hr'g Tr. at 105:6-10 (noting that the Washington Convention Center has previously hosted the Food and Drug Administration, the Treasury Department, and the Department of Commerce).

Maryland submits that its proprietary interests are also comparable to and compete in the same arena with the Hotel. While the State of Maryland does not have a proprietary interest in the hotel attached to the Bethesda Marriott Conference Center, the Conference Center itself, in which the State does have such an interest, has 39,000 square feet of meeting and event space, which compete directly with the Hotel's 38,000 square feet of meeting and event space. Am. Compl. ¶ 131; Hr'g Tr. at 105; Roginsky Decl. ¶ 41. The Conference Center has a large ballroom, has hosted embassy events in the past, and, compared with the Hotel, is essentially equidistant from many foreign embassies. Hr'g Tr. at 105.

Importantly, and contrary to the President's assertions, Plaintiffs allege that they are more than just competitors in the same arena as the Hotel. They argue they have been placed at a competitive disadvantage because the President, by virtue of the pre-eminence of his office, is unfairly skewing the hospitality market in favor of his Hotel. He is not merely a market participant, they say; he is actively diverting business from Plaintiffs' entities. In fact, Plaintiffs cite specific instances of foreign governments foregoing reservations at other hotels in the arena and moving them to the President's Hotel. *See* Pls.' Opp'n at 17 (noting that both Kuwait and Bahrain moved events from the Four Seasons and Ritz Carlton to the Hotel after the President was elected). Statements from foreign diplomats have confirmed that they will almost certainly be doing likewise. *See* Am. Compl. ¶ 39. Plaintiffs further allege that, since the President's election, the Hotel has raised its prices to premium levels and has increased its profits. *See id.* ¶¶ 100-01 (alleging that the starting rate for "guest rooms" at the Hotel increased to $500 on most nights, which is hundreds of dollars more than when the Hotel first opened shortly before the presidential election); Pls.' Opp'n at 18 (noting the Trump Organization, the Hotel's parent company, turned a $1.97 million profit during the first four months of 2017 despite having predicted a loss of $2.1 million for the same period).

Though the President emphasizes that the Four Seasons and Ritz Carlton hotels are not Plaintiffs' properties, the Court concludes, based on fairly straightforward economic logic, that the properties which Plaintiffs do have a proprietary interest in are in fact disadvantaged in much the same way as those two hotels have been. *See Massachusetts v. EPA*, 549 U.S. at 525 n.23 ("Even a small probability of injury is sufficient to create a case or controversy.") (quoting *Village of Elk Grove Village v. Evans,* 997 F.2d 328, 329 (7th Cir. 1993)). In other words, Plaintiffs have alleged sufficient facts to show that the President's ownership interest in the Hotel has had and almost

certainly will continue to have an unlawful effect on competition, allowing an inference of impending (if not already occurring) injury to Plaintiffs' proprietary interests. *Sherley*, 610 F.3d at 72 (citing *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002)); *see also TrafficSchool.com, Inc.*, 653 F.3d at 825-26 ("Evidence of direct competition is strong proof that plaintiffs have a stake in the outcome of the suit, so their injury isn't 'conjectural' or 'hypothetical.'").

The Court finds Plaintiffs have successfully articulated injury-in-fact to at least some of their proprietary interests.

### 4) *District of Columbia's and Maryland's Parens Patriae Interests.*

In addition to claiming injury to their sovereign, quasi-sovereign, and proprietary interests, Plaintiffs also assert, as *parens patriae*, injury to the economic welfare of their residents.[14] Specifically, Plaintiffs allege that their residents participate in a "thriving hospitality industry that comprises a substantial part of [their] economies." Am. Compl. ¶ 113. They claim their residents are harmed by the President's alleged violations of both Emoluments Clauses because the competitive playing field is illegally tilted towards the President's Hotel, resulting in competitive disadvantage to Plaintiffs' resident businesses, which in turn curtails the opportunities and diminishes the earnings of their residents. *Id.* ¶ 114.[15]

While acknowledging that in certain instances States have been precluded from bringing a *parens patriae* suit against the Federal Government, Plaintiffs nevertheless submit that *parens*

---

[14] *See* note 9, *supra*. As indicated there, *parens patriae* refers to the theory of standing by which a State may assert a quasi-sovereign interest, i.e., "public or governmental interests that concern the State as a whole," on behalf of its citizens. *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (quoting *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 (1907)); *see also Snapp*, 458 U.S. at 600-01, 607. Though the District of Columbia is not a sovereign State, the Supreme Court has recognized that U.S. territories may sue as *parens patriae* and assert quasi-sovereign interests. *See Snapp*, 458 U.S. at 608 n.15; *see also* note 11, *supra*.

[15] Maryland's interest as *parens patriae* does extend to, among other residents, the MGM and Gaylord Hotel facilities in the National Harbor in Prince George's County.

*patriae* standing is proper here because they are "assert[ing] [their] rights under federal law," rather than attempting to nullify a federal law. Pls.' Opp'n at 27 (citing *Massachusetts v. EPA*, 549 U.S. at 520 n.17). Moreover, they say, the competitive injury impacts a significant sector of their economies, in consequence of which Plaintiffs come to court as more than nominal parties. *Id.* at 26, 28.

The President argues that Plaintiffs cannot avail themselves of *parens patriae* standing for two distinct reasons. First, he challenges Plaintiffs' characterization of this as a *parens patriae* suit. This is precisely the type of *parens patriae* action, he says, that the Supreme Court prohibited in *Massachusetts v. Mellon*, because a suit against the President in his official capacity is effectively a suit against the United States. Def.'s Mot. Dismiss at 19-20 (citing *Mellon*, 262 U.S. at 485-86). In any event, the President argues, even if Plaintiffs could bring this suit against the Federal Government, *parens patriae* standing would still fail because Plaintiffs have not alleged a concrete injury, and to bring a *parens patriae* action, the State must be "more than a nominal party," it must allege an injury suffered by a "substantial segment of its population." *Id*. at 21 (citing *Snapp*, 458 U.S. at 607). According to the President, the Amended Complaint does not plausibly allege such an injury, positing instead a general injury caused by a single Hotel to no more than an "identifiable group of individual residents," which is not sufficient. *Id.*

It is true that this suit was originally filed against the President in his official capacity. And it is also true that, ordinarily, with respect to actions actively taken in a government official's "official capacity," the suit ordinarily amounts to a suit against the United States. But a suit against a Federal Government official is not necessarily the equivalent of a suit against the United States, where, as here, despite the "official capacity" styling of the suit, the challenged actions by the Government official fall well outside his "official duties." *Cf. Larson v. Domestic & Foreign*

*Commerce Corp.*, 337 U.S. 682, 689 (1949) ("There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that action is not a suit against the sovereign. . . . The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are *ultra vires* his authority and therefore may be made the object of specific relief."). It remains to be seen whether the President should be in this case in his individual capacity[16] in addition to or in lieu of his official capacity. But looking beyond the simple denomination of his status at this point, it is clear that the gist of the Amended Complaint is that the President's purported receipt of emoluments, as previously defined, has nothing at all to do with his "official duties." As the President himself concedes, Plaintiffs are challenging the President's acceptance of money taken through private transactions—something that has "nothing to do with the President's service . . . as President," Def.'s Mot. Dismiss at 30.

The Court is satisfied that Plaintiffs may properly bring this action against the President in his official capacity without running afoul of *Mellon*. As clarified by the Supreme Court in *Massachusetts v. EPA*, "there is a critical difference between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." 549 U.S. at 520 n.17 (citation and quotation marks omitted). Indeed, the cases the President urges this Court to look to involve States attempting to "nullify federal law" or to challenge the operation of a federal statute. *See, e.g.*, *Virginia ex rel. Cuccinelli*, 656 F.3d at 270 (challenging the constitutionality of the individual mandate in the Affordable Care Act by alleging it conflicted with a later enacted State

---

[16] *See* note 4, *supra*.

statute); *Hodges v. Abraham*, 300 F.3d 432, 436-37 (4th Cir. 2002) (noting that challenging the constitutionality of a Department of Energy action taken pursuant to the National Environment Protection Act on behalf of the State's citizens would be an improper *parens patriae* suit). In contrast, in the present case the District and Columbia and Maryland are asserting that their rights under the Emoluments Clauses of the U.S. Constitution are being violated by the President's private profiteering. This distinguishes the *parens patriae* standing in the present case from both *Cuccinelli* and *Hodges*, where it was not found, and comes within the type of *parens patriae* suit contemplated by *Massachusetts v. EPA*.

Despite the President's attempt to distinguish *Massachusetts v. EPA*, the fact that Congress had granted a procedural right to bring actions challenging the Environmental Protection Agency's actions in that case does not affect the outcome here. In determining that Massachusetts had standing to bring the suit there, the Supreme Court did not rely on this procedural right alone; it also emphasized the "special position and interest" of Massachusetts as a sovereign State and its "stake in protecting its quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. at 518, 520. Similar considerations are present here.

The Court is also satisfied that both the District of Columbia and Maryland are more than nominal parties. They allege competitive injuries affecting a large segment of their populations. The Amended Complaint alleges that in 2014, visitors to the District of Columbia generated approximately $6.81 billion in spending and drove $3.86 billion in wages for 74, 570 employees engaged in the hospitality industry. Am. Compl. ¶ 113. In Maryland, of more than 140,000 employees in the hospitality industry around the State, more than 72,000 work in the counties that border the District of Columbia.[17] Am. Compl. ¶ 113. Further, there are at least 15 "high-end"

---

[17] *Compare Snapp*, 458 U.S. at 609 (concluding Puerto Rico had a substantial interest, hence standing, to pursue a

restaurants and hotels in Maryland and 32 in the District of Columbia that can be said to either

directly compete with the Hotel's restaurant, BLT Prime, or with the Hotel itself, for event and

meeting spaces. Roginsky Decl. ¶ 24; Muller Decl. ¶¶ 24–26. Plaintiffs allege that the bottom lines

of all of these businesses are directly influenced by the President's purported violations. Pls.'

Opp'n at 28.

In the Court's view, that is enough. It can hardly be gainsaid that a large number of

Maryland and District of Columbia residents are being affected and will continue to be affected

when foreign and state governments choose to stay, host events, or dine at the Hotel rather than at

comparable Maryland or District of Columbia establishments, in whole or in substantial part

simply because of the President's association with it. The Court concludes that Plaintiffs are not

attempting to "stand in the shoes" of a limited number of businesses as the President suggests,

Hr'g Tr. at 34, 83; they are, quite plausibly, trying to protect a large segment of their commercial

residents and hospitality industry employees from economic harm.

Finally, as discussed in relation to Plaintiffs' proprietary interests, the competitor standing

line of cases also confirms that Plaintiffs have alleged more than a speculative possibility of future

injury to their quasi-sovereign interests. *See* Section III.A.3, *supra*.

The Court finds that Plaintiffs have sufficiently stated a concrete injury-in-fact to their

*parens patriae* interests in protecting the economic welfare of their residents.

## B.  Traceability

In addition to demonstrating an injury-in-fact in order to establish Article III standing,

Plaintiffs must show a "causal connection between the injury and the conduct complained of,"

---

*parens patriae* suit despite the fact that only 787 jobs were affected).

such that it is fairly traceable to the defendant's actions. *Lujan*, 504 U.S. at 560 (citing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, (1976)).

Plaintiffs argue that the injuries they have sustained to their various interests easily satisfy the traceability requirement under the competitor standing theory. *See* Pls.' Opp'n at 21-22 (citing *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013)); Hr'g Tr. at 140-42. They analogize their situation to *Northeastern Florida Chapter of Associated General Contractors v. Jacksonville*, 508 U.S. 656 (1993), where the Supreme Court held the petitioner had standing to challenge the City of Jacksonville's ordinance granting preferential treatment to certain minority-owned businesses in the awarding of city contracts under the Equal Protection Clause. In so holding, the Supreme Court clarified that the claimed injury in issue was the inability of plaintiffs to compete on an equal footing, not the loss of the contract. *Id.* at 666. Accordingly, the Supreme Court found that it followed that the ordinance had caused the petitioner's injury. *Id.* at 666 n.5. Similarly, Plaintiffs here argue that the Court should apply basic economic logic to find the traceability prong for standing satisfied. The Court should do so, they contend, because Plaintiffs are harmed when their competing facilities lose the business of foreign or domestic states attracted to the President's Hotel simply because it is the President's Hotel. The presence of third parties, say Plaintiffs, does not change the ultimate conclusion. Pls.' Opp'n at 20-21.

The President makes much of the proposition that third party actors beyond his control are involved in the challenged transactions. *See* Def.'s Mot. Dismiss at 15-16; Hr'g Tr. at 153-55. He cites several Fourth Circuit cases that discuss the difficulty of showing causation when third parties "must act in order for an injury to arise or be cured." Def.'s Mot. Dismiss at 15 (citing *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013); *Frank Krasner Enterprises, Ltd. v. Montgomery County*, 401 F.3d 230, 236 (4th Cir. 2005)). Because individuals choose to stay at

hotels, eat at restaurants, and stage events at a certain location for a wide variety of reasons, the

President argues, it is altogether speculative to suggest that foreign or domestic government

officials are choosing to stay at the Hotel in order to confer benefits on him, as opposed to the

many other reasons which may motivate their decisions. *Id.* at 16; Hr'g Tr. at 154.

The Court is not persuaded by the President's arguments.

In the first place, as the Court suggested at oral argument, accepting the President's third

party argument would render impossible any effort to ever engage in Foreign or Domestic

Emoluments Clause analysis because action by a foreign or domestic government, i.e., by a third

party, is always present by definition.

In the second place, none of the cases cited by the President are competitor standing cases.

*Frank Krasner*, for example, a case upon which the President relied heavily at oral argument,

involved a gun show promoter's challenge to a county law that denied public funding to venues

that displayed guns. 401 F.3d at 232, 233. As a result of the county law, a venue that had been

leased to the plaintiff for prior gun shows refused to lease to him for an upcoming gun show. The

plaintiff sued the county, challenging the law under the First and Fourteenth Amendments as well

as Maryland law. *Id*. at 233. In determining that the plaintiff lacked standing to sue the county, the

Supreme Court noted that "importantly" the private venue was not a party to the lawsuit and that it

stood directly in the way between the plaintiff and the county's challenged conduct. *Id*. at 233,

236. The case at bar is quite different. Here, the government official himself is the one allegedly

receiving illegal benefits, not a third party not before the Court. Indeed, when the injury is the loss

of an opportunity to fairly compete rather than the loss of the benefit itself, the presence of third

party actors in the marketplace has been found not to destroy traceability. *See, e.g.*, *Ne. Fla.*

*Chapter of Associated General Contractors*, 508 U.S. at 666 n.5 (causation was present even

though there was no showing that any petitioner would have received the contract absent the ordinance); *Int'l Bhd. of Teamsters*, 724 F.3d at 212 (noting that the causation and redressability requirements were "easily satisfied" because absent the challenged program, the petitioners would not have been subject to increased competition). The more relevant question, then, is whether the *increase of competition* can be fairly traced through the third party's intervening action back to the President. The Court is satisfied that it can.

Plaintiffs have plausibly alleged they have been subjected to increased competition as a result of the President's purported violations. Their allegation is bolstered by explicit statements from certain foreign government officials indicating that they are clearly choosing to stay at the President's Hotel, because, as one representative of a foreign government has stated, they want him to know "I love your new hotel," a sentiment the President appears to suggest he likes "very much." *See* Am. Compl. ¶¶ 39, 55 (alleging that in 2015, the President said about Saudi Arabia: "They buy apartments from me . . . . They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much."). Again, since the election, foreign governments have indisputably transferred business from the Four Seasons and Ritz Carlton hotels in the District to the President's Hotel. *See* Pls.' Opp'n at 17.

The President's argument that these facilities are not Plaintiffs' facilities fails to persuade for at least two reasons. First, these examples fairly suggest that the entities in which Plaintiffs do have a proprietary interest are suffering comparable detriment. Second, even though not directly owned by Plaintiffs, the Ritz Carlton and Four Seasons hotels are part of the District of Columbia industry encompassed within the District's *parens patriae* interest, as well, it may be said, are all the members of the hospitality industry in nearby Maryland to the extent they are within the scope of Maryland's *parens patriae* interest.

As for the injury-in-fact to Plaintiffs' quasi-sovereign interests insofar as they may be constrained to grant favors to the Trump Organization or patronize the Hotel in order to obtain federal benefits on a par with certain other States, traceability is also easily satisfied.

The Court finds the injuries to Plaintiffs' quasi-sovereign, proprietary, and *parens patriae* interests to be fairly traceable to the President's alleged violations.

## C. Redressability

The third and last prong of the Article III standing inquiry requires Plaintiffs to show that their injury-in-fact, if traceable to the President, is also likely to be redressed by a favorable court decision.

In their Amended Complaint, Plaintiffs request both injunctive and declaratory relief, which they allege will appropriately redress their injuries. They argue that even if foreign or domestic state governments continue to patronize the Hotel, a court order enjoining the President from receiving "emoluments," as defined for present purposes, "would certainly 'reduce[] to some extent'" their competitive disadvantage. Pls.' Opp'n at 22 (quoting *Massachusetts v. EPA*, 549 U.S. at 526). That is, if the President is prohibited from personally receiving emoluments from these sources in the future, the likelihood is that their patronage of the Hotel will be "reduced to some extent," and in consequence all the competitive businesses in the District and Maryland will be placed on a more equal footing with the Hotel. Hr'g Tr. at 174; Pls.' Opp'n at 22.

Plaintiffs submit the Court has the authority to impose both declaratory and injunctive relief against the President, noting that the Supreme Court has "long held" that federal courts "ha[ve] the authority to determine whether [the President] has acted within the law." Pls.' Opp'n at 56 (quoting *Clinton v. Jones*, 520 U.S. 681, 703 (1997)). This includes "the power to restrain unconstitutional presidential action" through injunctive and declaratory relief. *Id.* (citing *Franklin*

*v. Massachusetts*, 505 U.S. 788, 803 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 584 (1952)). According to Plaintiffs, the fact that the President is the sole defendant in this

case does not change the analysis, since this is "one of those rare instances when only injunctive

relief against the President himself will redress [the plaintiffs'] injury." *Id.* (quoting *Swan v.

Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996)). While acknowledging that in different contexts the

Supreme Court has stated that courts may not enjoin the President in the performance of "official

duties," Plaintiffs note that it has distinguished ministerial duties—involving simple,

non-discretionary actions—where injunctive relief may be appropriate. *Id.* at 58-59 (citing

*Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867)). In a similar vein, if injunctive relief were

granted in this case, Plaintiffs argue that no official duties would be implicated. Rather, the

injunction would simply prevent the President from receiving monies to which, under the

Constitution, he is not entitled to and which he is receiving through his private

businesses—something not even "colorably within the powers of the President." Hr'g Tr. at 168.

In any event, Plaintiffs emphasize that the requested declaratory relief is capable of providing

sufficient redress, Pls.' Opp'n at 57, "by resolving the quintessential controversy the Declaratory

Judgments Acts was intended to remedy." Hr'g Tr. at 16. In short, Plaintiffs say the Court is able to

resolve this controversy merely by declaring which of the parties is correct on the law. *Id.*

    The President maintains that Plaintiffs' alleged injuries are not "likely to be redressed" by a

court order: First because it is highly speculative that third-party government consumers would

stop patronizing the Hotel even if Plaintiffs prevailed on their claims. Any hypothetical injunction,

therefore, would not cure the competition of which Plaintiffs complain. Def.'s Mot. Dismiss at 16.

Second, the President submits that the Court lacks authority to issue an injunction against him in

the performance of his official duties. *Id.* at 54 (citing *Mississippi v. Johnson*, 71 U.S. (4 Wall.)

475 (1867); *Franklin v. Massachusetts*, 505 U.S. 788 (1992)). While the President concedes that

the Supreme Court has left open the question of whether a court may enjoin the President in the

performance of ministerial duties, he maintains that the requested relief is far afield of ministerial.

An injunction regarding the President's finances, he says, would require significant judgment,

planning, and discretion. Def.'s Reply at 29. And even assuming his actions were only ministerial

in nature, he says, no court has ever issued an injunction against a President in his official capacity

when he was the sole defendant. *Id.* He urges the Court to exercise similar restraint here.

The President also argues the Court lacks authority to issue a declaratory judgment. In

support of this proposition, he relies primarily on a statement in Justice Scalia's *concurring*

opinion in *Franklin v. Massachusetts*. *See* 505 U.S. 788, 829 (1992) (Scalia, J., concurring) ("[The

Court] cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief

against appellant President Bush, and since [the Court] ha[s] no power to do that," the "appellees'

constitutional claims should be dismissed."). Apart from the unconstitutionality of the relief

Plaintiffs seek, the President says, if the Court were to only issue declaratory relief, it would

amount to an impermissible advisory opinion. Hr'g Tr. at 100, 171.

The Court does not believe that the requested injunctive or declaratory relief would violate

the separation of powers doctrine. Language from later Supreme Court cases runs directly contrary

to the quoted statement of Justice Scalia in *Franklin*. Six years after Justice Scalia's statement in

*Franklin,* in *Clinton v. New York*, the Supreme Court expressly stated that a declaratory judgment

against the President could redress the plaintiff's injuries. *See Clinton v. New York*, 524 U.S. 417,

433 n.22 (1998) (noting that, having found an injury-in-fact, traceability and redressability were

"easily satisfied" because "each injury is traceable to the President's cancellation of [certain act

provisions], and [it] would be redressed by a declaratory judgment that the cancellations are

invalid."); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 780-81 (1982) (White, J., dissenting)

("Neither can there be a serious claim that the separation-of-powers doctrine insulates Presidential

action from judicial review or insulates the President from judicial process. No argument is made

here that the President, whatever his liability for money damages, is not subject to the courts'

injunctive powers. . . . Indeed, . . . it is the rule, not the exception, that executive

actions—including those taken at the immediate direction of the President—are subject to judicial

review. Regardless of the possibility of money damages against the President, then, the

constitutionality of the President's actions or their legality under the applicable statutes can and

will be subject to review.") (internal footnote and citations omitted).

The Court also disagrees that the President's status as the sole defendant changes this

analysis, given that no official other than he could be sued to enforce the purported violations at

issue. "[I]t would be exalting form over substance if the President's acts were held to be beyond

the reach of judicial scrutiny when he himself is the defendant, but held within judicial control

when he and/or the Congress has delegated the performance of duties to federal officials

subordinate to the President and one or more of them can be named as a defendant." *Nat'l Treasury

Emps.Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974). While the Court is not prepared to say

at this juncture what precise form injunctive relief, if any, could take, what seems entirely

plausible is that an appropriate injunction of some sort could be fashioned, were Plaintiffs to

succeed on the merits. *See* Hr'g Tr. at 149-52 (discussing possible injunction options).

In any event, it is entirely possible, as Plaintiffs suggest, that a declaratory judgment alone

could redress the injury, leaving it to the President to determine in good faith how he might comply

with it. The Court sees no barrier to its authority to grant either injunctive or declaratory relief.

There is yet another observation to be made with respect to the redressability argument. As the Supreme Court reiterated in *Massachusetts v. EPA*, if the injury can be "reduced to some extent," then a plaintiff has met the redressability prong for standing. *Massachusetts v. EPA*, 549 U.S. at 525-26 & n. 23. Again, it is true that the Court cannot prevent any and all third party foreign or domestic government actors from patronizing the Hotel, but that continues to miss the point. The ultimate issue is not a flat prohibition against such patronage by foreign or domestic states, but whether "to some extent" their incentive to cater to the President will be reduced if he can no longer receive the benefits which, through the Hotel, he currently derives. All of this is to say that Plaintiffs' injuries are likely to be redressed by a favorable court decision.

* * *

Summarizing the Court's holding as to Article III standing, Plaintiffs have alleged injuries-in-fact to their quasi-sovereign, proprietary, and *parens patriae* interests that are concrete and particularized, actual and imminent. Those injuries are fairly traceable to the President's purported conduct and are likely to be redressed by the Court through appropriate injunctive and declaratory relief if Plaintiffs succeed on the merits.

Plaintiffs have successfully cleared the first and primary hurdle for Article III standing.

Even so, an important question remains: What is it exactly that Plaintiffs have standing to challenge?

Plaintiffs assert that the President's actions have violated the Emoluments Clauses in many ways, not only with respect to the operations of the Hotel in the District of Columbia, but also through Trump Organization operations all over the United States, indeed around the world. But because Plaintiffs have to establish standing as to all claims made, *see DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006), the Court specifically inquired at oral argument which claims the

Plaintiffs believe extend beyond the Hotel. Plaintiffs conceded that their competitive injuries (i.e., to their proprietary and *parens patriae* interests) were limited to the District of Columbia-based Hotel. Hr'g Tr. at 62-63. But they went on to contend their sovereign and quasi-sovereign interests were essentially boundless, *id.*, the implication being that the injury to these interests was sustained on the basis of Trump Organization operations everywhere and anywhere, e.g., whether in the District of Columbia, in Florida, in China, or elsewhere. *See id.*

The Court finds that Plaintiffs' claims sweep too broadly. There is good reason why their standing should be recognized *vis-à-vis* the Hotel in Washington D.C., given the immediate impact on Plaintiffs in respect to the Hotel's operations. It is a considerable stretch, however, to find the requisite injury-in-fact to these particular Plaintiffs that is traceable to the Trump Organization's or, through it, the President's conduct outside the District of Columbia. How indeed, for instance, have Maryland or the District of Columbia suffered and how are they suffering immediate or impending injury as a result of whatever benefits the President might be deriving from foreign and state government patronage at the Trump Organization's Mar-a-Lago property in Florida or in the grant of patents to the Trump Organization or Trump relatives by China? In this respect, the Court, quite simply, sees neither immediate nor impending harm to Plaintiffs. Hence, the Court finds that these particular Plaintiffs lack standing to challenge the operations of the Trump Organization or the benefits the President may receive from its operations outside the District of Columbia. But to be perfectly clear: The Court reaches this conclusion only with respect to these Plaintiffs and the particular facts of the present case. This is in no way meant to say that other States or other businesses or individuals immediately affected by the same sort of violations alleged in the case at bar, e.g., a major hotel competitor in Palm Beach (near Mar-a-Lago) or indeed a hotel competitor

anywhere in the State of Florida, might not have standing to pursue litigation similar to that which is in process here.

## IV.    PRUDENTIAL STANDING

In addition to the Article III requirements, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). Prudential standing is a doctrine "not exhaustively defined," but includes "the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches" and "the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).

The President argues that these prudential standing requirements bar Plaintiffs' claims, even if they arguably satisfy Article III.

### A.  Zone of Interests

Whether a plaintiff comes within the "zone of interests" protected by the law invoked "is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id*. at 1387; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1307 (2017). Though first formulated in a case brought under the Administrative Procedure Act, the Supreme Court has since made clear "that it applies to all statutorily created causes of action." *Lexmark*, 134 S. Ct. at 1388. However, "[t]he test is not meant to be especially demanding." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

As an initial matter, Plaintiffs question whether the test even continues to exist, following the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377 (2014), where the court termed the label prudential standing "inapt." Pls.' Opp'n at 53.

In any event, Plaintiffs argue that, if the test does apply, they fall squarely within the zone of interests of the Emoluments Clauses. *Id.* at 53-54. The Domestic Clause, they say, specifically mentions the "United States" and "any of them." Maryland and by implication the District of Columbia are clearly within the zone of interests of that Clause. The Foreign Emoluments Clause is meant to preserve presidential independence and prevent corruption. Their claims, they say, are at the "heart" of what both Clauses are intended to protect, and if for any reason they would be deemed not to fall within the zone of interests of the Clauses, then it is likely no one ever would—a conclusion they urge this Court to reject. *Id.* at 54.

Finally, Plaintiffs argue that they are entitled to pursue an equitable action under the Emoluments Clauses. They submit that courts have long allowed suits to enjoin unconstitutional actions by public officials even where plaintiffs are not preemptively asserting a defense to a pre-enforcement action. *Id.* at 51. This is true, they contend, with respect to allegations of violations of the Constitution's structural provisions. *Id.* at 52 (citing *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010)).

The President disputes any suggestion that *Lexmark* abrogated the zone of interests test, citing cases in which courts have continued to apply the test post-*Lexmark.* Def.'s Reply at 15-16. He urges the Court to adopt the interpretation set forth by Judge Daniels in *CREW et al. v. Trump*, No. 17-cv-458 (S.D.N.Y. Dec. 21, 2017), namely that the history of the Emoluments Clauses indicates that they were not meant to protect commercial competitors so that a plaintiff asserting

such a competitive injury necessarily falls outside the zone. Hr'g Tr. at 125-126. But, says the President, to the extent the Emoluments Clauses "could be seen to create a private right," Plaintiffs fall outside the zone of interests, which "serve[s] to limit the role of the courts in resolving public disputes" by asking "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Def.'s Mot. Dismiss at 28 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

Further, while conceding that the Supreme Court has not limited equitable causes of action against federal officers solely to the pre-enforcement context, the President submits that this case is not a proper suit for the grant of equitable relief. *Id*. at 26-27; Def.'s Reply at 14. He disputes that Plaintiffs are not preemptively asserting a defense to a potential enforcement action. Def.'s Mot. Dismiss at 27. Plaintiffs, he says, are not "exposed to regulation or enforcement action by the President's alleged receipt of prohibited emoluments." Def.'s Reply at 15.

The Court need not engage the issue of whether the zone of interests test has been abandoned. Assuming it has not been, the Court finds that Plaintiffs fall within the zone of interests of the Emoluments Clauses. The Court disagrees with the conclusion reached by Judge Daniels in *CREW et al. v. Trump*, No. 17-cv-458, that the draftsmen of the Constitution did not have competitors in mind when they composed the Emoluments Clauses, with the implication that no competitors anywhere are ever within the zone of interests of the Clauses. But the Emoluments Clauses clearly were and are meant to protect all Americans. The President concedes as much. Hr'g Tr. at 126-27. That being so, there is no reason why Plaintiffs, a subset of Americans who have demonstrated present injury or the immediate likelihood of injury by reason of the President's purported violations of the Emoluments Clauses, should be prevented from challenging what might be the President's serious disregard of the Constitution. Under the

-41-

President's interpretation, it would seem that no one—save Congress which, as discussed momentarily, may never undertake to act—would ever be able to enforce these constitutional provisions.

The Court sees no problem in invoking its equitable jurisdiction here. Precedent makes clear that a plaintiff may bring claims to enjoin unconstitutional actions by federal officials and that they may do so to prevent violation of a structural provision of the Constitution. *See, e.g.*, *Bond v. United States*, 564 U.S. 211, 225-26 (2011) ("[W]here the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the federal structure of our Government."); *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (noting that the Government offered no reason or authority for why an Appointments Clause or separation of powers claim should be treated differently than any other constitutional claim in granting equitable relief) (citing *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 74 (2001) ("[E]quitable relief 'has long been recognized as the proper means for preventing entities from acting unconstitutionally.'")). Though the President attempts to draw a distinction based on the cases exposing a plaintiff to a potential enforcement action, he cites no support for the proposition to the effect that equitable relief is limited solely to that context. Indeed, to the contrary, the Court sees a strong parallel between cases where "Congress allegedly exceeded the limits on its legislative power in a manner that exposed plaintiffs to injurious regulation," Def.'s Reply at 14, and the present case, where the President is allegedly violating constitutional provisions in a way that exposes Plaintiffs to injurious illegal economic competition.

The Court finds that Plaintiffs fall within the zone of interests of the Emoluments Clauses for prudential standing purposes.

### B. Political Question

The "political question" doctrine provides another "narrow exception" to the rule that the "[j]udiciary has a responsibility to decide cases properly before it." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-195 (2012). A case "involves a political question . . . where there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Id.* at 195 (quoting *Nixon v. United States,* 506 U.S. 224, 228 (1993)). In such cases, a "court lacks authority to decide the dispute" even if a plaintiff meets other standing requirements. *Id.*

Plaintiffs say the political question doctrine does not apply and that the Court may properly resolve this case. Initially, they point out that only the Foreign Emoluments Clause mentions Congress, whereas the Domestic Emoluments Clause contains no such provision. Pls.' Opp'n at 54. To the extent the Domestic Emoluments Clause gives States a cause of action, it is direct. Congress has no role to play. And, say Plaintiffs, even though the Foreign Emoluments Clause allows Congress to approve receipt of emoluments, this does not remove the issue from the scope of judicial review, citing several cases the Supreme Court has decided which involved similar consent-of Congress provisions. *See id.* (citing *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 6 (2009) (Tonnage Clause); *Dep't of Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 342-43 (1964) (Export-Import Clause); *Canton R. Co. v. Rogan*, 340 U.S. 511 (1951) (same)). The President's reading of the Foreign Emoluments Clause, Plaintiffs argue, would turn the Clause "on its head," by essentially allowing the President to receive an unending stream of "emoluments" until such time, if ever, Congress might stir to action and ban them. *Id.* at 55. The mere potential for Congressional action, they say, should not warrant a departure from the rule that "a federal

court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.*
(citing *Susan B. Anthony List*, 134 S. Ct. at 2347).

The President maintains that Congress is better equipped to address whether his actions
violate the Foreign Emoluments Clause since the Constitution specifically vests in Congress the
power to waive Foreign Emoluments Clause restrictions. Def.'s Mot. Dismiss at 29. With regard to
the Domestic Emoluments Clause he argues that "[e]quity counsels restraint in abrogating
centuries-long tradition of resolving emoluments-related issues through these political processes."
*Id.*

On this issue, Plaintiffs prevail. The political question doctrine does not impede court
action in this case.

First, of course, the Domestic Emoluments Clause clearly does not assign any oversight
role to Congress or any other entity. Insofar as a State has a right to pursue a violation of the
Clause, it may do so directly and Congress has nary a say about it.

As for the Foreign Emoluments Clause granting Congress the power to consent to receipt
of certain "emoluments," the language of the Clause is not "a textually demonstrable constitutional
commitment of the issue to a coordinate political department." *Zivotofsky*, 566 U.S. at 195. If that
were so, the Supreme Court would not have decided other cases involving constitutional
provisions containing similar consent-of Congress provisions. *See, e.g., Polar Tankers, Inc. v. City
of Valdez*, 557 U.S. 1, 6 (2009) (reaching the merits of a Tonnage Clause challenge); *Dep't of
Revenue v. James B. Beam Distilling Co.*, 377 U.S. 341, 342–43 (1964) (holding that the tax in
question violated the Export-Import Clause). The President cites no authority to the contrary.

Also absent in this case is "a lack of judicially discoverable and manageable standards for
resolving" this issue, which might otherwise call into play the political question doctrine.

*Zivotofsky*, 566 U.S. at 195. It is well settled that courts have authority to determine whether the

President "has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997); *see also Nixon v.*

*Fitzgerald*, 457 U.S. at 753–54 ("It is settled law that the separation-of-powers doctrine does not

bar every exercise of jurisdiction over the President of the United States"). A plain reading of the

Foreign Emoluments Clause compels the conclusion that receiving emoluments, as have been

provisionally defined here, is impermissible unless and until Congress consents.[18]  Accordingly, in

absence of Congressional approval, this Court holds that it may review the actions of the President

to determine if they comply with the law. The Court is satisfied that this case "requires careful

examination of the textual, structural, and historical evidence put forward by the parties," which,

after all is "what courts do."  *Zivotofsky*, 566 U.S. at 201.

The political question doctrine does not bar judicial review in this case.

## V.      CONCLUSION

Plaintiffs have sufficiently alleged that the President is violating the Foreign and Domestic

Emoluments Clauses of the Constitution by reason of his involvement with and receipt of benefits

from the Trump International Hotel and its appurtenances in Washington, D.C. as well as the

operations of the Trump Organization with respect to the same. Plaintiffs have demonstrated their

standing to challenge those purported violations because they have shown injury-in-fact, fairly

traceable to the President's acts, and that the injury is likely redressable by the Court. Neither

prudential considerations of standing nor the political question doctrine preclude this conclusion.

The Court, however, given the particular allegations of this suit, finds that Plaintiffs lack standing

to challenge possible constitutional violations by the President involving operations of the Trump

---

[18]  The thrust of the President's argument that only Congress can act is particularly concerning. Suppose a majority (simple? two-thirds?) of Congress (the House? the Senate? both?) is controlled by one party—that of the President. And suppose the Congress never undertakes to approve or disapprove the President's receipt of such "emoluments." The President could continue to receive unlimited "emoluments" from foreign and state governments without the least oversight and with absolute impunity.

Organization outside the District of Columbia from which the President may receive personal benefits.

For the foregoing reasons, the President's Motion to Dismiss the suit is **DENIED-IN-PART** insofar as it disputes Plaintiffs' standing to challenge the involvement of the President with respect to the Trump International Hotel in Washington, D.C. and its appurtenances and any and all operations of the Trump Organization with respect to the same. The Motion to Dismiss is **GRANTED-IN-PART WITHOUT PREJUDICE** as to the operations of the Trump Organization and the President's involvement in the same outside the District of Columbia. The Court's ruling on Defendant's Motion to Dismiss is **DEFERRED-IN-PART** in that the Court has yet to rule on the remaining arguments regarding the meaning of the Emoluments Clauses and whether Plaintiffs have otherwise stated claims under the Clauses.

A further hearing to consider the President's remaining arguments will be set in consultation with counsel.

A separate Order will **ISSUE.**

 

 

                                                    **/s/**
                                      **PETER J. MESSITTE**
                              **UNITED STATES DISTRICT JUDGE**

**March 28, 2018**