# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> Defendant. | No. 17 Civ. 1154-EGS |

---

## MOTION FOR CLARIFICATION BY AMICI CURIAE SCHOLAR
## SETH BARRETT TILLMAN AND THE JUDICIAL EDUCATION PROJECT

---

Amici Curiae Scholar Seth Barrett Tillman and the Judicial Education Project ("Amici") respectfully move for clarification of this Court's March 30, 2018, Minute Order [ECF No. 62]. The Order provides: "The parties are directed to respond, by no later than April 30, 2018, to any arguments raised by amici that have not been addressed by the parties in their briefs. The response shall be a consolidated response to all amicus curiae briefs of no more than 45 pages."[1]

---

[1] This Court's order resembles a similar order issued by the Honorable Peter J. Messitte in parallel Foreign Emoluments Clause litigation before the United States District Court for the District of Maryland, Civil No. 8:17-cv-01596-PJM. [Exhibit A, ECF No. 63]. In that case, Amici Curiae Scholar Seth Barrett Tillman and the Judicial Education Project filed a Motion for Clarification, inquiring whether the Court sought a response from Amici Curiae supporting the defendant. [Exhibit B, ECF No. 71]. Judge Messitte invited "responses to any of the *amici curiae* briefs from any party or *amicus curiae* who wishes to respond." [Exhibit C, ECF No. 72 (emphasis added)]. Amici submitted a response, which addressed two issues that were not addressed by either the Plaintiff or the Defendants: whether the complaint was properly pleaded against the President in his official capacity, and whether the Foreign Emoluments Clause applies to the President. [Exhibit D, ECF No. 77]. During oral arguments, Judge Messitte referenced Amici's argument concerning the appropriateness of the official capacity suit. Subsequently, Plaintiffs amended their complaint to include a claim against the President in his individual capacity. [Exhibit E, ECF No. 90]. The same two issues—the distinction between an individual and an official capacity suit, and the applicability of the Foreign Emoluments Clause to the President—have likewise gone unaddressed by the parties in the instant litigation before this Court. If appropriate, Amici would be able to submit a similar pleading. [*See, e.g.*, Exhibit E, ECF No. 90].

We respectfully submit a question for this Court's consideration: Does this order invite only actual parties to respond, or does the order also invite Amici Curiae supporting the Defendant (and other amici) to respond to "any arguments raised by amici" by April 30, 2018?

Undersigned counsel are grateful for the Court's consideration of this motion.

Dated: New York, New York
      April 13, 2018

                    Respectfully submitted,

               By:  /s/ Robert W. Ray
                    Robert W. Ray
                    D.C. Bar No. 401377
                    THOMPSON & KNIGHT LLP
                    900 Third Avenue, 20th Floor
                    New York, New York 10022
                    Telephone: (212) 751-3349
                    Email: robert.ray@tklaw.com
                    *Co-Counsel for Amicus Curiae*
                    *Scholar Seth Barrett Tillman*

                    Josh Blackman
                      Admission *pro hac vice* pending
                    1303 San Jacinto Street
                    Houston, Texas 77002
                    Telephone: (202) 294-9003
                    Email: Josh@JoshBlackman.com
                    *Counsel for Amicus Curiae*
                    *Scholar Seth Barrett Tillman*

                    Carrie Severino
                    D.C. Bar No. 982084
                    Judicial Education Project
                    722 12th St., N.W., Fourth Floor
                    Washington, D.C. 20005
                    Telephone: (571) 357-3134
                    Email: carrie@judicialnetwork.com
                    *Counsel for Amicus Curiae*
                    *Judicial Education Project*

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**PETER J. MESSITTE**  
**UNITED STATES DISTRICT JUDGE**

6500 CHERRYWOOD LANE  
GREENBELT, MARYLAND  20770  
301-344-0632

## MEMORANDUM

TO:           Counsel of Record

FROM:        Judge Peter J. Messitte

RE:           The District of Columbia et al. v. Trump  
                  Civil No. PJM 17-1596

DATE:       November 28, 2017

\* \* \*

On November 14, 2017, several Motions for Leave to File *Amici Curiae* Briefs in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss were filed. They include briefs from: Former Government Ethics Officers (ECF No. 50); Sarah P. Chayes (ECF No. 55); Administrative Law, Constitutional Law, and Federal Courts Scholars (ECF No. 56); Former National Security Officials (ECF No. 57); and Certain Legal Historians (ECF No. 58). Because Plaintiffs have consented to the filing of the briefs and Defendant has taken no position, the Motions, ECF Nos. 50, 55, 56, 57, 58, are **GRANTED.**

A hearing on Defendant's Motion to Dismiss is set for January 25, 2018. The Motions requesting leave to file the *amici curiae* briefs were all accompanied by the proposed briefs. Accordingly, the deadline to respond to any *amici curiae* brief is December 29, 2017. Any party that wishes to file a reply must do so by January 16, 2018.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

                          /s/  
                      PETER J. MESSITTE  
                UNITED STATES DISTRICT JUDGE

cc:       Court File

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**Greenbelt Division**

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA and<br>State of MARYLAND,<br><br>                              *Plaintiffs,*<br><br>v.<br><br>DONALD J. TRUMP,<br>in his official capacity as President of the United<br>States of America,<br><br>                              Defendant. | No. 8:17-CV-01596-PJM |

---

### MOTION FOR CLARIFICATION

---

Amici Curiae Scholar Seth Barrett Tillman and the Judicial Education Project (Amici)

respectfully move for clarification of this Court's November 28, 2017, Order [ECF No. 63]. The

order provides, in part:

> The Motions requesting leave to file the amici curiae briefs were all accompanied by the
> proposed briefs. Accordingly, the deadline to respond to any amici curiae brief is De-
> cember 29, 2017. Any party that wishes to file a reply must do so by January 16, 2018.

We respectfully submit two questions for this Court's consideration:

1. Does this order invite Amici Curiae supporting the Defendant to respond to "any amici
   curiae brief" supporting the Plaintiffs by December 29, 2017?
2. Does this order invite Amici Curiae supporting the Plaintiffs ("Any party") to file a reply
   on January 16, 2018, to any response filed by Amici Curiae supporting the Defendant on
   December 29, 2017?

Undersigned counsel are grateful for the Court's consideration of this motion.

Dated: Baltimore, Maryland
          December 11, 2017

Respectfully submitted,

By:

/s/ Jan I. Berlage
Jan I. Berlage
Gohn Hankey Stichel & Berlage LLP
201 North Charles Street
Suite 2101
Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com

Robert W. Ray
  Admission *pro hac vice* pending
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3349
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Josh Blackman
  Admission *pro hac vice* pending
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Carrie Severino
  Admission *pro hac vice* pending
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2017, I caused a true and correct copy of the fore-
going to be served on all counsel of record through the Court's CM/ECF system.

/s/ Jan I. Berlage
Jan I. Berlage, Esq.

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

**PETER J. MESSITTE**                                      6500 CHERRYWOOD LANE
**UNITED STATES DISTRICT JUDGE**                    GREENBELT, MARYLAND  20770
                                                                          301-344-0632

<u>MEMORANDUM</u>

TO:          Counsel of Record

FROM:      Judge Peter J. Messitte

RE:          <u>The District of Columbia et al. v. Trump</u>
              Civil No. PJM 17-1596

DATE:      December 14, 2017

* * *

The Court is in receipt of *Amici Curiae* Seth Barrett Tillman's and Judicial Education Project's Motion for Clarification of the Court's November 28, 2017, Order. ECF No. 71. This Memorandum serves as a clarification of that Order.

The Court's Order invites responses to any of the *amici curiae* briefs from any party or *amicus curiae* who wishes to respond.  The deadline to respond remains December 29, 2017. Likewise, the Order invites replies to those responses from any party or *amicus curiae* who wishes to do so. The deadline for any replies remains January 16, 2018.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly.

                                                   /s/
                                          PETER J. MESSITTE
                                          UNITED STATES DISTRICT JUDGE

cc:      Court File

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA and THE STATE OF MARYLAND, | No. 8:17-CV-01596-PJM |
| *Plaintiffs*, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, | |
| *Defendant*. | |

---

## CORRECTED RESPONSE OF SCHOLAR SETH BARRETT TILLMAN AND THE JUDICIAL EDUCATION PROJECT AS *AMICI CURIAE* IN SUPPORT OF THE DEFENDANT

---

Robert W. Ray, Esq.
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Tel. (212) 751-3347
robert.ray@tklaw.com
*Co-Counsel for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Josh Blackman
1303 San Jacinto Street
Houston, Texas 77002
Tel. (202) 294-9003
Josh@joshBlackman.com
*Counsel of Record for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Tel. (571) 357-3134
carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

Jan I. Berlage
Gohn Hankey Stichel & Berlage LLP
201 North Charles Street
Suite 2101
Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................ 1

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................ 2

I.   The Plaintiffs' Complaint, Which Is Pleaded Against the President in His Official
     Capacity, Exclusively Concerns Trump's Private Conduct ............................... 2

     A.   Not Every Action Taken by the President is Presidential Action in His Official
          Capacity .......................................................................................................... 2

     B.   This Suit, Which Could Not Continue Against the President's Successor,
          Cannot Be Brought Against the President in His Official Capacity ........................ 3

     C.   The Plaintiffs' Amici Disregard *Lewis v. Clarke* and its Antecedent Cases ............. 5

II.  Plaintiffs' Amici Failed to Establish That the Foreign Emoluments Clause Applies
     to the President .................................................................................................. 7

     A.   "The Government Has Not Conceded That The President Is Subject to the
          Foreign Emoluments Clause" ........................................................................... 9

     B.   The Office of Legal Counsel Showed No Awareness of the Historical Evidence
          Concerning The Scope of the Foreign Emoluments Clause ..................................... 9

          1.   Evidence from Presidents Jackson and His Successors Does Not Resolve the
               Scope of the Foreign Emoluments Clause ......................................................... 10

          2.   Washington and His Successors During the Early Republic Openly
               Accepted Foreign Gifts Without Seeking Congressional Consent ..................... 12

          3.   Disputed Assertions of Power by Washington and His Successors Are More
               Probative About the Scope of the Foreign Emoluments Clause Than
               Voluntary Acquiescence by Post-Jackson Presidencies ..................................... 14

     C.   The Foreign Gifts and Decorations Act, Which Also Applies to "Spouse[s]" of
          Federal Officers, Cannot Be Justified Based Solely on The Foreign Emoluments
          Clause ............................................................................................................. 18

     D.   Plaintiffs' Amici Fail to Address the "Office . . . Under" Parliamentary Drafting
          Convention, Which Applies to Appointed Officials ......................................... 19

          1.   The Legal Historians' Brief Cites Alexander Hamilton's Official
               Communications to Define "Emoluments," but Not to Understand "Office .
               . . Under the United States" ........................................................................... 20

          2.   The Legal Historians Cite Statements from a Member of the First Congress
               to Interpret the Foreign Emoluments Clause, but Ignore An Anti-Bribery
               Law Passed by the First Congress ..................................................................... 24

i

3.    The Legal Historians Cite Joseph Story's *Commentaries* to Interpret the
       Foreign Emoluments Clause, but Ignore His Analysis of the Scope of
       "Office . . . under the United States"............................................................. 26

4.    The Legal Historians Discuss British Parliamentary Practice, but Ignore the
       Settled Meaning of the "Office . . . Under" Drafting Convention ................... 27

5.    The Legal Historians Focus on Advocacy from Mason and Randolph, and
       Ignore the Weight of Evidence to the Contrary from the Early Republic ....... 30

CONCLUSION .................................................................................................................... 33

# TABLE OF AUTHORITIES

**Federal Cases**

Calder v. Bull,
   3 U.S. (3 Dall.) 386 (1798) .................................................................. 29

Clinton v. City of N.Y.,
   524 U.S. 417 (1998).......................................................................... 17

Clinton v. Jones,
   520 U.S. 681 (1997)..................................................................... 3, 6, 7

CREW v. Donald J. Trump, in his Official Capacity as President of the United States,
   No. 1:17-cv-00458-GBD (S.D.N.Y. Aug. 11, 2017) ................................... 8

Dames & Moore v. Regan,
   453 U.S. 654 (1981).......................................................................... 17

District of Columbia v. Trump.......................................................... 5, 16

Free Enter. Fund v. PCAOB,
   561 U.S. 477 (2010).......................................................................... 17

Freytag v. C.I.R.,
   501 U.S. 868 (1991).................................................................... 16, 17

Goldwater v. Carter,
   444 U.S. 996 (1979).......................................................................... 19

Hafer v. Melo,
   502 U.S. 21 (1991)............................................................................. 5

Hodel v Cruckshank,
   3 Queensland L.J. 140 (Qld. 1889) ...................................................... 30

I.N.S. v. Chadha,
   462 U.S. 919 (1983).......................................................................... 16

Jones v. Clinton,
   72 F.3d 1354 (8th Cir. 1996) ................................................................ 7

Larson v. Domestic & Foreign Commerce Corp.,
   337 U.S. 682 (1949)............................................................................ 4

Lewis v. Clarke,
   137 S. Ct. 1285 (2017)................................................................ passim

McPherson v. Blacker,
   146 U.S. 1 (1892)............................................................................. 17

Myers v. United States,
   272 U.S. 52 (1926)..................................................................... 16, 27

Nixon v. Fitzgerald,
   457 U.S. 731 (1982)..................................................................... 3, 6, 7

NLRB v. Noel Canning,
   134 S. Ct. 2550 (2014) ................................................................ 17, 19, 20

Powell v. McCormack,
   395 U.S. 486 (1969) ............................................................................ 26

The Pocket Veto Case,
   279 U.S. 655 (1929) ..................................................................... 19, 20

R v. Obeid (No 2)
   [2015] New South Wales Supreme Court 1380 [30] ......................... 30

Schell v. Fauche,
   138 U.S. 562 (1891) ............................................................................ 16

South Carolina v. United States,
   199 U.S. 437 (1905) ............................................................................ 33

Stuart v. Laird,
   5 U.S. 299 (1803) .............................................................................. 17

United States v. Burr,
   25 F. Cas. 30 (No.14,692d) (C.C.D. Va. 1807) ................................. 3

United States v. Lopez,
   514 U.S. 549 (1995) ............................................................................ 20

United States v. Morrison,
   529 U.S. 598 (2000) ............................................................................ 20

Youngstown Sheet & Tube Co v. Sawyer,
   343 U.S. 579 (1952) ..................................................................... 17, 20

Zivotofsky v. Kerry,
   135 S. Ct. 2076 (2015) ........................................................................ 9

**Constitutional Provisions**

U.S. CONST. art. I, § 10, cl. 1 .................................................................. 29

U.S. CONST. art. I, § 6. cl. 2 .................................................................... 22

U.S. CONST. art. II, § 2, cl. 2 ............................................................ 27, 28

U.S. CONST. art. II, § 3 ............................................................................ 27

U.S. CONST. art. II, § 4 ............................................................................ 27

U.S. CONST. art. VI, cl. 3 ........................................................................ 27

**Federal Statutes**

5 U.S.C. § 7342(a)(1)(A)–(D) .................................................................. 19

5 U.S.C. § 7342(a)(1)(E) ..................................................................... 8, 19

5 U.S.C. § 7342(a)(1)(G) .......................................................................... 20

## Other Authorities

1 American State Papers/Miscellaneous, Index ii (1834) ............................................. 25

1 Joseph Story, Commentaries on the Constitution of the United States 577 (reprint 1891)
(1833) ....................................................................................................................... 27

1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry) ........................ 21

1 The Writings of James Monroe 1778–1794 (1788) .................................................... 33

14 Abridgment of the Deb. of Cong. 140 (1860) ......................................................... 11

14 The Papers of Alexander Hamilton, 157 (1969) ...................................................... 21

3 Debates in the Several State Conventions 222 (Jonathan Elliot ed., 2d ed. 1836) ........ 33

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution
(2d ed. 1836) (Mason's position) ...................................................................... 32, 33

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution
(2d ed. 1836) (Randolph's position) ........................................................................ 32

8 Annals of Cong. 2319 (1799), perma.cc/EB4H-TDE8 .............................................. 34

A List of Treasury Reports and Circulars Issued by Alexander Hamilton, 1789–1795
(Paul Leicester Ford ed., Brooklyn 1886) ................................................................ 23

A Register of Officers and Agents, Civil, Military, and Naval, in the Service of the United
States on the Thirteenth Day of September, 1817 (Washington, E. De Krafft 1818) ............. 25

Adam Liptak, 'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal
Storm, N.Y. TIMES (Sept. 25, 2017) ......................................................................... 24

André Maurois, Adrienne: The Life of the Marquise De La Fayette 178 (1961); A
Complete History of the Marquis De Lafayette 193 (1826) ........................................ 13

Anne Twomey, The Constitution of New South Wales 438 (2004) ............................... 30

Blount, the Senate Never Said That Senators Aren't Impeachable, 22 QUINNIPIAC L. REV.
33 (2014) ................................................................................................................ 34

Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as Amici Curiae
in Support of the Defendant, [ECF No. 27-1] ............................................................. 9

Brief of Amici Curiae Administrative Law, Constitutional Law, and Federal Courts
Scholars in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss .................... 2

Brief of Amicus Curiae by Certain Legal Historians On Behalf of Plaintiffs in his Official
Capacity as President of the United States, No. 1:17-cv-00458-GBD (S.D.N.Y. Aug.
11, 2017) ................................................................................................................ 15

Brief of Former Government Ethics Officers as Amici Curiae Supporting Plaintiffs,
[ECF No. 50] ........................................................................................................... 10

Brief of Former National Security Officials as Amici Curiae in Support of Plaintiffs'
Opposition to Defendants' Motion to Dismiss, [ECF No. 57-1 ....................................... 19

Elizabeth Chew, Unpacking Jefferson's Indian Hall, Discovering Lewis & Clark,
   perma.cc/658Z-WN5S ....................................................................................... 13

E-mail from Martyn Atkins, U.K. House of Commons Clerk (Procedure Committee) to
   Seth Barrett Tillman (Sept. 11, 2017), bit.ly/2xy0qXK ............................................ 31

Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790 ................................................ 13

Gautham Rao & Jed Handelsman Shugerman, Presidential Revisionism: The New York
   Times published the flimsiest defense of Trump's apparent emoluments violations yet.,
   SLATE (July 17, 2017) .................................................................................... 22

Gifts from Foreign Dignitaries, Monticello, perma.cc/C26E-X23E ................................ 13

House Documents, (May 10, 1844), bit.ly/2rsttt9 ........................................................ 11

J.L. De Lolme, The Constitution of England 62 (1775), bit.ly/2sl1yeK ......................... 30

Jack Maskell, CRS, Conflict of Interest and "Ethics" Provisions That May Apply to the
   President, 2 (Nov. 22, 2016), bit.ly/2teGovc ........................................................... 14

Jack Maskell, CRS, Gifts to the President of the U.S., 4 (Aug. 16, 2012),
   bit.ly/2s7AVZu ............................................................................................... 14

Jed Shugerman, Our correction and apology to Professor Tillman, SHUGERBLOG (Oct. 3,
   2017), https://perma.cc/R9N9-S472 ..................................................................... 24

John P. Deeben, The Official Register of the United States, 1816-1959, National
   Archives, perma.cc/RJD6-S232 ........................................................................... 24

Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts
   from the King of Siam, 12 Stat. 616 (Mar. 15, 1862) ............................................... 12

Joint Resolution No. 39: To authorize Benjamin Harrison to accept certain medals
   presented to him while President of the United States, 29 Stat. 759 (Apr. 2, 1896) ...... 18

Jonathan Fildes, Science Probe for 'Space Pistols,' BBC NEWS (May 26, 2008) ............. 14

Jonathan R. Siegel, Suing the President: Nonstatutory Review Revisited, 97 COLUM.
   L. REV. 1612 (1997). [ECF No. 46] ........................................................................ 9

Journal of the House 484 (Washington, Gales & Seaton 1826) (entry for December 30,
   1791) ............................................................................................................. 23

Laurence H. Tribe, American Constitutional Law § 6–35 (2000) ................................ 26

Letter from A. Hamilton to G. Washington (Jan. 24, 1795), bit.ly/2C0VRVm ................. 21

Letter from A. Lincoln to Regent Capt's of the Rep. of San Marino (May 7, 1861),
   perma.cc/U2G7-3BHW ..................................................................................... 11

Letter from A. Lincoln to the King of Siam (Feb. 3, 1862), perma.cc/SU5Z-PKYQ .......... 12

Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791),
   perma.cc/5F2V-G5GU ...................................................................................... 13

Letter from Louis Guillaume Otto to Armand Marc de Montmorin (Aug. 3, 1790),
   available in Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres,
   Correspondances Politiques, 39CP, Volume 35, Microfilm P5982 ........................ 13

Letter from T. Jefferson to Levett Harris (April 18, 1806), perma.cc/3FX8-Y5TG ............... 13

Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806),
   perma.cc/QB6Z-SWSD ................................................................................ 13

Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816),
   perma.cc/D47U-V4H3 .................................................................................. 14

Letter to J. Madison from John Graham (Aug. 8, 1816),
   perma.cc/RD8B-2ASW ................................................................................. 14

Letter to Judge George B. Daniels, id. at [ECF No. 96],
   bit.ly/2gaoHsD ............................................................................................ 24

Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7,
   1804), perma.cc/4ATK-BWVN ...................................................................... 13

List Of Civil Officers Of The United States, Except Judges, With Their Emoluments,
   For The Year Ending October 1, 1792, in 1 American State Papers/Miscellaneous 57
   (1834)........................................................................................................ 24

Memorandum for the Counsel to the President, Office of Legal Counsel, Applicability of
   the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
   Receipt of the Nobel Peace Prize, 2009 WL 6365082 (Dec. 7, 2009) ...................... 8

Memorandum from David J. Barron, Act. Asst. Att'y Gen., Applicability of the
   Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
   Receipt of the Nobel Peace Prize, OLC, (Dec. 7, 2009), bit.ly/2rx6CfT ................ 10

Memorandum of Law in Support of Plaintiffs' Opposition to Motion to Dismiss,
   [ECF No. 46]................................................................................................. 3

Memorandum Opinion for the Special Assistant to the President, Office of Legal Counsel,
   Proposal That the President Accept Honorary Irish Citizenship 278 (May 10, 1963),
   https://goo.gl/CEfHeS ............................................................................... 8, 10

Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830)................... 2, 11

Motion for Leave to File Response to Brief of Amici Curiae by Certain Legal Historians,
   CREW v. Trump, 17 Civ. 458 (S.D.N.Y.), [ECF No. 85]...................................... 24

Pa. Packet & Daily Advertiser (Aug. 13, 1790), bit.ly/2r9bBiz .................................. 13

Pauline Maier, Ratification: The People Debate the Constitution, 1787–1788 (2010) ............... 32

Pistols, James Monroe 3D (on website of the James Monroe Museum),
   perma.cc/T796-ED5B ................................................................................... 14

Press Release, National Archives (Sep. 23, 1999), perma.cc/SWY9-42QN ................ 12

Report on an Account of the Receipts and Expenditures of the United States for the Year
   1792 ["The 1792 Report"], in 15 Papers of Alexander Hamilton 474 (1969)........................ 23

Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the
United States (Feb. 26, 1793) ............................................................. 21

The Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the
United States: Hearing before the Committee on the Judiciary United States Senate,
111th Cong, 2d Sess 62, at 61 (2010), bit.ly/2ptL833 ............................................. 28

Thomas Jefferson, A Manual of Parliamentary Practice for the use of the Senate of the
United States 91 (1801) (1993 GPO reproduction), bit.ly/2DKJZXG .................................... 31

Thomas Jefferson, Notes on the State of Virginia 121–29 (1784),
perma.cc/4J8S-NZX3 .............................................................................. 19

## INTEREST OF *AMICI CURIAE*

This Court "invite[d] responses to any of the *amici curiae* briefs from any party or *amicus curiae* who wishes to respond," to be filed concurrently on December 29, 2017 [ECF No. 72]. This Court further "invite[d] replies to those responses from any party or *amicus curiae* who wishes to do so," to be filed concurrently on January 16, 2018. Scholar Seth Barrett Tillman and the Judicial Education Project ("JEP") submit this response, and may file a reply on January 16, 2018, to any other responses filed. Concurrently with this filing, Tillman and JEP also seek leave to participate in oral arguments.

## PRELIMINARY STATEMENT

Tillman and JEP advanced two arguments that are fatal to Plaintiffs' case: first, Plaintiffs' lawsuit is not an official capacity lawsuit, as evidenced by the fact that it could not continue against the President's successor in office; and second, the Foreign Emoluments Clause does not apply to the President, because he does not hold an "Office of Profit or Trust *under* [the United States]." Though Plaintiffs' Amici addressed both of these issues, they did not substantively respond to contrary arguments advanced by Tillman and JEP. Assuming this Court finds that the Plaintiffs have standing, and that the case is justiciable, Tillman and JEP provide two alternate paths to conclude this case that are not advanced by the Defendant. The most straight-forward approach is to dismiss the Complaint because it should not have been lodged against Donald J. Trump in his official capacity. Nevertheless, if this Court should conclude that the official capacity suit is proper, then Count I should be dismissed because the President does not hold an "office of Profit or Trust under" the United States. Additionally, as Tillman and JEP previously explained in our opening amicus brief, business transactions for value are not "Emoluments," so Count II must be dismissed.

**ARGUMENT**

I.      **The Plaintiffs' Complaint, Which Is Pleaded Against the President in His Official Capacity, Exclusively Concerns Trump's Private Conduct**

The dispositive problem with the Plaintiffs' Complaint begins in the caption: "District of Columbia & State of Maryland v. Donald J. Trump, *in his Official Capacity as President of the United States of America*."[1] The very first paragraph explains, "[t]his is an action against Donald J. Trump in his official capacity as President of the United States."[2] This characterization of Plaintiffs' lawsuit is maintained throughout the Complaint.[3] Plaintiffs do not even hint that their suit is alternatively brought against the President in his individual capacity. The problem, of course, is the conduct the Plaintiffs complain about consists *entirely* of personal commercial relationships that purportedly violate the Constitution's Foreign and Domestic Emoluments Clauses; specifically, that Donald Trump is accepting or receiving money in the form of distributions from LLCs and corporations which he owns (and/or controls) in whole or in part. Such a lawsuit is not an official capacity suit, as evidenced by the fact that this lawsuit could not be maintained against *any* potential successor in office to the President. Therefore, the Complaint should be dismissed.

A.      **Not Every Action Taken by the President is Presidential Action in His Official Capacity**

The Plaintiffs' Amici defend the Complaint's pleading by arguing that with respect to the Emoluments Clauses, there is no practical difference between Donald J. Trump in his individual and official capacity.[4] To the contrary, these separate spheres of doctrine are mutually exclusive. In *Clinton v. Jones*, the Supreme Court did not "dispute" the petitioner's argument that the

---

[1] *See, e.g.*, Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830), bit.ly/2s9aO40.
[2] *Id.* at ¶ 1, at p.1.
[3] *See, e.g., id.* at ¶ 20, at p.7.
[4] *Brief of Amici Curiae Administrative Law, Constitutional Law, and Federal Courts Scholars in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss*, [ECF No. 56-1, at 12]; *see also Memorandum of Law in Support of Plaintiffs' Opposition to Motion to Dismiss*, [ECF No. 46, at 40].

President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties."[5] Because the Chief Executive's duties "are not entirely 'unremitting,'"[6] there remains an important distinction between the President's "official acts"[7] and his "unofficial conduct."[8]

Not every action taken by the President is presidential action. A President's official duties must be disentangled from "personal, private conduct by a President."[9] That is, there is a difference between "unofficial conduct of the individual who happens to be the President" and the official conduct of the President.[10] The Plaintiffs' Amici disregard this foundational principle, blurring the line between the President's official acts, which are governed by the Constitution, and Donald Trump's private commercial transactions, which are not.[11]

**B.** **This Suit, Which Could Not Continue Against the President's Successor, Cannot Be Brought Against the President in His Official Capacity**

Given that this case concerns the President's personal conduct, this Court must ascertain whether a complaint brought against him in his official capacity can proceed. *Lewis v. Clarke*, which was decided by the Supreme Court earlier this year, illustrates why this case cannot proceed.[12] William Clarke, a Mohegan Tribal Gaming Authority employee, transported patrons to and from the Mohegan Sun Casino.[13] Brian and Michelle Lewis's vehicle was struck by Clarke's limousine on an interstate highway.[14] Because an official capacity suit would have given rise to the defense of tribal sovereign immunity, the Lewises strategically brought suit against Clarke in his

---

[5] Clinton v. Jones, 520 U.S. 681, 697–98. (1997).
[6] *Id.* at 699 (quoting United States v. Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No.14,692d)  (Marshall, C.J.)).
[7] *See* Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982).
[8] *See Jones*, 520 U.S. at 705.
[9] *See id.* at 688.
[10] *See id.* at 701.
[11] As discussed in Part II, *infra*, the President is in no regards bound by the Foreign Emoluments Clause.
[12] 137 S. Ct. 1285 (2017).
[13] *Id.* at 1289.
[14] *Id.*

individual capacity.[15] The Supreme Court agreed that the case was properly pleaded as an individual capacity suit: "[t]he suit is brought against a tribal employee operating a vehicle within the scope of his employment but on state lands, and the judgment will not operate against the Tribe."[16] Clarke could not raise tribal sovereign immunity as a defense because the suit could not be construed as an official capacity suit; that is, it "'will not require action by the sovereign or disturb the sovereign's property.'"[17]

Indeed, had Clark resigned, the Lewises would have had no cause of action against the Tribe at all. "When officials sued in their official capacities leave office," Justice Sotomayor's majority opinion explained, "their successors automatically assume their role in the litigation."[18] This transfer occurs not for mere convenience, but because "[t]he real party in interest [in an official capacity suit] is the government entity, not the named official."[19] Justice Sotomayor noted that "the relief sought [in an official capacity suit] is only nominally against the official and in fact is against the official's office and thus the sovereign itself."[20] Because *Lewis* concerned tortious conduct by an individual employee, the relief sought is primarily against the employee, and not the sovereign.

*Lewis v. Clarke*, which reaffirmed well-settled doctrine concerning official-capacity suits, explains with precision why *District of Columbia v. Trump* must be dismissed. First, "the relief sought is" *exclusively* "against the official and in fact is" *not* "against the official's office and thus the sovereign itself."[21] Stated differently, "[t]he real party in interest" is not the "government

---

[15] *See id.* at 1292 ("But sovereign immunity 'does not erect a barrier against suits to impose individual and personal liability.'" (citations omitted)).
[16] *Lewis*, 137 S. Ct. at 1291.
[17] *Id.* (quoting Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687 (1949)).
[18] *Id.* at 1291 (citations omitted).
[19] *Id.*
[20] *Id.*
[21] *Id.*

entity," but "the named official."[22] The Plaintiffs are not seeking injunctive relief against the President in his official capacity; or the federal government; or any government policy for that matter. Rather, Donald Trump is being sued to enjoin his private commercial activities.

How do we know this? If President Trump were to "leave office," his successor, Vice President Pence could not "assume [Trump's] role in the litigation."[23] Plaintiffs make no allegation that Vice President Mike Pence receives any financial benefit in any Trump-related commercial entities. As soon as Trump's presidency comes to an end, no action for any of the alleged (purported) violations of the Emoluments Clauses could continue against any successor in office to Trump. Thus, this official capacity case (against any successor in office) would have to be dismissed. While a negligence claim against Clarke can survive past his employment with the Tribe, constitutional claims in an official capacity against Trump's successor cannot survive past Trump's constitutional term. This Court would have no basis to issue any injunctive relief.

Furthermore, even if this suit were successful, it would "'not require action by the sovereign or disturb the sovereign's property.'"[24] Rather, it would only affect Trump's personal business assets. Donald Trump, not the President of the United States, is the real party in interest.[25] None of the President's purportedly unlawful actions are being taken in his official capacity. To the contrary, the conduct the Plaintiffs complain about consists *entirely* of personal commercial transactions.

### C.     The Plaintiffs' Amici Disregard *Lewis v. Clarke* and its Antecedent Cases

Although cited by Tillman and JEP, the amicus brief filed by twenty law professors, many of whom specialize in federal courts, had no response to *Lewis v. Clarke* or any of its antecedent

---

[22] *Id.*

[23] *See id.*; *see also* Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.").

[24] *Lewis*, 137 S. Ct. at 1291 (quoting Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687 (1949)).

[25] *Id.*

cases concerning official capacity suits.[26] To the contrary, the scholars undermined the Plaintiffs'

case. They wrote:

> *[R]egardless of how the case is captioned*, the plaintiffs' prayer for relief by its terms does
> not seek to direct the defendant in his performance of his official duties, alter the actions of
> the Executive Branch, or constrain the defendant's successors in office. Although the
> defendant's status as President gives rise to the illegality at issue, a judicial remedy that
> redresses the plaintiffs' injuries would not require the President to take any action—or
> decline to take any action—pursuant to his official duties. All he would have to do is to
> cease accepting emoluments from government clients. These are not official acts. *See
> Clinton v. Jones*, 520 U.S. 681, 694 (1997).[27]

*Regardless*? Amici's statement amounts to an admission that this action is not an official capacity

lawsuit. Plaintiffs' lawsuit is not directed against the sovereign: it does not seek to "direct the

performance of [the President in regard to] his official duties . . . or constrain the defendant's

successors in office."[28] Rather, it concerns the President's personal commercial transactions. The

scholars concede this point, and state that "[t]he defendant's acceptance of payments as a business

owner thus does not fall within even 'the 'outer perimeter' of his official responsibility' as

President."[29] The scholars make this point to avoid the defense of presidential immunity under

*Nixon v. Fitzgerald* for official acts, but in doing so, they clarify that the case is by no means an

official capacity lawsuit.

As the Court reaffirmed in *Lewis v. Clarke*, an official capacity lawsuit constrains the

government as sovereign: the named office-holder defendant is merely a nominal defendant, and

the action seeks to constrain the current office-holder and impliedly his successors in office.[30]

Where, as here, the factual allegations (if true) and the legal theory (such as it is) applies

exclusively to the current office holder and cannot possibly extend to any successor in office, no

official capacity suit is possible. The real party in interest is not the government, but only the

---

[26] *See supra* note 4, [ECF No. 56-1].
[27] *Id.* at 12 (emphasis added).
[28] *Id.*
[29] *Id.* at 11 (citing Nixon v. Fitzgerald, 457 U.S. 731, 756 (1982)).
[30] *Lewis*, 137 S. Ct. at 1291.

named defendant. Indeed, Amici's citation to *Clinton v. Jones* is telling: *Jones was not an official capacity lawsuit.*[31] The Plaintiffs' pleading identity crisis requires the dismissal of their Complaint.

## II. Plaintiffs' Amici Failed to Establish That the Foreign Emoluements Clause Applies to the President

Count I of the Complaint hinges on the position that the President holds an "Office of Profit or Trust under" the United States. Tillman and JEP provided this Court with a comprehensive historical argument demonstrating that the Foreign Emoluments Clause's general *Office under the United States* language does not encompass the presidency. Plaintiffs' Amici largely ignore this record, other than to cite statements from George Mason and Edmund Randolph, who argued that the President was bound by this provision. Plaintiffs only direct response is to muster a single, dismissive footnote, which presaged arguments from their Amici. It states:

> Although an amicus advances the idiosyncratic argument that the President is not subject to the Foreign Emoluments Clause, the President himself does not advance this reading, which would conflict with OLC's and Congress's longstanding actionable position and cannot be reconciled with the Clause's text, purpose, or history. *See* Memorandum for the Counsel to the President, Office of Legal Counsel, Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 2009 WL 6365082 (Dec. 7, 2009) (applying Clause to President Obama and observing that "[t]he President surely holds an Office of Profit or Trust" (brackets omitted)); Memorandum Opinion for the Special Assistant to the President, Office of Legal Counsel, Proposal That the President Accept Honorary Irish Citizenship 278 (May 10, 1963), https://goo.gl/CEfHeS (applying Clause to President Kennedy); 5 U.S.C. § 7342(a)(1)(E) (recognizing that the bar on foreign presents covers "the President and Vice President" and consenting to certain presents).[32]

---

[31] *See* Jones v. Clinton, 72 F.3d 1354, 1357–58 (8th Cir. 1996) ("The question before us, then, is whether the President is entitled to immunity, for as long as he is President, from civil suits alleging actionable behavior by him in his *private capacity rather than in his official capacity* as President. We hold that he is not." (emphasis added)). Furthermore, that the tortious conduct in *Jones* arose before President Clinton's inauguration is irrelevant; the Supreme Court's analysis concerning individual capacity suits applies to all cases brought against the President, regardless of when the conduct occurred.

[32] *See supra* note 4, [ECF No. 46, at 33 n.20] (emphasis added). A very similar footnote appears in the Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss in parallel litigation before the Southern District of New York. *CREW v. Donald J. Trump, in his Official Capacity as President of the United States*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Aug. 11, 2017), [ECF No. 57, at 31 n.18]. The Defendant's motion to dismiss in that matter has been granted. *See* CREW v. Trump, Civ. A. No. 1:17-cv-00458-GBD, 2017 WL 6524851 (S.D.N.Y. Dec. 21, 2017).

Rather than engaging this important question, which is central to the resolution of their case, the Plaintiffs and their Amici have effectively punted. First, the pair of Office of Legal Counsel ("OLC") opinions that Plaintiffs and their Amici cited show no awareness of the weight of evidence, spanning from the colonial period to the American Revolution, then through the Constitutional Convention, to the First Congress, the Washington Administration, and finally into the Early Republic, which demonstrates that elected federal officials, such as the President, do not hold an Office of Profit or Trust *under* the United States. Second, though the Legal Historians, as *amici curiae*, initially attempted to rebut this evidence in parallel litigation in the Southern District of New York, they expressly abandoned those arguments, and in this Court they have made no attempt to rebut the arguments put forward by Tillman and JEP. Finally, the Plaintiffs and their Amici point to the Foreign Gifts and Decoration Act ("FGDA") as evidence that Congress has regulated the President's acceptance of foreign gifts. This statute, however, proves too little, because it also applies to the "spouse[s]" of government officials, who hold no "office" of any kind, let alone one "under" the United States. Thus, this 1966 statute cannot be supported as a legislation enacted pursuant to Congress's authority under the Foreign Emoluments Clause. Plaintiffs' Amici put forward no evidence that in enacting the FGDA and its regulation of the conduct of federal officeholders, including the President, Congress was relying on the Foreign Emoluments Clause.

The Plaintiffs and their Amici bear the burden of proof and persuasion to impose this new judicial constraint on the President's authority. Indeed, due to the separation of powers, and the President's powers over international affairs—including the power to accept foreign gifts as an act

of recognition[33]—this burden is even higher than for mundane domestic civil cases.[34] The

Plaintiffs and their Amici barely try, and ultimately fail to meet that burden.

### A.   "The Government Has Not Conceded That The President Is Subject to the Foreign Emoluments Clause"

On October 25, 2017, the Justice Department submitted a letter to the Honorable George B.

Daniels, U.S. District Judge for the Southern District of New York, explaining its position

concerning the scope of the Foreign Emoluments Clause.[35] The letter stated that "the government

has not conceded that the President is subject to the Foreign Emoluments Clause."[36] The Justice

Department has not taken a position, one way or the other, about whether the President is in fact

subject to the Foreign Emoluments Clause.

### B.   The Office of Legal Counsel Showed No Awareness of the Historical Evidence Concerning The Scope of the Foreign Emoluments Clause

Beyond dismissing Tillman and JEP's argument as "idiosyncratic"—an adjective, not an

argument—the Plaintiffs only direct substantive response in Footnote 20 consists of citations to

two OLC memoranda, which are also cited by Amici.[37] The 2009 memorandum simply assumes

that that "[t]he President *surely* 'hold[s] an[] Office of Profit or Trust' . . . ."[38] OLC offered no

evidence whatsoever to support this assumption. (The Justice Department's October 25 letter

---

[33] *See* Zivotofsky v. Kerry, 135 S. Ct. 2076 (2015); *see also Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as Amici Curiae in Support of the Defendant*, [ECF No. 27-1, at 19] ("If the Constitution vests the President with vast authority over recognizing foreign nations, then certainly it entails the far lesser authority to accept presents from those very same countries. *Indeed, the President's decision to accept a gift from a yet unrecognized foreign state or head of government could itself amount to an act of recognition.*" (emphasis added)).

[34] Plaintiffs favorably cite Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L.  Rev. 1612 (1997). [ECF No. 46, at 57]. Professor Siegel explains that plaintiffs bear an even *heavier* burden when suing the President. *Id.* at 1677 ("In light of the breadth of the President's powers, one would expect that in many cases the standard of review applied by a court will be *extremely generous.*" (emphasis added)).

[35] Letter to the Court from Brett A. Shumate (Oct. 25, 2017), *CREW v. Donald J. Trump, in his Official Capacity as President of the United States*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Oct 25, 2017), [ECF No. 98], bit.ly/2pqubGM.

[36] *Id.*

[37] *Brief of Former Government Ethics Officers as Amici Curiae Supporting Plaintiffs*, [ECF No. 50, at 14 n.5, 17 n.6].

[38] Memorandum from David J. Barron, Act. Asst. Att'y Gen., Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, OLC, at 4 (Dec. 7, 2009), bit.ly/2rx6CfT (emphasis added).

represents a stark departure from this 2009 opinion.) The 1963 memorandum considered gifts given to Presidents Jackson and Lincoln in order to determine whether President Kennedy could accept honorary Irish citizenship.[39] Both of these modern opinions fail to account for the weight of evidence, spanning from the colonial period to the American Revolution, then through the Constitutional Convention, to the First Congress, the Washington Administration, and finally into the Early Republic. This record demonstrates that elected federal officials, such as the President, do not hold an Office of Profit or Trust *under* the United States.

### 1.   Evidence from Presidents Jackson and His Successors Does Not Resolve the Scope of the Foreign Emoluments Clause

As a threshold matter, neither President Jackson nor Lincoln actually asked for consent to keep foreign gifts. Rather, each simply asked Congress to dispose of the gifts. For example, Jackson "placed [a gold medal from the Republic of Columbia] at the disposal of Congress," and said, "our Constitution forbids the acceptance of presents from a foreign State."[40] This statement, which is not entirely correct, fails to answer the question of whether the Foreign Emoluments Clause binds the President. Even assuming the provision applies to the President (and it does not), such gifts could be accepted *with* the consent of Congress. The Plaintiffs and their Amici do not contest this point. President Jackson simply never asked for such consent. Presidents Tyler and Van Buren, who succeeded Jackson, expressed similar sentiments concerning the receipt of foreign gifts that were accepted for the United States as a sovereign, and not by the President as an individual.[41] (Practice and commentators uniformly agree that the President can accept a gift on behalf of the United States.)

---

[39] Memorandum Opinion for the Special Assistant to the President, Proposal That the President Accept Honorary Irish Citizenship, OLC at 278, 280–81 (May 10, 1963), goo.gl/CEfHeS.

[40] *See, e.g.,* Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830), bit.ly/2s9aO40.

[41] 14 *Abridgment of the Deb. of Cong.* 140 (1860), bit.ly/2s21miX (concerning gifts from the Imam of Muscat given to "the Government of the United States," President Van Buren communicated to Congress, "I deem it my duty to lay the proposition before Congress, for such disposition as they may think fit to make of it") (entry for May 25, 1840); *House*

President Lincoln's practices were a bit more complex, but likewise do not resolve the scope of the Foreign Emoluments Clause. In May 1861, President Lincoln deposited with the State Department a diploma of citizenship he received from San Marino.[42] Because the gift was addressed to President Buchanan, OLC suggested that Lincoln treated the diploma as a "gift[] to the United States, rather than as personal gift[]."[43] As a result, Lincoln's practice is not probative to whether the President was bound by the Foreign Emoluments Clause. In February 1862, President Lincoln acknowledged the receipt of a sword and photograph, which had been sent by the King of Siam, again, to his predecessor, James Buchanan.[44] Lincoln thanked the King for the sword and photograph, as well as "tusks of length," and acknowledged the King's "desire" to treat the gifts as "tokens of . . . good will and friendship for the American People."[45] Once again, Lincoln never actually sought Congress's consent to personally *accept* the gifts, which were ostensibly directed to the United States government as a whole. Rather, the Senate and House merely resolved that the gifts from Siam would be "*deposited* in the collection of curiosities at the Department of the Interior."[46]

Congress was aware of the difference between permitting officers to personally accept gifts, and merely depositing lawfully received gifts with the government. To illustrate this distinction, in 1856, the House and Senate jointly resolved to authorize "the Superintendent of the

---

*Documents*, bit.ly/2rsttt9 (May 10, 1844) (concerning gifts "from the Imam of Muscat . . . to the United States," President Tyler communicated to Congress that the gifts "will be disposed of in such manner as Congress may think proper to direct").

[42] *See* Letter from A. Lincoln to Regent Capt's of the Rep. of San Marino (May 7, 1861), perma.cc/U2G7-3BHW.

[43] *Honorary Irish Citizenship*, *supra* note 39, at 281.

[44] *Press Release*, National Archives (Sep. 23, 1999), perma.cc/SWY9-42QN.

[45] Letter from A. Lincoln to the King of Siam (Feb. 3, 1862), perma.cc/SU5Z-PKYQ.

[46] Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, 12 Stat. 616 (Mar. 15, 1862), bit.ly/2rwfvBK (noting that the gifts from Siam would be "deposited in the collection of curiosities at the Department of the Interior").

Coast Survey" to "*accept* the gold medal recently presented to him by the King of Sweden."[47]

Thus, the precedents cited by Plaintiffs and their amici from the mid-19th century do not resolve

how the Foreign Emoluments Clause was understood five decades after the federal convention.

> **2.**   **Washington and His Successors During the Early Republic Openly Accepted Foreign Gifts Without Seeking Congressional Consent**

While the practices of Presidents Jackson, Van Buren, Tyler, and Lincoln are marginally

probative, far better evidence of executive understanding comes from Presidents Washington and

his pre-Jackson successors. In 1791, Washington received, accepted, and kept a diplomatic gift—a

framed full-length portrait of King Louis XVI from the French ambassador to the United States.[48]

He never sought or received congressional consent for this gift, nor did he do so for the main key to

the Bastille accompanied with a picture of that fortress,[49] gifted to him by the Marquis de

Lafayette,[50] who at the time was a French government official.[51] President Jefferson received a

bust of Czar Alexander I, a diplomatic gift, from the Russian government.[52] Jefferson received,

accepted, and kept this diplomatic gift, without congressional consent.[53] Jefferson also received

presents from Indian tribes, which he considered "diplomatic gifts" from foreign nations.[54] Like

---

[47] A Resolution authorizing Alexander D. Bache to accept a Medal presented to him by the King of Sweden, 11 Stat. 152 (Aug. 30, 1856), bit.ly/2C514ha (emphasis added).

[48] *See* Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791), perma.cc/5F2V-G5GU.

[49] Fed. Gazette & Phila. Daily Advertiser (Aug. 12, 1790), at 2, bit.ly/2rlnKjP; Pa. Packet & Daily Advertiser (Aug. 13, 1790), at 2, bit.ly/2r9bBiz (same).

[50] Lest anyone mistakenly believe that the key was a private gift from LaFayette to his friend President Washington, this gift was discussed in diplomatic communications form the French government's representative in the United States to his superiors in the French ministry of foreign affairs. *See, e.g.*, Letter from Louis Guillaume Otto to Armand Marc de Montmorin (Aug. 3, 1790), available in Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres, Correspondances Politiques, 39CP, Volume 35, Microfilm P5982, pages 147–149.

[51] *See, e.g.*, André Maurois, *Adrienne: The Life of the Marquise De La Fayette* 178–82 (1961); *A Complete History of the Marquis De Lafayette* 193, 194 (1826), bit.ly/2tauZfC (same). At the time, Lafayette held multiple positions in the French government, including, among others, member of the legislature (and its former vice president), commander of the National Guard, and he had already received a commission in the regular French army.

[52] *See* Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7, 1804), perma.cc/4ATK-BWVN; *Gifts from Foreign Dignitaries*, Monticello, perma.cc/C26E-X23E.

[53] *See* Letter from T. Jefferson to Levett Harris (April 18, 1806), perma.cc/3FX8-Y5TG.

[54] *See* Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806), perma.cc/QB6Z-SWSD (emphasis added); Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, perma.cc/658Z-WN5S.

Washington, Jefferson never sought nor received congressional consent to keep these gifts—the receipt of which was known to the public.

The fourth and fifth presidents continued the practices of Washington and Jefferson. In 1816, General Ignacio Alvarez of the United Provinces of the Rio de la Plata (in present-day Argentina) gave President Madison two pistols "to form a closer connexion with the United States."[55] The pistols were delivered to Madison via diplomatic channels.[56] James Madison gave the guns to his successor, President James Monroe, all absent any congressional consent.[57] There is no evidence that any of these presidents sought or received congressional consent to keep these valuable gifts. The fact that Washington and other Founders who succeeded him in office accepted multiple foreign gift shows that there was no accident or mistake, but rather, it was part of an established government practice that no one objected to at the time or any time since, until recent litigation against President Trump.

OLC showed no awareness of these practices from Washington and his successors in the Early Republic. Thus, it is no surprise that the Department of Justice is no longer willing to stand behind OLC's assumption. While OLC has not yet revisited its unsupported conclusion, the Congressional Research Service ("CRS") has changed course. As recently as 2012, CRS concluded that "The President and all federal officials are restricted by the Constitution, at Article I, Section 9, [C]lause 8 . . . ."[58] However, more recently, after becoming aware of the Washington-era and other pre-Jackson precedents, CRS modified its position. Now CRS hedges:

---

[55] Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816), perma.cc/D47U-V4H3.
[56] Letter to J. Madison from John Graham (Aug. 8, 1816), perma.cc/RD8B-2ASW.
[57] *See Pistols*, James Monroe 3D, perma.cc/T796-ED5B (on website of the James Monroe Museum); Jonathan Fildes, *Science Probe for 'Space Pistols,'* BBC News (May 26, 2008), perma.cc/4DJP-PUF4. There is no doubt as to the provenance of the Washington and Jefferson diplomatic gifts, but the provenance of the pistols is disputed. Certainly, the pistols are not in the government's archives, where they would be unless someone had removed them.
[58] Jack Maskell, CRS, *Gifts to the President of the U.S.*, 4 (Aug. 16, 2012), bit.ly/2s7AVZu.

noting that the Foreign Emoluments Clause "might technically apply to the President."[59] This change is significant.

Despite the fact that Tillman and JEP identified these practices, the District of Columbia and the State of Maryland offered no response. To the contrary, the Plaintiffs posit that the Defendant does not "identify any historical precedent for [the President's] acceptance of profits and other lucrative benefits from foreign and domestic governments."[60] The record is replete with instances where Presidents Washington and his successors received, accepted, and kept diplomatic gifts from foreign states: all absent congressional consent. Likewise, though the Legal Historians, as *amici curiae*, discussed Washington, Jefferson, Madison, and Monroe to interpret the Foreign Emoluments Clause, they offered no response to these Presidents accepting diplomatic gifts during the Early Republic. Indeed, the Legal Historians analyzed "[t]he French practice of giving expensive diplomatic gifts,"[61] but had nothing to say about Washington's accepting valuable diplomatic gifts from the French government. The historical precedents identified by Tillman and JEP are on-point: foreign diplomatic gifts given to our first President and other founders who succeeded him during the Early Republic. The Legal Historians do nothing to rebut this evidence. If the Foreign Emoluments Clause does not regulate the President's acceptance of a "present" from a "foreign State," then it also cannot control his acceptance of a foreign "Emolument."

### 3. Disputed Assertions of Power by Washington and His Successors Are More Probative About the Scope of the Foreign Emoluments Clause Than Voluntary Acquiescence by Post-Jackson Presidencies

This Court might take the position that all presidents have equal authority, so the latter presidents ought to be preferred. Or this Court could surmise, as did the Legal Historians in

---

[59] Jack Maskell, CRS, *Conflict of Interest and "Ethics" Provisions That May Apply to the President*, 2 (Nov. 22, 2016), bit.ly/2teGovc.
[60] See *supra note* 4, [ECF No. 46, at 37].
[61] *Brief of Amici Curiae by Certain Legal Historians on Behalf of Plaintiffs,* [ECF No. 58-1, at 11].

parallel litigation, that "Presidents make mistakes (even George Washington), and courts generally do not assume that Early Republic practices are dispositive of the Constitution's meaning."[62] The Legal Historians asserted that courts should conclude that "early presidents plainly violated" the Foreign Emoluments Clause.[63] The Legal Historians wisely did not advance this argument before this Court, because the Supreme Court has taught a very different lesson: modern practice does not automatically overcome earlier precedents.[64] To the contrary, parties bear a heavy burden in asserting that "President Washington did not understand" the Constitution that his precedents helped define.[65] Given that the Legal Historians are effectively alleging that Washington publicly violated the Constitution absent any noticeable opposition, the burden on them is even heavier. They fail to meet this burden.

In *District of Columbia v. Heller*, the Supreme Court considered a wide range of historical sources: not only those from prior to ratification of the Bill of Rights, but also precedents from after 1791.[66] In dissent, Justice Stevens found "particularly puzzling" the majority's reliance on "postenactment" commentary.[67] To this, the Court countered that the "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation."[68] Yet, not all post-enactment commentary is of equal weight. As time passes from the framing, the Court observed, later sources do "not provide as much insight."[69] The most reliable sources are those

---

[62] Brief of *Amicus Curiae* by Certain Legal Historians On Behalf of Plaintiffs, *CREW v. Donald J. Trump, in his Official Capacity as President of the United States*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Aug. 11, 2017) , [ECF No. 70-1, at 23].

[63] *Id.*

[64] *See, e.g.*, I.N.S. v. Chadha, 462 U.S. 919, 944 (1983).

[65] *See* Freytag v. C.I.R., 501 U.S. 868, 917–18 (1991) (Scalia, J., concurring).

[66] District of Columbia v. Heller, 554 U.S. 570, 605–10, 614–16 (2008).

[67] *Id.* at 662 n.28 (Stevens, J., dissenting).

[68] *Id.* at 605.

[69] *Id.* at 614.

most proximate to the framing.[70] Post-enactment commentary is useful, if at all, where continuity confirms earlier understandings.

Under the rule in *Heller*, the Washington administration precedents and other precedents from the Early Republic prevail over the Jackson and post-Jackson precedents. They ought to prevail as well for a more important reason: when considering competing streams of historical practice by the three branches, courts give more weight to disputed assertions of power by one branch.[71] In our separation of powers jurisprudence, where the Executive Branch takes some action of doubtful constitutionality and in doing so arguably invades the constitutional sphere of Congress, Congress's failure (or repeated failures) to respond where pushback is to be expected ratifies the propriety of the contested action.[72] On the other hand, where the Executive Branch takes some action of dubious constitutionality and in doing so surrenders its own arguable powers, such acquiescence in regard to using a disputed power is accorded little weight because surrender occasions no public discussion or pushback by the other branches.[73]

When Washington and the pre-Jackson presidents publicly accepted diplomatic gifts, if that conduct was arguably unconstitutional, if it invaded Congress's authority to consent to such gifts under the Foreign Emoluments Clause's consent provision, then one would expect *someone*

---

[70] *See* Myers v. U.S., 272 U.S. 52, 136 (1926); Schell v. Fauche, 138 U.S. 562, 572 (1891).

[71] *See, e.g.*, McPherson v. Blacker, 146 U.S. 1, 35–36 (1892); *see* CREW v. Trump, Civ. A. No. 1:17-cv-00458-GBD, 2017 WL 6524851, at *12 (S.D.N.Y. Dec. 21, 2017) (Daniels, J.) ("As the only political branch with the power to consent to violations of the Foreign Emoluments Clause, Congress is the appropriate body to determine whether, and to what extent, Defendant's conduct unlawfully infringes on that power. If Congress determines that an infringement has occurred, it is up to Congress to decide whether to *challenge or acquiesce* to Defendant's conduct." (emphasis added)).

[72] *See* NLRB v. Noel Canning, 134 S. Ct. 2550, 2560 (2014); *see also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 583 (1952) (noting that "Congress has taken no action" after President Truman's communications; Dames & Moore v. Regan, 453 U.S. 654, 688 (1981) ("We are thus clearly not confronted with a situation in which Congress has in some way resisted the exercise of Presidential authority" after claim suspensions); *cf.* Stuart v. Laird, 5 U.S. 299, 309 (1803).

[73] Free Enter. Fund v. PCAOB, 561 U.S. 477, 497 (2010) ("Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents."); Freytag v. C.I.R., 501 U.S. 868, 879–880 (1991); *cf.* Clinton v. City of N.Y., 524 U.S. 417, 451–52 (1998 (Kennedy, J., concurring) ("It is no answer, of course, to say that Congress surrendered its authority by its own hand . . . . Abdication of responsibility is not part of the constitutional design.").

to object. But there are no reports of any such objection, by anyone, even in private correspondence. If there was no contemporaneous objection—no calls for impeachment (much less a lawsuit)—then the absence of public objections serves to ratify the contested conduct. On the other hand, when Jackson and post-Jackson presidents arguably surrendered their power to receive diplomatic gifts absent congressional consent, such acquiescence counts for something. Such acquiescence, however, counts for a good deal less than the Washington and other pre-Jackson precedents.

Distant post-ratification acquiescence starting a half century or later after the Constitution's ratification is far less probative than disputed assertions of power by Washington and his successors during the Early Republic. Indeed, OLC was only able to identify one instance where Congress gave a "grant of consent to a President, [where] it followed receipt" of a foreign gift.[74] In an 1896 joint resolution, Congress authorized former-President Benjamin Harrison (whose term ended in 1893) to "*accept* certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States."[75] As a former President, Harrison no longer held any federal position of any kind, and was not then bound by the Foreign Emoluments Clause. As a result, this progressive-era episode is of only the slightest value to understand the scope of the Foreign Emoluments Clause with respect to sitting presidents.

Further, even if Harrison considered himself still bound by the Foreign Emoluments Clause—perhaps because the gift was given during his administration—this voluntary ex-presidential acquiescence in regard to congressional consent, over a century after the

---

[74] *Honorary Irish Citizenship*, *supra* note 39, at 281 n.3.

[75] Joint Resolution No. 39: To authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, 29 Stat. 759 (April 2, 1896), bit.ly/2ssBLkJ (emphasis added). Had Harrison sought congressional consent during his time in office, he would have been placed in the odd position of having to sign a joint resolution into law that would have allowed him to accept a foreign gift. This oddity provides another structural reason why the Foreign Emoluments Clause should not be understood to extend to the elected officers: Members of Congress and the President should have no role in their own acceptance of foreign gifts with respect to bicameralism and presentment.

ratification of the Constitution, cannot outweigh the precedents set by sitting presidents immediately after ratification. Indeed, these presidents included Founders, Framers, and ratifiers. The Harrison gift and modern OLC opinions do not constitute a "long settled and established practice" that would prevail over practices of our founding presidents.[76] To the contrary, there has been no "constitutional impasse" between the President and Congress.[77] As Thomas Jefferson explained, "[o]ne precedent in favour of power is stronger than an hundred against it."[78]

C.    **The Foreign Gifts and Decorations Act, Which Also Applies to "Spouse[s]" of Federal Officers, Cannot Be Justified Based Solely on The Foreign Emoluments Clause**

The District of Columbia and the State of Maryland cite a single statute to demonstrate that "Congress's longstanding position" has been that the President is subject to the Foreign Emoluments Clause: in 1966, Congress enacted the Foreign Gifts and Decorations Act ("FGDA"), which placed restrictions on certain individuals' accepting gifts from foreign governments.[79] A similar argument is advanced by Amici.[80] Though the text of the statute is silent about which enumerated power it relies upon, the Plaintiffs and their Amici suggest it must be premised on the Foreign Emoluments Clause. Not so.

Under 5 U.S.C. § 7342(a)(1)(A)–(D), the law regulates all federal employees as well as members of the uniformed services. Because there is no doubt that these individuals hold an "Office of Profit or Trust under" the United States, in this respect, the FDGA may be viewed as a "long settled and established practice" of Congress exercising its powers under the Foreign

---

[76] The Pocket Veto Case, 279 U.S. 655, 689 (1929); *see also* NLRB v. Noel Canning, 134 S. Ct. 2550, 2559–60 (2014).
[77] *See* Goldwater v. Carter, 444 U.S. 996, 997 (1979) (Powell, J., concurring).
[78] Thomas Jefferson, *Notes on the State of Virginia* 121–29 (1784), perma.cc/4J8S-NZX3.
[79] 5 U.S.C. § 7342(a)(1)(E).
[80] *Brief of Former Government Ethics Officers as Amici Curiae Supporting Plaintiffs*, [ECF No. 50, at 16–17] ("Congress has exercised its power to permit emoluments on multiple occasions. One well-known example is the Foreign Gifts and Decorations Act."); *Brief of Former National Security Officials as Amici Curiae*, [ECF No. 57-1, at 15 n.26] ("Congress can address this concern, as it has in the past . . . ." (citing FDGA)).

Emoluments Clause with respect to *appointed* officials. However, 5 U.S.C. § 7342(a)(1)(G) regulates foreign gifts given to "the spouse" of otherwise covered officials. In no sense does a "spouse" hold an "Office of Profit or Trust under" the United States. Therefore, for the FDGA to fall within Congress's powers with respect to spouses of federal officials, Congress must rely on a "jurisdictional element" other than the Foreign Emoluments Clause.[81] The Foreign Commerce Clause and the Necessary and Proper Clause might very well serve this purpose. That analysis still leaves open what the "jurisdictional element" is with respect to elected officials, such as the President. Plaintiffs and their Amici argue that the FGDA serves as "gloss" on the Foreign Emolument Clause with respect to elected officials, such as the President.[82] The FDGA, which does not even reference the Foreign Emoluments Clause, cannot establish the sort of "long settled and established practice" needed to resolve this case.[83]

**D.      Plaintiffs' Amici Fail to Address the "Office . . . Under" Parliamentary Drafting Convention, Which Applies to Appointed Officials**

Beyond neglecting the historical practices of presidents during the Early Republic, the Plaintiffs' Amici have failed to address the "Office . . . under" drafting convention, which applies exclusively to appointed officials. In particular, to interpret the Foreign Emoluments Clause, the Legal Historians' brief cites Alexander Hamilton's writings, statements from a member of the First Congress, and Joseph Story's *Commentaries*. Yet, these sources confirm that "Office . . . under the United States" only applies to appointed officials.

---

[81] *See* United States v. Lopez, 514 U.S. 549, 561 (1995); United States v. Morrison, 529 U.S. 598, 611–12 (2000).
[82] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 611–12 (1952) (Frankfurter, J., concurring).
[83] The Pocket Veto Case, 279 U.S. 655, 689 (1929); NLRB v. Noel Canning, 134 S. Ct. 2550, 2559–60 (2014).

1.   **The Legal Historians' Brief Cites Alexander Hamilton's Official Communications to Define "Emoluments," but Not to Understand "Office . . . Under the United States"**

The Legal Historians' brief cites a 1795 letter from Secretary of the Treasury Alexander Hamilton to President George Washington that includes the word "emolument."[84] This argument establishes that the Legal Historians view Hamilton's official correspondences from *after* the ratification of the Constitution as indicative of the meaning of the Foreign Emoluments Clause. In light of this concession, their failure to address a far more significant official communication from Hamilton is inexplicable—especially since they previously addressed it in parallel litigation.

In 1792, the Senate directed President Washington's Secretary of the Treasury, Alexander Hamilton, to draft a financial statement listing the "emoluments" of "*every* person holding *any civil office or employment under the United States*."[85] Hamilton took more than nine months to draft and submit a response, which spanned some ninety manuscript-sized pages. The report included appointed or administrative personnel in *each* of the three branches of the federal government, including the Legislative Branch (e.g., the Secretary of the Senate and Clerk of the House and their staffs) and the clerks of the federal courts.[86] But Hamilton's carefully-worded response did *not* include the President, Vice President, Senators, or Representatives.[87] The presumptive meaning of this document is that Hamilton accurately responded to the Senate's precise request: elected officials do not hold *office . . . under the United States*, and so they were not listed.

---

[84] [ECF No. 58-1, at 23 n.68] (citing Letter from A. Hamilton to G. Washington (Jan. 24, 1795), bit.ly/2C0VRVm).

[85] 1 *Journal of the Senate of the U.S.A.* 441 (1820) (May 7, 1792 entry) (emphasis added), bit.ly/2rQswt8.

[86] *See* Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the United States (Feb. 26, 1793), *in* 14 *The Papers of Alexander Hamilton* 157, 157–59 (1969), perma.cc/49RT-TTGF.

[87] *Id.* The editors of the *Papers of Alexander Hamilton* marked this document "DS," meaning "document signed," which indicates that this document was the original signed by Hamilton. The transmittal letter of *The Complete Report*, which was drafted in long hand, can be found at bit.ly/2fj6IQ0. The reproduction in the *Papers of Alexander Hamilton* is typeset.

Contrary explanations do not hold up. Two of the Legal Historians whose brief is before this Court, Gautham Rao and Jed Handelsman Shugerman, have contended that Hamilton's list was designed to help avoid violations of the Constitution's Sinecure Clause.[88] It provides, "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time."[89] Under this clause, members of Congress cannot be appointed to offices (1) that were created during the term of Congress to which they were elected, or (2) whose "Emoluments" (i.e., salary) were increased during the term of Congress to which they were elected. Rao and Shugerman speculate that Hamilton's 1793 list identified positions that fell into these categories, so the President could avoid unconstitutional appointments. According to Rao and Shugerman, Hamilton understood that the Senate inquiry had a limited, unstated purpose and as a result, his roll of officers hewed to that purpose, excluding the presidency, even though (in Rao & Shugerman's view) the presidency was encompassed by the *office under the United States* language in the Senate order. It is not surprising that the Legal Historians do not advance this argument here, because it makes little sense.

First, by the time the Senate made its request to Hamilton in 1792, there had already been two sets of congressional elections, and two classes of Senators had been elected. Yet, the Senate order and Hamilton's 1793 roll of officers makes no attempt to distinguish between positions created during the Senate's first two-year term and the Senate's second two-year term. Without that information, Hamilton's 1793 roll of officers would not have been useful in regard to helping elected officials avoid violating the Sinecure Clause. Second, the Sinecure Clause would prevent a Senator from being appointed to an Article III judgeship that was created during his elected term.

---

[88] Gautham Rao & Jed Handelsman Shugerman, *Presidential Revisionism: The New York Times published the flimsiest defense of Trump's apparent emoluments violations yet.*, Slate (July 17, 2017), perma.cc/K6P4-RC6S.
[89] *See* U.S. Const. art. I, § 6. cl. 2.

Yet the Senate order specifically directed Hamilton to exclude all judges, and Hamilton's document followed those instructions. The list would have been useless to help avoid violations of the Sinecure Clause with respect to judicial appointments, which were and remain an important class of officers.

Third, there is no evidence that Congress ever made such a request of Hamilton prior to the start of the Second Congress in 1791 or prior to the start of the Fourth Congress in 1795. To the contrary, Hamilton and the Treasury Department issued dozens of circulars, memoranda, and reports concerning the federal workforce in response to congressional requests.[90] For example, in 1791, the House of Representatives directed the Secretary of the Treasury to prepare an annual statement listing an "accurate statement and account of the receipts and expenditures of all public moneys."[91] In response to this broad request, Hamilton's 72-page report included the compensation for all Article III judges, the members of the House and Senate, along with the Vice President and the President.[92] In contrast, where Hamilton was asked to list the "emoluments" of "*every* person holding *any civil office or employment under the United States*," excluding judges, he did not list the compensation for Representatives, Senators, the Vice President, or the President. In one document Hamilton and the Treasury Department included all elected officials, and in the other document, Hamilton did not include any elected officials. What differed was the language in the instructions instructing Hamilton's efforts. And where congressional guidance sought a list of those holding *office . . . under the United States*, Hamilton did not include any elected positions.

There is an entirely different document that lists the salaries of President Washington and Vice President Adams before recording the salaries of the appointed officers included in

---

[90] *See generally A List of Treasury Reports and Circulars Issued by Alexander Hamilton, 1789–1795* (Paul Leicester Ford ed., Brooklyn 1886), bit.ly/2zpBoqe.

[91] 1 *Journal of the House* 484 (Washington, Gales & Seaton 1826) (entry for December 30, 1791), bit.ly/2pr0p4A.

[92] *See* Report on an Account of the Receipts and Expenditures of the United States for the Year 1792 ["*The 1792 Report*"], *in* 15 *Papers of Alexander Hamilton* 474, 498–510 (1969), bit.ly/2BvwJF9.

Hamilton's original report.[93] In parallel litigation concerning the Foreign Emoluments Clause in the Southern District of New York, the same group of five Legal Historians had cited this second document to contend that the President holds an "office . . . under the United States."[94] However, Tillman and JEP filed a response, showing that this latter document was in fact a scrivener's copy drafted long after Hamilton's death.[95] Subsequently, the Legal Historians issued a formal apology, and withdrew their claim about this second document from their amicus brief.[96]

The editors of *American State Papers*, who would publish in 1834 a typeset reproduction of this scrivener's copy, explained, indirectly at least, why President Washington and Vice President's Adams's salaries were added. In 1816, Congress authorized the biennial publication of the *Official Register of the United States*, also known as the *Blue Book*,[97] to record the "compensation, pay, and emoluments" of "all officers and agents, civil, military, and naval, in the service of the United States."[98] The first edition of the *Blue Book*, published in 1818, lists the salaries of President Monroe and Vice President Tompkins before recording the salaries of appointed officers in all three branches; elected members of Congress are not listed.[99]

Though Hamilton's 1793 roll of officers did not include the salaries of President Washington and Vice President Adams, the editors of *American State Papers* nonetheless identified this document in the index as the "'Blue Book,' or list of civil officers of the United

---

[93] *See* List Of Civil Officers Of The United States, Except Judges, With Their Emoluments, For The Year Ending October 1, 1792, *in* 1 *American State Papers/Miscellaneous* 57 (1834), bit.ly/2ptHRkm. *The Condensed Report,* which was drafted in long hand, can be found at [bit.ly/2xknN6j]. The reproduction in *American State Papers* is typeset.

[94] Adam Liptak, *'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal Storm*, N.Y. Times (Sept. 25, 2017).

[95] *See* Motion for Leave to File Response to Brief of *Amici Curiae* by Certain Legal Historians, *CREW v. Trump*, 17 Civ. 458 (S.D.N.Y. Sept. 19, 2017), [ECF No. 85], bit.ly/2yc175l.

[96] *See* Letter to Judge George B. Daniels, *id.* at [ECF No. 96], bit.ly/2gaoHsD. *See* Jed Shugerman, *Our correction and apology to Professor Tillman*, Shugerblog (Oct. 3, 2017), perma.cc/R9N9-S472.

[97] John P. Deeben, *The Official Register of the United States, 1816-1959*, National Archives, perma.cc/RJD6-S232.

[98] *See, e.g., A Register of Officers and Agents, Civil, Military, and Naval, in the Service of the United States on the Thirteenth Day of September, 1817*, at iii (Washington, E. De Krafft 1818), bit.ly/2BwkFmM.

[99] *Id.* at 9, 16–17.

States."[100] That is, the editors viewed Hamilton's original 1793 document as a progenitor or the best analogue to the *Blue Book* from the time period in which the Constitution went into force. After all, Hamilton's 1793 roll of officers listed the "emoluments" of all appointed officials in the executive and legislative branches. (Congress had asked Hamilton to exclude judges.) However, there was one significant difference between the format of the 1818 *Blue Book* and Hamilton's 1793 roll: the latter's omission of the salaries of the President and the Vice President. To conform Hamilton's roll to the format of the *Blue Book*, an unknown Senate functionary inserted the emoluments of President Washington and Vice President Adams. Once this addition was made, Hamilton's roll closely tracked the format of the *Blue Book*. Even the sequencing was identical: President, Vice President, Department of State, Treasury Department, Department of War, etc. When viewed in the context of the *Blue Book*, the addition of the President and Vice President makes sense; it was a formatting or editorial decision made in 1834, not an interpretation of who holds "Office . . . under the United States" made in 1834, much less by Hamilton in 1793.

This latter report, which was drafted by an unknown Senate functionary—likely to conform to the format of the *Blue Book*—should not be accorded the same weight as the original document signed by Hamilton and transmitted to the Senate as an official Executive Branch communication. At this juncture, the Legal Historians and Plaintiffs' other *amici* have no response, whatsoever, to this important official communication from Alexander Hamilton.

> **2.     The Legal Historians Cite Statements from a Member of the First Congress to Interpret the Foreign Emoluments Clause, but Ignore An Anti-Bribery Law Passed by the First Congress**

To interpret the Foreign Emoluments Clause, the Legal Historians highlight two statements made during the Virginia ratification convention by William Grayson concerning the

---

[100] 1 *American State Papers/Miscellaneous*, Index ii (1834), bit.ly/2Da7uIW.

meaning of "emolument," highlighting that he would become "a senator in the First Congress."[101] This argument establishes that the Legal Historians understand the views of members of the First Congress as indicative of the meaning of the Foreign Emoluments Clause. There is a far more relevant act from the First Congress with respect to the scope of the Foreign Emoluments Clause, than these isolated statements. Namely, in a 1790 anti-bribery statute, Congress declared that a defendant convicted of bribing a federal judge "shall forever be disqualified to hold any *office of honor, trust, or profit under the United States*."[102] If, as Plaintiffs and their Amici argue, the President holds an "Office of Profit or Trust under [the United States]" then this 1790 statute, enacted one year after the Constitution went into force, would be deeply problematic. Congress does not have the power to add by statute new qualifications for federal elected positions.[103] Courts should avoid an interpretation of "Office . . . under the United States" under which the First Congress unconstitutionally added qualifications to the presidency. The more reasonable interpretation is that members of the First Congress (which included many Framers and ratifiers) understood that "Office . . . under the United States" did not extend to elected positions. The Legal Historians offer no response to the First Congress's usage of 'office under the United States' to exclude elected positions. Nor could they, for the Supreme Court has instructed that the statutes of the First Congress are entitled to special solicitude.[104]

---

[101] [ECF No. 58-1, at 20–21].

[102] An Act for the Punishment of Certain Crimes, 1 Stat. 112, 117 (1790), bit.ly/2rbNfVq (emphasis added). This language mirrored the text of the Disqualification Clause. *See* U.S. Const. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment [by the Senate] shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit under the United States*." (emphasis added)).

[103] *See, e.g.*, Powell v. McCormack, 395 U.S. 486, 527–47 (1969); Laurence H. Tribe, *American Constitutional Law* § 6–35 n.51 (2000) (explaining that Powell was a "largely historical inquiry").

[104] Myers v. U.S., 272 U.S. 52, 136 (1926).

   3.   **The Legal Historians Cite Joseph Story's *Commentaries* to Interpret
        the Foreign Emoluments Clause, but Ignore His Analysis of the Scope
        of "Office . . . under the United States"**

The Legal Historians cite Joseph Story's *Commentaries* to interpret the Foreign
Emoluments Clause.[105] Yet there is an important discussion from Story's *Commentaries*, not cited
by the Legal Historians, that undermines the crux of their position. In four clauses, the Constitution
uses the drafting convention "Officers of the United States": the Appointments Clause, the
Impeachment Clause, the Oaths Clause, and the Commission Clause.[106] According to Story's
*Commentaries*, such positions "derived their appointment from, and under the national
government" and not from "the people of the states."[107] In other words, such officers are appointed
under the Appointments Clause, and are not elected. Thus, according to Story, the President is not
an "officer of the United States." In the very same passage, Story also indicated that the same
interpretive position applied to the Constitution's "office . . . under the United States" language.[108]
In other words, the Constitution's general *officer of the United States* and *office under the United
States* language does not reach the presidency. Only express constitutional language reaches the
presidency. The Legal Historians make no effort to address Story's understanding of the "Office .
. . under the United States" drafting convention. They should, because if Story is correct, then
Plaintiffs' claim under the Foreign Emoluments Clause fails.

---

[105] [ECF No. 58-1, at 8, 10, 18].
[106] U.S. Const. art. II, § 2, cl. 2 (The President "shall nominate . . . Ambassadors, other public Ministers and Consuls,
Judges of the supreme Court, all other *Officers of the United States*."); *id.* at art. II, § 4 ("The President, Vice President
and all civil *Officers of the United States*, shall be removed from Office on Impeachment for, and Conviction of,
Treason, Bribery, or other high Crimes and Misdemeanors."); *id.* at art. VI, cl. 3 (mandating that "all executive and
judicial *Officers*, both *of the United States* and of the several States, shall be bound by Oath or Affirmation"); *id.* at art.
II, § 3 (mandating that the President "shall Commission all the *Officers of the United States*") (emphases added).
[107] 1 Joseph Story, *Commentaries on the Constitution of the United States* 577–79 (reprint 1891) (1833).
[108] *Id.*

4.    **The Legal Historians Discuss British Parliamentary Practice, but Ignore the Settled Meaning of the "Office . . . Under" Drafting Convention**

During her confirmation hearing, then-Solicitor General Elena Kagan observed that when drafting the Constitution, the Framers used both "very specific provisions" as well as provisions "of a much more general kind."[109] To illustrate the former category, Kagan cited the requirement that "[n]o Person shall be a Senator who shall not have attained to the Age of thirty Years."[110] Kagan explained that this provision is self-explanatory: "You just have to be 30 years old because that is what they wrote and that is what they meant and that is what we should do."[111] In contrast, the Fourth Amendment's prohibition "against *unreasonable* searches and seizures" was far more open-ended, and must be "applied to new situations and new factual contexts."[112]

"Office of Profit or Trust under the United States," as used in the Foreign Emoluments Clause, falls into the former category of "very specific provisions." All of the parties agree on this fact. Where Plaintiffs and their Amici go awry, however, is by reading it in the same fashion they would read the Constitution's requirement that Senators must be thirty years old. "Officer . . . under the United States" is not self-explanatory, and cannot be understood by simply counting all of the people who work "under" the auspices of the federal government: that is, everyone that receives a paycheck from the U.S. Treasury. This generalization cannot be right, because the Constitution uses precise language at different junctures to refer to different categories of federal officials: "officers *of* the United States" cannot mean the same thing as persons holding "office . . . *under* the United States." Rather, by 1789, "Office . . . under" was a well-established

---

[109] *The Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the United States: Hearing before the Committee on the Judiciary United States Senate*, 111th Cong, 2d Sess 62, at 61 (2010), bit.ly/2ptL833.
[110] U.S. Const. art. I, § 3, cl. 3.
[111] *Kagan, supra* note 109, at 61.
[112] *Id.*

parliamentary drafting convention in the Anglo-American legal tradition, that had a settled meaning: it referred to appointed, and not elected officials.

*Calder v. Bull*, one of the Supreme Court's earliest decisions, provides guidance in regard to how to understand the Constitution's specific provisions that have a technical, legal meaning.[113] *Calder* involved a dispute over the meaning of the Ex Post Facto Clause.[114] Specifically, did Connecticut run afoul of this clause when the state legislature "set aside a decree" of a probate court, and "granted a new hearing"?[115] Justice Chase acknowledged that "[t]he prohibition, 'that no state shall pass any *ex post facto law*,' necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing."[116] Unlike the thirty-year age requirement that Kagan identified, the provision at issue in *Calder* required further study. Justice Patterson agreed, noting that "[t]he words, *ex post facto*, when applied to a law, have a *technical meaning*, and, in legal phraseology, refer to crimes, pains, and penalties."[117] The term "Office . . . under the United States," as used in the Foreign Emoluments Clause, should be read in a similar fashion as the Ex Post Facto Clause: it "requires some explanation; for, naked and without explanation, it is unintelligible."[118] The question that this Court must resolve is whether "Office . . . under the United States" had such a technical, legal meaning. The answer is "yes."

As the unrebutted record reflects, the Framers of the Constitution, making use of the progenitor British drafting convention of "Office under the Crown," used the phrase "Office . . . under the United States" to refer to *appointed* officers in all three branches of government. In the Anglo-American legal tradition, "Office under the Crown" was and remains a commonly-used

---

[113] Calder v. Bull, 3 U.S. (3 Dall.) 386 (1798).
[114] U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."); *see also id*. at art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed [by Congress].").
[115] *Calder,* 3 U.S. (3 Dall.) at 386.
[116] *Id.* at 390.
[117] *Id.* at 396 (second emphasis added).
[118] *Id.* at 390 (emphasis added).

drafting convention that refers to appointed officers. For the last three centuries, "Office under the

Crown," a phrase commonly used in British statutes, has not extended to elected positions.[119] Sir

S.W. Griffith, who would become Australia's first Chief Justice, explained that "[t]he term office

of profit under the Crown was an *old phrase*, *well understood in relation to parliamentary law . . .*

.*"*[120] To this day, United Kingdom and Commonwealth courts distinguish between (1) officers

who are appointed to a position "under the Crown" and (2) officials who "hold their position by

virtue of their election by the people."[121]

In their brief, the Legal Historians discuss British parliamentary practice,[122] but have no

answer to this well-settled parliamentary term of art. In parallel litigation, the same Legal

Historians previously dismissed the relevance of this evidence, stating in a since-withdrawn

footnote that Tillman and JEP "offer[ed] no supporting historical evidence that the founders,

whose criticism of the British monarchy is no secret, equated the president with the king in this

way."[123] The Legal Historians wisely abandoned this argument, because Tillman and JEP

provided a thorough historical record to establish the straightforward point: "office . . . under" was

not a statement about political sovereignty, but was, and is still today, a mere parliamentary

shorthand: i.e., a statutory drafting convention with roots in pre-modern parliamentary law.

---

[119] *See, e.g.*, An Act for the Security of Her Majesty's Person and Government, 6 Ann. c. 7, § 25 (1707), bit.ly/2riHlG1 (disqualifying any person from holding a seat in the House of Commons if they hold a "new office or place of profit whatsoever under the [C]rown," that is, a position created after 1705); Memorandum of the U.K. Att'y Gen., at 135–36 (May 1, 1941), bit.ly/2rjcw00 ("If the Crown [the Executive Government] has the power of appointment and dismissal, this would raise a presumption that the Crown controls, and that the office is *one under the Crown. . . .* If the duties are duties under and controlled by the Government, then the office is, *prima facie . . .* an office under the Crown . . . ." (emphasis added)); J.L. De Lolme, *The Constitution of England* 62 (1775), bit.ly/2sl1yeK (explaining that one holding a "new office under the Crown" is "incapable of being elected [a] Member[]" of the Commons); Anne Twomey, *The Constitution of New South Wales* 438 (2004) ("As it is an elective office, and not generally subject to the direction or supervision of the government, one would assume that it is not an office held 'under the Crown.'").

[120] Hodel v Cruckshank, 3 Queensland L.J. 140, 141 (Qld. 1889).

[121] R v. Obeid (No 2) [2015] New South Wales Supreme Court 1380 [30], bit.ly/2rSRiZv ("The[se] [authorities] only indicate that a[] [Member of the Legislative Council] does not hold an office 'under the Crown' or 'under the Government.' Instead they hold their position by virtue of their election by the people and legally are not answerable to, or under the direction of, the 'Crown' or the 'Government.'").

[122] [ECF No. 58-1, at 9, 21].

[123] *Legal Historians*, *supra* note 62 at 22 n.82.

Following independence, American lawyers and statesmen, steeped in the English legal tradition, did not instantly forget and jettison everything they learned about British parliamentary practice. To the contrary, many of the practices in the First Congress derived from these longstanding English customs. For example, Section XLIX of Thomas Jefferson's *A Manual of Parliamentary Practice for the Use of the Senate of the United States* provided that "each petition, memorial or paper, presented to the Senate, [should] be also inserted on the journals."[124] This was not a new rule, fashioned by Jefferson out of whole cloth, but was a matter of established *lex parliamentaria*.[125] And so is the meaning of "Office . . . under the United States." This construction is bolstered by history of diplomatic gifts accepted by President Washington and other founders who succeeded him during the Early Republic, by Hamilton's 1793 roll of officers, by the First Congress's 1790 anti-bribery law, and by a wealth of other evidence.

**5.      The Legal Historians Focus on Advocacy from Mason and Randolph, and Ignore the Weight of Evidence to the Contrary from the Early Republic**

The Legal Historians have no answer to the evidence from Washington, Jefferson, Madison, Monroe, Hamilton, and the First Congress, other than to cite statements from George Mason and Edmund Randolph, who, during the Virginia ratifying convention, argued that the Foreign Emoluments Clause applies to the President.[126] There is reason to question the relevance of these statements. Neither of these Virginians signed the Constitution during the federal convention. As historian Pauline Maier observed, both Mason and Randolph feared that "the government under the Constitution would begin as 'a moderate aristocracy' and then, over time,

---

[124] Thomas Jefferson, *A Manual of Parliamentary Practice for the use of the Senate of the United States* 91 (1801) (1993 GPO reproduction), bit.ly/2DKJZXG.

[125] *See* E-mail from Martyn Atkins, U.K. House of Commons Clerk (Procedure Committee) to Seth Barrett Tillman (Sept. 11, 2017), bit.ly/2xy0qXK ("The requirement on the Clerk to record in the Journal the presentation to the House of each account and paper—which persists in essence to this day—is of very long standing, but the authority for the requirement cannot be readily traced to a particular order of the House.").

[126] *See, e.g.*, 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 484 (Jonathan Elliot ed., 2d ed. 1836), bit.ly/2gXirI1 (Mason's position); *id.* at 486, bit.ly/2fcvP7h (Randolph's position).

become a monarchy or 'a corrupt, tyrannical aristocracy.'"[127] Randolph, in particular, "predicted that the convention's plan of government would 'end in Tyranny.'"[128]

With these concerns, it is not surprising that Mason and Randolph would think that the President is bound by Foreign Emoluments Clause: requiring the President to seek congressional consent before accepting foreign gifts—and impeaching him for failing to do so—would go a long way to preventing a "corrupt, tyrannical aristocracy." Having such fears does not mean the Constitution itself put additional restrictions into law. As the Supreme Court has explained, "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take."[129] The "Office . . . under" the United States language had a "clear and intelligible" meaning, one that Mason and Randolph either were unaware of, or perhaps motivated by their fear of a tyrannical government, simply disregarded.

These same concerns could have led Mason and Randolph to miscomprehend other language in the Constitution, which was "clear and intelligible." For example, they contended that Senators and Representatives were impeachable because they fell under the scope of the Impeachment Clause's *Officers of the United States* language.[130] This was an especially strange position because the Constitution expressly provides that Representatives and Senators could be expelled through a *far* simpler procedure than bicameral impeachment and removal.[131] But, if the

---

[127] Pauline Maier, Ratification: The People Debate the Constitution, 1787–1788, at 47 (2010).

[128] *Id.*

[129] South Carolina v. United States, 199 U.S. 437, 449 (1905).

[130] *See* 3 *Debates in the Several State Conventions* 222 (Jonathan Elliot ed., 2d ed. 1836), bit.ly/2wQqkoO (Randolph stated that though Senators are chosen every two years, "they may also be impeached. There are no better checks upon earth."); *id.* at 402–03, bit.ly/2vODA9z (Mason stated that the House of Representatives should impeach a Senator who ratified a treaty because of "bribery and corruption").

[131] *See* U.S. Const. art. I, § 5 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.").

purpose of the Impeachment Clause was, as Mason said, to stop "bribery and corruption," then few if any limits should be read into the Constitution's constraints regarding conflicts and disloyalty. Mason's and Randolph's error did not go unnoticed. James Monroe, writing contemporaneously in 1788, objected "that the Senators are not impeachable, and therefore Governor Randolph's objection falls to the ground."[132] Monroe, a ratifier and a future president, concluded: "I am surprised that a man of that gentleman's [Randolph's] abilities . . . should have fallen into this mistake."

Perhaps, the Legal Historians share Mason and Randolph's fear that the presidency, without additional checks, will devolve into "a corrupt, tyrannical aristocracy." It is not surprising then that they too adopt, without any reservations, Mason and Randolph's understanding of the Foreign Emoluments Clause as its definitive construction. This deference is problematic, because it ignores the context of Mason and Randolph's advocacy, and how history has treated the positions they advocated. In the *Blount* case, the Senate agreed with Monroe, and rejected Mason and Randolph's overly broad reading of "Officers of the United States," to include members of Congress.[133] As a result, the Legal Historians can only urge this Court to trust Mason and Randolph concerning their reading of the Foreign Emoluments Clause (and its *office under the United States* language), but to disregard their rejected reading of the Impeachment Clause (and its closely-related *officer of the United States* language). This position is even more fraught, because it also disregards the overwhelming evidence to the contrary from Washington, Jefferson, Madison, Monroe, Hamilton, and the First Congress. The Legal Historians would have this Court believe that the views of two dissenting Framers—dissenters at the Federal Convention and

---

[132] 1 *The Writings of James Monroe 1778–1794*, at 347, 361–62 (1788), perma.cc/2E8V-GVV8.

[133] 8 *Annals of Cong.* 2319 (1799), perma.cc/EB4H-TDE8 (adopting resolution on January 11, 1799) (noting that "this Court ought not to hold jurisdiction."). *But cf.* Buckner F. Melton, Jr., *Let Me Be Blunt: In* Blount, *the Senate Never Said That Senators Aren't Impeachable*, 22 Quinnipiac L. Rev. 33 (2014).

dissenters in regard to the Constitution's *office*-language—should prevail over the understanding put forward in virtually every other source of authority from the Early Republic.

It cannot be the case that Mason and Randolph were unimpeachable paragons of virtue and unquestionable constructers of the Constitution, while Washington and his successors were corrupted by foreign monarchs or were ignorant of the document they helped define. Indeed, this later-in-time evidence, (much of) which consisted of official acts of the United States government that were visible to all, is far more probative than off-the-cuff free-flowing debate at a convention. The intentions of outlier individuals cannot be viewed as defining the Constitution's meaning.

## CONCLUSION

Because the Complaint cannot be pleaded against President Trump in his official capacity, it should be dismissed in its entirety. If this Court concludes that the official capacity suit is proper, then Count I should be dismissed because the President does not hold an "office of Profit or Trust under" the United States. And as we explained in our initial amicus brief, business transactions for value are not "Emoluments," so Count II must be dismissed. President Trump's business activities may raise ethical conflicts under modern good governance standards, but they raise no constitutional conflicts under the Foreign and Presidential Emoluments Clauses. Concurrently with this filing, Tillman and JEP also seek leave to participate in oral arguments.


Original Version Dated:       December 29, 2017
Corrected Version Dated:     December 31, 2017

                                   Respectfully submitted,

                    By:
                              /s/ Jan I. Berlage
                              Jan I. Berlage
                              Gohn Hankey Stichel & Berlage LLP
                              201 North Charles Street
                              Suite 2101

Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
    *Counsel for Amici Curiae*

Robert W. Ray
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3349
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Josh Blackman
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Carrie Severino
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2017, I caused a true and correct copy of the foregoing to be served on all counsel of record through the Court's CM/ECF system.

      /s/ Josh Blackman
      Josh Blackman, Esq.

# EXHIBIT E

The District of Columbia et al v. Trump, Docket No. 8:17-cv-01596 (D. Md. Jun 12, 2017), Court Docket

## Multiple Documents

| Part | Description |
| --- | --- |
| 1 | 3 pages |
| 2 | Memorandum in Support |
| 3 | Amended Complaint |
| 4 | Amended Complaint - Redlined |
| 5 | Text of Proposed Order |

© 2018 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

| | |
|---|---|
| THE DISTRICT OF COLUMBIA and THE STATE OF MARYLAND,<br><br>       Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America,<br><br>       Defendant. | Civil Action No. 8:17-cv-01596-PJM |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND TO APPLY THE PENDING MOTION TO DISMISS [DOC. 21] TO THE AMENDED COMPLAINT**

The District of Columbia and the State of Maryland hereby move the Court for leave to amend their complaint under Local Rule 103 and Rule 15 of the Federal Rules of Civil Procedure. This motion is supported by the accompanying memorandum of law, and the District and Maryland have filed a proposed order along with this motion. The District and Maryland have also attached the proposed amended complaint and a copy of the proposed amended complaint that is redlined to show their proposed changes to the original complaint.  Plaintiffs further respectfully request that the Court exercise its discretion to permit the amendment and apply the pending motion to dismiss the official capacity claims to the amended complaint.

Plaintiffs contacted defense counsel regarding the relief sought in this motion on February 12, 2018, and have had ongoing discussions since that date.  The parties have been unable to reach an agreement, and Defendant opposes this motion.

Dated:  February 23, 2018

THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE O. LUDAWAY
Chief Deputy Attorney General

/s/ Stephanie E. Litos
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C.  20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

Respectfully submitted,

THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven M. Sullivan
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD  21202
T: (410) 576-6325
F: (410) 576-6955

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600

*Attorneys for Plaintiffs*

*admitted pro hac vice*

## <u>CERTIFICATE OF SERIVCE</u>

I hereby certify that on February 23, 2018, I electronically filed a copy of the Plaintiffs'

Motion for Leave to File an Amended Complaint and to Apply the Pending Motion to Dismiss

[Doc. 21] to the Amended Complaint. Notice of this filing will be sent via email to all parties by

operation of the Court's electronic filing system. Parties may access this filing through the

Court's CM/ECF System.

_____

NAME

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA and<br>THE STATE OF MARYLAND,<br><div align="right">*Plaintiffs*,</div><br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States of America,<br><div align="right">*Defendant*.</div> | Civil Action No. 8:17-cv-01596-PJM |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT AND TO
APPLY THE PENDING MOTION TO DISMISS [DOC. 21] TO THE AMENDED
COMPLAINT**

The District of Columbia and the State of Maryland hereby move to amend their complaint

to name Donald J. Trump as a defendant in his individual capacity.[1] In all other respects, the

amended complaint is identical to the original complaint. This Court should grant the motion

because it is brought in good faith, will not prejudice President Trump, and is not futile. Plaintiffs

further respectfully request that the Court exercise its discretion to permit the amendment and

apply the pending motion to dismiss the official capacity claims to the amended complaint, thereby

minimizing delay and conserving judicial resources.

> **A. This Court should grant leave to amend because the motion is brought in good
> faith, will not prejudice President Trump, and is not futile.**

Rule 15 provides that leave to amend "shall be freely given," Fed R. Civ. P. 15(a)(2), to

allow the plaintiff "every opportunity to cure a formal defect in his pleading," *Laber v. Harvey*,

---

[1] In this memorandum, Plaintiffs use the honorific "President" or "President Trump" to refer to
Donald J. Trump in his official capacity and his individual capacity. Where relevant, the
memorandum notes the capacity in which the President is being sued.

438 F.3d 404, 426 (4th Cir. 2006) (en banc) (quotation marks omitted). Under this rule, "leave should be denied *only* when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Franks v. Ross*, 313 F.3d 184, 193 (4th Cir. 2002) (quotation marks omitted). None of these three exceptions applies here.

*First*, this motion is brought in good faith. Indeed, it was prompted by the Court's questioning at oral argument. *See, e.g.*, Tr. of Mot. Proceedings 44:21–24, 46:2-5, 97:17-25, 170:18-171:5. (D. Md. Jan 25, 2018). Plaintiffs continue to believe that suing the President for violating these Clauses in his official capacity is proper and reflects "the reality that the defendant's conduct is illegal by virtue of the fact that he is President." Br. of Scholars as Amici Curiae, ECF No. 56-1 at 18; *see Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (explaining that an action may be brought against a federal official acting "beyond the officer's powers" without necessarily being considered an action against the United States); *Pollack v. Hogan*, 703 F.3d 117, 119–21 (D.C. Cir. 2012) (applying *Larson* in suit for declaratory and injunctive relief alleging unconstitutional acts by the director of federal agency, sued in his official capacity, and holding that suit was not against the United States); *see also Boron Oil Co. v. Downie*, 873 F.2d 67, 69 (4th Cir. 1989) (explaining that "[a]n action seeking specific relief against a federal official" is "an action against the United States" if officer was "acting within the scope of his delegated authority"). However, Plaintiffs also acknowledge that this suit raises issues of first impression. Out of an abundance of caution, the plaintiffs therefore seek to amend their complaint to facilitate full review of their claims, both in this Court and in any future appeals. *See* Tr. 170:21–171:5.

*Second*, President Trump is not prejudiced by this amendment. The amended complaint states no new claims or allegations against him in his official capacity, and he has already fully exercised his right to respond to the unchanged allegations through the pending motion to dismiss. The President in his official capacity therefore has suffered no "lost opportunity" to respond to the identical allegations in the amended complaint. *See* 1 Steven S. Gensler, *Federal Rules of Civil Procedure, Rules and Commentary* Rule 15 ("Historically, prejudice under Rule 15(a) has been equated with lost opportunity."); *see also Laber*, 438 F.3d at 427 (explaining that "an amendment is not prejudicial," even if it "adds an additional theory to the facts already pled," when "offered before any discovery has occurred").

*Third*, the amendment is not futile because it is not "clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986). As this Court noted multiple times at oral argument, there are genuine issues regarding the best capacity or capacities in which to bring this case. *See* Tr. 26:5–6, 33:16–19, 73:18–19. The proposed amendment will allow the Court to decide the case "on the basis of the substantive rights involved rather than on technicalities." *Laber*, 438 F.3d at 426.

### B. This Court should apply the pending motion to dismiss the official capacity claims to the amended complaint, thereby minimizing delay and conserving judicial resources.

The Court and the parties have already invested a substantial amount of time in this case on the basis of the plaintiffs' existing complaint. The motion to dismiss that complaint has received extensive briefing by the parties and their *amici* and was the subject of a day-long hearing. The Court should therefore exercise its discretion to apply the pending motion to dismiss the official capacity claims to the amended complaint. *See Rock for Life-UMBC v. Hrabowski*, 594 F. Supp. 2d 598, 601 n.1 (D. Md. 2009) (granting motion to amend and treating a pending dispositive

motion as directed to the amended complaint, which added defendants but raised "no new theories or claims for relief" against any original defendant).

To be sure, the "general rule" is that "an amended pleading ordinarily supersedes the original and renders it of no legal effect." *Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001). But a preexisting motion to dismiss "is not automatically rendered moot" by an amended complaint. *Savage v. Centex/Taylor, LLC*, 2012 WL 946698, at *4 (D. Md. 2012). To the contrary, "[a] court . . . has a variety of ways in which it may deal with the pending motion, from denying the motion as moot to considering the merits of the motion in light of the amended complaint." *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 80 (D. Conn. 1994). Applying a preexisting dispositive motion to a later-filed amended complaint is not at all uncommon. *See, e.g.*, *Metsack v. Liberty Mut. Fire Ins. Co.*, 2015 WL 5797016, at *4 (D. Conn. 2015); *Saye v. First Specialty Ins. Co.*, 2015 WL 1737949, at *3 (E.D.N.Y. 2015); *Howard v. John Moore, L.P.*, 2014 WL 5090626, at *1 (S.D. Tex. 2014); *Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 103 (D.D.C. 2006); *see also* Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1476 (3d ed. 2010) (explaining that if the new pleading raises some of the same objections as were "raised in the original motion . . . , the court simply may consider the motion as being addressed to the amended pleading").

The *Metsack* and *Saye* cases, in particular, are instructive. In each of those cases, the plaintiffs filed an amended complaint that added a new defendant when the original defendant's motion to dismiss was pending. *See Metsack*, 2015 WL 5797016, at *4; *Saye*, 2015 WL 1737949, at *1. Because "the issues presented by [the motions to dismiss] . . . and the factual allegations relevant to those issues [had] not changed," the courts each applied the pending motions to dismiss to the unchanged allegations in the amended complaint. *Metsack*, 2015 WL 5797016, at *4; *see*

*also Saye*, 2015 WL 1737949, at *3 ("Here, the Amended Complaint restates the same claims against [the first defendant] that [the plaintiff] alleged in the original complaint; it essentially serves only to add [a second defendant] as a party to the suit. As such, I elect to consider the merits of [the first defendant]'s motion in light of the Amended Complaint.").

That is the right course here. The amended complaint adds no factual allegations or legal claims against the President in his official capacity. Instead, it simply adds a new defendant—the President in his individual capacity. Applying the pending motion to dismiss the official capacity claims to the amended complaint, rather than requiring the parties to re-brief the motion to dismiss on the official capacity claims and starting everything over from scratch, will avoid both prejudice and waste.  As to prejudice, there is none.  Because the amended complaint is "substantially identical to the original complaint," *Greater Cincinnati Coal. for Homeless v. City of Cincinnati*, 2009 WL 3029661, at *4 (S.D. Ohio 2009), applying the pending motion to dismiss to the identical official capacity claim in the amended complaint will do nothing to inhibit "preparation of [the President's] defense," *Rock for Life-UMBC*, 594 F. Supp.2d at 601 n.1.  And such an approach is also more efficient. "It would waste both the court's and the parties' resources to deny the motion and require defendants to file an identical motion directed to the first amended complaint." *Shame on You Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1140 (C.D. Cal. 2015).

In sum, construing the motion to dismiss as applying to the official capacity claims contained in the amended complaint would help "to secure the just, speedy, and inexpensive determination" of this action. Fed. R. Civ. P. 1.  Indeed, the suggested procedure will allow the Court to resolve both the official capacity and individual capacity claims as expeditiously as possible while simultaneously preserving all parties' rights.

# CONCLUSION

Maryland and the District respectfully request that the Court grant leave to amend the complaint and order that the amended complaint be filed in this action in the form attached to their motion.  Maryland and the District also respectfully request that the Court apply the pending motion to dismiss the official capacity claims to the amended complaint.

Dated:  February 23, 2018                                    Respectfully submitted,


THE DISTRICT OF COLUMBIA                        THE STATE OF MARYLAND

KARL A. RACINE                                          BRIAN E. FROSH
Attorney General for the District of                 Attorney General of Maryland
Columbia

NATALIE O. LUDAWAY                                 /s/ Steven M. Sullivan
Chief Deputy Attorney General                     STEVEN M. SULLIVAN
                                                                    Federal Bar No. 24930
                                                                    ssullivan@oag.state.md.us
/s/ Stephanie E. Litos                                  PATRICK B. HUGHES
STEPHANIE E. LITOS*                                 Federal Bar No. 19492
Senior Counsel to the Attorney General        phughes@oag.state.md.us
stephanie.litos@dc.gov                                Assistant Attorneys General
441 Fourth Street, N.W.                               200 Saint Paul Place, 20th Floor
Washington D.C.  20001                             Baltimore, MD  21202
T: (202) 724-6650                                        T: (410) 576-6325
F. (202) 741-0647                                        F: (410) 576-6955

NORMAN L. EISEN                                      JOSEPH M. SELLERS
Federal Bar No. 09460                                 Federal Bar No. 06284
neisen@citizensforethics.org                        jsellers@cohenmilstein.com
NOAH D. BOOKBINDER*                             CHRISTINE E. WEBBER*
nbookbinder@citizensforethics.org               Cohen Milstein Sellers & Toll PLLC
STUART C. MCPHAIL*                                 1100 New York Avenue, N.W.
smcphail@citizensforethics.org                    Washington, D.C. 20005
Citizens for Responsibility and Ethics           T: (202) 408-4600
   in Washington
455 Massachusetts Avenue, N.W.                 DEEPAK GUPTA*
Washington, D.C. 20001                             deepak@guptawessler.com
T: (202) 408-5565                                        JONATHAN E. TAYLOR*
F: (202) 588-5020                                        Gupta Wessler PLLC
                                                                    1900 L Street, N.W.
                                                                    Washington, D.C. 20009
*admitted pro hac vice                               T: (202) 888-1741

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

THE DISTRICT OF COLUMBIA
441 Fourth Street, N.W.
Washington, D.C. 20001,

and

THE STATE OF MARYLAND
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202,

       Plaintiffs,

       v.

DONALD J. TRUMP,
President of the United States of America, in
his official capacity and in his individual
capacity

1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500,

       Defendant.

Civil Action No. 8:17-cv-1596-PJM

**AMENDED COMPLAINT**

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
T: (410) 576-6325
F: (410) 576-6955

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533
Natalie.ludaway@dc.gov
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C. 20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600


*admitted pro hac vice

# TABLE OF CONTENTS

I. Nature of the action ................................................................................................ 2

II. Parties, jurisdiction, and venue ............................................................................. 8

III. Legal background .................................................................................................. 9

IV. Relevant facts ....................................................................................................... 12

      A.   The defendant's Foreign Emoluments Clause violations ......................................... 12

      B.   The defendant's Domestic Emoluments Clause violations ...................................... 26

      C.   Post-inauguration premium for the defendant's goods and services ....................... 32

      D.   The plaintiffs' interests in this litigation .................................................................. 32

V. Claims ................................................................................................................... 43

VI. Prayer for relief ................................................................................................... 45

# I.
## NATURE OF THE ACTION

1.      This is an action against Donald J. Trump in his official capacity as President of the United States and in his individual capacity.[1] The case involves unprecedented constitutional violations by the President that have injured and threaten to cause continuing injury to the District of Columbia ("the District") and the State of Maryland ("Maryland") and their respective residents, including direct injury to the plaintiffs' interests in properties located in the District, in Prince George's County, Maryland, and in Montgomery County, Maryland.

2.      The lawsuit alleges violations by the President of two distinct yet related provisions of the U.S. Constitution that seek to make certain that he faithfully serves the American people, free from compromising financial entanglements with foreign and domestic governments and officials. The first provision, the Foreign Emoluments Clause, prohibits any "Person holding any Office of Profit or Trust" from accepting "any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State," absent "the Consent of the Congress." U.S. Const. art. I, § 9, cl. 8. The second, the Domestic Emoluments Clause, entitles the President to receive a salary while in office and forbids him from "receiv[ing] within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. Together, these provisions help ensure that the President serves with undivided loyalty to the American people, and the American people only. Our republican form of government demands no less.

3.      Vested by the Constitution with extraordinary power, the President is bound by oath to "faithfully execute" his office and "preserve, protect and defend the Constitution of the United States." Since 1789, each President, regardless of temperament or ideology, has sought, in his own

---

[1] For ease of reference, Plaintiffs use the honorific "President" or the word "defendant" to refer to Donald J. Trump in his official capacity and his individual capacity.

way, to honor that solemn vow. Yet fundamental to a President's fidelity to that oath is the Constitution's demand that the President, as the highest officeholder in the land, disentangle his private finances from those of domestic and foreign powers. Never before has a President acted with such disregard for this constitutional prescription.

4.      President Trump's continued ownership interest in a global business empire, which renders him deeply enmeshed with a legion of foreign and domestic government actors, violates the Constitution and calls into question the rule of law and the integrity of the country's political system. Whatever the sincerity of the persons involved, foreign and domestic officials are put in the position of considering whether offering benefits to businesses associated with the President is important to maintaining goodwill. And irrespective of whether such benefits affect the President's decision-making or shift his foreign or domestic policy, uncertainty about whether the President is acting in the best interests of the American people, or rather for his own ends or personal enrichment, inflicts lasting harm on our democracy. The Framers of the Constitution foresaw that possibility, and acted to prevent that harm.

5.      The Emoluments Clauses are two critical, closely related anti-corruption provisions aimed at ensuring that the President faithfully serves *the people*, free from the distorting or compromising effects of financial inducements provided by foreign nations, their leaders, individual states in the Union, Congress, or other parts of the federal government. They ensure that Americans do not have to guess whether a President who orders their sons and daughters to die in foreign lands acts out of concern for his private business interests; they do not have to wonder if they lost their job due to trade negotiations in which the President has a personal stake; and they never have to question whether the President can sit across the bargaining table from foreign

leaders and faithfully represent the world's most powerful democracy, unencumbered by fear of harming his own companies.

6.    With respect to the Foreign Emoluments Clause, the Framers were aware that entanglements between American officials and foreign powers could pose a creeping, insidious threat to the Republic. The theory underlying the clause, informed by English history and by the Framers' experience, is that a federal officeholder who receives something of value from a foreign government can be imperceptibly induced to compromise what the Constitution insists be his only loyalty: the best interest of the United States of America. And rather than address such corruption by punishing it after the fact, the Framers concluded that the best solution was to write a strict prophylactic rule into the Constitution itself, thereby guaranteeing that improper incentives never undo this important safeguard of American autonomy. Applied to President Trump's diverse dealings, the text and purpose of the clause speak as one: absent the consent of Congress, private enrichment through the receipt of benefits from foreign governments is prohibited.[2]

7.    The Domestic Emoluments Clause was also designed to protect the government from corruption. The Founders intended the clause to serve as a guarantee that Congress, other parts of the federal government, and the states "can neither weaken [the President's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[3] The Framers further intended the clause to protect against self-dealing by ensuring that the President's service

---

[2]    Norman L. Eisen, Richard Painter & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* (Dec. 16, 2016), http://brook.gs/2hGIMbW; *see also* Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 18 (1994) ("Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government.").

[3]    The Federalist No. 73 (Alexander Hamilton).

is remunerated only by the compensation fixed in advance by Congress.

8.     Relatedly, and in ways particularly important to the plaintiffs, the Domestic Emoluments Clause shields the states and the District of Columbia from undue pressure to provide emoluments to the President, and protects them from reprisal for any refusal to do so. In a similar vein, the provision safeguards the states and the District from unfair advantages certain states may enjoy from opportunities to curry favor from the President by providing emoluments that other states lack.

9.     President Trump, acting through companies he owns or controls, has violated both the Foreign Emoluments Clause and the Domestic Emoluments Clause by receiving millions of dollars in payments, benefits, and other valuable consideration from foreign governments and persons acting on their behalf, as well as federal agencies and state governments. His repeated, ongoing violations include remuneration derived from: (a) leases of Trump properties held by foreign-government-owned entities; (b) purchase and ownership of condominiums in Trump properties by foreign governments or foreign-government-controlled entities; (c) other property interests or business dealings tied to foreign governments; (d) hotel accommodations, restaurant purchases, the use of venues for events, and purchases of other services and goods by foreign governments and diplomats at hotels, restaurants, and other domestic and international properties owned, operated, or licensed by President Trump; (e) continuation of the General Services Administration lease for President Trump's Washington, D.C. hotel despite his breach of the lease's terms, and potential provision of federal tax credits in connection with the same property; and (f) payments from foreign-government-owned broadcasters related to rebroadcasts and foreign versions of the television program "The Apprentice" and its spinoffs. Moreover, President Trump,

by asserting that he will maintain the interests at issue, is poised to engage in similar constitutional violations for the duration of his presidency.

10.     These present and continuing violations of the Constitution's anti-corruption protections threaten the free and independent self-governance at the core of our democracy. The President is making decisions every day with profound and far-reaching effects on American life, from determining who can travel into the country to deciding whether the United States will abandon global efforts to combat climate change; from proposing budgets to overseeing the federal workforce; from evaluating who will pay more in taxes to choosing how people will access health care. Yet Americans are left uncertain as to whether these decisions, with their sweeping impact on foreign and domestic policy, are driven solely by unyielding loyalty to the country's best interests, or rather are affected by self-interested motivations grounded in the international and domestic business dealings in which President Trump's personal fortune is at stake.

11.     The President's violations of the Emoluments Clauses undermine the trust the American people are entitled to have in their government. It is fundamental to our system of self-governance that our duly elected Presidents and the governments over which they preside will always act in singular pursuit of our liberty, security, health, and well-being. President Trump's myriad international and domestic business entanglements make him vulnerable to corrupt influence and deprive the American people of trust in their chief executive's undivided loyalty.

12.     The District and Maryland have compelling interests in ensuring that the Foreign and Domestic Emoluments Clauses are enforced and protect their residents as designed. The President's disregard for these constitutional constraints has resulted in significant and ongoing harm to the District and to Maryland.

13.     The District and Maryland have other sovereign, quasi-sovereign, and proprietary

interests in preventing the defendant's violations of the Emoluments Clauses. The defendant, his organization, and its affiliates have received presents or emoluments from foreign states or instrumentalities and federal agencies, and state and local governments in the form of payments to the defendant's hotels, restaurants, and other properties. The defendant has used his position as President to boost this patronage of his enterprises, and foreign diplomats and other public officials have made clear that the defendant's position as President increases the likelihood that they will frequent his properties and businesses.

14.     The defendant's ongoing constitutional violations harm the sovereign and quasi-sovereign interests of the District and Maryland. Maryland has an interest in preserving its role as a separate sovereign and securing observance of the terms under which it participates in the federal system. That interest is harmed by the defendant's violations of both Emoluments Clauses, but it carries particular force with respect to the Domestic Emoluments Clause, which exists (at least in part) for the protection of "the United States and any of them." Indeed, as government entities with authority to tax and regulate businesses and real estate, the District and Maryland are harmed by perceived and/or actual pressure to grant special treatment to the defendant and his extensive affiliated enterprises, or else be placed at a disadvantage vis-à-vis other states and governments that have granted or will grant such special treatment. In addition, the District and Maryland have an interest in protecting their economies and their residents, who, as the defendant's local competitors, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the defendant and his business enterprises due to his ongoing constitutional violations. Maryland is itself further injured by the reduction in tax revenue that flows from those violations.

15.     The defendant's ongoing constitutional violations also harm the proprietary

7

interests of the District and Maryland. The District and Maryland suffer direct financial harm in their capacity as proprietors of businesses that compete with the defendant's businesses, to the extent that businesses owned by him and/or his affiliated enterprises attract customers and divert them away from businesses that the District and Maryland own, license, or tax.

16.     The District of Columbia and Maryland bring this action to stop President Trump's violations of the Emoluments Clauses. As a direct result of those violations, the District and Maryland have been injured and will continue to be injured absent relief from this Court. To prevent these injuries, they request that this Court enter a declaratory judgment that President Trump has violated the Foreign and Domestic Emoluments Clauses and an injunction against violating these clauses further.

## II.
## PARTIES, JURISDICTION, AND VENUE

17.     The plaintiffs are the District of Columbia and the State of Maryland.

18.     The District of Columbia is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

19.     The State of Maryland is a sovereign state of the United States of America. The State is represented by and through its chief legal officer, the Attorney General of Maryland. He has general charge, supervision, and direction of the State's legal business, and acts as legal advisor and representative of all major agencies, boards, commissions, and official institutions of state

government. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.

20.     The defendant is Donald J. Trump, a natural person and the President of the United States of America. He is being sued in his official capacity and in his individual capacity.

21.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

22.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Maryland is a "judicial district" in which "a substantial part of the events or omissions giving rise to the claim occurred," and (in any event) where one of "the plaintiff[s] resides."

### III.
### LEGAL BACKGROUND

23.     ***The Foreign Emoluments Clause.*** The origins of the Foreign Emoluments Clause go back to at least 1651, when the Dutch broke with traditional European diplomatic customs and prohibited their foreign ministers from accepting "any presents, directly or indirectly, in any manner or way whatever."[4] The Framers also had the benefit of earlier thinking by those who drafted state constitutions, including Maryland's,[5] and by those who crafted the Articles of Confederation, which contained the clause's predecessor: "[N]or shall any person holding any

---

[4]     5 John Bassett Moore, *A Digest of International Law* § 651 (1906) (quoting Dutch Republic regulation).

[5]     *See* Md. Declaration of Rights of 1776, art. 32 ("That no person ought to hold, at the same time, more than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State.").

office of profit or trust under the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State."[6]

24.     The Foreign Emoluments Clause was not included initially at the Constitutional Convention, but it was added without dissent at the request of Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."[7] Edmund Jennings Randolph confirmed the clause's anti-corruption purpose, stating: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[8] The Framers recognized the perils of foreign influence and corruption, even in situations subtler than *quid pro quo* bribery, and they therefore created a broad constitutional prophylactic rule applicable to anything of value given by any foreign government to anyone holding an "Office of Profit or Trust under the United States," including the President.

25.     Consistent with the intent of the Framers, the Foreign Emoluments Clause is properly interpreted to cover monetary or nonmonetary transactions. Indeed, the text of the clause bars the receipt of both a "present" and an "Emolument," which together cover anything of value, including without limitation payments, transactions granting special treatment, and transactions above marginal cost. The clause also explicitly bars the receipt of "any present [or] Emolument . . . *of any kind whatever*," emphasizing the breadth of conduct covered under the provision.

26.     The Foreign Emoluments Clause covers not only transfers of anything of value from a king, prince, or foreign state individually, but also any transfer from instrumentalities or

---

[6]     Articles of Confederation of 1781, art. VI, § 1.

[7]     2 Farrand, *The Records of the Federal Convention of 1787*, at 389.

[8]     3 Farrand, *The Records of the Federal Convention of 1787*, at 327.

agents of a foreign state. This is in keeping with the considered view of the Department of Justice's Office of Legal Counsel, whose constitutional interpretations are instructive, though not controlling.[9]

27.     ***The Domestic Emoluments Clause.*** The Framers also intended to prevent the system of patronage, influence, and rent-extraction that predominated in the colonial governors' offices through a Domestic Emoluments Clause applying to just the President. The clause provides that the President's "Compensation" shall not be increased or decreased, and that he may not receive any "other Emolument from the United States, or any of them," during his term of office. The clause thus works to ensure that neither states nor the federal government can "weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[10] And because the clause is specifically concerned with the federal government as well as the states, it does not allow for Congress to consent to the President's receipt of additional emoluments beyond his salary. This ban on additional emoluments, Alexander Hamilton wrote, would ensure that the President would have "*no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.*"[11] Further, as recognized by judicial authorities, the ban "addressed the Framers' concern that the President should not have the ability to convert his or her office for profit."

28.     The Domestic Emoluments Clause reflects the Framers' particular concern about making sure that the nation's powerful chief executive remains free from distorting and corrupting influences that might hinder his ability to faithfully execute his office. The clause accordingly

---

[9]        Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 33 Op. O.L.C. 8 (2009).

[10]       The Federalist No. 73 (Alexander Hamilton).

[11]       *Id.* (emphasis added).

proscribes emoluments not only from states and the federal government, but also their respective

instrumentalities and subdivisions.

## IV.
## RELEVANT FACTS

### A.    The defendant's Foreign Emoluments Clause violations

29.    Following the defendant's inauguration, he continues to own and control hundreds

of businesses throughout the world, including hotels and other properties. His business empire

comprises a multitude of different corporations, limited-liability companies, limited partnerships,

and other entities that he owns or controls, in whole or in part, operating in the United States and

at least 20 foreign countries.[12] His businesses are loosely organized under an umbrella known as

the "Trump Organization," consisting of the Trump Organization LLC d/b/a The Trump

Organization and The Trump Organization, Inc., both of which are owned solely by him. But his

interests also include scores of other entities not directly owned by either Trump Organization

entity but that he personally owns, owns through other entities, and/or controls.[13] The defendant

also has several licensing agreements that provide continuing flows of income. Through these

entities and agreements, he personally benefits from business dealings, and is (and will be)

enriched by any business in which the entities he owns or controls engage with foreign

governments, instrumentalities, and officials.

30.    On January 11, 2017, the defendant announced a plan to turn "leadership and

management" of the Trump Organization over to his sons Eric Trump and Donald Trump Jr., as

---

[12]    Marilyn Geewax & Maria Hollenhorst, *Trump's Businesses And Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016), http://n.pr/2g2xZDP.

[13]    U.S. Office of Gov't Ethics, Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

well as a longtime company executive.[14] But the plan did not include relinquishing *ownership* of his businesses or establishing a blind trust.

31.     The defendant continues to own—and be well aware of the activities of—the Trump Organization and other corporations, limited-liability companies, limited partnerships, and other entities in which he retains an ownership interest. Although he formed a trust to hold his business assets, he may obtain distributions from his trust at any time.[15]

32.     The defendant's son, Eric Trump (who is also an advisor to the defendant's trust), initially indicated that he would not communicate with his father concerning his business interests. Eric Trump has now acknowledged, however, that he will provide business updates to the President on at least a quarterly basis.[16]

33.     The defendant has neither sought nor received "Consent of the Congress" with respect to his receipt of presents or emoluments from foreign government officials, entities, or instrumentalities.

**The District of Columbia's Trump International Hotel**

34.     The Trump International Hotel Washington, D.C. is located on Pennsylvania Avenue, N.W., just blocks from the White House. The defendant owns and controls this hotel through various entities.

_____

[14]     *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jkFUPK.

[15]     David Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (Apr. 4, 2017), http://bit.ly/2o1OM1C.

[16]     Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (Mar. 24, 2017), http://for.tn/2n2MRXa; Maggie Haberman & Glenn Thrush, *Trump Reaches Beyond West Wing for Counsel*, N.Y. Times (Apr. 22, 2017), http://nyti.ms/2rsFqvk.

35.     The defendant, through entities he owns, receives payments made to the Trump International Hotel by guests who stay in hotel rooms and patrons who use the hotel venues or other goods or services in the hotel.

36.     The restaurant BLT Prime is located in the Trump International Hotel. The defendant, through various business entities, owns the restaurant, licenses the name from BLT Prime, and pays BLT Prime to operate the restaurant.[17]

37.     Since the election, the Trump International Hotel has specifically marketed itself to the diplomatic community. On one occasion, barely a week after the election, it held an event where it pitched the hotel to about 100 foreign diplomats.[18] The hotel also hired a "director of diplomatic sales" to facilitate business with foreign states and their diplomats and agents, luring the director away from a competing hotel in Washington.[19]

38.     In addition, the defendant has repeatedly appeared at the hotel since his election, adding further media attention to the property and raising its public profile. Several figures in his administration, including Treasury Secretary Steve Mnuchin and Small Business Administration Administrator Linda McMahon, have also lived or continue to live in the hotel.[20]

39.     Diplomats and their agents have voiced their intent to stay at (or hold events at) the Trump International Hotel. "Believe me, all the delegations will go there," one "Middle Eastern

---

[17]     Jessica Sidman, *How Donald Trump Lost His DC Restaurants*, Washingtonian (Oct. 23, 2016), http://bit.ly/2htYzq9.

[18]     Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post (Nov. 18, 2016), http://wapo.st/2qukIgh.

[19]     *Id.*

[20]     Julie Bykowicz, *Trump Hotel May be Political Capital of the Nation's Capital*, Associated Press (Mar. 5, 2017), http://apne.ws/2n2Rxfs.

diplomat" told the *Washington Post* about the hotel.[21] An "Asian diplomat" agreed: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'"[22]

40.     These statements have become reality. The Embassy of Kuwait, a foreign state, held its National Day celebration at the Trump International Hotel on February 22, 2017.[23] Upon information and belief, Kuwait paid for the venue, food, and other services provided in connection with the celebration. The cost has been estimated at $40,000 to $60,000.[24] Before the election, a "save the date" reservation had been made with the Four Seasons hotel, where the event had previously been held.[25] According to one report, the Embassy of Kuwait moved the event under pressure from the Trump Organization (though Kuwait's ambassador to the United States denied being pressured).[26] As a result, the Trump International Hotel or its controlling entities have received one or more payments from Kuwait after 12:01 pm on January 20, 2017.

41.     Between January 23 and 26, 2017 and during February 2017, the Kingdom of Saudi Arabia, a foreign state, spent thousands of dollars on rooms, catering, and parking at the Trump

---

[21]     *Id.*

[22]     *Id.*

[23]     Jonathan O'Connell, *Kuwaiti Embassy is latest to book Trump D.C. hotel, but ambassador says he felt 'no pressure'*, Wash. Post (Dec. 20, 2016), http://wapo.st/2pMtw21; Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*, NPR (Feb. 25, 2017), http://n.pr/2lavPoB.

[24]     Julia Harte, *Kuwait could pay up to $60,000 for party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017), http://reut.rs/2oFztKa.

[25]     Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*.

[26]     Judd Legum & Kira Lerner, *Under political pressure, Kuwait cancels major events at Four Seasons, switches to Trump's D.C. hotel*, ThinkProgress (Dec. 19, 2016), http://bit.ly/2rssRzM.

International Hotel. In a Foreign Agents Registration Act report filed with the Department of Justice, an agent representing the Royal Embassy of the Kingdom of Saudi Arabia reported paying the hotel $190,272 for lodging, $78,204 for catering, and $1,568 for parking between October 1, 2016 and March 31, 2017, using money received from Saudi Arabia.[27] Some of the payments were made after the defendant's inauguration as President.[28] Upon information and belief, Saudi Arabia paid at least $250 per night for each of the rooms it rented through its agent between January 23 and 26, 2017,[29] and paid the hotel for meals and other services provided in connection with the stay. Saudi Arabia paid for individuals to have dinner at the hotel on January 23 and both breakfast and dinner on January 24.[30] Upon information and belief, at least one of the meals was provided by BLT Prime. Upon information and belief, Saudi Arabia paid the hotel through its agent for similar expenses associated with a visit in mid-February.[31] As a result, the Trump International Hotel or its controlling entities have received one or more payments from Saudi Arabia, through its agent, after 12:01 pm on January 20, 2017.

---

[27]     MSLGROUP Americas Inc. d/b/a Qorvis MSLGROUP, Supplemental Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended, for six month period ending 3/31/2017, filed May 31, 2017, http://bit.ly/2rAQjgE; Chuck Ross, *Saudis Spent $270K At Trump Hotel In Lobbying Campaign Against 9/11 Bill*, Daily Caller (June 4, 2017), http://bit.ly/2sSKB7F.

[28]     Byron Tau & Rebecca Ballhaus, *Trump Hotel Received $270,000 From Lobbying Campaign Tied to Saudis*, Wall Street Journal (June 6, 2017), http://on.wsj.com/2s42HH9.

[29]     Isaac Arnsdorf, *Saudis foot tab at Trump hotel*, POLITICO (Feb. 9, 2017), http://politi.co/2kZa6mS.

[30]     Operations Order from Jason E. Johns, President of NMLB Veterans Advocacy Group, to Fly-In Veterans regarding the Justice Against Sponsors of Terrorism Act (Jan. 23-26, 2017), http://bit.ly/2oiBdIp.

[31]     Ross, *Saudis Spent $270K At Trump Hotel In Lobbying Campaign Against 9/11 Bill*.

42.     On or about April 6, 2017, Kaha Imnadze, the Ambassador and Permanent Representative of Georgia to the United Nations, stayed at the Trump International Hotel and then tweeted his compliments about the hotel.[32] Upon information and belief, the government of Georgia, a foreign state, paid the hotel for his room and other services provided in connection with his stay. As a result, the Trump International Hotel or its controlling entities have received one or more payments from Georgia after 12:01 pm on January 20, 2017.

43.     On information and belief, after 12:01 pm on January 20, 2017, the Trump International Hotel or its controlling entities have received and will continue to receive payments from other foreign states, instrumentalities of foreign states, or foreign officials.

44.     On January 20, 2017, Trump Old Post Office LLC, the entity leasing the building in which the Trump International Hotel is located and in which the defendant has a beneficial interest, amended its governing agreement to provide that, during the defendant's presidency, the company will not make any distributions of profits to any entity in which the defendant has a beneficial interest and will credit these undistributed profits to an unrecovered capital contribution account held for the benefit of the designated entities that defendant controls. This amendment is immaterial to whether the defendant has violated the Foreign Emoluments Clause. The defendant remains owner of approximately 77.5% of the Trump Old Post Office LLC (the remaining shares are owned by three of his children), and thereby benefits from any amounts deposited into the unrecovered capital contribution account. He further may receive distribution from those amounts once he is no longer in office.

---

[32]     Kaha    Imnadze    (@kahaimnadze),    Twitter    (Apr.    6,    2017,    8:49    AM), http://bit.ly/2oiF8Fd.

45.     Additionally, by providing that the defendant's contributions will be used by Trump Old Post Office LLC for business purposes, the amendment increased the value of one of his assets.

46.     Prior to taking office, President Trump's attorney promised that all profits earned from foreign governments would be donated to the U.S. Treasury. The Trump Organization later admitted, however, that it was not tracking all payments that it received from foreign governments, and that it plans only to estimate, rather than calculate, such payments.[33]

**New York's Trump Tower**

47.     Trump Tower is a mixed-use skyscraper on Fifth Avenue in New York City. Through the use of various entities, the defendant owns and controls Trump Tower and, through entities he owns, receives payments made to Trump Tower by tenants.

48.     One of the largest tenants of Trump Tower is the Industrial and Commercial Bank of China ("ICBC"), which is a Chinese majority-state-owned enterprise.[34] As such, ICBC is an instrumentality of a foreign state.

49.     After 12:01 pm on January 20, 2017, Trump Tower or its controlling entities have received one or more payments from ICBC under its lease. Trump Tower or its controlling entities will continue to receive regular payments from ICBC under its lease agreement.

50.     The defendant has repeatedly referenced ICBC's Trump Tower lease in discussing his views of U.S.-China relations. During his presidential campaign in June 2015, for instance, the defendant stated: "I love China! The biggest bank in the world is from China. You know where

---

[33]     Ari Melber, et al., *Trump Failing to Track Foreign Cash at His Hotels*, NBC News (May 24, 2017), http://nbcnews.to/2qWzv3x.

[34]     Caleb Melby, et al., *When Chinese Bank's Trump Lease Ends, Potential Conflict Begins*, Bloomberg (Nov. 28, 2016), https://bloom.bg/2oQ07T4.

their United States headquarters is located? In this building, in Trump Tower."[35] Similarly, in March 2016, when asked about China's territorial claims in the South China Sea, the defendant told the *Washington Post*, "I do deals with them all the time. The largest bank in the world, 400 million customers, is a tenant of mine in New York, in Manhattan."[36]

51.     The term of ICBC's Trump Tower lease runs until October 2019, before the end of the defendant's term. As a result, any negotiations for a renewal or extension of the lease will occur while he is serving as President.[37]

52.     Trump Grill is a restaurant located inside Trump Tower that the defendant owns through various business entities. Upon information and belief, tenants of Trump Tower, including officials of China and other countries, have dined at Trump Grill as a result of their tenancy in the Tower and the foreign states themselves may host events there. Accordingly, foreign states or their instrumentalities likely have paid or will pay for services at Trump Grill. The defendant has and will continue to receive payments from various foreign states through Trump Grill.

**New York's Trump World Tower**

53.     Trump World Tower is a skyscraper on United Nations Plaza in New York City, containing condominium units. Through the use of various entities, the defendant manages and controls Trump World Tower and, through entities he owns, receives payments made by residents of the Trump World Tower for common charges and handles rental transactions involving condominium units.

---

[35]     *Id.*

[36]     *Id.*

[37]     *Id.*

54.     In 2001, the Kingdom of Saudi Arabia paid $4.5 million to purchase a floor of Trump World Tower.[38] The annual common charges for building amenities for the floor totaled $85,585 at the time. As of 2003, the most recent year for which information is publicly available, the Kingdom of Saudi Arabia paid monthly common charges of about $7,398—or $88,781 per year. The floor currently belongs to the Kingdom of Saudi Arabia for use by the Saudi Mission to the United Nations, which upon information and belief continues to pay common charges to the defendant.[39]

55.     In 2015, the defendant said about Saudi Arabia: "I get along great with all of them. They buy apartments from me." He further noted: "They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much."[40]

56.     The Kingdom of Saudi Arabia is a foreign state, and the Saudi Mission to the United Nations is an instrumentality of a foreign state.

57.     In 2002, the Permanent Mission of India to the United Nations, an instrumentality of a foreign state, paid $5.1 million to purchase two units in Trump World Tower from the defendant.[41] As of 2003, the most recent year for which information is publicly available, the Mission paid monthly common charges of approximately $3,639—or $43,670 per year. The units

---

[38]     Stephen R. Brown, *Donald Trump made millions from Saudi Arabia, but trashes Hillary Clinton for Saudi donations to Clinton Foundation*, N.Y. Daily News (Sept. 4, 2016), http://nydn.us/2bNEAq2.

[39]     *Id.*

[40]     *Id.*

[41]     N.Y.C. Dep't of Finance, Office of the City Registrar, Condo. Unit Deed: 845 U.N. Ltd. P'ship To The Permanent Mission of India to the U.N. (Dec. 23, 2002), http://on.nyc.gov/2pb8Obx.

continue to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

58.     In 2009, the Permanent Mission of Afghanistan to the United Nations, an instrumentality of a foreign state, paid $4.235 million to purchase a unit in Trump World Tower.[42] As of 2003, the most recent year for which information is publicly available, the common monthly charges for the unit purchased by the Mission were approximately $2,090 per month—or $25,085 per year. The unit continues to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

59.     In 2004, the Permanent Mission of Qatar to the United Nations, an instrumentality of a foreign state, paid $1,995,000 to purchase a unit in Trump World Tower, and in 2012, it paid $8.375 million to purchase two additional units in Trump World Tower. As of 2003, the most recent year for which information is publicly available, the common monthly charges for the units purchased by the Mission were a total of approximately $5,660 per month—or $67,920 per year. The units continue to belong to the Mission, which upon information and belief still pays common charges to the defendant.

60.     The defendant, through entities he owns, receives payments made to Trump World Tower by tenants and owners of units in the building through their payment of common charges and other fees. On information and belief, these payments include management and other fees paid to the building's management company, an entity owned by the defendant.

---

[42]     Max Abelson, *Afghanistan Buys $4.2 M. Trump Condo (with 'Peacefulness and Views')*, Observer (Sept. 11, 2009), http://bit.ly/2oQ74n3.

61.     Trump World Tower or its controlling entities will continue to receive regular common charge payments from Saudi Arabia, India, Afghanistan, and Qatar, and those payments will flow to the defendant.

62.     The World Bar is a bar located in Trump World Tower.

63.     Tenants of the Trump World Tower, including officials from Saudi Arabia, India, Afghanistan, and Qatar have patronized (or will patronize) the World Bar. Further, foreign states or agents or instrumentalities of these or other foreign states have hosted and will host events at the World Bar due to its location near the United Nations. By reason of his financial stake in Trump World Tower, the defendant will either receive payments from foreign states made to the World Bar, or the revenue that the World Bar receives, including from foreign states, affects the amount of rent that the defendant is able to charge the World Bar.

**Chinese trademarks**

64.     The defendant began to seek trademark protection in China for the use of his name in connection with building construction services in 2006. His application was rejected by the Trademark Office, and he subsequently lost his appeals to the Trademark Review and Adjudication Board, the Beijing Intermediate People's Court, and the Beijing High People's Court.[43] The defendant suffered his most recent court defeat in May 2015, the month before he declared his candidacy for President.

65.     Three weeks after his election, on December 2, 2016, the defendant spoke directly with Taiwanese President Tsai Ing-wen.[44] That conversation broke longstanding protocol and

---

[43]     Erika Kinetz, *With Trump's win in China, will Trump toilets get flushed?* Associated Press (Feb. 14, 2017), http://apne.ws/2mfcK9N.

[44]     Jordan Fabian & Neetzan Zimmerman, *Trump makes history with phone call to Taiwan leader*, The Hill (Dec. 2, 2016), http://bit.ly/2prWnYu.

suggested that the defendant might end the "One China" policy that the United States had observed for decades. The defendant further indicated before taking office that he might end the One China policy unless some benefit were received in exchange.[45]

66.     On February 9, 2017, however, the defendant spoke with Chinese President Xi Jinping and pledged to honor the One China policy.[46] Five days later, on February 14, 2017, China reversed its prior course and gave the defendant trademark protection.

67.     Chinese law prohibits awarding trademarks that are "the same as or similar to the name of leaders of national, regional, or international political organizations."[47]

68.     Even though China had denied the defendant trademark protection for more than ten years, including in a ruling from an appellate court, and despite Chinese law barring the use of foreign leaders' names as trademarks, China reversed course and decided to grant the defendant the trademark he had sought and valued. But China did so only after he had been elected President, questioned the One China policy, was sworn in, and then re-affirmed the One China policy.

69.     The trademarks have considerable value because they give the Trump Organization the sole right to profit from the Trump brand in China. China's granting of these trademarks constitutes a present or emolument provided to the defendant.

---

[45]     Jordan Fabian & Evelyn Rupert, *Trump promises Chinese president he'll honor 'one China' policy*, The Hill (Feb. 9, 2017), http://bit.ly/2pbgZUW; Laurel Raymond & Judd Legum, *Trump's trademark tests Chinese law*, Think Progress (Feb. 18, 2017), http://bit.ly/2pXHZTZ.

[46]     Fabian & Rupert, *Trump promises Chinese president he'll honor 'one China' policy*.

[47]     Raymond & Legum, *Trump's trademark tests Chinese law*.

70.     When asked why the defendant changed his position on the One China policy, and whether he had received something in exchange from China, White House Press Secretary Sean Spicer answered: "The President always gets something," but did not elaborate.[48]

**International versions and distribution of "The Apprentice" and its spinoffs**

71.     The defendant earns royalties and other payments from the distribution in other countries of the television program "The Apprentice" and its spinoffs (including "The Celebrity Apprentice" and "The New Celebrity Apprentice," for which he is still an executive producer), and also from international versions of the programs produced in other countries. In some instances, these payments originate from foreign governments or their agents or instrumentalities. For instance, the defendant is paid for a version of the program "The Apprentice" that airs in the United Kingdom.[49] The network that broadcasts "The Apprentice" and spinoff shows in the United Kingdom is an instrumentality of a foreign state.

72.     After 12:01 pm on January 20, 2017, the defendant has received and will continue to receive payments from foreign states via their payments for "The Apprentice" or its spinoffs and international versions. Such payments constitute presents or emoluments that the defendant has accepted and will accept from a foreign state.

**Other foreign connections, properties, and businesses**

73.     ***United Arab Emirates.*** The defendant's company is engaged in several real-estate projects in the United Arab Emirates, including Dubai's Trump International Golf Club, which

---

[48]     Madeline Conway, *Spicer on Trump's 'One China' agreement: 'The president always gets something'*, POLITICO (Feb. 27, 2017), http://politi.co/2prZpf7.

[49]     Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice'*, Forbes (Dec. 13, 2016), http://bit.ly/2pY0S9h.

opened on February 18, 2017.[50] Upon information and belief, the defendant, through various business entities, has a branding-and-management contract with the property, and thereby possesses a financial interest in the Trump International Golf Club.

74.     All services for the golf club, including electricity, water, and roads, "come at the discretion of the government," and the "club's bar will need government approvals to serve alcohol, not to mention other regulatory issues."[51]

75.     The golf club and other projects cannot be built or operated without permits, utility, and other services and approvals. These discretionary approvals accordingly confer value on the defendant, through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

76.     *Indonesia.* The defendant's company is engaged in at least two real-estate projects in Indonesia, including redeveloping a resort in Bali.[52] Upon information and belief, the defendant, through various business entities, has a licensing-and-management agreement with these projects, through which he possesses a financial interest in them.

77.     Completing the projects required or will require permits and approvals from the Indonesian government. The defendant will receive value from these discretionary permits and

---

[50]     Sudarsan Raghavan, *Trump's sons get red carpet treatment at Dubai golf club opening*, Wash. Post (Feb. 18, 2017), http://wapo.st/2pY20tL.

[51]     Jon Gambrell, *Golf Club Shows Pitfalls of His Presidency*, Associated Press (Jan. 3, 2017), http://apne.ws/2j0gOVk.

[52]     Ian Jarrett, *Pan Pacific makes way for Trump in Bali*, Travel Weekly (Feb. 17, 2017), http://bit.ly/2nU3ANN; Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), http://nyti.ms/2kKSKLp; Russ Choma, *Trump's Indonesian Business Partner Brags About His Access*, Mother Jones (Feb. 10, 2017), http://bit.ly/2kujqMC.

approvals through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

78.    ***Other.*** The defendant also owns, operates, and licenses numerous other businesses throughout the United States and abroad, including other hotels, other properties for sale or lease, and golf courses and clubs.[53] The defendant, through his financial stake in the company or companies receiving them, derives value from the foreign permits and approvals associated with the owning and operation of those businesses in violation of the Foreign Emoluments Clause. In addition, revenues from foreign states' patronage of his hotels, golf clubs, and other businesses may flow to the defendant. After 12:01 pm on January 20, 2017, the defendant, through at least one of his various businesses, properties, and other entities has received one or more presents or emoluments from foreign states and will continue to do so.

### B.    The defendant's Domestic Emoluments Clause violations

79.    As alleged above, the defendant owns and controls hundreds of businesses throughout the country, including hotels and other properties. The defendant personally benefits from the business dealings of these entities and agreements associated with them, and is and will be enriched by their business with state governments or federal agencies within the scope of the Domestic Emoluments Clause.

### The District of Columbia's Trump International Hotel

80.    On August 5, 2013, Trump Old Post Office LLC, a business entity owned primarily by the defendant, signed a 60-year lease with the General Services Administration ("GSA")—an

---

[53]    U.S. Office of Gov't Ethics, Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

independent agency of the United States, whose administrator is appointed by the President—to

open a hotel in the Old Post Office Building in the District of Columbia.

81.     More than 76% of Trump Old Post Office LLC is owned by DJT Holdings LLC,

which is in turn owned almost entirely by the Donald J. Trump Revocable Trust, of which the

defendant is the sole beneficiary. The Trump International Hotel Washington, D.C. is located at

this site. The defendant has not divested his interest in the lease since becoming President.

82.     Section 37.19 of the Old Post Office lease states: "No . . . elected official of the

Government of the United States . . . shall be admitted to any share or part of this Lease, or to any

benefit that may arise therefrom." A violation of Section 37.19 is a non-monetary breach and a

default unless it is remedied within 30 days after notice from the GSA. Accordingly, the defendant

has been in breach of the lease with the GSA since 12:01 pm on January 20, 2017, when he became

President.

83.     Before the defendant's inauguration, the GSA's Deputy Commissioner indicated to

Representatives Elijah Cummings, Peter DeFazio, Gerald Connolly, and André Carson that the

defendant would be in violation of the lease unless he "fully divests himself of all financial interests

in the lease" for the Trump International Hotel, which he has not done. Shortly after the

inauguration, Norman Dong, a GSA official appointed by former President Obama, became acting

administrator. But less than a day later, the defendant replaced Mr. Dong with Tim Horne, who

had coordinated the GSA's transition with the defendant's campaign.[54]

84.     Several weeks later, on March 16, 2017, the defendant released a proposed 2018

budget increasing GSA's funding, while cutting all (or nearly all) other non-defense-related

---

[54]     Isaac Arnsdorf, *Trump Picks Leader for Federal Agency Overseeing His D.C. Hotel*, POLITICO (Jan. 26, 2017), http://politi.co/2psgMfU.

agencies' budgets.[55] One week after that, on March 23, the GSA issued a letter stating that—contrary to the lease's plain terms—Trump Old Post Office LLC "is in full compliance with Section 37.19 [of the lease] and, accordingly, the lease is valid and in full force and effect."[56] A significant portion of the letter reviews the purported financial benefits of the lease to the GSA and taxpayers—even though those benefits are immaterial to the question of breach.

85.     Attached to the March 23, 2017 letter was an amendment to the agreement governing the business of Trump Old Post Office LLC. This amendment is the basis of the GSA's position that the tenant is in compliance with the lease, but the letter does not explain how the amendment brings the tenant into compliance. In fact, as described above, the amendment does not prevent the defendant from receiving "any benefit" from the lease, and Trump Old Post Office LLC remains in breach of the lease.

86.     In forbearing from enforcing the Old Post Office lease's default and termination procedures, despite the tenant's breach of its terms, and in cooperating with the tenant in attempting to create the appearance of compliance with the lease, the federal government has given the defendant an emolument in violation of the Domestic Emoluments Clause.

87.     Additionally, the defendant, through entities he owns, is seeking a $32 million historic-preservation tax credit for the Trump International Hotel. Approval of this credit is at the discretion of the National Park Service, an instrumentality of the federal government now under

---

[55]     Office of Mgmt. & Budget, Exec. Office of the President, America First, A Budget Blueprint to Make America Great Again (2017), http://bit.ly/2nvjrBO.

[56]     Letter from Kevin M. Terry, Contracting Officer, United States Gen. Servs. Admin., to Donald J. Trump, Jr. (Mar. 23, 2017), http://bit.ly/2nhKfaB.

the defendant's authority.[57] If approved, the tax credit would offset approximately 20% of the cost

of rehabilitating the building in which the Trump International Hotel is operating.

88.     On November 14, 2016, the defendant received approval from the National Park

Service for the second phase of the three-step-approval process. If final approval is granted, it may

constitute an emolument, in violation of the Domestic Emoluments Clause.

**Mar-a-Lago Club**

89.     The Mar-a-Lago Club is a private club and estate located in Palm Beach, Florida.

It is comprised of 20 acres of land, with a main mansion of over 100 rooms, along with a beach

club, pools, tennis courts, and a 20,000 square foot ballroom for private events. The estate itself

was purchased by the defendant in 1985. A decade later, in 1995, the defendant opened the club

as a hotel and resort for dues-paying members of the public. It is owned by the defendant directly

or owned by entities that he directly controls.

90.     The defendant, through entities he owns, receives payments made to the Mar-a-

Lago Club by members and guests who join or visit the club, or rent space there, or pay for other

goods or services at the club.

91.     Membership in the Mar-a-Lago Club requires payment of an initiation fee of

$200,000, plus tax, as well as $14,000 a year in annual dues. This fee was doubled following the

defendant's election as President—an increase from $100,000 to $200,000.[58] Since his election,

the defendant has also attempted to capitalize on his office by advertising his private property to

foreign governments and individuals.

---

[57]     Eric Levitz, *Trump Won the Presidency, Then Approval on a Tax Subsidy for His Hotel,* New York Mag. (Nov. 30, 2016), http://nym.ag/2oFF1o9.

[58]     Robert Frank, *Mar-a-Lago Membership Fee Doubles to $200,000*, CNBC (Jan. 25, 2017), http://cnb.cx/2kjIc2j.

92.     The State Department and at least two U.S. Embassies—those located in the United

Kingdom and Albania—have promoted the Mar-a-Lago estate and club on their respective

websites by posting a 400-word blog post, originally written by Leigh Hartman for a State

Department-managed website, "Share America," on April 4, 2017.[59]

93.     The State Department and embassies' actions have served to promote Mar-a-Lago

as the defendant's "Florida estate" and claimed that it "has become well known as the president

frequently travels there to work or host foreign leaders."[60]

94.     The State Department is an executive department within the federal government

under the defendant's authority.

95.     ShareAmerica, the blog for which the post was originally written, is specifically

directed towards foreign individuals and governments.[61]

96.     This post advertising Mar-a-Lago has since been removed from the websites of the

State Department and the embassies, but not before substantive, world-wide advertising of the

defendant's private property, using government resources, had occurred.

97.     The defendant has used his official position as President to promote his Mar-a-Lago

property. He has designated Mar-a-Lago as the "Winter White House," and also refers to it as the

"Southern White House."[62] Since taking office, he has visited Mar-a-Lago on at least seven

---

[59]     Darren Samuelsohn, *State Department, U.S. Embassies Promoting Trump's Mar-a-Lago*, POLITICO (Apr. 24, 2017), http://politi.co/2peC7Jb.

[60]     *Mar-a-Lago: The winter White House*, http://bit.ly/2paWtRK (blog post subsequently removed; former blog post shown at Dan Merica, *State Department removes Mar-a-Lago blog post*, CNN (Apr. 25, 2017), http://cnn.it/2pdRu2x).

[61]     *About Us*, ShareAmerica, https://share.america.gov/about-us/ (last visited June 9, 2017).

[62]     *See, e.g.*, Press Briefing by Press Secretary Sean Spicer (Feb. 2, 2017) ("Luckily, for those of you who are going to be joining the President down to Florida this weekend, you'll

occasions, and has met with a number of foreign leaders there, including Japanese Prime Minister

Shinzo Abe and the President of the People's Republic of China, Xi Jinping.[63]

98.     Upon information and belief, federal, state, and local governments, or their

instrumentalities, have made and will continue to make payments for the use of facilities owned

or operated by the defendant for a variety of functions. The defendant will receive a portion of

those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause.

99.     Although the exact extent of these emoluments is not currently known, examples

of current or potential violations include "public pension funds in at least seven U.S. states"—but

not the State of Maryland or the District of Columbia—that "have invested millions of dollars in

an investment fund that owns a New York hotel and pays one of President Donald Trump's

companies to run it, according to a Reuters review of public records."[64] And the defendant has

received (or will likely receive) a host of other potential emoluments from federal, state, and/or

local governments.

---

get some time to get a glimpse of summer at the 'Winter White House' in Mar-a-Lago."),
http://bit.ly/2k5Q3lZ; Remarks by President Trump in Listening Session with the National
Association of Manufacturers (Mar. 31, 2017) ("The President: . . . As you know the President of
China is coming to Florida. We're having a meeting—big meeting—at Mar-a-Lago. We call it the
Southern White House, which it actually is. It was originally built as the Southern White House, a
lot of people don't know."), http://bit.ly/2rUH0ZI.

[63]     *See* Background Briefing by Senior Administration Officials on the Visit of
President Xi Jinping of the People's Republic of China (Apr. 4, 2017) ("SENIOR
ADMINISTRATION OFFICIAL: . . . I'm certain it was President Trump's invitation that they
meet outside of Washington, D.C.—. . . you know, you've heard people refer to it as the 'winter
White House.' It's a place where he feels comfortable and at home, and where he can break the
ice with Xi Jinping without the formality, really, of a Washington meet-up."),
http://bit.ly/2nVQy26.

[64]     Julia Harte, *Exclusive: A New York hotel deal shows how some public pension funds
help to enrich Trump*, Reuters (Apr. 26, 2017), http://reut.rs/2oIONEp.

**C.      Post-inauguration premium for the defendant's goods and services**

100.    Since the defendant's inauguration as President, goods and services sold by his various Trump businesses have sold at a premium. The defendant's high office gives the Trump brand greater prominence and exposure. Moreover, these goods and services provide (or have the potential to provide) a unique benefit: access to, influence on, and the goodwill of the President of the United States.

101.    Thus, for example, the starting rate for "guest rooms" at the defendant's Old Post Office hotel increased to $500 on most nights, up hundreds of dollars from when the hotel first opened shortly before the defendant's election.[65]

102.    Further, as discussed earlier, the initiation fee for membership at defendant's Mar-a-Lago resort doubled from $100,000 to $200,000 shortly after he was elected.[66]

**D.      The plaintiffs' interests in this litigation**

103.    The plaintiffs' interests in this litigation are substantial. They are harmed by the defendant's constitutional violations in at least two distinct ways. *First*, they have suffered (and will continue to suffer) harm to their sovereign and/or quasi-sovereign interests, including Maryland's interest in preserving its rightful status within our federal system; the plaintiffs' interest in not being subjected to unfair competition by virtue of ongoing violations of constitutional provisions designed to guard against corruption and to protect interests distinct to the states themselves; the plaintiffs' interest in protecting their economies and their residents from economic harm; and Maryland's interest in preserving its tax revenue. *Second*, the plaintiffs have suffered (and will continue to suffer) proprietary and other financial harms as a result of the

---

[65]      The Associated Press, *Trump Hotel May Be Political Capital of Nation's Capital*, Fortune (Mar. 5, 2017), http://for.tn/2rsCsXl.

[66]      Robert Frank, *Mar-a-Lago membership fee doubles to $200,000*.

defendant's ongoing constitutional violations. These injuries can be redressed by a declaration that the defendant is in violation of the Emoluments Clauses and an injunction preventing his continued violation of them.

### Sovereign and quasi-sovereign injuries to the plaintiffs

104. ***Maryland's sovereign interest in enforcing the terms on which it agreed to enter the Union.*** Before adopting the federal Constitution, Maryland and its sister states were truly independent sovereigns. Many of these states—including Maryland—had incorporated protections against public corruption into their own legal codes and constitutions, with specific prohibitions on public officials accepting payments from federal, state, or foreign governments. The Maryland Declaration of Rights, adopted August 14, 1776, provides that "all persons invested with the legislative or executive powers of government are the trustees of the public," and contains a precursor to the U.S. Constitution's Emoluments Clauses.[67] This precursor combines the concerns of the two clauses into a single prohibition: "That no person ought to hold, at the same time, more than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State."[68] The Maryland Constitution of 1776 further provided for banishment "forever" as a potential punishment for a governor sharing "directly or indirectly" in the profits of another office, and also prohibited the governor from receiving part of the profits of supplying the army and navy.[69]

---

[67]    Md. Declaration of Rights of 1776, art. 4 (Aug. 14, 1776).

[68]    *Id.*, art. 32.

[69]    Md. Const. of 1776, arts. 33 and 53.

105.     Maryland's historical prohibition against foreign and domestic emoluments is consistent with the constitutions adopted by the other colonies at the time. The Pennsylvania Constitution of 1776, which Benjamin Franklin helped draft, made clear "[t]hat government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community."[70] The South Carolina Constitution of 1776,[71] and the Massachusetts Constitution of 1780,[72] contained similar prohibitions against corruption of public officials.

106.     The prohibitions contained in the Domestic and Foreign Emoluments Clauses were thus material inducements to the states entering the union. As a state sovereign, Maryland retains its power to bring suit to enforce those prohibitions today.

107.     ***The plaintiffs' governmental interest in not being compelled to compete improperly for influence or favor.*** As explained above, the Domestic Emoluments Clause in particular reflects the Framers' deep concern that one or more of the states (or the federal government) might seek to buy off the President so that he would exercise power to their advantage and to the detriment of other states, thereby disrupting the balance of power in the federalist

---

[70]     Const. of Pa., Declaration of the Rights of the Inhabitants of the Commonwealth or State of Pennsylvania, art. V; *see also id.* at § 36 ("As every freeman to preserve his independence, (if without a sufficient estate) ought to have some profession, calling, trade or farm, whereby he may honestly subsist, there can be no necessity for, nor use in establishing offices of profit, the usual effects of which are dependence and servility unbecoming freemen, in the possessors and expectants; faction, contention, corruption, and disorder among the people. But if any man is called into public service; to the prejudice of his-private affairs, he has a right to a reasonable compensation: And whenever an office, through increase of fees or otherwise, becomes so profitable as to occasion many to apply for it, the profits ought to be lessened by the legislature.").

[71]     S.C. Const. of 1776, art. X.

[72]     Mass. Const., ch. II, art. XIII.

34

system. Thus, the Domestic Emoluments Clause aims to prevent "the United States, or any of them," from feeling compelled (or being compelled) to confer private financial benefits on the President in order to compete for influence and favor.

108.    The District and Maryland each have a governmental interest in the enforcement of their respective laws regarding taxation, environmental protection, zoning, and land use as they relate to real property that the defendant or the "Trump Organization" may own or seek to acquire. The defendant and his affiliated enterprises have a large and expanding portfolio of real-estate holdings, including a hotel in the District, and the defendant's Trump International Realty, otherwise known as T International Realty LLC, is registered to conduct business in Maryland.[73]

109.    Real-estate acquisition, ownership, and development implicate a range of legal requirements under the laws of the District and Maryland, including tax laws that generate revenue for the District, Maryland, and their instrumentalities. The defendant has boasted that he has achieved success in real-estate acquisition and development by using his financial clout and political connections to extract from governments maximum concessions, exemptions, waivers, and variances with respect to taxes and other requirements imposed by law.[74] Indications to date suggest that this longstanding practice of the Trump Organization did not cease upon the defendant's election to the Presidency; rather, there is evidence that the defendant's ascendancy to

---

[73]    Md. State Dep't of Assessments and Taxation, Md. Business Express, Registration for Trump International Realty, http://bit.ly/2qXZWpQ.

[74]    Geraldine Baum, Tom Hamburger & Michael J. Mishak, *Trump has thrived with government's generosity*, L.A. Times (May 11, 2011), http://lat.ms/1UGMtc8; Jillian Kay Melchior, *Donald Trump Has Mastered the Art of the Tax Break*, National Review (Aug. 19, 2015) ("Trump has long sought subsidies, tax breaks, and other preferential treatment from the government."), http://bit.ly/1rher3Y.

the highest office in the land has enhanced his organization's ability to win concessions from governments with respect to his properties.[75]

110. The defendant's acceptance or receipt of presents and emoluments in violation of the Constitution presents the District and Maryland with an intolerable dilemma: either (1) grant the Organization's requests for concessions, exemptions, waivers, variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulations, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions. Either way, the result is the very type of injury that the Domestic Emoluments Clause was designed to prevent.

111. Moreover, the District and Maryland, which rank first and fourth, respectively, in per capita amount of federal government expenditures, are particularly susceptible to injury resulting from budgetary decisions that are subject to the corrupting influence of emoluments.[76] Federal funds make up approximately 25% of the District's fiscal year 2018 budget,[77] and Maryland is relying on federal funds for nearly 30% of the State government's budget for fiscal year 2018.[78] Federal government spending accounted for more than 42% of the District's gross

---

[75]      Michael LaForgia & Steve Eder, *When That Feisty Neighbor Becomes the President*, N.Y. Times (May 6, 2017), http://nyti.ms/2qXUxPw.

[76]      U.S. Dept. of Commerce, *Consolidated Federal Funds Report for Fiscal Year 2010* (Sept. 2011) at 23, 32, http://bit.ly/2r6mJRe.

[77]      Council of the District of Columbia, Committee of the Whole, *Report on Bill 22-241, the "Fiscal Year 2018 Federal Portion Budget Request Act of 2017"* (May 30, 2017) at 2, http://bit.ly/2s0x6Fz.

[78]      Md. Dept. of Legislative Services, *The 90 Day Report: A Review of the 2017 Legislative Session* at A-3, A-28, http://bit.ly/2r6gIEs.

domestic product and more than 28% of Maryland's in fiscal year 2014.[79] Both the District and

Maryland are home to headquarters for federal agencies. Civilian federal agencies employ

approximately 17% of the workforce in the District[80] and 10% of Maryland's total workforce.[81]

Federal agencies annually have spent more than $21 billion for procurement in the District and

more than $26 billion for procurement in Maryland.[82] Given this significance of federal

government spending and operations, and the President's significant role in determining how,

when, and where federal funds are spent, the conflict of interest inherent in the defendant's receipt

of emoluments directly and profoundly affects the District and Maryland.

112.    The plaintiffs seek to protect this distinct interest, and thereby vindicate their role

as governments in our constitutional scheme.

113.    ***The plaintiffs' interest in preventing economic injury to their residents and their***

***economies.*** The District is home to 680,000 residents, while the State of Maryland is home to over

6.1 million residents. Residents of both the District and Maryland participate in a thriving

hospitality industry that comprises a substantial part of the plaintiffs' economies. For example, in

2014, visitors to the District generated approximately $6.81 billion in spending[83] and drove $3.86

---

[79]    Pew Charitable Trusts, *Issue Brief: Federal Spending in the States 2005 to 2014* (Mar. 3, 2016) at 6, http://bit.ly/1QIOq43.

[80]    Office of Personnel Management, Data, Analysis & Documentation: Federal Employment Reports (Sept. 2015), http://bit.ly/2qZWcRE; District of Columbia, Wage and Salary Employment by Industry and Place of Work (Dec. 2015), http://bit.ly/2raFJhF.

[81]    John Fritze, *Trump's Budget Suggests Major Changes in Md.*, Baltimore Sun (Mar. 16, 2017), http://bsun.md/2r6n1Yk.

[82]    U.S. Dept. of Commerce, *Consolidated Federal Funds Report for Fiscal Year 2010* (Sept. 2011) at 37, 48, http://bit.ly/2r6mJRe.

[83]    Office of the Deputy Mayor for Planning and Economic Development, *Hospitality and Tourism*, https://dmped.dc.gov/page/hospitality-and-tourism.

billion in wages[84] for 74,570 employees in the District's hospitality industry.[85] In Maryland, tourists and travelers spent nearly $17 billion in 2015, yielding $5.7 billion in wages for more than 140,000 employees,[86] including more than 72,000 hospitality industry workers employed in the two Maryland counties that border the District of Columbia.[87] Both the District and Maryland regulate competition and transparency in this industry through laws that prohibit anticompetitive or deceptive practices and protect consumers.

114.    Residents of the District and Maryland are injured by the payment of presents and emoluments to the defendant because it tilts the competitive playing field toward his businesses; causes competing companies and their employees to lose business, wages, and tips; and generates a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition.

115.    The District and Maryland have the authority and right to vindicate their interest in providing and preserving a level playing field in the hospitality industry, and in ensuring that their residents are free from the injuries and competitive disadvantages that flow from defendant's violations of the Emoluments Clauses.

116.    ***Maryland's sovereign interests in tax revenues.*** The defendant's violations of the Emoluments Clauses also injure Maryland's interest in preserving tax revenue for the benefit of its residents. For example, National Harbor is a resort development with hotels, a casino,

---

[84]    *Id.*

[85]    *Id.*

[86]    Md. Tourism Development Board, *FY 2016 Tourism Development Annual Report* (Jan. 4, 2017) at 3, http://bit.ly/2r0k3Ra.

[87]    Md. Dept. of Commerce, *Montgomery County, Md.: Brief Economic Facts* (2017) at 2, http://bit.ly/2rFHvG2; Md. Dept. of Commerce, *Prince George's County, Md.: Brief Economic Facts* (2017) at 2, http://bit.ly/2sY6P8e.

restaurants, entertainment, a marina, and shops located on the Potomac River in Prince George's

County, Maryland. Although Maryland does not own National Harbor, the various hotels and other

businesses in the complex generate significant tax revenue for state and local governments,

through income tax assessed on the businesses and their employees, sales tax, hotel tax, and other

taxes and fees.

117.    The National Harbor development includes MGM National Harbor, a hotel,

entertainment, shopping, and casino complex that is subject to a Community Benefit Agreement

between MGM National Harbor, LLC, and the government of Prince George's County, a

subdivision of the State of Maryland.[88] The Community Benefit Agreement sets goals encouraging

MGM National Harbor to hire Prince George's County residents, to contract with minority

business enterprises and other businesses located in the County, and to create investment

opportunities for County residents. The casino is operated under a gaming license granted by the

Maryland Lottery and Gaming Control Commission, a state government entity. Under Maryland

law, the state and local governments receive 56% of the proceeds generated by MGM National

Harbor's video lottery terminals and 20% of the gross proceeds generated by its table games.[89] In

the first four months of 2017, MGM National Harbor's casino proceeds contributed more than $75

million in revenue to state and local government treasuries to fund various public purposes,

including more than $55 million for the State's Education Trust Fund.[90] Any circumstance that

---

[88]    *See* County Council of Prince George's County, Md., Resolution No. CR-68-2014
(July 23, 2014) (approving Community Benefit Agreement), http://bit.ly/2rotRaS.

[89]    Md. Code Ann., State Gov't § 9-1A-27; Md. Lottery and Gaming Control Agency,
*Maryland Casinos Generate $135.7 Million in Revenue During April*, http://bit.ly/2s8zSsD.

[90]    *Id.*

impairs National Harbor's ability to attract visitors and guests will diminish the revenues on which the state and local governments depend.

118.    Trump International Hotel, located in the District of Columbia, is a direct competitor of National Harbor's hotels and other businesses, including MGM National Harbor. Those hotels and businesses suffer competitive harm by the defendants' ongoing constitutional violations, and Maryland's tax coffers, in turn, are diminished as a result.[91]

**Proprietary and other financial injuries to the plaintiffs**

119.    ***The District of Columbia.*** The District has a financial interest in properties, venues, and other enterprises located within the District as owner, lender, or landlord.

120.    The District owns the Walter E. Washington Convention Center. The Washington Convention and Sports Authority (also known as Events DC), is an instrumentality of the government of the District of Columbia. Events DC operates event and conference venues in the District, including the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

121.    The District, through Events DC, serves the diplomatic community and foreign and state governments by providing services that compete with those owned or controlled by the defendant or the Trump Organization.

122.    In fiscal year 2016, Events DC generated over $30 million in revenue from building rental and ancillary charges. A portion of Events DC's revenue is based on demand for the Convention Center, D.C. Armory, and Carnegie Library.

---

[91]    Benjamin Freed, *MGM Says Its National Harbor Resort Will 'Blow Away' Donald Trump's DC Hotel*, Washingtonian (Jan. 20, 2016), http://bit.ly/2qXV7g6.

123.    On August 9, 2016, the Embassy of Colombia partnered with the U.S. Soccer Foundation to host an Olympic watch party at the Carnegie Library for the soccer match between the U.S. Women's National team and Colombia.[92]

124.    On September 6, 2016, the Embassy of Tajikistan celebrated Tajikistan Independence Day at a reception held at the Carnegie Library.[93]

125.    As discussed above, Trump International Hotel Washington, D.C., specifically markets its hotel rooms, event space, and food and beverage services to the diplomatic community and foreign governments.

126.    The defendant, his family, and other members of the defendant's administration have continued to promote his hotel properties, such as by making multiple appearances at those properties, including in connection with official business.

127.    Since the defendant's inauguration, foreign governments (including the Embassy of Kuwait and the Kingdom of Saudi Arabia) have held events at the hotel, and public officials have stated that, since the defendant was elected president, they are more likely to pay for goods and services at the defendant's properties in an attempt to curry favor with him.

128.    The defendant's receipt or acceptance of presents or emoluments through the Trump International Hotel Washington, D.C. and other properties owned or controlled by the defendant or the Trump Organization has resulted in a competitive injury to the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

---

[92]    Olympic Watch Party, US Soccer Foundation website (last visited June 10, 2017), http://bit.ly/2auRNlm.

[93]    *Tajik Independence*, Washington Diplomat Facebook page (last visited June 10, 2017), http://bit.ly/2rMR3z8.

129. The District's interest is further injured by the loss of the economic value of its brands in comparison to defendant's brand, as foreign and state governments and their agents and instrumentalities favor his businesses for reasons related to the defendant's receipt or acceptance of presents or emoluments.

130. ***The State of Maryland.*** Maryland has a proprietary interest in properties, venues, and enterprises that directly compete with those owned or controlled by the defendant or the Trump Organization. Maryland suffers economic loss because its enterprises are placed at a competitive advantage as the result of the defendant's ongoing violations of the Foreign and Domestic Emoluments Clauses.

131. Specifically, Maryland has a direct financial interest in the Montgomery County Conference Center, part of the Bethesda North Marriott Hotel and Conference Center located in Bethesda, Maryland. The site of the hotel and conference center is owned by the Montgomery County Revenue Authority, a public corporation established by Montgomery County, which is a subdivision of the State of Maryland. The County Revenue Authority leased the conference center portion of the site to Montgomery County and to the Maryland Stadium Authority, an instrumentality of the State,[94] as equal tenants-in-common to develop the conference center. The development of the conference center was funded through bonds issued by the Maryland Stadium Authority, separate bonds issued by the County Revenue Authority, and direct contributions from Montgomery County. The County Revenue Authority also leased the hotel portion of the site to a consortium of private investors that funded the development of the hotel. The hotel and conference center are overseen by a management committee that includes representatives of Montgomery County and the Maryland Stadium Authority, and the facility is operated by Marriott Hotel

---

[94]      Md. Code Ann., Econ. Dev. § 10-604 (2008 Repl. Vol.).

Services, Inc., under an agreement with Montgomery County. The conference center offers approximately 39,000 square feet of meeting space. In fiscal year 2016, activities at the conference center generated, directly and indirectly, an estimated $45.9 million in spending, and yielded estimated tax revenues of more than $2.7 million for the State and nearly $1 million for Montgomery County.[95]

132.    Furthermore, as explained above, the State of Maryland has suffered financial harm because it has a sovereign interest in the receipt of tax revenues from facilities (like the National Harbor) that are in competition with businesses owned by the defendant and/or his affiliated enterprises outside the State.

133.    The declaratory and injunctive relief that the plaintiffs are seeking would remedy these injuries by eliminating the plaintiffs' competitive disadvantage vis-à-vis the defendant.

## V.
## CLAIMS

### COUNT I
### Violations of the Foreign Emoluments Clause
### (Declaratory and Injunctive Relief)

134.    As discussed in detail above, the defendant has violated—and will continue to violate—the Foreign Emoluments Clause. The phrase "Person holding any Office of Profit or Trust," as used in the clause, includes the President. The phrases "present" and "Emolument . . . of any kind whatever" together cover anything of value, including without limitation monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "any King, Prince, or foreign State" includes any foreign government and any agent or instrumentality thereof.

---

[95]     *Montgomery County Conference Center Economic and Fiscal Impact Analysis FY 2016, Final Report* (Jan. 2017) at 1-2.

135.     The defendant has accepted "present[s]" or "Emolument[s]" directly from—or

from agents or instrumentalities of—China, the United Arab Emirates, Kuwait, Indonesia, Saudi

Arabia, Afghanistan, Qatar, India, Georgia, the United Kingdom, and other "foreign State[s],"

without seeking or obtaining "the Consent of the Congress" as required by the Foreign

Emoluments Clause.

136.     As described more fully in paragraphs 29 to 78 herein, the defendant is

committing or will commit these violations in connection with transactions involving the Trump

International Hotel Washington, D.C., New York's Trump Tower and Trump World Tower,

restaurants the defendant owns or that are located in his hotels or other properties, the television

program "The Apprentice" and its spinoffs and international versions, and other business and

property interests and transactions in the United States and abroad.

137.     As a direct result of these violations of the Foreign Emoluments Clause, the

plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional

significant harm directly from the further occurrence of these violations.

138.     No plan announced by the defendant or his attorneys as of the date of this filing

can make this conduct constitutional or otherwise remedy these constitutional violations.

139.     The District of Columbia and the State of Maryland are entitled to injunctive and

declaratory relief to stop the above-mentioned Foreign Emoluments Clause violations and any

other Foreign Emoluments Clause violations. This Court has the power to grant such relief

pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

## COUNT II
### Violations of the Domestic Emoluments Clause
### (Declaratory and Injunctive Relief)

140.     As discussed in detail above, the defendant has also violated—and will continue

to violate—the Domestic Emoluments Clause. As President, he is the sole subject of the clause.

The phrase "any other Emolument" under the clause covers remuneration beyond the President's "Compensation" as set by Congress, including monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "the United States, or any of them" includes any part of the federal government, any state government, any local government, and any agent or instrumentality thereof.

141.     The defendant is and will be accepting "any other Emolument" from "the United States, or any of them." As described more fully in paragraphs 79 to 99 herein, the defendant has committed violations of the Domestic Emoluments Clause, and without this Court's intervention he will continue violate the clause.

142.     As a direct result of these violations of the Domestic Emoluments Clause, the plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional significant harm directly from the further occurrence of these violations.

143.     No plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations.

144.     The District of Columbia and the State of Maryland are entitled to declaratory and injunctive relief to stop and prevent the above-mentioned Domestic Emoluments Clause violations and any other violations of the clause. This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, the District of Columbia and the State of Maryland respectfully request that this Court enter a judgment in their favor and against the defendant, consisting of:

(a)     A declaratory judgment, stating that the defendant has violated and will continue to violate the Foreign and Domestic Emoluments Clauses, as construed by this Court;

(b)     injunctive relief, enjoining the defendant from violating the Foreign and Domestic

Emoluments Clauses, as construed by this Court;

(c)     such other and further relief as this Court may deem just and proper.

Dated: February 23, 2018

THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of
Columbia

NATALIE O. LUDAWAY*
Chief Deputy Attorney General

/s/ Stephanie E. Litos
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C.  20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven M. Sullivan
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD  21202
T: (410) 576-6325
F: (410) 576-6955

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600

*admitted pro hac vice

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

THE DISTRICT OF COLUMBIA
441 Fourth Street, N.W.
Washington, D.C. 20001,

and

THE STATE OF MARYLAND
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202,

      Plaintiffs,

      v.

DONALD J. TRUMP,
President of the United States of America, in
his official capacity and in his individual
capacity
President of the United States of America
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500,

      Defendant.

Civil Action No. 8:17-cv-1596-PJM

### AMENDED COMPLAINT

BRIAN E. FROSH
Attorney General of Maryland

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
T: (410) 576-6325
F: (410) 576-6955

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE O. LUDAWAY
Chief Deputy Attorney General
Federal Bar No. 12533
Natalie.ludaway@dc.gov
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C. 20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
  in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020


DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600


*admitted pro hac vice

# TABLE OF CONTENTS

I. Nature of the action ................................................................................................... 2

II. Parties, jurisdiction, and venue ................................................................................ 8

III. Legal background .................................................................................................... 9

IV. Relevant facts ....................................................................................................... 12~~11~~

    A.   The defendant's Foreign Emoluments Clause violations ..................................... 12~~11~~

    B.   The defendant's Domestic Emoluments Clause violations ................................. 26~~25~~

    C.   Post-inauguration premium for the defendant's goods and services .................. 32~~30~~

    D.   The plaintiffs' interests in this litigation .......................................................... 32~~31~~

V. Claims ................................................................................................................... 43~~41~~

VI. Prayer for relief ................................................................................................... 45~~44~~

# I.
## NATURE OF THE ACTION

1.     This is an action against Donald J. Trump in his official capacity as President of the

United States and in his individual capacity.[1] The case involves unprecedented constitutional

violations by the President that have injured and threaten to cause continuing injury to the District

of Columbia ("the District") and the State of Maryland ("Maryland") and their respective residents,

including direct injury to the plaintiffs' interests in properties located in the District, in Prince

George's County, Maryland, and in Montgomery County, Maryland.

2.     The lawsuit alleges violations by the President of two distinct yet related provisions

of the U.S. Constitution that seek to make certain that he faithfully serves the American people,

free from compromising financial entanglements with foreign and domestic governments and

officials. The first provision, the Foreign Emoluments Clause, prohibits any "Person holding any

Office of Profit or Trust" from accepting "any present, Emolument, Office, or Title, of any kind

whatever, from any King, Prince, or foreign State," absent "the Consent of the Congress." U.S.

Const. art. I, § 9, cl. 8. The second, the Domestic Emoluments Clause, entitles the President to

receive a salary while in office and forbids him from "receiv[ing] within that Period any other

Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. Together, these

provisions help ensure that the President serves with undivided loyalty to the American people,

and the American people only. Our republican form of government demands no less.

3.     Vested by the Constitution with extraordinary power, the President is bound by oath

to "faithfully execute" his office and "preserve, protect and defend the Constitution of the United

States." Since 1789, each President, regardless of temperament or ideology, has sought, in his own

---

[1] For ease of reference, Plaintiffs use the honorific "President" or the word "defendant" to refer to Donald J. Trump in his official capacity and his individual capacity.

2

way, to honor that solemn vow. Yet fundamental to a President's fidelity to that oath is the Constitution's demand that the President, as the highest officeholder in the land, disentangle his private finances from those of domestic and foreign powers. Never before has a President acted with such disregard for this constitutional prescription.

4.     President Trump's continued ownership interest in a global business empire, which renders him deeply enmeshed with a legion of foreign and domestic government actors, violates the Constitution and calls into question the rule of law and the integrity of the country's political system. Whatever the sincerity of the persons involved, foreign and domestic officials are put in the position of considering whether offering benefits to businesses associated with the President is important to maintaining goodwill. And irrespective of whether such benefits affect the President's decision-making or shift his foreign or domestic policy, uncertainty about whether the President is acting in the best interests of the American people, or rather for his own ends or personal enrichment, inflicts lasting harm on our democracy. The Framers of the Constitution foresaw that possibility, and acted to prevent that harm.

5.     The Emoluments Clauses are two critical, closely related anti-corruption provisions aimed at ensuring that the President faithfully serves *the people*, free from the distorting or compromising effects of financial inducements provided by foreign nations, their leaders, individual states in the Union, Congress, or other parts of the federal government. They ensure that Americans do not have to guess whether a President who orders their sons and daughters to die in foreign lands acts out of concern for his private business interests; they do not have to wonder if they lost their job due to trade negotiations in which the President has a personal stake; and they never have to question whether the President can sit across the bargaining table from foreign

leaders and faithfully represent the world's most powerful democracy, unencumbered by fear of harming his own companies.

6.      With respect to the Foreign Emoluments Clause, the Framers were aware that entanglements between American officials and foreign powers could pose a creeping, insidious threat to the Republic. The theory underlying the clause, informed by English history and by the Framers' experience, is that a federal officeholder who receives something of value from a foreign government can be imperceptibly induced to compromise what the Constitution insists be his only loyalty: the best interest of the United States of America. And rather than address such corruption by punishing it after the fact, the Framers concluded that the best solution was to write a strict prophylactic rule into the Constitution itself, thereby guaranteeing that improper incentives never undo this important safeguard of American autonomy. Applied to President Trump's diverse dealings, the text and purpose of the clause speak as one: absent the consent of Congress, private enrichment through the receipt of benefits from foreign governments is prohibited.[2]

7.      The Domestic Emoluments Clause was also designed to protect the government from corruption. The Founders intended the clause to serve as a guarantee that Congress, other parts of the federal government, and the states "can neither weaken [the President's] fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[3] The Framers further intended the clause to protect against self-dealing by ensuring that the President's service

---

[2]      Norman L. Eisen, Richard Painter & Laurence H. Tribe, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* (Dec. 16, 2016), http://brook.gs/2hGIMbW; *see also* Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities, 18 Op. O.L.C. 13, 18 (1994) ("Those who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty. That judgment might be biased, and that loyalty divided, if they received financial benefits from a foreign government.").

[3]      The Federalist No. 73 (Alexander Hamilton).

4

is remunerated only by the compensation fixed in advance by Congress.

8.      Relatedly, and in ways particularly important to the plaintiffs, the Domestic
Emoluments Clause shields the states and the District of Columbia from undue pressure to provide
emoluments to the President, and protects them from reprisal for any refusal to do so. In a similar
vein, the provision safeguards the states and the District from unfair advantages certain states may
enjoy from opportunities to curry favor from the President by providing emoluments that other
states lack.

9.      President Trump, acting through companies he owns or controls, has violated both
the Foreign Emoluments Clause and the Domestic Emoluments Clause by receiving millions of
dollars in payments, benefits, and other valuable consideration from foreign governments and
persons acting on their behalf, as well as federal agencies and state governments. His repeated,
ongoing violations include remuneration derived from: (a) leases of Trump properties held by
foreign-government-owned entities; (b) purchase and ownership of condominiums in Trump
properties by foreign governments or foreign-government-controlled entities; (c) other property
interests or business dealings tied to foreign governments; (d) hotel accommodations, restaurant
purchases, the use of venues for events, and purchases of other services and goods by foreign
governments and diplomats at hotels, restaurants, and other domestic and international properties
owned, operated, or licensed by President Trump; (e) continuation of the General Services
Administration lease for President Trump's Washington, D.C. hotel despite his breach of the
lease's terms, and potential provision of federal tax credits in connection with the same property;
and (f) payments from foreign-government-owned broadcasters related to rebroadcasts and foreign
versions of the television program "The Apprentice" and its spinoffs. Moreover, President Trump,

by asserting that he will maintain the interests at issue, is poised to engage in similar constitutional violations for the duration of his presidency.

10.     These present and continuing violations of the Constitution's anti-corruption protections threaten the free and independent self-governance at the core of our democracy. The President is making decisions every day with profound and far-reaching effects on American life, from determining who can travel into the country to deciding whether the United States will abandon global efforts to combat climate change; from proposing budgets to overseeing the federal workforce; from evaluating who will pay more in taxes to choosing how people will access health care. Yet Americans are left uncertain as to whether these decisions, with their sweeping impact on foreign and domestic policy, are driven solely by unyielding loyalty to the country's best interests, or rather are affected by self-interested motivations grounded in the international and domestic business dealings in which President Trump's personal fortune is at stake.

11.     The President's violations of the Emoluments Clauses undermine the trust the American people are entitled to have in their government. It is fundamental to our system of self-governance that our duly elected Presidents and the governments over which they preside will always act in singular pursuit of our liberty, security, health, and well-being. President Trump's myriad international and domestic business entanglements make him vulnerable to corrupt influence and deprive the American people of trust in their chief executive's undivided loyalty.

12.     The District and Maryland have compelling interests in ensuring that the Foreign and Domestic Emoluments Clauses are enforced and protect their residents as designed. The President's disregard for these constitutional constraints has resulted in significant and ongoing harm to the District and to Maryland.

13.     The District and Maryland have other sovereign, quasi-sovereign, and proprietary

6

interests in preventing the defendant's violations of the Emoluments Clauses. The defendant, his organization, and its affiliates have received presents or emoluments from foreign states or instrumentalities and federal agencies, and state and local governments in the form of payments to the defendant's hotels, restaurants, and other properties. The defendant has used his position as President to boost this patronage of his enterprises, and foreign diplomats and other public officials have made clear that the defendant's position as President increases the likelihood that they will frequent his properties and businesses.

14.    The defendant's ongoing constitutional violations harm the sovereign and quasi-sovereign interests of the District and Maryland. Maryland has an interest in preserving its role as a separate sovereign and securing observance of the terms under which it participates in the federal system. That interest is harmed by the defendant's violations of both Emoluments Clauses, but it carries particular force with respect to the Domestic Emoluments Clause, which exists (at least in part) for the protection of "the United States and any of them." Indeed, as government entities with authority to tax and regulate businesses and real estate, the District and Maryland are harmed by perceived and/or actual pressure to grant special treatment to the defendant and his extensive affiliated enterprises, or else be placed at a disadvantage vis-à-vis other states and governments that have granted or will grant such special treatment. In addition, the District and Maryland have an interest in protecting their economies and their residents, who, as the defendant's local competitors, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the defendant and his business enterprises due to his ongoing constitutional violations. Maryland is itself further injured by the reduction in tax revenue that flows from those violations.

15.    The defendant's ongoing constitutional violations also harm the proprietary

7

interests of the District and Maryland. The District and Maryland suffer direct financial harm in their capacity as proprietors of businesses that compete with the defendant's businesses, to the extent that businesses owned by him and/or his affiliated enterprises attract customers and divert them away from businesses that the District and Maryland own, license, or tax.

16.     The District of Columbia and Maryland bring this action to stop President Trump's violations of the Emoluments Clauses. As a direct result of those violations, the District and Maryland have been injured and will continue to be injured absent relief from this Court. To prevent these injuries, they request that this Court enter a declaratory judgment that President Trump has violated the Foreign and Domestic Emoluments Clauses and an injunction against violating these clauses further.

## II.
## PARTIES, JURISDICTION, AND VENUE

17.     The plaintiffs are the District of Columbia and the State of Maryland.

18.     The District of Columbia is a municipal corporation empowered to sue and be sued, and is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest.

19.     The State of Maryland is a sovereign state of the United States of America. The State is represented by and through its chief legal officer, the Attorney General of Maryland. He has general charge, supervision, and direction of the State's legal business, and acts as legal advisor and representative of all major agencies, boards, commissions, and official institutions of state

8

government. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.

20.     The defendant is Donald J. Trump, a natural person and the President of the United States of America. He is being sued in his official capacity and in his individual capacity.

21.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

22.     Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Maryland is a "judicial district" in which "a substantial part of the events or omissions giving rise to the claim occurred," and (in any event) where one of "the plaintiff[s] resides."

### III.
### LEGAL BACKGROUND

23.     ***The Foreign Emoluments Clause.*** The origins of the Foreign Emoluments Clause go back to at least 1651, when the Dutch broke with traditional European diplomatic customs and prohibited their foreign ministers from accepting "any presents, directly or indirectly, in any manner or way whatever."[4] The Framers also had the benefit of earlier thinking by those who drafted state constitutions, including Maryland's,[5] and by those who crafted the Articles of Confederation, which contained the clause's predecessor: "[N]or shall any person holding any

---

[4]     5 John Bassett Moore, *A Digest of International Law* § 651 (1906) (quoting Dutch Republic regulation).

[5]     *See* Md. Declaration of Rights of 1776, art. 32 ("That no person ought to hold, at the same time, more than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State.").

office of profit or trust under the United States, or any of them, accept of any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign State."[6]

24.     The Foreign Emoluments Clause was not included initially at the Constitutional Convention, but it was added without dissent at the request of Charles Pinckney, who "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."[7] Edmund Jennings Randolph confirmed the clause's anti-corruption purpose, stating: "It was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[8] The Framers recognized the perils of foreign influence and corruption, even in situations subtler than *quid pro quo* bribery, and they therefore created a broad constitutional prophylactic rule applicable to anything of value given by any foreign government to anyone holding an "Office of Profit or Trust under the United States," including the President.

25.     Consistent with the intent of the Framers, the Foreign Emoluments Clause is properly interpreted to cover monetary or nonmonetary transactions. Indeed, the text of the clause bars the receipt of both a "present" and an "Emolument," which together cover anything of value, including without limitation payments, transactions granting special treatment, and transactions above marginal cost. The clause also explicitly bars the receipt of "any present [or] Emolument . . . *of any kind whatever*," emphasizing the breadth of conduct covered under the provision.

26.     The Foreign Emoluments Clause covers not only transfers of anything of value from a king, prince, or foreign state individually, but also any transfer from instrumentalities or

---

[6]     Articles of Confederation of 1781, art. VI, § 1.

[7]     2 Farrand, *The Records of the Federal Convention of 1787*, at 389.

[8]     3 Farrand, *The Records of the Federal Convention of 1787*, at 327.

10

agents of a foreign state. This is in keeping with the considered view of the Department of Justice's

Office of Legal Counsel, whose constitutional interpretations are instructive, though not

controlling.[9]

27.     ***The Domestic Emoluments Clause.*** The Framers also intended to prevent the

system of patronage, influence, and rent-extraction that predominated in the colonial governors'

offices through a Domestic Emoluments Clause applying to just the President. The clause provides

that the President's "Compensation" shall not be increased or decreased, and that he may not

receive any "other Emolument from the United States, or any of them," during his term of office.

The clause thus works to ensure that neither states nor the federal government can "weaken his

fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice."[10]

And because the clause is specifically concerned with the federal government as well as the states,

it does not allow for Congress to consent to the President's receipt of additional emoluments

beyond his salary. This ban on additional emoluments, Alexander Hamilton wrote, would ensure

that the President would have "*no pecuniary inducement to renounce or desert the independence

intended for him by the Constitution.*"[11] Further, as recognized by judicial authorities, the ban

"addressed the Framers' concern that the President should not have the ability to convert his or her

office for profit."

28.     The Domestic Emoluments Clause reflects the Framers' particular concern about

making sure that the nation's powerful chief executive remains free from distorting and corrupting

influences that might hinder his ability to faithfully execute his office. The clause accordingly

---

[9]        Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act
to the President's Receipt of the Nobel Peace Prize, 33 Op. O.L.C. 8 (2009).

[10]       The Federalist No. 73 (Alexander Hamilton).

[11]       *Id.* (emphasis added).

proscribes emoluments not only from states and the federal government, but also their respective instrumentalities and subdivisions.

## IV.
## RELEVANT FACTS

**A.     The defendant's Foreign Emoluments Clause violations**

29.     Following the defendant's inauguration, he continues to own and control hundreds of businesses throughout the world, including hotels and other properties. His business empire comprises a multitude of different corporations, limited-liability companies, limited partnerships, and other entities that he owns or controls, in whole or in part, operating in the United States and at least 20 foreign countries.[12] His businesses are loosely organized under an umbrella known as the "Trump Organization," consisting of the Trump Organization LLC d/b/a The Trump Organization and The Trump Organization, Inc., both of which are owned solely by him. But his interests also include scores of other entities not directly owned by either Trump Organization entity but that he personally owns, owns through other entities, and/or controls.[13] The defendant also has several licensing agreements that provide continuing flows of income. Through these entities and agreements, he personally benefits from business dealings, and is (and will be) enriched by any business in which the entities he owns or controls engage with foreign governments, instrumentalities, and officials.

30.     On January 11, 2017, the defendant announced a plan to turn "leadership and management" of the Trump Organization over to his sons Eric Trump and Donald Trump Jr., as

---

[12]     Marilyn Geewax & Maria Hollenhorst, *Trump's Businesses And Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016), http://n.pr/2g2xZDP.

[13]     U.S. Office of Gov't Ethics, Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

well as a longtime company executive.[14] But the plan did not include relinquishing *ownership* of his businesses or establishing a blind trust.

31.     The defendant continues to own—and be well aware of the activities of—the Trump Organization and other corporations, limited-liability companies, limited partnerships, and other entities in which he retains an ownership interest. Although he formed a trust to hold his business assets, he may obtain distributions from his trust at any time.[15]

32.     The defendant's son, Eric Trump (who is also an advisor to the defendant's trust), initially indicated that he would not communicate with his father concerning his business interests. Eric Trump has now acknowledged, however, that he will provide business updates to the President on at least a quarterly basis.[16]

33.     The defendant has neither sought nor received "Consent of the Congress" with respect to his receipt of presents or emoluments from foreign government officials, entities, or instrumentalities.

**The District of Columbia's Trump International Hotel**

34.     The Trump International Hotel Washington, D.C. is located on Pennsylvania Avenue, N.W., just blocks from the White House. The defendant owns and controls this hotel through various entities.

---

[14]     *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jkFUPK.

[15]     David Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (Apr. 4, 2017), http://bit.ly/2o1OM1C.

[16]     Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (Mar. 24, 2017), http://for.tn/2n2MRXa; Maggie Haberman & Glenn Thrush, *Trump Reaches Beyond West Wing for Counsel*, N.Y. Times (Apr. 22, 2017), http://nyti.ms/2rsFqvk.

35.    The defendant, through entities he owns, receives payments made to the Trump International Hotel by guests who stay in hotel rooms and patrons who use the hotel venues or other goods or services in the hotel.

36.    The restaurant BLT Prime is located in the Trump International Hotel. The defendant, through various business entities, owns the restaurant, licenses the name from BLT Prime, and pays BLT Prime to operate the restaurant.[17]

37.    Since the election, the Trump International Hotel has specifically marketed itself to the diplomatic community. On one occasion, barely a week after the election, it held an event where it pitched the hotel to about 100 foreign diplomats.[18] The hotel also hired a "director of diplomatic sales" to facilitate business with foreign states and their diplomats and agents, luring the director away from a competing hotel in Washington.[19]

38.    In addition, the defendant has repeatedly appeared at the hotel since his election, adding further media attention to the property and raising its public profile. Several figures in his administration, including Treasury Secretary Steve Mnuchin and Small Business Administration Administrator Linda McMahon, have also lived or continue to live in the hotel.[20]

39.    Diplomats and their agents have voiced their intent to stay at (or hold events at) the Trump International Hotel. "Believe me, all the delegations will go there," one "Middle Eastern

---

[17]    Jessica Sidman, *How Donald Trump Lost His DC Restaurants*, Washingtonian (Oct. 23, 2016), http://bit.ly/2htYzq9.

[18]    Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post (Nov. 18, 2016), http://wapo.st/2qukIgh.

[19]    *Id.*

[20]    Julie Bykowicz, *Trump Hotel May be Political Capital of the Nation's Capital*, Associated Press (Mar. 5, 2017), http://apne.ws/2n2Rxfs.

diplomat" told the *Washington Post* about the hotel.[21] An "Asian diplomat" agreed: "Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'"[22]

40.      These statements have become reality. The Embassy of Kuwait, a foreign state, held its National Day celebration at the Trump International Hotel on February 22, 2017.[23] Upon information and belief, Kuwait paid for the venue, food, and other services provided in connection with the celebration. The cost has been estimated at $40,000 to $60,000.[24] Before the election, a "save the date" reservation had been made with the Four Seasons hotel, where the event had previously been held.[25] According to one report, the Embassy of Kuwait moved the event under pressure from the Trump Organization (though Kuwait's ambassador to the United States denied being pressured).[26] As a result, the Trump International Hotel or its controlling entities have received one or more payments from Kuwait after 12:01 pm on January 20, 2017.

41.      Between January 23 and 26, 2017 and during February 2017, the Kingdom of Saudi Arabia, a foreign state, spent thousands of dollars on rooms, catering, and parking at the Trump

---

[21]      *Id.*

[22]      *Id.*

[23]      Jonathan O'Connell, *Kuwaiti Embassy is latest to book Trump D.C. hotel, but ambassador says he felt 'no pressure'*, Wash. Post (Dec. 20, 2016), http://wapo.st/2pMtw21; Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*, NPR (Feb. 25, 2017), http://n.pr/2lavPoB.

[24]      Julia Harte, *Kuwait could pay up to $60,000 for party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017), http://reut.rs/2oFztKa.

[25]      Jackie Northam, *Kuwait Celebration At Trump Hotel Raises Conflict of Interest Questions*.

[26]      Judd Legum & Kira Lerner, *Under political pressure, Kuwait cancels major events at Four Seasons, switches to Trump's D.C. hotel*, ThinkProgress (Dec. 19, 2016), http://bit.ly/2rssRzM.

International Hotel. In a Foreign Agents Registration Act report filed with the Department of Justice, an agent representing the Royal Embassy of the Kingdom of Saudi Arabia reported paying the hotel $190,272 for lodging, $78,204 for catering, and $1,568 for parking between October 1, 2016 and March 31, 2017, using money received from Saudi Arabia.[27] Some of the payments were made after the defendant's inauguration as President.[28] Upon information and belief, Saudi Arabia paid at least $250 per night for each of the rooms it rented through its agent between January 23 and 26, 2017,[29] and paid the hotel for meals and other services provided in connection with the stay. Saudi Arabia paid for individuals to have dinner at the hotel on January 23 and both breakfast and dinner on January 24.[30] Upon information and belief, at least one of the meals was provided by BLT Prime. Upon information and belief, Saudi Arabia paid the hotel through its agent for similar expenses associated with a visit in mid-February.[31] As a result, the Trump International Hotel or its controlling entities have received one or more payments from Saudi Arabia, through its agent, after 12:01 pm on January 20, 2017.

---

[27]     MSLGROUP Americas Inc. d/b/a Qorvis MSLGROUP, Supplemental Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended, for six month period ending 3/31/2017, filed May 31, 2017, http://bit.ly/2rAQjgE; Chuck Ross, *Saudis Spent $270K At Trump Hotel In Lobbying Campaign Against 9/11 Bill*, Daily Caller (June 4, 2017), http://bit.ly/2sSKB7F.

[28]     Byron Tau & Rebecca Ballhaus, *Trump Hotel Received $270,000 From Lobbying Campaign Tied to Saudis*, Wall Street Journal (June 6, 2017), http://on.wsj.com/2s42HH9.

[29]     Isaac Arnsdorf, *Saudis foot tab at Trump hotel*, POLITICO (Feb. 9, 2017), http://politi.co/2kZa6mS.

[30]     Operations Order from Jason E. Johns, President of NMLB Veterans Advocacy Group, to Fly-In Veterans regarding the Justice Against Sponsors of Terrorism Act (Jan. 23-26, 2017), http://bit.ly/2oiBdIp.

[31]     Ross, *Saudis Spent $270K At Trump Hotel In Lobbying Campaign Against 9/11 Bill*.

42.     On or about April 6, 2017, Kaha Imnadze, the Ambassador and Permanent Representative of Georgia to the United Nations, stayed at the Trump International Hotel and then tweeted his compliments about the hotel.[32] Upon information and belief, the government of Georgia, a foreign state, paid the hotel for his room and other services provided in connection with his stay. As a result, the Trump International Hotel or its controlling entities have received one or more payments from Georgia after 12:01 pm on January 20, 2017.

43.     On information and belief, after 12:01 pm on January 20, 2017, the Trump International Hotel or its controlling entities have received and will continue to receive payments from other foreign states, instrumentalities of foreign states, or foreign officials.

44.     On January 20, 2017, Trump Old Post Office LLC, the entity leasing the building in which the Trump International Hotel is located and in which the defendant has a beneficial interest, amended its governing agreement to provide that, during the defendant's presidency, the company will not make any distributions of profits to any entity in which the defendant has a beneficial interest and will credit these undistributed profits to an unrecovered capital contribution account held for the benefit of the designated entities that defendant controls. This amendment is immaterial to whether the defendant has violated the Foreign Emoluments Clause. The defendant remains owner of approximately 77.5% of the Trump Old Post Office LLC (the remaining shares are owned by three of his children), and thereby benefits from any amounts deposited into the unrecovered capital contribution account. He further may receive distribution from those amounts once he is no longer in office.

---

[32]     Kaha   Imnadze   (@kahaimnadze),   Twitter   (Apr.   6,   2017,   8:49   AM), http://bit.ly/2oiF8Fd.

17

45.     Additionally, by providing that the defendant's contributions will be used by Trump

Old Post Office LLC for business purposes, the amendment increased the value of one of his assets.

46.     Prior to taking office, President Trump's attorney promised that all profits earned

from foreign governments would be donated to the U.S. Treasury. The Trump Organization later

admitted, however, that it was not tracking all payments that it received from foreign governments,

and that it plans only to estimate, rather than calculate, such payments.[33]

**New York's Trump Tower**

47.     Trump Tower is a mixed-use skyscraper on Fifth Avenue in New York City.

Through the use of various entities, the defendant owns and controls Trump Tower and, through

entities he owns, receives payments made to Trump Tower by tenants.

48.     One of the largest tenants of Trump Tower is the Industrial and Commercial Bank

of China ("ICBC"), which is a Chinese majority-state-owned enterprise.[34] As such, ICBC is an

instrumentality of a foreign state.

49.     After 12:01 pm on January 20, 2017, Trump Tower or its controlling entities have

received one or more payments from ICBC under its lease. Trump Tower or its controlling entities

will continue to receive regular payments from ICBC under its lease agreement.

50.     The defendant has repeatedly referenced ICBC's Trump Tower lease in discussing

his views of U.S.-China relations. During his presidential campaign in June 2015, for instance, the

defendant stated: "I love China! The biggest bank in the world is from China. You know where

---

[33]     Ari Melber, et al., *Trump Failing to Track Foreign Cash at His Hotels*, NBC News
(May 24, 2017), http://nbcnews.to/2qWzv3x.

[34]     Caleb Melby, et al., *When Chinese Bank's Trump Lease Ends, Potential Conflict
Begins*, Bloomberg (Nov. 28, 2016), https://bloom.bg/2oQ07T4.

their United States headquarters is located? In this building, in Trump Tower."[35] Similarly, in

March 2016, when asked about China's territorial claims in the South China Sea, the defendant

told the *Washington Post*, "I do deals with them all the time. The largest bank in the world, 400

million customers, is a tenant of mine in New York, in Manhattan."[36]

51.    The term of ICBC's Trump Tower lease runs until October 2019, before the end of

the defendant's term. As a result, any negotiations for a renewal or extension of the lease will occur

while he is serving as President.[37]

52.    Trump Grill is a restaurant located inside Trump Tower that the defendant owns

through various business entities. Upon information and belief, tenants of Trump Tower, including

officials of China and other countries, have dined at Trump Grill as a result of their tenancy in the

Tower and the foreign states themselves may host events there. Accordingly, foreign states or their

instrumentalities likely have paid or will pay for services at Trump Grill. The defendant has and

will continue to receive payments from various foreign states through Trump Grill.

**New York's Trump World Tower**

53.    Trump World Tower is a skyscraper on United Nations Plaza in New York City,

containing condominium units. Through the use of various entities, the defendant manages and

controls Trump World Tower and, through entities he owns, receives payments made by residents

of the Trump World Tower for common charges and handles rental transactions involving

condominium units.

---

[35]    *Id.*

[36]    *Id.*

[37]    *Id.*

54.     In 2001, the Kingdom of Saudi Arabia paid $4.5 million to purchase a floor of Trump World Tower.[38] The annual common charges for building amenities for the floor totaled $85,585 at the time. As of 2003, the most recent year for which information is publicly available, the Kingdom of Saudi Arabia paid monthly common charges of about $7,398—or $88,781 per year. The floor currently belongs to the Kingdom of Saudi Arabia for use by the Saudi Mission to the United Nations, which upon information and belief continues to pay common charges to the defendant.[39]

55.     In 2015, the defendant said about Saudi Arabia: "I get along great with all of them. They buy apartments from me." He further noted: "They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much."[40]

56.     The Kingdom of Saudi Arabia is a foreign state, and the Saudi Mission to the United Nations is an instrumentality of a foreign state.

57.     In 2002, the Permanent Mission of India to the United Nations, an instrumentality of a foreign state, paid $5.1 million to purchase two units in Trump World Tower from the defendant.[41] As of 2003, the most recent year for which information is publicly available, the Mission paid monthly common charges of approximately $3,639—or $43,670 per year. The units

---

[38]     Stephen R. Brown, *Donald Trump made millions from Saudi Arabia, but trashes Hillary Clinton for Saudi donations to Clinton Foundation*, N.Y. Daily News (Sept. 4, 2016), http://nydn.us/2bNEAq2.

[39]     *Id.*

[40]     *Id.*

[41]     N.Y.C. Dep't of Finance, Office of the City Registrar, Condo. Unit Deed: 845 U.N. Ltd. P'ship To The Permanent Mission of India to the U.N. (Dec. 23, 2002), http://on.nyc.gov/2pb8Obx.

continue to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

58.     In 2009, the Permanent Mission of Afghanistan to the United Nations, an instrumentality of a foreign state, paid $4.235 million to purchase a unit in Trump World Tower.[42] As of 2003, the most recent year for which information is publicly available, the common monthly charges for the unit purchased by the Mission were approximately $2,090 per month—or $25,085 per year. The unit continues to belong to the Mission, which upon information and belief continues to pay common charges to the defendant.

59.     In 2004, the Permanent Mission of Qatar to the United Nations, an instrumentality of a foreign state, paid $1,995,000 to purchase a unit in Trump World Tower, and in 2012, it paid $8.375 million to purchase two additional units in Trump World Tower. As of 2003, the most recent year for which information is publicly available, the common monthly charges for the units purchased by the Mission were a total of approximately $5,660 per month—or $67,920 per year. The units continue to belong to the Mission, which upon information and belief still pays common charges to the defendant.

60.     The defendant, through entities he owns, receives payments made to Trump World Tower by tenants and owners of units in the building through their payment of common charges and other fees. On information and belief, these payments include management and other fees paid to the building's management company, an entity owned by the defendant.

---

[42]     Max Abelson, *Afghanistan Buys $4.2 M. Trump Condo (with 'Peacefulness and Views')*, Observer (Sept. 11, 2009), http://bit.ly/2oQ74n3.

61.     Trump World Tower or its controlling entities will continue to receive regular common charge payments from Saudi Arabia, India, Afghanistan, and Qatar, and those payments will flow to the defendant.

62.     The World Bar is a bar located in Trump World Tower.

63.     Tenants of the Trump World Tower, including officials from Saudi Arabia, India, Afghanistan, and Qatar have patronized (or will patronize) the World Bar. Further, foreign states or agents or instrumentalities of these or other foreign states have hosted and will host events at the World Bar due to its location near the United Nations. By reason of his financial stake in Trump World Tower, the defendant will either receive payments from foreign states made to the World Bar, or the revenue that the World Bar receives, including from foreign states, affects the amount of rent that the defendant is able to charge the World Bar.

**Chinese trademarks**

64.     The defendant began to seek trademark protection in China for the use of his name in connection with building construction services in 2006. His application was rejected by the Trademark Office, and he subsequently lost his appeals to the Trademark Review and Adjudication Board, the Beijing Intermediate People's Court, and the Beijing High People's Court.[43] The defendant suffered his most recent court defeat in May 2015, the month before he declared his candidacy for President.

65.     Three weeks after his election, on December 2, 2016, the defendant spoke directly with Taiwanese President Tsai Ing-wen.[44] That conversation broke longstanding protocol and

---

[43]     Erika Kinetz, *With Trump's win in China, will Trump toilets get flushed?* Associated Press (Feb. 14, 2017), http://apne.ws/2mfcK9N.

[44]     Jordan Fabian & Neetzan Zimmerman, *Trump makes history with phone call to Taiwan leader*, The Hill (Dec. 2, 2016), http://bit.ly/2prWnYu.

suggested that the defendant might end the "One China" policy that the United States had observed

for decades. The defendant further indicated before taking office that he might end the One China

policy unless some benefit were received in exchange.[45]

66.     On February 9, 2017, however, the defendant spoke with Chinese President Xi

Jinping and pledged to honor the One China policy.[46] Five days later, on February 14, 2017, China

reversed its prior course and gave the defendant trademark protection.

67.     Chinese law prohibits awarding trademarks that are "the same as or similar to the

name of leaders of national, regional, or international political organizations."[47]

68.     Even though China had denied the defendant trademark protection for more than

ten years, including in a ruling from an appellate court, and despite Chinese law barring the use of

foreign leaders' names as trademarks, China reversed course and decided to grant the defendant

the trademark he had sought and valued. But China did so only after he had been elected President,

questioned the One China policy, was sworn in, and then re-affirmed the One China policy.

69.     The trademarks have considerable value because they give the Trump Organization

the sole right to profit from the Trump brand in China. China's granting of these trademarks

constitutes a present or emolument provided to the defendant.

---

[45]     Jordan Fabian & Evelyn Rupert, *Trump promises Chinese president he'll honor 'one China' policy*, The Hill (Feb. 9, 2017), http://bit.ly/2pbgZUW; Laurel Raymond & Judd Legum, *Trump's trademark tests Chinese law*, Think Progress (Feb. 18, 2017), http://bit.ly/2pXHZTZ.

[46]     Fabian & Rupert, *Trump promises Chinese president he'll honor 'one China' policy*.

[47]     Raymond & Legum, *Trump's trademark tests Chinese law*.

70.     When asked why the defendant changed his position on the One China policy, and whether he had received something in exchange from China, White House Press Secretary Sean Spicer answered: "The President always gets something," but did not elaborate.[48]

**International versions and distribution of "The Apprentice" and its spinoffs**

71.     The defendant earns royalties and other payments from the distribution in other countries of the television program "The Apprentice" and its spinoffs (including "The Celebrity Apprentice" and "The New Celebrity Apprentice," for which he is still an executive producer), and also from international versions of the programs produced in other countries. In some instances, these payments originate from foreign governments or their agents or instrumentalities. For instance, the defendant is paid for a version of the program "The Apprentice" that airs in the United Kingdom.[49] The network that broadcasts "The Apprentice" and spinoff shows in the United Kingdom is an instrumentality of a foreign state.

72.     After 12:01 pm on January 20, 2017, the defendant has received and will continue to receive payments from foreign states via their payments for "The Apprentice" or its spinoffs and international versions. Such payments constitute presents or emoluments that the defendant has accepted and will accept from a foreign state.

**Other foreign connections, properties, and businesses**

73.     ***United Arab Emirates.*** The defendant's company is engaged in several real-estate projects in the United Arab Emirates, including Dubai's Trump International Golf Club, which

---

[48]     Madeline Conway, *Spicer on Trump's 'One China' agreement: 'The president always gets something'*, POLITICO (Feb. 27, 2017), http://politi.co/2prZpf7.

[49]     Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice'*, Forbes (Dec. 13, 2016), http://bit.ly/2pY0S9h.

opened on February 18, 2017.[50] Upon information and belief, the defendant, through various business entities, has a branding-and-management contract with the property, and thereby possesses a financial interest in the Trump International Golf Club.

74.     All services for the golf club, including electricity, water, and roads, "come at the discretion of the government," and the "club's bar will need government approvals to serve alcohol, not to mention other regulatory issues."[51]

75.     The golf club and other projects cannot be built or operated without permits, utility, and other services and approvals. These discretionary approvals accordingly confer value on the defendant, through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

76.     ***Indonesia.*** The defendant's company is engaged in at least two real-estate projects in Indonesia, including redeveloping a resort in Bali.[52] Upon information and belief, the defendant, through various business entities, has a licensing-and-management agreement with these projects, through which he possesses a financial interest in them.

77.     Completing the projects required or will require permits and approvals from the Indonesian government. The defendant will receive value from these discretionary permits and

---

[50]     Sudarsan Raghavan, *Trump's sons get red carpet treatment at Dubai golf club opening*, Wash. Post (Feb. 18, 2017), http://wapo.st/2pY20tL.

[51]     Jon Gambrell, *Golf Club Shows Pitfalls of His Presidency*, Associated Press (Jan. 3, 2017), http://apne.ws/2j0gOVk.

[52]     Ian Jarrett, *Pan Pacific makes way for Trump in Bali*, Travel Weekly (Feb. 17, 2017), http://bit.ly/2nU3ANN; Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), http://nyti.ms/2kKSKLp; Russ Choma, *Trump's Indonesian Business Partner Brags About His Access*, Mother Jones (Feb. 10, 2017), http://bit.ly/2kujqMC.

approvals through his financial stake in the company receiving them, in violation of the Foreign Emoluments Clause.

78.     ***Other.*** The defendant also owns, operates, and licenses numerous other businesses throughout the United States and abroad, including other hotels, other properties for sale or lease, and golf courses and clubs.[53] The defendant, through his financial stake in the company or companies receiving them, derives value from the foreign permits and approvals associated with the owning and operation of those businesses in violation of the Foreign Emoluments Clause. In addition, revenues from foreign states' patronage of his hotels, golf clubs, and other businesses may flow to the defendant. After 12:01 pm on January 20, 2017, the defendant, through at least one of his various businesses, properties, and other entities has received one or more presents or emoluments from foreign states and will continue to do so.

### B.      The defendant's Domestic Emoluments Clause violations

79.     As alleged above, the defendant owns and controls hundreds of businesses throughout the country, including hotels and other properties. The defendant personally benefits from the business dealings of these entities and agreements associated with them, and is and will be enriched by their business with state governments or federal agencies within the scope of the Domestic Emoluments Clause.

### The District of Columbia's Trump International Hotel

80.     On August 5, 2013, Trump Old Post Office LLC, a business entity owned primarily by the defendant, signed a 60-year lease with the General Services Administration ("GSA")—an

---

[53]      U.S. Office of Gov't Ethics, Donald J. Trump, 2016 Executive Branch Personnel Public Financial Disclosure Report (May 16, 2016), http://bit.ly/2gBUwIV.

independent agency of the United States, whose administrator is appointed by the President—to open a hotel in the Old Post Office Building in the District of Columbia.

81.     More than 76% of Trump Old Post Office LLC is owned by DJT Holdings LLC, which is in turn owned almost entirely by the Donald J. Trump Revocable Trust, of which the defendant is the sole beneficiary. The Trump International Hotel Washington, D.C. is located at this site. The defendant has not divested his interest in the lease since becoming President.

82.     Section 37.19 of the Old Post Office lease states: "No . . . elected official of the Government of the United States . . . shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom." A violation of Section 37.19 is a non-monetary breach and a default unless it is remedied within 30 days after notice from the GSA. Accordingly, the defendant has been in breach of the lease with the GSA since 12:01 pm on January 20, 2017, when he became President.

83.     Before the defendant's inauguration, the GSA's Deputy Commissioner indicated to Representatives Elijah Cummings, Peter DeFazio, Gerald Connolly, and André Carson that the defendant would be in violation of the lease unless he "fully divests himself of all financial interests in the lease" for the Trump International Hotel, which he has not done. Shortly after the inauguration, Norman Dong, a GSA official appointed by former President Obama, became acting administrator. But less than a day later, the defendant replaced Mr. Dong with Tim Horne, who had coordinated the GSA's transition with the defendant's campaign.[54]

84.     Several weeks later, on March 16, 2017, the defendant released a proposed 2018 budget increasing GSA's funding, while cutting all (or nearly all) other non-defense-related

---

[54]     Isaac Arnsdorf, *Trump Picks Leader for Federal Agency Overseeing His D.C. Hotel*, POLITICO (Jan. 26, 2017), http://politi.co/2psgMfU.

agencies' budgets.[55] One week after that, on March 23, the GSA issued a letter stating that—contrary to the lease's plain terms—Trump Old Post Office LLC "is in full compliance with Section 37.19 [of the lease] and, accordingly, the lease is valid and in full force and effect."[56] A significant portion of the letter reviews the purported financial benefits of the lease to the GSA and taxpayers—even though those benefits are immaterial to the question of breach.

85.    Attached to the March 23, 2017 letter was an amendment to the agreement governing the business of Trump Old Post Office LLC. This amendment is the basis of the GSA's position that the tenant is in compliance with the lease, but the letter does not explain how the amendment brings the tenant into compliance. In fact, as described above, the amendment does not prevent the defendant from receiving "any benefit" from the lease, and Trump Old Post Office LLC remains in breach of the lease.

86.    In forbearing from enforcing the Old Post Office lease's default and termination procedures, despite the tenant's breach of its terms, and in cooperating with the tenant in attempting to create the appearance of compliance with the lease, the federal government has given the defendant an emolument in violation of the Domestic Emoluments Clause.

87.    Additionally, the defendant, through entities he owns, is seeking a $32 million historic-preservation tax credit for the Trump International Hotel. Approval of this credit is at the discretion of the National Park Service, an instrumentality of the federal government now under

---

[55]    Office of Mgmt. & Budget, Exec. Office of the President, America First, A Budget Blueprint to Make America Great Again (2017), http://bit.ly/2nvjrBO.

[56]    Letter from Kevin M. Terry, Contracting Officer, United States Gen. Servs. Admin., to Donald J. Trump, Jr. (Mar. 23, 2017), http://bit.ly/2nhKfaB.

the defendant's authority.[57] If approved, the tax credit would offset approximately 20% of the cost of rehabilitating the building in which the Trump International Hotel is operating.

88.     On November 14, 2016, the defendant received approval from the National Park Service for the second phase of the three-step-approval process. If final approval is granted, it may constitute an emolument, in violation of the Domestic Emoluments Clause.

**Mar-a-Lago Club**

89.     The Mar-a-Lago Club is a private club and estate located in Palm Beach, Florida. It is comprised of 20 acres of land, with a main mansion of over 100 rooms, along with a beach club, pools, tennis courts, and a 20,000 square foot ballroom for private events. The estate itself was purchased by the defendant in 1985. A decade later, in 1995, the defendant opened the club as a hotel and resort for dues-paying members of the public. It is owned by the defendant directly or owned by entities that he directly controls.

90.     The defendant, through entities he owns, receives payments made to the Mar-a-Lago Club by members and guests who join or visit the club, or rent space there, or pay for other goods or services at the club.

91.     Membership in the Mar-a-Lago Club requires payment of an initiation fee of $200,000, plus tax, as well as $14,000 a year in annual dues. This fee was doubled following the defendant's election as President—an increase from $100,000 to $200,000.[58] Since his election, the defendant has also attempted to capitalize on his office by advertising his private property to foreign governments and individuals.

---

[57]     Eric Levitz, *Trump Won the Presidency, Then Approval on a Tax Subsidy for His Hotel,* New York Mag. (Nov. 30, 2016), http://nym.ag/2oFF1o9.

[58]     Robert Frank, *Mar-a-Lago Membership Fee Doubles to $200,000*, CNBC (Jan. 25, 2017), http://cnb.cx/2kjIc2j.

92. The State Department and at least two U.S. Embassies—those located in the United Kingdom and Albania—have promoted the Mar-a-Lago estate and club on their respective websites by posting a 400-word blog post, originally written by Leigh Hartman for a State Department-managed website, "Share America," on April 4, 2017.[59]

93. The State Department and embassies' actions have served to promote Mar-a-Lago as the defendant's "Florida estate" and claimed that it "has become well known as the president frequently travels there to work or host foreign leaders."[60]

94. The State Department is an executive department within the federal government under the defendant's authority.

95. ShareAmerica, the blog for which the post was originally written, is specifically directed towards foreign individuals and governments.[61]

96. This post advertising Mar-a-Lago has since been removed from the websites of the State Department and the embassies, but not before substantive, world-wide advertising of the defendant's private property, using government resources, had occurred.

97. The defendant has used his official position as President to promote his Mar-a-Lago property. He has designated Mar-a-Lago as the "Winter White House," and also refers to it as the "Southern White House."[62] Since taking office, he has visited Mar-a-Lago on at least seven

---

[59]  Darren Samuelsohn, *State Department, U.S. Embassies Promoting Trump's Mar-a-Lago*, POLITICO (Apr. 24, 2017), http://politi.co/2peC7Jb.

[60]  *Mar-a-Lago: The winter White House*, http://bit.ly/2paWtRK (blog post subsequently removed; former blog post shown at Dan Merica, *State Department removes Mar-a-Lago blog post*, CNN (Apr. 25, 2017), http://cnn.it/2pdRu2x).

[61]  *About Us*, ShareAmerica, https://share.america.gov/about-us/ (last visited June 9, 2017).

[62]  *See, e.g.*, Press Briefing by Press Secretary Sean Spicer (Feb. 2, 2017) ("Luckily, for those of you who are going to be joining the President down to Florida this weekend, you'll

occasions, and has met with a number of foreign leaders there, including Japanese Prime Minister

Shinzo Abe and the President of the People's Republic of China, Xi Jinping.[63]

98.     Upon information and belief, federal, state, and local governments, or their

instrumentalities, have made and will continue to make payments for the use of facilities owned

or operated by the defendant for a variety of functions. The defendant will receive a portion of

those payments, which constitute emoluments prohibited by the Domestic Emoluments Clause.

99.     Although the exact extent of these emoluments is not currently known, examples

of current or potential violations include "public pension funds in at least seven U.S. states"—but

not the State of Maryland or the District of Columbia—that "have invested millions of dollars in

an investment fund that owns a New York hotel and pays one of President Donald Trump's

companies to run it, according to a Reuters review of public records."[64] And the defendant has

received (or will likely receive) a host of other potential emoluments from federal, state, and/or

local governments.

---

get some time to get a glimpse of summer at the 'Winter White House' in Mar-a-Lago."),
http://bit.ly/2k5Q3lZ; Remarks by President Trump in Listening Session with the National
Association of Manufacturers (Mar. 31, 2017) ("The President: . . . As you know the President of
China is coming to Florida. We're having a meeting—big meeting—at Mar-a-Lago. We call it the
Southern White House, which it actually is. It was originally built as the Southern White House, a
lot of people don't know."), http://bit.ly/2rUH0ZI.

[63]     *See* Background Briefing by Senior Administration Officials on the Visit of
President Xi Jinping of the People's Republic of China (Apr. 4, 2017) ("SENIOR
ADMINISTRATION OFFICIAL: . . . I'm certain it was President Trump's invitation that they
meet outside of Washington, D.C.—. . . you know, you've heard people refer to it as the 'winter
White House.' It's a place where he feels comfortable and at home, and where he can break the
ice with Xi Jinping without the formality, really, of a Washington meet-up."),
http://bit.ly/2nVQy26.

[64]     Julia Harte, *Exclusive: A New York hotel deal shows how some public pension funds
help to enrich Trump*, Reuters (Apr. 26, 2017), http://reut.rs/2oIONEp.

### C.   Post-inauguration premium for the defendant's goods and services

100.   Since the defendant's inauguration as President, goods and services sold by his various Trump businesses have sold at a premium. The defendant's high office gives the Trump brand greater prominence and exposure. Moreover, these goods and services provide (or have the potential to provide) a unique benefit: access to, influence on, and the goodwill of the President of the United States.

101.   Thus, for example, the starting rate for "guest rooms" at the defendant's Old Post Office hotel increased to $500 on most nights, up hundreds of dollars from when the hotel first opened shortly before the defendant's election.[65]

102.   Further, as discussed earlier, the initiation fee for membership at defendant's Mar-a-Lago resort doubled from $100,000 to $200,000 shortly after he was elected.[66]

### D.   The plaintiffs' interests in this litigation

103.   The plaintiffs' interests in this litigation are substantial. They are harmed by the defendant's constitutional violations in at least two distinct ways. *First*, they have suffered (and will continue to suffer) harm to their sovereign and/or quasi-sovereign interests, including Maryland's interest in preserving its rightful status within our federal system; the plaintiffs' interest in not being subjected to unfair competition by virtue of ongoing violations of constitutional provisions designed to guard against corruption and to protect interests distinct to the states themselves; the plaintiffs' interest in protecting their economies and their residents from economic harm; and Maryland's interest in preserving its tax revenue. *Second*, the plaintiffs have suffered (and will continue to suffer) proprietary and other financial harms as a result of the

---

[65]   The Associated Press, *Trump Hotel May Be Political Capital of Nation's Capital*, Fortune (Mar. 5, 2017), http://for.tn/2rsCsXl.

[66]   Robert Frank, *Mar-a-Lago membership fee doubles to $200,000*.

defendant's ongoing constitutional violations. These injuries can be redressed by a declaration that the defendant is in violation of the Emoluments Clauses and an injunction preventing his continued violation of them.

### Sovereign and quasi-sovereign injuries to the plaintiffs

104. ***Maryland's sovereign interest in enforcing the terms on which it agreed to enter the Union.*** Before adopting the federal Constitution, Maryland and its sister states were truly independent sovereigns. Many of these states—including Maryland—had incorporated protections against public corruption into their own legal codes and constitutions, with specific prohibitions on public officials accepting payments from federal, state, or foreign governments. The Maryland Declaration of Rights, adopted August 14, 1776, provides that "all persons invested with the legislative or executive powers of government are the trustees of the public," and contains a precursor to the U.S. Constitution's Emoluments Clauses.[67] This precursor combines the concerns of the two clauses into a single prohibition: "That no person ought to hold, at the same time, more than one office of profit, nor ought any person, in public trust, to receive any present from any foreign prince or state, or from the United States, or any of them, without the approbation of this State."[68] The Maryland Constitution of 1776 further provided for banishment "forever" as a potential punishment for a governor sharing "directly or indirectly" in the profits of another office, and also prohibited the governor from receiving part of the profits of supplying the army and navy.[69]

---

[67]  Md. Declaration of Rights of 1776, art. 4 (Aug. 14, 1776).

[68]  *Id.*, art. 32.

[69]  Md. Const. of 1776, arts. 33 and 53.

105.     Maryland's historical prohibition against foreign and domestic emoluments is consistent with the constitutions adopted by the other colonies at the time. The Pennsylvania Constitution of 1776, which Benjamin Franklin helped draft, made clear "[t]hat government is, or ought to be, instituted for the common benefit, protection and security of the people, nation or community; and not for the particular emolument or advantage of any single man, family, or sett of men, who are a part only of that community."[70] The South Carolina Constitution of 1776,[71] and the Massachusetts Constitution of 1780,[72] contained similar prohibitions against corruption of public officials.

106.     The prohibitions contained in the Domestic and Foreign Emoluments Clauses were thus material inducements to the states entering the union. As a state sovereign, Maryland retains its power to bring suit to enforce those prohibitions today.

107.     ***The plaintiffs' governmental interest in not being compelled to compete improperly for influence or favor.*** As explained above, the Domestic Emoluments Clause in particular reflects the Framers' deep concern that one or more of the states (or the federal government) might seek to buy off the President so that he would exercise power to their advantage and to the detriment of other states, thereby disrupting the balance of power in the federalist

---

[70]     Const. of Pa., Declaration of the Rights of the Inhabitants of the Commonwealth or State of Pennsylvania, art. V; *see also id.* at § 36 ("As every freeman to preserve his independence, (if without a sufficient estate) ought to have some profession, calling, trade or farm, whereby he may honestly subsist, there can be no necessity for, nor use in establishing offices of profit, the usual effects of which are dependence and servility unbecoming freemen, in the possessors and expectants; faction, contention, corruption, and disorder among the people. But if any man is called into public service; to the prejudice of his-private affairs, he has a right to a reasonable compensation: And whenever an office, through increase of fees or otherwise, becomes so profitable as to occasion many to apply for it, the profits ought to be lessened by the legislature.").

[71]     S.C. Const. of 1776, art. X.

[72]     Mass. Const., ch. II, art. XIII.

system. Thus, the Domestic Emoluments Clause aims to prevent "the United States, or any of them," from feeling compelled (or being compelled) to confer private financial benefits on the President in order to compete for influence and favor.

108.    The District and Maryland each have a governmental interest in the enforcement of their respective laws regarding taxation, environmental protection, zoning, and land use as they relate to real property that the defendant or the "Trump Organization" may own or seek to acquire. The defendant and his affiliated enterprises have a large and expanding portfolio of real-estate holdings, including a hotel in the District, and the defendant's Trump International Realty, otherwise known as T International Realty LLC, is registered to conduct business in Maryland.[73]

109.    Real-estate acquisition, ownership, and development implicate a range of legal requirements under the laws of the District and Maryland, including tax laws that generate revenue for the District, Maryland, and their instrumentalities. The defendant has boasted that he has achieved success in real-estate acquisition and development by using his financial clout and political connections to extract from governments maximum concessions, exemptions, waivers, and variances with respect to taxes and other requirements imposed by law.[74] Indications to date suggest that this longstanding practice of the Trump Organization did not cease upon the defendant's election to the Presidency; rather, there is evidence that the defendant's ascendancy to

---

[73]    Md. State Dep't of Assessments and Taxation, Md. Business Express, Registration for Trump International Realty, http://bit.ly/2qXZWpQ.

[74]    Geraldine Baum, Tom Hamburger & Michael J. Mishak, *Trump has thrived with government's generosity*, L.A. Times (May 11, 2011), http://lat.ms/1UGMtc8; Jillian Kay Melchior, *Donald Trump Has Mastered the Art of the Tax Break*, National Review (Aug. 19, 2015) ("Trump has long sought subsidies, tax breaks, and other preferential treatment from the government."), http://bit.ly/1rher3Y.

the highest office in the land has enhanced his organization's ability to win concessions from governments with respect to his properties.[75]

110.    The defendant's acceptance or receipt of presents and emoluments in violation of the Constitution presents the District and Maryland with an intolerable dilemma: either (1) grant the Organization's requests for concessions, exemptions, waivers, variances, and the like and suffer the consequences, potentially including lost revenue and compromised enforcement of environmental protection, zoning, and land use regulations, or (2) deny such requests and be placed at a disadvantage vis-à-vis states and other government entities that have granted or will agree to such concessions. Either way, the result is the very type of injury that the Domestic Emoluments Clause was designed to prevent.

111.    Moreover, the District and Maryland, which rank first and fourth, respectively, in per capita amount of federal government expenditures, are particularly susceptible to injury resulting from budgetary decisions that are subject to the corrupting influence of emoluments.[76] Federal funds make up approximately 25% of the District's fiscal year 2018 budget,[77] and Maryland is relying on federal funds for nearly 30% of the State government's budget for fiscal year 2018.[78] Federal government spending accounted for more than 42% of the District's gross

---

[75]    Michael LaForgia & Steve Eder, *When That Feisty Neighbor Becomes the President*, N.Y. Times (May 6, 2017), http://nyti.ms/2qXUxPw.

[76]    U.S. Dept. of Commerce, *Consolidated Federal Funds Report for Fiscal Year 2010* (Sept. 2011) at 23, 32, http://bit.ly/2r6mJRe.

[77]    Council of the District of Columbia, Committee of the Whole, *Report on Bill 22-241, the "Fiscal Year 2018 Federal Portion Budget Request Act of 2017"* (May 30, 2017) at 2, http://bit.ly/2s0x6Fz.

[78]    Md. Dept. of Legislative Services, *The 90 Day Report: A Review of the 2017 Legislative Session* at A-3, A-28, http://bit.ly/2r6gIEs.

domestic product and more than 28% of Maryland's in fiscal year 2014.[79] Both the District and

Maryland are home to headquarters for federal agencies. Civilian federal agencies employ

approximately 17% of the workforce in the District[80] and 10% of Maryland's total workforce.[81]

Federal agencies annually have spent more than $21 billion for procurement in the District and

more than $26 billion for procurement in Maryland.[82] Given this significance of federal

government spending and operations, and the President's significant role in determining how,

when, and where federal funds are spent, the conflict of interest inherent in the defendant's receipt

of emoluments directly and profoundly affects the District and Maryland.

112.    The plaintiffs seek to protect this distinct interest, and thereby vindicate their role

as governments in our constitutional scheme.

113.    ***The plaintiffs' interest in preventing economic injury to their residents and their***

***economies.*** The District is home to 680,000 residents, while the State of Maryland is home to over

6.1 million residents. Residents of both the District and Maryland participate in a thriving

hospitality industry that comprises a substantial part of the plaintiffs' economies. For example, in

2014, visitors to the District generated approximately $6.81 billion in spending[83] and drove $3.86

---

[79]    Pew Charitable Trusts, *Issue Brief: Federal Spending in the States 2005 to 2014* (Mar. 3, 2016) at 6, http://bit.ly/1QIOq43.

[80]    Office of Personnel Management, Data, Analysis & Documentation: Federal Employment Reports (Sept. 2015), http://bit.ly/2qZWcRE; District of Columbia, Wage and Salary Employment by Industry and Place of Work (Dec. 2015), http://bit.ly/2raFJhF.

[81]    John Fritze, *Trump's Budget Suggests Major Changes in Md.*, Baltimore Sun (Mar. 16, 2017), http://bsun.md/2r6n1Yk.

[82]    U.S. Dept. of Commerce, *Consolidated Federal Funds Report for Fiscal Year 2010* (Sept. 2011) at 37, 48, http://bit.ly/2r6mJRe.

[83]    Office of the Deputy Mayor for Planning and Economic Development, *Hospitality and Tourism*, https://dmped.dc.gov/page/hospitality-and-tourism.

billion in wages[84] for 74,570 employees in the District's hospitality industry.[85] In Maryland, tourists and travelers spent nearly $17 billion in 2015, yielding $5.7 billion in wages for more than 140,000 employees,[86] including more than 72,000 hospitality industry workers employed in the two Maryland counties that border the District of Columbia.[87] Both the District and Maryland regulate competition and transparency in this industry through laws that prohibit anticompetitive or deceptive practices and protect consumers.

114.    Residents of the District and Maryland are injured by the payment of presents and emoluments to the defendant because it tilts the competitive playing field toward his businesses; causes competing companies and their employees to lose business, wages, and tips; and generates a range of market distortions that restrict and curtail opportunity, diminish revenues and earnings, and hamper competition.

115.    The District and Maryland have the authority and right to vindicate their interest in providing and preserving a level playing field in the hospitality industry, and in ensuring that their residents are free from the injuries and competitive disadvantages that flow from defendant's violations of the Emoluments Clauses.

116.    ***Maryland's sovereign interests in tax revenues.*** The defendant's violations of the Emoluments Clauses also injure Maryland's interest in preserving tax revenue for the benefit of its residents. For example, National Harbor is a resort development with hotels, a casino,

---

[84]    *Id.*

[85]    *Id.*

[86]    Md. Tourism Development Board, *FY 2016 Tourism Development Annual Report* (Jan. 4, 2017) at 3, http://bit.ly/2r0k3Ra.

[87]    Md. Dept. of Commerce, *Montgomery County, Md.: Brief Economic Facts* (2017) at 2, http://bit.ly/2rFHvG2; Md. Dept. of Commerce, *Prince George's County, Md.: Brief Economic Facts* (2017) at 2, http://bit.ly/2sY6P8e.

restaurants, entertainment, a marina, and shops located on the Potomac River in Prince George's County, Maryland. Although Maryland does not own National Harbor, the various hotels and other businesses in the complex generate significant tax revenue for state and local governments, through income tax assessed on the businesses and their employees, sales tax, hotel tax, and other taxes and fees.

117.    The National Harbor development includes MGM National Harbor, a hotel, entertainment, shopping, and casino complex that is subject to a Community Benefit Agreement between MGM National Harbor, LLC, and the government of Prince George's County, a subdivision of the State of Maryland.[88] The Community Benefit Agreement sets goals encouraging MGM National Harbor to hire Prince George's County residents, to contract with minority business enterprises and other businesses located in the County, and to create investment opportunities for County residents. The casino is operated under a gaming license granted by the Maryland Lottery and Gaming Control Commission, a state government entity. Under Maryland law, the state and local governments receive 56% of the proceeds generated by MGM National Harbor's video lottery terminals and 20% of the gross proceeds generated by its table games.[89] In the first four months of 2017, MGM National Harbor's casino proceeds contributed more than $75 million in revenue to state and local government treasuries to fund various public purposes, including more than $55 million for the State's Education Trust Fund.[90] Any circumstance that

---

[88]    *See* County Council of Prince George's County, Md., Resolution No. CR-68-2014 (July 23, 2014) (approving Community Benefit Agreement), http://bit.ly/2rotRaS.

[89]    Md. Code Ann., State Gov't § 9-1A-27; Md. Lottery and Gaming Control Agency, *Maryland Casinos Generate $135.7 Million in Revenue During April*, http://bit.ly/2s8zSsD.

[90]    *Id.*

impairs National Harbor's ability to attract visitors and guests will diminish the revenues on which the state and local governments depend.

118.    Trump International Hotel, located in the District of Columbia, is a direct competitor of National Harbor's hotels and other businesses, including MGM National Harbor. Those hotels and businesses suffer competitive harm by the defendants' ongoing constitutional violations, and Maryland's tax coffers, in turn, are diminished as a result.[91]

**Proprietary and other financial injuries to the plaintiffs**

119.    ***The District of Columbia.*** The District has a financial interest in properties, venues, and other enterprises located within the District as owner, lender, or landlord.

120.    The District owns the Walter E. Washington Convention Center. The Washington Convention and Sports Authority (also known as Events DC), is an instrumentality of the government of the District of Columbia. Events DC operates event and conference venues in the District, including the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

121.    The District, through Events DC, serves the diplomatic community and foreign and state governments by providing services that compete with those owned or controlled by the defendant or the Trump Organization.

122.    In fiscal year 2016, Events DC generated over $30 million in revenue from building rental and ancillary charges. A portion of Events DC's revenue is based on demand for the Convention Center, D.C. Armory, and Carnegie Library.

---

[91]    Benjamin Freed, *MGM Says Its National Harbor Resort Will 'Blow Away' Donald Trump's DC Hotel*, Washingtonian (Jan. 20, 2016), http://bit.ly/2qXV7g6.

123.     On August 9, 2016, the Embassy of Colombia partnered with the U.S. Soccer Foundation to host an Olympic watch party at the Carnegie Library for the soccer match between the U.S. Women's National team and Colombia.[92]

124.     On September 6, 2016, the Embassy of Tajikistan celebrated Tajikistan Independence Day at a reception held at the Carnegie Library.[93]

125.     As discussed above, Trump International Hotel Washington, D.C., specifically markets its hotel rooms, event space, and food and beverage services to the diplomatic community and foreign governments.

126.     The defendant, his family, and other members of the defendant's administration have continued to promote his hotel properties, such as by making multiple appearances at those properties, including in connection with official business.

127.     Since the defendant's inauguration, foreign governments (including the Embassy of Kuwait and the Kingdom of Saudi Arabia) have held events at the hotel, and public officials have stated that, since the defendant was elected president, they are more likely to pay for goods and services at the defendant's properties in an attempt to curry favor with him.

128.     The defendant's receipt or acceptance of presents or emoluments through the Trump International Hotel Washington, D.C. and other properties owned or controlled by the defendant or the Trump Organization has resulted in a competitive injury to the Walter E. Washington Convention Center, D.C. Armory, and Carnegie Library.

---

[92]     Olympic Watch Party, US Soccer Foundation website (last visited June 10, 2017), http://bit.ly/2auRNlm.

[93]     *Tajik Independence*, Washington Diplomat Facebook page (last visited June 10, 2017), http://bit.ly/2rMR3z8.

129.    The District's interest is further injured by the loss of the economic value of its brands in comparison to defendant's brand, as foreign and state governments and their agents and instrumentalities favor his businesses for reasons related to the defendant's receipt or acceptance of presents or emoluments.

130.    ***The State of Maryland.*** Maryland has a proprietary interest in properties, venues, and enterprises that directly compete with those owned or controlled by the defendant or the Trump Organization. Maryland suffers economic loss because its enterprises are placed at a competitive advantage as the result of the defendant's ongoing violations of the Foreign and Domestic Emoluments Clauses.

131.    Specifically, Maryland has a direct financial interest in the Montgomery County Conference Center, part of the Bethesda North Marriott Hotel and Conference Center located in Bethesda, Maryland. The site of the hotel and conference center is owned by the Montgomery County Revenue Authority, a public corporation established by Montgomery County, which is a subdivision of the State of Maryland. The County Revenue Authority leased the conference center portion of the site to Montgomery County and to the Maryland Stadium Authority, an instrumentality of the State,[94] as equal tenants-in-common to develop the conference center. The development of the conference center was funded through bonds issued by the Maryland Stadium Authority, separate bonds issued by the County Revenue Authority, and direct contributions from Montgomery County. The County Revenue Authority also leased the hotel portion of the site to a consortium of private investors that funded the development of the hotel. The hotel and conference center are overseen by a management committee that includes representatives of Montgomery County and the Maryland Stadium Authority, and the facility is operated by Marriott Hotel

---

[94]    Md. Code Ann., Econ. Dev. § 10-604 (2008 Repl. Vol.).

Services, Inc., under an agreement with Montgomery County. The conference center offers approximately 39,000 square feet of meeting space. In fiscal year 2016, activities at the conference center generated, directly and indirectly, an estimated $45.9 million in spending, and yielded estimated tax revenues of more than $2.7 million for the State and nearly $1 million for Montgomery County.[95]

132.     Furthermore, as explained above, the State of Maryland has suffered financial harm because it has a sovereign interest in the receipt of tax revenues from facilities (like the National Harbor) that are in competition with businesses owned by the defendant and/or his affiliated enterprises outside the State.

133.     The declaratory and injunctive relief that the plaintiffs are seeking would remedy these injuries by eliminating the plaintiffs' competitive disadvantage vis-à-vis the defendant.

## V.
## CLAIMS

## COUNT I
### Violations of the Foreign Emoluments Clause
### (Declaratory and Injunctive Relief)

134.     As discussed in detail above, the defendant has violated—and will continue to violate—the Foreign Emoluments Clause. The phrase "Person holding any Office of Profit or Trust," as used in the clause, includes the President. The phrases "present" and "Emolument . . . of any kind whatever" together cover anything of value, including without limitation monetary and non-monetary gifts or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "any King, Prince, or foreign State" includes any foreign government and any agent or instrumentality thereof.

---

[95]     *Montgomery County Conference Center Economic and Fiscal Impact Analysis FY 2016, Final Report* (Jan. 2017) at 1-2.

135.     The defendant has accepted "present[s]" or "Emolument[s]" directly from—or

from agents or instrumentalities of—China, the United Arab Emirates, Kuwait, Indonesia, Saudi

Arabia, Afghanistan, Qatar, India, Georgia, the United Kingdom, and other "foreign State[s],"

without seeking or obtaining "the Consent of the Congress" as required by the Foreign

Emoluments Clause.

136.     As described more fully in paragraphs 29 to 78 herein, the defendant is

committing or will commit these violations in connection with transactions involving the Trump

International Hotel Washington, D.C., New York's Trump Tower and Trump World Tower,

restaurants the defendant owns or that are located in his hotels or other properties, the television

program "The Apprentice" and its spinoffs and international versions, and other business and

property interests and transactions in the United States and abroad.

137.     As a direct result of these violations of the Foreign Emoluments Clause, the

plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional

significant harm directly from the further occurrence of these violations.

138.     No plan announced by the defendant or his attorneys as of the date of this filing

can make this conduct constitutional or otherwise remedy these constitutional violations.

139.     The District of Columbia and the State of Maryland are entitled to injunctive and

declaratory relief to stop the above-mentioned Foreign Emoluments Clause violations and any

other Foreign Emoluments Clause violations. This Court has the power to grant such relief

pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

### COUNT II
### Violations of the Domestic Emoluments Clause
### (Declaratory and Injunctive Relief)

140.     As discussed in detail above, the defendant has also violated—and will continue

to violate—the Domestic Emoluments Clause. As President, he is the sole subject of the clause.

The phrase "any other Emolument" under the clause covers remuneration beyond the President's "Compensation" as set by Congress, including monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost. And the phrase "the United States, or any of them" includes any part of the federal government, any state government, any local government, and any agent or instrumentality thereof.

141.     The defendant is and will be accepting "any other Emolument" from "the United States, or any of them." As described more fully in paragraphs 79 to 99 herein, the defendant has committed violations of the Domestic Emoluments Clause, and without this Court's intervention he will continue violate the clause.

142.     As a direct result of these violations of the Domestic Emoluments Clause, the plaintiffs, and their residents, have suffered significant harm. They also stand to suffer additional significant harm directly from the further occurrence of these violations.

143.     No plan announced by the defendant or his attorneys as of the date of this filing can make this conduct constitutional or otherwise remedy these constitutional violations.

144.     The District of Columbia and the State of Maryland are entitled to declaratory and injunctive relief to stop and prevent the above-mentioned Domestic Emoluments Clause violations and any other violations of the clause. This Court has the power to grant such relief pursuant to its inherent authority to grant equitable relief and 28 U.S.C. §§ 1331 and 2201.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, the District of Columbia and the State of Maryland respectfully request that this Court enter a judgment in their favor and against the defendant, consisting of:

(a)     A declaratory judgment, stating that the defendant has violated and will continue to violate the Foreign and Domestic Emoluments Clauses, as construed by this Court;

  (b)  injunctive relief, enjoining the defendant from violating the Foreign and Domestic

Emoluments Clauses, as construed by this Court;

  (c)  such other and further relief as this Court may deem just and proper.

Dated: February 23, 2018

THE DISTRICT OF COLUMBIA

KARL A. RACINE
Attorney General for the District of
Columbia

NATALIE O. LUDAWAY*
Chief Deputy Attorney General

/s/ Stephanie E. Litos
STEPHANIE E. LITOS*
Senior Counsel to the Attorney General
stephanie.litos@dc.gov
441 Fourth Street, N.W.
Washington D.C.  20001
T: (202) 724-6650
F. (202) 741-0647

NORMAN L. EISEN
Federal Bar No. 09460
neisen@citizensforethics.org
NOAH D. BOOKBINDER*
nbookbinder@citizensforethics.org
STUART C. MCPHAIL*
smcphail@citizensforethics.org
Citizens for Responsibility and Ethics
   in Washington
455 Massachusetts Avenue, N.W.
Washington, D.C. 20001
T: (202) 408-5565
F: (202) 588-5020

DEEPAK GUPTA*
deepak@guptawessler.com
JONATHAN E. TAYLOR*
Gupta Wessler PLLC
1900 L Street, N.W.
Washington, D.C. 20009
T: (202) 888-1741

THE STATE OF MARYLAND

BRIAN E. FROSH
Attorney General of Maryland

/s/ Steven M. Sullivan
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
PATRICK B. HUGHES
Federal Bar No. 19492
phughes@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD  21202
T: (410) 576-6325
F: (410) 576-6955

JOSEPH M. SELLERS
Federal Bar No. 06284
jsellers@cohenmilstein.com
CHRISTINE E. WEBBER*
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
Washington, D.C. 20005
T: (202) 408-4600

*admitted pro hac vice

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | |
|---|---|
| THE DISTRICT OF COLUMBIA and THE STATE OF MARYLAND, | |
| Plaintiffs, | |
| v. | Civil Action No. 8:17-cv-01596-PJM |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, | |
| Defendant. | |

**[PROPOSED] ORDER**

Pending before the Court is Plaintiffs' Motion For Leave To File An Amended Complaint And To Apply The Pending Motion To Dismiss [Doc. 21] To The Amended Complaint. Upon consideration of the Motion and Memorandum of Law in Support thereof, Plaintiffs' Motion is GRANTED.

As no additional claims have been raised against President Trump in his official capacity, it is ORDERED that the Court will treat the existing Motion to Dismiss (ECF No. 21), responsive briefing (ECF Nos. 46-48, 70), and amicus briefs (ECF Nos. 27, 65-69, 77) as applied to Plaintiffs' First Amended Complaint (ECF No. XXX).

_____
Peter J. Messitte
United States District Judge