# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

THE DISTRICT OF COLUMBIA and
THE STATE OF MARYLAND,

                    *Plaintiffs*,

v.

DONALD J. TRUMP,
in his official capacity as President of the United
States of America,

                    Defendant.

No. 8:17-CV-01596-PJM

---

**CORRECTED RESPONSE OF SCHOLAR SETH BARRETT TILLMAN AND THE
JUDICIAL EDUCATION PROJECT AS *AMICI CURIAE* IN SUPPORT OF THE
DEFENDANT**

---

Robert W. Ray, Esq.
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Tel. (212) 751-3347
robert.ray@tklaw.com
*Co-Counsel for Amicus
Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Tel. (571) 357-3134
carrie@judicialnetwork.com
*Counsel for Amicus Curiae
Judicial Education Project*

Josh Blackman
1303 San Jacinto Street
Houston, Texas 77002
Tel. (202) 294-9003
Josh@joshBlackman.com
*Counsel of Record for Amicus
Curiae Scholar Seth Barrett Tillman*

Jan I. Berlage
Gohn Hankey Stichel & Berlage LLP
201 North Charles Street
Suite 2101
Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ............................................................... 1

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT ............................................................................................ 2

I.    The Plaintiffs' Complaint, Which Is Pleaded Against the President in His Official Capacity, Exclusively Concerns Trump's Private Conduct ............................................. 2

    A.   Not Every Action Taken by the President is Presidential Action in His Official Capacity ................................................................................ 2

    B.   This Suit, Which Could Not Continue Against the President's Successor, Cannot Be Brought Against the President in His Official Capacity ..................... 3

    C.   The Plaintiffs' Amici Disregard *Lewis v. Clarke* and its Antecedent Cases ............. 5

II.   Plaintiffs' Amici Failed to Establish That the Foreign Emoluments Clause Applies to the President ................................................................................. 7

    A.   "The Government Has Not Conceded That The President Is Subject to the Foreign Emoluments Clause" ................................................................ 9

    B.   The Office of Legal Counsel Showed No Awareness of the Historical Evidence Concerning The Scope of the Foreign Emoluments Clause ........................... 9

        1.   Evidence from Presidents Jackson and His Successors Does Not Resolve the Scope of the Foreign Emoluments Clause ......................................... 10

        2.   Washington and His Successors During the Early Republic Openly Accepted Foreign Gifts Without Seeking Congressional Consent ................. 12

        3.   Disputed Assertions of Power by Washington and His Successors Are More Probative About the Scope of the Foreign Emoluments Clause Than Voluntary Acquiescence by Post-Jackson Presidencies ................................. 14

    C.   The Foreign Gifts and Decorations Act, Which Also Applies to "Spouse[s]" of Federal Officers, Cannot Be Justified Based Solely on The Foreign Emoluments Clause ....................................................................................... 18

    D.   Plaintiffs' Amici Fail to Address the "Office . . . Under" Parliamentary Drafting Convention, Which Applies to Appointed Officials ............................... 19

        1.   The Legal Historians' Brief Cites Alexander Hamilton's Official Communications to Define "Emoluments," but Not to Understand "Office . . . Under the United States" .......................................................... 20

        2.   The Legal Historians Cite Statements from a Member of the First Congress to Interpret the Foreign Emoluments Clause, but Ignore An Anti-Bribery Law Passed by the First Congress ............................................... 24

3.  The Legal Historians Cite Joseph Story's *Commentaries* to Interpret the
    Foreign Emoluments Clause, but Ignore His Analysis of the Scope of
    "Office . . . under the United States"............................................................. 26

4.  The Legal Historians Discuss British Parliamentary Practice, but Ignore the
    Settled Meaning of the "Office . . . Under" Drafting Convention .................. 27

5.  The Legal Historians Focus on Advocacy from Mason and Randolph, and
    Ignore the Weight of Evidence to the Contrary from the Early Republic ....... 30

CONCLUSION .......................................................................................................... 33

## TABLE OF AUTHORITIES

**Federal Cases**

Calder v. Bull,
   3 U.S. (3 Dall.) 386 (1798) ................................................................. 29

Clinton v. City of N.Y.,
   524 U.S. 417 (1998) ........................................................................... 17

Clinton v. Jones,
   520 U.S. 681 (1997) ..................................................................... 3, 6, 7

CREW v. Donald J. Trump, in his Official Capacity as President of the United States,
   No. 1:17-cv-00458-GBD (S.D.N.Y. Aug. 11, 2017) ............................ 8

Dames & Moore v. Regan,
   453 U.S. 654 (1981) ........................................................................... 17

District of Columbia v. Trump ........................................................... 5, 16

Free Enter. Fund v. PCAOB,
   561 U.S. 477 (2010) ........................................................................... 17

Freytag v. C.I.R.,
   501 U.S. 868 (1991) ..................................................................... 16, 17

Goldwater v. Carter,
   444 U.S. 996 (1979) ........................................................................... 19

Hafer v. Melo,
   502 U.S. 21 (1991) ............................................................................... 5

Hodel v Cruckshank,
   3 Queensland L.J. 140 (Qld. 1889) ................................................... 30

I.N.S. v. Chadha,
   462 U.S. 919 (1983) ........................................................................... 16

Jones v. Clinton,
   72 F.3d 1354 (8th Cir. 1996) ............................................................... 7

Larson v. Domestic & Foreign Commerce Corp.,
   337 U.S. 682 (1949) ............................................................................. 4

Lewis v. Clarke,
   137 S. Ct. 1285 (2017) ................................................................. passim

McPherson v. Blacker,
   146 U.S. 1 (1892) ............................................................................... 17

Myers v. United States,
   272 U.S. 52 (1926) ....................................................................... 16, 27

Nixon v. Fitzgerald,
   457 U.S. 731 (1982) ..................................................................... 3, 6, 7

NLRB v. Noel Canning,
    134 S. Ct. 2550 (2014) ............................................................ 17, 19, 20

Powell v. McCormack,
    395 U.S. 486 (1969) ..................................................................... 26

The Pocket Veto Case,
    279 U.S. 655 (1929) ................................................................. 19, 20

R v. Obeid (No 2)
    [2015] New New South Wales Supreme Court 1380 [30] ...................... 30

Schell v. Fauche,
    138 U.S. 562 (1891) ..................................................................... 16

South Carolina v. United States,
    199 U.S. 437 (1905) ..................................................................... 33

Stuart v. Laird,
    5 U.S. 299 (1803) ....................................................................... 17

United States v. Burr,
    25 F. Cas. 30 (No.14,692d) (C.C.D. Va. 1807) .................................. 3

United States v. Lopez,
    514 U.S. 549 (1995) ..................................................................... 20

United States v. Morrison,
    529 U.S. 598 (2000) ..................................................................... 20

Youngstown Sheet & Tube Co v. Sawyer,
    343 U.S. 579 (1952) ................................................................. 17, 20

Zivotofsky v. Kerry,
    135 S. Ct. 2076 (2015) ................................................................... 9

**Constitutional Provisions**

U.S. CONST. art. I, § 10, cl. 1 ...................................................... 29

U.S. CONST. art. I, § 6. cl. 2 ....................................................... 22

U.S. CONST. art. II, § 2, cl. 2 ................................................. 27, 28

U.S. CONST. art. II, § 3 ............................................................. 27

U.S. CONST. art. II, § 4 ............................................................. 27

U.S. CONST. art. VI, cl. 3 .......................................................... 27

**Federal Statutes**

5 U.S.C. § 7342(a)(1)(A)–(D) ..................................................... 19

5 U.S.C. § 7342(a)(1)(E) ........................................................ 8, 19

5 U.S.C. § 7342(a)(1)(G) ........................................................... 20

## Other Authorities

1 American State Papers/Miscellaneous, Index ii (1834) ........................................... 25

1 Joseph Story, Commentaries on the Constitution of the United States 577 (reprint 1891)
  (1833) .................................................................................................................. 27

1 Journal of the Senate of the U.S.A. 441 (1820) (May 7, 1792 entry) ...................... 21

1 The Writings of James Monroe 1778–1794 (1788) .................................................. 33

14 Abridgment of the Deb. of Cong. 140 (1860) ....................................................... 11

14 The Papers of Alexander Hamilton, 157 (1969) ..................................................... 21

3 Debates in the Several State Conventions 222 (Jonathan Elliot ed., 2d ed. 1836) ......... 33

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution
  (2d ed. 1836) (Mason's position) ................................................................. 32, 33

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution
  (2d ed. 1836) (Randolph's position) ................................................................. 32

8 Annals of Cong. 2319 (1799), perma.cc/EB4H-TDE8 ............................................. 34

A List of Treasury Reports and Circulars Issued by Alexander Hamilton, 1789–1795
  (Paul Leicester Ford ed., Brooklyn 1886) ............................................................. 23

A Register of Officers and Agents, Civil, Military, and Naval, in the Service of the United
  States on the Thirteenth Day of September, 1817 (Washington, E. De Krafft 1818) ............. 25

Adam Liptak, 'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal
  Storm, N.Y. TIMES (Sept. 25, 2017) ................................................................. 24

André Maurois, Adrienne: The Life of the Marquise De La Fayette 178 (1961); A
  Complete History of the Marquis De Lafayette 193 (1826) ................................. 13

Anne Twomey, The Constitution of New South Wales 438 (2004) ............................ 30

Blount, the Senate Never Said That Senators Aren't Impeachable, 22 QUINNIPIAC L. REV.
  33 (2014) ............................................................................................................. 34

Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as Amici Curiae
  in Support of the Defendant, [ECF No. 27-1] ......................................................... 9

Brief of Amici Curiae Administrative Law, Constitutional Law, and Federal Courts
  Scholars in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss ................... 2

Brief of Amicus Curiae by Certain Legal Historians On Behalf of Plaintiffs in his Official
  Capacity as President of the United States, No. 1:17-cv-00458-GBD (S.D.N.Y. Aug.
  11, 2017) ............................................................................................................. 15

Brief of Former Government Ethics Officers as Amici Curiae Supporting Plaintiffs,
  [ECF No. 50] ....................................................................................................... 10

Brief of Former National Security Officials as Amici Curiae in Support of Plaintiffs'
  Opposition to Defendants' Motion to Dismiss, [ECF No. 57-1 ................................. 19

Elizabeth Chew, Unpacking Jefferson's Indian Hall, Discovering Lewis & Clark,
   perma.cc/658Z-WN5S ................................................................................ 13

E-mail from Martyn Atkins, U.K. House of Commons Clerk (Procedure Committee) to
   Seth Barrett Tillman (Sept. 11, 2017), bit.ly/2xy0qXK.............................................. 31

Fed. Gazette & Phila. Daily Advertiser, Aug. 12, 1790 .................................. 13

Gautham Rao & Jed Handelsman Shugerman, Presidential Revisionism: The New York
   Times published the flimsiest defense of Trump's apparent emoluments violations yet.,
   SLATE (July 17, 2017).......................................................................................... 22

Gifts from Foreign Dignitaries, Monticello, perma.cc/C26E-X23E............................ 13

House Documents, (May 10, 1844), bit.ly/2rsttt9 ................................................. 11

J.L. De Lolme, The Constitution of England 62 (1775), bit.ly/2sl1yeK ..................... 30

Jack Maskell, CRS, Conflict of Interest and "Ethics" Provisions That May Apply to the
   President, 2 (Nov. 22, 2016), bit.ly/2teGovc ....................................................... 14

Jack Maskell, CRS, Gifts to the President of the U.S., 4 (Aug. 16, 2012),
   bit.ly/2s7AVZu ................................................................................................. 14

Jed Shugerman, Our correction and apology to Professor Tillman, SHUGERBLOG (Oct. 3,
   2017), https://perma.cc/R9N9-S472 ................................................................... 24

John P. Deeben, The Official Register of the United States, 1816-1959, National
   Archives, perma.cc/RJD6-S232............................................................................ 24

Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts
   from the King of Siam, 12 Stat. 616 (Mar. 15, 1862)............................................ 12

Joint Resolution No. 39: To authorize Benjamin Harrison to accept certain medals
   presented to him while President of the United States, 29 Stat. 759 (Apr. 2, 1896) ............... 18

Jonathan Fildes, Science Probe for 'Space Pistols,' BBC NEWS (May 26, 2008)....................... 14

Jonathan R. Siegel, Suing the President: Nonstatutory Review Revisited, 97 COLUM.
   L. REV. 1612 (1997). [ECF No. 46].......................................................................... 9

Journal of the House 484 (Washington, Gales & Seaton 1826) (entry for December 30,
   1791) .............................................................................................................. 23

Laurence H. Tribe, American Constitutional Law § 6–35 (2000).............................. 26

Letter from A. Hamilton to G. Washington (Jan. 24, 1795), bit.ly/2C0VRVm ................ 21

Letter from A. Lincoln to Regent Capt's of the Rep. of San Marino (May 7, 1861),
   perma.cc/U2G7-3BHW ...................................................................................... 11

Letter from A. Lincoln to the King of Siam (Feb. 3, 1862), perma.cc/SU5Z-PKYQ ............. 12

Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791),
   perma.cc/5F2V-G5GU......................................................................................... 13

Letter from Louis Guillaume Otto to Armand Marc de Montmorin (Aug. 3, 1790),
    available in Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres,
    Correspondances Politiques, 39CP, Volume 35, Microfilm P5982 ........................ 13

Letter from T. Jefferson to Levett Harris (April 18, 1806), perma.cc/3FX8-Y5TG ................... 13

Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806),
    perma.cc/QB6Z-SWSD ...................................................................................... 13

Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816),
    perma.cc/D47U-V4H3 ........................................................................................ 14

Letter to J. Madison from John Graham (Aug. 8, 1816),
    perma.cc/RD8B-2ASW ....................................................................................... 14

Letter to Judge George B. Daniels, id. at [ECF No. 96],
    bit.ly/2gaoHsD .................................................................................................. 24

Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7,
    1804), perma.cc/4ATK-BWVN ............................................................................ 13

List Of Civil Officers Of The United States, Except Judges, With Their Emoluments,
    For The Year Ending October 1, 1792, in 1 American State Papers/Miscellaneous 57
    (1834) ............................................................................................................... 24

Memorandum for the Counsel to the President, Office of Legal Counsel, Applicability of
    the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
    Receipt of the Nobel Peace Prize, 2009 WL 6365082 (Dec. 7, 2009) ...................... 8

Memorandum from David J. Barron, Act. Asst. Att'y Gen., Applicability of the
    Emoluments Clause and the Foreign Gifts and Decorations Act to the President's
    Receipt of the Nobel Peace Prize, OLC, (Dec. 7, 2009), bit.ly/2rx6CfT ................. 10

Memorandum of Law in Support of Plaintiffs' Opposition to Motion to Dismiss,
    [ECF No. 46] ...................................................................................................... 3

Memorandum Opinion for the Special Assistant to the President, Office of Legal Counsel,
    Proposal That the President Accept Honorary Irish Citizenship 278 (May 10, 1963),
    https://goo.gl/CEfHeS .................................................................................... 8, 10

Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830) ..................... 2, 11

Motion for Leave to File Response to Brief of Amici Curiae by Certain Legal Historians,
    CREW v. Trump, 17 Civ. 458 (S.D.N.Y.), [ECF No. 85] ........................................ 24

Pa. Packet & Daily Advertiser (Aug. 13, 1790), bit.ly/2r9bBiz ................................... 13

Pauline Maier, Ratification: The People Debate the Constitution, 1787–1788 (2010) .............. 32

Pistols, James Monroe 3D (on website of the James Monroe Museum),
    perma.cc/T796-ED5B ........................................................................................ 14

Press Release, National Archives (Sep. 23, 1999), perma.cc/SWY9-42QN ............................ 12

Report on an Account of the Receipts and Expenditures of the United States for the Year
    1792 ["The 1792 Report"], in 15 Papers of Alexander Hamilton 474 (1969) ............ 23

Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the
    United States (Feb. 26, 1793) ............................................................................ 21

The Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the
    United States: Hearing before the Committee on the Judiciary United States Senate,
    111th Cong, 2d Sess 62, at 61 (2010), bit.ly/2ptL833 ............................................. 28

Thomas Jefferson, A Manual of Parliamentary Practice for the use of the Senate of the
    United States 91 (1801) (1993 GPO reproduction), bit.ly/2DKJZXG ................................... 31

Thomas Jefferson, Notes on the State of Virginia 121–29 (1784),
    perma.cc/4J8S-NZX3 ................................................................................... 19

## INTEREST OF *AMICI CURIAE*

This Court "invite[d] responses to any of the *amici curiae* briefs from any party or *amicus curiae* who wishes to respond," to be filed concurrently on December 29, 2017 [ECF No. 72]. This Court further "invite[d] replies to those responses from any party or *amicus curiae* who wishes to do so," to be filed concurrently on January 16, 2018. Scholar Seth Barrett Tillman and the Judicial Education Project ("JEP") submit this response, and may file a reply on January 16, 2018, to any other responses filed. Concurrently with this filing, Tillman and JEP also seek leave to participate in oral arguments.

## PRELIMINARY STATEMENT

Tillman and JEP advanced two arguments that are fatal to Plaintiffs' case: first, Plaintiffs' lawsuit is not an official capacity lawsuit, as evidenced by the fact that it could not continue against the President's successor in office; and second, the Foreign Emoluments Clause does not apply to the President, because he does not hold an "Office of Profit or Trust *under* [the United States]." Though Plaintiffs' Amici addressed both of these issues, they did not substantively respond to contrary arguments advanced by Tillman and JEP. Assuming this Court finds that the Plaintiffs have standing, and that the case is justiciable, Tillman and JEP provide two alternate paths to conclude this case that are not advanced by the Defendant. The most straight-forward approach is to dismiss the Complaint because it should not have been lodged against Donald J. Trump in his official capacity. Nevertheless, if this Court should conclude that the official capacity suit is proper, then Count I should be dismissed because the President does not hold an "office of Profit or Trust under" the United States. Additionally, as Tillman and JEP previously explained in our opening amicus brief, business transactions for value are not "Emoluments," so Count II must be dismissed.

**ARGUMENT**

I.    **The Plaintiffs' Complaint, Which Is Pleaded Against the President in His Official Capacity, Exclusively Concerns Trump's Private Conduct**

The dispositive problem with the Plaintiffs' Complaint begins in the caption: "District of Columbia & State of Maryland v. Donald J. Trump, *in his Official Capacity as President of the United States of America*."[1] The very first paragraph explains, "[t]his is an action against Donald J. Trump in his official capacity as President of the United States."[2] This characterization of Plaintiffs' lawsuit is maintained throughout the Complaint.[3] Plaintiffs do not even hint that their suit is alternatively brought against the President in his individual capacity. The problem, of course, is the conduct the Plaintiffs complain about consists *entirely* of personal commercial relationships that purportedly violate the Constitution's Foreign and Domestic Emoluments Clauses; specifically, that Donald Trump is accepting or receiving money in the form of distributions from LLCs and corporations which he owns (and/or controls) in whole or in part. Such a lawsuit is not an official capacity suit, as evidenced by the fact that this lawsuit could not be maintained against *any* potential successor in office to the President. Therefore, the Complaint should be dismissed.

A.    **Not Every Action Taken by the President is Presidential Action in His Official Capacity**

The Plaintiffs' Amici defend the Complaint's pleading by arguing that with respect to the Emoluments Clauses, there is no practical difference between Donald J. Trump in his individual and official capacity.[4] To the contrary, these separate spheres of doctrine are mutually exclusive. In *Clinton v. Jones*, the Supreme Court did not "dispute" the petitioner's argument that the

---

[1] *See, e.g.*, Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830), bit.ly/2s9aO40.
[2] *Id*. at ¶ 1, at p.1.
[3] *See, e.g., id*. at ¶ 20, at p.7.
[4] *Brief of Amici Curiae Administrative Law, Constitutional Law, and Federal Courts Scholars in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss*, [ECF No. 56-1, at 12]; *see also Memorandum of Law in Support of Plaintiffs' Opposition to Motion to Dismiss*, [ECF No. 46, at 40].

President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties."[5] Because the Chief Executive's duties "are not entirely 'unremitting,'"[6] there remains an important distinction between the President's "official acts"[7] and his "unofficial conduct."[8]

Not every action taken by the President is presidential action. A President's official duties must be disentangled from "personal, private conduct by a President."[9] That is, there is a difference between "unofficial conduct of the individual who happens to be the President" and the official conduct of the President.[10] The Plaintiffs' Amici disregard this foundational principle, blurring the line between the President's official acts, which are governed by the Constitution, and Donald Trump's private commercial transactions, which are not.[11]

### B.     This Suit, Which Could Not Continue Against the President's Successor, Cannot Be Brought Against the President in His Official Capacity

Given that this case concerns the President's personal conduct, this Court must ascertain whether a complaint brought against him in his official capacity can proceed. *Lewis v. Clarke*, which was decided by the Supreme Court earlier this year, illustrates why this case cannot proceed.[12] William Clarke, a Mohegan Tribal Gaming Authority employee, transported patrons to and from the Mohegan Sun Casino.[13] Brian and Michelle Lewis's vehicle was struck by Clarke's limousine on an interstate highway.[14] Because an official capacity suit would have given rise to the defense of tribal sovereign immunity, the Lewises strategically brought suit against Clarke in his

---

[5] Clinton v. Jones, 520 U.S. 681, 697–98. (1997).
[6] *Id.* at 699 (quoting United States v. Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No.14,692d)  (Marshall, C.J.)).
[7] *See* Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982).
[8] *See Jones*, 520 U.S. at 705.
[9] *See id.* at 688.
[10] *See id.* at 701.
[11] As discussed in Part II, *infra*, the President is in no regards bound by the Foreign Emoluments Clause.
[12] 137 S. Ct. 1285 (2017).
[13] *Id.* at 1289.
[14] *Id.*

individual capacity.[15] The Supreme Court agreed that the case was properly pleaded as an individual capacity suit: "[t]he suit is brought against a tribal employee operating a vehicle within the scope of his employment but on state lands, and the judgment will not operate against the Tribe."[16] Clarke could not raise tribal sovereign immunity as a defense because the suit could not be construed as an official capacity suit; that is, it "'will not require action by the sovereign or disturb the sovereign's property.'"[17]

Indeed, had Clark resigned, the Lewises would have had no cause of action against the Tribe at all. "When officials sued in their official capacities leave office," Justice Sotomayor's majority opinion explained, "their successors automatically assume their role in the litigation."[18] This transfer occurs not for mere convenience, but because "[t]he real party in interest [in an official capacity suit] is the government entity, not the named official."[19] Justice Sotomayor noted that "the relief sought [in an official capacity suit] is only nominally against the official and in fact is against the official's office and thus the sovereign itself."[20] Because *Lewis* concerned tortious conduct by an individual employee, the relief sought is primarily against the employee, and not the sovereign.

*Lewis v. Clarke*, which reaffirmed well-settled doctrine concerning official-capacity suits, explains with precision why *District of Columbia v. Trump* must be dismissed. First, "the relief sought is" *exclusively* "against the official and in fact is" *not* "against the official's office and thus the sovereign itself."[21] Stated differently, "[t]he real party in interest" is not the "government

---

[15] *See id.* at 1292 ("But sovereign immunity 'does not erect a barrier against suits to impose individual and personal liability.'" (citations omitted)).

[16] *Lewis*, 137 S. Ct. at 1291.

[17] *Id.* (quoting Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687 (1949)).

[18] *Id.* at 1291 (citations omitted).

[19] *Id.*

[20] *Id.*

[21] *Id.*

entity," but "the named official."[22] The Plaintiffs are not seeking injunctive relief against the President in his official capacity; or the federal government; or any government policy for that matter. Rather, Donald Trump is being sued to enjoin his private commercial activities.

How do we know this? If President Trump were to "leave office," his successor, Vice President Pence could not "assume [Trump's] role in the litigation."[23] Plaintiffs make no allegation that Vice President Mike Pence receives any financial benefit in any Trump-related commercial entities. As soon as Trump's presidency comes to an end, no action for any of the alleged (purported) violations of the Emoluments Clauses could continue against any successor in office to Trump. Thus, this official capacity case (against any successor in office) would have to be dismissed. While a negligence claim against Clarke can survive past his employment with the Tribe, constitutional claims in an official capacity against Trump's successor cannot survive past Trump's constitutional term. This Court would have no basis to issue any injunctive relief.

Furthermore, even if this suit were successful, it would "'not require action by the sovereign or disturb the sovereign's property.'"[24] Rather, it would only affect Trump's personal business assets. Donald Trump, not the President of the United States, is the real party in interest.[25] None of the President's purportedly unlawful actions are being taken in his official capacity. To the contrary, the conduct the Plaintiffs complain about consists *entirely* of personal commercial transactions.

### C. The Plaintiffs' Amici Disregard *Lewis v. Clarke* and its Antecedent Cases

Although cited by Tillman and JEP, the amicus brief filed by twenty law professors, many of whom specialize in federal courts, had no response to *Lewis v. Clarke* or any of its antecedent

---

[22] *Id.*

[23] *See id.*; *see also* Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.").

[24] *Lewis*, 137 S. Ct. at 1291 (quoting Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687 (1949)).

[25] *Id.*

cases concerning official capacity suits.[26] To the contrary, the scholars undermined the Plaintiffs'

case. They wrote:

> [R]egardless of how the case is captioned, the plaintiffs' prayer for relief by its terms does
> not seek to direct the defendant in his performance of his official duties, alter the actions of
> the Executive Branch, or constrain the defendant's successors in office. Although the
> defendant's status as President gives rise to the illegality at issue, a judicial remedy that
> redresses the plaintiffs' injuries would not require the President to take any action—or
> decline to take any action—pursuant to his official duties. All he would have to do is to
> cease accepting emoluments from government clients. These are not official acts. See
> Clinton v. Jones, 520 U.S. 681, 694 (1997).[27]

*Regardless*? Amici's statement amounts to an admission that this action is not an official capacity

lawsuit. Plaintiffs' lawsuit is not directed against the sovereign: it does not seek to "direct the

performance of [the President in regard to] his official duties . . . or constrain the defendant's

successors in office."[28] Rather, it concerns the President's personal commercial transactions. The

scholars concede this point, and state that "[t]he defendant's acceptance of payments as a business

owner thus does not fall within even 'the 'outer perimeter' of his official responsibility' as

President."[29] The scholars make this point to avoid the defense of presidential immunity under

*Nixon v. Fitzgerald* for official acts, but in doing so, they clarify that the case is by no means an

official capacity lawsuit.

As the Court reaffirmed in *Lewis v. Clarke*, an official capacity lawsuit constrains the

government as sovereign: the named office-holder defendant is merely a nominal defendant, and

the action seeks to constrain the current office-holder and impliedly his successors in office.[30]

Where, as here, the factual allegations (if true) and the legal theory (such as it is) applies

exclusively to the current office holder and cannot possibly extend to any successor in office, no

official capacity suit is possible. The real party in interest is not the government, but only the

---

[26] *See supra* note 4, [ECF No. 56-1].
[27] *Id.* at 12 (emphasis added).
[28] *Id.*
[29] *Id.* at 11 (citing Nixon v. Fitzgerald, 457 U.S. 731, 756 (1982)).
[30] *Lewis*, 137 S. Ct. at 1291.

named defendant. Indeed, Amici's citation to *Clinton v. Jones* is telling: *Jones was not an official capacity lawsuit*.[31] The Plaintiffs' pleading identity crisis requires the dismissal of their Complaint.

## II.   Plaintiffs' Amici Failed to Establish That the Foreign Emoluements Clause Applies to the President

Count I of the Complaint hinges on the position that the President holds an "Office of Profit or Trust under" the United States. Tillman and JEP provided this Court with a comprehensive historical argument demonstrating that the Foreign Emoluments Clause's general *Office under the United States* language does not encompass the presidency. Plaintiffs' Amici largely ignore this record, other than to cite statements from George Mason and Edmund Randolph, who argued that the President was bound by this provision. Plaintiffs only direct response is to muster a single, dismissive footnote, which presaged arguments from their Amici. It states:

> Although an amicus advances the idiosyncratic argument that the President is not subject to the Foreign Emoluments Clause, the President himself does not advance this reading, which would conflict with OLC's and Congress's longstanding position and cannot be reconciled with the Clause's text, purpose, or history. *See* Memorandum for the Counsel to the President, Office of Legal Counsel, Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, 2009 WL 6365082 (Dec. 7, 2009) (applying Clause to President Obama and observing that "[t]he President surely holds an Office of Profit or Trust" (brackets omitted)); Memorandum Opinion for the Special Assistant to the President, Office of Legal Counsel, Proposal That the President Accept Honorary Irish Citizenship 278 (May 10, 1963), https://goo.gl/CEfHeS (applying Clause to President Kennedy); 5 U.S.C. § 7342(a)(1)(E) (recognizing that the bar on foreign presents covers "the President and Vice President" and consenting to certain presents).[32]

---

[31] *See* Jones v. Clinton, 72 F.3d 1354, 1357–58 (8th Cir. 1996) ("The question before us, then, is whether the President is entitled to immunity, for as long as he is President, from civil suits alleging actionable behavior by him in his *private capacity rather than in his official capacity* as President. We hold that he is not." (emphasis added)). Furthermore, that the tortious conduct in *Jones* arose before President Clinton's inauguration is irrelevant; the Supreme Court's analysis concerning individual capacity suits applies to all cases brought against the President, regardless of when the conduct occurred.

[32] *See supra* note 4, [ECF No. 46, at 33 n.20] (emphasis added). A very similar footnote appears in the Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss in parallel litigation before the Southern District of New York. *CREW v. Donald J. Trump, in his Official Capacity as President of the United States*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Aug. 11, 2017), [ECF No. 57, at 31 n.18]. The Defendant's motion to dismiss in that matter has been granted. *See* CREW v. Trump, Civ. A. No. 1:17-cv-00458-GBD, 2017 WL 6524851 (S.D.N.Y. Dec. 21, 2017).

Rather than engaging this important question, which is central to the resolution of their case, the Plaintiffs and their Amici have effectively punted. First, the pair of Office of Legal Counsel ("OLC") opinions that Plaintiffs and their Amici cited show no awareness of the weight of evidence, spanning from the colonial period to the American Revolution, then through the Constitutional Convention, to the First Congress, the Washington Administration, and finally into the Early Republic, which demonstrates that elected federal officials, such as the President, do not hold an Office of Profit or Trust *under* the United States. Second, though the Legal Historians, as *amici curiae*, initially attempted to rebut this evidence in parallel litigation in the Southern District of New York, they expressly abandoned those arguments, and in this Court they have made no attempt to rebut the arguments put forward by Tillman and JEP. Finally, the Plaintiffs and their Amici point to the Foreign Gifts and Decoration Act ("FGDA") as evidence that Congress has regulated the President's acceptance of foreign gifts. This statute, however, proves too little, because it also applies to the "spouse[s]" of government officials, who hold no "office" of any kind, let alone one "under" the United States. Thus, this 1966 statute cannot be supported as a legislation enacted pursuant to Congress's authority under the Foreign Emoluments Clause. Plaintiffs' Amici put forward no evidence that in enacting the FGDA and its regulation of the conduct of federal officeholders, including the President, Congress was relying on the Foreign Emoluments Clause.

The Plaintiffs and their Amici bear the burden of proof and persuasion to impose this new judicial constraint on the President's authority. Indeed, due to the separation of powers, and the President's powers over international affairs—including the power to accept foreign gifts as an act

of recognition[33]—this burden is even higher than for mundane domestic civil cases.[34] The

Plaintiffs and their Amici barely try, and ultimately fail to meet that burden.

A.     "The Government Has Not Conceded That The President Is Subject to the
       Foreign Emoluments Clause"

On October 25, 2017, the Justice Department submitted a letter to the Honorable George B.

Daniels, U.S. District Judge for the Southern District of New York, explaining its position

concerning the scope of the Foreign Emoluments Clause.[35] The letter stated that "the government

has not conceded that the President is subject to the Foreign Emoluments Clause."[36] The Justice

Department has not taken a position, one way or the other, about whether the President is in fact

subject to the Foreign Emoluments Clause.

B.     The Office of Legal Counsel Showed No Awareness of the Historical Evidence
       Concerning The Scope of the Foreign Emoluments Clause

Beyond dismissing Tillman and JEP's argument as "idiosyncratic"—an adjective, not an

argument—the Plaintiffs only direct substantive response in Footnote 20 consists of citations to

two OLC memoranda, which are also cited by Amici.[37] The 2009 memorandum simply assumes

that that "[t]he President *surely* 'hold[s] an[] Office of Profit or Trust' . . . ."[38] OLC offered no

evidence whatsoever to support this assumption. (The Justice Department's October 25 letter

---

[33] *See* Zivotofsky v. Kerry, 135 S. Ct. 2076 (2015); *see also Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as Amici Curiae in Support of the Defendant*, [ECF No. 27-1, at 19] ("If the Constitution vests the President with vast authority over recognizing foreign nations, then certainly it entails the far lesser authority to accept presents from those very same countries. *Indeed, the President's decision to accept a gift from a yet unrecognized foreign state or head of government could itself amount to an act of recognition.*" (emphasis added)).

[34] Plaintiffs favorably cite Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997). [ECF No. 46, at 57]. Professor Siegel explains that plaintiffs bear an even *heavier* burden when suing the President. *Id.* at 1677 ("In light of the breadth of the President's powers, one would expect that in many cases the standard of review applied by a court will be *extremely generous*." (emphasis added)).

[35] Letter to the Court from Brett A. Shumate (Oct. 25, 2017), *CREW v. Donald J. Trump, in his Official Capacity as President of the United States*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Oct 25, 2017), [ECF No. 98], bit.ly/2pqubGM.

[36] *Id.*

[37] *Brief of Former Government Ethics Officers as Amici Curiae Supporting Plaintiffs*, [ECF No. 50, at 14 n.5, 17 n.6].

[38] Memorandum from David J. Barron, Act. Asst. Att'y Gen., Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize, OLC, at 4 (Dec. 7, 2009), bit.ly/2rx6CfT (emphasis added).

represents a stark departure from this 2009 opinion.) The 1963 memorandum considered gifts given to Presidents Jackson and Lincoln in order to determine whether President Kennedy could accept honorary Irish citizenship.[39] Both of these modern opinions fail to account for the weight of evidence, spanning from the colonial period to the American Revolution, then through the Constitutional Convention, to the First Congress, the Washington Administration, and finally into the Early Republic. This record demonstrates that elected federal officials, such as the President, do not hold an Office of Profit or Trust *under* the United States.

### 1.   Evidence from Presidents Jackson and His Successors Does Not Resolve the Scope of the Foreign Emoluments Clause

As a threshold matter, neither President Jackson nor Lincoln actually asked for consent to keep foreign gifts. Rather, each simply asked Congress to dispose of the gifts. For example, Jackson "placed [a gold medal from the Republic of Columbia] at the disposal of Congress," and said, "our Constitution forbids the acceptance of presents from a foreign State."[40] This statement, which is not entirely correct, fails to answer the question of whether the Foreign Emoluments Clause binds the President. Even assuming the provision applies to the President (and it does not), such gifts could be accepted *with* the consent of Congress. The Plaintiffs and their Amici do not contest this point. President Jackson simply never asked for such consent. Presidents Tyler and Van Buren, who succeeded Jackson, expressed similar sentiments concerning the receipt of foreign gifts that were accepted for the United States as a sovereign, and not by the President as an individual.[41] (Practice and commentators uniformly agree that the President can accept a gift on behalf of the United States.)

---

[39] Memorandum Opinion for the Special Assistant to the President, Proposal That the President Accept Honorary Irish Citizenship, OLC at 278, 280–81 (May 10, 1963), goo.gl/CEfHeS.

[40] *See, e.g.*, Message from Pres., 1st Sess. of the 21st Cong. 187–88 (Jan. 19, 1830), bit.ly/2s9aO40.

[41] 14 *Abridgment of the Deb. of Cong.* 140 (1860), bit.ly/2s21miX (concerning gifts from the Imam of Muscat given to "the Government of the United States," President Van Buren communicated to Congress, "I deem it my duty to lay the proposition before Congress, for such disposition as they may think fit to make of it") (entry for May 25, 1840); *House*

President Lincoln's practices were a bit more complex, but likewise do not resolve the scope of the Foreign Emoluments Clause. In May 1861, President Lincoln deposited with the State Department a diploma of citizenship he received from San Marino.[42] Because the gift was addressed to President Buchanan, OLC suggested that Lincoln treated the diploma as a "gift[] to the United States, rather than as personal gift[]."[43] As a result, Lincoln's practice is not probative to whether the President was bound by the Foreign Emoluments Clause. In February 1862, President Lincoln acknowledged the receipt of a sword and photograph, which had been sent by the King of Siam, again, to his predecessor, James Buchanan.[44] Lincoln thanked the King for the sword and photograph, as well as "tusks of length," and acknowledged the King's "desire" to treat the gifts as "tokens of . . . good will and friendship for the American People."[45] Once again, Lincoln never actually sought Congress's consent to personally *accept* the gifts, which were ostensibly directed to the United States government as a whole. Rather, the Senate and House merely resolved that the gifts from Siam would be "*deposited* in the collection of curiosities at the Department of the Interior."[46]

Congress was aware of the difference between permitting officers to personally accept gifts, and merely depositing lawfully received gifts with the government. To illustrate this distinction, in 1856, the House and Senate jointly resolved to authorize "the Superintendent of the

---

*Documents*, bit.ly/2rsttt9 (May 10, 1844) (concerning gifts "from the Imam of Muscat . . . to the United States," President Tyler communicated to Congress that the gifts "will be disposed of in such manner as Congress may think proper to direct").

[42] *See* Letter from A. Lincoln to Regent Capt's of the Rep. of San Marino (May 7, 1861), perma.cc/U2G7-3BHW.

[43] *Honorary Irish Citizenship*, *supra* note 39, at 281.

[44] *Press Release*, National Archives (Sep. 23, 1999), perma.cc/SWY9-42QN.

[45] Letter from A. Lincoln to the King of Siam (Feb. 3, 1862), perma.cc/SU5Z-PKYQ.

[46] Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, 12 Stat. 616 (Mar. 15, 1862), bit.ly/2rwfvBK (noting that the gifts from Siam would be "deposited in the collection of curiosities at the Department of the Interior").

Coast Survey" to "*accept* the gold medal recently presented to him by the King of Sweden."[47]

Thus, the precedents cited by Plaintiffs and their amici from the mid-19th century do not resolve

how the Foreign Emoluments Clause was understood five decades after the federal convention.

### 2. Washington and His Successors During the Early Republic Openly Accepted Foreign Gifts Without Seeking Congressional Consent

While the practices of Presidents Jackson, Van Buren, Tyler, and Lincoln are marginally

probative, far better evidence of executive understanding comes from Presidents Washington and

his pre-Jackson successors. In 1791, Washington received, accepted, and kept a diplomatic gift—a

framed full-length portrait of King Louis XVI from the French ambassador to the United States.[48]

He never sought or received congressional consent for this gift, nor did he do so for the main key to

the Bastille accompanied with a picture of that fortress,[49] gifted to him by the Marquis de

Lafayette,[50] who at the time was a French government official.[51] President Jefferson received a

bust of Czar Alexander I, a diplomatic gift, from the Russian government.[52] Jefferson received,

accepted, and kept this diplomatic gift, without congressional consent.[53] Jefferson also received

presents from Indian tribes, which he considered "diplomatic gifts" from foreign nations.[54] Like

---

[47] A Resolution authorizing Alexander D. Bache to accept a Medal presented to him by the King of Sweden, 11 Stat. 152 (Aug. 30, 1856), bit.ly/2C514ha (emphasis added).

[48] *See* Letter from Ambassador Ternant to G. Washington (Dec. 22, 1791), perma.cc/5F2V-G5GU.

[49] Fed. Gazette & Phila. Daily Advertiser (Aug. 12, 1790), at 2, bit.ly/2rlnKjP; Pa. Packet & Daily Advertiser (Aug. 13, 1790), at 2, bit.ly/2r9bBiz (same).

[50] Lest anyone mistakenly believe that the key was a private gift from LaFayette to his friend President Washington, this gift was discussed in diplomatic communications form the French government's representative in the United States to his superiors in the French ministry of foreign affairs. *See, e.g.*, Letter from Louis Guillaume Otto to Armand Marc de Montmorin (Aug. 3, 1790), available in Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres, Correspondances Politiques, 39CP, Volume 35, Microfilm P5982, pages 147–149.

[51] *See, e.g.*, André Maurois, *Adrienne: The Life of the Marquise De La Fayette* 178–82 (1961); *A Complete History of the Marquis De Lafayette* 193, 194 (1826), bit.ly/2tauZfC (same). At the time, Lafayette held multiple positions in the French government, including, among others, member of the legislature (and its former vice president), commander of the National Guard, and he had already received a commission in the regular French army.

[52] *See* Letter to T. Jefferson from Levett Harris [American Consul-General to Russia] (Aug. 7, 1804), perma.cc/4ATK-BWVN; *Gifts from Foreign Dignitaries*, Monticello, perma.cc/C26E-X23E.

[53] *See* Letter from T. Jefferson to Levett Harris (April 18, 1806), perma.cc/3FX8-Y5TG.

[54] *See* Letter from T. Jefferson to Meriwether Lewis (Oct. 26, 1806), perma.cc/QB6Z-SWSD (emphasis added); Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, perma.cc/658Z-WN5S.

Washington, Jefferson never sought nor received congressional consent to keep these gifts—the receipt of which was known to the public.

The fourth and fifth presidents continued the practices of Washington and Jefferson. In 1816, General Ignacio Alvarez of the United Provinces of the Rio de la Plata (in present-day Argentina) gave President Madison two pistols "to form a closer connexion with the United States."[55] The pistols were delivered to Madison via diplomatic channels.[56] James Madison gave the guns to his successor, President James Monroe, all absent any congressional consent.[57] There is no evidence that any of these presidents sought or received congressional consent to keep these valuable gifts. The fact that Washington and other Founders who succeeded him in office accepted multiple foreign gift shows that there was no accident or mistake, but rather, it was part of an established government practice that no one objected to at the time or any time since, until recent litigation against President Trump.

OLC showed no awareness of these practices from Washington and his successors in the Early Republic. Thus, it is no surprise that the Department of Justice is no longer willing to stand behind OLC's assumption. While OLC has not yet revisited its unsupported conclusion, the Congressional Research Service ("CRS") has changed course. As recently as 2012, CRS concluded that "The President and all federal officials are restricted by the Constitution, at Article I, Section 9, [C]lause 8 . . . ."[58] However, more recently, after becoming aware of the Washington-era and other pre-Jackson precedents, CRS modified its position. Now CRS hedges:

---

[55] Letter to J. Madison from Ignacio Alvarez Thomas (Feb. 9, 1816), perma.cc/D47U-V4H3.
[56] Letter to J. Madison from John Graham (Aug. 8, 1816), perma.cc/RD8B-2ASW.
[57] *See Pistols*, James Monroe 3D, perma.cc/T796-ED5B (on website of the James Monroe Museum); Jonathan Fildes, *Science Probe for 'Space Pistols,'* BBC News (May 26, 2008), perma.cc/4DJP-PUF4. There is no doubt as to the provenance of the Washington and Jefferson diplomatic gifts, but the provenance of the pistols is disputed. Certainly, the pistols are not in the government's archives, where they would be unless someone had removed them.
[58] Jack Maskell, CRS, *Gifts to the President of the U.S.*, 4 (Aug. 16, 2012), bit.ly/2s7AVZu.

noting that the Foreign Emoluments Clause "might technically apply to the President."[59] This change is significant.

Despite the fact that Tillman and JEP identified these practices, the District of Columbia and the State of Maryland offered no response. To the contrary, the Plaintiffs posit that the Defendant does not "identify any historical precedent for [the President's] acceptance of profits and other lucrative benefits from foreign and domestic governments."[60] The record is replete with instances where Presidents Washington and his successors received, accepted, and kept diplomatic gifts from foreign states: all absent congressional consent. Likewise, though the Legal Historians, as *amici curiae*, discussed Washington, Jefferson, Madison, and Monroe to interpret the Foreign Emoluments Clause, they offered no response to these Presidents accepting diplomatic gifts during the Early Republic. Indeed, the Legal Historians analyzed "[t]he French practice of giving expensive diplomatic gifts,"[61] but had nothing to say about Washington's accepting valuable diplomatic gifts from the French government. The historical precedents identified by Tillman and JEP are on-point: foreign diplomatic gifts given to our first President and other founders who succeeded him during the Early Republic. The Legal Historians do nothing to rebut this evidence. If the Foreign Emoluments Clause does not regulate the President's acceptance of a "present" from a "foreign State," then it also cannot control his acceptance of a foreign "Emolument."

### 3. Disputed Assertions of Power by Washington and His Successors Are More Probative About the Scope of the Foreign Emoluments Clause Than Voluntary Acquiescence by Post-Jackson Presidencies

This Court might take the position that all presidents have equal authority, so the latter presidents ought to be preferred. Or this Court could surmise, as did the Legal Historians in

---

[59] Jack Maskell, CRS, *Conflict of Interest and "Ethics" Provisions That May Apply to the President*, 2 (Nov. 22, 2016), bit.ly/2teGovc.
[60] See *supra note* 4, [ECF No. 46, at 37].
[61] *Brief of Amici Curiae by Certain Legal Historians on Behalf of Plaintiffs*, [ECF No. 58-1, at 11].

parallel litigation, that "Presidents make mistakes (even George Washington), and courts generally do not assume that Early Republic practices are dispositive of the Constitution's meaning."[62] The Legal Historians asserted that courts should conclude that "early presidents plainly violated" the Foreign Emoluments Clause.[63] The Legal Historians wisely did not advance this argument before this Court, because the Supreme Court has taught a very different lesson: modern practice does not automatically overcome earlier precedents.[64] To the contrary, parties bear a heavy burden in asserting that "President Washington did not understand" the Constitution that his precedents helped define.[65] Given that the Legal Historians are effectively alleging that Washington publicly violated the Constitution absent any noticeable opposition, the burden on them is even heavier. They fail to meet this burden.

In *District of Columbia v. Heller*, the Supreme Court considered a wide range of historical sources: not only those from prior to ratification of the Bill of Rights, but also precedents from after 1791.[66] In dissent, Justice Stevens found "particularly puzzling" the majority's reliance on "postenactment" commentary.[67] To this, the Court countered that the "examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or ratification" is a "critical tool of constitutional interpretation."[68] Yet, not all post-enactment commentary is of equal weight. As time passes from the framing, the Court observed, later sources do "not provide as much insight."[69] The most reliable sources are those

---

[62] Brief of *Amicus Curiae* by Certain Legal Historians On Behalf of Plaintiffs, *CREW v. Donald J. Trump, in his Official Capacity as President of the United States*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Aug. 11, 2017) , [ECF No. 70-1, at 23].
[63] *Id.*
[64] *See, e.g.*, I.N.S. v. Chadha, 462 U.S. 919, 944 (1983).
[65] *See* Freytag v. C.I.R., 501 U.S. 868, 917–18 (1991) (Scalia, J., concurring).
[66] District of Columbia v. Heller, 554 U.S. 570, 605–10, 614–16 (2008).
[67] *Id.* at 662 n.28 (Stevens, J., dissenting).
[68] *Id.* at 605.
[69] *Id.* at 614.

most proximate to the framing.[70] Post-enactment commentary is useful, if at all, where continuity confirms earlier understandings.

Under the rule in *Heller*, the Washington administration precedents and other precedents from the Early Republic prevail over the Jackson and post-Jackson precedents. They ought to prevail as well for a more important reason: when considering competing streams of historical practice by the three branches, courts give more weight to disputed assertions of power by one branch.[71] In our separation of powers jurisprudence, where the Executive Branch takes some action of doubtful constitutionality and in doing so arguably invades the constitutional sphere of Congress, Congress's failure (or repeated failures) to respond where pushback is to be expected ratifies the propriety of the contested action.[72] On the other hand, where the Executive Branch takes some action of dubious constitutionality and in doing so surrenders its own arguable powers, such acquiescence in regard to using a disputed power is accorded little weight because surrender occasions no public discussion or pushback by the other branches.[73]

When Washington and the pre-Jackson presidents publicly accepted diplomatic gifts, if that conduct was arguably unconstitutional, if it invaded Congress's authority to consent to such gifts under the Foreign Emoluments Clause's consent provision, then one would expect *someone*

---

[70] *See* Myers v. U.S., 272 U.S. 52, 136 (1926); Schell v. Fauche, 138 U.S. 562, 572 (1891).

[71] *See, e.g.*, McPherson v. Blacker, 146 U.S. 1, 35–36 (1892); *see* CREW v. Trump, Civ. A. No. 1:17-cv-00458-GBD, 2017 WL 6524851, at *12 (S.D.N.Y. Dec. 21, 2017) (Daniels, J.) ("As the only political branch with the power to consent to violations of the Foreign Emoluments Clause, Congress is the appropriate body to determine whether, and to what extent, Defendant's conduct unlawfully infringes on that power. If Congress determines that an infringement has occurred, it is up to Congress to decide whether to *challenge or acquiesce* to Defendant's conduct." (emphasis added)).

[72] *See* NLRB v. Noel Canning, 134 S. Ct. 2550, 2560 (2014); *see also* Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 583 (1952) (noting that "Congress has taken no action" after President Truman's communications; Dames & Moore v. Regan, 453 U.S. 654, 688 (1981) ("We are thus clearly not confronted with a situation in which Congress has in some way resisted the exercise of Presidential authority" after claim suspensions); *cf.* Stuart v. Laird, 5 U.S. 299, 309 (1803).

[73] Free Enter. Fund v. PCAOB, 561 U.S. 477, 497 (2010) ("Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents."); Freytag v. C.I.R., 501 U.S. 868, 879–880 (1991); *cf.* Clinton v. City of N.Y., 524 U.S. 417, 451–52 (1998 (Kennedy, J., concurring) ("It is no answer, of course, to say that Congress surrendered its authority by its own hand . . . . Abdication of responsibility is not part of the constitutional design.").

to object. But there are no reports of any such objection, by anyone, even in private correspondence. If there was no contemporaneous objection—no calls for impeachment (much less a lawsuit)—then the absence of public objections serves to ratify the contested conduct. On the other hand, when Jackson and post-Jackson presidents arguably surrendered their power to receive diplomatic gifts absent congressional consent, such acquiescence counts for something. Such acquiescence, however, counts for a good deal less than the Washington and other pre-Jackson precedents.

Distant post-ratification acquiescence starting a half century or later after the Constitution's ratification is far less probative than disputed assertions of power by Washington and his successors during the Early Republic. Indeed, OLC was only able to identify one instance where Congress gave a "grant of consent to a President, [where] it followed receipt" of a foreign gift.[74] In an 1896 joint resolution, Congress authorized former-President Benjamin Harrison (whose term ended in 1893) to "*accept* certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States."[75] As a former President, Harrison no longer held any federal position of any kind, and was not then bound by the Foreign Emoluments Clause. As a result, this progressive-era episode is of only the slightest value to understand the scope of the Foreign Emoluments Clause with respect to sitting presidents.

Further, even if Harrison considered himself still bound by the Foreign Emoluments Clause—perhaps because the gift was given during his administration—this voluntary ex-presidential acquiescence in regard to congressional consent, over a century after the

---

[74] *Honorary Irish Citizenship*, *supra* note 39, at 281 n.3.

[75] Joint Resolution No. 39: To authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, 29 Stat. 759 (April 2, 1896), bit.ly/2ssBLkJ (emphasis added). Had Harrison sought congressional consent during his time in office, he would have been placed in the odd position of having to sign a joint resolution into law that would have allowed him to accept a foreign gift. This oddity provides another structural reason why the Foreign Emoluments Clause should not be understood to extend to the elected officers: Members of Congress and the President should have no role in their own acceptance of foreign gifts with respect to bicameralism and presentment.

ratification of the Constitution, cannot outweigh the precedents set by sitting presidents immediately after ratification. Indeed, these presidents included Founders, Framers, and ratifiers. The Harrison gift and modern OLC opinions do not constitute a "long settled and established practice" that would prevail over practices of our founding presidents.[76] To the contrary, there has been no "constitutional impasse" between the President and Congress.[77] As Thomas Jefferson explained, "[o]ne precedent in favour of power is stronger than an hundred against it."[78]

### C.   The Foreign Gifts and Decorations Act, Which Also Applies to "Spouse[s]" of Federal Officers, Cannot Be Justified Based Solely on The Foreign Emoluments Clause

The District of Columbia and the State of Maryland cite a single statute to demonstrate that "Congress's longstanding position" has been that the President is subject to the Foreign Emoluments Clause: in 1966, Congress enacted the Foreign Gifts and Decorations Act ("FGDA"), which placed restrictions on certain individuals' accepting gifts from foreign governments.[79] A similar argument is advanced by Amici.[80] Though the text of the statute is silent about which enumerated power it relies upon, the Plaintiffs and their Amici suggest it must be premised on the Foreign Emoluments Clause. Not so.

Under 5 U.S.C. § 7342(a)(1)(A)–(D), the law regulates all federal employees as well as members of the uniformed services. Because there is no doubt that these individuals hold an "Office of Profit or Trust under" the United States, in this respect, the FDGA may be viewed as a "long settled and established practice" of Congress exercising its powers under the Foreign

---

[76] The Pocket Veto Case, 279 U.S. 655, 689 (1929); *see also* NLRB v. Noel Canning, 134 S. Ct. 2550, 2559–60 (2014).
[77] *See* Goldwater v. Carter, 444 U.S. 996, 997 (1979) (Powell, J., concurring).
[78] Thomas Jefferson, *Notes on the State of Virginia* 121–29 (1784), perma.cc/4J8S-NZX3.
[79] 5 U.S.C. § 7342(a)(1)(E).
[80] *Brief of Former Government Ethics Officers as Amici Curiae Supporting Plaintiffs*, [ECF No. 50, at 16–17] ("Congress has exercised its power to permit emoluments on multiple occasions. One well-known example is the Foreign Gifts and Decorations Act."); *Brief of Former National Security Officials as Amici Curiae*, [ECF No. 57-1, at 15 n.26] ("Congress can address this concern, as it has in the past . . . ." (citing FDGA)).

Emoluments Clause with respect to *appointed* officials. However, 5 U.S.C. § 7342(a)(1)(G) regulates foreign gifts given to "the spouse" of otherwise covered officials. In no sense does a "spouse" hold an "Office of Profit or Trust under" the United States. Therefore, for the FDGA to fall within Congress's powers with respect to spouses of federal officials, Congress must rely on a "jurisdictional element" other than the Foreign Emoluments Clause.[81] The Foreign Commerce Clause and the Necessary and Proper Clause might very well serve this purpose. That analysis still leaves open what the "jurisdictional element" is with respect to elected officials, such as the President. Plaintiffs and their Amici argue that the FGDA serves as "gloss" on the Foreign Emolument Clause with respect to elected officials, such as the President.[82] The FDGA, which does not even reference the Foreign Emoluments Clause, cannot establish the sort of "long settled and established practice" needed to resolve this case.[83]

### D. Plaintiffs' Amici Fail to Address the "Office . . . Under" Parliamentary Drafting Convention, Which Applies to Appointed Officials

Beyond neglecting the historical practices of presidents during the Early Republic, the Plaintiffs' Amici have failed to address the "Office . . . under" drafting convention, which applies exclusively to appointed officials. In particular, to interpret the Foreign Emoluments Clause, the Legal Historians' brief cites Alexander Hamilton's writings, statements from a member of the First Congress, and Joseph Story's *Commentaries*. Yet, these sources confirm that "Office . . . under the United States" only applies to appointed officials.

---

[81] *See* United States v. Lopez, 514 U.S. 549, 561 (1995); United States v. Morrison, 529 U.S. 598, 611–12 (2000).
[82] Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 611–12 (1952) (Frankfurter, J., concurring).
[83] The Pocket Veto Case, 279 U.S. 655, 689 (1929); NLRB v. Noel Canning, 134 S. Ct. 2550, 2559–60 (2014).

1.     **The Legal Historians' Brief Cites Alexander Hamilton's Official Communications to Define "Emoluments," but Not to Understand "Office . . . Under the United States"**

The Legal Historians' brief cites a 1795 letter from Secretary of the Treasury Alexander Hamilton to President George Washington that includes the word "emolument."[84] This argument establishes that the Legal Historians view Hamilton's official correspondences from *after* the ratification of the Constitution as indicative of the meaning of the Foreign Emoluments Clause. In light of this concession, their failure to address a far more significant official communication from Hamilton is inexplicable—especially since they previously addressed it in parallel litigation.

In 1792, the Senate directed President Washington's Secretary of the Treasury, Alexander Hamilton, to draft a financial statement listing the "emoluments" of "*every* person holding *any civil office or employment under the United States*."[85] Hamilton took more than nine months to draft and submit a response, which spanned some ninety manuscript-sized pages. The report included appointed or administrative personnel in *each* of the three branches of the federal government, including the Legislative Branch (e.g., the Secretary of the Senate and Clerk of the House and their staffs) and the clerks of the federal courts.[86] But Hamilton's carefully-worded response did *not* include the President, Vice President, Senators, or Representatives.[87] The presumptive meaning of this document is that Hamilton accurately responded to the Senate's precise request: elected officials do not hold *office . . . under the United States*, and so they were not listed.

---

[84] [ECF No. 58-1, at 23 n.68] (citing Letter from A. Hamilton to G. Washington (Jan. 24, 1795), bit.ly/2C0VRVm).

[85] 1 *Journal of the Senate of the U.S.A.* 441 (1820) (May 7, 1792 entry) (emphasis added), bit.ly/2rQswt8.

[86] *See* Report on the Salaries, Fees, and Emoluments of Persons Holding Civil Office Under the United States (Feb. 26, 1793), *in* 14 *The Papers of Alexander Hamilton* 157, 157–59 (1969), perma.cc/49RT-TTGF.

[87] *Id.* The editors of the *Papers of Alexander Hamilton* marked this document "DS," meaning "document signed," which indicates that this document was the original signed by Hamilton. The transmittal letter of *The Complete Report*, which was drafted in long hand, can be found at bit.ly/2fj6IQ0. The reproduction in the *Papers of Alexander Hamilton* is typeset.

Contrary explanations do not hold up. Two of the Legal Historians whose brief is before this Court, Gautham Rao and Jed Handelsman Shugerman, have contended that Hamilton's list was designed to help avoid violations of the Constitution's Sinecure Clause.[88] It provides, "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time."[89] Under this clause, members of Congress cannot be appointed to offices (1) that were created during the term of Congress to which they were elected, or (2) whose "Emoluments" (i.e., salary) were increased during the term of Congress to which they were elected. Rao and Shugerman speculate that Hamilton's 1793 list identified positions that fell into these categories, so the President could avoid unconstitutional appointments. According to Rao and Shugerman, Hamilton understood that the Senate inquiry had a limited, unstated purpose and as a result, his roll of officers hewed to that purpose, excluding the presidency, even though (in Rao & Shugerman's view) the presidency was encompassed by the *office under the United States* language in the Senate order. It is not surprising that the Legal Historians do not advance this argument here, because it makes little sense.

First, by the time the Senate made its request to Hamilton in 1792, there had already been two sets of congressional elections, and two classes of Senators had been elected. Yet, the Senate order and Hamilton's 1793 roll of officers makes no attempt to distinguish between positions created during the Senate's first two-year term and the Senate's second two-year term. Without that information, Hamilton's 1793 roll of officers would not have been useful in regard to helping elected officials avoid violating the Sinecure Clause. Second, the Sinecure Clause would prevent a Senator from being appointed to an Article III judgeship that was created during his elected term.

---

[88] Gautham Rao & Jed Handelsman Shugerman, *Presidential Revisionism: The New York Times published the flimsiest defense of Trump's apparent emoluments violations yet.*, Slate (July 17, 2017), perma.cc/K6P4-RC6S.
[89] *See* U.S. Const. art. I, § 6. cl. 2.

Yet the Senate order specifically directed Hamilton to exclude all judges, and Hamilton's document followed those instructions. The list would have been useless to help avoid violations of the Sinecure Clause with respect to judicial appointments, which were and remain an important class of officers.

Third, there is no evidence that Congress ever made such a request of Hamilton prior to the start of the Second Congress in 1791 or prior to the start of the Fourth Congress in 1795. To the contrary, Hamilton and the Treasury Department issued dozens of circulars, memoranda, and reports concerning the federal workforce in response to congressional requests.[90] For example, in 1791, the House of Representatives directed the Secretary of the Treasury to prepare an annual statement listing an "accurate statement and account of the receipts and expenditures of all public moneys." [91] In response to this broad request, Hamilton's 72-page report included the compensation for all Article III judges, the members of the House and Senate, along with the Vice President and the President.[92] In contrast, where Hamilton was asked to list the "emoluments" of "*every* person holding *any civil office or employment under the United States*," excluding judges, he did not list the compensation for Representatives, Senators, the Vice President, or the President. In one document Hamilton and the Treasury Department included all elected officials, and in the other document, Hamilton did not include any elected officials. What differed was the language in the instructions instructing Hamilton's efforts. And where congressional guidance sought a list of those holding *office . . . under the United States*, Hamilton did not include any elected positions.

There is an entirely different document that lists the salaries of President Washington and Vice President Adams before recording the salaries of the appointed officers included in

---

[90] *See generally A List of Treasury Reports and Circulars Issued by Alexander Hamilton, 1789–1795* (Paul Leicester Ford ed., Brooklyn 1886), bit.ly/2zpBoqe.

[91] 1 *Journal of the House* 484 (Washington, Gales & Seaton 1826) (entry for December 30, 1791), bit.ly/2pr0p4A.

[92] *See* Report on an Account of the Receipts and Expenditures of the United States for the Year 1792 ["*The 1792 Report*"], *in* 15 *Papers of Alexander Hamilton* 474, 498–510 (1969), bit.ly/2BvwJF9.

Hamilton's original report.[93] In parallel litigation concerning the Foreign Emoluments Clause in the Southern District of New York, the same group of five Legal Historians had cited this second document to contend that the President holds an "office . . . under the United States."[94] However, Tillman and JEP filed a response, showing that this latter document was in fact a scrivener's copy drafted long after Hamilton's death.[95] Subsequently, the Legal Historians issued a formal apology, and withdrew their claim about this second document from their amicus brief.[96]

The editors of *American State Papers*, who would publish in 1834 a typeset reproduction of this scrivener's copy, explained, indirectly at least, why President Washington and Vice President's Adams's salaries were added. In 1816, Congress authorized the biennial publication of the *Official Register of the United States*, also known as the *Blue Book*,[97] to record the "compensation, pay, and emoluments" of "all officers and agents, civil, military, and naval, in the service of the United States."[98] The first edition of the *Blue Book*, published in 1818, lists the salaries of President Monroe and Vice President Tompkins before recording the salaries of appointed officers in all three branches; elected members of Congress are not listed.[99]

Though Hamilton's 1793 roll of officers did not include the salaries of President Washington and Vice President Adams, the editors of *American State Papers* nonetheless identified this document in the index as the "'Blue Book,' or list of civil officers of the United

---

[93] *See* List Of Civil Officers Of The United States, Except Judges, With Their Emoluments, For The Year Ending October 1, 1792, *in* 1 *American State Papers/Miscellaneous* 57 (1834), bit.ly/2ptHRkm. *The Condensed Report*, which was drafted in long hand, can be found at [bit.ly/2xknN6j. The reproduction in *American State Papers* is typeset.
[94] Adam Liptak, *'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal Storm*, N.Y. Times (Sept. 25, 2017).
[95] *See* Motion for Leave to File Response to Brief of *Amici Curiae* by Certain Legal Historians, *CREW v. Trump*, 17 Civ. 458 (S.D.N.Y. Sept. 19, 2017), [ECF No. 85], bit.ly/2yc175l.
[96] *See* Letter to Judge George B. Daniels, *id.* at [ECF No. 96], bit.ly/2gaoHsD. *See* Jed Shugerman, *Our correction and apology to Professor Tillman*, Shugerblog (Oct. 3, 2017), perma.cc/R9N9-S472.
[97] John P. Deeben, *The Official Register of the United States, 1816-1959*, National Archives, perma.cc/RJD6-S232.
[98] *See, e.g.*, *A Register of Officers and Agents, Civil, Military, and Naval, in the Service of the United States on the Thirteenth Day of September, 1817*, at iii (Washington, E. De Krafft 1818), bit.ly/2BwkFmM.
[99] *Id.* at 9, 16–17.

States."[100] That is, the editors viewed Hamilton's original 1793 document as a progenitor or the best analogue to the *Blue Book* from the time period in which the Constitution went into force. After all, Hamilton's 1793 roll of officers listed the "emoluments" of all appointed officials in the executive and legislative branches. (Congress had asked Hamilton to exclude judges.) However, there was one significant difference between the format of the 1818 *Blue Book* and Hamilton's 1793 roll: the latter's omission of the salaries of the President and the Vice President. To conform Hamilton's roll to the format of the *Blue Book*, an unknown Senate functionary inserted the emoluments of President Washington and Vice President Adams. Once this addition was made, Hamilton's roll closely tracked the format of the *Blue Book*. Even the sequencing was identical: President, Vice President, Department of State, Treasury Department, Department of War, etc. When viewed in the context of the *Blue Book*, the addition of the President and Vice President makes sense; it was a formatting or editorial decision made in 1834, not an interpretation of who holds "Office . . . under the United States" made in 1834, much less by Hamilton in 1793.

This latter report, which was drafted by an unknown Senate functionary—likely to conform to the format of the *Blue Book*—should not be accorded the same weight as the original document signed by Hamilton and transmitted to the Senate as an official Executive Branch communication. At this juncture, the Legal Historians and Plaintiffs' other *amici* have no response, whatsoever, to this important official communication from Alexander Hamilton.

> **2.     The Legal Historians Cite Statements from a Member of the First Congress to Interpret the Foreign Emoluments Clause, but Ignore An Anti-Bribery Law Passed by the First Congress**

To interpret the Foreign Emoluments Clause, the Legal Historians highlight two statements made during the Virginia ratification convention by William Grayson concerning the

---

[100] 1 *American State Papers/Miscellaneous*, Index ii (1834), bit.ly/2Da7uIW.

meaning of "emolument," highlighting that he would become "a senator in the First Congress."[101]
This argument establishes that the Legal Historians understand the views of members of the First
Congress as indicative of the meaning of the Foreign Emoluments Clause. There is a far more
relevant act from the First Congress with respect to the scope of the Foreign Emoluments Clause,
than these isolated statements. Namely, in a 1790 anti-bribery statute, Congress declared that a
defendant convicted of bribing a federal judge "shall forever be disqualified to hold any *office of
honor, trust, or profit under the United States*."[102] If, as Plaintiffs and their Amici argue, the
President holds an "Office of Profit or Trust under [the United States]" then this 1790 statute,
enacted one year after the Constitution went into force, would be deeply problematic. Congress
does not have the power to add by statute new qualifications for federal elected positions.[103]
Courts should avoid an interpretation of "Office . . . under the United States" under which the First
Congress unconstitutionally added qualifications to the presidency. The more reasonable
interpretation is that members of the First Congress (which included many Framers and ratifiers)
understood that "Office . . . under the United States" did not extend to elected positions. The Legal
Historians offer no response to the First Congress's usage of 'office under the United States' to
exclude elected positions. Nor could they, for the Supreme Court has instructed that the statutes of
the First Congress are entitled to special solicitude.[104]

---

[101] [ECF No. 58-1, at 20–21].
[102] An Act for the Punishment of Certain Crimes, 1 Stat. 112, 117 (1790), bit.ly/2rbNfVq (emphasis added). This
language mirrored the text of the Disqualification Clause. *See* U.S. Const. art. I, § 3, cl. 7 ("Judgment in Cases of
Impeachment [by the Senate] shall not extend further than to removal from Office, and disqualification to hold and
enjoy any *Office of honor, Trust or Profit under the United States*." (emphasis added)).
[103] *See, e.g.*, Powell v. McCormack, 395 U.S. 486, 527–47 (1969); Laurence H. Tribe, *American Constitutional Law* §
6–35 n.51 (2000) (explaining that Powell was a "largely historical inquiry").
[104] Myers v. U.S., 272 U.S. 52, 136 (1926).

3.      **The Legal Historians Cite Joseph Story's *Commentaries* to Interpret the Foreign Emoluments Clause, but Ignore His Analysis of the Scope of "Office . . . under the United States"**

The Legal Historians cite Joseph Story's *Commentaries* to interpret the Foreign Emoluments Clause.[105] Yet there is an important discussion from Story's *Commentaries*, not cited by the Legal Historians, that undermines the crux of their position. In four clauses, the Constitution uses the drafting convention "Officers of the United States": the Appointments Clause, the Impeachment Clause, the Oaths Clause, and the Commission Clause.[106] According to Story's *Commentaries*, such positions "derived their appointment from, and under the national government" and not from "the people of the states."[107] In other words, such officers are appointed under the Appointments Clause, and are not elected. Thus, according to Story, the President is not an "officer of the United States." In the very same passage, Story also indicated that the same interpretive position applied to the Constitution's "office . . . under the United States" language.[108] In other words, the Constitution's general *officer of the United States* and *office under the United States* language does not reach the presidency. Only express constitutional language reaches the presidency. The Legal Historians make no effort to address Story's understanding of the "Office . . . under the United States" drafting convention. They should, because if Story is correct, then Plaintiffs' claim under the Foreign Emoluments Clause fails.

---

[105] [ECF No. 58-1, at 8, 10, 18].
[106] U.S. Const. art. II, § 2, cl. 2 (The President "shall nominate . . . Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, all other *Officers of the United States*."); *id.* at art. II, § 4 ("The President, Vice President and all civil *Officers of the United States*, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."); *id.* at art. VI, cl. 3 (mandating that "all executive and judicial *Officers*, both *of the United States* and of the several States, shall be bound by Oath or Affirmation"); *id.* at art. II, § 3 (mandating that the President "shall Commission all the *Officers of the United States*") (emphases added).
[107] 1 Joseph Story, *Commentaries on the Constitution of the United States* 577–79 (reprint 1891) (1833).
[108] *Id.*

    **4.**     **The Legal Historians Discuss British Parliamentary Practice, but Ignore the Settled Meaning of the "Office . . . Under" Drafting Convention**

During her confirmation hearing, then-Solicitor General Elena Kagan observed that when drafting the Constitution, the Framers used both "very specific provisions" as well as provisions "of a much more general kind."[109] To illustrate the former category, Kagan cited the requirement that "[n]o Person shall be a Senator who shall not have attained to the Age of thirty Years."[110] Kagan explained that this provision is self-explanatory: "You just have to be 30 years old because that is what they wrote and that is what they meant and that is what we should do."[111] In contrast, the Fourth Amendment's prohibition "against *unreasonable* searches and seizures" was far more open-ended, and must be "applied to new situations and new factual contexts."[112]

"Office of Profit or Trust under the United States," as used in the Foreign Emoluments Clause, falls into the former category of "very specific provisions." All of the parties agree on this fact. Where Plaintiffs and their Amici go awry, however, is by reading it in the same fashion they would read the Constitution's requirement that Senators must be thirty years old. "Officer . . . under the United States" is not self-explanatory, and cannot be understood by simply counting all of the people who work "under" the auspices of the federal government: that is, everyone that receives a paycheck from the U.S. Treasury. This generalization cannot be right, because the Constitution uses precise language at different junctures to refer to different categories of federal officials: "officers *of* the United States" cannot mean the same thing as persons holding "office . . . *under* the United States." Rather, by 1789, "Office . . . under" was a well-established

---

[109] *The Nomination of Elena Kagan to Be an Associate Justice of the Supreme Court of the United States: Hearing before the Committee on the Judiciary United States Senate*, 111th Cong, 2d Sess 62, at 61 (2010), bit.ly/2ptL833.

[110] U.S. Const. art. I, § 3, cl. 3.

[111] *Kagan*, *supra* note 109, at 61.

[112] *Id.*

parliamentary drafting convention in the Anglo-American legal tradition, that had a settled meaning: it referred to appointed, and not elected officials.

*Calder v. Bull*, one of the Supreme Court's earliest decisions, provides guidance in regard to how to understand the Constitution's specific provisions that have a technical, legal meaning.[113] *Calder* involved a dispute over the meaning of the Ex Post Facto Clause.[114] Specifically, did Connecticut run afoul of this clause when the state legislature "set aside a decree" of a probate court, and "granted a new hearing"?[115] Justice Chase acknowledged that "[t]he prohibition, 'that no state shall pass any *ex post facto law*,' necessarily requires some explanation; for, naked and without explanation, it is unintelligible, and means nothing."[116] Unlike the thirty-year age requirement that Kagan identified, the provision at issue in *Calder* required further study. Justice Patterson agreed, noting that "[t]he words, *ex post facto*, when applied to a law, have a *technical meaning*, and, in legal phraseology, refer to crimes, pains, and penalties."[117] The term "Office . . . under the United States," as used in the Foreign Emoluments Clause, should be read in a similar fashion as the Ex Post Facto Clause: it "requires some explanation; for, naked and without explanation, it is unintelligible."[118] The question that this Court must resolve is whether "Office . . . under the United States" had such a technical, legal meaning. The answer is "yes."

As the unrebutted record reflects, the Framers of the Constitution, making use of the progenitor British drafting convention of "Office under the Crown," used the phrase "Office . . . under the United States" to refer to *appointed* officers in all three branches of government. In the Anglo-American legal tradition, "Office under the Crown" was and remains a commonly-used

---

[113] Calder v. Bull, 3 U.S. (3 Dall.) 386 (1798).
[114] U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."); *see also id*. at art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed [by Congress].").
[115] *Calder,* 3 U.S. (3 Dall.) at 386.
[116] *Id.* at 390.
[117] *Id.* at 396 (second emphasis added).
[118] *Id.* at 390 (emphasis added).

28

drafting convention that refers to appointed officers. For the last three centuries, "Office under the Crown," a phrase commonly used in British statutes, has not extended to elected positions.[119] Sir S.W. Griffith, who would become Australia's first Chief Justice, explained that "[t]he term office of profit under the Crown was an *old phrase*, *well understood in relation to parliamentary law . . . .*"[120] To this day, United Kingdom and Commonwealth courts distinguish between (1) officers who are appointed to a position "under the Crown" and (2) officials who "hold their position by virtue of their election by the people."[121]

In their brief, the Legal Historians discuss British parliamentary practice,[122] but have no answer to this well-settled parliamentary term of art. In parallel litigation, the same Legal Historians previously dismissed the relevance of this evidence, stating in a since-withdrawn footnote that Tillman and JEP "offer[ed] no supporting historical evidence that the founders, whose criticism of the British monarchy is no secret, equated the president with the king in this way."[123] The Legal Historians wisely abandoned this argument, because Tillman and JEP provided a thorough historical record to establish the straightforward point: "office . . . under" was not a statement about political sovereignty, but was, and is still today, a mere parliamentary shorthand: i.e., a statutory drafting convention with roots in pre-modern parliamentary law.

---

[119] *See, e.g.*, An Act for the Security of Her Majesty's Person and Government, 6 Ann. c. 7, § 25 (1707), bit.ly/2riHlG1 (disqualifying any person from holding a seat in the House of Commons if they hold a "new office or place of profit whatsoever under the [C]rown," that is, a position created after 1705); Memorandum of the U.K. Att'y Gen., at 135–36 (May 1, 1941), bit.ly/2rjcw00 ("If the Crown [the Executive Government] has the power of appointment and dismissal, this would raise a presumption that the Crown controls, and that the office is *one under the Crown*. . . . If the duties are duties under and controlled by the Government, then the office is, *prima facie* . . . an office under the Crown . . . ." (emphasis added)); J.L. De Lolme, *The Constitution of England* 62 (1775), bit.ly/2sl1yeK (explaining that one holding a "new office under the Crown" is "incapable of being elected [a] Member[]" of the Commons); Anne Twomey, *The Constitution of New South Wales* 438 (2004) ("As it is an elective office, and not generally subject to the direction or supervision of the government, one would assume that it is not an office held 'under the Crown.'").

[120] Hodel v Cruckshank, 3 Queensland L.J. 140, 141 (Qld. 1889).

[121] R v. Obeid (No 2) [2015] New South Wales Supreme Court 1380 [30], bit.ly/2rSRiZv ("The[se] [authorities] only indicate that a[] [Member of the Legislative Council] does not hold an office 'under the Crown' or 'under the Government.' Instead they hold their position by virtue of their election by the people and legally are not answerable to, or under the direction of, the 'Crown' or the 'Government.'").

[122] [ECF No. 58-1, at 9, 21].

[123] *Legal Historians*, *supra* note 62 at 22 n.82.

29

Following independence, American lawyers and statesmen, steeped in the English legal tradition, did not instantly forget and jettison everything they learned about British parliamentary practice. To the contrary, many of the practices in the First Congress derived from these longstanding English customs. For example, Section XLIX of Thomas Jefferson's *A Manual of Parliamentary Practice for the Use of the Senate of the United States* provided that "each petition, memorial or paper, presented to the Senate, [should] be also inserted on the journals."[124] This was not a new rule, fashioned by Jefferson out of whole cloth, but was a matter of established *lex parliamentaria*.[125] And so is the meaning of "Office . . . under the United States." This construction is bolstered by history of diplomatic gifts accepted by President Washington and other founders who succeeded him during the Early Republic, by Hamilton's 1793 roll of officers, by the First Congress's 1790 anti-bribery law, and by a wealth of other evidence.

> **5.** **The Legal Historians Focus on Advocacy from Mason and Randolph, and Ignore the Weight of Evidence to the Contrary from the Early Republic**

The Legal Historians have no answer to the evidence from Washington, Jefferson, Madison, Monroe, Hamilton, and the First Congress, other than to cite statements from George Mason and Edmund Randolph, who, during the Virginia ratifying convention, argued that the Foreign Emoluments Clause applies to the President.[126] There is reason to question the relevance of these statements. Neither of these Virginians signed the Constitution during the federal convention. As historian Pauline Maier observed, both Mason and Randolph feared that "the government under the Constitution would begin as 'a moderate aristocracy' and then, over time,

---

[124] Thomas Jefferson, *A Manual of Parliamentary Practice for the use of the Senate of the United States* 91 (1801) (1993 GPO reproduction), bit.ly/2DKJZXG.

[125] *See* E-mail from Martyn Atkins, U.K. House of Commons Clerk (Procedure Committee) to Seth Barrett Tillman (Sept. 11, 2017), bit.ly/2xy0qXK ("The requirement on the Clerk to record in the Journal the presentation to the House of each account and paper—which persists in essence to this day—is of very long standing, but the authority for the requirement cannot be readily traced to a particular order of the House.").

[126] *See, e.g.*, 3 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 484 (Jonathan Elliot ed., 2d ed. 1836), bit.ly/2gXirI1 (Mason's position); *id.* at 486, bit.ly/2fcvP7h (Randolph's position).

become a monarchy or 'a corrupt, tyrannical aristocracy.'[127] Randolph, in particular, "predicted that the convention's plan of government would 'end in Tyranny.'"[128]

With these concerns, it is not surprising that Mason and Randolph would think that the President is bound by Foreign Emoluments Clause: requiring the President to seek congressional consent before accepting foreign gifts—and impeaching him for failing to do so—would go a long way to preventing a "corrupt, tyrannical aristocracy." Having such fears does not mean the Constitution itself put additional restrictions into law. As the Supreme Court has explained, "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them, putting into form the government they were creating, and prescribing in language clear and intelligible the powers that government was to take."[129] The "Office . . . under" the United States language had a "clear and intelligible" meaning, one that Mason and Randolph either were unaware of, or perhaps motivated by their fear of a tyrannical government, simply disregarded.

These same concerns could have led Mason and Randolph to miscomprehend other language in the Constitution, which was "clear and intelligible." For example, they contended that Senators and Representatives were impeachable because they fell under the scope of the Impeachment Clause's *Officers of the United States* language.[130] This was an especially strange position because the Constitution expressly provides that Representatives and Senators could be expelled through a *far* simpler procedure than bicameral impeachment and removal.[131] But, if the

---

[127] Pauline Maier, Ratification: The People Debate the Constitution, 1787–1788, at 47 (2010).
[128] *Id.*
[129] South Carolina v. United States, 199 U.S. 437, 449 (1905).
[130] *See* 3 *Debates in the Several State Conventions* 222 (Jonathan Elliot ed., 2d ed. 1836), bit.ly/2wQqkoO (Randolph stated that though Senators are chosen every two years, "they may also be impeached. There are no better checks upon earth."); *id.* at 402–03, bit.ly/2vODA9z (Mason stated that the House of Representatives should impeach a Senator who ratified a treaty because of "bribery and corruption").
[131] *See* U.S. Const. art. I, § 5 ("Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.").

purpose of the Impeachment Clause was, as Mason said, to stop "bribery and corruption," then few if any limits should be read into the Constitution's constraints regarding conflicts and disloyalty. Mason's and Randolph's error did not go unnoticed. James Monroe, writing contemporaneously in 1788, objected "that the Senators are not impeachable, and therefore Governor Randolph's objection falls to the ground."[132] Monroe, a ratifier and a future president, concluded: "I am surprised that a man of that gentleman's [Randolph's] abilities . . . should have fallen into this mistake."

Perhaps, the Legal Historians share Mason and Randolph's fear that the presidency, without additional checks, will devolve into "a corrupt, tyrannical aristocracy." It is not surprising then that they too adopt, without any reservations, Mason and Randolph's understanding of the Foreign Emoluments Clause as its definitive construction. This deference is problematic, because it ignores the context of Mason and Randolph's advocacy, and how history has treated the positions they advocated. In the *Blount* case, the Senate agreed with Monroe, and rejected Mason and Randolph's overly broad reading of "Officers of the United States," to include members of Congress.[133] As a result, the Legal Historians can only urge this Court to trust Mason and Randolph concerning their reading of the Foreign Emoluments Clause (and its *office under the United States* language), but to disregard their rejected reading of the Impeachment Clause (and its closely-related *officer of the United States* language). This position is even more fraught, because it also disregards the overwhelming evidence to the contrary from Washington, Jefferson, Madison, Monroe, Hamilton, and the First Congress. The Legal Historians would have this Court believe that the views of two dissenting Framers—dissenters at the Federal Convention and

---

[132] 1 *The Writings of James Monroe 1778–1794*, at 347, 361–62 (1788), perma.cc/2E8V-GVV8.
[133] 8 *Annals of Cong*. 2319 (1799), perma.cc/EB4H-TDE8 (adopting resolution on January 11, 1799) (noting that "this Court ought not to hold jurisdiction."). *But cf.* Buckner F. Melton, Jr., *Let Me Be Blunt: In* Blount, *the Senate Never Said That Senators Aren't Impeachable*, 22 Quinnipiac L. Rev. 33 (2014).

dissenters in regard to the Constitution's *office*-language—should prevail over the understanding put forward in virtually every other source of authority from the Early Republic.

It cannot be the case that Mason and Randolph were unimpeachable paragons of virtue and unquestionable constructers of the Constitution, while Washington and his successors were corrupted by foreign monarchs or were ignorant of the document they helped define. Indeed, this later-in-time evidence, (much of) which consisted of official acts of the United States government that were visible to all, is far more probative than off-the-cuff free-flowing debate at a convention. The intentions of outlier individuals cannot be viewed as defining the Constitution's meaning.

## CONCLUSION

Because the Complaint cannot be pleaded against President Trump in his official capacity, it should be dismissed in its entirety. If this Court concludes that the official capacity suit is proper, then Count I should be dismissed because the President does not hold an "office of Profit or Trust under" the United States. And as we explained in our initial amicus brief, business transactions for value are not "Emoluments," so Count II must be dismissed. President Trump's business activities may raise ethical conflicts under modern good governance standards, but they raise no constitutional conflicts under the Foreign and Presidential Emoluments Clauses. Concurrently with this filing, Tillman and JEP also seek leave to participate in oral arguments.

Original Version Dated:      December 29, 2017
Corrected Version Dated:    December 31, 2017

                                     Respectfully submitted,

By:
        /s/ Jan I. Berlage
        Jan I. Berlage
        Gohn Hankey Stichel & Berlage LLP
        201 North Charles Street
        Suite 2101

Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
      *Counsel for Amici Curiae*

Robert W. Ray
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3349
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Josh Blackman
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Carrie Severino
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2017, I caused a true and correct copy of the foregoing to be served on all counsel of record through the Court's CM/ECF system.

      /s/ Josh Blackman
      Josh Blackman, Esq.

34