## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

Senator RICHARD BLUMENTHAL,
Representative JERROLD NADLER, *et al.*,

        Plaintiffs,

    v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

        Defendant.

Civil Action No. 17-1154 (EGS)

---

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
  CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

   I.  Presidents Are Bound by the Foreign Emoluments Clause ........................ 3

       A.   Text ................................................................................... 4

       B.   Contemporaneous Evidence ......................................................... 7

       C.   Purpose ................................................................................. 9

       D.   Settled Historical Practice ........................................................... 11

   II.  The *Amicus* Brief's Arguments to the Contrary are Unpersuasive ........................... 15

       A.   Neither Evidence nor Logic Supports the *Amicus* Brief's Theory .............. 15

       B.   The *Amicus* Brief Fails To Undermine the Only Contemporaneous Evidence ........................................................... 20

       C.   The *Amicus* Brief's Remaining Arguments Are Without Merit .................. 23

       D.   Accepting the *Amicus* Brief's Theory Requires Accepting Many Improbable Constitutional Interpretations ................................... 32

   III. This Suit Is Properly Brought Against the President in His Official Capacity .......... 33

CONCLUSION .................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Ameritech Corp. v. McCann*,
297 F.3d 582 (7th Cir. 2002) .................................................................. 34

*Bivens v. Six Unknown Named Agents*,
403 U.S. 388 (1971).................................................................................. 34

*Clark v. Library of Cong.*,
750 F.2d 89 (D.C. Cir. 1984) ................................................................. 39

*Collins v. Youngblood*,
497 U.S. 37 (1990).................................................................................... 17

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........................................................................ *passim*

*Dugan v. Rank*,
372 U.S. 609 (1963).................................................................................. 38

*Edelman v. Jordan*,
415 U.S. 651 (1974).................................................................................. 34

*Gibbons v. Ogden*,
22 U.S. 1 (1824)..................................................................................... 4, 7

*Hafer v. Melo*,
502 U.S. 21 (1991)....................................................................... 34, 36, 38

*Hatfill v. Gonzales*,
519 F. Supp. 2d 13 (D.D.C. 2007) ......................................................... 34

*Hutto v. Finney*,
437 U.S. 678 (1978).................................................................................. 38

*Jarrolt v. Moberly*,
103 U.S. 580 (1880).................................................................................. 10

*Kentucky v. Graham*,
473 U.S. 159 (1985)........................................................................... 34, 39-40

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949).................................................................................. 39

*Lewis v. Clarke*,
137 S. Ct. 1285 (2017)................................................................. 37, 38, 39, 40

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*McCulloch v. Maryland,*
    17 U.S. 316 (1819)......................................................... 12

Mistretta v. United States,
    488 U.S. 361 (1989)......................................................... 12

Nat'l Treasury Emps.' Union v. Campbell,
    654 F.2d 784 (D.C. Cir. 1981)......................................... 37

Nixon v. Fitzgerald,
    457 U.S. 731 (1982)......................................... 20, 36, 39

*NLRB v. Noel Canning,*
    134 S. Ct. 2550 (2014)..................................... *passim*

The Pocket Veto Case,
    279 U.S. 655 (1929)......................................................... 12

*Pollack v. Hogan,*
    703 F.3d 117 (D.C. Cir. 2012)......................................... 39

Swan v. Clinton,
    100 F.3d 973 (D.C. Cir. 1996)......................................... 39

Tennessee v. Whitworth,
    117 U.S. 139 (1886)......................................................... 4

United States v. Classic,
    313 U.S. 299 (1941)......................................................... 10

United States v. Maurice,
    26 F. Cas. 1211 (C.C.D. Va. 1823)................................. 5

United States v. South-Eastern Underwriters Ass'n,
    322 U.S. 533 (1944)......................................................... 5

U.S. Steel Corp. v. Multistate Tax Comm'n,
    434 U.S. 452 (1978)......................................................... 17

Will v. Mich. Dept. of State Police,
    491 U.S. 58 (1989)......................................................... 38

Ziglar v. Abbasi,
    137 S. Ct. 1843 (2017)..................................................... 34

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

| | |
|---|---|
| U.S. Const. art. I, § 3, cl. 3 | 36 |
| U.S. Const. art. I, § 3, cl. 5 | 3, 5 |
| U.S. Const. art. I, § 3, cl. 7 | 18, 33 |
| U.S. Const. art. I, § 6, cl. 2 | 18, 32 |
| U.S. Const. art. I, § 9, cl. 8 | 3, 4, 18, 35 |
| U.S. Const. art. II, § 1, cl. 1 | 5 |
| U.S. Const. art. II, § 1, cl. 2 | 18, 33 |
| U.S. Const. art. II, § 1, cl. 5 | 5 |
| U.S. Const. art. II, § 1, cl. 6 | 5-6 |
| U.S. Const. art. II, § 1, cl. 7 | 6 |
| U.S. Const. art. II, § 1, cl. 8 | 6 |
| U.S. Const. art. II, § 2, cl. 1 | 20 |
| U.S. Const. art. II, § 2, cl. 2 | 20 |
| U.S. Const. art. II, § 3 | 6, 20 |
| U.S. Const. art. II, § 4 | 6 |
| U.S. Const. art. VI, cl. 3 | 18 |
| Articles of Confederation of 1781, art. VI, para. 1 | 6 |
| 5 U.S.C. § 7342(a)(1)(E) | 14 |
| 5 U.S.C. § 7342(b)(2) | 14 |
| 5 U.S.C. § 7342(c)(1) | 14, 32 |
| 5 U.S.C. § 7342(d) | 14 |
| 42 U.S.C. § 1983 | 34 |
| An Act for allowing Compensation to the Members of the Senate and House of Representatives, 1 Stat. 70 (1789) | 25 |

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

An Act for allowing a Compensation to the President and Vice President of the United States, 1 Stat. 72 (1789) ............................................................................... 25

Pub. L. No. 89-554, § 7341, 80 Stat. 378 (1966)..................................................... 14

8 Annals of Cong. 1584 (1798) (Joseph Gales ed., 1834) ........................................ 9

S. Journal, 2d Cong., 1st Sess. (1792) ........................................................... 24, 26

EXECUTIVE BRANCH MATERIALS

6 Op. O.L.C. 156 (1982) ........................................................................... 16

10 Op. O.L.C. 96 (1986) ........................................................................... 9

*11 Op. O.L.C. 89 (1987)........................................................................... 36

*33 Op. O.L.C. 1 (2009), 2009 WL 6365082............................................................ 13

*Memorandum from Norbert A. Schlei, Office of Legal Counsel, *Proposal That the President Accept Honorary Irish Citizenship* (May 10, 1963) ......................... 13

Memorandum from Steven G. Bradbury, Office of Legal Counsel, *Officers of the United States Within the Meaning of the Appointments Clause* (Apr. 16, 2007) .... 18

BOOKS, ARTICLES, AND OTHER AUTHORITIES

1 *American State Papers*: *Misc.* (Walter Lowrie & Walter S. Franklin eds., 1834)... 26-27

Br. for Scholar Seth Barrett Tillman, *CREW v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) (No. 17-458), 2017 WL 2692500 ................................................. 15

Steven G. Calabresi, *Does the Incompatibility Clause Apply to the President?*, 157 U. Pa. L. Rev. PENNumbra 141 (2008) ................................................... 6, 19

*Tench Coxe, *An Examination of the Constitution for the United States of America, No. 4* (1787)............................................................................... 3, 9

*3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 2d ed. 1836) ........................................ 7, 8, 9

*4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (Jonathan Elliot ed., 2d ed. 1836) ........................................ 3, 11

Decl. of John P. Kaminski, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Dkt. No. 85-8)....................................................................... 25

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Decl. of Prof. Kenneth R. Bowling, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Dkt. No. 85-9) ......................................................................................... 26

Decl. of Robert W.T. Martin, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Dkt. No. 85-11)........................................................................................ 27

*The Federalist No. 22* (Clinton Rossiter ed., 1961).................................................... 1

*The Federalist No. 68* (Clinton Rossiter ed., 1961).................................................... 10

*The Federalist No. 76* (Clinton Rossiter ed., 1961).................................................... 18

George Washington's Mount Vernon: Preservation, *Louis Seize, Roi Des Français, Restaurateur De La Liberté*, *available at* perma.cc/H328-NWWN ....................... 30

James Monroe Museum, James Monroe 3D, *Pistols*, *available at* https://perma.cc/T796-ED5B ................................................................................. 28

*Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785).................. 5, 6, 26

Letter from John Graham to James Madison (Aug. 8, 1816), *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/99-01-02-5363........................................................................................................................ 28

Letter from Thomas Jefferson to Indian Nations (Jan. 10, 1809), *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-9516........................ 29

Letter from Thomas Jefferson to Robert Smith (May 31, 1805), *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-1816........................ 29, 30

Letter from James Madison to John Graham (Aug. 11, 1816), *Founders Online*, National Archives, http://founders.archives.gov/documents/Madison/99-01-02-5374........................................................................................................................ 28

Letter from George Mason to Thomas Jefferson (May 26, 1788), *Founders Online*, National Archives, http://founders.archives.gov/documents/Jefferson/01-13-02-0117........................................................................................................................ 8

Letter from Jean-Baptiste Ternant to George Washington (Dec. 22, 1791), *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/05-09-02-0194 .................. 29

Letter from Ignacio Alvarez Thomas to James Madison (Feb. 9, 1816), *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/99-01-02-4930 ....................... 28

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

Letter from George Washington to Jean-Baptiste Ternant (Dec. 22, 1791),
*Founders Online*, National Archives,
https://founders.archives.gov/documents/Washington/05-09-02-0194 .................. 30

Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev.
443 (2018) ................................................................................................ 6

*1 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ........... 3, 11

*2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ........... 3, 9

*Roll of the Officers, Civil, Military, and Naval, of the United States* (Feb. 16,
1802), *in* 1 *American State Papers*: *Misc.* (Walter Lowrie & Walter S. Franklin
eds., 1834). ........................................................................................... 27

James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J.
Pol. 174 (1994) ........................................................................................ 10

Statement of Interest by Donald Trump, *District of Columbia v. Trump*,
No. 17-1596 (D. Md. Mar. 26, 2018) (Dkt. No. 100) .............................. 36, 37

3 Joseph Story, *Commentaries on the Constitution of the United States* § 1346
(1833) .................................................................................................... 9

Zephyr Teachout, *Gifts, Offices, and Corruption*, 107 Nw. U. L. Rev. Colloquy 30
(2012) ................................................................................................... 25, 31

Seth Barrett Tillman, *Interpreting Precise Constitutional Text: The Argument for a
"New" Interpretation of the Incompatibility Clause, the Removal &
Disqualification Clause, and the Religious Test Clause*, 61 Clev. St. L. Rev. 285
(2013) ................................................................................................... 23, 33

Seth Barrett Tillman, *The Original Public Meaning of the Foreign Emoluments
Clause: A Reply to Professor Zephyr Teachout*, 107 Nw. U.L. Rev. Colloquy 180
(2013) ................................................................................................... 15, 21, 22

Seth Barrett Tillman, *Why President-Elect Obama May Keep His Senate Seat After
Assuming the Presidency*, 157 U. Pa. L. Rev. PENNumbra 135 (2008) ................. 32-33

Seth Barrett Tillman, *An "Utterly Implausible" Interpretation of the Constitution*,
157 U. Pa. L. Rev. PENNumbra 146 (2008) ............................................. 16

*Noah Webster, *An American Dictionary of the English Language* (1828) .............. 5

1 Francis Wharton, *A Digest of the International Law of the United States* (1886) ... 32

## INTRODUCTION

"In Republics," Alexander Hamilton warned, "persons elevated from the mass of the community by the suffrages of their fellow-citizens to stations of great pre-eminence and power may find compensations for betraying their trust, which, to any but minds actuated by superior virtue may appear . . . to overbalance the obligations of duty." *The Federalist No. 22*, at 149 (Clinton Rossiter ed., 1961). Mindful of this threat, the Framers included numerous safeguards against foreign influence and self-dealing in our national charter, including the Foreign Emoluments Clause. President Trump has brazenly violated that Clause's proscriptions since taking office. As a result, the Plaintiffs ask this Court to require the President to conform his conduct to the Constitution's requirements, enjoining him from accepting any "emoluments" or "presents" from foreign governments without first obtaining congressional consent.

Although the President's memorandum in support of his motion to dismiss did not contest the Clause's applicability to the President, and although he has argued in separate litigation raising a similar Foreign Emoluments Clause claim that such a suit is properly brought against him in his official (not personal) capacity, a brief filed on behalf of Professor Seth Barrett Tillman and the Judicial Education Project challenges both of those propositions. Pursuant to this Court's Minute Order of March 30, 2018, directing the parties to respond to "any arguments raised by *amici* that have not been addressed by the parties in their briefs," the Plaintiffs file this supplemental memorandum to address those two issues.

First, there is no serious question that the Foreign Emoluments Clause, which applies to any person holding an "Office of Profit or Trust under the United States," applies to the President of the United States. Indeed, no President in American history has ever claimed otherwise. The plain language of the Clause, its purpose, the contemporaneous evidence of its meaning, and the

subsequent settled practice of the political branches all make this result clear.

The *amicus* brief argues otherwise, claiming that the phrase "Office under the United States" was a term of art at the Founding that meant "a federal appointed position that is created, regularized, or defeasible by statute." Tillman Br. 7. Yet the brief offers not one shred of evidence supporting that assertion. It does not cite a single document, of any kind, from any era, in which the phrase "Office under the United States" is described as having the meaning the brief claims it had. Not one treatise, legal dictionary, lawyer's manual, pamphlet, letter, speech, judicial decision, or other historical document is provided in which anyone explains that this phrase carries the hidden meaning the *amicus* brief suggests.

Reading the Foreign Emoluments Clause in this way also goes against every interpretive principle the Supreme Court has prescribed for the judiciary to use when construing constitutional text. Application of those principles leads inexorably to the conclusion that the President holds an "Office of Profit or Trust under the United States" and is bound by the Foreign Emoluments Clause. *See infra*, Part I. The *amicus* brief's approach, by contrast, is to ignore these principles in favor of drawing selective inferences from historical silences and omissions. These silences and omissions cannot bear the weight the *amicus* brief assigns them. And in many cases, the very facts to which the brief points refute the brief's preferred inferences. *See infra*, Part II.

The *amicus* brief also argues, in a footnote, that this case cannot be brought against the President in his official capacity. That argument is equally without merit. This lawsuit seeks to enjoin the person holding the Office of the President from committing future violations of the Constitution. It does not seek to hold Donald J. Trump personally liable for damages, as a private individual, to compensate for his past violations of the Constitution. As such, this suit is properly being litigated against the President in his official, not personal, capacity. *See infra*, Part III.

2

**ARGUMENT**

**I.    Presidents Are Bound by the Foreign Emoluments Clause**

At the Founding, as today, the phrase "Office of Profit or Trust under [the United States]" undoubtedly encompassed "the Office of the President of the United States." U.S. Const. art. I, § 9, cl. 8; *id.* § 3, cl. 5. That conclusion is confirmed by the *only* Founding-era sources that address the matter: while the Constitution's ratification was being debated in the states, former Philadelphia delegates George Mason and Edmund Randolph—who were on opposite sides of the ratification debate—both publicly stated that presidents would be subject to the Foreign Emoluments Clause, and no one disputed that view.

Exempting presidents from the Foreign Emoluments Clause, moreover, would have undermined the Clause's acknowledged purpose—combatting "[t]he influence which foreign powers may attempt to exercise in our affairs," Tench Coxe, *An Examination of the Constitution for the United States of America, No. 4* (1787), by keeping American leaders "independent of external influence," 2 *The Records of the Federal Convention of 1787*, at 389 (Max Farrand ed., 1911) [*Convention Records*] (C. Pinckney). Indeed, allowing presidents to be secretly on a foreign state's payroll would have been antithetical to the entire constitutional project. The Framers based numerous aspects of our national charter on a recognition that the President would be within "the reach of foreign corruption," 1 *id.* at 138 (Madison), and on the danger that he "might receive a bribe which would enable him to live in greater splendor in another country than his own," 4 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 264 (Jonathan Elliot ed., 2d ed. 1836) [*Elliot's Debates*] (C.C. Pinckney).

Finally, if there were ever any doubt about whether presidents must obey the Clause, the settled practice of the political branches resolved that doubt long ago. For nearly two centuries, if

not longer, the executive and legislative branches have operated according to a shared understanding that the Clause applies to the President. No President has ever claimed otherwise. To the contrary, a documented and unbroken record of presidential compliance with the Clause stretches back at least to 1830, and executive branch legal opinions have uniformly regarded the President as bound by the Clause. Congress has consistently adhered to that position as well, embedding this view in legislation and directing presidents on how to dispose of specific foreign gifts. Thus, even if it originally were debatable whether the Clause applied to the President (which it was not), this "regular course of practice" over a span of two hundred years has "settle[d] the meaning" of the Clause. *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2560 (2014) (quoting Letter from James Madison to Spencer Roane (Sept. 2, 1819)).

A.    **Text**

The Foreign Emoluments Clause commands that "no Person holding any Office of Profit or Trust under [the United States] shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8.

"In interpreting this text," this Court must be "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague,* 282 U.S. 716, 731 (1931)). "Words in a constitution," therefore, "are always to be given the meaning they have in common use, unless there are very strong reasons to the contrary." *Tennessee v. Whitworth*, 117 U.S. 139, 147 (1886); *see Gibbons v. Ogden*, 22 U.S. 1, 188 (1824) (Marshall, C.J.) ("As men . . . generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened

patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said."). Thus, ordinarily "courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 539 (1944). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 576-77.

At the Founding, as today, the Office of the President of the United States fell within the normal and ordinary meaning of the phrase "any Office of Profit or Trust under the United States." The citizens who ratified the Constitution would therefore have understood that presidents were bound by the Foreign Emoluments Clause.

In the late eighteenth century, the ordinary meaning of "office" was "[a] publick charge or employment; magistracy." Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785); *see United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.) ("An office is defined to be 'a public charge or employment[.]'"); *see also* Noah Webster, *An American Dictionary of the English Language* (1828) (defining "office" as "[a] particular duty, charge or trust conferred by public authority and for a public purpose; an employment undertaken by commission or authority from government or those who administer it"). Consistent with that ordinary definition, the Constitution repeatedly states that the President holds an "office." *E.g.*, U.S. Const. art. II, § 1, cl. 5 (establishing qualifications for "the Office of President"); *id.* art II, § 1, cl. 1 (stating that the President "shall hold his Office during the Term of four Years"); *id.* art. I, § 3, cl. 5 (referring to "the Office of President of the United States"); *see also id.* art. II, § 1,

cl. 6; *id*. art. II, § 1, cl. 8; *id*. art. II, § 4.

The words "profit" and "trust" meant the same thing at the Founding that they do today. *See* Johnson, *supra* (defining "profit" as "Gain; pecuniary advantage" and as "Advantage; accession of good"); *id*. (defining "trust" as "Confidence; reliance on another"). Someone holding the Office of the President plainly profits from doing so—among other things, the Constitution requires the President to be paid a fixed compensation, U.S. Const. art. II, § 1, cl. 7—and the American people rely on the President to fulfill any number of important responsibilities, including "tak[ing] Care that the Laws be faithfully executed," *id*. art. II, § 3.

The phrase "under the United States" likewise had (and has) a straightforward meaning: under the federal government of the United States of America. *See* Steven G. Calabresi, *Does the Incompatibility Clause Apply to the President?*, 157 U. Pa. L. Rev. PENNumbra 141, 143 (2008) ("The United States is represented in the Constitution by the sovereign 'We the People.' The presidency is as much an office 'under' the power of We the People as are judgeships or the Chief Justiceship."). That phrase thus serves to specify which officials—federal and/or state—are regulated by the Foreign Emoluments Clause. *Cf*. Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443, 451 (2018) ("The qualifier 'of the United States' clarifies that Article II refers to federal officers rather than state or local governmental actors." (internal footnote omitted)). Indeed, the predecessor to the Foreign Emoluments Clause in the Articles of Confederation used the same phrase in the same clarifying manner, while separately indicating that state officials were also bound. *See* Articles of Confederation of 1781, art. VI, para. 1 ("any office of profit or trust under the United States, *or any of them*" (emphasis added)). By clarifying that the Foreign Emoluments Clause governed persons "holding any Office of Profit or Trust under the United States," the Framers made clear that their proposal would protect the states from the

harms that would ensue if federal officials were corrupted by foreign powers, *see infra* at 9-11, while leaving the states to regulate the conduct of their own officials. That change made sense within a constitutional structure that gave federal officials exclusive control over foreign affairs, especially given that the Framers knew the Constitution already would face steep opposition over its encroachments on state sovereignty.

Thus, if one adheres to the Supreme Court's admonition that the Framers "employed words in their natural sense," *Gibbons*, 22 U.S. at 188, and that "[t]he Constitution was written to be understood by the voters," using words and phrases "in their normal and ordinary as distinguished from technical meaning," *Heller*, 554 U.S. at 576, this is an open-and-shut case. The presidency, the highest federal office in the land, was surely understood by those who ratified the Constitution as being an "Office of Profit or Trust under the United States."

### B.    Contemporaneous Evidence

That obvious conclusion is confirmed by the *only* contemporaneous sources to discuss the matter. At the Virginia ratifying convention, Edmund Randolph—Governor of Virginia and formerly a delegate to the Constitutional Convention—touted the proposed Constitution by explaining that the Foreign Emoluments Clause "restrains *any person in office* from accepting of any present or emolument, title or office" from a foreign power. 3 *Elliot's Debates* 465 (emphasis added); *see id.* ("It was thought proper, in order to exclude corruption and foreign influence, to prohibit *any one in offic*e from receiving or holding any emoluments from foreign states." (emphasis added)).

Speaking that same day, George Mason—also an influential Philadelphia delegate—argued against ratification of the Constitution, focusing in particular on the broad powers of its proposed chief executive. Unbounded by term limits, Mason warned,

> [t]his President will be elected time after time: he will be continued in office for life. If we wish to change him, the great powers in Europe will not allow us. . . . Will not the great powers of Europe, as France and Great Britain, be interested in having a friend in the President of the United States? . . . *This very executive officer may, by consent of Congress, receive a stated pension from European potentates*.

*Id*. at 484 (emphasis added). Mason voiced the same complaint in a letter to Thomas Jefferson, objecting that, "[b]y the Consent of Congress, Men in *the highest Offices of Trust in the United States* may receive any Emolument, Place, or Pension from a foreign Prince, or Potentate; which is setting themselves up to the highest Bidder." Letter from George Mason to Thomas Jefferson (May 26, 1788), *Founders Online*, National Archives, http://founders.archives.gov/documents/Jefferson/01-13-02-0117 (emphasis added).

Countering Mason's charges at the Virginia convention, Randolph argued that the proposed mode of electing the President would make it "impossible for foreign force or aid to interpose," and that there was "no reason to conclude" that "he will be continually reelected." 3 *Elliot's Debates* 486. Randolph then continued: "There is another provision against the danger, mentioned by the honorable member, of the President receiving emoluments from foreign powers. . . . By the 9th section of the 1st article . . . . he is restrained from receiving any present or emolument whatever. It is impossible to guard better against corruption." *Id*.

No one present that day—including James Madison, who spoke next—suggested that Randolph and Mason were wrong about the Foreign Emoluments Clause's applicability to the President. And notably, had anyone believed the Constitution allowed presidents to accept unlimited money and gifts from foreign states, in secret, this would have provided a much stronger argument for George Mason and his fellow antifederalists. Yet no such argument was ever made.

That these two esteemed statesmen, on opposite sides of the ratification debate, both of whom had been delegates to the Constitutional Convention, and one of whom would become the

nation's first Attorney General, each understood the Foreign Emoluments Clause to apply to the President—and explicitly said so, without contradiction from anyone—confirms what the Constitution's text alone makes clear: the phrase "Office of Profit or Trust under the United States" applies to the presidency. If the phrase could have been understood as having a narrow and specialized usage that did not encompass the presidency—and there is no evidence it did—the *most* that could be claimed with a straight face is that this usage was a "secret or technical meaning[] that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 577.

### C.    Purpose

Exempting presidents from the strictures of the Foreign Emoluments Clause, moreover, would have seriously undermined its purpose: preventing foreign powers from manipulating the United States by corrupting its officials.

The Clause's adoption was prompted by "the necessity" of preserving foreign ministers and other American officials "independent of external influence." 2 *Convention Records* 389 (C. Pinckney). As one federalist put it while urging ratification, the Clause was "a wholesome provision" intended to combat "[t]he influence which foreign powers may attempt to exercise in our affairs." Coxe, *supra*; *accord* 3 *Elliot's Debates* 465 (Randolph) (the Clause was designed "to exclude corruption and foreign influence"); 8 Annals of Cong. 1584 (1798) (Joseph Gales ed., 1834) (Claiborne) (the Clause was "intended to lock up every door to foreign influence, to the influence of Courts and Monarchies, which could not but prove baneful to every free country"); 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1346 (1833) (the Clause was "founded in a just jealousy of foreign influence of every sort"); *see* 10 Op. O.L.C. 96, 98 (1986) ("[A]lthough the possibility of corruption and foreign influence of foreign ministers

apparently was of particular concern to the Framers, they expressly chose not to limit the prohibition on accepting emoluments from foreign governments to foreign ministers. They recognized that such a prohibition was also necessary for other officials and, accordingly, drafted the Clause to require undivided loyalty from *all* persons holding offices of profit or trust under the United States.").

"A constitutional provision should not be construed so as to defeat its evident purpose, but rather so as to give it effective operation and suppress the mischief at which it was aimed." *Jarrolt v. Moberly*, 103 U.S. 580, 586 (1880). Thus, where the interpretation of a constitutional provision is in doubt, the courts "cannot rightly prefer, of the possible meanings of its words, that which will defeat rather than effectuate the Constitutional purpose." *United States v. Classic*, 313 U.S. 299, 316 (1941).

Nothing could have undermined the evident purpose of the Foreign Emoluments Clause more than allowing the nation's highest officeholder to accept the largesse of foreign powers in secret and without limit. Thus, even if the text of the Clause were "ambiguous," which it is not, "the Clause's purpose demands the broader interpretation." *Noel Canning*, 134 S. Ct. at 2561.

Much of the Constitutional Convention was spent discussing how to ward off "dependency, cabals, patronage, unwarranted influence, and bribery," James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174, 181 (1994), and the Framers focused intently on securing the independence and integrity of the President. As Hamilton explained:

> Nothing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption. These most deadly adversaries of republican government might naturally have been expected to make their approaches . . . chiefly from the desire in foreign powers to gain an improper ascendancy in our councils. How could they better gratify this than by raising a creature of their own to the chief magistracy of the Union?

*The Federalist No. 68*, *supra*, at 412-13. Delegate Charles Cotesworth Pinckney (a relative of

10

Charles Pinckney) observed that "kings are less liable to foreign bribery and corruption . . . because no bribe that could be given them could compensate the loss they must necessarily sustain for injuring their dominions," but that "the situation of a President would be very different." As a temporary officeholder, the President "might receive a bribe which would enable him to live in greater splendor in another country than his own; and when out of office, he was no more interested in the prosperity of his country than any other patriotic citizen." 4 *Elliot's Debates* 264. Hamilton and Madison agreed: while the personal interest of a hereditary monarch was "so interwoven with that of the Nation . . . that he was placed above the danger of being corrupted from abroad," 1 *Convention Records* 289 (Hamilton), an elected President would lack "that permanent stake in the public interest which [would] place him out of the reach of foreign corruption." *Id*. at 138 (Madison).

Indeed, the threat that foreign states would lavish rewards on the President to subvert his loyalty—a threat that Mason and Randolph linked directly to the Foreign Emoluments Clause— was deemed serious enough that it shaped numerous aspects of our constitutional structure. That threat was the reason, for instance, that the Framers decided against entrusting the treaty power solely to the President and instead required Senate approval. *See, e.g.*, 4 *Elliot's Debates* 264-65.

Given these concerns, it would have been exceptionally odd for the Framers to exempt the President from the Clause's anti-corruption safeguards. But as the Constitution's text makes clear, and as confirmed by the only Founding-era sources discussing the matter, *see supra* at 3-9, the Framers did no such thing.

### D. Settled Historical Practice

Finally, if there were ever any doubt that the Foreign Emoluments Clause applied to the President (which, again, there was not), the settled practice of the political branches resolved that

doubt long ago. No President has ever claimed to be exempt from the Foreign Emoluments Clause, and for nearly two centuries the executive and legislative branches have operated according to a shared understanding that the Clause applies to the President.

When interpretive questions about the Constitution's meaning "concern the allocation of power between two elected branches of Government," the courts "put significant weight upon historical practice" in resolving those questions. *Noel Canning*, 134 S. Ct. at 2559. As Chief Justice Marshall once explained:

> [A] doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which . . . the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice.

*McCulloch v. Maryland*, 17 U.S. 316, 401 (1819); *see Mistretta v. United States*, 488 U.S. 361, 401 (1989) ("'traditional ways of conducting government . . . give meaning' to the Constitution" (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring))); *The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions of this character."). Indeed, James Madison himself observed that it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter . . . and that it might require a regular course of practice to liquidate & settle the meaning of some of them." *Noel Canning*, 134 S. Ct. at 2560 (quoting Letter from James Madison to Spencer Roane, *supra*). The Supreme Court's decisions "have continually confirmed Madison's view." *Id*.

The historical record shows that for nearly two centuries, if not longer, presidents have respected their obligations under the Foreign Emoluments Clause by declining to accept benefits

from foreign states without congressional consent. Congress has responded in kind by directing presidents on how to dispose of specific foreign gifts, and it has exercised its authority over the President in this area through legislation. For the bulk of the nation's history, therefore, the political branches have established and maintained an unbroken tradition of presidential compliance with the Foreign Emoluments Clause.

From the presidential administrations of Jackson and Lincoln to those of Kennedy and Obama, the historical record consistently shows presidents acknowledging their obligations under the Clause and acting accordingly. *See* Am. Compl. ¶ 31. As Martin Van Buren wrote to a foreign ruler, "a fundamental law of the Republic . . . forbids its servants from accepting presents from foreign States or Princes," and thus "precludes me from receiving" certain gifts offered to him. *Id*. ¶ 31(b). Abraham Lincoln similarly declined to accept a foreign monarch's gifts by explaining that "our laws forbid the President from receiving these rich presents as personal treasures." *Id*. ¶ 31(d). When Benjamin Harrison was offered medals by the governments of Brazil and Spain, it was only through Congress's consent that he was allowed to accept them personally. *Id*. ¶ 31(e). President Kennedy declined to accept honorary Irish citizenship after the Department of Justice advised him that doing so would implicate the Clause, *id*. ¶ 31(f), and President Obama accepted the Nobel Peace Prize only after receiving formal legal assurances that it would not violate the Clause because the prize did not come from a foreign state, *id*. ¶ 31(g); *see also id*. ¶ 31 (other presidents).

In legal opinions as well as in practice, the executive branch has consistently taken the position that presidents are bound by the Foreign Emoluments Clause, recognizing that the President "surely" holds an Office of Profit or Trust under the United States. 33 Op. O.L.C. 1, 4 (2009), 2009 WL 6365082, at *4; *see* Memorandum from Norbert A. Schlei, Office of Legal Counsel, *Proposal That the President Accept Honorary Irish Citizenship* (May 10, 1963).

The legislative branch has consistently taken that position as well. Congress has repeatedly exercised its prerogative to give or withhold its consent to presidents accepting specific foreign gifts, after those presidents notified Congress about the gifts and sought its direction. *See* Am. Compl. ¶ 31. Congress has also inscribed this position in statute. In the Foreign Gifts and Decorations Act, for instance, it provided blanket advance consent for presidents to accept a limited range of foreign-government benefits, *see* 5 U.S.C. § 7342(c)(1), (d), while affirming that presidents may not accept benefits that fall outside of this blanket consent, *id*. § 7342(b)(2); *see id*. § 7342(a)(1)(E). Congress earlier approved a process in which presidents could direct the State Department to take custody of a "present, decoration, or other thing" offered to them by a foreign government, while stipulating that presidents could personally accept such items only if authorized by Congress. Pub. L. No. 89-554, § 7341, 80 Stat. 378, 526-27 (1966).

This "regular course of practice," adhered to without exception by the official actions of the executive and legislative branches for nearly two centuries, has clearly "liquidate[d] & settle[d] the meaning" of the Foreign Emoluments Clause as it concerns the President, *Noel Canning*, 134 S. Ct. at 2560, even if that meaning were debatable to begin with.

\* \* \*

In sum, the language of the Foreign Emoluments Clause, as it would have been understood by those who ratified it, plainly encompasses the presidency. That conclusion is confirmed by the only contemporaneous discussions of the matter. The acknowledged aim of the Clause—preventing the meddling of foreign powers by keeping America's leaders independent of external influence—would have been defeated by exempting the nation's highest officeholder from its reach. Any such interpretation is deeply implausible given the Framers' specific concerns about foreign corruption of the President and the measures they took to avert it. And even if this question

14

were once debatable, the settled and unbroken practice of the political branches over two centuries has put it beyond dispute. Every piece of evidence, and every interpretive principle the Supreme Court has prescribed, points to the same conclusion: the President of the United States must obey the Foreign Emoluments Clause.

## II.     The *Amicus* Brief's Arguments to the Contrary Are Unpersuasive

Notwithstanding the foregoing, the *amicus* brief urges this Court to conclude that presidents are exempt from the Foreign Emoluments Clause. But the brief does not come close to overcoming the powerful and mutually reinforcing evidence set forth above, which makes clear that presidents are bound by the Clause.

### A.     Neither Evidence nor Logic Supports the *Amicus* Brief's Theory

In a nutshell, the *amicus* brief argues that the phrase "Office under the United States" was used as a term of art in the Constitution to refer only to appointed officials, not elected officials like the President, as were all the variants of this phrase, such as "Office of Profit or Trust under the United States." *See* Tillman Br. 2.[1] Ignoring the Supreme Court's admonition that the Constitution, which was "written to be understood by the voters," used words and phrases "in their normal and ordinary as distinguished from technical meaning," *Heller*, 554 U.S. at 576, the brief's entire thesis rests on the technical meaning it ascribes to that phrase and its variants—a technical

---

[1] For some reason, the brief avoids using the expression "term of art," instead repeatedly invoking the more nebulous expression "drafting convention." Nonetheless, by arguing that the phrase "Office under the United States" had an established, specialized meaning that departed from the ordinary meaning of those words, the brief is, in essence, arguing that the phrase was a term of art. *Cf.* Br. for Scholar Seth Barrett Tillman at 20, *CREW v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) (No. 17-458), 2017 WL 2692500 ("The Constitution's *Office of Profit or Trust under the United States*-language is a term of legal art."); Seth Barrett Tillman, *The Original Public Meaning of the Foreign Emoluments Clause: A Reply to Professor Zephyr Teachout*, 107 Nw. U.L. Rev. Colloquy 180, 191 (2013) ("My position was and is that Office . . . under the United States and officers . . . of the United States are terms of art as used in the Constitution of 1787.").

meaning that no one ever commented upon. The brief therefore skips past the normal and ordinary meaning that eighteenth-century Americans would have ascribed to the language of the Foreign Emoluments Clause. *Cf.* Seth Barrett Tillman, *An "Utterly Implausible" Interpretation of the Constitution*, 157 U. Pa. L. Rev. PENNumbra 146, 149 (2008) ("[T]he meaning of 'office under the United States' cannot be determined by concatenating the separate meanings of 'office' and 'under' and 'the United States.'").

Instead, the brief sets forth a "taxonomy" that it discerns hidden among the constitutional provisions that address offices and officers. Tillman Br. 4. Relevant to this case,[2] the *amicus* brief argues that because British statutes used the phrase "Office under the Crown" to refer to appointed officials, *i.e.*, not to members of Parliament or the Crown itself, the Americans who drafted and ratified the Constitution understood the phrase "Office of Profit or Trust under the United States" to refer only to "a federal appointed position that is created, regularized, or defeasible by statute." *Id.* at 7.

This cannot be emphasized enough: *the brief does not cite a single document of any kind from any era indicating that "Office under the United States" was recognized at the Founding as a term of art with the meaning the brief ascribes to it*. The Supreme Court has cautioned that

---

[2] The *amicus* brief interweaves extensive discussions of the phrase "Offic*er* *of* the United States," as used in the Appointments, Impeachment, Oaths, and Commission Clauses. These discussions are irrelevant. The term "officers" in those clauses likely refers to a narrower range of persons than those who "hold office" under the Foreign Emoluments Clause. *See* 6 Op. O.L.C. 156, 157 (1982) ("It is not clear . . . that the words 'any Office of Profit or Trust,' as used in the Emoluments Clause, should be limited to persons considered 'Officers' under the Appointments Clause. Both the language and the purpose of the two provisions are significantly different."). As Professor Tillman himself has explained, clauses that govern "Officers" are narrower than clauses that govern any person holding "an Office." *See* Tillman, *An "Utterly Implausible" Interpretation*, *supra*, at 148 ("'Officer' is inseparably connected with 'office,' and there can be no officer without an office. . . . The reverse is not equally true: it is possible—at times—to have or hold *office*, but not be an *officer*."); *id.* (citing "Chief Magistrates" as an example of persons who "hold office" but "are not at all times and for all purposes officers").

phrases in the Constitution should not be taken as having a "secret or technical meaning[] that would not have been known to ordinary citizens in the founding generation." *Heller*, 554 U.S. at 577. The interpretation offered by the *amicus* brief is not even that. The brief furnishes no evidence of *any* citizen in the Founding generation, ordinary or otherwise, articulating this understanding of the phrase "Office under the United States." It cites not a single treatise, legal dictionary, lawyer's manual, pamphlet, letter, speech, or other historical document in which that phrase is described as having the meaning the brief attributes to it. *Cf. U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 462-63 (1978) (citing "contemporary commentary" to demonstrate that the Framers used particular words as terms of art with "precise meanings"). Nor does the brief point to any document in which that phrase clearly is used to convey the meaning the brief says it had.[3]

That is reason enough to reject the brief's conclusion, given that this Court is being asked to take the unusual step of departing from a plain reading of the Constitution's language. But if more were needed, the only direct evidence that speaks to this question soundly contradicts the brief's claim. As discussed earlier, the nation's first Attorney General, along with one of its other most prominent early statesmen—both of whom participated in the Constitution's framing in Philadelphia—were demonstrably unaware that the phrase "Office of Profit or Trust under the United States" had the specialized meaning the brief claims it did. *See supra* at 7-9; *cf. Collins v. Youngblood*, 497 U.S. 37, 41 (1990) ("early opinions in this Court explained [that] 'ex post facto law' was a term of art with an established meaning at the time of the framing of the Constitution").

The *amicus* brief's reading is not only unsupported by external evidence, it is at odds with

---

[3] This includes the only Founding-era document that the brief actually cites—a financial statement prepared by the Treasury Department in 1793. *See infra* at 24-27.

the text of the Constitution itself. The Constitution uses variants of the phrase "Office under the United States" six times, but in every single instance the language is different:

- "any Office of honor, Trust or Profit under the United States," art. I, § 3, cl. 7;
- "any civil Office under the Authority of the United States," art. I, § 6, cl. 2;
- "any Office under the United States," *id.*;
- "any Office of Profit or Trust under [the United States]," art. I, § 9, cl. 8;
- "an Office of Trust or Profit under the United States," art. II, § 1, cl. 2;
- "any Office or public Trust under the United States," art. VI, cl. 3.

One would not expect such casual variation for an established term of art that conveyed a fixed and precise meaning not apparent from its plain words. And had the Framers wished to convey the concept of an appointed office, they could easily have written "any appointed office" or "any appointed federal office," instead of resorting to these various circumlocutions.

Apart from its lack of textual plausibility and evidentiary support, the *amicus* brief's hypothesis simply makes no sense. British officials were said to hold an office "under the Crown" because it was the Crown—the King or Queen—who created their offices and gave them their authority. *See, e.g.*, Memorandum from Steven G. Bradbury, Office of Legal Counsel, *Officers of the United States Within the Meaning of the Appointments Clause* 81-82 (Apr. 16, 2007) ("Officers . . . were persons holding sovereign authority delegated from the King," and an officer was "simply one whom the King had charged with a duty." (quotation marks omitted)). But under the Constitution, offices are established by federal law rather than by executive fiat—in legislation or in the Constitution itself. Those offices are therefore "under" the federal government as a whole, *i.e.*, "under the United States." *Cf. The Federalist No. 76*, *supra*, at 455 (Hamilton) (referencing "the offices *of the Union*" (emphasis added)).

Given this critical difference between the American and British systems on the basic matter of what an "office" actually was, there is no logical reason to suppose that the Framers were referring only to appointed positions when they used the phrase "Office under the United States."

The simpler explanation for the resemblance between this phrase and "office under the Crown"—if any explanation is needed—is that the Framers echoed familiar phrasing from the legal tradition in which they were raised. There is zero evidence that, in doing so, the Framers meant to import from British statutory drafting conventions a hidden meaning that made no sense in the context of the novel constitutional structure they were creating. "It may well be that the King of England in 1789 was not an officer 'under' the kingdom of Great Britain, but the President is most certainly an officer under the United States, the people of which are sovereign." Calabresi, *supra*, at 143.

In short, the Constitution does not provide for any "Office under the President," and the Framers did not use that phrase. The power and authority of those holding "office" does not derive from the President, but from a different source—the people. Those offices are "under the United States," not under the President. Yet despite the radical shift the Constitution effected regarding what an "office" was, the *amicus* brief insists the Framers clung to an incongruous term of art from statutes enacted under the British monarchy. For what purpose, it does not say, and why they did not simply write "an appointed office," it does not explain.

The more reasonable interpretation is simpler: the phrase "under the United States" has no secret meaning. It specifies which sovereign entity the Foreign Emoluments Clause applies to—the federal government, but not the state governments. *See supra* at 6-7.

This conclusion becomes even more obvious when one examines the implications of the *amicus* brief's theory. The brief argues that "Officers of the United States" refers to appointed positions in the executive and judicial branches, Tillman Br. 4, while "Office under the United States" refers to appointed positions in all three branches, *id*. at 6. So according to this theory, *see id.* at 7, the reason the Framers used the latter, broader phrase in the Foreign Emoluments Clause was to sweep in the appointed ministerial officials who aid members of Congress, like the Clerk

19

of the House of Representatives—officials who lack any power of their own. Meanwhile, the Framers deliberately exempted the President of the United States, the person charged with the power to make treaties, U.S. Const. art. II, § 2, cl. 2, receive Ambassadors and other public Ministers, *id*. art. II, § 3, act as Commander in Chief of the armed forces, *id*. art. II, § 2, cl. 1, and generally "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system," *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982). That defies belief.[4]

### B.   The *Amicus* Brief Fails To Undermine the Only Contemporaneous Evidence

A critical stumbling block for the *amicus* brief's argument is that the only Founding-era sources directly on point flatly contradict it. George Mason and Edmund Randolph claimed publicly at the Virginia ratifying convention, without contradiction, that presidents are subject to the Foreign Emoluments Clause. To sustain its thesis, the *amicus* brief attempts to discredit Mason and Randolph. It utterly fails to do so.

According to the *amicus* brief, this Court should discount Mason and Randolph's unequivocal statements that the Foreign Emoluments Clause applies to the President because Randolph and Mason "also thought that members of Congress could be impeached" under the Impeachment Clause. Tillman Br. 16. The basic argument is this: Mason's and Randolph's views on the Impeachment Clause (which governs "civil Officers of the United States") and the Foreign Emoluments Clause (which governs "Person[s] holding any Office of Profit or Trust under [the United States]") both sprang from the same confusion about "the Constitution's general *office-*

---

[4] Considering how the Clause's precursor would have operated under the Articles of Confederation further illustrates the problems with the theory the brief advances. As discussed, the nearly identical predecessor to the Foreign Emoluments Clause in the Articles applied to both federal and state offices. On the *amicus*'s reading, the states that joined together under the Articles allowed the governors of their fellow states to be on the payroll of a foreign monarch, but took care to ensure that the lower-level officials of those same states could not do the same.

language." *Id.* According to the brief, Mason's and Randolph's views on impeachment "did not

pass unnoticed, and even at the time, some saw their view as inconsistent with the constitutional

text. For example, James Monroe, objecting contemporaneously in 1788, observed 'that the

Senators are not impeachable, and therefore Governor Randolph's objection falls to the ground.'"

*Id*. at 11. Moreover, "a decade later, the Senate adopted Monroe's reading of the Constitution in

the first impeachment trial." *Id*. at 11-12. Thus, the brief argues, Mason and Randolph subscribed

to an unusual position regarding the meaning of "Officer" in the Impeachment Clause; their

position was wrong; this error also infected their understanding of the meaning of "Office of Profit

or Trust" in the Foreign Emoluments Clause; and therefore their views on that separate question

should be disregarded as well. *See id*. at 16-17.

     Even on its own terms, this is attenuated reasoning indeed. But compare this narrative with

how Professor Tillman has described the same matters in his academic writings. In a 2013 article,

he acknowledges that Mason and Randolph were far from alone in believing that Senators were

impeachable. In fact, "*a majority of (the handful of) Framers who spoke of the impeachability of

Senators took [that] position*." Tillman, *Original Public Meaning*, *supra*, at 194 (emphasis added).

Indeed: "Among the Framers, the *only exception seems to be James Monroe*, who argued that

members are not impeachable." *Id*. (emphasis added).

     Thus, while the *amicus* brief states that Mason's and Randolph's views "did not pass

unnoticed" (suggesting noteworthiness), claims that "some" disagreed with their views, and cites

James Monroe as an "example" of these "some," Tillman's academic writings state that *everyone*

who discussed the matter, *except* Monroe, agreed with Mason and Randolph.

     Moreover, the *amicus* brief claims to understand *why* Mason and Randolph believed that

Senators were impeachable—that is, they suffered from a general misunderstanding of how the

Constitution treats the terms "office" and "officer." Thus, the brief maintains that "Randolph and Mason's positions on the Impeachment and Foreign Emoluments Clauses are not independent, separate, or distinguishable: both positions arise from their view of the scope of the Constitution's general *office*-language," and that given their "view in regard to the Impeachment Clause's *office*-language . . . . There is no principled way for this Court to rely on their closely related view in regard to the scope of the Foreign Emoluments Clause's *office*-language." Tillman Br. 16-17. Yet Professor Tillman has elsewhere acknowledged that he does not know whether there was any connection between how the men interpreted these two separate clauses, because he does not know what their reasoning was: "Apparently, Randolph thought the President was an *officer of* and *under the United States* and subject both to the Impeachment Clause and the Foreign Emoluments Clause. . . . None of the Framers, however, left us a clear reasoned basis for their views." Tillman, *Original Public Meaning*, *supra*, at 194.

It gets worse. *The amicus* brief also purports to know why the Senate in the late 1790s dismissed the charges against a Senator whom the House had impeached. According to the brief, "the Senate adopted Monroe's reading of the Constitution in the first impeachment trial, which would become known as the *Blount* case," Tillman Br. 11-12, and the view that Senators could be impeached was "rejected . . . by the Senate sitting as a court of impeachment," *id*. at 16-17. Yet elsewhere Professor Tillman has stated that because the Senate gave no public explanation for its decision and the available materials are "ambiguous," no one knows why the Senate dismissed the impeachment proceedings—or whether it had anything to do with a belief that Senators are not impeachable. *See* Tillman, *Original Public Meaning*, *supra*, at 193-94 (It "is hardly clear . . . that the Senate dismissed the case because it determined that members of the legislature are not within

the scope of the House's impeachment power . . . . In short, *Blount* will remain an enigma.").[5]

In short, the *amicus* brief provides no basis for discounting Mason's and Randolph's views on the scope of the Foreign Emoluments Clause. If anything, the brief undercuts its own argument by highlighting a comparison between their views on that Clause and on the Impeachment Clause. After all, when Mason and Randolph claimed at the Virginia convention that members of Congress were impeachable, a statesman who disagreed challenged that view. *See* Tillman Br. 11-12. By contrast, when those same men claimed, at the same convention, that presidents were bound by the Foreign Emoluments Clause, no one disagreed. And that is unsurprising: the view that presidents are subject to the Clause—later vindicated by an unbroken tradition of nearly two centuries—fits the natural reading of the constitutional text and its undisputed purpose.

### C. The *Amicus* Brief's Remaining Arguments Are Without Merit

As noted earlier, the *amicus* brief cites no instance of any person in history expressing the view that "Office under the United States" was a term of art meaning "a federal appointed position that is created, regularized, or defeasible by statute." Tillman Br. 7. Lacking such evidence, the brief attempts to support its position through a series of inferences about various historical puzzles. Even if one accepted all the *amicus* brief's inferences, the evidence would still be insufficient to overcome the plain text and known purpose of the Clause. But on top of that, there is ample reason to question every inference the *amicus* brief seeks to draw.

---

[5] *See also* Seth Barrett Tillman, *Interpreting Precise Constitutional Text: The Argument for a "New" Interpretation of the Incompatibility Clause, the Removal & Disqualification Clause, and the Religious Test Clause*, 61 Clev. St. L. Rev. 285, 288 n.9 (2013) (quoting John D. Feerick, *The Twenty-Fifth Amendment: Its Complete History and Earliest Applications* 40 n.§ (1976), which explains that "'[t]he Senate dismissed the case, giving no reason for its decision. Since Blount had been expelled [by the Senate] before the dismissal [of the impeachment proceeding], another interpretation is that a member of Congress loses his status as a civil officer, and therefore may not be impeached, after he is expelled from Congress'").

*The 1790 Statute.* The *amicus* brief begins by citing a statute enacted in 1790 that provided that "a defendant convicted of bribing a federal judge 'shall forever be disqualified to hold any *office of honor, trust, or profit under the United States.*'" Tillman Br. 12 (quoting 1 Stat. 112, 117 (1790)). The brief says that because this statute would be "plainly unconstitutional" if applied to elected officials (a proposition for which it cites a 1969 Supreme Court decision), this must mean that the statute's drafters did not intend for it to apply to elected officials. From that inference, the brief draws another inference—that the Framers of the Constitution did not intend the similar language of the Foreign Emoluments Clause to apply to elected officials. *Id.*

But as the *amicus* brief acknowledges, the First Congress and other early Congresses enacted unconstitutional legislation, such as the Alien and Sedition Acts and the portion of the 1789 Judiciary Act addressed in *Marbury v. Madison*. *Id.* at 13. Attempting to salvage its argument, the brief invents a new principle of constitutional interpretation: all early legislation should be assumed constitutional unless it was "highly controversial legislation" or involved the "implementation of a new complex statutory system," in which case it remains possible that the early Congresses were capable of error. *Id.* This is not, and has never been, the law.

*The Treasury Report.* The *amicus* brief finds great significance in a 1793 financial statement prepared by the Treasury Department. The Senate had called upon the Secretary of the Treasury to provide "a statement of the salaries, fees, and emoluments, for one year, ending the first day of October next, to be stated quarterly, of every person holding any civil office or employment under the United States, (except the judges,) together with the actual disbursements and expenses in the discharge of their respective offices and employments for the same period." S. Journal, 2d Cong., 1st Sess. 441 (1792). The responsive document submitted by Secretary Alexander Hamilton "included appointed or administrative personnel in *each* of the three branches

of the federal government," but "did *not* include the President, Vice President, Senators, or Representatives." Tillman Br. 14. From this omission, the brief draws the inference that Hamilton concluded that the President did not hold "any civil office or employment under the United States." And from that inference, the brief further infers that the drafters and ratifiers of the Constitution also did not believe the presidency was an "Office of Profit or Trust under the United States." *Id.*

Significantly, however, no one knows why that particular Treasury report omitted the officials it did—whether this was a deliberate choice or an oversight, and whether, if deliberate, the choice had anything to do with a legal determination concerning the meaning of "office under the United States." Alternative explanations abound, including that

> (1) the salaries of the President and Vice President were widely known and therefore not deemed to be necessary in the report; (2) there were other prudential or political reasons that Hamilton did not include those salaries; (3) the context in which the question was asked led Hamilton to think that it was not intended to cover the President or Vice President; (4) Hamilton understood 'office under the United States' to mean what Tillman says it does, but others had a different understanding.

Zephyr Teachout, *Gifts, Offices, and Corruption*, 107 Nw. U. L. Rev. Colloquy 30, 41 (2012); *see also* An Act for allowing a Compensation to the President and Vice President of the United States, 1 Stat. 72 (1789) (setting annual salaries); An Act for allowing Compensation to the Members of the Senate and House of Representatives, 1 Stat. 70 (1789) (setting per diem and travel compensation); Decl. of John P. Kaminski, ¶ 13, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Dkt. No. 85-8) ("Perhaps Hamilton thought that Congress was well aware of these payments. Other explanations are also possible.").

These are guesses, of course, but so is the *amicus* brief's supposition that the omission reflected Hamilton's legal conclusion about the meaning of the phrase "office under the United States." Indeed, there is good reason to think that the document reflected no such legal conclusion. After all, the Senate requested the salaries and expenses "of every person holding any civil office

*or employment* under the United States" (emphasis added). The brief's explanation for why the President and Vice President were absent from the report is that they fell outside the term of art "office under the United States." But that does not explain why Hamilton would also conclude that they did not hold "employment" under the United States, given their official responsibilities and set compensations. *See* Johnson, *supra* (defining "employment" as "Business; object of industry; object of labour," "Business; the state of being employed," and "Office; post of business"). The *amicus* brief's theory does not account for this point, which suggests that the omission may have resulted from something other than a legal determination about who fell within the phrase "civil office or employment under the United States."[6]

Moreover, because many records from this period were lost, there is no way to know whether Senators considered the Treasury report fully responsive to their request, or whether Hamilton supplemented the report with additional information. *See* Decl. of Prof. Kenneth R. Bowling, ¶ 15, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Dkt. No. 85-9) ("A 'mass' destruction took place while congressional documents were prepared for inclusion" in a printed historical volume.). Indeed, a condensed version of the report is housed together with the full report at the National Archives, and this condensed version (which was printed in the *American State Papers*) includes the President and Vice President. *See* 1 *American State Papers*: *Misc.* 57 (Walter

---

[6] The *amicus* brief also oversimplifies the nature of Hamilton's task in a way that implies a focus on the legal question disputed here. It states that "[t]he Senate asked for a list of 'every person holding any civil office or employment under the United States,' and that is precisely what Hamilton delivered." Tillman Br. 14. But the Senate requested something much broader: "a statement of the salaries, fees, and emoluments, for one year, ending the first day of October next, to be stated quarterly, of every person holding any civil office or employment under the United States, (except the judges,) together with the actual disbursements and expenses in the discharge of their respective offices and employments for the same period." S. Journal, 2d Cong., 1st Sess. 441 (1792). This language does not suggest a focus on the legal question of who holds an "office," but rather a more practical focus on budgeting or other financial concerns (which may not have been affected by the report's omission of the President's well-known salary).

Lowrie & Walter S. Franklin eds., 1834), http://memory.loc.gov/ammem/amlaw/lwsp.html. Whatever the provenance of this condensed report—*compare* Tillman Br. 15 (arguing that it was a "scrivener's copy" produced after 1820), *with* Decl. of Robert W.T. Martin, ¶ 12, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Dkt. No. 85-11) ("the *Condensed Report . . .* may have been produced contemporaneously with the *Complete Report*, or it may have been produced as late as 1834 when *ASP* was published")—its inclusion of the President provides additional reason, as if more were necessary, to avoid placing undue significance on the omissions in the full report.

There is another problem with the *amicus* brief's heavy reliance on this document besides the impossibility of eliminating alternative explanations for its omissions. Less than ten years later, President Jefferson's administration produced its own list of persons holding federal office or employment and their salaries. *See Roll of the Officers, Civil, Military, and Naval, of the United States* (Feb. 16, 1802), *in* 1 *American State Papers: Misc.*, *supra,* 260. Providing this list to Congress, Jefferson wrote: "I now transmit . . . *a roll of the persons having office or employment under the United States*." *Id*. at 260 (emphasis added). Jefferson's list included the President, the Vice President, and every member of Congress. *Id*. at 300-01.[7]

***Early Presidents.*** The *amicus* brief claims that Presidents Washington, Jefferson, Madison, and Monroe personally accepted gifts from foreign states, and further claims that the lack of any objections to their conduct demonstrates a shared understanding that presidents were exempt from

---

[7] The inclusion of these officials cannot be explained as a later insertion by those who prepared the report for printing in the *American State Papers*, because a February 1802 transmittal letter to Jefferson from his Treasury Secretary Albert Gallatin specifically mentions those officials. In explaining how the report categorizes various officials among the "civil, foreign, military, and naval departments," the letter states: "*Civil establishment includes the President and Vice President, the Legislature* and officers attached to the same." *Id*. at 260-61 (emphasis added).

the Foreign Emoluments Clause. These claims are wrong across the board.

Two of the brief's examples collapse upon the most cursory inspection. According to the brief, after a South American leader from present-day Argentina sent two pistols to President Madison, "Madison gave the guns to his successor, President James Monroe." Tillman Br. 21. In a flight of conjecture, the brief then asserts that if the pistols were *not* gifts personally accepted by Madison, then Madison "wrongfully converted government property" and Monroe "connived with his predecessor to receive (what would amount to) stolen U.S. government property." *Id.* at 22.

The brief's story blatantly contradicts the very sources it cites. Did Madison personally accept the pistols? No: he instructed them to be "deposited in the Department of State." Letter from James Madison to John Graham (Aug. 11, 1816), *Founders Online*, National Archives, http://founders.archives.gov/documents/Madison/99-01-02-5374.[8] And contrary to the brief's assertion that "Madison gave the guns to his successor, President James Monroe," in reality "[i]t is unclear how Monroe obtained the pair," or whether Madison had anything to do with it, for "[t]here is no official record of the set being removed from the Department of State." James Monroe Museum: James Monroe 3D, *Pistols*, *available at* https://perma.cc/T796-ED5B.[9]

---

[8] Depositing the pistols with the State Department made sense in light of the evident purpose for which they were sent. Although the letter accompanying the pistols indeed called them "an homage due to the chief Magistrate of the United States," it also described them as "a Specimen of the first Essays of the Manufacture of Arms established, in the Provinces of Buenos-Ayres and Tucuman . . . . whose only merit consists in exhibiting the State of our Arts, and the Material of which it is composed." Letter from Ignacio Alvarez Thomas to James Madison (Feb. 9, 1816), *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/99-01-02-4930. Madison was informed by the official who delivered the pistols that they "were merely intended as specimens of the progress of the Arts among his Countrymen and by no means as a Regalia." Letter from John Graham to James Madison (Aug. 8, 1816), *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/99-01-02-5363.

[9] Although the text of the *amicus* brief unambiguously asserts that Madison gave the pistols to Monroe, Tillman Br. 22, in a footnote, it ambiguously acknowledges that "the provenance" of the pistols "is disputed," *id.* n.88.

The brief also notes that President Jefferson kept a bust of the Russian emperor Alexander I that was sent to him by the U.S. consul to St. Petersburg. But exactly how Jefferson viewed the acceptance of this gift, as a legal matter, is murky at best. In a letter that the brief does not cite, Jefferson wrote:

> [M]r Harris, our Consul at Petersburg has sent me as a present, a small marble bust of the emperor Alexander. I had concluded to reject it; but [M]r Madison advises it's being *recieved [sic] for the President's house, as destined for the office & not the officer*; and this because of the relation between the thing & the person of the emperor, whose unequivocal and marked manifestations of friendship to our country should privilege him against any thing which might seem to be a slight.

Letter from Thomas Jefferson to Robert Smith (May 31, 1805), *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-1816 (emphasis added). A questionable judgment, to be sure, but hardly clear evidence that Jefferson and his contemporaries regarded presidents as exempt from the Foreign Emoluments Clause because they did not hold "Office under the United States."[10]

The *amicus* brief's discussion of George Washington fares no better. It notes that in 1791 the French ambassador gave Washington a print of the French king in an ornate frame. But the ambassador's letter to Washington reads: "I shall feel a very great Satisfaction if you will consider *that feeble mark of my lively and respectfull attachment for your person*, as worthy your kind acceptance." Letter from Jean-Baptiste Ternant to George Washington n.1 (Dec. 22, 1791), *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/05-09-02-0194 (emphasis added). In Washington's reply, he refers to the gift "which you have been

---

[10] The brief also discusses gifts conveyed to Jefferson from American Indian nations, but cites no evidence that Indian nations were considered "foreign States" or their leaders "Kings" or "Princes." *Cf.* Letter from Thomas Jefferson to Indian Nations (Jan. 10, 1809), *Founders Online*, National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-9516 ("I take you and your people by the hand and salute you as my Children; I consider all my red children as forming one family with the whites[.]").

so obliging as to send to me this morning *as a mark of your attachment to my person*." Letter from George Washington to Jean-Baptiste Ternant (Dec. 22, 1791), *Founders Online*, National Archives, https://founders.archives.gov/documents/Washington/05-09-02-0194 (emphasis added). These comments suggest that the print may have been a personal gift from the ambassador (who was not a king or prince), based on the two men's "personal respect and friendship," *id*., not a gift from the French government. To be sure, Mount Vernon's website says that the print's "magnificent frame . . . would have been commissioned by the King as a gift for the President of the new United States," but it cites no documents supporting the conclusion that the frame "would have been" a gift from the King. *See* George Washington's Mount Vernon: Preservation, *Louis Seize, Roi Des Français, Restaurateur De La Liberté*, *available at* https://perma.cc/H328-NWWN; *see also id.* (noting that "Mount Vernon's object research is ongoing and information about this object is subject to change").

Washington's acceptance of the key to the Bastille from "his friend" the Marquis de Lafayette, Tillman Br. 19 n.68, who was also neither a king nor a prince, may also have been viewed as a gift from a friend. The brief attempts to dispel that possibility by writing that the key "was discussed in diplomatic communications form [*sic*] the French government's representative in the United States to his superiors in the French ministry of foreign affairs," *id.*, but it offers no further details.

Even if these presents were considered official gifts from France itself, which is far from clear, Washington's "prominent display" of them in his home does not necessarily imply that he believed himself exempt from the Foreign Emoluments Clause. Like Jefferson, Washington may have believed that the Clause did not restrict the acceptance of decorative items "destined for the office & not the officer." Letter from Thomas Jefferson to Robert Smith, *supra*. Whatever the legal

merit of that view, or its consistency with the aims of the Foreign Emoluments Clause, at least there is direct evidence of its existence, in the form of Jefferson's letter. In contrast, there is *no* direct evidence that the reason Washington accepted these gifts without recorded complaint was a shared belief that presidents do not hold an "Office of Profit or Trust under the United States." Accepting that inference requires believing that Washington and those around him all operated according to a shared public understanding of the Constitution's language that no one, at any point, ever put into words.

That is implausible, and the facts suggest otherwise. Among the contemporaries of Washington who voiced no complaint about these gifts was his own Attorney General, Edmund Randolph. *See* Tillman Br. 19. Yet we know that Randolph believed presidents were bound by the Foreign Emoluments Clause. *See supra* at 7-9. His failure to object strongly suggests that some other consideration was at play.[11] Thus, the *amicus* brief's explanation for the historical silence it relies upon is not merely one possibility among many—it is a distinctly improbable possibility.

Finally, even accepting for argument's sake that the interpretation of "Office under the United States" advanced by the brief once held sway, that interpretation was dead by at least 1830 and never revived. Since then, the political branches have consistently treated the Foreign Emoluments Clause as applying to elected officials like the President, firmly settling any doubt that might have once existed. *See supra*, Part I.D; *Noel Canning*, 134 S. Ct. at 2560 ("[T]his Court has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era."). Given that the brief's interpretation is also at odds with the Clause's plain text, incompatible with its

---

[11] Among many possibilities, "[i]t could be that Washington occupied such a unique role in American politics that his advisors were less likely to press upon him the importance of following the letter of the law." Teachout, *supra*, at 42.

purpose,[12] unsupported by any direct evidence, and contradicted by the only Framing-era sources to discuss the matter, the better conclusion is this: the *amicus* brief's interpretation has not merely vanished—it was never there.

### D. Accepting the *Amicus* Brief's Theory Requires Accepting Many Improbable Constitutional Interpretations

Although the *amicus* brief does not highlight this point, its theory that "Office under the United States" excludes the presidency has implications beyond the Foreign Emoluments Clause. Accepting this theory requires also accepting the following questionable constitutional propositions:

*A person can serve as President and as a member of Congress at the same time.* The Constitution says that "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." U.S. Const. art. I, § 6, cl. 2. If the President does not hold "any Office under the United States," he may serve in Congress while in office. *See* Seth Barrett Tillman, *Why President-Elect Obama May Keep His Senate Seat After Assuming the*

---

[12] In its only attempt to reconcile its claims with the known goals of the Foreign Emoluments Clause, the *amicus* brief states that "in the realm of foreign affairs, our separation of powers jurisprudence provides extra latitude for the President," and that "the President may need the authority to accept foreign gifts unilaterally without having to first seek congressional consent" to avoid "umbrage and disrespect." Tillman Br. 17-18. The first statement is merely a general observation that ignores the Framers' specific fear that foreign powers would corrupt the President, as well as the safeguards they implemented in response. *See supra* at 10-11. Moreover, presidents have long been able to avoid giving offense to foreign nations by taking physical custody of gifts offered to them, but immediately depositing those gifts with the State Department or requesting Congress's direction on their disposition. *See, e.g.*, Am. Compl. ¶ 31 (citing examples); *see also* 5 U.S.C. § 7342(c)(1)(B) (providing blanket congressional consent for acceptance of gifts "when it appears that to refuse the gift would likely cause offense or embarrassment or otherwise adversely affect the foreign relations of the United States"); *id*. § 7342(c)(1)(B)(i) (the gift "is deemed to have been accepted on behalf of the United States and, upon acceptance, shall become the property of the United States"); 1 Francis Wharton, *A Digest of the International Law of the United States* 758 (1886) (indicating that this practice was established by at least the early nineteenth century).

*Presidency*, 157 U. Pa. L. Rev. PENNumbra 135 (2008).

*A President can serve as an elector in the Electoral College*. The Constitution says that no "Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector." U.S. Const. art. II, § 1, cl. 2. If the presidency is not such an office, the President may be appointed to serve as an Elector. *See* Tillman, *Interpreting Precise Constitutional Text*, *supra*, at 344 n.94.

*A President whom Congress impeaches, removes from office, and disqualifies from holding office in the future can be reelected President and hold that office.* The Constitution says that judgment in cases of impeachment may include "disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States." U.S. Const. art. I, § 3, cl. 7. If the presidency is not such an office, a President who is impeached, removed, and disqualified by Congress cannot be barred from serving as President again after the next election. *See* Tillman, *Interpreting Precise Constitutional Text*, *supra*, at 311.

\* \* \*

In sum, nothing in the *amicus* brief provides reason to question what the text, purpose, and history of the Foreign Emoluments Clause all make clear: it applies to the President.

### III.    This Suit Is Properly Brought Against the President in His Official Capacity

The brief's final footnote raises the question of whether this suit should be brought against the President in his official or personal capacity. Contrary to the position of both the Plaintiffs and the Defendant, the brief argues that "this suit cannot be an 'official capacity' suit." Tillman Br. 22 n.89. That is wrong.

Quite simply, whether a suit is an official- or personal-capacity suit turns on the nature of the relief sought: a suit seeking injunctive or declaratory relief, rather than monetary damages, is always an official-capacity suit. This lawsuit seeks to enjoin the President from committing future

violations of the Constitution. It does not seek to hold Donald J. Trump personally liable for damages, as a private individual, to compensate for his past violations of the Constitution. As such, this suit is properly being litigated against the President in his official, not personal, capacity.

Lawsuits seeking to make the current occupant of an office "conform his future conduct of that office" to constitutional requirements, *Edelman v. Jordan*, 415 U.S. 651, 664 (1974), are brought against that official in his or her "official" capacity. Such suits are not brought against those officials in their personal capacities. *See Hatfill v. Gonzales*, 519 F. Supp. 2d 13, 23 (D.D.C. 2007) ("[T]he proper vehicle for seeking equitable relief against a government official is an official capacity suit.").

By contrast, "individual (or personal) capacity suits do not seek to conform the State's conduct to federal law; rather, such suits seek *recovery* from the defendant personally." *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) (emphasis added). For instance, state officials may be sued in their personal capacities to obtain damages for past constitutional violations under 42 U.S.C. § 1983, which declares that anyone who deprives another person of constitutional rights under color of state law "shall be liable to the party injured." A successful suit for damages under Section 1983 imposes personal financial liability directly on the state official who is sued. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law."). It imposes no financial liability on the state government. Hence, such suits are "necessarily" brought against state officials in their personal capacities. *Kentucky v. Graham*, 473 U.S. 159, 168-69 (1985). The same is true for damages actions against *federal* officials under the analogous implied remedy recognized in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017).

34

In sum, the choice between a personal- or official-capacity suit turns on the nature of the relief sought—whether the plaintiff seeks to stop an official from continuing to violate the Constitution or instead seeks to recover damages from an official for past violations.

This rule does not change merely because an official is violating the Constitution through his private business affairs, rather than through the performance of his job responsibilities. It is true that suits against a government official for injunctive relief usually center around the performance of that official's job duties (as do suits for damages). But that need not be so when the constitutional provision being violated is one that restricts an official's private behavior. The Foreign Emoluments Clause is such a provision. It regulates more than the actions an official takes on behalf of the state—*i.e.*, more than simply the conduct of government officials while they are fulfilling the responsibilities of their jobs. The Clause imposes on all officeholders a *negative* duty ("do not accept foreign emoluments") quite apart from those officeholders' *positive* duties—in the case of the President, executing the laws, conducting foreign relations, and the like. But the Clause does not impose this *negative* duty on officeholders only when they happen to be engaged in one of their separate *positive* duties. To the contrary, it declares that they may not accept "any" foreign emolument "of any kind whatever." U.S. Const. art. I, § 9, cl. 8. "Unlike most constitutional limits," therefore, "the Clause reaches officeholders' private conduct, making *any* receipt of foreign emoluments unconstitutional." Pls.' Opp. to Def.'s Mot. to Dismiss at 44 (Dkt. No. 17). In other words, the Clause makes no distinction between the behavior of an officeholder who is in the midst of performing one of his job functions and the behavior of that same officeholder in his free time.[13]

---

[13] These considerations illustrate why "[a]n injunction ordering the President to stop accepting emoluments through his companies" would not be directed at the unique official duties he exercises *as President* (*i.e.*, his unique positive duties under the Constitution to execute the

If, for example, a President were to personally accept a million-dollar check from a foreign government given to him as a diplomatic overture in a formal ceremony, this would of course violate the Foreign Emoluments Clause. But so would personally accepting a check mailed by that government to the President's personal residence with no reference to diplomatic affairs. *See* 11 Op. O.L.C. 89, 90 (1987) ("the Emoluments Clause is plainly applicable where an official is offered the gift, title or office in his private capacity"). In either case, the President would be violating his official duty under the Constitution to refrain from accepting foreign emoluments. Thus, in both cases, a suit to enjoin the future repetition of that conduct would be a suit against the President in his official capacity.[14]

Thus, the choice between an official- or personal-capacity suit depends on whether injunctive relief or damages are being sought. It does not depend on whether the constitutional violation arises out of the defendant's performance of his job duties. *See Hafer*, 502 U.S. at 26 ("the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury"). Indeed, contrary to what one would expect if the *amicus* brief were correct, damages suits arising from constitutional violations that an official commits while performing his job are *personal-capacity* suits. *See, e.g.*, *id.* at 27; *see also Nixon*, 457 U.S. at 733 (personal-capacity suit seeking

---

laws, conduct foreign relations, etc.), but would instead be directed only at a separate and ministerial duty he shares with "every other federal officeholder" (*i.e.*, the negative duty to refrain from accepting foreign emoluments). Pls.' Opp. to Def.'s Mot. to Dismiss at 44-45 (Dkt. No. 17).

[14] While the Foreign Emoluments Clause is unusual in regulating the private conduct of federal officials, it is not alone. *See, e.g.*, Statement of Interest by Donald Trump at 4, *District of Columbia v. Trump*, No. 17-1596 (D. Md. Mar. 26, 2018) (Dkt. No. 100) ("This is no different from, for example, a challenge to a Senator's noncompliance with the constitutional requirement that he or she be 'an Inhabitant of that State in which he shall be chosen,' U.S. Const. art. I, § 3, cl. 3. The real party in interest in that circumstance would be the Senator in his official capacity, even if the alleged injuries had stemmed from the Senator's personal choice to have an out-of-state residence.").

damages from a former President based on "actions allegedly taken in the former President's official capacity during his tenure in office").

The *amicus* brief offers just one argument to the contrary: "Given that the case could not continue against the President's successor, this suit cannot be an 'official capacity' suit." Tillman Br. 22 n.89. This argument seems to assume that if President Trump were replaced in office, his successor would not automatically be substituted as the Defendant in this case under the Federal Rules of Civil Procedure. In essence, the brief argues that the futility of a suit against President Trump's successor means that President Trump should not be sued in his official capacity. As the Department of Justice has explained, however, "that argument is mistaken. The reason that no substitution would be necessary is that the case would become moot due to the changed circumstances. That by no means suggests that Plaintiffs' challenge to the President's compliance with the Emoluments Clauses should be maintained as an individual-capacity suit when the Clauses do not otherwise bind the President as a private individual." Statement of Interest of Donald Trump at 6, *District of Columbia v. Trump*, No. 17-1596 (D. Md. Mar. 26, 2018) (Dkt. No. 100); *see Nat'l Treasury Emps.' Union v. Campbell*, 654 F.2d 784, 788 (D.C. Cir. 1981) ("where the conduct challenged is personal to the original named defendant, even though he was sued in his official capacity, a request for prospective injunctive relief is mooted when the defendant resigns").

The *amicus* brief also cites *Lewis v. Clarke*, 137 S. Ct. 1285 (2017), but that case does not support the brief's position. *Lewis* involved "an ordinary negligence action brought against a tribal employee in state court under state law," and the opinion addresses the extent to which "an Indian tribe's sovereign immunity bars individual-capacity damages actions against tribal employees for torts committed within the scope of their employment." 137 S. Ct. at 1288. The Court explained

that "in the context of lawsuits against state and federal employees or entities, courts should look to whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit." *Id*. at 1290 (citing *Hafer*, 502 U.S. at 25). And because "lawsuits brought against employees in their official capacity 'represent only another way of pleading an action against an entity of which an officer is an agent,' . . . they may also be barred by sovereign immunity." *Id*. at 1290-91 (quoting *Graham*, 473 U.S. at 165-66).

These comments, however, pertain to *damages* actions like *Lewis* (and *Hafer* and *Graham*), because the relief sought would be paid by the government entity, not the individual officer. In other words, official-capacity actions for retrospective monetary relief are simply treated as actions against the state. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). By contrast, "official-capacity actions for *prospective* relief are not treated as actions against the State." *Id.* n.10 (quoting *Graham*, 473 U.S. at 167 n.14 (emphasis added) (citing *Ex parte Young*, 209 U.S. 123 (1908))); *see Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("In the landmark decision in *Ex parte Young*, the Court held that, although prohibited from giving orders directly to a State, federal courts could enjoin state officials in their official capacities." (citation omitted)); *Hafer*, 502 U.S. at 30 ("the doctrine of *Ex parte Young* does not apply where a plaintiff seeks damages from the public treasury").

To be sure, even when only prospective relief is sought, certain *types* of official-capacity actions are regarded as "against . . . the sovereign itself." *Lewis*, 137 S. Ct. at 1291 (citing *Will*, 491 U.S. at 71, & *Dugan v. Rank*, 372 U.S. 609, 611, 620-22 (1963)). But that is only when "the relief granted operates against the United States," *Dugan*, 372 U.S. at 621, not when the relief seeks to correct "action by officers beyond their statutory powers" or action that is "constitutionally void." *Id*. at 621-22. In those situations:

> The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief . . . . without impleading the sovereign . . . because of the officer's lack of delegated power.

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949); *see Pollack v. Hogan*, 703 F.3d 117, 119–20 (D.C. Cir. 2012) ("suits for specific relief against officers of the sovereign allegedly acting beyond statutory authority or unconstitutionally are not barred by sovereign immunity" (quotation marks and citation omitted)); *Clark v. Library of Cong.*, 750 F.2d 89, 103 (D.C. Cir. 1984). Thus, when "the conduct against which specific relief is sought is beyond the officer's powers," it "is, therefore, not the conduct of the sovereign." *Larson*, 337 U.S. at 690. Such is the case when a President violates the Foreign Emoluments Clause.

Ultimately, *Lewis* makes clear why this lawsuit is properly brought against President Trump in his official capacity: "Personal-capacity suits . . . seek to impose *individual* liability upon a government officer for actions taken under color of state law." *Lewis*, 137 S. Ct. at 1291 (citing, *inter alia*, *Bivens*, 403 U.S. 388). But no individual damages liability is sought here—only prospective injunctive relief against the occupant of the Office of the President. *See Pollack*, 703 F.3d at 120 (official-capacity action may proceed where plaintiff's "sole allegation is that the named officers acted unconstitutionally, and she requests only injunctive and declaratory relief"); *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (same, in action against the President). Moreover, were this a personal-capacity suit, the President would "be able to assert *personal* immunity defenses," *Lewis*, 137 S. Ct. at 1291, that would make no sense in an injunctive suit, "such as objectively reasonable reliance on existing law," *Graham*, 473 U.S. at 166-67; *see also Nixon*, 457 U.S. at 749 (former president "entitled to absolute immunity from damages liability predicated on his official acts"). Because this is an official-capacity suit, however, "these defenses

are unavailable." *Graham*, 473 U.S. at 167; *accord Lewis*, 137 S. Ct. at 1291.

A lawsuit against the President, seeking only to prevent him—while he remains in office—from committing future violations of the Constitution, is properly brought against the President in his official capacity.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss, the Defendant's motion to dismiss should be denied.

Respectfully submitted,

Dated:  April 30, 2018

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2018, the foregoing document was filed with the Clerk of

the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: April 30, 2018

<u>/s/ Brianne J. Gorod</u>
Brianne J. Gorod