**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Senator RICHARD BLUMENTHAL, *et al.*,

     *Plaintiffs*,

  v.

DONALD J. TRUMP, in his official capacity as President of the United States,

     *Defendant*.

No. 17-cv-1154-EGS

**DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF HIS MOTION TO DISMISS AND IN RESPONSE TO THE BRIEFS OF AMICI CURIAE**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

RESPONSE TO AMICUS CURIAE BRIEFS ........................................................... 1

    I.   Amicus Brief of Federal Jurisdiction and Constitutional Law Scholars ............................1

    II.  Amicus Brief of Legal Historians.......................................................................................6

    III. Amicus Brief of Former Members of Congress ..............................................................12

    IV. Amicus Brief of Former National Security Officials ......................................................15

    V.  Amicus Brief of Ethics Officials .....................................................................................16

    VI. Amicus Brief of Separation of Powers Scholars .............................................................19

    VII. Amicus Brief of Scholar Seth Barrett Tillman and the Judicial Education Project ........21

CONCLUSION.......................................................................................................... 26

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) ........................................................................ 6

*Avacus Partners, L.P. v. Brian, No. 11011*,
   1990 Del. Ch. LEXIS 178, *21–22 (Ch. Oct. 24, 1990) .......................... 5

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) ......................................................... *passim*

*Chenoweth v. Clinton*,
   181 F.3d 112 (D.C. Cir. 1999) ....................................................... *passim*

*Coleman v. Miller*,
   307 U.S. 433 (1939) ............................................................................ 5

*Davis v. Passman*,
   442 U.S. 228 (1979) .......................................................................... 20

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) .......................................................................... 21

*FEC v. Atkins*,
   524 U.S. 11 (1993) ......................................................................... 4, 5

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .......................................................................... 20

*Kucana v. Holder*,
   558 U.S. 233 (2010) ............................................................................ 9

*Kucinich v. Bush*,
   236 F. Supp. 2d 1 (D.D.C. 2002) ......................................................... 3

*Lovitky v. Trump*,
   ---F. Supp. 3d---, No. 17-cv-450 (CKK),
   2018 WL 1730278, (D.D.C. Apr. 10, 2018) ....................................... 20

*Minn. Chippewa Tribe v. Carlucci*,
   358 F. Supp. 973 (D.D.C. 1973) ......................................................... 20

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) ............................................................................ 20

*Nat'l Treasury Emps. Union v. Nixon*,
    492 F.2d 587 (D.C. Cir. 1974) ........................................................................... 20

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................................... *passim*

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................................... 5

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ...................................................................... 20

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ............................................................................. 5

## STATUTES

1 Stat. 65 (1789-1799)……………………………………………………..……..10

1 Stat. 112 (1790)………………………………………………..…………………23

1 Stat. 400 (1794)……………………………………………………………………12

1 Stat. 565 (1798)……………………………………………………...………………12

1 Stat. 611 (1798)……………………………………………………...………………12

1 Stat. 613 (1799)……………………………………………………...………………12

2 Stat. 379 (1806)……………………………………………………...………………12

2 Stat. 451 (1807)……………………………………………………...………………12

2 Stat. 473 (1808)……………………………………………………...………………12

2 Stat. 506 (1809)……………………………………………………...……………12

2 Stat. 528 (1809)……………………………………………………...…………12

2 Stat. 605 (1810)……………………………………………………………...…12

2 Stat. 613 (1810)……………………………………………………………...…12

2 Stat. 700 (1812)……………………………………………………………...…12

3 Stat. 88 (1813)……………………………………………………………………12

3 Stat. 123 (1814)……………………………………………………………...…12

3 Stat. 195 (1815)……………………………………………………………...…12

5 Stat. 409 (1840)……………………………………………………………………........3

5 U.S.C. app. § 101(a)....................................................................................................... 16

5 U.S.C. § 7342................................................................................................................ 13

18 U.S.C. § 201................................................................................................................ 15

18 U.S.C. § 203................................................................................................................ 15

18 U.S.C. § 208................................................................................................................ 15

18 U.S.C. § 210................................................................................................................ 15

18 U.S.C. § 211.................................................................................................................. 1

H.R. Rep. No. 23-302 ...................................................................................................... 25

Private Law 86-94, 73 Stat. A45 (1959) ........................................................................... 3

Private Law 89-61, 79 Stat. 1356 (1965) ........................................................................... 3

S. Exec. Doc. No. 23-49 (1834)...................................................................................... 25

S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) ..................................................................... 11

5 Annals of Cong. 1583, *et seq*. (1789)…………………………………………………12

8 Annals of Cong. 1582–93 (1789)……………………………………………….……12, 13

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 6, cl. 2............................................................................................... 22

U.S. Const. art. I, § 9, cl. 8............................................................................................ *passim*

## OTHER AUTHORITIES

1 *The American Diplomatic Code, Embracing a Collection of Treaties and
Conventions between the United States and Foreign Powers*, "Convention Defining
and Establishing the Functions and Privileges of Consuls and Vice Consuls between
the United States and France," (Jonathan Elliot, ed. 1834) .................................................... 10, 11

3 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of
the Federal Constitution (1891) ........................................................................................ 22

4 *The Diplomatic Correspondence of the American Revolution*, "Consular Convention between
His Most Christian Majesty and the Thirteen United States of North America,"
(Jared Sparks, ed. 1829)........................................................................................................ 10, 11

10 *Documentary History of the Ratification of the Constitution*
(Merrill Jensen et al. eds., 1976–present) ................................................................. 9

11 *Documentary History of the Ratification of the Constitution*
(Merrill Jensen et al. eds., 1976–present) ................................................................. 8

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations*
*Act to the President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082
(Dec. 7, 2009) ............................................................................................................. 21

*Applicability of the Emoluments Clause to Non-Government Members of ACUS*,
   17 Op. O.L.C. 114 (1993) .......................................................................................... 17

*Applicability of the Emoluments Clause to Proposed Service of Government Employee on*
   *Commission of International Historians*,
   11 Op. O.L.C. 89 (1987)..………………………………………………..…………………17

Congressional Research Service, Procedural Analysis of Private Laws Enacted: 1986–2013
(Apr. 9, 2013), https://fas.org/sgp/crs/misc/RS22450.pdf ............................................ 3

E. James Ferguson, *The Power of the Purse: A History of American Public Finance,*
*1776-1790* (1961)......................................................................................................... 10

James Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the*
*U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*,
59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938 ................. 8, 9

Letter for Allie B. Latimer, General Counsel, General Services Administration, from
John M. Harmon, Assistant Attorney General, Office of Legal Counsel (Feb. 8, 1978)
https://justice.gov/olc/page/file/936081/download ...................................................... 13

Letter from Graham to Madison (Aug. 8, 1816),
https://founders.archives.gov/documents/Madison/99-01-02-5363 ............................. 25

Letter from James Madison to John Graham (Aug. 11, 1816),
https://founders.archives.gov/documents/Madison/99-01-02-5374 ............................. 25

Letter from the Marquis de Lafayette to George Washington (Mar. 17, 1790),
https://founders.archives.gov/documents/Washington/05-05-02-015 .......................... 25

Letter from Thomas Jefferson to Levett Harris,
https://founders.archives.gov/documents/Jefferson/99-01-02-3593............................. 25

Library of Congress, A Century of Lawmaking for a New Nation: U.S. Congressional
Documents and Debates, 1774–1875, American State Papers, Senate, 2nd Congress,
2nd Session, Miscellaneous, Vol. 1, https://memory.loc.gov/cgi-
bin/ampage?collId=llsp&fileName=037/llsp037.db&recNum=64 ........................................ 23, 24

Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983)........................................... 18

*Pistols*, James Monroe 3D, at perma.cc/T796-ED5B .................................................................. 26

*President Reagan's Ability to Receive Retirement Benefits from the State of California,*
   5 Op. O.L.C. 187 (1981).…………………………………………………………………………18

*Proposal That The President Accept Honorary Irish Citizenship* (May 10, 1963),
   https://www.justice.gov/sites/default/files/olc/opinions/1963/05/31/op-olc-supp-v001-
   p0278_0.pdf ................................................................................................................................. 22

Report of the Salaries, Fees, and Emoluments of Persons Holding Civil Office
   under the United States (Feb. 26, 1793),
   https://founders.archives.gov/documents/Hamilton/01-14-02-
   0051...............................................................................................................................................23

Restatement (Third) of the Law Governing Lawyers § 123, cmt. B ........................................... 17

Seth Barrett Tillman, Opening Statement*, Why President-Elect Obama May Keep*
*His Senate Seat After Assuming the Presidency,* 157 U. Pa. L. Rev. PENNumbra
134 (2008)...................................................................................................................................... 22

*The Federalist No. 60* (Jacob Cooke, ed., 1961) ......................................................................... 23

The Honorable George J. Mitchell U.S. Senate,
B-207467, 1983 WL 27823 (Comp. Gen. Jan. 18, 1983)............................................................. 18

U.S. Senate: Legislation, Laws, and Acts,
https://www.senate.gov/legislative/common/briefing/leg_laws_acts.htm ......................................3

## INTRODUCTION

Pursuant to this Court's Order of March 30, 2018, directing the parties to respond to "any arguments raised by amici that have not been addressed by the parties in their briefs," the President submits this supplemental brief in response to the amicus curiae briefs filed relating to his motion to dismiss for lack of jurisdiction and for failure to state a claim upon which relief can be granted.  Amici raise a wide range of issues, including Plaintiffs' standing as Members of Congress, the applicability of the Foreign Emoluments Clause to the President, the proper interpretation of the word "Emolument" and of the Clause, and whether Plaintiffs' requested relief violates the separation of powers.  The President will address each amicus brief in turn.

## RESPONSE TO AMICUS CURIAE BRIEFS

### I.      Amicus Brief of Federal Jurisdiction and Constitutional Law Scholars

Plaintiffs have alleged in this case that by failing to seek congressional consent before accepting any prohibited emoluments, the President has denied them "the opportunity to give or withhold their 'Consent' to his acceptance of individual emoluments," thus "injur[ing] [Plaintiffs] in their roles as members of Congress."  Am. Compl., ECF No. 14, ¶ 5.  The President demonstrated in his briefs that Plaintiffs' claimed injury is not a judicially cognizable injury under *Raines v. Byrd*, 521 U.S. 811 (1997), and D.C. Circuit precedent applying *Raines*— *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), and *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000).  *See* Mem. in Supp. of Mot. to Dismiss, ECF No. 15-1 ("MTD") at 7–9. *Raines* held that individual Members of Congress had no standing to challenge the Line Item Veto Act—which gave the President the authority to cancel spending provisions in an appropriations bill without vetoing the bill in its entirety—despite the Members' claim that the Act altered "the legal and practical effect" of the Members' votes on bills containing items subject to veto and thus deprived the Members of "their constitutional role" in the legislative process.  521 U.S. at 816.  *Chenoweth* held that individual Members had no standing to challenge a Presidential program established by Executive Order on the basis that the Members were deprived of "their constitutionally guaranteed responsibility of open debate and vote on issues

and legislation" involving the program.  181 F.3d at 113.  And in *Campbell*, the Members were held to have no standing to challenge the President's use of military forces against Yugoslavia, despite the Members having defeated both an authorization for military intervention and a declaration of war.  203 F.3d at 23.

In an amicus brief filed by a group of law professors, ECF No. 44, Amici support Plaintiffs' claim of standing, citing the same cases upon which Plaintiffs rely and raising many arguments similar to Plaintiffs'.  They also argue that Plaintiffs' alleged injury differs from the injury to legislative power in *Raines*, *Chenoweth*, and *Campbell* because in those cases, the injury belonged only to Congress while in the instant case the injury belongs to the individual Members.  That is, Amici concede that individual Members of Congress generally "do not possess any individual right to *enact* or *repeal* legislation standing alone" and "only have a right to vote on legislation that comes before them."  ECF No. 44 at 6–7.  They allege, however, that the Foreign Emoluments Clause "inverts the normal legislative process" by requiring a covered official to first seek congressional consent before accepting any prohibited benefits.  *Id.* at 9. That "inversion," Amici argue, necessarily grants each Member of Congress a "direct, individual legislative right" in an "identifiable voting opportunit[y]" and confers standing on each Member when the President fails to seek prior approval.  *Id.* at 11–12.

Amici's argument fails at the outset.  First, as with the power to enact any other legislation, the power to consent under the Foreign Emoluments Clause belongs only to Congress as a body, not to its individual Members.  The text of the Clause bears that out: the Clause references only the "Consent of *Congress*," U.S. Const. art. I. § 9, cl. 8 (emphasis added), and says nothing about individual Members' alleged "entitle[ment] [to] cast a vote on whether to grant consent," ECF No. 44 at 11.  The practical workings of the Clause underline the point: because the Clause does not require Congress to respond to an official's request for consent, a Member is not guaranteed an opportunity to vote at all.  That is, if an official requests congressional consent, Congress may do nothing.  And, even in the event a bill is introduced that proposes to grant or deny Congress's consent to an officeholder's acceptance of a present or an

emolument, the bill may never come to a vote.  Indeed, that is precisely the fate met by the two bills sponsored by some of the Plaintiffs concerning the President's alleged acceptance of emoluments here.  *See* MTD at 1.  Of course, if "a sufficient number [of Members] in each House [is] so inclined," *Campbell*, 203 F.3d at 23, Congress may enact a private bill or a joint resolution granting or denying consent.  *See, e.g.*, Private Law 86-94, 73 Stat. A45 (1959) (granting consent under the Foreign Emoluments Clause); Private Law 89-61, 79 Stat. 1356 (1965) (same); *see also* 5 Stat. 409 (1840) ("A Resolution to authorize the President to dispose of certain presents from the Imaum of Muscat and the Emperor of Morocco.").[1]  But, as Amici themselves recognize, such an enactment would need to comply with bicameralism and presentment, and the process would be no less stringent than with any other legislation.  *See* ECF No. 44 at 18.  There is no "inversion" of the legislative process and certainly none that would give individual Members a personal stake in the dispute with the Executive.

More fundamentally, a Member's opportunity to vote on a bill to grant or deny congressional consent to receipt of a present or emolument is no more personal to the Member than that in *Raines*, *Campbell*, or *Chenoweth*.  In each case, the claimed injury is based on the Members' constitutional prerogative to vote, whether under the Foreign Emoluments Clause as in this case, the War Powers Clause as in *Campbell*, or other enumerated Article I powers as in *Raines* and *Chenoweth*.  In each case, individual Members of Congress challenged Executive action that allegedly deprived them of that constitutional prerogative, and in each case, the individual Members' alleged injury "necessarily damage[d] all Members of Congress and both Houses of Congress equally."  *Raines*, 521 U.S. at 821, 829; *see also Kucinich v. Bush*, 236 F. Supp. 2d 1, 11 (D.D.C. 2002) (in suit by 32 Members of Congress challenging the President's termination of treaty without congressional consent, holding that the Members' alleged injury was not personal to them and was "no different from the institutional injuries alleged in

---

[1] *See also* U.S. Senate: Legislation, Laws, and Acts, https://www.senate.gov/legislative/common/briefing/leg_laws_acts.htm; Congressional Research Service, *Procedural Analysis of Private Laws Enacted: 1986–2013* (Apr. 9, 2013), *available at* https://fas.org/sgp/crs/misc/RS22450.pdf.

*Chenoweth*, *Campbell*, and *Raines*").  Accordingly, when an official fails to first seek congressional consent before accepting emoluments prohibited by the Foreign Emoluments Clause, it only means that the official has violated the Clause, not that each Member of Congress automatically acquires a judicially cognizable personal stake to challenge the violation.  The violation does not by itself deny any Member the opportunity to vote.  For the same reason, curing the violation would not by itself redress the alleged injury.  Yet Amici consistently conflate the merits question with the Members' standing throughout their brief.  *See, e.g.*, ECF No. 44 at 20–21, 24.

Amici apparently believe that Members of Congress necessarily have standing if they are injured in their official capacities.  According to Amici, the *Raines* Members were held to have no standing because the injury was to "Congress itself rather than the Members in their official capacities."  ECF No. 44 at 6.  Nothing could be further from the truth.  In fact, the fundamental standing problem the Court identified in *Raines* was that the Members' injury had been suffered in their official capacities—just like the injury Plaintiffs allege here.  Specifically, the *Raines* Court tied the Members' lack of standing to the fact that they claimed a loss of political power not in a "private capacity" but "solely because they are Members of Congress."  521 U.S. at 821.  "If one of the Members were to retire tomorrow," the Court explained, "he would no longer have a claim; the claim would be possessed by his successor instead."  *Id*.  The Court then distinguished those Members' claim from a "loss of [a] private right, which would make the injury more concrete," such as if the Members were "singled out for specially unfavorable treatment as opposed to other Members of their respective bodies" or were "deprived of something to which they *personally* are entitled," like "their seats as Members of Congress after their constituents had elected *them*."  *Id.*

Amici insist that simply because an injury to an individual Member's voting opportunity is shared by others does not mean that the Member has no personal stake in redressing such injury.  *See* ECF No. 44 at 12–13.  But no one disputes that some legally cognizable injuries in fact are shared by others.  Accordingly, the cases Amici cite to support their point are neither

here nor there.  In *FEC v. Atkins*, 524 U.S. 11 (1993), for example, a group of individuals

brought suit to challenge the Federal Election Commission's dismissal of their administrative

complaint requesting that a particular organization be treated as a "political committee" subject

to the disclosure requirements of the Federal Elections Campaign Act ("FECA").  The Supreme

Court found that the plaintiffs had standing because the FECA permitted suit by "a party

aggrieved by an order of the Commission dismissing a complaint filed by such party"; because

"[t]he injury of which [these plaintiffs] complain—their failure to obtain relevant information—

[was] injury of a kind that FECA seeks to address"; and because the plaintiffs had suffered an

injury in fact, which was "their inability to obtain information" that, on their view of the law, the

statute requires the organization make public.  *Atkins*, 524 U.S. at 19–21.  The Court noted in

particular that it "ha[d] previously held that a plaintiff suffers an 'injury in fact' when the

plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."  *Id.*

at 21 (citing cases).  *Atkins*, thus, sheds little light on the instant case.  Not only is it a statutory

case, where "Congress has the power to define injuries and articulate chains of causation that

will give rise to a case or controversy where none existed before," *Spokeo, Inc. v. Robins*, 136 S.

Ct. 1540, 1549 (2016), but as the Court noted, the claimed injury was one traditionally

recognized to be judicially cognizable, *see Atkins*, 524 U.S. at 21.  Similarly, the two additional

cases Amici cite—*Avacus Partners, L.P. v. Brian*, No. 11011, 1990 Del. Ch. LEXIS 178, *21–22

(Ch. Oct. 24, 1990), and *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035–37

(Del. 2004)—concern corporate shareholders' claims under state law and are far afield from the

standing inquiry at hand.

Amici argue that under *Coleman v. Miller*, 307 U.S. 433 (1939), "a bloc of individual[]

[legislators] acting in their official capacities" could have standing to sue.  ECF No. 44 at 7.  In

*Coleman*, a group of *state* legislators' votes—which "would have been sufficient to defeat" the

state's ratification of a federal constitutional amendment—were nullified by the state Lieutenant

Governor's tie-breaking vote.  *Coleman*, 307 U.S. at 437.  As the President explained in his

briefs, however, the instant case is a far cry from *Coleman* because, among other things,

Plaintiffs constitute only a minority in each House; to find standing here would raise separation-of-powers concerns not present in *Coleman*; and Congress may still vote on emoluments issues or enact other legislative measures to address the President's alleged acceptance of prohibited emoluments.  *See* MTD at 11–12; Reply in Supp. of Mot. to Dismiss, ECF No. 28 ("Reply"), at 5–7.[2]  Indeed, the vote nullification in *Coleman* was irreversible because of the nature of a decision to ratify a Federal constitutional amendment.  But here, Congress retains "ample legislative power" to work its will and the Members' claimed injury is "fully susceptible to political resolution," which necessarily precludes the Members' assertion of standing under D.C. Circuit precedent.  *Campbell*, 203 F.3d at 21, 23.  Amici are thus incorrect to suggest that all is lost once the President allegedly has accepted prohibited emoluments without congressional consent.  *See* ECF No. 44 at 24.  In fact, Congress may still choose to act, using all the tools it possesses.  And as the President has already explained, the reasoning of *Raines*, *Chenoweth*, and *Campbell* also refutes the proposition that in order to have legal significance, political remedies must put the Members back in the same position they would have been in if the Executive had not caused the alleged injury in the first place.  *See* Reply at 10–11.

In sum, Amici's additional arguments do nothing to salvage Plaintiffs' standing problem.

## II.    Amicus Brief of Legal Historians

One of the parties' central debates surrounds the meaning of the term "Emolument" as used in the Foreign Emoluments Clause—whether it means "profit arising from an office or employ," MTD at 20, as the President contends, or "anything of value and any benefits,

---

[2] It is therefore not surprising that since *Coleman* was decided in 1939, the Supreme Court has found legislative standing in only one other case, *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015), where a *state* legislature challenged a state initiative that removed congressional redistricting authority from the state legislature.  There, not only was the suit brought by the state legislature itself, but it also "d[id] not touch or concern the question whether Congress has standing to bring a suit against the President."  *Id.* at 2665 n.12.  By contrast, "a suit between Congress and the President would raise separation-of-powers concerns."  *Id.*  Moreover, the challenged initiative in *Arizona State Legislature* would have completely nullified any vote by the legislature then or in the future.  *Id.* at 2665.  Again, none of those conditions are present here.

monetary or nonmonetary," Am. Compl. ¶ 89, as Plaintiffs contend.  The parties do not dispute

that both definitions existed at the time of the Founding.  A group of professors (collectively

"legal historians") have filed an amicus brief in support of Plaintiffs' interpretation.  ECF No. 46.

Many of their arguments have already been addressed by the President's subsequently filed

Reply brief.  *See, e.g.*, Reply at 14–17 (responding to an article by one of the Amici analyzing

Founding-era dictionaries).  The President provides the following response to the three main

additional points raised by Amici.

First, Amici argue that the term "emolument" was not a "term of art in the eighteenth

century."  ECF No. 46 at 1, 4.  But the President has not argued that it was.  Nor does he dispute,

as Amici seem to believe, that the term is used in both legal and non-legal contexts.  *See id.*  The

President merely offered evidence establishing why, in context, his interpretation of the term is

the better one as between the two definitions that undisputedly existed at the time of the

Founding.  Notably, Amici appear to have misunderstood the President's argument when they

argue that there is no basis to limit "Emolument" in the Clause to cover only compensation for

"official services."  *Id.* at 14–15 & n.44.  But the President's interpretation is not so limited; it

also encompasses benefits derived in a purely private capacity in exchange for services rendered

in an employment (or equivalent) relationship with a foreign government.  *See* MTD at 20.

Second, Amici observe that influential scholars have used the term "emolument" to mean

profits from private market and other transactions.  Amici count 16 such uses by William

Blackstone in the *Commentaries on the Laws of England*; two in the English translation of

German scholar Samuel Pufendorf's *On the Law of Nature and of Nations*; and also two by the

Scottish economist Adam Smith in *The Wealth of Nations*.  ECF No. 46 at 4–7.  This sort of bean

counting, however, does little to aid the interpretive task at hand beyond confirming—as the

President has conceded—that Plaintiffs' preferred definition of "emolument" existed at the time

of the Constitutional Convention.  The same is true with respect to Amici's litany of citations to

Founding Era debates and the writings of early American leaders.  *Id.* at 16–23.  Of course,

Amici must concede that the President's proposed definition was well-recognized during the

constitutional ratification debates of 1787–88.  *See id.* at 18 ("As one might expect in constitutional debates, the *salary* and *fees* one might earn from holding government office were among *the most obvious uses of the word*.") (emphasis added); *see also id.* at 19 (citing 11 *Documentary History of the Ratification of the Constitution* 284 (Merrill Jensen *et al.* eds., 1976–present)) (discussing members of Parliament as entering that institution with an "idea of emoluments" arising from their position: "[t]hey expect something besides wages," such as "getting offices").  This should come as no surprise; as the President has explained, his proposed definition is rooted in the very etymology of the word emolument, relating to profit arising from labor.  *See* Reply at 16–17.  Thus, Amici have little to add beyond what was already clear: the Court's interpretive task is to determine which of the two definitions that were in use at the Founding applies in the context of a constitutional restriction on federal officeholders.  The President's briefs showed that Plaintiffs' and amici's "anything of value" interpretation of the term "Emolument" is both overbroad and unsupported by the historical record, and that the President's interpretation best takes account of the text, the constitutional structure, the Clause's purpose, the common historical usage of the term "emolument" in the context of federal employment, and the practice of officials from the Founding of the Nation.  *See* MTD at 18–32; Reply at 14–23.

Amici cite a recent quantitative study for the proposition that at the time of the Founding, the public used the word "emolument" in a broader sense "more often than not."  ECF No. 46 at 21–22 & n.64 (citing James Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English, 1760-1799*, 59 So. Texas L. Rev. __ (Forthcoming 2018), https://ssrn.com/abstract=3036938, at 35).  As explained in the President's Reply, however, this very study also found that where "the recipient of the emolument is an officer, regardless of the corpus [of documents analyzed], the narrower sense of *emolument* is the one overwhelmingly used."  Reply at 15 n.5 (citing Phillips & White,

*The Meaning of the Three Emoluments Clauses in the U.S. Constitution*, *supra*, at 39).[3]  This

more precise analysis sheds light on the Constitution's use of "Emolument" in the context of

federal officeholders and confirms that the President's interpretation is correct.

 Third, Amici discuss the historical backdrop of the Foreign Emoluments Clause and the

Clause's predecessor provisions to show that the Clause arose from concerns over foreign

influence and political corruption.  *See* ECF No. 46 at 7–14.  But there is no dispute about the

purpose of the Clause.  The question is whether that purpose, by itself, provides sufficient basis

to conclude that Plaintiffs' proposed definition of "Emolument" governs.  It does not.  As the

President explained in his Reply (at 20–21), his proposed interpretation serves the anti-

corruption, anti-foreign influence purpose as well.  Indeed, the President's interpretation would

address George Mason's concern about government officials being on a foreign government's

payroll.  *See* ECF No. 46 at 16 (Mason: "It is not many years ago, since the revolution, that a

foreign power offered emoluments to persons holding offices under our Governments") (quoting

10 *Documentary History of the Ratification of the Constitution* 1365–66 (Merrill Jensen *et al.*

eds., 1976-present)).

 In any event, "no law pursues its purpose at all costs, and . . . the textual limitations upon

a law's scope are no less a part of its 'purpose' than its substantive authorizations."  *Kucana v.*

*Holder*, 558 U.S. 233, 252 (2010).  As the President has demonstrated, while the Framers

weighed concerns that public officials would be influenced by pecuniary inducements, it was

common at the time for federal officials to have private business pursuits, and the Framers said

nothing about requiring officials to divest their private commercial interests in order to assume

federal office.  *See* MTD at 27–28.

 Amici dispute the President's characterization that the history of the Clause's adoption is

devoid of any concern about an official's private commercial businesses.  They point to

American Revolution-era merchants like Robert Morris, who they contend profited from his role

---

[3] The President's Reply inadvertently misidentified this article's title and the relevant page
number.

procuring military supplies for the war effort while also serving as Superintendent of Finance, "blend[ing] [his] public and private ventures." ECF No. 46 at 12–13. Amici, however, provide no historical evidence indicating that Morris's dealings motivated the Foreign Emoluments Clause. Instead, the relevant portions of the constitutional convention, of the ratification debates, and of the writings of Thomas Jefferson suggest that the Clause's inclusion in the Constitution was largely motivated by concerns about diplomatic gifts. *See* MTD at 25–27.

In any event, Morris's conduct gives rise to concerns about self-dealing in the performance of one's official duties. Morris was the chair of a congressional committee with procurement responsibility, and as the "virtual manager," he had the committee "lay out a large share of its fund in contracts with [himself] and his associates." *See* E. James Ferguson, *The Power of the Purse: A History of American Public Finance, 1776-1790*, at 76–77 (1961). This episode hardly suggests that the Framers were concerned about federal officials having private businesses that have nothing to do with their official duties.

Amici also point to "emoluments restrictions" in the 1784 and 1788 Consular Conventions with France and in the 1789 Act to Establish the Treasury Department to support their assertion that the Foreign Emoluments Clause was motivated by concerns about officials' private business pursuits. ECF No. 46 at 13. But those provisions are fully consistent with—indeed, they support—the President's office- and service-related interpretation of "Emolument." The 1789 Act to Establish the Treasury Department prohibited employees from, *inter alia*, taking "any emolument or gain *for negotiating or transacting* any business" in the Treasury Department "other than what shall be allowed by law" and set criminal and civil penalties for violating the prohibition. 1 Stat. 65, at 67, § 8 (1789-1799) (emphasis added). The Act's use of "emolument" thus relates to a restriction on additional benefits for government service. Similarly, the consular conventions with France used "emolument" in the context of limiting the authority of consular

agents to exact any "duty or emolument" from merchants, navigators, and vessels.[4]  These

provisions thus restrict the forms of compensation that consular agents may obtain from their

service, in keeping with the sort of restriction contemplated by the Foreign Emoluments Clause.

*See* MTD at 19–20 (Founding-era federal officials were not generally paid salaries but instead

were compensated through fees for services rendered, commissions, and other privileges and

benefits).

Finally, Amici disagree with the President's argument that the history of the 1810

proposed constitutional amendment supports his interpretation of the Clause.  The proposed

amendment would have extended the prohibitions of the Foreign Emoluments Clause to all

private citizens.  *See* Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2

Stat. 613 (1810).  Under the proposed amendment, the penalty for a violation was the loss of

citizenship, among other things.  *Id.*  The President has argued that it is inconceivable that an

overwhelming majority of Congress and nearly three-fourths of the States intended to strip the

citizenship of, for example, those hotel owners whose customers included visiting foreign

diplomats using government funds.  MTD at 32.  Amici argue that because embargos and

restrictions on foreign commerce were commonplace at that time, it was indeed conceivable that

Congress would strip tradespeople of citizenship for engaging in any kind of commerce with any

foreign instrumentality or official.  ECF No. 46 at 23–24.  But even Amici recognize that the

temporary embargos and restrictions on foreign commerce existed in an "era of European

conflict and war."  *Id.* at 24.  They were either of extremely limited duration, *see, e.g.*, 1 Stat.

400–01 (1794) (imposing a 30-day embargo), or were put in place in response to the aggression

---

[4] *See* "Consular Convention between His Most Christian Majesty and the Thirteen United States
of North America," in 4 *The Diplomatic Correspondence of the American Revolution* 198–208,
199–200 (1829) (Jared Sparks, ed. 1829) (1784 Consular Convention); "Convention Defining
and Establishing the Functions and Privileges of Consuls and Vice Consuls between the United
States and France," *in* 1 *The American Diplomatic Code, Embracing a Collection of Treaties and
Conventions between the United States and Foreign Powers* 72 (Jonathan Elliot, ed. 1834) (1788
Consular Convention).

of one foreign power;[5] to the Napoleonic Wars from which the United States sought to remain

neutral,[6] or to the War of 1812, during which Congress was concerned about U.S. citizens aiding

or having commercial intercourse with the enemy.[7]  As the President previously recognized, it

was possible that the 1810 proposed amendment was a manifestation of anti-foreign sentiments

of the time, *see* MTD at 31–32—a point Amici also emphasize, ECF No. 46 at 23–24.  But it

would radically over-read the strength of that anti-foreign sentiment to suggest that Congress

would permanently strip the citizenship of anyone engaging in any kind of commerce with any

foreign government or its representatives.  Yet, Plaintiffs' interpretation of the word

"emolument" would compel such an implausible result.

### III.    Amicus Brief of Former Members of Congress

In the brief filed by a group of former Members of Congress, Amici echo Plaintiffs'

broad reading of the Foreign Emoluments Clause; stress the importance of obtaining

congressional consent prior to any receipt of prohibited presents and emoluments; and ask the

Court to "perform its constitutional duty" of "enforcing the Foreign Emoluments Clause's clear

command."  ECF No. 41 at 15.  Amici raise nothing new regarding the proper interpretation of

the Clause.[8]  Nor is their discussion of the Clause's application to gifts and decorations from

---

[5] *See* 1 Stat. 565 (1798) (suspending commerce with France in response to French "aggression, depredations, and hostilities" against "the vessels and the property of the citizens of the United States" and the "laws of nations"), as amended by 1 Stat. 611 (1798) and 1 Stat. 613 (1799).

[6] *See* 2 Stat. 379 (1806); 2 Stat. 451 (1807); 2 Stat. 473 (1808); Stat. 506 (1809); 2 Stat. 528 (1809); 2 Stat. 605 (1810).

[7] *See* Stat. 700 (1812); 3 Stat. 88 (1813); *see also* 3 Stat. 123 (1814) (repealing embargo but clarifying that it should not be considered a permit to "import goods, wares or merchandise . . . or belonging at the time of such importation, to the enemy or enemies of the United States"); 3 Stat. 195 (1815).

[8] In discussing the Framers' intent behind the Clause, Amici quote extensively from the floor statements of Representatives from the Fifth Congress.  ECF No. 41 at 7–11.  Like Plaintiffs, Amici's repeated citations to 5 Annals of Cong. 1583, *et seq.* (1789) are erroneous.  The correct citation should be to the eighth volume of the Annals of Congress.  The House debate contained therein concerned whether to grant Thomas Pinckney's request to keep gifts from the courts of Madrid and London on the termination of his mission to those places.  8 Annals of Cong. 1582–

foreign governments, *see id.* at 11–14, in tension with the President's discussion of the same, *see* MTD at 32–34.  But Amici do attempt to draw the improper inference that if small gifts from foreign governments are prohibited by the Foreign Emoluments Clause, then all other benefits received by a covered official from a foreign government regardless of context must also be prohibited.  *See, e.g.*, ECF No. 41 at 13–15.[9]  That inference is incorrect.  As the President has explained, the Clause treats an "Emolument" as something distinct from a "present"; the former ties the benefit to the work or service of the person receiving the benefit, whereas the latter is a gratuitous gift without price or exchange.  *See* MTD at 24.  That reading is consistent with the cardinal principle that in interpreting the Constitution, every word must be given its due force and any interpretation should not result in surplusage.  *See id.*

Throughout their brief, Amici attribute to the President an argument he did not make— *i.e.*, that under the Foreign Emoluments Clause a covered official could first accept prohibited presents or emoluments and then wait to see if "Congress affirmatively [o]bjects."  ECF No. 41 at 6; *see also id.* at 3, 16.  Amici evidently have conflated the President's response to Plaintiffs' assertion of standing with his interpretation of the Clause's consent requirement.  As discussed above, Plaintiffs have argued that they are injured by their inability to vote on measures relating to the President's supposed acceptance of prohibited presents and emoluments because of the

---

93 (1789).  As the President previously noted, the House ultimately declined, despite the Senate's consent.  *See* MTD at 32–33, n.44.

[9] Amici cite an opinion of the Office of Legal Counsel concerning wedding gifts from foreign governments and their representatives to President Richard Nixon's daughters, presumably to suggest that even gifts to an officeholder's family members are subject to the Foreign Emoluments Clause.  *See* ECF No. 41 at 14 (citing Letter for Allie B. Latimer, General Counsel, General Services Administration, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel 5–6 (Feb. 8, 1978), https://justice.gov/olc/page/file/936081/download).  The precise issue in that opinion, however, was the applicability of the Foreign Gifts and Decorations Act ("FGDA"), 5 U.S.C. § 7342, which is broader in certain respects than the Foreign Emoluments Clause.  Whereas the Clause by its terms only applies to a holder of an "Office of Profit and Trust," U.S. Const. art. I, § 9, cl. 8, the FGDA regulates the receipt of foreign government gifts and decorations by defined government employees and their spouses and dependents.  5 U.S.C. § 7342(a)(1)(G).

President's failure to first seek the consent of Congress.  In response, the President explained that under Supreme Court and D.C. Circuit precedent on legislative standing, the cause of Plaintiffs' claimed injury is the action (or inaction) of their own colleagues in Congress.  *See* MTD at 9; Reply at 9–10.  Plaintiffs can redress their alleged lack of opportunity to vote by convincing their colleagues to act; not only is Congress free to hold a vote on emoluments issues, *see* Reply at 11 (noting that Congress could vote on a joint resolution that provides what Congress perceives to be the proper definition of an emolument and prohibits any and all emoluments, including ones unknown to Congress), but Congress also has ample tools to perform its legislative functions, *see* MTD at 9.  In making these standing-related arguments, the President is by no means suggesting that he could accept a prohibited present or emolument without first obtaining congressional consent.[10]  It is common ground that the Clause requires a covered official to seek consent before knowingly accepting a benefit prohibited by the Clause.  Rather, the President's position is that, properly construed, the Foreign Emoluments Clause does not require him to seek the consent of Congress because he has not accepted, and is not accepting, any prohibited emoluments or presents through his business interests.

Finally, Amici characterize the courts' role as one of "guard[ing] the outermost boundaries of the Foreign Emoluments Clause" and helping to "facilitate Congress's ability to perform its duty by ensuring the President does not accept emoluments without first disclosing and obtaining consent."  ECF No. 41 at 16.  Neither the Constitution nor the Foreign Emoluments Clause itself ascribes such a role to the courts.  In fact, as the President explained in his opening brief, the Framers envisioned only political means for redressing a President's violation of the Clause.  *See* MTD at 17.  Moreover, given the President's unique status in our constitutional scheme, if the requested relief is not barred by separation of powers principles, the

---

[10] The President notes that throughout history, covered officials sometimes had first accepted foreign gifts so as to avoid causing offense and then either sought congressional consent afterwards or deposited such gifts with the State Department.  *See* MTD at 31.

court must at a minimum exercise utmost restraint in issuing any relief against a sitting President. *Id.* at 17, 41–42; Reply at 24–25.

### IV.    Amicus Brief of Former National Security Officials

A group of former national security, foreign policy, and intelligence officials also filed a brief in support of Plaintiffs.  ECF No. 43 at 3.  They argue that the President's interpretation of the Foreign Emoluments Clause is overly narrow and, as a result, would give him license to engage in transactions that would be harmful to the national security and foreign policy interests of the United States.  *Id.*  Where Amici restate Plaintiffs' arguments about the proper scope and purpose of the Clause, *see id.* at 6–7, the President will not repeat his response to those arguments and instead refers the Court to his prior briefing, *see* MTD at 18–41; Reply at 14–23.

Amici seek to rely on a number of ethics and national security-related statutes and regulations that they contend address the same kinds of corruption and foreign influence concerns motivating the Clause.  ECF No. 43 at 9–10.  For example, they cite portions of the U.S. code criminalizing conflicts of interest and bribery.  *Id.* at 10 n.13 (citing 18 U.S.C. §§ 201, 203, 208, 210, 211).  Amici contend that because the President is not subject to some of these statutes, the Court should reject his interpretation of the Clause; otherwise, there would be a "legal vacuum" as to the transactions Amici believe are problematic.  *Id.* at 11.  Amici's argument, however, provides no basis to read the Clause more expansively than compelled by standard principles of constitutional interpretation.  The Foreign Emoluments Clause is not an all-purpose conflict-of-interest provision.  On the contrary, the fact that other laws may have broad scopes says nothing about whether the Clause must also be construed to provide the same. Indeed, if anything, those laws' very enactment indicates that the underlying policy concerns were not sufficiently addressed by prior laws or constitutional provisions.

Amici also argue that by requiring an official to notify and seek approval from Congress before accepting "something of value" from a foreign government, the Foreign Emoluments Clause sets forth a "process" that strikes a balance.  *Id.* at 2, 8.  Under that balance, transactions are not banned outright; instead, congressional consent is mandated.  Amici point to various

statutes and regulations requiring disclosure of information about interests or transactions that may give rise to a conflict of interest or a national security concern. *Id.* at 9. In each of these statutes, disclosure—rather than prohibition—is the means of resolving these potential problems. For example, Amici cite the process overseen by the Department of the Treasury regarding foreign investments in the United States, under which "companies contemplating mergers with or sales to foreign corporations in circumstances that could give rise to national security concerns must receive clearance from an inter-agency process" before carrying out their transaction. *Id.* at 10 n.18. But there is no connection between these disclosure-based legal schemes and the Foreign Emoluments Clause. The Clause's plain text negates the proposition that the Clause sets forth a mandatory disclosure regime whereby officials are obligated to provide information about any and all foreign-related financial interests for congressional review. *Cf.* 5 U.S.C. app. § 101(a), (d) (providing that specified officers and employees "shall file a report"). The fact that Congress saw fit to enact various disclosure regimes lends no support to the proposition that the Foreign Emoluments Clause contains one as well.

Finally, Amici make policy arguments that appear primarily directed to explaining why the Clause exists in the first place or to advocating for the creation of new legal restrictions not imposed by the Clause. ECF No. 43 at 12–15. Again, those policy arguments provide no basis to expand or alter the text of the Clause itself, which is not intended to cover every conceivable type of activity that may raise an appearance of impropriety. Instead, the Clause specifically identifies four categories of benefits that officeholders may not accept without congressional consent. *See* Reply at 21. And as Amici acknowledge, Congress remains free to enact new laws that address the sort of policy concerns Amici identify. *See* ECF No. 43 at 9–11.

## V.    Amicus Brief of Ethics Officials

A group of former federal government ethics officials have submitted a brief arguing that the Court should adopt the reasoning of prior opinions of the Department of Justice's Office of Legal Counsel ("OLC") and the Comptroller General. *See generally* ECF No. 42. But as fully demonstrated in the President's motion, the President's position is not inconsistent with the

conclusions of any published OLC or Comptroller General opinions.  MTD at 34–35.  In every

published OLC or Comptroller General opinion in which proposed conduct was determined to

involve prohibited emoluments, the determination involved an employment relationship (or a

relationship akin to an employment relationship) with a foreign government.  *See id.*  That is,

while those opinions do not specifically require an employment-like relationship in assessing the

meaning of "Emolument," the facts underlying each opinion already involved such a

relationship.  Reply at 18 n.14.

One of the OLC opinions Amici cite—*Applicability of Emoluments Clause to Proposed

Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89

(1987)—illustrates this point.  That opinion addressed the question of whether a National

Archives employee could in his "private capacity" serve on an international commission

established and funded by the Austrian Government—that is, whether the federal official could

be compensated for providing *personal service* to a foreign government.  *Id.* at 90.  OLC

concluded that he could not.  *Id.* at 91.  That is consistent with the President's interpretation of

the Clause, under which an officeholder is prohibited from accepting foreign government

benefits arising from services rendered not only in his official capacity but also in a personal

capacity that is akin to an employee of the foreign government.  *See* MTD at 20.

Amici also cite *Applicability of the Emoluments Clause to Non-Government Members of

ACUS*, 17 Op. O.L.C. 114, 119 (1993), where OLC determined that members of the

Administrative Conference of the United States ("ACUS") could not receive a distribution from

their law partnerships that included revenues from foreign governments.  Amici contend that this

opinion shows that no personal contact or relationship with a foreign government is required for

a benefit to be a prohibited emolument.  ECF No. 42 at 15–16.  But that opinion concerned

services provided by an ACUS member's law partners, and situations involving law partners and

their profit sharing are unique and distinct from the financial interests at issue in this case.  As

the President has explained, "a firm of lawyers is essentially one lawyer for purposes of the rules

governing loyalty to the client" and "each lawyer is vicariously bound by the obligation of

loyalty owed by each lawyer with whom the lawyer is associated."  MTD at 36 n.47 (citing Model Rules of Prof'l Conduct r. 1.10 cmt. (Am. Bar Ass'n 1983); Restatement (Third) of the Law Governing Lawyers § 123, cmt. B)).  Given that the officeholder is bound by the same duty of loyalty to the client as his law partners, OLC's conclusion that he may not share his partners' profits from a foreign government is not inconsistent with the President's interpretation of the Foreign Emoluments Clause.  On the President's interpretation, the legal ethics rules (rather than the structure of the law firm as a partnership) provide the key factor justifying application of the Clause to these law partners.  And the President agrees with Amici that payments made through a corporate structure can constitute prohibited emoluments if they are made pursuant to services rendered in an employment-like relationship.

Amici further argue that the Comptroller General's and OLC's opinions concerning the permissibility of President Ronald Reagan accepting state retirement benefits implicitly reject the President's position.  ECF No. 42 at 16.  But, in addition to noting that the retirement benefits were previously earned and vested, OLC also stressed in its opinion that these were benefits "for which [the President] no longer ha[d] to perform any services."  *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 O.L.C. Op. 187, 190 (1981).  The Comptroller General similarly observed that "acceptance of pension benefits requires no obligation to the State for future services."  *The Honorable George J. Mitchell U.S. Senate*, B-207467, 1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983).  Thus, these opinions do not undercut the President's interpretation of the Foreign Emoluments Clause.

Amici also contend that the President has overstated the consequences of Plaintiffs' interpretation.  According to Amici, the Government has not previously advocated a "one-size-fits-all" approach to the Clause and the President is thus wrong to infer the potentially absurd consequences of Plaintiffs' interpretation from a blanket approach. ECF No. 42 at 4, 9.  But on the issue of blanket prohibition, the President and Plaintiffs are in agreement that the Clause is precise in prohibiting four categories of benefits from foreign governments unless congressional consent is obtained—the parties simply disagree about the scope of at least two of those

18

categories.  And even according to the authorities cited by Amici, the Government has indeed recognized the Clause's categorical prohibition.  *See* ECF No. 42 at 7 (noting that OLC "has found a violation even when the risk of corruption was very low" where the potential relationship at issue would fit the definition of an "office" under the Clause).  The relevant point is that Plaintiffs have offered no persuasive rebuttal to the absurd consequences that would flow from Plaintiffs' interpretation of the Clause, *see* Reply at 22–23, which is a strong indication that the Court should not construe the Clause in the manner advocated by Plaintiffs.

Finally, Amici argue that compliance with the Foreign Emoluments Clause is "not especially difficult" and that the remedies for violations of the Clause are not "draconian" because congressional consent can always resolve any hard cases.  ECF No. 42 at 9–12.  These arguments, however, do not help in determining what the Clause prohibits.  The question of remedy or of congressional consent is only reached if the President has accepted a present or emolument within the meaning of the Clause.

### VI.      Amicus Brief of Separation of Powers Scholars

In his motion to dismiss, the President has argued, among other things, that Plaintiffs have no cause of action to seek the requested relief and that the requested relief, in any event, is barred by separation-of-powers principles.  MTD at 14–17, 41–43.  A group of professors have submitted an amicus brief arguing that separation-of-powers principles do not preclude adjudication of this case and that there are important policy reasons for the Court to intervene in this case.  ECF No. 45.

The first portion of Amici's brief is directed to an argument not raised by the President— that interpretation of the Foreign Emoluments Clause raises a non-justiciable political question.  *Id.* at 3–8.  Rather than invoking the political questions doctrine, the President's position is that Plaintiffs do not have a cause of action under the Foreign Emoluments Clause and that this is not a proper case for the Court to imply an equitable cause of action because, among many other reasons, Congress is far better equipped than the courts to address whether particular arrangements violate the Clause.  MTD at 14–17.  Amici begin with the indisputable proposition

that courts play an essential role in interpreting the Constitution.  True enough.  But that does not suggest that courts may issue opinions in the absence of a legal or equitable cause of action upon which their decision could be based.  *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (a plaintiff who has no cause of action may not "invoke the power of the court").  Moreover, Amici's suggestion that only judicial review requires the President to hew to our system of checks and balances reflects a fundamental misconception of the federal courts' jurisdiction and of our system of government.  Here, as the President has already explained, Congress continues to possess effective tools that would serve as checks on the Executive.  *See* Reply at 11.

Amici next challenge the President's argument that *Mississippi v. Johnson*, 71 U.S. 475 (1867), and its progeny, bars the relief sought in this case.  MTD at 41–43.  As putative counter-examples, Amici cite two cases involving purely ministerial duties, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 606 (D.C. Cir. 1974), and *Minn. Chippewa Tribe v. Carlucci*, 358 F. Supp. 973, 975–76 (D.D.C. 1973).  *See* ECF No. 45 at 10–11.  But, as the President has already shown, this lawsuit does not involve ministerial duties, *see* Reply at 24–25, and thus, the cited cases are inapposite.  In any event, even if ministerial duties were at issue, this Court should still exercise utmost restraint in deciding whether to enjoin a sitting President, as the D.C. Circuit warned in *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).  *See* Reply at 24–25; *see also Lovitky v. Trump*, ---F. Supp. 3d---, No. 17-cv-450 (CKK), 2018 WL 1730278, at *6 (D.D.C. April 10, 2018) (stating that, in light of *Swan* and *Franklin v. Massachusetts*, 505 U.S. 788 (1992), "the Court would hesitate to issue mandamus even if [the President's] duty . . . were ministerial").

Amici also argue that *Johnson*'s rule is sapped of its vitality in situations where there is no subordinate official who could be enjoined from carrying out the President's directive.  ECF No. 45 at 9–11.  Plaintiffs cite no authority for this proposition beyond the fact that most cases in which the President was a defendant also involved other government official defendants against whom relief could be directed—a circumstance not present in this case.  That the instant case is unusual does not provide a basis to permit otherwise unconstitutional relief against a sitting

20

President.  *See Franklin*, 505 U.S. at 829 (Scalia, J., concurring) ("[The Court] cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush, and since [the Court] ha[s] no power to do that," the "appellees' constitutional claim should be dismissed.").

Finally, Amici argue that relief is warranted here because of the policies underlying the Clause and because of the need for a remedy for the alleged violations.  ECF No. 45 at 12–21. But the Foreign Emoluments Clause is not a comprehensive conflict of interest provision covering every conceivable type of activity that may raise an appearance of impropriety.  *See* Reply at 20–21.  Moreover, as the Supreme Court has often said, "[t]he district courts of the United States . . . are 'courts of limited jurisdiction.'"  *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005).  Whether for policy or any other reason, this Court may not address a constitutional question where it has no jurisdiction to do so.  As for remedy, the President has previously noted that Congress can, for example, take action on matters not directly related to emoluments issues as part of its give-and-take with the President.  *See* Reply at 11.  Amici thus raise no persuasive basis to overcome the jurisdictional, prudential, and merits-related deficiencies in Plaintiffs' case.

## VII.    Amicus Brief of Scholar Seth Barrett Tillman and the Judicial Education Project

Amici Seth Tillman, a member in the Law Department of Maynooth University in Ireland, and the Judicial Education Project, a public interest organization, have submitted a brief arguing that the President does not hold an "Office . . .  under [the United States]" for purposes of all constitutional provisions containing that term, including the Foreign Emoluments Clause. ECF No. 40 at 1.  For purposes of his motion to dismiss, the President has assumed that he is subject to the Foreign Emoluments Clause on the assumption that he holds an "Office of Profit or Trust" within the meaning of the Clause.  U.S. Const. art. I, § 9, cl. 8.  Although no court has addressed this question, the Office of Legal Counsel has observed without discussion that "the President surely hold[s] an 'Office of Profit or Trust' under [the United States]," *Applicability of*

*the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 2009 WL 6365082, *4 (Dec. 7, 2009), and treated the President as subject to the Clause, *see, e.g.*, *Proposal That The President Accept Honorary Irish Citizenship* (May 10, 1963).[11]  Because the Court has ample grounds to dismiss the Amended Complaint, the President respectfully submits that this Court need not address this constitutional question.

The novel question whether the Foreign Emoluments Clause applies to the President should be left for another day.  Amici's central argument is that because the President holds an elected office, rather than an appointed office, he does not hold an "Office . . . under [the United States]" within the meaning of the constitutional provisions containing that term.  They contend that because a different term—"officer[s] of the United States"—includes only appointed Executive Branch officials and does not include the President, the President does not hold an Office under the United States.  Under Amici's interpretation, a President could, for example, simultaneously be a Member of Congress.  *See* U.S. Const. art. I, § 6, cl. 2 ("no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office"); *see, e.g.*, Seth Barrett Tillman, Opening Statement, *Why President-Elect Obama May Keep His Senate Seat After Assuming the Presidency*, 157 U. Pa. L. Rev. PENNumbra 134, 135–40 (2008).

In support of their argument, Amici assert that the term "Office . . . under the United States" in the Constitution is based on the British drafting convention of "Office under the Crown," which apparently only refers to appointed positions in British law.  ECF 40 at 7–13.  The debates in the Constitutional Convention, however, shed no light on whether the Framers intended to follow the British drafting convention.  Nor was the subject of the Clause's applicability to the President explicitly discussed.  As Amici recognize (*see* ECF No. 40 at 15),

---

[11] *Available at* https://www.justice.gov/sites/default/files/olc/opinions/1963/05/31/op-olc-supp-v001-p0278_0.pdf.

the subject was only addressed in an exchange between Edmund Randolph and George Mason during the Virginia ratifying convention.[12]

The President makes the following observations about the historical evidence presented by Amici.  Amici point to the First Congress's enactment of a statute in 1790 forever barring a person convicted of bribing a federal judge from holding "any office of honor, trust, or profit under the United States."  ECF No. 40 at 12 (citing Act of Apr. 30, 1790, ch. 9, § 21, 1 Stat. 112, 117 (1790)).  According to Amici, the First Congress would not have enacted such a statute if it thought that elected officials hold "offices under the United States" because the First Congress presumably knew that only the Constitution could set the qualifications of elected offices and the Office of the President.  *See id.*  Indeed, *the Federalist* recognized that the qualifications of Members of Congress are "defined and fixed in the Constitution, and are unalterable by the legislature."  *The Federalist* No. 60 (Alexander Hamilton), at 409 (Jacob Cooke, ed., 1961).  The same necessarily would be true of qualifications for the President.  That is, the 1790 Act enacted by the First Congress would in fact run afoul of such restrictions if applied to Members of Congress or the President, if such officials hold "offices under the United States."

Amici also point to then-Secretary of the Treasury Alexander Hamilton's compilation of the "salaries, fees, and emoluments, for one year, ending the 1st of October, 1792, of persons holding civil offices or employment under the United States, (except the judges)."[13]  Amici assert that the President was not included on that list, citing to the National Archives' online version of Hamilton's cover letter to the Senate with a table of contents.  *See* ECF No. 40 at 14 n.51.  The editor of the National Archives' page noted that the actual list consists of 90 pages of

---

[12] *See* 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 483–86 (1891).

[13] *See* Report of the Salaries, Fees, and Emoluments of Persons Holding Civil Office under the United States (Feb. 26, 1793), *available at* https://founders.archives.gov/documents/Hamilton/01-14-02-0051.  Amici provides a different link, https://perma.cc/49RT-TTGF, to the identical webpage.

manuscript and that "for an abbreviated version of [the manuscript], see [American State Papers], Miscellaneous, I, 57–68."[14]  As Amici recognize, *see* ECF No. 40 at 15, the "abbreviated version" did include the President.[15]  Regardless of the weight to be placed on either version of the list, the important point to be drawn from the Hamilton list of "salaries, fees, and emoluments" is that it did not appear to include any official's financial gains arising from private business pursuits.  As Amici note, *see id.* at 14 n.49, that is consistent with the President's interpretation of an "emolument" as a profit derived from a discharge of duties in an office or employment.  *See* MTD at 19.

Amici also assert that early Presidents received gifts from foreign officials without seeking congressional consent.  Amici cite George Washington's receipt of a portrait of King Louis XVI from the French ambassador and the key to the Bastille from a French officer, the Marquis de Lafayette.  *See* ECF No. 40 at 18–20.  In the absence of any evidence of congressional consent, Washington's acceptance of these gifts may suggest that he did not believe he was subject to the Clause.  On the other hand, it is also possible that he accepted the gifts believing that he was doing so on behalf of the American people.  *See* MTD at 33 (noting that rather than always declining foreign gifts, U.S. officials sometimes accepted foreign presents on behalf of the United States so as not to cause offense); *see, e.g.*, S. Exec. Doc. No. 37-23, at 6–7 (1862) (Abraham Lincoln's letter to the King of Siam stating that "our laws forbid the President from receiving these rich presents as personal treasures" but that he would accept them on behalf of the American people).  As Amici indicate, both of these items "were prominently displayed in the federal capital," and the key was "showcased in Philadelphia when the seat of government moved there" in 1790, ECF No. 40 at 19.  Of course, the fact that the key to the

---

[14] *Id.*

[15] *See* Library of Congress, A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774–1875, American State Papers, Senate, 2nd Congress, 2nd Session, at 57–68, Miscellaneous, Vol. 1, *available at* https://memory.loc.gov/cgi-bin/ampage?collId=llsp&fileName=037/llsp037.db&recNum=64.

Bastille is now at Mount Vernon, *see id.*, could undermine the view that Washington accepted

the key on behalf of the American people.  But Washington also might have viewed the key as a

personal gift.  Lafayette was a former Washington aide during the American Revolutionary War

and had described the gift as "a tribute Which I owe as A Son to My Adoptive father, as an aid

de Camp to My General, [and] as a Missionary of liberty to its patriarch."[16]

Amici further assert that Thomas Jefferson accepted a bust of Czar Alexander I from the

Russian government.  ECF No. 40 at 20–21.  This is a curious episode because Jefferson was

aware of the Foreign Emoluments Clause's prohibition on the acceptance of foreign government

presents and had complied with it while President.  *See* H.R. Rep. No. 23-302, at 2 (stating that

Jefferson, while President, received horses as presents from a foreign government; he accepted

the horses so as not to cause offense but then sold them and deposited the money into the

Treasury).  On the other hand, in writing to thank the American Consul-General for transmitting

the bust, Jefferson did not mention the Foreign Emoluments Clause, noting instead that he had a

rule of accepting "no present beyond a book, a pamphlet, or other curiosity of minor value"

while in office, but would make an exception because of his particular esteem for the Czar.[17]

Finally, Amici cite the gift of a pair of pistols given to James Madison by General

Ignacio Alvarez of the then United Provinces of the Rio de la Plata.  ECF No. 40 at 21.  Amici

suggest that Madison kept the pistols and later gave them to James Monroe, indicating that

neither President thought they were subject to the Foreign Emoluments Clause.  *See id.*

President Madison, however, had written to the Chief Clerk of the Department of State stating

that "[t]he present of Pistol(s) may be deposited in the Dept. of State."[18]  One of the sources

---

[16] *See* Letter from the Marquis de Lafayette to George Washington (Mar. 17, 1790),
https://founders.archives.gov/documents/Washington/05-05-02-0159.

[17] Letter from Thomas Jefferson to Levett Harris,
https://founders.archives.gov/documents/Jefferson/99-01-02-3593.

[18] Letter from James Madison to John Graham (Aug. 11, 1816),
https://founders.archives.gov/documents/Madison/99-01-02-5374; *see also* Letter from Graham
to Madison (Aug. 8, 1816), https://founders.archives.gov/documents/Madison/99-01-02-5363;

Amici cite also indicates that there was no official record of the pistols being removed from the State Department and that it is unclear how James Monroe ended up with them.[19]  In any case, Monroe evidently was aware of the Clause's prohibition because the State Department had gifts Monroe received as President.  *See id*. at 3 (1834) (listing "[two] medals in cast iron, presented by the Society of Beneficence at Cracow to the President of the United States (Mr. Monroe) in 1820").  Apparently, in none of these instances did the Presidents express his views on the applicability of the Foreign Emoluments Clause to him.

## CONCLUSION

For the foregoing reasons and the reasons stated in his briefs in support of his motion to dismiss, the President respectfully requests that the Court dismiss this case for lack of subject matter jurisdiction or for failure to state a claim.

---

*see also* S. Exec. Doc. No. 23-49, at 2–3 (1834) (listing among the foreign gifts received by U.S. officials and deposited with the Department of State a pair of pistols in a mahogany case, although the original recipient was not identified).

[19] *See Pistols*, James Monroe 3D, at perma.cc/T796-ED5B (cited in ECF No. 40 at 21 n.88).

Dated:  April 30, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC  20530
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2018, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *Jean Lin*
JEAN LIN