**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> *Defendant.* | No. 1:17 Civ. 01154-EGS |

---

**MOTION FOR LEAVE OF *AMICI CURIAE* SCHOLAR SETH BARRETT TILLMAN AND THE JUDICIAL EDUCATION PROJECT TO BE HEARD AT ORAL ARGUMENT**

---

Robert W. Ray, Esq.
D.C. Bar No. 401377
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3347
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus
Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
D.C. Bar No. 982084
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae
Judicial Education Project*

Josh Blackman
    *Admission pending*
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae
Scholar Seth Barrett Tillman*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...........................................................................................................................1

ARGUMENT .................................................................................................................................1

    I.    This Court Has the Inherent Authority to Allow *Amici* to Be Heard at Oral
        Argument ...........................................................................................................................1

    I.    *Amici* Should Be Heard at Oral Argument Because the Parties Are Not Adverse
        about the Propriety of the Official-Capacity Claims ........................................................3

    II.    *Amici* Should Be Heard at Oral Argument Because the Parties Are Not Adverse
        about the Applicability of the Foreign Emoluments Clause to the President ..................5

CONCLUSION.............................................................................................................................18

## TABLE OF AUTHORITIES

### Cases

Altizer v. Deeds,
  191 F.3d 540 (4th Cir. 1999) ................................................................... 2
Ass'n of Indep. Sch. of Greater Washington v. D.C.,
  Civ. A. No. 16-1778 (JEB), 2018 WL 1972459 (D.D.C. Apr. 26, 2018) ............................... 2
Beckles v. United States,
  137 S. Ct. 886 (2017) .......................................................................... 2
Cobell v. Norton,
  246 F. Supp. 2d 59 (D.D.C. 2003) .............................................................. 1
Dorsey v. United States,
  567 U.S. 260 (2012) ............................................................................ 2
Ellsworth Assocs. v. United States,
  917 F. Supp. 841 (D.D.C. 1996) ............................................................... 1
Franklin v. Massachusetts,
  505 U.S. 788 (1992) ............................................................................ 5
Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,
  561 U.S. 477 (2010) ............................................................................ 9
Hafer v. Melo,
  502 U.S. 21 (1991) ............................................................................ 4
Jin v. Ministry of State Sec.,
  557 F. Supp. 2d 131 (D.D.C. 2008) ............................................................. 1
Kentucky v. Graham,
  473 U.S. 159 (1985) ............................................................................ 4
Marbury v. Madison,
  5 U.S. (1 Cranch) 137 (1803) ................................................................... 9
McLane Co. v. E.E.O.C.,
  137 S. Ct. 1159 (2017) ......................................................................... 2
Michel v. Anderson,
  14 F.3d 623 (D.C. Cir. 1994) ................................................................... 2
Millbrook v. United States,
  569 U.S. 50 (2013) ............................................................................ 2
Monell v. N.Y.C. Dep't of Soc. Servs.,
  436 U.S. 658 (1978) ............................................................................ 4
Montgomery v. Louisiana,
  136 S. Ct. 718 (2016) .......................................................................... 2
N. Mariana Islands v. United States,
  Civ. A. No. 08-1572 (PLF), 2009 WL 596986 (D.D.C. Mar. 6, 2009) ................................. 2
Nat'l Fed'n of Indep. Bus. v. Sebelius,
  567 U.S. 519 (2012) ............................................................................ 2
Raymond J. Lucia Companies, Inc. v. S.E.C.,
  832 F.3d 277 (D.C. Cir. 2016) .................................................................. 6
Ryan v. Commodity Futures Trading Comm'n,
  125 F.3d 1062 (7th Cir. 1997) ................................................................. 1

United States v. Maurice,
   26 F. Cas. 1211 (C.C.D. Va. 1823)................................................................. 7
United States v. Mouat,
   124 U.S. 303 (1888).................................................................................... 9
United States v. Providence Journal Co.,
   485 U.S. 693 (1988).................................................................................... 2
United States v. Windsor,
   570 U.S. 744 (2013).................................................................................... 2
Welch v. United States,
   136 S. Ct. 1257 (2016)................................................................................ 2

## Constitutional Provisions

U.S. Const. art. I, § 3, cl. 7.............................................................................. 8
U.S. Const. art. I, § 6, cl. 2...................................................................... 10, 13
U.S. Const. art. I, § 9, cl. 8........................................................................ 5, 13
U.S. Const. art. II, § 1............................................................................... 9, 12
U.S. Const. art. II, § 2, cl. 2...................................................................... 8, 9
U.S. Const. art. II, § 3........................................................................ 8, 11, 12
U.S. Const. art. II, § 4................................................................................ 11
U.S. Const. art. VI, cl. 3.............................................................................. 9

## Federal Rules

Fed. R. App. P. 29........................................................................................ 1

## Other Authorities

1 Joseph Story, *Commentaries on the Constitution of the United States* § 793 (reprint
   1891) (1833) ......................................................................................... 11, 12
2 Joseph Story, *Commentaries on the Constitution* § 791 (Boston, Hilliard, Gray, and
   Co. 1833) ................................................................................................... 11
2 The Records of the Federal Convention of 1787 (Max Farrand ed., 2d prtg. 1974) ................. 11
Aaron-Andrew P. Bruhl, *If the Judicial Confirmation Process is Broken, Can a
   Statute Fix It?*, 85 Neb. L. Rev. 960 (2007) .............................................. 10
Adam Liptak, *'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal
   Storm*, NY Times, Sept. 25, 2017 ................................................................ 17
Akhil Reed Amar, *A Neo-Federalist View of Article III*, 65 B.U. L. Rev. 205 (1985) ............... 10
Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* §
   26 (2012).................................................................................................... 10
*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to
   the President's Receipt of the Nobel Peace Prize*, 33 O.L.C., 2009 WL 6365082
   (Dec. 7, 2009) ............................................................................................. 6
Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the
   Disqualification Clause Doesn't (Always) Disqualify*, 32 Quinnipiac L. Rev. 209
   (2014)...................................................................................................... 13

Brianne J. Gorod, *A Little More on Alexander Hamilton and the Foreign Emoluments Clause*, Take Care Blog (Aug. 1, 2017) ............................................................. 17

Brianne J. Gorod, *What Alexander Hamilton Really Said*, Take Care Blog (July 6, 2017) .................................................................................................................. 17

Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* in Support of Neither Party with Respect to Motion to Dismiss on Behalf of Defendant in his Individual Capacity, *DC & MD v. Donald J. Trump, in his official capacity as President of the United States of America, and in his individual capacity*, Civ. A. No. 8:17-cv-01596-PJM (D. Md. May 8, 2018) (Messitte, J.), Dkt. No. 114-1, 2018 WL 2159867 .......................................................... 3, 4, 5

Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* in Support of the Defendant, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. Sept. 19, 2017), Dkt. No. 16-1 (redocketed at Dkt. No. 40), 2017 WL 4230605 .............................................................................. 11, 14

Comment of Hashim (2:55 PM) *on* Seth Barrett Tillman, *Coda on Dual Service in Congress and as VP: Seth Barrett Tillman Replies*, Dorf on Law (Aug. 23, 2012, 8:11 AM) ................................................................................................................. 8

David A. McKnight, *The Electoral System of the United States* 346 (Philadelphia, J.B. Lippincott & Co. 1878) .............................................................................. 14

Decl. of Professor Robert W.T. Martin, ¶ 12, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Daniels, J.), Dkt. No. 85-11, 2017 WL 7964229 ....................... 16, 17

Defendant's Supplemental Brief in Support of his Motion to Dismiss and in Response to the Briefs of *Amici Curiae, Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018), Dkt. No. 51 ............................................... 5, 6

Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, https://perma.cc/6UUK-TC5X ................................................................................. 15

First Amended Complaint, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. Aug. 15, 2017), Dkt. No. 14 ........................................................................ 4

*Friends of the Court: Evaluating the Supreme Court's Amicus Invitations*, 101 Cornell L. Rev. 1533 (2016) .................................................................................... 2

*History*, The Shawnee Tribe, https://perma.cc/9XWF-2UMV .................................. 16

*History*, Wyandotte Nation , https://perma.cc/FX4H-2HHX ...................................... 16

Josh Blackman & Seth Barrett Tillman, *The Emoluments Clauses litigation, Part 1: The Constitution's taxonomy of officers and offices*, The Volokh Conspiracy (Sep. 25, 2017) ................................................................................................................. 11

Letter from Department of Justice Counsel to Judge Daniels, *Citizens for Responsibility and Ethics in Washington* (hereinafter "*CREW*") *v. Trump*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Oct. 25, 2017), Dkt. No. 98 ............................. 5

Letter from President Thomas Jefferson to Meriwether Lewis (Oct. 20, 1806) ........................... 15

Letter from Thomas Jefferson to Indian Nations (Jan. 10, 1809), *National Archives: Founders Online*, https://perma.cc/Y2DF-CT97 ...................................................... 15

*Mandan People*, Encyclopaedia Brittanica .............................................................. 15

Martin A. Schwartz, Sec. 1983 Litig. Claims & Defenses § 6.05 (2018) ....................................... 4

*Ottowa Indians*, Ohio History Connection, https://perma.cc/DS8J-M8KZ ................................. 16

Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018), Dkt. No. 50 ............................... 3, 4, 7, 13, 17

*Potawatomi History*, Wheeling Historical Society & Museum,
  https://perma.cc/9HJX-5794 ...................................................................................... 16

President of the United States' Statement of Interest, *DC & MD v. Donald J. Trump,*
  *in his official capacity as President of the United States of America*, Civ. A. No.
  8:17-cv-01596-PJM (D. Md. Mar. 26, 2018) (Messitte, J.), Dkt. No. 100, 2018 WL
  1511801 ....................................................................................................................... 3

Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785) ....................................... 7

*Should the Supreme Court Stop Inviting Amici Curiae to Defend Abandoned Lower*
  *Court Decisions?*, 63 Stan. L. Rev. 907 (2011) ........................................................................ 2

Solicitor General's Brief for Respondent Supporting Petitioners, *Lucia v. S.E.C.*, No.
  17-130 (U.S. Feb. 21, 2018), 2018 WL 1251862 ................................................................... 6

Statement of Interest by Donald Trump, *District of Columbia v. Trump*, No. 17-1596
  (D. Md. Mar. 26, 2018) (Dkt. No. 100) ................................................................................. 5

*Suing the President: Nonstatutory Review Revisited*, 97 Colum. L.  Rev. 1612 (1997) ............... 5

Suspension of the Privilege of the Writ of Habeas Corpus, 10 Op. Att'y. Gen. 74
  (July 5, 1861) ....................................................................................................................... 14

*The Native Americans*, PBS, https://perma.cc/522D-76DY ....................................................... 16

The Writings of Thomas Jefferson 1801–1806 (Paul Leicester Ford ed., N.Y. The
  Knickerbocker Press 1897) .................................................................................................... 15

## INTRODUCTION

On September 19, 2017, Scholar Seth Barrett Tillman and Judicial Education Project (JEP) moved for leave to file an *amicus* brief in support of defendant's motion to dismiss.[1] In that motion, *Amici* represented that "[i]f leave is granted to file this brief, *amici* will respectfully request leave in the public interest to participate in oral argument in this matter to advance an argument the government did not: that the President does not hold an 'Office . . . under the United States,' and is not subject to the Foreign Emoluments Clause."[2] This Court granted leave to file the *amicus* brief.[3] Through this motion, *Amici* now requests leave to participate in the oral arguments scheduled for June 7, 2018 with respect to two threshold questions on which there is a lack of adversity between the Plaintiffs and the Defendant: (1) whether the complaint is properly pleaded against the President in his official capacity, and (2) whether the President is subject to the Foreign Emoluments Clause.  Defendant takes no position on this motion.  Plaintiffs oppose this motion.

## ARGUMENT

### I.    THIS COURT HAS THE INHERENT AUTHORITY TO ALLOW *AMICI* TO BE HEARD AT ORAL ARGUMENT

District courts have inherent authority to grant participation by an *amicus curiae*.[4] The Court has broad discretion in determining whether to grant leave to participate as an *amicus*, and such status is typically allowed when "the information offered is timely and useful."[5] Specifically, *amicus* briefs are usually allowed "when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."[6] *Amici* can

---

[1] [Dkt. No. 16].
[2] [*Id.* at 5.]
[3] [Dkt. No. 40.]
[4] Jin v. Ministry of State Sec., 557 F. Supp. 2d 131, 136 (D.D.C. 2008). *See generally* Fed. R. App. P. 29.
[5] Ellsworth Assocs. v. United States, 917 F. Supp. 841, 846 (D.D.C. 1996) (quotation marks omitted).
[6] *Jin*, 557 F. Supp. 2d at 137 (citing Ryan v. Commodity Futures Trading Comm'n, 125 F.3d 1062, 1064 (7th Cir. 1997); *see also* Cobell v. Norton, 246 F. Supp. 2d 59, 62 (D.D.C. 2003) (same).

provide many forms of assistance to the Court, such as "ideas, arguments, theories, insights, facts or data that are not to be found in the parties' briefs."[7]

Federal courts have the inherent power to permit *amici* to participate in proceedings, whether by appointment, or in response to a motion for leave.[8] And they do so for several reasons. As one scholar observed, the Supreme Court will often appoint an *amicus curiae* "to defend judgments that respondents disavowed despite the fact that they prevailed below."[9] But for the participation of *amici* in such cases, there would be a lack of adversity between the parties with respect to part of,[10] or the entire judgment below.[11] The concern that animates the appointment of *amicus curiae* is particularly pronounced when there is a lack of adversity concerning threshold issues, such as whether the court has jurisdiction.[12] The D.C. Circuit has followed this principle.[13]

---

[7] *See* N. Mariana Islands v. United States, Civ. A. No. 08-1572 (PLF), 2009 WL 596986, at *1 (D.D.C. Mar. 6, 2009) (citations omitted).

[8] *See generally* United States v. Providence Journal Co., 485 U.S. 693, 704 (1988) ("[I]t is well within this Court's authority to appoint an *amicus curiae* to file briefs and *present oral argument* in support of that judgment" (emphasis added)); Altizer v. Deeds, 191 F.3d 540, 551 n.7 (4th Cir. 1999) (noting that "federal courts have frequently appointed *amici* to participate in an appeal where a party will not brief an important position" (internal citations omitted)); Ass'n of Indep. Sch. of Greater Washington v. D.C., Civ. A. No. 16-1778 (JEB), 2018 WL 1972459, at *4 (D.D.C. Apr. 26, 2018) ("AISGW participated in the case by filing an *amicus* brief in support of St. Paul's and presenting at oral argument.").

[9] Brian P. Goldman, *Should the Supreme Court Stop Inviting Amici Curiae to Defend Abandoned Lower Court Decisions?*, 63 Stan. L. Rev. 907, 924 (2011); *see* Katherine Shaw, *Friends of the Court: Evaluating the Supreme Court's Amicus Invitations*, 101 Cornell L. Rev. 1533, 1566 (2016) ("In other cases, the Court itself raises an issue or question it wishes to consider, but which the parties have not presented.").

[10] *See, e.g.*, Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 542 (2012) ("[W]e appointed an *amicus curiae* to defend *that aspect of the judgment below*." (emphasis added)).

[11] *See, e.g.*, McLane Co. v. E.E.O.C., 137 S. Ct. 1159, 1166 (2017) (appointing an advocate "as *amicus curiae* to *defend the judgment below*" (emphasis added)); Beckles v. United States, 137 S. Ct. 886, 892 (2017) (same); Welch v. United States, 136 S. Ct. 1257, 1263 (2016) (same); Millbrook v. United States, 569 U.S. 50, 52 n.1 (2013) (same); Dorsey v. United States, 567 U.S. 260, 272 (2012) (same).

[12] *See* Montgomery v. Louisiana, 136 S. Ct. 718, 727 (2016) ("The parties agree that the Court has jurisdiction to decide this case. To ensure this conclusion is correct, the Court appointed Richard D. Bernstein as *amicus curiae* to brief and argue the position that the Court lacks jurisdiction."); United States v. Windsor, 570 U.S. 744, 755 (2013) ("All parties agree that the Court has jurisdiction to decide this case; and, with the case in that framework, the Court appointed Professor Vicki Jackson as *amicus curiae* to argue the position that the Court lacks jurisdiction to hear the dispute."); *see also, e.g.*, Nat'l Fed'n of Indep. Bus., 567 U.S. at 542–43 ("And because there is a reasonable argument that the Anti–Injunction Act deprives us of jurisdiction to hear challenges to the individual mandate, but no party supports that proposition, we appointed an *amicus curiae* to advance it.").

[13] *See, e.g.*, Michel v. Anderson, 14 F.3d 623, 625 (D.C. Cir. 1994) ("Ordinarily, we would not entertain an *amicus'* argument if not presented by a party, but as these questions go to our jurisdiction, we are obliged to consider them on our own and therefore welcome *amici*'s presentation.").

This case presents two threshold issues on which there is no adversity: (1) whether the complaint is properly pleaded against the President in his official capacity, and (2) whether the President is subject to the Foreign Emoluments Clause.

## I.   *Amici* Should Be Heard at Oral Argument Because the Parties Are Not Adverse about the Propriety of the Official-Capacity Claims

Both parties agree that *all* claims brought under the Foreign Emoluments Clauses must be litigated against the President in his official capacity. The Plaintiffs contended that "[t]his suit is properly being litigated against the President in his official, not personal, capacity."[14] In a parallel Emoluments Clauses-related lawsuit, the Department of Justice stated the government's position: "Plaintiffs cannot state any individual-capacity claim against the President because the Emoluments Clauses do not apply to the President as a private individual."[15] To date, in this litigation, the Defendant has voiced no objection in connection with the way Plaintiffs have pleaded this action. Both of their positions are incorrect, for the reasons *Amici* articulated in a recent brief filed in a parallel Emoluments Clauses-related lawsuit before the U.S. District Court for the District of Maryland.[16]

The parties in the instant litigation agree that Plaintiffs' allegations give rise to *only* an official capacity claim. Because the parties are not adverse on this determinative threshold issue,

---

[14] Plaintiffs' Supplemental Memorandum at 34, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018), Dkt. No. 50.

[15] President of the United States' Statement of Interest at 1, *DC & MD v. Donald J. Trump, in his official capacity as President of the United States of America*, Civ. A. No. 8:17-cv-01596-PJM (D. Md. Mar. 26, 2018) (Messitte, J.), Dkt. No. 100, 2018 WL 1511801.

[16] Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* in Support of Neither Party with Respect to Motion to Dismiss on Behalf of Defendant in his Individual Capacity at 1, *DC & MD v. Donald J. Trump, in his official capacity as President of the United States of America, and in his individual capacity*, Civ. A. No. 8:17-cv-01596-PJM (D. Md. May 8, 2018) (Messitte, J.), Dkt. No. 114-1, 2018 WL 2159867 ("While as a general matter the Constitution limits official action taken by office-holders, the Emoluments Clauses, as well as the 13th and 21st Amendments, are exceptions. These provisions control both the official conduct, as well as the private or individual conduct, of an officeholder. Depending on the circumstances, violations of these provisions could be litigated through official or individual-capacity claims."). *Amici* have attached this brief as Exhibit A.

the Court is deprived of filings that highlight the difficulty of bringing only an official-capacity-

claim. What is that difficulty? The Plaintiffs argued that the Defendant commits a constitutional

tort "when he *accepts* such 'Emolument[s]'" that are prohibited by the Foreign Emoluments

Clause.[17] The determination of whether the complaint is properly pleaded as an official or

individual capacity case turns on *how* the Defendant "accepts" the purported emoluments.[18] The

facts alleged in the Plaintiffs' complaint demonstrate that the acceptance of the purported

emoluments involves quintessentially private commercial conduct; Defendant's acceptance of

purported emoluments was not taken pursuant to any official federal government policy, nor did

Defendant's acceptance of purported emoluments make use of any government property.[19] In these

circumstances Plaintiffs cannot make out an official capacity claim.

DOJ refuses to argue this point, and as a result, there is no adversity on this discrete

threshold issue. Indeed, both parties are of one mind on this issue: Plaintiffs, in this case favorably

cite the Department of Justice's Statement of Interest, in parallel litigation, concerning the capacity

issue.[20]

---

[17] First Amended Complaint ¶ 57, at 44, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. Aug. 15, 2017), Dkt. No. 14 ("Defendant has not sought or received 'the Consent of the Congress' to accept these 'Emolument[s]' and is therefore violating the Foreign Emoluments Clause *when he accepts* such 'Emolument[s].'" (emphasis added)).

[18] *Cf.* Tillman and JEP *DC & MD v. Trump* Amicus Brief, *supra* note 16, at 10–11 ("This conclusion is not changed if the payments were motivated by the clout of the President's position. The capacity analysis with respect to the Emoluments Clauses does not hinge on whether the donor's motive for giving the purported emoluments was to enjoy future benefits or good will from the President. The fact that the President would not have received the emoluments but for his being President does not turn an individual-capacity constitutional violation into an official-capacity claim. The reason is simple: official-capacity claims are tied to the office-holder's conduct, not the counter-parties' behavior or motives.").

[19] *Id.* at 12–15. *See, e.g.*, Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[B]ecause the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" *must* have played a part in the violation of federal law.'" (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)))); *see also, e.g.*, Martin A. Schwartz, Sec. 1983 Litig. Claims & Defenses § 6.05 (2018) ("In a personal-capacity suit [unlike an official capacity action], a plaintiff need not show a connection to a *governmental policy or custom* . . . ." (emphasis added)); *id.* ("In official-capacity suits, the governmental entity is the real party in interest; thus a plaintiff *must* show that the entity's *policy or custom* played a part in the violation of federal law." (emphasis added)).

[20] Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, *supra* note 14, at 36 n.14 ("While the Foreign Emoluments Clause is unusual in regulating the private conduct of federal officials, it is not alone. *See, e.g.*, Statement

## II.   *Amici* Should Be Heard at Oral Argument Because the Parties Are Not Adverse about the Applicability of the Foreign Emoluments Clause to the President

Plaintiffs vigorously maintain that the President is subject to the Foreign Emoluments Clause. No court of record has ever so ruled. In the absence of any precedent, Plaintiffs bear the burden of persuasion. And that burden is especially heavy because they seek to impose a new restriction on the presidency.[21] The Department of Justice does not disagree—nor does it agree. It states: "For purposes of his motion to dismiss, the President has assumed that he is subject to the Foreign Emoluments Clause on the assumption that he holds an 'Office of Profit or Trust' within the meaning of the Clause. U.S. Const. art. I, § 9, cl. 8."[22] The government's position here emulates Schrödinger's Cat: *maybe the Foreign Emoluments Clause applies to the President; maybe it doesn't; don't ask; we won't tell.*

Without question, the government knows how to take a decisive position on similar questions. For example, DOJ argued earlier this year in a Supreme Court brief that an Administrative Law Judge must be considered an "officer of the United States" for purposes of

---

of Interest by Donald Trump at 4, *District of Columbia v. Trump*, No. 17-1596 (D. Md. Mar. 26, 2018) (Dkt. No. 100) . . . ."). Plaintiffs' analysis is in error: the issue is not whether the conduct is private, but how the action should be pleaded. *See* Tillman and JEP *DC & MD* Amicus Brief, *supra* note 16, at 6–7 ("For example, the Secretary of State violates the Foreign Emoluments Clause in his official capacity if he publicly 'accept[s]' emoluments from a foreign state pursuant to a federal government policy—perhaps one laid down by the President—even if the policy were unlawful. He likewise violates the Foreign Emoluments Clause in his official capacity if the Secretary uses federal government property to commit the constitutional tort: i.e., the act of accepting the emoluments.").

[21] In a related context, the Supreme Court refused to apply the Administrative Procedure Act to the President, even though he was not "explicitly excluded from the APA's purview . . . [o]ut of respect for the separation of powers and the unique constitutional position of the President." Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992). *See* Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612, 1677 (1997) (explaining that plaintiffs bear an even heavier burden when suing the President).

[22] Defendant's Supplemental Brief in Support of his Motion to Dismiss and in Response to the Briefs of *Amici Curiae* at 21, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018), Dkt. No. 51. DOJ has taken the same position in parallel litigation. *See, e.g.*, Statement of Interest, *DC & MD v. Trump*, *supra* note 15, at 4 n.2 ("We assume for purposes of this Statement that the President is subject to the Foreign Emoluments Clause."); Letter from Department of Justice Counsel to Judge Daniels at 1, *Citizens for Responsibility and Ethics in Washington* (hereinafter "*CREW*") *v. Trump*, Civ. A. No. 1:17-cv-00458-GBD (S.D.N.Y. Oct. 25, 2017), Dkt. No. 98 ("[T]he government has not conceded that the President is subject to the Foreign Emoluments Clause.").

the Appointments Clause,[23] even though the historical record and established body of judicial precedent is very much in conflict.[24] Yet when it comes to the President and the Foreign Emoluments Clause, the Department of Justice proceeds with all deliberate agnosticism. The Civil Division's uncharacteristic uncertainty is particularly strange because in 2009 the Office of Legal Counsel opined that "the President *surely* hold[s] an 'Office of Profit or Trust' under [the United States]" for purposes of the Foreign Emoluments Clause.[25] If this position was "surely" true, then the government would not have filed Schrödinger briefs that were undecided on a point that is central to the resolution of Plaintiffs' claims.[26]

As a result, the Civil Division has, subtly, cast doubt on the Office of Legal Counsel's opinion. First, it described this issue as a "novel question,"[27] not one—as Plaintiffs insist—that is settled by longstanding Executive Branch precedent.

Second, DOJ's brief raised a red flag by contending that OLC reached its conclusion "without discussion."[28] While the 2009 opinion spans thirteen pages in length, the Civil Division now points out the obvious: the memorandum's analysis about the scope of the Foreign Emoluments Clause and its application to the presidency is only one word long: "surely." From *Amici's* perspective, the adversity that is very much lacking between the actual parties in this litigation, is very much present within 950 Pennsylvania Avenue.

---

[23] Solicitor General's Brief for Respondent Supporting Petitioners at *11, *Lucia v. S.E.C.*, No. 17-130 (U.S. Feb. 21, 2018), 2018 WL 1251862 ("The nature of the authority exercised by the Commission's ALJs confirms that they are constitutional officers, rather than mere employees.").

[24] *Raymond J. Lucia Companies, Inc. v. S.E.C.*, 832 F.3d 277, 289 (D.C. Cir. 2016), *reh'g en banc granted, judgment vacated* (Feb. 16, 2017), *on reh'g en banc*, 868 F.3d 1021 (D.C. Cir. 2017), *cert. granted sub nom.* 138 S. Ct. 736 (2018) (finding that "there is no indication Congress intended these officers [SEC ALJs] to be synonymous with 'Officers of the United States' under the Appointments Clause.").

[25] *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 O.L.C., 2009 WL 6365082, at *4 (Dec. 7, 2009) (emphasis added).

[26] *See supra* note 22 and accompanying text.

[27] Defendant's Supplemental Brief, *Blumenthal v. Trump*, *supra* note 22, at 22.

[28] *Id.* at 21.

Third, the Department of Justice walks through some, but not all, of the historical evidence raised by *Amici* without passing any judgment. Rather the DOJ merely makes a series of "observations."[29] The Department of Justice is well-equipped to dispute the relevance and validity of contrary historical evidence—look no further than its supplemental response in this case. DOJ actively disputed the evidence advanced by certain Legal Historians who filed an *amicus* brief concerning the scope of the term "emoluments" in support of the Plaintiffs.[30] Yet, Tillman and JEP's brief was met with agnosticism. If *Amici* are permitted to participate in oral arguments, we can provide the arguments and evidence that the DOJ should, but, for whatever reason, chose not to put forward.

*Amici's* participation would also provide this Court with an adversarial response to Plaintiffs' problematic reading of the Constitution's text. Plaintiffs' explain that the phrase "office . . . under the United States" refers to positions "under the federal government of the United States of America."[31] They contend that this "straightforward meaning," which draws no apparent distinction between appointed and elected positions, is the "normal and ordinary" understanding of the Foreign Emoluments Clause's language.[32] Plaintiffs' position, based on dictionary definitions, is that the presidency is an "office . . . under the United States" because it is a public charge on the Treasury or a public employment.[33] The primary evidence that Plaintiffs marshal to show that that the presidency is an "office . . . under the United States" would, in precisely the same manner, show that members of Congress likewise hold an "office . . . under the United

---

[29] *Id.* at 23.

[30] *Id.* at 6–12 (disputing claims by legal historians as *amicus curiae* concerning the scope of the term "emoluments").

[31] Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, *supra* note 14, at 6.

[32] *Id.* at 4–7.

[33] *See, e.g.*, *id.* at 5 ("In the late eighteenth century, the ordinary meaning of 'office' was '[a] publick charge or employment; magistracy.' Samuel Johnson, *A Dictionary of the English Language* (6th ed. 1785); *see United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.) ('An office is defined to be "a public charge or employment[.]"') . . . .").

States." Under Plaintiffs' theory, every official in the federal government—including the President, Vice President, Senators, and Representatives—could be covered by the Foreign Emoluments Clause.

Moreover, Plaintiffs' "plain reading" approach cannot be restricted uniquely to the *Office*-language in the Foreign Emoluments Clause. If the Court adopts this "plain reading" approach, it would apply to the three other constitutional provisions that use the "Office . . . under the United States" language.[34] Likewise, if the Court adopts this "plain reading" approach, there can be no principled distinction between the "office . . . under" the United States language in the Foreign Emoluments Clause and "officers of the United States" language appearing in other constitutional provisions.[35] Indeed, under a "plain reading," the phrase "officers *of* the United States," would appear to be broader language, and therefore, it would encompass every position encompassed by the Constitution's "office . . . *under* the United States" language. Why? *Of* suggests that the officer is *connected* or *related* to the United States, while *under* is a more limited, directional term, that excludes positions "over" or correlative with the United States.[36] In short, if the "Office . . . *under*" the United States language in the Foreign Emoluments Clause includes elected officials, such as

---

[34] *See* U.S. Const. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any *Office of honor, Trust or Profit under the United States* . . . ." (emphasis added)); *id.* at art. I, § 6, cl. 2 ("[N]o Person holding any *Office under the United States*, shall be a Member of either House during his Continuance in Office." (emphasis added)); *id.* at art. II, § 1, cl. 2 ("[N]o Senator or Representative, or Person holding an *Office of Trust or Profit under the United States*, shall be appointed an Elector." (emphasis added)).

[35] *See id.* at art. II, § 2, cl. 2 ("[H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other *Officers of the United States*, whose Appointments are not herein otherwise provided for, and which shall be established by Law . . . ." (emphasis added)); *id.* at art. II, § 3 (The President "shall Commission all the *Officers of the United States*." (emphasis added)); *id.* at art. II, § 4 ("The President, Vice President and all civil *Officers of the United States*, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors." (emphasis added)); *id.* at art. VI, cl. 3 ("The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial *Officers*, both *of the United States* and of the several States, shall be bound by Oath or Affirmation, to support this Constitution" (emphasis added)).

[36] Comment of Hashim (2:55 PM) *on* Seth Barrett Tillman, *Coda on Dual Service in Congress and as VP: Seth Barrett Tillman Replies*, Dorf on Law (Aug. 23, 2012, 8:11 AM), https://perma.cc/L5BH-SHHH (noting that *office . . . under the United States* "is arguably more narrow and consistent w/ [Professor Tillman's] interpretation, because 'under' is more likely than 'of' to connote *statutory* [that is, subordinate] offices.").

the President, as Plaintiffs argue, then so would the textually broader "officers *of* the United States" language appearing in other constitutional provisions. But the Supreme Court has repeatedly explained that elected officials, such as the President, cannot be "officers of the United States."[37] DOJ is no doubt aware of these holdings, but does not draw the logical conclusion: this Court must take Plaintiffs' "plain reading" off the table. *Amici's* participation at oral argument would be helpful to the Court because the parties' briefs are not adverse on this important textual point.

Again, Plaintiffs' position is an unlikely candidate to explain the Constitution's *Office*-language. Why? Were Plaintiffs' position correct, much language in the Constitution becomes redundant, if not nonsensical. For example, the Oaths Clause's text expressly applies *both* to "Senators and Representatives" as well as to Officers "*of* the United States."[38] The Elector Incompatibility Clause applies to "Senator[s]," "Representative[s]," along with any person "holding an Office of Trust or Profit *under* the United States."[39] If "office . . . under the United States" and "officers of the United States" encompass elected officials, such as Senators and Representatives, then enumerating those positions was entirely surplusage. DOJ, which is surely familiar with *Marbury v. Madison's* recognition that language in the Constitution should not be read as "mere surplusage,"[40] does nothing to point out the redundancies caused by Plaintiffs' theory.

---

[37] *See, e.g.*, United States v. Mouat, 124 U.S. 303, 307 (1888) ("Unless a person in the service of the government, therefore, holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not strictly speaking, an officer of the United States."); Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 497–98 (2010) (explaining that "[t]he people do not vote for the 'Officers of the United States'" (citing U.S. Const. art. II, § 2, cl. 2)). In short, *Officers of the United States* are appointed; the President is elected.

[38] U.S. Const. art. VI, cl. 3 ("The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution . . . .").

[39] U.S. Const. art. II, § 1 ("[N]o Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.").

[40] Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803) ("The subsequent part of the section is *mere surplusage*—is entirely without meaning—if such is to be the construction. . . . It cannot be presumed that any clause in the Constitution is intended to be without effect, and therefore such construction is inadmissible unless the words require

Furthermore, under the Plaintiffs' theory, the Incompatibility Clause becomes grammatically awkward. That clause provides, "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."[41] Could that phrase possibly mean "no person holding [*a House seat or Senate seat*] shall be a member of either House"? Remarkably, more than two-hundred members of Congress signed a brief suggesting that their own positions are in fact unconstitutional! Yet, DOJ was silent about this textual aberration. Plaintiffs' position also creates structural problems. Under the Plaintiffs' reading, the House would have to approve a Senator's accepting a foreign emolument, and vice versa, in violation of the principle of unicameral autonomy,[42] to say nothing about more general risks related to congressional self-dealing.

Plaintiffs may respond that Senators and Representatives, but not the President, are excluded from the scope of the Constitution's *office* and *officer* language. Once they make that critical concession, they necessarily abandon their "plain reading" approach. Why would some elected officials be included, but not others? They all work for the U.S. national government, and not the state governments. Their salaries are all charges on the Treasury. Under Plaintiffs' "plain reading approach," there is no way to distinguish between members of Congress and the President. Having made this critical concession, Plaintiffs can only draw epicycles to account for the retrograde motions of their flawed constitutional constructions. One simple example proves the point: pursuant to the Commissions Clause, the President "shall Commission *all* the Officers of

---

it."). *See, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 26 (2012) (noting that under the surplusage canon, "[i]f possible, every word and every provision is to be given effect"); Akhil Reed Amar, *A Neo-Federalist View of Article III*, 65 B.U. L. Rev. 205, 242 & n.121 (1985) ("Where possible, each word of the Constitution is to be given meaning; no words are to be ignored as mere surplusage.").
[41] U.S. Const. art. I, § 6, cl. 2.
[42] *See* Aaron-Andrew P. Bruhl, *If the Judicial Confirmation Process is Broken, Can a Statute Fix It?*, 85 Neb. L. Rev. 960, 996–1007 (2007) (developing cameral autonomy principle).

the United States."[43] *All* means all. If the President is an "Officer of the United States," as the

Plaintiffs' "plain reading" approach suggests, then the President would have to commission

himself as well as the Vice President. *Amici* know of no example of any President or Vice President

ever receiving a presidential commission. Simply put, the Plaintiffs' reading of the Constitution's

*Office*-language fails.

The Tillman and JEP taxonomy thoroughly accounts for the Constitution's divergent

*Office*-language.[44] It is also consistent with the position Justice Story put forward in his celebrated

*Commentaries on the Constitution*.[45] As Story explained, the Impeachment Clause provides that

"[t]he President, Vice President and all civil *Officers of the United States*, shall be removed from

Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and

Misdemeanors."[46] Story noted that this provision refers to "*all* civil officers," and not to "*all other*

civil officers."[47] Indeed, according to Madison's *Notes of Debates in the Federal Convention of*

*1787*, which were not yet public when Story's *Commentaries* were published, early drafts of the

Impeachment Clause expressly referred to "*other* civil officers."[48] However, the Committee of

Style later dropped the phrase "other," and replaced it with "all civil officers."[49] According to

---

[43] U.S. Const. art. II, § 3.
[44] For a thorough discussion of this taxonomy, *see* Josh Blackman & Seth Barrett Tillman, *The Emoluments Clauses litigation, Part 1: The Constitution's taxonomy of officers and offices*, The Volokh Conspiracy (Sep. 25, 2017), https://wapo.st/2rMafwP.
[45] 1 Joseph Story, *Commentaries on the Constitution of the United States* § 793, at 577–78 (reprint 1891) (1833); 2 Joseph Story, *Commentaries on the Constitution* § 791, at 259–60 (Boston, Hilliard, Gray, and Co. 1833) (same). *See* Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* in Support of the Defendant at 4–5, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. Sept. 19, 2017), Dkt. No. 16-1 (redocketed at Dkt. No. 40), 2017 WL 4230605 (explaining Story's position, in his *Commentaries on the Constitution*, with regard to "officer of the United States" language)); *id*. at 11 ("In his *Commentaries*, Story explained the President is not an 'officer of the United States.' In the very same passage, Story also indicated that the same interpretive position applied to the Constitution's 'office . . . under the United States' language. In other words, the Constitution's general *officer of the United States* and *office under the United States* language does not reach the presidency. Only express constitutional language reaches the presidency.").
[46] U.S. Const. art. II, § 4.
[47] Story (reprint 1891), *supra* note 45, at 578.
[48] *See* 2 The Records of the Federal Convention of 1787, at 545, 552 (Max Farrand ed., 2d prtg. 1974).
[49] *Id*. at 600.

Story's reading of the Constitution's text, the absence of the word "other" from the Impeachment Clause leads to the inference that the President and Vice President are not "officers of the United States."[50] Again, the President and Vice President, Story concluded, could not be considered "officers of the United States."

There is more. This principle, Story noted, was not limited to the Impeachment Clause and its "officers of the United States" language. Rather, Story observed that three "[o]ther clauses of the Constitution would seem to favor the same result."[51] By the "same result," Story indicated that the President and Vice President could not be governed by those provisions. First, the Commissions Clause provides the President "shall Commission *all* the *Officers of the United States*."[52] Were the President understood to be an "officer of the United States," then he would have to commission himself and the Vice President. Story rejects this absurdity—an absurdity which Plaintiffs' position compels. Second, the Electoral Incompatibility Clause provides that "no Senator or Representative, or Person holding an *Office of Trust or Profit under the United States*, shall be appointed an Elector."[53] Here, Story's position is that just as the Impeachment and Commissions Clauses' "officers *of* the United States" language would exclude the President, the Electoral Incompatibility Clause's "Office . . . *under* the United States" language would lead to the "same result." In other words, the President and Vice President should not be included within the scope of the Electoral Incompatibility Clause's "Office . . . under the United States" language. Story's view is that a President may serve as an elector.

---

[50] *See* Story (reprint 1891), *supra* note 45, at 578 (affirming that the Impeachment Clause "enumerated" the listed positions—President and Vice President—in order to "contradistinguish[]" them from the Constitution's "officers of the United States" language).

[51] *Id.*

[52] U.S. Const. art. II, § 3.

[53] U.S. Const. art. II, § 1.

The Incompatibility Clause, Story says, would also lead to the "same result." This third provision states that "no Person holding any *Office under the United States*, shall be a Member of either House during his Continuance in Office."[54] Here too, according to Story, the President is not included within the ambit of the provision or its "Office under the United States" language, even if this construction would allow the President to simultaneously serve as a "Member of either House." Plaintiffs, without discussion and without citation to any judicial support, dismiss as "questionable" two propositions—that the President could serve as an elector and that the President may serve as a member of either House—but Story says otherwise.[55] Plaintiffs' view, a mere intuition, which is put forward without any legal authority, is in conflict with Story's *Commentaries*.

Story's logic would apply with equal force to the Foreign Emoluments Clause, which only restricts those who hold an "Office of Profit or Trust under" the United States.[56] If the President is not covered by the Elector Incompatibility Clause and the Incompatibility Clause, it follows that he is not covered by the Foreign Emoluments Clause. All three of those provisions use "Office . . . under the United States" language. Other commentators have recognized that this argument—contrary to Plaintiffs' claim—does not originate with Professor Tillman, but with Story, and Story bases his view on *his* "plain reading" of the text of the Constitution.[57] Indeed, Story's *Commentaries* alone are more than enough to rebut the Plaintiffs' hyperbole that *Amici's* brief "does not cite a single document, of any kind, from any era, in which the phrase 'Office under the United States' is described as having the meaning the [Tillman and JEP] brief claims it had."[58]

---

[54] U.S. Const. art. I, § 6, cl. 2.
[55] Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, *supra* note 14, at 32.
[56] U.S. Const. art. I, § 9, cl. 8.
[57] *See, e.g.*, Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 Quinnipiac L. Rev. 209, 291 nn.393, 395–96 (2014) (citing to Story first, and then citing to Tillman for the line of argument excluding the President from both the category officer *of* and *under* the United States).
[58] Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, *supra* note 14, at 2.

Moreover, Story was not alone in holding this view.[59] These arguments are not difficult to make; they are well established in the literature. We do not put these arguments forward to argue them anew, but only to illustrate that DOJ remains unwilling to advance these straightforward arguments—or, even to take a position—notwithstanding the fact that all of these arguments are well established in the literature.

Finally, *Amici* highlight three historical errors made by Plaintiffs concerning the scope of the Foreign Emoluments Clause. For each error, DOJ could make rather obvious counter-arguments, but will not. As a result, this Court will not have adverse presentations at the scheduled oral argument. First, *Amici* explained that Washington's receipt of the main key to the Bastille should not be viewed as a "private gift" from the Marquis de Lafayette for a variety of reasons. One such reason was because the key was "discussed in diplomatic communications [from] the French government's representative in the United States to his superiors in the French ministry of foreign affairs."[60] Plaintiffs perfunctorily dismissed this argument, writing that *Amici's* brief "offer[ed] no further details" about the correspondence. Under this Court's standing order, *Amici* submitted a copy of this correspondence, along with an English translation.[61] Were there any doubts, Plaintiffs could have requested a copy of the record from the Court, from *Amici*, or sought the original, as *Amici* did, from the *Centre des Archives Diplomatiques du Ministere des Affaires Etrangeres* in Paris.

Second, *Amici* discussed presents that President Jefferson received from Indian tribes that Lewis & Clark brought home from their great trek. Modern historians have described such gifts as

---

[59] *See, e.g.*, David A. McKnight, *The Electoral System of the United States* 346 (Philadelphia, J.B. Lippincott & Co. 1878) ("[I]t is obvious that . . . the President is not regarded as 'an officer of, or under, the United States,' but as one branch of 'the Government . . . .'"); *see also, e.g.*, Suspension of the Privilege of the Writ of Habeas Corpus, 10 Op. Att'y. Gen. 74, 79 (July 5, 1861) (Bates, Att'y Gen.) ("The President is a *department* [that is, not a mere 'officer'] of the government; and . . . the only department which consists of a single man . . . ." (emphasis added)).
[60] Tillman and JEP *Blumenthal* Amicus Brief, *Blumenthal v. Trump*, *supra* note 45 at 19 n. 68.
[61] [Dkt. No. 12.]

"diplomatic gifts,"[62] that is, presents from foreign nations. Indeed, Jefferson personally described gifts from a Mandan tribal chief as coming from "*his* [that is, the Indian Chief's] country," not *our* country.[63] The Mandan tribe, which resided in and around present-day North Dakota, was—at that time—in every relevant sense a foreign nation.[64] The Mandan were not born in U.S. territory (i.e., it was not United States territory at the time they were born). There was no peace treaty between the Mandan and the United States. The Mandan had not sold or ceded any of their lands to the United States government. They were not made subject to any federal removal policy or placed onto any reservation. They were not subject to the supervision of any federal officer or administrator with express responsibility over their tribe. And, obviously, they had no voting rights. At this juncture, in American history, they were not (yet) integrated into the American polis in any meaningful way—they were not yet part of the American nation.

Plaintiffs attempt to counter this evidence with another letter that President Jefferson wrote on another occasion to five *other* Indian tribes.[65] However, the Wiandots, Ottowas, Chippeways, Poutewatamies, and Shawanese tribes, who Jefferson referred to as "my red children . . . forming one family with the whites," were situated in significantly different ways—both geographically and legally—than the Mandan were vis-à-vis the United States.[66] It is no surprise that Jefferson addressed these five tribes using familial language: these five tribes primarily resided East of the

---

[62] *See, e.g.*, Elizabeth Chew, *Unpacking Jefferson's Indian Hall*, Discovering Lewis & Clark, https://perma.cc/6UUK-TC5X.

[63] Letter from President Thomas Jefferson to Meriwether Lewis (Oct. 20, 1806), *in* 8 The Writings of Thomas Jefferson 1801–1806, at 476, 477 (Paul Leicester Ford ed., N.Y. The Knickerbocker Press 1897) (emphasis added), http://bit.ly/2KX7lxb.

[64] *Mandan People*, Encyclopaedia Brittanica ("Mandan, self-name Numakiki, North American Plains Indians who traditionally lived in semipermanent villages along the Missouri River in what is now North Dakota."), http://bit.ly/2Ge0Q5k.

[65] Letter from Thomas Jefferson to Indian Nations (Jan. 10, 1809), *National Archives: Founders Online*, https://perma.cc/Y2DF-CT97 ("I take you and your people by the hand and salute you as my Children; I consider all my red children as forming one family with the whites[.]").

[66] *Id.* (using Jefferson's spelling in the main text).

Mississippi in territory that was within the settled pre-Louisiana Cession borders of the United States, as well as in the area around the Great Lakes.[67]

Plaintiffs' rebuttal does nothing to discount Jefferson's own description of the gifts from the Mandan tribe, which was located about a *thousand* miles away from the five tribes that were connected to the Ohio Valley. By contrast, many of these tribesmen in the Louisiana Cession and further West had never met Westerners, and Lewis and Clark's Corps of Discovery explorers were certainly the first Americans that many had met.[68] Tribes such as the Mandan were in every relevant sense foreign, as Jefferson's correspondence with Lewis plainly shows. Contrary to Plaintiffs' contra-historical blanket assertion, not all Indian tribes are the same: they had, and still have, distinct cultures, languages, and histories. Plaintiffs' treatment of all such groups and their gifts as indistinguishable amounts to—at best—gross historical oversimplification. Again: Jefferson kept the Mandan diplomatic gifts. He did not ask for congressional consent. That is some substantial reason to think that Jefferson (like President Washington and others) did not think the Foreign Emoluments Clause applies to presidents. DOJ could have, but did not address any of this evidence that bears directly on the meaning of the Foreign Emoluments Clause.

Third, counsel for Plaintiffs have not accurately represented Professor Robert W.T. Martin's position in regard to Secretary of the Treasury Alexander Hamilton's 1793 roll of federal officers. In a sworn expert declaration submitted in parallel litigation in the Southern District of New York, Professor Martin concluded that a document, known as the *Condensed Report*, was not signed by Alexander Hamilton, but rather was a "scrivener's copy."[69] Martin *began* his analysis

---

[67] *See, e.g.*, *History*, Wyandotte Nation, https://perma.cc/FX4H-2HHX; *Ottowa Indians*, Ohio History Connection, https://perma.cc/DS8J-M8KZ; *Chippewa Indians*, Ohio History Connection, https://perma.cc/TRY7-TX8J; *Potawatomi History*, Wheeling Historical Society & Museum, https://perma.cc/9HJX-5794; *History*, The Shawnee Tribe, https://perma.cc/9XWF-2UMV.
[68] *See The Native Americans*, PBS, https://perma.cc/522D-76DY.
[69] Decl. of Professor Robert W.T. Martin, ¶ 12, *CREW v. Trump*, No. 17-458 (S.D.N.Y. Sept. 9, 2017) (Daniels, J.), Dkt. No. 85-11, 2017 WL 7964229.

by identifying two possible dates when the *Condensed Report* may have been produced: "the *Condensed Report . . .* may have been produced contemporaneously with the *Complete Report* [in 1793], or it may have been produced as late as 1834 when *ASP* [*American State Papers*] was published."[70] Counsel for Plaintiffs cite that single sentence to cast doubt on Professor Tillman's conclusion that the *Condensed Report* was produced at some point after 1820.[71] Yet, three paragraphs later, after explaining his analysis of the *Condensed Report*, Professor Martin concluded, without any equivocation, that "the *Condensed Report* is not a Hamilton-created or Hamilton-signed document, *but was created by order of the Secretary of the Senate no earlier than 1820*."[72] (1820 was long after Burr had killed Hamilton in their 1804 duel.) Professor Martin agrees with Professor Tillman, but counsel for Plaintiffs omitted contrary evidence to, unconvincingly, cast doubt on Professor Tillman's expertise.[73]

The actual provenance of the Hamilton document, like the French diplomatic correspondence concerning the key to the Bastille, and President Jefferson's correspondence concerning Indian tribal diplomatic gifts—all bear on the meaning of the Foreign Emoluments Clause and the scope of its "Office . . . under the United States" language. In each case, the Plaintiffs failed to accurately characterize simple facts. Because DOJ has not actually taken a position, the Plaintiffs' misstatements have not been subjected to adversarial scrutiny. There are

---

[70] *Id.*

[71] Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, *supra* note 14, at 26–27.

[72] Decl. of Professor Robert W.T. Martin, ¶ 15, *supra* note 69.

[73] This is not the first time Plaintiffs' counsel has engaged in such tactics. Adam Liptak, *'Lonely Scholar With Unusual Ideas' Defends Trump, Igniting Legal Storm*, NY Times, Sept. 25, 2017, https://nyti.ms/2KYseIb ("Ms. Gorod did not offer a direct response. [Instead, she said:] 'While there is a fascinating academic discussion to be had about the provenance of these particular documents, and that specific discussion will surely continue, it's ultimately immaterial to what's going on in the courts because at the end of the day, it is clear that the foreign emoluments clause applies to the president . . . .'"); Brianne J. Gorod, *A Little More on Alexander Hamilton and the Foreign Emoluments Clause*, Take Care Blog (Aug. 1, 2017), https://perma.cc/K55D-BWEG ("Based on simply looking at the *American State Papers* document online, it was clear that Tillman's characterization was, as I wrote in my original post, 'not even remotely' accurate."); Brianne J. Gorod, *What Alexander Hamilton Really Said*, Take Care Blog (July 6, 2017), https://perma.cc/WWU5-N6H7 ("Perhaps if [Tillman's] characterization of the *American State Papers* were accurate, he would be right to give it less weight. But it's not accurate, not even remotely so.").

other such historical errors and misrepresentations in Plaintiffs' supplemental memorandum that, given an opportunity to present at argument, *Amici* can point out to the Court. DOJ is unwilling to argue these points. *Amici's* presence is necessary if the Court is to have adversity.

## CONCLUSION

For the foregoing reasons, *Amici* respectfully request that they be granted leave to participate in the oral arguments scheduled for June 7, 2018.

Dated: May 21, 2018

Respectfully submitted,

By:  /s/ Robert W. Ray
Robert W. Ray, Esq.
D.C. Bar No. 401377
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3349
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Josh Blackman, Esq.
   Admission pending
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
D.C. Bar No. 982084
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2018, I caused a true and correct copy of the foregoing to be served on all counsel of record through the Court's CM/ECF system.

/s/ Robert W. Ray
Robert W. Ray, Esq.

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### GREENBELT DIVISION

|  |  |
|---|---|
| THE DISTRICT OF COLUMBIA and MARYLAND, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America and in his individual capacity, <br><br> *Defendants.* | No. 8:17-CV-01596-PJM |

---

## MOTION FOR LEAVE TO FILE BRIEF OF SCHOLAR SETH BARRETT TILLMAN AND JUDICIAL EDUCATION PROJECT AS *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY WITH RESPECT TO MOTION TO DISMISS ON BEHALF OF DEFENDANT IN HIS INDIVIDUAL CAPACITY

---

Robert W. Ray, Esq.
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Tel. (212) 751-3347
robert.ray@tklaw.com
*Co-Counsel for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Tel. (571) 357-3134
carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

Josh Blackman, Esq.
1303 San Jacinto Street
Houston, Texas 77002
Tel. (202) 294-9003
Josh@joshBlackman.com
*Counsel of Record for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Jan I. Berlage, Esq.
Gohn Hankey & Berlage LLP
201 North Charles Street
Suite 2101
Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
*Counsel for Amici Curiae*

## INTRODUCTION

On December 15, 2017, this Court "invite[d] responses to any of the *amici curiae* briefs from any party or *amicus curiae* who wishes to respond," to be filed concurrently on December 29, 2017. [Dkt. No. 72]. This Court further "invite[d] replies to those responses from any party or *amicus curiae* who wishes to do so," to be filed concurrently on January 16, 2018. Scholar Seth Barrett Tillman and the Judicial Education Project ("JEP"), and no other party, accepted this Court's invitation. [Dkt. No. 77]. In that brief, *Amici* contended that the Complaint was not properly pleaded against the President in his official capacity. During oral arguments, this Court referenced *Amici's* argument concerning the appropriateness of the official-capacity suit. Subsequently, Plaintiffs filed their Amended Complaint to include a claim against the President in his individual capacity. [Dkt. No. 90-2]. Now, "Defendant Donald J. Trump, President of the United States," that is the Defendant in his individual capacity, has "move[d] to dismiss the Amended Complaint with prejudice, as it relates to him in his individual capacity." [Dkt. No. 112].

Scholar Seth Barrett Tillman and Judicial Education Project (JEP) hereby move, through their respective undersigned counsel, for leave to file the accompanying *amicus brief*, attached hereto as Exhibit A, in the above-captioned case that is in support of neither party with respect to the Motion to Dismiss that was filed on behalf of defendant in his individual capacity [ECF No. 112]. Counsel for the Individual Capacity Defendant consented to the filing of this brief. Counsel for the Plaintiffs consent to the filing of this brief. Though *Amici* determined that it was not necessary to obtain the consent of the Official-Capacity Defendant, out of an abundance we sought consent. The Department of Justice consents to the filing of this brief. No party's counsel authored this Brief in whole or in part; no party or party's counsel contributed money that was intended to

fund preparing or submitting this Brief; and no person other than Amici Curiae or their counsel

contributed money that was intended to fund preparing or submitting this Brief.

## NATURE OF MOVANTS' INTEREST

Tillman, an American national, is a member of the regular full-time faculty in the

Maynooth University Department of Law, Ireland. Judicial Education Project (JEP) is a 501(c)(3)

organization dedicated to strengthening liberty and justice through defending the Constitution as

envisioned by the Framers—a federal government of defined and limited power, dedicated to the

rule of law, and supported by a fair and impartial judiciary.

Fifteen years ago, then-Judge Alito identified three different types of amici:

> Some friends of the court are entities with particular expertise not possessed by any party
> to the case. Others argue points deemed too far-reaching for emphasis by a party intent on
> winning a particular case. Still others explain the impact a potential holding might have on
> an industry or other group.

*Neonatology Assocs., P.A. v. C.I.R.*, 293 F.3d 128, 132 (3d Cir. 2002) (Alito, J.) (citations omitted).

Tillman and JEP can serve these roles.

With respect to Tillman, he is one of a very small handful of academics who has written

extensively on the Constitution's Foreign Emoluments Clause, and more recently he has written

on the Domestic Emoluments Clause. Arguments in the defendant's motion to dismiss are from,

or derived from, Tillman's scholarship. Additionally, JEP educates citizens about constitutional

principles, as envisioned by the Framers, and focuses on issues such as the judiciary's role in our

democracy, how judges interpret the Constitution, and the impact of court rulings on the nation.

JEP's educational efforts are conducted through various outlets, including print, broadcast, and

internet media. In pursuit of these constitutional principles, JEP has filed *amicus* briefs in numer-

ous cases before the federal courts of appeals and the Supreme Court.

## ARGUMENT

"There is no Federal Rule of Civil Procedure that applies to motions for leave to appear as amicus curiae in a federal district court. District courts therefore have discretion whether to grant or deny such leave and often look for guidance to Rule 29 of the Federal Rules of Appellate Procedure, which applies to amicus briefs at the federal appeals level." *Am. Humanist Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n*, 303 F.R.D. 266, 269 (D. Md. 2014). *See Altizer v. Deeds*, 191 F.3d 540, 551 n.7 (4th Cir. 1999) ("federal courts have frequently appointed *amici* to participate in an appeal where a party will not brief an important position") (internal citations omitted); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131, 136 (D.D.C. 2008). "The decision to grant leave to proceed as amici at the trial court level is discretionary." *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 728 (D. Md. 1996) (citations omitted).

The Court has broad discretion in determining whether to grant leave to participate as an *amicus*, and such status is typically allowed when "the information offered is 'timely and useful.'" *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996). Specifically, *amicus* briefs are usually allowed "when the *amicus* has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Jin*, 557 F. Supp. 2d at 137 (citing *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir. 1997) (Posner, C.J.)); *see also Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003) (same). *Amici* can provide many forms of assistance to the Court, such as "ideas, arguments, theories, insights, facts or data that are not to be found in the parties' briefs." *See N. Mariana Islands v. United States*, 2009 U.S. Dist. LEXIS 125427, 3-4 (D.D.C. Mar. 6, 2009) (citations omitted). *See also Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 940 F.2d 792, 808 (3d Cir. 1991) (*amicus* briefs assist the court "in cases of general public interest by making suggestions to the court, by providing

supplementary assistance to existing counsel, and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision").

When considering whether to allow the submission of an *amicus* brief, courts consider whether it "will aid in the determination of the motions at issue." *James Square Nursing Home, Inc. v. Wing*, 897 F. Supp. 682, 683 (N.D.N.Y. 1995) *aff'd*, 84 F.3d 591 (2d Cir. 1996). As this case is novel in almost every respect, and a matter of general public interest, Tillman and JEP will provide this Court with "a historical perspective and insights that may not be available from the parties." *Citizens Against Casino Gambling in Erie Cty. v. Hogen of Nat'l Indian Gaming Comm'n*, No. 07-CV-451S, 2008 WL 11357911, at *1 (W.D.N.Y. Jan. 10, 2008) (granting leave for an amicus curiae to participate in oral arguments).

The interest of Tillman and JEP in this litigation is to inform this Court of arguments concerning the distinction between official and individual capacity claims, with respect to the Foreign and Domestic Emoluments Clause. Counsel for *amici* can provide the Court with alternative arguments that are not presented by the defendant, which are likely to provide grounds for resolving this case, in whole or in part.

## CONCLUSION

For the foregoing reasons, Tillman and JEP respectfully request that they be granted leave

to file the attached *amicus* brief in support of the defendant in his individual capacity.


Dated:          May 8, 2018


                                             Respectfully submitted,


                              By:

                                   /s/ Jan I. Berlage
                                   Jan I. Berlage (23937)
                                   Gohn Hankey & Berlage LLP
                                   201 North Charles Street
                                   Suite 2101
                                   Baltimore, Maryland 21201
                                   Tel. (410) 752-1261
                                   JBerlage@ghsllp.com
                                   *Counsel for Amici Curiae*

                                   Robert W. Ray, Esq.
                                      Admission *pro hac vice*
                                   THOMPSON & KNIGHT LLP
                                   900 Third Avenue, 20th Floor
                                   New York, New York 10022
                                   Telephone: (212) 751-3349
                                   Email: robert.ray@tklaw.com
                                   *Co-Counsel for Amicus Curiae*
                                   *Scholar Seth Barrett Tillman*

                                   Josh Blackman, Esq.
                                      Admission *pro hac vice*
                                   1303 San Jacinto Street
                                   Houston, Texas 77002
                                   Telephone: (202) 294-9003
                                   Email: Josh@JoshBlackman.com
                                   *Counsel for Amicus Curiae*
                                   *Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
  Admission *pro hac vice*
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2018, I caused a true and correct copy of the foregoing to

be served on all counsel of record through the Court's CM/ECF system.

/s/ Jan I. Berlage
Jan I. Berlage (23937)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

| | |
|---|---|
| THE DISTRICT OF COLUMBIA and THE STATE OF MARYLAND, <br><br>        *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, and in his individual capacity, <br><br>        *Defendants*. | No. 8:17-CV-01596-PJM |

---

**BRIEF FOR SCHOLAR SETH BARRETT TILLMAN AND THE JUDICIAL EDUCATION PROJECT AS *AMICI CURIAE* IN SUPPORT OF NEITHER PARTY WITH RESPECT TO MOTION TO DISMISS ON BEHALF OF DEFENDANT IN HIS INDIVIDUAL CAPACITY**

---

Robert W. Ray, Esq.
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Tel. (212) 751-3347
robert.ray@tklaw.com
*Co-Counsel for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Tel. (571) 357-3134
carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

Josh Blackman, Esq.
1303 San Jacinto Street
Houston, Texas 77002
Tel. (202) 294-9003
Josh@joshBlackman.com
*Counsel of Record for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Jan I. Berlage, Esq.
Gohn Hankey & Berlage LLP
201 North Charles Street
Suite 2101
Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................. 1

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I.     The Foreign and Domestic Emoluments Clauses, Unlike Most Provisions in the
       Constitution, Can Control the Private Conduct of Office-Holders ................................... 2

       A.     Generally, the Constitution Only Limits Official Actions Taken by Office-
              Holders ........................................................................................................................ 3

       B.     The 13th and 21st Amendments Control Both Official and Private Conduct of
              Office-Holders .......................................................................................................... 4

       C.     The Foreign Emoluments Clause Controls an Office-Holder's Official and
              Private Conduct, and Could Be Litigated Through Official-Capacity or
              Individual-Capacity Claims ................................................................................ 6

       D.     The Domestic Emoluments Clause Controls the President's Official and
              Private Conduct, and Could Be Litigated Through Official-Capacity or
              Individual-Capacity Claims ................................................................................ 9

II.    The Plaintiffs' Amended Complaint Only Concerns Private Conduct, So It Cannot
       Be Litigated by Means of an Official-Capacity Claim Against the President ................. 12

III.   Even if the Amended Complaint is Properly Pleaded Against the President in His
       Individual Capacity, the Absence of an Implied Cause of Action Requires its
       Dismissal ....................................................................................................................... 15

CONCLUSION .................................................................................................................. 16

i

# TABLE OF AUTHORITIES

**Cases**

Brooks v. Arthur,
  626 F.3d 194 (4th Cir. 2010) ........................................................................... 1, 3

Civil Rights Cases,
  109 U.S. 3 (1883) ............................................................................................... 4

Clinton v. Jones,
  520 U.S. 681 (1997) ......................................................................................... 13

Foreman v. Unnamed Officers of the Fed. Bureau of Prisons,
  Civ. A. No. DKC 09-2038, 2010 WL 4781333 (D. Md. Nov. 17, 2010) ............... 12

Hafer v. Melo,
  502 U.S. 21 (1991) ................................................................................. 4, 12, 13

Higazy v. Templeton,
  505 F.3d 161 (2d Cir. 2007) ............................................................................ 12

Jesner v. Arab Bank, PLC,
  No. 16-499, --- S. Ct. ----, 2018 WL 19146635 (2018) ...................................... 15

Kentucky v. Graham,
  473 U.S. 159 (1985) ......................................................................................... 12

Larson v. Domestic & Foreign Commerce Corp.,
  337 U.S. 682 (1949) ........................................................................................... 4

Lewis v. Clarke,
  137 S. Ct. 1285 (2017) ..................................................................................... 13

McDonnell v. U.S.,
  136 S. Ct. 2355 (2016) ................................................................................ 10, 11

Monell v. N.Y.C. Dep't of Soc. Servs.,
  436 U.S. 658 (1978) ......................................................................................... 12

Nixon v. Fitzgerald,
  457 U.S. 731 (1982) ......................................................................................... 13

Powell v. McCormack,
  395 U.S. 486 (1969) ........................................................................................... 8

Rodearmel v. Clinton,
  666 F. Supp. 2d 123 (D.D.C. 2009) ..................................................................... 8

Ross v. Meese,
   818 F.2d 1132 (4th Cir. 1987) ........................................................... 12

Solida v. McKelvey,
   820 F.3d 1090 (9th Cir. 2016) ........................................................... 12

United States v. Burr,
   25 F. Cas. 30 (C.C.D. Va. 1807) ....................................................... 13

Will v. Mich. Dep't of State Police,
   491 U.S. 58 (1989) ............................................................................ 13

Zivotofsky v. Kerry,
   135 S. Ct. 2076 (2015) ...................................................................... 15

**Constitutional Provisions**

U.S. Const. amend. XIII ............................................................................. 4

U.S. Const. amend. XXI ............................................................................. 5

U.S. Const. art. I, § 5 ................................................................................. 8

U.S. Const. art. I, § 6, cl. 2 ................................................................... 8, 12

U.S. Const. art. I, § 9, cl. 8 ....................................................................... 6

U.S. Const. art. II, § 1, cl. 7 ...................................................................... 9

U.S. Const. art. II, § 4 ............................................................................. 10

**Other Authorities**

Amended Complaint, Dkt. No. 95 ............................................................ 10

*Amici's* Corrected Response, Dkt. No. 77 ............................................... 3

Blumenthal v. Trump, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018) (Sullivan,
   J.), Dkt. No. 50, 2018 WL 2042238 ................................................... 6

Josh Blackman & Seth Barrett Tillman, *The Emoluments Clauses Litigation, Part 8*, The
   Volokh Conspiracy (Feb. 8, 2018), perma.cc/YUV6-Y5AV ................... 15

Kimberly Breedon & A. Christopher Bryant, *Considering a Constructive Trust as a Remedy
   for President Trump's Alleged Violations of the Foreign Emoluments Clause*, 9
   ConLawNOW 111 (2018) .................................................................. 13

Laurence H. Tribe, *How to Violate the Constitution Without Really Trying: Lessons from the Repeal of Prohibition to the Balanced Budget Amendment*, 12 CONST. COMM. 217 (1995) ............................................................................... 4

Laurence Tribe & Joshua Matz, *To End A Presidency: The Power of Impeachment* 33 (2018).. 10

Letter from *Amici*, Dkt. No. 88, 2018 WL 1128948 (Jan. 29, 2018)........................................... 15

Martin A. Schwartz, Sec. 1983 Litig. Claims & Defenses § 6.05 (2018).................................... 12

Motion to Dismiss on Behalf of Defendant in his Individual Capacity, Dkt. No. 112-1 ...... passim

Plaintiffs' Supplemental Memorandum, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018) (Sullivan, J.), Dkt. No. 50, 2018 WL 2042238................ 6, 7, 12

Sheri Dillon *et al.*, *Morgan Lewis LLP White Paper, Conflicts of Interest and the President* 2 (Jan. 11, 2017), https://perma.cc/B8BU-X4U3 ..................................................... 14

Statement of Interest, Dkt. No. 100 .............................................................. 3, 7, 13, 14

Tillman and JEP Brief, Dkt. No. 27-1 ........................................................... 7, 9, 15

Tr. of Jan. 25, 2018 Hearing ........................................................................ 3

## INTEREST OF *AMICI CURIAE*

"Defendant Donald J. Trump, President of the United States," that is the Defendant in his individual capacity, has "move[d] to dismiss the Amended Complaint with prejudice, as it relates to him in his individual capacity."[1] The individual-capacity Defendant argues that Plaintiffs should *exclusively* plead this action as an official-capacity claim. *Amici* agree with the individual-capacity Defendant that the claims against the President in his individual capacity should be dismissed. However, contrary to the arguments of the individual-capacity Defendant, the claims in this case brought under the Emoluments Clauses cannot be pleaded against the President in his official capacity. The two issues are doctrinally related and inextricably linked; they need to be considered together. As a result, this brief is styled as an amicus brief in support of *neither* party.

## PRELIMINARY STATEMENT

The Plaintiffs' Amended Complaint alleges that the President is violating the Foreign and Domestic Emoluments Clauses in both his official and individual capacities.[2] Counsel for Defendant in his official capacity (hereinafter "DOJ") and counsel for Defendant in his individual capacity (hereinafter "Defendant Trump") both maintain that claims brought under the Emoluments Clauses can *only* be litigated against the President in his official, and not individual, capacity. While as a general matter the Constitution limits official action taken by office-holders, the Emoluments Clauses, as well as the 13th and 21st Amendments, are exceptions. These provisions control both the official conduct, as well as the private or individual conduct, of an officeholder. Depending on the circumstances, violations of these provisions could be litigated through official or individual-capacity claims. Ensuring that claims are properly pleaded is crucial in three important respects.

---

[1] Motion to Dismiss on Behalf of Defendant in his Individual Capacity at 1, Dkt. No. 112-1.

[2] Though there is only one President, *Amici* refer to the Defendants, plural, because the official-capacity Defendant (hereinafter "DOJ") and the individual-capacity Defendant (hereinafter "Defendant Trump") are in fact "two separate identities" for purposes of this litigation, and "are not in privity with one another for purposes of res judicata." Brooks v. Arthur, 626 F.3d 194, 201–02 (4th Cir. 2010).

1

First, unlike with official-capacity actions, individual-capacity actions can only proceed if Congress or the Judiciary created a cause of action. Second, different defenses and immunities are available for official-capacity actions, that are not available for individual-capacity actions. Finally, official-capacity claims (if they should prevail) are limited to injunctive relief—not so, for individual-capacity claims. These three distinct inquiries—which Defendants attempt to conflate—turn on how a claim is pleaded.

Because the facts in the Amended Complaint only concern private conduct, which does not implicate policies or property of the federal government, the official-capacity claims must be dismissed. While the individual-capacity claims are properly pleaded, these claims must also be dismissed due to the absence of any statutory or implied constitutional cause of action.

## ARGUMENT

### I.   The Foreign and Domestic Emoluments Clauses, Unlike Most Provisions in the Constitution, Can Control the Private Conduct of Office-Holders

As a general matter, the Constitution only limits official action taken by office-holders. There are exceptions, however. The 13th Amendment prohibits a government official from enslaving a person, regardless of whether the action is taken pursuant to a government policy or by using government property. Likewise, the 21st Amendment prohibits government officials from transporting alcohol into a prohibitionist state, regardless of whether the action is taken pursuant a government policy or by using government property. Where these constitutional torts are justiciable, and are committed by government officials, depending on the facts, plaintiffs could sue those government officials in their official or individual capacities.

A similar analysis applies to the Foreign and Domestic Emoluments Clauses. Both provisions control official and private conduct; that is certain government officials' accepting or receiving emoluments, regardless of whether the action is taken pursuant to a government policy

or by using government property. As a result, were violations of these provisions justiciable, de-

pending on the facts, plaintiffs could sue those officials in their official or individual capacities.

## A.  Generally, the Constitution Only Limits Official Actions Taken by Office-Holders

During oral arguments, the Court questioned whether this lawsuit was properly pleaded as

an "official capacity" action. The Court was right to do so. The Court recognized that this case has

"nothing" to do with the Defendant's "performance of his duties as President."[3] The Court also

noted that Plaintiffs' Complaint only concerns "somebody who is personally benefiting as a private

owner of a business," which has "nothing do to with his performance of his duties as president."[4]

Notwithstanding these uncontroverted facts,[5] both Defendant Trump and the DOJ insist that this

Court is mistaken.[6] DOJ maintained that "the Emoluments Clauses do not even apply to the Pres-

ident in his individual capacity."[7] Defendant Trump stated that "Emoluments Clauses violations,

can occur only by virtue of the person holding federal office and exercising those official duties."[8]

Defendants are correct in that, as a general matter, the Constitution limits official actions taken by

office-holders. That analysis, however, does not squarely apply to the 13th and 21st Amendments,

nor to the Foreign and Domestic Emoluments Clauses.

---

[3] Tr. of Jan. 25, 2018 Hearing at 28:16–18.

[4] *Id.*

[5] *Amici's* Corrected Response, Dkt. No. 77, at 2 (explaining that "the conduct the Plaintiffs complain about consists *entirely* of personal commercial relationships that purportedly violate the Constitution's Foreign and Domestic Emoluments Clauses; specifically, that Donald Trump is accepting or receiving money in the form of distributions from LLCs and corporations which he owns (and/or controls) in whole or in part.").

[6] Motion to Dismiss, *supra* note 1, at 14–15 ("Respectfully, then, the Court's suggestion that this dispute has 'nothing' to do with the Defendant's 'performance of his duties as president' was mistaken."); Statement of Interest at 5, Dkt. No. 100 ("That is, contrary to the Court's prior suggestion, the President's compliance with the Emoluments Clauses is part of his official duties, and any alleged noncompliance necessarily would be in the President's official capacity.").

[7] Statement of Interest, *supra* note 6, at 5.

[8] Motion to Dismiss, *supra* note 1, at 14.

### B.     The 13th and 21st Amendments Control Both Official and Private Conduct of Office-Holders

In certain instances, the Constitution controls not only official conduct, but can also restrict private conduct. Two decades ago, Professor Laurence H. Tribe identified two such provisions.[9] The first exception is the 13th Amendment, which declares that "slavery" shall not "exist within the United States."[10] Unlike the 14th Amendment, this blanket prohibition on slavery does not impose a state-action requirement.[11] If a federal or state officer enslaves a person under a government policy, he violates the 13th Amendment in his *official* capacity.[12] This is so even if—*especially* if—that policy was unlawful. Likewise, if a federal officer enslaves a person using government property, he violates the 13th Amendment in his *official* capacity.[13] These constitutional torts arise in connection with wrongdoing by the officer. Legal challenges to such violations must be filed against the officer in his official capacity.

By contrast, a federal or state officer could enslave a person without regard to any government policy, or without making use of government property. That is, he does so in his own home, with his own resources. Doing so would still violate the 13th Amendment, but in his *individual*, and not *official* capacity. Here, the officer personally commits a constitutional tort. He is, however, not acting for the sovereign in carrying out a government policy, nor did his actions make use of government property. In these circumstances, a lawsuit against the office or the government makes no sense. Rather, the officer should be sued in his individual capacity for what is, in effect,

---

[9] Laurence H. Tribe, *How to Violate the Constitution Without Really Trying: Lessons from the Repeal of Prohibition to the Balanced Budget Amendment*, 12 CONST. COMM. 217, 220 (1995).

[10] U.S. Const. amend. XIII.

[11] *See* The Civil Rights Cases, 109 U.S. 3 (1883).

[12] *See* Hafer v. Melo, 502 U.S. 21, 25 (1991) ("Because the real party in interest in an official capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" *must have played a part* in the violation of federal law.'" (citations omitted) (emphasis added)).

[13] *See* Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 687 (1949) (noting that unlike claims brought against an "agent's personal actions," claims brought against the sovereign will "require action by the sovereign or *disturb the sovereign's property*" (emphasis added)).

a private constitutional tort. Here relief will run against the wrongdoer, who happens to be an officer, and not against the government itself.

Professor Tribe also identified a second constitutional provision that controls both official and private conduct: the 21st Amendment states that "[t]he transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, *in violation of the laws thereof, is hereby prohibited.*"[14] That is, a violation of a state's prohibition laws is a violation of the Constitution. This analysis applies to the population generally, and equally to government officials. Imagine that Maryland prohibits the importation of intoxicating liquors. In response, two different Virginia mayors transport alcohol into Maryland in two different, but equally unlawful ways. In the first scenario, the Mayor of Charlottesville distills alcohol in City Hall, and, pursuant to an unconstitutional city policy, he ships the liquor from Virginia into Maryland using the city's vehicles. The mayor's actions violate the 21st Amendment, and his violation was in his official capacity. In the second scenario, the Mayor of Arlington brews beer in his bathtub at home and transports the beer into Maryland in his private vehicle. This mayor's actions also run afoul of the 21st Amendment, but here the violation is in the mayor's individual capacity. Both mayors violated the Constitution's 21st Amendment, but only the former violation could be challenged through an official-capacity lawsuit.

Nothing about the capacity analysis hinges on whether Marylanders are purchasing the mayoral moonshine in order to generate goodwill with the Virginia politicians. Even if a Baltimore bar unlawfully purchased the Arlington Mayor's home-brewed booze to curry favor with him or with the Virginia state government, or with both, any civil claim challenging such transactions

---

[14] U.S. Const. amend. XXI (emphasis added).

would remain an individual-capacity action. Such a claim could not be brought as an official-capacity action.

Though Professor Tribe identified "only" two ways in which private conduct can run afoul of the Constitution, the Foreign and Domestic Emoluments Clauses are, in *Amici's* view, a third and fourth way. Indeed, the plaintiffs in a parallel Emoluments Clauses-related lawsuit observed that the "Foreign Emoluments Clause," and we would add, the Domestic Emoluments Clause, are "*unusual* in regulating the *private* conduct of federal officials."[15] The Foreign and Domestic Emoluments Clauses differ from the 13th and 21st Amendment in one important respect: while the latter two apply to all Americans, the former two are only triggered by people holding specific offices or positions in the federal government. But, once triggered, they operate in the same fashion: each provision controls *both official* and *private* conduct. And, depending on the facts of a given case, *both* provisions could be litigated through official and/or individual-capacity claims.

### C.   The Foreign Emoluments Clause Controls an Office-Holder's Official and Private Conduct, and Could Be Litigated Through Official-Capacity or Individual-Capacity Claims

The Foreign Emoluments Clause provides that those holding "office . . . under the [United States]" cannot "accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" "without the Consent of the Congress."[16] This clause can be violated in an office-holder's official or individual capacity. For example, the Secretary of State violates the Foreign Emoluments Clause in his official capacity if he publicly "accept[s]" emoluments from a foreign state pursuant to a federal government policy—perhaps one laid down by the

---

[15] Plaintiffs' Supplemental Memorandum at 36 n.14, *Blumenthal v. Trump*, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. April 30, 2018) (Sullivan, J.), Dkt. No. 50, 2018 WL 2042238, http://bit.ly/2juoce4 (emphases added).

[16] U.S. Const. art. I, § 9, cl. 8. Because, in *Amici's* view, the President is not covered by this clause and its operative *Office*-language, the foregoing analysis will consider the Secretary of State, who, all agree, is bound by this constitutional provision.

President—even if the policy were unlawful. He likewise violates the Foreign Emoluments Clause in his official capacity if the Secretary uses federal government property to commit the constitutional tort: i.e., the act of *accepting* the emoluments.

On the other hand, if the Secretary privately "accept[s]" emoluments from a foreign state without regard to any government policy, and without using federal government property in order to accept the emoluments, then he violates the Foreign Emoluments Clause in his individual capacity. For example, imagine if the Secretary of State opens up a lemonade stand outside of his home. A foreign diplomat pays the Secretary to make him a glass of lemonade at a cost of $1,000,000.[17] Because the Secretary's *acceptance* of the payment did not make use of any government property, nor was it *accepted* pursuant to a federal government policy, it could not be challenged as an official-capacity action. The purported constitutional tort that violates the Foreign Emoluments Clause is the Secretary's *accepting* the purported emoluments, not his making lemonade or delivering it to a foreign diplomat. If such a case were justiciable—for example, if Congress created a statutory cause of action—a court could order disgorgement of the $1,000,000 as a remedy. The United States as sovereign could not provide any remedy, because it had no role in the constitutional violation. Indeed, the United States could have no role in this remedy because it would not control the account in which the funds were deposited.

DOJ offers one contrary example: in "a challenge to a Senator's noncompliance with the constitutional requirement that he or she be 'an Inhabitant of that State in which he shall be cho-

---

[17] *Amici* do not concede that such a commercial transaction would create "emoluments" for purposes of the Emoluments Clauses. Tillman and JEP Brief, Dkt. No. 27-1, at 24–30.

sen,'" the "real party in interest in that circumstance would be the Senator in his official capac-
ity."[18] This is so, DOJ explains, "even if the alleged injuries had stemmed from the Senator's per-
sonal choice to have an out-of-state residence."[19] This argument does not pass muster, because the
purported violation is not a constitutional tort. The decision of a Senator to reside in a different
state does not, by itself, violate the Constitution. Rather, the legal consequences, if any, of a Sen-
ator's decision to live elsewhere is a matter for the Senate to resolve. That body is the "Judge of
the Elections, Returns and *Qualifications* of its own Members," and it can pass judgment on a
Senator's residency.[20] The Supreme Court recognized that claims concerning a Senator's consti-
tutionally-determined qualifications, such as inhabitancy, are not subject to judicial review.[21] It is
a non sequitur how such a complaint or claim should be pleaded in an Article III court because it
is a non-justiciable political question.

For another purported contrary example, Defendant Trump cites the Ineligibility Clause.[22]
In *Rodearmel v. Clinton*, a foreign service officer challenged Hillary Clinton's appointment as
Secretary of State, because, while as Senator, she voted to increase the emoluments (i.e., salary)
of the office to which she was subsequently appointed.[23] According to Defendant Trump, this suit
could *only* proceed against Secretary Clinton in her "official capacity as Secretary of State."[24] The
*Rodearmel* court, which dismissed the complaint because the Plaintiff lacked standing, did not

---

[18] Statement of Interest, *supra* note 6, at 4. *See also* Motion to Dismiss, *supra* note 1, at 16. Plaintiffs in a parallel
Emoluments Clauses-related lawsuit advanced this same argument. *See* Plaintiffs' Supplemental Memorandum, *supra*
note 15, at 36 n.14.

[19] Statement of Interest, *supra* note 6, at 4.

[20] U.S. Const. art. I, § 5 (emphasis added).

[21] Powell v. McCormack, 395 U.S. 486, 552 (1969) (Douglas, J., concurring) ("Contests may arise over whether an
elected official meets the 'qualifications' of the Constitution, in which event the *House is the sole judge*." (emphasis
added)).

[22] Motion to Dismiss, *supra* note 1, at 16 (quoting U.S. Const. art. I, § 6, cl. 2 ("No Senator or Representative shall,
during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States,
which shall have been created, or the Emoluments whereof shall have been [i]ncreased during such time.")).

[23] Rodearmel v. Clinton, 666 F. Supp. 2d 123, 126 (D.D.C. 2009).

[24] *Id.* at 125–126.

opine on whether the complaint was properly pleaded as an official- or individual-capacity complaint.[25] Assuming the case was properly pleaded as an official-capacity complaint, it is still inapposite because Rodearmel's complaint did not concern any private conduct, much less any conduct analogous to the conduct alleged in the Amended Complaint against Defendant Trump. Neither the inhabitancy requirement of Article I, nor the Ineligibility Clause, supports the Defendants' position. Indeed, it is telling that *both* Defendants can only point to non-justiciable claims that are generalized grievances against the federal government in order to counter *Amici's* arguments related to capacity.

> **D.      The Domestic Emoluments Clause Controls the President's Official and Private Conduct, and Could Be Litigated Through Official-Capacity or Individual-Capacity Claims**

The Domestic Emoluments Clause provides that the President "shall not receive . . . any other Emolument from the United States, or any of" the states.[26] The President can violate this provision in his official or individual capacity. For example, if the President publicly "receive[s]" proscribed emoluments from a state pursuant to a federal government policy, or if the President uses federal government property in order to receive the emolument, he violates the Domestic Emoluments Clause in his official capacity.

On the other hand, if the President, privately "receive[s]" proscribed emoluments from a state without regard to any federal government policy, and without using federal government property, then he violates the Domestic Emoluments Clause in his individual capacity. Consider another hypothetical: the President opens up a lemonade stand outside of his private vacation home in Florida. A state legislature pays the President to make lemonade for its members at a cost of

---

[25] *Id.*
[26] U.S. Const. art. II, § 1, cl. 7.

$10,000,000.[27] In this scenario, the purported constitutional tort that violates the Domestic Emoluments Clause is the President's *receiving* the emoluments, and not his making lemonade or delivering it to the members. The capacity determination does not hinge on whether the payment is made on the sidewalk outside his vacation home, by electronic wire transfer, or even by a check mailed to the White House. If the President's act of *receiving* these profits was not facilitated by any federal government policy or property, then payment for the lemonade could not be challenged in court as an official-capacity action.[28] The payment could *only* be challenged through an individual-capacity action. If such a case were justiciable—for example, if Congress created a private cause of action—a court could order disgorgement of the $10,000,000 as a remedy, even for payments not yet made. The United States as sovereign could not provide any remedy, because its policies and property had no role in the constitutional violation. Indeed, the United States could have no role in this remedy because it would not control the account in which the funds were deposited.

This conclusion is not changed if the payments were motivated by the clout of the President's position. The capacity analysis with respect to the Emoluments Clauses does not hinge on whether the donor's motive for giving the purported emoluments was to enjoy future benefits or good will from the President. The fact that the President would not have received the emoluments but for his being President does not turn an individual-capacity constitutional violation into an

---

[27] *Amici* do not concede that such a commercial transaction would create "emoluments" for purposes of the Emoluments Clauses. Tillman and JEP Brief, *supra* note 17, at 24–30.

[28] For this reason, Plaintiffs' allegations concerning profits derived from the Trump International Hotel, *see* Am. Compl., Dkt. No. 95, at ¶¶ 80–88, are irrelevant. The purported constitutional tort is receiving payments, not providing hospitality services at the Hotel. The Amended Complaint makes no allegations that the Defendant uses any government property in the process of receiving such profits. Apparently, under the terms of the lease, the Hotel is not government property, but is property of the Trump Organization. Even if that real estate generates profits due to a lease with the General Services Administration, the President's *receipt* of those profits is not a consequence of any federal policy.

official-capacity claim.[29] The reason is simple: official-capacity claims are tied to the office-holder's conduct, not the counter-parties' behavior or motives. Where the officeholder's wrong-doing does not conform to any official policy and where he makes no use of government property in committing the constitutional tort, then the wrongdoer's conduct cannot be ascribed to his office or to the sovereign. As a result, no official-capacity claim may be pleaded, and only an individual-capacity action is possible. Situations involving past or future purported constitutional torts by officials, not tied to government policy and property, are, at most, individual-capacity suits.

Defendant Trump is correct that the Domestic Emoluments Clause *only* applies to the President "by virtue" of the fact that he is President. That is, taking the oath of office triggers the prohibitions against the receipt of certain emoluments. *Amici* agree with the Defendant that "[h]ad the President not been elected, and thereby assumed the duties of that office, no claim would lie against him under the Emoluments Clauses."[30] Respectfully, however, that is not "the end of the matter."[31] The *trigger* only determines who the clause applies to. It does not determine whether the claim should be pleaded as an official- or individual-capacity action. Rather, the capacity determination turns on whether the President uses federal government policy or property to commit the constitutional tort. The $10,000,000 lemonade contract, for example, implicates neither, and so it could only be challenged (if at all) via an individual-capacity claim. The fact that the Domestic

---

[29] However, such goodwill and such expectations by donors might be evidence why such purported emoluments were paid. In another forum, the donor's intent might be especially relevant to determining if a particular "emolument" is, in reality, a "bribe" prohibited by the Impeachment Clause. *See* U.S. Const. art. II, § 4. Congress may have independent constitutional authority to make this determination, even if it falls short of the Supreme Court's stringent definition of "quid pro quo corruption." *See* McDonnell v. U.S., 136 S. Ct. 2355, 2372–73 (2016); *see also* Laurence Tribe & Joshua Matz, *To End A Presidency: The Power of Impeachment* 33 (2018) (noting in regard to the Domestic Emoluments Clause, "By writing bribery into the Impeachment Clause, they ensured that the nation could expel a leader who would sell out its interests to advance his own.").

[30] Motion to Dismiss, *supra* note 1, at 21.

[31] *Id.*

Emoluments Clause in particular applies exclusively to the President does not convert all such purported wrongs under that clause to official-capacity claims.

## II.   The Plaintiffs' Amended Complaint Only Concerns Private Conduct, So It Cannot Be Litigated by Means of an Official-Capacity Claim Against the President

The analysis in Part I demonstrates that claims brought under the Emoluments Clauses must be pleaded differently based on the alleged facts at issue. If the federal officer accepted the purported illegal emoluments pursuant to some formal or informal Executive Branch policy, then the federal officer could be sued in an official capacity. Likewise, if the act of accepting or receiving the purported illegal emoluments made use of federal government property, then the federal officer could also be sued in his official capacity. Otherwise, the federal officer can only be sued (if at all) in his individual capacity. Based on the facts alleged in the Plaintiffs' Amended Complaint, there is no official conduct at issue. Rather, the President's acceptance and receipt of purported prohibited emoluments does not make use of any government policy or property. Thus, the sovereign is not the real party in interest. Plaintiffs' allegations cannot be properly pleaded as "official capacity" suits.

Both Defendants counter that, regardless of the facts pleaded, that nature of the remedy sought—in this case an injunction, rather than damages—determines how the complaint should be pleaded.[32] This analysis puts the cart before the horse. *Hafer v. Melo* recognized that "[b]ecause the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's "policy or custom" *must* have played a part in the violation of federal law.'"[33]

---

[32] Motion to Dismiss, *supra* note 1, at 15–16. *See also* Plaintiffs' Supplemental Memorandum, *supra* note 15, at 36 ("[T]he choice between an official- or personal-capacity suit depends on whether injunctive relief or damages are being sought. It does not depend on whether the constitutional violation arises out of the defendant's performance of his job duties.").

[33] 502 U.S. 21, 25 (1991) (quoting Kentucky v. Graham, 473 U.S. 159, 166 (1985) (quoting Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978))). *See also* Martin A. Schwartz, Sec. 1983 Litig. Claims & Defenses § 6.05 (2018) ("In a personal-capacity suit, a plaintiff need not show a connection to a *governmental policy or custom*; officials sued personally, however, may assert common-law immunity defenses." (emphasis added)).

Here, the key word is *must*. Where "the entity's policy or custom" did not "play[] a part in the violation of federal law,"[34] then the complaint cannot be pleaded against the officer in his *official* capacity.[35] Rather, such a claim can only be brought (if at all) as an individual-capacity suit. Furthermore, the mere fact that a plaintiff seeks injunctive relief, rather than damages, does not preclude an individual-capacity claim.[36] *Hafer* recognized "that the distinction between official-capacity suits and personal-capacity suits is more than 'a mere pleading device.'"[37]

Even on the Defendants' own terms, this remedy-based analysis falters. DOJ's statement of interest, for example, explains that an injunction against the President "would indeed 'require action by the sovereign,' assuming that separation-of-powers principles would not otherwise bar that relief."[38] What action would have to be taken by the United States as sovereign? DOJ posits that "[t]he President, as the holder of the Office of the President, would need to ensure compliance with the Emoluments Clauses, and his conduct as such would need to conform to any appropriate injunctive relief."[39] This explanation, with all due respect, avoids the critical question. Not everything done by a federal official constitutes "action by the sovereign." For example, a judgment against the Secretary of State's lemonade stand would not require any "action by the sovereign."

---

[34] *Hafer*, 502 U.S. at 25 (quotation marks omitted).

[35] For purposes of §1983, *Hafer* rejected a claim for damages against a state officer, because such a suit would be "no different from a suit against the State itself." *Id.* at 27. In this context, the Court explained, "the capacity in which the officer inflicts the alleged injury" was irrelevant, because the state itself was the real party in interest, and could not be forced to pay damages. *Id.*

[36] In the Fourth Circuit, for example, injunctive relief is available for a *Bivens* action. *See, e.g.*, Foreman v. Unnamed Officers of the Fed. Bureau of Prisons, Civ. A. No. DKC 09-2038, 2010 WL 4781333, at *2–3 (D. Md. Nov. 17, 2010) (Chasanow, J.) (observing that the Fourth Circuit "squarely held that a court may order declaratory and injunctive relief in a '*Bivens* type' action") quoting Ross v. Meese, 818 F.2d 1132, 1135 (4th Cir. 1987). *But cf.* Solida v. McKelvey, 820 F.3d 1090, 1093–94 (9th Cir. 2016); Higazy v. Templeton, 505 F.3d 161, 169 (2d Cir. 2007). Regardless of whether injunctive relief is available under *Bivens*, Congress could create a private cause of action that permits injunctive relief against an officer in his individual capacity.

[37] *Hafer*, 502 U.S. at 27 (quoting Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).

[38] Statement of Interest, *supra* note 6, at 6–7 (quoting Lewis v. Clarke, 137 S. Ct. 1285, 1291 (2017)).

[39] Statement of Interest, *supra* note 6, at 7.

This principle is equally true for the President: some of his actions constitute "action by the sovereign" and some do not. While the President "occupies a unique office with powers and responsibilities so vast and important that the public interest demands that he devote his undivided time and attention to his public duties,"[40] the Supreme Court has recognized that the Chief Executive's duties "are not entirely 'unremitting.'"[41] There remains an important distinction between the President's "official acts"[42] and his "unofficial conduct."[43]

If this Court issues a permanent injunction that, for example, orders the President to divest or disgorge certain assets—for example, in the form of a constructive trust[44]—the United States as a sovereign would have *no action* to take. Only Donald J. Trump, in his individual capacity, would have to divest or disgorge his personal assets. Any court-ordered injunctive relief would fall within the President's *personal* responsibilities. No check would (or could) be issued by the Treasury Department because the purported funds are not in the Treasury's accounts. Because no action by the sovereign was taken to create the private commercial trust that currently controls Defendant Trump's assets,[45] no sovereign action would be needed to, or could modify that trust in response to a court order. If the official-capacity action is to be maintained, both Defendants should be asked

---

[40] Clinton v. Jones, 520 U.S. 681, 697–98 (1997).

[41] *Id.* at 699 (quoting United States v. Burr, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (No. 14,692d) (Marshall, C.J.)).

[42] *See* Nixon v. Fitzgerald, 457 U.S. 731, 749 (1982).

[43] *See Jones*, 520 U.S. at 705. *Nixon v. Fitzgerald's* identification of the "'outer perimeter' of [the President's] official responsibility" concerns the availability of the defense of absolute immunity; it is not determinative of the line between an official-capacity and an individual-capacity claim. *Nixon*, 457 U.S. at 756.

[44] *See* Kimberly Breedon & A. Christopher Bryant, *Considering a Constructive Trust as a Remedy for President Trump's Alleged Violations of the Foreign Emoluments Clause*, 9 ConLawNOW 111, 114 (2018), http://bit.ly/2jvNWql. The availability of a constructive trust as a possible remedy illustrates why both Defendants were incorrect when they argued that the litigation would become "moot" if Donald J. Trump no longer served as President. *See* Statement of Interest, *supra* note 6, at 6; Motion to Dismiss, *supra* note 1, at 16. Even if a new President (or acting President) succeeds Trump, the Court could still hold the former President (or his estate) liable for *past, ongoing, and future* violations in his individual capacity through the imposition of injunctive relief, i.e., a constructive trust. Moreover, a constructive trust, as a remedy, includes prospective relief, as it is an order operating against payments yet-to-be made or yet-to-be received by Trump and Trump-related commercial entities.

[45] Sheri Dillon *et al.*, *Morgan Lewis LLP White Paper, Conflicts of Interest and the President* 2 (Jan. 11, 2017), https://perma.cc/B8BU-X4U3 (describing creation and organization of President-Elect Trump's "Trust").

to represent how an injunction or declaration in this case concerning the President's *accepting* or

*receiving* purported emoluments would "*require* action by the sovereign."[46] If no representation

can be proffered, then the official-capacity claim cannot proceed. Likewise, Plaintiffs did not file

suit against any other entity in the federal government, including the General Services Administra-

tion, which manages the lease to the Trump International Hotel.[47] As a result, they forfeited any

claim for this Court to issue an injunction against that agency that would "*require* action by the

sovereign." Because this Court could issue remedies that in no way "*require* action by the sover-

eign"—for example, divestment or disgorgement against Donald J. Trump in his private capac-

ity[48]—this case cannot be pleaded against the President in his official capacity even under the

Defendants' capacity-is-tied-to-the-remedy theory.

## III.   Even if the Amended Complaint is Properly Pleaded Against the President in His Individual Capacity, the Absence of an Implied Cause of Action Requires its Dismissal

Part II demonstrates why the official-capacity claims in the Amended Complaint must be

dismissed with prejudice because they are not properly pleaded. The individual-capacity claims,

in contrast, are properly pleaded. However, a properly-pleaded individual-capacity claim cannot

proceed unless there is available a cause of action created by Congress or the Judiciary. Congress

has not created a private cause of action under either the Foreign or Domestic Emoluments Clauses.

Furthermore, *Amici* agree with Defendant Trump that "there is no *Bivens* action available for vio-

lations of the Emoluments Clauses."[49] This principle, which *Amici* had already advanced in its

---

[46] Statement of Interest, *supra* note 6, at 7.
[47] *See supra* note 28 (discussing Trump International Hotel).
[48] See *supra* note 44 and accompanying text (discussing divestment, disgorgement, and constructive trust).
[49] Motion to Dismiss, *supra* note 1, at 20.

prior correspondence to the Court,[50] was bolstered by the Supreme Court's recent decision in *Jesner v. Arab Bank, PLC*.[51] And, while courts should generally proceed with caution before implying new causes of action respecting domestic concerns (such as with the Domestic Emoluments Clause), in light of *Jesner*, courts should proceed with even *greater* caution before implying new causes of action respecting foreign policy.[52] This principle applies to the Foreign Emoluments Clause, which can implicate the President's powers over international affairs, including the power to accept foreign diplomatic gifts as an act of recognition.[53] For all these reasons, insofar as the Amended Compliant relates to the President's conduct taken in "his individual capacity," that claim should be dismissed with prejudice.

## CONCLUSION

The official-capacity claims in the Amended Complaint should be dismissed with prejudice because they are not properly pleaded. The individual-capacity claims in the Amended Complaint, though properly pleaded, should be dismissed with prejudice because there is no available statutory or implied cause of action on which relief can be granted. Because the Defendants and Plaintiffs agree that Plaintiffs' claim is properly pleaded as an official-capacity claim, there is no adversity on this point. If the Court's decision-making would be aided by a diversity of views on this point at oral argument on this motion (or on the June 11, 2018 hearing), counsel for *Amici* would be pleased to appear.

---

[50] Letter from *Amici* at 2, Dkt. No. 88, 2018 WL 1128948 (Jan. 29, 2018); *see also* Josh Blackman & Seth Barrett Tillman, *The Emoluments Clauses Litigation, Part 8*, The Volokh Conspiracy (Feb. 8, 2018), perma.cc/YUV6-Y5AV**.**

[51] No. 16-499, --- S. Ct. ----, 2018 WL 1914663, at *15 (2018) ("The Court's recent precedents cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law . . . .").

[52] *Id.* at *15 ("In fact, the separation-of-powers concerns that counsel against courts creating private rights of action apply with particular force in the context of the [Alien Tort Statute] . . . The political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns . . . .").

[53] *See* Zivotofsky v. Kerry, 135 S. Ct. 2076 (2015); *see also* Tillman and JEP Brief, *supra* note 17, at 19 ("If the Constitution vests the President with vast authority over recognizing foreign nations, then certainly it entails the far lesser authority to accept presents from those very same countries. *Indeed, the President's decision to accept a gift from a yet unrecognized foreign state or head of government could itself amount to an act of recognition.*" (emphasis added)).

Dated:        May 8, 2018

Respectfully submitted,

By:

/s/ Jan I. Berlage
Jan I. Berlage (23937)
Gohn Hankey & Berlage LLP
201 North Charles Street
Suite 2101
Baltimore, Maryland 21201
Tel. (410) 752-1261
JBerlage@ghsllp.com
*Counsel for Amici Curiae*

Robert W. Ray, Esq.
   Admission *pro hac vice*
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3349
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Josh Blackman, Esq.
   Admission *pro hac vice*
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
   Admission *pro hac vice*
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 8, 2018, I caused a true and correct copy of the foregoing to

be served on all counsel of record through the Court's CM/ECF system.

/s/ Jan I. Berlage
Jan I. Berlage (23937)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JOHN CONYERS, JR., et al., | No. 17 Civ. 1154-EGS |
| Plaintiffs, | **[PROPOSED ORDER]** |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States of America, | |
| Defendant. | |

**ORDER**

Upon consideration of the Motion of scholar Seth Barrett Tillman and Judicial Education

Project for leave to be heard at oral arguments, it is hereby

**ORDERED** that the motion is **GRANTED**.

Dated: May __, 2018          _____
        Washington, D.C.                    EMMET G. SULLIVAN
                                         United States District Judge