```
            UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF
```

RICHARD BLUMENTHAL,              )
                                )
              et al.,           )  Civil Action
                                )  No. 17-1154
          Plaintiffs,           )
                                )
        v.                      )  June 7, 2018
                                )  10:00 a.m.
DONALD J. TRUMP,                )
                                )  Washington, D.C.
          Defendant.            )
                                )


        *TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
        *BEFORE THE HONORABLE EMMET G. SULLIVAN,*
            *UNITED STATES DISTRICT JUDGE*


APPEARANCES:

   For the Plaintiffs:        **Brianne Jenna Gorod, Trial Attorney**
                              CONSTITUTIONAL ACCOUNTABILITY CENTER
                              1200 18th Street, NW
                              Suite 501
                              Washington, DC 20036
                              (202) 296-6889 ext. 304
                              Email: Brianne@theusconstitution.org
                              U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Avenue, NW
                              Washington , DC 20530
                              (202) 305-8900
                              Email: Ryan.lee2@usdoj.gov

                              **Elizabeth Bonnie Wydra, Trial**
                              **Attorney**
                              CONSTITUTIONAL ACCOUNTABILITY CENTER
                              1200 18th Street, NW
                              Suite 501
                              Washington, DC 20036
                              (202) 296-6889
                              Email:
                              Elizabeth@theusconstitution.org

APPEARANCES: Cont.

For the Plaintiffs:          **Brian Rene Frazelle, Esq.**
                             CONSTITUTIONAL ACCOUNTABILITY CENTER
                             1200 18th Street, NW
                             Suite 501
                             Washington, DC 20036
                             (202) 296-6889 ext. 311
                             Email: Brian@theusconstitution.org


For the Defendant:           **Brett A. Shumate, Trial Attorney**
                             U.S. Department of Justice
                             Civil - Federal Programs Branch
                             950 Pennsylvania Ave.
                             Washington, DC 20530
                             202-514-2331
                             Email: Brett.a.shumate@usdoj.gov

                             **Jean Lin, Trial Attorney**
                             U.S. DEPARTMENT OF JUSTICE
                             Civil Division, Federal Programs
                             Branch
                             20 Massachusetts Avenue, NW
                             Suite 7218
                             Washington, DC 20530
                             (202) 514-3716
                             Fax: (202) 616-8470
                             Email: Jean.lin@usdoj.gov

                             **James Powers, Trial Attorney**
                             U.S. DEPARTMENT OF JUSTICE
                             Civil Division, Federal Programs
                             Branch
                             20 Massachusetts Avenue, NW
                             Suite 7218
                             Washington, DC 20530
                             (202) 353-0543
                             Email: James.powers@usdoj.gov

**Appearances:   (Cont.)**

**Court Reporter:**                **Scott L. Wallace, RDR, CRR**
                                   **Official Court Reporter**
                                   U.S. DISTRICT COURT for the DISTRICT
                                   OF COLUMBIA
                                   Room 6503, U.S. Courthouse
                                   Washington, D.C. 20001
                                   202.354.3196
                                   scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1          <u>**MORNING SESSION, JUNE 7, 2018**</u>

2     (10:14 a.m.)

3          THE COURT:  Good morning.

4          THE COURTROOM CLERK:  Good morning, Your Honor.  This is

5     Civil Action 17-1154, *Richard Blumenthal, et al., versus Donald*

6     *J. Trump.*

7          Would parties please come forward to this lectern and

8     identify yourselves for the record.

9          MS. WYDRA:  Good morning, Your Honor.  Elizabeth Wydra for

10    the plaintiffs.  With me at counsel's table are my colleagues,

11    Brian Frazelle, Brianne Gorod, and our lead plaintiff, Senator

12    Richard Blumenthal, and Representative Gerald Nadler.

13         THE COURT:  All right.  Good morning to everyone.

14         MS. WYDRA:  Good morning.  Per the Court's order to focus

15    on standing, my colleague, Ms. Gorod, will be presenting argument

16    on the first two prongs of Article III standing analysis, injury

17    in fact, and traceability, and then I will present argument on

18    whether that injury can be redressed by this Court, as well as

19    any questions the Court may have about political question

20    doctrine, separation of powers concerns or other issues raised in

21    the government's brief.

22         THE COURT:  All right.

23         MS. WYDRA:  Thank you, sir.

24         THE COURT:  Thank you very much, Counsel.  This is how

25    we're going to proceed.  I have a number of questions that I

1    really need to get answers to, and I will certainly allow brief

2    argument with respect to any other issues you wish to address,

3    but focusing on standing only.

4         MS. WYDRA:  Yes.

5         THE COURT:  All right.  Let me especially welcome the

6    senator and the congressman.  I've had the pleasure of having

7    three confirmation hearings, Senate confirmation hearings.  They

8    were all fun.  I loved every -- no, seriously.  I had one in '84,

9    '89, and '94.  I'm not interested in any others.  They were fun.

10   I had the pleasure of testifying before a subcommittee

11   representing the judiciary years ago before the congressman, the

12   subcommittee on criminal law, I believe, and the issue was

13   whether or not there should be a Constitutional amendment to the

14   Victims' Rights Statute or whether or not Title 18 should be

15   amended, and --

16        MR. SHUMATE:  That's probably the Constitution that --

17        THE COURT:  That's correct.  Exactly.  That's correct.

18   And that was -- that was -- it was great to appear before the

19   subcommittee, and it's great to have you both here.

20        And let me hear from defense counsel.

21        MR. SHUMATE:  Good morning, Your Honor.

22        THE COURT:  Good morning.

23        MR. SHUMATE:  Brett Shumate from the Department of Justice

24   on behalf of the United States.  With me at counsel table are

25   Jean Lin and Jim Powers.

1          THE COURT:  All right.  Great.  Great to have you here as

2     well.  Good to see you all.

3          I had asked Mark to tell the speakers that if you wanted

4     to get some coffee -- get some water or so, you're welcome to do

5     that.  I was -- I brought some water myself in recognition of the

6     great year that the Cavs are having.  I actually had a red Solo

7     cup until my law clerk said, You can't take that Solo cup in

8     there.  So I have a green cup, so...  I want to break the ice

9     here.  All right?

10          I want to thank everyone for their brilliant submissions.

11     I've read everything more than once, and people in my office have

12     read everything more than once.  I want to especially thank the

13     amici.  I issued an order saying I did not want to hear argument

14     from the amici.  That's not because your submissions were not

15     brilliant.  They are.  But I've read everything more than once,

16     believe me.  And the time is limited, so I wanted to focus on the

17     issue of standing right now.  Don't read anything into that.

18     I've separated standing out because standing is the threshold

19     issue before we get to other issues, if we get to other issues.

20          I always like to say to the litigants before me, don't

21     read too much into the questions that I ask.  Don't do that.  The

22     media does.  I think lawyers do to a certain extent.  I've had

23     the honor of being on three courts.  I've been a judge for 34

24     years, a lot of experience.  And it may sound like I'm leaning in

25     a certain direction, but I'm just asking a lot of questions

1    because my job is to make the right decision for the right

2    reasons, so don't get misled by the questions.

3         A couple of years ago, I presided over a nonjury trial,

4    very high-profile nonjury trial.  And to this day, I wonder if

5    the defendant did not present a case-in-chief because of the

6    types of questions I was answering -- asking during direct and

7    cross-examination.  It was a nonjury trial.  And, of course, I

8    was the finder of fact with a great deal of latitude for a judge

9    to ask all sorts of questions, and I did.  And I've just always

10   wondered whether or not that was a tactical or a strategic

11   decision or whether the attorneys read too much into my questions

12   and did not present a case.  So this is different.  It's not a

13   trial, but I just throw that out there.  Don't -- I'm going to

14   ask a lot of questions, and it may seem like I'm leaning in one

15   direction or the other or hopelessly confused about everything,

16   but I just -- my job is to make the right decision for the right

17   reasons.

18        What I would like to do is this:  The plaintiff, of

19   course, has the burden of showing standing, and I recognize it's

20   a motion to dismiss raising standing and other issues.  I'm going

21   to focus on standing today.  So, given the fact that the

22   plaintiffs have the burden, rather than hear from government

23   counsel first, I'm going to hear from the plaintiffs first to

24   very succinctly and concisely and, hopefully, persuasively tell

25   the Court what the basis is for standing by the plaintiffs, and

1    then I'll hear from defense counsel, and then I'll finally hear

2    from the plaintiffs again.  All right?

3         So let me invite whomever is going to respond to the

4    Court's questions to the bench or -- I'm not going to read all

5    the questions and then say, okay, batter up.  I would like for

6    someone to come up so I can focus on the questions.  So you are

7    the designated hitter.  Okay.  Good.

8         MS. GOROD:  That's right.

9         THE COURT:  Good morning, Counsel.

10        MS. GOROD:  Good morning, Your Honor.

11        THE COURT:  Good morning.  How are you this morning?

12        MS. GOROD:  Good.  Thanks.  How are you?

13        THE COURT:  I'm fine.  Thank you.

14        There were two individuals who were named plaintiffs who

15   have subsequent to the filing of this lawsuit resigned from

16   Congress, a senator from Minnesota and a congressman

17   from Michigan, I think, or New York.

18        Do those individuals still have standing?

19        MS. GOROD:  No, Your Honor.  I think now that they are no

20   longer serving in office since the representatives are serving --

21   or filing suit in their official capacities, those individuals --

22   and one member of the House also has, unfortunately, passed away

23   since the filing of the complaint, so those three individuals are

24   no longer --

25        THE COURT:  Who was that?

1          MS. GOROD:   Representative Louise Slaughter.

2          THE COURT:   I'm sorry to hear that.   I was not aware of

3     that.

4          They weren't dismissed out or they didn't voluntarily

5     withdraw their appearance in this lawsuit.   What does the Court

6     make of that, if anything?

7          MS. GOROD:   Your Honor, it was our view that there was not

8     any need to formally withdraw them.   Simply by virtue of the fact

9     that they are no longer members of the House or the Senate, we

10    think that they're no longer plaintiffs in the action.   Of

11    course, if Your Honor would like us to file an amended complaint

12    removing them from the caption or filing something formally to

13    indicate that, we would be happy to do so.

14         THE COURT:   Not necessary.   I just wanted to raise the

15    question because no one had raised it, and the defendants

16    didn't -- I don't think the defendants mentioned that.   Maybe

17    they did.   I don't recall whether they did.

18         I'm going to focus on *Raines* for a second.

19         MS. GOROD:   Sure.

20         THE COURT:   In *Raines*, the Court stated that the members

21    bringing the suit -- and I'm quoting -- do not claim that they

22    have been deprived of something to which they are personally

23    entitled, end quote.

24         Rather, quote, the injury claimed by the members of

25    Congress here is not claimed in any private capacity, but solely

1   because they are members of Congress.  If one of the members were

2   to retire tomorrow, he would no longer have a claim.  The claim

3   would be possessed by his successor, instead.  And that's *Raines*

4   at 821.

5        Why doesn't that language foreclose your claims?

6        MS. GOROD:  Yes, Your Honor.  So, I think it's important

7   to step back for a second and distinguish between the two types

8   of injury that the Court identified in *Raines*.  So first it

9   identified personal injury, and I believe that's what the Court

10  was talking about there.  That's when an individual is deprived

11  of some private right.  And so the paradigmatic example of that

12  is *Powell v. McCormack* in which a member was excluded from the

13  body and was denied the salary that goes along with their seat.

14       THE COURT:  And that was Representative Adam Clayton

15  Powell?

16       MS. GOROD:  That's right.  That's right, Your Honor.

17       The second type of injury that the Court discussed in

18  *Raines* was institutional injury, which *Raines* describes as injury

19  to their institutional power as legislators; in other words,

20  their ability to carry out the functions and responsibilities of

21  their job.  And the Court in *Raines* did not say that individual

22  members of Congress never have standing to sue for institutional

23  injury.  I think if that had been the Court's position, it would

24  have been a far shorter and far simpler opinion, and so would

25  post-*Raines* decisions in the D.C. Circuit, like *Campbell* and

1   *Chinoweth.*

2       Instead, what the Court made clear is you have to look at

3   the type of institutional injury that's being asserted.  That's

4   also from page 821 in the Court's opinion.

5       THE COURT:  Let me stop you for a second.  I just took a

6   look at the complaint to remind myself that it's not alleged, I

7   don't believe, that this action was brought by the Members of the

8   Senate and the House in their official capacities.

9       MS. GOROD:  It is being brought by them in their official

10  capacities because --

11      THE COURT:  Is that alleged in the complaint?

12      MS. GOROD:  I believe it's identified on the caption that

13  they're suing in their official capacities.

14      THE COURT:  You know what?  Maybe I'm overlooking it.

15      MS. GOROD:  And I think it's also identified in the party

16  section of the complaint.  But there's no question, Your Honor,

17  that there's a --

18      THE COURT:  Maybe it's at the end of -- I don't see any

19  reference to that in the caption, nor do I see that the lawsuit

20  identifies the parties plaintiff as being parties plaintiff in

21  their official capacity as opposed to their individual

22  capacities.

23      MS. GOROD:  Well, I think the injury --

24      THE COURT:  I'm not saying that's fatal, but it's silent

25  unless I'm overlooking that.

1    MS. GOROD:  Well, I think the point, Your Honor, as the

2    complaint makes clear, the injury here is to their ability to

3    cast a vote that they're explicitly entitled to cast under the

4    Foreign Emoluments Clause.

5        THE COURT:  So is the answer to my question, then, that

6    the lawsuit was brought on behalf of the members of Congress and

7    the Senate in their official capacities and not in their

8    individual personal capacities?

9        MS. GOROD:  That's right, Your Honor, because the injury

10   here is that the President, by accepting emoluments from foreign

11   governments without first waiting for Congress to give its

12   affirmative consent, is denying these members an opportunity

13   they're explicitly entitled to under the Foreign Emoluments

14   Clause.

15       THE COURT:  So they are not -- so the record is clear, the

16   plaintiffs are not alleging any personal injury, then, correct --

17       MS. GOROD:  Well --

18       THE COURT:  -- which was the case in *Powell*?

19       MS. GOROD:  They're not alleging the type of personal

20   injury that was at issue in *Powell* where it was an injury that

21   they had because of their rights as private individuals.  What

22   they're alleging here is that they've been injured in their

23   institutional powers as legislators.  They can't carry out the

24   responsibilities that text of the Constitution explicitly assigns

25   them, which is the right to consent or not consent to the

1    President's acceptance of emoluments.

2         THE COURT:  And that's a right that's enjoyed by both the

3    House of Representatives and the United States Senate, correct?

4         MS. GOROD:  That's right, Your Honor.  And I think it's

5    worth stepping back for just a moment to think a little bit about

6    why the Foreign Emoluments Clause is in the Constitution and why

7    in particular it's structured in the way that it is.

8         The Founders, Your Honor, were deeply concerned about

9    corruption.

10        THE COURT:  I'm well aware.

11        MS. GOROD:  Okay.

12        THE COURT:  And I'm sorry to cut you off, but I'm well

13   aware of the reasons for the Emoluments Clause.  I want to focus

14   on standing.  That's the only issue before me today.

15        MS. GOROD:  No, I understand, Your Honor, but the point I

16   would just make is that the structure of the Foreign Emoluments

17   Clause is really important to understanding why our plaintiffs

18   are injured.  Under the Foreign Emoluments Clause, before the

19   President can accept a single emolument from a foreign

20   government --

21        THE COURT:  So much for my response, but go ahead.  I'll

22   give you a few minutes.  Go ahead.

23        MS. GOROD:  No, no, no.  But the point is this.  There's

24   no implied consent under the Foreign Emoluments Clause.  Before

25   the President can accept an emolument, he needs to wait until

1    Congress has given its affirmative consent, until he's convinced

2    a majority of the members of both Houses of Congress to consent

3    to the acceptance of that emolument.  And so when the President

4    accepts emoluments anyway, what he's doing is denying our

5    plaintiffs a specific voting opportunity that they're explicitly

6    entitled to under the Constitution, and that's the right to cast

7    a binding vote before an emolument is accepted, with the burden

8    on the President to convince the majority of the members to give

9    their affirmative consent.

10         THE COURT:  How does that work in the real world, in the

11   Congressional world?  What happens?  The President is concerned

12   about a gift from a foreign king or something.

13         MS. GOROD:  Right.  So, you know, what the President

14   should be doing is what presidents in the past have done.  They

15   have submitted a letter to Congress identifying the emolument

16   that they want to accept, where that emolument is coming from,

17   and then wait to accept it until Congress gives its consent.

18   Congress can consent through a joint resolution, or Congress can

19   choose not to consent.  And, importantly, under the structure of

20   the clause -- this is why I think the clause's structure is

21   important -- they can choose not to consent by simply choosing

22   not to act.

23         THE COURT:  But it has to be an affirmative act one way or

24   the other, then, correct?

25         MS. GOROD:  No, Your Honor.  It has to be an affirmative

1   act to give a consent, but simple inaction is the same as not

2   consenting, and that's critical.  I mean, the Founders really

3   believed that the only way the Foreign Emoluments Clause could

4   serve its purpose and function as a broad prophylactic safeguard

5   against corruption was if the default rule was that officials

6   could not accept an emolument unless they could convince a

7   majority of the Members to give their affirmative consent.  They

8   wanted to take the roadblocks of legislative inertia and turn

9   them into an obstacle of corruption.  And what the government is,

10  in essence, arguing is that they should be an ally, that the

11  President can accept as many emoluments as he wants in secret so

12  long as Congress doesn't take affirmative action to stop him, and

13  that's simply not the Foreign Emoluments Clause that our Founders

14  adopted.

15       THE COURT:  The fact that Congress has taken no action,

16  then, is someone arguing that that indeed is action through its

17  inaction, in other words --

18       MS. GOROD:  Well, I don't understand the government

19  actually to be seriously contesting the point that affirmative

20  consent is required.  I mean, I think that follows naturally from

21  the text of the clause and its purpose and longstanding

22  historical practice.  I think that's also a merits question, Your

23  Honor, as you indicated.  And so if you have any concerns about

24  that, we're certainly happy to answer questions on that score

25  either today or at a subsequent hearing.  But I do think for

1   purposes of today's hearing -- for purposes of deciding standing,

2   you need to assume that the clause requires affirmative consent

3   for the President to accept emoluments.  And then the question

4   is:  Given that understanding, has the President deprived our

5   plaintiffs of a specific voting opportunity that they're

6   explicitly entitled to under the Constitution?

7        THE COURT:  No nullification?

8        MS. GOROD:  No nullification, exactly, Your Honor.  And

9   so --

10        THE COURT:  -- to the vote nullification under the *Arizona*

11   *Legislature* case?

12        MS. GOROD:  Exactly.  So what the Supreme Court recognized

13   in *Arizona* --

14        THE COURT:  Not exactly, though, because there was --

15   every member of the Arizona Legislature that was -- who was a

16   party plaintiff, unlike what we have here.

17        MS. GOROD:  For sure, Your Honor.  *Arizona State*

18   *Legislature* certainly doesn't get us everything that we need, but

19   one thing that it makes clear is that the deprivation of a future

20   voting opportunity is vote nullification.  You know, what

21   happened there was that the Arizona State Legislature was

22   deprived of its alleged prerogative to initiate redistricting.

23   And it's the precise injury here, where our members are being

24   denied the specific voting opportunity that they're entitled to

25   under the Foreign Emoluments Clause.

1       THE COURT:  Were the Democratic senators authorized by

2   their caucus -- is that the appropriate term -- senators

3   authorized by their caucus to bring this lawsuit?

4       MS. GOROD:  So each individual member of Congress made a

5   decision whether to join the lawsuit.

6       THE COURT:  Any institutional action by the Senate

7   authorizing the senators --

8       MS. GOROD:  There wasn't --

9       THE COURT:  -- on this?

10      MS. GOROD:  There wasn't, Your Honor, and I don't think

11  any is necessary here precisely because, as we already discussed,

12  the injury here is to individual members.  So, you know, in

13  *Raines*, you're right that the Court noted and attached some

14  importance.  It wasn't clear how much, as the D.C. Circuit

15  subsequently --

16      THE COURT:  The individual members in their official

17  capacity, though.

18      MS. GOROD:  That's right.  That's right.

19      THE COURT:  But this lawsuit did not require the official

20  sanction of the United States Senate.

21      MS. GOROD:  That's right.  If the -- if the injury were

22  solely to the Senate as a body and the Senate were the plaintiff,

23  then there would be a need for authorization, but here it's the

24  individual members that are being injured because each individual

25  member has a right to cast a vote on whether to give or withhold

1    their consent to the acceptance of emoluments.  That's what the

2    Foreign Emoluments Clause makes clear by assigning Congress, and

3    thereby its members, a specific and very unusual role in

4    overseeing the conduct of executive branch officials.

5         THE COURT:  I assume there was no official action by the

6    House of Representatives authorizing the House members to

7    commence this lawsuit?

8         MS. GOROD:  That's right.  And again, none was necessary

9    because this is an injury to individual members.  So in *Raines*

10   the Court attached some importance to the fact that the

11   individual bodies hadn't authorized the suit.  In fact, there

12   they were actively opposing it.  But that was because in *Raines*

13   the Court had already determined that the injury was to the body

14   as a whole and not to the individual members, so it makes sense

15   in that context.

16        THE COURT:  But you're not arguing that injury is to the

17   body?

18        MS. GOROD:  I think there would also be injury to the body

19   here, and I think it's possible that either House could, if it

20   decided it wanted to sue, but the fact that the body is --

21        THE COURT:  They're not alleging that in this case,

22   though, correct?

23        MS. GOROD:  That's not an issue in this case because the

24   plaintiffs here are not the bodies, but they're the individual

25   members.

1       THE COURT:  The action would be stronger if, indeed, this

2  was an injury -- if all of the members of the Senate were joined

3  as parties.

4       MS. GOROD:  I don't think it actually makes any

5  difference, Your Honor.  The fact is that under the Foreign

6  Emoluments Clause, because it requires the consent of the

7  Congress, the way that Congress gives its consent is through the

8  votes of its individual members.  As the Supreme Court has

9  recognized, while a legislator is serving in office, his vote is

10  the commitment of his apportioned share of the legislative power.

11       THE COURT:  How many Senators and how many Representatives

12  are necessary in this lawsuit to persuade the Court that there is

13  standing?

14       MS. GOROD:  I mean, I think, Your Honor, that a single

15  member could sue.  I mean, I think the number that have sued here

16  is testament to --

17       THE COURT:  In the *Kennedy* case?

18       MS. GOROD:  That's right, Your Honor, because the question

19  is:  Has the member been denied a specific --

20       THE COURT:  The Kennedys litigation was pre-*Raines*,

21  though, correct?

22       MS. GOROD:  I mean, it was pre-*Raines*, Your Honor, but --

23       THE COURT:  You're not depending upon that as precedent,

24  are you?

25       MS. GOROD:  I think it is still good precedent.  The D.C.

1    Circuit has, you know, relied on it repeatedly, and I think

2    *Raines* --

3          THE COURT:  Was {Indiscernible} purposes post-*Raines*?

4          MS. GOROD:  Not post-*Raines*, Your Honor, but I think --

5          THE COURT:  We're talking about post-*Raines* because

6    *Kennedy* -- I mean, we need to separate cases out post-*Raines* and

7    pre-*Raines*.  *Kennedy* was a pre-*Raines* case.

8          MS. GOROD:  That's right, Your Honor.

9          THE COURT:  Was standing found?

10         MS. GOROD:  That's right, Your Honor.  And so I think it's

11   worth coming back to *Raines*, as you say, and focusing on what

12   *Raines* did and what it didn't do.

13         THE COURT:  I want an answer to my question.  What's the

14   magic number for the number of Representatives and Senators to

15   persuade the Court there's standing?  And you said just one.

16         MS. GOROD:  Yes, and I can explain --

17         THE COURT:  -- {Indiscernible} rely upon *Kennedy* --

18         *MS. GOROD:*  -- what I'm relying on is *Raines* and *Campbell*

19   and *Chinoweth* and the questions that they make clear --

20         THE COURT:  I thought you answered, yes, you're relying

21   upon *Kennedy* as well, which is pre-*Raines*.

22         MS. GOROD:  Yes, Your Honor, and I think those cases do

23   support it, but I think the Court can still draw that conclusion

24   post-*Raines*, and this is why.  What *Raines* did was recognize that

25   the complete denial of an effective legal vote is a cognizable

1   injury.  What *Raines* was unwilling to do was allow the drastic

2   extension of the doctrine that would have been necessary to find

3   standing there, given that the plaintiffs in that case hadn't

4   shown that they've been deprived of specific voting opportunity

5   to which they were explicitly entitled under the Constitution.

6        THE COURT:  There could be a vote in the future, though,

7   correct, on this issue, correct?

8        MS. GOROD:  There could be a vote in the future, but, Your

9   Honor, there can't be the vote --

10       THE COURT:  It's not nullified in the future, correct?

11       MS. GOROD:  But, Your Honor, the vote that they could take

12   would be a vote on the general issue of emoluments.  The vote

13   that they cannot take and that the President is preventing them

14   from taking is a vote before an emolument is accepted.  That's

15   the specific vote that they're entitled to under the Foreign

16   Emoluments Clause.  And I think it's worth -- I think it's worth

17   pausing on this for a minute.  The government, obviously, spends

18   a lot of the time in its briefing talking about the fact that

19   Congress could, if it wants, vote on the general issue of

20   emoluments, but that just misunderstands what the injury is here.

21   The plaintiffs aren't arguing that the President has deprived

22   them of their opportunity to vote or their ability to legislate

23   under Article I, Section 8.  What they're alleging is that they

24   have been deprived of the specific vote that they're entitled to

25   under Article I, Section 9; that is, a binding vote before an

1   emolument has been accepted with the burden on the President to

2   obtain affirmative consent from both Houses of Congress.  And I

3   think, you know, thinking about the Advise and Consent Clause is

4   a helpful analogy here.  You know, if the President wants to name

5   someone to serve as Attorney General, what he does is submit that

6   name to the Senate, and then he waits until the Senate confirms

7   that individual before that person starts serving as Attorney

8   General.

9        If the President purported to have someone start serving

10  as Attorney General without having received consent from the

11  Senate, I don't think there would be any question that individual

12  Senators had standing to sue because they were deprived of the

13  specific vote that they were entitled to under the Advise and

14  Consent Clause.  And it wouldn't matter that they could still,

15  you know, legislate generally on the issue of emoluments.

16       Another point that the government makes in its brief is

17  that, you know, certain emoluments have been uncovered by the

18  press.  And so they argue Congress could take some kind of vote

19  with respect to those emoluments.  And we certainly appreciate

20  the good work that journalists and investigative reporters have

21  done in uncovering and exposing the real extent of the problem

22  here, but the press can't fix this problem for the President.

23  You know, with respect to emoluments that have already been

24  uncovered, there are a couple of problems.  One, Congress -- once

25  the President has already accepted the emolument, once it's been

1    reported that he's accepted an emolument, the injury has already

2    occurred because he's already deprived members of the specific

3    voting opportunity that they're entitled to under the Foreign

4    Emoluments Clause.  And, of course, that's also just simply no

5    answer at all to all of the emoluments that have not been

6    uncovered.  As we allege in our complaint, the emoluments that we

7    know about are only the tip of the iceberg.  Because the

8    President hasn't been following the procedures that the

9    Constitution prescribes, because he hasn't been coming to

10   Congress and presenting the emoluments that he wants to accept,

11   because he hasn't shared information with Congress about his

12   businesses' dealings with foreign governments, we don't know the

13   full scope of emoluments that he's been accepting and that he

14   plans to accept.  And Congress simply can't cast a vote that

15   they're entitled to under the Foreign Emoluments Clause with

16   respect to emoluments that they don't know about.

17         THE COURT:  Let me just take a look at the complaint.  The

18   assertions in your complaint, are they -- is the Court obligated

19   to accept those assertions?

20         MS. GOROD:  I think for purposes of standing, that's

21   right, Your Honor.

22         THE COURT:  All right.  So what you've alleged with

23   respect to the issue of standing and especially relevant to

24   whether plaintiffs have standing to bring their complaint --

25   bring their claims are as follows:  That the complaint alleges

1    that the defendant, President Trump, quote, has a financial

2    interest in vast business holdings around the world that engage

3    in dealings with foreign governments and receive benefits from

4    those governments by virtue of that financial interest.  The

5    defendant has accepted or necessarily will accept emoluments from

6    foreign states while holding the Office of President of the

7    United States, quote.  And that's your complaint at paragraph 2,

8    because the Foreign Emoluments -- and I'm quoting -- Clause

9    requires the President to obtain the consent of Congress before

10   accepting -- and that's crucial:  "Before."

11            MS. GOROD:  That's right, Your Honor, an affirmative

12   consent before.

13            THE COURT:  -- accepting otherwise prohibited emoluments,

14   plaintiffs, as Members of Congress, must have the opportunity to

15   cast a binding vote that gives or withholds their, quote-unquote,

16   consent before the President accepts any such emoluments.

17            So as you allege, the burden is on the President to do

18   something affirmatively before Congress can respond

19   affirmatively --

20            MS. GOROD:  That's right.

21            THE COURT:  -- correct?

22            Plaintiffs, as members -- strike that.  Quote, Despite

23   this Constitutional mandate, Defendant has chosen to accept

24   numerous benefits from foreign states without first seeking or

25   obtaining Congressional approval.  Indeed, he has taken the

1    position that the Foreign Emoluments Clause does not require him

2    to obtain such approval before accepting benefits arising out of

3    exchanges between foreign states and his businesses, and further,

4    quote, by accepting these benefits from foreign states without

5    first seeking or obtaining Congressional approval, Defendant has

6    also denied Plaintiffs the opportunity to give or withhold their

7    consent to his acceptance of individual emoluments and has

8    injured them in their roles as Members of Congress.  Plaintiffs

9    allege that they cannot force the Defendant to comply with the

10   Constitution absent a judicial order.

11        The injury, it seems to me, as alleged, is to the Congress

12   as a body as opposed to individuals, the Congress as a whole, the

13   U.S. House of Representatives and the United States Senate.

14        And why am I wrong?

15        MS. GOROD:  Because, Your Honor, the way that Congress

16   gives its consent is through the votes of individual members.

17   And what the Supreme Court made clear in *Raines* -- and this is

18   consistent with the way the D.C. Circuit has treated this case --

19   this issue post-*Raines* -- is that when there is a specific vote

20   that's been nullified, either a pass vote that's been disregarded

21   or a future voting opportunity that's been denied, that's a

22   cognizable legal injury that gives individual legislators

23   standing to sue.

24        THE COURT:  Is it your allegation -- are you alleging that

25   there are sufficient votes with the parties plaintiff before the

1    Court to approve or not emoluments that the President can accept?

2         MS. GOROD:  We're not, Your Honor, and it doesn't matter

3    how the vote ultimately comes out, as my colleague can speak

4    about in a little --

5         THE COURT:  A vote nullification -- I mean, unlike the --

6    unlike the -- I call it the 20/20 case in which the -- I think it

7    was *Coleman*, the *Coleman* case --

8         MS. GOROD:  Right.

9         THE COURT:  -- in which the lieutenant governor cast a

10   vote to break a 20/20 tie, there were votes there to carry the

11   day for those votes that were nullified by the action of the

12   lieutenant governor.

13        So my question is, are the votes there now to

14   affirmatively grant the relief that you're seeking to make the

15   President -- tell me exactly what you're asking me to order the

16   President to do.

17        MS. GOROD:  Right, Your Honor.  So, two points to that.

18   So what we are asking you to do is to order the President to

19   either stop accepting emoluments from foreign governments or to

20   first come to Congress and obtain Congressional consent.

21        THE COURT:  All right.  All right.  Let me stop you.  Are

22   those votes there with these parties plaintiff now?

23        MS. GOROD:  Well, the point, Your Honor, is that they're

24   being denied --

25        THE COURT:  That's not my question.

1          MS. GOROD:  Your Honor, let me explain -- let me just step

2     back for a minute and explain why the numbers mattered in

3     *Coleman*, if I can.

4          THE COURT:  I want an answer to my question.  Are the

5     votes there by these parties plaintiff now?

6          MS. GOROD:  We don't know -- we don't know, Your Honor,

7     how any individual member of Congress would vote on any

8     particular emolument.  We can't --

9          THE COURT:  How can you tell me that the individual

10    parties plaintiff, then, are injured?

11         MS. GOROD:  Because the injury, Your Honor, is from the

12    acceptance of the emoluments without first obtaining

13    Congressional consent.  If the President comes to Congress and

14    there is a vote and Congress gives consent, then our plaintiffs'

15    injury will be redressed regardless of how that vote turns out

16    and even if some of our plaintiffs vote to withhold consent.  And

17    I think it's worth underscoring, Your Honor, why the vote

18    actually matters, no matter how the vote comes out.

19         THE COURT:  Wouldn't your argument be stronger if you had

20    the requisite votes to grant -- to grant the relief that you're

21    seeking?

22         MS. GOROD:  I don't think that it actually matters, Your

23    Honor, given the nature of the injury here.  I don't think it

24    matters, Your Honor, and let me explain why.  So in *Coleman* the

25    species of vote nullification that was at issue was the

1   disregarding of a past vote.  And so, of course, it mattered what

2   the vote was.  You know, if the vote had been 30 in favor of

3   ratification and 10 against, the 10 who voted against

4   ratification wouldn't have had their votes disregarded.  They

5   would have simply lost the vote.

6          But here, the injury isn't that, you know, Congress took a

7   vote to give consent and members who voted to withhold consent

8   are upset about that.  The injury is that they've been deprived

9   of a future voting opportunity.  And we can't know how those

10  votes will come out.  Members can't know how they'll vote without

11  knowing what emoluments the President is accepting.  And again,

12  it doesn't matter how the vote ultimately comes out.  It's that

13  vote that matters.  It's the vote -- the absence of the vote

14  that's injuring our plaintiffs.  And the Founders -- it's worth

15  emphasizing -- included the consent of the Congress provision in

16  the Foreign Emoluments Clause for a very specific reason.  You

17  know, they thought that requiring an official who wanted to

18  accept an emolument to come first to Congress and obtain consent

19  would ensure the sort of accountability and transparency that

20  would address the corruption concerns that gave rise to the

21  clause in the first place, you know.  Representative Bayard in

22  discussing the Foreign Emoluments Clause noted that it requires

23  officeholders to make known to the world whatever presents they

24  might receive from foreign courts and to place themselves in such

25  a situation as to make it impossible for them to be unduly

1    influenced by any such presence.  And so what the Founders

2    thought was, if a vote occurred, if the individual -- the

3    official who wanted to accept an emolument made that emolument

4    known to the world, he convinced a majority of the members of

5    both Houses of Congress that it wouldn't present the sorts of

6    corruption and foreign influence concerns that gave rise to the

7    clause in the first place, then it was permissible for them to

8    accept it.  And so that's why it's so important that there be a

9    vote here, and that's why the absence of a vote -- the absence of

10   an opportunity for the vote --

11        THE COURT:  Regardless of the outcome of the vote.

12        MS. GOROD:  Regardless of the outcome of the vote.

13   Because what's happening now is that the President is brazenly

14   accepting all manner of foreign government benefits without

15   anyone, the American people or their representatives in Congress,

16   knowing what benefits he's accepting.

17        THE COURT:  All right.  Tell me very succinctly why

18   there's not been a vote.

19        MS. GOROD:  There's not been a vote, Your Honor, because

20   the Congress can't take a vote, the vote they're entitled to

21   under the Foreign Emoluments Clause, so long as the President is

22   accepting these emoluments in secret without first presenting

23   them to Congress.  And remember, it's the vote they're entitled

24   to under the Foreign Emoluments Clause, which is a

25   before-the-fact binding vote with the burden on the President to

1    convince the majority of the members to give their consent or

2    acceptance of the emolument.

3        THE COURT:  So, there's not any requirement on the part of

4    the Republican Senators to call for a vote on this issue?

5        MS. GOROD:  The point is, Your Honor, as soon as the

6    President accepts an emolument without first obtaining

7    Congressional consent, he's denying Congress and the Members of

8    Congress the right that they're entitled to under the clause,

9    which is --

10       THE COURT:  What's the answer to my question?

11       MS. GOROD:  No, there's no obligation, because if Congress

12   decides that it doesn't want to consent, it can do that by simply

13   choosing not to act.  And the President is supposed to wait to

14   accept emoluments until Congress has acted, until it has

15   affirmatively given its consent, and that's what the President is

16   not doing, and that's why --

17       THE COURT:  Can the Republican-controlled Senate take some

18   action to require a vote on this?

19       MS. GOROD:  No, Your Honor.  There's nothing that Congress

20   can do, no matter who's in it, no matter what their views are, so

21   long as the President is accepting these benefits without

22   waiting, without identifying them to Congress and then waiting

23   for Congress to give its consent.

24       THE COURT:  Are any Republican Members of Congress parties

25   plaintiff?

1          MS. GOROD:  They're not, Your Honor.

2          THE COURT:  Is there a reason that the Court can infer

3     from that?

4          MS. GOROD:  You know, Your Honor, no Republican member

5     decided to join the suit, but again, I don't think it matters.

6     The point is that each individual Member of Congress is being

7     denied an opportunity they're entitled to under the Constitution.

8     But I think what Your Honor's questions are getting at goes to

9     the second question that this Court has to ask to determine

10    whether Members of Congress have standing to sue, and that's a

11    question of legislative recourse.  What the Supreme Court made

12    clear in *Raines* and the D.C. Circuit subsequently confirmed is

13    that there are two key questions:  One, have members been

14    deprived of a vote to which they're explicitly entitled?  And I

15    think here they've certainly been denied the explicit vote that

16    they are entitled to under the Foreign Emoluments Clause.

17         THE COURT:  Can the parties plaintiff ask for a vote?

18         MS. GOROD:  They can't ask for a vote, Your Honor, because

19    the President is accepting emoluments without identifying those

20    emoluments to Congress.

21         THE COURT:  He himself has to trigger something before

22    there's a vote, then, correct?

23         MS. GOROD:  The President has to present the emolument to

24    Congress, and he has to wait until Congress gives its consent

25    before accepting it.

1     THE COURT:  And what you're arguing is that he's

2     continuing to accept emoluments without giving any opportunity to

3     anyone, Republican Members of Congress or Democratic Members of

4     Congress, to do anything?

5     MS. GOROD:  That's exactly right, Your Honor.  And that's

6     exactly what the Founders adopted the Foreign Emoluments Clause

7     to prevent.

8     It's a very unusual clause, Your Honor, in that its

9     express purpose is to expressly prohibit the President and other

10    federal officials from accepting these kinds of foreign

11    government benefits unless they first obtain the affirmative

12    consent of Congress.

13    Now, the second question --

14    THE COURT:  Let me ask you this:  Suppose this lawsuit --

15    Suppose, hypothetically, control of the House of Representatives

16    and control of the Senate rests in the Democratic minority -- the

17    majority after the November election, would you be here?

18    MS. GOROD:  As long as the President is still accepting

19    emoluments without first presenting them to Congress, we would

20    absolutely be here, Your Honor.

21    The point is that no matter who controls Congress, no

22    matter what their views are, there is simply nothing Congress can

23    do.

24    THE COURT:  You're telling me, then, there could be -- I'm

25    sure this is music to the ears of Senator Blumenthal -- there

1  could be 75 members of the Democratic Party elected to the

2  Senate, right?

3          (Laughter in the audience).

4          THE COURT:  Right?

5          MS. GOROD:  That's right, Your Honor.

6          THE COURT:  And 400 members of the Democratic Party

7  elected to the House --

8          MS. GOROD:  -- that's right --

9          THE COURT:  -- after November, and you'd still be here.

10         MS. GOROD:  We'd still be here, Your Honor, because the

11  President would still be depriving members of the --

12         THE COURT:  -- but can't the majority of both Houses do

13  something?

14         MS. GOROD:  No, they can't, Your Honor, and that's exactly

15  what I think we should talk about now, because that is a key

16  question, whether Congress has recourse that's adequate within

17  the meaning of *Raines*, whether Congress could fix the problem.

18  And because of the unusual nature of the violation here, Your

19  Honor, there's simply nothing that Congress can do to stop the

20  President's actions because, again, no matter who's in control of

21  the body, and that's true for a couple of reasons, and let me

22  tell you what those are.

23         THE COURT:  All right.

24         MS. GOROD:  So, first, Your Honor, unlike in most cases in

25  which a President is engaging in unlawful activity, the violation

1    here does not require the use of either federal funds or federal

2    personnel.

3          So that strips Congress of one of the most powerful tools

4    in its arsenal for stopping executive branch action that it

5    disapproves of, and that's the power of the purse.  So Congress

6    can appropriate funds; Congress can choose not to appropriate

7    them.  And what that means is that in most cases Congress can

8    unilaterally stop executive branch action that it thinks is

9    constitutional, but because the violation here is involving the

10   President's private businesses, there's nothing that Congress can

11   do to address it.  And I think it's worth contrasting this case

12   with *Campbell* and *Chenoweth,* the post-*Raines* D.C. Circuit cases

13   in that regard.

14         You know, in *Campbell*, the D.C. Circuit noted that the

15   Congress had a broad range of legislative authority available to

16   stop the executive action that it disapproved of, including, and

17   the Court specifically noted, it could cutoff funds.  In that

18   case, in fact, Congress had actually affirmatively authorized

19   funding for the military strikes.

20         In *Chenoweth*, it was uncontested that Congress could

21   terminate the environmental executive order that was at issue.

22   And so that is simply not the case here because, again, of the

23   very unusual nature of the violation we're talking about, the

24   President accepting foreign government benefits through his

25   private businesses.  So that's one reason Congress couldn't do

 1    anything no matter who's in control.

 2         THE COURT:  So you're telling me that Congress cannot

 3    order the President to provide information with respect to any

 4    gifts he's -- he has accepted or plans to accept?  Is that what

 5    you are telling me?

 6         MS. GOROD:  Well, what I'm saying, Your Honor, is that the

 7    information isn't enough.  The President would need to stop

 8    accepting the emoluments without first obtaining Congressional

 9    consent.  And the problem here, of course, is --

10         THE COURT:  -- and order him to stop accepting emoluments,

11    then, correct?

12         MS. GOROD:  So let's think about what that would look like

13    in practice.  Congress could potentially pass a law, but that law

14    would, as an initial matter, require the President's own

15    signature.  So it would require this President to agree --

16         THE COURT:  With the requisite numbers, they could

17    override his veto, right?

18         MS. GOROD:  They could, Your Honor.  So, let's --

19         THE COURT:  So they're not effectively denied a vote -- it

20    may take some time.  They could get the relief they wanted to if

21    they really wanted to, couldn't they?

22         MS. GOROD:  The question, Your Honor, is not just whether

23    there's anything that Congress can do.  The question is whether

24    there's an adequate remedy.  And so to determine whether the

25    remedy is adequate, you have to ask whether it's adequate in the

1    context of the Foreign Emoluments Clause.

2        So let me explain why requiring Congress to take

3    affirmative action by a super majority vote is not an adequate

4    remedy in this context.  And again, this is why the structure of

5    the clause and its purpose is so important.

6        The Foreign Emoluments Clause is designed as a

7    prohibition.

8        THE COURT:  That's why I asked that question about,

9    hypothetically, if Congress had the super majority after

10   November, would you be here.  And I think the answer is no,

11   because then Congress could get the relief it's seeking, order

12   the President not to continue to accept the emoluments that

13   they're complaining that he's accepting.

14       MS. GOROD:  Well, but the question, Your Honor --

15       THE COURT:  That's the remedy, though, correct?

16       MS. GOROD:  Well, the question is, would it be an adequate

17   remedy?  Is it possible that Congress could take affirmative

18   action by a super majority vote, an adequate remedy within the

19   meaning of *Raines*, and it's not, Your Honor, for this reason:

20   You know, the Foreign Emoluments Clause is designed to prohibit

21   officials from accepting any benefits until and unless Congress

22   gives its affirmative consent.  And so, requiring Congress to

23   take affirmative action to stop him by a super majority vote no

24   less would really flip the clause on its head and simply deprive

25   it of all meaning.  You know, instead of the default being that

1    an official can't accept any foreign government benefits, it

2    would be that the President can accept as many foreign government

3    benefits as he wants until and unless Congress takes affirmative

4    action by super majority vote, and that simply can't be an

5    adequate remedy within the meaning of *Raines*.

6         Again, Your Honor, it would take the roadblocks of

7    legislative inertia that were supposed to be obstacles to

8    corruption and it would turn them into an ally of corruption.

9    And there's no suggestion in any of the D.C. Circuit's case law

10   or in Supreme Court case law that Congress has to be put to that

11   sort of extraordinary measure in order to have standing to sue.

12        You know, in both *Campbell* and in *Chenoweth*, Congress

13   could have stopped the executive branch action it disapproved of

14   simply by not acting, by choosing not to act, by choosing not to

15   appropriate funds.

16        And, you know, it's also worth noting, Your Honor, that

17   another significant difference between this case and those is

18   that in this case Congress is largely operating in the dark,

19   right?  So in *Campbell* and *Chenoweth* --

20        THE COURT:  What do you mean by that?

21        MS. GOROD:  In *Campbell* and *Chenoweth* we're talking about

22   federal programs.  Congress had certainly more than enough

23   information to decide how it made sense to respond.  So in

24   *Campbell* we were talking about, you know, public military

25   strikes, the President had sent a report to Congress detailing

1     the expected scope and duration of the deployment.

2          In *Chenoweth* we were talking about, you know, a publicly

3     available executive order.  So Congress could determine how it

4     wanted to respond.  Here, because the President is not coming to

5     Congress and disclosing the benefits that he wants to accept,

6     because he has not shared information with Congress about his

7     businesses' dealings with foreign governments, Congress is

8     largely operating in the dark, and so that's --

9          THE COURT:  If the parties plaintiff before the Court do

10    not have standing, who would have standing for those claims?

11         MS. GOROD:  Your Honor, that's an important question, and

12    I think it's not clear that anyone would have standing to address

13    the full range of foreign government benefits that the President

14    is currently accepting.  As I'm sure you're aware --

15         THE COURT:  There's not a basis for a private cause of

16    action?

17         MS. GOROD:  So, Your Honor, there are two other lawsuits

18    that have been filed suing the President for his violation of the

19    Foreign Emoluments Clause, both essentially involving claims of

20    competitor standing.  One of those cases was dismissed and is now

21    on appeal in New York.  In the other, the District Court of

22    Maryland held that the states of Maryland and D.C. have standing,

23    but only with respect to the Trump D.C. Hotel, because that's the

24    particular Trump property that they're in competition with.

25         THE COURT:  Didn't an individual file a lawsuit raising

1   the claims that the individual plaintiffs in this case have

2   raised in their official capacity?

3        MS. GOROD:  Could a private individual?

4        THE COURT:  Yes.

5        MS. GOROD:  I mean, I think they would have to be able to

6   allege some kind of specific injury concrete in fact.  And so the

7   most, I think, obvious type of injury is the one alleged in two

8   other cases, which is competitor injury, but that means that that

9   plaintiff can only sue with respect to emoluments that are

10  obtained by properties that are in competition with that

11  individual.  And the problem, Your Honor, is that the President

12  is accepting a wide range of government benefits.  We're not just

13  talking about the foreign diplomats staying at the Trump Hotel,

14  we're talking about, you know, trademarks, intellectual property

15  rights that he's received from China and other countries.  We're

16  talking about regulatory benefits that he has received and may be

17  receiving from countries around the world.  We're talking about

18  foreign governments buying properties in Trump buildings, you

19  know, around the country and potentially around the world.  And

20  it's just not at all clear that there would be private

21  individuals who would have standing to sue with respect to all of

22  those violations.

23        THE COURT:  If the United States Senate took official

24  action to authorize a representative number of senators to file

25  this lawsuit and the House did the same, would you be in a

1    stronger position to argue standing?

2          MS. GOROD:  I think it's certainly right, Your Honor, that

3    the House as a body or the Senate as a body would also have

4    standing to sue, but the fact that they have standing to sue does

5    nothing to detract from the fact that there are plaintiffs who

6    have been injured and have standing.  You know, think about your

7    classic --

8          THE COURT:  Would the case be stronger or just as strong

9    or --

10         MS. GOROD:  I think we're just as strong here, Your Honor.

11   You know, what *Raines* recognizes, what post-*Raines* D.C. Circuit

12   case law recognizes is that individual members of Congress have

13   standing to sue in the, you know, relatively unusual situation in

14   which they have been deprived of a specific voting opportunity

15   that the Constitution explicitly entitles them to, and when

16   Congress lacks legislative remedies that are adequate to address

17   the harm, and this is the unusual situation in which that is the

18   case, because the Constitution, the Foreign Emoluments Clause

19   textually assigns Congress, textually assigns the members of

20   Congress an important role in overseeing the conduct of executive

21   branch officials when it comes to foreign emoluments.

22         THE COURT:  Sorry to be somewhat repetitious, but this is

23   important.  Obviously, if I were to write the opinion you want me

24   to write, what is your concise statement why the injury is

25   personal and concrete?

1      MS. GOROD:  Sure, Your Honor.  What *Raines* makes clear is

2  that there can be individual legislator standing when there is an

3  injury to the specific power of individual members of Congress,

4  and the injury here is to their specific voting opportunity under

5  the Foreign Emoluments Clause.

6      The Foreign Emoluments Clause guarantees individual

7  members of Congress the right to consent or not consent to the

8  acceptance of emoluments, and it makes clear that they can

9  exercise that right not to consent by choosing not to act.  And

10  the President, by accepting these emoluments, is depriving

11  individual members of that right, the right they're explicitly

12  entitled to under the Foreign Emoluments Clause.

13      THE COURT:  This is a case that the *Raines* authors

14  envisioned, then.

15      MS. GOROD:  I'm not sure the *Raines* authors could have

16  envisioned the full dynamics of this in particular, but what they

17  certainly envisioned was that individuals --

18      THE COURT:  -- there would be a case.

19      MS. GOROD:  For sure, Your Honor.  What they envisioned

20  was that individual --

21      THE COURT:  I'm struggling with why is this case that

22  case, though?

23      MS. GOROD:  Exactly, Your Honor.

24      THE COURT:  The numbers, because you tell me it could be

25  one senator, one representative, that would be sufficient,

1  correct?

2      MS. GOROD:  That's right, Your Honor.  And so this is the

3  case --

4      THE COURT:  There's no magic number.

5      MS. GOROD:  There's no magic number, but this is the rare

6  case, Your Honor, in which individual legislators have had a

7  complete denial of an effective vote.

8      That won't often be the case, Your Honor, because there

9  are few provisions of the Constitution that assign members of

10  Congress such a clear role in overseeing the conduct of executive

11  branch officials.  There are only a handful of Constitutional

12  provisions, Your Honor, that expressly prohibit executive action

13  unless Congress first gives its consent.

14      THE COURT:  And there's no opportunity for the parties

15  plaintiff to get that vote in their respective Houses?

16      MS. GOROD:  There's no opportunity so long as the

17  President insists on secretly accepting emoluments without --

18      THE COURT:  The President is key to that, not the

19  Republican majority.

20      MS. GOROD:  That's exactly right, Your Honor.  It's the

21  President who is injuring our plaintiffs by accepting these

22  emoluments in secret without first waiting for Congress to give

23  its affirmative consent.  And again, that's true no matter who's

24  in Congress, no matter what their views are, and it's that vote

25  that is so critical.  That's why the Founders included the

1    concept of the Congress provision in the Constitution to ensure

2    that federal officials, including the President, didn't accept

3    emoluments from foreign governments unless they first came to

4    Congress and convinced a majority of the members of both Houses

5    of Congress to give their consent.

6        THE COURT:  And it's the Senate range Justice Stevens

7    characterized the plaintiff's injury as being denied the right to

8    cast a vote guaranteed by the text of the Constitution.  He would

9    have found that the injury shared by all members was a concrete

10   injury.  Was your injury any different?

11       MS. GOROD:  Well, our injury is different.  And I think

12   what's important is how the majority in *Raines* characterized the

13   injury there.  And what the Court there was quite clear about was

14   that there was not vote nullification.  The legislators there

15   couldn't allege that they had been denied a vote.  They vote on

16   the Line Item Veto Act.  They simply lost that vote and they

17   couldn't allege that they were going to be denied any vote in the

18   future.  And so that's why the Court in *Raines* said that the

19   injury that was alleged there was a vast difference between that

20   injury and the injury in *Coleman*, and that's why they said they

21   couldn't allow the drastic extension of --

22       THE COURT:  *Coleman* was pre-*Raines*.  I know you make an

23   argument that *Coleman* was not effectively overruled by *Raines*,

24   but how can this Court plausibly rely on *Coleman* and *Arizona*

25   *State Legislature* when neither of those cases implicated federal

1    separation of powers issues?

2        MS. GOROD:  Your Honor, I think you're entirely right to

3    recognize that the separation of powers is an issue here, but, of

4    course, under our system of separation of powers, it's also the

5    responsibility of the courts to step in and actively check when

6    one branch is intruding on the responsibility entrusted to

7    another.

8        THE COURT:  This is not the typical political question

9    that would persuade the Court to just stay out of this?

10       MS. GOROD:  That's right, Your Honor.  And it's worth

11   noting that the D.C. Circuit's case law already reflects

12   separation of powers concerns.  It incorporates those into its

13   analysis.  That's why the Court asks whether Congress has a

14   remedy that's adequate to fix the harm on its own, for just

15   precisely that reason, to ensure that --

16       THE COURT:  That's not an issue in this case, though, a

17   political question.  I don't think the defendants raised that.

18       MS. GOROD:  I don't think the defendants -- I think in

19   their supplemental brief they were quite --

20       THE COURT:  -- I don't need to worry about that issue --

21       MS. GOROD:  I think that's right, Your Honor.

22       THE COURT:  {Indiscernible} --

23       MS. GOROD:  -- I think that's right.  And, you know, the

24   point is, Your Honor, with respect to general separation of

25   powers concerns, the D.C. Circuit case law incorporates that.  So

1    when you ask whether Congress has a remedy that's adequate within

2    the meaning of *Raines*, that takes into account separation of

3    powers concerns, that makes sure that this Court isn't

4    intervening in a dispute that could be mediated through the

5    political process, but is only stepping in because Congress can't

6    fix the problem on its own.

7         THE COURT:  To the extent that the Court accepts some

8    reliance on *Coleman* or accepts your reliance on *Coleman*, *Coleman*

9    talked about what's irreversible.  What's irreversible here,

10   though?

11        MS. GOROD:  Your Honor, what's irreversible here is that

12   once the President has accepted these emoluments --

13        THE COURT:  -- you can't do anything about it --

14        MS. GOROD:  -- there's nothing that Congress can do about

15   it.  He's deprived them of the vote that they're entitled to

16   under the Constitution, that before-the-fact vote with the burden

17   on him to convince the majority of members to give their consent,

18   and there's nothing that Congress can do to fix it.

19        The only thing, as we discussed, that Congress could even

20   plausibly do would require super majorities to take affirmative

21   action.

22        And again, that would essentially write the Foreign

23   Emoluments Clause out of existence.  And that's another thing,

24   Your Honor, that I think makes this case a very unusual one.  You

25   know, in most cases, the power issue is an affirmative grant of

1    power to Congress.  Here, the only thing the Foreign Emoluments

2    Clause does is act as a prohibition.  It is a prohibition on the

3    President and other federal officials receiving these benefits

4    unless Congress first gives its consent.  And so if you flip that

5    clause on its head and you say the President can accept as many

6    benefits as he wants without first obtaining consent, you're

7    essentially writing that clause out of the Constitution.  And so

8    that -- it was a very different situation in *Campbell* and in

9    *Chenoweth*.  You know, in *Campbell,* for example, as you know, the

10   power at issue was the Congressional power to declare war.

11        Even if, you know, Congress was required to engage in some

12   kind of self-help there in order to address the particular

13   violation at issue, Congress wasn't deprived of its general

14   powers to declare war.  It still could have declared war anywhere

15   it wanted to, and that's normally going to be the case.  And so

16   the Foreign Emoluments Clause, its particular structure, the

17   particular role that it serves is very unusual, as I've said

18   before, Your Honor, and the violation here is very unusual

19   because it's the President acting in secret and violating this

20   critical anti-corruption business through his private businesses.

21        And so that's what makes this case one in which it is

22   appropriate to grant members standing.  You know, the one thing

23   I'll additionally say, Your Honor, because you asked about

24   *Coleman*, I think it is worth noting that *Raines* did reaffirm

25   *Coleman*.  *Arizona State Legislature* reaffirmed *Coleman* over the

1    treatise of the Department of -- over the treatise to overrule

2    it.  And so *Coleman*, the idea that individual legislators can

3    have standing when there's been a complete nullification of their

4    vote is --

5        THE COURT:  You agree, do you not, that the landscape has

6    shifted, though?

7        MS. GOROD:  Oh, for sure, Your Honor.  We do not disagree

8    that *Raines* cut back on legislator standing as it then existed,

9    but the point that we think is critical is that *Raines* did

10   recognize that there can be injury when there's a complete denial

11   of an effective vote, and that's precisely the injury that our

12   plaintiffs are alleging here.

13       THE COURT:  {Indiscernible} what the Circuit would do and

14   what the Supreme Court would do, right?

15       MS. GOROD:  Right.

16       THE COURT:  Is that right?  So help me.  I don't want to

17   get reversed.

18       MS. GOROD:  I understand you.  We don't want you to get

19   reversed either.  So this is the reason why there is standing

20   here, and this is the reason why standing here is completely

21   consistent with *Raines* and completely consistent with *Campbell*

22   and with *Chenoweth*.

23       So first let's go back to those two key questions:  One,

24   is there vote deprivation here?  Here there is vote deprivation.

25   There's a complete denial of an effective --

1          THE COURT:  -- caused by the President, not by the --

2          MS. GOROD:  -- caused by the President because of the --

3          THE COURT:  -- not by the majority Houses, both the House

4     and the Senate.

5          MS. GOROD:  Yes, absolutely, Your Honor.  The plaintiffs

6     here are being injured by the President because it is the

7     President who is denying them the specific voting opportunity

8     that they're entitled to under the Foreign Emoluments Clause by

9     accepting these benefits without waiting for Congress to first

10    give its affirmative consent, and Congress lacks legislative

11    recourse that's adequate within the meaning of *Raines* for

12    essentially three reasons.

13         Again, this doesn't require the use of federal funds or

14    personnel, so that takes away the power of the purse, which is

15    the weapon that critically could have been used in either

16    *Campbell* or in *Chenoweth*, because this violation is occurring in

17    secret, through his private businesses, Congress is operating

18    largely in the dark which again was not the case in *Campbell*, was

19    not the case in *Chenoweth*, and would generally not be the case,

20    and finally, anything that Congress could even potentially do

21    would require one of two things, it would require the President

22    to agree, and so saying that a remedy that requires the very

23    official who is violating the Constitution, who is personally

24    enriching himself through his violations of the Constitution to

25    agree to stop voluntarily engaging in activity, that can't

1    possibly be an adequate remedy within the meaning of *Raines*.  And

2    so then the only other possible option to Congress, as Your Honor

3    recognized, is to take affirmative action by super majority vote

4    and requiring that sort of extraordinary measure would in the

5    context of the Foreign Emoluments Clause not be an adequate

6    remedy precisely because it would essentially write the Foreign

7    Emoluments Clause out of existence.  And, neither the Supreme

8    Court in *Raines* nor the D.C. Circuit in *Campbell* and *Chenoweth*

9    have ever suggested that that sort of extraordinary measure, one

10   that would essentially write the provision at issue out of the

11   Constitution, is adequate within the meaning of *Raines*.

12        THE COURT:  So, essentially you're asking for a mandamus

13   relief, essentially, ordering the President to comply with the

14   law.

15        MS. GOROD:  We're ordering -- we're asking for two things,

16   Your Honor.

17        THE COURT:  With that anyway.  That's nothing new.  That's

18   been the law since 1776, and no one's above the law.

19        MS. GOROD:  No one's above the law, Your Honor, and, you

20   know, I think there's two things that I would note that are

21   important, and my colleague of course can discuss this at greater

22   length.

23        You know, one, we need a declaration from Your Honor, you

24   know, making clear that the President is violating the Foreign

25   Emoluments Clause.  Obviously that goes to issues on the merits

1    that, you know, we'd be happy to discuss at a subsequent hearing,

2    but part of the problem here is that the President is insisting

3    that he doesn't need to go to Congress because he doesn't think

4    that these benefits he's accepting are emoluments within the

5    scope of the Foreign Emoluments Clause, and, you know, that's why

6    Court intervention is so important here, to make clear that the

7    benefits that the President is accepting are emoluments, and that

8    the President must therefore come to Congress and obtain

9    affirmative consent before accepting them.  And then, yes, Your

10   Honor, we're asking for an injunction requiring the President to

11   stop accepting these emoluments.  That's certainly an option, or

12   if he wants to continue accepting them, to do what past

13   presidents have done and go first to Congress and obtain

14   Congress's affirmative consent before accepting them.

15        THE COURT:  Does the Court have to go through the

16   balancing test to determine whether or not there's a basis for

17   injunctive relief?

18        MS. GOROD:  Well, I don't -- that's a good question, Your

19   Honor, and it's certainly one my colleague will be happy to

20   address, you know, at greater length.

21        THE COURT:  Actually, actually, I'm not going to go down

22   that road because, as a matter of law, this is probably combined

23   with the merits determination anyway.

24        MS. GOROD:  I think that's right.

25        THE COURT:  And would foreclose consideration of the

1     factors.

2          MS. GOROD:  Yeah, yeah.

3          THE COURT:  But we're not there yet, anyway, we're just at

4     the standing stage.

5          MS. GOROD:  That's right, Your Honor.

6          THE COURT:  So it's a request for injunctive relief, as

7     well as declaratory.

8          MS. GOROD:  That's right, Your Honor, and, you know, my

9     colleague will be happy to discuss at greater length why that

10    sort of relief is appropriate.

11         If Your Honor doesn't have any further questions --

12         THE COURT:  I've got some more.

13         MS. GOROD:  Okay.  I'm going to keep going.

14         THE COURT:  Just a few more, though.

15         MS. GOROD:  As many as you want, Your Honor.

16         THE COURT:  All right.  You want more?

17         MS. GOROD:  I'm here.  I've got nowhere else to be today.

18         THE COURT:  So let me throw away my clock, then, or my

19    watch.  You rely on *Goldwater* --

20         MS. GOROD:  -- yes --

21         THE COURT:  -- to contend that your minority status is

22    irrelevant because the injury is not the nullification of a vote

23    that already occurred, but rather the deprivation of the right to

24    vote.  Do you have any authority other than *Goldwater* for that --

25    to support that proposition?

1          MS. GOROD:  Yes, Your Honor, so the D.C. Circuit

2     reiterated that point in *Riegle* where there was a denial of a

3     right that the senators allegedly required under the Advice and

4     Consent Clause, and then in *Pearce* where a member of Congress was

5     denied a right to which he said he was entitled by statute.  And

6     then, I think, Your Honor, *Arizona State Legislature* confirmed

7     that just three years ago holding that the Arizona State

8     Legislature had standing when it was stripped of its alleged

9     prerogative to initiate redistricting.

10         THE COURT:  But it was completely different, though,

11    because it was every member of the legislature that was a party

12    plaintiff.

13         MS. GOROD:  Well, that's right.  It doesn't go to the

14    question of individual legislators.

15         THE COURT:  I mean, that's irrelevant, though, for

16    purposes of resolving the standing issue in this case.  It

17    doesn't have to be every member of the Democratic Senate or

18    House, right?

19         MS. GOROD:  Absolutely not.  The sole point for why

20    *Arizona State Legislature* is helpful here is that vote

21    nullification exists not only when a past vote has been

22    disregarded but also when a future voting opportunity has been

23    denied.  But you're right, it doesn't go to the question of, you

24    know, individual legislative standing, but I think *Raines* answers

25    that question when it recognizes that individual legislators can

1    have standing when there's been a complete denial of an effective

2    vote.  And, of course, *Campbell* and *Chenoweth*, you know, if they

3    thought that *Raines* had foreclosed the type of suit where an

4    individual is denied a power specific to individual members, the

5    specific voting power, those could have been far shorter

6    opinions.  But as said in both cases, the Court engaged with the

7    question of vote nullification and then ultimately rested its

8    holding -- rested its decision on the fact that Congress in those

9    cases had legislative recourse that was adequate within the

10   meaning of *Raines*.

11       THE COURT:  But *Raines*, *Chenoweth* and *Campbell* should

12   persuade this Court, though, that it cannot rely upon pre-*Raines*

13   precedent to find standing for a vote nullification issue.  Do

14   you agree with that?

15       MS. GOROD:  I think the D.C. Circuit has not been entirely

16   clear about the, you know, whether the pre-*Raines* case law

17   remains good law.  There's some discussion of that in *Chenoweth*,

18   and then some discussion of that in *Campbell.*  I mean,

19   ultimately, Your Honor, I don't think it matters one way or the

20   other.  I think *Raines,* you know, makes clear that individual

21   legislators can still have standing to sue.  In most cases they

22   won't, but they can still have standing to sue in the narrow

23   circumstance where there's been a complete denial of an effective

24   vote, and *Campbell* and *Chenoweth* support that as well, Your

25   Honor, because in both of those cases they discuss, you know,

1  whether there was vote nullification in that case before

2  ultimately concluding that legislators lack standing because in

3  those cases Congress had legislative remedies that were adequate.

4      THE COURT:  Even if the Court were to find standing based

5  on pre *Raines*, D.C. Circuit precedent, why would this Court not

6  then dismiss the case based on the doctrine of equitable

7  discretion as occurred in the *Warren Riegle* case?

8      MS. GOROD:  Because, Your Honor, what the D.C. Circuit has

9  done is combine the equitable discretion analysis into its

10  standing analysis, and so that's now basically incorporated into

11  the question of whether Congress lacks legislative remedies that

12  are adequate within the meaning of *Raines*, and so if this Court

13  concludes, as I think it should for the reasons we've already

14  discussed, that Congress here lacks legislative remedies that are

15  adequate, that's the end of the query.

16      If this Court concludes that our plaintiffs have been

17  deprived of a specific voting opportunity and a specific voting

18  opportunity that they're entitled to under the Foreign Emoluments

19  Clause and that Congress lacks a remedy that's adequate within

20  the meaning of *Raines*, then this Court can find that these

21  Plaintiffs have standing under *Raines* and *Campbell* and *Chenoweth*.

22      THE COURT:  You may have alluded to this, I just don't

23  recall.  Has Congress enacted any legislation governing

24  Emoluments Clause as it applies to this President or any other

25  President?

1      MS. GOROD:  Not as applies to this President specifically.

2  Congress has enacted the Foreign Gifts and Decorations Act which

3  provides that federal officials including the President can

4  accept certain gifts that are identified in that statute, so

5  one's a de minimis value, one's where not accepting them would

6  cause embarrassment, and that sort of thing.  And what that

7  reflects is that Congress can prospectively give consent if it

8  wants to do so, but Congress has not done it here.  And so as

9  long as Congress hasn't given consent, then Congress and its

10  individual members have the right not to consent to every

11  specific emolument that the President's accepting.  And again, by

12  accepting these emoluments without waiting for that affirmative

13  consent, he's denying them that specific voting opportunity that

14  the Foreign Emoluments Clause entitles them to.

15      THE COURT:  Have any parties plaintiff introduced any

16  bills to address this issue in the respective Houses?

17      MS. GOROD:  Right.  So --

18      THE COURT:  There are rules pending, I guess.

19      MS. GOROD:  Yeah, yeah.  So there are some resolutions

20  pending, you know, resolutions, it's worth noting, if they don't

21  require the President's signature, they don't have the force and

22  effect of law, they can't require the President to do anything at

23  all.  There are other bills pending, but of course none of those

24  bills can give members the votes that they're entitled to under

25  the Foreign Emoluments Clause.

1          THE COURT:  Are there joint resolutions pending now or?

2          MS. GOROD:  I believe that they're still pending, I'm not

3   entirely sure, but there have been some that have been once

4   introduced.

5          THE COURT:  So they have not been formally adopted by --

6          MS. GOROD:  That's right, Your Honor, but again, none of

7   those resolutions can give the specific voting opportunity that

8   the Foreign Emoluments Clause entitles them to.  Again, I think

9   it's worth emphasizing, the injury here isn't the general ability

10  to legislate under Article I Section 8.  You know, the question

11  isn't whether they can pass some kind of legislation related in

12  some way to the issue of emoluments.  The question is whether

13  they can get that specific vote that the Foreign Emoluments

14  Clause explicitly entitles them to, and that's what the President

15  is denying them by accepting these emoluments in secret without

16  first waiting for Congressional consent.

17         THE COURT:  It's troubling to the Court -- I'm not

18  necessarily agreeing with your argument, but it's troubling that

19  you represent that there may not be any basis at all for any

20  private cause of action by any citizen or voter to seek relief.

21         MS. GOROD:  I mean, I think --

22         THE COURT:  Absent these parties plaintiff.

23         MS. GOROD:  I think it is troubling, Your Honor, and I

24  think it speaks to, you know, the important role that Congress

25  and Congress's members are explicitly assigned in the text of the

1    Foreign Emoluments Clause.  And I think one reason that *Raines*

2    and D.C. Circuit case law preserves standing for individual

3    legislators in very narrow circumstances is, you know, because it

4    enables them to vindicate this kind of unusual Constitutional

5    provision, one that assigns to Congress a very specific role in

6    overseeing the executive branch.  Because Congress here does have

7    standing, because individual members are injured by every single

8    emolument that the President is accepting, these plaintiffs are

9    in a position to challenge the wide range of foreign government

10   benefits that the President is accepting, whereas, you note --

11   you know, other private plaintiffs may not be able to, and so

12   that's why if these plaintiffs don't have standing, it's entirely

13   possible that the Foreign Emoluments Clause will simply go

14   unenforced, that the President will be able to continue violating

15   it by accepting as many foreign government benefits as he wants.

16        THE COURT:  Is the Foreign Emoluments Clause without

17   precedent and totally atypical --

18        MS. GOROD:  I mean, there's --

19        THE COURT:  -- or are there analogous clauses and/or

20   statutes?

21        MS. GOROD:  Right, so it's very unusual, Your Honor.  I

22   would say there are a couple of provisions in the Constitution

23   that are analogous, and so that would be, you know, the Advise

24   and Consent Clause which we talked about a little bit earlier.

25   There's the Treaty Clause.  These are provisions of course that

1    require Congressional consent before the executive can take

2    certain action, and I think those analogies underscore why the

3    injury here is so real.  You know, as we talked about before, if

4    the President reported to name someone to serve on the Supreme

5    Court and that person started hearing cases without ever having

6    been confirmed by the Senate, you know, that would injure the

7    individual senators who have a right to vote and whether to

8    confirm that person.

9         THE COURT:  That's appointment, though, right?

10        MS. GOROD:  Well, but I think there could be, but that's

11   because there's a specific provision in the Constitution that

12   allows for recess appointments.  And I think that's --

13        THE COURT:  There's an exception to that.

14        MS. GOROD:  That's right.  And, you know, I think that

15   makes clear that where the founders wanted to give the President

16   the ability to act without waiting for affirmative consent, they

17   made that clear.  Here, there's nothing in the Constitution that

18   suggests that the President can in some circumstances accept

19   these benefits without first getting that affirmative consent

20   from Congress.

21        THE COURT:  If the President hypothetically entered into a

22   treaty on his own without the advice and consent of the Senate,

23   could these parties plaintiffs sue to block that?

24        MS. GOROD:  I think potentially, Your Honor.  So there

25   would be two questions.  So, one, were they deprived of a

1    specific voting opportunity?  To that question, I think the

2    answer is clearly yes, for the same reason.  So then the question

3    would be whether Congress lacks legislative remedies that are

4    adequate, and I think the answer to that question would probably

5    depend on the particular nature of the treaty and whether there

6    was some kind of legislative response that Congress could take to

7    fix the harm.  And I think that's a little difficult to say in

8    the abstract.  But it's certainly possible, Your Honor, depending

9    upon the circumstances, but I think, you know, again, that is a

10   pretty unusual situation in which it's not at all surprising that

11   individual members of Congress would have standing to sue if the

12   President were to report to ratify a treaty without Congress's

13   consent or have someone start serving as a Supreme Court Justice

14   or an Article III Judge without getting the required confirmation

15   by the Senate.

16        THE COURT:  And you're telling me, then, that -- probably

17   for the last time -- but there's no legislative remedy

18   foreseeable.

19        MS. GOROD:  That's right, Your Honor.  There's nothing

20   that Congress can do to fix the problem, nothing that's adequate,

21   an adequate remedy within the meaning of *Raines*.  And again

22   that's --

23        THE COURT:  And adequate would mean --

24        MS. GOROD:  So what *Raines* said is that, you know, in that

25   case, if Congress had adequate remedies, they could have repealed

1    the Line Item Veto Act, they actually could have exempted any

2    particular provision going forward from its scope simply by

3    including that in the legislation when they send it to the

4    President for his signature.  So the question is, you know,

5    whether there is something that Congress can do to fix the harm.

6         THE COURT:  But could Congress pass a law that orders the

7    President to return those emoluments?

8         MS. GOROD:  Your Honor, I think it's not clear whether

9    they could.  I know you could potentially get into some other

10   Constitutional issues, but at the end of the day, Your Honor --

11        THE COURT:  -- {Indiscernible} powers?

12        MS. GOROD:  Well, there were retainer issues, but at the

13   end of the day, Your Honor, I think that doesn't matter.  The

14   point is that you have to ask whether it's an adequate remedy

15   within the context of the Foreign Emoluments Clause, and in the

16   context of the Foreign Emoluments Clause, any remedy that would

17   either require the President's own signature, require him to

18   acquiesce, basically voluntarily agree to stop engaging in the

19   unlawful activity, or would require super majorities of Congress

20   to take affirmative action to stop him, can't be an adequate

21   remedy within the meaning of *Raines*.

22        THE COURT:  All right.  I don't think I have any other

23   questions right now, right this second.  Does anyone wish to --

24   are there any other points you would like to make on the standing

25   issue only?

1          MS. GOROD:  With that, I think I'll turn it over to my

2     colleague to address redressability and then answer any other

3     questions that you might come up with.

4          THE COURT:  Let me just speak with the court reporter for

5     one second.

6          (Discussion off the record.)

7          THE COURT:  Counsel, how much time -- I don't want to cut

8     you off, but I'm just trying to be kind to the court reporter,

9     because if I'm not, he won't be kind to me.

10         MS. WYDRA:  I think I can be very brief.  I want to be

11    respectful to his magic fingers, so I don't think this will take

12    terribly long.

13         THE COURT:  You're going to have to pay for the

14    transcript.

15         (Laughter in the audience.)

16         MS. WYDRA:  Of course.

17         THE COURT:  Before I forget it, I do want the parties to

18    order a transcript and just split the cost or whatever is

19    appropriate.

20         MS. WYDRA:  Yes, of course.  Absolutely, Your Honor.  So I

21    just want to speak briefly to the third prong that we have to

22    prove to show that we have Article III standing in this case, and

23    that's that the injury, so powerfully described by my colleague,

24    is redressable by a favorable opinion by this Court.  And I think

25    I would -- at the outset I would like to follow up on the

1    colloquy that you just had about whether or not the harms alleged

2    here could be redressed by other plaintiffs, and my colleague is

3    absolutely right that they could not.

4         First of all, in order to have competitor standing, for

5    example, as we've seen in the other two lawsuits pending on the

6    Foreign Emoluments Clause and the Domestic Emoluments Clause, you

7    have to know about the particular emolument, and we are dealing

8    here as alleged in the complaint with an entire universe of

9    potential emoluments and gifts ranging from regulatory benefits

10   to international resort deals, intellectual property rights.  And

11   the reason that the Emoluments Clause has Congress give that

12   affirmative consent before the President is allowed to accept

13   these emoluments allows for the President who is the one who has

14   this knowledge, we've relied on, you know, the diligent efforts

15   of the press, but even then, you know, the President might say

16   it's fake news so it certainly would be something that we would

17   want to hear from him.  So, perhaps there aren't plaintiffs who

18   know about these emoluments because he is accepting them in

19   secret, and so that's why it's so important that this Court

20   address the alleged injury here so that we can ensure that as the

21   Founders intended, all of these potentially corrupting foreign

22   emoluments and gifts are put to public scrutiny, are ensured by

23   Congress that they do not present the dangers to our national

24   security or policy interests abroad.  You know, it's simple that

25   Congress cannot consent to what it doesn't know, and while we

1    have alleged emoluments, they are most likely just the tip of the

2    iceberg and that's why we are here in court today.

3            Specifically, Your Honor, I would like to address the

4    government's assertion that the relief that we are requesting

5    here is not available.  We are requesting, as Your Honor knows,

6    declaratory and injunctive relief, and while the government

7    claims that *Mississippi v. Johnson* and the *Franklin* case

8    foreclosed this relief against the President, those cases

9    specifically, as the D.C. Circuit has noted, left open the

10   possibility that there could be injunctive relief against the

11   President, if he does not have any discretion on whether to

12   comply with a legal duty.  Here it is clear in the text of the

13   Constitution that the President must obtain Congressional consent

14   before accepting any foreign emoluments or gifts.  It is as the

15   Court recognized in *Swan*, a simple duty and one that he must

16   perform, just as presidents before him have followed the clause

17   and not accepted any emoluments without first getting consent of

18   Congress.

19           There are some cases where the Court has said, for

20   example, in *Swan*, that there are lower level officials against

21   whom injunctive relief can be granted instead of the President,

22   but here because of the unique nature of the Emoluments Clause,

23   we are looking directly at the President because this clause

24   addresses private conduct, the President's international business

25   dealings, relevant because of his official capacity as President,

1   and so therefore the President is the only one who can comply

2   with the Emoluments Clause as the Constitution expects him to.

3        So, finally on that particular point, as Your Honor

4   mentioned, there is sort of balancing, especially when you have

5   separation of powers concerns, as you do here, where we have two

6   branches of government coming before you.  And on the one hand in

7   these injunctive relief cases, the Court has noted those

8   concerns, but it has also noted on the other hand the bedrock

9   principle that we are a nation under the rule of law, that no one

10  is above the law, and here what we are asking the Court to do is

11  to interpret the Constitution.  There is a dispute between the

12  parties about the meaning of emoluments.

13       From an Amicus it is suggested it doesn't apply to the

14  President.  Fortunately, the government has not made that

15  argument.  But this is a simple matter of interpreting clear

16  Constitutional text, and as the Supreme Court said in *Tomski*,

17  That is what courts do.  So we are here before Your Honor --

18       THE COURT:  I'm glad you said it was a simple matter.

19       MS. WYDRA:  Sure, very simple.  Well, it's simple today

20  because I suppose you assume that we'll prevail on the merits

21  {indiscernible} standing analysis, so today it is simple.

22       THE COURT:  I have to accept all your allegations as true.

23  I have to do that.

24       MS. WYDRA:  Yes, yes.  Correct, Your Honor.  So I would

25  just close on this particular point, unless the Court has any

1    further questions, by noting that the Congress cannot do its job

2    under the Constitution unless the Court orders the President

3    through injunctive and declaratory relief to follow the

4    Constitution.  As you noted, this has been in the Constitution

5    from the very start.  He's been on notice that he must obtain

6    Congressional consent before accepting foreign emoluments or

7    gifts, but he has declined to do so, so there is no adequate

8    remedy, except for this Court to order him to comply.  And we of

9    course assume that the President will comply with this Court's

10   order, and it is the only way that the Congress can do the job,

11   the important anti-corruption job given to it by the Founders in

12   the Emoluments Clause.  So with that, we'll be happy to answer

13   any further questions that the Court may have.

14        THE COURT:  I don't have any other questions at this time.

15   I actually hadn't spent a lot of time when I was preparing for

16   this to address the request for injunctive relief, but my initial

17   reaction is that this is a nonjury matter.  I'm not sure whether

18   the Court has to deal with the winners issues, balancing certain

19   factors here.  I think under Rule 65(a)(2) the Court could

20   consolidate the request for injunctive relief with the merits

21   determination.  I'm going to decide this.  Well, I have to

22   address standing first, but if and when the Court gets to the

23   merits, the Court could just consolidate the request for

24   injunctive relief with the merits determination.

25        MS. WYDRA:  Certainly --

1          THE COURT:  And if there's any injunction at all, it would

2     be a permanent injunction.

3          MS. WYDRA:  Yes, absolutely, Your Honor, and I think that

4     for the limited purposes of today for the standing analysis,

5     whether this can be redressed by a favorable opinion by the

6     Court, certainly we think injunctive relief would be appropriate

7     and -- but also declaratory relief would also be appropriate so

8     the redressability prong is certainly met.  Thank you.

9          THE COURT:  All right.  Thank you very much.  Counsel, I

10    think it's appropriate -- we've been actually -- I put my watch

11    over here, but we've been talking for a long time and I think

12    it's only fair to give the court reporter a short recess, so

13    according to my watch it's a little bit after 11:20, so we'll

14    take a recess until 11:30.  There's no need to stand, but the

15    Court will stand in recess until 11:30.  Thank you.

16         (Thereupon, a recess in the proceedings occurred from

17    11:28 a.m. until 11:41 a.m.)

18         THE COURT:  All right.  Let me hear from defense counsel.

19         MR. SHUMATE:  Good morning, Your Honor.  May it please the

20    Court.  I would like to start with *Raines* because that's where we

21    left off and we're --

22         THE COURT:  Cover my questions first, and then I'll give

23    you some time.  Okay?

24         MR. SHUMATE:  Yes, Your Honor.

25         THE COURT:  You're not going to get off the hook, Counsel.

1     MR. SHUMATE:  Yes.

2     THE COURT:  Speaking of *Raines*, though, *Raines* did not

3  overrule *Coleman*.  It appears to me that the government has

4  overreached -- I say that respectfully -- when you say that in

5  your brief, quote, and I quote, a foundational principle -- you

6  say that, "It is a foundational principle that the denial of

7  institutional legislative prerogative is not a judicially

8  cognizable injury."

9     It seems like a stretch there.

10    MR. SHUMATE:  Your Honor, I think that comes from *Raines*.

11 And the injury here is just like *Raines*.  The injury here is an

12 allegation that the President is depriving them as members of

13 Congress of the opportunity to vote on his alleged receipt of

14 emoluments.  The alleged injury in *Raines* is that the Line Item

15 Veto Act was depriving the members of their Constitutional role

16 in the legislative process, and the Court said that is an

17 institutional injury, it's not a personal injury, and it's not

18 judicially cognizable because it's abstract and it's wildly

19 disbursed among all the members.  And that's exactly what we have

20 here, we have an allegation that the President has not come to

21 Congress and is robbing them of the opportunity to vote.

22    THE COURT:  Right.  And I have to accept that as true.

23    MR. SHUMATE:  Correct.

24    THE COURT:  And you agree with that, correct?

25    MR. SHUMATE:  For purposes of the motion, for sure, we

1   accept that as true.

2       THE COURT:  So what would a -- what would a plaintiff look

3   like with standing in this case?  Who would have standing?

4       MR. SHUMATE:  Well, Your Honor, there's a court in

5   Maryland that concluded that D.C. and Maryland have standing to

6   proceed on their claims.  We respectfully disagree with that

7   opinion but that is one court that has concluded that the

8   plaintiffs did have standing to bring an Emoluments Clause claim.

9   Now, that's --

10      THE COURT:  They were arguing different claims.  They were

11  arguing some sort of competitive injury there, weren't they?

12      MR. SHUMATE:  That's right, Your Honor.

13      THE COURT:  And these plaintiffs are not arguing

14  competitive injury, they're just saying they can't do their job

15  and D.C. has nothing to do -- or Maryland, and I love the city --

16  love the state of Maryland, but they have nothing to do with the

17  Emoluments Clause, there's no obligation for the President to do

18  anything with respect to either D.C. or for Maryland.  That's

19  just apples and oranges there.

20      MR. SHUMATE:  Well, I think that's a good point, Your

21  Honor, that the clause itself says "consent of Congress," the

22  clause doesn't say the consent of the individual members, so I

23  think that highlights the fact that they are seeking to vindicate

24  an institutional injury.  In *Raines*, *Chenoweth* and *Campbell* have

25  all been very clear that those institutional injuries can't be

1   asserted by individual members of Congress because they're widely

2   disbursed among all the members, they're abstract injuries,

3   they're not judicially cognizable.  The other important point in

4   *Raines* was the multiple paragraphs in which the Court had

5   described how disputes between the executive branch and the

6   legislative branch had gotten worked out throughout history.

7   There were a number of cases where members of Congress, the

8   President, didn't bring a lawsuit, but ultimately there was a

9   private plaintiff that brought the lawsuit, the issue got worked

10  out through the political process.  I think --

11      THE COURT:  Let me just ask you the same question I asked

12  plaintiffs' counsel.  In *Raines*, the Court stated that the

13  members bringing the suit, and I quote, "Do not claim that they

14  have been deprived of something to which they are personally

15  entitled," end quote.  "Rather," quote, "the injury claimed by

16  the members of Congress here is not claimed in any private

17  capacity but solely because they are members of Congress.  If one

18  of the members were to retire tomorrow, you would no longer have

19  a claim."  One.  The claim would be possessed by its successor

20  instead."  That's *Raines* at 821.  And I asked counsel for the

21  plaintiffs why this language doesn't foreclose plaintiffs'

22  claims.  What's your response?

23      MR. SHUMATE:  My response, Your Honor, is that this case

24  is nothing like *Powell* where a member was personally being denied

25  the seat in Congress.  This is fundamentally different.  This is

1    a case where every member of Congress has an interest in voting

2    on this question of whether the President is complying with the

3    emoluments clauses.  There's nothing unique or personal about

4    that.  It flows to whoever holds that seat.  This is just like

5    *Raines* and *Chenoweth*.  These are cases where Congress -- the

6    individual members don't have a personal interest in the case.

7         THE COURT:  Why don't they?  I mean, an individual member

8    of Congress is saying -- is alleging that he or she can't vote,

9    can't deal with what the people sent them to do -- to Capitol

10   Hill to vote.

11        MR. SHUMATE:  If that were --

12        THE COURT:  They're being deprived of something personal

13   as well as official, are they not?

14        MR. SHUMATE:  I don't think so, Your Honor.  If that were

15   a cognizable injury, then *Chenoweth* and *Campbell* would have had

16   to come out the other way.  In *Chenoweth* there was an argument

17   that the President had enacted a federal program before getting

18   legislation from Congress.  In *Campbell*, it was an allegation

19   that a President had initiated military action before getting the

20   consent of Congress.

21        This case is no different.  This is a case where the

22   members are arguing the President is doing something before

23   getting the consent of Congress.

24        THE COURT:  Right.

25        MR. SHUMATE:  And that is an institutional injury that is

1    not judicially cognizable under *Raines* and then under *Chenoweth*.

2         THE COURT:  So would it take the entire Senate and the

3    entire House as parties plaintiffs to seek the relief that these

4    plaintiffs are seeking?

5         MR. SHUMATE:  That would be a different case for sure but.

6         THE COURT:  Would you agree that they would have standing?

7         MR. SHUMATE:  I wouldn't, Your Honor.  That would be a

8    different case.

9         THE COURT:  Assuming the same facts, allegations are the

10   same, the parties plaintiff are, indeed, every member of House

11   and every member of the Senate, or alternatively members of the

12   House and members of the Senate who have been authorized to file

13   a suit seeking the relief that these plaintiffs are seeking.

14        MR. SHUMATE:  I think the same result would occur.  In

15   that case -- and that just -- the Supreme Court has never

16   recognized that Congress or one House of Congress has standing to

17   sue the executive branch.  I think from *Raines* the outcome would

18   probably be the same.

19        THE COURT:  Has the Supreme Court ever said conclusively

20   that an entire House or an entire Senate has no standing to sue

21   the President?

22        MR. SHUMATE:  No, they have not addressed that question,

23   Your Honor.  But I think the same principles underlying *Raines*

24   would result in dismissal.  Because of the separation of powers

25   concerns --

1          THE COURT:  *Raines* held out.  There could be -- there

2     could be a Congressional -- there could be members of Congress

3     that do have standing.  Didn't *Raines* hold that out?

4          MR. SHUMATE:  I think there were -- you're referring to

5     the example of *Powell*, first of all, an example where an

6     individual member is being deprived of something personal to

7     them, and they also said that -- they also discussed *Coleman* and

8     said, at best, *Coleman* would apply in a situation where a state

9     legislator was alleging that they had sufficient votes to take

10    some action or defeat a specific --

11         THE COURT:  *Raines* held open the possibility that there

12    could be an institutional injury that a sufficiently concrete and

13    personal to satisfy standing.  Other than that articulated in

14    *Coleman*, hypothetically, what institutional injury would be

15    sufficiently concrete and personal in the government's view?

16         MR. SHUMATE:  I can't think of one, Your Honor, involving

17    federal lawmakers or involving Congress itself because of the

18    separation of powers concerns.  And because of the long history

19    of these disputes getting worked out through the political

20    process.  There are always political remedies and legislative

21    tools that the Congress itself has to interact with the executive

22    branch, and that was really the underpinning of *Raines* in that

23    lengthy discussion of how these disputes had historically gotten

24    worked out through the political process.  And in *Raines* and in

25    *Chenoweth* and *Campbell,* the courts discussed all the various

1    political tools and remedies that were available to members of

2    Congress.  And these plaintiffs have the exact same remedies

3    available to them here.

4         THE COURT:  Which -- what are those remedies?

5         MR. SHUMATE:  So I think, as we talked earlier, there are

6    two pending bills in the House and the Senate on this very issue,

7    and in fact the House bill would deny consent to the President's

8    alleged receipt of emoluments during his time in office.  There's

9    no reason why the members couldn't vote today on that House

10   resolution, and the Senate has a similar bill as well.  That is a

11   political remedy that would give them the opportunity to vote

12   that they are seeking, and again, I think it's important --

13        THE COURT:  Well, that negates, then, the argument that

14   there's effective nullification of a Congressional vote then.  So

15   it may be deferred, but there's always a possibility.

16        MR. SHUMATE:  I think that shows why there's not vote

17   nullification here.  By vote nullification what the Supreme Court

18   and the D.C. Circuit have meant is something irreversible, a

19   ratification of a Constitutional amendment.  It really can't be

20   undone in any way, it's irreversible.  But they said that

21   something is not irreversible if there are political tools or

22   political self help, in the words, of *Campbell* that the members

23   can take, and so in *Raines*, the members could vote to repeal the

24   Line Item Veto Act.  In *Campbell*, the members could vote on a law

25   to bar the use of military force in Yugoslavia, or cut off

1   funding for troops in the military war zone.  And in *Chenoweth*,

2   the members could pass a law that forbade the President from

3   continuing with that federal program.  Likewise here, the members

4   could vote on a bill today to deny the President consent to

5   receive any emoluments during his --

6         THE COURT:  It's not going to happen, though.

7         MR. SHUMATE:  And the reason it's not going to happen is

8   because they haven't been able to convince their colleagues to

9   bring the bill up for a vote.  And even if the President were to

10   do what they are asking, come before Congress and ask for

11   consent, they still have to run through the same hoops that they

12   haven't been able to run through yet, which is they have to draft

13   a bill, which they've done.  They have to have it passed by both

14   Houses of Congress and they have to present it to the President

15   for his signature.  I think -- we do think that a law or a bill

16   or a resolution would require bicameralism and presentment to the

17   President.  So there are political remedies and the one thing

18   that they want they could do themselves.  They could vote today

19   on whether the President is in compliance or not in compliance

20   with the Emoluments Clause.  And that alone takes this case far

21   outside of *Coleman*, and puts it squarely within *Raines, Chenoweth*

22   and *Campbell*.  They're political remedies, there is not vote

23   nullification, the injury being alleged is an institutional one.

24         THE COURT:  If there were no political remedies, would you

25   agree there was standing for the relief the plaintiffs are

1 seeking?

2     MR. SHUMATE:  I would not, Your Honor.  I think -- to be

3 sure, there's *Coleman* and there's the *Arizona* case, those are

4 cases involving state legislatures or a state institution --

5     THE COURT:  Is *Coleman* still good law?

6     MR. SHUMATE:  Well, it has not been directly overruled and

7 my colleague is right that the Supreme Court relied on *Coleman* in

8 the *Arizona* case in 2015.  So, it is still good law, but at least

9 the D.C. Circuit has confined it to its facts, and hasn't relied

10 on it since *Raines*, and I think the way -- the takeaway that I

11 have from *Campbell* and *Chenoweth* is that unless the precise facts

12 of Coleman present themselves again, it's very difficult to find

13 a case where in the D.C. Circuit there would be legislative

14 standing, but the Supreme Court hasn't recognized a case where

15 federal lawmakers themselves have standing to sue the executive

16 branch, and that's the case we have here that is right in the

17 real house of *Raines*, *Chenoweth* and *Campbell*.

18     THE COURT:  So, isn't it troubling to the government that

19 there may not be a judicial remedy for the relief that these

20 plaintiffs seek?

21     MR. SHUMATE:  It's not, Your Honor.  I think the Supreme

22 Court addressed that in *Nixon v. Fitzgerald*.  I think it was

23 footnote 41 where the Court was addressing this allegation that

24 the President was above the law because he couldn't be sued, and

25 the Court said, It doesn't mean he's above the law, it simply

1    means that this remedy is not available against the President.

2    Just because these plaintiffs don't have standing, it doesn't

3    mean another plaintiff in a proper case might not have standing.

4         THE COURT:  Tell me what that plaintiff -- who's that

5    plaintiff, what would that plaintiff look like?  Would it be an

6    institutional plaintiff, an individual voter, a resident, a

7    citizen?

8         MR. SHUMATE:  Your Honor, again, I have a hard time

9    thinking through which plaintiff would be a proper plaintiff to

10   enforce the Emoluments Clause, and of course, we have other

11   arguments why the clause doesn't create a cause of action, but

12   again the Maryland Court did find that D.C. and Maryland have

13   standing.  We disagree with that decision, but it is an example

14   where the Court did apply standing principles and find the

15   plaintiffs in that case had standing.  Again, a very different

16   case from this one where the Supreme Court and the D.C. Circuit

17   have spoken clearly to the question of whether individual

18   lawmakers in Congress have standing to sue the executive branch

19   for an alleged deprivation of the right to vote, and the answer

20   is, I think, clear in the D.C. Circuit that that is an

21   institutional injury, it is not personal in nature, and there is

22   significant separation of powers concerns that are presented when

23   a lawsuit like this one is being brought.

24        THE COURT:  Just to be clear, I may have asked you this.

25   I'm not sure.  I think I did ask you whether or not, if the

1   lawsuit was authorized by Congress, would the plaintiffs have

2   standing.  I think your answer was no, correct?

3        MR. SHUMATE:  I don't think you asked me that question,

4   Your Honor.  I think you asked my colleague that question.

5        THE COURT:  What about that, if the lawsuit was authorized

6   by Congress?

7        MR. SHUMATE:  Well, my colleague did mention that --

8        THE COURT:  -- approved resolution approved by both

9   Houses.

10       MR. SHUMATE:  Our answer would be the same, Your Honor,

11  that that -- there would still be significant separation of

12  powers concerns that would be involved in the standing analysis,

13  and we don't think the Supreme Court as ever addressed the

14  question of whether Congress as an institution or one House of

15  Congress would have standing to bring that lawsuit.  We think

16  likely not because of the separation of powers concerns because

17  the injury would not be judicially cognizable.  There's a long

18  history of disputes being worked out through the political

19  process, so my answer would be no, it wouldn't matter whether the

20  body itself had authorized the lawsuit.

21       THE COURT:  Am I correct that the government has not

22  alleged that this is a political question raised by the

23  plaintiffs for which the Court should avoid wading into

24  resolving?  You have not made that argument, have you?

25       MR. SHUMATE:  Correct, Your Honor, we have not made a

1   political question doctrine argument.  We have certainly

2   discussed the fact that this is a political dispute, and it

3   wouldn't be appropriate for the Court to infer a cause of action

4   in a case like this one, and the equitable -- it wouldn't be an

5   appropriate case for the Court to exercise equitable power to

6   issue an injunction, but those are really merits questions, but

7   we are not raising the political question doctrine itself.

8            THE COURT:  I asked the plaintiffs how in light of *Raines*,

9   *Chenoweth* and *Campbell* this Court could rely on *Riegle*, *Goldwater*

10  and *Pearce* to find standing based on vote nullification.  If you

11  recall their response, what's your reaction to their response?

12           MR. SHUMATE:  My response, Your Honor, is many of those

13  cases were not directly overruled, but *Campbell* and *Chenoweth*

14  discussed them, and I think there is significant doubt whether

15  they remain good law in this Circuit, but more in *Riegle*, I think

16  are instructive because those were cases where a Court said, yes,

17  there's standing, but ultimately it doesn't matter because the

18  case must be dismissed on equitable grounds because of the

19  separation of powers concerns.  And *Raines*, of course, merged

20  those principles and since then, the D.C. Circuit has been clear

21  in *Chenoweth* and *Campbell* that these cases require dismissal, not

22  just because there's not a personal injury, but because of the

23  separation of powers concerns.  *Goldwater*, I think, is -- it's

24  unclear whether that remains good law, that of course was vacated

25  by the Supreme Court and many of the justices had different views

1    on whether that case was appropriate.  And then came *Raines*,

2    Judge Bates decided a similar case in *Kucinich*, the *Kucinich* case

3    that involved a very similar fact pattern involving a treaty

4    withdrawal, and he discussed all the case law, and he didn't find

5    the *Goldwater En Banc* decision --

6            THE COURT:  Was there an appeal in Judge Bates' case?

7            MR. SHUMATE:  I don't think there was, Your Honor, I don't

8    think there was.

9            THE COURT:  I don't think so either.  For purposes of a

10   standing analysis, and I think you agree with it, the Court must

11   assume the President's accepted foreign emoluments in violation

12   of the Constitution for purposes of standing.  In your

13   supplemental filing responding to the Amicus briefs, you argue

14   that, quote, "When an official fails to first seek Congressional

15   consent before prohibited emoluments --" actually before

16   emoluments are accepted, only means that the official has

17   violated the clause, not that each member of Congress

18   automatically requires a judicially cognizable personal stake to

19   challenge the violation."  What is the violation -- what is the

20   remedy for the violation of the Constitution?

21           MR. SHUMATE:  Well, in this case it's a political remedy.

22   There are remedies that are unique to the legislative branch that

23   suggest that the courts don't need to get involved in these

24   disputes, and --

25           THE COURT:  But the plaintiff said they can't vote on

1    this, though.  They can't do anything, their hands are tied.

2         MR. SHUMATE:  They can vote because they have bills

3    pending on this very issue in Congress and they could vote today

4    on this issue.

5         THE COURT:  But there are political reasons why they can't

6    vote.

7         MR. SHUMATE:  And those political reasons would remain

8    tomorrow or even after the Court were to rule, because they still

9    have to convince their colleagues to draft a bill, you know, to

10   bring it to the floor, both Houses have to pass it.  There's

11   still the same obstacles that would remain even if the Court were

12   to grant all the relief that they're asking for because the Court

13   can't force the leadership in Congress to bring the bills to a

14   vote.  This is a political dispute.  And I think *Campbell* and

15   *Chenoweth* also speak to the point we were making there in the

16   brief which is that just because there's an allegation that the

17   President is acting contrary to law doesn't mean that there's a

18   right in Congress --

19        THE COURT:  It's not just an allegation, it's an

20   allegation that has to be accepted as true.

21        MR. SHUMATE:  Sure, and it was accepted as true in those

22   other cases as well.  But for purposes of standing, just

23   because -- let's assume, the President is acting contrary to law,

24   doesn't mean there is standing in the members of Congress to

25   bring a lawsuit.  It doesn't mean there's vote nullification.

1    Think of *Campbell*.  *Campbell* was a case where the President

2    initiated military action in --

3         THE WITNESS:  It is vote nullification if you're saying

4    they can't vote.

5         MR. SHUMATE:  They made the same arguments in *Chenoweth*

6    and *Campbell*, and in *Campbell* they had actually voted, they had

7    voted down a Declaration of War, and voted down authorization of

8    use of military force, yet the President still took that action.

9    And there was an argument that that's vote nullification, they're

10   doing something contrary to the will of Congress.  And the D.C.

11   Circuit said no, there are still political remedies.  They can

12   vote on a law to forbid the use of forces, they can use their

13   appropriations power, there are all these political tools that

14   are uniquely available to this plaintiff that wouldn't be

15   available to any other plaintiff.

16        THE COURT:  But this clause, though, is not analogous to

17   any other clause or statute or regulation; would you agree?

18        MR. SHUMATE:  I don't agree, Your Honor.  Think of the War

19   Powers Clause and the War Powers resolution in *Campbell*.  I

20   believe the War Powers Clause specifically says the President

21   must get the consent of Congress before initiating military

22   action, something to that effect.  And that's very similar to

23   what we have here, President cannot accept emoluments or

24   foreign -- federal officials can't accept unless they get the

25   consent of Congress, and yet nevertheless the Court in *Chenoweth*

1    and in *Campbell* said there's no standing in those cases.  Now,

2    their primary argument is, the President has to do this before he

3    accepts the emolument, but it's no different in *Chenoweth*.  The

4    President has to act -- can only act pursuant to legislation in

5    creating a federal program, that was the argument in that case.

6    The President in *Campbell* could only initiate military action

7    pursuant to authorization from Congress.  In all of those cases,

8    there was the same allegation of a deprivation of the right to

9    vote because the President was doing something without getting

10   permission from Congress first.  That is not vote nullification

11   within the meaning of *Coleman*.

12       THE COURT:  Political remedy; legislative remedy of

13   passing legislation requiring the President to comply with the

14   Foreign Emoluments Clause, why does there have to be legislation

15   telling someone to comply with the law?

16       MR. SHUMATE:  Well, there could be other political

17   remedies.  For example, Judge Bates mentioned many of them in the

18   *Kucinich* case.  The Congress could refuse to confirm the

19   President's nominees, the Congress can use its appropriations

20   power, it can use the power of inquiry, it can hold hearings, it

21   can do a number of things that no other plaintiff could do, so

22   those political remedies are always available to Congress.  They

23   are not available to --

24       THE COURT:  How could they be enforced?  Suppose Congress

25   were to pass a law saying, The law is on the books, you're not

1    complying with it, so we order you to comply with the law.

2        MR. SHUMATE:  I think federal officials are entitled to a

3    presumption of regularity and a presumption that they will comply

4    with the law.

5        THE COURT:  If he doesn't, then what?  How do you enforce

6    that remedy?

7        MR. SHUMATE:  I think *Raines* speaks to that situation.

8    There are always going to be disputes between Congress and the

9    President, and they happen to get worked out through the

10    political process.  Again, Congress can pass a law on unrelated

11    subjects, they can hold hearings, they can do a number of things

12    to hold the President accountable that a private plaintiff

13    cannot.

14        THE COURT:  I mean, like, what would they do?  What would

15    Congress do; pass a law saying, Comply with the law that's been

16    on the books forever?  Comply with the law, and he doesn't comply

17    with the law; they don't have a remedy, do they?

18        MR. SHUMATE:  Well, in this case, Your Honor, they have a

19    clear remedy.  They have bills pending in Congress on this very

20    issue.  So we don't need to speculate about all of the other

21    things that Congress could --

22        THE COURT:  We have potential remedies that they can't get

23    a vote and that's why they're here.  They can't get a vote,

24    they're not going to get a vote.

25        MR. SHUMATE:  And that's not because the President is

1   doing something to prevent them from doing anything, it is

2   because the leadership in Congress has not --

3        THE COURT:  The President's party is doing something to

4   prevent them from getting a vote.  I think that's pretty clear,

5   isn't it?  Is there some other reason why they can't get a vote?

6        MR. SHUMATE:  The reason they can't get a vote is because

7   they can't convince their colleagues in Congress to bring the

8   matter to the floor.  In *Raines* there was a footnote where the

9   Supreme Court said at the end of the opinion, it's not even clear

10  whether the injury in that case was fairly traceable to the

11  executive branch because it seems like it's fairly traceable to

12  their colleagues in Congress who wouldn't bring the matter to a

13  vote.

14       THE COURT:  *Raines* stops short of saying the legislators

15  don't have standing unless they have enough plaintiffs to have

16  taken action on behalf of a legislative body.  *Raines* did say

17  that the Court attached, quote, unquote, some importance -- it's

18  verbatim to the fact that the plaintiffs have not been authorized

19  to represent their respective Houses of Congress.  That implies

20  that there could be a case in which a minority of legislators

21  would have a concrete injury.  Here we have a President who's

22  allegedly violating the Constitution, and the Court will also

23  note that multiple media reports state that the President -- that

24  the defendant has paid to the U.S. Treasury $151,000 resulting

25  from foreign government profits to the Trump organization.  And

1   the legislators in the majority refuse to take any action.  What

2   would the class of cases be in which a minority of legislators

3   would have standing?  And I guess I have to ask again, why is

4   this not the case?  They're not going to get a vote on any of

5   this.  The majority is not going to call for a vote, their hands

6   are tied.  It sounds like you're saying, So what else is new,

7   Judge, that's the way it is, that's the way of life in the U.S.

8   Congress on Capitol Hill these days.

9        MR. SHUMATE:  I think your question implicates the *Common*

10  *Cause v. Biden* case that Your Honor had in 2012 where members of

11  Congress wanted to pass the Dream Act, but the alleged obstacle

12  was the filibuster rule, the cultural rule in the Senate that was

13  blocking their right to vote, and the Court said --

14       THE COURT:  That was a very frustrating case, too.  I

15  can't rule from the heart, but go ahead.

16       MR. SHUMATE:  But this is a --

17       THE COURT:  They were mad at me over that.

18       MR. SHUMATE:  But that is an easy one, Your Honor, because

19  of *Raines* --

20       THE COURT:  It's easy.  You said it's easy.  She said it

21  was simple.  And, you know what, the lawyers in the filibuster

22  case said the same thing, easy and simple.

23       MR. SHUMATE:  What's -- the same separation of powers

24  concerns that you had in that case which you said were fatal were

25  that the Court didn't want to intrude on the --

1          THE COURT:  Did I say that?

2          MR. SHUMATE:  You did say "fatal."  I can move off this

3     case, if you would rather move on.

4          THE COURT:  That's all right.  Keep walking me down memory

5     lane.  Go ahead.

6          MR. SHUMATE:  The reason the Court didn't want to

7     interfere in the legislative process.

8          THE COURT:  It was frustrating.

9          MR. SHUMATE:  Yeah.

10         THE COURT:  It was frustrating to hear frustration.  And

11    that's what I'm hearing again here, frustration.

12         MR. SHUMATE:  And it's the frustration --

13         THE COURT:  The job that the voters sent them to Capitol

14    Hill to do, they're frustrated.

15         MR. SHUMATE:  I understand.  It's a frustration with the

16    political process.  The political process tends to work these

17    things out.  That's the teaching of *Raines*, *Campbell* and

18    *Chenoweth*.  I know it may be frustrating, but the teaching of

19    *Raines*, I think is clear throughout the D.C. Circuit cases that

20    an institutional injury is not a personal one, it's widely

21    disbursed among the members in its abstract.  I completely get

22    the frustration, but this is not a proper plaintiff to bring this

23    lawsuit.

24         THE COURT:  And we can't -- we can't even agree on who the

25    proper plaintiff would be, which really is very troubling to an

1    Article III member for anyone to argue that there may not be

2    anyone who can require legal compliance with the statute.

3          MR. SHUMATE:  And I think -- I understand that, Your

4    Honor, and I think the Supreme Court also responded to that

5    concern in the *Schlesinger* case, I think it was 1974.  Just

6    because this plaintiff doesn't have standing isn't a good

7    reason -- or that no plaintiff may have standing isn't a good

8    reason to find that this plaintiff has standing.  You have to

9    take the case, each one as they come, and I would also point the

10   Court to the footnote, I think it's 12 in the *Arizona* Opinion

11   where the Court said, you know, we find *Coleman* applies in this

12   case --

13         THE COURT:  The *Arizona Legislature*?

14         MR. SHUMATE:  Right.  They said that that institutional

15   plaintiff had standing, but they said it would be a different

16   case involving Congress suing the executive branch because of the

17   separation of powers concerns.  That's this case and the Supreme

18   Court has not gone to the length of allowing Congress as an

19   institution or a particular body of Congress to sue the executive

20   branch.

21         THE COURT:  Any additional points you wish to make,

22   Counsel?

23         MR. SHUMATE:  Your Honor, I think we've covered everything

24   that I wanted to cover today.  If you have any further questions,

25   I'd be happy to answer them.

1          THE COURT:  All right.  Not at this point.  I want to give

2     plaintiff a few more minutes, and thank you.

3          MR. SHUMATE:  Thank you, Your Honor.

4          THE COURT:  Counsel.  Everyone turned to look at you and I

5     said I'll give the plaintiff a few more, so go right ahead.

6          MS. GOROD:  Thank you, Your Honor.  Let me just make a few

7     quick points in response to the government's argument.  First,

8     the government's suggestion that *Raines* and *Campbell* and

9     *Chenoweth* stand for the proposition that members can never have

10    standing to sue for institutional injury is just a dramatic

11    over-reading of those cases.  In fact, if that is what *Raines* had

12    said, then there was a lot of wasted ink in *Campbell* and

13    *Chenoweth* because the Court could have simply said, These members

14    are suing for institutional injury, no standing.  What *Campbell*

15    and *Chenoweth* did instead was discuss the two key questions:  Is

16    there vote deprivation, have members been denied a specific

17    voting opportunity to which they're explicitly entitled; and then

18    two, does Congress lack legislative remedies that are adequate

19    within the meaning of *Raines*.  So I think the government is wrong

20    when it suggests that *Campbell* and *Chenoweth* would have turned

21    out differently if members had -- if members could sue for

22    institutional injury because those two cases were decided on the

23    question of whether Congress lacked adequate legislative

24    remedies, and both of those cases, the D.C. Circuit concluded

25    that the plaintiff there didn't have standing because Congress

1    could fix the harm.  Congress could have used the power of the

2    purse to literally stop the behavior that the President was

3    engaging in, something that Congress can't do here because the

4    President is engaging in this violation through his private

5    businesses.

6         Now, I want to talk a little bit about the resolutions

7    that the government brought up and that Your Honor discussed with

8    the government.  Those resolutions do nothing to change the fact

9    that members have standing here, and for two reasons.  First,

10   Your Honor, the government keeps talking about whether Congress

11   could cast some vote on some legislation, somehow related to

12   emoluments.  Again, that's not the question.  The question is

13   whether members have been denied the specific vote that they're

14   entitled to take under the Foreign Emoluments Clause.  And so

15   that again is a binding vote before the President accepts

16   emoluments with a burden on the President to convince the

17   majority of the members of Congress to give their consent.  And

18   so it doesn't matter who's in charge of Congress, Your Honor.

19   Congress can't take that vote as long as the President is

20   accepting these emoluments in secret without first presenting

21   them to Congress.

22        So, then the question is whether the existence of these

23   resolutions can be an adequate remedy within the meaning of

24   *Raines*, and I don't think the government even suggested how this

25   could be an adequate remedy, and the point again, Your Honor, is

1    that any action that would require a super majority of Congress

2    to take some kind of affirmative step to stop the President from

3    violating the clause would flip the clause on its head.  It would

4    essentially write the Foreign Emoluments Clause out of existence,

5    and nothing in *Raines* or *Campbell* or *Chenoweth* suggests that that

6    sort of extraordinary measure is necessary before individual

7    members can have standing to sue when they've been completely

8    denied an effective vote.  And again, *Raines* reaffirmed that

9    members have injury and can sue when they've been completely

10   denied an effective vote, which they have here, not by their

11   colleagues, but by the President who's accepting these emoluments

12   without first doing what past presidents have done, submitting

13   them to Congress and waiting for Congress to give its affirmative

14   consent before accepting them.

15        Third, I do just want to underscore one more time that the

16   Foreign Emoluments Clause is a very unusual clause.  The

17   government suggested that the declare war language is similar,

18   and this is what the declare War provision says, this is Article

19   I, Section 8, Clause 11.  It gives Congress the affirmative

20   authority to declare war, grant Letters of Marque and Reprisal,

21   and make rules concerning captures on land and water.  There's

22   nothing there about the consent of the Congress.  There's no

23   executive action that's prohibited without Congressional consent.

24   And that's what makes the Foreign Emoluments Clause so unusual.

25        THE COURT:  What about the treaty legislation, though?

1        MS. GOROD:  Yes, I think treaty is similar and I think

2   Advice and Consent are similar, and I they those clauses only

3   underscore why our plaintiffs have standing here.  You know, as

4   we discussed earlier, if the President purported to name someone

5   to serve as Secretary of State without that person first being

6   confirmed by the Senate, senators would be denied the right that

7   they're entitled to under the Advice and Consent clause, and it

8   wouldn't matter that they might be able to legislate generally on

9   the issue of appointments.

10       THE COURT:  But one Senator couldn't file an action

11  challenging that?

12       MS. GOROD:  I think that's right, Your Honor, but, you

13  know, again, you would have to also ask whether Congress had

14  adequate legislative remedies, but, you know, there aren't very

15  many cases -- You know, we talked about three clauses of the

16  Constitution, and it's a little bit difficult, I think, to

17  imagine the President purporting to name someone to serve as

18  Secretary of State without first getting confirmation by the

19  Senate, but if the President did that, that would be an egregious

20  violation of the Constitution, and it would be one that injures

21  each and every member of the Senate who's explicitly entitled

22  under the Constitution to cast a binding vote before that person

23  starts fulfilling the responsibilities of the role on whether

24  that person can do so.

25       So the declare of war, declare war provision is an

1    entirely different provision, and I think that underscores two

2    quick points I'll make about *Campbell*.  One, it's not even clear

3    there that there was vote deprivation.  It's certainly right that

4    the plaintiffs argue that the President had declared war, but

5    what the President argued was it had nothing to do with the

6    declare war power.  The President was acting pursuant to his

7    authority as commander-in-chief.  That was the basis for the

8    military strikes he was taking.  And as I think Judge Randolph

9    mentioned in his concurrence, the act of declaring war triggered

10   a number of legal consequences that hadn't actually taken effect.

11   And so that's why members of Congress hadn't had their votes

12   nullified there, and the same way that they are here, when the

13   President accepts emoluments without first obtaining

14   Congressional consent.  But in any event, what *Campbell* clearly

15   relied on was the absence of any remedy that Congress could take

16   that would be adequate within the meaning of *Raines*.  That was

17   the basis for its decision, and that was the basis for the

18   Court's decision in *Chenoweth*.  And that is why this case is so

19   different, both because the Foreign Emoluments Clause is a very

20   unusual provision, because the plaintiffs here, our plaintiffs,

21   have been denied a specific voting opportunity that they're

22   explicitly entitled to, and because there's nothing that Congress

23   can do that is an adequate remedy within the meaning of *Raines*.

24   That's true no matter who controls Congress.

25              THE COURT:  So the government's position that there are

1   political remedies is not persuasive then.

2        MS. GOROD:  It's not persuasive, Your Honor.

3        THE COURT:  If there was a political remedy, how would it

4   be enforced anyway?

5        MS. GOROD:  Well, I think that's another question, but I

6   mean, in this case there is simply nothing Congress can do.

7   Congress -- no matter who controls the body can't -- literally

8   cannot stop the President from engaging in this activity because

9   it doesn't require the use of federal funds and federal

10  personnel.  And anything that Congress might potentially be able

11  to do is going to either require the President to tie his own

12  hands to just agree to stop voluntarily violating the clause or

13  would require super majorities in Congress to take affirmative

14  action to override a Presidential veto.  And that kind of

15  extraordinary measure, which would essentially write the clause

16  out of existence.  It would turn the roadblocks of legislative

17  inertia -- they are supposed to be obstacles to corruption.  The

18  Founders wanted the clause to prevent officials from accepting

19  emoluments unless they could convince the majority of the members

20  of Congress to give them the okay.  It would turn those road

21  blocks into an ally of corruption, and, you know, that's the

22  fundamental problem with the government's argument.  They seem to

23  be assuming that Congress has given its consent when it hasn't,

24  and they talked about, you know, the hoops that Congress could go

25  through to try to stop the President, but the Foreign Emoluments

1    Clause puts the burden on the President to come to Congress and

2    convince Congress to give its consent.

3         THE COURT:  If the plaintiffs received an adverse ruling

4    and the November elections produced super majority, super

5    majorities in both Houses, and filed -- and the plaintiffs filed

6    a motion for reconsideration indicating that they were then

7    authorized by their respective Houses to seek reconsideration,

8    would the prior ruling be *res adjudicata*?

9         MS. GOROD:  I don't think so.  It would be a different

10   case in that eventuality.  As I said, I don't think that the

11   members here --

12        THE COURT:  Are these authorized by --

13        MS. GOROD:  That's right, Your Honor.  Certainly, if the

14   House or the Senate is a body within, it would be a different

15   case, but the point is, Your Honor, no matter who takes over the

16   Congress next year, there's nothing that Congress will be able to

17   do to stop this --

18        THE COURT:  And you've told me that, right, and I should

19   accept that as true, then, right?  There's nothing they can do,

20   super majority, there's no legislation they can pass under the

21   law or enforce it?

22        MS. GOROD:  The question is, is there an adequate remedy

23   under the Foreign Emoluments Clause and any remedy that would

24   require super majorities to take affirmative action would flip

25   the Foreign Emoluments Clause on its head, so that can't be an

1    adequate remedy within the meaning of *Raines*.

2           And then the final thing I'll just note, Your Honor, is

3    the government noted a couple of times that the District Court

4    for the District of Maryland held that the plaintiffs in the D.C.

5    Maryland lawsuit have standing.  But there's an important

6    qualification for that.  They have standing only with respect to

7    emoluments accepted by the D.C. Trump Hotel.  They don't have

8    standing to challenge the wide swath of other foreign government

9    benefits that the President has been and will be accepting.  It's

10   our plaintiffs who have a specific role and responsibility under

11   the Foreign Emoluments Clause in the text of the Constitution

12   that have the right to consent or not to consent to that wide

13   range of benefits, and if these plaintiffs don't have standing,

14   then it's entirely possible that no one will have standing to

15   challenge that wide range of benefits, and the President will be

16   able to continue brazenly accepting the Foreign Emoluments

17   Clause.  That is why the contravention of the courts is so

18   important.  It's the responsibility of the courts to step in when

19   one branch is intruding on the responsibility entrusted to

20   another branch, and that is exactly what the President is doing

21   here by accepting emoluments without filing the Constitutionally

22   prescribed procedure of submitting those emoluments to Congress

23   and waiting for Congress to give its affirmative consent before

24   accepting them.

25           THE COURT:  This is not a class action.  If it was a class

1   action, would that be significant or not?  In other words, had

2   the plaintiffs alleged that they're bringing this action on

3   behalf of themselves in their official and/or individual capacity

4   and on behalf of everyone similarly situated, what's the

5   significance of any of that?

6       MS. GOROD:  I don't think there would by any significance,

7   Your Honor.  The point is that each individual member of Congress

8   is injured when the President accepts these emoluments and denies

9   them their right and their responsibility under the Foreign

10  Emoluments Clause.

11      THE COURT:  Would you have a stronger argument, though, if

12  this were a class action on behalf of every --

13      MS. GOROD:  I don't think so, Your Honor.  These

14  plaintiffs are being injured each and every time the President

15  accepts an emolument without first giving them an opportunity to

16  give the affirmative consent.

17      THE COURT:  You're not going to budge on that, are you?

18      MS. GOROD:  I think we have an incredibly strong case,

19  Your Honor.  These plaintiffs are being injured and they're being

20  injured by the President, and Congress lacks legislative

21  recourses adequate within the meaning of *Raines*, and that's why

22  our plaintiffs have standing to sue the President for his brazen

23  violations of the Foreign Emoluments Clause.

24      THE COURT:  To me, though, it's just a gut reaction, it

25  seems to me that if this were indeed a class action on behalf of

1    everyone, similarly situated, all the House members and all the

2    Senate, I don't think they have to consent to that, they could

3    opt out, I guess, but if it were brought on behalf of everyone,

4    then why isn't that the body that *Raines* was thinking about?

5         MS. GOROD:  Well, what *Raines* made clear is individual

6    legislators can sue when there has been a complete denial of an

7    effective vote, and each individual member has had their vote --

8    the effectiveness of it completely denied by the President's

9    action.  The Foreign Emoluments Clause by its text explicitly

10   assigns each and every individual member of Congress the right to

11   consent or not consent to the acceptance of these emoluments, and

12   the President has been violating that right when he accepts these

13   emoluments without first obtaining Congressional --

14        THE COURT:  -- {Indiscernible} the Representatives the

15   same, we can't do our job.

16        MS. GOROD:  They can't do their job, and the President is

17   denying them the right that they have under the Constitution to

18   deny consent by simply choosing not to act, and there's nothing

19   that Congress can do; again, no matter who controls it, no matter

20   what their views are to fix the problem.

21        If Your Honor has no further questions.

22        THE COURT:  You know, I think I've run out of questions.

23        MS. GOROD:  Thank you, Your Honor.

24        THE COURT:  I'll look to my right and see if I have any

25   other questions.

1          Let me take a short recess, all right.  Anything further?

2     It's your motion to dismiss.  I kind of changed things around

3     because plaintiff does have the burden for standing purposes, but

4     I'm giving you a chance, if you want to say something for a few

5     minutes.

6          MR. SHUMATE:  One more point, Your Honor?

7          THE COURT:  Yes, sure.  And I'm going to take maybe a

8     three- or four-minute recess.  I just want to huddle with my

9     staff for a second.

10          MR. SHUMATE:  Just real quick.  I want to respond to my

11     colleagues's point about there being no adequate political

12     remedies.

13          THE COURT:  Right.

14          MR. SHUMATE:  That's not the test.  And if they're trying

15     to fit this in the *Coleman* except --

16          THE COURT:  You told me that.  You said, Judge, they have

17     a political remedy.  That's what you told me, right?  That's the

18     government's position, that there are political remedies here.

19          MR. SHUMATE:  Correct.

20          THE COURT:  Right.

21          MR. SHUMATE:  They say they have to be adequate.  I don't

22     know where they get the adequate modifier.  What the courts have

23     said is that --

24          THE COURT:  -- {Indiscernible} unless they're adequate.

25          MR. SHUMATE:  They're legislative tools.  So what *Campbell*

1    has said is political self-help, legislative tools that are

2    available to remedy their own injury.  The injury here again is a

3    deprivation of their right to vote.

4         THE COURT:  We agree.  They aren't remedies unless someone

5    can get some relief.  So your argument has to be they're

6    potential legislative -- they're potential political remedies.

7         MR. SHUMATE:  Right.  They're -- they have adequate

8    remedies here because they can vote on a bill, and I think there

9    was one complaint about how they have to override a veto.  Judge

10   Bates addressed that very scenario in the *Kucinich* case where he

11   said, Congress could also override a Presidential veto on this

12   very issue, so that is not a good example of something that

13   wouldn't make it inadequate or effective political remedy.  We

14   discussed a number of remedies that they had available.  The D.C.

15   Circuit has addressed them as well.  They are available to --

16        THE COURT:  Did the Circuit focus on whether or not the

17   remedies have to indeed be adequate?

18        MR. SHUMATE:  I don't think they've ever said adequate.  I

19   think they've said effective, maybe.  I think, perhaps, *Raines*

20   said effective political remedies, but think about the remedy in

21   *Campbell*.  Bombs were already exploding in Yugoslavia, and then

22   Congress could still vote to prevent further military action at

23   that point.  So, that's all I have, Your Honor.

24        THE COURT:  All right.  Okay.  No one needs to stand.  I

25   just want about five minutes to speak with my staff.  I'm not

 1    going to keep you much longer.

 2           MR. SHUMATE:  Thank you, Your Honor.

 3           (Thereupon, a recess in the proceedings occurred from

 4    12:22 p.m. until 12:23.)

 5           THE COURT:  I did say five minutes.  I'll just wait.  I'll

 6    just wait a few minutes.

 7           (Brief pause in proceedings.)

 8           THE COURT:  Plaintiff's counsel, let me ask you one more

 9    question.  And I forgot to ask this question earlier on.  In your

10    pleadings you place great weight on the inversion of the

11    legislative process under the Emoluments Clause, that is that

12    acceptance is prohibited unless Congress consents, but it is

13    still Congress acting by majority to consent or not, or not to

14    bring it to a vote; therefore, why is your injury any more

15    concrete and personal because of the inversion of the process?

16           MS. GOROD:  Well, I think the point, Your Honor, is that

17    because of the structure of the Foreign Emoluments Clause, the

18    burden is on the President to convince a majority of the members

19    of Congress to give their affirmative consent, and so that goes

20    to the question of vote deprivation because the President is

21    accepting these emoluments without first obtaining Congressional

22    consent.  He's denying our plaintiffs the specific voting

23    opportunity they're explicitly entitled to under the clause which

24    is a before-the-fact vote with the burden on the President.  The

25    other reason, Your Honor, that's relevant is it goes to the

1   question of whether Congress has legislative remedies that are

2   adequate, and just so Your Honor has it, *Raines* discusses -- uses

3   the term "adequate remedy" on page 829 of its opinion.

4        THE COURT:  Remedy.

5        MS. GOROD:  Adequate remedy, Your Honor.  And the question

6   then is whether the remedy is adequate in the context of the

7   Foreign Emoluments Clause.  And so the government's suggestion

8   that it's fine, that there's a remedy so long as Congress could

9   take some kind of affirmative action by super majority vote, that

10  explains why that view would totally undermine the clause.  It

11  would strip it of basically all meaning because instead of the

12  clause preventing federal officials from accepting emoluments

13  until Congress took affirmative action to okay the acceptance of

14  those emoluments, it would require Congress to take affirmative

15  action by super majority vote to prohibit the acceptance of the

16  emoluments, and what that would mean is that the President could

17  accept all manner of foreign government benefits in secret until

18  and unless Congress again took that affirmative action by super

19  majority vote to stop it.  It simply can't be an adequate remedy

20  if it totally denies the Constitutional provision at issue of all

21  meaning.  Thank you, Your Honor.

22        THE COURT:  Any response to that?

23        MR. SHUMATE:  Sure, Your Honor.  The D.C. Circuit has

24  clarified what the Supreme Court meant by vote nullification in

25  *Coleman*, it means something that's irreversible, there are no

1   political remedies that can be effective to redress that

2   situation.  The example in *Coleman* was ratification of the

3   federal Constitutional amendment.  There's nothing that the State

4   legislature in that case could have done to remedy that

5   situation.  But in *Campbell* and *Chenoweth* the Court has said

6   there are always going to be political tools that the Congress

7   has vis-à-vis the executive branch.  Those tools are available to

8   these congressmen and they are an effective or adequate political

9   remedy in this case, in particular the fact that there's a

10  pending bill on this very issue.

11        THE COURT:  And what's the status of that bill?

12        MR. SHUMATE:  I think it's still pending, Your Honor.

13  That was our last understanding as well, they were still pending.

14  I'm happy to give the Court the cites to those bills if you would

15  like.

16        THE COURT:  All right.  Thank you.  Thank you very much.

17  I want to thank everyone.  The arguments have been brilliant as I

18  expected them to be and very persuasive, and again, don't read

19  too much into the questions I'm asking.  I'm just wrestling with

20  very difficult issues and I want to make the right decisions for

21  the right reasons, but I'm going to recess this proceeding.  I

22  cannot have the United States senator here and a Congress person

23  here without stepping down into the well of the court and shaking

24  their hands, but I don't want the government to say the

25  government was treated differently so I'm going to shake the

1    hands of everyone at the table.  All right?  I can't let you

2    leave here until I shake your hands, everyone's hand.  All right.

3    Thank you.  No need to stand.  Thank you very much.

4         (Proceedings adjourned at 12:28 p.m.)

5                    **C E R T I F I C A T E**

6

7                    I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
8         proceedings in the above-entitled matter.

9

10       /s/ Scott L. Wallace              6/10/18
         ---------------------------      ----------------
11       **Scott L. Wallace, RDR, CRR           Date**
            **Official Court Reporter**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$151,000** [1] - 84:24

## '

**'84** [1] - 5:8
**'89** [1] - 5:9
**'94** [1] - 5:9

## /

**/s** [1] - 103:9

## 0

**05-1429** [1] - 1:4

## 1

**10** [2] - 28:3
**10:00** [1] - 1:6
**10:14** [1] - 4:2
**11** [1] - 90:19
**11:20** [1] - 66:13
**11:28** [1] - 66:17
**11:30** [1] - 66:14
**11:41** [1] - 66:17
**12** [1] - 87:10
**1200** [3] - 1:14, 21; 2:3
**12:22** [1] - 100:4
**12:23** [1] - 100:4
**12:28** [1] - 103:4
**17-1154** [1] - 4:5
**1776** [1] - 49:18
**18** [1] - 5:14
**18th** [3] - 1:14, 21; 2:3
**1974** [1] - 87:5

## 2

**2** [1] - 24:7
**20** [2] - 2:12, 18
**20/20** [2] - 26:6, 10
**20001** [1] - 3:5
**20036** [3] - 1:15, 22; 2:4
**2012** [1] - 85:10
**2015** [1] - 75:8
**2018** [2] - 1:6; 4:1
**202** [7] - 1:16, 18, 23; 2:5, 14, 19
**202-514-2331** [1] - 2:9
**202.354.3196** [1] - 3:5
**20530** [4] - 1:18; 2:8, 13, 19
**296-6889** [3] - 1:16, 23; 2:5

## 3

**30** [1] - 28:2
**304** [1] - 1:16
**305-8900** [1] - 1:18
**311** [1] - 2:5
**34** [1] - 6:23
**353-0543** [1] - 2:19

## 4

**400** [1] - 33:6
**41** [1] - 75:23

## 5

**501** [3] - 1:15, 22; 2:4
**514-3716** [1] - 2:14

## 6

**6/10/18** [1] - 103:9
**616-8470** [1] - 2:14
**65(a)(2** [1] - 65:19
**6503** [1] - 3:4

## 7

**7** [2] - 1:6; 4:1
**7218** [2] - 2:13, 18
**75** [1] - 33:1

## 8

**8** [3] - 21:23; 56:10; 90:19
**821** [3] - 10:4; 11:4; 69:20
**829** [1] - 101:3

## 9

**9** [1] - 21:25
**950** [2] - 1:17; 2:8

## A

**a.m** [4] - 1:6; 4:2; 66:17
**ability** [5] - 10:20; 12:2; 21:22; 56:9; 58:16
**able** [9] - 39:5; 57:11, 14; 74:8, 12; 91:8; 93:10; 94:16; 95:16
**above-entitled** [1] - 103:8
**abroad** [1] - 62:24
**absence** [4] - 28:13; 29:9; 92:15
**absent** [2] - 25:10; 56:22

**absolutely** [6] - 32:20; 48:5; 52:19; 61:20; 62:3; 66:3
**abstract** [4] - 59:8; 67:18; 69:2; 86:21
**accept** [35] - 13:19, 25; 14:16; 15:6, 11; 16:3; 23:10, 14, 19; 24:5, 23; 26:1; 28:18; 29:3, 8; 30:14; 32:2; 35:4; 36:12; 37:1; 38:5; 43:2; 46:5; 55:4; 58:18; 62:12; 64:22; 67:22; 68:1; 81:23; 94:19; 101:17
**acceptance** [11] - 13:1; 14:3; 18:1; 25:7; 27:12; 30:2; 41:8; 97:11; 100:12; 101:13, 15
**accepted** [14] - 14:7; 21:14; 22:1, 25; 23:1; 24:5; 35:4; 45:12; 63:17; 79:11, 16; 80:20; 95:7
**accepting** [53] - 12:10; 23:13; 24:10, 13; 25:2, 4; 26:19; 28:11; 29:14, 16, 22; 30:21; 31:19, 25; 32:10, 18; 34:24; 35:8, 10; 36:13, 21; 38:14; 39:12; 41:10; 42:17, 21; 48:9; 50:4, 7, 9, 11-12, 14; 55:5, 11-12; 56:15; 57:8, 10, 15; 62:18; 63:14; 65:6; 89:20; 90:11, 14; 93:18; 95:9, 16, 21, 24; 100:21; 101:12
**accepts** [11] - 14:4; 24:16; 30:6; 45:7; 82:3; 89:15; 92:13; 96:8, 15; 97:12
**according** [1] - 66:13
**account** [1] - 45:2
**ACCOUNTABILITY** [3] - 1:14, 21; 2:3
**accountability** [1] - 28:19
**accountable** [1] - 83:12
**acquiesce** [1] - 60:18
**act** [12] - 14:22; 15:1; 30:13; 37:14; 41:9; 46:2; 58:16; 82:4; 92:9; 97:18
**Act** [6] - 43:16; 55:2; 60:1; 67:15; 73:24; 85:11
**acted** [1] - 30:14
**acting** [6] - 37:14; 46:19; 80:17, 23; 92:6; 100:13
**action** [52] - 9:10; 11:7; 15:12, 15-16; 17:6; 18:5; 19:1; 26:11; 30:18; 34:4, 8, 16; 36:3, 18, 23; 37:4, 13; 38:16; 39:24; 42:12; 45:21; 49:3; 56:20; 58:2; 60:20; 70:19; 72:10; 76:11; 78:3; 81:2, 8, 22; 82:6; 84:16; 85:1; 90:1, 23; 91:10; 93:14; 94:24; 95:25; 96:1, 12, 25; 97:9; 99:22; 101:9, 13, 15, 18
**Action** [2] - 1:4; 4:5
**actions** [1] - 33:20
**actively** [2] - 18:12; 44:5
**activity** [4] - 33:25; 48:25; 60:19; 93:8
**Adam** [1] - 10:14
**additional** [1] - 87:21
**additionally** [1] - 46:23
**address** [13] - 5:2; 28:20; 34:11; 38:12; 40:16; 46:12; 50:20; 55:16; 61:2; 62:20; 63:3; 65:16, 22
**addressed** [5] - 71:22; 75:22; 77:13; 99:10, 15
**addresses** [1] - 63:24

**addressing** [1] - 75:23
**Adequate** [1] - 101:5
**adequate** [50] - 33:16; 35:24; 36:3, 16, 18; 37:5; 40:16; 44:14; 45:1; 48:11; 49:1, 5, 11; 53:9; 54:3, 12, 15, 19; 59:4, 20-21, 23, 25; 60:14, 20; 65:7; 88:18, 23; 89:23, 25; 91:14; 92:16, 23; 94:22; 95:1; 96:21; 98:11, 21-22, 24; 99:7, 17-18; 101:2, 6, 19; 102:8
**adjourned** [1] - 103:4
**adjudicata** [1] - 94:8
**adopted** [3] - 15:14; 32:6; 56:5
**adverse** [1] - 94:3
**Advice** [3] - 52:3; 91:2, 7
**advice** [1] - 58:22
**Advise** [3] - 22:3, 13; 57:23
**affirmatively** [5] - 24:18; 26:14; 30:15; 34:18
**ago** [3] - 5:11; 7:3; 52:7
**agree** [15] - 35:15; 47:5; 48:22, 25; 53:14; 60:18; 67:24; 71:6; 74:25; 79:10; 81:17; 86:24; 93:12; 99:4
**agreeing** [1] - 56:18
**ahead** [5] - 13:21; 85:15; 86:5; 88:5
**aided** [1] - 3:8
**al** [2] - 1:4; 4:5
**allegation** [9] - 25:24; 67:12, 20; 70:18; 75:23; 80:16, 19-20; 82:8
**allegations** [2] - 64:22; 71:9
**allege** [6] - 23:6; 24:17; 25:9; 39:6; 43:15, 17
**alleged** [20] - 11:6, 11; 16:22; 23:22; 25:11; 39:7; 43:19; 52:8; 62:1, 8, 20; 63:1; 67:13; 73:8; 74:23; 76:19; 77:22; 85:11; 96:2
**allegedly** [2] - 52:3; 84:22
**alleges** [1] - 23:25
**alleging** [9] - 12:16, 19, 22; 18:21; 21:23; 25:24; 47:12; 70:8; 72:9
**allow** [5] - 5:1; 21:1; 43:21
**allowed** [1] - 62:12
**allowing** [1] - 87:18
**allows** [2] - 58:12; 62:13
**alluded** [1] - 54:22
**ally** [3] - 15:10; 37:8; 93:21
**alone** [1] - 74:20
**alternatively** [1] - 71:11
**amended** [2] - 5:15; 9:11
**amendment** [3] - 51:3; 73:19; 102:3
**American** [1] - 29:15
**amici** [2] - 6:13
**Amicus** [2] - 64:13; 79:13
**analogies** [1] - 58:2
**analogous** [3] - 57:19, 23; 81:16
**analogy** [1] - 22:4
**analysis** [8] - 4:16; 44:13; 54:9; 64:21; 66:4; 77:12; 79:10
**answer** [16] - 12:5; 15:24; 20:13; 23:5; 27:4; 30:10; 36:10; 59:2, 4; 61:2; 65:12;

76:19; 77:2, 10, 19; 87:25
**answered** [1] - 20:20
**answering** [1] - 7:6
**answers** [2] - 5:1; 52:24
**anti** [2] - 46:20; 65:11
**anti-corruption** [2] - 46:20; 65:11
**anyway** [5] - 14:4; 49:17; 50:23; 51:3; 93:4
**appeal** [2] - 38:21; 79:6
**appear** [1] - 5:18
**appearance** [1] - 9:5
**APPEARANCES** [2] - 1:12; 2:1
**Appearances** [1] - 3:1
**apples** [1] - 68:19
**applies** [3] - 54:24; 55:1; 87:11
**apply** [3] - 64:13; 72:8; 76:14
**appointment** [1] - 58:9
**appointments** [3] - 58:12; 91:9
**apportioned** [1] - 19:10
**appreciate** [1] - 22:19
**appropriate** [13] - 17:2; 34:6; 37:15; 46:22; 51:10; 61:19; 66:6, 10; 78:3, 5; 79:1
**appropriations** [2] - 81:13; 82:19
**approval** [3] - 24:25; 25:2, 5
**approve** [1] - 26:1
**approved** [2] - 77:8
**argue** [5] - 22:18; 40:1; 79:13; 87:1; 92:4
**argued** [1] - 92:5
**arguing** [9] - 15:10, 16; 18:16; 21:21; 32:1; 68:10, 13; 70:22
**argument** [19] - 4:15, 17; 5:2; 6:13; 27:19; 43:23; 56:18; 64:15; 70:16; 73:13; 77:24; 78:1; 81:9; 82:2, 5; 88:7; 93:22; 96:11; 99:5
**arguments** [3] - 76:11; 81:5; 102:17
**arising** [1] - 25:2
**Arizona** [14] - 16:10, 13, 15, 17, 21; 43:24; 46:25; 52:6, 20; 75:3, 8; 87:10, 13
**arsenal** [1] - 34:4
**Article** [8] - 4:16; 21:23, 25; 56:10; 59:14; 61:22; 87:1; 90:18
**articulated** [1] - 72:13
**asserted** [2] - 11:3; 69:1
**assertion** [1] - 63:4
**assertions** [2] - 23:18
**assign** [1] - 42:9
**assigned** [1] - 56:25
**assigning** [1] - 18:2
**assigns** [5] - 12:24; 40:19; 57:5; 97:10
**assume** [6] - 16:2; 18:5; 64:20; 65:9; 79:11; 80:23
**assuming** [2] - 71:9; 93:23
**attached** [3] - 17:13; 18:10; 84:17
**Attorney** [8] - 1:13, 20; 2:6, 10, 16; 22:5, 7, 10
**attorneys** [1] - 7:11

**atypical** [1] - 57:17
**audience** [1] - 61:15
**audience)** [1] - 33:3
**authority** [4] - 34:15; 51:24; 90:20; 92:7
**authorization** [3] - 17:23; 81:7; 82:7
**authorize** [1] - 39:24
**authorized** [11] - 17:1, 3; 18:11; 34:18; 71:12; 77:1, 5, 20; 84:18; 94:7, 12
**authorizing** [2] - 17:7; 18:6
**authors** [2] - 41:13, 15
**automatically** [1] - 79:18
**available** [14] - 34:15; 38:3; 63:5; 73:1, 3; 76:1; 81:14; 82:22; 99:2, 14-15; 102:7
**Ave** [1] - 2:8
**Avenue** [3] - 1:17; 2:12, 18
**avoid** [1] - 77:23
**aware** [4] - 9:2; 13:10, 13; 38:14

## B

**balancing** [3] - 50:16; 64:4; 65:18
**Banc** [1] - 79:5
**bar** [1] - 73:25
**based** [3] - 54:4, 6; 78:10
**basis** [7] - 7:25; 38:15; 50:16; 56:19; 92:7, 17
**Bates** [3] - 79:2; 82:17; 99:10
**Bates'** [1] - 79:6
**batter** [1] - 8:5
**Bayard** [1] - 28:21
**bedrock** [1] - 64:8
**BEFORE** [1] - 1:10
**before-the-fact** [3] - 29:25; 45:16; 100:24
**behalf** [5] - 5:24; 12:6; 84:16; 96:3, 12, 25; 97:3
**behavior** [1] - 89:2
**bench** [1] - 8:4
**benefits** [29] - 24:3, 24; 25:2, 4; 29:14, 16; 30:21; 32:11; 34:24; 36:21; 37:1, 3; 38:5, 13; 39:12, 16; 46:3, 6; 48:9; 50:4, 7; 57:10, 15; 58:19; 62:9; 95:9, 13, 15; 101:17
**best** [1] - 72:8
**between** [7] - 10:7; 25:3; 37:17; 43:19; 64:11; 69:5; 83:8
**bicameralism** [1] - 74:16
**biden** [1] - 85:10
**bill** [10] - 73:7, 10; 74:4, 9, 13, 15; 80:9; 99:8; 102:10
**bills** [8] - 55:16, 23-24; 73:6; 80:2, 13; 83:19; 102:14
**binding** [6] - 14:7; 21:25; 24:15; 29:25; 89:15; 91:22
**bit** [5] - 13:5; 57:24; 66:13; 89:6; 91:16
**block** [1] - 58:23
**blocking** [1] - 85:13

**blocks** [1] - 93:21
**BLUMENTHAL** [1] - 1:3
**Blumenthal** [3] - 4:5, 12; 32:25
**bodies** [2] - 18:11, 24
**body** [16] - 10:13; 17:22; 18:13, 17-18, 20; 25:12; 33:21; 40:3; 77:20; 84:16; 87:19; 93:7; 94:14; 97:4
**bombs** [1] - 99:21
**Bonnie** [1] - 1:20
**books** [2] - 82:25; 83:16
**branch** [21] - 18:4; 34:4, 8; 37:13; 40:21; 42:11; 44:6; 57:6; 69:5; 71:17; 72:22; 75:16; 76:18; 79:22; 84:11; 87:16, 20; 95:19; 102:7
**Branch** [3] - 2:7, 12, 17
**branches** [1] - 64:6
**brazen** [1] - 96:22
**brazenly** [2] - 29:13; 95:16
**break** [2] - 6:8; 26:10
**Brett** [2] - 2:6; 5:23
**brett.a.shumate@usdoj.gov** [1] - 2:9
**Brian** [2] - 2:2; 4:11
**brian@theusconstitution.org** [1] - 2:5
**Brianne** [2] - 1:13; 4:11
**brianne@theusconstitution.org** [1] - 1:16
**brief** [7] - 4:21; 5:1; 22:16; 44:19; 61:10; 67:5; 80:16
**Brief** [1] - 100:7
**briefing** [1] - 21:18
**briefly** [1] - 61:21
**briefs** [1] - 79:13
**brilliant** [3] - 6:10, 15; 102:17
**bring** [14] - 17:3; 23:24; 68:8; 69:8; 74:9; 77:15; 80:10, 13, 25; 84:7, 12; 86:22; 100:14
**bringing** [3] - 9:21; 69:13; 96:2
**broad** [2] - 15:4; 34:15
**brought** [8] - 6:5; 11:7, 9; 12:6; 69:9; 76:23; 89:7; 97:3
**budge** [1] - 96:17
**buildings** [1] - 39:18
**burden** [12] - 7:19, 22; 14:7; 22:1; 24:17; 29:25; 45:16; 89:16; 94:1; 98:3; 100:18, 24
**business** [3] - 24:2; 46:20; 63:24
**businesses** [6] - 25:3; 34:10, 25; 46:20; 48:17; 89:5
**businesses'** [2] - 23:12; 38:7
**buying** [1] - 39:18

## C

**Campbell** [50] - 10:25; 20:18; 34:12, 14; 37:12, 19, 21, 24; 46:8; 47:21; 48:16, 18; 49:8; 53:2, 11, 18, 24; 54:21; 68:24; 70:15, 18; 72:25; 73:22, 24; 74:22; 75:11, 17; 78:9, 13, 21; 80:14; 81:1, 6, 19; 82:1, 6; 86:17; 88:8, 12, 14,

20; 90:5; 92:2, 14; 98:25; 99:21; 102:5
**cannot** [10] - 21:13; 25:9; 35:2; 53:12; 62:25; 65:1; 81:23; 83:13; 93:8; 102:22
**capacities** [7] - 8:21; 11:8, 10, 13, 22; 12:7
**capacity** [7] - 9:25; 11:21; 17:17; 39:2; 63:25; 69:17; 96:3
**Capitol** [3] - 70:9; 85:8; 86:13
**caption** [3] - 9:12; 11:12, 19
**captures** [1] - 90:21
**carry** [3] - 10:20; 12:23; 26:10
**case** [100] - 7:5, 12; 12:18; 16:11; 18:21, 23; 19:17; 20:7; 21:3; 25:18; 26:6; 34:11, 18, 22; 37:9, 17-18; 39:1; 40:8, 12, 18; 41:13, 18, 21-22; 42:3, 6, 8; 44:11, 16, 25; 45:24; 46:15, 21; 48:18; 52:16; 53:16; 54:1, 6-7; 57:2; 59:25; 61:22; 63:7; 68:3; 69:23; 70:1, 6, 21; 71:5, 8, 15; 74:20; 75:3, 8, 13-14, 16; 76:3, 15-16; 78:4, 18; 79:1, 4, 6, 21; 81:1; 82:5, 18; 83:18; 84:10, 20; 85:4, 10, 14, 22, 24; 86:3; 87:5, 9, 12, 16-17; 92:18; 93:6; 94:10, 15; 96:18; 99:10; 102:4, 9
**case-in-chief** [1] - 7:5
**cases** [33] - 20:6, 22; 33:24; 34:7, 12; 38:20; 39:8; 43:25; 45:25; 53:6, 9, 21, 25; 54:3; 58:5; 63:8, 19; 64:7; 69:7; 70:5; 75:4; 78:13, 16, 21; 80:22; 82:1, 7; 85:2; 86:19; 88:11, 22, 24; 91:15
**cast** [10] - 12:3; 14:6; 17:25; 23:14; 24:15; 26:9; 43:8; 89:11; 91:22
**caucus** [1] - 17:2
**caused** [2] - 48:1
**Cavs** [1] - 6:6
**CENTER** [3] - 1:14, 21; 2:3
**certain** [6] - 6:22, 25; 22:17; 55:4; 58:2; 65:18
**certainly** [18] - 5:1; 15:24; 16:18; 22:19; 31:15; 37:22; 40:2; 41:17; 50:11, 19; 59:8; 62:16; 65:25; 66:6, 8; 78:1; 92:3; 94:13
**certify** [1] - 103:7
**challenge** [4] - 57:9; 79:19; 95:8, 15
**challenging** [1] - 91:11
**chance** [1] - 98:4
**change** [1] - 89:8
**changed** [1] - 98:2
**characterized** [2] - 43:7, 12
**charge** [1] - 89:18
**check** [1] - 44:5
**Chenoweth** [41] - 34:12, 20; 37:12, 19, 21; 38:2; 46:9; 47:22; 48:16, 19; 49:8; 53:2, 11, 17, 24; 54:21; 68:24; 70:5, 15-16; 71:1; 72:25; 74:1, 21; 75:11, 17; 78:9, 13, 21; 80:15; 81:5, 25; 82:3; 86:18; 88:9, 13, 15, 20; 90:5; 92:18; 102:5
**chief** [2] - 7:5; 92:7
**China** [1] - 39:15

**Chinoweth** [2] - 11:1; 20:19
**choose** [3] - 14:19, 21; 34:6
**choosing** [6] - 14:21; 30:13; 37:14; 41:9; 97:18
**chosen** [1] - 24:23
**Circuit** [30] - 10:25; 17:14; 20:1; 25:18; 31:12; 34:12, 14; 40:11; 44:25; 47:13; 49:8; 52:1; 53:15; 54:5, 8; 57:2; 63:9; 73:18; 75:9, 13; 76:16, 20; 78:15, 20; 81:11; 86:19; 88:24; 99:15; 101:23
**Circuit's** [2] - 37:9; 44:11
**circumstance** [1] - 53:23
**circumstances** [3] - 57:3; 58:18; 59:9
**cites** [1] - 102:14
**citizen** [2] - 56:20; 76:7
**city** [1] - 68:15
**Civil** [5] - 1:4; 2:7, 11, 17; 4:5
**claim** [7] - 9:21; 10:2; 68:8; 69:13, 19
**claimed** [4] - 9:24; 69:15
**claims** [9] - 10:5; 23:25; 38:10, 19; 39:1; 63:7; 68:6, 10; 69:22
**clarified** [1] - 101:24
**class** [5] - 85:2; 95:25; 96:12, 25
**classic** [1] - 40:7
**Clause** [85] - 12:4, 14; 13:6, 13, 17-18, 24; 15:3, 13; 16:25; 18:2; 19:6; 21:16; 22:3, 14; 23:4, 15; 24:8; 25:1; 28:16, 22; 29:21, 24; 31:16; 32:6; 36:1, 6, 20; 38:19; 40:18; 41:5, 12; 45:23; 46:2, 16; 48:8; 49:5, 7, 25; 50:5; 52:4; 54:19, 24; 55:14, 25; 56:8, 14; 57:1, 13, 16, 24-25; 60:15; 62:6, 11; 63:22; 64:2; 65:12; 68:8, 17; 74:20; 76:10; 81:19; 82:14; 89:14; 90:4, 16, 19, 24; 92:19; 94:1, 23, 25; 95:11, 17; 96:10, 23; 97:9; 100:11, 17; 101:7
**clause** [29] - 14:20; 15:21; 16:2; 28:21; 29:7; 30:8; 32:8; 36:5, 24; 46:5, 7; 63:16, 23; 68:21; 76:11; 79:17; 81:16; 90:3, 16; 91:7; 93:12, 15, 18; 100:23; 101:10, 12
**clause's** [1] - 14:20
**clauses** [4] - 57:19; 70:3; 91:2, 15
**Clayton** [1] - 10:14
**clear** [34] - 11:2; 12:2, 15; 16:19; 17:14; 18:2; 20:19; 25:17; 31:12; 38:12; 39:20; 41:1, 8; 42:10; 43:13; 49:24; 50:6; 53:16, 20; 58:15, 17; 60:8; 63:12; 64:15; 68:25; 76:20, 24; 78:20; 83:19; 84:4, 9; 86:19; 92:2; 97:5
**clearly** [3] - 59:2; 76:17; 92:14
**CLERK** [1] - 4:4
**clerk** [1] - 6:7
**clock** [1] - 51:18
**close** [1] - 64:25
**coffee** [1] - 6:4
**cognizable** [9] - 20:25; 25:22; 67:8, 18; 69:3; 70:15; 71:1; 77:17; 79:18
**Coleman** [29] - 26:7; 27:3, 24; 43:20, 22-24; 45:8; 46:24; 47:2; 67:3; 72:7, 14;

74:21; 75:3, 5, 7, 12; 82:11; 87:11;
98:15; 101:25; 102:2
  **colleague** [11] - 4:15; 26:3; 49:21;
50:19; 51:9; 61:2, 23; 62:2; 75:7; 77:4,
7
  **colleagues** [6] - 4:10; 74:8; 80:9; 84:7,
12; 90:11
  **colleagues's** [1] - 98:11
  **colloquy** [1] - 62:1
  **COLUMBIA** [1] - 3:4
  **combine** [1] - 54:9
  **combined** [1] - 50:22
  **coming** [5] - 14:16; 20:11; 23:9; 38:4;
64:6
  **commander** [1] - 92:7
  **commander-in-chief** [1] - 92:7
  **commence** [1] - 18:7
  **commitment** [1] - 19:10
  **Common** [1] - 85:9
  **competition** [2] - 38:24; 39:10
  **competitive** [2] - 68:11, 14
  **competitor** [3] - 38:20; 39:8; 62:4
  **complaining** [1] - 36:13
  **complaint** [14] - 8:23; 9:11; 11:6, 11,
16; 12:2; 23:6, 17-18, 24-25; 24:7; 62:8;
99:9
  **complete** [8] - 20:25; 42:7; 47:3, 10,
25; 53:1, 23; 97:6
  **completely** [7] - 47:20; 52:10; 86:21;
90:7, 9; 97:8
  **compliance** [3] - 74:19; 87:2
  **comply** [12] - 25:9; 49:13; 63:12; 64:1;
65:8; 82:13, 15; 83:1, 3, 16
  **Comply** [1] - 83:15
  **complying** [2] - 70:2; 83:1
  **computer** [1] - 3:8
  **computer-aided** [1] - 3:8
  **concept** [1] - 43:1
  **concern** [1] - 87:5
  **concerned** [2] - 13:8; 14:11
  **concerning** [1] - 90:21
  **concerns** [18] - 4:20; 15:23; 28:20;
29:6; 44:12, 25; 45:3; 64:5, 8; 71:25;
72:18; 76:22; 77:12, 16; 78:19, 23;
85:24; 87:17
  **concise** [1] - 40:24
  **concisely** [1] - 7:24
  **concluded** [3] - 68:5, 7; 88:24
  **concludes** [2] - 54:13, 16
  **concluding** [1] - 54:2
  **conclusion** [1] - 20:23
  **conclusively** [1] - 71:19
  **concrete** [7] - 39:6; 40:25; 43:9; 72:12,
15; 84:21; 100:15
  **concurrence** [1] - 92:9
  **conduct** [4] - 18:4; 40:20; 42:10; 63:24
  **confined** [1] - 75:9
  **confirm** [2] - 58:8; 82:18
  **confirmation** [4] - 5:7; 59:14; 91:18

  **confirmed** [4] - 31:12; 52:6; 58:6; 91:6
  **confirms** [1] - 22:6
  **confused** [1] - 7:15
  **Congress** [258] - 8:16; 9:25; 10:1, 22;
12:6, 11; 14:1, 15, 17-18; 15:12, 15;
17:4; 18:2; 19:7; 21:19; 22:2, 18, 24;
23:10, 14; 24:9, 14, 18; 25:8, 11-12, 15;
26:20; 27:7, 13-14; 28:6, 15, 18; 29:5,
15, 20, 23; 30:7, 11, 14, 19, 22-24;
31:6, 10, 20, 24; 32:3, 12, 19, 21-22;
33:16, 19; 34:3, 5-7, 10, 15, 18, 20, 25;
35:2, 13, 23; 36:2, 9, 11, 17, 21-22;
37:3, 10, 12, 18, 22, 25; 38:3, 5-7;
40:12, 16, 19-20; 41:3, 7; 42:10, 13, 22,
24; 43:1, 4-5; 44:13; 45:1, 5, 14, 18-19;
46:1, 4, 11, 13; 48:9, 17, 20; 49:2; 50:3,
8, 13; 52:4; 53:8; 54:3, 11, 14, 19, 23;
55:2, 7-9; 56:24; 57:5; 58:20; 59:3, 6,
11, 20, 25; 60:5, 19; 62:11, 23, 25;
63:18; 65:1, 10; 67:13, 21; 68:21; 69:1,
7, 16-17, 25; 70:1, 5, 8, 18, 20, 23;
71:16; 72:2, 17, 21; 73:2; 74:10, 14;
76:18; 77:1, 6, 14-15; 79:17; 80:3, 13,
18, 24; 81:10, 21, 25; 82:7, 10, 18-19,
22, 24; 83:8, 10, 15, 19, 21; 84:2, 7, 12,
19; 85:8, 11; 87:16, 18-19; 88:18, 23,
25; 89:1, 3, 10, 17-19, 21; 90:1, 13, 19,
22; 91:13; 92:11, 15, 22, 24; 93:6, 10,
13, 20, 23-24; 94:1, 16; 95:22; 96:7, 20;
97:10, 19; 99:11, 22; 100:12, 19; 101:1,
8, 13-14, 18; 102:6, 22
  **Congress's** [3] - 50:14; 56:25; 59:12
  **Congressional** [19] - 14:11; 24:25;
25:5; 26:20; 27:13; 30:7; 35:8; 46:10;
56:16; 58:1; 63:13; 65:6; 72:2; 73:14;
79:14; 90:23; 92:14; 97:13; 100:21
  **congressman** [3] - 5:6, 11; 8:16
  **congressmen** [1] - 102:8
  **consent** [97] - 12:12, 25; 13:24; 14:1,
9, 17-19, 21; 15:1, 7, 20; 16:2; 18:1;
19:6; 22:2, 10; 24:9, 12, 16; 25:7, 16;
26:20; 27:13, 16; 28:7, 15, 18; 30:1, 7,
12, 15, 23; 31:24; 32:12; 35:9; 36:22;
41:7, 9; 42:13, 23; 43:5; 45:17; 46:4, 6;
48:10; 50:9, 14; 55:7, 9-10, 13; 56:16;
58:1, 16, 19, 22; 59:13; 62:12, 25;
63:13, 17; 65:6; 68:21; 70:20, 23; 73:7;
74:4, 11; 79:15; 81:21, 25; 89:17;
90:14, 22-23; 92:14; 93:23; 94:2; 95:12,
23; 96:16; 97:2, 11, 18; 100:13, 19, 22
  **Consent** [4] - 22:3, 14; 52:4; 57:24;
91:2, 7
  **consenting** [1] - 15:2
  **consents** [1] - 100:12
  **consequences** [1] - 92:10
  **consideration** [1] - 50:25
  **consistent** [3] - 25:18; 47:21
  **consolidate** [2] - 65:20, 23
  **Constitution** [36] - 5:16; 12:24; 13:6;
14:6; 16:6; 21:5; 23:9; 25:10; 31:7;

40:15, 18; 42:9; 43:1, 8; 45:16; 46:7;
48:23; 49:11; 57:22; 58:11, 17; 63:13;
64:2, 11; 65:2, 4; 79:12, 20; 84:22;
91:16, 20, 22; 95:11; 97:17
  **CONSTITUTIONAL** [3] - 1:14, 21; 2:3
  **Constitutional** [10] - 5:13; 24:23;
42:11; 57:4; 60:10; 64:16; 67:15; 73:19;
101:20; 102:3
  **constitutional** [1] - 34:9
  **Constitutionally** [1] - 95:21
  **Cont** [2] - 2:1; 3:1
  **contend** [1] - 51:21
  **contesting** [1] - 15:19
  **context** [7] - 18:15; 36:1, 4; 49:5;
60:15; 101:6
  **continue** [4] - 36:12; 50:12; 57:14;
95:16
  **continuing** [2] - 32:2; 74:3
  **contrary** [3] - 80:17, 23; 81:10
  **contrasting** [1] - 34:11
  **contravention** [1] - 95:17
  **control** [4] - 32:15; 33:20; 35:1
  **controlled** [1] - 30:17
  **controls** [4] - 32:21; 92:24; 93:7; 97:19
  **convince** [11] - 14:8; 15:6; 30:1; 45:17;
74:8; 80:9; 84:7; 89:16; 93:19; 94:2;
100:18
  **convinced** [3] - 14:1; 29:4; 43:4
  **Correct** [1] - 67:23
  **correct** [22] - 5:17; 12:16; 13:3; 14:24;
18:22; 19:21; 21:7, 10; 24:21; 31:22;
35:11; 36:15; 42:1; 64:24; 67:24; 77:2,
21, 25; 98:19; 103:7
  **corrupting** [1] - 62:21
  **corruption** [11] - 13:9; 15:5, 9; 28:20;
29:6; 37:8; 46:20; 65:11; 93:17, 21
  **cost** [1] - 61:18
  **Counsel** [4] - 4:24; 8:9; 66:25; 87:22
  **counsel** [11] - 5:20, 24; 7:23; 8:1; 61:7;
66:9, 18; 69:12, 20; 88:4; 100:8
  **counsel's** [1] - 4:10
  **countries** [2] - 39:15, 17
  **country** [1] - 39:19
  **couple** [5] - 7:3; 22:24; 33:21; 57:22;
95:3
  **course** [17] - 7:7, 19; 9:11; 23:4; 28:1;
35:9; 44:4; 49:21; 53:2; 55:23; 57:25;
61:16, 20; 65:9; 76:10; 78:19, 24
  **Court** [111] - 3:2; 4:18; 7:25; 9:5, 20;
10:8, 17, 21; 11:2; 16:12; 17:13; 18:10,
13; 19:8, 12; 20:15, 23; 23:18; 25:17;
26:1; 31:2, 9, 11; 34:17; 37:10; 38:9,
21; 43:13, 18, 24; 44:9, 13; 45:3, 7;
47:14; 49:8; 50:6, 15; 53:6, 12; 54:4,
12, 16, 20; 56:17; 58:5; 59:13; 61:24;
62:19; 63:15, 19; 64:7, 10, 16, 25; 65:2,
8, 13, 18-19, 22-23; 66:6, 15, 20; 67:16;
69:4, 12; 71:15, 19; 73:17; 75:7, 14,
22-23, 25; 76:12, 14, 16; 77:13, 23;
78:3, 5, 9, 16, 25; 79:10; 80:8, 11-12;

81:25; 84:9, 17, 22; 85:13, 25; 86:6;
87:4, 10-11, 18; 88:13; 95:3; 101:24;
102:5, 14; 103:11
  **court** [7] - 61:4, 8; 63:2; 66:12; 68:4, 7;
102:23
  **Court's** [6] - 4:14; 8:4; 10:23; 11:4;
65:9; 92:18
  **Courthouse** [1] - 3:4
  **COURTROOM** [1] - 4:4
  **courts** [9] - 6:23; 28:24; 44:5; 64:17;
72:25; 79:23; 95:17; 98:22
  **cover** [2] - 66:22; 87:24
  **covered** [1] - 87:23
  **create** [1] - 76:11
  **creating** [1] - 82:5
  **criminal** [1] - 5:12
  **critical** [4] - 15:2; 42:25; 46:20; 47:9
  **critically** [1] - 48:15
  **cross** [1] - 7:7
  **cross-examination** [1] - 7:7
  **CRR** [3] - 3:2; 103:7, 10
  **crucial** [1] - 24:10
  **cultural** [1] - 85:12
  **cup** [1] - 6:7
  **cut** [4] - 13:12; 47:8; 61:7; 73:25
  **cutoff** [1] - 34:17

---

**D**

  **D.C** [39] - 1:7; 3:5; 10:25; 17:14; 19:25;
25:18; 31:12; 34:12, 14; 37:9; 38:22;
40:11; 44:11, 25; 49:8; 52:1; 53:15;
54:5, 8; 57:2; 63:9; 68:5, 15, 18; 73:18;
75:9, 13; 76:12, 16, 20; 78:20; 81:10;
86:19; 88:24; 95:4, 7; 99:14; 101:23
  **dangers** [1] - 62:23
  **dark** [3] - 37:18; 38:8; 48:18
  **Date** [1] - 103:10
  **days** [1] - 85:8
  **DC** [7] - 1:15, 18, 22; 2:4, 8, 13, 19
  **de** [1] - 55:5
  **deal** [3] - 7:8; 65:18; 70:9
  **dealing** [1] - 62:7
  **dealings** [4] - 23:12; 24:3; 38:7; 63:25
  **deals** [1] - 62:12
  **decide** [2] - 37:23; 65:21
  **decided** [4] - 18:20; 31:5; 79:2; 88:22
  **decides** [1] - 30:12
  **deciding** [1] - 16:1
  **decision** [9] - 7:1, 11, 16; 17:5; 53:8;
76:13; 79:5; 92:17
  **decisions** [2] - 10:25; 102:20
  **declaration** [1] - 49:23
  **Declaration** [1] - 81:7
  **declaratory** [4] - 51:7; 63:6; 65:3; 66:7
  **declare** [8] - 46:10, 14; 90:17, 20;
91:25; 92:6
  **declared** [2] - 46:14; 92:4
  **declaring** [1] - 92:9

  **declined** [1] - 65:7
  **Decorations** [1] - 55:2
  **deeply** [1] - 13:8
  **default** [2] - 15:5; 36:25
  **defeat** [1] - 72:10
  **defendant** [4] - 7:5; 24:1, 5; 84:24
  **Defendant** [5] - 1:8; 2:6; 24:23; 25:5, 9
  **defendants** [4] - 9:15; 44:17
  **defense** [3] - 5:20; 8:1; 66:18
  **deferred** [1] - 73:15
  **Democratic** [6] - 17:1; 32:3, 16; 33:1,
6; 52:17
  **denial** [9] - 20:25; 42:7; 47:10, 25;
52:2; 53:1, 23; 67:6; 97:6
  **denied** [23] - 10:13; 16:24; 19:19; 25:6,
21; 26:24; 31:7, 15; 35:19; 43:7, 15, 17;
52:5, 23; 53:4; 69:24; 88:16; 89:13;
90:8, 10; 91:6; 92:21; 97:8
  **denies** [2] - 96:8; 101:20
  **deny** [3] - 73:7; 74:4; 97:18
  **denying** [8] - 12:12; 14:4; 30:7; 48:7;
55:13; 56:15; 97:17; 100:22
  **Department** [3] - 2:7; 5:23; 47:1
  **DEPARTMENT** [3] - 1:17; 2:11, 16
  **deployment** [1] - 38:1
  **deprivation** [10] - 16:19; 47:24; 51:23;
76:19; 82:8; 88:16; 92:3; 99:3; 100:20
  **deprive** [1] - 36:24
  **deprived** [9] - 9:22; 10:10; 16:4, 22;
21:4, 21, 24; 22:12; 23:2; 28:8; 31:14;
40:14; 45:15; 46:13; 54:17; 58:25;
69:14; 70:12; 72:6
  **depriving** [4] - 33:11; 41:10; 67:12, 15
  **described** [2] - 61:23; 69:5
  **describes** [1] - 10:18
  **designated** [1] - 8:7
  **designed** [2] - 36:6, 20
  **Despite** [1] - 24:22
  **detailing** [1] - 37:25
  **determination** [5] - 50:23; 65:21, 24
  **determine** [4] - 31:9; 35:24; 38:3;
50:16
  **determined** [1] - 18:13
  **detract** [1] - 40:5
  **difference** [3] - 19:5; 37:17; 43:19
  **different** [18] - 7:12; 43:10; 46:8;
52:10; 68:10; 69:25; 70:21; 71:5, 8;
76:15; 78:25; 82:3; 87:15; 92:1, 19;
94:9, 14
  **differently** [2] - 88:21; 102:25
  **difficult** [4] - 59:7; 75:12; 91:16;
102:20
  **diligent** [1] - 62:14
  **diplomats** [1] - 39:13
  **direct** [1] - 7:6
  **direction** [2] - 6:25; 7:15
  **directly** [3] - 63:23; 75:6; 78:13
  **disagree** [3] - 47:7; 68:6; 76:13
  **disapproved** [2] - 34:16; 37:13

  **disapproves** [1] - 34:5
  **disbursed** [3] - 67:19; 69:2; 86:21
  **disclosing** [1] - 38:5
  **discretion** [3] - 54:7, 9; 63:11
  **discuss** [5] - 49:21; 50:1; 51:9; 53:25;
88:15
  **discussed** [12] - 10:17; 17:11; 45:19;
54:14; 72:7, 25; 78:2, 14; 79:4; 89:7;
91:4; 99:14
  **discusses** [1] - 101:2
  **discussing** [1] - 28:22
  **Discussion** [1] - 61:6
  **discussion** [3] - 53:17; 72:23
  **dismiss** [3] - 7:20; 54:6; 98:2
  **dismissal** [2] - 71:24; 78:21
  **dismissed** [3] - 9:4; 38:20; 78:18
  **dispute** [4] - 45:4; 64:11; 78:2; 80:14
  **disputes** [6] - 69:5; 72:19, 23; 77:18;
79:24; 83:8
  **disregarded** [3] - 25:20; 28:4; 52:22
  **disregarding** [1] - 28:1
  **distinguish** [1] - 10:7
  **District** [3] - 38:21; 95:3
  **DISTRICT** [5] - 1:1, 11; 3:3
  **Division** [2] - 2:11, 17
  **doctrine** [4] - 4:20; 21:2; 54:6; 78:1, 7
  **Domestic** [1] - 62:6
  **DONALD** [1] - 1:7
  **Donald** [1] - 4:5
  **done** [8] - 14:14; 22:21; 50:13; 54:9;
55:8; 74:13; 90:12; 102:4
  **doubt** [1] - 78:14
  **down** [5] - 50:21; 81:7; 86:4; 102:23
  **draft** [2] - 74:12; 80:9
  **dramatic** [1] - 88:10
  **drastic** [2] - 21:1; 43:21
  **draw** [1] - 20:23
  **Dream** [1] - 85:11
  **duration** [1] - 38:1
  **during** [3] - 7:6; 73:8; 74:5
  **duty** [2] - 63:12, 15
  **dynamics** [1] - 41:16

---

**E**

  **ears** [1] - 32:25
  **easy** [4] - 85:18, 20, 22
  **effect** [3] - 55:22; 81:22; 92:10
  **effective** [15] - 20:25; 42:7; 47:11, 25;
53:1, 23; 73:14; 90:8, 10; 97:7; 99:13,
19-20; 102:1, 8
  **effectively** [2] - 35:19; 43:23
  **effectiveness** [1] - 97:8
  **efforts** [1] - 62:14
  **egregious** [1] - 91:19
  **either** [11] - 15:25; 18:19; 25:20; 26:19;
34:1; 47:19; 48:15; 60:17; 68:18; 79:9;
93:11
  **elected** [2] - 33:1, 7

**election** [1] - 32:17
**elections** [1] - 94:4
**Elizabeth** [2] - 1:20; 4:9
**elizabeth@theusconstitution.org** [1] - 1:24
**Email** [7] - 1:16, 19, 23; 2:5, 9, 15, 20
**embarrassment** [1] - 55:6
**EMMET** [1] - 1:10
**emolument** [23] - 13:19, 25; 14:3, 7, 15-16; 15:6; 21:14; 22:1, 25; 23:1; 27:8; 28:18; 29:3; 30:2, 6; 31:23; 55:11; 57:8; 62:7; 82:3; 96:15
**Emoluments** [77] - 12:4, 13; 13:6, 13, 16, 18, 24; 15:3, 13; 16:25; 18:2; 19:6; 21:16; 23:4, 15; 24:8; 25:1; 28:16, 22; 29:21, 24; 31:16; 32:6; 36:1, 6, 20; 38:19; 40:18; 41:5, 12; 45:23; 46:1, 16; 48:8; 49:5, 7, 25; 50:5; 54:18, 24; 55:14, 25; 56:8, 13; 57:1, 13, 16; 60:15; 62:6, 11; 63:22; 64:2; 65:12; 68:8, 17; 74:20; 76:10; 82:14; 89:14; 90:4, 16, 24; 92:19; 93:25; 94:23, 25; 95:11, 16; 96:10, 23; 97:9; 100:11, 17; 101:7
**emoluments** [82] - 12:10; 13:1; 14:4; 15:11; 16:3; 18:1; 21:12, 20; 22:15, 17, 19, 23; 23:5, 10, 13, 16; 24:5, 13, 16; 25:7; 26:1, 19; 27:12; 28:11; 29:22; 30:14; 31:19; 32:2, 19; 35:8, 10; 36:12; 39:9; 40:21; 41:8, 10; 42:17, 22; 43:3; 45:12; 50:4, 7, 11; 55:12; 56:12, 15; 60:7; 62:9, 13, 18, 22; 63:1, 14, 17; 64:12; 65:6; 67:14; 70:3; 73:8; 74:5; 79:11, 15-16; 81:23; 89:12, 16, 20; 90:11; 92:13; 93:19; 95:7, 21-22; 96:8; 97:11, 13; 100:21; 101:12, 14, 16
**emphasizing** [2] - 28:15; 56:9
**En** [1] - 79:5
**enables** [1] - 57:4
**enacted** [3] - 54:23; 55:2; 70:17
**end** [7] - 9:23; 11:18; 54:15; 60:10, 13; 69:15; 84:9
**enforce** [3] - 76:10; 83:5; 94:21
**enforced** [2] - 82:24; 93:4
**engage** [2] - 24:2; 46:11
**engaged** [1] - 53:6
**engaging** [6] - 33:25; 48:25; 60:18; 89:3; 93:8
**enjoyed** [1] - 13:2
**enriching** [1] - 48:24
**ensure** [4] - 28:19; 43:1; 44:15; 62:20
**ensured** [1] - 62:22
**entered** [1] - 58:21
**entire** [5] - 62:8; 71:2, 20
**entirely** [6] - 44:2; 53:15; 56:3; 57:12; 92:1; 95:14
**entitled** [33] - 9:23; 12:3, 13; 14:6; 16:6, 24; 21:5, 15, 24; 22:13; 23:3, 15; 29:20, 23; 30:8; 31:7, 14, 16; 41:12; 45:15; 48:8; 52:5; 54:18; 55:24; 69:15; 83:2; 88:17; 89:14; 91:7, 21; 92:22;

100:23; 103:8
**entitles** [4] - 40:15; 55:14; 56:8, 14
**entrusted** [2] - 44:6; 95:19
**environmental** [1] - 34:21
**envisioned** [4] - 41:14, 16-17, 19
**equitable** [5] - 54:6, 9; 78:4, 18
**especially** [4] - 5:5; 6:12; 23:23; 64:4
**Esq** [1] - 2:2
**essence** [1] - 15:10
**essentially** [10] - 38:19; 45:22; 46:7; 48:12; 49:6, 10, 12-13; 90:4; 93:15
**et** [2] - 1:4; 4:5
**event** [1] - 92:14
**eventuality** [1] - 94:10
**exact** [1] - 73:2
**exactly** [11] - 16:8, 12, 14; 26:15; 32:5; 33:14; 41:23; 42:20; 67:19; 95:20
**Exactly** [1] - 5:17
**examination** [1] - 7:7
**example** [10] - 10:11; 46:9; 62:5; 63:20; 72:5; 76:13; 82:17; 99:12; 102:2
**except** [2] - 65:8; 98:15
**exception** [1] - 58:13
**exchanges** [1] - 25:3
**excluded** [1] - 10:12
**executive** [22] - 18:4; 34:4, 8, 16, 21; 37:13; 38:3; 40:20; 42:10, 12; 57:6; 58:1; 69:5; 71:17; 72:21; 75:15; 76:18; 84:11; 87:16, 19; 90:23; 102:7
**exempted** [1] - 60:1
**exercise** [2] - 41:9; 78:5
**existed** [1] - 47:8
**existence** [5] - 45:23; 49:7; 89:22; 90:4; 93:16
**exists** [1] - 52:21
**expected** [2] - 38:1; 102:18
**expects** [1] - 64:2
**experience** [1] - 6:24
**explain** [5] - 20:16; 27:1, 24; 36:2
**explains** [1] - 101:10
**explicit** [1] - 31:15
**explicitly** [16] - 12:3, 13, 24; 14:5; 16:6; 21:5; 31:14; 40:15; 41:11; 56:14, 25; 88:17; 91:21; 92:22; 97:9; 100:23
**exploding** [1] - 99:21
**exposing** [1] - 22:21
**express** [1] - 32:9
**expressly** [2] - 32:9; 42:12
**ext** [2] - 1:16; 2:5
**extension** [2] - 21:2; 43:21
**extent** [3] - 6:22; 22:21; 45:7
**extraordinary** [5] - 37:11; 49:4, 9; 90:6; 93:15

**F**

**fact** [26] - 4:17; 7:8, 21; 9:8; 15:15; 18:10, 20; 19:5; 21:18; 29:25; 34:18; 39:6; 40:4; 45:16; 53:8; 68:23; 73:7;

78:2; 79:3; 84:18; 88:11; 89:8; 100:24; 102:9
**factors** [2] - 51:1; 65:19
**facts** [3] - 71:9; 75:9, 11
**fails** [1] - 79:14
**fair** [1] - 66:12
**fairly** [2] - 84:10
**fake** [1] - 62:16
**far** [4] - 10:24; 53:5; 74:20
**fatal** [1] - 11:24; 85:24; 86:2
**favor** [1] - 28:2
**favorable** [2] - 61:24; 66:5
**Fax** [1] - 2:14
**federal** [20] - 32:10; 34:1; 37:22; 43:2, 25; 46:3; 48:13; 55:3; 70:17; 72:17; 74:3; 75:15; 81:24; 82:5; 83:2; 93:9; 101:12; 102:3
**Federal** [3] - 2:7, 11, 17
**few** [6] - 13:22; 42:9; 51:14; 88:2, 5-6; 98:4; 100:6
**file** [5] - 9:11; 38:25; 39:24; 71:12; 91:10
**filed** [3] - 38:18; 94:5
**filibuster** [2] - 85:12, 21
**filing** [6] - 8:15, 21, 23; 9:12; 79:13; 95:21
**final** [1] - 95:2
**finally** [3] - 8:1; 48:20; 64:3
**financial** [2] - 24:1, 4
**finder** [1] - 7:8
**fine** [2] - 8:13; 101:8
**fingers** [1] - 61:11
**first** [45] - 4:16; 7:23; 10:8; 12:11; 24:24; 25:5; 26:20; 27:12; 28:18, 21; 29:7, 22; 30:6; 32:11, 19; 33:24; 35:8; 42:13, 22; 43:3; 46:4, 6; 47:23; 48:9; 50:13; 56:16; 58:19; 62:4; 63:17; 65:22; 66:22; 72:5; 79:14; 82:10; 88:7; 89:9, 20; 90:12; 91:5, 18; 92:13; 96:15; 97:13; 100:21
**fit** [1] - 98:15
**Fitzgerald** [1] - 75:22
**five** [2] - 99:25; 100:5
**fix** [10] - 22:22; 33:17; 44:14; 45:6, 18; 59:7, 20; 60:5; 89:1; 97:20
**flip** [4] - 36:24; 46:4; 90:3; 94:24
**floor** [2] - 80:10; 84:8
**flows** [1] - 70:4
**focus** [7] - 4:14; 6:16; 7:21; 8:6; 9:18; 13:13; 99:16
**focusing** [2] - 5:3; 20:11
**follow** [2] - 61:25; 65:3
**followed** [1] - 63:16
**following** [1] - 23:8
**follows** [2] - 15:20; 23:25
**footnote** [3] - 75:23; 84:8; 87:10
**FOR** [1] - 1:1
**forbade** [1] - 74:2
**forbid** [1] - 81:12

**force** [5] - 25:9; 55:21; 73:25; 80:13; 81:8
**forces** [1] - 81:12
**foreclose** [3] - 10:5; 50:25; 69:21
**foreclosed** [2] - 53:3; 63:8
**foregoing** [1] - 103:7
**Foreign** [66] - 12:4, 13; 13:6, 16, 18, 24; 15:3, 13; 16:25; 18:2; 19:5; 21:15; 23:3, 15; 24:8; 25:1; 28:16, 22; 29:21, 24; 31:16; 32:6; 36:1, 6, 20; 38:19; 40:18; 41:5, 12; 45:22; 46:1, 16; 48:8; 49:5, 24; 50:5; 54:18; 55:2, 14, 25; 56:8, 13; 57:1, 13, 16; 60:15; 62:6; 82:14; 89:14; 90:4, 16, 24; 92:19; 93:25; 94:23, 25; 95:11, 16; 96:9, 23; 97:9; 100:17; 101:7
**foreign** [33] - 12:10; 13:19; 14:12; 23:12; 24:3, 6, 24; 25:3; 26:19; 28:24; 29:6, 14; 32:10; 34:24; 37:1; 38:7, 13; 39:13, 18; 40:21; 43:3; 57:9, 15; 62:21; 63:14; 65:6; 79:11; 81:24; 84:25; 95:8; 101:17
**foreseeable** [1] - 59:18
**forever** [1] - 83:16
**forget** [1] - 61:17
**forgot** [1] - 100:9
**formally** [3] - 9:8, 12; 56:5
**fortunately** [1] - 64:14
**forward** [2] - 4:7; 60:2
**foundational** [2] - 67:5
**Founders** [10] - 13:8; 15:2, 13; 28:14; 29:1; 32:6; 42:25; 62:21; 65:11; 93:18
**founders** [1] - 58:15
**four** [1] - 98:8
**four-minute** [1] - 98:8
**Franklin** [1] - 63:7
**Frazelle** [2] - 2:2; 4:11
**frustrated** [1] - 86:14
**frustrating** [4] - 85:14; 86:8, 10, 18
**frustration** [5] - 86:10-12, 15, 22
**fulfilling** [1] - 91:23
**full** [3] - 23:13; 38:13; 41:16
**fun** [2] - 5:8
**function** [1] - 15:4
**functions** [1] - 10:20
**fundamental** [1] - 93:22
**fundamentally** [1] - 69:25
**funding** [2] - 34:19; 74:1
**funds** [6] - 34:1, 6, 17; 37:15; 48:13; 93:9
**future** [8] - 16:19; 21:6, 8, 10; 25:21; 28:9; 43:18; 52:22

# G

**general** [5] - 21:12, 19; 44:24; 46:13; 56:9
**General** [3] - 22:5, 8, 10
**generally** [3] - 22:15; 48:19; 91:8

**Gerald** [1] - 4:12
**gift** [1] - 14:12
**Gifts** [1] - 55:2
**gifts** [6] - 35:4; 55:4; 62:9, 22; 63:14; 65:7
**given** [9] - 7:21; 14:1; 16:4; 21:3; 27:23; 30:15; 55:9; 65:11; 93:23
**glad** [1] - 64:18
**goldwater** [1] - 78:23
**Goldwater** [4] - 51:19, 24; 78:9; 79:5
**Gorod** [3] - 1:13; 4:11, 15
**GOROD** [159] - 8:8, 10, 12, 19; 9:1, 7, 19; 10:6, 16; 11:9, 12, 15, 23; 12:1, 9, 17, 19; 13:4, 11, 15, 23; 14:13, 25; 15:18; 16:8, 12, 17; 17:4, 8, 10, 18, 21; 18:8, 18, 23; 19:4, 14, 18, 22, 25; 20:4, 8, 10, 16, 18, 22; 21:8, 11; 23:20; 24:11, 20; 25:15; 26:2, 8, 17, 23; 27:1, 6, 11, 22; 29:12, 19; 30:5, 11, 19; 31:1, 4, 18, 23; 32:5, 18; 33:5, 8, 10, 14, 24; 35:6, 12, 18, 22; 36:14, 16; 37:21; 38:11, 17; 39:3, 5; 40:2, 10; 41:1, 15, 19, 23; 42:2, 5, 16, 20; 43:11; 44:2, 10, 18, 21, 23; 45:11, 14; 47:7, 15, 18; 48:2, 5; 49:15, 19; 50:18, 24; 51:2, 5, 8, 13, 15, 17, 20; 52:1, 13, 19; 53:15; 54:8; 55:1, 17, 19; 56:2, 6, 21, 23; 57:18, 21; 58:10, 14, 24; 59:19, 24; 60:8, 12; 61:1; 88:6; 91:1, 12; 93:2, 5; 94:9, 13, 22; 96:6, 13, 18; 97:5, 16, 23; 100:16; 101:5
**governing** [1] - 54:23
**government** [33] - 7:22; 13:20; 15:9, 18; 21:17; 22:16; 29:14; 32:11; 34:24; 37:1; 38:13; 39:12; 57:9, 15; 63:6; 64:6, 14; 67:3; 75:18; 77:21; 84:25; 88:19; 89:7, 10, 24; 90:17; 95:3, 8; 101:17; 102:24
**government's** [9] - 4:21; 63:4; 72:15; 88:7; 92:25; 93:22; 98:18; 101:7
**governments** [8] - 12:11; 23:12; 24:3; 26:19; 38:7; 39:18; 43:3
**governor** [2] - 26:9, 12
**grant** [7] - 26:14; 27:20; 45:25; 46:22; 80:12; 90:20
**granted** [1] - 63:21
**great** [7] - 5:18; 6:1, 6; 7:8; 100:10
**greater** [3] - 49:21; 50:20; 51:9
**green** [1] - 6:8
**grounds** [1] - 78:18
**guaranteed** [1] - 43:8
**guarantees** [1] - 41:6
**guess** [3] - 55:18; 85:3; 97:3
**gut** [1] - 96:24

# H

**hand** [3] - 64:6, 8; 103:2
**handful** [1] - 42:11

**hands** [6] - 80:1; 85:5; 93:12; 102:24; 103:1
**happy** [8] - 9:13; 15:24; 50:1, 19; 51:9; 65:12; 87:25; 102:14
**hard** [1] - 76:8
**harm** [5] - 40:17; 44:14; 59:7; 60:5; 89:1
**harms** [1] - 62:1
**head** [4] - 36:24; 46:5; 90:3; 94:25
**hear** [10] - 5:20; 6:13; 7:22; 8:1; 9:2; 62:17; 66:18; 86:10
**HEARING** [1] - 1:10
**hearing** [5] - 15:25; 16:1; 50:1; 58:5; 86:11
**hearings** [4] - 5:7; 82:20; 83:11
**heart** [1] - 85:15
**held** [4] - 38:22; 72:1, 11; 95:4
**help** [4] - 46:12; 47:16; 73:22; 99:1
**helpful** [2] - 22:4; 52:20
**high** [1] - 7:4
**high-profile** [1] - 7:4
**highlights** [1] - 68:23
**Hill** [3] - 70:10; 85:8; 86:14
**himself** [2] - 31:21; 48:24
**historical** [1] - 15:22
**historically** [1] - 72:23
**history** [3] - 69:6; 72:18; 77:18
**hitter** [1] - 8:7
**hold** [4] - 72:3; 82:20; 83:11
**holding** [3] - 24:6; 52:7; 53:8
**holdings** [1] - 24:2
**holds** [1] - 70:4
**honor** [1] - 6:23
**Honor** [168] - 4:4, 9; 5:21; 8:10, 19; 9:7, 11; 10:6, 16; 11:16; 12:1, 9; 13:4, 8, 15; 14:25; 15:23; 16:8, 17; 17:10; 19:5, 14, 18, 22; 20:4, 8, 10, 22; 21:9, 11; 23:21; 24:11; 25:15; 26:2, 17, 23; 27:1, 6, 11, 17, 23-24; 29:19; 30:5, 19; 31:1, 4, 18; 32:5, 8, 20; 33:5, 10, 14, 19, 24; 35:6, 18, 22; 36:14, 19; 37:6, 16; 38:11, 17; 39:11; 40:2, 10; 41:1, 19, 23; 42:2, 6, 8, 12, 20; 44:2, 10, 21, 24; 45:11, 24; 46:18, 23; 47:7; 48:5; 49:2, 16, 19, 23; 50:10, 19; 51:5, 8, 11, 15; 52:1, 6, 13; 53:19, 25; 54:8; 56:6, 23; 57:21; 58:24; 59:8, 19; 60:8, 10, 13; 61:20; 63:3, 5; 64:3, 17, 24; 66:3, 19, 24; 67:10; 68:4, 12, 21; 69:23; 70:14; 71:7, 23; 72:16; 75:2, 21; 76:8; 77:4, 10, 25; 78:12; 79:7; 81:18; 83:18; 85:10, 18; 87:4, 23; 88:3, 6; 89:7, 10, 18, 25; 91:12; 93:2; 94:13, 15; 95:2; 96:7, 13, 19; 97:21, 23; 98:6; 99:23; 100:2, 16, 25; 101:2, 5, 21, 23; 102:12
**Honor's** [1] - 31:8
**HONORABLE** [1] - 1:10
**hook** [1] - 66:25
**hoops** [2] - 74:11; 93:24
**hopefully** [1] - 7:24

**hopelessly** [1] - 7:15
**Hotel** [3] - 38:23; 39:13; 95:7
**house** [1] - 75:17
**House** [25] - 8:22; 9:9; 11:8; 13:3;
18:6, 19; 25:13; 32:15; 33:7; 39:25;
40:3; 48:3; 52:18; 71:3, 10, 12, 16, 20;
73:6, 9; 77:14; 94:14; 97:1
**Houses** [14] - 14:2; 22:2; 29:5; 33:12;
42:15; 43:4; 48:3; 55:16; 74:14; 77:9;
80:10; 84:19; 94:5, 7
**huddle** [1] - 98:8
**hypothetically** [4] - 32:15; 36:9; 58:21;
72:14

**I**

**ice** [1] - 6:8
**iceberg** [2] - 23:7; 63:2
**idea** [1] - 47:2
**identified** [5] - 10:8; 11:12, 15; 55:4
**identifies** [1] - 11:20
**identify** [1] - 4:8
**identifying** [3] - 14:15; 30:22; 31:19
**III** [4] - 4:16; 59:14; 61:22; 87:1
**imagine** [1] - 91:17
**implicated** [1] - 43:25
**implicates** [1] - 85:9
**implied** [1] - 13:24
**implies** [1] - 84:19
**importance** [3] - 17:14; 18:10; 84:17
**important** [18] - 10:6; 13:17; 14:21;
29:8; 36:5; 38:11; 40:20, 23; 43:12;
49:21; 50:6; 56:24; 62:19; 65:11; 69:3;
73:12; 95:5, 18
**importantly** [1] - 14:19
**impossible** [1] - 28:25
**inaction** [2] - 15:1, 17
**inadequate** [1] - 99:13
**included** [2] - 28:15; 42:25
**including** [4] - 34:16; 43:2; 55:3; 60:3
**incorporated** [1] - 54:10
**incorporates** [2] - 44:12, 25
**incredibly** [1] - 96:18
**indeed** [6] - 15:16; 19:1; 24:25; 71:10;
96:25; 99:17
**indicate** [1] - 9:13
**indicated** [1] - 15:23
**indicating** [1] - 94:6
**Indiscernible** [7] - 20:3, 17; 44:22;
47:13; 60:11; 97:14; 98:24
**indiscernible** [1] - 64:21
**individual** [59] - 10:10, 21; 11:21; 12:8;
17:4, 12, 16, 24; 18:9, 11, 14, 24; 19:8;
22:7, 11; 25:7, 16, 22; 27:7, 9; 29:2;
31:6; 38:25; 39:1, 3, 11; 40:12; 41:2, 6,
11, 20; 42:6; 47:2; 52:14, 24-25; 53:4,
20; 55:10; 57:2, 7; 58:7; 59:11; 68:22;
69:1; 70:6; 72:6; 76:6, 17; 90:6; 96:3, 7;
97:5, 7, 10

**individuals** [8] - 8:14, 18, 21, 23;
12:21; 25:12; 39:21; 41:17
**inertia** [3] - 15:8; 37:7; 93:17
**infer** [2] - 31:2; 78:3
**influence** [1] - 29:6
**influenced** [1] - 29:1
**information** [5] - 23:11; 35:3, 7; 37:23;
38:6
**initial** [2] - 35:14; 65:16
**initiate** [3] - 16:22; 52:9; 82:6
**initiated** [2] - 70:19; 81:2
**initiating** [1] - 81:21
**injunction** [4] - 50:10; 66:1; 78:6
**injunctive** [11] - 50:17; 51:6; 63:6, 10,
21; 64:7; 65:3, 16, 20, 24; 66:6
**injure** [1] - 58:6
**injured** [12] - 12:22; 13:18; 17:24;
25:8; 27:10; 40:6; 48:6; 57:7; 96:8, 14,
19
**injures** [1] - 91:20
**injuries** [2] - 68:25; 69:2
**injuring** [2] - 28:14; 42:21
**injury** [84] - 4:16, 18; 9:24; 10:8, 17-18,
23; 11:3, 23; 12:2, 9, 16, 20; 16:23;
17:12, 21; 18:9, 13, 16, 18; 19:2; 21:1,
20; 23:1; 25:11, 22; 27:11, 15, 23; 28:6,
8; 39:6-8; 40:24; 41:3; 43:7, 9-11, 13,
19-20; 47:10; 51:22; 56:9; 58:3; 61:23;
62:20; 67:8, 11, 14, 17; 68:11, 14, 24;
69:15; 70:15, 25; 72:12, 14; 74:23;
76:21; 77:17; 78:22; 84:10, 21; 86:20;
88:10, 14, 22; 90:9; 99:2; 100:14
**ink** [1] - 88:12
**inquiry** [1] - 82:20
**insisting** [1] - 50:2
**insists** [1] - 42:17
**instead** [7] - 10:3; 11:2; 36:25; 63:21;
69:20; 88:15; 101:11
**institution** [3] - 75:4; 77:14; 87:19
**institutional** [21] - 10:18, 22; 11:3;
12:23; 17:6; 67:7, 17; 68:24; 70:25;
72:12, 14; 74:23; 76:6, 21; 86:20;
87:14; 88:10, 14, 22
**instructive** [1] - 78:16
**intellectual** [2] - 39:14; 62:10
**intended** [1] - 62:21
**interact** [1] - 72:21
**interest** [4] - 24:2, 4; 70:1, 6
**interested** [1] - 5:9
**interests** [1] - 62:24
**interfere** [1] - 86:7
**international** [2] - 62:10; 63:24
**interpret** [1] - 64:11
**interpreting** [1] - 64:15
**intervening** [1] - 45:4
**intervention** [1] - 50:6
**introduced** [2] - 55:15; 56:4
**intrude** [1] - 85:25
**intruding** [2] - 44:6; 95:19

**inversion** [2] - 100:10, 15
**investigative** [1] - 22:20
**invite** [1] - 8:3
**involved** [3] - 77:12; 79:3, 23
**involving** [7] - 34:9; 38:19; 72:16;
75:4; 79:3; 87:16
**irrelevant** [5] - 51:22; 52:15
**irreversible** [7] - 45:9, 11; 73:18,
20-21; 101:25
**issue** [37] - 5:12; 6:17, 19; 12:20;
13:14; 18:23; 21:7, 12, 19; 22:15;
23:23; 25:19; 27:25; 30:4; 34:21; 44:3,
16, 20; 45:25; 46:10, 13; 49:10; 52:16;
53:13; 55:16; 56:12; 60:25; 69:9; 73:6;
78:6; 80:3; 83:20; 91:9; 99:12; 101:20;
102:10
**issued** [1] - 6:13
**issues** [14] - 4:20; 5:2; 6:19; 7:20;
44:1; 49:25; 60:10, 12; 65:18; 102:20
**Item** [4] - 43:16; 60:1; 67:14; 73:24
**itself** [5] - 68:21; 72:17, 21; 77:20; 78:7

**J**

**James** [1] - 2:16
**James.powers@usdoj.gov** [1] - 2:20
**Jean** [2] - 2:10; 5:25
**jean.lin@usdoj.gov** [1] - 2:15
**Jenna** [1] - 1:13
**Jim** [1] - 5:25
**job** [10] - 7:1, 16; 10:21; 65:1, 10-11;
68:14; 86:13; 97:15
**Johnson** [1] - 63:7
**join** [2] - 17:5; 31:5
**joined** [1] - 19:2
**joint** [2] - 14:18; 56:1
**journalists** [1] - 22:20
**Judge** [8] - 59:14; 79:2, 6; 82:17; 85:7;
92:8; 98:16; 99:9
**judge** [2] - 6:23; 7:8
**JUDGE** [1] - 1:11
**judicial** [2] - 25:10; 75:19
**judicially** [6] - 67:7, 18; 69:3; 71:1;
77:17; 79:18
**judiciary** [1] - 5:11
**June** [1] - 1:6
**JUNE** [1] - 4:1
**JUSTICE** [3] - 1:17; 2:11, 16
**Justice** [4] - 2:7; 5:23; 43:6; 59:13
**justices** [1] - 78:25

**K**

**keep** [3] - 51:13; 86:4; 100:1
**keeps** [1] - 89:10
**Kennedy** [3] - 19:17; 20:6, 17, 21
**Kennedys** [1] - 19:20
**key** [5] - 31:13; 33:15; 42:18; 47:23;

88:15
  **kind** [12] - 22:18; 39:6; 46:12; 56:11; 57:4; 59:6; 61:8; 90:2; 93:14; 98:2; 101:9
  **kinds** [1] - 32:10
  **king** [1] - 14:12
  **knowing** [2] - 28:11; 29:16
  **knowledge** [1] - 62:14
  **known** [2] - 28:23; 29:4
  **knows** [1] - 63:5
  **Kucinich** [4] - 79:2; 82:18; 99:10

## L

  **lack** [2] - 54:2; 88:18
  **lacked** [1] - 88:23
  **lacks** [7] - 40:16; 48:10; 54:11, 14, 19; 59:3; 96:20
  **land** [1] - 90:21
  **landscape** [1] - 47:5
  **lane** [1] - 86:5
  **language** [3] - 10:5; 69:21; 90:17
  **largely** [3] - 37:18; 38:8; 48:18
  **last** [2] - 59:17; 102:13
  **latitude** [1] - 7:8
  **Laughter** [2] - 33:3; 61:15
  **law** [45] - 5:12; 6:7; 35:13; 37:9; 40:12; 44:11, 25; 49:14, 18-19; 50:22; 53:16; 55:22; 57:2; 60:6; 64:9; 73:24; 74:2, 15; 75:5, 8, 24-25; 78:15, 24; 79:4; 80:17, 23; 81:12; 82:15, 25; 83:1, 4, 10, 15-17; 94:21
  **lawmakers** [3] - 72:17; 75:15; 76:18
  **lawsuit** [22] - 8:15; 9:5; 11:19; 12:6; 17:3, 5, 19; 18:7; 19:12; 32:14; 38:25; 39:25; 69:8; 76:23; 77:1, 5, 15, 20; 80:25; 86:23; 95:5
  **lawsuits** [2] - 38:17; 62:5
  **lawyers** [2] - 6:22; 85:21
  **lead** [1] - 4:11
  **leadership** [2] - 80:13; 84:2
  **leaning** [2] - 6:24; 7:14
  **least** [1] - 75:8
  **leave** [1] - 103:2
  **lectern** [1] - 4:7
  **left** [2] - 63:9; 66:21
  **legal** [5] - 20:25; 25:22; 63:12; 87:2; 92:10
  **legislate** [4] - 21:22; 22:15; 56:10; 91:8
  **legislation** [10] - 54:23; 56:11; 60:3; 70:18; 82:4, 13-14; 89:11; 90:25; 94:20
  **legislative** [34] - 15:18; 19:10; 31:11; 34:15; 37:7; 40:16; 48:10; 52:24; 53:9; 54:3, 11, 14; 59:3, 6, 17; 67:7, 16; 69:6; 72:20; 75:13; 79:22; 82:12; 84:16; 86:7; 88:18, 23; 91:14; 93:16; 96:20; 98:25; 99:1, 6; 100:11; 101:1
  **legislator** [4] - 19:9; 41:2; 47:8; 72:9
  **legislators** [16] - 10:19; 12:23; 25:22;

42:6; 43:14; 47:2; 52:14, 25; 53:21; 54:2; 57:3; 84:14, 20; 85:1; 97:6
  **Legislature** [10] - 16:11, 15, 18, 21; 43:25; 46:25; 52:6, 8, 20; 87:13
  **legislature** [2] - 52:11; 102:4
  **legislatures** [1] - 75:4
  **length** [4] - 49:22; 50:20; 51:9; 87:18
  **lengthy** [1] - 72:23
  **less** [1] - 36:24
  **letter** [1] - 14:15
  **Letters** [1] - 90:20
  **level** [1] - 63:20
  **lieutenant** [2] - 26:9, 12
  **life** [1] - 85:7
  **light** [1] - 78:8
  **likely** [2] - 63:1; 77:16
  **likewise** [1] - 74:3
  **limited** [2] - 6:16; 66:4
  **Lin** [2] - 2:10; 5:25
  **Line** [4] - 43:16; 60:1; 67:14; 73:24
  **literally** [2] - 89:2; 93:7
  **litigants** [1] - 6:20
  **litigation** [1] - 19:20
  **longstanding** [1] - 15:21
  **look** [8] - 11:2, 6; 23:17; 35:12; 68:2; 76:5; 88:4; 97:24
  **looking** [1] - 63:23
  **lost** [2] - 28:5; 43:16
  **Louise** [1] - 9:1
  **love** [2] - 68:15
  **loved** [1] - 5:8
  **lower** [1] - 63:20

## M

  **machine** [1] - 3:7
  **mad** [1] - 85:17
  **magic** [4] - 20:14; 42:4; 61:11
  **majorities** [5] - 45:20; 60:19; 93:13; 94:5, 24
  **majority** [30] - 14:2, 8; 15:7; 29:4; 30:1; 32:17; 33:12; 36:3, 9, 18, 23; 37:4; 42:19; 43:4, 12; 45:17; 48:3; 49:3; 85:1, 5; 89:17; 90:1; 93:19; 94:4, 20; 100:13, 18; 101:9, 15, 19
  **mandamus** [1] - 49:12
  **mandate** [1] - 24:23
  **manner** [2] - 29:14; 101:17
  **Mark** [1] - 6:3
  **Marque** [1] - 90:20
  **Maryland** [11] - 38:22; 68:5, 15-16, 18; 76:12; 95:4
  **Massachusetts** [2] - 2:12, 18
  **matter** [30] - 22:14; 26:2; 27:18; 28:12; 30:20; 32:21; 33:20; 35:1, 14; 42:23; 50:22; 60:13; 64:15, 18; 65:17; 77:19; 78:17; 84:8, 12; 89:18; 91:8; 92:24; 93:7; 94:15; 97:19; 103:8
  **mattered** [2] - 27:2; 28:1

**matters** [6] - 27:18, 22, 24; 28:13; 31:5; 53:19
  **McCormack** [1] - 10:12
  **mean** [23] - 15:2, 20; 19:14, 22; 20:6; 26:5; 37:20; 39:5; 52:15; 53:18; 56:21; 57:18; 59:23; 70:7; 75:25; 76:3; 80:17, 24-25; 83:14; 93:6; 101:16
  **meaning** [23] - 33:17; 36:19, 25; 37:5; 45:2; 48:11; 49:1, 11; 53:10; 54:12, 20; 59:21; 60:21; 64:12; 82:11; 88:19; 89:23; 92:16, 23; 95:1; 96:21; 101:11, 21
  **means** [5] - 34:7; 39:8; 76:1; 79:16; 101:25
  **meant** [2] - 73:18; 101:24
  **measure** [5] - 37:11; 49:4, 9; 90:6; 93:15
  **media** [2] - 6:22; 84:23
  **mediated** [1] - 45:4
  **member** [24] - 8:22; 10:12; 16:15; 17:4, 25; 19:15, 19; 27:7; 31:4; 52:4, 11, 17; 69:24; 70:1, 7; 71:10; 72:6; 79:17; 87:1; 91:21; 96:7; 97:7, 10
  **Member** [1] - 31:6
  **members** [89] - 9:9, 20, 24; 10:1, 22; 12:6, 12; 14:2, 8; 16:23; 17:12, 16, 24; 18:3, 6, 9, 14, 25; 19:2, 8; 23:2; 24:22; 25:16; 28:7, 10; 29:4; 30:1; 31:13; 33:1, 6, 11; 40:12, 19; 41:3, 7, 11; 42:9; 43:4, 9; 45:17; 46:22; 53:4; 55:10, 24; 56:25; 57:7; 59:11; 67:12, 15, 19; 68:22; 69:1, 7, 13, 16-18; 70:6, 22; 71:11; 72:2; 73:1, 9, 22-24; 74:2; 80:24; 85:10; 86:21; 88:9, 13, 16, 21; 89:9, 13, 17; 90:7, 9; 92:11; 93:19; 94:11; 97:1; 100:18
  **Members** [9] - 11:7; 15:7; 24:14; 25:8; 30:7, 24; 31:10; 32:3
  **memory** [1] - 86:4
  **mention** [1] - 77:7
  **mentioned** [4] - 9:16; 64:4; 82:17; 92:9
  **merged** [1] - 78:19
  **merits** [8] - 15:22; 49:25; 50:23; 64:20; 65:20, 23-24; 78:6
  **met** [1] - 66:8
  **Michigan** [1] - 8:17
  **might** [6] - 28:24; 61:3; 62:15; 76:3; 91:8; 93:10
  **military** [1] - 34:19; 37:24; 70:19; 73:25; 74:1; 81:2, 8, 21; 82:6; 92:8; 99:22
  **minimis** [1] - 55:5
  **Minnesota** [1] - 8:16
  **minority** [4] - 32:16; 51:21; 84:20; 85:2
  **minute** [3] - 21:17; 27:2; 98:8
  **minutes** [6] - 13:22; 88:2; 98:5; 99:25; 100:5
  **misled** [1] - 7:2
  **Mississippi** [1] - 63:7
  **misunderstands** [1] - 21:20

**modifier** [1] - 98:22
**moment** [1] - 13:5
**morning** [12] - 4:3, 9, 13-14; 5:21; 8:9-11; 66:19
**MORNING** [1] - 4:1
**most** [7] - 33:24; 34:3, 7; 39:7; 45:25; 53:21; 63:1
**MOTION** [1] - 1:10
**motion** [4] - 7:20; 67:25; 94:6; 98:2
**move** [2] - 86:2
**MR** [71] - 5:16, 21, 23; 66:19, 24; 67:1, 10, 23, 25; 68:4, 12, 20; 69:23; 70:11, 14, 25; 71:5, 7, 14, 22; 72:4, 16; 73:5, 16; 74:7; 75:2, 6, 21; 76:8; 77:3, 7, 10, 25; 78:12; 79:7, 21; 80:2, 7, 21; 81:5, 18; 82:16; 83:2, 7, 18, 25; 84:6; 85:9, 16, 18, 23; 86:2, 6, 9, 12, 15; 87:3, 14, 23; 88:3; 98:6, 10, 14, 19, 21, 25; 99:7, 18; 100:2; 101:23; 102:12
**MS** [170] - 4:9, 14, 23; 5:4; 8:8, 10, 12, 19; 9:1, 7, 19; 10:6, 16; 11:9, 12, 15, 23; 12:1, 9, 17, 19; 13:4, 11, 15, 23; 14:13, 25; 15:18; 16:8, 12, 17; 17:4, 8, 10, 18, 21; 18:8, 18, 23; 19:4, 14, 18, 22, 25; 20:4, 8, 10, 16, 18, 22; 21:8, 11; 23:20; 24:11, 20; 25:15; 26:2, 8, 17, 23; 27:1, 6, 11, 22; 29:12, 19; 30:5, 11, 19; 31:1, 4, 18, 23; 32:5, 18; 33:5, 8, 10, 14, 24; 35:6, 12, 18, 22; 36:14, 16; 37:21; 38:11, 17; 39:3, 5; 40:2, 10; 41:1, 15, 19, 23; 42:2, 5, 16, 20; 43:11; 44:2, 10, 18, 21, 23; 45:11, 14; 47:7, 15, 18; 48:2, 5; 49:15, 19; 50:18, 24; 51:2, 5, 8, 13, 15, 17, 20; 52:1, 13, 19; 53:15; 54:8; 55:1, 17, 19; 56:2, 6, 21, 23; 57:18, 21; 58:10, 14, 24; 59:19, 24; 60:8, 12; 61:1, 10, 16, 20; 64:19, 24; 65:25; 66:3; 88:6; 91:1, 12; 93:2, 5; 94:9, 13, 22; 96:6, 13, 18; 97:5, 16, 23; 100:16; 101:5
**multiple** [2] - 69:4; 84:23
**music** [1] - 32:25
**must** [8] - 24:14; 50:8; 63:13, 15; 65:5; 78:18; 79:10; 81:21

# N

**Nadler** [1] - 4:12
**name** [5] - 22:4, 6; 58:4; 91:4, 17
**named** [1] - 8:14
**narrow** [2] - 53:22; 57:3
**nation** [1] - 64:9
**national** [1] - 62:23
**naturally** [1] - 15:20
**nature** [6] - 27:23; 33:18; 34:23; 59:5; 63:22; 76:21
**necessarily** [2] - 24:5; 56:18
**necessary** [6] - 9:14; 17:11; 18:8; 19:12; 21:2; 90:6

**need** [14] - 5:1; 9:8; 16:2, 18; 17:23; 20:6; 35:7; 44:20; 49:23; 50:3; 66:14; 79:23; 83:20; 103:3
**needs** [2] - 13:25; 99:24
**negates** [1] - 73:13
**never** [3] - 10:22; 71:15; 88:9
**nevertheless** [1] - 81:25
**New** [2] - 8:17; 38:21
**new** [2] - 49:17; 85:6
**news** [1] - 62:16
**next** [1] - 94:16
**Nixon** [1] - 75:22
**nominees** [1] - 82:19
**none** [3] - 18:8; 55:23; 56:6
**nonjury** [4] - 7:3, 7; 65:17
**normally** [1] - 46:15
**note** [4] - 49:20; 57:10; 84:23; 95:2
**noted** [9] - 17:13; 28:22; 34:14, 17; 63:9; 64:7; 65:4; 95:3
**nothing** [25] - 30:19; 32:22; 33:19; 34:10; 40:5; 45:14, 18; 49:17; 58:17; 59:19; 68:15; 69:24; 70:3; 89:8; 90:5, 22; 92:5, 22; 93:6; 94:16, 19; 97:18; 102:3
**notice** [1] - 65:5
**noting** [5] - 37:16; 44:11; 46:24; 55:20; 65:1
**November** [4] - 32:17; 33:9; 36:10; 94:4
**nowhere** [1] - 51:17
**nullification** [23] - 16:7, 10, 20; 26:5; 27:25; 43:14; 47:3; 51:22; 52:21; 53:7, 13; 54:1; 73:14, 17; 74:23; 78:10; 80:25; 81:3, 9; 82:10; 101:24
**nullified** [4] - 21:10; 25:20; 26:11; 92:12
**number** [12] - 4:25; 19:15; 20:14; 39:24; 42:4; 69:7; 82:21; 83:11; 92:10; 99:14
**numbers** [3] - 27:2; 35:16; 41:24
**numerous** [1] - 24:24
**NW** [6] - 1:14, 17, 21; 2:3, 12, 18

# O

**obligated** [1] - 23:18
**obligation** [2] - 30:11; 68:17
**obstacle** [2] - 15:9; 85:11
**obstacles** [3] - 37:7; 80:11; 93:17
**obtain** [10] - 22:2; 24:9; 25:2; 26:20; 28:18; 32:11; 50:8, 13; 63:13; 65:5
**obtained** [1] - 39:10
**obtaining** [9] - 24:25; 25:5; 27:12; 30:6; 35:8; 46:6; 92:13; 97:13; 100:21
**obvious** [1] - 39:7
**obviously** [3] - 21:17; 40:23; 49:25
**occur** [1] - 71:14
**occurred** [6] - 23:2; 29:2; 51:23; 54:7; 66:16; 100:3

**occurring** [1] - 48:16
**OF** [6] - 1:1, 10, 17; 2:11, 16; 3:4
**office** [4] - 6:11; 8:20; 19:9; 73:8
**Office** [1] - 24:6
**officeholders** [1] - 28:23
**official** [20] - 8:21; 11:8, 13, 21; 12:7; 17:16, 19; 18:5; 28:17; 29:3; 37:1; 39:2, 23; 48:23; 63:25; 70:13; 79:14, 16; 96:3
**Official** [2] - 3:3; 103:11
**officials** [14] - 15:5; 18:4; 32:10; 36:21; 40:21; 42:11; 43:2; 46:3; 55:3; 63:20; 81:24; 83:2; 93:18; 101:12
**often** [1] - 42:8
**once** [7] - 6:11, 15; 22:24; 45:12; 56:3; 14:23; 16:19; 20:15; 22:24; 31:13; 34:3, 25; 38:20; 39:7; 41:25; 44:6; 45:24; 46:21; 47:23; 48:21; 49:9, 23; 50:19; 53:19; 57:1, 5; 58:25; 61:5; 62:13; 63:15; 64:1, 6, 9; 68:7; 69:17, 19; 71:16; 72:16; 74:17, 23; 76:16, 23; 77:14; 78:4; 85:18; 86:20; 87:9; 90:15; 91:10, 20; 92:2; 95:14, 19; 98:6; 99:9, 24; 100:8
**one's** [4] - 49:18; 55:5
**open** [2] - 63:9; 72:11
**operating** [3] - 37:18; 38:8; 48:17
**Opinion** [1] - 87:10
**opinion** [8] - 10:24; 11:4; 40:23; 61:24; 66:5; 68:7; 84:9; 101:3
**opinions** [1] - 53:6
**opportunity** [33] - 12:12; 14:5; 16:5, 20, 24; 21:4, 22; 23:3; 24:14; 25:6, 21; 28:9; 29:10; 31:7; 32:2; 40:14; 41:4; 42:14, 16; 48:7; 52:22; 54:17; 55:13; 56:7; 59:1; 67:13, 21; 73:11; 88:17; 92:21; 96:15; 100:23
**opposed** [2] - 11:21; 25:12
**opposing** [1] - 18:12
**opt** [1] - 97:3
**option** [2] - 49:2; 50:11
**oranges** [1] - 68:19
**order** [17] - 4:14; 6:13; 25:10; 26:15, 18; 34:21; 35:3, 10; 36:11; 37:11; 38:3; 46:12; 61:18; 62:4; 65:8, 10; 83:1
**ordering** [2] - 49:13, 15
**orders** [2] - 60:6; 65:2
**organization** [1] - 84:25
**otherwise** [1] - 24:13
**outcome** [3] - 29:11; 71:17
**outset** [1] - 61:25
**outside** [1] - 74:21
**over-reading** [1] - 88:11
**overlooking** [2] - 11:14, 25
**overreached** [1] - 67:4
**override** [4] - 35:17; 93:14; 99:9, 11
**overrule** [2] - 47:1; 67:3
**overruled** [3] - 43:23; 75:6; 78:13
**overseeing** [4] - 18:4; 40:20; 42:10; 57:6

**own** [7] - 35:14; 44:14; 45:6; 58:22; 60:17; 93:11; 99:2

# P

**p.m** [2] - 100:4; 103:4
**page** [2] - 11:4; 101:3
**paid** [1] - 84:24
**paradigmatic** [1] - 10:11
**paragraph** [1] - 24:7
**paragraphs** [1] - 69:4
**part** [2] - 30:3; 50:2
**particular** [14] - 13:7; 27:8; 38:24; 41:16; 46:12, 16-17; 59:5; 60:2; 62:7; 64:3, 25; 87:19; 102:9
**parties** [19] - 4:7; 11:20; 19:3; 25:25; 26:22; 27:5, 10; 30:24; 31:17; 38:9; 42:14; 55:15; 56:22; 58:23; 61:17; 64:12; 71:3, 10
**Party** [2] - 33:1, 6
**party** [4] - 11:15; 16:16; 52:11; 84:3
**pass** [11] - 25:20; 35:13; 56:11; 60:6; 74:2; 80:10; 82:25; 83:10, 15; 85:11; 94:20
**passed** [2] - 8:22; 74:13
**passing** [1] - 82:13
**past** [5] - 14:14; 28:1; 50:12; 52:21; 90:12
**pattern** [1] - 79:3
**pause** [1] - 100:7
**pausing** [1] - 21:17
**pay** [1] - 61:13
**Pearce** [2] - 52:4; 78:10
**pending** [12] - 55:18, 20, 23; 56:1; 62:5; 73:6; 80:3; 83:19; 102:10, 12
**Pennsylvania** [2] - 1:17; 2:8
**people** [3] - 6:11; 29:15; 70:9
**per** [1] - 4:14
**perform** [1] - 63:16
**perhaps** [2] - 62:17; 99:19
**permanent** [1] - 66:2
**permissible** [1] - 29:7
**permission** [1] - 82:10
**person** [7] - 22:7; 58:5, 8; 91:5, 22, 24; 102:22
**personal** [17] - 10:9; 12:8, 16, 19; 40:25; 67:17; 70:3, 6, 12; 72:6, 13, 15; 76:21; 78:22; 79:18; 86:20; 100:15
**personally** [4] - 9:22; 48:23; 69:14, 24
**personnel** [3] - 34:2; 48:14; 93:10
**persuade** [4] - 19:12; 20:15; 44:9; 53:12
**persuasive** [3] - 93:1; 102:18
**persuasively** [1] - 7:24
**place** [4] - 28:21, 24; 29:7; 100:10
**plaintiff** [43] - 4:11; 7:18; 11:20; 16:16; 17:22; 25:25; 26:22; 27:5, 10; 30:25; 31:17; 38:9; 39:9; 42:15; 52:12; 55:15; 56:22; 68:2; 69:9; 71:10; 76:3-6, 9;

79:25; 81:14; 82:21; 83:12; 86:22, 25; 87:6-8, 15; 88:2, 5, 25; 98:3
**plaintiff's** [2] - 43:7; 100:8
**plaintiffs** [62] - 4:10; 7:22, 25; 8:2, 14; 9:10; 12:16; 13:17; 14:5; 16:5; 18:24; 21:3, 21; 23:24; 24:14, 22; 25:8; 27:16; 28:14; 39:1; 40:5; 42:21; 47:12; 48:5; 54:16; 57:8, 11-12; 58:23; 62:2, 17; 68:8, 13; 69:21; 71:3, 13; 73:2; 74:25; 75:20; 76:2, 15; 77:1, 23; 78:8; 84:15, 18; 91:3; 92:4, 20; 94:3, 5; 95:4, 10, 13; 96:2, 14, 19, 22; 100:22
**Plaintiffs** [5] - 1:5, 13; 2:2; 25:6; 54:21
**plaintiffs'** [3] - 27:14; 69:12, 21
**plans** [2] - 23:14; 35:4
**plausibly** [2] - 43:24; 45:20
**pleadings** [1] - 100:10
**pleasure** [2] - 5:6, 10
**point** [28] - 12:1; 13:15, 23; 15:19; 22:16; 26:23; 30:5; 31:6; 32:21; 44:24; 47:9; 52:2, 19; 60:14; 64:3, 25; 68:20; 69:3; 80:15; 87:9; 88:1; 89:25; 94:15; 96:7; 98:6, 11; 99:23; 100:16
**points** [5] - 26:17; 60:24; 87:21; 88:7; 92:2
**policy** [1] - 62:24
**political** [44] - 4:19; 44:8, 17; 45:5; 69:10; 72:19, 24; 73:1, 11, 21-22; 74:17, 22, 24; 77:18, 22; 78:1, 7; 79:21; 80:5, 7, 14; 81:11, 13; 82:12, 16, 22; 83:10; 86:16; 93:1, 3; 98:11, 17-18; 99:1, 6, 13, 20; 102:1, 6, 8
**position** [6] - 10:23; 25:1; 40:1; 57:9; 92:25; 98:18
**possessed** [2] - 10:3; 69:19
**possibility** [3] - 63:10; 72:11; 73:15
**possible** [6] - 18:19; 36:17; 49:2; 57:13; 59:8; 95:14
**possibly** [1] - 49:1
**post** [9] - 10:25; 20:3-6, 24; 25:19; 34:12; 40:11
**post-Raines** [9] - 10:25; 20:3-6, 24; 25:19; 34:12; 40:11
**potential** [4] - 62:9; 83:22; 99:6
**potentially** [7] - 35:13; 39:19; 48:20; 58:24; 60:9; 62:21; 93:10
**Powell** [6] - 10:12, 15; 12:18, 20; 69:24; 72:5
**power** [17] - 10:19; 19:10; 34:5; 41:3; 45:25; 46:1, 10; 48:14; 53:4; 78:5; 81:13; 82:20; 89:1; 92:6
**powerful** [1] - 34:3
**powerfully** [1] - 61:23
**Powers** [5] - 2:16; 5:25; 81:19
**powers** [20] - 4:20; 12:23; 44:1, 3-4, 12, 25; 45:3; 46:14; 60:11; 64:5; 71:24; 72:18; 76:22; 77:12, 16; 78:19, 23; 85:23; 87:17
**practice** [2] - 15:22; 35:13
**pre** [9] - 19:20, 22; 20:7, 21; 43:22;

53:12, 16; 54:5
**pre-Raines** [8] - 19:20, 22; 20:7, 21; 43:22; 53:12, 16
**precedent** [5] - 19:23, 25; 53:13; 54:5; 57:17
**precise** [2] - 16:23; 75:11
**precisely** [4] - 17:11; 44:15; 47:11; 49:6
**preparing** [1] - 65:15
**prerogative** [3] - 16:22; 52:9; 67:7
**prescribed** [1] - 95:22
**prescribes** [1] - 23:9
**presence** [1] - 29:1
**present** [8] - 4:17; 7:5, 12; 29:5; 31:23; 62:23; 74:14; 75:12
**presented** [1] - 76:22
**presenting** [5] - 4:15; 23:10; 29:22; 32:19; 89:20
**presentment** [1] - 74:16
**presents** [1] - 28:23
**preserves** [1] - 57:2
**presided** [1] - 7:3
**President** [166] - 12:10; 13:19, 25; 14:3, 8, 11, 13; 15:11; 16:3; 21:13, 21; 22:1, 4, 9, 22, 25; 23:8; 24:1, 6, 9, 16-17; 26:1, 15-16, 18; 27:13; 28:11; 29:13, 21, 25; 30:6, 13, 15, 21; 31:19, 23; 32:9, 18; 33:11, 25; 34:24; 35:3, 7, 15; 36:12; 37:2, 25; 38:4, 13, 18; 39:11; 41:10; 42:17, 21; 43:2; 45:12; 46:3, 5, 19; 48:1, 6-7, 21; 49:13, 24; 50:2, 7-8, 10; 54:24; 55:1, 3, 22; 56:14; 57:8, 10, 14; 58:4, 15, 18, 21; 59:12; 60:4, 7; 62:12, 15; 63:8, 11, 13, 21, 23, 25; 64:1, 14; 65:2, 9; 67:12, 20; 68:17; 69:8; 70:2, 17, 19, 22; 71:21; 74:2, 4, 9, 14, 17, 19; 75:24; 76:1; 80:17, 23; 81:1, 8, 20, 23; 82:2, 4, 6, 9, 13; 83:9, 12, 25; 84:21, 23; 89:2, 4, 15-16, 19; 90:2, 11; 91:4, 17, 19; 92:4-6, 13; 93:8, 11, 25; 94:1; 95:9, 15, 20; 96:8, 14, 20, 22; 97:12, 16; 100:18, 20, 24; 101:16
**President's** [13] - 13:1; 33:20; 34:10; 35:14; 55:11, 21; 60:17; 63:24; 73:7; 79:11; 82:19; 84:3; 97:8
**Presidential** [2] - 93:14; 99:11
**presidents** [4] - 14:14; 50:13; 63:16; 90:12
**press** [3] - 22:18, 22; 62:15
**presumption** [1] - 83:3
**pretty** [2] - 59:10; 84:4
**prevail** [1] - 64:20
**prevent** [5] - 32:7; 84:1, 4; 93:18; 99:22
**preventing** [2] - 21:13; 101:12
**primary** [1] - 82:2
**principle** [3] - 64:9; 67:5
**principles** [3] - 71:23; 76:14; 78:20
**private** [17] - 9:25; 10:11; 12:21; 34:10, 25; 38:15; 39:3, 20; 46:20; 48:17;

56:20; 57:11; 63:24; 69:9, 16; 83:12; 89:4

**problem** [10] - 22:21; 33:17; 35:9; 39:11; 45:6; 50:2; 59:20; 93:22; 97:20

**problems** [1] - 22:24
**procedure** [1] - 95:22
**procedures** [1] - 23:8
**proceed** [2] - 4:25; 68:6
**proceeding** [1] - 102:21
**proceedings** [4] - 66:16; 100:3, 7; 103:8
**Proceedings** [2] - 3:7; 103:4
**PROCEEDINGS** [1] - 1:10
**process** [12] - 45:5; 67:16; 69:10; 72:20, 24; 77:19; 83:10; 86:7, 16; 100:11, 15
**produced** [2] - 3:7; 94:4
**profile** [1] - 7:4
**profits** [1] - 84:25
**program** [3] - 70:17; 74:3; 82:5
**Programs** [3] - 2:7, 11, 17
**programs** [1] - 37:22
**prohibit** [4] - 32:9; 36:20; 42:12; 101:15
**prohibited** [4] - 24:13; 79:15; 90:23; 100:12
**prohibition** [3] - 36:7; 46:2
**prong** [2] - 61:21; 66:8
**prongs** [1] - 4:16
**proper** [4] - 76:3, 9; 86:22, 25
**properties** [2] - 39:10, 18
**property** [3] - 38:24; 39:14; 62:10
**prophylactic** [1] - 15:4
**proposition** [2] - 51:25; 88:9
**prospectively** [1] - 55:7
**prove** [1] - 61:22
**provide** [1] - 35:3
**provides** [1] - 55:3
**provision** [11] - 28:15; 43:1; 49:10; 57:5; 58:11; 60:2; 90:18; 91:25; 92:1, 20; 101:20
**provisions** [4] - 42:9, 12; 57:22, 25
**public** [2] - 37:24; 62:22
**publicly** [1] - 38:2
**purported** [2] - 22:9; 91:4
**purporting** [1] - 91:17
**purpose** [4] - 15:4, 21; 32:9; 36:5
**purposes** [11] - 16:1; 20:3; 23:20; 52:16; 66:4; 67:25; 79:9, 12; 80:22; 98:3
**purse** [3] - 34:5; 48:14; 89:2
**pursuant** [3] - 82:4, 7; 92:6
**put** [3] - 37:10; 62:22; 66:10
**puts** [2] - 74:21; 94:1

---

# Q

**qualification** [1] - 95:6
**query** [1] - 54:15

---

**questions** [32] - 4:19, 25; 6:21, 25; 7:2, 6, 9, 11, 14; 8:4-6; 15:24; 20:19; 31:8, 13; 47:23; 51:11; 58:25; 60:23; 61:3; 65:1, 13-14; 66:22; 78:6; 87:24; 88:15; 97:21, 25; 102:19
**quick** [3] - 88:7; 92:2; 98:10
**quite** [2] - 43:13; 44:19
**quote** [14] - 9:23; 24:1, 7, 15, 22; 25:4; 67:5; 69:13, 15; 79:14; 84:17
**quote-unquote** [1] - 24:15
**quoting** [2] - 9:21; 24:8

---

# R

**Raines** [114] - 9:18, 20; 10:3, 8, 18, 21, 25; 17:13; 18:9, 12; 19:20, 22; 20:2-7, 11-12, 18, 21, 24; 21:1; 25:17, 19; 31:12; 33:17; 34:12; 36:19; 37:5; 40:11; 41:1, 13, 15; 43:12, 18, 22-23; 45:2; 46:24; 47:8, 21; 48:11; 49:1, 8, 11; 52:24; 53:3, 10-12, 16, 20; 54:5, 12, 20-21; 57:1; 59:21, 24; 60:21; 66:20; 67:2, 10-11, 14; 68:24; 69:4, 12, 20; 70:5; 71:1, 17, 23; 72:1, 3, 11, 22, 24; 73:23; 74:21; 75:10, 17; 78:8, 19; 79:1; 83:7; 84:8, 14, 16; 85:19; 86:17, 19; 88:8, 11, 19; 89:24; 90:5, 8; 92:16, 23; 95:1; 96:21; 97:4; 99:19; 101:2
**raise** [1] - 9:14
**raised** [5] - 4:20; 9:15; 39:2; 44:17; 77:22
**raising** [3] - 7:20; 38:25; 78:7
**Randolph** [1] - 92:8
**range** [7] - 34:15; 38:13; 39:12; 43:6; 57:9; 95:13, 15
**ranging** [1] - 62:9
**rare** [1] - 42:5
**rather** [5] - 7:22; 9:24; 51:23; 69:15; 86:3
**ratification** [4] - 28:3; 73:19; 102:2
**ratify** [1] - 59:12
**RDR** [3] - 3:2; 103:7, 10
**RDR-CRR** [1] - 103:7
**reaction** [3] - 65:17; 78:11; 96:24
**read** [8] - 6:11, 15, 17, 21; 7:11; 8:4; 102:18
**reading** [1] - 88:11
**reaffirm** [1] - 46:24
**reaffirmed** [2] - 46:25; 90:8
**real** [5] - 14:10; 22:21; 58:3; 75:17; 98:10
**really** [9] - 5:1; 13:17; 15:2; 35:21; 36:24; 72:22; 73:19; 78:6; 86:25
**reason** [18] - 28:16; 31:2; 34:25; 36:19; 44:15; 47:19; 57:1; 59:2; 62:11; 73:9; 74:7; 84:5; 86:6; 87:7; 100:25
**reasons** [10] - 7:2, 17; 13:13; 33:21; 48:12; 54:13; 80:5, 7; 89:9; 102:21
**receipt** [2] - 67:13; 73:8

---

**receive** [3] - 24:3; 28:24; 74:5
**received** [4] - 22:10; 39:15; 94:3
**receiving** [2] - 39:17; 46:3
**recess** [9] - 58:12; 66:12, 14-16; 98:1, 8; 100:3; 102:21
**recognition** [1] - 6:5
**recognize** [4] - 7:19; 20:24; 44:3; 47:10
**recognized** [6] - 16:12; 19:9; 49:3; 63:15; 71:16; 75:14
**recognizes** [3] - 40:11; 52:25
**reconsideration** [2] - 94:6
**record** [4] - 4:8; 12:15; 61:6; 103:7
**recourse** [4] - 31:11; 33:16; 48:11; 53:9
**recourses** [1] - 96:21
**red** [1] - 6:6
**redistricting** [2] - 16:22; 52:9
**redress** [1] - 102:1
**redressability** [2] - 61:2; 66:8
**redressable** [1] - 61:24
**redressed** [4] - 4:18; 27:15; 62:2; 66:5
**reference** [1] - 11:19
**referring** [1] - 72:4
**reflects** [2] - 44:11; 55:7
**refuse** [2] - 82:18; 85:1
**regard** [1] - 34:13
**regardless** [3] - 27:15; 29:11
**regularity** [1] - 83:3
**regulation** [1] - 81:17
**regulatory** [2] - 39:16; 62:9
**reiterated** [1] - 52:2
**related** [2] - 56:11; 89:11
**relatively** [1] - 40:13
**relevant** [3] - 23:23; 63:25; 100:25
**reliance** [2] - 45:8
**relied** [5] - 20:1; 62:14; 75:7, 9; 92:15
**relief** [27] - 26:14; 27:20; 35:20; 36:11; 49:13; 50:17; 51:6, 10; 56:20; 63:4, 6, 8, 10, 21; 64:7; 65:3, 16, 20, 24; 66:6; 71:3, 13; 74:25; 75:19; 80:12; 99:5
**rely** [5] - 20:17; 43:24; 51:19; 53:12; 78:9
**relying** [2] - 20:18, 20
**remain** [3] - 78:15; 80:7, 11
**remains** [2] - 53:17; 78:24
**remedies** [32] - 40:16; 54:3, 11, 14; 59:3, 25; 72:20; 73:1, 4; 74:17, 22, 24; 79:22; 81:11; 82:17, 22; 83:22; 88:18, 24; 91:14; 93:1; 98:12, 18; 99:4, 6, 8, 14, 17, 20; 101:1; 102:1
**Remedy** [1] - 101:4
**remedy** [48] - 35:24; 36:4, 15, 17-18; 37:5; 44:14; 45:1; 48:22; 49:1, 6; 54:19; 59:17, 21; 60:14, 16, 21; 65:8; 73:11; 75:19; 76:1; 79:20; 82:12; 83:6, 17, 19; 89:23, 25; 92:15, 23; 93:3; 94:22; 95:1; 98:17; 99:2, 13, 20; 101:3, 5-6, 8, 19; 102:4, 9

---

remember [1] - 29:23
remind [1] - 11:6
removing [1] - 9:12
Rene [1] - 2:2
repeal [1] - 73:23
repealed [1] - 59:25
repeatedly [1] - 20:1
repetitious [1] - 40:22
report [2] - 37:25; 59:12
reported [3] - 3:7; 23:1; 58:4
reporter [3] - 61:4, 8; 66:12
Reporter [3] - 3:2; 103:11
reporters [1] - 22:20
reports [1] - 84:23
represent [2] - 56:19; 84:19
Representative [3] - 4:12; 10:14; 28:21
representative [3] - 9:1; 39:24; 41:25
Representatives [7] - 13:3; 18:6; 19:11; 20:14; 25:13; 32:15; 97:14
representatives [2] - 8:20; 29:15
representing [1] - 5:11
Reprisal [1] - 90:20
Republican [6] - 30:4, 17, 24; 31:4; 32:3; 42:19
Republican-controlled [1] - 30:17
request [4] - 51:6; 65:16, 20, 23
requesting [2] - 63:4
require [25] - 17:19; 25:1; 30:18; 34:1; 35:14; 45:20; 48:13, 21; 55:21; 58:1; 60:17, 19; 74:16; 78:21; 87:2; 90:1; 93:9, 11, 13; 94:24; 101:14
required [4] - 15:20; 46:11; 52:3; 59:14
requirement [1] - 30:3
requires [6] - 16:2; 19:6; 24:9; 28:22; 48:22; 79:18
requiring [6] - 28:17; 36:2, 22; 49:4; 50:10; 82:13
requisite [2] - 27:20; 35:16
res [1] - 94:8
resident [1] - 76:6
resigned [1] - 8:15
resolution [5] - 14:18; 73:10; 74:16; 77:8; 81:19
resolutions [7] - 55:19; 56:1, 7; 89:6, 8, 23
resolving [2] - 52:16; 77:24
resort [1] - 62:10
respect [12] - 5:2; 22:19, 23; 23:16, 23; 35:3; 38:23; 39:9, 21; 44:24; 68:18; 95:6
respectful [1] - 61:11
respectfully [2] - 67:4; 68:6
respective [4] - 42:15; 55:16; 84:19; 94:7
respond [5] - 8:3; 24:18; 37:23; 38:4; 98:10
responded [1] - 87:4
responding [1] - 79:13

response [9] - 13:21; 59:6; 69:22; 78:11; 88:7; 101:22
responsibilities [3] - 10:20; 12:24; 91:23
responsibility [6] - 44:5; 95:10, 18-19; 96:9
rested [2] - 53:7
rests [1] - 32:16
result [2] - 71:14, 24
resulting [1] - 84:24
retainer [1] - 60:12
retire [2] - 10:2; 69:18
return [1] - 60:7
reversed [2] - 47:17, 19
RICHARD [1] - 1:3
Richard [2] - 4:5, 12
Riegle [2] - 52:2; 54:7; 78:9, 15
Rights [1] - 5:14
rights [3] - 12:21; 39:15; 62:10
rise [2] - 28:20; 29:6
road [2] - 50:22; 93:20
roadblocks [3] - 15:8; 37:6; 93:16
robbing [1] - 67:21
role [9] - 18:3; 40:20; 42:10; 46:17; 56:24; 57:5; 67:15; 91:23; 95:10
roles [1] - 25:8
Room [1] - 3:4
rule [6] - 15:5; 64:9; 80:8; 85:12, 15
Rule [1] - 65:19
rules [2] - 55:18; 90:21
ruling [2] - 94:3, 8
run [3] - 74:11; 97:22
ryan.lee2@usdoj.gov [1] - 1:19

## S

safeguard [1] - 15:4
salary [1] - 10:13
sanction [1] - 17:20
satisfy [1] - 72:13
scenario [1] - 99:10
Schlesinger [1] - 87:5
scope [4] - 23:13; 38:1; 50:5; 60:2
score [1] - 15:24
Scott [4] - 3:2; 103:7, 9
scottlyn01@aol.com [1] - 3:6
scrutiny [1] - 62:22
seat [3] - 10:13; 69:25; 70:4
second [9] - 9:18; 10:7, 17; 11:5; 31:9; 32:13; 60:23; 61:5; 98:9
secret [9] - 15:11; 29:22; 42:22; 46:19; 48:17; 56:15; 62:19; 89:20; 101:17
Secretary [2] - 91:5, 18
secretly [1] - 42:17
Section [4] - 21:23, 25; 56:10; 90:19
section [1] - 11:16
security [1] - 62:24
see [4] - 6:2; 11:18; 97:24
seek [5] - 56:20; 71:3; 75:20; 79:14;

94:7
seeking [11] - 24:24; 25:5; 26:14; 27:21; 36:11; 68:23; 71:4, 13; 73:12; 75:1
seem [2] - 7:14; 93:22
self [4] - 46:12; 73:22; 99:1
self-help [2] - 46:12; 99:1
Senate [37] - 5:7; 9:9; 11:8; 12:7; 13:3; 17:6, 20, 22; 19:2; 22:6, 11; 25:13; 30:17; 32:16; 33:2; 39:23; 40:3; 43:6; 48:4; 52:17; 58:6, 22; 59:15; 71:2, 11-12, 20; 73:6, 10; 85:12; 91:6, 19, 21; 94:14; 97:2
Senator [3] - 4:11; 32:25; 91:10
senator [4] - 5:6; 8:16; 41:25; 102:22
senators [7] - 17:1, 7; 39:24; 52:3; 58:7; 91:6
Senators [4] - 19:11; 20:14; 22:12; 30:4
send [1] - 60:3
sense [2] - 18:14; 37:23
sent [3] - 37:25; 70:9; 86:13
separate [1] - 20:6
separated [1] - 6:18
separation [17] - 4:20; 44:1, 3-4, 12, 24; 45:2; 64:5; 71:24; 72:18; 76:22; 77:11, 16; 78:19, 23; 85:23; 87:17
seriously [2] - 5:8; 15:19
serve [5] - 15:4; 22:5; 58:4; 91:5, 17
serves [1] - 46:17
serving [6] - 8:20; 19:9; 22:7, 9; 59:13
SESSION [1] - 4:1
shake [2] - 102:25; 103:2
shaking [1] - 102:23
share [1] - 19:10
shared [3] - 23:11; 38:6; 43:9
shifted [1] - 47:6
short [3] - 66:12; 84:14; 98:1
shorter [2] - 10:24; 53:5
shorthand [1] - 3:7
show [1] - 61:22
showing [1] - 7:19
shown [1] - 21:4
shows [1] - 73:16
Shumate [2] - 2:6; 5:23
SHUMATE [71] - 5:16, 21, 23; 66:19, 24; 67:1, 10, 23, 25; 68:4, 12, 20; 69:23; 70:11, 14, 25; 71:5, 7, 14, 22; 76:8; 77:3, 7, 10, 25; 78:12; 79:7, 21; 80:2, 7, 21; 81:5, 18; 82:16; 83:2, 7, 18, 25; 84:6; 85:9, 16, 18, 23; 86:2, 6, 9, 12, 15; 87:3, 14, 23; 88:3; 98:6, 10, 14, 19, 21, 25; 99:7, 18; 100:2; 101:23; 102:12
signature [5] - 35:15; 55:21; 60:4, 17; 74:15
significance [2] - 96:5
significant [3] - 37:17; 76:22; 77:11; 78:14; 96:1

**silent** [1] - 11:24
**similar** [7] - 73:10; 79:2; 81:22; 90:17; 91:1
**similarly** [2] - 96:4; 97:1
**simple** [10] - 15:1; 62:24; 63:15; 64:15, 18-19, 21; 85:21
**simpler** [1] - 10:24
**simply** [21] - 9:8; 14:21; 15:13; 23:4, 14; 28:5; 30:12; 32:22; 33:19; 34:22; 36:24; 37:4, 14; 43:16; 57:13; 60:2; 75:25; 88:13; 93:6; 97:18; 101:19
**single** [3] - 13:19; 19:14; 57:7
**situated** [2] - 96:4; 97:1
**situation** [9] - 28:25; 40:13, 17; 46:8; 59:10; 72:8; 83:7; 102:2, 5
**Slaughter** [1] - 9:1
**so..** [1] - 6:8
**sole** [1] - 52:19
**solely** [3] - 9:25; 17:22; 69:17
**Solo** [2] - 6:6
**someone** [10] - 8:6; 15:16; 22:5, 9; 58:4; 59:13; 82:15; 91:4, 17; 99:4
**somewhat** [1] - 40:22
**soon** [1] - 30:5
**sorry** [3] - 9:2; 13:12; 40:22
**sort** [9] - 28:19; 37:11; 49:4, 9; 51:10; 55:6; 64:4; 68:11; 90:6
**sorts** [2] - 7:9; 29:5
**sound** [1] - 6:24
**sounds** [1] - 85:6
**speakers** [1] - 6:3
**speaking** [1] - 67:2
**speaks** [2] - 56:24; 83:7
**species** [1] - 27:25
**specific** [34] - 14:5; 16:5, 24; 18:3; 19:19; 21:4, 15, 24; 22:13; 23:2; 25:19; 28:16; 39:6; 40:14; 41:3; 48:7; 53:4; 54:17; 55:11, 13; 56:7, 13; 57:5; 58:11; 59:1; 72:10; 88:16; 89:13; 92:21; 95:10; 100:22
**specifically** [5] - 34:17; 55:1; 63:3, 9; 81:20
**speculate** [1] - 83:20
**spends** [1] - 21:17
**spent** [1] - 65:15
**split** [1] - 61:18
**spoken** [1] - 76:17
**squarely** [1] - 74:21
**staff** [2] - 98:9; 99:25
**stage** [1] - 51:4
**stake** [1] - 79:18
**stand** [5] - 66:14; 88:9; 99:24; 103:3
**standing** [111] - 4:15; 5:3; 6:17; 7:19-21, 25; 8:18; 10:22; 13:14; 16:1; 19:13; 20:9, 15; 21:3; 22:12; 23:20, 23-24; 25:23; 31:10; 37:11; 38:10, 12, 20, 22; 39:21; 40:1, 4, 6, 13; 41:2; 46:22; 47:3, 8, 19-20; 51:4; 52:8, 16, 24; 53:1, 13, 21-22; 54:2, 4, 10, 21; 57:2, 7, 12; 59:11; 60:24; 61:22; 62:4;

64:21; 65:22; 66:4; 68:3, 5, 8; 71:6, 16, 20; 72:3, 13; 74:25; 75:14; 76:2, 13-15, 18; 77:2, 12, 15; 78:10, 17; 79:10, 12; 80:22, 24; 82:1; 84:15; 85:3; 87:6-8, 15; 88:10, 14, 25; 89:9; 90:7; 91:3; 95:5, 8, 13-14; 96:22; 98:3
**start** [4] - 22:9; 59:13; 65:5; 66:20
**started** [1] - 58:5
**starts** [2] - 22:7; 91:23
**State** [10] - 16:17, 21; 43:25; 46:25; 52:6, 20; 91:5, 18; 102:3
**state** [5] - 68:16; 72:8; 75:4; 84:23
**statement** [1] - 40:24
**States** [7] - 5:24; 13:3; 17:20; 24:7; 25:13; 39:23; 102:22
**STATES** [2] - 1:1, 11
**states** [5] - 24:6, 24; 25:3; 38:22
**status** [2] - 51:21; 102:11
**Statute** [1] - 5:14
**statute** [4] - 52:5; 55:4; 81:17; 87:2
**statutes** [1] - 57:20
**stay** [1] - 44:9
**staying** [1] - 39:13
**step** [5] - 10:7; 27:1; 44:5; 90:2; 95:18
**stepping** [3] - 13:5; 45:5; 102:23
**Stevens** [1] - 43:6
**still** [24] - 8:18; 19:25; 20:23; 22:14; 32:18; 33:9-11; 46:14; 53:21; 56:2; 74:11; 75:5, 8; 77:11; 80:8, 11; 81:8, 11; 99:22; 100:13; 102:12
**stop** [21] - 11:5; 15:12; 26:19, 21; 33:19; 34:8, 16; 35:7, 10; 36:23; 48:25; 50:11; 60:18, 20; 89:2; 90:2; 93:8, 12, 25; 94:17; 101:19
**stopped** [1] - 37:13
**stopping** [1] - 34:4
**stops** [1] - 84:14
**strategic** [1] - 7:10
**Street** [3] - 1:14, 21; 2:3
**stretch** [1] - 67:9
**strike** [1] - 24:22
**strikes** [3] - 34:19; 37:25; 92:8
**strip** [1] - 101:11
**stripped** [1] - 52:8
**strips** [1] - 34:3
**strong** [3] - 40:8, 10; 96:18
**stronger** [5] - 19:1; 27:19; 40:1, 8; 96:11
**structure** [6] - 13:16; 14:19; 36:4; 46:16; 100:17
**structured** [1] - 13:7
**struggling** [1] - 41:21
**subcommittee** [3] - 5:10, 12, 19
**subjects** [1] - 83:11
**submissions** [2] - 6:10, 14
**submit** [1] - 22:5
**submitted** [1] - 14:15
**submitting** [2] - 90:12; 95:22
**subsequent** [3] - 8:15; 15:25; 50:1

**subsequently** [2] - 17:15; 31:12
**successor** [2] - 10:3; 69:19
**succinctly** [2] - 7:24; 29:17
**sue** [27] - 10:22; 18:20; 19:15; 22:12; 25:23; 31:10; 37:11; 39:9, 21; 40:4, 13; 53:21; 58:23; 59:11; 71:17, 20; 75:15; 76:18; 87:19; 88:10, 21; 90:7, 9; 96:22; 97:6
**sued** [2] - 19:15; 75:24
**sufficient** [3] - 25:25; 41:25; 72:9
**sufficiently** [2] - 72:12, 15
**suggest** [1] - 79:23
**suggested** [4] - 49:9; 64:13; 89:24; 90:17
**suggestion** [3] - 37:9; 88:8; 101:7
**suggests** [3] - 58:18; 88:20; 90:5
**suing** [4] - 11:13; 38:18; 87:16; 88:14
**suit** [7] - 8:21; 9:21; 18:11; 31:5; 53:3; 69:13; 71:13
**Suite** [5] - 1:15, 22; 2:4, 13, 18
**SULLIVAN** [1] - 1:10
**super** [17] - 36:3, 9, 18, 23; 37:4; 45:20; 49:3; 60:19; 90:1; 93:13; 94:4, 20, 24; 101:9, 15, 18
**supplemental** [2] - 44:19; 79:13
**support** [2] - 20:23; 51:25; 53:24
**suppose** [3] - 32:14; 64:20; 82:24
**Suppose** [1] - 32:15
**supposed** [3] - 30:13; 37:7; 93:17
**Supreme** [23] - 16:12; 19:8; 25:17; 31:11; 37:10; 47:14; 49:7; 58:4; 59:13; 64:16; 71:15, 19; 73:17; 75:7, 14, 21; 76:16; 77:13; 78:25; 84:9; 87:4, 17; 101:24
**surprising** [1] - 59:10
**Swan** [2] - 63:15, 20
**swath** [1] - 95:8
**system** [1] - 44:4

---

# T

**table** [3] - 4:10; 5:24; 103:1
**tactical** [1] - 7:10
**takeaway** [1] - 75:10
**teaching** [2] - 86:17
**tends** [1] - 86:16
**term** [2] - 17:2; 101:3
**terminate** [1] - 34:21
**terribly** [1] - 61:12
**test** [2] - 50:16; 98:14
**testament** [1] - 19:16
**testifying** [1] - 5:10
**text** [8] - 12:24; 15:21; 43:8; 56:25; 63:12; 64:16; 95:11; 97:9
**textually** [2] - 40:19
**themselves** [5] - 28:24; 74:18; 75:12, 15; 96:3
**thereby** [1] - 18:3
**therefore** [3] - 50:8; 64:1; 100:14

**Thereupon** [2] - 66:16; 100:3

**they've** [9] - 12:22; 21:4; 28:8; 31:15; 74:13; 90:7, 9; 99:18

**thinking** [3] - 22:3; 76:9; 97:4

**thinks** [1] - 34:8

**third** [2] - 61:21; 90:15

**three** [7] - 5:7; 6:23; 8:23; 48:12; 52:7; 91:15; 98:8

**threshold** [1] - 6:18

**throughout** [2] - 69:6; 86:19

**throw** [2] - 7:13; 51:18

**tie** [2] - 26:10; 93:11

**tied** [2] - 80:1; 85:6

**tip** [2] - 23:7; 63:1

**Title** [1] - 5:14

**today** [13] - 7:21; 13:14; 15:25; 51:17; 63:2; 64:19, 21; 66:4; 73:9; 74:4, 18; 80:3; 87:24

**today's** [1] - 16:1

**tomorrow** [3] - 10:2; 69:18; 80:8

**Tomski** [1] - 64:16

**took** [6] - 11:5; 28:6; 39:23; 81:8; 101:13, 18

**tools** [5] - 34:3; 72:21; 73:1, 21; 81:13; 98:25; 99:1; 102:6

**totally** [3] - 57:17; 101:10, 20

**traceability** [1] - 4:17

**traceable** [2] - 84:10

**trademarks** [1] - 39:14

**transcript** [4] - 3:7; 61:14, 18; 103:7

**TRANSCRIPT** [1] - 1:10

**transcription** [1] - 3:8

**transparency** [1] - 28:19

**Treasury** [1] - 84:24

**treated** [2] - 25:18; 102:25

**treatise** [2] - 47:1

**Treaty** [1] - 57:25

**treaty** [6] - 58:22; 59:5, 12; 79:3; 90:25; 91:1

**trial** [4] - 7:3, 7, 13

**Trial** [5] - 1:13, 20; 2:6, 10, 16

**trigger** [1] - 31:21

**triggered** [1] - 92:9

**troops** [1] - 74:1

**troubling** [5] - 56:17, 23; 75:18; 86:25

**true** [9] - 33:21; 42:23; 64:22; 67:22; 68:1; 80:20; 92:24; 94:19

**Trump** [8] - 4:6; 24:1; 38:23; 39:13, 18; 84:25; 95:7

**TRUMP** [1] - 1:7

**try** [1] - 93:25

**trying** [2] - 61:8; 98:14

**turn** [5] - 15:8; 37:8; 61:1; 93:16, 20

**turned** [2] - 88:4, 20

**turns** [1] - 27:15

**two** [20] - 4:16; 8:14; 10:7; 26:17; 31:13; 38:17; 39:7; 47:23; 48:21; 49:15, 20; 58:25; 62:5; 64:5; 73:6; 88:15, 18, 22; 89:9; 92:1

---

**type** [5] - 10:17; 11:3; 12:19; 39:7; 53:3

**types** [2] - 7:6; 10:7

**typical** [1] - 44:8

---

## U

**U.S** [9] - 1:17; 2:7, 11, 16; 3:3; 25:13; 84:24; 85:7

**ultimately** [7] - 26:3; 28:12; 53:7, 19; 54:2; 69:8; 78:17

**unclear** [1] - 78:24

**uncontested** [1] - 34:20

**uncovered** [3] - 22:17, 24; 23:6

**uncovering** [1] - 22:21

**under** [46] - 12:3, 13; 13:24; 14:6, 19; 16:6, 10, 25; 19:5; 21:5, 15, 23, 25; 22:13; 23:3, 15; 29:21, 24; 30:8; 31:7, 16; 41:4, 12; 44:4; 45:16; 48:8; 52:3; 54:18, 21; 55:24; 56:10; 64:9; 65:2, 19; 71:1; 89:14; 91:7, 22; 94:20, 23; 95:10; 96:9; 97:17; 100:11, 23

**Under** [1] - 13:18

**underlying** [1] - 71:23

**undermine** [1] - 101:10

**underpinning** [1] - 72:22

**underscore** [3] - 58:2; 90:15; 91:3

**underscores** [1] - 92:1

**underscoring** [1] - 27:17

**undone** [1] - 73:20

**unduly** [1] - 28:25

**unenforced** [1] - 57:14

**unfortunately** [1] - 8:22

**unilaterally** [1] - 34:8

**unique** [3] - 63:22; 70:3; 79:22

**uniquely** [1] - 81:14

**United** [7] - 5:24; 13:3; 17:20; 24:7; 25:13; 39:23; 102:22

**UNITED** [2] - 1:1, 11

**universe** [1] - 62:8

**unlawful** [2] - 33:25; 60:19

**unless** [18] - 11:25; 15:6; 32:11; 36:21; 37:3; 42:13; 43:3; 46:4; 64:25; 65:2; 75:11; 81:24; 84:15; 93:19; 98:24; 99:4; 100:12; 101:18

**unlike** [4] - 16:16; 26:5; 33:24

**unquote** [2] - 24:15; 84:17

**unrelated** [1] - 83:10

**unusual** [15] - 18:3; 32:8; 33:18; 34:23; 40:13, 17; 45:24; 46:17; 57:4, 21; 59:10; 90:16, 24; 92:20

**unwilling** [1] - 21:1

**up** [6] - 8:5; 61:3, 25; 74:9; 89:7

**upset** [1] - 28:8

**uses** [1] - 101:2

---

## V

**vacated** [1] - 78:24

---

**value** [1] - 55:5

**various** [1] - 72:25

**vast** [2] - 24:2; 43:19

**verbatim** [1] - 84:18

**versus** [1] - 4:5

**veto** [4] - 35:17; 93:14; 99:9, 11

**Veto** [4] - 43:16; 60:1; 67:15; 73:24

**Victims'** [1] - 5:14

**view** [3] - 9:7; 72:15; 101:10

**views** [5] - 30:20; 32:22; 42:24; 78:25; 97:20

**vindicate** [2] - 57:4; 68:23

**violated** [1] - 79:17

**violating** [8] - 46:19; 48:23; 49:24; 57:14; 84:22; 90:3; 93:12; 97:12

**violation** [14] - 33:18, 25; 34:9, 23; 38:18; 46:13, 18; 48:16; 79:11, 19-20; 89:4; 91:20

**violations** [3] - 39:22; 48:24; 96:23

**virtue** [2] - 9:8; 24:4

**vis-à-vis** [1] - 102:7

**voluntarily** [4] - 9:4; 48:25; 60:18; 93:12

**vote** [156] - 12:3; 14:7; 16:10, 20; 17:25; 19:9; 20:25; 21:6, 8-9, 11-12, 14-15, 19, 22, 24-25; 22:13, 18; 23:14; 24:15; 25:19; 26:3, 5, 10; 27:7, 14-18, 25; 28:1, 5, 7, 10, 12-13; 29:2, 9-12, 18-20, 23, 25; 30:4, 18; 31:14, 17-18, 22; 35:19; 36:3, 18, 23; 37:4; 42:7, 15, 24; 43:8, 14-17; 45:15; 47:4, 11, 24; 49:3; 51:22, 24; 52:20; 53:2, 7, 13, 24; 54:1; 56:13; 58:7; 67:13, 21; 70:8, 10; 73:9, 11, 14, 16-17, 23-24; 74:4, 9, 18, 22; 76:19; 78:10; 79:25; 80:2, 6, 14, 25; 81:3, 9, 12; 82:9; 83:23; 84:4-6, 13; 85:4, 13; 88:16; 89:11, 13, 15, 19; 90:8, 10; 91:22; 92:3; 97:7; 99:3, 8, 22; 100:14, 20, 24; 101:9, 15, 19, 24

**voted** [5] - 28:3, 7; 81:6

**voter** [2] - 56:20; 76:6

**voters** [1] - 86:13

**votes** [14] - 19:8; 25:16, 25; 26:10, 13, 22; 27:5, 20; 28:4, 10; 55:24; 72:9; 92:11

**voting** [22] - 14:5; 16:5, 20, 24; 21:4; 23:3; 25:21; 28:9; 40:14; 41:4; 48:7; 52:22; 53:5; 54:17; 55:13; 56:7; 59:1; 70:1; 88:17; 92:21; 100:22

---

## W

**wading** [1] - 77:23

**wait** [6] - 13:25; 14:17; 30:13; 31:24; 100:5

**waiting** [10] - 12:11; 30:22; 42:22; 48:9; 55:12; 56:16; 58:16; 90:13; 95:23

**waits** [1] - 22:6

**walking** [1] - 86:4

**Wallace** [4] - 3:2; 103:7, 9
**wants** [10] - 15:11; 21:19; 22:4; 23:10; 37:3; 38:5; 46:6; 50:12; 55:8; 57:15
**War** [5] - 81:7, 18-20; 90:18
**war** [11] - 46:10, 14; 74:1; 90:17, 20; 91:25; 92:4, 6, 9
**Warren** [1] - 54:7
**Washington** [9] - 1:7, 15, 18, 22; 2:4, 8, 13, 19; 3:5
**wasted** [1] - 88:12
**watch** [3] - 51:19; 66:10, 13
**water** [3] - 6:4; 90:21
**weapon** [1] - 48:15
**weight** [1] - 100:10
**welcome** [2] - 5:5; 6:4
**whereas** [1] - 57:10
**whole** [2] - 18:14; 25:12
**wide** [5] - 39:12; 57:9; 95:8, 12, 15
**widely** [2] - 69:1; 86:20
**wildly** [1] - 67:18
**winners** [1] - 65:18
**wish** [3] - 5:2; 60:23; 87:21
**withdraw** [2] - 9:5, 8
**withdrawal** [1] - 79:4
**withhold** [4] - 17:25; 25:6; 27:16; 28:7
**withholds** [1] - 24:15
**WITNESS** [1] - 81:3
**wonder** [1] - 7:4
**wondered** [1] - 7:10
**words** [4] - 10:19; 15:17; 73:22; 96:1
**world** [7] - 14:10; 24:2; 28:23; 29:4; 39:17, 19
**worry** [1] - 44:20
**worth** [12] - 13:5; 20:11; 21:16; 27:17; 28:14; 34:11; 37:16; 44:10; 46:24; 55:20; 56:9
**wrestling** [1] - 102:19
**write** [7] - 40:23; 45:22; 49:6, 10; 90:4; 93:15
**writing** [1] - 46:7
**WYDRA** [11] - 4:9, 14, 23; 5:4; 61:10, 16, 20; 64:19, 24; 65:25; 66:3
**Wydra** [2] - 1:20; 4:9

## Y

**year** [2] - 6:6; 94:16
**years** [4] - 5:11; 6:24; 7:3; 52:7
**York** [2] - 8:17; 38:21
**yourselves** [1] - 4:8
**Yugoslavia** [2] - 73:25; 99:21

## Z

**zone** [1] - 74:1