**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
Senator RICHARD BLUMENTHAL,    )
et al.,                        )
                               )
              Plaintiffs,       )
                               )
         v.                    )Civil Action No. 17-1154 (EGS)
                               )
DONALD J. TRUMP, in his official )
capacity as President of the   )
United States,                 )
                               )
              Defendant.        )
_____)
```

<u>**MEMORANDUM OPINION**</u>

## I.   Introduction

When Members of Congress sue the President in federal court over official action, a court must first determine whether the dispute is a "Case" or "Controversy" under Article III of the United States Constitution, rather than a political dispute between the elected branches of government. A critical part of this inquiry is whether the plaintiffs have legal standing to bring the action. Whether legislators have standing to sue often turns on whether they can obtain the remedy they seek from the court from fellow legislators. When a legislative remedy is available, courts generally dismiss the case on jurisdictional grounds. The Supreme Court, however, has not foreclosed federal courts from appropriately exercising jurisdiction over certain types of disputes between the political branches. This case is

one of those disputes. And when a case is properly before a court because it presents an Article III "Case" or "Controversy," it is the role of the Judiciary "to say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803).

Plaintiffs, approximately 201 minority Members of the 535 Members of the United States Senate and House of Representatives, allege that Donald J. Trump in his official capacity as President of the United States ("the President") is violating the Foreign Emoluments Clause ("Clause"). Under this Clause, certain federal officials, including the President, may not "accept" an "emolument" from "any King, Prince or foreign State" without "the Consent of Congress." U.S Const. art. I, § 9, cl. 8. In Count I, plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201 in the form of a declaratory judgment stating that the President is violating the Clause when he accepts emoluments from foreign states without first seeking the consent of Congress. Am. Compl., ECF No. 14 ¶¶ 85-86. In Count II, plaintiffs seek injunctive relief pursuant to the Court's inherent authority to grant equitable relief and pursuant to 18 U.S.C. § 1331 in the form of a Court order enjoining the President from accepting "any present, Emolument, Office, or Title, of any kind whatever" from a foreign state without obtaining "the Consent of Congress." *Id.* ¶ 92.

Pending before the Court is the President's motion to dismiss. The President argues that this case should be dismissed on four independent grounds,[1] but the threshold question is whether plaintiffs have standing to bring their claims. This opinion addresses only this threshold question. With respect to the grounds for dismissal that turn on the merits, the parties dispute whether the profits that the President's business interests earn from foreign governments are covered "emoluments." However, for the purpose of determining whether plaintiffs have standing to sue, the Court must accept as true the allegations that the President has accepted prohibited foreign emoluments without seeking the consent of Congress.

As is explained more fully below, the central question for standing purposes is how to characterize the injury that occurs when the President fails to seek the consent of Congress, as required by the Clause. Plaintiffs argue that each Member of Congress suffers a particularized and concrete injury when his or her vote is nullified by the President's denial of the opportunity to vote on the record about whether to approve his

---

[1] The President seeks dismissal on these grounds: (1) lack of subject matter jurisdiction because plaintiffs do not have standing to bring their claims; (2) lack of a cause of action to seek the relief requested; (3) failure to state a claim upon which relief can be granted; and (4) the injunctive relief sought is unconstitutional. Def.'s Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 15-1 at 17-18.

acceptance of a prohibited foreign emolument. The President argues that this is an intra-branch dispute which does not belong in federal court because the plaintiffs' remedy is to convince a majority of their colleagues in both Houses to pass legislation addressing the President's ability to accept prohibited foreign emoluments.

Upon careful consideration of the President's motion to dismiss, the opposition and reply thereto, the relevant arguments of *amici*,[2] the parties' arguments at the June 7, 2018 motion hearing, and for the reasons explained below, the Court finds that the plaintiffs have standing to sue the President for allegedly violating the Foreign Emoluments Clause. The Court therefore **DENIES IN PART** the motion to dismiss and **DEFERS** ruling on the remaining arguments in the motion to dismiss.

## II.   Factual Background

Relevant to whether they have standing to bring their claims, plaintiffs allege that the President "has a financial interest in vast business holdings around the world that engage in dealings with foreign governments and receive benefits from those governments." Am. Compl., ECF No. 14 ¶ 2. Plaintiffs also allege that the President owns "'more than 500 separate entities–hotels, golf courses, media properties, books,

---

[2] The Court appreciates the illuminating analysis provided by the *amici*.

management companies, residential and commercial buildings . . .
airplanes and a profusion of shell companies set up to
capitalize on licensing deals.'" *Id*. ¶ 34 (citation omitted).

As a result of his financial interests, plaintiffs allege
the President has accepted, and will accept in the future,
emoluments from foreign states. *Id*. Indeed, the President has
acknowledged "that his businesses receive funds and make a
profit from payments by foreign governments, and that they will
continue to do so while he is President." *Id*. ¶ 37. Public
reporting has also confirmed this to be the case. *Id*. The
President, through his personal attorney, has likewise asserted
that the Constitution does not require "him to seek or obtain
Congress' consent before accepting benefits arising out of
exchanges between foreign states and his businesses." *Id*. ¶ 40.
The President has therefore not provided any information to
Congress about any foreign emoluments he has received. *Id*. ¶ 41.
Plaintiffs allege that because the President has denied them the
opportunity to give or withhold their consent, he has injured
them in their roles as Members of Congress, *id*. ¶ 5, and that
they cannot force the President to comply with the Constitution
absent a judicial order, *id*. ¶ 83.

## III. Standard of Review

A motion to dismiss for lack of standing is properly
considered a challenge to the Court's subject matter

jurisdiction and should be reviewed under Federal Rule of Civil Procedure 12(b)(1). *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)("[T]he defect of standing is a defect in subject matter jurisdiction."). The Court must therefore consider the defendant's motion to dismiss pursuant to Rule 12(b)(1) before reaching a merits challenge pursuant to Rule 12(b)(6). *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007). To survive a Rule 12(b)(1) motion to dismiss, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). In so doing, the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of plaintiffs, but the court need not "accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 63 (D.D.C. 2001).

## IV. Analysis

### A. Standing

"Article III of the Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const. art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* The standing inquiry "often turns on the nature and source of the claim asserted" and the specific facts alleged. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560-61 (1992)); *see also Hollingsworth v. Perry*, 570 U.S. 700, 705 (2013) ("To have standing, a litigant

must seek relief for an injury that affects him in a personal and individual way."). These requirements help to "assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). "The [effect of the] exercise of judicial power [is] most vivid when a federal court declares unconstitutional an act of the Legislative or Executive Branch." *Id.* at 473. Therefore, to ensure the "continued effectiveness of the federal courts in performing that role . . . it has been recognized as a tool of last resort." *Id.* at 473-74.

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

When considering whether a legislator has standing, the Court "must carefully inquire as to whether [plaintiffs] have met their burden of establishing that their claimed injury is

personal, particularized, concrete, and otherwise judicially cognizable." *Raines*, 521 U.S. at 820. The "standing inquiry [is] especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 819-20.

**B.    Foreign Emoluments Clause**

The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S Const. art. I, § 9, cl. 8. "[T]he language of the Emoluments Clause is both sweeping and unqualified." 17 Op. O.L.C. 114, 121 (1993). The acceptance of an emolument barred by the Clause is prohibited unless Congress chooses to permit an exception. *Id.*; *see also* Letter from James Madison to David Humphreys (Jan. 5, 1803), https://founders.archives.gov/documents/Madison/02-04-02-0275# ("the Constitution of the United States has left with Congress the exclusive authority to permit the acceptance of presents from foreign Governments by persons holding Offices under the United States"). And the President may not accept any emolument until Congress votes to give its consent.

The Clause was intended by the Framers to guard against "corruption and foreign influence." 3 M. Farrand, *Records of the Federal Convention of 1787,* 327 (1966). Historically, Presidents have complied with the Clause by either seeking and obtaining congressional consent prior to accepting foreign presents or emoluments, or by requesting an opinion from the Executive or Legislative Branch's advisory office as to whether the Clause applies.[3] *See* Br. of Federal Jurisdiction and Constitutional Law Scholars as *Amici Curiae* in Support of Pls., ECF No. 44 at 24.[4] One such example occurred in 1830 when President Jackson placed "'at the disposal of Congress'" a gold medal presented to him by the Republic of Colombia, noting that accepting presents from a foreign government is prohibited by the Constitution. *Id.* (quoting Message of President Andrew Jackson to the Senate and House of Representatives, dated January 19, 1830, 3 *Compilation of the Messages and Papers of the Presidents* 1029, 1030 (James D. Richardson ed., 1897)). Similarly, when the King of Siam presented President Lincoln with various gifts, he informed Congress, which directed that the gifts "'be deposited in the

---

[3] In deciding a motion to dismiss, "a Court may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty." *Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012) (citing *Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010)).

[4] When citing electronic filings throughout this opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

collection of curiosities at the Department of Interior.'" *Id.*
at 25 (quoting Joint Resolution No. 20, A Resolution providing
for the Custody of the Letter and Gifts from the King of Siam,
Res. 20, 37th Cong., 12 Stat. 616 (1862)).

Modern Presidents, except for President Trump, have sought
advice from the Department of Justice Office of Legal Counsel
("OLC") prior to accepting potentially covered emoluments. *Id.*
For example, President Kennedy requested an opinion on whether
the offer of an "honorary Irish citizenship" would fall within
the scope of the Clause. *Id.* (citing 1 Op. O.L.C. Supp. at 278).
And prior to his acceptance of the Nobel Peace Prize in 2009,
President Obama requested an opinion from OLC as to whether
accepting the prize would conflict with the Clause. *Id.*

Since the Clause prohibits the President from accepting a
prohibited foreign emolument unless Congress votes to consent,
the Constitution gives each individual Member of Congress a
right to vote before the President accepts. Under the
Constitution, Congress expresses its consent through the
combined votes of its individual members. U.S. Const. art. I, §
9, cl. 8. Congress "consist[s] of a Senate and House of
Representatives." *Id.* art. I, § 1. The "Consent of Congress" is
obtained when a majority of the individual members of each House
vote to consent. *Id.* art. I, § 3, cl. 1 ("each Senator shall
have one Vote"); *id.* art. I, § 5, cl. 3 (requiring, at the

request of one-fifth of those present, that "the Yeas and Nays of the Members of either House on any question" to be recorded). That Congress acts as "the body as a whole"[5] in providing or denying consent does not alter each Member's constitutional right to vote before the President accepts a prohibited foreign emolument because the body can give its consent only through a majority vote of its individual members.

### C.   Plaintiffs Have Standing to Bring their Claims

The President argues that the Court lacks jurisdiction over plaintiffs' claims because plaintiffs have not met their burden to establish a judicially cognizable injury as is required by Article III. Def.'s Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 15 at 21-28; Def.'s Reply ("Reply"), ECF No. 28 at 10-19. The President also disputes that the alleged injury is fairly traceable to him. Mot. to Dismiss, ECF No. 15-1 at 24; Reply, ECF No. 28 at 8.

Plaintiffs contend that they have standing: (1) the injury-in-fact they have suffered is that the President has denied them a voting opportunity to which the Constitution entitles them; (2) the injury is fairly traceable to the President's conduct

---

[5] *United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole.").

because he has neither asked for their consent nor provided them
with any information about the prohibited foreign emoluments he
has already allegedly accepted; and (3) the injury can be
redressed by a favorable judicial decision if the Court requires
the President to obtain congressional consent before accepting
prohibited foreign emoluments. Pls.' Opp'n, ECF No. 17 at 13.

As discussed below, the President's arguments rely on a
repeated misstatement of the injury alleged and on proffers of
plainly inadequate legislative remedies. The Court is persuaded
that plaintiffs have sustained their burden to show that they
have standing to bring their claims: (1) they have adequately
alleged a judicially cognizable injury that is fairly traceable
to the President and can be redressed by a favorable judicial
decision; and (2) although plaintiffs' claims raise separation-
of-powers concerns, plaintiffs have no adequate legislative
remedy and this dispute is capable of resolution through the
judicial process.

### 1. Supreme Court and D.C. Circuit Precedent

#### a. *Raines v. Byrd*

The parties rely heavily on the Supreme Court's decision in
*Raines v. Byrd*. *See generally* Mot. to Dismiss, ECF No. 15-1;
Pls.' Opp'n, ECF No. 17; Reply, ECF No. 28 (discussing *Raines,*
521 U.S. 811 (1997)). The President argues that plaintiffs lack
standing pursuant to *Raines*; plaintiffs respond that *Raines* does

not foreclose their standing to bring their claims and indeed provides support for it. The Court will therefore discuss the case in detail.

In *Raines*, six members of Congress who had voted against the Line Item Veto Act ("Act") sued the Secretary of the Treasury and the Director of the Office of Management and Budget, challenging the constitutionality of the Act. *Raines,* 521 U.S. at 814. The Act authorized the President to "'cancel' certain spending and tax benefit measures after he ha[d] signed them into law." *Id*. The plaintiffs claimed that the Act injured them in their official capacities by: (1) "'alter[ing] the legal and practical effect of all votes they may cast on bills'" subject to the Act; (2) "'divest[ing] [them] of their constitutional role in the repeal of legislation'"; and (3) "'alter[ing] the constitutional balance of powers between the Legislative and Executive Branches . . . .'" *Id*. at 816 (quoting Compl.).

At issue was whether the plaintiffs had standing to bring their claims. The Court began its inquiry by focusing on the requirement in standing analysis that the injury be a personal one: "We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Id*. at 819 (quoting *Lujan*, 504 U.S. at 560-61 and

n.1). Next, the Court noted "[w]e have also stressed that the alleged injury must be legally and judicially cognizable. This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is . . . concrete and particularized,' *Lujan*, 504 U.S. at 560, and that the dispute is 'traditionally thought to be capable of resolution through the judicial process.'" *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). Finally, the Court noted that the jurisdictional standing requirement must be strictly complied with: "our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 819-20 (citations omitted). "'[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.'" *Id*. at 820 (quoting *Allen,* 468 U.S. at 751). In view of these observations, the Court concluded that it "must carefully inquire as to whether appellees have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Id*.

The Court distinguished *Powell v. McCormack*, in which it held that a Congressman's "constitutional challenge to his exclusion from the House of Representatives (and his consequent

loss of salary) presented an Article III case or controversy," *id.* at 820-21 (citing *Powell,* 395 U.S. 486, 496, 512-14 (1969)), on two grounds. First, the *Raines* plaintiffs had not been singled out for unfavorable treatment from the other members of their respective bodies as occurred in *Powell*; rather, "[t]heir claim is that the Act causes a type of institutional injury (the diminution of legislative power), which necessarily damages all Members of Congress and both Houses of Congress equally." *Id.* at 821. Second, the *Raines* plaintiffs "[did] not claim that they have been deprived of something to which they are *personally* entitled . . ." *id.*; rather, their

> claim of standing is based on a loss of political power, not loss of any private right, which would make the injury more concrete. . . . [T]he injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress. If one of the Members were to retire tomorrow, he would no longer have a claim; the claim would be possessed by his successor instead. The claimed injury thus runs (in a sense) with the Member's seat, a seat which the Member holds (it may quite arguably be said) as trustee for his constituents, not as a prerogative of personal power.

*Id.* (internal citation omitted). Thus, according to the Court, the *Raines* plaintiffs' injury was an institutional one and not sufficiently concrete and personal.

The Court then distinguished *Coleman v. Miller*, "[t]he one case in which we have upheld standing for legislators (albeit

*state* legislators) claiming an institutional injury." *Id.*
(discussing *Coleman v. Miller*, 307 U.S. 433 (1939)). In *Coleman*,
the vote on whether to ratify a proposed federal constitutional
amendment was tied at twenty to twenty, which meant the
amendment would not have been ratified. *Id.* at 822 (citing
*Coleman*, 307 U.S. at 436). The Lieutenant Governor, as the
presiding officer of the State Senate, cast a vote in favor of
the amendment and it was deemed ratified. *Id.* The twenty state
senators who had voted against the amendment sued, and
eventually the Court held that the members of the legislature
had standing because "if these legislators (who were suing as a
bloc) were correct on the merits, then their votes not to ratify
the amendment were deprived of all validity." *Id.* In *Raines*, the
Court clarified that "our holding in *Coleman* stands . . . for
the proposition that legislators whose votes would have been
sufficient to defeat (or enact) a specific legislative Act have
standing to sue if that legislative action goes into effect (or
does not go into effect), on the ground that their votes have
been completely nullified." *Id.* at 823. Noting that this is what
the *Coleman* holding stands for "at most," the Court declined to
distinguish *Coleman* on, *inter alia*, the ground that "*Coleman* has
no applicability to a similar suit brought by federal
legislators, since the separation-of-powers concerns present in
such a suit were not present in *Coleman* . . . ." *Id.* at 824 n.8.

The Court then distinguished the claims in *Raines* from
those in *Coleman*:

> [Here], [plaintiffs] have not alleged that
> they voted for a specific bill, that there
> were sufficient votes to pass the bill, and
> that the bill was nonetheless deemed defeated.
> In the vote on the Act, their votes were given
> full effect. They simply lost that vote. Nor
> can they allege that the Act will nullify
> their votes in the future in the same way that
> the votes of the *Coleman* legislators had been
> nullified. In the future, a majority of
> Senators and Congressmen can pass or reject
> appropriations bills; the Act has no effect on
> this process. In addition, a majority of
> Senators and Congressmen can vote to repeal
> the Act, or to exempt a given appropriations
> bill (or a given provision in an
> appropriations bill) from the Act; again, the
> Act has no effect on this process.

*Id*. at 824 (footnote omitted). Thus, according to the Court, the
*Raines* plaintiffs could not allege that their votes had been
nullified in the past; rather, they had lost the vote on the
Act. *See id*. And the *Raines* plaintiffs could not allege that
their votes would be nullified in the future because they had a
variety of legislative remedies at their disposal. *See id*.

The Court then considered the lack of a historical practice
of lawsuits being filed "on the basis of claimed injury to
official authority or power" as a result of analogous
confrontations between the Legislative and Executive Branches of
the federal government. *Id*. at 826; *see also infra* Section
IV.3.b. The Court concluded that, under the Constitution, it is

18

not the role of the Article III courts to have "'some amorphous general supervision of the operations of government . . . .'" *Raines,* 521 U.S. at 829 (quoting *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring)).

The Court rejected the *Raines* plaintiffs' basis for standing, ultimately holding that "these individual members of Congress do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing." *Id.* at 830 (no citation for internal quotation in original). In so holding, the Court noted that "appellees have alleged no injury to themselves as individuals (*contra*, *Powell*), the institutional injury they allege is wholly abstract and widely dispersed *(contra*, *Coleman*), and their attempt to litigate this dispute at this time and in this form is contrary to historical experience." *Id*. at 829. The Court stated that it "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id.* (footnote omitted). The Court also thought it important to note that "our conclusion [does not] deprive[] Members of Congress of an adequate remedy (since they may repeal the Act or exempt appropriations bills from its reach) nor forecloses the Act from constitutional

challenge (by someone who suffers judicially cognizable injury as a result of the Act)." *Id.*

### b. *Arizona State Legislature v. Arizona Independent Redistricting Commission*

Relying on *Coleman*, the Supreme Court recently reaffirmed that legislators, albeit state legislators as an institutional plaintiff, have standing to sue based on a vote nullification claim. In *Arizona State Legislature v. Arizona Independent Redistricting Commission,* the state legislature plaintiff challenged a ballot measure that would have denied it the authority to draw congressional districts. 135 S. Ct. 2652, 2659 (2015). The legislature's alleged injury was that the ballot initiative deprived it of its legislative prerogative to initiate redistricting. *Id.* at 2663. Relying on *Coleman,* as clarified in *Raines,* the Court held that the plaintiff had standing because "their votes have been completely nullified." *Id.* at 2665 (quoting *Raines*, 521 U.S. at 823). As the Court explained, "[o]ur conclusion that the Arizona Legislature has standing fits [within *Coleman*]" because the ballot initiative "together with the Arizona Constitution's ban on efforts to undermine the purposes of an initiative" would "'completely nullif[y]' any vote by the Legislature, now or 'in the future,' purporting to adopt a redistricting plan." *Id.* at 2667 (quoting *Raines*, 521 U.S. at 823-24). The Court distinguished *Raines* on

the grounds that *Raines* had not been brought by an institutional
plaintiff: "The Arizona Legislature, in contrast, is an
institutional plaintiff asserting an institutional injury, and
it commenced this action after authorizing votes in both of its
chambers. That 'different . . . circumstanc[e],' was not *sub
judice* in *Raines*." *Id*. at 2664 (citation omitted). The Court also
noted that the case before it "does not touch or concern the
question whether Congress has standing to bring a suit against
the President . . . which would raise separation of powers
concerns absent here." *Id*. at 2665 n.12.


                    *     *     *     *     *


    In sum, *Raines* teaches that when a suit is brought by an
individual Member of Congress, the member can allege either a
personal injury or an institutional injury. If the injury is
personal, standing is present when the injury arises out of
something to which the member is personally entitled, such as
the salary associated with his or her seat. As to an
institutional injury, the Court has recognized standing when a
legislator's vote has been completely nullified. The Supreme
Court has upheld legislator standing based on a vote
nullification claim in two instances. In *Coleman*, a bloc of
individual state "legislators whose votes would have been

21

sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (footnote omitted). In *Arizona State Legislature*, the legislature, as an institutional plaintiff authorizing the lawsuit, had standing to sue based on the alleged nullification of their votes "now" or "in the future" as a result of a ballot initiative. 135 S. Ct. at 2667. Although neither of these cases implicated federal separation-of-powers concerns, the *Raines* Court specifically declined to hold that *Coleman* would be inapplicable "to a similar suit brought by federal legislators." *Raines*, 521 U.S. at 824 n.8.

*Raines* also teaches that it is not necessary for an institutional claim to be brought by or on behalf of the institution. *Id.* at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit."). Indeed, in *Coleman*, the claim was not brought on behalf of the state senate as an institutional plaintiff, but rather by a bloc of individual legislators who had voted not to ratify the constitutional amendment. 307 U.S. at 436. Finally, by not overruling *Coleman,* the *Raines* Court suggests that vote nullification is an

institutional injury that is personal, although not in the sense that the injury in *Powell* was personal, to the legislators entitled to cast the vote that has been nullified.

Regarding the separation-of-powers concerns implicated by an inter-branch suit, *Raines* instructs the Court to consider whether there is a lack of a historical practice of lawsuits being filed "on the basis of claimed injury to official authority or power" as a result of analogous confrontations between the Legislative and Executive Branches of the federal government. *Raines,* 521 U.S. at 826. *Raines* also instructs the Court to consider whether there is an adequate legislative remedy and whether another plaintiff could bring the case. *Id.*

### c. D.C. Circuit Precedent

The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has applied *Raines* twice, each time finding legislator standing to be foreclosed.[6] In *Chenoweth v. Clinton*, four members of Congress sued the President and another

---

[6] Because the Court has determined that plaintiffs have standing to bring their claims pursuant to *Raines* and subsequent D.C. Circuit precedent, it need not address the parties' arguments regarding pre-*Raines* D.C. Circuit authority. At oral argument, the Court questioned plaintiffs about their reliance on pre-*Raines* D.C. Circuit authority, given that *Raines* called into question portions of that authority. *See Chenoweth*, 181 F.3d 112, 115 (D.C. Cir. 1999). In response, plaintiffs clarified their reliance on *Raines* and post-*Raines* D.C. Circuit precedent for the proposition that they have standing based on their vote nullification claim. Hr'g Tr., ECF No. 54 at 20:22-24.

Executive Branch official to enjoin the implementation of the
American Heritage Rivers Initiative ("AHRI"), a program
President Clinton created by Executive Order. 181 F.3d 112, 112
(D.C. Cir. 1999). After President Clinton announced his
intention to create the AHRI, three of the four plaintiffs
introduced a bill to end the program, but it never came to a
vote. *Id.* at 113. Plaintiffs then sued, alleging that the
President's creation of the program by Executive Order "deprived
[the plaintiffs] of their constitutionally guaranteed
responsibility of open debate and vote on issues and legislation
involving interstate commerce, federal lands, the expenditure of
federal monies, and implementation of the [National
Environmental Policy Act]." *Id.* (citing Compl.). Applying
*Raines*, the Court held that the plaintiffs lacked standing
because the injury they alleged was "a dilution of their
authority as legislators," which was "identical to the injury
the Court in *Raines* deprecated as 'widely dispersed' and
'abstract.'" *Id.* at 115 (no citation for internal quotation in
original). The Court reasoned that "[i]f, as the Court held in
*Raines*, a statute that allegedly 'divests [congressmen] of their
constitutional role' in the legislative process does not give
them standing to sue, then neither does an Executive Order that
allegedly deprives congressmen of their 'right[] to participate
and vote on legislation in a manner defined by the

Constitution.'" *Id.* (citation omitted). A central element of the Court's reasoning was that "[i]t [was] uncontested that the Congress could terminate the AHRI were a sufficient number in each House so inclined." *Id.* at 116.

In view of the Supreme Court's decision in *Raines*, the Court considered whether its earlier ruling in *Kennedy v. Sampson* survived. *Id.* at 116-17 (discussing *Kennedy v. Sampson*, 511 F.2d 430 (D.C. Cir. 1974)). In *Kennedy*, the Court held, partially relying on the pre-*Raines* understanding of *Coleman*, that an individual Senator had standing to challenge a Presidential pocket veto. *Kennedy*, 511 F.2d at 433-35. Noting that *Raines* narrowed the *Coleman* holding, the Court stated that *Kennedy* may nonetheless remain good law:

> Even under this narrow interpretation, one could argue that the plaintiff in *Kennedy* had standing. The pocket veto challenged in that case had made ineffective a bill that both houses of the Congress had approved. Because it was the President's veto—not a lack of legislative support—that prevented the bill from becoming law (either directly or by the Congress voting to override the President's veto), those in the majority could plausibly describe the President's action as a ***complete nullification*** of their votes.

*Chenoweth*, 181 F.3d. at 116-17 (emphasis added). The Court distinguished the claims before it from *Coleman* on the ground that plaintiffs "do not allege that the necessary majorities in Congress voted to block the AHRI. Unlike the plaintiffs in

*Kennedy* and *Coleman*, therefore, they cannot claim their votes were effectively nullified by the machinations of the Executive." *Id*. at 117.

In the second post-*Raines* case considered, *Campbell v. Clinton*, thirty-one Members of Congress sued President Clinton, alleging that he violated the War Powers Resolution and the War Powers Clause of the Constitution by directing the participation of U.S. forces in Yugoslavia. 203 F.3d 19, 19 (D.C. Cir. 2010). A month after President Clinton announced that participation, Congress voted on four resolutions related to the conflict: (1) a declaration of war was defeated 427 to 2; (2) an "authorization" of the air strikes was defeated 213 to 213; (3) a resolution that would have required the President to end U.S. participation in the operation was defeated; and (4) funding for involvement in the operation was approved. *Id*. at 20. Plaintiffs claimed that they fit within the "*Coleman* exception to the *Raines* rule" by filing suit after having "defeat[ed] the War Powers Resolution authorization by a tie vote." *Id.* at 22. The Court found neither of their claims to be analogous to the nullification that occurred in *Coleman*, which the Court understood "to mean treating a vote that did not pass as if it had, or vice versa." *Id*. at 22. In *Coleman*, "state officials endorsed a defeated ratification, treating it as approved, while the President here did not claim to be acting

pursuant to the defeated declaration of war or a statutory authorization, but instead 'pursuant to [his] constitutional authority to conduct U.S. foreign relations and as Commander-in-Chief and Chief Executive.'" *Id*. at 22 (discussing *Coleman v. Miller*, 307 U.S. 433 (1939) and quoting Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 35 Weekly Comp. Pres. Doc. 528 (Mar. 26, 1999)). The Court reasoned that plaintiffs' argument based on the War Powers Resolution, "although cast in terms of the nullification of a recent vote, essentially is that the President violated the . . . War Powers Resolution" and their argument based on the War Powers Clause "is that the President has acted illegally-in excess of his authority-because he waged war in a constitutional sense without a congressional delegation." *Id*. Regarding the *Raines* Court's use of the word "nullification," the Court stated:

> We think the key to understanding the Court's treatment of *Coleman* and its use of the word nullification is its implicit recognition that a ratification vote on a constitutional amendment is an unusual situation. It is not at all clear whether once the amendment was "deemed ratified," *see Raines,* 521 U.S. at 822, the Kansas Senate could have done anything to reverse that position. We think that must be what the Supreme Court implied when it said the *Raines* plaintiffs could not allege that the "[Line Item Veto Act] would nullify their votes *in the future,"* and that, after all, a majority of senators and congressmen could always repeal the Line Item

> Veto Act. *Id.* at 824 (emphasis added). The
> *Coleman* senators, by contrast, may well have
> been powerless to rescind a ratification of a
> constitutional amendment that they claimed had
> been defeated. In other words, they had no
> legislative remedy.

*Id.* at 22-23 (quoting *Raines*, 521 U.S. at 824) (footnote

omitted). Applying *Raines*, the Court held that the plaintiffs

lacked standing under "the *Coleman* exception" because they had

"ample legislative power to have stopped prosecution of the

'war'" despite having lost the vote on the War Powers Resolution

authorization. *Id.* at 23 (no citation for internal quotation in

original). Therefore, despite the tie vote, the *Campbell*

plaintiffs had legislative remedies at their disposal, unlike

the situation in *Coleman*.

                    *    *    *    *    *


     In sum, D.C. Circuit precedent teaches that individual

Members of Congress do not have standing to sue the Executive

Branch when their institutional injury is such that they can

obtain their remedy in Congress. In *Campbell*, the Court

understood vote nullification "to mean treating a vote that did

not pass as if it had, or vice versa." *Campbell*, 203 F.3d at 22.

In *Chenoweth*, the Court suggested that notwithstanding *Raines*, a

single Member of Congress could have standing to sue based on a

vote nullification claim when it was the President's action, rather than "a lack of legislative support," that nullified the Member's vote. *Chenoweth,* 181 F.3d at 117. Such a situation is therefore a third instance of a type of vote nullification for which a legislator could have standing.[7]

### 2. Plaintiffs Adequately Allege a Judicially Cognizable Injury

#### a. Injury-in-Fact

To establish that they have an injury-in-fact, plaintiffs must allege that their injury is "personal, particularized, concrete, and otherwise judicially cognizable." *Raines*, 521 U.S. at 820. Regarding the requirement that the injury be "legally and judicially cognizable," "the plaintiff [must allege to] have suffered 'an invasion of a legally protected interest which is .

---

[7] The closest constitutional analogy to plaintiffs' claims here is that in *Kucinich v. Bush.* 236 F. Supp. 2d 1 (D.D.C. 2002). In that case, thirty-two Members of the House of Representatives "challenged President Bush's unilateral withdrawal from the 1972 Anti-Ballistic Missile Treaty . . . without the approval of Congress," contending that President Bush was required to obtain their consent before terminating a treaty. *Id*. at 1. Applying *Raines*, *Chenoweth*, and *Campbell*, the Court held plaintiffs did not have standing because their "claim of a 'grievous institutional injury' where they are 'deprived of their constitutional right . . . to participate in treaty termination' was no different from the institutional injuries alleged in *Chenoweth*, *Campbell,* and *Raines." Id*. at 9. The Court did not discuss whether the plaintiffs' votes had been nullified. In any event, the Court also concluded that the plaintiffs' raised a nonjusticiable political question. *Id*. The President has not argued that the claims here involve nonjusticiable political questions. Therefore, this persuasive authority is inapposite.

. . concrete and particularized' *Lujan*, 504 U.S. at 560, and that the dispute is 'traditionally thought to be capable of resolution through the judicial process.'" *Id.* at 819 (quoting *Flast*, 392 U.S. at 97).

### b. Plaintiffs Adequately Allege an Institutional Injury

In the context of legislator standing, the Supreme Court has recognized at least one type of institutional injury for which legislators may have standing to sue: complete vote nullification. *Coleman*, 307 U.S. at 438; *Raines*, 521 U.S. at 821-23; *Ariz. State Legislature,* 135 S. Ct. at 2667; *Cummings v. Murphy*, No. 17-2308, slip op. at 18 (D.D.C. Aug. 14, 2018) ("[c]omplete vote nullification is clearly a type of institutional injury sufficient to support legislator standing"). Since an institutional injury will "necessarily damage all Members of Congress and both Houses of Congress equally," *Raines,* 521 U.S. at 821, it will not be a personal injury in the sense that the injury in *Powell* was personal. If institutional injuries were incapable of also being personal to individual members of the institution, however, the Court in *Raines* would have overruled *Coleman*. *Id*. at 819 ("We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to

him."). Instead, the Supreme Court reaffirmed *Coleman* in both *Raines, id.* at 821, and *Arizona State Legislature*, 135 S. Ct. at 2665, necessarily holding that the institutional injury alleged –vote nullification–was sufficiently personal to each of the individual plaintiffs to satisfy the standing requirement under Article III.

The Clause requires the President to ask Congress before accepting a prohibited foreign emolument. Accepting the allegations in the Complaint as true, which the Court must at this juncture, the President is accepting prohibited foreign emoluments without asking *and* without receiving a favorable reply from Congress. The "nature and source of the claim," *Warth,* 422 U.S. at 500, is an unusual[8] constitutional provision which unambiguously prohibits the President from accepting any emolument from "any King, Prince or foreign State" unless Congress chooses to permit an exception. U.S. Const. art. I, § 9, cl. 8; 17 Op. O.L.C. 114, 121 (1993). The specific facts alleged are that the President has accepted, and intends to continue accepting, prohibited foreign emoluments without seeking congressional consent. Am. Compl., ECF No. 14 ¶¶ 4, 37, 39, 40, 77, 78, 79. Furthermore, the President has not provided

---

[8] The only similar provision is the Article II requirement that the President obtain the advice and consent of Congress prior to taking covered executive branch action. U.S. Const. art. II, § 2, cl. 2.

any information to Congress about any foreign emoluments he has received. *Id*. ¶¶ 41, 80. The President is depriving plaintiffs of the opportunity to give or withhold their consent, thereby injuring them "in their roles as members of Congress." *Id*. ¶ 5. Specifically, the President has neither sought plaintiffs' consent prior to accepting prohibited foreign emoluments, nor provided any information to Congress about them, thereby preventing plaintiffs from "exercis[ing] their constitutional prerogative to authorize or reject the specific emoluments he is accepting." *Id*. ¶ 41. Plaintiffs adequately allege that the President has completely nullified their votes in the past because he has accepted prohibited foreign emoluments as though Congress had provided its consent. And he will completely nullify their votes in the future for the same reason, as plaintiffs allege that he intends to continue this practice. The President's alleged acceptance of prohibited foreign emoluments as though Congress provided consent is indistinguishable from "treating a vote that did not pass as if it had, or vice versa." *Campbell,* 203 F.3d at 22. And, as soon as the President accepts a prohibited foreign emolument without obtaining congressional consent, his acceptance is irreversible. *Id*. at 22-23. Accordingly, plaintiffs adequately allege that the President has completely nullified their votes.

Although plaintiffs do not sue on behalf of Congress, but rather in their individual official capacities as Members of Congress, their ability to bring this suit is not foreclosed by Supreme Court and D.C. Circuit precedent. The *Raines* Court did not hold that it would be necessary for an institutional claim to be brought by or on behalf of the institution. *Raines*, 521 U.S. at 829. Rather, the fact that the case had not been authorized by the institution was a relevant consideration, but not dispositive, in determining that the *Raines* plaintiffs lacked standing. *Id*. Moreover, the claim in *Coleman* was not brought on behalf of the state senate as an institutional plaintiff, but rather by a bloc of individual members who had voted not to ratify the constitutional amendment. *Coleman*, 307 U.S. at 438. The Supreme Court distinguished *Raines* from *Arizona State Legislature* because the latter *was* brought by the legislature as an institution, *Ariz. State Legislature*, 135 S. Ct. at 2664, but in finding the legislature to have standing, the Supreme Court did not hold that an institutional claim may be brought *only* by the institution. *See generally id*. Furthermore, notwithstanding *Raines*, a single Member of Congress could have standing to sue based on a vote nullification claim when it was the President's action, rather than "a lack of legislative support," that nullified the Member's vote. *Chenoweth,* 181 F.3d at 117.

33

### i. The President Misstates the Injury

The President acknowledges that "when a legislative vote is deemed defeated by executive action," the legislator has standing to sue unless there is a legislative remedy. Mot. to Dismiss, ECF No. 15-1 at 17. Although he disputes that plaintiffs' votes have been "defeated by executive action," his argument relies on a misstatement of the alleged injury. The President contends that plaintiffs cannot plausibly allege that he has prevented votes from being taken on the emoluments bills pending before Congress,[9] or that he has prevented Congress from otherwise voting on the emoluments issue. *Id.* at 24, 26. He also emphasizes that Congress may still choose to vote on the pending bills or on bills introduced in the future. *Id.* at 26. However, the votes contemplated by the President are not votes to consent, or not, in response to the President's request for consent prior to his acceptance of a prohibited foreign emolument. Rather, these are votes on the issue of emoluments. Injury to their power to *legislate on the issue of emoluments* is not the injury plaintiffs allege. *See generally* Am. Compl., ECF No. 14. To be clear, plaintiffs' alleged injury is caused by the

---

[9] *See* S. Con. Res. 8, 115th Cong. (2017) (among other things, declaring the President's dealings through his companies with foreign governments to be potential violations of the emoluments clause); H.R.J. Res. 16, 115th Cong. (2017) (denying congressional consent for the President to accept any foreign emolument during his Presidency).

President's alleged refusal to give them the opportunity to exercise their constitutional right to vote on whether to consent prior to his acceptance of prohibited foreign emoluments. It is irrelevant that Congress can express its consent through legislation on the issue of emoluments or that it has done so in the past on limited occasions.[10] In the absence of such legislation, the President deprives plaintiffs of the opportunity to vote every time he accepts an emolument from "any King, Prince, or foreign State" without the consent of Congress. U.S. Const. art. I, § 9, cl. 8.[11]

### ii. The President Reads the Precedent too Narrowly

According to the President, a Court may conclude that plaintiffs have standing for a vote nullification claim only when they can "allege that 'the necessary majorities in the Congress voted' to withhold consent to the President's alleged

---

[10] *See* Foreign Gifts and Decorations Act of 1966, 5 U.S.C. § 7342.

[11] Similarly, the President argues that unlike the situation in *Coleman*, there is nothing that is "unusual" or "irreversible" here because Congress may choose to vote on "the emoluments issue" in the future. Mot. to Dismiss, ECF No. 15-1 at 26; Reply, ECF No. 28 at 14. Again, the President's argument relies on the same misstatement of the alleged injury. Moreover, each time the President accepts prohibited foreign emoluments without the consent of Congress, that acceptance without consent is irreversible. Finally, although not "unusual" in the sense that word was used in *Coleman*, the President's failure to comply with the Clause is highly unusual given that prior Presidents have ensured that their actions were consistent with the Clause. *See supra* Section IV.B.

acceptance of prohibited foreign emoluments." Mot. to Dismiss, ECF No. 15-1 at 25 (quoting *Chenoweth*, 181 F.3d at 117). As an initial matter, again the President has misstated the injury. Moreover, the Court disagrees with this narrow reading of *Coleman*. Although the *Raines* Court narrowed the *Coleman* holding, the Court neither held nor implied that the only type of vote nullification claim for which a legislator would have standing would be "legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act . . . if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines,* 521 U.S. at 823. Indeed, following *Raines*, the Supreme Court recognized that the Arizona State Legislature as an institutional plaintiff had standing to bring a vote nullification claim. *See Ariz. State Legislature*, 135 S. Ct. at 2667. The legislature there did not allege that it had the "necessary majorities" to take action; rather the claimed injury was that the ballot initiative deprived the plaintiff of a legislative "prerogative." *Id.* at 2663. The D.C. Circuit has emphasized that the *Coleman* exception is a "narrow rule," *Chenoweth*, 181 F.3d at 116; *see Campbell*, 203 F.3d at 22-23, and has interpreted the *Coleman* exception "to mean treating a vote that did not pass as if it had, or vice versa," *Campbell*, 203 F.3d at 22. As the Court has explained, *supra* Section IV.C.2.b,

here the President has allegedly accepted prohibited foreign emoluments as though Congress has provided its consent, which is indistinguishable from "treating a vote that did not pass as if it had, or vice versa."[12] *Id.*

The President insists that upholding standing here would require a "drastic extension of *Coleman*," which the Supreme Court in *Raines* rejected. Mot. to Dismiss, ECF No. 15-1 at 25. The Court disagrees. *Raines* would have required a drastic extension of *Coleman* because the nature of the vote nullification in *Coleman* was different from the "abstract dilution of legislative power" alleged in *Raines*. *Raines*, 521 U.S. at 826. And critically, the *Raines* plaintiffs had adequate legislative remedies at their disposal. *Id.* at 824. Here, by contrast, the President's complete nullification of plaintiffs' votes is entirely different from the "abstract dilution of legislative power" alleged in *Raines. Id.* at 826. And as will be explained in detail, plaintiffs have no adequate legislative remedies. *See infra* Section IV.C.4.

---

[12] For the same reason, the Court rejects the President's argument that plaintiffs' reliance on the vote nullification theory articulated in *Coleman* is misplaced to the extent they claim their injury encompasses being deprived of the option of not voting because none of the precedent recognizes such an injury. Reply, ECF No. 28 at 17.

### c. Plaintiffs' Alleged Injury is Personal, Particularized and Concrete

Plaintiffs allege that the President has accepted, and intends to continue accepting, prohibited foreign emoluments without seeking congressional consent, thereby depriving them of the opportunity to vote on whether to consent to his acceptance of emoluments before he accepts them. Am. Compl., ECF No. 14 ¶¶ 3-4. Plaintiffs' injury is to a "legally protected interest" because the Clause prohibits the President from accepting "any" emolument from "any King, Prince, or foreign State" without the consent of Congress. U.S Const. art. I, § 9, cl. 8. Consent is obtained through the aggregate of the specific votes that each individual Member of Congress is entitled to take. *Id.* art. I, § 1; art. I, § 3, cl. 1; art. I, § 5, cl. 3. Although this injury is dispersed among all Members of Congress, as will necessarily be the case when an institutional injury is alleged, this does not render the injury less concrete or particularized. *See Raines,* 521 U.S. at 821 (stating an institutional injury will "necessarily damage all Members of Congress and both Houses of Congress equally"); *Ariz. State Legislature*, 135 S. Ct. at 2664 (Plaintiff "is an institutional plaintiff asserting an institutional injury"). Rather, each time the President allegedly accepts a foreign emolument without seeking congressional consent, plaintiffs suffer a concrete and

particularized injury—the deprivation of the right to vote on whether to consent to the President's acceptance of the prohibited foreign emolument—before he accepts it. And although the injury is an institutional one, the injury is personal to legislators entitled to cast the vote that was nullified. *See Raines,* 521 U.S. at 823 (narrowing but not overruling the holding in *Coleman*); *Ariz. State Legislature*, 135 S. Ct. at 2664-65 (holding that the legislature has standing to sue); *supra* Section IV.C.2.b. Accordingly, plaintiffs adequately allege that they "have suffered 'an invasion of a legally protected interest which is . . . [personal,] concrete and particularized.'" *Raines,* 521 U.S. at 819 (quoting *Lujan*, 504 U.S. at 560).

The President argues that the injury alleged here is insufficiently concrete to give the plaintiffs a "personal stake in the dispute" because the injury "damages all Members of Congress and both Houses of Congress equally." Reply, ECF No. 28 at 10 (quoting *Raines*, 521 U.S. at 821, 830). Furthermore, according to the President, the alleged injury cannot support Article III standing because it is felt equally by all Members of Congress "solely because they are Members of Congress," as distinct from the personal injury alleged in *Powell*. Reply, ECF No. 28 at 11 (quoting *Raines,* 521 U.S. at 821). The Court disagrees. The *Raines* Court recognized two types of injuries

that could support legislator standing: (1) a personal injury such as that typified in *Powell;* and (2) an institutional injury—vote nullification—such as that in *Coleman*. *Raines*, 521 U.S. at 829-30. An institutional injury will "necessarily damage all Members of Congress and both Houses of Congress equally" and will be felt equally by Members of Congress "solely because they are Members of Congress." *Id.* at 821. And as explained, *supra* at 30-31, by reaffirming *Coleman* in *Raines* and *Arizona State Legislature*, the Supreme Court necessarily held that the institutional injury alleged was sufficiently personal to each of the plaintiffs to satisfy the standing requirement under Article III.

### i. Plaintiffs' Alleged Injury is Distinguishable from the Injuries Alleged in the Precedent

The President argues that plaintiffs' claims are squarely foreclosed by *Raines*. The Court disagrees. As an initial matter, the President reads *Raines* to establish "a foundational principle that the denial of institutional legislative prerogative is not a judicially cognizable injury." Mot. to Dismiss, ECF No. 15-1 at 16. This broad principle, however, is not supported by *Raines*. *Raines* establishes that legislators may have standing based on the nullification of their votes, which is an institutional, as opposed to a personal, injury. *Raines*, 521 U.S. at 821-23. To establish the broad principle asserted by

the President, the *Raines* Court would have needed to overrule *Coleman*. Not only did the *Raines* Court not overrule *Coleman*, but the Court also relied on *Coleman* to uphold standing in *Arizona State Legislature*, in which the alleged injury was deprivation of a legislative prerogative. *Ariz. State Legislature*, 135 S. Ct. at 2663.

The President argues that the injury alleged here amounts only to a "dilution of institutional legislative power." Mot. to Dismiss, ECF No. 15-1 at 22 (quoting *Raines*, 521 U.S. at 820). Moreover, according to the President, there is little difference between the claim in *Raines* and the claim here because the members in *Raines* argued that the challenged Act "deprived them of 'their constitutional role in the repeal of legislation'" which "does not differ materially from Plaintiffs' claim that they have been denied their constitutional role in deciding whether to consent to the President's acceptance of allegedly prohibited foreign emoluments," Reply, ECF No. 28 at 10-11 (quoting *Raines*, 521 U.S. at 816). In so arguing, the President insists that plaintiffs' claimed injury is indistinguishable from the claimed injury in *Chenoweth*. Mot. to Dismiss, ECF No. 15-1 at 23-24. The Court disagrees. The injury alleged here is distinguishable from those alleged in *Raines* and *Chenoweth*. In *Raines*, plaintiffs sued after being on the losing side of the vote that enacted the Line Item Veto Act, alleging that their

41

injury was the diminution of legislative power caused by the
Act. *Raines*, 521 U.S. at 814. In *Chenoweth*, plaintiffs sued
after their bill seeking to end a program created by the
President by Executive Order failed to be brought to a vote,
alleging that their injury was that Members of Congress had been
deprived of their right to vote on the Presidentially-created
program. *Chenoweth,* 181 F.3d at 112. In each case, plaintiffs
either lost the vote in Congress or did not have the political
influence to bring their bill to a vote, and then sought relief
in the courts. Here, by contrast, plaintiffs' alleged injury is
caused by the President's alleged acceptance of prohibited
foreign emoluments before seeking and obtaining congressional
consent, not by any action taken or not taken by their
congressional colleagues. *See Chenoweth,* 181 F.3d at 117 ("it
was the President's veto—not a lack of legislative support—that
prevented the bill from becoming a law"); *infra* Section
IV.C.3.a. The President's repeated misstatement of the injury
does not change the nature of plaintiffs' alleged injury.
Finally, the President's alleged acceptance of a prohibited
foreign emolument before obtaining congressional consent does
not "dilute" plaintiffs' legislative power because they do not
allege injury to their ability to legislate on the issue of
emoluments.

### 3. Separation-of-Powers Considerations

#### a. Plaintiffs Lack Adequate Legislative Remedies

The Court does agree with the President that, "when legislators possess 'political tools with which to remedy their purported injury,' they may not seek the aid of the Judiciary." Mot. to Dismiss, ECF No. 15-1 at 26 (quoting *Campbell*, 203 F.3d at 23-24). But here, plaintiffs lack such tools.

In addition to Congress bringing the bills currently pending to a vote, *see supra* Section IV.C.2.b.i, the President suggests that the following types of legislation would provide plaintiffs with a legislative remedy: (1) voting on whether what plaintiffs allege "constitute[s] violations of the Foreign Emoluments Clause by the President and whether Congress should provide its consent," Mot. to Dismiss, ECF No. 15-1 at 2; (2) "vot[ing] on a private bill[13] consenting to the receipt of what it construed to be emoluments received from foreign governments or a joint resolution expressing its disagreement with such receipt," *id.* at 24; and/or (3) "vot[ing] on a joint

---

[13] A private bill is legislation that addresses a matter of narrow interest, which after being passed in identical form by the House and Senate, is submitted to the President for signature. United States Senate, Bills and Resolutions, Legislation, Laws and Acts, available at https://www.senate.gov/pagelayout/legislative/d_three_sections_w ith_teasers/bills.htm.

resolution[14] that provides what Congress perceives to be the proper definition of an emolument and prohibits any and all emoluments, including ones unknown to Congress," Reply, ECF No. 28 at 18. According to this argument, plaintiffs have ample legislative remedies at their disposal; they just don't have the votes.

The President's purported legislative remedies are clearly inadequate within the meaning of *Raines*. *Raines*, 521 U.S. at 829 (legislative remedy must be an "adequate" remedy). In *Raines*, *Chenoweth*, and *Campbell*, adequate legislative remedies were available to redress the plaintiffs' grievances. In *Raines*, "a majority of Senators and Congressmen c[ould] pass or reject appropriations bills; the Act has no effect on this process. Moreover, a majority of Senators and Congressmen c[ould] vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process." *Id*. at 824. In *Chenoweth*, "[i]t [was] uncontested that the Congress could

---

14 A joint resolution, with one exception, is legislation that requires the approval of both the House and Senate and is submitted to the President for signature. The exception is when the joint resolution proposes a constitutional amendment. United States Senate, Bills and Resolutions, Legislation, Laws and Acts, available at https://www.senate.gov/pagelayout/legislative/d_three_sections_w ith_teasers/bills.htm.

terminate the AHRI were a sufficient number in each House so inclined." *Chenoweth*, 181 F.3d at 116. And in *Campbell*, "Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign." *Campbell*, 203 F.3d at 23.[15]

Here, by contrast, legislation on the emoluments issue does not provide an adequate remedy. First, in asking this Court to accept the proposition that legislation on the emoluments issue would be an adequate remedy, the President asks this Court to ignore this constitutional Clause. The Court may not do so. *See Marbury*, 1 Cranch at 174 ("It cannot be presumed that any clause in the constitution is intended to be without effect . . . ."). The Clause is unambiguous: acceptance is prohibited without "Consent." U.S Const. art. I, § 9, cl. 8. The Clause therefore places the burden on the President to convince a majority of Members of Congress to consent. The legislation suggested by the President flips this burden, placing the burden on Members of Congress to convince a majority of their colleagues to enact the suggested legislation. This is not what the Clause requires.

---

[15] The President disputes that the precedent requires "political remedies [to] put the plaintiff members back in the same position as if the Executive had not caused the alleged injury in the first place." Reply, ECF No. 28 at 17. This is beside the point because in each case, there was an adequate legislative remedy, whereas here there is none.

Second, the President does not explain why such legislation, assuming he signed it, would prevent him from accepting prohibited foreign emoluments. His failure to explain is especially problematic given that the Constitution itself has not prevented him from allegedly accepting them. Third, the President does not explain how the proposed legislation would be adequate in view of the allegation that the President has not provided any information to Congress about the prohibited foreign emoluments he has received, and that he does not intend to change this practice. Am. Compl., ECF No. 14 ¶¶ 40, 41. Legislating after Congress happens to learn about his acceptance of a prohibited foreign emolument through news reports is clearly an inadequate remedy. Fourth, legislation disagreeing with the President's acceptance of prohibited foreign emoluments does not provide a remedy for him already having allegedly accepted them without seeking and obtaining consent. Finally, legislation would neither prevent the President from accepting future prohibited foreign emoluments, nor force him to return those he has already accepted.

Furthermore, and in contrast to the situation in *Chenoweth* and *Campbell*, Congress' appropriations power cannot be used to obtain a legislative remedy, such as refusing to appropriate funds for an Executive Branch program or for participation in a war, because there are no federal appropriations associated with

46

the President's receipt of prohibited foreign emoluments. This is another aspect of the Clause that makes it unusual. The President suggests that among plaintiffs' legislative remedies is the use of Congress' appropriations power to retaliate against him for his alleged acceptance of prohibited foreign emoluments by "tak[ing] action on matters not directly related to emoluments." Reply, ECF No. 28 at 18. Courts have treated Congress' use of its appropriations power as a legislative remedy in situations in which failing to provide funding could actually resolve the dispute. *See, e.g., Campbell*, 203 F.3d at 23 ("Congress always retains appropriations authority and could have cut off funds for the American role in the conflict."). Here, however, Congress lacks a "broad range of legislative authority it can use to stop" the President from failing to seek consent before accepting prohibited foreign emoluments. *Campbell*, 203 F.3d at 24 (noting that where "Congress has a broad range of legislative authority it can use to stop a President's" action, Congress cannot mount a challenge to that action pursuant to *Raines*).

Finally, the availability of the extreme measure of impeachment, see *Campbell*, 203 F.3d at 23 (noting that "there always remains the possibility of impeachment should a President act in disregard of Congress' authority"), to enforce the President's compliance with the Clause is not an adequate remedy

within the meaning of *Raines*. *Cf. Nat'l Treasury Emp. Union v. Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974) ("the Constitution should not be construed so as to paint this nation into a corner which leaves available only the use of the impeachment process to enforce the performance of a perfunctory duty by the President").

### b. Capable of Resolution Through the Judicial Process

*Raines* also instructs the Court to consider whether "the dispute is 'traditionally thought to be capable of resolution through the judicial process.'" *Raines*, 521 U.S. at 819 (quoting *Flast*, 392 U.S. at 97). The President argues that it is not because "every[16] confrontation between one or both Houses of Congress and the Executive Branch has been resolved through the political process rather than through suits brought by legislators." Reply, ECF No. 28 at 10 (citing *Raines*, 521 U.S. at 826). Plaintiffs respond that the *Raines* Court discussed the novelty of litigation between the legislative and executive

---

[16] Again, the President has overstated the proposition. What the *Raines* Court said was "in *analogous* confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826 (emphasis added). In *Kennedy v. Sampson*, the D.C. Circuit held that Senator Kennedy had standing to bring the suit and the Court issued a declaratory judgment ruling that the President's failure to take action on the bill at issue did not result in a pocket veto, but instead the bill became law. 511 F.2d at 442. Such suits are therefore not nonexistent.

branches, noting that it "appear[ed]" to argue against the plaintiffs, but did not elaborate further. Pls.' Opp'n, ECF No. 17 at 20.

The *Raines* Court's examples of analogous confrontations between Congress and the Executive Branch are distinguishable from the situation here. In *Raines,* the Court discussed at length the fact that no President sued to challenge the constitutionality of the Tenure of Office Act. *Raines*, 521 U.S. at 826. That Act, which required the consent of the Senate for the President to remove an official whose appointment to the Executive Branch required Senate confirmation, was passed in 1867 and repealed in 1887. *Id*. The *Raines* Court stated that if federal courts had become involved, "they would have been improperly and unnecessarily plunged into the bitter political battle being waged between the President and Congress" over the Act. *Id*. at 827. Here, there is no "bitter political battle" between the President and Congress over the constitutionality of an Act passed, and ultimately repealed, by Congress that impinged on the President's appointments authority. *Id.*

Two of the other three examples cited by the *Raines* Court involved constitutional challenges to legislation that impermissibly altered the power of the Legislative or Executive Branch, but where the claim was not brought by one branch against the other. *See INS v. Chadha,* 462 U.S. 919, 959

(1983)(holding the one House congressional veto provision in Section 244(1)(2) of the Immigration and Nationality Act to be unconstitutional); *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (holding the provisions of the then-existing Federal Election Campaign Act of 1971 that "vest[ed] in the [Federal Election] Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate[d] Art. II, § 2, cl., 2, of the Constitution."). These cases are distinguishable because here, plaintiffs do not allege that their injury has been caused by a similar type of legislation passed by Congress and signed into law by the President. Furthermore, there is no legislative remedy. In the final example, the Supreme Court held that a bill that was presented to the President less than ten days before a congressional session was adjourned did not become law when the President "neither signed the bill nor returned it to the Senate" in a challenge brought by certain Native American Tribes. *Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of the State of Washington v. United States*, 279 U.S. 655, 673, 691-92 (1929). This case is distinguishable for the same reasons—at issue there was the legal status of a bill that had been passed by both Houses of Congress and presented to the President less than ten days before the adjournment of the congressional session. The

decision to do so had been made by Congress and could be remedied by Congress.

Similarly, this is not a situation in which plaintiffs disagree with the manner in which the President is administering or enforcing the law. *See United States v. Windsor*, 570 U.S. 744, 789 (2013) (Scalia, J. dissenting) (Ours is not a "system in which Congress and the Executive can pop immediately into court, in their institutional capacity, whenever the President . . . implements a law in a manner that is not to Congress' liking."). Neither is it the situation in *Raines* where the Court rejected the plaintiffs' ability to sue the President over the exercise of a statutory provision they believed to be unconstitutional. *Raines*, 521 U.S. at 830. Furthermore, although historical practice militates against Members of Congress turning to the Courts to resolve a dispute for which there is a legislative resolution, as explained *supra* Section IV.C.3.a, there is no adequate legislative remedy here.

This case does not raise the concern that the Court, in exercising jurisdiction over plaintiffs' claims, would be engaging in some kind of "amorphous general supervision of the operations of government." *Id.* at 826 (quoting *Richardson*, 418 U.S. at 194 (Powell, J., concurring)). Rather, this dispute raises concrete legal questions that are within the purview of the federal courts to adjudicate: (1) what is an emolument;

(2) what does it mean to accept an emolument; and (3) whether
the President has violated the Foreign Emoluments Clause. The
President contends that "Congress is far better equipped than
the courts to assess whether particular arrangements violate the
Foreign Emoluments Clause, and if so, how best to address the
violation." Reply, ECF No. 28 at 18. While Congress clearly has
the power to legislate on the issue of emoluments, "it is 'the
duty of the judicial department'—in a separation-of-powers case
as in any other—'to say what the law is.'" *N.L.R.B. v. Canning*,
134 S. Ct. 2550, 2560 (2014) (quoting *Marbury*, 1 Cranch at 177).
Therefore, it is the role of the Judiciary to "say what the law
is" regarding the meaning of the Foreign Emoluments Clause and
the President's compliance with it. *Cf. United States v. Nixon*,
418 U.S. 683, 705 (1974) ("We therefore reaffirm that it is the
province and duty of this Court 'to say what the law is' with
respect to the claim of privilege asserted in this case.")
(quoting *Marbury,* 1 Cranch at 177). The President does not
dispute the role of the courts in interpreting the Constitution,
but rejects the proposition that judicial review is appropriate
here because "Congress continues to possess effective tools that
would serve as checks on the Executive." Def.'s Suppl. Br. in
Support of his Mot. to Dismiss and in Response to the Brs. of
Amici Curiae ("Def.'s Suppl. Br."), ECF No. 51 at 26-27.
Nevertheless, as explained *supra* Section IV.C.3.a, there are no

adequate legislative remedies here.

Furthermore, unlike in *Raines*, the dispute here is neither an "interbranch dispute about calibrating the legislative and executive powers [nor] is it an intrabranch dispute between segments of Congress itself," either of which would counsel against judicial involvement based on separation-of-powers principles. *Raines*, 521 U.S. at 833 (Souter, J., concurring). Rather, this dispute is about the President's alleged refusal to seek consent prior to his alleged acceptance of prohibited foreign emoluments that he receives as a result of his personal financial interests. The President has strenuously attempted to frame the dispute as "an intrabranch dispute between segments of Congress itself," *see Raines*, 521 U.S. at 833 (Souter, J., concurring), but as the Court has thoroughly explained, *supra* Section IV.3.A, this characterization is incorrect.

Accordingly, although this case implicates separation-of-powers concerns, finding standing here "keep[s] the Judiciary's power within its proper constitutional sphere." *Raines*, 521 U.S. at 820. As the Court has explained, plaintiffs' claim of standing is not based on a "loss of political power," *see id*. at 821, as was the case in *Raines*, because the injury alleged is not an injury to their power to legislate on the issue of emoluments. And since plaintiffs have no adequate legislative remedy, they appropriately seek relief in federal court. *See*

*Valley Forge Christian Coll.,* 454 U.S. at 473-74 ("exercis[ing]
. . . judicial power has been recognized as a tool of last
resort").

### 4. The Ability of Another Plaintiff to Bring this Case

*Raines* instructs the Court to consider whether another
plaintiff could bring the case. *Raines*, 521 U.S. at 829 (noting
that the Court's holding did not foreclose a constitutional
challenge by someone with standing). At oral argument, the Court
asked counsel for the President a hypothetical question:
Whether, if this case had been brought by Congress as an
institutional plaintiff, counsel would agree that it would have
standing. Hr'g Tr., ECF No. 54 at 71:2-6. The government refused
to concede that it would. *Id.* at 71:7-25, 77:5-20. At the same
time, counsel stated, "[j]ust because these plaintiffs don't
have standing, it doesn't mean another plaintiff in a proper
case might not have standing." *Id.* at 76:2-3. When pressed by
the Court about who that plaintiff would be, counsel conceded:
"I have a hard time thinking through which plaintiff would be a
proper plaintiff to enforce the Emoluments Clause." *Id.* at 76:8-
10. That no plaintiff would have standing to challenge the
President's alleged violation of the Clause is certainly
consistent with the President's argument that "when an official
fails to first seek congressional consent before accepting
emoluments prohibited by the Foreign Emoluments Clause, it only

means that the official has violated the Clause, not that each Member of Congress automatically acquires a judicially cognizable personal stake to challenge the violation." Def.'s Suppl. Br., ECF No. 51 at 11. The faulty premise underlying the President's argument, however, is that there is a legislative remedy for violating the Clause.  Hr'g Tr., ECF No. 54 at 79:12-80:18.

The Court is aware of one existing[17] challenge to the President's receipt of prohibited foreign emoluments. However, that challenge seeks to remedy entirely different injuries: The District of Columbia alleges injuries to its quasi-sovereign interest and its proprietary interest, and the State of Maryland alleges injuries to its sovereign interests, quasi-sovereign interest and its proprietary interest. *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 735 (D. Md. 2018).

Accordingly, if these plaintiffs do not have standing to bring their claims to address their alleged injury, it is unlikely that another plaintiff would, rendering the Clause unenforceable against the President except via impeachment. As explained, *supra* at 45, impeachment is an inadequate remedy within the meaning of *Raines*.

---

[17] Another challenge was dismissed for lack of standing. *See Citizens for Responsibility and Ethics in Washington v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017), *appeal docketed*, No. 18-474 (2d Cir. 2018).

### 5. Traceability and Redressability

"A plaintiff must allege a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. The President contends that "[p]laintiffs' alleged injury is not traceable to the President: The President has not prevented Congress from voting on whether he may accept emoluments, and Plaintiffs remain free to convince their congressional colleagues to redress their alleged injury." Reply, ECF No. 28 at 8. The Court disagrees. Again, the President has misstated the alleged injury. Moreover, this matter is before the Court on a motion to dismiss and the Court must take as true the facts that are alleged in the complaint. Plaintiffs' well-pleaded complaint alleges that the President has accepted prohibited foreign emoluments without first seeking the consent of Congress. Am. Compl., ECF No. 14 ¶¶ 4-5. The alleged injury is therefore directly traceable to the President's alleged failure to seek Congressional consent.

Plaintiffs seek declaratory relief in the form of a declaratory judgment stating that the President is violating the Clause when he accepts emoluments from foreign states without first seeking the consent of Congress, and injunctive relief in the form of an order from the Court enjoining the President from accepting "any present, Emolument, Office, or Title, of any kind

whatever" from a foreign state without obtaining "the Consent of Congress." *Id.*, ECF No. 14 ¶¶ 84-92. The President contends that the injunctive relief sought by plaintiffs is unconstitutional, Mot. to Dismiss, ECF No. 15-1 at 56-58; Reply, ECF No. 28 at 31-34, but does not contest that injunctive relief, were it available, would redress plaintiffs' injury, *see generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28. Whether injunctive relief is available here is a merits determination that the Court need not reach at this juncture, and the Court cannot assume, for the purposes of determining whether plaintiffs have standing, that injunctive relief would be unconstitutional. Because the President's alleged violation of the Clause could be redressed by the declaratory and injunctive relief sought, plaintiffs have satisfied the redressability component of the standing inquiry.

**V.   Conclusion**

Accordingly, the Court finds that plaintiffs have standing to sue the President for allegedly violating the Foreign Emoluments Clause. The Court therefore **DENIES IN PART** the motion

to dismiss and **DEFERS** ruling on the remaining arguments in the motion to dismiss. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:      **Emmet G. Sullivan**
             **United States District Judge**
             **September 28, 2018**