**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*,<br><br>         *Plaintiffs*,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>         *Defendant*. | No. 17-cv-1154-EGS |

**DEFENDANT'S MOTION FOR CERTIFICATION OF THE COURT'S SEPTEMBER 28, 2018 ORDER PURSUANT TO 28 U.S.C. § 1292(b)**

Defendant Donald J. Trump, President of the United States, hereby moves for certification of the Court's September 28, 2018 Order, ECF No. 58, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  The grounds for Defendant's Motion are set forth in the accompanying Statement of Points and Authorities.

Dated:  October 22, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*_____
JEAN LIN

Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2018, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jean Lin*
JEAN LIN

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*, | |
| *Plaintiffs*, | No. 17-cv-1154-EGS |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, | |
| *Defendant*. | |

**DEFENDANT'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR CERTIFICATION OF THE COURT'S SEPTEMBER 28, 2018 ORDER PURSUANT TO 28 U.S.C. § 1292(b)**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

A.  Certification for Interlocutory Appeal Is Appropriate Because of the Exceptional
Circumstances of This Case. ............................................................................................ 5

B.  The Order Involves a Controlling Question of Law. ........................................................ 8

C.  There is Substantial Ground for Difference of Opinion as to Plaintiffs' Standing to Sue. ........ 9

   1.  There is substantial ground for difference of opinion as to *Coleman*'s applicability to
this case. ................................................................................................................... 10

   2.  Whether Plaintiffs lack adequate legislative remedies is a question about which
reasonable jurists could differ. ................................................................................. 15

   3.  There is substantial ground for difference of opinion whether the standing of other
plaintiffs is relevant ................................................................................................. 17

D.  Certification Would Materially Advance the Termination of the Litigation. ................. 18

CONCLUSION ..................................................................................................................... 18

# TABLE OF AUTHORITIES

## CASES

*Ahrenholz v. Bd. of Trs.*,
219 F.3d 674 (7th Cir. 2000) .................................................................................. 5

*Al Maqaleh v. Gates*,
620 F. Supp. 2d 51 (D.D.C. 2009) .................................................................. 7, 8, 18

*Am. Council of the Blind v. Paulson*,
525 F.3d 1256 (D.C. Cir. 2008) ............................................................................ 5, 8

*APCC Servs., Inc. v. Sprint Commc'ns Co.*,
297 F. Supp. 2d 90 (D.D.C. 2003) ................................................................ 5, 8, 9, 18

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
135 S. Ct. 2652 (2015) ................................................................................ 10, 11, 12

*Campbell v. Clinton*,
203 F.3d 19 (D.C. Cir. 2000) ........................................................................... *passim*

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004) ....................................................................................... 1, 2, 6

*Chenoweth v. Clinton*,
181 F.3d 112 (D.C. Cir. 1999) ............................................................................. 10

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................................................ 17

*Coleman v. Miller*,
307 U.S. 433 (1939) .................................................................................... 3, 10, 12

*Comm. on Judiciary of U.S. House of Representatives v. Miers*,
542 F.3d 909 (D.C. Cir. 2008) ................................................................................ 6

*Common Cause v. Biden*,
909 F. Supp. 2d 9 (D.D.C. 2012),
*aff'd on other grounds*, 748 F.3d 1280 (D.C. Cir. 2014)............................... 10, 12, 14

*Cummings v. Murphy*,
321 F. Supp. 3d 92 (D.D.C. 2018) .......................................................................... 7

*Doe v. Trump*,
319 F. Supp. 3d 539 (D.D.C. 2018) ........................................................................ 6

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975)............................................................................................ 17

*Fernandez-Roque v. Smith*,
  671 F.2d 426 (11th Cir. 1982) ................................................................. 7

*Harrington v. Bush*,
  553 F.2d 190 (D.C. Cir. 1977) ................................................................ 11

*Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*,
  840 F. Supp. 2d 52 (D.D.C. 2012) ....................................................... 5, 8

*In re Trump*,
  874 F.3d 948 (6th Cir. 2017) ................................................................ 7, 9

*In re Vitamins Antitrust Litig.*,
  No. 99-197 TFH, 2000 WL 33142129 (D.D.C. Nov. 22, 2000) .............. 9

*INS v. Chadha*,
  462 U.S. 919 (1983) ............................................................................... 16

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
  233 F. Supp. 2d 16 (D.D.C. 2002) .......................................................... 8

*Klinghoffer v. S.N.C. Achille Lauro*,
  921 F.2d 21 (2d Cir. 1990) ................................................................... 8, 9

*Kucinich v. Bush*,
  236 F. Supp. 2d 1 (D.D.C. 2002) .............................................. 6, 7, 14, 15

*McGrain v. Daugherty*,
  273 U.S. 135 (1927) ............................................................................... 17

*Mohawk Indus., Inc. v. Carpenter*,
  558 U.S. 100 (2009) ............................................................................. 2, 5

*Molock v. Whole Foods Mkt. Grp., Inc.*,
  317 F. Supp. 3d 1 (D.D.C. 2018) ..................................................... 4, 5, 8

*Montesa v. Schwartz*,
  836 F.3d 176 (2d Cir. 2016) .................................................................... 8

*Moore v. U.S. House of Representatives*,
  733 F.2d 946 (D.C. Cir. 1984) ................................................................. 6

*Raines v. Byrd*,
  521 U.S. 811 (1997) ........................................................................ *passim*

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ................................................................... 9

*Schlesinger v. Reservists Comm. to Stop the War*,
   418 U.S. 208 (1974) ..................................................................................................... 17

*United States v. Richardson*,
   418 U.S. 166 (1974) ..................................................................................................... 17

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ..................................................................................................... 17

*Watkins v. United States*,
   354 U.S. 178 (1957) ..................................................................................................... 17

**UNITED STATES CONSTITUTION**

U.S. Const. art. I, § 9, cl. 8 ................................................................................. 1, 4, 16

**STATUTES**

28 U.S.C. § 1292(b) ........................................................................................... *passim*

**OTHER AUTHORITIES**

16 Charles Alan Wright et al., Federal Practice and Procedure (3d ed. 2008) ...................... 4, 8, 9

## INTRODUCTION

Defendant, the President of the United States, respectfully seeks certification of this Court's September 28, 2018 Order, ECF No. 58, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

Plaintiffs, 201 Members of Congress, brought this suit alleging that the President has violated the Foreign Emoluments Clause of the Constitution through his ownership interest in companies that conduct business with foreign governments.  Plaintiffs allege that they are injured by the President's alleged acceptance of foreign emoluments without first obtaining "the Consent of Congress."  U.S. Const. art. I, § 9, cl. 8.  Despite recognizing that "this case implicates separation-of-powers concerns," Mem. Op. at 53, ECF No. 59, the Court held that Plaintiffs have standing as Members of Congress because, in the Court's view, the Foreign Emoluments Clause "gives each individual Member of Congress a right to vote before the President accepts [any foreign emoluments]," and the President deprived them of that right by not seeking consent.  *Id.* at 11.  The Court's ruling marks the first to recognize legislative standing by individual Members of Congress since the Supreme Court's decision in *Raines v. Byrd*, 521 U.S. 811 (1997), and the D.C. Circuit's decisions interpreting *Raines*—all of which held that disputes between the political branches are rarely, if ever, judicially cognizable under our constitutional scheme of separation of powers.

This Court should certify its September 28 Order for interlocutory appeal.  The case presents the extraordinary circumstance of a suit by Members of the Legislative Branch against the sitting President of the United States for alleged violations of the Constitution.  Not only does the case raise significant separation-of-powers concerns, but the Supreme Court has emphasized that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding" in suits involving the President.  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) (citations omitted).  As the Supreme Court has cautioned, "the Executive's constitutional responsibilities and status are factors counseling judicial deference and restraint in the conduct of litigation against it," and "occasion[s] for

constitutional confrontation between [] two branches [of the Government] should be avoided whenever possible." *Id.* at 385, 389–90 (citation omitted).  Certifying the Court's threshold ruling for interlocutory review could avoid such confrontation.

Moreover, the Order clearly involves a "controlling question of law as to which there is substantial ground for difference of opinion," and resolving it on immediate appeal "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  The threshold legal question of the standing of individual Members of Congress is controlling because if the D.C. Circuit decides the issue in the President's favor, this case would be dismissed, thereby avoiding the need to address Plaintiffs' novel Foreign Emoluments Clause claim and preserving both the Court's and the parties' resources.  And reasonable jurists could disagree as to whether individual Members of Congress have standing to sue the President for alleged violations of the Foreign Emoluments Clause.  *Raines* teaches that "[o]ur regime contemplates a more restricted role for Article III courts" than one that would permit the Judiciary to resolve disputes between the political branches.  521 U.S. at 828.  In holding that even "a single Member of Congress could have standing to sue" because the President allegedly nullified the Member's vote by not seeking congressional consent (even if the Member would vote to consent to the alleged acceptance of foreign emoluments), Mem. Op. at 33, the Court's Order is in substantial tension with, or at least is a novel interpretation of, *Raines.*  Indeed, since *Raines*, every court that has considered the issue has declined to find that individual Members of Congress have standing to sue the President or Executive Branch agencies.  Certification, therefore, is warranted given the novelty of the Court's interpretation and the significant constitutional import of the Court's ruling.  As the Supreme Court has noted, a "district court[] should not hesitate to certify an interlocutory appeal" when its ruling "involves a new legal question or is of special consequence."  *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009).  That is precisely the case here.[1]

---

[1]  Pursuant to Local Civil Rule 7(m), counsel for the President has consulted with counsel for Plaintiffs, who indicates Plaintiffs oppose this motion.

# BACKGROUND

Plaintiffs bring this suit against the President, in his official capacity, alleging that he has violated, and continues to violate, the Foreign Emoluments Clause because he allegedly receives prohibited benefits from foreign governments through his ownership interests in companies that transact business with foreign governments. *See generally* 1st Am. Compl., ECF No. 14. The President moved to dismiss the complaint, arguing that Plaintiffs (1) lack standing to bring their claims, (2) have no equitable cause of action under the Foreign Emoluments Clause because, among other things, they have not alleged interests addressed by the Clause, (3) have failed to state a claim under the Clause, and (4) cannot obtain the requested equitable remedies against the President in his official capacity. Def.'s Mot. to Dismiss, ECF No. 15; Statement of P. & A. in Supp. ("MTD Mem."), ECF No. 15-1. On September 28, 2018, the Court denied the motion in part, finding that Plaintiffs have standing to sue. The remainder of the President's motion remains pending.

The Court's finding of standing was based on its conclusion that the President's alleged actions constitute vote nullification—*i.e.*, "treating a vote that did not pass as if it had, or *vice versa*," Mem. Op. at 32 (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)—under *Coleman v. Miller*, 307 U.S. 433 (1939), and that such institutional injury may support standing for individual Members of Congress. Specifically, the Court reasoned that the Foreign Emoluments Clause gives each Member of Congress a right to vote on whether to consent to the President's alleged acceptance of foreign emoluments and that the President has deprived them of that right because he "has neither sought plaintiffs' consent prior to accepting prohibited foreign emoluments, nor provided any information to Congress about them." Mem. Op. at 31–32. Because the President "has accepted prohibited foreign emoluments as though Congress had provided its consent," the Court reasoned, he has "completely nullified [Plaintiffs'] votes in the past" and "will completely nullify their votes in the future for the same reason." *Id.* at 32.

The Court distinguished *Raines* on the basis that the *Raines* plaintiffs "[did] not claim that they have been deprived of something to which they are *personally* entitled" but were

3

claiming standing on the basis of their "loss of political power." *Id.* at 16, 53.  At the same time, the Court recognized that Plaintiffs' claim about the President's failure to seek "the Consent of Congress," U.S. Const. art. I, § 9, cl. 8, is an "institutional claim." Mem. Op. at 33.  But that does not pose an impediment to Plaintiffs' claim of standing, the Court held, because *Coleman* was brought by a bloc of individual legislators seeking to vindicate an institutional claim, and *Raines* neither overruled *Coleman* nor held "that an institutional claim may be brought *only* by the institution." *Id.*

Although the Court acknowledged that "this case implicates separation-of-powers concerns," *id.* at 53, it held that Plaintiffs' claims are nonetheless justiciable; the Court believed that Plaintiffs lack adequate legislative remedies for their alleged injury, *id.* at 43–48, and that this case is capable of resolution through the judicial process, *id.* at 48–54.  Moreover, the Court reasoned that if Plaintiffs do not have standing, then "it is unlikely that another plaintiff would." *Id.* at 55.  Finally, the Court held that Plaintiffs had established the traceability and redressability prongs of the standing analysis because Plaintiffs had adequately alleged that the President has caused their alleged injury of vote nullification and that injunctive relief against him would redress the injury.  *Id.* at 56–57.

## ARGUMENT

Courts may certify an order for interlocutory appeal if it involves "[1] a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).  In determining whether to grant §1292(b) certification, the Court should be mindful of § 1292(b)'s purpose to "inject an element of flexibility into the technical rules of appellate jurisdiction" and should weigh, among other things, "[t]he difficulty and general importance of the question presented" and "the significance of the gains from reversal." 16 Charles Alan Wright et al., Federal Practice and Procedure § 3930 (3d ed. 2008).

While courts in this District have stated that § 1292(b) certification must be justified by exceptional circumstances, *see, e.g.*, *Molock v. Whole Foods Mkt. Grp., Inc.*, 317 F. Supp. 3d 1,

4 (D.D.C. 2018), the Supreme Court has explained that "district courts should not hesitate to certify an interlocutory appeal" when a decision "involves a new legal question or is of special consequence." *Mohawk Indus.*, 558 U.S. at 111. One court of appeals also has "emphasize[d] the duty of the district court . . . to allow an immediate appeal to be taken when the statutory criteria are met." *Ahrenholz v. Bd. of Trs.*, 219 F.3d 674, 677 (7th Cir. 2000). Indeed, courts in this Circuit have not hesitated to allow interlocutory appeal when the § 1292(b) criteria are met. *See, e.g.*, *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1265 (D.C. Cir. 2008); *Molock*, 317 F. Supp. 3d at 4; *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 840 F. Supp. 2d 52, 57 (D.D.C. 2012); *APCC Servs., Inc. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 96 (D.D.C. 2003).

As explained below, this case presents the kind of extraordinary circumstance that warrants interlocutory review and all three requirements of § 1292(b) are met here.

### A. Certification for Interlocutory Appeal Is Appropriate Because of the Exceptional Circumstances of This Case.

In this case, "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment." *Am. Council of the Blind*, 525 F.3d at 1265 (citation omitted). This is a suit by individual Members of Congress seeking to adjudicate their contentions concerning the Foreign Emoluments Clause with respect to the President. They ask the Judiciary to enjoin the sitting President from alleged constitutional violations—*i.e.*, accepting foreign emoluments without the consent of Congress. 1st Am. Compl. at 57. The practical and political consequences of such a suit are readily apparent. And the separation-of-powers concerns implicated by such inter-branch confrontations alone warrant immediate appellate review of the threshold issue of whether the individual Members have standing to sue. Although this Court found *Raines* not controlling, *Raines* at least teaches that in a case involving inter-branch disputes, separation-of-powers principles counsel the Judiciary to exercise extreme restraint. Indeed, *Raines* discussed "several episodes in our history" of "analogous confrontations between one or both Houses of Congress and the Executive Branch"

that would have been resolved by the Judiciary if "claimed injury to official authority or power" by either Branch alone conferred standing to commence litigation.  521 U.S. at 826–28.  But as the Court in *Raines* held, "[o]ur regime contemplates a more restricted role for Article III courts."  *Id*. at 828; *see also Moore v. U.S. House of Representatives*, 733 F.2d 946, 959 (D.C. Cir. 1984) (Scalia, J., concurring) ("[T]he system of checks and balances [would be] replaced by a system of judicial refereeship, if the officers of the political branches are deemed to have a personal, 'private' interest in the powers that have been conferred upon them . . . by Constitution or statute.").  Moreover, involvement of the Judiciary in an "interbranch controversy" "would risk damaging the public confidence that is vital to the functioning of the Judicial Branch." *Raines*, 521 U.S. at 833 (Souter, J., concurring).

Thus, the Supreme Court has also taught that "occasion[s] for constitutional confrontation between [] two branches [of the Government] should be avoided whenever possible."  *Cheney*, 542 U.S. at 389–90.  The D.C. Circuit likewise has long recognized that separation-of-powers considerations ordinarily require the Judiciary to stay its hands.  *See, e.g.*, *Moore*, 733 F.2d 946 (dismissing suit by Members of Congress as a matter of equitable discretion because of the separation-of-powers problems it created); *Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (granting stay pending appeal in a dispute over compliance with Congressional subpoena by the former White House Counsel in part because the "present dispute is of potentially great significance for the balance of power between the Legislative and Executive Branches").  And judges in this Court similarly have adhered to that principle.  *See, e.g.*, *Doe v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing the President from suit challenging a presidential policy because "[s]ound separation-of-power principles counsel the Court against granting [declaratory and injunctive] relief against the President directly"); *Kucinich v. Bush*, 236 F. Supp. 2d 1, 11 (D.D.C. 2002) (Members of Congress had no standing to challenge the President's unilateral termination of treaty; "it is appropriate to defer to the political branches of government, out of respect for the traditional

restricted role of the judiciary in disputes between the Legislative and Executive Branches, and in keeping with the Constitution's separation of powers structure").

Moreover, the fact that this Court is the first to interpret *Raines* to permit individual Members of Congress to sue the President for alleged infringement of their asserted institutional prerogative is extraordinary enough to warrant immediate appellate review. *Cf. Cummings v. Murphy*, 321 F. Supp. 3d 92, 105 (D.D.C. 2018) (plaintiffs, who are seventeen Members of the House Oversight Committee, did not have standing under *Raines* to sue to compel the production of documents under statute conferring a right to certain information when requested by any seven members of the Committee, because their injury was only "institutional," not "personal," and because "Individual Members of Congress generally do not have standing to vindicate the institutional interests of the house in which they serve"); *Kucinich*, 236 F. Supp. 2d at 4 (Members of Congress had no standing under *Raines* to challenge the President's unilateral termination of treaty; observing that "[t]he question whether members of Congress have standing to sue Executive Branch officials is neither novel nor unsettled"); *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55–56 (D.D.C. 2009) (court found "extraordinary circumstances" warranting § 1292(b) certification where court made a novel interpretation and application of Supreme Court precedent).

Equally counseling in favor of immediate appeal is the fact that this case involves novel constitutional claims against the sitting President. *See, e.g.*, *In re Trump*, 874 F.3d 948, 952–53 (6th Cir. 2017) (permitting interlocutory appeal of an order denying the President's motion to dismiss a "state-law claim that present[ed] a novel question" because of the apparent "practical and political consequences of such a case"); *see also Fernandez-Roque v. Smith*, 671 F.2d 426, 431 (11th Cir. 1982) (in case presenting "novel controversies" involving the rights of illegal aliens and "the scope of the constitutional powers of Congress and the President to conduct foreign affairs," court of appeals issued writ of mandamus requiring district court to first resolve the question of its jurisdiction and to certify that ruling for interlocutory appeal because the jurisdictional question is a "controlling issue of national significance"); *Al Maqaleh*, 620 F.

7

Supp. 2d at 55 (in case involving habeas corpus rights of alien detainees held in a U.S. military base in Afghanistan, granting § 1292(b) certification given the "novelty of the issues" and the "extraordinary jurisdictional issue" in question).  If the D.C. Circuit were to conclude on interlocutory appeal that Plaintiffs lack standing, this case would come to an end, avoiding the need to address the novel constitutional issue presented by Plaintiffs' Foreign Emoluments Clause claim and conserving judicial resources.  *See Am. Council of the Blind*, 525 F.3d at 1265 (finding that the Secretary of Treasury had satisfied the "extraordinary circumstances" requirement for interlocutory appeal because "[w]ere we to conclude that the Secretary should have prevailed on summary judgment, our consideration of this matter would eliminate the need for further proceedings and preserve judicial resources").

And, as shown below, the Court may grant certification because all three statutory requirements are met.

**B.  The Order Involves a Controlling Question of Law.**

Under § 1292(b), a controlling question of law is "one that would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court's or the parties' resources."  *Molock*, 317 F. Supp. at 4 (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002)).  "Controlling questions of law include issues that would terminate an action if the district court's order were reversed." *APCC Servs.*, 297 F. Supp. 2d at 96; *Howard*, 840 F. Supp. at 55.  Thus, issues of subject matter jurisdiction are controlling questions of law because "reversal of the district court's order would terminate the action."  *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990); *accord APCC Servs.*, 297 F. Supp. 2d at 96; *Montesa v. Schwartz*, 836 F.3d 176, 194 (2d Cir. 2016) (reviewing on § 1292(b) interlocutory appeal whether plaintiffs had standing to bring an Establishment Clause challenge); 16 Fed. Prac. & Proc. § 3931 ("Among the categories of rulings that may be obviously suited for interlocutory appeal . . . are those rejecting . . . challenges to subject-matter jurisdiction [and] justiciability . . . .") (citations omitted).

Here, the issue of Plaintiffs' standing to sue is a threshold issue of subject matter jurisdiction that would be dispositive of this litigation if decided differently. It is thus a controlling question of law under the first prong of § 1292(b).

### C. There is Substantial Ground for Difference of Opinion as to Plaintiffs' Standing to Sue.

As for the required "substantial ground for difference of opinion" under § 1292(b), it may be established "where a court's challenged decision conflicts with decisions of several other courts." *APCC Servs.*, 297 F. Supp. 2d at 97–98. A "novel issue" may also satisfy this element of § 1292(b) without awaiting development of contradictory precedent if "fair-minded jurists might reach contradictory conclusions." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *see also In re Trump*, 874 F.3d at 952 (same); *Klinghoffer*, 921 F.2d at 25 (interlocutory appeal appropriate where issues were "difficult and of first impression"). And, a court may find a "substantial ground for difference of opinion" even where it is confident in the correctness of its ruling. *See, e.g.*, *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 33142129, at *2 (D.D.C. Nov. 22, 2000) ("Although this Court firmly believes that the facts of this case warrant a ruling in favor of application of the Federal Rules to jurisdictional discovery, the Court recognizes that the arguments in support of the opposite conclusion are not insubstantial."). Moreover, "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case." 16 Fed. Prac. & Proc. § 3930; *see, e.g.*, *APCC Servs.*, 297 F. Supp. 2d at 98 ("certification may be justified even if there is a relatively low level of uncertainty" where, for example, "'proceedings that threaten to endure for several years depend on an initial question of jurisdiction or the like'") (quoting 16 Fed. Prac. & Proc. § 3930).

Here, there is substantial ground for difference of opinion as to Plaintiffs' standing to sue because the Court has interpreted and extended Supreme Court and D.C. Circuit precedent in a novel way that warrants immediate review in the Court of Appeals.

**1. There is substantial ground for difference of opinion as to *Coleman*'s applicability to this case.**

Central to the Court's holding is its finding that Plaintiffs have alleged a cognizable institutional injury in the form of "vote nullification" such as that recognized in *Coleman v. Miller*, 307 U.S. 433 (1939). Mem. Op. at 31–32. In *Coleman*, a bloc of state senators, whose votes would have been sufficient to defeat the state's ratification of a Federal constitutional amendment if the state's Lieutenant Governor had not cast a tie-breaking vote in favor of ratification, and who the state supreme court held had a right to challenge that action in state court, were found to have standing to seek review in the Supreme Court on the basis that their votes had been nullified. *Coleman*, 307 U.S. at 441. Reasonable jurists could disagree about the propriety of extending *Coleman*'s holding in the unique circumstances of that case to this very different case.

*First*, *Coleman* has never been extended to confer standing on *federal* legislators in a suit involving inter-branch conflicts. The D.C. Circuit has distinguished *Coleman* from *Raines* in just this manner: "the federal constitutional separation of powers concerns that underlay . . . *Raines* (and which [the D.C. Circuit] emphasized in *Chenoweth* [*v. Clinton*, 181 F.3d 112, 113 (D.C. Cir. 1999)]) were not present [in] . . . *Coleman*." *Campbell*, 203 F.3d at 22. In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652 (2015), where the state legislature was also found to have standing to sue, the Supreme Court emphasized that the case before it "d[id] not touch or concern the question whether Congress has standing to bring a suit against the President," but "a suit between Congress and the President would raise separation-of-powers concerns." *Id.* at 2665 n.12. This Court itself has also recognized the separation-of-powers problems that would arise if *Coleman* were extended to the federal context, concluding in a suit involving conflict between the Senate and Members of the House that the suit "raises fatal separation-of-powers concerns." *Common Cause v. Biden*, 909 F. Supp. 2d 9, 24, 26–27 (D.D.C. 2012) (citing *Raines*' discussion distinguishing *Coleman* on this basis), *aff'd on other grounds*, 748 F.3d 1280 (D.C. Cir. 2014). Because "[a] separation of

powers issue arises as soon as the *Coleman* holding is extended to United States legislators,"
*Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977), there is substantial ground for
difference of opinion whether *Coleman* can appropriately apply to a suit by Members of
Congress against the President.[2]

 *Second*, the *Coleman* vote nullification theory was premised on the plaintiffs constituting
a sufficient proportion of the legislature to take legislative action. As the Supreme Court
explained in *Raines*, "*Coleman* stands (*at most . . .*) for the proposition that legislators *whose
votes would have been sufficient to defeat (or enact) a specific legislative Act* have standing to
sue if that legislative action goes into effect (or does not go into effect), on the ground that their
votes have been completely nullified." 521 U.S. at 823 (emphasis added). The only other case
where the Supreme Court has found legislative standing for an institutional injury, *Arizona State
Legislature*, involved a lawsuit brought by the state legislature itself. 135 S. Ct. at 2664
(distinguishing *Raines* on the grounds that the "Arizona Legislature . . . is an institutional
plaintiff asserting an institutional injury, and it commenced this action *after authorizing votes in
both of its chambers*") (emphasis added). Like *Raines* and unlike *Coleman* and *Arizona State
Legislature*, Plaintiffs here constitute a minority of each House of Congress and they lack
authorization from either entity to sue on its behalf. Although this Court interpreted these cases
to allow Plaintiffs standing here, finding that *Coleman* did not require any minimum number of
legislators to sue as a bloc and that *Arizona State Legislature* does not preclude individual
legislators from suing to vindicate an institutional interest, the Court's ruling is at least an
extension of those cases. And reasonable jurists could disagree about whether such an extension
is warranted, particularly in light of the Supreme Court's prior refusal to extend *Coleman*. *See
Raines*, 521 U.S. at 826 (rejecting individual Members' standing where upholding it "would

---

[2] Notably, the state senators in *Coleman* were found by the state court to have standing to sue in
state court. The Supreme Court then held that they had standing to seek review in the Supreme
Court of the judgment that had been entered against them. Here, the individual federal
legislators seek to bring an action directly in federal court in the first instance. *See* MTD Mem.
at 11 n.4.

require a drastic extension of *Coleman*"); *Common Cause*, 909 F. Supp. 2d at 24, 26 (rejecting application of vote nullification as a basis for legislative standing where doing so would "transform it from a narrow exception into a broader one").

*Third*, the asserted injury in *Coleman* did *not* damage all members of the legislature equally.  The only members of the legislature in *Coleman* who had suffered any injury were the state senators whose "votes *not* to ratify the amendment were deprived of all validity."  *Raines*, 521 U.S. at 822 (emphasis added).  The state senators who had voted *in favor* of ratification had not been injured at all.  Here, by contrast, Plaintiffs' asserted injury is a "type of institutional injury" (loss of an opportunity to cast a vote on whether to give or withhold consent) that "necessarily damages," if at all, "all Members of Congress and both Houses of Congress equally."  *Raines*, 521 U.S. at 821.  And that is precisely the type of "[w]idely dispersed" injury that the Supreme Court recently reaffirmed is insufficient to confer Article III standing.  *Ariz. State Legislature*, 135 S. Ct. at 2664 (quoting *Raines*, 521 U.S. at 829).  Reasonable jurists could therefore disagree about whether Plaintiffs' asserted injury in this case is in fact akin to the asserted injury in *Coleman*.

*Fourth*, "vote nullification," as interpreted by the Supreme Court and the D.C. Circuit, hinged on the irreversible nature of the challenged action, which reasonable jurists could find lacking here.  *Coleman* involved state senators' votes on a Federal constitutional amendment. 307 U.S. at 441.  As the D.C. Circuit explained in *Campbell*, once the Federal constitutional amendment was deemed ratified by the state, the senators had "no legislative remedy" to reverse it in the future.  203 F.3d at 22–23.  Similarly, in *Arizona State Legislature*, the challenged state initiative would have removed redistricting authority from the legislature entirely and "'completely nullif[ied]' any vote by the Legislature now or 'in the future,' purporting to adopt a redistricting plan."  135 S. Ct. at 2665 (quoting *Raines*, 521 U.S. at 823–24).

In this case, the Court found that Plaintiffs' alleged injury similarly cannot be remedied in the future, reasoning that "as soon as the President accepts a prohibited foreign emolument

without obtaining congressional consent, his acceptance is irreversible." Mem. Op. at 32.[3]  But reasonable jurists could disagree as to whether such action is comparable to those in *Coleman* and *Arizona State Legislature*, given that Congress still has the ability to vote on whether to consent to the President's alleged acceptance of foreign emoluments, even if *post hoc*.  Under the Court's reasoning, legislators would have standing to challenge Presidential action whenever the President allegedly acts without following prescribed constitutional or statutory procedures that would have allowed Congress to weigh in first.  The D.C. Circuit, however, has rejected such a proposition.

In *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), the individual Members challenged the President's use of military forces in Yugoslavia without first obtaining congressional authority, which the Members argued was required by the War Powers Clause of the Constitution and the War Powers Resolution.  *Id.* at 19, 23–24.  The D.C. Circuit found that they had no standing to sue, despite the fact that no legislative action could turn the clock back to the time before the challenged military operations occurred *without* the requisite congressional authorization.  Although the *Campbell* plaintiffs also cast their injury in terms of vote nullification, the D.C. Circuit rejected that characterization because the President was not acting pursuant to a "defeated declaration of war or a statutory authorization" as if it had been passed. *Id.* at 22.  Rather, the Court found, the plaintiffs' claim was essentially that the President had "acted illegally . . .  because he waged war in the constitutional sense without a congressional delegation," and such a claim was not "analogous to a *Coleman* nullification."  *Id.* at 22.  In so

---

[3] The history of the Foreign Emoluments Clause's application arguably refutes this finding.  The historical record is replete with examples of U.S. officials *first* accepting gifts from foreign governments and then either seeking consent from Congress or obviating any Foreign Emoluments Clause issue by depositing the gift or its proceeds with the Treasury.  Def.'s MTD Mem. at 32–33.  Moreover, although the Court observed that past Presidents have "complied with the Clause . . . by requesting an opinion from the Executive or Legislative Branch's advisory office as to whether the Clause applies," Mem. Op. at 10–11, such a manner of compliance would seem to give rise to a claim for legislative standing by any Member of Congress under the Court's reasoning because such advice does not constitute prior consent from Congress itself.

holding, the Court also rejected the argument that the "right to vote in the future" does not remedy past deprivation of a voting opportunity; as the Court put it, *Raines* teaches that "if at first you don't succeed [in convincing your colleagues in Congress], try and try again." *Id.* at 24.

Reasonable jurists thus could disagree whether the President's failure to seek congressional consent before his alleged acceptance of foreign emoluments is analogous to a *Coleman* nullification. Indeed, one court has already concluded in an analogous context that individual legislators did not have standing even where the President acted without obtaining their prior consent as allegedly required by the Constitution. *See Kucinich*, 236 F. Supp. 2d at 9 (Members of Congress had no standing to challenge the President's unilateral withdrawal from a treaty, despite claim that "they have been divested of their constitutional role in treaty termination," because their "institutional injuries" were "no different" from those alleged in *Raines* and *Campbell*). Although Plaintiffs cast their injury as being alleged nullification of their interest in voting on whether to consent to the President's alleged acceptance of emoluments, at bottom, their complaint is simply that the President is violating the law—an allegation that has never been thought to confer standing on an individual Member of Congress.

This Court's further distinction that individual Members have standing when the injury is attributable to the President as here and not to "any action taken or not taken by their congressional colleagues," Mem. Op. at 42, is also in substantial tension with *Campbell* and *Kucinich*, where it was the President, not the plaintiffs' colleagues in Congress, who caused the alleged injury. At the least, the foregoing shows that the Court's decision here represents an extension of governing precedent. As the Court itself has previously recognized, the theory of vote nullification applied in *Coleman* as a basis for standing is a "narrow" exception that would not be applicable in a case that is "factually distinguishable" from *Coleman*. *Common Cause*, 909 F. Supp. 2d at 24.

### 2. Whether Plaintiffs lack adequate legislative remedies is a question about which reasonable jurists could differ.

There is likewise substantial ground for difference of opinion as to whether Plaintiffs have adequate legislative recourse such that it would be inappropriate for the Judiciary to intervene in the political branches' dispute—assuming that the presence or absence of such measures is relevant to the issue of standing by individual Members of Congress. *Campbell* explained that there are many measures available to Congress in a dispute with the President, which, even if imperfect and incapable of undoing past allegedly unlawful action, are adequate to preclude legislative standing:  "In this case, Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign . . . .  Of course, Congress always retains appropriations authority and could have cut off funds for the American role in the conflict."  *Campbell*, 203 F.3d at 23.

Although this Court reasoned that Congress cannot cut funding concerning the President's alleged emoluments violation, and rejected the relevance of legislative measures that involve matters unrelated to the emoluments issue, Mem. Op. at 47, at least one judge in this Court has held that all legislative tools that can be wielded during the political give-and-take between the branches are relevant in determining the "adequacy" of legislative remedies.  In *Kucinich*, Judge Bates held that the plaintiffs there had adequate legislative remedies to address their injury arising from the President's unilateral treaty termination because Congress could, among numerous other political options, "refuse to fund unrelated matters that were important to the President, or even reduce budgets for the Executive Branch; the Senate could reject presidential nominees, or could refuse to provide consent to enter into other treaties submitted by the President."  236 F. Supp. 2d at 10.

In any event, Congress can still vote on whether to consent or to withhold consent to the President's alleged acceptance of foreign emoluments, and as discussed above, *Campbell* has held that the "right to vote in the future" could remedy the deprivation of an opportunity to vote in the past.  203 F.3d at 24.  Indeed, if the President's past alleged violations cannot be

adequately remedied by congressional action now, it is not clear how this Court would be in a better position to provide a remedy.

Reasonable jurists could also disagree as to whether Congress's consent legislation would provide an adequate remedy to Plaintiffs' injury as they characterize it—that alleged injury being the denial of an opportunity to vote on whether to consent or withhold consent. The Court found that such legislation would not provide an adequate remedy because Plaintiffs do not allege "an injury to their power to legislate on the issue of emoluments," Mem. Op. at 53, and because the suggested legislation would "plac[e] the burden on Members of Congress to convince a majority of their colleagues to enact the suggested legislation" instead of "plac[ing] the burden on the President to convince a majority of Members of Congress to consent," as the Clause allegedly requires, *id.* at 45. But whichever way the question of consent is put before Congress—whether the President first approaches Congress to seek consent or whether an individual Member *sua sponte* introduces a bill to provide consent—the legislative process is identical, as is a Member's opportunity to vote. Indeed, because the Foreign Emoluments Clause references only the "Consent of Congress," U.S. Const. art. I. § 9, cl. 8, the Constitution's only requirement for the manner of such consent is that it proceed through the "single, finely wrought and exhaustively considered, procedure" in Article I, sections 1 and 7 of the Constitution. *INS v. Chadha*, 462 U.S. 919, 951 (1983). Whether the end result of that legislative process is a private bill, a joint resolution, or a generally applicable piece of legislation that governs the President's receipt of foreign emoluments does not change the nature of Plaintiffs' alleged injury in this case, which is the alleged deprivation of their right to vote on whether to consent or withhold consent to the President's alleged acceptance of foreign emoluments. Reasonable jurists could thus conclude that, contrary to the Court's suggestion, any of these options is a sufficient legislative remedy for the alleged injury.

Finally, the Court found that Plaintiffs' legislative remedies are circumscribed by Congress's lack of information of the President's alleged acceptance of emoluments. Mem. Op. at 46. But reasonable jurists could disagree as to that conclusion as well because Congress has

16

tools to carry out its legislative functions and does not require civil discovery to do so.  *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975), *Watkins v. United States*, 354 U.S. 178, 200–01 (1957).  To the extent Plaintiffs are unable to use the available legislative tools because of a lack of support from their colleagues, that is an intra-branch dispute, one in which the courts lack jurisdiction to intervene. *Cf. Campbell*, 203 F.3d at 23 (no standing under *Coleman* where legislative remedies were available but plaintiffs lacked legislative support to pass them).

### 3.  There is substantial ground for difference of opinion whether the standing of other plaintiffs is relevant.

Reasonable jurists similarly could disagree about whether the ability of another plaintiff to bring this case has any bearing on the Court's standing analysis.  The Court held that it does, citing the *Raines* Court's observation that its decision did not "foreclose[] the [Line Item Veto] Act from constitutional challenge" by some other plaintiff "who suffers judicially cognizable injury as a result of the Act."  Mem. Op. at 19–20, 54–55 (quoting *Raines*, 521 U.S. at 829). Reasonable jurists could conclude that this Court has erroneously extended *Raines* because the ruling is in substantial tension with the Supreme Court's long-standing guidance that "the assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982)); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974) (same); *see also United States v. Richardson*, 418 U.S. 166, 179 (1974) ("the absence of any particular individual or class to litigate [constitutional claims] gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process.").

In sum, there is substantial ground for difference of opinion as to the Court's finding of legislative standing.

**D.  Certification Would Materially Advance the Termination of the Litigation.**

Finally, the third prong of § 1292(b) is also met.  "When there are substantial grounds for difference of opinion as to a court's subject matter jurisdiction, courts regularly hold that immediate appeal may materially advance the ultimate termination of the litigation."  *Al Maqaleh*, 620 F. Supp. 2d at 55 (citation omitted).  This is so because an early determination that the Court lacks jurisdiction "would conserve judicial resources and spare the parties from possibly needless expense if it should turn out that this Court's rulings are reversed."  *APCC Servs.*, 297 F. Supp. 2d at 100 ("[I]n the event that it is ultimately found that this Court lacks jurisdiction to litigate [this] case[], it would be far better for all concerned, including plaintiff[], to have these matters resolved now, as opposed to sometime in the distant future.").  Reversal of the Court's September 28 Order would terminate this litigation for lack of jurisdiction, conserving the parties and the Court's judicial resources.  There is accordingly little doubt that certification would materially advance the termination of this litigation.

## CONCLUSION

For the foregoing reasons, the President respectfully requests the Court grant this motion and certify its September 28, 2018 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

Dated:  October 22, 2018

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Jean Lin*_____
JEAN LIN
Special Counsel
JAMES R. POWERS
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov