

Office of Inspections
Office of Inspector General
U.S. General Services Administration

# Evaluation of GSA's Management and Administration of the Old Post Office Building Lease

**JE19-002 (Redacted)**
**January 16, 2019**

## I.       Introduction

On July 28, 2017, the Office of Inspector General of the General Services Administration (GSA OIG) opened this evaluation of GSA's management and administration of GSA's ground lease of the Old Post Office Building (OPO). We initiated this evaluation based on numerous complaints from Members of Congress and the public about GSA's management of the lease. The complaints generally raised two issues regarding the lease: (1) does the Foreign Emoluments Clause or the Presidential Emoluments Clause of the U.S. Constitution bar President Donald J. Trump's business interest in the Trump Old Post Office LLC (Tenant) and (2) does the President's business interest in Tenant violate Section 37.19 of the lease.[1]

This report focuses on GSA's decision-making process for determining whether the President's election caused Tenant to be in breach of the lease upon the President's inauguration. We did not seek to determine whether the President's interest in the hotel violates either the Emoluments Clauses or Section 37.19 of the lease, or whether any violation caused a breach of the terms and conditions of the lease. Rather, we sought to determine whether there were any improprieties in GSA's decision-making process regarding these issues.

We found that GSA recognized that the President's business interest in the OPO lease raised issues under the Constitution's Emoluments Clauses that might cause a breach of the lease; however, GSA decided not to address those issues in connection with the management of the lease. We also found that the decision to exclude the emoluments issues from GSA's consideration of the lease was improper because GSA, like all government agencies, has an obligation to uphold and enforce the Constitution; and because the lease, itself, requires that consideration. In addition, we found that GSA's unwillingness to address the constitutional issues affected its analysis of Section 37.19 of the lease that led to GSA's conclusion that Tenant's business structure satisfied the terms and conditions of the lease. As a result, GSA foreclosed an early resolution of these issues, including a possible solution satisfactory to all parties; and the uncertainty over the lease remains unresolved.

## A.       Background

Constructed between 1892 and 1899, the OPO was designed to house both the U.S. Post Office Department Headquarters and the main Washington, D.C. post office branch.[2] The OPO was slated for demolition in 1928 but a lack of funding during the Great Depression saved it; thereafter, it served as the home for various federal agencies.[3] In 1964, the President's Council on Pennsylvania Avenue recommended demolition of the OPO in an effort to harmonize the architecture in the Federal Triangle area of the city; however, local citizens united against demolition and the plan was not executed.[4] The OPO was listed in the National Register of Historic Places in 1973.[5]

In 1976, Congress passed the Public Buildings Cooperative Use Act, which provided GSA the authority to renovate the OPO for mixed use, with the upper levels used to house government offices and space on the upper and lower levels leased for restaurant and other retail use to generate revenue.[6] The OPO redevelopment was not successful, however, because of low

occupant satisfaction and high retail turnover, including the bankruptcy of the original developer.[7] In addition, GSA costs to support both federal and retail occupants exceeded revenue and the property was underutilized.[8] Consequently, GSA determined the best use of the OPO would be to buy out the existing retail leases and redevelop the property with terms and conditions beneficial to the government under the National Historic Preservation Act (NHPA), Section 111.[9] The NHPA specifically allows federal agencies to lease (or outlease) an historic property to a person or organization if the agency head determines that the lease will adequately ensure the preservation of the historic property.[10]

Congress passed the Old Post Office Building Redevelopment Act of 2008 and directed GSA to proceed with the OPO redevelopment.[11] GSA's redevelopment goals included leveraging private market expertise, putting the OPO to its highest and best use, providing a financially lucrative return to the government, preserving the historic integrity of the asset, providing for continued public access, and contributing to the vitality of Pennsylvania Avenue, the Federal Triangle area, and the city.[12] Congress required congressional review before any proposed redevelopment agreement became effective, and directed GSA to provide a report of the cost benefit analysis of the proposed agreement and its material provisions.[13]

GSA assigned a small team of employees to oversee the OPO redevelopment issues. This team included a contracting officer, Kevin Terry; an attorney, Timothy Tozer; and a project manager. Brett Banks assumed the project manager duties from a predecessor early in the project.

GSA issued a request for proposals on March 24, 2011, for the OPO redevelopment and ground lease.[14] The solicitation included an "As Is, Where Is" provision, and made GSA responsible for compliance with the NHPA and the National Environmental Policy Act, as well as continued public access to the OPO Clock Tower.[15]

After reviewing and evaluating proposals, GSA selected the Trump Old Post Office LLC (Tenant) as the preferred selected developer on February 7, 2012, to restore and redevelop the site into a luxury 260-room hotel.[16] Donald J. Trump (Trump) and Trump Old Post Office Member Corp. (a Delaware corporation wholly owned by Trump) formed Tenant.[17] GSA and Tenant then entered into discussions to negotiate the terms and conditions of the lease. GSA identified 31 provisions of the lease that the agency considered "material" in its report to Congress as required by the 2008 Act.[18] Section 37.19, which prohibits elected officials from being "admitted to" certain interests in the lease, was not one of those provisions, and therefore, was not reported to Congress.[19]

After the Act's congressional review period expired, the parties executed a 60-year ground lease on August 5, 2013, which required Tenant to pay GSA a minimum of $3 million in rent annually.[20] At this time, Trump had a majority interest in Tenant, in which several other business entities also held a small interest each.

On May 31, 2014, GSA delivered exclusive possession of the premises to Tenant; and on August 12, 2014, GSA issued a notice to proceed, authorizing Tenant to begin construction. GSA provided a temporary certificate of occupancy to Tenant on September 12, 2016 allowing

JE19-002

Tenant to conduct a soft opening of the hotel. The Trump International Hotel officially opened on October 26, 2016, and it has been in continuous operation since that date.

On November 8, 2016, Donald J. Trump was elected President of the United States.

Long before the 2016 presidential election campaign, Trump's successful bid to redevelop the historic building into a luxury hotel garnered attention.[21] His involvement with the project continued to attract press interest throughout the 2016 presidential election campaign; occasional news articles raised concerns about potential conflicts of interest and the Emoluments Clauses.[22] Public attention to his investment in the OPO intensified after the election. GSA received Freedom of Information Act requests and requests for information from Members of Congress raising concerns about the Foreign Emoluments Clause and foreign governments' use of the hotel, as well as whether the President's interest in Tenant violated Section 37.19 of the lease.[23]

Shortly after the November 2016 election, lawyers in GSA's Office of General Counsel (OGC) began discussing the issues raised under the Constitution's Emoluments Clauses and Section 37.19 of the lease. The relevant provisions are as follows:

> U.S. Constitution, Article I, Section 9, Clause 8 -**The Foreign Emoluments Clause**:
>
> > [N]o Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.
>
> U.S. Constitution, Article II, Section 1, Clause 7 -**The Presidential Emoluments Clause**:
>
> > The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.
>
> Ground Lease, Old Post Office Building, **Section 37.19: Interested Parties**:
>
> > No member or delegate to Congress, or elected official of the Government of the United States or the Government of the District of Columbia, shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom; provided, however, that this provision shall not be construed as extending to any Person who may be a shareholder or other beneficial owner of any publicly held corporation or other entity, if this Lease is for the general benefit of such corporation or other entity.

As described in further detail below, in December 2016, the OGC lawyers decided not to consider whether the President's business interest in the OPO lease might result in his receipt of emoluments under the Constitution's Emoluments Clauses. In March 2017, after receiving

guidance from the OGC lawyers, the GSA contracting officer responsible for the OPO lease decided that Tenant was in full compliance with Section 37.19 of the lease.

## B.    Methodology

During the course of this evaluation, the OIG conducted over two dozen interviews of GSA personnel involved in the administration of the OPO lease, including the GSA lease contracting officer, Kevin Terry; the GSA lease project manager, Brett Banks; GSA Deputy General Counsel Lennard Loewentritt; GSA Office of General Counsel attorneys Associate General Counsel for Real Property Barry Segal and Deputy Associate General Counsel for Real Property Timothy Tozer; former OGC Regional Counsel Paula DeMuth; and Public Building Service (PBS) Deputy Commissioner Michael Gelber. We also sought to interview former GSA General Counsel Kris Durmer, but he declined to be interviewed.

In addition, we reviewed over 10,000 GSA documents and emails concerning the OPO lease, including the lease agreement and related files, documents, and emails concerning lease negotiations and interpretations. We also reviewed Founding Era and other sources for the meaning and usage of the term emolument, in order to understand whether a federal official's private business activities might raise constitutional issues. We conducted our evaluation in accordance with the Council of the Inspectors General on Integrity and Efficiency *Quality Standards for Inspection and Evaluation* (January 2012).

This report first presents an overview of the facts related to GSA's decision-making process for the emoluments issues and its consideration of Section 37.19 of the lease. The next part of the report analyzes (1) how the Emoluments Clauses issues arise with the lease; (2) the reasons for GSA's decision to avoid the constitutional emoluments issues and why that was improper; and (3) how the decision to overlook the constitutional issues influenced GSA's understanding of Section 37.19. The Conclusion includes our findings and recommendation.

## II.    Facts

GSA's legal work on the Emoluments Clauses and Interested Parties provision fell to a small group of OGC supervisory attorneys: Tozer and former Regional Counsel Paula DeMuth, as well as General Counsel Kris Durmer, Deputy Counsel Lennard Loewentritt, and Associate General Counsel for Real Property Barry Segal.[24] Demuth and Tozer told us that they walled Contracting Officer Terry off to avoid any political influence over him and preserve his independence.

## A.    Emoluments

The selection in July 2016 of Tenant's primary owner, Donald J. Trump, as a major political party candidate for President raised the possibility for GSA that its lease of the OPO might generate questions under the Foreign Emoluments Clause and the Presidential Emoluments Clause. However, one attorney said OGC did not discuss this possibility until shortly before the November election, when news articles appeared that questioned whether Trump's election would trigger Emoluments Clause and other conflicts of interest issues. According to one senior attorney, the emoluments issues did not become a hot button issue until after the election.

JE19-002

One attorney specifically recalled that emoluments did not become an issue for OGC until an article regarding the issue appeared in *Government Executive* on November 28, 2016.

The attorneys recalled participating in a few internal discussions about the emoluments issues after the election. Most attorneys on the OPO project were aware that there was a Foreign Emoluments Clause and a Presidential Emoluments Clause. [25] One attorney stated his view at the time was that the purpose of the Presidential Emoluments Clause was to prevent a President from receiving additional compensation beyond his salary for performing his job as an elected official and that the clause did not apply to income from pre-existing business arrangements. Another attorney thought that there were good arguments to be made on both sides of the issues presented by the two Emoluments Clauses. In the end, they all agreed early on that there was a possible violation of the Constitution's Emoluments Clauses.

Nonetheless, the attorneys decided to ignore the emoluments issues. They told us that the agency generally does not deal with constitutional issues (other than issues involving land condemnation or GSA officials), and consequently, the Constitution's emoluments issues were not in GSA's purview. In their view, OGC is only responsible for rendering an opinion on an explicit provision of the OPO lease, such as Section 37.19. Emoluments raised larger issues regarding the President's business interests. One attorney told us that they decided not to "spin their wheels" on something that was not before them and, if necessary, they could address the issue another day.

When asked whether GSA addresses emoluments issues in other contexts, Loewentritt acknowledged that issues under the Foreign Emoluments Clause occasionally arise in connection with foreign gifts and travel paid by foreign governments for GSA employees, but said that OGC does not get involved with supplemental income emoluments. He told us those issues were for the Department of Justice's Office of Legal Counsel (OLC) or the Office of Government Ethics (OGE).

OGC made the decision not to address the emoluments issues by mid-December 2016. On December 16, 2016, Tenant notified the contracting officer of plans to restructure the President-elect's financial interests in Tenant. The subsequent correspondence between GSA and Tenant focused on the restructuring and Section 37.19 of the lease, until Terry issued his Estoppel Certificate on March 23, 2017.

Segal told us that the decision to focus on Section 37.19 and not on the emoluments issues came out of a discussion between himself, Durmer, and Loewentritt. He also told us all the OPO attorneys agreed with ignoring the constitutional issue because it was bigger than GSA and the lease. Former General Counsel Durmer declined the OIG's request for an interview.

OGC decided to ignore the constitutional issues without preparing a formal decision memorandum to document the rationale for the position they were taking. One attorney told us that the decision-making process was just talking among the lawyers. Attorneys also told us that they made this decision without conducting any research of the two Emoluments Clauses or checking for any OLC opinions about the Emoluments Clauses. However, one attorney

acknowledged that, as a matter of personal interest, he read an OLC emoluments opinion involving President Reagan mentioned in a press report.

OGC lawyers did not contact or request guidance from OLC before making this decision.[26] One senior attorney told us that OLC knew about the OPO lease "and it was up to them to do something." Another attorney stated that because OGC was not going to address the constitutional issues, they did not need to confer with OLC. Similarly, Loewentritt stated that OGC did not refer the emoluments issues to OLC because OGC would not opine on them, although OLC could.

Both Segal and Tozer stated that they had little involvement with the Administrator's office about the position OGC took on the lease and no involvement from the Presidential Transition Team. Segal said he had at least one meeting about the lease with Administrator Roth, ███ ███████████████████████████████.* Tozer told us that Administrator Roth agreed to wait until GSA received information from Tenant to interpret the lease. As described further below, Tenant provided information about its structural reorganization to GSA after Roth's tenure as Administrator ended with the inauguration of President Trump on January 20, 2017.

Several weeks after OGC decided to forego consideration of the constitutional issues, the first lawsuit was filed raising Foreign Emoluments Clause and Presidential Emoluments Clause challenges to the President's interest in the lease.[27] One of the attorneys told us that, shortly afterwards, on January 31, 2017, OGC attorneys told Tenant's attorneys in a meeting that GSA would not raise any issues concerning the Emoluments Clauses.

On March 3, 2017, OGC provided Terry with a legal memorandum from DeMuth and Tozer instructing him



The memorandum acknowledged, however,

According to the memorandum,

Terry told us that he did not consider the Emoluments Clauses in his analysis because they were not included within the "four corners of the lease." Terry went on to say that he thought the Foreign Emoluments Clause was relevant to the lease but that the Clause has broader implications for the President and that it was most likely another government body that would be responsible for making a decision. He also stated that it is not GSA's role to focus on constitutional law and that he believes the courts should determine whether there was a constitutional violation. Terry nonetheless said that he tried to familiarize himself with the emoluments issues by reading news articles.

---

* All of the redactions in this report contain information GSA asserts is protected from disclosure pursuant to the attorney-client and deliberative process privileges.

JE19-002

## B.    Section 37.19

The OPO team started working on the ground lease in 2009, but had little understanding of Section 37.19 when the provision became part of the lease. Terry told us that the section was used in other GSA outleases, such as the one for The Monaco Hotel, but doubted that the team spent more than 15 minutes discussing Section 37.19 among themselves, before he signed the OPO lease. Banks also told us he did not recall much discussion of the provision, and Tozer told us he did not recall any discussion of, or having any familiarity with, the provision.

### 1.    Origins of Section 37.19

We found that Section 37.19 is based on an 1808 Act of Congress that prohibited Members of Congress from participating in contracts or agreements with the United States, and subjected Members and government officers who made such contracts to criminal prosecution.[28] This early Act also provided that every federal government contract or agreement must include a prohibition that:

> … no member of Congress shall be admitted to any share or part of such contract or agreement, or to any benefit to arise thereupon.[29]

This wording remained in the public contract laws when, in 1983, the Pennsylvania Avenue Development Corporation (PADC) executed a lease for the redevelopment of the historic Willard Hotel. The provision in the Willard Hotel lease stated:

> No member or delegate to Congress, or elected official of the Government of the District of Columbia, shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this Lease if made with a corporation for its general benefit.[30]

GSA later inherited oversight for the lease after PADC dissolved.[31]

OGC attorney Jeffrey Domber used the Willard Hotel lease as a template for GSA's 1999 outlease of the Tariff Commission Building/General Post Office, a National Historic Landmark, for its redevelopment as The Monaco Hotel by Kimpton Hotels and Restaurant Group Inc. Domber surmised that he added the language "or elected official of the Government" to the admitted clause because he thought interested parties should include United States officials, and not just be limited to elected officials of the D.C. government. He told us the clause was intended to minimize a public official's interference with the commercial operation of the government landlord and included elected officials "period." Domber told us he also added language to Section 37.19's proviso clause, about beneficial ownership interests in entities, at the suggestion of the lessee's attorneys.[32] Domber said that the clause never became an issue in negotiations, he assumed because the Kimpton did not include anyone with political ambitions. As a result, the revised clause used in the Monaco Hotel lease stated in full:

> No member or delegate to Congress, or elected official of the Government or the Government of the District of Columbia, shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom; provided, however, that

> this provision shall not be construed as extending to any Person who may be a
> shareholder or other beneficial owner of any publicly held corporation or other
> entity, if this Lease is for the general benefit of such corporation or other entity.

GSA made no changes to the Monaco Hotel lease Interested Parties provision when
pasting it into OPO lease Section 37.19. By the time GSA executed the OPO lease,
Congress had revised the 1808 language used in Section 37.19 "… to conform to the
understood policy, intent, and purpose of Congress in the original enactments …."[33] The
revised language stated: "A Member of Congress may not enter into or benefit from a
contract or agreement or any part of a contract or agreement with the Federal
Government."[34]

GSA did not consider Section 37.19 a material term of the OPO lease, and it was not discussed
during lease negotiations.[35] There also was no discussion on the OGC OPO team about Section
37.19's impact if Trump became President, in view of his earlier presidential bids. Terry,
however, told us that he was aware of Trump's earlier interest in the presidency but it was not
a consideration during lease negotiations because at the time Terry thought a Trump
presidency unlikely.

>    2.    GSA Review of 37.19

As with the emoluments issue, GSA personnel first began seriously discussing the meaning of
Section 37.19 shortly after the election. Following the publication of the first of several articles
about Section 37.19 on November 15, 2016, the OGC attorneys working on the OPO project
began discussing whether President Trump's business interest in the OPO lease constituted a
breach of the section.[36] Terry told us that he immediately formed an opinion, based on his
"plain reading" of Section 37.19, that there was no breach of Section 37.19; however, he waited
to formalize his opinion because he was willing to consider other points of view. According to
Terry, OGC attorneys Segal, Tozer, and DeMuth approached him before the inauguration ████

██████████████████████████████████████████████████

As noted earlier, Trump had a majority interest in Tenant, in which several other business
entities also held a small interest each. On December 16, Tenant sent Terry a letter indicating
that President-elect Trump "intends to assign all of his interests in Trump Old Post Office
Member Corp to DJT Holdings Managing Member LLC" and that Tenant anticipated that the
transfer would occur no earlier than January 1, 2017. On January 11, 2017, the President-elect
and Tenant's counsel, Sheri Dillon, held a press conference announcing that the President-elect
would relinquish leadership and management of the Trump Organization and voluntarily
donate all profits from foreign government payments made to his hotel to the United States
Treasury.[37]

President Trump was sworn into office on January 20, 2017. After the inauguration, Tenant's
counsel notified Terry that the President had transferred his interest in the Old Post Office to a
revocable trust and relinquished his management over that interest, for the period of his
presidency; however, he still retained his financial interest in the property.

JE19-002

OGC lawyers, Terry, and Banks met with Tenant representatives Donald J. Trump, Jr., Eric Trump, and counsel on January 31, 2017, to discuss Tenant's new organizational structure.[38] Terry told us that during the January 31, 2017, meeting, he strongly encouraged the President's divesture from Tenant. Terry told us that he pushed hard for divestiture in discussions with Tenant's representatives to provide value to the government, not because he thought that the lease was breached. Terry said he wanted to get the OPO out of controversy so he encouraged divestiture to try and prevent any issues related to emoluments, even though emoluments issues were not GSA's responsibility to consider. However, Terry stated he did not have a solid position to force a complete divestiture since there was not a breach of the lease. In addition to the January 31, 2017 meeting, one or more OGC attorneys met separately with Tenant's counsel to review documents.

On February 10, 2017, Terry solicited Tenant's position and analysis on whether Tenant was in "full and complete compliance" with the Lease, specifically Section 37.19.[39] Counsel for Tenant responded February 17, 2017, concluding that, among other points, (1) Section 37.19 does not apply when an elected official is "admitted to" a lease before their election and (2) Tenant is an "other entity" under Section 37.19's exception for owners who have a beneficial interest in a "publicly held corporation or other entity."[40] After receiving Tenant's response, Terry requested a legal opinion from OGC.

OGC's March 3, 2017 memorandum for Terry



The memorandum ultimately

On March 20, 2017 Tenant provided further analysis of its position and requested a certificate stating that it was in full compliance with Section 37.19 of the lease and that the lease was valid and in full force and effect.[41] The same day, Terry requested further guidance from OGC. OGC responded

## C.      Contracting Officer's Decision

Terry communicated his decision to Tenant on March 23, 2017. Terry told us he looked at the four corners of the lease and the plain meaning of its language. He considered Tenant's letters that explained its interpretation of the lease language.[42] Terry also considered the OGC opinions. Terry concluded that Tenant satisfied his interpretation of the admitted clause. His decision memorandum to Tenant stated that "most of the review and reporting on Section 37.19 has focused on only a few select words, and reached simplistic 'black and white' conclusions regarding the meaning and implications of the clause." However, Terry noted, "it has been less widely reported that other legal professionals and former government contracting officials have reviewed the language and come to different conclusions," and cited one such press article.[43]

JE19-002

On March 23, 2017, Terry issued the Estoppel Certificate Tenant requested. His accompanying letter stated his determination that Tenant was "in full compliance with Section 37.19 and, accordingly, the Lease is valid and in full force and effect."[44]

Terry stated that no one inside or outside GSA pressured him to render any specific decision about Section 37.19. He stated that he had no meetings with the Administrator, other GSA leadership, or the Presidential Transition Team about Section 37.19. Terry also stated that he could not remember speaking with anyone in GSA other than Tozer and DeMuth about the lease, and that Acting Administrator Horne (who served in that position from January 20, 2017 to December 11, 2017) was not involved in the decision-making process.

At the time he issued the Estoppel Certificate, Terry knew that OGC recognized a violation of the Foreign Emoluments Clause might be relevant to a breach and that this important issue remained open. Nonetheless, he did not qualify his certification.

### III.   Analysis

As noted earlier, the OGC lawyers responsible for providing guidance on the OPO lease acknowledged that the President's interest in the lease might violate the Foreign Emoluments Clause, and thus constitute a breach of the lease. However, despite recognizing the emoluments issue, they decided not to address it and went on to advise Terry on the Section 37.19 issue without benefit of analysis of the constitutional issue.

In this section of the report, we evaluate whether GSA should have addressed the issue raised under the Emoluments Clauses as part of its administration of the lease. To do so, we first consider whether, as GSA acknowledged, the Emoluments Clauses *might* apply to the benefits a government officer or employee receives from private business activities. We then address GSA's reasons for ignoring the constitutional issue, and the effect this had on its analysis of Section 37.19 of the lease.

### A.   The Emoluments Issue

To evaluate whether the Emoluments Clauses might apply to the benefits a government officer or employee receives from private business activities, we surveyed sources that show the contemporaneous use and meaning of the term "emolument" during the Founding Era. We also considered how the Supreme Court understood the meaning of the term, by reviewing the Court's opinions that might show general usages over long periods of time. Finally, we considered publicized accounts of the first President's private purchases and sales that may show a historic practice of presidential business activities with the United States and foreign states.

If "emoluments" include an official's gains from private business activities, the President's interest in the lease raises at least potential constitutional issues. The Foreign Emoluments Clause becomes relevant if the hotel receives payments from or on behalf of foreign governments, or a foreign instrumentality, when its representatives stay or hold events at the hotel or otherwise use its services. The Presidential Emoluments Clause becomes relevant if the

JE19-002

United States or a State of the United States similarly pays for the use of the hotel's services, or if Tenant receives other benefits from the government related to the hotel.

Although the term emolument may be archaic, it is a term that the United States government, including GSA, currently uses in security clearance agreements. This is not an isolated use. Nearly three million federal employees and contractor personnel (2,865,402 as of October 2015) have signed agreements that:

> assign to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication, or revelation of classified information not consistent with the terms of this Agreement.[45]

The impetus for these assignments was a 1980 Supreme Court opinion that considered a former Central Intelligence Agency officer's publication of a book for his private gain about agency intelligence activities. The Court imposed a constructive trust over the former officer's proceeds from his book to deny him any pecuniary benefit from violating his contract with the agency for prepublication review.[46] The assignments on security clearance forms achieve the same result, by removing the profit incentive from misusing classified information for personal benefit.

These standard form agreements, available or referenced on GSA's public and internal websites, recognize that a government officer's private business activities produce emoluments. This much also is apparent from the current dictionary definition of "emolument" as the "… profit or perquisites from office, employment, or labor: fees, salary," as well as an archaic use meaning advantage and benefit.[47]

A word's meaning in the 21st century, however, is not necessarily the same as the meaning in the late 18th century when the new United States adopted the Constitution. As discussed below, we found evidence that the term had varied meanings at the time of the Constitution's adoption and ratification; these meanings included the income or other benefits a public officer receives from private business activities; and that usage continued after the Founding Era to the present day, as the government's security clearance agreements illustrate.

> 1.    *First Congress and Emoluments*

The Supreme Court recognizes that the laws enacted by the First Congress provide "contemporaneous and weighty evidence of the Constitution's meaning" since many of the Members of the First Congress had taken part in framing that instrument.[48] We identified four laws that the First Congress enacted that use the terms "emolument" or "emoluments."

*An Act to establish the Treasury Department* created senior officers for the Department of Treasury. The enactment did not permit these officers to "directly or indirectly … take or apply to his own use, any emolument or gain for negotiating or transacting any business in the said department, other than what shall be allowed by law." Any official convicted of violating these prohibitions committed a high misdemeanor and was fined, removed from office, and barred from holding any office under the United States.[49]

*An Act for the Government of the Territory of the United States, south of the river Ohio* addressed the "powers, duties and emoluments" of a superintendent of Indian affairs.[50]

*An Act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels* addressed the "fees and emoluments" that collectors of customs, naval officers, and surveyors received for performing their duties.[51]

Finally, *An Act to incorporate the subscribers to the Bank of the United States* created the Bank of the United States as a government chartered but privately owned entity, and provided that the Bank's directors could not receive "any emolument" unless approved by stockholders at a general meeting.[52]

In these enactments, "emolument" was the officers' gain from conducting "any business" with their agency (the senior Treasury officers); the officers' compensation and benefits for performing public duties (the superintendent of Indian affairs and the customs officers); and the benefits a private person receives from private office or employment (in the case of the Bank directors).

### 2.    Contemporaneous Dictionaries

The First Congress's differing uses of "emolument" corresponds to the definitions found in late 18th century dictionaries. The Supreme Court often looks to Samuel Johnson and Thomas Sheridan's dictionaries for the meaning of terms from the Founding Era.[53] Both define "emolument" simply as profit or advantage throughout the pre-Revolutionary and Founding eras. Other leading dictionaries of the time likewise defined "emolument" as advantage, profit, gain, or benefit.[54]

Contemporaneous dictionaries also defined "emolument" as the gain or profit obtained through one's labor, investment, or cost. For example, Nathan Bailey's dictionaries alternated between defining emolument as "Advantage, Profit" and defining the term as "gain arising from the grist of a corn-mill" and "profit gotten by labour and cost." Another treatise that explained the synonyms "Gain, Profit, Lucre, Emolument" stated: "*Emolument* relates to commissions and employments; intimating not only the salaries, but all other perquisites."[55]

Although published after the Constitution, Noah Webster's 1828 American Dictionary similarly defined "emolument" as: "1. The profit arising from office or employment; that which is received as a compensation for services, or which is annexed to the possession of office, as salary, fees and perquisites. 2. Profit; advantage; gains in general." Webster's definition of "office" was not limited to public office, but included: "Duty or employment of a private nature; as the *office* of a midwife" and "Business; particular employment."[56]

### 3.    Emoluments in English Law

Perhaps the most important contemporaneous resource for English lawyers during our colonial period was *Blackstone's Commentaries on the Laws of England* (1769) (Blackstone's Commentaries).[57] The framers of the Constitution were familiar with Blackstone's

JE19-002

Commentaries, which was distributed extensively in the American colonies and "constituted the preeminent authority on English law for the founding generation."[58]

Blackstone used the term "emolument" in varied contexts, rather than as a specialized legal term of art. Among these uses, "emolument" included:

- Benefits that belonged to "public or private employment;"
- Interests in property;
- Income attached to a benefice, or ecclesiastical office; and
- Monetary benefits a bankrupt received for surrendering his property.[59]

In Blackstone's time, the term office not only meant public (and religious) offices, but also private offices, such as business and private employment.[60] For example, the public "bailiff" made arrests. The private bailiff managed a farm or manor and collected rents.[61] Both those holding public office and those holding a private office, or employment, received "the fees and emoluments thereunto belonging."[62]

English court decisions of the period also illustrate the types of emoluments or benefits that a person acquired from private business endeavors. A person operating a ferry under a franchise or license was entitled to the profit and emolument from their endeavors.[63] A person who built a bridge next to his mill did so for his own profit and "private emolument."[64]

### 4.   The Founders' Use of "Emolument"

The Founders' records and other writings also show the varied contemporaneous general uses of the term emolument.[65] In 1786, James Madison wrote to Thomas Jefferson on behalf of himself and James Monroe proposing a plan through which Jefferson would use his private credit to obtain money for the purpose of investing in the purchase of land in New York "on the obligation of Monro[e] and myself, with your suretyship to be laid out by Monro[e] and myself for our *triple emolument* …."[66] Madison's use reflects one of several common uses in the period:

- In 1784, George Washington conveyed reports that his gristmill manager and business partner had not been attentive to Washington's interests: "But I hope your [Accounts] will give the lie to these reports, by shewing that something more than your own *emolument* was intended by the partnership …."[67]
- In 1781, the Continental Congress passed a resolution that "'James Mease, late clothier-general, and William West, jun., his deputy or appointee: who, in conjunction with Major General Arnold, did, under colour of office, in the year 1778, take from sundry inhabitants of this city, great quantities of merchandise, not necessary for the army, which were converted to their *private emolument*'" and that "flagrant abuse of office and of the public confidence" merits "exemplary punishment."[68]
- A representative in the North Carolina ratification debates in 1788 expressed concern with federal judges receiving "*emoluments*" from state governments

JE19-002                                          13

JE19-002

> because: "It is impossible for any judges, receiving pay from a single state, to be impartial in cases where the local laws or interests of that state clash with the laws of the Union, or the general interests of America."[69]

- One of the first acts of the Continental Congress in its 1774 Address to the People of Great Britain exemplifies another usage: "Prior to this era you were content with drawing from us the wealth produced by our commerce. You restrained our trade in every way that could conduce to your ***emolument***."[70]

5. *The Supreme Court's Use of "Emolument"*

We also considered how the Supreme Court understood the meaning of the term emolument by reviewing the Court's opinions that might show general usages over a long period of time.

Although the Supreme Court has not interpreted any of the *constitutional* emoluments provisions, the Court frequently considered numerous *statutory* emoluments provisions that compensated federal officers, particularly the customs officers whose collections provided an important source of revenue for the new government. Successive Congresses changed the compensation formulae for these collectors, whose compensation typically included some combination of salary, fees and commissions they could charge, and a share of the monies they recovered for the United States in the form of penalties, fines, and forfeitures.[71]

The Supreme Court's opinion in one case, *Hoyt v. United States*, 51 U.S. (10 How.) 109 (1850), is typical of the complexities that these changing compensation Acts presented. The government sued a collector for the collections he owed the Treasury. The collector relied on a 1799 Act that distinguished between "fees" and "emoluments." He argued that an 1802 Act that capped the *emoluments* a collector may retain did not apply to his *fees*, meaning that the collector could retain all fees. Ultimately, the Court decided against Hoyt because an 1838 compensation Act controlled the dispute rather than the 1799 and 1802 Acts Hoyt relied upon.[72]

*Hoyt* is important because it shows the Court recognized that "emolument" was a catchall term that included "every species of compensation or pecuniary profit derived from" the collector's discharge of the duties of the office. Fees, fines, and similar terms "…denote a compensation for a particular kind of service…" that a public collector performed.[73] In a different case heard by the Court, for example, the emoluments included an Army major's emoluments: his personal subsistence, forage for two horses, and the pay, ration, and clothing allowance for two servants.[74]

The use of "emolument" as a catchall also appears in the Court's opinions that employ the term to describe the gain that arises from private business activities, such as:

- The livelihood an attorney earned upon admission to practice before a court;[75]
- The benefits from using a ship for trade in commerce;[76]
- The benefits a canal company received from a right to divert water for a dam and canal;[77]
- The benefits a patent owner received from a patent;[78]

- The benefits private companies received for providing public services such as transportation, lighting, and water;[79]
- The benefits attached to corporate office;[80]
- The benefits the riparian owner gained from using navigable waterways; and[81]
- The benefits that attached to property interests.[82]

This usage parallels the varied uses we found contemporaneous with the Constitution's adoption and ratification, as well as the government's use of emolument in its agreements with those government employees and contractors who receive access to classified national security information.

### 6.    Historical Practice

We also analyzed reports of Washington's business activities for any evidence that he conducted private business during his presidency with the United States or foreign governments.[83] The following summarizes what we found; additional information is available in the attached Appendix A.

*Purchase of Lots.* During and after his presidency, Washington purchased lots of land in the territory that Maryland ceded to the United States for the District of Columbia. His correspondence and other records show that Washington purchased two lots from proprietor (owner) Robert Peter and six additional lots during his presidency. If the United States owned the latter six lots, Washington's purchase might provide a historical precedent that private business dealings did not offend the Presidential Emoluments Clause, which prohibits a President's receipt of any emolument from the United States or a State. However, we found evidence in the historical records and other accounts that these six lots were owned privately.

Maryland's cession of territory for the new District of Columbia did not give the United States any right of property "in the soil" of those who owned the land in the ceded territory. At the time Washington purchased the lots, trustees held ownership of the lots under agreements with the proprietors of the land, who had transferred their property to the trustees (in part, so that a share of the land could be sold to pay for the Capitol and President's house and other government buildings). The proprietors' trust agreements and Maryland law provided that the trustees retained ownership until title passed to the purchasers.

We also found evidence that the commissioners who conducted the sales of the lots acted pursuant to authority held by the trustees, rather than under authority of the United States. Although Congress authorized commissioners to survey the new district and otherwise prepare for the government's movement to the new district, the commissioners' involvement in the sales did not appear to give Washington a benefit *from the United States*. Congress did not include sales among the commissioners' authorities, much less the sales of land that was owned privately. Maryland law did give the commissioners authority to sell land that the United States did not own, but only through condemnation proceedings, and then only in very limited circumstances. All this suggests that the commissioners' authority to sell lots held by the

JE19-002

trustees appears to be derived from the proprietors' trust agreements and Maryland law, not from any authority conferred by the United States.

*Sales of Flour.* President Washington's gristmill produced flour that was sold locally and overseas. The Foreign Emoluments Clause prohibits the President (and others holding positions of trust under the United States) from receiving emoluments "of any kind whatever" from Kings, Princes, and foreign states (which include foreign government controlled instrumentalities). The Clause does not prohibit receiving emoluments from domestic or foreign merchants that ship to a port in a foreign country.

We found evidence that before the Revolution, Washington sold flour, as well as herring, corn, and tobacco to merchants who sold overseas to London, Lisbon, and ports in the West Indies, including other English colonies; and Washington himself shipped produce overseas.[84] Our review of Washington's publicly available correspondence, however, found no evidence that he sold flour or other produce during his presidency to a foreign government directly or to a merchant whom Washington knew to represent a foreign government.

In sum, we found evidence that the term "emolument" as used historically and today includes the gain from private business activities. As noted above, if emoluments include an official's gains from private business activities, the President's interest in the lease raises potential constitutional issues.

## B.      GSA's Reasons for Ignoring the Emoluments Issue

As described above, by mid-December 2016, OGC's senior attorneys on the OPO project agreed there was a possible violation of the Foreign Emoluments Clause but decided not to address the issue. As one senior attorney told us, OGC decided to "punt."

We conclude that decision was improper for several reasons: (1) as a federal agency, GSA is subject to the Constitution, which also is incorporated into the OPO lease; (2) GSA already had determined that the Foreign Emoluments Clause bars a federal employee from doing business with a foreign government in his private capacity, a conclusion reinforced by instruction OGC received from OGE; (3) OGC ignored OLC's binding legal opinions on the Emoluments Clauses, even though OGC OPO attorneys knew that OLC issued opinions involving both President Reagan and President Obama; and (4) OGC failed to seek OLC's guidance, even though the GSA OPO attorneys knew that OLC issued opinions on the Foreign and Presidential Emoluments Clauses.

### 1.      GSA Ignored the Constitution

OGC lawyers told us they ignored the emoluments issues and that constitutional issues rarely arise within GSA's work. They also stated that the Foreign Emoluments Clause is not in GSA's purview, and not for GSA "to evaluate." OGC lawyers also justified their inaction by stating that Section 37.19 is a specific lease provision but the Foreign Emoluments Clause raised larger issues.

JE19-002

The notion that GSA can disregard selected parts of the Constitution fundamentally ignores Article VI of the Constitution. Clause 2 in Article VI establishes the whole Constitution as "the supreme Law of the Land" and, therefore, it governs every agency. As an executive agency of the United States, both GSA and its employees have an obligation to ensure that agency actions comply with the law, whether the lease incorporates the Constitution or not. Using the language some witnesses employed, the Constitution most certainly is in GSA's purview.

Moreover, the lease, by its very terms, contemplates that laws will be considered even if they are not specifically included in the text. For example, Section 6.2 of the lease prohibits Tenant's use of the premises "for any purpose or in any way" that violates the applicable laws (including the Constitution).[85] This provision has little meaning if GSA cannot rely on those very laws because they are not stated verbatim in the lease.

More to the point, Section 37.2 of the lease provides expressly that "federal laws of the United States" govern (except in limited instances where District of Columbia laws apply).[86] The Constitution certainly is the law of the United States and, consequently, applies to the lease, even if those terms are not mentioned expressly in the lease. The contracting officer's and other witnesses' assertions that the Constitution's emoluments provisions fall outside the four corners of the lease renders the above provisions meaningless, by drawing an artificial distinction that simply cannot be reconciled with the very provisions of the lease that incorporate the laws of the United States. Like any other federal agency, it is not only appropriate that GSA address potential violations of the Constitution that arise with its activities, GSA cannot ignore them. GSA did not fulfill that obligation. Therefore, the contracting officer may have approved an interest in the lease that the Constitution forbids.

Finally, OGC's March 3, 2017 memorandum for Terry ███████████████████████ ██████████████████████████████████ However, OGC attorneys also told us that the decision not to consider the Constitution's provisions was made by mid-December 2016, several weeks before the first lawsuit was filed that raised emoluments challenges to the lease.[87] It is noteworthy, moreover, that GSA's reluctance to consider the emoluments issues did not inhibit the contracting officer from granting an Estoppel Certificate that determined, before the judges rendered any decisions, that Tenant was in compliance with the terms and conditions of the lease, terms that included compliance with the Constitution.

### 2.   OGC Ignored Nonbinding Precedents and Instruction

The agency also disregarded existing precedent and instruction that provided important guidance for understanding the contours of the constitutional provisions GSA confronted. Significantly, we found that OGC had already addressed the threshold question that the lease presents: Does the Foreign Emoluments Clause restrict the income or other benefits that an officer or employee receives from their private business activities with foreign states?

At least as early as 2013, OGC recognized that a Foreign Emoluments Clause issue could arise when a GSA employee sought a waiver to participate in an outside real estate company in the Washington D.C. area.[88] When the issue arose, the employee's supervisor, with the assistance

JE19-002                                    17

of an OGC ethics advisor assigned to the matter, who worked under Segal (a designated Ethics Official), issued a decision memorandum that partially granted the waiver and cautioned the employee:

> [B]e aware that because you are requesting to conduct business in the Washington D.C. area, you are beholden to the Emoluments Clause which states:
>
>> "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Constitution Article I, Section 9, Clause 8 (art. I, § 9, cl. 8)
>
> Therefore, you are prohibited from doing any business with another Country (for example any transaction regarding an Embassy or Residence.)

Tozer (one of the Standards of Conduct Counselors) knew about this memorandum and asked for a copy when a similar waiver issue arose.

The emoluments guidance OGC provided in 2013 comports with the instruction that OGC received from OGE. Shortly before the election, on September 23, 2016, OGE issued a Legal Advisory to all Executive agency ethics officials on post-employment restrictions. The instruction included restrictions on employment or compensation from a foreign government for certain civilian retirees who remain subject to the same restrictions that the Foreign Emoluments Clause imposes on current employees.[89]

### 3.    *OGC Ignored Binding Department of Justice OLC Precedents*

OGC also disregarded the opinions of the Department of Justice's OLC on the Foreign Emoluments Clause and the Presidential Emoluments Clause. OGC understood that OLC provides guidance on constitutional issues. Deputy General Counsel Loewentritt, OGC's senior career attorney, acknowledged that questions about constitutional issues under the Emoluments Clause are something for OLC to address. One of the OGC attorneys also acknowledged reading the OLC opinion involving President Reagan, which addressed the purpose of the Foreign Emoluments and the Presidential Emoluments Clauses and conducted a dictionary analysis of the term emolument.[90] That attorney also knew about an OLC opinion which addressed the application of the Foreign Emoluments Clause to President Obama's receipt of the Nobel Peace Prize.[91]

OGC could have obtained an understanding of the emoluments issues simply by reviewing OLC's published opinions. OLC's "core function" is to "provide controlling advice to Executive Branch officials on questions of law that are centrally important to the functioning of the Federal Government."[92] We found that OGC attorneys understood that "OLC opinions are controlling on questions of law within the Executive Branch."[93]

Importantly, as noted above, OLC's legal opinions on the Foreign Emoluments Clause and the Presidential Emoluments Clause include one opinion involving President Barack Obama and

JE19-002

another involving President Ronald Reagan. Those and other OLC emoluments opinions provide the following guidance:

1. The Foreign Emoluments Clause encompasses "every kind of influence by foreign *governments* upon officers of the United States …" in view of its "expansive language and underlying purpose."[94]

2. The Foreign Emoluments Clause applies to a federal employee's stipend or consulting fees from a foreign governmental entity in the employee's private business capacity.[95]

3. The President holds an "Office of Profit or Trust," as used in the Foreign Emoluments Clause, which reaches not only foreign states but also their instrumentalities, determined by an inquiry into whether the decision to confer a particular gift is subject to the foreign government's control or influence.[96]

4. The Foreign Emoluments Clause prohibits a federal employee's private business arrangement with a U.S. company, where a foreign government selected the company in order to acquire the federal employee's expertise, and the foreign government was the actual source of the company's payments to employee.[97]

5. The Foreign Emoluments Clause does not permit a part time federal officer to receive income from a private business partnership that includes earnings from a foreign government client, even though the officer had no involvement with that client.[98]

6. The Foreign Emoluments Clause prohibits a federal employee, who holds an office of profit or trust under the United States, from receiving compensation of any sort arising out of an employment relationship with a foreign state.[99]

7. The Presidential Emoluments Clause "was designed to protect 'the independence intended for him [the President] by the Constitution,' so that neither Congress nor the states could 'weaken his fortitude by operating on his necessities, nor corrupt his integrity by appealing to his avarice. Neither the Union, nor any of its members, will be at liberty to give, nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act.'" An inquiry into whether the Presidential Emoluments Clause permits a particular benefit involves an inquiry into the purpose of the Clause and the dictionary meaning of the term emolument.[100]

   *4.    OGC Failed to Seek Guidance from OLC*

Finally, OGC also could have sought guidance from OLC directly, but did not. We found that OGC is familiar with seeking guidance from OLC, and had requested advice from OLC during the period covered by this report. We found that, after eight Members of Congress sought information about the OPO, OGC knew to request OLC guidance in February 2017.

JE19-002

As shown above, OLC has issued numerous emoluments opinions, including issues relating to former Presidents Reagan and Obama. The meaning and application of the Foreign Emoluments Clause and the Presidential Emoluments Clause are precisely the types of issues that OLC has shown it is willing to consider, particularly when there is a "practical need" for guidance.[101] One of the OGC OPO lawyers recognized the significance of these opinions, citing the Reagan opinion for the purpose test and citing the Obama opinion as an example of a controlling opinion on the Foreign Emoluments Clause.

OGC confronted a similar problem 20 years ago when OGC sought guidance on a complex business structure between six entities, in which two Members of Congress held beneficial interests through blind or excepted trusts, and a real estate investment trust that held government leases. The proposal raised a question whether the interests of the Members under the proposed transaction violated the criminal statutes, based on the 1808 Act that prohibited Members from entering in or holding federal government contracts. OGC sought guidance from OLC because of the statutory bar to Members of Congress contracting with the government. Within two months, OLC issued two opinions that rejected several alternatives suggested by the entities at issue, but also identified for GSA's General Counsel one alternate arrangement suggested by the entities that satisfied the law.[102] OGC charted a different course here.

The President's nomination in July 2016 alerted GSA that the agency might face novel issues with the OPO lease. OGC had ample time to review OLC's emoluments opinions to understand what the Constitution requires under OLC's existing precedents and work with OLC to address any emoluments issues in the event of his election. We recognize that under its OLC Best Practices, OLC addresses constitutional issues in the context of specific facts and circumstances, which changed in January 2017 as Tenant's business structure changed.[103] However, much as OGC and the Members of Congress discovered in 1998, OLC might have worked with OGC in order to determine whether Tenant's current business structure or some other structure in OLC's view would satisfy the Constitution's restrictions, and those of Section 37.19.

Instead, GSA chose to leave any Foreign Emoluments Clause and Presidential Emoluments Clause issues unresolved without seeking the type of OLC assistance that OGC sought in 1998 when Members of Congress requested guidance. We conclude that GSA's decision to ignore the Emoluments Clauses was improper.

## C.   Emoluments and Section 37.19

We found that when OGC attorneys considered how Section 37.19 should be interpreted, they employed the standard tools attorneys use for interpreting language in contracts, statutes, and other legal documents: the rules that the Supreme Court and lower courts have developed through their decisions in cases.

We found that OGC did not, however, analyze the Constitution's Foreign and Presidential Emoluments Clauses as they affected Section 37.19. As a consequence, OGC left the decision to

JE19-002

the contracting officer, who granted Tenant's request for an Estoppel Certificate that leaves a constitutional cloud over the lease.

1.      *Section 37.19*

OGC determined ████████████████████████████████████████████████████
They made this determination ███████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

a. <u>Primary Clause</u>: The first issue that arises is whether Section 37.19 bars an official from receiving a benefit under the lease if the official entered into the lease as a private person, before becoming a public official. The primary clause states:

> No member or delegate to Congress, or elected official of the Government of the United States or the Government of the District of Columbia, *shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom* …. (Emphasis added)

This issue largely turns on what the term "admitted to" means.

Tenant urged "admit" means to allow entry under current dictionary definitions. Consequently, the argument goes, President Trump was "admitted" to the lease before he became an elected official, and therefore, the prohibition does not apply to his business interest in the lease.[104]

However, OGC recognized ████████████████████████████████████████████

███████████████████████████████ Moreover, OGC's March 3, 2017 memorandum to Terry ████████████████████████████████████████████████████████████████

██████████████ In revising the law in 2011, Congress removed the word "admitted" for the expressed purpose "… to conform to the understood *policy, intent, and purpose of Congress in the original enactments*, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections …."[105]

b. <u>Proviso</u>: The second issue arises with the proviso that creates an exception to the prohibition in the primary clause when an official fits the prohibition. The proviso states:

> … provided, however, that this provision shall not be construed as extending to any Person who may be a shareholder or other beneficial owner of any *publicly held corporation or other entity*, if this Lease is for the general benefit of such corporation or other entity. (Emphasis added)

Here, the issue primarily turns on whether "publicly held" modifies both "corporation" and "other entity."

Tenant applied the grammar rule to support its interpretation that "publicly held" does not modify "other entity," because "other" is an intervening modifier. Consequently, as a limited

JE19-002                                        21

JE19-002

liability company, Tenant is an "other entity," and Tenant falls squarely within the exception to the prohibition in the primary clause.

However, OGC recognized ███████████████████████████████████████████████ OGC also recognized ████ ███████████████████████████████████████ This view is the same that the Supreme Court took in *Duncan v. Walker*, 533 U.S. 167 (2001), where the Court interpreted statutory language, "State post-conviction or other collateral review," that closely parallels the phrasing found in Section 37.19, "publicly held corporation or other entity." The Court rejected an interpretation that would render the word "'State'" "insignificant, if not wholly superfluous" in the context of the particular statute under consideration.[106] Similarly, OGC understood ████ ████████████████████████████████████████████████[107] One attorney told us GSA needs to change the clause moving forward ██████████████████████████████████████████████████

## 2.   *Constitutional Avoidance*

Both OGC and Tenant relied on common rules of construction for their interpretations that courts employ for interpreting language in federal contracts and statutes, like the grammar rule and the rule that all words should be given meaning. As noted above, OGC recognized ████████ ████████████████████████████████████████████ In these circumstances, a third rule of construction becomes relevant: the rule of constitutional avoidance.

Under the rule of constitutional avoidance, "where an otherwise acceptable construction … would raise serious constitutional problems …," language should be interpreted to avoid the constitutional issues "unless such construction is plainly contrary to the intent of Congress."[108] This prudential rule has special relevance to a contract or lease where constitutional restraints may limit the agency's own statutory authority, and by extension that of its contracting officer.[109]

We found that at least some of the OGC OPO attorneys knew about the constitutional avoidance rule from researching OLC opinions starting in December 2016 for an understanding of the Seven Member Rule.[110] For example, we found one attorney knew of an OLC opinion that stated "the familiar rule that courts will adopt an interpretation of a statute that will avoid constitutional questions." However, we found that OGC did not consider in connection with the OPO lease whether GSA has an obligation to interpret its lease provisions to avoid constitutional questions.

OGC should have recognized from OLC's authoritative Executive Branch precedents, as well as OGC's own experience and instruction on emoluments, that the OPO lease presented serious constitutional questions. In this circumstance, the constitutional avoidance rule requires an inquiry to determine whether there are other plausible interpretations of Section 37.19 that do not present constitutional problems.[111] Such an inquiry might have led, as we discussed earlier,

to discussions with OLC regarding a solution. Much like the discussions that yielded the solution OLC found for OGC in 1998, when Members of Congress sought to participate in a business structure that included government leases, those discussions might have led OLC to identifying options for GSA and Tenant that did not raise potential constitutional issues.

However, OGC refused to consider any constitutional implications and failed to conduct this inquiry. At the same time, OGC acknowledged in interviews with the OIG that if a constitutional violation is later found, the attorneys would look at Section 37.19 again. The difficulty, of course, is that GSA accepted Tenant's interpretation of Section 37.19, and the contracting officer has issued his Estoppel Certificate. As a consequence, the constitutional issues are preserved rather than avoided. We found that GSA should have considered the potential impact of the Constitution on how Section 37.19 should be interpreted under the avoidance doctrine before issuing the Estoppel Certificate.

Moreover, the impact of GSA's failure to do so extends beyond the OPO lease. Terry's decision to grant an Estoppel Certificate also affects the Tariff Building lease, and any other leases that use similar provisions. At present, the Section 37.19 language has been included in at least one outlease executed subsequent to the OPO lease. In May 2016, GSA and Miami-Dade College finalized negotiations on a lease to renovate and use the historic David W. Dyer Building in downtown Miami. Other than relevant geographical substitutions, Section 37.19 has been copied and inserted in the lease wholesale for the Dyer Building.

## IV.    Conclusion and Recommendation

GSA administers and manages the ground lease for the Old Post Office Building that the Trump Old Post Office LLC (Tenant) redeveloped into a hotel. Following the 2016 election, it was necessary for GSA to consider whether President-elect Trump's business interests in Tenant might cause a breach of the lease under Section 37.19, Interested Parties provision, upon his becoming President.

GSA's analysis should have considered whether the Foreign Emoluments Clause or the Presidential Emoluments Clause of the U.S. Constitution barred the President's business interest in Tenant. We found that GSA, through its OGC and PBS, recognized that the President's business interest in the OPO lease raised issues under the Constitution's Emoluments Clauses that might cause a breach of the lease, but decided not to address those issues in connection with the management of the lease. We also found that OGC improperly ignored these Emoluments Clauses, even though the lease itself requires compliance with the laws of the United States, including the Constitution. In addition, we found that GSA's unwillingness to address the constitutional issues affected its analysis of Section 37.19 and the decision to grant Tenant an Estoppel Certificate.

GSA's decision-making process related to Tenant's possible breach of the lease included serious shortcomings. GSA had an obligation to uphold and enforce the Constitution. However, GSA opted not to seek any guidance from OLC and did not address the constitutional issues related to the management of the lease. As a result, GSA foreclosed an

JE19-002

opportunity for an early resolution to these issues, including a possible solution satisfactory to all parties; and the constitutional issues surrounding the President's business interests in the lease remain unresolved.

In interviews with the OIG, OGC has acknowledged that if a constitutional violation were later found, they would have to revisit the issue of potential breach of the OPO lease's Interested Parties provision; however, the fact remains that GSA continues to use the language of the provision in other leases. We recommend that before continuing to use the language, GSA determine the purpose of the Interested Parties provision, conduct a formal legal review by OGC that includes consideration of the Foreign and Presidential Emoluments Clauses, and revise the language to avoid ambiguity.

In its response to our draft report, GSA agreed with our recommendation. The agency's response is contained in Appendix B.

JE19-002

## Endnotes:

[1] The Foreign Emoluments Clause is found at U.S. Const. art. I, § 9, cl. 8. The Presidential Emoluments Clause is at U.S. Const. art. II, § 1, cl. 7.

[2] U.S. Gen. Servs. Admin., Rep. of Material Provisions of the Old Post Office Dev. Agreement Submitted Pursuant to Old Post Office Building Redevelopment Act of 2008, Public Law 110-359 at 3 (2013) (GSA Rep. of Material Provisions).

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] Public Buildings Cooperative Use Act of 1976, Pub. L. No. 94-541, 90 Stat. 2505 (1976); GSA Rep. of Material Provisions at 3.

[7] H.R. REP. NO. 110-724, at 3 (2008), *available at* https://www.congress.gov/congressional-report/110th-congress/house-report/724/1.

[8] S. REP. No. 110-501, at 2 (2008), *available at* https://www.congress.gov/congressional-report/110th-congress/senate-report/501/1.

[9] *See* GSA Rep. of Material Provisions at 4 (GSA's redevelopment goals include "putting the OPO to its highest and best use"); *see also* S. REP. No. 110-501, at 2; H.R. REP. No. 110-724, at 3-4. NHPA, Section 111 is codified at 54 U.S.C. § 306121.

[10] Outlease also is a term GSA uses when the agency rents available space to private business as well as state and local governments. These properties can include retail shops, food service facilities, office space, warehouse space, or parking lots. See https://www.gsa.gov/real-estate/gsa-properties/outleasing.

[11] Pub. L. No. 110-359, 122 Stat. 4005 (2008).

[12] *See* GSA Rep. of Material Provisions at 4.

[13] Old Post Office Building Redevelopment Act of 2008, Pub. L. No. 110-359, § 5, 122 Stat. at 4006-07.

[14] U.S. Gen. Servs. Admin., Request for Proposals, Redevelopment of Old Post Office: Washington, D.C. (Mar. 24, 2011); *see also* U.S. Gen. Servs. Admin., Old Post Office Redevelopment: Executive Factsheet 1 (2015); GSA Rep. of Material Provisions at 4 (2013).

[15] Request for Proposals at 6.

[16] U.S. Gen. Servs. Admin., Old Post Office Redevelopment: Executive Factsheet 2 (2015); GSA Rep. of Material Provisions at 5 (2013).

[17] OPO Lease at 1.

[18] The Act did not specify criteria for determining materiality.

JE19-002

[19] GSA Rep. of Material Provisions at 6-10 (2013).

[20] Ground Lease by & between the U.S. (as "Landlord") & Trump Old Post Office LLC (as "Tenant"), Lease No: GS-LS-11-1307 (Aug. 5, 2013) (available online at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room); see also U.S. Gen. Servs. Admin., Old Post Office Redevelopment: Executive Factsheet 2 (2015); Letter from Kevin Terry, Contracting Officer, U.S. Gen. Servs. Admin., to Trump Old Post Office LLC 2 (March 23, 2017) (available online at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room).

[21] See, e.g., Carol Ross Joynt and Shane Harris, *UPDATED: Controversy Follows Donald Trump's Winning Old Post Office Pavilion Bid,* WASHINGTONIAN (June 19, 2012), *available at* https://www.washingtonian.com/2012/06/19/its-not-all-smooth-sailing-for-trumps-post-office-renovation/; Steve Kelman, *The Lectern: 2 ½ cheers for GSA, Donald Trump and the Old Post Office,* FEDERAL COMPUTER WEEKLY (June 6, 2014), *available at* https://fcw.com/blogs/lectern/2014/06/trump-develops-old-post-office.aspx.

[22] *See, e.g.,* Rick Bockman, *Handing over Trump Inc.,* THE REAL DEAL, NEW YORK REAL ESTATE NEWS (April 1, 2016) (Foreign Emoluments Clause and potential conflicts of interest), *available at* https://therealdeal.com/issues_articles/handing-over-trump-inc/; Aram Roston and Daniel Wagner, *Donald Trump Won Control Of A Prized D.C. Landmark – Here's How,* BUZZFEED (April 28, 2016) (potential conflict of interest), *available at* https://www.buzzfeed.com/aramroston/how-donald-trump-won-control-of-a-prized-dc-landmark?utm_term=.ewOX5EGZl6#.skLqNYPvgW; Russ Choma, *Donald Trump Has a Huge Conflict of Interest That No One's Talking About,* MOTHER JONES (Aug. 15, 2016) (conflict of interest), *available at* https://www.motherjones.com/politics/2016/08/trump-conflict-of-interest-old-post-office-hotel/.

[23] See Letter of Rep. Cummings, DeFazio, Connolly, and Carson to GSA Administrator Roth (Nov. 30, 2016) (section 37.19); Letter of Sen. Warren and Carper to GSA Administrator Roth (Dec. 1, 2016) (Section 37.10, Presidential Emoluments Clause, Emoluments Clause); The Madison Project FOIA request (Jan. 10, 2017).

[24] General Counsel Durmer served in this position from September 2009 until the Presidential Inauguration on January 20, 2017. Deputy Counsel Loewentritt was Acting General Counsel from January 20, 2017 until May 12, 2017.

[25] This report uses Foreign Emoluments Clause and Presidential Emoluments Clause where the context of a document or interview suggests the reference is to one or the other. Emoluments Clauses refers to both.

[26] Four attorneys in OGC told us that they did not contact or request guidance from OLC. General Counsel Kris Durmer declined to be interviewed.

[27] *See Citizens for Responsibility and Ethics in Washington v. Trump,* No. 1:17-cv-00458 (S.D.N.Y. filed Jan. 23, 2017).

[28] *See An Act concerning public contracts,* ch. 48, §§ 1, 3 - 4, 2 Stat. 484-85 (1808). The early Acts of Congress are publicly available in searchable PDF on the Library of Congress website at https://www.loc.gov/law/help/statutes-at-large/.

[29] *Id.* at § 3. Versions of these provisions remain in force today in the criminal and public contract laws of the United States Code. *See* 18 U.S.C. §§ 431-432; 41 U.S.C. § 6306(a).

[30] Amended & Restated Agreement of Lease Between Penn. Ave. Dev. Corp, Landlord, & Willard Assocs., Tenant (Dec. 21 1983) (on file with author).

JE19-002

[31] *See* 41 U.S.C. § 22 (1982) (historical) (providing that "no Member of or Delegate to Congress shall be admitted to any share or part of such contract or agreement, or to any benefit to arise thereupon"), available at https://www.loc.gov/item/uscode1982-014041001/.

[32] Domber recalled that the attorneys explained that lessee had other partnerships and was considering a limited partnership with an opaque ownership structure.

[33] Pub. Law No. 111-350, § 2(b) ("CONFORMITY WITH ORIGINAL INTENT"), 124 Stat. 3677, 3677 (Jan. 4, 2011).

[34] *Id.* at 3805-06; 41 U.S.C. § 6306(a) (Jan. 4, 2011) (effective date).

[35] *See* U.S. Gen. Servs. Admin., Rep. of Material Provisions of the Old Post Office Dev. Agreement 4 (2013).

[36] Steven Schooner & Daniel Gordon, *Trump Leases His D.C. Hotel from a Government Agency He'll Soon Be in Charge Of,* THE WASHINGTON POST (Nov. 15, 2016), *available at* https://www.washingtonpost.com/posteverything/wp/2016/11/15/trump-needs-to-give-up-his-trump-hotel-lease-right-now/?utm_term=.c8bb57f331ce.

[37] Transcript of Donald Trump's News Conference: Full Transcript & Video, N.Y. Times (Jan 11, 2017) https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html.

[38] *See* Kevin Terry Mar. 23, 2017 Letter to Donald J. Trump, Jr. at 4, available at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room (Contracting Officer Letter).

[39] *See* Kevin Terry Feb. 10, 2017 Letter to Trump Old Post Office LLC at pdf. 13-19., Exhibit 1.A to Kevin Terry Mar. 23, 2017 Letter to Donald J. Trump, Jr., available at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room (Contracting Officer Letter).

[40] *See* Sheri A. Dillon Feb. 17, 2017 Letter to Kevin Terry at pdf. 21-32., Exhibit 1.B to Kevin Terry Mar. 23, 2017 Letter to Donald J. Trump, Jr., available at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room (Contracting Officer Letter).

[41] *See* Sheri A. Dillon Mar. 20, 2017 Letter to Kevin Terry at pdf. 35., Exhibit 1.C to Kevin Terry Mar. 23, 2017 Letter to Donald J. Trump, Jr., available at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room (Contracting Officer Letter).

[42] *See* Kevin Terry Mar. 23, 2017 Letter to Donald J. Trump, Jr. at 1, available at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room (Contracting Officer Letter).

[43] *Id.*

[44] *Id.* at 8.

[45] Standard Form 312 (Rev. 7-2013), Classified Information Nondisclosure Agreement, at ¶ 5 ("SF 312"), *available at* https://www.gsa.gov/forms-library/classified-information-nondisclosure-agreement-0; National Counterintelligence and Security Center, 2015 Annual Report on Security Clearance Determinations at 5 (reporting 2,865,402 personnel with access to classified information), available at https://www.dni.gov/index.php/newsroom/reports-publications/reports-publications-2016/item/1603-2015-annual-report-on-security-clearance-determinations.

JE19-002

[46] *Snepp v. United States*, 444 U.S. 507, 514-516 (1980). Following *Snepp,* the government adopted SF 189 (8-83), the predecessor to SF 312. See Classified Information Nondisclosure Agreement (SF-189), at 31 (Answer to Question 8), *available at* https://babel.hathitrust.org/cgi/pt?id=uiug.30112075638277;view=1up;seq=5; *see also id*. at 36 ¶ 5 (SF 189 emoluments provision).

[47] Webster's Third New International Dictionary, Unabridged at 742 (1993) (capital letters omitted).

[48] *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986) (concluding that the First Congress's rejection of an amendment to a bill that established the Department of Foreign Affairs was evidence that the Constitution does not contemplate an active role for Congress in the supervision of Executive officers) (internal quotation marks and citation omitted).

[49] *An Act to establish the Treasury Department,* ch. 12, §§ 1, 8, 1 Stat. 65, 67 (Sept 2, 1789). The early Acts of Congress are publicly available in searchable PDF on the Library of Congress website at https://www.loc.gov/law/help/statutes-at-large/.

[50] *An Act for the Government of the Territory of the United States, south of the river Ohio,* ch.14 § 2, 1 Stat. 123 (May 26, 1790).

[51] *An Act to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels*, ch.35, §§ 53-54, 1 Stat. 145, 171-73 (Aug. 4, 1790).

[52] *An Act to incorporate the subscribers to the Bank of the United States*, ch. 10, § 7(IV), 1 Stat. 191, 193-194 (Feb. 25, 1791).

[53] *See, e.g., Arizona State Legislature v. Arizona Indep. Redistricting Com'n,* __ U.S. __, 135 S. Ct. 2652, 2671 (2015) (consulting Johnson and Sheridan dictionaries, as well as those by Nathan Bailey and Noah Webster, in construing the meaning of "legislature" in the Election Clause).

[54] 1 Samuel Johnson, A Dictionary of the English Language (10th ed. 1792); *id.* (6th ed. 1785); *id.* (4th ed. 1773); *id.* (1st ed. 1755); 1 Thomas Sheridan, A Complete Dictionary of the English Language (3d ed. 1790); *id.* (2d rev. ed. 1789); 1 Thomas Sheridan, A General Dictionary of the English Language (1780). *See also* William Perry, Royal Standard English Dictionary (6th American ed. 1788) (defining "emolument" as "advantage, profit"); Thomas Dyche & William Pardon, A New General English Dictionary (18th ed. 1781) (defining "emolument" as "benefit, advantage, profit, &c. [sic]"). See also George William Lemon, English Etymology (1783) (defining "emolument" as "used to signify *any advantage,* or *gain*").

[55] *Compare* Nathan Bailey, An Universal Etymological English Dictionary (24th ed. 1782) (defining "emolument" as "Advantage, Profit") *with* Nathan Bailey, The New Universal Etymological English Dictionary (7th ed. 1776) (defining "emolument" as "properly gain arising from the grist of a corn-mill; also profit gotten by labour and cost"); 1 John Trusler, The Distinction Between Words Esteemed Synonymous in the English Language 96 (2d ed. 1783).

[56] *See, e.g.,* 1, 2 Noah Webster, American Dictionary of the English Language (1828). Webster defined emolument's adjective form, emolumental, as "Producing profit; useful; profitable; advantageous." *Id.* (vol. 1).

[57] References to Blackstone's Commentaries are to the 1771 fourth edition, published in Dublin, for Book 1, and to the 1771-72 America edition, reprinted in Philadelphia, for Book 2. We use the America edition in view of that set of Blackstone's Commentaries' purchase by several Founders, including 16 signatories to the Declaration of Independence, President John Adams, and the father of John Marshall, later Chief Justice of the Supreme Court.

JE19-002

*See* Wilfrid Prest & Michael Widener curators, *250 Years of Blackstone's Commentaries: an exhibition* at 11-12 (2015), *available at* https://digitalcommons.law.yale.edu/britlaw; *see also* https://archive.org/details/commentariesonla177204blac/page/n5 (listing subscribers). We did not locate a digital copy of the America edition's Book 1, and accordingly rely on the fourth edition of Blackstone's, *available at* https://archive.org/details/commentariesonla711blac/page/n3 (1 Blackstone). For Book 2, America edition, *see* https://archive.org/details/commentariesonla02blac/page/n5 (cover page, noting the edition is reprinted from the British copy with the last edition) (2 Blackstone).

[58] *Alden v. Maine*, 527 U.S. 706, 715 (1999); *see also Schick v. United States*, 195 U.S. 65, 69 (1904) ("Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution … it has been said that more copies of the work had been sold in this country than in England; so that undoubtedly, the framers of the Constitution were familiar with it").

[59] 2 Blackstone, ch. 3 at 36 (discussing the "fees and emoluments" belonging to offices of "public or private employment"); 2 Blackstone, Appendix No. II at iv (describing interests in land to include "…woods, underwoods, ways, waters, water-courses, fishings, privileges, profits, easements, commodities, advantages, emoluments …"); 1 Blackstone ch. 18 at 470 (the glebe, or land, and tithes "vested in the then parson … as a temporal recompense to him for his spiritual care of the inhabitants, and with intent that the same emoluments should ever afterwards continue as a recompense for the same care"); 2 Blackstone, ch. 31 at 471-72 ("the law of bankrupts … has given them the liberty of their persons, and some pecuniary emoluments, upon condition they surrender up their whole estate to be divided among their creditors").

[60] 2 Blackstone, ch. 3 at 36 (discussing "office"); *see also* 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) (definition of "office"). Other definitions include an agency or "peculiar use," voluntary acts of good or ill, acts of worship, devotions, and places for conducting business. *Id.*

[61] 1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) (definition of "bailiff" as a subordinate officer, an officer who makes arrests, or an understeward of a manor). For a description of the duties of public and private bailiffs, see ENCYCLOPAEDIA BRITANNICA, *available at* https://www.britannica.com/topic/bailiff. *See also* S.F.C. MILSOM, HISTORICAL FOUNDATIONS OF THE COMMON LAW at 240 (noting that any management of land or a town house could make a person a bailiff) (Buttersworth, London ed. 1969); 1 Blackstone, ch. 9 at 345-46 (bailiffs as sheriffs' officers who collect fines, served writs, and make arrests, among other duties).

[62] 2 Blackstone, ch. 3 at 36.

[63] *Blissett v. Hart*, 125 E.R. 1293 (1744).

[64] *Rex v. Inhabitants of the West Riding of Yorkshire*, 98 E.R. 364, 366 (1770) (discussing earlier decision).

[65] For the relevance generally of the Founders' statements, *see Alden v. Maine*, 527 U.S. at 716-19 (discussing Founders' views on sovereign immunity during the ratification debates).

[66] Correspondence of George Washington, Thomas Jefferson, and James Madison are available online from the National Archives, in cooperation with the University of Virginia Press, at Founders Online, https://founders.archives.gov/. The permalink for each document is styled: http://founders.archives.gov/documents/[Washington, Jefferson, or Madison]/[document specific number]. Citations are abbreviated to [Washington, Jefferson or Madison]/[document specific number]. From James Madison to Thomas Jefferson (Aug. 12, 1786), *available at* Madison/01-09-02-0026 (emphasis added).

[67] From George Washington to Gilbert Simpson (Feb. 13, 1784), *available at* Washington/04-01-02-0084.

JE19-002

[68] 19 Journals of the Continental Congress 40 (Jan. 9, 1781) (emphasis added), *available at* https://memory.loc.gov/ammem/amlaw/lwjclink.html.

[69] Remarks of Archibald Maclaine, North Carolina Ratification Debates (July 29, 1788), *in* 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION at 172 (emphasis added), *available at* http://oll.libertyfund.org/titles/elliot-the-debates-in-the-several-state-conventions-5-vols.

[70] 1 JOURNALS OF THE CONTINENTAL CONGRESS 81, 84 (Oct. 21, 1774) (emphasis added); First Continental Congress, Address to the People of Great Britain (Oct. 21, 1774), 1 American Archives Documents of the American Revolutionary Period, 1774-1776, 917, 918 (emphasis added), *available at* http://amarch.lib.niu.edu/islandora/object/niu-amarch%3A97565.

[71] *See United States v. Walker*, 63 U.S. (22 How.) 299, 307-13 (1859) (discussing successive compensation enactments); JOHN M. DOBSON, TWO CENTURIES OF TARIFFS: THE BACKGROUND AND EMERGENCE OF THE U.S. INTERNATIONAL TRADE COMMISSION 1, 31 (1976) (stating that until 1913 "customs duties had accounted for between 50 and 90 percent of the total Federal income" and including a chart showing customs duties accounted for over 80% of federal revenue from 1791 through 1800), *available at* https://www.usitc.gov/publications/332/pub0000.pdf; Enclosure I: Estimate of Receipts and Expenditures for 1801 (Mar. 14, 1801) (showing amount of income expected from imposts), *available at* https://founders.archives.gov/documents/Jefferson/01-33-02-0236. For a general discussion of the meaning of the terms imposts, duties and similar terms in the Founding Era, see Robert G. Natelson, *What the Constitution Means by "Duties, Imposts, and Excises" – and "Taxes" (Direct or Otherwise)*, 66 CASE W. RES. L. REV. 297 (2015).

[72] *Hoyt v. United States*, 51 U.S. at 132, 135-137.

[73] Id. at 135.

[74] *McLean v. United States*, 226 U.S. 374 (1912).

[75] *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 355 (1871).

[76] *Himely v.* Rose, 9 U.S. (5 Cranch) 313, 319 (1809) (Johnson, J. separate opinion).

[77] *Rundle v. Del. & Raritan Canal Co.*, 55 U.S. (14 How.) 80, 93-94 (1852).

[78] *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 465 (1957).

[79] *See e.g., Commissioners of Buncombe Co. v. Tommey*, 115 U.S. 122, 128 (1884).

[80] *Dirks v. S.E.C.*, 463 U.S. 646, 653 n. 10 (1983).

[81] *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 432 (1855).

[82] *Richter v. Jerome*, 123 U.S. 233, 234 (1887).

[83] For relevance of historical practice, see, *NLRB v. Canning*, ___U.S.___, 134 S. Ct. 2550, 2559-60 (2014) (Recess Appointments Clause). Reports of Washington's purchase of lots in what became the District of Columbia and foreign flour sales are found at *George Washington's Aggressive Real Estate Investment*, *available at* www.mountvernon.org/george-washington/real-estate; *Capitol Hill Townhomes*, *available at* http://www.mountvernon.org/george-washington/the-first-president/george-washingtons-townhouses-in-capitol-

hill; *Ten Facts About the Gristmill* § 9, *available at* http://www.mountvernon.org/the-estate-gardens/gristmill/ten-facts-about-the-gristmill/.

[84] *See* Diary Entry (June 6, 1771) & ed. note (sales of flour to merchants that shipped to Jamaica, Lisbon, and the West Indies), *available at* Washington/01-03-02-0001-0015-0002; From George Washington to Robert McMickan (Jan. 12, 1773) & ed. notes 1 (shipping flour and herring for Barbadoes or Jamaica markets), *available at* Washington/02-09-02-0122; Diary Entry (Apr. 2, 1775) & ed. note (Washington's ship *Farmer* carried corn to Lisbon), *available at* Washington/01-03-02-0005-0008-0002; From George Washington to Robert Cary & Co. (Sept. 20, 1759) & ed. notes 2 & 8 (tobacco shipped to London), *available at* Washington/02-06-02-0189-0001.

[85] OPO Lease §§ 6.2, 37.10; *see also id.* § 1.1 (defining "Applicable Laws" and "Laws and Regulations").

[86] OPO Lease § 37.2.

[87] *See Citizens for Responsibility and Ethics in Washington v. Donald J. Trump*, No. 1:17-cv-00458 (S.D.N.Y. filed Jan. 23, 2017).

[88] The Supplemental Standards of Ethical Conduct for Employees of the General Services Administration impose restrictions on employees who "personally and substantially" participate in real estate activities as part of their official duties. 5 C.F.R. § 6701.104.

[89] OGE LA-16-08 (Sep. 23, 2016) at Q. 3; *see also* 37 U.S.C. § 908.

[90] *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 1981 WL 30896 (June 23, 1981).

[91] *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, ___ Op. O.L.C. ___, 2009 WL 6365082 (Dec. 7, 2009).

[92] *Memorandum for Attorneys of the Office, Re: Best Practices for OLC Legal Advice and Written Opinions,* at 1 (Jul. 16, 2010) ("OLC Best Practices"), *available at* https://www.justice.gov/olc/best-practices-olc-legal-advice-and-written-opinions.

[93] Bradley Boettcher to Tim Tozer Email (Feb. 6, 2017), *quoting and attaching Memorandum for Attorneys of the Office, Best Practices for OLC Opinion* at 1 (May 16, 2005).

[94] *Applicability of Emoluments Clause to Proposed Service of Government Employee on Comm'n of Int'l Historians*, 11 Op. O.L.C. 89, 89-90, 1987 WL 256400 (July 30, 1987).

[95] *Emoluments Clause Questions Raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, 1986 WL 1239553 at *1 (May 23, 1986).

[96] *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, __ Op. O.L.C.__, 2009 WL 6365082, at *3-4, 7 (Dec. 7, 2009).

[97] *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 1982 WL 170682 (Feb. 24, 1982).

[98] *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 114, 119-120 (O.L.C.), 1993 WL 777080 (Oct. 28, 1993); see also *Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, __ Op. O.L.C. __, 2010 WL 2516024 at *1 n.2 (June 3, 2010) (reversing earlier decision that

nongovernment member of the advisory committee Administrative Conference of the United States (ACUS) is covered by the Emoluments Clause, but not addressing other aspects of the 1993 opinion).

[99] *Payment of compensation to individual in receipt of compensation from a foreign government (Mr. Richard E. Newkirk, OAP)* (O.L.C.), at 8 (Oct. 4, 1954), *available at* https://www.justice.gov/olc/page/file/935721/download.

[100] *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 U.S. Op. O.L.C. 187, 188, 1981 WL 30896 (June 23, 1981) (quoting THE FEDERALIST NO. 73).

[101] OLC Best Practices at 3, *available at* https://www.justice.gov/olc/best-practices-olc-legal-advice-and-written-opinions.

[102] *Applicability of 18 U.S.C. §§ 431-433 to Limited Partnership Interests in Government Leases under Proposed Modified Transaction*, 22 Op. O.L.C. 33, 1998 WL 2027627 (Feb. 17, 1998); *Applicability of 18 U.S.C. § 431 to Limited Partnership Interests in Government Leases*, 22 Op. O.L.C. 41, 1998 WL 2027628 (Mar. 13, 1998).

[103] OLC Best Practices at 2, 3.

[104] *See* Sheri A. Dillon Feb. 17, 2017 Letter to Kevin Terry at 5-6., Exhibit 1.B to Kevin Terry Mar. 23, 2017 Letter to Donald J. Trump, Jr., available at https://www.gsa.gov/reference/freedom-of-information-act-foia/electronic-reading-room (Contracting Officer Letter).

[105] Pub. Law No. 111-350, § 2(b) ("CONFORMITY WITH ORIGINAL INTENT"), §3, 124 Stat. 3677, 3677, 3805-06 (Jan. 4, 2011) (emphasis added); 41 U.S.C. § 6306(a) (2011) (emphasis added).

[106] *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

[107] If "publicly held" does modify "other entity," the proviso exception would apply to entities such as publicly held Real Estate Investment Trusts and publicly held partnerships, but not privately held business entities.

[108] *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citations omitted).

[109] For the general proposition that government agencies lack authority to violate the Constitution, *see Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 697 (1949). By example, we would not expect GSA to assert authority to outlease space to a vendor that insisted on an unconstitutional racially restrictive covenant that permitted discrimination to those served. *See generally, Shelley v. Kraemer*, 334 U.S. 1 (1948) (restrictive covenants in housing).

[110] *Constitutionality of Statute Requiring Executive Agency to Report Directly to Congress*, 6 Op. O.L.C. 632, 643, 1982 WL 170732, at *10 (Nov. 5, 1982). The Seven Member Rule refers to 5 U.S.C. § 2954, which addresses requests for information from an Executive Branch agency when those requests come from seven Members of the House of Representatives Committee on Government Operations or five Senators on the Senate Committee on Governmental Affairs.

[111] See *Jennings v. Rodriguez*, __ U.S. __, 138 S. Ct. 830, 842 (2018).

JE19-002

## APPENDIX A

The appendix describes the documentary evidence we found that Washington purchased privately owned lots in the District of Columbia during his presidency. The primary sources we consulted include:

- Acts of Congress (see above for online access), available at https://www.loc.gov/law/help/statutes-at-large/index.php.

- Session Laws of the Maryland General Assembly, available at http://aomol.msa.maryland.gov/html/laws2.html.

- Correspondence of George Washington, Thomas Jefferson, and others available online from the National Archives, in cooperation with the University of Virginia Press, at Founders Online, https://founders.archives.gov/. The permalink for each document is styled: http://founders/archives.gov/documents/[Washington or Jefferson]/[document specific number]. Citations to Washington papers are abbreviated to Washington/[document specific number]. Similarly, citations to Jefferson papers are abbreviated Jefferson/[document specific number].

- Reports of The Commission to Investigate the Title of the United States to Lands in the District of Columbia ("Land Title Commission"), part of the Congressional Serial Set , available at https://catalog.hathitrust.org/Record/006228203 through the HathiTrust Digital Library:

  - First Commission Report, *Title of the United States to lands in the District of Columbia*, S. Doc. No. 60-653, 60th Cong., 2d Sess. (Jan. 14, 1909), *published in* Congressional Serial Set No. 5407, at No. 653 ("First Commission Report");
  - Second Commission Report, *Title of the United States to lands in the District of Columbia,* S. Doc. No. 61-632, 61st Cong., 2d Sess. (June 16, 1910), *published in* Congressional Serial Set No. 5660, at No. 632 ("Second Commission Report"); and
  - Third Commission Report, *Title of the United States to lands in the District of Columbia,* S. Rep. No. 62-907, 62d Cong., 2d Sess. (July 13, 1912), *published in* Congressional Serial Set No. 6122, at No. 907 ("Third Commission Report").

<u>DISCUSSION</u>

We found evidence in Washington's correspondence that he purchased eight lots located in the District of Columbia during his presidency. His will, the accompanying schedule of properties, and the reports of the Land Title Commission confirm these purchases.[1]

If Washington purchased lots owned by the United States, that might be some evidence of an early historic practice that a President's gain from private business activities with the United

JE19-002

States does not violate the Presidential Emoluments Clause.[2] Our review considered any evidence that the United States owned the lots that Washington purchased during his presidency. We also considered any evidence that, even if the United States did not own the lots Washington purchased, the Commissioners' participation in the sales provided a benefit from the United States that might be viewed as an emolument. The evidence that we found suggests that Washington purchased privately owned property during his presidency. The evidence similarly suggests that the Commissioners' participation in the sales did not provide a benefit from the United States.

1.   <u>Historical Context for Lot Sales</u>:

In July 1790, Congress enacted the Residence Act to implement the U.S. Constitution's provision for a "Seat of the Government of the United States" under the United States' exclusive jurisdiction.[3] The Act authorized the President to prepare for the new government's move to the new federal district in December 1800.[4] Until then, Maryland law applied to the land it ceded.[5]

The Act created presidentially appointed Commissioners who were responsible for surveying and defining the boundaries for the new federal district. Congress also gave these Commissioners the power to purchase or accept land "for the use of the United States" and the responsibility for providing suitable buildings for the new government, including the Congress and the President. Congress authorized the President to appoint the Commissioners and to accept grants of money for the government.[6]

The possibility of using lot sales to fund public buildings arose when the principal landowners within the proposed Federal City (known as the proprietors) agreed that each would donate part of their land to "Trustees on behalf of the Public."[7] To accomplish their purpose, the proprietors executed deeds that conveyed land to two trustees, Thomas Beall and John Mackall Gantt.[8] The deeds authorized Beall and Gantt to:

- Hold all or a part of the land for a federal city, laid out in streets, squares, and lots, as the President approves for the new city;

- Convey to the Commissioners all the streets and those squares, parcels and lots as the President shall deem proper "for the use of the United States forever;"

- Make a fair and equal division of the remaining lots, returning one share to the proprietor and one share donated for sale on terms and conditions set by the President;

- Convey the complete, fee simple, ownership in the land to the purchasers of the lots sold;

- Use the proceeds from the lot sales to pay the proprietors at the rate of £ 25 per acre for the squares and lots conveyed to the United States;

JE19-002

- Transfer the remaining monies or securities from the sales to the President in order to achieve the purposes of the Residence Act by funding the construction of public buildings to house the government; and

- Upon the President's request (which did not occur until November 1796), convey the trustees' ownership interest in any unsold lots, not reserved to the proprietors, to the President or his designee.[9]

Before the lot lines could be drawn, surveyors had to set the boundaries of the new territory, as well as prepare a plat of the new capital city that divided land into squares, and the squares into lots.[10]

Maryland's General Assembly regulated the land sales in order to ensure purchasers received good title. A December 1791 enactment:

- Provided that Maryland's cession of land did not vest any right in the land to the United States or disturb the rights of the individual land owners;

- Recognized that the proprietors had "conveyed their lands in trust" to Beall and Gantt;

- Extended the Beall and Gantt trusts to include interests in the land that the proprietors could not convey (such as the interests of minors);

- Authorized the Commissioners to condemn land in the city of Washington and two existing towns (Hamburgh and Carollsburgh) where some lot owners had not come to any agreement to deed to Beall and Gantt, and hold that land in trust; and

- Authorized the Commissioners to appoint a clerk for recording divisions and certificates of sales and payment.[11]

Doubts about the validity under Maryland law of the lot sales in the new federal district led the General Assembly to provide that any land recordings that satisfied its 1791 act also satisfied Maryland's laws for passing good title.[12] The General Assembly later provided that the certificates a purchaser received from the Commissioners, upon full payment for a lot, "shall be sufficient and effectual to vest the legal estate in the purchasers . . . without any deed or formal conveyance."[13]

As required by the proprietors' deeds to Beall and Gantt, Washington set the terms for the sales and approved the Commissioners' authority to conduct public auctions and private sales of lots.[14] In practice, we found some evidence that the Commissioners set the date for a public sale and advertised the sale several months before securing Washington's approval for the date of the sale.[15] According to broadsides announcing public auctions, the Commissioners held the sales of the donated lots according to the deeds of trust and on the basis of bids.[16] When the Commissioners decided the bids fell below a lot's value, there is some evidence that they placed bids on behalf of the public, to protect the public interest for sale later at a higher price.[17] Commissioners also sold at private sales, and contemporaneous documents reflect that

the Commissioners might seek competing bids where more than one party expressed interest in a lot.[18]

2.    <u>Washington's Lot Purchases During His Presidency</u>:

We found evidence that Washington purchased privately owned lots during his presidency.

*a. The Lots Purchased*:

Washington first purchased at a September 1793 public sale four lots (those allocated for sale to fund public buildings) in square 667, located in Carrollsburgh.[19] The Commissioners sent Washington certificates that set the terms of payment for the lots and provided that, upon full payment, he "will be entitled to a conveyance of the said lot in Fee." The Commissioners later sent Washington a Certificate for Purchase of Lots and payment of the price, "which by a late Act transfers the Title without the formality of Deeds." The price for the lots was $ 1066.66, with interest. Washington later commented that he "paid pretty smartly" for these lots.[20]

Washington was unsuccessful in purchasing Hamburgh lots during the September 1793 sale, but the Commissioners later advised that a prospective buyer of a large number of lots expressed his willingness to defer to Washington's interest.[21] The following year, Washington purchased two public lots in square 21 for £ 200 each.[22] We found some evidence that this was twice the price that the Commissioners obtained in earlier sales for other lots near the planned site for the President's House (the White House).[23] Washington later purchased two adjacent lots from a private owner, Robert Peter, and received a deed from Peter in 1795.[24]

*b. Ownership of the Lots Purchased in Commissioner Sales*:

We found that Maryland's cession of land for the new district ceded sovereignty to the United States over the Maryland portion of the new federal district, but not title to the land. The Maryland General Assembly's 1791 Act expressly provided that nothing in its cession for the new District of Columbia "… shall be so construed to vest in the United States any right of property in the soil, as to affect the rights of individuals therein …."[25]

We also found evidence that the allocation of lots for the public to fund construction projects also did not give the United States ownership and divest the proprietors' trustees from their ownership and obligations for the donated land. The Land Title Commission reviewed the available records of these divisions and concluded that "the lands devoted to sale for the purpose of securing funds for erecting buildings were not set forth in the agreements of division as becoming the property of the United States."[26] Instead, the Commission found that "… in each assignment the apportionment is to the 'public' and not to the United States."[27]

The six public lots that Washington purchased during his presidency appear to be among the lots that the proprietors donated for sale, in order to raise funds for the President's House (White House), the Capitol, and other government buildings (and return a share of the proceeds to the proprietors). We found evidence that Washington understood that the public lots he purchased were held privately by the trustees, not by the government.[28] Broadsides for the Commissioners' 1793 sale announced that the sales would be made "according to the deeds in

JE19-002

trust of the lands within the city."[29] Under those deeds, Beall and Gantt, not the United States, "conveyed to the respective purchasers fee simple."[30] Washington's correspondence reflects that he understood the significance of purchasing the complete, fee simple ownership of land.[31]

The Land Title Commission concluded that "the course of title of the lands involved seems to be perfectly clear" during the period of his presidency when Washington purchased lots: the "sale of lands by the commissioners automatically divested from the original trustees ...."[32] The Land Title Commission found that "the course of the title" became less clear when, at Washington's request as provided by the proprietors' trust agreement, Beall and Gantt conveyed their interests to the Commissioners on November 30, 1796.[33] This occurred after Congress directed that lots be sold in order to repay loans needed for preparing the new government seat.[34] At that point, the Commissioners replaced Beall and Gantt as trustees, and acquired the prior trustees' fee simple ownership in the lands donated in trust for the public.[35]

Prior to November 30, 1796, however, the evidence we found indicates that the title to the public lots that the Commissioners sold passed directly from the trustees, Beall and Gantt, to the purchasers (such as Washington). Based on this evidence, it appears that Washington purchased lots during his presidency from the trustees and from a private landowner (Peters).

3.    The Commissioners' Authority for Selling Lots:

We also considered whether the Commissioners' participation in the sales, alone, gave Washington a benefit *from the United States*. Accordingly, we considered the source for the Commissioners' authority to conduct sales.

As noted above, the Residence Act expressly gave the Commissioners the power to purchase or accept land; but the Act did not include authority to sell land, much less sell land that the United States did not own. Maryland law did not give the commissioners authority to sell land that the trustees held in trust. The General Assembly only gave the Commissioners authority to condemn and sell land of owners who would *not* execute deeds with trustees Beall and Gantt, after the owners received valuation.[36]

The proprietors' deeds to the trustees authorized that the "... lots shall and may be sold at any time or times in such manner and on such terms and conditions as the president of the United States for the time being shall direct ...."[37]  Washington, in turn, exercised the authority given to him by the deeds of trust when he authorized the Commissioners to conduct public and private sales, as the Broadsides advertised.[38] It appears then that the Commissioners' authority derived from the private deeds of trust. The Residence Act did not include land sales among the authorities Congress granted the Commissioners in their capacity as United States officers. In these circumstances, the evidence we considered suggests that the Commissioners' participation in the lot sales gave Washington a benefit from the proprietors' private trust agreements with Beall and Gantt, rather than from the United States.

As noted above, the Commissioners' role changed when Washington requested Beall and Gantt to transfer their interests under the trusts in 1796, as those documents provided. However, Washington did not make further lot purchases until after his presidency, when he purchased

JE19-002

two lots in September 1798 to build townhouses, a public lot in square 634 (which the commissioners now held in trust) and an adjacent private lot in the same square that he purchased from Daniel Carroll.[39] The Presidential Emoluments Clause does not encompass a former President's receipt of emoluments from the government.[40]

We are mindful that disputes over the lot sales bred litigation for over 170 years. Something as fundamental as which plat was used for conveying the streets for the new city was not resolved for 102 years, and the United States' ownership of the alleys not until the 1970s.[41] The government's interest in the donated public lots was resolved 111 years after Washington's presidency, with the District of Columbia Court of Appeals deciding that title to the lots donated for the public "never vested in the United States." Rather "the fee passed through the trustees from the grantors to the purchasers," while the United States "simply received the proceeds of the sales."[42] In view of the disagreements over the early sales long after Washington died, we relied on the plain language that appears in the contemporaneous documents prepared by and for the participants in those transactions as the best gauge for understanding contemporaneous meaning and historic precedent.

We recognize that there may well be contemporaneous evidence not yet found or that our review did not discover.[43] Consequently our report does not reach a definitive judgment on whether Washington's lot purchases show a historic practice of the first President conducting private business with the United States. Nonetheless, the evidence that we found suggests that Washington purchased privately owned property during his presidency. The evidence similarly suggests that the Commissioners exercised authority under the proprietors' trust agreements when they participated in the sale of six lots held by Beall and Gantt, the trustees, to Washington during his presidency.

JE19-002

## Endnotes:

[1] As discussed later, Washington purchased lots in squares 21 and 667 during his presidency. We found that Washington included these lots in his final will and accompanying schedule of properties, as well as lots in square 634 purchased after his presidency. The Last Will and Testament of George Washington at 23, 39 n.44, 47-48 (John C. Fitzpatrick ed., Mt. Vernon Ladies' Ass'n 1939), *available at* https://archive.org/details/lastwilltestamen1939wash. *See also* First Commission Report at 13 (square 21), 47 (square 667).

[2] Whether any business Washington had with the United States or any foreign government violated the Foreign or Presidential Emoluments Clauses also requires an examination of broader issues of constitutional interpretation, such as a structural analysis of the clause and an inquiry into its purpose.

[3] U.S. Const. art. I, § 8, cl. 17. *See An Act for establishing the temporary and permanent seat of the Government of the United States*, ch. 28, §§ 1, 5-6, 1 Stat. 130 (Jul. 16, 1790) (Residence Act). An amended act provided that the President could include in the new federal district land on the Virginia side of the Potomac, but that public buildings had to be erected on the Maryland side. *An Act to amend "An act for establishing the temporary and permanent seat of the Government of the United States*," ch. 17, 1 Stat. 214 (Mar. 3, 1791).

[4] Residence Act, at §§ 2-3, 6.

[5] *Id.* at § 1.

[6] *Id.* at §§ 2-4.

[7] *See* Agreement of the Proprietors of the Federal District (Mar. 30, 1791) & ed. note, Washington/05-08-02-0016. The agreement generally provided for their donation of land for the new city and that the lots created from the proprietors' land shall be "joint property between the Trustees on behalf of the Public and each present Proprietor" and equally divided between them. The Agreement further provided for compensating the proprietors at a rate of 25£ per acre for the lands donated for public buildings and improvements. *See also* Second Commission Report at 5 (discussing the "evidence of the assignment of the lots to the public").

[8] *See Morris v. United States*, 174 U.S. 196, 202-06 (1899) (reproducing text of Deed of David Burns). For similar deeds to Carrollsburgh and Hamburgh lots, see *id.* at 248-50 (quoting deeds) and *United States v. Groen*, 72 F. Supp. 713, 717 (D.D.C. 1947) (Carrollsburg proprietors' deeds in trust to Beall and Gantt to carry out the proprietors' agreements to "relinquish our rights to the said lots and lands, as the President or such Commissioners or persons acting as aforesaid shall direct, to secure to the United States the donation intended by this agreement"). For a digital copy of an original deed, see Indenture of Thomas Johns, et al. to Thomas Beall and John Mackall Gantt (Apr. 9, 1793), *available at* http://nationalbuildingmuseum.net/pdf/PubProg_QuirksofL%27Enfant_WhayneQuin_5-24-2012.pdf.

[9] *Morris v. United States*, 174 U.S. at 202-05; *see also id.* at 266 (trustees conveyed fee simple interest in lots to the Commissioners at Washington's request on Nov. 30, 1796); *see also* Second Commission Report at 7 (same).

[10] For problems with the accuracy of survey lines, see To George Washington from the Commissioners for the District of Columbia (Mar. 11-12, 1793) & ed. notes 5, 8 (inaccurate measures and survey work certified that was not done), Washington/05-12-02-0230; Proclamation (Oct. 17, 1791) & ed. note (noting bidding on lots in connection with this sale was hampered by the lack of a printed plan, or plat of the city that showed the land divided into squares and lots), Washington/05-09-02-0052; From George Washington to David Stuart (Nov. 20, 1791) (discussing Washington's reaction to hearing that L'Enfant refused to provide a map of the new "Federal City" for satisfying purchasers at the sale), Washington/05-09-02-0118); To George Washington from the

JE19-002

Commissioners for the District of Columbia (Apr. 9, 1793) (discussing the need for replatting and redividing some squares), Washington/05-12-02-0344.

[11] *An Act concerning the territory of Columbia and the city of Washington*, Laws of Maryland, Sess. 200, vol. 204, ch. 45, 572 (Dec. 19, 1791).

[12] *A Supplement to the act, entitled, An act concerning the territory of Columbia, and the city of Washington*, Sess. 202, vol. 644, ch. 59, 689 (Dec. 23, 1792) (Early State Records Film No. 3181 (third column)).

[13] *A Further supplement to the act concerning the territory of Columbia and the city of Washington*, Sess. 203, vol. 645, ch. 58, 63 (Dec. 28, 1793). This enactment alleviated the trustees from their obligation to provide a deed in order to transfer title. Conflicting claims over which proprietor owned the land, incomplete surveys, and the commissioners' private sale of lots before the divisions of squares may have complicated the trustees' ability to prepare a deed. *See, e.g.,* Second Commission Report at 6 (noting difficulties in making divisions, in part, because there were conflicting claims of individual proprietors as to the ownership of particular squares); To George Washington from the Commissioners for the District of Columbia (Mar. 11-12, 1793) (finding inaccuracies in surveys and that surveyor did not accomplish some of the work he certified as done), Washington/05-12-02-0230; To George Washington from the Commissioners for the District of Columbia (Apr. 9, 1793) (need to correct the lines in some squares and replatting and redividing some squares), Washington/05-12-02-0344.

[14] *Morris v. United States*, 174 U.S. at 203-04 (quoting deeds). *See also* Proclamation (Oct. 17, 1791) & ed. note (authorizing sales and outlining terms and conditions), Washington/05-09-02-0052; From George Washington to the Commissioners for the District of Columbia (Sept. 29, 1792) & ed. note (authorizing public and private sales), Washington/05-11-02-0088; To George Washington from the Commissioners for the District of Columbia (Sept. 16, 1793) & ed. note 2 (Commissioners' authority for arranging public and private sales), Washington/05-14-02-0068.

[15] *See* From Commissioners for the District of Columbia to George Washington (Sept. 16, 1793) & ed. notes 2-3 (September 1793 sale advertised in January in a Philadelphia newspaper, the *Gazette of the United States*), Washington/05-14-02-0068.

[16] Broadside: Sale of Lots in the Federal City, (Oct. 8, 1792) (bids under three dollars not accepted), Washington/05-11-02-0108; *see also* Proclamation (Oct. 17, 1791) & ed. note (noting that bidding hampered because prospective buyers could not see how squares fit in the overall city plan), Washington/05-09-02-0052.

[17] To George Washington from the Commissioners for the District of Columbia (Oct. 21, 1791) (four of the 35 lots sold in the first public sale "fall again to the public [and] those bids were to protect its Interest"), Washington/05-09-02-0056.

[18] To George Washington from the Commissioners for the District of Columbia & ed. note 3 (Apr. 20, 1795) (referencing commissioners' letter notifying interested party that they will accept another offer unless "better terms are offered by others"), Washington/05-18-02-0044.

[19] For the characterization of these lots as "public" lots, see Second Commission Report at 5, 30 (noting the division of lands "between the original proprietors and the public" and the "assignment of the lots to the public," included in the tables as "Assigned to the United States"). Maps that show the numbered squares in Carrollsburgh and in Hamburgh where Washington purchased lots are included with a Washington letter, found at From George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), Washington/05-15-02-0289 (the maps were not part of Washington's letter). Hamburgh was located in the Foggy Bottom area of Washington, D.C., and Carrollsburgh located near the confluence of the Potomac and Anacostia (the Eastern Branch) rivers bordering the city. The Supreme Court's opinion in *Morris v. United States*, 174 U.S. at 219-21, also includes maps showing the Carrollsburgh and Hamburgh locations.

JE19-002

[20] Washington's correspondence shows monetary amounts in dollars ($) and pounds (£). The report uses the currency indicated in the correspondence citied. For Washington's purchase of lots in square 667, see Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793) & ed. note, Washington/05-14-02-0074; From George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794) & ed. note 2, Washington/05-14-02-0068; To George Washington from the Commissioners for the District of Columbia (Mar. 23, 1794) & ed. note 1, Washington/05-15-02-0331; From George Washington to the District of Columbia Commissioners (Sept. 28, 1798) & ed. note 3, Washington/06-03-02-0023. The certificate only covers lots 12-14, and Washington received a separate certificate for lot 5. The Land Title Commission found that Washington paid $306.66 for Lot 5 and $776 for lots 12-14, a total of $1082.66. *See* First Commission Report at 47.

[21] From George Washington to the Commissioners for the District of Columbia (Mar. 14, 1794), Washington/05-15-02-0289; To George Washington from the Commissioners for the District of Columbia (Mar. 23, 1794) & ed. note 2, Washington/05-15-02-0331; From George Washington to the Commissioners for the District of Columbia (Apr. 11, 1794), Washington/05-15-02-0442.

[22] To George Washington from the Commissioners for the District of Columbia (Apr. 23, 1794) & ed. note 2, Washington/05-15-02-0499; From George Washington to the Commissioners for the District of Columbia (June 1, 1794) & ed. note 2, Washington/05-16-02-0139; Second Commission Report at 5, 19; *see also* note 19, supra.

[23] To George Washington from David Stuart (Dec. 10, 1792) & ed. note 3 (discussing 15 lots sold near the President's House for £ 100 each), Washington/05-11-02-0295; To George Washington from the Commissioners for the District of Columbia (Oct. 13, 1792) & ed. note 1 (24 lots sold near the President's House for an average of £ 85 per lot), Washington/05-11-02-0115.

[24] For the purchases from Robert Peter, see To George Washington from the Commissioners for the District of Columbia (June 7, 1794) & ed. note 1 (discussing Peter's willingness to sell and his execution of a deed to Washington for the lots on May 11, 1795), Washington/05-16-02-0161; From George Washington to the Commissioners for the District of Columbia (Mar. 24, 1795) & ed. notes 1-2 (Tobias Lear, Washington's assistant, paid the balance for three lots, including both the lots that Robert Peter sold), Washington/05-17-02-0455. *See also* First Commission Report at 5 (showing lots 1 and 4 assigned to the United States and lots 2 and 3 remaining with the proprietor); *id.* at 13 (showing a total payment of $ 2,133.32 for the four lots); Second Commission Report at 19 (showing lots 1 and 4 assigned to the United States and lots 2 and 3 assigned to the proprietor).

[25] *An Act concerning the territory of Columbia and the city of Washington,* Laws of Maryland, Sess. 200, vol. 204, ch. 45, § 2 at 573 (Dec. 19, 1791).

[26] Second Commission Report at 8. The Land Title Commission also found that the contemporaneous record of these assignments of lots is incomplete. *Id.* at 5-7; Third Commission Report at 17-22. According to the Land Title Commission, a division should include "an instrument signed by the original proprietors and by the commissioners and containing a plat of the square as it was divided into lots, with or without alleys, as the case might be, and a certificate of the date of division and the assignment by lots or by the whole square to the public or to the original proprietor" and then recorded. Third Commission Report at 17.

[27] Second Commission Report at 8. Although the assignments were to the public, the United States was the beneficiary of the proceeds from sales of donated land; and the Report refers to the public share as assignments to the United States and the United States conveyed lots. *Id.* at 3-4, 19. The Land Title Commission also noted that the distinction is "scarcely with a difference," citing two specific instances where land assigned to the public was conveyed to the United States for the Washington Navy Yard and Marine barracks. *Id* at 8. We found evidence that the United States purchased the land for both the Washington Navy Yard and the Marine barracks. *See* To Thomas Jefferson from Samuel Smith (May 4, 1801) (reporting "pieces of ground purchased for the purpose of Navy Yards – to wit – New Hampshire, Boston, New York, Philadelphia, Washington, & Norfolk…"), Jefferson/01-34-02-0021; Memorandum from Thomas Munroe (June 15, 1802) ed. note (including query on "balance of about $2250 due for square purchased by U.S. for Marine barracks"), Jefferson/01-37-02-0492.

JE19-002

[28] From George Washington to Thomas Beall (Nov. 10, 1796) (Early Access document), Washington/99-01-02-01071; *see also Morris v. United States*, 174 U.S. at 266 (discussing Washington's request that the trustees convey to the commissioners in fee simple all land subject to the trusts remaining unexecuted).

[29] Broadside: Sale of Lots in the Federal City, § 8 (Oct. 8, 1792), Washington/05-11-02-0108; *see also* Proclamation (Oct. 17, 1791) & ed. note 1 § 8 (regulations providing that the conveyances shall be made pursuant to the deeds of trust), Washington/05-09-02-0052.

[30] *Morris v. United States,* 174 U.S. at 203-04.

[31] For examples of Washington's familiarity with fee simple ownership, see From George Washington to John Gill (May 4, 1795) (offering to modify land sale by placing condition on the use of land until the payment of the full purchase price, "when you will be possessed of the fee Simple, & a legal right to do what you please with the land"), Washington/05-18-02-0081; From George Washington to James Ross (Aug. 29, 1795) & ed. note 3 (power of attorney prepared by Washington to dispose of fee simple interest in land), Washington/05-18-02-0399; From George Washington to Alexander Addison (July 8, 1796) (Early Access document) (describing his execution of a deed to convey an estate "in fee Simple"), Washington/99-01-02-00704; From George Washington to James Mercer (Dec. 12, 1774) & ed. note 3 (account of Washington's acquisition of a tract of land to secure his ownership in fee simple), Washington/02-10-02-0143.

[32] Second Commission Report at 7-8. Under Maryland law, conveyance occurred the moment the commissioners received full payment: "the certificates granted … to purchasers of lots in the said city, with acknowledgment of the payment of the whole purchase money, and interest, if any … shall be sufficient and effectual to vest the legal estate in the purchasers … without any deed or formal conveyance." *See A Further supplement to the act concerning the territory of Columbia and the city of Washington*, Sess. 203, vol. 645, ch. 58 at 63, § 1 (Dec. 28, 1793).

[33] Second Commission Report at 7-8; *see also Morris v. United States,* 174 U.S. at 205; From George Washington to Gustavus Scott (Nov. 11, 1796), Washington/99-01-02-01073.

[34] *An Act authorizing a Loan for the use of the City of Washington, in the District of Columbia, and for other purposes therein mentioned*, ch. 21 §§ 1-2, 1 Stat. 461 (May 6, 1796).

[35] Second Commission Report at 8. With Beall and Gantt's transfer of their trust interests and obligation, the Commissioners "had two sets of functions – first, as trustees to hold the donated lands, and second, as public officials to care for lands purchased by the United States and to dispose of the lands donated to the building fund when the identity of such lands should have been ascertained." *Id.*

[36] *See An Act concerning the territory of Columbia and the city of Washington*, Sess. Laws of Maryland, Sess. 200, vol. 204, ch. 45 §§ 4, 13, 574, 576 (Dec. 19, 1791). Section 13 of that Act repealed an earlier Maryland law that authorized the commissioners to condemn land "for the erection of public buildings, and for other public purposes." *An Act to condemn land, if necessary, for the public buildings of the United States*, Sess. 199, vol. 204, ch. 44, 514 (Dec. 22, 1790). Washington was aware that merchants in the area of the new district had sought condemnation legislation from the General Assembly. To George Washington from William Deakins, Jr., and Benjamin Stoddert (Dec. 9, 1790) & ed. notes, Washington/05-07-02-0025; From George Washington to William Deakins, Jr., and Benjamin Stoddert (Feb. 17, 1791) & ed. note 2, Washington/05-07-02-0214.

[37] *Morris v. United States*, 174 U.S. at 203 (quoting deed).

[38] *Id.*; Proclamation (Oct. 17, 1791) ed. note 1 § 8 (providing "These regulations are the terms and conditions under and upon which conveyances are to be made according to the deeds in Trust of the Lands within the City"), Washington/05-09-02-0052; Broadside: Sale of Lots in the Federal City (Oct. 8, 1792) (providing "ALL Lands

JE19-002

purchased at this Sale, are to be subject to the Terms and Conditions declared by the President, pursuant to the Deeds in Trust"), Washington/05-11-02-0108.

[39] For these lots, see From Alexander White to George Washington (Sept. 8, 1798) & ed. note 1 (expressing opinion on the lots that might suit Washington's plan to build two houses, and noting Washington's subsequent purchase of public lot 16 and Daniel Carroll's lot 6), Washington/06-02-02-0463; To George Washington from the District of Columbia Commissioners (Sept, 27, 1798) & ed. note 1 (discussing purchases), Washington/06-03-02-0020. For Washington building two connected houses on lots he purchased after his presidency, see From George Washington to the District of Columbia Commissioners (Sept, 28, 1798) & ed. note 2, Washington/06-03-02-0023. *See also* First Commission Report at 45 (Washington's purchase of lot 16, square 634).

[40] We found one post-presidency transaction that relates back to his purchases while President. In 1798, Washington complained that his square 667 purchases included water rights, but that these rights were not reflected in his certificates. From George Washington to the District of Columbia Commissioners (Sept. 28, 1798) & ed. note 3, Washington/ 06-03-02-023; *see also* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793) & ed. note 1 (lots 12-14 come with "a privilege of improving, in front of the Lot, into the Eastern branch"), Washington/05-14-02-0074.

The commissioners investigated and found Washington "clearly entitled to the water Lots" and compensated Washington by assigning him "4, 5, 6, and water front" east of square 667 covered by the cost of his 1793 purchase. To George Washington from the District of Columbia Commissioners (Oct. 3, 1798), Washington/06-03-02-0038; First Commission Report at 47 (entry for square 667 "4, 5, and 6, water front" for Gen. Geo Washington, with the notation: "The amount received for this lot is included in that received for lots 12, etc., square No. 667."); *see also id*. (entry for square 667 "lots 12, 13,and 14" with the notation "In this amount is covered the sum paid for lots 4, 5, and 6, square east of square No. 667." Our investigation did not find a certificate for these lots, and the lots do not appear in Washington's will and accompanying schedule of properties (unlike the other lots he purchased), cited earlier.

[41]*See Morris v. United States*, 174 U.S. at 252-71 (discussing the Ellicott and the Dermont plats); *Washington Med. Ctr. v. United States*, 545 F.2d 116, 121-126 (Ct. Cl. 1976) (alleys vested in the United States), *cert. denied,* 434 U.S. 902 (1977). For other cases that addressed the early sales, see *Oneale v. Thornton*, 10 U.S. (6 Cranch) 53 (1810); *Van Ness v. Mayor, Aldermen, and Bd. of Common Council of the City of Washington*, 29 U.S. (4 Pet.) 232 (1830); *Potomac Steam-Boat Co. v. Upper Potomac Steam-Boat Co,*109 U.S. 672 (1884); *Shoemaker v. United States*, 147 U.S. 282 (1893); *Bursey v. Lyon*, 30 App. D.C. 597 (Ct. App. D.C. 1908); *Fowler v. Koehler*, 43 App. D.C. 349 (Ct. App. D.C. 1915); *Fitzhugh v. United States*, 40 F. 2d 797 (Ct. App. D.C. 1930); *United States v.Belt*, 142 F. 2d 761 (D.C. Cir. 1944); *United States v. Groen*, 72 F. Supp. 713; *Campbell v. Morris*, 1797 WL 430 (Gen. Ct. Md. May 1, 1797), *rev'd* Ct. App. (June 1,1800).

[42] *Bursey v. Lyon*, 30 App. D.C. at 608.

[43] *See, e.g.,* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793) ed. note (certificate of Washington's purchase of lot 5 in square 667 included in a private sale), Washington/05-04-02-0074.

**Appendix B**



GSA Office of General Counsel

January 9, 2019

TO:       Carol F. Ochoa
              Inspector General (J)

FROM:     Jack St. John
              General Counsel (L)

SUBJECT:  Evaluation of GSA's Management and Administration of the Old Post Office
              Building Lease (JEF17-014-000)

This is in response to the Office of Inspector General's final report entitled *Evaluation of GSA's Management and Administration of the Old Post Office Building Lease*, dated January 4, 2019. The analysis and findings contained in the report primarily involve actions taken by the Office of General Counsel (OGC) and, accordingly, the Administrator of General Services asked me to provide the agency's response. OGC appreciates the opportunity provided by your office to engage with the evaluation team prior to receipt of the final report, as well as the professionalism and courtesies extended to our office.

The General Services Administration (GSA) is gratified to learn that following a rigorous, sixteen-month investigation, the agency's concerted efforts to ensure that the contracting officer was able to render an impartial decision free of undue influence of any kind proved successful. We note that after interviewing over two dozen employees and reviewing over 10,000 documents, your office found not a single instance in which a political appointee or career federal employee at GSA attempted to improperly interfere with or exert pressure on the contracting officer's decision-making process. In fact, your office found no undue influence, pressure, or unwarranted involvement of any kind by anyone, including the Executive Office of the President and the Office of Management and Budget.

The report's primary findings relate to actions that occurred either during the previous Administration or prior to the confirmation of the current Administrator, when career federal employees occupied the most senior positions at the agency. For example, the decision not to address or consider the Emoluments Clauses occurred in mid-December 2016. The decision not to seek guidance from the Office of Legal Counsel (OLC) began in the summer of 2016 and ended around Inauguration Day. And the decision to grant an estoppel certificate occurred on or before March 23, 2017, when career officials were acting in the Administrator, Deputy Administrator, and General Counsel positions. Any commentary resulting from the report that

**U.S. General Services Administration**
1800 F Street, NW
Washington, DC 20405-0002
www.gsa.gov

suggests the agency took any action in order to protect the President's business interests is therefore plainly meritless.

We also note that the report, despite its lengthy historical analysis of the Emoluments Clauses, does not find that any constitutional violation occurred. The apparent purpose of that analysis, as well as the report's discussion of certain OLC precedent, is to support the proposition that an Emoluments violation is merely possible. With regard to that point, the agency respectfully refers you to the publicly available filings submitted by the United States Department of Justice (DOJ), of which OLC is a component, in various litigations regarding the Emoluments Clauses currently pending in federal courts around the country. Those filings, as you will see, cite the very OLC opinions referenced in your report to support DOJ's position that the Old Post Office lease does not violate the Emoluments Clauses.

In conclusion, the agency agrees with the report's single recommendation and will take action consistent with that recommendation prior to continuing to use the language of Section 37.19 of the Old Post Office building lease in the future. The agency appreciates your continued assistance in identifying ways to better deliver value and savings in real estate, acquisition, technology, and other mission-support services across government. Please feel free to contact me at 202-501-2200 with any questions.

2



# OFFICE OF
# INSPECTOR GENERAL
U.S. General Services Administration





**For media inquiries**

OIG_PublicAffairs@gsaig.gov

**(202) 501-0450**

## REPORT FRAUD, WASTE, AND ABUSE

 **(800) 424-5210**

 **Anonymous Hotline Form**

 **fraudnet@gsaig.gov**

**www.gsaig.gov ● 1800 F Street NW, Washington, DC 20405**