**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
Senator RICHARD BLUMENTHAL,    )
et al.,                        )
                               )
            Plaintiffs,        )
                               )
        v.                     )Civil Action No. 17-1154 (EGS)
                               )
DONALD J. TRUMP, in his official )
capacity as President of the   )
United States,                 )
                               )
            Defendant.         )
_____)
```

**MEMORANDUM OPINION**

I.   **Introduction**

In its previous Opinion, the Court held that plaintiffs, approximately 201 Members of the 535 Members of the United States Senate and House of Representatives, had standing to sue defendant Donald J. Trump in his official capacity as President of the United States ("the President") for alleged violations of the Foreign Emoluments Clause ("the Clause"). *See Blumenthal v. Trump*, 335 F. Supp. 3d 45, 72 (D.D.C. 2018) ("*Blumenthal I*"). The President has moved to dismiss the Amended Complaint for failure to state a claim because, *inter alia*, he contends that "Emolument" should be narrowly construed to mean "profit arising from an official's services rendered pursuant to an office or employ." Def.'s Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 15-

1 at 38.[1] The President's definition, however, disregards the
ordinary meaning of the term as set forth in the vast majority
of Founding-era dictionaries; is inconsistent with the text,
structure, historical interpretation, adoption, and purpose of
the Clause; and is contrary to Executive Branch practice over
the course of many years.

Pursuant to the Clause, certain federal officials,
including the President, shall not "accept" an "Emolument" from
"any King, Prince, or foreign State" without "the Consent of the
Congress." U.S Const. art. I, § 9, cl. 8. In Count I, plaintiffs
seek declaratory relief pursuant to 28 U.S.C. § 2201 in the form
of a declaratory judgment stating that the President is
violating the Clause when he accepts Emoluments from foreign
states without first seeking the consent of Congress. Am.
Compl., ECF No. 14 ¶¶ 85-86. In Count II, plaintiffs seek
injunctive relief pursuant to the Court's inherent authority to
grant equitable relief and pursuant to 28 U.S.C. § 1331 in the
form of a Court order enjoining the President from accepting
"any present, Emolument, Office, or Title, of any kind whatever"
from a foreign state without obtaining "the Consent of the
Congress." *Id.* ¶ 92.

---

[1] When citing electronic filings throughout this Memorandum
Opinion, the Court cites to the ECF header page number, not the
original page number of the filed document.

2

In holding that plaintiffs had standing to sue the President in *Blumenthal I*, the Court deferred ruling on the remaining arguments in the President's motion to dismiss: (1) failure to state a claim upon which relief can be granted; (2) lack of a cause of action to seek the relief requested; and (3) the injunctive relief sought is unconstitutional. Mot. to Dismiss, ECF No. 15-1 at 17-18.

Upon careful consideration of the President's motion to dismiss, the opposition and reply thereto, the relevant arguments of *amici*,[2] and for the reasons explained below, the Court finds that: (1) plaintiffs have stated a claim against the President for allegedly violating the Foreign Emoluments Clause; (2) plaintiffs have a cause of action to seek injunctive relief against the President; and (3) the injunctive relief sought is constitutional. The Court therefore **DENIES** the portions of the motion to dismiss that were deferred in the Court's prior Order.

## II.  Factual Background

Plaintiffs allege that the President "has a financial interest in vast business holdings around the world that engage in dealings with foreign governments and receive benefits from those governments." Am. Compl., ECF No. 14 ¶ 2. In particular, the President owns "more than 500 separate entities-hotels, golf

---

[2] The Court appreciates the illuminating analysis provided by the *amici*.

courses, media properties, books, management companies, residential and commercial buildings, . . . airplanes and a profusion of shell companies set up to capitalize on licensing deals." *Id*. ¶ 34 (internal quotation mark omitted). Since being elected President, he has "not divested or otherwise given up his ownership interest in his worldwide business holdings." *Id.* ¶ 36.

As a result of his financial interests, plaintiffs allege the President has accepted, and will accept in the future, Emoluments from foreign states. *Id*. ¶ 37. Indeed, the President has acknowledged "that his businesses receive funds and make a profit from payments by foreign governments, and that they will continue to do so while he is President." *Id*. Public reporting has also confirmed this to be the case. *Id*.

Plaintiffs allege that "[t]hese various benefits from foreign governments—payments, loans, permits, exemptions, policy changes, and intellectual property rights—constitute prohibited 'Emolument[s]' and/or 'present[s]' under the Foreign Emoluments Clause . . . ." *Id.* ¶ 38 (citation omitted). Specifically, the President has allegedly accepted valuable intellectual property rights from the Chinese government without seeking and obtaining the consent of Congress. *Id*. ¶¶ 44-50. The President has also allegedly accepted payments for hotel rooms and events from foreign diplomats and from foreign lobbying groups paid for by

4

foreign governments without seeking and obtaining the consent of Congress. *Id.* ¶¶ 52-57. The President has allegedly accepted payments from foreign governments derived from real estate holdings, *id.* ¶¶ 58-62, as well as licensing fees paid by foreign governments for "The Apprentice," *id.* ¶¶ 63-65, all without seeking and obtaining the consent of Congress, *id.* ¶¶ 59, 62, 65. Finally, the President has allegedly accepted regulatory benefits from foreign governments without seeking and obtaining the consent of Congress. *Id.* ¶¶ 66-67.

## III. Standard of Review

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While detailed factual allegations are not necessary, a plaintiff must plead enough facts "to raise a right to relief above the speculative level." *Id.*

When ruling on a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and

5

matters about which the Court may take judicial notice."
*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).
The Court must construe the complaint liberally in plaintiffs'
favor and grant plaintiff the benefit of all reasonable
inferences deriving from the complaint. *Kowal v. MCI Commc'ns
Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Court need not
accept inferences that are "unsupported by the facts set out in
the complaint." *Id.* "Nor must the [C]ourt accept legal
conclusions cast in the form of factual allegations." *Id.*
"[O]nly a complaint that states a plausible claim for relief
survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662,
679 (2009).

## IV. Analysis

### A. Constitutional Interpretation

"When interpreting a constitutional provision, [the Court]
must look to the natural meaning of the text as it would have
been understood at the time of the ratification of the
Constitution." *Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir.
2013) (citing *District of Columbia v. Heller*, 554 U.S. 570
(2008)). "In interpreting the text [the Court is] guided by the
principle that '[t]he Constitution was written to be understood
by the voters; its words and phrases were used in their normal
and ordinary as distinguished from technical meaning.'" *Heller*,
554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716,

731 (1931)). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Id.* at 576-77. In determining the normal and ordinary meaning, the Court is to consider founding-era dictionaries and other contemporaneous sources. *See*, *e.g.*, *N.L.R.B. v. Canning*, 573 U.S. 513, 527 (2014); *Heller*, 554 U.S. at 581-86. When the text is ambiguous, the Court is to consider the purpose of the clause and the historical interpretations and applications of the clause. *Canning*, 573 U.S. at 528-29; *see also Heller*, 554 U.S. at 592 ("This meaning is strongly confirmed by the historical background of the [provision]."). The Court is also to "treat[] [government] practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Canning*, 573 U.S. at 525, 530-32 (considering opinions of the Office of Legal Counsel ("OLC") and the Comptroller General in determining the meaning of the Recess Appointments Clause).

**B.   "Emolument" Is Broadly Defined as Any Profit, Gain, or Advantage[3]**

The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the
> United States: And no Person holding any
> Office of Profit or Trust under them, shall,
> without the Consent of the Congress, accept of
> any present, Emolument, Office, or Title, of
> any kind whatever, from any King, Prince, or
> foreign State.

U.S. Const. art. I, § 9, cl. 8.

**1. The Ordinary Meaning, Text, Structure, Adoption, and
Historical Interpretation of the Clause;
Constitutional Purpose; and Consistent Executive
Branch Practice Support a Broad Interpretation of
"Emolument"**

**a. Ordinary Meaning of "Emolument"**

The parties dispute whether the profits that the

President's business interests earn from foreign governments are

"Emoluments" covered by the Clause. The President contends that

the Clause "is not a blanket prohibition on commercial

transactions with foreign governments by businesses in which the

---

[3] The parties do not dispute that the Clause applies to the
President. *See generally* Mot. to Dismiss, ECF No. 15-1; Pls.'
Opp'n, ECF No. 17; Def.'s Reply ("Reply"), ECF No. 28. The Court
therefore declines to reach the question despite the argument to
the contrary of one a*micus* brief and based on Judge Peter J.
Messitte's persuasive analysis of that argument and conclusion
that the Clause does indeed apply to the President in the only
other judicial opinion construing the Clause. *See District of
Columbia v. Trump*, 315 F. Supp. 3d 875, 882-87 (D. Md. 2018)
("*Trump*"); *see also* Br. for Scholar Seth Barrett Tillman and
Judicial Education Project as Amici Curiae in Supp. of the Def.,
ECF No. 16-1.

official has a financial interest," but rather "applies only to the receipt of compensation for services rendered by an official in an official capacity or in an employment (or equivalent) relationship with a foreign government, and to the receipt of honor and gifts by an office-holder from a foreign government." Mot. to Dismiss, ECF No. 15-1 at 33-34. In support of his position, the President explains that at the time of the Nation's founding, an "'[E]molument' was a common characteristic of a federal office . . . comprehensively describ[ing] 'every species of compensation or pecuniary profit derived from a *discharge of the duties of the office*.'" *Id.* at 34 (alteration in original) (first citing *United States v. Hartwell*, 73 U.S. 385, 393 (1867); and then quoting *Hoyt v. United States*, 51 U.S. 109, 135 (1850).[4] According to the President, this was because most federal officials did not receive salaries as is the case today, but rather, were compensated by fees in exchange for their services. *Id.* Therefore, he argues, this "common usage" of the word at the time of the founding compels interpreting the term to mean "profit arising from an office or employ." *Id.* at

---

[4] The President's added emphasis on the phrase and reliance on this case are misleading given that the Court was not construing the meaning of the term "Emolument" generally, but rather a statutory provision concerning "the annual [E]moluments of any [customs] collector." *Hoyt*, 51 U.S. at 135. Accordingly, the Emolument would necessarily derive from the discharge of the duties of the office.

35 (quoting James Barclay, *A Complete & Universal English Dictionary on a New Plan* (1774)("Barclay's Dictionary")).[5] To illustrate, the President provides two examples of what would constitute Emoluments under his definition: (1) "a federal official would receive an Emolument if he or she was paid by a foreign government to take certain official actions"; and (2) "an Emolument would [] be received if an official became an employee or entered an employment-like relationship with the foreign government, such as if a federal government lawyer provided legal advice and services to a paying foreign power." *Id*. According to the President, "[t]his interpretation is consistent with the nature of the other prohibited categories in the Foreign Emoluments Clause: present, office, and title, which are all things personally conferred or bestowed on a U.S. official holding an 'Office of Profit or Trust.'" *Id*.

Plaintiffs rely on contemporaneous dictionaries, general-purpose writings, contemporaneous state constitutions, and legal decisions to support their argument that at the time the Constitution was written, "'[E]molument' was a commonly used

---

[5] Plaintiffs point out that Barclay's dictionary defines "employ" not as "employment" but as "a person's trade, business" and "a public office" and therefore this source supports defining an Emolument to include "profit arising from . . . a person's trade, business." Pls.' Opp'n, ECF No. 17 at 42. Plaintiffs contend that this definition does not therefore support the President's position. *Id*. at 42-43.

term that often referred to profit or gain in general." Pls.'
Opp'n, ECF No. 17 at 39 (citing *The Oxford English Dictionary*
(2d ed. 1989) (referring to eighteenth century texts); Samuel
Johnson, *A Dictionary of the English Language* (1755); John
Mikhail, *The Definition of "Emolument" in English Language &
Legal Dictionaries*, 15-23-1806, at 8 (July 9, 2017) (working
paper),

https://papers.ssrn.com/so13/papers.cfm?abstract_id=2995693

(explaining that [E]molument was defined as "'profit,'
'advantage,' 'gain,' or 'benefit' . . . in every known English
language dictionary" published in the seventeenth and eighteenth
centuries, that this was the exclusive definition provided in
over 92% of these dictionaries, and that the President's
preferred definition appears in less than 8% of these
dictionaries, but that the broader definition also appears in
these latter dictionaries)). Plaintiffs also emphasize, again
relying on contemporaneous documents, that the term "was
frequently used to mean the profits accruing from private
financial transactions." *Id*. at 40.

Plaintiffs maintain that interpreting the term to
"requir[e] an employment-like relationship[] is based on a
flawed reading of Founding-era dictionaries . . . [and]
requiring the provision of specific services in an official
capacity" lacks legal support. *Id*. at 41. Moreover, they argue

that even if the Court were to adopt the narrow definition that
appears in the Oxford English Dictionary—"[p]rofit or gain
arising from station, office, or employment; dues, reward;
remuneration, salary"—"the gain arising from President Trump's
status as the head of a worldwide business empire" falls within
this definition. *Id.* Furthermore, according to plaintiffs,
"[t]he narrower definition the President cites also embraces
profit or gain 'arising from [his] office,' as when foreign
governments seek his favor by granting him lucrative trademarks
or selecting his hotels" because these "benefits 'arise from'
the office he holds, because (the Plaintiffs allege) they are
being given to him because he is the President." *Id.* (citing Am.
Compl., ECF No. 14 ¶¶ 48, 54).

The President contends that the number of sources citing
the two competing definitions is not relevant because the
meaning of the term in the Clause depends on the constitutional
context, the history of the Clause, and founding-era practices.
Reply, ECF No. 28 at 22. The President also asserts that
plaintiffs' reliance on Professor Mikhail's article is misplaced
because another law review article has criticized it for making
inaccurate assumptions. *Id.* at 22-23. The President argues that
Professor Mikhail's article and the sources it references
actually support his position because they "demonstrate that the
President's definition is closely related to the etymology of

[E]molument, which is profit derived from labor, or more specifically, from grinding corn." *Id.* at 23. The President also notes that the Oxford English Dictionary lists his definition of "emolument" first, and before plaintiffs' broader definition, indicating that the President's definition predates that of the plaintiffs. *Id.* at 24.

*Amici* Legal Historians soundly reject the President's "narrow definition of 'Emolument' [as] inaccurate, unrepresentative, and misleading":

> Little or no evidence indicates that the two obscure sources—Barclay (1774) and Trusler (1766)—on which [the President] relies for [his] "office- and employment-specific" definition of "[E]molument" were owned, possessed, or used by the founders, let alone had any impact on them, or on those who debated and ratified the Constitution. For example, neither of these sources is mentioned in the more than 178,000 searchable documents in the *Founders Online* database, which makes publicly available the papers of the six most prominent founders. Nor do these volumes appear in other pertinent databases, such as *Journals of the Continental Congress*, *Letters of Delegates to Congress*, *Farrand's Records*, *Elliot's Debates*, or the *Documentary History of the Ratification of the Constitution*. By contrast, all of the dictionaries that the founding generation did possess and use regularly define "[E]molument" in the broad manner favoring the plaintiffs: "profit," "advantage," or "benefit."
>
> Second, a careful review of English language dictionaries from 1604 to 1806 shows that *every* definition of "[E]molument" published during this period relies on one or more of the elements of the broad definition [the

President] rejects in [his] brief: "profit,"
"advantage," "gain," or "benefit." . . .
Finally, Trusler's volume is not a standard
dictionary, but rather a thesaurus, which
presumes that "gain," "profit," and
"[E]molument" are synonyms; moreover, its
explanation of "[E]molument" was copied
directly from a French thesaurus, hence it is
not even reliably grounded in English usage.
The impression [the President] creates in
[his] brief by contrasting four historical
definitions of "[E]molument"—two broad and two
narrow—is, therefore, highly misleading.

Br. of Amici Curiae by Certain Legal Historians on Behalf of

Pls. ("Br. of Legal Historians"), ECF No. 46 at 12-13 (footnotes

omitted).

The President does not dispute that the broader definition

existed at the time the Constitution was ratified, Mot. to

Dismiss, ECF No. 15-1 at 37, and plaintiffs acknowledge that a

narrower definition existed at the time, Pls.' Opp'n, ECF No. 17

at 41. Plaintiffs' main contention is that because the evidence

demonstrates that the broader definition was more pervasive, it

was what was intended in the Clause. The President responds that

the narrower definition is the "better one" to use given the

context and history of the Clause.

The Court is persuaded that the weight of the evidence in

"founding-era dictionaries and other contemporaneous sources"

supports the broad meaning of the term advocated by plaintiffs

and supported by the Legal Historians. *Trump*, 315 F. Supp. 3d at

882 (citing *Canning*, 573 U.S. at 527). The fact that there is

evidence from founding-era sources that both the broad definition advocated by plaintiffs, as well as a narrower definition associating "Emolument" with employment, existed at the ratification of the Constitution, however, suggests some ambiguity in the term. Accordingly, the Court considers the surrounding text, structure, adoption, historical interpretation, and purpose of the Clause, as well as Executive Branch practice to determine the meaning of "Emolument." *See Canning*, 573 U.S. at 528-29 (when the constitutional text is ambiguous, the court is to consider the purpose of the clause and the historical interpretations and applications of the clause).

### b. Text and Structure of the Clause, and Other Uses in the Constitution

The President acknowledges that the broader definition of "Emolument" advocated by plaintiffs "resembles a broader definition that also existed at the time of the founding" but points to the legal interpretive principle that a word with different meanings should be interpreted by reference to the context. Mot. to Dismiss, ECF No. 15-1 at 37-38. Accordingly, "when read harmoniously with the rest of the Clause, [Emolument] has the natural meaning of the narrower definition of profit arising from an official's services rendered pursuant to an office or employ." *Id.* at 38. The President also asserts that

15

plaintiffs' broad definition of "Emolument" would subsume the term "present" in the Clause and render it redundant, noting that plaintiffs use the terms "Emolument" and "present" interchangeably. *Id.* at 38-39 (citing *Holmes v. Jennison*, 39 U.S. 540, 570-71 (1840) ("In expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added.")).

The President contends that the other two instances in which "Emolument" is used in the Constitution provide further support for his narrow definition because "[e]ach is associated with an office and refers to compensation for services rendered in the capacity as the holder of that office." *Id.* at 36 (citing U.S. Const. art. II, § 1, cl. 7 ("The President, shall, at stated Times, receive for his services, a Compensation . . . and he shall not receive within that Period any other Emolument from the United States, or any of them."); U.S. Const. art. I, § 6, cl. 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time. . . .")).

Plaintiffs argue that even if the President's narrow definition of "Emolument" existed, the Clause does not use the word in such a narrow sense, because to do so would render the phrase "of any kind whatever" surplusage. Pls.' Opp'n, ECF No. 17 at 43. Plaintiffs assert that the purpose of this phrase "is to rule out interpretations [of 'Emoluments'] that would allow some 'kinds' of emolument to be accepted." *Id*. at 44. Plaintiffs point to the Incompatibility Clause to support their argument that the reach of the Clause is broad. *Id*. The Incompatibility Clause provides that no member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office . . . the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl.2. Plaintiffs point out that this Clause applies only to Emoluments bestowed by the federal government upon civil office holders, whereas the Foreign Emoluments Clause contains no such prohibition. Pls.' Opp'n, ECF No. 17 at 44. Plaintiffs also argue that the reason the Clause permits exceptions—with the consent of Congress—is precisely because its reach is so broad. *Id.*

In response to plaintiffs' argument that the phrase "of any kind whatever" compels their preferred definition, the President argues that this phrase "emphasizes the Clause's reach—every kind of [E]molument, present, office, or title—and is not a basis to choose which definition" was intended in the Clause.

17

Reply, ECF No. 28 at 25. In response to plaintiffs' argument
that the President's definition renders "of any kind whatever"
to be surplusage because of the word "any," the President posits
that there is no redundancy in his interpretation because "[t]he
more plausible role of this first use of the word 'any' in the
Clause is numeric—that *no* prohibited Emoluments may be received
by a covered official without the consent of Congress, whereas
the phrase 'of any kind whatever' operates to ensure that every
*type* of the identified compensation is also prohibited." *Id*. at
26.

Finally, the President disputes that use of the term
"Emoluments" in the Incompatibility Clause bolsters plaintiffs'
interpretation of the term because "the fact that a reference to
an office is not included in the Foreign Emoluments Clause is
simply due to the fact that the Foreign Emoluments Clause has a
broader reach—it regulates not only compensation or benefits
arising from holding federal office but also any employment-like
relationship between a foreign government and a covered
official." *Id.* The President notes that the term "Emolument" is
used only one other time in the Constitution—in the Domestic
Emoluments Clause which provides that "[t]he President shall, at
stated Times, receive for his Services, a Compensation . . . and
he shall not receive within that Period any other Emolument from
the United States, or any of them." *Id*. at 27 (quoting U.S.

Const. art. II, § 1, cl.7). The President concludes that it would not make sense for the term to have different meanings in the Constitution and that "all three clauses in which the term appears are tied to holding office and regulat[ing] the conduct of office-holders." *Id*.

The Court is persuaded that the text and structure of the Clause, together with the other uses of the term in the Constitution, support plaintiffs' definition of "Emolument" rather than that of the President. The Clause bans, without congressional approval, "*any* present, Emolument, Office, or Title, *of any kind whatever*, from any King, Prince, or foreign State." U.S Const. art. I, § 9, cl. 8 (emphasis added). The President's argument that the phrase "of any kind whatever" should be understood to modify "Emoluments" defined narrowly rather than being "a basis to choose which definition" was meant in the Clause, Reply, ECF No. 28 at 25, is unpersuasive and inconsistent with his own argument. The President himself argues that a word with different meanings should be interpreted by reference to the context. Mot. to Dismiss, ECF No. 15-1 at 38. "[T]he meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). Here, it is uncontested that the broad meaning and a narrower meaning tied to employment existed at the time the Constitution was

ratified, and this expansive modifier, which as plaintiffs point out is used nowhere else in the Constitution, logically serves to ensure that the acceptance of any foreign Emolument, however defined, is prohibited without congressional consent. *See also Trump*, 315 F. Supp. 3d at 888 ("If there were any doubt as to the limits of the Foreign Clause, the Framers used the word 'any' twice, ensuring a broad and expansive reach.").

The President's argument that the use of "Emolument" in the Incompatibility Clause and the Domestic Emoluments Clause supports his narrow definition is similarly unconvincing. In the former, "Emolument" specifically refers to an office, indicating that when the Founders intended for an Emolument to refer to an official's salary or payment associated with their office, they said so explicitly. *See* U.S. Const. art. I, § 6, cl. 2. In the latter, the Emoluments that are prohibited are those that would be received "from the United States or any of them." U.S. Const. art. II, § 1, cl. 7. Thus, rather than "Emolument" having different meanings the three times it is used in the Constitution, more logically, the broader meaning is modified in each Clause according to the purpose of the Clause. *See Virginia*, 148 U.S. at 519; *see also Trump*, 315 F. Supp. 3d at 888 ("If '[E]molument' were always to be read as a synonym for salary or payment for official services rendered, th[e] modifier in the Incompatibility Clause would have been unnecessary.").

Also unconvincing is the President's argument that adopting plaintiffs' definition of "Emolument" to mean "profit," "gain," or "advantage" would render the term "present" redundant. The President points out that a "present" was defined as it is today: "[s]omething bestowed upon another without price or exchange; the act of giving." Mot. to Dismiss, ECF No. 15-1 at 39 (quoting Barclay's Dictionary). As Judge Messitte observed, defining an "Emolument" as a "profit," "gain," or "advantage" "ensure[s] that the Clause covered all types of financial transactions—solicited or unsolicited, reciprocated or unreciprocated, official or private"—even if "Emolument" is sometimes used synonymously with "present." *Trump*, 315 F. Supp. 3d at 889.

Furthermore, Judge Messitte points out that the President's narrow definition "would seem to create its own concerning redundancies within the Constitution." *Id*. As the President explained, a practical example of his definition would be when "a federal official would receive an [E]molument if he or she was paid by a foreign government to take certain official actions." Mot. to Dismiss, ECF No. 15-1 at 35. Judge Messitte persuasively states that this example

> is tantamount to defining the transaction as
> nothing less than one of federal bribery, a
> crime which prohibits a federal public
> official from, directly or indirectly,
> receiving or accepting "anything of value" in

21

> return for "being influenced in the
> performance of any official act." 18 U.S.C. §
> 201(b)(2). Given that Article II, Section 4 of
> the Constitution already addresses the crime
> of bribery, making it an impeachable offense,
> there would have been little need to include
> two additional and distinct Emoluments Clauses
> prohibiting the acceptance of money from
> foreign or state governments for official
> services rendered. Moreover, it seems highly
> unlikely that the Framers would have intended
> bribery to be both an impeachable offense and,
> at the same time, an activity Congress could
> consent to when a foreign government donor is
> involved. The President makes no attempt to
> come to terms with this anomaly.

*Trump*, 315 F. Supp. 3d at 889 (footnote omitted). Finally, there

is no question that the receipt of Emoluments is tied to the

office of President and regulating his conduct as President, but

that does not compel defining "Emolument" as narrowly as the

President advocates.

### c. Adoption and Historical Interpretation of the Clause

The President argues that "[t]he adoption and historical

interpretation of the . . . Clause are consistent with the

office- and employment-specific construction of the term

'Emolument.'" Mot. to Dismiss, ECF No. 15-1 at 40. In support,

the President observes that "the history of the Clause's

adoption [is] devoid of any concern about an official's private

commercial businesses." *Id*. at 42. Plaintiffs describe this as

a "dog that didn't bark" argument, stating that even if this is

true, "it [] tells us nothing. Discussion of the Clause was not

extensive because the Clause was not controversial." Pls.'
Opp'n, ECF No. 17 at 44. Furthermore, according to plaintiffs,
"the agrarian economy of the eighteenth century, the
comparatively limited role of government, and the primitive
travel technology available would have made private commerce
with foreign states an unlikely conduit for foreign influence
at the time." *Id.* at 44-45.

Citing examples of early Presidents exporting agricultural
products to foreign countries, the President argues that
historical evidence supports his position that the Clause was
not intended "to reach commercial transactions that a President
(or other federal official) may engage in as an ordinary
citizen through his business enterprises." Mot. to Dismiss, ECF
No. 15-1 at 43-44. Plaintiffs point out that none of the
examples are of commercial transactions with a foreign
government, thus the President can "claim only that they *might*
have conducted such business." Pls.' Opp'n, ECF No. 17 at 45.
The President responds that while the records are limited and
inconclusive, because "there is no question that private
business pursuits by federal officials, including by early
Presidents, were common at the time of the Nation's founding[,]
[i]t is reasonable to infer that at least some of their
transactions may have been with foreign or domestic government
actors, including foreign state-chartered trading companies."

Reply, ECF No. 28 at 29. The President relies heavily on one historical incident—President George Washington's purchase of land from the federal government in the then-Territory of Columbia—to argue that if plaintiffs' definition of "Emoluments" applies, President Washington would have violated the Domestic Emoluments Clause, pointing out that the precedents President Washington set are considered authoritative. Mot. to Dismiss, ECF No. 15-1 at 45-46.

Finally, the President argues that a proposed constitutional amendment that would have applied the prohibitions in the Clause to all private citizens undermines the broad definition, asserting that it is "implausible that this amendment was intended or understood as providing for the revocation of the citizenship of anyone engaging in commerce with foreign governments or their instrumentalities . . . [and] . . . inconceivable that Congress and nearly three-fourths of the States intended to strip the citizenship of, for example, those hotel owners whose customers included visiting foreign diplomats using government funds." *Id.* at 47. *Amici* Legal Historians point out, however, that "[i]n 1810, Americans *conceived* precisely of this problem" given the historical context. Br. of Legal Historians, ECF No. 32 at 33. Plaintiffs also point out that the President's argument is self-defeating because, for example, "a household servant temporarily hired by

24

a visiting foreign diplomat . . . would be 'in an employment-like relationship' with the diplomat." Pls.' Opp'n, ECF No. 17 at 45 (citing Mot. to Dismiss, ECF No. 15-1 at 22). The Court is persuaded that the adoption of the Clause and its historical interpretation support plaintiffs' definition rather than that of the President. It is well-established that there was little discussion of the Clause by the Framers because it was noncontroversial. *See* Br. of Legal Historians, ECF No. 46 at 24. Furthermore, the Court declines to make the inference advocated by the President—that it is reasonable to infer that some of the early Presidents' private business pursuits would have been with foreign state-chartered trading companies—because the President has provided no evidence to justify making such an inference. *See generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28. On a motion to dismiss, it is the plaintiff, not the defendant, who receives the benefit of all reasonable inferences deriving from the complaint. *See Kowal*, 16 F.3d at 1276. Similarly, the Court declines to infer that the President's narrow definition should be adopted based on President Washington's purchase of public land, potentially in violation of the Domestic Emoluments Clause, given this was a single incident as compared with the great weight of the historical interpretation of the Clause. *See also Trump*, 315 F. Supp. 3d at 903-904 (noting that the facts regarding this

transaction are "seriously incomplete"). Finally, the Court is not persuaded that the President's reliance on a proposed constitutional amendment that never became law, and for which he is unable to cite any floor debates that would illuminate the intent of the amendment, should be accorded any weight in determining the meaning of "Emolument."

### d. Purpose of the Clause

The President pays little attention to interpreting the meaning of "Emolument" by reference to the purpose of the Clause, briefly acknowledging that "[a]lthough the Clause was intended to combat corruption and foreign influence, the text, original understanding, and historical practice provide no support for Plaintiffs' inferential leap from the Clause's purpose to a blanket prohibition on receiving 'any monetary or nonmonetary benefit' regardless of context." Mot. to Dismiss, ECF No. 15-1 at 53. The President also notes that the Framers "gave no indication that they intended to require officeholders to divest their private commercial businesses in order to assume federal office." *Id*. The President argues that plaintiffs' definition would result in "absurd consequences" because, among other things, royalties from foreign book sales, United States Treasury bonds, and stock holdings could be considered prohibited foreign Emoluments. *Id*. at 53-56.

26

Plaintiffs argue that even if the term is considered
ambiguous, any ambiguity should be resolved against the
President because his proposed definition "would defeat the
Clause's purpose—throwing open the doors to the corruption of
any officeholder wealthy enough to own businesses and reducing
the Clause to a mere bribery law, not a prophylactic safeguard
against the *possibility* of corruption." Pls.' Opp'n, ECF No. 17
at 45. Plaintiffs cite contemporaneous documents to support
their argument that the purpose of the Clause was "to exclude
corruption and foreign influence," *id.* at 46 (quoting 3 *Elliot's
Debates* 465 (Randolph)), prompted by the need to guard against
"the influence which foreign powers may attempt to exercise in
our affairs," *id.* (quoting Tench Coxe, *An Examination of the
Constitution for the United States of America,* No. 4 (Oct. 21,
1787), and to "lock up every door to foreign influence," *id.*
(quoting 5 *Annals of Cong.* 1584 (1978) (Claiborne)). Plaintiffs
also cite contemporary OLC memoranda which consistently give the
Clause a broad scope. *Id.* at 46-47.

*Amici* Former Government Ethics Officers, former government
officials tasked with interpreting the Clause, dispute that
"absurd consequences" would result from adopting plaintiffs'
broad definition of "Emolument" because "the government applies
a totality-of-the-circumstances approach to Emoluments Clause
questions, with a bias in favor of breadth, and a keen eye to

27

the anti-corruption purpose of the clause[].” Br. of Former
Gov’t Ethics Officers as Amici Curiae Supporting Pls.’ Opp’n to
Def.’s Mot. to Dismiss (“Br. of Former Gov’t Ethics Officers”),
ECF No. 42 at 10. So, for example, *amici* dispute that royalties
from foreign book sales would be subject to the Clause unless “a
foreign government attempts to influence a President by
purchasing copies of his book, or if a competent authority finds
a real potential for such influence.” *Id.* at 15. As to
restricting the ability to hold Treasury bonds or stock
holdings, *amici* state that “these payments are unlikely to raise
concerns because it is highly doubtful that holding publicly
traded securities would create the potential for others to
exercise undue influence over the holder.” *Id.* at 14.
In view of the overwhelming evidence pointing to over two
hundred years of understanding the scope of the Clause to be
broad to achieve its purpose of guarding against even the
possibility of “corruption and foreign influence,” 3 *Records of
the Federal Convention of 1787,* at 327 (Max Farrand ed., 1966),
the Court is persuaded that adopting plaintiffs’ broad
definition of “Emolument” ensures that the Clause fulfills this
purpose. *See also Canning*, 573 U.S. at 528 (“[W]e believe the
[Recess Appointments] Clause’s purpose demands the broader
interpretation” in light of the ambiguity of the constitutional
text.). In view of the arguments of *amici* to the contrary, the

28

Court is also not persuaded that "absurd consequences" would result from this broad definition in view of the consistent Executive Branch practice of applying a totality-of-the-circumstances approach to applying the Clause. For the same reason, it is clear that adopting the plaintiffs' definition would not result in a "blanket prohibition" that disregards context.

### e. Executive Branch Practice

As the Court explained in *Blumenthal I*, "[h]istorically, Presidents have complied with the Clause by either seeking and obtaining congressional consent prior to accepting foreign presents or Emoluments, or by requesting an opinion from the Executive or Legislative Branch's advisory office as to whether the Clause applies." *Blumenthal I*, 335 F. Supp. 3d at 53 (citing Br. of Federal Jurisdiction and Constitutional Law Scholars as Amicus Curiae in Supp. of Pls., ECF No. 44 at 24 ("Br. of Federal Jurisdiction and Constitutional Law Scholars")). "Modern Presidents, except for President Trump, have sought advice from OLC prior to accepting potentially covered Emoluments." *Id.* at 53-54 (citing Br. of Federal Jurisdiction and Constitutional Law Scholars, ECF No. 44 at 25). The Comptroller General of the United States is also charged with interpreting the application of the Clause. Mot. to Dismiss, ECF No. 15-1 at 49.

The President points to interpretations from these authorities as support for his preferred definition of "Emolument" because "[i]n every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited [E]moluments, the determination involved an employment relationship (or a relationship akin to an employment relationship) with the foreign government." *Id.* Plaintiffs respond that the reason for this is simple: "OLC and the Comptroller General render decisions in response to requests from federal officers. Most such officers are not real estate magnates, but rather people who earn money by providing their individual labor or expertise." Pls.' Opp'n, ECF No. 17 at 49.

*Amici* Former Government Ethics Officers explain that the OLC, Comptroller General, and Department of Defense apply the following principles when determining whether the Clause applies to the situation at issue. Br. of Former Gov't Ethics Officers, ECF No. 42 at 7-8. First, because the "'expansive language and underlying purpose . . . strongly suggest that [the Clause] be given broad scope' . . . analyses have therefore usually started from the presumption that the clause applies . . . [because] . . . '[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty.'" *Id.* at 8-9 (internal citations and quotations omitted). Second, and as explained above, the government uses a

30

"totality-of-the-circumstances approach" in determining whether the Clause applies to the situation and "has never come close to adopting anything like the rigid, narrow rule advanced by the [President]." *Id.* at 10-11. As an example, "the government has reached varying conclusions as to whether particular payments come from a 'foreign state' depending on how much control foreign governments exercise over those payments." *Id.* at 10. *Amici* also point out that "the government has never determined that the clause permits a public officeholder to maintain an interest in a business that stands to benefit by virtue of that person holding public office." *Id.* at 11. *Amici* explain that officials pay "close attention to whether the arrangement creates even a potential for improper foreign government influence over a person in an office of public trust. When such a potential exists—even if the probability is quite low—the government has found that such arrangements violate the Foreign Emoluments Clause." *Id.*

Given that there is only one other judicial opinion interpreting the Clause, the Court looks to OLC and Comptroller General opinions as sources of authority for how "Emolument" is defined and how the Clause is interpreted and applied. *Canning*, 573 U.S. at 525 (noting that "the longstanding 'practice of the government' can inform our determination of 'what the law is'" and that "this Court has treated practice as an important

31

interpretive factor even when the nature or longevity of that
practice is subject to dispute, and even when that practice
began after the founding era") (citations omitted). OLC opinions
have consistently cited the broad purpose of the Clause and
broad understanding of "Emolument" advocated by plaintiffs to
guard against even the *potential* for improper foreign government
influence. *E.g., Application of Emoluments Clause to Part-Time
Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C.
96, 98 (1986) (The Clause's "expansive language and underlying
purpose . . . strongly suggest that it be given broad scope.");
*Applicability of the Emoluments Clause to Non-Government Members
of ACUS*, 17 Op. O.L.C. 114, 121 (1993) ("The language of the
Emoluments Clause is both sweeping and unqualified.");
Memorandum from Norbert A. Schlei, Assistant Att'y Gen., Office
of Legal Counsel, to  Andrew F. Oehmann, Office of the Att'y
Gen., *Re: Invitation by Italian Government to Officials of the
Immigration and Naturalization Service & a Member of the White
House Staff* 2 (Oct. 16, 1962),
https://www.justice.gov/olc/page/file/935741/download (noting
"the sweeping nature of the constitutional prohibition and the
fact that in the past it has been strictly construed, being
directed against every possible kind of influence by foreign
governments over officers of the United States"). Accordingly,
adopting the President's narrow definition of "Emolument" would

32

be entirely inconsistent with Executive Branch practice defining "Emolument" and determining whether the Clause applies.

Significantly, the President has not cited an OLC or Comptroller General opinion that supports his position. *See generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28. To the contrary, he can only assert that his position "is not inconsistent with the conclusions of any published OLC or Comptroller General opinions." Def.'s Suppl. Br. in Supp. of his Mot. to Dismiss and in Resp. to the Brs. of Amici Curiae, ECF No. 51 at 23-24. However, one opinion directly contradicts his narrow reading of the Clause, and another undermines his narrow definition of "Emolument."

In 1993, OLC issued an opinion stating that non-governmental lawyers who were members of the Administrative Conference of the United States ("ACUS") could not receive partnership distributions from their respective firms where the distribution would include fees from foreign government clients even though the lawyers "did not personally represent a foreign government, and indeed had no personal contact with that client of the firm." *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. at 119. OLC reasoned that:

> Because the amount the Conference member would
> receive from the partnership's profits would
> be a function of the amount paid to the firm

> by the foreign government, the partnership
> would in effect be a conduit for that
> government. Thus, some portion of the member's
> income could fairly be attributed to a foreign
> government. We believe that acceptance of that
> portion of the member's partnership share
> would constitute a prohibited [E]molument.

*Id.*[6] Judge Messitte noted that "[t]his language directly contradicts the President's suggestion that there can be no violation of the Foreign [Emoluments] Clause if the federal official is receiving benefits in a private capacity." *Trump*, 315 F. Supp. 3d at 902. And as *amici* observe, this Opinion "devastates the [President's] primary argument for a narrow reading of the clause because it shows that even an attenuated economic interest in ordinary commercial transactions that generate value for both sides can violate the [Foreign] Emoluments Clause if that business nevertheless creates the potential for undue influence over public officials." Br. of Former Gov't Ethics Officers, ECF No. 42 at 21. The Court agrees.

Nor does the Comptroller General opinion concluding that President Ronald Reagan's receipt of California pension benefits did not violate the Domestic Emoluments Clause provide support

---

[6] OLC later determined that non-governmental members of ACUS were not subject to the Clause, but did not modify its determination that the distribution was an Emolument. *Applicability of the Emoluments Clause to Nongovernmental Members of ACUS*, 2010 WL 2516024 (June 3, 2010).

for the President's definition of "Emolument." The Comptroller
General determined that "the term '[E]molument' cannot be
considered to extend to benefits that have been earned or to
which entitlement arose before his occupancy of that office, and
that clearly have no connection, either direct or indirect, with
the Presidency . . . [because they]. . . cannot be construed as
being in any manner received in consequence of his possession of
the Presidency." Hon. George J. Mitchell, U.S. Senate, B-207467,
1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983). Those
retirement benefits are entirely distinguishable from the
situation here, where it is alleged that, among other things,
foreign diplomats stay at the President's Washington D.C. hotel
"to curry favor with [him] because of his position as President
of the United States," Am. Compl., ECF No. 14 ¶ 54; and that
"his businesses receive funds and make a profit from payments by
foreign governments, and that they will continue to do so while
he is President," *id*. ¶ 37; *see also Trump*, 315 F. Supp. 3d at
903 (observing that "profits received from foreign or domestic
governments that patronize the Trump International Hotel for the
express purpose of potentially currying favor with a sitting
President present a stark contrast to the fully vested
retirement benefits that then-Governor Reagan earned from the
State of California which the State of California was not free
to withdraw.").

Finally, the President finds support for his preferred definition in statutory provisions that exempt certain employment relationships between government officials and foreign officials from the scope of the Clause, asserting that "[h]ad Congress understood the Clause to reach more broadly than compensation arising from personal services rendered to a foreign government, it surely would have exempted a wider range of activities." Mot. to Dismiss, ECF no. 15-1 at 52. The Court is not persuaded that the President's reliance on statutory provisions that were never enacted should be accorded any weight in determining the scope of the Clause.

Consistent Executive Branch practice, which "has never come close to adopting anything like the rigid, narrow rule advanced by the [President]," Br. of Former Gov't Ethics Officers, ECF No. 42 at 10-11, clearly supports plaintiffs' broad definition of "Emolument" rather than that of the President. Accordingly, "Emolument" is broadly defined as any profit, gain, or advantage. *See also Trum*p, 315 F. Supp. 3d at 905 (finding that the term Emolument "extends to any profit, gain, or advantage, of more than *de minimis* value, received by [the President], directly or indirectly, from foreign . . . governments").

### C.     Plaintiffs Have Stated a Claim Under the Foreign Emoluments Clause

With "Emolument" defined broadly as any profit, gain, or advantage, it is clear that the Amended Complaint states a plausible claim against the President for violations of the Clause. Plaintiffs have alleged that the President has accepted a variety of Emoluments from foreign governments—intellectual property rights, payments for hotel rooms and events, payments derived from real estate holdings, licensing fees for "The Apprentice," and regulatory benefits—without seeking and obtaining the consent of Congress. Am. Compl., ECF No. 14, ¶¶ 44-67. Accepting the allegations in the Amended Complaint as true, which the Court must at this juncture, plaintiffs' allegations state a plausible claim for relief, and survive the President's motion to dismiss. *Iqbal*, 556 U.S. at 679.

### D.     Plaintiffs Have a Cause of Action to Seek Injunctive Relief and the Injunctive Relief Sought Is Constitutional

#### 1. Plaintiffs Have a Cause of Action to Seek Injunctive Relief

The President, analogizing the Foreign Emoluments Clause to the Supremacy Clause, argues that the Clause "is not a source of federal rights such that the Court may imply a cause of action under the Clause." Mot. to Dismiss, ECF No. 15-1 at 29. As he must, however, the President acknowledges that equitable relief is available "to enjoin unconstitutional actions by public

officials," but emphasizes that such relief is only available in "a proper case," *id.* (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015)), as "an act of equitable discretion by the district court," *id.* (citing *eBay, Inc. v. MercExchange*, *LLC*, 547 U.S. 388, 391 (2006). The President argues that this is not "a proper case" for the Court to exercise its equitable discretion for three reasons. *Id.* at 30-32. First, "[p]laintiffs are not preemptively asserting a defense to a potential enforcement action against them by the Government, which is the paradigmatic situation where implied equitable claims against the Government have been recognized." *Id.* at 30. "Second, equity 'may not be used to create new substantive rights' . . . and the . . . Clause does not create any personal or judicially enforceable rights." *Id.* at 31. As part of this point, the President argues that plaintiffs cannot show that their injury falls within the zone of interests protected by the Clause because only Congress as a whole, and not its individual members, fall within the zone of interests protected by the Clause. *Id.* Third, plaintiffs "can obtain relief only by suing the President himself, which (if not legally foreclosed) is at a minimum grounds for extreme equitable restraint." *Id.* at 32 (citation omitted). The President concludes by reiterating his argument that plaintiffs' remedy lies with Congress rather than the Courts. *Id.*

Plaintiffs respond that they have an implied cause of action to seek injunctive relief based on long-standing Supreme Court precedent ensuring the "'ability to sue to enjoin unconstitutional actions' by government officials." Pls.' Opp'n, ECF No. 17 at 50-51 (quoting *Armstrong,* 135 S. Ct. at 1385-86). According to plaintiffs, an implied private right of action exists "when a plaintiff is injured by a constitutional violation, including a 'separation of powers' violation," unless there is a reason to treat the claim differently from any other constitutional claim. *Id.* (citing *Free Enter. Fund v. P.C.A.O.B.*, 561 U.S. 477, 491 n.2 (2010)). Plaintiffs argue that there is no reason to treat the claim here differently, and they reject the President's analogy to the Supremacy Clause. *Id.* at 51.

Plaintiffs reject the President's contention that the "zone-of-interests" test applies to constitutional claims in light of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014), but state that even if it does, they easily satisfy it. Pls.' Opp'n, ECF No. 17 at 52. Plaintiffs argue that "[t]he interest they seek to vindicate is at the heart of the Clause, which employs separation of powers to combat foreign corruption." *Id.* Plaintiffs observe that the President concedes that Congress as a whole would satisfy any zone-of-interests test, but that he offers no reason why

39

individual Members of Congress have a different zone of interests. *Id.*

The Court is not persuaded that it should find no implied cause of action in the Foreign Emoluments Clause on the ground that the Supremacy Clause does not create a cause of action. In holding there is no implied cause of action in the Supremacy Clause, the Supreme Court stated that it "does not create a cause of action. It instructs courts what to do when state and federal law clash . . ." *Armstrong*, 135 S. Ct. at 1383. That "instruction" stands in sharp contrast to the Clause, which prohibits the acceptance of any foreign Emoluments of any kind whatever without the consent of Congress. Furthermore, the President points to no authority holding that the Appointments Clause, which arguably **is** analogous to the Foreign Emoluments Clause, does not create an implied right of action. *See generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28.

The Court is persuaded that this is a proper case in which to exercise its equitable discretion to enjoin allegedly unconstitutional action by the President. *See Armstrong*, 135 S. Ct. at 1384 ("[W]e have long held that federal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials.") (citations omitted). As plaintiffs point out, there is no reason for the exercise of equitable discretion to be limited to defend a

potential enforcement action and the President has cited no
authority to the contrary. Pls.' Opp'n, ECF No. 17 at 54.
Rather, "it is established practice for this Court to sustain
the jurisdiction of federal courts to issue injunctions to
protect rights safeguarded by the Constitution" unless there is
a reason not to do so. *Free Enter. Fund*, 561 U.S. at 491 n.2
(citation omitted); *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54
(1982) ("It is settled law that the separation-of-powers
doctrine does not bar every exercise of jurisdiction over the
President of the United States."). Here, accepting the
allegations in the Amended Complaint as true, which the Court
must at this juncture, the President is accepting prohibited
foreign emoluments without seeking congressional consent,
thereby defeating the purpose of the Clause to guard against
even the possibility of "corruption and foreign influence." 3
*Records of the Federal Convention of 1787,* at 327 (Max Farrand
ed., 1966). Exercising the Court's equitable discretion here is
therefore "not in derogation of the separation of powers, but to
maintain their proper balance." *Nixon*, 457 U.S. at 754.

"[T]he plaintiff's complaint [must] fall within 'the zone
of interests' to be protected or regulated by the statue or
constitutional guarantee in question." *Valley Forge Christian
Coll. v. Ams. United for Separation of Church & State*, *Inc.*, 454
U.S. 464, 475 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499

41

(1975)). "We doubt, however, that it is possible to formulate a single [zone of interests] inquiry that governs all statutory and constitutional claims." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987). Assuming the zone-of-interests test applies here, the Court is persuaded that individual Members of Congress satisfy that test. The President has conceded that Congress as a body would satisfy the zone-of-interests test, Mot. to Dismiss, ECF No. 15-1 at 31, but asserts in his reply that "[p]laintiffs' claim that they have been deprived of legislative prerogatives as Members of Congress is at most 'marginally related' to the Foreign Emoluments Clause's purpose of guarding against foreign influence," Reply, ECF No. 28 at 20 (citing *Clarke*, 479 U.S. at 394, 399). The Court disagrees. The only way the Clause can achieve its purpose is for the President to seek and obtain the consent of Congress before he accepts foreign Emoluments. The Amended Complaint alleges that plaintiffs' injury is that they have been deprived of the right to vote to consent to the President's receipt of foreign Emoluments before he accepts them. Am. Compl., ECF No. 14 ¶ 82. Plaintiffs' injury is therefore hardly "marginally related" to the purpose of the Clause, but is directly related to the only way the Clause can achieve its purpose. *See Riegle v. Fed. Open Mkt Comm.*, 656 F.2d 873, 879 (D.C. Cir. 1981) ("[T]he interest which Riegle claims was injured by defendants' action (his right

to advise and consent to the appointment of officers of the executive branch) is within the zone of interests protected by the Appointments Clause of the Constitution." (citation omitted)).[7] And as the Court explained at length in its previous Opinion, here there is no adequate legislative remedy. *Blumenthal I*, 335 F. Supp. 3d at 66-68.

The Court rejects the President's suggestion that "extreme equitable restraint" is appropriate here because plaintiffs can only obtain relief from the President. Mot. to Dismiss, ECF No. 15-1 at 32. Rather, the fact that plaintiffs can only obtain relief from the President is precisely the reason the Court should exercise its equitable discretion here. *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 752 (2018) (observing that "it would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he and/or the Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant"

---

[7] The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") expressly disapproved of "*Riegle's* intimation in dicta that the standing of private plaintiffs to bring particular action affects the propriety of our entertaining the same challenge when brought by a legislator." *Melcher v. Fed. Open Mkt Comm.*, 836 F.2d. 561, 565 (D.C. Cir. 1987). However, the Court did not address the zone-of-interests analysis in *Riegle*. *See generally id.*

(quoting *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 613
(D.C. Cir. 1974)); *see also* Br. of Separation of Powers Scholars
as Amici Curiae in Supp. of Pls. ("Br. of Separation of Powers
Scholars"), ECF No. 45 at 15-16 (explaining that the cases cited
by the President do not require dismissal of this lawsuit
because: (1) in *Mississippi v. Johnson*, 71 U.S. 475 (1866), the
Supreme Court dismissed the case and Mississippi then brought
suit against Secretary of War and two other defendants
challenging the same Acts; and (2) in *Franklin v. Massachusetts*,
505 U.S. 788 (1992) (plurality opinion), the injury could be
redressed by the Secretary of Commerce. Rather, when there is no
other remedy, courts have allowed suits against the President to
proceed).

The Court is mindful that "the separation-of-powers
doctrine requires that a branch not impair another in the
performance of its constitutional duties." *Loving v. United
States*, 517 U.S. 748, 757 (1996) (citing *Mistretta v. United
States*, 488 U.S. 361, 397-408 (1989)). However, as *amici*
Separation of Powers Scholars point out, there is no such risk
here as the President has not identified what duties would be
impaired, which is distinct from *Mississippi v. Johnson*, where
"the relief sought by the plaintiff against the President would
have interfered directly with the President's ability to take
care that the Reconstruction Acts were faithfully executed." Br.

44

of Separation of Powers Scholars, ECF No. 45 at 17-18 (citing
*Johnson,* 71 U.S. at 499). *Amici* also note that "far from
distracting the President from his official duties, 'any
Presidential time spent dealing with, or action taken in
response to' a case clarifying the scope of the Foreign
Emoluments Clause is actually 'part of a President's official
duties.'" *Id.* at 19 (quoting *Clinton v. Jones*, 520 U.S. 681, 718
(1997) (Breyer, J., concurring in the judgment)). The Court
agrees. The parties dispute the meaning of "Emolument" but not
that the Clause applies to the President. Accordingly,
adjudicating this case ensures that the President fulfills his
duty to "take Care that the Laws be faithfully executed," U.S.
Const. art. II, § 3, and consistent with his oath of office to
"preserve, protect and defend the Constitution of the United
States," U.S. Const. art. II, § 1, cl. 8.

## 2. The Injunctive Relief Sought Is Constitutional

The President argues that the remedy plaintiffs seek is
unconstitutional because an injunction against him in his
official capacity would effectively "impose a condition on [his]
ability to serve as President and to perform the duties he is
duly elected to perform," Mot. to Dismiss, ECF No. 15-1 at 56,
thereby "implicating core 'executive and political' duties,"
Reply, ECF No. 28 at 32 (quoting *Johnson*, 71 U.S. at 499).
Plaintiffs respond that the relief sought is not barred because

complying with the Clause is akin to performing a ministerial duty rather than an official one, and there is no prohibition on injunctive relief for the performance of a ministerial duty by the President. Pls.' Opp'n, ECF No. 17 at 52-54. The President complains that if plaintiffs' interpretation of the Clause is correct, an injunction requiring his "compliance with the Clause would impose significant burdens" on him. Reply, ECF No. 28 at 32. The President also disputes that compliance with the Clause can be characterized as ministerial because of the "judgment" and "planning" needed to ensure compliance, but that even if it was so properly characterized, "this Court should still exercise utmost restraint in deciding whether to enjoin a sitting President." *Id*.

The Court agrees that restraint is appropriate. However, Supreme Court and D.C. Circuit precedent do not foreclose injunctive relief against the President under certain circumstances. A "grant of injunctive relief against the President himself is extraordinary, and should . . . raise [] judicial eyebrows." *Franklin*, 505 U.S. at 802. That said, the Supreme Court "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id*. (citing *Johnson*, 71 U.S. at 498-99). "A ministerial duty is one that admits of no discretion, so that the official in question has no

46

authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (citing *Johnson*, 71 U.S. at 498 ("[A] ministerial duty . . . is one in respect to which nothing is left to discretion.")). "[A] ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" *Id.* at 978 (quoting *13th Reg'l Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

"The language of the Emoluments Clause is both sweeping and unqualified." 17 Op. O.L.C. at 121. The acceptance of an Emolument barred by the Clause is prohibited unless Congress chooses to permit an exception. *Id.* Given the "sweeping and unqualified" Constitutional mandate, the President has "no discretion . . . no authority to determine whether to perform the duty" to not accept any Emolument until Congress gives its consent. *Swan*, 100 F.3d at 977. Accordingly, seeking congressional consent prior to accepting prohibited foreign emoluments is a ministerial duty. *Id.* The President's argument regarding the "judgment" and "planning" needed to ensure compliance with the Clause is beside the point. It may take judgment and planning to comply with the Clause, but he has no discretion as to whether or not to comply with it in the first instance. *See id*. The President complains about the "significant

burdens" an injunction requiring him to comply with the Clause would impose. Reply, ECF No. 28 at 32. However, as discussed *supra* Section IV.D.1, the correct inquiry is not whether injunctive relief requiring the President to comply with the Constitution would burden him, but rather whether allowing this case to go forward would interfere with his ability to ensure that the laws be faithfully executed. *See Clinton*, 520 U.S. at 718 (Breyer, J., concurring in the judgment). Accordingly, the injunctive relief sought in this case is constitutional.

## V. Conclusion

For the reasons discussed above, the Court finds that: (1) plaintiffs have stated a claim against the President for allegedly violating the Foreign Emoluments Clause; (2) plaintiffs have a cause of action to seek injunctive relief against the President; and (3) the injunctive relief sought is constitutional. The Court therefore **DENIES** the portions of the motion to dismiss that were deferred in the Court's prior Order. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**            United States District Judge**
**            April 30, 2019**