**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>     *Defendant*. | No. 17-cv-1154-EGS |

**DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF HIS MOTION
PURSUANT TO 28 U.S.C. § 1292(b) FOR CERTIFICATION OF
THE COURT'S DENIAL OF MOTION TO DISMISS
AND DEFENDANT'S MOTION TO STAY**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 3

ARGUMENT ................................................................................................................... 4

I.  THIS COURT'S APRIL 30, 2019 ORDER SATISFIES THE STANDARD FOR
    INTERLOCUTORY REVIEW PURSUANT TO 28 U.S.C. § 1292(b).................................4

      A.    The April 30 Order Involves Controlling Questions of Law, the Resolution
       of Which May Materially Advance the Ultimate Termination of This
       Litigation...............................................................................................................4

      B.    There is Substantial Ground for Difference of Opinion as to the
       Controlling Questions Resolved in the April 30 Order. ..........................................5

           1.    Reasonable jurists could disagree about whether Plaintiffs have an
             equitable cause of action to enforce the Foreign Emoluments
             Clause...........................................................................................................5

           2.    A substantial ground for difference of opinion exists as to the
             availability of equitable relief against the President in his official
             capacity. ......................................................................................................8

           3.    There is substantial ground for difference of opinion as to the
             interpretation of the Foreign Emoluments Clause. ...................................10

                i.   The original public meaning of the term "Emolument" ..................... 10

                ii.  The text and structure of the Foreign Emoluments Clause
                and other uses in the Constitution..................................................... 15

                iii.  Adoption and historical interpretation of the Clause......................... 15

                iv.  The purpose of the Foreign Emoluments Clause................................ 16

                v.   Executive Branch and Other Precedent ............................................. 18

II.  THE COURT SHOULD STAY PROCEEDINGS WHILE IT CONSIDERS THE
     § 1292(b) MOTION AND, IF IT DECIDES TO GRANT THE MOTION, FURTHER
     STAY PROCEEDINGS PENDING APPEAL.....................................................................19

CONCLUSION................................................................................................................ 21

## TABLE OF AUTHORITIES

**CASES**

*Armstrong v. Exceptional Child Ctr.*,
  135 S. Ct. 1378 (2015)................................................................................................ 5

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004).......................................................................................... 2, 4, 19

*Clinton v. Jones*,
  520 U.S. 681 (1997)............................................................................................ *passim*

*Doe v. Trump*,
  319 F. Supp. 3d 539 (D.D.C. 2018) ............................................................................ 8

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
  565 U.S. 606 (2012)...................................................................................................... 6

*Flora v. United States*,
  362 U.S. 145 (1960).................................................................................................... 12

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992).............................................................................................. 7, 8, 9

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010)...................................................................................................... 6

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999)................................................................................................. 5, 6

*Holmes v. Jennison*,
  39 U.S. 540 (1840)...................................................................................................... 13

*In re Trump*,
  874 F.3d 948 (6th Cir. 2017) ...................................................................................... 2

*Kucana v. Holder*,
  558 U.S. 233 (2010).................................................................................................... 16

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936).................................................................................................... 19

*Loving v. United States*,
  517 U.S. 748 (1996).................................................................................................... 20

*McCulloch v. Maryland,*
    17 U.S. 316 (1819) .................................................................................................. 13

*Mich. Corr. Org. v. Mich. Dep't of Corr.,*
    774 F.3d 895 (6th Cir. 2014) .................................................................................... 6

*Mississippi v. Johnson,*
    71 U.S. 475 (1867)................................................................................................. 8, 9

*Mohawk Indus., Inc. v. Carpenter,*
    558 U.S. 100 (2009) .................................................................................................. 4

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018).............................................................................................. 12

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982).................................................................................................. 7

*Nw. Austin Muni. Util. Dist. No. One v. Holder,*
    557 U.S. 193 (2009) .................................................................................................. 7

*Raines v. Byrd,*
    521 U.S. 811 (1997).................................................................................................. 8

*Small v. United States,*
    544 U.S. 385 (2005)................................................................................................ 12

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) .................................................................................. 9

*United States v. Nixon,*
    418 U.S. 683 (1974)................................................................................................ 20

*United States v. Richardson,*
    418 U.S. 166 (1974).................................................................................................. 9

*Virginia v. Tennessee,*
    148 U.S. 503 (1893)................................................................................................ 13

*Yamaha Motor Corp. v. Calhoun,*
    516 U.S. 199 (1996).................................................................................................. 5

*Yates v. United States,*
    135 S. Ct. 1074 (2015)............................................................................................ 11

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................................................ 20

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) .......................................................................................... 6

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 6, cl. 2 ...................................................................................... 13

U.S. Const. art. I, § 8 ............................................................................................... 13

U.S. Const. art. I, § 9, cl. 8 ................................................................................. 3,  12

U.S. Const. art. I, § 10, cl. 3 .................................................................................... 13

U.S. Const. art. II, § 1, cl. 7 .................................................................................... 14

U.S. Const. art. II, § 1, cl. 8 .................................................................................... 10

U.S. Const. art. II, § 3 ............................................................................................. 10

**STATUTES**

5 U.S.C. § 7342 ....................................................................................................... 18

18 U.S.C. § 201 ....................................................................................................... 14

28 U.S.C. § 1292 ................................................................................................ 1, 3, 4

**RULES**

Local Civil Rule 7(m) ............................................................................................... 2

**LEGISLATIVE MATERIALS**

Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810) ......... 16

**OTHER AUTHORITIES**

3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of
the Federal Constitution* (2d ed. 1891) ..................................................................... 11

*Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13 (1994) ............................................................................ 18

*Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114 (1993), *modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/18411/download 2010 WL 2516024 (June 3, 2010) ...................... 18

*Application of the Emoluments Clause of the Constitution & the Foreign Gifts & Decorations Act*, 6 Op. O.L.C. 156 (1982) ................................................................................ 17

James Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760–1799*, 59 So. Texas L. Rev. 181 (2017) ............................................................................................................... 11, 12

Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, (May 23, 1986), https://www.politico.com/f/?id=00000158-b547-db1e-a1f9-ff7f60920001 .......................................................................................... 17

Memorandum for S. A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954) ............... 19

## INTRODUCTION

Plaintiffs are Members of Congress who brought this suit against the President for alleged violations of the Foreign Emoluments Clause of the Constitution.  The President has demonstrated, in his initial motion for interlocutory appeal of the Court's September 28, 2018 Order on Plaintiffs' standing to sue, that the exceptional circumstances of this case justify departure from the basic policy of postponing appellate review until after the entry of final judgment.  The Court's April 30, 2019 Order inferring an equitable cause of action from the Foreign Emoluments Clause—which, until recently, had never been interpreted by a court or judicially enforced, let alone against the President—confirms the extraordinary significance of this case.  And despite the 150-year unbroken history of federal courts refraining from enjoining a sitting President in the performance of his official duties, this Court determined that it has the power to do so.  Even aside from the significant separation-of-powers implications of these rulings, the April 30 Order has broadly interpreted the Foreign Emoluments Clause in a manner that calls into doubt the constitutionality of conduct of public officials—from President George Washington to President Barack Obama—that has been accepted throughout history.

These circumstances alone strongly counsel in favor of interlocutory review.  But the April 30 Order further meets the requirements for such review because it resolved at least three "controlling question[s] of law as to which there is substantial ground for difference of opinion," the resolution of which on appeal "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Specifically, resolution of either of the two threshold justiciability questions in the President's favor would terminate this suit.  And if the Court of Appeals agrees with the President's interpretation of the Foreign Emoluments Clause, the case would be substantially narrowed, if not over.

Reasonable jurists could disagree as to this Court's conclusions on each of those three questions of law.  They could conclude, for example, that this is not a proper case in which to infer an equitable cause of action, given the lack of historical precedent in equity for this type of suit, as well as Congress's primary responsibility to decide whether to create a cause of action to

enforce the Foreign Emoluments Clause, and if so, whether to extend it to the President.  Similar separation-of-powers concerns also could lead reasonable jurists to conclude that this Court cannot issue the requested equitable relief against the President on the theory that compliance with the Foreign Emoluments Clause is "ministerial" because that compliance—which is, on Plaintiffs' own theory of the case, part of the President's official duties—requires judgment and planning.  Finally, reasonable jurists could also differ about the proper interpretation of the Clause.

The practical consequences of the Court's September 28 and April 30 Orders cannot be overstated.  Plaintiffs are now poised to seek civil discovery against the President, including into his personal finances and official actions, which will distract the President from his official duties.  As the Supreme Court has taught, "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery."  *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)).  Accordingly, before any further proceedings in this case, this Court should permit interlocutory appeal to first confirm the correctness of its rulings.  *See*, *e.g.*, *In re Trump*, 874 F.3d 948, 952, 953 (6th Cir. 2017) (permitting interlocutory appeal of an order denying the President's motion to dismiss a "state-law claim that present[ed] a novel question"; noting that in light of the separation-of-powers concerns, a panel of that court "should ensure that the [state law] claim rests on a solid footing before permitting litigation to continue").

For similar reasons, this Court should stay proceedings pending resolution of the President's § 1292(b) motion, and if the Court grants that motion, it should further stay proceedings pending appeal.[1]

---

[1]  Pursuant to Local Civil Rule 7(m), counsel for the President has consulted with counsel for Plaintiffs, who indicates Plaintiffs oppose this motion.

**BACKGROUND**

Two hundred and one Members of Congress sued the President, alleging that he has

violated, and continues to violate, the Foreign Emoluments Clause, U.S. Const. art. I, § 9, cl. 8,

because he allegedly receives, without the consent of Congress, prohibited emoluments from

foreign governments through his interests in private businesses.  1st Am. Compl., ECF No. 14.

The President moved to dismiss, arguing that Plaintiffs (1) lack standing to bring their claims, (2)

have no equitable cause of action under the Foreign Emoluments Clause and assert interests that

are not protected by the Clause, (3) fail to state a claim under the Clause, and (4) cannot obtain

the requested equitable relief against the President in his official capacity.  Def.'s Mot. to

Dismiss, ECF No. 15; Statement of P. & A. in Supp. ("MTD Mem."), ECF No. 15-1.

On September 28, 2018, the Court denied the motion in part, finding that Plaintiffs have

standing to sue.  The President moved to certify that ruling for interlocutory appeal pursuant to

28 U.S.C. § 1292(b).  *See* ECF No. 60; Def.'s Statement of P. & A. in Supp. of Mot. for

Certification of the Court's Sept. 28, 2018 Order [Def.'s Initial § 1292(b) Mot.], ECF No. 60-1.

That motion remains pending.

On April 30, 2019, the Court denied the remainder of the President's motion to

dismiss.  *See* Order, Apr. 30, 2019, ECF No. 66; Mem. Op., Apr. 30, 2019, ECF No. 67

(hereinafter "Op.").  The Court rejected both of the President's remaining justiciability

arguments, holding that this is a "proper case in which to exercise [the Court's] equitable

discretion to enjoin allegedly unconstitutional action by the President," Op. at 40; *see also id.* at

37–45, and that the Court has jurisdiction to "enjoin the President in his official capacity"

because compliance with the Foreign Emoluments Clause is a ministerial duty, *id.* at 45–48.

On the merits, the Court held that Plaintiffs have stated a claim for violation of the

Foreign Emoluments Clause, which the Court broadly construed to prohibit the receipt by a

covered official of "any profit, gain, or advantage" from a foreign government.  Op. at

37.  Although the Court recognized that there was "some ambiguity" in the Clause's use of the

term "Emolument," Op. at 15, it rejected the President's narrower definition of the term as

3

"profit arising from an office or employ," *id.* at 9, after examining the text and structure of the Clause and other uses of "Emolument" in the Constitution, *id.* at 15–22; the historical record concerning adoption and interpretation of the Clause, *id.* at 22–26; the purpose of the Clause, *id.* at 26–29; and written opinions by government offices interpreting the Clause, *id.* at 29–36.

The President now supplements his prior, pending motion for interlocutory appeal and respectfully seeks certification of the Court's April 30 Order pursuant to 28 U.S.C. § 1292(b).

## ARGUMENT

## I.   THIS COURT'S APRIL 30, 2019 ORDER SATISFIES THE STANDARD FOR INTERLOCUTORY REVIEW PURSUANT TO 28 U.S.C. § 1292(b).

Interlocutory review of this Court's April 30 Order is warranted because the Order involves "[1] controlling question[s] of law [2] as to which there [are] substantial ground[s] for difference of opinion and [3] . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Again, "[t]he high respect that is owed to the [President]" must "inform the conduct of the entire proceeding," including this Court's application of the 1292(b) standards.  *Cheney*, 542 U.S. at 385 (quoting *Clinton*, 520 U.S. at 707); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 110–11 (2009) ("district courts should not hesitate to certify an interlocutory appeal" when a decision "involves a new legal question or is of special consequence").

### A.   The April 30 Order Involves Controlling Questions of Law, the Resolution of Which May Materially Advance the Ultimate Termination of This Litigation.

The Court's April 30 Order resolved at least three legal questions:  (1) whether Plaintiffs have an equitable cause of action under the Foreign Emoluments Clause; (2) whether this Court may issue the requested declaratory and injunctive relief against the President; and (3) the meaning of the Clause.  Each of these questions is a "controlling question of law," the resolution of which could end, or at least materially narrow, this litigation.  *See* Def.'s Initial § 1292(b) Mot. at 8, 18 (discussing standard).  If Plaintiffs have no equitable cause of action under the Foreign Emoluments Clause, this case would come to an end.  The same is true if this Court has

4

no power to issue equitable relief against the President in his official capacity—the only type of relief Plaintiffs seek in this case.  And if the Court of Appeals adopts the President's interpretation of "Emolument," this case would be substantially narrowed if not terminated.  It would, therefore, be appropriate first to confirm that the Court's April 30 Order is without defect before allowing Plaintiffs to embark on what likely will be intrusive discovery of the President.[2]

### B.  There is Substantial Ground for Difference of Opinion as to the Controlling Questions Resolved in the April 30 Order.

There is substantial ground for difference of opinion as to all three controlling questions of law resolved in the April 30 Order.

#### 1.  Reasonable jurists could disagree about whether Plaintiffs have an equitable cause of action to enforce the Foreign Emoluments Clause.

Whether Plaintiffs have an equitable cause of action to enforce the Foreign Emoluments Clause presents a substantial ground for difference of opinion.  This Court found this case to be a "proper case" to exercise its equitable power, Op. at 38 (citing *Armstrong v. Exceptional Child Ctr.*, 135 S. Ct. 1378, 1384 (2015)), because in the Court's view, doing so would "maintain [the] proper balance" of the separation of powers.  *Id.* at 41.  The Court also found no reason to limit equitable causes of action to suits preemptively "defend[ing] [ ] potential enforcement action[s]," *id.* at 40–41, which the President had argued is a classic situation when equitable jurisdiction appropriately has been exercised.

Reasonable jurists could disagree with these findings.  The Supreme Court "ha[s] long held" that "the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisdiction," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318, 332 (1999); and thus, that "[t]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of

---

[2] Only one controlling question of law needs to satisfy the requirements of § 1292(b) to warrant certification.  Once an order is certified, the Court of Appeals "may address any issue fairly included within the certified order."  *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996).

injunctive relief . . . depend on traditional principles of equity jurisdiction," *id.* at 319–20 (citation omitted).  Here, although this Court observed that it is "established practice" for the courts to sustain equitable jurisdiction to "protect rights safeguarded by the Constitution," Op. at 41 (citation omitted), the case it cites, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010), is actually more in line with the "classical[]" type of implied equitable suit, which "permit[s] potential defendants in legal actions to raise in equity a defense available at law," *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 906 (6th Cir. 2014). This type of equitable suit merely shifts the timing and posture of litigating a legal question that Congress has already authorized to be adjudicated in federal court.  In contrast, Plaintiffs seek to create an equitable cause of action even though they "are not subject to or threatened with any enforcement proceeding," and thus, this dispute otherwise would not be in federal court *at all*. *See Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting).

Not only does this case fall outside the traditional equity jurisdiction, but the Supreme Court also has emphasized that judicially inferring a cause of action is a "significant step under separation-of-powers principles." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017).  This is so because it intrudes upon "Congress, [which] has a substantial responsibility to determine" whether suit should lie against individual officers and employees. *Id.* (suggesting such concerns apply with lesser force to "*traditional* equitable powers" than to "a damages remedy" (emphasis added)).  Accordingly, the Supreme Court observed, the correct answer to the question of "who should decide" on the availability of a cause of action, "Congress or the courts," is, as it "most often will be[,] Congress." *Id.* at 1857.

This is particularly the case when a plaintiff seeks to infer an equitable cause of action against the President.  Supreme Court precedent provides that even when an express or implied cause of action is generally available, that cause of action does not extend to the President absent an express statement from Congress in light of the serious separation-of-powers concerns. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) ("Out of respect for the separation of

6

powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA."); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) ("But it does not follow that we must—in considering a *Bivens* . . . remedy . . . assume that the cause of action runs against the President of the United States," given "the absence of explicit affirmative action by Congress").

Here, Plaintiffs seek equitable relief directly against the President where Congress has not created any private right of action at all, let alone expressly stated that any such right of action extends to the President.  In light of the separation-of-powers concerns that would arise from judicially inferring a cause of action against the Chief Executive, a reasonable jurist could conclude that Congress at the very least must expressly provide for such a cause of action before the courts must confront whether such an action is constitutional.  *See Nw. Austin Muni. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (citation omitted)); *Clinton*, 520 U.S. at 690 n.11 ("[I]t is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." (citation omitted)).

Reasonable jurists similarly could disagree on the related question whether Plaintiffs have asserted interests protected by the Foreign Emoluments Clause.  This Court found that Plaintiffs have asserted cognizable interests protected by the Clause because their injury is "directly related to the only way the Clause can achieve its purpose."  Op. at 42.  But the Clause's aim is to protect against *the corrupting influence on official action* through the acceptance of Emoluments from foreign governments—and to do so as a prophylactic protection for the benefit of the public.  Thus, even assuming that someone could have an interest protected under the Clause that is cognizable in an Article III court, it would be a plaintiff who could satisfy the difficult burden of plausibly alleging an injury (or a threat of injury) arising from an adverse official action taken because of an official's acceptance of prohibited Emoluments.  It would not be Members of Congress who allege only the "dilution of institutional legislative

power" to vote on the alleged receipt of Emoluments.  *See Raines v. Byrd*, 521 U.S. 811, 826 (1997).

### 2.   A substantial ground for difference of opinion exists as to the availability of equitable relief against the President in his official capacity.

Even assuming that Congress implicitly authorized an equitable cause of action against the President in his official capacity merely through the general grant of equity jurisdiction, whether such relief is constitutionally permissible also presents a substantial question about which reasonable jurists could differ.  In *Mississippi v. Johnson*, 71 U.S. 475 (1867), the Supreme Court held that federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties."  *Id.* at 500; *see also Franklin*, 505 U.S. at 802–03 (plurality opinion); *Doe v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing the President from a suit challenging a presidential policy because "[s]ound separation-of-powers principles counsel the Court against granting [declaratory and injunctive] relief against the President directly").  This Court held that *Johnson* does not bar relief requiring the President "to perform a purely ministerial act," Op. at 46, and "seeking congressional consent prior to accepting prohibited foreign emoluments is a ministerial duty," *id*. at 47.  According to the Court, while "[i]t may take judgment and planning to comply with the Clause," the President "has no discretion as to whether or not to comply with it in the first instance."  *Id.*

If the fact that the President is prohibited from violating the Clause alone were sufficient to confer jurisdiction on federal courts, then *Mississippi v. Johnson* would have been decided differently.  President Andrew Johnson likewise was prohibited from enforcing the statutes at issue if they were unconstitutional, and yet, the Supreme Court still found that it had no jurisdiction to issue an injunction against him.  *Johnson*, 71 U.S. at 498.  The relevant question, instead, is whether the President's performance of duty requires "exercise of judgment," *id.* at 499, or involves "a simple, definite duty" in "which nothing is left to discretion," *id.* at 498.  On that question, reasonable jurists could conclude that in determining whether it is necessary to seek congressional consent, the President must first exercise discretion and judgment to

8

determine whether his financial interests are compatible with the Clause, and accordingly, that the President's "performance of [that] official dut[y]" is not ministerial.  *Id.* at 501.  Indeed, this Court itself recognizes that compliance with the Clause involves "judgment and planning."  Op. at 47.

Even if compliance with the Clause were a ministerial act, there is substantial ground for difference of opinion whether equitable relief in this circumstance would nevertheless be appropriate.  The D.C. Circuit has observed that it has "never attempted to exercise power to order the President to perform a ministerial duty" in part because "while the Court in *Franklin* explicitly left open the question of whether a court may enjoin the President to perform a ministerial duty, it also issued a stern admonition that injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken."  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  As the court further explained, "[t]he reasons why courts should be hesitant to grant such relief are painfully obvious; the President, like Congress, is a coequal branch of government, and for the President to be ordered to perform particular executive . . . acts at the behest of the Judiciary, at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers."  *Id.* (quotations and citations omitted).

This Court nevertheless concluded that providing equitable relief against the President in this case would be appropriate because "plaintiffs can only obtain relief from the President."  Op. at 43.  But reasonable jurists could conclude that the fact that the President is the only possible defendant against whom relief can be directed only heightens the separation-of-powers concerns raised by such relief.  *Cf. United States v. Richardson*, 418 U.S. 166, 179 (1974) ("In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process."); *Franklin*, 505 U.S. at 829 (Scalia, J., concurring in part and concurring in the judgment) ("In sum, we cannot remedy appellees' asserted injury without ordering declaratory or injunctive relief against appellant President Bush, and since we have no power to

9

do that, I believe appellees' constitutional claims should be dismissed.").  Although this Court further found that this lawsuit would ensure that the President satisfies his obligations to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and to uphold the Constitution, *id.* art. II, § 1, cl. 8, the same could be said of any lawsuit alleging that a President has violated the Constitution.  As *Mississippi v. Johnson* and *Franklin v. Massachusetts* make clear, the reason that suits seeking equitable relief against a sitting President are barred is due to the constitutional separation of powers, not the merits of the suits.  The same separation-of-powers principle also counsels against the need for the President to identify for the Judiciary which of the President's duties are impaired by the lawsuit, *see* Op. at 44 (observing that "the President has not identified what duties would be impaired").  It suffices that this suit seeks to enjoin the President concerning his performance of duties required by the Constitution.

> **3.  There is substantial ground for difference of opinion as to the interpretation of the Foreign Emoluments Clause.**

The interpretation of the Foreign Emoluments Clause also presents an issue about which reasonable jurists could differ.  The Court's 48-page opinion itself highlights the complexity of the interpretive task—whether the term "Emolument" in the Foreign Emoluments Clause has the broader definition of "profit, gain or advantage" as Plaintiffs contend or the narrower definition of "profit arising from an office or employ" as the President contends.  Indeed, the Court's own analysis of the original meaning of the term "Emolument," the text, history, and purpose of the Foreign Emoluments Clause, and non-judicial precedent indicates that none of the categories unequivocally supports the Court's conclusion that the broader definition applies.

> **i.  The original public meaning of the term "Emolument"**

To begin, the original public meaning of the term "Emolument" clearly is a subject about which reasonable jurists could differ.  The Court itself recognizes that there is "some ambiguity in the term" because both parties' proposed definitions "existed at the ratification of the Constitution."  Op. at 15.  Although the Court concluded that the "weight of the evidence in founding-era dictionaries and other contemporaneous sources supports the broad meaning of the

term," *id.* at 14 (citation omitted), reasonable jurists could conclude otherwise for at least three reasons.

*First*, the narrower definition of the term has firm historical roots and was commonly used to refer to all forms of compensation for a federal officeholder's performance of official duties by the founding generation. *See* MTD Mem. at 19, 22; MTD Reply, ECF No. 28, at 17. George Mason, for example, used it during the Virginia ratifying convention when he warned about the possibility of the President receiving a pension from a foreign government. *See* 3 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* at 484 (2d ed. 1891) (Mason: "This very executive officer, may, by consent of Congress, receive a stated pension from European potentates. This is an idea not altogether new in America. It is not many years ago—since the revolution—that a foreign power offered emoluments to persons holding offices under our government.").

*Second*, the evidence of "founding-era dictionaries" analyzed in an article cited by Plaintiffs and this Court, *see* Op. at 11, is not so sweeping, as the President has already demonstrated, *see* MTD Reply at 15–17 (nearly 25%, as opposed to the 8% posited by Plaintiffs, contain the President's proposed definition or its variation of "profit from labor"). Such tallying of dictionaries, in any event, is not fruitful because it does not account for context or frequency of usage, among other things. *See Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) ("In law as in life, [] the same words, placed in different contexts, sometimes mean different things.").

*Third*, an empirical analysis of tens of thousands of texts from 1760 to 1799 found that where "the recipient of the emolument is an officer, regardless of the corpus [of documents analyzed], the narrower sense of 'emolument' is the one overwhelmingly used." James Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760–1799*, 59 So. Texas L. Rev. 181, 224 (2017); *see also* MTD Reply at 15–16 (citing prior version of this article). This evidence is particularly significant because the linguistic analysis was based on the writings of the Founders, including George Washington, Benjamin Franklin, John Adams, Thomas Jefferson, Alexander

Hamilton, and James Madison, and those of their generation.  *See* Phillips & White, *Meaning of the Three Emoluments Clauses*, 59 So. Texas L. Rev. at 203–04 (the three sources include (1) the National Archives' Founders Online collection; (2) Evans Early American Imprint Series, which consists of nearly two-thirds of all books, pamphlets, and broadsides known to have been printed in this country from 1640 to 1821; and (3) Hein Online, which consists of legal materials). Because the term "Emolument" in the Foreign Emoluments Clause is used in the context of restricting the conduct of federal officeholders, the Framers very well could have intended it to have the narrower definition.

### ii.  The text and structure of the Foreign Emoluments Clause and other uses in the Constitution

This Court found that the text of the Foreign Emoluments Clause compels the broader definition because the Clause's use of the modifiers "any" and "any kind whatever" connotes an expansive reach.  Op. at 19–20; U.S. Const. art. I, § 9, cl. 8 (no officeholder shall "accept of *any* present, Emolument, Office, or Title, of *any kind whatever*, from any King, Prince or foreign State" without congressional consent) (emphasis added).  Reasonable jurists, however, could find that the modifiers merely serve to clarify that the Clause covers all instances of the narrower definition and forecloses all implied exceptions, not to expand its meaning.  Thus, for example, while the Clause covers every type of "Title" granted by a foreign government, the modifiers likely do not expand the meaning of "Title" to include deeds to real property.  *Cf. Small v. United States*, 544 U.S. 385, 388 (2005) (recognizing that the phrase "any sum," while a "catchall" phrase, does not "define what it catches") (quoting *Flora v. United States,* 362 U.S. 145, 149 (1960)); *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) (whether the word "any" means the modified term "sweep[s] broadly" "necessarily depends on the statutory context"; holding that use of "any" before the phrase "effluent limitation or other limitation" "cannot expand the phrase 'other limitation' beyond those limitations" that it would otherwise be interpreted to cover in context).  The modifiers are not rendered superfluous if the narrower definition of "Emolument" applies because they would serve to capture the multitude of ways

federal officials were compensated at the time of the Founding—including through fees for services rendered; commissions; shares of fines, penalties, and forfeitures; forage for horses; pay for servants; and, in some instances, salaries. *See* MTD Reply at 18–19. They also would foreclose any implied exceptions for "de minimis" Emoluments or Emoluments that are purportedly "unlikely" to have any corrupting influence. *See id.*

Similarly, a reasonable jurist could find that the canon of avoiding surplusage precludes the broader definition of "Emolument" because that definition subsumes the term "present" in the Clause. *See* Op. at 21 (Court recognizing some redundancy). Indeed, the canon is applied with particular force to constitutional interpretation because "[i]n expounding the Constitution of the United States, every word must have its due force . . . [and] no word was unnecessarily used." *Holmes v. Jennison*, 39 U.S. 540, 570–71 (1840); *see also Virginia v. Tennessee*, 148 U.S. 503, 517–18 (1893) (narrowly interpreting the terms "compact" and "agreement" in the Compact Clause, U.S. Const. art. I, § 10, cl. 3, to mean only those agreements and compacts tending to increase the States' political power, even though the terms "taken by themselves, are sufficiently comprehensive to embrace all forms of stipulation, written or verbal, and relating to all kinds of subjects"); *McCulloch v. Maryland*, 17 U.S. 316, 401 (1819) (narrowly interpreting the term "necessary" in the Necessary and Proper Clause, U.S. Const. art. I, § 8); MTD Mem. at 23–24.

The Court's textual analysis also rejected the President's reliance on the Incompatibility Clause, which provides that no Member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office . . . the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl. 2. The Court reasoned that this clause, by its specific association between a "civil Office" and the "Emoluments" derived from it, indicates that "when the Founders intended for an Emolument to refer to an official's salary or payment associated with their office, they said so explicitly." Op. at 20. But reasonable minds could differ about this inference. The Incompatibility Clause uses the term "Emoluments whereof" to signify that its concern is with the compensation that Members of Congress might derive from

particular civil offices.  The Foreign Emoluments Clause, by contrast, has a broader ambit, restricting "Emoluments" that a federal officeholder may receive by virtue of his office or *any* employment or equivalent relationship with a foreign government.  That is, the Framers had a good reason to specifically refer to particular "civil Office[s]" in the Incompatibility Clause and to omit such a specification in the Foreign Emoluments Clause.

        As for the third instance the term "Emolument" is used in the Constitution, namely the Domestic Emoluments Clause, the Court found that the clause's limitation to benefits received "from the United States or any of them" shows that the "broader meaning" of Emolument is "modified . . . according to the purpose" of the clause.  Op. at 20; U.S. Const. art. II, § 1, cl. 7 (providing that the President "shall … receive for his Services, a Compensation," and that he "shall not receive … any other Emolument from the United States, or any of them," during his Presidency).  While that phrase does restrict the *sources* of prohibited emoluments, it gives no indication about the meaning of "Emolument" itself.  In fact, reasonable jurists could find that the clause actually reinforces the President's employment-related definition; in prohibiting the President from accepting, in addition to his prescribed "Compensation," any "other Emolument" "for his Services," the Clause directly equates "Emolument" with compensation for services provided by the President.

        Finally, there is reasonable ground for difference of opinion about whether the President's definition is redundant of another constitutional provision against bribery, as this Court has concluded.  Op. at 21–22.  Reasonable jurists could find that the President's definition of "Emolument" is broader than bribery because as used in the Clause, it does not require an "intent to influence any official act" or a showing that the official has been "influenced" in the performance of his official act, 18 U.S.C. § 201(b)(1), (2).  Nor is it limited to official conduct but encompasses benefits from non-official employment relationships with foreign governments, as the Court itself acknowledged.  Op. at 10.

### iii. Adoption and historical interpretation of the Clause

The Court found that the "adoption of the Clause and its historical interpretation support plaintiffs' definition rather than that of the President." Op. at 25. Reasonable minds could differ on this point as well. The Court discounted the historical precedent of President Washington purchasing public land from the federal government, reasoning that it "was a single incident as compared with the great weight of historical interpretation of the Clause." *Id*. But the Supreme Court has taught that when interpreting the Constitution, the conduct of the Founders should be given significant weight. *See* MTD Mem. at 18. This historical example is significant not only because it involved President Washington, but also because one of the three Commissioners in charge of the transaction had attended the Constitutional Convention, and the other two had voted in the state ratification conventions. *See id.* at 30. And yet, no concern was raised about a possible violation of the Domestic Emoluments Clause.

The Court stated that it declined to infer that "some of the early Presidents' private business pursuits would have been with foreign state-chartered trading companies." Op. at 25. The President is not, however, asking the Court to infer, as a disputed adjudicative fact, that early Presidents engaged in such commercial transactions. Rather, the absence of any concern about the need to avoid foreign government customers, even as those early Presidents engaged in international commercial transactions, is itself telling. If the Clause covers benefits arising from a federal official's private commercial transactions with a foreign state, surely someone would have raised concerns about whether foreign government instrumentalities may have been among the customers of the farm and other products regularly exported by early Presidents. *See* MTD Mem. at 28–30. Reasonable jurists, therefore, could conclude from the absence of such concerns, from the fact that many federal officials were employed with the understanding that they would continue to have income from private pursuits, *see id.* at 28, and from President Washington's transaction with the federal government, that the term "Emolument" in the Constitution is meant to have the narrower meaning.

Finally, the Court rejected any reliance on the 1810 proposed constitutional amendment that would have extended the prohibitions of the Foreign Emoluments Clause to all private citizens. *See* Proposing an Amendment to the Constitution, S.J. Res. 2, 11th Cong., 2 Stat. 613 (1810). The Court found the President's reliance on this provision unwarranted because it "never became law" and no "floor debates . . . illuminate[d] the intent of the amendment." Op. at 26. But this proposed amendment did overwhelmingly pass both Houses of Congress and fell only two states short of ratification. *See* MTD Mem. at 32. A reasonable jurist could find it inconceivable that both Congress and a majority of the States intended the amendment to prohibit all citizens from transacting any business with foreign governments on penalty of a loss of citizenship—a result that would arise from attributing the broader definition to "Emolument."

### iv.  The purpose of the Foreign Emoluments Clause

This Court relied heavily on the anti-corruption, anti-foreign influence purpose of the Foreign Emoluments Clause in concluding that the broader definition of "Emolument" applies. *See* Op. 28. But the President's proposed interpretation serves that purpose as well, including by addressing George Mason's concern about government officials being on a foreign government's payroll. *See supra* at 11. Moreover, "no law pursues its purpose at all costs," and because "the textual limitations upon a law's scope are no less a part of its 'purpose' than its substantive authorizations," *Kucana v. Holder*, 558 U.S. 233, 252 (2010), a reasonable jurist very well could conclude that the Framers intended the Clause to reach only specific categories of benefits that include the narrower definition of "Emolument," rather than to prohibit any transaction between a covered official and a foreign government instrumentality.

The Court also rejected the President's argument that a broad reading of the Clause would lead to absurd consequences. Op. at 27–28. The President cited many examples illustrating that the broad definition would render unconstitutional numerous examples of previously accepted conduct, such as foreign benefits through stock holdings, sale of books, permits and licenses while living abroad, or ownership of foreign real property, among other things. *See* MTD Mem. at 38–40. And under the analogous Domestic Emoluments Clause, a

President would also be barred from holding U.S. Treasury bills or state bonds.  *See id.* at 39.

Because the narrower definition would not call into doubt the constitutionality of conduct that so

far has not been deemed to be in violation of the Foreign Emoluments Clause, reasonable jurists

could determine that it is the appropriate definition.

The Court found the concern about producing absurd results unwarranted because rather

than a "'blanket prohibition' that disregards context," Op. at 29, the government purportedly

applies a "totality-of-the-circumstances approach to Emoluments Clause questions," and under

that approach, types of benefits that do not "raise concerns" or raise a "real potential" for foreign

influence are not encompassed within the Clause.  *Id.* at 27–28.

There is substantial ground for difference of opinion as to whether the Clause is amenable

to a "totality of the circumstances" interpretation.  Plaintiffs' preferred definition, adopted by the

Court, has no carve-outs and the plain language of the Clause clearly imposes a blanket

prohibition.  The Court itself found that the modifiers "any" and "any kind whatever" are meant

to give the Foreign Emoluments Clause the broadest possible reach and thus foreclose any type

of exceptions.  *See, e.g.*, Op. at 19–20.  Moreover, the government does not have a "totality of

the circumstances" approach to interpreting the term "Emolument."  It considers the

circumstances of the proposed conduct only when determining whether a payment or benefit is

"from" a foreign government.[3]  That is different from saying that a clear "Emolument" may be

---

[3] *See, e.g.*, *Application of the Emoluments Clause of the Constitution & the Foreign Gifts & Decorations Act*, 6 Op. O.L.C. 156, 156–57 (1982) (a Nuclear Regulatory Commission employee could not work for an American consulting firm on a project for the Mexican government where the retention of the NRC employee by the consulting firm appeared to be the principal reason for the Mexican government's selection of the consulting firm, and where the NRC employee was the firm's sole source of expertise and was, at least in part, hired because of prior experience working on the same project in an official capacity); Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, O.L.C., *Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales*, at 1 (May 23, 1986), *available at* https://www.politico.com/f/?id=00000158-b547-db1e-a1f9-ff7f60920001 (Clause did not bar a NASA scientist from accepting a $150 consulting fee from a foreign public university where it was not clear that the university should be regarded as a foreign state, given its functional and

excepted from the Clause's scope simply because it does not raise concerns about foreign influence and corruption.  As the Office of Legal Counsel ("OLC") has said, "[t]he decision whether to permit exceptions that qualify for the Clause's absolute prohibition or that temper any harshness it may cause is textually committed to *Congress*, which may give consent to the acceptance of offices or emoluments otherwise barred by the Clause."  *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 17–18 (1994).  This is consistent with Congress's view that the Clause imposes a blanket ban on certain benefits, as expressed by the fact that Congress saw the need to provide advance consent to federal officials' acceptance of even *de minimis* gifts, *i.e.* "gift[s] of minimal value tendered and received as a souvenir or mark of courtesy."  5 U.S.C. § 7342(c)(1)(A).

### v. Executive Branch and Other Precedent

Finally, while this Court also placed significant reliance on the opinions of OLC and the Comptroller General in rejecting the President's definition of "Emolument," Op. at 34–35, those opinions actually did not address the situation at hand.  As the President has explained, except for one readily distinguishable opinion concerning law partners sharing the duty of loyalty to their client,[4] in every other opinion in which prohibited emoluments were found, the underlying facts involved an employment or employment-like relationship between the federal officeholder and the foreign government—which, under the President's reading, is the predicate to having an emoluments violation.  Def.'s Suppl. Brief in Response to *Amici Curiae*, ECF No.

_____

operational separation and independence from the government, and the circumstances of the proposed consultancy did not present a concern for corruption and foreign influence such that the consultancy fee should be presumed to come directly from the foreign government).

[4] *See Applicability of the Emoluments Clause to Non-Gov't Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (non-paid, non-government members of the Administrative Conference of the United States ("ACUS") are prohibited from receiving a distribution from their law partnerships), *modified by* Mem. Op. for the Chairman of ACUS from David J. Barron, Acting Assistant Attorney General, 2010 WL 2516024 (June 3, 2010), https://www.justice.gov/file/18411/download (ACUS members are *not* subject to the Foreign Emoluments Clause because they do not hold "Office[s] of Profit or Trust").

51, at 16–17.  Moreover, OLC has previously defined "Emolument" in terms similar to that used

by the President here.  *See* Memorandum for S. A. Andretta, Administrative Assistant Attorney

General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment

of Compensation to Individual in Receipt of Compensation from a Foreign Government*, at 8

(Oct. 4, 1954) ("[T]he term 'emolument', as used in [the Foreign Emoluments Clause],

particularly since it is modified by the phrase 'of any kind whatever,' was intended to cover

compensation of any sort *arising out of an employment relationship* with a foreign state.")

(emphasis added), *available at* https://www.justice.gov/olc/page/file/935721/download (cited in

MTD Mem. at 36).  Thus, if anything, this body of government opinions confirms that there is

significant ground for difference of opinion as to the proper definition of the term "Emolument"

in the Foreign Emoluments Clause.

## II.  THE COURT SHOULD STAY PROCEEDINGS WHILE IT CONSIDERS THE § 1292(b) MOTION AND, IF IT DECIDES TO GRANT THE MOTION, FURTHER STAY PROCEEDINGS PENDING APPEAL.

For the same reasons that § 1292(b) certification is appropriate because of the significant

separation-of-powers concerns implicated by the Court's rulings, a stay is proper while the Court

considers whether to grant interlocutory appeal and, if granted, pending appeal.  "[T]he power to

stay proceedings is incidental to the power inherent in every court to control the disposition of

the causes on its docket with the economy of time and effort for itself, for counsel, and for

litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  "Especially in cases of extraordinary

public moment," the opposing party "may be required to submit to delay not immoderate in

extent and not oppressive in its consequences if the public welfare or convenience will thereby

be promoted."  *Id.* at 256.  Thus, the "high respect that is owed to the office of the [President]"

and that "should inform the conduct of the entire proceeding, including the timing and scope of

discovery" may justify issuance of a stay pending appeal in a case involving the President.

*Jones*, 520 U.S. at 706–07; *see, e.g.*, *Cheney*, 542 U.S. at 389–90 (granting writ of mandamus

and vacating district court orders that permitted discovery against the Vice President and other

senior officials in the Executive Branch; stating that "'occasion[s] for constitutional confrontation between the two branches' should be avoided whenever possible" (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974))).

This case presents the unprecedented circumstance of impending civil discovery against the sitting President of the United States concerning his compliance with a constitutional provision in his official capacity. Any discovery would necessarily be a distraction to the President's performance of his constitutional duties. As Justice Jackson observed long ago, the Presidency concentrates executive authority "in a single head in whose choice the whole Nation has a part, making him the focus of public hopes and expectations. In drama, magnitude and finality his decisions so far overshadow any others that almost alone he fills the public eye and ear." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). The Supreme Court also has recognized that "[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996); *see also Jones*, 520 U.S. at 701. The public interest therefore decidedly tips in favor of a stay.

In contrast, Plaintiffs will not be prejudiced by a stay. Plaintiffs quite conspicuously have not sought preliminary injunctive relief, despite the purported harm they face. This forecloses any argument that they would be substantially or irreparably harmed by a brief delay pending resolution of the President's motion and if applicable, pending appeal. The propriety of the President's request for a stay is underscored by the U.S. Court of Appeals for the Fourth Circuit's recent stay of district court proceedings in a lawsuit similarly challenging the President's alleged violation of the Foreign Emolument Clause (as well as the Domestic Emoluments Clause). In that case, the President sought a petition for writ of mandamus from the court of appeals concerning the district court's denial of his motion to dismiss and motion for interlocutory appeal of that denial. *In re Trump*, No. 18-2486, Doc. 3-1 (4th Cir.) (Dec. 17, 2018). The Fourth Circuit stayed all district court proceedings, including discovery, pending its

consideration of the mandamus petition.  *In re Trump*, No. 18-2486, Doc. 9 (4th Cir.) (Dec. 20, 2018).  This Court should do the same.

## CONCLUSION

For the foregoing reasons, the President respectfully requests the Court stay proceedings pending resolution of the President's § 1292(b) motion, certify the Court's September 28, 2018 and April 30, 2019 Orders for interlocutory appeal, and stay proceedings pending appeal.

Dated:  May 14, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
BRADLEY HUMPHREYS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov