**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, Representative JERROLD NADLER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States of America, <br><br> Defendant. | Civil Action No. 17-1154 (EGS) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR A STAY
AND SUPPLEMENTAL BRIEF REGARDING DEFENDANT'S MOTION
FOR CERTIFICATION PURSUANT TO 28 U.S.C. § 1292(b)**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
  CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION .................................................................................................... 1

LEGAL STANDARDS ............................................................................................ 4

ARGUMENT .......................................................................................................... 10

    I.   The President's Motion for a Stay Must Be Denied ................................... 10

        A.  Likelihood of Success on the Merits .............................................. 10

            1.  Standing .............................................................................. 10

            2.  Scope of the Foreign Emoluments Clause ........................ 18

            3.  Availability of Equitable Relief ........................................ 23

        B.  Irreparable Harm ............................................................................ 25

        C.  Harm to Plaintiffs .......................................................................... 35

        D.  The Public Interest ......................................................................... 38

    II.  The Criteria for Interlocutory Appeal Are Not Satisfied ......................... 40

        A.  Substantial Ground for Difference of Opinion .............................. 41

        B.  Advancing the Ultimate Termination of the Litigation .................. 42

CONCLUSION ....................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Aamer v. Obama,*
742 F.3d 1023 (D.C. Cir. 2014) ............................................................. 8

*Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce,*
697 F.2d 303 (D.C. Cir. 1982) ............................................................... 13

*Amer. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ................................................................................ 25

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
135 S. Ct. 2652 (2015) .......................................................................... 13

*Armstrong v. Exceptional Child Ctr., Inc.,*
135 S. Ct. 1378 (2015) .......................................................................... 24

*Baker v. Socialist People's Libyan Arab Jamahirya,*
810 F. Supp. 2d 90 (D.D.C. 2011) ........................................................ 26, 35

*Barnes v. Kline,*
759 F.2d 21 (D.C. Cir. 1984) ................................................................ 13, 18

*Bliley v. Kelly,*
23 F.3d 507 (D.C. Cir. 1994) ................................................................ 13

*Blumenthal v. Trump,*
2019 WL 1923398 (D.D.C. Apr. 30, 2019) ........................................... *passim*

*Blumenthal v. Trump,*
335 F. Supp. 3d 45 (D.D.C. 2018) ........................................................ *passim*

*Burke v. Barnes,*
479 U.S. 361 (1987) .............................................................................. 13

*Campbell v. Clinton,*
203 F.3d 19 (D.C. Cir. 2000) ................................................................ 12, 14, 15

*Carroll v. Safford,*
44 U.S. 441 (1845) ................................................................................ 25

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .............................................................. *passim*

*Cheney v. U.S. Dist. Court for D.C.,*
542 U.S. 367 (2004) .............................................................................. 34

## TABLE OF AUTHORITIES – cont'd

Page(s)

*Chenoweth v. Clinton*,
  181 F.3d 112 (D.C. Cir. 1999) ................................................................ 14

*Clinton v. Jones*,
  520 U.S. 681 (1997) ....................................................................... *passim*

*Coleman v. Miller*,
  307 U.S. 433 (1939) ................................................................ 13, 17, 36

*Comm. in Solidarity With the People of El Salvador v. Sessions*,
  929 F.2d 742 (D.C. Cir. 1991) ............................................................. 25

*Comm. on Oversight & Gov't Reform v. Holder*,
  2013 WL 11241275 (D.D.C. Nov. 18, 2013)........................................ 2, 5

*Comm. on the Judiciary v. Miers*,
  558 F. Supp. 2d 53 (D.D.C. 2008) ....................................................... 40

*Council of D.C. v. Gray*,
  2014 WL 11015652 (D.D.C. May 22, 2014) ........................................ 28

*CREW v. FEC*,
  904 F.3d 1014 (D.C. Cir. 2018) ........................................ 2, 5, 7, 26, 45

*Cummings v. Murphy*,
  321 F. Supp. 3d 92 (D.D.C. 2018) .................................................. 12, 13

*Cuomo v. NRC*,
  772 F.2d 972 (D.C. Cir. 1985) ....................................................... 5, 6, 28

*Doe 1 v. Trump*,
  2017 WL 6553389 (D.C. Cir. Dec. 22, 2017) ............................... *passim*

*Educ. Assistance Found. v. United States*,
  2014 WL 12780253 (D.D.C. Nov. 21, 2014)......................................... 43

*First Am. Corp. v. Al-Nahyan*,
  948 F. Supp. 1107 (D.D.C. 1996) ........................................................ 42

*Free Enter. Fund v. PCAOB*,
  561 U.S. 477 (2010) ..................................................................... 23, 24

*Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*,
  704 F. Supp. 2d 50 (D.D.C. 2010) ..................................................... 9, 19

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) ............................................................................. 27

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Gen. Carbon Co. v. OSHRC*,
854 F.2d 1329 (D.C. Cir. 1988) ................................................ 45

*Glossip v. Gross*,
135 S. Ct. 2726 (2015) ............................................................ 7

*Goldwater v. Carter*,
617 F.2d 697 (D.C. Cir. 1979) ................................................ 13

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ................................................ 10, 38

*Grace v. Whitaker*,
2019 WL 329572 (D.D.C. Jan. 25, 2019) ................................ 9

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ................................................................ 23, 24

*Harmon v. Brucker*,
355 U.S. 579 (1958) ................................................................ 24

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ................................................................ 10, 29

*House of Representatives v. Burwell*,
2015 WL 13699275 (D.D.C. Oct. 19, 2015)............................ 5, 42

*In re al-Nashiri*,
791 F.3d 71 (D.C. Cir. 2015) .................................................. 28

*In re Hardy*,
561 B.R. 281 (D.D.C. 2016).................................................... 35

*In re NRG Power Mktg., Inc.*,
2003 WL 21768028 (D.C. Cir. July 16, 2003)........................ 7

*In re Special Proceedings*,
840 F. Supp. 2d 370 (D.D.C. 2012) ........................................ 6, 7, 8, 9, 12

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017) .............................................. 3, 25, 26, 27, 28

*Judicial Watch, Inc. v. Nat'l Energy Pol. Dev. Grp.*,
233 F. Supp. 2d 16 (D.D.C. 2002) .......................................... 5, 41, 42, 44

*Kendall v. United States ex rel. Stokes*,
37 U.S. 524 (1838) .................................................................. 25

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*Kennedy v. Sampson*,
   511 F.2d 430 (D.C. Cir. 1974) .................................................................... 13

*Kiyemba v. Bush*,
   2008 WL 4898963 (D.C. Cir. Oct. 20, 2008)............................................... 7

*Land v. Dollar*,
   330 U.S. 731 (1947) .................................................................................... 25

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ................................................................................... 6, 36

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ....................................................................... *passim*

*Llewelyn v. Oakland Cty. Prosecutor's Office*,
   402 F. Supp. 1379 (E.D. Mich. 1975) ........................................................ 10

*Marbury v. Madison*,
   5 U.S. 137 (1803) ....................................................................................... 25

*MCI WorldCom, Inc. v. FCC*,
   1999 WL 1863622 (D.C. Cir. May 18, 1999) ............................................. 7

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ................................................................... 2, 26

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2009) .................................................................................... 44

*Nat'l Cmty. Reinvest. Coal. v. Accr. Home Lenders Holding Co.*,
   597 F. Supp. 2d 120 (D.D.C. 2009) ........................................................... 41, 42

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ................................................................... 25

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) .................................................................................... 33

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ................................................................... 21, 30, 31, 33, 39

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................... *passim*

*Noel Canning v. NLRB*,
   705 F.3d 490 (D.C. Cir. 2013) ................................................................... 16

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Oestereich v. Selective Serv. Sys. Local Bd. No. 11*,
   393 U.S. 233 (1968) ................................................................................................ 25

*Population Inst. v. McPherson*,
   797 F.2d 1062 (D.C. Cir. 1986) .............................................................................. 38

*Price v. Dunn*,
   2019 WL 2078104 (U.S. May 13, 2019).................................................................. 8

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ................................................................................ 8

*Raines v. Byrd*,
   521 U.S. 811 (1997) ........................................................................... 12, 13, 15, 36

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ................................................................................................ 38

*Riegle v. Fed. Open Mkt. Comm.*,
   656 F.2d 873 (D.C. Cir. 1981) ................................................................................ 13

*Sale v. Haitian Ctrs. Council, Inc.*,
   509 U.S. 155 (1993) ................................................................................................ 25

*Santa Fe Pac. R.R. Co. v. Payne*,
   259 U.S. 197 (1922) ................................................................................................ 25

*Sargent v. Paine Webber Jackson & Curtis, Inc.*,
   882 F.2d 529 (D.C. Cir. 1989) ................................................................................ 5

*Scripps-Howard Radio v. FCC*,
   316 U.S. 4 (1942) .................................................................................................... 25

*Spalding v. Vilas*,
   161 U.S. 483 (1896) ................................................................................................ 34

*Steele v. United States*,
   287 F. Supp. 3d 1 (D.D.C. 2017) ...................................................................... 8, 9, 26

*Swint v. Chambers Cty. Comm'n*,
   514 U.S. 35 (1995) .................................................................................................. 5

*Tolson v. United States*,
   732 F.2d 998 (D.C. Cir. 1984) ................................................................................ 41

*Trout v. Garrett*,
   891 F.2d 332 (D.C. Cir. 1989) ................................................................................ 5

## TABLE OF AUTHORITIES – cont'd

Page(s)

*United States v. Burr*,
25 F. Cas. 30 (C.C.Va. 1807) ................................................................. 29, 33

*United States v. Munoz-Flores*,
495 U.S. 385 (1990) ............................................................................... 15

*United States v. Nixon*,
418 U.S. 683 (1974) ............................................................................... 33, 41

*United States v. Philip Morris Inc.*,
314 F.3d 612 (D.C. Cir. 2003) .............................................................. 7, 38

*United States v. Richardson*,
418 U.S. 166 (1974) ............................................................................... 15

*United States v. W. Elec. Co.*,
777 F.2d 23 (D.C. Cir. 1985) ............................................................... 27

*Va. Petroleum Jobbers Ass'n v. FPC*,
259 F.2d 921 (D.C. Cir. 1958) ............................................................. 5, 25, 35

*Van Hollen v. FEC*,
2012 WL 1758569 (D.C. Cir. May 14, 2012) ...................................... 7

*Virginian R. Co. v. United States*,
272 U.S. 658 (1926) ............................................................................... 5

*Vitarelli v. Seaton*,
359 U.S. 535 (1959) ............................................................................... 25

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ............................................................. 8, 27

*Wash. Post v. NLRB*,
1993 WL 411478 (D.C. Cir. Sept. 24, 1993) ...................................... 7

*Watson Labs., Inc. v. Sebelius*,
2012 WL 13076147 (D.D.C. Oct. 23, 2012) ....................................... *passim*

*Winter v. NRDC*,
555 U.S. 7 (2008) ................................................................................... 7, 10

*Wisc. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ............................................................. *passim*

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ............................................................................... 25

**TABLE OF AUTHORITIES – cont'd**

Page(s)

<u>CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS</u>

28 U.S.C. § 1292(b) ...................................................................................... *passim*

S. Rep. No. 85-2434 (1958) .......................................................................... 6, 44

U.S. Const. art. I, § 3, cl. 1 .......................................................................... 11

U.S. Const. art. I, § 5, cl. 3 ........................................................................... 11

U.S. Const. art. II, § 2, cl. 2 ......................................................................... 11

U.S. Const. art. III, § 2, cl. 1 ....................................................................... 24


<u>EXECUTIVE BRANCH MATERIALS</u>

*Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op.
    O.L.C. 114 (1993) ................................................................................. 19, 23

*Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory*
    *Comm'n*, 10 Op. O.L.C. 96 (1986) ......................................................... 38


<u>BOOKS, ARTICLES, AND OTHER AUTHORITIES</u>

*Barclay's A Complete and Universal English Dictionary on a New Plan* (1774) ......... 20

16 *Federal Practice & Procedure* (3d ed.) ..................................................... 6, 43, 44

Fed. Ct. App. Manual § 5:6 (6th ed.) ............................................................ 6

*The Federalist No. 58* (Madison) (Clinton Rossiter ed., 1961) ..................................... 15, 16

Letter from Pat A. Cipollone, Counsel to the President, to Chairman Jerrold Nadler (May
    15, 2019), https://www.documentcloud.org/documents/6004364-Cipollone-Letter-to-
    Nadler-5-15-19.html#document/p1 .......................................................... 18

John F. Preis, *In Defense of Implied Injunctive Relief in Constitutional Cases*, 22 Wm. &
    Mary Bill of Rts. J. 1 (2013) ..................................................................... 24

## INTRODUCTION

President Trump's supplemental brief and motion for a stay make clear what he seeks in this case: outright immunity from a constitutional rule that binds every other official in the executive branch. The duty imposed by the Foreign Emoluments Clause is a straightforward one shared by every person who holds an office of profit or trust in the federal government.  Yet for more than two years now, the President has been violating it—accepting financial benefits from foreign governments without first obtaining Congress's affirmative consent.

The President's convoluted and self-serving interpretation of the Foreign Emoluments Clause is untenable, as this Court has recognized. But the President now seeks to achieve a *de facto* victory in this case anyway, by delaying its resolution. Already more than halfway through his term, President Trump knows that pausing the litigation while he pursues an appeal will frustrate any chance of resolving this case before the end of his current term. If the President succeeds in running out the clock, an entire presidential term will have gone by with the nation's highest officeholder making countless foreign policy decisions under a cloud of potentially divided loyalty and compromised judgment caused by his enrichment from foreign states. That is precisely the nightmare scenario the Framers adopted the Foreign Emoluments Clause to avoid.

This Court should not allow it. Plaintiffs' case must be allowed to move forward, or the Foreign Emoluments Clause, and its essential safeguards against the corruption of America's leaders, will be a dead letter. That is why regardless of whether this Court decides to certify an interlocutory appeal—and the President has not satisfied, and cannot satisfy, the standard necessary to justify interlocutory review, *see infra*—this Court should deny the President's request for a stay. Given the posture of this case and the inherent delays of appellate review, a stay would jeopardize any realistic chance of holding President Trump accountable to the Foreign

1

Emoluments Clause. Moreover, granting a stay would negate one of the essential requirements of 28 U.S.C. § 1292(b)—that the appeal "may materially advance the ultimate termination of the litigation." *Id.* If Plaintiffs prevail on appeal after a stay has been granted, the appeal will have significantly *prolonged* rather than advanced the termination of this litigation because the discovery process will be starting from scratch upon remand. By contrast, the absence of a stay will not in any way slow down the President's ability to terminate the case by winning on appeal.

Critically, the President has come nowhere close to satisfying "the stringent requirements" he must meet "to obtain the extraordinary relief of a stay pending appeal." *CREW v. FEC*, 904 F.3d 1014, 1016-17 (D.C. Cir. 2018). The burden is on the President to show that those requirements are met. *Id.* at 1016. Yet remarkably, his cursory argument in favor of a stay does not explain what those requirements are—much less show that they are satisfied. Instead, the President asserts that a stay is proper "[f]or the same reasons that § 1292(b) certification is appropriate." Def. Supp. Br. 19 (Dkt. No. 71-1). But "the conditions for a stay ... are different than the conditions for an interlocutory appeal," *Comm. on Oversight & Gov't Reform v. Holder*, 2013 WL 11241275, at *2 (D.D.C. Nov. 18, 2013), and the President cannot possibly satisfy them.

In place of sustained argument under the governing legal tests, President Trump takes two tacks. First, he notes that the Fourth Circuit granted a stay of discovery while considering a petition for a writ of mandamus (not an interlocutory appeal) in *District of Columbia v. Trump*. But the two cases present different legal questions, and in any event this case is not in the Fourth Circuit. Here, the President must show that the "high standard" set by the D.C. Circuit has been satisfied. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Second, the President throws adjectives at the problem, asserting that the supposedly

"exceptional," "extraordinary," and "unprecedented" circumstances here warrant a stay. Def. Supp. Br. 1, 20. The President's hyperbole is no substitute for the multi-part showing he must make. Among other things, the President must demonstrate that he "will be irreparably injured absent a stay." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). Any such injury "must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief.'" *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (quoting *Chaplaincy*, 454 F.3d at 297). The President has not even attempted to make that showing. The closest he comes is to claim that "[a]ny discovery would necessarily be a distraction to the President's performance of his constitutional duties" while airily invoking the separation of powers. Def. Supp. Br. 20. But how could that be so? Discovery here will be focused on third-party businesses owned by the President—which he has repeatedly claimed he has no involvement in running. Plaintiffs do not plan to seek any information from the executive branch or any other government. To the extent that Plaintiffs may need access to some of the President's personal financial records, the President does not explain how this limited document exchange constitutes irreparable harm to him personally, or how it presents a risk of interference with his presidential duties that is so certain, great, and imminent that there is "a clear and present need" for a stay. *Newby*, 838 F.3d at 8.

In short, the President offers only "sweeping and conclusory statements," *Doe 1 v. Trump*, 2017 WL 6553389, at *2 (D.C. Cir. Dec. 22, 2017), but the D.C. Circuit has repeatedly recognized that such "entirely unsubstantiated and conclusory assertions," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), do not satisfy the irreparable-harm standard. *See Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Bare allegations of what is likely to occur are of no value …. The movant must provide ... proof indicating that the harm is certain to occur in the near

future."). Likewise, the Supreme Court has consistently held that presidents cannot obtain stays or other special exemptions from litigation merely by invoking the separation of powers or making unsupported claims that "burdens will be placed on the President that will hamper the performance of his official duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997).

The President fares no better on the other requirements he must satisfy to obtain a stay. Far from demonstrating that he is likely to succeed on the merits of an appeal, his briefing only reveals how tenuous his positions are: unable to furnish new arguments or any new support that would undermine this Court's rulings, he is reduced to simply reiterating the same points this Court already considered and rejected. He also fails to show that a stay will not harm Plaintiffs, a danger readily apparent from the posture of this case and the obvious consequences of delaying discovery until after an appeal. Finally, in light of the grave threats to the nation that ensue when its President accepts secret payments from undisclosed foreign governments in defiance of the Constitution, the public interest tips decidedly against a stay.

Nor can the President satisfy the requirements set out in 28 U.S.C. § 1292(b) for interlocutory appeal, which is meant to be a rare exception to the rule that appeals must await final judgment. The President cannot meet his burden of identifying a "substantial ground for difference of opinion" because he essentially repeats the same arguments this Court previously rejected, without providing any reason to think that other courts would reach a different conclusion. And his request for an interlocutory appeal is at odds with his request for a stay, because the granting of that stay, in the posture of this case, would delay rather than advance "the ultimate termination of the litigation." The President's motions should be denied.

## LEGAL STANDARDS

Section 1292(b) permits a non-final judicial order to be certified for an immediate appeal

when a district judge believes the order (1) "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). "The moving party bears the burden of establishing all three elements." *House of Representatives v. Burwell*, 2015 WL 13699275, at *1 (D.D.C. Oct. 19, 2015). Because interlocutory appeals under § 1292(b) are an "exception to the firm final judgment rule," *Trout v. Garrett*, 891 F.2d 332, 335 (D.C. Cir. 1989), which "is designed to prevent parties from interrupting litigation by pursuing piecemeal appeals," *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 45 (1995), a "party seeking certification pursuant to § 1292(b) must meet a high standard to overcome the strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals." *Judicial Watch, Inc. v. Nat'l Energy Pol. Dev. Grp.*, 233 F. Supp. 2d 16, 20 (D.D.C. 2002) (quotation marks omitted); *see* Pls. Opp. to Mot. for Certification (Dkt. No. 61) (providing more detail on § 1292(b) standards).

Importantly, "[a]pplication for an appeal under § 1292(b) does not automatically stay proceedings in the district court," *Sargent v. Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 530 (D.C. Cir. 1989), and "the conditions for a stay ... are different than the conditions for an interlocutory appeal," *Holder*, 2013 WL 11241275, at *2. Indeed, "a stay pending appeal is an extraordinary remedy." *Watson Labs., Inc. v. Sebelius*, 2012 WL 13076147, at *1 (D.D.C. Oct. 23, 2012); *accord CREW*, 904 F.3d at 1017 (citing "the extraordinary relief of a stay pending appeal"); *Cuomo v. NRC*, 772 F.2d 972, 978 (D.C. Cir. 1985). "A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Nken*, 556 U.S. at 427 (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) (per curiam), and *Virginian*

*R. Co. v. United States*, 272 U.S. 658, 672 (1926)).

Requests to stay proceedings while seeking an interlocutory appeal under 28 U.S.C. § 1292(b) are even more disfavored. While that statute authorizes immediate appeals in limited circumstances, it includes an important caveat: "*Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order." 28 U.S.C. § 1292(b). By providing that "[t]he presumption is against a stay," and "requiring that a stay be specifically ordered, Congress intended to avoid unnecessary delays." Fed. Ct. App. Manual § 5:6 (6th ed.) (footnotes omitted).

Indeed, Congress created interlocutory appeals precisely because of "the need for expedition of cases pending before the district courts." S. Rep. No. 85-2434, at *5256 (1958). And aware that such appeals might, counterproductively, "result in delay rather than expedition of cases," Congress established several "protection[s] against delay," including "the provision which requires that application for an appeal pursuant to this legislation will not stay proceedings in the district court unless such a stay is ordered." *Id*. at *5257. Thus, even when "the certified order may dispose of the entire case without need for further proceedings, ... there may be good reason for pushing ahead, particularly if there is any reason to fear that effective discovery is threatened by delay." 16 *Federal Practice & Procedure* § 3929 (3d ed.) (footnote omitted).

On any stay motion, "it is the movant's obligation to justify the court's exercise of such an extraordinary remedy." *In re Special Proceedings*, 840 F. Supp. 2d 370, 372 (D.D.C. 2012) (quoting *Cuomo*, 772 F.2d at 978); *see Nken*, 556 U.S. at 433-34 (a stay is "an exercise of judicial discretion," and "[t]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion"); *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936) ("the suppliant for a stay must make out a clear case of hardship or inequity in being required to go

forward, if there is even a fair possibility that the stay ... will work damage to some one else").

"In determining whether to stay an order pending appeal, the Court considers the same four factors as it would in resolving a motion for a preliminary injunction: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *In re Special Proceedings*, 840 F. Supp. 2d at 372 (quoting *Nken*, 556 U.S. at 434); *see Doe 1*, 2017 WL 6553389, at *1; *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

These standards are "stringent," as the D.C. Circuit has consistently emphasized. *See, e.g.*, *CREW*, 904 F.3d at 1016 (noting "the stringent requirements for a stay pending appeal."); *Doe 1*, 2017 WL 6553389, at *1 (same); *Van Hollen v. FEC*, 2012 WL 1758569, at *1 (D.C. Cir. May 14, 2012) (same); *Kiyemba v. Bush*, 2008 WL 4898963, at *1 (D.C. Cir. Oct. 20, 2008) (same); *In re NRG Power Mktg., Inc.*, 2003 WL 21768028, at *1 (D.C. Cir. July 16, 2003) (same); *MCI WorldCom, Inc. v. FCC*, 1999 WL 1863622, at *1 (D.C. Cir. May 18, 1999) (same); *Wash. Post v. NLRB*, 1993 WL 411478, at *1 (D.C. Cir. Sept. 24, 1993) (same).

Significantly, a movant seeking a stay must prevail on all four factors. *See Nken*, 556 U.S. at 426, 435; *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015); *Chaplaincy*, 454 F.3d at 304 (even if the "irreparable harm prong" is satisfied, "a preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits, that the injunction would not substantially injure other interested parties, and that the public interest would be furthered by the injunction"); *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003) (all four criteria needed for stay of discovery pending interlocutory appeal).

"The D.C. Circuit traditionally evaluated these four factors using a sliding-scale

approach—meaning that a strong showing on one factor could make up for a weaker showing on another." *Steele v. United States*, 287 F. Supp. 3d 1, 3 (D.D.C. 2017) (quotation marks omitted). In particular, "in cases where the other three factors strongly favor[ed] issuing an injunction," the Circuit held that "a plaintiff need only raise a 'serious legal question' on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014). After *Nken* and *Winter*, this approach is no longer valid. *See Nken*, 556 U.S. at 438 (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other."); *Price v. Dunn*, 2019 WL 2078104, at *4 (U.S. May 13, 2019) (Thomas, J., concurring in the denial of certiorari) ("Under the traditional stay factors, a petitioner is required to make 'a strong showing that he is likely to succeed on the merits.' It is not enough ... that the question be 'substantial.'" (citations omitted)).[1]

Significantly, however, even under the Circuit's traditional approach, a lesser showing on the first factor could be overcome only when *all* the remaining factors weighed heavily in favor of a stay. *See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) ("a substantial case on the merits" may suffice "when ... *the other three factors strongly favor interim relief*" (emphasis added)); *id.* at 844 ("it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation" "*if the other elements are present* (i.e., the balance of hardships *tips decidedly* toward plaintiff)" (emphasis added)); *see also Watson Labs.*, 2012 WL 13076147, at *1 n.1; *In re Special Proceedings*, 840 F. Supp. 2d at 372 ("[T]he Court is not persuaded that merely raising a 'serious legal question' on the merits is sufficient for [a party] to obtain a stay

---

[1] Thus far, the Circuit has not had a case in which it was necessary to resolve "whether a sliding-scale test of this sort survives *Winter*." *Steele*, 287 F. Supp. 3d at 3; *see, e.g.*, *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 n.1 (D.C. Cir. 2016).

based on this factor. Typically, a movant must show a likelihood of success on the merits to achieve a stay. It is only when the other three factors tip sharply in the movant's favor that the standard for success on the merits changes.").

On the first factor of the stay analysis, "[m]ore than a mere possibility of relief is required." *Nken*, 556 U.S. at 434 (quotation marks omitted). And in this Circuit, "the law is clear that a party cannot establish the necessary likelihood of success merely by reiterating arguments it made previously to the court." *Watson Labs.*, 2012 WL 13076147, at *1; *see In re Special Proceedings*, 840 F. Supp. 2d at 372 (likelihood of success not satisfied where movant's legal arguments "are identical to the arguments he asserted [before], all of which the Court carefully and thoroughly considered and ultimately rejected," and where movant "has offered neither new argument nor new support for his previously-raised arguments"); *Grace v. Whitaker*, 2019 WL 329572, at *3 (D.D.C. Jan. 25, 2019) (rejecting stay based on "a repackaging" of arguments made earlier); *Steele*, 287 F. Supp. 3d at 4 (rejecting "rehashed arguments"); *Friendship Edison Pub. Charter Sch. Collegiate Campus v. Nesbitt*, 704 F. Supp. 2d 50, 53 (D.D.C. 2010) (movant "offer[ed] no new rationale for why [the court's prior] conclusion was incorrect").

"By the same token, simply showing some possibility of irreparable injury, fails to satisfy the second factor" of the stay analysis. *Nken*, 556 U.S. at 434-35 (citation and quotation marks omitted). Indeed, the D.C. Circuit has established a particularly "high standard" for irreparable injury. *Chaplaincy*, 454 F.3d at 297. The harm "'must be both certain and great; it must be actual and not theoretical.' The moving party must show '[t]he injury complained of is of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm.'" *Id*. (quoting *Wisc. Gas*, 758 F.2d at 674). For this reason, the Circuit requires "that the movant substantiate the claim that irreparable injury is 'likely' to occur," and it consistently rejects

"unsubstantiated and speculative allegations." *Wisc. Gas*, 758 F.2d at 674.

"Once an applicant satisfies the first two factors," a court still must assess "the harm to the opposing party and weigh[] the public interest." *Nken*, 556 U.S. at 435. Failure on either of those factors also dooms a movant's request. *See Winter*, 555 U.S. at 23-24 (failure to satisfy "public interest" factor "alone requires denial of the requested injunctive relief," regardless of whether "plaintiffs have ... established a likelihood of success on the merits"). Significantly, it is the movant's burden "to show that issuance of the stay will *not* substantially injure the other parties to the proceeding." *Doe 1*, 2017 WL 6553389, at *3 (emphasis added). And "[i]t may be assumed that the Constitution is the ultimate expression of the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (quoting *Llewelyn v. Oakland Cty. Prosecutor's Office*, 402 F. Supp. 1379, 1393 (E.D. Mich. 1975)).

## ARGUMENT

### I.    The President's Motion for a Stay Must Be Denied

#### A.    Likelihood of Success on the Merits

To obtain the extraordinary relief of a stay pending appeal, a movant must make "a strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 426 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). The President has not done so. He has not even tried. His only discussion of the merits is intended to satisfy the lower standard for interlocutory certification, *i.e.*, that "there is substantial ground for difference of opinion" about this Court's rulings, 28 U.S.C. § 1292(b). The President fails to meet even that standard, much less make a "strong showing" that he is "likely" to prevail on appeal, *Nken*, 556 U.S. at 426.

#### 1.    Standing

Concerning Plaintiffs' standing, the President "merely ... reiterate[s] arguments [he] made previously to the court," *Watson Labs.*, 2012 WL 13076147, at *1, superficially reframing them

by prefacing each with the words "reasonable jurists could disagree ...." *See* Def. Mem. 10-17 (Dkt. No. 60-1). Continuing to cite the same decisions he relied on in his motion to dismiss, none of which involved the Foreign Emoluments Clause or another constitutional provision with its distinctive characteristics, the President once again fails to reckon with that Clause's unique nature and how it demands a conclusion that standing exists here.

The Foreign Emoluments Clause has two features that are each "unusual" in their own right, as this Court has recognized, and no other constitutional provision combines both of these unusual features. First, the Clause imposes a specific procedural requirement (obtain "the Consent of the Congress") that federal officials must satisfy before they take certain actions (accept "any" emolument "of any kind whatever" from "any ... foreign state"). As this Court noted, the "only similar provision" in the Constitution is the requirement that presidents obtain the Senate's advice and consent before appointing officers and making treaties. *Blumenthal v. Trump*, 335 F. Supp. 3d 45, 62 n.8 (D.D.C. 2018) (citing U.S. Const. art. II, § 2, cl. 2).

This unambiguous requirement of a successful prior vote, combined with the unambiguous right of each Senator and Representative to participate in those votes, *id.* at 54 (citing U.S. Const. art. I, § 3, cl. 1, and *id.* art. I, § 5, cl. 3), means that "each time the President ... accepts a foreign emolument without seeking congressional consent, plaintiffs suffer a concrete and particularized injury—the deprivation of the right to vote on whether to consent to the President's acceptance of the prohibited foreign emolument." *Id.* at 65.

Second, the Foreign Emoluments Clause contains another unusual feature, setting it apart from even the Appointments and Treaty Clauses—it regulates the private conduct of federal officials. Because President Trump is violating the Clause through his private business enterprises, without the need to use government money or personnel to commit those violations, "there are no

federal appropriations associated with the President's receipt of prohibited foreign emoluments," and thus "Congress' appropriations power cannot be used to obtain a legislative remedy, such as refusing to appropriate funds." *Id*. at 68.

Denied their right to cast specific votes to which the Constitution expressly entitles them, deprived of any ability to remedy this harm through the power of the purse, and lacking any other "adequate remedy" for the President's constitutional violations, *Raines v. Byrd*, 521 U.S. 811, 829 (1997), Plaintiffs are experiencing a harm that falls within the narrow class of institutional injuries over which individual members of Congress may sue. "The President's alleged acceptance of prohibited foreign emoluments as though Congress provided consent is indistinguishable from 'treating a vote that did not pass as if it had,'" *Blumenthal*, 335 F. Supp. 3d at 62 (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)), and "as soon as the President accepts a prohibited foreign emolument without obtaining congressional consent, his acceptance is irreversible," *id*. (citing *Campbell*, 203 F.3d at 22-23). "Accordingly, plaintiffs adequately allege that the President has completely nullified their votes." *Id.* And "[c]omplete vote nullification is clearly a type of institutional injury sufficient to support legislator standing." *Id*. at 61 (quoting *Cummings v. Murphy*, 321 F. Supp. 3d 92, 105 (D.D.C. 2018)); *see Raines*, 521 U.S. at 823-24, 826.

The President has no response to this. Instead, his arguments are essentially "identical to the arguments he asserted in his [motion to dismiss], all of which the Court carefully and thoroughly considered and ultimately rejected." *In re Special Proceedings*, 840 F. Supp. 2d at 372. With few exceptions, he offers no "new argument," and he certainly provides no "new support for his previously-raised arguments." *Id*. In the few places where the President does respond directly to the reasoning of this Court's decisions, he utterly fails to mount a credible case, making clear that he cannot make "a strong showing" that he is "likely" to prevail. *Nken*, 556 U.S. at 426.

12

The President advances two main contentions. The first is that Plaintiffs' claims do not fit the vote-nullification framework of *Coleman v. Miller*, 307 U.S. 433 (1939). The second is that Plaintiffs have adequate legislative remedies. On neither claim is he likely to succeed.

**Vote nullification.** The President bizarrely claims that "*Coleman* has never been extended to confer standing on *federal* legislators in a suit involving inter-branch conflicts." Def. Mem. 10. But of course the D.C. Circuit has concluded numerous times that members of Congress have standing under *Coleman*'s vote-nullification rationale, including in cases based on alleged presidential violations of the Constitution. *See Kennedy v. Sampson*, 511 F.2d 430, 434-36 (D.C. Cir. 1974); *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir. 1979) (en banc); *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873 (D.C. Cir. 1981); *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303 (D.C. Cir. 1982); *Barnes v. Kline*, 759 F.2d 21 (D.C. Cir. 1984), *vacated as moot*, 479 U.S. 361 (1987); *Bliley v. Kelly*, 23 F.3d 507 (D.C. Cir. 1994). The *Coleman*-style vote nullification experienced by Plaintiffs here is precisely analogous to the alleged injuries that the D.C. Circuit recognized were cognizable in these cases. *See, e.g.*, *Goldwater*, 617 F.2d at 702.

*Raines* reaffirmed *Coleman* and suggested that individual members of Congress can sue the executive if their votes are completely nullified. *See Blumenthal*, 335 F. Supp. 3d at 62, 65-66. This is not a controversial proposition. *See, e.g.*, *Cummings*, 321 F. Supp. 3d at 105 (examining "whether vote nullification is the *only* type of institutional injury that grants individual legislators standing" (emphasis added and omitted)).

*Raines* also suggested that the deprivation of a future vote can amount to vote nullification under *Coleman*, *see Raines*, 521 U.S. at 823-24, which the Supreme Court later confirmed in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652, 2665 (2015); *see Blumenthal*, 335 F. Supp. 3d at 66.

13

Given all this, it is clear that Plaintiffs' claims fit within the *Coleman* framework and that the Supreme Court has endorsed this framework. The President's arguments, therefore, hinge on the D.C. Circuit's two post-*Raines* decisions. But those decisions cannot help him. In *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999), the Circuit held that individual members of Congress could not sue the President over a claim that "the President's creation of [a] program by executive order exceeded his statutory and constitutional authority." *Id*. Such action, the plaintiffs alleged, caused "a dilution of their authority as legislators," *id*. at 115, an injury that might have been cognizable under the D.C. Circuit's pre-*Raines* precedent, *see* Pls. Opp. to Mot. to Dismiss 9-10 (Dkt. No. 17). But in *Chenoweth* the court concluded that "*the portions of our legislative standing cases upon which the current plaintiffs rely* are untenable in the light of *Raines*." *Chenoweth*, 181 F.3d at 115 (emphasis added).

Although the *Chenoweth* plaintiffs tried to frame their injury as a deprivation of their right to vote on legislation, *see id.* at 113, the court explained that there was no interference with Congress's ability to pass legislation or with the plaintiffs' ability to vote on legislation. "Unlike the plaintiffs in *Kennedy* and *Coleman*, therefore, they cannot claim their votes were effectively nullified by the machinations of the Executive." *Id*. at 117. Thus, *Chenoweth* carefully differentiated between claims based on mere dilution of influence, which *Raines* foreclosed, and claims based on nullification of specific votes, which *Raines* did not foreclose. The *Chenoweth* plaintiffs failed because they plausibly alleged only the former. *Id*. ("Their claim ... that the President's implementation of the [program] without congressional consent injured them by diluting their authority … is indistinguishable from the claim to standing the ... Court rejected in *Raines*. *Nor can the Representatives claim that their vote was nullified ....*" (emphasis added)).

As for *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000), that case supports the concept

14

of vote nullification advanced by Plaintiffs. There, the D.C. Circuit explained that under *Coleman*, as interpreted by *Raines*, vote nullification means "treating a vote that did not pass as if it had, or vice versa." *Id*. at 22 (citing *Raines*, 521 U.S. at 824). This does not mean "that the President 'nullifies' a congressional vote and thus legislators have standing whenever the government does something Congress voted against, still less that congressmen would have standing anytime a President allegedly acts in excess of statutory authority." *Id*. Rather, true vote nullification occurs only in the "unusual situation" where members of Congress lack "an adequate political remedy." *Id*. at 21-22 (citing *Raines*, 521 U.S. at 829). The plaintiffs in *Campbell* failed because they had such a remedy. *See id*. at 23 (contrasting the "powerless" *Coleman* senators with the *Campbell* plaintiffs, who "enjoy ample legislative power to have stopped prosecution of the 'war'").

The concept of vote nullification adopted by the D.C. Circuit in its most recent decisions on legislator standing, therefore, completely aligns with the concept advanced by Plaintiffs here. *See Blumenthal*, 335 F. Supp. 3d at 62.[2]

***Adequate legislative remedies.*** President Trump appears to concede that Congress cannot stop him from unlawfully accepting foreign emoluments by exercising its power of the purse—the "ultimate weapon of enforcement available to the Congress," *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974)); *see Blumenthal*, 335 F. Supp. 3d at 68 ("in contrast to the situation in *Chenoweth* and *Campbell*, Congress' appropriations power cannot be used to obtain a legislative remedy"). The President's omission tacitly acknowledges that Congress is deprived here of its "most complete and effectual weapon," *United States v. Munoz-Flores*, 495 U.S. 385, 395 (1990)

---

[2] The other two arguments the President raises—that *Coleman* is inapt because the injury there "did *not* damage all members of the legislature," Def. Mem. 12, and that vote nullification always requires plaintiffs to constitute "a sufficient proportion of the legislature to take legislative action," *id*. at 11—merely repeat points he made in his motion to dismiss, without offering any new analysis or support. *See Blumenthal*, 335 F. Supp. 3d at 64.

(quoting *The Federalist No. 58*, at 359 (Madison) (Clinton Rossiter ed., 1961)), a tool that is vitally important because it enables Congress to take *unilateral* action. *See Noel Canning v. NLRB*, 705 F.3d 490, 510 (D.C. Cir. 2013) ("The Framers placed the power of the purse in the Congress in large part because ... the appropriations power was a tool with which the legislature could resist 'the overgrown prerogatives of the other branches of government.'" (quoting *The Federalist No. 58*, *supra*, at 357). That concession alone is damning to his claim.

The President also appears to concede that legislation is not an adequate remedy for his violations. At least, he offers no persuasive response to this Court's observation that legislation "flips th[e] burden" imposed by the Clause, "placing the burden on Members of Congress to convince a majority of their colleagues to enact the suggested legislation." *Blumenthal*, 335 F. Supp. 3d at 67. His only gesture in that direction involves editing the Clause to remove its requirement of *prior* consent. *See* Def. Mem. 16 ("the Constitution's *only requirement*" for consenting to emoluments is that it proceed through the normal legislative channels (emphasis added)). The President similarly ignores the fact that the Constitution does not require legislation to *disapprove* of an emolument—for disapproval is the default in the absence of affirmative consent. *Blumenthal*, 335 F. Supp. 3d at 62 ("The Clause requires the President to ask Congress before accepting a prohibited foreign emolument.").[3]

With nothing to say concerning legislation or appropriations, the President revives his

---

[3] Beyond this, persuading the President to voluntarily stop enriching himself by signing legislation to that effect cannot be regarded as an adequate remedy. The President's personal financial stake in the matter introduces a dynamic that was entirely absent in *Raines*, *Campbell*, and *Chenoweth*. Indeed, no previous case in which a court suggested legislation as an available remedy involved a president with this kind of direct, private interest in the defeat of that legislation. And requiring Congress to override a presidential veto would, of course, exacerbate the burden-shifting problem: instead of requiring a congressional majority to approve foreign emoluments, it would require a two-thirds majority to *disapprove* them.

contention that Congress can still vote to approve or condemn the President's emoluments after he accepts them (assuming, of course, that Congress learns about them). *See* Def. Mem. 13 ("Congress still has the ability to vote on whether to consent to the President's alleged acceptance of foreign emoluments, even if *post hoc.*"). As this Court has recognized, however, that caveat is the whole ballgame. The ability to *approve* an emolument after its acceptance does not restore what has been lost: "each Member's constitutional right to vote *before* the President accepts a prohibited foreign emolument." *Blumenthal*, 335 F. Supp. 3d at 54 (emphasis added). And a *post hoc* vote to *condemn* the President's conduct would be merely symbolic—it would not "force him to return" the emoluments. *Id.* at 68. This option, therefore, cannot be regarded as a viable means of "maintaining the effectiveness of their votes." *Coleman*, 307 U.S. at 438.

Compounding this problem, Congress cannot vote on what it does not know about, and "the President has not provided any information to Congress about the prohibited foreign emoluments." *Blumenthal*, 335 F. Supp. 3d at 68. "Legislating after Congress happens to learn about his acceptance of a prohibited foreign emolument through news reports is clearly an inadequate remedy." *Id*. The President disputes that proposition "because Congress has tools to carry out its legislative functions and does not require civil discovery to do so." Def. Mem. 16-17 (citing cases concerning Congress's subpoena power). That was an unsatisfactory rejoinder even when the President made it last October: the Clause imposes no burden on Congress to ferret out emoluments that presidents may be accepting in secret, and indeed, "[t]he only way the Clause can achieve its purpose is for the President to seek and obtain the consent of Congress before he accepts foreign Emoluments." *Blumenthal v. Trump*, 2019 WL 1923398, at *13 (D.D.C. Apr. 30, 2019). And it is a downright outrageous assertion for the President to make today, given his unprecedented refusal to respond to legitimate congressional inquiries—in defiance of the very Supreme Court

authority he cited to this Court.[4]

The President has one final suggestion. Congress can retaliate, he says, against the President on topics unrelated to his Foreign Emoluments Clause violations. It could "refuse to fund unrelated matters … or even reduce budgets for the Executive Branch; the Senate could reject presidential nominees, or could refuse to provide consent to enter into other treaties submitted by the President." Def. Mem. 15 (citation and quotation marks omitted). In other words, the President is arguing that Congress, instead of going to court for a legal ruling, should instead block treaties that it believes are in the nation's best interest, reject the appointment of leaders it believes to be qualified, and cut funding for government activities that it believes benefit the American people, all to coerce the President into obeying the Constitution. The separation of powers does not require that destructive result, as the D.C. Circuit has recognized. *See Barnes*, 759 F.2d at 29 (discussing "retaliation by Congress in the form of refusal to approve presidential nominations, budget proposals, and the like," and concluding: "That sort of political cure seems to us considerably worse than the disease, entailing, as it would, far graver consequences for our constitutional system than does a properly limited judicial power to decide what the Constitution means in a given case.").

### 2.     *Scope of the Foreign Emoluments Clause*

This Court explained in its April 30 opinion that Plaintiffs have stated a claim against the President for violating the Foreign Emoluments Clause because, among other things, "the text and

---

[4] *See* Oral Argument Transcript at 14-17, *Trump v. Cummings*, No. 19-1136 (D.D.C. May 14, 2019) (President's private attorney William S. Consovoy arguing that Congress lacks power to use subpoenas to investigate whether the President is violating the Foreign Emoluments Clause); Letter from Pat A. Cipollone, Counsel to the President, to Chairman Jerrold Nadler, at 4 (May 15, 2019), https://www.documentcloud.org/documents/6004364-Cipollone-Letter-to-Nadler-5-15-19.html#document/p1 (arguing that Congress lacks power "to conduct a pseudo law enforcement investigation" concerning the President).

structure of the Clause ... support plaintiffs' definition of 'Emolument' rather than that of the President." *Blumenthal*, 2019 WL 1923398, at *6. Nowhere did this Court suggest that this was a close call. On the contrary, this Court explained that the President's interpretation "disregards the ordinary meaning of the term as set forth in the vast majority of Founding-era dictionaries; is inconsistent with the text, structure, historical interpretation, adoption, and purpose of the Clause; and is contrary to Executive Branch practice over the course of many years." *Id*. at *1.

The President "offers no new rationale for why that conclusion was incorrect, beyond the argument[s] that [this Court] explicitly rejected." *Nesbitt*, 704 F. Supp. 2d at 53. Indeed, the President tries to use the thoroughness of the Court's opinion to his advantage, citing the depth of this Court's analysis as illustrating "the complexity of the interpretive task." Def. Supp. Br. 10. The President seems to suggest that whenever a court must engage in an extended analysis, the conclusion is inherently doubtful. That is, of course, wrong, and the President has not shown that his interpretation of the Clause is likely to succeed on appeal.

Significantly, no neutral arbiter has ever accepted the cramped interpretation of the Clause put forth by the President. The only two judges to have ruled on the matter have soundly rejected that interpretation. The Justice Department's Office of Legal Counsel rejected a narrow view of the Clause in an opinion that is directly on point.[5] And recently the Inspector General of the U.S. General Services Administration questioned the President's view as well.[6]

***Original public meaning of "emolument."*** The President continues to cite the narrower alternative definition of "emolument" found in *Barclay's* dictionary: "profit arising from an office or employ." Def. Supp. Br. 11. He has absolutely no response to Plaintiffs' rejoinder that this

---

[5] *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114 (1993).

[6] *See* Exhibit A to Pls. Notice of Supp. Authority 11-13 (Dkt. No. 63-1).

dictionary "defines 'employ' not as 'employment' but as 'a person's trade, business' ... and therefore this source supports defining an Emolument to include 'profit arising from ... a person's trade, business.'" *Blumenthal*, 2019 WL 1923398, at *3 n.5; *see also Office*, Barclay's Dictionary (1774) (defining "office" to include not only "any public charge or employment" but also "private employment"). The President therefore fails to show that the "narrower definition of the term" in Founding-era dictionaries even supports his argument.

The same error infects the lone academic article the President attempts to use to undermine the weight of evidence from Founding-era dictionaries. *See* Def. Supp. Br. 11. More recent scholarship employing the same methods "found no evidence that *emolument* had a distinct narrow meaning of 'profit arising from an office or employ.' All three analyses indicated just the opposite: *emolument* was consistently used and understood as a general and inclusive term." Br. *Amici Curiae* of Prof. Clark D. Cunningham and Prof. Jesse Egbert on Behalf of Neither Party 2-3, *In re: Donald Trump*, No. 18-2486 (4th Cir. Jan. 29, 2019).

**Text and structure.** This Court next concluded that "the text and structure of the Clause, together with the other uses of the term in the Constitution, support plaintiffs' definition of 'Emolument' rather than that of the President." *Blumenthal*, 2019 WL 1923398, at *6. The President's textual analysis in his supplemental brief is purely a reiteration of the arguments made in his motion to dismiss, a tactic that "cannot establish the necessary likelihood of success." *Watson Labs.*, 2012 WL 13076147, at *1.

**History.** This Court was also "persuaded that the adoption of the Clause and its historical interpretation support plaintiffs' definition rather than that of the President." *Blumenthal*, 2019 WL 1923398, at *8. The President's leading response to that conclusion is "the historical precedent of President Washington purchasing public land from the federal government," Def. Supp. Br. 15,

which the President discussed at length in his motion to dismiss.

This was weak tea to begin with, relying as it did "on one historical incident," *Blumenthal*, 2019 WL 1923398, at *8, that was surrounded by ambiguity and from which numerous inferences were required to be drawn to support the President's argument. *See id*. But here too, more recent research undermines whatever meager support this incident might once have offered. The GSA's Office of the Inspector General "found evidence in the historical records and other accounts that these six lots were owned privately," not by the federal government, *see* Dkt. No. 63-1, at 15, destroying the entire predicate for the argument. And in any event, Washington's conduct would at most have violated the *Domestic Emoluments Clause*, which does not contain the expansive language of the Foreign Emoluments Clause ("any ... Emolument ... of any kind whatever").

The rest of the President's discussion here is simply a reiteration of the same "dog that didn't bark" arguments, *Blumenthal*, 2019 WL 1923398, at *7 (quoting Plaintiffs' brief), that this Court has already considered and rejected.

***Purpose.*** As before, "[t]he President pays little attention to interpreting the meaning of 'Emolument' by reference to the purpose of the Clause," *id*. at *8, and for obvious reasons: he simply cannot "explain why the Clause would prevent officers from being paid to review a Ph.D. thesis, consult on power plants or meteorology, or teach at a public high school, but then would allow an officer to accept millions of dollars through his business empire," Pls. Opp. to Mot. to Dismiss at 40-41 (footnotes omitted), particularly when the official in question is the President— the person empowered to "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system," *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982).

Instead, the President continues to argue that difficult questions may arise about the scope of the Clause in light of how Plaintiffs and this Court have interpreted the term "emolument." Def.

Supp. Br. 16. Ignoring the fact that the Clause is limited by more than the meaning of this word—such as the requirement that an officeholder "accept" an emolument "from" a foreign state—he reiterates his claim that Plaintiffs' view would automatically prohibit, for instance, holding stock at a publicly traded company that deals with foreign states. He further asserts that this would be an "absurd" result because such conduct has been "previously accepted." *Id.*[7]

As with any constitutional provision, there may be room for debate about the Clause's outer reaches. But none of the President's hypothetical examples are at issue here. This Court was presented with a choice between two alternative interpretations of the Clause. It concluded that the President's interpretation failed under every relevant test. *Blumenthal*, 2019 WL 1923398, at *1. The President needs much more than a few hypotheticals to make a "strong showing that he is likely to succeed on the merits." *Nken*, 556 U.S. at 434.

***Executive branch and other precedent.*** Finally, the President rejects the wealth of precedent in opinions by the Office of Legal Counsel and the Comptroller General because, he says, in most of them "the underlying facts involved an employment or employment-like relationship between the federal officeholder and the foreign government." Def. Supp. Br. 18.

First, Plaintiffs have already explained the simple reason for that: "OLC and the Comptroller General render decisions in response to requests from federal officers. Most such officers are not real estate magnates, but rather people who earn money by providing their individual labor or expertise." *Blumenthal*, 2019 WL 1923398, at *10 (quoting Plaintiffs' brief).

Second, at least one OLC opinion "directly contradicts [the President's] narrow reading of the Clause," concluding that "non-governmental lawyers who were members of the Administrative

---

[7] The President cites no precedent demonstrating who, exactly, has "previously accepted" the legitimacy of the various actions he discusses. *See id.*

22

Conference of the United States ('ACUS') could not receive partnership distributions from their respective firms where the distribution would include fees from foreign government clients even though the lawyers 'did not personally represent a foreign government, and indeed had no personal contact with that client of the firm.'" *Id.* (quoting 17 Op. O.L.C. at 119). The Court agreed that this opinion "devastates" the President's argument. *Id.*

Unbelievably, the President is still pushing the same transparent falsehood that he used earlier to try to distinguish this OLC opinion. The opinion, he says, is "readily distinguishable" because it "concern[ed] law partners sharing the duty of loyalty to their client." Def. Supp. Br. 18; *see* Mot. to Dismiss 36 n.47 (Dkt. No. 15-1). Plaintiffs have already pointed out that "OLC's decision had nothing to do with legal ethics rules regarding client loyalty, but rested instead on the simple proposition that 'some portion of the member's income could fairly be attributed to a foreign government.'" Pls. Opp. to Mot. to Dismiss 40 (quoting 17 Op. O.L.C. at 119 (citation omitted)). That the President continues to rely on this fabricated insinuation provides only one more reason that he is not "likely to succeed" on interlocutory appeal. *Nken*, 556 U.S. at 434.

### 3. *Availability of Equitable Relief*

President Trump also disputes this Court's conclusion that "this is a proper case in which to exercise its equitable discretion to enjoin allegedly unconstitutional action by the President." *Blumenthal*, 2019 WL 1923398, at *13. His contentions lack any substance.

The President suggests that allowing equitable relief here would "create remedies previously unknown to equity jurisdiction." Def. Supp. Br. 5 (quoting *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 332 (1999)). But "'it is established practice … to issue injunctions to protect rights safeguarded by the Constitution' unless there is a reason not to do so." *Blumenthal*, 2019 WL 1923398, at *13 (quoting *Free Enter. Fund v. PCAOB*, 561

U.S. 477, 491 n.2 (2010)). The only reason suggested by the President is that Plaintiffs are not potential defendants in an enforcement proceeding, which he claims is the only situation warranting relief under traditional equity principles. His earlier briefing cited no authority for that proposition, as this Court pointedly observed. *See id*. In light of the Court's observation, the silence on this point in the President's latest brief is deafening: no such authority exists. And the Supreme Court has said the opposite: "an implied private right of action directly under the Constitution" exists "as a general matter." *Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385-86 (2015) ("equitable relief ... is traditionally available to enforce federal law"); *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers.").

President Trump also claims that equitable relief is improper where Congress has not created a cause of action. But that is contrary to long-established practice and basic principles of equity. "The ability to sue to enjoin unconstitutional actions by state and federal officers … reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 135 S. Ct. at 1384. The Framers incorporated this established tradition when they defined the "judicial Power" to encompass "all Cases, in Law and Equity." U.S. Const. art. III, § 2, cl. 1; *see Grupo Mexicano de Desarrollo*, 527 U.S. at 318. "At the time of the American Founding, it was not uncommon for Chancery to enforce the common law through equitable remedies even where the common law might not itself make damages available." John F. Preis, *In Defense of Implied Injunctive Relief in Constitutional Cases*, 22 Wm. & Mary Bill of Rts. J. 1, 15 (2013). And so, from the early days of the Republic, courts have used their equitable power to restrain unlawful

executive action, regardless of the existence of a statutory cause of action.[8]

President Trump also repeats his one-size-fits-all argument for escaping accountability: that the judiciary may not enjoin the President. But he adds nothing to that argument, which this Court has already rejected. Moreover, this Court has not yet enjoined the President and would always have the option of issuing a declaratory judgment. *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974). This argument will not succeed on interlocutory appeal.

## B. Irreparable Harm

Even if President Trump could make a strong showing that he is likely to succeed on the merits, that would not be enough. *John Doe Co.*, 849 F.3d at 1131-32; *Va. Petroleum Jobbers*, 259 F.2d at 926 (despite "probability of success on the merits," an "inadequate showing on the remaining ... considerations prevents us from granting the stay"). The President must also show that he "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 434.

Indeed, the very reason that courts may enter stays pending appeal is to prevent irreparable harm. *Nken*, 556 U.S. at 432 ("authority to grant stays" is "justified by the perceived need 'to prevent irreparable injury to the parties or to the public' pending review" (quoting *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 9 (1942))). Thus, "[w]hen there appears to be no real harm to prevent, a court is justified in refusing to provide such relief." *Comm. in Solidarity with the People of El Salvador v. Sessions*, 929 F.2d 742, 746 (D.C. Cir. 1991); *Wisc. Gas*, 758 F.2d at 674 (addressing

---

[8] Recognition of this authority is as old as *Marbury v. Madison*, 5 U.S. 137, 154, 162-73 (1803). *See also Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 623-24 (1838); *Carroll v. Safford*, 44 U.S. 441, 463 (1845); *Amer. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 109-11 (1902); *Santa Fe Pac. R.R. Co. v. Payne*, 259 U.S. 197, 198-99 (1922); *Land v. Dollar*, 330 U.S. 731, 734, 736-37 (1947); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Vitarelli v. Seaton*, 359 U.S. 535, 537-38, 540, 545 (1959); *Oestereich v. Selective Serv. Sys. Local Bd. No. 11*, 393 U.S. 233, 235, 238-39 (1968); *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165, 170 (1993). President Trump's citations to cases involving implied rights of action *for damages* are irrelevant. *See* Def. Supp. Br. 6-7.

25

only irreparable harm because that factor was sufficient to "dispose[] of the[] motions"); *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 97 (D.D.C. 2011) ("the court of appeals has found that the failure to make any showing of irreparable harm is grounds for refusing to grant a stay, even if the other three factors merit relief" (citing cases)).

Despite the fact that the President must establish "irreparable harm" to merit a stay, the President's motion remarkably does not even utter the term "irreparable harm" in discussing the consequences of this suit moving forward. Indeed, the President makes only the most perfunctory effort to explain how denying a stay could cause him *any kind of harm at all*. Yet under the "high standard" the D.C. Circuit has established, *Steele*, 287 F. Supp. 3d at 5 (quoting *Chaplaincy*, 454 F.3d at 297), irreparable injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins*, 787 F.3d at 555 (quoting *Chaplaincy*, 454 F.3d at 297). Relief "will not be granted against something merely feared as liable to occur at some indefinite time." *Wisc. Gas*, 758 F.2d at 674 (quotation marks omitted).

For this reason, the Circuit requires "that the movant substantiate the claim that irreparable injury is 'likely' to occur," and it consistently rejects "unsubstantiated and speculative allegations." *Id.*; *see, e.g.*, *John Doe Co.*, 849 F.3d at 1134 (rejecting "entirely unsubstantiated and conclusory assertions"); *Doe 1*, 2017 WL 6553389, at *2 (rejecting "sweeping and conclusory statements"); *CREW*, 904 F.3d at 1019 (rejecting claims that "fail to rise beyond the speculative level"). Movants who rely on speculation and "fail to articulate a tangible injury" are not entitled to relief. *Chaplaincy*, 454 F.3d at 298; *see Nken*, 556 U.S. at 434-35 ("simply showing some possibility of irreparable injury fails to satisfy the second factor" (citation and quotation marks omitted)).

Those standards doom the President's request. In the only paragraph of his motion that

even discusses the subject, *see* Def. Supp. Br. 20, the President offers nothing but "sweeping and conclusory statements," *Doe 1*, 2017 WL 6553389, at *2, and "unsubstantiated and speculative allegations," *Wisc. Gas*, 758 F.2d at 674. His argument, in fact, boils down to a single, unsupported, categorical assertion: "Any discovery would necessarily be a distraction to the President's performance of his constitutional duties." Def. Supp. Br. 20.

But the President has "provided no non-conclusory factual basis" for this assertion, *Doe 1*, 2017 WL 6553389, at *2, and he fails to explain "precisely," *id*., how the discovery Plaintiffs seek could meaningfully distract him from his duties. *See John Doe Co.*, 849 F.3d at 1135 ("As the Supreme Court has explained, 'the expense and disruption of defending [oneself] in protracted adjudicatory proceedings' is not an irreparable harm." (quoting *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (brackets added by *John Doe Co.*))); *United States v. W. Elec. Co.*, 777 F.2d 23, 30 (D.C. Cir. 1985) ("The cost and delay associated with litigation does not serve to establish irreparable harm...."). While he baldly asserts that Plaintiffs are set to "embark on what likely will be intrusive discovery of the President," including inquiries into his "official actions," Def. Supp. Br. 5, 2, "this allegation is purely hypothetical," *Wisc. Gas*, 758 F.2d at 674, and "far too speculative," *Chaplaincy*, 454 F.3d at 298. No discovery plan has been approved by this Court or even submitted by the parties. Indeed, Plaintiffs have not indicated that they will seek any information from the executive branch or any other government. Plaintiffs intend to focus their discovery requests on third-party companies owned by the President—companies that he has repeatedly claimed he has no involvement in running. To the extent that Plaintiffs may need access to some of President Trump's personal financial records, he does not explain how this limited document discovery would "necessarily" distract him from his duties.

In sum, the President's claims are "entirely unsubstantiated." *Holiday Tours*, 559 F.2d at

843 n.3. In making them, the President ignores the "requirement that the movant substantiate the claim that irreparable injury is 'likely' to occur." *Wisc. Gas*, 758 F.2d at 674. "Bare allegations of what is likely to occur are of no value .... The movant must provide ... proof indicating that the harm is certain to occur in the near future." *Id*. President Trump fails to do that. Indeed, "belying [his] claims of irreparable tangible harm at this point," *Chaplaincy*, 454 F.3d at 298, he is forced to speculate about the nature and scope of discovery that Plaintiffs will seek, Def. Supp. Br. 2, 5, and the President's empty assertion does not show that any risk of interference with his presidential duties caused by discovery in this case is so certain, great, and imminent that there is "a clear and present need" for a stay. *Newby*, 838 F.3d at 8. If anything, his paltry showing "underscores the absence in this proceeding of any discrete injury that is of such *imminence* that equitable relief is urgently necessary." *Chaplaincy*, 454 F.3d at 298 (quotation marks omitted); *cf. Wisc. Gas*, 758 F.2d at 675 ("The fact that petitioners have not attempted to provide any substantiation is a clear abuse of this court's time and resources."). And by advancing his assertion "without any evidence to support such a finding," the President "ask[s] this court to act on pure conjecture." *Id.* at 676; *see Cuomo*, 772 F.2d at 977 (explaining that "we test these harms for substantiality, likelihood of occurrence and adequacy of proof"). This "is far from the 'certain and great' injury that is required in this Circuit." *Council of D.C. v. Gray*, 2014 WL 11015652, at *2 (D.D.C. May 22, 2014) (quoting *Cuomo*, 772 F.2d at 976).

Nor can the President demonstrate irreparable harm simply by waiving around the phrase "separation of powers." *See John Doe Co.*, 849 F.3d at 1135 ("[T]he [plaintiff] insists that any alleged separation-of-powers injury is by its very nature irreparable. The short answer is that this Court has held otherwise."); *id.* (without "'immediate or ongoing harm,'" even the "'violation of separation of powers' by itself is not invariably an irreparable injury" (quoting *In re al-Nashiri*,

791 F.3d 71, 79-80 (D.C. Cir. 2015))). "Since the traditional stay factors contemplate individualized judgments in each case, the formula cannot be reduced to a set of rigid rules." *Hilton*, 481 U.S. at 777. But that is what President Trump is asking for: a rigid rule that a stay of discovery is always required pending a request for interlocutory appeal whenever a case involves the President of the United States. Not only is such a rule incompatible with the D.C. Circuit's standards, it also is contrary to Supreme Court precedent involving related presidential controversies—including the very decisions cited by President Trump.

The President asserts, and Plaintiffs agree, that the "high respect that is owed to the office of the Chief Executive ... should inform the conduct of [this] entire proceeding, including the timing and scope of discovery." *Jones*, 520 U.S. at 707. The President's mistake is his assumption that this high respect alone entitles him to a stay of discovery pending interlocutory appeal. Contrary to that premise, the Supreme Court has consistently rebuffed the notion that the separation of powers or the unique role of the executive automatically exempts the President from complying with the standard rules of our legal system. Instead, the Court has made clear that "the President, like all other government officials, is subject to the same laws that apply to all other members of our society." *Id*. at 688 (quotation marks omitted).

In *Clinton v. Jones*, the Court rejected a president's categorical claim that allowing a civil lawsuit against him to proceed to trial during his tenure in office would create "serious risks for the institution of the Presidency." *Id*. at 689 (quoting DOJ brief). The President's bid for absolute immunity from such process, "grounded purely in the identity of his office" was "unsupported by precedent." *Id*. at 695. As the Court explained, it is "settled that the President is subject to judicial process in appropriate circumstances," a principle the Court traced back to Chief Justice John Marshall. *Id*. at 703-04 (citing *United States v. Burr*, 25 F. Cas. 30 (C.C.Va. 1807)).

Like this case, *Clinton v. Jones* involved a civil lawsuit premised on alleged legal violations that the President committed through his private behavior.[9] The case therefore did not implicate the concerns that animated the Court's decision in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), which held presidents absolutely immune from damages liability for official acts taken as president because the specter of such liability would affect the discharge of their duties. *Jones*, 520 U.S. at 693 ("[such] immunity … enabl[es] such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability"); *id*. at 693-94 ("Our central concern was to avoid rendering the President 'unduly cautious in the discharge of his official duties.'" (quoting *Fitzgerald*, 457 U.S. at 752 n.32)).

For that reason, President Clinton argued—as President Trump does here—that the demands of litigation would inevitably be a distraction from his duties that would impinge on his constitutional role. He claimed that "burdens will be placed on the President that will hamper the performance of his official duties" and that litigation "may impose an unacceptable burden on the President's time and energy, and thereby impair the effective performance of his office." *Id*. at 701-02; *id*. at 697-98 ("He submits that—given the nature of the office—the doctrine of separation of powers places limits on the authority of the Federal Judiciary to interfere with the Executive Branch that would be transgressed by allowing this action to proceed.").

The Supreme Court unanimously rejected these arguments. "Presidents and other officials face a variety of demands on their time, ... some private, some political, and some as a result of

---

[9] To be clear, the obligation not to accept foreign emoluments, even through private conduct, is indeed part of the President's official duties. *See* Pls. Supp. Mem. 36 n.14 (Dkt. No. 50). But this obligation is part of his official duties only because he holds federal office—not because he is the President specifically. Thus, while the obligation is part of his duties, this obligation does not relate to the unique responsibilities conferred on him specifically because he is the President. The same obligation applies to every person who holds an office of profit or trust in the federal government. *See id*. at 35-36.

official duty." *Id.* at 705 n.40. Despite the President's "'unique position in the constitutional scheme,'" it "does not follow ... that separation-of-powers principles would be violated by allowing this action to proceed." *Id.* at 698-99 (quoting *Fitzgerald*, 457 U.S. at 749). "The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution." *Id.* at 703. After all: "The burden on the President's time and energy that is a mere byproduct of such review surely cannot be considered as onerous as the direct burden imposed by judicial review and the occasional invalidation of his official actions." *Id.* at 705 n.40. "While such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional separation-of-powers concerns." *Id.* at 706.

Crucially, the Court also emphasized that President Clinton's request to postpone the trial was "premature." *Id.* at 708. "The proponent of a stay bears the burden of establishing its need," and at the time "there was no way to assess whether a stay ... would be warranted. Other than the fact that a trial may consume some of the President's time and attention, there [was] nothing in the record to enable a judge to assess the potential harm that may ensue." *Id.* President Clinton, in other words, made the same cardinal error that President Trump makes here: "presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Id.* at 702; *see id.* at 710 (Breyer, J., concurring in the judgment) ("the President cannot simply rest upon the claim that a private civil lawsuit for damages will interfere with the constitutionally assigned duties of the Executive Branch ... without detailing any specific responsibilities or explaining how or the degree to which they are affected

by the suit" (quotation marks omitted)).[10]

Here too, President Trump's claims about potential distraction from his duties are premature and unsubstantiated. Under *Jones*, it is clearly insufficient that the discovery process "may consume some of the President's time and attention." *Id*. at 708 (majority opinion). But the bare possibility of "distraction to the President's performance of his constitutional duties" is all the President has offered in the way of irreparable harm. Def. Supp. Br. 20. Missing is any specific, credible explanation of why such distraction, even assuming it occurs, would inevitably be significant. As noted earlier, discovery will be focused on third-party businesses that the President claims to have no involvement in running. Any requests for materials concerning the President's personal finances should impose a minimal burden at most. A unanimous Supreme Court did not blink an eye while blessing far more time-consuming demands in *Jones*. *See* 520 U.S. at 691-92 ("We assume that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule...."); *id*. at 692 n.14 ("Presidents have responded to written interrogatories, given depositions, and provided videotaped trial testimony...."). Given all this, President Trump's mere assertion of potential distraction does not establish an irreparable harm that is "'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief.'" *Newby*, 838 F.3d at 8. Rather, "if properly managed by the District Court," discovery is "highly unlikely to occupy any substantial amount of [his] time." *Jones*, 520 U.S. at 702.

Significantly, *Jones* reflects well-entrenched principles. Chief Justice John Marshall ruled that a subpoena *duces tecum* could be directed to President Jefferson, notwithstanding the latter's

---

[10] Notably, too, *Jones* concerned whether a full civil *trial* should be deferred until after President Clinton's tenure. Although the district judge had stayed any trial, the same judge "ruled that discovery in the case could go forward," *id*. at 687, and no one questioned that decision.

displeasure. *Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807). The Supreme Court "unequivocally and emphatically endorsed Marshall's position when [it] held that President Nixon was obligated to comply with a subpoena commanding him to produce certain tape recordings of his conversations with his aides." *Jones*, 520 U.S. at 704 (citing *United States v. Nixon*, 418 U.S. 683 (1974)). In that case, while acknowledging that courts "should be particularly meticulous" when the President is involved, the Court made clear that broad invocations of presidential prerogatives "must be considered in light of our historic commitment to the rule of law." *Nixon*, 418 U.S. at 702, 708. The Court went on to hold that such a "generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial." *Id*. at 713.

Similarly, when overruling President Nixon's objections to a statute that required federal employees to review presidential materials from his administration, the Supreme Court rejected Nixon's "bare claim" that "the mere screening of the materials by the archivists will impermissibly interfere with candid communication of views by Presidential advisers." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 451 (1977). According to the Court, Nixon offered "no reason" why review under the statute was "likely to impair confidentiality, *id*. at 452; his claims of invasion of privacy could not properly "be considered in the abstract" but only "in light of the specific provisions of the Act," *id*. at 458; and any First Amendment burden was "speculative," *id*. at 467. Once again, generalized and undifferentiated claims of presidential prerogative were found wanting.

When the Court has sustained special executive privileges that require more than "judicial deference and restraint," *Fitzgerald*, 457 U.S. at 753, it has done so because the litigation threatened to intrude upon the internal decision-making process of the executive branch. *See id.* at 745 ("the head of an Executive Department … should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil

suit for damages" (quoting *Spalding v. Vilas*, 161 U.S. 483, 498 (1896)); *see Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385 (2004) ("special considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated"). There is not the slightest hint that those risks are present here. No discovery plan has been finalized, and Plaintiffs have given no indication that they will seek *any* materials from the executive branch. Both the nature of this case and its posture, therefore, are entirely different than in *Cheney*.[11]

President Trump, in sum, has not demonstrated that allowing discovery to proceed at this point will cause him any harm that is "certain," "great," "actual," and "imminen[t]." *Newby*, 838 F.3d at 8 (quoting *Chaplaincy*, 454 F. 3d at 297). As this case moves forward, if any particular discovery requests would, in the President's view, unjustifiably intrude upon his constitutional role, he will be free to object to those requests at that time. His blanket resistance to permitting *any* steps forward rests on the "speculative" and "hypothetical" claim, *Chaplaincy*, 454 F.3d at 298, that "*[a]ny discovery* would necessarily be a distraction to the President's performance of his constitutional duties," Def. Supp. Br. 20 (emphasis added), combined with the erroneous further claim that *any* such distraction would necessarily derogate from the separation of powers. Both halves of this equation are false. "Sitting Presidents have responded to court orders to provide testimony and other information with sufficient frequency that such interactions between the Judicial and Executive Branches can scarcely be thought a novelty." *Jones*, 520 U.S. at 704-05

---

[11] *See Cheney*, 542 U.S. at 385-88 (where "overly broad discovery requests" have been issued to senior government officials who "give advice and make recommendations to the President," thus threatening an "unnecessary intrusion into the operation of the Office of the President," the executive branch need not bear the burden of "making particularized objections" to the requests on the basis of executive privilege in order to obtain relief from them).

(citing examples involving Presidents Monroe, Grant, Nixon, Ford, Clinton, and Carter).

No irreparable harm has been shown—not even close. On that basis alone the President's motion for a stay should be denied. *Wisc. Gas*, 758 F.2d at 674; *Baker*, 810 F. Supp. 2d at 97.[12]

### C.      Harm to Plaintiffs

Even if the President could make "showings of probable success and irreparable injury," he would still need to demonstrate that issuing a stay will have no significant "adverse effect" on Plaintiffs. *Va. Petroleum Jobbers*, 259 F.2d at 925; *see In re Hardy*, 561 B.R. 281, 289 (D.D.C. 2016). He has not, and cannot.

As a threshold matter, the President wrongly suggests that *Plaintiffs* bear the burden of proving that they will be "irreparably harmed" by a stay. Def. Supp. Br. 20. That is flat wrong. The burden is on *the President* to demonstrate that Plaintiffs will *not* be harmed. And he must do more than show a lack of "irreparable" harm—he must show that Plaintiffs will suffer no substantial harm at all. *See Doe 1*, 2017 WL 6553389, at *3 ("Appellants have failed to show that issuance of the stay will not substantially injure the other parties to the proceeding.").

And while the President claims that Plaintiffs will not be harmed by a stay, this is yet another bare assertion made with virtually no argument. *See* Def. Supp. Br. 20. Given the circumstances, the substantial harm Plaintiffs will suffer if this case is grounded to a halt "pending resolution of the President's motion and if applicable, pending appeal," *id.*, is obvious.

This is not "an ordinary civil damages action … where postponement normally is possible

---

[12] *See* Mem. Op. at 41, *Trump v. Comm. on Oversight & Reform*, No. 19-1136 (D.D.C. May 20, 2019) (Dkt. No. 35) ("The court is well aware that this case involves records concerning the private and business affairs of the President of the United States. But on the question of whether to grant a stay pending appeal, the President is subject to the same legal standard as any other litigant that does not prevail.").

without overwhelming damage to a plaintiff." *Jones*, 520 U.S. at 710 (Breyer, J., concurring in the judgment). For more than half of this President's term, Plaintiffs have been denied their right, explicit in the Constitution, to decide whether the President may accept specific benefits from foreign states. With no adequate legislative recourse available, *Blumenthal*, 335 F. Supp. 3d at 54, it is only through a judicial order that Plaintiffs can vindicate their "interest in maintaining the effectiveness of their votes." *Raines*, 521 U.S. at 823 (quoting *Coleman*, 307 U.S. at 438). As this Court has recognized, the President's unlawful deprivation of those votes inflicts a "concrete and particularized" harm on a "legally protected interest" that each Plaintiff shares. *Blumenthal*, 335 F. Supp. 3d at 65. "A stay pending appeal would deepen and prolong [that] undeniable injury." *Watson Labs.*, 2012 WL 13076147, at *3.[13]

Indeed, the consequences would be far worse: a stay seriously risks foreclosing the possibility of meaningful relief. "It takes time to decide a case on appeal. Sometimes a little; sometimes a lot." *Nken*, 556 U.S. at 421. "No court can make time stand still while it considers an appeal," *id.* (quotation marks omitted), "and if a court takes the time it needs, the court's decision may in some cases come too late," *id.*; *see Landis*, 299 U.S. at 256 ("Already the proceedings in the District Court have continued more than a year. With the possibility of an intermediate appeal to the Circuit Court of Appeals, a second year or even more may go by before this court will be able to pass upon the Act.").

---

[13] With little else to substantiate his argument, the President claims that Plaintiffs' decision not to seek preliminary injunctive relief "forecloses any argument" that a stay will harm them. Def. Supp. Br. 20. That contention is meritless. There are many reasons not to seek the extraordinary remedy of a preliminary injunction even when suffering grave harm. One is that some claims are not readily amenable to preliminary relief at the outset of litigation. Here, for instance, Plaintiffs and the Court are still proceeding largely in the dark about the exact nature and quantity of the President's financial transactions with foreign governments, relying mainly on second-hand press accounts. That lack of concrete information significantly complicates any effort to craft an appropriately tailored preliminary injunction.

An appellate decision in this case is virtually guaranteed to arrive "too late," *Nken*, 556 U.S. at 421, if discovery does not proceed in the meantime. At present, we are almost two and a half years into President Trump's term. If this Court certifies its orders for interlocutory appeal, briefing will ensue in the D.C. Circuit on whether it should accept the appeal. The court of appeals will need time to consider and resolve that question. Should it accept the appeal, briefing on the merits will then commence. Even if expedited briefing is ordered, briefing and oral argument will take months. And months more can be expected before the court renders its decision. After that, the President will have the option of seeking *en banc* review, prompting additional delay while the D.C. Circuit considers that request. Even if the Circuit denies reconsideration, the President will then have sixty days in which to petition the Supreme Court for *certiorari*. Briefing will then commence on that petition. Even if the Supreme Court declines to take the case, the President will have achieved a *de facto* victory: delaying discovery to that point will have ensured that there is not enough time in the remainder of the President's term for Plaintiffs to seek final judgment. An entire presidential term will have passed, therefore, with Plaintiffs unable to exercise their constitutionally guaranteed prerogative.

These realities belie the President's blithe assertion that Plaintiffs will be unharmed by "a brief delay" pending appeal. Def. Supp. Br. 20. In the posture of this case, a delay of discovery pending appeal would jeopardize Plaintiffs' ability to vindicate their rights. For that reason, the President's reassurances "fail[] to show that issuance of the stay will not substantially injure the other parties to the proceeding." *Doe 1*, 2017 WL 6553389, at *3; *see Jones*, 520 U.S. at 707 (majority opinion) ("[I]t was an abuse of discretion for the District Court to defer the trial until after the President leaves office. Such a lengthy and categorical stay takes no account whatever of the respondent's interest in bringing the case to trial."). In the circumstances of this litigation, a

stay would not merely "increase the danger of prejudice" to Plaintiffs, *Jones*, 520 U.S. at 707-08, but could vitiate the value of this case and its potential to vindicate their rights.

### D.     The Public Interest

"[I]t may be assumed that the Constitution is the ultimate expression of the public interest." *Gordon*, 721 F.3d at 653 (citation and quotation marks omitted), and the public interest is not served by a situation that "permit[s] and prolong[s] a continuing violation of United States law." *Nken*, 556 U.S. at 436 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) (brackets in *Nken*)); *cf. Newby*, 838 F.3d at 12 ("there is a substantial public interest in having governmental agencies abide by the federal laws" (citation and quotation marks omitted)); *Population Inst. v. McPherson*, 797 F.2d 1062, 1082 (D.C. Cir. 1986) ("The public has an interest in assuring [adherence] ... to Congressional directives."); *Philip Morris Inc.*, 314 F.3d at 622 (basing stay decision in part on promoting "broader public interests in the observance of law" (quotation marks omitted)).

The Foreign Emoluments Clause is the Constitution's chief bulwark against the corruption of America's leaders by foreign governments. The importance of the Clause's function—ensuring "the undivided loyalty of individuals occupying positions of trust under our government," *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Comm'n*, 10 Op. O.L.C. 96, 100 (1986)—cannot be overstated. As this Court has recognized, moreover, "[t]he only way the Clause can achieve its purpose is for the President to seek and obtain the consent of Congress before he accepts foreign Emoluments," and Plaintiffs have plausibly alleged that President Trump is violating that mandate, *Blumenthal*, 2019 WL 1923398, at *12-13. Indeed, the numerous reported examples cited in Plaintiffs' Amended Complaint may be only the tip of the iceberg, and since that complaint was filed in 2017, reports suggest that President Trump's

acceptance of prohibited foreign emoluments has continued unabated. *See* Pls. Notice of Supp. Authority 2-3 n.1 (Dkt. No. 63).

Despite that, President Trump insists that the special role of the presidency justifies a stay. But the high position he occupies militates in the other direction. It is precisely because of the President's unique and powerful role that this case must move forward. For more than half of his term, America's highest officeholder has been defying the Constitution by enriching himself with secret financial benefits from foreign governments, at least some of which are providing those benefits to influence American foreign policy. *See* Am. Compl. ¶¶ 34-74 (Dkt. No. 14). Resolving Plaintiffs' allegations and enforcing the Foreign Emoluments Clause are matters of the utmost importance, not only to Plaintiffs but to the nation as a whole.

The President is empowered to make "the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Fitzgerald*, 457 U.S. at 752. As President Trump makes foreign policy decisions that are of paramount importance to the nation's security and well-being, he cannot help but know how certain decisions could affect his personal business profits. And because he is not informing Congress of the full range of emoluments he is accepting, nor the identities of the foreign governments providing them, there is no way to gauge whether any particular decision made by the President has been partly—even unconsciously—motivated by his own personal financial considerations. By violating the Foreign Emoluments Clause in this systemic and ongoing manner, the President is depriving the American people of assurance that their highest elected official is pursuing their interests with undivided loyalty.

As these circumstances illustrate, the public interest in enforcing the Foreign Emoluments Clause is at its height when the alleged violator is the President. As a group of former national security officials explained as *amici* in this case: "Our security decisions should be based on

39

national interest, not private gain; the venues for foreign policy and national security decision making should be embassies and diplomatic meetings, not corporate board rooms and private resorts; the means should be diplomatic engagement, not unreported financial relationships." Former Nat'l Security Officials Br. 4 (Dkt. No. 22-1). By misreading the Clause, the President has given himself "license to engage in a wide range of financial entanglements that could leave vulnerable even the most important national security and foreign policy interests of the United States." *Id.* at 3. Thus, the strong public interest that always exists in adherence to the Constitution is here "heightened by the circumstances as well." *Nken*, 556 U.S. at 436.

President Trump simply declares that permitting discovery to proceed would trench upon the separation of powers—contrary to Supreme Court precedent, *see supra* at 29-34. But separation-of-powers concerns point in the opposite direction. The Foreign Emoluments Clause, which demands the consent of a coordinate branch before federal officials may take specified actions, *embodies* the separation of powers—a structural safeguard the Clause harnesses to prevent corrosive foreign influence. For more than two years President Trump has trampled on that safeguard. Therefore, "whatever way this Court decides the issues before it may impact the balance between the political branches in this and future settings." *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 95 (D.D.C. 2008). And while the harms caused by stymying this case are clear, the President has not explained how discovery would impair the performance of his duties in any way.

Because the Clause is "of the most fundamental significance under our constitutional structure," the public has a "strong interest" in seeing it preserved. *Newby*, 838 F.3d at 12 (quotation marks omitted). The public interest therefore tips—resoundingly—against a stay.

## II.   The Criteria for Interlocutory Appeal Are Not Satisfied

To obtain certification of an order for interlocutory appeal, a party must identify a

controlling question of law "as to which there is substantial ground for difference of opinion," 28

U.S.C. § 1292(b), and also demonstrate that "an immediate appeal from the order may materially

advance the ultimate termination of the litigation," *id*. Interlocutory appeals are meant to facilitate,

rather than hinder, the prompt disposition of cases. Thus a "party seeking certification pursuant to

§ 1292(b) must meet a high standard to overcome the 'strong congressional policy against

piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by

interlocutory appeals.'" *Judicial Watch*, 233 F. Supp. 2d at 20 (quoting *Nixon*, 418 U.S. at 690).

Such appeals, therefore, "are rarely allowed." *Nat'l Cmty. Reinvest. Coal. v. Accr. Home Lenders

Holding Co.*, 597 F. Supp. 2d 120, 122 (D.D.C. 2009) (quoting *Judicial Watch*, 233 F. Supp. 2d at

20); *see Tolson v. United States*, 732 F.2d 998, 1002 (D.C. Cir. 1984) ("Section 1292(b) is meant

to be applied in relatively few situations ...." (quotation marks omitted)).

## A.    Substantial Ground for Difference of Opinion

President Trump seeks leave to appeal this Court's rulings on Plaintiffs' standing, their

ability to obtain equitable relief against him, and the scope of the Foreign Emoluments Clause. On

none of those questions has he identified substantial grounds for difference of opinion. Plaintiffs

have already explained why. *See supra*, Part I.A. While that discussion was framed around the

President's failure to meet the even higher standard required for a stay, it makes plain that the

President's objections to this Court's rulings also fail to satisfy § 1292(b).

The threshold for establishing a substantial ground for difference of opinion "is a high

one." *Judicial Watch*, 233 F. Supp. 2d at 19. Although the President emphasizes the complexity

of the questions involved, § 1292(b) "was not intended merely to provide review of difficult

rulings in hard cases." *Id*. at 24 (quotation marks omitted). And as Plaintiffs have shown, President

Trump's criticism of this Court's rulings amounts to little more than a reiteration of the same

41

arguments the Court already considered and rejected. The President offers no new reason to question any of these rulings. "The mere claim that a decision has been wrongly decided is not enough to justify an interlocutory appeal." *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1117 (D.D.C. 1996); *see Nat'l Cmty. Reinvestment Coal.*, 597 F. Supp. 2d at 122 ("Mere disagreement, even if vehement, with a court's ruling does not establish a substantial ground for difference of opinion…." (quoting *Judicial Watch*, 233 F. Supp. 2d at 20)). Nor does it suffice to say that this Court's rulings "interpreted and extended Supreme Court and D.C. Circuit precedent in a novel way." Def. Mem. 9. If that were the test, as Plaintiffs already have explained, then interlocutory appeals would be the norm instead of the rare exception. *See* Pls. Opp. to Mot. for Certification 12-13. President Trump has not satisfied the relevant standard.

### B.      Advancing the Ultimate Termination of the Litigation

Even if the President could establish a substantial ground for difference of opinion, he still would need to demonstrate that "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). He has not done so. And if a stay were granted, as he also requests, there is no way this condition could be satisfied.

President Trump relies on the simplistic argument that appeal should be allowed because "resolution of … the … threshold justiciability questions in the President's favor would terminate this suit." Def. Supp. Br. 1. But his "contention that certification of this Court's Orders for interlocutory appeal will materially advance this litigation necessarily assumes that [he] will prevail on appeal." *Judicial Watch*, 233 F. Supp. 2d at 28. As Plaintiffs have shown, that is not likely. And such simplistic reasoning, again, would make interlocutory appeals the norm rather than the rarely allowed exception. *See Burwell*, 2015 WL 13699275, at *1 ("To be sure, the case would be over more quickly if Defendants were able to appeal—and if they prevailed—now. But

that is true every time a defendant's motion to dismiss is denied."). This Court must therefore make a more subtle determination. Assuming that the other § 1292(b) conditions were satisfied, this Court would need to consider the remaining steps in this case and make a predictive judgment about the most likely route to prompt termination—a victory for the President on interlocutory appeal, or allowing Plaintiffs to pursue their case to final judgment?

In making that calculation, this Court should consider, among other things, how likely the President is to secure a reversal on interlocutory appeal and how promptly the case could move toward final judgment in this Court. "Any immediate appeal under an interlocutory order *could* affect the future conduct of the litigation and avoid unnecessary litigation. The key factors are whether an appeal would *likely* and *materially* advance the ultimate determination." *Educ. Assistance Found. v. United States*, 2014 WL 12780253, at *3 (D.D.C. Nov. 21, 2014) (citation and quotation marks omitted); *see* 16 *Federal Practice and Procedure*, *supra*, § 3930 (the "disadvantages of immediate appeal increase with the probabilities that lengthy appellate consideration will be required [and] that the order will be affirmed").

The fastest route to the ultimate termination of this litigation is likely to follow the normal course: deferring appeal until after summary judgment. As Plaintiffs have shown, President Trump has scant basis to think that his arguments will prevail on interlocutory appeal. Such appeal, therefore, is likely to entail only delay and a waste of the parties' and the courts' resources. Conversely, there is no reason that discovery and summary judgment briefing cannot move swiftly. Plaintiffs intend to pursue focused discovery aimed at proving only the basic facts essential to their claim—that the President is accepting certain types of financial benefits from foreign governments. Much of this should be simple: The Trump Organization is already purporting to keep track of foreign-government payments at the President's hotels, for purposes of the "donation" of "profits"

to the Treasury Department. Having already been generated, these records should be readily accessible. Likewise, it should not be an onerous task to identify which foreign governments own or lease space in the President's towers or to document their annual payments.

Discovery and summary judgment briefing, therefore, can move rapidly. This consideration, combined with the President's low chances of success on appeal, means that the President has not "demonstrat[ed] that interlocutory appeal of this question at this point in time would materially advance the litigation as a whole." *Judicial Watch*, 233 F. Supp. 2d at 29.

Critically, moreover, this Court's granting of a stay pending appeal would destroy any argument that § 1292(b)'s third prong is satisfied. Because of the considerable delays inherent in any appeal, postponing discovery until after resolution of an interlocutory appeal would eliminate any realistic chance of moving this case forward in a timely fashion. *See supra* at 37.

That fact is key because "the need for expedition of cases," S. Rep. No. 85-2434, at *5256, is why § 1292(b) was enacted in the first place. Its strict limitations are meant to prevent interlocutory appeals from "result[ing] in delay rather than expedition of cases." *Id*. at 5257; *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) ("Permitting piecemeal, prejudgment appeals ... undermines efficient judicial administration." (quotation marks omitted)). Thus, even when "the certified order may dispose of the entire case without need for further proceedings, ... there may be good reason for pushing ahead, particularly if there is any reason to fear that effective discovery is threatened by delay." 16 *Federal Practice and Procedure*, *supra*, § 3929 (footnote omitted). Given the posture of this case, as Plaintiffs have explained above, a stay would seriously threaten "effective" discovery. For that reason, the § 1292(b) conditions cannot be deemed satisfied if a stay is granted. And the President has failed to show that those conditions are satisfied in any event.

44

## CONCLUSION

President Trump's motion for a stay "represents the mere skeleton, if that much, of a proper motion for a stay." *Gen. Carbon Co. v. OSHRC*, 854 F.2d 1329, 1329 (D.C. Cir. 1988). It "fails completely to address some of the criteria relevant to that determination," *id*. at 1330, and what it does address simply reveals that the President cannot meet the demanding standards required for "the extraordinary relief of a stay pending appeal." *CREW*, 904 F.3d at 1017. And a stay, if granted, would be fatal to the President's additional request for an interlocutory appeal because it would mean such an appeal would slow, rather than advance, the ultimate termination of this litigation. In any event, that request also fails for the additional reason that the President does not, and cannot, identify substantial grounds for disagreement about this Court's rulings.

For the foregoing reasons, the President's motions should be denied.

Respectfully submitted,

Dated: May 21, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 21, 2019, the foregoing document was filed with the Clerk of

the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: May 21, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod
