## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*<br><br>              *Plaintiffs*,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>              *Defendant*. | No. 17-cv-1154-EGS |

## ANSWER TO FIRST AMENDED COMPLAINT

Defendant Donald J. Trump, in his official capacity as President of the United States, by and through his undersigned counsel, hereby answers Plaintiffs' Amended Complaint, ECF No. 14, as follows:

## I.
## INTRODUCTION

1.      Plaintiffs, 30 members of the United States Senate and 171 members of the United States House of Representatives, bring this action against President Donald J. Trump to obtain relief from the Presidents' continuing violation of the Foreign Emoluments Clause of the United States Constitution, which was designed to ensure that our nation's leaders would not be corrupted by foreign influence or put their own financial interests over the national interest.  To achieve those aims, the Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatsoever, from any King, Prince, or foreign State."

**Response:**  The first sentence of Paragraph 1 constitutes Plaintiffs' characterization of their Amended Complaint, to which no response is required, but to the extent a response may be

deemed required, it is admitted that Plaintiffs seek to bring this action against the President in his

official capacity.  The remainder of this paragraph consists of legal conclusions and legal

arguments, to which no response is required, but to the extent a response may be deemed

required, the allegations are denied, except to admit that the Foreign Emoluments Clause's

purpose is to protect against the corrupting influence on official action through the acceptance of

presents, offices, titles, or emoluments from foreign governments—and to do so as a

prophylactic protection for the benefit of the public and that Plaintiffs have cited a portion of that

Clause.

2.      Defendant, President Donald J. Trump, has a financial interest in vast business

holdings around the world that engage in dealings with foreign governments and receive benefits

from those governments.  By virtue of that financial interest, Defendant has accepted, or

necessarily will accept, "Emolument[s]" from "foreign State[s]" while holding the office of

President of the United States.

**Response:**  The first sentence of Paragraph 2 is denied, except to admit that the Donald J.

Trump Revocable Trust indirectly owns all of the President's financial interests in investment

and business assets; that the trustees, in consultation with the Chairman of the Advisory Board of

that Trust, control the Trust assets and their distribution; and that the President is the beneficiary

of the Trust.  The second sentence of Paragraph 2 consists of legal conclusions and legal

arguments, to which no response is required, but to the extent a response may be deemed

required, is denied.

3.      Because the Foreign Emoluments Clause requires the President to obtain "the

Consent of the Congress" before accepting otherwise prohibited "Emolument[s]," Plaintiffs, as

members of Congress, must have the opportunity to cast a binding vote that gives or withholds their "Consent" before the President accepts any such "Emolument."

**Response:**  Paragraph 3 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

4.      Despite this constitutional mandate, Defendant has chosen to accept numerous benefits from foreign states without first seeking or obtaining congressional approval.  Indeed, he has taken the position that the Foreign Emoluments Clause does not require him to obtain such approval before accepting benefits arising out of exchanges between foreign states and his businesses.  Because Defendant has failed to come to Congress and seek its consent for at least some foreign emoluments that have been the subject of public reporting, it is impossible to know whether Defendant has also accepted, or plans to accept, other foreign emoluments that have not yet been made public.  By accepting these benefits from foreign states without first seeking or obtaining congressional approval, Defendant has thwarted the transparency that the "Consent of the Congress" provision was designed to provide.

**Response:**  The first, third and fourth sentences of Paragraph 4 consist of legal conclusions and legal arguments to which no response is required, but to the extent a response may be deemed required, are denied.  The second sentence of Paragraph 4 is denied, except to admit that Defendant's position is that benefits arising from commercial transactions between businesses in which a covered official has financial interests and a foreign government are not subject to the Foreign Emoluments Clause in the absence of an employment-like relationship between the official and the foreign government.

5.      Moreover, by accepting these benefits from foreign states without first seeking or obtaining congressional approval, Defendant has also denied Plaintiffs the opportunity to give or

withhold their "Consent" to his acceptance of individual emoluments and has injured them in their roles as members of Congress.

**Response:**  Paragraph 5 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

6.     To redress that injury, Plaintiffs seek declaratory relief establishing that Defendant violates the Constitution when he accepts any monetary or nonmonetary benefit—any "present, Emolument, Office, or Title, of any kind whatsoever"—from a foreign state without first obtaining "the Consent of the Congress."  Plaintiffs also seek injunctive relief ordering Defendant not to accept any such benefits from a foreign state without first obtaining "the Consent of the Congress."

**Response:**  Paragraph 6 consists of Plaintiffs' characterization of the relief requested in the Amended Complaint, to which no response is required, but to the extent a response may be deemed required, Defendant denies that Plaintiffs are entitled to the requested relief.

## II.
## PARTIES, JURISDICTION, AND VENUE

7.     Richard Blumenthal is a United States Senator who represents the state of Connecticut.  Senator Blumenthal is the Ranking Member of the Constitution Subcommittee of the Senate Judiciary Committee.

**Response:**  Admitted.

8.     John Conyers, Jr. is a United States Representative who represents Michigan's 13th congressional district.  Representative Conyers is the Ranking Member of the House Judiciary Committee.

**Response:**  Paragraph 8 is denied, except to admit that the allegations in Paragraph 8 were true at the time the Amended Complaint was filed.

9.      Additional plaintiffs are the 39 members of the United States Senate and 170 members of the United States House of Representatives whose names appear in the caption of this Complaint.

**Response:**  Admitted.

10.      As members of Congress, Plaintiffs have been entrusted by the Constitution with the important role of determining when the President and other individuals who hold an "Office of Profit or Trust" under the United States may accept "Emolument[s]" from "foreign States." By empowering members of Congress with this important gatekeeping role, the Founders provided a mechanism by which federal officeholders could accept benefits from foreign governments in appropriate circumstances while still maintaining a structural safeguard against corruption and foreign influence.

**Response:**  Paragraph 10 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

11.      Defendant Donald J. Trump is President of the United States of America and thus holds an "Office of Profit or Trust" under the United States.  He is being sued in his official capacity as President of the United States.

**Response:**  Defendant admits that he is President of the United States of America and that Plaintiffs have brought an official capacity suit against him.  The remainder of Paragraph 11 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

12.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 2201.

**Response:**  Paragraph 12 consists of a legal conclusion concerning jurisdiction, to which no response is required, but to the extent a response may be deemed required, is denied.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).  Defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Columbia is a "judicial district" in which the "defendant in the action resides," in which "a substantial part of the events or omissions giving rise to the claim occurred," and in which "a substantial part of property that is the subject of the action is situated."  For example, Trump International Hotel Washington, D.C., which is central to some of Plaintiffs' allegations, is located in this district.

**Response:**  Paragraph 13 consists of a legal conclusion concerning venue, to which no response is required, but to the extent a response may be deemed required, is admitted.

## III.
## BACKGROUND

14.     Article I, Section 9, Clause 8 of the U.S. Constitution provides:  "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatsoever, from any King, Prince, or foreign State."  Commonly known as the "Foreign Emoluments Clause," this provision reflects the Founders' deep concern that corruption and foreign influence could undermine the new republic and harm the American people.

**Response:**  The first sentence of Paragraph 14 is admitted.  The second sentence of Paragraph 14 is denied, except to admit that the Foreign Emoluments Clause's purpose is to protect against the corrupting influence on official action through the acceptance of presents, offices, titles, or emoluments from foreign governments—and to do so as a prophylactic protection for the benefit of the public.

15.     Because the Founders believed that corruption was one of the gravest threats to the new nation, they viewed anti-corruption measures as essential to preserving an enduring republican system of government.  As George Mason warned his fellow delegates at the Constitutional Convention, "if we do not provide against corruption, our government will soon be at an end."  Thus, in drafting the Constitution, the Founders sought to ensure that "corruption was more effectually guarded against, in the manner this government was constituted, than in any other that had ever been formed."  Alexander Hamilton explained that "[n]othing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."

**Response:**  Paragraph 15 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes and to aver that Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in first sentence of Paragraph 15.

16.     The preoccupation with stemming corruption, born of the Founders' experience under British rule, pervaded the debates at the Constitutional Convention.  According to James Madison's notes of the Convention, fifteen delegates used the word "corruption" no fewer than fifty-four times, and corruption was a topic of discussion on almost a quarter of the days that the Convention was in session.  The Founders wanted to ensure that in the United States, unlike in Britain, the nation's leaders would be dependent on the people alone—not on those who would give them financial benefit—and would be motivated solely by the national interest, not their own personal interests.  To promote that goal, the Founders included in the nation's new charter a number of safeguards against corruption.  These safeguards took the form of "procedural

devices and organizational arrangements" meant to ward off "dependency, cabals, patronage, unwarranted influence, and bribery."

**Response:** Paragraph 16 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant avers that some delegates used the word "corruption" during the constitutional convention and that Defendant otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16.

17.     The Founders were also deeply worried that foreign powers would interfere with America's internal affairs, undermining the nation's republican institutions and making its leaders subservient to foreign interests.  Alexander Hamilton wrote that one of the vulnerabilities of republics "is that they afford too easy an inlet to foreign corruption."  During the Constitutional Convention, Elbridge Gerry warned that "[f]oreign powers will intermeddle in our affairs, and spare no expense to influence them," while Gouverneur Morris invoked "the melancholy picture of foreign intrusions as exhibited in the History of Germany," and "urged it as a standing lesson to other nations."

**Response:** Paragraph 17 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes.

18.     Of particular concern to the Founders was the risk that foreign states would give benefits and rewards to the nation's chief executive to subvert his loyalty.  As Hamilton noted, the personal interest of a hereditary monarch was "so interwoven with that of the Nation . . . that

he was placed above the danger of being corrupted from abroad."  By contrast, as Madison observed, an elected President would lack "that permanent stake in the public interest which would place him out of the reach of foreign corruption."  During the state debates over ratification of the Constitution, former delegate Charles Cotesworth Pinckney similarly explained that while "kings are less liable to foreign bribery and corruption . . . because no bribe that could be given them could compensate the loss they must necessarily sustain for injuring their dominions . . . . the situation of a President would be very different."  As a temporary officeholder, the President "might receive a bribe which would enable him to live in greater splendor in another country than his own; and when out of office, he was no more interested in the prosperity of his country than any other patriotic citizen."  This threat prompted the Founders to reject entrusting the treaty power solely to the President—susceptible as he was to foreign influence—and instead to require Senate approval, among other precautions.

**Response:**  Paragraph 18 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes.

19.      As the Founders saw it, the dangers of corruption and foreign influence were joined together in the contemporary European practice of diplomatic gift-giving.  Eighteenth-century ambassadors and ministers were typically bestowed lavish presents by the monarchs with whom they dealt, often consisting of "jewels, plate, tapestry, or porcelain, or sometimes of money."  The "usual presents from the European Courts" varied by country, and "in Holland, it was customary to give a gold chain and medal; in France, a gold snuff-box; and in Spain, a

picture."  America's Founders, however, made a clean break from such customs as soon as they established their own national government under the Articles of Confederation, prohibiting "any person holding any office of profit or trust under the United States, or any of them" from "accept[ing] any present, emolument, office, or title of any kind whatsoever, from any king, prince or foreign state."  Emphatically rejecting the custom of foreign gift acceptance, the Founders sought to cultivate undivided loyalty of the part of American officeholders.  Absolute in it language, there was, in practice, only one exception to the ban: an officeholder could accept a foreign benefit if it was presented to Congress and if Congress approved of its receipt.

**Response:**  Paragraph 19 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 except to admit that Plaintiffs accurately quoted a portion of the sixth article of the Articles of Confederation of 1781.

20.     This restriction on accepting foreign emoluments was one of the few measures to be transferred from the Articles of Confederation to the new Constitution in 1787, reflecting its importance to the Founding generation.  At Philadelphia, the Foreign Emoluments Clause was added to the draft of the new Constitution by unanimous agreement of the state delegations after Charles Pinckney "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."  In adding that Clause, the Founders largely borrowed the language of the precursor provision in the Articles of Confederation, but they made one important change:  they "institutionalized the practice" that federal officeholders could accept otherwise prohibited emoluments from foreign states if they first obtained the consent of Congress.

**Response:**  Paragraph 20 consists of legal conclusions and legal arguments, to which no response is required but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 except to admit that the Foreign Emoluments Clause has its origin in the sixth article of the Articles of Confederation of 1781, which contained the identical proscription, without the current Clause's proviso authorizing a congressional waiver, and that Paragraph 20 accurately quoted Charles Pinckney.

21.     During ratification, Edmund Jennings Randolph emphasized the twin evils that the Clause was meant to avert, explaining that "[i]t was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."  A prominent contemporary pamphleteer urging ratification stressed the value of the Clause in similar terms:  "The influence which foreign powers may attempt to exercise in our affairs was foreseen, and a wholesome provision has been made against it."  In sum, the Clause was "founded in a just jealousy of foreign influence of every sort."

**Response:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes.

22.     Because the Founders wanted to eliminate "foreign influence of every sort," they drafted the Clause with language "both sweeping and unqualified," "prohibit[ing] those holding offices of profit or trust under the United States from accepting '*any* present, Emolument, Office, or Title, *of any kind whatsoever*' from '*any* . . . foreign State' unless Congress consents."  Consistent with that broad language, the Clause has been understood to be "'directed against

every kind of influence by foreign government upon officers of the United States,' in the absence of consent by Congress."

**Response:**  Paragraph 22 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes, except for the phrase "foreign influence of every sort" which is not, and that the Foreign Emoluments Clause's purpose is to protect against the corrupting influence on official action through the acceptance of presents, offices, titles, or emoluments from foreign governments—and to do so as a prophylactic protection for the benefit of the public.

23.     Notably, the word "emolument" was defined broadly in the eighteenth century to mean "profit," "advantage," "benefit," and "comfort."  Contemporary writers used the term to refer, among other things, to profits accruing from private commerce.  Founding-era statesmen including George Washington and James Madison likewise used the term when referring to "the consequences of ordinary business dealings."  And Governor Randolph's comments at the Virginia Ratifying Convention, specifically addressing the Foreign Emoluments clause, reflected this broad definition as well.

**Response:**  Paragraph 23 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to admit that more than one definition of emolument existed at the time of the Founding and those definitions included the one stated in Paragraph 23.

24.     Thus, it has long been understood by Congress and the executive branch that the Foreign Emoluments Clause applies to the acceptance of any benefits or advantages from foreign

states—including compensation for services rendered in a private capacity.  Benefits and

advantages that have been viewed as failing within the scope of the Clause include the following:

a.      A NASA employee's receipt of a $150 consulting fee for reviewing a

Ph.D. thesis.

b.      Payments to a Nuclear Regulatory Commission employee by an American

consulting firm for work regarding the construction of a Mexican

government power plant.

c.      Payments to a part-time Nuclear Regulatory Commission staff consultant

by an American corporation for work on a contract with the government of

Taiwan.

d.      Payments to members of the Administrative Conference of the United

States, by those members' law firms, of "a share of partnership earnings,

where some portion of that share is derived from the partnership's

representation of a foreign government."

e.      A retired U.S. Air Force member's employment "as a teacher in a local

borough high school in the United Kingdom."

f.      A courthouse employee's "receipt of pension payments from the British

Government."

g.      A Post Office clerk's acceptance of an honorary military insignia from the

German government.

h.      A gift of photographs to U.S. military and civilian officers by a foreign

prince as "a simple remembrance of courtesy."

     i.     A Navy surgeon's receipt of a "token of thankfulness" from a foreign

government for his services on behalf of one of its citizens.

**Response:**  Paragraph 24 is denied, except to admit that the proposed or actual receipt of

the benefits referred to in the second sentence of Paragraph 24 (and its subsections) have been

found by government entities to constitute prohibited presents, offices, Emoluments, or Titles

under the Foreign Emoluments Clause.  Defendant respectfully refers the Court to the cited

opinions of various government entities and the cited congressional resolution for a complete and

accurate statement of their contents.

25.     As these examples illustrate, the Clause has long been understood to apply to any

rewards or benefits given by foreign states—whether tangible or honorary, monetary or

nonmonetary, of great value or slight.  This interpretation prevents officeholders from accepting

anything from a foreign state that might weaken their independence or cause them to act against

the national interest—a danger the Founders perceived even in the "trifling presents" of

ornament and jewelry that were customary of European diplomacy and that motivated the

adoption of the Clause.

**Response:**  Paragraph 25 consists of legal conclusions and legal arguments, to which no

response is required, but to the extent a response may be deemed required, is denied, except to

admit that the prohibition in the Foreign Emoluments Clause was prompted in part by an incident

involving a foreign government's gift to a U.S. ambassador, and the concern that, as a result of

such gifts, U.S. ministers could be subject to foreign influence.

26.     By entrusting Congress with responsibility for deciding which specific benefits

could be received from foreign states, the Founders ensured that federal officeholders would not

decide for themselves whether particular emoluments were likely to compromise their own

independence or lead them to put personal interest over national interest.  An officeholder, in short, would not be the sole judge of his own integrity.  The important separation-of-powers principle embodied in Congress's gatekeeping role also ensured that any acceptance of foreign "Emolument[s]" would be transparent and subject to public examination, further minimizing the dangers of corruption and influence that such transfers of wealth or benefit might otherwise pose.

**Response:**  Paragraph 26 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to admit that the Foreign Emoluments Clause's purpose is to protect against the corrupting influence on official action through the acceptance of presents, offices, titles, or emoluments from foreign governments—and to do so as a prophylactic protection for the benefit of the public—and that it contains a proviso permitting Congress to consent to the benefits prohibited.

27.     When Congress was first called upon to exercise this responsibility in 1798, lawmakers reaffirmed the views expressed a decade earlier during the Constitution's ratification about the dangers of foreign manipulation and the importance of the Foreign Emoluments Clause in guarding against it.  Representative William C.C. Claiborne described the Clause as "intended to lock up every door to foreign influence, to the influence of Courts and Monarchies, which could not but prove baneful to every free country."  Representative James Bayard noted that "[i]f presents were allowed to be received without number, and privately, they might produce an improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors."  Representative Matthew Lyon expressed a refusal to consent to the acceptance of any foreign emoluments, as "he should not be willing to lay this country under an obligation to a foreign country by our Ministers accepting presents."

**Response:**  Paragraph 27 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, except to admit that the quoted language was contained in 8 Annals of Cong. 1582–93 (1798).

28.     At the same time, lawmakers stressed that the dangers of foreign influence and divided loyalty were reduced when officeholders obeyed the Constitution's mandate by seeking the consent of Congress before accepting any foreign benefit.  As Representative Bayard explained, the Clause required officeholders "to make known to the world whatever presents they might receive from foreign Courts and to place themselves in such a situation as to make it impossible for them to be unduly influenced by such presents." Representative Harrison Gray Otis likewise noted:  "When every present to be received must be laid before Congress, no fear need be apprehended from the effects of any such presents.  For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged."

**Response:**  Paragraph 28 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to admit that the quoted language was contained in 8 Annals of Cong. 1582–93 (1798).

29.     In short, as Secretary of State Madison explained in 1803, "the Constitution of the United States has left with Congress the exclusive authority to permit the acceptance of presents from foreign governments by persons holding offices under the United States."  In order "to exclude corruption and foreign influence," an officeholder must "make known to the world" any

benefit he wishes to accept from a foreign state and "come before his country to be judged" by seeking "the Consent of the Congress."

**Response:**  Paragraph 29 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied, except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes.

30.     By extending the reach of these important rules to everyone who holds "any Office of Profit or Trust" under the United States, the Founders ensured that the Foreign Emoluments Clause would apply to all federal officeholders and thus guard against corruption in the highest reaches of the new nation's government.  Such officeholders naturally included the President of the United States.  As Randolph explained at the Virginia Ratifying Convention, "[t]here is another provision against the danger . . . of the president receiving emoluments from foreign powers . . . . I consider, therefore, that he is restrained from receiving any present or emoluments whatever.  It is impossible to guard better against corruption."  And as noted, the Founders were especially afraid that foreign nations would use favors to subvert the loyalty of the President.

**Response:**  Paragraph 30 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant denies that the officeholders who the Founders intended to be covered by the Foreign Emoluments Clause "naturally included the President," and avers that he lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30 except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes.

31.     Historically, presidents have respected their obligations under the Foreign Emoluments Clause and have declined to accept presents or emoluments from foreign states without obtaining the consent of Congress:

a.      President Andrew Jackson transmitted to Congress in 1830 a commemorative gold medal that Columbia's president Simón Bolívar had presented to him.  Congress directed that the medal be "deposited in the Department of State."

b.      President Martin Van Buren in 1840 was offered two horses, a case of rose oil, five bottles of rose water, a package of cashmere shawls, a Persian rug, a box of pearls, and a sword by the Imam of Muscat.  Writing to the Imam, Van Buren explained that "a fundamental law of the Republic which forbids its servants from accepting presents from foreign States or Princes, precludes me from receiving" the items."  Van Burn then apprised Congress of the gifts:  "I deem it my duty to lay the proposition before Congress, for such disposition as they may think fit to make of it."  Congress directed him to deposit the items with the State Department, selling any items that could not "conveniently be deposited or kept" there and placing the proceeds with the U.S. Treasury.

c.      President John Tyler in 1843 was offered two horses by the Imam of Muscat.  He notified Congress, seeking direction regarding the disposition of the gifts.  Congress directed Tyler to sell the horses at auction and place the proceeds with the U.S. Treasury.

d.      President Abraham Lincoln wrote to the King of Siam in 1862 regarding gifts that the King had sent to the President—two decorative elephant tusks, an ornate sword, and a photograph of the King.  Lincoln wrote that "our laws forbid the President from receiving these rich presents as personal treasures . . . . Congress being now in session at the capital, I have had great pleasure in making it known to them this manifestation of Your Majesty's munificence and kind consideration."  Congress directed that the items be deposited with the Department of the Interior.

e.      President Benjamin Harrison had "certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States."  In 1896, Congress authorized him to personally accept the medals.

f.      President John F. Kennedy was offered honorary Irish citizenship in 1963 by the government of Ireland.  The White House sought the views of the Department of Justice's Office of Legal Counsel, which advised that acceptance would implicate the Foreign Emoluments Clause.  Kennedy declined to accept the honor.

g.      President Barack Obama was named the winner of the Nobel Peace Prize in 2009.  The White House sought the views of the Office of Legal Counsel, which advised that acceptance of the price would not fall within the Foreign Emoluments Clause because the Nobel Committee that awards the prize is not a foreign state or controlled by a foreign state.

**Response:**  Paragraph 31 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, except to admit that the historical anecdotes alleged in this paragraph were discussed in the sources cited by Plaintiffs in the footnotes, that prior Presidents have solicited the consent of Congress or the opinions of the Office of Legal Counsel concerning receipt of certain gifts and honors from foreign governments, and that Congress previously has consented to the receipt of certain foreign gifts and honors by covered officials.

32.     In sum, past presidents have recognized that they are bound by the Foreign Emoluments Clause and have responded accordingly—either seeking Congress's consent to accept foreign emoluments or simply choosing not to receive them.

**Response:**  Paragraph 32 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, Defendant avers that past President have acted consistently with the Foreign Emoluments Clause but Defendant otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32.

33.     Although Defendant Donald J. Trump has accepted the privilege of occupying the highest office in the land, he is not obeying the same rules as the federal officers and employees described above or following the example of compliance set by former presidents.  He has refused to divest from his businesses and instead continues to accept financial payments and other benefits from foreign states through his many business entities without first obtaining the consent of Congress.

**Response:**  Denied.

20

## IV.
## RELEVANT FACTS

**A.     Defendant's Acceptance of Benefits from Foreign States**

34.     Defendant is the owner, in whole or in part, of hundreds of businesses, which are "linked in a complex network of interconnected individual corporations, limited liability companies and partnerships.  The list includes more than 500 separate entities—hotels, golf courses, media properties, books, management companies, residential and commercial buildings, . . . airplanes and a profusion of shell companies set up to capitalize on licensing deals."  These business interests are located in the United States and in at least twenty foreign countries.

**Response:**  The allegations in Paragraph 34 are denied, except to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interests in investment and business assets; that such financial interests include those from overseas business activities; that the trustees of the Donald J. Trump Revocable Trust, in consultation with the Chairman of the Advisory Board of the Trust, control the Trust assets and their distribution; and that the President is the beneficiary of the Trust.

35.     While it is well known that Defendant's business empire is vast and global, the exact nature of his holdings and the benefits he receives from them remain unclear.  Defendant has refused to release his tax returns, and the complicated interconnection between the hundreds of discreet business entities and shell companies in which he owns an interest makes it impossible to determine the full scope of the benefits he is currently accepting from foreign states.  Contributing to the lack of transparency, "[o]ver the last 12 months, about 70% of buyers of Trump properties were limited liability companies—corporate entities that allow people to purchase property without revealing all of the owners' names."

**Response:**  The allegations in Paragraph 35 are denied, except to aver that Defendant lacks knowledge or information sufficient to form a belief about the truth of the quoted allegation in the last sentence and to admit that he has not publicly disclosed his tax returns.

36.     Defendant has not divested or otherwise given up his ownership interest in his worldwide business holdings since he was elected President of the United States.

**Response:**  The allegations in Paragraph 36 are denied, except to admit that the President has transferred all of his financial interests in investment and business assets to the Donald J. Trump Revocable Trust; that the Trust indirectly owns all such financial interests; that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution; and that the President is the beneficiary of the Trust.

37.     Defendant has acknowledged, through his personal attorney, that his businesses receive funds and make a profit from payments by foreign governments, and that they will continue to do so while he is President.  Further, public reporting has confirmed that Defendant and his businesses have accepted benefits from foreign states since he took office.

**Response:**  The allegations in this paragraph are denied, except to admit that The Trump Organization has issued a document entitled Donation of Profits from Foreign Government Patronage,[1] and that Defendant is aware of news reports of a payment made by The Trump Organization to the U.S. Treasury on account of receipts from foreign government patronage of entities operated by The Trump Organization.

38.     These various benefits from foreign governments—payments, loans, permits, exemptions, policy changes, and intellectual property rights—constitute prohibited

---

[1] *Available at* https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/Trump%20Org%20Pamphlet%20on%20Foreign%20Profits.pdf.

"Emolument[s] and/or "present[s]" under the Foreign Emoluments Clause (hereinafter referred to collectively as "Emolument[s]" or "foreign emoluments").

**Response:** Denied.

39.     Defendant has not sought "the Consent of the Congress" with respect to any of the benefits that he has accepted, or will accept, from foreign states in conjunction with his business holdings.

**Response:** Defendant denies that he has received benefits prohibited by the Foreign Emoluments Clause and accordingly denies the allegations of Paragraph 39 on that basis.

40.     Because Defendant has failed to come to Congress and seek consent before accepting foreign emoluments that have been confirmed through public reporting, it is impossible to know whether Defendant is accepting other foreign emoluments that have not yet been made public.  Indeed, through his personal attorney, Defendant has indicated that he does not believe the constitution requires him to seek or obtain Congress's consent before accepting benefits arising out of exchanges between foreign states and his businesses.

**Response:** The first sentence of Paragraph 40 is denied.  Defendant denies the allegations in the second sentence, except to admit that his position is that benefits arising from commercial transactions between businesses in which a covered official has financial interests and a foreign government are not subject to the Foreign Emoluments Clause in the absence of an employment-like relationship between the official and the foreign government.

41.     Because Defendant has not sought congressional consent before accepting these foreign emoluments, nor provided information about them to Congress, Plaintiffs are unable to exercise their constitutional prerogative to authorize or reject the specific emoluments he is accepting.  While some information about Defendant's financial dealings with foreign states is

publicly available in press reports and financial disclosures, that information is fragmentary.
Even where reliable sources confirm specific transactions between foreign states and
Defendant's businesses, the complex structure of those transactions and Defendant's financial
holdings makes it impossible to determine precisely how a given arrangement benefits him or
affects the foreign state in question.  Without this information, Plaintiffs cannot judge whether
they should consent to the acceptance of any particular payment or other benefit from a foreign
state, as the Constitution requires.

**Response:**  The first sentence of Paragraph 41 is denied.  Defendant lacks knowledge or
information sufficient to form a belief as to the truth of the allegations contained in the second
and third sentences of Paragraph 41.  The final sentence of paragraph 41 is denied.

42.     In sum, Defendant's refusal to disclose to Congress the foreign emoluments he
wishes to accept makes it impossible for Plaintiffs to judge whether any specific foreign
emoluments should be approved, and often to know of their existence.  Defendant has therefore
denied Plaintiffs the opportunity to decide, on a case-by-case basis, whether to authorize his
acceptance of particular foreign emoluments from foreign states.  The Constitution expressly
demands that Plaintiffs be given that opportunity.

**Response:**  Denied.

43.     By accepting benefits from foreign states without first obtaining "the Consent of
the Congress," Defendant is therefore committing numerous violations of the Foreign
Emoluments Clause.  Some of these violations have been partially described in media reports
and other publicly available sources, as detailed below.  But because Defendant refuses to come
to Congress and seek consent, thereby preventing the transparency that "the Consent of the

Congress" was designed to provide, other violations, upon information and belief, remain completely hidden.

**Response:**  Denied.

**Acceptance of Intellectual Property Rights**

44.     On February 14, 2017, the Chinese government registered a trademark to Defendant for branded construction services, "the result of a 10-year legal battle that turned in [Defendant]'s favor after he declared his candidacy."

**Response:**  Paragraph 44 is denied, except to admit that Defendant has received trademarks from the Chinese government.

45.     On February 27 and March 6, 2017, the Chinese government granted preliminary approval of 38 new trademarks to Defendant and one of his companies, covering "branded spa and massage services, golf clubs, hotels, insurance, finance and real estate companies, restaurants, bars, and a trademark class that covers bodyguards, social escorts, and concierge services."

**Response:**  Paragraph 45 is denied, except to admit that Defendant has received trademarks from the Chinese government.

46.     In May 2017, the Chinese government granted Defendant preliminary approval of two more trademarks, one for catering services and one that "can be used in clothing like trousers, underwear and suits."

**Response:**  Paragraph 46 is denied, except to admit that Defendant has received trademarks from the Chinese government.

47.     On June 6 and June 13, 2017, the Chinese government granted Defendant preliminary approval of eight additional trademarks, covering services that include "construction, advertising, weather forecasting and dietary consulting."

**Response:**  Paragraph 47 is denied, except to admit that Defendant has received trademarks from the Chinese government.

48.     Circumstances suggest that at least some of these trademarks were approved or expedited as a result of Defendant's status as President of the United States.  After the preliminary approval of trademarks in February and March, the director of a Hong Kong intellectual property consultancy "said he had never seen so many applications approved so expeditiously," and those approvals closely followed Defendant's abrupt decision as President to honor the one-China policy, in contrast to his earlier statements.  Moreover, many of the preliminary approvals granted since Defendants became President were for trademarks that the Chinese government has previously rejected.  Regarding these reversals, another intellectual property attorney stated:  "The speed with which these approvals were decided is mind-blowing. . . . I have never seen any decisions made that quickly.  That suggests special treatment."

**Response:**  Defendant lacks knowledge or information sufficient to form a belief about the truth of the first, second, and fourth sentences of Paragraph 48, except to aver that Defendant has received trademarks from the Chinese government.  The third sentence is denied.

49.     Possession of these various trademarks "offers a potential business foothold for [Defendant]'s family company and protects his name in a country notorious for counterfeiters," benefits that are of particular value to Defendant as his company prepares to build twenty to thirty hotels in major Chinese cities.  Foreign trademarks "can be enormously valuable—whether they are intended as groundwork for future business activity or defensive measures against

squatting to protect the value of the brand," and a Trump Organization spokesman has stated that the company has pursued Chinese trademarks "to protect its brand and overall intellectual property rights from third-party infringers."

**Response:**  Denied, except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes, except for the quoted language of "against squatting to protect the value of the brand," which is not.

50.     By accepting the registration of these trademarks, Defendant has violated the Foreign Emoluments Clause because he did not first seek and obtain "the Consent of the Congress" before accepting these benefits from a foreign state.

**Response:**  Denied.

51.     As of April 2017, according to one investigation, Defendant's companies had 157 trademark applications pending in 36 foreign nations."  Accepting the registration of these trademarks would violate the Foreign Emoluments Clause unless Defendant first sought and obtained "the Consent of the Congress," which he has not done.

**Response:**  Defendant lacks knowledge or information sufficient to form a belief about the truth of the first sentence of Paragraph 51.  The second sentence is denied.

**Acceptance of Payments for Hotel Rooms and Events**

52.     In 2013, Trump Old Post Office LLC signed a lease with the General Services Administration, so it could house Trump International Hotel Washington, D.C. in the Old Post Office building located at 1100 Pennsylvania Avenue, N.W., Washington, D.C. 20004. Defendant owns approximately 77 percent of Trump Old Post Office LLC.

**Response:**  The first sentence is of paragraph 52 is admitted.  The second sentence of paragraph 52 is denied, except to admit that the Donald J. Trump Revocable Trust indirectly

owns all of the President's financial interest in the Hotel, that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets, and that the President is the beneficiary of the Trust.

53.     "For Washington hotels . . . diplomats' visits are big business," and Defendant's hotel has been "actively courting" foreign diplomats, including hiring a "director of diplomatic sales" and hosting an event soon after the November 2016 election in which "[a]bout 100 foreign diplomats, from Brazil to Turkey" were given "a sales pitch about [Defendant]'s newest hotel." An attendee who works with foreign officials noted that "'[t]he place was packed'" and that "much of the discussion among Washington-based diplomats [was] over 'how are we going to build ties with the new administration.'"

**Response:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.     According to public reports, diplomats plan to stay at the hotel to curry favor with Defendant because of his position as President of the United States.  "In interviews with a dozen diplomats . . . some said spending money at Trump's hotel is an easy, friendly gesture to the new president."  According to an Asian diplomat, "Why wouldn't I stay at [Defendant's] hotel blocks from the White House, so I tell the new president, 'I love your new hotel!'  Isn't it rude to come to this city and say 'I am staying at your competitor?'"  One Middle Eastern diplomat put it even more simply:  "Believe me, all the delegations will go there."

**Response:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54, except to admit that the quoted language is contained in the sources cited by Plaintiffs in the footnotes and to state that the paragraph cites and

characterizes news reports, to which Defendant respectfully refers the Court for a complete and accurate statement of their contents.

55.    Indeed, during the first four months of 2017, Defendant's company made nearly $2 million in profit from the hotel, although the company had earlier projected that it would *lose* over $2 million during that period.  These profits accumulated despite an occupancy rate well below standard for the industry, and despite the hotel's ranking by a "travel group that specializes in high-end accommodations" as "the world's third-lousiest new hotel."  "Driving the profits are the extraordinary prices guests have been willing to pay for rooms," as the hotel charges "three times the average rate," making it probably the most expensive hotel in the city."

**Response:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.

56.    By virtue of his ownership of the Trump International Hotel Washington, D.C., Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality every time foreign diplomats stay at the hotel, foreign embassies hold events there, or foreign governments otherwise pay for rooms there.  On information and belief, there have been at least three such incidents since Defendant's inauguration:

       a.    In late January 2017, "[a] lobbying firm working for Saudi Arabia paid for a room at [Defendant]'s Washington hotel after Inauguration Day," as part of its effort to bring activists to Washington "to urge Congress to repeal the law letting 9/11 victims' families sue the kingdom."  This transaction marked "the first publicly known payment on behalf of a foreign government to a Trump property since [Defendant] became president." The lobbying firm made additional payments to the hotel in early February

2017, and all payments were reimbursed by the Saudi government.
Between November 2016 and February 2017, the firm paid Defendant's
hotel approximately $270,000 for lodging, catering, and parking—all
reimbursed by the Saudi government.

   b.     On February 22, 2017, the Embassy of Kuwait held its National Day
          Celebration at Trump International Hotel Washington, D.C.  According to
          cost estimates from the hotel, the price of the celebration was between
          $40,000 and $60,000.

   c.     On or about April 6, 2017, the Ambassador & Permanent Representative
          of Georgia to the United Nations stayed at Trump International Hotel
          Washington, D.C.

**Response:**  The first sentence of Paragraph 56 is denied.  Defendant lacks knowledge or
information sufficient to form a belief as to the truth of the remaining allegations in Paragraph
56.

   57.     Defendant has not sought or received "the Consent of the Congress" to accept
these "Emolument[s]" and is therefore violating the Foreign Emoluments Clause when he
accepts such "Emolument[s]."

**Response:**  Denied.

**Acceptance of Payments Derived from Real Estate Holdings**

   58.     Defendant owns Trump Tower, a mixed-use skyscraper located at 725 Fifth
Avenue, New York, N.Y. 10022.  Since Defendant became President, at least two entities owned
by foreign states have been tenants of Trump Tower: (1) the Industrial and Commercial Bank of

China, which is owned by China, and (2) the Abu Dhabi Tourism & Culture Authority, which is owned by the United Arab Emirates.

**Response:**  Paragraph 58 is denied, except to admit that the Industrial and Commercial Bank of China became a tenant of Trump Tower in 2008 and the Abu Dhabi Tourism & Culture Authority was a tenant of Trump Tower from 2011 to January 2017.

59.     By virtue of his ownership of Trump Tower and the leases of these entities, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality.  Defendant has not sought or received "the Consent of the Congress" to accept these "Emolument[s]" and is therefore violating the Foreign Emoluments Clause.

**Response:**  Denied.

60.     Defendant also owns Trump World Tower, which is located at 845 United National Plaza, New York, N.Y. 10017.

**Response:**  Denied, except to admit that the Trump World Tower is located at the address identified in Paragraph 60.

61.     In 2001, the Kingdom of Saudi Arabia purchased a floor of Trump World Tower, and the floor currently belongs to the Saudi Mission to the United Nations.  At the time of the sale, the floor had "yearly common charges of $85,585 for building amenities."

**Response:**  Paragraph 61 is denied, except to admit that the Kingdom of Saudi Arabia purchased a floor of Trump World Tower in 2001, that unit owners of Trump World Tower paid a common charge in 2001, and that, on information and belief, the Saudi Mission to the United Nations is a current occupant of that floor.

62.     If Saudi Arabia continues to pay common charges to Defendant's company, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its

agent or instrumentality, and he will have done so without first seeking and receiving "the Consent of the Congress," in violation of the Foreign Emoluments Clause.

**Response:**  Denied.

**Acceptance of Licensing Fees for "The Apprentice"**

63.     While serving as President, Defendant remains an executive producer of the MGM-produced television show "The Apprentice."  In that role, he is contractually entitled to a percentage of the profits derived from licensing the show and its related spin-offs to television networks, including in foreign countries.  "The show has current iterations in the U.K., Brazil, Bulgaria, Indonesia and Vietnam; each of these must pay MGM a licensing fee for the show's name and set-up, a portion of which goes to Trump."

**Response:**  The first two sentences of Paragraph 63 are denied, except to admit that Defendant receives an executive producer credit for "The Apprentice" and that he is contractually entitled to a percentage of the licensing fee for the show and its related spin-offs. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 63.

64.     In the United Kingdom, the television network that pays these licensing fees is owned and operated by the government.  Specifically, the state-owned network BBC One broadcasts a version of "The Apprentice," for which the network pays a licensing fee, a portion of which goes to Defendant.

**Response:**  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64.

65.     By taking a portion of licensing fees paid by foreign governments, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or

instrumentality, and he will have done so without first seeking and receiving "the Consent of the Congress," in violation of the Foreign Emoluments Clause.

**Response:** Denied.

**Acceptance of Regulatory Benefits**

66.     Defendant is at least part owner of numerous business ventures around the world, including in Argentina, China, India, Indonesia, Scotland, Turkey, United Arab Emirates, and the Philippines.  Many of these ventures are in the planning stages, and as public reports note, "foreign developers could stand to benefit if their governments were to grease the skids for Trump-branded projects as a way to curry favor with the new American president."  Indeed, since the election, there have been reports of Defendant asking for, and receiving, such help from foreign governments:

> a.     In November 2016, when Argentine President Mauricio Macri called Defendant to congratulate him on his victory, Defendant reportedly asked him "to deal with the permitting issues that are currently holding up" a project that Defendant and Argentine partners have been working on for a number of years, namely, the development of a major office building in Buenos Aires.  "[T]hree days after Trump spoke with Argentina's president, . . . the long delayed project was moving ahead."

> b.     In a meeting "held shortly after the presidential election," Defendant reportedly "encouraged [British politician Nigel Farage] . . . to oppose the kind of offshore wind farms that [Defendant] believes will mar the pristine view from one of his two Scottish golf courses."

c.     Further, "[d]ays after [Defendant]'s election victory, a news agency in the former Soviet republic of Georgia reported that a long-stalled plan for a Trump-branded tower in a seaside Georgian resort town was now back on track."

**Response:**  The allegations in the first sentence of Paragraph 66 are denied, except to admit that the Donald J. Trump Revocable Trust indirectly owns all of the President's financial interests in investment and business assets; that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution; and that the President is the beneficiary of the Trust.  The first half of the second sentence is denied, except to admit that, while still the President-elect, Defendant directed The Trump Organization to terminate all pending deals.  The second half of the second sentence, and subparagraphs a and b of the third sentence describe news reports to which no response is required, but to the extent a response may be deemed required, Defendant admits that the quoted language is contained in the new articles cited by Plaintiffs in the footnotes.  Defendants lacks knowledge or information sufficient to form a belief as to the truth of the allegations in subparagraph c of the third sentence.

67.     Defendant's acceptance of any benefits from foreign governments related to his business ventures abroad—including payments, loans, permits, exemptions, tax incentives, and favorable policy changes—would violate the Foreign Emoluments Clause unless Defendant first sought and obtained "the Consent of the Congress," which he has not done.

**Response:**  Denied.

**Consequences of Defendant's Failure to Comply with the Constitution**

68.     Defendant's refusal to seek and obtain "the Consent of the Congress" before accepting the payments and benefits discussed above suggests that Defendant may have accepted other payments and benefits from foreign states that have not yet been made public.  Neither the Plaintiffs' nor the public, therefore, can know the full range of Defendant's unconstitutional acceptance of foreign emoluments.

**Response:**  Denied.

69.     By accepting such benefits without first obtaining congressional consent, Defendant is causing the harms that the Founders sought to prevent when they adopted the Foreign Emoluments Clause.  The Clause was meant to ensure "the undivided loyalty of individuals occupying positions of trust under our government," because, as the Founders recognized, "[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty."  Defendant's conduct deprives the American people of assurance that their highest elected official is pursuing their best interests with undivided loyalty.

**Response:**  The first sentence of Paragraph 69 is denied.  The second and third sentences consist of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, are denied, except to admit that the Foreign Emoluments Clause's purpose is to protect against the corrupting influence on official action through the acceptance of presents, offices, titles, or emoluments from foreign governments— and to do so as a prophylactic protection for the benefit of the public.  The fourth sentence is denied.

70.     For instance, as Defendant address critical trade issues with China, which could dramatically affect the American economy and American jobs, he may be influenced by the fact that New York's Trump Tower will soon be renegotiating its lease with the state-owned Industrial and Commercial Bank of China, or the fact that the Chinese government recently granted him numerous trademarks enabling his companies to pursue lucrative business opportunities in that country.

**Response:**  Denied.

71.     As Defendant brokers arms deals with Saudi Arabia, as he navigates conflicts between Saudi Arabia and Qatar, and as he decides whether to commit U.S. resources to support Saudi military actions in Yemen, which potentially could escalate and put American servicemembers in harm's way, he may be influenced by his desire to pursue hotel deals in Saudi Arabia requiring government approvals.  Indeed, Defendant said during the presidential campaign that he "would want to protect Saudi Arabia" from Iranian aggression and also stated: "Saudi Arabia, I get along with all of them.  They buy apartments from me.  They spend $40 million, $50 million.  Am I supposed to dislike them?"

**Response:**  Denied, except to admit that Defendant said the quoted language in Paragraph 71 and to aver that during Defendant's Presidency, under the terms of the Trust Agreement of the Donald J. Trump Revocable Trust, The Trump Organization will not pursue any new transaction or contract with a foreign country, agency, or instrumentality thereof, other than normal and customary arrangements already undertaken before the President's election.

72.     As Defendant decides how to shape U.S. policy toward Russia, he may be influenced by his long-standing, though yet unrealized, desire to build housing and hotels in Russia, which could also require government approvals or licenses.  Indeed, Donald Trump Jr.,

Defendant's son and an executive in the Trump Organization, has in the past acknowledged the business ties between Defendant and Russia, noting in 2008 that "Russians make up a pretty disproportionate cross-section of a lot of our assets" and that we see a lot of money pouring in from Russia."

**Response:**  The first sentence of Paragraph 72 is denied.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the second sentence.

73.     Finally, as Defendant weighs the United States' response to allegations that Philippine president Rodrigo Duterte has endorsed extrajudicial killings and other human rights abuses, he may be influenced by the millions of dollars he is set to receive in licensing revenue from the new Trump Tower in Manila, particularly because his business partner in that venture was appointed by Duerte to serve as a top trade envoy to the United States.

**Response:**  Denied, except to admit that any license fee from the Trump Tower in Manila will be paid to entities indirectly owned by the Donald J. Trump Revocable Trust; that the trustees, in consultation with the Chairman of the Advisory Board of that Trust, control the Trust assets and their distribution; and that the President is the beneficiary of the Trust.

74.     As Defendant makes countless other foreign policy decisions, he may similarly be influenced by how those decisions will affect his business pursuits.  And because Defendant is not coming to Congress and identifying emoluments he wishes to accept, the American people will have no way of knowing whether his actions as President reflect only his beliefs about what is best for the country, or whether they are partly motivated by personal financial considerations. For instance, when Defendant publicly advocated during the presidential campaign for a ban on Muslims entering the United States, Turkish President Recep Tayyip Erdogan called for Defendant's name to be removed from the Trump Tower Istanbul, two high-rises containing

offices and luxury apartments, connected by a shopping mall.  But after Defendant subsequently

defended Erdogan's suppression of political dissidents, "the calls for the renaming of the Trump

Towers Mall ended."  Defendant himself has acknowledged that he has "a little conflict of

interest" regarding Turkey because "I have a major, major building in Istanbul."

**Response:**  The first two sentences of Paragraph 74 are denied.  The third and fourth

sentences are denied, expect to aver that Defendant lacks knowledge or information sufficient to

form a belief as to the truth of the allegations concerning the Turkish President's actions or the

quoted language in the fourth sentence.  The fifth sentence is denied, except to aver that

Defendant said the quoted language.

75.     To avoid even the possibility that conflicts of interest like these would harm the

American people by compromising the judgment of their leaders, the Founders laid down the

strict prohibitions of the Foreign Emoluments Clause.

**Response:**  Denied.

**B.     Plaintiffs' Injuries**

76.     The text of the Foreign Emoluments Clause expressly assigns members of

Congress a role in regulating federal officeholders' acceptance of emoluments from foreign

states.  By providing that persons holding an "Office of Profit or Trust" under the United States

may accept such "Emolument[s]" with, and only with, "the Consent of the Congress," the

Constitution makes clear that members of Congress must have the opportunity to cast a binding

vote that gives or withholds their "Consent" before the President or any other federal

officeholder accepts a foreign "Emolument."

**Response:**  Paragraph 76 consists of legal conclusions and legal arguments, to which no

response is required, but to the extent a response may be deemed required, is denied, except to

admit that the Foreign Emoluments Clause permits a covered official to accept prohibited "Emoluments" with the consent of Congress.

77.     Since taking office, Defendant has accepted, or necessarily will accept, numerous emoluments from foreign states.

**Response:**  Denied.

78.     Congress has not consented to defendant's acceptance of any of the emoluments that he has received or will be receiving in the future.

**Response:**  Defendant denies that he has received any "Emoluments" prohibited by the Foreign Emoluments Clause and accordingly denies the allegations in Paragraph 78.

79.     Although the Foreign Emoluments Clause places on federal officeholders who wish to accept "Emolument[s]" the burden of seeking "the Consent of the Congress," Defendant has never sought Congress's consent for his acceptance of these foreign emoluments.

**Response:**  Defendant denies that he has received any "Emoluments" prohibited by the Foreign Emoluments Clause and accordingly denies the allegations in Paragraph 79.

80.     Similarly, Defendant has not provided Congress with any information about the foreign emoluments he has accepted or the transactions that produced them.

**Response:**  Defendant denies that he has received any "Emoluments" prohibited by the Foreign Emoluments Clause and accordingly denies the allegations in Paragraph 80.

81.     Defendant's refusal to seek Congress's consent and provide information about the foreign emoluments he is accepting makes it impossible for Plaintiffs to evaluate the unique circumstances of each emolument and decide, on a case-by-case basis, whether any of those specific emoluments should be approved.

**Response:**  Defendant denies that he has received any "Emoluments" prohibited by the

Foreign Emoluments Clause and accordingly denies the allegations in Paragraph 81.

82.     By accepting emoluments without "the Consent of Congress," Defendant has

violated the Foreign Emoluments Clause.  In the process, Defendant has deprived Plaintiffs of

their ability to vote on which emoluments he, as a federal officeholder, may accept.  When

legislators' votes are "completely nullified" or "deprived of all validity," they may seek judicial

redress to "have their votes given effect."  Such nullification occurs where a previously cast vote

has been unlawfully disregarded and where, as here, legislators are unlawfully denied "an

opportunity to cast a binding vote" in the first place.  By refusing to seek Plaintiffs' consent as

constitutionally required, "[t]he President's action has deprived them of this opportunity

completely, in the sense that they have no legislative power to exercise an equivalent voting

opportunity."  Plaintiffs thus have "a plain, direct, and adequate interest in maintaining the

effectiveness of their votes" on whether consent should be given to Defendant's acceptance of

foreign emoluments.

**Response:**  Denied.

83.     Without a judicial order, Plaintiffs cannot force Defendant to obey the

Constitution's text by seeking their consent before accepting such foreign emoluments.  The

declaratory and injunctive relief that Plaintiffs are seeking would redress this injury by ensuring

that Defendant accepts no "present, Emolument, Office, or Title" from any "foreign State"

without first giving them an opportunity to vote on whether to provide their consent.

**Response:**  Denied.

**V.**
**CLAIMS**

**COUNT I**
**Violations of the Foreign Emoluments Clause**
**(Declaratory Relief)**

84.     Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph of this Complaint as if set forth here in full.

**Response:**  With respect to the allegations in Paragraph 84, Defendant repeats and repleads the answers set forth in the responses to the preceding paragraphs.

85.     There is an actual controversy between Plaintiffs and Defendant as to the meaning of the Foreign Emoluments Clause and its application to Defendant and his conduct. Specifically, Plaintiffs allege that Defendant, by virtue of his continuing ownership of vast business interests around the world, has been, or necessarily soon will be, accepting emoluments from foreign states.  Because Defendant has not sought and received the Consent of Congress, he is in violation of the Foreign Emoluments Clause.  Defendant, through his personal attorney, has indicated that he disagrees with these allegations, believing instead that "[t]he Constitution does not require [Defendant] to do anything here."

**Response:**  Defendant denies the allegations in Paragraph 85 except to admit that Defendant's position is that benefits arising from commercial transactions between businesses in which a covered official has financial interests and a foreign government are not subject to the Foreign Emoluments Clause in the absence of an employment-like relationship between the official and the foreign government.

86.     Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201.  A declaration resolving the actual controversy between Plaintiffs and Defendant will aid in the resolution of legal issues in this action.  Without this relief, Plaintiffs will continue to suffer injury.

**Response:**  Denied.

## COUNT II
### Violations of the Foreign Emoluments Clause
### (Injunctive Relief)

87.     Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph of this Complaint as if set forth here in full.

**Response:**  With respect to the allegations in Paragraph 87, Defendant repeats and repleads the answers set forth in the responses to the preceding paragraphs.

88.     Defendant is a "person holding any Office of Profit or Trust" under the Foreign Emoluments Clause.

**Response:**  Paragraph 88 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

89.     The Foreign Emoluments Clause prohibits "Person[s] holding any Office of Profit or Trust" under the United States from accepting "present[s]" or Emolument[s] . . . of any kind whatever"—that is, anything of value and any benefits, money or nonmonetary—from "any King, Prince, or foreign State," without the Consent of the Congress."

**Response:**  Paragraph 89 consists of legal conclusions and legal arguments, to which no response is required, but to the extent a response may be deemed required, is denied.

90.     As described more fully in paragraphs 34-63 herein, Defendant has committed and, absent this Court's intervention, will continue to commit violations of the Foreign Emoluments Clause because he has accepted, or necessarily will accept, "Emolument[s]" from foreign states without obtaining the consent of Congress.

**Response:**  Denied.

91.     By accepting "Emolument[s]" from foreign states without obtaining the consent of Congress, Defendant has denied each Plaintiff the opportunity to cast binding votes on whether to provide his or her consent to Defendant's acceptance of these individual "Emolument[s]."

**Response:**  Denied.

92.     Plaintiffs are entitled to injunctive relief to stop the above-mentioned injury, and this Court has the power to grant such relief pursuant to its inherent ability to grant equitable relief and pursuant to 28 U.S.C. § 1331.  Such relief would order Defendant not to accept "any present, Emolument, Office, or Title, of any kind whatsoever" from a foreign state without obtaining "the Consent of the Congress," thus ensuring that individual members of Congress have the opportunity to vote on a case-by-case basis whether to give their consent, as the Constitution requires.

**Response:**  Denied.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in Plaintiffs' favor and against Defendant, consisting of:

(a)     A declaratory judgment stating that:

(1)     Defendant is a "Person holding any Office of Profit or Trust" within the meaning of the Foreign Emoluments Clause;

(2)     the Foreign Emoluments Clause prohibits any "Person holding an Office of Profit or Trust" from accepting any benefits of value, monetary or nonmonetary, from "any King, Prince, or foreign State";

(3)      the phrase "any king, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof; and

(4)      by accepting "Emolument[s]" from foreign states without first seeking and obtaining "the Consent of the Congress," Defendant is violating the Foreign Emoluments Clause;

(b)      Injunctive relief, enjoining Defendant from accepting "Emolument[s]" from foreign states without first obtaining the consent of Congress; and

(c)      Such other and further relief as this Court may deem just and proper.

**Response:**  This final section of the Amended Complaint consists of Plaintiffs' request for relief, to which no response is required, but to the extent a response may be deemed required, the Defendant denies that Plaintiffs are entitled to the relief requested, or to any relief.

Each and every allegation of the Amended Complaint not heretofore expressly responded to is hereby denied.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs do not have standing.

2.      Plaintiffs lack a cause of action for their claims and have failed to assert interests protected by the Foreign Emoluments Clause.

3.      The Court lacks jurisdiction to issue the relief requested.

4.      Plaintiffs have failed to state a claim.

Dated:  May 28, 2019                                  Respectfully submitted,

                                                      JOSEPH H. HUNT
                                                      Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *Jean Lin*
JEAN LIN
Special Counsel
JAMES R. POWERS
BRADLEY P. HUMPHREYS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-3716
Fax: (202) 616-8202
Email: jean.lin@usdoj.gov