**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, <br><br> *Defendant*. | No. 17-cv-1154-EGS |

**DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION PURSUANT TO
28 U.S.C. § 1292(b) AND OF HIS MOTION TO STAY PROCEEDINGS**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.   THE COURT SHOULD STAY PROCEEDINGS WHILE IT CONSIDERS THE
     § 1292(b) MOTION AND, IF IT DECIDES TO GRANT THE MOTION, FURTHER
     STAY PROCEEDINGS PENDING APPEAL. ..........................................................2

     A.  Plaintiffs Apply the Wrong Standard to Oppose a Stay of Proceedings............................2

     B.  This Court Should Exercise Its Inherent Power to Grant A Stay. ......................................4

II.  THIS COURT'S APRIL 30, 2019 ORDER SATISFIES THE STANDARD FOR
     INTERLOCUTORY REVIEW PURSUANT TO 28 U.S.C. § 1292(b)..................................6

     A.  Immediate Appeal of the Court's Order May Materially Advance the Ultimate
         Termination of the Litigation...............................................................................6

     B.  There is Substantial Ground for Difference of Opinion as to the Controlling Legal
         Questions Resolved in the April 30 Order. ........................................................8

CONCLUSION.............................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

*Ali v. Carnegie Inst. of Wash.*,
  309 F.R.D. 77 (D.D.C. 2015) ................................................................. 8

*Ali v. Rumsfeld*,
  649 F.3d 762 (D.C. Cir. 2011) .............................................................. 12

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256 (D.C. Cir. 2008) .............................................................. 7

*APCC Servs. v. Sprint Commc'ns Co.*,
  297 F. Supp. 2d 90 (D.D.C. 2003) ........................................................... 7

*Armstrong v. Exceptional Child Ctr., Inc.*,
  135 S. Ct. 1378 (2015) ..................................................................... 10

*Ashbourne v. Hansberry*,
  302 F. Supp. 3d 338 (D.D.C. 2018) .......................................................... 4

*Ass'n of Irritated Residents v. Fred Schakel Dairy*,
  634 F. Supp. 2d 1081 (E.D. Cal. 2008) ................................................... 3, 4

*Belize Soc. Dev. Ltd v. Gov't of Belize*,
  668 F.3d 724 (D.C. Cir. 2012) .............................................................. 4

*Brown v. United States*,
  131 Fed. Cl. 540 (Fed. Cl. 2017) ........................................................... 3

*Cheney v. U.S. Dist. Ct. for D.C.*,
  542 U.S. 367 (2004) ...................................................................... 1, 5

*Clinton v. Jones*,
  520 U.S. 681 (1997) ................................................................... 1, 4, 5

*Citizens for Responsibility and Ethics in Washington v. FEC*,
  904 F.3d 1014 (D.C. Cir. 2018) ............................................................. 3

*Dellinger v. Mitchell*,
  442 F.2d 782 (D.C. Cir. 1971) .............................................................. 4

*Doe 1 v. Trump*,
  No. 17-5267, 2017 WL 6553389 (D.D.C. Dec. 22, 2017) ....................................... 3

*Fonville v. District of Columbia*,
766 F. Supp. 2d 171 (D.D.C. 2011) ......................................................... 4

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) .............................................................................. 11, 12

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) ................................................................................. 10

*Freeman* v. *Quicken Loans, Inc.*,
566 U.S. 624 (2012) ................................................................................. 17

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) ................................................................................. 11

*Harmon v. Brucker*,
355 U.S. 579 (1958) ................................................................................. 10

*Hisler v. Gallaudet Univ.*,
344 F. Supp. 2d 29 (D.D.C. 2004) ............................................................ 4

*In re Special Proceedings*,
840 F. Supp. 2d 370 (D.D.C. 2012) ....................................................... 3, 9

*Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*,
230 F. Supp. 2d 12 (D.D.C. 2002) ............................................................ 3

*Kiyemba v. Bush*,
No. 08-5424, 2008 WL 4898963 (D.C. Cir. Oct. 20, 2008) ...................... 3

*Kucana v. Holder*,
558 U.S. 233 (2010) ................................................................................. 17

*Landis v. N. American Co.*,
299 U.S. 248 (1936) ............................................................................... 4, 5

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*,
571 U.S. 191 (2014) ................................................................................. 12

*Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*,
774 F.3d 18 (D.C. Cir. 2014) ................................................................... 13

*Mississippi v. Johnson*,
71 U.S. 475 (1867) ................................................................................... 12

*Molock v. Whole Foods Mkt. Grp., Inc.*,
   317 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................... 8

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 12

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ........................................................................................... 11

*Nken v. Holder*,
   556 U.S. 418 (2009) ......................................................................................... 2, 3

*Philipp v. Fed. Republic of Germany*,
   253 F. Supp. 3d 84 (D.D.C. 2017) ......................................................................... 3

*S. Pac. Co. v. State of Ariz. ex rel. Sullivan*,
   325 U.S. 761 (1945) ........................................................................................... 12

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
   559 F.2d 841 (D.C. Cir. 1977) ............................................................................... 9

*Winter v. NRDC*,
   555 U.S. 7 (2008) ................................................................................................. 3

*Yamaha Motor Corp. v. Calhoun*,
   516 U.S. 199 (1996) ........................................................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................................................. 5

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I § 9, cl. 8 ..................................................................................... 13

## STATUTES

1 Stat. 130 ............................................................................................................ 15

28 U.S.C. § 1292(b) .......................................................................................... 1, 6

## LEGISLATIVE AND EXECUTIVE MATERIALS

*Retired Marine Corps Officers*,
 B-217096, 1985 WL 52377 (Comp. Gen. Mar. 11, 1985)....................................................... 18

S. Rep. No. 85-2434, 1958 WL 3723 .......................................................................................... 7

## OTHER AUTHORITIES

16 Fed. Prac. & Proc. § 3930 ....................................................................................................... 9

Brief of *Amici Curiae* Prof. Clark D. Cunningham and Prof. Jesse Egbert on Behalf of Neither
 Party, *In re Donald Trump*, No. 18-2486 (4th Cir. Jan. 29, 2019), Doc No. 27 ..................... 14

Brief of *Amici Curiae* Scholar Seth Barrett Tillman and the Judicial Education Project,
 *District of Columbia v. Trump*, No. 18-2488 (4th Cir. Jan. 31, 2019), Doc. No. 31-1............. 16

Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793),
 http://founders.archives.gov/documents/Washington/05-14-02-0074...................................... 15

Clark D. Cunningham & Jesse Egbert, *Scientific Methods for Analyzing Original Meaning:
 Corpus Linguistics and the Emoluments Clauses* (2019)
 http://www.clarkcunningham.org/JP/Emolument/Cunningham-Egbert-ScientificMethods-
 SSRN%20version.pdf. ........................................................................................................ 14

James Phillips & Sara White, *The Meaning of the Three Emoluments Clauses in the U.S.
 Constitution: A Corpus Linguistic Analysis of American English from 1760–1799*, 59 So.
 Texas L. Rev. 181 (2017) ....................................................................................................... 14

Letter from Commissioners for the District of Columbia to George Washington
 (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068 ....... 15

Letter from George Washington to Thomas Jefferson (Mar. 31, 1791),
 https://founders.archives.gov/documents/Washington/05-08-02-0019 ................................... 16

**INTRODUCTION**

This extraordinary lawsuit has all the hallmarks of a case worthy of interlocutory review. It is brought by members of the legislative branch against the President concerning his compliance with a constitutional provision that no appellate court has ever interpreted or even held judicially enforceable. And it is seeking equitable relief no court has ever issued directly against the President. Plaintiffs attempt to paint this unprecedented action as a garden-variety lawsuit and urge that, if certification is granted here, then interlocutory appeal would become the norm. That is obviously not true. Certification for interlocutory appeal under 28 U.S.C. § 1292(b) is warranted, as is a limited stay of proceedings.

Plaintiffs devote most of their brief to opposing a stay of proceedings, but they erroneously invoke a standard that is applicable only to evaluating stays of court orders or judgements pending appeal. The President is not seeking a stay of an order or judgment. Rather, the President seeks only a stay of proceedings while the Court considers the § 1292(b) motion and, if that motion is granted, pending interlocutory appeal. This Court has broad and inherent authority to grant that sort of stay to control its docket and to promote judicial economy. Moreover, "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)). This is particularly the case where, as here, the suit against the President in his official capacity presents several significant justiciability issues that strongly counsel in favor of a stay pending interlocutory appeal to first confirm the Court's power to proceed.

As for the § 1292(b) factors, Plaintiffs are silent about the "controlling question of law" factor, effectively conceding that the element is satisfied. They also conflate the § 1292(b) analysis—including its requirement of a showing that interlocutory appeal may materially advance the ultimate termination of the litigation—with the impact of a potential stay, insisting that the Court should deny certification *because* a stay might be granted, a proposition that is in

direct tension with § 1292(b)'s express language.  Finally, Plaintiffs' discussion about whether there is substantial ground for difference of opinion as to the legal questions resolved by the Court's April 30 Order fails both because Plaintiffs cannot overcome the President's arguments and because Plaintiffs incorrectly rely on the standard for motions for reconsideration, rather than for § 1292(b) certification.  The President need not present new arguments or new information to obtain certification and his supposed failure to carry that inapplicable burden is irrelevant.

The Court should grant the President's motion for § 1292(b) certification and for a stay.

## ARGUMENT

**I.    THE COURT SHOULD STAY PROCEEDINGS WHILE IT CONSIDERS THE § 1292(b) MOTION AND, IF IT DECIDES TO GRANT THE MOTION, FURTHER STAY PROCEEDINGS PENDING APPEAL.**

### A.    Plaintiffs Apply the Wrong Standard to Oppose a Stay of Proceedings.

In his supplemental filing in support of § 1292(b) certification and motion for a stay, the President urged this Court to exercise its inherent authority to manage its docket by staying proceedings while the Court considers whether to grant interlocutory appeal and, if such appeal is granted, then pending appeal.  Def.'s Suppl. Br., ECF No. 71-1, at 19–20.  In response, Plaintiffs devote more than 30 pages of their brief to attempting to show that a stay is unwarranted under the stringent standard articulated in *Nken v. Holder*, 556 U.S. 418 (2009). The *Nken* standard is plainly inapplicable here.  That standard applies to requests for a stay of a court *order* or *judgment* pending appeal, not to a mere stay of *proceedings* under the court's inherent authority to control its docket (which the President seeks here).  *Nken* itself involved a request for staying the petitioner's removal to Cameroon pending review of his petition.  The Supreme Court explained that the type of stay at issue—one that "temporarily suspend[s] . . . the order or judgment in question"—has "some functional overlap with an injunction."  *Id.* at 428–29.  Thus, the Court imposed a legal test that has "substantial overlap [with] the factors governing preliminary injunctions," *id.* at 434—namely, the *Winter* test, which considers the

likelihood of success, irreparable harm, harm to the parties, and public interest. *Id.* at 434; *Winter v. NRDC*, 555 U.S. 7, 24 (2008).

The cases upon which Plaintiffs rely similarly involve a movant seeking to stay a court order or judgment. In *Citizens for Responsibility and Ethics in Washington v. FEC*, 904 F.3d 1014 (D.C. Cir. 2018) (per curiam), for example, the D.C. Circuit applied the *Nken / Winter* test in considering the plaintiff's request to stay the district court's order vacating a regulation of the Federal Election Commission. *Id.* at 1017. And in *In re Special Proceedings*, 840 F. Supp. 2d 370, 372 (D.D.C. 2012), this Court applied the *Nken / Winter* standard to address a request for a stay of its order requiring the release of an investigative report. As the Court said, that is the appropriate standard "[i]n determining whether to stay *an order* pending appeal." *Id.* at 372 (emphasis added); *see also, e.g.*, *Kiyemba v. Bush*, No. 08-5424, 2008 WL 4898963, at *1 (D.C. Cir. Oct. 20, 2008) (per curiam) (applying the *Nken / Winter* standard to consider request to stay order that appellees be released into the United States); *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.D.C. Dec. 22, 2017) (applying the *Nken / Winter* standard to consider request to stay injunction); *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 230 F. Supp. 2d 12, 13–14 (D.D.C. 2002) (Sullivan, J.) (analyzing the defendants' request for a stay of an order to produce documents under the *Nken / Winter* standard).

Here, by contrast, the President does not seek a stay of any order or judgment of this Court. *See Brown v. United States*, 131 Fed. Cl. 540, 542 n.2 (Fed. Cl. 2017) (distinguishing between a request for a stay of a federal court *order or judgment*, on the one hand, and a stay of further *proceedings* in district court). He asks the Court to stay proceedings pending resolution of his § 1292(b) motion and, if that motion is granted, pending appeal. While certification under § 1292(b) does not automatically stay district court proceedings, courts often do so pursuant to their inherent authority. *See, e.g.*, *Philipp v. Fed. Republic of Germany*, 253 F. Supp. 3d 84, 89 (D.D.C. 2017) ("In an exercise of discretion, the Court shall stay the proceedings pending the resolution of the interlocutory appeal by the D.C. Circuit."); *Ass'n of Irritated Residents v. Fred Schakel Dairy*, 634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008) (granting motion to stay

proceedings pending interlocutory appeal because "[i]t would be a waste of judicial and party resources to proceed with the other claims while the appeal is pending"). As the Supreme Court has held, "the power to stay *proceedings* is incidental to the power inherent in every court to control the disposition of the causes on its docket with the economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. American Co.*, 299 U.S. 248, 254 (1936) (emphasis added). And in exercising that inherent authority to stay proceedings, the court need only find that the need for the stay '"overrides the injury to the party being stayed."' *Belize Soc. Dev. Ltd v. Gov't of Belize*, 668 F.3d 724, 732 (D.C. Cir. 2012) (quoting *Dellinger v. Mitchell*, 442 F.2d 782, 787 (D.C. Cir. 1971)). Thus, for example, "a trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it," so as to await resolution of other proceedings bearing upon the case. *Ashbourne v. Hansberry*, 302 F. Supp. 3d 338, 351 (D.D.C. 2018) (quoting *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004)); *see also, e.g.*, *Fonville v. District of Columbia*, 766 F. Supp. 2d 171, 174 (D.D.C. 2011) (Sullivan, J.) (entering a stay, even though "[t]his case has been pending for several years," because "resolution of pending litigation in the D.C. Court of Appeals will likely 'narrow the issues in the pending cases and assist in the determination of questions of law involved'") (quoting *Landis*, 299 U.S. at 253). This standard stands in stark contrast with the *Nken / Winter* standard, which Plaintiffs improperly seek to invoke.

**B.    This Court Should Exercise Its Inherent Power to Grant A Stay.**

Under the correct standard, the President's supplemental brief has already demonstrated that a stay is warranted, given the significant separation-of-powers concerns arising from the Court's rulings and the unprecedented nature of this lawsuit. Def.'s Suppl. Br. at 19–21. While this case squarely presents the type of "extraordinary public moment" recognized in *Landis* as warranting a stay, the stay would also conserve the parties' and the Court's resources if it is determined on interlocutory appeal that the suit may not be maintained.

Plaintiffs' heavy reliance on *Clinton v. Jones*, 520 U.S. 681 (1997), is misplaced. *See* Pls.' Opp'n, ECF No. 74, at 29–33. Unlike the limited stay requested here, President Clinton in

*Jones* sought a blanket stay of a damages suit against him for the duration of his presidency.  *See* 520 U.S. at 692.  Moreover, *Jones* involved President Clinton's conduct before taking office, whereas this case challenges the President's compliance with the Constitution in his official capacity, where separation-of-powers concerns are most acute.[1]  *Id.* at 706.  Furthermore, the suit in *Jones* was plainly justiciable, whereas in this case reasonable jurists could conclude that Members of Congress are not proper plaintiffs, that the President is not a proper defendant in an implied equitable suit under the Foreign Emoluments Clause, and that the Court has no power to issue the requested equitable relief.  If this case is certified for interlocutory appeal, it would be particularly appropriate to stay proceedings in order to avoid the potentially improper exercise of jurisdiction in a suit against the President in his official capacity.

*Jones*, in any event, supports the President's request for a limited stay here.  The Supreme Court recognized in *Jones* that "the District Court has broad discretion to stay proceedings as an incident to its power to control its own docket," *id.* (citing *Landis*), and instructed the District Court to consider the "the potential burdens on the President" the litigation may pose, *id.*, because of the "unique" position the President occupies within our constitutional scheme, *id.* at 698; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring).  As the Court said, "[t]he high respect that is owed to the office of the Chief Executive, though not justifying a rule of categorical immunity, is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery."  *Jones*, 520 U.S. at 707; *see also Cheney*, 542 U.S. at 385 (same).  That guidance weighs strongly in favor of granting the President's request for a limited stay of proceedings here, and the Court should grant the requested stay.

---

[1] Recognizing the obvious distinction between *Jones* and this case, Plaintiffs attempt to cast this litigation as purely about the President's private behavior.  *See* Pls.' Opp'n at 30.  Yet, in a footnote, Plaintiffs are forced to acknowledge that this suit arises exclusively because of the President's official position.  *Id.* at 30 n.9.  Indeed, the President could only violate the Foreign Emoluments Clause in his official capacity, and questions concerning his compliance with the Constitution unquestionably implicate his official duties as President.

II.     **THIS COURT'S APRIL 30, 2019 ORDER SATISFIES THE STANDARD FOR INTERLOCUTORY REVIEW PURSUANT TO 28 U.S.C. § 1292(b).**

The President demonstrated in his supplemental brief that certification of this Court's April 30 Order for interlocutory appeal is warranted because the Order (1) involves three different controlling questions of law (2) as to which there is substantial ground for difference of opinion, and (3) an immediate appeal from the Order may materially advance the ultimate termination of the litigation.  28 U.S.C. § 1292(b).  Plaintiffs' opposition fails to rebut the President's showing.  As to the first element, Plaintiffs' opposition is silent, effectively conceding that the requirement is met.

A.     **Immediate Appeal of the Court's Order May Materially Advance the Ultimate Termination of the Litigation.**

Plaintiffs' discussion of the "material advancement" prong of the § 1292(b) analysis focuses on an irrelevant factor—namely, the potential effect of the Court granting a stay pending appeal.  *See* Pls.' Opp'n at 44 (asserting that "granting of a stay pending appeal would destroy any argument that § 1292(b)'s third prong is satisfied").  This argument makes no sense.  The question whether a stay of proceedings pending interlocutory review is appropriate is entirely distinct from the § 1292(b) analysis.  Indeed, the statute itself expressly contemplates that a stay may or may not be granted after certification of an order for interlocutory review.  *See* 28 U.S.C. § 1292(b) ("[The] application for an appeal hereunder shall not stay proceedings in the district court *unless* the district judge or the Court of Appeals or a judge thereof shall so order." (emphasis added)).  It is, therefore, not surprising that Plaintiffs cite no authority for the proposition that the likelihood of a stay has any bearing on the Court's § 1292(b) analysis.

Equally unavailing is Plaintiffs' argument that proceeding to discovery and summary judgment would conclude the case more swiftly as compared to interlocutory appeal.  That argument assumes that Plaintiffs will prevail on interlocutory appeal—which is an unwarranted assumption, especially when there is "substantial ground for difference in opinion" as to the legal questions resolved by the Court's two orders denying the President's motion to dismiss and discovery has yet to commence.  Again, if the Court of Appeals decides any of the three

6

justiciability questions (standing, cause of action, and propriety of equitable relief) in the President's favor, the case would be over.  Certification for interlocutory review therefore would materially advance the termination of this litigation.

Plaintiffs' argument further ignores § 1292(b)'s important statutory purpose of conserving the resources of the litigants and the Court.  *See* S. Rep. No. 85-2434, 1958 WL 3723 (1958) (citing these considerations in discussing the example of a jurisdictional ruling, the certification of which would have avoided months of litigation had § 1292(b) certification been available).  This Court repeatedly has held that §1292(b) certification is appropriate where early appellate resolution of controlling legal questions "would conserve judicial resources and spare the parties from possibly needless expense if it should turn out that this Court's rulings are reversed."  Initial 1292(b) Mem., ECF No. 60-1, at 18 (quoting *APCC Servs. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 100 (D.D.C. 2003)); *see also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1265 (D.C. Cir. 2008) (defendant satisfied the "extraordinary circumstances" requirement for interlocutory appeal because "[w]ere we to conclude that the Secretary should have prevailed on summary judgment, our consideration of this matter would eliminate the need for further proceedings and preserve judicial resources").

Section 1292(b)'s core rationale of conserving resources is directly implicated here because, despite Plaintiffs' blithe assertions to the contrary, discovery in this matter is likely to be costly and time consuming for the parties and for the numerous third parties that Plaintiffs intend to serve with subpoenas, particularly given the potential for significant discovery disputes.  Those discovery proceedings, which could take place in multiple venues across the country, will also implicate significant separation-of-powers concerns because they will necessarily distract the President from his core Article II obligations.  And, contrary to Plaintiffs' assertion that the President must explain precisely how the discovery Plaintiffs seek would "meaningfully distract [the President] from his duties," Pls.' Opp'n at 27, it is enough that Plaintiffs have expressed an intent to seek discovery of the President's personal financial records and to serve interrogatories on him, *see* Local Rule 16.3 Report, ECF No. 75, at 3, 6–7, and that discovery against a sitting

President in his official capacity is unprecedented.  Under these circumstances, the separation-of-powers principle strongly counsels restraint.  It plainly would be far more prudent and efficient to first allow for interlocutory review of the clear and discrete legal questions presented by the Court's orders, because the contrary resolution of any of those questions would end, or at least substantially narrow, further district court proceedings.

**B.     There is Substantial Ground for Difference of Opinion as to the Controlling Legal Questions Resolved in the April 30 Order.**

The President's supplemental brief demonstrated that there is substantial ground for difference of opinion as to all three controlling questions of law resolved in the April 30 Order. *See* Def.'s Suppl. Br. at 8–19.  Despite the length of their opposition brief, Plaintiffs fail to adequately address the President's showing.  In large part, Plaintiffs repeatedly contend that the President has failed to present new arguments or information in support of his petition for §1292(b) certification.  *See, e.g.*, Pls.' Opp'n at 9–10; *id.* at 42.  But § 1292(b) requires no such showing.  In contrast with a motion for reconsideration under the Federal Rules, which requires a movant to present new arguments or new information, *see Ali v. Carnegie Inst. of Wash.*, 309 F.R.D. 77, 86 (D.D.C. 2015) (holding that a request for reconsideration under the Federal Rules of Civil Procedure cannot be based on the "same arguments previously considered by the Court"), the § 1292(b) inquiry focuses on whether there is "substantial ground for difference of opinion" as to the controlling legal questions resolved by the court's order.  In conducting that inquiry, the court invariably will have considered and rejected the movants' arguments on the controlling legal questions when issuing the initial order.  Nevertheless, the Court need not find that its prior ruling was wrong, based on new arguments or evidence, in order to certify the order.  Rather, if the Court determines that there is substantial ground to believe that reasonable jurists could resolve the questions differently, it should grant certification, even where it remains convinced of the correctness of its initial ruling.  *See, e.g.*, *Molock v. Whole Foods Mkt. Grp., Inc.*, 317 F. Supp. 3d 1, 5–6 (D.D.C. 2018), *appeal filed*, No. 18-7162 (D.C. Cir. Oct. 31, 2018)

("[a]lthough this court remains unpersuaded by these contrary interpretations" of the issue, the "reasoning employed in those cases" did not "lack[] merit").

Plaintiffs' innumerable citations to decisions concerning the stay of enforcement of orders and judgments is similarly irrelevant because in that situation, the Court must find that the movant is "likely to prevail on the merits of its appeal." *See, e.g.*, *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (citation omitted).  And it would make little sense for a court to reconsider an order based on arguments that it had previously rejected in issuing that very order absent new legal grounds or evidence.  *See In re Special Proceedings*, 840 F. Supp. 2d at 372–73 (denying a motion to stay an order where the movant had not offered "new argument" or "new support for his previously-raised arguments" that would provide a basis for "the Court to reconsider" its prior decision).

In short, the President's § 1292(b) briefing presents more than a "mere disagreement" with the Court's decisions; it identifies not only the novelty and importance of the issues resolved by the Court but also numerous grounds to believe that reasonable jurists could evaluate the same authorities to reach a different conclusion.  That is more than enough to warrant certification here under the proper standard, considering that "[t]he level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case."  Initial 1292(b) Mem. at 9 (quoting 16 Fed. Prac. & Proc. § 3930).  The Court should therefore grant the President's motion for § 1292(b) certification.

Plaintiffs make only a handful of additional arguments, none of which has merit.[2]

***Standing***.  On the mistaken belief that the President must show a likelihood of success on the merits, Plaintiffs generally recapitulate the same arguments they raised before concerning

---

[2] Because under § 1292(b) "appellate jurisdiction applies to the *order* certified to the court of appeals," *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205 (1996), to ensure appellate jurisdiction this Court should certify both its September 28, 2018 and April 30, 2019 Orders for interlocutory appeal.

standing, all of which the President has already fully addressed across five briefs, including in his initial motion for interlocutory appeal, demonstrating that there is substantial ground for difference of opinion about Plaintiffs' standing to sue.  *See* Def.'s MTD, ECF No. 15-1, at 5–13; Reply in Support of Def.'s MTD, ECF No. 28, at 3–12; Def.'s Suppl. Br. in Support of MTD, ECF No. 51, at 1–6; Initial 1292(b) Mem. at 9–17; Reply in Support of Def.'s Initial 1292(b) Mot., ECF No. 62, at 7–8.  There is no need to belabor the issue further; the question at hand is not whether the President is likely to win on the standing question, but rather, whether there is substantial ground for a difference of opinion in order to seek interlocutory review of that question.  There surely is here.

   ***Cause of Action and Equitable Relief Against the President***.  Plaintiffs dispute that there is substantial ground for difference of opinion as to the existence of an equitable cause of action to enforce the Foreign Emoluments Clause.  They maintain that the President has failed to show any relevant limitation on the Court's equitable jurisdiction.  But in so arguing, they cite only cases where either the court actually had no equitable jurisdiction under the circumstances of the case, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015) ("power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations"); or the parties were seeking equitable relief as a defense against government actions directed at them, *Harmon v. Brucker*, 355 U.S. 579, 580–82 (1958) (per curiam) (suit seeking to prevent the Secretary of the Army from discharging petitioners without a certification of "honorable" discharge); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 487 (2010) (plaintiff was an accounting firm subject to investigation by government board).  Here, by contrast, Plaintiffs are not facing the prospect of any coercive action by governmental authorities.

   Moreover, Plaintiffs' opposition focuses only on the history of implied equitable causes of action against *inferior executive officers* and has no response to the President's showing that an expressed or implied cause of action does not automatically extend to the President without a clear statement from Congress.  As the President has explained, Def.'s Suppl. Br. at 6–7, the Supreme Court has twice held that, in light of separation-of-powers concerns, an express

statement from Congress is required before a general cause of action may be extended to the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (express statutory cause of action; "[o]ut of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA"); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (implied cause of action; "[b]ut it does not follow that we must—in considering a *Bivens* . . . remedy . . . assume that the cause of action runs against the President of the United States," given "the absence of explicit affirmative action by Congress"). Thus, even if an equitable cause of action may be implied from the Foreign Emoluments Clause against *inferior executive officers* in the circumstances of this case, it may not be extended to the President.

To hold otherwise would also be contrary to the Supreme Court's teaching in *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), that the traditional principles of equity jurisdiction—upon which "the substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief" depend—must specifically provide for the requested relief. *Id.* at 319–20. *Grupo Mexicano* itself involved a request by creditors who had not previously obtained a judgment against the defendant-debtor for an injunction to restrain the defendant from disposing of his assets. The Court held that the district court erred in issuing the injunction because such remedy was "unknown to traditional equity practice" for such creditors, but was available only to those creditors with a prior judgment against the defendant-debtor. *Id.* at 327. Despite many policy arguments for extending the injunctive relief to the plaintiff-creditors, the Court said that it "do[es] not decide which side has the better of these arguments" because "resolving them in this forum is incompatible with the democratic and self-deprecating judgment [the Court has] long since made: that the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence." *Id.* at 332.

Similarly here, the requested equitable relief against the President is previously unknown to equity jurisdiction. While the President submits that this Court has no power to grant it, there

is certainly substantial ground for difference of opinion on that question to warrant interlocutory review now.[3]

Finally, in response to the President's argument that under *Mississippi v. Johnson*, 71 U.S. 475, 500 (1867), federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties," Plaintiffs posit that the Court could simply issue a declaratory judgment against him rather than an injunction.  But declaratory relief also is "incompatible with [the President's] constitutional position," *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992) (Scalia, J., concurring), because it would still produce "needless head-on confrontations between district judges and the Chief Executive," *id.* at 828, which is why courts "have never submitted the President to declaratory relief," *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

Indeed, if the President is correct that injunctive relief is unavailable against him under *Mississippi v. Johnson*, and that there is no equitable cause of action under the Foreign Emoluments Clause, then the Declaratory Judgment Act would not provide a basis for the Court to issue the requested declaratory relief against the President, either.  "It is a well-established rule that the Declaratory Judgment Act is not an independent source of federal jurisdiction.  Rather, the availability of [declaratory] relief presupposes the existence of a judicially remediable right." *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 199 (2014).  That is, "the operation of the Declaratory Judgment Act" is "only procedural, leaving substantive rights unchanged."  *Id.*; *accord Ali v. Rumsfeld,* 649 F.3d 762, 778 (D.C. Cir. 2011) (the Declaratory Judgment Act does not "provide a cause of action"); *Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*,

---

[3] Plaintiffs also have no response to the President's zone-of-interests argument that Members of Congress are at a minimum not proper plaintiffs to invoke any cause of action that may exist to enforce the Foreign Emoluments Clause.  Indeed, if Congress's right to consent is sufficient to bring Members of Congress within the zone of interests of the relevant constitutional provision, as Plaintiffs contend, then individual Members of Congress would also be able to sue States for alleged violations of the Dormant Commerce Clause, which clearly is not the law.  *See S. Pac. Co. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 769 (1945) ("[Congress] may . . . permit the states to regulate the commerce in a manner that would otherwise not be permissible . . . .").

774 F.3d 18, 25 n.8 (D.C. Cir. 2014).  Thus, it is no response to say that the Court could simply issue a declaratory judgment, if Plaintiffs are unable to identify a cause of action pursuant to which the Court has the power to enjoin the President.  At a minimum, this is an issue about which reasonable jurists could differ.

*Scope of the Foreign Emoluments Clause*.  The President's supplemental brief showed that there is substantial ground for difference of opinion concerning the correct interpretation of the term "Emolument" in part because this Court recognized that the definition advocated by the President also existed at the time of the Founding.  Def.'s Suppl. Br. at 10 (citing Apr. 30, 2019 Op. at 15).  Plaintiffs respond that they have stated a claim even under the President's definition, because the meaning of the terms "office" and "employ" encompasses "a person's trade, [or] business" and "private employment," which, according to plaintiffs, would cover profits from businesses in which the President has a financial interest.  Pls.' Opp'n at 19–20 (citation omitted).

But that has no bearing on whether interlocutory review over this dispute is appropriate.  To be sure, Plaintiffs are wrong to construe the terms "office" and "employ" in isolation rather than in context.  But the point for now is that reasonable jurists could find that the Clause's plain language only prohibits the acceptance of compensation for an official's "employ" *by a foreign government*.  *See* U.S. Const. art. I, § 9, cl. 8 (prohibiting acceptance of any "Emolument, Office, or Title . . . *from* [a foreign government]") (emphases added).  And as the historical practice indicates, that prohibition does not encompass profits from ordinary commercial transactions between a federal officer's private businesses and foreign government customers.  The issue is at least a novel one, and worthy of review before further proceedings.

*Original Public Meaning of "Emolument."*  Similarly, in demonstrating that reasonable minds could differ about which definition of "Emolument" was intended by the Framers, the President has cited an empirical analysis of tens of thousands of texts from 1760 to 1799, which found that where the recipient of the emolument is an officer, the narrower definition of emolument was the one overwhelmingly used.  Def.'s Suppl. Br. at 11 (citing James Phillips &

Sara White, *The Meaning of the Three Emoluments Clauses in the U.S. Constitution: A Corpus Linguistic Analysis of American English from 1760–1799*, 59 So. Texas L. Rev. 181, 224 (2017) ("Phillips & White Article")). Plaintiffs claim that the "weight of evidence from Founding-era dictionaries" is to the contrary. Pls.' Opp'n at 20. The source they cite in support, however, actually recognizes that "[l]inguists generally consider dictionaries an unreliable source for scientific research of actual usage" and are likely to result in "biased" results because, for example, dictionaries "generally reflected the ideas of a single author or were simply copied from other dictionaries." Brief of *Amici Curiae* Prof. Clark D. Cunningham and Prof. Jesse Egbert on Behalf of Neither Party at 9–10, *In re Donald Trump*, No. 18-2486 (4th Cir. Jan. 29, 2019), Doc No. 27. Moreover, the *amici*'s research does not demonstrate an "error infect[ing]" the Phillips & White Article, as Plaintiffs claim. Pls.' Opp'n at 20. The working paper underlying the *amici*'s Fourth Circuit brief explicitly acknowledged that the Phillips & White Article simply "used a different set of research methods" than that used by the *amici*.[4] Regardless, it is of little moment for present purposes that the parties continue to disagree on the question; the issue is whether reasonable jurists could disagree on this issue, which they undoubtedly could.

Plaintiffs also dispute the significance of the historical precedent of President George Washington purchasing several lots of public land from the federal government. Def.'s Suppl. Br. at 15. The President had urged that this precedent demonstrated that the Framers did not intend the term "Emolument" as used in the Constitution to extend to all benefits regardless of context. Plaintiffs now argue that this historical precedent is undermined by the fact that the Inspector General of the General Services Administration ("GSA") found evidence indicating that the lots of land purchased by Washington—which were "ceded to the United States for the

---

[4] *See* Clark D. Cunningham & Jesse Egbert, *Scientific Methods for Analyzing Original Meaning: Corpus Linguistics and the Emoluments Clauses*, at 7 n.31 (2019) http://www.clarkcunningham.org/JP/Emolument/Cunningham-Egbert-ScientificMethods-SSRN%20version.pdf.

District of Columbia," GSA Inspector General Report ("GSA Report"), ECF No. 63-1, App. A at 15—were "owned privately," Pls.' Opp'n at 21 (quoting GSA Report at 15); *see also* GSA Report, App. A, at 4.  The GSA report itself, however, describes the lots purchased by Washington as "public lots," stating that "[t]he six *public* lots that Washington purchased during his presidency appear to be among the lots that the proprietors donated for sale, in order to raise funds for the President's House (White House), the Capitol and other government buildings (and return a share of the proceeds to the proprietors)."  GSA Report, App. A at 4 (emphasis added). The Inspector General's view—which expressly did "not reach a definitive judgment," *id.* at 6— that the sales were private transactions apparently was based on her finding that "Maryland's cession of land for the new district ceded sovereignty to the United States . . . but not title to the land," and that the cession was not intended to "vest in the United States any right of property in the soil, as to affect the rights of individuals therein . . . ."  *Id.* at 4 (citation omitted).

Even assuming ambiguity about the title and ownership of the land donated to the United States by the landowners, there is no doubt that Washington benefited personally from the federal government through his purchase of the land donated to the United States.  The Commissioners were federally appointed and authorized by President Washington to conduct the public sale of the donated land, and they described the land as public property.[5]  They did not conduct the sale on behalf of the private landowners, and in fact, the landowners received no proceeds from the sale.

As President Washington explained to Thomas Jefferson about the agreement he reached in his capacity as President with the individual landowners, the land was "ceded to the public" except that "[t]he landholders [were] to have the use and profits of all their ground until the city

---

[5] *See* Certificate for Lots Purchased in the District of Columbia (Sept. 18, 1793), http://founders.archives.gov/documents/Washington/05-14-02-0074 ; *see also* 1 Stat. 130; Letter from Commissioners for the District of Columbia to George Washington (Sept. 16, 1793), https://founders.archives.gov/documents/Washington/05-14-02-0068 (seeking Washington's "permission to make sales of the publick property in the City of Washington").

is laid off into lots, and sale is made of those lots which, by this agreement, become *public property*."[6]   That is, the land sold by the D.C. Commissioners was land donated to the United States and was public property when purchased by Washington.  In addition, Washington stated that "the present Proprietors shall retain every other lot" beyond those ceded and would "be allowed at the rate of Twenty five pounds per acre" as payment "for such part of the land as may be taken for public use, for square, walks, &ca."[7]  Consistent with this understanding, one *amicus* has explained that although the Commissioners "did make certain payments to the landowners . . . , those payments were not [to pay] for auctioned land, such as the lots Washington bid on," but were for land appropriated for public use at £25 per acre, and "[n]o payments were made to the proprietors for the land that was sold at auction.  The proprietors gifted such land to the government in the expectation that their other properties in the new federal capital would become more valuable."[8]

In any event, the Court need not decide this disagreement as to the historical record. Again, for purposes of interlocutory appeal, it is enough that reasonable jurists could conclude that Washington received benefit from the federal government through the land sale transactions; that if Plaintiffs' interpretation of "Emolument" were correct, then Washington likely violated the Domestic Emoluments Clause; and that this historical precedent therefore casts doubt on Plaintiffs' interpretation.

**Purpose and Executive Branch Precedent.**  Plaintiffs also argue that their interpretation of the Foreign Emoluments Clause is the only possible one because it makes no sense for the Clause to prohibit federal officeholders from receiving small compensation from foreign governments for their services while allowing the President to purportedly receive millions of

---

[6] *See* Letter from George Washington to Thomas Jefferson (March 31, 1791), https://founders.archives.gov/documents/Washington/05-08-02-0019.

[7] *Id.*

[8] *See* Brief of *Amici Curiae* Scholar Seth Barrett Tillman and the Judicial Education Project at 8–10, *District of Columbia v. Trump*, No. 18-2488 (4th Cir. Jan. 31, 2019), Doc. No. 31-1.

dollars through businesses in which he has interests.  Pls.' Opp'n at 21.  But, again, as the President has already demonstrated, a reasonable jurist very well could conclude that the Framers intended the Clause to reach only specific categories of benefits that include the narrower definition of "Emolument," even with the modifier "any kind whatever."  *See Freeman* v. *Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012) (finding that although the word "any" "has an 'expansive meaning," it is not "transformative" and can "never change in the least, the clear meaning of the phrase selected by Congress here") (citation omitted).

This conclusion is reinforced by the absurd consequences that the President explained would flow from Plaintiffs' interpretation.  Plaintiffs attempt to address these consequences by arguing that "none of the President's hypothetical examples are at issue here," and that "there may be room for debate about the Clause's outer reaches."  Pls.' Opp'n at 22.  But Plaintiffs' concession that their interpretation does not work in some instances alone underscores that at the least, reasonable jurists could find that Plaintiffs' interpretation was not the one intended by the Framers.  Moreover, although Plaintiffs acknowledge that the Clause's scope is limited by the fact that a benefit is only prohibited if it is "accepted" "from" a foreign state, *id.*, Plaintiffs make no effort to explain how this helps them.  For example, Plaintiffs say nothing about how royalties on book sales to foreign governments would not, in their view, be emoluments "from" the government purchaser, given Plaintiffs' apparent view that the President's receipt of profits from businesses in which he has a financial interest is an acceptance by the President of emoluments "from" the businesses' government customers.

In sum, Plaintiffs' expansive position necessarily means that *no* federal officer can own *any* stock in *any* business that transacts business with *any* foreign governments, and that the President cannot own *any* bonds issued by *any* domestic governments (because the interest payments accepted from federal or municipal bonds would violate the Domestic Emoluments Clause).  Plaintiffs cannot escape the problems caused by the "outer reaches" of their interpretation by resorting to the purpose of the Clause because again, "no law pursues its purpose at all costs," and "the textual limitations upon a law's scope are no less a part of its

17

'purpose' than its substantive authorizations.'" Def.'s Suppl. Br. at 16 (quoting *Kucana v. Holder*, 558 U.S. 233, 252 (2010)). The hypothetical scenarios at least illustrate that reasonable minds can differ about the meaning of the Clause, and support addressing the question on interlocutory review now.

Finally, Plaintiffs accuse the President and undersigned counsel of mischaracterizing one of the Office of Legal Counsel ("OLC") opinions concerning law partner members of the Administrative Conference of the United States ("ACUS"). Pls.' Opp'n at 23. There is no mischaracterization. Regardless of the particular focus of the ACUS opinion, the opinion is distinguishable by the fact that law partners share a duty of loyalty to all of their firm's clients under legal ethics rules. Def.'s Suppl. Br. in Support of MTD at 17–18. Indeed, the relevance of an attorney's duty of loyalty in determining the applicability of the Foreign Emoluments Clause is demonstrated in a Comptroller General opinion that determined that retired military officers who were attorneys employed by or serving as "of counsel" to an incorporated law firm could not serve as legal counsel for a foreign government, despite the law firm's corporate structure. As the Comptroller General noted, under relevant state law, "an attorney's professional relationship with his clients remains unchanged notwithstanding the existence of a professional corporation," and, thus, the retired officers' law firm, even though a professional corporation, "differ[ed] significantly from ordinary business corporations." *Retired Marine Corps Officers*, B-217096, 1985 WL 52377, at *1, *4 (Comp. Gen. Mar. 11, 1985). In any event, this issue also is no impediment to certification for interlocutory review now.

## CONCLUSION

For the foregoing reasons, and the reasons provided in the President's prior § 1292(b) briefing and motion for a stay, the President respectfully requests the Court stay proceedings pending resolution of the President's § 1292(b) motion, certify both the Court's September 28, 2018 and April 30, 2019 Orders for interlocutory appeal, and stay proceedings pending appeal.

Dated:  May 28, 2019                     Respectfully submitted,

                                         JOSEPH H. HUNT
                                         Assistant Attorney General

                                         JAMES M. BURNHAM
                                         Deputy Assistant Attorney General

                                         JENNIFER D. RICKETTS
                                         Director, Federal Programs Branch

                                         ANTHONY J. COPPOLINO
                                         Deputy Director

                                         /s/ *Jean Lin*
                                         JEAN LIN
                                         Special Counsel
                                         JAMES R. POWERS
                                         BRADLEY HUMPHREYS
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Phone: (202) 514-3716
                                         Fax: (202) 616-8202
                                         Email: jean.lin@usdoj.gov