**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, *et al.*, <br><br>          *Plaintiffs*, <br><br>    v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, <br><br>          *Defendant*. | No. 17-cv-1154-EGS |

## <u>DEFENDANT'S NOTICE OF SUPPLEMENT AUTHORITY</u>

Defendant Donald J. Trump, President of the United States, hereby provides notice of the Supreme Court's recent decision in *Virginia House of Delegates v. Bethune-Hill*, No. 18-281 (U.S. June 17, 2019) (slip op.), which is relevant to the President's pending motion for certification for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), ECF Nos. 60, 71. A copy of the decision is attached to this notice. *See* Ex. A.

In *Bethune-Hill*, the Supreme Court held that one house of Virginia's General Assembly—there the Virginia House of Delegates—lacks standing to defend the constitutionality of a Virginia statute. The Court held that the Virginia Constitution's grant of lawmaking authority to the "General Assembly," of which the Virginia House of Delegates "constitutes only a part," means that the House of Delegates has no cognizable interest in litigation concerning the constitutionality of a state redistricting plan. Slip op. at 8; *see id*. at 7–10. Citing *Raines* v. *Byrd*, 521 U.S. 811, 819 (1997), the Court explained that "[j]ust as individual members lack standing to assert the institutional interests of a legislature . . . a single

House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole."  Slip op. at 8.

Similarly here, the Foreign Emoluments Clause empowers "Congress"—not individual Members of either House of Congress—to provide consent to the receipt of prohibited foreign Emoluments.    Therefore, *Bethune-Hill* teaches that even the House of Representatives or the Senate would not have standing to enforce the Foreign Emoluments Clause in this Court, let alone individual Members of Congress.

*Bethune-Hill* itself constitutes a basis to dismiss this lawsuit for lack of standing.  At a minimum, the decision demonstrates that there are substantial grounds for difference of opinion about Plaintiffs' standing to sue and that interlocutory review of the Court's order concerning Plaintiffs' standing is warranted.

Dated:  June 20, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JAMES M. BURNHAM
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

/s/ *James R. Powers*
JEAN LIN
Special Counsel
JAMES R. POWERS
BRADLEY P. HUMPHREYS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone: (202) 353-0543
Email: james.r.powers@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2019, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ *James R. Powers*
JAMES R. POWERS

# Exhibit A

(Slip Opinion)          OCTOBER  TERM,  2018                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VIRGINIA HOUSE OF DELEGATES ET AL. *v.* BETHUNE-HILL ET AL.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

No. 18–281.  Argued March 18, 2019—Decided June 17, 2019

After the 2010 census, Virginia redrew legislative districts for the State's Senate and House of Delegates.  Voters in 12 impacted House districts sued two state agencies and four election officials (collectively, State Defendants), charging that the redrawn districts were racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause.  The House of Delegates and its Speaker (collectively, the House) intervened as defendants, participating in the bench trial, on appeal to this Court, and at a second bench trial, where a three-judge District Court held that 11 of the districts were unconstitutionally drawn, enjoined Virginia from conducting elections for those districts before adoption of a new plan, and gave the General Assembly several months to adopt that plan.  Virginia's Attorney General announced that the State would not pursue an appeal to this Court.  The House, however, did file an appeal.

*Held*: The House lacks standing, either to represent the State's interests or in its own right.  Pp. 3–12.

   (a) To cross the standing threshold, a litigant must show (1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision.  *Hollingsworth* v. *Perry*, 570 U. S. 693, 704.  Standing must be met at every stage of the litigation, including on appeal.  *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64.  And as a jurisdictional requirement, standing cannot be waived or forfeited.  To appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing.  *Wittman* v. *Personhuballah*, 578 U. S. ___, ___.  Pp. 3–4.

   (b) The House lacks standing to represent the State's interests.

Syllabus

The State itself had standing to press this appeal, see *Diamond* v. *Charles*, 476 U. S. 54, 62, and could have designated agents to do so, *Hollingsworth*, 570 U. S., at 710. However, the State did not designate the House to represent its interests here. Under Virginia law, authority and responsibility for representing the State's interests in civil litigation rest exclusively with the State's Attorney General. Virginia state courts permitted the House to intervene to defend legislation in *Vesilind* v. *Virginia State Bd. of Elections*, 295 Va. 427, 813 S. E. 2d 739, but the House's participation in *Vesilind* occurred in the same defensive posture as did the House's participation in earlier phases of this case, when the House did not need to establish standing. Moreover, the House pointed to nothing in the *Vesilind* litigation suggesting that the Virginia courts understood the House to be representing the interests of the State itself. *Karcher* v. *May*, 484 U. S. 72, distinguished. Throughout this litigation, the House has purported to represent only its own interests. The House thus lacks authority to displace Virginia's Attorney General as the State's representative. Pp. 4–7.

(c) The House also lacks standing to pursue this appeal in its own right. This Court has never held that a judicial decision invalidating a state law as unconstitutional inflicts a discrete, cognizable injury on each organ of government that participated in the law's passage. Virginia's Constitution allocates redistricting authority to the "General Assembly," of which the House constitutes only a part. That fact distinguishes this case from *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ___, where Arizona's House and Senate—*acting together*—had standing to challenge the constitutionality of a referendum that gave redistricting authority exclusively to an independent commission. The Arizona referendum was also assailed on the ground that it *permanently* deprived the legislative plaintiffs of their role in the redistricting process, while the order challenged here does not alter the General Assembly's dominant initiating and ongoing redistricting role. *Coleman* v. *Miller*, 307 U. S. 433, also does not aid the House here, where the issue is the constitutionality of a concededly enacted redistricting plan, not the results of a legislative chamber's poll or the validity of any counted or uncounted vote. Redrawing district lines indeed may affect the chamber's membership, but the House as an institution has no cognizable interest in the identity of its members. The House has no prerogative to select its own members. It is a representative body composed of members chosen by the people. Changes in its membership brought about by the voting public thus inflict no cognizable injury on the House. *Sixty-seventh Minnesota State Senate* v. *Beens*, 406 U. S. 187, distinguished. Nor does a court order causing legisla-

Syllabus

tors to seek reelection in districts different from those they currently represent affect the House's representational nature.  Legislative districts change frequently, and the Virginia Constitution guards against representational confusion by providing that delegates continue to represent the districts that elected them, even if their reelection campaigns will be waged in different districts.  In short, the State of Virginia would rather stop than fight on.  One House of its bicameral legislature cannot alone continue the litigation against the will of its partners in the legislative process.  Pp. 7–12.

Appeal dismissed.  Reported below: 326 F. Supp. 3d 128.

   GINSBURG, J., delivered the opinion of the Court, in which THOMAS, SOTOMAYOR, KAGAN, and GORSUCH, JJ., joined.  ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and BREYER and KAVANAUGH, JJ., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–281

_____

## VIRGINIA HOUSE OF DELEGATES, ET AL., APPELLANTS *v.* GOLDEN BETHUNE-HILL, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA

[June 17, 2019]

JUSTICE GINSBURG delivered the opinion of the Court.

The Court resolves in this opinion a question of standing to appeal. In 2011, after the 2010 census, Virginia redrew legislative districts for the State's Senate and House of Delegates. Voters in 12 of the impacted House districts sued two Virginia state agencies and four election officials (collectively, State Defendants) charging that the redrawn districts were racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. The Virginia House of Delegates and its Speaker (collectively, the House) intervened as defendants and carried the laboring oar in urging the constitutionality of the challenged districts at a bench trial, see *Bethune-Hill* v. *Virginia State Bd. of Elections*, 141 F. Supp. 3d 505 (ED Va. 2015), on appeal to this Court, see *Bethune-Hill* v. *Virginia State Bd. of Elections*, 580 U. S. ___ (2017), and at a second bench trial. In June 2018, after the second bench trial, a three-judge District Court in the Eastern District of Virginia, dividing 2 to 1, held that in 11 of the districts "the [S]tate ha[d] [unconstitutionally] sorted voters . . . based on the color of their skin." *Bethune-Hill* v. *Virginia*

*State Bd. of Elections*, 326 F. Supp. 3d 128, 180 (2018). The court therefore enjoined Virginia "from conducting any elections . . . for the office of Delegate . . . in the Challenged Districts until a new redistricting plan is adopted." *Id.*, at 227. Recognizing the General Assembly's "primary jurisdiction" over redistricting, the District Court gave the General Assembly approximately four months to "adop[t] a new redistricting plan that eliminate[d] the constitutional infirmity." *Ibid.*

A few weeks after the three-judge District Court's ruling, Virginia's Attorney General announced, both publicly and in a filing with the District Court, that the State would not pursue an appeal to this Court. Continuing the litigation, the Attorney General concluded, "would not be in the best interest of the Commonwealth or its citizens." Defendants' Opposition to Intervenor-Defendants' Motion to Stay Injunction Pending Appeal Under 28 U. S. C. §1253 in No. 3:14–cv–852 (ED Va.), Doc. 246, p. 1. The House, however, filed an appeal to this Court, App. to Juris. Statement 357–358, which the State Defendants moved to dismiss for want of standing. We postponed probable jurisdiction, 586 U. S. ___ (2018), and now grant the State Defendants' motion. The House, we hold, lacks authority to displace Virginia's Attorney General as representative of the State. We further hold that the House, as a single chamber of a bicameral legislature, has no standing to appeal the invalidation of the redistricting plan separately from the State of which it is a part.[1]

---

[1] After the General Assembly failed to enact a new redistricting plan within the four months allowed by the District Court, that court entered a remedial order delineating districts for the 2019 election. The House has noticed an appeal to this Court from that order as well, and the State Defendants have moved to dismiss the follow-on appeal for lack of standing. See *Virginia House of Delegates* v. *Bethune-Hill*, No. 18–1134. In the appeal from the remedial order, the House and the State Defendants largely repeat the arguments on standing earlier

Opinion of the Court

## I

To reach the merits of a case, an Article III court must have jurisdiction. "One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth* v. *Perry*, 570 U. S. 693, 704 (2013). The three elements of standing, this Court has reiterated, are (1) a concrete and particularized injury, that (2) is fairly traceable to the challenged conduct, and (3) is likely to be redressed by a favorable decision. *Ibid.* (citing *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992)). Although rulings on standing often turn on a plaintiff's stake in initially filing suit, "Article III demands that an 'actual controversy' persist throughout all stages of litigation." *Hollingsworth*, 570 U. S., at 705 (quoting *Already, LLC* v. *Nike, Inc.*, 568 U. S. 85, 90–91 (2013)). The standing requirement therefore "must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 64 (1997). As a jurisdictional requirement, standing to litigate cannot be waived or forfeited. And when standing is questioned by a court or an opposing party, the litigant invoking the court's jurisdiction must do more than simply allege a nonobvious harm. See *Wittman* v. *Personhuballah*, 578 U. S. ___, ___–___ (2016) (slip op., at 5–6). To cross the standing threshold, the litigant must explain how the elements essential to standing are met.

Before the District Court, the House participated in both bench trials as an intervenor in support of the State Defendants. And in the prior appeal to this Court, the House participated as an appellee. Because neither role entailed

---

advanced in this appeal. The House's claim to standing to pursue an appeal from the remedial order fares no better than its assertion of standing here. See *post*, p. ___.

invoking a court's jurisdiction, it was not previously incumbent on the House to demonstrate its standing. That situation changed when the House alone endeavored to appeal from the District Court's order holding 11 districts unconstitutional, thereby seeking to invoke this Court's jurisdiction. As the Court has repeatedly recognized, to appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing. *Wittman*, 578 U. S. ___; *Diamond* v. *Charles*, 476 U. S. 54 (1986). We find unconvincing the House's arguments that it has standing, either to represent the State's interests or in its own right.

## II

### A

The House urges first that it has standing to represent the State's interests. Of course, "a State has standing to defend the constitutionality of its statute." *Id.*, at 62. No doubt, then, the State itself could press this appeal. And, as this Court has held, "a State must be able to designate agents to represent it in federal court." *Hollingsworth*, 570 U. S., at 710. So if the State had designated the House to represent its interests, and if the House had in fact carried out that mission, we would agree that the House could stand in for the State. Neither precondition, however, is met here.

To begin with, the House has not identified any legal basis for its claimed authority to litigate on the State's behalf. Authority and responsibility for representing the State's interests in civil litigation, Virginia law prescribes, rest exclusively with the State's Attorney General:

> "All legal service in civil matters for the Commonwealth, the Governor, and every state department, institution, division, commission, board, bureau, agency, entity, official, court, or judge . . . shall be rendered and performed by the Attorney General, except as

Opinion of the Court

provided in this chapter and except for [certain judicial misconduct proceedings]."  Va. Code Ann. §2.2–507(A) (2017).[2]

Virginia has thus chosen to speak as a sovereign entity with a single voice.  In this regard, the State has adopted an approach resembling that of the Federal Government, which "centraliz[es]" the decision whether to seek certiorari by "reserving litigation in this Court to the Attorney General and the Solicitor General."  *United States* v. *Providence Journal Co.*, 485 U. S. 693, 706 (1988) (dismissing a writ of certiorari sought by a special prosecutor without authorization from the Solicitor General); see 28 U. S. C. §518(a); 28 CFR §0.20(a) (2018).  Virginia, had it so chosen, could have authorized the House to litigate on the State's behalf, either generally or in a defined class of cases.  *Hollingsworth*, 570 U. S., at 710.  Some States have done just that.  Indiana, for example, empowers "[t]he House of Representatives and Senate of the Indiana General Assembly . . . to employ attorneys other than the Attorney General to defend any law enacted creating legislative or congressional districts for the State of Indiana."  Ind. Code §2–3–8–1 (2011).  But the choice belongs to Virginia, and the House's argument that it has authority to represent the State's interests is foreclosed by the State's contrary decision.

The House observes that Virginia state courts have permitted it to intervene to defend legislation.  But the sole case the House cites on this point—*Vesilind* v. *Virginia State Bd. of Elections*, 295 Va. 427, 813 S. E. 2d 739

_____

[2]The exceptions referenced in the statute's text are inapposite here. They include circumstances where, "in the opinion of the Attorney General, it is impracticable or uneconomical for [the] legal service to be rendered by him or one of his assistants," or where the Virginia Supreme Court or any of its justices are litigating matters "arising out of [that court's] official duties."  §2.2–507(C).

Opinion of the Court

(2018)—does not bear the weight the House would place upon it. In *Vesilind*, the House intervened in support of *defendants* in the trial court, and continued to *defend* the trial court's favorable judgment on appeal. *Id.,* at 433–434, 813 S. E. 2d, at 742. The House's participation in *Vesilind* thus occurred in the same defensive posture as did the House's participation in earlier phases of this case, when the House did not need to establish standing. Moreover, the House has pointed to nothing in the Virginia courts' decisions in the *Vesilind* litigation suggesting that the courts understood the House to be representing the interests of the State itself.

Nonetheless, the House insists, this Court's decision in *Karcher* v. *May*, 484 U. S. 72 (1987), dictates that we treat *Vesilind* as establishing conclusively the House's authority to litigate on the State's behalf. True, in *Karcher*, the Court noted a record, similar to that in *Vesilind*, of litigation by state legislative bodies in state court, and concluded without extensive explanation that "the New Jersey Legislature had authority under state law to represent the State's interests . . . ." 484 U. S., at 82. Of crucial significance, however, the Court in *Karcher* noted no New Jersey statutory provision akin to Virginia's law vesting the Attorney General with exclusive authority to speak for the Commonwealth in civil litigation. *Karcher* therefore scarcely impels the conclusion that, despite Virginia's clear enactment making the Attorney General the State's sole representative in civil litigation, Virginia has designated the House as its agent to assert the State's interests in this Court.

Moreover, even if, contrary to the governing statute, we indulged the assumption that Virginia had authorized the House to represent the State's interests, as a factual matter the House never indicated in the District Court that it was appearing in that capacity. Throughout this litigation, the House has purported to represent its own inter-

ests. Thus, in its motion to intervene, the House observed
that it was "the legislative body that actually drew the
redistricting plan at issue," and argued that the existing
parties—including the State Defendants—could not ade-
quately protect its interests. App. 2965–2967. Nowhere
in its motion did the House suggest it was intervening as
agent of the State. That silence undermines the House's
attempt to proceed before us on behalf of the State. As
another portion of the Court's *Karcher* decision clarifies, a
party may not wear on appeal a hat different from the one
it wore at trial. 484 U. S., at 78 (parties may not appeal in
particular capacities "unless the record shows that they
participated in those capacities below").[3]

## B

The House also maintains that, even if it lacks standing
to pursue this appeal as the State's agent, it has standing
in its own right. To support standing, an injury must be
"legally and judicially cognizable." *Raines* v. *Byrd*, 521
U. S. 811, 819 (1997). This Court has never held that a
judicial decision invalidating a state law as unconstitu-
tional inflicts a discrete, cognizable injury on each organ of
government that participated in the law's passage. The
Court's precedent thus lends no support for the notion that
one House of a bicameral legislature, resting solely on its
role in the legislative process, may appeal on its own
behalf a judgment invalidating a state enactment.

Seeking to demonstrate its asserted injury, the House

———————

[3] Nor can we give ear to the House's assertion that forfeiture or ac-
quiescence bar the State Defendants from contesting the House's
authority to represent the State's interests. See Brief for Appellants
29–30. As earlier observed, standing to sue (or appeal) is a nonwaiv-
able jurisdictional requirement. See *supra*, at 3. Moreover, even if
forfeiture were not beyond the pale, the State Defendants here could
hardly be held to have relinquished an objection to the House's partici-
pation in a capacity—on behalf of the State itself—in which the House
was not participating in the District Court.

emphasizes its role in enacting redistricting legislation in particular.  The House observes that, under Virginia law, "members of the Senate and of the House of Delegates of the General Assembly shall be elected from electoral districts established by the General Assembly."   Va. Const., Art. 2, §6.  The House has standing, it contends, because it is "the legislative body that actually drew the redistricting plan," and because, the House asserts, any remedial order will transfer redistricting authority from it to the District Court.  Brief for Appellants 23, 26–28 (internal quotation marks omitted).  But the Virginia constitutional provision the House cites allocates redistricting authority to the "General Assembly," of which the House constitutes only a part.

That fact distinguishes this case from *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ___ (2015), in which the Court recognized the standing of the Arizona House and Senate—*acting together*—to challenge a referendum that gave redistricting authority exclusively to an independent commission, thereby allegedly usurping the legislature's authority under the Federal Constitution over congressional redistricting.  In contrast to this case, in *Arizona State Legislature* there was no mismatch between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assigned exclusive redistricting authority.  See 576 U. S., at ___–___ (slip op., at 11–12).  Just as individual members lack standing to assert the institutional interests of a legislature, see *Raines*, 521 U. S., at 829,[4] a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole.

Moreover, in *Arizona State Legislature*, the challenged

—————

[4] *Raines* held that individual Members of Congress lacked standing to challenge the Line Item Veto Act.

referendum was assailed on the ground that it *permanently* deprived the legislative plaintiffs of their role in the redistricting process. Here, by contrast, the challenged order does not alter the General Assembly's dominant initiating and ongoing role in redistricting. Compare *Arizona State Legislature*, 576 U. S., at ___ (slip op., at 14) (allegation of nullification of "any vote by the Legislature, now or in the future, purporting to adopt a redistricting plan" (internal quotation marks omitted)), with 326 F. Supp. 3d, at 227 (recognizing the General Assembly's "primary jurisdiction" over redistricting and giving the General Assembly first crack at enacting a revised redistricting plan).[5]

Nor does *Coleman* v. *Miller*, 307 U. S. 433 (1939), aid the House. There, the Court recognized the standing of 20 state legislators who voted against a resolution ratifying the proposed Child Labor Amendment to the Federal Constitution. *Id.,* at 446. The resolution passed, the opposing legislators stated, only because the Lieutenant Governor cast a tie-breaking vote—a procedure the legislators argued was impermissible under Article V of the Federal Constitution. See *Arizona State Legislature*, 576 U. S., at ___–___ (slip op., at 13–14) (citing *Coleman*, 307 U. S., at 446). As the Court has since observed, *Coleman* stands "at most" "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on

_____

[5]Misplaced for similar reasons is the House's reliance on this Court's statements in *INS* v. *Chadha*, 462 U. S. 919, 929–931, and nn. 5–6, 939–940 (1983), that the United States House and Senate were "proper parties" or "adverse parties." First, it is far from clear that the Court meant those terms to refer to standing, as opposed to the simple fact that both Houses of Congress had intervened. In any event, the statute at issue in *Chadha* granted *each* Chamber of Congress an *ongoing* power—to veto certain Executive Branch decisions—that each House could exercise independent of any other body.

10        VIRGINIA HOUSE OF DELEGATES *v.* BETHUNE-HILL

Opinion of the Court

the ground that their votes have been completely nulli-
fied." *Raines*, 521 U. S., at 823. Nothing of that sort
happened here. Unlike *Coleman*, this case does not con-
cern the results of a legislative chamber's poll or the valid-
ity of any counted or uncounted vote. At issue here, in-
stead, is the constitutionality of a concededly enacted
redistricting plan. As we have already explained, a single
House of a bicameral legislature generally lacks standing
to appeal in cases of this order.

Aside from its role in enacting the invalidated redistrict-
ing plan, the House, echoed by the dissent, see *post*, at
1–5, asserts that the House has standing because altered
district boundaries may affect its composition. For sup-
port, the House and the dissent rely on *Sixty-seventh
Minnesota State Senate* v. *Beens*, 406 U. S. 187 (1972) (*per
curiam*), in which this Court allowed the Minnesota Sen-
ate to challenge a District Court malapportionment litiga-
tion order that reduced the Senate's size from 67 to 35
members. The Court said in *Beens*: "[C]ertainly the [Min-
nesota Senate] is directly affected by the District Court's
orders," rendering the Senate "an appropriate legal entity
for purpose of intervention and, as a consequence, of an
appeal in a case of this kind." *Id.,* at 194.

*Beens* predated this Court's decisions in *Diamond* v.
*Charles* and other cases holding that intervenor status
alone is insufficient to establish standing to appeal.
Whether *Beens* established law on the question of stand-
ing, as distinct from intervention, is thus less than pellu-
cid. But even assuming, *arguendo*, that *Beens* was, and
remains, binding precedent on standing, the order there at
issue injured the Minnesota Senate in a way the order
challenged here does not injure the Virginia House. Cut-
ting the size of a legislative chamber in half would neces-
sarily alter its day-to-day operations. Among other things,
leadership selection, committee structures, and voting
rules would likely require alteration. By contrast, al-

Opinion of the Court

though redrawing district lines indeed may affect the membership of the chamber, the House as an institution has no cognizable interest in the identity of its members.[6] Although the House urges that changes to district lines will "profoundly disrupt its day-to-day operations," Reply Brief 3, it is scarcely obvious how or why that is so. As the party invoking this Court's jurisdiction, the House bears the burden of doing more than "simply alleg[ing] a nonobvious harm." *Wittman*, 578 U. S., at ___ (slip op., at 6).

Analogizing to "group[s] other than a legislative body," the dissent insists that the House has suffered an "obvious" injury. *Post*, at 3. But groups like the string quartet and basketball team posited by the dissent select their own members. Similarly, the political parties involved in the cases the dissent cites, see *post*, at 3, n. 1 (citing *New York State Bd. of Elections* v. *Lopez Torres*, 552 U. S. 196, 202 (2008), and *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 229–230 (1989)), select their own leadership and candidates. In stark contrast, the House does not select its own members. Instead, it is a representative body composed of members chosen by the people. Changes to its membership brought about by the voting public thus inflict no cognizable injury on the House.[7]

The House additionally asserts injury from the creation of what it calls "divided constituencies," suggesting that a

---

[6] The dissent urges that changes to district lines will alter the House's future legislative output. See *post*, at 1–5. A legislative chamber as an institution, however, suffers no legally cognizable injury from changes to the *content* of legislation its future members may elect to enact. By contrast, the House has an obvious institutional interest in the *manner* in which it goes about its business.

[7] The dissent further suggests that "we must assume that the districting plan enacted by the legislature embodies the House's judgment" regarding the best way to select its members. *Post*, at 4. For the reasons explained *supra*, at 7–10, however, the House's role in the legislative process does not give it standing to pursue this appeal.

Opinion of the Court

court order causing legislators to seek reelection in districts different from those they currently represent affects the House's representational nature.    But legislative districts change frequently—indeed, after every decennial census—and the Virginia Constitution resolves any confusion over which district is being represented.   It provides that delegates continue to represent the districts that elected them, even if their reelection campaigns will be waged in different districts.   Va. Const., Art. 2, §6 ("A member in office at the time that a decennial redistricting law is enacted shall complete his term of office and shall continue to represent the district from which he was elected for the duration of such term of office . . . ."). We see little reason why the same would not hold true after districting changes caused by judicial decisions, and we thus foresee no representational confusion. And if harms centered on costlier or more difficult election campaigns are cognizable—a question that, as in *Wittman*, 578 U. S., at ___–___ (slip op., at 5–6), we need not decide today—those harms would be suffered by individual legislators or candidates, not by the House as a body.

In short, Virginia would rather stop than fight on.  One House of its bicameral legislature cannot alone continue the litigation against the will of its partners in the legislative process.

*      *      *

For the reasons stated, we dismiss the House's appeal for lack of jurisdiction.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–281

_____

## VIRGINIA HOUSE OF DELEGATES, ET AL., APPELLANTS *v.* GOLDEN BETHUNE-HILL, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

[June 17, 2019]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE BREYER, and JUSTICE KAVANAUGH join, dissenting.

I would hold that the Virginia House of Delegates has standing to take this appeal. The Court disagrees for two reasons: first, because Virginia law does not authorize the House to defend the invalidated redistricting plan on behalf of the Commonwealth, see *ante,* at 4–7, and, second, because the imposition of the District Court's districting plan would not cause the House the kind of harm required by Article III of the Constitution, see *ante,* at 7–12. I am convinced that the second holding is wrong and therefore will not address the first.

I

Our decision in *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560 (1992), identified the three elements that constitute the "irreducible constitutional minimum of standing" demanded by Article III. A party invoking the jurisdiction of a federal court must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc.* v. *Robins,* 578 U. S. ___, ___ (2016) (slip op., at 6). The Virginia House of Delegates satisfies all those requirements in this case.

I begin with "injury in fact." It is clear, in my judgment,

that the new districting plan ordered by the lower court will harm the House in a very fundamental way. A legislative districting plan powerfully affects a legislative body's output of work. Each legislator represents a particular district, and each district contains a particular set of constituents with particular interests and views. Cf., *e.g.*, App. 165 (noting the "varied factors that can create or contribute to communities of interest" in districts (House Committee on Privileges and Elections resolution)). The interests and views of these constituents generally have an important effect on everything that a legislator does—meeting with the representatives of organizations and groups seeking the legislator's help in one way or another, drafting and sponsoring bills, pushing for and participating in hearings, writing or approving reports, and of course, voting. When the boundaries of a district are changed, the constituents and communities of interest present within the district are altered, and this is likely to change the way in which the district's representative does his or her work. And while every individual voter will end up being represented by a legislator no matter which districting plan is ultimately used, it matters a lot how voters with shared interests and views are concentrated or split up. The cumulative effects of all the decisions that go into a districting plan have an important impact on the overall work of the body.

All of this should really go without saying. After all, it is precisely because of the connections between the way districts are drawn, the composition of a legislature, and the things that a legislature does that so much effort is invested in drawing, contesting, and defending districting plans. Districting matters because it has institutional and legislative consequences. To suggest otherwise, to argue that substituting one plan for another has no effect on the work or output of the legislative body whose districts are changed, would really be quite astounding. If the selection

ALITO, J., dissenting

of a districting plan did not alter what the legislative body does, why would there be such pitched battles over redistricting efforts?

What the Court says on this point is striking.  According to the Court, "the House as an institution has no cognizable interest in the identity of its members," and thus suffers no injury from the imposition of a districting plan that "may affect the membership of the chamber" or the "content of legislation its future members may elect to enact."  *Ante*, at 11, and n. 6 (emphasis deleted).  Really? It seems obvious that any group consisting of members who must work together to achieve the group's aims has a keen interest in the identity of its members, and it follows that the group also has a strong interest in how its members are selected.  And what is more important to such a group than the content of its work?

Apply what the Court says to a group other than a legislative body and it is immediately obvious that the Court is wrong.  Does a string quartet have an interest in the identity of its cellist?  Does a basketball team have an interest in the identity of its point guard?  Does a board of directors have an interest in the identity of its chairperson?  Does it matter to these groups how their members are selected?  Do these groups care if the selection method affects their performance?  Of course.

The Virginia House of Delegates exists for a purpose: to represent and serve the interests of the people of the Commonwealth.  The way in which its members are selected has a powerful effect on how it goes about this purpose[1]—a proposition reflected by the Commonwealth's choice to mandate certain districting criteria in its consti-

_____

[1] The Court has not hesitated to recognize this link in other contexts. See, *e.g.*, *New York State Bd. of Elections* v. *Lopez Torres*, 552 U. S. 196, 202 (2008); *Eu* v. *San Francisco County Democratic Central Comm.*, 489 U. S. 214, 229–230 (1989).

4        VIRGINIA HOUSE OF DELEGATES *v.* BETHUNE-HILL

ALITO, J., dissenting

tution. See Va. Const., Art. II, §6. As far as the House's standing, we must assume that the districting plan enacted by the legislature embodies the House's judgment regarding the method of selecting members that best enables it to serve the people of the Commonwealth. (Whether this is a permissible judgment is a merits question, not a question of standing. Cf. *Warth* v. *Seldin*, 422 U. S. 490, 502 (1975)). It therefore follows that discarding that plan and substituting another inflicts injury in fact.

Our most pertinent precedent supports the standing of the House on this ground. In *Sixty-seventh Minnesota State Senate* v. *Beens*, 406 U. S. 187 (1972) (*per curiam*), we held that the Minnesota Senate had standing to appeal a district court order reapportioning the Senate's seats. In reaching that conclusion, we noted that "certainly" such an order "directly affected" the Senate. *Id.*, at 194. The same is true here. There can be no doubt that the new districting plan "directly affect[s]" the House whose districts it redefines and whose legislatively drawn districts have been replaced with a court-ordered map. That the *Beens* Court drew its "directly affect[s]" language from a case involving a standard reapportionment challenge, see *Silver* v. *Jordan*, 241 F. Supp. 576, 579 (SD Cal. 1964) (*per curiam*), aff'd, 381 U. S. 415 (1965) (*per curiam*), only serves to confirm that the House's injury is sufficient to demonstrate standing under *Beens*.

In an effort to distinguish *Beens*, it is argued that the District Court decision at issue there, which slashed the number of senators in half, "ha[d] a distinct and more direct effect on the body itself than a mere shift in district lines." Brief for United States as *Amicus Curiae* 17; see Brief for State Appellees 38. But even if the effect of the court order was greater in *Beens* than it is here, it is the existence—not the extent—of an injury that matters for purposes of Article III standing.

The Court suggests that the effects of the court-ordered

ALITO, J., dissenting

districting plan in *Beens* were different from the effects of the plan now before us because the former concerned the legislature's internal operations. See *ante*, at 10–11. But even if the imposition of the court-ordered plan in this case would not affect the internal operations of the House (and that is by no means clear), it is very strange to think that changes to such things as "committee structures" and "voting rules," see *ante*, at 10, are more important than changes in legislative output.

In short, the invalidation of the House's redistricting plan and its replacement with a court-ordered map would cause the House to suffer a "concrete" injury. And as Article III demands, see *Spokeo*, 578 U. S., at ___–___ (slip op., at 6–7), that injury would also be "particularized" (because it would target the House); "imminent" (because it would certainly occur if this appeal is dismissed); "traceable" to the imposition of the new, court-ordered plan; and "redress[able]" by the relief the House seeks here. *Ibid.*

## II

Although the opinion of the Court begins by citing the three fundamental Article III standing requirements just discussed, see *ante*, at 3, it is revealing that the Court never asserts that the effect of the court-ordered plan at issue would not cause the House "concrete" harm. Instead, the Court claims only that any harm would not be "'judicially cognizable,'" *ante*, at 7; see also *ante*, at 11. The Court lifts this term from *Raines* v. *Byrd*, 521 U. S. 811, 819 (1997), where the Court held that individual Members of *Congress* lacked standing to challenge the constitutionality of the Line Item Veto Act. But the decision in *Raines* rested heavily on federal separation-of-powers concerns, which are notably absent here. See *id.*, at 819–820, 826–829; *id.*, at 832–835 (Souter, J., concurring in judgment). And although the Court does not say so

6      VIRGINIA HOUSE OF DELEGATES *v.* BETHUNE-HILL

ALITO, J., dissenting

expressly, what I take from its use of the term "judicially cognizable" injury rather than "concrete" injury is that the decision here is not really based on the *Lujan* factors, which set out the "irreducible" minimum demanded by Article III. 504 U. S., at 560. Instead, the argument seems to be that the House's injury is insufficient for some other, only-hinted-at reason.

Both the United States, appearing as an *amicus*, and the Commonwealth of Virginia are more explicit. The Solicitor General's brief argues as follows:

> "In the federal system, the Constitution gives Congress only 'legislative Powers,' U. S. Const. Art. 1, §1, and the 'power to seek judicial relief . . . cannot possibly be regarded as merely in aid of the legislative function.' *Buckley* v. *Valeo*, 424 U. S. 1, 138 (1976) (per curiam). As a result, 'once Congress makes its choice in enacting legislation, its participation ends.' *Bowsher* v. *Synar*, 478 U. S. 714, 733 (1986). . . . *The same is true here.* A branch of a state government that makes rather than enforces the law does not itself have a cognizable Article III interest in the defense of its laws." Brief for United States as *Amicus Curiae* 14–15 (emphasis added).

The Virginia Solicitor General makes a similar argument. See Brief for State Appellees 42–44.

These arguments are seriously flawed because the States are under no obligation to follow the Federal Constitution's model when it comes to the separation of powers. See *Whalen* v. *United States*, 445 U. S. 684, 689, n. 4 (1980); cf. *Raines*, *supra*, at 824, n. 8; *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ___, ___, n. 12 (2015) (slip op., at 14, n. 12). If one House of Congress or one or more Members of Congress attempt to invoke the power of a federal court, the court must consider whether this attempt is consistent with the

ALITO, J., dissenting

structure created by the Federal Constitution.  An interest asserted by a Member of Congress or by one or both Houses of Congress that is inconsistent with that structure may not be judicially cognizable.  But I do not see how we can say anything similar about the standing of state legislators or state legislative bodies.[2]  Cf. *Karcher* v. *May*, 484 U. S. 72, 81–82 (1987).  The separation of powers (or the lack thereof) under a state constitution is purely a matter of state law, and neither the Court nor the Virginia Solicitor General has provided any support for the proposition that Virginia law bars the House from defending, in its own right, the constitutionality of a districting plan.

\*     \*     \*

For these reasons, I would hold that the House of Delegates has standing, and I therefore respectfully dissent.

_____

[2] The Court's observation that the Virginia Constitution gives legislative districting authority to the General Assembly as a whole—in other words, to the House of Delegates and the Senate in combination—does not answer the question.  To start, a similar argument against standing was pressed and rejected in *Sixty-seventh Minnesota State Senate* v. *Beens*, 406 U. S. 187 (1972) (*per curiam*), see Motion of Appellees to Dismiss Appeal in O. T. 1971, No. 71–1024, p. 9, and the Court does not explain why a different outcome is warranted here.  Nor am I persuaded by the Court's citation of *Arizona State Legislature* v. *Arizona Independent Redistricting Comm'n*, 576 U. S. ___ (2015).  There, the Court held that the Arizona Legislature had standing to bring a suit aimed at protecting its redistricting authority.  But from the fact that a whole legislature may have standing to defend its redistricting authority, it does not follow that the House necessarily lacks standing to challenge a redistricting decision based on concrete injuries to its institutional interests.  Cf. *Spokeo, Inc.* v. *Robins*, 578 U. S. ___, ___, n. 7 (2016) (slip op., at 8, n. 7).