IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Senator RICHARD BLUMENTHAL, et al.,<br><br>                Plaintiffs,<br>v.<br><br>DONALD J. TRUMP,<br>in his official capacity as President of the United States of America,<br><br>                Defendant. | No. 17 Civ. 1154-EGS |

**BRIEF OF SCHOLAR SETH BARRETT TILLMAN AND JUDICIAL EDUCATION PROJECT AS *AMICI CURIAE* IN SUPPORT OF THE DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF HIS MOTION PURSUANT TO 28 U.S.C. § 1292(b) FOR CERTIFICATION OF THE COURT'S DENIAL OF MOTION TO DISMISS AND DEFENDANT'S MOTION TO STAY**

Robert W. Ray, Esq.
D.C. Bar No. 401377
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3347
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus*
*Curiae Scholar Seth Barrett Tillman*

Carrie Severino, Esq.
D.C. Bar No. 982084
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

Josh Blackman
   District Court Admission pending
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@joshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

**Table of Contents**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 1

I. Washington's Practices were Inconsistent with the Court's Broad Definition of Emolument ................................................................................................................ 1

    A. Washington Engaged in "Private Business Pursuits . . . With [a] Foreign State-Chartered" Corporation ................................................................. 2

    B. Washington Derived "Advantages" From Business Transactions With The Federal Government .................................................................................. 4

    C. Washington Accepted Valuable Gifts From Foreign Governments ....................... 6

II. The Court Erred in not Deciding Whether the Foreign Emoluments Clause Applies to the President ............................................................................................................ 7

III. The Official Capacity Claim Fails the Causation and Redressability Elements Of Article III Standing ................................................................................................. 9

CONCLUSION ....................................................................................................................... 9

# INTRODUCTION

Scholar Seth Barrett Tillman and the Judicial Education Project ("*Amici*") submit this brief in support of Defendant's supplemental brief pursuant to 28 U.S.C. § 1292(b). Certification is warranted for three reasons. First, "substantial ground for difference of opinion" exists with respect to the meaning of the term emolument. Specifically, this Court did not consider evidence in the record concerning how George Washington understood the term emolument. Second, the Court declined to make an essential *jurisdictional* determination of whether the President is subject to the Foreign Emoluments Clause. Third, "substantial ground for difference of opinion" exists with respect to whether an official-capacity claim can proceed in this case.

# ARGUMENT

## I. Washington's Practices were Inconsistent with the Court's Broad Definition of Emolument

The Court concluded that "the great weight of the historical interpretation" supports a broad definition of the term emolument: "any profit, gain, or advantage." The Court did consider a "single incident" that supports a narrow definition of emolument: in 1793, President Washington purchased public land from the federal government at a public auction. Under the Court's definition of emolument, President Washington openly violated the Domestic Emoluments Clause. Under DOJ's and *Amici*'s more narrow definition of emolument, President Washington acted lawfully.

Respectfully, there are at least four other incidents that bear on Washington's understanding of the term emolument. First, during the Revolutionary War, then-General Washington accepted dividends from the Bank of England, a foreign state-chartered trading company. Second, President Washington purchased additional public land from the federal government at another public auction in 1794. Third and fourth, President Washington accepted two valuable gifts from the French government and its officials. Under the Court's definition of emolument, Washington

1

would have openly flouted the Articles of Confederation, the Domestic Emoluments Clause, and the Foreign Emoluments Clause, respectively.

For the Court to be correct, President Washington would have had to break supreme law on at least five public instances, when none of his critics raised any objections. Courts should hesitate before asserting that President Washington "did not understand" the Constitution he helped to define.[1] The better position is that the Court's understanding of an emolument as "any profit, gain, or advantage" was not shared by Washington, several Founders who were his successors, and their contemporaries in the Early Republic. At a minimum, reasonable jurists would disagree about the proper construction of the Foreign Emoluments Clause, a provision the federal courts have only recently begun to interpret. Certification under § 1292, therefore, is warranted.

### A. Washington Engaged in "Private Business Pursuits . . . With [a] Foreign State-Chartered" Corporation

DOJ, like *Amici*, rejects the broad definition of emolument, which embraces "private commercial transactions with a foreign state."[2] To support this more narrow construction, DOJ observed that several Presidents during the Early Republic—including Washington, Jefferson, Madison, and Monroe—"were plantation owners" who, during their time in office, "export[ed] cash crops overseas."[3] DOJ asked the Court to draw an inference from this established commercial practice to inform the original public meaning of emolument: "that some of the early Presidents' private business pursuits would have been with foreign state-chartered trading companies."[4] And if such transactions occurred, then the Court should not presume that these Presidents openly

---

[1] Freytag v. C.I.R., 501 U.S. 868, 917–18 (1991) (Scalia, J., concurring). *See* Tillman District Court Brief, ECF No. 16-1, at 20 n.7 (citing Akhil Reed Amar, *America's Unwritten Constitution* 209, 308 (2015) ("Washington defined the archetypical presidential role," and "[a]s America's first 'first man,' [he] set precedents from his earliest moments on the job.")).
[2] Mot. to Dismiss, ECF No. 15-1, at 30.
[3] *Id.* at 28–29.
[4] Slip op. at 25; *id.* at 23; *see also* DOJ Reply, ECF No. 28, at 29.

flouted the Constitution. Accordingly, the argument goes, the Court should reject the Plaintiffs' broad interpretation of emolument that would, in effect, indict our founding presidents as crooks. The Court declined to draw this inference because "the President has provided no evidence to justify making such an inference."[5]

There is substantial evidence to support the inference that Washington, for one, did not view "private business pursuits . . . with foreign state-chartered trading companies" as emoluments. During the Revolutionary War, George Washington owned stock in, and received dividends from, the Bank of England.[6] This foreign corporation received its charter by operation of an act of the English Parliament: the Tonnage Act of 1694.[7] The Bank of England, which was analogous to the first Bank of the United States,[8] served as the private banker for the British Exchequer.[9] More importantly, the Bank of England was analogous to the foreign government "instrumentalit[ies]" that Plaintiffs allege Trump-affiliated commercial entities are doing business with.[10]

At the relevant times, the Articles of Confederation governed our young republic. That charter included a Foreign Emoluments Clause, which provided "[N]or shall any person holding any office of profit or trust under the United States, or any of them [i.e., any State], accept of any present, emolument, office or title of any kind whatever from any King, Prince or foreign State . . . ."[11] Furthermore, the Continental Congress had chosen Washington as the commander-in-chief

---

[5] Slip op. at 25.
[6] *See* Bryan Jones, *The Farming Game* 151 (1982); Eugene E. Prussing, *George Washington, Captain of Industry/The Bank of England Stock—The Bank of the United States*, 70(5) Scribner's Mag. 549, 554, 556–57 (Nov. 1921); *see also* Sol Bloom, *Our Heritage: George Washington and the Establishment of the American Union* 210 (1944); Thomas Bayard McCabe, *Central Banking's Role in Our Free Enterprise Society* 17 (1951).
[7] Robert J. Reinstein, *The Limits of Congressional Power*, 89 Temp. L. Rev. 1, 11 n.53 (2016).
[8] *See* Ron Chernow, *Alexander Hamilton* 347 (2004).
[9] *See Our History*, Bank of England, https://perma.cc/B7FQ-Y5QA; *see also* Robert E. Wright, *The Wealth of Nations Rediscovered* 13 (2002).
[10] *See* Plaintiffs' Amend. Comp. ECF No. 14, at ¶¶ 56, 59, 62, 65, Part VI/Prayer For Relief.
[11] Articles of Confederation of 1781, art. VI, para. 1. Textually, the Confederation provision was very similar to the Foreign Emoluments Clause now in force under the United States Constitution. *Accord* U.S. Const. art. I, § 9, cl. 8 ("[N]o Person holding any Office of Profit or Trust under them [i.e., the United States], shall, without the Consent of

3

of the nation's armed forces. As an appointed military officer, he held an "office . . . under the United States," and could not "accept of any . . . emolument" from a "foreign State."

If the Court's analysis were correct, then General Washington would not have been permitted to accept distributions—a "profit, gain, or advantage"—from the Bank of England, a "foreign state-chartered . . . company." But he did. Nor was Washington a passive beneficiary of bank-related benefits. For example, throughout the Revolution, Washington's personal London representatives, at his instructions, transferred such monies out of the Bank of England, to make payments to his creditors.[12] Thus Washington was not a mere passive recipient of automatic distributions; rather, he made timely use of sophisticated foreign commercial agents who actively "accept[ed]" dividend income on his behalf during the war. After peace was made, Washington took action to close the account and to repatriate the funds from the Bank of England account.[13]

*Amici* know of no evidence that any contemporaries or that any subsequent historians or legal scholars suggested that these transactions violated established law. This absence of debate reaffirms DOJ's position that "substantial ground for difference of opinion" exists with respect to how Washington, and those in the early Republic, understood the term emolument. The better reading is that during the Founding era, an emolument was tied to lawfully authorized office-related or employment-related compensation.

**B.    Washington Derived "Advantages" From Business Transactions With The Federal Government**

George Washington's practices *after* the ratification of the Constitution lend further support to DOJ and *Amici*'s position. Specifically, President Washington purchased public land from

---

the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.").
[12] *See* Bloom, *supra* note 6, at 210; Letter from George Washington to Robert Cary & Co (May 1, 1759), Founders Online, https://tinyurl.com/yy3arfaf.
[13] *See* Bloom, *supra* note 6, at 210; Prussing, *supra* note 6, at 556.

4

the federal government. Under the Court's definition of emolument, this land would be a "profit, gain, or advantage" from the federal government. However, the Court stopped short of asserting that President Washington violated the Domestic Emoluments Clause. Instead, the Court "decline[d] to infer that [DOJ's] narrow definition should be adopted based on President Washington's purchase of public land, potentially in violation of the Domestic Emoluments Clause, given this was a *single* incident as compared with the great weight of the historical interpretation of the Clause."[14] The Court added that "the facts regarding this transaction are 'seriously incomplete.'"[15] Respectfully, the Court erred in two regards.

First, there was not a "single incident." Indeed, *Plaintiffs* submitted substantial supplemental authority to the contrary.[16] The Office of Inspector General of the General Services Administration explained that there were two chronologically *separate* land transactions.[17] In 1793, Washington purchased land in square 667. And in 1794, he bought two further lots of land in square 21.[18]

Second, the record concerning Washington's land transactions is quite thorough. In a brief submitted to the United States Court of Appeals for the Fourth Circuit, *Amici* explained how Judge Peter J. Messitte—whom this Court favorably cited—erred when he asserted that "the surrounding facts [relating to the 1793 auction] . . . are seriously incomplete."[19] In short, there was an open auction with oral bids. Six months prior to the auction, it had been advertised in a newspaper in

---

[14] Slip op. at 25–26 (emphasis added).
[15] *Id.* (quoting D.C. v. Trump, 315 F. Supp. 3d 875, 903–904 (D. Md. 2018) (Messitte, J.)).
[16] *See* Plaintiffs' Notice of Supplemental Authority, ECF No. 63.
[17] *See generally Evaluation of GSA's Management and Administration of the Old Post Office Building Lease*, Office of Inspections/Office of Inspector General/U.S. General Services Administration, JE19–002, at App'x A, at 4 & n.22 (Jan. 16, 2019).
[18] *Id.*; *see also* Letter from George Washington to the Commissioners for the District of Columbia (June 1, 1794), Founders Online, https://perma.cc/3FLV-4Z6L; *id.* (editor's footnote 2).
[19] Brief of *Amici Curiae* Scholar Seth Barrett Tillman and the Judicial Education Project in Support of Defendant-Appellant at 5–10, D.C. v. Trump, No. 18-2488 (4th Cir. Jan. 31, 2019), ECF No. 31-1, http://bit.ly/2VwqLgb.

Philadelphia—then America's commercial capital and its former national capital. There were some eighteen bidders. These conclusions were well supported by primary documents and good secondary authorities. This Court's factual errors concerning the land transactions further support certification under § 1292.[20]

### C. Washington Accepted Valuable Gifts From Foreign Governments

If the Court is correct that an "emolument" includes "any profit, gain, or advantage," and that the President is subject to the Foreign Emoluments Clause, then the clause also prohibits the President from accepting diplomatic gifts and other presents from foreign states without congressional consent. Yet, the Court did not address *Amici*'s substantial evidence concerning such foreign gifts associated with President Washington and other founders who succeeded him as President during the Early Republic.[21] One such gift—a valuable gold-leafed framed full-length portrait of Louis XVI—was authorized by the French government as a diplomatic gift,[22] and then put into the hands of its ambassador to the United States, Ternant, who gifted it to President Washington. Washington put this gift on public display at the time—all without congressional consent. It was even recorded in diplomatic correspondence of third countries.[23]

---

[20] *See* Josh Blackman & Seth Barrett Tillman, *Who was right about the Emoluments Clauses? Judge Messitte or President Washington?*, Volokh Conspiracy (Aug. 3, 2018), https://perma.cc/FD4D-QR9D.

[21] *See* Brief for Scholar Seth Barrett Tillman and the Judicial Education Project as *Amici Curiae* in Support of the Defendant at 18–22, Blumenthal v. Trump, Civ. A. No. 1:17-cv-01154-EGS (D.D.C. Sept. 19, 2017), ECF No. 16-1 (redocketed at ECF No. 40), http://bit.ly/2JvOOdV.

[22] William B. Adair, *A Masterpiece of Artisanship*, Picture Framing Magazine, Aug. 2010, at 28 ("Originally an official diplomatic gift from the King of France, it was presented by the first French Ambassador to America, Jean Baptiste Ternant, to George Washington in December 1791."); *id*. at 31 (describing the frame and portrait as part of an ambassadorial "kit"); William Adair, *George Washington's Frames: A Study in Contrasts*, Picture Framing Magazine, June 1992, at 34 ("This majestic frame was commissioned by the King for a print given to Washington by the French Ambassador in 1791."); *id*. at 35 (same).

[23] *See, e.g.*, S.W. Jackman, *A Young Englishman Reports on the New Nation: Edward Thornton to James Bland Burges, 1791–1793*, 18(1) Wm. & Mary Q. (3d ser.) 85, 108, 121 (Jan. 1961) (reporting British diplomatic correspondence discussing the LaFayette gifts & the Ternant portrait); *see also, e.g.*, 3 Moncure Daniel Conway, *The Life of Thomas Paine, 1791–1804* (New York, G.P. Putnam's Sons 1895) (reporting correspondence from French minister in the United States to his home government discussing the LaFayette gifts).

Under the Court's broad definition of emolument, valuable diplomatic gifts—such as the framed full-length portrait of Louis XVI—are squarely encompassed by the Foreign Emoluments Clause. It follows that under the Court's holding, Washington acted unconstitutionally. Yet, no one at the time objected in the press, in private correspondence, or in Congress, even among anti-administration members. Furthermore, subsequent commentators, historians, and legal scholars raised no concerns about these gifts until litigation against President Trump began.

In sum, it was error to reduce Washington's practices to a "single incident," when there were several land transactions, and several diplomatic gifts at issue, as well as similar incidents among Washington's successors. The existence of this full historical record, which the Court did not consider, strongly favors certification. While later-in-time practices can form a *gloss*—that is, to expand—constitutional powers, these modern practices cannot contract, or prevent future actors from adhering to the original governmental practice.[24]

## II. The Court Erred in not Deciding Whether the Foreign Emoluments Clause Applies to the President

The Court found that a cause of action can be implied from the Foreign Emoluments Clause. If this position is correct—and *Amici* do not think it is—then the Court failed to make a necessary finding: that the President is subject to the Foreign Emoluments Clause. The Court declined to reach this issue:

---

[24] *Compare McPherson v. Blacker*, 146 U.S. 1, 35–36 (1892) (holding that later-in-time practice regarding state-wide election of electors did not nullify original practice of district-only election) *with NLRB v. Noel Canning*, 573 U.S. 513, 525–26 (2014) (holding that later-in-time practice regarding recess-appointments expanded upon original governmental practice). *See also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 497 (2010) ("Perhaps an individual President might find advantages in tying his own hands. But the separation of powers does not depend on the views of individual Presidents."); *cf. Clinton v. City of N.Y.*, 524 U.S. 417, 451–52 (1998) (Kennedy, J., concurring) ("It is no answer, of course, to say that Congress surrendered its authority by its own hand . . . . Abdication of responsibility is not part of the constitutional design."). *See generally* Josh Blackman, *Defiance and Surrender*, 59 So. Texas L. Rev. 157, 164–165 (2018).

> The parties do not dispute that the [Foreign Emoluments] Clause applies to the President. *See generally* Mot. to Dismiss, ECF No. 15-1; Pls.' Opp'n, ECF No. 17; Def.'s Reply ("Reply"), ECF No. 28. The Court therefore declines to reach the question despite the argument to the contrary of one *amicus* brief and based on Judge Peter J. Messitte's persuasive analysis of that argument and conclusion that the Clause does indeed apply to the President in the only other judicial opinion construing the Clause.[25]

Respectfully, the Court erred here, and it has done so in regard to a nonwaivable issue: subject matter jurisdiction. Questions of subject matter jurisdiction cannot be waived by the parties. Rather, "a [federal] court must always assure itself of its subject-matter jurisdiction regardless of whether a party has raised a challenge."[26]

The Court found that there is an "implied cause of action in the Foreign Emoluments Clause," and that this provision empowers the court to "exercise its equitable discretion to enjoin allegedly unconstitutional action by the President."[27] In effect, the Foreign Emoluments Clause provides *both* the cause of action, and the jurisdictional basis for the Court to issue a remedy. The Court's power to hear the dispute is founded *entirely* on the Foreign Emoluments Clause. That clause only reaches those holding "office . . . under the United States." A finding that the President holds such an office is essential to the Court's jurisdictional framework. At a minimum, to satisfy itself of jurisdiction, this Court should expressly decide whether, in fact, the President is subject to the Foreign Emoluments Clause and its operative "office . . . under the United States" language.[28]

---

[25] Slip op. at 8 n.3.
[26] *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018).
[27] Slip op. at 40.
[28] *See* Tillman Brief, *supra* note 21 (arguing that the President is not subject to the Foreign Emoluments Clause).

8

### III. The Official Capacity Claim Fails the Causation and Redressability Elements Of Article III Standing

*Amici* previously explained that "this suit cannot be an 'official capacity' suit."[29] The *sine qua non* of an official capacity suit is that a government "'policy or custom' *must* have played a part in the violation of federal law."[30] The Plaintiffs do not allege that any governmental policy played any role—much less *caused*—the purported violation of the Foreign Emoluments Clause.

Furthermore, Plaintiffs' official capacity claim cannot satisfy the causation element of Article III's standing requirement.[31] Because the United States as sovereign—the actual defendant—took no actions to violate the Constitution, and because all the alleged constitutional wrongs were done by Trump-affiliated *private* commercial entities or by Trump as a private citizen, the Court cannot order the sovereign to take any corrective action. The alleged injuries cannot be redressed by any order running against the official capacity defendant: the government of the United States. Therefore, this claim fails the redressability element of Article III.[32] At bottom, the Plaintiffs lack standing to sue the President in his official capacity for quintessentially private conduct.

The Court failed to consider these jurisdictional issues. Moreover, there is "substantial ground for difference of opinion" on these questions. Judge Peter J. Messitte, whom this Court favorably cited, recognized that an individual-capacity claim against the President may have merit.[33]

### CONCLUSION

For the foregoing reasons, *Amici* respectfully request that DOJ's motion should be granted.

---

[29] *Id.* at 22 n.89.
[30] *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (emphasis added) (citations omitted).
[31] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).
[32] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citations omitted).
[33] Order, D.C. v. Trump, Civ. A. No. 8:17-cv-1596-PJM (D. Md. Dec. 17, 2018) (Messitte, J.), ECF No. 150 (asking the parties to "address the questions of whether the Court can dismiss *without prejudice* the claims against President Trump in his individual capacity, and if so, whether it should do so." (emphasis added)). The fact that the claims would be dismissed without prejudice suggests that at some later juncture those claims could be litigated.

9

Dated: New York, New York
May 21, 2019

Respectfully submitted,

By: /s/ Robert W. Ray
Robert W. Ray
D.C. Bar No. 401377
THOMPSON & KNIGHT LLP
900 Third Avenue, 20th Floor
New York, New York 10022
Telephone: (212) 751-3349
Email: robert.ray@tklaw.com
*Co-Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Josh Blackman
   District Court Admission pending
1303 San Jacinto Street
Houston, Texas 77002
Telephone: (202) 294-9003
Email: Josh@JoshBlackman.com
*Counsel for Amicus Curiae*
*Scholar Seth Barrett Tillman*

Carrie Severino
D.C. Bar No. 982084
Judicial Education Project
722 12th St., N.W., Fourth Floor
Washington, D.C. 20005
Telephone: (571) 357-3134
Email: carrie@judicialnetwork.com
*Counsel for Amicus Curiae*
*Judicial Education Project*

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2019 I caused a true and correct copy of the foregoing to be served on all counsel of record through the Court's CM/ECF system.

/s/ Robert W. Ray
Robert W. Ray, Esq.
