**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 19-____**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

In re DONALD J. TRUMP, in his official capacity
as President of the United States,

Petitioner.

———————————————

## PETITION FOR A WRIT OF MANDAMUS TO THE UNITED STATES
## DISTRICT COURT FOR THE DISTRICT OF COLUMBIA AND
## MOTION FOR STAY OF DISTRICT COURT PROCEEDINGS
## PENDING MANDAMUS

———————————————

JOSEPH H. HUNT
  *Assistant Attorney General*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
MARTIN TOTARO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5374*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT............................................1

STATEMENT.................................................................................................................5

ARGUMENT .................................................................................................................9

I.    THE PRESIDENT HAS A CLEAR AND INDISPUTABLE RIGHT
TO RELIEF ....................................................................................................9

    A.    The district court's standing holding was clearly and
indisputably incorrect ...................................................................9

    B.    The district court's cause-of-action holding was clearly
and indisputably incorrect.........................................................19

    C.    The district court's Foreign Emoluments Clause holding
was clearly and indisputably incorrect ...................................23

II.    MANDAMUS IS APPROPRIATE IN THIS EXTRAORDINARY
CASE .............................................................................................................24

III.    THIS COURT SHOULD STAY DISCTRICT COURT PROCEEDINGS
PENDING ITS CONSIDERATION OF THIS PETITION ...................28

CONCLUSION ...........................................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Ali v. Rumsfeld*,
   649 F.3d 762 (D.C. Cir. 2011) ........................................................................21

*Allen v. Wright*,
   468 U.S. 737 (1984) .......................................................................................12

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
   135 S. Ct. 2652 (2015) ...................................................................................17

*Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) ...................................................................................19

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .....................................................................................12, 15

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) .......................................... 11, 14, 15, 16, 17, 18

*Cheney v. United States Dist. Court for D.C.*,
   542 U.S. 367 (2004) ......................................... 2, 5, 9, 24, 25, 26, 27

*Chenoweth v. Clinton*,
   181 F.3d 112 (D.C. Cir. 1999) .................................................................11, 14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .......................................................................................12

*Clinton v. Jones*,
   520 U.S. 681 (1997) .......................................................................................25

*Coleman v. Miller*,
   307 U.S. 433 (1939) .......................................................................................16

*Douglas v. Independent Living Ctr. of S. Cal., Inc.*,
   565 U.S. 606 (2012) .......................................................................................20

*Fernandez-Roque v. Smith,*
   671 F.2d 426 (11th Cir. 1982) ...............................................................27

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ................................................................... 3, 21

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) .................................................................... 19, 20

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
   527 U.S. 308 (1999) ..................................................................... 3, 19

*Halo Elecs., Inc. v. Pulse Elecs., Inc.,*
   136 S. Ct. 1923 (2016) ..........................................................................27

*Harrington v. Bush,*
   553 F.2d 190 (D.C. Cir. 1977) ............................................................17

*In re Kellogg Brown & Root, Inc.,*
   756 F.3d 754 (D.C. Cir. 2014) ............................................................28

*Lexmark Int'l, Inc. v. Static Components, Inc.,*
   572 U.S. 118 (2014) ..............................................................................22

*Michigan Corrs. Org. v. Michigan Dep't of Corrs.,*
   774 F.3d 895 (6th Cir. 2014) ....................................................... 19, 20

*Mississippi v. Johnson,*
   71 U.S. 475 (1867) ....................................................................... 21, 22

*Natural Res. Def. Council, Inc. v. Hodel,*
   865 F.2d 288 (D.C. Cir. 1988) ............................................................15

*Newdow v. Roberts,*
   603 F.3d 1002 (D.C. Cir. 2010) ..........................................................21

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ..............................................................................21

*Nken v. Holder,*
   556 U.S. 418 (2009) ..............................................................................28

*In re Papandreou,*
    139 F.3d 247 (D.C. Cir. 1998) .............................................................25

*Raines v. Byrd,*
    521 U.S. 811 (1997) ....................................2, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18

*In re Sealed Case No. 98-3077,*
    151 F.3d 1059 (D.C. Cir. 1998) ......................................................... 25, 28

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ...........................................................21

*United States v. Richardson,*
    418 U.S. 166 (1974) ......................................................................23

*United States v. Windsor,*
    570 U.S. 744 (2013) ................................................................. 15, 16

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ......................................................................22

*Virginia House of Delegates v. Bethune-Hill,*
    139 S. Ct. 1945 (2019) ............................................ 2, 11, 12, 14, 15, 17, 18

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) .............................................................. 3, 19

**U.S. Constitution:**

Art. I:
    § 5, cl. 4 .................................................................................13
    § 6, cl. 2 .................................................................................24
    § 9, cl. 8 ..................................................................................5
    § 10, cl. 2 ...............................................................................13
    § 10, cl. 3 ...............................................................................13

Art. II, § 1, cl. 7 ..................................................................... 6, 24

**Statutes:**

28 U.S.C. § 1292(b) ................................................................................................ 1, 8

28 U.S.C. § 1651 ....................................................................................................... 1

28 U.S.C. § 1651(a) ................................................................................................... 9

**Rule:**

Fed. R. App. P. 21 ..................................................................................................... 1

## INTRODUCTION AND SUMMARY OF ARGUMENT

In this extraordinary case, individual Members of Congress have brought suit directly under the Constitution against the President of the United States for alleged violations of the Foreign Emoluments Clause.  The Members' complaint rests on a host of novel and flawed constitutional premises—including an assertion of legislator standing that is flatly foreclosed by a Supreme Court decision issued last month—and litigating the claims would entail intrusive discovery into the President's personal financial affairs on account of his federal office.  Despite this remarkable complaint, the district court treated this case as a run-of-the-mill commercial dispute.  Not only did it deny the President's motion to dismiss, but it refused even to certify for immediate appeal under 28 U.S.C. § 1292(b) its orders denying dismissal:  without disputing that there are substantial legal grounds for disagreeing with its refusal to dismiss the case, the court simply held that an interlocutory appeal would not materially advance the termination of the litigation because it intended to provide for an expeditious schedule of discovery and summary judgment briefing.  In so ruling, the court ignored the unique separation-of-powers concerns posed by discovery in a case against the President in his official capacity.

Pursuant to 28 U.S.C. § 1651 and Federal Rule of Appellate Procedure 21, the government respectfully requests that this Court issue a writ of mandamus directing the district court to dismiss the complaint outright or, at a minimum, to certify for interlocutory appeal pursuant to section 1292(b) the court's September 28, 2018, and

April 30, 2019, orders denying the President's motion to dismiss.  In addition, the government respectfully requests that this Court promptly stay district-court proceedings pending disposition of this petition, as the Fourth Circuit has done in a parallel case, *In re Trump*, No. 18-2486 (4th Cir. Dec. 20, 2018).

A party seeking mandamus must demonstrate that it has a "clear and indisputable" right, there are "no other adequate means" of relief, and the writ is otherwise "appropriate under the circumstances."  *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004).  Each of those requirements is easily satisfied in this case.

The district court's failure to dismiss the complaint for lack of Article III standing was clear and indisputable legal error.  The Supreme Court held in *Raines v. Byrd*, 521 U.S. 811 (1997), that federal legislators generally lack Article III standing to sue to enforce the asserted institutional interests of Congress.  Since then, neither that Court nor this one has found standing on the part of Congress, much less individual Members, to sue the Executive.  And just last month, the Supreme Court held in *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), that one branch of a state legislature lacked standing to appeal a federal court's invalidation of a state law governing redistricting even though it affected the legislature's own composition; the Court reasoned that, where the interest asserted is shared by the entire legislature, Article III requires at a minimum that any suit be brought by the legislature itself— not an amalgam of individual legislators or even a single chamber of a bicameral body.

Assuming Article III would permit a suit by the legislative branch at all, that principle applies here *a fortiori*:  a minority of Members of Congress clearly lack standing to vindicate an alleged interest in the President's compliance with the Foreign Emoluments Clause that is based merely on the ability of Congress as a whole to provide consent for the President's acceptance of otherwise-prohibited Emoluments. Indeed, the district court ignored *Bethune-Hill* even though the government promptly brought that decision to its attention while the motion for section 1292(b) certification was pending.

Equally indefensible was the district court's decision to infer a novel equitable cause of action to enforce the Foreign Emoluments Clause against the President of the United States.  Judicially inferring a cause of action that goes beyond traditional equitable practice is a "significant step under separation-of-powers principles," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017), because "Congress is in a much better position than [the courts] to . . . design the appropriate remedy" for a legal injury, *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 322 (1999).  That is particularly true when a plaintiff seeks to infer an equitable cause of action directly against the President, who is not subject to suit in his official capacity even under statutory causes of action absent an "express statement by Congress," given his unique position in our constitutional structure.  *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).  And all the more so because the plaintiffs here are legislators who lack cognizable interests protected by the Clause, which imposes a prophylactic

requirement to prevent foreign corruption of official action.  The district court's contrary holding that the President may be subject to an injunction or declaratory judgment at the behest of the Members improperly minimized all of these separation-of-powers concerns.

The district court also clearly erred in interpreting the Foreign Emoluments Clause.  Below, the President explained that the text, structure, and history of the Constitution's Emoluments Clauses demonstrate that the term "Emolument" therein refers only to compensation accepted from a foreign or domestic government for services rendered by an officer in either an official capacity or employment-type relationship.  The district court's contrary construction of the term "Emolument," which would broadly encompass any "profit, gain, or advantage," renders parts of the constitutional text superfluous and is contradicted by unbroken executive practice from the Founding era to modern times.  On mandamus, this Court need not resolve this merits issue given the obvious threshold defects with the Members' suit.  But the district court's interpretive error underscores that this suit is fatally flawed.

Mandamus is appropriate in these circumstances to correct such fundamental errors.  The President has no other adequate means of obtaining relief.  If the district court's clearly erroneous orders are allowed to stand, this improper suit will proceed and the Members will commence discovery aimed at probing the President's personal financial affairs because he holds federal office.  Indeed, that discovery, the Members acknowledge, may be directed at the President himself, "distract[ing] [him] from the

energetic performance of [his] constitutional duties." *Cheney*, 542 U.S. at 382.  As the Supreme Court has stressed, the "high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Id.* at 385 (alteration in original).  And that is particularly true where, as here, the discovery that the Members envision seeks to end-run the process of seeking information if there is a legitimate legislative interest, through a congressional subpoena.  Mandamus is appropriate in light of these separation-of-powers concerns with the requested discovery and the indisputable futility of the underlying suit.

For essentially the same reasons, the government also requests that the Court promptly stay further district-court proceedings pending consideration of this mandamus petition.  The Members have already propounded thirty-seven subpoenas to third parties.  Those requests require a response by July 29, 2019, and the government respectfully requests that, by July 22, 2019, this Court grant a stay of proceedings, as the Fourth Circuit has done in a parallel Emoluments suit.

## STATEMENT

**A.**  The Foreign Emoluments Clause provides that "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  U.S. Const. art. I, § 9, cl. 8.  Although not directly at issue here, the Domestic

5

Emoluments Clause provides that "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." *Id.* art. II, § 1, cl. 7.

**B.**   Plaintiffs are 215 Members of Congress who sued the President in his official capacity on June 14, 2017.  The Members allege that, "[s]ince taking office, [the President] has accepted, or necessarily will accept, numerous emoluments from foreign states."  Add. 138, 172 (Second Am. Compl. ¶¶ 1, 77).  They allege that the President owns hundreds of businesses in the United States and in at least twenty foreign countries, and that he violates the Foreign Emoluments Clause whenever such businesses receive "any monetary or nonmonetary benefit . . . from a foreign state without first obtaining 'the Consent of the Congress.'" Add. 139, 155 (Second Am. Compl. ¶¶ 6, 34).  The Members assert that these alleged violations injure them because they are denied an "opportunity to cast a binding vote that gives or withholds their 'Consent' before the President . . . accepts a foreign 'Emolument.'" Add. 171-72 (Second Am. Compl. ¶ 76).  They seek a declaration that the President has violated the Foreign Emoluments Clause and an injunction prohibiting him from accepting foreign Emoluments without first obtaining congressional consent.  Add. 175-76 (Second Am. Compl. 57-58).

**C.**   The government moved to dismiss the Members' complaint for lack of jurisdiction and for failure to state a claim on which relief could be granted.  The district court bifurcated its motion-to-dismiss proceedings.  On September 28, 2018, it held that the Members had Article III standing to bring this suit.  Add. 4.  It reasoned that legislators have standing to allege that their votes have been "completely nullified," Add. 17 (quoting *Raines*, 521 U.S. at 823), and that the Members' votes were so nullified due to the President's alleged acceptance of "prohibited foreign emoluments as though Congress had provided its consent," Add. 32.  The government promptly moved to certify an interlocutory appeal of that order on October 22, 2018.

On April 30, 2019, the district court denied the remainder of the motion to dismiss.  Add. 59.  As to the Members' cause of action, the court held that it is proper to imply a right of action to protect any "right[] safeguarded by the Constitution unless there is a reason not to do so."  Add. 99 (quotation marks omitted).  The court further rejected the government's argument that relief was unavailable directly against the President, concluding that an injunction could properly be entered against the President because compliance with the Emoluments Clauses is a mere "ministerial duty."  Add. 105.  The court also determined that the Members fall within the Foreign Emoluments Clause's zone of interests because "the only way the Clause can achieve its purpose" is if Congress is permitted to vote on the receipt of Emoluments.  Add. 100.  As to the meaning of the Foreign Emoluments Clause, the district court ruled

7

that the term "Emolument" meant any "profit, gain, or advantage," a definition that encompassed the Members' factual allegations.  Add. 94.  The government moved to certify an interlocutory appeal of that order on May 14, 2019.

On June 25, 2019, the district court denied certification of its two orders.  Add. 107.  The court reasoned only that, because the issues in this case could "be resolved on cross motions for summary judgment" after expeditious discovery and summary-judgment briefing, the government did not satisfy section 1292(b)'s requirement that interlocutory appeal "materially advance the ultimate termination of the litigation." Add. 112-16 (quoting 28 U.S.C. § 1292(b)).  The court did not dispute the existence under section 1292 of multiple "controlling" questions as to which there is, at the very least, "substantial ground for difference of opinion."  Indeed, the court did not address at all the relative merits of its orders denying the government's motion to dismiss.

**D.**  The Members' pre-discovery statement makes clear that they may seek what they assert will be "limited" discovery from the President.  Dkt. No. 75, at 2-3. That discovery may include attempts to obtain "the President's financial documents." *Id.* at 3.  Moreover, while the Members assert that they "plan to focus discovery" on third parties, even that discovery would concern the financial interests of the President on account of his office, in order to "determine whether President Trump is currently receiving funds" from his business enterprises attributable to proceeds from foreign governmental customers.  *Id.* at 2-3.

On June 25, the district court entered a discovery schedule contemplating three months of fact discovery. To date, the Members have propounded thirty-seven third-party subpoenas. The subpoena recipients are required to respond by July 29, 2019.

## ARGUMENT

An appellate court has the power under 28 U.S.C. § 1651(a) to issue a writ of mandamus directing the conduct of a district court where (1) the petitioner has a "clear and indisputable" right to relief; (2) there are "no other adequate means to attain the relief"; and (3) mandamus relief is otherwise "appropriate under the circumstances." *Cheney v. United States Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004). Although the standard for mandamus is, and should be, a high one, it is satisfied in the extraordinary circumstances presented here.

## I.   THE PRESIDENT HAS A CLEAR AND INDISPUTABLE RIGHT TO RELIEF.

### A.   The district court's standing holding was clearly and indisputably incorrect.

**1.**  In *Raines v. Byrd*, 521 U.S. 811 (1997), six Members of Congress who had unsuccessfully opposed the Line Item Veto Act brought suit following its enactment seeking to declare the Act unconstitutional. *Id.* at 814-16. The *Raines* plaintiffs contended that the Act had injured them by "alter[ing] the legal and practical effect of [their] votes" and "divest[ing] [them] of their constitutional role in the repeal of legislation." *Id.* at 816. The Supreme Court held that the plaintiff legislators lacked a judicially cognizable injury under Article III. *Id.* at 818, 829-30. After noting that the

Members had not asserted any "*personal injury*"—that is, harm suffered in a "private capacity"—the Court explained that the Members' institutional injury was not judicially cognizable.  *Id.* at 818-19, 821.

Most important to that institutional-injury analysis, the Court emphasized the absence of any "historical practice" supporting the legislators' suit.  *Raines*, 521 U.S. at 826.  "It is evident from several episodes in our history," the Court observed, "that in analogous confrontations between one or both Houses of Congress and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power."  *Id.*  The fact that past Congresses and Presidents never resorted to the courts to resolve these and other inter-branch disputes underscored that the *Raines* plaintiffs' suit was not one "traditionally thought to be capable of resolution through the judicial process."  *Id.* at 819.

*Raines* also noted two other factors militating against the plaintiffs' standing. First, the Court "attach[ed] some importance to the fact that [the plaintiffs] have not been authorized to represent their respective Houses of Congress in this action."  521 U.S. at 829.  The Court observed that Congress's powers are "not vested in any one individual, but in the aggregate of the members who compose the body," *id.* at 829 n.10, and reaffirmed that "[g]enerally speaking, members of collegial bodies do not have standing to [take litigative actions] the body itself has declined to take," *id.* Second, the Court highlighted that the plaintiffs had "adequate remed[ies]" through the legislative process that would entirely address their injuries, provided that they

10

could persuade a majority of their colleagues to agree. *Id.* at 829. For instance, Congress could "repeal the Act or exempt appropriations bills from its reach." *Id.*

After *Raines*, this Court has twice rejected claims of standing by federal legislators. *See Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000); *Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999). On both occasions, this Court reaffirmed that *Raines* generally forecloses such suits, and emphasized the narrowness of any possible exception. *Campbell*, 203 F.3d at 20-22; *Chenoweth*, 181 F.3d at 113-14. This Court also emphasized that *Raines* abrogated its prior precedent on legislative standing. *Chenoweth*, 181 F.3d at 113-15.

In *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), the Supreme Court applied *Raines* to hold that one chamber of Virginia's bicameral legislature lacked standing to appeal to defend a state redistricting plan affecting the composition of the legislature itself. *Id.* at 1952-55. The Virginia House of Delegates argued that it had standing because Virginia's constitution allocates the authority to establish "electoral districts" to "the General Assembly." *Id.* at 1953. But the Court rejected that argument, explaining that "the House constitutes only a part" of the General Assembly, and so lacked standing to sue regardless of whether the Assembly itself could establish a cognizable injury. *Id.* "Just as individual members lack standing to assert the institutional interests of a legislature," the Court concluded, "a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature

11

as a whole," such as the alleged interest in drawing the electoral maps that would determine its own composition. *Id.* at 1953-54 (citing *Raines*, 521 U.S. at 829).

Finally, it warrants emphasis that the specific limitations on legislative standing in *Raines* and *Bethune-Hill* reflect the fundamental rationale of Article III standing. "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers," *Allen v. Wright*, 468 U.S. 737, 752 (1984), and "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

**2.** The lack of Article III standing in this case follows a fortiori from *Bethune-Hill* for three reasons. *First*, *individual Members* of the House and Senate necessarily "lack standing to assert the institutional interests" of "the Congress" as they cannot even assert any interests of their respective Chambers. *See Bethune-Hill*, 139 S. Ct. at 1953 (citing *Raines*, 521 U.S. at 829). *Second*, the separation-of-powers concerns that counseled against standing in *Bethune-Hill* are even stronger for *federal* legislators, because the Constitution itself vests "enforcement powers" concerning compliance with federal law in the Executive, not the Legislative, branch. *See Buckley v. Valeo*, 424 U.S. 1, 138 (1976); *Raines*, 521 U.S. at 824 n.8. And *third*, the asserted legislative interest in whether or not to pass a law consenting to a foreign "Emolument" is weaker than the Virginia House's asserted interest in *Bethune-Hill* concerning a redistricting law that directly affected its own composition. *See* 139 S. Ct. at 1953.

12

Indeed, the implications of plaintiffs' theory of standing only underscore its inadequacy, particularly after *Bethune-Hill.*  For example, the Members' professed interest in whether Congress should consent to prohibited Emoluments would perversely imply that Congress *has* standing to enforce the Foreign Emoluments Clause but *lacks* standing to enforce the Domestic Emoluments Clause because the latter prohibition is absolute rather than qualified by congressional consent.  And it would also mean that one House of Congress has standing to enforce against sovereign States—or the other chamber of Congress—the numerous constitutional provisions that require the consent of Congress.  *E.g.*, U.S. Const. art. I, § 5, cl. 4 (adjournment of a House of Congress); *id.* § 10, cl. 2 (imposts or duties); *id.* § 10, cl. 3 (duties of tonnage and interstate compacts).  Those propositions are plainly untenable, and the case should end with *Bethune-Hill*, which the district court ignored even though the government brought that recent decision to its attention while the section 1292(b) motion was pending.

Moreover, even setting aside *Bethune-Hill*'s square holding that individual legislators cannot sue to enforce alleged institutional interests of their legislature as a whole, the Members' suit fails.  *Raines* and its progeny refute the existence of any judicially cognizable legislative interest in compliance with the Foreign Emoluments Clause by the President or other federal officers.

Most fundamentally, the district court made little effort to square its conclusion with the lack of historical support for Article III adjudication of interbranch political

13

disputes.  *See Raines*, 521 U.S. at 826-29.  Neither the Members nor the court ever

identified an analogous confrontation that was adjudicated in federal court.  *See*

*Chenoweth*, 181 F.3d at 113-14 ("Historically, political disputes between Members of

the Legislative and Executive Branches were resolved without resort to the courts.").

And contrary to the district court's assertion (Add. 53), the type of dispute implicated

here is not new:  Members of Congress frequently clash with the Executive on

whether Congress's consent is constitutionally necessary before the President's taking

particular actions.  *See, e.g.*, *Campbell*, 203 F.3d at 20; *Chenoweth*, 181 F.3d at 113.  That

the merits of those disputes have never culminated in adjudication by courts

demonstrates that such interbranch disputes are not "traditionally thought to be

capable of resolution through the judicial process."  *Raines*, 521 U.S. at 819.

Otherwise, Members of Congress could sue every time the President or his

subordinates—by Executive Order, agency rulemaking, or other executive action—

allegedly circumscribe Congress's institutional role of providing "consent" for federal

action that the Executive lacks authority to take unilaterally.  *But see id.* at 826 (no

standing to allege "the abstract dilution of institutional legislative power").

The district court likewise disregarded the additional factors that the *Raines*

Court found relevant.  The district court never reckoned with the fact that the

Members have not been "authorized to represent their respective Houses of Congress

in this action," *Raines*, 521 U.S. at 829, and that they have not been and could not

have been authorized to represent the United States itself, *compare Bethune-Hill*, 139 S.

14

Ct. at 1952 (noting that Virginia "could have authorized the House to litigate on the State's behalf"), *with Buckley*, 424 U.S. at 138.  The district court's conclusion that "a single Member of Congress could have standing to sue based on a vote nullification theory when it was the President's action, rather than a lack of legislative support, that nullified the Member's vote," Add. 33, is impossible to square with this Court's holdings in *Campbell* and *Chenoweth*, where it *was* the President's actions that caused the Members' alleged injuries.  *E.g.*, *Campbell*, 203 F.3d at 20 ("Appellants claim that the President . . . failed to end U.S. involvement in the hostilities after 60 days.").

Similarly, the district court's suggestion that, unlike in *Raines*, 521 U.S. at 829, the Members lack legislative remedies as an alternative to suit is untenable.  Congress, unlike members of the public, has access to various "self-help" remedies uniquely available to legislators.  *Campbell*, 203 F.3d at 24; *see United States v. Windsor*, 570 U.S. 744, 791 (2013) (Scalia, J., dissenting) (noting that Congress has "available innumerable ways to compel executive action without a lawsuit"); *Natural Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 319 (D.C. Cir. 1988) ("[T]he most representative branch is not powerless to vindicate its interests or ensure Executive fidelity to Legislative directives.").  Among other powers, Congress can withhold funds from the Executive, decline to enact legislation that the Executive desires, or enact and override vetoes of legislation that the Executive disfavors—including on the subject of Emoluments.  The availability of such political remedies reinforces the wisdom of Article III's "barrier against congressional legal challenges to executive action."

15

*Campbell*, 203 F.3d at 21; *see id.* at 24 ("*Raines* explicitly rejected [the] argument that

legislators should not be required to turn to politics instead of the courts for their

remedy."). Using these remedies, Congress may force the Executive to comply with

its view of the law. But Congress "must care enough to act against the" Executive

Branch itself, "not merely enough to instruct its lawyers to ask [the courts] to do so,"

let alone outside counsel for a minority of Members. *See Windsor*, 570 U.S. at 791

(Scalia, J., dissenting).

Finally, the district court misunderstood a possible narrow exception identified

in *Raines*. The Court there noted that it had only ever "upheld standing for legislators

(albeit *state* legislators) claiming an institutional injury" in "one case." *Raines*, 521 U.S.

at 821. In that case, *Coleman v. Miller*, 307 U.S. 433 (1939), a group of state legislators

brought suit in state court contending that their votes in the legislature, which would

have been dispositive to reject a proposed federal constitutional amendment, had

been "completely nullified" through an improper voting procedure that ratified the

amendment. *Raines*, 521 U.S. at 823. *Raines* explained that *Coleman* stands—"at

most"—for "the proposition that legislators whose votes would have been sufficient

to defeat (or enact) a specific legislative Act have standing to sue if that legislative

action goes into effect (or does not go into effect), on the ground that their votes

have been completely nullified." *Id.* Subsequently, this Court emphasized that this

"very narrow possible *Coleman* exception to *Raines*" is satisfied only in circumstances

where the plaintiff legislators "could [not] have done anything to reverse" the

16

outcome of the challenged legislative vote.  *Campbell*, 203 F.3d at 22-23; *see Bethune-Hill*, 139 S. Ct. at 1954 (limiting *Coleman* to "the results of a legislative chamber's poll or the validity of any counted or uncounted vote.").

The Members' attempt to fit this case into any *Coleman* exception fails at multiple levels.  To begin, *Coleman*—a case involving state legislators—does not apply to claims brought by Members of Congress.  Even before *Raines*, this Court recognized that "[a] separation of powers issue arises as soon as the *Coleman* holding is extended to United States legislators," because "[i]f a federal court decides a case brought by a United States legislator, it risks interfering with the proper affairs of a coequal branch."  *Harrington v. Bush*, 553 F.2d 190, 205 n.67 (D.C. Cir. 1977).  In light of "the separation-of-powers concerns present[ed]," the Supreme Court in *Raines* expressly reserved the question whether *Coleman* could be extended to a suit "brought by federal legislators."  521 U.S. at 824 n.8.  And this Court has not applied that decision post-*Raines* to allow federal legislators to litigate institutional claims of injury (even assuming arguendo that *Coleman* might not be limited to state legislators). Recently, the Supreme Court reiterated that "a suit between Congress and the President would raise separation-of-powers concerns absent" in a case applying *Coleman* to a claim by a state Legislature.  *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2665 n.12 (2015); *see also Bethune-Hill*, 139 S. Ct. at 1959 (Alito, J., dissenting) (noting that "[a]n interest asserted by a Member of

Congress or by one or both Houses of Congress" may not be "consistent with the structure created by the Federal Constitution").

Moreover, even assuming *Coleman* could be extended to the federal context, the Members' claim here in no way resembles the claim in *Coleman*. The Members here do not allege that their "votes have been completely nullified" such that their "votes would have been sufficient to defeat (or enact) a specific legislative Act" and yet the "legislative action [went] into effect (or [did] not go into effect)" despite their votes. *Raines*, 521 U.S. at 823; *see also Bethune-Hill*, 139 S. Ct. at 1954 (reiterating that *Coleman* applies, "at most," in that specific context). Indeed, the Members do not even allege that their votes would be sufficient to approve or disapprove of the President's alleged receipt of Emoluments. And unlike the ratification of a proposed constitutional amendment at issue in *Coleman*, the injuries alleged by the Members here are hardly irrevocable through future legislative action. *See Campbell*, 203 F.3d at 23 (stating that "the very narrow possible *Coleman* exception to *Raines*" applies only where a plaintiff legislator "ha[s] no legislative remedy").

In all events, even assuming that this suit asserting legislative injuries somehow falls with a gap left open by *Raines*, it is unequivocally foreclosed by *Bethune-Hill* because it is brought by a minority of Members rather than Congress as a whole. Because the President is clearly and indisputably entitled to dismissal of the Members' suit for lack of Article III standing, a writ of mandamus is appropriate.

B.     **The district court's cause-of-action holding was clearly and indisputably incorrect.**

**1.**  Neither the Constitution nor any statute provides an express cause of action for alleged violations of the Foreign Emoluments Clause.  And the Supreme Court has cautioned that the creation of a "judge-made remedy" of an implied cause of action in equity is available only in "some circumstances" that present "a proper case."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (federal equity jurisdiction is limited to historical practices of the English Court of Chancery). Inferring a cause of action that extends beyond "traditional equitable powers" is a "significant step under separation-of-powers principles" because it intrudes upon "Congress, [which] has a substantial responsibility to determine" whether a suit should lie against individual officers and employees.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017).

Implied equitable claims against government officers have typically involved suits that "permit potential defendants in legal actions to raise in equity a defense available at law."  *Michigan Corrs. Org. v. Michigan Dep't of Corrs.*, 774 F.3d 895, 906 (6th Cir. 2014); *see, e.g.*, *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).  Such suits ordinarily do not pose separation-of-powers concerns because they merely shift the timing and posture of litigating a legal question that Congress has already authorized to be adjudicated in federal court.

Here, by contrast, the district court barely paused in creating an equitable cause of action even though the Members "are not subject to or threatened with any enforcement proceeding" and even though the parties' dispute otherwise would not be in federal court *at all*. *See Douglas v. Independent Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting). The Members' attempt to wield the Constitution "as a cause-of-action-creating *sword*" poses significant separation-of-powers concerns. *Michigan Corrs. Org.*, 774 F.3d at 906. The district court believed it could create a cause of action because the Supreme Court has permitted a suit in equity to enjoin a violation of the Appointments Clause. Add. 98. But the relevant precedent allowed such a suit where a "formal investigation" had been threatened against one of the plaintiffs' private businesses. *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 487 (2010). The Members here have not alleged any such investigation, nor any other analogous harm to their property or person warranting invocation of equitable remedies. That crucial difference places *Free Enterprise Fund* squarely within the precedents discussed above, and this case squarely outside of them.

**2.** This is a particularly inappropriate context to recognize a non-traditional equitable claim because there is neither a proper defendant nor a proper plaintiff.

**a.** No equitable relief is available against the President in his official capacity. As the Supreme Court has explained, imposing such relief would violate the fundamental principle, rooted in the separation of powers, that federal courts have

"no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 501 (1867); *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03, 806 (1992) (plurality op.).  As this Court has explained, "for the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers."  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (citation omitted; alteration in original).  And this Court has further noted that "similar considerations" govern claims for declaratory relief against the President.  *Id.* at 976 n.1; *see Newdow v. Roberts*, 603 F.3d 1002, 1012-13 (D.C. Cir. 2010); *see also Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) ("[T]he availability of declaratory relief presupposes the existence of a judicially remedial right.").

This constitutional rule, at a minimum, counsels against holding that the President is subject to an implied cause of action in equity or a direct declaratory judgment when there is neither historical precedent nor express language supporting such a suit.  Indeed, the Supreme Court has repeatedly held that, in light of these separation-of-powers concerns, an express statement is at the very least required before even a generally available cause of action may be extended specifically to the President.  *See Franklin*, 505 U.S. at 801 (APA's express cause of action); *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (*Bivens* and other implied causes of action for damages).  That alone forecloses subjecting the President to suit here.

21

The district court's contrary reasoning is plainly erroneous.  In the court's view (Add. 105), an injunction against the President would be proper because compliance with the Foreign Emoluments Clause is the type of mere "ministerial duty" that *Mississippi* suggested the President might permissibly be ordered to satisfy.  71 U.S. at 477.  But a ministerial duty is one in "which nothing is left to discretion."  *Id.* at 498.  Here, by contrast, determining compliance with the Foreign Emoluments Clause requires ample "exercise of judgment."  *Id.* at 499.  It is immaterial that violating the Clause would be prohibited, because President Johnson in *Mississippi* likewise was prohibited from enforcing the statutes at issue if they were unconstitutional.  *Id.* at 498.  What matters is that President Trump must exercise judgment in determining whether his financial interests are compatible with the continued exercise of his office under the Emoluments Clauses, and thus his "performance of [that] official dut[y]" is not ministerial under *Mississippi.  Id.* at 501.

**b.**  Even assuming that individual Members of Congress could ever demonstrate Article III standing to sue to enforce institutional interests, legislators have no legally or judicially cognizable interests to sue to enforce the Foreign Emoluments Clause.  The Supreme Court "has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quotation marks omitted); *see also Lexmark Int'l, Inc. v. Static Components, Inc.*, 572 U.S. 118, 129 (2014) (explaining

22

that the zone-of-interests limitation on congressionally authorized causes of action is of "general application" and "applies unless it is expressly negated").

As the Members acknowledge, the Foreign Emoluments Clause is a prophylactic measure that aims to protect the public at large against the corrupting influence of foreign Emoluments on official actions.  The Members, in bringing this suit, do not even allege any such corrupted action, let alone direct injury from any such corrupted action.  Instead, they assert only an abstract interest in an alleged violation of the law by an official in the Executive Branch, cast as an infringement of their ability to consent to otherwise-prohibited Emoluments.  They thus do not assert an interest that is even arguably protected under the Clause, but rather what is in essence only a generalized grievance, shared by all members of the public, in having an official comply with a prophylactic provision of the Constitution adopted for the benefit of the public generally.  *United States v. Richardson*, 418 U.S. 166, 176-78 (1974). There is no basis in Article III or in the courts' equitable authority for such a suit.

C.   **The district court's Foreign Emoluments Clause holding was clearly and indisputably incorrect.**

The district court was also clearly mistaken to hold that the Members have stated a claim under the Foreign Emoluments Clause, as properly construed.  As the government explained, interpreting the Clause to prohibit only compensation accepted from a foreign government for services rendered by an officer in either an official capacity or employment-type relationship is supported by contemporaneous

dictionaries; by intra-textual comparison both within the Foreign Emoluments Clause itself and with the Domestic Emoluments Clause, U.S. Const. art. II, § 1, cl. 7, and the Incompatibility Clause, *id.* art. I, § 6, cl. 2; and by consistent Executive practice from the Founding era to modern times.  Dkt. No. 15-1, at 18-41.  But the district court rejected this well-supported interpretation and instead construed the term "broadly as any profit, gain, or advantage."  Add. 95.  This Court need not rely on that merits defect to grant this mandamus petition, given the threshold standing and cause-of-action defects.  *Supra* p. 4.  That said, the government stands ready to provide supplemental briefing on the merits if this Court so desires, as occurred in the parallel Fourth Circuit case.  *In re Trump*, No. 18-2486 (4th Cir. Dec. 20, 2018) (inviting additional briefing); Reply Brief for Petitioner, *In re Trump*, No. 18-2486, at 15-22 (Feb. 21, 2019) (providing additional briefing).

## II.    MANDAMUS IS APPROPRIATE IN THIS EXTRAORDINARY CASE.

Because the district court's orders declining to dismiss this suit are clearly and indisputably incorrect, this Court should grant the petition if the President has "no other adequate means to attain relief" and the writ of mandamus is otherwise "appropriate under the circumstances."  *Cheney*, 542 U.S. at 380-81.  Although an appeal from final judgment is ordinarily an adequate means of relief from the erroneous failure to dismiss a complaint, *see id.* at 381-82, that is not the case here given the unique and fundamental separation-of-powers concerns presented by allowing a suit to proceed and discovery to commence in a case against the President

in his official capacity that targets his private financial affairs because of the office he

holds.  The Supreme Court has repeatedly held that "[t]he high respect that is owed to

the office of the Chief Executive . . . is a matter that should inform the conduct of the

entire proceeding, including the timing and scope of discovery." *Id.* at 385 (quoting

*Clinton v. Jones*, 520 U.S. 681, 707 (1997)).  Where the underlying suit is clearly and

indisputably nonjusticiable (and meritless), it is not "adequate" to expose the

President to suit and unwarranted and distracting discovery, and it is accordingly

"appropriate" to provide mandamus relief to eliminate that "threat[] [to] the

separation of powers." *Id.* at 380-81; *see also In re Sealed Case No. 98-3077*, 151 F.3d

1059, 1065 (D.C. Cir. 1998) (per curiam) (mandamus appropriate when "the burden

of discovery . . . could not be recompensed" by appeal of final judgment); *In re

Papandreou*, 139 F.3d 247, 250-51 (D.C. Cir. 1998) (similar).

The district court has ignored the constitutional implications of proceeding

with this litigation.  In concluding that it was appropriate to commence discovery

rather than certify an interlocutory appeal, the district court explained that an

expedited discovery and summary-judgment schedule would provide the President

with protection from the burdens of protracted litigation.  Add. 113.  But the fact that

this suit is brought against the President "remove[s] this case from the category of

ordinary discovery orders where interlocutory appellate review is unavailable, through

mandamus or otherwise." *Cheney*, 542 U.S. at 381.  As the Supreme Court has

25

explained, "separation-of-powers considerations should inform a court of appeals' evaluation of a mandamus petition involving the President." *Id.* at 382.

Those separation-of-powers concerns apply with force here. If the Members seek discovery against the President directly, that would inevitably "distract" the President "from the energetic performance of [his] constitutional duties." *Cheney*, 542 U.S. at 382. The Members' plan to target third parties to discover the President's personal financial information also poses severe separation-of-powers problems. As an end-run around the congressional subpoena process for seeking information if there is a legitimate legislative interest, the Members have initiated a meritless suit where they plainly lack standing and a cause of action in an effort to invoke the judicial discovery process. Allowing such a gambit would distract the President from the performance of his constitutional duties in similar ways as seeking discovery directly against the President. In both instances, whether intended or not, any information produced through discovery would undoubtedly be publicized and used to distract and harass the President. The Members cannot deny that obtaining such discovery for its own sake is a primary purpose of the suit. Indeed, below, the Members devoted the vast majority of their argument to opposing the government's motion for a stay of discovery pending interlocutory appeal, while opposing certification of the interlocutory appeal only in the final pages of their brief. *Compare* Dkt. No. 74, at 10-40 (opposing stay), *with id.* at 40-44 (opposing certification). The Members should not be permitted to use this (clearly and indisputably) flawed suit to

pry into the President's personal finances in such a manner.  Because the district court

refused to dismiss an "unwarranted impairment of another branch in the performance

of its constitutional duties," this Court should step in to terminate this litigation now.

*Cheney*, 542 U.S. at 390.[1]

Alternatively, if this Court were disinclined to grant mandamus to dismiss this

suit, it should at the very least grant mandamus to order the district court to certify its

motion-to-dismiss orders for interlocutory appeal.  *See Fernandez-Roque v. Smith*, 671

F.2d 426, 431 (11th Cir. 1982).  The sole reason that the district court gave for its

refusal to certify was its view that further district-court proceedings could terminate

this litigation faster than an appeal would.  Add. 117.  Again, though, that analysis

entirely ignored *Cheney*'s teaching that "[s]pecial considerations applicable to the

President" instruct that this Court "should be sensitive to requests by the

Government for interlocutory appeals" such as this one.  542 U.S. at 391-92.  Of

course, the decision whether to grant certification under section 1292(b) is

discretionary.  But "[d]iscretion is not whim," *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S.

Ct. 1923, 1931 (2016), and can be "clear[ly] abuse[d]," *Cheney*, 542 U.S. at 380.  This is

the rare case where the district court's exercise of discretion warrants mandamus

---

[1] The separation-of-powers concerns of the Executive Branch would be exacerbated if the Members also seek, as plaintiffs in parallel Emoluments suits have done, to inquire into the effect of alleged Emoluments on official actions of the President's administration, including through third-party subpoenas of government agencies.

relief, given that the legal standard for certification was plainly met and that the

district court's reasoning to the contrary ignored important separation-of-powers

concerns.

## III.   THIS COURT SHOULD STAY DISTRICT-COURT PROCEEDINGS PENDING ITS CONSIDERATION OF THIS PETITION.

This Court has previously granted stays of district-court proceedings pending

disposition of a petition for a writ of mandamus.  *See, e.g.*, *In re Kellogg Brown & Root,*

*Inc.*, 756 F.3d 754, 756 (D.C. Cir. 2014); *In re Sealed Case No. 98-3077*, 151 F.3d at

1063.  And the Fourth Circuit recently stayed district-court discovery in a parallel case

brought by different plaintiffs against the President under the Foreign and Domestic

Emoluments Clauses.  *In re Trump*, No. 18-2486 (4th Cir. Dec. 20, 2018).  A stay is

likewise appropriate here.  *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009) (standard

for stay pending appeal).  As discussed above, the President is likely to obtain

mandamus, and he is likely to suffer irreparable injury in the interim from the

continuation of this suit and intrusive discovery into his personal finances based on

the public office he holds.  Plaintiffs have already sought discovery against thirty-

seven third parties, demanding information including the tax returns of the Trump

Organization and other entities.  A response to those subpoenas is required by July

29, 2019.

No countervailing harm will result from the requested stay.  Even setting aside

that the Members' injuries are not cognizable at all, they do not come close to

outweighing the separation-of-powers concerns with this suit against the President in which the Members seek to pry into his personal finances on account of his office. Indeed, the Members have not sought and could not plausibly seek a preliminary injunction, which underscores that they face no immediate harm sufficient to outweigh the harm to the President.  Nor can the Members explain how a suit such as this is a more appropriate vehicle to try to obtain the information they seek than the ordinary tools Congress possesses that do not rely on the judicial branch.  The government thus requests that this Court promptly issue a stay of district court proceedings pending the Court's disposition of this petition.

## CONCLUSION

The petition for a writ of mandamus should be granted.  Additionally, this Court should stay district-court proceedings pending resolution of this petition. Because the subpoenas have a return date of July 29, 2019, the government respectfully requests that this Court act on the stay motion by July 22, 2019, in order to provide time to seek relief from the Supreme Court if necessary.

Respectfully submitted,

JOSEPH H. HUNT
    *Assistant Attorney General*

HASHIM M. MOOPPAN
    *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
*/s/ Martin Totaro*
MARTIN TOTARO
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7513*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 616-5374*

July 2019

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1) because it contains 7362 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Martin Totaro*

Martin Totaro

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiffs in district court, and respondents here, are 215 Members of Congress whose names appear at Add. 119-137.

The defendant in district court, and petitioner here, is Donald J. Trump, in his official capacity as President of the United States.

The amici in district court are: (1) Seth Barrett Tillman and the Judicial Education Project; (2) Michael Barnes, Leonard Boswell, Barbara Boxer, Bob Carr, Tom Coleman, Mickey Edwards, Lee Hamilton, Tom Harkin, Gary Hart, Bob Inglis, Carl Levin, Brad Miller, George Miller, Philip Sharp, Chris Shays, Peter Smith, Mark Udall, Henry Waxman, and Dick Zimmer; (3) Don Fox, Marilyn Glynn, Karen Kucik, Lawrence R. Reynolds, Amy Comstock Rick, Trip Rothschild, Walter Shaub, Richard M. Thomas, Kathleen Whalen, Harvey Wilcox, and Leslie Wilcox; (4) Madeleine K. Albright, Bruce Andrews, Daniel Benjamin, Antony Blinken, William J. Burns, Bathsheba N. Crocker, Ryan Crocker, Daniel Feldman, Joshua A. Geltzer, Suzy George, Chuck Hagel, Heather A. Higginbottom, Christopher R. Hill, John F. Kerry, Prem Kumar, James C. O'Brien, Jeffrey Prescott, Kori Schake, Eric P. Schwartz, Wendy R. Sherman, Vikram Singh, and James B. Steinberg; (5) Matthew I. Hall,

Thomas Campbell, Erwin Chemerinsky, Perry Dane, Frank Deale, Robin Effron, Heather Elliott, Jamal Greene, Aziz Huq, Jon D. Michaels, Sandra Rierson, Eric J. Segall, Joan E. Steinman, Emily Garcia Uhrig, and Arthur D. Wolf; (6) Rebecca L. Brown, Harold H. Bruff, Neil Kinkopf, Christopher H. Schroeder, Peter M. Shane, Kevin M. Stack, and Peter L. Strauss; and (7) Jed H. Shugerman, John Mikhail, Jack Rakove, Gautham Rao, and Simon Stern.

## B.      Rulings Under Review

Petitioner seeks review of the September 28, 2018, April 30, 2019, and June 25, 2019 opinions and orders of the United States District Court for the District of Columbia in *Blumenthal v. Trump*, No. 1:17-cv-1154.  Those opinions are reproduced at Add. 1, Add. 59, and Add. 107.

## C.      Related Cases

The case on review has not previously been before this Court or any other court, save the district court where it originated.  Counsel for the government is not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Martin Totaro*
Martin Totaro

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 21(a)(1), I hereby certify that on July 8, 2019, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system.  Service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.  The district court will also be provided with a paper copy of this filing through hand delivery to the district court clerk's office.

/s/ Martin Totaro

Martin Totaro

ADDENDUM

# TABLE OF CONTENTS

**Record Materials:**

District Court Opinion, Dkt. No. 59 (Sept. 28, 2018)................................................Add. 1

District Court Opinion, Dkt. No. 67 (Apr. 30, 2019) .............................................Add. 59

District Court Opinion and Order, Dkt. No. 82 (June 25, 2019)...................... Add. 107

Second Amended Complaint, Dkt. No 87 (June 25, 2019) ................................ Add. 119

**Constitutional and Statutory Provisions:**

U.S. Const. art. I, § 9, cl. 8 ...................................................................... Add. 178

U.S. Const. art. II, § 1, cl. 7...................................................................... Add. 178

28 U.S.C. § 1292 ........................................................................................ Add. 179

28 U.S.C. § 1651 ........................................................................................ Add. 179

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
Senator RICHARD BLUMENTHAL,     )
et al.,                         )
                                )
            Plaintiffs,         )
                                )
        v.                      ) Civil Action No. 17-1154 (EGS)
                                )
DONALD J. TRUMP, in his official)
capacity as President of the    )
United States,                  )
                                )
            Defendant.          )
_____ )
```

**MEMORANDUM OPINION**

## I.    Introduction

When Members of Congress sue the President in federal court over official action, a court must first determine whether the dispute is a "Case" or "Controversy" under Article III of the United States Constitution, rather than a political dispute between the elected branches of government. A critical part of this inquiry is whether the plaintiffs have legal standing to bring the action. Whether legislators have standing to sue often turns on whether they can obtain the remedy they seek from the court from fellow legislators. When a legislative remedy is available, courts generally dismiss the case on jurisdictional grounds. The Supreme Court, however, has not foreclosed federal courts from appropriately exercising jurisdiction over certain types of disputes between the political branches. This case is

one of those disputes. And when a case is properly before a
court because it presents an Article III "Case" or
"Controversy," it is the role of the Judiciary "to say what the
law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803).

Plaintiffs, approximately 201 minority Members of the 535
Members of the United States Senate and House of
Representatives, allege that Donald J. Trump in his official
capacity as President of the United States ("the President") is
violating the Foreign Emoluments Clause ("Clause"). Under this
Clause, certain federal officials, including the President, may
not "accept" an "emolument" from "any King, Prince or foreign
State" without "the Consent of Congress." U.S Const. art. I, §
9, cl. 8. In Count I, plaintiffs seek declaratory relief
pursuant to 28 U.S.C. § 2201 in the form of a declaratory
judgment stating that the President is violating the Clause when
he accepts emoluments from foreign states without first seeking
the consent of Congress. Am. Compl., ECF No. 14 ¶¶ 85-86. In
Count II, plaintiffs seek injunctive relief pursuant to the
Court's inherent authority to grant equitable relief and
pursuant to 18 U.S.C. § 1331 in the form of a Court order
enjoining the President from accepting "any present, Emolument,
Office, or Title, of any kind whatever" from a foreign state
without obtaining "the Consent of Congress." *Id.* ¶ 92.

Pending before the Court is the President's motion to dismiss. The President argues that this case should be dismissed on four independent grounds,[1] but the threshold question is whether plaintiffs have standing to bring their claims. This opinion addresses only this threshold question. With respect to the grounds for dismissal that turn on the merits, the parties dispute whether the profits that the President's business interests earn from foreign governments are covered "emoluments." However, for the purpose of determining whether plaintiffs have standing to sue, the Court must accept as true the allegations that the President has accepted prohibited foreign emoluments without seeking the consent of Congress.

As is explained more fully below, the central question for standing purposes is how to characterize the injury that occurs when the President fails to seek the consent of Congress, as required by the Clause. Plaintiffs argue that each Member of Congress suffers a particularized and concrete injury when his or her vote is nullified by the President's denial of the opportunity to vote on the record about whether to approve his

---

[1] The President seeks dismissal on these grounds: (1) lack of subject matter jurisdiction because plaintiffs do not have standing to bring their claims; (2) lack of a cause of action to seek the relief requested; (3) failure to state a claim upon which relief can be granted; and (4) the injunctive relief sought is unconstitutional. Def.'s Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 15-1 at 17-18.

3

acceptance of a prohibited foreign emolument. The President argues that this is an intra-branch dispute which does not belong in federal court because the plaintiffs' remedy is to convince a majority of their colleagues in both Houses to pass legislation addressing the President's ability to accept prohibited foreign emoluments.

Upon careful consideration of the President's motion to dismiss, the opposition and reply thereto, the relevant arguments of *amici*,[2] the parties' arguments at the June 7, 2018 motion hearing, and for the reasons explained below, the Court finds that the plaintiffs have standing to sue the President for allegedly violating the Foreign Emoluments Clause. The Court therefore **DENIES IN PART** the motion to dismiss and **DEFERS** ruling on the remaining arguments in the motion to dismiss.

## II. Factual Background

Relevant to whether they have standing to bring their claims, plaintiffs allege that the President "has a financial interest in vast business holdings around the world that engage in dealings with foreign governments and receive benefits from those governments." Am. Compl., ECF No. 14 ¶ 2. Plaintiffs also allege that the President owns "'more than 500 separate entities-hotels, golf courses, media properties, books,

---

[2] The Court appreciates the illuminating analysis provided by the *amici*.

management companies, residential and commercial buildings . . .
airplanes and a profusion of shell companies set up to
capitalize on licensing deals.'" *Id*. ¶ 34 (citation omitted).

As a result of his financial interests, plaintiffs allege
the President has accepted, and will accept in the future,
emoluments from foreign states. *Id*. Indeed, the President has
acknowledged "that his businesses receive funds and make a
profit from payments by foreign governments, and that they will
continue to do so while he is President." *Id*. ¶ 37. Public
reporting has also confirmed this to be the case. *Id*. The
President, through his personal attorney, has likewise asserted
that the Constitution does not require "him to seek or obtain
Congress' consent before accepting benefits arising out of
exchanges between foreign states and his businesses." *Id*. ¶ 40.
The President has therefore not provided any information to
Congress about any foreign emoluments he has received. *Id*. ¶ 41.
Plaintiffs allege that because the President has denied them the
opportunity to give or withhold their consent, he has injured
them in their roles as Members of Congress, *id*. ¶ 5, and that
they cannot force the President to comply with the Constitution
absent a judicial order, *id*. ¶ 83.

## III. Standard of Review

A motion to dismiss for lack of standing is properly
considered a challenge to the Court's subject matter

jurisdiction and should be reviewed under Federal Rule of Civil

Procedure 12(b)(1). *Haase v. Sessions*, 835 F.2d 902, 906 (D.C.

Cir. 1987)("[T]he defect of standing is a defect in subject

matter jurisdiction."). The Court must therefore consider the

defendant's motion to dismiss pursuant to Rule 12(b)(1) before

reaching a merits challenge pursuant to Rule 12(b)(6). *Sinochem*

*Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 430-31

(2007). To survive a Rule 12(b)(1) motion to dismiss, the

plaintiff bears the burden of establishing jurisdiction by a

preponderance of the evidence. *Moran v. U.S. Capitol Police Bd.*,

820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defenders*

*of Wildlife*, 504 U.S. 555, 561 (1992)). "Because Rule 12(b)(1)

concerns a court's ability to hear a particular claim, the court

must scrutinize the plaintiff's allegations more closely when

considering a motion to dismiss pursuant to Rule 12(b)(1) than

it would under a motion to dismiss pursuant to Rule 12(b)(6)."

*Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65

(D.D.C. 2011). In so doing, the court must accept as true all of

the factual allegations in the complaint and draw all reasonable

inferences in favor of plaintiffs, but the court need not

"accept inferences unsupported by the facts alleged or legal

conclusions that are cast as factual allegations." *Rann v. Chao*,

154 F. Supp. 2d 61, 63 (D.D.C. 2001).

## IV.  Analysis

### A.  Standing

"Article III of the Constitution limits the jurisdiction of the federal courts to 'Cases' and 'Controversies.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const. art. III, § 2). "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The standing requirement "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* The standing inquiry "often turns on the nature and source of the claim asserted" and the specific facts alleged. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Lujan*, 504 U.S. at 560-61 (1992)); *see also Hollingsworth v. Perry*, 570 U.S. 700, 705 (2013) ("To have standing, a litigant

7

must seek relief for an injury that affects him in a personal and individual way."). These requirements help to "assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). "The [effect of the] exercise of judicial power [is] most vivid when a federal court declares unconstitutional an act of the Legislative or Executive Branch." *Id.* at 473. Therefore, to ensure the "continued effectiveness of the federal courts in performing that role . . . it has been recognized as a tool of last resort." *Id.* at 473-74.

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

When considering whether a legislator has standing, the Court "must carefully inquire as to whether [plaintiffs] have met their burden of establishing that their claimed injury is

personal, particularized, concrete, and otherwise judicially

cognizable." *Raines*, 521 U.S. at 820. The "standing inquiry [is]

especially rigorous when reaching the merits of the dispute

would force us to decide whether an action taken by one of the

other two branches of the Federal Government was

unconstitutional." *Id.* at 819-20.

### B.   Foreign Emoluments Clause

The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the
> United States: And no Person holding any
> Office of Profit or Trust under them, shall,
> without the Consent of the Congress, accept of
> any present, Emolument, Office, or Title, of
> any kind whatever, from any King, Prince, or
> foreign State.

U.S Const. art. I, § 9, cl. 8. "[T]he language of the Emoluments

Clause is both sweeping and unqualified." 17 Op. O.L.C. 114, 121

(1993). The acceptance of an emolument barred by the Clause is

prohibited unless Congress chooses to permit an exception. *Id.*;

*see also* Letter from James Madison to David Humphreys (Jan. 5,

1803), https://founders.archives.gov/documents/Madison/02-04-02-

0275# ("the Constitution of the United States has left with

Congress the exclusive authority to permit the acceptance of

presents from foreign Governments by persons holding Offices

under the United States"). And the President may not accept any

emolument until Congress votes to give its consent.

9

The Clause was intended by the Framers to guard against "corruption and foreign influence." 3 M. Farrand, *Records of the Federal Convention of 1787,* 327 (1966). Historically, Presidents have complied with the Clause by either seeking and obtaining congressional consent prior to accepting foreign presents or emoluments, or by requesting an opinion from the Executive or Legislative Branch's advisory office as to whether the Clause applies.[3] *See* Br. of Federal Jurisdiction and Constitutional Law Scholars as *Amici Curiae* in Support of Pls., ECF No. 44 at 24.[4] One such example occurred in 1830 when President Jackson placed "'at the disposal of Congress'" a gold medal presented to him by the Republic of Colombia, noting that accepting presents from a foreign government is prohibited by the Constitution. *Id.* (quoting Message of President Andrew Jackson to the Senate and House of Representatives, dated January 19, 1830, 3 *Compilation of the Messages and Papers of the Presidents* 1029, 1030 (James D. Richardson ed., 1897)). Similarly, when the King of Siam presented President Lincoln with various gifts, he informed Congress, which directed that the gifts "'be deposited in the

---

[3] In deciding a motion to dismiss, "a Court may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty." *Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C. 2012) (citing *Mintz v. FDIC*, 729 F. Supp. 2d 276, 278 n.2 (D.D.C. 2010)).

[4] When citing electronic filings throughout this opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

10

collection of curiosities at the Department of Interior.'" *Id.*
at 25 (quoting Joint Resolution No. 20, A Resolution providing
for the Custody of the Letter and Gifts from the King of Siam,
Res. 20, 37th Cong., 12 Stat. 616 (1862)).

Modern Presidents, except for President Trump, have sought
advice from the Department of Justice Office of Legal Counsel
("OLC") prior to accepting potentially covered emoluments. *Id.*
For example, President Kennedy requested an opinion on whether
the offer of an "honorary Irish citizenship" would fall within
the scope of the Clause. *Id.* (citing 1 Op. O.L.C. Supp. at 278).
And prior to his acceptance of the Nobel Peace Prize in 2009,
President Obama requested an opinion from OLC as to whether
accepting the prize would conflict with the Clause. *Id.*

Since the Clause prohibits the President from accepting a
prohibited foreign emolument unless Congress votes to consent,
the Constitution gives each individual Member of Congress a
right to vote before the President accepts. Under the
Constitution, Congress expresses its consent through the
combined votes of its individual members. U.S. Const. art. I, §
9, cl. 8. Congress "consist[s] of a Senate and House of
Representatives." *Id.* art. I, § 1. The "Consent of Congress" is
obtained when a majority of the individual members of each House
vote to consent. *Id.* art. I, § 3, cl. 1 ("each Senator shall
have one Vote"); *id.* art. I, § 5, cl. 3 (requiring, at the

request of one-fifth of those present, that "the Yeas and Nays of the Members of either House on any question" to be recorded). That Congress acts as "the body as a whole"[5] in providing or denying consent does not alter each Member's constitutional right to vote before the President accepts a prohibited foreign emolument because the body can give its consent only through a majority vote of its individual members.

### C. Plaintiffs Have Standing to Bring their Claims

The President argues that the Court lacks jurisdiction over plaintiffs' claims because plaintiffs have not met their burden to establish a judicially cognizable injury as is required by Article III. Def.'s Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 15 at 21-28; Def.'s Reply ("Reply"), ECF No. 28 at 10-19. The President also disputes that the alleged injury is fairly traceable to him. Mot. to Dismiss, ECF No. 15-1 at 24; Reply, ECF No. 28 at 8.

Plaintiffs contend that they have standing: (1) the injury-in-fact they have suffered is that the President has denied them a voting opportunity to which the Constitution entitles them; (2) the injury is fairly traceable to the President's conduct

---

[5] *United States v. Ballin*, 144 U.S. 1, 7 (1892) ("The two houses of congress are legislative bodies representing larger constituencies. Power is not vested in any one individual, but in the aggregate of the members who compose the body, and its action is not the action of any separate member or number of members, but the action of the body as a whole.").

because he has neither asked for their consent nor provided them
with any information about the prohibited foreign emoluments he
has already allegedly accepted; and (3) the injury can be
redressed by a favorable judicial decision if the Court requires
the President to obtain congressional consent before accepting
prohibited foreign emoluments. Pls.' Opp'n, ECF No. 17 at 13.

As discussed below, the President's arguments rely on a
repeated misstatement of the injury alleged and on proffers of
plainly inadequate legislative remedies. The Court is persuaded
that plaintiffs have sustained their burden to show that they
have standing to bring their claims: (1) they have adequately
alleged a judicially cognizable injury that is fairly traceable
to the President and can be redressed by a favorable judicial
decision; and (2) although plaintiffs' claims raise separation-
of-powers concerns, plaintiffs have no adequate legislative
remedy and this dispute is capable of resolution through the
judicial process.

### 1. Supreme Court and D.C. Circuit Precedent

#### a. *Raines v. Byrd*

The parties rely heavily on the Supreme Court's decision in
*Raines v. Byrd*. *See generally* Mot. to Dismiss, ECF No. 15-1;
Pls.' Opp'n, ECF No. 17; Reply, ECF No. 28 (discussing *Raines,*
521 U.S. 811 (1997)). The President argues that plaintiffs lack
standing pursuant to *Raines*; plaintiffs respond that *Raines* does

13

not foreclose their standing to bring their claims and indeed provides support for it. The Court will therefore discuss the case in detail.

In *Raines*, six members of Congress who had voted against the Line Item Veto Act ("Act") sued the Secretary of the Treasury and the Director of the Office of Management and Budget, challenging the constitutionality of the Act. *Raines,* 521 U.S. at 814. The Act authorized the President to "'cancel' certain spending and tax benefit measures after he ha[d] signed them into law." *Id*. The plaintiffs claimed that the Act injured them in their official capacities by: (1) "'alter[ing] the legal and practical effect of all votes they may cast on bills'" subject to the Act; (2) "'divest[ing] [them] of their constitutional role in the repeal of legislation'"; and (3) "'alter[ing] the constitutional balance of powers between the Legislative and Executive Branches . . . .'" *Id*. at 816 (quoting Compl.).

At issue was whether the plaintiffs had standing to bring their claims. The Court began its inquiry by focusing on the requirement in standing analysis that the injury be a personal one: "We have consistently stressed that a plaintiff's complaint must establish that he has a 'personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." *Id*. at 819 (quoting *Lujan*, 504 U.S. at 560-61 and

14

Add. 14

n.1). Next, the Court noted "[w]e have also stressed that the alleged injury must be legally and judicially cognizable. This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is . . . concrete and particularized,' *Lujan*, 504 U.S. at 560, and that the dispute is 'traditionally thought to be capable of resolution through the judicial process.'" *Id.* (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)). Finally, the Court noted that the jurisdictional standing requirement must be strictly complied with: "our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 819-20 (citations omitted). "'[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers.'" *Id*. at 820 (quoting *Allen,* 468 U.S. at 751). In view of these observations, the Court concluded that it "must carefully inquire as to whether appellees have met their burden of establishing that their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Id*.

The Court distinguished *Powell v. McCormack*, in which it held that a Congressman's "constitutional challenge to his exclusion from the House of Representatives (and his consequent

loss of salary) presented an Article III case or controversy,"
*id.* at 820-21 (citing *Powell,* 395 U.S. 486, 496, 512-14 (1969)),
on two grounds. First, the *Raines* plaintiffs had not been
singled out for unfavorable treatment from the other members of
their respective bodies as occurred in *Powell*; rather, "[t]heir
claim is that the Act causes a type of institutional injury (the
diminution of legislative power), which necessarily damages all
Members of Congress and both Houses of Congress equally." *Id.* at
821. Second, the *Raines* plaintiffs "[did] not claim that they
have been deprived of something to which they are *personally*
entitled . . ." *id.*; rather, their

> claim of standing is based on a loss of
> political power, not loss of any private
> right, which would make the injury more
> concrete. . . . [T]he injury claimed by the
> Members of Congress here is not claimed in any
> private capacity but solely because they are
> Members of Congress. If one of the Members
> were to retire tomorrow, he would no longer
> have a claim; the claim would be possessed by
> his successor instead. The claimed injury thus
> runs (in a sense) with the Member's seat, a
> seat which the Member holds (it may quite
> arguably be said) as trustee for his
> constituents, not as a prerogative of personal
> power.

*Id.* (internal citation omitted). Thus, according to the Court,
the *Raines* plaintiffs' injury was an institutional one and not
sufficiently concrete and personal.

The Court then distinguished *Coleman v. Miller*, "[t]he one
case in which we have upheld standing for legislators (albeit

***state*** legislators) claiming an institutional injury." *Id.* (discussing *Coleman v. Miller*, 307 U.S. 433 (1939)). In *Coleman*, the vote on whether to ratify a proposed federal constitutional amendment was tied at twenty to twenty, which meant the amendment would not have been ratified. *Id.* at 822 (citing *Coleman*, 307 U.S. at 436). The Lieutenant Governor, as the presiding officer of the State Senate, cast a vote in favor of the amendment and it was deemed ratified. *Id.* The twenty state senators who had voted against the amendment sued, and eventually the Court held that the members of the legislature had standing because "if these legislators (who were suing as a bloc) were correct on the merits, then their votes not to ratify the amendment were deprived of all validity." *Id.* In *Raines*, the Court clarified that "our holding in *Coleman* stands . . . for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Id.* at 823. Noting that this is what the *Coleman* holding stands for "at most," the Court declined to distinguish *Coleman* on, *inter alia*, the ground that "*Coleman* has no applicability to a similar suit brought by federal legislators, since the separation-of-powers concerns present in such a suit were not present in *Coleman* . . . ." *Id.* at 824 n.8.

17

The Court then distinguished the claims in *Raines* from those in *Coleman*:

> [Here], [plaintiffs] have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect. They simply lost that vote. Nor can they allege that the Act will nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified. In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process. In addition, a majority of Senators and Congressmen can vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process.

*Id*. at 824 (footnote omitted). Thus, according to the Court, the *Raines* plaintiffs could not allege that their votes had been nullified in the past; rather, they had lost the vote on the Act. *See id*. And the *Raines* plaintiffs could not allege that their votes would be nullified in the future because they had a variety of legislative remedies at their disposal. *See id*.

The Court then considered the lack of a historical practice of lawsuits being filed "on the basis of claimed injury to official authority or power" as a result of analogous confrontations between the Legislative and Executive Branches of the federal government. *Id*. at 826; *see also infra* Section IV.3.b. The Court concluded that, under the Constitution, it is

18

Add. 18

not the role of the Article III courts to have "'some amorphous general supervision of the operations of government . . . .'" *Raines,* 521 U.S. at 829 (quoting *United States v. Richardson,* 418 U.S. 166, 192 (1974) (Powell, J., concurring)).

The Court rejected the *Raines* plaintiffs' basis for standing, ultimately holding that "these individual members of Congress do not have a sufficient 'personal stake' in this dispute and have not alleged a sufficiently concrete injury to have established Article III standing." *Id.* at 830 (no citation for internal quotation in original). In so holding, the Court noted that "appellees have alleged no injury to themselves as individuals (*contra*, *Powell*), the institutional injury they allege is wholly abstract and widely dispersed *(contra*, *Coleman*), and their attempt to litigate this dispute at this time and in this form is contrary to historical experience." *Id.* at 829. The Court stated that it "attach[ed] some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." *Id.* (footnote omitted). The Court also thought it important to note that "our conclusion [does not] deprive[] Members of Congress of an adequate remedy (since they may repeal the Act or exempt appropriations bills from its reach) nor forecloses the Act from constitutional

19

challenge (by someone who suffers judicially cognizable injury
as a result of the Act)." *Id.*

### b. *Arizona State Legislature v. Arizona Independent Redistricting Commission*

Relying on *Coleman*, the Supreme Court recently reaffirmed
that legislators, albeit state legislators as an institutional
plaintiff, have standing to sue based on a vote nullification
claim. In *Arizona State Legislature v. Arizona Independent
Redistricting Commission,* the state legislature plaintiff
challenged a ballot measure that would have denied it the
authority to draw congressional districts. 135 S. Ct. 2652, 2659
(2015). The legislature's alleged injury was that the ballot
initiative deprived it of its legislative prerogative to
initiate redistricting. *Id.* at 2663. Relying on *Coleman,* as
clarified in *Raines,* the Court held that the plaintiff had
standing because "their votes have been completely nullified."
*Id.* at 2665 (quoting *Raines*, 521 U.S. at 823). As the Court
explained, "[o]ur conclusion that the Arizona Legislature has
standing fits [within *Coleman*]" because the ballot initiative
"together with the Arizona Constitution's ban on efforts to
undermine the purposes of an initiative" would "'completely
nullif[y]' any vote by the Legislature, now or 'in the future,'
purporting to adopt a redistricting plan." *Id.* at 2667 (quoting
*Raines*, 521 U.S. at 823-24). The Court distinguished *Raines* on

20

the grounds that *Raines* had not been brought by an institutional
plaintiff: "The Arizona Legislature, in contrast, is an
institutional plaintiff asserting an institutional injury, and
it commenced this action after authorizing votes in both of its
chambers. That 'different . . . circumstanc[e],' was not *sub
judice* in *Raines*." *Id.* at 2664 (citation omitted). The Court also
noted that the case before it "does not touch or concern the
question whether Congress has standing to bring a suit against
the President . . . which would raise separation of powers
concerns absent here." *Id.* at 2665 n.12.

*       *       *       *       *

In sum*, Raines* teaches that when a suit is brought by an
individual Member of Congress, the member can allege either a
personal injury or an institutional injury. If the injury is
personal, standing is present when the injury arises out of
something to which the member is personally entitled, such as
the salary associated with his or her seat. As to an
institutional injury, the Court has recognized standing when a
legislator's vote has been completely nullified. The Supreme
Court has upheld legislator standing based on a vote
nullification claim in two instances. In *Coleman*, a bloc of
individual state "legislators whose votes would have been

sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified." *Raines*, 521 U.S. at 823 (footnote omitted). In *Arizona State Legislature*, the legislature, as an institutional plaintiff authorizing the lawsuit, had standing to sue based on the alleged nullification of their votes "now" or "in the future" as a result of a ballot initiative. 135 S. Ct. at 2667. Although neither of these cases implicated federal separation-of-powers concerns, the *Raines* Court specifically declined to hold that *Coleman* would be inapplicable "to a similar suit brought by federal legislators." *Raines*, 521 U.S. at 824 n.8.

*Raines* also teaches that it is not necessary for an institutional claim to be brought by or on behalf of the institution. *Id.* at 829 ("We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit."). Indeed, in *Coleman*, the claim was not brought on behalf of the state senate as an institutional plaintiff, but rather by a bloc of individual legislators who had voted not to ratify the constitutional amendment. 307 U.S. at 436. Finally, by not overruling *Coleman,* the *Raines* Court suggests that vote nullification is an

22

institutional injury that is personal, although not in the sense
that the injury in *Powell* was personal, to the legislators
entitled to cast the vote that has been nullified.

Regarding the separation-of-powers concerns implicated by
an inter-branch suit, *Raines* instructs the Court to consider
whether there is a lack of a historical practice of lawsuits
being filed "on the basis of claimed injury to official
authority or power" as a result of analogous confrontations
between the Legislative and Executive Branches of the federal
government. *Raines,* 521 U.S. at 826. *Raines* also instructs the
Court to consider whether there is an adequate legislative
remedy and whether another plaintiff could bring the case. *Id.*

### c. D.C. Circuit Precedent

The Court of Appeals for the District of Columbia Circuit
("D.C. Circuit") has applied *Raines* twice, each time finding
legislator standing to be foreclosed.[6] In *Chenoweth v. Clinton*,
four members of Congress sued the President and another

---

[6] Because the Court has determined that plaintiffs have standing
to bring their claims pursuant to *Raines* and subsequent D.C.
Circuit precedent, it need not address the parties' arguments
regarding pre-*Raines* D.C. Circuit authority. At oral argument,
the Court questioned plaintiffs about their reliance on pre-
*Raines* D.C. Circuit authority, given that *Raines* called into
question portions of that authority. *See Chenoweth*, 181 F.3d
112, 115 (D.C. Cir. 1999). In response, plaintiffs clarified
their reliance on *Raines* and post-*Raines* D.C. Circuit precedent
for the proposition that they have standing based on their vote
nullification claim. Hr'g Tr., ECF No. 54 at 20:22-24.

Executive Branch official to enjoin the implementation of the
American Heritage Rivers Initiative ("AHRI"), a program
President Clinton created by Executive Order. 181 F.3d 112, 112
(D.C. Cir. 1999). After President Clinton announced his
intention to create the AHRI, three of the four plaintiffs
introduced a bill to end the program, but it never came to a
vote. *Id.* at 113. Plaintiffs then sued, alleging that the
President's creation of the program by Executive Order "deprived
[the plaintiffs] of their constitutionally guaranteed
responsibility of open debate and vote on issues and legislation
involving interstate commerce, federal lands, the expenditure of
federal monies, and implementation of the [National
Environmental Policy Act]." *Id.* (citing Compl.). Applying
*Raines*, the Court held that the plaintiffs lacked standing
because the injury they alleged was "a dilution of their
authority as legislators," which was "identical to the injury
the Court in *Raines* deprecated as 'widely dispersed' and
'abstract.'" *Id.* at 115 (no citation for internal quotation in
original). The Court reasoned that "[i]f, as the Court held in
*Raines*, a statute that allegedly 'divests [congressmen] of their
constitutional role' in the legislative process does not give
them standing to sue, then neither does an Executive Order that
allegedly deprives congressmen of their 'right[] to participate
and vote on legislation in a manner defined by the

24

Add. 24

Constitution.'" *Id*. (citation omitted). A central element of the
Court's reasoning was that "[i]t [was] uncontested that the
Congress could terminate the AHRI were a sufficient number in
each House so inclined." *Id*. at 116.

In view of the Supreme Court's decision in *Raines*, the
Court considered whether its earlier ruling in *Kennedy v.
Sampson* survived. *Id*. at 116-17 (discussing *Kennedy v. Sampson*,
511 F.2d 430 (D.C. Cir. 1974)). In *Kennedy*, the Court held,
partially relying on the pre-*Raines* understanding of *Coleman*,
that an individual Senator had standing to challenge a
Presidential pocket veto. *Kennedy*, 511 F.2d at 433-35. Noting
that *Raines* narrowed the *Coleman* holding, the Court stated that
*Kennedy* may nonetheless remain good law:

> Even under this narrow interpretation, one
> could argue that the plaintiff in *Kennedy* had
> standing. The pocket veto challenged in that
> case had made ineffective a bill that both
> houses of the Congress had approved. Because
> it was the President's veto—not a lack of
> legislative support—that prevented the bill
> from becoming law (either directly or by the
> Congress voting to override the President's
> veto), those in the majority could plausibly
> describe the President's action as a ***complete
> nullification*** of their votes.

*Chenoweth,* 181 F.3d. at 116-17 (emphasis added). The Court
distinguished the claims before it from *Coleman* on the ground
that plaintiffs "do not allege that the necessary majorities in
Congress voted to block the AHRI. Unlike the plaintiffs in

*Kennedy* and *Coleman*, therefore, they cannot claim their votes were effectively nullified by the machinations of the Executive." *Id.* at 117.

In the second post-*Raines* case considered, *Campbell v. Clinton*, thirty-one Members of Congress sued President Clinton, alleging that he violated the War Powers Resolution and the War Powers Clause of the Constitution by directing the participation of U.S. forces in Yugoslavia. 203 F.3d 19, 19 (D.C. Cir. 2010). A month after President Clinton announced that participation, Congress voted on four resolutions related to the conflict: (1) a declaration of war was defeated 427 to 2; (2) an "authorization" of the air strikes was defeated 213 to 213; (3) a resolution that would have required the President to end U.S. participation in the operation was defeated; and (4) funding for involvement in the operation was approved. *Id.* at 20. Plaintiffs claimed that they fit within the "*Coleman* exception to the *Raines* rule" by filing suit after having "defeat[ed] the War Powers Resolution authorization by a tie vote." *Id.* at 22. The Court found neither of their claims to be analogous to the nullification that occurred in *Coleman*, which the Court understood "to mean treating a vote that did not pass as if it had, or vice versa." *Id.* at 22. In *Coleman*, "state officials endorsed a defeated ratification, treating it as approved, while the President here did not claim to be acting

26

pursuant to the defeated declaration of war or a statutory authorization, but instead 'pursuant to [his] constitutional authority to conduct U.S. foreign relations and as Commander-in-Chief and Chief Executive.'" *Id*. at 22 (discussing *Coleman v. Miller*, 307 U.S. 433 (1939) and quoting Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 35 Weekly Comp. Pres. Doc. 528 (Mar. 26, 1999)). The Court reasoned that plaintiffs' argument based on the War Powers Resolution, "although cast in terms of the nullification of a recent vote, essentially is that the President violated the . . . War Powers Resolution" and their argument based on the War Powers Clause "is that the President has acted illegally-in excess of his authority-because he waged war in a constitutional sense without a congressional delegation." *Id*. Regarding the *Raines* Court's use of the word "nullification," the Court stated:

> We think the key to understanding the Court's
> treatment of *Coleman* and its use of the word
> nullification is its implicit recognition that
> a ratification vote on a constitutional
> amendment is an unusual situation. It is not
> at all clear whether once the amendment was
> "deemed ratified," *see Raines,* 521 U.S. at
> 822, the Kansas Senate could have done
> anything to reverse that position. We think
> that must be what the Supreme Court implied
> when it said the *Raines* plaintiffs could not
> allege that the "[Line Item Veto Act] would
> nullify their votes *in the future,"* and that,
> after all, a majority of senators and
> congressmen could always repeal the Line Item

27

> Veto Act. *Id*. at 824 (emphasis added). The
> *Coleman* senators, by contrast, may well have
> been powerless to rescind a ratification of a
> constitutional amendment that they claimed had
> been defeated. In other words, they had no
> legislative remedy.

*Id.* at 22-23 (quoting *Raines*, 521 U.S. at 824) (footnote

omitted). Applying *Raines*, the Court held that the plaintiffs

lacked standing under "the *Coleman* exception" because they had

"ample legislative power to have stopped prosecution of the

'war'" despite having lost the vote on the War Powers Resolution

authorization. *Id*. at 23 (no citation for internal quotation in

original). Therefore, despite the tie vote, the *Campbell*

plaintiffs had legislative remedies at their disposal, unlike

the situation in *Coleman*.

*   *   *   *   *

In sum, D.C. Circuit precedent teaches that individual

Members of Congress do not have standing to sue the Executive

Branch when their institutional injury is such that they can

obtain their remedy in Congress. In *Campbell*, the Court

understood vote nullification "to mean treating a vote that did

not pass as if it had, or vice versa." *Campbell*, 203 F.3d at 22.

In *Chenoweth*, the Court suggested that notwithstanding *Raines*, a

single Member of Congress could have standing to sue based on a

28

vote nullification claim when it was the President's action, rather than "a lack of legislative support," that nullified the Member's vote. *Chenoweth,* 181 F.3d at 117. Such a situation is therefore a third instance of a type of vote nullification for which a legislator could have standing.[7]

### 2. Plaintiffs Adequately Allege a Judicially Cognizable Injury

#### a. Injury-in-Fact

To establish that they have an injury-in-fact, plaintiffs must allege that their injury is "personal, particularized, concrete, and otherwise judicially cognizable." *Raines*, 521 U.S. at 820. Regarding the requirement that the injury be "legally and judicially cognizable," "the plaintiff [must allege to] have suffered 'an invasion of a legally protected interest which is .

---

[7] The closest constitutional analogy to plaintiffs' claims here is that in *Kucinich v. Bush.* 236 F. Supp. 2d 1 (D.D.C. 2002). In that case, thirty-two Members of the House of Representatives "challenged President Bush's unilateral withdrawal from the 1972 Anti-Ballistic Missile Treaty . . . without the approval of Congress," contending that President Bush was required to obtain their consent before terminating a treaty. *Id*. at 1. Applying *Raines*, *Chenoweth*, and *Campbell*, the Court held plaintiffs did not have standing because their "claim of a 'grievous institutional injury' where they are 'deprived of their constitutional right . . . to participate in treaty termination' was no different from the institutional injuries alleged in *Chenoweth*, *Campbell,* and *Raines." Id.* at 9. The Court did not discuss whether the plaintiffs' votes had been nullified. In any event, the Court also concluded that the plaintiffs' raised a nonjusticiable political question. *Id*. The President has not argued that the claims here involve nonjusticiable political questions. Therefore, this persuasive authority is inapposite.

. . concrete and particularized' *Lujan*, 504 U.S. at 560, and
that the dispute is 'traditionally thought to be capable of
resolution through the judicial process.'" *Id.* at 819 (quoting
*Flast*, 392 U.S. at 97).

### b. Plaintiffs Adequately Allege an Institutional Injury

In the context of legislator standing, the Supreme Court
has recognized at least one type of institutional injury for
which legislators may have standing to sue: complete vote
nullification. *Coleman*, 307 U.S. at 438; *Raines*, 521 U.S. at
821-23; *Ariz. State Legislature,* 135 S. Ct. at 2667; *Cummings v.
Murphy*, No. 17-2308, slip op. at 18 (D.D.C. Aug. 14, 2018)
("[c]omplete vote nullification is clearly a type of
institutional injury sufficient to support legislator
standing"). Since an institutional injury will "necessarily
damage all Members of Congress and both Houses of Congress
equally," *Raines,* 521 U.S. at 821, it will not be a personal
injury in the sense that the injury in *Powell* was personal. If
institutional injuries were incapable of also being personal to
individual members of the institution, however, the Court in
*Raines* would have overruled *Coleman*. *Id*. at 819 ("We have
consistently stressed that a plaintiff's complaint must
establish that he has a 'personal stake' in the alleged dispute,
and that the alleged injury suffered is particularized as to

30

him."). Instead, the Supreme Court reaffirmed *Coleman* in both
*Raines, id*. at 821, and *Arizona State Legislature*, 135 S. Ct. at
2665, necessarily holding that the institutional injury alleged
–vote nullification–was sufficiently personal to each of the
individual plaintiffs to satisfy the standing requirement under
Article III.

The Clause requires the President to ask Congress before
accepting a prohibited foreign emolument. Accepting the
allegations in the Complaint as true, which the Court must at
this juncture, the President is accepting prohibited foreign
emoluments without asking *and* without receiving a favorable
reply from Congress. The "nature and source of the claim,"
*Warth,* 422 U.S. at 500, is an unusual[8] constitutional provision
which unambiguously prohibits the President from accepting any
emolument from "any King, Prince or foreign State" unless
Congress chooses to permit an exception. U.S. Const. art. I, §
9, cl. 8; 17 Op. O.L.C. 114, 121 (1993). The specific facts
alleged are that the President has accepted, and intends to
continue accepting, prohibited foreign emoluments without
seeking congressional consent. Am. Compl., ECF No. 14 ¶¶ 4, 37,
39, 40, 77, 78, 79. Furthermore, the President has not provided

---

[8] The only similar provision is the Article II requirement that
the President obtain the advice and consent of Congress prior to
taking covered executive branch action. U.S. Const. art. II, §
2, cl. 2.

any information to Congress about any foreign emoluments he has received. *Id*. ¶¶ 41, 80. The President is depriving plaintiffs of the opportunity to give or withhold their consent, thereby injuring them "in their roles as members of Congress." *Id*. ¶ 5. Specifically, the President has neither sought plaintiffs' consent prior to accepting prohibited foreign emoluments, nor provided any information to Congress about them, thereby preventing plaintiffs from "exercis[ing] their constitutional prerogative to authorize or reject the specific emoluments he is accepting." *Id*. ¶ 41. Plaintiffs adequately allege that the President has completely nullified their votes in the past because he has accepted prohibited foreign emoluments as though Congress had provided its consent. And he will completely nullify their votes in the future for the same reason, as plaintiffs allege that he intends to continue this practice. The President's alleged acceptance of prohibited foreign emoluments as though Congress provided consent is indistinguishable from "treating a vote that did not pass as if it had, or vice versa." *Campbell*, 203 F.3d at 22. And, as soon as the President accepts a prohibited foreign emolument without obtaining congressional consent, his acceptance is irreversible. *Id*. at 22-23. Accordingly, plaintiffs adequately allege that the President has completely nullified their votes.

Although plaintiffs do not sue on behalf of Congress, but rather in their individual official capacities as Members of Congress, their ability to bring this suit is not foreclosed by Supreme Court and D.C. Circuit precedent. The *Raines* Court did not hold that it would be necessary for an institutional claim to be brought by or on behalf of the institution. *Raines*, 521 U.S. at 829. Rather, the fact that the case had not been authorized by the institution was a relevant consideration, but not dispositive, in determining that the *Raines* plaintiffs lacked standing. *Id*. Moreover, the claim in *Coleman* was not brought on behalf of the state senate as an institutional plaintiff, but rather by a bloc of individual members who had voted not to ratify the constitutional amendment. *Coleman*, 307 U.S. at 438. The Supreme Court distinguished *Raines* from *Arizona State Legislature* because the latter *was* brought by the legislature as an institution, *Ariz. State Legislature*, 135 S. Ct. at 2664, but in finding the legislature to have standing, the Supreme Court did not hold that an institutional claim may be brought *only* by the institution. *See generally id*. Furthermore, notwithstanding *Raines*, a single Member of Congress could have standing to sue based on a vote nullification claim when it was the President's action, rather than "a lack of legislative support," that nullified the Member's vote. *Chenoweth,* 181 F.3d at 117.

33

Add. 33

### i. The President Misstates the Injury

The President acknowledges that "when a legislative vote is deemed defeated by executive action," the legislator has standing to sue unless there is a legislative remedy. Mot. to Dismiss, ECF No. 15-1 at 17. Although he disputes that plaintiffs' votes have been "defeated by executive action," his argument relies on a misstatement of the alleged injury. The President contends that plaintiffs cannot plausibly allege that he has prevented votes from being taken on the emoluments bills pending before Congress,[9] or that he has prevented Congress from otherwise voting on the emoluments issue. *Id.* at 24, 26. He also emphasizes that Congress may still choose to vote on the pending bills or on bills introduced in the future. *Id.* at 26. However, the votes contemplated by the President are not votes to consent, or not, in response to the President's request for consent prior to his acceptance of a prohibited foreign emolument. Rather, these are votes on the issue of emoluments. Injury to their power to *legislate on the issue of emoluments* is not the injury plaintiffs allege. *See generally* Am. Compl., ECF No. 14. To be clear, plaintiffs' alleged injury is caused by the

---

[9] *See* S. Con. Res. 8, 115th Cong. (2017) (among other things, declaring the President's dealings through his companies with foreign governments to be potential violations of the emoluments clause); H.R.J. Res. 16, 115th Cong. (2017) (denying congressional consent for the President to accept any foreign emolument during his Presidency).

President's alleged refusal to give them the opportunity to
exercise their constitutional right to vote on whether to
consent prior to his acceptance of prohibited foreign
emoluments. It is irrelevant that Congress can express its
consent through legislation on the issue of emoluments or that
it has done so in the past on limited occasions.[10] In the absence
of such legislation, the President deprives plaintiffs of the
opportunity to vote every time he accepts an emolument from "any
King, Prince, or foreign State" without the consent of Congress.
U.S. Const. art. I, § 9, cl. 8.[11]

### ii. The President Reads the Precedent too Narrowly

According to the President, a Court may conclude that
plaintiffs have standing for a vote nullification claim only
when they can "allege that 'the necessary majorities in the
Congress voted' to withhold consent to the President's alleged

---

[10] *See* Foreign Gifts and Decorations Act of 1966, 5 U.S.C. §
7342.

[11] Similarly, the President argues that unlike the situation in
*Coleman*, there is nothing that is "unusual" or "irreversible"
here because Congress may choose to vote on "the emoluments
issue" in the future. Mot. to Dismiss, ECF No. 15-1 at 26;
Reply, ECF No. 28 at 14. Again, the President's argument relies
on the same misstatement of the alleged injury. Moreover, each
time the President accepts prohibited foreign emoluments without
the consent of Congress, that acceptance without consent is
irreversible. Finally, although not "unusual" in the sense that
word was used in *Coleman*, the President's failure to comply with
the Clause is highly unusual given that prior Presidents have
ensured that their actions were consistent with the Clause. *See
supra* Section IV.B.

acceptance of prohibited foreign emoluments." Mot. to Dismiss,
ECF No. 15-1 at 25 (quoting *Chenoweth*, 181 F.3d at 117). As an
initial matter, again the President has misstated the injury.
Moreover, the Court disagrees with this narrow reading of
*Coleman*. Although the *Raines* Court narrowed the *Coleman* holding,
the Court neither held nor implied that the only type of vote
nullification claim for which a legislator would have standing
would be "legislators whose votes would have been sufficient to
defeat (or enact) a specific legislative Act . . . if that
legislative action goes into effect (or does not go into
effect), on the ground that their votes have been completely
nullified." *Raines,* 521 U.S. at 823. Indeed, following *Raines*,
the Supreme Court recognized that the Arizona State Legislature
as an institutional plaintiff had standing to bring a vote
nullification claim. *See Ariz. State Legislature*, 135 S. Ct. at
2667. The legislature there did not allege that it had the
"necessary majorities" to take action; rather the claimed injury
was that the ballot initiative deprived the plaintiff of a
legislative "prerogative." *Id.* at 2663. The D.C. Circuit has
emphasized that the *Coleman* exception is a "narrow rule,"
*Chenoweth*, 181 F.3d at 116; *see Campbell*, 203 F.3d at 22-23, and
has interpreted the *Coleman* exception "to mean treating a vote
that did not pass as if it had, or vice versa," *Campbell*, 203
F.3d at 22. As the Court has explained, *supra* Section IV.C.2.b,

36

here the President has allegedly accepted prohibited foreign emoluments as though Congress has provided its consent, which is indistinguishable from "treating a vote that did not pass as if it had, or vice versa."[12] *Id.*

The President insists that upholding standing here would require a "drastic extension of *Coleman*," which the Supreme Court in *Raines* rejected. Mot. to Dismiss, ECF No. 15-1 at 25. The Court disagrees. *Raines* would have required a drastic extension of *Coleman* because the nature of the vote nullification in *Coleman* was different from the "abstract dilution of legislative power" alleged in *Raines*. *Raines*, 521 U.S. at 826. And critically, the *Raines* plaintiffs had adequate legislative remedies at their disposal. *Id.* at 824. Here, by contrast, the President's complete nullification of plaintiffs' votes is entirely different from the "abstract dilution of legislative power" alleged in *Raines*. *Id.* at 826. And as will be explained in detail, plaintiffs have no adequate legislative remedies. *See infra* Section IV.C.4.

---

[12] For the same reason, the Court rejects the President's argument that plaintiffs' reliance on the vote nullification theory articulated in *Coleman* is misplaced to the extent they claim their injury encompasses being deprived of the option of not voting because none of the precedent recognizes such an injury. Reply, ECF No. 28 at 17.

37

### c. Plaintiffs' Alleged Injury is Personal, Particularized and Concrete

Plaintiffs allege that the President has accepted, and intends to continue accepting, prohibited foreign emoluments without seeking congressional consent, thereby depriving them of the opportunity to vote on whether to consent to his acceptance of emoluments before he accepts them. Am. Compl., ECF No. 14 ¶¶ 3-4. Plaintiffs' injury is to a "legally protected interest" because the Clause prohibits the President from accepting "any" emolument from "any King, Prince, or foreign State" without the consent of Congress. U.S Const. art. I, § 9, cl. 8. Consent is obtained through the aggregate of the specific votes that each individual Member of Congress is entitled to take. *Id.* art. I, § 1; art. I, § 3, cl. 1; art. I, § 5, cl. 3. Although this injury is dispersed among all Members of Congress, as will necessarily be the case when an institutional injury is alleged, this does not render the injury less concrete or particularized. *See Raines,* 521 U.S. at 821 (stating an institutional injury will "necessarily damage all Members of Congress and both Houses of Congress equally"); *Ariz. State Legislature*, 135 S. Ct. at 2664 (Plaintiff "is an institutional plaintiff asserting an institutional injury"). Rather, each time the President allegedly accepts a foreign emolument without seeking congressional consent, plaintiffs suffer a concrete and

38

particularized injury—the deprivation of the right to vote on whether to consent to the President's acceptance of the prohibited foreign emolument—before he accepts it. And although the injury is an institutional one, the injury is personal to legislators entitled to cast the vote that was nullified. *See Raines,* 521 U.S. at 823 (narrowing but not overruling the holding in *Coleman*); *Ariz. State Legislature*, 135 S. Ct. at 2664-65 (holding that the legislature has standing to sue); *supra* Section IV.C.2.b. Accordingly, plaintiffs adequately allege that they "have suffered 'an invasion of a legally protected interest which is . . . [personal,] concrete and particularized.'" *Raines,* 521 U.S. at 819 (quoting *Lujan*, 504 U.S. at 560).

The President argues that the injury alleged here is insufficiently concrete to give the plaintiffs a "personal stake in the dispute" because the injury "damages all Members of Congress and both Houses of Congress equally." Reply, ECF No. 28 at 10 (quoting *Raines*, 521 U.S. at 821, 830). Furthermore, according to the President, the alleged injury cannot support Article III standing because it is felt equally by all Members of Congress "solely because they are Members of Congress," as distinct from the personal injury alleged in *Powell*. Reply, ECF No. 28 at 11 (quoting *Raines,* 521 U.S. at 821). The Court disagrees. The *Raines* Court recognized two types of injuries

39

that could support legislator standing: (1) a personal injury
such as that typified in *Powell;* and (2) an institutional
injury—vote nullification—such as that in *Coleman*. *Raines*, 521
U.S. at 829-30. An institutional injury will "necessarily damage
all Members of Congress and both Houses of Congress equally" and
will be felt equally by Members of Congress "solely because they
are Members of Congress." *Id.* at 821. And as explained, *supra* at
30-31, by reaffirming *Coleman* in *Raines* and *Arizona State
Legislature*, the Supreme Court necessarily held that the
institutional injury alleged was sufficiently personal to each
of the plaintiffs to satisfy the standing requirement under
Article III.

### i. Plaintiffs' Alleged Injury is Distinguishable from the Injuries Alleged in the Precedent

The President argues that plaintiffs' claims are squarely
foreclosed by *Raines*. The Court disagrees. As an initial matter,
the President reads *Raines* to establish "a foundational
principle that the denial of institutional legislative
prerogative is not a judicially cognizable injury." Mot. to
Dismiss, ECF No. 15-1 at 16. This broad principle, however, is
not supported by *Raines*. *Raines* establishes that legislators may
have standing based on the nullification of their votes, which
is an institutional, as opposed to a personal, injury. *Raines*,
521 U.S. at 821-23. To establish the broad principle asserted by

40

the President, the *Raines* Court would have needed to overrule
*Coleman*. Not only did the *Raines* Court not overrule *Coleman*, but
the Court also relied on *Coleman* to uphold standing in *Arizona
State Legislature*, in which the alleged injury was deprivation
of a legislative prerogative. *Ariz. State Legislature*, 135 S.
Ct. at 2663.

   The President argues that the injury alleged here amounts
only to a "dilution of institutional legislative power." Mot. to
Dismiss, ECF No. 15-1 at 22 (quoting *Raines*, 521 U.S. at 820).
Moreover, according to the President, there is little difference
between the claim in *Raines* and the claim here because the
members in *Raines* argued that the challenged Act "deprived them
of 'their constitutional role in the repeal of legislation'"
which "does not differ materially from Plaintiffs' claim that
they have been denied their constitutional role in deciding
whether to consent to the President's acceptance of allegedly
prohibited foreign emoluments," Reply, ECF No. 28 at 10-11
(quoting *Raines*, 521 U.S. at 816). In so arguing, the President
insists that plaintiffs' claimed injury is indistinguishable
from the claimed injury in *Chenoweth*. Mot. to Dismiss, ECF No.
15-1 at 23-24. The Court disagrees. The injury alleged here is
distinguishable from those alleged in *Raines* and *Chenoweth*. In
*Raines*, plaintiffs sued after being on the losing side of the
vote that enacted the Line Item Veto Act, alleging that their

41

injury was the diminution of legislative power caused by the
Act. *Raines*, 521 U.S. at 814. In *Chenoweth*, plaintiffs sued
after their bill seeking to end a program created by the
President by Executive Order failed to be brought to a vote,
alleging that their injury was that Members of Congress had been
deprived of their right to vote on the Presidentially-created
program. *Chenoweth,* 181 F.3d at 112. In each case, plaintiffs
either lost the vote in Congress or did not have the political
influence to bring their bill to a vote, and then sought relief
in the courts. Here, by contrast, plaintiffs' alleged injury is
caused by the President's alleged acceptance of prohibited
foreign emoluments before seeking and obtaining congressional
consent, not by any action taken or not taken by their
congressional colleagues. *See Chenoweth,* 181 F.3d at 117 ("it
was the President's veto—not a lack of legislative support—that
prevented the bill from becoming a law"); *infra* Section
IV.C.3.a. The President's repeated misstatement of the injury
does not change the nature of plaintiffs' alleged injury.
Finally, the President's alleged acceptance of a prohibited
foreign emolument before obtaining congressional consent does
not "dilute" plaintiffs' legislative power because they do not
allege injury to their ability to legislate on the issue of
emoluments.

### 3. Separation-of-Powers Considerations

#### a. Plaintiffs Lack Adequate Legislative Remedies

The Court does agree with the President that, "when legislators possess 'political tools with which to remedy their purported injury,' they may not seek the aid of the Judiciary." Mot. to Dismiss, ECF No. 15-1 at 26 (quoting *Campbell*, 203 F.3d at 23-24). But here, plaintiffs lack such tools.

In addition to Congress bringing the bills currently pending to a vote, *see supra* Section IV.C.2.b.i, the President suggests that the following types of legislation would provide plaintiffs with a legislative remedy: (1) voting on whether what plaintiffs allege "constitute[s] violations of the Foreign Emoluments Clause by the President and whether Congress should provide its consent," Mot. to Dismiss, ECF No. 15-1 at 2; (2) "vot[ing] on a private bill[13] consenting to the receipt of what it construed to be emoluments received from foreign governments or a joint resolution expressing its disagreement with such receipt," *id.* at 24; and/or (3) "vot[ing] on a joint

---

[13] A private bill is legislation that addresses a matter of narrow interest, which after being passed in identical form by the House and Senate, is submitted to the President for signature. United States Senate, Bills and Resolutions, Legislation, Laws and Acts, available at https://www.senate.gov/pagelayout/legislative/d_three_sections_with_teasers/bills.htm.

43

resolution[14] that provides what Congress perceives to be the proper definition of an emolument and prohibits any and all emoluments, including ones unknown to Congress," Reply, ECF No. 28 at 18. According to this argument, plaintiffs have ample legislative remedies at their disposal; they just don't have the votes.

The President's purported legislative remedies are clearly inadequate within the meaning of *Raines*. *Raines*, 521 U.S. at 829 (legislative remedy must be an "adequate" remedy). In *Raines*, *Chenoweth*, and *Campbell*, adequate legislative remedies were available to redress the plaintiffs' grievances. In *Raines*, "a majority of Senators and Congressmen c[ould] pass or reject appropriations bills; the Act has no effect on this process. Moreover, a majority of Senators and Congressmen c[ould] vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process." *Id*. at 824. In *Chenoweth*, "[i]t [was] uncontested that the Congress could

---

[14] A joint resolution, with one exception, is legislation that requires the approval of both the House and Senate and is submitted to the President for signature. The exception is when the joint resolution proposes a constitutional amendment. United States Senate, Bills and Resolutions, Legislation, Laws and Acts, available at https://www.senate.gov/pagelayout/legislative/d_three_sections_with_teasers/bills.htm.

terminate the AHRI were a sufficient number in each House so inclined." *Chenoweth*, 181 F.3d at 116. And in *Campbell*, "Congress certainly could have passed a law forbidding the use of U.S. forces in the Yugoslav campaign." *Campbell*, 203 F.3d at 23.[15]

Here, by contrast, legislation on the emoluments issue does not provide an adequate remedy. First, in asking this Court to accept the proposition that legislation on the emoluments issue would be an adequate remedy, the President asks this Court to ignore this constitutional Clause. The Court may not do so. *See Marbury*, 1 Cranch at 174 ("It cannot be presumed that any clause in the constitution is intended to be without effect . . . ."). The Clause is unambiguous: acceptance is prohibited without "Consent." U.S Const. art. I, § 9, cl. 8. The Clause therefore places the burden on the President to convince a majority of Members of Congress to consent. The legislation suggested by the President flips this burden, placing the burden on Members of Congress to convince a majority of their colleagues to enact the suggested legislation. This is not what the Clause requires.

---

[15] The President disputes that the precedent requires "political remedies [to] put the plaintiff members back in the same position as if the Executive had not caused the alleged injury in the first place." Reply, ECF No. 28 at 17. This is beside the point because in each case, there was an adequate legislative remedy, whereas here there is none.

45

Second, the President does not explain why such legislation, assuming he signed it, would prevent him from accepting prohibited foreign emoluments. His failure to explain is especially problematic given that the Constitution itself has not prevented him from allegedly accepting them. Third, the President does not explain how the proposed legislation would be adequate in view of the allegation that the President has not provided any information to Congress about the prohibited foreign emoluments he has received, and that he does not intend to change this practice. Am. Compl., ECF No. 14 ¶¶ 40, 41. Legislating after Congress happens to learn about his acceptance of a prohibited foreign emolument through news reports is clearly an inadequate remedy. Fourth, legislation disagreeing with the President's acceptance of prohibited foreign emoluments does not provide a remedy for him already having allegedly accepted them without seeking and obtaining consent. Finally, legislation would neither prevent the President from accepting future prohibited foreign emoluments, nor force him to return those he has already accepted.

Furthermore, and in contrast to the situation in *Chenoweth* and *Campbell*, Congress' appropriations power cannot be used to obtain a legislative remedy, such as refusing to appropriate funds for an Executive Branch program or for participation in a war, because there are no federal appropriations associated with

46

the President's receipt of prohibited foreign emoluments. This is another aspect of the Clause that makes it unusual. The President suggests that among plaintiffs' legislative remedies is the use of Congress' appropriations power to retaliate against him for his alleged acceptance of prohibited foreign emoluments by "tak[ing] action on matters not directly related to emoluments." Reply, ECF No. 28 at 18. Courts have treated Congress' use of its appropriations power as a legislative remedy in situations in which failing to provide funding could actually resolve the dispute. *See, e.g., Campbell*, 203 F.3d at 23 ("Congress always retains appropriations authority and could have cut off funds for the American role in the conflict."). Here, however, Congress lacks a "broad range of legislative authority it can use to stop" the President from failing to seek consent before accepting prohibited foreign emoluments. *Campbell*, 203 F.3d at 24 (noting that where "Congress has a broad range of legislative authority it can use to stop a President's" action, Congress cannot mount a challenge to that action pursuant to *Raines*).

Finally, the availability of the extreme measure of impeachment, see *Campbell*, 203 F.3d at 23 (noting that "there always remains the possibility of impeachment should a President act in disregard of Congress' authority"), to enforce the President's compliance with the Clause is not an adequate remedy

47

within the meaning of *Raines*. *Cf. Nat'l Treasury Emp. Union v.*
*Nixon*, 492 F.2d 587, 615 (D.C. Cir. 1974) ("the Constitution
should not be construed so as to paint this nation into a corner
which leaves available only the use of the impeachment process
to enforce the performance of a perfunctory duty by the
President").

### b. Capable of Resolution Through the Judicial Process

*Raines* also instructs the Court to consider whether "the
dispute is 'traditionally thought to be capable of resolution
through the judicial process.'" *Raines*, 521 U.S. at 819 (quoting
*Flast*, 392 U.S. at 97). The President argues that it is not
because "every[16] confrontation between one or both Houses of
Congress and the Executive Branch has been resolved through the
political process rather than through suits brought by
legislators." Reply, ECF No. 28 at 10 (citing *Raines*, 521 U.S.
at 826). Plaintiffs respond that the *Raines* Court discussed the
novelty of litigation between the legislative and executive

---

[16] Again, the President has overstated the proposition. What the
*Raines* Court said was "in *analogous* confrontations between one
or both Houses of Congress and the Executive Branch, no suit was
brought on the basis of claimed injury to official authority or
power." *Raines*, 521 U.S. at 826 (emphasis added). In *Kennedy v.*
*Sampson*, the D.C. Circuit held that Senator Kennedy had standing
to bring the suit and the Court issued a declaratory judgment
ruling that the President's failure to take action on the bill
at issue did not result in a pocket veto, but instead the bill
became law. 511 F.2d at 442. Such suits are therefore not
nonexistent.

branches, noting that it "appear[ed]" to argue against the plaintiffs, but did not elaborate further. Pls.' Opp'n, ECF No. 17 at 20.

The *Raines* Court's examples of analogous confrontations between Congress and the Executive Branch are distinguishable from the situation here. In *Raines,* the Court discussed at length the fact that no President sued to challenge the constitutionality of the Tenure of Office Act. *Raines*, 521 U.S. at 826. That Act, which required the consent of the Senate for the President to remove an official whose appointment to the Executive Branch required Senate confirmation, was passed in 1867 and repealed in 1887. *Id*. The *Raines* Court stated that if federal courts had become involved, "they would have been improperly and unnecessarily plunged into the bitter political battle being waged between the President and Congress" over the Act. *Id*. at 827. Here, there is no "bitter political battle" between the President and Congress over the constitutionality of an Act passed, and ultimately repealed, by Congress that impinged on the President's appointments authority. *Id.*

Two of the other three examples cited by the *Raines* Court involved constitutional challenges to legislation that impermissibly altered the power of the Legislative or Executive Branch, but where the claim was not brought by one branch against the other. *See INS v. Chadha,* 462 U.S. 919, 959

49

(1983)(holding the one House congressional veto provision in Section 244(1)(2) of the Immigration and Nationality Act to be unconstitutional); *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (holding the provisions of the then-existing Federal Election Campaign Act of 1971 that "vest[ed] in the [Federal Election] Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate[d] Art. II, § 2, cl., 2, of the Constitution."). These cases are distinguishable because here, plaintiffs do not allege that their injury has been caused by a similar type of legislation passed by Congress and signed into law by the President. Furthermore, there is no legislative remedy. In the final example, the Supreme Court held that a bill that was presented to the President less than ten days before a congressional session was adjourned did not become law when the President "neither signed the bill nor returned it to the Senate" in a challenge brought by certain Native American Tribes. *Okanogan, Methow, San Poelis (or San Poil), Nespelem, Colville, and Lake Indian Tribes or Bands of the State of Washington v. United States*, 279 U.S. 655, 673, 691-92 (1929). This case is distinguishable for the same reasons—at issue there was the legal status of a bill that had been passed by both Houses of Congress and presented to the President less than ten days before the adjournment of the congressional session. The

50

decision to do so had been made by Congress and could be remedied by Congress.

Similarly, this is not a situation in which plaintiffs disagree with the manner in which the President is administering or enforcing the law. *See United States v. Windsor*, 570 U.S. 744, 789 (2013) (Scalia, J. dissenting) (Ours is not a "system in which Congress and the Executive can pop immediately into court, in their institutional capacity, whenever the President . . . implements a law in a manner that is not to Congress' liking."). Neither is it the situation in *Raines* where the Court rejected the plaintiffs' ability to sue the President over the exercise of a statutory provision they believed to be unconstitutional. *Raines*, 521 U.S. at 830. Furthermore, although historical practice militates against Members of Congress turning to the Courts to resolve a dispute for which there is a legislative resolution, as explained *supra* Section IV.C.3.a, there is no adequate legislative remedy here.

This case does not raise the concern that the Court, in exercising jurisdiction over plaintiffs' claims, would be engaging in some kind of "amorphous general supervision of the operations of government." *Id.* at 826 (quoting *Richardson*, 418 U.S. at 194 (Powell, J., concurring)). Rather, this dispute raises concrete legal questions that are within the purview of the federal courts to adjudicate: (1) what is an emolument;

(2) what does it mean to accept an emolument; and (3) whether the President has violated the Foreign Emoluments Clause. The President contends that "Congress is far better equipped than the courts to assess whether particular arrangements violate the Foreign Emoluments Clause, and if so, how best to address the violation." Reply, ECF No. 28 at 18. While Congress clearly has the power to legislate on the issue of emoluments, "it is 'the duty of the judicial department'—in a separation-of-powers case as in any other—'to say what the law is.'" *N.L.R.B. v. Canning*, 134 S. Ct. 2550, 2560 (2014) (quoting *Marbury*, 1 Cranch at 177). Therefore, it is the role of the Judiciary to "say what the law is" regarding the meaning of the Foreign Emoluments Clause and the President's compliance with it. *Cf. United States v. Nixon*, 418 U.S. 683, 705 (1974) ("We therefore reaffirm that it is the province and duty of this Court 'to say what the law is' with respect to the claim of privilege asserted in this case.") (quoting *Marbury,* 1 Cranch at 177). The President does not dispute the role of the courts in interpreting the Constitution, but rejects the proposition that judicial review is appropriate here because "Congress continues to possess effective tools that would serve as checks on the Executive." Def.'s Suppl. Br. in Support of his Mot. to Dismiss and in Response to the Brs. of Amici Curiae ("Def.'s Suppl. Br."), ECF No. 51 at 26-27. Nevertheless, as explained *supra* Section IV.C.3.a, there are no

adequate legislative remedies here.

Furthermore, unlike in *Raines*, the dispute here is neither
an "interbranch dispute about calibrating the legislative and
executive powers [nor] is it an intrabranch dispute between
segments of Congress itself," either of which would counsel
against judicial involvement based on separation-of-powers
principles. *Raines*, 521 U.S. at 833 (Souter, J., concurring).
Rather, this dispute is about the President's alleged refusal to
seek consent prior to his alleged acceptance of prohibited
foreign emoluments that he receives as a result of his personal
financial interests. The President has strenuously attempted to
frame the dispute as "an intrabranch dispute between segments of
Congress itself," *see Raines*, 521 U.S. at 833 (Souter, J.,
concurring), but as the Court has thoroughly explained, *supra*
Section IV.3.A, this characterization is incorrect.

Accordingly, although this case implicates separation-of-
powers concerns, finding standing here "keep[s] the Judiciary's
power within its proper constitutional sphere." *Raines*, 521 U.S.
at 820. As the Court has explained, plaintiffs' claim of
standing is not based on a "loss of political power," *see id*. at
821, as was the case in *Raines*, because the injury alleged is
not an injury to their power to legislate on the issue of
emoluments. And since plaintiffs have no adequate legislative
remedy, they appropriately seek relief in federal court. *See*

53

*Valley Forge Christian Coll.,* 454 U.S. at 473-74 ("exercis[ing] . . . judicial power has been recognized as a tool of last resort").

### 4. The Ability of Another Plaintiff to Bring this Case

*Raines* instructs the Court to consider whether another plaintiff could bring the case. *Raines*, 521 U.S. at 829 (noting that the Court's holding did not foreclose a constitutional challenge by someone with standing). At oral argument, the Court asked counsel for the President a hypothetical question: Whether, if this case had been brought by Congress as an institutional plaintiff, counsel would agree that it would have standing. Hr'g Tr., ECF No. 54 at 71:2-6. The government refused to concede that it would. *Id.* at 71:7-25, 77:5-20. At the same time, counsel stated, "[j]ust because these plaintiffs don't have standing, it doesn't mean another plaintiff in a proper case might not have standing." *Id.* at 76:2-3. When pressed by the Court about who that plaintiff would be, counsel conceded: "I have a hard time thinking through which plaintiff would be a proper plaintiff to enforce the Emoluments Clause." *Id.* at 76:8-10. That no plaintiff would have standing to challenge the President's alleged violation of the Clause is certainly consistent with the President's argument that "when an official fails to first seek congressional consent before accepting emoluments prohibited by the Foreign Emoluments Clause, it only

54

means that the official has violated the Clause, not that each Member of Congress automatically acquires a judicially cognizable personal stake to challenge the violation." Def.'s Suppl. Br., ECF No. 51 at 11. The faulty premise underlying the President's argument, however, is that there is a legislative remedy for violating the Clause.  Hr'g Tr., ECF No. 54 at 79:12-80:18.

The Court is aware of one existing[17] challenge to the President's receipt of prohibited foreign emoluments. However, that challenge seeks to remedy entirely different injuries: The District of Columbia alleges injuries to its quasi-sovereign interest and its proprietary interest, and the State of Maryland alleges injuries to its sovereign interests, quasi-sovereign interest and its proprietary interest. *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 735 (D. Md. 2018).

Accordingly, if these plaintiffs do not have standing to bring their claims to address their alleged injury, it is unlikely that another plaintiff would, rendering the Clause unenforceable against the President except via impeachment. As explained, *supra* at 45, impeachment is an inadequate remedy within the meaning of *Raines*.

---

[17] Another challenge was dismissed for lack of standing. *See Citizens for Responsibility and Ethics in Washington v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017), *appeal docketed*, No. 18-474 (2d Cir. 2018).

Add. 55

### 5. Traceability and Redressability

"A plaintiff must allege a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751. The President contends that "[p]laintiffs' alleged injury is not traceable to the President: The President has not prevented Congress from voting on whether he may accept emoluments, and Plaintiffs remain free to convince their congressional colleagues to redress their alleged injury." Reply, ECF No. 28 at 8. The Court disagrees. Again, the President has misstated the alleged injury. Moreover, this matter is before the Court on a motion to dismiss and the Court must take as true the facts that are alleged in the complaint. Plaintiffs' well-pleaded complaint alleges that the President has accepted prohibited foreign emoluments without first seeking the consent of Congress. Am. Compl., ECF No. 14 ¶¶ 4-5. The alleged injury is therefore directly traceable to the President's alleged failure to seek Congressional consent.

Plaintiffs seek declaratory relief in the form of a declaratory judgment stating that the President is violating the Clause when he accepts emoluments from foreign states without first seeking the consent of Congress, and injunctive relief in the form of an order from the Court enjoining the President from accepting "any present, Emolument, Office, or Title, of any kind

56

Add. 56

whatever" from a foreign state without obtaining "the Consent of
Congress." *Id.*, ECF No. 14 ¶¶ 84-92. The President contends that
the injunctive relief sought by plaintiffs is unconstitutional,
Mot. to Dismiss, ECF No. 15-1 at 56-58; Reply, ECF No. 28 at 31-
34, but does not contest that injunctive relief, were it
available, would redress plaintiffs' injury, *see generally* Mot.
to Dismiss, ECF No. 15-1; Reply, ECF No. 28. Whether injunctive
relief is available here is a merits determination that the
Court need not reach at this juncture, and the Court cannot
assume, for the purposes of determining whether plaintiffs have
standing, that injunctive relief would be unconstitutional.
Because the President's alleged violation of the Clause could be
redressed by the declaratory and injunctive relief sought,
plaintiffs have satisfied the redressability component of the
standing inquiry.

## V. Conclusion

Accordingly, the Court finds that plaintiffs have standing
to sue the President for allegedly violating the Foreign
Emoluments Clause. The Court therefore **DENIES IN PART** the motion

to dismiss and **DEFERS** ruling on the remaining arguments in the motion to dismiss. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:      Emmet G. Sullivan**
**             United States District Judge**
**             September 28, 2018**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
Senator RICHARD BLUMENTHAL,     )
et al.,                         )
                                )
          Plaintiffs,           )
                                )
     v.                         ) Civil Action No. 17-1154 (EGS)
                                )
DONALD J. TRUMP, in his official)
capacity as President of the    )
United States,                  )
                                )
          Defendant.            )
_____)
```

**MEMORANDUM OPINION**

## I.    Introduction

In its previous Opinion, the Court held that plaintiffs,

approximately 201 Members of the 535 Members of the United

States Senate and House of Representatives, had standing to sue

defendant Donald J. Trump in his official capacity as President

of the United States ("the President") for alleged violations of

the Foreign Emoluments Clause ("the Clause"). *See Blumenthal v.*

*Trump*, 335 F. Supp. 3d 45, 72 (D.D.C. 2018) ("*Blumenthal I*").

The President has moved to dismiss the Amended Complaint for

failure to state a claim because, *inter alia*, he contends that

"Emolument" should be narrowly construed to mean "profit arising

from an official's services rendered pursuant to an office or

employ." Def.'s Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 15-

Add. 59

1 at 38.[1] The President's definition, however, disregards the ordinary meaning of the term as set forth in the vast majority of Founding-era dictionaries; is inconsistent with the text, structure, historical interpretation, adoption, and purpose of the Clause; and is contrary to Executive Branch practice over the course of many years.

Pursuant to the Clause, certain federal officials, including the President, shall not "accept" an "Emolument" from "any King, Prince, or foreign State" without "the Consent of the Congress." U.S Const. art. I, § 9, cl. 8. In Count I, plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201 in the form of a declaratory judgment stating that the President is violating the Clause when he accepts Emoluments from foreign states without first seeking the consent of Congress. Am. Compl., ECF No. 14 ¶¶ 85–86. In Count II, plaintiffs seek injunctive relief pursuant to the Court's inherent authority to grant equitable relief and pursuant to 28 U.S.C. § 1331 in the form of a Court order enjoining the President from accepting "any present, Emolument, Office, or Title, of any kind whatever" from a foreign state without obtaining "the Consent of the Congress." *Id.* ¶ 92.

---

[1] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

In holding that plaintiffs had standing to sue the President in *Blumenthal I*, the Court deferred ruling on the remaining arguments in the President's motion to dismiss: (1) failure to state a claim upon which relief can be granted; (2) lack of a cause of action to seek the relief requested; and (3) the injunctive relief sought is unconstitutional. Mot. to Dismiss, ECF No. 15-1 at 17-18.

Upon careful consideration of the President's motion to dismiss, the opposition and reply thereto, the relevant arguments of *amici*,[2] and for the reasons explained below, the Court finds that: (1) plaintiffs have stated a claim against the President for allegedly violating the Foreign Emoluments Clause; (2) plaintiffs have a cause of action to seek injunctive relief against the President; and (3) the injunctive relief sought is constitutional. The Court therefore **DENIES** the portions of the motion to dismiss that were deferred in the Court's prior Order.

## II.  Factual Background

Plaintiffs allege that the President "has a financial interest in vast business holdings around the world that engage in dealings with foreign governments and receive benefits from those governments." Am. Compl., ECF No. 14 ¶ 2. In particular, the President owns "more than 500 separate entities-hotels, golf

---

[2] The Court appreciates the illuminating analysis provided by the *amici*.

courses, media properties, books, management companies, residential and commercial buildings, . . . airplanes and a profusion of shell companies set up to capitalize on licensing deals." *Id.* ¶ 34 (internal quotation mark omitted). Since being elected President, he has "not divested or otherwise given up his ownership interest in his worldwide business holdings." *Id.* ¶ 36.

As a result of his financial interests, plaintiffs allege the President has accepted, and will accept in the future, Emoluments from foreign states. *Id.* ¶ 37. Indeed, the President has acknowledged "that his businesses receive funds and make a profit from payments by foreign governments, and that they will continue to do so while he is President." *Id.* Public reporting has also confirmed this to be the case. *Id.*

Plaintiffs allege that "[t]hese various benefits from foreign governments—payments, loans, permits, exemptions, policy changes, and intellectual property rights—constitute prohibited 'Emolument[s]' and/or 'present[s]' under the Foreign Emoluments Clause . . . ." *Id.* ¶ 38 (citation omitted). Specifically, the President has allegedly accepted valuable intellectual property rights from the Chinese government without seeking and obtaining the consent of Congress. *Id.* ¶¶ 44-50. The President has also allegedly accepted payments for hotel rooms and events from foreign diplomats and from foreign lobbying groups paid for by

foreign governments without seeking and obtaining the consent of Congress. *Id.* ¶¶ 52-57. The President has allegedly accepted payments from foreign governments derived from real estate holdings, *id.* ¶¶ 58-62, as well as licensing fees paid by foreign governments for "The Apprentice," *id.* ¶¶ 63-65, all without seeking and obtaining the consent of Congress, *id.* ¶¶ 59, 62, 65. Finally, the President has allegedly accepted regulatory benefits from foreign governments without seeking and obtaining the consent of Congress. *Id.* ¶¶ 66-67.

## III. Standard of Review

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While detailed factual allegations are not necessary, a plaintiff must plead enough facts "to raise a right to relief above the speculative level." *Id.*

When ruling on a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and

matters about which the Court may take judicial notice."
*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).
The Court must construe the complaint liberally in plaintiffs'
favor and grant plaintiff the benefit of all reasonable
inferences deriving from the complaint. *Kowal v. MCI Commc'ns
Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Court need not
accept inferences that are "unsupported by the facts set out in
the complaint." *Id.* "Nor must the [C]ourt accept legal
conclusions cast in the form of factual allegations." *Id.*
"[O]nly a complaint that states a plausible claim for relief
survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662,
679 (2009).

## IV. Analysis

### A. Constitutional Interpretation

"When interpreting a constitutional provision, [the Court]
must look to the natural meaning of the text as it would have
been understood at the time of the ratification of the
Constitution." *Canning v. N.L.R.B.*, 705 F.3d 490, 500 (D.C. Cir.
2013) (citing *District of Columbia v. Heller*, 554 U.S. 570
(2008)). "In interpreting the text [the Court is] guided by the
principle that '[t]he Constitution was written to be understood
by the voters; its words and phrases were used in their normal
and ordinary as distinguished from technical meaning.'" *Heller*,
554 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716,

731 (1931)). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Id.* at 576-77. In determining the normal and ordinary meaning, the Court is to consider founding-era dictionaries and other contemporaneous sources. *See*, *e.g.*, *N.L.R.B. v. Canning*, 573 U.S. 513, 527 (2014); *Heller*, 554 U.S. at 581-86. When the text is ambiguous, the Court is to consider the purpose of the clause and the historical interpretations and applications of the clause. *Canning*, 573 U.S. at 528-29; *see also Heller*, 554 U.S. at 592 ("This meaning is strongly confirmed by the historical background of the [provision]."). The Court is also to "treat[] [government] practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute, and even when that practice began after the founding era." *Canning*, 573 U.S. at 525, 530-32 (considering opinions of the Office of Legal Counsel ("OLC") and the Comptroller General in determining the meaning of the Recess Appointments Clause).

**B. "Emolument" Is Broadly Defined as Any Profit, Gain, or Advantage[3]**

The Foreign Emoluments Clause provides:

> No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8.

**1. The Ordinary Meaning, Text, Structure, Adoption, and Historical Interpretation of the Clause; Constitutional Purpose; and Consistent Executive Branch Practice Support a Broad Interpretation of "Emolument"**

**a. Ordinary Meaning of "Emolument"**

The parties dispute whether the profits that the President's business interests earn from foreign governments are "Emoluments" covered by the Clause. The President contends that the Clause "is not a blanket prohibition on commercial transactions with foreign governments by businesses in which the

---

[3] The parties do not dispute that the Clause applies to the President. *See generally* Mot. to Dismiss, ECF No. 15-1; Pls.' Opp'n, ECF No. 17; Def.'s Reply ("Reply"), ECF No. 28. The Court therefore declines to reach the question despite the argument to the contrary of one a*micus* brief and based on Judge Peter J. Messitte's persuasive analysis of that argument and conclusion that the Clause does indeed apply to the President in the only other judicial opinion construing the Clause. *See District of Columbia v. Trump*, 315 F. Supp. 3d 875, 882-87 (D. Md. 2018) ("*Trump*"); *see also* Br. for Scholar Seth Barrett Tillman and Judicial Education Project as Amici Curiae in Supp. of the Def., ECF No. 16-1.

official has a financial interest," but rather "applies only to
the receipt of compensation for services rendered by an official
in an official capacity or in an employment (or equivalent)
relationship with a foreign government, and to the receipt of
honor and gifts by an office-holder from a foreign government."
Mot. to Dismiss, ECF No. 15-1 at 33-34. In support of his
position, the President explains that at the time of the
Nation's founding, an "'[E]molument' was a common characteristic
of a federal office . . . comprehensively describ[ing] 'every
species of compensation or pecuniary profit derived from a
*discharge of the duties of the office*.'" *Id.* at 34 (alteration
in original) (first citing *United States v. Hartwell*, 73 U.S.
385, 393 (1867); and then quoting *Hoyt v. United States*, 51 U.S.
109, 135 (1850).[4] According to the President, this was because
most federal officials did not receive salaries as is the case
today, but rather, were compensated by fees in exchange for
their services. *Id.* Therefore, he argues, this "common usage" of
the word at the time of the founding compels interpreting the
term to mean "profit arising from an office or employ." *Id.* at

---

[4] The President's added emphasis on the phrase and reliance on
this case are misleading given that the Court was not construing
the meaning of the term "Emolument" generally, but rather a
statutory provision concerning "the annual [E]moluments of any
[customs] collector." *Hoyt*, 51 U.S. at 135. Accordingly, the
Emolument would necessarily derive from the discharge of the
duties of the office.

35 (quoting James Barclay, *A Complete & Universal English Dictionary on a New Plan* (1774)("Barclay's Dictionary")).[5] To illustrate, the President provides two examples of what would constitute Emoluments under his definition: (1) "a federal official would receive an Emolument if he or she was paid by a foreign government to take certain official actions"; and (2) "an Emolument would [] be received if an official became an employee or entered an employment-like relationship with the foreign government, such as if a federal government lawyer provided legal advice and services to a paying foreign power." *Id*. According to the President, "[t]his interpretation is consistent with the nature of the other prohibited categories in the Foreign Emoluments Clause: present, office, and title, which are all things personally conferred or bestowed on a U.S. official holding an 'Office of Profit or Trust.'" *Id*.

Plaintiffs rely on contemporaneous dictionaries, general-purpose writings, contemporaneous state constitutions, and legal decisions to support their argument that at the time the Constitution was written, "'[E]molument' was a commonly used

---

[5] Plaintiffs point out that Barclay's dictionary defines "employ" not as "employment" but as "a person's trade, business" and "a public office" and therefore this source supports defining an Emolument to include "profit arising from . . . a person's trade, business." Pls.' Opp'n, ECF No. 17 at 42. Plaintiffs contend that this definition does not therefore support the President's position. *Id*. at 42-43.

term that often referred to profit or gain in general." Pls.'
Opp'n, ECF No. 17 at 39 (citing *The Oxford English Dictionary*
(2d ed. 1989) (referring to eighteenth century texts); Samuel
Johnson, *A Dictionary of the English Language* (1755); John
Mikhail, *The Definition of "Emolument" in English Language &
Legal Dictionaries*, 15-23-1806, at 8 (July 9, 2017) (working
paper),

https://papers.ssrn.com/so13/papers.cfm?abstract_id=2995693

(explaining that [E]molument was defined as "'profit,'
'advantage,' 'gain,' or 'benefit' . . . in every known English
language dictionary" published in the seventeenth and eighteenth
centuries, that this was the exclusive definition provided in
over 92% of these dictionaries, and that the President's
preferred definition appears in less than 8% of these
dictionaries, but that the broader definition also appears in
these latter dictionaries)). Plaintiffs also emphasize, again
relying on contemporaneous documents, that the term "was
frequently used to mean the profits accruing from private
financial transactions." *Id*. at 40.

Plaintiffs maintain that interpreting the term to
"requir[e] an employment-like relationship[] is based on a
flawed reading of Founding-era dictionaries . . . [and]
requiring the provision of specific services in an official
capacity" lacks legal support. *Id*. at 41. Moreover, they argue

that even if the Court were to adopt the narrow definition that
appears in the Oxford English Dictionary—"[p]rofit or gain
arising from station, office, or employment; dues, reward;
remuneration, salary"—"the gain arising from President Trump's
status as the head of a worldwide business empire" falls within
this definition. *Id.* Furthermore, according to plaintiffs,
"[t]he narrower definition the President cites also embraces
profit or gain 'arising from [his] office,' as when foreign
governments seek his favor by granting him lucrative trademarks
or selecting his hotels" because these "benefits 'arise from'
the office he holds, because (the Plaintiffs allege) they are
being given to him because he is the President." *Id.* (citing Am.
Compl., ECF No. 14 ¶¶ 48, 54).

     The President contends that the number of sources citing
the two competing definitions is not relevant because the
meaning of the term in the Clause depends on the constitutional
context, the history of the Clause, and founding-era practices.
Reply, ECF No. 28 at 22. The President also asserts that
plaintiffs' reliance on Professor Mikhail's article is misplaced
because another law review article has criticized it for making
inaccurate assumptions. *Id.* at 22-23. The President argues that
Professor Mikhail's article and the sources it references
actually support his position because they "demonstrate that the
President's definition is closely related to the etymology of

[E]molument, which is profit derived from labor, or more

specifically, from grinding corn." *Id.* at 23. The President also

notes that the Oxford English Dictionary lists his definition of

"emolument" first, and before plaintiffs' broader definition,

indicating that the President's definition predates that of the

plaintiffs. *Id.* at 24.

    *Amici* Legal Historians soundly reject the President's

"narrow definition of 'Emolument' [as] inaccurate,

unrepresentative, and misleading":

> Little or no evidence indicates that the two
> obscure sources—Barclay (1774) and Trusler
> (1766)—on which [the President] relies for
> [his] "office- and employment-specific"
> definition of "[E]molument" were owned,
> possessed, or used by the founders, let alone
> had any impact on them, or on those who debated
> and ratified the Constitution. For example,
> neither of these sources is mentioned in the
> more than 178,000 searchable documents in the
> *Founders Online* database, which makes publicly
> available the papers of the six most prominent
> founders. Nor do these volumes appear in other
> pertinent databases, such as *Journals of the
> Continental Congress*, *Letters of Delegates to
> Congress*, *Farrand's Records*, *Elliot's
> Debates*, or the *Documentary History of the
> Ratification of the Constitution*. By contrast,
> all of the dictionaries that the founding
> generation did possess and use regularly
> define "[E]molument" in the broad manner
> favoring the plaintiffs: "profit,"
> "advantage," or "benefit."
>
> Second, a careful review of English language
> dictionaries from 1604 to 1806 shows that
> *every* definition of "[E]molument" published
> during this period relies on one or more of
> the elements of the broad definition [the

> President] rejects in [his] brief: "profit,"
> "advantage," "gain," or "benefit." . . .
> Finally, Trusler's volume is not a standard
> dictionary, but rather a thesaurus, which
> presumes that "gain," "profit," and
> "[E]molument" are synonyms; moreover, its
> explanation of "[E]molument" was copied
> directly from a French thesaurus, hence it is
> not even reliably grounded in English usage.
> The impression [the President] creates in
> [his] brief by contrasting four historical
> definitions of "[E]molument"—two broad and two
> narrow—is, therefore, highly misleading.

Br. of Amici Curiae by Certain Legal Historians on Behalf of

Pls. ("Br. of Legal Historians"), ECF No. 46 at 12-13 (footnotes

omitted).

The President does not dispute that the broader definition

existed at the time the Constitution was ratified, Mot. to

Dismiss, ECF No. 15-1 at 37, and plaintiffs acknowledge that a

narrower definition existed at the time, Pls.' Opp'n, ECF No. 17

at 41. Plaintiffs' main contention is that because the evidence

demonstrates that the broader definition was more pervasive, it

was what was intended in the Clause. The President responds that

the narrower definition is the "better one" to use given the

context and history of the Clause.

The Court is persuaded that the weight of the evidence in

"founding-era dictionaries and other contemporaneous sources"

supports the broad meaning of the term advocated by plaintiffs

and supported by the Legal Historians. *Trump*, 315 F. Supp. 3d at

882 (citing *Canning*, 573 U.S. at 527). The fact that there is

evidence from founding-era sources that both the broad definition advocated by plaintiffs, as well as a narrower definition associating "Emolument" with employment, existed at the ratification of the Constitution, however, suggests some ambiguity in the term. Accordingly, the Court considers the surrounding text, structure, adoption, historical interpretation, and purpose of the Clause, as well as Executive Branch practice to determine the meaning of "Emolument." *See Canning*, 573 U.S. at 528-29 (when the constitutional text is ambiguous, the court is to consider the purpose of the clause and the historical interpretations and applications of the clause).

### b. Text and Structure of the Clause, and Other Uses in the Constitution

The President acknowledges that the broader definition of "Emolument" advocated by plaintiffs "resembles a broader definition that also existed at the time of the founding" but points to the legal interpretive principle that a word with different meanings should be interpreted by reference to the context. Mot. to Dismiss, ECF No. 15-1 at 37-38. Accordingly, "when read harmoniously with the rest of the Clause, [Emolument] has the natural meaning of the narrower definition of profit arising from an official's services rendered pursuant to an office or employ." *Id*. at 38. The President also asserts that

plaintiffs' broad definition of "Emolument" would subsume the term "present" in the Clause and render it redundant, noting that plaintiffs use the terms "Emolument" and "present" interchangeably. *Id.* at 38-39 (citing *Holmes v. Jennison*, 39 U.S. 540, 570-71 (1840) ("In expounding the Constitution of the United States, every word must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added.")).

The President contends that the other two instances in which "Emolument" is used in the Constitution provide further support for his narrow definition because "[e]ach is associated with an office and refers to compensation for services rendered in the capacity as the holder of that office." *Id.* at 36 (citing U.S. Const. art. II, § 1, cl. 7 ("The President, shall, at stated Times, receive for his services, a Compensation . . . and he shall not receive within that Period any other Emolument from the United States, or any of them."); U.S. Const. art. I, § 6, cl. 2 ("No Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time. . . .")).

Plaintiffs argue that even if the President's narrow definition of "Emolument" existed, the Clause does not use the word in such a narrow sense, because to do so would render the phrase "of any kind whatever" surplusage. Pls.' Opp'n, ECF No. 17 at 43. Plaintiffs assert that the purpose of this phrase "is to rule out interpretations [of 'Emoluments'] that would allow some 'kinds' of emolument to be accepted." *Id*. at 44. Plaintiffs point to the Incompatibility Clause to support their argument that the reach of the Clause is broad. *Id*. The Incompatibility Clause provides that no member of Congress "shall, during the Time for which he was elected, be appointed to any civil Office . . . the Emoluments whereof shall have been encreased during such time." U.S. Const. art. I, § 6, cl.2. Plaintiffs point out that this Clause applies only to Emoluments bestowed by the federal government upon civil office holders, whereas the Foreign Emoluments Clause contains no such prohibition. Pls.' Opp'n, ECF No. 17 at 44. Plaintiffs also argue that the reason the Clause permits exceptions—with the consent of Congress—is precisely because its reach is so broad. *Id.*

In response to plaintiffs' argument that the phrase "of any kind whatever" compels their preferred definition, the President argues that this phrase "emphasizes the Clause's reach—every kind of [E]molument, present, office, or title—and is not a basis to choose which definition" was intended in the Clause.

Reply, ECF No. 28 at 25. In response to plaintiffs' argument
that the President's definition renders "of any kind whatever"
to be surplusage because of the word "any," the President posits
that there is no redundancy in his interpretation because "[t]he
more plausible role of this first use of the word 'any' in the
Clause is numeric—that *no* prohibited Emoluments may be received
by a covered official without the consent of Congress, whereas
the phrase 'of any kind whatever' operates to ensure that every
*type* of the identified compensation is also prohibited." *Id*. at
26.

Finally, the President disputes that use of the term
"Emoluments" in the Incompatibility Clause bolsters plaintiffs'
interpretation of the term because "the fact that a reference to
an office is not included in the Foreign Emoluments Clause is
simply due to the fact that the Foreign Emoluments Clause has a
broader reach—it regulates not only compensation or benefits
arising from holding federal office but also any employment-like
relationship between a foreign government and a covered
official." *Id.* The President notes that the term "Emolument" is
used only one other time in the Constitution—in the Domestic
Emoluments Clause which provides that "[t]he President shall, at
stated Times, receive for his Services, a Compensation . . . and
he shall not receive within that Period any other Emolument from
the United States, or any of them." *Id*. at 27 (quoting U.S.

Const. art. II, § 1, cl.7). The President concludes that it would not make sense for the term to have different meanings in the Constitution and that "all three clauses in which the term appears are tied to holding office and regulat[ing] the conduct of office-holders." *Id*.

The Court is persuaded that the text and structure of the Clause, together with the other uses of the term in the Constitution, support plaintiffs' definition of "Emolument" rather than that of the President. The Clause bans, without congressional approval, "*any* present, Emolument, Office, or Title, *of any kind whatever*, from any King, Prince, or foreign State." U.S Const. art. I, § 9, cl. 8 (emphasis added). The President's argument that the phrase "of any kind whatever" should be understood to modify "Emoluments" defined narrowly rather than being "a basis to choose which definition" was meant in the Clause, Reply, ECF No. 28 at 25, is unpersuasive and inconsistent with his own argument. The President himself argues that a word with different meanings should be interpreted by reference to the context. Mot. to Dismiss, ECF No. 15-1 at 38. "[T]he meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). Here, it is uncontested that the broad meaning and a narrower meaning tied to employment existed at the time the Constitution was

ratified, and this expansive modifier, which as plaintiffs point out is used nowhere else in the Constitution, logically serves to ensure that the acceptance of any foreign Emolument, however defined, is prohibited without congressional consent. *See also Trump*, 315 F. Supp. 3d at 888 ("If there were any doubt as to the limits of the Foreign Clause, the Framers used the word 'any' twice, ensuring a broad and expansive reach.").

The President's argument that the use of "Emolument" in the Incompatibility Clause and the Domestic Emoluments Clause supports his narrow definition is similarly unconvincing. In the former, "Emolument" specifically refers to an office, indicating that when the Founders intended for an Emolument to refer to an official's salary or payment associated with their office, they said so explicitly. *See* U.S. Const. art. I, § 6, cl. 2. In the latter, the Emoluments that are prohibited are those that would be received "from the United States or any of them." U.S. Const. art. II, § 1, cl. 7. Thus, rather than "Emolument" having different meanings the three times it is used in the Constitution, more logically, the broader meaning is modified in each Clause according to the purpose of the Clause. *See Virginia*, 148 U.S. at 519; *see also Trump*, 315 F. Supp. 3d at 888 ("If '[E]molument' were always to be read as a synonym for salary or payment for official services rendered, th[e] modifier in the Incompatibility Clause would have been unnecessary.").

Also unconvincing is the President's argument that adopting plaintiffs' definition of "Emolument" to mean "profit," "gain," or "advantage" would render the term "present" redundant. The President points out that a "present" was defined as it is today: "[s]omething bestowed upon another without price or exchange; the act of giving." Mot. to Dismiss, ECF No. 15-1 at 39 (quoting Barclay's Dictionary). As Judge Messitte observed, defining an "Emolument" as a "profit," "gain," or "advantage" "ensure[s] that the Clause covered all types of financial transactions—solicited or unsolicited, reciprocated or unreciprocated, official or private"—even if "Emolument" is sometimes used synonymously with "present." *Trump*, 315 F. Supp. 3d at 889.

Furthermore, Judge Messitte points out that the President's narrow definition "would seem to create its own concerning redundancies within the Constitution." *Id*. As the President explained, a practical example of his definition would be when "a federal official would receive an [E]molument if he or she was paid by a foreign government to take certain official actions." Mot. to Dismiss, ECF No. 15-1 at 35. Judge Messitte persuasively states that this example

> is tantamount to defining the transaction as
> nothing less than one of federal bribery, a
> crime which prohibits a federal public
> official from, directly or indirectly,
> receiving or accepting "anything of value" in

> return for "being influenced in the
> performance of any official act." 18 U.S.C. §
> 201(b)(2). Given that Article II, Section 4 of
> the Constitution already addresses the crime
> of bribery, making it an impeachable offense,
> there would have been little need to include
> two additional and distinct Emoluments Clauses
> prohibiting the acceptance of money from
> foreign or state governments for official
> services rendered. Moreover, it seems highly
> unlikely that the Framers would have intended
> bribery to be both an impeachable offense and,
> at the same time, an activity Congress could
> consent to when a foreign government donor is
> involved. The President makes no attempt to
> come to terms with this anomaly.

*Trump*, 315 F. Supp. 3d at 889 (footnote omitted). Finally, there

is no question that the receipt of Emoluments is tied to the

office of President and regulating his conduct as President, but

that does not compel defining "Emolument" as narrowly as the

President advocates.

### c. Adoption and Historical Interpretation of the Clause

The President argues that "[t]he adoption and historical

interpretation of the . . . Clause are consistent with the

office- and employment-specific construction of the term

'Emolument.'" Mot. to Dismiss, ECF No. 15-1 at 40. In support,

the President observes that "the history of the Clause's

adoption [is] devoid of any concern about an official's private

commercial businesses." *Id*. at 42. Plaintiffs describe this as

a "dog that didn't bark" argument, stating that even if this is

true, "it [] tells us nothing. Discussion of the Clause was not

extensive because the Clause was not controversial." Pls.'
Opp'n, ECF No. 17 at 44. Furthermore, according to plaintiffs,
"the agrarian economy of the eighteenth century, the
comparatively limited role of government, and the primitive
travel technology available would have made private commerce
with foreign states an unlikely conduit for foreign influence
at the time." *Id*. at 44-45.

Citing examples of early Presidents exporting agricultural
products to foreign countries, the President argues that
historical evidence supports his position that the Clause was
not intended "to reach commercial transactions that a President
(or other federal official) may engage in as an ordinary
citizen through his business enterprises." Mot. to Dismiss, ECF
No. 15-1 at 43-44. Plaintiffs point out that none of the
examples are of commercial transactions with a foreign
government, thus the President can "claim only that they *might*
have conducted such business." Pls.' Opp'n, ECF No. 17 at 45.
The President responds that while the records are limited and
inconclusive, because "there is no question that private
business pursuits by federal officials, including by early
Presidents, were common at the time of the Nation's founding[,]
[i]t is reasonable to infer that at least some of their
transactions may have been with foreign or domestic government
actors, including foreign state-chartered trading companies."

Reply, ECF No. 28 at 29. The President relies heavily on one historical incident—President George Washington's purchase of land from the federal government in the then-Territory of Columbia—to argue that if plaintiffs' definition of "Emoluments" applies, President Washington would have violated the Domestic Emoluments Clause, pointing out that the precedents President Washington set are considered authoritative. Mot. to Dismiss, ECF No. 15-1 at 45-46.

Finally, the President argues that a proposed constitutional amendment that would have applied the prohibitions in the Clause to all private citizens undermines the broad definition, asserting that it is "implausible that this amendment was intended or understood as providing for the revocation of the citizenship of anyone engaging in commerce with foreign governments or their instrumentalities . . . [and] . . . inconceivable that Congress and nearly three-fourths of the States intended to strip the citizenship of, for example, those hotel owners whose customers included visiting foreign diplomats using government funds." *Id.* at 47. *Amici* Legal Historians point out, however, that "[i]n 1810, Americans *conceived* precisely of this problem" given the historical context. Br. of Legal Historians, ECF No. 32 at 33. Plaintiffs also point out that the President's argument is self-defeating because, for example, "a household servant temporarily hired by

a visiting foreign diplomat . . . would be 'in an employment-like relationship' with the diplomat." Pls.' Opp'n, ECF No. 17 at 45 (citing Mot. to Dismiss, ECF No. 15-1 at 22). The Court is persuaded that the adoption of the Clause and its historical interpretation support plaintiffs' definition rather than that of the President. It is well-established that there was little discussion of the Clause by the Framers because it was noncontroversial. *See* Br. of Legal Historians, ECF No. 46 at 24. Furthermore, the Court declines to make the inference advocated by the President—that it is reasonable to infer that some of the early Presidents' private business pursuits would have been with foreign state-chartered trading companies— because the President has provided no evidence to justify making such an inference. *See generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28. On a motion to dismiss, it is the plaintiff, not the defendant, who receives the benefit of all reasonable inferences deriving from the complaint. *See Kowal*, 16 F.3d at 1276. Similarly, the Court declines to infer that the President's narrow definition should be adopted based on President Washington's purchase of public land, potentially in violation of the Domestic Emoluments Clause, given this was a single incident as compared with the great weight of the historical interpretation of the Clause. *See also Trump*, 315 F. Supp. 3d at 903-904 (noting that the facts regarding this

transaction are "seriously incomplete"). Finally, the Court is

not persuaded that the President's reliance on a proposed

constitutional amendment that never became law, and for which

he is unable to cite any floor debates that would illuminate

the intent of the amendment, should be accorded any weight in

determining the meaning of "Emolument."

### d. Purpose of the Clause

The President pays little attention to interpreting the

meaning of "Emolument" by reference to the purpose of the

Clause, briefly acknowledging that "[a]lthough the Clause was

intended to combat corruption and foreign influence, the text,

original understanding, and historical practice provide no

support for Plaintiffs' inferential leap from the Clause's

purpose to a blanket prohibition on receiving 'any monetary or

nonmonetary benefit' regardless of context." Mot. to Dismiss,

ECF No. 15-1 at 53. The President also notes that the Framers

"gave no indication that they intended to require officeholders

to divest their private commercial businesses in order to assume

federal office." *Id*. The President argues that plaintiffs'

definition would result in "absurd consequences" because, among

other things, royalties from foreign book sales, United States

Treasury bonds, and stock holdings could be considered

prohibited foreign Emoluments. *Id*. at 53-56.

Plaintiffs argue that even if the term is considered ambiguous, any ambiguity should be resolved against the President because his proposed definition "would defeat the Clause's purpose—throwing open the doors to the corruption of any officeholder wealthy enough to own businesses and reducing the Clause to a mere bribery law, not a prophylactic safeguard against the *possibility* of corruption." Pls.' Opp'n, ECF No. 17 at 45. Plaintiffs cite contemporaneous documents to support their argument that the purpose of the Clause was "to exclude corruption and foreign influence," *id.* at 46 (quoting 3 *Elliot's Debates* 465 (Randolph)), prompted by the need to guard against "the influence which foreign powers may attempt to exercise in our affairs," *id.* (quoting Tench Coxe, *An Examination of the Constitution for the United States of America,* No. 4 (Oct. 21, 1787), and to "lock up every door to foreign influence," *id.* (quoting 5 *Annals of Cong.* 1584 (1978) (Claiborne)). Plaintiffs also cite contemporary OLC memoranda which consistently give the Clause a broad scope. *Id.* at 46-47.

*Amici* Former Government Ethics Officers, former government officials tasked with interpreting the Clause, dispute that "absurd consequences" would result from adopting plaintiffs' broad definition of "Emolument" because "the government applies a totality-of-the-circumstances approach to Emoluments Clause questions, with a bias in favor of breadth, and a keen eye to

the anti-corruption purpose of the clause[].” Br. of Former

Gov't Ethics Officers as Amici Curiae Supporting Pls.' Opp'n to

Def.'s Mot. to Dismiss (“Br. of Former Gov't Ethics Officers”),

ECF No. 42 at 10. So, for example, *amici* dispute that royalties

from foreign book sales would be subject to the Clause unless “a

foreign government attempts to influence a President by

purchasing copies of his book, or if a competent authority finds

a real potential for such influence.” *Id.* at 15. As to

restricting the ability to hold Treasury bonds or stock

holdings, *amici* state that “these payments are unlikely to raise

concerns because it is highly doubtful that holding publicly

traded securities would create the potential for others to

exercise undue influence over the holder.” *Id.* at 14.

In view of the overwhelming evidence pointing to over two

hundred years of understanding the scope of the Clause to be

broad to achieve its purpose of guarding against even the

possibility of “corruption and foreign influence,” 3 *Records of

the Federal Convention of 1787,* at 327 (Max Farrand ed., 1966),

the Court is persuaded that adopting plaintiffs' broad

definition of “Emolument” ensures that the Clause fulfills this

purpose. *See also Canning*, 573 U.S. at 528 (“[W]e believe the

[Recess Appointments] Clause's purpose demands the broader

interpretation” in light of the ambiguity of the constitutional

text.). In view of the arguments of *amici* to the contrary, the

Court is also not persuaded that "absurd consequences" would result from this broad definition in view of the consistent Executive Branch practice of applying a totality-of-the-circumstances approach to applying the Clause. For the same reason, it is clear that adopting the plaintiffs' definition would not result in a "blanket prohibition" that disregards context.

### e. Executive Branch Practice

As the Court explained in *Blumenthal I*, "[h]istorically, Presidents have complied with the Clause by either seeking and obtaining congressional consent prior to accepting foreign presents or Emoluments, or by requesting an opinion from the Executive or Legislative Branch's advisory office as to whether the Clause applies." *Blumenthal I*, 335 F. Supp. 3d at 53 (citing Br. of Federal Jurisdiction and Constitutional Law Scholars as Amicus Curiae in Supp. of Pls., ECF No. 44 at 24 ("Br. of Federal Jurisdiction and Constitutional Law Scholars")). "Modern Presidents, except for President Trump, have sought advice from OLC prior to accepting potentially covered Emoluments." *Id.* at 53-54 (citing Br. of Federal Jurisdiction and Constitutional Law Scholars, ECF No. 44 at 25). The Comptroller General of the United States is also charged with interpreting the application of the Clause. Mot. to Dismiss, ECF No. 15-1 at 49.

The President points to interpretations from these authorities as support for his preferred definition of "Emolument" because "[i]n every published OLC or Comptroller General opinion in which proposed conduct was determined to involve prohibited [E]moluments, the determination involved an employment relationship (or a relationship akin to an employment relationship) with the foreign government." *Id.* Plaintiffs respond that the reason for this is simple: "OLC and the Comptroller General render decisions in response to requests from federal officers. Most such officers are not real estate magnates, but rather people who earn money by providing their individual labor or expertise." Pls.' Opp'n, ECF No. 17 at 49.

*Amici* Former Government Ethics Officers explain that the OLC, Comptroller General, and Department of Defense apply the following principles when determining whether the Clause applies to the situation at issue. Br. of Former Gov't Ethics Officers, ECF No. 42 at 7-8. First, because the "'expansive language and underlying purpose . . . strongly suggest that [the Clause] be given broad scope' . . . analyses have therefore usually started from the presumption that the clause applies . . . [because] . . . '[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty.'" *Id.* at 8-9 (internal citations and quotations omitted). Second, and as explained above, the government uses a

"totality-of-the-circumstances approach" in determining whether the Clause applies to the situation and "has never come close to adopting anything like the rigid, narrow rule advanced by the [President]." *Id.* at 10-11. As an example, "the government has reached varying conclusions as to whether particular payments come from a 'foreign state' depending on how much control foreign governments exercise over those payments." *Id.* at 10. *Amici* also point out that "the government has never determined that the clause permits a public officeholder to maintain an interest in a business that stands to benefit by virtue of that person holding public office." *Id.* at 11. *Amici* explain that officials pay "close attention to whether the arrangement creates even a potential for improper foreign government influence over a person in an office of public trust. When such a potential exists—even if the probability is quite low—the government has found that such arrangements violate the Foreign Emoluments Clause." *Id.*

Given that there is only one other judicial opinion interpreting the Clause, the Court looks to OLC and Comptroller General opinions as sources of authority for how "Emolument" is defined and how the Clause is interpreted and applied. *Canning*, 573 U.S. at 525 (noting that "the longstanding 'practice of the government' can inform our determination of 'what the law is'" and that "this Court has treated practice as an important

interpretive factor even when the nature or longevity of that
practice is subject to dispute, and even when that practice
began after the founding era") (citations omitted). OLC opinions
have consistently cited the broad purpose of the Clause and
broad understanding of "Emolument" advocated by plaintiffs to
guard against even the *potential* for improper foreign government
influence. *E.g., Application of Emoluments Clause to Part-Time
Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C.
96, 98 (1986) (The Clause's "expansive language and underlying
purpose . . . strongly suggest that it be given broad scope.");
*Applicability of the Emoluments Clause to Non-Government Members
of ACUS*, 17 Op. O.L.C. 114, 121 (1993) ("The language of the
Emoluments Clause is both sweeping and unqualified.");
Memorandum from Norbert A. Schlei, Assistant Att'y Gen., Office
of Legal Counsel, to  Andrew F. Oehmann, Office of the Att'y
Gen., *Re: Invitation by Italian Government to Officials of the
Immigration and Naturalization Service & a Member of the White
House Staff* 2 (Oct. 16, 1962),
https://www.justice.gov/olc/page/file/935741/download (noting
"the sweeping nature of the constitutional prohibition and the
fact that in the past it has been strictly construed, being
directed against every possible kind of influence by foreign
governments over officers of the United States"). Accordingly,
adopting the President's narrow definition of "Emolument" would

be entirely inconsistent with Executive Branch practice defining

"Emolument" and determining whether the Clause applies.

Significantly, the President has not cited an OLC or

Comptroller General opinion that supports his position. *See*

*generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28. To

the contrary, he can only assert that his position "is not

inconsistent with the conclusions of any published OLC or

Comptroller General opinions." Def.'s Suppl. Br. in Supp. of his

Mot. to Dismiss and in Resp. to the Brs. of Amici Curiae, ECF

No. 51 at 23-24. However, one opinion directly contradicts his

narrow reading of the Clause, and another undermines his narrow

definition of "Emolument."

In 1993, OLC issued an opinion stating that non-

governmental lawyers who were members of the Administrative

Conference of the United States ("ACUS") could not receive

partnership distributions from their respective firms where the

distribution would include fees from foreign government clients

even though the lawyers "did not personally represent a foreign

government, and indeed had no personal contact with that client

of the firm." *Applicability of the Emoluments Clause to Non-*

*Government Members of ACUS*, 17 Op. O.L.C. at 119. OLC reasoned

that:

> Because the amount the Conference member would
> receive from the partnership's profits would
> be a function of the amount paid to the firm

> by the foreign government, the partnership
> would in effect be a conduit for that
> government. Thus, some portion of the member's
> income could fairly be attributed to a foreign
> government. We believe that acceptance of that
> portion of the member's partnership share
> would constitute a prohibited [E]molument.

*Id.*[6] Judge Messitte noted that "[t]his language directly

contradicts the President's suggestion that there can be no

violation of the Foreign [Emoluments] Clause if the federal

official is receiving benefits in a private capacity." *Trump*,

315 F. Supp. 3d at 902. And as *amici* observe, this Opinion

"devastates the [President's] primary argument for a narrow

reading of the clause because it shows that even an attenuated

economic interest in ordinary commercial transactions that

generate value for both sides can violate the [Foreign]

Emoluments Clause if that business nevertheless creates the

potential for undue influence over public officials." Br. of

Former Gov't Ethics Officers, ECF No. 42 at 21. The Court

agrees.

Nor does the Comptroller General opinion concluding that

President Ronald Reagan's receipt of California pension benefits

did not violate the Domestic Emoluments Clause provide support

---

[6] OLC later determined that non-governmental members of ACUS were
not subject to the Clause, but did not its modify determination
that the distribution was an Emolument. *Applicability of the
Emoluments Clause to Nongovernmental Members of ACUS*, 2010 WL
2516024 (June 3, 2010).

for the President's definition of "Emolument." The Comptroller
General determined that "the term '[E]molument' cannot be
considered to extend to benefits that have been earned or to
which entitlement arose before his occupancy of that office, and
that clearly have no connection, either direct or indirect, with
the Presidency . . . [because they]. . . cannot be construed as
being in any manner received in consequence of his possession of
the Presidency." Hon. George J. Mitchell, U.S. Senate, B-207467,
1983 WL 27823, at *3 (Comp. Gen. Jan. 18, 1983). Those
retirement benefits are entirely distinguishable from the
situation here, where it is alleged that, among other things,
foreign diplomats stay at the President's Washington D.C. hotel
"to curry favor with [him] because of his position as President
of the United States," Am. Compl., ECF No. 14 ¶ 54; and that
"his businesses receive funds and make a profit from payments by
foreign governments, and that they will continue to do so while
he is President," *id.* ¶ 37; *see also Trump*, 315 F. Supp. 3d at
903 (observing that "profits received from foreign or domestic
governments that patronize the Trump International Hotel for the
express purpose of potentially currying favor with a sitting
President present a stark contrast to the fully vested
retirement benefits that then-Governor Reagan earned from the
State of California which the State of California was not free
to withdraw.").

Finally, the President finds support for his preferred definition in statutory provisions that exempt certain employment relationships between government officials and foreign officials from the scope of the Clause, asserting that "[h]ad Congress understood the Clause to reach more broadly than compensation arising from personal services rendered to a foreign government, it surely would have exempted a wider range of activities." Mot. to Dismiss, ECF no. 15-1 at 52. The Court is not persuaded that the President's reliance on statutory provisions that were never enacted should be accorded any weight in determining the scope of the Clause.

Consistent Executive Branch practice, which "has never come close to adopting anything like the rigid, narrow rule advanced by the [President]," Br. of Former Gov't Ethics Officers, ECF No. 42 at 10-11, clearly supports plaintiffs' broad definition of "Emolument" rather than that of the President. Accordingly, "Emolument" is broadly defined as any profit, gain, or advantage. *See also Trum*p, 315 F. Supp. 3d at 905 (finding that the term Emolument "extends to any profit, gain, or advantage, of more than *de minimis* value, received by [the President], directly or indirectly, from foreign . . . governments").

**C.    Plaintiffs Have Stated a Claim Under the Foreign Emoluments Clause**

With "Emolument" defined broadly as any profit, gain, or advantage, it is clear that the Amended Complaint states a plausible claim against the President for violations of the Clause. Plaintiffs have alleged that the President has accepted a variety of Emoluments from foreign governments—intellectual property rights, payments for hotel rooms and events, payments derived from real estate holdings, licensing fees for "The Apprentice," and regulatory benefits—without seeking and obtaining the consent of Congress. Am. Compl., ECF No. 14, ¶¶ 44-67. Accepting the allegations in the Amended Complaint as true, which the Court must at this juncture, plaintiffs' allegations state a plausible claim for relief, and survive the President's motion to dismiss. *Iqbal*, 556 U.S. at 679.

**D.    Plaintiffs Have a Cause of Action to Seek Injunctive Relief and the Injunctive Relief Sought Is Constitutional**

**1. Plaintiffs Have a Cause of Action to Seek Injunctive Relief**

The President, analogizing the Foreign Emoluments Clause to the Supremacy Clause, argues that the Clause "is not a source of federal rights such that the Court may imply a cause of action under the Clause." Mot. to Dismiss, ECF No. 15-1 at 29. As he must, however, the President acknowledges that equitable relief is available "to enjoin unconstitutional actions by public

officials," but emphasizes that such relief is only available in "a proper case," *id.* (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015)), as "an act of equitable discretion by the district court," *id.* (citing *eBay, Inc. v. MercExchange*, *LLC*, 547 U.S. 388, 391 (2006). The President argues that this is not "a proper case" for the Court to exercise its equitable discretion for three reasons. *Id.* at 30-32. First, "[p]laintiffs are not preemptively asserting a defense to a potential enforcement action against them by the Government, which is the paradigmatic situation where implied equitable claims against the Government have been recognized." *Id.* at 30. "Second, equity 'may not be used to create new substantive rights' . . . and the . . . Clause does not create any personal or judicially enforceable rights." *Id.* at 31. As part of this point, the President argues that plaintiffs cannot show that their injury falls within the zone of interests protected by the Clause because only Congress as a whole, and not its individual members, fall within the zone of interests protected by the Clause. *Id.* Third, plaintiffs "can obtain relief only by suing the President himself, which (if not legally foreclosed) is at a minimum grounds for extreme equitable restraint." *Id.* at 32 (citation omitted). The President concludes by reiterating his argument that plaintiffs' remedy lies with Congress rather than the Courts. *Id.*

Plaintiffs respond that they have an implied cause of action to seek injunctive relief based on long-standing Supreme Court precedent ensuring the "'ability to sue to enjoin unconstitutional actions' by government officials." Pls.' Opp'n, ECF No. 17 at 50-51 (quoting *Armstrong,* 135 S. Ct. at 1385-86). According to plaintiffs, an implied private right of action exists "when a plaintiff is injured by a constitutional violation, including a 'separation of powers' violation," unless there is a reason to treat the claim differently from any other constitutional claim. *Id.* (citing *Free Enter. Fund v. P.C.A.O.B.*, 561 U.S. 477, 491 n.2 (2010)). Plaintiffs argue that there is no reason to treat the claim here differently, and they reject the President's analogy to the Supremacy Clause. *Id.* at 51.

Plaintiffs reject the President's contention that the "zone-of-interests" test applies to constitutional claims in light of *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014), but state that even if it does, they easily satisfy it. Pls.' Opp'n, ECF No. 17 at 52. Plaintiffs argue that "[t]he interest they seek to vindicate is at the heart of the Clause, which employs separation of powers to combat foreign corruption." *Id.* Plaintiffs observe that the President concedes that Congress as a whole would satisfy any zone-of-interests test, but that he offers no reason why

individual Members of Congress have a different zone of interests. *Id.*

The Court is not persuaded that it should find no implied cause of action in the Foreign Emoluments Clause on the ground that the Supremacy Clause does not create a cause of action. In holding there is no implied cause of action in the Supremacy Clause, the Supreme Court stated that it "does not create a cause of action. It instructs courts what to do when state and federal law clash . . ." *Armstrong*, 135 S. Ct. at 1383. That "instruction" stands in sharp contrast to the Clause, which prohibits the acceptance of any foreign Emoluments of any kind whatever without the consent of Congress. Furthermore, the President points to no authority holding that the Appointments Clause, which arguably **is** analogous to the Foreign Emoluments Clause, does not create an implied right of action. *See generally* Mot. to Dismiss, ECF No. 15-1; Reply, ECF No. 28.

The Court is persuaded that this is a proper case in which to exercise its equitable discretion to enjoin allegedly unconstitutional action by the President. *See Armstrong*, 135 S. Ct. at 1384 ("[W]e have long held that federal courts may in some circumstances grant injunctive relief . . . with respect to violations of federal law by federal officials.") (citations omitted). As plaintiffs point out, there is no reason for the exercise of equitable discretion to be limited to defend a

potential enforcement action and the President has cited no authority to the contrary. Pls.' Opp'n, ECF No. 17 at 54. Rather, "it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution" unless there is a reason not to do so. *Free Enter. Fund*, 561 U.S. at 491 n.2 (citation omitted); *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982) ("It is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States."). Here, accepting the allegations in the Amended Complaint as true, which the Court must at this juncture, the President is accepting prohibited foreign emoluments without seeking congressional consent, thereby defeating the purpose of the Clause to guard against even the possibility of "corruption and foreign influence." 3 *Records of the Federal Convention of 1787,* at 327 (Max Farrand ed., 1966). Exercising the Court's equitable discretion here is therefore "not in derogation of the separation of powers, but to maintain their proper balance." *Nixon*, 457 U.S. at 754.

"[T]he plaintiff's complaint [must] fall within 'the zone of interests' to be protected or regulated by the statue or constitutional guarantee in question." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, *Inc.*, 454 U.S. 464, 475 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 499

(1975)). "We doubt, however, that it is possible to formulate a single [zone of interests] inquiry that governs all statutory and constitutional claims." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 400 n.16 (1987). Assuming the zone-of-interests test applies here, the Court is persuaded that individual Members of Congress satisfy that test. The President has conceded that Congress as a body would satisfy the zone-of-interests test, Mot. to Dismiss, ECF No. 15-1 at 31, but asserts in his reply that "[p]laintiffs' claim that they have been deprived of legislative prerogatives as Members of Congress is at most 'marginally related' to the Foreign Emoluments Clause's purpose of guarding against foreign influence," Reply, ECF No. 28 at 20 (citing *Clarke*, 479 U.S. at 394, 399). The Court disagrees. The only way the Clause can achieve its purpose is for the President to seek and obtain the consent of Congress before he accepts foreign Emoluments. The Amended Complaint alleges that plaintiffs' injury is that they have been deprived of the right to vote to consent to the President's receipt of foreign Emoluments before he accepts them. Am. Compl., ECF No. 14 ¶ 82. Plaintiffs' injury is therefore hardly "marginally related" to the purpose of the Clause, but is directly related to the only way the Clause can achieve its purpose. *See Riegle v. Fed. Open Mkt Comm.*, 656 F.2d 873, 879 (D.C. Cir. 1981) ("[T]he interest which Riegle claims was injured by defendants' action (his right

to advise and consent to the appointment of officers of the executive branch) is within the zone of interests protected by the Appointments Clause of the Constitution." (citation omitted)).[7] And as the Court explained at length in its previous Opinion, here there is no adequate legislative remedy. *Blumenthal I*, 335 F. Supp. 3d at 66-68.

The Court rejects the President's suggestion that "extreme equitable restraint" is appropriate here because plaintiffs can only obtain relief from the President. Mot. to Dismiss, ECF No. 15-1 at 32. Rather, the fact that plaintiffs can only obtain relief from the President is precisely the reason the Court should exercise its equitable discretion here. *See District of Columbia v. Trump*, 291 F. Supp. 3d 725, 752 (2018) (observing that "it would be exalting form over substance if the President's acts were held to be beyond the reach of judicial scrutiny when he himself is the defendant, but held within judicial control when he and/or the Congress has delegated the performance of duties to federal officials subordinate to the President and one or more of them can be named as a defendant"

---

[7] The Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") expressly disapproved of "*Riegle's* intimation in dicta that the standing of private plaintiffs to bring particular action affects the propriety of our entertaining the same challenge when brought by a legislator." *Melcher v. Fed. Open Mkt Comm.*, 836 F.2d. 561, 565 (D.C. Cir. 1987). However, the Court did not address the zone-of-interests analysis in *Riegle. See generally id.*

(quoting *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 613 (D.C. Cir. 1974)); *see also* Br. of Separation of Powers Scholars as Amici Curiae in Supp. of Pls. ("Br. of Separation of Powers Scholars"), ECF No. 45 at 15-16 (explaining that the cases cited by the President do not require dismissal of this lawsuit because: (1) in *Mississippi v. Johnson*, 71 U.S. 475 (1866), the Supreme Court dismissed the case and Mississippi then brought suit against Secretary of War and two other defendants challenging the same Acts; and (2) in *Franklin v. Massachusetts*, 505 U.S. 788 (1992) (plurality opinion), the injury could be redressed by the Secretary of Commerce. Rather, when there is no other remedy, courts have allowed suits against the President to proceed).

The Court is mindful that "the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *Loving v. United States*, 517 U.S. 748, 757 (1996) (citing *Mistretta v. United States*, 488 U.S. 361, 397-408 (1989)). However, as *amici* Separation of Powers Scholars point out, there is no such risk here as the President has not identified what duties would be impaired, which is distinct from *Mississippi v. Johnson*, where "the relief sought by the plaintiff against the President would have interfered directly with the President's ability to take care that the Reconstruction Acts were faithfully executed." Br.

of Separation of Powers Scholars, ECF No. 45 at 17-18 (citing *Johnson,* 71 U.S. at 499). *Amici* also note that "far from distracting the President from his official duties, 'any Presidential time spent dealing with, or action taken in response to' a case clarifying the scope of the Foreign Emoluments Clause is actually 'part of a President's official duties.'" *Id.* at 19 (quoting *Clinton v. Jones*, 520 U.S. 681, 718 (1997) (Breyer, J., concurring in the judgment)). The Court agrees. The parties dispute the meaning of "Emolument" but not that the Clause applies to the President. Accordingly, adjudicating this case ensures that the President fulfills his duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and consistent with his oath of office to "preserve, protect and defend the Constitution of the United States," U.S. Const. art. II, § 1, cl. 8.

### 2. The Injunctive Relief Sought Is Constitutional

The President argues that the remedy plaintiffs seek is unconstitutional because an injunction against him in his official capacity would effectively "impose a condition on [his] ability to serve as President and to perform the duties he is duly elected to perform," Mot. to Dismiss, ECF No. 15-1 at 56, thereby "implicating core 'executive and political' duties," Reply, ECF No. 28 at 32 (quoting *Johnson*, 71 U.S. at 499). Plaintiffs respond that the relief sought is not barred because

complying with the Clause is akin to performing a ministerial
duty rather than an official one, and there is no prohibition on
injunctive relief for the performance of a ministerial duty by
the President. Pls.' Opp'n, ECF No. 17 at 52-54. The President
complains that if plaintiffs' interpretation of the Clause is
correct, an injunction requiring his "compliance with the Clause
would impose significant burdens" on him. Reply, ECF No. 28 at
32. The President also disputes that compliance with the Clause
can be characterized as ministerial because of the "judgment"
and "planning" needed to ensure compliance, but that even if it
was so properly characterized, "this Court should still exercise
utmost restraint in deciding whether to enjoin a sitting
President." *Id*.

    The Court agrees that restraint is appropriate. However,
Supreme Court and D.C. Circuit precedent do not foreclose
injunctive relief against the President under certain
circumstances. A "grant of injunctive relief against the
President himself is extraordinary, and should . . . raise []
judicial eyebrows." *Franklin*, 505 U.S. at 802. That said, the
Supreme Court "left open the question whether the President
might be subject to a judicial injunction requiring the
performance of a purely 'ministerial' duty." *Id*. (citing
*Johnson*, 71 U.S. at 498-99). "A ministerial duty is one that
admits of no discretion, so that the official in question has no

authority to determine whether to perform the duty." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (citing *Johnson*, 71 U.S. at 498 ("[A] ministerial duty . . . is one in respect to which nothing is left to discretion.")). "[A] ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" *Id.* at 978 (quoting *13th Reg'l Corp. v. Dep't of the Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

"The language of the Emoluments Clause is both sweeping and unqualified." 17 Op. O.L.C. at 121. The acceptance of an Emolument barred by the Clause is prohibited unless Congress chooses to permit an exception. *Id.* Given the "sweeping and unqualified" Constitutional mandate, the President has "no discretion . . . no authority to determine whether to perform the duty" to not accept any Emolument until Congress gives its consent. *Swan*, 100 F.3d at 977. Accordingly, seeking congressional consent prior to accepting prohibited foreign emoluments is a ministerial duty. *Id.* The President's argument regarding the "judgment" and "planning" needed to ensure compliance with the Clause is beside the point. It may take judgment and planning to comply with the Clause, but he has no discretion as to whether or not to comply with it in the first instance. *See id*. The President complains about the "significant

burdens" an injunction requiring him to comply with the Clause would impose. Reply, ECF No. 28 at 32. However, as discussed *supra* Section IV.D.1, the correct inquiry is not whether injunctive relief requiring the President to comply with the Constitution would burden him, but rather whether allowing this case to go forward would interfere with his ability to ensure that the laws be faithfully executed. *See Clinton*, 520 U.S. at 718 (Breyer, J., concurring in the judgment). Accordingly, the injunctive relief sought in this case is constitutional.

## V. Conclusion

For the reasons discussed above, the Court finds that: (1) plaintiffs have stated a claim against the President for allegedly violating the Foreign Emoluments Clause; (2) plaintiffs have a cause of action to seek injunctive relief against the President; and (3) the injunctive relief sought is constitutional. The Court therefore **DENIES** the portions of the motion to dismiss that were deferred in the Court's prior Order. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:     Emmet G. Sullivan**
**            United States District Judge**
**            April 30, 2019**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                              )
Senator RICHARD BLUMENTHAL,   )
et al.,                       )
                              )
            Plaintiffs,       )
                              )
        v.                    )Civil Action No. 17-1154 (EGS)
                              )
DONALD J. TRUMP, in his official )
capacity as President of the  )
United States,                )
                              )
            Defendant.        )
_____)
```

## MEMORANDUM OPINION AND ORDER

The Court has issued two previous Opinions in this case. In its September 28, 2018 Opinion, the Court held that plaintiffs, approximately 201 Members of the 535 Members of the United States Senate and House of Representatives, had standing to sue defendant Donald J. Trump in his official capacity as President of the United States ("the President") for alleged violations of the Foreign Emoluments Clause ("the Clause"). *See Blumenthal v. Trump*, 335 F. Supp. 3d 45, 72 (D.D.C. 2018). In its April 30, 2019 Opinion, the Court held that: (1) the term "Emolument" is broadly defined as any profit, gain, or advantage; (2) plaintiffs stated a plausible claim against the President for violations of the Clause; (3) plaintiffs have a cause of action to seek injunctive relief to prevent the President's violations of the Clause; and (4) the relief plaintiffs seek—an

injunction against the President—is constitutional. *See*
*Blumenthal v. Trump*, 373 F. Supp. 3d 191, 207, 211, 212 (D.D.C.
2019).

Pending before the Court are the President's motions for
certification for interlocutory appeal of the Court's September
28, 2018 Order, ECF No. 60;[1] and April 30, 2019 Order, ECF No.
71-1. The President also moves to stay proceedings while the
Court considers the motions and pending appeal if the Court
grants them. *Id*. at 25. Upon careful consideration of the
President's motions, the oppositions and replies thereto, and
for the reasons explained below, the Court **DENIES** the
President's motions.[2]

A District Court may certify an interlocutory order for
immediate appeal if the judge is "of the opinion that such order
involves [1] a controlling question of law [2] as to which there
is substantial ground for difference of opinion and [3] that an
immediate appeal from the order may materially advance the

---

[1] The President filed his first motion for certification of
interlocutory appeal before the Court had ruled on all the
issues the President raised in his motion to dismiss the
complaint. To conserve judicial resources, the Court declined to
consider the first motion until it had ruled on all the issues
raised in the motion to dismiss as the ruling could have
rendered the motion for certification of interlocutory appeal
moot. The President's argument in his initial brief that the
Court of Appeals could render a quick decision on the single
issue of standing, Def.'s Reply, ECF No. 62 at 4, is therefore
moot.
[2] The Court thanks *amici* for their submission.

ultimate termination of the litigation." 28 U.S.C. § 1292(b).

Through section 1292(b), "Congress ... chose to confer on

District Courts first line discretion" and "circumscribed

authority to certify for immediate appeal interlocutory orders

deemed pivotal and debatable." *Swint v. Chambers County Comm'n,*

514 U.S. 35, 46, 47 (1995). The availability of immediate appeal

of interlocutory orders subject to the requirements of section

1292(b) is an "exception to the firm final judgment rule

governing federal courts." *Trout v. Garrett*, 891 F.2d 332, 335

(D.C. Cir. 1989). Accordingly, a party seeking certification

pursuant to section 1292(b) must meet a high standard to

overcome the "strong congressional policy against piecemeal

reviews, and against obstructing or impeding an ongoing judicial

proceeding by interlocutory appeals." *United States v. Nixon,*

418 U.S. 683, 690 (1974). "Although courts have discretion to

certify an issue for interlocutory appeal, . . . interlocutory

appeals are rarely allowed [and] the movant 'bears the burden of

showing that exceptional circumstances justify a departure from

the basic policy of postponing appellate review until after the

entry of final judgement.'" *Virtual Def. and Dev. Int'l, Inc. v.*

*Republic of Moldova,* 133 F. Supp. 2d 9, 22 (D.D.C. 2001) (citing

*First Am. Corp. v. Al-Nahyan,* 948 F. Supp. 1107 (D.D.C. 1996)).

Finally, "[t]he moving party bears the burden of establishing

all three elements" of the provisions of section 1292(b). *U.S.*

*House of Representatives v. Burwell*, No. 14-1967, 2015 WL
13699275, at *1 (D.D.C. Oct. 19, 2015) (citing *Nat'l Cmty.
Reinvestment Coal. v. Accredited Home Lenders Holding Co.,* 597
F. Supp. 2d 120, 121 (D.D.C. 2009)); *see also Butler v.
DirectSat USA, LLC,* 307 F.R.D. 445, 452 ("Unless *all* of the
statutory criteria are satisfied . . . 'the district court may
not and should not certify its order . . . under section
1292(b).'") (citing *Ahrenholz v. Bd. of Trs. of the Univ. of
Ill.*, 219 F.3d 674, 676 (7th Cir.)).

The President contends that the Court's Orders involve four
controlling questions of law: (1) whether plaintiffs have
standing to sue, Def.'s Statement of P. & A. in Supp. of Mot.
for Certification ("Def.'s Br.") ECF No. 60-1 at 8[3]; (2) whether
plaintiffs have an equitable cause of action; (3) whether the
Court can order the declaratory and injunctive relief sought;
and (4) the meaning of the Clause, Def.'s Suppl. Br. in Supp. of
His Mot. ("Def.'s Suppl. Br."), ECF No. 71-1 at 10.

Despite bearing the burden of establishing all three
elements of section 1292(b), the President has made little
effort to demonstrate the third element—that "an immediate
appeal from the [Court's Orders] may materially advance the

---

[3] When citing electronic filings throughout this Memorandum
Opinion and Order, the Court cites to the ECF header page
number, not the original page number of the filed document.

ultimate termination of the litigation." 28 U.S.C. § 1292(b).

The President contends that this element is met because there

are substantial grounds for difference of opinion as to whether

plaintiffs have standing to sue and if the Court was reversed on

this issue, the case would be terminated for lack of

jurisdiction. Def.'s Br., ECF No. 60-1 at 23. The President also

states that "[r]esolution of either of the two threshold

justiciability questions [whether plaintiffs have standing to

sue and whether plaintiffs have an equitable cause of action] in

the President's favor would terminate this suit. And if the

Court of Appeals agrees with the President's interpretation of

the Foreign Emoluments Clause, the case would be substantially

narrowed, if not over." Def.'s Suppl. Br., ECF No. 71-1 at 7.

But as plaintiffs point out, if reversal by the Court of

Appeals were the standard for meeting this element of the

section 1292(b) test, "every denial of a defendant's dispositive

motion would merit an interlocutory appeal." Pls.' Opp'n, ECF

No. 61 at 12 (citing *Educ. Assistance Found. v. United States*,

No. 11-1573, 2014 WL 12780253, at *3 (D.D.C. Nov. 21, 2014)

("Any immediate appeal under an interlocutory order *could* affect

the conduct of litigation and avoid unnecessary litigation.").

Furthermore, the President's "contention that certification of

this Court's Orders for interlocutory appeal will materially

advance this litigation necessarily assumes that [he] will

prevail on appeal." *Judicial Watch Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 28 (D.D.C. 2002).

To determine whether the third element has been met, the Court considers whether an immediate appeal "would *likely* and *materially* advance the ultimate determination" of the litigation. *Educ. Assistance Found.,* 2014 WL 12780253, at *3 (quoting *McKenzie v. Kennickell*, No. 73-0974, 1986 WL 32653, at *2 (D.D.C. Oct. 27, 1986); *see also Burwell*, 2015 WL 13699275, at *1 (noting that the third element was not satisfied where the case could be "decided in a matter of months—likely before an interlocutory appeal could even be decided"). The Court also considers whether "[a]n immediate appeal would conserve judicial resources and spare the parties from possibly needless expense." *APCC Services Inc. v. AT&T Corp.,* 297 F. Supp. 2d 90, 100 (D.D.C. 2003).

Here, the parties agree that all of the issues in this case can be resolved on cross motions for summary judgment. *See* Local Rule 16.3 Report, ECF No. 75 at 3. Plaintiffs have proposed a three month time period for discovery commencing June 28, 2019 and concluding September 27, 2019. *Id.* at 6. The President states that "fact discovery should not commence unless the Court denies the motion for interlocutory appeal," *id.* at 7, and the parties agree on a proposed briefing schedule that would be complete within another three months, *id.* at 5.

The parties agree, therefore, that discovery will conclude and cross motions for summary judgment will be fully briefed within six months. Once the cross motions are ripe, the Court will be able to resolve them expeditiously thereby terminating the case. In view of this abbreviated discovery and briefing schedule, the President has not "carried [his] burden of demonstrating that interlocutory appeal of this question at this point in time would materially advance the litigation as a whole." *Judicial Watch*, 233 F. Supp. 2d at 29. This discovery and briefing schedule stands in stark contrast to cases in this district where Courts have found the moving party to have met the burden of establishing the third element of the section 1292(b) test. For example, in *Molock v. Whole Foods Market Group*, Judge Mehta observed that "[d]iscovery in this case, in its present form, promises to be drawn out, complex, and expensive" and that "[t]he potential time and expense of obtaining such discovery is staggering." 317 F. Supp. 3d 1, at *7 (D.D.C. 2018). In *APCC Services Inc.*, Judge Huvelle found the third element of the section 1292(b) test to be satisfied in protracted litigation where discovery had been ongoing "more than four years after the filing of the suit" and where the significant costs of discovery were expected to "exceed any possible damages award." 297 F. Supp. at 100.

The President asserts that "'[w]hen there are substantial grounds for difference of opinion as to a court's subject matter jurisdiction, courts regularly hold that immediate appeal may materially advance the ultimate termination of the litigation.'" Def.'s Br., ECF No. 60-1 at 23 (quoting *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 55 (D.D.C. 2009)) (citing *APCC Services Inc.*, 297 F. Supp. 2d at 109 and *Lemery v. Ford Motor Co.*, 244 F. Supp. 2d 720, 728 (S.D. Tex. 2002)). This Court does not read the cited cases to support such a broad proposition and finds the facts here to be distinguishable. The Court has explained Judge Huvelle's reasoning in *APCC Services Inc.* for finding this element to have been satisfied *supra,* and in *Lemery*, the Court found this element to be satisfied with little analysis in a products liability case where there would be protracted discovery at "tremendous expense." 244 F. Supp. 2d at 728. Neither situation is the case here. Furthermore, although in each case, the question for certification involved a jurisdictional issue, that was not the sole reason the Court found this element to be satisfied and for granting the motion.

The President also argues that the cases plaintiffs cite in support of their argument actually support his position because each of the cases was in a late stage and "certain to conclude in relatively short order through a resolution of summary judgment motions or a brief trial." Def.'s Reply, ECF No. 62 at

5. The Court disagrees that the cases provide support for the President's position. Rather, these cases are more similar to the situation here, where even though discovery has not begun, it will be scheduled to conclude and cross motions for summary judgment to be fully briefed within six months. *See Burwell*, 2015 WL 13699275 at *1 (denying motion for certification because "[u]nlike typical civil litigation, where the denial of a motion to dismiss would be followed by months or even years of discovery, this case is presently suited for summary disposition," which could be decided "in a matter of months"); *United States ex rel. Barko v. Halliburton Co.*, 4 F. Supp. 3d 162, 167 (D.D.C. 2014) (denying motion for certification in part because "[t]o pause litigation so close to the end of discovery and so near the deadline for summary judgment briefing would waste judicial resources."). While some of the cases cited were poised for a quicker resolution than is the case here, *see Washington Tennis & Educ. Found., Inc. v. Clark Nexsen*, Inc., 324 F. Supp. 3d, 128, 146 (D.D.C. 2018) ("Once calendared, trial on Defendant's counterclaim can be accomplished in less than a week."); *Brown v. Pro Football Inc.*, 812 F. Supp. 237, 239 (D.D.C. 1992) ("Given that the trial on damages is imminent, it is evident that it would not expedite the ultimate termination of this litigation to delay proceedings for an interlocutory appeal."); *Singh v. George Washington Univ.*, 383 F. Supp. 2d 99,

105 (D.D.C. 2005) ("With this litigation poised for a relatively short, limited trial, it would not materially advance the termination of the litigation to authorize a piecemeal appeal."), this case will be poised for resolution within six months; an immediate appeal would hardly materially advance its ultimate termination.

Since the President has failed to meet his burden of establishing "that an immediate appeal from the order may materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), the Court need not consider whether the President has met his burden of establishing the other two criteria for certifying an order for an immediate appeal. *See Educ. Assistance Found.*, 2014 WL 12780253, at *3 ("The plaintiff having failed to establish that the Court's ruling on the admissibility of the subject document presents a controlling question of law, and that an interlocutory appeal would materially advance the litigation, the Court need not consider whether there exists a substantial ground for a difference of opinion regarding the document's admissibility.") (citing 28 U.S.C. § 1292(b) and *Ahrenholz,* 219 F.3d at 676 ("Unless all these criteria are satisfied, the district court may not and should not certify its order to us for an immediate appeal under section 1292(b)."); *Baylor v. Mitchell Rubenstein & Assocs.*, No. 13-1995, 2014 WL 12644263, at *2 (D.D.C. July 30, 2014) ("But

even if the Court were able to find that substantial grounds for difference of opinion did exist, it would nonetheless deny the motion for certification because plaintiff has not demonstrated that this case satisfies section 1292(b)'s third requirement: 'that an immediate appeal from the order may materially advance the ultimate termination of the litigation.'") (citation omitted).

The President argues that the exceptional circumstances of this case make certification for interlocutory appeal appropriate. *See* Def.'s Br., ECF No. 60-1 at 10-13. But "even if the circumstances [are] truly extraordinary . . . that would favor certification only if all the criteria required by § 1292(b) are otherwise met." *District of Columbia v. Trump*, 344 F. Supp. 3d 828, 842 (D. Md. 2018). As explained above, the President has failed to meet his burden of demonstrating the third element of the section 1292(b) test.

The President also moves to stay proceedings: (1) while the Court considers the section 1292(b) motions; and (2) pending appeal if the Court grants the motions. Def.'s Suppl. Br., ECF No. 71-1 at 25. Because the Court has denied the President's motions for certification, his request to stay proceedings pending consideration of the motions and pending appeal if the motion is granted are **DENIED** as **MOOT.**

Accordingly, it is hereby

**ORDERED** that [60] the President's motion for certification for interlocutory appeal of the Court's September 28, 2018 Order is **DENIED**; and it is further

**ORDERED** that [71] the President's motion for certification for interlocutory appeal of the Court's April 30, 2019 Order and for stay is **DENIED**.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
            **United States District Judge**
            **June 25, 2019**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Senator RICHARD BLUMENTHAL                )
706 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Representative JERROLD NADLER             )
2132 Rayburn House Office Building        )          Civil Action No. 17-1154 (EGS)
Washington, D.C. 20515,                   )
                                          )
Senator RICHARD J. DURBIN                 )
711 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator PATTY MURRAY                      )
154 Russell Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator ELIZABETH WARREN                  )
309 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator AMY KLOBUCHAR                     )
425 Dirksen Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator BERNARD SANDERS                   )
332 Dirksen Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator PATRICK LEAHY                     )
437 Russell Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator SHELDON WHITEHOUSE                )
530 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator CHRISTOPHER A. COONS              )
218 Russell Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator MAZIE K. HIRONO                   )
713 Hart Senate Office Building           )
Washington, D.C. 20510,                   )

1

Senator CORY A. BOOKER                    )
717 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator KAMALA D. HARRIS                  )
112 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator MICHAEL F. BENNET                 )
261 Russell Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator MARIA CANTWELL                    )
511 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator BENJAMIN L. CARDIN                )
509 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator TOM CARPER                        )
513 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator CATHERINE CORTEZ MASTO            )
516 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator TAMMY DUCKWORTH                   )
524 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator KIRSTEN E. GILLIBRAND             )
478 Russell Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator MARTIN HEINRICH                   )
303 Hart Senate Office Building           )
Washington, D.C. 20510,                   )
                                          )
Senator TIM KAINE                         )
231 Russell Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )
Senator EDWARD J. MARKEY                  )
255 Dirksen Senate Office Building        )
Washington, D.C. 20510,                   )
                                          )

2

Senator JEFF MERKLEY          )
313 Hart Senate Office Building    )
Washington, D.C. 20510,        )
                                          )

Senator CHRIS MURPHY        )
136 Hart Senate Office Building    )
Washington, D.C. 20510,        )
                                          )

Senator JACK REED           )
728 Hart Senate Office Building    )
Washington, D.C. 20510,        )
                                          )

Senator BRIAN SCHATZ        )
722 Hart Senate Office Building    )
Washington, D.C. 20510,        )
                                          )

Senator TOM UDALL          )
531 Hart Senate Office Building    )
Washington, D.C. 20510,        )
                                          )

Senator CHRIS VAN HOLLEN  )
110 Hart Senate Office Building    )
Washington, D.C. 20510,        )
                                          )

Senator RON WYDEN         )
221 Dirksen Senate Office Building )
Washington, D.C. 20510,        )
                                          )

Representative NANCY PELOSI  )
1236 Longworth House Office Building )
Washington, D.C. 20515,        )
                                          )

Representative STENY H. HOYER )
1705 Longworth House Office Building )
Washington, D.C. 20515,        )
                                          )

Representative JAMES E. CLYBURN )
200 Cannon House Office Building  )
Washington, D.C. 20515,        )
                                          )

Representative KATHERINE CLARK )
2448 Rayburn House Office Building )
Washington, D.C. 20515,        )
                                          )

Representative ZOE LOFGREN   )
1401 Longworth House Office Building )
Washington, D.C. 20515,        )
                                          )

3

Representative SHEILA JACKSON LEE            )
2079 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative STEVE COHEN                    )
2104 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative HENRY C. "HANK"               )
JOHNSON JR.                                  )
2240 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative TED DEUTCH                     )
2447 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative KAREN BASS                     )
2059 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative CEDRIC L. RICHMOND             )
506 Cannon House Office Building             )
Washington, D.C. 20515,                      )
                                             )
Representative HAKEEM JEFFRIES                )
2433 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative DAVID N. CICILLINE             )
2233 Rayburn House Office Building           )
Washington, D.C. 20515,                      )
                                             )
Representative ERIC SWALWELL                  )
407 Cannon House Office Building             )
Washington, D.C. 20515,                      )
                                             )
Representative TED W. LIEU                    )
403 Cannon House Office Building             )
Washington, D.C. 20515,                      )
                                             )
Representative JAMIE RASKIN                   )
412 Cannon House Office Building             )
Washington, D.C. 20515,                      )
                                             )

4

Representative PRAMILA JAYAPAL )
1510 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative VAL BUTLER DEMINGS )
217 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative J. LUIS CORREA )
1039 Longworth House Office Building )
Washington, D.C. 20515 )
)
Representative MARY GAY SCANLON )
1535 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative SYLVIA GARCIA )
1620 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOE NEGUSE )
1419 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative GREG STANTON )
128 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative MADELINE DEAN )
129 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative DEBBIE MUCARSEL- )
POWELL )
114 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative VERONICA ESCOBAR )
1505 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative ALMA ADAMS )
2436 Rayburn House Office Building )
Washington, D.C. 20515, )

5

Representative PETE AGUILAR )
109 Cannon House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative NANETTE DIAZ )
BARRAGÁN )
1030 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative JOYCE BEATTY )
2303 Rayburn House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative AMI BERA )
1727 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative DONALD S. BEYER, JR. )
1119 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative SANFORD D. BISHOP JR. )
2407 Rayburn House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative EARL BLUMENAUER )
1111 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative LISA BLUNT ROCHESTER )
1519 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative SUZANNE BONAMICI )
2231 Rayburn House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative BRENDAN F. BOYLE )
1133 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )
Representative ANTHONY BROWN )
1323 Longworth House Office Building )
Washington, D.C. 20515, )
                                                    )

Add. 124

Representative JULIA BROWNLEY )
2262 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative CHERI BUSTOS )
1233 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative G.K. BUTTERFIELD )
2080 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative SALUD O. CARBAJAL )
1431 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative TONY CÁRDENAS )
2438 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ANDRÉ CARSON )
2135 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative SEAN CASTEN )
429 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative KATHY CASTOR )
2052 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JOAQUIN CASTRO )
2241 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JUDY CHU )
2423 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative GILBERT R. CISNEROS, JR. )
431 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative YVETTE D. CLARKE )
2058 Rayburn House Office Building )
Washington, D.C. 20515, )
)

7

Representative WILLIAM LACY CLAY                    )
2428 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative EMANUEL CLEAVER, II                  )
2335 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative GERALD E. CONNOLLY                   )
2238 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative JIM COOPER                           )
1536 Longworth House Office Building                )
Washington, D.C. 20515,                            )
                                                   )
Representative JIM COSTA                            )
2081 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative JOE COURTNEY                         )
2332 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative CHARLIE CRIST                        )
215 Cannon House Office Building                    )
Washington, D.C. 20515,                            )
                                                   )
Representative ELIJAH E. CUMMINGS                   )
2163 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative DANNY K. DAVIS                       )
2159 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative SUSAN A. DAVIS                       )
1214 Longworth House Office Building                )
Washington, D.C. 20515,                            )
                                                   )
Representative PETER DEFAZIO                        )
2134 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )
Representative DIANA DEGETTE                        )
2111 Rayburn House Office Building                  )
Washington, D.C. 20515,                            )
                                                   )

8

Add. 126

Representative ROSA L. DELAURO                    )
2413 Rayburn House Office Building                )
Washington, D.C. 20515,                           )
                                                  )
Representative SUZAN K. DELBENE                   )
2330 Rayburn House Office Building                )
Washington, D.C. 20515,                           )
                                                  )
Representative MARK DESAULNIER                    )
503 Cannon House Office Building                  )
Washington, D.C. 20515,                           )
                                                  )
Representative DEBBIE DINGELL                     )
116 Cannon House Office Building                  )
Washington, D.C. 20515,                           )
                                                  )
Representative LLOYD DOGGETT                      )
2307 Rayburn House Office Building                )
Washington, D.C. 20515,                           )
                                                  )
Representative MICHAEL F. DOYLE                   )
306 Cannon House Office Building                  )
Washington, D.C. 20515,                           )
                                                  )
Representative ELIOT L. ENGEL                     )
2426 Rayburn House Office Building                )
Washington, D.C. 20515,                           )
                                                  )
Representative ANNA G. ESHOO                      )
202 Cannon House Office Building                  )
Washington, D.C. 20515,                           )
                                                  )
Representative ADRIANO ESPAILLAT                  )
1630 Longworth House Office Building              )
Washington, D.C. 20515,                           )
                                                  )
Representative DWIGHT EVANS                       )
1105 Longworth House Office Building              )
Washington, D.C. 20515,                           )
                                                  )
Representative BILL FOSTER                        )
2366 Rayburn House Office Building                )
Washington, D.C. 20515,                           )
                                                  )
Representative LOIS FRANKEL                       )
2305 Rayburn House Office Building                )
Washington, D.C. 20515,                           )
                                                  )

9

Representative MARCIA L. FUDGE )
2344 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative TULSI GABBARD )
1433 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative RUBEN GALLEGO )
1131 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOHN GARAMENDI )
2368 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JESÚS G. "CHUY" GARCÍA )
530 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative JIMMY GOMEZ )
1530 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative AL GREEN )
2347 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative RAUL M. GRIJALVA )
1511 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative DEBRA HAALAND )
1237 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOSH HARDER )
131 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative ALCEE L. HASTINGS )
2353 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JAHANA HAYES )
1415 Longworth House Office Building )
Washington, D.C. 20515, )
)

10

Representative DENNY HECK                      )
2452 Rayburn Office Building                   )
Washington, D.C. 20515,                        )
                                               )
Representative BRIAN HIGGINS                    )
2459 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative KATIE HILL                       )
1130 Longworth House Office Building           )
Washington, D.C. 20515,                        )
                                               )
Representative JAMES A. HIMES                   )
1227 Longworth House Office Building           )
Washington, D.C. 20515,                        )
                                               )
Representative JARED HUFFMAN                    )
1527 Longworth House Office Building           )
Washington, D.C. 20515,                        )
                                               )
Representative EDDIE BERNICE JOHNSON            )
2306 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative MARCY KAPTUR                     )
2186 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative WILLIAM R. KEATING               )
2351 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative ROBIN L. KELLY                   )
2416 Rayburn House Office Building             )
Washington, D.C. 20515,                        )
                                               )
Representative JOSEPH P. KENNEDY III            )
304 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative RO KHANNA                        )
221 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )
Representative DANIEL T. KILDEE                 )
203 Cannon House Office Building               )
Washington, D.C. 20515,                        )
                                               )

11

Representative DEREK KILMER )
1410 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative ANN KIRKPATRICK )
309 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative RAJA KRISHNAMOORTHI )
115 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative JAMES R. LANGEVIN )
2077 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative RICK LARSEN )
2113 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JOHN B. LARSON )
1501 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative BRENDA L. LAWRENCE )
2463 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative AL LAWSON )
1406 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative BARBARA LEE )
2470 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ANDY LEVIN )
228 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative MIKE LEVIN )
1626 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JOHN LEWIS )
300 Cannon House Office Building )
Washington, D.C. 20515, )
)

12

Representative DAVE LOEBSACK )
1211 Longworth House Office Building )
Washington, D.C. 20515, )
                                    )
Representative ALAN LOWENTHAL )
108 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative NITA M. LOWEY )
2365 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative BEN RAY LUJÁN )
2323 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative STEPHEN LYNCH )
2109 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative CAROLYN B. MALONEY )
2308 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative SEAN PATRICK MALONEY )
2331 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative DORIS MATSUI )
2311 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative BETTY MCCOLLUM )
2256 Rayburn House Office Building )
Washington, D.C. 20515, )
                                    )
Representative A. DONALD MCEACHIN )
314 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative JAMES P. MCGOVERN )
408 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )
Representative ANN MCLANE KUSTER )
320 Cannon House Office Building )
Washington, D.C. 20515, )
                                    )

13

Representative JERRY MCNERNEY )
2265 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative GREGORY W. MEEKS )
2310 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative GRACE MENG )
2209 Raybur House Office Building )
Washington, D.C. 20515, )
)
Representative GWEN S. MOORE )
2252 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JOSEPH D. MORELLE )
1317 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative SETH MOULTON )
1127 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative GRACE F. NAPOLITANO )
1610 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative RICHARD E. NEAL )
2309 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative DONALD NORCROSS )
2437 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ALEXANDRIA OCASIO- )
CORTEZ )
229 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative ILHAN OMAR )
1517 Longworth House Office Building )
Washington, D.C. 20515, )
)

14

Representative FRANK PALLONE, JR.               )
2107 Rayburn House Office Building              )
Washington, D.C. 20515,                         )
                                                )
Representative JIMMY PANETTA                    )
212 Cannon House Office Building                )
Washington, D.C. 20515,                         )
                                                )
Representative BILL PASCRELL, JR.               )
2409 Rayburn House Office Building              )
Washington, D.C. 20515,                         )
                                                )
Representative DONALD M. PAYNE, JR.             )
103 Cannon House Office Building                )
Washington, D.C. 20515,                         )
                                                )
Representative ED PERLMUTTER                    )
1226 Longworth House Office Building            )
Washington, D.C. 20515,                         )
                                                )
Representative SCOTT H. PETERS                  )
2338 Rayburn House Office Building              )
Washington, D.C. 20515,                         )
                                                )
Representative DEAN PHILLIPS                    )
1305 Longworth House Office Building            )
Washington, D.C. 20515,                         )
                                                )
Representative CHELLIE PINGREE                  )
2162 Rayburn House Office Building              )
Washington, D.C. 20515,                         )
                                                )
Representative MARK POCAN                       )
1421 Longworth House Office Building            )
Washington, D.C. 20515,                         )
                                                )
Representative AYANNA PRESSLEY                  )
1108 Longworth House Office Building            )
Washington, D.C. 20515,                         )
                                                )
Representative DAVID E. PRICE                   )
2108 Rayburn House Office Building              )
Washington, D.C. 20515,                         )
                                                )
Representative MIKE QUIGLEY                     )
2458 Rayburn House Office Building              )
Washington, D.C. 20515,                         )
                                                )

Add. 133

Representative KATHLEEN M. RICE )
2435 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative HARLEY ROUDA )
2300 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative LUCILLE ROYBAL- )
ALLARD )
2083 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative C. A. DUTCH )
RUPPERSBERGER )
2206 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative BOBBY L. RUSH )
2188 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative TIM RYAN )
1126 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative LINDA T. SÁNCHEZ )
2329 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JOHN P. SARBANES )
2370 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative JAN SCHAKOWSKY )
2367 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative ADAM B. SCHIFF )
2269 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative BRADLEY S. SCHNEIDER )
1432 Longworth House Office Building )
Washington, D.C. 20515, )
)

16

Representative ROBERT C. "BOBBY"          )
SCOTT                                     )
1201 Longworth House Office Building      )
Washington, D.C. 20515,                   )
                                          )
Representative JOSÉ E. SERRANO            )
2354 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative TERRI SEWELL               )
2201 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative DONNA E. SHALALA           )
1320 Longworth House Office Building      )
Washington, D.C. 20515,                   )
                                          )
Representative BRAD SHERMAN               )
2181 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative ALBIO SIRES                )
2268 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative ADAM SMITH                 )
2264 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative DARREN SOTO                )
1507 Longworth House Office Building      )
Washington, D.C. 20515,                   )
                                          )
Representative JACKIE SPEIER              )
2465 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )
Representative MARK TAKANO                )
420 Cannon House Office Building          )
Washington, D.C. 20515,                   )
                                          )
Representative BENNIE G. THOMPSON         )
2466 Rayburn House Office Building        )
Washington, D.C. 20515,                   )
                                          )

17

Add. 135

Representative MIKE THOMPSON )
406 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative DINA TITUS )
2464 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative RASHIDA TLAIB )
1628 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative PAUL D. TONKO )
2369 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative NORMA J. TORRES )
2444 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative LORI TRAHAN )
1616 Longworth House Office Building )
Washington, D.C. 20515, )
)
Representative JUAN VARGAS )
2244 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative MARC VEASEY )
2348 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative FILEMON VELA )
307 Cannon House Office Building )
Washington, D.C. 20515, )
)
Representative NYDIA M. VELÁZQUEZ )
2302 Rayburn House Office Building )
Washington, D.C. 20515, )
)
Representative DEBBIE WASSERMAN )
SCHULTZ )
1114 Longworth House Office Building )
Washington, D.C. 20515, )
)

Add. 136

Representative MAXINE WATERS      )
2221 Rayburn House Office Building  )
Washington, D.C. 20515,          )
                                )
Representative BONNIE WATSON   )
COLEMAN                    )
2442 Rayburn House Office Building  )
Washington, D.C. 20515,          )
                                )
Representative PETER WELCH      )
2187 Rayburn House Office Building  )
Washington, D.C. 20515,          )
                                )
Representative JENNIFER WEXTON  )
1217 Longworth House Office Building )
Washington, D.C. 20515,          )
                                )
Representative SUSAN WILD        )
1607 Longworth House Office Building )
Washington, D.C. 20515,          )
                                )
Representative FREDERICA S. WILSON )
2445 Rayburn House Office Building  )
Washington, D.C. 20515,          )
                                )
Representative JOHN YARMUTH    )
402 Cannon House Office Building    )
Washington, D.C. 20515,          )
                                )
                 Plaintiffs,    )
                                )
        v.                      )
                                )
DONALD J. TRUMP, in his official capacity )
as President of the United States of America )
1600 Pennsylvania Avenue, N.W.    )
Washington, D.C. 20500,          )
                                )
                 Defendant.    )

_____

## SECOND AMENDED COMPLAINT

Senator Richard Blumenthal and Representative Jerrold Nadler, along with 213 other

members of Congress, for their complaint against Donald J. Trump, in his official capacity as

President of the United States of America, allege as follows:

19

# I.
## INTRODUCTION

1.        Plaintiffs, 29 members of the United States Senate and 186 members of the United States House of Representatives, bring this action against President Donald J. Trump to obtain relief from the President's continuing violation of the Foreign Emoluments Clause of the United States Constitution, which was designed to ensure that our nation's leaders would not be corrupted by foreign influence or put their own financial interests over the national interest.  To achieve those aims, the Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."[1] Through this measure, the nation's Founders invested members of Congress with an important role in preventing the corruption and foreign influence that the Founders sought to avoid— permitting federal officeholders to accept otherwise prohibited "Emolument[s]" only if they first received "the Consent of the Congress."

2.        Defendant, President Donald J. Trump, has a financial interest in vast business holdings around the world that engage in dealings with foreign governments and receive benefits from those governments.  By virtue of that financial interest, Defendant has accepted, or necessarily will accept, "Emolument[s]" from "foreign State[s]" while holding the office of President of the United States.

3.        Because the Foreign Emoluments Clause requires the President to obtain "the Consent of the Congress" before accepting otherwise prohibited "Emolument[s]," Plaintiffs, as members of Congress, must have the opportunity to cast a binding vote that gives or withholds their "Consent" before the President accepts any such "Emolument."

---

[1] U.S. Const. art. I, § 9, cl. 8.

4.      Despite this constitutional mandate, Defendant has chosen to accept numerous benefits from foreign states without first seeking or obtaining congressional approval.  Indeed, he has taken the position that the Foreign Emoluments Clause does not require him to obtain such approval before accepting benefits arising out of exchanges between foreign states and his businesses.  Because Defendant has failed to come to Congress and seek its consent for at least some foreign emoluments that have been the subject of public reporting, it is impossible to know whether Defendant has also accepted, or plans to accept, other foreign emoluments that have not yet been made public.  By accepting these benefits from foreign states without first seeking or obtaining congressional approval, Defendant has thwarted the transparency that the "Consent of the Congress" provision was designed to provide.

5.      Moreover, by accepting these benefits from foreign states without first seeking or obtaining congressional approval, Defendant has also denied Plaintiffs the opportunity to give or withhold their "Consent" to his acceptance of individual emoluments and has injured them in their roles as members of Congress.

6.      To redress that injury, Plaintiffs seek declaratory relief establishing that Defendant violates the Constitution when he accepts any monetary or nonmonetary benefit—any "present, Emolument, Office, or Title, of any kind whatever"—from a foreign state without first obtaining "the Consent of the Congress."  Plaintiffs also seek injunctive relief ordering Defendant not to accept any such benefits from a foreign state without first obtaining "the Consent of the Congress."

## II.
## PARTIES, JURISDICTION, AND VENUE

7.      Richard Blumenthal is a United States Senator who represents the state of Connecticut.  Senator Blumenthal is the Ranking Member of the Subcommittee on Oversight,

Agency Action, Federal Rights and Federal Courts of the Senate Judiciary Committee.

8.      Jerrold Nadler is a United States Representative who represents New York's 10th congressional district.  Representative Nadler is the Chairman of the House Judiciary Committee.

9.      Additional plaintiffs are the other 28 members of the United States Senate and 185 members of the United States House of Representatives whose names appear in the caption of this Complaint.

10.      As members of Congress, Plaintiffs have been entrusted by the Constitution with the important role of determining when the President and other individuals who hold an "Office of Profit or Trust" under the United States may accept "Emolument[s]" from "foreign States." By empowering members of Congress with this important gatekeeping role, the Founders provided a mechanism by which federal officeholders could accept benefits from foreign governments in appropriate circumstances while still maintaining a structural safeguard against corruption and foreign influence.

11.      Defendant Donald J. Trump is the President of the United States of America and thus holds an "Office of Profit or Trust" under the United States.  He is being sued in his official capacity as President of the United States.

12.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

13.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).  Defendant is "an officer . . . of the United States . . . acting in his official capacity or under color of legal authority," and the District of Columbia is a "judicial district" in which the "defendant in the action resides," in which "a substantial part of the events or omissions giving rise to the claim occurred," and in which "a substantial part of property that is the subject of the action is situated."  For example, Trump International Hotel Washington, D.C., which is central to some

Add. 140

of Plaintiffs' allegations, is located in this district.

## III.
## BACKGROUND

14.     Article I, Section 9, Clause 8 of the U.S. Constitution provides: "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  Commonly known as the "Foreign Emoluments Clause," this provision reflects the Founders' deep concern that corruption and foreign influence could undermine the new republic and harm the American people.

15.     Because the Founders believed that corruption was one of the gravest threats to the new nation, they viewed anti-corruption measures as essential to preserving an enduring republican system of government.  As George Mason warned his fellow delegates at the Constitutional Convention, "if we do not provide against corruption, our government will soon be at an end."[2]  Thus, in drafting the Constitution, the Founders sought to ensure that "corruption was more effectually guarded against, in the manner this government was constituted, than in any other that had ever been formed."[3]  Alexander Hamilton explained that "[n]othing was more to be desired than that every practicable obstacle should be opposed to cabal, intrigue, and corruption."[4]

16.     This preoccupation with stemming corruption, born of the Founders' experience

---

[2] 1 *The Records of the Federal Convention of 1787*, at 392 (Max Farrand ed., 1911) [hereinafter "*Convention Records*"].

[3] 4 *Debates in the Several State Conventions on the Adoption of the Federal Constitution* 302 (Jonathan Elliot ed., 1836) [hereinafter "*Elliot's Debates*"] (Charles Cotesworth Pinckney).

[4] *The Federalist No. 68*, at 411 (Clinton Rossiter ed., Signet Classics 2003).

under British rule, pervaded the debates at the Constitutional Convention.  According to James Madison's notes of the Convention, fifteen delegates used the word "corruption" no fewer than fifty-four times,[5] and corruption was a topic of discussion on almost a quarter of the days that the Convention was in session.[6]  The Founders wanted to ensure that in the United States, unlike in Britain, the nation's leaders would be dependent on the people alone—not on those who would give them financial benefits—and would be motivated solely by the national interest, not their own personal interests.  To promote that goal, the Founders included in the nation's new charter a number of safeguards against corruption.  These safeguards took the form of "procedural devices and organizational arrangements" meant to ward off "dependency, cabals, patronage, unwarranted influence, and bribery."[7]

17.     The Founders were also deeply worried that foreign powers would interfere with America's internal affairs, undermining the nation's republican institutions and making its leaders subservient to foreign interests.  Alexander Hamilton wrote that one of the vulnerabilities of republics "is that they afford too easy an inlet to foreign corruption."[8]   During the Constitutional Convention, Elbridge Gerry warned that "[f]oreign powers will intermeddle in our affairs, and spare no expence to influence them,"[9] while Gouverneur Morris invoked "the melancholy picture of foreign intrusions as exhibited in the History of Germany," and "urged it

---

[5] James D. Savage, *Corruption and Virtue at the Constitutional Convention*, 56 J. Pol. 174, 181 (1994).

[6] Zephyr Teachout, *The Anti-Corruption Principle*, 94 Cornell L. Rev. 341, 352 (2009).

[7] Savage, *supra* note 5, at 181; *see id*. at 177-82 (describing how fear of corruption influenced the structure of the electoral college, Congress's power to impeach, the prohibition on members of Congress holding other offices, and the prohibition on acceptance of foreign emoluments).

[8] *The Federalist No. 22*, at 145 (Clinton Rossiter ed., Signet Classics 2003).

[9] 2 *Convention Records* 268 (Gerry).

as a standing lesson to other nations."[10]

18.     Of particular concern to the Founders was the risk that foreign states would give benefits and rewards to the nation's chief executive to subvert his loyalty.  As Hamilton noted, the personal interest of a hereditary monarch was "so interwoven with that of the Nation . . . that he was placed above the danger of being corrupted from abroad."[11]   By contrast, as Madison observed, an elected President would lack "that permanent stake in the public interest which would place him out of the reach of foreign corruption."[12]   During the state debates over ratification of the Constitution, former delegate Charles Cotesworth Pinckney similarly explained that while "kings are less liable to foreign bribery and corruption . . . because no bribe that could be given them could compensate the loss they must necessarily sustain for injuring their dominions . . . . the situation of a President would be very different."  As a temporary officeholder, the President "might receive a bribe which would enable him to live in greater splendor in another country than his own; and when out of office, he was no more interested in the prosperity of his country than any other patriotic citizen."[13]   This threat prompted the Founders to reject entrusting the treaty power solely to the President—susceptible as he was to foreign influence—and instead to require Senate approval, among other precautions.[14]

19.     As the Founders saw it, the dangers of corruption and foreign influence were joined together in the contemporary European practice of diplomatic gift-giving.  Eighteenth-century ambassadors and ministers were typically bestowed lavish presents by the monarchs with

---

[10] 1 *Convention Records* 530 (Morris).

[11] *Id.* at 289 (Hamilton).

[12] *Id.* at 138 (Madison).

[13] 4 *Elliot's Debates* 264 (Charles Cotesworth Pinckney).

[14] *See id.* at 264-65.

whom they dealt, often consisting of "jewels, plate, tapestry, or porcelain, or sometimes of money."[15] The "usual presents from the European Courts" varied by country, and "in Holland, it was customary to give a gold chain and medal; in France, a gold snuff-box; and in Spain, a picture."[16] America's Founders, however, made a clean break from such customs as soon as they established their own national government under the Articles of Confederation, prohibiting "any person holding any office of profit or trust under the United States, or any of them" from "accept[ing] any present, emolument, office, or title of any kind whatever, from any king, prince, or foreign state."[17] Emphatically rejecting the custom of foreign gift acceptance, the Founders sought to cultivate undivided loyalty on the part of American officeholders. Absolute in its language, there was, in practice, only one exception to the ban: an officeholder could accept a foreign benefit if it was presented to Congress and if Congress approved of its receipt.[18]

20. This restriction on accepting foreign emoluments was one of the few measures to be transferred from the Articles of Confederation to the new Constitution in 1787, reflecting its importance to the Founding generation. At Philadelphia, the Foreign Emoluments Clause was added to the draft of the new Constitution by unanimous agreement of the state delegations after Charles Pinckney "urged the necessity of preserving foreign Ministers & other officers of the U.S. independent of external influence."[19] In adding that Clause, the Founders largely borrowed

---

[15] 4 John Bassett Moore, *A Digest of International Law* 578 (1906) (quoting Letter from William Temple Franklin to Thomas Jefferson (Apr. 27, 1790)).

[16] 5 Annals of Cong. 1589 (1798) (Joseph Gales ed., 1834) (Bayard).

[17] Articles of Confederation of 1781, art. VI, para. 1.

[18] *See Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. 13, 16 n.4 (1994) (citing instances under the Articles in which Congress consented to American officials' acceptance of gifts from foreign monarchs); 5 Annals of Cong. 1585 (1798) (Otis) (citing officials who were offered gifts from foreign governments and presented those gifts to Congress for approval).

[19] 2 *Convention Records* 389; *see id.* at 384.

26

the language of the precursor provision in the Articles of Confederation, but they made one important change: they "institutionalized the practice" that federal officeholders could accept otherwise prohibited emoluments from foreign states if they first obtained the consent of Congress.[20]

21.     During ratification, Edmund Jennings Randolph emphasized the twin evils that the Clause was meant to avert, explaining that "[i]t was thought proper, in order to exclude corruption and foreign influence, to prohibit any one in office from receiving or holding any emoluments from foreign states."[21]   A prominent contemporary pamphleteer urging ratification stressed the value of the Clause in similar terms: "The influence which foreign powers may attempt to exercise in our affairs was foreseen, and a wholesome provision has been made against it."[22]   In sum, the Clause was "founded in a just jealousy of foreign influence of every sort."[23]

22.     Because the Founders wanted to eliminate "foreign influence of every sort," they drafted the Clause with language "both sweeping and unqualified,"[24] "prohibit[ing] those holding offices of profit or trust under the United States from accepting '*any* present, Emolument,

---

[20] *See Emoluments Clause*, The Heritage Guide to the Constitution, http://www.heritage.org/constitution/#!/articles/1/essays/68/emoluments-clause (last visited June 12, 2017).

[21] 3 *Convention Records* 327.

[22] Tench Coxe, *An Examination of the Constitution for the United States of America*, *No. 4* (Oct. 21, 1787), *in* The Federalist and Other Contemporary Papers on the Constitution of the United States 769 (E.H. Scott ed., 1894).

[23] Joseph Story, *Commentaries on the Constitution of the United States* § 1352 (5th ed. 1891).

[24] *Applicability of Emoluments Clause to Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. at 17.

27

Add. 145

Office, or Title, *of any kind whatever*' from '*any . . .* foreign State' unless Congress consents."[25]
Consistent with that broad language, the Clause has been understood to be "'directed against
every kind of influence by foreign governments upon officers of the United States,' in the
absence of consent by Congress."[26]

23.     Notably, the word "emolument" was defined broadly in the eighteenth century to
mean "profit," "advantage," "benefit," and "comfort."[27]   Contemporary writers used the term to
refer, among other things, to profits accruing from private commerce.[28]   Founding-era statesmen
including George Washington and James Madison likewise used the term when referring to "the
consequences of ordinary business dealings."[29]   And Governor Randolph's comments at the
Virginia Ratifying Convention, specifically addressing the Foreign Emoluments Clause,

---

[25] *Id.* (quoting U.S. Const., art. I, § 9, cl. 8 (emphasis added by Office of Legal Counsel)).

[26] *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 98 (1986) (quoting 24 Op. Att'y Gen. 116, 117 (1902)).

[27] *Oxford English Dictionary* (2d ed. 1989) (citing eighteenth-century texts for definition of "emolument" meaning "Advantage, benefit, comfort"); Samuel Johnson, *A Dictionary of the English Language* (1755) (defining "emolument" as "Profit; advantage"); *see, e.g.*, Jonathan Swift, *The Tale of a Tub* 91 (Henry Morley ed., 1889) (1704) ("And so I proceed with great content of mind upon reflecting how much emolument this whole globe of earth is like to reap by my labours.").

[28] *See, e.g.*, Samuel Johnson, *Taxation No Tyranny: An Answer to the Resolutions and Address of the American Congress* 9 (1775) ("A merchant's desire is not of glory, but of gain; not of publick wealth, but of private emolument; he is, therefore, rarely to be consulted about war and peace, or any designs of wide extent and distant consequence.").

[29] John Mikhail, *A Note on the Original Meaning of "Emolument,"* Balkinization (Jan. 18, 2017), https://balkin.blogspot.com/2017/01/a-note-on-original-meaning-of-emolument.html (citing examples); *see* John Mikhail, *The Definition of 'Emolument' in English Language and Legal Dictionaries, 1523–1806* (July 13, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2995693 (concluding that "'emolument' was not a term of art at the founding with a highly restricted meaning" but rather was used in a "broad variety of contexts, including private commercial transactions").

reflected this broad definition as well.[30]

24.    Thus, it has long been understood by Congress and the executive branch that the Foreign Emoluments Clause applies to the acceptance of any benefits or advantages from foreign states—including compensation for services rendered in a private capacity.   Benefits and advantages that have been viewed as falling within the scope of the Clause include the following:

a.    A NASA employee's receipt of a $150 consulting fee for reviewing a Ph.D. thesis.[31]

b.    Payments to a Nuclear Regulatory Commission employee by an American consulting firm for work regarding the construction of a Mexican government power plant.[32]

c.    Payments to a part-time Nuclear Regulatory Commission staff consultant by an American corporation for work on a contract with the government of Taiwan.[33]

d.    Payments to members of the Administrative Conference of the United States, by those members' law firms, of "a share of partnership earnings, where some portion of that share is derived from the partnership's representation of a

---

[30] Randolph observed in his comments that "[a]ll men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community."  3 *Convention Records* 327.

[31] Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Memorandum for H. Gerald Staub, Office of Chief Counsel, NASA, Re: Emoluments Clause Questions raised by NASA Scientist's Proposed Consulting Arrangement with the University of New South Wales* 2-3 (May 23, 1986).

[32] *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 156 (1982).

[33] *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. at 96.

foreign government."[34]

    e.    A retired U.S. Air Force member's employment "as a teacher in a local borough high school in the United Kingdom."[35]

    f.    A courthouse employee's "receipt of pension payments from the British Government."[36]

    g.    A Post Office clerk's acceptance of an honorary military insignia from the German government.[37]

    h.    A gift of photographs to U.S. military and civilian officers by a foreign prince as "a simple remembrance of courtesy."[38]

    i.    A Navy surgeon's receipt of a "token of thankfulness" from a foreign government for his services on behalf of one of its citizens.[39]

25.    As these examples illustrate, the Clause has long been understood to apply to any rewards or benefits given by foreign states—whether tangible or honorary, monetary or nonmonetary, of great value or slight. This interpretation prevents officeholders from accepting anything from a foreign state that might weaken their independence or cause them to act against

---

[34] *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 120 (1993).

[35] Comptroller General, *Matter of: Major James D. Dunn & Senior Master Sergeant Marcus A. Jenkins*, B-251084 (Oct. 12, 1993).

[36] Comptroller General, *Officers and Employees—Acceptance of Foreign Presents, Emoluments, Etc.—Court Employees*, B-132808 (Aug. 26, 1957).

[37] *Delivery of an Insignia from the German Emperor to a Clerk in the Post-Office Dep't*, 27 Op. Att'y Gen. 219, 220 (1909).

[38] *Gifts from Foreign Prince—Officer—Constitutional Prohibition*, 24 Op. Att'y Gen. 116, 118 (1902).

[39] A Resolution allowing Doctor E.K. Kane, and the Officers associated with him in their late Expedition to the Arctic seas, in search of Sir John Franklin, to accept such Token of Acknowledgment from the Government of Great Britain as it may please to present, Aug. 30, 1856, 11 Stat. 152.

the national interest—a danger the Founders perceived even in the "trifling presents"[40] of ornament and jewelry that were customary of European diplomacy and that motivated the adoption of the Clause.[41]

26.    By entrusting Congress with responsibility for deciding which specific benefits could be received from foreign states, the Founders ensured that federal officeholders would not decide for themselves whether particular emoluments were likely to compromise their own independence or lead them to put personal interest over national interest.  An officeholder, in short, would not be the sole judge of his own integrity.  The important separation-of-powers principle embodied in Congress's gatekeeping role also ensured that any acceptance of foreign "Emolument[s]" would be transparent and subject to public examination, further minimizing the dangers of corruption and influence that such transfers of wealth or benefit might otherwise pose.

27.    When Congress was first called upon to exercise this responsibility in 1798,[42] lawmakers reaffirmed the views expressed a decade earlier during the Constitution's ratification about the dangers of foreign manipulation and the importance of the Foreign Emoluments Clause in guarding against it.  Representative William C.C. Claiborne described the Clause as "intended to lock up every door to foreign influence, to the influence of Courts and Monarchies, which could not but prove baneful to every free country."[43]  Representative James Bayard noted that "[i]f presents were allowed to be received without number, and privately, they might produce an

---

[40] 5 Annals of Cong. 1587 (1798) (Bayard).

[41] *See supra*, ¶¶ 19-20.

[42] Former envoy Thomas Pinckney was offered "the customary presents" by the kings of England and Spain, but "declined receiving them, saying, that he would lay the matter before Congress."  5 Annals of Cong. 1590 (1798) (Rutledge).  The Senate authorized acceptance of the presents, but the House withheld its consent, *see id.* at 1570-93, subsequently passing a resolution to clarify that the Congressmen "were induced to such refusal solely by motives of general policy, and not by any view personal to the said Thomas Pinckney," *id*. at 1775.

[43] 5 Annals of Cong. 1584 (1798) (Claiborne); *see id.* at 1587.

improper effect, by seducing men from an honest attachment for their country, in favor of that which was loading them with favors."[44]  Representative Matthew Lyon expressed a refusal to consent to the acceptance of any foreign emoluments, as "he should not be willing to lay this country under an obligation to a foreign country by our Ministers accepting presents."[45]

28.     At the same time, lawmakers stressed that the dangers of foreign influence and divided loyalty were reduced when officeholders obeyed the Constitution's mandate by seeking the consent of Congress before accepting any foreign benefit.  As Representative Bayard explained, the Clause required officeholders "to make known to the world whatever presents they might receive from foreign Courts and to place themselves in such a situation as to make it impossible for them to be unduly influenced by any such presents."[46]  Representative Harrison Gray Otis likewise noted: "When every present to be received must be laid before Congress, no fear need be apprehended from the effects of any such presents.  For, it must be presumed, that the gentleman who makes the application has done his duty, as he, at the moment he makes the application, comes before his country to be judged."[47]

29.     In short, as Secretary of State Madison explained in 1803, "the Constitution of the United States has left with Congress the exclusive authority to permit the acceptance of presents from foreign governments by persons holding offices under the United States."[48]  In order "to exclude corruption and foreign influence,"[49] an officeholder must "make known to the world"[50]

---

[44] *Id.* at 1583 (Bayard).

[45] *Id.* at 1589 (Lyon).

[46] *Id.* at 1583 (Bayard).

[47] *Id.* at 1585 (Otis).

[48] Letter from James Madison to David Humphreys (Jan. 5, 1803), *in* 4 Moore, *supra* note 15, at 579.

[49] 3 *Convention Records* 327 (Randolph).

any benefit he wishes to accept from a foreign state and "come before his country to be judged"[51] by seeking "the Consent of the Congress."[52]

30.     By extending the reach of these important rules to everyone who holds "any Office of Profit or Trust" under the United States, the Founders ensured that the Foreign Emoluments Clause would apply to all federal officeholders and thus guard against corruption in the highest reaches of the new nation's government.[53]  Such officeholders naturally included the President of the United States.  As Randolph explained at the Virginia Ratifying Convention, "[t]here is another provision against the danger . . . of the president receiving emoluments from foreign powers. . . . I consider, therefore, that he is restrained from receiving any present or emoluments whatever.  It is impossible to guard better against corruption."[54]  And as noted, the Founders were especially afraid that foreign nations would use favors to subvert the loyalty of the President.[55]

31.     Historically, presidents have respected their obligations under the Foreign Emoluments Clause and have declined to accept presents or emoluments from foreign states without obtaining the consent of Congress:

    a.  President Andrew Jackson transmitted to Congress in 1830 a commemorative gold medal that Colombia's president Simón Bolívar had presented to him.

---

[50] 5 Annals of Cong. 1583 (1798) (Bayard).

[51] *Id.* at 1585 (Otis).

[52] U.S. Const. art. I, § 9, cl. 8.

[53] *Emoluments Clause*, The Heritage Guide to the Constitution, *supra* note 20 ("the clause was directed not merely at American diplomats serving abroad, but more generally at officials throughout the federal government").

[54] David Robertson, *Debates and other Proceedings of the Convention of Virginia* 345 (2d ed. 1805) (1788).

[55] *See supra*, ¶ 18.

33

Congress directed that the medal be "deposited in the Department of State."[56]

b. President Martin Van Buren in 1840 was offered two horses, a case of rose oil, five bottles of rose water, a package of cashmere shawls, a Persian rug, a box of pearls, and a sword by the Imam of Muscat.[57] Writing to the Imam, Van Buren explained that "a fundamental law of the Republic which forbids its servants from accepting presents from foreign States or Princes, precludes me from receiving" the items.[58] Van Buren then apprised Congress of the gifts: "I deem it my duty to lay the proposition before Congress, for such disposition as they may think fit to make of it."[59] Congress directed him to deposit the items with the State Department, selling any items that could not "conveniently be deposited or kept" there and placing the proceeds with the U.S. Treasury.[60]

c. President John Tyler in 1843 was offered two horses by the Imam of Muscat. He notified Congress, seeking direction regarding the disposition of the gifts.[61] Congress directed Tyler to sell the horses at auction and place the

---

[56] *See Message from the President of the United States*, at 3 (Jan. 22, 1834), *in* Message from the President of the United States to the Two Houses of Congress at the Commencement of the First Session of the Twenty-Third Congress, at 259 (1833).

[57] 14 *Abridgment of the Debates of Congress from 1789 to 1856*, at 140-41 (Thomas Hart Benton ed., 1860).

[58] *Id.* at 141 (reprinting Letter from Martin Van Buren to Syed Bin Sutan, Imaum of Muscat (May 8, 1840)).

[59] *Id.* at 140 (reprinting Letter from Martin Van Buren to the Senate (May 21, 1840)).

[60] Joint Resolution No. 4, A Resolution to authorize the President to dispose of certain presents from the Imaum of Muscat and the Emperor of Morocco, July 20, 1840, 5 Stat. 409.

[61] 4 Moore, *supra* note 15, at 582.

34

proceeds with the U.S. Treasury.[62]

d.  President Abraham Lincoln wrote to the King of Siam in 1862 regarding gifts that the King had sent to the President—two decorative elephant tusks, an ornate sword, and a photograph of the King.  Lincoln wrote that "our laws forbid the President from receiving these rich presents as personal treasures. . . . Congress being now in session at this capital, I have had great pleasure in making known to them this manifestation of Your Majesty's munificence and kind consideration."[63]  Congress directed that the items be deposited with the Department of the Interior.[64]

e.  President Benjamin Harrison had "certain medals presented to him by the Governments of Brazil and Spain during the term of his service as President of the United States."[65]  In 1896, Congress authorized him to personally accept the medals.[66]

f.  President John F. Kennedy was offered honorary Irish citizenship in 1963 by the government of Ireland.  The White House sought the views of the Department of Justice's Office of Legal Counsel, which advised that

---

[62] An Act to authorize the sale of two Arabian horses, received as a present by the Consul of the United States at Zanzibar, from the Imaum of Muscat, Mar. 1, 1845, 5 Stat. 730.

[63] Letter from Abraham Lincoln, President of the United States of America, to His Majesty Somdetch Phra Paramendr Maha Mongut, King of Siam (Feb. 3, 1862), *available at* http://quod.lib.umich.edu/l/lincoln/lincoln5/1:269.1?rgn=div2;view=fulltext.

[64] Joint Resolution No. 20, A Resolution providing for the Custody of the Letter and Gifts from the King of Siam, Mar. 15, 1862, 12 Stat. 616.

[65] Joint Resolution No. 39, Joint Resolution to authorize Benjamin Harrison to accept certain medals presented to him while President of the United States, Apr. 2, 1896, 29 Stat. 759.

[66] *Id*.

35

acceptance would implicate the Foreign Emoluments Clause.[67]    Kennedy declined to accept the honor.[68]

g.  President Barack Obama was named the winner of the Nobel Peace Prize in 2009.  The White House sought the views of the Office of Legal Counsel, which advised that acceptance of the prize would not fall within the Foreign Emoluments Clause because the Nobel Committee that awards the prize is not a foreign state or controlled by a foreign state.[69]

32.    In sum, past presidents have recognized that they are bound by the Foreign Emoluments Clause and have responded accordingly—either seeking Congress's consent to accept foreign emoluments or simply choosing not to receive them.

33.    Although Defendant Donald J. Trump has accepted the privilege of occupying the highest office in the land, he is not obeying the same rules as the federal officers and employees described above or following the example of compliance set by former presidents.  He has refused to divest from his businesses and instead continues to accept financial payments and other benefits from foreign states through his many business entities without first obtaining the consent of Congress.

---

[67] Norbert A. Schlei, Office of Legal Counsel, *Proposal That the President Accept Honorary Irish Citizenship: Memorandum Opinion for the Special Assistant to the President* 278 (May 10, 1963).

[68] *See* Clodagh Sheehy, *JFK Had To Turn Down Citizenship Offer From Government*, Irish Indep. (Dec. 29, 2006), http://www.independent.ie/irish-news/jfk-had-to-turn-down-citizenship-offer-from-government-26352995.html.

[69] *Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1, 1 (2009).

Add. 154

## IV.
## RELEVANT FACTS

### A.    Defendant's Acceptance of Benefits from Foreign States

34.    Defendant is the owner, in whole or in part, of hundreds of businesses, which are "linked in a complex network of interconnected individual corporations, limited liability companies and partnerships. The list includes more than 500 separate entities—hotels, golf courses, media properties, books, management companies, residential and commercial buildings, . . . airplanes and a profusion of shell companies set up to capitalize on licensing deals."[70] These business interests are located in the United States and in at least twenty foreign countries.[71]

35.    While it is well known that Defendant's business empire is vast and global, the exact nature of his holdings and the benefits he receives from them remain unclear. Defendant has refused to release his tax returns, and the complicated interconnection between the hundreds of discrete business entities and shell companies in which he owns an interest makes it impossible to determine the full scope of the benefits he is currently accepting from foreign states. Contributing to the lack of transparency, "[o]ver the last 12 months, about 70% of buyers of Trump properties were limited liability companies—corporate entities that allow people to purchase property without revealing all of the owners' names."[72]

---

[70] John W. Schoen, *Inside Trump's Holdings: A Web of Potential Conflicts*, CNBC.com (Jan. 23, 2017), http://www.cnbc.com/2017/01/19/inside-trumps-holdings-a-web-of-potential-conflicts.html.

[71] Marilyn Geewax, *Trump's Businesses and Potential Conflicts: Sorting It Out*, NPR (Dec. 5, 2016), http://www.npr.org/2016/12/05/503611249/trumps-businesses-and-potential-conflicts-sorting-it-out; *see* Donald J. Trump, U.S. Office of Gov't Ethics Form 278e (May 16, 2016), *available at* https://www.documentcloud.org/documents/2838696-Trump-2016-Financial-Disclosure.html.

[72] Nick Penzenstadler et al., *Most Trump Real Estate Now Sold to Secretive Buyers*, USAToday (June 13, 2017), https://www.usatoday.com/story/news/2017/06/13/trump-property-buyers-make-clear-shift-secretive-llcs/102399558/?siteID=je6NUbpObpQ-p94xNqqEtnpXcOmZy086bA.

36. Defendant has not divested or otherwise given up his ownership interest in his worldwide business holdings since he was elected President of the United States.

37. Defendant has acknowledged, through his personal attorney, that his businesses receive funds and make a profit from payments by foreign governments, and that they will continue to do so while he is President.[73] Further, public reporting has confirmed that Defendant and his businesses have accepted benefits from foreign states since he took office.[74]

38. These various benefits from foreign governments—payments, loans, permits, exemptions, policy changes, and intellectual property rights—constitute prohibited "Emolument[s]" and/or "present[s]" under the Foreign Emoluments Clause (hereinafter referred to collectively as "Emolument[s]" or "foreign emoluments").[75]

39. Defendant has not sought "the Consent of the Congress" with respect to any of the benefits that he has accepted, or will accept, from foreign states in conjunction with his business holdings.

40. Because Defendant has failed to come to Congress and seek consent before accepting foreign emoluments that have been confirmed through public reporting, it is impossible to know whether Defendant is accepting other foreign emoluments that have not yet

---

[73] *See Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017) (statement of Sheri A. Dillon, Partner, Morgan, Lewis & Bockius LLP), https://www.nytimes.com/2017/01/11/us/politics/trump-press-conference-transcript.html.

[74] *See infra*, ¶¶ 44-67.

[75] Historically, certain awards and benefits from foreign states have been understood by Congress and the executive branch to be prohibited by the Clause without a determination of which specific term or terms they implicate. *See, e.g.*, Schlei, *supra* note 67, at 280 ("medals and decorations have always been regarded as coming within the constitutional provision, although it has never been precisely articulated whether one of these constitutes a 'present, Emolument, Office, or Title'"). Whether any of the benefits discussed below are better characterized as "present[s]" or "Emolument[s]" may depend on their terms and the circumstances under which they are conferred—information that Defendant has not fully disclosed.

38

been made public. Indeed, through his personal attorney, Defendant has indicated that he does not believe the Constitution requires him to seek or obtain Congress's consent before accepting benefits arising out of exchanges between foreign states and his businesses.[76]

41. Because Defendant has not sought congressional consent before accepting these foreign emoluments, nor provided information about them to Congress, Plaintiffs are unable to exercise their constitutional prerogative to authorize or reject the specific emoluments he is accepting. While some information about Defendant's financial dealings with foreign states is publicly available in press reports and financial disclosures, that information is fragmentary. Even where reliable sources confirm specific transactions between foreign states and Defendant's businesses, the complex structure of those transactions and Defendant's financial holdings makes it impossible to determine precisely how a given arrangement benefits him or affects the foreign state in question.[77] Without that information, Plaintiffs cannot judge whether they should consent to the acceptance of any particular payment or other benefit from a foreign state, as the Constitution requires.

42. In sum, Defendant's refusal to disclose to Congress the foreign emoluments he wishes to accept makes it impossible for Plaintiffs to judge whether any specific foreign emoluments should be approved, and often to know of their existence. Defendant has therefore denied Plaintiffs the opportunity to decide, on a case-by-case basis, whether to authorize his acceptance of particular emoluments from foreign states. The Constitution expressly demands that Plaintiffs be given that opportunity.

---

[76] *See, e.g.*, *Donald Trump's News Conference: Full Transcript and Video*, *supra* note 73 (statement of Sheri A. Dillon) ("The Constitution does not require [Defendant] to do anything here.").

[77] *See* Susanne Craig, *Trump's Empire: A Maze of Debts and Opaque Ties*, N.Y. Times (Aug. 20, 2016), https://www.nytimes.com/2016/08/21/us/politics/donald-trump-debt.html?_r=0.

43.     By accepting benefits from foreign states without first obtaining "the Consent of the Congress," Defendant is therefore committing numerous violations of the Foreign Emoluments Clause.  Some of these violations have been partially described in media reports and other publicly available sources, as detailed below.  But because Defendant refuses to come to Congress and seek consent, thereby preventing the transparency that "the Consent of the Congress" was designed to provide, other violations, upon information and belief, remain completely hidden.

### Acceptance of Intellectual Property Rights

44.     On February 14, 2017, the Chinese government registered a trademark to Defendant for branded construction services, "the result of a 10-year legal battle that turned in [Defendant]'s favor after he declared his candidacy."[78]

45.     On February 27 and March 6, 2017, the Chinese government granted preliminary approval of 38 new trademarks to Defendant and one of his companies, covering "branded spa and massage services, golf clubs, hotels, insurance, finance and real estate companies, restaurants, bars, and a trademark class that covers bodyguards, social escorts, and concierge services."[79]

46.     In May 2017, the Chinese government granted Defendant preliminary approval of two more trademarks, one for catering services and one that "can be used in clothing like trousers, underwear and suits."[80]

---

[78] Erika Kinetz, *China Grants Preliminary Approval to 38 New Trump Trademarks*, AP (Mar. 9, 2017), https://apnews.com/8f54b14808a2459f9efcb0089f41f056/China-grants-preliminary-approval-to-38-new-Trump-trademarks.

[79] *Id.*  Trademarks that receive preliminary approval are automatically registered after ninety days if there are no objections.  *Id.*

[80] Sui-Lee Wee, *Trump Adds Another Chinese Trademark to His Portfolio*, N.Y. Times (May 23, 2017), https://www.nytimes.com/2017/05/23/business/trump-china-

47.    On June 6 and June 13, 2017, the Chinese government granted Defendant preliminary approval of eight additional trademarks, covering services that include "construction, advertising, weather forecasting and dietary consulting."[81]

48.    Circumstances suggest that at least some of these trademarks were approved or expedited as a result of Defendant's status as President of the United States.    After the preliminary approval of trademarks in February and March, the director of a Hong Kong intellectual property consultancy "said he had never seen so many applications approved so expeditiously,"[82] and those approvals closely followed Defendant's abrupt decision as President to honor the one-China policy, in contrast to his earlier statements.[83]    Moreover, many of the preliminary approvals granted since Defendant became President were for trademarks that the Chinese government had previously rejected.[84]    Regarding these reversals, another intellectual property attorney stated: "The speed with which these appeals were decided is mind-blowing. . . .

---

trademarks.html?_r=1; Paul Mozur, *Trump Awarded a New Chinese Trademark, This Time for Catering*, N.Y. Times (June 1, 2017), https://www.nytimes.com/2017/06/01/business/trump-china-trademark.html.

[81] Jill Disis & Serenitie Wang, *Trump's Newest Chinese Trademarks: Religious Clothing, Advertising*, CNN Money (June 14, 2017), http://money.cnn.com/2017/06/14/news/trump-chinese-trademarks-religious-clothing/index.html; Sui-Lee Wee, *Trump Adds More Trademarks in China*, N.Y. Times (June 13, 2017), https://mobile.nytimes.com/2017/06/13/business/trump-china-trademarks.html?emc=edit_th_20170614&nl=todaysheadlines&nlid=51243100&_r=0&referer=.

[82] *Id.*

[83] Simon Denyer & Philip Rucker, *Backing Away From a Fight, Trump To Honor One-China Policy*, Wash. Post (Feb. 10, 2017), https://www.washingtonpost.com/world/asia_pacific/trump-agrees-to-honor-one-china-policy-in-call-to-xi-jinping/2017/02/10/ea6e7ece-ef4a-11e6-9973-c5efb7ccfb0d_story.html?utm_term=.655101b0f540.

[84] *See* Erika Kinetz, *China Approves 9 of Trump's Trademarks that They Had Previously Rejected*, AP (June 14, 2017), http://www.businessinsider.com/ap-china-overturns-rejections-of-9-trump-trademarks-2017-6.

41

I have never seen any decisions made that quickly.  That suggests special treatment."[85]

49.     Possession of these various trademarks "offers a potential business foothold for [Defendant]'s family company and protects his name in a country notorious for counterfeiters,"[86] benefits that are of particular value to Defendant as his company prepares to build twenty to thirty hotels in major Chinese cities.[87]  Foreign trademarks "can be enormously valuable—whether they are intended as groundwork for future business activity or defensive measures against squatting to protect the value of the brand,"[88] and a Trump Organization spokesman has stated that the company has pursued Chinese trademarks "to protect its brand and overall intellectual property rights from third-party infringers."[89]

50.     By accepting the registration of these trademarks, Defendant has violated the Foreign Emoluments Clause because he did not first seek and obtain "the Consent of the Congress" before accepting these benefits from a foreign state.

51.     As of April 2017, according to one investigation, Defendant's companies had 157 trademark applications pending in 36 foreign nations.[90]  Accepting the registration of these trademarks would violate the Foreign Emoluments Clause unless Defendant first sought and obtained "the Consent of the Congress," which he has not done.

---

[85] *Id.*

[86] Kinetz, *China Grants Preliminary Approval*, *supra* note 78.

[87] Rob Schmitz, *Trump's Hotels in China Could Be a Conflict for the President-Elect*, NPR (Nov. 24, 2016), http://www.npr.org/2016/11/24/503236237/trumps-hotels-in-china-could-be-a-conflict-for-the-president-elect.

[88] Kinetz, *China Approves 9 of Trump's Trademarks*, *supra* note 84.

[89] Wee, *Trump Adds More Trademarks*, *supra* note 81 (statement of Alan Garten, executive vice president and chief legal officer).

[90] Sharon LaFraniere & Danny Hakim, *Trump's Trademark Continues Its March Across the Globe, Raising Eyebrows*, N.Y. Times (Apr. 11, 2017), https://www.nytimes.com/2017/04/11/us/politics/trump-trademark-ethics.html.

42

**Acceptance of Payments for Hotel Rooms and Events**

52.     In 2013, Trump Old Post Office LLC signed a lease with the General Services Administration, so it could house Trump International Hotel Washington, D.C. in the Old Post Office building located at 1100 Pennsylvania Avenue, N.W., Washington, D.C. 20004. Defendant owns approximately 77 percent of Trump Old Post Office LLC.[91]

53.     "For Washington hotels . . . diplomats' visits are big business," and Defendant's hotel has been "actively courting" foreign diplomats,[92] including hiring a "director of diplomatic sales" and hosting an event soon after the November 2016 election in which "[a]bout 100 foreign diplomats, from Brazil to Turkey" were given "a sales pitch about [Defendant]'s newest hotel."[93] An attendee who works with foreign officials noted that "'[t]he place was packed'" and that "much of the discussion among Washington-based diplomats [was] over 'how are we going to build ties with the new administration.'"[94]

54.     According to public reports, diplomats plan to stay at the hotel to curry favor with Defendant because of his position as President of the United States.  "In interviews with a dozen diplomats . . . some said spending money at Trump's hotel is an easy, friendly gesture to the new president."[95]  According to an Asian diplomat, "Why wouldn't I stay at [Defendant's] hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!'  Isn't it

---

[91] *See* U.S. Office of Gov't Ethics Form 278e, *supra* note 71.

[92] Eric Lipton & Susanne Craig, *At Trump Hotel in Washington, Champagne Toasts in an Ethical 'Minefield,'* N.Y. Times (Jan. 19, 2017), https://www.nytimes.com/2017/01/19/us/politics/trump-international-hotel-ethics.html.

[93] Jonathan O'Connell & Mary Jordan, *For Foreign Diplomats, Trump Hotel Is Place To Be*, Wash. Post (Nov. 18, 2016), https://www.washingtonpost.com/business/capitalbusiness/2016/11/18/9da9c572-ad18-11e6-977a-1030f822fc35_story.html?utm_term=.1a4c839c9c6a.

[94] *Id.*

[95] *Id.*

43

rude to come to his city and say 'I am staying at your competitor?'"[96]  One Middle Eastern diplomat put it even more simply: "Believe me, all the delegations will go there."[97]

55.      Indeed, during the first four months of 2017, Defendant's company made nearly $2 million in profit from the hotel, although the company had earlier projected that it would *lose* over $2 million during that period.[98]  These profits accumulated despite an occupancy rate well below standard for the industry,[99] and despite the hotel's ranking by a "travel group that specializes in high-end accommodations" as "the world's third-lousiest new hotel."[100]  "Driving the profits are the extraordinary prices guests have been willing to pay for rooms," as the hotel charges "three times the average rate," making it probably "the most expensive hotel in the city."[101]

56.      By virtue of his ownership of the Trump International Hotel Washington, D.C., Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality every time foreign diplomats stay at the hotel, foreign embassies hold events there, or foreign governments otherwise pay for rooms there.  On information and belief, there have been at least three such incidents since Defendant's inauguration:

---

[96] *Id.*

[97] *Id.*

[98] Jonathan O'Connell, *Trump D.C. Hotel Turns $2 Million Profit in Four Months*, Wash. Post (Aug. 10, 2017), https://www.washingtonpost.com/politics/trump-dc-hotel-turns-2-million-profit-in-four-months/2017/08/10/23bd97f0-7e02-11e7-9d08-b79f191668ed_story.html?utm_term=.24484d88a37e.

[99] *Id.*

[100] Benjamin Freed, *Luxury Travel Group Gives Trump's DC Hotel a Brutal Review*, Washingtonian (Dec. 20, 2016), https://www.washingtonian.com/2016/12/20/travel-group-dc-trump-hotel-one-worlds-worst-new-luxury-hotels/.

[101] O'Connell, *supra* note 98.

a. In late January 2017, "[a] lobbying firm working for Saudi Arabia paid for a room at [Defendant]'s Washington hotel after Inauguration Day," as part of its effort to bring activists to Washington "to urge Congress to repeal the law letting 9/11 victims' families sue the kingdom."[102]  This transaction marked "the first publicly known payment on behalf of a foreign government to a Trump property since [Defendant] became president."[103]  The lobbying firm made additional payments to the hotel in early February 2017, and all payments were reimbursed by the Saudi government.[104]  Between November 2016 and February 2017, the firm paid Defendant's hotel approximately $270,000 for lodging, catering, and parking—all reimbursed by the Saudi government.[105]

b. On February 22, 2017, the Embassy of Kuwait held its National Day Celebration at Trump International Hotel Washington, D.C.  According to cost estimates from the hotel, the price of the celebration was between $40,000 and $60,000.[106]

---

[102] Isaac Arnsdorf, *Saudis Foot Tab at Trump Hotel*, Politico (Feb. 9, 2017), http://www.politico.com/story/2017/02/trump-hotel-saudi-arabia-234878?cmpid+sf.

[103] *Id.*

[104] Byron Tau & Rebecca Ballhaus, *Trump Hotel Received $270,000 From Lobbying Campaign Tied to Saudis*, Wall St. J. (June 5, 2017), https://www.wsj.com/articles/trump-hotel-received-270-000-from-lobbying-campaign-tied-to-saudis-1496700739.

[105] *Id.*  Public reports do not indicate what portion of these payments were made after Defendant became President, though an executive from the lobbying firm has claimed that the majority of the payments occurred before he became President.  *Id.*

[106] Julia Harte, *Kuwait Could Pay Up To $60,000 for Party at Trump Hotel in Washington*, Reuters (Feb. 27, 2017), http://www.reuters.com/article/us-usa-trump-hotel-idUSKBN1640LE.

    c. On or about April 6, 2017, the Ambassador & Permanent Representative of Georgia to the United Nations stayed at Trump International Hotel Washington, D.C.[107]

57. Defendant has not sought or received "the Consent of the Congress" to accept these "Emolument[s]" and is therefore violating the Foreign Emoluments Clause when he accepts such "Emolument[s]."

**Acceptance of Payments Derived from Real Estate Holdings**

58. Defendant owns Trump Tower, a mixed-use skyscraper located at 725 Fifth Avenue, New York, N.Y. 10022. Since Defendant became President, at least two entities owned by foreign states have been tenants of Trump Tower: (1) the Industrial and Commercial Bank of China, which is owned by China,[108] and (2) the Abu Dhabi Tourism & Culture Authority, which is owned by the United Arab Emirates.[109]

59. By virtue of his ownership of Trump Tower and the leases of these entities, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality. Defendant has not sought or received "the Consent of the Congress" to accept these "Emolument[s]" and is therefore violating the Foreign Emoluments Clause.

---

[107] Kaha Imnadze (@kahaimnadze), Twitter (Apr. 6, 2017, 8:49 AM), https://twitter.com/kahaimnadze/status/850012655347789824.

[108] Caleb Melby, Stephanie Baker, & Ben Brody, *When Chinese Bank's Trump Lease Ends, Potential Conflict Begins*, Bloomberg Pol. (Nov. 28, 2016), https://www.bloomberg.com/politics/articles/2016-11-28/trump-s-chinese-bank-tenant-may-negotiate-lease-during-his-term.

[109] Adam Schreck, *In a First, Emirati Foreign Minister Defends Trump Visa Ban*, AP (Feb. 1, 2017), http://bigstory.ap.org/article/4ecfcc9c03bb412fae7233be0f53f2b6/first-emirati-foreign-minister-defends-trump-visa-ban. According to a subsequent report, the Abu Dhabi tourism authority ended its lease effective January 31, 2017. Lorraine Woellert, *Abu Dhabi Tourism Office Quits Trump Tower*, Politico (June 6, 2017), http://www.politico.com/story/2017/06/06/abu-dhabi-trump-tower-tourism-office-239188.

46

Add. 164

60.     Defendant also owns Trump World Tower, which is located at 845 United Nations Plaza, New York, N.Y. 10017.

61.     In 2001, the Kingdom of Saudi Arabia purchased a floor of Trump World Tower, and the floor currently belongs to the Saudi Mission to the United Nations.[110]  At the time of the sale, the floor had "yearly common charges of $85,585 for building amenities."[111]

62.     If Saudi Arabia continues to pay common charges to Defendant's company, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality, and he will have done so without first seeking and receiving "the Consent of the Congress," in violation of the Foreign Emoluments Clause.

### Acceptance of Licensing Fees for "The Apprentice"

63.     While serving as President, Defendant remains an executive producer of the MGM-produced television show "The Apprentice."  In that role, he is contractually entitled to a percentage of the profits derived from licensing the show and its related spin-offs to television networks, including in foreign countries.  "The show has current iterations in the U.K., Brazil, Bulgaria, Indonesia and Vietnam; each of these must pay MGM a licensing fee for the show's name and set-up, a portion of which goes to Trump."[112]

64.     In the United Kingdom, the television network that pays these licensing fees is owned and operated by the government.  Specifically, the state-owned network BBC One

---

[110] Stephen Rex Brown, *Exclusive: Donald Trump Made Millions from Saudi Government, but Trashes Hillary Clinton for Saudi Donations to Clinton Foundations*, N.Y. Daily News (Sept. 4, 2016), http://www.nydailynews.com/news/politics/exclusive-donald-trump-made-millions-saudi-government-article-1.2777211.

[111] *Id.*

[112] Madeline Berg, *Here's How Much Donald Trump Will Earn From Producing 'Celebrity Apprentice,'* Forbes (Dec. 13, 2016), https://www.forbes.com/sites/maddieberg/2016/12/13/heres-how-much-trump-will-earn-from-producing-celebrity-apprentice/#505f22311d0c.

broadcasts a version of "The Apprentice,"[113] for which the network pays a licensing fee, a portion of which goes to Defendant.

65.     By taking a portion of licensing fees paid by foreign governments, Defendant has accepted, or necessarily will accept, "Emolument[s]" from a "foreign State" or its agent or instrumentality, and he will have done so without first seeking and receiving "the Consent of the Congress," in violation of the Foreign Emoluments Clause.

### Acceptance of Regulatory Benefits

66.     Defendant is at least part owner of numerous business ventures around the world, including in Argentina,[114] China,[115] India,[116] Indonesia,[117] Scotland,[118] Turkey,[119] United Arab Emirates,[120] and the Philippines.[121]   Many of these ventures are in the planning stages, and as

---

[113] *See The Apprentice*, BBC One, http://www.bbc.co.uk/programmes/b0071b63 (last visited June 12, 2017).

[114] Josh Marshall & Catherine Thompson, *Cashing in BIGLY in Argentina!*, Talking Points Memo (Nov. 21, 2016), http://talkingpointsmemo.com/edblog/cashing-in-bigly-in-argentina.

[115] Schmitz, *supra* note 87.

[116] Richard C. Paddock et al., *Potential Conflicts Around the Globe for Trump, the Businessman President*, N.Y. Times (Nov. 26, 2016), https://www.nytimes.com/2016/11/26/us/politics/donald-trump-international-business.html.

[117] Richard C. Paddock & Eric Lipton, *Trump's Indonesia Projects, Still Moving Ahead, Create Potential Conflicts*, N.Y. Times (Dec. 31, 2016), https://www.nytimes.com/2016/12/31/world/asia/indonesia-donald-trump-resort.html.

[118] Severin Carrell, *Trump's Scotland Golf Resort Proceeds with Expansion Despite Business Pledge*, The Guardian (Jan. 14, 2017), https://www.theguardian.com/us-news/2017/jan/14/trump-scotland-golf-resort-conflicts-of-interest.

[119] Pema Levy, *Trump Admitted to a Conflict of Interest in Turkey*, Mother Jones (Nov. 15, 2016), http://www.motherjones.com/politics/2016/11/donald-trump-i-have-little-conflict-interest-turkey.

[120] Jon Gambrell, *AP Exclusive: Golf Club Shows Pitfalls of Trump Presidency*, AP (Jan. 3, 2017), http://bigstory.ap.org/article/f105158bacc94890bc952a26f8a5c819.

[121] Jackie Northam, *Trump Business Deals in Southeast Asia Raise Conflict of Interest Concerns*, NPR (Jan. 6, 2017),

public reports note, "foreign developers could stand to benefit if their governments were to grease the skids for Trump-branded projects as a way to curry favor with the new American president."[122] Indeed, since the election, there have been reports of Defendant asking for, and receiving, such help from foreign governments:

    a.  In November 2016, when Argentine President Mauricio Macri called Defendant to congratulate him on his victory, Defendant reportedly asked him "to deal with the permitting issues that are currently holding up" a project that Defendant and Argentine partners have been working on for a number of years, namely, the development of a major office building in Buenos Aires.[123] "[T]hree days after Trump spoke with Argentina's president, . . . the long delayed project was moving ahead."[124]

    b.  In a meeting "held shortly after the presidential election," Defendant reportedly "encouraged [British politician Nigel Farage] . . . to oppose the kind of offshore wind farms that [Defendant] believes will mar the pristine view from one of his two Scottish golf courses."[125]

---

http://www.npr.org/sections/parallels/2017/01/06/508411598/trump-business-deals-in-southeast-asia-raise-conflict-of-interest-concerns.

[122] Rosalind S. Helderman & Tom Hamburger, *Trump's Presidency, Overseas Business Deals and Relations with Foreign Governments Could All Become Intertwined*, Wash. Post (Nov. 25, 2016), https://www.washingtonpost.com/politics/trumps-presidency-overseas-business-deals-and-relations-with-foreign-governments-could-all-become-intertwined/2016/11/25/d2bc83f8-b0e2-11e6-8616-52b15787add0_story.html?utm_term=.9f2b946fffd5.

[123] Marshall & Thompson, *supra* note 114.

[124] Helderman & Hamburger, *supra* note 122.

[125] Danny Hakim & Eric Lipton, *With a Meeting, Trump Renewed a British Wind Farm Fight*, N.Y. Times (Nov. 21, 2016), https://www.nytimes.com/2016/11/21/business/with-a-meeting-trump-renewed-a-british-wind-farm-fight.html.

    c. Further, "[d]ays after [Defendant]'s election victory, a news agency in the former Soviet republic of Georgia reported that a long-stalled plan for a Trump-branded tower in a seaside Georgian resort town was now back on track."[126]

67.     Defendant's acceptance of any benefits from foreign governments related to his business ventures abroad—including payments, loans, permits, exemptions, tax incentives, and favorable policy changes—would violate the Foreign Emoluments Clause unless Defendant first sought and obtained "the Consent of the Congress," which he has not done.

### Consequences of Defendant's Failure To Comply with the Constitution

68.     Defendant's refusal to seek and obtain "the Consent of the Congress" before accepting the payments and benefits discussed above suggests that Defendant may have accepted other payments and benefits from foreign states that have not yet been made public. Neither the Plaintiffs nor the public, therefore, can know the full range of Defendant's unconstitutional acceptance of foreign emoluments.

69.     By accepting such benefits without first obtaining congressional consent, Defendant is causing the harms that the Founders sought to prevent when they adopted the Foreign Emoluments Clause. The Clause was meant to ensure "the undivided loyalty of individuals occupying positions of trust under our government,"[127] because, as the Founders recognized, "[t]hose who hold offices under the United States must give the government their unclouded judgment and their uncompromised loyalty."[128] Defendant's conduct deprives the

---

[126] Helderman & Hamburger, *supra* note 122.

[127] *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. at 100.

[128] *Employment of Government Employees by Foreign Public Universities*, 18 Op. O.L.C. at 18.

American people of assurance that their highest elected official is pursuing their best interests
with undivided loyalty.

70.    For instance, as Defendant addresses critical trade issues with China, which could
dramatically affect the American economy and American jobs, he may be influenced by the fact
that New York's Trump Tower will soon be renegotiating its lease with the state-owned
Industrial and Commercial Bank of China,[129] or the fact that the Chinese government recently
granted him numerous trademarks enabling his companies to pursue lucrative business
opportunities in that country.[130]

71.    As Defendant brokers arms deals with Saudi Arabia,[131] as he navigates conflicts
between Saudi Arabia and Qatar,[132] and as he decides whether to commit U.S. resources to
support Saudi military actions in Yemen, which potentially could escalate and put American
servicemembers in harm's way, he may be influenced by his desire to pursue hotel deals in Saudi
Arabia requiring government approvals.[133]    Indeed, Defendant said during the presidential

---

[129] Melby, Baker, & Brody, *supra* note 108.

[130] Kinetz, *China Grants Preliminary Approval*, *supra* note 78.

[131] Michael J. de la Merced, *Saudi Arabia To Invest $20 Billion in Infrastructure, Mostly in U.S.*, N.Y. Times (May 20, 2017),
https://www.nytimes.com/2017/05/20/business/dealbook/saudi-arabia-to-invest-20-billion-in-infrastructure-mostly-in-us.html; Mark Landler et al., *$110 Billion Weapons Sale to Saudis Has Jared Kushner's Personal Touch*, N.Y. Times (May 18, 2017),
https://www.nytimes.com/2017/05/18/world/middleeast/jared-kushner-saudi-arabia-arms-deal-lockheed.html.

[132] David D. Kirkpatrick, *Trump's Business Ties in the Gulf Raise Questions About His Allegiances*, N.Y. Times (June 17, 2017),
https://www.nytimes.com/2017/06/17/world/middleeast/trumps-business-ties-in-persian-gulf-raise-questions-about-his-allegiances.html?cn=bWVudGlvbg%3D%3D&_r=0 (noting that Defendant's position on this dispute differed from the position of his Secretary of State).

[133] Drew Harwell & Anu Narayanswamy, *A Scramble To Assess the Dangers of President-Elect Donald Trump's Global Business Empire*, Wash. Post (Nov. 20, 2016),
https://www.washingtonpost.com/business/economy/a-scramble-to-assess-the-dangers-of-

51

campaign that he "would want to protect Saudi Arabia" from Iranian aggression and also stated: "Saudi Arabia, I get along with all of them. They buy apartments from me. They spend $40 million, $50 million. Am I supposed to dislike them?"[134]

72.     As Defendant decides how to shape U.S. policy toward Russia, he may be influenced by his long-standing, though yet unrealized, desire to build housing and hotels in Russia,[135] which could also require government approvals or licenses. Indeed, Donald Trump Jr., Defendant's son and an executive in the Trump Organization, has in the past acknowledged the business ties between Defendant and Russia, noting in 2008 that "Russians make up a pretty disproportionate cross-section of a lot of our assets" and that "we see a lot of money pouring in from Russia."[136]

73.     Finally, as Defendant weighs the United States' response to allegations that Philippine president Rodrigo Duterte has endorsed extrajudicial killings and other human rights abuses, he may be influenced by the millions of dollars he is set to receive in licensing revenue from the new Trump Tower in Manila, particularly because his business partner in that venture

---

president-elects-global-business-empire/2016/11/20/1bbdc2a2-ad18-11e6-a31b-4b6397e625d0_story.html?utm_term=.0926499e36bb.

[134] *Id.*

[135] Oren Dorell, *Donald Trump's Ties to Russia Go Back 30 Years*, USA Today (Feb. 15, 2017), https://www.usatoday.com/story/news/world/2017/02/15/donald-trumps-ties-russia-go-back-30-years/97949746/; *see* Mike McIntire, *Russia Renewed Unused Trump Trademarks in 2016*, N.Y. Times (June 18, 2017), https://www.nytimes.com/2017/06/18/us/politics/russia-trump-trademarks.html ("The extension of trademarks such as 'Trump International Hotel and Tower' protects his brand in that country and preserves conditions for potential business deals."); *see also* Kevin G. Hall & Ben Wieder, *Trump Dreamed of His Name on Towers Across Former Soviet Union*, McClatchy (June 28, 2017), http://www.mcclatchydc.com/news/nation-world/national/article158518589.html.

[136] Rosalind S. Helderman, *Here's What We Know About Donald Trump and His Ties to Russia*, Wash. Post (July 29, 2016), https://www.washingtonpost.com/politics/heres-what-we-know-about-donald-trump-and-his-ties-to-russia/2016/07/29/1268b5ec-54e7-11e6-88eb-7dda4e2f2aec_story.html?utm_term=.d25e09c907e7.

was appointed by President Duterte to serve as a top trade envoy to the United States.[137]

74.     As Defendant makes countless other foreign policy decisions, he may similarly be influenced by how those decisions will affect his business pursuits.  And because Defendant is not coming to Congress and identifying the emoluments he wishes to accept, the American people will have no way of knowing whether his actions as President reflect only his beliefs about what is best for the country, or whether they are partly motivated by personal financial considerations.  For instance, when Defendant publicly advocated during the presidential campaign for a ban on Muslims entering the United States, Turkish President Recep Tayyip Erdogan called for Defendant's name to be removed from the Trump Towers Istanbul, two high-rises containing offices and luxury apartments, connected by a shopping mall.  But after Defendant subsequently defended Erdogan's suppression of political dissidents, "the calls for the renaming of the Trump Towers Mall ended."[138]  Defendant himself has acknowledged that he has "a little conflict of interest" regarding Turkey because "I have a major, major building in Istanbul."[139]

75.     To avoid even the possibility that conflicts of interest like these would harm the American people by compromising the judgment of their leaders, the Founders laid down the strict prohibitions of the Foreign Emoluments Clause.

**B.     Plaintiffs' Injuries**

76.     The text of the Foreign Emoluments Clause expressly assigns members of

---

[137] Drew Harwell & Matea Gold, *While in White House, Trumps Remained Selling Points for 'Very Special' Philippines Project*, Wash. Post (May 2, 2017), https://www.washingtonpost.com/politics/while-in-white-house-trumps-remained-selling-points-for-very-special-philippines-project/2017/05/02/09ee6164-2e99-11e7-9dec-764dc781686f_story.html?utm_term=.b60fdfde5a42.

[138] Paddock et al., *supra* note 116.

[139] Harwell & Narayanswamy, *supra* note 133.

Case 1:17-cv-01154-EGS Document 87 Filed 07/25/19 Page 214 of 221

Congress a role in regulating federal officeholders' acceptance of emoluments from foreign states. By providing that persons holding an "Office of Profit or Trust" under the United States may accept such "Emolument[s]" with, and only with, "the Consent of the Congress," the Constitution makes clear that members of Congress must have the opportunity to cast a binding vote that gives or withholds their "Consent" before the President or any other federal officeholder accepts a foreign "Emolument."

77.     Since taking office, Defendant has accepted, or necessarily will accept, numerous emoluments from foreign states.

78.     Congress has not consented to Defendant's acceptance of any of the emoluments that he has received or will be receiving in the future.

79.     Although the Foreign Emoluments Clause places on federal officeholders who wish to accept "Emolument[s]" the burden of seeking "the Consent of the Congress," Defendant has never sought Congress's consent for his acceptance of these foreign emoluments.

80.     Similarly, Defendant has not provided Congress with any information about the foreign emoluments he has accepted or the transactions that produced them.

81.     Defendant's refusal to seek Congress's consent and provide information about the foreign emoluments he is accepting makes it impossible for Plaintiffs to evaluate the unique circumstances of each emolument and decide, on a case-by-case basis, whether any of those specific emoluments should be approved.

82.     By accepting emoluments without "the Consent of the Congress," Defendant has violated the Foreign Emoluments Clause. In the process, Defendant has deprived Plaintiffs of their ability to vote on which emoluments he, as a federal officeholder, may accept. When

Add. 172

legislators' votes are "completely nullified" or "deprived of all validity,"[140] they may seek judicial redress to "have their votes given effect."[141] Such nullification occurs both where a previously cast vote has been unlawfully disregarded and where, as here, legislators are unlawfully denied an "opportunity to cast a binding vote" in the first place.[142] By refusing to seek Plaintiffs' consent as constitutionally required, "[t]he President's action has deprived them of this opportunity completely, in the sense that they have no legislative power to exercise an equivalent voting opportunity."[143] Plaintiffs thus have "a plain, direct and adequate interest in maintaining the effectiveness of their votes" on whether consent should be given to Defendant's acceptance of foreign emoluments.[144]

83.   Without a judicial order, Plaintiffs cannot force Defendant to obey the Constitution's text by seeking their consent before accepting such foreign emoluments. The declaratory and injunctive relief that Plaintiffs are seeking would redress this injury by ensuring

---

[140] *Raines v. Byrd*, 521 U.S. 811, 822-23 (1997).

[141] *Coleman v. Miller*, 307 U.S. 433, 438 (1939); *see Kennedy v. Sampson*, 511 F.2d 430, 436 (D.C. Cir. 1974) (recognizing legislator's standing "to vindicate the effectiveness of his vote" after "an illegal nullification" by the executive branch).

[142] *Goldwater v. Carter*, 617 F.2d 697, 702-03 (D.C. Cir. 1979) (en banc) (recognizing standing where President's action "deprived each individual Senator of his alleged right to cast a vote" on whether to terminate a treaty), *vacated on other grounds*, 444 U.S. 996 (1979); *see Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663, 2665 (2015) (recognizing standing where action that "strips the Legislature of its alleged prerogative to initiate redistricting" would "completely nullify any vote by the Legislature, now or in the future," on that topic (brackets and quotation marks omitted)); *Moore v. U.S. House of Representatives*, 733 F.2d 946, 949 (D.C. Cir. 1984) (recognizing standing where members of the House of Representatives were allegedly denied their constitutional prerogative "to originate bills for raising revenues"); *Am. Fed'n of Gov't Emps., AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982) (recognizing standing where legislator was allegedly deprived by the executive branch of his "statutory right to participate in the legislative process"); *cf. Raines*, 521 U.S. at 824 (denying standing because legislators could not claim that the statute they were challenging "will nullify their votes in the future").

[143] *Goldwater*, 617 F.2d at 703.

[144] *Coleman*, 307 U.S. at 438.

that Defendant accepts no "present, Emolument, Office, or Title" from any "foreign State" without first giving them an opportunity to vote on whether to provide their consent.

# V.
# CLAIMS

## COUNT I
### Violations of the Foreign Emoluments Clause
### (Declaratory Relief)

84.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph of this Complaint as if set forth here in full.

85.    There is an actual controversy between Plaintiffs and Defendant as to the meaning of the Foreign Emoluments Clause and its application to Defendant and his conduct. Specifically, Plaintiffs allege that Defendant, by virtue of his continuing ownership of vast business interests around the world, has been, or necessarily soon will be, accepting emoluments from foreign states. Because Defendant has not sought and received the consent of Congress, he is in violation of the Foreign Emoluments Clause. Defendant, through his personal attorney, has indicated that he disagrees with these allegations, believing instead that "[t]he Constitution does not require [Defendant] to do anything here."[145]

86.    Plaintiffs are entitled to declaratory relief under 28 U.S.C. § 2201. A declaration resolving the actual controversy between Plaintiffs and Defendant will aid in the resolution of legal issues in this action. Without this relief, Plaintiffs will continue to suffer injury.

## COUNT II
### Violations of the Foreign Emoluments Clause
### (Injunctive Relief)

87.    Plaintiffs re-allege and incorporate by reference each and every foregoing paragraph of this Complaint as if set forth here in full.

---

[145] *Donald Trump's News Conference: Full Transcript and Video*, *supra* note 73.

88.     Defendant is a "Person holding any Office of Profit or Trust" under the Foreign Emoluments Clause.

89.     The Foreign Emoluments Clause prohibits "Person[s] holding any Office of Profit or Trust" under the United States from accepting "present[s]" or "Emolument[s] . . . of any kind whatever"—that is, anything of value and any benefits, monetary or nonmonetary—from "any King, Prince, or foreign State," without "the Consent of the Congress."

90.     As described more fully in paragraphs 34-62 herein, Defendant has committed and, absent this Court's intervention, will continue to commit violations of the Foreign Emoluments Clause because he has accepted, or necessarily will accept, "Emolument[s]" from foreign states without obtaining the consent of Congress.

91.     By accepting "Emolument[s]" from foreign states without obtaining the consent of Congress, Defendant has denied each Plaintiff the opportunity to cast binding votes on whether to provide his or her consent to Defendant's acceptance of these individual "Emolument[s]."

92.     Plaintiffs are entitled to injunctive relief to stop the above-mentioned injury, and this Court has the power to grant such relief pursuant to its inherent ability to grant equitable relief and pursuant to 28 U.S.C. § 1331.  Such relief would order Defendant not to accept "any present, Emolument, Office, or Title, of any kind whatever" from a foreign state without obtaining "the Consent of the Congress," thus ensuring that individual members of Congress have the opportunity to vote on a case-by-case basis whether to give their consent, as the Constitution requires.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment in

Plaintiffs' favor and against Defendant, consisting of:

(a)    A declaratory judgment stating that:

(1) Defendant is a "Person holding any Office of Profit or Trust" within the meaning of the Foreign Emoluments Clause;

(2) the Foreign Emoluments Clause prohibits any "Person holding any Office of Profit or Trust" from accepting any benefits of value, monetary or nonmonetary, from "any King, Prince, or foreign State";

(3) the phrase "any King, Prince, or foreign State" under the Foreign Emoluments Clause includes any foreign government and any agent or instrumentality thereof; and

(4) by accepting "Emolument[s]" from foreign states without first seeking and obtaining "the Consent of the Congress," Defendant is violating the Foreign Emoluments Clause;

(b)    Injunctive relief, enjoining Defendant from accepting "Emolument[s]" from foreign states without first obtaining the consent of Congress; and

(c)    Such other and further relief as this Court may deem just and proper.

Dated: June 20, 2019

CONSTITUTIONAL ACCOUNTABILITY CENTER

By: */s/ Brianne J. Gorod*
      Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W.
Suite 501
Washington, D.C. 20036

58

(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org

Add. 177

**U.S. Const. art. I, § 9, cl. 8 (Foreign Emoluments Clause)**

No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

**U.S. Const. art. II, § 1, cl. 7 (Domestic Emoluments Clause)**

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them.

## 28 U.S.C. § 1292. Interlocutory Decisions

\* \* \*

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

\* \* \*

## 28 U.S.C. § 1651. Writs

(a) The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

(b) An alternative writ or rule nisi may be issued by a justice or judge of a court which has jurisdiction.