**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Senator RICHARD BLUMENTHAL,
Representative JERROLD NADLER, *et al.*,

                    Plaintiffs,

          v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

                    Defendant.

Civil Action No. 17-1154 (EGS)

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR CERTIFICATION**
**PURSUANT TO 28 U.S.C. § 1292(b) AND MOTION FOR A STAY PENDING APPEAL**

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY
    CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
brian@theusconstitution.org

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 4

   I.  Motion To Certify an Interlocutory Appeal ............................................................ 4

   II. Motion for a Stay ..................................................................................................... 8

        A. Likelihood of Success on the Merits ............................................................ 10

           1.   *Standing* ............................................................................................ 10

           2.   *Cause of Action* ............................................................................... 15

        B. Irreparable Injury .......................................................................................... 17

        C. Harm to Plaintiffs ......................................................................................... 23

        D. The Public Interest ........................................................................................ 24

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
   654 F.2d 758 (D.C. Cir. 1980) ................................................................. 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015) ............................................................................ 15

*Blumenthal v. Trump*,
   335 F. Supp. 3d 45 (D.D.C. 2018) ...................................................... 10, 11, 12, 13

*Blumenthal v. Trump*,
   373 F. Supp. 3d 191 (D.D.C. 2019) ...................................................... 15, 16, 17

*Campbell v. Clinton*,
   203 F.3d 19 (D.C. Cir. 2000) ................................................................. 13

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) .......................................................... 10, 17, 19

*Cheney v. U.S. Dist. Ct. for D.C.*,
   542 U.S. 367 (2004) .............................................................................. 18, 22

*Clinton v. Jones*,
   520 U.S. 681 (1997) .................................................................. 20, 21, 22, 23, 24

*Coleman v. Miller*,
   307 U.S. 433 (1939) .............................................................................. 11

*Comm. on Oversight & Gov't Reform v. Holder*,
   2013 WL 11241275 (D.D.C. Nov. 18, 2013)............................................. 9

*Comm. on the Judiciary v. Miers*,
   558 F. Supp. 2d 53 (D.D.C. 2008) ............................................................ 25

*CREW v. FEC*,
   904 F.3d 1014 (D.C. Cir. 2018) ............................................................ 3, 10, 23

*Cummings v. Murphy*,
   321 F. Supp. 3d 92 (D.D.C. 2018) ............................................................ 13

*Doe 1 v. Trump*,
   2017 WL 6553389 (D.C. Cir. Dec. 22, 2017)........................................ 9, 18, 23

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
   565 U.S. 606 (2012) .............................................................................. 15

# TABLE OF AUTHORITIES – cont'd

Page(s)

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ................................................................................ 16, 17

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) ................................................................................ 16

*Glossip v. Gross,*
135 S. Ct. 2726 (2015) ............................................................................ 10

*Harmon v. Brucker,*
355 U.S. 579 (1958) ................................................................................ 16

*In re al-Nashiri,*
791 F.3d 71 (D.C. Cir. 2015) .................................................................. 20

*John Doe Co. v. CFPB,*
849 F.3d 1129 (D.C. Cir. 2017) .............................................................. 19, 20

*Kennedy v. Sampson,*
511 F.2d 430 (D.C. Cir. 1974) ................................................................ 24

*Mexichem Specialty Resins, Inc. v. EPA,*
787 F.3d 544 (D.C. Cir. 2015) ................................................................ 17

*Mississippi v. Johnson,*
71 U.S. 475 (1866) .................................................................................. 16, 17

*Nixon v. Fitzgerald,*
457 U.S. 731 (1982) ................................................................ 20, 21, 22, 24

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................ 9, 10, 17

*Raines v. Byrd,*
521 U.S. 811 (1997) ................................................................................ 11, 13

*Riegle v. Fed. Open Mkt. Comm.,*
656 F.2d 873 (D.C. Cir. 1981) ................................................................ 17

*Swan v. Clinton,*
100 F.3d 973 (D.C. Cir. 1996) ................................................................ 16

*United States v. Munoz-Flores,*
495 U.S. 385 (1990) ................................................................................ 12

*United States v. Nixon,*
418 U.S. 683 (1974) ................................................................................ 21

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. Philip Morris Inc.*,
    314 F.3d 612 (D.C. Cir. 2003) .................................................................................. 10

*United States v. Richardson*,
    418 U.S. 166 (1974) ................................................................................................... 12

*Va. House of Delegates v. Bethune-Hill*,
    139 S. Ct. 1945 (2019) ................................................................................... 11, 13, 14

*Va. Petroleum Jobbers Ass'n v. FPC*,
    259 F.2d 921 (D.C. Cir. 1958) .............................................................................. 10, 23

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 10, 18


CONSTITUTIONAL PROVISIONS, STATUTES, AND LEGISLATIVE MATERIALS

28 U.S.C. § 1292(b) ........................................................................................... 2, 4, 8, 9

S. Rep. No. 85-2434 (1958) .............................................................................................. 9

U.S. Const. art. I, § 3, cl. 1 ............................................................................................. 12

U.S. Const. art. I, § 5, cl. 3 ............................................................................................. 12

U.S. Const. art. I, § 9, cl. 8 ............................................................................................. 12


BOOKS, ARTICLES, AND OTHER AUTHORITIES

Associated Press, *Trump's Company Says It Donated Nearly $200K to U.S. Treasury*,
    Politico (Feb. 25, 2019), https://www.politico.com/story/2019/02/25/trump-company-
    treasury-donation-1183943 ........................................................................................ 6

Sheri Dillon et al., Morgan, Lewis & Brockius LLP, *Conflicts of Interest and the*
    *President: Background for President-Elect Trump's January 11, 2017 Press*
    *Conference*, https://www.documentcloud.org/documents/3400512-Morgan-Lewis-
    Trump-Trust-White-Paper.html ............................................................................. 7, 18

16 *Federal Practice & Procedure* (3d ed.) ...................................................................... 9

Fed. Ct. App. Manual § 5:6 (6th ed.) ............................................................................... 9

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Erika Kinetz, *China Grants Preliminary Approval to 38 New Trump Trademarks*,
    Associated Press (Mar. 8, 2017), https://apnews.com/8f54b14808a2459f9efcb00
    89f41f056 ............................................................................................................... 6, 7

Letter from George A. Sorial, Executive Vice President and Chief Compliance Counsel,
    The Trump Organization, to Hon. Jason Chaffetz & Hon. Elijah E. Cummings,
    Chairman & Ranking Member, House Comm. on Oversight and Gov't Reform (May
    11, 2017), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/
    documents/Trump%20Org%20to%20Oversight%20Committee%205-11-
    17_Redacted.pdf. ................................................................................................... 5, 6

Letter from George A. Sorial, Executive Vice President and Chief Compliance Counsel,
    The Trump Organization, to Hon. Robert Menendez, Ranking Member, Senate Comm.
    on Foreign Relations (Apr. 6, 2018), https://www.foreign.senate.gov/imo/media/doc/
    Trump%20Org%20response%20to%20RM%20re%20Hotel%20Foreign%20Profits.
    pdf  ...................................................................................................................... 6, 19

OGE Form 278e (Mar. 2014), Donald J. Trump, https://oge.app.box.com/s/e32qrrfvy
    xk9cgrvteo7diicwd11pac4.......................................................................................... 7

The Trump Organization, *Donation of Profits from Foreign Government Patronage*
    (undated), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/doc
    uments/Trump%20Org%20Pamphlet%20on%20Foreign%20Profits.pdf ............... 6

## INTRODUCTION

For more than half of his term, President Trump has been violating the Constitution's Foreign Emoluments Clause by accepting benefits from foreign governments without first obtaining Congress's affirmative consent.   Given the importance of the Foreign Emoluments Clause as the Constitution's chief bulwark against the foreign corruption of America's leaders, it is critical that this case be resolved as expeditiously as possible so that the President does not achieve a *de facto* victory in this litigation simply by delaying its resolution.

In its recent Order, the D.C. Circuit denied President Trump's petition for a writ of mandamus, but it directed this Court to immediately reconsider the President's motion to certify an interlocutory appeal and his motion to stay the proceedings.  Mandamus Order 2.  This Court subsequently directed the parties to file supplemental briefs limited to the issues raised in the D.C. Circuit's Order.   Minute Order (Dkt. No. 91).   Among other things, the D.C. Circuit's Order indicated that this Court should consider whether "resolving the legal questions and/or postponing discovery would be preferable, or whether discovery is even necessary (or more limited discovery would suffice) to establish whether there is an entitlement to declaratory and injunctive relief of the type sought by plaintiffs."  Mandamus Order 2.

Plaintiffs believe that limited discovery focused on the third-party businesses through which the President is accepting foreign-government benefits will best enable this Court to determine which of those entities are accepting foreign-government benefits of the various types identified in Plaintiffs' complaint, as well as how funds from those entities are then deposited in the President's revocable trust.  Local Rule 16.3 Report 2-3 (Dkt. No. 75).  But Plaintiffs do not believe that discovery is necessarily required to establish that the President is accepting at least some benefits that qualify as emoluments under this Court's April 30 opinion and to allow this

Court to grant declaratory and injunctive relief barring the President from accepting foreign emoluments without congressional consent, in light of (among other things) the Trump Organization's acknowledgment that it is receiving "profits" arising from foreign-government patronage of its businesses, *see infra* at 5-7; *see also* Def. Suppl. Br. 4 (Dkt. No. 93) ("it is questionable whether any discovery is needed to prove a violation and obtain relief under Plaintiffs' own broad theory of 'emolument'").

Plaintiffs believe that the Trump Organization's admissions and other public record materials could be sufficient for this Court to resolve on summary judgment the question whether the President is violating the Foreign Emoluments Clause and to issue an order enjoining the President from accepting certain categories of foreign-government benefits until he first obtains the affirmative consent of Congress.  If this Court agrees that it could rely on such materials at summary judgment and that they would be sufficient to enable it to craft an appropriately tailored injunction, Plaintiffs are prepared to forgo discovery and file a motion for summary judgment on an expedited basis.  As Plaintiffs have repeatedly indicated in both this Court and the D.C. Circuit, it is imperative that the President not be allowed to run out the clock on this litigation, thereby immunizing himself from his obligation to comply with the Foreign Emoluments Clause.

If this Court were to order expedited summary judgment briefing on this basis, Plaintiffs do not believe an interlocutory appeal would be appropriate because it would not "materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), and the D.C. Circuit's concerns about the separation-of-powers issues presented by discovery in this case would no longer be present, *see* Mandamus Order 2; *see also* Pls. Stay Opp. 40-44 (Dkt. No. 74) (explaining why the President has not satisfied the standard for certification of an interlocutory appeal).

If this Court concludes, however, that such materials would not be sufficient to resolve this

case on summary judgment or otherwise agrees with the D.C. Circuit that this Court's Orders of September 28, 2018, and April 30, 2019 "squarely meet the criteria for certification under Section 1292(b)," Mandamus Order 1, Plaintiffs believe that this Court should certify an appeal expeditiously, so that the "expedited interlocutory appeal with focused briefing and oral argument" that the D.C. Circuit's Order contemplates, *id.* at 2, can occur as quickly as possible.

Moreover, under that scenario, this Court should deny the President's request for a stay pending appeal so that the limited discovery that would enable this Court to determine which of the President's business entities are accepting foreign-government benefits of the various types identified in Plaintiffs' complaint can continue while the interlocutory appeal is pending. As Plaintiffs have previously explained, they are currently seeking only limited discovery focused on third-party businesses, Local Rule 16.3 Report 2-3, and there is no reason why such limited discovery cannot continue while an interlocutory appeal is pending. Indeed, the President has come nowhere close to satisfying "the stringent requirements" he must meet "to obtain the extraordinary relief of a stay pending appeal." *CREW v. FEC*, 904 F.3d 1014, 1016, 1017 (D.C. Cir. 2018). Significantly, the President's principal argument in favor of a stay is that discovery directed at President Trump would "distract the President from the performance of his constitutional duties." Mandamus Pet. 26; Def. Suppl. Br. 3. But Plaintiffs are prepared to forgo any discovery directed at President Trump during the pendency of an interlocutory appeal. And there is simply no reason—and the President has offered none—why discovery against businesses that he plays no role in running should "distract [him] from the performance of his constitutional duties." Mandamus Pet. 26.

Meanwhile, as Plaintiffs have previously noted, given the posture of this case and the inherent delays of appellate review, a stay would jeopardize any realistic chance of holding

President Trump accountable to the Foreign Emoluments Clause.  Thus, additional delay would harm not only Plaintiffs, but also the public interest.  By flouting the Foreign Emoluments Clause, President Trump is depriving the American people of assurance that their highest elected official is pursuing their interests with undivided loyalty, and creating the very risk of undue foreign influence that the Framers sought to prevent.  Resolving Plaintiffs' allegations and enforcing the Clause are thus matters of the utmost importance, not only to Plaintiffs but to the entire nation.

## ARGUMENT

### I.      Motion To Certify an Interlocutory Appeal

After this Court denied President Trump's motion to dismiss in its Orders of September 28, 2018, and April 30, 2019, the President moved to certify those Orders for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  This Court then denied President Trump's motion based on the President's failure to establish that an interlocutory appeal "may materially advance the ultimate termination of the litigation."   Mem. Op. and Order 4-5 (Dkt. No. 82) (quoting 28 U.S.C. § 1292(b)).  In its July 19 Order, the D.C. Circuit held that this Court's Orders denying the President's motion to dismiss "squarely meet the criteria for certification under Section 1292(b)," Mandamus Order 1, and observed that it "appears" that this Court abused its discretion by "concluding that an immediate appeal would not advance the ultimate termination of the litigation just because discovery and summary judgment briefing could proceed expeditiously," *id.* at 1, 2. According to the Circuit, this Court did not "adequately address whether—given the separation of powers issues present ... –resolving the legal questions and/or postponing discovery would be preferable, or whether discovery is even necessary ... to establish whether there is an entitlement to declaratory and injunctive relief of the type sought by plaintiffs."  *Id.* at 2.

As Plaintiffs have previously indicated, they believe that limited discovery focused on the third-party businesses through which the President is accepting foreign-government benefits will

4

best enable this Court to determine which of those entities are accepting foreign-government benefits of the various types identified in Plaintiffs' complaint: "(1) intellectual property rights, (2) payments for rooms and events at hotels and golf clubs, (3) payments derived from real estate holdings, (4) licensing fees, and (5) regulatory benefits." Local Rule 16.3 Report 2. Plaintiffs also "anticipate[d] the need for additional document discovery from these entities ... to determine how funds from those entities are then deposited in the Donald J. Trump Revocable Trust." *Id.* Consistent with that plan, Plaintiffs have issued subpoenas to the Donald J. Trump Revocable Trust, to various Trump-owned companies, and to two non-Trump companies that reportedly co-own some of the President's commercial towers.

While limited discovery of that type would be necessary to identify the specific companies in which President Trump holds a verified ownership interest that are receiving each of the aforementioned categories of financial benefits from foreign governments, Plaintiffs do not believe that discovery is necessarily required to establish that the President is accepting at least some benefits that qualify as emoluments under this Court's April 30 opinion and to allow this Court to grant declaratory and injunctive relief barring the President from accepting foreign emoluments without congressional consent.

Significantly, as to "payments for rooms and events at hotels and golf clubs," *id.*, the Trump Organization itself has acknowledged that it is receiving such payments from foreign governments and has established a "voluntary procedure by which [it] identifies and donates to the U.S. Treasury profits from foreign government patronage at its hotels and similar businesses during President Trump's tenure in office." Letter from George A. Sorial, Executive Vice President and Chief Compliance Counsel, The Trump Organization, to Hon. Jason Chaffetz & Hon. Elijah E. Cummings, Chairman & Ranking Member, House Comm. on Oversight and Gov't Reform 1 (May

5

11, 2017), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/
documents/Trump%20Org%20to%20Oversight%20Committee%205-11-17_Redacted.pdf.

According to the Trump Organization, this policy has been "implemented at each hotel, golf, social
club and winery location," *id.*, and the Trump Organization has made payments to the U.S.
Treasury of $151,470 and $191,538 in 2018 and 2019, respectively, *see* Letter from George A.
Sorial, Executive Vice President and Chief Compliance Counsel, The Trump Organization, to
Hon. Robert Menendez, Ranking Member, Senate Comm. on Foreign Relations 1 (Apr. 6, 2018),
https://www.foreign.senate.gov/imo/media/doc/Trump%20Org%20response%20to%20RM%20r
e%20Hotel%20Foreign%20Profits.pdf [hereinafter "Sorial 2018 Letter"] (enclosing 2018 check
to Treasury and transmittal letter); Associated Press, *Trump's Company Says It Donated Nearly
$200K to U.S. Treasury*, Politico (Feb. 25, 2019),
https://www.politico.com/story/2019/02/25/trump-company-treasury-donation-1183943.[1]

Moreover, as to "intellectual property rights," Local Rule 16.3 Report 2, public reporting
has indicated that China's trademark office provisionally approved dozens of Trump trademarks
early in the President's term, and records of at least some of those foreign trademarks are publicly
available. *See* Erika Kinetz, *China Grants Preliminary Approval to 38 New Trump Trademarks*,

---

[1] The Trump Organization has provided additional information about its donation of profits
from foreign-government patronage in a publicly available pamphlet, The Trump Organization,
*Donation of Profits from Foreign Government Patronage* 2 (undated),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/Trump%20Org
%20Pamphlet%20on%20Foreign%20Profits.pdf (addressing "the procedure and application of
the Trump Organization's ... voluntary directive to donate all profits from foreign governments'
patronage at our hotels and similar businesses during President Trump's presidential term to the
U.S. Treasury"), and in letters to members of Congress. In one letter, for example, the Trump
Organization indicated that "[t]he donation represents ... the profits attributable to foreign
government patronage at both (a) all wholly-owned Trump hotel, resort, and club properties, and
(b) all such properties managed by the Trump Organization where the management fee earned is
derived in part from foreign government patronage." Sorial 2018 Letter 3.

Associated Press (Mar. 8, 2017), https://apnews.com/8f54b14808a2459f9efcb0089f41f056 (linking to Chinese trademark records).[2]

Finally, President Trump's personal lawyers have made clear that President Trump retains an ownership interest in the Trump Organization, explaining prior to the President's inauguration that "all of President-Elect Trump's investment and business assets, commonly known as The Trump Organization—comprised of hundreds of entities—have been or will be conveyed to a Trust," Sheri Dillon et al., Morgan, Lewis & Brockius LLP, *Conflicts of Interest and the President: Background for President-Elect Trump's January 11, 2017 Press Conference* at 2, https://www.documentcloud.org/documents/3400512-Morgan-Lewis-Trump-Trust-White-Paper.html, and the President's continued ownership interest in these properties is confirmed by his annual financial disclosure forms, OGE Form 278e (Mar. 2014), Donald J. Trump, https://oge.app.box.com/s/e32qrrfvyxk9cgrvteo7diicwd11pac4.

Plaintiffs believe that these admissions by the Trump Organization and the President's personal lawyers and the intellectual property public records could be sufficient for this Court to resolve on summary judgment the question whether the President is violating the Foreign Emoluments Clause and to issue an order enjoining the President from accepting direct monetary payments to Trump properties and intellectual property rights from foreign governments unless he first obtains the affirmative consent of Congress. If this Court agrees that it could rely on these materials to resolve this case on summary judgment, Plaintiffs are prepared to forgo discovery and to file a motion for summary judgment on an expedited basis.

If this Court were to order expedited summary judgment briefing, Plaintiffs do not believe

---

[2] Trademarks that receive preliminary approval are automatically registered after ninety days if there are no objections. Kinetz, *supra*.

an interlocutory appeal would be appropriate because it would not "materially advance the ultimate termination of the litigation," 28 U.S.C. § 1292(b), and the D.C. Circuit's concerns about the separation-of-powers issues raised by discovery in this case would no longer be present, *see* Mandamus Order 2; *see also* Pls. Stay Opp. 40-44 (explaining why the President has not satisfied the standard for certification of an interlocutory appeal).  Under this scenario, it would be most appropriate for this Court to expeditiously resolve Plaintiffs' motion for summary judgment and for any appeal to come after this Court has issued a final judgment.

But if this Court believes that it could not rely on these public record materials at summary judgment or otherwise agrees with the D.C. Circuit that this Court's Orders of September 28, 2018 and April 30, 2019 "squarely meet the criteria for certification under Section 1292(b)," Mandamus Order 1, this Court should certify an appeal expeditiously, so that the "expedited interlocutory appeal with focused briefing and oral argument" that the D.C. Circuit's Order contemplates, *id.* at 2, can occur as quickly as possible.

## II.     Motion for a Stay

The D.C. Circuit's July 19 Order also directed this Court to reconsider the President's motion to stay the proceedings.  In contrast to its discussion of the motion for certification, the Circuit gave no indication of how it believed the motion for a stay should be resolved, beyond noting in its discussion of  28 U.S.C. § 1292(b)'s third requirement that this Court should address whether "postponing discovery would be preferable, or whether discovery is even necessary (or more limited discovery would suffice) to establish whether there is an entitlement to declaratory and injunctive relief of the type sought by plaintiffs," Mandamus Order 2.  As Plaintiffs have previously demonstrated, President Trump is not entitled to a stay of proceedings even if this Court certifies its earlier Orders for interlocutory appeal.

"[T]he conditions for a stay ... are different than the conditions for an interlocutory appeal,"

*Comm. on Oversight & Gov't Reform v. Holder*, 2013 WL 11241275, at *2 (D.D.C. Nov. 18, 2013), and there is no presumption that a court should stay proceedings if it certifies an order for interlocutory appeal.  Indeed, the presumption is the opposite.  Section 1292(b), while authorizing certification of immediate appeals, includes the important caveat that "application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order."  28 U.S.C. § 1292(b).  Aware that interlocutory appeals might, counterproductively, "result in delay rather than expedition of cases," Congress established several "protection[s] against delay" in the statute, including "the provision which requires that application for an appeal pursuant to this legislation will not stay proceedings in the district court unless such a stay is ordered."  S. Rep. No. 85-2434, at *5257 (1958).  By providing that "[t]he presumption is against a stay," and "requiring that a stay be specifically ordered, Congress intended to avoid unnecessary delays."  Fed. Ct. App. Manual § 5:6 (6th ed.) (footnotes omitted).  Thus, even when "the certified order may dispose of the entire case without need for further proceedings, ... there may be good reason for pushing ahead, particularly if there is any reason to fear that effective discovery is threatened by delay."  16 *Federal Practice & Procedure* § 3929 (3d ed.) (footnote omitted).  Significantly, the movant "bears the burden" of justifying the use of this extraordinary remedy.  *Nken v. Holder*, 556 U.S. 418, 433 (2009).

In determining whether an order should be stayed pending appeal, courts consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Doe 1 v. Trump*, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017) (quoting *Nken*, 556 U.S. at 426); *Nken*, 556 U.S. at 433 ("'A stay is not a matter of right ....'" (internal citation

omitted)); *see* Mandamus Pet. 28 (citing *Nken* for the "standard for stay pending appeal").[3]

As the D.C. Circuit has consistently emphasized, these standards are "stringent." *CREW*, 904 F.3d at 1016. Moreover, a movant seeking a stay must prevail on all four factors. *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003); *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see Nken*, 556 U.S. at 426, 435; *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015). Thus, it is not enough to show, standing alone, either irreparable harm or a probability of success on the merits. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006); *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 926 (D.C. Cir. 1958) (per curiam). Instead, both criteria (and the two others) are required.

President Trump, however, cannot satisfy *any* of the parts of this test, let alone all four. His motion must therefore be denied.

### A.    Likelihood of Success on the Merits

#### 1.    Standing

In this litigation, the President has consistently read the precedent on legislative standing "too [n]arrowly" and relied on "a misstatement of the alleged injury," *Blumenthal v. Trump*, 335 F. Supp. 3d 45, 63 (D.D.C. 2018), in order to argue that Plaintiffs' claim "is unequivocally foreclosed" by precedent and that "the President is clearly and indisputably entitled to dismissal of the Members' suit for lack of Article III standing." Mandamus Pet. 18.

---

[3] The President previously argued that the *Nken* standard does not apply here, Def. Interlocutory Appeal & Stay Reply 2-4 (Dkt. No. 77), but he appears to have abandoned that argument, unless he believes that this Court and the Court of Appeals should be applying different standards to the same question. He is right to have abandoned the argument because at this point in the case the President is seeking to stay the effects not only of this Court's Orders denying his motion to dismiss, but also of the Court's June 25, 2019, Order directing the commencement of fact discovery. Thus, the *Nken* standard plainly applies. In any event, a stay is unwarranted even under the alternative standard the President once proposed. *See* Pls. Interlocutory Appeal & Stay Surreply (Dkt. No. 86).

The D.C. Circuit disagreed. Recognizing that the standing question here "arises at the intersection of precedent," Mandamus Order 1 (citing *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019), and *Coleman v. Miller*, 307 U.S. 433 (1939)), the Circuit rejected the President's request to dismiss the complaint, *id*.

Nor is the President likely to prevail the next time Plaintiffs' standing comes before the D.C. Circuit, on interlocutory appeal or otherwise, because President Trump is inflicting on Plaintiffs a harm that falls within the narrow class of institutional injuries over which individual members of Congress may seek judicial relief.  Since the Supreme Court first recognized individual legislator standing in *Coleman v. Miller*, 307 U.S. 433, both the Supreme Court and the D.C. Circuit have been careful not to foreclose all standing for individual members of Congress. Rather, they have preserved the ability of members of Congress to seek judicial relief in at least one narrow circumstance: when the executive has completely denied them the effectiveness of their votes and no legislative remedy is "adequate," *Raines v. Byrd*, 521 U.S. 811, 829 (1997).  As this Court recognized, that is what is happening here.  President Trump is completely denying Plaintiffs a voting right to which the Constitution explicitly entitles them—the right to vote on whether to give or withhold their consent to his acceptance of foreign emoluments before he accepts them.

In arguing to the contrary, the President has continually failed to reckon with the unique nature of the Foreign Emoluments Clause, which has two features that are each "unusual" in their own right, *Blumenthal*, 335 F. Supp. 3d at 62, 68, and which no other constitutional provision combines.

First, the Clause imposes a specific procedural requirement (obtain "the Consent of the Congress") that federal officials must satisfy before they take particular actions (accept "any"

emolument "of any kind whatever" from "any ... foreign State"). U.S. Const. art. I, § 9, cl. 8. The "only similar provision" in the Constitution is the requirement that presidents obtain the Senate's advice and consent before appointing officers and making treaties. *Blumenthal*, 335 F. Supp. 3d at 62 n.8.

This requirement of a successful prior vote, combined with the right of each Senator and Representative to participate in that vote, *id.* at 54 (citing U.S. Const. art. I, § 3, cl. 1, and *id*. art. I, § 5, cl. 3), means that "each time the President ... accepts a foreign emolument without seeking congressional consent, plaintiffs suffer a ... deprivation of the right to vote on whether to consent to the President's acceptance of the prohibited foreign emolument," *id.* at 65. Under the Constitution, the President can no more deny members of Congress that vote than he can install a Supreme Court Justice without the Senate's prior consent.

Second, the Foreign Emoluments Clause—unlike the Appointments and Treaty Clauses— regulates the *private* conduct of federal officials, not just the performance of their governmental responsibilities. And because President Trump is violating the Clause through his private businesses, "there are no federal appropriations associated with the President's receipt of prohibited foreign emoluments," *id.* at 68, which means that Congress cannot stop him by exercising its power of the purse—the "ultimate weapon of enforcement available to the Congress," *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974). Without Congress's "most complete and effectual weapon" for keeping the executive in line, *United States v. Munoz-Flores*, 495 U.S. 385, 395 (1990), or any other means of forcing President Trump to obey the Clause, there are "no adequate legislative remedies" for the President's denial of Plaintiffs' voting rights. *Blumenthal*, 335 F. Supp. 3d at 64.

Denied their right to cast specific votes to which the Constitution expressly entitles them,

deprived of any ability to remedy this harm through the power of the purse, and lacking any other "adequate remedy" for the President's constitutional violations, *Raines*, 521 U.S. at 829, Plaintiffs are experiencing a harm that falls within the narrow class of institutional injuries over which individual members of Congress may sue.  "The President's alleged acceptance of prohibited foreign emoluments as though Congress provided consent is indistinguishable from 'treating a vote that did not pass as if it had,'" *Blumenthal*, 335 F. Supp. 3d at 62 (quoting *Campbell v. Clinton*, 203 F.3d 19, 22 (D.C. Cir. 2000)), and "as soon as the President accepts a prohibited foreign emolument without obtaining congressional consent, his acceptance is irreversible," *id*. (citing *Campbell*, 203 F.3d at 22-23).  "Accordingly, plaintiffs adequately allege that the President has completely nullified their votes." *Id.*  And "[c]omplete vote nullification is clearly a type of institutional injury sufficient to support legislator standing." *Id*. at 61 (quoting *Cummings v. Murphy*, 321 F. Supp. 3d 92, 105 (D.D.C. 2018)); *see also* Mandamus Opp. 4-22; Pls. Interlocutory Appeal & Stay Opp. 10-18; Pls. MTD Opp. 4-28 (Dkt. No. 17).

Unable to show that *Raines v. Byrd* or subsequent D.C. Circuit precedent forecloses Plaintiffs' claims, the President now looks to the Supreme Court's recent decision in *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945.  *See* Def. Notice of Suppl. Authority (Dkt. No. 81).  It serves him no better.

In *Bethune-Hill*, "a single chamber of a bicameral legislature" claimed standing to appeal the judicial invalidation of a measure enacted by the legislature as a whole.  139 S. Ct. at 1950. But the Supreme Court "has never held that a judicial decision invalidating a state law as unconstitutional inflicts a discrete, cognizable injury on each organ of government that participated in the law's passage." *Id.* at 1953.  (By contrast, the Court *has* clearly held that legislators are injured by the complete nullification of their votes.)  Thus, there was "no support for the notion

that one House of a bicameral legislature, resting solely on its role in the legislative process, may appeal on its own behalf a judgment invalidating a state enactment." *Id.*; *cf.* Mandamus Reply 3 (inadvertently acknowledging the novelty of the standing theory rejected in *Bethune-Hill*, namely that "the members of the Virginia House [ha]d an individual interest in whether [a] redistricting law that they had enacted would be *judicially nullified*" (emphasis added)). As in *Raines*, there was simply a "mismatch" between the parties seeking to litigate and the parties that could plausibly claim injury. *Bethune-Hill*, 139 S. Ct. at 1953-54 ("Just as individual members lack standing to assert the institutional interests of a legislature, a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole." (citation omitted)).

Critically, the Supreme Court emphasized that vote nullification was not at issue in *Bethune-Hill* because the Virginia House of Delegates was permitted to play its full role in the enactment of the legislation: "Unlike *Coleman*, this case does not concern the results of a legislative chamber's poll or the validity of any counted or uncounted vote." *Id.* at 1954. And just as no vote was disregarded in the past, none would be impaired in the future: "the challenged order does not alter the General Assembly's dominant initiating and ongoing role in redistricting." *Id.*

As this Court knows, Plaintiffs are not seeking to represent the House or Senate, but rather to vindicate their individual voting rights. Nor are they claiming a cognizable interest in the enforcement or continued validity of a duly enacted law. Rather they are challenging the President's unlawful interference with the procedural role that the Constitution assigns them in the acceptance of foreign emoluments. *Bethune-Hill* adds nothing new with respect to individual legislators' ability to sue over vote nullification.

In short, while the Supreme Court and the D.C. Circuit have rejected other forms of legislative standing, they have carefully preserved vote nullification as a viable, cognizable injury,

14

recognizing that in an extreme and unusual case—where unlawful executive action completely negates their voting rights, and where no political remedy is adequate—members of Congress may need to turn to the courts to vindicate their institutional prerogatives.  This is that case.  Because President Trump is unable to show otherwise, he is not likely to prevail on appeal on this basis.

### 2.    *Cause of Action*

In denying President Trump's motion to dismiss, this Court recognized that "this is a proper case in which to exercise [the Court's] equitable discretion to enjoin allegedly unconstitutional action by the President."  *Blumenthal v. Trump*, 373 F. Supp. 3d 191, 209 (D.D.C. 2019) (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015)).  The President sought to persuade the D.C. Circuit that this holding "was clearly and indisputably incorrect."  Mandamus Pet. 19.  But here, too, the President failed—the Circuit simply declared it "unsettled" whether "the Foreign Emoluments Clause … or other authority gives rise to a cause of action against the President."  Mandamus Order 1.

To be sure, the brazenness of President Trump's constitutional violations is forcing the courts to address remedial questions that have so far escaped definitive resolution.  But that does not mean President Trump is likely to prevail in his arguments that he is immune from declaratory or injunctive relief, and he is not.

As the Supreme Court has repeatedly made clear, "equitable relief ... is traditionally available to enforce federal law."  *Armstrong*, 135 S. Ct. at 1385-86.  The President has insisted, to the contrary, that equitable relief is not available here because Plaintiffs "'are not subject to or threatened with any enforcement proceeding.'"  *See, e.g.*, Mandamus Pet. 20 (quoting *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting)).  But the President has not cited one case standing for the proposition that equitable relief is limited to that

15

situation.  Nor could he, because the Supreme Court has said otherwise: "an implied private right of action directly under the Constitution" exists "as a general matter." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010); *Harmon v. Brucker*, 355 U.S. 579, 581-82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."); *see* Pls. MTD Opp. 41-43; Pls. Stay Opp. 23-25.

The President also argues that equitable relief is unavailable against him in his official capacity. *See, e.g.*, Mandamus Pet. 20.  Again, not so.  The case on which he relies, *Mississippi v. Johnson*, 71 U.S. 475 (1866), distinguished injunctions involving a "purely ministerial act," *id*. at 498 ("a simple, definite duty, … imposed by law"), a point that both this Court and the Supreme Court have recognized.  *See Blumenthal*, 373 F. Supp. 3d at 211 (in *Johnson*, "the Supreme Court 'left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely "ministerial" duty'" (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992))).  And "seeking congressional consent prior to accepting prohibited foreign emoluments is a ministerial duty," *id.* at 212 (citing *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996)), because it is a duty the President "has no authority to determine whether to perform." *Swan*, 100 F.3d at 977.  That the President might wish to debate the Clause's scope does not change that.  *Id*. at 978 ("[A] ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" (quoting *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)); *see* Pls. MTD Opp. 44-45.

What is more, the ministerial duty at issue here—refraining from accepting unauthorized foreign emoluments—is merely the same restriction that binds every other officeholder in the

federal government.   It is not specific to the President, and it does not involve the unique responsibilities of his office, and it is therefore nothing like the "purely executive and political" duties discussed in *Johnson*, 71 U.S. at 499, and in *Franklin*, 505 U.S. at 792.[4]

Finally, President Trump raises the zone-of-interests test, but tellingly, cites no case in which a constitutional claim was dismissed under this test.  In any event, Plaintiffs easily satisfy any test: their injury is "hardly 'marginally related' to the purpose of the Clause, but is directly related to the only way the Clause can achieve its purpose." *Blumenthal*, 373 F. Supp. 3d at 210 (citing *Riegle v. Fed. Open Mkt. Comm.*, 656 F.2d 873, 879 (D.C. Cir. 1981)).

That makes three propositions for which President Trump cannot cite a single case from any court setting forth the rule he advocates.  None of these arguments is likely to succeed.

### B.    Irreparable Injury

In addition to showing that he is likely to succeed on the merits, the President must show that he "will be irreparably injured absent a stay." *Nken*, 556 U.S. at 434.  And under the "high standard" that the D.C. Circuit has established, *Chaplaincy*, 454 F.3d at 297, irreparable injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297).  For that reason, the Circuit requires movants to "substantiate the claim that irreparable injury is 'likely' to occur" and consistently rejects "unsubstantiated and speculative

---

[4] *See Johnson*, 71 U.S. at 497, 499 (injunction would have restrained the President from "carrying out … acts of Congress" requiring him "to assign generals to command in the several military districts," supported by "military force …. under [his] supervision [as] commander-in-chief"); *Franklin*, 505 U.S. at 792 (injunction would have required the President to "transmit to the Congress" a new and revised "statement showing the whole number of persons in each State … and the number of Representatives to which each State would be entitled" (internal citations and quotation marks omitted)).

allegations." *Wis. Gas Co.*, 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value.... The movant must provide ... proof indicating that the harm is certain to occur in the near future.").

This standard dooms the President's request, even if special deference and caution are accorded to that request by virtue of the office he holds. The President has said "he is likely to suffer irreparable injury ... from the continuation of this suit and intrusive discovery into his personal finances." Mandamus Pet. 28. But what exactly the *injury* is, or why it is *irreparable*, he does not say. His motion for a stay to this Court did not even utter the term "irreparable harm" in discussing the consequences of this suit moving forward, much less present any sustained argument on that topic. The closest he has come to answering these questions is to claim that discovery would "distract the President from the performance of his constitutional duties" and "would undoubtedly be publicized and used to distract and harass the President." *Id.* at 26; Def. Suppl. Br. 3 (discovery "risks 'distract[ing]' the President 'from the energetic performance of [his] constitutional duties" (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004))).

With all due respect to the President's clairvoyance, that does not cut it. He has "provided no non-conclusory factual basis" for this "sweeping" assertion, *Doe 1*, 2017 WL 6553389, at *2, and he fails to explain "precisely" how the discovery Plaintiffs seek could distract him from his duties, *id*. The only discovery requests Plaintiffs have propounded are to third parties, and President Trump has repeatedly claimed he is no longer running any of his companies. *See, e.g.*, Sheri Dillon et al., *supra*, at 2 ("President-Elect Trump will relinquish management of his investment and business assets for the duration of his Presidency" and "will resign from all official positions he holds with The Trump Organization entities."); *id.* (the managers of the Trump Organization "will have the authority to manage The Trump Organization and have full decision-

making authority for the duration of the Presidency, *without any involvement whatsoever by President-Elect Trump*" (emphasis added)); Sorial 2018 Letter, *supra*, at 4 ("the President has no involvement in managing The Trump Organization").

Because Plaintiffs' discovery requests are directed at third-party entities that President Trump himself claims to have no involvement in running, these requests will impose *no* burden on the President's time or attention.[5]  To the extent the President is concerned about publicity, moreover, Plaintiffs have already indicated that they are willing to agree to a protective order. *See* Local Rule 16.3 Report 8.

In sum, the President's claims are "entirely unsubstantiated." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017).  Indeed, "belying [his] claims of irreparable tangible harm at this point," *Chaplaincy*, 454 F.3d at 298, the President has been forced to point to discovery sought by "plaintiffs in parallel Emoluments suits."  Mandamus Pet. 27 n.1.  But Plaintiffs *here* have disavowed any intent to seek discovery from "government agencies" or to "inquire into the effect of alleged Emoluments on official actions of the President's administration," *id.*, because success on their claim requires neither: the President violates the Clause when he accepts prohibited benefits without first obtaining congressional consent, regardless of whether those benefits produce tangible policy consequences.  Moreover, Plaintiffs in this case—unlike in "parallel ... suits"—do not bring a Domestic Emoluments Clause claim, obviating any need for information

---

[5] Indeed, the Trump Organization has claimed that "since the President has no involvement in managing The Trump Organization, no undue influence on the President or his Administration can result from any [foreign-government] transactions."  Sorial 2018 Letter, *supra*, at 4.  That claim is obviously false with respect to undue influence because the President does not need to manage the Trump Organization to learn that particular foreign governments have made payments to its companies.  But if the President truly "has no involvement in managing The Trump Organization," then he cannot possibly claim that he needs to devote time to assisting in the process of responding to discovery requests.

about federal payments to Trump businesses.  Finally, because Plaintiffs' standing is not rooted in competitive injury, they do not need to scrutinize business and marketing practices.

Nor can the President demonstrate irreparable harm simply by waving around the phrase "separation of powers."  *See John Doe Co.*, 849 F.3d at 1135 ("[T]he [plaintiff] insists that any alleged separation-of-powers injury is by its very nature irreparable.  The short answer is that this Court has held otherwise."); *In re al-Nashiri*, 791 F.3d 71, 79-80 (D.C. Cir. 2015) ("abstract concern with the separation of powers" is not enough—irreparable injury requires "immediate or ongoing harm" such as "'interference with the internal deliberations of a Department of the Government of the United States'" (citation omitted)).

Indeed, the Supreme Court has consistently rebuffed the notion that the separation of powers automatically exempts presidents from complying with the standard rules of our legal system.  Instead, "the President, like all other government officials, is subject to the same laws that apply to all other members of our society."  *Clinton v. Jones*, 520 U.S. 681, 688 (1997) (citation omitted).

In *Jones*, the Court rejected President Clinton's categorical claim that allowing a civil lawsuit against him to proceed to trial would create "serious risks for the institution of the Presidency."  *Id.* at 689 (quoting DOJ brief).  Like this case, *Jones* involved alleged legal violations that the President committed through his private behavior.[6]  It therefore did not implicate the concerns that animated *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), which held presidents absolutely immune from damages liability for official acts taken as president because the specter of such liability would affect the discharge of their duties.  *Jones*, 520 U.S. at 693-94.

---

[6] To be clear, the obligation not to accept foreign emoluments, even through private behavior, is part of the President's official duties, *see* Pls.' Suppl. Mem. 36 n.14 (Dkt. No. 50).

Thus, President Clinton argued in *Jones*—as President Trump does here—that litigation demands would be a distraction, impinging on his constitutional role. *Id*. at 697-702. The Supreme Court unanimously rejected that argument. Despite the President's "'unique position in the constitutional scheme,'" it "does not follow ... that separation-of-powers principles would be violated by allowing this action to proceed." *Id*. at 698-99 (quoting *Fitzgerald*, 457 U.S. at 749). "The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution." *Id.* at 703.

Crucially, the Court also emphasized that President Clinton's request to postpone the trial was "premature." *Id*. at 708. "The proponent of a stay bears the burden of establishing its need," and at the time "there [was] nothing in the record to enable a judge to assess the potential harm that may ensue," "[o]ther than the fact that a trial may consume some of the President's time and attention." *Id*. President Clinton, in other words, made the same error that President Trump makes here: "presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Id*. at 702.[7] This teaching of *Jones* reflects well-entrenched principles. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 702, 708 (1974) (while courts "should be particularly meticulous" when the President is involved, broad invocations of presidential prerogatives "must be considered in light of our historic commitment to the rule of law").

Thus, while the "high respect that is owed to the office of the Chief Executive ... should

---

[7] Notably, too, *Jones* concerned whether a full civil *trial* should be deferred until after President Clinton's tenure. Although the district judge had stayed any trial, the same judge "ruled that discovery in the case could go forward," 520 U.S. at 687, and no one questioned that decision.

inform the conduct of [this] entire proceeding, including the timing and scope of discovery," *Jones*, 520 U.S. at 707, such restraint does not obligate this Court to swallow wholesale a President's unsupported claim that allowing discovery to proceed would inevitably impair the performance of his constitutional duties.  Presidents, like other litigants, must provide some factual basis for their claims of irreparable harm.

Furthermore, when the Supreme Court has sustained special executive privileges that require more than "judicial deference and restraint," *Fitzgerald*, 457 U.S. at 753, it has done so because the litigation threatened to intrude upon the executive branch's internal decision-making process.  *See id.* at 745; *Cheney*, 542 U.S. at 385-88 (the executive branch need not bear the burden of "making particularized objections" to "overly broad discovery requests" issued to officials who "give advice and make recommendations to the President").  Those risks are not present here because Plaintiffs do not plan to seek any executive branch materials.

Finally, to dispel any possible claim that allowing discovery to go forward would risk intruding on the President's time and attention, thereby implicating separation-of-powers concerns, Plaintiffs are prepared to forgo any discovery directed at President Trump during the pendency of an interlocutory appeal.  In other words, while Plaintiffs previously indicated that, in addition to seeking records from third-party businesses and the Donald J. Trump Revocable Trust, they "may also need additional limited discovery related to ... the President's financial documents to determine whether President Trump is currently receiving funds from the Trust, or if he is receiving funds from his business enterprises through other means," Local Rule 16.3 Report 2-3, and that they "may need to serve limited interrogatories on Defendant to identify initial sources for third-party subpoenas," *id*. at 3, Plaintiffs have not served any subpoenas or interrogatories on President Trump, and they are willing to forgo that option until the threshold legal questions in

this case are resolved through interlocutory appeal.

Moreover, as this case moves forward, if any discovery requests would, in the President's view, unjustifiably intrude upon his constitutional role, he can object to those requests at that time. His blanket resistance to *all* requests hinges on the "speculative" claim, *CREW*, 904 F.3d at 1019, that *any* discovery would be a distraction—combined with the further claim that *any* such distraction would necessarily derogate from the separation of powers. Both halves of that equation are false. "Sitting Presidents have responded to court orders to provide testimony and other information with sufficient frequency that such interactions between the Judicial and Executive Branches can scarcely be thought a novelty." *Jones*, 520 U.S. at 704-05 (citing numerous examples).

Under these conditions—limited discovery directed at third-party businesses that the President has no involvement in running—the President cannot show that he will suffer irreparable injury if discovery is allowed to proceed while an interlocutory appeal is pending.

## C.      Harm to Plaintiffs

Even if the President could make "showings of probable success and irreparable injury," he would still need to demonstrate that a stay will have no significant "adverse effect" on Plaintiffs. *Va. Petroleum Jobbers*, 259 F.2d at 925. The burden is on *the President*, therefore, to demonstrate that Plaintiffs will *not* be harmed. And he must do more than show a lack of "irreparable" harm— he must show that Plaintiffs will suffer no substantial harm at all. *See Doe 1*, 2017 WL 6553389, at *3 ("Appellants have failed to show that issuance of the stay will not substantially injure the other parties to the proceeding."). The President has not made this showing, and he cannot.

For more than half of this President's term, Plaintiffs have been denied their right, explicit in the Constitution, to participate in deciding which emoluments he may accept from foreign states.

Only a judgment in this case can restore the gatekeeping role the Framers assigned them—and vindicate the effectiveness of their votes. "No more essential interest could be asserted by a legislator." *Kennedy v. Sampson*, 511 F.2d 430, 436 (D.C. Cir. 1974).

A stay pending appeal would not only prolong this injury but would seriously risk foreclosing the possibility of timely relief altogether. If discovery does not begin until all appellate proceedings are complete, the President may achieve a *de facto* victory regardless of who ultimately prevails, potentially delaying resolution of this case through an entire presidential term—with Plaintiffs unable to exercise their constitutionally guaranteed prerogative all the while. *Cf.* Pls. Stay Opp. 36-37. In these circumstances, a stay would not merely "increase the danger of prejudice" to Plaintiffs, *Jones*, 520 U.S. at 707-08, but could vitiate any meaningful chance to vindicate their rights.

### D.     The Public Interest

Plaintiffs have plausibly alleged that President Trump is violating the Constitution's chief bulwark against the foreign corruption of America's leaders. While the President insists that the special role of the presidency justifies a stay, the high position he occupies militates in the other direction. The President is empowered to make "the most sensitive and far-reaching decisions entrusted to any official under our constitutional system." *Fitzgerald*, 457 U.S. at 752. By accepting rewards from foreign states in secret, President Trump is defying the Framers' design and depriving the American people of assurance that their highest elected official is pursuing their interests with undivided loyalty.

Thus, while President Trump declares that permitting discovery to proceed would trench upon the separation of powers, that doctrine points in the opposite direction. The Foreign Emoluments Clause, which demands the consent of a coordinate branch before federal officials

may take specified actions, *embodies* the separation of powers.  By giving Congress an ongoing procedural role in vetting foreign emoluments—a role exercised independent of the executive branch—the Framers created a structural safeguard that harnesses this separation to prevent corrosive foreign influence.  For more than two years, President Trump has trampled on that safeguard.  Therefore, "whatever way this Court decides the issues before it may impact the balance between the political branches in this and future settings."  *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 95 (D.D.C. 2008).  Resolving Plaintiffs' claims is thus a matter of the utmost importance, not only to Plaintiffs but to the entire nation.  The public interest therefore tips—resoundingly—against a stay.

## CONCLUSION

For the foregoing reasons, the President's motions for certification of an interlocutory appeal and for a stay should be denied.  In the alternative, if the President's motion for certification is granted, it should be granted expeditiously, and the motion for a stay should be denied.

Respectfully submitted,

Dated: August 5, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod

Elizabeth B. Wydra (DC Bar No. 483298)
Brianne J. Gorod (DC Bar No. 982075)
Brian R. Frazelle (DC Bar No. 1014116)
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W., Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
brianne@theusconstitution.org
brian@theusconstitution.org

*Counsel for Plaintiffs*

25

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2019, the foregoing document was filed with the Clerk of the Court, using the CM/ECF system, causing it to be served on all counsel of record.

Dated: August 5, 2019

/s/ Brianne J. Gorod
Brianne J. Gorod